**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

§

§   Case No. **19-34054-sgj11**

**The Dugaboy Investment Trust et al- Appellant**

§

vs.                                         §

**Highland Capital Management, L.P.**
**Et al-** Appellee

§                    **3:25-cv-02072-S**
§

   **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**


# Volume 4

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

**APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO
BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE
RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING
STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.   **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2.   **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3.   **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4.   **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5.   **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6.   **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby **depriving Dugaboy of an impartial judge with respect to the stay motion?**

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru vol. 5*

*Vol 5*
*003493*

2

| | Date | No. | Description |
|---|---|---|---|
| Vol. 5 003504 | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| 003519 | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| 003521 | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| 003530 | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| Vol 6 003544 | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| 003909 | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| *Vol 6*<br><br>*003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| *Vol. 7*<br><br>*003936*<br>*Thru End of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15*<br><br>*011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| *vol. 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| *011855* | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| *011864* | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| *011869* | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| *011874* | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| *Vol 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| *011877* | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| *012039* | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3406 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| *No PDF Available* | 8/31/2022 | 3478 N/A | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| *012047* | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

| | | | |
|---|---|---|---|
| *Vol. 15* | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| *012050* | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| *012077* *Vol. 16* | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| *012079* | 9/7/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| *012357* | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

| | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
|---|---|---|---|
| | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

Handwritten annotations in left margin:
- Vol. 16 — 012361
- Vol. 17 — 012363
- 012641
- Vol. 18 — 012697 Thru End of Vol. 21
- Vol. 22 — 016732
- 016737
- 016773
- 016809

| | | | |
|---|---|---|---|
| | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery)) |
| | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4255 *(to be submitted to Clerk on flash drive)* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

Vol. 22

016827

016830

016855

016863

016865

Vol. 23

016867

Thru end of Vol. 25

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

*Vol. 26*

*019524*

*019527*

|  |  |  | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
|---|---|---|---|
| *Vol. 27* *019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28* *020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| VOL. 28<br><br>020266 | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| VOL. 29<br><br>020267 | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| 020271 | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| 020282 | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| 020289 | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *020296* | | | |
| *020298* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *020300* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *020309* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020311* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30* *020407* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

| | | | |
|---|---|---|---|
| *vol. 31* | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020680* | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| *020696* | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| *020808* | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| *020830* | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| *020837* | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025                    Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment*
*Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.


*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

9

1    reasons.  One is the creditor constituency.  Highland did not

2    file bankruptcy because of some of the typical reasons a large

3    company files Chapter 11.  For example, it did not have a

4    large asset-based secured lender with whom it was in default.

5    It only had relatively insignificant secured indebtedness

6    owing to Jefferies, with whom it had a brokerage account, and

7    one other entity called Frontier State Bank.

8        Highland did not have problems with trade vendors or

9    landlords.  It did not suffer any type of catastrophic

10   business calamity.  In fact, it filed Chapter 11 six months

11   before the COVID-19 pandemic was declared.  The Debtor filed

12   Chapter 11 due to a myriad of massive unrelated business

13   litigation claims that it was facing, many of which had

14   finally become liquidated or were about to become liquidated

15   after a decade or more of contentious litigation in multiple

16   fora all over the world.

17       The Unsecured Creditors' Committee in this case has

18   referred to the Debtor under its former chief executive, Mr.

19   Dondero, as a serial litigator.  This Court agrees with that

20   description.  By way of example, the members of the Creditors'

21   Committee and their history of litigation with the Debtor and

22   others in the Highland complex are as follows:

23       First, the Redeemer Committee of the Highland Crusader

24   Fund, which I'll call the Redeemer Committee.  This Creditors'

25   Committee member obtained an arbitration award against the

Case 3:25-cv-02072-S   Document 6-4   Filed 08/15/25   Page 19 of 1017   PageID 2482

10

1  Debtor of more than $190 million, inclusive of interest,

2  approximately five months before the petition date from a

3  panel of the American Arbitration Association.  It was on the

4  verge of having that award confirmed by the Delaware Chancery

5  Court immediately prior to the petition date, after years of

6  disputes that started in late 2008 and included legal

7  proceedings in Bermuda.  This creditor's claim was settled

8  during the bankruptcy case in the amount of approximately

9  $137.7 million.  The Court is omitting various details and

10  aspects of that settlement.

11     The second Creditors' Committee member, Acis Capital

12  Management, LP, which was formerly in the Highland complex of

13  companies but was not affiliated with Highland as of the

14  petition date.  This UCC member and its now-owner, Josh Terry,

15  were involved in litigation with Highland dating back to 2016.

16  Acis was forced into an involuntary bankruptcy in the

17  Bankruptcy Court for the Northern District of Texas, Dallas

18  Division, by Josh Terry, who was a former Highland portfolio

19  manager, in 2018 after Josh Terry obtained an approximately $8

20  million arbitration award and judgment against Acis that was

21  issued by a state court in Dallas County, Texas.  Josh Terry

22  was ultimately awarded the equity ownership of Acis by the

23  Dallas Bankruptcy Court in the Acis bankruptcy case.

24     Acis subsequently asserted a multimillion dollar claim

25  against Highland in the Dallas Bankruptcy Court for Highland's

APP. 0009

11

1    alleged denuding of Acis in fraud of its creditors, primarily

2    Josh Terry.

3        The litigation involving Acis and Mr. Terry dates back to

4    mid-2016, and has continued on, with numerous appeals of

5    bankruptcy court orders, including one appeal still pending at

6    the United States Court of Appeals for the Fifth Circuit.

7        There was also litigation involving Josh Terry and Acis in

8    the Royal Court of the Island of Guernsey and in a court in

9    New York.

10       The Acis claim was settled during this bankruptcy case in

11   court-ordered mediation for approximately $23 million.  Other

12   aspects and details of this settlement are being omitted.

13       Now, the third Creditors' Committee member, UBS

14   Securities.  It's a creditor who filed a proof of claim in the

15   amount of $1,039,000,000 in the Highland case.  Yes, over one

16   billion dollars.  The UBS claim was based on the amount of a

17   judgment that UBS received from a New York state court in 2020

18   after a multi-week bench trial which had occurred many months

19   earlier on a breach of contract claim against other entities

20   in the Highland complex.  UBS alleged that the Debtor should

21   be liable for the judgment.  The UBS litigation related to

22   activities that occurred in 2008.  The litigation involving

23   UBS and Highland and its affiliates was pending for more than

24   a decade, there having been numerous interlocutory appeals

25   during its history.

Case 3:25-cv-02072-S   Document 16-4   Filed 06/30/25   Page 21 of 1017   PageID 2484

12

1       The Debtor and UBS recently announced a settlement of the

2   UBS claim, which came a few months after court-ordered

3   mediation.  The settlement is in the amount of $50 million as

4   a general unsecured claim, $25 million as a subordinated

5   claim, and $18 million of cash coming from a nondebtor entity

6   in the Highland complex known as Multistrat.  Other aspects of

7   this settlement are being omitted.

8       The fourth and last Creditors' Committee member is Meta-e

9   Discovery.  It is a vendor who happened to supply litigation

10  and discovery-related services to the Debtor over the years.

11  It had unpaid invoices on the petition date of more than

12  $779,000.

13      It is fair to say that the members of the Creditors'

14  Committee in this case all have wills of steel.  They fought

15  hard before and during the bankruptcy case.  The members of

16  the Creditors' Committee are highly sophisticated and have had

17  highly sophisticated professionals representing them.  They

18  have represented their constituency in this case as

19  fiduciaries extremely well.

20      In addition to these Creditors Committee members, who were

21  all embroiled in years of litigation with Highland and its

22  affiliates in various ways, the Debtor has been in litigation

23  with Patrick Daugherty, a former limited partner and employee

24  of Highland, for many years in both Delaware and Texas state

25  courts.  Patrick Daugherty filed a proof of claim for "at

APP. 1901

13

1    least $37.4 million" relating to alleged breached employment-

2    related agreements and for the tort of defamation arising from

3    a 2017 press release posted by the Debtor.

4        The Debtor and Patrick Daugherty recently announced a

5    settlement of the Patrick Daugherty claim in the amount of

6    $750,000 cash on the effective date, an $8.25 million general

7    unsecured claim, and a $2.75 million subordinated claim.

8    Other aspects and details of this settlement are being

9    omitted.

10       Additionally, an entity known as HarbourVest, who invested

11   more than $70 million with an entity in the Highland complex,

12   asserted a $300 million proof of claim against Highland,

13   alleging, among other things, fraud and RICO violations.  The

14   HarbourVest claim was settled during the bankruptcy case for a

15   $45 million general unsecured claim and a $35 million junior

16   claim.

17       Other than these claims just described, most of the other

18   claims in this case are claims asserted against the Debtor by

19   other entities in the Highland complex, most of which entities

20   the Court finds to be controlled by Mr. Dondero; claims of

21   employees who believe that they are entitled to large bonuses

22   or other types of deferred compensation; and claims of

23   numerous law firms that did work for Highland and were unpaid

24   for amounts due to them on the petition date.

25       Yet another reason this is not your garden-variety Chapter

14

1   11 case is its postpetition corporate governance structure.

2   Highland filed bankruptcy October 16, 2019.  Contentiousness

3   with the Creditors' Committee began immediately, with first

4   the Committee's request for a change of venue from Delaware to

5   Dallas, and then a desire by the Committee and the U.S.

6   Trustee for a Chapter 11 or 7 trustee to be appointed due to

7   concerns over and distrust of Mr. Dondero and his numerous

8   conflicts of interest and alleged mismanagement or worse.

9       After many weeks of the threat of a trustee lingering, the

10  Debtor and the Creditors' Committee negotiated and the Court

11  approved a corporate governance settlement on January 9, 2020

12  that resulted in Mr. Dondero no longer being an officer or

13  director of the Debtor or of its general partner, Strand.

14      As part of the court-approved settlement, three eminently-

15  qualified Independent Directors were chosen by the Creditors'

16  Committee and engaged to lead Highland through its Chapter 11

17  case.  They were James Seery, John Dubel, and Retired

18  Bankruptcy Judge Russell Nelms.  They were technically the

19  Independent Directors of Strand, the general partner of the

20  Debtor.  Mr. Dondero had previously been the sole director of

21  Strand, and thus the sole person in ultimate control of the

22  Debtor.

23      The three independent board members' resumes are in

24  evidence.  James Seery eventually was named CEO of the Debtor.

25  Suffice it to say that this changed the entire trajectory of

15

1   the case.  This saved the Debtor from a trustee.  The Court

2   trusted the new directors.  The Creditors' Committee trusted

3   them.  They were the right solution at the right time.

4       Because of the unique character of the Debtor's business,

5   the Court believed this solution was far better than a

6   conventional Chapter 7 or 11 trustee.  Mr. Seery, in

7   particular, knew and had vast experience at prominent firms

8   with high-yield and distressed investing similar to the

9   Debtor's business.  Mr. Dubel had 40 years of experience

10  restructuring large, complex businesses and serving on their

11  boards of directors in this context.  And Retired Judge Nelms

12  had not only vast bankruptcy experience but seemed

13  particularly well-suited to help the Debtor maneuver through

14  conflicts and ethical quandaries.

15      By way of comparison, in the Chapter 11 case of Acis, the

16  former affiliate of Highland that this Court presided over two

17  or three years ago, which company was much smaller in size and

18  scope than Highland, managing only five or six CLOs, a Chapter

19  11 trustee was elected by the creditors that was not on the

20  normal rotation panel for trustees in this district, but

21  rather was a nationally-known bankruptcy attorney with more

22  than 45 years of large Chapter 11 case experience.  This

23  Chapter 11 trustee performed valiantly, but was sued by

24  entities in the Highland complex shortly after he was

25  appointed, which this Court had to address.  The Acis trustee

16

1    could not get Highland and its affiliates to agree to any

2    actions taken in the case, and he finally obtained

3    confirmation of a plan over Highland and its affiliates'

4    objections in his fourth attempted plan, which confirmation

5    then was promptly appealed by Highland and its affiliates.

6         Suffice it to say it was not easy to get such highly-

7    qualified persons to serve as independent board members and

8    CEO of this Debtor.  They were stepping into a morass of

9    problems.  Naturally, they were worried about getting sued, no

10   matter how defensible their efforts might be, given the

11   litigation culture that enveloped Highland historically.  It

12   seemed as though everything always ended in litigation at

13   Highland.

14        The Court heard credible testimony that none of them would

15   have taken on the role of Independent Director without a good

16   D&O insurance policy protecting them, without indemnification

17   from Strand, guaranteed by the Debtor; without exculpation for

18   mere negligence claims; and without a gatekeeper provision,

19   such that the Independent Directors could not be sued without

20   the bankruptcy court, as a gatekeeper, giving a potential

21   plaintiff permission to sue.

22        With regard to the gatekeeper provision, this was

23   precisely analogous to what bankruptcy trustees have pursuant

24   to the so-called "Barton Doctrine," which was first

25   articulated in an old U.S. Supreme Court case.

17

1        The Bankruptcy Court approved all of these protections in

2    a January 9, 2020 order.  No one appealed that order.  And Mr.

3    Dondero signed the settlement agreement that was approved by

4    that order.

5        An interesting fact about the D&O policy came out in

6    credible testimony at the confirmation hearing.  Mr. Dubel and

7    an insurance broker from Aon, named Marc Tauber, both credibly

8    testified that the gatekeeper provision was needed because of

9    the so-called, and I quote, "Dondero Exclusion" in the

10   insurance marketplace.

11       Specifically, the D&O insurers in the marketplace did not

12   want to cover litigation claims that might be brought against

13   the Independent Directors by Mr. Dondero because the

14   marketplace of D&O insurers are aware of Mr. Dondero's

15   litigiousness.  The insurers would not have issued a D&O

16   policy to the Independent Directors without either the

17   gatekeeping provision or a "Dondero Exclusion" being in the

18   policy.

19       Thus, the gatekeeper provision was part of the January 9,

20   2020 settlement.  There was a sound business justification for

21   it.  It was reasonable and necessary.  It was consistent with

22   the Barton Doctrine in an extremely analogous situation --

23   *i.e.*, the independent board members were analogous to a three-

24   headed trustee in this case, if you will.  Mr. Dondero signed

25   off on it.  And, again, no one ever appealed the order

18

1   approving it.

2        The Court finds that, like the Creditors' Committee, the

3   independent board members here have been resilient and

4   unwavering in their efforts to get the enormous problems in

5   this case solved.  They seem to have at all times negotiated

6   hard and with good faith.  As noted previously, they changed

7   the entire trajectory of this case.

8        Still another reason why this was not your garden-variety

9   case was the mediation effort.  In summer of 2020, roughly

10  nine months into the Chapter 11 case, this Court ordered

11  mediation among the Debtor, Acis, UBS, the Redeemer Committee,

12  and Mr. Dondero.  The Court selected co-mediators, since this

13  seemed like such a Herculean task, especially during COVID-19,

14  where people could not all be in the same room.  Those co-

15  mediators were Retired Bankruptcy Judge Allan Gropper from the

16  Southern District of New York, who had a distinguished career

17  presiding over complex Chapter 11 cases, and Ms. Sylvia Mayer,

18  who likewise has had a distinguished career, first as a

19  partner in a preeminent law firm working on complex Chapter 11

20  cases, and subsequently as a mediator and arbitrator in

21  Houston, Texas.

22       As noted earlier, the Acis claim was settled during the

23  mediation, which seemed nothing short of a miracle to this

24  Court, and the UBS claim was settled many months later, and

25  this Court believes the groundwork for that ultimate

19

1   settlement was laid, or at least helped, through the

2   mediation.  And as earlier noted, other enormous claims have

3   been settled during this case, including that of the Redeemer

4   Committee, who, again, had asserted approximately or close to

5   a $200 million claim; HarbourVest, who asserted a $300 million

6   claim; and Patrick Daugherty, who asserted close to a $40

7   million claim.

8       This Court cannot stress strongly enough that the

9   resolution of these enormous claims and the acceptance of all

10  of these creditors of the Plan that is now before the Court

11  seems nothing short of a miracle.  It was more than a year in

12  the making.

13      Finally, a word about the current remaining Objectors to

14  the Plan before the Court.  Once again, the Court will use the

15  phrase "not garden-variety."  Originally, there were over one

16  dozen objections filed to this Plan.  The Debtor has made

17  various amendments or modifications to the Plan to address

18  some of these objections.  The Court finds that none of these

19  modifications require further solicitation, pursuant to

20  Sections 1125, 1126, 1127 of the Code, or Bankruptcy Rule

21  3019, because, among other things, they do not materially

22  adversely change the treatment of the claims of any creditor

23  or interest holder who has not accepted in writing the

24  modifications.

25      Among other things, there were changes to the projections

20

1    that the Debtor filed shortly before the confirmation hearing

2    that, among other things, show the estimated distribution to

3    creditors and compare plan treatment to a likely disbursement

4    in a Chapter 7.

5        These do not constitute a materially adverse change to the

6    treatment of any creditors or interest holders.  They merely

7    update likely distributions based on claims that have now been

8    settled, and they've otherwise incorporated more recent

9    financial data.  This happens often before confirmation

10   hearings.  The Court finds that it did not mislead or

11   prejudice any creditors or interest holders, and certainly

12   there was no need to resolicit the Plan.

13       The only Objectors to the Plan left at this time were Mr.

14   Dondero and entities that the Court finds are controlled by

15   him.  The standing of these entities to object to the Plan

16   exists, but the remoteness of their economic interest is

17   noteworthy, and the Court questions the good faith of the

18   Objectors.  In fact, the Court has good reason to believe that

19   these parties are not objecting to protect economic interests

20   they have in the Debtor, but to be disruptors.

21       Mr. Dondero wants his company back.  This is

22   understandable.  But it's not a good faith basis to lob

23   objections to the Plan.  The Court has slowed down

24   confirmation multiple times on the current Plan and urged the

25   parties to talk to Mr. Dondero.  The parties represent that

21

 1   they have, and the Court believes that they have.

 2       Now, to be specific about the remoteness of the objectors'

 3   interests, the Court will address them each separately.

 4   First, Mr. Dondero has a pending objection.  Mr. Dondero's

 5   only economic interest with regard to the Debtor at this point

 6   is an unliquidated indemnification claim.  And based on

 7   everything this Court has heard, his indemnification claim

 8   will be highly questionable at this juncture.

 9       Second, a joint objection has been filed by the Dugaboy

10   Trust and the Get Good Trust.  As for the Dugaboy Trust, it

11   was created to manage the assets of Mr. Dondero and his

12   family, and it owns a 0.1866 percent limited partnership

13   interest in the Debtor.  The Court is not clear what economic

14   interest the Get Good Trust has, but it likewise seems to be

15   related to Mr. Dondero, and it has been represented to the

16   Court numerous times that the trustee is Mr. Dondero's college

17   roommate.

18       Another group of Objectors that has joined together in one

19   objection is what the Court will refer to as the Highland and

20   NexPoint Advisors and Funds.  The Court understands they

21   assert disputed administrative expense claims against the

22   estate.  While the evidence presented was that they have

23   independent board members that run these companies, the Court

24   was not convinced of their independence from Mr. Dondero.

25   None of the so-called independent board members of these

22

1   entities have ever testified before the Court.  Moreover, they

2   have all been engaged with the Highland complex for many

3   years.

4        The witness who testified on these Objectors' behalves at

5   confirmation, Mr. Jason Post, their chief compliance officer,

6   resigned from Highland after more than twelve years in October

7   2020, at the same time that Mr. Dondero resigned or was

8   terminated by Highland.  And a prior witness recently for

9   these entities whose testimony was made part of the record at

10  the confirmation hearing essentially testified that Mr.

11  Dondero controlled these entities.

12       Finally, various NexBank entities objected to the Plan.

13  The Court does not believe they have liquidated claims.  Mr.

14  Dondero appears to be in control of these entities as well.

15       To be clear, the Court has allowed all of these objectors

16  to fully present arguments and evidence in opposition to

17  confirmation, even though their economic interests in the

18  Debtor appear to be extremely remote and the Court questions

19  their good faith.  Specifically on that latter point, the

20  Court considers them all to be marching pursuant to the orders

21  of Mr. Dondero.

22       In the recent past, Mr. Dondero has been subject to a TRO

23  and preliminary injunction by the Bankruptcy Court for

24  interfering with the current CEO's management of the Debtor in

25  specific ways that were supported by evidence.  Around the

23

 1  time that this all came to light and the Court began setting

 2  hearings on the alleged interference, Mr. Dondero's company

 3  phone supplied to him by Highland, which he had been asked to

 4  turn in, mysteriously went missing.  The Court merely mentions

 5  this in this context as one of many reasons that the Court has

 6  to question the good faith of Mr. Dondero and his affiliated

 7  objectors.

 8      The only other pending objection besides these objections

 9  of the Dondero and Dondero-controlled entities is an objection

10  of the United States Trustee pertaining to the release,

11  exculpation, and injunction provisions in the Plan.

12      In juxtaposition to these pending objections, the Court

13  notes that the Debtor has resolved earlier-filed objections to

14  the Plan filed by the IRS, Patrick Daugherty, CLO Holdco,

15  Ltd., numerous local taxing authorities, and certain current

16  and former senior-level employees of the Debtor.

17      With that rather detailed factual background addressed,

18  because certainly context matters here, the Court now

19  addresses what it considers the only serious objections raised

20  in connection with confirmation.  Specifically, the Plan

21  contain certain releases, exculpation, plan injunctions, and a

22  gatekeeper provision which are obviously not fully consensual,

23  since there are objections.  Certainly, these provisions are

24  mostly consensual when you consider that parties with hundreds

25  of millions of dollars' worth of legitimate claims have not

24

1   objected to them.

2        First, a word about plan releases generally, since the

3   Objectors at times seem to gloss over, in this Court's view,

4   relevant distinctions, and seem to refer to the plan releases

5   in this Plan and the exculpations and the plan injunctions all

6   as impermissible third-party releases, when, in fact, they are

7   not, *per se.*

8        It has, without a doubt, become quite commonplace in

9   complex Chapter 11 bankruptcy cases to have three categories

10  of releases in plans.  These three types are as follows.

11       First, Debtor Releases.  A debtor release involves a

12  release by the debtor and its bankruptcy estate of claims

13  against nondebtor third-parties.  For example, a release may

14  be granted in favor of creditors, directors, officers,

15  employees, professionals who participated in the bankruptcy

16  process.  This is the least-controversial type of release

17  because the debtor is extinguishing its own claims, which are

18  property of the estate, that a debtor has authority to utilize

19  or not, pursuant to Sections 541 and 363 of the Bankruptcy

20  Code.

21       Authority for a debtor release pursuant to a plan arises

22  out of Section 1123(b)(3)(A), which indicates that a plan may

23  provide for "the settlement or adjustment of any claim or

24  interest belonging to the debtor or to the estate."

25       In this context, it would appear that the only analysis

25

1    required is to determine whether the release or settlement of

2    the claim is an exercise of reasonable business judgment on

3    that part of the debtor, is it fair and equitable, is it in

4    the best interest of the estate, given all the relevant facts

5    and circumstances?  Also relevant is whether there's

6    consideration given of some sort by the releasees.

7         Now, the second type of very commonplace Chapter 11 plan

8    release is an exculpation.  Chapter 11 plans also very often

9    have these exculpation provisions, and they're something much

10   narrower in scope and time than a full-fledged release.  An

11   exculpation provision is more like a shield for a certain

12   subset of key actors in the case for their acts during and in

13   connection with the case, which acts may have been merely

14   negligent.

15        Specifically, a plan may absolve certain actors -- usually

16   estate fiduciaries -- such as an Official Unsecured Creditors'

17   Committee and its members, Committee professionals, sometimes

18   Debtor professionals, senior management, officers and

19   directors of the Debtor, from any liability for postpetition

20   negligent conduct -- *i.e.*, conduct which occurred during the

21   administration of the Chapter 11 case and in the negotiation,

22   drafting, and implementation of a plan.  An exculpation

23   provision typically excludes gross negligence and willful

24   misconduct.  It is usually worded in a passive voice, so it

25   may seem a little unclear as to whether it is actually a

26

1   release and by whom.

2       In any event, the rationale is that parties who actively

3   participate in a court-approved process -- often, court-

4   approved transactions by court order -- should receive

5   protection for their work.  Otherwise, who would want to work

6   in such a messy, contentious situation, only to be sued for

7   alleged negligence for less-than-perfect end results?

8       Chapter 11 end results are not always pretty.  One could

9   argue that these exculpation provisions, though, are much ado

10  about nothing.  Why?  For one thing, again, the shield is only

11  as to negligent conduct.  There is no shield for other

12  problematic conduct, such as gross negligence or willful

13  misconduct.

14      Second, in many situations, any claims or causes of action

15  that might arise will belong to the Debtor or its estate.

16  Thus, they would already be released pursuant to a debtor

17  release.

18      Additionally, there is case law stating that, where a

19  claim is brought against an estate professional whose fees

20  have already been approved in a final fee application, any

21  claims are barred by *res judicata*.  Thus, exculpated

22  professionals would only have potential exposure for a very

23  short window of time, until final fee applications.

24      Additionally, certain case law in Texas makes clear that

25  an attorney generally does not owe any duties to persons other

27

 1    than his own client.

 2         All of this suggests that the shield of a typical

 3    exculpation provision may rarely become useful or needed.

 4         Moving now to the third type of release, a true third-

 5    party release, Chapter 11 plans also sometimes contain third-

 6    party releases.  A true third-party release involves the

 7    release of claims held by nondebtor third parties against

 8    other nondebtor third parties, and there is often no

 9    limitation on the scope and time of the claims released.

10         This is the most heavily scrutinized of the three types of

11    plan releases.  Much of the case authority focuses on whether

12    a third-party release is consensual or not in analyzing their

13    propriety and/or enforceability.

14         In Highland, there are no third-party releases.  Rather,

15    there are debtor releases and exculpations.  There also happen

16    to be plan injunctions and gatekeeper provisions that have

17    been challenged.  The Objectors argue that these provisions

18    violate the Fifth Circuit's opinion in *Pacific Lumber* or are

19    otherwise beyond the jurisdiction or authority of the

20    bankruptcy court.  These arguments are now addressed.

21         First, the debtor release is found at Article IX.D of the

22    Plan.  The language, in pertinent part, reads as follows.  "On

23    and after the effective date, each Released Party is deemed to

24    be hereby conclusively, absolutely, unconditionally,

25    irrevocably, and forever released and discharged by the Debtor

28

and the Estate, in each case on behalf of themselves and their

respective successors, assigns, and representatives, including

but not limited to the Claimant Trust and the Litigation Sub-

Trust, from any and all causes of action, including any

derivative claims, asserted on behalf of the Debtor, whether

known or unknown, foreseen or unforeseen, matured or

unmatured, existing or hereafter arising, in law, equity,

contract, tort, or otherwise, that the Debtor or the Estate

would have been legally entitled to assert in their own right,

whether individually or collectively, or on behalf of the

holder of any claim against, or interest in, a debtor or other

person."

There are certain exceptions discussed, and then Released

Parties are defined at Definition 113 of the Plan collectively

as:  the Independent Directors; Strand, solely from the date

of the appointment of the Independent Directors through the

effective date; the CEO/CRO; the Committee, the members of the

Committee, in their official capacities; the professionals

retained by the Debtor and the Committee in the Chapter 11

case; and the employees.  This is a defined term in the Plan

Supplement and does not include certain employees.

To be clear, these are not third-party releases such as

addressed in the *Pacific Lumber* case.  These are the Debtor's

and/or the bankruptcy estate's causes of action that are

proposed to be released.  Releases by a debtor are

29

1    discretionary and can be provided by a debtor to persons who

2    have provided consideration to the debtor and the estate.

3    Section 1123(b)(3)(A) of the Bankruptcy Code permits this.

4        The evidence here supported the notion that these releases

5    are a *quid pro quo* for the Released Parties' significant

6    contributions to a highly complex and contentious

7    restructuring.  The Debtor is releasing its own claims.  Some

8    of the Released Parties would have indemnification rights

9    against the Debtor.  And the Debtor's CEO, James Seery,

10   credibly testified that he does not believe any claims exist

11   as to the Released Parties.  The Court approves the Debtor

12   releases and overrules the objections to them.

13       Next, the exculpations appear at Article IX.C of the Plan

14   and provide as follows:  Subject in all respects to Article

15   XII.D of the Plan, to the maximum extent permitted by

16   applicable law, no Exculpated Party will have or incur, and

17   each Exculpated Party is hereby exculpated from, any claim,

18   obligation, suit, judgment, damage, demand, debt, right, cause

19   of action, remedy, loss, and liability for conduct occurring

20   on or after the petition date in connection with or arising

21   out of the filing and administration of the Chapter 11 case,

22   the negotiation and pursuit of a disclosure statement, the

23   Plan, or the solicitation of votes for or confirmation of the

24   Plan, the funding or consummation of the Plan, or any related

25   agreements, instruments, et cetera, et cetera, whether or not

30

 1   such Plan distributions occur following the effective date,

 2   the implementation of the Plan, and any negotiation,

 3   transactions, and documentation in connection with the

 4   foregoing clauses, provided, however, the foregoing will not

 5   apply to any acts or omissions of any Exculpated Party arising

 6   out of or related to acts or omissions that constitute bad

 7   faith, fraud, gross negligence, criminal misconduct, or

 8   willful misconduct; or Strand or any employee other than with

 9   respect to actions taken by such entities from the date of

10   appointment of the Independent Directors through the effective

11   date.

12        Exculpated Parties are later defined at Section -- or,

13   earlier defined at Section 62 of the Plan, Definition No. 62

14   of the Plan, as later limited by the Debtor, as announced in

15   the confirmation hearing.  And so these are the Exculpated

16   Parties:  the Debtor and its successors and assigns; the

17   employees, certain employees, as defined; Strand; the

18   Independent Directors; the Committee, the members of the

19   Committee, in their official capacities; the professionals

20   retained by the Debtor and the Committee in the Chapter 11

21   case; the CEO and CRO; and the related persons as to each of

22   these parties listed in Part (iv) through (viii) above;

23   provided, for the avoidance of doubt, and it goes on to say

24   Dondero, Mark Okada, and various others aren't Exculpated

25   Parties.

31

1        Now, as earlier mentioned, the Objectors argue that

2    *Pacific Lumber*, 584 F.3d 229, a Fifth Circuit case from 2009,

3    categorically rejects the permissibility of nonconsensual

4    exculpations as well as third-party releases in a Chapter 11

5    plan.  So the Court is going to take a deep dive into that

6    assertion.

7        In *Pacific Lumber*, the Fifth Circuit reviewed on appeal

8    numerous challenges to a confirmed plan of affiliated debtors

9    known as Palco and Scopac and four subsidiaries.  The debtor

10   Palco owned and operated the sawmill, a power plant, and even

11   a town called Scotia, California.  The debtor Scopac owned

12   timberlands.  A creditor, a secured creditor called Marathon

13   had a claim against Palco's assets.  Marathon estimated

14   Palco's assets were worth $110 million.  Its claim was $160

15   million.  Meanwhile, other parties had large secured claims

16   against the other debtor, Scopac.

17       The plan that the bankruptcy court confirmed, which was on

18   appeal to the Fifth Circuit, was filed by both the secured

19   creditor Marathon and a joint plan proponent called MRC.  MRC

20   was a competitor of the debtor Palco.  The Marathon/MRC plan

21   proposed to dissolve all the debtors, cancel intercompany

22   debts, and create two new entities, Townco and Newco.  Almost

23   all of the debtor Palco's assets, including the town of

24   Scotia, California, would be transferred to Townco.  The

25   timberlands and other assets, including the sawmill, would be

32

1 placed in Newco.

2      Marathon and MRC proposed to contribute $580 million to

3 Newco to pay claims against Scopac.  And Marathon would

4 convert its secured claim against Palco's assets into equity,

5 giving it full ownership of Townco, a 15 percent stake in

6 Newco, and a new note for the sawmill's working capital.  MRC

7 would own the other 80 percent of Newco and would manage and

8 run the company.

9      An indenture trustee for the secured indebtedness against

10 Scopac -- which, by the way, had also been a plan proponent of

11 a competing plan -- appealed the confirmation order, raising

12 eight distinct issues on appeal.  One of the eight issues

13 pertained to what the Fifth Circuit referred to as a

14 "nondebtor exculpation and release clause."  This issue is

15 discussed on the last two pages of a very lengthy opinion.

16      While the complained-of provision is not quoted verbatim

17 in the *Pacific Lumber* opinion, it appears to have been a

18 typical exculpation clause.  Not a third-party release; a

19 typical exculpation clause.  The Fifth Circuit stated, "The

20 plan releases MRC, Marathon, Newco, Townco, and the Unsecured

21 Creditors' Committee, and their personnel, from liability,

22 other than for willful and gross negligence related to

23 proposing, implementing, and administering the plan" at Page

24 251.

25      The Fifth Circuit held that "the nondebtor releases must

33

 1   be struck except with respect to the Creditors' Committee and

 2   its members."

 3       Footnote 26 of the opinion also states that the appellants

 4   had "not briefed why Newco and Townco or their officers and

 5   directors should not be released," and so "we do not analyze

 6   their position."  Rather, the Fifth Circuit merely analyzed

 7   why the exculpation provision was not permissible as to the

 8   two plan proponents, MRC and Marathon.

 9       Thus, the Court views *Pacific Lumber* as being a holding

10   that squarely addressed the propriety of two plan proponents,

11   a secured lender and a third-party competitor purchaser of the

12   Debtors, obtaining nonconsensual exculpation in the plan.

13   However, its reasoning certainly cannot be ignored, strongly

14   suggesting it would not be inclined to approve an exculpation

15   for any party other than a Creditors' Committee or its

16   members.

17       As far as the Fifth Circuit's reasoning, it relied on

18   Bankruptcy Code Section 524(e) for striking down the

19   exculpations, stating, "The law states, however, that

20   discharge of a debt of the debtor does not affect the

21   liability of any other entity on such debt."  Page 251.  The

22   opinion suggests that MRC and Marathon may have tried to argue

23   that 524(e) did not apply to their exculpations because MRC

24   and Marathon were not liable as co-obligors in any way on any

25   of the debtor's debt.

APP 1022

34

1    The Fifth Circuit seemed dismissive of this argument,

2    stating as follows, "MRC/Marathon insist the release clause is

3    part of their bargain because, without the clause, neither

4    company would have been willing to provide the plan's

5    financing.  Nothing in the records suggests that MRC/Marathon,

6    the Committee, or the Debtor's officers and directors were co-

7    liable for the Debtor's prepetition debts.  Instead, the

8    bargain the proponents claim to have purchased is exculpation

9    from any negligence that occurred during the course of the

10   case.  Any costs the released parties might incur defending

11   against suits alleging such negligence are unlikely to swamp

12   either of these parties or the consummated reorganization.  We

13   see little equitable about protecting the released nondebtors

14   from negligence suits arising out of the reorganization."

15      The Court goes on to note that, in a variety of cases,

16   that releases have been approved, but these cases "seem

17   broadly to foreclose nonconsensual nondebtor releases and

18   permanent injunctions."

19      The Court then adds at Footnote 27 that the Fifth Circuit

20   in the past did not set aside challenged plan releases that

21   were in final nonappealable orders and were the subject of

22   collateral attack much later, citing its famous *Republic*

23   *Supply v. Shoaf* case, where the Fifth Circuit ruled that *res*

24   *judicata* barred a debtor from bringing a claim that was

25   specifically and expressly released by a confirmed

APP. 1023

35

1    reorganization plan because the debtor -- the objector failed

2    to object to the release at confirmation.

3        The Fifth Circuit in *Pacific Lumber* also noted that the

4    Bankruptcy Code permits bankruptcy courts to enjoin third-

5    party asbestos claims under certain circumstances, 524(g),

6    which the Court said suggests nondebtor releases are most

7    appropriate as a method to channel mass tort claims towards a

8    specific pool of assets, citing numerous cases, including

9    *Johns-Manville*.

10       In reach its holding, the Fifth Circuit saw no reason to

11   uphold exculpation to the plan proponents MRC and Marathon,

12   seeming to find it inconsistent with 524(e) under the facts at

13   bar, but the Court did uphold exculpation for the Creditors'

14   Committee and its members, stating, "We agree, however, with

15   courts that have held that 1103(c) under the Code, which lists

16   the Creditors' Committee's powers, implies Committee members

17   have qualified immunity for actions within the scope of their

18   duties."  Numerous cites.  "The Creditors' Committee and its

19   members are the only disinterested volunteers among the

20   parties sought to be released here.  The scope of protection,

21   which does not insulate them from willful and gross

22   negligence, is adequate."

23       Thus, the Court held that the exculpation provisions in

24   *Pacific Lumber* must be struck except with regard to the

25   Creditors' Committee and its members.

APP 1024

001797

36

1        Now, after all of that, this Court believes the following

2    can be gleaned from *Pacific Lumber*.  First, the Fifth Circuit

3    hinted that consensual exculpations and/or consensual

4    nondebtor third-party releases are permissible.  The Court

5    was, of course, dealing with nonconsensual exculpations in

6    *Pacific Lumber*.  In this regard, I note Page 252, where the

7    Court cited various prior Fifth Circuit authority and then

8    stated, "These cases seem broadly to foreclose nonconsensual

9    nondebtor releases and permanent injunctions."

10        The second thing that can be gleaned from *Pacific Lumber*:

11   The Fifth Circuit hinted that nondebtor releases may be

12   permissible in cases involving global settlements of mass

13   claims against the debtors and co-liable parties.  The Court,

14   of course, referred to 524(g), but various other cases which

15   approved nondebtor releases where mass claims were channeled

16   to a specific pool of assets.

17        Third, the Fifth Circuit outright held that exculpations

18   from negligence for a Creditors' Committee and its members are

19   permissible because the concept is both consistent with

20   1103(c), "which implies Committee members have qualified

21   immunity for actions within the scope of their duties," and a

22   good policy result, since "if members of the Committee can be

23   sued by persons unhappy with the outcome of the case, it will

24   be extremely difficult to find members to serve on an official

25   committee."

37

1          Fourth, the Fifth Circuit recognized in *Pacific Lumber*

2     that *res judicata* may bar complaints regarding an

3     impermissible plan release, citing to its earlier *Republic*

4     *Supply v. Shoaf* opinion.

5          Now, being ever-mindful of the Fifth Circuit's words in

6     *Pacific Lumber*, this Court cannot help but wonder about at

7     least three things.

8          First, did the Fifth Circuit leave open the door that

9     facts/equities might sometimes justify approval of an

10    exculpation for a person other than a Creditors' Committee and

11    its members?  For example, the Fifth Circuit stated, in

12    referring to the plan proponents Marathon and MRC, that "Any

13    costs the released parties might incur defending against suits

14    alleging such negligence are unlikely to swamp either of these

15    parties or the consummated reorganization."  Here, this Court

16    can easily expect the proposed exculpated parties to incur

17    costs that could swamp them and the reorganization based on

18    the past litigious conduct of Mr. Dondero and his controlled

19    entities.  Do these words of the Fifth Circuit hint that

20    equities/economics might sometimes justify an exculpation?

21         Second, did the Fifth Circuit's rationale for permitted

22    exculpations to Creditors' Committee and their members, which

23    was clearly policy-based, based on their implied qualified

24    immunity flowing from their duties in Section 1103 and their

25    disinterestedness, and the importance of their role in a

38

1    Chapter 11 case, did this rationale leave open the door to

2    sometimes permitting exculpations to other parties in a

3    particular Chapter 11 case besides Creditors' Committees and

4    their members?  For example, in a situation such as the

5    Highland case, in which Independent Directors, brought in to

6    avoid a trustee, are more like a Creditors' Committee than an

7    incumbent board of directors.

8        Third, the Fifth Circuit's sole statutory basis was

9    Section 524(e).  This Court would humbly submit that this is a

10   statute dealing with prepetition liability in which some

11   nondebtor is liable with the Debtor.  Exculpation is a concept

12   dealing with postpetition liability.

13       The Ninth Circuit recently, in a case called *Blixseth v.*

14   *Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020), approved the

15   validity of an exculpation clause incorporated into a

16   confirmed Chapter 11 plan that purported to absolve certain

17   nondebtor parties that were "closely involved" in drafting the

18   plan.  They were the largest secured creditor, a purchaser,

19   and an individual who was an indirect owner of certain of the

20   debtor companies.  The exculpation was from any negligence,

21   liability, for "any act or omission in connection with,

22   related to, or arising out of the Chapter 11 cases."

23       By the time the appeal was before the Ninth Circuit, the

24   only issue was the propriety of the exculpation clause as to

25   the large secured creditor, which was also a plan proponent,

39

1   since all the other exculpated parties had settled with the

2   appellant.

3        The Court, in determining that the exculpation clause was

4   permissible as to the secured lender, concluded that Section

5   524(e) "does not bar a narrow exculpation clause of the kind

6   here at issue -- that is, one focused on actions of various

7   participants in the plan approval process and relating only to

8   that process," Page 1082.  Why?  Because "Section 524(e)

9   establishes that discharge of a debt of the debtor does not

10  affect the liability of any other entity on such debt."  In

11  other words, the discharge in no way affects the liability of

12  any other entity for the discharged debt.  By its terms,

13  524(e) prevents a bankruptcy court from extinguishing claims

14  of creditors against nondebtors over the very discharged debt

15  through the bankruptcy proceedings.

16       The Court went on to explicitly disagree with *Pacific*

17  *Lumber* in its analysis of 524(e), reiterating that an

18  exculpation clause covers only liabilities arising from the

19  bankruptcy proceedings and not of any of the debtor's

20  discharged debt.  Footnote 7, Page 1085.

21       Ultimately, the Court held that under Section 105(a),

22  which empowers a bankruptcy court to issue any order, process,

23  or judgment that is necessary or appropriate to carry out the

24  provisions of Chapter 11 and Section 1123, which establishes

25  the appropriate content of the bankruptcy plan, under these

40

 1   sections, the bankruptcy court had authority to approve an

 2   exculpation clause intended to trim subsequent litigation over

 3   acts taken during the bankruptcy proceedings and so render the

 4   plan viable.

 5       This Court concludes that, just as the Fifth Circuit left

 6   open the door for consensual exculpations and releases in

 7   *Pacific Lumber*, just as it left open the door for consensual

 8   exculpations and releases in *Pacific Lumber*, its dicta

 9   suggests that an exculpation might be permissible if there is

10   a showing that "costs that the released parties might incur

11   defending against suits alleging such negligence are likely to

12   swamp either the Exculpated Parties or the reorganization."

13   Again, that was a quote from the Fifth Circuit.

14       If ever there were a risk of that happening in a Chapter

15   11 reorganization, it is this one.  The Debtor's current CEO

16   credibly testified that Mr. Dondero has said outside the

17   courtroom that if Mr. Dondero's own pot plan does not get

18   approved, that he will "burn the place down."  Here, this

19   Court can easily expect the proposed exculpated parties might

20   expect to incur costs that could swamp them and the

21   reorganization process based on the past litigious conduct of

22   Mr. Dondero and his controlled entities.

23       Additionally, this Court concludes that the Fifth

24   Circuit's rationale in *Pacific Lumber* for permitted

25   exculpations to Creditors' Committees and their members, which

41

1  was clearly policy-based based on their implied qualified

2  immunity flowing from Section 1103 and their importance in a

3  Chapter 11 case, leaves the door open to sometimes permitting

4  exculpations to other parties in a particular Chapter 11 case

5  besides a UCC and its members.

6      Again, if there was ever such a case, the Court believes

7  it is this one, in which Independent Directors were brought in

8  to avoid a trustee and are much more like a Creditors'

9  Committee than an incumbent board of directors.  While,

10  admittedly, there are a few exculpated parties here proposed

11  beyond the independent board, such as certain employees, it

12  would appear that no one is invulnerable to a lawsuit here if

13  past is prologue in this Highland saga.

14      The Creditors' Committee was initially not keen on

15  exculpations for certain employees.  However, Mr. Seery

16  credibly testified that there was a contentious arm's-length

17  negotiation over this and that he needs these employees to

18  preserve value implementing the Plan.  Mr. Dondero has shown

19  no hesitancy to litigate with former employees in the past, to

20  the *nth* degree, and there is every reason to believe he would

21  again in the future, if able.

22      Finally, in this situation, in the case at bar, we would

23  appear to have a *Shoaf* reason to approve the exculpations.

24  The January 9, 2020 order of this Court, Docket Entry 339,

25  which approved the independent board and an ongoing corporate

Case 3:25-cv-02072-S   Document 64-4   Filed 06/03/25   Page 51 of 1017   PageID 2514

42

1    governance structure for this case, and which is incorporated

2    into the Plan at Article IX.H, provided as follows:  "No

3    entity may commence or pursue a claim or cause of action of

4    any kind against any Independent Director, any Independent

5    Director's agents, or any Independent Director's advisors

6    relating in any way to the Independent Director's role as an

7    Independent Director of Strand without the Court (1) first

8    determining, after notice, that such claim or cause of action

9    represents a colorable claim of willful misconduct or gross

10   negligence against Independent Director, any Independent

11   Director's agents, or any Independent Director's advisors; and

12   (2) specifically authorizing such entity to bring such a

13   claim.  The Court will have sole jurisdiction to adjudicate

14   any claim for which approval of the Court to commence or

15   pursue has been granted."

16        This was both an exculpation from negligence as to the

17   Independent Directors and their agents and advisors, as well

18   as a gatekeeping provision.  This Court believes that this

19   provision basically approved an exculpation for the

20   Independent Directors way back on January 9, 2020 for their

21   postpetition conduct that might be negligent.  And this is the

22   law of the case and has *res judicata* preclusive effect now.

23        Thus, as to the three Independent Directors, as well as

24   the other named parties in the January 9, 2020 order, their

25   agents, their advisors, we have a situation that fits within

APP 0934

43

1   *Republic Supply v. Shoaf*, and we fit within the exception

2   articulated in *Pacific Lumber*.

3        The Court reserves the right to supplement these findings

4   and conclusions as to the exculpations, but based on the

5   foregoing, they are approved and the objections are overruled.

6        Now, turning to the Plan objection, it appears at Article

7   IX.F of the Plan and provides, in pertinent part, as follows:

8   Upon entry of the confirmation order, all enjoined parties are

9   and shall be permanently enjoined on and after the effective

10  date from taking any action to interfere with the

11  implementation or consummation of the Plan.  Except as

12  expressly provided in the Plan, the confirmation order, or a

13  separate order of the Bankruptcy Court, all Enjoined Parties

14  are and shall be permanently enjoined on and after the

15  effective date, with respect to any claims and interests, from

16  directly or indirectly -- and then commencing, conducting,

17  continuing any suit, action, proceeding of any kind, and

18  numerous other acts of that vein.

19       The injunction set forth herein shall extend to and apply

20  to any act of the type set forth in any of the causes above

21  against any successors to the Debtor, including but not

22  limited to the Reorganized Debtor, the Litigation Sub-Trust,

23  and the Claimant Trust, and their respective property and

24  interests in property.

25       Plan injunctions like this are commonplace and

001805

44

1  appropriate.  They are entirely consistent with and

2  permissible under Bankruptcy Code Sections 1123(a)(5),

3  1123(a)(6), 1141(a) and (c), and 1142, as well as Bankruptcy

4  Rule 3016(c), which articulates the form that a plan

5  injunction must be set forth in a plan.

6      The Court finds the objections to the Plan Injunctions to

7  be unfounded, and they are thus overruled without much

8  discussion here.

9      Now, lastly, the Gatekeeper Provision.  It appears at

10  Paragraph 4 of Article IX.F of the Plan and provides, in

11  pertinent part, "Subject in all respects to Article XII.D, no

12  Enjoined Party may commence or pursue a claim or cause of

13  action of any kind against any Protected Party that arose or

14  arises from or is related to the Chapter 11 case, the

15  negotiation of the Plan, the administration of the Plan, or

16  property to be distributed under the Plan, the wind-down of

17  the business of the Debtor or Reorganized Debtor, the

18  administration of the Claimant Trust or the Litigation Sub-

19  Trust, or the transactions in furtherance of the foregoing,

20  without the Bankruptcy Court (1) first determining, after

21  notice and a hearing, that such claim or cause of action

22  represents a colorable claim of any kind, including but not

23  limited to negligence, bad faith, criminal misconduct and

24  willful misconduct, fraud, or gross negligence against a

25  Protected Party; and (2) specifically authorizing such

APP 1023

45

1   Enjoined Party to bring such claim or cause of action against

2   such Protected Party, provided, however, that the foregoing

3   will not apply to a claim or cause of action against Strand or

4   against any employee other than with respect to actions taken,

5   respectively, by Strand or any such employee from the date of

6   appointment of the Independent Directors through the effective

7   date.  The Bankruptcy Court will have sole and exclusive

8   jurisdiction to determine whether a claim or cause of action

9   is colorable and, only to the extent legally permissible and

10  as provided for in Article XI, shall have jurisdiction to

11  adjudicate the underlying colorable claim or cause of action."

12      This gatekeeper provision appears necessary and reasonable

13  in light of the litigiousness of Mr. Dondero and his

14  controlled entities that has been described at length herein.

15  Provisions similar to this have been approved in this district

16  in the *Pilgrim's Pride* case and the *CHC Helicopter* case.  The

17  provision is within the spirit of the Supreme Court's Barton

18  Doctrine.  And it appears consistent with the notion of a pre-

19  filing injunction to deter vexatious litigants that has been

20  approved by the Fifth Circuit in such cases as *Baum v. Blue*

21  *Moon Ventures*, 513 F.3d 181, and in the *In re Carroll* case,

22  850 F.3d 811, which arose out of a bankruptcy pre-filing

23  injunction.

24      The Fifth Circuit, in fact, noted in the *Carroll* case that

25  federal courts have authority to enjoin vexatious litigants

46

1  under the All Writs Act, 28 U.S.C. § 1651.  And additionally,

2  under the Bankruptcy Code, a bankruptcy court can issue any

3  order, including a civil contempt order, necessary or

4  appropriate to carry out the provisions of the Code, citing,

5  of course, 105 of the Bankruptcy Code.

6      The Fifth Circuit stated that, when considering whether to

7  enjoin future filings against a vexatious litigant, a

8  bankruptcy court must consider the circumstances of the case,

9  including four factors:  (1)  the party's history of

10 litigation; in particular, whether he has filed vexatious,

11 harassing, or duplicative lawsuits; (2) whether the party had

12 a good faith basis for pursuing the litigation, or perhaps

13 intended to harass; (3) the extent of the burden on the courts

14 and other parties resulting from the party's filings; and (4)

15 the adequacy of alternatives.

16     In the *Baum* case, the Fifth Circuit stated that the

17 traditional standards for injunctive relief -- *i.e.*,

18 irreparable harm and inadequate remedy at law -- do not apply

19 to the issuance of an injunction against a vexatious litigant.

20     Here, although I have not been asked to declare Mr.

21 Dondero and his affiliated entities as vexatious litigants *per*

22 *se*, it is certainly not beyond the pale to find that his long

23 history with regard to the major creditors in this case has

24 strayed into that possible realm, and thus this Court is

25 justified in approving this provision.

47

1    One of the Objectors' lawyers stated very eloquently in

2    closing argument, in opposing the plan injunction and

3    gatekeeping provisions, that "Even a serial killer has

4    constitutional rights," suggesting that these provisions would

5    deprive Mr. Dondero and his controlled entities of fundamental

6    rights or due process somehow.  But to paraphrase the district

7    court in the *Carroll* case, no one, rich or poor, is entitled

8    to abuse the judicial process.  There exists no constitutional

9    right of access to the courts to prosecute actions that are

10   frivolous or malicious.  The Plan injunction and gatekeeper

11   provisions in Highland's plan simply set forth a way for this

12   Court to use its tools, its inherent powers, to avoid abuse of

13   the court system, protect the implementation of the Plan, and

14   preempt the use of judicial time that properly could be used

15   to consider the meritorious claims of other litigants.

16   Accordingly, the Objectors' objections to this provision

17   are overruled.

18   As earlier stated, this Court reserves the right to alter

19   or supplement this ruling in a written order.  In this regard,

20   the Court directs Debtor's counsel -- I hope you are still

21   awake; it's been a long time -- the Court directs Debtor's

22   counsel to submit a form of order.  And specifically, I assume

23   that you've already prepared or have been in the process of

24   preparing a set of findings of fact, conclusions of law, and

25   confirmation order that tracks the confirmation evidence and

APP 1026

48

1    recites conclusions of law that the Plan complies with all the

2    various provisions of Section 1123, 1129, and other applicable

3    Code provisions.

4         What I want you to do is take this bench ruling and add it

5    to what you've prepared.  And what I mean is, as you can tell,

6    I've been reading:  I will have my courtroom deputy email to

7    you all a copy of what I just read.  I'll have her obviously

8    copy the Debtor's counsel, Creditors' Committee, Dondero and

9    the other Objectors, copy them on this written document she's

10   going to send out.  And, again, I want you to kind of meld it

11   into what you've already been preparing.

12        Obviously, I did not address in this oral ruling every

13   provision of 1129(a) and (b).  I did not address every 1123

14   objection.  I did not even address every single objection of

15   the Objectors.  But, again, any objection I've not

16   specifically addressed today is overruled.

17        The briefing, I should say, that the Debtor submitted,

18   there was a Memorandum of Law in Support of Confirmation filed

19   on January 22nd.  There was also a reply brief, a hundred

20   pages or so, separately filed, replying to all the objections.

21   I don't disagree with anything that was in that.  So, again,

22   to the extent you want to send me conclusions of law that are

23   along the lines of that briefing, I would consider that.

24        And so what I thought is you'll send me the melded

25   document and I will edit it if I see fit.  I recognize this

Case 3:25-cv-02072-S   Document 16-4   Filed 06/03/25   Page 58 of 1017   PageID 2521

49

 1   may take a few days, so I don't give you a strict timetable,

 2   just hopefully it won't take too many days.

 3       All right.  Is there anyone out there -- Mr. Pomerantz,

 4   you had to go to jury duty, except I can't believe --

 5             MR. POMERANTZ:  No, I --

 6             THE COURT:  I can't believe you were called, but are

 7   you there?

 8             MR. POMERANTZ:  Your Honor, I am here.  I was luckily

 9   excused, because I probably wouldn't have made it.

10       Your Honor, one just comment I'd make.  You referred to

11   the January 9th order.  You didn't refer to the CEO order,

12   which is your order July 16th, which had the same gatekeeper

13   provision.  I assume that was the same analysis?

14             THE COURT:  That was an oversight.  Same analysis.

15   And that's exactly why I said I reserve the right to

16   supplement or amend, because I know there had to be places

17   like that where I omitted to mention something important.

18             MR. POMERANTZ:  But thank you, Your Honor, for your

19   thoughtful ruling, and we will certainly incorporate your

20   materials into the order that we're working on and get it to

21   you when we can.  But we appreciate it on behalf of the

22   Debtor.  We know this took a lot of time and a lot of effort.

23   Hopefully, you got a chance to still watch the Super Bowl

24   yesterday.

25             THE COURT:  Well, when I saw that Tom Brady was going

50

1  to win, I turned it off.

2      I'm sorry.  That's terrible.  You know, my law clerk, my

3  law clerk that you can't see, Nate, he is from Ann Arbor,

4  Michigan, University of Michigan, and he almost cried when I

5  said I didn't like Tom Brady the other day.  So, I apologize.

6          MR. POMERANTZ:  Your Honor, one other comment.  We

7  had our motion to assume our nonresidential real property

8  lease that was also on.  It got missed in all the fanfare, but

9  it was -- it has been unopposed and essentially done pursuant

10 to stipulation.  So we'd like to submit an order on that as

11 well.

12         THE COURT:  Okay.  I have seen that, and I approve it

13 under 365.  You may submit the order.  Okay.  Thank you.

14         MR. POMERANTZ:  Thank you, Your Honor.

15         THE CLERK:  All rise.

16     (Proceedings concluded at 10:35 a.m.)

17                      --oOo--

18

19

20                   CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22 above-entitled matter.

23  **/s/ Kathy Rehling**                      **02/09/2021**

24 _____      _____

   Kathy Rehling, CETD-444                    Date
25 Certified Electronic Court Transcriber

51

INDEX

PROCEEDINGS                                                      3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Confirmation Hearing [1808]                                      3

Agreed Motion to (1) Assume Non-Residential Real Property       50
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624]

END OF PROCEEDINGS                                              50

INDEX                                                           51

# EXHIBIT 10

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj11** |
| | ) | |
| | ) | |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | July 8, 2020 |
| | ) | 1:30 p.m. Docket |
| Debtor. | ) | |
| | ) | - MOTION TO EXTEND EXCLUSIVITY |
| | ) | PERIOD (737) |
| | ) | - MOTION TO EXTEND TIME TO |
| | ) | REMOVE ACTIONS (747) |
| | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

For the Debtor:            Jeffrey N. Pomerantz
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd.,
                            13th Floor
                           Los Angeles, CA  90067
                           (310) 277-6910

For the Official Committee Matthew A. Clemente
of Unsecured Creditors:    SIDLEY AUSTIN, LLP
                           One South Dearborn Street
                           Chicago, IL  60603
                           (312) 853-7539

For the Debtor:            Zachery Z. Annable
                           Melissa S. Hayward
                           HAYWARD & ASSOCIATES, PLLC
                           10501 N. Central Expressway,
                            Suite 106
                           Dallas, TX  75231
                           (972) 755-7104

For Acis Capital           Rakhee V. Patel
Management GP, LLC:        Annmarie Antoinette Chiarello
                           WINSTEAD, P.C.
                           2728 N. Harwood Street, Suite 500
                           Dallas, TX  75201
                           (214) 745-5250

2

```
 1    APPEARANCES, cont'd.:

 2    For Acis Capital              Brian Patrick Shaw
      Management GP, LLC:           ROGGE DUNN GROUP, P.C.
 3                                  500 N. Akard Street, Suite 1900
                                    Dallas, TX  75201
 4                                  (214) 239-2707

 5    For Redeemer Committee of     Mark A. Platt
      the Highland Crusader         FROST BROWN TODD, LLC
 6    Fund:                         100 Crescent Court, Suite 350
                                    Dallas, TX  75201
 7                                  (214) 580-5852

 8    For Redeemer Committee of     Terri L. Mascherin
      the Highland Crusader         JENNER & BLOCK, LLP
 9    Fund:                         353 N. Clark Street
                                    Chicago, IL  60654-3456
10                                  (312) 923-2799

11    For Redeemer Committee of     Marc B. Hankin
      the Highland Crusader         JENNER & BLOCK, LLP
12    Fund:                         919 Third Avenue
                                    New York, NY  10022-3098
13                                  (212) 891-1600

14    For Jim Dondero:              D. Michael Lynn
                                    John Y. Bonds, III
15                                  BONDS ELLIS EPPICH SCHAFER JONES,
                                      LLP
16                                  420 Throckmorton Street,
                                      Suite 1000
17                                  Fort Worth, TX  76102-5304
                                    (817) 405-6903
18
      For UBS Securities, LLC:      Jeffrey E. Bjork
19                                  LATHAM & WATKINS, LLP
                                    355 South Grand Avenue, Suite 100
20                                  Los Angeles, CA  90071
                                    (213) 485-1234
21
      Recorded by:                  Michael F. Edmond, Sr.
22                                  UNITED STATES BANKRUPTCY COURT
                                    1100 Commerce Street, 12th Floor
23                                  Dallas, TX  75242
                                    (214) 753-2062
24

25
```

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

4

1        <u>DALLAS, TEXAS - JULY 8, 2020 - 1:37 P.M.</u>

2        THE COURT:  All right.  Hello.  This is Judge

3  Jernigan.  Hopefully you can all hear me.  We're ready to

4  start the Highland hearings we have today, Case No. 19-34054.

5  Let's start off by getting appearances from those lawyers who

6  want to appear formally today.  First, for the Debtor, do we

7  have Mr. Pomerantz or a team from Pachulski Stang?

8        MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

9  Pomerantz; Pachulski Stang Ziehl & Jones; counsel for the

10  Debtors.

11        THE COURT:  All right.  Good afternoon.  Anyone else

12  for the Debtors that wants to appear?

13        MR. ANNABLE:  Yes, Your Honor.  Yes, Your Honor.

14  Zachery Annable and Melissa Hayward, local counsel for the

15  Debtors.

16        THE COURT:  All right.  Thank you.  All right.  For

17  the Unsecured Creditors' Committee, I think I see Mr. Clemente

18  there on the screen.

19        MR. CLEMENTE:  Good afternoon, Your Honor.  Matthew

20  Clemente; Sidley Austin; on behalf of the Creditors'

21  Committee.

22        THE COURT:  All right.  Very good.  I know we have

23  lots of other folks on the line.  I'm not sure who else might

24  want to formally appear.  I'll check on some of the usuals.

25  For Acis, do we have Ms. Patel or Ms. Chiarello?

001817

APP 1044

5

1          MS. PATEL:  Good afternoon, Your Honor.  Rakhee Patel

2   and Annmarie Chiarello of the Winstead firm on behalf of Acis

3   Capital Management, LP.  Also on the phone is Brian Shaw of

4   the Rogge Dunn Group.

5          THE COURT:  All right.  Thank you.  For the Redeemer

6   Committee, do we have anyone appearing for them?

7          MS. MASCHERIN:  Good morning, Your Honor.

8          MR. PLATT:  Your Honor, --

9          MS. MASCHERIN:  Go ahead, Mark.

10          MR. PLATT:  Sorry.  Mark Platt, Your Honor, on behalf

11   of the Redeemer Committee of the Highland Crusader Fund.  And,

12   obviously, Ms. Mascherin is on the screen as well.

13          THE COURT:  Okay.

14          MS. MASCHERIN:  Good afternoon, Your Honor.

15          THE COURT:  Good afternoon.  Let's see.

16          MR. PLATT:  And Mr. Hankin is on the phone as well,

17   --

18          THE COURT:  Okay.

19          MR. PLATT:  -- Your Honor.

20          THE COURT:  All right.  Very good.  All right.  Any

21   other -- UBS, by chance?

22       (No response.)

23          THE COURT:  Okay.  Anyone for the CLO Issuers?

24       (No response.)

25          THE COURT:  All right.  Anyone I missed?  U.S.

APP 1065

6

1    Trustee, perhaps?

2        (No response.)

3            THE COURT:  All right.  Well, --

4            MR. LYNN:  Your Honor, --

5            THE COURT:  Okay.

6            MR. LYNN:  -- good afternoon.  Michael Lynn and John

7    Bonds for Jim Dondero.

8            THE COURT:  Oh, okay.  Hello.  How are you?

9            MR. LYNN:  Well, thank you.

10           THE COURT:  All right.  Anyone else wishing to appear

11   at this time?

12       (No response.)

13           THE COURT:  All right.  We have a couple of matters

14   set on our calendar.  A motion to extend the deadline for

15   removal of actions, to which I saw no written responses, and

16   then a third motion to extend exclusivity, and I saw a

17   Committee response to that.

18       I don't have on my hard calendar anything about a status

19   conference regarding mediation, but I found in our notes from

20   our hearing, I believe it was the UBS hearing in middle of

21   June, that I said, you know, we might want to talk about that

22   if we don't hear some rosy news or some developing positive

23   news today at the July 8th hearing.  So we'll kind of put that

24   on the back burner and see if there's a need to talk about

25   that today.

7

1       All right.  So, Mr. Pomerantz, are you going to start us

2    off?

3            MR. POMERANTZ:  Yes, Your Honor.  And actually, I had

4    some comments that sort of touched on a few of the issues you

5    talked about and I think it's apropos to talk about it in the

6    context of the motion to extend exclusivity, which I do note,

7    Your Honor, is not objected to.

8       We had asked in the motion for a 30-day extension and an

9    additional extension beyond that in increments of 30 days, up

10   to a maximum of 90 days, with the Creditors' Committee's

11   consent.  We have read their response.  We understand they are

12   accepting a 30-day extension, but wanted to put the Debtor and

13   I'm sure the Court on notice that, at the end of 30 days, they

14   don't anticipate any further extensions, which I think, based

15   upon the course of actions, will be just fine, because I

16   think, as I will report to Your Honor, we expect to be able to

17   file a plan by then.

18      But I thought I would take this time, Your Honor, and sort

19   of (audio gap) little context, and that is the (inaudible) to

20   give Your Honor just a brief update of the status of the case,

21   the status on the filing of the Debtor's plan, and as Your

22   Honor alluded to, the Debtor's thoughts regarding mediation,

23   because we have spent a lot of time since Your Honor first

24   raised the issue in the middle of June talking about it, and

25   we think we have a structure that has significant support from

8

1    the main parties in this case.

2        So, as I mentioned, Your Honor, at the hearing on June

3    30th, after stabilizing operations, the Board began to focus

4    on resolving the significant litigation claims that have been

5    filed against the estate.  And the first step in that process,

6    Your Honor, is the Board wanted to commission an independent

7    analysis of those claims, not burdened by what had come before

8    it in connection with the analysis.  So we spent a lot of

9    time, our firm did, providing detailed analysis on the major

10   claims against the estate, including the Acis claim, the UBS

11   claim, and the Redeemer claim.

12       Then the pandemic hit, and a lot of the Board's attention

13   was spent on dealing with the disruption to the Debtor's

14   business that was caused by the pandemic.  However, during the

15   last couple of months, Your Honor, the Board has began to

16   focus on engaging with UBS, Redeemer, and the Acis groups in

17   order to assess the ability to be able to resolve the claims

18   short of contested and time-consuming litigation.  Because as

19   I mentioned to Your Honor on several occasions, the Board

20   intended, when it came in on January 9th, and I think has done

21   a good job, is changing the culture that had existed before,

22   the culture of litigation, to potentially a culture of

23   settlement and mediation.

24       And in that regard, Your Honor, I'm pleased to report that

25   the Debtor has reached an agreement in principle with the

9

1   Redeemer Committee regarding the allowance of the Redeemer

2   Committee's claim.  The agreement is subject to resolution of

3   a few minor drafting issues, and the Debtor anticipates

4   seeking Court approval of a settlement in the near future.

5       With respect to Acis, Acis's claims, two weeks ago the

6   Independent Board made an offer to resolve the Acis claims.

7   At this point, has not heard back.  Hopes to hear back from

8   Acis.

9       In the interim, the Debtor has also filed an objection to

10  the Acis claim, which it would intend to prosecute if it

11  cannot be resolved consensually, either before or in

12  connection with the mediation process that I will lay out that

13  we would propose to the Court in a few moments.

14      With respect to the UBS claim, Your Honor, the Board

15  believes that the Court's ruling on UBS's relief from stay

16  motion was a necessary first step before settlement

17  discussions could get off the ground, and the hope is that the

18  claim could be resolved through mediation, if not sooner, and

19  the parties discussing potentially different counterproposals.

20  None have been made yet, but it is the intention of the Board

21  to engage with UBS.

22      With respect to the mediation process, Your Honor, the

23  Board agrees with the comments that the Court made that

24  mediation could be a very useful tool and a catalyst to a

25  settlement.  That would resolve the litigation that has

10

1   burdened this estate for many years.

2        Since the last hearing, Your Honor, I've had discussions

3   with both Committee counsel, Mr. Clemente, and counsel for

4   each of the Committee members regarding a mediation process

5   that I think, subject to Your Honor's concurrence, has broad

6   support among the major parties, just proving to Your Honor

7   that the parties can come together and agree on something in

8   this case.

9        There is consensus that the Court should order a mediation

10  that would encompass essentially two general areas.  First,

11  the mediation would seek to resolve the claims of Acis and

12  UBS, to the extent the parties cannot reach agreement on their

13  own prior to the commencement of the mediation.

14       However, resolving claims against the estate is really

15  only one part of the equation.  A true global resolution would

16  also (audio gap) the Debtor's estate may have against Jim

17  Dondero and related entities, claims that I'm sure Your Honor

18  recalls the Committee bargained for the ability to prosecute

19  in connection with the global settlement approved by Your

20  Honor in January.

21       I've spoken with Mr. Lynn, Mr. Dondero's counsel.  I know

22  he's participating in the hearing.  And he has indicated that

23  Mr. Dondero is willing to participate in a plan mediation

24  process to see if a global resolution can be reached.

25       The Debtor and the Committee have also discussed the names

11

1   of potential mediators, and subject, of course, to Your

2   Honor's approval, the Debtor and the Committee have reached

3   out to Judge Jones' clerk for the Southern District of Texas

4   and he has told us that he has the time and the willingness to

5   mediate.

6        We also believe that, if available, since there is a lot

7   in terms of mediation in this case, that it may be helpful to

8   have two mediators.  And if Judge Isgur -- we haven't reached

9   out to him -- is also available, we believe that both of those

10  judges possess the qualities that this case would need to

11  resolve -- to give the best chance of resolving the claims and

12  the plan process in an efficient and a timely manner.

13       We would contemplate that the parties would submit fees to

14  the mediator by July 31st, and the mediation would occur

15  sometime in the second half of August.

16       Notwithstanding the mediation process, however, Your

17  Honor, the Debtor is moving forward towards expeditiously

18  filing a plan, which will not need to wait for mediation to

19  conclude.  And in that regard, Your Honor, the Debtor and the

20  Committee have worked cooperatively over the last several

21  weeks to draft a plan that would allow the Debtor to emerge

22  from Chapter 11 as quickly as possible -- you know, 120 days

23  or so after it would be filed.

24       The Debtor and the Committee and its members recognize

25  that the administrative fees attending to the continued

001824

12

1   administration of this case in bankruptcy is material, and

2   that one way to reduce them is to emerge from bankruptcy as

3   quickly as possible.

4        To that end, Your Honor, the Debtor is optimistic that it

5   will be able to file a plan by the end of the current

6   exclusivity period, which, if Your Honor grants the pending

7   motion, would be August 12th.  And, at present, the plan

8   contemplates the creation of an asset monetization vehicle

9   that will seek to monetize the assets in an appropriate

10  manner.

11       The Debtor believes that the current plan is confirmable,

12  whether or not the Debtor is successful in resolving the large

13  claims against the estate, either consensually or in

14  mediation.  Worst case, the claims litigation process can

15  proceed post-confirmation.

16       At the same time, however, Your Honor, the Independent

17  Board -- led by Mr. James Seery, who has testified before Your

18  Honor and who has been appointed as the Debtor's chief

19  executive officer, subject to Court approval, and that hearing

20  is scheduled for July 14th -- has also had positive

21  discussions with Jim Dondero regarding a plan structure that

22  would not only allow for the prompt exit from Chapter 11 but

23  could also inject some liquidity into the case that would

24  allow actual distributions to be made to creditors much more

25  expedited than perhaps waiting for the monetization of the

13

 1 │ assets.  And Mr. Seery continues to have those discussions
 2 │ with Mr. Dondero, and he and the Board are cautiously
 3 │ optimistic that they will bear fruit.
 4 │      However, Your Honor, just to be clear, the Debtor intends
 5 │ to file a plan by the expiration of exclusivity whether or not
 6 │ Mr. Dondero is part of that plan, and his involvement will not
 7 │ distract the Debtor from emerging from Chapter 11 as quickly
 8 │ as possible.
 9 │      So we feel we have presented some rosy news today in terms
10 │ of resolution of some of the claims and a path forward, that
11 │ we think this case is on a different trajectory than it was
12 │ quite some time ago, and we look forward to continuing a
13 │ dialogue with the parties before mediation and in mediation,
14 │ if Your Honor orders it, and hopefully can have a quick and
15 │ (inaudible) resolution of the case.
16 │      THE COURT:  All right.  I have a few questions, but
17 │ I'll turn to other lawyers to see what they have to say, and
18 │ their comments may answer some questions I have.  Mr.
19 │ Clemente, go ahead.
20 │      MR. CLEMENTE:  Yes, Your Honor.  Thank you.  Matthew
21 │ Clemente from Sidley on behalf of the Committee.
22 │      Mr. Pomerantz is correct with respect to exclusivity.  As
23 │ we laid out in our papers, the Committee has no objection to
24 │ the additional 30 days of exclusivity through August 12th, and
25 │ the Committee sees no reason why a plan cannot be filed within

14

1   that time frame.

2       As we laid out in our papers, we at this time don't see

3   any reason for exclusivity to extend beyond August 12th.  But

4   I do think that is consistent with the relief that the Debtor

5   is asking for.

6       To be sure, Your Honor, given the position of the

7   Committee and its constituency, we do not see any plan here

8   that gets done without our consent, frankly, and approval.

9   And we've made that point consistently to the Debtor, and we

10  continue to make that point.  Filing a plan with which the

11  Debtor knows this constituency does not agree, frankly, we

12  think would be a waste of time and resources and will create

13  needless litigation, to which Your Honor expressed a strong

14  distaste for at the last hearing.

15      So, Your Honor, we will continue to work with the Debtor

16  in moving forward with a plan, and we are hopeful that the

17  Debtor will continue to understand the importance of working

18  cooperatively with the Committee to propose a plan the

19  Committee can support, as opposed to one it knows the

20  Committee will take issue with.

21      So, with that, Your Honor, again, we don't have any issue

22  or objection to the entry of the exclusivity order, but I did

23  want to make Your Honor aware of the Committee's views.

24      Second, Your Honor, with respect to mediation, the

25  Committee is supportive of the mediation proposal Mr.

15

1   Pomerantz laid out.  Mr. Pomerantz touched on it, and the

2   Committee has been consistently clear, however, that the

3   mediation should not distract from the task of moving forward

4   with a plan, a plan, as Mr. Pomerantz told you, will be

5   designed to be confirmable even without claim resolution or

6   Mr. Dondero's involvement.

7       The Committee believes that it is important that the

8   claims be addressed first in the mediation, the claim

9   resolution issues, as they believe that that is the

10  appropriate sequencing.  It can all happen as part of the same

11  mediation, but the Committee feels very strongly that the

12  claims should be addressed first in the context of that

13  mediation.

14      And with respect to Mr. Dondero's involvement, the

15  Committee is not opposed to having his involvement and the

16  Committee will negotiate in good faith during the mediation

17  and will be looking to the mediator to help determine the most

18  effective way to involve Mr. Dondero in the process -- again,

19  with the very strong view that the claims should be addressed

20  first in the context of that mediation.

21      That is all I have, Your Honor, but I'm happy, obviously,

22  to answer any questions you have.

23          THE COURT:  Okay.  Let's hear from anyone else.  Any

24  other lawyers want to weigh in?

25          MS. PATEL:  Good afternoon, Your Honor.  Rakhee Patel

16

1   on behalf of Acis.  And I will endeavor to not tread the same

2   ground that Mr. Pomerantz and Mr. Clemente have.  But just to

3   kind of -- probably more so for the benefit of others that are

4   participating in the hearing, because I know Your Honor,

5   you're familiar with our matter, I hit on the two pieces of

6   litigation that I think, you know, bear discussing in the

7   context of mediation.  And by the way, just to be clear, I

8   have -- I have no position different than Mr. Clemente with

9   respect to exclusivity.

10      But as Your Honor is aware, there is a lawsuit involving

11   Acis and Highland Capital Management.  It's an adversary.

12   It's been through various permutations, the first of which

13   started roughly two years ago.  I think we just passed the

14   two-year anniversary of the first adversary that all ended up

15   being consolidated down and added to over time.  And

16   immediately prior to Highland's bankruptcy, that adversary was

17   effectively abated by virtue of the withdrawal of the

18   reference motion that was filed and argued and the Court was

19   writing what I understand to be a lengthy Report and

20   Recommendation in connection with.  And that was then

21   ultimately stayed by Highland's bankruptcy case in October of

22   2019.

23      As Mr. Pomerantz indicated, Highland has now objected to

24   Acis's proof of claim.  That just came roughly about two weeks

25   ago.  And keeping in mind, Your Honor, that Acis's proof of

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 08/20/25   Page 77 of 1017   PageID 2540
Main Document   Page 76 of 772

17

1  claim is its complaint in that adversary that I just

2  referenced.

3      At present, Acis's response is due somewhere around July

4  23rd, I believe, and there is a hearing scheduled on that

5  claim objection on August the 6th.  So a hearing has been set

6  imminently.

7      Mr. Pomerantz and Mr. Couch were very kind to put in a

8  peremptory call immediately prior to the filing, and they

9  advised that they were going to be filing that claim objection

10 and that they were going to be setting it for hearing on

11 August the 6th, and I advised them that I had planned on being

12 on vacation that week, which is all a very long way of saying,

13 Your Honor, I think we're going to have to, in light of

14 mediation, work up an alternate schedule.

15     And I'm confident that we'll be able to reach that

16 alternate schedule, but we'll be keeping the mediation and its

17 scheduling and the parties with schedules in mind.  Because it

18 doesn't seem to make an awful lot of sense to me to be

19 litigating the claim objection before we get to mediation.

20     On the -- on other fronts, and, again, you know, I know

21 Your Honor presided over the Acis case, obviously, for the

22 last two and half years, commencing with the involuntary

23 bankruptcy that touched off that case.  But on the -- on the

24 related front, is, as I advised the Court at the status

25 conference during the Acis status conference, there was a suit

18

 1   that was filed by Acis against Mr. Dondero, certain of

 2   Highland Capital Management's employees, the former treasurer,

 3   Mr. Waterhouse, as well as CLO Holdco, Grant Scott, and

 4   certain of the Independent Directors of Highland CLO Funding.

 5        And, you know, as Your Honor may recall, that suit was

 6   filed to get ahead of the 546 or -- and/or Section 108 time

 7   period cutoff.  But that suit is now pending.  In connection

 8   with that litigation, Your Honor, there has been -- there are

 9   a couple of answers that were filed and there's -- there have

10   been a panoply of motions to dismiss filed as well on various

11   grounds:  Personal jurisdiction -- ranging from personal

12   jurisdiction, subject matter jurisdiction, 12(b)(6) grounds.

13   Kind of a smattering of a whole lot of things.  And all of

14   that bundles together, Your Honor, into a whole lot more

15   litigation.

16        So, in thinking about that piece of litigation and its

17   overall impact on where the parties are, I endeavored to reach

18   out to all of the counsel, the various counsel for the

19   constituent groups therein to talk about what we were going to

20   do with that piece of litigation, certainly now that we are

21   discussing mediation.  And I've had various positive at least

22   preliminary discussions with Mr. Bonds, counsel for Mr.

23   Dondero, and then also Mr. Kane, who is counsel for CLO Holdco

24   and Grant Scott, and they were generally receptive to the

25   concept of an abatement, pending mediation, just, again, so we

Case 3:25-cv-02072-S    Document 5-4    Filed 08/08/25    Page 79 of 1017    PageID 2542

19

1    can put a pin in the litigation, see where we can get to in

2    the context of mediation, if some sort of resolution can be

3    reached that advances the collective ball and hopefully helps

4    to, if not resolve the litigation, perhaps reduce or certainly

5    streamline it.

6        I've reached out to, by email, to counsel for certain of

7    the other employees who are, at present, evaluating that --

8    the request for an agreed abatement, and I've also reached out

9    via email and phone to counsel for the Independent -- the two

10   Independent Directors for Highland CLO Funding.  That's Mr.

11   Maloney and Ms. Matsumora.  And I've not heard from them as

12   yet.

13       So, in connection with that, Your Honor, likely, at least

14   as of right now, my thought is that we would basically be

15   filing a motion tomorrow seeking to abate that piece of

16   litigation in connection with the mediation that we're

17   discussing today, and, of course, depending upon the outcome

18   of today.  And we may seek to expedite that motion to abate if

19   the parties don't agree to extend at least present responsive

20   deadlines, et cetera.  Because, again, it doesn't seem to make

21   an awful lot of sense to be continuing with litigation while

22   everyone is trying to get into resolution mode.

23       So, Your Honor, as you know, Acis has tried to remain

24   consistently in resolution mode, but we hear Your Honor loud

25   and clear and we will endeavor and try and streamline and at

APP 1059

20

1    least give the best-faith effort at trying to get things

2    resolved as expeditiously as possible as we can.

3           THE COURT:  Well, if that is the case, why haven't --

4    why hasn't the Debtor heard back from you on the offer they

5    made two weeks ago?

6           MS. PATEL:  Your Honor, the offer was made after --

7    shortly after the claim objection was filed.  The claim

8    objection itself, Your Honor, is a two-page claim objection.

9    And, frankly, if I turn my camera around, you'd see that I am

10   surrounded by paper.  We are analyzing the claim objection as

11   filed.

12      Your Honor, in terms of talking about Acis's claim, Acis,

13   as you know, has been -- has been attempting to discuss its

14   claim, and even during Acis's bankruptcy case, we engaged in

15   two different mediations to try and resolve the overarching --

16   a lot of the facts that -- and circumstances that underlie the

17   complaint, and those were unsuccessful.

18      Shortly after the Board was appointed -- and by shortly, I

19   mean I think the hearing was in the morning; we ended up -- I

20   and Mr. Terry ended up having lunch with the Board and the

21   Board's counsel to again being fostering a relationship and to

22   begin discussing Acis's claim in earnest.  And we had a

23   lengthy meeting at my offices -- if my memory serves, it was

24   in early February -- with Mr. Nelms and with Mr. Seery.  And

25   then, frankly, didn't hear a whole heck of a lot with respect

21

```
 1   to our claim or any type of negotiation.  So the first thing
 2   that we heard back with respect to it was just a couple of
 3   weeks ago, and Your Honor, we --
 4        (Audio interruptions.)
 5            THE COURT:  Okay.
 6            MS. PATEL:  We will --
 7            THE COURT:  Someone needs to put their phone on mute.
 8   Okay.  Thank you.
 9            MS. PATEL:  Thank you, Your Honor.  We have
10   endeavored -- we have rolled up our sleeves and we are
11   analyzing the claim objection and trying to narrow the issues.
12   And we will be providing a substantive response back to the
13   Debtor as quickly as we can.
14        The settlement proposal, frankly, Your Honor, came in
15   while Mr. Terry was on vacation, so we did have a little bit
16   of time lapse on that.
17            THE COURT:  Okay.  Where are people going on vacation
18   these days?  I can't get anywhere.
19            MS. PATEL:  Your --
20            THE COURT:  I've had to cancel a couple of vacations.
21   I don't know where people are going.
22        But okay.  Well, I'm very disappointed, nevertheless, to
23   hear that there's been zero response in two weeks.
24        Anyone else wish to make a comment before I get to some
25   questions I have?
```

22

1          MR. LYNN:  Your Honor, Michael Lynn for Jim Dondero.

2       This is just a comment.  The Acis v. Dondero, et al. suit

3    parallels in many respects the objection to the claim filed by

4    the Debtor with respect to the Acis claim.  We would probably

5    seek to join in the objection, if for no other reason than to

6    preserve our ability to address factual issues that the two

7    matters have in common, to ensure against a future preclusive

8    effect.

9          THE COURT:  Okay.  Anyone else?

10         MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz

11   again.  I have a couple of comments with respect to Ms.

12   Patel's.  Would you like me to address them now?

13         THE COURT:  Go ahead.  Uh-huh.

14         MR. POMERANTZ:  Okay.  Your Honor, I think it's

15   helpful to the Court to understand sort of the big picture in

16   terms of our discussions with Acis.  Prior to making  a

17   settlement proposal, which, incidentally, occurred before the

18   claim objection was filed, a week or so ago -- well, actually,

19   a few week before that, we had offered to sit down and meet

20   with Acis with respect to their claim.

21       The initial response we received back was that, unless the

22   Guernsey lawsuit was dismissed, they were not interested in

23   sitting down and meeting with us.  We were disappointed in

24   that because, as we have consistently maintained since the

25   Board has taken over, the Board does not control that Guernsey

23

1    lawsuit.  But in any event, that was what Acis's position was.

2        Subsequently, a few weeks after that, we were told that

3    Acis would be willing to sit down and have a discussion with

4    us about their claim, similar to the discussions we had with

5    Redeemer and similar to the discussions we had with UBS.

6        To make that discussion most productive, two and a half

7    days into that -- I certainly realize two and a half days is

8    not a lot of time -- we provided Ms. Patel and Mr. Shaw with a

9    draft of the objection, which was mostly identical to the one

10   that got filed.  There was a couple of minor changes.  We then

11   had a discussion with them.  I'm not going to, of course,

12   reveal the substance of the discussion, but the purpose was to

13   go over our thoughts before it was filed.  And we were told,

14   as Ms. Patel said, that Mr. Terry was on vacation, and we

15   didn't expect, after putting, as Ms. Patel said, a roughly 60-

16   page objection, that they would be able to turn it around.

17   Several days later, we called up Ms. Patel and Mr. Shaw,

18   communicated orally a settlement proposal, told them that a

19   settlement -- told them that an objection would be filed and

20   offered to, at their convenience, to sit down and talk about

21   the claims.

22       We are still hopeful, Your Honor, in light of Ms. Patel's

23   comments that we will receive a response, that we will receive

24   a response.  And to the extent we can narrow the issues down

25   and -- before mediation, I think those ought to be helpful.

Main Document   Page 83 of 272

24

 1       We also spoke to Ms. Patel.  She had indicated she had a

 2   vacation scheduled.  At the time, I think we were starting to

 3   talk about mediation.  And the Debtor has no intention of

 4   mediating while litigating.  We don't believe that's an

 5   effective use of people's time.  So while it is on for August

 6   6th, to the extent Your Honor does order us to mediation and

 7   mediation occurs at the end of August, we would anticipate

 8   that the hearing on the claim objection would be set for some

 9   time in September.  But we are encouraged.

10       We also, after the additional litigations were filed by

11   Ms. Patel against Mr. Dondero and certain of the Debtor's

12   employees, who are still current employees, we had suggested

13   that it might make sense to have an abatement and a stay of

14   those proceedings, given the interrelatedness of those

15   proceedings and the matters in Acis's claim objection.  They

16   initially rejected that, but I'm very happy to hear that their

17   view now is that it does make more sense to try to see if we

18   can coalesce around a mediation process without satellite

19   litigation occurring.

20       So we are -- we are, to the -- we're not a party to that

21   litigation.  We weren't asked.  The first time we had been

22   told that that litigation would be stayed was I heard it just

23   a few minutes ago.  But we are very much in support of that

24   and hope that the parties can coalesce around a mediated

25   resolution as opposed to a litigated resolution.

APP 1964

Case 3:25-cv-02072-S   Document 15-4   Filed 06/30/25   Page 85 of 1017   PageID 2548

25

1          THE COURT:  Okay.  Remind me again the amount of

2     Acis's proof of claim.

3          MR. POMERANTZ:  I will let Ms. Patel answer that

4     because it's a little unclear and there are some -- been

5     disputes in terms of who said what about it.  So I would ask

6     Ms. Patel to remind the Court of what they're claiming.

7          MS. PATEL:  Your Honor, on the face of our -- of the

8     filed proof of claim, it states that the claim is in excess of

9     $75 million.

10         THE COURT:  Okay.  All right.  Anyone else wish to

11    make a statement today?

12       (No response.)

13         THE COURT:  All right.  Well, as I said, I have a few

14    questions, some I came in here with and some sort of popped up

15    in my brain as I heard the presentations today.

16      Mr. Pomerantz, I mean, I feel in many ways I have sort of

17    only a 30,000-foot level understanding of certain things going

18    on outside of the courtroom.  And here's what I mean by that.

19    You made a comment that the Board, you know, had to deal with

20    the destruction of the Debtor's business caused by the

21    pandemic.  I think those were your exact words.  I would like

22    to understand that better, because there was indeed a theme in

23    your motion to extend exclusivity of, you know, one of the

24    reasons we're not where we would like to be at this juncture

25    is, among other things, you know, we had the pandemic hit.

APP 4985

26

1      I don't have a full appreciation of how that has slowed

2   things down.  I mean, I know there was one specific comment

3   that Jefferies issued margin calls and so that caused

4   liquidity issues.  But other than that, I'm not -- I mean,

5   yes, the capital markets fell off a cliff in March, but my

6   impression, naïve as it may be, is that things have kind of

7   bounced back after March.  So, tell me how the pandemic has

8   had an effect in trying to get to resolution of issues and a

9   plan.

10         MR. POMERANTZ:  Absolutely, Your Honor.  So, as I

11  think Your Honor knows in the calls, the Debtor's primary

12  assets consist of two things.  One, public stock that it

13  trades through a proprietary account in its select account,

14  and other stocks, public stocks, which, as Your Honor

15  mentioned, the pandemic roiled the stock market, and for the

16  period of time in March and early April, given the fact that

17  the Debtor had margin accounts, a substantial amount of the

18  time spent primarily by Mr. Seery, who effectively started

19  becoming a CEO at that time -- we'll deal with his motion next

20  week -- if it wasn't for his efforts, his expertise and

21  acumen, the result could have been a lot worse.

22      So he's been spending a lot of time in dealing with

23  Jefferies, because, as Your Honor is aware, with margin

24  accounts, there is really limited protections that are

25  available under the Bankruptcy Code, and the automatic stay

27

1   and other protections don't necessarily apply, and Jefferies

2   could have turned around and sold all the stock.  So the value

3   that was preserved took a lot of time and effort.  That was

4   one area.

5       The second area, Your Honor, is the Debtor's assets also

6   include interests in private equity investments.  A lot of the

7   Debtor's funds that it manages and which the Debtor has

8   significant interest in have a variety of different companies.

9   Each of those companies were dealing with the pandemic in

10  their own different ways, whether it was addressing issues of

11  applying for PPP loans, whether it was addressing employees,

12  there's capital structure issues, each of them are potentially

13  a Chapter 11 making all of their own.

14      So, again, the type of effort and time that it took --

15  again, principally, Mr. Seery, acting as CEO, but also, you

16  know, the other Board members -- was a lot, to stabilize those

17  investments and to make sure that they were not lost through

18  actions by lenders or whatnot.

19      And the third aspect is the Debtor manages funds, still

20  manages funds and actively manages funds.  And managing funds

21  that have principally financial-type assets in this

22  environment has been extremely challenging.

23      As Your Honor accurately mentions, over the last couple

24  months the stock market has come to a little more stability.

25  Whether that will remain is anyone's guess.  And during that

28

1   time, that's when a lot of the efforts that I've mentioned in

2   terms of the claims work has been put back on.  But there was

3   a month or two period during the pandemic, the early stages,

4   that really impacted the Debtor's ability, and it was all-

5   hands-on-deck to address those issues.

6       At the same time, though, Your Honor, our firm was working

7   on the extensive analysis that was required to, for example,

8   address all the legal issues in connection with what I think I

9   recall is a 34-count complaint by Acis; for our firm to get up

10  to speed with respect to the UBS claim, which, as Your Honor

11  heard a few weeks ago, spanned 11 years of litigation; and

12  also to address the issues with Redeemer and be in a position

13  that, as I mentioned before, we have reached a settlement.

14      So, there were a lot of things going on.  We had hoped to

15  be where we are now a couple of months ago.  But I think the

16  Board, under the strong leadership of the Board and the strong

17  leadership of Mr. Seery, has effectively stabilized the

18  operations, and we have now been able to, the last couple of

19  months, really turn to how do we get out of this case, as

20  evidenced by the comments I made with the substantial effort

21  that's been made in the plan and the substantial progress I

22  think has been made on putting the Board in a position to sit

23  down and have meaningful discussions with creditors

24  (inaudible).

25          THE COURT:  Okay.  I mean, again, I don't -- I don't

Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 89 of 1017   PageID 2552

29

1   have a witness here, but, well, remind me, what do we have set

2   July 14th?

3           MR. POMERANTZ:  So, July 14th, Your Honor, we have

4   two motions.  One is a motion to appoint Jim Seery as the

5   chief executive officer.  Again, I will talk more about it in

6   connection with that hearing.  If Your Honor recalls, as part

7   of the term sheet in January, there was a recognition by the

8   Committee and by the Debtor that instilling the Board was

9   obviously critical.  It was critical to avoid this case going

10  into a different direction.  And I think there was a

11  recognition that it would be important that somebody stepped

12  up and become the CEO.

13      It was too early to tell whether that somebody would come

14  from the Debtor's board, the newly-installed board, or someone

15  else, but there was a contemplated process.  And while the

16  first couple of months of the case were spent, again, on

17  stabilizing operations, I think starting in mid-March and as

18  we went on it was pretty clear that, of the three people on

19  the Board, while all of them are providing invaluable services

20  in leading the Debtor to where it is now, Mr. Seery was

21  stepping up primarily because of his significant operational

22  background in connection with these types of assets.  And he

23  has essentially been working a couple hundred hours a month or

24  thereabouts over the last few months doing the things I just

25  alluded to, and the Debtor has determined to seek his

APP 1089

30

1   retention as a CEO.  Has had discussion with the Committee on

2   terms.  They're not all finalized or resolved yet, but that

3   hopefully will be uncontested by the 14th.

4        Mr. Seery will also undertake the role of chief

5   restructuring officer, which, as Your Honor recalls, we

6   already have Brad Sharp as -- from DSI as chief restructuring

7   officer.  They will essentially become financial advisor.  DSI

8   has provided a valuable role to the Board and to counsel in

9   this case.  But given that Mr. Seery will, if the Court

10  approves the motion, become the CEO, it would make sense that

11  he be the CRO as well, so it's a separate motion to

12  essentially transmute the DSI representation from a CRO

13  representation to a financial advisor representation.  So the

14  two matters are on, Your Honor, but I've --

15            THE COURT:  Okay.

16            MR. POMERANTZ:  -- given Your Honor a preview.

17            THE COURT:  Well, I'd like to hear testimony from

18  both of them on the 14th, Mr. Seery and Mr. Sharp.

19       Again, I -- I mean, ideally, we would have evidence at a

20  hearing on a motion to extend exclusivity.  And I understand

21  you didn't have any objections, you worked out essentially an

22  agreement with the Committee.  So, I mean, I understand you

23  didn't necessarily think that evidence would be needed.

24       But I, again, you know, my understanding is 30,000-foot

25  level.  I'm just trying to understand, you know, with three

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 16-4 Filed 08/06/25   Page 91 of 1017    PageID 2554
Main Document    Page 90 of 273

31

1    wonderful independent board members and with a CRO and all

2    these fantastic professionals, it just feels like we -- you

3    know, multiple things could be going on at once, and I kind of

4    feel like, you know, January 9th, six months ago, we had the

5    independent board installed.  We had the protocol order with

6    the Committee worked out, you know, which we call it a

7    settlement, but it was mostly a mechanism to allow the

8    Committee to have oversight and monitoring.  And it just feels

9    like, January 9th, okay, then we were in a position to really

10   start focusing on these big claims.  We knew it was Acis and

11   we knew it was UBS, even though the bar date hadn't hit.  And

12   it feels like to me we've -- I shouldn't say bought a lot of

13   time, but a lot of time has gone by for not as many results as

14   I would like.

15       Tell me why I'm being unfair.  And, again, I go back to,

16   okay, if it's the pandemic, help me to understand what it was

17   about.  You know, I kind of got scared by that phrase you

18   used, destruction to the Debtor's business caused by the

19   pandemic.  I mean, I guess part of what I'm getting at here

20   is, Has there been a massive loss of value by the Debtor

21   caused by the pandemic, and that has been sort of a halting

22   event to being able to talk about a plan?

23            MR. POMERANTZ:  Well, Your Honor, I believe, and I

24   actually went back to my notes, and I think I said disruption.

25   I didn't say destruction.

Case 3:25-cv-02072-S   Document 16-4 Filed 09/03/25   Page 92 of 1017   PageID 2555

32

1          THE COURT:  Oh.

2          MR. POMERANTZ:  And if Your Honor heard destruction,

3     --

4          THE COURT:  I heard destruction.  Maybe I --

5          MR. POMERANTZ:  -- or if I misspoke, I apologize.

6     But there wasn't any implication of a destruction in the

7     Debtor's business.  Again, financial assets did take a hit.

8     There were some concerns in how, you know, to monetize those

9     assets, the stock assets, and working through the Jefferies

10    issues as well as the private equity issues.

11         And look, Your Honor:  When the Board took over on January

12    9th, I think they recognized soon after their appointment that

13    there was a lot of stuff to do.  There was -- it was a really

14    steep learning curve.  Highland, as people have described it

15    in the hearings in this case, is an extremely complicated

16    structure of companies.

17         So, yes, perhaps things could have moved a little quicker.

18    Your Honor does recall the early stages of the case, we dealt

19    with motions for the appointment of a trustee by the United

20    States Trustee.  There was other litigation over retention of

21    professionals and others, which, you know, Your Honor has

22    commented about in the past, and I think we're past that and

23    beyond that.  But there has been a lot of work.

24         And, again, on the claims work, the Board, to be

25    independent, did not want to rely on the employees of the

33

1    Debtor in evaluating the various claims.  So that took a lot

2    of time and effort.

3        So, you know, look, I think you could look at it two ways.

4    One way you could look at it, that it's been pending six

5    months and we don't have a plan yet, we don't have the claims

6    resolution.  I would -- and I tend to be a glass-is-half-full

7    type of person -- I think the message that we are hearing

8    today is that the plan process is on track.  We have resolved

9    one of the three major litigation claims.  We have coalesced

10   around a mediation process that people can get behind and

11   hopefully have concluded at the end of August.  That the

12   process is going to include not only the inbound claims

13   against the company but potentially the claims by the company

14   against some of the targets.

15       I think there is reason for optimism at this point in the

16   case.  And while, you know, I wish it was May and we were

17   having this discussion, not July, I still think there has been

18   a lot of groundwork that was prepared to get to the place

19   we're here.  And, you know, the Board is laser-focused on

20   getting results, and getting results quick.

21            THE COURT:  Okay.  Let me follow on about the

22   agreement in principle on the Redeemer claim.  They had an

23   arbitration award.  So that doesn't sound like a major

24   milestone to me, to be honest.  Tell me why I'm wrong about

25   that.  They had an arbitration award.

Case 3:25-cv-02072-S   Document 15-4   Filed 06/05/25   Page 94 of 1017   PageID 2557

34

1          MR. POMERANTZ:  Sure.  Your Honor, they do have an

2     arbitration award, but there are several aspects of the

3     arbitration award that needed negotiation and resolution.  A

4     significant part of the arbitration award was the Debtor's

5     obligation to repurchase some Cornerstone shares that Redeemer

6     had for a certain dollar amount.  Well, obviously, the Debtor

7     in bankruptcy doesn't have the ability to write a check to

8     repurchase it.

9          There was issues on the Debtor's ability to ultimately

10    recoup different fees that the arbitrator had determined had

11    been taken inappropriately that had to be repaid, and to what

12    extent the Debtor would be entitled to a credit.

13         So, by no means am I telling Your Honor that the Redeemer

14    claims and issues were as difficult as the Acis and UBS claims

15    and issues.  But there were a variety of issues, there were a

16    variety of matters that had to be discussed.  You know, we

17    worked cooperatively with Redeemer and with Jenner & Block.

18    And we, again, have reached a resolution that is going to

19    provide a face amount of a claim which is materially less than

20    the claim that was on file.

21         But Your Honor, by no means am I trying to convince Your

22    Honor that this was the same type of work that needed to go

23    into -- resolve the others.  But having said that, getting

24    that claim resolved, which the Debtor believes is the largest

25    legitimate claim against this estate, I think is an important

APP 1074

35

 1   step forward that will lead towards hopefully the confirmation

 2   of a plan and hopefully spur on efforts from all the parties

 3   -- Acis, UBS, and the Debtor -- to try to make the same type

 4   of progress in their claims.

 5        THE COURT:  Okay.  All right.  My next question is, I

 6   mean, you've talked about -- I think it was the previous

 7   hearing I heard you say a term sheet had been provided to the

 8   Committee or going back and forth.  I mean, help me to

 9   understand what you're envisioning the plan is going to look

10   like in this case.  I mean, I know there's a wide swing

11   between UBS being owed a billion dollars and being owed

12   nothing, and Acis being owed $70 million versus, you know,

13   nothing or wherever you think the number should be, or the

14   Debtor's board thinks the number should be.  I know, you know,

15   these are giant questions.  But can you answer for me what

16   you're envisioning?

17       I mean, again, one of the pleadings said, you know, the

18   plan should provide for orderly monetization of assets,

19   provide for a process for resolution of claims, and pursue

20   causes of action.  I mean, again, that's kind of 30,000-foot

21   stuff.  Tell me what you're envisioning.

22        MR. POMERANTZ:  Sure.  So, Your Honor, just to take a

23   step back, we -- this case was filed not necessarily for the

24   traditional reason that cases are filed.  There weren't operational

25   fixes that needed to be done at the business.

36

1          THE COURT:  Right.

2          MR. POMERANTZ:  There wasn't a capital structure that

3    needed to be revised.

4          THE COURT:  Right.

5          MR. POMERANTZ:  Right?  So, as everyone knows, the case

6    was filed because the Redeemer Committee got its arbitration award,

7    to prevent execution on that.  Okay?

8        We also had a very complicated business.  There are not many, I

9    think, examples of asset managers around the country of the type of

10   Highland Capital that actually go through a Chapter 11.  And it

11   caused a tremendous amount of upheaval, of issues.  Your Honor,

12   we've been dealing with the protocols on a daily basis with the

13   Committee.  Your Honor has seen some of that.

14       So while the hope was, from the beginning of the case, to end

15   this case in a nice, tidy bow, get a resolution that would not only

16   resolve everyone's claims but also try to resolve the claims that

17   the estate had against third parties, as time was going by the

18   parties realized that there was nothing more bankruptcy could

19   provide this company.  This company right now has litigation issues

20   to deal with that can be resolved with the help of the Bankruptcy

21   Court, as appropriate, in connection with the claims process.  And

22   the Board -- and the Committee, for that matter -- were looking at

23   the substantial amount of fees that were being incurred by the

24   Debtor professionals and the Committee professionals which were

25   draining liquidity from the company and started to think, How can we

37

 1    exit this case?  Even if we can't get what has been referred to by

 2    people as a grand bargain, how can we exit this case quickly and

 3    efficiently?

 4        So what really has to be done in terms of exiting the case?

 5    Coming up with a way to monetize the assets, a structure in which

 6    those assets can be monetized; not doing anything in the context of

 7    a plan process that would in any way interfere with the

 8    estate's obligations under the Advisers Act with the SEC or

 9    otherwise; and coming up with a governance structure of who's

10    going to govern that.

11        So the plan that is currently contemplated -- and it's

12    more than a term sheet, Your Honor.  We have had numerous

13    versions of the plan go back and forth.  We are right now

14    waiting.  The pen is in the hand of the Committee.  We think

15    we are very close to having a form of a plan and a form of a

16    disclosure statement that would essentially contemplate some

17    type of trust vehicle that would monetize the assets.  And the

18    structure of how that trust would work, whether it's one

19    trust, whether it's two, whether it's one trustee, whether

20    it's two, how that trust would be governed, who would be on

21    the governing board:  Those are all issues that are currently

22    being worked out.

23        At the same time, the company is doing a thorough analysis

24    of every contract and every asset, to make sure that

25    assignment provisions and contract provisions and regulatory

38

1    issues, that we don't somehow trip up in connection with the

2    plan process.

3        So, essentially, at its core and at its minimum, it will

4    be transferring the assets into a monetization vehicle, some

5    type of trust vehicle, which, again, the corporate and

6    regulatory lawyers are working with us, with the bankruptcy

7    lawyers, to figure out the appropriate way, given the nature

8    of the Debtor's business, having an oversight board that has,

9    you know, creditor support.  And if you ask Mr. Clemente,

10   it'll be total creditor identification of the people, which we

11   are in discussions of what the Board looks like after.  And

12   monetization over time, and a way to resolve the claims over

13   time.

14       So that is essentially the concept.  Again, to the extent

15   we can resolve the claims soon, to the extent we can work on a

16   negotiation with Mr. Dondero to bring in liquidity so that

17   creditors will not have to wait for the monetization of the

18   assets, which a lot of these assets are not assets that are

19   easily monetizable and it will take some time.  But it is --

20   the Debtor feels strongly and I think the Committee feels

21   equally as strongly that emerging from Chapter 11 with some

22   type of vehicle to monetize the assets, governance and

23   control, and a way to resolve remaining claims, that is the

24   minimum that can and should be accomplished and that the

25   Debtor is committed to accomplishing in short order.

APP 1078

39

1    If something else comes out of it where we get more,

2    again, where the claims are resolved or where we have a grand

3    bargain with Mr. Dondero, that's something we're going to

4    strive for.  But at a minimum, it needs to be an asset

5    monetization vehicle, governance, and a way to -- a structure

6    to resolve claims.

7            THE COURT:  Okay.  Asset monetization vehicle.  You

8    know, subject to regulatory lawyers and corporate lawyers

9    figuring out the exact mechanics, you're saying essentially

10   put the business of Highland into a trust or trusts, and then,

11   I guess, from cash flow of the business over time, the

12   creditors would be paid?  Or are you saying something more

13   than that?

14           MR. POMERANTZ:  Well, again, I think it's on an

15   asset-by-asset basis.  And, you know, Mr. Seery, you know, is

16   -- has become very familiar with all the assets, now has a --

17   ideas in mind which he's shared with the Board on how to best

18   monetize the assets.  Some assets, there may be a quick sale.

19   Some assets, it may be over time.  So it's a combination.

20    This is not going to be a fire sale of the Debtor's

21   assets.  It's not in the best interest of the Debtor, we

22   believe.  It's not in the best interest of the creditors.  We

23   don't think anyone is in favor of that.  It's dealing with

24   each of the assets in an appropriate manner and figuring out

25   how to monetize them, recognizing that given -- even though

APP 1079

40

1    the stock market has bounced back, the market for privately-

2    owned businesses may not have bounced back as much.

3        So it's figuring out with the appropriate people,

4    appropriate governance structure, how best to monetize those

5    assets, recognizing that creditors want to be paid and they're

6    -- they don't want to be in the business of long-term holds.

7    So, the Debtor gets that.  But it's really being a thoughtful

8    approach on how to get the best value from those assets.

9        THE COURT:  Okay.  There's nothing, though, being

10   discussed as far as a big chunk of cash distribution up front,

11   unless Dondero comes up with it?

12       MR. POMERANTZ:  Well, potentially.  I mean,

13   potentially, Mr. Dondero is a potential source of liquidity.

14   There are some significant assets that may be able to be

15   liquidated sooner rather than later.  So it's something that's

16   in discussion.

17       But the lion's share of the value for creditors is likely

18   going to come over time, unless there is someone who, like Mr.

19   Dondero, who is essentially willing to buy back the company.

20   And that is something that's being explored.

21       So, look, we've had a lot of transparency with the

22   Committee.  We have weekly meetings, the Board and the

23   Committee.  We just started a few weeks ago.  I think the

24   professionals are working together.  They understand what the

25   assets are in the estate.  So, to that end, I think we have

41

1    been working very cooperatively with our creditors over the

2    last few months and we're just seeking to do it the best way.

3         So nothing I've said today, nothing, you know, should come

4    as and will come as a surprise to the Committee, but we're

5    working better, recognizing that ultimately the creditors want

6    to be paid, and doing that in an appropriate manner and a

7    thoughtful manner is what the Debtor is committed to do with

8    its partner, the Committee, in this process.

9              THE COURT:  Okay.  Sort of jumping back, I forgot to

10   ask earlier when we were talking about Acis:  Has the Fifth

11   Circuit rescheduled oral argument on the appeal of the Acis

12   confirmation order and order for relief?

13             MR. POMERANTZ:  I believe -- Your Honor, maybe Ms.

14   Patel would know off the top of her head.

15             THE COURT:  Ms. Patel?

16             MS. PATEL:  Your Honor, it was -- it was briefly -- I

17   -- and I say briefly, it was briefly we had -- we got a notice

18   at some point, I believe in early June, that the Fifth Circuit

19   had reset oral argument.  And then approximately, I can't

20   remember exactly, but it was like, I don't know, a week or

21   maybe ten days later, we got a notice that it was cancelled

22   again.  We have not received notice that it is rescheduled, so

23   it is still pending.  But it has not been taken off oral -- it

24   has not been taken off oral argument at some juncture.

25             THE COURT:  Okay.  Well, I acknowledge that that is a

APP 1081

42

1    pandemic disruption for sure.  It would have been nice to have

2    that resolved one way or another by now.

3            MS. PATEL:  Agreed, Your Honor.  We were trying to

4    figure out, frankly, in the week to ten days that it took from

5    the scheduling to how it was cancelled, exactly how our team

6    was going to get down to New Orleans.  And the -- I think the

7    leading contender was to rent an RV and drive down so we could

8    safely get there.  So it certainly has been a casualty of the

9    pandemic.

10           THE COURT:  Okay.  All right.  Two more questions.

11   And this one has been a bit of a tough one for me to decide

12   whether I should broach this topic or not.  You know, I read

13   the newspapers, the financial papers, just like everyone else,

14   and I saw a headline that I wished almost I wouldn't have

15   seen, and it was a headline about Dondero or Highland

16   affiliates getting three PPP loans.  And, you know, I'm only

17   supposed to consider evidence I hear in the courtroom, right,

18   or things I hear in the courtroom, but I've got this

19   extrajudicial knowledge right now thanks to just keeping up on

20   current events.  I decided I needed to ask about this.

21       What can you tell me about this, Mr. Pomerantz?  I mean, I

22   assumed, from less-than-clear reporting, that it wasn't

23   Highland Capital Management, LP, but I'd like to hear anything

24   you can report about this.

25           MR. POMERANTZ:  So, look, Your Honor, the first I

APP 1982

43

1   could say is that, to my knowledge, Highland Capital, the

2   Debtor, has not obtained a PPP loan.  I know there have been

3   discussions with certain funds that basically have certain

4   assets, private operating companies, about obtaining PPP

5   loans.  I don't have the specifics for Your Honor.  I'm happy

6   to provide that.

7        Of course, to the extent Mr. Dondero, on any of his

8   affiliated funds that are under the control of the Debtor, I

9   would have no way of answering that, but I'm happy to follow

10  up with that with the Board and report back to Your Honor in

11  whatever appropriate manner you felt to obtain that

12  information.

13            THE COURT:  Okay.  Well, let's have a report on that

14  on the 14th when we come in.  You know, maybe Mr. Seery or Mr.

15  Sharp or some other person.  But you can probably imagine the

16  different things going through my brain.  You know, well,

17  first, let's see if it was -- you know, I don't -- again, I'm

18  not expecting it to be Highland Capital Management, LP.  I

19  would be beyond shocked if, you know, that somehow happened

20  when they're in bankruptcy.  And, you know, I think it would

21  require a 364 motion, just like any other borrowing, although

22  I know it's kind of a forgivable loan.  Strange bird.

23        But then if it's some affiliate of Highland, I still feel

24  like we need some transparency and disclosure on that.  I

25  mean, I -- and who were the human beings behind it.  It just

44

1   raises a lot of questions in my brain.  Anything else?

2          MR. POMERANTZ:  Your Honor, would you mind saying

3   what newspaper you found it in?  Because not everything one

4   reads in the newspaper is accurate, but we will definitely --

5          THE COURT:  Oh, yeah.  I know --

6          MR. POMERANTZ:  -- follow up on it and --

7          THE COURT:  Fake news really is a thing.

8          MR. POMERANTZ:  I didn't say fake news.

9          THE COURT:  Oh, I know, I know.  It's not really a

10  good term.  But *Business Insider*?  Is that reputable?  Or no?

11  I thought I saw it in one of the local papers, too.  I mean,

12  someone tell me if that's, --

13         MR. POMERANTZ:  We -- we --

14         THE COURT:  -- you know, something unreliable.

15         MR. POMERANTZ:  We will investigate it, Your Honor.

16  I don't know what confidentiality restrictions would be on

17  whether if any of those entities -- but we will get the

18  information.  If there's any concern on confidentiality,

19  perhaps we could have an *in-camera* on that.  But before we get

20  ahead of ourselves, let me broach the issue with the Board and

21  Mr. Sharp and then be in a position to act and respond more

22  intelligently.

23         THE COURT:  Okay.  My last topic is to come back to

24  mediation.  I was surprised that Judge Jones' or Judge Isgur's

25  staff expressed that they had availability.  They are the

APP 1984

45

1  busiest judges in the country right now.  I'm wondering when

2  were they contacted.  Was it really recently, or a week or two

3  ago?  Because they've probably gotten ten new mega-cases in

4  the past two weeks.

5          MR. POMERANTZ:  So, Your Honor, the last -- the last

6  two weeks, again, probably since June 15th, we had been

7  discussing the structure of a mediation.  We, the Debtor,

8  proposed perhaps a combination of Judge Isgur and Jones.  We

9  initially had that conversation with Mr. Clemente, and then we

10  socialized it with the rest of the Committee members.  As of

11  last Thursday, I believe it was, we had consensus that Judge

12  Jones, and if available, also Judge Isgur, would make sense.

13      I sent an email to Judge Jones' clerk, indicating that we

14  had a hearing today, that it would be helpful if we got a

15  response, and this morning, two hours before the hearing,

16  Judge Jones' clerk responded and told Mr. Clemente and I that

17  he is available and ready and suggested that we have a

18  conference with -- again, I'm not sure if it'll be him or his

19  clerk, to talk about availability.  Of course, we didn't want

20  to go ahead and have that discussion until, you know, we got

21  Your Honor's input on it.

22          THE COURT:  Okay.  I mean, a couple of things come to

23  mind.  One is I am just flabbergasted that they would have any

24  availability.  I know they're -- I'm aware of Judge Jones

25  doing hearings on weekends.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 09/06/25    Page 106 of 1017    PageID 2569
Main Document    Page 6089 of 2722

46

1    But second, I'm also concerned what is their idea of

2    availability.  Because in order for a mediator to meaningfully

3    help you on this, I mean, it's going to take not just hours

4    but days of time, unless you want the mediator to just have a

5    30,000-foot view.  And I mean, I just cannot imagine, --

6              MR. POMERANTZ:  So, --

7              THE COURT:  -- once again, that they would have days

8    and days to come up to speed with, you know, 11 years of

9    litigation or however long it was, not that long, with UBS,

10   you know the years with Acis, you know, the various alleged

11   claims and causes of action, and, you know, the Byzantine

12   structure here.  I mean, you know, not that they have to be,

13   you know, as educated as a judge presiding over litigated

14   matters, but I just cannot imagine they could meaningfully

15   spend time on this.

16        So what are you all envisioning?  Because I know what I'm

17   envisioning, and maybe we're not seeing it the same way.  I

18   mean, what are you thinking?  That you'll go in and spend a

19   day with, you know, maybe just each of you doing a 25-page

20   white paper, and you'll either settle it by the end of the day

21   or not, or what?

22             MR. POMERANTZ:  So, let me start by saying that when

23   everyone raised the issue of Judge Jones and Isgur, everyone

24   had the same potential concern that Your Honor has mentioned.

25   You know, my firm and me personally, I'm involved in a couple

47

 1   of cases before Judge Jones now, significant cases.  So there

 2   was a concern.

 3      I think people also generally thought that if they

 4   accepted and they knew what they were getting into, they would

 5   want to do a good job and they'd have the time.

 6      We have not had the ability to have an extensive

 7   discussion.  That discussion could either occur with Mr.

 8   Clemente and myself speaking to the clerk or the judge, or if

 9   Your Honor -- nothing stops Your Honor from picking up the

10   phone, speaking to Judge Jones and asking him as well.

11      But I expect it to be a very intensive mediation process.

12   I do understand that Judge Jones only does mediations in

13   person, so this would require people getting to Houston,

14   which, in my experience, while I have participated in

15   mediations virtually on the phone, it's a lot more effective

16   to be in person.  We would anticipate detailed mediation

17   briefs.  We would envision each of the parties speaking to

18   Judge Jones to give him their perspective.  But it would be --

19   it would be a significant assignment.

20      Again, whether we would conclude at the end of August, I

21   don't know, but I would contemplate a good two, three days of

22   in-person mediation at the end of August, and then probably,

23   if necessary, to set up for something else, which, again,

24   there are several different things.  And I mentioned in my

25   opening remarks why I think people like Judge Jones -- and

48

1   this is also why we thought about Judge Isgur as well -- it's

2   not often you have two mediators, but two mediators,

3   especially judges who work together and who are pretty adept

4   at mediation, I mean, you know, having a bankruptcy judge be a

5   mediator is fine, but Judge Jones and Isgur, they have done a

6   lot of that, and I understand have continued to do that,

7   notwithstanding themselves getting busy.

8        So I can't answer Your Honor's question of whether they

9   know what they are getting themselves into.  I would hope that

10  by, again, a combination, or Mr. Clemente and I speaking to

11  them or Your Honor speaking to them, they would understand.

12  And if they are willing to do it -- obviously, Highland is a

13  high-profile case; I know judges, sitting judges, often like

14  to help out their brethren who are sitting on the bench.  So

15  if they are ready and able to do it, we'd think we'll have

16  lucked out, and we think they would be great to aid the

17  process.

18       If for some reason they don't really appreciate or if

19  Judge Jones doesn't appreciate what it is, then we can go back

20  to square one, and, you know, I'm sure find other people as

21  well.  But we'd like to sort of give it a shot.

22            THE COURT:  Okay.

23            MR. BJORK:  Your Honor?

24            THE COURT:  Yes?

25            MR. BJORK:  May I be heard?  This is Jeff Bjork with

49

1    Latham, hi, on behalf of UBS.  I apologize.  I just wanted to

2    say that, from our perspective, we have concern, we raised

3    this concern about Judge Jones or Isgur having the time to

4    really evaluate the claims.  I mean, as you noted, our claim

5    is complex, to say the least.  So is Acis's.  There's a lot of

6    history behind it.

7        And so while we appreciate the fact that there is a

8    mediation process that will be moving forward, we have raised

9    the prospect of having a separate mediator like Dan Weinstein

10   or someone of that ilk to serve as a mediator with respect to

11   our claim dispute, with the goal of trying to advance that in

12   advance of August.

13       So we have put that out to the Debtors.  We raised that

14   today in advance of this hearing.  We're happy to progress

15   that discussion.  But I wanted you to understand, from our

16   perspective, we share your concern.

17               THE COURT:  Okay.  Anyone else?

18               MR. POMERANTZ:  So, just on that, Your Honor, --

19               THE COURT:  Uh-huh.

20               MR. POMERANTZ:  -- you know, we understood UBS's

21   view.  We believe each of the other Committee members and the

22   Committee believe Judge Jones would be the appropriate person.

23   And, again, I think we're all I think somewhat in the dark

24   here, and I think the next step is to really find out the time

25   that they have available to devote to it.  And, again, if they

001862
APP 1089

50

```
 1   have the time to devote to it, I don't think Mr. Bjork could

 2   challenge that Judge Jones would be an excellent mediator and

 3   excellent to resolve a complicated issue like the UBS claim.

 4          THE COURT:  Uh-huh.  But you all cannot go down to

 5   Houston live anytime in the near future.  I don't know if

 6   you're reading.  Houston is pretty much like New York was two

 7   months ago.  It's -- well, the death rate is not as terrible

 8   because it's younger people getting it, but it's the hotspot

 9   for coronavirus right now.  And --

10          MR. POMERANTZ:  And we understand that, Your Honor.

11          THE COURT:  Uh-huh.

12          MR. POMERANTZ:  And, again, you know, we're sitting

13   here on July 8th.  A lot could change by August 25th.  A lot

14   couldn't change.  I'm not, you know, I'm not sure there are

15   other places in the country people like to travel to more.  I

16   mean, you know, --

17          THE COURT:  Uh-huh.

18          MR. POMERANTZ:  -- there are several places that are

19   hotspots.  It may be challenging to do an in-person mediation.

20   I know on the Debtor's side we are committed to make it

21   happen.  I might just ask Ms. Patel if she has the number of

22   the RV company she was going to -- because maybe that's an

23   appropriate way to get there.

24          THE COURT:  All right.  So, well, let's see.  I was

25   going to say you'd be quarantined 14 days after, but you're in
```

51

1    California, not New York.  New York, you know, has quarantined

2    --

3            MR. POMERANTZ:  Yes.

4            THE COURT:  -- people traveling from Texas.  Well,

5    and remind me:  August 25th.  That was just sort of an

6    internal target date you all had created?

7            MR. POMERANTZ:  Yeah.  It was around, you know,

8    again, the end of August, you know, that we'd, you know, do

9    around that time.

10           THE COURT:  Uh-huh.  All right.  You know, I'm --

11   I've been talking to lawyers in different cases, where the

12   topic of mediation is being discussed, about more and more

13   mediators, and this is private mediators, are becoming very

14   adept with Zoom mediation.  And what I thought was noteworthy

15   -- I hadn't thought through this, you know.  I thought, well,

16   you can do mediation like this.  You know, if you can do court

17   by video, why can't you do mediation by video, what's the big

18   deal?  But there are private mediators who apparently have

19   become every adept very fast at having these separate caucus

20   rooms, okay?  So when you have mediation involving, you know,

21   12 different constituencies, you know, the mediator will close

22   out all the other conference rooms and go to these three

23   people, and then close that out and go to these eight people

24   in this other room.  And it just really hadn't occurred to me

25   that, oh, if you're not live and in person, how do you that,

APP 4094

1   you know, the going back and forth from room to room?  And

2   they've got some tricks worked out where some of them are

3   doing that.  And I just don't know that any sitting judges are

4   going to have that all worked out.

5       I have a couple of names in mind.  And I have not talked

6   to either of these folks, but I had thought of these people.

7   You know, they're going to cost you money.  They're not going

8   to be free mediators like Judge Jones and Judge Isgur.  But

9   two people.  One, I had thought of retired Judge Jim Peck.  I

10   don't know if he has availability, or, you know, a conflict or

11   anything like that, but he's someone I happened to have gone

12   to baby judge school with back in 2006, and, you know, have

13   somewhat of a friendship with him.  And I thought of him

14   because not only does he have a personality that I think might

15   fit this situation, but, as you know if you ever had a case

16   with him, I mean, he's just so very smart.  You know, he dealt

17   -- handled the *Lehman* case.  You know, he's not going to be --

18   he'll be a very quick study, is what I'm thinking, as far as

19   whatever factual background he would need to assemble to get

20   up to speed.

21       And, again, I just worry -- and I'm going to get on the

22   phone and talk to Judge Jones and Judge Isgur -- but I'm just

23   really worried if they will devote the amount of time for this

24   to have a meaningful shot at settling.

25       Another name I thought of is a lawyer in Houston who was

APP 1092

53

1    at Weil Gotshal many years, Sylvia Mayer.  I don't know if any

2    of you know her, but she pretty much does mediation and

3    arbitration full-time now, and she is one of the people I am

4    aware has mastered this Zoom separate conference rooms.  So,

5    once again, you know, a very quick study, I think, my

6    impression from past dealings with her.

7         There may be many other names we could add to that list,

8    but you might want to all kind of talk offline about those as

9    well.

10        But here's what I want to do.

11        (Audio interruption.)

12            THE COURT:  Was someone wanting to speak up?

13        Okay.  I am going to think on this more between now and

14   the 14th.  And, again, I'm going to be reaching out to Isgur

15   and Jones, and might reach out to Jim Peck and Sylvia Mayer as

16   well, just to have a lot of options out there.  And then we'll

17   talk on the 14th about what my research has revealed in

18   talking to these folks.

19        So, everyone, just let's continue to think on this

20   mediation thing.  But, again, I want this to be meaningful.

21   I'm very worried that, you know, if all you get is one day,

22   even a long day, with these folks, that it's just not at all

23   realistic that there would be a chance at settling.  So I've

24   really got to think on this.

25        As far as the motions before the Court, I'm going to grant

54

 1   the motion to extend exclusivity for 30 days.  Okay?  So,

 2   August 12th.  And no potential add-ons for two 30-day

 3   additional extensions, which, you know, the mechanism, I think

 4   you were hoping not to have to come back to the Court, that if

 5   the Committee agreed, you know, you could just automatically

 6   get up to 90 days.  I'm not quite clear.  But the point is I'm

 7   just extending to August 12th, and for now that's all I'm

 8   going to do.  Okay?

 9          MR. POMERANTZ:  Understood, Your Honor.

10          THE COURT:  And we didn't talk about the other

11   motion.  That was sort of a no-brainer, I think, as far as

12   everyone was probably concerned, the motion to extend the

13   period to remove actions.  The current deadline is July 14th.

14   You're wanting to extend that out to January 14th, 2021,

15   correct?

16          MR. POMERANTZ:  Correct, Your Honor.

17          THE COURT:  All right.  Is there anyone who wanted to

18   say anything about that one?

19      (No response.)

20          THE COURT:  All right.  So that -- I think there's

21   good cause to grant that motion as well.

22      The only other thing --

23          MR. POMERANTZ:  Your Honor, one --

24          THE COURT:  Okay.

25          MR. POMERANTZ:  One comment on what Your Honor said

55

1   about mediation.  Again, I had a dialog with Albert, Judge

2   Jones' clerk.  We may want to get him on the phone, Mr.

3   Clemente and I.  Of course, we won't do it if Your Honor

4   doesn't think it's helpful.  But it might be helpful.  And,

5   again, I didn't know if that was going to be with Judge Jones

6   or if it was going to be with just his clerk, to talk about

7   days or whatnot.

8       But we'd be happy to get on the phone in order to give him

9   the parties' perspective, which, look, we all agree this has

10  to be a meaningful mediation.  And perhaps hearing it also

11  from us in terms of what we expect and what we contemplate and

12  what we think the issues might be and whatnot could be

13  helpful.

14      If Your Honor doesn't want us to do that, that's fine.

15  But since I suspect his clerk will get back to me and say "Are

16  you available?" to Mr. Clemente and I, I just didn't want to

17  step on any toes and I wanted to check with Your Honor whether

18  you want us to take that call or not.

19          THE COURT:  Okay.  I got a little confused.  You're

20  asking for a blessing to kind of continue the dialogue you've

21  already started with their offices?

22          MR. POMERANTZ:  Well, I'm just asking.  Again, I

23  don't want to be presumptuous.

24          THE COURT:  Uh-huh.

25          MR. POMERANTZ:  The fact that Your Honor is calling

56

 1   Judge Jones is important.  But I expect Judge Jones' clerk to

 2   get back to us and say, "Are you available to have a

 3   conversation?"  And I just want to know what Your Honor's

 4   pleasure is in terms of whether we should have it or not.  I

 5   think it might be helpful, but if Your Honor says, okay,

 6   you've brought it here, you want to take it over from here, I

 7   would obviously respect that.  But just, just wanted to come

 8   out of this hearing clear on what your expectations are in

 9   terms of that communication.

10            THE COURT:  Okay.  I'll take it from here.  And if

11   they call back, just say, you know, I understand Judge

12   Jernigan is going to be calling Judge Jones directly.  And so

13   -- but I'll get on the phone this afternoon, so hopefully

14   there won't be any awkwardness on that.

15            MR. POMERANTZ:  Thank you, Your Honor.

16            THE COURT:  All right.  Anything else?

17       The only other thing I was going to tie back to is I fully

18   expect that there would be across-the-board agreement to abate

19   the Acis newly-filed adversary, so I hope I would -- I don't

20   even remember who all the defendants are, but please make that

21   a priority, talking about that in the next few days, and

22   report to me on that on the 14th.  Okay?  Ms. Patel?

23            MS. PATEL:  From Acis's perspective, yes, Your Honor,

24   will do.  I'm on -- I'm all over it.

25            THE COURT:  Okay.  All right.  Well, if there's

57

1 nothing else, we'll go ahead and adjourn for today. And I'll

2 keep -- if there's anything worthwhile to report on the

3 mediation front before we have our hearing on the 14th, I'll

4 have my courtroom deputy reach out to all counsel by email and

5 let you know. Okay? All right.

6       MR. POMERANTZ: Thank you very much, Your Honor.

7       MS. PATEL: Thank you, Your Honor.

8       THE COURT: Thank you. We stand adjourned.

9       THE CLERK: All rise.

10    (Proceedings concluded at 3:00 p.m.)

11               --oOo--

12

13

14

15

16

17

18

19                CERTIFICATE

20

     I certify that the foregoing is a correct transcript to

21 the best of my ability from the electronic sound recording of

the proceedings in the above-entitled matter.

22

  **/s/ Kathy Rehling**              **07/09/2020**

23

_____    _____

24 Kathy Rehling, CETD-444             Date

Certified Electronic Court Transcriber

25

58

INDEX

PROCEEDINGS                                                          4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Mediation                                                          53

Motion to Extend or Limit the Exclusivity Period (737) -           53
*Granted*

Debtor's Motion for Entry of an Order Further Extending            54
the Period Within Which It May Remove Actions Pursuant
to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of
Bankruptcy Procedure (747) - *Granted*

END OF PROCEEDINGS                                                 57

INDEX                                                              58

APP. 1998

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5-4    Filed 09/06/22    Page 119 of 1017    PageID 2582
Main Document    Page 122 of 732
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 1 of 53

# EXHIBIT 11

```
                    UNITED STATES BANKRUPTCY COURT

                 FOR THE NORTHERN DISTRICT OF TEXAS

             BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE


In Re:                            ) Case No. 18-30264-SGJ-11
                                  ) Case No. 18-30265-SGJ-11
                                  ) (Jointly administered under
ACIS CAPITAL MANAGEMENT, L.P.     )  Case No. 18-30264-SGJ-11)
and ACIS CAPITAL MANAGEMENT GP,   )
LLC,                              ) DEBTORS' MOTION to FILE
                                  ) REDACTED QUARTERLY REPORTS
              Debtors.            )
                                  ) September 23, 2020
_____   ) Dallas, Texas


 Appearances via video and/or telephone:

 For the Reorganized        Annemarie Chiarello
 Debtors:                   Rahkee V. Patel
                            Winstead PC
                            500 Winstead Building
                            2728 North Harwood Street
                            Dallas, Texas  75201


 For James Dondero:         D. Michael Lynn, of Counsel
                            Bonds Ellis Eppich Schafer Jones LLP
                            420 Throckmorton Street, Suite 1000
                            Forth Worth, Texas  76102


 For William T. Neary,      Lisa L. Lambert, Assistant U.S. Trustee
 United States Trustee:     Office of the U.S. Trustee, Region 6
                            1100 Commerce Street, Room 976
                            Dallas, Texas  75242-1496

 Digital Court              United States Bankruptcy Court
 Reporter:                  Northern District of Texas
                            Michael F. Edmond, Judicial
                             Support Specialist
                            Earle Cabell Building, U.S. Courthouse
                            1100 Commerce Street, Room 1254
                            Dallas, Texas  75242
                            (214) 753-2062, direct; 753-2072, fax



 Certified Electronic       Palmer Reporting Services
 Transcriber:               1948 Diamond Oak Way
                            Manteca, California  95336-9124

            Proceedings recorded by digital recording;
  transcript produced by federally-approved transcription service.
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/03/25   Page 120 of 1017   PageID 2583
Main Document   Page 119 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 2 of 53

2

<u>I N D E X</u>

Witnesses:

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Joshua Terry |  |  |  |  |
| By Ms. Chiarello: | 27 |  | 40 |  |
| By Ms. Lambert: |  | 36 |  |  |

Exhibits Received in Evidence:

Debtors'/Movants' A through W
(C through K and Q through T
received for notice purposes only):       page 18

Arguments:

Opening on behalf of the Debtors/Movants:    page  5
Opening on behalf of the U.S. Trustee:       page 11
Opening on behalf of James Dondero:          page 16

Closing on behalf of the Debtors/Movants:    page 45
Closing on behalf of the U.S. Trustee:       page 46

The Ruling of the Court:                     page 48

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15 Main DocumentFiledPage06/0125/25 of 2702Page 121 of 1017   PageID 2584
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 3 of 53

*Debtors' Motion to File Redacted Quarterly Reports*     3

1  <u>Wednesday, September 23, 2020</u>                    <u>11:02 o'clock a.m.</u>

2                    P R O C E E D I N G S

3          THE COURT:  Last on our 10:30 docket is an Acis

4  Capital matter.  It's a motion of Acis to file redacted

5  quarterly operating reports.  This is in Case Number 18-30264.

6          Ms. Chiarello, I see you there for the reorganized

7  debtor, correct?

8          MS. CHIARELLO:  Yes.  Good morning, Your Honor.

9  Annemarie Chiarello here on behalf of Acis Capital Management,

10  L.P. and Acis Capital Management, GP, LLC, the reorganized

11  debtors.

12          We also have with us on the phone and video, Joshua

13  Terry.  Mr. Terry is a principal of the reorganized debtors.

14  And I believe Ms. Patel is also on the video.

15          THE COURT:  All right.  Thank you very much.

16          For the U.S. Trustee, I believe I see Ms. Lambert

17  there.  Correct?

18          MS. LAMBERT:  Yes, Your Honor.

19          THE COURT:  All right.  Good morning to you.

20          Do we have —

21          MS. LAMBERT:  Good morning.

22          THE COURT:  — anyone else wishing to appear this

23  morning on this matter?

24      (No audible response.)

25          THE COURT:  All right.  So we have, it looks like,

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/05/25   Page 122 of 1017   PageID 2585
Main Document   Page 105 of 232
Case 18-30264-sgj11  Doc 1186  Filed 09/28/20   Entered 09/28/20 00:18:35   Page 4 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                4

 1  several people on the phone.  They may just want to observe, but

 2  I always want to double check that someone may be on mute and

 3  think they're appearing but they're not.

 4          So, Mike, can you — can you make sure everyone's off

 5  mute for a minute?  Are you able to do that?

 6          THE REPORTER:  Yes, ma'am.

 7          THE COURT:  Okay.  So everyone's off mute now.  If you

 8  wish to appear and you haven't, go ahead.

 9          MR. LYNN:  Your Honor, are you able to hear me?

10          THE COURT:  I can now.

11          MR. LYNN:  I fear I can barely hear you.  I'm going to

12  dial in a second time and see if I get better reception.

13          THE COURT:  All right.  Well, that's Mr. Lynn for Mr.

14  Dondero.

15          I can recognize your voice.  So we heard you.  And it

16  sounds like you were going to try to change your device to get

17  better audio.

18          All right.  Anyone else wishing to appear?

19          All right.  Well, Ms. Chiarello, are you making the

20  argument this morning?

21          MS. CHIARELLO:  Yes, Your Honor.

22      (Noise.)

23          MS. CHIARELLO:  May I begin?

24          THE COURT:  You may.  And I just realized I left my

25  exhibit notebook back in chambers.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Docume FiledFiled1806/06/0625 of 2722 123 of 1017   PageID 2586
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 5 of 53

*Opening Statement on behalf of the Debtors/Movants*     5

1       So, May, can you go grab that?

2       Okay, the law clerk's going to grab that.  Thank you.

3       <u>OPENING STATEMENT ON BEHALF OF THE DEBTORS/MOVANTS</u>

4       MS. CHIARELLO:  Thank you, Your Honor.

5       Good morning again.  Annemarie Chiarello here on

6 behalf of Acis Capital Management, L.P. and Acis Capital

7 Management, GP, the reorganized debtors.  We're here on Acis'

8 motion to file its quarterly operating report under redaction.

9 That motion was filed at Docket Number 1161.  The two objecting

10 parties that we have today are the United States Trustee's

11 Office and we believe Mr. Dondero filed a comment rather than

12 formal objection.

13       And, before we get any further, this Court has heard

14 days, weeks, months of testimony in this case.  Undoubtedly

15 you're aware that Mr. Dondero is not a creditor or an equity

16 holder in the debtor, at least not the named equity holder,

17 former or otherwise, in the debtor.  So we'd just like to

18 reserve our right to object to Mr. Dondero's standing to be

19 heard today.  I'm happy to go into that further.  I thought it

20 may make sense to present to you our opening argument and then

21 address the standing as the last issue, but I'm happy to address

22 it whichever way you'd like.

23       THE COURT:  Let's defer that for now, so you may go

24 ahead with your opening, your other issues.

25       MS. CHIARELLO:  Your Honor, we're here on a 107(b)

APP 103
001876

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 16-5    Filed 09/04/25    Page 124 of 1017    PageID 2587
Main Document    Page 06 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 6 of 53

*Opening Statement on behalf of the Debtors/Movants*                     6

1   motion, a motion to really file our quarterly operating reports

2   with limited information available to — on the public docket.

3   We don't believe there's any dispute as to the standard that's

4   applicable.  And the United States Trustee, who has filed a

5   substantive objection, we agree on the standard.  We don't

6   believe Mr. Dondero disagrees with the applicability of the

7   standard here, but again it's under 107, at the request of a

8   party-in-interest the Bankruptcy Court shall protect information

9   that is confidential or commercial information.

10          And, as a threshold matter, we're — we're sorry for

11  wasting — or using the Court's time for this.  I know Acis has

12  taken up a lot of your time in the last few years.  And we tried

13  to reach a practical solution with respect to this issue.  If

14  Your Honor had looked through our exhibits or the docket, you

15  will see that initially Highland Capital Management filed a

16  lengthy objection to this — to this motion and ultimately they

17  withdrew their objection after coming — after we worked on a

18  stipulation that was agreeable to each party.  It's in your

19  exhibit notebook at Exhibit A.  And I really think that's

20  demonstrative of what we're trying to do here.

21          So as Your Honor is aware, Acis had limited creditors

22  during its bankruptcy case and few remaining creditors that need

23  to be paid through the plan of reorganization.  There are really

24  only four remaining creditors, three of which are disputed and

25  subject to claim objection.  Those are Hunton Andrews Kurth,

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/03/25   Page 125 of 1017   PageID 2588
Main Document   Page 6 of 22
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 7 of 53

*Opening Statement on behalf of the Debtors/Movants*                    7

1   Stinson Leonard, Highland Capital Management, and then the

2   remaining nonobjected-to creditor is Mr. Terry's claim.  So

3   today we have no creditors who are objecting to the relief that

4   we're requesting, but I do think the presence of Mr. Dondero,

5   whether or not this Court decides to grant him — or decides to

6   hear him on his — on his comment, is really illustrative of our

7   problem.

8           Mr. Dondero's objection highlights that noncreditors

9   may misuse the information in Acis' quarterly operating reports.

10  We know Mr. Dondero doesn't want this information in order to

11  see if the plan is being complied with as an essential creditor

12  or a party-in-interest.  We don't know why Mr. Dondero is

13  objecting, but we don't believe his actions are benevolent.

14          As a reminder, this case is postconfirmation and we

15  only have four remaining creditors.  And our motion does not

16  request that the Court permit Acis to redact information on the

17  QORs related to payments to creditors.  We're asking the Court

18  to permit Acis to redact information related to its business

19  operation.  We are concerned that Dondero-controlled entities

20  are going to misuse this information.

21          We are concerned that the Donor Advised Fund; the

22  Charitable DAF Devised Fund, L.P., which we've referred to as

23  the DAF; and CLO HoldCo, again has been referred to as part of

24  the DAF structure; and entities controlled by Grant Scott, Jim

25  Dondero's college roommate, are going to use information in the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 126 of 1017   PageID 2589
Main Document   Page 126 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 8 of 53

*Opening Statement on behalf of the Debtors/Movants*                    8

1    Acis unredacted QORs to sue parties related to the Acis CLOs,

2    including U.S. Bank, Brigade, and Moody's.  And this concern has

3    come to fruition as multiple times in the last year U.S. Bank;

4    Moody's; Acis Capital Management, L.P.; Brigade; and even Mr.

5    Terry individually have been sued by the DAF, CLO HoldCo, or

6    both.

7              We understand the United States Trustee's concern

8    about setting precedent for sealing QORs, but we do think here

9    the facts matter.  And we'd like to highlight again that there

10   are no objecting creditors.  The creditors remaining are two law

11   firms who are capable of filing objections; Highland Capital

12   Management, who we have agreed to provide this information in a

13   form that we believe protects the confidentiality of the

14   information.

15             And, Your Honor, if you take a look at the

16   stipulation, you will see that, generally speaking, we provide

17   the — the — and that's at Exhibit A, we're providing that — the

18   Acis QOR information to:  The Highland Capital Board; and

19   Pachulski, debtors' counsel for Highland Capital Management; and

20   their restructuring advisor, Development Specialists, Inc., but

21   we have prevented that information from living on the Highland

22   Capital Management server because we have — as Your Honor is

23   aware in this Highland Capital Management case there have been

24   some issues about what lived on the Highland Capital Management

25   server, who has access to it, and which of the Highland entities

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5-4    Filed 06/6/25    Page 127 of 1017    PageID 2590
Main Document    Page 610 of 732
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 9 of 53

*Opening Statement on behalf of the Debtors/Movants*                    9

 1    gets to control that information.  And ultimately we want to

 2    make sure that this information can't be misused by Mr.

 3    Dondero's entities.

 4              Again we're not trying to limit this information from

 5    other courts or actual creditors.  Our goal is to reduce

 6    frivolous and expensive litigation that is bad for the Acis CLOs

 7    and has aided Acis' ability to reorganize.  We are not

 8    attempting to limit legitimate discovery in another court or we

 9    are not trying to limit the United States Trustee's access to

10    this information.  If you take a look at our proposed order, it

11    provides that it should be given to the United States Trustee's

12    Office.

13              And with that, Your Honor, unless you have any

14    questions, I'd like to move to Mr. Dondero's standing or lack

15    thereof.

16              THE COURT:  All right.  Go ahead.

17              MS. CHIARELLO:  So as Your Honor's aware, under

18    Section 1109(b), there is a very broad party-in-interest

19    standard with respect to being heard in a bankruptcy matter.

20    And there are — there are enumerated parties including

21    creditors, obviously the United States Trustee under a different

22    statute, the debtor, certain parties-in-interest.  But Mr.

23    Dondero is not a creditor and he is not an equity holder in the

24    debtor, nor is he former equity in the debtor.  At this point he

25    is merely a litigation counterparty.

001880

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4   Filed 06/26/25   Page 128 of 1017   PageID 2591
Main Document   Page 128 of 2722
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 10 of 53

*Opening Statement on behalf of the Debtors/Movants*                    10

1        And if you take a look at our Exhibits C through V,

2    those are the debtors' schedules and — schedules and claims

3    registry which show that Mr. Dondero is not a creditor or — and

4    is not looked at as an equity holder, and has not filed a proof

5    of claim against the debtor.

6        Judge Bohm, faced with a similar situation in 2016,

7    found that a litigation counterparty was not a party-in-interest

8    has standing to be heard in a postconfirmation matter.  So that

9    case is *In re Odin Demolition* and it's at 544 B.R. 615.  In that

10   case Judge Bohm, was faced with a motion to reopen a bankruptcy

11   case after litigation had been brought pursuant to a plan.  The

12   party that moved to reopen the bankruptcy case was actually the

13   defendant in the matter, really seeking to make sure that they

14   were to have an order clarifying whether certain claims and

15   causes of action had been reserved properly under the plan.  And

16   in that case Judge Bohm denied the litigation counterparty's

17   motion to reopen for, among other reasons, that they didn't have

18   standing as a noncreditor to reopen the bankruptcy case and as a

19   party — as an entity that was not a party-in-interest.  And we

20   believe that Mr. Dondero is in the same category.

21       At the very — at the very least, I think Mr. Dondero's

22   arguments should be — should be faced with some suspicion.  And

23   we'd like to highlight that although it was quite some time ago,

24   we don't see Mr. Dondero on the video or the phone, and we do

25   have a standing order in this case with respect to presenting

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 06/06/25   Page 129 of 1017   PageID 2592
Main Document   Page 129 of 232
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 11 of 53

*Opening Statement on behalf of the U.S. Trustee*                   11

1    argument.  As you have — you at one point required under — under

2    Order 36- — Docket Number 36 — 336, you required party

3    representatives to be at every hearing if the parties were going

4    to take a position.

5         So for all of those reasons we don't believe Mr.

6    Dondero's comments should be heard.  But to the extent that Your

7    Honor does intend to indulge Judge Lynn and Mr. Dondero, we — we

8    object and we dispute the contentions that Acis had or may

9    misuse its role on the Highland Capital Management Committee to

10   do anything nefarious.  I don't think there — there's no

11   evidence that that's occurred and it's, frankly, particularly in

12   light of concurrent events, it's rather insulting to insinuate

13   that there's been any — anything nefarious going on there.

14        THE COURT:  All right.  Thank you, Ms. Chiarello.

15        I'll hear next from the U.S. Trustee, Ms. Lambert.

16        <u>OPENING STATEMENT ON BEHALF OF THE U.S. TRUSTEE</u>

17        MS. LAMBERT:  Judge Jernigan, —

18        THE COURT:  Okay.

19        MS. LAMBERT:  — as Acis has stated, the parties are in

20   agreement about what the legal standards are and really about

21   most of the facts, but not about what the legal conclusion here

22   is or what the appropriate remedy is for the problem.

23        Acis contends that none of the creditors are here.

24   First, the United States Trustee contends that this is a public

25   document that the public is entitled to have access to; that

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 6-5   Filed 09/05/25   Page 130 of 1017   PageID 2593
Main Document   Page 129 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 12 of 53

*Opening Statement on behalf of the U.S. Trustee*                    12

1  professors, government agencies, Congress use to evaluate

2  whether plans are being complied with and whether the Bankruptcy

3  Code is being performed successfully as applied.

4          Secondly, two of the creditors that are subject to

5  objection are law firms, so they're in an awkward position to

6  object to their former clients' position, number one.  And,

7  number two, because the information has been redacted, they

8  don't really have the ability to assess what the information is

9  or speak as to whether they need it.  And in the context of

10 objected-to proofs of claim, where the plan contemplates

11 payment, they are entitled to know whether there is a reserve

12 for them or not.  This they cannot access and evaluate from the

13 information that's been provided.

14         This information is typically disclosed in bankruptcy

15 cases, in large forfeit cases; confidential information is often

16 disclosed in individual cases.  That information may lead to

17 litigation.  The parties to contracts are entitled to know

18 whether their contracts are being complied with.  Undoubtedly,

19 the DAF litigation has been a series of annoying and costly —

20 costly litigation events.  We don't question that, but the

21 proper remedy for that is to seek some relief in this Court by

22 asking that the Court enforce the interpretation of its order

23 and its prior interpretation of the DAF agreement — the DAF

24 litigation issues and seek to have any complaint in another

25 forum enjoined or require that the litigation be filed here in

001883

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/06/25   Page 131 of 1017   PageID 2594
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 13 of 53

*Opening Statement on behalf of the U.S. Trustee*          13

1   the Acis bankruptcy case, not that the public be denied access

2   to the information, because that does not comply with the

3   standards that the Constitution requires for public access to

4   the court as discussed in the *Nixon* case and as interpreted in

5   the statutory context of 107 and 9018 and in the cases that

6   discuss how those should be applied in a constitutional context

7   such as a line — (brief garbled audio).

8          Alternatively, if the Court is inclined to do this,

9   and this started as a motion to seal, which was withdrawn, and

10  then Acis filed a motion to redact, and we hoped that the

11  redactions would be more limited, but the redactions go to the

12  substantive information in the case.  You cannot evaluate

13  compliance with the plan under the redactions that — that are

14  set forth in the proposed orderly operating reports.  You cannot

15  tell from quarter to quarter where the money is or what's been

16  paid or what has happened.  And that's where we get to.

17         This is not information that can be tailored for this

18  case.  And, therefore, it's not really a redaction.  It's really

19  a motion to seal.  The fact — the information that they provide

20  is about the claims that have not been paid, but let's — that

21  information is accessible otherwise in the bankruptcy reports,

22  in the claims register, and in the objections to claims.  The

23  information that's not available to creditors and to the public

24  is the information that's been redacted about the finances in

25  the case.

APP 0111
001884

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Document 15-4 Page 126 of 722 Page 132 of 1017 PageID 2595
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20 Entered 09/28/20 00:18:35 Page 14 of 53

*Opening Statement on behalf of the U.S. Trustee*                    14

1          So often fraudulent transfers, whether prepetition or

2    postpetition, are disclosed in operating reports.  The

3    bankruptcy processes is not designed to cover up litigation

4    issues.  Here, the allegation is that the litigation issues are

5    frivolous, and that may be true, but the remedy for that is

6    different than sealing the quarterly operating reports.

7          And for these reasons we would ask that the motion be

8    denied or, alternatively, if the Court is inclined to do this,

9    that the Court define a period of time for unsealing the

10   quarterly operating reports, because, as set forth in the case

11   law and in the Federal Judicial Center Guide, generally, orders

12   to seal should define a period for unsealing them; and — and

13   also that the Court allow the United States Trustee to comply

14   with its ethical and statutory obligations, in that the Court

15   include the standard language that it would include in sealing

16   orders for that purpose.

17         However, we still contend that the evidence will

18   reflect that the sealing should not occur and that this is bad

19   precedent for bankruptcy cases and especially large corporate

20   cases.  I'm available if the Court wants more.  Thank you.

21         THE COURT:  All right.  Ms. Lambert, I'm going to ask

22   you a follow-up question.  You just said it would be bad

23   precedent.  Have you ever seen either redaction of or sealing of

24   either monthly operating reports or quarterly operating reports

25   in a Chapter 11?  I've never, that I can remember, had anyone

**001885**

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Filed 06/05/25   Page 133 of 1017   PageID 2596
Main Document   Page 26 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 15 of 53

*Opening Statement on behalf of the U.S. Trustee*          15

1   ask me to do this, so I've never looked into it.  Is this

2   something that is occasionally happening and I'm just not

3   experiencing it till now, or do you know?

4          MS. LAMBERT:  No, Your Honor.  In fact, Mr. Neary,

5   when I discussed this motion with him, said that he had never

6   seen this before either.  We are aware of some circumstances

7   where particular line items in quarterly operating reports have

8   been redacted, but never something substantive or that caused an

9   inability to access, to evaluate, or determine what had happened

10  in accordance with the plan.

11          Similarly, the Court asked about monthly operating

12  reports, no, we have not seen that before.  As is pointed out in

13  other pleadings that were filed, the SEC also requires

14  disclosure of this type of information in large corporate cases.

15          I can, however, Your Honor, think of two Chapter 7

16  cases where large settlements were sealed and the final reports

17  were sealed.  Both of those resulted in discussions with the

18  U.S. Trustee about this should not have occurred and we request

19  that it not occur again.  And there were provisions for

20  unsealing them at a subsequent date.  That is the only

21  circumstance which I feel ethically I'm bound to disclose to the

22  Court that I can think is analogous to this.

23          THE COURT:  All right.  Well, I ask and I'll just tell

24  you all what's dancing in my head.  I mean bankruptcy judges,

25  we've been talking for a couple of decades now about, you know,

001886

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/27/25   Page 134 of 1017   PageID 2597
Main Document   Page 257 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 16 of 53

*Opening Statement on behalf of James Dondero*               16

1   these motions to seal or motions to heavily redact.  They seem

2   to be coming with more and more frequency in the large Chapter

3   11 complex cases.

4        And, you know, I'm about to hear from Mr. Lynn, but in

5   the Highland case of course I had a motion to seal the plan and

6   disclosure statement because of pending mediation.  And I

7   approved that under the very unique situation that I thought it

8   was, but I've never sealed a plan and disclosure statement

9   before.

10        And, again, it's a subject that causes I think all of

11  us bankruptcy judges angst because we do have this general

12  notion, not just a notion, a statute, 107, that presumes

13  everything is publicly available, again unless commercial

14  information, scandalous, confidential.  So there's kind of a

15  perception that more and more and more people are wanting to

16  avail themselves of 107 and say something's commercial, say

17  something's sensitive, confidential.  But, you know, sometimes

18  it's very questionable.

19        All right.  So with that, Mr. Lynn, are you there?

20  Your client's standing has been challenged, first and foremost.

21  Why don't you start there and then we'll see where we go from

22  there.

23        MR. LYNN:  Your Honor, can you hear me?

24        THE COURT:  I can, yes.

25        OPENING STATEMENT ON BEHALF OF JAMES DONDERO

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document Filed 06/03/25 of 2722 135 of 1017    PageID 2598
Main Document    Page 04125
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 17 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                    17

1          MR. LYNN:  Okay, good.  Well, I had hoped to break in

2    earlier because I could have, I think, solved some of this

3    problem.  Let me begin by saying Mr. Dondero is the portfolio

4    manager for certain funds that have an interest in CLOs that

5    Acis manages.  So indirectly he has an interest in there.

6    However, he does not have a direct interest in this.  And we

7    filed the four comments rather than a response or an objection.

8          We agreed with the United States Trustee, although we

9    do not agree with some of her comments regarding DAF litigation

10   that occurred after the confirmation of the Acis plan, which we

11   think is probably beyond the jurisdiction of the Bankruptcy

12   Court.

13         We also don't agree with the rude characterizations of

14   Mr. Dondero and the angelic characterizations of Mr. Terry that

15   counsel for Acis mentioned.  However, we don't have any

16   particular interest in whether or not this motion is granted

17   other than on a precedential level.

18         THE COURT:  All right.  Well, Ms. Chiarello, I'm going

19   to ask you:  Do you — do you intend to put on any evidence

20   today?  And you know you have a notebook full of exhibits, but

21   is your client perhaps going to testify on this?

22         All right.  We're — I guess you were muted.  If you

23   could unmute — go ahead.

24         MS. CHIARELLO:  Oh, yeah.  Yes, Your Honor, we intend.

25   As a threshold matter, we would move to admit Exhibits A through

001888
APP 0115

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 136 of 1017   PageID 2599
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 18 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                18

1   W, which are in your binder and with the caveat being I believe

2   Ms. Lambert wanted to make clear that Exhibits C through K are

3   not admitted for the truth of the matter asserted therein but

4   merely to show that they have been sent and the contents.  But

5   obviously, particularly with respect to the DAF complaint, we

6   obviously would contest the truthfulness of the matters asserted

7   in those.  And the same caveat for Exhibits Q through T.  And,

8   with that, we would move to admit Exhibits A through W.

9          THE COURT:  All right.  Are there any objections, Ms.

10  Lambert?  If you could unmute yourself.

11         MS. LAMBERT:  The agreement is as stated by Ms.

12  Chiarello so that the exhibits that she carved out are admitted

13  for notice purposes but not for the truth of the matter

14  asserted.  That includes the proof of claim register.  And the

15  other items are admitted for all purposes.

16         THE COURT:  All right.  So to be clear for the record,

17  I'm admitting A through W, but C through K and Q through T are

18  being admitted for notice purposes only, not for the truth of

19  the matter asserted.

20      (Debtors'/Movants' Exhibits A through W received in

21  evidence, as noted above by the Court.)

22         THE COURT:  Ms. Chiarello, could you tell me, do we —

23  were these filed on the docket so I can cross-reference that or

24  do I just have the hard copies?

25         MS. CHIARELLO:  Your Honor, they are filed with the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/12/25   Page 137 of 1017   PageID 2600
Main Document   Page 220 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 19 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                    19

1    docket.  And I believe your hard copies, although it's hard to

2    tell for the first few because there are things that were filed,

3    the filings on filings, they should have the file mark copies as

4    well on the top.  So, for example, if you go to Exhibit T, it

5    should have the 1180-21.  So I believe then that these were all

6    filed at Docket Number 1180.

7              THE COURT:  Okay.

8              MS. CHIARELLO:  So if it's 1180 —

9              THE COURT:  All right, I gotcha.

10             MS. CHIARELLO:  — 1180-1 through 26.

11             THE COURT:  You know that I need to give the court

12   reporter hard copies of all this, and the answer is no.  These

13   are all found at Docket Entry Number 1180 on the Acis docket.

14             All right, with that, —

15             MS. CHIARELLO:  Yes, Your Honor.

16             THE COURT:  — call your witness.

17             MS. CHIARELLO:  Yes, Your Honor.

18             Your Honor, if it would — I believe Ms. Lambert has —

19   doesn't have any objection to — or objection to the

20   admissibility of our exhibits.  If you would be amenable to it,

21   we'd like to walk through some of what those exhibits are to

22   limit the amount of testimony from Mr. Terry.  But if you'd like

23   to hear from Mr. Terry first, we can offer you that.

24             THE COURT:  No, that's fine.  You can walk through the

25   exhibits first.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 1-4    Filed 06/13/22    Page 138 of 1017    PageID 2601
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 20 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                    20

 1              MS. CHIARELLO:  Okay.  Do you mind if I share my

 2      screen?

 3              THE COURT:  Go ahead.

 4              MS. CHIARELLO:  Okay.  Can you see it?

 5              THE COURT:  Um-hum.

 6              MS. CHIARELLO:  Okay.  So we've moved in as Exhibit A

 7      the stipulation between Acis and Highland Capital Management,

 8      refers us to the Acis QOR.  As I mentioned earlier, you will see

 9      in paragraph 3 that the parties that have the — or who the

10      information is being made available on a confidential basis are

11      Pachulski Stang Ziehl and Jones; Mr. Seery; Mr. Nelms; Mr.

12      Dubel; and Highland's bankruptcy advisor, Development

13      Specialists, Inc.; Mr. Dondero; the Charitable Donor Advised

14      Fund; and CLO HoldCo are parties that the Viewing Parties are

15      prohibited from disclosing this information to.

16              Next, — next we'll move to Exhibit B, which is the

17      Acis — and I'll put up in one moment — which is the proposed

18      redacted exhibit — I'm sorry — redacted quarterly operating

19      report with respect — showing the information that we are and

20      are not redacting.  So, again, this is postconfirmation, so

21      these operating reports are somewhat limited.  But we'd be

22      redacting information related to Acis' cash receipts, but for

23      cash disbursements, creditors can see the payments made under a

24      plan.  And — and then the remaining information would be

25      redacted as it — again, this is the backup for, again, the cash

APP 0118
001891

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Docume Filed 08/01/22 of 2722 139 of 1017   PageID 2602
Main Document   Page 21 of 53
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 21 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                    21

1    disbursement.

2            So I'm going to move through Exhibit C through E and G

3    all at once.  First, for purposes of today, I'll pull this up,

4    but I know Your Honor has a — I'll pull up G, but you have all

5    of them in front of you.  So these are the DAF lawsuits that we

6    have been discussing.  There are a number of iterations of them,

7    the most recent which is Exhibit G.

8            So you take a look at these and the plaintiffs are

9    either CLO HoldCo or the Donor Charitable Advised Fund.  It

10   sounds from Judge Lynn's comments that Mr. Dondero may serve in

11   some capacity with respect to these entities, but you — you have

12   heard these mentioned as the DAF.  They assert that they are

13   interest — or they hold an interest in the Acis CLOs either

14   directly or indirectly.  And, generally speaking, this

15   litigation alleges misconduct related to the Acis CLOs and

16   misconduct related to the Acis bankruptcy case.

17           With respect to the mismanagement, it will sound

18   familiar to Your Honor as it's quite similar to the

19   mismanagement alleged by Highland Capital Management during

20   Acis' bankruptcy case, an objection that this Court overruled

21   when it confirmed Acis' plan of reorganization.

22           So the parties to these lawsuits, which admittedly

23   have changed, this is probably the most fulsome one, include

24   U.S. Bank; Moody's; Acis Capital Management, which is of course

25   our debtor, our reorganized debtor; Brigade Capital Management,

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4   Filed 06/03/25   Page 140 of 1017   PageID 2603
Main Document   Page 22 of 22
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 22 of 53

*Debtors' Motion to File Redacted Quarterly Reports*   22

1    L.P., which is the debtors' subadvisor; and Mr. Terry

2    individually.

3            I think what's most notable — or maybe most

4    interesting, maybe not most notable, just how — how interesting

5    this litigation has become.  So one of the causes of action that

6    is present here is actually a defamation claim against Moody's.

7    And the defamation claim is quite surprising, particularly in

8    light of who is bringing this cause of action.  So the Acis, the

9    DAF, and CLO HoldCo, who allege that they are noteholders in the

10   Acis CLOs, are actually suing Moody's for not downgrading their

11   investment.  So that's at page 26 of Exhibit G.

12           And, again, this is — this is more — I mean it's

13   really just litigation for whatever value it is.  At some point

14   this litigation was dismissed.  If you look at Exhibit H and F,

15   those are dismissal orders.  I will note they were dismissed

16   without prejudice in February of 2020.  However, the — if you

17   take a look at Exhibit J, you will see — now I have to

18   understand how to switch between these exhibits — so Exhibit J

19   is actually dated April 20 — 21, and it's a letter from Mr.

20   Hurst, counsel for the DAF entities, to U.S. Bank, basically

21   raising the same concerns related to the mismanagement of the

22   Acis CLOs.  So this letter was sent after the litigation was

23   dismissed, so I don't think we — we don't see the dismissal as

24   anything other than a strategy, if you will.

25           Again we have another letter now on this Exhibit K,

001893

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4 Page 0/225 of 272   141 of 1017   PageID 2604
        Main Document   Page 141 of 232
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 23 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                    23

1    which is a letter from Grant Scott on behalf of the Donor

2    Advised Fund, L.P.  So this is a letter from Mr. Scott to Seward

3    and Kissel, who were counsel for U.S. Bank in this — actually in

4    this bankruptcy case.  I believe they're on the telephone.

5            And Mr. Scott is a patent lawyer.  You can tell from

6    his letterhead.  And he is Mr. Dondero's college roommate.  And

7    he is, again, alleging these same sort of issues related to the

8    Acis CLOs and Acis' performance.  If you take a look at the

9    third paragraph you can see his concerns.  And — and all of

10   these letters request an accounting from the Acis CLOs.  We

11   don't necessarily know why.  We obviously have suspicions, but

12   we think they're — they're asking for certain information.

13           And if you take a look at — this is — Exhibit L, you

14   will see Mr. Kotwick's response to Mr. Scott with respect to the

15   requested information.  Effectively Mr. Kotwick responds that

16   under the documents, the DAF and CLO HoldCo aren't entitled to

17   this information.  So we really see this as an end-run for Mr.

18   Dondero and his entities to get information that they would not

19   otherwise be entitled to under their documents.  And,

20   unfortunately, we believe that this is also bolstered by

21   requests we have received previously from counsel to Highland

22   Capital Management prior to the entry of the stipulation, and

23   those are Exhibits I and M, again requesting really detailed

24   financial information from Acis, which we believe is unrelated

25   to plan performance.  And we can talk about plan compliance in a

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/02/25   Page 142 of 1017   PageID 2605
Main Document   Page 24 of 53
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 24 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                 24

1   moment.

2           And, finally, Your Honor, I think it's worth noting

3   that there are two transcripts at Exhibits N and O.  Both are

4   transcripts actually from the Highland Capital Management

5   bankruptcy case.  And Exhibit N is a transcript from the

6   February hearing on the motion to employ Lynn Pinker — I'm sorry

7   — Foley Lardner, and it was originally intended to be a hearing

8   on a motion to employ Lynn Pinker Cox and Hurst.  And so at page

9   59, Judge Nelms testifies that the Highland Capital Management

10  Board was not aware of this DAF litigation.  So we don't take a

11  lot of comfort in knowing that the Board — it's not that the

12  Board can control this litigation, at least that hasn't — and

13  that's not what has been demonstrated.  We hope — we hope that

14  they can exert their influence here, but we don't know that that

15  necessarily is within their purview.

16          And this is further illustrated by actually a comment

17  from last week.  Now I'm in Exhibit O.  And so if you look at

18  page 42, although I'm sure Your Honor remembers, we heard from

19  counsel for Mr. — from Judge Lynn's firm, Mr. Assink makes

20  statements on the record to this Court that Mr. Dondero was

21  still working with entities that he controlled to file proofs of

22  claim in the Highland bankruptcy case.  And I know that

23  definitely was surprising to us, but really illustrates the fact

24  that Mr. Dondero is still around, still has the same intentions,

25  and we don't believe that the letter-writing campaign or

001895

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document  Page 40 of 272  143 of 1017    PageID 2606
Document  Filed 06/05/25  Page 143 of 1017
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 25 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                    25

```
 1   litigation has stopped.

 2            And, finally, Your Honor, we want to move to Exhibit

 3   W.  This is something I'm not sure the Court is aware of.

 4   Sorry.  This is the final judgment from the Guernsey Court with

 5   respect to Mr. Terry.  If you recall, Your Honor, Mr. Terry was

 6   sued on the Island of Guernsey, effectively contemporaneous with

 7   Acis' first confirmation hearing.  So Highland CLO Funding

 8   Limited, which we have called things like ALF, HCLO, CLOF, they

 9   sued Mr. Terry in Guernsey effectively for filing the Acis

10   involuntary petition.  And ultimately that case was dismissed,

11   and I'm probably to butcher the Guernsey term, but it does seem

12   for lack of jurisdiction.

13            And in connection with that case, the Guernsey Court

14   found that testimony submitted by Mr. Sevilla, an Island —

15   Exhibit W on page 8, so his information, particularly this

16   confidential information was related to whether Mr. Terry's

17   payment of his involuntary fees and expenses were — should be

18   characterized as a bribe rather than an allowed administrative

19   claim under the Bankruptcy Code, Mr. Sevilla's testimony was

20   found to be inaccurate with respect to that and a number of

21   other items with respect to jurisdiction over Mr. Terry, but I

22   don't know that that's necessarily relevant.

23            So with that, Your Honor, unless you have any

24   questions, we'd move — we'd call Mr. Terry to the stand.

25            THE COURT:  Let me ask one question before we do that.
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Docume Filed 06/027 of 2722 144 of 1017   PageID 2607
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 26 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                26

 1   So what pending satellite litigation remains at this point?  If

 2   the DAF lawsuits were dismissed, granted without prejudice, and

 3   this Guernsey lawsuit is now resolved, what — what is left of

 4   what I'll call the satellite litigation?

 5           MS. CHIARELLO:  Your Honor, Mr. — I believe there is

 6   still pending litigation in state court and actually Mr. Terry

 7   can answer that question better than I can.  But with respect to

 8   litigation that is not in front of Your Honor, I believe that

 9   there remains — Acis has state court litigation, but between

10   Acis, on one hand, and the Highland-related entity on the other,

11   I believe there is something still pending in state court, but I

12   think Mr. Terry should speak to that.

13           THE COURT:  Okay.  Because I'm understanding the heart

14   of the argument here with your motion is that Dondero, Dondero-

15   controlled entities have misused information in connection with

16   lawsuits filed against —

17           MS. CHIARELLO:  Um-hum.

18           THE COURT:  — Mr. Terry and U.S. Bank, Brigade,

19   Moody's, and so that's what I'm getting at:  Are there pending

20   lawsuits where that is still a concern?

21           MS. CHIARELLO:  So I think that the answer to your

22   question is the most recent DAF litigation has been dismissed.

23   However, after that dismissal there have been letters —

24           THE COURT:  Right.

25           MS. CHIARELLO:  — from Mr. Scott asserting the same

001897

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4 Filed 06/03/25   Page 145 of 1017   PageID 2608
Main Document   Page 26 of 2722
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 27 of 53

---

*Terry - Direct/Chiarello*                                                    27

1    causes of action.  And we don't — we have no reason to believe

2    that that is over.  It just may not be occurring today.  And we

3    are concerned that providing this information emboldens that

4    type of litigation.

5              THE COURT:  Okay, got it.

6              All right.  Well, Mr. Terry, I'll need to swear you

7    in.  So if you could make sure you allow your video to capture

8    you.  Do we have you, Mr. Terry?  Let's make sure you're not on

9    mute and your video is activated.  I saw you earlier today.

10             MR. TERRY:  Yes.  Can you see me, Your Honor, and can

11   you hear me?

12             THE COURT:  I can now.  Thank you.

13        JOSHUA TERRY, DEBTORS'/MOVANTS' WITNESS, SWORN/AFFIRMED

14             THE WITNESS:  I do.

15             THE COURT:  All right.  Thank you.

16             Ms. Chiarello.

17                         DIRECT EXAMINATION

18   BY MS. CHIARELLO:

19   Q.  Good afternoon — I'm sorry.  Good morning, Mr. Terry.  We've

20   got 13 minutes.  I know you testified a number of times before

21   the Court, but would you introduce yourself?

22   A.  I'm the president of Acis Capital Management, L.P. and also

23   the ultimate owner of Acis Capital Management, L.P.

24   Q.  And, Mr. Terry, I believe you had a copy of the exhibits

25   electronically available to you, but to the extent if possible

APP. 135
001898

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/29/25   Page 146 of 1017   PageID 2609
Main Document   Page 29 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 28 of 53

*Terry - Direct/Chiarello*                                    28

1    I'm going to put them in front of the screen that form the share

2    screen.  But as a threshold matter, I think it's probably

3    important to address a few things that have been raised today.

4            So with respect to how the plan works, can you explain

5    how — what's required under the plan with respect to a reserve

6    creditor, unsecured creditors, or disputed claims, and explain

7    if there is a balance or how much is in that reserve?

8    A.  Yes.  There is — under the plan, I believe, and I'm going

9    off memory, but as I recall there is a requirement that the

10   debtor or the reorganized debtor in this case keep an adequate

11   reserve for potential future claims, and we have since we've

12   emerged.

13           MS. CHIARELLO:  And, Your Honor, there is a pending

14   settlement with Highland Capital Management.

15   BY MS. CHIARELLO:

16   Q.  So I think it's prudent to take that into account, so

17   accounting for that Highland Capital Management claim, do you

18   believe that there are sufficient reserves to pay the remaining

19   unsecured creditors to the extent that they would be allowed

20   pursuant to the plan?

21   A.  Yes.

22   Q.  Okay.  And then you heard Judge Jernigan ask a question with

23   respect to satellite litigation.  Can you — can you speak to

24   what remaining litigation there is between Acis, on one hand, or

25   you, on one hand, and Highland, on the other, or Dondero-related

APP 0426
001899

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/04/25   Page 147 of 1017   PageID 2610
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 29 of 53

*Terry - Direct/Chiarello*                                          29

 1   entities, on the other?

 2   A.   Yeah.  As I understand it, in state court in the 162nd

 3   District there is still an open case between, on one hand,

 4   Highland Capital Management, L.P., which obviously this

 5   bankruptcy case stayed that party in that litigation, but James

 6   Dondero and Thomas Surgent as well, and then my wife and I as

 7   the plaintiffs.  And this relates to the stolen retirement money

 8   as well as some related other claims that we had.  That

 9   litigation, originally Highland had filed claims against me

10   individually, which were already rejected by the arbitrators.

11   They sued me again for the same thing.

12          In state court, we won a summary judgment hearing in

13   March of 2019, which dismissed Highland's claims against me and

14   left my wife and I as the plaintiffs regarding the retirement

15   money.  That case, we did settle that on October 2nd, 2019,

16   which was a few weeks prior to trial.  And so that settlement

17   was between Highland, Dondero and Surgent, and then my wife and

18   I, on the other hand.  And so we had a rule and an agreement in

19   place, which I think has been an exhibit in this Court before,

20   but that case still remains open technically, I believe.

21          Then Acis, on the other hand, does have a state court

22   action against former attorneys of Acis.  And that one is in the

23   162nd district as well.  And then there are the pending

24   adversaries which are in this Court.

25          And I believe after the Guernsey judgment, I believe

001900

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 148 of 1017   PageID 2611
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 30 of 53

*Terry - Direct/Chiarello*                                          30

1    that matter is closed pending a — there is still an assessment

2    of cost or fees that can be awarded, given I was individually

3    the prevailing party.

4    Q.   Thank you, Mr. Terry.  So I am going to pull up what is

5    Exhibit B, which is a — it's been filed with the docket, but it

6    is the — it's Acis' quarterly operating reports, which have been

7    filed with appeal — I'm sorry — filed with redactions.  Can you

8    explain kind of the narrow redactions that we have and what we

9    are — or what Acis is not intending to redact?

10   A.   Correct.  The — the items that we're not redacting are

11   payments to creditors and essentially the U.S. Trustee fees on —

12   on the QORs.  The other information is redacted.

13   Q.   And how many remaining creditors does Acis have?

14   A.   In terms of allowed claims, it's just me individually.  In

15   terms of disputed claims, it's Lackey Hershman, which while I

16   believe it's now called Stinson Leonard, and then Andrews Kurth,

17   and then Highland are the three remaining disputed claims.

18   Q.   And are any of them objecting today?

19   A.   No, not to my knowledge.

20   Q.   And with respect to the cash receipts and cash disbursements

21   and the information that's being redacted here, can you explain

22   why that information is confidential or commercial information?

23   A.   So certain — as I believe former Judge Lynn mentioned, Mr.

24   Dondero has access as portfolio manager to certain CLO indenture

25   trustee reports of the Acis CLOs and is able to get information

APP 0128
001901

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/06/23   Page 149 of 1017   PageID 2612
Main Document   Page 232 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 31 of 53

*Terry - Direct/Chiarello*                                                           31

```
 1   from those that the average creditor would not get.  And it's my
 2   belief that Mr. Dondero or Grant Scott or other Dondero-related
 3   individuals or entities, believe they can discern information
 4   between our QORs and this other information that they have that
 5   might help them perpetuate this litigation that seems to be
 6   their agenda, unfortunately; that, you know, we don't believe
 7   necessarily they can discern what they think they can discern,
 8   but unfortunately that hasn't stopped them in the past from
 9   mischaracterizing information, such as the Guernsey lawsuit.
10   And, you know, we're concerned that, you know, this information
11   will then allow them a basis to continue to file lawsuits to the
12   detriment of our CLOs, to the detriment of the service providers
13   to our CLOs, and to the detriment of our business and our
14   reorganization.
15   Q.  Thank you.  So, Mr. Terry, can you explain to the Court who
16   is the DAF or what we're referring to when we say the DAF?
17   A.  Yeah.  There's a series of entities that are generally
18   referred to as the DAF.  I think the two plaintiffs are the
19   Charitable Donor Advised Fund, L.P., and then CLO HoldCo
20   Limited, which as I understand it it's a subsidiary of the
21   former entity.  Grant Scott serves as director of both of those
22   entities.  Ultimately, these entities are owned by Highland
23   Foundations, of which, as I understand, Mr. Dondero serves as
24   president and Grant Scott serves as treasurer of the ultimate
25   shareholders of these entities.
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4   Filed 09/04/25   Page 150 of 1017   PageID 2613
Main Document   Page 233 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 32 of 53

*Terry - Direct/Chiarello*                                                32

1   Q.   And, Mr. Terry, who is Grant Scott?

2   A.   Grant Scott is Mr. Dondero's college roommate.  He's a

3   patent attorney in North Carolina with an electrical engineering

4   degree that focuses on semiconductor and microelectronic

5   patents.

6   Q.   Okay.  So how has the DAF litigation and then the threatened

7   continuation of the DAF litigation affected the Acis CLOs?

8   A.   So in a number of ways, unfortunately.  You know, I think

9   the first — the first way is it really prevents resets or

10  inhibits the ability to reset these CLOs, which we've tried to

11  do since emerging.  We've requested that of HCLOF.  We were

12  hopeful when this independent board was put in place that we

13  would be able to work with them to get the CLOs reset finally.

14  And, you know, coincidentally or not, about a week after the

15  conversation started with the new independent board back in

16  February was when the lawsuit was amended to add Acis, me

17  individually, and Brigade up in New York.  So unfortunately it's

18  kept resets from happening.

19          I think additionally these — when everybody has to

20  lawyer up, there's various indemnification provisions in place

21  in these CLO documents.  And it's expensive to the CLOs.  It

22  becomes an administrative expense essentially of the CLOs.  And

23  the definition of administrative expense allows, within the

24  indenturers, allows for the U.S. Bank, as indenture trustee,

25  their counsel is paid — U.S. Bank's expenses are paid first

001903
APP 1139

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4   Filed 09/04/25   Page 151 of 1017   PageID 2614
Main Document   Page 154 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 33 of 53

*Terry - Direct/Chiarello*                                      33

1    before any other vendors are paid in the CLO.

2            So naturally when U.S. Bank is sued as indenture

3    trustee, it leads to a big expense burden of the CLOs.  And then

4    when Acis, Brigade, myself, others are sued, it leads to

5    indemnification issues of the CLOs, which ultimately are, you

6    know, a burden on the CLO that we had hoped to try to minimize

7    as much as we can.  So those are the two main ways.  It's the

8    resets and the expenses.

9    Q.  All right.  So does the mere threat of litigation in — I

10   think what I'd characterize as — a letter-writing campaign, does

11   that — does that affect the Acis CLOs somewhat similarly to an

12   actual filing of the complaint?

13   A.  It does.  It's similar in a way on the expenses, on the

14   expense front.  And it also will continue to be a cloud on a

15   reset transaction.

16   Q.  So what has been the effect of what I call the DAF

17   litigation and the letter-writing campaign on Acis'

18   reorganization?

19   A.  Unfortunately, it — this litigation in general has been an

20   impediment since we emerged.  I mean just broadly speaking, the

21   effective date was February 15th, 2019.  There were affidavits

22   submitted in Guernsey on the 15th and 18th from Mr. Sevilla;

23   from Bill Scott, the former chairman of Highland CLO Funding;

24   Heather Bestwick, the other director of Highland CLO Funding,

25   submitting this Court's ruling to the Guernsey Court saying,

001904
APP 0131

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/06/25   Page 1035 of 2722   152 of 1017   PageID 2615
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 34 of 53

|                                    |     |
| ---------------------------------- | --- |
| *Terry - Direct/Chiarello*         | 34  |

1    'This is an offense, we can't get a fair trial in the United

2    States.'

3         The — after that we had a May 2019 hearing in

4    Guernsey.  These letters started, the demand letters started in

5    August of 2019 to U.S. Bank, Moody's, and S&P.  The lawsuit

6    occurred in October of 2019 and then was amended in November and

7    amended in January and amended in February.  And then we had a

8    letter in April and another letter in May of 2020.  And so it's

9    just been a constant — obviously it's a distraction, but when

10   all the service providers to Acis CLOs — or not all, but a lot

11   are being sued, it's a cloud over other third parties'

12   willingness to want to engage with Acis on their business.  And,

13   unfortunately, it's understandable.  So that — that's been an

14   impediment.

15        And then there have also been concerns raised and due

16   diligence meetings, and whatnot, that, well, what if you did a

17   CLO, and Mr. Dondero did acquire — and the secondary market

18   acquired a position in that CLO just to sue all the service

19   providers to that CLO initially, even if he wasn't involved in

20   the initial transaction, just because, you know, he seems to

21   have it out for me, and so that's just unfortunately constantly

22   this cloud over trying to go out and get new business.  It's

23   just this unending, you know, litigation against Acis.

24   Q.  All right.  So I think there was kind of — let me go back to

25   my question.  So effectively you — you fought and — and won the

Case 19-34054-sgj11  Doc 2062  Filed 03/18/21  Entered 03/18/21 20:59:39  Desc
Case 3:25-cv-02072-S  Document 15-4  Filed 06/06/25  Page 153 of 1017  PageID 2616
Main Document  Page 153 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20  Entered 09/28/20 00:18:35  Page 35 of 53

*Terry - Direct/Chiarello*                                          35

1   Guernsey litigation; is that — is that a correct assessment?

2   A.  Yes.

3   Q.  And ultimately it was dismissed after — how long had it been

4   pending when it was dismissed for lack of jurisdiction?

5   A.  Two — two years since the date it was filed, roughly.

6   Almost two years.

7   Q.  So even if you succeed in this litigation that's there, this

8   type of litigation, it injures Acis; is that correct?

9   A.  Yes.

10          MS. LAMBERT:  Objection, leading.

11          THE COURT:  Sustained.

12          MS. LAMBERT:  Yeah, and I — I ask that the answer be

13   stricken.

14          THE COURT:  It will be stricken.

15          MS. LAMBERT:  I'm sorry.  I had trouble unmuting.

16          THE COURT:  All right.  It is so ordered.

17          Continue.

18   BY MS. CHIARELLO:

19   Q.  Mr. Terry, what are the effects of the litigation on Acis?

20   A.  Well, I mean it's problematic.  It continues to be a cloud.

21   You know, as mentioned before, it continues to be a cloud over —

22   over our business.

23          MS. CHIARELLO:  Your Honor, I have nothing further.  I

24   prefer to redirect if there is a cross.

25          THE COURT:  All right.  Any cross, Ms. Lambert?

APP 0123
001906

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/23/  Page 154 of 1017   PageID 2617
Main Document   Page 36 of 3722
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 36 of 53

*Terry - Cross/Lambert*                                        36

1          Ms. Lambert?

2          MS. LAMBERT:  Yes.  Yes, Your Honor, —

3          THE COURT:  Go ahead.

4          MS. LAMBERT:  — there is a cross.

5                    <u>CROSS-EXAMINATION</u>

6   BY MS. LAMBERT:

7   Q.  Mr. Dondero, you and I have met before —

8          THE COURT:  You called him Mr. — you called him Mr.

9   Dondero.  That is —

10         MS. LAMBERT:  Mr. — I have questions about Mr.

11  Dondero.

12  BY MS. LAMBERT:

13  Q.  Mr. Terry, you and I met before.  And sometimes we've been

14  aligned, the U.S. Trustee and your individual interest, and

15  sometimes we've been opposed; is that right?

16  A.  Yes, I believe so.

17  Q.  First I want to ask you about the reserve amount.  The

18  reserve amount is redacted in the two quarterly operating

19  reports that are in evidence, right?

20  A.  Well, technically I don't think the reserve — a reserve

21  amount is one of the items on the operating report.  The reserve

22  amount, so I don't know how to exactly answer that question.

23  Q.  You didn't disclose the reserved amount today, did you?

24         You didn't —

25  A.  That's — well, I don't know if that's correct either.  If I

001907
APP 0151

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5-4    Filed 06/06/23    Page 155 of 1017    PageID 2618
Main Document    Page 155 of 262
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 37 of 53

*Terry - Cross/Lambert*                                           37

1    could, the outstanding claims, there's a Highland claim that

2    might total eight million pending this settlement agreement that

3    obviously has been reached.  I think that's what they have

4    alleged their prepetition gap period and admin claim to be in

5    total.  And then the other objected-to claims are about $400,000

6    in terms of Lackey Hershman/Stinson Leonard, whatever, I forget

7    how that's styled, and then Hunton Andrews Kurth.  And then —

8    and then there's my claim as well.  But the — which there is

9    between 8- and 900,000 outstanding on that.  So, in general,

10   when I think of the reserved amount I think of those claims and

11   how am I going to pay them over time with not just existing

12   cashflow but future cashflow.

13   Q.  You would agree with me that you have not disclosed today

14   the amount that has been set aside from reserve, correct?

15            MS. CHIARELLO:  Objection, asked and answered.

16            THE COURT:  Overruled.

17            THE WITNESS:  I don't think that is — I don't know how

18   to answer your question because the reserved amount isn't an

19   amount on the operating report, it's an amount that I need to

20   reserve for both in cash and in future cashflow, as I understand

21   it.

22   BY MS. LAMBERT:

23   Q.  Your counsel asked you if there was a reserve.  You have not

24   provided the dollar amount of the reserve to the Court today,

25   have you?

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document DocumentFiled 06/06/23 of 2722 156 of 1017   PageID 2619
Main Document   Page 156 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 38 of 53

*Terry - Cross/Lambert*                                    38

1   A.  Well, the dollar amount of the reserve is all of these

2   factors that we're talking about that can help take care of

3   these claims that I just mentioned.  So the dollar amount of the

4   reserve would be $8 million plus $400,000 plus somewhere between

5   8- and $900,000 total, but then, for example, there's a Highland

6   settlement that will take care of some of that, hopefully, there

7   is cash onhand and then there's future cashflows that will take

8   care of that amount that needs to be reserved for.

9   Q.  You would agree with me that on today's date, Acis and the

10  Stinson law firm do not currently agree on the amount owed to

11  Stinson, right?

12  A.  I believe that's correct.

13  Q.  You would agree with me that on today's date Acis and

14  Hunton, which you refer to as Andrews Kurth, do not agree on the

15  amount owed to Hunton, right?

16  A.  That's correct, I believe so.

17  Q.  And if the reserve amount is redacted or the underlying

18  information is not provided and the quart- — is redacted in the

19  quarterly reports, they can't complain about whether there is a

20  reserve or not, can they?

21  A.  Respectfully, the question was based on a reserve amount

22  that's in the QOR, and I don't think there is an item in the QOR

23  that's a reserve amount.

24  Q.  They can't evaluate the cashflow to determine whether they

25  should ask for a reserve, can they?

001909

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5-4 Filed 09/04/25    Page 157 of 1017    PageID 2620
Main Document    Page 40 of 2722
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 39 of 53

*Terry - Cross/Lambert*                                                    39

1    A.  I feel like there's two parts to that question.  The reserve

2    is inherent in the plan, that I have to keep a reserve, I

3    believe.  They can't — they could always ask for information.

4    Q.  I'm going to shift from the reserve to Acis' compliance with

5    the agreements.  You would agree with me that in or out of

6    bankruptcy Acis has to comply with its management contractual

7    obligations, wouldn't you?

8    A.  Generally, yes.

9    Q.  And — and the parties to your contractual obligations are

10   entitled to compliance, right?

11           MS. CHIARELLO:  Objection, Your Honor.  I think this

12   is outside the scope of direct.

13           THE COURT:  Well, she could always recall him, I

14   guess, as her own witness, so I'm going to go ahead and allow

15   it.  So overruled.

16           THE WITNESS:  I'm sorry.  Can you repeat the question,

17   Ms. Lambert?

18   BY MS. LAMBERT:

19   Q.  Complying with your contractual obligations is something

20   that the parties to the contracts are entitled to evaluate,

21   correct?

22   A.  I believe so.

23           MS. LAMBERT:  I have no further questions.

24           THE COURT:  All right.  Any redirect, Ms. Chiarello?

25           MS. CHIARELLO:  Just briefly.

APP 1127
001910

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/06/25    Page 158 of 1017    PageID 2621
Main Document    Page 251 of 2722
Case 18-30264-sgj11  Doc 1186  Filed 09/28/20    Entered 09/28/20 00:18:35    Page 40 of 53

*Terry - Redirect/Chiarello*                                40

REDIRECT EXAMINATION

1

2    BY MS. CHIARELLO:

3    Q.   Mr. Terry, does the plan require — or did the plan have a

4    bucket of money to pay unsecured creditors upon confirmation?

5    Was there a set dollar amount of funds?

6    A.   No.  There — there wasn't a set dollar amount of funds just

7    to pay unsecured creditors upon confirmation.

8    Q.   So how does the plan contemplate paying unsecured creditors?

9    A.   I think in part from cash that was available upon

10   confirmation and then in part from ongoing business operations.

11   Q.   So to the extent that there were not funds available on the

12   date that Acis emerged, creditors would be paid from Acis'

13   future cashflows; is that correct?

14   A.   Yes.

15   Q.   Okay.  And have Hunton — Hunton Andrews Kurth asked you or

16   requested any information from Acis regarding plan compliance?

17   A.   No, not to my knowledge.

18   Q.   Has Stinson Leonard requested any information from Acis

19   related to plan compliance?

20   A.   Not to my knowledge.

21   Q.   Okay.  And to the extent that that information was requested

22   from Hunton or Stinson Leonard or, I guess, Mr. Terry as an

23   individual, would you be amenable to providing that information

24   to them under some — the same or similar terms that you have

25   provided that information to Highland Capital Management?

001911
APP 1138

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Docsument Filed 04/04/25 of 2022 Page 159 of 1017   PageID 2622
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 41 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                    41

1    A.   Yes.

2              MS. CHIARELLO:  I have no further questions, Your

3    Honor.

4              THE COURT:  Any recross, Ms. Lambert?

5              Okay, I think that was a no.  Okay.

6              MS. LAMBERT:  No, Your Honor.

7              THE COURT:  I'm trying to figure out do I have a

8    question for Mr. Terry or maybe it's a question for you, Ms.

9    Chiarello.  As I was trying to keep track of what litigation was

10   pending versus what is not, there was a reference to adversary

11   proceedings in the Bankruptcy Court.  Since I haven't had those

12   before me yet I have not studied them.

13             So could someone tell me — I mean I know about the

14   biggie, if you will, the 34-count adversary proceeding involving

15   Highland and Highland's claims in the alleged fraudulent

16   transfers and whatnot, but are there others?  If so, I haven't

17   had reason to study those, so I'd like to know what those

18   involve.

19             MS. CHIARELLO:  Yes, Your Honor.  There are a few

20   other adversary proceedings that are pending in front of Your

21   Honor.  And you haven't — you're not familiar with them because

22   they have largely been stayed or delayed given kind of the

23   posture of the Highland Capital Management bankruptcy case.

24   Those were filed on the eve of the 108 deadline, just to

25   preserve causes of action.  So the first of which is what we

APP 1139
001912

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 10-4   Filed 06/04/25   Page 160 of 1017   PageID 2623
Main Document   Page 41 of 52
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 42 of 53

*Debtors' Motion to File Redacted Quarterly Reports*                42

1   have been referring to as the officer adversary.  I don't have

2   the case number in front of me, but I can get it for you.  And

3   that is asserting similar — a similar factual scenario that's at

4   issue in the big Highland — or the big adversary case that Your

5   Honor is familiar with, but the causes of action are against

6   Acis' former officers and directors, so Mr. Dondero, Mr.

7   Waterhouse, an individual — it's really individuals including

8   some Highland Capital employees.  We hope that that is in the

9   midst of being resolved or — to some degree.  And I think you —

10  there hasn't been a 9019 filed by Highland Capital Management,

11  so I'm — and I'm not sure where that stands, but I think some of

12  that will be addressed or I'm hopeful some of it will be

13  addressed, and when you are able to see that.

14          And then there is one other adversary pending related

15  to a preference in a fraudulent-transfer claim against Mr.

16  Stinik.  Mr. Stinik was a Highland Capital — he had the Highland

17  Capital Management email address but contends that he was a

18  contractor for Acis.  The basis of the lawsuit is effectively

19  there is — there was no contract between Mr. Stinik and Acis.

20  And it's a relatively small dollar fraudulent-transfer and

21  preference action, I think it was about $380,000 total.  I may

22  be — that may be a little high.  But, again, I think — I think

23  that — it's not — it's not before Your Honor today and it's

24  certainly — I believe we're working to move that trial — to a

25  trial date out, but it's really in the discovery phase.

001913

**APP 1149**

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/04/25    Page 161 of 1017    PageID 2624
Main Document    Page 254 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 43 of 53

*Debtors' Motion to File Redacted Quarterly Reports*          43

```
 1          THE COURT:  All right.  Well, when you were describing
 2   the officer adversary proceeding against — or officer and
 3   director adversary proceeding against Dondero, Waterhouse, and
 4   some Highland employees, I was a little confused.  Do you think
 5   that has been entirely settled or — because you mentioned the
 6   9019 motion.  I know that Acis and Highland have resolved your
 7   issues, but has this been resolved as well?
 8          MS. CHIARELLO:  Your Honor, if I may —
 9          Ms. PATEL:  Your Honor, —
10          THE COURT:  Oh, Ms. — Ms. Patel is speaking up.  She
11   may be the point person on that.
12          MS. PATEL:  Yes.
13          THE COURT:  Go ahead.
14          MS. PATEL:  Yes, Your Honor.  If I — if I can chime
15   in.  With respect to the settlement.  The settlement involves
16   certain of the defendants in the Dondero, et al. adversary, so
17   the nonHighland adversary, but not all of them.  There are
18   certain employees who are contemplated to be included as a part
19   of the resolution.  Now there are still developments that could
20   happen and that will become a little bit more clear I think when
21   the 9019 is filed.  It's anticipated that that 9019 — at least
22   everyone's targeting that to be filed, frankly, today.  That
23   might get pushed out.  And, just as a full disclosure, it might
24   get pushed out a couple of days, but the parties are working
25   hard to get that 9019 on file.  But — so it's a little bit of a
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 162 of 1017   PageID 2625
Main Document   Page 45 of 732
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 44 of 53

*Debtors' Motion to File Redacted Quarterly Reports*          44

1    hybrid answer as to what's going to happen with respect to it,

2    but the resolution does not contemplate a full global resolution

3    of the Dondero, et al. lawsuit, it's just a few — a few of the

4    defendants, namely, certain Highland employees.

5              THE COURT:  Okay.  Thank you.

6              All right.  Well, that — that's really all I had as

7    far as follow-up questions.

8              So thank you, Mr. Terry, we appreciate your testimony

9    today.

10         (Witness excused.)

11             THE COURT:  Is there anything else, Ms. Chiarello?

12             MS. CHIARELLO:  Just by briefly, Your Honor.

13             I think it's important to highlight that we are here

14   truthfully near — past confirmation, and there is no absolute

15   right for creditors —

16             MS. LAMBERT:  Your Honor, I'm trying to determine have

17   we closed the evidence, so we're submitting closing arguments?

18             THE COURT:  Well, I'm trying to determine that as

19   well.

20             Ms. Chiarello, are you having — are you going to have

21   any more evidence?

22             MS. CHIARELLO:  No, Your Honor.  We rest on the

23   evidence submitted.

24             THE COURT:  Okay.  So I need to ask Ms. Lambert:  Do

25   you have evidence at this time?

001915

APP 1142

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 6-4    Filed 06/04/25    Page 163 of 1017    PageID 2626
Main Document    Page 246 of 722
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 45 of 53

*Closing Argument on behalf of the Debtors/Movants*                    45

1          MS. LAMBERT:  The U.S. Trustee's evidence has been

2    admitted in the redacted quarterly reports that were admitted in

3    the case in chief of Acis.  The U.S. Trustee has no additional

4    evidence.  Thank you.

5          THE COURT:  All right.  Thank you.

6          All right, Ms. Chiarello, you may resume.

7          <u>CLOSING ARGUMENT ON BEHALF OF THE DEBTORS/MOVANTS</u>

8          MS. CHIARELLO:  I apologize, Your Honor.  Again

9    Annemarie Chiarello on behalf of Acis, L.P.

10          I think it's important to note here that we are post

11   confirmation.  We are really almost nearly two years post

12   confirmation.  And in a situation where a case has been closed

13   pursuant to a final decree, creditors would not have access to

14   this issue — this information.  This is not an absolute right of

15   creditor to get this information.  Even though that is — that is

16   the case, Acis is absolutely amenable to providing this

17   information to creditors.

18          Our concern is really having it available to

19   litigation counterparties and parties who not only previously

20   sued Acis but have — who have threatened to sue Acis, Brigade,

21   U.S. Bank, and even Moody's, the rating agency.  We believe we

22   have met our burden with respect to 107(b).  And given that we

23   have demonstrated that the information is confidential, under

24   107(b) the Court does not have discretion to permit this

25   information to be publicized on the docket.

APP 1143
001916

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/06/25    Page 164 of 1017    PageID 2627
Main Document    Page 46 of 53
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 46 of 53

*Closing Argument on behalf of the U.S. Trustee*                    46

1          Like I have said, we have been amenable to Ms. Lambert

2    in providing this information to her in whichever — including

3    whatever revision she would like in the order with respect to

4    her and the United States Trustee having access to this

5    information, our concern is really related to litigation

6    counterparties.  And I know that this is very unorthodox and

7    it's not typical for operating reports to be redacted, however

8    this is a very highly specific factual scenario that we don't

9    expect to be the case in other — in other bankruptcies.

10   Typically bankruptcies doesn't result in this type of satellite

11   litigation, and we're well aware of that.  And we hope that

12   we're moving forward, where that isn't going to continue to be

13   the case.  But given what's already occurred to — for Acis and

14   even though — even though Acis has the ability to defeat some of

15   these frivolous claims or suits filed in Guernsey, this doesn't

16   — we don't want to embolden litigation counterparties with

17   information that they should be able — if they think they're

18   entitled to, they can get a legitimate discovery.

19          So with that, Your Honor, we ask the Court to grant

20   our motion for redact — to redact Acis' quarterly operating

21   reports in a manner consistent with what you have seen of

22   Exhibit B.

23          THE COURT:  All right.  Thank you.

24          Ms. Lambert, closing argument.

25          CLOSING ARGUMENT ON BEHALF OF THE U.S. TRUSTEE

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4   Filed 06/04/25   Page 165 of 1017   PageID 2628
Main Document   Page 164 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 47 of 53

*Closing Argument on behalf of the U.S. Trustee*                    47

1          MS. LAMBERT:  Yes, Your Honor.

2          On balance, the Court has two components here.  One

3    component is the public's access to information, information

4    that is used to evaluate compliance with the Code and the rules

5    and the plan.  And both the creditors and the public are

6    entitled to that information.

7          On this side, the debtor, Acis, or the

8    postconfirmation debtor contends that Stinson and Hunton should

9    not knock at their door and ask for information if they need it.

10   Over here we have the component of the contention that the

11   litigation against the debtor or the postconfirmation debtor

12   regarding compliance with the management agreement, compliance

13   with its fiduciary duties and similar, and the side effects for

14   Moody's and for — for other entities is a reason to protect

15   information that normally would be public in the bankruptcy

16   case.

17         The people over here should not have to knock on the

18   door because there is an issue about compliance.  Compliance is

19   a requirement of the Bankruptcy Code and rules.  And I know that

20   the Court and I have experienced cases both personally and in

21   observe where unfortunately people have gotten involved in

22   ongoing years of litigation.

23         Historically, Mr. Terry and Mr. Dondero and their

24   related entities had a business marriage.  Historically, that

25   business marriage has come to an end, but they still have a

001918
APP 1165

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document Document 49 Filed 06/09/25 of 272 166 of 1017    PageID 2629
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 48 of 53

*The Ruling of the Court*                                                48

1    child together, which is Acis.  And the reporting about that

2    child and the financial information about that child does not

3    change the obligation to comply with the legal requirements and

4    to comply with the contractual requirements.  If there is

5    litigation that is being filed, it is frivolous.  Federal rules

6    and the common law provide remedies for that, including remedies

7    that are sufficient to compensate for that.

8            In addition, even with the third-party litigation, to

9    the extent that it impacts the ability of Acis to do new

10   contracts, there are also mitigation remedies for that.  It's

11   unfortunate, but that is the factual situation that we have.

12   That factual situation is nonsufficient to limit the information

13   that is normally publicly required in this context.

14   Alternatively, the United States Trustee requests that the

15   motion be denied in its entirety or, alternatively, that it be

16   tailored in accordance with the prayer and the U.S. Trustee's

17   objection.

18                   THE RULING OF THE COURT

19           THE COURT:  All right.  Thank you.

20           Well, we're going — we're going to stop it right here.

21   I think that Mr. Dondero technically did not have standing here

22   today, that I think — I think Mr. Lynn weighed in and explained,

23   you know, that he felt compelled to weigh in on a potentially

24   precedential matter and so he's weighed in, and so we're going

25   to cut it off there.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 6-15   Filed 09/04/25   Page 167 of 1017   PageID 2630
Main Document   Page 166 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 49 of 53

*The Ruling of the Court*                                        49

1          I have found this to be a somewhat tough call, tough

2    decision here today because, on the one hand, it sort of feels

3    like in this context, at this very late juncture of Acis'

4    Chapter 11, there's sort of a no-harm/no-foul situation.  We are

5    not only well past, more than a year and a half past

6    confirmation and the effective date, but we only have a couple

7    of creditors left at this point other than Highland and — who

8    gets the information pursuant to an agreement, or at least its

9    professionals and independent board members do and Mr. Terry

10   himself.  So it sort of feels a little bit like, eh, if I would

11   grant this motion, there are really likely only a couple of

12   parties-in-interest who are impacted, and they have gotten

13   notice, they haven't weighed in.  That is Hunton Andrews Kurth

14   and Stinson.  But 107 governs this motion.  And, as has been

15   noted, it talks in terms of everything being public record and

16   open to examination to the public without any charge.  And the

17   Court can deviate from this public access only on motion of a

18   party to protect a trade secret, or confidential research,

19   development, or commercial information, or to protect a person

20   with respect to scandalous or a defamatory matter contained in a

21   paper filed.  So that's the governing statute.

22          So looking at the evidence today, would these

23   quarterly operating reports and the numbers they reflect for

24   receipts and disbursements and whatnot, is this in the nature of

25   any of those elements of 107(b), I don't think it is.  The only

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Document Docume Filed 06/25/1 of 272a 168 of 1017 PageID 2631
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20 Entered 09/28/20 00:18:35 Page 50 of 53

*The Ruling of the Court*                                                    50

1   thing that it might be is commercial information, but I really

2   don't think there's been a showing that it is of the nature that

3   107(b) is intended to address.

4          Now don't get me wrong, I am very troubled by some of

5   what I've heard today.  I doubt Mr. Dondero is listening in

6   personally, but I'm going to say, and maybe it will get back to

7   him, maybe it won't, but that I'm very troubled by hearing that

8   Dondero-controlled entities, and I believe the DAF, based on

9   what I've heard in the past, is Dondero controlled, I'm very

10  troubled that Dondero-controlled entities are suing Acis and

11  parties that have dealt with Acis, U.S. Bank, Brigade, and the

12  Moody's one is really mind-boggling, but I'm very troubled that

13  this could be hampering Acis' ability to do a reset and it's

14  driving up expenses.

15         And if these lawsuits were brought before me through a

16  removal or any other mechanism, you know, first, I would have to

17  look at subject matter jurisdiction of the Bankruptcy Court.

18  Yes, we're way past the effective date of Acis' plan, but the

19  Fifth Circuit case authority provides that if there is a dispute

20  postconfirmation that bears on the interpretation,

21  implementation, or execution of a confirmed plan, then the

22  Bankruptcy Court has subject matter jurisdiction in that

23  context.  And it sure sounds like, hearing Mr. Terry's version

24  of things today, which sounded very credible, that this is

25  potentially impinging on the reorganization and plan of Acis.

APP 1148

001921

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document Filed 06/06/25    Page 252 of 272 169 of 1017    PageID 2632
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 51 of 53

*The Ruling of the Court*                                                51

1          So it's very troubling to me that — well, I've said it

2    before in Highland hearings, that these battles just continue

3    on, but if it's impairing with a plan I confirmed, it's

4    impairing a plan I confirmed, it's impairing the ability to

5    perform under that plan, then that is a problem for the

6    plaintiffs.

7          Now I've heard there is no pending litigation in that

8    regard, but I'm troubled by the April 2020 letter I saw that is

9    essentially a suggestion we may start this up again, the

10   litigation that we dismissed.  It's just ridiculous, for lack of

11   a better term, that Dondero and his entities would be doing some

12   of the things it sounds like they're doing:  Suing Moody's, for

13   crying out loud, for not downgrading the Acis CLOs.  If Mr.

14   Dondero doesn't think that is so transparently vexatious

15   litigation, yeah, I'm going out there and saying that.  I

16   haven't seen it, but, come on.

17         So, bottom line, I don't find the 107 standard here is

18   met today, so I am denying entirely the motion.  I haven't been

19   convinced that this is commercial information that 107(b)

20   justifies redacting or sealing.  But, again, I am most troubled

21   by what I've heard today.

22         I have found Mr. Terry to be a very credible witness

23   today on these points.  He's testified in this Court many times

24   and I continue to find him a very credible witness.

25         And so to the extent Mr. Dondero is listening or gets

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/25   Page 170 of 1017   PageID 2633
Main Document   Page 153 of 272
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 52 of 53

*The Ruling of the Court*                                         52

1    a transcript, I hope it's loud and clear to him that to the

2    extent you are engaging in efforts surreptitious or overt to

3    derail Acis in its reorganization, there is going to be a price

4    to pay for that.  So I hope that message gets to him.

5             Very troubled, very troubled by what I've heard today.

6             All right.  Well, I think that concludes our business

7    here today.  Is there anything else anyone wants to raise?

8             MS. LAMBERT:  Judge Jernigan, Ms. Lambert for the U.S.

9    Trustee.  Would you like me to prepare an order just as for the

10   reasons stated?

11            THE COURT:  I would like you to do that.  Thank you

12   very much.  All right.

13            MS. LAMBERT:  And I think I will order the — I think I

14   will order the transcript and have it sent to Mr. Lynn.

15            THE COURT:  All right.  Thank you.

16        (The hearing was adjourned at 5:21 o'clock p.m.)

17                              —o0o—

18

19

20

21

22

23

24

25

APP 159
001923

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 171 of 1017   PageID 2634
Main Document   Page 54 of 242
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 53 of 53

State of California          )
                            )     SS.
County of San Joaquin        )


          I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

          I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

          I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.



                              Susan Palmer
                              Palmer Reporting Services

                              Dated September 26, 2020

001924
APP 151

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 04/06/25   Page 172 of 1017   PageID 2635
Main Document   Page 255 of 2722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 1 of 100

# EXHIBIT 12

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                  )   Case No. 19-34054-sgj11
In Re:                            )
                                  )
HIGHLAND CAPITAL                  )   Dallas, Texas
MANAGEMENT, L.P.,                 )   June 30, 2020
                                  )   9:30 a.m. Docket
          Debtor.                 )
                                  )   MOTION FOR REMITTANCE OF FUNDS
                                  )   HELD IN REGISTRY OF COURT
                                  )   FILED BY CLO HOLDCO, LTD.
                                  )   (590)
_____   )

                        TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

For the Debtor:              Jeffrey N. Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067
                             (310) 277-6910

For the Debtor:              John A. Morris
                             Greg Demo
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For CLO Holdco, Ltd.,        John J. Kane
Movant:                      Brian W. Clark
                             KANE RUSSELL COLEMAN LOGAN, P.C.
                             901 Main Street, Suite 5200
                             Dallas, TX  75202
                             (214) 777-4261

For the Official Committee   Matthew A. Clemente
of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                             One South Dearborn Street
                             Chicago, IL  60603
                             (312) 853-7539
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15-4   Filed 06/06/25   Page 173 of 1017   PageID 2636
Main Document   Page 256 of 2722

Case 19-34054-sgj11  Doc 802  Filed 07/02/20   Entered 07/02/20 18:59:24   Page 2 of 100

2

```
 1    APPEARANCES, cont'd.:

 2    For the Debtor:              Zachery Z. Annable
                                   HAYWARD & ASSOCIATES, PLLC
 3                                 10501 N. Central Expressway,
                                     Suite 106
 4                                 Dallas, TX  75231
                                   (972) 755-7104
 5
      For the Issuer Group:        Amy K. Anderson
 6                                 JONES WALKER, LLP
                                   811 Main Street, Suite 2900
 7                                 Houston, TX  77002
                                   (713) 437-1866
 8
      For the Issuer Group:        James T. Bentley
 9                                 SCHULTE ROTH & ZABEL, LLP
                                   919 Third Avenue
10                                 New York, NY  10022
                                   (212) 756-2000
11
      For Acis Capital            Rakhee V. Patel
12    Management GP, LLC:          WINSTEAD, P.C.
                                   2728 N. Harwood Street, Suite 500
13                                 Dallas, TX  75201
                                   (214) 745-5250
14
      For Redeemer Committee of   Mark A. Platt
15    the Highland Crusader        FROST BROWN TODD, LLC
      Fund:                        100 Crescent Court, Suite 350
16                                 Dallas, TX  75201
                                   (214) 580-5852
17
      For Redeemer Committee of   Marc B. Hankin
18    the Highland Crusader        JENNER & BLOCK, LLP
      Fund:                        919 Third Avenue
19                                 New York, NY  10022-3098
                                   (212) 891-1600
20
      Recorded by:                 Michael F. Edmond, Sr.
21                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
22                                 Dallas, TX  75242
                                   (214) 753-2062
23

24

25
```

APP 1153

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/25   Page 174 of 1017    PageID 2637
Main Document    Page 6 of 722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 3 of 100

3

1    Transcribed by:                Kathy Rehling
                                     311 Paradise Cove
2                                    Shady Shores, TX  76208
                                     (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4 Filed 06/06/25    Page 175 of 1017    PageID 2638
Main Document    Page 175 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 4 of 100

4

```
 1              DALLAS, TEXAS - JUNE 30, 2020 - 9:37 A.M.

 2          THE CLERK:  All rise.

 3          THE COURT:  Good morning.  Please be seated.  This is

 4   Judge Jernigan, and I am ready to start our Highland setting.

 5   Let me start by getting appearances.  I see Mr. Kane there on

 6   the video for our Movant this morning on for CLO Holdco.  Is

 7   that correct?

 8          MR. KANE:  Yes, Your Honor.  Thank you.

 9          THE COURT:  Good morning.  All right.  Who do we have

10   for the Debtor?  Do we have Mr. Pomerantz or others from the

11   Pachulski firm?

12          MR. POMERANTZ:  Yes.  Good morning, Your Honor.  It's

13   Jeff Pomerantz and John Morris, and also on the phone is Greg

14   Demo, on behalf of the Debtors.

15          THE COURT:  Okay.  Thank you.

16          MR. MORRIS:  Good morning, Your Honor.

17          THE COURT:  Good morning to all of you.  All right.

18   What about for the Unsecured Creditors' Committee?  Do we have

19   Mr. Clemente or Ms. Reid or others?

20          MR. CLEMENTE:  Yes.  Good morning, Your Honor.

21   Matthew Clemente from Sidley Austin on behalf of the

22   Creditors' Committee.

23          THE COURT:  Okay.  Good morning.

24          MR. CLEMENTE:  Good morning.

25          THE COURT:  All right.  I'll just say, do we have
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 176 of 1017   PageID 2639
Main Document   Page 259 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 5 of 100

5

```
 1  some of our other usual participants, maybe someone from Acis,

 2  Ms. Patel or Ms. Chiarello?  No?

 3          MR. ANNABLE:  Your Honor, --

 4          THE COURT:  Oh.

 5          MR. ANNABLE:  -- this is Zachery Annable --

 6          THE COURT:  Oh.

 7          MR. ANNABLE:  Your Honor, --

 8          THE COURT:  Good morning.

 9          MR. ANNABLE:  -- this is Zachery Annable.

10          THE COURT:  All right.  Good morning, Mr. Annable,

11  also for the Debtor.  Any other --

12          MS. ANDERSON:  Oh, sorry.

13          THE COURT:  Oh.  Go ahead?

14          MS. ANDERSON:  Yes.  Sorry, Your Honor.  I

15  (inaudible).

16          MS. PATEL:  Good morning, Your Honor.  Rakhee Patel

17  on the phone.  I'm not planning on participating.  We're just

18  listening in today.

19          THE COURT:  All right.  Any other counsel wishing to

20  appear this morning?

21          MS. ANDERSON:  Good morning, Your Honor.  Oh.

22          THE COURT:  Go ahead.

23      (No response.)

24          THE COURT:  Do we have -- is that maybe Ms. Anderson?

25          MS. ANDERSON:  That was, Your Honor.  I apologize.
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/06/25    Page 177 of 1017    PageID 2640
Main Document    Page 6 of 722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 6 of 100

6

```
 1    This is Amy Anderson with Jones Walker on behalf of the
 2    Issuers.  And Mr. James Bentley with Schulte Roth & Zabel is
 3    also on the phone this morning.
 4              THE COURT:  All right.  Good morning to you both.
 5    Any other people wishing to appear?
 6              MR. PLATT:  Your Honor, Mark Platt for the Redeemer
 7    Committee of the Highland Crusader Fund.  And Marc Hankin from
 8    Jenner & Block is on the phone as well.
 9              THE COURT:  Okay.  Good morning to you both.
10              MR. HANKIN:  Good morning.
11              THE COURT:  Anyone else?
12              MR. CLARK:  Your Honor, this is Brian Clark from Kane
13    Russell.  I'm here with Mr. Kane on behalf of CLO Holdco.
14              THE COURT:  Okay.  Good morning.
15              MR. CLARK:  Good morning.
16              THE COURT:  All right.  Anyone else?
17        All right.  Well, I'll start by asking:  Do we have any
18    stipulations or agreements with regard to evidence or how
19    we're going to proceed this morning?
20              MR. KANE:  Yes, Your Honor.  This is John Kane for
21    CLO Holdco.  We do.
22              THE COURT:  All right.
23              MR. KANE:  I would like to note on that question that
24    we've actually worked very well together.  CLO Holdco has had
25    a pretty open discourse with Committee's counsel and got on
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15 Filed 06/06/25   Page 178 of 1017   PageID 2641
Main Document   Page 251 of 2722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 7 of 100

7

1   the phone yesterday to go through any final evidentiary

2   issues, and then had some follow-up late last night.  And so

3   what we'd like to announce to the Court is that there's a

4   stipulation to the admissibility of all of the exhibits in

5   both parties' witness and exhibit list.

6           THE COURT:  All right.

7           MR. KANE:  And on top of that, there are a number of

8   factual stipulations.  And I can walk through that on our kind

9   of case-in-chief presentation, or we can walk through that

10  now, either way, whichever is most convenient for the Court.

11     The actual stipulations are largely related to what is and

12  isn't a dispute in this hearing.

13     So, the Committee has stipulated that, for the purposes of

14  this hearing, there is no contest about the amount in

15  controversy.  CLO Holdco is claiming that it is entitled to

16  the full amount of the funds in the registry, and there's

17  really no dispute about the amount that CLO Holdco is

18  asserting its interest in.  There's no accounting concerns

19  here.

20          THE COURT:  Okay.

21          MR. KANE:  There is also a stipulation for the

22  purposes of this hearing that I do believe bears reading into

23  the record, and I'd like to do that on the case-in-chief, just

24  to make sure that everything is clear, we're not overstating

25  or understating any party's position.

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Document 15-4 Filed 06/06/25 Page 179 of 1017 PageID 2642
Main Document Page 652 of 722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20 Entered 07/02/20 18:59:24 Page 8 of 100

8

1          THE COURT:  Okay.

2          MR. KANE:  But, in summary of that, there's really no

3   dispute that, upon CLO's obtaining the interests in the

4   Dynamic and AROF Funds, it did not, after obtaining them,

5   later transfer that interest to any other party.

6          THE COURT:  Okay.

7          MR. KANE:  And then, finally, Your Honor, this was

8   reached late last night:  There is a stipulation between the

9   parties for the purposes of this hearing to a statement made

10  by the Debtor in a footnote that essentially states that there

11  was a transfer of a note from the Dugaboy Trust, it's a note

12  payable owed by the Dugaboy Trust, to the Get Good Trust, that

13  that $24 million note was transferred to the Debtor, and that

14  the principal paid down on that note has reduced the

15  obligation from about $24 million to about $17.5 million in

16  principal obligations, and that the Dugaboy Investment Trust

17  has been paying amounts due and owing under that note to the

18  Debtor.  We'll go into a little bit more detail about why

19  that's relevant in our case-in-chief and in our closing

20  argument.

21         THE COURT:  All right.

22         MR. KANE:  I think the way we'd like to proceed, Your

23  Honor, is each side provide an opening statement, and then

24  we'll transition to showing our case-in-chief and kind of a

25  walk-through of the evidence, and then a closing argument to

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 180 of 1017   PageID 2643
Main Document   Page 153 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 9 of 100

9

 1   kind of draw things to a conclusion, Your Honor.

 2       I will say that, given the stipulation reached last night

 3   on the payments on the Dugaboy Trust, we do not believe that

 4   the testimony of Mr. David Klos is going to be necessary any

 5   longer.

 6           THE COURT:  All right.  Let me recap a couple of

 7   things.  First, there was the stipulation as to the

 8   admissibility of each other's exhibits.  The Movant's

 9   exhibits, your exhibits, Mr. Kane, were filed at Docket Entry

10   No. 782, so that's where I'm going to look today as exhibits

11   are referenced.

12       Now, I know there were some sealed documents in the list

13   of exhibits.  I show Exhibits 11, 12, 13, 14, 15, and 16 are

14   actually under seal.  All right.

15           MR. KANE:  Yes, Your Honor.

16           THE COURT:  So, then turning to the Creditors'

17   Committee, their exhibits are at Docket Entry No. 789 on

18   PACER.  They have three exhibits.

19       So those are the exhibits for the record that we're

20   talking about, correct?

21           MR. KANE:  Yes, Your Honor.

22           MR. CLEMENTE:  That's correct, Your Honor.

23           THE COURT:  Okay.  Thank you.

24       And then the last thing I wanted to clarify is your

25   comment about there's no contest about the amount in

Main Document   Page 10 of 272

1   controversy.  So, dollars and cents, are we talking about

2   $1,516,354.38 related to the Dynamic Fund and then $898,075.53

3   regarding the Argentina Fund?

4          MR. KANE:  Yes, Your Honor.

5          THE COURT:  Okay.  Very good.

6          MR. KANE:  John Kane for CLO.  Yes, Your Honor.

7          THE COURT:  Okay.  Thank you.  All right.  Well, you

8   may make your opening statement.

9          MR. KANE:  Thank you, Your Honor.

10         OPENING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

11         MR. KANE:  So, I would like to begin with just making

12  sure that we have -- we've set the stage for this dispute as

13  well as I can here.  I want to look at, Your Honor, the

14  requests for relief that are before this Court.

15     So, CLO has requested that this Court remit funds from its

16  registry.  And there is no other (inaudible) request for leave

17  by any other party.

18     There is no adversary proceeding against CLO Holdco filed

19  by the Committee.  There are no claims or causes of action of

20  any kind asserted by the Committee.  There is no objection to

21  CLO Holdco's proof of claim on file.  There is no motion for a

22  prejudgment writ of attachment, and there is no motion by the

23  Committee for an injunction.  And we'd argue that that would

24  be procedurally improper anyway.

25     The only thing that the Committee has done is objected to

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Document   Filed Page 06/06/25 of 2722 182 of 1017   PageID 2645

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 11 of 100

11

 1 | this Court's release of funds from the registry to CLO Holdco.

 2 |     Your Honor, this is a -- this is a registry dispute.  This

 3 | is a dispute under Title 28 of the United States Code, Section

 4 | 2042.  And under that statute,  CLO Holdco has the burden of

 5 | proof here to show by a preponderance of evidence that it has

 6 | a valid legal claim to the funds in the registry of the Court.

 7 |     So, how does it prove by a preponderance of the evidence

 8 | that it has that claim?  Courts looking at this issue show

 9 | that CLO Holdco has to show that it has title to the funds, it

10 | has to provide evidence of ownership, and it has to show proof

11 | that that claim is current.  In other words, it's not an

12 | unliquidated claim, it's not a claim that's been transferred

13 | to somebody else or that's possessed by some other party.

14 |     So, Your Honor, what is the evidence going to show in this

15 | case?  And as we walk you through our case-in-chief, we think

16 | it's going to be very clear that the evidence will show that

17 | CLO Holdco obtained an interest in what we are going to refer

18 | to as the Dynamic and the AROF Funds.  Those interests are

19 | evidenced by executed subscription agreements.  Once they were

20 | in CLO Holdco's possession, those interests weren't

21 | transferred to any other party.

22 |     The Dynamic and the AROF Funds were liquidated.  The

23 | Debtor accounted for CLO Holdco's interests in those funds.

24 | The Debtor sought to distribute those funds to CLO Holdco.

25 | There is no dispute over the amount of CLO Holdco's liquidated

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 256 of 272
Case 3:25-cv-02072-S   Document 5-4   Filed 06/06/25   Page 183 of 1017   PageID 2646

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 12 of 100

12

 1   interests in those funds.  And now CLO Holdco is seeking a

 2   request for the remittance of those funds from the registry of

 3   the Court.

 4        Your Honor, our evidence will completely establish that

 5   CLO Holdco has a claim, a valid, legal claim well beyond the

 6   preponderance of the evidence standard.

 7        Your Honor, those, the facts, the evidence that proves up

 8   each of those elements are not subject to any objection and

 9   are not refuted.

10        Based on that evidence, Your Honor, the bigger question to

11   CLO Holdco is why are fighting in this contested matter?  We

12   have to look to the Committee's objection here.  What are they

13   really arguing?

14        The Committee's argument is essentially a guilt-by-

15   association argument.  There's a suggestion in the Committee's

16   objections that James Dondero did bad things.  CLO Holdco is

17   this related entity, and so it must have done bad things, too.

18   The Committee needs time to investigate potential claims and

19   causes of action, and because CLO Holdco is a Cayman entity,

20   any judgment that it might hypothetically obtain in the future

21   will be uncollectable unless these funds are seized and held

22   in the registry of the Court and used as a surety against that

23   later hypothetical judgment.

24        So, Your Honor, this is an evidentiary hearing, and what

25   we would ask the Court to do is scrutinize the evidence.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/05/25   Page 184 of 1017   PageID 2647
Main Document   Page 157 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 13 of 100

13

1       So, what is the Committee's evidence likely to show?

2   Well, there are only three exhibits submitted by the

3   Committee.  One of them is the Acis opinion that you issued on

4   the involuntary file.  The second is the Acis opinion you

5   issued confirming the plan of reorganization in that case.

6   And those two opinions combine for a grand total of two total

7   references to CLO Holdco.  And the third exhibit proposed by

8   the Committee is a transcript of the March hearing on the

9   distribution motion, in which there really were no evidentiary

10  issues addressed associated with CLO Holdco at all.

11      So the better question becomes, Your Honor, what elements

12  is missing?  And as we go through our case-in-chief, we'd ask

13  you to consider the following.  The Committee will provide no

14  evidence that it pursued any discovery from CLO Holdco in the

15  ten weeks since CLO Holdco filed its motion for remittance of

16  funds from the registry.  There were no follow-up questions

17  asserted by the Committee in response to CLO Holdco's

18  deposition by written questions and David Klos' responses to

19  those questions.  The Committee did not subpoena any witness

20  to testify at this hearing, and they've presented no evidence

21  of wrongdoing by CLO Holdco. And finally, the Committee will

22  show that there is no evidence whatsoever regarding CLO's

23  ability to satisfy a money judgment, should the Committee

24  obtain that judgment in the future.

25      So, if we look at the scope of the evidence that's

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/06/25    Page 185 of 1017    PageID 2648

Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 14 of 100

14

1   presented by the parties in this case, we have CLO Holdco

2   presenting overwhelming evidence of a present valid legal

3   claim to the funds in the registry of the Court, and no

4   evidence submitted by the Committee to refute that fact, and

5   no claim for affirmative relief by the Committee or any

6   evidence that would be necessary to prove up any claim for

7   relief.

8       So, Your Honor, based on the evidence that you will hear

9   today, we ask that this Court deny the Committee's objection

10  and grant CLO Holdco's motion.

11      You will see that there is no evidence supporting any kind

12  of injunction or prejudgment writ of attachment, and that the

13  -- that CLO Holdco has satisfied its burden of proof by a

14  preponderance of the evidence to show ownership of the funds

15  in the registry that this Court holds as a statutory trustee

16  for its benefit.

17      Thank you.

18          THE COURT:  All right.  I am going to interject

19  something here.  I'm glad that the March 4, 2020 transcript is

20  part of the evidence here, because I have to say -- I had

21  wanted to go back and look at that, and had not done it, and

22  this is why -- your words, Mr. Kane, were, Why are we fighting

23  this contested matter?  I have to say, I had the same reaction

24  myself, but with a slightly different spin on it.  I thought

25  this was a pragmatic solution that everyone agreed to on March

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 186 of 722
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 186 of 1017   PageID 2649

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 15 of 100

15

1    4th.  I don't think CLO Holdco, Ltd., your client, made a

2    formal appearance at the hearing on March 4th, but I take it

3    you all got notice of the hearing.

4        Tell me why so quickly we're revisiting this issue.

5    That's the way I look at it.  Maybe my perspective is not

6    accurate and you're going to tell me it's not accurate.  But

7    it feels like to me we just were here on this issue with the

8    Debtor's own motion filed February 24, wanting a court order

9    blessing these disbursements to affiliated or potentially

10   insider parties who were due to receive these funds, and then

11   things just sort of evolved at the March 4th hearing where

12   everyone would agree that the money -- I guess at least the

13   money that was owed to your client, as well as Highland

14   Capital Management Services, Inc. -- would be kept in the

15   registry of the Court, just as a placeholder.  Okay?  So

16   that's the perspective I come in with.  That is my memory of

17   what happened.  Tell me why I'm not seeing it the way you're

18   seeing it.

19       MR. KANE:  Yes, Your Honor.  For the record, John

20   Kane for CLO Holdco.  I'd be happy to address the Court's

21   question.

22       That motion was filed seeking relief on essentially an

23   expedited basis.

24       I'm sorry.  I don't know if I cut out there.  I had a

25   little glitch on my screen.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 187 of 1017   PageID 2650
Main Document   Page 186 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 16 of 100

16

1      But that hearing sought relief, in essence, on an

2    expedited basis, and drew a vehement objection from both the

3    Committee and also the Acis parties, Mr. Terry and the like.

4      When we looked at that issue, we determined that there was

5    likely a reasonable solution.  CLO Holdco's representative,

6    Grant Scott, had conversations with Judge Nelms, one of the

7    Independent Directors for the Debtor, discussing the

8    resolution of a -- of a proposal that would resolve some of

9    what we understood to be the Debtor's concerns about its

10   duties to distribute those funds.

11     It would not be a permanent solution.  At least, that was

12   our understanding.  Putting funds into the registry of the

13   Court would preserve the issue of CLO Holdco showing this

14   Court that it had a legal entitlement to those funds, as

15   opposed to proceeding with some dispute over the technical

16   merits of the Debtor's right or need legally to distribute

17   those funds to the parties.

18     So we felt like it was a reasonable remedy to satisfy the

19   Debtor's concerns and also to satisfy the Committee's

20   concerns.  The Committee would have an opportunity to continue

21   discovery and to take discovery following the filing of that

22   motion, as we sought to prove to this Court that we have a

23   right to the funds, to dispel any concerns that the Court

24   might have.

25     And frankly, Your Honor, I think that there is some case

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/25/1 of 27 42 188 of 1017   PageID 2651
Main Document   Page 187 of 722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 17 of 100

17

1  law out there that would suggest that you had a right to

2  deposit the funds in the registry of the Court.  So we didn't

3  think that there was any issue whatsoever with depositing the

4  funds in the registry, understanding that that would allow us

5  an opportunity to prove to you at a later date that we had a

6  right to remove those funds from the registry.

7      And Your Honor, I'm happy to try and dig through it real

8  quick, but there's language in the transcript that talks about

9  the preservation of the rights of the parties whose funds

10  would be pled into the registry to then go seek the funds out

11  of the registry as part of that agreement.  So that's exactly

12  what we're doing.  The issue here for us, Your Honor, is that

13  we can establish our burden of proof that we have a right to

14  these funds.

15      I understand that the Committee had concerns.  Right?  I

16  mean, they're a little bit in the same position as the Debtor.

17  I understand, as a practitioner, why the Committee had reason

18  to want to scrutinize the transactions involving CLO Holdco as

19  a related entity.  That doesn't mean that they have a

20  (inaudible) right to preclude those distributions, and that's

21  why we're here.

22      So we've now had ten weeks for the Committee to perform

23  discovery, to heavily scrutinize the nature of the

24  transactions involving CLO Holdco.  Leading up to this

25  presentation to the Court of our evidence that we have a legal

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 09/06/25   Page 189 of 1017   PageID 2652
Main Document   Page 252 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 18 of 100

18

1    and factual right to have these funds back out of the registry

2    under Title 28 of the U.S. Code, the Committee didn't do any

3    discovery at all on these issues.  At least, not to CLO

4    Holdco.

5        So we believe that we're here trying to show the Court,

6    okay, we want to dispel the Court's concerns.  The Committee

7    has had an opportunity to scrutinize these transactions.  But

8    we'd like our money.  There are operational needs and the

9    like.  We would like to have our funds.  And we believe that,

10   unequivocally, the funds that are in the registry of the Court

11   are CLO Holdco's.  They're not subject to a claim of any other

12   party.

13       So that, Your Honor, is why we've submitted our motion

14   seeking a recovery of the funds from the registry.

15           THE COURT:  All right.  So, I think what I hear you

16   saying is that on March 4th you all were agreeable to this

17   money being put into the registry of the Court, but everyone

18   understood that you were, pretty promptly after March 4th,

19   going to file a motion to get an adjudication on why you

20   should get these funds.  Is that what you're saying?

21           MR. KANE:  What I'm saying, Your Honor, is, at the

22   time, we didn't have any problem with the funds being pled

23   into the registry of the Court, understanding that we had

24   reserved our right to later seek the funds from the registry.

25           THE COURT:  Well, --

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/06/25   Page 190 of 1017   PageID 2653
Main Document   Page 453 of 2722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 19 of 100

19

1          MR. KANE:  I'm not sure --

2          THE COURT:  -- again, I --

3          MR. KANE:  I'm not sure what the commitment says.

4          THE COURT:  Maybe I'm splitting hairs, but we were

5   here in March, and then April 15th you file the motion.  And,

6   you know, I'm -- it just -- I guess I'm trying to understand.

7   You know, we were here to litigate this in March, and then

8   this, you know, kind of status quo agreement was reached.  And

9   then a month later, about a month later, you're filing the

10  motion to tee up the issue all over again.

11      It's just -- it's not what I anticipated.  Yes, I knew

12  everyone was reserving their rights, but it wasn't what I was

13  anticipating.  You know, if I had known a month later that one

14  of the parties who was agreeing to this was going to be filing

15  a motion, I would have just said, you know, why don't we do

16  this today.

17      So, again, I'm asking:  Am I just misremembering this?

18  Did everyone but me have a clear idea that, pretty promptly

19  after March 4th, you all were going to ask to come back on,

20  you know, a non-expedited basis for the Court to adjudicate

21  what was already teed up that day to be adjudicated?

22          MR. CLEMENTE:  Your Honor, the --

23          MR. KANE:  Your Honor, I can't speak to the other

24  parties' understanding.

25          THE COURT:  Okay.  Mr. Clemente was kind of raising

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 191 of 1017   PageID 2654
Main Document   Page 20 of 202

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 20 of 100

```
 1   his hand to speak up.

 2            MR. CLEMENTE:  Yes.

 3            THE COURT:  Am I going down a trail here that I'm the

 4   only --

 5            MR. CLEMENTE:  No.

 6            THE COURT:  -- I'm the only one --

 7            MR. CLEMENTE:  No, you're not.

 8            THE COURT:  Okay.  Mr. Clemente?

 9            MR. CLEMENTE:  No.  No, you're not, Your Honor.  I

10   have a couple comments, and I have much more to say,

11   obviously.  But just direct on what Your Honor said:  Nothing

12   has changed since March 4th.  I think that is fair to say.

13   And interestingly, in the initial motion, you know, this idea

14   of the 28 U.S. 2042 governing and it becoming a simple issue

15   of taking the time regarding amounts or ownership of the money

16   in the registry was not raised in the motion.  So I found that

17   kind of interesting.

18       But I was before you, Your Honor.  And you'll recall on

19   March 4th that -- that's absolutely not.  I thought what we

20   were doing was merely preserving the status quo for some

21   period of time, which is what I believe Your Honor is

22   suggesting that she recalls as well.

23       It would have been, I think, a little counterintuitive for

24   us to have all been there, ready to do that litigation, and

25   then decide to put something in the registry, and then have
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/06/25   Page 192 of 1017   PageID 2655
Main Document   Page 16 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 21 of 100

21

1   the argument that you can't look at the Bankruptcy Code to

2   determine whether the money should come out of the registry or

3   not, and then be back in front of you, you know, three or four

4   weeks later to relitigate any of those issues.

5        So that was absolutely my recollection and understanding,

6   Your Honor, and I think from your comments I intuit that it

7   was your understanding as well, that this was not something

8   that we were going to deal with again very quickly, but was

9   something to preserve the status quo, a reasonable solution,

10  an equitable solution under Section 105.  And I believe that's

11  what Your Honor ordered.

12           THE COURT:  All right.  Well, I'll let you go ahead

13  and make your opening statement.  I think Mr. Kane was

14  finished before I started asking my questions.

15           MR. CLEMENTE:  Okay.

16           THE COURT:  Mr. Clemente, you may proceed.

17           MR. CLEMENTE:  Thank you, Your Honor.  I appreciate

18  that.  So, and I'll try and be brief on the opening.

19     OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

20                    UNSECURED CREDITORS

21           MR. CLEMENTE:  Your Honor, like it or not, CLO Holdco

22  is not an independent, unrelated, third-party investor merely

23  seeking distributions on account of its own arm's-length

24  independent investments.  Instead, CLO is a related party in

25  literally every sense of the word.  That's not in dispute.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 193 of 1017   PageID 2656
Main Document   Page 192 of 232

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 22 of 100

22

 1   That is part of the Jim Dondero or Mr. Dondero web of

 2   entities.

 3       CLO Holdco is effectively controlled by Mr. Dondero.  It

 4   was seeded and received assets transferred from the Debtor,

 5   including the assets giving rise to the distribution that's in

 6   the registry.  None of that is in dispute.  All of this at a

 7   time when Mr. Dondero controlled the Debtor as well as the

 8   parties through the various intermediate transactions that

 9   ultimately resulted in the assets arriving in CLO Holdco.

10   That is not in dispute.

11       Mr. Dondero's past fraudulent conduct, including

12   fraudulent transfers, is also not in dispute.  He was on all

13   sides of this transaction.  And therefore this transaction,

14   along with many of the others, must be viewed with skepticism

15   and scrutinized very closely by the Committee and by this

16   Court.

17       The Committee has only just begun such work, Your Honor.

18   And given the Byzantine empire created by Mr. Dondero, it will

19   take time and significant resources to fully and properly

20   conduct an investigation.

21       And Mr. Kane referred to, did we do discovery?  We did

22   not.  Our reaction to this motion was the same as Your Honor.

23   And as you can see by the stipulations that we have agreed to

24   for purposes of this hearing, we didn't want this to be a

25   situation where the estate would spend a tremendous amount of

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 194 of 1017   PageID 2657
Main Document   Page 257 of 732

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 23 of 100

23

 1   resources to deal with something that we thought that was

 2   dealt with on March 4th.

 3       But aside from that, given the web that's been created

 4   here, we can't just isolate one piece of it.  We can't just be

 5   like, I'm going to look at the CLO Holdco documents and be

 6   able to develop a full theory.  This is a tapestry of

 7   interrelated entities that is opaque and vague and purposely

 8   so.  So you can't just focus on one piece and then try and

 9   say, well, I know what this piece is, because that piece has

10   many interrelated complex ramifications and relationships

11   where, frankly, you can't just say, okay, let's focus on this

12   one issue, because you're going to miss the entire tapestry.

13       We still need to examine, as I mentioned, the whole thing,

14   and this takes time and it takes an investment.  So while I

15   understand CLO Holdco wants to receive its distribution, I

16   also understand that my constituency wants to be paid, some of

17   whom have been waiting for over a decade.

18       To be clear, Your Honor, my constituency didn't choose to

19   be here in the bankruptcy.  But CLO Holdco chose to associate

20   itself with Mr. Dondero and to take assets from Highland in

21   convoluted related-party transactions and reap the benefits of

22   those transactions.  CLO Holdco can't now step away from that

23   and try and suggest to Your Honor that this is about taking

24   time under 28 U.S.C. 2042.  That was never what it was about

25   on March 4th, and it's not what it's about today.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 195 of 1017
Case 3:25-cv-02072-S   Document 54-4   Filed 06/06/25   Page 195 of 1017   PageID 2658

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 24 of 100

24

1        Instead, it's about the overall situation and why we find

2   ourselves here.

3        And Your Honor, I'm here to tell you, I think, and I

4   believe Your Honor would agree, that the Bankruptcy Code and

5   Section 105 and all the other provisions of the Code are alive

6   and well in this courtroom, despite the distribution being put

7   into the registry on March 4th.

8        You clearly found you had the authority under Section 105

9   to hold the funds, nothing has changed in the intervening

10   time, and therefore the funds should remain in the registry.

11       This is not a dispute under, you know, 28 U.S.C 2042 about

12   ownership, again, or where somebody pleads an amount in the

13   registry to let other people argue that they actually owned

14   the money.  This was always about preserving the estate and

15   maintaining the status quo.

16       Such a result might be unfair if it was a different party,

17   but CLO is a related party controlled by Mr. Dondero.  It's

18   not an unaffiliated party.

19       So, from our perspective, the motion should be denied,

20   Your Honor.

21            THE COURT:  All right.  Thank you.

22       I assume no one else has an opening statement because

23   there were no other pleadings filed regarding this motion.

24       All right.  Mr. Kane, let's turn to your evidence.

25            MR. KANE:  Thank you, Your Honor.  I'll tell you

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/02/25   Page 196 of 1017   PageID 2659
Main Document   Page 196 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 25 of 100

25

1    what.  Just to make sure that we're hitting on the issue that

2    was out in front of this Court a moment ago, I'd like to start

3    by just directing the Court's attention to the Committee's

4    Exhibit 3 or Exhibit C, which is a transcript of that hearing

5    from March.

6                THE COURT:  Okay.

7                MR. KANE:  And Your Honor, Page 119, Lines 4 through

8    11, are your statements about what you were doing entering the

9    order.  And you know, when the funds are being pled into the

10   registry of the Court, but I do think the Court has broad

11   equitable powers to remedy, to fashion remedies that preserve

12   the status quo.  And I think it is appropriate here to order

13   that most of this money, that most of the $8.6 million that

14   would go to related investors in these three Funds -- this is

15   the important part -- be put into the registry of the Court

16   pending further motions, orders, adversary proceedings anyone

17   wants to file to make a claim to that money.

18       So, Your Honor, that's what we did.  We -- the rights were

19   reserved.  CLO Holdco made a motion, filed its essentially

20   claim to the money that's in the registry of the Court.

21       So, Your Honor, I'd like now to just briefly walk through

22   the exhibits, because I think it's important to understand

23   exactly what CLO Holdco's claim to the funds really is.

24       So, Your Honor, first, I'd like to move for the admission

25   of CLO Holdco's Exhibits 1 through 16 and all subparts.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/06/25   Page 197 of 1017   PageID 2660
Main Document   Page 196 of 232

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 26 of 100

26

1          THE COURT:  All right.  Well, I understood earlier

2     there is a stipulation to the admissibility of these.  So, for

3     the record, I am admitting CLO Exhibits 1 through 16 in their

4     entirety, and they appear at Docket Entry 782.  All right?

5          MR. KANE:  Thank you, Your Honor.

6      (CLO Holdco's Exhibits 1 through 16 are received into

7     evidence.)

8          MR. KANE:  Your Honor, Exhibit 1A is the Highland

9     Capital Loan Fund, LP subscription agreement.  Now, this

10    subscription agreement is in the amount of $2,032,183.24 and

11    is dated December 28, 2016.

12      You'll notice that CLO Holdco obtains an interest in the

13    Highland Capital I Fund through a transfer in kind.  Schedule

14    1 to Exhibit 1A shows the progression of this interest,

15    admittedly, from the Debtor to the Get Good Trust down through

16    a series of charitable entities, through the Charitable DAF,

17    to CLO Holdco.

18      Your Honor, Exhibit 1B, we've included just make sure

19    everybody's on the same page.  The Highland Capital Loan Fund,

20    LP, in which H -- CLO had the subscription interest, had a

21    name change to essentially what we were referring to as the

22    Dynamic Fund.  It was changed to Highland Dynamic Income Fund,

23    LP.  So when there are references to the Highland Capital Loan

24    Fund subscription, it's really a reference to the subscription

25    in the Dynamic Fund.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 198 of 1017   PageID 2661
Main Document   Page 251 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 27 of 100

27

1    Exhibit 1C is Highland Argentina Regional Opportunity Fund

2    Limited subscription documents.  This is a $2.5 million

3    subscription dated June 6, 2018, showing that CLO Holdco

4    obtained its $2-1/2 million subscription in the AROF Fund by

5    payment.

6    Exhibit 1D is a NAV statement dated November 11, 2019

7    showing CLO Holdco's interest in the Dynamic Fund totaled

8    $1.689 million and change.

9    Exhibit 1E is the NAV statement from December 31, 2019

10   from the AROF Fund showing that CLO Holdco's interests in that

11   fund were valued at $918,905.82.

12   Exhibits 1F and 1G are the investment management

13   agreements for Dynamic and AROF.  And then Exhibits 1H and 1I

14   are the Dynamic LP agreement and the AROF LP agreement.

15   We can skim over Exhibits -- well, actually, I'd like to

16   point to Exhibit 2 and note that there are no (inaudible)

17   related to any CLO Holdco wrongdoing in the Committee's (audio

18   gap) to the -- CLO Holdco's motion for remittance of funds

19   held in the registry of the Court.

20   Also, on Paragraph 10, the Committee acknowledges that, in

21   exchange for the transfer of the Dynamic interests, the Get

22   Good Trust transferred the Dugaboy Trust note of about $24

23   million.

24   And in Paragraphs 17 and 18, the Committee acknowledges

25   that it had been pursuing discovery on CLO Holdco obtaining

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/03/25   Page 199 of 1017   PageID 2662
Main Document   Page 282 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 28 of 100

1    interests in the Dynamic Fund since early February.

2        Your Honor, Exhibit 3 is CLO Holdco's reply to the

3    Committee.  Exhibit 4 is the notice of hearing.  Exhibit 5 is

4    the Debtor's February 4th -- or, 24th distribution motion.

5    And Your Honor, we have a stipulation between the Committee

6    and CLO Holdco for the sake of this hearing to the facts

7    included in Footnote 7.

8        So, in Footnote 7, the Debtor states, I'll read it into

9    the record for the Court:

10            The limited partnership interests in Dynamic held by

11            CLOH, CLO Holdco, were originally held by the Debtor.

12            The Debtor transferred those interests to the Get

13            Good Nonexempt Trust, defined as Get Good, on

14            December 28, 2016, in exchange for 97.6835 percent of

15            Get Good's interest in a promissory note in the

16            original principal amount of approximately $24

17            million issued by the Dugaboy Investment Trust.  Get

18            Good subsequently transferred its interests in

19            Dynamic to Highland Dallas Foundation, which

20            transferred those interests to CLO Holdco.  The

21            Dugaboy Investment Trust has been paying amounts due

22            and owing under the $24 million note, and the current

23            principal amount is approximately $17.5 million.

24        Your Honor, that's an important fact, and I'll get to that

25    in just a moment.  But one of the reasons why that's an

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 200 of 1017   PageID 2663
Main Document   Page 153 of 2722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 29 of 100

1   important fact is the Dugaboy Investment Trust note is

2   actually (audio gap) note with a balloon payment due at

3   maturity.  So, paydown of the principal means that the Dugaboy

4   Trust is actually paying Highland Dallas Foundation principal

5   payments on that note, despite not having a strict contractual

6   obligation to do so until the maturity date, which expires in

7   another 16 years.  So it's been paying principal that it

8   doesn't have to pay, and interest on the note, which was

9   exchanged for the Dynamic and other interests transferred to

10  the Get Good Trust.

11       Your Honor, the next exhibit is Exhibit 6.  This is the

12  Committee objection to the distribution motion.  We'd also

13  note that there is no reference to any bad acts by the

14  Committee alleged against CLO Holdco other than simply having

15  a relationship with James Dondero and the fact that its

16  investments were managed by Highland.  And that's included in

17  Paragraph 11 of that pleading.

18       7 is the Debtor's reply to the Committee's objection.

19       8 is the Debtor's responses to CLO Holdco's deposition by

20  written question.  Your Honor, this has been stipulated as

21  admissible in full by the Committee.  And we think that this

22  is important because, starting on Page 7 of this exhibit,

23  David Klos, the chief accountant -- or, the chief accounting

24  officer of Highland Capital Management, LP, the Debtor, walks

25  through the Debtor's means for determining ownership, the

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/05/25    Page 201 of 1017    PageID 2664
Main Document    Page 201 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 30 of 100

 1  accounting for interests, the liquidation of Funds, and

 2  determining amounts due from the proceeds of those Funds to

 3  CLO Holdco for both the Dynamic and the AROF Funds.

 4      So, again, Your Honor, the Committee is not stipulating

 5  that the Debtor has appropriately performed this function and

 6  that the amounts that are purportedly due from the Debtor's

 7  liquidation of these Funds to the Committee is accurate.

 8      Number 9, Your Honor, is a stipulation regarding CLO

 9  Holdco's lack of a transfer of any interests in Dynamic and

10  the AROF Funds.

11      I noted for Your Honor at the beginning of my open that

12  this was a stipulation I really did want to read into the

13  record.  I want to be fair to the Committee, and there are

14  some limitations on this stipulation.  So what I'd like to do

15  is read this, then.  This is an email statement from Allison

16  Stromberg of Sidley on behalf of the Committee.  And Mr.

17  Clemente is cc'd on this email dated June 22, 2020:  "With a

18  few edits, we can agree to the stipulation for the purposes of

19  the June 30 hearing."  And this is the edited version that Ms.

20  Stromberg proposed:

21          "The Committee and CLO stipulate to the following,

22          solely for the purposes of this hearing.  Grant Scott

23          represented to the Committee that CLO Holdco, Ltd.

24          did not, after obtaining the disputed interests in

25          the entities commonly referred to as the Dynamic and

APP 181

Case 19-34054-sgj11  Doc 2062  Filed 03/18/21  Entered 03/18/21 20:59:39  Desc
Case 3:25-cv-02072-S  Document 15  Filed 06/06/25  Page 202 of 1017  PageID 2665
Main Document  Page 202 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20  Entered 07/02/20 18:59:24  Page 31 of 100

31

 1          the AROF Funds, transfer those interests to any other

 2          party.   The Committee, solely for the purposes of

 3          this hearing, does not contest that assertion and

 4          stipulates to that fact.   This stipulation shall not

 5          be binding on the Committee in any future proceedings

 6          and shall not have any preclusive effect against the

 7          Committee in any future disputes, contested matters,

 8          adversary proceedings, or other legal matters between

 9          the Committee and CLO or any other party.   Further,

10          this stipulation shall not in any way preclude or

11          limit the Committee from asserting claims or causes

12          of action against CLO in the future, including but

13          not limited to claims challenging the validity of

14          CLO's disputed interest and/or transactions through

15          which CLO Holdco obtained such disputed interests or

16          claims to avoid and recover such disputed interests

17          in the Dynamic and AROF Funds or their proceeds."

18      Your Honor, for the sake of this hearing, no dispute that

19  when CLO obtained those interests, it didn't transfer them to

20  any other party.

21      Exhibit 10 includes another stipulation between

22  Committee's counsel and CLO Holdco's counsel.  And this

23  relates to some of the exhibits that are already in the

24  record.  And for that, Your Honor, we can skim over this.

25      When the motion was initially filed, we had a signature

Case 19-34054-sgj11  Doc 2062  Filed 03/18/21  Entered 03/18/21 20:59:39  Desc
Case 3:25-cv-02072-S  Document 15-4  Filed 06/06/25  Page 203 of 1017  PageID 2666
Main Document  Page 1 of 1017

Case 19-34054-sgj11 Doc 802 Filed 07/02/20  Entered 07/02/20 18:59:24  Page 32 of 100

32

```
1    page issue on one of the exhibits and a metadata strip on

2    another exhibit that we corrected.  We provided the corrected

3    exhibits to the Committee.  The corrected exhibits were

4    included with this motion.  And it's noted in our witness and

5    exhibit list which corrected exhibits those are.  They'll be

6    1A and 1C.

7         Exhibit 11, Your Honor, is an important exhibit for us.

8    And we would direct the Court's attention to Page 3 of this

9    exhibit.  So, on Page 3, there is a list of debits and credits

10   associated with the Highland Argentina Regional Opportunity

11   Fund statement of accounts -- essentially, a bank statement

12   from June 6, 2018 to June 30, 2018.

13        You'll note, Your Honor, that there is an incoming source,

14   an incoming wire transfer from CLO Holdco, Ltd., which

15   credited the AROF account by $2.5 million.  That's the date of

16   this subscription agreement, Your Honor, and it's consistent

17   with the subscription agreement statement that shows that CLO

18   Holdco obtained a subscription in the AROF Fund by a wire

19   transfer.  So it's not a transfer from Highland of the

20   interests like it was with the Dynamic Fund.

21        Exhibit 12, Your Honor, is a purchase and sale agreement.

22   Now, this is an exchange between the Get Good Trust and the

23   Debtor.  It's dated December 28, 2016.  And I'll talk about

24   this a little bit in our closing argument, but I did want to

25   just have a brief walk through this.  Under this purchase and
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/05/25   Page 204 of 1017   PageID 2667
Main Document   Page 237 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 33 of 100

33

1    sale agreement, there is an exchange.  This is not a one-sided

2    agreement that denudes the Debtor of assets without anything

3    in return.  This exhibits shows that the Debtor receives the

4    Get Good interests in the Dugaboy note, which was

5    approximately a $24 million note.  In exchange, Get Good

6    received about $23 million worth of various interests.  It

7    received a $2.032 million interest in the Highland Loan Fund.

8    And Your Honor, if you'll recall, that's the Dynamic Fund.  It

9    received certain American Airlines call options that had a

10   fair market value at the time of about $8.7 million.  And then

11   it received various participation interests in Highland's

12   interests in the Crusader Funds, which had a fair market value

13   at the time of about $12.6 million.

14        Now, Exhibit A, which is internally attached to Exhibit

15   12, is a copy of the Dugaboy note.  And that, Your Honor,

16   shows that this was an interest-only note, about $2.75 percent

17   interest, with the principal due on a 20-year term.  So,

18   annual interest payments, principal due at a later date, and

19   there was no prepayment penalty on principal.  So, Your Honor,

20   you've seen that the principal was paid down at least about

21   $6-1/2 million, in addition to other interest payments made

22   under the terms of that note.  So the Debtor did receive

23   consideration in exchange.

24        Exhibit 13 is an amendment to that purchase and sale

25   agreement.  And we included this as what we call a full

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 205 of 1017   PageID 2668
Main Document   Page 238 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 34 of 100

34

1    disclosure agreement.  There is an adjustment to the deal

2    terms in which the call options are revoked, and instead of

3    the Get Good Trust receiving the call options in the American

4    Airlines stock, it received participation interests.  There's

5    no adjustment to the Dugaboy note, and there's no adjustment

6    to the Crusader interests that were transferred.

7         Your Honor, Exhibit 14, this is also just a full

8    disclosure exhibit.  This shows that the Get Good Trust was

9    identifying as a trust beneficiary the Highland Dallas

10   Foundation, to make, in essence, the charitable donation that

11   would then be pushed down to the Charitable DAF and then

12   invested by CLO Holdco.

13        Exhibit 15 is the Dynamic Fund side letter exhibit dated

14   January 10, 2017.  And this really is included to show, in the

15   last "Whereas," Your Honor, the series of transfers from the

16   Debtor to the Get Good Trust down to CLO Holdco and how CLO

17   Holdco came to acquire the interests in the Dynamic Fund.

18        And finally, Your Honor, is Exhibit 16.  We think this is

19   an important exhibit for a number of reasons.  First, the

20   Debtor disclosed in correspondence with CLO Holdco and the

21   Committee that this exhibit was produced in November of 2019

22   by the Debtor to the Committee.  I notice that the Bates stamp

23   was a significantly lower number than the rest of the exhibits

24   we received in our discovery request.

25        But this document shows a number of important facts.  If

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/13/25   Page 206 of 1017   PageID 2669
Main Document   Page 206 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 35 of 100

35

1   you look at Page 2, Your Honor, this shows that the

2   consolidated balance sheet for Highland Capital Management, LP

3   showed a net -- a positive net worth at the time of about $418

4   million.  And if you look at it on a cash flow basis, the

5   consolidated income statement for year-end dated December 31,

6   2016 shows about $39,356,000 of net income in 2016

7   attributable to Highland Capital Management, LP.

8       And then if you turn the Page 33, Your Honor, there is a

9   heading called Investment Liability.  And the bottom paragraph

10  on -- over on Page 33 of Exhibit 16 shows that, in this

11  audited financial statement, PricewaterhouseCoopers had

12  analyzed this transfer transaction.  It states:

13      "On December 28, 2016, the Partnership" -- that's

14      Highland Capital Management, LP, the Debtor --

15      "entered into a purchase and sale agreement with the

16      Get Good Nonexempt Trust.  In consideration for a

17      note receivable from an affiliate, the Partnership

18      sold or participated in certain investments that it

19      already held, with the participated investments

20      carrying an aggregate market value of $21.3 million

21      as of the date of the transaction.  The fair value of

22      the agreement will fluctuate with the fair value of

23      the securities throughout the term.  As of December

24      31, 2016" -- that was three days later -- "the

25      participated investment value had reduced from $21.83

APP 1486

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5-4    Filed 06/05/25    Page 207 of 1017    PageID 2670
Main Document    Page 206 of 272

Case 19-34054-sgj11  Doc 802  Filed 07/02/20    Entered 07/02/20 18:59:24    Page 36 of 100

36

1          to $18.7 million."

2          Again, Your Honor, this is in exchange for a $24 million

3    note that it's been paying.

4          So, Your Honor, given the stipulation of the Debtor, we no

5    longer need to call David Klos, so what we would propose to do

6    at this time is close our case-in-chief and allow Mr. Clemente

7    to go forward with (audio gap).

8              THE COURT:  All right.  Mr. Clemente, you may proceed

9    with your evidence.

10             MR. CLEMENTE:  Thank you, Your Honor.  Just a couple

11   of things to note (indecipherable) into argument, though I

12   would point Your Honor to the Committee's -- so, first of all,

13   I'd move for the formal admission of the Committee's exhibits

14   for purposes of this hearing, Exhibits 1 through 3, which are

15   the two Acis opinions and the transcript from the March 4th

16   hearing.  Again, it's subject to the stipulation Mr. Kane

17   referenced earlier.

18             THE COURT:  All right.  Committee Exhibits 1 through

19   3 are admitted by stipulation, and they appear on the docket

20   at Docket Entry No. 789.

21        (Unsecured Creditors' Committee's Exhibits 1 through 3 are

22   received into evidence.)

23             MR. CLEMENTE:  Thank you, Your Honor.  And I'd like

24   to point Your Honor to Page 43 of Exhibit 3, which is the

25   transcript from the March 4th hearing, and read into the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 208 of 1017   PageID 2671
Main Document   Page 41 of 292

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 37 of 100

37

 1   record a statement by Mr. Lynn which says, "We'd like to

 2   suggest the following, should the Court determine" --

 3          THE COURT:  Okay.  Tell me --

 4          MR. CLEMENTE:  Yes?

 5          THE COURT:  I didn't hear what page again?

 6          MR. CLEMENTE:  Oh, I'm sorry, Your Honor.  It's Page

 7   43, starting at Line 14.

 8          THE COURT:  Okay.

 9          MR. CLEMENTE:  And Mr. Lynn states, "We'd like to

10   suggest the following, should the Court determine that the

11   motion be denied, and that is that instead of the Debtor

12   retaining the funds, that the Debtor distribute the funds into

13   the registry of the Court.  That way, they" -- meaning the

14   Debtor, Your Honor -- "lose control over the funds and they

15   can say they distributed them in accordance with their

16   agreements and applicable law."

17       So, the point, again, Your Honor, from the hearing was to

18   simply preserve the status quo yet ensure that the funds would

19   be safeguarded by depositing them within the registry of the

20   Court.

21       Additionally, Your Honor -- and Your Honor may be

22   scratching her head as to why the Committee stipulated to all

23   of this.  It's not about taking in kind and filing three

24   documents.  That was never the issue at the March 4th hearing.

25   Frankly, that's not the issue today.  The March 4th hearing

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 09/04/25   Page 209 of 1017   PageID 2672
Main Document   Page 208 of 292

Case 19-34054-sgj11  Doc 802  Filed 07/02/20   Entered 07/02/20 18:59:24   Page 38 of 100

38

1    wasn't about ownership of the Funds, which is what the

2    exhibits Mr. Kane just walked through purports to show.  The

3    March 4th hearing was about the web and the circumstances

4    surrounding the case and the circumstances surrounding CLO

5    Holdco.

6        What Mr. Kane's exhibits don't refute is the fact that all

7    of the interests that CLO Holdco has on which it's here today

8    and funds were deposited into the registry on account of came

9    from the Debtor.  What Mr. Kane's factual record does not

10   dispute is that, at that time, the Debtor was controlled by

11   Mr. Dondero.  And the Dugaboy Trust and the Get Good Trust

12   were at various times controlled by Mr. Dondero, Mr. Scott,

13   and Nancy Dondero, Mr. Dondero's sister.

14       So, again, Your Honor, it isn't about walking through

15   account statements.  It's about the context in totality.

16       Finally, Your Honor, and I believe the exhibits Mr. Kane

17   referred to, including Exhibit 12, they make clear, and I

18   think Mr. Kane admits that, that these interests did come from

19   the Debtor.

20       Finally, Your Honor, the other factual point I would like

21   to make refers to Mr. Kane's Exhibit 16, which he finished up

22   with.  These are the consolidated financial statements of

23   Highland Capital Management.  I find it all very interesting

24   what the book values of assets and liabilities are, but I do

25   not believe that there's any reference in these financial

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 210 of 1017   PageID 2673
Main Document   Page 293 of 732

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 39 of 100

39

1   statements to contingent liabilities or litigation claims,

2   including claims with respect to Redeemer or potential claims

3   with respect to UBS.

4       So, Your Honor, I would just suggest that this exhibit,

5   although for purposes of the stipulation we agree with what

6   the numbers, you know, that the numbers say what they are,

7   it's entirely replete -- and I think Your Honor would know, of

8   course, that any analysis of fraudulent transfer would have to

9   take into a reasonable estimate of contingent liabilities.

10      So that's the only other point I would like to make from

11  the factual background, Your Honor.  Unless you have any

12  questions for me, I'll just reserve the rest for argument.

13          THE COURT:  All right.  I have no other questions at

14  this time for you.

15      All right.  Shall we go to closing arguments, then?

16          MR. KANE:  Yes, Your Honor.  This is John Kane for

17  CLO Holdco.  I did want to make one important clarification,

18  because it was about a characterization of the exhibits that

19  were presented by CLO Holdco.

20      Mr. Clemente stated that we had no -- or, that the

21  evidence that I've presented indisputably showed that all of

22  the interests have been liquidated, so the funds that we're

23  seeking here today came from the Debtor.  And what our Exhibit

24  11 shows is that CLO Holdco used its cash that it wired to the

25  AROF Fund to obtain its interests in AROF.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15-4   Filed 06/06/25    Page 211 of 1017    PageID 2674
Main Document    Page 211 of 232

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 40 of 100

40

```
 1        That was not a transfer by the Debtor.  There is no

 2   evidence suggesting whatsoever that that flowed down from a

 3   Highland interest to CLO Holdco.  That was a cash acquisition

 4   by CLO Holdco to AROF for its subscription interest in the

 5   Argentina Fund.

 6             THE COURT:  All right.  Well, Mr. Clemente, let me

 7   follow up on that.  Are you going back to 2011, and is that

 8   what you were referring to, that all of CLO Holdco's original

 9   seed money -- I guess it was a couple of levels up from CLO

10   Holdco -- originated from Highland?

11             MR. CLEMENTE:  That's correct, Your Honor.  And

12   that's what Your Honor writes in the Acis opinions, --

13             THE COURT:  Uh-huh.

14             MR. CLEMENTE:  -- that ultimately the DAF and the CLO

15   Holdco were seeded by the Debtor.  That's our position, that

16   all of the assets that ultimately were used to seed the DAF

17   came from the Debtor, and then obviously Mr. Kane's exhibits

18   demonstrate that the particular interests with respect to

19   Dynamic came from the Debtor.

20             THE COURT:  All right.  Mr. Kane, any comment about

21   that?

22             MR. KANE:  Yes, Your Honor.  And this is -- we're

23   back in an evidentiary hearing.  So whether or not there were

24   seed funds that were contributed by Dondero or related trusts,

25   that I think this Court has found that was the case in the
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 212 of 1017   PageID 2675
Main Document   Page 215 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 41 of 100

41

1    past, but that does not mean that there were not other viable

2    investments, personal funding by Dondero individually,

3    deposits by Mark Okada individually or other third parties

4    through Dallas Foundation, that there were not legitimate

5    funds, legitimate means of generating revenue by CLO Holdco

6    that allowed it to reinvest money.

7        And this is -- there's an inference made, Your Honor, by

8    the Committee that because there was an initial seed of this

9    CLO Holdco entity by Jim Dondero and various trusts, whether

10   through Highland or other entities, that all of the funds that

11   it forever uses are somehow inherently tied to Highland.

12   We're talking about 2011, transitioning to 2018 for a cash

13   investment made.  I think that is a huge stretch.

14       I think it's important to know that there is zero evidence

15   presented by the Committee to substantiate the statement that

16   this $2.5 million somehow arose from Highland Capital

17   Management, LP.

18           THE COURT:  Okay.  All right.  Well, proceed with

19   your closing argument, please.

20           MR. KANE:  Yes, thank you, Your Honor.

21         CLOSING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

22           MR. KANE:  So, I do want to go back a little bit to

23   what you had previously stated about the March hearing.  So,

24   we acknowledge that the Court has a right to submit funds into

25   the registry of the Court in a contested matter under rare

Case 19-34054-sgj11  Doc 2062  Filed 03/18/21  Entered 03/18/21 20:59:39  Desc
Case 3:25-cv-02072-S    Document 15-4  Filed 06/09/25  Page 213 of 1017    PageID 2676
Main Document  Page 296 of 732

Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 42 of 100

42

1    circumstances under Rule 67 and *In re Kim*.  But it is our

2    position that once funds are pled into the registry of the

3    Court, there is a material shift in how those funds are

4    treated and what the Court can really do to adjudicate matters

5    involving those funds.

6        So, there are zero Bankruptcy Code references that relate

7    to a Chapter 11 dispute and Bankruptcy Code statutes that

8    address the registry of the Court.  The only Bankruptcy Code

9    statute in the entirety of the Bankruptcy Code that references

10   the registry of the Court or proceeding under 28 U.S.C. 2041

11   and 2042 is Section 347(a) of the Bankruptcy Code, which

12   applies to unclaimed funds only in Chapter 7, 12, and 13

13   cases.

14       So, Your Honor, we're looking at a situation here where

15   funds are in the registry of the Court.  And once funds are in

16   the registry of the Court, under 28 U.S.C. 2041, the Court

17   holds money as a statutory trustee for the rightful owners.

18       That's an issue that's been addressed by most circuits,

19   Your Honor.  And as noted by the First Circuit, the funds that

20   are deposited in the registry of the Court are not at the

21   disposal of the judge but held in trust for the rightful

22   owner.  That's the *Alstom Caribe* case from the First Circuit

23   in 2007.

24       The Fifth Circuit has addressed this issue on a number of

25   occasions, and noted that once funds are deposited into the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/09/25   Page 214 of 1017   PageID 2677

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 43 of 100

43

1   Court's registry, the Court should determine ownership and

2   make disbursements.  It's not suggesting a long hold.  That's

3   from *Craig's Stores*, a Fifth Circuit decision in 2005.

4        Your Honor, CLO Holdco acknowledges that the Fifth

5   Circuit's decision in *U.S. v. Cochran* and 28 U.S.C. 2042 place

6   the burden of proof of ownership squarely on the party seeking

7   funds from the registry of the Court.  And so here, as shown

8   in *Craig's Stores* and *U.S. v. Beach*, which is an Eleventh

9   Circuit decision, CLO Holdco has to prove ownership by a

10  preponderance of the evidence.  On that showing, the Fifth

11  Circuit noted in *Cochran* that a court needs to remit the funds

12  to the party that satisfied its burden of proof.

13       So, how do I satisfy my burden of proof?  I have to show

14  that -- I have to show that I have title to those funds or

15  that CLO Holdco has title to those funds.

16       Your Honor, a lot of courts have addressed what title

17  means in a 28 U.S.C. 2042 dispute.  And proving title means

18  demonstrating a present right to the funds.  A present right

19  is a right that is not hypothetical, it's not unliquidated,

20  and it isn't presently possessed by some other party.

21       So, applying the evidence here, there is overwhelming

22  evidence that CLO Holdco has a present right to these funds.

23  The Dynamic subscription proves that CLO Holdco had an

24  interest in the Dynamic Fund.  The AROF subscription proved

25  that CLO Holdco had an interest in the AROF Fund.  We provided

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 215 of 1017   PageID 2678
Main Document   Page 215 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 44 of 100

1   proof to the Court of either how those interests were

2   transferred to CLO Holdco or how they were acquired by cash

3   payment by CLO Holdco.  The Committee has stipulated that,

4   once obtained, CLO Holdco did not transfer those interests to

5   any other party.  So, Your Honor, that hits the no other party

6   presently possessing title.

7        We can show Your Honor through Mr. Klos' testimony and

8   testimony previously presented to the Court that the Debtor

9   liquidated all of the parties that had an interest in the

10  Dynamic and AROF Funds interests.  Those Funds are done.

11       Mr. Klos' testimony and his deposition by written

12  questions shows that the Debtor calculated the pro rata

13  interest due to CLO Holdco, and the Committee has stipulated

14  to those amounts.  They're not in dispute.

15       So, Your Honor, frankly, I'm not entirely sure what else

16  CLO Holdco would need to show to concretely establish that it

17  has a present valid legal claim to the interests in the

18  registry of the Court.  It's satisfied every element of its

19  claim to the funds.

20       And right there, under a 28 U.S.C. 2402 dispute, that

21  should end the discussion about whether we're entitled to

22  remittance of the funds from the registry amount.  We have a

23  proven, current, valid legal title hold.  And that's all

24  that's required for relief under Fifth Circuit case law,

25  Fourth Circuit case law, Eleventh Circuit case law addressing

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Document 15-4 Filed 06/06/25 Page 216 of 1017 PageID 2679
Main Document Page 1299 of 2722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20 Entered 07/02/20 18:59:24 Page 45 of 100

45

1    these registry motions.

2        Your Honor, we understand that the Committee is arguing

3    that the funds should just sit in the registry of the Court.

4    We'd like to reiterate, we think it's very important that the

5    Committee has not asserted any form of affirmative relief in

6    this Court.  There is no adversary proceeding.  There is no

7    motion for some kind of prejudgment writ of attachment or

8    anything like that.  This is a defensive play by the

9    Committee.  It is an -- it is solely an objection to CLO

10   Holdco's position.  That objection wants to maintain the

11   status quo.  That's it.

12       So, what is maintaining the status quo?  Well, if we're

13   going to address the Committee's objection, we need to look at

14   *Rosen v. Cascade*, which is an Eleventh Circuit case that says,

15   when a party issues this type of objection, or even a motion

16   for (audio gap) relief, you need to look at the actual nature

17   of the relief sought by the party, not necessarily just the

18   description of the relief sought.

19       Well, what is the nature of the relief?  The Committee has

20   noted in its pleadings that it wants this Court to leave CLO

21   Holdco's funds in the registry so that it can use those funds

22   as security against a potential hypothetical future judgment

23   because it believes that collection against CLO Holdco, a

24   Cayman entity, may otherwise be difficult.

25       Okay.  So the Committee wants this Court to keep CLO

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 1 of 232   Page 217 of 1017   PageID 2680

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 46 of 100

46

1   Holdco's funds, after it's proven title to those funds, to

2   serve as surety against a potential future judgment.  As we

3   noted in our pleadings, Your Honor, *Black's Law* defines

4   attachment as seizing of a person's property to secure a

5   judgment.  We believe that that's exactly what's happening

6   here.  The Committee wants the Court to hold CLO Holdco's

7   property pending a potential future judgment.

8       Your Honor, a prejudgment remedy like attachment invokes

9   Bankruptcy Rule 7064, and at least here the Committee is

10  willing to -- or, CLO Holdco is willing to acknowledge that

11  7064 is applicable in a contested matter like the one before

12  the Court.  But to obtain relief under 7064, the party would

13  have to satisfy Texas law and the requirements for a

14  prejudgment writ of attachment.

15      Your Honor, that falls under Section 61 of the Texas Civil

16  Practice and Remedies Code.  But importantly, Judge Houser has

17  addressed that specific issue in the *Atlas Financial Mortgage*

18  case.  And she hits the nail on the head.  She notes that, To

19  prove a claim for a right to a writ of attachment, prejudgment

20  writ of attachment, the party seeking that relief must have

21  made, and this is a quote, "a certain and liquidated demand or

22  a demand whose amount is reasonably certain."  And she cites

23  the Fifth Circuit case *In re Fredeman Litigation* .

24      There is no demand by the Committee, and there is

25  certainly no demand for an amount certain.  There is no claim.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 218 of 1017
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 218 of 1017   PageID 2681

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 47 of 100

47

1    There is no cause of action asserted by the Committee against

2    CLO Holdco.

3        Judge Houser went on to state that, If the amount of

4    damages can only be ascertained by the fact-finder, a writ of

5    attachment is inappropriate.

6        Your Honor, again, we have no idea what is asserted.

7    Presumably, any damage model that the Committee asserts that

8    it has would have to be thoroughly litigated and the damage

9    modelled by the Court.

10       Also, prejudgment writ of attachments are only available

11   in liquidated claims that arise out of contract.  That doesn't

12   exist in this case.

13       So the Committee is just flat out ineligible for any kind

14   of prejudgment writ of attachment.

15       So, next, Your Honor, that flows to, well, is an

16   injunction available?  Arguably, the Committee is defensively,

17   not affirmatively, but defensively asking this Court to enjoin

18   CLO Holdco from removing its funds from the registry of the

19   Court or otherwise using those funds.  Well, that was what

20   happened in *Atlas Financial Mortgage*.  Judge Houser said,

21   well, you're not eligible for a prejudgment writ of

22   attachment, but you actually are eligible for a preliminary

23   injunction.  But she went into a very detailed analysis of

24   when a preliminary injunction would be obtainable.

25       And Your Honor, I think before I get to Judge Houser's

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15-4   Filed 06/06/25   Page 219 of 1017    PageID 2682
Main Document   Page 252 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 48 of 100

48

1    kind of final analysis on that issue, I'd like to look at what

2    do the Bankruptcy Rules say?  Bankruptcy Rule 7001, Subsection

3    7, notes that an adversary proceeding is a proceeding to

4    obtain an injunction or other equitable relief other than when

5    that relief is in the plan.  So, plan injunction, totally

6    different animal.  And CLO Holdco readily admits that.  But an

7    injunction against the assets of another party requires an

8    adversary proceeding.

9        Bankruptcy Rule 7065 incorporates Federal Rule of Civil

10   Procedure 65, which is -- which addresses the means of

11   obtaining a preliminary injunction.  Importantly, Bankruptcy

12   Rule 9014 excludes 7065 in Bankruptcy Rules applicable in a

13   contested matter.

14       So, again, Your Honor, the Bankruptcy Rules essentially

15   trickle down on this idea that if the Committee wants some

16   form of injunctive relief, it must file an adversary

17   proceeding to obtain that relief against CLO Holdco.

18       And Judge Houser's analysis in the *Atlas Financial*

19   *Mortgage* case is very consistent with that position.  The

20   party seeking the injunction, she said, must assert a

21   cognizable claim to specific assets or must seek an equitable

22   remedy involving those assets in its adversary proceeding and

23   complaint.

24       There is no adversary proceeding here.  There is no

25   complaint.  The Committee has not asserted any claim or cause

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 154   Filed 06/06/25   Page 220 of 1017   PageID 2683
Main Document   Page 220 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 49 of 100

1   of action against any specific assets owned by CLO Holdco.

2   And the Committee has not asserted any equitable remedy

3   against any specific asset in an adversary proceeding against

4   CLO Holdco.

5       Your Honor, as Judge Houser noted, Federal Rule of Civil

6   Procedure 65, as incorporated by 7065, enables a court to

7   issue preliminary injunctions -- and I stress this -- pending

8   trial.  It is a prejudgment, post-commencement of adversary

9   proceeding remedy.

10      And before Judge Houser is willing to issue -- and,

11  really, any court under the Fifth Circuit -- is willing to

12  issue a preliminary injunction, those courts consider four key

13  factors that must be proven by the movant before the

14  injunction can enter.  And that is:  A substantial likelihood

15  of success on the merits; (2) a substantial threat of

16  irreparable injury if the injunction does not issue; (3) that

17  the threatened injury if the injunction is denied outweighs

18  any harm that will result if the injunction is granted; and

19  (4) that the grant of injunction will not disserve the public

20  interest.

21      That's from *Janvey v. Alguire*, which is a Fifth Circuit

22  decision in 2011 and is incorporated into Judge Houser's *Atlas*

23  *Financial Mortgage* decision.

24      So, let's look at those elements, Your Honor, even

25  assuming that the Committee is somehow asserting a claim for

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/05/25   Page 221 of 1017   PageID 2684
Main Document   Page 50 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 50 of 100

50

1    injunctive relief.

2         The Committee has the burden of proving that there is a

3    likelihood of success on the merits of its claims against CLO

4    Holdco.  The Committee has not asserted any claims against CLO

5    Holdco.  Moreover, CLO Holdco is unable to identify any

6    potential claim that the Committee could assert based on the

7    facts that are in evidence.

8         There is evidence of a $2.5 million cash payment by CLO

9    Holdco to obtain a subscription in AROF.  There is evidence of

10   an exchange of reasonably equivalent value between Highland

11   and Get Good for the initial transfer of the Dynamic

12   interests.  Your Honor, the Dugaboy Trust note has been paying

13   down.  There is no evidence of insolvency at the time of the

14   transfer as a result of the Dynamic transfer.  In fact,

15   Exhibit 16 shows the Debtor had a very large equity value and

16   made actually a million dollars.  And there's no evidence of

17   any fraudulent intent at any time related to the Dynamic

18   transfer.  There is simply no evidence whatsoever, and no

19   attempt by CLO -- or, by the Committee to obtain any evidence

20   from CLO Holdco.

21        So, Your Honor, there is no substantial likelihood of

22   success on the merits.  As Judge Houser noted in *Atlas*

23   *Financial*, the Committee would have to prove the estate's

24   entitlement -- or doesn't -- the Committee wouldn't have to

25   prove the estate's entitlement to summary judgment on its

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 10/06/25   Page 222 of 1017   PageID 2685
Main Document   Page 222 of 242

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 51 of 100

51

1    claim, but it would have present a prima facie case in support

2    of its claim.  And in stating that, Judge Houser cited to

3    *Janvey's* Fifth Circuit decision.

4        So, Your Honor, is there a prima facie case presented by

5    the Committee?  The answer is a resounding no.  It cannot

6    satisfy the first element of the factor test required to issue

7    an injunction against CLO Holdco.

8        How about a substantial threat of irreparable injury if an

9    injunction is not issued?  Your Honor, this goes back to the

10   Committee performing no discovery against CLO Holdco.  If the

11   Committee wanted to prove up this point, presumably it would

12   have to present evidence to the Court that CLO Holdco was

13   either financially unable to satisfy a judgment or wouldn't

14   satisfy a judgment for some other reason.  The simple fact

15   that CLO Holdco is a Cayman entity does not mean that it is

16   incapable of satisfying a judgment.  CLO Holdco, through its

17   counsel, has had conversations with the Committee about the

18   assets in CLO Holdco.  And, in fact, there's not a whole lot

19   of dispute that CLO Holdco does possess a significant value of

20   assets.

21       It is not, inherently, Your Honor, some judgment-proof

22   entity.

23       But, again, CLO Holdco does not have the burden of proof

24   on disproving this potential issue.  It would be the

25   Committee's burden of proof.  The Committee can't satisfy

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/06/22    Page 223 of 1017    PageID 2686
Main Document    Page 206 of 282

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 52 of 100

52

1   either of the first and most important elements of a test for

2   an injunction.  Your Honor, that injunction simply cannot

3   issue.

4       Now, the Committee will say, well, the Court should be

5   able to issue a naked injunction under Section 105(a) of the

6   Bankruptcy Code because the Court has these broad, equitable

7   powers.  And in its pleas, it cites to a number of decisions

8   that it alleges support that position.

9       It cites to *King Louie Mining*.  Well, *King Louie Mining*

10  granted an injunction and cited to Section 105(a), but the

11  injunction was granted against property that was subject to a

12  pending adversary proceeding.  Again, injunction issued under

13  7065.

14      The Committee cites to *In re Momentum Manufacturing.*

15  Well, in that case, 105(a) was used to grant equitable

16  estoppel, not a preliminary injunction.

17      The Committee cites to *Caesar's Entertainment* repeatedly

18  for this proposition this Section 105(a) can be used by the

19  Court to grant this naked injunction, but the injunction

20  granted in *Caesar's* was granted against a third party where

21  there was a pending adversary proceeding to claw back the

22  assets of that third party.

23      The Committee also cites to the *DeLorean* decision.  Well,

24  in that case, there was a 105(a) statement by the Court when

25  it entered an injunction in an adversary proceeding filed

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 09/06/25 Page 224 of 1017   PageID 2687
Main Document   Page 157 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 53 of 100

53

1    seeking the injunction.  The Court went through the 7065

2    factors before it issued the injunction.

3         And then the Committee cites to *Sire Plan*.  Well, there

4    was 105(a) relief granted, but it was also granted in an

5    adversary proceeding, and the relief was consistent with the

6    language of the Bankruptcy Act, albeit the Court even admitted

7    that it was a liberal interpretation, again.

8         So, what case law or actions have been cited by the

9    Committee in support of this Court's ability to grant a 105(a)

10   injunction outside of the parameters of a plan?  Well, it

11   cited to the *Lewis v. Celotex* decision, which is a Fifth

12   Circuit case.  I think it's worth discussing, Your Honor,

13   because we readily acknowledge that, in that case, there was a

14   preliminary injunction that was incredibly broad in that it

15   addressed five parties who were seeking to recover on

16   supersedeas bonds after the case was commenced, after the

17   *Celotex* bankruptcy case was commenced.

18        And I want to note that there's a Supreme Court decision

19   on a separate dispute called *Edwards v. Celotex*.  Now, in the

20   *Edwards v. Celotex* dispute, the Fifth Circuit disagreed with

21   the lower court's decision and its ability to enter the

22   injunction.  It did so -- officially made its ruling on

23   jurisdictional grounds.  But the U.S. Supreme Court reviewed

24   the Fifth Circuit's decision and overturned it.  But when it

25   overturned it, the Supreme Court did two things.  One, it

1    refused to address whether a court could actually enter the

2    injunction under 105(a).  It addressed (audio gap)

3    jurisdictional argument.

4         But the Supreme Court also noted that while the Fifth

5    Circuit allegedly ruled on a jurisdictional basis, it

6    certainly appeared that the Fifth Circuit was partially ruling

7    because it found the 105(a) injunction inappropriate at that

8    position of the case.

9         So there is at least some dicta from the Supreme Court and

10   the Fifth Circuit that that 105(a) injunction issued in the

11   *Celotex* case was inappropriate.

12        Also, Your Honor, the Third Circuit notes in a footnote in

13   its decision in *Lewis v. Celotex* that while it would uphold

14   the injunction, it noted that the injunction was narrow in

15   scope as far as what it actually did.  And once the bankruptcy

16   judge reviewed the judgments against the debtor, the

17   avoidability, if the judgments were voidable for one reason or

18   another, the Court would have to lift the stay to allow the

19   party in that case to proceed against the assets.

20        And Your Honor, that's basically where we are in this

21   case.  The Court used its equitable rights under 105(a) to

22   deposit funds in the registry of the Court, and now the Court

23   has an opportunity to review CLO Holdco's evidence to see if

24   it can meet its preponderance standard to prove that it has a

25   right to the funds in the registry of the Court.  And once it

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 226 of 1017   PageID 2689

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 55 of 100

55

1    does, it should release those funds to CLO Holdco.  That

2    analysis is really pretty consistent with the *Lewis v. Celotex*

3    decision, which is the only case that's cited by the Committee

4    that includes an injunction outside of the scope of an

5    adversary proceeding.

6        So, Your Honor, there really is nothing here supporting

7    the Committee's position.  The Committee hasn't proved up any

8    right to a writ of attachment.  It hasn't satisfied any of the

9    elements, procedurally or factually, to be able to obtain an

10   injunction against CLO Holdco's assets.

11       So, Your Honor, based on the evidence presented, we

12   request this Court grant CLO Holdco's motion and allow us to

13   withdraw funds from the registry of the Court.

14           THE COURT:  Thank you, Mr. Kane.  All right.  Mr.

15   Clemente, I hope that you will focus in your closing argument,

16   I suspect you will, but the arguments, the primary arguments

17   of Mr. Kane that this is -- this holding of money in the

18   registry of the Court in this context is tantamount to a

19   prejudgment remedy, there is no adversary there in order to

20   have a preliminary injunction under 105, you really need an

21   adversary under 7001:  I hope you'll address those arguments,

22   among others.  All right.  Mr. Clemente?

23           MR. CLEMENTE:  Yes.  Thank you, Your Honor.  Matt

24   Clemente from Sidley on behalf of the Official Committee of

25   Unsecured Creditors.

CLOSING ARGUMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS

MR. CLEMENTE:  Well, Your Honor, I think Mr. Kane's

arguments overall generally miss the point, and the issue is

really about context.

Mr. Kane referred to the monies being pled into the

registry.  That is not the case at all.  Your Honor ordered

them placed into the registry at the March 4 hearing.  That,

in my view, distinguishes it almost entirely from all the

cases that CLO Holdco cites in their papers.

This is not a dispute about ownership.  This is not an

interpleader.  This is not some party saying, I don't know

what to do with these monies and so I'm pleading them into the

Court and please, Court, give me direction.  That is

absolutely not the circumstance or context in which the monies

were ordered by this Court under Section 105 to be put into

the registry.

So, from my perspective, I think that, Your Honor,

effectively distinguishes the current situation from the

situations that Mr. Kane cites.

Belatedly, Your Honor, and I'll touch on this in a moment,

none of this about 28 U.S.C. was ever raised in the actual

motion, which I found to be fairly interesting.

So I wanted to start with those comments, but then I want

to take a step back, because I do believe that the context and

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 228 of 1017   PageID 2691
Main Document   Page 251 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 57 of 100

57

1   background of this bankruptcy case is critical to this

2   dispute.

3      CLO Holdco would have the Court view it as an independent

4   third-party investor merely requesting the release of proceeds

5   of its investment that Mr. Kane referred to in his argument as

6   another party.  It's not just another party.  I would do that

7   as well and I would try and distance myself from Mr. Dondero,

8   but the fact of the matter is CLO Holdco cannot.

9      The Committee, as Your Honor knows, never objected to

10  distributions to independent third parties, including in

11  connection with the initial distribution motion, and the

12  Committee is not doing that now.

13     And recall just a bit of context around the March 4th

14  motion, Your Honor.  Under the protocol that the Committee

15  negotiated, the Debtor -- related-party transactions needed

16  the consent of the Committee if they exceeded a certain

17  threshold.  The Debtor came to us with respect to these

18  distributions, and the Committee said, no, because of the

19  related party involvement and given the web that Mr. Dondero

20  has created.  And so the Debtor then filed a motion in front

21  of Your Honor seeking Your Honor's authority to make the

22  distribution.

23     Again, this is entirely unlike the cases that Mr. Kane

24  talks about.  This is about the context in which that

25  distribution -- and these were funds that the Debtor

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/25   Page 229 of 1017   PageID 2692
Main Document   Page 252 of 302

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 58 of 100

58

1   controlled -- I agree, weren't funds that the Debtor owned,

2   but the Debtor controlled them, and I believe that is an

3   important factor that I'll touch on later, Your Honor, in

4   distinguishing it from the prejudgment cases and other things

5   that Mr. Kane talks about.

6       Importantly, Your Honor, CLO Holdco is not an independent

7   third-party investor, and CLO Holdco and other related parties

8   hold a special place in this case in the hearts and the minds

9   of the Committee, and I think also of Your Honor.

10      Again, and just a little bit of a background here, because

11  I do need to sort of create the picture here.  Mr. Dondero has

12  created a web of over 2,000 related entities, which includes a

13  sub-web involving CLO Holdco.  At the outset of the cases,

14  Your Honor, the Debtor's advisors could not even identify all

15  the Debtor's affiliates.

16      As we laid out in our papers, CLO Holdco, through its

17  parent entity, and this is not disputed, and it's proven up --

18  out by the documents that Mr. Kane walked through, controlled

19  by a patent attorney, not an investment professional but a

20  patent attorney that was a college roommate of Mr. Dondero, it

21  has at all times, including when the transfers were made, been

22  advised by the Debtor, which, when these transfers were made,

23  then it was controlled by Mr. Dondero.

24      Mr. Dondero credited and directed each of the beneficial

25  owners, which are the foundations, and the assets and

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Main Document   Filed 09/05/25   Page 230 of 1017   Page 223 of 272   PageID 2693

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 59 of 100

59

1   interests gave rise to the distribution that CLO Holdco is

2   seeking now that were Debtor assets that were either

3   transferred through a series of conduit and intermediate

4   transfers, which is what Mr. Kane's papers, you know, bear

5   out, and which -- with which we agree with, into the hands of

6   CLO Holdco, again, at a time when Mr. Dondero was in control

7   of the Debtor and in control of the intermediate parties and

8   in control of CLO Holdco.  So he therefore was on all sides of

9   the transfer.

10      Your Honor, to be specific -- and, again, there's no

11   dispute over this; we lay this out in our papers -- the Debtor

12   transferred its interest in what was ultimately renamed as the

13   Dynamic Fund, along with other interests and assets, to

14   something called the Get Good Nonexempt Trust, in exchange for

15   not a hundred percent, but 97.6 percent of a $24 million note

16   issued by something called the Dugaboy Investment Trust.  That

17   note itself, Your Honor, from Exhibit 12, if you read the

18   introduction to the note, was a substitute for a previous note

19   issued by Dugaboy to the Get Good Trust.  And at least on the

20   (audio gap) note, (audio gap) unsecured note bearing interest

21   at 2.75 percent.  We don't know whether that note in and of

22   itself had been exchanged for a different note.  We just don't

23   know.

24      We do know that there was a note with Get Good and

25   Dynamic, or Get Good and Dugaboy, and that note was replaced

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 60 of 272   Page 231 of 1017   PageID 2694

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 60 of 100

60

1   in a series of transactions, however, documented together,

2   Your Honor.  The Get Good Trust then transferred the interests

3   to the Highland Dallas Foundation, and then ultimately through

4   the DAF entities into CLO Holdco.

5        And, again, this is not in dispute, and it's bore out by

6   the documents.  Both the Get Good Trust and the Dugaboy Trust

7   are Dondero family trusts for which Nancy Dondero, the sister

8   of Mr. Dondero, and/or Grant Scott are trustees, and for which

9   it appears Mr. Dondero was at some point also a trustee.

10  That's evidenced on Committee Exhibit 12, where it talks about

11  that prior note.  It was issued or made by a Mr. Dondero as

12  Trustee, I believe, for the Get Good Trust.

13       And I just would note, these transactions also support the

14  basis or form the basis for CLO Holdco's purported $11 million

15  claim that they filed against the estate.

16       Your Honor, from my perspective, this is all very

17  confusing and it raises many questions, not the least of which

18  is why was this done, what is the Dugaboy Trust, what did the

19  Debtor actually receive relative to what transferred, and,

20  frankly, what was the purpose of all this?  And did the

21  Dugaboy Trust ultimately pay on the note?  And I'll address

22  Mr. Kane's discussion about payments that were made on the

23  note in a moment.

24       Your Honor, I don't believe any of this is in dispute.

25  And indeed, this Court previously found that CLO Holdco's

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/25 Page 61 of 232 232 of 1017   PageID 2695

Case 19-34054-sgj11  Doc 802  Filed 07/02/20   Entered 07/02/20 18:59:24   Page 61 of 100

61

1   parent was seeded by the Debtor, managed by the Debtor, and

2   CLO Holdco's quote/unquote independent trustee was a longtime

3   friend of Mr. Dondero.  That's in the record.  That's where he

4   makes his case.

5       The key point of all this, Your Honor, is that CLO Holdco

6   is anything but an independent third-party investor merely

7   seeking the return of its invested funds, and its argument

8   should not be viewed through that lens and instead should be

9   viewed through the lens of Mr. Dondero being on all sides of

10  the transactions and transfers and pulling the strings and

11  controlling it all.  And this lens is clearly tainted by the

12  previous documented conduct of Mr. Dondero.

13      As the Court is well aware, (inaudible) as controlled by

14  Mr. Dondero, has a history of engaging in misconduct, breaches

15  of fiduciary duty, and fraudulent transactions in multiple

16  settings, with its principal, Mr. Dondero, taking a central

17  role.  And Your Honor, as you know, this bankruptcy case is

18  the result of arbitration proceedings, awards, judgments, and

19  other litigation against the Debtor arising from this

20  misconduct.

21      Therefore, the Committee and the Court must approach and

22  consider each of the related-party Dondero-controlled

23  transactions with skepticism, including the transactions with

24  CLO Holdco.

25      Now, Your Honor, CLO Holdco provided voluminous documents

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 09/06/25   Page 233 of 1017   PageID 2696
Main Document   Page 233 of 242

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 62 of 100

62

1    and other information which Mr. Kane meticulously walked

2    through, none of which, for purposes of this proceeding only,

3    the Committee takes issue with.

4        But Your Honor, as I've mentioned before, this discussion

5    isn't about taking in kind, columns of numbers, and signatures

6    on documents.  What it is about is the context in which CLO

7    Holdco's interests arose and the relationship that it has with

8    this Debtor prepetition.  And despite the documents and

9    admissions, what CLO Holdco doesn't do and cannot do is refute

10   any of that, including the fact that CLO Holdco was seeded by

11   the Debtor, and the very interests which gave rise to the

12   distributions came from the Debtor at a time when it was

13   controlled by the Debtor.

14       This is not new money third-party investment or anything

15   close to it.  Instead, again, and as the Court found in the

16   Acis case, CLO Holdco was seeded by the Debtor, and as its own

17   exhibits demonstrate, the interests were transferred from the

18   Debtor.

19       Your Honor, I don't think I'm painting with too broad of a

20   brush, then, to state that transactions with Dondero on both

21   sides, as we have here, must be subject to scrutiny by the

22   Committee and the creditors -- and, frankly, the Court -- to

23   determine their legitimacy.

24       And yes, Your Honor, the distributions are not property of

25   the Debtor's estate.  We've never argued that they are.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/04/25   Page 234 of 1017   PageID 2697

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 63 of 100

63

 1    However, allowing it to be distributed to this entity, through

 2    the holding company, a Cayman Island entity, controlled by Mr.

 3    Dondero, would have the effect of prejudicing the estates and

 4    rewarding Dondero for potentially fraudulent conduct, which is

 5    something we cited in the *Sire Plan* case, where a party should

 6    not be allowed to benefit from its fraudulent scheme.

 7         All the Committee is asking to do -- and, frankly, what

 8    the Court did at the March 4th hearing -- is something the

 9    Debtor should have done, and that is let's keep the status quo

10    to allow the investigation to proceed to determine the

11    legitimacy of the transfers to CLO Holdco.  This best balances

12    the interests of all parties.  CLO Holdco's money is

13    safeguarded.  As Mr. Dondero's attorney claimed, stated on the

14    record at March 4th, the registry is, Your Honor, not

15    surprisingly, a place that is safe.

16         And Your Honor, the burden of keeping those distributions

17    with the Court isn't that onerous at all on CLO Holdco, in

18    particular relative to the burden that is on the creditors,

19    some of whom have been seeking recompense for almost a decade.

20    To be clear, Your Honor, the Committee and its constituencies

21    did not ask to be in bankruptcy.  It was thrust upon them by

22    the actions of Mr. Dondero and his team.  Now that they are in

23    bankruptcy, the creditors are forced to deal with the

24    consequences of that decision by Mr. Dondero.

25         Similarly, CLO Holdco must deal with the consequences that

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/02/25   Page 235 of 1017   PageID 2698
Main Document   Page 64 of 242

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 64 of 100

64

1   flow from being controlled by Mr. Dondero and having been

2   seeded at the direction of Mr. Dondero and taking transfers of

3   assets from the Debtor at the direction of Mr. Dondero, which

4   I submit here should be having the distributions continue to

5   be maintained in the Court registry.

6       Your Honor, I will turn to some of the arguments raised by

7   Mr. Kane.  First, the Bankruptcy Code and Section 105 continue

8   to apply to these issues.  As I mentioned before, I was a bit

9   surprised and, frankly, taken aback, Your Honor, when I saw

10   CLO Holdco's response to our objection.  Their motion is

11   completely silent on this argument that somehow the Bankruptcy

12   Code doesn't apply and instead the only issue this Court would

13   have to determine would be dictated by a non-bankruptcy

14   statute, 28 U.S.C. 2042.

15       Putting aside any discussion of whether this should have

16   been in the motion to begin with, as I mentioned at the

17   outset, Your Honor, I was before you pre-COVID when we

18   addressed these issues, and I certainly did not view placement

19   of the funds into the registry as some mechanism which would

20   divest the Bankruptcy Code from continuing to be applied.

21       Again, it's all about the context of that March 4th

22   hearing.  This wasn't a dispute about ownership of the funds.

23   This was about the Debtor coming in and doing something that

24   the Committee took issue with under the protocols that it had

25   negotiated.  That's entirely different and distinct from just

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/23/25    Page 236 of 1017    PageID 2699

Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 65 of 100

65

1    placing money into a registry and then allowing all parties to

2    come in with their document to show that, based on my account

3    statement, my book balance, this is my funds, these are my

4    funds.  Which I agree with Mr. Kane on that.  It's not -- I

5    mean, Your Honor has no stake in that fight from that

6    perspective.

7        But this is different.  Your Honor does have a stake in

8    this fight because it was to preserve and protect the estate

9    and maintain the status quo.

10        As I mentioned earlier, I don't presume to speak for Your

11    Honor, but I would suspect that Your Honor didn't think that

12    she was divesting herself of discussion under Section 105 by

13    placing the funds into the registry.  Instead, it was simply a

14    mechanism to deal with them and maintain the status quo.  They

15    could have been held -- they could have been held in

16    (inaudible) account, for example, but they weren't.  This

17    seemed like a logical, practical solution to the issue that

18    was presented to the Court.

19        Had we understood that, Your Honor, had I understood that

20    -- and, again, I was before you -- I wouldn't have agreed to

21    that.  And, frankly, I wouldn't have -- wouldn't have

22    understood -- if I understood that we'd be here today

23    belatedly arguing about that, I would not have agreed to it,

24    either.

25        Additionally, Your Honor, the cases cited by CLO Holdco

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 10/06/25    Page 237 of 1017    PageID 2700
Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 66 of 100

66

 1   are just not applicable on their facts.  Unlike the cases

 2   cited by CLO Holdco, this has never been a dispute about the

 3   ownership or pleading -- interpleader-type action regarding

 4   the funds.  This is all about preserving the estate and the

 5   status quo.  This is why the monies were placed into the

 6   registry, not as a mechanism to determine ownership.

 7        Therefore, the Bankruptcy Code and Section 105 clearly

 8   continue to -- continue to apply.  And Your Honor found on

 9   March 4th that you already had the authority under Section 104

10   to do this, and nothing has changed in the interim, aside from

11   Mr. Kane has come in with documents showing -- which we don't

12   dispute -- that if you tick and tie everything, it adds up to

13   the money that he asserts that CLO Holdco should be given,

14   should be distributed.

15        Your Honor, regarding the 105 issue, there is clearly an

16   issue as to whether the seeding of CLO Holdco and transfers of

17   Debtor assets to it involved transfers that are fraudulent or

18   otherwise avoidable.  And I'll touch on the payment on the

19   note in a moment.

20        Those actions, of course, are assets of the estate for the

21   benefit of the creditors, and in fact, under the governing

22   protocol, the Committee negotiated to have standing to pursue

23   those claims.  And CLO Holdco is just that, a holdco.  And a

24   Cayman entity, to boot.  And despite Mr. Kane's references to

25   conversations that may have been had about what it is CLO

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 238 of 1017   PageID 2701
Main Document   Page 251 of 272

Case 19-34054-sgj11  Doc 802  Filed 07/02/20   Entered 07/02/20 18:59:24   Page 67 of 100

67

1    Holdco has or doesn't have, we have no idea.  And it's

2    controlled, ultimately, let us not lose sight of the fact, by

3    Mr. Dondero.

4         So, allowing CLO Holdco to take distributions will place

5    them with an offshore entity, potentially outside the

6    jurisdiction of this Court, or at the very least, placed in

7    five or six entities removed or who knows where, including

8    potentially other foreign entities.

9         Therefore, exercising authority under Section 105 is

10   consistent with preserving, protecting, and maximizing the

11   value of the Debtor's estate, which estate includes claims,

12   causes of action, and avoidance actions.

13        As you know, 105 is the means and -- circumstances (audio

14   gap) preserve and protect the estate.

15        And to be sure, this is not inconsistent with any other

16   provision of the Bankruptcy Code, and it's, in fact, from our

17   perspective, in furtherance of the goals of the Code.

18        Your Honor, regarding the payments that Mr. Kane (audio

19   gap), the fact that a few payments were made on the note

20   doesn't change the fact that Section 105 applies and the Court

21   should deny the motion.

22        As with all that is Highland, nothing is simple or easy.

23   First, CLO Holdco received millions more in assets and

24   transfers, aside from the interests giving rise to the

25   distributions at issue.  So the fact that there were payments

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document D4cument Filed Pagd06/2223 of 2392 239 of 1017   PageID 2702

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 68 of 100

68

1    on the notes really speak nothing to the fact of whether the

2    overall transaction was for reasonably equivalent value or

3    otherwise problematic, especially when there is nothing in the

4    record regarding the Dugaboy Trust, its wherewithal to pay, or

5    the fairness of the terms of the note, or any of that.  Or why

6    the note was structured this way or, you know, what the Get

7    Good Trust and the Dugaboy Trust do, how they interact, who

8    makes decision on what gets paid and doesn't get paid.

9        The few payments, while interesting, Your Honor, again, do

10   not establish reasonably equivalent value or the propriety, in

11   our view, of the transfers.

12       Finally, as this Court knows, reasonably equivalent value

13   is not determinative of whether the transfer was intentionally

14   fraudulent or otherwise potentially avoidable or problematic.

15   So, while deeds are interesting, Your Honor, I would submit

16   that they don't move the needle in changing the fact that the

17   motion should be denied.

18       Now, Your Honor, to the point that you raised with me

19   before I started my remarks here.  Much has been made about

20   inappropriate prejudgment remedy or attachment or similar

21   arguments.  I submit this case is moot, Your Honor.  Again, at

22   the risk of repeating myself, I will emphasize that CLO Holdco

23   is not an independent third party.  Like it or not, it is tied

24   up in a ruinous web with Mr. Dondero, and that in and of

25   itself makes this case unique and distinguishes it from the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 04/04/25   Page 240 of 1017   PageID 2703
Main Document   Page 223 of 242

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 69 of 100

69

```
 1     other cases cited by CLO Holdco.

 2         Additionally, Your Honor, the current circumstances are

 3     distinguishable because the Debtor had control over these

 4     funds.  That's why we were in front of you on March 4th.  I

 5     agree, and I'm not arguing, that the Debtor did not own these

 6     funds.  But it clearly had control over them at the time that

 7     it sought to make the distributions on March 4th.  So, in my

 8     humble opinion, Your Honor, that means the Court had control

 9     over that.

10         Having them held in a registry while an investigation

11     occurs is not akin to slapping a lien on someone's house or

12     taking possession of an automobile, like the cases cited by

13     Mr. Kane where they require there's some -- an adversary

14     proceeding or some type of complaint.

15         The situation here, again, Your Honor, matters.  The

16     Debtor was before you seeking your authority to make this

17     distribution.  That is entirely different than if I were to

18     walk in here and say my colleague, Mr. Twomey, I think that,

19     you know what, I don't like him and so I have a claim against

20     him, and I want Your Honor to enjoin him from being able to

21     sell his automobile.  That is entirely different, and in my

22     view completely distinguishes it from any of the cases that

23     Mr. Kane cited, including, of course, I have much respect for

24     Judge Houser, but including the case authored by Judge Houser.

25         So, Your Honor, again, having them held in the registry is
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 241 of 1017
Case 3:25-cv-02072-S   Document 54   Filed 06/06/25   Page 241 of 1017   PageID 2704
Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 70 of 100

70

1    not akin to the type of situation -- to the situation that Mr.

2    Kane discussed in his cases.

3        In fact, Your Honor, although the Board chose not to do

4    so, a decision with which Your Honor knows I vehemently

5    disagreed, I think the Debtor could have not and frankly

6    should not have sought to make the distributions to CLO Holdco

7    in the first place, and instead have come to this Court, and

8    this Court clearly had the authority to provide them with the

9    protection in doing so.  Because, again, the Debtor had

10   control of the funds.

11       And I understand there's contractual arrangements, and Mr.

12   Kane walked through some of those.  But at the end of the day,

13   if the Debtor has control over it, that means Your Honor has

14   control over it.  And Your Honor clearly could have ordered --

15   and, in fact, did, under Section 105 -- the authority to tell

16   the Debtor, don't make the distribution.

17       That is not the same as the Committee walking in and

18   trying to argue it's entitled to some prejudgment remedy or

19   something on a stranger to the case, where there was already

20   the relationship and the establishment and the nexus that

21   existed in this case was already there.  I'd submit those

22   other cases that Mr. Kane cites are designed to protect

23   against, and reasonably so:  This is not that situation, Your

24   Honor.

25       As a result, Your Honor, of what the Debtor did, the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 242 of 1017   PageID 2705
Main Document   Page 225 of 242

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 71 of 100

71

```
 1    Committee finds itself placed behind the proverbial eight
 2    ball.  Its constituencies have waited -- literally decades, in
 3    some cases -- for recompense from an entity with a documented
 4    history of fraudulent conduct.  And it's forced to deal with a
 5    bankruptcy it did not choose.  It must spend literally
 6    millions of dollars from the estate that could be part of its
 7    recovery investigating an intentional take and obfuscating
 8    whatever transaction with literally thousands of entities,
 9    while on the other hand the Cayman Island holding company that
10    is controlled by Mr. Dondero, the funds over which the Debtor
11    had control and came to this Court seeking authority to make
12    the distribution, and seeded by the Debtor when Mr. Dondero
13    controlled it, takes distributions on account of interests
14    which were previously the Debtor's and the transfer of which
15    may very well be avoidable.
16        Your Honor, I'd submit this is precisely an appropriate
17    use of Section 105.  And talk around prejudgment remedies and
18    attachment, frankly, is simply not on point, Your Honor,
19    because I think this situation is distinguishable.
20        And to be clear, Your Honor, Rule 7064, which is cited by
21    CLO Holdco, as I read it, does not preclude the use of Section
22    105 to achieve this outcome.  To the contrary, Rule 7064 might
23    even expand the tools available to the Court to include those
24    available under state law.  It does not restrict them, in my
25    view.
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document    Page 243 of 1017
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 243 of 1017   PageID 2706

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 72 of 100

72

```
1        And there was a reference to Rule 7067, which does not
2    apply, because the Court ordered the funds placed into the
3    registry.  They weren't pled into the registry.  The Debtor
4    didn't want them put in the registry.  The Debtor wanted to
5    distribute them, which is why it came to the Court in the
6    first place.
7        So, Your Honor, I'm at the end of my remarks, and I would
8    like to say that I think -- not that I think; I know -- what
9    we are seeking is an equitable result which is clearly within
10   this Court's authority and discretion under the Bankruptcy
11   Code, including Section 105.
12       CLO Holdco's motion cannot be viewed in a vacuum.  The
13   circumstances surrounding, the reason why the distribution
14   motion was brought in the first place, including the Debtor's
15   control over those funds, the circumstances surrounding CLO
16   Holdco, Mr. Dondero's involvement, how it was seeded, how it
17   obtained the interests giving rise to the distribution, all
18   matter, Your Honor, as does the documented history of
19   fraudulent transfers and inappropriate conduct of Mr. Dondero.
20   Viewed appropriately in this context and the balancing of the
21   harms resulting from keeping the distribution in the registry,
22   I submit there is more than ample justification for this Court
23   to deny the motion and order the continued holding of the
24   distributions in the registry.
25       With that, Your Honor, I've concluded my remarks.  Am
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 09/06/25   Page 244 of 1017   PageID 2707

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 73 of 100

73

1    happy to address any questions you may have.

2            THE COURT:  Just one.  Could you remind me of the

3    relevant provisions of what I'll call the protocol order that

4    was negotiated with the Committee?  Because as you pointed

5    out in your argument, the Debtor filed the motion to make

6    these disbursements from the Dynamic Fund and the Argentina

7    Fund because of concerns about the do's and don'ts of that

8    protocol order.  So if there's relevant language in there you

9    think I should be reminded of, could you --

10           MR. CLEMENTE:  Yeah, that --

11           THE COURT:  -- read it?

12           MR. CLEMENTE:  Your Honor, that's exactly right.

13   That's exactly correct.  I don't -- I'm pretty sure I have it

14   somewhere, but I don't have it right in front of me.  But the

15   point there was, Your Honor, when the Committee came to the

16   case and it began to understand all of the related parties,

17   the Committee clearly was concerned that value that either

18   rightfully belonged to the Debtor or had been inappropriately

19   transferred or siphoned away from the Debtor would be

20   distributed to related parties, and then the Committee would

21   be in the position of having to chase after that money.

22       So we negotiated a series of very complicated protocols

23   that Your Honor ultimately approved, and the protocol at issue

24   here was, if distributions, I believe, from any fund where the

25   Debtor managed it and maintained an entity in excess of $2

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/05/25   Page 245 of 1017   PageID 2708
Main Document   Page 228 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 74 of 100

74

 1    million was to be made, that the Debtor would come to the

 2    Committee and the Committee would have five days, I believe,

 3    to say, We think you -- you know, we agree with it or we

 4    don't.  And if the Committee didn't agree with it, that then

 5    the Debtor would go to Court before Your Honor to seek the

 6    authority to do it.

 7         And so, again, back to an argument I made earlier, that's

 8    how we found ourselves here on March 4th.  The Debtor had

 9    control over those funds in the sense of he was the party

10    making distributions and doing other things.  They had to come

11    to Your Honor to actually get Your Honor to rule one way or

12    the other to make those distributions.  That, to me,

13    distinguishes it from the cases Mr. Kane cites regarding

14    prejudgment remedies and attachments and things of that

15    nature.

16              THE COURT:  Thank you.  All right.  Mr. Kane, the

17    Movant always get the last word.  And in making whatever quick

18    rebuttal you have, I'll just ask you to please address Mr.

19    Clemente's argument that context matters.

20         This is not as though someone requested an injunction

21    without an adversary proceeding against CLO Holdco.  This

22    order of the Court that money go into the registry of the

23    Court resulted from a Debtor motion, several responses

24    thereto, and then a suggestion that was made by Mr. Dondero's

25    counsel that others embraced:  Let's just stick the disputed

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 54   Filed 06/06/25   Page 246 of 1017   PageID 2709
Main Document   Page 75 of 732

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 75 of 100

75

```
 1    money into the registry of the Court for now and we'll sort

 2    this out in due time.

 3        You know, you've made some very compelling legal

 4    arguments, I have to say, Mr. Kane, but we have this

 5    overarching issue of the context.  So, your response, please.

 6            MR. KANE:  Yes, Your Honor.  I'm happy to start with

 7    that.  I do think the context is important.  I think that Mr.

 8    Clemente and I would disagree about what elements of the

 9    context are most important.

10        I would note that the portion of your order that I

11    previously cited during this hearing, whether the -- that

12    funds are to be pled into the registry of the Court and that

13    that would allow parties seeking those funds to file whatever

14    motions or to seek whatever orders were necessary to obtain

15    those funds.  And so what we're looking at here is, right,

16    there is a related-party entity.  But let's talk about

17    generally what the context of this dispute is about.

18        Mr. Clemente noted repeatedly in his closing argument that

19    this is not a dispute about Debtor assets.  Okay?  And I think

20    that's really important.  This is a dispute about funds that

21    are not owned by the Debtor.  The Committee readily admits

22    that.  The Debtor readily admits that.  And so what we're

23    talking about here is tying up assets that are not assets of

24    the Debtor's estate.

25        And so an indefinite freeze on assets that are not assets
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/04/25   Page 247 of 1017   PageID 2710
Main Document   Page 246 of 272

Case 19-34054-sgj11   Doc 802   Filed 07/02/20   Entered 07/02/20 18:59:24   Page 76 of 100

76

1    of the Debtor's estate is disturbing from a procedural

2    perspective.

3        So, I get the Committee's concerns about, hey, this is a

4    related entity.  Right?  This is CLO Holdco.  There are ties

5    to Jim Dondero.  We're not trying to hide that fact.  We're

6    not trying to say, no, that's not really true.  But what I

7    would also say is that there is no evidence that the seeding

8    of CLO Holdco from Highland assets was necessarily a

9    fraudulent transfer or effectuated by seedings of fraudulent

10   conveyances.  Okay?

11       Mr. Clemente even noted, as he was giving his

12   presentation, that there is no factual investigation into the

13   Dugaboy Trust by the Committee or anything like that.  These

14   are baseless allegations, or at least allegations that

15   entirely lack evidence.  So we're at a spot right now,

16   contextually, Your Honor, where the Court has CLO Holdco's

17   funds in its registry.  No other party is laying claim to

18   those funds.  The Committee wants those funds to stick in the

19   registry for an indefinite period of time, even though they're

20   not assets of the Debtor's bankruptcy estate.  And the only

21   reason it wants to do that is for the funds to serve as

22   security against a potential future judgment or claim.

23       And so, contextually for us, well, if there aren't -- if

24   there's no competing claim for the assets and they're stuck in

25   the Court's registry, you know, contrary to Mr. Clemente's

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 248 of 1017
Case 3:25-cv-02072-S   Document 5-4   Filed 09/26/25   Page 251 of 272   PageID 2711
Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 77 of 100

77

```
1    argument, a vacuous argument on the balancing of harms, we're

2    deprived of the use of $2.4 million and change of assets that

3    could go to additional investments or to satisfy operating

4    costs.

5        So there is real harm on a going forward basis from CLO

6    Holdco's perspective.

7        So that, Your Honor, is the context as we see this.  This

8    is about non-debtor assets frozen to serve as potential

9    security of a hypothetical judgment on claims that have never

10   been ascertained, asserted, identified.

11       So let me address a couple of issues on rebuttal, and I'll

12   be pretty quick about this.

13           THE COURT:  Please.

14           MR. KANE:  Mr. Clemente was making hay about the fact

15   that I said pled into the registry of the Court and that --

16   because, Your Honor, pled into the registry of the Court, this

17   isn't an interpleader action, that this was an order entered

18   by the Court.  That's a distinction without difference.  And

19   the reason that's the case is, if you look at 7067, which is

20   the only Bankruptcy Rule that addresses pleading funds into

21   the registry of the Court, 7067(b) notes, Money paid -- not

22   pled, not ordered -- money paid into the registry of the Court

23   is treated under 28 U.S.C. 2041 and withdrawn pursuant to 28

24   U.S.C. 2042.

25       So, you know, regardless of whether Mr. Clemente
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 249 of 1017
Case 3:25-cv-02072-S   Document 54-4   Filed 06/06/25   Page 249 of 1017   PageID 2712

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 78 of 100

78

1    appreciated how I had described the transition of funds from

2    the Debtor's control into the Court's registry, the reality is

3    that 28 U.S.C. 2042 does create the legal thresholds that are

4    required to withdraw funds from the registry of the Court.

5        Mr. Clemente argues that, well, cases where a car is

6    repossessed or a lien is placed on a party's assets under a

7    prejudgment writ of attachment or injunction are dissimilar

8    from this case, is really legally -- it's inaccurate.  Those

9    are erroneous statements.  There is no difference.  If this

10   Court retains CLO Holdco's assets, it's the exact same thing

11   as another -- a third party's assets being held in a blocked

12   account or a third party's assets being retained by a court or

13   third party pending a future judgment.  We're in the exact

14   same procedural position there.

15       Mr. Clemente got into a balance of harm's analysis when he

16   was discussing this Court's application of an injunction under

17   Section 105(a), arguing that an adversary proceeding is

18   unnecessary or that injunctive relief could be issued under

19   7064.  Your Honor, 7064 and 7065 are there.  And there is a

20   distinction from the courts between a prejudgment writ of

21   attachment that would be applicable under 7064 and an

22   injunction that would be issued under 7065.  Injunctive relief

23   is addressed under 7001(7) and 7065.

24       So you can't just say, well, no, you can do it as a -- as

25   -- on a motion like you would a prejudgment writ of

APP 1229

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 10/06/25   Page 250 of 1017   PageID 2713
Main Document   Page 250 of 292

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 79 of 100

79

 1    attachment.  Bankruptcy Rules aren't structured like that.

 2        But importantly, Mr. Clemente presented no facts to

 3    support his balancing of harms argument and presented no facts

 4    to establish that he has any viable claims against CLO Holdco.

 5    Arguments that James Dondero participated in frauds does not

 6    mean that there's a claim or cause of action that the

 7    Committee can assert against CLO Holdco, which is what would

 8    be required to obtain an injunction.

 9        This is a big if.  If the Committee is seeking to obtain

10    an injunction, it must satisfy its burden of proving under

11    7065 and the four-factor test established by *Janvey v. Alguire*

12    in the Fifth Circuit in 2011 and the many cases before that.

13    And it just can't do it.

14        So I want to leave the Court with one case citation,

15    because if the Court is considering some means of entering a

16    preliminary injunction outside of an adversary proceeding, I

17    was able to find a grand total of one case that address that

18    in the Fifth Circuit.  And that is the 1995 decision of *In re*

19    *Zale* in which the Fifth Circuit noted that the only way a

20    105(a) preliminary injunction could be issued, after a finding

21    of these unusual circumstances and the like, was if all of the

22    protections of an adversary proceeding had been afforded to

23    the non-movant and if the party that was requesting the

24    injunction satisfied the four-factor test that's found in

25    7065.

APP 1339

Case 19-34054-sgj11  Doc 2062  Filed 03/18/21  Entered 03/18/21 20:59:39  Desc
Case 3:25-cv-02072-S  Document 15  Filed 06/03/25  Page 251 of 1017  PageID 2714
Main Document  Page 234 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20  Entered 07/02/20 18:59:24  Page 80 of 100

1          There are no extraordinary circumstances or unusual

2     circumstances here.  And if this Court believes that the

3     context of this case warrants that, then the Committee would

4     still have to satisfy that four-factor test for a preliminary

5     injunction.  And it has the burden of proof on those four

6     factors.  It hasn't presented any evidence whatsoever to

7     support that it can meet the first, let alone the second,

8     third, and fourth factors of that test.

9          So, Your Honor, with that, I'll close our case, unless you

10    have additional questions, and request that the Court grant

11    CLO Holdco's motion.

12          THE COURT:  A couple of follow-up questions.  I have

13    certain facts in my brain, and I can't remember if they're in

14    evidence or stipulated to or I read them in a pleading.  So, I

15    just want to ask:  Somewhere I remember seeing that CLO

16    Holdco, or, you know, maybe it's its parent, I think -- Mr.

17    Clemente said we have a Byzantine structure here and we have a

18    sub-web within a bigger web with regard to CLO Holdco.  But,

19    anyway, CLO Holdco or its parent has assets of approximately

20    $225 million?  Is that evidence or undisputed?

21          MR. KANE:  Your Honor, that was contained in one of

22    the pleadings asserted, I believe, by the Committee, and that

23    was the Charitable DAF entities, not necessarily CLO Holdco.

24    There hasn't been any evidence presented by the Committee of

25    the assets held by CLO Holdco other than what we have before

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 5    Filed 09/04/25    Page 252 of 1017    PageID 2715
Main Document    Page 235 of 242

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 81 of 100

1    the Court.

2           THE COURT:  Okay.  So it's not something you would

3    stipulate or offer one way or another?

4           MR. KANE:  No, Your Honor, I think that's factually

5    incorrect and I don't stipulate to that.

6           THE COURT:  Okay.  I think my notes show that that

7    was the alleged amount of assets as of September 30, 2019.

8    But, again, that may have just been a pleading, not anything

9    in evidence.

10       All right.  And are Mr. Scott or Mr. Dondero on the phone

11   today or on the video?  I'm just curious.

12          MR. KANE:  Your Honor, I lost you on the video a

13   little bit, but assuming you can hear me, though, Mr. Scott is

14   not.  We had conversations with the Committee about various

15   exhibits and whether or not Mr. Scott would be here to testify

16   to prove up exhibits.  Once the exhibits were all stipulated

17   as admissible, then there was no need for Mr. Scott to

18   participate.

19          THE COURT:  Okay.  I was not going to ask him

20   anything.  I just was curious if he was listening in.  Or Mr.

21   Dondero, for that matter.  I guess Mr. Dondero is not on the

22   line, correct?  (Pause.)  All right.  I'll --

23          MR. KANE:  Your Honor, I -- I think -- I'm sorry.

24   I've had no conversations with Mr. Dondero.  I have no idea

25   whether he's on the line.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/23/25   Page 253 of 1017   PageID 2716
Main Document   Page 236 of 242

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 82 of 100

82

```
 1              THE COURT:  Okay.  I'll take silence to mean he's
 2   probably not, but --
 3        All right.  I asked that question for, I guess, a couple
 4   of reasons.  But the main reason I asked is -- and I'm going
 5   to say this as kindly as I can.  They're not here to hear it
 6   anyway.  But I feel like perhaps they are a little tone deaf,
 7   for lack of a better term, on how this all looks to the Court
 8   today.  And what I mean by that is, obviously, I assume it was
 9   their decision to bring this motion, at least Mr. Scott's, and
10   likely Mr. Dondero as well had some involvement in that
11   decision.  And the reason I say that it feels like they're a
12   little tone deaf about how this looks is that we just had an
13   extensive hearing and some very thorough pleadings, a lot of
14   evidence uploaded, on a $2.5 million issue.  And I don't --
15   you know, I appreciate that that is a significant sum of
16   money, but we've used the word context a lot this morning:  In
17   the context of this reorganization, it seems like a very big
18   deal was raised here, at the choice of Mr. Scott and Mr.
19   Dondero, over a $2.5 million issue, in the context of a
20   reorganization that involves at least hundreds of millions of
21   dollars of debt, if not over a billion.  UBS says they're owed
22   a billion.
23        And I just asked my question a minute ago about the value
24   of assets that the DAF or CLO Holdco or that sub-structure has
25   managed, because while no one will commit, is it $225 million
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Main Document   Filed 09/02/25   Page 237 of 272   Page 254 of 1017   PageID 2717

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 83 of 100

83

1  or not, you know, I take it that the Committee had a good

2  faith basis for saying that, and if it's not that, it's

3  probably a quite sizable number.

4      Again, so I'm kind of thinking out loud about the

5  proportionality of this issue.  $2.5 million, not anything to

6  sneeze at, but we're talking about a Charitable DAF that

7  probably has many, many, many more times that of assets.  And

8  so there was certainly no equitable argument of hardship or,

9  you know, significant detriment that's befalling CLO Holdco by

10 the tying up of this money in the registry of the Court for

11 this relatively short time period.  So, again, it feels a

12 little tone deaf to be bringing this argument, occupying so

13 much time from the parties, the lawyers, the Court, over this

14 issue.

15     And just to further elaborate on that, it matters to me,

16 and I say this about the tone-deafness, partly because I

17 thought -- I said this at the beginning of the hearing, and I

18 still say it -- we already put this issue to rest, albeit

19 temporarily, in March.  And in April, we get this new motion.

20 Again, I recognize the language of the March order reserved

21 everyone's rights to come back and argue about this, but,

22 again, the buzzwords for this hearing are going to be context

23 matters, I guess.  Mr. Clemente, you get credit for that buzz

24 phrase, those buzzwords.

25     Again, I issued the order with regard to putting these

APP 1294

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/23/22    Page 255 of 1017    PageID 2718
Main Document    Page 238 of 272

Case 19-34054-sgj11  Doc 802  Filed 07/02/20    Entered 07/02/20 18:59:24    Page 84 of 100

84

 1    monies in the registry of the Court at the suggestion of Mr.

 2    Dondero's very wonderful lawyer, retired Judge Lynn.  And,

 3    again, the context was we had a protocol order early in this

 4    case that the Committee negotiated heavily with regard to

 5    monies being disbursed out under the control of the Debtor,

 6    and heavily negotiated.  I remember the CLO Issuers, I think,

 7    had some pause and concerns and got their language into that

 8    order.

 9        So we had this protocol order.  Debtor was worried about

10    violating the protocol order, so Debtor files the motion

11    February 24th, wanting the blessing of a court order before it

12    transferred these monies to CLO Holdco and some other

13    Highland-affiliated entities.  There were vehement objections,

14    and the Court issued the order saying, Let's put these monies

15    into the registry of the Court, at the suggestion of very able

16    counsel as to how we could resolve that contested matter we

17    were there on on March 4th.

18        So, you know, a month later, April, we have this new

19    motion of CLO Holdco reviving the dispute, the $2.5 million

20    dispute that we had just put to rest temporarily in March at

21    the suggestion of lawyers.  I didn't issue a 105 injunction

22    outside the context of an adversary proceeding just on my own,

23    *sua sponte*.  It was suggested to me that this was a good

24    solution.  People embraced it.  That's what we did.  And I

25    sure didn't have in my brain that a month later we'd have a

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document DSumeFiledP0g06/239 of 2722 256 of 1017   PageID 2719
Main Document   Page 256 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 85 of 100

85

1   brand new motion regarding whether these monies should be

2   disbursed to CLO Holdco all over again, when that was the

3   issue that was already before the Court in March.

4       I, again, fully recognize that everybody reserved their

5   rights, but I focus on this context because, again, I wish Mr.

6   Dondero and Mr. Scott were on the call to hear this:  This

7   almost feels like a good faith issue to me.  You know, maybe I

8   would feel slightly different if there had been a broad

9   emphasis, heavy emphasis, CLO Holdco standing up through a

10  lawyer that day saying, We're just letting you know, we're

11  going to get together a motion in very short order and tee

12  this up again.  Because I would have probably said no.  You

13  know, if -- let's just hear it right now today, if this is

14  only a three-week mandate or whatever.  So, good faith is

15  something that I can't help but scratch my head and be

16  troubled by.

17      So, I want to emphasize that CLO Holdco's lawyer has made

18  perfect arguments regarding the potential legal issues here.

19  There are some valid arguments here about is this tantamount,

20  holding the money in the registry of the Court that a non-

21  debtor asserts is its property, is that tantamount to a

22  prejudgment remedy?  You know, did it require an adversary

23  proceeding?  Did it require the traditional four-prong prove-

24  up for a preliminary injunction?  And did the Court just give

25  short shrift to those legal technicalities?

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Main Document   Filed 06/24/25   Page 260 of 272   Page 257 of 1017   PageID 2720

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 86 of 100

86

1    Again, these are compelling arguments, but I'm overruling

2    the arguments because, again, I believe it ignores the context

3    that CLO Holdco essentially consented, acquiesced, in this

4    placeholder keep-the-status-quo solution.  And I question its

5    good faith in, so quickly after consenting, bringing this

6    motion.

7    But moreover, I do find that in the unique context of the

8    disputes before the Court on March 4th, I did have authority

9    to issue a 105 injunction.  105, as we all know, at Subsection

10   (a) gives a bankruptcy court authority to issue orders

11   necessary or appropriate to carry out provisions of Title 11,

12   and the last sentence even provides a mechanism for the Court

13   to *sua sponte* take action to, among other things, prevent an

14   abuse of process or just do what's necessary or appropriate to

15   implement court orders or rules.

16   So I think, again, in the context before the Court, it was

17   not only a consensual thing, but the Court had authority.  And

18   the backdrop of this, again, cannot be overstated.  Again, to

19   use Mr. Clemente's word, we have this Byzantine structure

20   here.  It's a lot for the Committee to get its arms around.

21   And even the CLO Holdco structure -- again, I'm looking at my

22   notes, my fancy chart -- we have CLO Holdco, a Cayman Island

23   entity.  Its parent is Charitable DAF Fund, LP, another Cayman

24   Island entity.  It, in turn, is owned by Charitable DAF

25   Holdco, Ltd., yet another Cayman Island entity.  Its general

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 258 of 1017   PageID 2721

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 87 of 100

87

1   partner happens to be a Delaware entity, Charitable DAF GP,

2   LLC, but the beneficial owners of it are the three Highland

3   Foundations, of which Dondero is president and director, and

4   Mr. Scott the treasurer and director.

5        So, I'm not saying the Byzantine structure is in and of

6   itself problematic, although one might wonder why a charitable

7   organization needs to have three offshore entities as part of

8   its structure.  I digress.  But we all know a Byzantine

9   structure and ties to Dondero do not mean something is

10  attackable in and of itself, but we have had issues raised

11  about the Dynamic Fund and the various transfers with regard

12  to Dugaboy, the Dondero Family Trust, and Get Good Trust and

13  the note.  All of that is worthy of examination, and the

14  Committee has not had all that long in this case to

15  investigate it.

16       So, I'm going to say a couple of more things.  First, the

17  motion is denied, but I'm going to put more strings on it than

18  that.  I'm denying the motion, but as part of this ruling I'm

19  going to order that the Committee has 90 days, unless the

20  Court happens to extend that on motion or agreement of the

21  parties, to file an adversary proceeding against CLO Holdco or

22  the money shall be released.  Okay?

23       So, again, I intended it, as I think everybody did, to be

24  a placeholder, to keep the status quo little bit.  Again, Mr.

25  Kane has raised good arguments that maybe an adversary

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/06/25    Page 259 of 1017    PageID 2722
Main Document    Page 242 of 2722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 88 of 100

88

1    conceivably was necessary or might become necessary.  So here

2    we have a requirement of an adversary within 90 days or the

3    money shall be released to Holdco -- again, unless someone

4    moves to extend that or I get an agreement to extend that and

5    I happen to decide to issue an order extending that.

6        I presume that if an adversary is filed, then if the

7    Committee wants that money to continue to be held in the

8    registry of the Court, then they would have to file an

9    application for injunctive relief, essentially, to keep the

10   money in the registry of the Court pending the resolution of

11   the adversary proceeding.

12       So that is the ruling of the Court.  Mr. Clemente, I'll

13   ask you to draft up the order.  And I reserve the right to

14   supplement this oral ruling in that form of order.  And please

15   run it by Mr. Kane before electronically submitting it to the

16   Court.

17       Now, I'm going to say a couple of other things, and then

18   I'll, before closing, I'll ask if there are questions or other

19   announcements.  I have told the parties and the lawyers to

20   focus on a plan and problem-solving how we're going to pay

21   creditors.  And I think I expressed my strong hope that people

22   would stop litigating everything.  I think I'm remembering

23   saying this most recently at the UBS hearing a few weeks ago

24   on a motion to lift stay.  Once again, we had a very lengthy

25   hearing that day.  I denied the motion.  And here we are

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/01/25   Page 260 of 1017   PageID 2723
Main Document   Page 243 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 89 of 100

89

1   again.

2       You know, I want certain people to understand that it's

3   time to stop fighting everything.  The Debtor is in bankruptcy

4   because of years and years and years and years and years of

5   litigating everything to the nth degree.  I'm fed up with it,

6   and I tend to believe that behind the scenes -- I have no

7   doubt that behind the scenes there are people working hard

8   towards crafting a plan, and I think we're coming up on an

9   exclusivity deadline in late July, maybe.  What do I have to

10  say to make it clear:  People need to stop litigating and

11  start focusing on a plan to get creditors paid.  I don't want

12  to do something drastic like appoint a global mediator, but it

13  is definitely dancing around in my brain if we keep having,

14  again, sideshows.  Okay?

15      So, Mr. Pomerantz, what do you want to tell me about

16  what's going on behind the scenes?  Again, I am certainly not

17  probing into settlement discussions, but do we have progress

18  being made, or is everyone just threatening to file new

19  litigation?

20          MR. POMERANTZ:  Yes, Your Honor.  For the record,

21  it's Jeff Pomerantz; Pachulski Stang Ziehl & Jones; on behalf

22  of the Debtors.

23      Your Honor, the Debtor took to heart the comments that

24  Your Honor made at the conclusion of the UBS hearing.  It's

25  been the Board's desire to move this case forward, both in the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 261 of 1017   PageID 2724
Main Document   Page 90 of 732

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 90 of 100

90

1   plan process and in terms of a claims resolution process.  And

2   I think I mentioned to Your Honor that at least with respect

3   to the UBS hearing, I think that we needed to get by that

4   hearing before until I think we can make any progress with

5   them.

6        Since that time, and in anticipation of the hearing that

7   is going to occur on July 8th, when I indicated to Your Honor

8   that we would hopefully present a structure and a mechanism to

9   do exactly what Your Honor said, there has been a lot of work

10  and a lot of effort, both at the Board level to come up with a

11  concept, a structure, and a timing for the mediation process,

12  and I personally have spoken to not only Mr. Clemente but

13  counsel for every member of the Committee, to hopefully

14  coalesce around a concept, identification of mediators, what

15  would be mediated, and how that would take -- process.

16       We understand the Committee is meeting today to discuss

17  that.  Right after this hearing, we have a weekly meeting

18  between the Board and the Committee.  We will discuss that

19  further.  But your message was taken by the Debtor, and I

20  believe by the other parties, loud and clear, that Your Honor

21  would (audio gap).

22       At the same time, we recognize that that might be

23  impossible.  Since the last hearing, we filed our objection to

24  the Acis claims.  UBS filed its claim on Friday, the 26th.  As

25  Your Honor is aware, we're preparing an objection to that

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 262 of 1017   PageID 2725
Main Document   Page 245 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 91 of 100

91

1    claim as well, as well as others.

2        We do not want to litigate while we mediate.  However,

3    this case has progressed for a while, and I think it's going

4    to be important for all parties to understand that if the

5    mediation is not successful, they and I will be called on to

6    make some difficult decisions on the claims that are asserted

7    against the estate to go forward.

8        At the same time, and separate and apart from the

9    mediation process, the Debtor has been working on a plan with

10   the Creditors' Committee.  It is in its advanced stages.  And

11   while it's not ready to be imminently filed, we think in short

12   order we will be able to file a plan.  What the plan says and

13   whether it's just essentially putting assets in a monetization

14   vehicle and resolving the claims after confirmation, or

15   whether something can be done more globally, what has been

16   referred to with the parties as a grand bargain, is still

17   something that we are trying to flesh out.

18       But make no mistake, Your Honor:  The Board has wanted to

19   move this case forward.  Your comments, I think, have been

20   extremely helpful in telegraphing what your thoughts are.  I

21   think the Committee understands that, the Creditors' Committee

22   understand that, that it's just not sustainable on a number of

23   levels to keep on fighting and litigating and have these types

24   of hearings.

25       So we will present, hopefully, on July 8th, as -- a game

APP 1242

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 263 of 1017   PageID 2726
Main Document   Page 246 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 92 of 100

92

1   plan.  Hopefully, we'll have everyone's approval.  But even if

2   we don't have every -- anyone -- everyone's approval, it'd be

3   the Debtor's thoughts to present to Your Honor how the Debtor

4   believes we should proceed.

5           THE COURT:  All right.  Well, thank you.  I had

6   forgotten we were coming back so soon.  July 8th.  Next week.

7   I had in my brain late July.  But that -- is it a status

8   conference or an actual motion that's set?

9           MR. POMERANTZ:  Your Honor, we have a couple of

10  hearings on calendar for that day.

11          THE COURT:  Okay.

12          MR. POMERANTZ:  I believe one is exclusivity, --

13          THE COURT:  Okay.

14          MR. POMERANTZ:  -- which I do not think is going to

15  be contested, based upon my conversations with Mr. Clemente,

16  although I understand he'll want to explain to the Court what

17  the Committee's position on any further extensions would be.

18      There is also a motion to extend the removal deadline.

19      So, thus far, there is nothing contested, but we intend to

20  be able to use that, Your Honor, to present an approach that

21  hopefully will resolve this.

22      Your Honor, I have one other comment that I wanted to make

23  in connection with the motion Your Honor just heard.

24          THE COURT:  Okay.

25          MR. POMERANTZ:  As Your Honor recalls and as we

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 264 of 1017   PageID 2727

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 93 of 100

93

1    mentioned today, there were distributions from a variety of

2    different Funds to a variety of related parties.  In June,

3    distributions were set to be made to those same parties.  And

4    with the consent of CLO Holdco and with the consent of HCM

5    Services, those monies were not distributed to them, but are

6    in the process of being submitted to the Court's registry.

7            THE COURT:  Okay.

8            MR. POMERANTZ:  The expectation would be that they

9    were going to be treated the same way as the old funds, based

10   upon Your Honor's ruling.

11       We understand from the Court that we, Your Honor, that we

12   probably need a separate order with respect to that, and

13   that's with respect to the CLO and HCM Services.  So we would

14   prepare that order.

15       Whether both those distributions would be made to Mark

16   Okada -- and if Your Honor recalls, at the last hearing, Your

17   Honor only withheld the amount necessary to pay Mr. Okada's

18   note, which was ultimately paid, and the remaining amounts

19   were distributed to him.  And in light of that, we advised the

20   Committee that we would distribute additional monies to Mr.

21   Okada, and there was no objection.

22       (Echoing.)

23            MR. POMERANTZ:  So, in sum, Your Honor, we would

24   submit to Your Honor a further order to Your Honor for the

25   additional funds, otherwise payable from those funds to CLO

APP 1244

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/04/25   Page 265 of 1017   PageID 2728
Main Document   Page 94 of 722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 94 of 100

94

1     Holdco and to HCM Services, to be put in the Court's registry.

2          THE COURT:  All right.  Someone needs to be put on

3     mute.  I don't know who that is, but we're getting some

4     background.  Okay.

5          MR. CLEMENTE:  Again, Your Honor.  Your Honor, Matt

6     Clemente, very, very quickly, Your Honor.

7          THE COURT:  Okay.

8          MR. CLEMENTE:  Again, the Committee obviously took to

9     heart your comments at the last hearing and very much

10    appreciate the comments you just gave in terms of where you're

11    at and how you're viewing and feeling about things.  And so I

12    will obviously discuss those very, very carefully with the

13    Committee.

14        Just to point out to Your Honor, Mr. Pomerantz talked

15    about the distribution to Mr. Okada.  And, again, you talk

16    about context and optics and understanding where we are.  I

17    read and understood -- I was in front of you -- regarding the

18    ruling from the last time.  Remember, we objected to the

19    distribution to Mr. Okada last time.  We did not do that this

20    time, Your Honor.

21        So the Committee does very much understand Your Honor's

22    desire for this to not continue to be a litigation issue.  We

23    could have easily tried to object to Mr. Okada's distribution

24    again, and we did not, Your Honor.

25        So I want Your Honor to understand that the Committee very

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 266 of 1017   PageID 2729
Main Document   Page 95 of 722

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 95 of 100

95

```
 1    much understands where Your Honor is thinking and how she's
 2    viewing things, and I suspect that the Committee will be very
 3    responsive and respectful of your comments, Your Honor.
 4              THE COURT:  Thank you.  All right.  Well, then, Mr.
 5    Pomerantz, I'll be on the lookout for your order that the
 6    Clerk's Office needs for more money to be deposited in the
 7    registry of the Court.  And, again, I understand that it is
 8    the newest disbursement that would otherwise be due to
 9    Highland Capital Management Services, Inc. and to CLO Holdco,
10    Ltd., and that would certainly be my intention after today's
11    ruling, that the newest distribution for those entities go
12    into the registry of the Court.
13         So, we'll be on the lookout for that.  And I guess I will
14    see you on July 8th for other case matters, and we'll see
15    where we are next week.
16         All right.
17              MR. CLEMENTE:  Thank you, Your Honor.
18              MR. KANE:  Your Honor?
19              THE COURT:  Thank you.
20              MR. KANE:  Your Honor, this is John Kane.
21              THE COURT:  Okay.
22              MR. KANE:  Sorry.  I have mainly just a brief
23    statement.  And I have no intention of trying to persuade you
24    a different way from your ruling.  I understand that ruling is
25    already there.
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 96 of 722   Page 267 of 1017   PageID 2730

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 96 of 100

96

1      But I was -- I was on the phone representing CLO Holdco on

2    the last Acis plan status conference and listened to your

3    directives to the parties about the litigious nature that's

4    been taking place in this case.  And I've had lengthy

5    conversations with my client, Grant Scott, about those same

6    concerns.

7      So I did want to disclose to Your Honor, first, that

8    nothing in our motion was trying to contradict the Court's

9    ability to initiate plead funds into the registry of the Court

10   or order that.  We weren't trying to relitigate the same

11   proceeding a second time.

12     But, importantly, at the outset of this, I had

13   conversations with the Committee about our efforts to try and

14   locate a feasible bond to put up as collateral to remove the

15   funds from the registry so that we could satisfy both the

16   Committee's concerns but also CLO Holdco's concerns about

17   liquidity issues at the CLO Holdco level.

18     Unfortunately, we were not able, after discussing with two

19   different bond brokers, to locate a bond that we thought was

20   going to be economically feasible, given the potential time

21   period that the funds could be in the registry, given that

22   there was no temporal limitation on how long the Committee

23   would be investigating these claims, or, really, how long

24   litigation could take, depending on the complexity of the

25   claims and the number of parties included on that complaint.

APP 1367

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/04/25   Page 268 of 1017   PageID 2731
Main Document   Page 251 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 97 of 100

97

1     We were looking at a potential even, you know, two percent

2     cash bond on an annual basis was going to be hundreds of

3     thousands of dollars, potentially.  And that's something that

4     we decided really wasn't feasible.

5     And I also want to make abundantly clear that I would not

6     have attempted to relitigate any issue whatsoever.  I

7     personally viewed that this is a separate and distinct legal

8     issue.  I was not present at that March hearing.  So I

9     apologize if this came across as some kind of litigation

10    tactic.

11    But the reason that our motion was filed is because of

12    liquidity concerns at the CLO Holdco level relayed to me by

13    Grant Scott.  There was no evidence presented of that because,

14    Your Honor, we did not believe that we had the burden of

15    proving any kind of harm issue because we were not the party

16    seeking that injunction, and that wasn't an issue that had

17    been subject to any kind of discovery whatsoever.

18    So, I just -- I always get very uncomfortable when there

19    are allegations of good faith, bad faith, the like.  I want

20    this Court to understand that CLO Holdco's counsel is advising

21    CLO Holdco regarding your views on the litigious nature of

22    proceedings in this case, this bankruptcy case, that that is

23    something that is very real, that I have taken to heart, that

24    I am using to influence my client's decision-making, and that

25    this was not an attempt by CLO Holdco to unnecessarily address

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/05/25   Page 269 of 1017   PageID 2732
Main Document   Page 252 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 98 of 100

98

1   or relitigate an issue for some small balance.

2        CLO Holdco, most of its assets are either encumbered or

3   are illiquid.  There is a large portion of illiquid assets

4   that are not encumbered.  So we are able to pay any kind of

5   judgment.  Let me restate that.  That we would -- we would

6   likely have to liquidate considerable assets to do that, which

7   is where the settlement gives a potential opportunity cost and

8   appreciation of asset value, which is why we proceeded with

9   this motion.

10       I'm not intending any of those statements to be admitted

11  into evidence or to persuade you to either rule differently

12  for some reason or another, but I did think that, given your

13  concerns, that it was important to provide the Court with

14  context for why we took the tactic that we did to try and

15  obtain funds from the registry of the Court.

16       This, on the CLO Holdco level, was not a bad faith effort.

17  We weren't trying to relitigate an issue that was already

18  there, and certainly we weren't trying to litigate unless

19  litigation we felt was necessary from a financial cost-benefit

20  analysis.  And that was a real analysis that we discussed

21  between me and my client.

22       I just wanted to share that with the Court.  I've shared

23  with the Committee counsel that we understand that there are

24  major concerns about Jim Dondero, about his control over

25  various entities, about transfers.  I'm trying to work as hard

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 270 of 1017   PageID 2733
Main Document   Page 253 of 272

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 99 of 100

99

1    as I can to distance CLO Holdco from that taint, because

2    understanding that it's in what has been alleged as a

3    Byzantine web, we think it's important to separate CLO Holdco

4    and its operations to ensure that things are done in an

5    appropriate fashion with square corners.

6        That's all I have, Your Honor.  We have no objection to

7    the additional funds being pled into the registry of the

8    Court.  We can agree those funds would be adjudicated as part

9    of this dispute.  We understand that we did not prevail, and

10   we appreciate your Court hearing our argument.

11       (Proceedings concluded at 12:06 p.m.)

12                         --oOo--

13

14

15

16

17

18

19                        CERTIFICATE

20       I certify that the foregoing is a correct transcript to
     the best of my ability from the electronic sound recording of
21   the proceedings in the above-entitled matter.

22    **/s/ Kathy Rehling**                        **07/02/2020**

23   _____      _____

     Kathy Rehling, CETD-444                      Date
24   Certified Electronic Court Transcriber

25

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S     Document 15-4   Filed 09/05/25   Page 271 of 1017     PageID 2734
Main Document   Page 254 of 282

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 100 of 100

100

INDEX

PROCEEDINGS                                                      4

OPENING STATEMENTS

- By Mr. Kane                                                   10
- By Mr. Clemente                                              21

WITNESSES

-none-

EXHIBITS

CLO Holdco, Ltd.'s Exhibits 1 through 16         Received 26
Unsecured Creditors' Committee's Exhibits        Received 36
  1 through 3

CLOSING ARGUMENTS

- By Mr. Kane                                                   41
- By Mr. Clemente                                              56

RULINGS                                                        81

END OF PROCEEDINGS                                             99

INDEX                                                         100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

002024
APP 4351

# EXHIBIT 13

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

```
IN RE:                          ) Case No. 19-34054-sgj11
                                ) Chapter 11
                                )
HIGHLAND CAPITAL                ) Courtroom 1
MANAGEMENT, L.P.,               ) 1100 Commerce Street
                                ) Dallas, Texas 75242-1496
                                )
                                ) July 21, 2020
                                ) 1:38 p.m.
```

        TRANSCRIPT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS
          EMERGENCY MOTION TO COMPEL PRODUCTION BY THE
       DEBTOR (808); DEBTORS MOTION FOR ENTRY OF (I) A PROTECTIVE
       ORDER, OR, IN THE ALTERNATIVE, (II) AN ORDER DIRECTING THE
    DEBTOR TO COMPLY WITH CERTAIN DISCOVERY DEMANDS TENDERED BY THE
      OFFICIAL COMMITTEE OF UNSECURED CREDITORS, PURSUANT TO FEDERAL
          RULES OF BANKRUPTCY PROCEDURE 7026 AND 7034 (810)
            BEFORE HONORABLE JUDGE STACEY G. JERNIGAN
                 UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA WEBEX:

```
For the Debtor:             Pachulski Stang Ziehl & Jones LLPL
                            By:  IRA D. KHARASCH, ESQ.
                            10100 Santa Monica Boulevard
                            13th Floor
                            Los Angeles, California 90067

                            Pachulski Stang Ziehl & Jones, LLP
                            By:  JOHN A. MORRIS, ESQ.
                            780 Third Avenue, 34th Floor
                            New York, New York 10017-2024


ECRO:                       Michael Edmond
```

**TRANSCRIPTION SERVICE:**   **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone: 215-862-1115**
email CourtTranscripts@aol.com

    Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

2

APPEARANCES VIA WEBEX:
(Continued)


For the Debtor:            Hayward & Associates PLLC
                           By:  MELISSA S. HAYWARD, ESQ.
                                ZACHERY Z. ANNABLE, ESQ.
                           10501 N. Central Expressway
                           Suite 106
                           Dallas, Texas 75231

For the Unsecured          Sidley Austin LLP
Creditors' Committee:      By:  MATTHEW A. CLEMENTE, ESQ.
                           One South Dearborn
                           Chicago, Illinois 60603

                           Sidley Austin LLP
                           By:  PAIGE HOLDEN MONTGOMERY, ESQ.
                           2021 McKinney Avenue, Suite 2000
                           Dallas, Texas 75201

For James Dondero:         Bonds Ellis Eppich Schafer Jones LLP
                           By:  JOHN BONDS, ESQ.
                                MICHAEL LYNN, ESQ.
                           420 Throckmorton Street, Suite 1000
                           Fort Worth, Texas 76102

For Atlas IDF, GP,         Rochelle McCullough, LLP
et al.:                    By:  E. P. KEIFFER, ESQ.
                           325 North St. Paul Street
                           Suite 4500
                           Dallas, Texas 75201

For H.C. and Fund          K&L Gates LLP
Advisors:                  By:  JAMES WRIGHT, ESQ.
                                STEPHEN TOPETZES, ESQ.
                           1601 King Street, N.W.
                           Washington, DC  20006

For CCS Medical:           Jones Day
                           By:  TRACY K. STRATFORD, ESQ.
                           North Point, 901 Lakeside Avenue
                           Cleveland, Ohio 44114-1163

3

APPEARANCES VIA WEBEX:
(Continued)


For CLO Holdco, Ltd:          Kane Russell Coleman Logan PC
                              By:  JOHN J. KANE, ESQ.
                              901 Main Street
                              Suite 5200
                              Dallas, Texas 75202


For NexPoint:                 Wick Phillips
                              By:  LAUREN DRAWHORN, ESQ.
                              100 Throckmorton Street, Suite 1500
                              Fort Worth, Texas 76102


For HCLOF:                    King & Spalding
                              By:  REBECCA T. MATSUMURA, ESQ.
                              500 W. 2nd Street, Suite 1800
                              Austin, Texas 78701


                              King & Spalding
                              By:  MARK M. MALONEY, ESQ.
                              1925 Monroe Drive NE
                              Atlanta, Georgia 30324

For Redeemer Committee        Jenner & Block LLP
of the Highland               By:  TERRI L. MASCHERIN, ESQ.
Crusader Fund:                353 N. Clark Street
                              Chicago, Illinois 60654-3456


                              Jenner & Block LLP
                              By:  MARC B. HANKIN, ESQ.
                              919 Third Avenue
                              New York, New York 10022-3098


For NexBank Capital:          Alston & Bird
                              By:  JARED M. SLADE, ESQ.
                                   JONATHAN T. EDWARDS, ESQ.
                              Chase Tower
                              2200 Ross Avenue
                              Suite 2300
                              Dallas, Texas 75201

APP 1254

4

APPEARANCES VIA WEBEX:
(Continued)


For UBS Securities:          Latham & Watkins LLP
                             By:  ANDREW CLUBOK, ESQ.
                             555 Eleventh Street, N.W.
                             Suite 1000
                             Washington, DC 20004

                             Latham & Watkins LLP
                             By:  KIMBERLY A. POSIN, ESQ.
                             355 South Grand Avenue
                             Los Angeles, California 90071-1560

For Acis Capital            Winstead PC
Management L.P.:            By:  RAKHEE V. PATEL, ESQ.
                                 ANNMARIE CHIARELLO, ESQ.
                             2728 N. Harwood Street
                             Suite 500
                             Dallas, Texas 75201

For Ellington, et al.:      Winston & Strawn LLP
                             By:  KATHERINE PRESTON, ESQ.
                             800 Capitol Street, Suite 2400
                             Houston, Texas 77002

                                 * * *

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/25/25   Page 259 of 2722   276 of 1017   PageID 2739

5

1      **(IN INSTANCES WHERE CONNECTION IS FADING IN AND OUT, AN**

2 **INAUDIBLE RESULTED DUE TO THE LACK OF AUDIBILITY.   IN INSTANCES**

3      **OF MUFFLED VOICES OR REVERBERATION OF THE TELEPHONIC**

4      **PARTICIPANTS ON CHANNEL 2, AN INDISCERNIBLE RESULTED)**

5           THE COURT:  This is Judge Jernigan, and we are ready

6  to start a hearing today in Highland.  Before I take

7  appearances, let me just kind of say where I think we are.

8           We have a document production dispute on the calendar

9  today, primarily between the Unsecured Creditors' Committee and

10 the debtor.  Basically it's an ESI protocol dispute, as I

11 understand it.

12          We have had eight other parties in interest weigh in

13 on the dispute with pleadings.  So I'll do a roll call.

14   (The Court engaged in off-the-record unrelated colloquy)

15          THE COURT:  I'm a little hamstrung here because I

16 don't have my glasses, but my law clerk is working on that.  I

17 guess I do have a magnifying glass here.

18          All right, well, why don't we do a roll call while

19 he's getting my glasses, of the different parties in interest.

20 I'm going to call parties one-by-one to avoid talking overlap.

21          For the Committee, it looks like we have Mr.

22 Clemente, is that correct?

23                 (No audible response heard)

24          THE COURT:  Oh, you're on mute.

25          MR. CLEMENTE:  My apologies, Your Honor.  Matt

6

 1  Clemente from Sidley on behalf of the Committee.  My partner,

 2  Paige Montgomery, is also here with me, and she will be

 3  addressing the Court today, as well.

 4          THE COURT:  Okay.  Very good.  For the debtor, who do

 5  we have participating today?

 6          MR. KHARASCH:  Good morning, Your Honor.  It's Ira

 7  Kharasch of Pachulski Stang, and we also have John Morris from

 8  Pachulski Stang, as well.

 9          THE COURT:  Okay; good afternoon.

10          All right.  Mr. Dondero's counsel weighed in.  Who do

11  we have appearing for Mr. Dondero this afternoon?

12          MR. LYNN:  Yes, Your Honor.  Michael Lynn and John

13  Bonds for Jim Dondero.

14          THE COURT:  Okay, very good.

15          Now I'm going to go through the seven other parties

16  that have weighed in.  For the party Atlas, do we have Paul

17  Keiffer or some other lawyer participating?

18          MR. KEIFFER:  Yes, Your Honor, Paul Keiffer here.

19          THE COURT:  All right; good afternoon.

20          For H.C. and Fund Advisors, who do we have appearing?

21          MR. WRIGHT: Good afternoon, Your Honor.  You have

22  James Wright and Steve Topetzes at K&L Gates.

23          THE COURT:  Okay; very good.

24          All right, CCS Medical, who do we have appearing?

25          MS. STRATFORD:  Your Honor, it's Tracy Stratford from

002030
APP 1257

Main Document   Page 251 of 2742

1  Jones Day.

2          THE COURT:  Okay; thank you.

3          MS. STRATFORD:  Thank you.

4          THE COURT:  CLO Holding, who do we have?

5          MR. KANE:  Your Honor, John Kane for CLO Holdco,

6  Limited.

7          THE COURT:  Okay, Holdco, excuse me; thank you.

8          What about NexPoint?

9              (No audible response heard)

10         THE COURT:  Anyone appearing for NexPoint?  Jason

11 Rudd, Lauren Drawhorn perhaps?

12             (No audible response heard)

13         MR. WRIGHT:  Your Honor, this is James Wright again

14 at K&L Gates.  We represent one of the NexPoint entities,

15 NexPoint Advisors.  But I understand there are some other

16 NexPoint entities that we don't represent, and they may have a

17 separate objection, just to be clear.

18         THE COURT:  Okay.  Yes, there was a separate

19 objection.  The same firm, Wick Phillips, filed an objection by

20 MGM.

21         So, again, I'll ask, is there anyone on the phone for

22 those clients?

23             (No audible response heard)

24         THE COURT:  All right, well, we may -- oh, I see

25 Lauren Drawhorn on the video; are you muted, Ms. Drawhorn?  Ms.

8

1   Drawhorn, we can see you but we can't hear you.  Cannot hear

2   you.  We definitely see you.

3          If we can't -- yes, if you could call on your cell

4   phone, we can hear you that way, and you can keep your visual

5   on, as well.

6          Okay, I'll go on.  What about HCLOF, do we have

7   someone from King & Spalding?

8                    (No audible response heard)

9          THE COURT:  Okay.  I'm not hearing anyone from King &

10  Spalding.

11         MR. MALONE:  Your Honor, this is Mark Malone.  I'm

12  not sure if you can hear me, I'm only dialed in on my phone.

13         THE COURT:  Okay, I --

14         MR. MALONE:  Can you hear me?

15         THE COURT:  I do hear you, Mr. Malone; thank you.

16         MR. MALONE:  Yes, and Rebecca Matsumura is trying --

17  I suspect feverishly, I don't have the video.  I know she's

18  plugged in on the video.  She'll be handling any argument,

19  assuming we can get her on.  If not, I'm happy to handle it.

20  But we are here, Your Honor; thank you.

21         THE COURT:  All right, thank you.

22         MS. MATSUMURA:  Can y'all hear me now?

23         THE COURT:  Yes.  Who is that?

24         MS. MATSUMURA:  This is --

25         THE COURT:  Was that Ms. Matsumura?

002032
APP 1259

9

 1          MS. MATSUMURA:  This is Rebecca Matsumura; sorry

 2   about that.

 3          THE COURT:  Okay, we hear you and we see you; very

 4   good.

 5          All right.  I'll go back to Ms. Drawhorn, do we have

 6   you on the phone yet?

 7                    (No audible response heard)

 8          THE COURT:  All right.  Well, hopefully -- hopefully

 9   we can get whatever technical difficulties there worked out.

10          I'll ask, for the record, are there any other parties

11   in interest wishing to make an appearance?  And I'm going to

12   forewarn you that I'm not going to be inclined to let any other

13   party make an argument today unless you give me a reason I

14   should that absolutely knocks my socks off.  So I assume we

15   might have people wanting to appear, but who are not going to

16   make an argument.  If so, go ahead.

17          MR. ANNABLE:  Your Honor, this is Zachary Annable and

18   Melissa Hayward of Hayward & Associates, local counsel for the

19   debtor.  We just wanted to let you know we're here, too.

20          THE COURT:  All right; thank you.

21          Anyone else?

22          MS. MASCHERIN:  Yes, Your Honor.  Terri Mascherin and

23   Marc Hankin from Jenner & Block on behalf of the Redeemer

24   Committee of the Highland Crusader Fund.

25          THE COURT:  All right; thank you, Ms. Mascherin.

002033
APP 1289

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Main Document   Filed 09/05/25   Page 281 of 1017   PageID 2744   Page 254 of 272

10

 1                MR. SLADE:  Your Honor, it's Jared Slade and Jonathan

 2   Edwards of Alston & Bird.  We're here on behalf of NexBank.

 3   And I'm not sure if it's going to knock your socks off, but we

 4   were engaged just this week by NexBank as a party in interest,

 5   the issue about the ESI disclosures.  We have been negotiating

 6   with the Creditors' Committee about the issues, and we hope to

 7   have an opportunity to present a minute or two at the end about

 8   why we were differently situated than some of the other

 9   objectors, if the Court entertains it.

10                THE COURT:  Okay.

11                MR. SLADE:  Thank you.

12                THE COURT:  Thank you.

13                MR. CLUBOK:  And, Your Honor, Andrew Clubok and

14   Kimberly Posin for UBS.

15                THE COURT:  Okay; thank you.

16                MS. PATEL:  Good afternoon, Your Honor.  Rakhee Patel

17   and Annmarie Chiarello on behalf of Acis Capital Management,

18   but we don't intend on making any presentation, Your Honor,

19   unless anyone specifically asks to address things.  Our matters

20   are after this.

21                THE COURT:  Okay, correct.

22                Anyone else?

23                     (No audible response heard)

24                THE COURT:  All right.  Well, let's talk --

25                MS. DRAWHORN:  Your Honor?

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/25/25   Page 255 of 2722   Page 282 of 1017   PageID 2745

11

 1            THE COURT:  Oh, go ahead.

 2            MS. DRAWHORN:  This is Lauren Drawhorn, I got my --

 3   I'm sorry, I got the audio -- the speaking to work.

 4            THE COURT:  Okay.

 5            MS. DRAWHORN:  I'm appearing on behalf of the

 6   NexPoint Real Estate entities, there's 15 of them.  I can go

 7   through them, if you want, or -- they're listed on Docket 847.

 8            And then I'm also appearing on behalf of MGM

 9   Holdings, Inc.

10            THE COURT:  Okay, thank you, Ms. Drawhorn.  We've got

11   you loud and clear now.

12            All right, well, I want to talk for a moment about

13   how we are going to proceed here today, and I'm hoping we don't

14   go late, late, late with ten or so parties wanting to weigh in

15   on document production because we do have the Acis status

16   conference regarding the September 10th setting on the

17   objection to Acis's proof of claim, I want to make sure we get

18   to that today.

19            And then I do want to talk a little bit about where

20   we stand on getting the mediation going.

21            So for everyone's benefit, I'm just going to let you

22   know that I think I have a handle on the primary disputes

23   between the Committee and the debtor.  There's a lot of finger-

24   pointing that is going on in the papers.

25            The UCC is suggesting that the debtor has been

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document Filed 06/25 of 1/22 283 of 1017    PageID 2746
                                                                                    Main Document    Page 256 of 272

12

1  dragging its heels; and the debtor saying no, it hasn't.

2          I really don't want to get bogged down by that today.

3  I really just want to focus on the handful of things that seem

4  to be in dispute between the Committee and the debtor, and so

5  we're going to obviously start with the Committee and the

6  debtor.  I want to hear about are we going to have evidence

7  today.  I know there were a couple of declarations filed.

8          And then I'm inclined to, thereafter, just give these

9  eight or nine other parties five or ten minutes each to present

10  any arguments that they think I need to hear.

11          But I'll tell you, I closely read the Committee's

12  pleadings, I closely read the debtor's pleadings, Mr. Dondero's

13  pleading.

14          And then, frankly, I skimmed very rapidly the other

15  seven or so pleadings because of being pressed for time, but I

16  do think I get the gist of them.  And I think a lot of them

17  kind of have the same theme.

18          But before turning to the debtor and the Committee,

19  let me just tell you what my understanding is that we're going

20  to primarily focus on:

21          We're obviously talking about emails of nine

22  different custodians of the debtor, three of which I understand

23  to be in-house lawyers.  And whether it's the Committee's

24  protocol that should be ordered here, or the debtor's protocol,

25  and the way I see the two protocols differing is the debtor

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/05/25   Page 257 of 272   Page 284 of 1017   PageID 2747

13

 1  wants independent contract -- or contract attorneys for the

 2  debtor to do a relevance review.  UCC says no, that's going to

 3  be time-consuming, and strangers can't meaningfully do that.

 4        It looks like there's a dispute about the search term

 5  request.  Committee thinks what debtor is wanting is too

 6  stringent.

 7        And then, of course, we have some competing views

 8  about how the privilege review process would work, and the

 9  debtor has obviously this overriding concern about

10  confidentiality obligations it has, either contractually and/or

11  shared services agreements, or through other law.

12        So now I will, at long last, turn -- I'm going to, I

13  guess, start with the Committee because it is first in time

14  with its pleading the motion to compel.  And then, of course,

15  the debtor came quickly behind that pleading with its own

16  motion for protective order.

17        And so -- I don't know, Mr. Montgomery, or Mr.

18  Clemente, let me hear from you on how you --

19        MR. MORRIS:  Your Honor?

20        THE COURT:  -- want to go forward today.

21        MR. MORRIS:  Your Honor, this is John Morris from

22  Pachulski.  I greatly apologize for interrupting, but I have a

23  slightly different suggestion.

24        We had made a proposal to try to resolve our disputes

25  with the Committee a few days ago.  The Committee responded

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Filed 04/04/25   Page 263 of 272 285 of 1017   PageID 2748

14

1  with its own proposal about an hour before this hearing, and

2  we'd like an opportunity to confer with them.  But under --

3  even under the -- even if we were to reach an agreement, I

4  think the Court needs to rule on the other objections.

5          So my suggestion, subject to the Committee's

6  acceptance and Your Honor's acceptance, of course, is that we

7  allow the Committee to proceed and let the --

8                  (Technical interference)

9          THE COURT:  Okay.

10          MR. MORRIS:  Let the other objectors be heard.

11          And then after the conclusion, and the resolution of

12  those objections, some of which I understand may have been

13  resolved already, we take a short break, and allow me to confer

14  with Ms. Montgomery to see if we can resolve the balance of the

15  issues, that's my suggestion.

16          THE COURT:  Okay.  So start with the Committee, hear

17  their argument, and then any objectors who haven't otherwise

18  been taken care of through agreements, hear from them, all

19  right.  Well, I am perfectly happy to go forward this way,

20  especially if it means that we'll save some time in court, and

21  the debtor and Committee can get on the same page without the

22  Court ordering something.

23          So will it be Ms. Montgomery or Mr. Clemente?  Which

24  one of you wants to start us off?

25          MR. CLEMENTE:  Your Honor, it's Matt Clemente.  My

APP. 4285
002038

Case 19-34054-sgj11  Doc 2062  Filed 03/18/21  Entered 03/18/21 20:59:39  Desc
Case 3:25-cv-02072-S  Document 15  Filed 06/25/25  Page 260 of 272  286 of 1017  PageID 2749

15

1    colleague, Ms. Montgomery, will be handling it.  So I'll turn

2    it over to her, please.

3             THE COURT:  All right.  Ms. Montgomery?

4                       (Pause)

5             MS. MONTGOMERY:  ... the objection that the debtor

6    has filed --

7             THE COURT:  All right.  Ms. Montgomery, I'm going to

8    ask you to start from the beginning, we missed the first few

9    seconds, okay?

10            MS. MONTGOMERY:  Sure.  Can you hear me now?

11            THE COURT:  Yes.

12            MS. MONTGOMERY:  So consistent with the proposal that

13   Mr. Morris laid out, I plan to reserve any arguments with

14   regard to the dispute between the Committee and the debtors for

15   now in the hopes that we can get those resolved at the

16   conclusion, and we'll just focus on the objections, if that

17   works for the Court.

18            THE COURT:  Okay, that's fine.

19            MS. MONTGOMERY:  We've been working diligently with

20   all of the objectors that Your Honor is aware of, as well as a

21   few that did not file objections over the last week or so in an

22   attempt to resolve as many of their concerns as possible before

23   today's hearing.

24            And we're happy to tell the Court that we have

25   resolved some of those objections.  We were able to negotiate

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/27/25   Page 287 of 1017   PageID 2750
Main Document   Page 277 of 702

16

1  an out-of-court resolution with regard to an entity called

2  Omnimax International, Inc. without them filing an objection.

3         And we have resolved the objection of Highland CLO

4  Funding Ltd.  And pursuant to that agreement with Highland CLO

5  Funding, Highland CLO Funding has requested that the Court

6  order, at the end of today's argument, include a statement that

7  any documents that they produce pursuant to joint privilege

8  aren't subject to a privilege waiver by virtue of their

9  production to the Committee.

10        THE COURT:  Okay.

11        MS. MONTGOMERY:  And if I missed anything there, I'm

12 sure that counsel for Highland CLO will correct me at the end.

13        THE COURT:  Okay.

14        MS. MONTGOMERY:  We also have an agreement in

15 principle with Highland Capital Management Fund Advisors, LP

16 and the remaining entities that submitted their objections at

17 Docket 841.

18        Pursuant to that agreement in principle, we have no

19 objection to those entities being treated as parties to a

20 protective order or to having certain data being isolated from

21 review as a preliminary matter subject to reservation of

22 rights.

23        What we don't have an agreement on, Your Honor, is

24 how those documents will be isolated.  And we intend to

25 continue working with Highland Capital Management Fund Advisors

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 287 of 732   Page 288 of 1017
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 61 of 272   PageID 2751

17

1  and K&L Gates to try to knock out the details of that in the

2  coming days.  We preliminarily don't believe that it's

3  necessary for you to hear the details of that objection for

4  today.

5            THE COURT:  Okay.

6            MS. MONTGOMERY:  So with regard to the remaining

7  objections -- my apologies, Your Honor.

8            There are essentially three categories of documents

9  that make up the assorted objections -- the issues that are set

10 forth in the objections.  There are some documents that are

11 allegedly confidential, and I think that Your Honor has

12 probably read quite a bit about that in the pleadings that have

13 been submitted to the Court.

14           It's our position, Your Honor, that there's a very

15 strong protective order in place in this case.  And that the

16 protective order should be sufficient to handle any

17 confidentiality concerns that have arisen pursuant to the

18 objections.

19           We also believe, Your Honor, that a number of the

20 documents at issue are subject to a joint privilege, and we've

21 briefed this, and it sounds like Your Honor is very familiar

22 with the materials that we've submitted to the Court.  And as a

23 result of that joint privilege, we believe that many of the

24 documents that are included in the ESI that we've requested

25 should be made available to the Committee.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 66 of 2732   Page 289 of 1017   PageID 2752

18

 1            As you know, Your Honor, there are thousands of

 2   companies that have been identified as affiliates of the

 3   debtor.  Many of those affiliates have shared service

 4   agreements with the debtor, in which the debtor provided

 5   business functions for these purportedly separate entities.

 6            And if you look at my briefing, there isn't any

 7   segregation of employees of the debtor that represent each of

 8   these affiliates.  And instead, the debtor maintains a

 9   centralized pool, and whoever can perform the service for the

10   affiliate does so.

11            The basis for most of the remaining objections that

12   we're talking about here today is that these shared service

13   agreements include provision of legal services.  And in some

14   instances, for shared IT -- like shared service servers for

15   emails and other documents.

16            Under those shared service agreements, the debtor's

17   in-house legal department provides legal advice to these

18   thousands of entities on as-needed basis.  And you're going to

19   hear from the objectors in a moment some of those separate

20   companies are objecting to production of their documents by the

21   debtor, even though those documents are on the debtor's

22   servers, in the debtor's employees' files, and generally

23   available to debtor personnel.

24            We wanted to begin, Your Honor, with the objections

25   to NexPoint Real Estate Advisors.  We previously -- we

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 290 of 1017   PageID 2753
Main Document   Page 273 of 732

19

1  previously discussed NexPoint Advisors and its affiliates,

2  represented by K&L Gates, but obviously there's also a separate

3  objection for NexPoint Real Estate Advisors and affiliated

4  entities.

5        NexPoint Real Estate Advisors argues that it would be

6  unduly burdened if the debtor were to produce documents related

7  to it to the Committee.  It's unclear, however, how NexPoint

8  would be burdened by the debtor producing documents, nor is it

9  clear what expense NexPoint would incur as a result of that

10  production.

11        In fact, it appears that NexPoint is attempting to

12  raise defenses that belong to the debtor instead.  This may be

13  because NexPoint shares many things with the debtor under the

14  shared services agreement:

15        First, they have shared employees who are employed

16  both by the debtor and NexPoint Real Estate.  Although pursuant

17  to the shared service agreement, only the debtor pays the

18  salaries of those shared employees.  It shares back- and

19  middle-office services, it shares administrative services,

20  including cohabitating in the same office space on information

21  and belief, and it also shares IT services, possibly including

22  servers, and in-house counsel that provide assistance with

23  advice with respect to legal issues.

24        Despite all of the shared services, NexPoint is

25  arguing that it should be given a separate and independent

APP 1279
002043

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 291 of 1017
Case 3:25-cv-02072-S   Document 65   Filed 06/06/25   Page 754 of 2722   PageID 2754

20

1  opportunity to review all documents possibly related to it, and

2  to decide what it relevant, responsive, and privileged.

3          Your Honor, it's the Committee's position that

4  NexPoint chose to commingle its data with that of the debtor;

5  to share in-house counsel with the debtor; to co-office with

6  the debtor; to share employees with the debtor; and to

7  generally allow the debtor to provide many of its services.

8  But now it believes it has a separate ability to review

9  documents in the debtor's possession before they're produced to

10  the Committee.  And this is the sort of gamesmanship that we've

11  been trying to avoid through the motion to compel.

12          NexPoint may very well be the subject of estate

13  claims, it's impossible for us to know at this point because we

14  don't have access to the data that's necessary for us to

15  determine what estate claims might exist.  And we don't believe

16  that NexPoint should also have the ability to dictate to the

17  estate which documents the estate -- that the estate already

18  possesses and needs to investigate those claims.

19          With regard to the various Rand entities and Atlas, I

20  believe Your Honor referenced Atlas when we began.  Essentially

21  the same argument appears to apply with Rand, although to a

22  somewhat lesser extent.

23          The objection for Rand is slightly different in that

24  it focuses on the shared IT infrastructure with the debtor, and

25  not necessarily the custodial data for nine individuals that

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/04/25   Page 292 of 1017   PageID 2755
Main Document   Page 6775 of 2722

21

 1  were the subject of the motion to compel.

 2          Unlike with NexPoint, it doesn't appear that Rand has

 3  legal services provided by the debtor.

 4          And their objection primarily focuses on the

 5  potential that there is Rand data on servers that are

 6  accessible by the debtor which, in itself is an indication that

 7  the data may not have been maintained separately as to Rand

 8  and, therefore, confidentially.  And as such, any privilege

 9  related to data contained on that server as to Rand would be

10  waived.

11          That said, we are amenable to their request to be

12  made party to the protective order.  And that all data related

13  to them be produced as highly confidential as a preliminary

14  matter, subject, of course, to our ability to request a de-

15  designation of that data where the default designation appears

16  to be improper.

17          The next objection is CLO Holdco.  CLO Holdco also

18  argues that there may be data among that of the nine

19  custodians, all of whom are employees of the debtor, that

20  relate to a privilege held exclusively by CLO Holdco.  We don't

21  believe that that position is tenable.

22          The briefing on this particular objection, Your

23  Honor, includes some back and forth with regard to Teleglobe,

24  and related cases.

25          Teleglobe is one of the foundational cases on the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/06/25   Page 256 of 2722   Page 293 of 1017   PageID 2756

22

1   issue of privilege with regard to business affiliates.  And it

2   provides that communications between affiliates can maintain

3   privilege because the members of a corporate family are joint

4   clients, and this reflects both the separateness of the entity

5   and the reality that they are all represented by the same in-

6   house counsel.

7          We don't believe that Teleglobe stands for the

8   position that there can be completely separate privileges held

9   by affiliates with the in-house counsel that is employed by the

10  parent company, or any other member of an affiliate family.

11         As a result, either the communications are subject to

12  a joint privilege, and the debtor having access to the

13  communications isn't a waiver of confidentiality requirements

14  of privilege, or there is no common interest.  There is no

15  joint client interest, and the debtor having access to the

16  documents is a waiver.  But either way, the Committee should be

17  provided with the documents under the terms of the final term

18  sheet because the Committee is standing in the debtor's shoes

19  with regard to those estate claims, and the debtor has

20  conceded, and the Court has, you know, ordered that those

21  documents should be -- that the privilege isn't waived.  The

22  privilege should be shared with the Committee, it's not

23  waived.

24         Separately, CLO Holdco has argued that it should be

25  able to conduct an independent review of the documents.  As you

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/06/25   Page 294 of 1017   PageID 2757

23

1  know, and I think we referenced in our hearing last week, the

2  impetus for the motion to compel is specifically the need for

3  expedited access to documents related to CLO Holdco so that we

4  can comply with the Court's 90-day deadline.

5          CLO Holdco entered into the shared service agreement,

6  it agreed to allow the debtor have access to this material, the

7  debtor has that data.  And we don't think they can now seek to

8  claw back access to the ESI that's in the debtor's possession.

9          The remaining objectors, Your Honor, stand in a

10  slightly different position.  CCS Medical and MGM, in

11  particular, are bringing objections, not based on the shared

12  service agreement, but based upon the facts that there are

13  employees of the debtor that have served in board positions for

14  each of those entities.

15          But, you know, based on the information that we have

16  to date, we understand that that -- that those board positions

17  were obtained pursuant to investments or other relationships

18  with the debtor, and that the debtor has or had relationship

19  with those entities outside of the board position.  And those

20  additional relationships that are separate from board

21  membership make it very difficult to craft searches that would

22  exclude only outside information related to board service.

23          And so while the Committee doesn't necessarily have

24  an objection to attempts to isolate the communications that are

25  truly related to board service, we've had difficulty

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 66 of 272   295 of 1017   PageID 2758
Document   Filed 06/02/25   Page 295 of 272

24

1  negotiating the terms of what that would look like with MGM, at

2  least.  We haven't had an opportunity to speak with CCS Medical

3  because -- because of its overlap, Your Honor.

4        We also think -- and this is set forth in our

5  documents -- that it's possible that the documents that were

6  shared with the debtor are -- have been waived, to the extent

7  that there was any privilege associated with it because of the

8  way that the debtor maintains its email servers.

9        And then I believe finally, the last objection that

10  has been filed with the Court for today is from Mr. Dondero.

11  And he argues that any data related to information that's being

12  produced under the protocols should not be made available to

13  Josh Terry, Acis Capital Management GP LLC, or Acis Capital

14  Management LP.

15        But there's nowhere in Dondero's briefing that sets

16  forth a basis of law for a categorical restriction of that

17  nature.  And as you know, Mr. Dondero and his affiliated

18  entities are at the center of the Committee's investigation of

19  the estate claims.  And we believe imposing a categorical

20  confidentiality ban against one member of a Committee would

21  considerably complicate and impede that investigation.

22        We understand a desire to have any documents that are

23  created in connection with pending litigation between Acis and

24  the debtor, Dondero, and other Dondero-related parties, that

25  that information be marked as attorneys' eyes only, highly

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4   Filed 06/27/25   Page 296 of 1017   PageID 2759
Main Document   Page 296 of 792

25

1  confidential so that only outside counsel has access to it, but

2  that's not really the basis for Mr. Dondero's objection, and as

3  a result, we don't believe that objection has value.

4          And then, Your Honor, I don't know to the extent you

5  intend to hear from NexBank Capital and its affiliates, and so

6  if -- I would like to reserve any sort of response to them --

7          THE COURT:  Okay.

8          MS. MONTGOMERY:  -- to the extent that you allow them

9  to speak.

10          But, you know, in concluding, Your Honor, the debtor

11  and its affiliates have interwoven so much of their operations,

12  their legal services, and even their data storage, that it's

13  incredibly difficult to try to pick apart the data, with the

14  exception of MGM and CCS, the objectors here today agreed to

15  those shared services, and now they want to argue that what was

16  shared was actually separate.

17          The Committee has been tasked with investigating the

18  estate's claims against the very affiliates that now seek to

19  unwind their information and said that unnecessary burdens to

20  production.  And as a result, we request that those objections

21  be overturned, that the motion be granted, and that the ESI

22  subject to the motion to compel be produced to the Committee.

23          THE COURT:  All right.  Well, let me -- I'm just

24  going to go down the list of objectors.

25          Let me start with the two that Ms. Montgomery

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/23/25    Page 297 of 1017    PageID 2760
Main Document    Page 296 of 2732

26

1  announced have been resolved:  Highland CLO Funding Limited.

2  Matsumura, were you going to be the one to weigh in on

3  confirming that?

4          MS. MATSUMURA:  Yes, Your Honor.  I can confirm we've

5  reached an agreement with the Committee that the documents that

6  are -- contain confidential and privileged information of HCLOF

7  will be produced on a highly confidential designation under the

8  protective order, so that will be only the Committee's

9  professionals.

10         And that as Ms. Montgomery stated, any of the

11 documents produced by the debtor pursuant to this agreement

12 will not be construed as a waiver of any privilege that the

13 funds share of those documents.

14         THE COURT:  Okay; thank you.

15         All right, what about HMC Fund Advisors?  I

16 understand that your issues have been resolved, you're still

17 working out a couple of things, but who wants to weigh in on

18 that to confirm that?

19         MR. WRIGHT:  Good afternoon, Your Honor.  It's James

20 Wright at K&L Gates for -- actually a number of entities that

21 are all at Docket 841.  There was an objection at 841 that's

22 HMC Fund Advisors, NexPoint Advisors, and then a number of

23 individual funds, and I will not burden the record with listing

24 each of them out.

25         THE COURT:  Thank you.

27

 1          MR. WRIGHT:  I agree with the Committee's summary,

 2  that we have made a lot of progress.

 3          There are some technical things that we're still

 4  working out, but I think that we're -- you know, we've been --

 5  we've made a lot of progress, we've been working in good faith,

 6  and -- get there -- but we just need a minute to -- we were on

 7  the phone with them, frankly, ten minutes before this hearing

 8  started, I think we just need a little bit more time.

 9          THE COURT:  Okay; thank you.

10          All right.  Well, why don't we start with Mr.

11  Dondero, and your objection which I understand deals mostly

12  with Acis and Josh Terry.

13          Go ahead.

14          MR. LYNN:  Thank you, Your Honor.

15          As you've gathered, our concerns are somewhat

16  different from the other parties who are objecting.  Mr.

17  Dondero agreed to the arrangement involving shared privilege in

18  allowing the Committee the kind of discovery that they're

19  seeking here.

20          And accordingly, we would (indiscernible) object to

21  what they're doing.

22          But as I understand the Committee's response to the

23  Dondero response to the motion to compel, (indiscernible)

24  because, first, there is no basis in law (indiscernible) Acis

25  and Mr. Terry (indiscernible) and participate (indiscernible)

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/06/25   Page 6 of 272   Page 299 of 1017   PageID 2762

28

1   in consideration of the estate claims.

2          And second, (indiscernible) and I quote,

3   "considerably complicate and impede the Committee's

4   investigation."

5          Even assuming for a minute that Acis and Mr. Terry

6   are so central to the investigation that their absence from it

7   could not be tolerated by a Committee, just as there may be

8   nothing in the statute that permits the Court specifically to

9   restrict Mr. Terry and Acis's access to information so, too,

10  there's nothing in the Bankruptcy Code or the Bankruptcy Rules

11  that prevents the Court from doing so.

12          There is (indiscernible) the authority for the

13  Bankruptcy Court to grant what Mr. Dondero asks, which is that

14  Acis and Mr. Terry be excluded from the information gained by

15  the Committee during the course of its investigation.  Section

16  105, as this Court is acutely aware, is the problem-solving

17  section of the Bankruptcy Code that allows the Court to fashion

18  results that may be necessary to fill in gaps that the Code

19  leaves open.

20          There was nothing in the law that authorized it, even

21  before the passage of Section (indiscernible) of the Code, it

22  was common for (indiscernible) representatives are

23  (indiscernible).  And, indeed, (indiscernible) representatives

24  are also (indiscernible) in other (indiscernible).

25          Similarly, I know of nothing in the Code or the Rules

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/26/25   Page 300 of 1017   PageID 2763
Main Document   Page 300 of 2732

29

1  that provides for the retention of a Chief Restructuring

2  Officer.  Yet, Section 105 has allowed for that necessary post,

3  as is true (indiscernible) which are also not provided for in

4  the law.

5          In this case, (indiscernible) Section 105 has been

6  used to justify an independent board, and to justify the very

7  same privilege that is at the root of the disputes.  Section

8  105 (indiscernible) to justify the removal by a court of a

9  member of the Creditors' Committee.  That's in the <u>First</u>

10 <u>Republic Bank Corporation</u> case, Judge Felsenthal determined

11 that he had the authority to remove, and he chose to remove, a

12 member of the Creditors' Committee.  A similar result was

13 reached in the <u>MAP International</u> case out of the Eastern

14 District of Pennsylvania, and a similar result (indiscernible)

15 following Judge Felsenthal was reached by the Bankruptcy Court

16 for the District of Arizona in <u>In Re America West Airlines.</u>

17         If the Bankruptcy Court has authority pursuant to

18 Section 105 to remove a Committee member, clearly Section 105

19 gives authority to the Court to eliminate a member's access to

20 and involvement in an investigation that will give that

21 Committee member a leg-up in discovery in another case.

22         In the litigation commenced by Acis is, indeed, in

23 another case, not in this case, and the litigation is intended

24 to provide a benefit -- a windfall to Mr. Terry, not to provide

25 (indiscernible) who he is supposed to be representing as a

1   member of the Creditors' Committee.

2          As pointed out in an article in The Review of Banking

3   and Financial Services in October of 2016, "Members of a

4   Creditors' Committee may not use their positions as Committee

5   members to advance their individual interests."  And I'm

6   quoting there the <u>MAP International</u> case.  Similarly, that

7   fight has been made by Collier in Paragraph 1102.05[3] of the

8   Collier treatise.

9          Indeed, the Acis litigation may not only drain assets

10  from Highland, it may reduce the (indiscernible) Dondero and

11  other potential defendants in the same causes of action as to

12  their ability to (indiscernible) any judgment that defendants

13  may manage to obtain.

14         Under those circumstances, unsecured creditors

15  represented by Acis and Mr. Terry will have their recovery

16  reduced by virtue of those judgments.

17         It is clear that the Bankruptcy Court may restrict a

18  committee member's access to information, as Collier points

19  out, where a member of a committee is a competitor of the

20  debtor, as, indeed, Acis is, the member may be restricted as to

21  the information that the member gets so it does not obtain

22  competitive advantage.

23         I recognize that the same claims may be, indeed, a

24  central concern of the Committee, (indiscernible) with Acis and

25  Mr. Terry creates serious problems, perhaps Mr. Terry should

31

1   resign from the Committee or be removed.

2          In fact, in this case, when UBS filed the motion for

3   relief from stay in order to pursue litigation in New York,

4   very properly, UBS excluded itself -- recused itself from

5   discussion of the motion for relief from stay.  And Mr. Terry,

6   I respectfully submit, should do the same here.

7          Further, as far as complicating and repeating the

8   Committee's investigation, and the Committee did not elucidate

9   how that would happen, whatever trouble or cost (indiscernible)

10  Acis and Mr. Terry may cost is nothing compared to the trouble

11  and cost to the debtor of complying with a request for millions

12  and millions of communications.

13         In conclusion, Your Honor, in litigation such as that

14  being pursued by Acis in the Acis case, as courts have said,

15  the Federal Rules were designed to create, quote, "a level

16  playing field," end quote.

17         A couple of those cases, the Hillsborough Holding

18  decision of the Bankruptcy Court out of the Middle District of

19  Florida; Allstate Insurance versus Electrolux out of the

20  Northern District of Illinois; and Passlogix, Inc. versus 2FA

21  Tech out of the Southern District of New York.

22         Yet the motion to compel is brought without

23  protection from (indiscernible) that Acis seeks, there clearly

24  will be no level playing field in that litigation.  And the

25  commitment of this Court (indiscernible) in general to

1    (indiscernible) litigation processes will be undermined.

2           Your Honor, if anybody wants cites to any of these

3    authorities that I provided to the Court, I'll be happy to

4    provide them.

5           THE COURT:  All right.  Thank you, I appreciate

6    that.

7           I'm going to go next to --

8           MR. LYNN:  Your Honor, I didn't hear you.

9           THE COURT:  Pardon?  I thanked you for your argument,

10   and I do not need those case cites.

11          I'm going to go next to CLO Holdco.  Mr. Kane, will

12   you be making the argument there?

13          MR. KANE:  Yes, Your Honor, I will; thank you for the

14   time. This is John Kane for CLO Holdco, for the record.

15          And first, I want to start by kind of acknowledging

16   that we really did take to heart what you said previously in

17   attempts to avoid unnecessary litigation.  I've been working

18   with Ms. Montgomery for over a week now in an effort to try and

19   resolve some of our concerns about the discovery requests, at

20   the same time trying to be mindful of what I believe to be my

21   client's privileges and our right (indiscernible) the party

22   that reviews documents and produces them.

23          We are -- CLO Holdco is subject to a request for

24   production of documents from the Committee.  We are working to

25   prepare a review, to obtain all of the requisite documents to

33

 1  have a fulsome production to the Committee.  And Ms. Montgomery

 2  and I have had conversations about how that production will

 3  take place.  While we acknowledge that there are obviously some

 4  timing concerns here given the 90 days relating to that

 5  registry order that was relatively recently entered.

 6        So we've mindful of all of those issues, and our

 7  dispute here is about whether we're giving up privileged

 8  documents or whether we aren't.

 9        It's our position that since that request for

10  production of documents to CLO Holdco, CLO Holdco has a right

11  to review those documents, and to produce documents in

12  accordance with the Federal Rules.  And that the request by the

13  Committee to have all ESI produced by these various custodians

14  basically provides an end around to the request for production

15  of documents delivered to CLO Holdco.  And it does look through

16  the guise of this joint client privilege exception to the

17  general privilege rules.

18        But we've got a fundamental misunderstanding of the

19  law by the Committee as the exception applies to the general

20  rule of privilege.  And it basically breaks down to a simple

21  analogy, one we can apply to the case of law.  The analogy

22  would be like if our firm, Kane Russell Coleman and Logan,

23  represented Texas Capital Bank and Wells Fargo on a bunch of

24  separate matters, and then because we had a great relationship

25  with both, we are going to represent Texas Capital Bank in a

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 08/28/25   Page 305 of 1017   PageID 2768
Main Document   Page 35 of 272

34

1  merger with Wells Fargo, and we are going to be retained as

2  kind of a mutual third party counsel by both sides to help

3  manage this merger.

4        Now if that merger representation turned into a later

5  dispute between the parties, the correspondence between Wells

6  Fargo and Kane Russell Coleman and Logan, and the

7  correspondence between Texas Capital Bank and Kane Russell

8  Coleman and Logan would not be precluded from production to

9  either party as long as it were (indiscernible) representation.

10 They have the same counsel for the same representation.  So

11 that this idea of privilege doesn't really apply the same way.

12 Those documents pass back and forth, I have a duty to both of

13 those clients equally.

14        But what they wouldn't be able to obtain is, let's

15 say, Texas Capital Bank's request for production of documents

16 to me, counsel, seeking all correspondence that I have ever had

17 with Wells Fargo on any other matter, regardless of whether it

18 was -- it was related to or unrelated to a joint

19 representation.  And really, that's what the Committee is

20 trying to do here, they want all ESI, there are no parameters.

21 So it doesn't matter if there's a joint representation on a

22 specific matter between CLO Holdco and the debtor, what the

23 Committee is asserting is because they use the same counsel,

24 that all matters or all correspondence between counsel for the

25 debtor, all internal counsel, and counsel for CLO Holdco, since

002058
APP 1285

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 06/23/25   Page 306 of 1017   PageID 2769

35

1  it was essentially the same person, the same people, all of

2  that is subject to production.

3          So here's an example of how this plays out, Your

4  Honor.  At our last hearing, you heard a bunch of testimony

5  about a transfer of Highland, the debtor's interest in the

6  Dynamic fund, and how on December 28, 2016, with one document,

7  we can trace -- I'm sorry -- we can trace this trail of

8  transfers from Highland to CLO Holdco, and we know that

9  Highland's internal counsel was representing both sides of the

10 deal.  They were representing the debtor, they were also

11 representing CLO Holdco as the creation of those documents was

12 done for both parties by the same entity and the same

13 transaction, that's critical.

14         So do I have an assertion of privilege for CLO Holdco

15 in that situation?  No, I don't believe that I do.  I think

16 that joint client exception that's addressed in <u>Teleglobe</u>, and

17 <u>Nguyen</u>, and in the <u>Nester</u> decision that's cited by the

18 Committee in their pleadings precludes me from stopping the --

19 or the disclosure of documents that were between internal

20 counsel and CLO Holdco as they're related to that dynamic

21 transaction because internal counsel at Highland represented

22 both sides of the deal.

23         But there are other representations taken up by

24 internal counsel for Highland under the shared services

25 agreement between CLO Holdco and Highland that really don't

36

1  have anything to do with Highland.  So much (indiscernible)

2  litigation, we'll say, between CLO Holdco and some other party

3  like U.S. Bank that does not have Highland Capital Management

4  as a party to that litigation, and could not have Highland

5  Capital Management as a party to that litigation.

6          (Indiscernible) under this joint client privilege

7  exception that the Committee is asserting should control this

8  entire deal.  So in a situation like that, I would still be

9  able to review and withhold documents that were privileged,

10 attorney-client communications, or work product communications

11 without having to disclose those to the Committee even though

12 the Committee stands in the debtor's shoes.  Because there is

13 this isolation, Highland is not a party that is jointly

14 represented in that transaction.

15         So all of the documents that have been exchanged

16 between CLO Holdco and the debtor in representations where the

17 debtor is not an active participant as a party in a joint

18 representation, all of that documentation is the sole property

19 of CLO Holdco.  It shouldn't be subject to disclosure simply

20 because one of these custodians engaged in correspondence with

21 CLO Holdco.

22         So, for instance, the Argentina Bank, let's say, if

23 Highland is not being represented in a transaction with CLO

24 Holdco related to the Argentina Bank, and Grant Scott, as

25 trustee of CLO Holdco, inquires internally about a -- let's say

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/26/25    Page 308 of 1017    PageID 2771
Main Document    Page 291 of 732

37

1  a NAV statement related to its interest, that's not necessarily

2  a document that would have to be produced to the Committee

3  because it is a potentially privileged communication if it was

4  with one of the attorneys in-house.

5         Now that doesn't mean that everything is going to be

6  privilege, or that there aren't going to be a significant

7  number of these joint client privilege exceptions where we have

8  to disclose attorney-client communications because Highland was

9  on the other side of the transaction, but that's something that

10  I should be reviewing as CLO Holdco's attorney, and identifying

11  documents for a privilege log, and then having a conversation

12  with the Committee's counsel about whether these are subject to

13  the joint client privilege exception, or whether they are truly

14  privileged documents or not.

15         So we've already got a request for production out

16  there.  I mean presumably, Your Honor, this is already -- you

17  know, this is already underway.  What we just want to do is try

18  and protect the documents that are actually privileged

19  communications or work product communications from disclosure

20  to the Committee.

21         THE COURT:  All right; thank you, Mr. Kane.

22         Let me hear next from NexPoint Real Estate Financial.

23              (No audible response heard)

24         THE COURT:  All right.  I can't hear you.  Is this

25  Ms. Drawhorn who will be addressing this one?

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/29/25   Page 292 of 272   Page 309 of 1017   PageID 2772

38

1         MS. DRAWHORN:  Can you hear me -- can you --

2         THE COURT:  Yes.

3         MS. DRAWHORN:  Can you hear me now?

4         THE COURT:  I can.

5         MS. DRAWHORN:  Okay.  I had to unmute both my phone

6    and the -- and the computer, okay.

7         Lauren Drawhorn on behalf of NexPoint Real Estate

8    Finance and the 15 related entities and -- that are listed on

9    Docket 847, I won't go through them all.

10        So our -- one of the -- we've got a couple issues

11   with the motion to compel relative to our shared services

12   agreement with the debtor, and largely because of the breadth

13   of the request wanting ESI from all nine of these custodians.

14   And we have concerns that because there are no limits on that

15   request, that we've got our confidentiality and privilege

16   issues that are concerned about.

17        The real estate entities are -- NexPoint Real

18   Estate entities are typically traded, and there are some

19   regulatory constraints that we have on the dissemination of

20   information and it being public.  And so obviously we need to

21   protect those interests and try and prohibit the disclosure of

22   information.

23        While there -- while the NexPoint Real Estate

24   entities do -- did have a shared services agreement, it is the

25   businesses unrelated to and separate from Highland, except for

002062
APP 4289

1   the occasional times when they co-invested.

2           So generally speaking, they were separate businesses.

3   Any use of services from Highland employees under the shared

4   services would be for separate deals.  And so because they're

5   separate, we believe that it's unlikely that they would be

6   relevant to the estate claims.

7           In other words, the request should be narrowed to

8   limit the amount of information that's not related to the

9   Committee's estate claims, (indiscernible) related to NexPoint

10  Real Estate entities' deals and confidential information and

11  business information.

12          The other issue we have in connection with

13  confidentiality is in connection with NexPoint Real Estate's

14  entities business operations.  They continue to receive

15  information electronically from third parties that have been

16  the subject -- that information was provided subject to

17  confidentiality agreements there.  So under those agreements

18  with other parties, there are requirements and obligations for

19  NexPoint Real Estate entities to notify those parties and

20  provide them an opportunity to object.

21          So we are wanting the additional protections and

22  limits on the discovery to protect this confidential

23  information and our obligations to other parties, and to

24  regulatory entities.

25          We also have concerns on the privilege -- any

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/02/25   Page 294 of 702   Page 311 of 1017   PageID 2774

40

1   privilege information, again, since these custodians were

2   counsel, and provided -- occasionally provided legal advice in

3   connection with NexPoint Real Estate entities' deals that,

4   again, were unrelated to Highland and separate from the debtor.

5   That information will be -- would be privileged and

6   (indiscernible) NexPoint Real Estate entities' privilege

7   (indiscernible) position you just heard, and the Committee's

8   response is that that was waived or part of this joint client,

9   and we disagree with that.  Where the legal advice was given on

10  a separate matter, there would be no joint privilege between

11  the NexPoint Real Estate entities and the debtor.  We think

12  that that privilege should be protected, and the privileged

13  documents should be withheld from the production.

14          The Committee responded by their -- that we -- that

15  NexPoint Real Estate entities are not burden.  We did argue in

16  our objection that this request, under 26(b) (indiscernible)

17  because it was also an undue burden because it's so broad -- so

18  broad.  And that burden (indiscernible), as you know, isn't

19  required to be the physical burden of us going through and

20  producing documents.  An undue burden encompasses the invasion

21  of confidential information and privilege concerns.  So we

22  think that there is a good basis to limit the information that

23  is being produced to protect NexPoint Real Estate entities'

24  confidential information and business information.

25          So what we're requesting we suggested in our

002064
APP 4294

41

1  objection was to allow NexPoint -- the NexPoint Real Estate

2  entities to have input on the search terms that would narrow

3  the production and potentially exclude the NexPoint Real Estate

4  entities' confidential information, information that would be

5  unrelated to the Committee's estate claims.

6        We also requested that NexPoint be given an

7  opportunity to review the documents -- the NexPoint documents

8  before produced -- and this is similar to what is my

9  understanding the debtor would -- for all of the -- the

10 previous production that was provided.  So it is my

11 understanding that before the debtor produced any document that

12 instituted the shared services agreement, confidentiality

13 privileges, they contacted that party and said "Here's this

14 document that we're going to produce, are you okay with it?

15 Are you okay with it, is there any objection?"

16       And so that's all we're requesting is an opportunity

17 that the NexPoint documents that -- that are potentially giving

18 -- to make sure that they're designated correctly under the

19 protective order, so as highly confidential versus

20 confidential, again, because of those confidentiality concerns

21 that I mentioned earlier.  And then also to confirm the

22 privilege designation and to make sure anything privileged is

23 not being produced.

24       And then the last request we have is just to make

25 NexPoint a party to the protective order so that we are able to

42

1  obtain those protections as the highly confidential and

2  confidential designations.

3          THE COURT:  All right; thank you, Ms. Drawhorn.

4          All right, let's see.  How about we hear from Atlas

5  IDF GP next.

6          MR. KEIFFER:  Thank you, Your Honor.  Paul Keiffer

7  for the Atlas IDF entities and parties located at -- or I

8  should say named at Docket Number 837, I won't burden the

9  Court, as others have not done, as well, with the full list of

10 parties.

11         And also taking in mind -- or keeping in mind what

12 the Committee has done as far as discussing issues, I want to -

13 - I have just a few points:

14         First off is that my clients don't have a specific

15 concern with the ESI request.  The shared privileges and the

16 joint privilege is supposed to hold, we want that to hold as it

17 has been requested for everybody else, and I think that was the

18 intent of the Committee in regard to that point.

19         It's also, as the Committee indicated, between the

20 debtor and the -- I'm sorry -- between the Committee and the

21 Rand Advisors' related entities that they want to be expressly

22 involved or brought into the agreed protective order.  Lots of

23 documents are being requested, not so much through the

24 electronic -- the ESI, but through the fourth production of

25 documents request that we got that -- which we received on the

002066   APP 1223

1   9th of July that gave us six days to respond to, and that's why

2   we started talking and having discussions with the Committee

3   about this.

4          But there -- there there's all these document

5   requests, and we have our own fiduciary duties, we -- either

6   contractually, statutorily, or regulatorily.  And as the

7   Committee noted, they'd be perfectly fine with having us being

8   brought into (indiscernible) -- whatever you want to call the

9   right under the coverage of agreed protective order.  We're not

10  expressly under it because we're -- we're not a specific party

11  to it, but we need to be -- we feel it's the most appropriate

12  for us, too, in this context, and they've acknowledged that

13  it's a reasonable step to be added to the agreed protective

14  order, so we're happy with that.

15         As far as the documents being produced, the only --

16  the principal attached -- the principal issue for Rand Advisors

17  there is that it's principally its email server issue.  Rand

18  Advisors, and the others, have their on documents on its own

19  servers, as best as I understand.  And so it's really more

20  documents that would be appended to emails and discussions

21  between the parties, either in the context of  (indiscernible)

22  some of the nine individuals that are custodians, that they're

23  described as custodians or otherwise.

24         But the UCC has agreed to let whatever documents are

25  produced in that context, both through the ESI and through the

44

 1   request for production that's outlined there, that we're having
 2   to respond to under the shared services agreement with the
 3   debtor.  But those would also be subject to highly confidential
 4   status, subject to the Committee seeking to downgrade to
 5   confidential, or not confidential at all.

 6          Now the other issue is the attorney-client privilege
 7   where Rand Advisors and the others were generally using
 8   RandAdvisors.com suffix, would have negotiations and
 9   discussions with its own private counsels.  And the question
10   here, we don't -- I'm not sure whether or not the shared -- I
11   mean the servers are or are not sufficiently silo'd or
12   otherwise.

13          But we really don't have that hard of an issue here -
14   - that difficult of an issue here as we only -- there's only
15   three defined suffixes that are out there that would be of
16   concern to the Rand Advisor entities, and those are suffixes
17   such as romclaw.com, our law firm, we didn't realize that that
18   was the case.  Also, there would be maybe Sadis -- Sadis or --
19   another law firm, maybe three or five suffixes we need to have
20   set aside for attorney-client privilege review.  And if we have
21   those, I think that the Rand Advisor group has gotten what they
22   -- what they think is reasonably appropriate under the
23   circumstances.

24          And we're not asking the Court to, you know -- well,
25   we don't see this as truly a request for production, it's kind

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document Filed 06/23/25   Page 316 of 1017   PageID 2779
Main Document   Page 316 of 1017

45

1  of a hybrid kind of a (indiscernible).  But under the shared

2  services and the final term sheet, and that allows access, lets

3  the Committee be the debtor and get to many things, but yet

4  they use request for productions as a methodology to say what

5  they're looking for, but they're not really requests for

6  production, per se, because it's -- I've already got it now,

7  this is (indiscernible) debtor, it's what we can look at.

8          And so we're wanting to make sure that we have under

9  our side of this relationship under the shared service

10  agreement some modicum of protection for its specific attorney-

11  client issues that it has.  We recognize the joint privilege

12  issue, that's going to (indiscernible).  But there are three to

13  five very simple suffixes as we can give to the Committee for

14  doing its search (indiscernible) romclaw.com, that's my law

15  firm, it would know not to go -- you know, set those aside.

16  There's one or two other law firms that they deal with

17  specifically, and if they go through the next step, and it

18  turns out that there's three or four other people on the email

19  that aren't part of Rand Advisor that's something with the

20  debtor or some third party altogether, then sure, there's no

21  privilege there.

22          But if it's the discussions between Rand Advisor

23  entities and its counsels specifically, then it should be

24  something that's set aside and reviewed in a different manner.

25  And I don't think it's really even close to burdensome in the

002069
APP 1296

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4  Filed 10/06/25  Page 6330 of 2722  317 of 1017   PageID 2780

46

1  context of how much is going on in this case, and how many

2  documents are going to be reviewed.

3         That's principally our concern.  We are -- that's

4  another suggested solution to deal with the two elements that

5  we raised in our response on Pages 6 and 8 to a likely

6  solution, which is to basically deal with attorney-client

7  privileges, subpart C, is just to have these exclusion --

8  exclusionary suffixes to address that, very simple.

9         The rest of this, as far as having a log to keep

10 produced items in its context, to be able to (indiscernible)

11 what documents were produced, well, that's probably a bridge

12 too far.  We don't need to have that, we don't think that's

13 (indiscernible) concern for us.

14        So keeping up with the few things, the agreed

15 protective order being made expressly applicable to us so that

16 for our purposes, when we have to deal with issues of

17 confidentiality regarding our clients contractually,

18 statutorily, or regulatorily, that's the (indiscernible) I

19 think there's always a legal process (indiscernible).

20        Two, that everything gets a highly confidential

21 status initially, and subject to being downgraded, obviously

22 with notice and opportunity to object.

23        And then lastly, just that the three suffixes be

24 added to the review standard so that -- three to five suffixes,

25 and I'll have those easily enough in the next few days to give

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document    Filed 06/06/25    Page 0605 of 2722    Page 318 of 1017    PageID 2781

47

 1  to the Committee to allow me to preserve its attorney-client

 2  privilege without having to go into the issue of whether or not

 3  this is a means by which Rule 34, or the other appropriate

 4  discovery rules, are really being invoked or not in this

 5  context, or whether this is just "I'm standing in the debtor's

 6  shoes, and I should be able to do these things."  It's --

 7  that's an odd -- we can bypass that oddity by dealing with

 8  those requested suffixes being set aside.

 9          THE COURT:  Okay; thank you.

10          All right, let's hear from CCS, please.

11          MS. STRATFORD:  Good afternoon, Your Honor.  This is

12  Tracy Stratford from Jones Day on behalf of CCS Medical.

13          THE COURT:  Okay.

14          MS. STRATFORD:  Our concern is relatively narrow and

15  unique.  CCS is one of the country's leading providers of home

16  delivery medical services.  And so they deliver things like

17  insulin pumps and orthotics to people in their homes.

18          Two of Highland's employees, Mr. Parker and Mr.

19  Dondero, were directors of CCS Medical.  And so CCS Medical

20  sent information to them, sensitive business information about

21  the strategic direction of the business, about pricing, about

22  what the business would be doing or wouldn't be doing, about

23  decision-making that would happen within CCS Medical.  That

24  sensitive information was sent to the director, including these

25  two individuals who were employed by Highland at their Highland

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/06/25   Page 319 of 1017   PageID 2782

48

1   email addresses.

2          All we're asking is for the ability to look through

3   these emails first so that we can identify anything that is

4   competitively sensitive, so that we can identify anything that

5   is privileged, and talk to the Committee about it separately.

6          We don't know, frankly, what the claims are that the

7   Committee is looking to press, so I can't say that none of it

8   is relevant, although it doesn't seem to be particularly

9   relevant to what's being discussed today.

10          But to the extent that some of those documents might

11  be relevant, the non-privileged ones, but commercially

12  sensitive ones, we want to have that discussion.  We would like

13  the ability to look at those documents first, and that would be

14  at our cost, so there's no cost to the estate.  We don't think

15  it would take particularly long.

16          And we would have offered the solution directly to

17  the Committee, but they wouldn't return our phone calls.  So

18  we've sent emails, we've called them, and heard nothing back.

19  We would have loved to have negotiated this, but that didn't

20  happen.

21          The only argument that the Committee makes in

22  response to our suggestion, which were laid out pretty clearly

23  in our very short objection, is that there's a privilege waiver

24  here, or a waiver of confidentiality because we sent this

25  information to these two board members who were employed by

002072
APP 1289

1  Highland.  (Inaudible) as a matter of law.  And the very case

2  that they cite in their papers explains that.

3         If you take a look at the In Re Royce Homes case that

4  they cite in their response to the objection, what they say is

5  that once you send confidential information to another

6  corporation, the privilege is automatically waived.  That's not

7  the case.

8         In fact, if you look at that case, it's very lengthy

9  because the Court looks at a number of factors.  And amongst

10  those factors is the expectation that the sender has that the

11  recipient will be able to maintain the information as

12  confidential or protected.

13         Here we have two executives at Highland who were

14  receiving information as members of the board of directors,

15  they controlled the company, they had the ability to control

16  who reviewed their email, and CCS Medical had every reason to

17  believe that those two directors would preserve their duty of

18  loyalty to the company and maintain their individual emails as

19  confidential.  There's no waiver under that circumstance.

20         But to the extent that this issue is one that needs

21  to be decided, it can't be decided on these papers because none

22  of those facts are before the Court.  None of the factors that

23  are discussed in the In Re Royce Homes case are -- have been

24  briefed.

25         And so to the extent that we're going to discuss a

50

1   waiver, we would like the opportunity to do that.  We don't

2   think the Court ever needs to reach this issue because we think

3   that we can, in a very efficient and effective way, screen the

4   emails by just having the vendor search for particular domains,

5   review them ourselves, identify what's privileged.  And what's

6   not privileged, we can turn over.

7           To the extent there's any dispute later on, we can

8   bring it before the Court at that time, but we think this is an

9   easy problem to solve, Your Honor.

10          THE COURT:  Thank you.

11          MS. STRATFORD:  Thank you.

12          THE COURT:  All right.

13          Well, let's see who I missed.  Ms. Drawhorn, did you

14  have a separate argument for MGM?

15          MS. DRAWHORN:  Yes, Your Honor.

16          THE COURT:  Okay, go ahead.

17          MS. DRAWHORN:  I do.

18          THE COURT:  All right.

19          MS. DRAWHORN:  And so MGM is in a similar situation

20  to the party you just heard.  And the only reason that MGM is

21  being pulled into the discovery dispute is because Mr. Dondero

22  served as a director on the -- on the board of directors for

23  MGM.

24          So we also believe -- and we have been in discussions

25  with the Committee about potentially pulling out or excluding

51

 1  certain MGM information just by providing a list of the emails,

 2  the dot-com of the other executives, or executive assistants,

 3  or other board of directors members who would be sending

 4  confidential information that was circulated just because --

 5  for purposes of the board of directors of MGM and for MGM

 6  business matters.

 7          So we -- we agree and -- or disagree with the

 8  Committee, and agree with the position you just heard.  The

 9  Committee's response to our -- to MGM's objection is that we

10  waived by sending confidential MGM information to Mr. Dondero's

11  account at Highland, that waived conference or privilege, and

12  we disagree with that.  We -- we just heard that sending to an

13  employer's email account in and of itself is not sufficient to

14  waive privilege or confidentiality.  There are a multitude of

15  factors that need to be considered, including the expectation

16  of privacy in considering the fiduciary duties of board of

17  directors under California law, which is where MGM operates.

18  That that confidentiality is one of the fiduciary duties.

19          We would expect that sending information to our

20  directors would remain confidential.  And just the mere fact

21  that he utilized his -- Mr. Dondero utilized his Highland email

22  account would not be sufficient to waive any confidentiality or

23  any privilege.

24          And then I -- I -- it is hard to believe that

25  anything MGM-related would be extremely relevant to the

002075   APP 1902

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Filed 06/05/25    Page 326 of 1017    PageID 2786
Main Document    Page 323 of 724    323 of 1017

52

 1  Committee's claims, but regardless, I think there's an easy way

 2  to pull that information and make sure that nothing is being

 3  disclosed, which would be by providing these specific email

 4  addresses of outside counsel to MGM's board of directors.

 5  We've got, you know, two -- two counsels that would not have

 6  provided any services to the debtor, that we can say anything

 7  at those email addresses should get excluded from production.

 8          Same with the outside advisors to the MGM board, we

 9  can easily provide that email address and have that information

10  excluded.

11          And then as to the other confidential MGM

12  information, we have a list of the executives and their

13  assistants, we would have provided -- and other board members,

14  we would have provided that.  I just think it should be fairly

15  easy to give those email addresses and exclude them from the

16  production, and make sure that that confidentiality and

17  privilege is maintained and protected.

18          THE COURT:  All right; thank you, Ms. Drawhorn.

19          Okay, NexBank's counsel, you were going to try to

20  knock my socks off with a reason why I should hear your

21  argument today when you didn't file an objection.  So, Counsel,

22  now's your chance.

23          MR. SLADE:  I appreciate it, Your Honor; thank you

24  very much.  Jared Slade of Alston & Bird for NexBank.

25          NexBank advances the same arguments about concern of

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/06/25   Page 637 of 1732   Page 324 of 1017   PageID 2787

53

 1  counterparty confidential information, as well as attorney-

 2  client privilege concerns.  And to that end, it's requested

 3  some preview time to be able to review the documents and

 4  provide the appropriate search terms.

 5         I think there are three things which will happen in

 6  the next 50 seconds that make us differently situated:

 7         The first is unlike the other objectors, our shared

 8  services agreement provides expressly that debtor shall take

 9  all options, legal or otherwise, that are necessary to prevent

10  the disclosure of confidential information by the receiving

11  party or any of its representatives.  So we have a different

12  legal basis that was addressed in part in the debtor's motion

13  originally on this issue.

14         The reason we have that is because we're a bank, and

15  we have two other categories of information that are

16  particularly sensitive and we're concerned about being

17  disclosed:

18         The first are bank examination materials.  Privilege

19  is a part of those, and we are very concerned about an issue or

20  problem with our regulators in connection with the fact that we

21  have, in fact, taken appropriate steps to try to protect those

22  and treat those as privileged and confidential information.

23         The other category of information is consumer

24  information.  We're talking about things protected by

25  (indiscernible) and other consumer information which are

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/06/25   Page 326 of 1342   Page 325 of 1017   PageID 2788

54

1  protected in the statutes.

2        Again, we're willing to go through the effort and

3  expense to be given an opportunity to be able to review that

4  because (indiscernible) that any of that is going to be

5  relevant to what the Creditors' Committee is looking at, that

6  we understand where we are.  And provided that we are able to

7  do that, and are also afforded an opportunity by the Court to

8  be a party to the protective orders so we can take advantage of

9  the designations and not be prohibited from the (indiscernible)

10  third party beneficiary provision, we should be able to meet

11  our obligation.

12        Thank you, Your Honor.

13        THE COURT:  All right; thank you.

14        All right, Ms. Montgomery, I'm going to turn back to

15  you.  And let me make sure I understand entirely your position

16  on all of these objectors.

17        You have said -- correct me if I'm wrong -- the

18  Committee has no problem with making all of these objectors

19  subject to the protective order that was negotiated with the

20  debtor way back when in January, or did I overspeak -- overstep

21  on that one?

22              (No audible response heard)

23        THE COURT:  Ms. Montgomery, I can't hear you.

24              (No audible response heard)

25        THE COURT:  Ms. Montgomery, you must be on mute.

002078
APP 1305

55

 1            Michael, is she still on there?

 2            ECRO:  (Inaudible).

 3            THE COURT:  Okay.  Ms. Montgomery, we're showing

 4    you're on mute.  There you are, okay.

 5            MS. MONTGOMERY:  Can you -- can you understand me

 6    now?

 7            THE COURT:  Yes.

 8            MS. MONTGOMERY:  Okay.  I don't know what happened, I

 9    didn't touch anything.

10            THE COURT:  That's okay.

11            MS. MONTGOMERY:  Technology.

12            No, Your Honor, you're accurate -- that is accurate.

13    We don't have any problem with any of the objectors being made

14    parties to the protective order for purposes of, you know, for

15    their clients to be subject to the same -- the same

16    protections.

17            THE COURT:  All right.  And then my next thing I

18    wanted to confirm is that protective order, is it already

19    worded that it's UCC professionals' eyes only or no?

20            MS. MONTGOMERY:  So the current -- the current

21    protective order has two tiers.

22            THE COURT:  Okay.

23            MS. MONTGOMERY  And the highly confidential tier has

24    a very -- a much more limited disclosure group, it includes the

25    Court, it includes the outside professionals, so I guess it

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/06/25   Page 326 of 292   327 of 1017   PageID 2790

56

 1  would be also FTI, etc.

 2          And then, you know, other parties that would be, you

 3  know, fundamentally necessary for us to use those -- that data,

 4  like court reporters.  It does not include the members of the

 5  Committee.

 6          THE COURT:  All right, so you said it's two tiers.

 7  You mean like there's highly confidential, that's professionals

 8  and those people you named only; and then there's a second

 9  tier, confidential, then the Committee members, the actual

10  businesspeople could see it?

11          MS. MONTGOMERY:  That's absolutely right, but the

12  confidential data would still be subject to protection.  So we

13  think it's a strong protective order, and should meet the needs

14  of all of the objectors.

15          THE COURT:  Okay.  Let me -- I'm giving you the last

16  word.  You can respond in any way you want to all of these

17  eight or so separate arguments, but I would like you to start

18  first with CCS Medical and MGM.  I think you acknowledged at

19  the beginning they're in a little bit different category, but

20  now that you've heard their lawyers articulate how they are

21  different, do you think that at least with these two, their

22  ability to first review anything you produce, or the debtor is

23  going to produce, relating to CCS Medical and MGM might be

24  reasonable?

25          MS. MONTGOMERY:  Yes, Your Honor.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/03/25   Page 328 of 1017   PageID 2791
Main Document   Page 251 of 272

57

 1              I'd even go a step further.  I mean we were working

 2   to negotiate with MGM, and my apologies to Ms. Stratford

 3   because I must have missed her communications, it was not

 4   intentional; we would have happily negotiated the same with

 5   regard to her.  That those documents might even just be

 6   excluded from the review subject to some specific, you know,

 7   protections so that we can make sure that things aren't being

 8   overly included.

 9              So I think that the UCC would be open to a limited

10   review.  The devil's in the details with all ESI, Your Honor,

11   so it would really just be determining to make that as targeted

12   as possible so it's not -- you know, it's not including

13   documents that don't have anything to do with the board's

14   service.

15              THE COURT:  Okay.  It's -- let me ponder what you

16   just said.

17              It would exclude anything not having to do with their

18   board service, Dondero or Trey Parker's board service.

19              MS. MONTGOMERY:  Yes.  So we believe that because the

20   debtor has separate relationships potentially with these other

21   entities, we understand the concern with regard to the data

22   that's related to their role as a director.

23              But, for example, if there is communications between

24   Mr. Dondero and someone else at the debtor that just says like,

25   you know, "MGM stock is trending up," I don't know that that's

002081
APP 0308

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Document   Filed 06/05/25   Page 62 of 2732   Page 329 of 1017   PageID 2792

58

1  necessarily related to his status as a director as I don't know

2  that it's related to an estate claim.  It's perhaps a bad

3  example, but the concept remains, Your Honor, we think that

4  there has to be a way to slice that so that all the parties are

5  getting the protection that they need for their confidential

6  board communications without overly dipping into the data

7  that's otherwise in the debtor's position.

8            THE COURT:  All right.

9            Well, let me -- let me go to Mr. Keiffer's client.

10  I'd like to hear your specific rebuttal to his idea that maybe

11  you can come up with three or five categories, suffix as he

12  called them, to just, at the outset, carve them out from the

13  possibility of Committee review.

14            MS. MONTGOMERY:  So I'm not entirely certain that I

15  completely understood the proposal, Your Honor, and my

16  apologies for that.  But I don't know that Mr. Keiffer is

17  suggesting that those categories be excluded from these nine

18  custodians that are the subject to the motion to compel, or if

19  he was requesting that there be some sort of exclusion that

20  applies to data that's otherwise produced related to his client

21  by the debtor, so maybe it's not in the nine custodians' data.

22            In any case, Your Honor, we're open to discussions to

23  try to resolve any of these objections.  I don't know that

24  we've specifically discussed that with Mr. Keiffer, but we're

25  happy to do so.  If it's limited in nature, and it's not going

002082   APP 0309

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 330 of 1017   PageID 2793
Document   Filed 06/06/25   Page 263 of 272

59

 1  to unnecessarily slow down production, you know, we're open to

 2  talking about it.

 3          THE COURT:  Okay.  Well, let me -- let me make sure I

 4  understand -- and I know this is subject to discussion with the

 5  debtor when we break, but the UCC's proposed protocol here was

 6  -- let me go through a couple of mechanics.

 7          All the files of the nine custodians would be

 8  provided to this E discovery vendor to put in a repository.

 9  And then hopefully the debtor and the Creditors' Committee

10  would come up with a set of mutually agreeable privilege terms

11  to hopefully identify what would -- you agree be attorney-

12  client privilege or work product privilege so that the search

13  terms don't get to that privileged information.

14          If you have disputes, you're going to have a third

15  party neutral, you've discussed, to resolve the disputes about

16  those search terms.

17          And then all documents, not including those agreed

18  privilege terms, would get produced to the Committee, obviously

19  subject to the earlier agreed upon protective order, and then

20  the debtors contract attorneys would review the held back files

21  to see if they're really privileged, or not.  And if not,

22  they'd be produced.  And if they are, they would -- if they

23  think they are, a privilege log would be produced, and then any

24  disputes could be resolved by this neutral third party.

25          I don't know if that's still your protocol on the

002083
APP 0349

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15  Filed 09/03/25    Page 254 of 2722    Main Document    Page 331 of 1017    PageID 2794

60

 1  table, but that's how I understood it to work from your papers.

 2          I guess what I'm getting at is -- I'm pondering Mr.

 3  Keiffer's argument, and really a few others.  I mean if this is

 4  what you're still holding fast to, I mean there's a lot of

 5  opportunities along the way to protect attorney-client

 6  privilege information of these affiliated entities, right?

 7  You're going to first try to craft appropriate search terms so

 8  as not to get at privileged information.  If you can't get

 9  agreements on those, you'll have the third party neutral weigh

10  in.

11          And then the documents that are turned up ultimately

12  through the search, the debtor's going to get a chance to

13  review for privilege and hold back.

14          I guess -- I guess the thought is the debtor's only

15  going to be looking towards its own privileged information,

16  not necessarily NexPoint, or Highland, CLO Funding, and the

17  others.

18          So -- I mean if you could address -- first off, is

19  that the protocol that's still on the table?  Did I correctly

20  described the Creditors' Committee's proposed protocol?

21          MS. MONTGOMERY:  Sorry.  Yes, Your Honor, that's

22  what's set forth in our motion.  We've been working with the

23  debtors to try to make that more functional; we haven't reached

24  an agreement yet.  Perhaps we'll be able to do that when we

25  take a break in just a moment.

002084    APP 0311

61

1          But, you know, we've been trying to figure out, Your

2     Honor, if there are ways that we can further limit the

3     production based on search terms in some way so that we can

4     limit the privilege logging and review that has to occur.  But

5     like I said, that's -- that's outstanding at the moment, and I

6     don't know that the parties have an agreement or would be able

7     to reach an agreement.  We're hopeful, but I'm not entirely

8     certain.

9          But otherwise, yes, Your Honor, I think you've pretty

10    well explained the protocol, with one exception, which is that

11    the privilege review that was proposed, that review would be to

12    determine whether or not the documents that were being produced

13    -- that were, you know, presumptively privileged were related

14    to estate claims.  And if they were related to estate claims,

15    then those would be produced to the Committee under the terms

16    of the final term sheet.

17         If they are attorney-client privileged, and not

18    related to estate claims, then those would be withheld and

19    logged.

20         THE COURT:  All right.

21         Well, let's go back to Mr. Keiffer's suggestion.  I

22    mean if he -- okay.  I was confused; I think Ms. Montgomery was

23    confused, too.

24         Mr. Keiffer, you had talked about these three or four

25    suffixes, and one of them would be your law firm if -- I think

62

 1  what I was understanding, communications that went between

 2  Atlas and your law firm; communications that went between Atlas

 3  and one or two other outside counsel.  Is that encapsulating

 4  what you think could be crafted in here --

 5            MR. KEIFFER:  Yes, Your Honor.

 6            THE COURT:  -- and excluded?

 7            MR. KEIFFER:  Yes, Your Honor, that's exactly what

 8  we're talking about.

 9            The reason I used "suffixes" just as a term because

10  after the act.  So it's ROMCLAW.com is the suffix.  And so if

11  you look for that -- if that is the part of the search terms

12  and, you know, you see that, and that means set aside, you see

13  my law firm's suffix on the email somewhere in that, then you

14  know that that's something you need to set aside, as well as

15  another law firm that they had would be SGLawyers.com, those

16  are the -- that's what was referencing, it's just an easy way.

17            We don't have a lot in our specific circumstance --

18  and I think it was also some of the more attenuating parties

19  that come in and -- complaining have been -- would be looking

20  for something like that, so if they had a -- maybe that's the

21  same thing that they're kind of looking for.  But for us, it is

22  very simple terms, it's what the law firm email addresses are.

23  And when they show up, that's the search term that pushes them

24  aside.

25            THE COURT:  All right.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document    Filed 06/03/25    Page 357 of 372    334 of 1017    PageID 2797

63

1          MR. KEIFFER:  Because that would okay, it's probably

2     something -- because before we even knew what was going on, we

3     were working on putting that proof of claim together that we

4     filed, we would have emails out there concerning circumstances

5     between myself and my client.  And those would -- those

6     ostensibly would be available under the -- under the -- if it

7     were (indiscernible) litigated, and the Committee won that

8     issue, those would be available.

9          But we think the easier thing to do is just set them

10    side, let's not go down that road.

11         The other -- we think there's very few of those, and

12    we'll be happy to give them -- the suffixes in a few days.

13    I'll make sure Mr. Honis -- that my client representative gives

14    me all of those.

15         THE COURT:  All right.

16         Well, Ms. Montgomery, again, I'm just looking through

17    my notes of your early comments.  I mean you had put Mr.

18    Keiffer's client in a little bit of a separate category, right?

19    Saying it didn't appear that Atlas or Rand entities -- they're

20    one in the same, right?  Or -- well, same group of clients or

21    same group of entities:  Rand, Atlas --

22         MR. KEIFFER:  They are, Your Honor, that's all --

23    they're all in my group.

24         THE COURT:  Okay.  So you had made the comment, Ms.

25    Montgomery, that they did not appear to share legal counsel.

64

```
 1              MS. MONTGOMERY:  I did.

 2              THE COURT:  In other words, the three in-house

 3  lawyers that are custodians, right?

 4              MS. MONTGOMERY:  That's right, Your Honor.  And I

 5  think that our position would be because they don't share legal

 6  counsel, if there were communications essentially from these

 7  three law -- like law firm email addresses that are in these

 8  nine custodial data, then those documents might not be

 9  privileged.

10              If what Mr. Keiffer's concerned about is

11  communications not to these nine custodians that involve those

12  three or four addresses where there isn't sort of a debtor

13  representative involved, then I think that's a separate

14  situation, and we'd be more than willing to reach an agreement

15  regarding how those documents should be treated, whether it's

16  by review by Mr. Keiffer in logging or just exclusion from

17  review.

18              MR. KEIFFER:  Your Honor, may I ask for one quick

19  clarification.  We still want to maintain that to the extent I

20  don't know for sure whether -- what extent legal services were

21  or were not provided.

22              And to the extent that their joint privileges waived,

23  a way around those things, that's the better way of doing it

24  than to say that they've been waived and things.  So let's just

25  let the joint client privilege point, which we previously
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 336 of 732   Page 336 of 1017   PageID 2799

65

1   discussed, be the main means by which those go through.  There

2   might be (indiscernible) discussions with one of the nine folks

3   that -- when Highland was involved in the transaction.  There

4   may be a common interest privilege, etc.  I think it has to

5   stay at that highly confidential level just because it's

6   (indiscernible) had it lowered in its tier -- I mean a tier --

7   or possible references, whether it's confidential, highly

8   confidential, confidential or not confidential at all.

9               THE COURT:  Okay.  I just --

10              MR. KEIFFER:  That's the only --

11              THE COURT:  I just got very confused.  I think we

12   were discussing if -- if there are --

13              MR. KEIFFER:  May I, Your Honor?

14              THE COURT:  Yeah, I -- I -- well, if there are

15   communications from folks at Highland to these three or so law

16   firms that Atlas uses, then there could be an agreement those

17   are cut out -- carved out.

18              But if there is -- if there are communications from

19   the six other custodians who are not lawyers to Rand entity --

20   or -- or these law firms --

21              MR. KEIFFER:  No, Your Honor --

22              THE COURT:  I -- I --

23              MR. KEIFFER:  Pardon me, Your Honor.  The law firms

24   aren't really the issue here.  Only the issue with regard to

25   seeking things through what is the shared server circumstance

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/03/25    Page 30 of 232    Page 337 of 1017    PageID 2800

66

1  in the email server.

2         An example may be that when there's an email that

3  comes in from Isaac to my client saying "You've got some

4  production requirements," and I'm on that email, I would

5  initially show up on that email, but that wouldn't be one that

6  would be as part of a shared services type of potential legal

7  discussions about current circumstances and telling me, "Oh, by

8  the way, we've been requested for this information under a

9  shared services agreement, you have X days to produce."

10        If, on the other hand, it's -- some years ago, back

11  when things were happening, not current, but years ago when

12  things were going on, that there was -- that there was an email

13  between my client's counsel and the debtor's counsel, there

14  would be the shared privilege or the joint privilege element

15  that would keep it at a different level, even though there may

16  be some other issues in regard to the shared services related

17  to privilege.

18        What we mentioned earlier -- and I think the

19  Committee's okay with this -- with the joint client privilege

20  is not affected by the process.  And so that -- the only thing

21  that's really, really out here that adds to the circumstance is

22  where emails show the three to five dot-com addresses.  That

23  they get set aside to go through a different -- go through a

24  process of review, you know, to see if they're attorney client

25  between myself and my client, or between previous counsels and

67

1   my clients, just as between them.

2           THE COURT:  All right.

3           MR. KEIFFER:  That's all we're really looking for in

4   that.

5           THE COURT:  Okay.

6           Ms. Montgomery, again, I'm giving you the last word

7   in rebuttal to any of this you want to say at this point.  But

8   I do hope you'll address one more thing as part of that, and

9   that is Mr. Dondero's arguments about Acis.  I just want to

10  clarify I understand where you stand on that.

11          MS. MONTGOMERY:  Yes, Your Honor.  With regard to Mr.

12  Dondero's arguments regarding Acis, we have no qualms with the

13  position that communications that are related to the Acis

14  litigation should be treated as outside counsel or highly

15  confidential -- at the highly confidential level, right?  That

16  makes sense, Your Honor, and we're not trying to bypass

17  discovery on behalf of any of the members of the Committee, or

18  anything of that nature.

19          Our concern with the objection was that's not what's

20  being asked for.  If Mr. Dondero had asked that communications

21  or documents that relate to the underlying litigation be not

22  provided to the members of the Committee, and held at only the

23  lawyers' eyes only, we wouldn't have had a problem with that.

24          Instead, what he's asking is that all documents not

25  be shared with one of the members of the Committee, and we

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/03/25   Page 339 of 1017   PageID 2802
Main Document   Page 63 of 232

68

1  think that's overly broad.  And, frankly, I'm unclear as to why

2  that would be necessary.

3       THE COURT:  Okay; all right.  Anything else you want

4  to say?

5       MS. MONTGOMERY:  Only to the extent that you have

6  questions about any of the arguments that they made, Your

7  Honor.  We don't want to take up more of your time than

8  necessary.

9       THE COURT:  All right.  Well, I'm going to carve out

10 three specific areas, and then I'll just give you the more

11 broad ruling.

12      With regard to CCS Medical and MGM, I think they have

13 shown themselves to be in a more unique -- a unique situation

14 in contrast to the others since we certainly don't have any

15 issues of shared in-house lawyers, shared IT, and whatnot.  We

16 just have the board connection to Mr. Dondero and Trey Parker

17 on CCS Medical, and with regard to Mr. Dondero and MGM.

18      So I do think these objectors should have the

19 independent ability to review before disclosure to the

20 Creditors' Committee, at their own cost, any information

21 pertaining to those two entities to make sure there's not any

22 privileged information they want to argue should be held back

23 or commercially sensitive information.

24      So, again, hopefully you all can amicably work out

25 the wording of that, but that is the concept of the ruling of

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Main Document    Page 340 of 1017    Page 323 of 722    PageID 2803

69

1   the Court.

2           Second, with regard to the Atlas/Rand parties, I

3   think that they should be entitled to a separate review of any

4   items that involve those dot-com law firm names to weigh in on

5   whether those are privileged.

6           And, of course, these are all subject to further

7   Court review and litigation before the Court if people cannot

8   agree on that.  I say that, or the third party neutral, I guess

9   that would hopefully be the first step before any of this comes

10  to the Court.

11          So that is the special category as to Atlas/Rand.

12          As far as the Dondero argument, I do like the

13  suggestion, Ms. Montgomery, that you made that if there is any

14  documentation relating to Acis litigation that is produced to

15  the Committee, that it should be considered in that first

16  category that it's highly confidential, so it's for

17  professional eyes only; Mr. Terry or Acis businesspeople cannot

18  see that.  But that it -- that's just a special category of

19  documents, any ESI that pertains to the Acis litigation,

20  wherever that litigation is pending, this Court, Guernsey,

21  State Court, wherever.

22          So all other objections are overruled except --

23  obviously I do think it's important to do, Ms. Montgomery, what

24  you said you would do, and make all of these objectors

25  expressly parties who are subject to the original agreed

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/03/25   Page 340 of 2702   341 of 1017   PageID 2804
Page 340 of 722

70

1  protective order.  Okay, so I think that gives them some level

2  of protection.  But I have been strongly persuaded in

3  everything I've heard today that there is a very strong chance

4  with regard to most of these entities that share legal counsel

5  with Highland, and share IT, and servers that we have had a

6  waiver of privilege, we have common interest privilege, joint

7  privilege, something of that regard to have impaired their

8  privilege arguments.  So I'm just throwing that out there for

9  the benefit of everyone as far as future disputes that there

10 might be.

11         All right, Ms. Montgomery, do you have any questions

12 about that ruling?

13         MS. MONTGOMERY:  (No audible response heard).

14         THE COURT:  No?  All right.

15         MS. MATSUMURA:  Your Honor, may I make one brief

16 comment?  This is Rebecca Matsumura for Highland CLO Funding.

17         THE COURT:  Yes.

18         MS. MATSUMURA:  I just wanted to clarify, we didn't

19 make it as an explicit part of our deal with the Committee that

20 we also be made party to the protective order.  But we'd also

21 ask for that relief, as well as, you know, such being given to

22 all of the objectors.

23         THE COURT:  Okay, the Court grants that request.

24         All right, Ms. Montgomery, anything else?

25         MS. MONTGOMERY:  (No audible response heard).

 1              THE COURT:  Shall we break now to let the Committee

 2   counsel and debtor counsel talk about their remaining

 3   unresolved issues?  How long of a break, Ms. Montgomery, do you

 4   think you will need?

 5              MS. MONTGOMERY:  (No audible response heard).

 6              THE COURT:  Okay.  I think you're on mute.

 7              MR. MORRIS:  Your Honor, this is John Morris from

 8   Pachulski on behalf of the debtor.

 9              THE COURT:  Oh, okay.

10              MR. MORRIS:  I just -- yeah, I just need to put some

11   -- a couple of bells and whistles, it will probably take me two

12   minutes to finish-up an email from Ms. Montgomery.  And then if

13   we could just -- I would suggest give us until -- 45 -- until I

14   guess 3:45 --

15              THE COURT:  All right.

16              MR. MORRIS:  -- local time.

17              THE COURT:  All right.  Well --

18              MR. MORRIS:  And then see -- hopefully we'll know --

19   at least narrow the issues, if not reached a complete

20   agreement, by that time.

21              THE COURT:  Okay.  I'll come back at 3:45.

22              UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

23              (Recess 3:23 p.m./Reconvene 3:46 p.m.)

24              THE COURT:  All right.  This is Judge Jernigan again.

25   I'm going back on the record in Highland Capital.  Do we have

72

 1   at least Mr. Morris and Ms. Montgomery available from their

 2   session?

 3            MS. MONTGOMERY:  Can you guys -- can you hear me,

 4   Your Honor?

 5            THE COURT:  I can hear you now; thank you.

 6            MS. MONTGOMERY:  Okay, I have no idea why it keeps

 7   muting, so my apologies for that.

 8            We just briefly met.  We need just a few more

 9   minutes, Your Honor, to run one issue past our client, but we

10   do believe we're going to have at least one matter outstanding

11   for the Court to consider hopefully, but we've managed to

12   resolve everything else.

13            THE COURT:  Okay.  So do you literally mean one

14   minute, or were you being general?  Do we need five minutes

15   or --

16            MS. MONTGOMERY:  I think five would be sufficient,

17   Your Honor.

18            THE COURT:  All right.  Well, I'll take another

19   break.  I'll be back in five minutes.

20            MS. MONTGOMERY:  My apologies.

21            THE COURT:  Okay; no problem.

22               (Recess 3:47 p.m./Reconvene 3:59 p.m.)

23            THE COURT:  All right.  This is Judge Jernigan, we're

24   back on the record in Highland after a break.

25            Mr. Morris, I see you there.  And do we have positive

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/03/25   Page 327 of 742   344 of 1017   PageID 2807

73

1  news to report?

2          MR. MORRIS:  I think we do.  We haven't completely

3  resolved every single issue, there is still one remaining one

4  that we'd like to present to the Court.

5          THE COURT:  Okay.

6          MR. MORRIS:  But we have otherwise, I think, reached

7  an agreement with respect to all other matters.

8          Ms. Montgomery, I don't know if you want to share

9  with the Court or -- I don't even know if Your Honor wants us

10  to present the agreement to her or we'll just submit it in a

11  proposed order later.

12          THE COURT:  Well, if you could just hit the

13  highlights so we have it on the record that we have an

14  agreement, and the pertinent points.

15          MR. MORRIS:  Okay.  So I'll just -- I'm just reading

16  from the email.

17          The Requested ESI will be securely delivered to

18  Meta-e.  Meta-e is a third-party service provider,

19  (indiscernible) the Committee.  So the requested ESI for the

20  nine custodians will be delivered to Meta-e.

21          Number two, the debtor will proceed with the

22  production of the 800,000 e-mails previously identified by use

23  of agreed search terms, subject to the Court's prior rulings

24  with respect to the third party objections, and subject further

25  to a privilege review using terms agreed by the parties, with

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4   Filed 06/03/25   Page 345 of 1017   PageID 2808
Main Document   Page 344 of 732

74

1   the resolution of any disputes on those privileged terms

2   resolved on an expedited basis in accordance with the

3   Committee's proposal in their motion to compel.  And that

4   really is just longhand, I guess, for a special master.

5           If and when the UCC wants to conduct further searches

6   on the requested e-mails, it will give the debtor with three

7   business days to consent to the search terms, with such consent

8   not to be unreasonably withheld.  In the absence of any

9   objection, the e-mails will be produced subject to the Court's

10  rulings on the third-party objections, as well as privilege

11  review previously described.  Search terms need not necessarily

12  be tied to formal requests for production, and may be provided

13  to the debtor on a rolling basis.

14          If debtor does not consent to search terms, it must

15  lodge an objection with the Committee.  The parties shall

16  confer in good faith and if no resolution is reached within two

17  business days, the debtor may seek judicial review on an

18  expedited basis.  It will be debtor's burden to establish that

19  the search terms are not reasonably designed to identify data

20  relevant to Estate Claims.  Initial caps because the "Estate

21  Claims" is from the governance settlement back in January.

22          All ESI containing search terms not subject to

23  objection will be produced to the Committee pending

24  determinations on those terms, if any, as to which there is

25  disagreement.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document Filed 06/03/25 Page 0632 of 2722 346 of 1017   PageID 2809

75

1          Next, Your Honor, taking into account the speed with

2   which the parties intend to proceed and the volume of

3   documents, all ESI produced that is not subject to the

4   privilege term search shall be produced on a "highly

5   confidential" basis under the protective order, and the debtor

6   shall respond within two business days to any designation

7   challenge by the UCC.  Documents that have been reviewed for

8   privilege will be categorized by debtor in the first instance

9   as either highly confidential, confidential, or not subject to

10  confidentiality.

11         Next, all persons or entities who objected to the

12  UCC's motion to compel or who are otherwise identified in the

13  debtor's motion for a protective order shall be deemed to be

14  parties to the court-ordered protective order that was entered

15  in January.

16         All documents from any custodian -- any of the non-

17  custodians that are related to or otherwise concern the pending

18  Acis litigation shall be marked "highly confidential" and not

19  subject to privilege challenge.

20         And finally, any disputes regarding the privilege

21  review process will be resolved by the special master and both

22  parties expressly reserve their rights thereto.

23         So there's one last issue --

24         THE COURT:  Can I -- before we --

25         MR. MORRIS:  Of course.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Filed 06/03/25    Page 346 of 272    347 of 1017    PageID 2810

76

 1          THE COURT:  -- go on and I forget, can we call this

 2  human being a third party neutral instead of a special master?

 3  And I'm -- I'm splitting hairs on that because there is a rule

 4  somewhere -- is it -- is it in 105 or is it a rule that says a

 5  bankruptcy judge can't appoint a special master?

 6          MR. MORRIS:  I don't know, but let's just call him or

 7  her a third party neutral.

 8          THE COURT:  Yeah, I'm not crazy, isn't that -- I

 9  think it's in one of the 9000 rules.

10          MR. MORRIS:  I'm sure you're right.,

11          THE COURT:  I'm not sure how different this third

12  party neutral is in substance from a special master, but it

13  will just make me feel better.

14          MR. MORRIS:  Yeah, it's just somebody who can --

15          THE COURT:  If the Fifth Circuit ever looks at it --

16          MR. MORRIS:  Yeah, it's just somebody who can help us

17  resolve either issues of creating these privilege terms or

18  resolving any other disputes so that we don't have to burden

19  the Court with such issues.

20          THE COURT:  Okay; very good.

21          Well, let's hear the unresolved issue then.

22          MR. MORRIS:  Okay.  So the last issue, Your Honor, is

23  as Your Honor knows -- Your Honor, I need to, if I may, just

24  provide some perspective here because these issues are very,

25  very important to the debtor.  I take personal responsibility

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/03/25   Page 348 of 1017   PageID 2811
Main Document   Page 347 of 2742

77

1   for all discovery matters in this case.  I've had the support

2   of the independent board, and of all of Highland's employees

3   who have worked very hard to get these documents in this case.

4         We produced -- really we were substantially complete

5   with all (indiscernible), and we did it with the following

6   principles in mind:  We wanted to, of course, eliminate or at

7   least limit any potential liability exposure to the debtor, and

8   that's what prompted us to make the motion to compel.  And as

9   Your Honor saw, there were eight separate objections brought by

10  40 or 50 different parties, and it's exactly for that reason

11  that we were seeking the ability to do the review initially

12  because we have -- you know, we may have wound up disagreeing

13  with some third parties as to the scope of their obligations,

14  but we knew there were obligations that existed and the board

15  was very specific in instructing me to make sure that we

16  (indiscernible) liability (indiscernible).  So I'm really

17  pleased that the objecting party stepped up, and that the Court

18  issued its rulings.  But that was really one of our

19  (indiscernible) principles.

20        Another one is to make sure that we protect the

21  privilege to non-estate claims.  We negotiated very

22  (indiscernible) term sheet with the Committee.  We gave the

23  Committee standing to pursue estate claims.  We gave the

24  Committee a shared privilege to all privileged communications

25  of estate claims.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 54   Filed 06/03/25   Page 349 of 1017   PageID 2812
Main Document   Page 633 of 2722

78

1        But what we did not do, what we did not agree to was

2   to waive the privilege with respect to non-estate claims.   So

3   that's the second principle that we've been trying to protect

4   because the board and (indiscernible) we have an obligation to

5   the estate and to the Committee, so we're trying to protect the

6   estate's privilege for non-estate claims.

7        And the third thing is just to make sure this process

8   runs as efficiently as it could.   You know, I don't know that

9   going from 800,000 emails to eight million is -- can be

10  categorized as a success, but that's what the Committee's

11  wanted to do, and the board has been very specific not to be

12  obstructionist here, but just to be guided by the principles

13  that I've articulated.   And that's kind of how we got here.

14       And so the last issue here, Your Honor, touches on

15  the principles that I just described, and that is the nine

16  custodians at issue, three of them are lawyers:   Scott

17  Ellington, Isaac Leventon, and Mr. Surgent.   They're all

18  lawyers, they're all licensed to practice law, they all give

19  legal advice, they give legal advice to the board, they give

20  legal advice on countless issues that are completely unrelated

21  to estate claims for which the Committee does not have standing

22  to pursue, and for which the Committee does not have a shared

23  privilege.

24       So the third issue, Your Honor, is just to say that

25  for those three out of nine custodians, we actually do a real

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/06/25   Page 350 of 1017   PageID 2813

79

1  privilege review on a document-by-document basis.

2         Now I'll just leave it at that, that's what the issue

3  is.  And the Committee, I think -- I'll let them speak for

4  itself.

5         THE COURT:  Okay.  I -- I didn't know there was any

6  disagreement about debtor lawyers or debtor contract lawyers

7  doing a privilege review.  I thought it was just a -- you know,

8  the two-tier, first a relevance review and then a privilege

9  review.

10         MR. MORRIS:  It's in our objection, Your Honor.

11         THE COURT:  Pardon?

12         MR. MORRIS:  We did raise it -- we did raise the

13  issue in our objection.

14         THE COURT:  Oh.

15         MR. MORRIS:  This isn't the first time I --

16         THE COURT:  Well, no, no, no, no, I thought --

17         MR. MORRIS:  Maybe I'm mistaken.

18         THE COURT:  I thought it was already part of the

19  UCC's proposed protocol that there be a privilege review by

20  debtor's lawyers.

21         MR. MORRIS:  That's right, and that's just using kind

22  of garden variety search terms.  What I'm saying is that when

23  it comes to -- and that's fine to take the six non-lawyers,

24  that's fine for Mr. Dondero, that's fine, you know, for Mr.

25  Waterhouse, and for the other non-lawyers.  But for a lawyer,

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/03/25   Page 334 of 2722   Page 351 of 1017   PageID 2814

80

 1  Your Honor, I think -- I think -- I mean this is of such vital

 2  importance, and is -- almost everything they do is -- not

 3  everything; I overstated.  Sometimes they're engaged in

 4  business advice.  But for the most part, they're practicing

 5  lawyers.

 6          And I think we just need a heightened standard of

 7  protection for those individuals, and it's just the three of

 8  the nine.  I mean it's for three of the nine who are licensed

 9  lawyers, and we're asking for a wholesale privilege review for

10  those three people, not just searching to see if their email

11  says they privilege or work product, you know, there are other

12  search terms that may come up.

13          THE COURT:  Okay.  Ms. Montgomery, elaborate on where

14  the difference is on your proposed procedure versus the

15  debtor's, all right?

16          MS. MONTGOMERY:  Yes, Your Honor.

17          The proposal that is before the Court, you're

18  correct, does provide for a privilege review.  We've never

19  argued that there shouldn't be a privilege review.  We

20  understand that the creditors stand only in the shoes of the

21  debtor with regard to the estate claims, and not more broadly.

22          The dispute really here, Your Honor, is on the nature

23  of the search when it comes down to these three custodians that

24  are attorneys.  And Mr. Morris is suggesting that all of the

25  documents -- every document that has a custodial file, is in

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document    Filed 06/06/25    Page 353 of 2732    Page 352 of 1017    PageID 2815

81

1  their custodian file should be touched by the debtor so that

2  they could look at it and determine whether or not it is

3  privileged.  And if it is privileged, whether or not it's

4  related to an estate claim.

5          And our position, Your Honor, is that that's

6  unnecessary, and that it's going to cost a lot of money, and

7  also slow down the review process.

8          And the basis, Your Honor, for our position is that

9  this sort of assumption stands on the ground that every

10 document a lawyer touches can be -- you know, is automatically

11 privileged.  And as a general rule, we all know that that's not

12 the case.  Not every document a lawyer touches is protectable.

13 And that's particularly true with regard to in-house counsel.

14 Their roles by their nature involve providing both legal advice

15 and business advice, and only the legal advice is protectable.

16         Several courts have held that the presumption might -

17 - regarding privilege that might exist for law firm counsel is

18 not the same presumption that should be held with regard to in-

19 house counsel.  In fact, the presumption should be that the

20 advice is business advice, unless it's establishing legal

21 advice.

22         And of the three custodians that the debtor

23 discussed, two of them -- they're all, in fact, licensed

24 attorneys.  But one of them is not in the legal department, he

25 is acting as the head of compliance.  And as you know, the case

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 08/08/25   Page 353 of 1017   PageID 2816

82

 1  law on compliance is fairly well-settled that there isn't a

 2  presumption of privilege with regard to the compliance issues.

 3         And so as a result, we think it's most appropriate to

 4  use robust privilege terms.  You know, think of things like

 5  privilege, lawyer, attorney-client, work product, etc., and

 6  we've proposed a list of those terms to the debtor, and we're

 7  willing to continue to work that out with this third party

 8  neutral.

 9         But we don't believe that it's appropriate for every

10  single document that is related to these three custodians be

11  reviewed for privilege purposes, that's just excessive and

12  expensive.

13         MR. MORRIS:  Your Honor, if I may?

14         THE COURT:  You may.

15         MR. MORRIS:  I dare say that not ten percent of what

16  I write has the word "privilege," "attorney-client," "work

17  product" in my emails.  That is -- you will never be able to

18  create a list that's sufficient to protect a lawyer from

19  producing privileged communications.

20         There's no dispute here that the Committee's rights

21  extend no further than estate claims.  And I might feel

22  differently here, Your Honor, and maybe there's some wiggle

23  room here, but they can create six terms that are actually

24  designed to elicit information relating to estate claims,

25  right?  And we've asked them to do that for many months.  And

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/03/25   Page 357 of 722   354 of 1017   PageID 2817

83

1  if they're -- if I thought that they were actually looking for
2  information that related to estate claims for which the debtor
3  has agreed the Committee would share the privilege, my concerns
4  would be much more modest in scope.

5           But here, you have individuals who have been acting
6  as lawyers for five years.  To expect them to write the word
7  "lawyer," or "privilege," or "work product" in every email, or
8  to suggest that if they haven't done that, then it's fair game.
9  Even if you have no idea if it relates to an estate claim is
10 just -- it's just (indiscernible).  It's just -- it's not
11 right.

12          They're getting the emails of six custodians.
13 They're getting the emails using the search terms with the six
14 custodians.  It is costly, it will slow it down for three of
15 the nine people, but that's because they haven't given us --
16 they haven't given us search terms that are designed to elicit
17 estate claims.  They're just -- they're asking for everything.
18 And I've never ever seen anybody -- any court allow, you know,
19 the unfettered access subject to only search terms that may or
20 may not be sufficient.  I just -- we feel very, very strongly
21 about this.  They're getting six out of nine custodians, and
22 we're not even saying that they won't get the lawyers in these
23 three custodians' emails.  We'll give them whatever relates to
24 estate claims.

25          MS. MONTGOMERY:  Very briefly.  I think what Mr.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 06338 of 2702   355 of 1017   PageID 2818

84

1   Morris has raised is dealt with by virtue of the agreement that

2   we just told you about, which is that we're going to be using

3   search terms that are aimed at identifying estate claims.  And

4   that the review and the production process to us would be only

5   of the documents that contained that search term, and the

6   privilege would be for the subset of documents that contain

7   that search term and also contain a privilege term.

8          And it's not limited to just privilege, Your Honor.

9   There are things in there like "lawsuit," or "litigation," or

10  "claim," or -- and we're open to continue to discuss those.

11         Like I said, we only object to a wholesale review of

12  every document, we don't really think that that's necessary.

13         MR. MORRIS:  We're -- we're -- and I just want to

14  clarify, we're not talking about reviewing every document.

15  We're only talking about the documents that would come up using

16  whatever search terms the Committee devises.

17         So by our count, there's between one point five and

18  two million emails from the three lawyers.  We're not

19  suggesting that we would look at every one of them, there would

20  be no need to do that.

21         But what we would do is review the emails that are

22  the subject of search terms to make sure there (indiscernible).

23         THE COURT:  Okay.  Let me -- at the risk of repeating

24  myself -- go through the explicit protocol the UCC had in its

25  pleading:

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 65 of 272   Page 356 of 1017   PageID 2819

85

1        Number one, all files of the nine custodians,

2   including those three lawyers, would be provided over to the E-

3   discovery vendor to put in a repository.

4        Then you come up with this robust list of privilege

5   terms to ferret out what might be privileged.  You try to agree

6   on that robust set of privilege terms.  If you can't, you get

7   the third party neutral to work out your disagreement,

8   hopefully.

9        So you get that resolved, and the search protocol is

10  executed, and all documents, not including one of those

11  robustly created privilege terms, get produced to the Committee

12  subject to that agreed protective order from January, 2020

13  where there's carve out and, you know, ability to pull back,

14  right, if there's inadvertent production of privilege, right?

15  That's an essential term, right?  If something accidentally

16  gets produced that shouldn't, then there's always a mechanism

17  to pull it back.

18       And then the debtor's contract attorneys would review

19  all of the held back documents, the documents held back, you

20  know, because the privilege terms were triggered, and they were

21  held back, to determine if they are really privileged.  If not,

22  then they get produced.

23       But if you decide they are, in fact, privilege, then

24  you create a privilege log, and that gets shared with the

25  Committee.  And if there are disputes about that, then you go

 1  to the third party neutral to resolve those.

 2          Okay, is there anything I misstated about what the

 3  Committee has proposed?

 4                  (No audible response heard)

 5          THE COURT:  Is there anything I've misstated?  Ms.

 6  Montgomery's shaking her head no.

 7              MS. MONTGOMERY:  No, Your Honor, I don't believe so.

 8              MR. MORRIS:  So --

 9          THE COURT:  So I really am -- if that's the case, I'm

10  not getting, Mr. Morris, why --

11              MR. MORRIS:  Let me try one more time, because --

12          THE COURT:  You're going to get your chance to review

13  stuff that's --

14              MR. MORRIS:  No, but -- but we're not, and here's --

15  here's the gap in what you have just described.  Everything you

16  have just described is perfectly fine for the six non-lawyers.

17          Our concern is if you don't have -- if -- there's no

18  question that the lawyers have engaged in the provision of

19  legal services, there's no question that the provision of legal

20  services extended beyond estate claims.

21          And the concern is no matter how hard you devise

22  search terms, and this is just a matter of practice in my

23  experience, you're always going to get documents that don't get

24  captured by the search terms.

25          And so what you've described works very well if the

Case 19-34054-sgj11  Doc 2062  Filed 03/18/21  Entered 03/18/21 20:59:39  Desc
Case 3:25-cv-02072-S  Document 15-4 Filed 04/04/25  Page 358 of 1017  PageID 2821

87

1  document -- if the search terms actually work.

2          What our concern is for lawyers only, that that's not

3  sufficient.  That we will lose too many documents that will not

4  be captured using the search terms for which, you know,

5  clawback -- clawback issues are just -- we're talking about

6  millions of documents that are going to be reviewed and

7  produced.  Under these circumstances, more than any other, Your

8  Honor, these lawyers privileged communications that do not

9  relate to estate claims should be subject to protection.  They

10  should be subject to more protection than non-lawyers are

11  getting.

12          THE COURT:  The clawback --

13          MR. MORRIS:  And given --

14          THE COURT:  The clawback isn't enough.  The clawback

15  isn't enough.

16          MR. MORRIS:  It's not enough.  You can't unring the

17  bell, Your Honor.

18          And given the massive amount of information that the

19  Committee is seeking that we are willing to provide, frankly, I

20  don't think it's unreasonable to say, yeah, no, we're going to

21  treat lawyers like lawyers.

22          THE COURT:  So balance is you think, you know, those

23  lawyer eyes that can't unsee what they see, okay, if they get

24  it, yeah, you can claw it back, but they can't unsee it.  And

25  so somehow, it's going to, you know, be harmful.

1          But the flip side of that is -- well --

2          MR. MORRIS:  I did try to create a little more --

3          THE COURT:  A great delay and expense, right, for you

4    all to first go through the gazillion documents, and then, you

5    know, there's a privilege log that might be --

6          MR. MORRIS:  I --

7          THE COURT:  -- much larger than --

8          MR. MORRIS:  I did --

9          THE COURT:  Go ahead.

10         MR. MORRIS:  I did try to create a little space for

11   Your Honor, a little comfort zone, and that is that the

12   Committee actually use search terms that was designed to get

13   communications related to estate claims, right?  Because these

14   lawyers have countless emails, for example, relating to the

15   board's deliberations on settlement with UBS, or with the

16   Redeemer Committee, or with Acis, these things have been going

17   on for months.  That shouldn't be subject to clawback, they

18   should never be produced.

19         And so if there's -- you know, if the Committee were

20   to devise actual search terms that were intended to get estate

21   claim information, like I said before, that may make more --

22   that might provide a little bit more comfort.  But to allow

23   them to just use, you know, regular search terms on those

24   emails when you have non-estate claim information, and they

25   have -- I'm telling Your Honor, just countless emails over the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 360 of 1017   PageID 2823

89

1  last six months with the board, responding to board inquiries,

2  responding to claims dispute resolutions, responding to all

3  kinds of things.

4         You know, at a minimum, I would want -- I would want

5  it to stop as of the petition date.  But I think -- but I think

6  even beyond that, they're lawyers, they're licensed

7  practitioners who are rendering legal advice, and they're doing

8  so in the kind of context that have nothing to do with estate

9  claims.  And you have six other custodians, six, with whom the

10  Committee's proposal is completely acceptable.

11         THE COURT:  Well, this is a hard one.  This is a very

12  hard one, Ms. Montgomery.  What -- I mean what do you have to

13  offer me other than delay/expense?  And that's -- you know,

14  those are not small considerations, but that's really what it

15  boils down to, right?

16         MS. MONTGOMERY:  Well, there's delay, there's

17  expense, and then there's the protections that are already put

18  forth in the protective order, Your Honor, which we think are,

19  as we've said already today, robust.

20         We understand their concern with regard to clawback.

21  They have an attorneys' eyes only highly confidential

22  designation that they can use, and that will be used under the

23  agreement we've reached with regard to any document that they

24  haven't looked at.  So those will only be going to outside

25  counsel and the Committee's professionals.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 1-6 Filed 04/16/25 Page 354 of 372   361 of 1017   PageID 2824

90

1          And I just don't know -- you know, I think the

2    protections are there, and that the cost, you know, when

3    balanced against what we're really asking them to do and the

4    protections that are in place for them, just -- they don't --

5    they don't balance out, Your Honor.

6          MR. MORRIS:  Your Honor, with all due respect, it's a

7    little -- it's a little difficult for me to listen to cost

8    being a concern when you have a Committee who's asked for the

9    emails of nine custodians over a five-year period.  Actually

10   they've asked for ESI, the eight million number is just emails.

11   So it's not -- it's emails and attachments.

12         So the notion that cost is now an impediment while

13   we've gone from 800,000 emails to eight million doesn't

14   (indiscernible) with me.

15         THE COURT:  All right.  Well, again, I don't find

16   this to be at all easy.  But I am going to sustain the debtor's

17   objection on this, if that's the right way to say it.  I'm

18   going to accept the position, and order that these three

19   custodians, Scott Ellington, Isaac Leventon, and Tom Surgent,

20   that before any production, those three individuals' files can

21   go through, will go through separate review by the debtor.  So

22   they're carved out of the rest of these protocols, and

23   presumably as promptly as possible, there will be rolling

24   production.  Debtor will produce non-privileged files and will

25   create a privilege log.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/05/25   Page 362 of 1017   PageID 2825
Main Document   Page 345 of 732

91

1          And if there are disputes about that privilege log,

2    either the third party neutral will work them out or I guess

3    I'm the ultimate arbiter, if need be.  I don't know exactly how

4    you have those mechanics.  Maybe you don't have the judge

5    involved; I don't know.

6          Why don't you tell me so I can know whether to be

7    expecting a request to weigh in.  Do you have it set up where

8    the third party neutral's the final say on things like whether

9    something belongs on a privilege log or if it's really

10   privileged?

11          MR. MORRIS:  I don't think we've addressed that, Your

12   Honor.

13          THE COURT:  Okay.

14          MR. MORRIS:  But I'm sure we can --

15          MS. MONTGOMERY:  I think it may be already be covered

16   in the protective order, Your Honor; I'm just checking to see.

17          THE COURT:  Okay.  And I just want to say that I

18   understand very well from my months working on the Acis

19   bankruptcy that these in-house lawyers -- I'm inclined to say

20   they wear many hats.  I don't know if that's the right way -- I

21   had Mr. Ellington on the witness stand once; I had Mr. Leventon

22   on the witness stand many times.  And I will tell you the

23   Court's impression is that they are both businesspeople, as

24   well as lawyers.  And I never had Surgent, the compliance

25   fellow, in here.

1          But I'm just letting you know I hope there aren't,

2   you know, umpteen disputes about things held back as privilege.

3   The way I view it, there may be things that are privileged, and

4   things that absolutely were not -- are not.  I know we've got

5   privilege related to estate causes of action versus attorney-

6   client privilege or work product that doesn't relate to causes

7   of action.  And I'm already bracing myself for how hard is that

8   going to be to ferret out is it related to an estate cause of

9   action or not.

10         I'm really -- while I feel good that we've worked out

11  a lot today, I am really bracing myself because I don't think

12  this is the last discovery dispute I'm going to see.  I just

13  don't.  We have a lot of things that kind of sound good when

14  you say them fast, but just -- you know my view.  Well, you

15  know my views.  I've seen two of these in-house lawyers on the

16  witness stand before.  And, again, part businessperson, part

17  lawyer, and I know what the case law says.  If it's really a

18  communication that is about rendering legal advice, that's one

19  thing.

20         But if it has nothing to do with that, or little to

21  do with that, it's mainly in their role as a business

22  consultant, or other capacities, there might not be a

23  privilege.

24         MR. PATEL:  Your Honor, this is --

25         THE COURT:  Go ahead.

93

 1              MS. PATEL:  Your Honor, this is Rakhee Patel.  If I

 2    can briefly be heard on a point of clarification on the

 3    agreement.

 4              THE COURT:  Well, okay, what are you talking about on

 5    the agreement?

 6              MS. PATEL:  Well, Your Honor, what I heard as part of

 7    the agreement reached between the Committee and the debtor is

 8    that all Acis information will be designated as highly

 9    confidential determination, and certainly --

10              THE COURT:  Okay.  Acis litigation.  If it's related

11    to Acis litigation.  If they misspoke, that's what I ordered

12    earlier.  You didn't misspeak, right?

13              MR. MORRIS:  I don't believe so, Your Honor.  I think

14    that's --

15              THE COURT:  Okay.

16              MR. MORRIS:  That's what was --

17              THE COURT:  Okay.

18              MR. MORRIS:  I think it was relating to or concerning

19    the Acis litigation matters.

20              THE COURT:  Is that --

21              MS. PATEL:  Understood, Your Honor.  Yeah, and I just

22    wanted to clarify because what I heard, and apologies if I

23    caught a bit of it, but is that Acis litigation will be

24    designated as highly confidential, and that it is not subject

25    to further review.  And I wrote that down because I wanted to

002117
APP. 1341

1  just, again, clarify what "not subject to further review"

2  means.

3          My concerns, Your Honor, are kind of twofold:

4          Number one is that certain documentation, as Your

5  Honor just referenced, and you'll recall Mr. Ellington and Mr.

6  Leventon testify during the Acis bankruptcy case that during

7  the involuntary and then during the case in chief, were

8  generally testifying as fact witnesses.  And my concern is is

9  that there are other things, for example, in Acis's bankruptcy

10  case, the original schedules were signed by Mr. Leventon.

11          THE COURT:  Right.

12          MS. PATEL:  Well, some of these are Acis's documents

13  or Acis's information, and Acis is the holder of the privilege

14  on those.

15          So to say that they're highly confidential and

16  they're privileged, that they're -- it's our privilege, I

17  should be allowed to assert my own privilege with respect to

18  those documents, and waive my own privilege -- my client's

19  privilege with respect to that even though --

20          THE COURT:  Okay.  Can I cut this off?  I -- I --

21  what I believe is the deal, someone correct me if I'm wrong, is

22  that with regard to documents produced, ESI produced to the

23  Committee, if it pertains to Acis litigation matters, okay,

24  litigation between Acis and any Highland -- Highland or

25  Highland affiliate or Highland insiders, that is going to be

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/06/25    Page 366 of 1017    PageID 2829
Main Document    Page 365 of 732

95

1  designated as highly confidential, meaning only professionals

2  for the Committee get to see it, not Committee

3  members/businesspeople.  That's the whole agreement with regard

4  to Acis, right?

5          MR. MORRIS:  Yes.

6          MS. PATEL:  And that was going to be my only point,

7  Your Honor, was that we can -- Acis is obviously going to be

8  able to go get it if necessary.  In other words, we -- this

9  isn't about prejudice to Acis's rights to even get it because

10 it is our privileged information anyway; or, number two, we can

11 get it in the ordinary discovery process.

12         Obviously we've got a claim objection that may go to

13 trial, and we may need to seek these documents separately.

14         THE COURT:  Right.  That -- this doesn't mean -- this

15 does not mean Acis never gets to see it.

16         MS. PATEL:  Okay.

17         THE COURT:  If Acis requests something in discovery

18 with regard to the claim objection or other litigation, then

19 that's subject to a whole different agreement or order, right,

20 Mr. Morris?

21         MR. MORRIS:  Yes.  Yes, Your Honor.

22         THE COURT:  Okay.

23         MS. PATEL:  Thank you, Your Honor.

24         THE COURT:  All right.  Well, I -- I kind of lost my

25 train of thought, but I guess I'm trying to signal, for

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Filed 06/06/25 of 2722 367 of 1017   PageID 2830
Main Document   Page 635 of 2722

96

1  whatever it's worth, that if there are disputes down the road

2  regarding files from these three individuals -- Ellington,

3  Leventon, Surgent -- and the debtor is saying they're

4  privileged, you know, and not related to estate causes of

5  action, and the Committee is disagreeing, be prepared to make

6  your best argument.  Because I am expecting that some

7  communications, even if they're unrelated to estate causes of

8  action, may very well be in the nature of business type

9  communications because I've seen with my two eyes that they

10  fulfill different roles in that organization.

11        So I hope we don't get bogged down because of my

12  ruling on this today.

13        The other thing I wanted you to kind of keep dangling

14  in your mind is as I was reading the pleadings, preparing for

15  this afternoon, I was very much fixated on -- we had this

16  protocol and a compromise worked out with the Committee way

17  back, at the end of last year, finalized in January and, you

18  know, the agreement was that the Committee would have standing

19  to pursue the estate causes of action, and would get privileged

20  documents related -- you know, communications related to these

21  estate causes of action.  And that was to avoid a Chapter 11

22  trustee, which we all know under case law, Weintraub would

23  inherit all privileges, all attorney-client privilege

24  information.

25        So I guess what I'm getting at is I thought -- I

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/05/25   Page 251 of 272   Main Document   Page 368 of 1017   PageID 2831

97

 1  thought we had an agreement last January, and that we were

 2  going to be smoothly going down this road of document

 3  production.  And here we are in mid-July, and we're having this

 4  fight.  That doesn't make me very happy because I was happy not

 5  to appoint a Chapter 11 trustee last January because I thought,

 6  okay, we have this major compromise with the Committee, they're

 7  going to go forward, and evaluate estate causes of action,

 8  they're going to get documents that are subject to attorney-

 9  client privilege.  And, you know, it just -- again, I said

10  earlier I didn't want to get into the he said and she said, but

11  the facts speak for themselves that were in July, and just now

12  finalizing this protocol.

13          And I guess the one more thing I will say on that is

14  I know I gave a 90-day deadline for the Committee to either

15  bring causes of action against CLO Holdco -- and I forget the

16  other entity -- or the money in the registry of the Court would

17  be released.

18          I didn't know we still had so far to go with document

19  production when I ruled that.  So if someone asks for an

20  extension after today, I think I'd probably be inclined to give

21  an extension.  Not a huge, huge, huge extension, but I was a

22  little bit -- not appreciating where the Committee was with

23  regard to getting documents when I said that that day.

24          All right.  So I'll be looking for your form of

25  order, hopefully in the next day or two on this.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 352 of 2722 Page 369 of 1017   PageID 2832

98

```
 1              Is there anything further on this topic?  Or shall we

 2   go to the Acis status conference?

 3              MR. MORRIS:  Your Honor, just a couple of things.

 4              THE COURT:  Yes?

 5              MR. MORRIS:  Number one, I do want to give the Court

 6   some comfort of knowing that while Mr. Surgent is the Chief

 7   Compliance Officer, he's also the Deputy General Counsel at

 8   Highland, so he is -- he is (indiscernible).

 9              Number two, as you may have seen from our papers, the

10   board considered three outside vendors to do the document

11   review, and ultimately selected one, and we had prepared a

12   stipulation.  The Court should expect to see, hopefully in the

13   next day or two, a stipulation pursuant to which the debtor

14   seeks its authority to retain a third party vendor named Robert

15   Hass (phonetic) to assist with the document review.  This has

16   all been discussed with the Committee, the Committee has

17   consented to the theory of the retention, but I would ask them

18   to go back perhaps and look at the stipulation so we can get

19   that signed up and get people to work as quickly as possible.

20              THE COURT:  Okay, very good.

21              Now what about the third party neutral, do you have

22   that person identified?

23              MR. MORRIS:  No, we haven't talked about that.  I'm

24   sure we can get that resolved as we're discussing the form of

25   order.
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/03/25   Page 353 of 742   370 of 1017   PageID 2833

99

1              THE COURT:  Okay, very good.

2              All right, well, if there's nothing further, again,

3    let's roll to Acis.

4              And I guess actually -- maybe we should briefly talk

5    about mediation, where things stand, in case there are people

6    on the call who don't want to stick around for the Acis

7    discussion.  I don't know, maybe everyone wants to hear the

8    whole hearing today.

9              So let me just tell you where things stand:  We have

10   -- my courtroom deputy reached out to you all late last week,

11   and let you all know that both Sylvia Mayer from Houston, as

12   well as retired Bankruptcy Judge Allan Gropper, are interested

13   in being co-mediators on this, and that was subject to doing

14   their conflicts review.

15             And then the next thing after that, they were going

16   to reach out to the lawyer contacts, and give their, quote,

17   "initial disclosures."

18             I emailed about 9:30 last night with Sylvia Mayer,

19   and she was making sure she had all the right contact people.

20   I gave her lawyers for the debtor, for the Committee, for Acis,

21   for UBS, for Dondero, and the Redeemer Committee -- Crusader

22   Redeemer Committee.

23             Right now, it's my view that that is the universe of

24   parties to participate, although I can see the co-mediators

25   rolling in more people.  Like someone suggested Mark Okada, and

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Document Filed Page 354 of 2702 Main Document Page 371 of 1017 PageID 2834

100

1  -- I think probably it would be premature in the beginning, but
2  maybe he'll be rolled in.  You know, if the UBS proof of claim
3  is resolved in mediation, and the Acis -- and/or the Acis proof
4  of claim are resolved in mediation, and then -- you know, I
5  think those are kind of the highest priorities here of the
6  mediation, then certainly he might be brought in, but right
7  now, I'm not going to order that.

8       So about 9:30 last night, I sent Sylvia Mayer the
9  lawyer people to email, the co-mediators' disclosures.  And she
10 was going to be in a mediation all day today, but I would
11 suspect probably tonight, if y'all haven't gotten anything yet
12 -- I haven't looked at my email during this hearing, but I
13 would suspect maybe tonight or tomorrow you're probably going
14 to get that communication from Sylvia Mayer with whatever their
15 disclosures are for the parties to consider.  And, you know,
16 assuming everyone gets comfortable with that, then the
17 administrative people at the triple A, the American Arbitration
18 Association, we're going to get going with, you know, the
19 administrative side of this, and you all would talk about
20 scheduling.

21      So all this to say I hope here in the next few days
22 there is an active effort to get things scheduled and get the
23 dialogue going with those co-mediators.

24      The only other thing I would add is I don't
25 necessarily anticipate that Sylvia Mayer would mediate the,

1  say, Acis proof of claim, and Judge Gropper would mediate, say,

2  the UBS proof of claim.  I think -- I don't think it

3  necessarily breaks down that way.  I think you would probably

4  just have co-mediators doing the whole ball of wax here

5  because, among other things, the plan treatment discussion is

6  probably going to roll into proof of claim allowance

7  discussions.

8          So that is, I think, what this would shape up to be.

9  That you would have co-mediators working on all of this.

10         So any questions at this point?

11              (No audible response heard)

12         THE COURT:  Again, I know -- if you haven't gotten an

13  email by the end of today, it's surely going to be in the next

14  day or two that you'll get their email reaching out about their

15  disclosures.  Okay?

16         UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

17         MR. CLUBOK:  Your Honor --

18         MS. MASCHERIN:  Your Honor, this is Terri Mascherin

19  on behalf of the Redeemer Committee.

20         Just a quick question:  Did I hear correctly that you

21  have given the mediators our contact information?  Because we

22  have not been copied on the email -- the emails that have gone

23  around.

24         In fact, we haven't been copied on any of the emails

25  that have gone around about the mediation.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 373 of 722
Case 3:25-cv-02072-S    Document 15-4    Filed 06/03/25    Page 356 of 722    373 of 1017    PageID 2836

102

 1           THE COURT:  Okay; thank you, Ms. Mascherin.

 2           Let me make sure you're completely in the loop.  So I

 3   did have my courtroom deputy reach out to debtor, Committee,

 4   Dondero, UBS, and Acis last week, their counsel, regarding the

 5   interest of both Sylvia Mayer and former Judge Gropper.

 6           And at the time she did that, I was thinking since

 7   the Redeemer Committee had an agreement with the debtor, you

 8   all have announced at the last hearing or two you had an

 9   agreement that perhaps you all would not be participating.

10           And I actually did have some lawyers respond to my

11   courtroom deputy that, no, we think they very much need to be

12   involved.

13           So that was just a missed step, I would say, on my

14   part, not having that email go out to you originally.  So I

15   will make sure when we get out of this hearing that my

16   courtroom deputy forwards to you the little bit of email

17   traffic there was.  There were not a lot of emails, but maybe

18   her email and three or four responses of other lawyers.

19           So the co-mediators have been given your name.  If

20   others, besides you, want to be on her contact list, you know,

21   certainly Mr. Hankin or Mr. Platt, you can let her know when

22   you get the initial -- her, Sylvia Mayer, know when you get the

23   initial email from her.  But you're on the list now, and I --

24   again, it was just a mistaken belief on my part that maybe you

25   wouldn't be part of the mediation since your claim had been

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 10/06/25   Page 357 of 782   374 of 1017   PageID 2837

103

1  agreed to with the debtor, so --

2          MS. MASCHERIN:  Okay.  I appreciate it, and thank you

3  for clarifying, Your Honor.

4          THE COURT:  Okay; thank you.

5          MR. CLUBOK:  Your Honor --

6          THE COURT:  All right --

7          MR. CLUBOK:  Your Honor, this is -- Your Honor, may I

8  speak briefly?

9          THE COURT:  Certainly.

10          MR. CLUBOK:  Thank you, Your Honor.  This is Andrew

11  Clubok on behalf of UBS.

12          And I apologize if you did not see the email that we

13  sent to Ms. Ellison this morning.  But we -- our position is we

14  very much are fine with Crusader, or frankly any other major

15  creditor, involving the overall mediation.

16          But the issue of reaching an overall plan, the so

17  call grand bargain that Mr. (indiscernible) talked about.  What

18  we don't -- and we just want to be sure that no one takes it

19  that you're ordering this or thinks it's appropriate, because

20  in the first instance to have a productive discussion on our

21  specific claim with the debtor, it's not going to be helpful

22  and productive -- in fact, it would be counterproductive -- to

23  have other creditors in our class sitting in listening to that,

24  weighing in.  You know, obviously their position will all be

25  make it as low as possible.  It's not helpful to have a whole

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 06/03/25   Page 375 of 1017   PageID 2838
Main Document   Page 358 of 732

104

 1  nother set of lawyers doing that, and I just want to make sure

 2  people don't come away thinking that you've ordered -- I hope

 3  you have not ordered that, and if you have, I would like to

 4  speak to that.

 5        But just like we wouldn't be sitting in -- we were

 6  not permitted to sit in when the debtor spoke with Crusader

 7  about setting their claim, we're not -- we have not been part

 8  of the discussion with Acis and if the debtors have discussions

 9  -- with Acis.  The other parties, we were actually told before

10  they would not be involved in (indiscernible) first instance.

11        There is a time -- an appropriate time for a creditor

12  to object, but we don't even know what the settlement is with

13  Redeemer.  Once we hear it, we may have an objection; hopefully

14  not.  Hopefully it will be perfectly fine.

15        And we understand that once we reach an agreement

16  with the debtor, that's subject to an objection process, and

17  everyone is going to have a chance to weigh in.  It's just not,

18  we think, going to be effective, and I set this out in an email

19  that I sent earlier but -- just today.  And so I just want to

20  make sure that, you know, people aren't taking from what you

21  said that Crusader is just going to be able to sit in our

22  (indiscernible), Acis does or does not (indiscernible)

23  specifically their claim, etc.

24        THE COURT:  All right.  Well, let me tell you how I

25  usually do this, and how I expect to do it here.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document Filed Page 06/25 of 2722 376 of 1017    PageID 2839

105

1          Once everything is nailed down with the mediators,

2     and I say that because they're going to send you their

3     disclosures, and hopefully everybody's going to be fine with

4     everything.  When I get the green light that, yes, we're going

5     to go forward, I have a standard form of mediation order.  And

6     it pretty much gives discretion to the mediators to run this

7     the way they want to.  And, for example, if they want

8     participants to submit a white paper, you know, no more than 25

9     pages in length, or whatever, you know, the mediators can

10    instruct that.

11         And it has all of the usual bells and whistles about

12    confidentiality that nobody can subpoena the mediators, or

13    compel them to testify.  And I'm not going to talk to them

14    about the substance.

15         I just want a report, either things settled or not.

16    People negotiated in good faith or not.

17         And so I don't think there will be any ambiguity

18    about the rules of the road, it's just what I think is a fairly

19    normal mediation order.

20         And, therefore, you know, I think the confidentiality

21    that you're concerned about will be built into that order, and

22    will be kind of the usual -- what I think is the usual

23    protocol.  That if you want the mediator to keep something

24    confidential, and not share it with another party, then it's --

25    that's the way it's going to be.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 09/06/25    Page 350 of 2722    Page 377 of 1017    PageID 2840

106

1          MR. CLUBOK:  Okay.  I believe -- we certainly agree

2   the mediators will different roles.  We just -- I just -- and

3   the mediator may have different sessions, different breakout

4   sessions.  But we just believe that if our claim, or any

5   creditor's claim, with the debtor in the first instance, to

6   have a productive mediation, settlement should be done the way

7   the (indiscernible) claim is (indiscernible), which is directly

8   with the debtor.  And that we'd have a chance to see if that --

9   if that gets somewhere and results in something.  We're --

10  we're -- that's our input about about meeting our specific

11  claim to maximize the chance of avoiding litigation and

12  resolving it.

13          THE COURT:  Well, again, I fully suspect they're

14  going to reach out to all of you all and get all of your ideas

15  about the sequence of the mediation, you know, whether it's all

16  together with people in separate rooms on day one, or hey,

17  let's start with UBS, let's start with Acis.  I mean it would

18  be expected that the co-mediators will reach out to you all

19  from day one with everybody's ideas about what would be the

20  most productive format.  So I hope that answers your question.

21          You know, to a large extent, this is to be

22  determined.  But, you know, the ground rules I'm giving them is

23  let's try to get this UBS proof of claim resolved.  Let's try

24  to get the Acis proof of claim resolved.  Let's try to get to a

25  grand bargain on what a plan looks like, and the treatment of

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 351 of 272   378 of 1017   PageID 2841

107

1   all the unsecured creditors.

2          So I think these are extremely experienced people who

3   will be pretty skilled at how to proceed.

4          MR. CLUBOK:  That does answer our question; thank

5   you, Your Honor.

6          THE COURT:  Okay.

7          MR. CLUBOK:  That's all I wanted to clarify.  That

8   you weren't directing them to do anything in terms of how they

9   proceed, and we'll pick it up with them.

10          THE COURT:  Okay; very good.

11          MR. CLUBOK:  Thank you.

12          THE COURT:  Anyone else want to say anything about

13   this?

14                  (No audible response heard)

15          THE COURT:  All right.  Well, let's turn then to the

16   status conference that both the debtor and Acis wanted to have

17   today.  Back on the 14th, I guess it was, Mr. Pomerantz, I

18   think, raised the issue that the Acis proof of claim, which at

19   that point the debtor had objected to, and now Mr. Dondero has

20   objected to, was set for hearing, I think, August 6th.  But

21   there had been a discussion about continuing that hearing to

22   September 10th to hopefully focus primarily on mediation.

23          But then we wanted to have a status conference today

24   to kind of talk about what the September 10th hearing would

25   look like.  We don't want it to just be a status conference.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 1165 of 2422   Filed 06/05/25   Page 379 of 1017   PageID 2842

108

```
 1              And, Mr. Pomerantz, I don't know if you're on the

 2   line, but you said there were legal issues as well as factual

 3   issues.  And so my brain was kind of going down the trail of

 4   are you suggesting motions for summary judgment might be a

 5   first step on September 10th?  I have no idea what you had in

 6   mind.

 7              So who -- is it going to be Mr. Morris taking the

 8   lead on this --

 9              MR. KHARASCH:  Your Honor --

10              THE COURT:  -- or Mr. Pomerantz?

11              MR. KHARASCH:  Your Honor, it's Mr. Kharasch.

12              THE COURT:  Oh.

13              MR. KHARASCH:  It's Ira Kharasch.

14              THE COURT:  Oh, Mr. Kharasch.

15              MR. KHARASCH:  Yeah.

16              THE COURT:  Okay, there you are.

17              MR. KHARASCH:  I --

18              THE COURT:  You appeared earlier.

19              MR. KHARASCH:  I did.  I did.  So two things, Your

20   Honor:

21              First, Mr. Pomerantz wanted me to express to Your

22   Honor that he would have loved to have been here today, as he's

23   been here in the past, however, he is in the hospital with a

24   medical condition, we think things will work out just fine,

25   but --
```

Case 3:25-cv-02072-S   Document 61-3   Filed 06/06/25   Page 380 of 1017   PageID 2843

109

 1          THE COURT:  I'm sorry to hear that.

 2          MR. KHARASCH:  Thank you, Your Honor.

 3          THE COURT:  Please express my best wishes.

 4          MR. KHARASCH:  Absolutely.  But he just wanted to let

 5  you know why he's not here.

 6          So, number two, I think, Your Honor, at the last

 7  week, I think we mentioned that the continued hearing on the

 8  claim objection would be September 17.  There's a little

 9  confusion about that versus September 10.  I don't know if Ms.

10  Patel is in agreement about that.  I think we're both in

11  agreement that it was September 17th, but I'm not completely

12  sure of the different dates.

13          THE COURT:  Okay.  I did not run that date by my

14  courtroom deputy.  I just -- I looked at the transcript from

15  the hearing.  Y'all said September 10th, but maybe someone

16  misspoke.

17          What do you think, Ms. Patel?

18          MS. PATEL:  Your Honor, I think the confusion might

19  be -- I believe the original hearing was August the 10th, and

20  that's what's getting moved off.  And so September 17th is --

21  I've seen a September 19th date, as well, but I think that's a

22  Sunday or --

23          MR. KHARASCH:  It's a Saturday.  I think it's a

24  Saturday.

25          MS. PATEL:  Saturday.  So I think September 17th is

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 380 of 2722   Filed 06/06/25   Page 381 of 1017   PageID 2844

110

 1  the day that Acis is amenable to -- to -- the process we're

 2  about to discuss with the date being the 17th of September.

 3          THE COURT:  Okay; very good.

 4          MR. KHARASCH:  Thank you, Your Honor.

 5          THE COURT:  Okay.

 6          MR. KHARASCH:  And --

 7          THE COURT:  So 17th, okay.

 8          MR. KHARASCH:  Yeah.  And, Your Honor, I think the

 9  good news here is the debtor and Acis's counsels are in

10  agreement subject to your blessing of that agreement as to how

11  we want to approach things.

12          Again, we did continue the hearing to today and the

13  purpose, Your Honor, is to give us a chance to discuss with the

14  Acis team how we both thought -- how to proceed in a manageable

15  way to make this September 17th hearing date a productive

16  hearing, and manageable, and easily understandable, and easy

17  for the Court to deal with, because we're dealing with a

18  massive claim, and a very big claim objection.

19          So what we come up with is the following way that we

20  think should be a productive way to handle it.  We would like

21  to have another status conference on or about August 14, which

22  is, I think, just after Ms. Patel's vacation.  If it has to be

23  a few days later, that's fine.

24          And during that time, we'll also be seeing a draft

25  response to our claim objection.  But the purpose is before

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/06/25   Page 383 of 722   382 of 1017   PageID 2845

111

1  that status conference on the 14th, Your Honor, we would

2  propose the following:

3        That a few days before, we file a joint statement

4  that would propose the following to the Court:  We would come

5  up come up with respect to the September 17 hearing date, that

6  we would come up with a list of issues for summary adjudication

7  that both parties would like to deal with by summary

8  adjudication on the September 17 hearing date.  We would set

9  those forth in the joint statement for the Court to review.

10       We'd also set out a list of issues that are not

11  subject -- we don't believe are not subject to summary

12  adjudication.  That would be dealt with later, if not through a

13  trial or otherwise, if not dealt with by the summary

14  adjudication proceeding, depending on how that goes.

15       We would also propose for that status conference,

16  that joint statement, Your Honor, a proposed discovery and

17  pretrial schedule that would occur after the September 17

18  summary adjudication, and a proposed trial date.

19       Just for the record, both parties do want to move as

20  quickly as possible after the September 17th hearing date in

21  terms of discovery, and get to a trial as quickly as possible,

22  maybe even before plan confirmation.  But this would be part of

23  the greater discussion, then we'd starting pinning down

24  proposed dates for Your Honor to talk about at the next status

25  conference here, Your Honor, on or about August 14th.

112

1    We'd also address the Acis request that the debtor

2  file an answer to the Acis second amended complaint in the Acis

3  case.  We had talked about that, that was a new topic of

4  discussion.

5    And that's really the -- that's what we would propose

6  to get before the Court.  We'd file it -- it's August 14, we'd

7  file it two days before the hearing because that's soon after

8  Ms. Patel's vacation.  If it's a few days later, we'd give the

9  Court -- we would file it a few days earlier to give the Court

10 more time to look at the joint statement.

11    To the extent we can't agree on all of these issues

12 that I just enumerated in the joint statement, the joint

13 statement would address those issues that we haven't agreed on,

14 and the unilateral position of the parties to be discussed

15 before the Court at the continued status conference.

16    So we think in that way, Your Honor, we can make

17 everyone's life easier to go forward and get something done at

18 the September 17 claim objection date.

19    THE COURT:  All right.  Well, Ms. Patel, do you agree

20 with everything you just heard?

21    MS. PATEL:  Yes, generally speaking, Your Honor.

22 Just a couple of things.

23    THE COURT:  All right.  Mr. Bonds, I'm going to ask

24 you to put your phone on mute.  I think we're getting some

25 disruption from your end.

002136

APP. 4383

113

 1              MR. BONDS:  It is on mute; I'm sorry.

 2              THE COURT:  Okay.  Well, Mike, I don't know where

 3  that's coming from.

 4              ECRO:  I think it's Mr. Ira's phone.  He's on mute

 5  now.

 6              THE COURT:  Okay.

 7              ECRO:  That's where it's coming from.

 8              THE COURT:  Ms. Patel, go ahead.

 9              MS. PATEL:  Thank you, Your Honor.

10              Just a couple of things, again, so the Court -- just

11  so I can set the Court's expectations a little bit on where

12  we're going to head, and these were discussions we had with Mr.

13  Kharasch over the (indiscernible) yesterday.  But I wanted to,

14  again, reiterate the parties' expectation is that if we're

15  going to go down this path -- a double (indiscernible) path

16  while we're doing things by summary adjudication at the

17  September 17th hearing which issues -- you know, we'll decide

18  which buckets of issues are appropriate for September 17th,

19  that nevertheless, that there would be an expeditious trial

20  setting, and that's what I think the parties are anticipating

21  coming back to the Court and asking for in August.

22              And that that trial setting would be at some

23  juncture, preferably before plan confirmation.  But if it has

24  to go to trial, that's certainly no (inaudible), so make that

25  simultaneous with the plan confirmation.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15   Filed 08/06/25   Page 385 of 1017   PageID 2848
Main Document   Page 385 of 722

114

 1          But just -- that's just a little bit of

 2  foreshadowing, I suppose, Your Honor, more than anything else.

 3          We also requested that basically we would just go

 4  through one -- what we'll call summary adjudication process.

 5  And Your Honor hit on a great question of is this a motion for

 6  summary judgment?  I'm not sure that we really necessarily

 7  defined it as a motion for summary judgment, as much as this is

 8  intended to be a "there's not going to be anymore motions to

 9  dismiss or motions for (indiscernible) pleading, etc."  The

10  September 17th hearing is intended to be the full shot of

11  "let's go through all the issues that can be determined on

12  September 17th by agreement, and then that's it, other than

13  that, we're going to be talking about trial."

14          The other point that I would just raise again just to

15  enlighten the Court, this isn't -- the summary adjudication

16  would not just be issues that Highland has raised in its

17  objection to Acis's claim, but it could also be summary

18  adjudication with respect to Acis's affirmative claims as

19  against the estate.  So it's a two-way street with respect to

20  that.

21          And then finally, Your Honor, Acis just requested

22  that we at least have a discussion with respect to the Highland

23  Capital Management filing an answer with respect to Acis's

24  complaint.  And as Your Honor recalls, the proof of claim that

25  Acis filed is -- attaches the second amended complaint that's

1  pending in the adversary.  That complaint has never had an

2  answer filed with respect to it, so we need an answer really as

3  kind of a responsive pleading.  And the hope was that that

4  would help streamline the issues so -- and, frankly, I think it

5  would be helpful from my perspective to decide what are the

6  appropriate issues for the summary adjudication basket to be

7  heard on September 17th, and what are the appropriate -- what's

8  the appropriate basket that is going to have to go trial.

9        And that was -- that was my thinking with respect to

10  that.  But we'll continue to have those discussions, and foster

11  that.

12        But beyond that, that's just some things that I

13  wanted to sort of foreshadow, I guess, for the Court, just to

14  (indiscernible) the Court's expectations as to what's going to

15  happen at the August hearing, and where things are headed.

16        THE COURT:  All right.  Well, just a couple of things

17  I'll throw in.

18        Before we get off, I'll make sure September 17th is

19  available.

20        (The Court engaged in off-the-record colloquy)

21        THE COURT:  So we'll circle back and make sure that's

22  good.

23        As far as this process, I like everything I heard.

24        As far as getting the summary adjudication on certain

25  issues, I kind of like the idea of not cross-motions for

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Document 67-22 Filed 06/06/25   Page 387 of 1017   PageID 2850
Main Document   Page 60 of 272

116

 1  summary judgment, no, please.  Maybe instead, you just come up

 2  with a set of stipulated facts, and then based on these

 3  stipulated facts, we think you can rule as a matter of law on

 4  A, B, and C, and then the other side disagrees that you can

 5  based on A, B, and C.

 6          But on the other hand, you think we can -- you can

 7  rule in front of us because of D, E, F.  And then the other

 8  side -- so I guess what I'm saying is -- hmmm, I'm trying to

 9  avoid the whole cumbersome summary judgment process, but -- can

10  we --

11          MR. KHARASCH:  Your Honor, can --

12          THE COURT:  Mr. Kharasch, do you have an idea?

13          MR. KHARASCH:  Yes.  We've been thinking about that

14  very point, Your Honor, and that's something I'm going to talk

15  to Ms. Patel about, you know, prior to that status conference

16  hearing.

17          We agree with you, we don't want to recreate the

18  wheel on a bunch of paper that's already before the Court.  We

19  might come up with a proposal, Your Honor, where we just submit

20  a short statement of why we think -- you know, before the

21  September hearing date, here's what's going to be argued on

22  summary adjudication, we'll cross-reference what's already in

23  front of the Court in terms of our claim objection, point you

24  to different parts of it, rather than me filing things.

25  Hopefully stipulate to certain facts to make your life easier,

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 387 of 2762   388 of 1017   PageID 2851

117

1   and to, you know, just make sure everything's easily directed.

2        But that's the kind of thing we'd like -- I think

3   we're going to be talking about to make things easier and more

4   streamlined.

5        THE COURT:  Okay.  Ms. Patel, you agree that's a goal

6   to shoot for?  Rather than cross motions for summary judgment,

7   and responses, and replies, and giant appendixes, just have

8   something like a set of stipulated facts, and here are the

9   contested issues of law?

10       MS. PATEL:  Yes, Your Honor.  I think that would be

11  sort of the general goal.

12       THE COURT:  Okay, all right.  Well, that -- that

13  sounds like a good game plan.

14       So I like this overall idea, we'll kind of check in

15  on August 14th.  A few days before that, you'll file the joint

16  statement of what you think the list of issues of law are that

17  would be argued on the 17th.

18       And then as far as the answer to the Acis adversary

19  proceeding, that adversary proceeding is technically subject to

20  the automatic stay, and there are other parties in the

21  litigation.  So as I've mentioned before, we have drafted back

22  in chambers a giant report and recommendation on a motion to

23  withdraw the reference that was filed way long ago by -- I

24  think it was jointly by Highland and HCLOF.  But I may be

25  wrong, it may have only been HCLOF, it's been so long since

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Filed Page 6 0372 of 272 389 of 1017   PageID 2852
Main Document   Page 6 0372 of 272

118

1  I've looked at it.

2          But my point is it's stayed.  So I mean as a

3  technical matter, if you want to agree that Highland will file

4  an answer, I mean I guess you'll have to do an agreed order

5  lifting the stay, maybe just for the limited purpose of

6  allowing Highland to do an answer with you all agreeing it's

7  not going to go any further than that at this juncture.  Or --

8  I mean I'm just asking, frankly, because we've got other

9  parties involved who want to know the answer to that question

10  maybe.

11          And then I've got a report and recommendation that

12  I've got to dust off, and finalize, and send in to the District

13  Court if we're lifting the stay for all purposes.

14          I assume you just want to do a limited lifting the

15  stay to let them file an answer, but everything else is still

16  on hold?

17          MS. PATEL:  Your Honor, I think that would be the

18  general concept.  And to be fair, it's a concept that I was,

19  you know, late in the day yesterday with Mr. Kharasch, and so

20  we haven't really quite formulated exactly how we Proceed

21  forward with it.  So I don't -- I'm not trying to ambush him on

22  the issue.

23          But I think we can either craft something that to the

24  extent that it is an answer, a very traditional answer, you

25  know, concept in the adversary proceeding, then, yes, I agree

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 95373 of 2422   Page 390 of 1017   PageID 2853

119

 1  that I think it would be appropriate to do a very limited

 2  agreed order lifting the stay for the limited purpose of filing

 3  the answer, and that's it.  Again, just so we have the

 4  pleading.

 5        Or if we -- that perhaps maybe Mr. Kharasch and I can

 6  come and put our creative brains together and see if we can

 7  come up with something that acts an awful lot like an answer,

 8  but is here and filed in the Highland bankruptcy case that kind

 9  of functions similarly.

10        THE COURT:  Okay.

11        MR. KHARASCH:  Yeah, just to be clear, Your Honor, we

12  haven't agreed to anything; we heard about this concept

13  yesterday.  I have not really had a chance to think it through.

14  I'm not -- I'm not saying absolutely no, we have to discuss it

15  with our client.  (Indiscernible) but we have an open mind, and

16  will continue our discussions.

17        One thing, Your Honor, do we definitely have the

18  August 14 date as a status conference?  And if so, at what

19  time?

20        THE COURT:  It is available.  Let's do it at 9:30,

21  and I'm not going to give you a ton of time that day because I

22  have a bear of a trial that next week that I'm going to need to

23  be in mostly hibernation preparing for.  So let's say 9:30 on

24  Friday, August 14th.

25        MR. KHARASCH:  That's fine, Your Honor; thank you

120

 1   very much.

 2            THE COURT:  And then I -- on September 17th at 9:30,

 3   I also have available.

 4            MR. KHARASCH:  That's great.

 5            THE COURT:  The morning only, I've got a full

 6   afternoon.

 7            All right, so I was going to ask you to do sort of

 8   like a mini scheduling order, reflective of what we discussed

 9   today.  And it sounds like you'll have a few things to iron out

10   after we get off the phone, but I think we've got enough here

11   to kind of have a partial scheduling order, or something to

12   that effect, dealing with objections to Acis's proof of claim.

13            Mr. Bonds, you're on there, I see now, for Mr.

14   Dondero.  I think you've joined in the -- I don't know if you

15   call it a joint, or you filed your separate objection to the

16   Acis proof of claim, correct?

17            MR. BONDS:  (No verbal response).

18            THE COURT:  Okay.  You're on mute, if you could

19   unmute yourself.

20            MR. BONDS:  Your Honor --

21            THE COURT:  We're getting some echo, but is there

22   anything you want to add to this discussion?

23            MR. BONDS:  Your Honor, there is.  We believe that we

24   are entitled to participate in the Acis claim of because it's

25   so intertwined with the underlying lawsuit -- Your Honor, I'm

121

1  sorry.

2      THE COURT:  All right.  Well, I understand you filed

3  an objection.  Is there any -- is there any -- well, is there

4  any objection to the Dondero -- I don't know if he's going to

5  say anything separate from the debtor, but Dondero being

6  involved as an objecting party.

7      MR. BONDS:  (Indiscernible).  I'm sorry.

8      THE COURT:  Okay.  We're having real terrible --

9      (The Court engaged in off-the-record colloquy)

10     THE COURT:  Okay.  We have two feeds that say D.

11  Michael Lynn, and that's causing a feedback loop, according to

12  the younger smarter people here behind me.  Like maybe you have

13  a phone and a computer?  All right, well, I've actually turned

14  to Mr. Kharasch and Ms. Patel, do you all have any problem with

15  Dondero kind of joining in, and -- I haven't reviewed his

16  objection to see how it differs from the debtor's.

17     MR. KHARASCH:  Yeah, frankly, Your Honor -- Ira

18  Kharasch.  We have not spent time reviewing that objection, as

19  well, so we haven't really thought about it.

20     I mean it's out there, I'm not sure I see the problem

21  with it.  But we would like some time to see how -- what it

22  looks like, and how it plays into it.  I'm not -- I'd be

23  surprised if -- well, I'm not even going to say anything as to

24  what's in it because I just haven't read it.

25     THE COURT:  Okay, all right.  Ms. Patel?

APP. 1872
002145

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 393 of 1017   PageID 2856
Main Document   Page 0 of 272

122

 1              MS. PATEL:  Your Honor, from Acis's perspective,

 2    same.  I, frankly, have not given it enough consideration.  And

 3    just out of the gate, I think one of the issues is going to be

 4    Mr. Dondero's standing to kind of join in on the claim

 5    objection, but it's something that, frankly, I just truly

 6    haven't spent enough time thinking that issue through, or

 7    whether there's going to be an issue.  So I'm just not sure.

 8              THE COURT:  All right.  Well, I'll try one more time.

 9    Mr. Bonds, do you have a good connection now?

10              MR. BONDS:  (No audible response heard).

11              THE COURT:  All right.  I'm just going to direct you

12    all to visit with Mr. Bonds or Mr. Lynn, and see if you can

13    come up with any agreements.  And if you can't, then maybe Mr.

14    Dondero's counsel can request a status conference.  I'm not

15    inclined to want to do another one before August 14, but maybe

16    we can just hear what they have to say on August 14th about the

17    process.

18              MR. KHARASCH:  I think that makes sense, Your Honor.

19    And we'll -- and we'll talk to them.

20              THE COURT:  Okay.

21              MR. KHARASCH:  We'll talk to them beforehand.

22              THE COURT:  Okay, all right.

23              MS. PRESTON:  Your Honor, may I briefly be heard?

24              THE COURT:  Who is this?

25              MS. PRESTON:  This is Katherine Preston from Winston

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 09/06/25    Page 327 of 742    Page 394 of 1017    PageID 2857

123

 1  & Strawn, I represent Mr. Ellington, Mr. Leventon, and some of

 2  the other Highland employees.

 3           THE COURT:  Okay.

 4           MS. PRESTON:  And I apologize, I tried to appear

 5  earlier and had some technical difficulties.

 6           THE COURT:  Okay.

 7           MS. PRESTON:  We just wanted to ask regarding

 8  mediation.  We've discussed with some of the parties to that

 9  mediation dissipating, and so we just wanted to be included, as

10  well, in any of those discussions and communications.

11           THE COURT:  All right.  And I guess the party in

12  interest status would be that you've been sued by Acis, is

13  that -- is there any --

14           MS. PRESTON:  That's correct.

15           THE COURT:  Okay.  Well, I think what I'm going to do

16  is think about that one a bit.

17           I almost put that one in the same category as Mark

18  Okada.  I'm just trying to be as productive as possible in the

19  way this goes forward where the primary issues are the UBS

20  proof of claim and the Acis proof of claim.  And granted,

21  there's a lot of satellite litigation out there, and -- and

22  that might be a factor as far as -- let me think about that

23  one, okay?

24           Your request is duly noted, and I'm going to think

25  about that, and I'll let you all know through my courtroom

124

1  deputy what I decide on that.  But I'm leaning towards that

2  might be a second stage of mediation if we have wonderful

3  breakthroughs on the Acis and UBS proof of claim sides, so

4  that's my answer on that.

5          MS. PRESTON:  Thank you.

6          THE COURT:  Uh-huh.  Anything else?

7          MS. PRESTON:  Thank you, Your Honor.

8          THE COURT:  All right.  Well, it's a little bit late,

9  it's 5:19 central time, and if there's nothing further, we're

10  adjourned, and we'll look for all the orders to be

11  electronically submitted.

12          Thank you.

13          MULTIPLE SPEAKERS:  Thank you.

14      (Whereupon, at 5:20 p.m., the hearing was adjourned.)

15

16

17

18

19

20

21

22

23

24

25

125

1

2

3              CERTIFICATE OF TRANSCRIBER

4       I, KAREN HARTMANN, a certified Electronic Court

5  Transcriber, certify that the foregoing is a correct transcript

6  from the electronic sound recording of the proceedings in the

7  above-entitled matter.

8

9

10

11  Karen Hartmann, AAERT CET**D0475    Date: July 24, 2020

12  Transcripts Plus, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

002149

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 398 of 732   397 of 1017   PageID 2860
Main Document   Page 6 of 232

Case 19-34054-sgj11  Doc 864  Filed 07/17/20   Entered 07/17/20 10:53:51   Page 1 of 134

# EXHIBIT 14

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj11** |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | July 14, 2020 |
|  | ) | 1:30 p.m. Docket |
| Debtor. | ) |  |
|  | ) | APPLICATIONS TO EMPLOY JAMES |
|  | ) | P. SEERY AND DEVELOPMENT |
|  | ) | SPECIALISTS, INC. (774, 775) |
|  | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

```
For the Debtors:          Jeffrey N. Pomerantz
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          10100 Santa Monica Blvd.,
                            13th Floor
                          Los Angeles, CA  90067
                          (310) 277-6910

For the Debtors:          John A. Morris
                          Greg Demo
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          780 Third Avenue, 34th Floor
                          New York, NY  10017-2024
                          (212) 561-7700

For the Debtors:          Ira D. Kharasch
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          10100 Santa Monica Blvd.,
                            13th Floor
                          Los Angeles, CA  90067-4003
                          (310) 277-6910

For the Debtors:          Zachery Z. Annable
                          Melissa S. Hayward
                          HAYWARD & ASSOCIATES, PLLC
                          10501 N. Central Expressway,
                            Suite 106
                          Dallas, TX  75231
                          (972) 755-7104
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/08/25   Page 398 of 1017   PageID 2861
Main Document   Page 351 of 2722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 2 of 134

2

```
 1  │  APPEARANCES, cont'd.:

 2  │  For the Official Committee  Matthew A. Clemente
    │  of Unsecured Creditors:      SIDLEY AUSTIN, LLP
 3  │                               One South Dearborn Street
    │                               Chicago, IL  60603
 4  │                               (312) 853-7539

 5  │  For the Official Committee: Paige Holden Montgomery
    │  of Unsecured Creditors:      SIDLEY AUSTIN, LLP
 6  │                               2021 McKinney Avenue, Suite 2000
    │                               Dallas, TX  75201
 7  │                               (214) 969-3500

 8  │  For Acis Capital            Rakhee V. Patel
    │  Management GP, LLC:          WINSTEAD, P.C.
 9  │                               2728 N. Harwood Street, Suite 500
    │                               Dallas, TX  75201
10  │                               (214) 745-5250

11  │  For Acis Capital            Brian Patrick Shaw
    │  Management GP, LLC:          ROGGE DUNN GROUP, P.C.
12  │                               500 N. Akard Street, Suite 1900
    │                               Dallas, TX  75201
13  │                               (214) 239-2707

14  │  For Redeemer Committee of   Mark A. Platt
    │  the Highland Crusader        FROST BROWN TODD, LLC
15  │  Fund:                        100 Crescent Court, Suite 350
    │                               Dallas, TX  75201
16  │                               (214) 580-5852

17  │  For Redeemer Committee of   Terri L. Mascherin
    │  the Highland Crusader        JENNER & BLOCK, LLP
18  │  Fund:                        353 N. Clark Street
    │                               Chicago, IL  60654-3456
19  │                               (312) 923-2799

20  │  For Redeemer Committee of   Marc B. Hankin
    │  the Highland Crusader        JENNER & BLOCK, LLP
21  │  Fund:                        919 Third Avenue
    │                               New York, NY  10022-3098
22  │                               (212) 891-1600

23  │

24  │

25  │
```

APP. 1378

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15-4   Filed 06/06/25    Page 399 of 1017    PageID 2862
Main Document    Page 382 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 3 of 134

3

```
 1    APPEARANCES, cont'd.:

 2    For UBS Securities, LLC:      Andrew Clubok
                                    Latham & Watkins, LLP
 3                                  555 Eleventh Street, NW,
                                      Suite 1000
 4                                  Washington, DC  20004
                                    (202) 637-2200
 5
      For UBS Securities:           Kimberly A. Posin
 6                                  LATHAM & WATKINS, LLP
                                    355 South Grand Avenue, Suite 100
 7                                  Los Angeles, CA  90071-1560
                                    (213) 891-7322
 8
      For Certain Employees:        David Neier
 9                                  WINSTON & STRAWN, LLP
                                    200 Park Avenue
10                                  New York, NY  10166
                                    (212) 294-6700
11
      Recorded by:                  Michael F. Edmond, Sr.
12                                  UNITED STATES BANKRUPTCY COURT
                                    1100 Commerce Street, 12th Floor
13                                  Dallas, TX  75242
                                    (214) 753-2062
14
      Transcribed by:               Kathy Rehling
15                                  311 Paradise Cove
                                    Shady Shores, TX  76208
16                                  (972) 786-3063

17

18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

APP. 1379

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/03/25   Page 400 of 1017   PageID 2863
Main Document   Page 633 of 722

Case 19-34054-sgj11  Doc 864  Filed 07/17/20   Entered 07/17/20 10:53:51   Page 4 of 134

4

1           DALLAS, TEXAS - JULY 14, 2020 - 1:34 P.M.

2           THE COURT:  ... to get lawyer appearances.  First,

3    for the Debtor, do we have some Pachulski lawyers on the

4    phone?  Please make your appearance.

5           MR. POMERANTZ:  Good morning, Your Honor.  It's

6    Jeffrey Pomerantz; Pachulski Stang Ziehl & Jones.  Also with

7    me are John Morris, and then listening in are Greg Demo and

8    Ira Kharasch.

9           THE COURT:  All right.  Thank you all.  And do we

10   have any Hayward lawyers on the phone?

11          MR. ANNABLE:  Yes, Your Honor.

12          THE COURT:  I presume that was Mr. Annable.

13          MR. ANNABLE:  Yes, Your Honor.  Sorry.  My mic's not

14   picking up.  It's Zachery Annable and Melissa Hayward --

15          THE COURT:  All right.

16          MR. ANNABLE:  -- as local counsel for the Debtor.

17          THE COURT:  Okay.  Thank you.  For the Unsecured

18   Creditors' Committee, who do we have from Sidley Austin?

19          MR. CLEMENTE:  Good afternoon, Your Honor.  Matthew

20   Clemente from Sidley Austin, and Paige Montgomery is also on

21   the phone.

22          THE COURT:  All right.  Thank you.  All right.  I'll

23   go to some of our usual appearances.  Do we have lawyers for

24   the Redeemer Committee this afternoon?  (No response.)  All

25   right.

APP. 1389

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 06/03/25   Page 401 of 1017   PageID 2864
Main Document   Page 354 of 712

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 5 of 134

1          MS. MASCHERIN:  Yes.  Excuse me, Your Honor.

2          THE COURT:  Yes?

3          MS. MASCHERIN:  This is Terri Mascherin.  I wasn't

4   sure whether I had the microphone on mute or not.

5          THE COURT:  Okay.

6          MS. MASCHERIN:  I apologize.  Terri Mascherin, Jenner

7   & Block.  My colleague, Marc Hankin, is on the phone.  And I

8   believe that Mark Platt is also on the line.

9          THE COURT:  All right.  Thank you.  What about UBS?

10  Anyone wanting to appear for UBS?

11         MR. CLUBOK:  Yes.  Good afternoon, Your Honor.  This

12  is Andrew Clubok from Latham & Watkins, LLP.  And my partner,

13  Kimberly Posin, is on as well.

14         THE COURT:  Okay.  Thank you.  What about for Acis?

15  Any lawyers appearing for Acis?

16         MS. PATEL:  Yes.  Good afternoon, Your Honor.  Rakhee

17  Patel of the Winstead firm and Brian Shaw of the Rogge Dunn

18  Group appearing on behalf of Acis.

19         THE COURT:  All right.  Do we have Mr. Lynn or Mr.

20  Bonds for James Dondero?  (No response.)  Maybe not.  All

21  right.  Is there anyone else who wishes to appear for today's

22  hearings?

23         MR. NEIER:  Good afternoon, Your Honor.  David Neier

24  of Winston & Strawn making a reappearance, but this time for

25  several employees of Highland:  Mr. Leventon, Mr. Sevilla, Mr.

APP. 1381

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 402 of 1017
Case 3:25-cv-02072-S   Document 15-4   Filed 06/02/25   Page 402 of 1017   PageID 2865

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 6 of 134

6

 1  Ellington, several others.

 2         THE COURT:  Oh, okay.  Thank you.  Any other

 3  appearances today?

 4      (No response.)

 5         THE COURT:  All right.  I'll assume everyone else is

 6  just going to observe.

 7      Well, we have two employment applications.  Mr. Pomerantz,

 8  how did you want to proceed on those?

 9         MR. POMERANTZ:  So, Your Honor, we have the two

10  motions to present, Your Honor.  I'm happy to say that neither

11  of them are opposed.

12      Before I present the motions to Your Honor, I wanted to

13  ask if Your Honor would like to address the mediation issues

14  at the conclusion of the hearing or prior to the presentation

15  of the motions.

16         THE COURT:  At the conclusion.  Thank you.

17         MR. POMERANTZ:  Thank you, Your Honor.

18      Your Honor, the first motion on the docket today is a

19  Motion to Appoint James Seery as the Debtors' chief executive

20  officer and chief restructuring officer, effective as of March

21  15th, which is about the time that Mr. Seery began performing

22  the services as the chief executive officer.

23      While there's a good argument that the retention of a

24  chief executive officer is in the ordinary course of business

25  and does not require court approval, the Debtor, out of an

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 403 of 1017   PageID 2866
Main Document   Page 386 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 7 of 134

7

 1   abundance of caution, filed the motion, and the motion seeks

 2   approval of the agreement which is attached to the motion.

 3        The second motion, Your Honor, is a Motion to Approve the

 4   Retention of DSI as the Debtors' Financial Advisor.  And as

 5   the Court is aware, Mr. Sharp, a managing director of DSI, was

 6   approved as the Debtors' Chief Restructuring Officer pursuant

 7   to this Court's January 10th order.

 8        Although Mr. Seery is proposed to replace Mr. Sharp as the

 9   Debtors' Chief Restructuring Officer, Mr. Seery still requires

10   the financial assistance and advisory support that DSI has

11   been providing to him, the Board, and the Debtor for several

12   months.

13        While each of these motions, as I mentioned, Your Honor,

14   are unopposed, we plan to put on the testimony of James Seery,

15   John Dubel, and Brad Sharp to provide the Court with the

16   evidentiary basis to support the relief that is requested.

17   And with the testimony, Your Honor, we intend to accomplish

18   several things.

19        First, Your Honor, in light of our exchange at the hearing

20   on July 8th, we thought it'd be appropriate for Mr. Seery to

21   provide a more fulsome response to Your Honor regarding the

22   nature and extent of the Debtors' operations and assets and

23   the variety of significant activities that the Board in

24   general and Mr. Seery as the chief executive officer has been

25   performing over the last several months.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/04/25   Page 404 of 1017   PageID 2867
Main Document   Page 357 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 8 of 134

8

1       We think this is very important, Your Honor, given that

2   the Debtor has substantial and multiple complex business

3   operations that it oversees that are in -- that are in

4   subsidiaries outside of Chapter 11 or are in entities managed

5   by the Debtor and also not in Chapter 11.  And the Court, we

6   appreciate, especially in light of Your Honor's comments, does

7   not have the benefit of seeing what is really going on.  So

8   we're hoping, by Mr. Seery's testimony, it will provide Your

9   Honor with a much clear picture, and, quite frankly, a better

10  job doing it than I was able to do last week.

11      Mr. Seery's testimony will support the need for the

12  retention of the chief executive officer and why his

13  particular background and qualifications made him the

14  appropriate choice for the role.

15      Second, Mr. Dubel, as the chairman of the compensation

16  committee of the Board, will testify regarding the process

17  undertaken by the compensation committee that led to the

18  conclusion to ask Mr. Seery to become the chief executive

19  officer and the agreement -- under the terms and conditions

20  set forth in the agreement.

21      Lastly, Mr. Sharp will testify regarding the activities he

22  and DSI have been performing since the commencement of the

23  case, the assistance they have been providing to Mr. Seery

24  over the last few months, and how the nature and extent of the

25  services they are providing will essentially remain the same

APP. 1564

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Document 154 Filed 06/03/22 Page 405 of 1017 PageID 2868
Main Document Page 405 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20 Entered 07/17/20 10:53:51 Page 9 of 134

9

1   if Your Honor approves the motion to employ Mr. Seery.

2       Before I turn the virtual podium over to my partner, John

3   Morris, to present the testimony, Your Honor, I thought I

4   would provide the Court with a brief summary of the events

5   leading to the Debtors' filing of the motion.

6           THE COURT:  Okay.

7           MR. POMERANTZ:  As Your Honor will recall, the Court

8   entered an order on January 9th approving a settlement between

9   the Debtor and the Committee, and a significant part of that

10  settlement involved modifications to the Debtors' corporate

11  governance that resulted in the installation of the

12  Independent Board.

13      The term sheet that was attached in the settlement motion

14  specifically contemplated that the Independent Board, in

15  consultation with the Committee, would determine whether it

16  was appropriate to retain a chief executive officer, and

17  further went on to say that the chief executive officer could

18  be a member of the Board.

19      And the retention of a chief executive officer was on

20  everyone's minds from the beginning, because since Mr.

21  Dondero's authority as the CEO of the Debtor was being

22  terminated in connection with the settlement, the Debtor and

23  the Committee contemplated that, in order to manage a dynamic

24  and widespread asset management platform like Highland's, that

25  the retention of a chief executive officer may very well be

APP. 1385

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/09/25   Page 406 of 1017   PageID 2869
Main Document   Page 405 of 2122

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 10 of 134

10

 1  necessary.

 2      I will leave it to Mr. Seery and Mr. Dubel to explain to

 3  the Court what transpired during the early stages of the case

 4  and the decision-making process that led to Mr. Seery starting

 5  to act as the Debtors' chief executive officer.  And I would

 6  also leave it to Mr. Dubel to discuss the sequence of events

 7  which led from the appointment of him as the chief executive

 8  officer through the filing of the motion that brings us here

 9  today, which events will include the establishment of a

10  compensation committee; the commissioning of a report from the

11  Debtors' compensation expert, Mercer; the procurement of the

12  Debtors' [sic] and officers insurance coverage to cover Mr.

13  Seery and Mr. Dubel; the negotiations over the (inaudible) of

14  Mr. Seery; and lastly, the negotiations with the Committee

15  which has resulted in the motion being fully consensual.

16      I'll also leave it to Mr. Seery to explain his personal --

17  professional background and why he was qualified to fill that

18  role.

19      The agreement, Your Honor, between Mr. Seery and the

20  Debtor includes the following material provisions.

21      First, there would be base compensation at the rate of

22  $150,000 a month, retroactive to March 15th.  And while Mr.

23  Seery will remain on the Board as part of his role as the

24  chief executive officer, the $150,000 per month would cover

25  his services not only as a CEO but also a member of the Board.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/30/25   Page 407 of 1017   PageID 2870
Main Document   Page 406 of 2722

Case 19-34054-sgj11   Doc 864   Filed 07/17/20   Entered 07/17/20 10:53:51   Page 11 of 134

11

1   In other words, the Board fees that were agreed to back in

2   January of $60,000 a month, $50,000 a month, and $30,000 a

3   month would be replaced by the $150,000 a month commencing on

4   March 15th.

5       While the compensation committee and Mr. Seery reached

6   agreement on the structure of potential bonus compensation,

7   the Committee has not agreed to that proposed structure.  As a

8   result, the compensation committee and Mr. Seery decided that

9   approval sought in this motion would only be the monthly

10  compensation and the other non-economic terms, but would not

11  include the bonus compensation.  Any bonus compensation sought

12  to be paid to Mr. Seery would be pursuant to a separate motion

13  filed, if at all, a lot later in the case.

14      The Committee was also uncomfortable with the open-ended

15  nature of the agreement and wanted some control in being able

16  to seek to terminate it.  To accommodate the Committee, Mr.

17  Seery and the Debtor agreed to the following:  After 90 days

18  from the date the Court enters an order approving this

19  agreement, if the Court is inclined to do so, the Committee

20  may provide the Debtor with notice that it does not want the

21  agreement to continue.  The Debtor would then have two weeks

22  to file a motion on normal notice seeking to extend the date

23  of the agreement, and Mr. Seery would be entitled to his base

24  compensation until the Court ruled on the motion.

25      Also, the Committee asked us that be made clear in the

APP. 1387

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 408 of 1017   PageID 2871
Main Document   Page 351 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 12 of 134

12

1   order, which we've done, that Mr. Seery's retention would

2   terminate on the effective date on the plan, subject, of

3   course, of his right to seek bonus compensation pursuant to a

4   separate motion.  The agreement also contains standard

5   reimbursement and indemnification provisions.

6       Your Honor, those conclude my initial remarks.  I'm happy

7   to take questions.  And then, at the appropriate time, I

8   return it over to Mr. Morris, who will put on the testimony of

9   Mr. Seery, Mr. Dubel, and Mr. Sharp.

10          THE COURT:  All right.  I'd like to pretty quickly

11  get to the evidence.  So, I'll ask:  Does anyone have a

12  burning desire to make an opening statement?  If so, please

13  let's keep it brief.

14      (No response.)

15          THE COURT:  All right.  I assume everyone is content

16  to wait until the end and speak up in any way they want to

17  speak up.

18      Mr. Morris, are you ready to call your witness?

19          MR. MORRIS:  I am, Your Honor.  Can you hear me right

20  now?

21          THE COURT:  I can.  Thank you.

22          MR. MORRIS:  Okay.  Your Honor, this is John Morris

23  from Pachulski Stang Ziehl & Jones for the Debtor.  As the

24  Debtors' first witness, we call James Seery.

25          THE COURT:  All right.  Mr. Seery, I need to swear

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 409 of 1017   PageID 2872
Main Document   Page 392 of 722

Case 19-34054-sgj11  Doc 864  Filed 07/17/20   Entered 07/17/20 10:53:51   Page 13 of 134

Seery - Direct                     13

 1   you in by video.  So could you take your phone off mute and

 2   please raise your right hand.  Can you say Testing 1, 2, so I

 3   know you're there?

 4            MR. SEERY:  Testing 1, 2.

 5            THE COURT:  All right.

 6             JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

 7            THE COURT:  All right.  Thank you.  Mr. Morris?

 8            MR. MORRIS:  Thank you, Your Honor.  Before I begin

 9   my questioning of Mr. Seery, the Debtor had filed its witness

10   list and its exhibit list.  We provided copies of the exhibits

11   to the Court and to the Committee, and I would like to just

12   move into evidence Debtors' Exhibits 1 through 7 at this time.

13            THE COURT:  All right.  So I have in front of me

14   Docket Entry No. 822 with Exhibits 1 through 7.  Any

15   objection?  (No response.)  All right.  1 through 7 are

16   admitted.

17       (Debtors' Exhibits 1 through 7 are received into

18   evidence.)

19            MR. MORRIS:  Thank you, Your Honor.  And just as an

20   overview, so you have a sense of where we're going with Mr.

21   Seery's testimony, I am going to begin with some very brief

22   background questionings and then have Mr. Seery answer some

23   questions concerning the overview of the company and the

24   corporate structure of the company.  You may have heard some

25   of this before, but I think in the context of a motion such as

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 410 of 1017   PageID 2873
Main Document   Page 409 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 14 of 134

Seery - Direct                    14

 1   the appointment of a CEO, I think it would be helpful to hear

 2   it all.

 3       When I finish with that, we're going to move into the area

 4   of the Board and the work that the Board has done and Mr.

 5   Seery's work as a member of the Board.

 6       And then we'll transition into really the meat of the

 7   discussion here, and that is what has he done in his capacity

 8   as CEO.  And to be clear, he's not the CEO, he doesn't call

 9   himself the CEO, but he's functioned as the CEO, and I think

10   that's the point that we want to present to the Court.  And we

11   want to present to the Court the fact that he functioned as a

12   CEO really from day one of the process.  And we're not going

13   to get into, you know, every single thing he's done, because

14   we'd be here for an awfully long time, but we do intend to

15   highlight a couple of the transactions that he worked on and

16   give you a sense of his role in trying to develop a plan and

17   resolving claims.

18       And I think, with that, you'll have a better understanding

19   of Mr. Seery, his role, and why we believe it's a proper

20   exercise of the Debtors' business judgment to appoint him as

21   CEO.

22           THE COURT:  All right.  Sounds good.

23           MR. MORRIS:  All right.

24                   DIRECT EXAMINATION

25   BY MR. MORRIS:

APP. 1309

002163

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 394 of 722
Case 3:25-cv-02072-S   Document 15-4   Filed 06/09/25   Page 411 of 1017   PageID 2874
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 15 of 134

Seery - Direct                          15

1   Q    Mr. Seery, can you hear me?

2   A    I can.  Can you hear me?

3   Q    Yes, I can.

4         MR. MORRIS:  Your Honor, just one other point.  I

5   have a legal assistant on the phone here.  She's participating

6   in the WebEx.  Her name is La Asia Canty.  La Asia is going to

7   handle the exhibits when and if we need to put them up on the

8   screen.  So we've tried to practice that, and hopefully it

9   will go smoothly, but I may turn to Ms. Canty from time to

10  time with some help with the exhibits.

11        THE COURT:  All right.  Fine.

12  BY MR. MORRIS:

13  Q    Okay.  Mr. -- what is your current relationship to the

14  Debtor?

15  A    I'm an Independent Director of Strand, which is the

16  general partner of the Debtor.

17  Q    All right.  And when did you become the Independent

18  Director of Strand?

19  A    On January 9th, along with John Dubel and Russ Nelms.

20  Q    The Court has previously heard about your background, but

21  from a high level, can you just hit the highlights for the

22  Court as to your experience, et cetera?

23  A    To go swiftly -- and if Your Honor wants me to go further,

24  I certainly can -- I was a restructuring and finance lawyer

25  for 10 years, handling virtually every type of restructuring

APP. 1391

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 412 of 1017   PageID 2875
Main Document   Page 16 of 272

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 16 of 134

Seery - Direct                          16

1   matter as well as financing in distressed matters during that

2   time.

3       In 1999, I went to the business side and I began to manage

4   distressed assets at Lehman Brothers as well as a leverage

5   finance business.  That grew into my running the risky finance

6   business as well as the loan business at Lehman globally,

7   which included high-grade loans, high-yield loans, trading and

8   sales of those products, a big part of distressed, all of

9   restructuring, all of asset management, and all of the hedging

10  of the portfolio that we had.

11      From there, I left Lehman with a small group and sold it

12  to Barclay's.  I moved on and ran a hedge fund with two former

13  partners of mine who are the founding partners called River

14  Birch Capital.  It was a long-short credit fund; mostly

15  credit, though we did structured finance as well, and we also

16  handled some equities.

17  Q    Okay.  Let's spend a few minutes, as a preview, talking

18  about the Debtor and its business.  And let's start with the

19  basics.  Is there a way you can summarize the business of the

20  Debtor?

21  A    I think, from a high level, the best way to think about

22  the Debtor is that it's a registered investment advisor.  As a

23  registered investment advisor, which is really any advisor of

24  third-party money over $25 million, it has to register with

25  the SEC, and it manages funds in many different ways.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Main Document    Page 6396 of 2722    Page 413 of 1017    PageID 2876

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 17 of 134

Seery - Direct                          17

1      The Debtor manages approximately $200 million current

2  values -- it was more than that at the start of the case -- of

3  its own assets.  It doesn't have to be a registered investment

4  advisor for those assets, but it does manage its own assets,

5  which include directly-owned securities; loans from mostly

6  related entities, but not all; and investments in certain

7  funds which it also manages.

8      In addition, the Debtor manages about roughly $2 billion

9  in -- $2 billion in total managed assets, around $2 billion in

10  CLO assets, and then other entities, which are hedge funds or

11  PE style.

12      In addition, the Debtor provides shared services for

13  approximately $6 billion of assets.  Those are assets that are

14  owned by related entities but not owned by Debtor-owned or

15  managed entities.  And those are a combination of back office

16  services, which include timely reporting, asset management,

17  legal and compliance support, trading and research support,

18  but not the actual management of the assets.

19      The Debtors run -- and I think the way to think about it

20  is on a functional basis; at least, that's the way I think

21  about it -- and there's really six areas.  There's corporate

22  management; finance, accounting and tax; trading and research;

23  private equity and fund investing; compliance and legal; and

24  then structured equity, which really includes all of the CLO

25  businesses.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/09/25   Page 414 of 1017   PageID 2877
Main Document   Page 397 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 18 of 134

Seery - Direct                          18

1    The goals of the Debtor generally are what you'd expect

2    out of an asset manager.  A little bit different than most

3    because the Debtor does own assets, which is a little

4    different than when money asset managers typically hold assets

5    away from the asset manager.  But number one, discharge

6    Highland's, which I'll call Highland (inaudible), LP, duties

7    to investors in the funds.  Those are fiduciary duties under

8    the Investment Advisors Act.  Each day, you've got to make

9    sure that you do that first and foremost.

10   Number two, create positive MPD in each of the funds that

11   we manage, either through sales, purchases, or hedging.

12   Next, make sure that we report timely finances of our own

13   assets, including in the funds, but also, to the third-party

14   investors.  Maximize the value of HCMLP's owned assets.  And

15   then operate as efficiently as possible for the lowest cost.

16   That's essentially how the Debtor -- how we think about

17   the Debtor from a functional perspective.  It's got about 70

18   employees laid out in those areas that I mentioned, and each

19   of those employees every day usually think about those goals

20   and try to discharge their duties by focusing on those goals.

21   Q    Thank you, Mr. Seery.  And can you describe for the Court

22   how those 70 or so employees are organized?  Is there an

23   internal corporate structure that you're working with?

24   A    Yeah.  The way -- the way -- I apologize.  The way we

25   think about it is, as I said, corporate management, which is

APP. 1394

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Main Document   Filed 06/06/25   Page 415 of 1017   PageID 2878   Page 398 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 19 of 134

Seery - Direct                    19

1   really HR and overseeing the function that it's filling every

2   day, that's been really -- because Mr. Dondero was removed

3   from management.  It used to all roll up to him.  That's been

4   effectively rolling up to me since February.

5       Finance, accounting, and tax.  Each of these businesses

6   every day require certain amounts of liquidity.  Each of them

7   have requirements that they have to pay out to investors.

8   Each of them have expenses.  And all of them have different

9   kinds of tax either obligations or reporting.  Those are

10  managed by Frank Waterhouse as the CFO.  (inaudible), sorry.

11      Trading and research.  With respect to the assets, they're

12  not -- they're not static assets.  Many of them do get traded

13  on a regular basis.  A gentleman, Joe Sowin, heads up the

14  trading of the liquid assets.  John Povish (phonetic) heads up

15  the research and the trading of the more illiquid assets, but

16  not PE.  In addition, we have PE assets that require some

17  management every day, including Board seats.  That's a

18  gentleman by the name of Cameron Baynard, and also he will

19  fund investments in that area.  J.P. Sevilla is responsible

20  for working with Cameron on those investments and leading that

21  team.

22      Importantly, because of the nature of what the Debtor

23  does, the fiduciary obligations, as well as the

24  responsibilities to each investor and the legal overlay, we

25  have a robust compliance and legal department.  That's headed

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15   Filed 06/06/25   Page 416 of 1017   PageID 2879
Main Document   Page 099 of 2722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 20 of 134

Seery - Direct                          20

1    by Thomas Surgent and Scott Ellington.  Scott:  more focused

2    on transactional issues with respect to legal.  He is actually

3    general counsel.  Everything that has do with compliance, the

4    interrelatedness of the funds, trading between funds or

5    positions that are shared across funds, which are many, runs

6    through Thomas Surgent and his team.

7        And finally, structured equity.  Sitting on top of the

8    structured finance business that we have, understanding those

9    assets, particularly of two billion-ish assets in CLOs, that's

10   headed by Hunter Covitz.

11   Q   Can you describe for the Court your interaction with each

12   of the department heads that you just identified?

13   A   Well, depending on the nature of the issue each day, I

14   have at least -- I'd say generally at least weekly contact

15   with most, often daily contact with most.  So, for example,

16   when there are trading issues, particularly as the market was

17   extremely volatile with respect to unliquid securities, Joe

18   Sowin and I were on the phone several times a day.

19       Relating to the COVID issues, Brian Collins, who heads the

20   HR group, and I were on the phone several times a day.

21       Relating to structured equity, depending on what's

22   happening with a particular fund or what's happening in loan

23   prices, I speak to Hunter Covitz.  And it goes down the line.

24       So it really depends on each of the areas and what's going

25   on in the business, but I try to touch base with each of those

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 417 of 1017   PageID 2880
Main Document   Page 440 of 742

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 21 of 134

Seery - Direct                          21

 1   department heads on a regular basis.

 2       Frank Waterhouse, of course, is at least weekly.  We have

 3   a standing call every week to make sure that we're focused on

 4   liquidity, which is always a concern in a Chapter 11, and

 5   Frank and his team are on that call and prepare weekly

 6   materials for us.

 7   Q   Okay.

 8           MR. MORRIS:  Your Honor, before I move to the next

 9   area of questions, the work of the Board, I just wanted to see

10   if the Court had any questions on the corporate organizational

11   structure, the internal structure of the business, or any of

12   the matters that Mr. Seery touched on?

13           THE COURT:  I do not.  And I do have in front of me a

14   demonstrative aid that Mr. Annable sent over ahead of time, so

15   I appreciate that as well.

16           MR. MORRIS:  Okay.  Your Honor, I think Mr. Seery

17   covered much of what's on that document, but if you'd like him

18   to go through that, we're happy to do it.

19           THE COURT:  No, that's fine.

20           MR. MORRIS:  Okay.

21   BY MR. MORRIS:

22   Q   Then let's shift gears a little bit and start talking

23   about the work of the Independent Board itself.  The

24   Independent Board was appointed in mid-January; is that right?

25   A   Yeah.  It was the first -- January 9th, the first week of

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 09/04/25   Page 418 of 1017   PageID 2881
Main Document   Page 418 of 2722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 22 of 134

Seery - Direct                          22

1    January, and we started working that afternoon.

2    Q    Okay.  Can you describe for the Court what the -- the

3    Board's initial focus?  What were you focused on?

4    A    Well, if you think about the areas that I just mentioned

5    previously, the Board initially, for lack of a better term,

6    gang-tackled everything.  So we tried to make sure that we had

7    a broad base of understanding among the three of us with

8    respect to the business.

9        I, because of my background, had a lot more familiarity

10   with asset management, these type of asset security

11   businesses.  But we wanted to make sure that each of us was at

12   least facile with the main areas that we had to understand.

13   First was operations.  How does the company run each day?

14   Particularly, how was it going to run without Mr. Dondero?

15   And I went through some of those functional areas and how we

16   thought about those and who head each of those.

17       Next in the -- I don't mean to say it's second, because

18   it's always first, but liquidity.  What did the Debtors'

19   liquidity look like?  How are we going to manage that

20   liquidity, not just for the near-term, but also for the

21   medium-term, and then even into the slightly longer-term?  We

22   had to think about what assets are there, what money those

23   assets might need that we would have to invest in them, and

24   whether there was liquidity in those assets that we can create

25   liquidity in order to fund the Debtors' business.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 419 of 1017   PageID 2882
Main Document   Page 23 of 272

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 23 of 134

Seery - Direct                    23

1      Personnel, we needed a good opportunity to understand who

2    did what, not just in the senior managers that I mentioned,

3    but deeper into the staff, because we're going to rely on

4    those folks.  Particularly worked through with DSI.

5      As I mentioned, the Debtor, unlike a lot of other asset

6    managers, owns a lot of assets.  It's a disparate group of

7    assets, but getting a feel and understanding for what those

8    assets were, what the critical issues surrounding those assets

9    are, who managed them day-to-day:  We wanted to make sure that

10   each of the directors had a good (inaudible) and understanding

11   of those issues that might arise with respect to those assets,

12   and a good sense of how quickly those issues could, you know,

13   further arise.

14     We also had to get a very good understanding of each of

15   the funds that we manage.  As I said, the Investment Advisors

16   Act puts a fiduciary duty on Highland Capital to discharge its

17   duty to the investors.  So while we have duties to the estate,

18   we also have duties, as I mentioned in my last testimony, to

19   each of the investors in the funds.

20     Now, some of them are related parties, and those are a

21   little bit easier.  Some of them are owned by Highland.  But

22   there are third-party investors in these funds who have no

23   relation whatsoever to Highland, and we owe them a fiduciary

24   duty both to manage their assets prudently but also to seek to

25   maximize value.  And we wanted to make sure we had a good

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Filed 09/04/25    Page 420 of 1017    PageID 2883
Main Document    Page 64 of 272

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 24 of 134

Seery - Direct                          24

1   understanding of that.

2        Finally, with respect to the shared service arrangements,

3   we needed to get an understanding of that $6 billion in assets

4   and how our business, HCMLP, worked with those -- those shared

5   service counterparties and exactly who did what for whom.

6   It's very complicated because it had been run much more on a

7   functional basis than on a line basis from each contract.  So

8   it's not as if your employees are allocated to NexBank.  It's

9   the whole panoply of businesses that we enter into, and

10  providing those services to NexBank, not through a central

11  point but through whatever requests come in from the counter-

12  parties.  So we needed a good understanding of what those

13  contracts looked and what those obligations were.

14           A VOICE:  John, you're on mute.

15           MR. MORRIS:  Thank you.

16  BY MR. MORRIS:

17  Q    All of that work was going on in the first weeks of the

18  appointment of the Board?

19  A    Yeah, it would not be fair to say we could do that in a

20  couple weeks.  So it took far longer than that.  But that

21  didn't mean that issues didn't start to arise immediately in

22  February.  And so, while we were learning, we were also

23  starting to get a feel for different things that could happen

24  in the company.

25       As in many companies, immediately, one of the first things

APP. 1409

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/06/25    Page 421 of 1017    PageID 2884
Main Document    Page 420 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 25 of 134

Seery - Direct                          25

1   you have to deal with is, particularly at the beginning of the

2   year, what does compensation look like; who are the -- what do

3   promotions look like; are you going to be able to hold this

4   team together to service these assets?  And yeah, we had that,

5   with an additional wrinkle that Highland's payment structure

6   defers a significant amount of compensation to its employees,

7   and it vests over time, and it has the very typical provision

8   that if you are not there when it vests -- when it is going to

9   be paid, actually, not when it vests.  Even if you're vested,

10  if you're not there when it gets paid, you're not entitled to

11  it.  And so understanding who was owed what; how the vesting

12  worked; what the compensation structure looked like compared

13  to third parties, was one of the first things we had to do.

14  And Highland has an extremely robust review process.  Brian

15  Collins manages it.  It's first-rate.  It goes through both

16  360 in terms of what other employees think of each other as

17  well as bottoms up, in terms of performance.  And then it has

18  a top-down component, which ultimately ran through Mr.

19  Dondero.  Since he was effectively removed from that role, the

20  Board had to jump in and get a full understanding with Brian

21  about what the process looked like; how it was going to work;

22  how it compared to other firms; and whether we could go

23  forward with it.  And that was one of the motions that was

24  brought early to the Court.

25  A    Let's talk a minute about the transactional work that the

APP. 1191

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 04/05   Page 421 of 1017   PageID 2885
Main Document   Page 421 of 2722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 26 of 134

Seery - Direct                          26

 1   Board was called to focus on initially.  Are you familiar with

 2   the transactional protocols that the Debtor agreed to with the

 3   Committee?

 4   Q    I am.

 5   A    Can you describe for the Court the impact those protocols

 6   had on the Board's work?

 7   Q    Well, they make it extremely difficult.  And I understand

 8   the purposes behind the protocols.  Was not involved in

 9   negotiating them.  However, because of the limitations they

10   put on the Debtor, they make it very difficult to manage

11   certain of the assets.  So, if an asset needs money to invest

12   in it, depending on the size, it may need Committee approval.

13   If the -- if there are expenses that need to be paid from --

14   in related entities, and the related entity does not have the

15   capital to make the expense payment, the Debtor needs to put

16   the money in.  Can the Debtor put that money in without the

17   Committee's approval, and if the Committee doesn't approve,

18   would we have to go to Court?

19       So, the functioning on a day-to-day basis for how to deal

20   with those assets became very difficult.  And that came up

21   really early, as the market started to get a lot more

22   volatility by mid-February.  We saw with respect to the

23   internal accounts trades that we would have liked to put on,

24   for example, short position, where we just weren't able to put

25   the trades on.

Seery - Direct                               27

 1        Now, we could go to the Committee, and we did, but

 2   understanding why we wanted to put it on; explaining it;

 3   presenting that opportunity to the Committee; and then having

 4   them go to the full Committee with it:  It's very cumbersome.

 5   And the trading markets don't wait for a week to determine

 6   whether that offering that you want to -- that you want to

 7   access is available.

 8        So, early on, we got a sense of how difficult it would be

 9   to manage the business with the protocols.

10        One of the areas I think that was significant and that we

11   talked about significantly with the Committee was an entity

12   called Multi-Strat.  Multi-Strat is a fund that is owned by

13   the Debtor.  It's, in essence, a PUNY-style (phonetic) fund.

14   It's an older fund.  And it's about 60 percent owned by the

15   Debtor and roughly 30 percent owned by Dondero-related

16   entities.

17        However, there are 90 million, roughly 89 million,

18   approximately, third-party redeemers who had redeemed in that

19   fund but have yet to be paid, so they're treated like equity

20   claims but they're a fixed dollar amount because they are set

21   at the date that they redeemed based on the NAV at that time,

22   the net asset claim.

23        So, we were -- we were stuck with looking at that fund and

24   trying to determine how do we best manage the fund to get up-

25   side for the Debtor as well as the related entities that owned

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/04/25   Page 424 of 1017   PageID 2887

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 28 of 134

Seery - Direct                          28

1    the equity, making sure that we treated the redeemed entities

2    as fiduciaries, so which we acted as their fiduciaries, but

3    then also assuring that we managed the assets that that fund

4    owns in a prudent way.

5        One of the large assets in that fund were 13 life

6    policies.  And these are, in essence, life insurance policies

7    that the Debtor bought from third parties.  And there's a

8    market that trades life policies, and they owned these

9    policies on (inaudible).  The value at the time was marked

10   around $32 million when -- when we took control.

11       The problem with the policies and some of the other

12   expenses at Multi-Strat is that they didn't -- Multi-Strat

13   didn't have the funds to continue to pay premiums.  So, if the

14   premiums weren't paid, that $32 million was at risk of going

15   to zero.  Why?  Because if the premiums aren't paid, the

16   policies lapse.  And once they lapse, the insurance company

17   will pay you zero for them.  They don't them buy them back

18   anywhere.  That's the market.  But we looked at those assets

19   and began to consider how we would fund, from a liquidity

20   perspective, monies going into Multi-Strat.

21       The amounts required would require CC's approval under the

22   protocols, and the Debtor prepetition had advanced monies to

23   Multi-Strat to make premium payments and other expenses at

24   Multi-Strat.  We went to the Committee and were able to get

25   approval to put a couple million dollars in early on to keep

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/03/25   Page 425 of 1017   PageID 2888
Main Document   Page 434 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 29 of 134

Seery - Direct                               29

 1   the policies alive while we analyzed the best opportunity for

 2   maximizing value with respect to those policies.

 3        But thereafter, we needed additional money to try to

 4   consider how to continue to maximize value, and the Committee

 5   balked.  So we went to Dondero-related entities, and they

 6   actually put equity into the Multi-Strats.  So we -- the

 7   Debtor had made a postpetition, in essence -- it wasn't a

 8   postpetition advance because it was going outside of the

 9   Debtor, but postpetition, the Debtor made a loan to Multi-

10   Strat to service the policies, and then Dondero-related

11   entities made an equity investment into Multi-Strat to

12   continue to service the policies.

13        Well, we understood as a Board but that wasn't going to

14   work and that the protocols were going to continue to hinder

15   us, so we entered into a sale process with respect to those

16   policies.

17   Q   And the work that you're describing with respect to Multi-

18   Strat, is that -- just to transition to your work as

19   functionary CEO, would it fall into that bucket as opposed to

20   the Board work that we were talking about earlier?

21   A   Yeah, absolutely.  I think the -- the initial assessment,

22   as I said, we made as a group.  And we looked at what the

23   opportunity set was, and determined that, because of the

24   costs, we weren't going to be able to continue to fund money

25   into Multi-Strat to make those payments.

APP. 1405

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/05/25   Page 426 of 1017   PageID 2889
Main Document   Page 430 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 30 of 134

Seery - Direct                               30

 1        So the Board asked me to take on trying to work out a

 2    process to sell those policies.  So, working with Fred Caruso

 3    of DSI, we hired a broker, after interviewing a couple

 4    different brokers.  We considered the views of the internal

 5    Highland team with respect to value and how to maximize that

 6    value.  We entered into a sale process for those policies, and

 7    we ended up with a number of bidders and broke it down to two

 8    bidders for the 13 policies, breaking up the policies to

 9    maximize the value.  They're only on eight lives, so it's not

10    fair to call it a portfolio.  And so there's significant

11    amounts of premiums that have to be paid on a monthly basis

12    and going forward, and realizations on those policies are very

13    uncertain because it's hard to take them over an actuarial

14    methodology because there's only eight lives.

15        We tried to consider other ways to finance those policies,

16    but seven turned out to be, in our view, far and away the best

17    net present value for the investors in the fund.

18        The challenge that we had, as I mentioned, is the

19    complexity of Multi-Strat was also layered with a loan from

20    NexBank that was secured by four of the policies.  That $32

21    million loan was also secured by the MGM stock owned by Multi-

22    Strat.

23        And then, as we got towards closing, we learned that one

24    of the buyers wanted a more detailed title rep, and as we

25    peeled through, we found a long-dormant UBS fraudulent

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 5 Main Document Filed 06/425 of 2 Page 427 of 1017    PageID 2890

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 31 of 134

Seery - Direct                         31

 1   conveyance suit that had been brought against Multi-Strat.
 2   There was no lien on the policies, but it made it impossible
 3   for us to give the clean rep that the buyer wanted.
 4       And at this point, I was running that with Fred Caruso, at
 5   the request of the Board, and it became almost a full-time job
 6   except for the five other things that we have to do during
 7   April.  And we negotiated a variety of different -- well,
 8   considered a variety of different opportunities to try to
 9   complete the sale.
10       First, I negotiated directly with UBS to see if they would
11   agree to a release, and then when the funds, other than
12   certain escrows which had to be paid out to NexBank as well as
13   repayment of the Debtors' fund, (inaudible), that didn't -- it
14   was very unfruitful in terms of those negotiations.
15       I then moved towards a potential bankruptcy of Multi-
16   Strat, where we would file Multi-Strat, have to do a 363 sale,
17   have a DIP loan to service the NexBank monthly payments.  That
18   seemed very expensive.
19       We also thought about doing it as not selling them, so
20   perhaps we would a 360 -- a filing without a sale and try to
21   maximize the value by holding onto the policies but have to
22   get financing.
23       Ultimately, we came up with a structure which was we
24   escrowed funds for UBS, $10 million of funds, but they're not
25   actually for UBS.  We preserved all of our rights to defend

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5-4    Main Document Filed 06/04/25    Page 428 of 1017    Page 451 of 732    PageID 2891

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 32 of 134

Seery - Direct                          32

```
 1   the claims and we had paid down NexBank.  We allocated funds
 2   to make sure that we can pay NexBank for the next year before
 3   their loan comes due.  We allocated for all the expenses in
 4   Multi-Strat.  And then when we went back to the sellers, lo
 5   and behold, one of the two sellers balked.  Didn't -- or
 6   buyers, I'm sorry.  Balked.  Didn't want to complete the sale.
 7   And fortunately, our broker (inaudible) and Fred Caruso had
 8   had another buyer in the wings, kept them warm, and were able
 9   to complete the sale for $37 million.
10       So that goes to:  How does this business function, what's
11   the complexity of it, and what have I and the rest of the
12   Board been doing?  That was virtually a month's worth of work.
13   Q   And when did the Board ask you, if you recall, to
14   undertake this project?  When did it begin and when did it
15   end?
16   A   Well, the initial project, around -- around Multi-Strat,
17   we started analyzing it as a group in January, the first week
18   we were there.  I started probably taking control of it
19   sometime in mid-February, with Fred Caruso.  So, DSI was
20   already on it.  We were looking to work with the Debtors' team
21   as well as hire a broker.  We, as a group, as a Board, made
22   the decision to sell the policies.  Ultimately, we sold them
23   for about $37 million, which was -- which was more, a few
24   million dollars more than the mark on the policies when we
25   took them.
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 08/04/25   Page 429 of 1017   PageID 2892

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 33 of 134

Seery - Direct                         33

1   Q    Can you give the Judge a sense of your role, as distinct

2   from the Board's role, how you went about completing or

3   attempting to complete all of the tasks that you've described

4   and the interaction with the Board and what the Board's role

5   was in assessing all of that?

6   A    With respect to the Multi-Strat policies?

7   Q    Uh-huh.

8   A    I think, you know, initially, it was a understand, for the

9   three of us, understand the policies; understand the premium

10  obligations; understand what the benefits, the potential up-

11  sides to those policies were; and understand what the risks

12  were if we were to fail to make a premium payment; what did

13  the lapse period look like.  And we did that collectively.

14  From there, all of the individual work around -- we came up

15  with a strategy to sell the policies, and then the tactical

16  work with Fred Caruso about how to execute sale of the

17  policies and completing that sale through the issues NexBank,

18  through the issues with UBS, resolving those issues, that

19  became really my job.

20  Q    Now, I do want to take a step back, because we kind of

21  transitioned from the Board to the work that you were doing,

22  and I wanted to ask:  You're seeking -- the Debtor is seeking

23  to have you appointed as the CEO, right?

24  A    Yes.

25  Q    Can you just describe for Judge Jernigan your

002182   APP. 0409

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/25    Page 430 of 1017    PageID 2893
Main Document    Page 429 of 722

Case 19-34054-sgj11  Doc 864  Filed 07/17/20    Entered 07/17/20 10:53:51    Page 34 of 134

Seery - Direct                          34

1  understanding of the duties and responsibilities of the CEO

2  position that we're seeking your appointment for?

3  A    Sure.  From a high level, it's -- I apologize.  From a

4  high level, it's what I said earlier, which is the Board sets

5  the strategy, the CEO implements the strategy.  And so I work

6  with the Highland team and the managers that I described

7  earlier, whose function that is, to try to execute on that

8  strategy.  So that's, that's the basic overlay of what we do.

9  But that includes everything from, as I mentioned, personnel

10  issues to COVID-19 protocol to determining whether we're going

11  to sell certain assets and then how we're going to sell them,

12  determining how we'll resolve issues like Multi-Strat.

13      Another good example was the trading accounts that the

14  Debtor had.  So, on the second or third week of January, or

15  perhaps the third or fourth week, we determined as we were

16  going through the asset review that the Debtor had two primary

17  liquid or semi-liquid securities accounts, and those were in

18  the Select account, which was a separate fund that had

19  previously third-party investors but was effectively a hundred

20  percent, 99 and change percent, owned by Highland at this

21  point.  And an internal account, which was basically just

22  HCMLP-owned and denominated securities.  These were generally

23  at Jefferies.  Both of them employed significant margin.

24          THE WITNESS:  If this is too pedantic, Your Honor,

25  please tell me if I'm going too deep.

APP. 0449

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 431 of 1017
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 431 of 1017   PageID 2894

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 35 of 134

Seery - Direct                    35

1       But margin is, in essence, a way for a security purchaser

2   to borrow money to facilitate the purchase and holding of the

3   securities.  In essence, the lender, which in this case was

4   Jefferies, a large, well-known, reputable financier and New

5   York investment bank, was the Debtors' account holder.  The

6   Debtor would select securities.  Jefferies would establish a

7   haircut.  The haircut is really the -- how the lender

8   determines how much they want to lend against the assets.  So

9   if there's a -- if there's a haircut of a hundred percent in

10  use there, there would be no margin against that asset.  A

11  haircut of 50 percent means the debtor will give you -- or,

12  the lender will give you 50 percent of the funds you need to

13  own and hold that asset and you put up 50 percent of the

14  funds.

15      And in a margin loan, the way that the lender protects

16  itself is, each day, it assesses the value of the asset; it

17  looks at the volatility of the asset; and then it asks for

18  more margin if the asset value went down in the trading

19  markets; and then you have a day or two or three, depending on

20  the structure, to post the new margin.

21      If you don't post the new margin, and this the way every

22  margin loan works, the lender has the ability to seize the

23  asset, sell it, and pay off its loan.  It will then give you

24  the proceeds above the loan, if any.

25      The debtor -- the lender does that by looking at both the

1  daily prices, to make sure that it can manage its exposure,
2  but also it considers the volatility.  And what it does when
3  it's looking at the volatility, and volatility is really a
4  measure, the way -- the way that securities analysts look at
5  it, is a forward year of the movement, potential movement of a
6  security.  And that's how you set your haircut.  Because if
7  the -- if the asset is very, very stable -- for example, your
8  home -- if your home was a margin loan and your mortgage, say,
9  is a margin loan, there wouldn't be much calling of margin
10  every day, because if the lender loaned 80 percent of the
11  value of your home, there may be house sales that go higher or
12  lower, but they don't necessary move that much really quickly,
13  particularly if these loans set what's called a threshold
14  amount that allow a little bit of movement each way.

15      The margin loans, though, are on securities that can move
16  tremendously.  And what happened in February and then in early
17  March, volatility spiked up, prices moved significantly,
18  prices moved against the Highland positions.  So Jefferies did
19  two things.  One is it called margin, because it was -- its
20  equity cushion, in essence, was getting trimmed, and it wanted
21  more protection.  Number two, it increased the haircuts, which
22  it was entitled to do because it looked forward and said, The
23  volatility in this market is worse than we thought.  It will
24  be a higher volatility and there's more risk to us that the
25  asset could be worth less than the loan.

APP 0412

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 10/04/25   Page 433 of 1017   PageID 2896
Main Document   Page 46 of 2702

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 37 of 134

Seery - Direct                        37

1       I started working with Joe Sowin, who's a head trader, a

2   very accomplished trader at Highland.  He actually reports

3   into the -- not on the Debtors' payroll but another payroll

4   that we don't manage.  But he spends a ton of time working on

5   Highland assets and trading those assets.  And Joe and I

6   started working together to try to manage the Jefferies

7   exposure.

8       At one point, Jefferies actually seized the Select

9   account.  Again, Select wasn't in bankruptcy, but Jefferies

10  had safe harbor provisions or protections anyway and they

11  could have done it.  We felt they were about to seize the

12  internal account, and so we sent them a note that said that

13  perhaps their safe harbors weren't as good as they thought.

14  But, more importantly, here's our sale program.  Jim Seery's

15  going to take over the account, working with Joe, and we're

16  going to manage it down.

17      In the Select account, Jefferies took it over -- and this

18  is not really a blame to Jefferies; it's part of the market --

19  they sold out of that account pretty quickly.  They did work

20  with us, but they were the selling position and covering their

21  loan, and we lost virtually all of the value in that account.

22      In the internal account, we effectively kept Jefferies

23  from seizing it, gave them a sale program, and then day-to-day

24  managed the sale of the more significant assets, as well as

25  the hedges, which mean we traded pretty aggressively

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 434 of 1017   PageID 2897
Main Document   Page 457 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 38 of 134

Seery - Direct                          38

 1   throughout the day.  This was a full-day job, trading that

 2   account, with Joe as the trader and then me acting as the PM,

 3   effectively.

 4       We took that account, which if Jefferies had taken it over

 5   and done -- it had virtually the same securities, it had just

 6   a small number of securities, as well as some hedges which had

 7   significant basis risk related to the securities -- we took

 8   that account over.  If we'd gotten the same program as

 9   Jefferies, we would have lost $11 million.  We made about $23

10   million.  So that swing, that swing was pretty significant.

11   I'm sorry, we made about $11-1/2 million, about a $23 million

12   swing than if Jefferies had taken it over.

13       So that was another example of what I've been doing that

14   the Board designated me to do to help run this business.

15   Working with Joe, as well as research, as well as discussing

16   these positions on a regular basis with Jefferies, weekly

17   calls and daily e-mails, we were able to preserve that value

18   in that account.

19   Q   And so, just for context, this is happening in late

20   February or early March, as COVID is hitting and the markets

21   are volatile; is that fair?

22   A   That's when we started taking it over.  The real -- the

23   real -- the lay in the markets was about March 22nd or 23rd.

24   Q   Uh-huh.

25   A   And that's when it became a daily grind on those positions

002187
APP 0414

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 64423   of 2722 435 of 1017   PageID 2898

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 39 of 134

Seery - Direct                              39

 1   for a solid month to make sure that we got it in a decent

 2   place.

 3       And remind you that we were trading those accounts within

 4   the strictures of the protocols.  So we didn't have the

 5   ability to -- the securities were -- rather less liquid.  We

 6   didn't have the ability to just dump them, because we would

 7   have destroyed the market and taken significant losses.

 8       In addition, because of the protocols, we didn't have the

 9   ability to go out and buy hedges, even though we had a

10   negative bias as to where the market was, particularly in

11   those less-traded securities.

12       And it's -- it was public that Highland (inaudible) and

13   Highland (inaudible) was in bankruptcy, so you can be certain

14   that the traders were leaning on those -- those securities

15   from short decisions.  So it was a very difficult, time-

16   consuming effort, and a great job by Joe.

17   Q    When you talk about a time-consuming effort, how would

18   you -- how would you characterize the amount of time you spent

19   on this project in the month of March?  Was it a full-time

20   job?

21   A    Yeah.  Yeah.  I mean, full-time is relative, right, but it

22   was -- it was a lot of time.  So we would start out, you know,

23   like everybody else who is in those markets and do it the same

24   way, it's pretty tried and true:  By 6:30 in the morning,

25   you're starting to look at what the EOP, what Asia did, where

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/23/ of 2722   436 of 1017   PageID 2899
Main Document   Page 435

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 40 of 134

Seery - Direct                           40

 1   European markets were opened up, what the futures were looking

 2   like, looking at your own securities, checking all of the

 3   mail, talking to your research folks.  To the extent that you

 4   know that there's other investors in those investments, we

 5   reached out to those -- I have a number of contacts in the

 6   market who are in these kinds of assets -- to see what they're

 7   thinking and how they're looking at value.  And then set up a

 8   trading strategy with Joe, and then execute on it every day.

 9   And that trading strategy, again, was not static.  So during

10   the day, a dynamic trading strategy has to be adjusted

11   depending on what the market is doing, and Joe was excellent

12   at it.

13   Q   I think you mentioned the protocols earlier.  Can you just

14   talk a little bit more about how you and the Debtor

15   communicated with the Committee through this process of

16   addressing the Jefferies mortgage -- mortgage defaults?

17   A   Well, every day, we sent a report to -- to the Debtor -- I

18   mean, to the Committee, I apologize -- with our positions in

19   each of the accounts and tell them exactly what we're doing,

20   what the plan is, what we're set up to do, where we think it's

21   going, and what assistance we might need through the

22   protocols.

23       I think it became really difficult for the Debtors'

24   professionals -- the Committee's professionals to deal with

25   these issues, because it's just not what they were used to

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-Main-Filed 06/04/25   Page 437 of 1017   PageID 2900

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 41 of 134

Seery - Direct                              41

1   doing every day.  So we would report to them.  The Committee

2   met weekly.  We can -- provided direct information to

3   Committee members when they -- you know, there's members on

4   the Committee who are very versed in these types of assets.

5   We would talk to them directly, I would talk to them directly,

6   and tell them exactly what we're doing and why and get their

7   input, because there was no magic special sauce as to exactly

8   what to do.

9   Q   And would you characterize the process as transparent and

10  open between you and the Committee and its members?

11  A   Oh, oh, absolutely.  You know, we were -- they were

12  constructive.  I wouldn't say that the Committee wasn't

13  constructive.  I think the difficulty the Committee had, which

14  is what, you know, any third party would have, is that:  Why

15  are we going to put more money into these accounts when the

16  value is going down, and what's -- what's your -- what are

17  your price targets?  How do you think about those assets;

18  who's the analyst who's working on it; how do they compare to

19  other assets?  So it wasn't an easy process for the Committee

20  to get their arms around, either.

21  Q   Okay.

22         MR. MORRIS:  Your Honor, we have other transactions

23  that we could talk about if you think that would be useful, or

24  we could continue to push this forward.

25         THE COURT:  You can continue to push it forward.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 438 of 1017   PageID 2901
Main Document   Page 441 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 42 of 134

Seery - Direct                        42

1    Thank you.

2            MR. MORRIS:  Okay.

3    BY MR. MORRIS:

4    Q    Then let's transition for a moment just about your

5    recollection as to kind of when and how, you know, the

6    discussions with the Board and the Committee evolved with

7    respect to your taking over as CEO.  Did there come a point in

8    time that you can recall when the Board asked you to consider

9    that?

10   A    Yeah.  The Board asked me to consider it I would say

11   probably late January or early February.  And the initial

12   discussions, even before, you know, before we were selected.

13   So, as John Dubel and I had been selected by the Debtor and

14   the Committee, we talked about the need for one central point

15   of management for this company.  That it's 70 employees and

16   diverse assets, diverse business practices.  How are we going

17   to mold that as a Committee?  It really needed somebody to

18   execute the strategic plan that the Board put in place.

19       And so John had asked me about that even before we were

20   selected.  Committee counsel asked me about it.  So there was

21   -- there was some, at least away from me, there was some view

22   that perhaps I was going to be the person that was most

23   likely, if it was needed.

24       My view in early February was that, you know, we were

25   effectively, as the phrase goes, drinking from a fire hose,

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Main Document Page 439 of 742
Case 3:25-cv-02072-S Document 6-4 Filed 06/04/25 Page 439 of 1017 PageID 2902
Case 19-34054-sgj11 Doc 864 Filed 07/17/20 Entered 07/17/20 10:53:51 Page 43 of 134

Seery - Direct                               43

1    and I wanted to get a better sense of who the folks were at

2    Highland; what their responsibilities are; how they performed;

3    what I thought of them as performers; how -- I had -- or,

4    having some idea what the claims are and how that process

5    would work; and could we make this a success?

6        So, early on, in January and in February, as we started

7    having these discussions, I was in the Highland offices at

8    least three, usually four days a week.  And I was there from

9    7:30 in the morning until 6:00 or 7:00 at night every day.

10   And that gave me just a different feel for exactly how the

11   organization was running and the issues that were coming up

12   every day.

13       That evolved into March where, after I took over the

14   securities accounts in early March and then took over the

15   Multi-Strat issues, that John and Russ Nelms pushed me to

16   really consider stepping up fully to the CEO role.  So, by

17   early April, I think it's the first week of April, we actually

18   -- we put it forth and go to the Committee.  So we started

19   negotiating what potential terms were, how it would work.

20       You know, one of the concerns that I had, you know, we had

21   no idea, and I suppose we still don't, how the COVID-19 issues

22   will play out and how that would both -- because at the time

23   they were really affecting New York, where I'm based and I

24   live, and less so in Dallas.  But by mid-March, it was pretty

25   clear that the whole country was being affected.  And now,

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 440 of 1017   PageID 2903
Main Document   Page 423 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 44 of 134

Seery - Direct                          44

1   obviously, it's hitting all over.

2       And hopefully that will settle, but what we did learn, and

3   I think a lot of businesses learned, is that particularly

4   these types of service businesses that function electronically

5   in lot of respects, even when they are in an office, because

6   you're in front of your screen, that we are very lucky to have

7   these types of roles where we can really perform the job, if

8   not equally well, pretty darn close to how you perform it when

9   you're at the office.  And so that issue subsided a little bit

10  in terms of how I would interrelate -- not the issue going

11  away, obviously -- but how I could interrelate and work with

12  the team to drive the business, even if I was doing it from

13  New York.

14  Q   And have you continued to play a leadership role from the

15  time you spoke with your fellow Board members in early March

16  until the present?

17  A   I have.  And I think one of the things that the Committee,

18  you know, recognized was that John and Russ, experienced

19  professionals, were willing to step back and let me take the

20  day-to-day working with the Committee or presenting to the

21  Committee.  So we do have weekly Board meetings and we do have

22  almost daily Board calls, and then, without an official

23  meeting, we meet on the phone virtually every Saturday or

24  Sunday, sometimes both, with the three of us, to go through

25  what's happened every -- each week, how the plan has evolved

APP 0429

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 441 of 732   Page 441 of 1017

Case 3:25-cv-02072-S   Document 54   Filed 06/04/25   Page 441 of 1017   PageID 2904

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 45 of 134

Seery - Direct                          45

1    and where we're pushing it.

2         But in terms of the presentations to the Committee, I took

3    the lead on those in both designing and working with the Board

4    then and then implementing them and laying them out for the

5    Committee, as well as the individual negotiations.

6         So, early on, we determined that we had to try to figure

7    out a way to push this case forward, notwithstanding that we

8    weren't getting -- we didn't see a lot of movement from any of

9    the parties, frankly, on trying to figure out a way to

10   coalesce around a direction.  So we designed a program that we

11   laid out for the Committee in which we considered three main

12   areas to consider for a plan.  And I took the lead on doing

13   that.

14   Q   So, let's talk a little bit about the claims resolution

15   process and the formulation of a plan.  Have you played any

16   role in the claims resolution process?

17   A   Well, we haven't actually resolved any claims completely

18   yet, but we're very close on one, and I've taken the lead on

19   doing that.

20        On the other two, I've been involved heavily with the --

21   both counsel and with DSI in analyzing the claims.  As well as

22   with the rest of the Board, frankly.  The -- you know, we've

23   got a significant amount of expertise between John Dubel and

24   Russ Nelms with respect to how to think about these issues in

25   the context both of a bankruptcy, obviously, with Russ, and in

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/25   Page 442 of 1017   PageID 2905
Main Document   Page 46 of 132

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 46 of 134

Seery - Direct                           46

1    the context of both a restructuring and in the business with

2    respect to John.

3        So we've gang-tackled those, again, effectively, all

4    analyzing the various issues with respect to these claims.

5    But in terms of having the direct negotiations, particularly

6    on two of them, I've taken -- I've taken more of the lead

7    about where we could go.  And if you -- particularly with my

8    background in restructuring, and having wrestled with

9    substantive consolidation, alter ego, piercing the veil since

10   1988 or '89, you know, some of the issues that have arisen in

11   this case are very, very familiar to me.  I've spent a

12   significant part of my career dealing with those.  So I've

13   taken the lead on those types of issues.

14       I think that where I was going was in terms of structuring

15   potential outcomes for plans.  And we are -- you know, we've

16   been slowed down, as I think Jeff Pomerantz mentioned last

17   week, to a fair degree by COVID, in that the business impacts,

18   we can go into, and Jeff touched on some of those, but the

19   social impacts with respect to negotiating are hard to -- are

20   hard to understate.  The -- you can run a business like this

21   through your screen.  It's very difficult to simply negotiate

22   by phone or by video.  The face-to-face, at least in my

23   experience, makes a big difference in moving parties, and we

24   haven't had as much of that.

25       What we've tried to do recently, starting in May, is we've

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 443 of 1017   PageID 2906
Main Document   Page 426 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 47 of 134

Seery - Direct                                    47

1    put together a program for the Committee, and we'll walk them

2    through what I think are the -- what we determine as a Board

3    and then we laid out the specifics -- I didn't; DSI -- of what

4    the options are in this case.

5        And I think number one was the status quo.  Do we maintain

6    this case status quo, continue to run the business, and then

7    try to negotiate, resolve, mediate, or litigate, first through

8    dispositive motions, then through something more significant

9    if we can't do it through dispositive motions, these claims?

10       The Debtor right now on an operating basis does burn cash.

11   I can go into the specifics, but the Committee knows them, and

12   I'd prefer to do those *in camera* if we -- if the Judge would

13   like that.  We do burn cash on an operating basis, but not

14   that much.  The Debtor has about $30 million (inaudible) and

15   the business does run, and generally each year the operating

16   burn, if you will, which is, in compensation, is filled by

17   selling some assets that have appreciated in value.  And the

18   Debtor runs real -- with those accretions, run roughly

19   breakeven.

20       The problem in this case is that we are burning a

21   significant amount of bankruptcy professional fees.  And it's

22   the lament of creditors and business operators and the

23   bankruptcy bar.  I think, certainly, the judges that I see for

24   a long time.  And the percentage -- the cost of the cases

25   keeps going up and the percentage of the assets keeps going,

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 09/04/25    Page 444 of 1017    PageID 2907
Main Document    Page 467 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 48 of 134

Seery - Direct                          48

1   but particularly if the asset values are going down.

2       So the status quo didn't make a lot of sense unless we

3   were going to get very swift movement from the parties, and I

4   mean all sides, to try to resolve the case.

5       The other type of outcome we thought about in terms of a

6   plan was a downsiding model.  Downsizing model, excuse me.  In

7   that model, we would try to significantly cut headcount, try

8   to significantly cut expenses.  Run the business as leanly as

9   possible.  And then try to go through those steps with respect

10  to resolving the claims.

11      Again, the problem, the problem with that is resolution of

12  those claims was uncertain and could take a long time, unless

13  we had significant movement from either side.  But, moreover,

14  in terms of operating the business, we determined that with

15  respect to both the managed accounts and shared service

16  agreements, we really couldn't effectively do the job that the

17  Debtor does with a smaller staff.  Truth is, even at 70

18  people, the HCMLP staff is pretty lean.  It's a really good

19  team and they are very efficient and they've really proved it

20  through working offsite, you know, through the pandemic.

21      But we really thought that if we -- and analyzed it.  If

22  we were to try to cut that team and provide the services, we

23  would fall down.  So we would breach the duties or potentially

24  incur liabilities under those various contracts.

25      The third area that we took a look at, which was what we

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 54   Filed 06/04/25   Page 445 of 1017   PageID 2908

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 49 of 134

Seery - Direct                          49

1    called the subservicing model.  In this model, we would try to

2    separate the business of the Debtor, which has a small

3    operating loss, but it's still material money, from the asset

4    management.  That way, you could hold onto the assets for the

5    benefit of the creditors or the Debtor, depending on where the

6    claims comes out, still provide the services to those third

7    parties under the subservicing agreements or the management

8    agreements.  You wouldn't make money on that, but you'd get

9    rid of the operating burn.

10        And that model had a number of issues, but we've sort of

11   evolved that model to what I think has been referred to in

12   court as the debtor-creditor monetization vehicle.  So a

13   little bit of a cumbersome name, but the idea would be to try

14   to separate the assets, which potentially are the ways to pay

15   the creditors, depending on where claims come out, and then --

16   and the operations, and make sure you can continue the

17   operations without a heavy burn.

18        That model also permits us to cut, we believe, bankruptcy

19   operating expenses significantly.  So, right now, because of

20   the nature of the case, we have two professionals doing every

21   job:  Committee professionals and Debtor professionals.  We

22   would be able to reduce that cost by putting those into one

23   entity that'll be a trust-like structure to service the

24   business, resolve the claims, monetize the assets.

25        And, finally, something I started working on -- I'd say on

**002198**

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 10/14/25   Page 446 of 1017   PageID 2909
Main Document   Page 50 of 134

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 50 of 134

Seery - Direct                        50

1   my own, but that wouldn't be true -- with the DSI team,

2   particularly the two -- we have two excellent analysts on the

3   case.  A very detailed model of what I think has been referred

4   to maybe even in court as a potential grand bargain plan.  And

5   that plan looks at monetizing the assets over what period we

6   believe that we could get that done.  (inaudible) we're

7   looking at the values that we could achieve as well as setting

8   out what we think are reasonable numbers for the claim

9   distributions and then how they would be made.

10      Now, on the asset side of the ledger, we have a pretty

11   good understanding.  We obviously know where the assets are

12   bought, and we have a pretty good sense of what the current

13   market looks like for those assets.  We're not a forced

14   seller, but we have -- we have been involved in processes

15   around a number of the assets and have a good sense of where

16   values are and how long it would take to achieve those values.

17      You don't have to sell an asset as well to get money from

18   it.  There might be ways to finance those assets.  Although,

19   to be sure, in this environment, financing particularly these

20   types of assets has become very, very difficult.

21      The other side of the equation of the claims, and we're

22   using our best estimate of where we think those claims come

23   out in terms of payment, the creditors often have a different

24   view as to what they would like those claims to come out with.

25   So we're trying to figure out, through negotiation and

002199   APP 0426

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 1-5 Filed 06/4/25   Page 447 of 1017   PageID 2910
Main Document   Page 440 of 2722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 51 of 134

Seery - Direct                          51

1    discussion, how we get those two sides closer together.  And

2    that, that would be the grand bargain plan.

3        And I think where we're really focused now is that status

4    quo doesn't make sense.  We've gone that way too long.

5    Downsizing doesn't work because of the complexity of these

6    operations and the contractual obligations that the Debtor

7    has.  And it's really a grand bargain plan or a Debtor

8    monetization, a debtor-creditor monetization vehicle, which

9    would be structured like a trust and still be able to service

10   the business while resolving the claims.

11   Q    Taking into account the uncertainty because there are

12   still some options being considered, in your leadership role,

13   have you -- do you have a sense of timing?  Is there a

14   timeline by which certain milestones are at least

15   aspirational, if not achievable?

16   A    Well, I don't think I'm telling anyone what they don't

17   know, that deadlines get people to act and make decisions.

18   Sometimes they're good decisions, sometimes they're not, but

19   we're going to push forward on both of these plan

20   opportunities now.  So we intend to file a debtor-creditor

21   monetization vehicle plan, and we'll keep pushing the parties

22   towards settlements.

23       You know, as we say on the Multi-Strat negotiations, until

24   it was clear that we were either going to default, because we

25   didn't have the money to pay those premiums, or we're going to

APP 1427

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/04/25   Page 448 of 1017   PageID 2911
Main Document   Page 451 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 52 of 134

Seery - Direct                        52

 1   file Multi-Strat as a bankruptcy, it was hard to get folks to
 2   really come to the table and think about how to settle that
 3   issue.
 4       These issues in regard to the total case are much more
 5   complicated.  We're going to file a plan.  We believe that
 6   will set a bit of a crucible to folks to think about how to
 7   move forward with their claims.  We are, as Jeff Pomerantz
 8   mentioned last time, agreed in principle, but we have some
 9   issues to work through with Redeemer that we hope to be able
10   to resolve by this week.  And so that's my internal goal, but
11   I expect to be able to do it.
12       The reason that's complex is not that it's simply a -- the
13   arbitration award is not simply a money award; it actually
14   requires certain offsets, it requires certain assets be sold
15   and paid for.  And we're trying to carve our way around some
16   of those, because they (inaudible) agreement, because they're
17   -- they're more difficult than simply exchanging cash for
18   assets, because we don't have the ability to do that right
19   now.  We don't have the cash, and we're in bankruptcy.
20       So I do believe that we can get these done.  And then if
21   mediation is something that would work, great.  We're going to
22   try to do it without mediation as well.  Going to try to do it
23   before we get to mediation and resolve claims.  And if we're
24   unable to do that, hopefully mediation will push it forward or
25   we have to have a fallback, which will be dispositive motions

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Main Document   Page 64 of 272   Page 449 of 1017   PageID 2912

Case 19-34054-sgj11  Doc 864  Filed 07/17/20   Entered 07/17/20 10:53:51   Page 53 of 134

Seery - Direct                           53

1   with respect to certain of the claims.

2       But we expect to have and I think we have a number of

3   claims objections that have (inaudible).  We've resolved

4   those.  We're really down to three claims.  And one of them is

5   almost done.

6   Q   All right.  At the last hearing, --

7           MR. MORRIS:  Your Honor, that really does finish the

8   substance of the testimony with respect to this motion, but at

9   the last hearing Your Honor raised some questions about PPP

10  loans.

11          THE COURT:  Yes.

12          MR. MORRIS:  Would you like me to just take a moment

13  with Mr. Seery to address that?

14          THE COURT:  Yes, please.

15          MR. MORRIS:  Okay.

16  BY MR. MORRIS:

17  Q   Mr. Seery, you're aware that the Judge raised some

18  questions about whether and to what extent the Debtor may have

19  been involved in any of the PPP loans?

20  A   Yes.

21  Q   And have you done any work to try to figure out the

22  answers to the questions the Judge posed?

23  A   Well, work in response to the question, but also work

24  previously.  So, just a -- quickly, as I think we all know,

25  the PPP program was put forth to try to give companies cash

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 450 of 1017   PageID 2913
Main Document   Page 453 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 54 of 134

Seery - Direct                          54

 1    that they had to use for employee payments, to continue to
 2    keep payroll supported and to continue to have folks hold
 3    their jobs.
 4        We have -- and I think the *Business Insider* article, which
 5    I'm not familiar, I know the publication is not something I
 6    seen much, but I'm not familiar with the specifics of that
 7    article, and -- but any PPP, away from the assets that HCMLP
 8    actually owns or controls.  And we've got -- we've got three
 9    -- and I think there's some substance to the article.  But
10    we've got three businesses.  And these are -- this is public,
11    but I'll go into the -- sort of the obvious reasons without
12    going into the specifics of the business around the ones that
13    I know of well.
14        Carey Limousine is a business that transports folks in
15    high-quality cars from airports or from events or between
16    businesses.  It was hit severely by the COVID-19 pandemic.,
17    particularly with respect to the air transportation, which was
18    really one of its biggest areas.  The business,
19    notwithstanding Uber and the other type of shared ride
20    services, had actually done quite well, and Highland was an
21    owner of a significant portion of that business related to
22    some loans that it held in various funds.
23        That business's management, with its own outside counsel,
24    sought a PPP loan.  Then our director came to us and discussed
25    with the Board the propriety of that loan.  We engaged outside

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 451 of 1017   PageID 2914
Main Document   Page 64 of 232

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 55 of 134

Seery - Direct                            55

1   counsel, not bankruptcy counsel but counsel that had

2   particularized expertise in PPP, and spent a ton of time

3   really understanding both the law as well as the specific

4   regs.  Carey did get a PPP loan.  It is potentially

5   forgivable, depending on how it's used.

6       The second entity that was similar but didn't come to the

7   Board, we have a business called SSP, which is an excellent

8   highway business that provides equip -- materials for a lot of

9   different road construction, but primarily highway road

10  construction.  Very well run business.  That entity got a PPP

11  loan as well, primarily worried about whether the construction

12  on the highways would shut down.

13      So it's been -- I don't believe that's really happened in

14  Texas, which is where most of their business is, but they

15  qualified for that loan.  They did not come to the Board.  A

16  very specific carve-out, because one of the interest holders

17  that we share that position with is a Small Business

18  Administration fund and, so it was very clear that it was

19  entitled to that loan.

20      Then there's a third entity called Roma that got a very

21  small PPP loan.  We don't control the entity and we were not

22  involved in its acquisition of that loan.  Again, it would

23  have to be used as required.

24      One of the things I want to make sure that is in the

25  record and for Your Honor with respect to Carey, we spent a

002204
APP 1131

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/435 of 272a 452 of 1017   PageID 2915
Main Document   Page 451 of 1017

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 56 of 134

Seery - Direct                              56

 1  lot of time as a Board focused on, one, whether it was legal

 2  to get that loan, first.  We're doing everything right, by the

 3  book.  We're not going to play in the gray.  There is no gray.

 4  There's black and white in these areas.

 5      Number two, was it ethical, was it appropriate that we

 6  went and got this loan or that Carey went and got this loan?

 7  Management, with the outside counsel, was sure that we could

 8  do it, but we didn't want to take their word for it, so we

 9  went out and got our own counsel, third-party counsel for the

10  Board to make sure that this was appropriate.

11      Three, the requirements around these loans are significant

12  and the penalties for violating them are severe.  So if you

13  get a loan by mistake, are you really required to pay it back?

14  And if you're mistaken, that will be expensive, but it won't

15  be a real penalty.  But if you get a loan that's really

16  inappropriate, that you shouldn't have gotten, that was a

17  material misstatement of any of the facts around it, the

18  penalties are significant.  And not only in terms of the

19  opprobrium that you'd suffer in the press, because that's

20  coming, but in terms of how you use the funds.

21      So they can only be used in very specific ways, and we

22  were exceptionally careful around this program.

23      The basis of the program is to keep people employed.  And

24  with a business like Carey Limousine in particular, where

25  there's a significant amount of debt, where the business is

Seery - Examination by the Court          57

1    shut down by COVID, where we didn't have the funds to put into

2    Carey, nor even if we wanted to, we might not have been able

3    to do it without the Committee's approval because of the

4    protocol, a PPP loan was not only legal but it was

5    appropriate.  And it's being used in that fashion, meaning to

6    keep employees employed.

7    Q    Thank you very much, Mr. Seery.

8              MR. MORRIS:  Your Honor, I have no further questions

9    of Mr. Seery.  Does the Court have any questions?

10             THE COURT:  I actually have a follow-up question

11   regarding the PPP, just to kind of put a bow on this.

12                     EXAMINATION BY THE COURT

13             THE COURT:  I'm looking at the demonstrative aide.  I

14   don't know if you, Mr. Seery, have it there handy.

15             THE WITNESS:  I do, Your Honor.

16             THE COURT:  Okay.  So I'm turning to Page 6, the

17   chart, the subchart, Investments and Subsidiaries.  The third

18   column, Privately-Held Equity, Various Companies.  I mean,

19   that would be the type of investment entity we're talking

20   about here that got the PPP loan:  Carey Limousine, SSP, Roma?

21   Nothing that was -- well, I'm going to say Highland affiliate.

22   Affiliate, that's a dicey term, but that's the type of entity

23   in the organizational structure we're talking about, correct?

24             THE WITNESS:  Those are the ones -- I want to be very

25   careful, because I know what I know and I know I won't

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/06/25   Page 454 of 1017   PageID 2917
Main Document   Page 437 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 58 of 134

Seery - Examination by the Court                58

1   represent anything that I don't know.

2       So, with respect to the entities that HCMLP, the Debtor,

3   controls, that's absolutely the case.  I don't know, and I can

4   try to find out, but they are not HCMLP-controlled entities.

5   Whether other entities in the related-party complex received

6   loans -- so, obviously, HCMLP did not receive a loan.  And the

7   only entities that we were involved with is the ones I

8   mentioned to you.

9       And I should mention, there are other entities in the

10  privately-held equity that got other government money, in the

11  medical space, that they didn't even ask for.  HHS pushed

12  forward payments to folks in the business, medical healthcare-

13  providing businesses, to assure that they had liquidity to

14  provide.  And so -- and this has been described to me exactly

15  this way, that they woke up in the morning and found money in

16  their account.  And with one of the companies, they actually

17  returned a bunch of the money because it was from a dormant

18  provider number and they didn't believe it was appropriate to

19  keep that money.  So that was one of the entities that we

20  control with other investors.

21      But with respect to our HCMLP entities, these are the only

22  ones I know.  With respect to other related entities that

23  might be in the family of businesses, for lack of a better

24  term, that were alluded to in the *Business Insider* article, I

25  don't know that answer.  So, I -- if I -- I can try to find

002207
APP 1494

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 455 of 1017   PageID 2918
Case 3:25-cv-02072-S   Document 5-4   Filed 04/04/25   Page 455 of 1017   PageID 2918
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 59 of 134

Seery - Examination by the Court          59

1   out.  I just don't know the answer, Your Honor.

2          THE COURT:  All right.  Thank you.  Well, this has

3   been extremely helpful.

4       I should ask does anyone have any questions of Mr. Seery?

5   The Committee counsel, perhaps?  Anyone else?

6          MR. CLUBOK:  Your Honor, this is Andrew Clubok.  In

7   light of the testimony, I do have some questions on behalf of

8   UBS.

9          THE COURT:  All right.  Briefly.  Go ahead.

10          MR. CLUBOK:  Okay.

11          MR. MORRIS:  Your Honor?  Your Honor, I'm sorry to

12   interrupt, but there's no objection lodged here.  If Your

13   Honor wants to permit it, that's obviously the Court's

14   prerogative.  But as just a point of order, having not lodged

15   an objection, I don't know what right anybody has to cross-

16   examine the witness.

17          THE COURT:  All right.  Well, that's why I said

18   briefly.  I think that Mr. Morris makes a good point, Mr.

19   Clubok.  You could have filed a written objection, response,

20   comment, or something.  So, you're a party in interest.  I'll

21   give you a little bit of leeway here.  But please keep it

22   brief.

23          MR. CLUBOK:  Yeah.  Thank you, Your Honor.  It's just

24   some of the things that Mr. Seery said which we didn't expect

25   to hear that has raised a few questions that I just very

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S     Document 15    Filed 04/25/25    Page 456 of 1017     PageID 2919
Main Document   Page 239 of 2722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 60 of 134

Seery - Cross                            60

1   briefly will try to address.

2                      CROSS-EXAMINATION

3   BY MR. CLUBOK:

4   Q    Mr. Seery, good afternoon.  I'm Andrew Clubok, Latham &

5   Watkins, on behalf of UBS.

6        Mr. Seery, you talked about the fiduciary duties you've

7   understood yourself to have with respect to certain parties,

8   and my question to you is:  Have you understood, since the

9   beginning of your service as an Independent Director of

10  Strand, that you had fiduciary duties to the unsecured

11  creditors of the Debtor?

12  A    It's a -- it's a -- the answer is I understand the

13  fiduciary duties very well.  I think we have fiduciary duties

14  to the estate.  So Highland -- what I tried to explain is that

15  Highland, as an asset manager, has very specific fiduciary

16  duties that are set forth in (inaudible) in the cases and the

17  rules that have interpreted it.  We, as directors of Strand,

18  have a duty to the estate.

19       I don't think it's -- I don't think it's fair, and I'd

20  have to subject myself to some education from counsel, I don't

21  think it's fair to say we had a specific fiduciary duty to a

22  particular creditor.

23       So, for example, if I had a fiduciary duty to UBS, it

24  would be very difficult for me to object to UBS's claim.  It

25  would be -- I don't know how I could do that as a fiduciary.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/04/25   Page 457 of 1017   PageID 2920
Main Document   Page 456 of 722

Case 19-34054-sgj11   Doc 864   Filed 07/17/20   Entered 07/17/20 10:53:51   Page 61 of 134

Seery - Cross                          61

1    When the claim is crystalized in the estate, I believe that we

2    have fiduciary duties to each and every interest holder in the

3    estate.

4    Q   My question is a little simpler, and I just -- well, I'm

5    actually not asking legally whether you do or not.  I'm asking

6    what your understanding has been since your role.  Have you

7    conducted yourself in a way in which you have treated your

8    obligations as though you have a fiduciary obligation to the

9    unsecured creditors?

10          MR. MORRIS:  Objection to the form of the question.

11          THE COURT:  Sustained.

12          MR. CLUBOK:  Okay.

13   BY MR. CLUBOK:

14   Q   You said that you believe that you have, with respect to

15   Multi-Strat, which is an entity that you manage, you said that

16   you understood yourself to have fiduciary duties to the

17   redeemers of Multi-Strat.  Do you recall that?

18   A   Yes.

19   Q   Yeah.  And Multi-Strat is outside of the estate, but HCM,

20   the Debtor manages Multi-Strat.  And you said because of, you

21   know, your role, you personally feel as if you have a

22   fiduciary duty to the redeemers in Multi-Strat, correct?

23   A   I --

24          MR. MORRIS:  Objection to the form of the question.

25   Mischaracterizes the testimony.

APP 1437

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15-4   Filed 06/04/25   Page 451 of 732   458 of 1017   PageID 2921
Case 19-34054-sgj11   Doc 864   Filed 07/17/20   Entered 07/17/20 10:53:51   Page 62 of 134

Seery - Cross                              62

 1              THE COURT:  Sustained.

 2              MR. CLUBOK:  Your Honor, I believe that the

 3      transcript -- I believe Mr. Seery said in direct that he

 4      considered himself to have fiduciary duties with respect to

 5      the redeemers of Multi-Strat.  The transcript will show it.  I

 6      don't know what the objection is.  Maybe I misstated when I

 7      asked my question, but I'm just starting --

 8              THE COURT:  Okay.

 9              MR. CLUBOK:  I'm just trying to understand --

10              THE COURT:  All right.  I'll let you rephrase the

11      question, but this -- I've probably -- I may have made a

12      mistake in letting you ask questions, because this is about

13      the propriety of him being CEO and the reasonableness of

14      compensation.  This isn't a discovery opportunity.  So I'm a

15      little confused the relevance of what you're asking.  Could

16      you address that for me?

17              MR. CLUBOK:  Sure.  Your Honor, Mr. Seery on direct

18      described what he understood his fiduciary duties to be.  I

19      think we -- it made me wonder, he didn't mention the unsecured

20      creditors or what he believes his fiduciary relationship is,

21      if any, with the creditors, unsecured creditors.  I would -- I

22      think it's a fair question to ask what his understanding is,

23      because now he's going to take on a new role as CEO, and I

24      think it's appropriate for everyone to understand, so we know

25      when we're dealing with Mr. Seery --

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/04/25   Page 459 of 1017   PageID 2922
Main Document   Page 63 of 134

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 63 of 134

Seery - Cross                              63

```
 1          THE COURT:  Okay.
 2          MR. CLUBOK:  -- what his --
 3          THE COURT:  I think -- I think he --
 4          MR. CLUBOK:  -- he understands -- what he understands
 5   his fiduciary duties to be.
 6          THE COURT:  I think he answered the question, and
 7   frankly, I think he answered it correctly.  His fiduciary
 8   duties go to the estate, right?  And the creditors are the
 9   beneficiaries of his actions in that regard, right?  So I
10   think he correctly answered the question already.  All right?
11   Next question.
12          MR. CLUBOK:  Okay.  He says that there's three
13   aspects of the business he's been managing: $300 million,
14   roughly, of Highland's own assets; the fact that they manage
15   $3 billion in other assets, I think in managed assets; and
16   then they have shared services for $6 billion in assets owned
17   by related entities, mostly.
18   BY MR. CLUBOK:
19   Q   For those three separate businesses, I just want to
20   briefly understand:  With respect to the first one, for
21   example, there's $300 million, you said, roughly, of
22   (inaudible) assets.  Roughly what were the value of the assets
23   when you started your role in January of 2020?
24   A   It's hard to compare apples to apples on this because
25   there are certain assets that we've taken out that didn't
```

002212

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/04/25   Page 460 of 1017   PageID 2923
Main Document   Page 64 of 272

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 64 of 134

Seery - Cross                            64

1   change in value.  So I would say they were carried on the

2   balance sheet at different levels.  I think a good rough

3   number would be in the $500 to $600 million area.

4   Q    Okay.

5   A    And the biggest -- the biggest movants in asset values

6   have been on securities, both ones that we continue to own and

7   the accounts that Jefferies -- that were levered, and those

8   were shown as unlevered marks on the balance sheet and the

9   losses that were incurred there.  And then with respect to

10   certain of the PE assets and then a major movement on a

11   related-party loan, where the Board, through analysis that we

12   did with DSI and others, believes that loan is likely to be

13   worthless.  Likewise, the claim of that entity we believe is

14   likely to be worthless.

15   Q    And then to the extent the assets, you say, have a rough

16   value of $300 million, you alluded to significant professional

17   fees, bankruptcy costs, administrative fees, the Debtor is

18   burning cash.  My question is, If it's $300 million today

19   roughly of total value of assets, what's your current best

20   estimate of the total amount that will be available to be

21   distributed to the creditors net of those -- that burning of

22   cash and the admin fees and the other issue that you

23   mentioned?  What is your current expectation of the total

24   amount that will be able to be distributed to the creditors?

25           MR. MORRIS:  Your Honor, just -- I just object to

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Document 1-24   Filed Page 06/454 of 2732   461 of 1017   PageID 2924

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 65 of 134

Seery - Cross                              65

1    this line of inquiry.  It's like free discovery, as Your Honor

2    suggested earlier.  I don't know what it has to do with Mr.

3    Seery's work, his qualifications, the compensation

4    arrangements.  And I think it's inappropriate.

5            THE COURT:  Okay.  I'll overrule and allow this one

6    remaining question, but that's going to be it, unless your

7    next questions pertain to the employment or compensation

8    structure.

9            THE WITNESS:  Yeah, I don't have a crystal ball as to

10   what the assets are going to be worth.  I think that they are

11   fairly marked right now, and we have significant discovery

12   that we've had with respect to a number of the assets and

13   marked at views as to their value.  So I think that we're at a

14   pretty good base value, assuming that we don't rush into

15   forced sales of assets.

16      So, as I know the Court is aware and I hope you're aware,

17   when you look at asset values, and you look at them on a

18   liquidation basis, the numbers are normally much lower than

19   when you look at them as selling them on a more controlled

20   basis.  If you have liquid securities, that's not the case.

21   So if I have $500 million of Apple at $363 today, it's

22   probably a good chance that it'll be worth something different

23   in a month, something different in two months.  But if I need

24   to move my position, I can do that.

25           These assets are much more difficult to move.  And the act

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 462 of 1017   PageID 2925
Main Document   Page 66 of 134

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 66 of 134

Seery - Cross                              66

1   of selling them often changes the value, which is why we

2   engage professional bankers to help move, first, those assets.

3       So I just don't have a good crystal ball.  I think the

4   valuations that we have now are pretty good.  I think they've

5   been scrubbed well.  But that doesn't mean that certain of

6   these assets will maintain the exact value they have.  So, I

7   gave a good example of Carey Limousine, which is a very small

8   asset but it's an easy one to understand because everybody can

9   relate to a car service company that does, you know, a little

10  bit more high-end and is focused on the airport travel and how

11  that's been impacted.

12      That asset value has gone down precipitously, even though

13  it was small, because of that.  So I don't -- I don't really

14  have a great crystal ball as to what's going to happen.  If

15  we're very successful in the fourth quarter and the economy

16  stabilizes and the COVID vaccines are out in record time and

17  move forward, then I think we've got potential for upside.

18  But right now, in the current environment, I think we're

19  marked fairly.

20  BY MR. CLUBOK:

21  Q    Yeah.  But my question really wasn't about the value of

22  the assets.  I realize those could go up or down.  And you

23  think they're fairly marked.  My question was, What's the

24  total amount of setoff from those assets to the extent the

25  bankruptcy fees you alluded to, the burning of cash on the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 463 of 722   Page 463 of 1017   PageID 2926

Case 3:25-cv-02072-S   Document 15-4   Filed 04/04/25

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 67 of 134

Seery - Cross                        67

1   other businesses, you know, how much, you know, net -- what's

2   the amount that will come off of those assets or that should

3   be -- that we should assume will be deducted from those assets

4   because of the professional fees that have been incurred or

5   you predict will be incurred through the end of the year and

6   the burn of cash that you mentioned, et cetera?

7       I'm trying to understand how you supervised -- because

8   you've managed those expenses as well as the assets, right?

9   And so I just think it's important for us to understand, at

10  the end of six months, and then how things are set for the

11  rest of the year, what's the total amount of, you know, call

12  it liabilities or costs associated with running the business,

13  running the business and at a cash burn rate, bankruptcy fees,

14  et cetera, that we --

15          THE COURT:  Okay.  I'm going to cut it off.  I'm

16  going to cut it off.  That, in my view, is going a little too

17  far afield.  That's a discussion outside the courtroom.  So,

18  thank you, and we're going to see:  Does the Committee have

19  anything they want to ask?

20          MR. CLEMENTE:  Your Honor, Matt Clemente on behalf of

21  the Committee.

22      I certainly do not have any questions to ask.  I do have a

23  couple of statements that I want to make, but I don't know if

24  now is the appropriate time or if there's going to be further

25  testimony.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/04/25   Page 464 of 1017   PageID 2927
Main Document   Page 457 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 68 of 134

Seery - Examination by the Court          68

1          THE COURT:  Okay.  I think there might be another

2     witness or two, but we'll let you make your comments at the

3     appropriate time.

4                    EXAMINATION BY THE COURT

5          THE COURT:  Mr. Seery, I meant to ask, I forgot to

6     ask:  You've mentioned a couple of times the Debtor, Highland,

7     has 70-ish employees.  Has the number gone down since the case

8     was filed, is Highland losing employees, or is it staying

9     stable?

10          THE WITNESS:  We lost -- we lost seven employees.

11     There were some that were severed for performance reasons.

12     That happens every year.  There were some that just moved on

13     because they decided to move on.  And that some -- and then we

14     had some that, because of the bankruptcy, we lost.  We added,

15     I think, one or two employees that we're pretty excited about

16     in the fund valuation area, which is a pretty critical area

17     for the shared services.  Unfortunately, they haven't been

18     able to go to the office, but fortunately, they've been able

19     to work.

20        So we're down, Your Honor, probably eight total, and so

21     we're more of the low to mid-60 area right now.

22          THE COURT:  Okay.  And --

23          MR. SEERY:  And we were a little bit north of 70 when

24     we took the case.

25          THE COURT:  Okay.  And the COVID situation, I mean,

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4   Filed 06/04/25   Page 465 of 1017   PageID 2928
Main Document   Page 468 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 69 of 134

Seery - Examination by the Court          69

1   if you walked into the office, would there be people around in

2   masks, or are people still working at home?

3          MR. SEERY:  People -- so, in -- yeah.  So, in March,

4   very early on, as things started to shut down, Brian Collins,

5   who's the director of human resources and an accomplished

6   professional, came to the Board and basically said, you know,

7   yeah, Texas is better, but it's not immune.  We need to come

8   up with a program.

9          And with Russ Nelms and John Dubel and I, we developed a

10  program, with Brian -- with Brian driving it, to figure out

11  exactly how to approach going into the office; how we would

12  maintain the office; and then, if something were to happen,

13  what we would do.

14         We had an employee who, with her family, got COVID in --

15  we believe in New York, came back.  And as soon as we found

16  out that person wasn't feeling good in the office, it was the

17  first day they were back, a protocol with thermometers and --

18  at that time, thermometers were thought to be valuable -- we

19  immediately sent that employee home.  We then brought in a

20  cleaning crew to clean up the office with EPA and FDA-approved

21  materials, and then had several days off and brought folks

22  back the following week.

23         We found that to be, frankly, unwieldy as COVID started to

24  continue to creep a bit through March and into April.  At that

25  point, we did have other employees, not who came into the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 54   Filed 04/29/25   Page 466 of 1017   PageID 2929
Main Document   Page 466 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 70 of 134

Seery - Examination by the Court          70

1   office, but who had contracted COVID, so we shut down HCMLP.

2   When we cleaned the office, we shut it down completely.

3   Nobody could go in.

4      When -- since then, we have set the office up where we had

5   initial (inaudible) when things were pretty good, so we

6   divided the move into -- into basically 20 percent could be in

7   the office at any one time.  And then, since that time, as

8   things have gotten worse, we found that we were, one, working

9   extremely well offsite; and two, that it was just a better

10  environment for the employees.  So we've been working

11  continually offsite.

12     If folks need to go in, because either they need more

13  advanced systems that they can't go to plug-and-play at home,

14  or because there's just materials that they want to get,

15  they're able to do in.  We have tons of disinfectant

16  everywhere.  We have masks available.  We put in dividers,

17  Plexiglas dividers between the work stations to assure that if

18  someone was at a station for a long time, it didn't -- it was

19  less likely that you could have transmission.

20     I will tell Your Honor that HCMLP is not reporting to the

21  office.  Some of the affiliated businesses, and I don't know

22  the percentage, have been.  So those businesses, which we

23  don't control, are going in.

24     From my perspective, as long as the numbers are where they

25  are in Texas, from both a business perspective in terms of

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4  Filed 09/04/25   Page 467 of 1017   PageID 2930
    Main Document   Page 450 of 792

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 71 of 134

Seery - Examination by the Court          71

1   making sure that the employee base doesn't contract COVID in

2   material amounts -- first, any amount -- but in material

3   amounts that would impact our ability to run the business.

4   And then with respect to the civic part of it, which is we

5   don't want to be a part of forcing the spread or causing the

6   spread of this disease, we know we can work from home.  We're

7   going to continue to do that until we believe it's very safe

8   to go back.

9        Notwithstanding that we have the ability and have been

10  doing it with extensive cleaning, extensive disinfectant, and

11  with dividers, until we are very comfortable that we can go

12  back and protect our employees and that it's the right civic

13  thing to do, we're not going to go back, particularly since it

14  doesn't impact our ability to perform.

15            THE COURT:  Okay.  I really want to, you know, get to

16  the rest of our hearing soon, but I heard something that made

17  me have a question.  You said there are other entities we

18  don't control whose employees are going in.  Could you tell me

19  exactly what you meant by that?

20            THE WITNESS:  There's -- away from HCMLP, there's

21  approximately another 75 to 80 -- it may be slightly more --

22  employees at the other entities that are NexPoint, NexBank,

23  NexPoint Advisors.  They are under different protocols that

24  neither I nor Russ nor John control.  The office --

25            THE COURT:  Let me just stop you.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 468 of 1017
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 468 of 1017   PageID 2931

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 72 of 134

Seery - Examination by the Court          72

1          THE WITNESS:  Please.

2          THE COURT:  So it's just Nex -- well, NexPoint-

3    related companies?

4          THE WITNESS:  Uh-huh.

5          THE COURT:  NexPoint and --

6          THE WITNESS:  Yes.

7          THE COURT:  -- affiliates of NexPoint?

8          THE WITNESS:  Correct, Your Honor.  The office, the

9    HCMLP offices are huge.  And when we were there pre-COVID,

10   with the full complement of folks, it felt like they were

11   relatively empty.  I shouldn't say -- they felt like there was

12   plenty of space.

13       What we found, with both sets, our employees and then the

14   NexPoint-related employees, when 140 or 150 people were in

15   that office, which pre-COVID felt comfortable, post-COVID

16   didn't feel so comfortable.  So our employees, we started, as

17   I mentioned, with the shift-working.  And then we decided to

18   go completely mobile unless somebody feels they have to be in

19   the office, and we want to make sure that they follow the

20   protocols when they do.

21       With respect to the non-HCMLP related entities, those

22   entities, some percent of those employees are still going into

23   the office.

24       Now, when they're there, to be frank, what I said was a

25   pretty comfortable place with 140 people is a pretty empty

APP 1148

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 06/04/25   Page 469 of 1017   PageID 2932
Main Document   Page 452 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 73 of 134

Seery - Examination by the Court          73

1   place if there's only 50.  But our employees, we felt it was

2   important, since we were able to execute from home, we didn't

3   need, on most parts, the extra systems to be able to execute

4   in the office, that we could largely perform from home to make

5   sure that we weren't taking any risks with the business but

6   also taking -- one, taking risks for the employees; two,

7   taking any risks for the business; and three, as I mentioned,

8   the civil perspective.

9          THE COURT:  Okay.  We're going to have to take a

10  five-minute break here in just a second, but let me kind of

11  elaborate on why I was drilling down on that question about

12  NexPoint.  I mean, isn't it Highland employees who service

13  NexPoint?  Or am I wrong about that?

14         THE WITNESS:  Highland employees service a lot of

15  NexPoint.  But NexPoint, NexBank, the various funds, NXRT,

16  there's a number of businesses:  They have their own employees

17  as well.

18         THE COURT:  Okay.

19         THE WITNESS:  So the whole complex is about 150

20  employees.

21         THE COURT:  Okay.

22         THE WITNESS:  Highland Management is about 70.

23         THE COURT:  Okay.  All right.  Well, are we finished

24  with Mr. Seery's testimony, Mr. Morris?

25         MR. MORRIS:  Yes, Your Honor.  Our next witness after

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 470 of 1017   PageID 2933
Main Document   Page 453 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 74 of 134

Seery - Examination by the Court                74

1    the break will be John Dubel.

2            THE COURT:  Okay.  Very good.

3            MR. MORRIS:  And we --

4            THE COURT:  Mr. Seery, again, this has been extremely

5    helpful for me, and I hope for others.  I hope you'll stick

6    around, because when we circle back to the mediation

7    discussion at the end of today, I really would like you to be

8    involved in that discussion.  I may want your input on one or

9    two things.  So can you stick around?

10           THE WITNESS:  Absolutely, Your Honor.  Other than

11   getting some water and maybe turning the air conditioning back

12   on in this room, I'll stay.

13           THE COURT:  You must not be in Texas if you don't

14   have your air conditioning on.  I assume you're in New York.

15   All right.  Five-minute break.  We'll be back.

16           THE WITNESS:  It's hot, but not Texas hot.

17           THE COURT:  Okay.  Thank you.

18           THE WITNESS:  Thank you, Your Honor.

19           THE CLERK:  All rise.

20      (A recess ensued from 3:16 p.m. until 3:22 p.m.)

21           THE CLERK:  All rise.

22           THE COURT:  All right.  Please be seated.  We're back

23   on the record in Highland.

24      Mr. Morris, you were going to call Mr. Dubel next?

25           MR. MORRIS:  Yes, the Debtor calls John Dubel.

002223

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 471 of 1017   PageID 2934
Case 3:25-cv-02072-S    Document 5-4   Filed 06/06/25   Page 454 of 2322   PageID 2934
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 75 of 134

Dubel - Direct                              75

1              THE COURT:  Dubel?

2              MR. DUBEL:  Your Honor, may I have just one minute to

3    -- my air conditioner.

4              THE COURT:  All right.  Mr. Dubel, I said your name

5    wrong.  Could you say Testing 1, 2?

6              MR. DUBEL:  I can do that, Your Honor.  Testing 1, 2.

7              THE COURT:  Okay.  Very good.  Please raise your

8    right hand.

9              JOHN DUBEL, DEBTORS' WITNESS, SWORN

10             THE COURT:  All right.  Thank you.  Mr. Morris, you

11   may proceed.

12             MR. MORRIS:  Thank you, Your Honor.  As Mr. Pomerantz

13   previewed, Mr. Dubel's testimony is going to largely cover the

14   corporate governance-type issues concerning the evolution of

15   the motion, the discussions or the, you know, beginning of the

16   discussions, and how the proposal itself evolved.

17      If I may, Your Honor, just to perhaps move this along, I

18   might lead the witness a little bit.  If it's a problem,

19   you'll let me know, okay?

20             THE COURT:  Okay.  I will let you know if it's a

21   problem.

22             MR. MORRIS:  Okay.

23                        DIRECT EXAMINATION

24   BY MR. MORRIS:

25   Q   Good afternoon, Mr. Dubel.  You're a member of the Board

APP 1454

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 472 of 1017   PageID 2935
Main Document   Page 455 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 76 of 134

Dubel - Direct                              76

1   of Strand today; is that right?

2   A    I am.

3   Q    And you've held that position since mid-January; is that

4   right?

5   A    Since January 9th, yes.

6   Q    Okay.  And you understand that we're here today on the

7   Debtors' motion to appoint Mr. Seery as the Debtors' CEO, CRO,

8   and the Foreign Representative?

9   A    I do understand that, yes, sir.

10   Q    Does the Board unanimously support the motion?

11   A    I think the Board does, and specifically the compensation

12   committee, because of obviously the conflict that Mr. Seery

13   might have, you know, but the Board fully supports it, and the

14   compensation committee is comprised of Mr. -- Judge -- Judge

15   Nelms and myself.

16   Q    Okay.  And do you believe that -- withdrawn.  Does the

17   Board believe that it's in the Debtors' best interests to

18   retain Mr. Seery on the terms proposed?

19   A    We do.

20   Q    And why does the Board believe that?

21   A    Well, as the Court has heard from the testimony of Mr.

22   Seery today, he has a tremendous amount of skills and

23   experience in the area of asset management.  He's effectively

24   been serving as the CEO since -- well, in a lot of ways, since

25   January 9th, when we asked him to step up and take on some

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 1-3   Filed 04/15/25   Page 456 of 2722   473 of 1017   PageID 2936
Main Document   Page 77 of 134

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 77 of 134

Dubel - Direct                              77

1   additional responsibilities, but very clearly since the middle

2   of February, and specifically, the middle of March.

3        And as the Court noted, he is -- knows these assets very

4   well.  He knows the operations.  He's done an exemplary job of

5   handling all of the issues.  He has spent a tremendous amount

6   of time working with the Committee members, trying to develop

7   good lines of communications.

8        And, you know, Russ -- having, you know, served in a C

9   Suite position for 25 years of my 30-plus years of

10  restructuring experience, and 15 years as a CEO, we need a

11  good leader, an operational leader to run the organization.

12  So we can support him because you need to have someone in

13  there who can make decisions; work quickly; obviously,

14  communicate well with the Board, which he has been doing for

15  quite some time.  So, all the -- all of the reasons why we are

16  very pleased to have him take on this role.

17  Q    Okay.  Let's talk a little bit about what led to this

18  particular motion.  Do you recall when the idea of appointing

19  a CEO first arose?

20  A    I would say it was back in December, before the

21  Independent Board was put together, when we first started

22  intervening with the creditors and with the Debtor.  It was

23  raised to me in my interview, would I be, you know, willing to

24  step in as a CEO if asked to?  And I'm assuming it was also

25  asked of Mr. Seery.  I didn't ask him that.  And it was all

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 474 of 1017   PageID 2937
Main Document   Page 457 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 78 of 134

Dubel - Direct                              78

1   obviously coming, you know, out of the protocols that were

2   being developed where Mr. Dondero would step down as the CEO

3   and the Independent Board would basically be responsible for

4   the operations of the company.  But we had the opportunity to

5   go out and seek either one of the three Independent Board

6   Members as the CEO or go outside to the marketplace and try

7   and find an independent or a third-party CEO.

8   Q   And to the best of your recollection, was that flexibility

9   built into the term sheet that was part of the corporate

10  governance settlement?

11  A   It was.

12  Q   All right.

13        MR. MORRIS:  Your Honor, this is where we're going to

14  test our technological capabilities.  I'm going to ask Ms.

15  Canty to put up and to share Exhibit 1, and let's see if we're

16  able to do that.

17        THE COURT:  Okay.  But if anything goes wrong, I

18  actually do have the docket up on my screen.  I can pull them

19  up.  But, oh, even better.  Even better.  Okay.

20        MR. MORRIS:  All right.  It looks like it worked.

21  Ms. Canty, if you could turn to Page 2, please.  I think

22  that's Page 1.

23      (Pause.)

24        MR. MORRIS:  I think it's stuck.

25        THE COURT:  Hmm.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 06/04/25   Page 475 of 1017   PageID 2938
Main Document   Page 458 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 79 of 134

Dubel - Direct                              79

1          THE WITNESS:  If need be, I have a teenager who could

2     probably figure this out, because I sure can't.

3          MR. MORRIS:  I'm impressed that La Asia got to this

4     point already.  Okay.  Good.  Just the one on the right.  Is

5     there a way to focus in on the top paragraph on the right?

6          THE WITNESS:  I'll put my glasses on and I'll be able

7     to read it.

8          MR. MORRIS:  Okay.  Right there.  Perfect.

9     BY MR. MORRIS:

10    Q    Is -- are you familiar with the provisions generally in

11    the term sheet relating to the opening of CEO?

12    A    I am.

13    Q    And is this the provision that you were referring to

14    earlier?

15    A    It is.

16    Q    And does this provision, to the best of your

17    understanding, provide the Board with the flexibility, in

18    consultation with the UCC, to exercise its business judgment

19    and appoint a CEO if it determined that to be in the Debtors'

20    best interest?

21    A    It does.  It's consistent with the discussions had -- that

22    were had prior to our appointment, and it obviously was

23    incorporated in the term sheet that was approved by the Court

24    on January 9th.

25    Q    And this also reflects the understanding that you

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-41   Filed 06/25/25   Page 476 of 1017   PageID 2939
Main Document   Page 459 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 80 of 134

Dubel - Direct                                80

1   described earlier, where one of the Independent Directors

2   could, in fact, be selected as the CEO; is that right?

3   A    That is correct.

4          MR. MORRIS:  All right.  Let's just take that down,

5   please, Ms. Canty.

6   BY MR. MORRIS:

7   Q   Mr. Dubel, has Mr. Seery, in fact, taken on day-to-day

8   operational responsibilities for the Debtor?

9   A    Yeah.  Yes, he has.  And I think early on the Board

10  realized that, between the three Board members, we would try

11  and divvy up the responsibilities, as Mr. Seery referred to

12  earlier, and it was definitely like drinking from a fire hose

13  in the early stages of the case, where the new Board was put

14  in place.  And we tried to divvy up our responsibilities,

15  taking into consideration each of the Board Members'

16  expertise.

17     But it was pretty clear that the main business operations

18  required somebody with the skill set that Mr. Seery had, and

19  it would be much more efficient, as we progressed forward, to

20  coalesce around one individual as a CEO.

21          MR. MORRIS:  Ms. Canty, can you pull up Exhibit 2?

22  BY MR. MORRIS:

23  Q   And while we're doing that, Mr. Dubel, do you recall early

24  on that the Board asked Mr. Seery to become involved in the

25  trading of the prime accounts?

002229

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 477 of 1017   PageID 2940
Main Document   Page 450 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 81 of 134

Dubel - Direct                          81

1   A    I do, yes.

2   Q    Okay.

3         MR. MORRIS:  La Asia, I don't know if you can scroll

4   down just to --

5         Your Honor, these are minutes from the Board's very first

6   meeting.  And if we go to the next page, right here, you'll

7   see there's a discussion in the second paragraph.

8   BY MR. MORRIS:

9   Q    Mr. Dubel, does that reflect the Board's deliberation and

10  decision, really, on the first day, to give Mr. Seery, you

11  know, the responsibility for dealing and overseeing the prime

12  accounts?

13  A    It does.  And what I was saying is, prior to the

14  appointment, in doing all of our diligence prior to joining

15  the Board, we realized there were all these issues that needed

16  to be dealt with.  And so we came in on the very first day,

17  ready to recognize that there were certain things that needed

18  sort of expertise.  And they were presented to us by DSI and

19  the management of HCMLP as areas that needed some additional

20  handling and oversight.  And so we asked Mr. Seery to step

21  into that role on the very first day, which he -- which he

22  agreed to and the Board approved it.

23  Q    Okay.  Let's get to the meat and potatoes here.  Did there

24  come a time when the Board and Mr. Seery actually began

25  discussing the possibility of his serving as the CEO?

APP 1457

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 65    Filed 06/06/25    Page 478 of 1017    PageID 2941
Main Document    Page 451 of 722

Case 19-34054-sgj11  Doc 864  Filed 07/17/20   Entered 07/17/20 10:53:51   Page 82 of 134

Dubel - Direct                    82

1    A    Yes, there did.

2    Q    And can you share with the Court your recollection of how

3    that began?

4    A    So, there were informal discussions, I would say, through

5    the month of February, as we started to realize that there

6    were -- the decision-making  was going to be cumbersome,

7    having, you know, three parties involved.  As I said earlier,

8    having spent 15 years or so my career as a chief executive

9    officer, I understand where you really want to have one person

10   be responsible for these issues.

11       And so we were conversing with Mr. Seery to see if he

12   would take on that role.  And, obviously, we had felt very

13   comfortable, Mr. Nelms and I felt very comfortable with the

14   communications that he was having with us on things that we

15   had asked him to do.  There was a very free and open

16   discussion with the Board members.  So we continued, you know,

17   to look at opportunities where it might make sense.

18       And then, you know, towards the beginning of March, it was

19   pretty obvious that we were going to want to coalesce around

20   the motion.  We thought about whether or not that would be

21   some third party.  But having, again, experience of having to

22   go out in the marketplace to find CEOs when I'd been either,

23   you know, a director or involved in companies, we realized

24   that can be very time-consuming, would take us months to find

25   somebody.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 479 of 1017   PageID 2942
Main Document   Page 452 of 702

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 83 of 134

Dubel - Direct                            83

```
 1        And so we continued to discuss it with Mr. Seery.  And
 2   around the middle of March or so, right around the time that
 3   we had a Creditors' Committee meeting in New York, we asked
 4   Mr. Seery if he would take that role on, and he agreed to, to
 5   take that role.
 6   Q    And that's -- and is that why the Debtor is seeking
 7   authority to retain Mr. Seery nunc pro tunc back to March
 8   15th?
 9   A    We are.  I mean, effectively, he really started the role
10   in the February time frame.  But we officially asked him about
11   this in -- right after that meeting on March -- I think it was
12   March 11th or so.
13   Q    So, is it fair to say that's when the Board had a meeting
14   of the minds with respect to not necessarily the terms but at
15   least the engagement of Mr. Seery as CEO?
16   A    Yes, that is fair to say.
17   Q    Okay.
18   A    And that's when he really did step up and take on all of
19   those responsibilities, you know, with the acknowledgement and
20   understanding that we would work out the appropriate terms for
21   his engagement.
22   Q    Okay.  And a couple of weeks later, do you recall that Mr.
23   Seery made a written proposal to you and Mr. Nelms?
24   A    He did make a written proposal after, you know, having
25   discussions with us orally about various issues and roles and
```

APP 1459

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/04/25   Page 480 of 1017   PageID 2943
Main Document   Page 0455 of 2722

Case 19-34054-sgj11  Doc 864  Filed 07/17/20   Entered 07/17/20 10:53:51   Page 84 of 134

Dubel - Direct                          84

1    responsibilities.  I think it was around April 4th or so that

2    he presented us with a written proposal.

3              MR. MORRIS:  All right.  Ms. Canty, can you call up

4    Exhibit 3, please?  (Pause.)  Okay.  If you'll scroll down.

5    BY MR. MORRIS:

6    Q    Mr. Dubel, is this the April, the early April e-mail that

7    you were referring to in which Mr. Seery made a proposal for

8    the terms of his engagement as CEO?

9    A    Yes.  This document refreshes my recollection.  It wasn't

10   April 4th.  It was April (audio gap).  But yes, that's the

11   document I was referring to.

12   Q    Okay.  What happened next, after -- after the -- after

13   this was presented to you and Mr. Nelms?  What did you guys

14   do?

15   A    So, what we wanted to do is understand what was our

16   responsibility as a board.  So we reached out to counsel to

17   figure out how the process should work.  We set up a

18   compensation committee.  It's called a comp committee; it's

19   more I would call it a nomination committee or a governance

20   committee also, because it was all about retaining Mr. Seery

21   in that role.

22        We got advice from counsel on what the process should be.

23   We reached out to our compensation consultant at Mercer, who

24   had been providing us assistance in other areas of the

25   company's compensation program, to talk to them about what the

APP 1409

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document Deciment Filed Page 0604544 of 2722 481 of 1017    PageID 2944

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 85 of 134

Dubel - Direct                          85

1   various market comps, you know, compensation programs were and

2   what would be an appropriate market comp for Mr. Seery's

3   compensation, and, you know, moved forward that way.

4          MR. MORRIS:  Ms. Canty, can you pull up Exhibit 4,

5   please?

6   BY MR. MORRIS:

7   Q    Do you know what this document is, Mr. Dubel?

8   A    Yes.  This looks like the minutes from the meeting of our

9   first compensation committee on April 8th, compensation

10  committee of Strand Advisors.

11  Q    And this was a meeting between you and Mr. Nelms, with

12  counsel; is that right?

13  A    That is correct.

14  Q    And this was precipitated by Mr. Seery's written proposal

15  that was made a few days before that; is that fair?

16  A    Well, I would say it was precipitated by the advice we had

17  gotten through counsel that we should set up a compensation

18  committee and consider what would be the appropriate way of

19  retaining Mr. Seery, you know, as a chief executive officer.

20  His proposal came in a couple of days earlier than that, and

21  so this was our first official time to get together as a

22  committee and review it and discuss the issue.

23  Q    And was this a contemporaneous record of the steps that

24  the compensation committee took to do its due diligence with

25  respect to the proposal?

002234

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/04/25   Page 482 of 1017   PageID 2945
Main Document   Page 455 of 722

Case 19-34054-sgj11  Doc 864  Filed 07/17/20   Entered 07/17/20 10:53:51   Page 86 of 134

Dubel - Direct                          86

```
 1   A    It is.

 2   Q    Okay.  Did the compensation committee --

 3        MR. MORRIS:  You can take that down, Ms. Canty.

 4   BY MR. MORRIS:

 5   Q    Did the compensation committee communicate with the

 6   Creditors' Committee with respect to these matters?

 7   A    We did.

 8   Q    Can you --

 9   A    As a part of the protocols, one of the things I -- and I'd

10   go back and re-read the protocol language, but one of the

11   things it said was work with the UCC to determine who would be

12   an appropriate CEO.  And so we realized we would do that, and

13   we started to reach out to the various members of the

14   Creditors' Committee to discuss that.

15   Q    Okay.  And do you recall whether the compensation

16   committee or the Debtor generally shared Mr. Seery's proposal

17   with the Committee?

18   A    We did.  I don't recall the exact date, but we did share

19   it with the UCC through the UCC counsel.

20   Q    Do you recall if the report that was commissioned by the

21   Debtor with respect to Mercer, the Mercer Report, was that

22   shared with the Committee?

23   A    It was.

24   Q    Can you describe for Judge Jernigan your recollection as

25   to, you know, the Committee's reaction and, you know, position
```

Case 19-34054-sgj11  Doc 2062  Filed 03/18/21  Entered 03/18/21 20:59:39  Desc
Case 3:25-cv-02072-S  Document 15-4 Main Document Filed 04/04/25 Page 483 of 1017  Page 484 of 722  PageID 2946

Case 19-34054-sgj11 Doc 864 Filed 07/17/20  Entered 07/17/20 10:53:51  Page 87 of 134

Dubel - Direct                        87

 1   with respect to the proposed retention of Mr. Seery as CEO?

 2   A   We shared the report from Mercer with the Committee in --

 3   I think it was early May.  And we spent time with them in the

 4   April time frame talking about the fact that we were going to

 5   be seeking Mr. Seery's appointment as CEO and telling them

 6   that we were going to be commissioning a report to make sure

 7   we had what we thought was market compensation.

 8       The Committee was generally very supportive.  They had

 9   been obviously experiencing Mr. Seery taking on that role of

10   effectively the CEO for a period of time, so they understood

11   where, you know, where he was coming from and what -- how he

12   was going to operate the business.

13       They understood, to my knowledge and in my discussions,

14   they understood the benefits of having a single person as the

15   CEO rather than trying to manage the business by committee.

16   We discussed with them why it made sense.

17       And so, you know, they were supportive of it.  Obviously,

18   we had to negotiate the terms of the compensation.

19   Q   And did that take some time, to negotiate the compensation

20   terms?

21   A   It did.  Initially, it was being done through myself and

22   Mr. Nelms, working directly with the Committee.  But, again,

23   having been in that position of having to negotiate with the,

24   you know, the committee on terms of my own personal

25   compensation -- not this committee, but in other cases -- we

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/04/25    Page 484 of 1017    PageID 2947
Main Document    Page 457 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 88 of 134

Dubel - Direct                              88

 1  recognized that it was probably more efficient for Mr. Seery
 2  to speak directly with the Committee, Committee members.  And
 3  so we asked him to pick up that, you know, responsibility
 4  also.  And he did.  He kept us informed every step of the way.
 5  And I, as the de facto chairman of the compensation committee,
 6  also spoke directly with the various members of the Committee
 7  during this time frame, where there was (echoing)
 8  communication about compensation.
 9  Q    Mr. Pomerantz mentioned it in his opening remarks, but do
10  you recall kind of what the bigger issues were with respect to
11  the proposed compensation terms with the Committee?
12  A    Sure.  The Committee -- well, there was always negotiation
13  going on, obviously.  The Committee, at the end of it, they
14  had no problems with the monthly compensation, recognizing
15  that whatever his board compensation would be would
16  effectively be wrapped into the monthly compensation.
17      What the issues really came down to for them revolved
18  around the restructuring fee that was being proposed, success
19  fee, you know, what have you.  And there was a lot of
20  different views, as you can imagine, between the four members
21  of the Committee as to how that should be set up.
22      Mr. Nelms and I were very cognizant that we did not want
23  to have Mr. Seery (echoing) -- I'm sorry.  I'm getting a lot
24  of background noise here.
25          THE COURT:  Yes.  I'm not sure who needs to mute

APP 1461

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 485 of 1017   PageID 2948
Main Document   Page 2 of 272

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 89 of 134

Dubel - Direct                         89

 1  their phone, but someone needs to mute their phone.  Okay.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  Uh-huh.

 4        (Echoing subsides.)

 5              THE WITNESS:  So we were very concerned that

 6  structures not be put in place that could cause the potential,

 7  the appearance of a conflict between the role that Mr. Seery

 8  was playing and his compensation.

 9        It's always a, you know, a challenging issue here, to make

10  sure that, you know, a CEO of any company is looking out for

11  the best interests of the estate and not looking out

12  specifically for any particular creditor, equity, or group of

13  creditors, just because that's the way the compensation was

14  designed.  And so that was a challenge.

15        At the end of the day, we wanted to have what we felt was

16  fair compensation for the success fee and restructuring fee

17  for Mr. Seery, because we wanted him incented to get the job

18  done, as he has alluded to in his prior testimony as to what

19  he's trying to do here.  And so there did come a point where

20  we could not get to a meeting of the minds and so we chose to

21  move forward on the compensation with just the monthly agreed

22  to.  Mr. Seery was good enough to agree to that for just the

23  monthly, and that we would put forward the restructuring fee

24  at a later date.

25  BY MR. MORRIS:

Dubel - Direct                          90

1   Q    Okay.  Thank you.  In addition to the CEO title, the

2   Debtor is asking for the Court to appoint Mr. Seery as the CRO

3   and the Foreign Representative; is that right?

4   A    That is correct.

5   Q    And why is the Debtor seeking that relief?

6   A    Well, initially, the CRO was brought in, I believe it was

7   the middle of October, when the case was filed and before the

8   Independent Board was put in place.  And there were reasons

9   why, you know, the Committee had asked for the CRO to have

10  certain responsibilities.  Those carried through in the

11  protocols.

12       And obviously, you know, we had no issues with those, but

13  what we also felt, Mr. Nelms and I, and in consultation with

14  Mr. Seery, was that it would be more appropriate to have one

15  person be responsible for all of the issues within the

16  company.  And since there was an Independent Board, and since

17  one of those Independent Board Members was becoming the CEO,

18  the need for another individual to be the CRO might send

19  conflicting signals inside the organization.  And so we

20  decided that it would be appropriate to put those

21  responsibilities into Mr. Seery's lap.  And we spoke with Mr.

22  Sharp from DSI, and he agreed.  And so that's the reason why

23  we moved it forward that way.

24  Q    Okay.  I understood you to say that the meeting of the

25  minds, at least conceptually, was somewhere around March 12th

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 487 of 1017   PageID 2950
Main Document   Page 90 of 272

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 91 of 134

Dubel - Direct                      91

1  in New York, or March 11th.  I think the Judge may have asked

2  the question or at least implied that she wanted to know kind

3  of why it took so long to get the motion on file.  I think

4  you've discussed some of the issues, but just kind of in a

5  bullet-point way, can you give the Judge an explanation as to,

6  you know, why it took several months to get this motion in

7  front of the Court if a meeting of the minds occurred back in

8  March?

9  A    Sure.  I believe the motion was filed on the -- I think it

10 was the 22nd or so of June.

11 Q    Okay.

12 A    And so we -- we asked Mr. Seery.  He accepted the

13 responsibility in the middle of March.  Right at that point in

14 time was when the whole pandemic issue was, you know, really

15 coming hot and heavy at the company.  As Mr. Seery testified

16 earlier, he had -- he was spending a tremendous amount of time

17 just focusing on the operations of the business, focusing on

18 the assets, dealing with the prime accounts, the select

19 accounts, working with Jeff Reeves, working with the other

20 individual investments that we had, to make sure that those

21 were under control.

22      I would say I applaud him for putting the business first

23 in front of him, and then I think probably at 1:00 o'clock in

24 the morning he was able to finally sit down and put together

25 his own compensation request.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/06/25    Page 488 of 1017    PageID 2951
Main Document    Page 92 of 134

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 92 of 134

1        We did need time to go through with the Mercer folks and

2   get, you know, the market information, and that took a lot of,

3   you know, a lot of time.

4        And then, more importantly, we wanted to make sure we

5   could get something in front of the Court that was agreed to

6   by the Committee.  So we did share the information with the

7   Committee.  We spent a lot of time in negotiations with the

8   Committee, trying to get to a resolution.  As I said earlier,

9   we asked Mr. Seery to step in and there be, you know, one-on-

10  one discussions to maybe shortcut some of that.

11       And finally, at the point in time where we realized we

12  could not get a full, you know, fully-agreed compensation

13  program, we asked him to just break it down into the monthly,

14  and then come back for a restructuring bonus at the end of the

15  case.

16       And so all of that, while trying to manage the business in

17  the COVID era, is what took such a long period of time.

18  Q    Did it also take some time to obtain appropriate D&O

19  insurance for Mr. Seery as the CEO?

20  A    It did.  We had to, as the Board of Strand, we had to set

21  up a D&O program for the Board members when we first got

22  involved back in January.  That took a tremendous amount of

23  time.  It was very difficult to obtain in the marketplace, for

24  any number of reasons, but mainly because the insurance market

25  understood what Highland was all about and the various

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/04/25    Page 489 of 1017    PageID 2952
Main Document    Page 2472 of 2722

Case 19-34054-sgj11   Doc 864   Filed 07/17/20   Entered 07/17/20 10:53:51   Page 93 of 134

 1   players, and they were very reticent to insure Highland.

 2        So, because we were Strand, because there were other

 3   protections that were afforded to the Independent Directors,

 4   we were able to obtain it.

 5        When we asked the various carriers to add Mr. Seery on as

 6   the CEO for HCMLP, it was very challenging to put folks on.

 7   We were eventually able to get our first layer to sign on, the

 8   first-layer insurer.  The second layer would not do it, and we

 9   had to go find a third carrier who would do it.  And we

10   actually got that done at some time in the latter part of

11   June, right after we had filed the motion.

12   Q   Okay.

13             MR. MORRIS:  Your Honor, I've got just a few more

14   questions, but they're going to be devoted to the DSI motion.

15   I don't know if you wanted to ask -- if you had any questions

16   on the motion with respect to Mr. Seery or I should just

17   continue on.

18             THE COURT:  I do not have questions.  You can

19   continue.

20             MR. MORRIS:  Okay.

21   BY MR. MORRIS:

22   Q   Okay.  So, let's just finish up, Mr. Dubel.  There is a

23   second motion in front of the Court, and this one is for the

24   appointment of DSI as financial advisor.  Are you familiar

25   with that motion?

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/02/25   Page 490 of 1017   PageID 2953
Main Document   Page 94 of 1017

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 94 of 134

Dubel - Direct                                94

```
 1   A    I am.

 2   Q    Does the Board unanimously support that motion?

 3   A    We do.

 4   Q    Has the Board concluded, in an exercise of its independent

 5   business judgment, that the engagement of DSI as financial

 6   advisor is in the Debtors' best interests?

 7   A    We have.  Yes.

 8   Q    Can you explain to the Court why the Board reached that

 9   conclusion?

10   A    Well, we do need the services of a financial advisor.

11   It's very important in this case to have an independent, you

12   know, restructuring, you know, financial advisor to assist us.

13   As Mr. Seery testified earlier, they have been very

14   instrumental in helping him prepare the financial analysis

15   that has been part of what he's been using to start

16   negotiating and working forward on the -- putting together a

17   plan of reorganization.

18        They've also spent a tremendous amount of time acting as a

19   bridge to FTI, the Committee's financial advisors, which is

20   very common in these types of cases.  And so that's been

21   extremely helpful.  And that role needs to continue.

22        They also are handling all of -- all the administrative

23   bankruptcy issues, the SOFAs, the MORs.  They're doing a lot

24   of work for us, not necessarily specifically on the large

25   claims, but on helping us analyze and review all of the other
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-14   Filed 06/04/25   Page 491 of 1017   PageID 2954
Main Document   Page 95 of 132

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 95 of 134

Dubel - Examination by the Court            95

1   myriad of -- I think it's two hundred something claims that
2   have been filed in the case.
3       So they've been here since -- I guess they came in pre-
4   filing.  They have a lot of history and knowledge, and we want
5   to continue to utilize that knowledge as we continue to move
6   forward.  So that's why.  And the Board is very comfortable
7   with the job they've been doing, and so we felt it was
8   appropriate to continue to use them as the financial advisor,
9   just in a slightly different role.
10          MR. MORRIS:  Your Honor, I have no more questions of
11  Mr. Dubel.
12          THE COURT:  All right.  Well, I'm going to just jump
13  in and ask my own questions, and then I will -- I'll, you
14  know, offer him up for cross if people will promise to
15  restrict it to employment terms.
16              EXAMINATION BY THE COURT
17          THE COURT:  So, what -- my question is about Mr.
18  Sharp.  As I recall, the compensation is not going to change
19  at all, even though the role is changing.  He won't be CRO
20  anymore, Mr. Sharp.  He won't be the Foreign Representative
21  anymore.  But obviously, he and his firm will remain very
22  engaged as financial advisor.
23      What I'm getting at is there was a $100,000 per month flat
24  fee for Mr. Sharp, and then other professionals at DSI will
25  bill by the hour.  Tell me why the Board thinks that's still

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 492 of 1017   PageID 2955
Case 3:25-cv-02072-S   Document 5-4   Filed 04/25/25   Page 492 of 1017   PageID 2955
Case 19-34054-sgj11   Doc 864   Filed 07/17/20   Entered 07/17/20 10:53:51   Page 96 of 134

Dubel - Examination by the Court          96

1    the appropriate compensation package with the modified role of

2    Mr. Sharp.  I'm getting at, $100,000 a month, is that still

3    the right thing, or hourly compensation, did you discuss that,

4    and why is --

5            THE WITNESS:  We did, Your Honor.  And I'll be

6    (inaudible) with you.  I don't know who negotiated that

7    originally for -- with, you know, with DSI, but I find it to

8    be a very fair-to-the-Debtor compensation package of $100,000

9    for Mr. Sharp, but it also includes Mr. Caruso, who Mr. Seery

10   has referenced earlier.  I think it was a very good

11   negotiation that was had by the Debtor.

12       So when we looked at it, we said, if we switch to a

13   straight hourly, based upon the amount of time and effort

14   that's being put in by the two of those individuals, it might

15   cost us a little bit more.  So we chose to continue it at that

16   level.

17       And I know Mr. Seery will continue to lean on those two

18   folks and get his money's worth.  I'm confident of that.

19           THE COURT:  Okay.  You just reminded me of something

20   that I did not remember, I guess.  Mr. -- we're getting two

21   for the price of one, is basically the -- Mr. Caruso does not

22   bill by the hour?

23           THE WITNESS:  They -- they work together.  It's their

24   compensation.  I would imagine they keep hours internally,

25   just to keep track of it, but what they bill us for the two

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/04/25   Page 493 of 1017   PageID 2956
Main Document   Page 97 of 732

Case 19-34054-sgj11  Doc 864  Filed 07/17/20   Entered 07/17/20 10:53:51   Page 97 of 134

Dubel - Examination by the Court               97

1    individuals, Mr. Caruso and Mr. Sharp, is a flat fee of

2    $100,000 for the two of them.

3            THE COURT:  Okay.  All right.  And do you remember,

4    by comparison, the financial advisor to the Committee -- is it

5    FDI?  Whoever it is.

6            THE WITNESS:  It -- it --

7            THE COURT:  How are they getting compensated?  Is it

8    strictly on an hourly basis, or is there also a combo flat fee

9    and hourly?

10            THE WITNESS:  (echoing) on an hourly basis, and I

11    have one of their most recent charts.  It was the May fee

12    application that they just filed, and they -- they bill in a

13    range from $1,245 an hour for, you know, senior managing

14    directors, to $875 an hour for managing directors, down to,

15    you know, $690 an hour for directors.  Yeah.  A very fair and

16    appropriate marketplace compensation, but I think what we are

17    incurring under the structure that we have for DSI is below

18    that.

19            THE COURT:  If those two guys were billing normal

20    market hourly fees, you think it would be busting $100,000 a

21    month, perhaps?

22            THE WITNESS:  I think it -- I think it would be well

23    in excess of $100,000, --

24            THE COURT:  Okay.

25            THE WITNESS:  -- based upon the hours that we have

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/04/25    Page 494 of 1017    PageID 2957
Main Document    Page 94 of 134

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 98 of 134

Dubel - Examination by the Court          98

1    seen to date from them, Your Honor.

2          THE COURT:  Okay.  Now, does anyone else have

3    questions for Mr. Dubel related to these employment

4    arrangements proposed?

5        (No response.)

6          THE COURT:  I guess not.  I actually have one more

7    question.  I think it will be for my benefit, but maybe for

8    benefit of parties in interest, I hope.  You made a comment

9    about getting insurance for Mr. Seery, and you said it was a

10   bit of a challenge because insurers in the marketplace kind of

11   knew what Highland was about.  I think those were your words.

12          THE WITNESS:  Yes, Your Honor.

13          THE COURT:  Here is my question.  As far as knowing

14   what Highland is about, other persons, not me, have used the

15   words that people were Mr. Dondero's puppet master, or he was

16   the puppet master, had his hands all over this, here and

17   there.  And we obviously endeavored to change that with the

18   new Board in place.  What would you say if people out there

19   think Dondero still might be a puppet master?  What -- I mean,

20   is there any concern there that you could address?

21          THE WITNESS:  Sure.  And let me, let me take it in

22   two parts, because I think it's important for you to

23   understand from a third-party insurer's point of view.  The

24   D&O marketplace has seen a lot of litigation surrounding the

25   Highland Capital name.  And because of that, that obviously

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/04/25   Page 495 of 1017   PageID 2958
Main Document   Page 494 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 99 of 134

Dubel - Examination by the Court            99

1  causes them concern.  Their business is to write insurance and

2  never pay a dime.  I ran an insurance company for six years,

3  and you never want to pay a dime out, you just want to collect

4  premiums.

5           THE COURT:  Yes.  And I probably prefaced this in a

6  confusing way.  I'm really not going back to the insurance.  I

7  just said that comment, when you were talking about insurance,

8  made me want to ask, for my benefit and for other parties'

9  benefit:  How much control, if any, does Dondero have?  In

10 theory, he was not supposed to have any control over the

11 Debtor anymore, but can you say something to make us all feel

12 comfortable that, if he ever was a puppet master, he's not a

13 puppet master anymore?

14           THE WITNESS:  Well, I won't use that terminology.

15 What I will say is, since January 9th --

16           THE COURT:  Yes.  It was someone else's term, not

17 mine.  I'm just repeating it.

18           THE WITNESS:  That's okay.  Since January 9th, when

19 the Independent Board was put in place, the Independent Board

20 has had the responsibility, is responsible for the operations

21 of this business.  Mr. Dondero, as Mr. Seery alluded to

22 earlier in talking about the number of people in the

23 organization, has other businesses that he's involved with

24 that operate out of the offices through shared services.  But

25 it's very clear to all the employees that the Independent

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4   Filed 06/20/25   Page 496 of 1017   PageID 2959
Main Document   Page 495 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 100 of 134

Dubel - Examination by the Court                 100

 1   Board is responsible for HCMLP and that since, really, you

 2   know, the early March time frame, that Mr. Seery is the CEO.

 3       So there is no concern on my part that Mr. Dondero is

 4   having undue influence.  He is still our portfolio manager,

 5   but Mr. Seery is working with him as appropriate, and I have

 6   no concern that Mr. Seery is not getting the job done and

 7   getting any undue influence from Mr. Dondero.

 8              THE COURT:  All right.  Thank you.

 9       Mr. Morris, do you have any redirect?

10              MR. MORRIS:  I do not, Your Honor.  I appreciate the

11   question, and I think Mr. Dubel answered it appropriately.

12              THE COURT:  All right.  Thank you, Mr. Dubel.  I do

13   appreciate your testimony today.  It was helpful.

14       All right.  Mr. Morris, --

15              THE WITNESS:  Thank you, ma'am.

16              THE COURT:  -- what else do you have?  You have Mr.

17   Sharp on your witness list.  Did you want to --

18              MR. SHARP:  I'm here, Your Honor.

19              THE COURT:  -- put him on?

20              MR. MORRIS:  I'm intending to do that.  If Your Honor

21   thinks it's not necessary, I don't need to ask more questions.

22   It's a relatively brief examination that will just focus on

23   the slight change in his role.

24              THE COURT:  All right.  Well, if you feel the need to

25   make a record, you may.  I just have one question I want to

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-7   Filed 09/04/30   Page 497 of 1017   PageID 2960
Main Document   Page 101 of 134

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 101 of 134

Sharp - Examination by the Court          101

1  ask him, to shore up the record.

2          MR. MORRIS:  So perhaps, Your Honor, could we swear

3  him in, you ask your question, and then I'll see if there's

4  (echoing)?

5          THE COURT:  All right.  Mr. Sharp, I see you there.

6  Please raise your right hand.

7      (Echoing.)

8          BRADLEY SHARP, DEBTORS' WITNESS, SWORN

9          THE COURT:  Thank you.  We were getting some

10  distortion there.  So, again, if you're not Mr. Sharp, please

11  put your phone on mute.

12                  EXAMINATION BY THE COURT

13          THE COURT:  All right.  Mr. Sharp, I just wanted to

14  hear from you how many hours a month do you think that you and

15  Mr. Caruso are working on the Highland matter?

16          THE WITNESS:  I don't have the hours in front of me,

17  Your Honor, but I think Mr. Dubel unfortunately alluded to

18  poor negotiating on DSI's part.  That'd be my responsibility,

19  because I'm the one that did that.

20      From October through May, if you look at the time for Mr.

21  Caruso and myself, DSI has provided about a $730,000 discount.

22  So if we were actually being paid on our hourly rate, our fees

23  would be $730,000 more than the $100,000 a month.  We

24  typically run -- my rate is $720 an hour.  I think Mr.

25  Caruso's is about the same.  The time for the two of us each

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 06/04/25   Page 498 of 1017   PageID 2961
Main Document   Page 61 of 272

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 102 of 134

Sharp - Direct                           102

1   month runs about $200,000, which we then write down to

2   $100,000.

3           THE COURT:  All right.

4           THE WITNESS:  (echoing) a month.

5           THE COURT:  Okay.  That answers my question.  Mr.

6   Morris, is there anything you wanted to put on the record?

7                    DIRECT EXAMINATION

8   BY MR. MORRIS:

9   Q   Mr. Sharp, are you the person who was (echoing) with the

10  (echoing) CRO (echoing) Seery (echoing)?

11  A   Yes, I am.  I think it's much more efficient, frankly.

12  We've worked very well with Mr. Seery since the beginning,

13  since January 9th.  That's going to continue.  I think it

14  takes away some confusion, both internally and externally, in

15  that, you know, Mr. Seery is the CEO, the CRO, and everyone

16  knows that we are providing the analytical and support for him

17  with whatever he needs.

18  Q   And I want to focus just for a second on DSI's (echoing).

19  Is DSI's responsibilities in the case changing at all?

20  A   No.  No.  We have been working for the Board and

21  responding directly to Mr. Seery.  You know, as Mr. Seery

22  testified, he works directly with myself and directly with my

23  team, and that's not going to change.

24          MR. MORRIS:  I have no further questions, Your Honor.

25          THE COURT:  All right.  Anyone have any questions

APP 1478

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/05/25   Page 499 of 1017   PageID 2962
Main Document   Page 452 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 103 of 134

Sharp - Direct                                103

1   regarding the employment terms?

2       (No response.)

3           THE COURT:  All right.  Well, I thank you, Mr. Sharp.

4   We appreciate it.

5       All right.  Mr. --

6           MR. MORRIS:  The Debtor rests, Your Honor.

7           THE COURT:  Okay.  Well, I presume no one else had a

8   witness to call.  Again, we didn't have any responsive

9   pleadings on this.

10      So, with that, I am going to turn to the Committee counsel

11  at this point.  Mr. Clemente, I know you said early on that

12  you wanted to make some comments, so this is your opportunity.

13          MR. CLEMENTE:  Well, thank you, Your Honor.  Matt

14  Clemente from Sidley on behalf of the Committee.

15      And just very briefly, Your Honor, as you know, we did not

16  file an objection.  It sounds from what we heard today that

17  Mr. Seery and the Board are working hard, which is, frankly,

18  what I think you expect and what we expect of them.

19      We don't have an objection to the retention of Mr. Seery

20  as CEO at $150,000 a month, which is inclusive of director

21  fees.  And as Mr. Pomerantz said, the Committee does not agree

22  -- in fact, that was the source of quite a bit of the

23  negotiation of the last couple of months -- with the bonus

24  proposal.  But, again, we understand that that will be

25  addressed by a separate motion.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document      Page 500 of 1017
Case 3:25-cv-02072-S    Document 15-4    Filed 06/06/25    Page 453 of 722    PageID 2963

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 104 of 134

104

1       Your Honor, we appreciate Mr. Seery's testimony to advise

2   you and to create the record for purposes of today's

3   uncontested matter.  And obviously, the Committee -- there's

4   no live objection.  And while the Committee may have different

5   views of what Mr. Seery said -- for example, the working of

6   the protocols, the sophistication of the advisors to the

7   Committee -- again, for purposes of the matter before the

8   Court today, we're not going to take any issue with any of

9   those statements, Your Honor, but reserve the right to do so

10  again in future if it becomes necessary.

11      So, with that, Your Honor, I have no further comments, but

12  I did want to make those couple comments for the record, to

13  make sure Your Honor understood where the Committee is coming

14  from.

15           THE COURT:  Okay.  Thank you.  Does anyone else wish

16  to make comments about the applications before the Court?

17      (No response.)

18           THE COURT:  All right.  Mr. Morris, I'll turn it back

19  to you.

20      I found in my notes one question that I had.  Looking at

21  your Exhibit 3 is what made me decide I have this question.

22  The Exhibit 3 was the e-mail exchange of Sunday, April 5th

23  amongst the Board members.  Let me ask you this.  There was

24  something in there regarding Mr. Seery, this would be a full-

25  time position, but he would be permitted to serve on outside

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Document 1 Filed Page 04/24 of 2722 501 of 1017   PageID 2964

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 105 of 134

105

1   boards of directors.  Is that a term that survived, or no?

2   And if it did, I want to ask how many outside board

3   memberships does he have?  Again, I expect, like I think

4   everyone, that it's going to be very full-time, so I don't

5   want to hear that he's on 12 other boards.  How did that --

6           MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

7   Since I was the one who actually was involved in negotiations

8   more than Mr. Morris, --

9           THE COURT:  Okay.

10          MR. POMERANTZ:  -- maybe I can answer.  I believe it

11  was something that survived.  I am not aware of any other

12  boards that Mr. Seery is on.  And if he has actually been able

13  to do anything meaningful while performing what is I think

14  probably 200 hours a month and being available 24/7, I take my

15  hat off to him.  But I would ask him to confirm if he has any

16  other material role, but I have not seen anything.

17          THE COURT:  All right.  What about that, Mr. Seery?

18          MR. SEERY:  I -- currently, I'm not on any other

19  outside boards except two charities.

20          THE COURT:  Okay.

21          MR. SEERY:  One is a foundation called the

22  (inaudible) Foundation, which is a charity for (inaudible)

23  individuals, disabled folks, and -- most of whom are abused.

24  And I'm also involved with a charity, I'm not on the board but

25  on a funding committee for Team Rubicon, which is a reference

002254   APP 1481

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 54   Filed 06/04/25   Page 502 of 1017   PageID 2965
Main Document      Page 106 of 342

Case 19-34054-sgj11  Doc 864  Filed 07/17/20   Entered 07/17/20 10:53:51   Page 106 of 134

106

1   -- reference service, assistance in disasters.  So they don't

2   take time like this, and so I'm not going to be involved in

3   any --

4            THE COURT:  Okay.  Thank you.  That's what I would

5   hope to hear.  I didn't want to hear that you were on, you

6   know, 12 other for-profit boards.

7        So, all right.  So, Mr. Morris, Mr. Pomerantz, do you have

8   anything to say before we wrap up this topic?

9            MR. POMERANTZ:  Your Honor, I'm happy to give Your

10  Honor a closing statement if you think it's necessary.  I

11  think you know what I would say, to summarize.  But I think

12  we've been at this a while, so (inaudible).

13       So unless Your Honor has any questions for me, I would

14  just say that the evidentiary record, I believe, supports the

15  entry of an order approving both the Motion to Employ Mr.

16  Seery as the Chief Executive Officer, CRO, and Foreign

17  Representative, and the Motion to Appoint DSI as the Financial

18  Advisor.

19           THE COURT:  All right.  Well, I am going to grant

20  both of these motions.  Again, as for Mr. Seery, it's as

21  modified per the agreements with the Committee, that

22  modification being that, as for any bonuses, we're just

23  deferring to another day whether Mr. Seery is going to get any

24  bonuses related to a plan, what kind of plan it might be, a

25  case resolution plan or a monetization vehicle plan.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 436 of 272 503 of 1017   PageID 2966
Main Document   Page 106 of 342

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 107 of 134

107

 1       You know, I really hope, frankly, Mr. Seery is before me

 2   seeking a bonus in the very near future and we're all happy

 3   about the prospect of paying him a bonus because a plan has

 4   been achieved, hopefully a case resolution plan.  I will just

 5   tell you right now, I will have a big smile on my face and

 6   will warmly consider that if we get a great result here.

 7       But it's deferred to another day.  So I do find it's --

 8   the evidence amply shows a sound business justification and

 9   reasonable business judgment on the part of the Debtor in

10   proposing that Mr. Seery be CEO and CRO, essentially, and a

11   foreign representative, where necessary, at the base pay of

12   $150,000 per month, again, with bonuses to be considered at

13   appropriate times down the road if we feel that that is a good

14   thing for Mr. Seery to be paid.

15       And I likewise find that, under 327, 328, 363, the amended

16   application with regard to DSI Specialists and Mr. Sharp and

17   Mr. Caruso should be granted, it appearing to be reasonable

18   business judgment and in the best interests of the estate and

19   appropriate in all ways under those Code sections.

20       All right.  So we are going to look for orders on those

21   two matters.

22       Now, unless you have other housekeeping matters you want

23   to talk about, I want to circle back to the mediation topic.

24   Mr. Pomerantz, Mr. Morris, anything you wanted to raise?

25            MR. POMERANTZ:  There is actually one other

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/05/25   Page 504 of 1017   PageID 2967
Main Document   Page 107 of 134

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 108 of 134

108

1    housekeeping matter that Ms. Patel and I have been speaking

2    about and we said we would raise before Your Honor.

3        As Your Honor heard at the last hearing, we had filed an

4    objection to the Acis claim.  We initially set the objection

5    for August 6th.  Ms. Patel reached out to us, I understand, I

6    remember at the last hearing indicated that August 6th was

7    difficult for her.  And especially since we were having the

8    mediation, we had talked to her about a rescheduling.  So we

9    are intending put the matter on the September 10th calendar.

10   We have also granted Acis an extension to file a response to

11   July 31st.

12       What I think we would like the Court's input on, and not

13   now, but we would suggest having it done at the next hearing,

14   which is July 21st, as I'm sure Your Honor has not yet read

15   our objection, but it's a quite lengthy objection, I think 55,

16   60 pages.  There's a lot of issues there.  There are some

17   factual issues, some -- there are some legal issues.  There

18   are some combination of factual and legal issues.

19       We think it would be helpful to the process to set up a

20   status conference with Your Honor -- again, to be held perhaps

21   on July 21st, because discovery motions are pending -- where

22   we could walk through with Your Honor what exactly everyone

23   would intend to accomplish on September 10th.  We don't

24   believe it should just be a status conference.  We searched

25   other dates.  On the other hand, I think both parties will

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/03/25   Page 505 of 1017   PageID 2968
Main Document   Page 505 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 109 of 134

109

```
 1   have different views on what exactly will be at issue.  But I

 2   think it would be helpful, from both sides, to hear Your

 3   Honor's expectations and to get some ground rules so we can

 4   make a hearing, if necessary, on September 10th as productive

 5   as possible.

 6        THE COURT:  All right.  So, in writing down dates,

 7   did you tell me what -- a deadline you have given Acis, or

 8   what is the deadline that would apply under the Rules versus

 9   what you have agreed to?  Is there something different you've

10   agreed to?

11        MR. POMERANTZ:  Sure.  I believe, for a hearing on

12   August 6th, based upon when we filed it, I believe their

13   objection would have been due July 23rd or thereabouts.  They

14   have asked us for July 31st, and I don't want to be as

15   presumptuous, Your Honor, to say that I have given them the

16   extension.  I know that's up to you, Your Honor, to do so.

17   The Debtor does not have any opposition to an extension in

18   that respect, especially given the fact that we're not going

19   to have a hearing until September, although it's obviously

20   going to be important to be able to move forward with

21   negotiations to understand what their specific position is,

22   and, of course, for a mediator to look at both as well.

23        So, again, it's July 31st, September 10th, and then

24   setting up something with Your Honor, whether it be July 21st

25   or some other date, to walk through Your Honor what that
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/09/25   Page 506 of 1017   PageID 2969
Main Document   Page 110 of 232

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 110 of 134

110

 1  hearing will look like so it could be most efficient.

 2         THE COURT:  All right.  Well, I am agreeable to that

 3  set of dates and deadlines.  Ms. Patel, did you want to say

 4  anything about it?

 5         MS. PATEL:  No, Your Honor.  Mr. Pomerantz hit the

 6  salient terms.  Yes, July 31st is the agreed response date.

 7  And that allows, frankly, parties to -- an opportunity --

 8  allows Acis the opportunity to meaningfully brief the issues,

 9  as Mr. Pomerantz indicated.

10     It's a 60-page objection.  It's very weighty.  There's a

11  lot of issues that require due consideration.  So we have

12  agreed on that extended date.  It's in sufficient time to

13  allow the parties time to read a response and analyze it ahead

14  of a mediation in August.

15     And as Mr. Pomerantz indicated, yes, the parties would

16  like -- effectively, I think he -- he might have referred to

17  it as a status conference.  Apologies, my WebEx is cutting in

18  and out a little bit this afternoon.  But I think it's

19  probably a status conference/scheduling conference so we can

20  talk about what the trial of the claim objection is going to

21  look like and how it should be structured.  And I think, as

22  Mr. Pomerantz alluded to, parties may have very different

23  contexts with respect to that, but we want to just run it by

24  Your Honor, and ultimately it is going to be up to Your Honor

25  with respect to how the trial goes forward.

APP 1486

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/09/25   Page 507 of 1017   PageID 2970
Main Document   Page 111 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 111 of 134

111

```
 1              THE COURT:  All right.  Well, I hope that you all are

 2    going to have lots of specific thoughts to share on what the

 3    hearing on September 10th would look like, because, holy cow,

 4    a $70 million proof of claim that -- I haven't looked at your

 5    proof of claim, but it is presumably based on the 34 counts in

 6    the adversary proceeding filed in the Acis case, and maybe

 7    then some.

 8       So, you know, I don't know how in the world, if we had to

 9    have a contested hearing on September 10th, we could get that

10    all done in one day.

11              MR. POMERANTZ:  Your Honor, Jeff Pomerantz again.

12    Without getting ahead of ourselves, at least the Debtors' view

13    is there are some threshold legal issues --

14              THE COURT:  Okay.

15              MR. POMERANTZ:  -- that are raised in the objection.

16    And then there are, of course, a series of issues that are

17    factual-intensive.

18       So what we intend to present is how we think we can

19    efficiently deal with it.  Again, it's not our expectation to

20    have a lengthy trial on the entire claim objection.  But,

21    again, Ms. Patel and I agreed that what we weren't going to do

22    is turn this into a status conference.

23              THE COURT:  Okay.

24              MR. POMERANTZ:  To the effect that neither party was

25    ready.  I would just leave it at that --
```

APP 1487

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/06/25    Page 508 of 1017    PageID 2971
Main Document    Page 91 of 232

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 112 of 134

112

```
1              THE COURT:  Okay.

2              MR. POMERANTZ:  -- and say we'd be prepared to talk

3    with you on the 21st.

4              THE COURT:  Okay.  Well, we -- we'll use that setting

5    partly as a status conference to talk about the September 10th

6    hearing.  And, again, I hope you both will have some specific

7    ideas to give me.

8         So, July 21st, we have -- remind me what we have.  We are

9    so busy, I haven't looked one week ahead to --

10             MR. POMERANTZ:  I believe, and Mr. Morris could

11   correct me if I get ahead of ourselves.  I know there's been

12   discussions between us and the Committee on two very -- two,

13   in some sense, the opposite sides of the coin -- discovery

14   motions that are pending before Your Honor.  I thought July

15   21st may have been pre-obtained.  Again, I could be ahead of

16   my partner there.

17             THE COURT:  Okay.  That sounds like something that

18   I've set on an expedited basis in the past few days.  Mr.

19   Morris, Mr. Clemente -- Mr. Clemente filed a motion, or

20   someone from their shop filed a motion --

21             MR. CLEMENTE:  Your Honor?  Your Honor?

22             THE COURT:  -- during the middle of our last hearing,

23   as I recall.  And I was kind of surprised to get out of court

24   and learn about it.  But you're saying you haven't gotten

25   information you've been asking for for months, and we also
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 509 of 1017   PageID 2972
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 113 of 134

113

```
1   have a motion for a protective order.

2       So, just give me a short -- I'm trying to figure out how

3   much time we're going to be in court next week on the 21st.

4   It's a discovery dispute.

5           MR. POMERANTZ:  And I'll --

6           THE COURT:  So, Mr. Pomerantz?  Go ahead.

7           MR. POMERANTZ:  Your Honor, if my colleague, Paige

8   Montgomery, is on, she's in a better position to address that.

9   I don't know if Ms. Montgomery is on.

10           MS. MONTGOMERY:  I'm here.  I don't -- my WebEx has

11   been cutting in and out, but I think (inaudible) hear me.

12           THE COURT:  We can hear you, but we can't --

13           MR. POMERANTZ:  Yes, we can.

14           THE COURT:  Oh, there you are.  We can now see you as

15   well.  So, --

16           MS. MONTGOMERY:  Yes, Your Honor.  I think the amount

17   of time that might be required for the discovery motions is

18   going to be dependent on the number of third-party objections

19   that may or may not be filed tomorrow.  We've been in

20   communication with a number of different parties over the last

21   couple of days, trying to resolve those.

22       But I think, if it were just the two motions and the two

23   parties that filed those, John, I don't know if you disagree,

24   but I'd say that's probably an hour.  I just don't know how

25   many other people -- I don't know how many other people will
```

002262

APP 1489

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15-4   Filed 06/04/25    Page 510 of 1017    PageID 2973
Main Document   Page 493 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 114 of 134

114

1    want to participate, Your Honor.

2          THE COURT:  Okay.  Well, it's going to be whatever

3    it's going to be, but we're going to have -- the main event on

4    the 21st is going to be this document discovery contest, and I

5    guess there's a related motion for protective order.  But I

6    don't know how much it's going to be about resisting producing

7    documents versus we'll produce documents if we have a

8    protective order.

9       Mr. Morris, can you, in, you know, a few seconds, answer

10   that?

11         MR. MORRIS:  Sure.  As the Debtor, we're trying to --

12   we've got certain interests to protect.  We thought we were in

13   a different place in the middle of June, and, you know, this

14   proposal that the Committee made for the first time on July --

15   on June 26th is really what, from my perspective, prompted us

16   to be here.

17      But we've made a proposal to the Committee.  We haven't

18   received a response to that.  We're trying to address these

19   issues.  But it's not, you know, it's not contentious.  I

20   think our interests are legitimate.  I think the motion that

21   we made is either for a protective order or for an order

22   directing us to produce the documents.  Because as the motion

23   itself sets forth, Your Honor, the Debtor has certain

24   contractual and other obligations to some third parties.  We

25   have given notice to those third parties of our -- of our

APP 1489

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15   Filed 06/09/25    Page 511 of 1017    PageID 2974
Main Document   Page 494 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 115 of 134

1   intent to make this motion, because we are kind of between a

2   rock and a hard place.  We can't produce the documents

3   without, you know, potentially violating obligations to third

4   parties.

5        And so we'd just ask the Court to be the referee here, to

6   make the decision as to how it gets resolved.  And we've given

7   notice to these third parties so that they fairly have an

8   opportunity to be heard, too.  And I've been in communication

9   with some of them as well, and I've encouraged them to speak

10  with the Debtor, because ultimately, you know, if the Debtor

11  and the third parties can come to an agreement on the

12  production of the documents, you know, that will resolve, you

13  know, a substantial piece of the issue.

14          MR. POMERANTZ:  You mentioned the -- you meant the

15  Committee, John, not the Debtor.

16          MR. MORRIS:  I apologize.  Yes.  Thank you.

17          MR. POMERANTZ:  Thank you, John.

18          THE COURT:  Okay.  Well, I hope you have this largely

19  worked out.  Obviously, I hope that.  You know, I just

20  remember doing a very quick pass through the Committee's

21  motion, but I do remember them saying they've been trying to

22  get these documents for a very long time, and I think I recall

23  there's pressure building now because I gave you a 90-day

24  deadline to either file a lawsuit regarding the CLO Holdco

25  issues that we had a hearing on a few weeks ago, a couple of

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/04/25   Page 512 of 1017   PageID 2975
Main Document   Page 116 of 134

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 116 of 134

116

 1   weeks ago, or I'm probably going to release the money in the

 2   registry of the Court.  And so that's part of why you're

 3   trying to get these documents as soon as possible, right, Ms.

 4   Montgomery?

 5        MS. MONTGOMERY:  Yes, Your Honor.

 6        THE COURT:  Okay.  All right.  You all try to work

 7   this out.  Okay?

 8        MR. CLEMENTE:  Thank you.

 9        THE COURT:  Well, I was partly pressing the issue of

10   what's July 21st going to look like because I think we may

11   carry over the discussion about mediation.  We're going to

12   start it right now, but I think we may have to carry it over

13   to the 21st, and I hope finally kind of get a game plan

14   together on that day.

15      So, I wanted Mr. Seery to be available.  Mr. Seery is --

16   if you're still there somewhere.  You're very important, in my

17   view, to mediation potentially being successful here -- and

18   the whole Board is, for that matter -- because -- well, let me

19   digress a minute.

20      Mediation is going to be very tough here.  We all know

21   that mediation tends to be more likely to succeed if we've got

22   face-to-face, in-person participation.  And as I said last

23   week, I just don't know how I can order people to be in face-

24   to-face mediation right now.  I just -- we've got people

25   spread out, and I think it would be very, very bad to order

APP 1492

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/04/25    Page 496 of 2422    513 of 1017    PageID 2976
Main Document    Page 496 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 117 of 134

117

 1    face-to-face mediation right now.

 2        But on the topic of mediation, you know, I've heard some

 3    things that, you know, we all know, but I've heard some things

 4    from Mr. Seery that are important to stress today.  This isn't

 5    the type of case that needs to be in bankruptcy for months and

 6    months and months and months.  Okay?  We have the issue of the

 7    professional fees accruing, of course, like every case.  But

 8    we have a company where -- it's a strange fit for bankruptcy,

 9    right, this kind of company.  And it's so dependent on people

10    to provide value.  And people can bolt.  You know, people can

11    get weary of the bankruptcy and want to be somewhere else

12    where that taint is not there in the marketplace.

13        The issue of the UCC protocols was brought up by Mr.

14    Seery, and I know that is something that is going to be

15    cumbersome, you know, for this company to be in bankruptcy

16    long-term.

17        So, I want to go to Mr. Seery, and it may be unusual for

18    me to reach out to you and ask this, but I want to hear from

19    you:  Do you think mediation is a waste-of-time pipe dream,

20    for lack of a better term?  I really want mediation to happen,

21    because I don't know how we quickly get a confirmed plan if we

22    have, well, the voting issue, for one, right?  We have to, at

23    a minimum, figure out what is UBS's voting claim.  What's its

24    claim for voting purposes?  What is Acis's claim for voting

25    purposes?  A looming, huge issue in my mind.  So I feel like

1   we've got to have mediation.  We've got to get a strong shot

2   at getting these two claims liquidated, at least for voting

3   purposes, if not overall.

4       So, is this a pipe dream, Mr. Seery, in your view, that

5   mediation might get to resolution on these two claims?  What

6   do you think about it?

7           MR. SEERY:  The quick answer, Your Honor, is I don't

8   think it's a pipe dream.  I think there's a legitimate shot to

9   move parties together.

10      Let me just say one thing that -- reflecting on what Mr.

11  Clemente said.  I want to make clear for the record that, to

12  the extent I misspoke, and it would have been misspeaking, I

13  have no negative implication regarding the sophistication,

14  professionalism, or focus of Sidley --

15          THE COURT:  Uh-huh.

16          MR. SEERY:  -- or FTI or any of the professionals.  I

17  know these folks.  They're really good.  They're very

18  sophisticated.  I have the highest professional and personal

19  respect for them.  So, to the extent that I misspoke, I

20  apologize.

21          THE COURT:  I don't think you did, and that's not how

22  I heard it --

23          MR. SEERY:  Okay.

24          THE COURT:  -- and that's certainly not how I meant

25  it.  It's just a fact of bankruptcy that it's expensive.

APP 1491

1   Okay?  So, --

2            MR. SEERY:  Yeah.

3            THE COURT:  Right.

4            MR. SEERY:  I just wanted that to be clear.

5       I think, particularly with respect, Your Honor, to the

6   Acis and UBS claims, our professionals have done a lot of work

7   on them.  Obviously, the professionals for Acis and UBS have

8   done a lot of work on them.  There may be things that we know,

9   the perspectives that we have, and perspectives that the other

10  side has, that may not be as well-founded as each side thinks.

11  It could be very valuable to have a third-party objective

12  observer, cajoler, somebody who's strong, to help move the

13  parties off of certain positions.

14       We would like to think, as a Board, Independent Board, and

15  I'd like to think as an Independent Director and now as a CEO,

16  I didn't really have a -- the proverbial dog in that fight for

17  either of those claims.  I wasn't -- I'm not a Highland

18  employee.  I don't have any animus towards any of the sides.

19  I don't have any history with any of the sides.

20       But I'm realistic that I take a perspective around certain

21  claims and how they're brought, the factual and legal basis

22  for them.  And I get a lot of that information from Highland

23  employees, and we use that information to then perform the

24  analysis with our professionals.

25       Likewise, these parties have been involved in, on the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/09/25   Page 516 of 1017   PageID 2979
Main Document   Page 64 of 232

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 120 of 134

120

1   other side, very entrenched disputes with Highland and

2   Highland employees.  And they've dug in on their positions.

3        Having a third party hear each side and start to move

4   could give us the chance to break it open.  I think there's --

5   and there's two really important aspects.  One is the claim

6   amount, and then, obviously, the distributions on the claims:

7   How to make those, how much are they, when are they made?  We

8   can work on both of those, and I think we need some help

9   moving us both on the claim amounts and on how to make the

10  distributions.

11       We've made progress with Redeemer because even though they

12  had -- they had an arbitration award, so we knew what the

13  outside would be.  Now, Redeemer and their attorneys are very

14  good and very creative.  They could stretch the outside in

15  those discussions.  I won't get into what they are.  But we

16  were able to more easily fashion around the particulars of

17  that claim because there was that judgment from the

18  arbitrators that, while it hasn't been entered, gave us much

19  more guidelines as to where we could look.  The other claims

20  are much more amorphous, at least at this stage, and having a

21  third party help us develop perhaps closer goal lines would be

22  useful, in my opinion.

23       But, again, I think it's very important that we do it

24  quickly.  I think we -- you know, somebody who is focused,

25  strong.  I'm sure they'll be highly intelligent and versed in

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 08/05/25   Page 517 of 1017   PageID 2980
Main Document   Page 650 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 121 of 134

121

1    the field, but somebody who's got the opportunity and time to

2    do it.   And then, if it's unsuccessful, then, as Mr. Pomerantz

3    and Ms. Patel alluded to, then perhaps we may need some

4    judicial help to move those goal lines a little bit.

5         But I do think that mediation -- and I apologize for the

6    length of my answer -- could be a very helpful way to do it,

7    provided we get there quickly.

8              THE COURT:  All right.  I guess my other question I

9    wanted your view on is structure.  You know, when someone --

10   Mr. Pomerantz, I think -- told me that he or others had

11   reached out to our judges in Houston, Judge Jones and Judge

12   Isgur, my initial reaction -- and, frankly, my continued

13   thought on that -- is they just don't have meaningful time,

14   because I don't think one day of cajoling is going to be

15   enough to get -- you know, you're a billion dollars apart on

16   UBS, right?  The Debtor, I guess, thinks zero is the amount of

17   their claim, and UBS thinks it's a billion, and it's been

18   litigated for 11 years.  And then I personally know, you know,

19   how Acis feels about its positions.

20        So, anyway, what I'm getting at is structure.  I in some

21   ways think what we need here is sort of a master statesman-

22   type person who would spend meaningful time, not just a day or

23   two, but days or even weeks trying to reach a grand

24   compromise.

25        On the other hand, in my experience -- I've never done

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 09/05/51 of 2722 518 of 1017   PageID 2981
Main Document   Page 518 of 1017

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 122 of 134

 1  that in a case as judge.  But as a lawyer, I felt like that

 2  kind of person can hijack a case, and we don't need that here.

 3  We have wonderful professionals, a wonderful Board, a

 4  wonderful CEO.  We don't need that kind of help, I worry.

 5      So, I guess where I'm evolving, you know, we've got the

 6  two-sitting-judge option that would be free mediators that

 7  could give you a day or two.  Maybe.  And then we have kind of

 8  the master statesman who might be in there for weeks, trying

 9  to help you reach a grand compromise.

10      Another option, I think, is one or two mediators who just

11  zero in, you know, on the UBS claim versus -- and the Acis

12  claim.  And I have a couple of private mediators in mind that

13  have very good video capabilities to have a sophisticated

14  video mediation.

15      So, all of this rambling to say, Do you think we need to

16  just zero in on Acis and UBS and maybe have one or two people

17  to do formal video mediation with those two parties, or do we

18  need sort of more of a grand pooh-bah, grand compromise-type

19  person?

20          MR. SEERY:  My view, Your Honor, is that we should

21  focus on the claims, but they're not just going to be two-

22  party, because we do have other active constituents.  I think

23  Redeemer, with their party in interest status, is going to

24  want to be part of it.

25      I think if we can focus on those, we have the

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 01/06/25   Page 519 of 1017   PageID 2982
Main Document   Page 502 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 123 of 134

123

1   professionals to help drive the grander bargain that I've

2   alluded to in some of those discussions we've been having.  So

3   they haven't progressed as far as I would like, but they have

4   progressed.  We do need the bottom line number for where

5   claims are going to come out.  But also that will help frame a

6   little bit as to what parties expect in terms of distributions

7   on their claims.

8       And I think the reason that we had some impetus behind a

9   sitting judge -- frankly, I didn't know that sitting judges

10   couldn't be paid.  I think that's -- there should be a

11   standard rate, because we shouldn't take people's time for

12   free in these cases, and I know judges work extremely hard and

13   if they're going to put in extra time, then they should maybe

14   be compensated, but that's a whole different issue.

15       I don't think we should get too hung up on the cost.  We

16   are -- the costs of this case are extremely high, and we are,

17   with best intents, sometimes getting ourselves wrapped up in

18   things that should be, I think, more swiftly and economically

19   dealt with and dispatched.

20       So, if we can get a good mediator, and I think the reason

21   folks think about a judge is -- a sitting judge, it's not just

22   the vast experience that folks -- judges like yourself have,

23   Your Honor, and in particular with these issues, but also the

24   requirement that all the participants, notwithstanding the

25   professionals and -- that you see here, the requirement that

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 0653 of 2732    Page 520 of 1017

Case 3:25-cv-02072-S    Document 15-4    Filed 04/15/25    Page 520 of 1017    PageID 2983

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 124 of 134

124

 1    all the participants know that they're dealing with a sitting

 2    judge, there's a certain decorum that's required.  But that, I

 3    think we get anyway.  But there's also a -- there's less

 4    willingness to go to the furthest reaches of your argument

 5    when you have someone who's on the bench who sees those types

 6    of positions taken frequently and can dispatch with them more

 7    readily.

 8         So, I think there are a number of individuals that I've

 9    dealt with in the past who would have the ability, the

10    gravitas, for lack of a better term, to be able to help push

11    the parties in the right direction.  And I think it's a matter

12    of finding somebody, as you said, with both the capabilities,

13    which we'll find, but also the capacity in terms of the time

14    to do it.  And then, in the video age, maybe some facility in

15    being able to make that happen both rapidly and effectively on

16    screen.

17              THE COURT:  Okay.

18              MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

19    And I'd just make a couple of comments.

20              THE COURT:  Okay.

21              MR. POMERANTZ:  You know, as Mr. Seery said, we were

22    predisposed towards a sitting judge.  And while we did share

23    the same concerns about the timing of Judge Jones and Isgur,

24    we understand you've probably been in communication with them,

25    and if that's not going to work, we appreciate it.  We want

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/05/04 of 2722 521 of 1017   PageID 2984

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 125 of 134

125

1   this mediation to be effective and we want someone to spend

2   the time with it.  And if you didn't feel that they, you know,

3   could commit to that, we totally appreciate that.

4       We thought long and hard about the people that you

5   identified at the last hearing, former Judge Peck and Sylvia

6   Mayer.  We've done our diligence.  The Debtor would be willing

7   to mediate before Sylvia Mayer.  We think that, based upon our

8   diligence, the people we've spoken to, that she, if she

9   otherwise had the time and the abil... the time to devote to

10  it, that being a former big-firm lawyer in permanent practice

11  now as a mediator, that the Debtor would find her acceptable.

12          THE COURT:  All right.  Does anyone else wish to

13  comment?  Because I have a very positive view of Sylvia Mayer,

14  and certainly her video capabilities, I think, are far and

15  away better than a few other people I've chatted with.

16          MS. PATEL:  Your Honor?

17          MR. CLEMENTS:  Your Honor?  Oh, I'm sorry.

18          MS. PATEL:  Go ahead.

19          MR. CLEMENTE:  Your Honor, --

20          THE COURT:  Not that I would ever, you know, put that

21  ahead of, you know, overall abilities, but it just is an added

22  plus, a huge plus right now during COVID.

23      Go ahead.

24          MR. CLEMENTE:  Your Honor, Matt Clemente on behalf of

25  the Committee.  Just a couple observations, building a little

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5-4    Filed 06/05/25    Page 522 of 1017    PageID 2985

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 126 of 134

126

```
 1    bit on what Mr. Seery said.

 2        We had consensus among the Committee around Judge Isgur

 3    and Judge Jones.  I think the view, the consensus view -- and,

 4    again, I use the word consensus and not unanimity because I

 5    want Your Honor to understand that -- is that having a sitting

 6    judge, ideally, given the personalities as you've expressed

 7    and I think as Mr. Seery has expressed, provides the best

 8    possibility for a successful mediation.  It may not be that

 9    overlord that spends three weeks, but, you know, it is a

10    strong personality that -- not that any of the names that have

11    been raised aren't tremendously to be respected, but that

12    would be respected by all of the parties simply by the fact

13    that they're a sitting judge.

14        With that said, Your Honor, and, again, the speed.  Again,

15    I don't have unanimity from the Committee, but there is

16    consensus to see if Sitting Judge Green from the Southern

17    District of New York would have the time and the capability to

18    spend.  And I know Your Honor has concerns about the time.  I

19    think Judge Isgur and Judge Jones occupy a special place in

20    terms of how busy they are, but at least among the Committee

21    members, there's been discussion that that may be a suitable

22    approach in terms of identifying a mediator and accomplishing

23    the objectives of having a very strong mediation, mediator, on

24    a timely basis, that has the best possibility of success.

25        That being said, Your Honor, based on what Mr. Pomerantz
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/05/25   Page 523 of 1017   PageID 2986
Main Document   Page 526 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 127 of 134

127

 1   said, if Mr. Green is not acceptable or if Your Honor doesn't

 2   wish for us to go in that direction, I do have consensus among

 3   the Committee members to move forward with Ms. Mayer as

 4   mediator.

 5       So, a little -- maybe a little convoluted in my comments

 6   there, Your Honor, but the main thrust is I think there is

 7   consensus among the Committee to consider a sitting judge, and

 8   Judge Green would be someone who would be satisfactory.  And

 9   if he's not acceptable, or I should say acceptable but not

10   able to do it, Ms. Mayer would be acceptable to the Committee.

11           THE COURT:  All right.  Well, let me put this out

12   there.  I talked on a no-names basis with Ms. Mayer last

13   Friday.  And it was actually more in the nature of making

14   inquiries about how an organization she's connected with, the

15   AAA -- you've heard of the American Arbitration Association;

16   they, of course, do mediation -- what their experience and

17   capabilities were with many, many parties and video mediation.

18   And as you might guess, they have a lot of experience already

19   -- you know, a number well in excess of a hundred; I can't

20   remember -- of doing video mediations with many parties and

21   having the different constituencies in this caucus room and

22   that caucus room.  And, very importantly, having lots of IT

23   staff to give instructions, to give help, to, you know, tackle

24   technology problems.

25       But in that discussion, I learned that there is a panel

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/05/2 of 2724 524 of 1017    PageID 2987
Main Document    Page 4557 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 128 of 134

128

```
 1    that AAA has put together of 12 mediators that have bankruptcy

 2    expertise.  And, of course, Sylvia Mayer is one of those

 3    people.  But Retired Bankruptcy Judge Gropper -- is it Groper

 4    or Gropper from the Southern District of New York?  I always

 5    forget which way he pronounces his name.  Anyway, he is on

 6    that.  He is on that panel of 12.

 7        Mr. Seery, you're grinning like you want to say something

 8    about this.

 9            MR. SEERY:  No.  Only on the Gropper/Groper, because

10    there's a professional that I know that is similarly named,

11    and I believe -- and I believe Judge Groper -- I may have it

12    wrong, but I think it's -- it's Judge Groper and Dan Gropper.

13    But that's the best I --

14            MR. NEIER:  It's Dan Groper and Judge Gropper.  I

15    actually had a mediation with the two of them when they argued

16    about the pronunciation of their name.

17            THE COURT:  Okay.  Well, Gropper.  So we -- it's

18    Gropper.  Okay.

19            A VOICE:  Yes.

20            THE COURT:  My point was, without -- I've not talked

21    to him at all.  And by the way, I haven't personally reached

22    out to Jim Peck, but we'll stop that discussion about him.

23    But after getting off the call with Sylvia Mayer and a couple

24    of other people at the AAA Friday, I put together in my brain,

25    maybe we could have a Sylvia Mayer/Allan Gropper tag team, two
```

1   mediators.  Okay?  I don't know how that would affect the

2   cost, but that might be the way to go in such a complex case.

3   You know, maybe they could divvy up among themselves.  One

4   would be the primary mediator on Acis, one would be the

5   primary mediator on UBS, but they would both work together.

6        If you all want to think on that, digest that a little,

7   and we, you know, decide definitely next week on the 21st, we

8   could do that.  Or we could just all say, yeah, that's a good

9   game plan, and I can get on the phone after this.  Or it

10  actually may be tomorrow, because I have a terrible hearing

11  that I've got to prepare for at 9:30 in the morning tomorrow.

12  It may be tomorrow.

13       But do people want to let that soak in a little bit, or

14  shall -- I mean, --

15            MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

16            THE COURT:  -- frankly, I can order it either way.  I

17  can order it.  But I just really want to be conciliatory to

18  the parties who are owed the money and have to pay the money,

19  if you want to think on it some.

20            MR. POMERANTZ:  Your Honor, it's Jeff Pomerantz.

21  Having my newly-minted CEO on the phone, Mr. Seery, I would

22  ask him, and if he says that it would be okay, then it would

23  be okay with me.

24            MR. SEERY:  Be fine with me.

25            THE COURT:  Okay.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/05/25   Page 526 of 1017   PageID 2989
Main Document   Page 509 of 732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 130 of 134

130

1        MR. SEERY:  Yeah, I think the key is moving forward.

2   I know it's much harder with a Committee, and I respect, you

3   know, Matt Clemente's job there of having to get consensus.

4   But from our perspective, if we were to push it off, you know,

5   on the 21st, Your Honor, we -- we would request you to order

6   something, because I don't want this to delay.

7        THE COURT:  Okay.

8        MR. CLUBOK:  Your Honor, if I may, speaking for UBS,

9   it's Andrew Clubok.  You'll be happy to know I think that

10  we're in agreement with Mr. Seery, and I guess, derivatively,

11  Mr. Pomerantz.  We think the most important thing is to move

12  it along quickly, and we trust -- you know, we're familiar

13  with Judge -- or, with Mayer, and whether it's Groper or

14  Gropper, I lost track, but I'm sure he is also going to be

15  equally capable.  We do kind of think that two is probably

16  necessary, given, you know, the sort of multi-layer

17  (inaudible).

18     But, really, our position has simply been we'll happily

19  mediate with any, you know, effective mediator as quickly as

20  possible, because we do think the sooner we do that, the

21  sooner we might have a chance to get to yes.  So, I'm -- we're

22  prepared to just say yes to the idea.

23        THE COURT:  All right.  Does anyone else want to

24  comment?

25        MS. PATEL:  Your Honor?  And can you hear me?  I'm

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/05/25   Page 527 of 1017   PageID 2990

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 131 of 134

131

1   sorry.  It's --

2                THE COURT:  Yes.

3                MS. PATEL:  Again, I'm still having WebEx problems.

4                THE COURT:  Yes.

5                MS. PATEL:  Your Honor, again, for the record, Rakhee

6   Patel.

7        Acis is fine with the proposal, Your Honor.  We've been

8   amenable to virtually every proposal, and have been trying to

9   hopefully be helpful with respect to getting this moved to

10   mediation as quickly as possible.  We equally think that we

11   should get to mediation as quickly as we can.

12        And, you know, the only -- the only -- and I appreciate

13   Your Honor's contemplativeness on this.  As you know, at least

14   in connection with the Acis case, you know, we've been through

15   two unsuccessful mediations so far.  So we're really hoping

16   that the third time will go much better than the prior two.

17        So, anyway, this is my very long way of saying we're fine

18   with the proposal and are happy to kind of sign off on it.  We

19   don't need until July 21st to respond on that.

20                THE COURT:  Okay.  Anyone else?

21        (No response.)

22                THE COURT:  All right.  Well, very good.  I'm going

23   to move ahead on this and will confirm to you, hopefully

24   before the 21st, through my courtroom deputy.  And, again,

25   given the late hour, I think it's going to be tomorrow before

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 10/04/25   Page 528 of 1017   PageID 2991
Main Document   Page 1551 of 2732

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 132 of 134

132

```
1    I pick up the phone and reach out to Sylvia Mayer and former
2    Judge Gropper.
3         But, again, I did, in speaking generically with Sylvia
4    Mayer, asking her, Have you ever done like a two-mediator
5    mega-mediation, and she said, Oh, sure.  You know, that's --
6    she acted like it was quite common.  It's not something that I
7    have seen very often, but I think we'll be in business with
8    this game plan.
9         Because, you know, I know everyone on this call knows
10   this, but maybe not everyone's client knows this:  If we don't
11   -- if we don't have a successful mediation of both of these
12   claims, or at least one of these claims, it's going to be
13   years and years and years.  I mean, I know it's already been
14   years for UBS, but it will -- it will be many, many more
15   years.  And that's not what we're supposed to do in
16   bankruptcy.  We're supposed to stop burdensome litigation and
17   solve problems.  And I can't imagine your clients want to go
18   on with three or four more years of litigation.  But that's
19   exactly what it will be, it's exactly what it will be, many
20   more years of litigation, if we don't have mediated
21   settlements.
22        So, all right.
23             MS. PATEL:  Your Honor, if I may very quickly.  I
24   just wanted to make sure the Court was aware of something.  In
25   the context of mediation and as it relates to Acis's claim,
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 10/06/25   Page 529 of 1017   PageID 2992
Main Document   Page 528 of 722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 133 of 134

133

1    yesterday counsel for Mr. Dondero filed a joinder in the

2    Debtors' objection to Acis's claim.  So, again, just thinking

3    about this in the context of mediation, I think, with that

4    joinder, they will be a necessary party.  So, going back to

5    Mr. Seery's point, this is not just --

6             THE COURT:  Oh, absolutely.  Mr. Dondero is --

7             MS. PATEL:  -- a two-party --

8             THE COURT:  -- going to be a required party in

9    mediation.  Absolutely.  So, --

10            MS. PATEL:  Thank you, Your Honor.

11            THE COURT:  All right.  Well, if there's nothing

12   further, we'll see you on the 21st.  And, again, my courtroom

13   deputy may be reaching out before then if we've got things

14   nailed down on mediation.

15       (Proceedings concluded at 4:54 p.m.)

16                         --oOo--

17

18

19

20                       CERTIFICATE

21

22       I certify that the foregoing is a correct transcript to
     the best of my ability from the electronic sound recording of
     the proceedings in the above-entitled matter.

23       **/s/ Kathy Rehling**                    **07/16/2020**

24   _____          _____

25   Kathy Rehling, CETD-444                         Date
     Certified Electronic Court Transcriber

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 04/06/25   Page 530 of 1017   PageID 2993
Main Document   Page 530 of 782

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 134 of 134

134

INDEX

PROCEEDINGS                                                          4

WITNESSES

James P. Seery
- Direct Examination by Mr. Morris                                  13
- Examination by the Court                                          57
- Cross-Examination by Mr. Clubok                                   60
- Examination by the Court                                          68

John Dubel
- Direct Examination by Mr. Morris                                  75
- Examination by the Court                                          95

Bradley Sharp
- Examination by the Court                                         101
- Direct Examination by Mr. Morris                                 102

EXHIBITS

Debtors' Exhibits 1 through 7                           Received 13

RULINGS

Application to Employ James P. Seery, Jr. as CEO , CRO     106
and Foreign Representative Nunc Pro Tunc to March 15,
2020 filed by Debtor Highland Capital Management, L.P.
(774) - *Granted*

Amended Application to Employ and Retain Development       106
Specialists, Inc. to Provide a Chief Restructuring
Officer, Additional Personnel, and Financial Advisory
and Restructuring-Related Services for Such Debtor, Nunc
Pro Tunc as of the Petition Date filed by Debtor
Highland Capital Management, L.P. (775) - *Granted*

END OF PROCEEDINGS                                                 133

INDEX                                                             134

# EXHIBIT 15

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

```
IN RE:                    .    Case No. 19-34054-11(SGJ)
                          .
HIGHLAND CAPITAL          .    Earle Cabell Federal Building
MANAGEMENT, L.P.,         .    1100 Commerce Street
                          .    Dallas, TX 75242-1496
                          .
          Debtor.         .    March 4, 2020
. . . . . . . . . . . . . ..   1:31 p.m.
```

TRANSCRIPT OF HEARING ON MOTION OF THE DEBTOR FOR ENTRY OF AN
ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE
DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"
BEFORE HONORABLE STACEY G. JERNIGAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For Highland Capital      Pachulski Stang Ziehl & Jones, LLP
Management:               By:  JEFF POMERANTZ, ESQ.
                               GREG DEMO, ESQ.
                          10100 Santa Monica Blvd., 13th Floor
                          Los Angeles, CA 90067


                          Hayward & Associates PLLC
                          By:  MELISSA HAYWARD, ESQ.
                               ZACHARY ANNABLE, ESQ.
                          10501 N. Central Expry, Ste. 106
                          Dallas, TX 75231




Audio Operator:           Michael F. Edmond
```

Proceedings recorded by electronic sound recording, transcript
produced by a transcript service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

| | |
|---|---|
| For Acis Capital | Winstead, P.C. |
| Capital Management: | By:  RAKHEE V. PATEL, ESQ. |
| | 2728 N. Harwood Street, Suite 500 |
| | Dallas, TX  75201 |
| | |
| | Rogge Dunn Group, PC |
| | By:  BRIAN SHAW, ESQ. |
| | 500 N. Akard St., Suite 1900 |
| | Dallas, TX 75201 |
| | |
| For Official Committee | Sidley Austin LLP |
| of Unsecured Creditors: | By:  MATT CLEMENTE, ESQ. |
| | DENNIS TWOMEY, ESQ. |
| | One South Dearborn |
| | Chicago, IL 60603 |
| | |
| | Sidley Austin LLP |
| | By:  PENNY REID, ESQ. |
| | 2021 McKinney Avenue, Suite 2000 |
| | Dallas, TX 75201 |
| | |
| For CalPERS: | Singer & Levick, P.C. |
| | By:  MICHELLE SHRIRO, ESQ. |
| | 16200 Addison Road, Suite 140 |
| | Addison, TX 75001 |
| | |
| For James Dondero: | Lynn, Pinker, Cox & Hurst, LLP |
| | By:  MICHAEL LYNN, ESQ. |
| | JOHN BOND, ESQ. |
| | 2100 Ross Avenue, Suite 2700 |
| | Dallas, Texas 75201 |
| | |
| For Redeemer Committee: | Frost Brown Todd LLC |
| | By:  MARK PLATT, ESQ. |
| | 100 Crescent Court, Suite 350 |
| | Dallas, TX 75201 |
| | |
| | |
| For Issuers Group: | Jones Walker LLP |
| | By:  AMY ANDERSON, ESQ. |
| | 811 Main Street, Suite 2900 |
| | Houston, TX 77002 |

**WWW.JJCOURT.COM**

APP 0512

3

APPEARANCES (Cont'd):

TELEPHONIC APPEARANCES:

For CalPERS:              Nixon Peabody, P.C.
                          By:  LOUIS CISZ, ESQ.
                          One Embarcadero Center, 32nd Floor
                          San Francisco, CA 94111

                          - - -

002286

4

**INDEX**

| WITNESSES | PAGE |
|---|---|
| **JAMES P. SEERY, JR.** | |
|  Direct Examination by Ms. Hayward | 60 |
|  Cross-examination by Ms. Reid | 84 |
|  Cross-examination by Ms. Patel | 97 |
|  Examination by the Court | 103 |
| | |
| Closing argument by Mr. Pomerantz | 110 |
| Closing argument by Mr. Clemente | 113 |

| EXHIBITS | | ID | EVID |
|---|---|---|---|
| **FOR THE DEBTOR:** | | | |
| 1 | Chart of Dynamic Income Fund structure | | 83 |
| 2 | Partnership agreement for Dynamic Income Fund | | 83 |
| 3 | Chart of Latin America Argentina Fund | | 83 |
| 4 | Partnership agreement for Argentina Fund | | 83 |
| 5 | Chart Fund | | 83 |
| 6 | Limited partnership agreement | | 83 |
| 7 | Order re ordinary course governance procedures | | 83 |
| 8 | Final term sheet | | 83 |
| 9 | Notice of amended operating protocols | | 83 |
| | CVs of Board members | | 83 |

**WWW.JJCOURT.COM**

5

1          THE COURT:  -- set a motion of the debtor for entry

2    of an order authorizing but not directing the debtor to cause

3    distributions to certain related entities.

4          Let's get lawyer appearances in the courtroom.

5          MR. POMERANTZ:  Good afternoon, Your Honor.  Jeff

6    Pomerantz and Greg Demo, Pachulski Stang Ziehl & Jones, on

7    behalf of the debtors.

8          THE COURT:  Thank you.

9          MS. HAYWARD:  Good afternoon, Your Honor.  Melissa

10   Hayward and Zachary Annable of Hayward & Associates on behalf

11   of the debtor.

12         THE COURT:  Thank you.

13         MR. CLEMENTE:  Good afternoon, Your Honor.  Matthew

14   Clemente, Dennis Twomey, and Penny Reid from Sidley Austin on

15   behalf of the Official Committee of Unsecured Creditors.

16         THE COURT:  Thank you.

17         MS. SHRIRO:  Good afternoon, Your Honor.  Michelle

18   Shriro on behalf of CalPERS.  And I also have my co-counsel

19   Louis Cisz from Nixon Peabody, and he is -- he should be on the

20   line.

21         THE COURT:  Okay.  Thank you.

22         MR. LYNN:  Good afternoon, Your Honor.  Michel Lynn

23   and John Bonds for James Dundero.

24         THE COURT:  Okay.  Thank you.

25         MS. PATEL:  Good afternoon, Your Honor.  Rakhee

002288

APP 0545

6

1  Patel, Winstead PC, on behalf of Acis Capital Management, LP,

2  and Acis Capital Management, GP, LLC.  Also, I have my co-

3  counsel Mr. Brian Shaw of the Rogge Dunn Firm on behalf of the

4  same clients.

5          THE COURT:  Thank you.

6          MR. PLATT:  Good afternoon, Your Honor.  Mark Platt

7  firm Frost Brown Todd on behalf of the Redeemer Committee of

8  the Highland Crusader Fund.  And I believe Terry Mascherin is

9  on the phone, as well --

10         THE COURT:  All right.

11         MR. PLATT:  -- from Jenner & Block.

12         THE COURT:  Thank you.

13         MS. ANDERSON:  Good afternoon, Your Honor.  Amy

14 Anderson with Jones Walker on behalf of the Issuers.  I believe

15 Mr. James Bentley with Schulte Roth is also on the phone on

16 behalf of the same parties.

17         THE COURT:  Okay.  Thank you.

18         All right.  We do have a large number of people on

19 the phone.  I'm just going to go through the live lines and

20 take roll.  Asif Attarwalla for UBS, are you there?

21         MR. ATTARWALLA:  Here.  Yes, Your Honor.

22         THE COURT:  All right.  James Bentley?

23         MR. BENTLEY:  Yes, Your Honor.  I'm here.

24         THE COURT:  Okay.  Also Jeff Bjork from Latham?

25 Yes/no?

WWW.JJCOURT.COM

7

```
 1                       (No response)
 2            THE COURT:  All right.  Earnestiena Cheng for FTI?
 3            MS. CHENG:  Yes, Your Honor.
 4            THE COURT:  Okay, thank you.  And Louis Cisz, I think
 5   we heard he was CalPERS co-counsel.  Are you there?
 6            MR. CISZ:  Yes, I am, Your Honor.
 7            THE COURT:  All right.  Thank you.  Kimberly Gianis
 8   for Contrarian?  Yes/no?
 9                       (No response)
10            THE COURT:  All right.  Terry Mascherin, I think we
11   heard he was there for the Redeemer Committee.
12            MR. MASCHERIN:  Yes, Your Honor.
13            THE COURT:  Okay.  I'll just ask anyone else on the
14   phone who wishes to appear, go ahead at this time.
15                       (No response)
16            THE COURT:  All right.  That may be it.
17            All right.  Mr. Pomerantz, I see a 20-minute time
18   estimate on our calendar.  I'm not sure where that came from,
19   but that --
20            MR. POMERANTZ:  I think that's quite aggressive.
21            THE COURT:  Okay.
22            MR. POMERANTZ:  Good afternoon again, Your Honor.
23   Jeff Pomerantz, Pachulski Stang Ziehl & Jones.  First, I want
24   to thank Your Honor for scheduling the hearing on shortened
25   time.  I would also like to introduce once again the three
```

002290

APP 0547

8

1  members of the independent board who have been appointed

2  pursuant to the settlement, Your Honor, that Your Honor

3  approved on January 9th.  That's James Seery, John Dubel, and

4  Russell Nelms.

5          THE COURT:  Okay.  Hello.

6          MR. POMERANTZ:  I thought it might be helpful, Your

7  Honor, to provide Your Honor with a brief background of each

8  board member, how they have been approaching their duties as

9  independent directors, and what the focus has been the first

10 two months of the case.  And then I will go into the background

11 of this present motion.

12         THE COURT:  Okay.

13         MR. POMERANTZ:  James Seery will be the debtor's

14 witness at today's hearing, and he's a 30-year restructuring

15 lawyer with extensive experience with high-yield and distressed

16 investing both as a principal and manager which is precisely

17 the business in which the debtors operate.  He is an attorney

18 licensed to practice in New York who has passed and held the

19 Series 7, 63, 79, SIE and Series 24 FINRA principal

20 designations.

21         From April 2012 to 2017, he was the president and

22 senior investing manager of RiverBirch Capital.  And RiverBirch

23 is an SEC-registered investment advisor managing a $1.3 billion

24 global long short fund that focused on high yield loans, bonds,

25 CLOs, and distressed investments.  Prior to that, Mr. Seery

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/06/22   Page 538 of 2722   539 of 1017   PageID 3002

9

1  spent ten years as a senior high yield manager at Lehman

2  Brothers, and he was the global head of Lehman Brothers fixed-

3  income loan business.

4       Accordingly, Mr. Seery brings to his role as an

5  independent director a unique combination of a legal

6  background, restructuring experience, and a deep knowledge of

7  the highly regulated business in which the debtor operates.

8       Mr. Dubel brings 35 years' practice in the

9  restructuring area.  His experience includes turnaround

10 management, crisis management, operational restructurings, and

11 corporate acquisitions and divestitures.  He's worked at both

12 sides of the table, both on the company side and other side.

13 And he brings a unique perspective to each situation, and he

14 spent the last ten years being an independent director for a

15 wide range of distressed companies including Purdue Pharma

16 which obviously is the newest in current Chapter 11, WMC

17 Mortgage, Wartaco (phonetic), FXI, and ResCap.

18       And as an independent board member, he's plated a

19 principle role in overseeing management, negotiating with

20 creditors, supervising and investigating resolution, either

21 consensually or through litigation of insider and affiliate

22 claims, and also spearheading reorganization efforts.

23       I'm sure Your Honor is familiar with Russell Nelms

24 but briefly he was a distinguished bankruptcy litigator with

25 Carrington Coleman for 20 years which followed a stint of six

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 540 of 1017   PageID 3003

10

 1  years as a United States Army judge advocate, and also he sat

 2  with the bankruptcy court here in Fort Worth from 2004 to 2018.

 3          Your Honor, these individuals bring a complementary

 4  skill set to the independent board that have made them uniquely

 5  qualified to manage the debtor's restructuring efforts in this

 6  case, that bring a combination of sophisticated asset

 7  management experience, financial restructuring, a legal

 8  insolvency background, and judicial experience.  They've been

 9  involved in many cases on all sides of the aisle, whether it's

10  been alleged wrongdoing or questionable conduct with people

11  they've ever had to supervise as a board member, advise as a

12  restructuring lawyer, work with as a financial advisor, or

13  administer their cases as a judge.

14          Mr. Seery and Dubel were selected by the Committee

15  not only because of their relevant expertise but because of

16  their commitment to independence and ability to stand up to

17  strong personalities that exist on all sides of this case.  Mr.

18  Nelms, while originally identified by the debtor, was scheduled

19  by the Committee, and was ultimately chosen to be the third

20  board member by Mr. Seery and Dubel from a group of highly-

21  qualified candidates.

22          Your Honor, I provide this background to stress that

23  the independent board consists of individuals whose background

24  and experience speak to their independence, experience, and

25  strength, and who take their job seriously to do what they

002293

11

1  believe is right for this debtor, and they're not bring

2  influenced by any party in this case, be that the debtor, Jim

3  Dondero, members of the management committee, members of the

4  debtor's management, or the creditors' committee.  The

5  reputations of each of these gentlemen at are stake in a case

6  like this, and they take their attendance very seriously.

7        Upon taking over on January 9th, 2020, the board

8  quickly made a few observations about the current circumstances

9  that have guided their actions today.  First, the board

10  understood that the debtor was where it was in part due to many

11  years of intense litigation arising out of sometimes aggressive

12  management decisions or failure to settle certain employee

13  disputes and that the litigation led to cost and diversion of

14  time and energy for what the debtor did best which was manage

15  assets.

16        The board concluded that for case to succeed, the

17  board would have to chance the culture from one of litigation

18  to reconciliation and consensus building.  It doesn't mean that

19  the debtor will back down from defending itself from claims

20  that it doesn't believe are legitimate but rather the

21  litigation that the company under their watch would be involved

22  in would need to be carefully vetted by the independent board,

23  outside advisors, and the results of which would guide the

24  board's conduct.

25        The board's focus has and continues to be operating

002294

12

1  the debtor's business in accordance with its obligations of

2  their debtor in possession in conformance with its statutory,

3  contractual, and fiduciary obligations as an investment

4  advisor.  By scrupulously meeting its obligations as an

5  investment advisor, the debtor will continue to enhance the

6  asset management business and avoid the litigation that

7  contributed to this case.

8         Second, the board understood the relationship between

9  the debtor's largest creditors and senior management had

10  materially deteriorated and that there was severe lack of trust

11  that creditors had with respect to management.  The board

12  initially determined, has determined to continue retaining the

13  services of senior management because it believes that their

14  historical background and deep knowledge of the debtor's assets

15  provide material value to the estate.  However, the board's

16  decisions thus far have and will continue to be based upon

17  their independent review of the facts and circumstances and

18  based upon consultation with outside advisors as appropriate.

19         Third, the board believe that a lengthy stay in

20  Chapter 11 only would serve to erode asset value while at the

21  same time leading to extensive restructuring costs.  The Court

22  and the board developed a timeline that will hopefully lead to

23  a confirmed plan at the end of the year.

24         Against this backdrop, the board is focused on the

25  following things the first two months of the case.  Initially,

WWW.JJCOURT.COM

13

1  the board met with all department heads and other members of

2  senior management including Mr. Dondero and let them know that

3  the board was now in charge and that all business decisions

4  needed to be run by the board subject to the board delegating

5  authority as it deemed appropriate.

6          The board has had several calls with the committee

7  and its professionals to discuss among other things the board's

8  initial determination as to staffing levels and employee

9  compensation, time-sensitive transactions that needed the

10 committee's input under the Court's approved operating

11 protocols, and the proposed timeline for achieving

12 restructuring.  There is an in-person meeting scheduled next

13 week in New York City between all the committee members and

14 their professionals and the debtor and their professionals.

15         Members of the board have also reached out to

16 individual committee members and have had or will have meetings

17 with them to understand their specific concerns with the debtor

18 and to importantly have a dialogue about the claims they have

19 against the debtor, as resolving the claims against the debtor

20 is a key part of achieving a consensual restructuring in this

21 case.

22         The debtor's asset basis is also extremely complex,

23 and the board has worked hard to get a grasp on how best to

24 maximize their value.  The board has analyzed the debtor's

25 liquidity needs and worked with the debtor's chief

APP 0523
002296

14

1  restructuring officer to develop a 13-week cash flow and

2  otherwise address how to enhance liquidity.  The board has also

3  conducted a thorough review of the debtor's employee basis,

4  including performance reviews and address ongoing staffing and

5  compensation in a manner that the board believes will sustain

6  the debtor's business operations and maximize value.

7         Related to the motion before the Court, the board has

8  evaluated the status of certain funds which were in the process

9  of being wound down at the commencement of the case and has

10  supervised their wind-down in a manner consistent with the

11  debtors' fiduciary, statutory, contractual liabilities.  The

12  board has also commissioned outside counsel to provide an

13  independent analysis of the significant litigation claims that

14  are facing the debtor.  And as I mentioned, the board

15  anticipates engaging with these creditors to seek a resolution.

16         The board is acutely aware that resolving

17  consensually claims of creditors and claims the estate has

18  against third parties is the only way to restructure this

19  debtor efficiently and economically.  I'll now turn Your Honor

20  to the background with respect to the motion, explain the

21  relief requested, and address the two objections that are

22  before the Court.

23         Your Honor will hear testimony from Mr. Seery that

24  the debtor is the asset manager of two hedge funds, Dynamic and

25  ARF, that are in liquidation because of redemption requests

002297
APP 1524

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 06/05/25   Page 545 of 1017   PageID 3008
Page 65 of 2322

15

1  from large non-affiliated investors that render the funds

2  economically not viable.  The term of the third fund, which is

3  a private equity fund, Restoration Capital expired, and the

4  governing board comprised of large institutional pension funds

5  has refused to grant further extensions.

6      Mr. Seery will testify that while these wind-downs

7  were already in process and fully disclosed to the Court prior

8  to the installation of the independent board, the board

9  evaluated the decision to wind down the funds independently of

10  the debtor's decision and decided that the prudent exercise of

11  the debtor's business judgment was to continue with the wind-

12  down.  Neither the committee nor Acis challenge the board's

13  selection to continue with the wind-down.

14      You will hear testimony from Mr. Seery that a

15  priority of the independent board was to make sure that the

16  debtor operated in accordance with applicable law to ensure

17  that the debtor fills its obligations to investors and doesn't

18  act or fail to act in a manner which could expose the debtor to

19  liability.  After all, as I mentioned, Your Honor, a material

20  reason why the debtor is before the Court is because of

21  litigation claims that have plagued it over the last several

22  years.

23      Mr. Seery will testify that in evaluating the

24  debtor's duties and obligations as an asset manager of these

25  three funds, the board consulted with bankruptcy counsel with

16

1  respect to the applicability of the operated protocols and

2  domestic and Cayman counsel specializing in advising funds with

3  respect to their obligations under the transactional documents,

4  the Advisors Act, and general fiduciary duty obligations.

5       Tim Silva, a partner of WilmerHale, the debtor's

6  outside firm that provides fund advice, is present in the

7  courtroom and will be available to answer any questions the

8  Court or the parties have.  Dennis Olarou, a partner with Carey

9  Olsen, is on the phone.  He is the debtor's Cayman counsel and

10 also available.

11      Importantly, Mr. Seery will testify that the

12 independent board made the decisions that led to the filing of

13 this motion based upon their own expertise and the advise of

14 outside counsel and did not rely on the advice of the debtor's

15 employees or any of the related parties.

16      He will further testify that based upon the input of

17 outside counsel, the independent board concluded, one, that the

18 operating documents governing the funds did not permit the

19 debtor to unilaterally withhold distributions from some

20 investors and not others; that, two, the debtor risked

21 breaching its fiduciary duty to investors under principles of

22 common law if it withheld distributions on its own; and that,

23 three, the debtor risked liability under the Advisors Act if it

24 essentially attempted to use its position as an investment

25 manager to gain leverage against investors in connection with

APP 1526
002299

17

1 an unrelated matter, to wit, potential claims that the estate

2 may have.

3          The motion describes in detail the nature and extent

4 of the debtor's obligations, and I think the substance of that

5 is not challenged by either the Committee or Acis.  I didn't

6 read their objections to challenge that the debtor has these

7 obligations and seeks to fulfill them.

8          Based upon the foregoing and to make sure that the

9 debtor didn't expose itself to liability, Mr. Seery will

10 testify that the board decided that it was obligated to

11 exercise its authority as asset manager to distribute the funds

12 to all investors.  After consultation with the bankruptcy

13 counsel, Mr. Seery will testify that the independent board

14 decided to provide the Committee with notice prior to making

15 such distributions as were required by the operating protocols

16 approved as part of the settlement.

17          The Committee objected to the distributions which led

18 to the filing of this motion.  The objections relate to

19 distributions to be made as follows.  Mr. Seery will testify

20 that Dynamic proposes to distribute $35 million of investor

21 funds that are held by Dynamic of which CLO Holdco stands to

22 receive $872,000 and Mr. Okada stands to receive $4,176,000.

23          With respect to ARF, Mr. Seery will testify that they

24 propose to distribute $22 million of investor funds held by

25 ARF.  HoldCo stands to receive $1.5 million.  And with respect

18

1   to Restoration Capital Partners, it proposes to distribute

2   $123,250,000 of which 2.1 million will be received by ACM

3   Services and, importantly, the debtor will receive 18 and a

4   half million dollars, the balance of approximately 121 million

5   would be distributed to non -- or 103 million would be

6   distributed to non-related parties, including CalPERS which

7   filed the statement with the Court.

8          The Committee and Acis argue that the Court should

9   prohibit the debtor from making distributions to related

10   parties, notwithstanding the debtor has contractual, fiduciary,

11   statutory obligations to do so as an asset manager.  It is

12   important for the Court to understand that the money to be paid

13   to these related parties is not the debtor's money, it's not

14   property of the estate.  It's actually funds that are the

15   investors' funds that were invested in these various funds.

16          Essentially, the Committee argues and Acis argues

17   that because the debtor may assert claims against some of all

18   of these related parties at some time in the future, the Court

19   should prohibit the debtor from authorizing the distribution of

20   non-debtor estate funds.  Essentially as we said in our papers,

21   the objectors are asking this Court to issue a pre-judgment

22   write of attachment adjoining these distributions without the

23   filing of any complaint which would assert causes of action,

24   without the need to satisfy applicable standards for a pre-

25   judgment writ either under Federal Rule of Civil Procedure 64

APP. 0528

19

1 estate law, and without appropriate notice to the parties and

2 an opportunity to object.

3       The objectors want to use the debtor's position as an

4 asset manager to stop distribution of funds in which the debtor

5 has no interest to gain a potential litigation advantage

6 against these related parties. The debtor just submits that is

7 not appropriate. The Committee and Acis spent a lot of time in

8 their papers talking about the allegations and in some estate

9 case findings against the debtor's prior management relating to

10 the operation of the debtor's business, some of which have

11 matured into claims against the estate.

12       However, the fact that the debtor's actions taken by

13 prior management led to claims against the debtor is not

14 legally relevant as to whether the debtor should be permitted

15 to make these distributions of non-estate funds. Allegations

16 of prior wrongdoing would not be sufficient in the context of a

17 pre-judgment attachment, and it should not form the basis for

18 essentially the injunctive relief the Committee and Acis urge

19 to the Court.

20       The Committee also argues that because the

21 Committee's currently investigating claims against the released

22 parties and other insiders that the distribution should be held

23 up essentially indefinitely until the Committee completes its

24 investigation. Whether or not the estate has claims against

25 the related parties and insiders is unknown at this point

002302
APP. 529

20

1  except for the notes which I will address in a moment.

2          Also, whether or not there are claims and how the

3  related parties acquired their investment in the funds is also

4  unknown at this time.  Since January 9th, the Committee has had

5  standing to investigate and prosecute these claims and the

6  debtor is cooperating with the Committee in its investigation.

7  If legitimate claims exist, they should most certainly be

8  prosecuted, and the independent board will cooperate with the

9  Committee in its efforts.

10         However, at this point other than with respect to the

11  notes, there is no admissible evidence that any claims exist,

12  and no claims have been clearly articulated other than some

13  vague allegations of fraudulent conveyance, breach of fiduciary

14  duty, the garden variety of claims you would expect to be

15  asserted in a case like this.  Again, no bankruptcy court, no

16  non-bankruptcy court would be authorized to enjoin payments on

17  the basis of these vague and unasserted claims, and the Court

18  shouldn't accept the invitation to do so wither.

19         The Committee also points to certain demand notes

20  executed by Jim Dondero, Mark Okada, and ACM Services in favor

21  of the debtor as a basis for withholding the distributions.

22  The debtor has made a demand on Mr. Okada to pay back the note,

23  and he has asserted that he may have potential offsets and the

24  nature of potential service obligations and expense

25  reimbursements allegedly owed to.  At some point in time, we

WWW.JJCOURT.COM

21

1  suspect those issues will be resolved either consensually or

2  there will be litigation to recover the demand.

3        ACM Services which is owned 75 percent by Mr. Dondero

4  and 25 percent by Mr. Okada, executed several notes in favor of

5  the debtor of which 850,000 are demand notes.  The total amount

6  is approximately seven and a half million.  The remaining notes

7  are current and have been paid down over the years.

8        The debtor has not made demand on ACM Services for

9  payment of the notes, nor have they made demand on Mr. Dondero

10 for payment of the notes he issued in favor of the debtor.  Mr.

11 Seery will testify that the reason for that is that, as I

12 indicated before, the board recognizes that in order for there

13 to be a consensual restructuring in this case, it's going to

14 involve not only resolution with the creditors and their claims

15 but also resolution with Mr. Dondero or potential claims the

16 estate has.

17       The independent board at this early stage in the case

18 does not believe that commencement of an adversary proceeding

19 against Mr. Dondero at this time is in their best interest.  If

20 this case turns into a litigation case, and as Your Honor

21 experienced previously, then such litigation will be commenced.

22 However, until the board has the opportunity to try to forge a

23 consensual resolution, aggressive action is premature.  The

24 last thing, Your Honor, CLO Holdco is not a party to any demand

25 notes.

22

1          THE COURT:  Let me stop you.

2          MR. POMERANTZ:  Sure.

3          THE COURT:  You mentioned dollars on the notes.  The

4  note receivable from Okada I think is 1.3 million.

5          MR. POMERANTZ:  With credentials, yes.

6          THE COURT:  And then you mentioned roughly seven and

7  a half million of notes receivable from HCM Services.

8          MR. POMERANTZ:  Of which 950 are demand notes.  The

9  rest are currently before me in accordance with the terms.

10         THE COURT:  Okay.  You didn't mention a dollar amount

11 on the note receivable from Dondero.  My notes show 9.3

12 million.

13         MR. POMERANTZ:  Yeah, and so I think that's around

14 that --

15         THE COURT:  Is that a demand note or notes?

16         MR. POMERANTZ:  That is a demand note and then the

17 related party notes, yes --

18         THE COURT:  Okay.

19         MR. POMERANTZ:  -- Your Honor.  And, again, we're now

20 the board knows, fully aware.  The board could have commenced a

21 lawsuit.  Honestly, Your Honor, the Committee could have

22 commenced a lawsuit in the last two months.  I suspect the

23 Committee also would like to see a consensual restructuring.

24         And I think parties are taking the view of, again,

25 this can be a litigation case which would be like a lot of

APP 1522
002305

23

1   money for all the professionals, not really do all that well

2   for the creditors.  Or the parties could cooperatively work

3   towards a restructuring to see based upon the leverage, based

4   upon the claims everyone has that it makes more sense.  And the

5   board's determination, again, made on its own coming into this

6   case in the last two months is that proceeding aggressively now

7   just does not make sense.

8       Even though it has not commenced any litigation

9   against the related parties nor presented any evidence of any

10  claims against the related parties, the Committee asks this

11  Court to use its equitable powers under Section 105 to enjoin

12  the distribution again of non-estate funds to the related

13  parties.  Your Honor, bankruptcy court -- bankruptcy

14  practitioners in certain cases love to use 105, assert 105.  My

15  experience has been when you assert 105 and that's all you

16  assert 105, it really means you don't have much authority and I

17  think that's the case here.

18      The courts have held that 105 is not -- grant the

19  court authority to be a roving commission to do equity because

20  it has to be tethered to something in the Bankruptcy Code.

21  Here the proper way for the Committee to obtain the relief they

22  sought was to file a complaint and seek pre-judgment remedy,

23  either an attachment under Rule 64 or an attachment under

24  applicable provisions of Texas law or other applicable law, or

25  an injunction under FRCP 65.

APP 1528
002306

24

 1          The debtor would not stand in the way if the

 2   Committee decided to do that.  That's what the debtor bargained

 3   for.  They gave the Committee the authority to do that.  The

 4   Committee has not yet done that.  And the Court should just not

 5   allow the debtor -- the Committee to use the debtor's position

 6   as fiduciary to its investors as leverage.  That's what's

 7   really happening.  The only reason we're here is because the

 8   debtor is the asset manager of these other funds, and the

 9   Committee and Acis want the debtor to use that leverage and

10   somehow to gain an advantage.

11          Your Honor, we would submit that the fiduciary duty

12   of the estate is to act in accordance with its obligations, and

13   that's the primary fiduciary duty and that the creditors are

14   best served if the company complies with its obligations and

15   doesn't expose the estate to any liability.

16          Lastly, Your Honor, I want to address the Committee

17   and Acis's allegations regarding the circumstances surrounding

18   the sale of the MGM shares, the proceeds of which the debtors

19   intend to use to distribute as part of the RCP fund.  Whether

20   or not Mr. Dondero's authorized to make that trade, it's really

21   irrelevant to the issues before the Court.  The independent

22   board first learned about the trade only a few weeks ago, and

23   the independent board -- and, again, this happened back in

24   November, two months before the independent board took over.

25   They promptly investigated the circumstances around the trade,

002307

APP 1594

25

1  engaged counsel to advise whether it was binding and,

2  importantly, evaluated whether the trade was a sound exercise

3  in the debtor's business judgment at that time.

4          The board concluded that the trade was binding and

5  that it in fact was a good trade as of November 2019 and

6  disclosed that information to the Committee and engaged the

7  Committee in a dialogue to discuss the options that the debtor

8  had with respect to that trade.  The Committee, while I

9  understand was not unanimous, ultimately agreed with the

10 independent board that it was in the debtor's best interest to

11 consummate that trade.  While we understand that the Committee

12 and Acis may want to investigate the circumstances surrounding

13 that trade to determine whether the estate has any colorable

14 claims that could be asserted, that doesn't provide a basis for

15 enjoying the distribution of the funds.

16         Moreover, the allegation in Acis papers that Mr.

17 Dondero used his position on the board of MGM to facilitate the

18 trade so that ACM Services could receive $2.1 million of 123

19 and $250,000 sale, it just lacks and factual support.  And, in

20 fact, Mr. Dondero has steadfastly encouraged the investment

21 board not to sell the MGM shares because he believes they will

22 continue to appreciate and the estate and its creditors would

23 be benefitted thereby.

24         The reason that the RCP shares were sold is as I

25 mentioned before, the RCP, the term of that private equity fund

002308   APP 1525

26

1  expired.  No more extensions were given, and the debtor as a

2  fiduciary and as an asset manager needed to liquidate the

3  assets in that estate which included the shares.  But, again,

4  if there are claims surrounding how that happened, we

5  understand there's concern that the creditors have about the

6  circumstances, they can investigate them and the independent

7  board will surely cooperate with such investigation.

8          In conclusion, Your Honor, this independent board was

9  installed because of its independence and sophistication in

10 managing a business as complex as the debtor's.  As you will

11 hear in the testimony, the independent board has been

12 thoughtful and thorough in its approach to the issues raised by

13 this motion and is trying to manage the debtor in a responsible

14 way to maximize value and prevent the estate from incurring any

15 liability.  The independent board understands and shares the

16 Committee's and Acis's decision to hold other parties

17 accountable for any liability they have against the debtor

18 arising out of conduct that occurred pre- or post-bankruptcy.

19 But trying to use the debtor's role as an independent asset

20 manager and fiduciary duty to investors is inappropriate and

21 create risks for the estate.

22         For these reasons, Your Honor, the debtor

23 respectfully requests that the Court approve the motion and

24 overrule the objections.

25         THE COURT:  All right, thank you.  Other opening

27

1  statements, Mr. Clemente?

2          MR. CLEMENTE:  Yes, Your Honor.  You actually touched

3  on a question that I had.  I assume I have more fulsome

4  comments that I had anticipated making after testimony, but so

5  I would reserve the opportunity to do that.  It was quite a

6  lengthy opening there, so I didn't know whether there was going

7  to be the opportunity for that after testimony, but --

8          THE COURT:  Certainly.

9          MR. CLEMENTE:  -- I certainly want to reserve that.

10 Thank you, Your Honor.

11         So I do have some opening remarks prepared, but I'm

12 going to react a little bit to what I just heard.  I and the

13 Committee do not dispute the credentials of the board.  We

14 obviously were involved in choosing them.  I heard a lot about

15 the duty to, quote/unquote, investors.  I don't think I heard a

16 word about the duty to the creditors and to the estate.  And I

17 think it's important when thinking about the investors that Mr.

18 Pomerantz keeps referring to, the Committee is not talking

19 about the legitimate third party investors, the CalPERS.  The

20 Committee is talking about the very people that were in charge

21 of this debtor while breaches of fiduciary duty were rampant

22 and their related entities that resulted in the filing of this

23 bankruptcy case.

24         And I find it a little bit rich, Your Honor, that

25 their debtor is using the duty to investors to include third

APP 1527

002310

28

1   parties to try and come in here and passionately argue that

2   distribution should be made at this time to these insider

3   parties without a word at all about why it may actually be in

4   the creditors' best interest or this estate's best interest to

5   not make those distributions at this time.  So those were a

6   couple of comments that struck me as I was listening to what

7   Mr. Pomerantz said.

8          But let me be clear, Your Honor, as Your Honor is

9   aware the debtor is in bankruptcy because of the documented and

10  egregious breaches of fiduciary duties and contractual

11  obligations to its creditors and its propensity for fraudulent

12  and litigious conduct as documented.  Mr. Dondero and until

13  recently Mr. Okada dominated all aspects of the debtor and

14  controlled all of its decision-making, including the decision-

15  making that led various tribunals, including this Court, to

16  conclude that the debtor had breached its fiduciary duty,

17  engaged in fraudulent conduct, and employed persons who are not

18  credible and not truthful.

19         Against this backdrop, Your Honor, the debtor wants

20  to make distributions to investors, again, the investors we're

21  talking about here are Mr. Okada, and entities owned and/or

22  controlled by Mr. Dondero and Mr. Okada without regard

23  apparently because I didn't hear anything about that to the

24  interest of creditors under the rubric of a fiduciary duty that

25  is supposedly owed to those insider parties, the same insider

002311

APP. 1538

29

1  parties, Your Honor, who were found to have breached the duties

2  to the creditors of this estate or to the investors which then

3  resulted in them becoming creditors of this estate and led to

4  the bankruptcy.

5        Your Honor, I think the irony is fairly thick, and I

6  don't think the Court should allow the distributions at this

7  time.  These insider parties, and I'm glad Mr. Pomerantz

8  mentioned it to you because their papers did not mention the

9  notes that were owed, they owe the debtor millions of dollars.

10 The numbers that Your Honor read are just the direct notes

11 among those parties.  They do not include the notes that are

12 owed by, for example, affiliated entities of Mr. Dondero.  So

13 those numbers are even larger than what Mr. Pomerantz suggested

14 to Your Honor.

15       Second, as the debtors do finally disclose in their

16 papers, the insider parties receive certain of the insider

17 interests from the debtor pursuant to transactions that were

18 only recently disclosed to the Committee and not have been

19 examined by the Committee.  So in many of the circumstances,

20 the very interests that are giving rise to the basis for these

21 distributions once belonged to the debtor.

22       Third, obviously, the insider parties are the focus

23 of the Committee's ongoing investigation of the estate causes

24 of action, and that's entirely appropriate given the long

25 history and the findings made by this Court and others

30

1  regarding the behavior of this debtor prior to the bankruptcy.

2       Your Honor, instead of allowing the distributions to

3  be made, the Court should direct that the distributions that

4  the debtor seeks to make to the insider parties to be placed

5  into a segregated interest-bearing account pending the

6  resolution of potential claims against the insider parties

7  including the collection of notes owed by the insider parties

8  and the investigation into the validity of the insider

9  interests.

10      If the insider parties have an issue with this,

11 obviously, they can come before Your Honor, perhaps they'll

12 come before Your Honor today, and explain to you why what is

13 being proposed is unfair to them or why despite the

14 circumstances surrounding this case, the rampant breaches of

15 fiduciary duty, the questionable transactions, and the

16 existence of the notes they owe the debtor they should receive

17 those distributions now.  And we can do that after a fulsome

18 discovery of those parties, a fulsome record, full opportunity

19 to brief.

20      I believe, the Committee believes this is a very

21 sensible proposal, and it would seem to serve all interests.

22 The interests of the estate would be protected.  Let's talk

23 about those.  Obviously, we're more likely to recover on the

24 notes and any potential claims, including claims that the

25 insider interests were inappropriately obtained.

**WWW.JJCOURT.COM**

31

1          Mr. Pomerantz referred to the word "leverage."

2  Again, it's the estate, the estate should be thinking about how

3  it can actually collect on its claims and notes.  So the word

4  "leverage" I don't think is appropriate here.  It just seems

5  sensible.  The interest of the insider parties would also be

6  protected.  The money will be placed in a segregated account,

7  and the status quo would be preserved.  And legitimate third

8  party investors, we are all fully in support of the legitimate

9  third party investors receiving their distributions.  We've

10 never had an issue with that, Your Honor.

11         Mr. Pomerantz referred to the authority, Section 105.

12 I do believe the Court has ample authority under Section 105 of

13 the Bankruptcy Code to order the relief requested by the

14 Committee.  Obviously, Section 105 is broad and, as we'll

15 discuss further later, it's been interpreted by this Court and

16 other courts to apply very broadly and in circumstances similar

17 to this.

18         Additionally, Your Honor, although I do not believe

19 105 needs to be tethered, I believe is the word that was used,

20 to other sections of the Code.  I do believe that other

21 sections of the Code are implicated as the relief the Committee

22 requests impacts property of the estate which includes the

23 notes and potential claims against the insider parties as well

24 as the rights and obligations of the debtor under the various

25 contracts that Mr. Pomerantz referred to.

32

1        So, we have 105.  If we need to tether it to

2   something, we can tether it to 541 and we can tether it to 363.

3   What we're asking the Court to do impacts property of the

4   estate, impacts the rights and obligations of the debtor.

5        Finally, Your Honor, there was a long discussion or

6   somewhat of a discussion about the fact that the Committee has

7   not sought a preliminary injunction or has not filed claims

8   against the insider parties.  First, again, I believe Section

9   105 gives the Court the authority that it needs to provide the

10  relief.  Second, the Court has the flexibility should it choose

11  to construe or find it necessary to construe our objection as a

12  request for a preliminary injunction and the request satisfies

13  that standard.

14       Third, Your Honor, this has been an expedited process

15  initiated by the debtor.  If this Court believes that other or

16  further proceedings or processes are necessary or appropriate,

17  the Court should allow the parties the time for that.  We

18  agreed to an expedited motion practice under the protocols.

19  That's a fact.  The protocols cover a variety of circumstances

20  designed with the exigencies of the debtor's business in mind,

21  not designed with trying to speed distributions to Dondero,

22  Okada, and the insider parties.  There simply is no exigencies

23  surrounding that, and the Committee should not be prejudiced if

24  this Court believes a further or other procedural vehicle is

25  necessary.

**WWW.JJCOURT.COM**

APP. 1542

1        And a moment, Your Honor, on the investigation, as

2   Your Honor is aware the insider parties have dominated the

3   debtor for years.  Only recently January 9th the Committee has

4   gotten the ability to investigate.  And to date, we've been

5   doing that.  I do dispute what Mr. Pomerantz said about the

6   debtor's cooperation.  I believe that they've used words to

7   that effect but we've not gotten the documents that we need.

8   This is a complicated enterprise as Your Honor is aware.  It's

9   unrealistic to think that we would be in a position to bring

10  claims against insider parties at this particular time in the

11  case.  And we cannot be prejudiced by saying we should have

12  completed our investigation and had brought claims every time

13  the debtor thinks it should make a distribution to Mr. Dondero

14  or one of its related entities.

15        And so, Your Honor, to sum up, we think that the most

16  logical solution here and frankly the one that I assume the

17  debtor would have agreed with me on would be to come to this

18  Court, allow the distributions to be made to all the third

19  party investors, to withhold the distributions to the related

20  parties while the investigation occurs, while the notes are

21  settled, and while the Committee determines and the Court may

22  perhaps ultimately determine whether the interest that gave

23  rise to those distributions were in fact appropriately with

24  those parties.

25        Instead, we're here talking about duties owed to,

**WWW.JJCOURT.COM**

APP 1543

34

1  quote/unquote, the investors without considering what it is

2  that's owed to these creditors and to this estate.  And with

3  that, Your Honor, we would ask that the motion be denied or

4  however you'd look at it but that the relief we noticed in our

5  paper be ordered by Your Honor.

6        THE COURT:  Let me follow up and make sure I

7  understand a couple of things.  You've said a couple of times

8  that it's just the distributions that would go to related

9  investors, Mark Okada, CLO Holdco, HCM Services.  And I got the

10 impression from your pleadings as well as your oral statements

11 that the Committee is not challenging in any way the decision

12 to wind down these three funds, if you will.  You know, my

13 reading of the pleadings was November 2019, you know, less than

14 a month after the bankruptcy was filed or about a month after

15 the bankruptcy was filed, you know, there were significant

16 redemptions.  In the face of significant redemptions, the

17 debtor decided it was appropriate to wind these down.

18       Is that going to be the subject of evidence and

19 testimony today?  Is the Committee at all concerned about how

20 that all played out, whether it was legitimate unaffiliated

21 investors seeking redemption or if it was by chance insider

22 investors?

23       MR. CLEMENTE:  No, Your Honor.  The Committee is not

24 challenging the wind-down as I believe you're referring to.  We

25 are not doing that, Your Honor.

**WWW.JJCOURT.COM**

35

1          THE COURT:  Okay.  And this may be one instance where

2    it's kind of hard for me to separate what happened in the

3    related case of Acis versus this where we had all of a sudden

4    we don't want Acis to, you know, manage these in that case CLOs

5    anymore until redemptions were happening.

6          MR. CLEMENTE:  I understand, Your Honor.

7          THE COURT:  And the business judgment of that --

8    well, it's complicated, right.

9          MR. CLEMENTE:  I completely understand.

10         THE COURT:  It was, in the end of the day, depriving

11   Acis debtor of management fees.  Same thing is happening here,

12   right?  Highland is being deprived of management fees by the

13   wind-down of these three funds, but you're not challenging the

14   business judgment of the --

15         MR. CLEMENTE:  That is correct, Your Honor.

16         THE COURT:  -- whole process of the redemptions

17   period?

18         MR. CLEMENTE:  That is correct, Your Honor.

19         THE COURT:  Okay.

20         MR. CLEMENTE:  There is a pot of funds sitting in

21   those funds, and there is a pot of funds sitting in RCP --

22         THE COURT:  It was a legitimate non-affiliated

23   entity's --

24         MR. CLEMENTE:  We're not challenging it, Your Honor.

25         THE COURT:  Okay.

36

1          MR. CLEMENTE:  What we are challenging obviously is

2     now the distribution of those funds to the related entities.

3     That's where we take issue with it at this particular moment in

4     time.

5          THE COURT:  Okay.

6          All right.  Who else wishes to make an opening

7     statement?  I know Acis had a joinder or a slightly different

8     objection, I think.

9          MS. PATEL:   Yes, Your Honor.  Good afternoon.

10    Again, Rakhee Patel on behalf of Acis.  And I'll address Your

11    Honor's question first.  Acis has concerns about the wind-down

12    of these funds.  I'll just clear with respect to it.  And Your

13    Honor referenced, you know, perhaps we need to separate what

14    happened in the Acis case and whether that's happening here or

15    not.

16         Your Honor, I'm not sure from Acis's perspective that

17    we don't object to the wind-down of these funds.  We just

18    frankly don't have enough information to kind of take a

19    position with respect to that whether these funds should be

20    wound down.  But the fact of the matter is is in the lead-in

21    into this motion -- and this is sort of the source and subject

22    of Acis's additional objection and not just plain vanilla

23    joinder and with the Committee -- is is that the transactions

24    happened.  The sale of the stock has happened.  So whether it's

25    in connection with the wind-down of the funds or whether it's

002319
APP. 1546

37

 1  just a sale, it's happened now.

 2          So I'm not sure that we can unring that bell, but

 3  Acis's whole point and as we sort of set out in our joinder and

 4  our separate comment or objection was, Your Honor, the light of

 5  day needs to be cast on this transaction as a whole and we need

 6  to be talking about it that the transaction needs to be

 7  discussed here in open court.  And, frankly, the entire

 8  creditor body needs to have and the Court needs to have

 9  transparency with respect to that.

10          So to that point, Your Honor, the debtor filed the

11  motion to approve the distributions of the proceeds from the

12  sale in accordance with the procedures approved as part of the

13  broader settlement motion that Your Honor heard in January.

14  Now the debtor incredibly takes the position that this Court

15  and the creditors are effectively powerless to stop these

16  distributions.  And here's the problems with that position.

17          First, from a technical legal perspective, the debtor

18  ignores the language of Section 363.  Frankly, it's easy to

19  have a strong initial knee-jerk reaction that Section 363

20  doesn't apply here because there's no sale of property to the

21  estate.  The MGM stock was held down in a different entity.

22  Your Honor, frankly, I did it myself.  But when you analyze the

23  language of Section 363, it also prescribes the use of property

24  of the estate outside of the ordinary course of business.  And

25  here, the use of property of the estate is the debtor's

002320
APP 4545

38

1  valuable management rights of the various entities, so Dynamic,

2  AROF or AROF or NRCP.

3       And let's just assume for argument's sake that the

4  debtor's statement is correct and enforceable and there's no

5  problem with it that the funds are in liquidation.  No one can

6  rationally argue that that liquidation of a fund or a manager's

7  actions in liquidating said fund are ordinary course.  So there

8  is sort of the Section 363 hook for lack of a better term.

9       Second, from an equity perspective, it is wholly

10 inequitable for the debtor in an attempt to derail the Court

11 and the creditors from inserting a Chapter 11 trustee -- and

12 recall, Your Honor, that this case was filed on October 16th of

13 2019 where the debtor filed to seek protection from the

14 imminent within minutes if not hours of entry of $189 million

15 judgment against the debtor.  And it's really frankly, and as

16 Mr. Pomerantz acknowledged, the product of failed -- numerous

17 other failed litigation strategies.  Acis, UBS, Pat Daugherty,

18 quickly all -- and all of those the pieces of litigation

19 quickly coming home to roost.

20      Acis was clear right out of the gate, Your Honor, at

21 the first day hearings held on October the 18th, 2019 that it

22 would seek the appointment of a trustee.  And in an attempt to

23 sort of take itself out of a trustee potentially being

24 appointed or, you know, as to forestall that happening, the

25 debtor filed an ordinary course protocol motion.  And this is

002321
APP 1548

39

1  in October of 2019.  And as a part of that ordinary course

2  protocol motion, the proposal was that Mr. Sharp, the CRO of

3  the debtor, be appointed the CRO of the debtor and that he

4  would be the gatekeeper, he would be in charge of all related

5  party transactions, and he would oversee all of those

6  transactions.

7          And, Your Honor, indeed Mr. Sharp testified that he

8  was the gatekeeper.  He was the guy in charge, and that was on

9  I want to say like November 20th of 2019.  And commensurately,

10  Mr. Waterhouse, the CFO for Highland Capital Management, also

11  testified and Mr. Waterhouse was the first day declarant for

12  Highland as well.  He testified that everyone understood that

13  Mr. Sharp was to be the gatekeeper.  And, indeed, Mr. Sharp

14  would -- they had training at Highland Capital Management to

15  the effect that all employees knew if you've got a related

16  party transaction, it's got to go through Brad Sharp.

17          So in an attempt to sort of derail Acis from getting

18  a trustee appointed, they affirmatively sought out these

19  protocols and ultimately agreed to protocols that look similar,

20  not exactly but similar to those proposed ordinary course

21  protocols.  And the protocols that ultimately were approved

22  required court approval.  And now we've got them coming back

23  and saying, ha ha, just kidding, no one can do anything about

24  it anyway and we have to make these distributions because we've

25  got a fiduciary duty to do it.

**WWW.JJCOURT.COM**

002322
APP 4549

40

1    On that note, the debtor who should be fully

2  transparent during this process while it seeks the benefit of

3  bankruptcy including the automatic stay, argues in its reply

4  brief filed this morning at Footnote 9 that the underlying sale

5  transaction in excess of $123.25 million is sacrosanct and

6  irrelevant because the Committee blessed it.  Acis objected,

7  Your Honor.  When that transaction was presented to the

8  Committee, Acis objected.

9    First, it would have its cake and eat it, too.  It

10  can't take advantage of the protocols it likes while at the

11  same time stiff-arming those that are inconvenient to it.  It

12  can't say the transaction's good because the Committee blessed

13  it, but the Committee didn't bless the distributions to the

14  insiders and, oh well, you can't do anything about that anyway.

15    Second, the broader transaction is violative of at a

16  minimum traditional notions of transparency in bankruptcy and

17  likely 363 along what the debtor's fiduciary duties to its

18  creditors.  As Mr. Clemente pointed out, the debtor has dueling

19  fiduciary duties, and we didn't hear nearly a word with respect

20  to the debtor's fiduciary duties to its creditors.  And, Your

21  Honor, we're not looking to generally micromanage what this

22  debtor is doing, but this transaction is fundamentally flawed

23  and at a minimum has red flags all over it.

24    As we now know from the CalPERS objection, Mr.

25  Dondero entered into a transaction with Highland Capital

002323

APP. 1559

41

1  Management buying CalPERS' interest and likely others'

2  interests at June 30 prices or by giving over a set number of

3  MGM shares to CalPERS.  That's the agreement that's attached to

4  the CalPERS objection.  The agreement was always a win-win for

5  Highland Capital Management because it could either make money

6  on the arbitrage of the stock -- it bought it at a particular

7  price, and if it's ordered at a different price, you got to

8  keep the differential -- or give over the stock if the stock be

9  valued and priced.  Win-win.

10         He then immediately the very next day fraudulently

11  transferred that agreement from Highland Capital Management to

12  Highland Capital Management Services, an entity in which he is

13  the 75-percent owner and Mr. Okada is the 25-percent owner.

14  That is 15 days before filing this Chapter 11 bankruptcy case.

15  The only purported consideration for the transfer, and I think

16  this is Exhibit B, to the CalPERS objection, was an indemnity

17  by Highland Capital Management Services.  That's the only

18  consideration that was transferred as a part of that

19  transaction, Your Honor.

20         Then when the stock price rises in November, he seeks

21  committee approval for a transaction that still benefits

22  Highland Capital Management Services.  Despite not having a

23  Committee response, he enters into a rogue unauthorized trade

24  of MGM stock on whose board he serves on and is thus privy to

25  information, violative of the very protocols that the debtor

APP 1551

002324

42

1  was pressing so strenuously to avoid the appointment of a

2  trustee.  Indeed, Brad Sharp testified the day before the rogue

3  trade that this exact type of transaction had to go through

4  him.  And Mr. Waterhouse's testimony came right after that to

5  indicate that everybody at the debtor knew that Mr. Sharp had

6  to approve it.

7          Ultimately, the Committee rejected that transaction

8  in November, but the trade was already done.  If Mr. Dondero

9  had his way, Highland Capital Management Services would have

10 benefitted from the transaction.  Frankly, every one of these

11 transactions needs the light of day shed upon them here in

12 court to determine what is in the best interest of creditors.

13 The debtor's attempt to cloak itself in the Committee's non-

14 objection, and I want to be clear on this, it was a non-

15 objection.  I think reference was made that the Committee

16 agreed to the sale of the MGM stock.  That's not what happened.

17 The Committee just did not object to the transaction which can

18 likely best be characterized frankly as everyone plugging their

19 nose while simultaneously telling this Court it can't do

20 anything about the proceeds is the exact reason why the Court

21 should be inquiring into the transaction in the first place.

22         And not so incidentally, that stock that Mr. Dondero

23 traded without authority in November is trading approximately

24 20 percent higher today, around the low 90s.

25         THE COURT:  All right.  Thank you.


**WWW.JJCOURT.COM**

43

1                    Thank you.  All right.

2                    Do we have any other opening statements?  I'm

3      probably going to have to take a break before we do evidence

4      and hear my 2:30 matter, which I don't think is going to take

5      very long, at all.

6                    All right.  Judge Lynn.

7                    MR. LYNN:  Your Honor, thank you.

8                    We're not opposed to the motion, and we understand

9      the concerns expressed both by the debtor, the debtor's

10     independent board, which feels that it's compelled to make the

11     distribution to insiders.  And while we don't necessarily agree

12     with them, we understand the Creditors Committee's concerns as

13     well.

14                   We'd like to suggest the following should the Court

15     determine that the motion should be denied.  And that is that

16     instead of the debtor retaining the funds, that the debtor

17     distribute the funds into the registry of the Court.  That way,

18     they lose control over the funds and they can say that they've

19     distributed them in accordance with their agreements and

20     applicable law.

21                   The funds would remain there until either a recipient

22     or prospective recipient posts a bond or other suitable

23     collateral or the Creditors Committee agrees to the

24     distribution to the insider or there is a Court entered for

25     another reason after a showing made before Your Honor.  The

44

 1  debtor and the Creditors Committee would, of course, retain all

 2  rights to seek the funds they would have had, which rights they

 3  would have had immediately before the distribution to the

 4  registry, plus any rights that would be gained by reason of the

 5  distribution itself.

 6        The debtor thus distributes, the Creditors Committee

 7  retains its rights, the Court retains control, and this can all

 8  be done, we believe, by a Court order and we hope this may give

 9  the Court a suitable alternative.

10        THE COURT:  Okay.  Let me make sure I understand.

11  You said, if the Court is inclined to deny the motion.  Are you

12  offering, I guess Mr. Dondero's proposal that -- I mean, these

13  aren't disbursements that would all go to him, they would --

14  some would go to Okada, and -- who's not objected or appeared.

15  But -- let me cut to the chase.

16        Are you trying to avoid a hearing and evidence

17  altogether by saying, you know, these related entities agree

18  their distributions will go into the registry of the Court

19  right now?

20        MR. LYNN:  Mr. Dondero supports this position.  We do

21  not speak for Mr. Okada.

22        THE COURT:  Right.

23        MR. LYNN:  I understand that more than one of the

24  entities -- and Your Honor must forgive me.  We're relatively

25  new to this case.

**WWW.JJCOURT.COM**

45

1        THE COURT:  Yeah.  One is Holdco, and that is

2   technically a DAF, a charitable entity that --

3        MR. LYNN:  Yes.  I believe that's so, and I

4   understand there may have been communications between the

5   independent board and the trustee of a DAF, but I was not a

6   party to those communications.  I'm just trying to give the

7   Court an alternative -- Mr. Dondero is doing so -- that might

8   be acceptable to the debtor and at the same time would

9   accomplish what the Creditors Committee wants, which is to

10  retain control of the funds.

11       I must say, Your Honor, that having been there

12  myself, I have a great deal more confidence in the registry of

13  the Court protecting funds than I do in just about anyone else.

14       THE COURT:  All right.  Well, that would certainly

15  seem to give the Committee everything it's asking for, and --

16       MR. POMERANTZ:  Your Honor, if I may interrupt.

17       I understand from members of the debtor's independent

18  board who have spoken to Grant Scott, who is the principal in

19  charge of CLO Holdco, that CLO Holdco would also support the

20  proposal that has just been made by Judge Lynn.  We do not have

21  the agreement of Mr. Okada to support that proposal.

22       THE COURT:  Okay.  Although, he has not weighed in

23  with any sort of -- well, I don't know.  How do we feel about

24  Mr. Okada's interest here?  I mean, he's obviously been given

25  notice of all of that, and --

002328
APP 4565

46

1          MR. POMERANTZ:  Well, actually we asked him --

2          THE COURT:  Okay.

3          MR. POMERANTZ:  -- when we heard last night that this

4   might be a possibility.  He has rejected that.  And in light of

5   his rejection of that proposal, we as the debtor feel we need

6   to proceed with the motion.  I would think it substantially

7   narrows the issues that are going to be in evidence, all the

8   stuff we've heard about MGM Trade, which may at some point in

9   time be something that people don't testify from the podium and

10  that actually the subject of real evidence.  But with respect

11  to Mr. Okada, we will have to go forward with the motion.

12         MR. LYNN:  Yeah, so let me express that at this

13  point, Mr. Dondero is of course not supporting the Acis

14  suggestion that a trustee should be appointed.  We did not

15  understand that this hearing would address that issue.

16         THE COURT:  Yeah.  I'm not sure.  That's what they

17  were suggesting today.  I think they were just saying at one

18  point, they adamantly wanted a trustee, and these protocols

19  alleviated their concerns and caused them to back off.  And

20  now, they're upset that, you know, the debtor is resisting the

21  protocols in a way.  So -- all right.

22         Mr. Clemente, what say you?  I --

23         MR. CLEMENTE:  Your Honor, I --

24         MR. LYNN:  Thank you, Your Honor.

25         THE COURT:  Thank you.

47

 1              MR. CLEMENTE:  -- I think you can tell from our

 2   papers, this is effectively what we asked for.

 3              THE COURT:  Right.

 4              MR. CLEMENTE:  I don't even know why it took us to

 5   get to this point for that.  It seemed so obvious to me.  But

 6   when it was articulated by the former Judge here, it -- I think

 7   it just held more -- maybe it made more sense.

 8              As far as Mr. Okada's concerned, I think Your Honor

 9   could clearly deposit the funds in the registry of the Court,

10   and he's free to come in.  I think that's what Counsel for

11   Mr. Dondero was actually suggesting.  So I'm not sure that

12   anything is required further with respect to Mr. Okada, unless

13   he has a representative here that would like to raise something

14   with Your Honor.  So, to me, on behalf of the Committee, I

15   think that accomplishes what the Committee was trying to do

16   with its objection.

17              THE COURT:  All right.

18              Anyone else wish to be heard?  Ms. Shriro, I know

19   that you filed something for CalPERS, but obviously, your

20   client is an unaffiliated investor in the private equity fund,

21   RCP.  You just want to get paid.

22              MS. SHRIRO:  That's correct.  We just want to get

23   paid, and I would defer to my co-counsel on the phone.  If he

24   has any comments, this would be the time to raise them.

25              THE COURT:  All right.

APP 4587

48

1           Co-Counsel on the phone, I think it's Mr. Cisz.  Is

2   that correct?

3           MS. SHRIRO:  Yes.

4           THE COURT:  Okay.  Anything you want to say about

5   what's (indiscernible)?

6           MR. CISZ:  That's correct, Your Honor.  This is Louis

7   Cisz on behalf of CalPERS, and Ms. Shriro is correct.  So long

8   as CalPERS receives its distribution relative to the sale of

9   the MGM stock, CalPERS otherwise doesn't take a position with

10  respect to the motion.

11          THE COURT:  Okay.  Thank you.

12          All right.  Well, turning to the literal terms of the

13  motion, the relief the motion sought was simply an order

14  authorizing distribution of the cash from these wind-downs of

15  the three funds to insider investors.  And so we have the

16  Committee objection, we have the Acis objection, we have

17  Dondero's counsel here appearing.  I think I can, given this

18  request for relief and the opposition of the Committee, as well

19  as one of the Committee members, Acis, and due to these

20  representations of Dondero's counsel and the board, I can order

21  that the money that would otherwise go to insider investors --

22  I think it's roughly about 8.6 million -- will, instead of

23  going to the insider investors, will go into the registry of

24  the Court with reservation of everyone's rights later to file

25  motions requesting that it be disbursed to them.  So everyone

49

1  understands, this is just kind of a holding place for the funds

2  right now.

3           MR. POMERANTZ:  Your Honor, we do not have

4  Mr. Okada's representation and the debtor is not modifying its

5  motion.  The debtor would like to proceed with respect to

6  Mr. Okada.  We asked him, he did not want to agree to the same

7  things that would be in consideration by CLO Holdco, and for

8  the reasons we've identified in the motion and I've expressed

9  to Your Honor, we feel we have the obligation, we have the duty

10 to proceed, and we would request the opportunity to put on

11 evidence so you can hear from Mr. Seery and ultimately make a

12 determination whether the Committee and Acis have laid out a

13 legitimate basis for use of 105.  I'll reserve my comments and

14 their comments until the end.

15          But we would want to proceed in that limited matter

16 because we don't have all agreements of the parties and the

17 same reasons stand for why we filed the motion to proceed with

18 the distribution for Mr. Okada.

19          THE COURT:  Okay.  Well, I guess I misinterpreted

20 everything that I thought was going on out there.  Mr. Okada, I

21 guess, you said is owed 4.176 million from the Dynamic Hedge

22 Fund, and then -- I don't know if that was the total amount

23 from the three funds, but you feel like you have a fiduciary

24 duty to pursue that disbursement.

25          MR. POMERANTZ:  Absolutely, Your Honor.

**WWW.JJCOURT.COM**

50

1          THE COURT:  All right.

2          MR. POMERANTZ:  And again, you know, we could get

3   this into argument.  Mr. Okada is in a much different position

4   than some of the other insiders.  We understand the comments

5   about Mr. --

6          THE COURT:  Well, I remember some of the dynamics

7   here, but let me tell you what I'm going to feel the need to

8   get into if we hear evidence.  And what we'll do is we're going

9   to take a short break in a minute.  Let me ask the Barker

10  people who I think are in the back.

11      (Off record discussion 2:34:51 to 2:35:01)

12         THE COURT:  Okay.  So we'll take a 10-minute break in

13  a minute.

14         But again, one reason I was sort of delighted to get

15  the suggestion of Judge Lynn is I see this evidentiary hearing

16  as being a little more involved than looking at contractual

17  obligations and whatnot, and you know, the fact that these are

18  non-property of the estate funds that we're talking about.  I

19  have fundamental questions having read the pleadings about the

20  decision to wind-down these funds that was made in November

21  2019, days after Highland filed bankruptcy.

22         Who made the decision?  Was it insider investors

23  seeking redemption?  Or was it, you know, did we have large

24  unaffiliated investors exercising redemptions, and so

25  therefore, it was reasonable business judgment, you know, we

WWW.JJCOURT.COM

002333

APP 4589

51

1  need to wind down?

2          I know the issues are a little bit different with the

3  two hedge funds versus the RCP fund that had the term.  And I

4  understand, I read the pleadings, how the term expired in April

5  2018, it was extended for one year, and then the advisory board

6  didn't consent to an additional extension.

7          Again, maybe the new board has thoroughly scrubbed

8  this and you're going to tell me that in evidence.  And maybe

9  the Committee has thoroughly scrubbed this, and you're going to

10 tell me that with evidence.  But I -- I'll want to hear that.

11 I'll want to hear that this was all legitimate, independent,

12 non-affiliated investors pressing for the wind-down of these

13 funds, and we didn't have what I refer to as the Acis situation

14 where -- well --

15         MR. POMERANTZ:  Your Honor, Mr. Seery is prepared to

16 testify to each of those.  And as I mentioned, the board did

17 thoroughly consider it and you will -- Your Honor will hear

18 evidence that led Mr. Seery and the board to conclude that each

19 of these were appropriate.  But we intended to get into that in

20 the evidence.

21         THE COURT:  Okay.

22    (Proceedings recessed from 2:37 p.m. to 3:01 p.m.)

23         THE COURT:  All right.  We're going back on the

24 record in Highland.  Mr. Pomerantz, are you ready to call your

25 witness?

002334

APP 1561

52

1          MR. CLEMENTE:  Your Honor, if I might before.

2          THE COURT:  Mr. Clemente?

3          MR. CLEMENTE:  Matt Clemente on behalf of the

4    Committee, again.

5          I would just like to revisit the colloquy we had

6    before we broke.

7          THE COURT:  Okay.

8          MR. CLEMENTE:  I'm still confused as to why Your

9    Honor just can't enter or so order that the debtor has

10   satisfied its duty upon depositing the money into the Court

11   registry.  And we don't need to have any of this this

12   afternoon.  I see it as similar to the Foley hearing where Your

13   Honor expressed some frustration.  It's kind of maybe not the

14   best use of time.  I'm not sure what exactly we're trying to

15   accomplish here.

16         If the debtor's concerned about its duty to a

17   constituent who is not present in Court today, I think Your

18   Honor can deal with that by entering an order that says, you

19   know, based on the pleadings and the record so far, the debtor

20   has satisfied its duty and placed the money in the Court

21   registry.

22         And if Mr. Okada has an issue with that, he can come

23   back before Your Honor.  I'm just not quite sure what the point

24   is here, Your Honor.

25         THE COURT:  All right.  Well, let's turn back to

WWW.JJCOURT.COM

53

1  Mr. Pomerantz, and let's talk about what my, I guess, unrefuted

2  evidence is.  I have -- Mr. Okada would be due for the Dynamic

3  Hedge Fund, 4.176 million is what I read in the pleadings where

4  you told me.

5          And then, I don't know that I have written down what

6  he would be owed from either the Argentina Fund or the RCP

7  Fund.  Anything?

8          MR. POMERANTZ:  Zero.

9          THE COURT:  Zero.  So we're talking about the 4.176

10  from termination of the Dynamic Fund.

11          MR. POMERANTZ:  Right.

12          THE COURT:  Meanwhile, we know there is a $1.3

13  million demand note --

14          MR. POMERANTZ:  Correct.

15          THE COURT:  -- owing to Highland from Okada.  And I

16  feel like I heard that there was more, but that's the only --

17          MR. POMERANTZ:  That is the only note from Mr. Okada.

18          Your Honor, I think part of it is I stood up and gave

19  a lengthy presentation, and I told Your Honor what the

20  testimony would show.  Now there's been a lot of issues in this

21  case about what the board's doing, what it's not doing.  Part

22  of our reason for being here today and part of my presentation

23  was to get Your Honor comfortable with how the board is

24  handling its duties.  I didn't want you to hear that just from

25  me.  I wanted you to hear that from Mr. Seery.

**WWW.JJCOURT.COM**

002336

54

 1          There also have been allegations by Acis and concerns
 2   Your Honor has raised as to what went into the wind-down of
 3   these funds, given Your Honor's past experience with Acis.  And
 4   I'm sure Ms. Patel's past experience with Acis.

 5          I think it's important to hear from Mr. Seery because
 6   he has good explanations of why each of these funds are in
 7   wind-down.  And then, furthermore, look, Your Honor will decide
 8   what Your Honor decides and whether the Committee and Acis have
 9   met the showing under 105 to hold back the Okada funds.  If
10   Your Honor decides that, of course we will abide by that
11   decision.

12          But we didn't want any implication that we were sort
13   of laying down for that issue.  So I think it would be helpful
14   maybe to hear some testimony from Mr. Seery.  If Your Honor
15   then concludes that funds shouldn't be disbursed, Your Honor
16   will conclude that funds shouldn't be disbursed.  I don't think
17   this has to be very lengthy.  I think we've -- we've narrowed
18   the issues, given that we don't have an issue with respect to
19   RCP anymore.  We don't have the issue with HCM Services
20   receiving money on account of a trade that Acis is very
21   critical about.  Again, those issues at an appropriate time can
22   be raised in appropriate form, and Your Honor will have a full
23   evidentiary hearing, as opposed to a tail wagging the dog on
24   this motion when it's not even relevant anymore.

25          So what I would propose is that we allow Mr. Seery to

WWW.JJCOURT.COM

55

 1  take the stand.  We allow him to address Your Honor's concerns.

 2  We allow him to testify to the things that I said he would

 3  testify to so it gives Your Honor some comfort, and hopefully

 4  the other parties comfort, exactly how Mr. Seery and the other

 5  board members are performing their duties.

 6          THE COURT:  Okay.  Can we all agree to some

 7  reasonable time limitations here?  I'm thinking we're done in

 8  an hour.  Maximum 30 minute direct of debtor, or redirect, and

 9  maximum 30 minute cross of all objectors.  Can we do that

10  today?

11          MR. POMERANTZ:  I think we can do that, Your Honor.

12          THE COURT:  Okay.  Then that's --

13          MR. CLEMENTE:  My only question, Your Honor -- Matt

14  Clemente on behalf of the Committee -- is what are we still

15  talking about here?  Are we just talking about the distribution

16  to Mr. Okada?  And the other distributions are off the table as

17  suggested by -- or as agreed to at least on behalf of

18  Mr. Dondero?  I don't even know what we're talking about.

19          MR. POMERANTZ:  That is correct, Your Honor.  It's

20  only the distributions to Mr. Okada.

21          THE COURT:  Although, I think he wanted the Court to

22  get some testimony from Mr. Seery about sort of the business

23  judgment of the three wind-downs, but I don't think that's

24  going to --

25          MR. POMERANTZ:  That shouldn't take a long time.

**WWW.JJCOURT.COM**

56

1          THE COURT:  -- be a probe today of MGM stock sales.

2          MR. POMERANTZ:  No, it won't be at all, Your Honor.

3   And again, look, we understand Your Honor has had experience

4   with Acis, and we understand the concerns, Your Honor, coming

5   in, seeing redemptions, and the questions you asked.

6          Again, it's important for the debtor to be able to

7   demonstrate to Your Honor that this board is doing its

8   appropriate things and hearing from Mr. Seery why he made these

9   decisions so Your Honor can get comfortable, not only in these

10  matters, but in other matters that brought before Your Honor in

11  the future that this board is doing exactly what they should be

12  doing acting as an independent fiduciary.

13         That's why I think some of our testimony, but we're

14  happy to live within the time frame that Your Honor has given

15  us.

16         THE COURT:  Okay.  All right.  Thank you.

17         MS. PATEL:  Your Honor, I just wanted to follow along

18  with one of the comments that I made during my opening

19  statement and hopefully, it will help further narrow the issues

20  and keep us within the time limits, is is that when -- in

21  responding to Your Honor's question about the wind-down of

22  these funds, and I said Acis had concerns, I want to say we've

23  got concerns with respect to the Argentina and the Dynamic

24  fund.  We frankly just don't understand or have that much

25  information with which to really evaluate the transaction, so

WWW.JJCOURT.COM

57

1    we're a little hamstrung today for purposes of cross-

2    examination because that's not something that necessarily Acis

3    has inquired into.

4            But separate and apart from that, just again so

5    everyone's clear, with respect to the wind-down of RCP, Acis

6    does not take issue with respect to the genesis of the wind-

7    down.  So the decision to wind it down is a find from Acis's

8    perspective that should probably have been wound down.  Now,

9    the methodology of how it's being wound-down, that's fair game.

10           THE COURT:  I don't know what that meant --

11           MS. PATEL:  Okay.

12       (Laughter)

13           THE COURT:  -- the methodology of how it's being

14   wound-down.

15           MS. PATEL:  Okay.  Let me --

16           THE COURT:  Very quickly because, you know --

17           MS. PATEL:  Yes.  Your Honor, what I meant by that

18   was, in terms of the decision to wind-down RCP, that makes

19   sense to Acis because it is a fund that should have been wound-

20   down.  How it is going about being wound-down, that is open for

21   dispute, and one of those things being here this MGM stock

22   sale, etcetera.

23           THE COURT:  We'll hear from Mr. Seery.  I thought

24   there was a pile of cash at this point, but maybe I misread the

25   pleadings.

002340
APP. 1587

58

1          Okay.

2          MR. POMERANTZ:  Your Honor, let's remember what this

3    motion is.  This motion wasn't a referendum on wind-down, it

4    was the ability to make a distribution.

5          THE COURT:  Right.

6          MR. POMERANTZ:  Mr. Dondero's counsel, who is

7    speaking on behalf of ACM Services, said they're prepared to

8    hold those distributions in the registry of the Court.  The

9    issues regarding what Ms. Patel testified from the podium, at

10   some point, they may very well be the subject of a hearing in

11   the Court.  We're happy to continue responding to the Committee

12   and Ms. Patel's comments and questions about how, but it's just

13   not relevant here.

14         And, Your Honor, there is no way if Ms. Patel is

15   going to go down that road that we will ever be here only an

16   hour.  That is a much longer discussion.

17         THE COURT:  And let me just clarify where I was

18   coming from.

19         I thought if we were evaluating whether insiders

20   should get $8.6 million of distributions, the bona fides of the

21   decision to go into wind-down mode needed to be explored a

22   little bit and see if some of these insiders were improperly

23   exercising control in that.

24         So I agree with what you're saying.  Now, that we're

25   just talking about deferring to another day all but maybe

WWW.JJCOURT.COM

59

 1  Mr. Okada's disbursement, we don't need to hear great detail

 2  about the whole decision-making process for the wind-down of

 3  these three.  A little bit of background would be useful,

 4  but --

 5          MR. POMERANTZ:  Absolutely, Your Honor, and we

 6  will --

 7          THE COURT:  -- it doesn't need to be, you know --

 8          MR. POMERANTZ:  -- tailor our testimony to the issues

 9  that Your Honor was concerned about and the comments that I

10  made, and we will keep within the time limit that Your Honor

11  wants us to keep it to.

12          THE COURT:  All right.  Very good.

13          Mr. Seery?

14          MR. SEERY:  Yes, Your Honor.

15          THE COURT:  There you are.  If you could approach the

16  witness stand.  I know I've been introduced to you before.  I'm

17  not sure if you've taken the witness stand yet.

18          MR. SEERY:  I have not.

19          THE COURT:  I don't think you have.

20          Please raise your right hand.

21          JAMES P. SEERY, JR., DEBTOR'S WITNESS, SWORN

22          THE COURT:  All right.  Please be seated.

23          MS. HAYWARD:  Your Honor, may I approach with an

24  exhibit binder?

25          THE COURT:  You may.

**WWW.JJCOURT.COM**

Seery - Direct/Hayward                    60

1          MS. HAYWARD:  Or two?

2          THE COURT:  Okay.  One for the Court.

3     Thank you.

4          MS. HAYWARD:  May I approach the witness?

5          THE COURT:  You may.

6                    DIRECT EXAMINATION

7     BY MR. HAYWARD:

8     Q    Well, good afternoon, Mr. Seery.  Since this is your first

9     time testifying, would you introduce yourself to the Court and

10    give her just a little bit of background?

11    A    I'll go pretty quickly because of the time constraints.

12    James P. Seery, Jr., for the record.  I am an independent

13    director for Highland Capital.  I've been in the asset

14    management restructuring business for about 32 years.

15         I started as a restructuring lawyer handling

16    everything from real estate to debtor's side to financial

17    transactions.  From there, I moved into asset management and

18    distressed investing.

19         From there, I moved into managing a large global loan

20    portfolio for a big investment bank.  That included teams of

21    people who both underwrote, distributed, held, managed,

22    restructured, and traded both loans, indicated loan assets,

23    primarily, but also high end bonds, distressed assets, as well

24    as CLO assets.

25         After that, I went into a hedge fund.  We had a

**WWW.JJCOURT.COM**

002343

Seery - Direct/Hayward                           61

1  billion, three long-short credit fund.  I was the senior

2  investment partner and president of that firm.  We did similar

3  types of investments, high yield, high yield loans, distressed

4  loans, CLO assets, and some other structured products, long-

5  shorts.  So we were domestic primarily, but we also had a

6  global investment view and an office in London.

7            Subsequent to that, I was a co-head of a credit

8  business for an investment bank.  And then, in the last six

9  months, I've decided to do this job.

10 Q   So of the three board members, you're kind of the stock

11 guy.  Would that be a fair --

12 A   I think -- stock isn't really my stock and trade, but I do

13 know my way a little bit around the stock market.  But it's

14 primarily been credit products, but I do -- I am familiar with

15 equities and equity trade.

16 Q   Okay.  So since coming onto the board, give the Court a

17 day in the life, if you don't mind, and maybe starting with the

18 day that the board took over on January 9th.

19 A   I think, as Your Honor will recall, when we left and we

20 talked about what the role would be and what the compensation

21 would be, I think your comment was, Your Honor, that it -- we

22 wouldn't be 50,000 feet.  Well, we -- we're actually fully on

23 the ground.  We're not even five feet above.  We don't keep

24 track of our hours like lawyers, but probably logged about 190

25 hours in January starting on the 9th, and then about 150 hours,

Seery - Direct/Hayward                           62

1   160 hours in February.  And I know my fellow board members are

2   similar time commitments.

3          We're involved day-to-day in each of the decisions

4   that the debtor makes from assets management decisions,

5   understanding how the funds are being managed and what the ways

6   that they could either be walled off if they're in liquidation,

7   or if what the proper way to treat them on a day-to-day basis

8   is, evaluating assets that the debtor owns directly or through

9   funds, be thinking about ways to monetize those assets;

10  employee issues, what they're doing, who they're reporting to,

11  how they're -- how they're performing, how they're being paid;

12  claims issues.

13         This case got started, as we all know, by three major

14  litigations, and they're not all easy to understand.  They've

15  got the redeemer arbitration, which I think is fairly

16  straightforward in terms of liability and amount.  There's a

17  number of offsets that are complicated.

18         We've got the UVS litigation that is a lot more

19  complicated because it's not against the debtor.  The judgment

20  is against two offshore funds that are, in essence, shells, and

21  there's a very complex history around the 10-year litigation

22  that that is.

23         Then we have the Acis litigation, which comes out of

24  the Acis bankruptcy, but is an unliquidated claim.  So

25  understanding those thinking about what the pros and cons of

WWW.JJCOURT.COM

002345

Seery - Direct/Hayward                    63

 1  those claims are, how we would manage them down the road, how
 2  we would go forward.  Thinking about how to resolve them has
 3  been a key part of what we're doing on a day-to-day basis.
 4  Q    So has the board done an independent analysis of all these
 5  various litigation claims?
 6  A    Not yet.  So we've -- we've done a preliminary analysis,
 7  and then we've gone further.  So with respect -- we haven't sat
 8  down with -- frankly with Redeemer, yet, although one of the
 9  board members has had a call with them separately.  But we have
10  sat down with the Acis creditors, and we've done some
11  significant analysis around that.  And we have sat down with
12  UBS claimants, and we've done significant analysis around that.
13            All three of those require a ton more work, and not
14  because it's not easy to figure out what the numbers are.  It's
15  really difficult to figure out what the liability is, how it
16  rolls up to the debtor, and then how to satisfy it, and so
17  we're trying to get our hands around that.  But that is a
18  critical component of resolving this case.
19  Q    When the board took over, did -- what types of things did
20  you do immediately upon taking over control of this debtor?
21  Did you meet with people at the facility?
22  A    Oh, sure.  So the first thing we did, actually, is have
23  lunch with the Committee and with Acis, and we wanted to get
24  their perspective because they were here and it was easier to
25  do that than to run back to the debtor and try to -- try to

002346   APP 1573

Seery - Direct/Hayward                          64

1   then set up another meeting.

2           And so we wanted to get their perspective.  They'd
3   been living with the debtor from the litigations and through
4   the time in Delaware and the litigation in this case.  So we
5   got a feel for them of what their desires were, how they
6   thought the case would work out or potentially resolve, and
7   also, how they thought about our role.

8           One of the things we stressed at that time, and I
9   stressed when I was interviewed for the role, is that -- I know
10  my fellow directors feel the same way, but I'm a pretty
11  independent person, and I wasn't going to be certainly the
12  management of Highlands guy, nor would I be the guy of the
13  Committee.  So we're going to -- I'm going to work
14  independently make decisions with the fellow board members in
15  what I think is the best way.

16          I'm going to try to exercise my duty in both care and
17  loyalty to the estate, but then if the estate has duties, I'm
18  going to make sure we exercise those.  And I feel very strongly
19  about that because this is just one -- a decent sized matter,
20  but one small piece of a career, and I'm not going to
21  compromise myself to satisfy either people on the management
22  side or people on the Committee side.

23  Q    Yeah.  Well, and I want to talk a little bit about the
24  duties since you mentioned them, because we heard I think the
25  Committee say that we -- the debtor has not mentioned the

WWW.JJCOURT.COM

002347

APP 1571

Seery - Direct/Hayward                                65

1   fiduciary duties to the estate in the opening statement.  Do
2   you think that by presenting this motion the debtor -- does
3   this motion contemplate protecting the fiduciary duties that
4   the debtor owes to the estate?
5   A    To me, it absolutely does.  But to be fair, I think that
6   the rhetorical flair and opening remarks and missing the duties
7   to the estate, we're very conscious as a board of our duties to
8   the estate.  We're also very conscious of our duties as an
9   asset manager.  And what is in the pleadings is absolutely the
10  case, it's been -- it's my experience, my understanding of the
11  law, and it's being confirmed by both Cayman counsel, and by
12  fund counsel in the U.S. separate from bankruptcy counsel.

13       We owe a duty under the Advisor's Act to the funds
14  and to the investors in those funds.  That duty actually
15  supercedes the benefit to the estate, but it doesn't undercut
16  it because by vindicating the duty to the funds, you actually
17  vindicate the duty to the estate.  If you create liability at
18  the funds, it will roll to the estate.  So by exercising your
19  duty correctly, you do in fact, vindicate the duty of the
20  estate.

21       And what's important in the Advisor's Act, and it's
22  an interesting part of U.S. law.  At least my understanding,
23  it's been confirmed by outside counsel, is if the manager,
24  which would be Highland, has an interest, it's actually
25  required to subordinate that interest to the interest of the

Seery - Direct/Hayward                              66

1    investors in the funds it managed.  And it makes sense.

2            If you have funds invested in a fund with an outside

3    investor, you want to make sure that that investor is not --

4    that manager is not using your funds to aggrandize itself as

5    opposed to looking out for your best interest.  And so, I think

6    by vindicating our obligations with respect to the funds, we

7    actually enhance our obligations with respect to the estate.

8    Q    Let's talk a little bit about the funds now.  So

9    originally, the motion pertained to three different funds.

10   Could you just briefly explain to the Court the status of those

11   funds and how they got there?

12   A    Yeah.  I'll try to go quickly, and if I skip something or

13   I go too quickly, Your Honor, please let me know.

14           The Highland Dynamic Fund, which is the primary one

15   we're talking about now, I think you'll see at the end of Tab 1

16   how it's set up right before Tab 2.  And I haven't looked at

17   these exhibits in a long time, so I apologize.  I didn't know I

18   was getting this.  But it's really straightforward.

19           These funds are set up, and this is a pretty typical

20   structure.  It's a limited partnership structure.  It's got a

21   master feeder structure.  And what does that mean?  The master

22   is the main fund.  That's the King Exemptive Limited

23   Partnership at the bottom.

24           It's fed by two feeders, a domestic feeder and an

25   offshore feeder.  Why is it done that way?  Purely tax.

002349

Seery - Direct/Hayward                          67

1   Offshore investors, non-taxables in the U.S. who are worried
2   about ECI or UVTI, or unrelated business income, we want to
3   make sure that there's no withholding or any tax ramifications
4   with respect to the distributions they get off the fund.  Since
5   it's a pass-through entity, both of those investors, either
6   domestic or foreign, are non-taxables in the U.S., will have
7   their own tax treatment when it gets up to them.  So they don't
8   want anything withheld.
9           When you look at the left side of the page, Dynamic
10  domestic feeder, the other investors is where you'd include
11  Mark Okada.  This fund was founded originally under a different
12  name.  I believe it was called the Highland Loan Fund.  It
13  might have been CLO Loan Fund, I apologize.  And then that was
14  in 2013.
15          Mark Okada put $2 million cash into the fund at that
16  time.  Why did he put it in?  This fund was designed to own CLO
17  assets and loan assets.  Okada was the founder of that part of
18  the business and the driver of that business.  It was pretty
19  essential that he put some money in.
20          However, in '13, they did get third-party investors,
21  but this fund never got real scale.  I think it was only a bit
22  over $100 million.  Not insignificant, but not a big fund.  And
23  they went out looking for loan funds, loan opportunities, and
24  CLO paper.  So the CLO papers, the debt of the CLOs, generally
25  (indiscernible) type paper that was higher yielding unless

002350
APP 1577

Seery - Direct/Hayward                    68

1   there was some interesting opportunity in the -- in the higher

2   rated tranches.

3        In 2018, the fund got restructured, and they -- I'm

4   pretty sure that's when the name change occurred.  Okada put

5   another two and a half million dollars of cash in.  So he

6   didn't get this as free-carry or anything.  This was actually

7   cash that he deposited in the fund.

8        In 2019, Okada in the spring of 2019, determined that

9   he was leaving Highland.  And his separation was finally

10  completed in September of 2019.  So he is no longer an employee

11  of the debtor.  He has no influence, say, discussion, he's not

12  involved in anything.  He hasn't been since we've been there.

13       The investor, I think it was late summer, either

14  understood that or the fund hadn't performed that well.

15  Frankly, it was undersized anyway.  Realdania, a third-party, I

16  believe they're European, issued a redemption notice.  This was

17  a hedge fund style fund.  So we've got three different funds

18  here, two of them are hedge fund, and we explained a little bit

19  in the papers, but the real dynamic, no pun intended,

20  difference between the two is that Dynamic and Argentina are

21  hedge funds which provide liquidity to the investor.

22       What does that mean?  Monthly, quarterly, semi-

23  annually, they can look for redemptions.  The fund manager

24  sales assets because the assets are supposed to be a little bit

25  more liquid, makes distributions per the redemptions.

002351
APP 1576

Seery - Direct/Hayward                     69

 1          If the redemptions are too big and the sales will
 2  somehow disadvantage the remaining investors, either gates come
 3  down or you put the fund into liquidation.  Realdania had made
 4  a, I believe it's a $65 million -- it was initially a smaller
 5  one, then there was a $65 million redemption, and it -- this is
 6  prepetition.  The debtor determined we've got to wind this fund
 7  up because we can't basically more than halve it and then
 8  continue to try to function.  It would have been far too
 9  undersized.

10          So the debtor then went about selling the assets,
11  creating a pool of cash, and then this motion is to liquidate
12  it and pay the investors, including Okada.  When it's done,
13  assuming they made the full distributions, about 80-something
14  percent of the assets will have been distributed.  There's a
15  few small assets that are left.  They're not particularly
16  liquid, but they're small and I'm relatively certain we can
17  unload those at decent prices, create cash for the investors,
18  make the final distribution, so it would be a hold cash to
19  wind-down and then dissolve the various little limited
20  partnerships.

21          Argentina is similar.  The basically different
22  premise of why that fund existed, the original theory was post
23  the Argentina crisis with the election of Macri in '15.  Late
24  '15, Argentina started going through a number of changes in its
25  economy and the thought was that Argentina would start to grow

002352
APP 1579

Seery - Direct/Hayward                          70

1   and really be able to realize the potential of its people and

2   its resources.  That didn't work out that well, and then at the

3   end of, I think it was '18, Macri was voted out and the former

4   Kirchner, effectively, government is going to back.  Argentina

5   economy has slid into basically -- certainly recession over

6   multiple quarters, but even some would say depression.

7           Very difficult time.  This was not a unique fund for

8   Highland.  There were a lot of these Argentina-type opportunity

9   funds, and that -- that performance has not been particularly

10  good.  The decision there was made to wind-down a third-party

11  investor who made a 15 percent withdrawal, and that a number of

12  other funds that I forget the percentage, but they're managed

13  by UBS, third parties made a -- indicated that they were going

14  to have full redemptions, as well, so that fund was put into

15  liquidation.

16          Importantly, I think something that was mentioned

17  before, there's no benefit to keeping these funds around.  They

18  don't make any fees.

19  Q    Why is that?

20  A    And once they've gone into liquidation, they're not paying

21  any fees.  Similarly, RCP -- now, RCP is a different style of

22  fund, and I think Your Honor, you mentioned it in the papers,

23  you saw that it was a 10-year old fund.  That term was

24  extended.  It was originally a 2008 fund.  It was done as a

25  distressed for control.  Very different opportunity,

WWW.JJCOURT.COM

002353
APP 1589

Seery - Direct/Hayward                    71

1  (indiscernible), at the time, they probably didn't see the

2  global financial crisis, but saw it as distressed and the

3  opportunity to do distressed for control positions had to be

4  long term.  So that fund had no liquidity provisions for

5  investors.  Typical PE-style fund.

6          The -- when it got to the end of its life, the 10-

7  year life, Highland didn't have the ability to extend the term.

8  A steering committee of third-party institutional investors

9  with no Highland influence whatsoever, Ontario Teachers,

10  CalPERS, some of the biggest, most sophisticated investors in

11  the world in both debt, equity, and distress were driving that.

12  There was also a couple of other funds that are third parties

13  on that steering group.  And they still exist.  They gave a

14  one-year extension.  Highland had no ability to do anything

15  about that.

16          In exchange for the extension, Highland waived fees.

17  So there are no fees being paid on the RCP Fund.  There was a

18  series of one-month extensions that went -- was finished in

19  November of 2019.  And with this distribution, there's still a

20  lot of assets in RCP that have to be managed, about 175

21  million.  And so we're going to -- after we make the

22  distribution -- we've had a few calls and I've been on them,

23  with the steering group.

24          We've told them we're coming to Court to make the

25  distribution.  We were confident that we would be able to -- to

002354
APP 1584

Seery - Direct/Hayward                    72

1  be able to make a distribution to them subject to the Court's

2  order, that we make that distribution and somewhere in the next

3  two weeks we're going to have a steering group meeting to talk

4  about the other assets and how we monetize them.

5         They are different types of assets.  Some have more

6  liquidity than others, so we're going to need to come up with a

7  plan.  It's 85 percent, roughly, third parties.  Highland

8  Capital Management, the debtor, actually has a roughly 15

9  percent interest in HCM Services, has as a couple percentage,

10 because I think there would have been about 2 percent of the

11 distribution.

12        So it's vast -- the vast majority of the owners of

13 the fund are outsiders, and we're going to need to come up with

14 a structured plan to get them their cash because they've been

15 invested for 12 years in this fund.

16 Q   Do you agree, having had the chance to come in and look

17 over all these things, that these funds should be wound-down?

18 A   Oh, absolutely.  So I think it's easiest to say,

19 Dynamic -- Okada was the driver.  It never got to where it

20 wanted.  The biggest investor wanted out.  It's not big enough

21 to support itself.  Even if one were to look today, and say, it

22 should have, frankly, owning CLO paper when this fund was

23 started until today, there should have been good appreciation

24 in it, and it just didn't -- I don't know the reasons it

25 didn't, but it didn't perform the way it should have, and it

WWW.JJCOURT.COM

Seery - Direct/Hayward                          73

1  didn't attract the investors it should have.  Perhaps that had

2  something to do with it, you know, the way the other cases or

3  litigations were going on and the public nature of them.

4         And frankly, coming out of the global financial

5  crises, Highland had had a tough time of it, so it wasn't as if

6  it was the easiest thing to raise funds.  Argentina, there's

7  absolutely no question that the purpose and structure of that

8  fund and what it set out to do doesn't work, just doesn't work.

9  So it makes no sense to keep that going, and that's why the

10 investors -- third-party investors sought redemptions.

11        The insider interests, while not immaterial, are

12 pretty small.  Okada's interest is about 12 percent in the

13 fund, and he's not driving it.  Like I said, he's not even at

14 the debtor.  These two -- but to be fair -- both the decisions

15 to wind-down Dynamic and Argentina were made before the board

16 was involved and before the petition was filed, and they really

17 related to the withdrawals from third parties.

18 Q   So why are we here today?  Do you -- do these funds wind-

19 down in the ordinary course of their business?

20 A   Well, it -- they all have life.  So I'd say in the case of

21 RCP, it's pretty clearly in the ordinary course because it

22 reached the end of its life.  And the investors were very clear

23 that they wanted to be cashed out.  So the difficult part is

24 that it -- because of its structure and in the way it was

25 originally set up as a PE-style fund, it has illiquid, a number

APP 1523
002356

Seery - Direct/Hayward                    74

 1  of illiquid assets.

 2          And the challenge in any of the PE funds is to time

 3  your exit, and the timing on this hasn't been opportune because

 4  the opportunity to sale has not been as good as one might hope

 5  and the investors are just at the point where they want to get

 6  cashed out as we've heard today from CalPERS.  But we've seen

 7  it in the documents and our discussions -- and my discussions

 8  directly with them.

 9          The other funds, once they've reached this -- it's an

10  ordinary course thing for funds.  When funds either they're --

11  they've reached their life or investors redeem and they get to

12  this state where they really can't support themselves, it's a

13  very ordinary thing for managers to wind-down funds.

14  Q    And as part of the winding down of the funds, is it also

15  ordinary then to make distributions once the funds have become

16  liquid?

17  A    Well, I mean one of the questions you started to ask, or

18  maybe did ask, and I didn't answer, was why are we here?

19          Our view as an independent board, my view as an

20  independent board member, is we have an obligation to all

21  investors.  It would be really easy if the documents or the law

22  said all investors, other than ones who might have been related

23  somehow to the asset manager.  It just doesn't say that.  And

24  as we talked about, this is -- these are not funds from

25  Highland.  If they were funds from Highland, again, it would be

WWW.JJCOURT.COM

Seery - Direct/Hayward                              75

1  really easy.

2          As I described for Highland Dynamic, I don't need to

3  hold and carry water for Mark Okada.  But I do need to carry my

4  own fiduciary duties and make sure that I exercise them well.

5  The gentleman put $2 million in -- this is April 2013, put 2

6  million -- 2.5 million in cash in 2018, and the fund is being

7  wound down.  It's not the debtor's money.  If it was the

8  debtor's money, it would be really easy to say, you know,

9  Mr. Okada, I'm not going to give you the money because we may

10 have claims against you, and a different discussion would

11 ensue.

12 Q   Well, I want to walk through that just a little bit.  You

13 say it's not the debtor's money.  Where is the money?

14 A   This money sits in funds or in bank accounts.  Its assets

15 are denominated and they're held in trust.  And the cash that's

16 in accounts, they're denominated in the name of the fund.  The

17 asset manager, Highland, has the ability to access the accounts

18 and use the funds in accordance with the fund documents.  It

19 does not have the ability to access the accounts and use the

20 funds however it see fit.

21 Q   So it's like an authorized signer?

22 A   It's certainly an authorized signer in terms of what its

23 ability to do in terms of accessing the funds.  Typically,

24 that's done through the trustee.  But it can manage the funds.

25 It couldn't take the funds and make an unrelated investment.

Seery - Direct/Hayward                    76

1  It couldn't take the funds and use it for its own purposes and

2  pay them back later.  It's just simply not permitted.

3  Q    Well, taking that to the next level.  If the Court did not

4  allow these distributions to be made, would the distributions

5  then go to the debtor?

6  A    No.

7  Q    Where would they go?

8  A    There's really no provision for it.  There are certain

9  provisions in the underlying documents that would enable the

10 manager to withhold funds.  If there was a change in law that

11 didn't permit a distribution.  If there was some other reason

12 that it became unfeasible to make the distribution.  If you

13 couldn't find the investor, and sometimes that happens.  There

14 are provisions of how you deal with those funds.  But they

15 never would go to the manager.

16 Q    So what is the -- why is the primary reason then that

17 we're here today asking this Court for permission to distribute

18 these funds?

19 A    It's pretty straightforward.  We have a fiduciary duty and

20 we've confirmed that with outside counsel, both Cayman and

21 domestic fund counsel, to make distributions and treat all

22 investors in the funds pro rata.  And we're here to make sure

23 we vindicate our duties, not exercising our fiduciary duties,

24 doing things that were not permitted.  One, we don't think

25 that's right or appropriate.  Two, that's not going to help

WWW.JJCOURT.COM

002359

APP 1586

Seery - Direct/Hayward                    77

1  resolve this case that probably contributes to some of the

2  things that led to this case.  So we're not real interested as

3  an independent board in doing things that are close to the

4  edge, along the margin, try to use our positions to leverage

5  investors.

6  Q    Are you familiar with the protocols?

7  A    I am.

8  Q    Okay.  But for the protocols, do you believe that the

9  debtor would need to obtain the Court's permission in order to

10 makes these distributions on behalf of these funds?

11 A    I don't think so, no.

12 Q    So then, why are we asking the Court's permission?

13 A    Well, the protocols require it, and I think the Committee,

14 you know, with due respect and I mean that truly, would like us

15 to withhold the funds, and that provides certain leverage

16 potentially over insiders.  I think when I look at the

17 protocols, I think the main function of the protocols is to

18 assure that there isn't undue influence by insiders over the

19 actions of the company, and that insiders are not somehow

20 benefitting themselves by virtue of their control over the

21 company.

22         The independent board has control over the company.

23 We're not naive and think we have control over every single

24 persons every single second of every day, but we do have

25 control over what happens with the accounts, how payments are

WWW.JJCOURT.COM

002360

Seery - Direct/Hayward                          78

1  made, when we wind something down, when an asset is sold, how

2  the proceeds will be used.  That's the board.  That's not

3  anybody in management.  The decision around these distributions

4  was made by the board independently.  We did consult with the

5  CCO, and that was important to make sure we got all the facts

6  with respect to these funds.

7          We then sought outside counsel to inform our

8  decision, both Cayman and domestic.  We didn't have any

9  influence whatsoever and we didn't speak to Mr. Dondero nor

10  Mr. Okada other than to tell Mr. Okada that we were coming to

11  court and then to ask him if he would defer his distribution.

12  And we know his response.

13  Q    I want to ask you just a couple -- I know I'm almost at my

14  30 minutes here, so I just want to ask you a few quick

15  questions because one of the issues that came up were these

16  demand notes.  I understand that Mr. Okada does have a demand

17  note.

18  A    He does.  We've --

19  Q    And has the board --

20  A    And we've sent a demand.

21  Q    Okay.  And what was -- what is the status of that demand

22  note?

23  A    He acknowledges that he signed it and he said that he's

24  owed certain things from the company.  He's asked how we work

25  those through because he was severed -- or severed himself in

Seery - Direct/Hayward                           79

1   September, and he has -- they reached a severance agreement
2   according to Mr. Okada.  I haven't personally investigated it
3   yet, but we will get to it quickly.  And he has some expenses
4   that are owed, but I don't think those are material.

5          I'm quite confident.  He said his severance was
6   agreement not money, but terms, was very standard.  We'll take
7   a look at that and make sure there's agreement on that.

8          I think it would be covered by the protocol, but it's
9   probably a transaction, so we'd have to talk to the Committee
10  about it, but we'll work -- I'm confident that we can work our
11  way through a standard severance agreement very quickly and
12  resolve that issue and collect on the note.

13  Q    Now, to be clear, the demand note is payable to whom?
14  A    The demand note is payable to the debtor.
15  Q    Okay.
16  A    It was actually a note that was -- he didn't receive cash
17  for the note.  It's basically a tax -- rather than gross-up
18  salary sometime in the past, for whatever reason they decided
19  not to gross it up to cover taxes.

20         Because of the structure of the limited partnership,
21  they could have had taxable income without matching cash, and
22  so they issued notes back to Highland to cover certain of those
23  obligations rather than actually making a distribution.
24  Q    To you knowledge, does Mr. Okada owe any money to the
25  fund?

**WWW.JJCOURT.COM**

APP 4589

Seery - Direct/Hayward                    80

1  A    No.  Not a -- my knowledge is that he does not.  So I am

2  knowledgeable of it, and he does not owe any money to the fund.

3  Q    Okay.  Quickly, I just want to talk a little bit about

4  Mr. Dondero.  One of I think the points that was made at the

5  very beginning of opening statements was that Mr. Dondero is

6  still around.  Why is that?

7  A    He's around because he has incredible knowledge about the

8  investments.  He is a portfolio manager for the fund.  He does

9  work with respect to non-Highland unrelated funds, some of

10 which Highland employees do work under shared services

11 arrangement and we get paid for them.  But Mr. Dondero is

12 around for those reasons and his knowledge about a number of

13 the investments in which we're involved.

14 Q    Does the Debtor -- or does the board have the power to

15 terminate Mr. Dondero if it decides to?

16 A    Yeah, he's -- we could, he's unpaid so there's no cost to

17 his involvement.  His expertise around certain investments,

18 particularly the equity funds as well as some of the larger

19 investments, including the PE investments, is really important.

20 Q    And with respect to the Dondero notes, what are the status

21 of those demand notes?

22 A    We've done an investigation of the notes and I wouldn't

23 say it's as exhaustive as -- it's in similar stages as our

24 examination of other assets.  We've looked at Dondero's notes,

25 we made a decision to send a demand letter to Okada because

Seery - Direct/Hayward                        81

1  he's no longer a part of the company and there's no real

2  benefit that we saw strategically to not making that demand.

3  It's a small amount of money relative to the size of the case,

4  it's real money, but it's a small amount of money relative to

5  the size of the case.  We should clean that up and move on from

6  Mr. Okada.

7          With respect to the Dondero notes on Dondero entity

8  notes, we want to think about those strategically.  They're a

9  sizable amount of money, not just the ones that are demand, but

10 also there's a number of the notes that ate notes with

11 maturities and they're actually current, they're all current,

12 but how can we use those cash, can we collect those, and I

13 think that's more strategic in terms of how we resolve this

14 case.

15         I agree with Mr. Pomerantz's statement that I think

16 it evolves into a pure litigation case and we really hope it

17 doesn't.  That then -- those can just be sued on and the demand

18 notes are pretty clear as to how they work and even include

19 cost of collection.  So they're pretty straightforward notes.

20 Q    But so for now the board --

21 A    Well, we thought about it, we don't think it makes sense

22 to make that demand at this time.  There's -- our initial --

23 we're not -- we haven't come up with what the plan is for this

24 case, but we have ideas.  We do think they involve Mr. Dondero

25 and they involved contributions from Mr. Dondero whether in the

002364

APP 1591

 1  form of notes, whether in the form of cash, whether in the form

 2  of other assets.  We haven't discussed those with him, but we

 3  do think that's ultimately, at least preliminarily, where we're

 4  going to end up somewhere.  So strategically we think that

 5  that'll make sense to include in that sort of a resolution.

 6  Q    Okay.  And --

 7            THE COURT:  You have one minute.

 8            MS. HAYWARD:  Yes, thank you, Your Honor.

 9  BY MS. HAYWARD:

10  Q    Last question I'm going to ask you, are you aware of any

11  legal basis to withhold these funds now from Mr. -- from these

12  investors and these related parties?

13  A    I'm not aware of any, but as the Court has contemplating,

14  as the Committee has said, perhaps now that Section 105, you

15  know, grants that sort of authority, but that'll be up to the

16  Judge.

17            MS. HAYWARD:  Your Honor, a housekeeping matter.  I

18  move for the admission of Exhibits 1 through 12.  I don't think

19  any of them are controversial.  But I will let --

20            THE COURT:  You want me to look through

21            MS. HAYWARD:  Your Honor, they are --

22            THE COURT:   -- all of these.

23       (Laughter.)

24            MS. HAYWARD:  Your Honor, just for the record, they

25  are Number -- Exhibit 1 is the chart showing the structure of

002365
APP 1592

Seery - Direct/Hayward                    83

1  the Dynamic Income Fund.

2         THE COURT:  Right.  We looked at that.

3         MS. HAYWARD:  Exhibit 2 is the partnership agreement,

4  so I know they're large documents, but they're not numerous

5  documents.  Exhibit 3 is just the chart of the Latin America

6  Argentina Fund.  Four, the partnership agreement for that fund.

7  Five, the chart (indiscernible) Third Fund.  Six would be the

8  agreement, the limited partnership agreement for that fund.

9  Seven, Your Honor, is Your Honor's order on the ordinary course

10 governance procedures.

11        THE COURT:  Okay.

12        MS. HAYWARD:  Eight is the final term sheet.  Nine is

13 the notice of amended operating protocols that was filed last

14 week.

15        THE COURT:  All right.  And then CVs of our board

16 members.

17        MS. HAYWARD:  And then the CVs for the board members.

18        THE COURT:  Any objections to these?

19        MS. REID:  No objection, Your Honor.

20        THE COURT:  Okay.  They're admitted.

21        MS. HAYWARD:  Okay.

22        THE COURT:  All right.  Any cross-examination?

23        MS. REID:  Yes, Your Honor.

24        THE COURT:  Okay.

25        MS. REID:  Good afternoon, Your Honor.  Penny Reid on

Seery - Cross/Reid                                     84

1   behalf of the Creditors Committee.

2                        CROSS-EXAMINATION

3   BY MS. REID:

4   Q    Good afternoon, Mr. Seery.

5   A    Good afternoon.

6   Q    You are aware, Mr. Seery, aren't you, of the Acis

7   bankruptcy?

8   A    I'm aware of it, yes.

9   Q    Okay.  And you're aware that prior to that bankruptcy Mr.

10  Terry obtained an arbitration award in October of 2017.

11  Correct?

12  A    I'm aware of that, yes.

13  Q    And, Mr. Seery, are you aware that four days after that

14  arbitration award assets started being transferred away from

15  Acis, stripping it of its value at that time?

16  A    I've read the judge's decision in the Acis case but I'm

17  not aware of any of the underlying facts, other than from

18  reading that case.

19  Q    So you aren't aware of all the assets that went out of

20  Acis the day after an arbitration award was entered.

21  A    No, I haven't looked at any of those.

22  Q    Okay.  And you're not aware that the day after a final

23  judgment was entered more assets were stripped from Acis.  Is

24  that correct?

25  A    Other than reading the Judge's decision I'm not aware of

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document Filed 06/05/23 Page 615 of 1017   PageID 3078
Main Document   Page 614 of 722   Page 615 of 1017   PageID 3078

Seery - Cross/Reid                                            85

1  any of the specific assets, no.

2  Q    Are you aware that two days after that, or entry of the

3  final judgment was ordered, Acis' entire risk retention

4  structure was transferred away from it and into the ownership

5  of Highland CLO Holdings?

6  A    I'm aware of some of the facts relating to the Acis case

7  from the decision and I'm aware of some of the facts from the

8  Acis case because of my discussions with Ms. Patel and Mr.

9  Terry.  I'm not aware of the specific transfers to which you're

10 referring without having -- looking at them.

11 Q    Okay.  So you're not aware that some of the assets that

12 were stripped from Acis went to one of the entities you're

13 wanting to send money to today.  Is that right?

14        MS. HAYWARD:  Objection.  Your Honor, I'm not sure

15 how this is relevant to the Debtor's distribution motion --

16        MS. REID:  Well, it's relevant to the distributions

17 that you're trying to give to the same entity.

18        MS. HAYWARD:  Your Honor, I think right now Mr.

19 Okada --

20        THE WITNESS:  What I --

21        THE COURT:  Just a minute.

22        THE WITNESS:  Sorry.

23        THE COURT:  We have an objection.  Let me hear the

24 objection.

25        MS. HAYWARD:  Your Honor, I think at this point Mr.

002368   APP 1585

Seery - Cross/Reid                    86

1   Okada is the only one getting a distribution at issue in this

2   case as of now in light of the representation that was made by

3   Judge Lynn.

4              THE COURT:  All right.  Well, what is your response

5   to the relevance objection?  She's saying that this line of

6   inquiry has kind of been taken off the table since -- I'm not

7   sure which entity, I think you're talking about the Holdco, CLO

8   Holdco.  Right?

9              MS. HAYWARD:  Yes, Your Honor.

10             THE COURT:  Since now the disbursement that would

11  have gone to it is being put off the table and would go into

12  the registry of the Court.  So what is your response?

13             MS. REID:  Well, Your Honor, and I can take it off,

14  but currently it's my understanding that Mr. Okada is a 25

15  percent owner in Holdco.  But I can move on to the next

16  question.

17  BY MS. REID:

18  Q    Which is, are you aware that Mr. Okada right after the

19  final judgment was entered transferred their entire interest to

20  Nutra Limited?

21  A    Who transferred to whom?

22  Q    Right after the final judgment --

23  A    Right.

24  Q    -- that Mr. Terry obtained, Mr. Okada transferred their

25  entire limited partner interest in Acis, LP to Nutra.

**WWW.JJCOURT.COM**

Seery - Cross/Reid                    87

1  A    So I apologize.  A couple of things.  One is it goes to

2  what you said, I don't believe Mr. Okada has any interest in

3  sale of Holdco, but you're saying Mr. Okada and their in your

4  question, and so it doesn't make sense.  He's an individual.

5  So I just don't know what you're asking me.  You said Mr. Okada

6  transferred their interest.   Who's their?

7  Q    Are you aware that Acis -- that you're aware that after

8  the entry of the Acis judgment that Mr. Okada's limited

9  partners interest in Acis was transferred to Nutra?

10         MS. HAYWARD:  Again, Your Honor, I lodge the same

11  objection to relevance.

12         THE COURT:  All right.  Again, what is your response

13  to the relevance objection?

14         MS. REID:  I think it's very relevant because I mean

15  he has been saying that they have a fiduciary duty to

16  investors.  Mr. Okada is not your normal independent investor.

17  It's a related party that has engaged in prior improper acts in

18  this court which you're aware, aren't you -- well.

19         THE COURT:  Yeah, I'll overrule the objection and

20  allow a little latitude.

21         THE WITNESS:  So I think what you're referring to is

22  the position in Nutra and I'm aware of some of those issues.

23  Mr. Okada apparently owns 25 percent of Nutra, Mr. Dondero owns

24  75 percent of it.  The control in Nutra is actually vested in

25  Highland Capital Management through a control agreement.  So

Seery - Cross/Reid                                     88

1   I'm not -- I'm aware that they made a transfer and that Nutra

2   owns that interest now, and I'm aware that that split is 75-25,

3   I assume because of that split just like ATM Services, Mr.

4   Okada doesn't have any say in how it's run.  And the control in

5   that entity anyway is vested in Highland, the Debtor.

6   BY MS. REID:

7   Q    So you're aware there were improper transfers made at --

8   during -- before the Acis bankruptcy.  Is that correct?

9   A    I'm aware --

10  Q    You're not aware?

11  A    I'm aware of the decision and I'm aware of the transfers.

12  The designation of it then as improper, I'm not sure that I can

13  say one way or the other because I've looked at the transfers

14  and I can't tell you whether that transfer was improper.  So if

15  you're asking me if I'm aware that that transfer occurred, I

16  think I said I was.  I don't think it's fair for you to color

17  that the transfer was improper.  If somebody --

18  Q    Are you aware of the Court's decision --

19  A    I am --

20  Q     -- that they were improper?

21  A     -- I don't recall the Court's decision with respect to

22  that transfer.  There were a lot of transfers, a number of

23  which the Judge ruled were improper.

24  Q    Okay.  So you are aware that there were improper transfers

25  made from Acis that the Judge found were improper.  Correct?

002371
APP 1598

Seery - Cross/Reid                                89

1  A    Yes, I am.

2  Q    Okay.  And you're aware that Mr. Okada was the Chief

3  Investment Officer at the time those transfers were made.

4  Correct?

5  A    Of which entity?

6  Q    Of Highland, of the Debtor.

7  A    I believe he was -- I believe he was a co-CIO of the

8  Debtor at that time, but I'm not positive.

9  Q    So you don't know.

10 A    I'm not sure, no.

11 Q    Okay.  Do you know he was -- he was the Debtor's -- so you

12 do not know one way or the other.

13 A    I am aware that at some time he was the CIO and then the

14 co-CIO.  I don't know the specific time that he was the sole

15 CIO.  I just don't know.

16 Q    Do you know if he was involved with the Debtor at the time

17 these improper transfers were made?

18 A    He definitely worked for the Debtor at that time.

19 Q    Okay.  You -- the reply that was filed today by the --

20 this morning by the Debtor states that the making of these

21 distribution to Mr. Dondero and Mr. Okada is essential to

22 rebuilding the Debtor's reputation in the marketplace.  Is that

23 correct?

24 A    I believe that's what it says, yes.  I assume you're

25 reading it?

WWW.JJCOURT.COM

Seery - Cross/Reid                                    90

1   Q    I am.

2   A    Okay.

3   Q    Aren't you -- is the marketplace not well aware of

4   Highland's history including the Acis and the Redeemer

5   Committee litigation?

6   A    I believe the market is aware of the Acis and Redeemer

7   litigations.

8   Q    Okay.  And is the marketplace well aware of the extensive

9   wrongdoing that Mr. Okada and Mr. Dondero engaged in as found

10  by this Court and the other tribunals?

11  A    I don't know how the marketplace -- I know that they're

12  aware of the decisions, I can't tell you whether the

13  marketplace as a large general matter knows the specifics.  I

14  don't know.

15  Q    Have any non-insider investors expressed concern to you

16  over the possibility of Mr. Okada not receiving the

17  distribution?

18  A    No, I don't believe so.  I think -- just to make sure I

19  answered your question, have the non-insiders raised issues

20  about Mr. Okada --

21  Q    Not getting distribution.

22  A    No, there won't --

23  Q    No one is really concerned about that except Mr. Okada.

24  Correct?

25  A    I think each investor is concerned about their own

**WWW.JJCOURT.COM**

Seery - Cross/Reid                                      91

1  distributions, so like with respect to RCP I don't CalPERS

2  referred at all to the distributions to Ontario, they probably

3  don't care, they care about their own distributions.

4  Q    And the only one we're talking about right now is the one

5  to Mr. Okada.  Correct?

6  A    That's correct.  I hope so.  Right?  Meaning I'm under the

7  impression that the Committee doesn't object to the investment,

8  to the release of funds and the distribution to third-party

9  investors.

10  Q    Mr. Seery, you testified that one of the reasons you're

11  seeking to distribute these funds is because the Debtor has

12  fiduciary duties to investors.  Correct?

13  A    Yes.

14  Q    Okay.  But these funds aren't being distributed to just

15  regular investors.  Correct?  They're being distributed to

16  insiders.

17  A    Again, unfortunately these are things one has to be

18  precise with.  The question is insider under some securities

19  law, or insider under the Bankruptcy Code?  So --

20  A    Insider under the protocols.

21  Q    I believe the term there, again, we should be precise, is

22  related party.  So he's a related party under the protocols.

23  As far as I know there's no separation under the Investment

24  Advisors Act, under the Cayman law, under Delaware law, or

25  under the contracts with respect to persons who might have

                        Seery - Cross/Reid                    92

 1  worked for the investment manager who made an investment in the

 2  fund.

 3  Q    Are you aware that the Debtor also has duties to the

 4  Creditors Committee?

 5  A    I don't believe the Debtor has any duties to the Creditors

 6  Committee.

 7  Q    To the estate?

 8  A    I believe the Debtor has significant and overriding

 9  duties, but that's what we're here for, to the estate.

10  Q    To the estate.  And were very conscious of those duties.

11  Correct?

12  A    I am indeed.

13  Q    That's what you testified.  Right?

14  A    Yes.

15  Q    Okay.  So can you explain to me what -- how you consider

16  the estate's considerations in deciding to distribute these,

17  what was your consideration of the estates, how does this

18  benefit the estate?

19  A    This benefits the estate because we have an obligation to

20  the funds and to the investors in the funds to perform

21  according to the terms of the funds.  Unfortunately there is no

22  provision in the fund documents or in the law that allows us to

23  treat the investors in the funds in a disparate way.  And we

24  believe, after consulting with outside counsel, domestic and

25  Cayman, considering federal law under the Advisors Act, as well


                        WWW.JJCOURT.COM

Seery - Cross/Reid                                          93

1    as Delaware law, that the only way to make distributions, other

2    than if there was a law change, was pro rata to all of the

3    investors.

4           So in order to vindicate our obligations to the

5    outside investors, we also have to pay the inside investors.

6    In addition, if we don't pay the inside investors, there's no

7    basis not to do that.  Now there may ultimately be no liability

8    because it will be hard to bring a case.  But it seems to me

9    that incurring potentially liability is not in the best

10   interest of the estate.  Holding up a distribution from non-

11   estate property doesn't seem to do anything to help the estate.

12   In fact, it puts it at risk.

13          And so we did the work and that's how we determined,

14   exercising what I think is our duty of care, which is really

15   researching this, and we spent a lot of time and a lot of money

16   making sure we got this right.  And our duty of loyalty.  Is

17   there some good reason that the fund could hold up the

18   distribution.  Until we have a claim is there a valid to attack

19   these distributions.

20          By the way, there were $8 million out of 180 million.

21   Now if there had been 180 -- if there had been 172 out of 180,

22   maybe we would come in here and say, We should something a

23   little bit different because we're really letting the small

24   outside investors dictate us and force us to make distributions

25   to related parties that the Committee has some concern about.

Seery - Cross/Reid                                    94

1         But while $8 million is real money, and I don't deny

2   that, again, it's not huge in this case.  And it seemed to us,

3   after doing the work, that we were putting the estate at risk

4   by no exercising our fiduciary duties.  Moreover, we each have

5   reputations, and they're important to us, and they don't

6   override our fiduciary duties.  We're not going to do things to

7   aggrandize ourselves, to help our reputation versus the estate.

8   But running this Debtor correctly seems to us, looking at the

9   history, was the right thing to do.

10  Q    Has anyone, Mr. Seery, threatened to bring a fiduciary

11  duty claim against you if you don't pay these funds?

12  A    No.

13  Q    Has any -- has Mr. Okada said he's going to bring a claim

14  against you if you don't distribute these funds?

15  A    No, and nor did I consult him about it.  We just told him

16  what we were doing.  We're not -- I'm not inviting someone to

17  sue us.  That I think would be, you know, grossly wrong for us.

18  Q    Now we've touched a little bit on this, Mr. Okada owes the

19  Debtor 1.3 million.  Correct?  In the demand note?

20  A    Approximately, yes.

21  Q    All right.  And you have made a demand on Mr. Okada.

22  Correct?

23  A    That's correct.

24  Q    And he hasn't paid it.  Right?

25  A    No, he has not.

Seery - Cross/Reid                                      95

1  Q    And that's money into the estate.  Correct?

2  A    That will be, yes.

3  Q    Now do you still think it's okay to just hand him off, you

4  know, $4 million and even though he's not paying the estate

5  that you have a duty to?

6  A    There's no such thing in my life as just handing off $4

7  million.  This is fund money --

8  Q    Distributable.

9  A     -- that will be distributed to the owners of the fund pro

10 rata.  We're not handing off anything to Mr. Okada or anybody

11 else.

12 Q    But Mr. Okada has not agreed to pay back his note.

13 Correct?

14 A    He's not agreed to pay it back, no.  Technically I would

15 say no.

16 Q    Okay.  And that's because of some severance agreement that

17 you're not aware of what the terms are.  Is that right?

18 A    I have not -- we have not -- I have not looked at the

19 terms, I don't believe many of my fellow directors yet have.

20 It's something that is on the burner for us to get to as soon

21 as this is over.

22 Q    And are --

23 A    He's pushing for it.

24 Q     -- are you aware that the Committee has asked for that

25 severance agreement?

Seery - Cross/Reid                                    96

1  A    I was not aware of that, no.

2  Q    You're not aware of that.

3  A    I haven't seen it.

4  Q    And you don't know that it hasn't been produced to us.  Is

5  that correct?

6  A    I don't -- I have not seen it myself, I don't -- didn't

7  know that you'd asked for it, nor do I know that it hadn't been

8  produced.

9  Q    Okay.  And you haven't looked at it.

10 A    I haven't seen it.

11 Q    So you don't know if his failure to pay that money back is

12 valid or not.  Is that correct?

13 A    That's -- I don't -- he still owes the money whether he

14 has appropriate setoffs and whether a settlement agreement

15 would actually work as one.  I don't -- haven't really analyzed

16 that and I don't know that our counsel has either.  It may be

17 that he owes the money and we're holding a severance agreement,

18 but those aren't mutual obligations that are subject to setoff.

19 Q    You don't know one way or the other whether he has a right

20 of setoff.  Correct?

21 A    I don't believe he -- other than perhaps expenses I

22 don't -- haven't heard any articulated monetary setoff against

23 the obligations he owes.

24 Q    If the Court orders that his distribution be put into the

25 Court registry, do you still think you've breached your duty to

Seery - Cross/Patel                               97

1  the estate somehow by that?

2  A    I think if the Court orders it, I don't think we would be

3  subject to a breach of liability.  I think that we're here

4  vindicating our responsibilities and our duties to investors.

5  If there's an interceding court order, we will follow it.

6  Q    Thank you.

7            MS. HAYWARD:  I have no further questions.

8            THE COURT:  All right.  I think that was about 17

9  minutes.  Any other examination?  Okay.  You'll have 13

10 minutes.

11           MS. PATEL:  Just a few questions, Your Honor.

12                    CROSS-EXAMINATION

13 BY MS. PATEL:

14 Q    Good afternoon, Mr. Seery.

15 A    Good afternoon.

16 Q    Mr. Seery, I think your testimony was that the fund, let's

17 use RCP -- or I'm sorry, that's the wrong one --

18 A    Dynamic?

19 Q    I think it was the Dynamic --

20 A    Dynamic.

21 Q    -- Income Fund is the one that Mr. Okada has an

22 investment in.  Correct?

23 A    That's correct.

24 Q    Okay.  And the fund has duties to Mr. Okada including

25 fiduciary duties as an investor.  Right?

Seery - Cross/Patel                                98

1  A    That's correct.

2  Q    Okay.  Does Mr. Okada have duties to the fund?

3  A    I don't believe he does, no.

4  Q    Okay.  Did he ever?

5  A    I believe he did.

6  Q    Okay.  That was during his tenure at Highland Capital

7  Management.  Right?

8  A    I think as an officer of Highland Capital Management, the

9  investment manager, he would have had duties to the fund, yes.

10 Q    Okay.  And have you investigated whether he's breached any

11 of his duties to the fund?

12 A    We have looked, we have not seen anything.  We know that

13 the redemptions came in without any objection.  We have not

14 spoken to the individual investors.

15 Q    Okay.  So would it be fair to say then that you haven't

16 concluded your investigation of whether Mr. Okada has breached

17 any of his duties to the fund itself?

18 A    I don't think that would be fair.  I think what would be

19 fair to say is we've taken a look, we see no evidence

20 whatsoever that there were any breaches by Mr. Okada of his

21 duty to that fund, so there would be no reason to undertake an

22 investigation that we had yet to complete.

23 Q    Okay.  And who undertook that investigation, was it just

24 the board or did you have others involved?

25 A    It was the board.

**WWW.JJCOURT.COM**

002381
APP 0606

Seery - Cross/Patel                                                99

1  Q     Okay.  No one else?

2  A     The investigation with respect to the -- we got data from

3  other people but I'm the one who looked at whether there were

4  any claims related to the redemptions, any objections to any of

5  the other distributions, any objections to the fees, and we

6  found none.

7  Q     Okay.  So no outside counsel advised you with respect to

8  whether Mr. Okada had potentially breached any duties to the

9  fund?

10 A     No, again, it's not something that we would have looked at

11 with no evidence whatsoever that there was any sort of

12 complaint or breach.

13 Q     Okay.  All right.  Mr. Seery, with respect to the, I'll

14 call it the agreement because I'm assuming that it is an

15 agreement, that Mr. Dondero's counsel announced on the record

16 regarding putting the funds that would otherwise be payable to

17 Mr. Dondero into the registry of the Court.  Do you have an

18 understanding whether that agreement also extends to Highland

19 Capital Management Services?

20 A     Yeah, just to be clear because, again, we should be

21 precise, Mr. Dondero was not going to receive any money.  The

22 CLO Holdco, which is owned by the charitable DAF has

23 investments in the Argentina Fund and the Dynamic Fund.  It was

24 going to receive money.  Highland Capital Services has around a

25 2 percent interest in RCP, it was going to receive money.

WWW.JJCOURT.COM

Seery - Cross/Patel                        100

1   I understand that Mr. Dondero, through his counsel,
2   directed that the distribution to Highland Capital Services
3   would not be made.  Mr. Okada owns 25 percent of that, he was
4   not consulted.  I know that because I spoke to Mr. Okada.  The
5   distribution with respect to the CLO Holdco has been similarly
6   treated, but that was done by Grant Scott talking to Mr. Nelms
7   (phonetic) for the charitable DAF that controls the CLO Holdco.
8   Q    Okay.  So, again, to be clear, Mr. Okada has not consented
9   to the agreement that was announced on the record with respect
10  to any distributions to Highland Capital Management Services.
11  Correct?
12  A    He has not, but since he doesn't control it and Mr.
13  Dondero does, the agreement is binding.
14  Q    Okay.  And how do you know that Mr. Dondero controls
15  Highland Capital Management Services?
16  A    Mr. Okada told me.
17  Q    Okay.  All right.  Mr. Seery, with respect to Mr. Okada, I
18  believe your testimony was he separated from Highland Capital
19  Management in September of 2019.  Correct?
20  A    I believe I testified that he originally began his
21  separation in the spring, I don't know exactly when it was, and
22  I believe his official resignation was some time around
23  September.
24  Q    Okay.  Would September 30 of 2019 sound about right?
25  A    It -- approximately, I don't know the date.

002383
APP 1649

Seery - Cross/Patel                                101

1  Q    Okay.  So it was towards the end of September though.

2  Correct?

3  A    I don't -- I don't know whether it was September 1,

4  September 15 or September 30, I just don't know the answer.

5  Q    Okay.  And at the time Mr. Okada separated from Highland

6  or any time before then, did Mr. Okada have a non-compete

7  agreement?

8  A    I have not looked at Mr. Okada's contract.

9  Q    Okay.

10  A    So I don't know.

11  Q    All right.  Does -- did Mr. Okada have something called a

12  non-solicit --

13  A    I don't know.

14  Q    -- where he wouldn't solicit clients for example of

15  Highland Capital Management?

16  A    I don't know.

17  Q    Okay.  Did Mr. Okada have what's called a non-recruit

18  where he wouldn't come in and try and recruit employees of

19  Highland Capital Management?

20  A    Again, because I haven't looked at his contract, if he had

21  one, I don't know that he did, and because I haven't looked at

22  it, and I testified that I haven't seen this severance

23  agreement he's talking about, I don't have any understanding of

24  the terms of Mr. Okada's employment with Highland Capital

25  Management.

002384
APP 0614

Seery - Cross/Patel                     102

1   Q    Okay.  So you just haven't looked at any of those things.

2   A    That's correct.

3   Q    All right.  Are you aware -- well, did you have an

4   opportunity to look at -- I believe there was a press release

5   that was somewhere around September 2019 where Mr. Okada said

6   he was actually retiring from Highland Capital Management?

7   A    I would have no reason to have looked at such a thing in

8   September.

9   Q    Okay.  All right.  So you haven't seen that.  Let me ask

10  you another question, are you aware that Mr. Okada has a new

11  business by the name of Sycamore Tree Capital?

12  A    I'm aware that he intends to start a new fund, I have no

13  idea what the name is and I'd have no idea what development --

14  stage of development it's in.

15  Q    Okay.  Are you aware if any Highland employees have been

16  engaged by Sycamore Tree Capital

17  A    I'm aware that at least one maybe, I'd have no idea

18  whether that employee, ex-employee now, is involved or not.

19  Q    And isn't that employee Troy Parker?

20  A    That's correct, yes.

21  Q    Okay.  What did Troy Parker do for Highland Capital

22  Management?

23  A    Most recently he ran the PE book.

24  Q    Okay.

25          MS. PATEL:  No further questions, Your Honor.

WWW.JJCOURT.COM

002385

APP 0612

Seery - By the Court                    103

1          THE COURT:  All right.  We have seven minutes.  Do

2    you have questions, Judge Lynn?  We have a little bit of time?

3          JUDGE LYNN:  No, but I just want to make clear Mr.

4    Dondero's suggestion for resolving the motion was not a

5    dickered agreement, it was a suggestion that we would hope

6    would make life easier for the parties and the Court.

7          THE COURT:  Okay.  Thank you.  Thank you.

8          I had one or two questions.  Is there going to be

9    redirect?  Well, no, you used all your time, you don't get

10   redirect.

11       (Laughter.)

12

13         MS. HAYWARD:  And, Your Honor, I don't have redirect.

14         THE COURT:  Oh, very good.

15                        EXAMINATION

16   BY THE COURT:

17   Q    Let me ask you, sir, I want to revisit Dynamic, that's the

18   one I hear most about obviously since that's the one that Mr.

19   Okada --

20   A    Yes.

21   Q    -- has the distribution rights from.  You know, I was

22   fixated before I came out here a little on the time line.

23   Right?  So the pleadings said Dynamic, the termination date was

24   November 15, 2019.

25   A    Correct, Your Honor.

**WWW.JJCOURT.COM**

002386
APP 0643

Seery - By the Court                    104

1  Q    About 30 days after the Highland bankruptcy was filed.

2  What I heard your testimony to be was that pre-petition the

3  largest third-party investor -- I wrote it down phonetically --

4  A    Realdania.

5  Q    -- Realdania --

6  A    I'm not sure if there's someone in the courtroom who know

7  them.

8  Q    Sounds like a Spanish company maybe.

9  A    I believe they're a European company, it's an investor I'm

10 not familiar with, Your Honor, but I have seen the redemption

11 notices.

12 Q    Okay.  They issued a $65 million --

13 A    I believe it was in the neighborhood of 65 million, yes.

14 Q    And it was pre-petition?  You wouldn't know?

15 A    It was pre-petition, I think it was around 40 percent of

16 the fund.

17 Q    Okay.  I mean do you remember when?  Was I t --

18 A    I believe it was in the spring and it followed a -- spring

19 or early summer and it followed a separate redemption from a

20 different investor.

21 Q    Okay.  So there was another third-party investor, even

22 before Realdania that --

23 A    That's my recollection, yes, Your Honor.

24 Q    -- that was unaffiliated with Highland.

25 A    That's correct.


WWW.JJCOURT.COM

002387

Seery - By the Court                    105

1  Q    Okay.  So it's your business judgment that once these two

2  biggies issued their redemptions, it just wasn't worthwhile to

3  keep this fund going anymore.

4  A    That's correct, Your Honor.  And as I said, Mr. Okada was

5  a driver to that fund and he had left.  He did not actually

6  redeem, but he was being compulsory redeemed as the fund went

7  into liquidation.  So all of the investors, redeemed and non,

8  will be treated the same.

9  Q    All right.  So I guess one thing I'm getting at is timing

10 of Mr. Okada leaving versus timing of these third-party

11 redemptions happening.

12 A    Right.  I could --

13 Q    Is there any --

14 A    I see no connection whatsoever.  And, again, his piece of

15 the fund was about -- I believe it was round 12 percent of the

16 fund.

17 Q    Yeah, his --

18 A    And it's a material amount of money I suppose to most

19 folks, including myself, but it's not -- it wasn't a driver

20 whatsoever that we could see, and he did not redeem.  So the

21 third-party redeemed, Okada was leaving having been the driver

22 of the fund, it was an undersized fund anyway, there was no

23 real valid reason to keep a small fund trying to do this around

24 after Mr. Okada left.

25 Q    Okay.  I'm just wondering whether I should or not, you

002388   APP 0645

                              Seery - By the Court                    106

 1  know, the timing of this.  So this is -- starts spring of 2019,

 2  but then a month post-petition let's terminate this thing.  I

 3  mean who actually makes that decision?

 4  A    Well, the decision to continue forward is made by the

 5  board.  Before that it would have been made by the managers of

 6  the funds or the compliance group.  So I have not looked into

 7  specifically who said, Let's terminate it.  To be perfectly

 8  frank, I don't know --

 9  Q    But it would --

10  A    -- the specifics.

11  Q    -- the manager, Highland?

12  A    It's Highland who determines to terminate it.  Ultimately,

13  if all the investors issued redemption notices, then the fund

14  would have to liquidate --

15  Q    Right.

16  A    -- on its own.  So Highland --

17  Q    Right.

18  A    -- wouldn't have any say about it.  But to put it into

19  liquidation, I believe it was Highland that did it.  Some of

20  the funds, it could be foreign directors, but that's not what

21  happened.

22  Q    Uh-huh.  Okay.  So there are third-party non-affiliated

23  investors still in it, there's 35 million that would go out the

24  door and --

25  A    It's about -- there's a couple of assets that still have

                              WWW.JJCOURT.COM

Seery - By the Court                    107

1   to be liquidated.  Approximately 85 percent of the distribution

2   is to third-party un-affiliated investors.  And then we --

3   we'll have -- we'll retain some cash to make sure that we can

4   manage the liquidation of the fund and the dissolution of the

5   entities.  But we still have to get rid of a small amount of

6   assets that are pretty liquid.

7   Q    Okay.  Now I heard you also say that Highland isn't owning

8   any fees anymore on these refunds.  Did I not hear you say

9   that?

10  A    Yeah, certainly -- so I think on ours I think.  On Dynamic

11  and on AROF, the Argentina Recovery Opportunity Fund, once they

12  were put into liquidation they don't earn any fees anymore.

13  The --

14  Q    Okay.  Let me -- okay, so when did that stop, when were

15  they "put into liquidation" so the management fees stop?

16  A    I believe that Dynamic would have been in the fall, I

17  don't know the exact date, and Argentina --

18  Q    Well --

19  A    -- was before that.

20  Q    -- the Court termination date used in the pleadings was

21  November 20, 2019.

22  A    Yeah, but I don't recall the exact date, Your Honor.  We

23  can certainly figure that out, I just don't recall off the top

24  of my head.  When the fee cutoff date -- the fee cutoff date

25  for RCP was I believe in April of 2018 when the one-year

002390
APP 0647

Seery - By the Court                     108

1  extension was given.  That was the trade for the extension.

2  Q    Okay.  But you don't know for sure when the management fee

3  cutoff was --

4  A    No.

5  Q    -- on either Argentina or Dynamic.

6  A    No, that's correct, Your Honor.

7  Q    I mean would it have been in November 2019 you think?

8  A    I think it was before that, but I don't -- I believe so

9  but I don't know for sure.

10 Q    Okay.

11 A    If I'm wrong, I'll figure that out and correct it to you.

12 Q    Okay.  All right.  Thank you.  You're --

13 A    Thank you.

14 Q    -- excused.

15 A    Thank you.

16        THE COURT:  Does anyone in the room know the answer

17 to that?

18        MS. HAYWARD:  Your Honor, we can figure it out very

19 quickly I think.

20        THE COURT:  Really?  Okay.

21     (Pause in the proceedings.)

22        THE COURT:  Actually I had one more question for Mr.

23 Seery.

24        THE WITNESS:  Yes.

25 BY THE COURT:

APP 1616

Seery - By the Court                    109

1  Q    Do we have any other Highland managed funds out there that

2  are imminently going to be going into wind-down mode?  Is that

3  easy to answer?

4  A    We have a number of CLO funds that are what we call 1.0

5  CLOs.  They're old and they're effectively winding down.  And a

6  number of those we don't get fees off of, but they had --

7  because they own very illiquid assets, we have to realize on

8  those assets.  May of those have cross-ownership to funds that

9  we do get fees on.  We need --

10 Q    Let me back you up.  Why didn't Highland get fees on

11 those?

12 A    Because sometimes in the CLO structure it depends on what

13 kind of asset gets treated under the net asset value, so for

14 example if it's equity, it may not count, even if it has a

15 value, you don't get paid a fee on it.  So if you had a loan

16 that converted to equity, some of those CLOs you  may not get a

17 fee on because you don't own any loans anymore.  So, but most

18 of those assets, if a CLO owned equity for example in a PE

19 company, we would have other funds that owned additional equity

20 in that same PE company.

21       We do have other assets where they aren't necessarily

22 wind-down, but there will be distributions to entities that may

23 or may not be related parties under the protocols, and we are

24 in the process, and the Committee's aware of it, selling

25 certain assets, and hopefully those sales will go the way we

WWW.JJCOURT.COM

Seery - By the Court                    110

1  want them to.  They're valuable assets so we feel we have a

2  good opportunity to realize good value for the estate.  There

3  would be requirements on certain of them to pay off debt from

4  certain entities before we can distribute money back up to

5  Highland Capital.

6  Q    All right.  Thank you.

7  A    Thank you.

8            THE COURT:  You're excused.

9            All right.  Anything else today?

10           MR. POMERANTZ:  Do you want to hear closings, or have

11  you heard enough, Your Honor?

12           THE COURT:  I mean if you  have a quick one or two

13  minute closing, I'll hear that, to recap anything.  Did you

14  have that quick answer that Ms. Hayward --

15           MR. POMERANTZ:  We are --

16           THE COURT:   -- was confident about?

17           MR. POMERANTZ:  We are trying to find it.

18           THE COURT:  Okay.

19           MR. POMERANTZ:  We have a couple of emails out,

20  hopefully by, we get a couple of answers.

21           THE COURT:  Okay.  Okay.

22            CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23           MR. POMERANTZ:  Your Honor, I just wanted the

24  highlight the fiduciary duty as you -- I know it was a subject

25  of discussion with Mr. Seery, cross-examination.  Again, as you

**WWW.JJCOURT.COM**

111

1    heard, and as the only evidence before Your Honor is, Mr.

2    Seery, who as Your Honor knows is a restructuring lawyer,

3    practice in it.  He's fully aware of what the fiduciary duty

4    requires.

5           And first and foremost, I think it may even be 28 USC

6    959, the Debtor has to operate in accordance with applicable

7    law.  Every debtor before Your Honor has to act in accordance

8    with applicable law, and if the debtor is not acting in

9    accordance with applicable law, then they are creating

10   liability.  As Mr. Seery testified, that is exactly what that

11   the Debtor is doing. And this concept of dueling fiduciary

12   duties or the board taking certain actions that just happened

13   to benefit insiders as indicating that they are not looking out

14   for the estate is just not accurate.  That's not how the law

15   works and I think Mr. Seery said it correctly, that the Debtor

16   fulfills its fiduciary duty to the estate by operating in

17   accordance with applicable law.

18          With respect to 105, Your Honor, the cases cited by

19   the Committee don't support granting injunctive relief forward

20   of attachment without going through the necessary process.

21   They do cite the DeLorean case which at first blush sounds like

22   a court authorized the holding of money, but if you read that

23   case carefully, it was done because there was a complaint and

24   because the Court ultimately determined that the evidence

25   before the Court established grounds for preliminary

**WWW.JJCOURT.COM**

112

1   injunction.

2          Mr. Clemente has asked Your Honor to hold that the

3   objection filed satisfies the standard.  But the objection

4   isn't a legal document.  The Committee has not put on any

5   evidence to support any claims that exist.  The testimony from

6   Mr. Seery is that there's a claim under a note and that there

7   are defenses to the note.  So Your Honor does not have the

8   sufficient evidentiary basis in order to meet the standards of

9   the injunction of which irreparable harm -- there's a whole

10  host of reasons.

11         So while we understand what the Committee wanted to

12  do.  If they wanted to file an action, they could have.  We

13  don't expect them to have completed their investigation on all

14  the types of claims they're looking at.  But they've been aware

15  of this Okada note for a couple of months.  It would not have

16  been difficult for them to file, as they have standing, a

17  lawsuit to recover any.  They asked us to issue a demand note,

18  we did, and we got the answer.

19         So, Your Honor, I don't think there's a basis under

20  105, the way it's being used here and the lack of evidentiary

21  record to support it.  And for those reasons, Your Honor, we

22  would ask that Your Honor support the motion and other than the

23  distributions that are being held in the registry, allow the

24  distribution to be made to Mr. Okada.

25         THE COURT:  Okay.

**WWW.JJCOURT.COM**

113

1              MR. POMERANTZ:  Thank you, Your Honor.

2              THE COURT:  All right.  Other quick closings?

3              MR. CLEMENTE:  Your Honor, I'll be very quick.

4       CLOSING ARGUMENT ON BEHALF OF THE COMMITTEE

5              MR. CLEMENTE:  There's obviously a lot more that I

6       could say, but I'll be respectful and be very quick.

7              First of all, Your Honor is the judge and you're the

8       one that determines what the law is and what the duties

9       ultimately are for this Debtor.  Mr. Seery I think indicated in

10      his testimony that, for what it's worth, he does not believe

11      that there would be a viable claim for breach of fiduciary duty

12      if Your Honor ordered the distribution to Mr. Okada be put in

13      the Court registry.

14             I think the testimony was clear from Mr. Seery that

15      Mr. Okada, at all times relevant, when all the things that

16      happened that involved the Redeemer Committee, that involved

17      Acis, that involved UBS, Mr. Okada was at least co-Chief

18      Investment Officer and we all know he was co-founder of

19      Highland.  I think Your Honor's questions, and perhaps

20      frustration with sort of trying to figure out some of the

21      answers, show how interrelated all of these things are and the

22      various capacities and roles that Mr. Okada had back at the

23      time when all these different transactions occurred.

24             I think the testimony we heard is that Mr. Seery did

25      a lot of work around why we should pay Mr. Okada, but almost no

WWW.JJCOURT.COM

114

1  work around why we shouldn't pay Mr. Okada.  And so I go back

2  to what I said earlier, Your Honor, I think Mr. Okada is

3  perfectly capable of coming into this court and arguing that

4  once the monies that were put into this Court's registry should

5  be distributed to him, he can come in and do that.

6          But I think for purposes of today, Your Honor has

7  heard more than enough to come to the conclusion that the

8  appropriate remedy here is to place the money within the

9  registry of this Court.  It satisfies the fiduciary duty of the

10 Debtor and it protects the interest of Mr. Okada, who is free

11 to come into this court and make whatever argument he so

12 chooses as to his entitlement to those funds.

13         Unless Your Honor has any questions of me, I'll sit

14 down.

15         THE COURT:  Thank you.

16         MR. CLEMENTE:  Thank you.

17         THE COURT:  Anything else?

18         MR. POMERANTZ:  Your Honor, in answer to you

19 question, November 11 was the date that the fees were no longer

20 payable to the Debtor in the Dynamic Fund.

21         THE COURT:  November 11 post-petition.

22         MR. POMERANTZ:  Correct.

23         THE COURT:  I like being transparent and I -- and so

24 I sometimes share my thoughts hoping that it will help.  But

25 I'm -- you all get why I'm fixated on this point?  Maybe I'm

002397
APP. 1624

115

1    sharing my thoughts when I don't have to.  But the time line

2    looks suspect, whether it should be or not, it looks maybe

3    problematic.  Do you see what I'm saying?

4         We had this fund that I understand never got to real

5    scale and in spring 2019 we have a couple of big unrelated

6    third-parties -- third-party investors issue redemptions and

7    that makes it really not a very worthwhile fund, so maybe it

8    should go into wind-down mode.  Nevertheless, Highland has been

9    continuing to get its management fee.  I don't know how much

10   management fee, but it's been getting a management fee until it

11   files bankruptcy, and then, Oh, let's wind this sucker down.

12        Do you see what -- you know, I don't know.  I mean

13   again, a hearing for another day.  But this is the kind of

14   thing I get concerned about, and maybe kind of want to look

15   into the bona fides of the decision making process to wind

16   down, let's terminate this thing and make disbursements.  And,

17   you know, did we have any fingerprints of this on insiders that

18   should make me troubled.  I don't know.  I mean if I'm going

19   out on a lark here, just stop me.

20        MR. POMERANTZ:  Well, look, Your Honor, I certainly

21   understand why you're concerned.  As you said at the first

22   hearing, you have stuff in your head that you can't forget, and

23   I understand.  I wasn't around but I understand the history and

24   especially the history with certainly similar things that may

25   have happened in the Acis case.

116

1    The facts are that Realdania made its redemption

2  request on August 15, the fees that the -- August 15, but that

3  the liquidation was the time where the management fees stopped,

4  which incidentally were $12,000 a month based upon the level of

5  this spot.

6    THE COURT:  Okay.

7    MR. POMERANTZ:  So, Your Honor, I understand your

8  concerns, however, what I would say is, you have Mr. Seery here

9  answering your questions.  You have Mr. Seery who said he's

10  conducted an thorough investigation.  At some point, and I'm --

11  you know, obviously you brought up a couple of questions, at

12  some point the creditors -- Your Honor has to accept that if

13  the board has done a thorough analysis, and we're coming into

14  this hearing today, and before we filed the motion, as Mr.

15  Seery said, we crossed all our Ts and dotted all our Is.

16    We spent a lot of money collectively, the different

17  firms that are involved, because we wanted to make sure it's

18  the right thing.  We understood that coming to Your Honor

19  asking to pay investors who are related parties, given the

20  context of this case and given the Committee's opposition, was

21  going to be a big challenge.  We thought it was the right thing

22  to do, but we wanted to make sure Your Honor knows that the

23  board actually did a thorough investigation, again, spearheaded

24  by Mr. Seery, who is not just someone off the street, but as he

25  testified, this is what he's done over the last 10-15 years.

002399

APP 4626

117

1          So I certainly understand Your Honor's concerns.  Mr.

2    Seery I think has testified about the thorough investigation,

3    and that the 12,000 a month, that I think if he got back on the

4    stand, he would testify that would be a breach of duty to the

5    investors to continue on getting fees.  There's an obligation

6    at some point, when the redemptions happened, to either pay the

7    redemptions, put the fund in liquidation, and that's what

8    happened.

9          And just because it wasn't done by the board, it was

10   done before, it was important, as I mentioned in my opening,

11   and as Mr. Seery testified, he looked at that carefully and

12   thoroughly.  He didn't want to be embarrassed, we didn't want

13   to be embarrassed coming in and not having those answers.  So,

14   Your Honor, this is a long way of saying I think at some point

15   the board is entitled to the deference of business judgment if

16   they can demonstrate that they've gone through the process

17   necessary to earn the deference to business judgment, which I

18   think Mr. Seery has done.

19          THE COURT:  Okay.  And while we're on the subject, I

20   mean 12,000 a month was the management fee to Highland from

21   Dynamic.  What was the management fee from Argentina, do you

22   have that off the top of your head?

23          MR. SEERY:  It would have been in the same -- these

24   are approximately --

25          THE COURT:  The same range?

118

1          MR. SEERY:   -- the same neighborhood.

2          THE COURT:  Okay.

3          MR. SEERY:  That the meetings would be based upon

4    fees.

5          THE COURT:  Okay.

6          MR. SEERY:  Or the redemptions (indiscernible)

7    variable asset now (indiscernible).

8          THE COURT:  Okay.

9          MR. SEERY:  (indiscernible).

10         THE COURT:  Okay.  All right.  Just a minute while I

11   do some math.

12       (Pause in the proceedings.)

13         THE COURT:  All right.  I'm doing this math in my

14   head.  There's a $7.4 million note receivable from HCM Services

15   of which Okada is the 25 percent owner of.

16         MR. POMERANTZ:  Your Honor, 7.4 is not the demand

17   notes.  Again, 985,000 is the demand notes.  The rest of those

18   notes are performing and not in the fall.

19         THE COURT:  Okay.  All right.  With regard to the

20   motion and the objection and the Committee there's been a lot

21   of argument about 105 and what it permits the Court to do and

22   what it doesn't as far as fashioning an equitable remedy here.

23   Here I mean it's clear that this Debtor has receivables owed by

24   these related parties, although they don't necessarily match up

25   perfectly with the amount of disbursements that are owed by

WWW.JJCOURT.COM

119

1  these funds and of course the funds are separate legal entities

2  than the Debtor.  So I'm not glossing over that fact or

3  ignoring that fact.

4       But I do think the Court has broad equitable powers

5  to remedy -- to fashion remedies that preserve the status quo

6  and I think it is appropriate here to order that most of this

7  money, that most of the 8.6 million that would go to related

8  investors in these three funds, be put into the registry of the

9  court pending further motions, orders, adversary proceedings

10 anyone wants to file to make a claim to that money.  I said

11 most of it.

12       I am going to order that with regard to the amount

13 that would be payable to Mr. Okada, the 4.176 million, we will

14 subtract from that the 1.3 million that represents the demand

15 note receivable that the Debtor has so that I'm essentially

16 doing an equitable offset at that point.  So he can only be

17 paid -- he should only be paid from the Dynamic Fund whatever

18 4.176 million minus 1.3 million is, and the rest shall be put

19 into the registry of the court.  And everybody's rights are

20 reserved on anything and everything with regarding to do tos

21 and do froms.

22       I reserve the right to supplement in more detail in a

23 written form of order to justify the Court's 105 action here.

24 But, Mr. Pomerantz, I'd ask you to upload a form of order on

25 this, please.

**WWW.JJCOURT.COM**

120

1          MR. POMERANTZ:  We'll be happy to, Your Honor.  We'll

2   circulate it to the Committee and Ms. Patel as well.

3          THE COURT:  All right.  Well, thank you all, and --

4          MR. CLEMENTE:  Your Honor, but just to be clear

5   though, the other amounts, correct, to HCM Services and CLO

6   Holdco, would that be part of the order or what did Your Honor

7   have in mind with respect to that?

8          THE COURT:  Well --

9          MR. CLEMENTE:  Because I believe those are to be

10  deposited with the Court as well, yes.

11         THE COURT:   -- all of -- everything gets deposited

12  in the registry of the court, except Mr. Okada will get

13  whatever the differential is of 4.176 minus 1.3.  Okay?

14         MR. CLEMENTE:  Thank you, Your Honor.

15         THE COURT:  All right.  Thank you.

16         COURT SECURITY OFFICER:  All rise.

17                              *****

18

19

20

21

22

23

24

25

002403   APP. 1639

121

# **C E R T I F I C A T I O N**

We, DIPTI PATEL, KAREN WATSON and TERRI STARKEY,
court approved transcriber, certify that the foregoing is a
correct transcript from the official electronic sound recording
of the proceedings in the above-entitled matter, and to the
best of my ability.


/s/ Dipti Patel
DIPTI PATEL


/s/ Karen Watson
KAREN WATSON


/s/ Terri Starkey
TERRI STARKEY
J&J COURT TRANSCRIBERS, INC.        DATE:  March 6, 2020

002404

APP. 1631

# EXHIBIT 16

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

```
                              )   Case No. 19-34054-sgj11
In Re:                        )
                              )
HIGHLAND CAPITAL              )   Dallas, Texas
MANAGEMENT, L.P.,             )   June 15, 2020
                              )   1:30 p.m. Docket
        Debtor.               )
                              )   UBS'S MOTION FOR RELIEF FROM
                              )   THE AUTOMATIC STAY TO PROCEED
                              )   WITH STATE COURT ACTION (644)
                              )
_____)
```

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

```
For the Debtor:          Jeffrey N. Pomerantz
                         Alan J. Kornfeld
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         10100 Santa Monica Blvd.,
                          13th Floor
                         Los Angeles, CA  90067
                         (310) 277-6910

For the Debtor:          Robert J. Feinstein
                         Greg Demo
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         780 Third Avenue, 34th Floor
                         New York, NY  10017-2024
                         (212) 561-7700

For the Debtor:          Melissa S. Hayward
                         Zachery Z. Annable
                         HAYWARD & ASSOCIATES, PLLC
                         10501 N. Central Expressway,
                          Suite 106
                         Dallas, TX  75231
                         (972) 755-7104

For UBS Securities, LLC: Martin A. Sosland
                         BUTLER SNOW, LLP
                         5430 LBJ Freeway, Suite 1200
                         Dallas, TX  75240
                         (469) 680-5502
```

2

```
 1   APPEARANCES, cont'd.:

 2   For UBS Securities, LLC:    Andrew Clubok
                                 Sarah A. Tomkowiak
 3                               LATHAM & WATKINS, LLP
                                 555 Eleventh Street, NW,
 4                                 Suite 1000
                                 Washington, DC  20004-1304
 5                               (202) 637-2335

 6   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
 7                               One South Dearborn Street
                                 Chicago, IL  60603
 8                               (312) 853-7539

 9   For Alvarez & Marsal,       Michael A. Rosenthal
     Investment Manager,         GIBSON, DUNN & CRUTCHER, LLP
10   Highland Crusader Funds:    200 Park Avenue
                                 New York, NY  10066
11                               (212) 351-4000

12   For Acis Capital            Brian Patrick Shaw
     Management GP, LLC:         ROGGE DUNN GROUP, P.C.
13                               500 N. Akard Street, Suite 1900
                                 Dallas, TX  75201
14                               (214) 239-2707

15   For Acis Capital            Rakhee V. Patel
     Management GP, LLC:         WINSTEAD, P.C.
16                               2728 N. Harwood Street, Suite 500
                                 Dallas, TX  75201
17                               (214) 745-5250

18   For Redeemer Committee of   Mark A. Platt
     the Highland Crusader       FROST BROWN TODD, LLC
19   Fund:                       100 Crescent Court, Suite 350
                                 Dallas, TX  75201
20                               (214) 580-5852

21   For Redeemer Committee of   Marc B. Hankin
     the Highland Crusader       JENNER & BLOCK, LLP
22   Fund:                       919 Third Avenue
                                 New York, NY  10022-3098
23                               (212) 891-1600

24

25
```

3

APPEARANCES, cont'd.:

| | |
|---|---|
| For Redeemer Committee of the Highland Crusader Fund: | Terri L. Mascherin<br>JENNER & BLOCK, LLP<br>353 N. Clark Street<br>Chicago, IL  60654-3456<br>(312) 923-2799 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX  75242<br>(214) 753-2062 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX  76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

4

Main Document   Page 638 of 722

 1             <u>DALLAS, TEXAS - JUNE 15, 2020 - 1:35 P.M.</u>

 2             THE COURT:  Please be seated.  All right.  This is

 3     Judge Jernigan.  We have a hearing in Highland.  I've got

 4     problems with this chair.  Just a minute.  Here we go.  We

 5     have a motion to lift stay in the Highland Capital case, Case

 6     No. 19-34054.  It's a motion of UBS for relief from the stay

 7     to go forward with litigation in the New York state court.

 8         I'm going to do a roll call, hopefully as efficiently as

 9     possible.  I'm going to first call the names that I think are

10     likely to be with us, and if I don't call your name, at the

11     end of the roll call, if you wish to appear, I'll invite you

12     to go ahead.

13         All right.  First, for UBS, the Movant, I'm guessing we

14     have some Latham & Watkins folks, and perhaps Marty Sosland as

15     well.  I'll start with you.  Mr. Sosland, are you by chance on

16     the phone?

17             MR. SOSLAND:  I am, Your Honor.

18             THE COURT:  Good afternoon.

19             MR. SOSLAND:  I'm on WebEx.

20             THE COURT:  You're on the video?

21             MR. SOSLAND:  Good afternoon.

22             THE COURT:  Good afternoon.  Who else do we have?  Do

23     we have Mr. Clubok, Ms. Tomkowiak?  Who do we have from Latham

24     & Watkins?

25             MR. CLUBOK:  Good afternoon, Your Honor.  It's Andrew

APP. 1625

5

```
 1   Clubok from Latham & Watkins.  And I'm here with my partner,
 2   Sarah Tomkowiak.
 3           THE COURT:  Okay.  Good afternoon.  All right.  So I
 4   think we have four objectors in all.  I'll start with the
 5   Debtor.  Mr. Pomerantz, I'm assuming you're on the phone with
 6   some of your team?
 7           MR. POMERANTZ:  Yes, I am, Your Honor.  I'm also on
 8   the phone with Robert Feinstein, Alan Kornfeld, and Greg Demo.
 9           THE COURT:  All right.  Good afternoon to all of you.
10           MR. FEINSTEIN:  Good afternoon, Your Honor.
11           THE COURT:  All right.  Do we have your local
12   counsel, Ms. Hayward or Mr. Annable?
13           MR. ANNABLE:  Yes, Your Honor.  Zachery Annable and
14   Melissa Hayward on behalf of the Debtor.  We're here.
15           THE COURT:  All right. Very good.  Now I'll take --
16           MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.
17   Before we went to the relief from stay, there was one minor
18   other item that Mr. Demo is going to handle that's resolved,
19   Hunton & Williams' application.  So if he could put the
20   resolution on the record before we go into what's likely going
21   to be a lengthy hearing.  But I didn't mean to interrupt Your
22   Honor from taking appearances.
23           THE COURT:  All right.  Thank you.  You know, I
24   didn't see that on our calendar and I thought in my brain, we
25   continued that to today, I think.  So we'll start with that
```

APP 1626

6

1  once we finish the roll call.

2      All right.  For the Unsecured Creditors' Committee, do we

3  have Ms. Reed, Mr. Clemente?  Who do we have on the phone?

4          MR. CLEMENTE:  Good afternoon, Your Honor.  Matthew

5  Clemente from Sidley Austin on behalf of the Committee.

6          THE COURT:  All right.  Anyone else from Sidley

7  Austin?

8          MR. CLEMENTE:  I think we're -- I think we're set,

9  Your Honor.

10         THE COURT:  All right.

11         MR. CLEMENTE:  Thank you.

12         THE COURT:  What about for the Redeemer Committee?

13 Do we have Mr. Platt or others on the phone?

14         MR. PLATT:  Yes, Your Honor.  Mark Platt is on, and I

15 believe Terri Mascherin from Jenner & Block is on video as

16 well, and Marc Hankin is on the phone --

17         THE COURT:  All right.

18         MR. PLATT:  -- from Jenner.

19         THE COURT:  Ms. Mascherin, Mr. Hankin, are you there?

20         MS. MASCHERIN:  Yes, Your Honor.  Terri Mascherin.

21         THE COURT:  All right.

22         MS. MASCHERIN:  Good afternoon.

23         THE COURT:  All right.  Then --

24         MR. HANKIN:  Marc Hankin, Your Honor.

25         THE COURT:  Okay.  Very good.  All right.  We also

APP. 1627

7

1   had a joinder in the objections by Acis.  Do we have Ms. Patel

2   or others for Acis?

3          MR. SHAW:  Yes, Your Honor.  Brian Shaw and Ms. Patel

4   are on for Acis.

5          THE COURT:  All right.  Well, those are all --

6          MS. PATEL:  Good afternoon, Your Honor.

7          THE COURT:  Oh, go ahead.

8          MS. PATEL:  Good afternoon, Your Honor.  This is

9   Rakhee Patel.

10          THE COURT:  All right.  Thank you, Ms. Patel.

11      Those were all of the most likely appearances.  If you

12   want to appear and you've not appeared yet, you may go ahead.

13   (Pause.)  All right.

14          MR. ROSENTHAL:  Good afternoon, Your Honor.  Michael

15   Rosenthal from Gibson Dunn on behalf of Alvarez & Marsal.

16   They're the investment manager of the Highland Crusader Funds.

17          THE COURT:  Okay.  Thank you, Mr. Rosenthal.

18      Any other appearances?

19      All right.  Well, Mr. Pomerantz, or I think you said --

20          MR. DEMO:  Your Honor?

21          THE COURT:  -- Mr. Demo wanted to present the

22   resolution of Andrews Kurth Hunton & Williams' employment.

23   You may go ahead.

24          MR. DEMO:  Yes.  Thank you, Your Honor.  Greg Demo on

25   behalf of Highland Capital Management.

8

1     We did work with the Committee to come to a resolution on

2   this retention application.  We are looking to retain Hunton

3   to help us with a tax situation arising from a 2008 tax audit.

4   The Committee had some reservations, and we're able to resolve

5   them.  The resolution that we have is that the engagement, at

6   least in the first instance, will be limited to a certain time

7   period, and that's between June 15th through September 30th.

8   And it'll also be capped at a specific dollar amount, which is

9   $65,000 a month that is calculated on an average rolling basis

10  over the period.  So, total of fees of $227,500, although,

11  obviously, everybody will work to keep those fees down.

12     At the end of that period, the end of the September 30th

13  period, the idea is that either we'll come to a further

14  agreement with the Committee on how to expand the retention of

15  Hunton, or else we'll come back to this Court and seek a

16  further retention.

17     The Committee would reserve all of their objections, if

18  they had any, to the expanded retention, and the only

19  objection that they would not retain would be objecting to

20  Hunton's fees based on the fact that their retention was not

21  expanded.

22     All fees would be applied for under Section 330 and all

23  the other applicable provisions of the Bankruptcy Code.

24     And that is the resolution that we have with the

25  Committee, Your Honor, on the Hunton retention.

9

```
 1            THE COURT:  All right.  Very good.  Mr. Clemente,
 2   will you confirm that that reflects the deal?
 3            MR. CLEMENTE:  Your Honor, Matthew Clemente on behalf
 4   of the Committee.
 5      I will, Your Honor.  I will confirm that.  As Your Honor
 6   undoubtedly is aware, we're keenly focused on making sure that
 7   Debtor funds, you know, benefit only the Debtor estate and not
 8   other parties, and that was really the issue we had in dealing
 9   with Mr. Demo.  But he accurately reflected our agreement.
10            THE COURT:  Okay.  Very good.  Well, I thank you all
11   for working that out, and I'd be happy to sign an order to
12   this effect.  So if you could please electronically submit it,
13   Mr. Demo.
14            MR. DEMO:  Will do, Your Honor.
15            THE COURT:  All right.  Well, the main event today,
16   as we have discussed, is the motion to lift stay of UBS.
17   Before we talk about oral -- or, opening statements, are there
18   any housekeeping matters or announcements, stipulations,
19   anything of that nature that affects how we proceed this
20   afternoon?
21            MR. CLUBOK:  Yes, Your Honor.  Again, Andrew Clubok
22   on behalf of UBS.
23      The parties, all of the parties have agreed that all of
24   the exhibits that are attached both to UBS's motion and to all
25   of the Objectors' papers, all of them, with one exception,
```

APP. 1649

10

 1   which I'll explain, are to be admitted for purposes of this

 2   hearing only.  So, we've all stipulated to their admission.

 3   We won't (inaudible).  And they're -- they will be deemed

 4   admitted for all purposes, but just for this hearing.  We all

 5   reserve the right to object to their use in further

 6   proceedings or other matters.

 7        The one exception and -- is Exhibit D to the Redeemer's

 8   objection.  I believe that -- I believe the Debtor objected to

 9   Exhibit D.  And I think that Redeemer, can't speak for them,

10   but I think everyone agreed that that would need to be

11   admitted for purposes of this hearing.  So that's the one

12   exception.

13            THE COURT:  All right.  I'm going to ask people to

14   speak up or forever hold your peace.  The Court is going to

15   admit into evidence today, only for today's hearing, not for

16   other hearings, all exhibits that were attached to the various

17   parties' -- UBS's motion, the objections -- except Exhibit D

18   to the Redeemer objection.

19        Before I get people's confirmation, let me just clarify

20   one thing.  All parties except the Debtor refer to Exhibit A,

21   B, et cetera to their pleadings.  The Debtor actually filed a

22   separate Appendix A of exhibits at Docket No. 688 with 12

23   items.  I assume that was included in addition to the

24   attachments to the motions and objections.

25            MR. CLUBOK:  Yes, Your Honor.

11

```
 1              THE COURT:  Okay.

 2              MR. CLUBOK:  Those were just duplicative of the

 3    exhibits, is my understanding, --

 4              THE COURT:  Oh, okay.

 5              MR. CLUBOK:  -- that were otherwise filed as part of

 6    the objection.

 7              THE COURT:  All right.  Thank you.  Anyone have

 8    anything to change about this announcement?

 9         All right.  Very good.  So the record is clear, the Court

10    is considering all exhibits attached or submitted by the

11    parties before the hearing, except Exhibit D to the Redeemer

12    objection.

13         All right.  Well, I thank you all.  That saves some time

14    here today.

15         (All parties' exhibits admitted into evidence except

16    Exhibit D to Redeemer Objection.)

17              THE COURT:  Anything else?

18              MR. CLUBOK:  Your Honor?  Yes, there's one other

19    housekeeping issue, and that is UBS filed a motion to request

20    leave to file a reply brief.  And we submitted the reply brief

21    along with that motion.  Oh, dear.  Did we lose -- can you

22    still hear me, Your Honor?

23              THE COURT:  Yes, I can.  Can you hear me?

24              MR. CLUBOK:  Okay.  We had -- yes, we had a technical

25    glitch for a second and it warned me that we were losing
```

12

1  video, but everything's worked out.

2          THE COURT:  Okay.

3          MR. CLUBOK:  So, Your Honor, UBS filed a motion for

4  leave to file a reply.  And by the way, there were further

5  exhibits attached to that, which are part of that stipulation

6  that we just referenced.  Your Honor, I believe, has not yet

7  technically ruled on that, but we -- we wanted to preview

8  those arguments.  We could obviously have just made them all

9  cold here, but there's a lot in there, so we thought it would

10 be helpful to the parties and hopefully to the Court to seek

11 leave to file a reply brief so that everyone can know, you

12 know, plenty of time in advance our response as to many of the

13 different arguments raised in the objection.

14     Your Honor, I think, technically, because of the Rules, we

15 were prohibited from providing you with an unredacted copy.

16 So I think that all Your Honor may have before you right now

17 is a redacted version.  There are some minor issues that to

18 the extent we need to get into those details, we can certainly

19 talk about them in open court.  But we do ask that the Court

20 rule on our motion for leave to file a reply brief.

21          THE COURT:  All right.  Do we have any objections to

22 that?  It was filed, I think, about 6:15 Thursday night, and I

23 saw the motion for leave on Friday.  Anyone have a problem

24 with the Court considering the reply?

25     It's something in our Rules, I think it's pretty common,

13

1   that -- you know, obviously, the motion, the average motion to

2   lift stay that's filed in the bankruptcy court deals with a

3   car or a house and we have very streamlined procedures to, you

4   know, a motion and an objection and that's it.  This is

5   obviously an atypical or something more complicated than usual

6   motion to lift stay.  Anyone have a problem with me

7   considering the reply?

8       All right.  Leave is granted, then, on that.  I will

9   consider the content of that reply.

10       MR. CLUBOK:  Thank you, Your Honor.  And I believe

11  those are all the housekeeping issues that I'm aware of.

12      There was -- Ms. Tomkowiak reminded me -- I guess a motion

13  -- motion to seal.  Some of the exhibits are -- I think both

14  sides are impacted by confidentiality agreements and so forth.

15  I don't think any of the motions to seal on any side are

16  objected to.

17      So perhaps those could all be agreed upon, particularly

18  for our reply brief, and that would allow us to then get you

19  an unredacted copy, if we're permitted, if the motion to seal

20  is granted.  Then you'll be -- we'll be able to get you very

21  quickly an unredacted copy of our reply brief.

22      THE COURT:  All right.  Anyone have a problem with

23  this?

24      All right.  Let me be clear.  We're only talking about the

25  reply and attachments to it?  We're not talking about anything

14

1   else out there?

2           MR. CLUBOK:  That's correct, Your Honor.

3           THE COURT:  All right.  Well, I will grant that

4   motion to seal.

5      So, again, I just want to make sure the Clerk's Office

6   ends up being clear.  You'll end up filing the unredacted

7   version, and then I'll -- I'll be able to, obviously, compare

8   it to what was filed.  And I think -- I'm just thinking

9   through the mechanics.  The Clerk's Office always wants

10  clarity.  I'm giving you permission to file under seal an

11  unredacted version.  It's as simple as that.  So, the Clerk's

12  Office will follow up with you if they need any other piece of

13  paper.

14          MR. CLUBOK:  Thank you, Your Honor.  And would you

15  like -- I think Mr. Sosland can arrange, either by, whatever's

16  the easiest, to give you a courtesy copy, either by email or

17  by messenger, so that you can just quickly look at the

18  unredacted version, if that'll be helpful.

19          THE COURT:  All right.  Well, yes, let's have him

20  send it to my courtroom deputy.   So he should have that email

21  address:  sgjsettings -- wait, is that it?  Or is it

22  sgj_settings@txnb.uscourts.gov?  All right?

23          MR. SOSLAND:  We have it, Your Honor.  Thanks.

24          THE COURT:  Okay.  Very good.  Thanks.

25          MR. CLUBOK:  Thank you very much, Your Honor.

15

1          THE COURT:  All right.  Well, are there any other

2    housekeeping matters?  Otherwise, I presume you all want to

3    make some opening statements to kind of tie this all together.

4       All right.  Well, you may proceed with your opening

5    statement.

6          OPENING STATEMENT ON BEHALF OF UBS SECURITIES, LLC

7          MR. CLUBOK:  Thank you very much, Your Honor, and

8    good afternoon.

9       Your Honor, we're here today seeking relief from the

10   automatic stay provided by Section 362.  And we also ask that

11   the Court enter a related order that will explicitly allow us

12   to preserve UBS's rights to try the state court action, the

13   entirety of the claims that are permitted.  Have a jury.

14   Before a jury.  So we've asked the Court do that in one of two

15   ways, either by noting that pursuant to Section 105(a) or

16   simply by extending the times in the bar date past the trial

17   that we expect to have in the state court.

18      That's why we're here.  Now let me explain why we think

19   that relief should be granted, if I may.

20      Your Honor, very simply, to tie all -- you've got a

21   mountain of paper in front of you.  It is a lot more than the

22   usual motion --

23          THE COURT:  Uh-huh.

24          MR. CLUBOK:  -- for relief, as you noted.  And that

25   paper that you have before you, that mountain of paper and

16

1    those many, many exhibits, are a tiny, tiny fraction of the

2    paper that has been generated over 11 years of litigation in

3    New York state courts.

4       We are here seeking the relief to allow us to proceed and

5    complete that litigation because right now we are literally in

6    the middle of a trial that will finally resolve the claim that

7    UBS brought more than 11 years ago against Highland and other

8    non-debtor related entities.

9       Those claims involve, like I said, not just Highland, but

10   non-debtor entities that are not subject to the bankruptcy

11   stay, against whom we have jury rights, and those claims have

12   been litigated as extensively as certainly any case I've ever

13   been involved with, and according to Justice Friedman, she

14   said this in open court, it was the most complicated case

15   she's ever dealt with, and she's a judge who has dealt with

16   enormous complexity in the New York courts, including much

17   litigation related to the aftermath of the fiscal crisis,

18   Lehman Brothers, et cetera.

19      But after 11 years of litigation, five trips to the

20   appellate court in New York and back down, five different

21   opinions from the appellate court, including a TRO at one

22   point -- they found that we had a substantial likelihood of

23   success on our fraudulent conveyance claims -- after all of

24   that, we get to a trial.  We complete half of that trial.  The

25   second half of the trial is ready to be completed -- granted,

17

1   as soon as the New York courts reopen, but we'll come back to

2   that.  We expect that to certainly be within a matter of

3   months, certainly not years.

4        And we should be allowed to complete that trial, a trial

5   that has already had the judge make credibility determinations

6   about some 20 witnesses that she's seen either live or through

7   videotape deposition designations, almost all of whom

8   testimony will be relevant in the second phase of the trial,

9   many of whom, certainly, Highland's key witness, witnesses and

10  experts.  And she's literally in the middle of that trial.

11  She's in the middle of deciding one of the so-called threshold

12  issues.  Actually, she's already decided it, and we'll get to

13  that.  But this is a case, if any case screams out for relief

14  from the automatic stay, it's this one, to allow us to simply

15  finish the trial that is right now literally in the middle of

16  it.

17       Now, over that 11 years of litigation, I am pretty sure

18  that every single argument that could have been made has been

19  made, ruled on, and/or waived.  And that includes these so-

20  called two new threshold issues that, by my count, Highland's

21  fourth set of lawyers that have touched this case over the

22  years have now come up with and said, oh, gee, here's the key

23  to the kingdom, some new -- two new supposed threshold issues.

24  Those are their arguments in their papers, that if they could

25  just convince Your Honor somehow that our claim for the breach

18

1    of implied duty of good faith and fair dealing that's directly

2    against Highland, somehow that's affected in a way by res

3    judicata that's not consistent with those five appellate court

4    decisions and the countless decisions already by the trial

5    court.

6        And also they want you to rule right now on how the

7    settlement with two prior Defendants in that litigation

8    affects the -- or may potentially affect an offset against our

9    total ultimate judgment.

10       Now, mind you, that issue was already litigated and

11   presented to Judge Friedman, and as reflected in her decision,

12   she said that that -- that issue is properly to be dealt with

13   as a post-trial motion.  She's already ruled on that.  A post-

14   judgment motion, not right here in the middle of the case,

15   where it's -- it's both too late and too early.  It's too late

16   because it's after the deadline for summary judgments and they

17   didn't make this argument.  In fact, they made a very

18   inconsistent argument, and they will be estopped from making

19   this argument.

20       It's also too early because it's not yet at the -- what

21   Justice Friedman ruled in her decision was the impact of that

22   settlement will be decided once we have a final judgment,

23   because Highland had argued that they should get a $70 million

24   setoff and we've argued that they may or may not, depending on

25   what claims we ultimately win at trial.  But it's a fairly

19

1   simple post-trial motion.

2        Justice Friedman already said -- and Highland already

3   urged her to rule on it upfront, in the first phase.  We had

4   briefed the issue, both sides, extensively.  She said no, it

5   can be decided later.

6        But what's happened here is what we have seen time and

7   time again over 11 years litigating with Highland.  As I

8   mentioned, this is their fourth set of lawyers who have been

9   -- whose thoughts have been brought to bear on this

10  litigation.  And we noted in our brief, I think Mr.

11  Pomerantz's firm has spent something like a million dollars by

12  our estimate in developing these new thoughts.  At least

13  according to their fee petition as of a couple months ago,

14  they're already up to $800,000; I'm guessing they're pushing a

15  million by now.

16       And what they've done is simply reargue, tried to

17  relitigate the same issues that have been litigated time and

18  time again.  As we explain -- it's obviously quite familiar --

19  on Page 4 of our reply brief, courts have routinely said you

20  cannot use Chapter 11 to relitigate instead of reorganize.

21  And this is a classic case of what the Debtor here is trying

22  to do.

23       Now, in terms of timeliness -- and I'm going to get to

24  that in a moment -- but in terms of how to deal with those so-

25  called threshold issues quickly, the very fastest way to deal

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Main Document   Filed 09/06/25   Page 654 of 2722   Page 671 of 1017   PageID 3134

20

 1   with those threshold issues is to give us relief from the stay
 2   and let's present those two issues to Justice Friedman.
 3   Because from experience that we've seen and how Justice
 4   Friedman dealt with this the last time it happened, and I'll
 5   talk about that in a moment, Justice Friedman could deal with
 6   those issues extremely quickly.  I would expect she wouldn't
 7   even require briefing by us, because she knows those issues
 8   extremely well, she's written decisions on both of them over
 9   the years, and there's a carefully-studied appellate court
10   decision that relates to them.
11       And Justice Friedman, what she's already done in that
12   case, and Highland knows well, is that after we tried Phase I
13   but before the decision was issued, Highland swapped out its
14   attorneys and came on with I think by then its third set of
15   lawyers.  And when the third set of lawyers came in, after we
16   had already tried Phase I but before Phase II -- so,
17   basically, where we are now -- this was, I've lost track of
18   time, but maybe, you know, eight, nine months ago, or maybe
19   even a year ago, as we were waiting for the decision -- that
20   set of lawyers, they were brought on and they said, well, gee,
21   we've got a brand-new theory that cracks this case wide open.
22   Here's the new theory of Highland can avoid liability.  And
23   Judge, if you just let us bring this up, you won't even have
24   to bother with silly old Phase II and you can just end this
25   thing right now.  It's a simple rifle shot.

21

1    Justice Friedman -- I wish it had been on video, I wish

2    there had been a camera -- let's just say her reaction was

3    clear, unmistakable, and key.  And very quickly she rejected

4    Highland, in no uncertain terms, effort to do that.  Forced

5    them to withdraw the motion.  Explained to them, this is not

6    the proper time to bring new threshold motions, years after we

7    litigated motions to dismiss, years after we litigated summary

8    judgment, years after all those issues went up and down to the

9    appellate courts.

10              THE COURT:  Can I stop you?

11              MR. CLUBOK:  So, Highland knows this.

12              THE COURT:  Can I stop you right there?  I want to

13   make sure I am clear on what the so-called threshold issues

14   that you think Judge Friedman might be able to deal with

15   better, more efficiently.  I have in my brain that you're

16   talking about the res judicata issue, and then also this issue

17   of whether UBS released Highland as to fraudulent transfers

18   that might be related to Redeemer Fund assets.  Does that

19   makes sense?  I'm not sure I said that as crisply as possible.

20   They say that as to these fraudulent transfers you would be

21   pursuing, 80 percent plus were released as part of the

22   settlement with the Crusader Fund.  Are those the two

23   threshold issues, or are there many that I'm not naming?

24              MR. CLUBOK:  You've got them, Judge.  You've got

25   them.  Those are the two issues.  The one, the impact of res

22

 1   judicata, which literally we've had, you know, multiple

 2   different up-and-downs to the appellate court and summary

 3   judgment rulings that are unmistakable that those should be

 4   rejected.

 5       The other one, I would put it more broadly, a little bit.

 6   It's the impact of this prior settlement on our claim.  And

 7   Highland has a brand-new theory of how that settlement

 8   agreement supposedly impacts our claim.  I believe it's -- it

 9   appears from the papers and from what we've been told that

10   this is coming from the Redeemer Committee primarily, because

11   they make the same argument and it seems to be a new argument

12   perhaps they came up with.  Perhaps, in the million-dollars-

13   plus spent, Mr. Pomerantz's firm came up with it.  But

14   regardless, it's a brand-new theory of supposedly how this

15   settlement agreement operates to supposedly cut the legs out

16   of most of our claim.

17       Now, mind you, Highland has already argued to the Court

18   how the settlement agreement operates, and what they've

19   previously argued -- and by the way, these settlement

20   agreements were signed, I believe, five years ago.  For four

21   years and nine months or four years and ten months, we never

22   heard this argument.  Instead, what we heard in the court in

23   New York was, oh, the settlement agreement means that Highland

24   gets $70 million of setoff to the total claim out of -- we

25   were seeking $500 million plus interest.  They said, well, we

23

1   get a total of seventy million point five as a setoff.  And

2   there was arguments back and forth and it was briefed in front

3   of Justice Friedman, and they asked her to rule on that

4   upfront in the first phase of the trial.

5       After the briefing and after the argument that it was a

6   $70.5 million setoff, Justice Friedman, agree with you, yes,

7   and we said, look, it is possible they will get that $70.5

8   million setoff.  We agree.  It depends on what total claims we

9   win at trial.  For instance, if we won complete relief from

10  all of our claims, I think UBS would agree that $70.5 million

11  may well be an appropriate setoff, that amount.  However, if

12  Highland only wins some of its claims, and depending on how we

13  win the claims, they might not be entitled to that $70.5

14  million setoff.

15      Nowhere did Highland ever dream up that this contract we

16  signed with them five years ago somehow meant that they got

17  $200 million off or $400 million off or $800 million off or

18  $950 million off, whatever the new theory is, that somehow

19  that settlement agreement had some incredible destructive

20  power of Highland -- of UBS's claims.  This is the first we

21  have heard of it, you know, three months ago, after four years

22  and nine months of living with the settlement agreement, a

23  course of conduct, clear writing to the contrary, and parol

24  evidence that we, if we ever had to litigate this, we would

25  bring out.

APP. 1654

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 675 of 1017   PageID 3138
Main Document   Page 675 of 732

24

1          But Justice Friedman would just look at, I predict -- it's

2     always dangerous to predict what a judge will do -- but we

3     have seen how Justice Friedman reacted to the last set of

4     Highland lawyers who came in after the trial and tried to

5     create a new argument that they hadn't raised before, post-

6     summary judgment, post even the trial starting.  I suspect

7     Justice Friedman would be able to handle this quickly.

8          I've only given you, even on this one little issue, I've

9     given you a very superficial statement about it, because it

10    goes back years of having -- entering into this agreement,

11    living with it for years, having a course of conduct that

12    reflected how the parties interpreted this agreement and what

13    it meant and how it didn't reduce -- if Highland had thought

14    that that agreement reduced our claim from a billion to $950

15    million, I'm pretty sure they would have argued it four and a

16    half years ago or 4.11 -- four years and eleven months ago.

17         The fact is, it's a brand-new argument.  We could prove

18    that if we had to litigate it.  But if we had to litigate it,

19    there's no one better, with all due respect, Your Honor, there

20    is no judge in the country more equipped to handle that issue

21    and every other issue relating to this case than Justice Marcy

22    Friedman, who has been living with this case almost as long as

23    I have.  I think she's on her eighth year now of overseeing

24    this case, through all these different iterations, all these

25    different efforts by Highland to delay proceedings and to

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 659 of 722   676 of 1017   PageID 3139

25

1   avoid ultimately getting to a jury, which will finally set our

2   -- the liability they owe.

3       So, and by the way, those two supposed threshold issues,

4   what Highland tells you is, well, gee, Judge, if you just rule

5   on them -- first of all, you learn about them and hear about

6   how we characterize what was said in front of Justice

7   Friedman, trying to tell you third-hand what we said,

8   reconstruct what the parties have argued there, ask you to

9   revisit her ruling.  If you do all that, and by the way, if

10  you rule in their favor, then somehow there's going to be a

11  significant reduction in our claim for fraudulent conveyance.

12      It's not even true.  Their math is wrong.  Even if they

13  were right about all that, we'd still have a claim for

14  fraudulent conveyance of over $150 million.  So, again, I

15  could write a whole brief explaining that to you.  Justice

16  Friedman would know it off the top of her head.

17      But even if all that happened, it would not impact our

18  claim for breach of implied duty of good faith and fair

19  dealing, a claim that has survived summary judgment, survived

20  an interlocutory appeal, which, by the way, Highland obtained

21  a stay from -- this trial would have been done years ago

22  except Highland obtained a stay from the loss of summary

23  judgment on our breach of duty of good faith and fair dealing.

24  It went up to the appellate court and the dismissal -- denial

25  of summary judgment was sustained and we finally got to go

26

1   forward with the trial.

2       So, this little one issue that's supposedly a threshold

3   issue, it alone has enough complexity to take up months of

4   this Court's time.  And nine, you know, nine out of ten of the

5   results of that is not going to impact Highland's argument --

6   or, Highland's claim or Highland's defense in anything like

7   the way they tell you it will.  And we'd have to brief that

8   extensively and you'd be asked to decide it, you'd be asked to

9   ignore what Justice Friedman already said about this very same

10  issue.  All of that doesn't make sense when we're right in the

11  middle of a trial.  And those are the two supposedly threshold

12  issues.

13      Now, what else will deciding those two supposedly

14  threshold issues not get you?  Or not get any of the parties?

15  What it won't get is, if we go forward as the Debtor now wants

16  to do, we will be stuck with two parallel proceedings.  We

17  have claims against non-debtor affiliates to the tune of well

18  over a hundred million dollars, from non-judgment-proof

19  defendants including in that.  We have these claims.  We have

20  a right to a jury.  They are not subject to the automatic

21  stay.  And we will proceed in front of a jury, as we're

22  scheduled to do in New York state court.

23      Now, what does Highland say to that?  They say, well, you

24  know, we haven't done it yet, but one day we could try to

25  remove those claims.  Then we could ask the federal court in

27

New York to transfer those claims to the federal court here in
Texas.  Then we could ask the Texas court to refer it to Your
Honor for a bunch of other proceedings, only so, at the end of
the day, that referral then is withdrawn so that we could
actually try it with a jury I guess in federal court in Texas.

I mean, it doesn't get us to a different place, because
ultimately we will have a right to -- even if they get what
they dream of, we'll have a right to try those claims in front
of a jury, and those claims substantially overlap in terms of
witnesses, facts, you know, all the -- the total trial, with
the claims that they're saying, well, gee, you could just try
them here after the threshold motion.  Then you're going to
have a trial here on the nonjury claims.

And, you know, Your Honor, that's best-case scenario.
Because what actually will happen, if they ever remove the
case and if they try this maneuver of getting it to Your
Honor, we will, as we've made clear in our reply brief, as we
made clear in our opening brief and then clarified in our
reply brief, we will seek mandatory abstention, or in the
alternative, permissive abstention.  And those claims clearly
fall within the rule for mandatory abstention.  They are --
there is no independent basis for jurisdiction for those
claims in this Court.  The claims are a non-core proceeding,
the ones against the non-debtors.  The actions are obviously
commenced in state court, about 11 years ago.  And they can be

28

1   timely adjudicated there.

2       And basically all the Debtor said in response, this is --
3   their whole defense boils down to this:  Um, we think, because
4   of COVID and the unusual circumstances of COVID, the trial
5   that you would theoretically have will be faster than a trial
6   that the state court will have in New York.  And by the way,
7   when I say you, I mean really the two trials.  That, at the
8   end of the day, there'll be a trial of -- against Highland,
9   and a jury trial against the non-debtor affiliates after the
10  reference is withdrawn after all of the up and down.  And that
11  will supposedly be faster than just finishing things up in New
12  York as soon as the courts open up in a few months, being the
13  first in line with Justice Friedman to finish this trial.

14      Now, that is not -- there's no -- they have certainly not
15  met their burden of proof that that is true, but moreover,
16  it's also not the standard.  We don't have to show that our
17  trial in New York will be two months after than the trial here
18  or two months slower.  The rule and the cases we cite -- we
19  cite these in our opening brief, and they were unresponded-to
20  -- is that the action -- the ability of the Court to timely
21  adjudicate is just something that you are required to analyze,
22  not as a relative matter, not as a prediction of, gee, the
23  state court could be four months and this Court could be two
24  months, or the state court could be six months and this Court
25  could be four months, even if that were possible.  No.  The

APP 1669

29

1   test is whether or not it is timely in and of itself.

2        And the cases that we cite on this issue, you know, in our

3   opening brief, you know, really make it clear the way the

4   Court should look at this.  *In re TransWorld Airlines* and *In*

5   *re Legal Extranet*, the latter being Bankruptcy Western

6   District of Texas, the former being Bankruptcy District of

7   Delaware, the courts both said, in effect, the issue is not

8   whether the action could be more timely adjudicated

9   theoretically here in bankruptcy court, but only that the

10  matter can be timely adjudicated in state court.

11       And Your Honor, as the Plaintiff in that state court

12  action, who've spent 11 years getting halfway through trial,

13  and now the only thing that's stopping us is the ability to

14  ask the Court to set the next available trial deadline, we

15  have hopes the courts will open in the fall.  Worst-case

16  scenario, it'll open up in about six months, in the first

17  quarter of next year, by all expectations.  A few extra months

18  to allow us to decide our case is certainly not -- it's

19  certainly timely.

20            THE COURT:  Okay.

21            MR. CLUBOK:  Because some of the cases we cited --

22            THE COURT:  Mr. Clubok, I want to drill down on that

23  just a bit.  The Phase II, which you hope will be a jury

24  trial, there's the breach of implied covenant of good faith

25  and fair dealing, but there's fraudulent conveyance and alter

30

1 ego. Do I understand correctly those have actually not been

2 pleaded yet, fraudulent conveyance and alter ego? Did I

3 misread, misunderstand, or is that correct?

4          MR. CLUBOK: No, Your Honor, that is incorrect. It's

5 not your fault that you misunderstand it, because, frankly,

6 reading some of the objections makes it very confusing. Okay?

7     For example, alter ego? Alter ego, the alter ego claim

8 that has been properly pled and is the issue that we tried in

9 that case, is an alter ego between two non-debtors, Highland

10 Financial Partners and an entity called SOHC. Acis, in their

11 objection, spent a lot of time trying to explain to you how

12 somehow that you're going to know more about the alter ego

13 claim because since UBS's assets increased in value, somehow

14 it affects the alter ego claim. And I don't blame Acis. They

15 haven't lived with that case for 11 years. I don't think

16 their -- I am sure their counsel didn't do this intentionally.

17 That has nothing to do with our case. What it does is just

18 demonstrate how confusing and complicated the proceedings are

19 in New York and for some new lawyers, particularly ones from,

20 you know, representing either Acis or the Redeemers, who don't

21 really understand our case. They start sending things, and

22 then the next thing you know the Court is I'll just say

23 misunderstanding the claim.

24     The alter ego claim that is going to be litigated in Phase

25 II is one that we have dealt with for years, and it's a part

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/04/25   Page 683 of 722   682 of 1017   PageID 3145

31

1   of our TRO in which we showed a substantial likelihood of

2   success in a decision that we received in the appellate court

3   when we originally froze certain assets.

4       It is -- again, I could write a whole 'nother four page --

5   four -- you know, extended the briefing just on that part of

6   our case.  But suffice it to say that alter ego claim has also

7   gone up and down to the New York appellate courts, that not

8   only was it pleaded, it was pleaded, it survived motions to

9   dismiss.  It went up to the appellate court at least three

10  times.  It was the subject of a summary judgment motion.  They

11  lost the summary judgment motion.  The summary judgment motion

12  was appealed.  They lost that.

13      So that alter ego claim, not only was it pleaded, it's

14  ready to be tried.

15      And by the way, in all of the briefing that the parties

16  did in New York -- I suspect Acis doesn't know this.  I

17  suspect Redeemer -- why would they; it's not their

18  responsibility to know this -- the parties all agreed:  That

19  was a New York State law issue.  The test that the parties

20  have agreed should apply is a New York state test for alter

21  ego.  It, again, relates to two entities that are not the

22  Debtor.  It's complicated by how that relates into the case.

23  But it really just shows the perils of asking Your Honor to

24  come along, after 11 years, and try to figure out what the

25  heck is going on in that case, when Justice Friedman would

APP. 1682

32

1    answer that in five seconds.

2         THE COURT:  Okay.  You're probably getting to this,

3    but you didn't answer the fraudulent conveyance question, and

4    I'm guessing the answer is no, that has not been pleaded yet,

5    and you have to win on the alter ego argument before you have

6    standing to pursue that, or no?

7         MR. CLUBOK:  I hate to say this, Your Honor, but

8    that's incorrect.  Again, I don't like to say that to judges

9    ever.  But what we pleaded from the beginning, or actually

10   from -- I think from maybe 2011, not the -- you know, two

11   years into the case, we amended our pleadings, subject -- and

12   that briefing or those repleadings were subject to motions to

13   dismiss, summary judgment, held argument, et cetera.  Both the

14   fraudulent conveyance and the alter ego have all been pled.

15   They've survived motions to dismiss.  They've survived summary

16   judgments in New York, where you get interlocutory appeals of

17   state court decisions.  They've survived multiple trips up and

18   down in the courts.  And, again, like the alter ego, the

19   fraudulent conveyance was already subject to a -- the TRO,

20   which is -- which is the basis of our TRO.  We presented both

21   the fraudulent conveyance evidence and the alter ego evidence

22   already to the appellate court as a part of getting our TRO.

23   We submitted it all to the trial court as part of defeating

24   summary judgment.  And all of this has been upheld.

25         THE COURT:  Okay.

33

```
 1          MR. CLUBOK:  So, yes, all of that has already been
 2   litigated.  It's not --
 3       (Sound cuts out.)
 4          THE COURT:  Whoops.  What just happened?  What just
 5   happened?
 6       (Pause.)
 7          MR. CLUBOK:  ... issues.
 8          THE COURT:  Okay.  Here we are.  We lost you for
 9   about 30 seconds there, Mr. Clubok.
10          MR. CLUBOK:  Those were my best 30 seconds, Your
11   Honor.
12          THE COURT:  Let me ask you something.  Maybe it's
13   fate.  What I hear you saying, and you may have a lot more to
14   say, but is that if I lifted the stay, there would be great
15   efficiency, Judge Friedman would quickly, quickly deal with
16   these threshold issues, and there has been so much already
17   adjudicated and motions to dismiss and motions for summary
18   judgment and appeals back and forth that you think you'd get
19   to your jury pretty darn fast?  Nobody can say when, but you
20   think you're going to get to a jury pretty fast if it goes
21   back to the state court.  Yes or no?
22          MR. CLUBOK:  Absolutely yes.
23          THE COURT:  And so you -- okay.  Giving you, you
24   know, the benefit of every doubt here, you think -- and I'm
25   going to be as kind as I can be on this -- but a jury of 12
```

34

1    New Yorkers, you know, cab drivers, janitors, nurses, God love

2    them, they are the best trier of fact on issues of credit

3    default swaps and CLOs and offshore transfers?  I'm just

4    trying to get that one, why you want a jury trial on this kind

5    of subject matter.  That's a hard question for you to answer,

6    I suspect.

7           MR. CLUBOK:  No, Your Honor, it's not.  It's easy.

8    All the hard issues, all the complicated questions of CEOs and

9    credit default swaps and CSs, those were already decided by

10   Judge Friedman, who was the finder of fact on the breach of

11   contract claims.  The contract has a jury waiver clause.  So

12   Justice Friedman is the -- she --

13          THE COURT:  Right.

14          MR. CLUBOK:  -- was the finder of fact on those

15   complicated issues.  She's already made factual findings and

16   credibility determinations on all those complicated issues.

17   There are two sets of remaining issues that are -- were

18   scheduled to be tried concurrently.  That is the relatively

19   simple issues of fraudulent conveyance, alter ego, and

20   punitive damages.  Those, we have a right to a jury, as

21   Justice Friedman has already found, against all the

22   Defendants.  Okay?  And we absolutely want our right to a

23   jury.

24       I don't -- Your Honor, we don't do it lightly.  I can't

25   get into the jury research that's been done by both parties,

35

1   but suffice it to say we are one hundred percent (audio gap)

2   we want a jury for the claim.  And we've already told Judge

3   Friedman that's what we're going to do.

4       The more complicated claims, the, gee, what's a credit

5   default swap and all that other stuff, that has already been

6   decided, all those issues, by Judge Friedman.

7       And what happens in the second phase is Judge Friedman

8   gets to say to the jury, I've already decided these following

9   facts.  I will instruct you that you are to accept these facts

10  as true because I've already found them.  That's the way it

11  works in these bifurcated trials where you have a judge

12  deciding some issues and then you have a judge and jury

13  deciding others, in New York state court.

14      We -- the parties spent months and months and months going

15  through how to do this.  We agreed this is -- by the way, I

16  think it was originally Justice Friedman's idea.  Something

17  else in the papers and they try to -- I could write a whole

18  'nother brief about how we ended up with that kind of

19  proceeding.  But it was, I believe, originally Justice

20  Friedman's idea.  Highland's lawyers were very much for it.

21  In fact, they -- they were the ones originally who insisted on

22  the jury.  Originally -- it is the case that long ago we had a

23  noted issues years ago where we hoped that maybe the case

24  would just go faster if we went to a jury and there was no

25  position filed.  But Highland insists on a jury, and under the

36

1   law in New York, when any party insists on a jury, all parties
2   have the right to it.
3       We spent months and months going back and forth on that
4   issue.  Many discussions, both on the record and in chambers.
5   And we got to the point where what Justice Friedman said was,
6   I'll do the hard stuff, I'll do all these hard issues in Phase
7   I, the stuff that maybe we don't trust a jury to do.  But
8   besides, we have a jury waiver.
9       By the way, frankly, Your Honor, I believe in juries.
10  I've had super-complicated cases and we try to make them
11  simple if we can, and, you know, I think New Yorkers or
12  Texans, whether we try -- whether we try these claims in New
13  York or if the defense gets their way and they get to remove,
14  to transfer, or refer down, then withdraw the reference, and
15  we try it to a jury in Texas in federal court, I trust the
16  jury will be able to understand it.  We'll make it simple and
17  we'll make it clean for the jury to understand.  And we're
18  sure as heck not going to waive our right to a jury because
19  now Highland's fourth law firm suggests we could.
20      What's really going on here, Judge, is that they've been
21  in front of Justice Friedman for years.  They know how a lot
22  of these issues are going to come out, because she's already
23  ruled on all these issues.  And we're in the middle of a
24  trial, and except for COVID and except for -- and I haven't --
25  this is the one other issue that I've not really gotten to --

37

except for the detrimental reliance we had on the promise that
Highland made to us back in December, late November/early
December, when we first got this decision, we would have come
right away to the bankruptcy court and said, hey, we're in
middle of a trial.  Justice Friedman had promised us, as soon
as she issued her first ruling, she would set the next
available jury trial date immediately.  That was the deal we
all had.

    We were ready to try the case, if not before Christmas,
certainly in January of 2020.  Certainly, the first quarter.
We would have done that.  We would have come to the bankruptcy
court and we would have said, Give us relief from the
automatic stay because, come on, we're in the middle of a
trial.  There's a bunch of non-debtor affiliates.  This will
go fast -- there's no possible way it could go faster.  And we
were ready to do that, and Highland said to us, their general
counsel, Scott Ellington, said to us, no, no, no, please don't
do that.  There's all these reasons why we don't want you to
do that.  We think it'll facilitate -- we'll work with you in
good faith on settlement.  We want to keep the decision
nonpublic for a while, while we have good-faith settlement
discussions.  We -- we will enter into good-faith settlement
discussions with you, and we will work with you over the next
few months.  And don't you worry, because we will tell Justice
Friedman that if you give us six months, we all agree that the

38

1   trial can happen in six months from now and we'll all push for

2   a speedy trial as soon after what is now June of 2020 as

3   possible.  That was the agreement we reached.

4           THE COURT:  All right.  Mr. Clubok, I'm going to save

5   you some time right here.  If you're arguing that there was a

6   waiver of Highland's right to oppose the motion to lift stay,

7   if you're arguing there's an agreement that should be binding

8   on them to lift the stay, that's just not going to persuade

9   me.  We have other parties in interest who are the

10  beneficiaries of the 362 automatic stay.  So I'm just going to

11  tell you right now, I don't think there's anything more you

12  can say that's going to persuade me on that one.  Okay?

13          MR. CLUBOK:  Appreciate it, Your Honor.  And I will

14  take your advice and not continue, although I will reserve my

15  right to reply to say one more thing about it, or -- if you

16  let me.  But we -- I want to be clear.  We're not saying

17  you're forced to hold -- uphold that agreement, even though we

18  had it in writing and even though we told another -- a judge,

19  a state court judge, that that was the deal.  We're not saying

20  that you're forced to hold it.

21      We are saying that you are entitled to consider, when you

22  balance the equities, and you hear them now saying, gee,

23  there's going to more -- several more months before you get to

24  trial in New York:  Well, sure.  The reason we didn't have a

25  trial back in January was because of that agreement.  That's

39

1    the only part we're saying.  We're not saying you're forced to

2    now hold onto it.  But there was some serious detrimental

3    reliance, because they said that they agreed with us that the

4    right thing to do six months hence from now, after trying to

5    settle, would be to tell Justice Friedman and to try to seek

6    to lift the stay.

7        That's the only reason we bring it up, not because you're

8    bound by it, because we respectfully ask you to consider that

9    when you hear their arguments of, gee, now it's going to take

10   another six months or so, or three months or four months or

11   six months or whatever it'll take in New York.  Yeah.  The

12   reason we've waited six months was because of that agreement.

13   Okay?  That's the only reason I bring it up.

14       The final thing that I want to say, Your Honor, is just

15   that I want to make it clear:  These so-called threshold

16   motions, they are not threshold motions.  They are motions

17   that are rehashing arguments that were made years ago,

18   repeatedly, that they think, because they're not in front of

19   Justice Friedman and because the New York Court of Appeal I

20   guess wouldn't have jurisdiction over however you rule, that

21   they can get away with relitigating issues that have already

22   been decided in litigation, they've already been ruled upon,

23   or they were long ago waived.  Or there's estoppel that

24   applies.

25       And we -- the threshold issues that we would argue about,

002443

40

 1   those so-called threshold issues, are -- is all of that stuff.

 2   But we'd be litigating whether they could even pursue those

 3   claims in front of Your Honor.  Then we'd litigate the merits

 4   of the claims.  Then, even if they were resolved, they don't

 5   take care of 95 percent of the claims that we have against the

 6   Debtor.

 7       If we were in front of Justice Friedman, she would know

 8   what I'm talking about in a heartbeat and she would be able to

 9   rule on this and she'd -- because she's done the same thing

10   when they tried this.  They came up with some brand-new

11   threshold issue about a year ago that they tried to present to

12   her.  They said, hey, don't bother to issue your ruling; we

13   have a new threshold issue that'll just cause us to win.  And

14   she, you know, politely let them have it.  And that is because

15   it's too late, it's past summary judgment, it's already been

16   decided on by the appellate courts in New York, we shouldn't

17   have to relitigate it, that alone is prejudicial, and by the

18   way, won't even have the impact they say.

19       So, Your Honor, I'd just like to conclude this opening.  I

20   really appreciate you giving me all the time to make all of

21   these arguments.  I realize you don't love our they got a

22   promise argument, but I do, like I said, even on that one,

23   there's a reason we raised it.

24       But at the end of the day, there's no court better

25   equipped to conclude these proceedings than Justice Friedman's

41

```
 1   court in New York.  There's no judge in the country who could
 2   possibly ever catch up to her on this case.  There is
 3   definitely no judge in the country who's already made
 4   credibility determinations, in the middle of a trial, in
 5   which, by the way, she'll be called upon to be the fact-finder
 6   again in the second phase, because part of the claims are for
 7   a judge to decide.
 8       So she's in the middle of making these determinations.
 9   She's already seen witnesses.  There was no videotape of the
10   trial so there's nobody who can now jump into the middle and
11   make new credibility determinations.  And Highland, you know,
12   at least the new Highland, the new folks in charge of Highland
13   now, I guess they think a new bite at the apple, a chance to
14   relitigate here in this Court, maybe a different result, maybe
15   confusion will reign and the Court won't understand, you know,
16   what the nature of the claims are or think that, you know,
17   that we just pled these for the first time or they haven't
18   been pled.  For, again, no fault of Acis, no fault of
19   Redeemer, they don't seem to understand these claims, and
20   there's no way they could because they haven't lived with
21   them.  And again, our claims involve claims against non-
22   debtors as well as the Debtor.
23       All of those reasons are why it would be very prejudicial
24   not to lift the automatic stay.  There has been no substantial
25   showing to the contrary.  And UBS, having come forward with
```

42

1   this evidence of cause, showing that cause exists to lift the

2   automatic stay, as Your Honor knows, the Debtor then bears the

3   burden to show otherwise.  They haven't met that burden.  They

4   can't meet that burden.  The things they say in their papers

5   are all what-ifs and speculation and, gee, if we just do this,

6   maybe we'll win this and maybe this will happen.  That is not

7   satisfying the burden to overcome our request for relief from

8   the automatic stay, so that after 11 years of litigation our

9   case can finally finish, be brought to a closure, and we can

10  get a -- one court to conclude this business of deciding the

11  merits of these claims.

12          THE COURT:  Okay.  Just one more question for now.

13  The trial, the bench trial, was 13 days between July 9th and

14  July 27th, 2018 in Phase I.  The judge issued her written

15  ruling -- when was it?  Quite recently, right?

16          MR. CLUBOK:  Well, November of 2019.  So, a little --

17  it was actually issued originally in November of 2019.  The

18  parties, as I said, as part of the deal, we agreed to keep it

19  nonpublic for a while and it wasn't really issued until

20  January because we, in good faith, Highland said they wanted

21  to work with us on settlement, and that's what we started

22  doing.

23          THE COURT:  Okay.

24          MR. CLUBOK:  So it was issued in November of 2019.

25          THE COURT:  Okay.  My point is, does it help you or

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Filed 04/06/25   Page 657 of 2722   694 of 1017   PageID 3157

43

1  hurt you that it took Judge Friedman almost a year and a half

2  to issue the written ruling?  I mean, when I say does it help

3  you or hurt you, help or hurt you, I'm thinking, whoa, the

4  Fifth Circuit would really slap my wrist if I took a year and

5  a half to get a written ruling out.  We have, you know, our

6  slowpoke reports.  If I take more than 60 days to get a ruling

7  out, you know, I'm going to get an embarrassing phone call,

8  perhaps.  That sounds like a very long time.

9      On the other hand, you might tell me, well, she was

10  becoming such an expert during that 18 months that now she'll

11  be really quick.

12      So, what is your response to that?

13          MR. CLUBOK:  Several things, Your Honor.  Originally,

14  when Justice Friedman, we had the trial, she said, you know

15  what, I'll have -- this is complicated.  It was enormously

16  complicated.  And it did take a long time for her to digest

17  the mountains of evidence.  It is not an easy case.  Okay?

18  She said, it'll take me a while, but I'll finish up by about

19  October and then we'll immediately -- then we'll be ready to

20  try the case in the jury trial in October.  That's what she

21  originally said.

22      We had post-trial briefing, though, Your Honor, and the

23  parties both wanted it.  And then, frankly, there was medical

24  issues on the side of the Defendants that were raised, and we

25  were asked to greatly extend the period for post-trial

44

 1   briefing.  We did that, obviously, without a second question,

 2   without, you know, oh my gosh, is it going to delay the trial

 3   for another few months, our decision, even though it'd been

 4   ten years.  We didn't -- we -- and counsel, I'm sure, I'm a

 5   hundred percent certain, would confirm this.  They were very

 6   appreciative.  And we just said, you know, take whatever time

 7   you need.

 8       That significantly delayed the post-trial briefing.  So

 9   the post-trial briefing wasn't completed until, I believe, you

10   know, after the original time she was going to do her trial.

11   So that was a big delay.

12       The other thing that happened was Highland then brought in

13   new counsel.  And like I said, they all of a sudden -- so we'd

14   already tried the case.  We'd already done the post-trial

15   briefing.  Highland then brings in new counsel.  That was

16   their third firm.  And those counsel said, hey, we've been

17   looking at the record and we see a massive issue that the

18   other two prior counsels missed and now we want to bring a new

19   threshold motion.  That's what they call it, a new threshold

20   motion.  And then we got deterred on that, with them seeking

21   to bring -- file leave to bring new threshold motion and

22   asking the judge and we got delayed on those things as well.

23       The -- that motion that they brought, it took Judge

24   Friedman one week, one week to rule on it once they brought

25   that.

45

1       So, yes, she learned a lot during our trial.  She studied

2   a lot.  She is a perfectionist, and she dug in like I've --

3   you know, few judges I've had.  But that so-called new

4   threshold motion, which was super-complicated and it had all

5   kinds of new theories and was going to crack the case, one

6   week, it took her, to opine.

7       So I'm confident that these new so-called threshold

8   motions, she would see them for what they are, not threshold

9   motions, rehashed arguments, either too late or already

10  overruled, and she would be able to deal with them quickly.

11      Also, Your Honor, a jury, you know, the next phase, as

12  soon as we can get a jury, the jury doesn't get -- juries,

13  it's usually my experience, don't take weeks or months to

14  deliberate.  You know, they're not going to take weeks or

15  months.  We're going to go sit in front of a jury, we're going

16  to present our case, and we're going to get a decision

17  lickety-split from that jury, I'll bet.  Maybe in a few days.

18  You know, any jury, I guess, could hold up.  But even the

19  fastest judge, I daresay that jury will be faster than the

20  fastest judge.

21      It is funny how we trust 12 people, or New York may be

22  fewer than 12, to make a decision very quickly, where a judge

23  is given, at least in federal court, 60 days, and in state

24  court sometimes more.  But juries somehow, with that

25  collective group, figure out a way to do it, and they'll give

46

 1   us a decision, you know, within a few days after the trial.

 2          THE COURT:  Okay.  I said that was the last question.

 3   This really is the last question, for right now.  Mediation.

 4   Did you all ever mediate this?

 5          MR. CLUBOK:  Yes, Your Honor.  That's a terrific

 6   question.  So, we did mediate this several times over the

 7   years.  Those mediations ultimately led to settlement with two

 8   of the other Defendants.  One of them, the Redeemer Committee.

 9   So those mediations were successful, then.  We did not get to

10   a success point with Highland back then.

11       However, in November, once we got the decision -- and by

12   the way, for years, all we heard was:  You have no chance of

13   winning, we have a million in setoffs, there's going to be

14   this, that, and the other thing, your $500 million plus

15   interest to a billion-dollar claim is going to be -- you're

16   going to have lost money -- Highland.  That's what we had to

17   hear for many years.  So we couldn't get to settlement.

18       But after the judgment and after, I think, reality set in,

19   prior to the new law firm and new set of directors taking

20   their fourth fresh look at this, we -- we didn't lightly enter

21   into the agreement in November.  We very much believed the

22   people who were running Highland at that point, that we could

23   have a very productive settlement discussion.  I don't really

24   -- I think, if you were betting, I don't think you would bet

25   that there's going to be a trial, regardless.  I think what

47

1   you'd bet is reasonable people, at this point, now that we

2   have the guidance of Phase I, should be able to go have a

3   mediation, figure out a value for the claim, and we wouldn't

4   have to try this case anywhere.

5       What Highland wants to do, though, what they're trying to

6   do is naturally put their thumb on that scale of that

7   mediation.  I mean, by the way, we thought that would have

8   happened in the last six months.  We've asked for it

9   repeatedly.  We've suggested mediators.  That's what we'd like

10  to do.  We do think that the claim should be subject to a

11  mediation.  And frankly, all the claims in this case could

12  probably be -- could do with mediation and help from a --

13  mediation or an arbitrator.

14      We thought that would happen.  It hasn't happened.  We

15  hope that it does happen.  But what Highland wants to do here

16  now is put their thumb on that mediation by saying, hey, we

17  already know how Justice Friedman would rule on these so-

18  called threshold issues, and by the way, we know what we're

19  probably faced with, because we probably did juror research

20  too and we know what we're facing in front of a jury in New

21  York.  So we just want this judge to help us out in our --

22          THE COURT:  Okay.

23          MR. CLUBOK:  -- settlement negotiations by making it

24  more complicated for you to recover.

25          THE COURT:  All right.  Thank you, Mr. Clubok.  All

48

```
 1   right.  I will hear from Highland --

 2           MR. CLUBOK:  Thank you, Your Honor.

 3           THE COURT:  -- now.  Who is going to make the

 4   argument for Highland?

 5           MR. FEINSTEIN:  That'll be me, Your Honor, Robert

 6   Feinstein, Pachulski Stang Ziehl & Jones.

 7           THE COURT:  All right.  Thank you.  You may proceed,

 8   Mr. Feinstein.

 9             OPENING STATEMENT ON BEHALF OF THE DEBTOR

10           MR. FEINSTEIN:  Thank you, Your Honor.  First, good

11   afternoon.  Can you hear me and see me okay?

12           THE COURT:  I can, perfectly.  Thanks.

13           MR. FEINSTEIN:  And one of my colleagues, Elissa

14   Wagner, is going to share her screen so that Your Honor can

15   see just a few slides --

16           THE COURT:  Okay.

17           MR. FEINSTEIN:  -- while I talk.

18       So, Your Honor, this is a very important day for Highland,

19   the Debtor.  You know, my colleagues are on the call, and I

20   believe some of our directors are on the phone as well.  The

21   Debtor wants to make progress towards confirming a plan in

22   this case and make distributions to creditors.  That's one of

23   the principal goals of Chapter 11.  But here, the Debtor's

24   ability to do that has been stymied by one creditor, by UBS,

25   asserting a putative claim -- and I say putative literally --
```

49

1    putative claim so large as to dwarf every other claim in the

2    estate.

3        Mr. Clubok has argued since I've met him that he has got a

4    way of showing that Highland is going to become liable for the

5    billion-dollar judgment that was entered against the Funds,

6    but there he leaves out a lot of the story.  He's testified

7    quite a bit from the podium, Your Honor.  And while I can't

8    cross-examine him along the way, I will tell you things that

9    he said that are not consistent.  And there's a lot of

10   testimony about what Judge Friedman said, what the client

11   said, what previous lawyers said.  There's not enough time to

12   go into it, Your Honor, and some of it, I think, is

13   irrelevant.

14       But after all this time, and Mr. Clubok in this case,

15   since the beginning of Highland's bankruptcy, has said that

16   UBS has a good claim against the Debtor for over a billion

17   dollars.  On that basis it obtained a seat on the Creditors'

18   Committee, which, by the way, opposes Highland's motion.  But

19   it's now serving to gridlock the entire bankruptcy case.

20   Nobody is going to negotiate a plan -- and this is not just

21   Highland, but other creditors -- with a creditor who claims,

22   without a judgment in hand, that he has got a claim of a

23   billion dollars against the Debtor, and on theories that are

24   atypical, unusual, and that should be rejected.

25       But, you know, let's start with the fact that when Mr.

50

1    Clubok started the case, he brought a breach of contract claim

2    against Highland, the Debtor, for the liability of the Funds

3    that, you know, was the subject of the Phase I trial.  That

4    breach of contract claim against Highland was dismissed.  But

5    now what he's resorting to are a bunch of theories, and breach

6    of implied covenant and alter ego.

7        And Your Honor asked a question before.  It was a good

8    one.  And that is:  What is the status of the alter ego claim?

9    And Mr. Clubok answered about a different alter ego claim.

10   Their fraudulent conveyance claims don't work, Your Honor,

11   unless there's a link in the chain that's created, meaning

12   that HFP and SOHC have to be alter egos.  Otherwise, Highland

13   would not have standing -- excuse me, - UBS would not have

14   standing to bring the alter ego -- to bring the fraudulent

15   conveyance claim.

16       But here's the point, Your Honor:  The alter ego claim

17   against Highland, the Debtor, has never been asserted.  Never.

18   What's going on here is -- and I'll testify, I guess, in this

19   instance -- Mr. Clubok has said to me and others, hey, I

20   didn't -- I never brought a pleaded claim against Highland,

21   the Debtor, as the alter ego of the Funds, but I didn't -- I

22   didn't have to.  I can do this later.  I can do this as a

23   supplementary proceeding under New York practice.  And that's

24   categorically wrong, there, as here.  Highland was a party to

25   the initial case.  And we cited the *Board of Managers* case in

51

1    our brief, Your Honor, which I'll get to in a bit, to show

2    that that claim had to be brought at the time or it's barred

3    by res judicata.

4         So, but the salient point here, Your Honor, is that one of

5    the claims that Highland -- that UBS is asserting as a basis

6    for a billion-dollar liability has never been pleaded, has

7    never been brought, has never been tried.  So when Mr. Clubok

8    says we'll be litigating, these are issues that were already

9    rejected, that is categorially false as to the alter ego

10   claim.

11        And so much of what else he said in terms of what we're

12   relitigating is simply inaccurate.  The trial court in New

13   York never ruled on the effect of the credits from the

14   fraudulent conveyance settlement.  What you heard Mr. Clubok

15   say is that Justice Friedman said, we're not dealing with this

16   now, we can deal with it later.  But to suggest that that's

17   being relitigated is just categorically false.  Mr. Clubok may

18   know more about the state court proceedings, but that doesn't

19   give him the right to mischaracterize them.  This is why there

20   are transcripts.  This is why there are opinions.  That's what

21   we're relying upon, Your Honor, to make our case.

22        So, Mr. Clubok has acknowledged that, on this motion, UBS

23   has the burden of showing cause.  And that's a heavy burden,

24   Your Honor.  And we don't think that's been established here,

25   for a variety of reasons that I will try to relate.

APP. 1682

52

1        As we've said, Your Honor, we do think that there are two

2   threshold issues that have not been litigated in state court

3   that, if decided, would take a lot of the mystery out of this

4   case about whether UBS's claim is a billion dollars or $50

5   million.  That's a huge difference.  And parties, the other

6   creditors who hold substantial claims, who want their

7   recoveries, aren't going to engage with a creditor who has a

8   highly-disputed billion-dollar claim that they knew, as we do,

9   is a small fraction of that, if it can be established.  And

10  again, there are serious substantive defects with the

11  fraudulent transfer claims that we think, Your Honor, on a

12  threshold basis, Your Honor can dispose of the notion that

13  there's a billion-dollar claim in this case relatively easy,

14  easily.

15       So I do want to just revisit a little bit of the

16  background to this case, Your Honor, just to kind of set the

17  record straight.  And, you know, as I said, the first time

18  that UBS filed suit, it brought a contract claim against

19  Highland, the Debtor, and that was dismissed.  And the basis

20  for the dismissal is that the documents that were signed

21  between UBS and Highland -- there was an engagement letter for

22  the structuring of the CLO syndication, and then there were

23  two warehouse agreements.  And Highland was a signatory to the

24  warehouse agreement, but it was the Funds, it was the non-

25  debtor Funds who were the parties who were ultimately liable

53

1    if there were investment losses.

2        And when the state court dismissed Highland, the Debtor,

3    from that case, it did so saying that Highland never, quote,

4    undertook that liability.  It was not a guarantor of that

5    liability.  So there's -- that is Mr. Clubok's first foray.

6    It was a complaint that he started in February of 2009.  And

7    while he's amended it to try to add different claims, it does

8    not change the fundamental fact that, as a matter of contract,

9    Highland, the Debtor, was found to be not liable for that

10   billion-dollar judgment that was adjudicated in Phase I of the

11   trial.

12       And, as a result of the fact that Mr. Clubok put his --

13   all his eggs in a basket in his complaint that he filed in

14   2009, under res judicata, and the single action theory, which

15   is -- I think it's true outside of New York as well as in --

16   is that if you're going to sue somebody based on a set of

17   facts, you need to put it all in there.  You need to put all

18   of your claims in there.  You can't sue people seriatim.  You

19   can't file certain claims and then, if you fail, come back

20   later and try to add new claims based on the same underlying

21   facts that were available to you when you first filed the

22   complaint.

23       That is the basis of an important ruling, Your Honor, by

24   the Appellate Division on res judicata, which is that, having

25   had his opportunity to plead claims based on the facts as he

54

1    knew them, Mr. Clubok chose certain causes of action and left

2    others out.  And his claims were dismissed.  But now he can't

3    come back and come up with new theories based upon facts,

4    operative facts that were known to him when he filed his first

5    complaint.

6        So the upshot of the Appellate Division's ruling is that

7    UBS is barred from bringing claims based on operative facts

8    that occurred prior to the date of their first complaint.

9        Now, Mr. Clubok tried to spin this in his opposition

10   papers, in the reply, and I think mischaracterized it.  He

11   said that it's simply untrue that he is barred from asserting

12   claims based on pre-February 2009 conduct.  That's not what

13   the Appellate Division ruled.  What the Appellate Division

14   ruled was it may be possible to bring in evidence of stuff,

15   the things that occurred prior to that date, but you're -- did

16   I lose Your Honor?

17            THE COURT:  No.

18            MR. FEINSTEIN:  Oh, okay.  I see a little circle.

19            THE COURT:  Oh.

20            MR. FEINSTEIN:  I thought maybe you froze.

21            THE COURT:  Okay.

22            MR. FEINSTEIN:  I'm sorry.

23            THE COURT:  I'm here.

24            MR. FEINSTEIN:  Thank you.  Thank you.

25       So, in order to bring a claim, you have to rely on

55

1    operative facts that form the basis for the cause of action

2    from and after March of 2009.  Does it mean that evidence

3    about things that happened before then is inadmissible?  No.

4    My colleague has -- Elissa has put up on the screen, Your

5    Honor, a portion of the Appellate Division's ruling in 2011.

6    And it couldn't be clearer, Your Honor.  It says, "Here, to

7    the extent that claims against Highland in the new complaint

8    implicate events alleged to have taken place before the filing

9    of the original complaint, res judicata applies."

10       Okay?  So, for that decision to have meaning, and that

11   decision has never been appealed, that means that operative

12   facts that support causes of action from and after February of

13   2009 are fair game.  But if any claim is based on operative

14   facts that occurred before then, it's barred.

15       And based on that, Your Honor, and that alone, there is no

16   liability here, under contract or any other theory, for

17   implied covenant or alter ego, for the breach of contract,

18   which occurred in 2008, before the first complaint was filed.

19       So it is a difficult, if not impossible, path for Mr.

20   Clubok to try to conjure up a claim that fits within the res

21   judicata bar by the Appellate Division that tries to go back

22   in time and hold the Debtor liable for a breach of contract

23   that happened in 2008.  It just doesn't work.

24       So, let me address, Your Honor, there are three claims

25   that they assert --

56

1      Elissa, will you put on Slide 2, please?  Thank you.

2      There are three claims that --

3          THE COURT:  Now, are you trying to share the content

4   with me and others of what Elissa is putting up?

5          MR. FEINSTEIN:  Yes.

6          THE COURT:  Okay.  It's not --

7          MR. FEINSTEIN:  I hope you're seeing it.

8          THE COURT:  It's not working.  I just see you.  I

9   don't see the shared content.

10          MR. FEINSTEIN:  Ah, okay.  All right.  Well, it's no

11   matter, Your Honor.  I'm going to plow through and we'll make

12   like the slides don't exist.

13          THE COURT:  Okay.

14          MR. FEINSTEIN:  Sorry.

15          THE COURT:  If you want me to look at one of the

16   exhibits as you talk, I can do that.

17          MR. FEINSTEIN:  Your Honor, oh, no.  It's okay, Your

18   Honor.

19          THE COURT:  Okay.

20          MR. FEINSTEIN:  (garbled) document.  It's --

21   technology in the last few months has been a challenge for

22   counsel and the Court.

23          THE COURT:  For all of us, uh-huh.

24          MR. FEINSTEIN:  It really has.

25      So, Your Honor, there are two pleaded claims and one

57

 1   unpleaded claim by UBS against the Debtor, and we want to

 2   consider them one by one.

 3        So, one of them is the breach of the implied covenant of

 4   good faith and fair dealing.  That's been pleaded.

 5        Another is fraudulent conveyance.  That's been pleaded.

 6        And as I noted, Your Honor, the last theory is alter ego

 7   that Highland, the Debtor, is the alter ego of the Funds.

 8   That's never been pleaded.  And Mr. Clubok's view is, I don't

 9   need to do that, I can do that later.  The *Board of Managers*

10   decision that we've cited shows that he had to do it already

11   and he didn't.

12        So the implied covenant claim, Your Honor, I think I've

13   addressed, but there are a couple other things I want to say

14   about it.  First of all, if Your Honor will allow us to move

15   forward and brief this in the context of a claim objection, we

16   think that very quickly we could impress upon Your Honor that

17   this cause of action fails.  Again, the only basis that this

18   claim can be brought forward, because it was pleaded after the

19   initial complaint, it has to rely on post-February of 2009

20   facts.  Let's be clear that this claim was not brought in

21   Phase I.  And the only -- only breach of contract claim was

22   litigated in Phase I.  There was no judgment rendered against

23   Highland, because, again, they weren't -- they were found not

24   to be liable under the contract.

25        The implied covenant, as we, again, if you'll let us brief

58

1    this, Your Honor, the implied covenant theory can't be used to

2    create obligations on a party that are inconsistent with the

3    express terms of the party's contract.  And the Appellate

4    Division decision in 2010 that dismissed the contract claim

5    made it very clear that the contracts contain, quote, no

6    promise by the Debtor to undertake liability with respect to

7    UBS's losses.

8        So you can't, under applicable law, Your Honor, use an

9    implied covenant theory to contradict a contract, to create an

10   obligation that's not in the contract.  But that's precisely

11   what's being done here.  So, and to be clear, Your Honor, the

12   -- well, let me move on.

13       The next thing that they asserted is alter ego.  And as I

14   said, Your Honor, that has never been pleaded.  The *Board of*

15   *Managers v. Hudson Condo* case -- excuse me.  The *Board of*

16   *Managers v. Jeffrey Brown Associates*, which we cited in our

17   brief, is directly on point, that res judicata bars the

18   assertion of an alter ego claim against a party that was

19   initially named in the lawsuit.  So that the -- while you may

20   be able under New York law -- and I've practiced here for 40

21   years -- you may be able to use a supplementary proceeding to

22   assert a judgment against a party who was not named in the

23   lawsuit as the alter ego, but if that party was named in the

24   lawsuit, you needed to assert this at the outset.  And they

25   didn't, for whatever reason.  But that means that this claim

59

 1   is also barred by res judicata.

 2        So then we get to fraudulent transfer, Your Honor.  And on

 3   fraudulent transfer, there are -- the issue really is one of

 4   simply acknowledgment that the *ad damnum* has to be reduced

 5   because there were settlements.  So, the initial fraudulent

 6   transfer claims -- which did occur, by the way, after February

 7   of 2009, so those are fair game under the time bar -- they

 8   assert that HFP transferred approximately $440 million of

 9   assets to a bunch of Highland funds and to the Debtor in March

10   of 2009.

11        In 2015, UBS settled with two -- on two of those counts.

12   It settled with Crusader and Credit Strategies.  Those were 80

13   percent of the amounts that were the subject of the fraudulent

14   transfers, again, under -- there are two ways to look at the

15   settlement, Your Honor.  One is that there should be a credit

16   for the Defendants on account of the dollars that were paid to

17   settle the claims.  But here, the dollars that were paid were

18   for far less than the face amount of the *ad damnum*.  Out of

19   the $240 million of *ad damnum*, oh, $180-or-so million were the

20   subject of the two claims that were settled.

21        So it just does not pass the straight-face test or any

22   kind of logic for UBS to argue that it could still sue

23   Highland, the Debtor, for $240 million, when it settled claims

24   that Highland was named on or Highland signed the settlement

25   agreement, like UBS did, leaving only $50 million worth of

APP. 1689

60

1  transfers out there.

2      So, even with post-petition interest, you would get to

3  maybe $90 million on those claims.  That is a far cry than a

4  billion-dollar claim.  And it's a game-changer in the context

5  of a bankruptcy where parties need to negotiate with one

6  another and the Debtor to try to come up with a consensual

7  plan.  That's impossible when there is a chasm between what

8  the estate and other creditors think UBS's claim is worth and

9  UBS running around telling the world, I've got a billion-

10 dollar claim.

11     We need to bridge this gap, and we need to bridge it

12 quickly or this Debtor is going to languish in bankruptcy for

13 an indefinite period of time.

14     And Your Honor, the -- Mr. Clubok, on the one hand, said,

15 well, Justice Friedman is very familiar with this.  These --

16 Phase I was a prelude to Phase II.  That's not true.  That's

17 not true.  They're very different claims.  Phase I was just a

18 breach of contract liability.  Phase II has got all sorts of

19 theories and operative facts that occurred -- or, based on

20 operative facts that occurred well after the breach of

21 contract claim for fraudulent transfer.

22     So it's a fallacy to say that another judge other than

23 Justice Friedman couldn't decide these issues, because these

24 facts have not been presented to Justice Friedman.  The legal

25 theories have not been adjudicated by Justice Friedman.  We'll

APP. 1691

61

1    guess at how long it might take to get in front of Justice

2    Friedman in a moment.  But the point is, they are very

3    different.  And in fact, as we've noted in our brief, UBS

4    counsel said in state court that the remaining claims, quote,

5    have little to do with the breach of contract claims.  They

6    present new parties, new factual issues that were not

7    addressed in Phase I.

8        So, you know, we think that there is no efficiency in

9    going to state court.  In fact, just the opposite.

10       And let me just stop and talk about that, Your Honor.  I

11   may be the only attorney on the phone who practices in New

12   York.  I haven't been in my office in over three months

13   because it's -- because of the shutdown order.  Lawyers are

14   not essential services in New York City.  Probably a lot of

15   people would agree.  So I haven't been able to go to my

16   office.  And you can't go in the courthouse.

17       Your Honor, I want to just cite to Your Honor the website

18   of the New York court system:  www.newyorkcourts.gov/crest.

19   The court, and this is the court administrator, issued a press

20   release with regard to the status of the New York City court

21   system.  So, the New York court system is now entering Phase

22   I.  And again, this is all a matter of public record.  Phase I

23   allows the judges and the clerk and security to go into the

24   courthouse, but not the general public.  There are no hearings

25   going on, as you -- as we would normally expect.  I mean, the

62

1    New York City courthouse is a very busy, bustling place that

2    usually is overrun with people.  I saw a picture online this

3    morning where the building was empty.  Why?  Because there are

4    no proceedings going on.  The justices are now going to try to

5    get up and running and maybe start doing video hearings.  But

6    the idea of a jury trial in that courthouse this year is

7    unimaginable for me, Your Honor.  Unimaginable.  Because

8    before you get out of Phase I, you've got to go to Phase II.

9    And Upstate New York, some of the courts have now gone into

10   Phase II, where they're hearing only essential family matters:

11   adoptions, child custody, things like that.  They're not

12   hearing commercial cases.  That's Phase II.

13       I don't know whether Phase III encompasses jury trials,

14   but we're two phases off of that in New York City.

15       So, I, you know, I continue to believe, Your Honor --

16   again, this is my opinion -- that this case will not be tried

17   this year, and I think there is a chance that it won't be

18   tried next year.  And in his presentation, Mr. Clubok said,

19   oh, this is going to happen in three months.  I wish.  I don't

20   think it's going to happen in six months.  But then he says,

21   And once the courthouse doors are open, we're going to be

22   first in line.  There is no evidence.  I mean, this is one of

23   those areas where Mr. Clubok is testifying with no basis at

24   all.  Okay?  There's no basis to believe that the UBS-Highland

25   case is first in line when the courthouse opens for a jury

63

 1   trial.  The courts have -- even in a non-pandemic situation,

 2   Your Honor, I've been in practice here a long time, it takes a

 3   long time to try a case in New York.  And you can see that the

 4   11-year history of this case was a function of there being

 5   several lengthy delays, like the year and a half delay in

 6   having the Phase I trial decided.

 7       So, you know, there's just -- it's delay upon delay.  When

 8   are the courts going to open?  When are they going to open for

 9   jury trials, and where will this case be in the queue?  And

10   then how long will it take to decide?  Your Honor, I submit to

11   you that it's -- if it's not months, it could be years.

12       And here's the problem.  This puts a freeze on Highland's

13   bankruptcy case.  Highland wants to get out of bankruptcy.

14   Highland wants to distribute its assets to creditors.  If the

15   case is going to be held in suspense indefinitely while we

16   wait for the court system in New York to reopen or the UBS-

17   Highland case to make its way to the front of the queue, to

18   pick a jury -- I don't know how you're going to conduct a jury

19   trial in the age of pandemics, how people are going to

20   evaluate the credibility of witnesses who are wearing face

21   masks.  I mean, just a host of problems, Your Honor,

22   conducting a jury trial, even in a system like New York's that

23   wasn't already bogged down with delays and just a massive,

24   massive caseload.  And the backlog could have only gotten

25   worse during the shutdown.

64

1      So, having taking that personal privilege, Your Honor, as

2   a New Yorker, let me just proceed with the argument on the

3   merits in terms of stay relief.

4      All right.  So, the burden is on UBS to show cause.  And

5   UBS has argued in its papers, citing 362(g)(2), I think it is,

6   that somehow the burden shifts to Highland.  Counsel just

7   misreads the statute.  He's pointing to a provision that talks

8   about lifting the stay where a secured creditor wants to

9   foreclose, and the issue is who -- where there's a burden of

10  showing equity in the property, which is a factor to deny stay

11  relief.  Obviously, that has nothing to do with our situation.

12  The burden is on UBS to show cause, and they haven't

13  established it.

14     So, what's the standard for the Court to apply?  Lifting

15  the stay is up to the Court's discretion.  There is no mandate

16  here that you must allow UBS to go to state court to litigate

17  their claim in front of a jury whenever.  They're -- they have

18  a claim against the Debtor.  Your Honor has the ability and

19  jurisdiction to adjudicate claims as part of the ordinary

20  bankruptcy process.

21     And here, Your Honor should exercise the discretion to

22  hear this claim and to see if these threshold issues carry

23  weight, because the claim is so large that its disposition is

24  really essential to the success or failure of Highland's plan.

25  And to relegate this case to a freeze of unknown length,

65

1    months, years, before creditors can ever see recovery from the

2    case is not judicial economy. It's inflicting unnecessary

3    delay and expense on the parties.

4        And we're talking about claims, Your Honor, that are well

5    within the expertise of this Court because they involve

6    fraudulent transfer claims and typical things that bankruptcy

7    courts resolve all the time.

8        So, you know, we think that the hardship on the parties of

9    being held in suspense while UBS goes on its jihad in state

10   court for months, if not years, that the balance of hardships

11   really tips in the favor of the estate and the other creditors

12   in the estate to try to see this claim resolved through Your

13   Honor's proceedings, rather than be subjected to indefinite

14   delay.

15       One moment, Your Honor, while I check my notes.

16       (Pause.)

17       I'm just going through my notes, Your Honor, because I

18   went a little out of order, but I covered a lot of what I

19   wanted to say.

20       So, Your Honor, let me make a suggestion. We -- the

21   issues that we want to tee up in terms of these dispositive

22   issues, one is whether or not there could be an alter ego

23   claim against Highland. It's never been alleged before. We

24   think that the state court rulings on res judicata as well as

25   some very persuasive authority like *Board of Managers* means

66

1    that that claim can't be brought.

2        That's something that has not been litigated in state

3    court before.  I think Your Honor could very easily address

4    it.

5        The other issue is the impact of the settlements on the

6    fraudulent transfers, because, again, it's very different if

7    UBS has a $50 million claim on a good day as opposed to a

8    billion-dollar claim.  And again, very straightforward.  It

9    will involve the interpretation of the settlement agreements.

10   We think it's very straightforward.  It's something that's

11   well within Your Honor's experience, jurisdiction, to decide.

12   It's a proof of claim.  And we think that that could really

13   break the logjam in this case.

14       And if those two issues are decided favorably for the

15   estate, that the asserted claim of UBS will now be within a

16   ballpark that other creditors and the Debtor can deal with, as

17   opposed to the continued threat that there's a billion-dollar

18   claim out there.

19       That ruling, Your Honor, really could make the difference

20   between whether or not this Debtor confirms a plan with you or

21   not and whether creditors can get distributions or not.

22       So -- and I would hasten to add, Your Honor, that I think

23   that, while the matters are complex, I think the specific

24   issues are not, and that they can be presented to Your Honor

25   and that Your Honor could decide them before the New York

67

1   court system even opens up, let alone before a jury trial can

2   be scheduled in this matter.  So we think that that is really

3   the way to go, Your Honor, and that will avoid the prejudice

4   to all the parties, not just the Debtor, but all the other

5   creditors who'd like to see their distribution.

6        So, Your Honor, I'm not going to address the agreement for

7   stay relief based on Your Honor's comments.

8        I just want to address, lastly, that if Your Honor does

9   deny the motion, that Your Honor -- for stay relief, that Your

10  Honor also deny the request by UBS for a further extension of

11  its proof of claim.  There was an agreement between the

12  parties that extended the bar date already for UBS and that

13  provided that we would have this stay relief that (inaudible).

14  There was never any discussion that, if stay relief was

15  denied, that there would be further time for UBS to file a

16  proof of claim.

17       While this is cloaked in the desire to preserve a jury

18  trial that we never had, the reality here, Your Honor, is that

19  this is just more delay and posturing and trying to keep the

20  notion that there's a big claim out there and a big trial in

21  the future for leverage purposes, for UBS to be able to say to

22  the other creditors, you know, I'm in control here, I've got a

23  billion-dollar claim, I'm still going to pursue a jury trial.

24  It is gumming up the case.  It is freezing the case.  And the

25  only way to break the logjam, Your Honor, is for Your Honor to

68

1   do that.  It's for Your Honor to deny stay relief, to require,

2   as they agreed, to require UBS to file a proof of claim within

3   five days of Your Honor's ruling.  We will then proceed with

4   an objection to claim that will lay out the issues, we think,

5   very clearly, the (inaudible) very clearly.  And UBS will have

6   their opportunity to be heard, and then Your Honor can decide.

7       And if Your Honor sustains the objections based on the

8   issues we've presented to the Court, like I said, that's going

9   to clear a path for this case to move to confirmation.

10      If Your Honor overrules the objection, then I guess what

11  have we lost but a couple months' time trying to adjudicate

12  that and spare the estate of being stuck in suspense for an

13  indefinite period of time?

14      So, on that basis, Your Honor, we would ask that you deny

15  the stay relief motion and deny the extension on the proof of

16  claim.  I'd be happy to answer any questions that Your Honor

17  has and then I'd yield to the parties.

18          THE COURT:  I have a question unrelated to the

19  arguments.  Exclusivity in this case, I know there was an

20  agreement regarding the most recent extension, and I can't

21  remember what the deadline is.  I feel like it's late July,

22  maybe.  Can someone remind me of that?

23          MR. POMERANTZ:  Your Honor?  Yes, Your Honor.  This

24  is Jeff Pomerantz.  So, the current exclusivity expires on

25  July 13th.  We have since filed, I believe it was last Friday

69

 1  night, a further motion to extend for an additional 30 days.

 2  We are in discussions with the Committee about various

 3  structures, about a plan and whether -- and how we would

 4  ultimately emerge from Chapter 11.  That matter will be heard,

 5  I believe, on July 8th.  And it asks for 30 days and an

 6  additional two -- additional 30 days, subject to Committee

 7  consent.

 8        THE COURT:  All right.  So you all are envisioning

 9  walking and chewing gum at the same time, basically going down

10  a dual track if I deny the motion?  You know, you're wanting

11  me to set a deadline five days from now or whatever it would

12  be for them to file a proof of claim, you would envision a

13  prompt objection, and going down that path at the same time as

14  proposing a plan in July or August?

15        MR. POMERANTZ:  Your Honor, look, there's a couple of

16  ways this case could end, right?  We kick the can down the

17  road, file some type of plan that shifts all the litigation

18  post-confirmation.  That may be what happens in this case.

19  That is not what the Debtor wants to happen in this case.

20        THE COURT:  Uh-huh.

21        MR. POMERANTZ:  The Debtor has been moving very

22  quickly to try to engage with the various creditors.  Mr.

23  Clubok said we spent a lot of time.  Yes, the Debtor and the

24  independent directors did spend a lot of time dealing with

25  this claim, dealing with the Acis claim, and dealing with the

70

 1   Redeemer claim.  It's those three claims that are the primary

 2   obstacles towards being able to distribute money to creditors.

 3       So if, Your Honor, we are either litigating where we think

 4   we should in this Court on UBS's matter and the Acis matter,

 5   if we can't resolve it, Redeemer's matter, or elsewhere, we

 6   are going to try to move things forward.  But at the end of

 7   the day, unless these claims can be resolved, and UBS is the

 8   largest one, there will not be any distributions to creditors,

 9   which is what the Court wants to have happen as quickly as

10   possible.

11           THE COURT:  Okay.  Thank you.  All right.  I have no

12   other questions for Debtor's counsel at this time, so how

13   about we go to Committee counsel now.  Mr. Clemente?

14     OPENING STATEMENT ON BEHALF OF THE CREDITORS' COMMITTEE

15           MR. CLEMENTE:  Yes.  Thank you, Your Honor.  Matthew

16   Clemente, Sidley Austin, on behalf of the Official Committee

17   of Unsecured Creditors.

18       Your Honor, as an initial matter, when I refer to the

19   Committee, as we did in our papers, I am referring to the

20   three non-UBS Committee members: --

21           THE COURT:  Uh-huh.

22           MR. CLEMENTE:  -- Acis, Meta (inaudible) and

23   Redeemer.  UBS obviously did not participate in Committee

24   discussions regarding this objection.  I just wanted to make

25   sure that Your Honor understood that.

71

 1      With that, Your Honor, the Committee does oppose the

 2   motion to lift stay.  I've been listening to Mr. Clubok and to

 3   the Debtor, and the merits, I think, you know, are probably

 4   very interesting, but I'm not sure they are necessarily

 5   terribly relevant to the determination that Your Honor has to

 6   make today.

 7      The issue is whether to lift the stay based on a showing

 8   of cause and after taking into consideration whether lifting

 9   the stay is in the best interest of the estate and the

10   creditors.  I don't think it's whether, you know, one party or

11   another is likely to prevail.  I think that's the

12   consideration that Your Honor instead must look at, cause and

13   the impact on the estate.

14      The Committee submits lifting the stay is not in the best

15   interests of the estate.  The Committee's focus remains on the

16   efficient and quick resolution of these cases that provides

17   for maximum recovery to its constituency, the general

18   unsecured creditors.

19      And while Mr. Pomerantz referred briefly to the plan,

20   obviously, Your Honor, we have just seen the exclusivity

21   extension motion.  I have not had an opportunity to discuss it

22   with the Committee, you know, so I don't know what position we

23   may take on that.  But as a general matter, we do believe it's

24   imperative to push forward as quickly as possible with a plan.

25      The asserted UBS claim, as Your Honor as heard, would

72

1    dwarf all other claims against the estate by far.  Resolution

2    of that claim will therefore impact the size and timing of any

3    distributions to the other general unsecured creditors.

4    That's just, I think, a plain fact of math.

5        Thus, the Committee believes having the UBS claim quickly

6    resolved is in the best interest of the estate and the

7    creditors.

8        And the Committee further believes that this Court is the

9    best forum and is in the best position to allow for the

10   quickest resolution of the claim.

11       Although I do not presume to speak for this Court's time

12   or its calendar, I do know that this Court is used to hearing

13   complicated matters and rendering decisions in a quick but

14   fulsome fashion that allows for all parties to fully present

15   their cases.

16       Additionally, Your Honor, bankruptcy proceedings are

17   designed for inclusion and public scrutiny, which will ensure

18   that any creditors or other parties in interest will be able

19   to participate in a process and forum that's accessible and

20   that they can participate in.  This is particularly important,

21   Your Honor, given the magnitude of the asserted UBS claim.

22       Your Honor, the speed and efficiency is balanced against

23   lifting the stay to allow the UBS claim to proceed forward in

24   New York state court.  There is no visibility by creditors in

25   terms of what the calendar looks like or when New York state

73

 1   courts will resume in-person trials, let alone when they will

 2   have a jury trial, to the extent UBS is entitled to one.

 3       What information we do have clearly suggests that trials

 4   will not resume anytime soon and that there logically would be

 5   a backlog that would need to be worked through.

 6       I am not a New York state court litigator, Your Honor.  I

 7   am a bankruptcy attorney from the Midwest.  But I do know,

 8   from looking at the history of the UBS claim that it does have

 9   against the non-debtor affiliates, that the New York state

10   court process previously took a long time, and therefore it

11   can reasonably be expected to again take quite some time.

12       And given the vagaries of a state court process, it will

13   not provide for the level of transparency and participation

14   and speed that I submit this Court can provide, and frankly,

15   should provide, given the magnitude of the asserted claim,

16   while also, and importantly, giving UBS a full and fair

17   opportunity to advance its claim, Your Honor.

18       Additionally, the sheer magnitude of the claim asserted by

19   UBS dictates this Court should resist the motion to lift stay.

20   While it is complex -- or excuse me -- while it is clearly not

21   the only issue in this very complicated and very complex and

22   very difficult case, it will perhaps have the most meaningful

23   and material impact on creditor recoveries of any of those

24   other issues.

25       Given its central importance, Your Honor, the Committee

74

1    believes it is appropriate that the claim be adjudicated in

2    this collective forum through an established process with

3    which all other various stakeholders are familiar and provide

4    for the appropriate transparency and participation in the

5    adjudication of what is clearly the largest claim asserted

6    against the estate.

7        Finally, but not least, Your Honor, as I understand the

8    UBS claim, and we heard the Debtor speak to it, and Mr. Clubok

9    as well, it presents itself as the type of claim that is in

10   this Court's wheelhouse -- namely, fraudulent transfer claims

11   and other similar claims.  Although from reading the papers,

12   as with all things Highland, there's obviously an overwhelming

13   and significant degree of complexity, at bottom, it appears

14   that Your Honor would simply be required to call balls and

15   strikes on the kinds of claims which this Court has

16   undoubtedly addressed many times before:  namely, fraudulent

17   transfer and similar claims.

18       To sum up, Your Honor, the Committee's position is simple

19   and I think the analysis is simple.  It wants the UBS claim

20   resolved as quickly as possible in a forum that provides for

21   the appropriate level of transparency and participation, given

22   the asserted size of the claim and its impact on creditor

23   recoveries and therefore its centrality to this case.

24   Bankruptcy courts in general and this Court in particular are

25   designed to, and, frankly, are set up to efficiently yet

75

1   fairly adjudicate material claims in an expeditious and

2   transparent fashion, which is in the best interest of the

3   estate and its creditors.

4        Your Honor, for these reasons, the Committee believes the

5   lift stay motion should be denied.

6            THE COURT:  Okay.

7            MR. CLEMENTE:  With that, Your Honor, unless you have

8   questions for me, those are my remarks.

9            THE COURT:  Not at this time.  All right.  The

10  Redeemer Committee filed a very lengthy objection.  Who will

11  be presenting that objection today?

12           MS. MASCHERIN:  Your Honor, I will.  This is Terri

13  Mascherin on behalf of the Crusader Redeemer Committee.

14           THE COURT:  All right.  Thank you.  You may proceed.

15  OPENING STATEMENT ON BEHALF OF THE CRUSADER REDEEMER COMMITTEE

16           MS. MASCHERIN:  Thank you, Your Honor.  Your Honor,

17  the Redeemer Committee submits that there is -- there's

18  similar showing for cause to lift the stay when lifting the

19  stay would prejudice not only the estate but all other

20  creditors in this bankruptcy proceeding and would

21  substantially delay administration of the Debtor's estate and

22  any meaningful distributions to creditors.

23        I'd like to give Your Honor, if I may, just a couple words

24  of background on who the Redeemer Committee is and why we

25  believe we have some unique knowledge and -- that we'd -- that

76

1    we'd like to bring with respect to this objection.

2        The Redeemer Committee is a committee consisting of nine

3    individuals who serve as designated representatives of major

4    investors in the Highland Crusader Fund.  The Highland

5    Crusader Fund was Highland's flagship investment fund before

6    the last recession.  It went into redemption in 2008, followed

7    by an involuntary insolvency proceeding in Bermuda.  That

8    court proceeding, the insolvency proceeding in Bermuda, was

9    resolved by way of a scheme and plan of liquidation that was

10   negotiated between Highland Capital Management, the Debtor

11   here, and the two classes of redeeming investors.  And that

12   scheme and plan was approved by the Bermuda court.

13       The governance that is set up in the scheme and the plan

14   provided for the election of an oversight Committee -- that

15   is, the Redeemer Committee.

16       The Redeemer Committee members were elected from amongst

17   the consenting as opposed to the redeemers of the Crusader

18   Fund.

19       The scheme and plan permitted the Debtor, Highland, to

20   remain as manager of the Crusader Fund to complete the

21   liquidation of the fund, but the Redeemer Committee was given,

22   among other powers, the power to remove Highland as manager

23   for cause, or not for cause, and also to bring claims against

24   Highland Capital Management under the plan and the scheme.

25       The Redeemer Committee determined in July 2016 to remove

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15-4   Filed 09/03/25   Page 728 of 1017    PageID 3191
Main Document   Page 751 of 792

77

1   Highland as manager of the fund and simultaneously commence an

2   arbitration before the International Center for Dispute

3   Resolution.  That proceeding resulted in an arbitration award

4   against the Debtor for $490 million in damages, inclusive of

5   pre-judgment interest as of the petition date.

6       Since the -- since Highland -- Highland filed, by the way,

7   filed this proceeding, this bankruptcy proceeding, literally

8   as we were on the steps of the courthouse in the Delaware

9   Chancery Court for the hearing on the motion to confirm the

10  arbitration award that was issued in favored of the Redeemer

11  Committee.

12      So UBS is not the only party who was denied access to its

13  preferred court, shall we say, but the Redeemer Committee is

14  cooperating in this bankruptcy.  The Redeemer Committee, like

15  UBS, has been appointed a member of the Unsecured Creditors'

16  Committee.  And the Redeemer Committee, we would submit, Your

17  Honor, has a unique perspective to bring on this motion for

18  two reasons.

19      First of all, the Redeemer Committee is the holder of a

20  very large liquidated though not-yet-allowed claim in this

21  bankruptcy by virtue of the arbitration award.  We've

22  essentially concluded our litigation against the Debtor.

23      Second, the Redeemer Committee is uniquely knowledgeable

24  about the litigation and the work between UBS and the Debtor

25  because the Crusader Fund was a party to that suit.  In fact,

78

 1    the settlement agreement, which contains a release provision

 2    which we submit and the Debtor submits ought to have a

 3    significant impact upon the size of the claims that the Debtor

 4    can -- or that UBS can prosecute now with respect to the

 5    fraudulent transfers and the breach of implied covenant, that

 6    was negotiated by my clients, the Redeemer Committee, and you

 7    will see their signatures at the very end of Exhibit H, which

 8    is -- to our objection, which is that settlement agreement.

 9        Your Honor, we submit there has been no showing of cause

10    to lift the stay here.  I'd like to mention a couple of court

11    decisions which I think bring important principles that the

12    Court should consider in considering whether UBS has met its

13    burden here to show cause.

14        Courts have recognized, when relief from the automatic

15    stay is sought, the party seeking the relief has an initial

16    burden to demonstrate cause for the relief.  And where, as

17    here, the movant seeking to lift the stay is an unsecured

18    creditor, the burden on a movant is -- has been recognized as

19    being especially heavy.  That's recognized in the Southern

20    District Bankruptcy Court decision in the *(inaudible) Energy*

21    *Partners* case, for example, which we cited in our papers.

22        In fact, in the *Residential Capital, LLC* bankruptcy

23    proceedings in the Southern District, the Court said, and I

24    quote, "When the movant is an unsecured creditor, the policies

25    of the automatic stay weigh against granting the relief

79

1    requested."

2         And in *In re Leibowitz*, another Southern District

3    bankruptcy decision, the Court said, and I quote, "The general

4    rule is that claims that are not viewed as secured in the

5    context of 362(d)(1) should not be granted relief from the

6    stay unless extraordinary circumstances are established to

7    justify such relief."

8         We would submit, Your Honor, that UBS failed even to make

9    a *prima facie* showing of cause here.  They point to prejudice,

10   they say, to themselves if they can't go to New York and have

11   a jury trial, and they point to judicial economy.  We would

12   submit those factors actually argue very strongly against a

13   finding of cause in this case.

14        There would be substantial prejudice to other creditors in

15   this proceeding if UBS is permitted to essentially get cause

16   on large parts of this bankruptcy proceeding and go off to New

17   York to litigate.  UBS barely acknowledges that the lifting of

18   the stay to allow it to proceed in New York would have any

19   impact on creditors.  We submit that the impact would be quite

20   (inaudible).

21        It can't seriously be disputed, we submit, Your Honor,

22   that this Court could determine the validity and the amount of

23   UBS's claim more expeditiously than UBS could get relief for a

24   jury trial and the subsequent proceedings in New York.

25        We agree with the Debtor's counsel that there is no

APP. 0749

002483

80

1    prospect of jury trials and hearings in the courts in

2    Manhattan anytime certainly this year, and perhaps well into

3    next year, and we've cited some commentators who've written

4    pieces that have been published to that effect.

5        Meanwhile, the sheer size of the claim that UBS is

6    purporting to submit here -- of course, they haven't filed a

7    claim -- but the sheer size of the claim as it has been

8    described in this proceeding makes it central to these

9    proceedings.  And for -- for a fact, in the *Choice ATM*

10   *Enterprises* case, which was decided by Judge Lynn, Judge Lynn

11   denied a motion to lift stay that was brought by a creditor

12   where the creditor's claim at issue "would be the largest

13   claim against the estate and thus critical to the

14   reorganization."  That's very much the case here, and it's

15   appropriate for you to consider that this claim, if allowed at

16   the amount of roughly one billion dollars, which UBS is

17   asserting is the value of its claim, would dwarf the rest of

18   the estate.

19       Bankruptcy, of course, is designed to provide an orderly

20   liquidation procedure under which all creditors are treated

21   equally.  Given those policies, the bankruptcy court ought to

22   try to preserve a level playing field for all creditors.  And

23   we cited in our papers the decision in *In re Canejo*

24   *Enterprises*, which was a Ninth Circuit case from 1986, where

25   the Court denied a motion to lift stay for that reason,

81

 1   because the -- because the Court found that lifting the stay

 2   as to one large creditor in that case would in effect give

 3   that creditor oversized leverage with respect to resolution of

 4   the proceedings.

 5       The same is true here.  As both Committee counsel and

 6   Debtor counsel have pointed out, with the overhang of what we

 7   think is an oversized one billion dollar claim, it's very

 8   difficult to negotiate the way to see clear to a plan of

 9   reorganization here, where other creditors, like my clients,

10   for example, don't know whether they stand to receive a

11   quarter of the estate's proceeds or something much less than

12   that.

13       And we submit, Your Honor, that that is, in fact, what UBS

14   wants to preserve here, is that leverage, that negotiating

15   leverage, which thus far has really stymied efforts to move

16   forward.

17       As both Mr. Pomerantz and Mr. Clemente alluded to, the

18   Creditors' Committee has been working hard on trying to get to

19   a plan of reorganization.  That's what we want.  We want some

20   certainty of how this proceeding will conclude, and it's just,

21   as a practical matter, very difficult to come to anything

22   close to certainty of a practical resolution with that one

23   billion dollar gorilla sitting in the room.

24       This Court, we would submit, as counsel for the Debtor

25   argued, can resolve the claims that UBS has pending against

82

1    the Debtor quite efficiently and quite expeditiously under the

2    rules that you have available to you under the Bankruptcy

3    Court Rules.  So we submit the New York court really has no

4    appreciable advantage in resolving these claims.

5        As counsel for the Debtor pointed out, there are

6    essentially -- there are two claims that are pending in the

7    New York action against the Debtor.  One is a fraudulent

8    transfer claim; the other is a claim for breach of the implied

9    covenant of good faith and fair dealing.

10       I won't get into whatever defenses the Debtor may have

11   against that good faith and fair dealing claim, but I will say

12   this much:  All of the claims, all of those claims arise from

13   the fraudulent transfers that were alleged to have taken place

14   in March of 2009.  So they essentially all stem from the

15   fraudulent transfer claims.  Those claims are based upon

16   entirely different facts, different witnesses, different legal

17   issues, than the claims that were tried back in 2018 that

18   resulted in that judgment that was entered against the CLO

19   warehouse counterparty that was entered last fall.

20       But you don't have to take my word for it that the

21   fraudulent transfer-based claims are premised on an entirely

22   different set of facts.  We can look at UBS's own words to

23   establish that.  When it suited UBS's strategy, when UBS

24   persuaded the Court to bifurcate the proceedings into what it

25   now refers to as two phases of the same trial -- and this is

83

 1    going back to the spring of 2018, Your Honor -- UBS persuaded

 2    the Court to bifurcate the proceedings, and UBS conceded at

 3    that time that the claims against the Debtor that remained to

 4    be adjudicated -- and I'm quoting from Exhibit J to our

 5    objection here, which is UBS's brief in support of bifurcation

 6    -- those claims, UBS argued, quote, "have minimal overlap in

 7    evidence and issues" with the claims that Judge Friedman has

 8    -- Justice Friedman has already tried in New York.

 9        UBS went on to say, and I quote, "The second trial, which

10    will relate to new parties and different claims, will involve

11    new factual issues that will not be addressed at all in the

12    first trial."

13        And in that same pleading, UBS argued, "The issues and

14    evidence will be largely separate, and certainly will not be

15    inextricably interwoven and intertwined" with the issues from

16    the first case.

17        I would submit, Your Honor, that Your Honor could resolve

18    fraudulent transfer-based claims quite expeditiously.  Those

19    -- fraudulent transfers are the bread and butter, are the

20    kinds of claims that bankruptcy courts resolve every day.  And

21    to the extent that it was necessary for you to look to any of

22    the factual findings that Justice Friedman made, they're laid

23    out in her judgment, which is a very lengthy opinion that was

24    entered last fall and this Court could very easily find them

25    there.

84

1      Now, a couple of moments about the -- what we've talked to

2  about -- what we've talked -- what we've referred to as the

3  threshold issues.  And I'll preface this by saying that, over

4  the years, the Redeemer Committee and Highland Capital

5  Management have not agreed on very many things, but we do

6  agree that there are two threshold legal issues which we

7  submit would seriously materially impact the amount of any

8  claim that the -- that UBS can pursue in this bankruptcy

9  against the Debtor.

10      The first of those is the res judicata issue.  Mr. Clubok,

11  I think, has been a little less than precise about exactly

12  what the basis -- in his argument today about exactly what the

13  basis is for the $1 billion claim that he referred to.  But if

14  we look at UBS's motion to lift the stay at Page 10, UBS

15  stated, "If found liable, the Debtor will be responsible for

16  the judgment awarded to UBS in Phase I, in addition to any

17  other amounts awarded to UBS in Phase II."

18      So I think UBS stated quite clearly in its motion to lift

19  the stay at Page 10 that what it intends to pursue in this

20  bankruptcy court and what it purports to be intending to

21  pursue in the New York court, at least in large part, is to

22  hold the Debtor responsible for that $1 billion judgment that

23  was entered on the warehouse transactions.

24      It is that articulation of its claim which leads the

25  Redeemer Committee and leads the Debtor to raise the issue of

85

1   res judicata.  And I won't go through again all of the

2   analysis of the decisions, but I would direct Your Honor to

3   the *UBS Securities, LLC v. Highland Capital Management*

4   decision, which is cited in our papers.  It's found at 86

5   A.D.3d 469 or 927 New York Supplement 2nd at 59.

6       In that decision, when UBS first sought to bring the

7   claims that are part of the lawsuit that's now become known as

8   Phase II of the UBS proceedings, the Court ruled as follows,

9   and I quote:  "To the extent the claims against Highland in

10  the new complaint implicate events alleged to have taken place

11  before the filing of the original complaint" -- that date was

12  February 24th of 2009 -- "res judicata applies."

13      The Court went on to explain that any claims against the

14  Debtor arising from the restructured warehouse transaction are

15  barred by res judicata.  Quote, "That is because UBS's claims

16  against Highland in the original action and in this action all

17  arise out of the restructured warehousing transaction, while

18  the claim against Highland in the original action was based on

19  Highland's alleged obligation to indemnify UBS for actions

20  taken by the affiliate Fund, and the claims against Highland

21  in the second action arose out of Highland's alleged

22  manipulation of those Funds, *i.e.*, alter ego.  They form a

23  single factual grouping.  Both are related to the same

24  business deal and to the diminution of the value of securities

25  placed with UBS as a result of that deal."

86

1    So the Court held that to the extent that UBS in that

2    second proceeding, which is now being referred to as Phase II,

3    was asserting claims against Highland Capital Management that

4    were based upon the warehouse transaction or any other conduct

5    that occurred prior to February 24, 2009, those claims were

6    barred by res judicata because they were not raised as part of

7    the original action, which was a separate lawsuit, as we

8    explain in our papers.

9    So while we're not here to argue the merits of the res

10   judicata issue right now, it comes to the fore because of the

11   way UBS described its claim, because of the fact that UBS

12   asserted in its motion that it intends to seek to hold the

13   Debtor liable for that $1 billion judgment that was entered

14   for breach of the warehouse facility.  And we submit that when

15   the time comes for the Court to consider objections to UBS's

16   claim, that the res judicata -- that res judicata as a result

17   of the Appellate Division's decisions in New York will make

18   quick action of any effort by UBS to hold the Debtor

19   responsible for that $1 billion judgment.

20   Now, in its reply, UBS makes an interesting statement with

21   respect to this alter ego argument, this claim to hold the

22   Debtor responsible for the $1 billion judgment.  And we think

23   that the statement in the reply, Your Honor, is quite telling.

24   It's found on Page 6 in a footnote, Footnote 5.

25   In that footnote, UBS seems to try to preserve the right

APP. 0717

87

1    to bring that $1 billion alter ego claim, to hold the Debtor

2    responsible for the judgment that was entered last fall.  And

3    this is the reply brief at Page 6, Footnote 5.  In that

4    footnote, UBS stated as follows, quote -- and this is at the

5    very end of the footnote, Your Honor -- that UBS, of course,

6    reserves all rights to pursue any post-trial relief, including

7    holding the Debtor liable as an alter ego.

8        So, Your Honor, we would submit what that suggests is that

9    what UBS wants to do here is to go to New York to get a jury

10   trial on its pleaded claims against the Debtor, which are only

11   fraudulent transfer and breach of the implied covenant of good

12   faith and fair dealing claims, and then to initiate even

13   further proceedings in New York, seeking to hold the Debtor

14   liable for the 2018 $1 billion judgment.

15       Your Honor, how long must all of the other creditors of

16   this estate wait for that, for UBS to finish adjudicating its

17   claims against Highland?  The delay, I submit, would be

18   crippling.

19       A few words about the issue of the release, and this is an

20   issue that the Redeemer Committee is quite familiar with

21   because the Redeemer Committee negotiated that settlement

22   agreement.  The -- again, this isn't the time to argue the

23   merits of the issue, but I raise the issue just to impress

24   upon Your Honor that it is a serious gating issue, we believe,

25   and an issue which ought to be addressed, because it could

88

1    have a material impact on the Debtor's exposure on any claims

2    from UBS.

3        Now, as I've said, the claims that UBS has stated in New

4    York against the Debtor are claims for fraudulent transfers

5    which were brought against the Debtor and certain of its

6    affiliates, and a claim against the Debtor for breach of an

7    implied covenant on fair dealing.  In its briefing with

8    respect to bifurcation, UBS made clear that both of those

9    claims against the Debtor relate to the fraudulent conveyances

10   which -- by which UBS contends the Debtor's affiliate, which

11   is a company called HLC, transferred certain assets to the

12   Crusader Fund, to the Credit Strategy Fund, to the Debtor

13   itself, and to other affiliates, including the fund that's

14   currently known as the Multi-Strategy Fund.

15       And again, you don't have to believe me when I say that

16   those claims all arise out of the fraudulent transfers.  We

17   can look at UBS's own arguments.  And this, again, is in

18   Exhibit J to the Redeemer Committee's objection, where UBS

19   described the implied covenant claim as follows:  "The implied

20   covenant claim which involved Highland Capital Management's

21   role in the March 2009 fraudulent conveyances overlaps

22   factually with the fraudulent conveyance claim."

23       Your Honor, as we've shown in Exhibits H and I, in 2015

24   the Highland Crusader Fund and the Highland Credit Strategy

25   Fund, which together were the recipient of over 80 percent of

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 723 of 732   Page 740 of 1017   PageID 3203

89

 1   the assets that comprised those claimed fraudulent transfers,

 2   those two funds entered into settlements with UBS.  Those two

 3   funds paid a total of approximately $70 million to settle the

 4   fraudulent transfer claim.  The value of the fraudulent

 5   transfer claims, as Mr. -- or as Debtor's counsel has pointed

 6   out, the value of the fraudulent transfers to those two funds

 7   was somewhere in the neighborhood of $180 to $200 million out

 8   of the $240 million of fraudulent transfers that UBS is

 9   seeking to recover from.

10       As part of the settlement agreement, UBS agreed to release

11   Highland Capital Management from any claim arising out of the

12   fraudulent transfers that took place either to the Crusader

13   Fund or the Credit Strategy Fund.  And I would direct Your

14   Honor to Exhibits H and I.  The language of the two settlement

15   agreements is quite similar.  If we look, for example, just at

16   Exhibit H, Section 5.3, of the Highland Crusader Fund

17   settlement, you will see that UBS released Highland Capital

18   Management for "losses or other relief specifically arising

19   from the fraudulent transfers to Crusader alleged in the UBS

20   litigation."

21       As we explained in our papers, the term that's used there,

22   I believe, is HCM Released Parties, or something similar to

23   that.  If you go back through the definitions, you'll see that

24   Highland Capital Management was specifically released with

25   respect to claims arising from the fraudulent transfers to

90

 1   Crusader.

 2       The same language appears in Exhibit I, which is the

 3   settlement agreement between the Highland Credit Strategy Fund

 4   and UBS.

 5       So this is a threshold legal issue, Your Honor, which we

 6   submit has the potential to significantly reduce the amount of

 7   any allowable claims to UBS.  And because the Crusader Fund is

 8   a party to that settlement -- and the Crusader Fund's counsel,

 9   Mr. Rosenthal, I believe is listening to the proceedings today

10   -- because the Redeemer Committee members were signatories to

11   that settlement agreement, the Crusader Fund and Redeemer

12   Committee ought to have an opportunity to be heard with

13   respect to an objection to UBS's claim that is premised upon

14   the settlement agreement involving those two parties.

15       We submit, Your Honor, that you are well suited to

16   deciding the res judicata and release issues.  They're issues

17   that rely only upon what we think are very clear court

18   decisions on the res judicata -- outlining the bounds of res

19   judicata with respect to UBS's claim, and what we would submit

20   is unambiguous settlement language.

21       One final word I would like to express, Your Honor.  With

22   regard to the last-ditch argument that UBS made, their

23   argument that if you don't lift the stay you should at least

24   extend the bar date indefinitely only for UBS or enter some

25   sort of an order preserving UBS's right to jury trial:  Your

91

1   Honor, this case has been pending since October, this

2   bankruptcy case.  UBS waited until May to file a motion to

3   lift stay.  And I know they've made some arguments about why

4   they waited, but we've been sitting around for quite some

5   time, trying to make progress in this case.

6       UBS has already had the benefit of a special delay in the

7   bar date.  Everyone else filed their claims in April.  They

8   agreed to a stipulation, which this Court entered as an order,

9   which provides that UBS would file its claim within five

10  business days after the Court's ruling in the event that the

11  Court denies the motion to lift stay.

12      They've had their delay.  They asked for extra time, in

13  fact, to bring their motion to lift stay.  What UBS is

14  suggesting now is that they should get yet even more delay,

15  indefinite in length.  Your Honor, we're trying to get moving

16  with this proceeding.  We'd like to see the Debtor submit a

17  plan.  The Committee is trying to work with the Debtor on a

18  plan.  I tell you, my clients, Redeemer Committee, are in

19  serious discussions with the Debtor about resolving the

20  allowable amount of their claim.  And this case ought to move

21  forward.  But if Your Honor grants UBS's motion, what will

22  happen is this case will stall, to the prejudice of the estate

23  and to the prejudice of all other creditors.

24      Thank you, Your Honor.

25          THE COURT:  All right.  Thank you.

002495

92

1      Ms. Patel, will you be making the argument for Acis?

2          MR. SHAW:  Your Honor, Brian Shaw on behalf of Acis.

3  I'll be very, very brief.

4          THE COURT:  Okay.

5      OPENING STATEMENT ON BEHALF OF ACIS CAPITAL MANAGEMENT

6          MR. SHAW:  Judge, one of the foundational principals

7  of the Bankruptcy Code is the policy of equal treatments of --

8  treatment of creditors.  Granting stay relief here would be to

9  prefer UBS over all other creditors.  And UBS is not unique.

10  We have plenty of litigation creditors in this case.  We have

11  Acis.  We have Mr. Daugherty.  We have the Redeemer Committee.

12  We have UBS.  So, granting relief from stay treats UBS

13  differently, makes them a super-creditor, and violates that

14  fundamental foundational principle of bankruptcy law.

15      The second and final point I'll make, Judge, is I think I

16  heard Mr. Clubok, in reference to your question about

17  mediation, say something like he did not expect to have to

18  ultimately try this case.  And if I misquote him, I'm sure

19  he'll let us know.  I think that tells you everything about

20  the motivations here.  I think that tells us everything about

21  the fact that this is about leverage and not about all of the

22  parties in interest here.

23      This is not a case just about UBS.  It's a case, a

24  bankruptcy case about all the parties in interest, including

25  the Debtor and creditors and other parties in interest.

Main Document   Page 727 of 732

93

1        That's all I have, Your Honor.

2            THE COURT:  Thank you.  All right.  Mr. Clubok,

3   you're the movant so you get the last word.

4            MR. CLUBOK:  I appreciate that, Your Honor.  A lot to

5   cover here.  Let me say, make this brief observation at the

6   outset, and then I'm going to talk about some of the specific

7   things that were said.

8        Number one, this really proves the old adage, the enemy of

9   my enemy is my friend.  I did hear Ms. Mascherin say, oh, gee,

10  we've never agreed with Highland before in years and years;

11  all of a sudden now we agree with them.  There is a reason why

12  we're like the skunk at a picnic here, we're getting ganged

13  up, and it's not, Your Honor, because the parties are trying

14  to get to a speedier resolution.  It's because they think they

15  can substantively impact our claim and get more -- each of the

16  creditors think they get more amongst themselves if they can

17  knock down our claim.

18       I heard over and over again Ms. Mascherin and others say,

19  oh, I'm not going to argue about the merits here, and then

20  they went on in great detail to try to argue about the merits

21  of our claim.

22       So my second point, overall point that I want to make is

23  -- and this is one where I've got to say at least one thing

24  was said by all the objectors.  Mr. Clemente -- I agree with

25  this.  What Mr. Clemente said was the merits aren't relevant

APP. 0724

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/02/25   Page 745 of 1017   PageID 3208
Main Document   Page 745 of 2722

94

1   today.  And to Mr. Clemente's credit, I think he less than

2   everyone else went on to then argue the merits, regardless of

3   the fact that they're not relevant today.

4        The merits aren't relevant to today, Your Honor.  What's

5   relevant to today is who is going to be deciding those merits.

6   Okay.  And it is so crystal clear from hearing the argument

7   and how they lived with these arguments for years and years

8   and years that what I'm hearing today is the same argument I

9   heard in the I think third appeal, the fourth appeal, the

10  summary judgment, and the fifth appeal.

11       So much of what you were told today, Your Honor, dates

12  back to some language, some stray language that was used in a

13  2011 decision.  Okay?  And ever since that language was used

14  in that 2011 decision that Mr. Feinstein cited and Ms.

15  Mascherin cited, ever since that 2011 decision, Highland has

16  argued over and over again, essentially, ha ha, this means you

17  lose the bulk of your claim.

18       That 2011 decision, they argued it, and we went up and

19  down to the appellate court multiple times to demonstrate

20  that's not true.

21       And Your Honor, we lay out a little snippet of that on

22  Page 5 of our reply brief.  I'm not going to get into all of

23  the substance of decisions that happened since 2011, because

24  that's what you were told matters here, but I'll just briefly

25  quote that in rejecting summary judgment, denying summary

95

1   judgment that Highland had right before the trial, when they

2   said, hey, there's no breach of duty of an implied good faith

3   and fair dealing, hey, this 2011 decision kills your case,

4   hey, most of your damages can't be asserted, the Court said --

5   the district court rejected it.  And the appellate court said,

6   talking about the district -- the trial court, I mean, the

7   appellate court said, The Court correctly rejected Defendant's

8   argument because neither our prior decisions nor the doctrine

9   of res judicata bars Plaintiffs from introducing evidence of

10  pre-February 24, 2009 conduct, to the extent necessary to

11  prove with respect to post-[February] 24, 2009 conduct their

12  alter ego, fraudulent conveyance, and breach of implied

13  covenant claims.  That is, all three of those claims, the

14  alter ego claims that actually exist, not that we're being

15  told that -- and we've been supposedly -- with this, the

16  fraudulent conveyance claims that are directly against

17  Highland, and most importantly, because this will give up the

18  cap, if we win, to the entirety of that $500 million in

19  damages we suffered, a breach of implied duty of good faith

20  and fair dealing.

21      You just heard some terrific new arguments from Mr.

22  Feinstein and then a little bit from Ms. Mascherin as to why

23  we're going to probably supposedly lose that.

24      And again, going back to what Mr. Clemente said, without

25  getting into the merits, I'll just say we have defeated that

96

 1    several times already in New York courts since 2011, that

 2    language they claim -- they tell you means what it doesn't

 3    mean.

 4        They just want a new forum.  They lost in front of Justice

 5    Friedman.  They lost in the appellate court in New York.  We

 6    defeated summary judgment, and we're in the middle of a trial

 7    where we are pursuing these claims.  And now they see this as

 8    a possibility to relitigate in a new forum those exact same

 9    claims.  That's what this comes down to.  We talk about

10    motivations.  It's clear the motivation is to do what this

11    Court should not do, which is use Chapter 11 to let them

12    relitigate cases, not reorganize.

13        And the third big-picture -- that brings me to my third

14    big-picture point, Your Honor.  Your Honor, you were told by

15    Mr. Feinstein the progress of confirming a plan is just

16    stymied by this one debtor.  And then you were told many other

17    things.  The success or failure of the plan all -- is all

18    dependent on UBS's claim.  Ms. Mascherin asserted that she's

19    having discussions.  And you're sort of being led to believe

20    that if we just could resolve UBS's claims, if that were

21    somehow possible in the next month or two, even though it's

22    enormously complex and it's going to take months, whether they

23    try and move it here or we finish up in New York City or --

24    but you're told that, oh, that's just the one thing holding up

25    the plan.  Your Honor, I can't get into the settlement

97

1   discussions we've had, although you were -- you know, maybe I

2   can, because I have to rebut the false impression you've been

3   given.  But I'll say this:  There was a motion filed by

4   Debtor's counsel a couple days ago, I think maybe Friday,

5   where they asked for further extensions for the exclusivity

6   period so that they can continue with their plan.  And in

7   that, they reference a term sheet that they had signed.  They

8   said, hey, we've signed this term sheet, and because of that

9   we're pretty close, give us another 30 days.  And by the way,

10  that can be extended by two more 30 days.

11      I can -- let's just leave it at this:  It's Highland's

12  burden of proof.  They could not satisfy their burden of proof

13  to honestly tell you that agreeing to that term sheet is

14  dependent upon how we divvy up the proceeds from liquidating

15  assets among the creditors.

16      What I think is clear is that Highland has lots of non-

17  liquid assets that I believe we're going to be told are going

18  to take a year or two to turn into anything that would be

19  available to creditors.  Okay?  It's not like the plan is all

20  ready to go, they're ready to distribute all the money, and

21  all the proceeds are getting taken care of, including all the

22  claims.  That's kind of the impression they led you to

23  believe.  I mean, Mr. Feinstein basically said it directly.

24      It's just not true.  If it were true, let them show you

25  the term sheet.  Let them satisfy what is, by the way, their

APP. 1728

98

1    burden of proof.  The cases make it clear that it's our burden

2    to come forward but then their burden of proof.

3        They can't do it because it's not true.  And to sit here

4    and listen to them try to tell you, oh, this is the one thing

5    holding things up, it's just -- it's on its face -- I don't

6    know how to characterize it other than to say -- let's just

7    say politely they've not met their burden of proof to show you

8    that they're all ready to go with a plan and the one thing

9    holding it back is whether -- the value of UBS's claim.

10       So those are the three big-picture things.  And then I'd

11   just like to respond to some very specific things that were

12   said and I believe misstated.

13       Most importantly, I would ask you to look at, please, Page

14   5 -- 4, 5, and 6 of our reply brief.  People kept saying,

15   Don't get into the merits.  This is not about the merits.  But

16   they just want you -- they want to ask you to relitigate the

17   res judicata issues that have already been decided.

18       And I say they've been decided.  They get up here and they

19   tell you, oh, no, they're new issues, or we haven't been

20   decided, or decided a different way.  Let's just go to Justice

21   Freidman.  She will have -- she will be able to handle that in

22   a week, like she did the last one, is my guess.

23       By the way, Mr. Feinstein bragged that he's the --

24   supposedly the only New York lawyer here.  That's not true.

25   I'm barred in New York.  I practice in New York.  I'm barred

99

1  in Ohio.  But I litigate -- and New York and Washington, D.C.

2  And I daresay I'm the only lawyer here, other than Ms.

3  Mascherin, I imagine, who has practiced in front of Justice

4  Friedman.  I practiced in front of Justice Friedman for years

5  in not just in this case but in other cases, and the notion

6  that she can't handle this very quickly and effectively and

7  wouldn't do it very quickly and effectively, for people to

8  start representing, gee, what it's like to be a New York

9  lawyer or what happens in New York state court, I think

10  there's a -- let's just say a difference of opinion.

11       Certainly, my client -- my client, who is on the phone,

12  Suzanne Forster, she's also a part of New York.  We're

13  familiar with the New York courts.  We litigate there quite a

14  bit.  And the dispar... I mean, it's easy to hit on New

15  Yorkers, I guess even if you're a New Yorker you can claim to

16  hit on it, but I'm confident that Justice Friedman will do as

17  she promised and move this case along.  I can't guarantee you

18  the trial date, because six months ago, when she -- we were

19  ready to try the case and we agreed to the delay.  She said,

20  Great, I'll work on that schedule for you.

21       Now, COVID happened, right, and that's a crazy, unforeseen

22  circumstance.  And so I can't predict that COVID will allow a

23  trial to start back up in September or in January.  Some

24  people have said different things.

25       But when you're talking about a matter of months to

APP. 1739

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 751 of 1017   PageID 3214

100

1    resolve a claim that is so complex that you've heard four

2    different lawyers tell you totally different things than what

3    the New York appellate courts have told us, and different from

4    what Justice Friedman told us, and different than what

5    Highland's last set of lawyers argued to Justice Friedman, all

6    of those are the things that we'd get into and not on the

7    merits if we actually had to deal with the merits of these so-

8    called threshold issues, which aren't threshold issues, but

9    that's again why that should be quickly resolved by Justice

10   Friedman, who would not even let them proceed, I imagine, as

11   opposed to asking for you to give them another bite at that

12   apple.

13       Now, I just want to make sure I address the other things

14   that they say.

15       You know, I never heard a single word, of all those

16   objectors, Your Honor, we filed our reply brief to make sure

17   that our position was clear.  I argued.  I just heard five

18   other folks argue.  Not a single one of them told you what's

19   going to happen to UBS to the extent that it is entitled to

20   try these same claims against the other defendants that are

21   still in the case that aren't in bankruptcy court.  I mean,

22   might say some of the claims are exactly the same.  Fraudulent

23   conveyance against Multi-Strat, for example, a nondebtor in

24   New York that we have a $60 to $90 million claim against.

25   Same facts.  Also, Highland is responsible just for that part

1    of the case.  And that's not affected in any way, shape, or

2    form by any settlement agreement with anyone.

3         So you've got the exact same claim, basically, the same

4    facts.  That particular fraudulent transfer, transfer just to

5    Multi-Strat, we can go after the transferee and we can go

6    after the transferor.  We have the right to punitives.  All of

7    it's a jury trial.  That's pending right now in New York.

8    And how are we not going to be prejudiced if we're going to

9    argue -- we're going to have to try that case in two separate

10   courts?  That case is not affected in any way by these so-

11   called threshold issues.  Not in any way, shape, or form.  Not

12   by the settlement agreement, not by the res judicata argument.

13   So, right there, that chunk of, you know, $60 to $90 million,

14   just that one claim alone.

15        There are other fraudulent transfers by Highland to itself

16   and to other entities that also were not subject to the

17   settlement.  We think there's something like $150 million, at

18   least, in fraudulent transfers, even if you credited this

19   settlement wipes out the rest of our fraudulent transfer

20   claims, an argument that, by the way, is inconsistent with

21   Highland's previous argument, and we'd be arguing that to you

22   if we're forced to get to the merits, which, of course, we're

23   not supposed to do today, even though many of the other

24   lawyers argued on the merits.

25        But then we get to breach of duty of good faith and fair

102

 1   dealing.  And here is where, Your Honor, I agree, our

 2   language, that one sentence that they jump on in the opening

 3   brief was looser than it should have been.  We said something

 4   like, in the second phase, we'll find out if Highland is

 5   responsible for the $500 million judgment.  And they jumped on

 6   that and they're trying to tell you, aha, that means these

 7   guys have a secret plan to pursue a brand new alter ego theory

 8   and that's the whole plan and that's really what's going on

 9   here.

10       Your Honor, all that means is, as a practical matter,

11   Phase I, assess how much money, $500 million, was owed to UBS

12   as of February 24, 2009, when we filed suit.  Every action

13   that Highland took after that to ensure that those payments

14   would not be made -- and there were hundreds of millions of

15   dollars left after February 24th, 2009 where Highland could

16   have paid UBS or caused UBS to be paid -- when Highland chose

17   not to -- and by the way, not only did they choose not to, but

18   we gave you a little taste of the kind of things they did.

19   There's an email, I think it's Exhibit 5 to our opening.  I'm

20   sorry.  Exhibit H.  It -- anyway, there's a -- as you'll see,

21   there's a brief email chain where they talk about how they're

22   going to (inaudible) court and then they're going to stymy all

23   of our opportunity to recover the money.

24       So the $500 million just is the amount that two of the

25   Highland entities owed us under a contract that Highland had

1   signed.  We have already won, defeated summary judgment and

2   many appellate decisions that say that every single thing that

3   Highland did after February 2009 to not cause us to get paid

4   is potentially a breach of implied duty of good faith and fair

5   dealing.  That part of our claim is going forward.  That's not

6   something that Your Honor can -- unless you want to overturn

7   summary judgment and the appellate -- New York appellate

8   courts on an issue of New York state law, no matter how much

9   Mr. Feinstein or Ms. Mascherin would have liked that to be

10   changed, that's just asking to relitigate a decision that's

11   already been handed down by the appellate court in New York.

12   Okay?

13       And that's why this whole exercise is so terribly

14   misguided and wrong and why we would suffer terrific prejudice

15   to (a) have to relitigate those claims.  Assume we win, then

16   we're going to litigate the rest of our claim, I guess, in

17   their mind, here against Highland, while litigating a very

18   similar claim, on similar facts, with the same witnesses, in

19   front of a jury in New York.  They've apparently abandoned or

20   were going to remove it and you're going to survive

21   abstention, or because they didn't say it, maybe they're just

22   hoping that you agree with them.  But for all the reasons we

23   cite in our brief, mandatory abstention, leave permissive

24   abstention, will apply to those claims against the non-

25   debtors.

APP. 1791

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15   Filed 09/08/22   Page 755 of 1017    PageID 3218
Main Document   Page 733 of 1722

104

1        Turning to what Mr. Pomerantz said.  And I think it was

2    Mr. Pomerantz.  I apologize if it was Mr. Feinstein.  But I

3    think at one point Mr. Pomerantz jumped in and answered a

4    question you asked, and that answer was pretty revealing to

5    what's really going on here.  Okay?

6        What's really going on here is this isn't just about how

7    much gets paid to each creditor.  It's not about delaying the

8    total plan.  It's not about not being able to -- it's not

9    about getting people paid much faster, because it's going to

10   take a year or two to liquidate the assets in order to pay any

11   of the creditors a sufficient amount of money.  It's just

12   about short-circuiting our right to get a fair determination

13   of our claim when we're literally in the middle of a trial.

14       And I daresay none of the cases they've cited to you where

15   bankruptcy courts have decided to refuse to lift the automatic

16   stay are ones like this, where a party, after 11 years of

17   litigation, was in the middle of trial.  We cited those

18   timeliness cases.  That's something else I didn't hear any

19   response to by any of the Objectors.  We cite them on -- in

20   our opening brief, I think on Page 5 of our opening brief.  We

21   cite several cases that stand for the proposition that

22   timeliness just means is there going to be a timely

23   adjudication.  And in those cases, cases that were still in

24   the summary judgment stage or in the middle of discovery, the

25   Court said no.  In one case, it was a case that had just been

105

1   filed.  At the same time the bankruptcy was filed, in the

2   state court, filed in bankruptcy about the same time, the

3   Court said the bankruptcy -- that's going to move things

4   along.

5        Those cases specifically say things like -- we're talking,

6   talking about a matter of months and not years with an S.  It

7   easily satisfies the timely requirement.  And for us to be

8   able -- Page 43 was -- Ms. Tomkowiak reminded me of the

9   opening brief, we think our cases on timeliness.

10       Ms. Mascherin.  Ms. Mascherin, by the way, throws out as

11  an aside that she has a $190 million claim, that the Redeemer

12  Committee has a $190 million claim.  Frankly, that's not -- we

13  don't believe that's true.  That claim is not a secured claim.

14  That claim is subject to many setoffs.  As an economic matter,

15  frankly, that claim is worth about $90 million maybe at most,

16  maybe even less.

17       Now, that's going to be the subject of either a

18  negotiation, which would be great if Ms. Mascherin is correct

19  and Highland is working with her in good faith to come to a

20  resolution of that claim.  If it's a fair number, then that

21  will be great.  And if not, I guess people will object.

22       Acis's claim, you know, it needs to be adjudicated or

23  resolved.  Mr. Daugherty's claim needs to be adjudicated or

24  resolved.

25       There's a lot of things that need to happen in this Court,

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 757 of 1017   PageID 3220
Case 3:25-cv-02072-S   Document 15-4   Filed 09/08/25   Page 757 of 1017   PageID 3220

106

 1   along with seeing a plan.  And by the way, the plan that we

 2   expect to see is not going to be dependent on exactly which of

 3   the creditors gets which, based on what we understand as of

 4   this point.  Certainly, it hasn't been demonstrated to be the

 5   case by Highland in its argument.

 6        And so when you talk about doing two things at the same

 7   time, or walking and chewing gum at the same time, there's a

 8   lot of gum and a lot of walking to be chewed by all the other

 9   creditors in this estate and the directors in terms of

10   figuring out how they're going to liquidate some of these

11   long-term assets and how money is going to show up not a year

12   or two years from now but hopefully sooner.

13        Meanwhile, if you lift the stay, we can go to Judge

14   Friedman.  We can say to her, hey, remember when you promised

15   that we'd have a trial in six months?  We realized there's

16   COVID, but let's do everything else to be all ready to be on

17   the -- the first in your queue.  And by the way, I'm not

18   guaranteeing.  I never -- if I -- if you thought I said it, I

19   didn't, but I certainly would not guarantee we're going to be

20   first in the queue, but I predict that if we tell Judge

21   Friedman what's happened here and we ask her if we can be

22   first in the queue, I suspect we'll have a pretty good shot at

23   that.  We certainly should be entitled to give it a shot and

24   to see before we just immediately lose all of our rights in

25   these cases.

107

1    Your Honor, there are extraordinary circumstances here.

2    You know, Ms. Mascherin said we have some kind of burden of

3    proof to show extraordinary circumstances.  That's not the

4    test.  You know, the test is cause, and then the burden

5    shifts, as we know from cases.  But there are some pretty

6    extraordinary circumstances.

7          THE COURT:  What -- what --

8          MR. CLUBOK:  We're in the middle of a fight.

9          THE COURT:  I just -- I can't resist chiming in on

10   that one, the burden shifting.  I mean, does the burden really

11   ever shift in this context if we're not talking about assets,

12   collateral, and equity/no equity?  I'm a little stumped on the

13   burden shifting that you've argued here.

14         MR. CLUBOK:  Well, Your Honor, Page 2 and 3 of our

15   brief sets it out.  Under Section 362(d)(1) of the Bankruptcy

16   Code, we have the initial burden of producing evidence

17   establishing a *prima facie* case that cause exists.  That's the

18   (inaudible) *Self* case.  Once that burden is met, however, the

19   debtor "has the ultimate burden of persuasion or the risk of

20   non-persuasion as to all stay issues under Section 362(d)(1)."

21   That's that same case.  And we cite that on Page 2 and 3, and

22   we also say *See also* a case from the Fifth Circuit.

23    So that is the law that we've cited.  The Defendants --

24   the Objectors, I should say, just hand-wave and just tell you

25   it's not true, but that's the case law that we've cited that I

108

 1   think will stand on the Fifth Circuit and the bankruptcy court

 2   decision that we cited.  But look.  So that will -- that is

 3   the case.  But in any event, we -- there is an inescapable

 4   fact here that we're in the middle of a trial, that there are

 5   non-debtor defendants in that trial, that there's a lot of

 6   overlapping facts.  And by the way, there's a level of

 7   complexity that is so great that the stuff you've heard today

 8   will take us a long, long time for us to explain to you why

 9   it's not true, it's rehashed, it's incorrect, it's already

10   been decided, or it's been waived.  But it's not, as they say,

11   in all of these snippet and out-of-context arguments you've

12   heard while you hear lawyers telling you, hey, we're not

13   getting into the merits, but now let's just give you a little

14   preview of the merits, that's all the kind of stuff that

15   Justice Friedman could deal with so quickly and easily, and

16   they know it, and that's what's really going on here.

17       In terms of, you know, what Mr. Shaw said, and I'll just

18   briefly say, you know, it's not that you get -- you've got to

19   have a -- you've got -- put it this way.  Because of the stage

20   of the proceeding, Acis's claim, for example, which I had

21   heard might be $5 million, but now I hear it might be $100

22   million, I don't think that's even out of the gate in terms of

23   litigating.  And if Acis thinks that Your Honor can handle

24   that more quickly and efficiently, that's why it'll be here.

25   Or they're happier with you making decisions about that case

109

 1   than, you know, the judge behind door number two.  That's

 2   terrific.  That will move along the resolution of what their

 3   claim is, or maybe they'll settle it, ideally, with the

 4   Debtor.

 5       But that claim is so differently-situated than our claim,

 6   which is, after 11 years of litigation, literally in the

 7   middle of a trial, where the judge has already made

 8   credibility determinations, and she was the fact-finder under

 9   part of the case and is going to be the fact-finder under the

10   second part of the case as well for some of the claims.  So

11   that's why that's very different.

12       The last thing I just want to say is we talk about

13   motivation.  We talk about leverage.  I mean, we haven't been

14   litigating with Highland for 11 years because it's fun.  I

15   mean, it's not fun.  I promise you.  Litigating with anyone --

16   and I will -- I think all the -- I think Ms. Mascherin even

17   would agree with me that it's not super-fun always litigating

18   with Highland.  Probably Acis would agree as well.

19       We've done that not to -- as an ultimate plan to have

20   leverage in the bankruptcy court.  We pursued that for 11

21   years because they owed us $500 million in 2009 after we sued.

22   They had hundreds of millions dollars that they controlled,

23   and they breached their duty of good faith and fair dealing

24   and caused fraudulent transfers, such that we've been paid not

25   one penny, not one penny from Highland, even though this Court

110

1    has -- the New York court has already found that they were

2    liable to us for $500 million as of that date.

3        So that's why we've been pursuing them.  It wasn't some

4    master plan so that one day we could be here in bankruptcy

5    court and somehow get an unfair shake.  It was so that we

6    could get a fair resolution of our claim.  And we fought

7    through all the same arguments I heard today.  I have been in

8    the New York Court of Appeals five times.  Or four times, I

9    guess.

10       By the way -- yeah, four times in the New York Court of

11   Appeals.  At least three of them since 2011.  I've lost track

12   of which ones came before or after.  But I've heard these same

13   arguments over and over again.  I heard them at summary

14   judgment briefing.  I heard them in the state court at the

15   trial.  They've been rejected.

16       To ask Your Honor to give them a new bite at the apple and

17   to ask you to make an interpretation of these issues that are

18   surely New York state law, that have been well resolved in New

19   York state law, that Justice Friedman could decide in her

20   sleep, and she proved the last time they did it she could

21   decide in about a week, that's not -- that's not appropriate,

22   and we've certainly showed good cause and we showed the

23   prejudice we would be suffering if the Objectors are given the

24   chance to just relitigate in a new forum issues that have

25   already been litigated.

111

1         THE COURT:  All right.

2         MR. CLUBOK:  Thank you.

3         THE COURT:  Thank you.  Well, I want you all to know

4    that I thought all of the briefing was spectacular.  It was

5    extremely well done.  And I want you to know that I spent all

6    weekend looking at it.  I'm telling you that both to

7    compliment you and to let you know why I am going to go ahead

8    and rule on this.

9         I, my law clerk, we've spent a lot of time looking at your

10   very wonderfully-prepared pleadings.  And if you saw me

11   occasionally looking over at my computer when you were

12   arguing, I was not drifting off, doing something else; I

13   actually opened the email that Mr. Sosland sent my courtroom

14   deputy earlier this afternoon with the unredacted UBS reply

15   and attachments, to make sure I considered that, because that

16   would have been the only thing that I hadn't reviewed before

17   coming in here this afternoon.  So I greatly appreciate the

18   complexity of this 11-year litigation dispute.  I guess the

19   dispute started earlier than February 2009.

20        But 362 is obviously the governing statute here.  I have

21   subject matter jurisdiction, and I'm able to enter a final

22   order on this motion of UBS.  And applying 362 and the cause

23   standard, I find that UBS has not established cause to lift

24   the stay, and I'm going to deny the motion.

25        First, I will say that I believe the burden has been on

112

1   the Movant here, and the Movant never did get past the 50-yard
2   line on showing cause.

3       As many of you noted, cause is a discretionary, highly
4   discretionary standard that governs the bankruptcy judge's
5   decision.  Here, there are a number of factors that have made
6   me decide there is just not cause to lift the stay here.
7   Timing is, as you would guess, the most critical factor here.
8   I don't believe UBS, as eloquent as its arguments were, met
9   its burden of convincing me that things could more timely be
10  resolved in the state court, or even timely be resolved.

11      While I certainly have the utmost respect for Justice
12  Friedman and all of the many years of scaling the learning
13  curve that she no doubt has here, we have this very
14  uncomfortable, unpleasant fact, I think we would all agree, of
15  the COVID pandemic.  None of us can say when things will get
16  back to normal in the New York state courts.  And the likely
17  prospects of delay here, we just cannot ignore.  The judge
18  will have a backlog for all of these months of not having
19  court hearings, and then who knows when a jury trial can
20  happen.  So that unpleasant fact does not work to UBS's
21  advantage here.

22      Also, the fact that this litigation has already been
23  pending over 11 years and only very recently resulted in a
24  written ruling in Phase I, I think is a very unpleasant fact
25  here.  While all of the prior rulings may set things up for

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 08/06/25   Page 257 of 272   764 of 1017   PageID 3227

113

1  Phase II to go more rapidly, I'm just not convinced that a

2  state court anywhere would have the rapid focus that any

3  bankruptcy court will have, this one or any bankruptcy court

4  would have in getting a proof of claim resolved, especially an

5  allegedly $1 billion proof of claim that the whole

6  reorganization strategy hinges on.

7      Here, this Court has the capacity to address even a very

8  complicated proof of claim objection very fast.  We have been

9  up and running, doing evidentiary video hearings for a couple

10 of months now.  Even in this building in the past few months,

11 there have been live in-person hearings on rare occasion in

12 the bankruptcy court, but we have had a handful of them

13 amongst the bankruptcy judges, and the criminal judges are

14 still having live in-person hearings all through the pandemic,

15 and I think our chief district judge is empaneling a jury for

16 the first time this month.

17     So, while anything can change here for the worst as far as

18 the pandemic, I feel like the timing issues heavily weigh in

19 favor of us being able to resolve a UBS proof of claim faster

20 here with a bench trial.

21     This Debtor cannot wait years for this UBS claim of

22 liability of Highland to be resolved.  I will vow to get

23 through this promptly and give you thorough attention, just as

24 I'm sure Justice Freidman has done.  But we just cannot have

25 the massive uncertainty of a potentially $1 billion proof of

114

1   claim delay this case.

2       Someone called UBS the one billion dollar gorilla in the

3   room.  That's, I think, an apt description.  So, timing here

4   is the biggest problem for UBS.  I think a delay here that I

5   believe would be inherent if the state court adjudicated Phase

6   II would be very harmful to this Debtor's reorganization

7   prospects and the other creditors.

8       Other factors that the Court is, of course, supposed to

9   consider in this context -- judicial economy, judicial

10  efficiency, burden on the parties, equities -- I do not think

11  that any of these have been shown here to obviously favor

12  lifting of the stay.  So the motion is denied.

13      I do want to reiterate to people, I am not going to

14  relitigate anything that Justice Friedman has decided.  I will

15  be careful not to do that.  And so be careful what you ask me

16  to do.  I am going to respect the comity of the state court on

17  matters that have already been decided by her.

18      I'm also not going to litigate UBS's claims against non-

19  debtor affiliates, unless somehow there's mass movement for me

20  to do that that I'm convinced I should do that.  So this will

21  just be UBS filing a proof of claim against the Debtor,

22  Highland Capital Management, LP, and presumably the objection,

23  and then the trial on the merits, a bench trial on the merits.

24      I guess I should just reiterate for the record what I

25  hinted at early on, that I'm overruling UBS's argument that

115

1    the Debtor's alleged agreement a few months ago through Scott

2    Ellington to lift the stay in favor of this litigation going

3    forward in the New York state court is binding on the Debtor

4    or other creditors.  Waivers of the automatic stay are

5    generally not enforceable unless there's an order of the Court

6    on notice to all the creditors who are beneficiaries of the

7    automatic stay.  So, no matter what he said, he didn't have

8    the power, and the other creditors cannot be held to that

9    alleged agreement.

10        The last thing -- I mean, not the last thing, the next to

11   the last thing I'm going to say is the proof of claim -- we'll

12   say that UBS must file a proof of claim.  Someone threw five

13   days out there.  We're already past the regular bar date.  So

14   UBS, any argument you want to make that that's not enough

15   time, to say -- and Friday is the 19th.

16        MR. CLUBOK:  Yes, Your Honor.  We would like some

17   more time on that.

18        You know, I will say a couple things.  We are here six

19   months later.  There's one thing I didn't address.  I know

20   you're not giving us -- you're not going to credit us for the

21   agreement that was made, but we did rely on that agreement and

22   did not pursue preparing a proof of claim because we thought

23   we were in a settlement posture.  I would ask the Court to

24   give us -- you know, given the nature of this claim and the

25   size of this, I think it's ambitious now to do it in five

116

1  business days, or June 22nd.  I know there was an original

2  agreement with that, although I also will note that we were

3  assured we'd get more time if we needed to for various

4  reasons, if they were reasonable.

5     I also, frankly, Your Honor, I hate to raise this, but I

6  do think we need to look at our appellate options, because

7  this is going to put us in a situation where we're necessarily

8  going to be trying this case in two different courts with two

9  different decisions, and it is fairly -- you know, it is not

10  the case that there's some plan that's ready to go, that it's

11  just being held up by UBS's proof of claim.  So I guess we

12  would ask that we be given some period of time.  You know, I

13  think we have -- I think we have two weeks to decide whether

14  or not -- sorry.  Yeah, I think we have two weeks to decide

15  whether to appeal.  We would like to have at least that long.

16  Maybe we won't appeal.  That decision has not been made.  I

17  have to talk to my client.  We'll see how it goes.

18     We appreciate your ruling, and we -- you know, not --

19  we're going to appeal, and we'll certainly talk to the Debtor

20  and the other creditors about that and see if we can work

21  something out.  But we'd like a fair amount of time to

22  consider that as an option.  And then, if we do, we certainly

23  don't want a situation being, which is so easy to fix, that to

24  -- just like a proof of claim being filed, we lose our right

25  to end up with a jury trial.  You know, it ultimately makes

117

 1  more sense to try all of this in front of one jury, which is

 2  what's going to be the nature of our appeal.

 3      We can do other things like, you know, give the substance

 4  of what would be in a proof of claim, so we can keep moving

 5  things along in this court.  There's other ways to deal with

 6  it.  The Court can make decisions.  But it's a pretty big hit

 7  if we're just forced to do that right away.  And also, given

 8  the circumstances, and the reason we are six months later than

 9  we would be in dealing with all of this is because we did rely

10  on that promise.  And even if you're not going to hold them to

11  it, it certainly is why we're here.  We would ask that the

12  Court issue a ruling that would help us out, given the

13  circumstances.

14          MR. FEINSTEIN:  Your Honor, may I be heard on this on

15  behalf of the Debtor?

16          THE COURT:  You may.

17          MR. FEINSTEIN:  Thank you.  For the record, Robert

18  Feinstein.

19      Your Honor, there was a -- a briefing schedule that was

20  fully negotiated with the Debtor and UBS, where it was agreed,

21  and it's recited in the stipulation, that there would be an

22  extension of the bar date until the later of June 22nd or five

23  business days after resolution of this motion.  And we worked

24  out a briefing schedule on this motion.

25      So this was already embodied in the document submitted to

APP. 4748

118

1    the Court.  So -- and that was prepared well after any notion

2    that the putative agreement to lift the stay was going to move

3    forward.

4        We told Mr. Clubok months ago our position on that, and

5    the stipulation -- the stipulation with the (garbled) bar date

6    all came long after that.  Your Honor, we can't rely on the

7    supposed agreement to buy more time now.  We negotiated with

8    him to file a proof of claim five business days after Your

9    Honor's ruling on the motion, if Your Honor denied the motion.

10   And we think that that -- that we should stick to that.

11        MR. CLUBOK:  If I may briefly respond.  Of course,

12   it's ironic that, that agreement, we're to be held to, but the

13   other agreement that put us in this mess, that should be just

14   ignored.

15       I also will say there was an oral assurance by Mr.

16   Pomerantz toward many of my colleagues that, don't worry,

17   we'll get more time if we need it, we'll work it out.

18       I don't even want to get into the circumstances of where

19   we were when we reached that agreement.  There were medical

20   issues going on and everyone -- oh, and the other thing is,

21   when we set that deadline, it was because we were assured by

22   the Debtor that, well in advance of that, they would give us

23   an actual offer of settlement that we could start negotiating

24   settlement numbers.  That was the whole idea.  And they said,

25   oh, putting it off to June 22nd will be plenty of time.  You

APP. 4749

Main Document   Page 753 of 2722

119

1   guys will get -- I think at that time they promised us -- I

2   can't remember if it was April or early May.  You know, we've

3   not even seen that.

4        So that was the whole reason we agreed to set those dates,

5   was on the representation that we were going to be having

6   settlement discussions.  Instead, those were cut off, et

7   cetera.

8              THE COURT:  All right.  All right.

9              MR. CLUBOK:  I don't really want to get into the

10  whole back-and-forth.

11             THE COURT:  With respect, I've heard enough.

12      I do want to say, you know, we keep covering this ground

13  again, but it is crystal clear that a debtor cannot enter into

14  an agreement to lift the stay that is going to be binding on

15  all of the creditors and other parties in interest.  It's just

16  I can't -- you know, I don't know of one case that would be

17  supportive here of that argument.  You know, maybe -- I don't

18  know every case that gets decided, but it's -- I think it's

19  crystal clear.

20      And it's quite a different thing, informal agreements to

21  extend deadlines and have scheduling orders.  That's a very

22  different type of agreement.

23      But I am going to give the Debtor -- I mean, excuse me,

24  UBS two weeks.  Okay?  So, well, I'm going to make it close of

25  business Friday, the 26th.  Okay.  So that will be the

APP. 1759

120

 1   deadline for UBS to file a proof of claim.  And that's just

 2   the way it's going to be here.

 3       Now, I don't think I have any other housekeeping matters.

 4   I'll just ask Debtor's counsel to draft the form of order and

 5   obviously run it by Mr. Clubok and his team and give them a

 6   reasonable --

 7           MR. FEINSTEIN:  We'll do that.

 8           THE COURT:  -- a reasonable time to respond.  But I

 9   can't imagine it's going to be a very lengthy order.  I

10   obviously reserve the right to supplement in a written form of

11   order anything I said orally today that I think I might need

12   to clarify or elaborate on.

13       Now, did anyone have any remaining housekeeping matters

14   before I go into one last topic I want to address regarding

15   mediation?

16       All right.  Here's what I'm going to say.  We obviously

17   have two gorillas, actually, in the room.  I've not studied

18   the Redeemer Committee proof of claim.  I just know that I

19   heard from day one that they had approximately a $200 million

20   proof of claims or claim resulting from an arbitration and all

21   they lacked was a judgment confirming it.  Okay?  So, you

22   know, we all know what the courts say about arbitration.  You

23   know, it's just pretty darn hard to set aside an arbitration

24   award.  Okay?

25       So the way I have been viewing this is Redeemer Committee

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 772 of 1017   PageID 3235
Main Document   Filed 06/06/25   Page 772 of 2722   Page 772 of 1017   PageID 3235

121

```
 1   is a claim that has to be dealt with.  You know, I don't know,
 2   I haven't studied the proof of claim, I don't know what
 3   arguments, I don't what setoffs may be.  But my guess is
 4   there's not a lot of wiggle room with regard to that claim.
 5        But then you have this one, which I didn't know until the
 6   last few days that UBS didn't actually have a judgment against
 7   Highland.  I mean, at some point UBS comes in, we have a
 8   billion-dollar claim against Highland, and it was only in the
 9   last few days when I started looking at this I appreciated the
10   fact that, oh, they have a billion-dollar claim against these
11   two Funds, still, you know, contingent, unliquidated, unknown
12   what liability Highland is going to have to UBS.
13        So we've got that gorilla in the room that's making me
14   think about mediation.  And then Acis.  I well understand the
15   Acis issues, but oh my goodness, we have this giant adversary
16   with -- how many counts was it, Tom?  34 counts?
17            THE CLERK:  Yes.
18            THE COURT:  Thirty-four counts in the adversary that
19   Acis -- Reorganized Acis is pursuing against Highland and
20   HCOLF.  And when the stay went into effect from the Highland
21   bankruptcy, my law clerk and I had a giant report and
22   recommendation to the district court that we were soon going
23   to pull the trigger on, and, oh, well, this is all stayed.
24        So I don't think Acis has asserted anywhere close to a
25   billion dollars.  I don't know what the size of the Acis proof
```

122

1    of claim is.

2        Mr. Shaw, what is the size of the Acis proof of claim

3    that's been filed?

4            MR. SHAW:  At least $70 million, Your Honor.

5            THE COURT:  Okay.  I knew it made my eyes pop out a

6    little.  You know, obviously, there are 34 counts and multiple

7    defendants and unclear dollar amounts associated with each.

8    But what are we going to do here?

9        I'm going to start with you, Mr. Pomerantz.  We have too

10   many years of litigation, too, too many years of litigation.

11   And I think I said early on it's time to stop litigating and

12   figuring out how we're going to pay creditors.  But obviously

13   you have these two biggie unknown ones.  I am thinking about,

14   do I order mediation (echoing) of the UBS claim?

15       Someone may not have their phone on mute.  Please put your

16   phone on mute or your device on mute if you don't have it on

17   mute.

18       Okay.  Good.

19       Do I order mediation of the UBS proof of claim once it's

20   filed?  Do I order mediation of the Acis proof of claim and

21   adversary?  Do I get some sort of mediation czar to help with

22   mediation of the plan?  I hate to go that route, and, you

23   know, that's a lot of intermeddling with the Debtor-in-

24   Possession, especially when you've got this fine new board of

25   directors and whatnot.  But I'm just letting you know what's

123

1    going on in my head.  I don't -- I want people to get off

2    their litigation mentality and get focused on the end game

3    here of a plan and everybody getting paid what they're

4    entitled to sooner rather than later.

5        So, Mr. Pomerantz, what is your initial reaction to what's

6    going through my brain?

7            MR. POMERANTZ:  So, Your Honor, I think Your Honor is

8    where the board was when it took over on January 9th.  I think

9    I've appeared before Your Honor on several occasions and told

10   you that the strategy and the game plan of this board was to

11   break the culture of Highland, which is litigating, and

12   attempt to resolve the litigation.

13       Your Honor has mentioned the three large claims.  There

14   are others, but these are the three large claims.  They're all

15   people who sit on the Creditors' Committee.  And as you can

16   imagine, sitting from a standing start on January 9th, it's

17   taken -- it took the board quite a while to be in a position

18   to understand each of the claims.

19       They came to our firm.  They asked us to do an extensive

20   analysis of the UBS claim.  We then started to engage UBS in

21   negotiations.  And they didn't go anywhere.  And quite

22   frankly, I think at least our side and other -- the Objectors

23   felt that we needed to have this hearing, that Your Honor's

24   determination of the relief from stay matter might be a

25   catalyst to further discussions.  And we are, of course, open

124

 1  to further discussions.  We obviously have a big difference in

 2  view of the UBS claim, as does UBS, but we're hoping that, as

 3  a result of this hearing, that that would spur on negotiations

 4  and allow the parties to sit down.

 5      Acis, we are actually going to be meeting with Acis for

 6  the first time on Wednesday in order to discuss their claim.

 7  We've prepared an extensive objection to the claim, which, if

 8  it hasn't already been forwarded to Mr. Shaw and Ms. Patel in

 9  advance of that meeting, will be today.  And we're hoping,

10  after sitting down with them on Wednesday, that it will be the

11  first time the board could let Acis know where the board

12  believes are the concerns and issues with respect to the

13  claim, that we could have meaningful settlement discussions.

14      And with Redeemer, we are perhaps the furthest along,

15  partly because it's the least complex of the three, and we've

16  had several discussions back and forth.  We would not rule out

17  mediation.  That may be necessary.  It is not the board's

18  desire to spend the creditors' money litigating on multiple

19  fronts with each of these creditors.

20      However, I think at this point it might be a little

21  premature.  It may be appropriate to set some kind of a status

22  conference 30 days from now, where we can approach -- we could

23  come back to the Court with a further thoughtful

24  recommendation on whether we think mediation would be

25  appropriate or whether it wouldn't be appropriate.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 06/06/25   Page 776 of 1017   PageID 3239
Main Document   Page 259 of 282

125

 1      But we're hoping, with, again, this hearing, the meeting

 2   with Acis, and the discussions we had with Redeemer, that we

 3   will be able to make progress.  And if not, litigation may be

 4   necessary, but it may very well mean that some form of

 5   mediation with each of these creditors on their claims is

 6   helpful.

 7      But I would like the opportunity to sit down, talk to the

 8   board about that after the dust clears from this settlement --

 9   this hearing, as well as the further discussions we intend to

10   have over the next couple of weeks.

11           THE COURT:  All right.  Well, do you remember, or we

12   can look it up, when our next hearing is in this case?

13           MR. POMERANTZ:  I believe we have a hearing on July

14   8th, Your Honor.

15           THE COURT:  Okay.

16           MR. POMERANTZ:  Perhaps we could report to the Court

17   at that point and have a status conference and be able to

18   address Your Honor's comments in more detail based upon where

19   we are then.

20           THE COURT:  All right.  So that's what we're going to

21   do.  July 8th, whatever time it is, we're going to add to the

22   calendar a status conference.  And just so you all know, we're

23   going to talk about do we need mediation -- again, with regard

24   to UBS or with regard to Acis or more globally?  So I hope

25   that you all will give that a lot of thought.  I'm sure you

126

1  will.

2      Is there anything else, Mr. Pomerantz?

3          MR. POMERANTZ:  Nothing else, Your Honor.  Thanks for

4  your time and effort and going through what was mounds of

5  paper, and the time and effort you spent today as well as

6  throughout the case.  Thank you, Your Honor.

7          THE COURT:  All right.  Well, thank you all again.

8  My compliments.  It was all very well done, so that made it

9  easier to get through.  All right.  We stand adjourned.

10      (Proceedings concluded at 4:43 p.m.)

11                      --oOo--

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21
       I certify that the foregoing is a correct transcript to
22  the best of my ability from the electronic sound recording of
   the proceedings in the above-entitled matter.

23   **/s/ Kathy Rehling**                          **06/17/2020**

24  _____    _____

25  Kathy Rehling, CETD-444                    Date
   Certified Electronic Court Transcriber

APP. 1757

127

```
                                    INDEX
 1
     PROCEEDINGS                                                    4
 2
     OPENING STATEMENTS
 3
     - By Mr. Clubok                                               15
 4   - By Mr. Feinstein                                            48
     - By Mr. Clemente                                             70
 5   - By Ms. Mascherin                                            75
     - By Mr. Shaw                                                 92
 6
     WITNESSES
 7
     -none-
 8
     EXHIBITS
 9
     All Parties' Exhibits Received (exclusive of Exhibit D       11
10   to Redeemer Objection)

11
     RULINGS
12
     Application to Employ - Granted                               9
13   Motion for Leave - Granted                                   13
     Motion to Seal - Granted                                     14
14   Motion for Relief from the Automatic Stay - Denied          111
     UBS Proof of Claim Deadline Set                             119
15
     END OF PROCEEDINGS                                          126
16
     INDEX                                                       127
17

18

19

20

21

22

23

24

25
```

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5    Filed 06/16/25   Page 779 of 1017   PageID 3242
Main Document   Page 752 of 2722
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 1 of 18

# EXHIBIT 17

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03000-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND | § | |
| ADVISORS, L.P., NEXPOINT ADVISORS, L.P., | § | |
| | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/26/25   Page 780 of 1017   PageID 3243
Main Document   Page 763 of 782
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 2 of 18

HIGHLAND INCOME FUND, NEXPOINT
STRATEGIC OPPORTUNITIES FUND,
NEXPOINT CAPITAL, INC., AND CLO
HOLDCO, LTD.,

Defendants.

### DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST CERTAIN ENTITIES OWNED AND/OR CONTROLLED BY MR. JAMES DONDERO

Highland Capital Management, L.P., the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), and the debtor and debtor-in-possession (the "Debtor" or "Highland") in the above-captioned chapter 11 case ("Bankruptcy Case"), submits this memorandum of law (the "Memorandum") in support of  the *Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against Certain Entities Owned and/or Controlled by Mr. James Dondero* (the "Motion"), pursuant to sections 105(a) and 362(a) of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for a temporary restraining order ("TRO") and preliminary injunction enjoining defendants Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P.  ("NPA," and together with HCMFA, the "Advisors"), Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc. (collectively, the "Funds"), and CLO Holdco, Ltd. ("CLO Holdco," and together with the Advisors and Funds, the "Defendants") from engaging in any Prohibited Conduct.[2]  In support of its Motion, the Debtor states as follows:

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the *Declaration of Mr. James P. Seery, Jr. in Support of the Debtor's Motion for a Temporary Restraining Order Against Certain Entities Owned and Controlled by Mr. James Dondero*, being filed contemporaneously herewith (the "Seery Dec.").

002533
APP. 1789

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 09/04/25   Page 781 of 1017   PageID 3244
Main Document   Page 00754 of 2722
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 3 of 18

## I.
## INTRODUCTION

1.      Highland's immediate need for injunctive relief stems from Defendants' recent and repeated interference with the Debtor's operations and contractual rights.  These actions include, in pertinent part, Defendants' interference with the sale of certain collateralized loan obligation ("CLO") assets and Defendants' threats to initiate a process to terminate the Debtor's CLO management agreements (the "CLO Management Agreements").

2.      The Debtor assumed that the Defendants would have gotten the message on December 16, 2020, when this Court granted the Debtor's motion for a directed verdict dismissing their prior motion—characterized by the Court as, among other things, "frivolous"— on these very topics.  The Debtor was wrong.  With the support and encouragement of Mr. James Dondero, Defendants not only persist but have expanded their threats and refuse to back down.

3.      Mr. Dondero directly or indirectly (a) owns and controls each of the Advisors, (b) owns and/or controls CLO Holdco, and (c) controls each of the Funds.  In a recent deposition, Mr. Dondero candidly admitted that he supports all of the actions taken by the Defendants. But pursuant to the "corporate governance" settlement approved by the Court a year ago, Mr. Dondero is prohibited from causing Defendants to terminate any agreements with the Debtor, including the CLO Management Agreement.  Moreover, pursuant to Temporary Restraining Order, Mr. Dondero is enjoined from, among other things, interfering with the Debtor's business, or from causing or encouraging any entity controlled by Mr. Dondero to interfere with the Debtor's business.

4.      As discussed below, injunctive relief is necessary because if Defendants are not enjoined from interfering with the Debtor's ability to manage the Debtor's operations and sale of CLO assets, pursuant to the CLO Management Agreements—conduct which Defendants have no

002534
APP. 1761

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Document Docume Filed 06/02/25 of 2 Page 782 of 1017 PageID 3245
Main Document Page 0 755 of 2722
Case 21-03000-sgj Doc 6 Filed 01/06/21 Entered 01/06/21 20:00:40 Page 4 of 18

legal or equitable right to engage in—the Debtor will be unable to fulfill its duties, and the Debtor's estate will be irreparably harmed.

5. The Debtor has, therefore, filed the Motion and commenced a separate adversary proceeding, (1) bringing a cause of action against Defendants for tortious interference with contract, and (2) seeking declaratory relief and an order to temporarily, preliminarily, and permanently enjoin Defendants from: (a) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's (i) management of the CLOs, (ii) decisions concerning the purchase or sale of any assets on behalf of the CLOs, or (iii) contractual right to serve as the portfolio manager (or other similar title) of the CLOs; (b) otherwise violating section 362(a) of the Bankruptcy Code; (c) seeking to terminate the portfolio Management Agreements and/or servicer agreements between the Debtor and the CLOs (collectively, (2)(a)-(c) constitute the "Prohibited Conduct"); (d) conspiring, colluding, or collaborating with (x) Mr. Dondero, (y) any entity owned and/or controlled by Mr. Dondero, and/or (z) any person or entity acting on behalf of Mr. Dondero or any entity owned and/or controlled by him, to, directly or indirectly, engage in any Prohibited Conduct; and (e) engaging in any Prohibited Conduct with respect to any of the Successor Parties (as that term is defined below).

## II.
## FACTUAL BACKGROUND

### A. Mr. James Dondero Owns and/or Controls Each of the Defendants

6. There can be no genuine dispute that Mr. Dondero owns and/or controls each of the Defendants. (Seery Dec. ¶ 5.)

### *The Advisors and the Funds*

APP. 1762
002535

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 6-5 Filed 09/02/25   Page 783 of 1017   PageID 3246
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 5 of 18

7.     On December 16, 2020, Mr. Dustin Norris ("Mr. Norris") testified under oath in

support of the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as*

*Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1528] that was

brought by the Advisors and Funds (the "Restriction Motion").

8.     Mr. Norris is the Executive Vice President of each the Advisors and each of the

Funds. *See* Transcript of December 16, 2020, hearing on the Restriction Motion (the "Hearing").

Seery Dec. ¶ 7; Exhibit 1, at 38:15-39:2.

9.     During the hearing, Mr. Norris testified that Mr. Dondero (a) owns and controls,

directly or indirectly, each of the Advisors, and (b) is the portfolio manager of each of the Funds,

each of which is advised by one of the Advisors. Seery Dec. ¶ 8; Exhibit 1, at 35:15-37:13.

10.     In their public filings with the Securities and Exchange Commission, each of the

Funds disclosed that the Advisors were owned and controlled by Mr. Dondero and that Mr.

Dondero was the portfolio manager for each of the Funds. Seery Dec. ¶ 9.

### *CLO Holdco*

11.     CLO Holdco is a wholly-owned and controlled subsidiary of the DAF.   On

information and believe, the DAF is managed by the Charitable DAF Holdco, Ltd. ("DAF

Holdco"), which is the managing member of the DAF. Seery Dec. ¶ 10.

12.     DAF Holdco is owned by three different charitable foundations:  Highland Dallas

Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City

Foundation, Inc. (collectively, the "Highland Foundations").  Mr. Dondero is the president and

one of the three directors of each of the Highland Foundations.  Mr. Grant Scott ("Mr. Scott") –

Mr. Dondero's college roommate – is also an officer and director of each of the Highland

Foundations. Seery Dec. ¶ 11.

002536
APP. 1703

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Filed 06/27/21   Page 784 of 1017   PageID 3247
Main Document   Page 757 of 782
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 6 of 18

13.     Although the Debtor is the investment manager for the DAF, neither the Board nor Mr. Seery, as CEO and CRO of the Debtor, have any right or ability to control or direct the DAF or CLO Holdco.  That control is exercised by Mr. Scott at the direction of Mr. Dondero. Seery Dec. ¶ 12.

**B.      This Court has Entered Three Orders that are Implicated by the Defendants' Actions and Threatened Actions**

14.     This Court has entered three Orders that are relevant to the Motion and the relief sought by the Debtor.

15.     On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  On January 9, 2019, this Court entered an Order granting the Settlement Motion [Docket No. 339] (the "Settlement Order"). Seery Dec. ¶ 14; Exhibit 2.

16.     As part of the Settlement Order, this Court also approved a term sheet (the "Term Sheet") [Docket No. 354-1] between the Debtor and the Official Committee of Unsecured Creditors (the "Committee") pursuant to which Mr. John S. Dubel, Mr. Russell Nelms, and Mr. Seery were appointed to the Board. Seery Dec. ¶ 15; Exhibit 3.

17.     As required by the Term Sheet, on January 9, 2020, Mr. James Dondero resigned from his roles as an officer and director of Strand and as the Debtor's President and Chief Executive Officer. Seery Dec. ¶ 16; Exhibit 4.

18.     The Settlement Order directed Mr. Dondero not to "cause any Related Entity to terminate any agreements with the Debtor." Seery Dec. ¶ 17; Exhibit 2 ¶ 9.

19.     Upon information and belief, each of the Defendants is a "Related Entity" as defined in the Term Sheet because each of the Defendants is directly or indirectly owned and/or

6

002537
APP. 4764

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 605 Main Document Filed 06/06/25   Page 785 of 1017   PageID 3248
Page 785 of 1017   PageID 3248
Case 21-03000-sgj   Doc 6   Filed 01/06/21   Entered 01/06/21 20:00:40   Page 7 of 18

controlled by Mr. Dondero and/or Mr. Scott. Seery Dec. ¶ 18 Exhibit 3, Ex. D (Reporting Requirements) ¶ 1.D(A)(i) and (ii).

20.     Defendants' actions and threatened actions also implicate the *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* [Adv. Pro. No. 20-03190-sgj, Docket No. 10], entered on December 10, 2020 (the "TRO" and together with the Settlement Order, the "Orders"). Seery Dec. ¶ 19; Exhibit 5.

21.     Pursuant to the TRO, the Court temporarily enjoined and restrained Mr. Dondero from, among other things, "interfering with or otherwise impeding, directly or indirectly, the Debtor's business" and from "causing, encouraging, or conspiring with (a) any entity owned or controlled by [Mr. Dondero], and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct [as defined in the TRO]," including interfering or impeding the Debtor's business. *Id*. ¶¶ 2(d), 3.

22.     Finally, on December 8, 2020, Defendants (except CLO Holdco) filed the Restriction Motion. The Restriction Motion sought to prevent the Debtor from fulfilling its duties as the portfolio manager of certain CLOs by impeding any attempted sale of assets. After hearing the testimony of Dustin Norris, the Court called the Defendants' Motion "frivolous," granted the Debtor's motion for a directed verdict, and subsequently entered an order denying the Restriction Motion.

**C.     Defendants Interfere with and Impede the Debtor's Business and Threaten to Terminate the Debtor's Management Agreements**

23.     In addition to filing the Restriction Motion, on recent three occasions, Defendants have either interfered with and impeded the Debtor's business or have threatened to do so by initiating the process for removing the Debtor as the portfolio manager of the CLOs. Such

002538
APP. 1785

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Document 9-1 Filed 10/06/25 Page 786 of 1017 PageID 3249
Case 21-03000-sgj Doc 6 Filed 01/06/21 Entered 01/06/21 20:00:40 Page 8 of 18

conduct also violates the Orders and flouts the Court's decision on the Restriction Motion and the Court's observations made at the Hearing. Seery Dec. ¶ 21.

24.    **First**, on December 22, 2020, employees of NPA and HCMFA interfered with and impeded the Debtor's business by refusing to settle the CLOs' sale of AVYA and SKY securities that Mr. Seery had personally authorized.  The Advisors engaged in this conduct notwithstanding (a) the denial of the Restriction Motion and the Court's pointed comments during that Hearing on the Restriction Motion, and (b) Mr. Norris's sworn acknowledgments on behalf of the Advisors and Funds during the Hearing that (i) the Debtor's management of the CLOs is governed by written contracts as to which none of the Advisors or Funds are parties, Seery Dec. ¶ 22; Exhibit 1 at 41:25-42-7; (ii) the Debtor has the exclusive duty and responsibility to buy and sell assets on behalf of the CLOs, *id.* at 42:17-43:3; and (iii) as the Advisors knew when they invested in the CLOs on behalf of the Funds, that holders of preference shares (such as the Funds) have no right to make investment decisions on behalf of the CLOs, *id.* at 43:4-11.

25.    Notably, the Advisors' interference with trades that Mr. Seery authorized on behalf of the CLOs is the same type of conduct that lead the Court to impose the TRO against Mr. Dondero. *See Declaration of Mr. James P. Seery, Jr. in Support of Debtor's Motion for a Temporary Restraining Order Against Mr. James Dondero* [Adv. Pro. No. Docket No. 4] ¶¶ 21-23, Ex. 8.

26.    **Second**, also on December 22, 2020, the Defendants wrote to the Debtor and renewed their "request" that the Debtor refrain from selling any assets on behalf of the CLOs until the confirmation hearing (the "December 22 Letter").  In support of their "request," the Debtor re-asserted almost verbatim the arguments advanced in connection with the Restriction Motion – all of which were soundly rejected by the Court. Seery Dec. ¶ 24.

APP. 786
002539

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 6   Filed 09/05/25   Page 787 of 1017   PageID 3250
Main Document   Page 9 of 18
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 9 of 18

27.     The Debtor responded on December 24, 2020, demanding that Defendants
withdraw their December 22 Letter and confirm that neither the Defendants nor anyone acting on
their behalf will take any further steps to interfere with the Debtor's directions as the CLOs'
portfolio manager by the close of business on December 28, 2020. Seery Dec. ¶ 25; Exhibit 6.
The Defendants have not complied with (or even responded to) the Debtor's demands. *Id.*

28.     ***Finally***, the Defendants recently threatened to seek to remove the Debtor as the
portfolio manager of the CLOs.   Specifically, in a letter dated December 23, 2020 (the
"December 23 Letter" and together with the December 22 Letter, the "Defendants' Letters"), the
Defendants informed the Debtor that one or more of them "intend to notify the relevant trustee
and/or issuers that the process of removing the Debtor as fund manager should be initiated,
subject to and with due deference for the applicable provisions of the United State Bankruptcy
Code, including the automatic stay of Section 362." Seery Dec. ¶ 26.

29.     The Debtor responded to the December 23 Letter the next day, and advised the
Defendants that the Settlement Order prohibited the termination of the Debtor's Management
Agreements with the CLOs, and that there was no factual, legal, or contractual basis to remove
the Debtor as the CLOs' portfolio manager in any event.   The Debtor demanded that the
Defendants withdraw their December 23 Letter and commit not to take any actions, directly or
indirectly, to terminate the CLO Management Agreements, by the close of business on
December 28, 2020.   The Defendants have not complied with (or even responded to) the
Debtor's demands. Seery Dec. ¶ 27; Exhibit 7.

30.     Because Mr. Dondero owns and/or controls the Defendants, the Debtor forwarded
the correspondence between the Debtor and the Defendants, including the Defendant's
Threatening Letters, to Mr. Dondero's counsel.  In response, Mr. Dondero's counsel contended

002540   APP. 787

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 6 Filed 04/04/25   Page 788 of 1017   PageID 3251
Main Document   Page 10 of 18
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 10 of 18

that "[w]hile there are relationships between my client and some of the movants, I believe they are separate entities and should be treated as such." Seery Dec. ¶ 28; Exhibit 8.

31.     Upon information and belief, Mr. Dondero has taken no steps to cause the Defendants – entities that he indisputably owns and/or controls and that are each a "Related Entity" under the Term Sheet – to comply with the Debtor's demands made in response to the Defendants' Letters. Seery Dec. ¶ 29.

### III.
### LEGAL STANDARD

32.     Pursuant to section 105(a) of the Bankruptcy Code, bankruptcy courts are authorized to "issue any order, process, of judgment that is necessary or appropriate to carry out the provisions of the Code. *In re FiberTower Network Servs. Corp.*, 482 B.R. 169, 182 (Bankr. N.D. Tex. 2012) (quoting 11 U.S.C. § 105); *see also In re OGA Charters, LLC*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016) ("The Court may issue injunctions as part of its equitable powers, pursuant to 11 U.S.C. § 105."). In other words, courts have broad authority to take actions necessary to "protect the integrity of the bankruptcy estate" and to "enjoin actions that 'might impede the reorganization process.'" *FiberTower*, 482 B.R. at 182 (quoting *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 837 F.2d 89, 93 (2d Cir.1988)). "A preliminary injunction seeks to 'prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" *OGA Charters*, 554 B.R. at 424 (quoting *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir.1985)).

33.     Injunctive relief is warranted under section 105(a) where the movant shows: (1) a likelihood that it will prevail on the merits; (2) irreparable injury in the absence of injunctive relief; (3) that the balance of the equities favor the movant; and (4) that the injunction would serve the public interest. *See OGA Charters, 554 B.R. at 424*; *Green v. Wells Fargo Bank, N.A.*,

002541
APP. 768

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Main Document Page 672 of 2722 Page 789 of 1017 PageID 3252
Case 21-03000-sgj Doc 6 Filed 01/06/21 Entered 01/06/21 20:00:40 Page 11 of 18

575 Fed.Appx. 322, 323 n. 3 (5th Cir. 2014) (stating the four prong test for a preliminary injunction as likelihood of success, irreparable harm, balance of the equities, and the public interest); *In re Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1189 (5th Cir. 1986) (same); *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 219 (5th Cir. 2010) (same).

34.     A temporary restraining order should be granted pending a hearing for a preliminary injunction where it appears that "immediate and irreparable injury, loss or damage will result to the movant." *See* Fed. R. Bankr. P. 7065 (incorporating by reference Fed. R. Civ. P. 65); *see also In re Seatco, Inc.*, 259 B.R. 279, 285 (Bankr. N.D. Tex. 2001) (noting that Fed. R. Civ. P. 65 applies in adversary proceedings, "except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor-in-possession without compliance with Rule 65(c)[.]").   The issuance of an injunction is within the broad discretion of the court. *See In re Compton Corp.*, 90 B.R. 798, 806 (Bankr.N.D.Tex. 1988) ("It is [] clear that the issuance of an injunction, as a general matter, is within the discretion of the court."); *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986) (noting that the decision to issue or not to issue an injunction is subject to "considerable discretion" in the district court); *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 511 (2d Cir. 2005) ("The district court has wide discretion in determining whether to grant a preliminary injunction, and this Court reviews the district court's determination only for abuse of discretion.").

35.     For the reasons that follow, the Debtor satisfies the standard for injunctive relief.

APP. 789

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S     Document 65-4   Filed 06/27/25   Page 790 of 1017     PageID 3253
Main Document   Page 773 of 792
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 12 of 18

# IV.
## ARGUMENT

36.     Injunctive relief is necessary to prevent the imminent and irreparable harm that would be caused to the Debtor if Defendants are permitted to engage in any of the Prohibited Conduct.

37.     The Debtor is likely to succeed on the merits of its underlying claim for tortious interference with contractual relations because Defendants' interference with the Debtor's CLO Management Agreements cannot be disputed (they are in writing), and such interference is causing the Debtor's estate irreparable damages.  Moreover, the relief sought—the protection of its bankruptcy estate during its chapter 11 proceedings—is precisely the type of relief authorized under sections 105 and 362 of the Bankruptcy Code. *See OGA Charters*, 554 B.R. at 432-33 (granting injunctive relief to protect the debtor's assets during chapter 11 proceedings, and noting that a "preliminary injunction, is, in essence, merely an extension of § 362's stay" of the debtor's bankruptcy estate asset).

38.     The equities strongly (if not exclusively) favor the Debtor because the Debtor's ability to operate and comply with its obligations will be jeopardized if Defendants are permitted to engage in the Prohibited Conduct—conduct which Defendants have no legal or equitable right to engage in.  Moreover, the Court has already considered and summarily denied the Restriction Motion, rendering the Defendants' conduct indefensible.

39.     Finally, and for all these same reasons, granting injunctive relief serves the public interest because the Debtor's chances of a successful liquidation will be severely jeopardized if injunctive relief is not granted.

002543   APP. 1770

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Main Document Filed 06/09/25   Page 26 of 27 2 791 of 1017   PageID 3254
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 13 of 18

A.     **The Debtor will Suffer Irreparable Harm in the Absence of Injunctive Relief**

40.     The Debtor's estate will be severely injured if Defendants are not enjoined from engaging in the Prohibited Conduct.  Irreparable harm is "a harm 'for which there is no adequate remedy at law.'" *OGA Charters,* 554 B.R. at 424 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)); *see also Compass Bank v. Veytia*, EP-11-CV-228-PRM, 2011 WL 13234883, at *2 (W.D. Tex. Sept. 21, 2011) ("The general rule in the Fifth Circuit is that 'harm is irreparable where there is no adequate remedy at law, such as monetary damages.'") (quoting *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2010)).

41.     In the bankruptcy context, "irreparable harm" refers to either "irreparable harm to the interest of a creditor or irreparable harm to the bankruptcy estate." *In re Hunt*, 93 B.R. 484, 495 (Bankr. N.D. Tex. 1988) (internal quotations omitted).  The element of irreparable injury to the debtor's estates is described as "irreparable harm to the creditors and estates from disruption of th[e] Court's exclusive authority to effectively manage the[] cases." *Id*.  Moreover, "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Compass Bank*, 2011 WL 13234883, at *2 (citing *Janvey*, 647 F.3d at 600); (holding that "dissipation of assets ... would impair the court's ability to grant an effective remedy").

42.     Here, in the absence of injunctive relief, both the Debtor's estate and its creditors will face imminent and irreparable harm that cannot be adequately remedied.  If Defendants continue to engage in the Prohibited Conduct, the Debtor's ability to perform under the CLO management agreements will be severely impaired.  Given the Defendants' threats and demands,

002544
APP. 774

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 09/02/25   Page 792 of 1017   PageID 3255
Main Document   Page 775 of 792
Case 21-03000-sgj   Doc 6   Filed 01/06/21   Entered 01/06/21 20:00:40   Page 14 of 18

the harm is thus the not merely "speculative, theoretical, or remote," but imminent and irreparable. *FiberTower Network Services*, 482 B.R. at 187.

**B.** **The Debtor Demonstrates Likelihood of Success on the Merits**

43.     The Debtor is likely to succeed on the merits of its underlying claim for tortious interference with contract.  To satisfy the likelihood of success element, the movant need only present their "prima facie case but need not show that [they] are certain to win." *Janvey*, 647 F.3d at 595 (internal quotations omitted).  Moreover, the relevant "merits" question in this case is not whether Debtor is likely to prevail on appeal, but rather "whether this [C]ourt is authorized and likely to grant the requested relief." *FiberTower*, 482 B.R. at 183–84 (citing COLLIER ON BANKRUPTCY ¶ 105.03[1][a] (16th ed. 2012) ("In connection with the 'likelihood' argument, many courts have looked to the purpose of the requested injunction ... the likelihood of success argument will track closely the bankruptcy right sought to be vindicated."); *see also Hunt*, 93 B.R. at 493 ("[t]he inquiry [for success on the merits] for a preliminary injunction necessarily focuses on the outcome of a later proceeding, at which time the merits giving rise to the litigation will be decided" rather than success on the merits "so that reorganization efforts mandated by the Bankruptcy Code will not be thwarted by the [enforcement] proceeding.") (internal quotations omitted).

44.     Here, the Debtor demonstrates a likelihood of success on the merits of its underlying claim.  To succeed on a claim for tortious interference with contract, the plaintiff must show: (1) the existence of a valid contract; (2) the defendant willfully and intentionally interfered with the contract; (3) the interference was a proximate cause of the plaintiff's injuries; and (4) the plaintiff suffered actual damages or loss. *See In re Cantu*, 400 B.R. 104, 111 (Bankr. S.D. Tex. 2008).  Proximate causation is shown where the defendant "interfered by actively persuading a party to breach a contract or otherwise causing the contract to be more difficult to

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document Us Filed 0/06/24 of 27/22 793 of 1017   PageID 3256
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 15 of 18

fulfill or of less or no value." *Weatherford Int'l, LLC v. Binstock*, 452 F. Supp. 3d 561, 576 (S.D. Tex. 2020). Here, there can be no dispute that the CLO Management Agreements constitute valid contracts. Defendants are willfully and intentionally interfering with the Management Agreements by, among other things, (1) threatening to initiate the process for removing the Debtor as the portfolio manager of the CLOs, (2) refusing to allow the sale of certain CLO assets and securities, in direct contravention of the Board's explicit business judgment and authorization to do so, and (3) otherwise attempting to influence and interfere with the Board's decisions concerning the purchase or sale of any assets on behalf of the CLOs. Such interferences are hindering the Board's ability to fulfill its duties and contractual rights under the CLO Management Agreements to manage the Debtor's assets and smoothly wind down the Debtor's business. Defendants' interferences, which include thwarting the Debtor's efforts to effectuate certain CLO trades, have damaged the Debtor's estate.

45. Moreover, the relief the Debtor seeks is precisely the type contemplated by the Bankruptcy Court's broad powers to grant injunctive relief under Section 105. *See* 11 U.S.C § 105(a) (authorizing the bankruptcy court to "issue any order, process, of judgment that is necessary or appropriate to carry out the provisions of the Code."); *see also* 11 U.S.C. § 362. The Debtor seeks to enjoin Defendants from attempting to control, manage, or otherwise influence the Debtor's management and sale of its CLO assets. Injunctive relief is, therefore, warranted for the purpose of protecting the Board's ability to manage the Debtor's assets, and in turn, to protect the integrity of the Debtor's bankruptcy estate. *See FiberTower*, 482 B.R. at 182. Furthermore, as noted above, there can be no credible dispute that Defendants engaged in the conduct complained of because it is reflected in contemporaneous, written communications.

15

APP. 2773

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 09/26/25   Page 794 of 1017   PageID 3257
Main Document   Page 16 of 232
Case 21-03000-sgj   Doc 6   Filed 01/06/21   Entered 01/06/21 20:00:40   Page 16 of 18

### C.      The Equities Strongly Favor the Debtor

46.      The balance of the equities also tip decisively in the Debtor's favor.  In the absence of injunctive relief, the Debtor faces imminent and irreparable harm.  If Defendants are not prevented from continuing to interfere with the Debtor's business, management of its assets, and ability to perform and fulfill its duties as portfolio manager to the CLOs under the CLO Management Agreements, the Debtor's ability to successfully liquidate and satisfy its claims will be threatened.  By contrast, there are no equities that favor denying injunctive relief.  Defendants have no legal or equitable right to engage in any of the Prohibited Conduct, all of which is adverse to the Debtor's interests, and all of which undermine this Court's Orders.  Indeed, the Court already told them that less than a month ago when denying the Restriction Motion.

47.      In sum, the potential harm to the Debtor in the absence of injunctive relief far outweighs any harm to Defendants if injunctive relief issues. *See FiberTower*, 482 B.R. at 189 (finding that the balance of equities favored the debtors where "[t]he potential harm to Debtors … far outweighs the possible harm to Defendant" if injunctive relief is granted "because, among other reasons, the Debtors "face the loss of cash collateral[.]").

### D.      Injunctive Relief Serves the Public Interest

48.      Injunctive relief will further the public interest because it is necessary to protect the Debtor's ability to successfully liquidate its assets and satisfy its claims.  "Courts have often held that injunctions that facilitate reorganizations serve the public interest." *FiberTower*, 482 B.R. at 189 (citing *SAS Overseas Consultants v. Benoit*, No. 99–1663, 2000 WL 140611, at *5 (E.D.La. Feb. 7, 2000); *Lazarus Burman Assocs. v. Nat'l Westminster Bank U.S.A. (In re Lazarus Burman Assocs.)*, 161 B.R. 891, 901 (Bankr.E.D.N.Y.1993)).  In other words, "[i]n bankruptcy, the public policy is to have an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start, by satisfying valid claims against

16

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-4   Filed 06/23/22   Page 795 of 1017   PageID 3258
Main Document   Page 0073 of 2722
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 17 of 18

that estate." *OGA Charters*, 554 B.R. at 426; *see also In re Hunt*, 93 B.R. at 497 ("Chapter 11 expresses the public interest of preserving the going-concern values of businesses, protecting jobs, ensuring the equal treatment of and payment of creditors, and if possible saving something for the equity holders.").

49.     To this end, "[t]he Bankruptcy Court is vested with management duties to further this interest and ensure a meaningful process for all of these competing entities." *Id.* (citing *In re Timbers of Inwood Forest Assocs., LTD.*, 808 F.2d 363, 373 (5th Cir.1987) ("Early and ongoing judicial management of Chapter 11 cases is essential if the Chapter 11 process is to survive and the goals of reorganizability on the one hand, and creditor protection, on the other, are to be achieved.").   Thus, in general, preventing the dissipation of potential assets belonging to the debtor that, pursuant to 11 U.S.C. § 541, may be brought into the bankruptcy estate is in the public interest. *See OGA Charters*, 554 B.R. at 426 (finding that the "public interest may be served where the purpose of the preliminary injunction is such that it serves to" uphold a core "pillar of bankruptcy by preserving a debtor's … assets that can be potentially used to satisfy valid claims against the bankruptcy estate.").

50.     Here, if Defendants are not enjoined from engaging in the Prohibited Conduct, the Debtor's liquidation process will be jeopardized at the expense of its creditors. *See FiberTower Network Services*, 482 B.R. at 189 (holding that an injunction would serve the public interest where, the "Debtors' chances of successfully reorganizing will be jeopardized unless injunctive relief is granted," further noting that "if the Debtors were to liquidate, their employees and customers would be adversely affected.").   By contrast, the public interest would not be served by allowing Defendants to continue to interfere with the Debtor's CLO Management Agreements, and overall liquidation process.   The Debtor's management must be able to fully

002548
APP. 775

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S      Document 15   Filed 06/17/25   Page 796 of 1017   PageID 3259
Main Document   Page 18 of 232
Case 21-03000-sgj Doc 6 Filed 01/06/21   Entered 01/06/21 20:00:40   Page 18 of 18

execute its duties of managing and selling its assets so that the Debtor can properly wind down, satisfy valid claims against the estate, and maximize the value of the Debtor's assets for the benefit of all stakeholders.

## <u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests that the Court grant the Motion and enter an Order in the form annexed thereto as Exhibit A, and grant any further relief as the Court deems just and proper.

Dated:  January 6, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

        -and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 18



December 22, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HCMFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

308494123.3

002550

APP 1777

In other cases, such companies in combination with CLO Holdco hold all, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full.  In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

Contractually, the Debtor is obligated to maximize value for the benefit of the preference shareholders.  Accordingly, we respectfully request that no further dispositions of CLO interests occur pending the confirmation hearing.  While we recognize the Court denied the Advisor and Funds motion on this subject, the Court did not require liquidations occur immediately, and we reserve all rights to and remedies against the Debtor should the Debtor continue to liquidate CLO interests in contravention of this joint request.  Given the Advisor, Funds, and CLO Holdco's requests, it is difficult to understand the Debtor's rationale for continued liquidations, or the benefit to the Debtor from pursuing those sales.

As you know, HCMLP's duties are set forth in the portfolio management agreements of the CLOs, which themselves have been adopted under the Investment Advisers Act of 1940 ("Advisers Act"). As HCMLP readily admits, it is: (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced those CLOs; (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan-confirmation; and (iii) adding a replacement manager as subadviser prior to January 31, 2021.  The Advisors, Funds, and CLO Holdco assert that those actions run in contravention to HCMLP's duty to maximize value for the holders of preference shares and thus what HCMLP has agreed to under the portfolio management agreement, as well as its duties under the Advisers Act, which ultimately will adversely impact the economic owners noted above.

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

December 22, 2020
Page 3

For the forgoing and other reasons, we request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.


Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

002552

APP. 1779



December 23, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HMCFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HMCFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

308545876.3

APP. 1789

In other cases, such companies in combination with CLO Holdco hold, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full.  In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

In pleadings filed with the Bankruptcy Court, you asserted that one or more of the entities identified above lacked the authority to seek a replacement of the Debtor as fund manager because of the alleged affiliate status of the beneficial owners of such entities.  We disagree.

Consequently, in addition to our request of yesterday, where appropriate and consistent with the underlying contractual provisions, one or more of the entities above intend to notify the relevant trustees and/or issuers that the process of removing the Debtor as fund manager should be initiated, subject to and with due deference for the applicable provisions of the United States Bankruptcy Code, including the automatic stay of Section 362. The basis for initiating the process for such removal includes, but is not limited to, the fact that HCMLP's duties, as set forth in the portfolio management agreements of the CLOs, are subject to the requirements of the Investment Advisers Act of 1940 ("Advisers Act"). HCMLP appears to be acting contrary to those duties under the agreements and where HCMLP is not fulfilling its duties under the portfolio management agreement it is therefore violating the Advisers Act. Thus, because HCMLP is (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced, including key investment professionals identified in the transactional documents for those CLOs (generally Mark Okada and Jim Dondero); (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan confirmation;  (iii)

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/06/25    Page 802 of 1017    PageID 3265
Main Document    Page 6 of 2732

December 23, 2020
Page 3

adding a replacement manager as subadviser prior to January 31, 2021; and (iv) for other cause, the Advisors, Funds, and CLO Holdco have concluded that they have no choice but to initiate HCMLP's removal as fund manager where such entities are contractually and legally permitted or obligated to do so.

Because the process of removal is being initiated, subject to the applicable provisions of the Bankruptcy Code, we respectfully request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.   To the extent there are CLO transactions prior to the confirmation, we intend to fully explore the business justification for doing so, as we do not believe there is any rational business reason to liquidate securities prior to that time.


Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

NEW YORK, NY
LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

LOS ANGELES

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

SAN FRANCISCO

150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

DELAWARE

919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

WEB: www.pszjlaw.com

Gregory Demo                December 24, 2020                212-561-7700
                                                            gdemo@pszjlaw.com

**<u>Via E-mail</u>**

James A. Wright III
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111

A. Lee Hogewood III
K&L Gates LLP
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, North Carolina 27609

Re:   ***In re Highland Capital Management, L.P.*, Case
        No. 19-34054-sgj (Bankr. N.D. Tex)**

Dear Counsel:

        As you know, we represent Highland Capital Management,
L.P. (the "<u>Debtor</u>"), the debtor-in-possession in the above-captioned
bankruptcy case.

        On December 8, 2020, your firm filed that certain *Motion for
Order Imposing Temporary Restrictions on Debtor's Ability, as
Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles*
[D.I. 1528] (the "<u>Motion</u>")[1] on behalf of Highland Capital
Management Fund Advisors, L.P., NexPoint Advisors, L.P.,
Highland Income Fund, NexPoint Strategic Opportunities Fund, and
NexPoint Capital, Inc. (collectively, the "<u>Movants</u>").  After hearing
the sworn testimony of the Movants' witness and the arguments
made on the Movants' behalf, Judge Jernigan found that the Motion
was "a very, very frivolous motion" and that your firm "wasted [her]

---

[1] All capitalized terms used but not defined herein shall have the meanings given
to them in the Motion.

002556
APP. 1783

Case 3:25-cv-02072-S   Document 54-1   Filed 06/27/25   Page 804 of 1017   PageID 3267



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

James A. Wright III
A. Lee Hogewood III
December 24, 2020
Page 2

time." (Transcript, 64:5-12) An order was entered denying the Motion on December 18, 2020 [D.I. 1605].

On December 22, we received the letter attached as Exhibit A (the "Letter") from your firm on behalf of the Movants and CLO Holdco, Ltd. (an entity affiliated with James Dondero) re-asserting almost verbatim the frivolous arguments raised in the Motion. Concurrently, we received notice that certain of the Movants' employees would not settle trades on behalf of the CLOs that were authorized by the Debtor acting in its capacity as the CLOs' portfolio manager. The Movants' employees who interfered with the Debtor's directions justified their conduct by asserting – again almost verbatim – the frivolous arguments raised in the Motion.

The Movants have caused the Debtor to incur substantial costs defending itself against the Motion and preparing to defend against the frivolous suits forecasted in the Letter. The Debtor demands that the Movants withdraw the letter by 5:00 p.m. CT on Monday, December 28, 2020, and confirm that the Movants and anyone acting on their behalf will take no further steps to interfere with the Debtor's directions as the CLOs' portfolio manager. If the Movants fail to timely comply with these demands, the Debtor shall seek prompt judicial relief, including seeking sanctions under Federal Rule of Bankruptcy Procedure 9011.

The Debtor reserves all rights it may have, whether in law equity, or contract, including the right to seek reimbursement of any and all fees and expenses incurred in seeking sanctions.

Please feel free to contact me with any questions.

Sincerely,

Gregory Demo

Enclosure
cc:    Jeffrey Pomerantz, Esq.
       Ira Kharasch, Esq.
       John Morris, Esq.
       John J. Kane, Esq.

# Exhibit A

002558

APP. 1785



December 22, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds").  CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HCMFA own preference shares in many of the CLOs.  In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor.  If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

308494123.3

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/09/25   Page 807 of 1017   PageID 3270
Main Document   Page 806 of 2722

December 22, 2020
Page 2

In other cases, such companies in combination with CLO Holdco hold all, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full.  In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

Contractually, the Debtor is obligated to maximize value for the benefit of the preference shareholders.  Accordingly, we respectfully request that no further dispositions of CLO interests occur pending the confirmation hearing.  While we recognize the Court denied the Advisor and Funds motion on this subject, the Court did not require liquidations occur immediately, and we reserve all rights to and remedies against the Debtor should the Debtor continue to liquidate CLO interests in contravention of this joint request.  Given the Advisor, Funds, and CLO Holdco's requests, it is difficult to understand the Debtor's rationale for continued liquidations, or the benefit to the Debtor from pursuing those sales.

As you know, HCMLP's duties are set forth in the portfolio management agreements of the CLOs, which themselves have been adopted under the Investment Advisers Act of 1940 ("Advisers Act").  As HCMLP readily admits, it is: (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced those CLOs; (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan-confirmation; and (iii) adding a replacement manager as subadviser prior to January 31, 2021.  The Advisors, Funds, and CLO Holdco assert that those actions run in contravention to HCMLP's duty to maximize value for the holders of preference shares and thus what HCMLP has agreed to under the portfolio management agreement, as well as its duties under the Advisers Act, which ultimately will adversely impact the economic owners noted above.

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

December 22, 2020
Page 3

       For the forgoing and other reasons, we request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III



December 28, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Via Email

Gregory V. Demo
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

Thank you for your letters of December 24, 2020, demanding a reply by the afternoon of the 28th. To cut to the chase, we decline to withdraw the letters of December 22 and 23, 2020. The letter dated December 22, 2020 was a request from counsel for the Funds and Advisors, as well as Holdco, to you as counsel for the Debtor, asking that the Debtor cease further trading in property you have acknowledged is not an asset of the Debtor's estate. The request is continuing. The letter dated December 23, 2020 was notification from counsel for the Funds and Advisors, as well as Holdco, to you as counsel for the Debtors that the process to remove the Debtor as manager of certain funds would be initiated, *subject to* applicable orders in the pending bankruptcy case, provisions of the Bankruptcy Code and, specifically the automatic stay.

Neither letter was presented to, or constituted a request for relief from, any court. Thus, your threat to seek sanctions under Rule 9011 would not seem to be actionable or otherwise warranted by existing law. That said, if you believe there is authority for seeking 9011 sanctions against a party or a lawyer based upon either a request or a notification exclusively between counsel, please provide and we will certainly consider it. I would add that the demand to respond within a single business day, over an intervening holiday, is not in compliance with Rule 9011 in any event. Given that the rule is inapplicable, the procedural infirmity of your demand is immaterial.

Substantively, please consider the following:

308558666.5

APP. 1789

002562

First, there is no confusion on the part of our Firm or our client that our motion was denied.  Thus, the Debtor is not prohibited from engaging in sales of CLO assets.  Because the Debtor is free to do so, however, does not mean that the Debtor must engage in such transactions.  The Debtor has acknowledged that the assets it has sold and may sell are expressly not property of the estate.  Thus, any benefits of such transactions to the estate are not evident.  On the other hand, the parties holding a majority of the beneficial interests in the assets have requested, and continue to request, that the Debtor refrain from selling those assets for a short time.  What is the harm in refraining?

Second, in order to pursue the trades over the last several days, the Debtor has initiated the trades, as we understand it, by giving instructions to a trading desk other than Highland Capital Management Fund Advisors ("HCMFA").  The Debtor has demanded that employees of HCMFA "book" or "settle" the trades.  Having not initiated the trades and with the trades executed outside of compliance protocols including HCMLP's order management system, HCMFA employees have been reluctant to do so because, among other reasons, they did not initiate them and cannot be sure such trades were properly pre-cleared.  The Debtor presently has adequate staff and resources to process and settle trades without requiring involvement of HCMFA employees.   In short, if the Debtor wishes to make trades, it has the ability to make them without HCMFA's assistance.  If the Debtor desires or requires the continued support of HCMFA to make such trades, we should discuss an appropriate protocol and payment for such support.

Third, the Debtor's view that the historic affiliate relationship between it, the Funds, the Advisors and Holdco precludes those entities from replacing management is misplaced.  While Mr. Dondero was never a control person of Holdco, we acknowledge he was once a control person in connection with many of the relevant entities.   There is no doubt that Mr. Dondero no longer has control over the activities of the Debtor as fund manager, and thus the affiliate status that might have precluded the Funds and Advisors from seeking the removal and replacement of the fund manager no longer exists.  Indeed, in the transcript of the hearing of December 16, at which the Court denied my clients' motion, Debtor's counsel made crystal clear that the Debtor's board had no interest in speaking with Mr. Dondero and further that Mr. Seery viewed discussions with Mr. Dondero as "a waste of time."  Once Mr. Dondero ceased to be a control person or employee of the Debtor, any affiliate status between the Debtor on the one hand and the Advisers and the Funds on the other also terminated.  This termination was effective pursuant to both Investment Company Act of 1940 (the "1940 Act") and the Indentures governing the CLOs. Having reviewed these facts with the 1940 Act experts in our Firm, we are confident that affiliate status is no longer an impediment to removal.

In view of the foregoing, I suggest that the parties could benefit from a call this week to discuss our competing communications and perhaps broader questions as well.  Please let me know your availability over the next few days and I will work to coordinate a call.

Warm regards,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

308558666.5

APP. 1789

December 28, 2020
Page 3

Cc:  (via email)

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Hayley R. Winograd

John J. Kane

George Zornado
R. Charles Miller

308558666.5

**002564**

APP 4791

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/2/95 of 2722 812 of 1017   PageID 3275
Main Document   Page 695 of 2722
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 1 of 21

Docket #0003  Date Filed: 2/17/2021

# EXHIBIT 19

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
FAX: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03010-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND | § | |
| ADVISORS, L.P., AND NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendants. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210217000000000003

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 115    Filed 06/09/25    Page 813 of 1017    PageID 3276
Main Document    Page 2 of 21
Case 21-03010-sgj Doc 3 Filed 02/17/21    Entered 02/17/21 08:40:02    Page 2 of 21

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS .................................................................................. 4

     A.    The Debtor Has the Contractual Right to Terminate the Shared Services
          Agreements, and It Timely Exercised that Right ................................... 4

               The Debtor's Shared Services Agreement with HCMFA .......................... 4

               The Debtor's Shared Services Agreement with NPA .............................. 4

     B.    Prior to Providing the Termination Notices, the Debtor Worked on a
          Transition Plan, but the Advisors Failed to Engage or Pay for Services
          Rendered ................................................................................. 5

     C.    The Debtor Offers to Extend the Termination Date to Avoid a Catastrophe
          and Attempts to Engage the Funds' Board to Aid in the Adoption of a
          Transition Plan .......................................................................... 7

III. LEGAL STANDARD ...................................................................................... 8

IV. ARGUMENT .................................................................................................. 11

     A.    The Funds, their Investors, and the Debtor will Suffer Imminent and
          Irreparable Harm in the Absence of a Mandatory Injunction .............................. 11

     B.    The Debtor Will Demonstrate a Likelihood of Success on the Merits ................ 13

     C.    The Equities Strongly Favor the Debtor ............................................ 14

     D.    Injunctive Relief Serves the Public Interest ........................................ 15

CONCLUSION .................................................................................................. 16

DOCS_NY:42317.7 36027/002

APP. 1723
002566

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/27/25    Page 814 of 1017    PageID 3277
Main Document   Page 497 of 732
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 3 of 21

## TABLE OF AUTHORITIES

**CASES**

*Canal Auth. of State of Fla. v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) ............................................................................. 10

*Compass Bank v. Veytia,*
    EP-11-CV-228-PRM, 2011 WL 13234883, at *2 (W.D. Tex. Sept. 21, 2011)................. 11, 12

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,*
    710 F.3d 579 (5th Cir. 2013) ............................................................................. 11

*Davis v. Angelina College Board of Trustees,*
    No. 9:17-CV-179, 2018 WL 1755392 (E.D. Tex. 2018)........................................... 9

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.,*
    746 F.2d 816 n.21 (D.C. Cir. 1984) .................................................................... 10

*Green v. Wells Fargo Bank, N.A.,*
    575 Fed. Appx. 322, 323 n. 3 (5th Cir. 2014)....................................................... 9

*Hernandez v. Sessions,*
    872 F.3d 976 (9th Cir. 2017) ............................................................................. 10

*In re Commonwealth Oil Ref. Co., Inc.,*
    805 F.2d 1175 (5th Cir. 1986) ........................................................................... 9

*In re FiberTower Network Servs. Corp.,*
    482 B.R. 169 (Bankr. N.D. Tex. 2012)....................................................... passim

*In re Hunt,*
    93 B.R. 484 (Bankr. N.D. Tex. 1988)........................................................ 11, 13, 15

*In re Life Partners Holdings, Inc.,*
    15-40289-RFN-11, 2017 WL 11517832, at *2 (N.D. Tex. Dec. 12, 2017) ............... 10

*In re OGA Charters, LLC,*
    554 B.R. 415 (Bankr. S.D. Tex. 2016) .................................................. 8, 9, 11, 15

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2010) ...................................................................... 11, 12, 13

*Justin Indus., Inc. v. Choctaw Sec., L.P.,*
    920 F.2d 262 (5th Cir. 1990) ............................................................................. 9

*La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency,*
    608 F.3d 217 (5th Cir. 2010) ............................................................................. 9

DOCS_NY:42317.7 36027/002

002567

APP. 794

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 815 of 1017   PageID 3278
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 4 of 21

*Lake Charles Diesel, Inc. v. Gen. Motors,*
   328 F.3d 192 (5th Cir. 2003) ................................................................. 10

*Lazarus Burman Assocs. v. Nat'l Westminster Bank U.S.A. (In re Lazarus Burman Assocs.),*
   161 B.R. 891 (Bankr. E.D.N.Y.1993) ...................................................... 15

*MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.),*
   837 F.2d 89 (2d Cir.1988) ........................................................................ 9

*Martinez v. Matthews,*
   544 F.2d 1233 (5th Cir. 1976) ............................................................... 10

*Miss. Power & Light Co. v. United Gas Pipe Line,*
   760 F.2d 618 (5th Cir.1985) ..................................................................... 9

*Pipkin v. JVM Operating, L.C.,*
   197 B.R. 47 (E.D. Tex. 1996) ........................................................... 11, 12

*RoDa Drilling Co. v. Siegal,*
   552 F.3d 1203 (10th Cir. 2009) ............................................................. 10

*Rush v. Nat'l Bd. of Med. Examiners,*
   268 F. Supp. 2d 673 (N.D. Tex. 2003) .................................................. 10

*SAS Overseas Consultants v. Benoit,*
   No. 99–1663, 2000 WL 140611, at *5 (E.D. La. Feb. 7, 2000) ............... 15

*Texas v. Ysleta Del Sur Pueblo,*
   No. EP-17-CV-179-PRM, 2018 WL 1566866, at *9 (W.D. Tex. March 29, 2018) ................. 9

**STATUTES**

11 U.S.C. § 105 ........................................................................................... 8, 14

11 U.S.C. §§ 362, 542, 1107 ........................................................................... 14

**OTHER AUTHORITIES**

COLLIER ON BANKRUPTCY ¶ 105.03[1][a] (16th ed. 2012) ................................ 13

DOCS_NY:42317.7 36027/002

APP. 4785
002568

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4 Filed 06/06/25 of 2722 816 of 1017   PageID 3279
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 5 of 21

**DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR A MANDATORY INJUNCTION REQUIRING THE ADVISORS TO
ADOPT AND IMPLEMENT A PLAN FOR THE TRANSITION OF
SERVICES BY FEBRUARY 28, 2021**

Highland Capital Management, L.P., the plaintiff in the above-captioned adversary

proceeding (the "Adversary Proceeding"), and the debtor and debtor-in-possession (the "Debtor"

or "Highland") in the above-captioned chapter 11 case ("Bankruptcy Case"), submits this

memorandum of law (the "Memorandum") in support of the *Debtor's Motion for a Mandatory

Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services

by February 28, 2021* (the "Motion"), pursuant to sections 105(a), 362(a), 542, and 1107 of title

11 of the United States Code (the "Bankruptcy Code") and Rules 7001 and 7065 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), against defendants Highland Capital

Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P.  ("NPA," and

together with HCMFA, the "Advisors").[2]  In support of its Motion, the Debtor states as follows:

## I.

## INTRODUCTION

1.      The Advisors serve as the investment manager, either directly or indirectly, to a

number of investment vehicles (collectively, the "Funds") regulated pursuant to the Securities

Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940.

Certain of the Funds are publicly traded and have thousands of retail investors who are at risk

due to the Advisors' deleterious conduct.

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the *Declaration of Mr. James P. Seery, Jr. in Support of the Debtor's Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* (the "Seery Declaration") being filed contemporaneously herewith.

002569
APP. 1786

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 08/06/25   Page 817 of 1017   PageID 3280
Main Document   Page 6 of 22
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 6 of 21

2.      The Advisors are owned and controlled by James Dondero.  Pursuant to certain Shared Services Agreements, the Debtor has historically provided back office and middle office services that enable the Advisors to manage the Funds.  Although the Debtor is paid for these services, providing the services requires the Debtor to maintain a full staff, the cost of which has historically caused substantial net losses to the Debtor.

3.      Each of the Shared Services Agreements gives either party the unilateral right to terminate the respective Shared Services Agreement by providing prior written notice.  On November 30, 2020, the Debtor provided written notice of its intent to terminate the Shared Services Agreements effective as of January 31, 2021.

4.      The Termination Notices could not have come as a surprise to the Advisors because the Debtor was in bankruptcy and had been pursuing an "asset monetization" plan of reorganization that would leave it with a substantially scaled-down work force since at least August 2020.  With that in mind, the Debtor began developing a plan pursuant to which the shared services would be transitioned to an entity that would be created, owned, and operated by certain of the Debtor's employees who were expected to be terminated as part of the implementation of the Debtor's Plan.

5.      At the same time, the Debtor continued to provide the services required under the Shared Services Agreements – despite the Advisors being in substantial arrears with an outstanding amount due to the Debtor in excess of $3 million – and otherwise continued in its attempts to transition those services in a smooth and orderly manner.  Indeed, in order to give the Advisors more time to engage and complete the transition, the Debtor has extended the

002570
APP. 1787

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 45   Filed 06/05/25   Page 818 of 1017   PageID 3281
Main Document   Page 6851 of 2722
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 7 of 21

termination date on two occasions, with the current termination deadline being February 19, 2021.[3]

6.      Regrettably, as described in more detail below, and notwithstanding the Debtor's best efforts to aid in the transition of services, the Advisors have willfully failed and refused to adopt and effectuate a transition plan, choosing instead to spend the last months threatening the Debtor and certain of its employees and seeking to deflect responsibility for their own wrongful conduct.

7.      The status quo is untenable.  The Debtor has the contractual right to terminate the Shared Services Agreements, and it has exercised that right.  Pursuant to the Debtor's Plan, there will shortly be a substantial reduction in the Debtor's work force and the Debtor will be unable to provide services to the Advisors.  The Advisors' failure to work with the Debtor or to otherwise develop a transition plan of its own has put thousands of retail investors at risk.

8.      The Debtor is faced with an awful choice.  It can either (a) exercise its rights to terminate the Shared Services Agreements to the detriment of the Funds and their investors and be sucked into more litigation because of Mr. Dondero's conduct, or (b) attempt to provide services to the Advisors under the Shared Services Agreements at substantial losses and risk material delays in the implementation of the Debtor's Plan.

9.      Therefore, the Debtor moves, on an emergency basis, for a mandatory injunction compelling the Advisors to adopt and implement a transition plan by February 28, 2021, when the Debtor is expected to substantially reduce its workforce.  In the absence of such a mandate, the Funds (together with their thousands of investors) and the Debtor will be irreparably harmed.

---

[3] Although the Shared Services Agreement will terminate on February 19, 2021, the Debtor is willing to further extend the termination dates of the Shared Services Agreements through February 28, 2021, solely to prevent catastrophic harm to the retail investors in the Funds, but the Debtor will be unable to extend the termination date further as the Debtor is expected to reduce its workforce at the end of February and will have insufficient personnel thereafter to perform under the Shared Services Agreements.

002571
APP. 1798

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/03/25   Page 819 of 1017   PageID 3282
Main Document   Page 682 of 732
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 8 of 21

II.

**STATEMENT OF FACTS**

**A.     The Debtor Has the Contractual Right to Terminate the Shared
        Services Agreements, and It Timely Exercised that Right**

10.     The Debtor is party to the Shared Services Agreements pursuant to which it has a

contractual right of termination upon written notice.

***The Debtor's Shared Services Agreement with HCMFA***

11.     The Debtor and HCMFA are parties to that certain *Second Amended and Restated*

*Shared Services Agreement*, effective as of February 8, 2013.  Seery Dec. **Exhibit A**.

12.     Pursuant to section 2.01 of the HCMFA Shared Services Agreement and Annex A

affixed thereto, the Debtor provides certain services to HCMFA that enable HCMFA to manage

the Funds.

13.     The HCMFA Shared Services Agreement was for a one-year term, subject to

automatic one-year renewals "unless sooner terminated under Section 7.02."

14.     Section 7.02 of the Shared Services Agreement provides that "[e]ither Party may

terminate this Agreement, with or without cause, upon at least 60 days advance written notice at

any time prior to the expiration of the Term."

15.     On November 30, 2020, the Debtor provided written notice to HCMFA that it

intended to terminate the HCMFA Shared Services Agreement as of January 31, 2021.  Seery

Dec. **Exhibit B**.

***The Debtor's Shared Services Agreement with NPA***

16.     The Debtor and NPA are parties to that certain *Amended and Restated Shared*

*Services Agreement*, effective as of January 1, 2018.  Seery Dec. **Exhibit C**.

002572
APP. 1789

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document Filed 04/03/25   Page 820 of 1017   PageID 3283
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 9 of 21

17.     Pursuant to Article II of the NPA Shared Services Agreement, the Debtor provides certain services to NPA that enable NPA to manage the Funds.

18.     The NPA Shared Services Agreement did not have a fixed term.  Instead, section 7.01 provided that "[e]ither Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other."

19.     On November 30, 2020, the Debtor provided written notice to NPA that it intended to terminate the NPA Shared Services Agreement as of January 31, 2021.  Seery Dec. **Exhibit D.**

**B.      Prior to Providing the Termination Notices, the Debtor Worked on a Transition Plan, but the Advisors Failed to Engage or Pay for <u>Services Rendered</u>**

20.     On August 12, 2020, after considering its strategic options, the Debtor filed an "asset monetization" plan of reorganization pursuant to which, in general, the Debtor proposed to reduce staff, reject certain contracts, and monetize its assets consistent with maximizing value for all stakeholders.  [Docket No. 944].

21.     Thus, at least as of that time, all stakeholders – including the Advisors – were on notice that the Debtor intended to continue operations on a scaled-down basis with the goal being an orderly monetization of assets.[4]

22.     Consistent with that intent, the Debtor began formulating a plan for the transition of services provided under the Shared Services Agreements.

---

[4] Furthermore, on November 13, 2020, the Debtor filed its *Third Amended Plan of Reorganization of Highland Capital Management* [Docket No. 1383] (the "<u>Third Amended Plan</u>").  In its Third Amended Plan (and subsequent plans), the Debtor explicitly stated that it did not intend to continue providing services under the Shared Service Agreements precisely because they are money losers.  Third Amended Plan, Art. IV.A ("[I]t is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.  The Debtor believes that the continued provision of the services under such contracts will not be cost effective.").

002573

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 820 of 2722   821 of 1017   PageID 3284
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 10 of 21

23.     Specifically, beginning in the summer of 2020, the Debtor attempted to negotiate for the orderly transition of services with James Dondero, the individual who owns and controls each of the Advisors.

24.     The Debtor's proposal contemplated the transition of services to the Advisors from the Debtor to an entity that would be created, owned, and operated by certain of the Debtor's employees ("NewCo") who were expected to be terminated as part of the Debtor's asset monetization plan.

25.     With Mr. Dondero in control, the Advisors never provided any constructive response to the Debtor's proposal.  Indeed, Mr. Dondero specifically informed the Debtor that he intended to make the transition difficult for the apparent purpose of creating leverage in plan negotiations.

26.     In addition to failing to engage in any process designed to provide for the orderly transition of services, the Advisors also failed to pay the Debtor for the services provided under the Shared Services Agreement.

27.     Since the Petition Date, each of the Advisors has failed to meet certain of its payment obligations under the Shared Services Agreements.  For the period between the Petition Date and January 31, 2021, (a) HCMFA owes the Debtor $2,121,276 for services rendered under the HCMFA Shared Services Agreement, and (b) NPA owes the Debtor $932,977 for services rendered under the NPA Shared Services Agreement.  These amounts exclude amounts owed for services provided prior to the Petition Date.

28.     The Debtor loses significant money providing services under the Shared Services Agreements, which is why it publicly stated its intention in the Third Amended Plan (and each subsequent amendment and modification to the Plan) not to assume or assume and assign them.

DOCS_NY:42317.7 36027/002

002574

APP. 1801

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/05/25   Page 822 of 1017   PageID 3285
Main Document   Page 11 of 21
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 11 of 21

While that is bad enough, the Advisors failure to pay for services previously rendered is a blatant breach of the Agreements.

**C.    The Debtor Offers to Extend the Termination Date to Avoid a Catastrophe and Attempts to Engage the Funds' Board to Aid in the Adoption of a Transition Plan**

29.    Instead of engaging in the process, the Advisors and certain of their employees were more focused on threatening the Debtor and its employees, all in a transparent effort to deflect responsibility for their own obstinate and wrongful conduct.

30.    With the January 31, 2021, termination date fast approaching, and with the Advisors continuing to fail to work cooperatively on a transition plan, the Debtor took the initiative and offered to extend the termination date by two weeks (i) in order to avoid catastrophic consequences for the Funds and their investors that would result from an abrupt termination, and (ii) in the hope that the Advisors would use the extended time to finally and constructively engage.

31.    Thus, on January 29, 2021, the parties executed an agreement extending the termination date to February 14, 2021, in exchange for the Advisors paying in advance for services to be rendered by the Debtor during that two-week period.  Seery Dec. **Exhibit E**.

32.    During the following two weeks, the Debtor and its employees and professionals made every effort to bring the issue of the transition of services to a resolution.  Among other things, the Debtor continued to refine the proposal for the transition of services to NewCo.

33.    The Debtor also attempted to get the attention of the Funds' Boards because it was concerned that the Boards were either uninformed, not engaged, or were under the influence and control of Mr. Dondero.

34.    Among other communications, James P. Seery, Jr., the Debtor's Chief Executive Officer, sent formal written communications to the Board of Directors for the Funds on January

DOCS_NY:42317.7 36027/002

**APP. 1802**

002575

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 40-6 Filed 04/06/23   Page 823 of 1017   PageID 3286
Main Document   Page 686 of 742
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 12 of 21

27, 2021, February 8, 2021, and February 12, 2021.[5]  Seery Dec. **Exhibits F, G and H,** respectively.

35.     Despite the efforts of certain of the Advisors' professionals, and despite the Debtor's willingness to make all reasonable concessions on a transition agreement, Mr. Dondero and the Advisors have refused to "say yes" or to otherwise take steps to formulate a transition plan for the protection of the Funds and their investors.

36.     Faced with an untenable situation, the Debtor again agreed to extend the termination date, this time to February 19, 2021.  *See* Seery Dec. **Exhibit I**.

37.     Finally, on February 16, 2021, the Debtor made its last attempt to reach an agreement before being forced to take alternative actions to protect itself, the Funds, and investors, by sending the Advisors a proposed term sheet that provided a reasonable transition plan. Seery Dec. **Exhibit J**.  The Advisors refused to agree to the terms thereunder.

38.     Given that the Court will soon enter an order confirming the Debtor's Plan, and the reduction in the Debtor's work force will follow soon thereafter, the Debtor will be unable to provide services to the Advisors much longer.  The Advisors' failure to agree on or formulate a transition plan is creating catastrophic risk for the Funds and their investors.  The Advisors' failure to plan for a transition is also creating material risk to the Debtor.

### III.

### LEGAL STANDARD

39.     Pursuant to section 105(a) of the Bankruptcy Code, bankruptcy courts are authorized to "issue any order, process, of judgment that is necessary or appropriate to carry out the provisions of the Code. *In re FiberTower Network Servs. Corp.*, 482 B.R. 169, 182 (Bankr.

---

[5] Mr. Seery's formal correspondence was in addition to his informal correspondence and communications with the Funds' Board and the substantial communications between counsel to the Debtor, the Advisors, and the Funds.

002576
APP. 1503

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 13 of 21
Case 3:25-cv-02072-S   Document 16-7   Filed 06/05/25   Page 824 of 1017   PageID 3287
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 13 of 21

N.D. Tex. 2012) (quoting 11 U.S.C. § 105); *see also In re OGA Charters, LLC*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016) ("The Court may issue injunctions as part of its equitable powers, pursuant to 11 U.S.C. § 105."). In other words, courts have broad authority to take actions necessary to "protect the integrity of the bankruptcy estate" and to "enjoin actions that 'might impede the reorganization process.'" *FiberTower*, 482 B.R. at 182 (quoting *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 837 F.2d 89, 93 (2d Cir.1988)). "A preliminary injunction seeks to 'prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" *OGA Charters*, 554 B.R. at 424 (quoting *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir.1985)).

40.     Injunctive relief is warranted under section 105(a) where the movant shows: (1) a likelihood that it will prevail on the merits; (2) irreparable injury in the absence of injunctive relief; (3) that the balance of the equities favor the movant; and (4) that the injunction would serve the public interest. *See OGA Charters*, 554 B.R. at 424; *Green v. Wells Fargo Bank, N.A.*, 575 Fed. Appx. 322, 323 n. 3 (5th Cir. 2014) (stating the four-prong test for a preliminary injunction as likelihood of success, irreparable harm, balance of the equities, and the public interest); *In re Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1189 (5th Cir. 1986) (same); *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 219 (5th Cir. 2010) (same).

41.     A mandatory preliminary injunction—that is, a preliminary injunction that orders a party to "take action" or perform, as opposed to a prohibitory preliminary injunction—seeks to alter the *status quo* prior to litigation rather than maintain it. *See Davis v. Angelina College Board of Trustees*, No. 9:17-CV-179, 2018 WL 1755392 (E.D. Tex. 2018); *Texas v. Ysleta Del Sur Pueblo*, No. EP-17-CV-179-PRM, 2018 WL 1566866, at *9 (W.D. Tex. March 29, 2018).

DOCS_NY:42317.7 36027/002

APP. 1804
002577

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/08/25   Page 825 of 1017   PageID 3288
Main Document   Page 608 of 732
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 14 of 21

42.    The factors for assessing a mandatory or prohibitory injunction are the same, although a plaintiff seeking a mandatory injunction must show a "clear entitlement" to the relief sought. *Texas,* 2018 WL 1566866, at \*9 (citing *Justin Indus., Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 268 (5th Cir. 1990) ("[B]ecause [the plaintiff] is seeking a mandatory injunction, it bears the burden of showing a clear entitlement to the relief under the facts and the law."); *see also Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (noting that in order for mandatory injunctions to issue, plaintiff must show that the "facts and the law clearly favors" them).

43.    Although there is a heavier burden on the plaintiff to establish that a mandatory injunction is warranted, the Fifth Circuit has cautioned that the focus must be on the prevention of injury rather than preserving the "status quo":

> It must not be thought, however, that there is any particular magic in the phrase 'status quo.' *The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.* It often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. *The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.*

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (emphases added); *see also Rush v. Nat'l Bd. of Med. Examiners*, 268 F. Supp. 2d 673, 678 (N.D. Tex. 2003) ("An indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable injury."); *In re Life Partners Holdings, Inc.*, 15-40289-RFN-11, 2017 WL 11517832, at \*2 (N.D. Tex. Dec. 12, 2017) (noting that "mandatory preliminary injunctions 'that goes beyond the status

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 54   Filed 06/09/25   Page 826 of 1017   PageID 3289
Main Document   Page 15 of 21
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 15 of 21

quo' … may be appropriate to 'keep[] in effect a contractual relationship' to maintain the status quo." (quoting *Lake Charles Diesel, Inc. v. Gen. Motors*, 328 F.3d 192, 196 (5th Cir. 2003)).[6]

44.     For the reasons set forth above and below, the facts and the law show that the Debtor has a "clear entitlement" to the mandatory injunctive relief requested.

## IV.

## <u>ARGUMENT</u>

45.     A mandatory injunction requiring the Advisors to adopt and implement a plan for the transition of back office and middle office services from the Debtor is necessary to prevent imminent and irreparable harm to the Funds, their investors, and the Debtor that would be caused by the Advisors' continued failure to adopt and implement such a plan.

**A.     The Funds, their Investors, and the Debtor will Suffer Imminent and Irreparable Harm in the Absence of a Mandatory Injunction**

46.     The Funds, their investors, and the Debtor's estate will be severely injured if Defendants are not mandated to adopt and implement a transition plan.  Irreparable harm is "a harm 'for which there is no adequate remedy at law.'" *OGA Charters,* 554 B.R. at 424 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)); *see also Compass Bank v. Veytia*, EP-11-CV-228-PRM, 2011 WL 13234883, at *2 (W.D. Tex. Sept. 21, 2011) ("The general rule in the Fifth Circuit is that 'harm is irreparable where there is no adequate remedy at law, such as monetary damages.'") (quoting *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2010)).

---

[6] *See also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) ("While we recognize that mandatory preliminary injunctions are traditionally disfavored … when the moving party demonstrates that the 'exigencies of the case require extraordinary interim relief,' the district court may grant the motion upon satisfaction of the heightened burden.") (internal citations omitted); *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) ("Mandatory injunctions are most likely to be appropriate when 'the status quo … is exactly what will inflict the irreparable injury upon complainant.'" (citing *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984)).

11

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 6-8   Filed 00/00/25 of 2702 827 of 1017   PageID 3290
Main Document   Page 250 of 272
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 16 of 21

47.    In the bankruptcy context, "irreparable harm" refers to either "irreparable harm to the interest of a creditor or irreparable harm to the bankruptcy estate." *In re Hunt*, 93 B.R. 484, 495 (Bankr. N.D. Tex. 1988) (internal quotations omitted).  The element of irreparable injury to the debtor's estate is described as "irreparable harm to the creditors and estates from disruption of th[e] Court's exclusive authority to effectively manage the[] cases." *Id.*; *see also Pipkin v. JVM Operating, L.C.*, 197 B.R. 47, 51 (E.D. Tex. 1996) (noting that "[a]n injury is irreparable if it cannot be undone through monetary remedies[,]" and where, for instance, "there is injury to a party's operations, reputation, and goodwill.") (internal quotations omitted).  Moreover, "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Compass Bank*, 2011 WL 13234883, at *2 (citing *Janvey*, 647 F.3d at 600); (holding that "dissipation of assets ... would impair the court's ability to grant an effective remedy").

48.    Here, the Advisors' failure to adopt and implement a transition plan is untenable because – as the Advisors have known for months – the Debtor will soon be unable to provide services under the Shared Services Agreements, and such willful misconduct and gross negligence will cause irreparable harm to the Funds and their investors and to the Debtor's operations, goodwill, estate, and ability to implement the Plan.  *See Pipkin*, 197 B.R. at 56 (affirming mandatory injunction where trustee showed that absent such relief, he would "be unable to fulfill his fiduciary duties to expeditiously liquidate the estate" and where such relief was proper "after confirmation of a plan to protect the debtor and the administration of the bankruptcy estate") (internal quotations omitted).

49.    In the absence of a mandatory injunction, the Debtor will be forced to either (a) exercise its rights to terminate the Shared Services Agreements to the detriment of the Funds and

12

002580   APP. 0807

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document Docs Filed 02/06/25    Page 51 of 272 828 of 1017    PageID 3291
Case 21-03010-sgj  Doc 3  Filed 02/17/21    Entered 02/17/21 08:40:02    Page 17 of 21

their investors and be sucked into more litigation caused by Mr. Dondero's conduct, or (b) attempt to provide services to the Advisors under the Shared Services Agreements at substantial losses and risk material delays in the implementation of the Debtor's Plan.

50.    Either way, the ability of the Funds to function – and thus the ability of the Funds' retail and other investors to buy and sell interests in the Funds – will be at risk of substantial disruption, thereby creating the potential for catastrophic, unforeseeable, and incalculable consequences for investors, the Funds, the Debtor – and especially the Advisors.  Any such disruption will be at best a distraction for the Debtor and, at worst, cause the Debtor to incur substantial costs and litigation risk.  Regardless, there will be a significant impact on the Debtor's ability to implement its Plan and manage its estate.

**B.    The Debtor Will Demonstrate a Likelihood of Success on the Merits**

51.    To satisfy the likelihood of success element, the movant need only present their "prima facie case but need not show that [they] are certain to win." *Janvey*, 647 F.3d at 595 (internal quotations omitted).  Moreover, the relevant "merits" question in this case is not whether the Debtor is likely to prevail on appeal, but rather "whether this [C]ourt is authorized and likely to grant the requested relief." *FiberTower*, 482 B.R. at 183–84 (citing COLLIER ON BANKRUPTCY ¶ 105.03[1][a] (16th ed. 2012) ("In connection with the 'likelihood' argument, many courts have looked to the purpose of the requested injunction ... the likelihood of success argument will track closely the bankruptcy right sought to be vindicated."); *see also Hunt*, 93 B.R. at 493 ("[t]he inquiry [for success on the merits] for a preliminary injunction necessarily focuses on the outcome of a later proceeding, at which time the merits giving rise to the litigation will be decided" rather than success on the merits "so that reorganization efforts mandated by the Bankruptcy Code will not be thwarted by the [enforcement] proceeding.") (internal quotations omitted).

DOCS_NY:42317.7 36027/002

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-1   Filed 09/09/25   Page 829 of 1017   PageID 3292
Main Document   Page 252 of 322
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 18 of 21

52.     Here, Debtor will succeed on the merits of its claims for (a) a declaratory judgment that it has the contractual right to terminate each of the Shared Services Agreements, that it properly exercised those rights, and that, effective February 19, 2021, it has no further legal or equitable obligation to provide any services to the Advisors; (b) damages for breach of contract; and (c) for a mandatory injunction requiring the Advisors to adopt and implement a plan for the orderly transition of shared services by February 28, 2021.

53.     The terms of the Shared Services Agreements are unambiguous and give the Debtor the unfettered right to terminate services upon prior written notice.  There will be no dispute that the Debtor timely and properly provided such written notice in conformity with the provisions of the Shared Services Agreements.

54.     Moreover, the relief the Debtor seeks is precisely the type contemplated by the Bankruptcy Court's broad powers to grant injunctive relief under Section 105. *See* 11 U.S.C § 105 (a) (authorizing the bankruptcy court to "issue any order, process, of judgment that is necessary or appropriate to carry out the provisions of the Code."); *see also* 11 U.S.C. §§ 362, 542, 1107.  The Debtor seeks to require the Advisors to fulfill their duty to the Funds by ensuring that they have services necessary to manage the Funds.  The injunction will also allow the Debtor to focus on its own business, including the implementation of its Plan, and avoid the substantial costs and disruption inherent in being forced to continue its relationship with the Advisors and Funds.  Injunctive relief is, therefore, warranted for the purpose of protecting the integrity of the markets in which the Funds' shares are traded, the Funds' investors, and the Debtor's reorganization process. *See FiberTower*, 482 B.R. at 182.

**C.     The Equities Strongly Favor the Debtor**

55.     The equities strongly favor the Debtor.  The evidence will show that: (a) the Advisors were on notice since at least August 2020 that the Debtor was unlikely to provide

14

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 09/08/25   Page 830 of 1017   PageID 3293
Main Document   Page 625 of 2702
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 19 of 21

services under the Shared Services Agreement for an extended period of time; (b) the Debtor has been pursuing a transition plan since the summer of 2020; (c) the Third Amended Plan filed on November 13, 2020 (and each subsequent version of the Plan), expressly stated that the Debtor would not assume or assume and assign the Shared Services Agreements; (d) the Debtor timely provided notice of termination of the Shared Services Agreements on November 30, 2020; (e) upon information and belief, the Advisors (and not the Debtor) owe contractual and other duties to the Funds, the entities most at risk; and (f) the Debtor has acted in good faith by, among other things, twice extending the anticipated termination date.

56.     Based on these facts, the balance of the equities strongly favors the Debtor.

**D.     Injunctive Relief Serves the Public Interest**

57.     Injunctive relief will further the public interest because it is necessary to protect public markets and thousands of retail investors who currently have no knowledge of the risks they face, as well as the Debtor in its efforts to timely implement the Plan that was recently approved by the Court.   "Courts have often held that injunctions that facilitate reorganizations serve the public interest."  *FiberTower*, 482 B.R. at 189 (citing *SAS Overseas Consultants v. Benoit*, No. 99–1663, 2000 WL 140611, at *5 (E.D. La. Feb. 7, 2000); *Lazarus Burman Assocs. v. Nat'l Westminster Bank U.S.A. (In re Lazarus Burman Assocs.)*, 161 B.R. 891, 901 (Bankr. E.D.N.Y.1993)).   In other words, "[i]n bankruptcy, the public policy is to have an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start, by satisfying valid claims against that estate."  *OGA Charters*, 554 B.R. at 426; *see also In re Hunt*, 93 B.R. at 497 ("Chapter 11 expresses the public interest of preserving the going-concern values of businesses, protecting jobs, ensuring the equal treatment of and payment of creditors, and if possible saving something for the equity holders.").

DOCS_NY:42317.7 36027/002

002583

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/25/24   Page 831 of 1017   PageID 3294
Main Document   Page 654 of 732
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 20 of 21

58.     Indeed, the public interest virtually requires that the Advisors be directed to adopt and implement a transition plan.  In the absence of a mandatory injunction, thousands of retail investors are likely to suffer catastrophic losses, and there will likely be substantial market disruptions with unforeseeable consequences.  Each of these events will likely cause the Debtor substantial harm and interfere with the Debtor's ability to implement its Plan.

## <u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests that the Court (i) grant its Motion and enter an Order in the form annexed hereto as Exhibit A, and (ii) grant the Debtor any further relief as the Court deems just and proper.

002584   APP. 0811

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Page 832 of 1017   PageID 3295
Main Document   Page 825 of 732
Case 21-03010-sgj Doc 3 Filed 02/17/21   Entered 02/17/21 08:40:02   Page 21 of 21

Dated:  February 17, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

APP. 0812
002585

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/06/25    Page 833 of 1017    PageID 3296
Main Document    Page 625 of 732
Case 21-03010-sgj Doc 25 Filed 02/24/21   Entered 02/24/21 18:55:35   Page 1 of 5

# EXHIBIT 20



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed February 24, 2021**

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | Case No. 21-03010-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., AND NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendants. | § | |

## ORDER

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 834 of 1017   PageID 3297
Main Document   Page 257 of 272
Case 21-03010-sgj Doc 25 Filed 02/24/21   Entered 02/24/21 18:55:35   Page 2 of 5

This matter having come before the Court on the *Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [Docket No. 2] (the "Motion")[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff in the above-captioned adversary proceeding, and this Court having considered (i) the Motion; (ii) *Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Damages and for Declaratory and Injunctive Relief* [Docket No. 1] (the "Complaint"); (iii) the arguments and law cited in the Debtor's *Memorandum of Law in Support of its Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [Docket No. 3] (the "Memorandum of Law," and together with the Motion and Complaint, the "Debtor's Papers"); (iv) the *Objection to Mandatory Injunction and Brief in Support Thereof* [Docket No. 20] (the "Objection"), filed on February 22, 2021, by the Advisors; (v) the testimonial and documentary evidence admitted into evidence during the hearing held on February 23, 2021 (the "Hearing"), including the credibility of witnesses Mr. James P. Seery, Jr., Mr. James Dondero, and Mr. Dustin Norris; and (vi) the arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding[3] pursuant to 28 U.S.C. § 157(b)(2);

---

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to such terms in the Motion.

[3] **The court orally stated at the hearing that, at a minimum, there is bankruptcy subject matter jurisdiction in this action, since: (a) there is a conceivable effect on the bankruptcy estate being administered (i.e., the pre-confirmation test for bankruptcy subject matter jurisdiction), since there is a risk of potential liability or regulatory actions being pursued against the estate, if the Debtor does not obtain relief in this action, and, also (b) the outcome of this action could bear on the interpretation, implementation, and execution of a confirmed plan (i.e., the post-confirmation test for bankruptcy subject matter jurisdiction). The court also concluded, upon further analysis, that the action should be deemed to present a "core" matter, with regard to which the bankruptcy court may issue final orders and exercise Constitutional authority, since, among other things, the relief sought is, in essence, supplemental to the confirmation order and in furtherance of implementation of the confirmed plan. *See* 11 U.S.C. § 1142(b). In all events, should this order ever be subject to an appeal, and the District Court concludes that "noncore" matters are involved, the bankruptcy**

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5-4   Filed 06/23/25   Page 835 of 1017   PageID 3298
Main Document    Page 628 of 722
Case 21-03010-sgj Doc 25 Filed 02/24/21    Entered 02/24/21 18:55:35    Page 3 of 5

and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate and that no other notice need be provided; and upon all of the proceedings had before this Court, the legal and factual bases set forth in the Debtor's Papers, and the evidence submitted at the Hearing; and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth in the record on this Motion, the Court makes the following findings of fact:

1.      Each of the Advisors is controlled by Mr. Dondero.

2.      The Debtor had the contractual right to terminate the HCMFA Shared Services Agreement on 60 days' written notice.

3.      The Debtor properly exercised its right to terminate the HCMFA Shared Services Agreement by providing at least 60 days' written notice.

4.      The HCMFA Shared Services Agreement and the Debtor's obligation to provide services to HCMFA under the HCMFA Shared Services Agreement terminated on February 19, 2021.

5.      The Debtor had the contractual right to terminate the NPA Shared Services Agreement on 30 days' written notice.

6.      The Debtor properly exercised its right to terminate the NPA Shared Services Agreement by providing at least 30 days' written notice.

7.      The NPA Shared Services Agreement and the Debtor's obligation to provide services to NPA under the NPA Shared Services Agreement terminated on February 19, 2021.

---

**court requests that the District Court regard this ruling as a *proposed* set of findings, conclusions and order from the bankruptcy court and that the District Court adopt this ruling, pursuant to 28 U.S.C. § 157(c)(1).**

DOCS_NY:42406.7 36027/002

**002588**

APP. 0815

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Document 15 Filed 06/23/25 Page 836 of 1017 PageID 3299
Case 21-03010-sgj Doc 25 Filed 02/24/21 Entered 02/24/21 18:55:35 Page 4 of 5

8.      Except as expressly set forth herein, effective as of February 19, 2021, the Debtor has no obligation to provide any services, software, or assistance to any of HCMFA, NPA, the Funds, or any servicer or personnel retained by any of HMCFA, NPA, or the Funds.

9.      As of February 20, 2021, each of HCMFA and NPA had adopted an operating plan to obtain or provide all services previously provided by the Debtor that are necessary to fully perform under their agreements with the Funds without the aid or assistance of the Debtor.

10.      Except as expressly set forth herein, as of February 20, 2021, neither HCMFA nor NPA needs any services, including contractual arrangements and software, previously provided by the Debtor or its employees under the Shared Services Agreements that are necessary to fully perform under their agreements with the Funds.

11.      On or prior to February 28, 2021, the Advisors will promptly provide the Debtor with written notice of the documents, data, and books and records (collectively, the "Data") that the Advisors' believe constitute their property. If the Debtor in reasonable good faith determines such Data is the Advisors' property, the Debtor will take reasonable efforts to provide the Advisors with a copy of such Data. **Subject to paragraph 13 below, on and prior to February 28, 2021, each party will bear its own costs and expenses associated with the copying of the Data.** Under no circumstances will the Debtor be required to erase or otherwise remove any Data from the Debtor's systems. For the avoidance of doubt, the Debtor will have no obligation to provide any Data that constitutes the Debtor's privileged, confidential, or proprietary information.

12.      Subject to paragraph 14, the Debtor will have no obligation to provide any Data to the Advisors after February 28, 2021. If the Debtor in reasonable good faith cannot satisfy any request for Data made pursuant to paragraph 11 by the close of business on February 28, 2021, the Debtor will have no further obligation to provide such Data.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-4    Filed 06/16/25    Page 0 of 2722   837 of 1017    PageID 3300
Main Document    Page 06 of 2722    Page 837 of 1017
Case 21-03010-sgj Doc 25 Filed 02/24/21    Entered 02/24/21 18:55:35    Page 5 of 5

13.     The Debtor will not be required to incur any *material* time, cost, or expense in furtherance of its obligations set forth in paragraph 11—**the Advisors' witness having represented to the court that the copying and/or transfer of the Data would be fairly easy to achieve and that the Advisors stood by ready to receive the Data**.  To the extent any requests require material time, cost, or expense, the Debtor may petition this Court for the payment of any fees, costs, or expenses incurred in connection with the fulfillment of its obligations under paragraph 11 (including the cost of such petition) and shall have no obligation to provide such Data until the Court has ruled on such petition.

14.     If the Debtor cannot in reasonable good faith provide requested Data by February 28, 2021, or if the Advisors request any Data after February 28, 2021, and in each case if the parties cannot agree on the propriety of such request after conferring in good faith, the Advisors may petition this Court for access to such Data.  Regardless, the Advisors will bear any and all costs associated with any requests for Data and the delivery of such Data under this paragraph.

15.     Notwithstanding anything herein to the contrary, the delivery of Data to the Advisors will not constitute a waiver of any privileges, including attorney-client privilege, or any confidentiality requirements.

16.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

17.     Based on the foregoing, the Motion is dismissed as moot.

### End of Order ###

DOCS_NY:42406.7 36027/002

APP. 0847

002590

# EXHIBIT 21

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
| HIGHLAND CAPITAL | ) |  |
| MANAGEMENT, L.P., | ) | Dallas, Texas |
|  | ) | Tuesday, February 23, 2021 |
|  | ) | 9:00 a.m. Docket |
| Debtor. | ) |  |
|  | ) |  |

|  |  |  |
|---|---|---|
| HIGHLAND CAPITAL | ) | **Adversary Proceeding 20-3190-sgj** |
| MANAGEMENT, L.P., | ) |  |
|  | ) |  |
| Plaintiff, | ) | PLAINTIFF'S MOTION FOR ORDER |
|  | ) | REQUIRING JAMES DONDERO TO |
| v. | ) | SHOW CAUSE WHY HE SHOULD NOT |
|  | ) | BE HELD IN CIVIL CONTEMPT FOR |
| JAMES D. DONDERO, | ) | VIOLATING THE TRO [48] |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

|  |  |  |
|---|---|---|
| HIGHLAND CAPITAL | ) | **Adversary Proceeding 21-3010-sgj** |
| MANAGEMENT, L.P., | ) |  |
|  | ) |  |
| Plaintiff, | ) | DEBTOR'S EMERGENCY MOTION FOR |
|  | ) | MANDATORY INJUNCTION REQUIRING |
| v. | ) | THE ADVISORS TO ADOPT AND |
|  | ) | IMPLEMENT A PLAN FOR THE |
| HIGHLAND CAPITAL MANAGEMENT | ) | TRANSITION OF SERVICES BY |
| FUND ADVISORS, L.P., | ) | FEBRUARY 28, 2021 [2] |
| et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

For the Debtor/Plaintiff:   Jeffrey N. Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

2

APPEARANCES, cont'd.:

For the Debtor/Plaintiff:     John A. Morris
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
                              (212) 561-7700

For the Official Committee    Matthew A. Clemente
of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                              One South Dearborn Street
                              Chicago, IL  60603
                              (312) 853-7539

For the Advisor               Davor Rukavina
Defendants:                   Julian Vasek
                              MUNSCH HARDT KOPF & HARR, P.C.
                              500 N. Akard Street, Suite 3800
                              Dallas, TX  75201-6659
                              (214) 855-7554

For the Advisor               A. Lee Hogewood, III
Defendants:                   K&L GATES, LLP
                              4350 Lassiter at North Hills
                                Avenue, Suite 300
                              Raleigh, NC  27609
                              (919) 743-7306

For Defendant James D.        John T. Wilson
Dondero:                      BONDS ELLIS EPPICH SCHAFER
                                JONES, LLP
                              420 Throckmorton Street,
                                Suite 1000
                              Fort Worth, TX  76102
                              (817) 405-6900

Recorded by:                  Michael F. Edmond, Sr.
                              UNITED STATES BANKRUPTCY COURT
                              1100 Commerce Street, 12th Floor
                              Dallas, TX  75242
                              (214) 753-2062

Transcribed by:               Kathy Rehling
                              311 Paradise Cove
                              Shady Shores, TX  76208
                              (972) 786-3063

        Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.

3

<u>DALLAS, TEXAS - FEBRUARY 23, 2021 - 9:07 A.M.</u>

2        THE COURT:  This is Judge Jernigan, and we have

3   Highland settings this morning.  We have a couple of settings

4   in adversary proceedings, one in Adversary 21-3010, Debtor's

5   Emergency Motion for a Mandatory Injunction Requiring the So-

6   Called Advisors to Adopt and Implement a Plan for Transition

7   of Services; and then, second, in Adversary 20-3190, a Motion

8   to Hold James Dondero in Contempt for Violating a Previous

9   TRO, allegedly.

10       So, let's go ahead and get our lawyer appearances.  First,

11   for the Debtor, Highland, who is appearing this morning?

12       MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

13   Pomerantz and John Morris of Pachulski Stang Ziehl & Jones.

14   Mr. Morris will be handling the hearings today.

15       THE COURT:  All right.  Thank you.

16       All right.  For the Advisors, who do we have appearing?

17       MR. RUKAVINA:  Davor Rukavina and my co-counsel, Lee

18   Hogewood.  We are appearing for the two Defendants in

19   Adversary Proceeding 21-03010.  We are not appearing in the

20   other adversary and contempt matter.

21       THE COURT:  All right.  For Mr. Dondero, who do we

22   have appearing this morning?

23       MR. WILSON:  Your Honor, John Wilson with the law

24   firm of Bonds Ellis Eppich Schafer Jones.  And with me is

25   Bryan Assink.

4

1      (Interruption.)

2          THE COURT:  All right.  I didn't hear what you said,

3   Mr. Wilson, after appearing for yourself and Mr. Assink.

4   Would you repeat that?

5          MR. WILSON:  That was all I said, Your Honor.  I

6   don't know what that other noise was.

7          THE COURT:  Oh, okay.

8      (Court confers with Clerk.)

9          THE COURT:  Okay.  Someone came in as a PC user, is

10  what my court reporter said.

11     All right.  Well, do we have the Committee appearing

12  today?

13         MR. CLEMENTE:  Yes.  Good morning, Your Honor.

14  Matthew Clemente; Sidley Austin; on behalf of the Committee.

15         THE COURT:  All right.  Thank you.

16     All right.  Well, that's all the appearances I will ask

17  for right now.  I know we have interested observers, parties

18  in interest observing today.

19     Mr. Morris, how did you want to proceed this morning?

20         MR. MORRIS:  John Morris; Pachulski Stang Ziehl &

21  Jones.

22     What I thought we'd do, Your Honor, is begin with the

23  Debtor's Motion for the Mandatory Injunction.  I thought it

24  would -- may make sense to begin with some opening statements

25  and proceed right to the evidence.  The Debtor has two

5

1   witnesses to call, Mr. Seery and then Mr. Dondero.  And then

2   we would rest after the admission into evidence of our

3   exhibits.  The Advisors, you know, can certainly cross-examine

4   Mr. Seery.  You know, and then we'll have closing statements

5   and hopefully finish that part of the proceeding up.

6        And then we'll move on to the contempt proceeding.  Mr.

7   Dondero has a motion *in limine* to exclude certain evidence.

8   The Debtor has agreed -- I don't know if I've seen an order

9   from the Court -- but the Debtor has agreed to have that heard

10  today, if Your Honor would like to do that.  The Debtor is

11  certainly prepared to argue that motion prior to the

12  commencement of the contempt proceeding.  And then after that

13  motion is decided, we could just do the same drill:  Some

14  opening statements, hopefully hear from a few witnesses, put

15  in our evidence, and finish up.

16        THE COURT:  All right.  Well, that was the sequence I

17  had envisioned.  Since you're looking for an injunction, you

18  know, immediately, you're wanting to transition services by

19  February 28th, I thought that it made sense to take that one

20  up first.  So, with that, I'll hear your opening statement.

21        MR. MORRIS:  Okay.  Thank you, Your Honor.

22        MR. RUKAVINA:  Your Honor, Davor Rukavina, briefly.

23  I just would like for the record to be clear.  Are we having a

24  combined record for both adversaries, or is the -- first the

25  one and then the other, which would be my strong preference?

6

```
 1              THE COURT:  No, I did not envision a combined record.

 2              MR. RUKAVINA:  Okay.

 3              THE COURT:  Mr. Morris, was that what you were

 4     suggesting and I didn't understand?

 5              MR. MORRIS:  No.

 6              THE COURT:  No, he was not.

 7              MR. MORRIS:  Not at all.

 8              THE COURT:  Okay.  So we're just --

 9              MR. RUKAVINA:  Okay.  Thank you.

10              THE COURT:  -- focusing on the Advisor-Debtor dispute

11     this morning with the evidence.  Okay.

12         Mr. Morris, go ahead.

13              MR. RUKAVINA:  Thank you, Your Honor.

14              OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

15              MR. MORRIS:  Okay.  Thank you, Your Honor.  John

16     Morris; Pachulski Stang Ziehl & Jones.

17         Before I begin, I just want to tell the Court that the

18     lawyers -- this has been a very difficult week.  We had three

19     depositions yesterday.  And I just, I think it's important for

20     the Court to know that the lawyers have cooperated really

21     quite well.  It's difficult circumstances.  Not every

22     conversation is polite and perfect.  But for Your Honor's

23     purposes, I do appreciate everybody's cooperation getting to

24     this point.

25              THE COURT:  Well, I'm glad you told me that, because
```

APP. 0823

7

1   I was wrongly thinking I might hear this morning that you all

2   worked it out overnight.

3           MR. MORRIS:  No.

4           THE COURT:  I will let you know, I cannot for the

5   life of me figure out why this couldn't be worked out, but I'm

6   going to hear the evidence and argument and better understand

7   that, I guess.

8           MR. MORRIS:  You are.  And let me try to explain

9   that.  And what I'd like to do in my opening is just give you

10  some background as to how we got here, what the Debtor's

11  interest was in bringing the motion, and what the Debtor is

12  seeking from the Court today.  And I think, with that, perhaps

13  we'll fill in any of the blanks that may be appearing on your

14  page.

15          THE COURT:  Okay.

16          MR. MORRIS:  And I think the best place to start,

17  Your Honor, is just -- I know that the Court is familiar with

18  the relationship of the parties, but for the record in this

19  particular case I think that it's important to just put that

20  out there.  I've got a small demonstrative deck that I think

21  would be helpful, and I would just ask that we put up on the

22  screen --

23          THE COURT:  All right.

24          MR. MORRIS:  -- the first slide of the deck.

25          THE COURT:  Okay.

8

1          MR. MORRIS:  And this slide, Your Honor, you'll hear

2   testimony and I don't think there will be any dispute about

3   the substance of this particular slide.  But as Your Honor is

4   aware, HCMLP, the Debtor, has certain shared services

5   agreements with the two Defendants here that are the two

6   Advisors.  That's HCM Fund Advisors, NexPoint Advisors.

7   Pursuant to those shared services agreements, the Debtor

8   provided certain back- and middle-office services.  And the

9   shared services for purposes of this hearing contain some very

10  important termination clauses.

11      The evidence will show that the Advisors provide advisory

12  services to certain investment funds.  There's about ten or

13  twelve investment funds to which they provide advisory

14  services pursuant to these advisory service agreements.  Some

15  of those funds are publicly traded.  As Your Honor has heard

16  previously, some of those funds have thousands of individual

17  investors, mom-and-pop investors and retail investors.  So

18  that is the -- kind of the -- how this all fits together, and

19  we'd just like to keep that in context.

20      The agreements themselves, as I mentioned, have certain

21  termination clauses.

22      If we could just go to the next slide, please.

23      The agreement between the Debtor and Highland Capital

24  Management Fund Advisors had their shared services agreement,

25  and you can see in the footnote where I cite to the exhibit.

9

1   This is Debtor's Exhibit 2 that appears at the adversary

2   proceeding Docket No. 10.  It's a very straightforward

3   termination clause.  It's a clause that says the agreement is

4   for a period of a year, with automatic renewals.  And then

5   Section 7.02 provides that either party may terminate this

6   agreement with or without cause upon at least 60 days' written

7   notice.

8       If we could go to the next slide, you'll see that this is

9   the excerpt from the NexPoint Advisors shared services

10  agreement.  And this provision is slightly different because

11  it requires only 30-day written notice.  That -- and that

12  particular agreement can be found at Debtor's Exhibit No. 4.

13      So that's kind of the nature of the parties and that's the

14  important part of the agreement, at least from the Debtor's

15  perspective.

16      And how does this -- how is this all particularly relevant

17  today?  The Debtor filed for bankruptcy back in October of

18  2019.  As the Court is aware, Mr. Dondero was in control of

19  both the Debtor and the Advisors at that time.  The Advisors

20  had certainly prior notice that the Debtor would be filing for

21  bankruptcy.  And indeed, I think you'll hear some testimony

22  today from Dustin Norris that the Advisors had begun to think

23  about what would happen to the shared services agreements, you

24  know, a year and a half ago, prior to the bankruptcy filing.

25      Fast forward to August, August of 2020.  The Debtor had

10

1   been in bankruptcy at that point for about ten months.  And if

2   Your Honor will recall, at around that time the Debtor filed

3   its first plan of reorganization.

4        And if we could just go to the next slide, please.

5        This was an important event for the Debtor at the time,

6   because while the Debtor did not yet have the support of any

7   meaningful constituency, it did make a public statement for

8   the first time that unless executory contracts were assumed or

9   otherwise treated in the manner provided in Article 5 of the

10  plan, they would be deemed rejected.  So, as of August 2020,

11  this was the marker that the Debtor laid.

12       And certainly, discussions continued about a potential

13  grand bargain.  You've heard a lot about that.  They morphed

14  later on into discussions about a pot plan.  But for purposes

15  of, you know, public disclosure, there is no question that by

16  August 2020 everybody should have been on notice that, in the

17  absence of an assumption of the executory contracts, they

18  would be deemed to be rejected.

19       You'll hear from Mr. Seery today.  Mr. Seery will testify

20  as to the events that took place in the weeks following the

21  filing of this document.  He'll -- he will describe for you at

22  a high level but just in general how the parties began

23  discussing the possibility of a transition of services

24  agreement, the form of which was not certain at the time.

25  There were a couple of possibilities, including a Dondero-

11

1   related entity taking it over.  There was the possibility of a

2   -- what's been referred to and what will be referred to as

3   Newco, which was going to be a new entity formed by some of

4   the Debtor's employees upon consummation of the plan.  I think

5   there was discussion about the possibility of just leaving

6   things in place if somehow a grand bargain could be achieved.

7   But discussions ensued in the fall.

8       And as Your Honor will also recall, you know, we had the

9   mediation.  The mediation wasn't successful in resolving the

10  grand bargain.  The mediation did result in the agreement with

11  Acis, and that's when, you know, tensions began to increase

12  with Mr. Dondero and the board.

13      Mr. Seery will testify that through the fall, while

14  discussions continued, you know, it became a little bit more

15  -- it became a little bit more difficult.  And Your Honor will

16  recall that in October the board asked for Mr. Dondero's

17  resignation, which he complied with, pursuant to the corporate

18  governance provisions.

19      But it was in this time that Mr. Seery will also testify

20  that Mr. Dondero made it clear, in a call that there were

21  numerous people on, that if, you know, we could get to a grand

22  bargain, that would be great, but if that we couldn't, nobody

23  should assume that the transition of services would be easy.

24      Now, you know, Mr. Seery will testify that he found that

25  interesting because the transition of services really should

1  have been more of the Advisors' concern than the Debtor's, but

2  it was a point that Mr. Seery noted, and he'll tell you about.

3      By November, the Debtor had reached a consensus with the

4  Creditors' Committee on the formulation of a plan.  If you'll

5  recall, in late October, there was a contested disclosure

6  statement hearing during which the Committee objected to the

7  releases and to certain corporate governance provisions.  And

8  those -- those objections led to negotiations, and those

9  negotiations led to an amended plan, which was the Third

10 Amended Plan.

11     And if we could go to the next slide, this is also, from

12 our perspective, an important marker in the narrative here,

13 because in mid-November, we'd gone beyond just saying that if

14 the contracts aren't assumed they would be deemed rejected to

15 making a public statement that shared services agreements are

16 not going to be assumed.  And they're not going to be assumed

17 because they're not cost-effective.  And Mr. Seery will

18 testify as to why the contracts were not cost-effective.  But

19 there was no doubt by mid-November that the contracts weren't

20 going to be assumed by the Debtor.

21     A couple of weeks later, to remove any doubt, the Debtor

22 exercised its right under the shared services agreement and

23 gave notice of termination.

24     If we can go to the next slide, please.  You'll see in

25 this, in this slide, you've got -- yeah, there you go.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 850 of 1017   PageID 3313

13

1   There's a letter dated November 30th.  And this can be found,

2   this is Debtor's Exhibit 3.  There is a letter notifying the

3   Fund Advisors that the Debtor intended to terminate the shared

4   services agreement on January 31, 2021.  In other words, the

5   Debtor gave the 60-day notice that we just looked at under the

6   shared services agreement of its intention to terminate the

7   shared services agreement.

8       Can we go to the next slide, please?

9       On the same day, the Debtor also gave notice of its

10  intention to terminate the shared services agreement with

11  NexPoint Advisors.  And I would note that, notwithstanding the

12  fact that the shared services agreement with NexPoint Advisors

13  only required a 30-day notice period, the Debtor, in fact,

14  gave 60 days' notice, just to keep them on the same track.

15      And as Your Honor knows, in the subsequent weeks, the

16  Debtors pushed ahead with their plan of reorganization.  They

17  amended it a couple of times.  Those amendments didn't have

18  anything -- have any impact on the termination notices.

19  You'll hear no evidence today that the Debtor rescinded the

20  termination notices.  You'll hear no evidence today that the

21  Debtor ever considered rescinding the termination notices.

22      And so we fast-forward now a couple of months later to

23  January, and what's happening?  Mr. Seery will testify that,

24  you know, the Debtor really was using its best efforts to try

25  to engage, to try to finish this up.  And he'll tell you what

14

1    the Debtor's motivations were here.  While the Debtor doesn't

2    owe any obligations directly to the Funds, while the Debtor

3    doesn't owe any obligations directly to the retail fund

4    investors, the Debtor was very, very concerned that it be able

5    to implement its plan of reorganization.  And that plan of

6    reorganization, which Your Honor just approved very recently,

7    and in fact entered the order yesterday, pursuant to that plan

8    the Debtor is going to and has begun the process of downsizing

9    substantially.  And they were going to eliminate a lot of the

10   employees, and they knew in January that there was no way the

11   Debtor was ever going to have the ability to provide any

12   services at any time after February 28th.  I mean, they gave

13   notice of January 31st.

14       So, the Debtor wanted to make sure that it could proceed

15   in the future without any obligation, without any claim that

16   there's obligations.  So the Debtor was really focused on

17   trying to try to finish up this transition services agreement.

18   And the negotiations picked up a little bit in late January,

19   but here we were, with a January 31st deadline, and the Debtor

20   -- the Debtor [sic] asked for an extension of time.  And the

21   Debtor [sic] asked for an extension of time presumably because

22   they weren't prepared to assume the back-office and the

23   middle-office services that the Debtor was providing.

24       And so the Debtor agreed and the parties agreed, pursuant

25   to a written agreement, to extend the deadline by two more

 1   weeks.  And the parties continued to negotiate during those

 2   two weeks, but there were difficulties.  And threats were

 3   made.  And Mr. Seery will testify that those threats caused

 4   the Debtor to insist that the negotiations basically be

 5   chaperoned by outside counsel.

 6       It didn't last long.  It was really just for the purpose

 7   of trying to get the temperatures down to a degree where

 8   people could engage in a more cooperative fashion.  But that's

 9   what we were dealing with in late January and early February.

10   We couldn't get to yes.

11       And parties negotiated.  Terms sheets went back and forth.

12   You're going to hear this testimony, not from Mr. Seery, but

13   you'll hear it, ironically, from the Advisors, that last week

14   an agreement was reached.  The only sticking point was Mr.

15   Dondero's insistence that he be permitted access to the

16   Debtor's offices.  It is the only thing that prevented the

17   parties from reaching an agreement.

18       And they say that the Debtor was unreasonable in not

19   allowing him into their offices.  And Mr. Seery will testify

20   that we'd already been through this process, that we'd already

21   obtained a TRO, that we'd already obtained a preliminary

22   injunction that bars him from the offices, and we just,

23   admittedly, we would not agree to that provision.  But we

24   would not be here today if the Advisors simply said, we'll

25   leave that for another day, we've been operating for two

16

 1  months without Mr. Dondero in the offices, we've otherwise got

 2  an agreement that accomplishes everything we need to do.

 3  Instead, they said no.

 4      And here's another interesting point.  You're going to

 5  hear the testimony from Mr. Norris, and he's going to tell you

 6  that the so-called independent boards of the funds, they were

 7  fully supportive of the Advisors' position.  They thought that

 8  it was a really smart idea to walk away from a fully-

 9  negotiated transition services agreement because the Debtor

10  wouldn't let Mr. Dondero into the office.  They thought that

11  was a great idea and they fully supported it.  Nobody -- none

12  of the board members are going to be here today to testify to

13  that, but Mr. Norris is going to -- I'm going to make sure

14  that Mr. Norris informs the Court that that was the boards'

15  view.

16      And so, instead of saying yes, they said no.  And we had

17  told them last Tuesday, if you don't agree to this, we're

18  going to commence the lawsuit.  So they didn't agree to it, so

19  we commenced the lawsuit.

20      But negotiations continued.  And you know, I think the

21  lawyers for the Advisors acted in very good faith here, Your

22  Honor.  They did the best they could.  We continued to

23  negotiate.  On Friday, they presented to the Debtor two

24  options, Option A and Option B.  And at one point, they said,

25  we're not -- we may have to tweak Option B, so hold off for

17

1    now.  And you're going to see this in the emails.  It was just

2    black and white.  And we said okay, fine.  And then they came

3    back and they said no, no, no, Option B is good, Option B is

4    good, so tell us what you want to do.  And at 1:00 o'clock on

5    Friday, there was a phone call.  The Debtor informed the

6    Advisors' lawyers that they choose Option B.  We're done.  And

7    we started talking about wire transfers.  We started talking

8    about documenting this for the Court in a consensual order.

9    And we would be done.

10       And we had a call scheduled, I think at first at 3:30.

11   Again, this will be -- this will all be in the evidence.  This

12   is what the evidence is going to show.  We had a call at 3:30.

13   They asked for an extension of time.  Then they told us they

14   were trying to get the consent of the person whose consent

15   they needed.  They pushed it off further.  And then, you know,

16   then we got the bad email from Mr. Hogewood that said, we're

17   not going to have a group call, I'm just going to call by

18   myself.  And we knew what that meant.

19       And so he called up.  He informed the Debtor that Plan B

20   was off the table, the one that we had just accepted like for

21   the second time.  So Plan B was now off the table, and we

22   said, we're done.  I mean, we can't continue to negotiate

23   this.

24       A couple of hours later, they send an email and they say,

25   Plan B is back now on the table, but we're taking back the

APP 0854

18

1   million dollars that we had previously agreed to.  And we

2   said, no, thank you.

3       They continued to make offers over the weekend, Mr. Seery

4   will testify, offers pursuant to which they were seeking I

5   think what they called the *a la carte* services from the

6   Debtor.  And we weren't able to reach that agreement.  And,

7   again, I think what Mr. Dondero is going to tell you, Your

8   Honor, is that -- well, you're going to hear two different

9   stories, actually.  Mr. Dondero is going to tell you that when

10  we wouldn't let him back in the office on Tuesday, he

11  disengaged.  So he didn't -- he didn't really care.  He didn't

12  really have anything to do with it.  He doesn't know what plan

13  the Debtor has today.  He doesn't know how the services are

14  being transitioned.  He really doesn't know anything after

15  last Wednesday as regards to this matter.

16      But Mr. Norris will tell you that it was, in fact, Mr.

17  Dondero who pulled Plan B on Friday afternoon because he

18  didn't understand it.  There was a misunderstanding, they

19  said, even though Mr. Dondero will tell you that he

20  specifically authorized Mr. Norris and D.C. Sauter to

21  negotiate the agreement.  Okay?  That's a -- it's not a pretty

22  story.  I don't know that there's going to be a lot of dispute

23  about the facts, to be honest with you, because they're

24  reflected in documents.  This is as much a document case as it

25  is anything else.

APP 1325

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document    Page 639 of 742    856 of 1017    PageID 3319

19

1    So, you know, where does that leave us?  Because there are

2    certain developments that have happened in the last 24 hours,

3    you know, that I'll -- that guess I'll share with you now.  We

4    did take discovery yesterday.  As I mentioned, we did have a

5    number of depositions.  And during one of those depositions,

6    Mr. Norris disclosed that the Advisors do, in fact, have a

7    plan, or at least they assert that they have a plan.  And the

8    plan has, I think, what I would characterize as four legs to

9    it.

10    Number one is they hired yesterday on a contract basis

11    somebody to perform audit and accounting services.  I think

12    his name is Mr. Palmer.  And he started yesterday.

13    They took in-house the payroll issues and are utilizing --

14    to supplement that, they're now going to utilize a firm called

15    Paylocity.  And Paylocity is a firm that the parties use

16    regularly now.  So that's the second leg of their plan.

17    The third leg is an IT company called Siepe.  I think

18    Siepe is run by a former Highland employee.  And Siepe will

19    provide -- and I think Mr. Norris is going to testify -- has

20    been providing for a couple of weeks on a shadow basis certain

21    IT functions.

22    And, finally, they're still trying to negotiate with

23    Newco.  Newco would be the entity that would be formed with

24    some of the Highland employees.  But those negotiations aren't

25    finished.

APP 1826

20

1    So, I appreciated the objection that was filed yesterday.

2    They basically said that this is moot, that they've got a

3    plan, so there is nothing for the Court to do.  We still have

4    concerns.  I think Mr. Seery will testify as to those

5    concerns.

6    But it does -- it does go, you know, much further than we

7    thought, even though it was just adopted.  I mean, I guess the

8    lawsuit had its intended effect, and in the last 24, 48, 72

9    hours, they're -- they're engaging in the process of

10    transition.

11    So, you know, why are we here and what are we hoping to

12    accomplish now that we've gotten news of that development?  I

13    think it's pretty simple, Your Honor.  We simply want the

14    Court to make sure that the Debtor is protected here, that the

15    Debtor -- that there is a plan in place pursuant to which the

16    Debtor will not be obligated to provide any services and it

17    will be allowed to implement its plan in a way that not only

18    protects the Debtor but really will protect the public

19    marketplace, it will protect the funds and the investors, and,

20    frankly, the Advisors as well.

21    We wanted this to be a smooth transition.  We tried very

22    hard to make it a smooth transition.  Unfortunately, that

23    didn't come to pass.  But we do believe that the Debtor needs

24    the comfort of an order.

25    And the Advisors are simply wrong in their papers when

21

 1   they say we're asking the Court to dictate terms.  I don't

 2   care if they have an agreement with the Debtor.  I don't care

 3   who they have an agreement with.  I don't care what the

 4   agreement says.  I don't think the Court has to order any

 5   particular terms.  We just want to make sure that they have a

 6   plan in place and that plan is implemented before the end of

 7   the month, because we will not be able to do anything for them

 8   after that time.

 9        Thank you very much, Your Honor.

10            THE COURT:  Thank you.  Mr. Rukavina?

11            MR. HOGEWOOD:  Good morning, Your Honor.  Lee

12   Hogewood.  I'm going to take on the opening statement, if the

13   Court please.

14            THE COURT:  All right.  Thank you.

15        OPENING STATEMENT ON BEHALF OF THE ADVISOR DEFENDANTS

16            MR. HOGEWOOD:  And let me, let me begin by saying

17   that I agree with Mr. Morris that counsel, I think, have

18   cooperated throughout this process.  And I also -- and in

19   particular thank them for asking that the hearing be pushed

20   back for 30 minutes, which was at my request, as an earlier

21   start.

22        One other housekeeping matter that I would like to request

23   is I will not have a further speaking role after the opening

24   statement, and if it would be permissible for me to listen to

25   the rest of the hearing by telephone, that would be much

22

1    appreciated, if there's not an objection to that.

2            THE COURT:  All right.  I assume there's no

3    objection.

4            MR. MORRIS:  No.

5            THE COURT:  All right.  Permission granted.

6            MR. HOGEWOOD:  Thank you, Your Honor.

7        I think the theme of perhaps this hearing is a theme of

8    divorce.  It's a divorce that is long overdue.  The lawsuit

9    filed last week, it seems to be an effort of one of the

10   divorcing parties, the Debtor, to employ the power of this

11   Court to be sure that the Debtor is absolved of all

12   consequences of the divorce.

13       Divorces are often messy.  This one is particularly so.

14   Presently, I think there are three or four other adversary

15   proceedings among these parties that will have to be sorted

16   out over the coming many months.

17       But on the issue before the Court today, the Advisors need

18   very little from the Debtor in this divorce in the final

19   analysis, other than access to data and books and records that

20   the Advisors own and which will remain on formerly-shared

21   systems.

22       To carry the divorce analogy further, like many divorcing

23   couples, there are so-called children at risk.  In this case,

24   the children are the employees of the Debtor, the Advisors,

25   the funds and their investors.

23

1     The Debtor's other purpose seems to be that they -- to be

2     absolved of responsibility for the children.  And just to be

3     clear, the Advisors need no child support from the Debtor for

4     the funds or others beyond the access to data, books and

5     records that belong to our client and remain comingled with

6     the Debtor's data.

7     But we didn't seek any relief.  We are merely defending

8     ourselves in this action.  And I think what I say about what

9     the evidence will show is not going to be altogether that

10    different from what Mr. Morris has said.  There's absolutely

11    no dispute that the parties failed to reach an agreement.  I

12    also think there's no dispute that the parties worked

13    diligently to reach one.  They overcame very -- a large number

14    of very difficult business issues to make the orderly

15    transition happen.  But in the end, they could not complete a

16    deal.

17    And for the Debtor, you know, the question of who drew the

18    hard line in the sand about no, I think we see it a little bit

19    differently.  For the Debtor, it would not agree for Mr.

20    Dondero to have access, even if and only after the Advisors

21    paid for the construction of a wall to segregate the remaining

22    Debtor employees from Advisor employees and even if the Debtor

23    employees had separate access to the Debtor's section of the

24    premises, where the Advisors would be essentially subleasing

25    the remainder of the space.

24

1        For the Advisors, the prospect of its leader, the leader

2   of the enterprise, being prohibited from working in the same

3   office as the employees of the Advisors made no business sense

4   and was likely to become an ongoing logistical nightmare.

5        The gap could not be bridged in time, and so the Advisors

6   moved out on the 19th, as directed by the Debtor.

7        As the Court knows, there's no provision in the Bankruptcy

8   Code or any other statute that required these parties to agree

9   on a transition of shared services.  There's no legal

10  obligation on either party to reach an agreement on how to

11  divorce and separate.  Neither can be compelled to reach an

12  agreement if an agreement is not ultimately in their mutual

13  respective business interests, as determined by each of them.

14       The Debtor claims to have terminated the contract pursuant

15  to its terms.  It amended the termination date twice in

16  exchange for agreed advance payments to try to reach a deal.

17       In the meantime, the Advisors had to be aware of the

18  possibility that a deal might not be reached, and so they

19  began working in earnest on an alternative plan to be able to

20  continue to service their clients, their funds and investors,

21  as needed after the services were terminated.

22       So it is not clear exactly what the Debtors really seek

23  here.  A mandatory injunction to do what?  To have a plan?

24  The evidence will show, I think as Mr. Morris suggested, that

25  our clients have a plan.  It was implemented -- it began to be

25

1   implemented this past weekend, but it had been worked on for

2   some time in advance.  It's -- based on this, there's no

3   jurisdiction for or purpose in a court order directing us to

4   do that which we are determined to do anyway and have -- and

5   have already done.

6       The evidence will show that there's no meaningful

7   irreparable harm to the Debtor based on the current

8   circumstances.  Mr. Seery would be expected to testify, based

9   on yesterday's deposition, of some vague notion of confusion

10  among the employees, but there was no meaningful discussion of

11  irreparable harm to the Debtor.

12      So the -- and, indeed, the confusion of the employees, in

13  the context of a Chapter 11 debtor that has just confirmed a

14  plan of liquidation, I think confusion could be -- the source

15  of confusion could be a large number of things, not merely the

16  transition issues.

17      To carry the divorce analogy further, the requested

18  mandatory injunction is somewhat like requiring a divorcing

19  spouse who has left the home to explain the details of his or

20  her post-divorce life.  And there's -- there's no purpose in

21  that.  In our papers, we've explained the lack of jurisdiction

22  over this matter as a core proceeding, and certainly even

23  under the related-to jurisdiction of the Court, as well as a

24  constitutional -- lack of a constitutional basis for

25  jurisdiction under *Stern v. Marshall*.  And I know Mr. Rukavina

26

 1    will take those issues up in his closing arguments.

 2        We've also indicated -- made an arbitration demand, which

 3    is provided for under one of the two advisory agreements.  And

 4    in the context of seeking, in this case, seeking a permanent

 5    injunction, as we stated in our papers, there's really no --

 6    there's no proper exception from the arbitration demand.

 7        So there's really, as we sit here today, there's really no

 8    case or controversy, and the timeline that Mr. Morris

 9    described is pretty much not in dispute.  The evidence is

10    going to show that there was a developing consensus among the

11    business teams in January to meet a January 31 deadline with a

12    transition.  On January 27th, the -- 27, the Debtor demanded

13    as a condition of transition nearly $5 million in what they

14    allege to be postpetition underpayments under the shared

15    services agreement.  This was a new and difficult issue.  The

16    amounts, we're disputing.  And the Debtor had not circulated a

17    term sheet, only a proposed schedule of services.  The term

18    sheet came on the 28th.

19        On the 29th, we were able to agree to the first two-week

20    extension to allow these discussions over a 13- or 14-page

21    term sheet to be continued and discussed.  That extension

22    required the advance payment of an agreed amount to cover that

23    two-week period of extension of services.  Negotiations

24    continued, as discussed, and a further extension through the

25    19th was granted.

27

1      Negotiations broke down at the time a suit was filed, and

2   were renewed and ultimately broke down again, as Mr. Morris

3   described.

4      In the end, the Court should dismiss the proceeding for

5   lack of jurisdiction.  The bankruptcy court is not a divorce

6   court, nor is it a place where every perceived ill that the

7   Debtor may incur may be resolved by injunction.  The Court is,

8   after all, a court of limited jurisdiction.  If the Court does

9   proceed, we simply ask that the claims be rejected and

10  dismissed on the facts.

11     The Defendants have asked for nothing from the Debtor

12  other than continued access to data, books and records to

13  which they're entitled.  We've moved out of the house.  We

14  have plans that will allow us to continue to serve our

15  clients.  And we would ask that you not order us to do so.

16  Thank you.

17          THE COURT:  All right.  Well, I realize, you know,

18  legal arguments have been hinted at here, and of course were

19  briefed.  I want to hear the evidence, and then we'll talk

20  more about legal arguments at the close of the evidence.

21     All right.  Mr. Morris, you may call your witness.

22          MR. MORRIS:  All right.  Your Honor, before I call my

23  witness, I think just for efficiency purposes I would like to

24  move my documents into evidence so that we don't have to do

25  that on a document-by-document basis.

APP 1844

28

```
 1              THE COURT:  All right.

 2              MR. MORRIS:  And the Court will find -- unlike some

 3     of the prior proceedings, there actually aren't an

 4     overwhelming number.  But the Court will find Exhibits 1

 5     through 16 at the adversary proceeding docket, Docket No. 10,

 6     --

 7              THE COURT:  Uh-huh.

 8              MR. MORRIS:  -- the original witness and exhibit list

 9     that the Debtors filed.  And then we added a few more

10     documents I think late yesterday.  There was a supplement that

11     included Exhibits 17 through 21, and that can be found at the

12     adversary proceeding Docket No. 19.

13        So the Debtor would respectfully move into evidence

14     Exhibits 1 through 21 on those lists.

15              THE COURT:  All right.  Any objection?

16              MR. RUKAVINA:  Your Honor, I believe Mr. -- well, not

17     necessarily an objection, Your Honor.  I believe Mr. Morris

18     and I have an agreement that my Exhibits A through N as in

19     Nancy will also be admitted.  And if that agreement holds,

20     then I have no objection to his exhibits.

21              MR. MORRIS:  And it does, Your Honor.

22              THE COURT:  Okay.  And --

23              MR. RUKAVINA:  Then I would -- I would move for

24     admission at this time as well, Your Honor.

25              THE COURT:  All right.  And let's make sure I know
```

Seery - Direct                          29

1    where A through N appear.  It looks like they are -- are they

2    all at 18, Docket Entry 18?

3              MR. VASEK:  Correct, Your Honor.

4              THE COURT:  All right.  So I will admit 1 through 21

5    of the Debtor, which appear at Docket Entry No. 10 and 19, and

6    Exhibits A through N of the Advisors, which appear at Docket

7    Entry No. 18.  All right.

8        (Debtor's Exhibits 1 through 21 are received into

9    evidence.  Advisors' Exhibits A through N are received into

10   evidence.)

11             MR. MORRIS:  Okay.  And with that, the Debtor calls

12   James Seery as its first witness.

13             THE COURT:  All right.  Mr. Seery, I think I saw you

14   earlier on the video.  If you could --

15             MR. SEERY:  Good morning, Your Honor.

16             THE COURT:  Good morning.  All right.  Please raise

17   your right hand.

18       (The witness is sworn.)

19             THE COURT:  All right.  Thank you.  Mr. Morris?

20             MR. MORRIS:  Thank you, Your Honor.

21             JAMES P. SEERY, JR., DEBTOR'S WITNESS, SWORN

22                     DIRECT EXAMINATION

23   BY MR. MORRIS:

24   Q   Can you hear me okay, Mr. Seery?

25   A   I can.  Yes, sir.

Seery - Direct                                    30

1   Q    Okay.  Let's just cut right to the chase.  Was the Debtor

2   party to certain shared services agreements with Highland

3   Capital Management Fund Advisors and NexPoint Fund Advisors?

4   A    Yes.

5   Q    And I'm going to refer to those two entities as the

6   Advisors; is that okay?

7   A    That's fine.  Thank you.

8   Q    And pursuant to the shared services agreements, did the

9   Debtor historically provide back- and middle-office services

10  to the Advisors?

11  A    Yes.

12  Q    Okay.  And is it your understanding that the Advisors

13  provide advisory services to certain investment funds?

14  A    That's my understanding, yes.

15  Q    Okay.  Do you have any understanding as to whether or not

16  the Advisors provide those services to the funds pursuant to

17  written agreements?

18  A    I believe they have agreements with each of the funds.

19  Q    Okay.  And do you understand that some of those investment

20  funds are publicly traded?

21  A    I believe most of those are, the -- those '40 Act funds

22  are retail funds, yes.

23  Q    And what does it mean, you know, in your -- in your world,

24  what does it mean to be a retail fund?

25  A    There are institutional-type investments which are only

APP 4847

Seery - Direct                              31

1   available to institutional investors or credit investors,

2   depending on the type of investment it is, and there's

3   particular rules around what types of investors can engage in

4   certain types of investing activity, designed to, really, have

5   more sophisticated investors engage, if they desire, in more

6   risky endeavors and less who's believed to be sophisticated

7   investors engage in more what are referred to as retail

8   activities.

9        That's not saying that the retail activities aren't

10  sophisticated and risky.  They can be.  But there's a division

11  in how certain types of investors are able to access certain

12  types of investments, and retail funds typically are open to

13  any investor that wants to invest, and they can buy those on a

14  -- or sell them on a regular basis.

15  Q   Are you aware of any agreement of any kind between the

16  Debtor and any of the funds that are advised by the Advisors?

17  A   No, there are no -- no such agreements.

18  Q   Okay.  Let's turn our attention to August 2020.  Did there

19  come a time in August when the Debtor filed its initial plan

20  of reorganization?

21  A   Yes.

22  Q   And can you just describe generally for the Court what the

23  structure of that plan was?

24  A   As we've discussed before, that was the monetization plan.

25  It was at this point that the Debtor determined that it had to

Seery - Direct                                    32

1  file a monetization plan to effectively distribute the assets

2  to the stakeholders, depending on how their claims were

3  ultimately resolved.  And the monetization plan was the plan

4  we came up with.

5  Q    Okay.  And do you recall that that initial plan provided

6  for the treatment of certain executory contracts?

7  A    Yes.

8           MR. MORRIS:  Can we just put up on the screen Exhibit

9  12, please?  And if we could focus in on that first paragraph.

10 BY MR. MORRIS:

11 Q    Is it your understanding that the initial plan filed by

12 the Debtors provided that unless an executory contract was

13 subject to one of those provisions in the first paragraph,

14 that it would be deemed rejected?

15 A    Yes.  It was a pretty integral part of the plan, that we

16 were going to downsize the operations of the business

17 considerably, and many of the operating businesses, the

18 servicing of shared service counterparties, were going to be

19 eliminated, and we would either terminate those agreements

20 pursuant to their terms or they would be deemed rejected.

21 Q    Okay.  And what were the consequences for the shared

22 services agreements for a provision such as this?

23 A    Well, the counterparties would no longer have those

24 services and have to seek them, to the extent they needed

25 them, elsewhere.

Seery - Direct                               33

1   Q    Okay.  Was this the only plan that the Debtor was pursuing

2   at this time?

3   A    It was the only plan that we filed.  We were considering

4   other options, which at that point was the so-called grand

5   bargain, which we were attempting to negotiate alongside the

6   monetization plan.

7   Q    Did the Debtor engage in any discussions with the Advisors

8   after filing this plan about a possible transition of

9   services?

10  A    Yes.

11  Q    Can you describe for the Court your recollection about

12  those discussions in the fall of 2020?

13  A    Well, initially, it started in the summer.  And knowing

14  that this was a significant possibility, I gathered the

15  Highland operating team, many of whom are responsible for

16  servicing the counterparties under the shared service

17  arrangements, and they knew that they were not going to be

18  part of the continuing Debtor if the monetization plan was

19  confirmed.  And I described that there's a corporate carve-

20  out, that there would be significant work that had to be done,

21  that that team would have to accomplish, you'd have to

22  allocate responsibilities and know exactly how you're going to

23  perform these services, indeed, if the counterparties wanted

24  those services performed post-confirmation.

25       And we started with a Zoom meeting in August and tried to

Seery - Direct                                34

1   replicate a similar meeting each week so that we stayed on a

2   timetable.

3       By the early fall, or mid-fall, I'm sorry, I guess it was

4   November 24th, I had a conversation directly with Mr. Dondero

5   by phone.  And on that phone call, I described very much to

6   him the same situation.

7       It was Mr. Dondero, Mr. Ellington, Mr. Lynn, Mr.

8   Pomerantz, Mr. Demo, and Mr. James Romey from DSI on the call.

9   And on that call, I know we went through several issues, and

10  some of them were becoming particularly heated, especially the

11  settlement with Acis, because that was problematic for Mr.

12  Dondero.

13      We advised Mr. Dondero that he would have to resign from

14  the board if he was going to take antagonistic -- not the

15  board, the portfolio manager position -- if he was going to

16  take antagonistic positions versus the Debtor.

17      Mr. Lynn indicated that he was going to depose me with

18  respect to the 9019 settlements and was -- wanted to be able

19  to object to those, as well as the Acis settlement as well as

20  the Redeemer settlement.

21      We also talked about the potential of the grand bargain

22  plan, and we talked very specifically about the filed plan,

23  the monetization plan, and the transition that would have to

24  be accomplished.  And I walked through, again, my comparison

25  to a corporate carve-out and the difficulty of achieving those

Seery - Direct                          35

1  kind of transactions even if all parties were working hard to

2  get them done and wanted to get them done.

3      And I recall very specifically Mr. Dondero telling me that

4  I should be prepared, if his grand bargain plan wasn't

5  accepted, that my transition plan wouldn't be very easy and he

6  would make it difficult.  And I recall very specifically

7  saying that I was a Boy Scout for a long time and that the

8  Debtor would, in fact, be prepared.  While we thought it was

9  going to be in his economic best interest to come to

10  agreement, that we would not be left unprepared and the Debtor

11  would move forward even if he didn't agree.

12  Q   During the negotiations that you're talking about, was the

13  form of -- just to focus on the transition part, was a form or

14  structure of a successor to the Debtor, at least in terms of a

15  provider of the back- and middle-office services, discussed?

16  A   Yes.

17  Q   And what was the -- what was the substance of those

18  discussions concerning the form of the successor?

19  A   The initial substance was that it would be some subsidiary

20  of NPA or a Dondero related-party entity.  I picked NPA just

21  as a -- because it was a registered investment advisor, it

22  would be an easy transition over, and that's where the

23  employees could go, that's where the services could be

24  provided from, it would be rather seamless, and they were

25  sharing certain services already -- for example, HR services

Seery - Direct                          36

 1  like medical insurance, health insurance, et cetera.  And so I
 2  thought that that would be the easiest entity.  It would
 3  obviously require Mr. Dondero's agreement.
 4      Subsequently, the idea of a Newco became an idea that was
 5  developed originally by Mr. Ellington.  At least, his
 6  representation to me was that the -- he and other employees
 7  didn't want to work directly for Mr. Dondero because he's
 8  already retraded them on the compensation.  Deferred
 9  compensation.
10  Q   As time moved on, by November, was the Debtor gaining any
11  momentum with respect to its asset monetization plan?
12  A    Well, the asset monetization plan began to gain
13  considerable traction as the possibility of either a grand
14  bargain or a pot plan fell away.  There were significant
15  negotiations that we had already discussed in respect -- or,
16  at the confirmation hearing in respect of the terms of that
17  plan, and it began to gain significant momentum towards the
18  voting and the confirmation deadlines.
19  Q   And did the Debtor make a decision in November to
20  specifically disclose that it intended to reject all of the
21  shared services agreements?
22  A    Well, prior to that time, I had been in front of the
23  retail boards by phone a couple times and explained basically
24  the overview of the bankruptcy, what was happening.
25  Initially, the attempts at a grand bargain, then the filing of

APP 4953

Seery - Direct                                    37

1    the monetization plan, and the -- and the possibility of a

2    grand bargain and the competition between the two and the

3    likely scenarios for each.

4         In addition, we talked about, if there wasn't a grand

5    bargain, what the transition would look like and my

6    expectation, as I described earlier, that it was in everyone's

7    economic best interest -- meaning NPA's, HCMFA's, as well as

8    the funds -- to transition these services from the Debtor,

9    because we weren't going to continue them, to a Dondero-

10   related entity to perform those services for the funds.

11        There were -- there came a time when the disputes with Mr.

12   Dondero became significant enough where the Advisors and the

13   funds were actually objecting to certain things that I and the

14   Debtor were doing in the case, and I told one of the retail

15   board members that I would no longer participate in any of

16   their calls.  And he understood why, and I was very specific

17   that it had to do with their antagonistic actions versus the

18   estate.

19        So, as we moved forward towards November, the monetization

20   plan became clear, it became more and more clear that the

21   monetization plan was the only plan on the table.  And by mid-

22   to late November, we had settled on terminating the shared

23   service agreements and send out termination notices at the end

24   of November.

25   Q    Before you send out the termination notices, do you recall

APP 1854

Seery - Direct                              38

1    the Debtor filed their Third Amended Plan --

2    A    Yes.

3    Q    -- in particular?

4         MR. MORRIS:  And can we just put up on the screen,

5    please, Exhibit 13?

6    BY MR. MORRIS:

7    Q    Do you recall if that's the plan that provided the notice

8    that the shared services agreements would be terminated?

9    A    That -- that -- well, the plan continued the position that

10   if agreements weren't specifically assumed they would be

11   deemed rejected.

12        It also made clear that we weren't going to continue to

13   provide any services for the Advisors and their managed funds.

14        And then we actually sent specific termination notices

15   under the agreements.  So those agreements were terminated

16   pursuant to their terms.  They didn't need to wait for the

17   confirmation of a plan to be deemed rejected.

18   Q    Okay.

19        MR. MORRIS:  Can we scroll down just a little bit?

20   Okay.  Keep going.  Yeah, right there.

21   BY MR. MORRIS:

22   Q    Do you see the provision beginning on the bottom of Page

23   24?  Again, this is Exhibit 13.  Continuing to the top of the

24   next page.  That's the provision that put the world on notice

25   that the Debtor was not going to assume or assume and assign

Seery - Direct                         39

1   the shared services agreements, right?

2   A   Well, this is another one of the provisions.  The original

3   plan made clear that that's what we were going to do, the

4   original filing that we did in August.

5   Q   Okay.

6   A   We were very clear that we would not be assuming these

7   agreements.

8       This filing made clear that we were, again, but with even

9   more specificity, not going to continue to provide these

10  services, and then subsequently we filed or delivered the

11  termination notices.

12  Q   Okay.  And I see the last sentence of the paragraph ending

13  at the top of Page 25 states that the contracts "will not be

14  cost-effective."  Do you see that?

15  A   Yes.

16  Q   What is that a reference to?

17  A   Well, I think we've had discussions before, around

18  confirmation and prior to that, those hearings, that the

19  Debtor was run at a loss.  And the more work we do, the more

20  losses we find.

21      Basically, the Debtor ran at an operating loss, and then

22  had to sell assets to pay deferred compensation or other

23  expenses.  The Debtor has been run that -- it appears the

24  Debtor has been run that way for a long time, and many of the

25  services that the Debtor provides to the shared services, the

Seery - Direct                                40

1    cost of those services exceed the amount that we receive under

2    those contracts.

3        In addition, there's other entities that services -- and

4    persons for whom significant services are provided and nobody

5    pays anything.  They're not even contracts.

6        So, these contracts, the Debtor as an operating entity was

7    run at a loss.  These contracts were negative.  And that

8    doesn't even deal with the fact that many times these entities

9    didn't pay what they did, in fact, owe under the contract.  So

10   there are significant receivables that are owed by these

11   entities that haven't been paid.

12       In addition, the Debtor advances funds on a regular basis

13   for effectively the operating expenses of the Advisors and is

14   often not repaid timely.

15   Q   Okay.  A couple of weeks -- I think you referred to

16   termination notices.  Did the Debtor send termination notices

17   to the Advisors shortly after filing this Third Amended Plan?

18   A   Yes.  They were sent at the end of November.

19   Q   Okay.  Let's just look at the termination provisions, and

20   then we'll quickly at the termination notices.

21           MR. MORRIS:  Can we put on the screen Trial Exhibit

22   2, which was part of the deck of my opening?

23   BY MR. MORRIS:

24   Q   Are you generally familiar, Mr. Seery, with the shared

25   services agreements with the Advisors?

Seery - Direct                                41

1  A    I am.

2  Q    And are you aware that the shared services agreements

3  contain termination clauses?

4  A    Yes.

5  Q    All right.  So this is -- what I've put on the screen is

6  the Debtor's Exhibit No. 2, and it's the shared services

7  agreement with Highland Capital Management Fund Advisors.  Do

8  you see that?

9  A    I do.

10        MR. MORRIS:  Can we just focus in on Section 7,

11  please?

12  BY MR. MORRIS:

13  Q    Okay.  And is it your understanding that's the termination

14  clause?

15  A    Yes.  There's the term.  It's in 7.01.  And the

16  termination provision is in 7.02.

17  Q    Okay.  And can you just describe for the Court your

18  understanding of how Article 7 works?

19  A    Article 7 works that the agreement will automatically

20  renew on an annual basis unless one or the other parties

21  terminates the agreement.  And so each party is entitled to

22  terminate the agreement on 60 days' advance written notice.

23  Q    All right.

24        MR. MORRIS:  If we can take that down and put up

25  Debtor's Exhibit No. 4, please.

Seery - Direct                                42

1   BY MR. MORRIS:

2   Q    And do you see this is the shared services agreement

3   between the Debtor and NexPoint Advisors, LP?

4   A    Yes.

5   Q    And are you generally familiar with this document?

6   A    I am.

7          MR. MORRIS:  Can we go to Article 7, please?  Thank

8   you.

9   BY MR. MORRIS:

10  Q    Can you tell the Court your understanding of what Article

11  7 provides?

12  A    It's a little bit different than the last one.  This is a

13  later agreement.  The other one was a document that was

14  clearly cribbed from another agreement that wasn't exactly a

15  shared service arrangement.  But this one doesn't have the

16  automatic renewal.  It just puts the agreement into operation,

17  and then either party may terminate it at any time on 30 days'

18  written notice.

19  Q    And did the Debtor rely on the two Article 7 provisions

20  that we just looked at to give notice of termination of the

21  shared services agreements?

22  A    I'm sorry.  Somebody clicked in.  Did you say did the

23  Debtor rely on?

24  Q    Yes.

25  A    Yeah, those are the governing provisions that we relied

Seery - Direct                                   43

1  on, yes.

2  Q    Okay.

3        MR. MORRIS:  So can we put up on the screen Exhibit

4  3, please?

5  BY MR. MORRIS:

6  Q    And is this the Debtor's written notice to Highland

7  Capital Management Fund Advisors of its termination of the

8  shared services agreement effective as of January 31, 2021?

9  A    Yes.  That's our notice of termination.

10 Q    Did the Debtor ever rescind this notice?

11 A    No.

12 Q    Okay.  Did the Debtor ever tell the Advisors, to the best

13 of your knowledge, that the Debtor was considering rescinding

14 this notice?

15 A    No.

16       MR. MORRIS:  Thank you.  Can you take that down and

17 put up Trial Exhibit No. 5, please?

18 BY MR. MORRIS:

19 Q    And is this the Debtor's written notice to NexPoint

20 Advisors dated November 30, 2020 that it was terminating the

21 shared services agreement as of January 31, 2021?

22 A    Yes.  That's the Debtor's termination notice to NPA.

23 Q    Did the Debtor ever rescind this notice?

24 A    No.

25 Q    To the best of your knowledge, did the Debtor ever tell

APP 4869

Seery - Direct                                44

1    anybody at the Advisors that it was considering rescinding

2    this notice?

3    A    No.

4    Q    Okay.  The Debtor --

5         MR. MORRIS:  We can take that down now.  Thank you.

6    BY MR. MORRIS:

7    Q    The Debtor amended their plan of reorganization after

8    November; is that right?

9    A    Yes.  There were a couple of different amendments.

10   Q    To the best of your knowledge, did any amendment ever have

11   any impact at all on the Debtor's statement that it would not

12   be assuming or assuming and assigning the shared services

13   agreements?

14   A    No.  It goes beyond the best of my knowledge:  It didn't

15   happen, because it was an integral part of the plan.

16   Q    Okay.  And can you describe the Debtor's overall view of

17   the plan and the impact that it had or was expected to have on

18   the shared services agreements?

19   A    The basic nature of the plan, as I discussed earlier,

20   going back to August, but as refined, is that the Debtor will

21   no longer be in the business of providing shared services to

22   these Advisors.

23   Q    Okay.  So the notices are sent on November 30th.  They're

24   60-day notices.  What do you recall happening in December with

25   respect to negotiations over the transition of services, if

Seery - Direct                          45

1   anything?

2   A    The short answer is not much.  So, we did, as I said,

3   start the transition analysis and discussions and put together

4   detailed spreadsheets with the various agreements that might

5   be necessary for each side.  And some agreements would be

6   required for the Debtor to go forward, some contracts.  Other

7   contracts were not necessary for the Debtor but were deemed to

8   be necessary for the Advisors.  And we were working through

9   that analysis continually through the fall and through

10  December.  But there weren't -- at that point, there wasn't

11  very much going on with direct negotiations as to how this was

12  going to happen.  And my analogy for the Debtor was like

13  pushing on a string.

14      Frank Waterhouse in particular had been told by Jim

15  Dondero that he did not have authority to negotiate for him.

16  So once we had laid out what the contracts were, and we had an

17  original structure that the rent would be divided 75/25 and

18  paid by the Advisors, and then the costs of the contracts

19  would be divided 60/40, with the majority paid by the

20  Advisors, we really didn't get much traction other than trying

21  to put together that term -- that schedule so we knew what

22  those costs were, and then also to figure out what was unpaid

23  by the counterparties.

24      In addition, at that time, because it was pretty clear

25  that the monetization plan was going to go forward and go into

APP 1862

Seery - Direct                                    46

1   the confirmation, right around that time, and it may have been

2   the beginning of January, the Advisors stopped paying on

3   certain of the notes, and then we accelerated those notes.

4   Q    And do you have an understanding as to who was the -- who

5   was the negotiating leader on behalf of the Advisors in the

6   December-January time period, if anybody?

7   A    Well, for the Advisors, it was a combination of the

8   Highland team that would transition over and their counsel.

9   And the -- meaning the counsel for the Advisors.

10  Q    So now, moving into -- withdrawn.  Were the Debtor's

11  professionals engaged in this process, not just you?

12  A    Oh.  Oh, yes.  Very deeply.  We spent literally hundreds

13  of hours with both DSI and your firm, the Pachulski firm,

14  negotiating provisions, the structure, how this would work,

15  what the transition would look like.

16      As I said earlier, corporate carve-out is very

17  complicated, and there are -- there are often transition

18  services that have to be carried through for a period of time

19  where both sides will use certain services.  And then there

20  are shared services which will be carried through for a longer

21  period of time.

22      We came up with a structure that we think worked really

23  well in light of the term of the lease or the tenor of the

24  lease, so that we knew how that would work between the

25  parties, as well as certain IT contracts specifically that

APP 4803

Seery - Direct                                47

1   were required for both parties to function and when their

2   renewals would come up and then how those businesses -- how

3   those functions would transition or be subject to renewal of

4   additional contracts.

5   Q   As the calendar turns into January and January 31st is

6   approaching, do you recall the tenor of discussions or what's

7   happening in the last two weeks of January, if anything, with

8   respect to --

9   A   Well, --

10  Q   -- the negotiations?

11  A   Yeah.  I mean, we started really pushing it, particularly

12  after confirmation, to try to get this done, because either

13  the funds and the Advisors had alternative arrangements or

14  they didn't.  And if they didn't, we thought that would be

15  very difficult for, obviously, for them and their funds, but

16  also for the Debtor, because we had kept their records

17  previously, we had done the work previously, we had sent in

18  terminations, and these are SEC-regulated funds.  So we became

19  very concerned that there was not going to be a responsible

20  transition.  And in fact, we had gotten very little feedback

21  -- no feedback, frankly, from the boards -- but very little

22  feedback from anybody as to whether they were going to accept

23  the terms that we had put forth or whether they were going to

24  find an alternative arrangement.

25  Q   As the calendar got closer to January 31st, was there a

Seery - Direct                                    48

 1   request by the Advisors for an extension of the termination

 2   deadline?

 3   A   It became clear that they did not and had not done

 4   virtually anything.  I sent, I think, three or four letters

 5   and emails directly to board members imploring them to pay

 6   attention, to take action, and if they had an alternative

 7   plan, to tell us.  By the end of January, it was clear that

 8   they didn't have any alternative plan and needed more time.

 9        MR. RUKAVINA:  Your Honor, I'll move to strike that.

10   Clear that they had no alternative plan.  There's no

11   foundation for him to make that statement.

12        THE COURT:  I overrule.

13   BY MR. MORRIS:

14   Q   You mentioned the SEC.  Was the Debtor concerned about the

15   SEC's position if the Debtor had simply terminated services

16   under the contracts as of January 31st?

17   A   Very much so.  So, my own personal experience, as well as

18   the experience of our fund counsel, is that while the SEC

19   keeps a close eye on a number of issues related to investing

20   and fund management, retail funds get particular focus because

21   of the individuals who can invest in those and at least the

22   perception that they may not be as able to defend their rights

23   as others.  So the SEC does keep a particularly close watch on

24   those kinds of funds.

25        We were concerned that, even though we had done everything

APP 4805

Seery - Direct                                49

1   we believe correctly to terminate the agreements pursuant to

2   their terms, and in fact had negotiated for months in good

3   faith and spent millions of dollars trying to get a

4   transition, that if the funds were to simply stop providing

5   information to their investors or were to stop being able to

6   service their investors, that a SEC investigation would ensue

7   and that it would cost the Debtor time and considerable money

8   to deal with those issues.

9        Notwithstanding that, we felt it was important to notify

10  the SEC, and so we reached out through our counsel and advised

11  them of what we believed was going on and our view, based upon

12  the actual discussions and the request from the Advisors for

13  an extension, that nothing had been done up into the first

14  weeks of February.

15  Q    Thank you.  And ultimately, the Debtor and the Advisors

16  agreed to a two-week extension of time; do I have that right?

17  A    We agreed to a two-week extension in the first extension.

18  Q    Uh-huh.

19  A    And during that time, we tried to get, in particular, the

20  employees that would be transitioning and become the Newco to

21  really focus on trying to get an agreement nailed down.  And

22  so we had our -- our advisors take the agreement that was

23  largely structured in terms of knowing what the contracts were

24  and the costs that -- and work on trying to nail down the

25  final terms with respect to how the shared services would work

APP 4886

Seery - Direct                          50

1   over a period of time, including working with third-party

2   vendors.

3   Q    I just want to follow up on a couple of things that were

4   in your prior answer to make sure that the record is clear.

5   Does the Debtor have special fund counsel?

6   A    Yes.

7   Q    And who is the Debtor's fund counsel?

8   A    WilmerHale.

9   Q    And is it your understanding that they have the expertise

10  with respect to the securities and the management of funds of

11  the type that are at issue in this case?

12  A    Yes.  They're one of the top firms in the country in this

13  area.

14  Q    Okay.  And did -- well, I'll just leave it at that.  Do

15  you recall during this time if the Debtor informed the

16  Advisors that it would participate in negotiations only if

17  outside counsel were present?

18  A    Not negotiations.  I think we would always have been

19  willing to engage ourselves in negotiations.  What we were

20  concerned with were the employees who were forming Newco being

21  put in what we thought were untenable positions with respect

22  to negotiations involving certain members of the Advisors'

23  team and the board -- of the funds' boards of directors.  And

24  that came from very specific concerns that employees raised

25  with us about threatening conduct and statements from some of

Seery - Direct                                        51

 1  those folks.

 2       There were a few employees that had shared service

 3  responsibilities that were actually deemed employees or deemed

 4  officers at some of the Advisors.  And so there was what I

 5  will call a blame game going on, and the -- as soon as we came

 6  to the end of January and there wasn't an ability to get a

 7  deal done, certain members of the Advisor team or the fund

 8  boards took very strident positions vis-à-vis those Debtor

 9  employees.  And we were very concerned that, if there wasn't

10  someone there, counsel and taking notes, that those employees

11  would be at a disadvantage.

12       We also recommended that those employees resign those

13  positions because the negotiation and the positions of the

14  parties had separated such that we thought that having the

15  shared responsibility was untenable.

16       We made clear that we would have one of our counsel sit on

17  the phone and they would be there to listen and take notes and

18  nothing else.  And so that was something that I put in place

19  after advice of counsel that we were leaving our employees in

20  a very untenable space.

21  Q   And with respect to the notion of resigning, do you recall

22  if you gave the employees the option of resigning from one

23  entity or the other, or was it just from the Advisors?

24  A    From the Advisors.  But they obviously could have always

25  resigned from the Debtor.  We don't have any, with those

1   employees, any contracts, and certainly it was -- I think I've

2   always made clear that if someone has a better opportunity,

3   they should go take it.

4   Q    And is it fair to say that during this two-week period,

5   notwithstanding some of the things that you described, the

6   parties did, in fact, make progress towards getting to a final

7   transition services agreement?

8   A    Yeah.  I think -- I think we made -- we made good

9   progress.  And even on the resignation issue, my understanding

10  -- and I didn't have these discussions directly -- was that

11  the Advisors agreed and I think the funds agreed that those

12  employees could resign, and if they ended up at Newco and

13  Newco was providing services, they could reassume those

14  positions post-termination from the Debtor.

15       So I think there was considerable progress around those

16  items.

17       The operational items, there was considerable progress

18  around.

19       There was already, I think, really good understanding and

20  agreement on the cost split.

21       And then there was considerable discussion around the

22  shared -- some of the shared items going forward, and then how

23  the transition mechanics would work in the event that one

24  party wanted to continue a contract and the other didn't.

25       So there was -- there was -- by the end of the two-week

Seery - Direct                          53

1    period, we'd started to make enough progress that we -- we

2    thought we'd actually get there.  It really shouldn't have

3    taken as long as it did.  It was -- it was, you know, one step

4    forward, one and a half steps back, quite often.  But I think

5    we had a -- largely had an idea that we were very close

6    towards the end of that two-week period.

7    Q    And was that the reason why the Debtor agreed to a short

8    further extension of the termination deadline to February

9    19th?

10   A    Yes.  The original concept that I had come up with with

11   one of the employees who was negotiating for the Newco was

12   that there was no reason that we would have any -- we

13   shouldn't be able to get it done in two weeks, particularly

14   since the economics had largely been agreed to and deemed fair

15   by the financial staff as well as the operators in the

16   business.  That we would use the next week to cross T's and

17   dot I's and get in a position to transition the employee team.

18        We also at that time extended the time for the employees

19   by a week, to make sure that, just in case we didn't get a

20   deal done, we had the staff to be able to clean up, if you

21   will, if negotiations completely fell apart.

22        But we did, we did agree to an extension at that point.

23   The counterparties paid for that extension.  They paid the

24   costs, not fully loaded, but costs of the employees, to help

25   defray the costs that we were carrying for them.  And that we

Seery - Direct                                54

1   hoped we'd have it completed by that final week.

2   Q   Did you have concerns, as the CEO, that the employees have

3   sufficient time to transition and wind down other aspects of

4   the Debtor's business that were being adversely impacted by

5   this process?

6   A   Oh, absolutely.  And if the deal was done, then we would

7   have a shared service arrangement.  And just to be clear, the

8   way that typically works is that -- we'll use the actual

9   parties -- the Debtor would still stay in its space, use its

10  systems, have its contracts.  The Newco or NPA entity would

11  stay in its space and use its contracts, most of which are in

12  the Debtor's name, but under the same arrangement that we had

13  previously, and we would be sharing a lot of services, so that

14  the transition issues that the Debtor has we would be able to

15  accomplish because the team would still be with us but they

16  would be part of the Newco or NPA as a shared resource.

17      In the event that we weren't able to reach agreement, I

18  needed to make accommodation with those employees to continue

19  to provide those services in order for the Debtor to complete

20  its transition.

21  Q   All right.  So let's take -- let's take this back a week,

22  to last Tuesday.  As of that time, did the Debtor believe that

23  it had reached an agreement on all material terms with the

24  Advisors?  With one exception?

25  A   Cautiously, yes.  I think at that point we felt that we

Seery - Direct                                    55

1  were -- we were close, but there was a material open issue

2  that we had in terms of trying to get the final agreement

3  done.

4      And frankly, we were very concerned -- and this is borne

5  by history, not just of my own but the other folks on our team

6  who've been around a lot longer -- that there was a

7  considerable risk that the deal that was agreed to wouldn't

8  actually be signed and it would be retraded as we went

9  forward.

10 Q   As of Tuesday, did the Debtor inform the lawyers for the

11 Advisors that it was prepared to sign a fully-negotiated term

12 sheet, or, in the absence of that, it would seek judicial

13 relief?

14 A   Well, I gave instruction to counsel -- and this was -- you

15 know, we had reviewed this with both your firm and with

16 Wilmer, the WilmerHale firm -- as to how we should go about

17 making sure that the estate was protected in the event that

18 there was either a retrade or we simply couldn't come to a

19 final agreement.  And we had -- I advised your firm to tell

20 counsel on the other side that the agreement was done, that we

21 were prepared to sign it, but if they were unwilling to sign

22 it we were going to seek Court intervention to make sure that

23 we had approval of what we had done to date, declaratory

24 judgments setting forth or approving what we had done with

25 respect to the negotiations.

Seery - Direct                                    56

1  Q    Was there -- was -- was there one issue that was -- one
2  meaningful issue that dividing the parties at that point in
3  time?
4  A    Well, the new -- the new issue that was surfaced, and it
5  was a new issue, was this idea that, notwithstanding the
6  preliminary injunction and notwithstanding how the business
7  has been run for the last couple months, that Mr. Dondero
8  would be able to come back into the office.  It didn't seem,
9  frankly, like a real business issue, but it became a
10 significant sticking issue.  Because for the Debtor, it's a
11 very significant issue.
12 Q    Why didn't the Debtor just agree to allow Mr. Dondero back
13 into the offices?
14 A    Well, as the Court has heard before in prior hearings, Mr.
15 Dondero's conduct through the fall, once the monetization plan
16 had been put in place, has been extremely difficult, to say
17 the least.  Threatening email or texts to me.  Obstreperous
18 litigation, I would say vexatious litigation, with respect to
19 every aspect of the transition.  Numerous retrading of
20 provisions in this negotiation.  And statements and
21 effectively, I think, threats to other employees, including
22 while he was on the stand, you know, in the court.  And I
23 found, from my seat, that that would be really difficult to
24 bring employees back into the Debtor to help implement the
25 plan while Mr. Dondero was in that space.  There was really no

Seery - Direct                              57

1   need for him to have to be in that space from an operational

2   perspective, as the funds and the Advisors had proved for the

3   prior two months.

4   Q    Is it your understanding that, but for the issue of Mr.

5   Dondero's access, the Advisors and the Debtor had otherwise

6   agreed to all material terms of a transition services

7   agreement as of last Tuesday evening?

8   A    Yes.

9   Q    Did the Advisors sign the term sheet that the Debtor had

10   tendered that reflected what you just described?

11   A    I don't recall if the Advisors did.  I certainly did.  But

12   there were -- there were additional changes.  So we -- we had

13   reached that agreement earlier in the week.  We didn't get

14   agreement on the final point of Mr. Dondero's access.  We

15   filed our pleadings in the Court, and I believe that was

16   Tuesday or Wednesday, and then moved forward towards this

17   hearing.

18       And during that time, the negotiations continued.  So

19   there were a number of different changes, but we -- we were

20   very clear that we had an arrangement, we had a deal that was

21   fully negotiated, we had a deal that we thought was extremely

22   beneficial to the Advisors, that it worked well for the

23   Debtor, that it worked well for the Debtor's employees, who

24   would then be Newco employees, or NPA employees, depending on

25   how they ended up splitting it, and that the flexibility of

Seery - Direct                                58

1    that agreement served all the parties' interests and we didn't

2    intend to change it.

3    Q    Did -- do you know whether the Debtor provided to the

4    Advisors' counsel a copy of the complaint and the motion that

5    it was intending to file prior to the time that it actually

6    filed the documents?

7    A    Yes, we did.

8    Q    Okay.  So the Debtor gave -- is it fair to say the Debtor

9    gave the Advisors specific notice, and, indeed, copies of the

10   documents before the action was commenced?

11   A    Well, I think we -- part of the strategy we'd come up with

12   with WilmerHale was that we should do everything we can to be

13   accommodative, within the reason -- within what we thought was

14   reasonable for the Debtor being able to implement its plan.

15   And I believe we did that.  And out of caution and

16   frustration, both with respect to the inability to get TS, if

17   you will, as well as the concern that you could have a

18   retrade, based on past experience, we told him if we didn't

19   have an agreement that was signed and that was binding, that

20   we would move forward with the court hearing.

21        The reason this is structured, by the way, as a binding

22   term sheet, it was a scramble in January to try to put it

23   together.  Otherwise, we would have had a binding agreement.

24   It actually reads more like an agreement than a term sheet,

25   and has a significant Schedule A on the back.  But the amount

Seery - Direct                                    59

1   of time that's been spent on this, it's probably not fair to

2   call it a term sheet.  It's an agreement.

3   Q    After the Debtor commenced the action, do you recall that

4   last Friday the Advisors made a written proposal through their

5   counsel with two options, an Option A and an Option B?

6   A    Yes, I do.

7   Q    Did the Debtor perceive at that time that the Advisors'

8   attorneys were authorized to make that offer?

9   A    Well, they represented that they were.  We were at a -- we

10  were at a crossroads.  We had spent so much time on this

11  agreement and trying to get to a final shared service

12  arrangement that the last day for employees, which was

13  scheduled to be the last day of the month, was coming on us

14  very quickly.  And if we weren't going to get this shared

15  arrangement done, we had to make significant decisions with

16  respect to how to transition, with whom to transition, and how

17  to move forward to implement the plan.  So we couldn't,

18  frankly, waste any more time on this agreement.  And I say

19  "waste" with thought, because we thought it was productive,

20  but the amount of time, literally months, is astounding for

21  something that is not that complicated.

22       We got to Friday, and the new arrangement or proposal from

23  the Debtor was -- was basically you can -- I mean, from the

24  funds, Advisors, was you can take A or B.  A was, in essence,

25  the same arrangement we had prior in the week, but Mr. Dondero

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 06/06/25   Page 897 of 1017   PageID 3360
Main Document   Page 6830 of 2722   Page 897 of 1017   PageID 3360

Seery - Direct                              60

1    could come in the office.  We'd already told them that was

2    untenable, it didn't work.

3        B was you could -- we could do the same arrangement except

4    the Advisors would not be responsible for any of the rent.

5    Recall that I mentioned that this was a 75/25 split on the

6    rent.  Roughly, that's about a million dollars to the estate.

7        We spent time Friday morning with the IT folks and with

8    the operations folks on can this be done?  Can we actually

9    provide -- can you provide the services?  Can these funds be

10   run if they're not in the office?  And the answer was so long

11   as the operations people can have access to the office and so

12   long as the IT people can have access to the office, we could

13   largely run it.  So this was just really a retrade on

14   economics.

15       We determined that, fine, we'll take Option B, even though

16   it cost the estate.  We didn't have the luxury of being able

17   to continue to waste time and negotiate this with the

18   impending dates coming up.  So we agreed to Option B on

19   Friday.  I, in fact, sent my term sheet to counsel to deliver,

20   and it was scheduled, I think, as you mentioned earlier in

21   your opening, for the afternoon of Friday for a call to go

22   through wire transfers, which included an initial payment plus

23   a deferred payment, a monthly payment, plus the cost payments

24   that would be made under the agreement, and certain offsets

25   that we had previously agreed to.

Seery - Direct                              61

1  Q   And are you aware, did the Debtor, through counsel, inform

2  the Advisors, through counsel, that the Debtor had accepted

3  Option B?

4  A   Yes.  My counsel told me that they had sent over notice to

5  them, that the call to walk through the final points and to

6  assure that wires were being sent and to engage in the

7  exchange of signatures was set up and everything was agreed

8  to.

9  Q   And what happened later in the day?

10 A   I would say shockingly, but it wasn't, we were told that

11 the call was off.  Mr. Hogewood advised that, through email,

12 that there would no longer be a necessity of a call and he

13 would be reaching out directly to Debtor's counsel.

14 Q   And did you learn after -- after -- in the afternoon that

15 the Advisors had withdrawn Option B, the one that the Debtor

16 had accepted?

17 A   Initially, it was withdraw Option B, and then it was

18 accompanied I think with a basic statement that we don't

19 really need you anymore, which was surprising, only because it

20 --

21     (Interruption.)

22 A   -- a transition like this, you would -- you would run

23 systems side by side, make sure that your IT folks were

24 heavily involved.  You would assure that your -- your human

25 resources and operations folks were involved.  And none of

Seery - Direct                                62

1  that had been done because it was assumed that the transition

2  would happen.

3  Q   Is it your understanding that the Advisors were still at

4  that time willing to do Option A, the one that would allow Mr.

5  Dondero back in the office?

6  A   I believe they were, yes.

7  Q   Do you know if the Advisors made any further offers in

8  respect of a transition of services over the weekend?

9  A   Well, that was one of the things that was odd and belied

10  their statement that they could operate without any assistance

11  from the Debtor, is that they left Option A on the table.  If

12  they had alternate arrangements, why was Option A still on the

13  table?  So that was puzzling, but counsel made the

14  representation to us and we took it.  And then other counsel

15  over the weekend just started lobbing in proposals.

16  Q   Did those proposals contemplate in any way the continued

17  provision of services by the Debtor to the Advisors?

18  A   That's -- that's what they were, yes.

19  Q   Okay.  All right.  Why did the Debtor commence this

20  lawsuit?

21  A   Well, I -- as I explained earlier, we believe that we've

22  done everything we were supposed to do or required to do under

23  the contracts, the shared service arrangements, in terms of

24  both operating under those agreements and terminating them

25  according to their terms.  We believe we've done everything

APP 1879

Seery - Direct                                    63

 1   that we'd be required to do under the Bankruptcy Code with
 2   respect to filing a plan, making clear what the provisions are
 3   with respect to executory contracts, and making that plan --
 4   making it even more clear what the provisions dealt with, how
 5   the provisions of the plan would impact executory contracts
 6   and how those contracts would be deemed rejected if they
 7   weren't explicitly accepted and assumed.  And we made clear,
 8   we wanted to make clear that we'd properly terminated the
 9   agreements in accordance with their terms.

10       So we filed this action because of the, frankly, the back-
11   and-forth negotiations as well as the accusations and threats
12   from earlier in the negotiations that I previously described,
13   where we're seeking now a declaration that the shared services
14   were properly terminated in accordance with their terms, that
15   the shared services were not assumed pursuant to the contract,
16   and although they'd been terminated, even if they had not been
17   terminated, they would -- they would be deemed rejected.  That
18   the Debtor is permitted, because of the terms of both the plan
19   and the contracts, which have been terminated, to cease all
20   access and support and has no further responsibility for
21   providing any services to the shared service counterparties
22   under those terminated agreements, and that the shared service
23   parties, the Advisors, come forth and tell the Court, tell the
24   world, tell the investors, and tell the SEC that they have an
25   alternative arrangement.

APP 1889

Seery - Direct                                64

1    And, again, our concern is while, yes, we are good

2    corporate citizens and we want to make sure that we don't

3    leave, if you will, a mess because of the actions that are

4    happening in the court, we're very concerned that our

5    counterparties may not be as concerned about the mess they

6    leave.

7         And we -- one of the reasons we reached out to the SEC was

8    to make sure that they were on notice of this proceeding and

9    the potential impact on retail investors, and we think that

10   it's something that the Court should require these Advisors,

11   who have been in antagonistically fighting the case, knowing

12   the specific provisions of the case, and not making

13   arrangements until the last 24-48 hours, we do -- we do

14   believe that, as corporate citizens and as responsible

15   fiduciaries in a bankruptcy, we have some responsibility to

16   make sure these terminations are handled correctly.  While we

17   may not be able to force them to do so, we should have them

18   tell us how they're doing it.

19   Q    Does -- did the Debtor have any concerns that the failure

20   of the Advisors to adopt and implement a transition plan, that

21   that might have negative impacts on the Debtor's ability to

22   implement its plan of reorganization?

23   A    Well, as I said earlier, the SEC, in our experience and

24   our counsel's experience, takes a particular focus on retail

25   funds.  And where those funds have blown up for various

Seery - Direct                                65

1   reasons, whether they are unable to make a redemption or

2   they're caught in some kind of security that doesn't match the

3   investment parameters of the fund or whatever those are, the

4   SEC takes a particular focus, and investigations can take

5   significant time and have significant cost for all parties who

6   are anywhere near the retail funds.  And, clearly, as the

7   provider of shared services to the Advisors, while we didn't

8   have any agreement with the funds, if the SEC came in to

9   investigate or if they do come in to investigate what's gone

10  on here, there will be a significant cost, and it will, if not

11  derail, it will certainly slow down our implementation of our

12  plan.

13  Q    What exactly does the Debtor want the Court to -- what

14  relief is the Debtor seeking now that the Debtor has learned

15  of the four-legged plan that was described yesterday in the

16  deposition?

17  A    The declaratory relief that I just stated would be

18  essential for the Debtor.  One, that the contracts were

19  properly terminated, in accordance with their terms.  Two,

20  that they were not assumed pursuant to the plan.  And three,

21  that the Debtor is permitted to cease all services and all

22  access to the shared service counterparties.

23      To the extent that they need assistance, we'll help them

24  out, we'll give them information.  If they have third-party

25  professionals that they want to send over, we'll help them

Seery - Direct                                      66

 1  with data retrieval.  But we do have a plan to implement, and

 2  we don't have necessarily the full staff to provide services

 3  that they were otherwise receiving from us.  So we would like

 4  a declaration that we do not owe them any of those prior

 5  services from the terminated contracts.

 6  Q    Did you hear in the opening Mr. Hogewood mention that the

 7  Advisors do want continued access to the Debtor's books and

 8  records?  Or to their, I guess, to their own books and

 9  records?

10  A    They'll be able to get access, but that doesn't mean that

11  it's access 24 hours a day.  That doesn't mean they get to

12  continue to use the systems without paying for them.  That

13  doesn't mean they get to use employees without paying for

14  them.  If they have data requests, we would certainly get to

15  them, but we have to maintain and employ people to do that.

16  Q    And is part of the injunction that the Debtor seeks here

17  is to have the Court direct the Advisors to implement and

18  adopt a transition plan that would include taking -- taking

19  their books and records so that the Debtor isn't in that

20  position for a long-term -- on a long-term basis?

21  A    Well, we certainly don't want to be in that position for a

22  long-term basis.  We -- we're certainly not going to be the

23  party that has to maintain their records.  If they can lift

24  them off, we will do that.

25        The challenge has been, according to our IT professionals,

APP 1823

Seery - Direct                              67

 1   who are quite good, separating the data is difficult.

 2       Now, we know that the Advisors' employees were extracting

 3   a lot of data off the system over the last week.  And whether

 4   it was on thumb drives or direct transfers, we know that a lot

 5   of data has been taken, which is fine.  We just don't -- we

 6   don't know what else they might need and we're not in a

 7   position to provide a full level of service to them at --

 8   after today.

 9   Q   Is the Debtor asking the Court to force the Advisors to

10   adopt any particular plan?

11   A   Not at all.  If they -- if their plan works, that's great.

12   If they went to a third-party service, some other fund --

13   outside fund advisors or shared service providers that can do

14   the job, that's fine.  We would like to just have the least

15   amount of burden on our estate going forward, and a

16   declaration that we have no responsibility to provide any

17   particular services, I think, is essential.

18   Q   And would the mandatory injunction that required the

19   Advisors to adopt and implement a transition services plan,

20   would that -- how does that advance the Debtor's goals?

21   A   Well, it sets forth exactly what the Advisors and the

22   funds think they need.  And if it's something other than that,

23   then they're going to have to come talk to us, and we'll

24   figure out whether we can provide it and then how it gets paid

25   for.

Seery - Cross                              68

1           MR. MORRIS:  Your Honor, I have no further questions

2    of Mr. Seery right now.

3           THE COURT:  All right.  Pass the witness.  Mr.

4    Rukavina?

5           MR. MORRIS:  Your Honor, may I just ask for a short

6    break?

7           THE COURT:  All right.  Does everyone need a break?

8           MR. RUKAVINA:  Your Honor, I won't -- Your Honor, I

9    won't have much for this witness, so I might suggest if Mr.

10   Morris can wait five or ten minutes.  But whatever is good for

11   the Court.

12          MR. MORRIS:  Go right ahead, sir.

13          THE COURT:  All right.

14          MR. MORRIS:  Thank you.

15          THE COURT:  Ten minutes.  If you take more than ten,

16   we're going to break.  Thank you.

17          MR. RUKAVINA:  Yes.

18                       CROSS-EXAMINATION

19   BY MR. RUKAVINA:

20   Q   Mr. Seery, very quickly, I just want to make sure that the

21   record here is complete.  You were discussing Option A and B

22   that was put on the table on Friday, and you were discussing

23   then how Option B was taken off.  Do you recall that?

24   A   Yes.

25   Q   And you did mention to the judge that Option A was that my

Seery - Cross                          69

 1   clients would take all of the leasehold space, correct?

 2   A    I don't think I mentioned that, no.

 3   Q    Okay.  Well, I just want to make sure the judge

 4   understands that Option A, my clients would have paid for a

 5   hundred percent of the rent going forward.  Correct?

 6   A    I don't believe that's how Option A worked, no.  I believe

 7   that Option A was structured that, in essence, the Debtor

 8   would get out and the shared -- the Advisors would keep all of

 9   the space as well as all of the systems and all of the

10   records.

11   Q    Correct.  But the Advisors would pay a hundred percent --

12   okay.

13           MR. RUKAVINA:  Let's just pull up Exhibit 19, Mr.

14   Vasek, please.

15   BY MR. RUKAVINA:

16   q    And I just want the -- I just the record to be clear here,

17   Mr. Seery.

18           MR. RUKAVINA:  Mr. Vasek, are you there?  (Pause.)

19   And then scroll down to Page 5 of 7.  Okay.  Stop there.

20   BY MR. RUKAVINA:

21   Q    Mr. Seery, can you see this to refresh your memory?

22   A    Yes.  I didn't need it to be refreshed.  That's what I

23   said.

24   Q    Well, doesn't Option -- doesn't Option A here say NexPoint

25   parties take one hundred percent of the leased premises and

Seery - Cross                                70

1    one hundred percent of the rental cost?

2    A    It does, but the key part of it is that the Debtor gets

3    out.

4    Q    I understand that.

5    A    It gives up control of that stuff.

6    Q    I understand that.  I was just trying to clarify for the

7    record, because you didn't mention it before, that NexPoint

8    would pay a hundred percent of the rent.  And I am correct

9    about that, right?

10   A    That's correct.

11   Q    Okay.  And Option B, you mentioned in your direct

12   testimony that in Option B my clients would pay no rent.  Do

13   you recall that?

14   A    Yes.

15   Q    But do you also recall that under Option B my clients

16   would vacate the premises?

17   A    I believe -- yes.  I think I said that, yes.

18   Q    Okay.  I believe you also mentioned that the Dondero

19   access issue was a last-second issue.  In fact, that had been

20   a lingering issue for weeks, had it not?

21   A    I don't believe so.  I don't think it came in until after

22   January 31st.

23   Q    Are you not aware that with each turn of the draft

24   agreement your lawyers would change it to make it clear that

25   Dondero couldn't have access while the Advisors' lawyers would

APP 1887

Seery - Cross                       71

1   change it to make clear that Dondero could have access?

2   A   I'm aware that those went on, but I believe that was after

3   January 31st.

4   Q   Okay.  I think I have very few questions, since Mr. Morris

5   really, I think, went over it in quite some detail.  Please

6   confirm for the Court that my clients' employees have vacated

7   the premises as of last Friday?

8   A   That's my understanding, but they still are accessing

9   services.

10  Q   Okay.  And please confirm for the Court that the Debtor

11  has not and will not provide any transition services after

12  last Friday, February 19th.

13  A   We actually have provided assistance, and certain of the

14  employees of the Debtor are doing things for the -- your

15  clients.

16      So, for example, trades were conducted yesterday by

17  clients of HCMLP for your clients.  Data was accessed by your

18  clients.  Equipment was taken from the office and used by your

19  clients.  The systems were maintained by the Debtor and

20  accessed by your clients.  It's a pretty extensive list.

21  Q   But that's because you have decided to allow that to

22  facilitate the transition, correct?

23  A   That's correct.

24  Q   Yeah.  You're not doing that because there's an agreement

25  in place; you're doing it out of good faith but not because

Seery - Cross                          72

1   there's any kind of requirement to do that, correct?

2   A    That's correct.

3   Q    Okay.  As of February 19th, the Debtor is no longer

4   required to provide any of the shared services, and it will

5   not, unless you on a one-by-one basis agree to permit it,

6   correct?

7   A    I haven't been doing it on a one-by-one basis.  We did it

8   on a blanket basis.

9   Q    Okay.  And as of the end of today, that's over, right?

10  A    I hope so.  We'll have an order that will give us the

11  declarations we desire and we can move forward.

12  Q    Well, let me clarify my question.  If the judge does not

13  enter a mandatory injunction, the Debtor has nevertheless told

14  the Advisors that any of the shared services are done as of

15  the end of the day, correct?

16  A    I don't believe that's the case.  We'll consult with our

17  counsel, both bankruptcy and regulatory.

18  Q    I think you mentioned this, but you can confirm for the

19  Court that some of the data held by the Debtor is actually the

20  property of the Advisors, correct?

21  A    I don't -- I don't know that it's the property of the

22  Advisors.  I think they're entitled to receive it, but we're

23  entitled to keep a copy.

24  Q    Okay.  Well, I'm not going to waste the Court's time by

25  reading the transition services agreement, but if that -- I'm

APP 1889

Seery - Cross                              73

 1  sorry, the shared services agreement -- but if that agreement
 2  provides that my clients' data is its property, you wouldn't
 3  disagree with that, would you?
 4  A    No, I wouldn't --
 5          MR. MORRIS:  Objection.
 6          THE WITNESS:  If that's what it says, I wouldn't
 7  disagree with it.
 8  BY MR. RUKAVINA:
 9  Q    Okay.  And in fact, the Advisors have already copied a
10  large amount of data and have taken that copy for their own
11  use, correct?
12  A    That's what I've been advised.
13  Q    Okay.  And with respect to their own data, not the
14  Debtor's data, you will continue to, with reasonable access,
15  permit them to copy the balance of whatever their own data
16  remains, correct?
17  A    To the extent that we can, yes.
18  Q    Yeah.  Yeah.  Okay.  And just to confirm, other than the
19  employees that you determined will be retained by the
20  Reorganized Debtor, the remaining employees will be terminated
21  effective February 28th?
22  A    Not -- not all, no.  There's a -- there are some changes
23  to that.
24  Q    Okay.  Well, some employees are going to be terminated on
25  February 28th, correct?

Seery - Cross                              74

1   A    Yes.

2   Q    Okay.  And the Debtor doesn't have a problem with my

3   clients either directly or indirectly retaining those

4   employees, correct?

5   A    No problem at all.

6   Q    Okay.  Thank you.

7         MR. RUKAVINA:  Your Honor, I'll pass the witness.

8   Thank you.

9         THE COURT:  Any redirect?

10        MR. MORRIS:  I have no redirect, Your Honor.

11        THE COURT:  All right.  Thank you, Mr. Seery.

12     We'll take a ten-minute break.  It's 10:51 Central.  We'll

13   come back a minute or two after 11:00.

14        THE CLERK:  All rise.

15        MR. MORRIS:  Thank you, Your Honor.

16        MR. POMERANTZ:  Thank you, Your Honor.

17     (A recess ensued from 10:51 a.m. until 11:05 a.m.)

18        THE CLERK:  All rise.

19        THE COURT:  All right.  Please be seated.  All right.

20   We're back on the record in the Highland-Advisors matter.  Mr.

21   Morris, you may call your next witness.

22        MR. MORRIS:  Thank you, Your Honor.  The Debtor calls

23   (audio gap) Dondero.

24        THE COURT:  I'm sorry.  Did you say Mr. Dondero?

25        MR. MORRIS:  Yes.

75

```
 1              THE COURT:  All right.  Mr. Dondero, could you speak

 2    up?  Please say, "Testing, one, two" so we pick up your video.

 3              MR. DONDERO:  Testing, one, two, three.

 4         (Feedback.)

 5              THE COURT:  All right.  Well, I heard you.  I don't

 6    see the video yet.  There you are.  Okay.  We're going to hope

 7    we've got some good audio.  I was hearing a little bit of

 8    feedback.  Please raise your right hand.

 9              MR. DONDERO:  Oops, I'm sorry.  I can't hear anybody.

10              THE COURT:  All right.  I need you to please raise

11    your right hand to be sworn in.  Well, this is a problem.  Mr.

12    Dondero, --

13              MR. DONDERO:  Take off the headphones?

14              MR. WILSON:  Judge, we're trying to get his

15    headphones to get the sound through them.  Should just be just

16    a second.

17         (Pause.)

18              THE COURT:  All right.  Do I need to be speaking to

19    see if they can hear me clearly?

20              A VOICE:  How's it going?

21              THE COURT:  All right.  What's going on?

22              MR. WILSON:  I can hear you, Judge.  We're just

23    working through a technical issue with Mr. Dondero's

24    headphones.

25              THE COURT:  All right.
```

APP 1822

Dondero - Direct                          76

 1              MR. WILSON:  Hopefully we can resolve that

 2     momentarily.  (Pause.)  We can try that.

 3          (Pause.)

 4              MR. WILSON:  Your Honor, we're going to move Mr.

 5     Dondero to another room so that we can get this issue resolved

 6     without the need for headphones.

 7          (Pause.)

 8              MR. DONDERO:  Testing, one, two, three.

 9              THE COURT:  All right.  We got you.  Well, we've got

10     your sound.  Can you hear us okay, Mr. Dondero?

11              MR. DONDERO:  Yes.

12              THE COURT:  All right.  Please raise your right hand.

13          (The witness is sworn.)

14              THE COURT:  All right.  Mr. Morris, go ahead.

15              MR. MORRIS:  Thank you, Your Honor.  John Morris;

16     Pachulski, Stang, Ziehl & Jones; for the Debtor.

17                  JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

18                       DIRECT EXAMINATION

19     BY MR. MORRIS:

20     Q   Can you hear me okay, Mr. Dondero?

21     A   Yes.

22     Q   Okay.  Just a few questions.  You were aware in November

23     that the Debtor had given notice of termination of the shared

24     services agreements with the Advisors, correct?

25     A   Yes.

Dondero - Direct                          77

1   Q    Okay.  And you understood that the Debtor was going to

2   terminate all shared services to the Advisors as of January

3   31, 2021, correct?

4   A    Yes.

5   Q    And were Dustin Norris and D.C. Sauter authorized by you

6   to try to negotiate with the Debtor the terms of a transition

7   services agreement?

8   A    Yes.

9   Q    And had the Debtor adopted a transition plan as of January

10  31, 2021 pursuant to which it would not need any services from

11  the Debtor?

12  A    I don't know.

13  Q    Okay.  You're not aware of the Advisors having a plan in

14  place as of the termination date that would have allowed the

15  Advisors to obtain back-office and middle-office services from

16  somebody other than the Debtor, correct?

17  A    I don't know.  They were always working on a Plan A and a

18  Plan B.

19  Q    Okay.  Are you -- did you become aware that the Debtor had

20  agreed to extend the termination deadline by a couple of

21  weeks?

22  A    Yes.

23  Q    And is it your understanding that that extension was

24  granted in order to give the Advisors more time to develop a

25  transition services plan?

APP 1894

Dondero - Direct                    78

1   A    I -- I think it was to continue negotiations.  I don't --

2   I don't know if the plan was part of the reason.

3   Q    Okay.  Did you learn at some point early last week that

4   the Debtor and the Advisors had reached an agreement on all

5   material terms of a transition services agreement but for your

6   access to the Debtor's offices?

7   A    Yes.  I believe over a thousand line items.

8   Q    Okay.  And did you learn that the Debtor had tendered a

9   term sheet that reflected the entirety of the parties'

10  agreement but for your access, with a demand that the

11  agreement get signed or the Debtor would commence a lawsuit?

12  A    I became aware of that Wednesday, in the middle of the ice

13  storm, middle of the day.

14  Q    Okay.  Let's pull up Exhibit 17 and see if I can refresh

15  your recollection as to the timing and the substance.

16         MR. MORRIS:  And if we could go to the bottom of the

17  email string.

18  BY MR. MORRIS:

19  Q    This is an email string between lawyers for the debtor

20  and the Advisors.  Do you see that there's an email from Mr.

21  Demo there dated Tuesday, February 16th?

22  A    Yes.

23  Q    Okay.  And the lawyers on this email from K&L Gates, those

24  were the lawyers who were representing the interests of the

25  Advisors; is that right?

Dondero - Direct                         79

1   A    Yes.

2   Q    And do you understand that Timothy Silva of WilmerHale and

3   my colleague, Mr. Demo, were representing the interests of the

4   Debtor?

5   A    Yes.

6   Q    And do you see in the first paragraph that Mr. Demo

7   informs Mr. Hogewood that the Debtor is prepared to sign the

8   attached term sheet, in the absence of which it would be

9   filing an adversary proceeding?

10  A    Yes.

11  Q    Okay.  And does that reflect your recollection that, in

12  fact, it was on Tuesday afternoon that the Debtor made the

13  demand to either sign the term sheet or there would be

14  litigation?

15  A    It doesn't change my testimony.  The first time I heard

16  about it was -- about a suit coming at 6:00 was on Wednesday.

17  Q    Okay.  Let's go up to the -- Mr. Hogewood's response.  Did

18  you learn that -- did you have any communications with anybody

19  on Tuesday about the possibility of the Debtor filing a

20  lawsuit?

21  A    No.

22  Q    Okay.  Can you go -- can you go to the email above?  Do

23  you see -- let me see if this refreshes your recollection.  Do

24  you see that Mr. Demo sent to Mr. Hogewood on Tuesday, just

25  before 5:00 p.m., drafts of the Debtor's adversary proceeding

APP 4896

Dondero - Direct                          80

1   papers?

2   A    Yeah, I've never -- except for I think you gave me these

3   emails yesterday, but until yesterday I've never seen these

4   emails before.

5   Q    So, so the lawyers who were representing the Advisors'

6   interests weren't keeping you informed last week about the

7   status of negotiations; is that your testimony?

8   A    Generally.  Again, I delegated it to Dustin and D.C. to

9   handle the details.

10  Q    Okay.

11        MR. MORRIS:  And scroll up to the -- to Mr.

12  Hogewood's response.

13  BY MR. MORRIS:

14  Q    Did you learn that Mr. Hogewood had asked for an extension

15  of the deadline from 6:00 p.m. to midnight at any time last

16  week?

17  A    No.

18        MR. MORRIS:  Let's go -- let's go -- let's go to Mr.

19  Silva's email, the next one up.

20  BY MR. MORRIS:

21  Q    Were you aware that the parties were negotiating and

22  trying to finish up the agreement last Tuesday as the Debtor's

23  deadline for filing a lawsuit was drawing near?

24  A    I knew they were in negotiations on Tuesday and Wednesday,

25  but I didn't know the deadline was growing near until

Dondero - Direct                          81

 1   Wednesday.

 2   Q    Did you learn -- did you learn what the open issue or open

 3   issues were as of that time?

 4   A    I believe there was only one open issue.  It was regarding

 5   my occupancy.

 6   Q    And what is your understanding of what the issue was as of

 7   that time last week?

 8   A    Since the beginning of the case, the Highland employees

 9   have been told to work from home so that the estate didn't

10   have any COVID liability.  There hasn't been a Highland

11   employee in the office in a year except for occasional visits.

12   NexPoint employees have worked every day through COVID, full

13   staff every day.

14        With us taking over either a hundred percent or 75 percent

15   of the lease, and the supervisory leadership strategy that I

16   deserve, and on a regulatory basis have a responsibility to

17   provide for the RIAs, I needed to be in the office on a going-

18   forward basis.  And I believe grand efforts were made on the

19   part of Dustin and D.C. to create a wall for a section of the

20   office for the Highland employees -- who have never come in

21   for the last year, probably aren't coming in for the next year

22   -- but if they were to come in, they would have private egress

23   and ingress, and nobody else in the office, including myself,

24   would ever see them come and go.

25        And I know there were clear negotiating representations

Dondero - Direct                          82

1    made on their part, but there's never anything that I've been

2    accused of that's been in-person activity.  There have been a

3    couple texts, a couple emails, but nothing ever in-person.  So

4    the separation for employees who probably were never going to

5    come in the office, and as NexPoint was paying 75 or a hundred

6    percent of the lease, it made inordinate sense -- in fact, it

7    was only tenable -- if I was able to come in and provide

8    leadership and oversight to the (audio gap) Advisors.

9    Q    Did you testify last night that it was Judge Jernigan who

10   ordered the Debtor's employees to stay out of the office

11   because of COVID?

12   A    That's what I remember from early in the case, so that

13   there wouldn't be any COVID liabilities in the estate, but

14   that's why the Highland employees haven't been around for a

15   year.

16   Q    So it's your -- it's your memory that Highland employees

17   haven't been around for a year and that the reason for that is

18   because Judge Jernigan issued an order telling them to stay

19   out of the office because of the COVID risk; is that right?

20   A    That's -- that was my recollection.

21   Q    Okay.  You haven't been in the office in the calendar year

22   2021 except for the day that you went to give your deposition

23   early in January; is that right?

24   A    Yes.

25   Q    And have the Advisors functioned, notwithstanding your

002672                                          APP 1809

Dondero - Direct                              83

1  absence from the office?

2  A    Yes.

3  Q    Okay.  And in fact, at the end of the day, notwithstanding

4  everything you just said, is it fair to say that the only

5  issue that you're aware of that separated the Debtor and the

6  Advisors as of last Wednesday was your access to the offices?

7  A    I believe that's the case.

8          MR. MORRIS:  And can we just scroll up a little bit

9  to Mr. Hogewood's -- the next email on the next page?  Yeah.

10 Right there.

11 BY MR. MORRIS:

12 Q    In fact, that's -- to put a fine point on it, the

13 Advisors' lawyer says specifically is keeping Jim Dondero away

14 from the office worth losing out on the financial advantages?

15 Is that the position that the Advisors took at that time?

16 A    Again, I've never seen these emails before and I'm not

17 aware of the specific back-and-forth negotiations.

18 Q    Okay.  But that's consistent with your understanding, that

19 the only issue that was outstanding as of that moment in time,

20 the only material issue, was your access to the office.

21 Right?

22 A    As of that moment in time, yes.

23 Q    And otherwise, the Advisors, but for your desire to have

24 access, the Advisors would have had a fully-negotiated

25 complete transition services agreement with the Debtor and

002673
APP 1909

Dondero - Direct                        84

1    there would have been no lawsuit, fair?

2    A    I believe, yeah, I believe that's largely what -- the

3    status at that point.

4    Q    Okay.  And so -- and so, because you weren't given access,

5    the Advisors didn't agree to the proposal that was otherwise

6    acceptable, correct?

7    A    Yes.

8    Q    Okay.  And did you lose interest in the negotiations after

9    the Debtor made it clear that they wouldn't provide access to

10   you?

11   A    Lose interest?  Yeah, but I mean, the two parallel paths

12   for discretion I had given Dustin and D.C. to work on was

13   either complete the negotiated settlement that really would

14   have been, I think, the best transition for everybody and a

15   win-win for everybody, but if not, be prepared for us to go it

16   alone or the Advisors to be able to go it alone and operate

17   without Highland and without being in the space.

18   Q    And did you give that instruction last Thursday after the

19   -- after the Debtor refused to give you access?

20   A    Yeah.  They knew that that -- those were -- those were the

21   only two -- the only two -- the only two that I had approved.

22   They were the only two directions I had approved.

23   Q    Are you aware that on Friday -- withdrawn.  On Friday, the

24   lawyers at K&L Gates made a proposal to the Debtor that

25   contained two options; is that correct?

Dondero - Direct                            85

1   A    Yes.

2           MR. MORRIS:  Can we please put up on the screen

3   Exhibit #19, please?  And if we could go to the bottom.

4   BY MR. MORRIS:

5   Q    Mr. Hogewood wrote to my colleague, Mr. Demo, just before

6   noon on Friday, February 19th.  Do you see that?

7   A    Yes.

8   Q    And this -- Mr. Hogewood presented two options.  You were

9   -- were you aware on Friday morning that Mr. Hogewood was

10  going to be presenting two options?

11  A    I was generally aware, which I think is what I testified

12  to in my depo yesterday, that D.C. and Dustin were

13  enthusiastically trying to come up with a settlement.  They

14  believed it was close enough to try and get something done,

15  and they were going to work, you know, an A and a B, but

16  consistent with my direction that there was really only two

17  alternatives, but they were still optimistic, because, besides

18  it being a win-win for everybody, it would be less risk and

19  less work for the Advisors if something like the original

20  transaction could get done.

21  Q    Okay.  Do you see --

22          MR. MORRIS:  If we could take a look at Option B.

23  BY MR. MORRIS:

24  Q    Option B, as written by Mr. Hogewood, would have had the

25  Debtor assume the entire lease and have NexPoint vacate at the

Dondero - Direct                          86

 1  end of the month.  Do you see that?

 2  A    Yes.

 3  Q    And that's an offer that was made by Mr. Hogewood on

 4  behalf of the Advisors on Friday just around noontime; is that

 5  fair?

 6  A    I believe so.

 7  Q    Okay.  Do you know --

 8           MR. MORRIS:  Can we scroll up, please?

 9  BY MR. MORRIS:

10  Q    And Mr. Demo responds just a few moments later by saying

11  that he would discuss the options, right?

12  A    Yes.

13  Q    Okay.  And then the very next moment, if you scroll to the

14  next one, Mr. Hogewood actually informs Mr. Demo that he had

15  been informed, "There may be an edit needed to Option B, so I

16  need to pull that back momentarily."  Do you see that?

17  A    Yes.

18  Q    Do you know what edit was being considered by the Advisors

19  early in the afternoon on Friday?

20  A    No.

21  Q    Okay.

22           MR. MORRIS:  Let's scroll up to the next email,

23  please.

24  BY MR. MORRIS:

25  Q    And Mr. Demo just responds and he says, "Understood."

Dondero - Direct                          87

1   Fair?

2   A    (garbled)

3   Q    Let's -- okay.  And then the next email from Mr. Hogewood

4   says, "I am authorized to put Option B back on the table as

5   stated below.  Both A and B are on the table for your

6   consideration."  Do you see that?

7   A    Yes.

8   Q    Do you believe that Mr. Hogewood was acting without

9   authority when he made that statement to the Debtor?

10  A    I don't know.

11  Q    Did you ever ask Mr. Sauter or Mr. Norris whether Mr.

12  Hogewood was acting outside the scope of his authority when he

13  made this offer?

14  A    No.

15          MR. MORRIS:  Can we scroll up to the email -- the

16  next email, please?

17  BY MR. MORRIS:

18  Q    Do you see that Mr. Silva on behalf of the Debtor was

19  looking for a time to discuss?

20  A    Yes.

21  Q    And then if we go to the next email in this string,

22  they're asking for dial-in.  Did you learn early in the

23  afternoon on Friday that the Debtor had accepted Option B as

24  presented by Mr. Hogewood on behalf of the Advisors?

25  A    I -- I don't know when I became aware of that.

Dondero - Direct                               88

1  Q   Did you learn --

2       MR. MORRIS:  Let's go ahead and take this down and go

3  to the next exhibit, please.  And start at the bottom.

4  BY MR. MORRIS:

5  Q   Do you see that Mr. Hogewood is writing to my colleagues

6  again, and in the middle paragraph he says, "As you know, the

7  term sheet preserves everyone's rights on various claims and

8  other litigation, and Davor suggested it would be appropriate

9  to track that language in the body of the agreed settlement

10 order in addition to attaching the term sheet to the order"?

11     Were you aware early Friday afternoon that the lawyers for

12 the parties were discussing the form of an agreed settlement

13 order that would embody the Option B approach?

14 A   No.

15 Q   Do you see in the next paragraph there's a question as to

16 whether John is preparing the order or an offer for the K&L

17 Gates firm to take that on?  Do you see that?

18 A   Yes.

19 Q   Were you aware that the law firm representing the Advisors

20 that you own and control were offering to prepare a settlement

21 offer -- a settlement order that would include the Option B

22 approach that had been accepted by the Debtor?

23 A   Nope.  I wasn't involved in any of these details, nor had

24 I seen any of these emails.

25 Q   Okay.  Let's go to the next email and see if you know

Dondero - Direct                         89

1    anything about the facts or the assertions in that email.  Do

2    you see Mr. Demo responds, and at the end of his first

3    sentence, there is enough -- there's a reference to having

4    enough room on the wires.  Do you see that?

5    A    Yes.

6    Q    Are you aware -- were you aware on Friday afternoon that

7    the lawyers for the Advisors that you own and control and the

8    lawyers for the Debtor were having discussions about how to

9    timely effectuate a wire transfer?

10   A    No.

11           MR. MORRIS:  Can we go up to the 3:33 p.m. email?

12   BY MR. MORRIS:

13   Q    And just to move this along, did you learn that the

14   parties -- that lawyers for the parties were expecting to go

15   through the final draft of the document?

16   A    No.

17   Q    Were you aware that the lawyers representing the entities

18   that you own and control wanted more time to be able to do

19   that?

20   A    I wasn't involved in this at all.

21   Q    Okay.

22           MR. MORRIS:  Can we scroll up to the email at 3:43

23   p.m.?

24   BY MR. MORRIS:

25   Q    And do you see where Mr. Hogewood informs Mr. Demo that he

APP 1906

Dondero - Direct                        90

1   needs to push the call further because he is "having trouble

2   connecting with someone to be sure they are in a position to

3   review."  Do you see that?

4   A    Yes.

5   Q    Was Mr. Hogewood trying to reach you on the afternoon of

6   February 19th in order to make sure you had the opportunity to

7   review the term sheet that was about to be signed?

8   A    I don't know.

9   Q    Do you see, if you scroll up, Mr. Demo asks Mr. Hogewood

10  if he needs a little bit more time?

11  A    Yes.

12  Q    And then, finally, the last email in this deck, do you see

13  at 4:15 Mr. Hogewood says to Mr. Demo, "We should cancel this

14  call and I should just call you and John."  Do you see that?

15  A    Yes.

16  Q    And that's because the Advisors pulled Option B that the

17  Debtor had agreed to; is that right?

18  A    Yes.

19  Q    And it's your testimony that you had nothing to do with

20  that decision; is that right?

21  A    No.  It -- no.  I didn't say that.  Once I became fully

22  aware of what A and B were, I had no interest in A or B, and I

23  pointed the team back to the conversations we had had on

24  Wednesday regarding either it's the win-win scenario for

25  everybody and continuity and the office and me being in the

Dondero - Direct                        91

1    office or it's a -- it's a divorce.  And -- but I didn't have

2    an interest in A or B.

3    Q   And yet it is fair to say, though, that the Advisors'

4    outside counsel and the Debtor's counsel spent the whole day

5    on Friday pursuing Options A and B, including preparing

6    settlement orders and for wire transfers, right?

7    A    They'd been working tirelessly Wednesday, Thursday,

8    Friday, Saturday, Sunday, trying to strike a deal, trying to

9    be reasonable, but to no avail.  I think now it's --

10   everybody's comfortable with the divorce and being out of the

11   office.

12   Q    Did -- do you know whether the Advisors made any proposals

13   to the Debtor over the weekend for an *a la carte* menu of

14   services that might be considered?

15   A   Yes.  I believe -- yes.

16   Q   Okay.  Does the Debtor -- withdrawn.  Do the Advisors have

17   a plan pursuant to which it will obtain all of the back-office

18   and middle-office services that it needs that were previously

19   provided by the Debtor in order to fully perform under the

20   advisory agreements with the funds?

21   A   I believe they have a plan.

22   Q   And is that plan sufficient to enable the Advisors to

23   fully perform their services under the advisory agreements

24   with the funds?

25   A   I believe so.  The major gating item, which I think

APPX 6906

Dondero - Direct                    92

 1  changed over the weekend, was the historic data for the funds
 2  was being held hostage, and I think over the weekend, for the
 3  first time, it was agreed that the funds could have their
 4  historic data that they were entitled to.  And I think that
 5  improved the quality of their alternative plans.
 6  Q   Does the -- do the Advisors need anything from the Debtor
 7  today?
 8  A   I believe very little, if nothing.  They just need data
 9  and information and software that they're entitled to that
10  they've paid for, paid for in full over the years.
11  Q   And does the -- do the Advisors have a plan in place to
12  obtain that information that it contends it's entitled to?
13  A   I don't have the specific -- specifics.  Dustin is your
14  person there.
15  Q   Do you personally believe that the Debtor had the right to
16  terminate the shared services agreement as of last Friday?
17          MR. RUKAVINA:  Your Honor, I'll object to that
18  question as that calls for a legal conclusion.  And I will
19  note for the record that we are not trying today their
20  declaratory action Count One, and we do not consent to that
21  being tried.
22          THE COURT:  Okay.  I overrule.  He can answer if he
23  has an answer.
24          THE WITNESS:  I don't know.
25  BY MR. MORRIS:

002682
APP 0909

Dondero - Direct                              93

1   Q    Do you believe that there is anything defective about the

2   termination notices that you testified being aware to as of

3   last November 30th?

4   A    I don't know.

5   Q    Do you have any reason to believe that those termination

6   notices are unenforceable?

7   A    I don't know.

8   Q    Do you have any reason to believe that the Debtor has any

9   continuing obligation to the Advisors following last Friday,

10  after last Friday?

11  A    I do believe there's an overall industry standard practice

12  in terms of transitioning.  I do think there's a

13  responsibility of all parties to do things in a regulatorily-

14  compliant way.  So I do believe that that overrides and

15  supersedes some of this contract dancing.

16  Q    How much -- what regulatory regime are you referring to?

17  A    The SEC.

18  Q    Are you aware of any particular rule that would require

19  the Debtor to provide services of any kind to the Advisors

20  after the termination of the shared services agreements?

21  A    No.  I'm going based on experience.

22  Q    Okay.  So you don't have anything specific in mind; is

23  that fair?

24  A    I have specific historic experience --

25  Q    All right.  I'm asking you --

Dondero - Direct                          94

1  A    -- of the --

2  Q    I'm sorry.

3  A    And then, I mean, I do have in mind, you know, based on

4  our historic experience, like when we moved from State Street

5  to SCI, I think it took nine months longer than anybody

6  expected, and there wasn't a hard break in anybody's

7  activities or attitudes toward each other.  It was -- it

8  delayed for issues that were -- some were beyond everybody's

9  control, some of them were faults of the different parties,

10 but in no case did anybody try and cause damage or allow

11 damage to happen to regulated funds.

12 Q    How long is the Debtor, in your view, how long is the

13 Debtor obligated to make the data available to the Advisors?

14 How long does this obligation stay in effect?

15 A    I don't have a specific timeline.  I did hear Seery say a

16 few minutes ago that you would give it all and they would just

17 keep a copy.  I think to the extent that that happened, that

18 cures quite a bit of it.  But, again, the data had been held

19 hostage as a negotiating point up until this weekend.

20 Q    Hmm.  Have the Advisors made arrangements to make the copy

21 of the data that you just referred to?

22 A    I don't know.

23 Q    Do you know if there is a monetary amount that the Debtor

24 is required to incur in order to continue to maintain the data

25 until the Advisors can get a copy?

Dondero - Direct                          95

1   A    I don't know, but I -- I don't believe it's material at

2   all.

3   Q    Okay.  Have you done any analysis to -- if you don't know

4   how long it's going to take to get the copy, how do you know

5   how much it's going to cost to maintain the copy until it's

6   retrieved?

7   A    I don't, but large files up on the cloud in general are

8   not that complicated to move around.

9   Q    But it's your view, as the owner and controller of the

10  Advisors, that the Debtor has a continuing obligation,

11  notwithstanding the termination of the shared services

12  agreement, to maintain the data for some indefinite period of

13  time until the Advisors obtain a copy.  Is that right?

14  A    I'm saying there needs to be reasonable business

15  transition in these circumstances.  And I don't -- I don't --

16  I'm not the systems person, I don't know the details, but I

17  know the costs are minimal.  The monthly storage charge and --

18  what, is the Debtor going to delete everything to save $100 of

19  storage charge on the cloud to intentionally harm investors?

20  I mean, that's -- that's an alternative, but none of that

21  makes any sense to me.

22  Q    Let me ask you this.  Under the shared -- under the

23  transition services agreement that was fully negotiated as of

24  last Tuesday or Wednesday, but for your access, was the whole

25  issue of data access addressed in that document?

Dondero - Direct                              96

1   A    I don't know.  I assume so.

2   Q    Okay.  And do you also assume that the data issue would

3   have been fully and completely addressed under the Option B

4   that the Debtor accepted on Friday afternoon?

5   A    I have no idea what was in Option -- I mean, I have no

6   idea what was in Option B regarding the data.

7   Q    Okay.

8        MR. MORRIS:  Your Honor, I have nothing further.

9        THE COURT:  All right.  Pass the witness.  Mr.

10  Wilson?

11       MR. RUKAVINA:  I think, actually, Your Honor, he's my

12  witness on this one, since we're the Defendants.

13       THE COURT:  Oh, I'm sorry.  He's in Mr. Wilson's

14  office.  I got confused.  Go ahead, Mr. Rukavina.

15       MR. RUKAVINA:  No problem.  No problem.

16    Mr. Vasek, if you'll please pull up Debtor Exhibit 2, and

17  if you'll please go to Section 6.02.  Well, make it so we can

18  see 6.03 as well.

19                    CROSS-EXAMINATION

20  BY MR. RUKAVINA:

21  Q    Okay.  Mr. Dondero, can you hear me?

22  A    Yes.

23  Q    Mr. Morris was asking you about data and return of data.

24  I'd like for you to read with me Section 6.02, the second

25  half, where it starts, "For the avoidance of doubt."  Can you

Dondero - Cross                          97

1   see that, sir?

2   A    Yes.

3   Q    (reading)  "For the avoidance of doubt, all books and

4   records kept and maintained by Service Provider on behalf of

5   Recipient shall be the property of Recipient, and Service

6   Provider will surrender promptly to Recipient any such books

7   or records upon Recipient's request."  And then there's a

8   parenthetical about retaining a copy.  Do you see that, sir?

9   A    Yes.

10  Q    Did I read that correctly?

11  A    Yes.

12  Q    Okay.  And Service Provider here is the Debtor, and

13  Recipient is one of the Advisors, correct?

14  A    Yes.

15  Q    Okay.  And now let's quickly read Section 6.03.  (reading)

16  "Upon expiration or termination of this agreement, Service

17  Provider will be obligated to return to Recipient as soon as

18  is reasonably practicable any equipment or other property or

19  material of Recipient that is in Service Provider's control or

20  possession."  Did I read that correctly?

21  A    Yes.

22  Q    Okay.  And are the Advisors relying on these provisions

23  when you mentioned in response to Mr. Morris that the Debtor

24  had some obligation to provide them their own data?

25  A    Yes.  I -- again, I'm not involved in the details or the

Dondero - Cross                          98

1    specifics, but that's a very standard clause you'd expect to

2    see in a service agreement, and I'm -- in some form or

3    fashion, I'm sure D.C. and Dustin are aware of that and have

4    negotiated accordingly.

5    Q   Well, let's talk about that briefly.  Mr. Morris asked you

6    several questions with respect to the negotiations in the last

7    few weeks on the transition services agreement and with

8    respect to the weekend's events, to which you responded that

9    you don't know the answer.  Do you recall those questions

10   generally?

11   A   Yes.

12   Q   And is that because you delegated those decisions to both

13   D.C. and Dustin and outside counsel, or is that because you're

14   incompetent?

15   A   I've found that I am mischaracterized whenever I talk to

16   Seery directly or deal with things directly, and there's too

17   much of an intent in this case to make this personalized about

18   me.  And there was over a thousand line items to negotiate.

19   Dustin and D.C. are very capable executives.  And again, to

20   avoid mischaracterization and personalization of this stuff, I

21   let them handle it.

22   Q   Okay.  And you were also asked by Mr. Morris about the

23   Advisors' current backup plan or divorce plan, whatever we

24   want to call it, and you didn't know some of those answers.

25   Is that also because you delegated that to Mr. Norris, Dustin

Dondero - Cross                              99

1 | Norris?

2 | A   Yes.

3 | Q   Okay.  It's not because you don't take an interest in it;

4 | it's because you delegated it to someone that you just called

5 | a very capable executive, correct?

6 | A   Yes.

7 | Q   Okay.  And Mr. Morris asked you about certain events of

8 | last Tuesday and Wednesday.  What was going on, sir, here in

9 | North Texas last Tuesday and Wednesday?

10 | A    Well, it was the ice storm.  I couldn't get in touch with

11 | my lawyers on Wednesday, including yourself, you know, and

12 | people didn't have electricity, they didn't have coverage.

13 | Q   Is it fair to say, sir, --

14 | A   I couldn't --

15 | Q   Is it fair to say, sir, just to speed this up, that last

16 | Tuesday, Wednesday, and Thursday, the Advisors and you and

17 | outside counsel, primarily me, were having a very hard time

18 | getting in touch, and in fact, we really couldn't get in

19 | touch?

20 |       MR. MORRIS:  Objection to the form of the question.

21 | I mean, if Mr. Rukavina wants to testify, he's welcome to do

22 | that, but I think he's leading.

23 |       THE COURT:  I'll overrule.

24 |       THE WITNESS:  The answer is yes.  The world wasn't

25 | functioning --

APP 4916

Dondero - Cross                          100

```
 1   BY MR. RUKAVINA:

 2   Q    Okay.

 3   A    -- in Dallas, Texas, or in my legal ecosystem.

 4   Q    Is it possible that, as a result of that, certain

 5   miscommunications between all of us took place?

 6   Misunderstandings?

 7   A    Lack of --

 8   Q    Misunderstandings?

 9   A    Yeah.  A lack of communication, period.

10   Q    And Mr. Morris discussed your physical presence on the

11   premises.  In fact, other than that one time that was

12   mentioned when you went to the office for the deposition, you

13   have not been at NexPoint or the other Advisor's corporate

14   offices for almost two months now; is that correct?

15   A    Correct.

16   Q    Has that caused disruption to the business of the

17   Advisors?

18   A    It's definitely affected the efficiency.  And again, I

19   don't think it's compliant on a long-term basis for a

20   registered investment advisor to not have its oversight

21   employees, you know, or oversight most senior employee on

22   staff.

23   Q    Thank you, Mr. Dondero.

24            MR. RUKAVINA:  Your Honor, I'll pass the witness.

25            THE COURT:  All right.  Mr. Morris?
```

APP 1917

Dondero - Redirect                              101

```
 1                      REDIRECT EXAMINATION
 2   BY MR. MORRIS:
 3   Q    Sir, notwithstanding last week's weather, you knew that
 4   the lawyers for both the Advisors and the Debtor had reached
 5   an agreement on every single material term except for your
 6   access to the office, correct?
 7   A    Yes.
 8   Q    The weather doesn't change anything about that, right?
 9   A    Correct.
10   Q    And the only reason that the Advisors refused to sign the
11   agreement and this lawsuit was commenced is because you
12   personally would not reach an agreement that didn't allow you
13   into the offices, correct?
14   A    I mean, yes, largely.
15   Q    Okay.
16           MR. MORRIS:  No further questions, Your Honor.
17           THE COURT:  Any --
18           MR. RUKAVINA:  Isn't it --
19           THE COURT:  -- recross?
20           MR. RUKAVINA:  Thank you, Your Honor.
21                      RECROSS-EXAMINATION
22   BY MR. RUKAVINA:
23   Q    Isn't it also true, Mr. Dondero, that the same can be said
24   about Mr. Seery, that the only reason why the Debtor didn't
25   enter into that agreement was because he would not permit you
```

APP 4918

Dondero - Recross                          102

 1  to be on the premises for the next couple of years?

 2  A    Yes.

 3          MR. RUKAVINA:  Thank you, Your Honor.

 4          THE COURT:  All right.  That concludes Mr. Dondero's

 5  testimony for now.

 6      Mr. Morris, any more witnesses?

 7          MR. MORRIS:  No, Your Honor.  The Debtor rests.

 8          THE COURT:  All right.  Mr. Rukavina, you may call

 9  your first witness.

10          MR. RUKAVINA:  Your Honor, just to give you a heads

11  up, I'm probably going to have an hour, hour and a half with

12  Mr. Norris.  So I don't know what the Court's plan is for

13  working through lunch or not, but I'll just give you that so

14  that you can make the appropriate decision.

15          THE COURT:  All right.  Well, I would like to go

16  ahead and get started and get some of that accomplished before

17  lunch.  My situation is I'm hoping to get an update, but I

18  have another 1:30 matter that I think is going to be very,

19  very short, but I'm waiting to -- you know, my courtroom

20  deputy was going to reach out to the lawyers involved in that

21  matter.  So my point is I may have to break from this for a

22  few minutes at 1:30, so I'd like to time our lunch break so

23  that it occurs a little bit before 1:30.  I think that'll make

24  this easier.

25      So let's go ahead and get started.  You wanted to call Mr.

Norris - Direct                                103

1  Norris?
2          MR. RUKAVINA:  Yes, Your Honor.  Dustin with a D,
3  Norris.
4          THE COURT:  All right.  Dustin Norris, would you
5  please say, "Testing, one, two"?
6          MR. NORRIS:  Testing, one, two.
7          THE COURT:  All right.
8          MR. NORRIS:  Testing, one, two.
9          THE COURT:  I hear you loud and clear.  I'm not
10 seeing you yet.  Oh, there you are.  Okay.  Please raise your
11 right hand.
12         MR. NORRIS:  Hello.
13     (The witness is sworn.)
14         THE COURT:  All right.  Thank you.  Mr. Rukavina?
15         DUSTIN NORRIS, DEFENDANT'S WITNESS, SWORN
16                  DIRECT EXAMINATION
17 BY MR. RUKAVINA:
18 Q   Mr. Norris, can you hear me?
19 A   Yes, I can.
20 Q   Okay.  Are you able to close the blinds behind you or
21 somehow make that room a little darker?
22 A   Let me reposition.  Is that better?
23 Q   Yes, thank you.  For the record, sir, what is your name?
24 A   Dustin Norris.
25 Q   And what is your educational background?

APP 1920

Norris - Direct                                104

1    A    I have a bachelor's and master's degree in accounting from

2    Brigham Young University.

3    Q    Okay.  Do you hold any professional licenses or

4    certifications?

5    A    Yes.  CPA license, as well as FINRA License Series 7, 63,

6    and 24.

7    Q    Have you ever been disciplined by any regulatory body with

8    respect to your licenses?

9    A    No.

10   Q    Have you ever had a crime, even a speeding ticket?

11   A    No, never -- never had a crime.  Not even a speeding

12   ticket.  For the record, I did get pulled over for not coming

13   to a complete stop at a stop sign, but was dismissed through

14   defensive driving.  This is actually my first experience or

15   interaction with a court other than the same interaction with

16   the Court in December of last year.

17   Q    Have you ever had your honesty or integrity challenged or

18   questioned?

19   A    No, I haven't.

20   Q    Okay.  And are you familiar with the two Advisors who are

21   my clients here today?

22   A    I am.

23   Q    And how are you or why are you familiar with them?

24   A    So, I am the executive vice president of each Advisor.

25   Q    Okay.

Norris - Direct                    105

1   A    And --

2   Q    Go ahead.

3   A    I've been working for the Advisors since 2012.

4   Q    So you have been employed by the Advisors since 2012?

5   A    That's correct.

6   Q    Okay.  And what does your role as executive vice president

7   entail?

8   A    So, I oversee the marketing, sales, distribution, business

9   development for our investment products, private placements,

10  registered products, the funds that we've -- been talked about

11  in this, this hearing.

12  Q    Okay.  And who do you report to?

13  A    To Mr. Dondero.

14  Q    Okay.  And briefly, for the record, what is the business

15  of these two Advisors that are Defendants today?

16  A    Yeah.  So, they primarily provide investment advice and

17  management of various investment vehicles.  That's private

18  investment vehicles, it's public investment vehicles,

19  publicly-registered closed-end funds, REITs, BDC, ETFs, and

20  mutual funds.

21  Q    Can you give the judge an estimate of the order of

22  magnitude of all of the underlying investments managed or

23  advised through all these vehicles that you mentioned?

24  A    It's several billion dollars under management for NexPoint

25  and Highland Capital Management Fund Advisors.

Norris - Direct                                    106

1  Q    And is Mr. Dondero the fund manager, the guy in charge for

2  all those investments?

3  A    Most of them, yes.

4  Q    Okay.  And do you understand yourself to be a fiduciary?

5  A    I do, both to the funds and to our Advisors.

6  Q    Okay.  What do you mean, the funds?  And in particular,

7  what -- what are the retail funds that Mr. Seery talked about

8  earlier?

9  A    Yeah.  So, we have a number of publicly-registered mutual

10 funds, closed-end funds, and ETF.  And those are, as Mr. Seery

11 pointed out, available to anyone that really wants to buy

12 them, anybody that has a brokerage account or the ability to

13 buy them through a financial advisor.  And so those are the

14 funds that I'm talking about.  Primarily, they're 1940 Act--

15 registered mutual funds and closed-end funds.

16 Q    Do any of those funds have their own boards?

17 A    Yes.  All of the '40 Act funds have their own board.  It's

18 an independent board of trustees.

19 Q    What do you mean by an independent board of trustees?

20 A    Yeah.  So the majority of the board members are

21 independent, and it's actually a -- 75 percent of the board

22 members are independent trustees, as defined by the rules and

23 regulations of the SEC.  And so they actually hire us as the

24 advisor.  On an annual basis, they review our advisory

25 agreements.  And they control the day-to-day operation -- not

Norris - Direct                                    107

1    the daily operations, but control the oversight of those

2    funds.  And on an annual basis, they renew or choose not to

3    renew our advisory agreements.

4        And so it is an independent process and an independent

5    board.  And each one of them have independent legal counsel as

6    well that advises them on all matters that they incur,

7    including everything we're talking about today.

8    Q    Who is that independent legal counsel, if you know?

9    A    Yeah.  Blank Rome is the name of the law firm, and Stacy

10   Louizos is the partner that represents them.

11   Q    Does Mr. Dondero sit now, or since this bankruptcy case

12   was filed, has he sat on any of these independent boards?

13   A    He has not, no.

14   Q    Okay.  For these funds with independent boards, are you

15   also any kind of employee or officer of them?

16   A    Yeah.  So, the funds themselves don't have individual

17   employees.  They have officers that oversee the operations.

18   And I am executive vice president of each of the funds.

19   Q    Okay.  And as the executive vice president of each of

20   those funds, who do you report to?

21   A    So, I regularly report to the board on matters pertaining

22   to the funds.  I'm the liaison between the funds and the board

23   on a number of matters.  So I've been attending board meetings

24   since December 2012 for these funds.

25   Q    Okay.  Have those boards met and had meetings in the last

APP 1924

Norris - Direct                        108

 1   couple of months regarding the shared services agreements and
 2   any transition thereof?
 3   A    Extensive meetings.  They've held eight meetings since the
 4   beginning of the year, board meetings.  And those weren't just
 5   short.  Some of them were very long.  Last year, there were 24
 6   recorded board meetings, and a number of conversations in
 7   between, a number of discussions with their legal counsel, a
 8   number of discussions with the chairman of the board.  So it's
 9   -- they've been extensively involved through the process.
10         MR. MORRIS:  Your Honor, I move to strike the hearsay
11   that we're hearing here about discussions that the boards had
12   with other folks.  If Mr. Norris has personal knowledge,
13   that's one thing, but I think he's gone well beyond that.
14         THE COURT:  Okay.  Response, Mr. Rukavina?
15         MR. RUKAVINA:  I'm not sure what testimony Mr. Morris
16   is talking about, third-party testimony.  I think the witness
17   just said that the board has met many, many times to discuss
18   the issues that are up for today.
19         THE COURT:  Okay.
20         MR. MORRIS:  And I think to the extent that the
21   witness participated in such meetings, that's fine, he can
22   specifically testify about that, but I don't think he should
23   be otherwise testifying about what other people did who aren't
24   here today to testify as to their own personal conduct.
25         THE COURT:  Okay.  Okay.

Norris - Direct                                        109

1           MR. RUKAVINA:  I can rephrase the question, Your

2    Honor.

3           THE COURT:  I sustain.  Rephrase.

4    BY MR. RUKAVINA:

5    Q    Have you personally participated in meetings of those

6    boards, Mr. Norris, at which those boards and you discussed

7    the transition services agreement potentially being negotiated

8    with the Debtor and the shared services agreements that were

9    being terminated by the Debtor?

10   A    Yes.  I participated in eight board meetings this year.

11   There's been five of them in February alone.  And there were

12   24 board meetings last year, and I was a participant in each

13   one of those meetings.

14   Q    Okay.  And did you advise those boards at some point in

15   time about the termination of the shared services agreements?

16   A    Yes, we did.

17   Q    When did you start advising those boards that that was

18   something that may happen or that has actually been noticed as

19   happening?

20   A    So, throughout the fall last year, I think the expectation

21   was that there would be a -- I mean, obviously, there had been

22   a plan filed with the Court.  That was discussed with the

23   board.  Mr. Seery testified that he joined the board meetings

24   in the fall and in the summer and talked about those.  The

25   discussions were around the transition of services.  There was

Norris - Direct                          110

1   discussion about a new company.  And so the discussions were

2   ongoing.

3       When the filing actually -- from when the filing actually

4   happened, that was ongoing, of how would we be able to

5   continue the services.  And so, from the beginning, those were

6   discussions that were had.

7       We did notify the board when the termination occurred.  As

8   well, we had a board meeting, a one-and-a-half day board

9   meeting on December -- I think the dates were December 10th

10  and 11th -- where the termination was discussed in detail.

11  Q   Now, obviously, the Debtor sent notices of termination of

12  these shared services agreements in late November.  You're

13  obviously familiar with that, right?

14  A   Correct.

15  Q   Separate and apart from the Debtor's decision to terminate

16  these agreements, were you and the Advisors considering

17  terminating these agreements?

18  A   We were.  We had discussion --

19  Q   Let me ask -- let me ask the next question.  I appreciate

20  you answering, but let me -- let me do my job.  When were the

21  Advisors considering making such a move, and why?

22  A   This was in the October-November time frame of last fall,

23  as the -- particularly around the services we had been

24  receiving related to the shared services agreement and the

25  payroll reimbursement agreements.  We didn't think that the

Norris - Direct                                    111

 1   service was fulsome, we didn't think we were getting the

 2   service that was under the agreements, and the service had

 3   dropped off.

 4        And in particular, the -- there was -- there were

 5   conflicts involved between the Debtor and between the service

 6   providers, particularly legal and compliance services, given

 7   all that was going on.  And there were a number of matters

 8   they couldn't participate on.  Historically used their legal

 9   and compliance services significantly.

10        And that, in addition to discovering that there were a

11   number of employees we were reimbursing for in payroll

12   reimbursement agreements that were no longer employed by the

13   Debtor, yet we were paying for the full services.

14        So, with that, we had discussions internally about if and

15   when or how we could terminate them, and --

16   Q    Let me stop you.

17   A    -- termination --

18   Q    Let me stop you.  Ultimately, I take it, the Advisors

19   never tried to terminate these shared services agreements,

20   correct?

21   A    That's correct.

22   Q    Why?

23   A    There was an order specifically that Jim or anybody

24   related to Jim could not terminate an agreement with the

25   Debtor.  And he specifically pointed that out to us when we

APP. 1928

Norris - Direct                              112

1   discussed this, and so we knew we couldn't take action.  There

2   was also -- counsel discussed that the stay with the Court --

3   Q   Let's not -- let's not talk about counsel.  Let's not talk

4   about counsel, --

5   A   Sorry.

6   Q   -- Mr. Norris.  Okay.  But the point is, at least as of

7   last October, would you agree, that the notion that these

8   agreements would be terminated by one or the other parties was

9   known to you?

10  A   Yeah.  So, the -- we expected that at some point there

11  would need to be a termination.  I -- that was discussed.  And

12  there was a plan, and I'm sure we'll talk about it, but a plan

13  to transition the employees and the services to a new company

14  and to new service providers.  And I think both sides had been

15  working for quite a while to ensure there was a smooth

16  transition, and we expected that to happen.  But there would

17  need to be a termination of that agreement -- either a

18  transfer of that agreement or a termination to a new company

19  that would be providing new services, or transferred those

20  services directly to us.

21  Q   So I'd like you to pick what word you'd like to use, but

22  what I've called a backup plan in my objection or what Jim

23  called a divorce plan in his testimony, how -- what shall we

24  call this backup plan?

25  A   All-contingency plannings.  Or we'll call it backup plan.

Norris - Direct                          113

1   Q    Okay.

2   A    I think that works.

3   Q    So is it fair to conclude that since at least last

4   October, the Advisors have known about the possibility of

5   having to do a backup plan?

6   A    Yeah.  And I think even before then we knew there was a

7   possibility.  But the plan, the strong Plan A of everything

8   that had been communicated to us by the Debtor and their

9   employees was that the intent was to transfer all those

10  services to a new company, with the same individuals providing

11  the same services.  There was no significant indication to us

12  that that would be any different.

13      Yet we still had then begun planning, well, what if,

14  right, Plan B was implemented or began many months ago and in

15  recent weeks, in recent months, it's been expedited to be able

16  to ensure that we have a solid Plan B.  But yes, it's been

17  ongoing for months.

18  Q    So if there is an implication or allegation made that the

19  Advisors were negligent with respect to transitioning from the

20  shared services agreements because they didn't start taking it

21  seriously last August or September, would you agree or

22  disagree with that allegation?

23  A    I would disagree, because there were assurances or

24  discussions that made it very clear that everybody was working

25  together towards a Plan A.  Yet we were still discussing -- I

Norris - Direct                                    114

1   know Mr. Seery mentioned he's a Boy Scout.  I agree in that.

2   Be prepared.  I'm an Eagle Scout.  And so we have been

3   preparing, but the preparations weren't needed in the manner

4   that we thought they were needed until in the last month,

5   right, and -- because everything was moving in the right

6   direction for a clean transition plan, and even up until last

7   week.

8       However, the last month and a half we've had to prepare in

9   earnest for Plan B, and that involved a tremendous amount of

10  effort.  And I'm happy to go into that now.  But yes, there's

11  -- there has been -- we have 80 employees across our Advisors,

12  and almost every single one of them have been involved in Plan

13  B, and a group of about 18 of us for several weeks, planning,

14  game-planning, and thinking through all the contingency plans.

15  Q   Well, let's round off the discussion about these boards.

16  Did you make the boards aware since last fall and into this

17  year about both the ideal plan, which was, I guess, you know,

18  an agreement with the Debtor, but also a backup plan, in case?

19  A   Yeah.  So, in -- in August, --

20  Q   When --

21  A   -- when the Court -- oh, sorry, yeah.

22  Q   No, no.  Well, go ahead.

23  A   Go ahead.

24  Q   I was going to ask you how and when, but you -- you -- go

25  ahead.

APP. 1934

Norris - Direct                                    115

1    A    Yeah.  Yeah.  So, up until August, there was, I think, a

2    view that there would be a negotiation, a negotiation reached.

3    Things had been pushing along.  We know that in August there

4    was a plan filed with the Court.  And Mr. Seery even joined

5    our board meeting.  And so in that meeting he discussed with

6    us, as well as the legal team of the Debtor, discussed with us

7    the Plan B at that point, which was defined with the Court.

8    That the goal and objective was a grand bargain, as he

9    explained it, and that he -- that was the Plan A.  But even

10   under either plan, there would be a transition of services.

11   He joined again, I believe, one or two more times, to

12   additional board calls that fall.  There was mediation we were

13   aware of and had discussed with the board to help resolve some

14   of these items.

15        And so, you know, just in the same time frame Mr. Seery

16   shared earlier, it corresponded with those discussions that we

17   were having.

18        In addition, D.C. Sauter and other individuals at our

19   firm, as well as individuals from the Debtor, were working

20   throughout the fall and into the winter on the various

21   discussions on transition.  And so that's --

22   Q    Did you hear Mr. Dondero testify about over a thousand

23   line items?

24   A    Yeah, I did.

25   Q    Do you know what -- what is he referring to, do you know?

APP 1922

Norris - Direct                         116

1   A    So, within the transition services agreement, there --

2   there's about 11 or 12 pages in an exhibit that are a number

3   of agreements.  That's -- that's the remaining agreements that

4   we've agreed that are needed.  He may have had a little

5   hyperbole in his thousand, but there is -- there were -- there

6   was at least a thousand points of discussion that had to be

7   resolved.  Most of them were minor, right, and we came to a

8   quick agreement on most of those, and there was only a handful

9   of things that needed to be resolved.  And because of that, I

10  felt comfortable and confident, particularly from the middle

11  of January on, where I became much more involved, that there

12  would be an orderly agreement on those points.

13  Q    Did you tell the boards that the Debtor would enter into

14  the agreement that had been negotiated only on the condition

15  that Mr. Dondero not be permitted to be on the premises?

16  A    Sorry.  You said the Debtor would enter into or -- oh,

17  that he wouldn't be permitted onto the premises?

18  Q    Well, we'll go more -- we'll go in detail later, but I

19  want to round off the board discussion here.  Obviously, you

20  heard from Mr. Seery and in my paper that we had an agreement

21  done except for one issue, right?

22  A    Yes.  Yes.

23  Q    And that issue was whether Mr. Dondero would be on the

24  premises or not, right?

25  A    Yes.

APP. 1923

Norris - Direct                                117

1  Q    Did you discuss that with the board, that issue?

2  A    We did.  We --

3  Q    And did you get any instructions from the board that have

4  led you to do anything other than you've actually done?

5  A    No.  No, we -- they -- the board, as I mentioned, we've

6  had eight board meetings this year discussing in detail our

7  backup planning.  They understood the Jim access issue and

8  they felt comfortable with our backup planning.  But also, you

9  know, our view, and I think that they shared that, that he

10 should have access --

11 Q    Well, let's stop there.  Let's stop there.  Let's stop

12 there.  I'll ask -- I'll ask more of those questions later.  I

13 don't -- I don't want to invite Mr. Morris's objections here

14 based on you talking outside the scope --

15 A    Yeah.

16 Q    -- of my question.  Let's move on now to the shared

17 services agreements themselves.  You heard Mr. Seery's

18 characterization of them from a top level.  Would you agree

19 with his characterization, or how would you characterize what

20 the shared services agreements actually did?

21 A    Yeah.  I think he called them middle- and back-office

22 services.  I think, to add a little bit more to that, it's IT

23 services, including the systems and computers that we all use.

24 It's HR.  It is accounting and back-office services, many of

25 those for our advisors and some of them for our funds.  We do

APP. 0954

Norris - Direct                          118

1   outsource a number of accounting functions to other service

2   providers, and have for years, and they provide an oversight

3   function for the accounting and the books and records for our

4   funds.   They also provide tax services and things like that

5   for our advisors and funds.

6   Q    Now, in --

7   A    And as well legal and compliance services.  Legal and

8   compliance services as well.

9   Q    In our exhibits that have been admitted are two employee

10  or payroll reimbursement agreements.  We don't have to go

11  through those in detail, but you're -- are you aware of those

12  agreements?

13  A    I am, yes.  And I would add that -- and those are in

14  addition to the services that are provided under the shared

15  services agreement.  Those are front-office or investment

16  services.

17  Q    Okay.  Now, did there come a time when a dispute arose

18  between the Debtor and the Advisors as to how much an amount

19  was owing by the Advisors to the Debtor under the shared

20  services agreement?

21  A    That's correct.

22  Q    What was the basis of that dispute?

23  A    Yeah.  So, in particular, as I mentioned earlier, certain

24  of the services we believe we are no longer receiving.  Many

25  of those related to legal and compliance.  We've had to shift

Norris - Direct                               119

1    a lot of those responsibilities in-house and to outside

2    counsel.

3        And particularly related to the payroll reimbursement

4    agreements, we hadn't realized that we were overpaying for

5    employees that -- and again, they're payroll reimbursement

6    agreements for employees that are dual-hat employees, dual

7    employees of the Debtor and our Advisors, providing investment

8    services.  And there's a list or exhibit that shows the number

9    -- the actual employees with their names and the allocations

10   of their time.  And so two-thirds of those employees, when we

11   realized or saw the list or received the list on the exhibit

12   in the agreement, which was around the end of November or

13   early December, two-thirds of them are no longer employed by

14   the Debtor.  And we continue -- and they continue to bill us

15   based on historical averages, not based on the actual amounts.

16       So we inquired of that, we asked for email --

17   Q   Let me -- let me pause you.

18   A   Oh, sorry.

19   Q   Let me pause you.

20   A   Yeah.

21   Q   Let me pause you.  So, during the negotiations with the

22   Debtor in December, January, and February, did you ask for any

23   kind of clarification or reconciliation of these amounts?

24   A   Yeah.  So, on multiple occasions, we asked for the detail

25   of what they were invoicing us for, and then, in particular,

Norris - Direct                                    120

1  in late January and again a couple times in February, I asked

2  multiple employees for reconciliation.  Two reconciliations.

3  One was a reconciliation of the employees that they were

4  charging under the expense -- I'm sorry -- payroll

5  reimbursement agreement, to the actual amounts that they

6  charged us, and then separately I asked for a reconciliation

7  of amounts billed to us under the shared services agreement to

8  what they actually incurred on their end.

9      And the rationale for the latter was because the expense

10 reimbursement -- or, sorry, the shared services agreement for

11 Highland Capital Management Fund Advisors is actually a cost

12 plus a margin of five percent.  So they are to charge us what

13 their costs are plus a margin of five percent, yet they

14 continue to bill us the same amounts based on historical

15 averages.

16     And so the amounts in dispute were particularly in the

17 last few months, where those amounts hadn't changed and where

18 we raised this concern.

19 Q   Did you get a response or a reconciliation from the Debtor

20 on these overpayment issues?

21 A   No.

22 Q   Okay.  Now, when did you become -- well, you heard Mr.

23 Dondero say that he delegated the primary responsibility for a

24 transition of services to you, correct?

25 A   Yes.

Norris - Direct                        121

1  Q    When was that?

2  A    Yeah.  So, January -- in mid-January, I became very

3  involved.  I had less of authorization prior to that.  I was

4  involved in some of the negotiations on contracts and things

5  like that in early December.  Had a meeting with Debtor

6  employees on that, and that they had been working on for

7  months, along with Mr. Sauter.  Mr. Sauter had taken more of

8  an active role prior, in December and October and even

9  September, and before -- before all that.

10      So, in January, mid-January, they actually came to me on

11  January 12th with permission from Mr. Seery to interact

12  directly with me and to negotiate the additional terms of the

13  transition with me.  And Jim authorized me at that time to

14  move forward.

15  Q    Okay.  Did you discuss with Mr. Seery whether you would be

16  permitted to talk to Debtor employees as part of this?

17  A    So, I did not talk to Mr. Seery, but I talked to J.P.

18  Sevilla, Brian Collins, David Klos, and Frank Waterhouse, who

19  they had told me explicitly that Mr. Seery had authorized them

20  to negotiate with me.

21  Q    Okay.  Was there some impediment prior to that

22  authorization to being able to discuss Newco issues with the

23  Debtor's employees?

24  A    So, there were a number of things.  And as this Court is

25  very well aware, that three weeks prior to that, there were a

Norris - Direct                                    122

1    number of events.  There was a TRO for Mr. Dondero and our

2    Advisors, there was a preliminary injunction for Mr. Dondero,

3    and there were claims of interference.  And we took a very

4    cautious approach and didn't want to interfere in any manner.

5    And so in these regards, and in many, I mean, everyone was

6    very cautious.  And so those were -- those were steps that it

7    was challenging.

8        In addition, I should note that Mr. Scott Ellington was

9    helping the Debtor and negotiating this transition agreement

10   before he was let go in early January.

11       And so with all those events, we had to take a more

12   cautious approach to communication.

13   Q   Okay.  And approximately when did Mr. -- did the Debtor,

14   to your satisfaction, authorize direct interaction with the

15   employees so that you could negotiate a more fulsome

16   agreement?

17   A   Yeah.  It was when they called me on January 12th --

18   Q   Okay.  And is it fair to say --

19   A   -- and notified me of that.

20   Q   Is it fair to say that that's the date when the

21   negotiations really got going?

22   A   Absolutely, yes.  Yeah.

23   Q   Okay.  Did you ever ask the Debtor for a draft agreement

24   or term sheet or whatever you want to call it as far as a

25   transition of services would be?

Norris - Direct                         123

1   A    I did, on multiple occasions.

2   Q    When did you finally receive one?

3   A    So, it was on January 28th, which was the last business

4   day of the shared services agreement term.  Sorry, January

5   29th, a Friday.  And January 12th, we engaged, as I mentioned.

6   We came to quick resolution on various items.  And we began

7   asking for a term sheet.  I actually asked them whether they

8   -- who they wanted to draft it, their counsel or our counsel.

9   They checked with their counsel.  I thought it was a good idea

10  and agreed that it was a good idea for their counsel to draft

11  it, because, as they put it, this was their baby for many

12  months.  They had -- because the Debtor employees and DSI,

13  their consultants, had been very involved, in taking 15 months

14  to that point, in figuring out what contracts were needed,

15  analyzing what needed on a --

16  Q    Let me stop you.

17  A    -- go-forward basis --

18  Q    Let me stop you, --

19  A    Yeah.

20  Q    -- Mr. Norris.  The point being, it was agreed between you

21  and the Debtor that the Debtor would take the first stab at a

22  term sheet, and you received that on or about January 29th of

23  this year?

24  A    Correct.

25  Q    Okay.  Now, obviously, the Debtor extended the

APP. 1949

Norris - Direct                                    124

 1  termination, first to February the 14th, and then, second, to

 2  February 19.  Correct?

 3  A    That is correct.

 4  Q    Okay.  Did the Advisors pay the Debtor for those delays,

 5  pay cash money to the Debtor for those delays?

 6  A    We did.  And we -- yes, we did.

 7  Q    Okay.  And without belaboring the point or taking any more

 8  time than necessary, the numbers that I have in my objection

 9  are that, for the first extension, we paid --

10  A    I believe it was around $560,000.

11  Q    Thank you.  Thank you.  And for the second extension, do

12  you recall?

13  A    Around two hundred -- just over $200,000.

14  Q    Okay.  Why were those extensions necessary?

15  A    They were necessary for multiple reasons, but it was

16  necessary to get a transition agreement completed, and that

17  was our goal and intent.  It was also necessary to protect our

18  funds and our investors, to have a smooth transition.  But

19  primarily, we were in a great spot until -- up until January

20  29th, we hadn't received a term sheet.  So we couldn't

21  negotiate a term sheet that was pages long, with schedules

22  that were 10 or 15 pages long, in a day, and so we asked, in

23  good faith, can we have an extension?  And they also were

24  agreeable to that, and it made sense for all parties.

25       Prior to that receiving the term sheet, though, there were

Norris - Direct                          125

1    concerns that we would lose those services.  They threatened

2    to pull those services.  However, at the end, all parties

3    agreed.

4        And then the extension, the second extension was needed in

5    order to continue those -- those agreements, negotiations as

6    well, as they had pushed the termination date of the employees

7    from the anticipated January 31st to January 19th, and so we

8    asked that they moved the termination date of the shared

9    services in line with the termination of the employees,

10   because our understanding was those employees would be

11   transitioning to a new company providing those same services.

12   Q    Okay.  Maybe I misunderstood something because of the

13   video nature of this, but you mentioned something like pushing

14   the termination of the employees from January 30th to January

15   19th.  Just for the record to be clear, because, again, I

16   might have misunderstood or misheard, but when was the Debtor

17   going to terminate nonessential employees originally and up to

18   what date was that pushed?

19   A    Yeah.  So our understanding is they were going to

20   terminate them on the 31st of January.  They did end up

21   receiving termination notices that said January 19th.  And so

22   that was pushed from what our understanding was, but that was

23   the first time I believe the employees received termination

24   notices for the 19th.  Thereafter, after we negotiated an

25   extension of our shared services agreement one more week

Norris - Direct                                126

 1  before the 14th, to the 19th, the very next day they extended
 2  the termination dates to the 28th for all employees, which
 3  would extend it one week beyond the negotiated termination
 4  date for the shared services agreement.
 5  Q   Well, here's my fundamental question.  To your knowledge,
 6  was that the Debtor's separate business decision as to when to
 7  terminate employees or did you request that the Debtor extend
 8  it to February 28th?
 9  A   That was their separate business decision.  Um, --
10  Q   That's fine.
11  A   That was -- that was their separate business decision to
12  extend it.  We didn't even anticipate them extending it --
13  Q   I just want the record to --
14  A   (overspoken)
15  Q   I just want the -- I just want the record to be clear, Mr.
16  Norris.  Let me direct you, please.
17  A   Yes.
18  Q   That that decision to extend the employee termination was
19  not at our request?
20  A   Correct.
21  Q   Now, let's talk about these negotiations a little bit.  To
22  go back to this agreement that we had other than the Dondero
23  access issue as of last Tuesday, you agree that there was an
24  agreement other than the Dondero access issue as of last
25  Tuesday, right?

Norris - Direct                              127

1   A    Yes, that's correct.

2   Q    Okay.  How, if at all, was the amount of money that we

3   owed to the Debtor issue resolved between you and your

4   counterparts at the Debtor?

5   A    Yeah.  So, they, at the end of January, demanded that --

6   and this was the first time that I was aware of the extent of

7   the amounts or that they were going to include payment of

8   past-due or disputed amounts as part of this agreement.  That

9   came in on, I believe, January 27th.  And they demanded we pay

10  it or they would cut off all shared services effective Friday,

11  the 29th.  And that included our access to the -- to our

12  websites, our domains, our emails.  It would include access to

13  the office.  And so that was a major item.

14       They demanded five point -- approximately $5.2 million in

15  payments from our Advisors and a number of other entities.

16  And so, as part of that, that was a -- that was a problem,

17  because we can't speak for the other entities.

18       In addition, now we were commingling a financial dispute

19  with the peaceful transition of services.  And so that was

20  resolved.  We agreed with the Debtor and ultimately agreed

21  that, okay, we would pay these disputed amounts as part of

22  this, reserving our rights for any additional -- any

23  additional argument of that for another time, but we would

24  agree to pay our portion, which is approximately $3 million,

25  our disputed portion of what they were billing, with $1

Norris - Direct                           128

1   million up front.  They wanted it all up front, but they were

2   willing to allow us to pay $1 million up front and the

3   remainder over 14 months.

4   Q    Okay.  Going back to this agreement save the one issue,

5   how was the employee issue resolved?

6   A    Yeah.  So, the employee issue was an important one, and it

7   had been.  These employees had been working hard providing

8   service for our funds and advisors for a very long time.  The

9   plan all along was to transition them, as Mr. Seery said, to a

10  new entity.  It would either by controlled by Mr. Dondero or

11  by the employees themselves.

12       And so we needed -- we need those services, right, in the

13  long run.  And so that was resolved in that there would be a

14  new company formed, which we've been calling Newco.  It would

15  be employee-owned.  Initially, would be providing services

16  exclusively to our Advisors, but then would have the ability

17  to go out and provide the same services to other companies.

18  And so we found that as -- from the beginning a great

19  solution.  And the principals of what would become Newco have

20  been interfacing with us and with Mr. Dondero regarding the

21  combination of those services.

22       So, as part of this agreement, the services would

23  transition directly to Newco, with the same people providing

24  the same services in the same seats.

25  Q    Okay.  What about -- just so that the record is clear,

APP 1965

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-4   Filed 09/06/25   Page 966 of 1017   PageID 3429

Norris - Direct                         129

1   there's a large corporate office over at Crescent Court here

2   in Uptown Dallas, right?

3   A    That's correct.

4   Q    And the lease, obviously, just to speed things up, the

5   lease is in the name of the Debtor, but for many years

6   NexPoint and other employees have been on premises, correct?

7   A    Yes.  We've been there since they opened the space.  I

8   believe it was February 2012 when we moved there.  Maybe

9   February 2011.  But our Advisors have been there in that space

10  since then.

11  Q    Okay.  So how was the future of this lease and resulting

12  lease payments resolved as part of this tentative agreement as

13  of last Tuesday?

14  A    Yeah.  So, it was a 75/25 split, where the Debtor would

15  pay 25 percent and we would pay 75 percent for the remaining

16  lease term, which was approximately 14 months.

17  Q    And approximately how much would our 75 percent over 14

18  months have amounted to?

19  A    I believe that's approximately one -- between $1-1/2 and

20  $2 million.

21  Q    Okay.  Now, we'll talk about this in some detail later,

22  but there are certain third-party software and information

23  providers -- Bloomberg, for example -- that the Debtor uses

24  that we have access to under the agreements but that the

25  Debtor must pay the third parties for, correct?

Norris - Direct                           130

1          MR. MORRIS:  Your Honor, I just object.  Again, if

2    Mr. Rukavina wants to testify -- this is not a question.  This

3    is testimony.

4          MR. RUKAVINA:  Your Honor, --

5          MR. MORRIS:  I mean, there's no foundation.  There's

6    nothing.

7          THE COURT:  Sustained.

8          MR. RUKAVINA:  Okay.  Very well.

9    BY MR. RUKAVINA:

10   Q    Mr. Norris, does the Debtor -- or, did the Debtor provide,

11   pursuant to shared services agreements, access to third-party

12   software platforms?

13   A    Yes.  They did.  There was a number of agreements --

14   Q    Stop.  Stop.

15   A    -- that were --

16   Q    Stop.  Stop.  Stop.  Were these some of the things that

17   you were negotiating with the Debtor as you were negotiating

18   that transition of services?

19   A    Yes.

20   Q    Name a few of the most important of these third-party

21   service providers that you were negotiating with the Debtor.

22   A    Yeah.  Bloomberg, particularly the order management system

23   of Bloomberg.  Oracle, which is an accounting system, to name

24   a few.  Those were the most important ones.

25   Q    Describe with some more specificity, please, what the

Norris - Direct                         131

1   order management system is.  OMS.

2   A    Yeah.  An order management system is an operating system

3   that allows you to trade various funds and asset classes all

4   through one system.  And so we have a number of funds, we have

5   a number of asset classes we trade, which include loans,

6   bonds, and equities.  And so trading all of that through a

7   system that then sorts it, allocates it, and does it all in an

8   efficient manner -- in addition, it incorporates various rules

9   and metrics for trading and efficiency -- so it's very

10  customized, it's very customized for the rules related to our

11  funds, very customized for the rules related to what we trade

12  for our Advisors, and it's been used primarily by the traders

13  from our Advisors or employed by our Advisors.

14      So that's what the OMS is.  And it's Bloomberg that has

15  the software, and it's been customized directly with

16  Bloomberg.

17  Q    Okay.  Did you come to an agreement with the Debtor as to

18  how the future costs or license fees for these platforms and

19  services would be allocated between the Debtor and the

20  Advisors?

21  A    We did.  It would be, for most of them, which is

22  approximately a hundred contracts, is about -- is a 60/40

23  allocation.  We would pay 60 percent and they would pay 40

24  percent.  There are some of them that they said they didn't

25  use that we agreed we would pay a hundred percent of.  But

APP. 1948

Norris - Direct                        132

1   most of them are a 60/40 split.

2   Q    Okay.  And did you calculate approximately how much in

3   payments pursuant to that formula we would make, the Advisors

4   would make in the future under the draft agreement?

5   A    Yeah.  So, it is approximately $240,000 per month,

6   inclusive of the lease.  So, exclusive of the lease, it was

7   about $120,000 per month.

8        In addition, there were one-time payments for annual

9   payments, which I think was around $200,000 or $300,000.

10       So it is a -- it's a couple million dollars over the life

11   of the contract.

12   Q    Okay.  And to fast forward to last Tuesday, the one issue

13   that had not been resolved was Mr. Dondero's physical presence

14   on the premises, correct?

15   A    That's right.  That's right.

16   Q    Was this a last-second issue or had this been discussed

17   for some time?

18   A    No, it wasn't a last-second issue.  We actually included

19   it in our first multiple drafts or responses to their term

20   sheet.  We got the term sheet on the 29th of January and it

21   did not include any specifics around Mr. Dondero's access, but

22   we added that in early drafts of the term sheet and it was

23   removed by their counsel and reinserted in the -- I know there

24   was discussion between counsel on various aspects of it.  It

25   was removed from what was their final version, and maybe even

APP 4949

Norris - Direct                         133

1   the draft before that, but it was added in by us again as --
2   for all the reasons we mentioned before.  We thought it needed
3   to be stated explicitly in the agreement.  And the attorneys
4   had discussed that it could be handled --
5   Q    Let's not talk about -- yeah, let's not talk about the
6   attorney discussions.
7   A    Okay.
8   Q    You heard Mr. Seery say that the Debtor refused to permit
9   Mr. Dondero onto the premises and you heard him say why.  Did
10  the Advisors offer any compromise on this access issue?
11  A    We did.
12  Q    What was that offer?
13  A    So, we offered to -- and in all this, it's thinking, what
14  are the employees from the Debtor that are going to be using
15  this?  We haven't even really received a good understanding of
16  who that is.
17       However, we offered to take approximately 25 percent of
18  the office.  And there is a clear area where we could build a
19  wall.  They could have their own separate access, their own
20  separate restrooms, their own separate entrance, where they
21  wouldn't have any involvement or connection to us.  And so we
22  also offered with that, whenever you need access to the other
23  portion, let us know.  We can even have Jim Dondero leave, if
24  you're concerned.
25       And so that was one option.  We could build a wall.  And

APP 1959

Norris - Direct                                    134

1   we even put that in the written agreement.  We will build a

2   wall at our expense.  That was the -- that was the -- what our

3   offer was.

4   Q    How did the Debtor respond to that offer?

5   A    They removed it from the agreement and they told us that

6   we had until 6:00 p.m. to sign their agreement with no Dondero

7   access or they would file a lawsuit.

8   Q    And this was last Tuesday?

9   A    This was Tuesday.

10  Q    Okay.  Were you able to respond by their deadline, which

11  they -- then they later moved to midnight of that same day?

12  A    I'm not sure if there was a response.  It was handled

13  between attorneys.  Our counsel.  I had -- just as Mr. Dondero

14  stated, I had rolling blackouts in my home from 2:00 a.m. on

15  Monday until Thursday.  I -- I and D.C. were aware of the

16  offer, as was our counsel, and I believe there was a -- and I

17  believe there was a response from our counsel in time, but I'm

18  not -- I wasn't certain at the time.  I knew that, as well,

19  there was an extension, but I didn't find out until the next

20  day because I did not have power.

21  Q    And ultimately, the Debtor either rejected that last offer

22  or let the offer expire by not accepting it.  It doesn't

23  matter which.  But is that accurate?

24            MR. MORRIS:  Objection to the form --

25            THE WITNESS:  Yes.

Norris - Direct                                135

1          MR. MORRIS:  -- of the question.

2          MR. RUKAVINA:  Your Honor, I'll ask it a different

3    way.

4          THE COURT:  Sustained.

5          MR. RUKAVINA:  I'll ask it a different way.

6    BY MR. RUKAVINA:

7    Q    Did the Advisors accept the Debtor's last offer made on

8    Tuesday of last week, the one you just referenced?

9    A    No.

10   Q    Why?

11   A    As explained, I think, clearly by Mr. Dondero as well, it

12   did not have the provisions that we thought necessary.  And

13   when you think about this, we were going to be required to pay

14   significant dollars for an office space where our president

15   and principal was not permitted.

16       We had an option to go other -- elsewhere, right?  Here,

17   we're in a separation experience.  This agreement that they

18   had, they had told us early on it was fill-or-kill.  They told

19   us early on that it was not *a la carte*.  When we pushed them

20   on that a couple weeks later, they said, well, the only thing

21   that's not negotiable is the office, right?  If you want

22   everything else, you've got to have the office.  That was in a

23   discussion with various attorneys on the phone.

24       And so, with this, we knew this was a kind of take-it-or-

25   leave-it offer, and we could have gone elsewhere.  And we had

Norris - Direct                              136

1   already been preparing, in the event that we couldn't have a

2   deal, to go elsewhere.  And so, with that, if they were not

3   going to permit -- which we thought was very reasonable,

4   specifically with all of the additions, you know, the

5   consideration -- sorry, my battery is about to die on my

6   computer.  I'm plugging in the charger here.

7       So, with all of those considerations, we couldn't sign

8   that deal, especially as -- without that key access.

9   Q    You personally, Dustin Norris, now, personally, as an

10  officer and a fiduciary, did you think that it was appropriate

11  or inappropriate that Mr. Dondero be allowed on the premises

12  in the future?

13  A    I thought it would be appropriate for him to be there.

14  Q    Why?

15  A    So, I've been working for Mr. Dondero for a long time.  I

16  know the way he operates, and I know that the way that he

17  manages his organization, which is a complex organization, he

18  needs to be there in person.  We haven't been in the office

19  because of a -- a disregard for COVID.  We are an essential

20  business, and we have been, as a financial services business.

21  But the way we operate is very in-person, and that's how Jim

22  operates.

23      In addition, I've never heard of a situation where the

24  principal or the control person of a company -- there's no

25  question that Mr. Dondero controls the organization -- cannot

APP 4953

Norris - Direct                              137

1   be there in person.

2        And so, from that perspective, given and knowing all of

3   our other plans, given the ability for many people to

4   relocate, given the abundance of office space elsewhere, if we

5   were forced to accept an agreement that did not allow Mr.

6   Dondero for the next 14 months to be there in person, it was

7   -- it was going to be a challenge for us from a business

8   perspective.

9   Q   Do customers or investors or prospective customers and

10  investors come to the offices historically to meet with the

11  Advisors and their personnel?

12  A   Pre-COVID, yes.  Regularly.

13  Q   Okay.  Would Mr. Dondero participate in those meetings?

14  A   He would, yes.

15  Q   Were you concerned that him being unable to participate in

16  those meetings would affect future business and profitability?

17  A   Yeah.  I think if you look at this -- key investors come

18  in and see this big cavernous open office and ask why the

19  manager of the funds is not even allowed to be in your office,

20  you know, or is that impacting the way you operate, then yes,

21  I think he needs to interact with people that are coming

22  through the office.

23  Q   He has not been in the office since about the beginning of

24  this year; is that correct?

25  A   Correct.

APP 1954

Norris - Direct                          138

1   Q    Do you feel like that has caused any harm or disruption to

2   the Advisors' business?

3   A    Yeah.  I don't know that I would characterize it as harm,

4   but it has been disruption, right?  I'm -- the way that we

5   operate, having Jim there, being able to have consistent,

6   regular meetings in person, which for me were multiple times

7   per day on a regular basis, and many others, it was

8   disruptive.  Being able to reach him, how to reach him.  Do I

9   need to get in my car and drive to another location where he's

10  at, which I did on many occasions.  We typically get people

11  together very quickly in groups:  Let's go talk to Jim.  And

12  that becomes a challenge to get things done quickly and in an

13  efficient manner.

14       So it has been a disruption, and it's not something that

15  we would desire to do, if we had the choice, for another 14

16  months.

17  Q    Okay.  Now let's talk about the backup plan, please.  I

18  guess let's start with:  What is our backup plan?  Well, let

19  me start with this.

20  A    Yeah.

21  Q    Do we have a backup plan?

22  A    And I think the key now, instead of calling it a backup

23  plan, is an operating plan.

24  Q    Okay.

25  A    For --

Norris - Direct                                  139

1   Q    Do --

2   A    -- several weeks, --

3   Q    Let me -- let me -- that's a very good point.  Prior to a

4   few days ago, did we have a backup plan in place for what we

5   would do if we were not able to enter into a transition

6   services agreement with the Debtor?

7   A    We did, yes.  And --

8   Q    Since when -- let me -- let me direct you.  Let me direct

9   you.  Since when did we have that backup plan?

10  A    Yeah.  So, the backup plan -- the backup plan began many

11  months ago, but as I mentioned earlier, it began in earnest in

12  the end of January, right?  And over the last month

13  especially, we've been putting in place all of the required

14  systems and processes and procedures in order to continue

15  doing all the duties under our advisory agreements.  And that

16  includes all of the services that are provided for the Debtor

17  -- by the Debtor.

18       And our backup plan, a big part of that included the

19  transition, and it still includes the transition of those

20  employees to Newco.  We are in active negotiations and believe

21  that Newco, once those employees are terminated on the 28th,

22  they will be able to perform their same duties on March 1st of

23  this year.

24       And so we expect those services to happen.  In the

25  interim, we've prepared for and have contingency plans in

APP 4956

Norris - Direct                              140

 1   place in order to do all that we need to do.  We have systems

 2   and servers that are set up in an SEC-compliant manner.  We

 3   are operating on a new email system.  We have our files --

 4   Q    Let's go --

 5   A    -- that are essential.

 6   Q    Let's go step by step here so that the judge --

 7   A    Yeah.

 8   Q    -- has a very clear picture of what all is involved.  So

 9   I'm going to try to break it down.  I think both you and Mr.

10   Seery talked about back-office and middle-office services.

11   What are those?  What does that refer to in the industry?

12   A    Yeah.  So, back-office -- back-office and middle-office

13   includes HR, IT.  Accounting is a big part of that back-office

14   services.  And in regards to our funds, it is the oversight of

15   the accounting process on a day-to-day basis and on a monthly

16   and quarterly basis, for annual reports, for audits.  It's the

17   day-to-day valuation services that are provided to our funds.

18   And so those are the key functions.  It's legal and compliance

19   as well --

20   Q    So let's --

21   A    -- the Debtor has been providing for our funds.

22   Q    Let's go step by step.  So let's assume that I'm -- I want

23   to invest in your fund.  In a retail fund, pardon me.  Am I

24   able to pop up daily or almost instant information regarding

25   its assets, its valuations, et cetera?

APP 1957

Norris - Direct                      141

1   A    Yes.  So, most of our --

2   Q    Is that -- is that --

3   A    -- funds --

4   Q    Is that part of what you were just describing about

5   valuation and accounting services on a real-time basis?

6   A    Yes, it's part.  It's more of the oversight function.

7   Q    Okay.

8   A    We outsource the daily processing and NAV-striking, or the

9   actual accounting, day-to-day accounting, to an outside third

10  party called SEI.  And the Debtor had provided oversight

11  function as well as valuation services for that daily

12  accounting process.

13  Q    Okay.  So the Debtor, for accounting, wasn't actually

14  crunching the numbers every day; it'll -- supervising third

15  parties.  And that's been the historical norm, correct?

16  A    That's correct.  I actually --

17  Q    Now, let's --

18  A    -- years ago filled that function.

19  Q    Okay.  So let's -- so how are we, the Advisors, today,

20  compensating for the lack of the Debtor's back-office and

21  middle-office services, or how are we transitioning from that

22  today?

23  A    Yeah.  So, a key part of that is the transition to Newco,

24  right, and as well that is planned for next week.  However, in

25  the interim, we have very good plans and processes in place.

Norris - Direct                          142

1    We have -- on the accounting front, on a day-to-day basis, we

2    have added our key personnel, our accounting teams, which has

3    been actually bulked up in recent years.  We have a number of

4    publicly-traded REITS that have SOX-compliant processes and

5    procedures.

6        And the CFO of our real estate platform, Brian Mitts, used

7    to be the principal financial officer of all of these funds.

8    He continues to be and operates as the principal financial

9    officer for one of them, or had been throughout all of this

10   time, and is a participant in all of the board meetings and

11   regular valuation processes.  In addition, he has a team of

12   accountants.

13       And so they are now copied on all the day-to-day

14   accounting emails from our third-party providers.  They have

15   been for several days.

16       In addition, as a backup measure, we hired on a consulting

17   basis the former senior accounting manager who worked until

18   April of about two years ago for the Debtor, providing these

19   same services to our funds.  And so, on a contract basis, he's

20   there as needed.

21       In addition, we have received from the Debtor a list of

22   employees, if they're needed, that we could hire.  There's

23   about seven of them in the accounting and operations

24   functions.  They gave us permission last week to do so.  And

25   one for valuation.

Norris - Direct                                    143

1    So, those functions, if they're needed in the interim

2    period before Newco is in place, we'll have those.

3        In addition, from an IT perspective, which is an important

4    part here, they maintain -- the Debtor maintained our systems

5    and servers.  We have contracted --

6    Q   Let's not -- let's not -- we'll talk --

7    A   Yeah.

8    Q   We'll talk about -- we'll talk about IT momentarily.

9    A   Yeah.

10   Q   You mentioned -- so you just discussed accounting.  What

11   about -- and I think you -- did your discussion right now

12   include transition of the valuation services?

13   A   Yeah.  So, in that regard, --

14   Q   Okay.  What about -- what about -- what about legal,

15   transition of legal services and compliance, regulatory

16   compliance?

17   A   Yeah.  That -- as I had mentioned before, the services we

18   had been receiving from the Debtor have slimmed down

19   dramatically, and particularly around legal services.  We

20   still had been receiving significant support from Lauren

21   Thedford, who is a very reliable team member of the Debtor.

22   She was also serving as an officer of the funds, of our funds,

23   until Friday, when she resigned.  But we have in place with

24   SEI, they provide admini... regulatory and legal admin

25   services to us, and have all along.  They're prepared to step

Case 3:25-cv-02072-S   Document 154   Filed 06/06/25   Page 981 of 1017   PageID 3444

Norris - Direct                          144

1   up in her absence.

2      And also K&L Gates, who already serves as advisor counsel

3   and fund counsel, is set and has been already picking up the

4   slack and prepared to do anything that Lauren was doing.  She

5   is a valuable team member.  We hope that as we transition to

6   Newco that she'll be able to, as mentioned earlier, step back

7   on as an officer of the funds.

8   Q    Now let's talk about IT, information technology.  What

9   services was the Debtor providing to the Advisors in the

10  nature of IT under the shared services agreements?

11  A    Yeah.  So, our IT equipment, our computers, our screens,

12  were their property, or at least that's -- that's the --

13  that's what -- it's in their name.  Not all of it, but some of

14  it.  In addition, they provide IT support.  So if we have an

15  IT problem, we need to call the IT guy, they provide that.

16  They provide support for the servers.  They own the servers.

17  They own the system.  Or at least that's what -- that's what

18  their -- their claim is.  And so they provide all of those

19  kind of IT functions for us, or had until this past weekend.

20  Q    Does that include email?

21  A    That's right.  They -- they --

22  Q    Does that include -- hold on.

23  A    We have a number of --

24  Q    Hold on.  Hold on.  Does that include Internet -- does

25  that include Internet connectivity?

APP 1961

Norris - Direct                               145

1   A    It included the Internet connections at work.  It included

2   the phones.  It included our emails and email servers and the

3   --

4   Q    What about --

5   A    -- domain that, even though they're in our names -- yeah.

6   Q    That's what I was going to ask next.  What about domain

7   names?  How are those handled?

8   A    They have claimed that those are theirs as well, that the

9   domains we use for our websites and for our emails are theirs.

10  Q    Okay.  And what about electronic data, just a wealth of

11  internal books and records, kind of corporate data?  Did the

12  Debtor provide --

13  A    Yeah.

14  Q    -- any services with respect to that?

15  A    Yeah.  So, they retain all of the data that we use on

16  their networks and servers, and all of that is stored on

17  shared drives and on their system or on the computers that are

18  owned by them.  And so even though they're our books and

19  records, I believe you read earlier the provisions of the data

20  provision, and so that is all stored on their systems.

21  Q    Okay.  So we just kind of discussed the universe of the IT

22  services that the Debtor provided.  Did we miss anything or is

23  that kind of the stuff that really matters?

24  A    I think that -- I think that covers the --

25  Q    Okay.

APP. 1962

Norris - Direct                        146

1   A    -- the main items.

2   Q    How is that being handled by the Advisors today, or how is

3   that -- or has it been transitioned from the Debtor?

4   A    Yeah.  So, largely, we are handling it on our own and

5   through a third-party provider.  So, we have bought and

6   purchased our own domain names.  We've transitioned our emails

7   to those new domain names.  We have made copies of our data,

8   or a lot of our data.  There's still some stuff we need.  But

9   our essential data.  And we have transitioned to a new server

10  and systems that are -- that are secured and perform through

11  this third party who does this for a number of asset managers,

12  for endowments.  And the way he has set it up is in an SEC-

13  compliant matter.  So, dual authentication.  All of the things

14  that you would expect from a security standpoint are in place.

15  And we are operating starting on -- we were mirroring for a

16  couple weeks, but on our own beginning on Saturday, when the

17  shared services were terminated, and have been sending those

18  emails from those -- the new systems and servers.

19  Q    So that was going to be my next question.  Is it that we

20  just did this (snaps fingers) Saturday like that, or did we

21  actually have a mirroring in place for quite some time?

22  A    Yeah, we have for -- been working on this for multiple

23  weeks with the outside IT service provider, and it's been done

24  in phases.  And so we've been -- we had a certain small

25  portion of the people start early, they tested it out, and

Norris - Direct                                147

1  then we rolled it out more broadly over the last couple of

2  weeks.

3  Q    Who is that third-party IT provider?  What was that --

4  A    Siepe.

5  Q    Is that -- that's not proprietary information, is it?

6  A    It's not.

7  Q    Okay.  Who is the third-party provider?

8  A    It's Siepe.  And they're a outsource --

9  Q    Well, let me -- let me -- let me --

10  A    -- provider --

11  Q    Let me --

12  A    Yeah.

13  Q    Let me direct you.  Will you please spell Siepe?  I'm not

14  even sure how to spell it.  And then tell the Court what Siepe

15  is and what it does.

16  A    Siepe, it's S-I-E-P-E, and I believe it's Italian for

17  hedge, and they are an outsourced IT and IT development

18  provider.  And it was actually started by a former member of

19  -- a former employee of Highland about a decade ago, I

20  believe.  He spun out and created his own firm.  And they do

21  this for a number of asset managers, including for Highland.

22  So they understand our systems.  They understand their

23  systems.  They're intimately familiar with what we need.

24  They've been servicing our Advisors for years and have created

25  a lot of the connections that we have with outside service

Norris - Direct                                148

1  providers.

2  Q    This ain't their first rodeo?

3  A    No.  I would think -- it would be -- have been challenging

4  to do it without Siepe, and -- but they were able to execute

5  very quickly because they knew and were already operating with

6  us for years.

7  Q    So can investors, clients, in these funds today get on the

8  Internet and get whatever information they were able to get a

9  week ago, can they still get that today regarding their

10  investments?

11  A    Yes, they can.  And I would add one other thing here,

12  important, is the investors, all of their books and records

13  and the data related to our advi... to our funds, the

14  accounting data and the client data, are held at third

15  parties.  So we have a third-party transfer agent that has all

16  of the information on client records.  That is -- they don't

17  come to us for their client statements.  They go to our

18  transfer agent.

19      In addition, our accounting functions, those data and

20  files are all on their systems.

21      And so as far as we're talking about data and what they

22  can come to us, they never come to us for their systems and

23  their data.  If they want to know what the value is, they can

24  go to Morningstar.com or Yahoo Finance and see daily the

25  pricing of our funds, which are published daily, even

Norris - Direct                          149

 1  yesterday, published there for them.  But their actual client

 2  data is held at third-party administrators.

 3  Q    The point being, do you, other than maybe a change in the

 4  email address, the point being do you think that investors or

 5  clients or customers are even aware of the transition away

 6  from the Debtor in the last few days?

 7  A    Based on business interaction --

 8           MR. MORRIS:  Object to the form of the question.

 9           THE COURT:  I'm sorry, was there an objection?

10           MR. MORRIS:  There is an objection.  To the extent

11  the question is asking for what other people think or believe

12  or perceive, I think that's improper.  No foundation.

13           THE COURT:  All right.  I sustain.

14  BY MR. RUKAVINA:

15  Q    Have you received any complaints from investors or

16  customers or clients in the last few days about their ability

17  to do anything with respect to their investments?

18  A    Not that I'm aware of, no.

19  Q    Okay.

20           THE COURT:  All right.  Mr. Rukavina, it's about

21  1:00.  How many more minutes do you have?

22           MR. RUKAVINA:  I don't think I have more than ten

23  minutes, Your Honor.  Fifteen minutes, tops.

24           THE COURT:  Okay.  Well, we need to take a lunch

25  break, so we're just going to break here.  It is 1:00 o'clock.

APP 4906

Norris - Direct                    150

1   I'm advised that my 1:30 matter is going to take maybe ten

2   minutes.  So we will convene -- let me get a clarification.

3       If we reconvene at 1:45, Mike, do we need to hang up?  Do

4   we need to terminate this and --

5            THE CLERK:  Yes.  We need to terminate this because

6   she's already gotten one set up at 1:30, the other one.

7            THE COURT:  Okay.

8            THE CLERK:  So they could probably just call in to

9   that one.  We just need to get them the information.  Let me

10  see if I can contract Traci, see what the best way.  Because,

11  like I said, we've already got one for them.

12           THE COURT:  Okay.

13           THE CLERK:  So this one is going to end.

14           THE COURT:  All right.  So just stay, I guess,

15  connected.  Is that what you're saying?

16           THE CLERK:  Yes, stay connected.

17           THE COURT:  Yes, stay connected.  We'll come back at

18  1:45.  And my staff will let you know if by chance we need to

19  terminate this and reconnect.  But I think you can just stay

20  connected.  Operate under that assumption for now.

21      All right.  So I will see you at 1:45.

22           MR. MORRIS:  Thank you, Your Honor.

23           THE CLERK:  All rise.

24           MR. POMERANTZ:  Thank you.

25      (A luncheon recess ensued from 1:01 p.m. to 2:14 p.m.)

Norris - Direct                    151

1           THE COURT:  Mr. Rukavina was examining Mr. -- I was

2    about to say Dustin -- Mr. Norris.  So, are you ready to

3    proceed, Mr. Rukavina?  You said you had a few more minutes.

4           MR. RUKAVINA:  Your Honor?  Pardon me.  Your Honor,

5    I'm ready.  Mr. Norris, can you hear me?

6           THE WITNESS:  Yes, I can.  Thank you.

7           THE COURT:  All right.  Mr. Norris, I'll remind you

8    you are still under oath from your prior swearing in.

9        All right.  You may proceed.

10          THE WITNESS:  Thank you.

11                  DIRECT EXAMINATION, RESUMED

12   BY MR. RUKAVINA:

13   Q   Mr. Norris, I think before we broke we rounded off a

14   discussion about the previously backup/now-operational plan

15   for IT and electronic data.  I'd like to move on now to office

16   space.

17   A   Okay.

18   Q   What is the current status and plan for the Advisors to

19   have office space, both for their current employees and for

20   the Newco employees?

21   A   Yeah.  So, from our perspective, we've been in talks with

22   an organization that's willing to sublease a space that is

23   approximately -- close to our current space.  And that is the

24   current plan.

25       In the interim period, all of our employees are working

Norris - Direct                         152

1   remotely, and are doing so without any major issues.  They're

2   able to -- in this COVID environment, fortunately, there are

3   systems and processes that have already been built out and

4   we've been able to transition to that without any issues.

5   Major issues.  Without any major issues.

6   Q   Is there any temporary office space available this week

7   for, you know, meetings or anything that might have to happen

8   in-person?

9   A   Yeah.  So, I'm actually sitting in a temporary office

10  space for a meeting.  A company we have a relationship with is

11  allowing -- and -- office space here.

12  Q   Okay.  What about hardware, like computers, routers, all

13  of that stuff you testified earlier, most of which was the

14  Debtor's property that I'm taking it we left on the Debtor's

15  premises when we vacated Friday?  What's the status of --

16          MR. MORRIS:  Your Honor, objection.  Again, I don't

17  know what the testimony is and the references to "we".

18  There's no -- there's no evidence in the record that anything

19  was left behind.  There's no evidence of any of this.

20          MR. RUKAVINA:  I'll start again, Your Honor.

21          THE COURT:  All right.  Sustained.

22  BY MR. RUKAVINA:

23  Q   Mr. Norris, you've heard Mr. Dondero testify or Mr. Seery

24  testify that the employees of the Advisors that were onsite at

25  Crescent Court vacated.  Did you hear that testimony?

002742
APP. 1089

Norris - Direct                              153

 1   A    Yes.

 2   Q    Is that accurate testimony?

 3   A    That is accurate.  We all moved out by the end of day on

 4   Friday.

 5   Q    That's Friday, the 19th of February?

 6   A    Correct.

 7   Q    Did any employees, to your knowledge, or did you see

 8   anyone take any equipment, machinery, et cetera, that was not

 9   property of the Advisors?

10   A    Yeah.  So, we were informed that we would have access to

11   the systems, as they testified to earlier, until today.  So we

12   held onto those.  They never told us they needed our laptops.

13   They never told us to leave our stuff, or their stuff.  And so

14   we're prepared to provide those and return those.  And we are

15   actually operating now independent of those IT resources,

16   being laptops, et cetera, and screens.

17        So, there were a number of laptops that were assigned to

18   us that we purchased just in the last few months, about 15 of

19   them.  A number of screens as well.  We took those, and those

20   continue to be used.

21        For essential personnel, we had, over the last several

22   weeks, purchased additional laptops.  As you know, laptops --

23   you may know laptops are in short supply, and so we ordered

24   them for the essential people that did not have a computer at

25   home, so that they could be operating.  Those were outfitted

APP 1979

Norris - Direct                        154

1    and ready, many of them picked up last week, some picked up

2    this morning.  And those that didn't have a laptop ready, we

3    ensured that they had home access and are able to log in

4    through the cloud.  So, all of our systems are hosted by AWS,

5    which is an Amazon system, set up so that we can remote login

6    through a VPN connection.  So, our employees are able to

7    access their email and our systems through there.

8    Q    Okay.  To the extent any of the Advisors' employees are in

9    possession of computer equipment that belongs to the Debtor,

10   will that be returned promptly?

11   A    Yes.  As they request it, it will be, yes.

12   Q    Okay.  Have the Advisors offered to purchase for cash

13   money those used laptops and other equipment?

14   A    We have, yes.

15   Q    Did the Debtor accept?

16   A    It was part of our, as we referred to earlier, a slimmed-

17   down proposal over the weekend, which was very minimal, and it

18   included the laptops.  And we offered a sum for that, and the

19   OMS system.  The sum we offered was $300,000, and we also

20   offered to take one hundred percent of the OMS invoice going

21   forward, and offered the Debtor to continue using that, as we

22   know they -- we believe they may or may not need use for it.

23   But we offered that over the weekend, and they simply

24   responded with, We don't even know why you need this.  And the

25   answer was their offer was still on the table, with no access

1  to Jim, and the whole agreement.

2  Q    So, the Debtor wouldn't negotiate on an *a la carte*

3  purchase?

4  A    No.  We offered, actually, last Thursday as well, once we

5  had received the -- kind of the -- Wednesday or Thursday, I

6  can't remember the exact date, after the court filing had been

7  made, for a small, very slimmed-down, which was primarily the

8  OMS and certain data items, which they came back with some

9  counters which weren't workable.  And then again, throughout

10 the weekend, I worked all day Saturday.  They said they would

11 be willing to consider a slim-down, but send them an

12 agreement, and -- something that Jim Dondero had explicitly

13 agreed to.  And we spent all day, discussed with Jim, and sent

14 them to them Sunday morning, to which they -- they did not

15 agree to.

16 Q    Okay.  Did they counter, or did they just say no?

17 A    I think that the -- the counter was the offer from Friday,

18 and I can't remember which one it was.  But there was a

19 counter, but it was not what Jim had authorized.

20 Q    Okay.  Let's move onto the third-party software that we

21 discussed before, Bloomberg, OMS, or Oracle.  What is the

22 current status of that vis-à-vis our transition plan?

23 A    Yeah.  So, from a trading perspective, trading has been

24 done outside of OMS in the past, right?  And if you look at --

25 it's not as easy.  There's also -- so, we have a manual

Norris - Direct                          156

 1  process in place that we're able to, and that we've tested,

 2  that we're able to perform from a trading perspective, where

 3  our traders interface directly with the brokers, where they're

 4  able to manually input the trade.  They're able to be

 5  communicated to our custodians and our accountants, and then

 6  that is able to be settled manually.

 7      So, that's not ideal.  We would like to have an order

 8  management system.  That said, I know there's discussions with

 9  the Debtor, more employees of DSI, about getting copies of

10  their OMS for the data that is ours within the OMS, or

11  allowing us to get that data in order to actually enter into

12  an agreement separately with Bloomberg, which we've been

13  discussing with Bloomberg.  And Bloomberg is willing, with

14  their approval, to get that copy and set it up without any

15  setup fees for us, and we would have a new instance of that

16  OMS.

17      Separately, there are some other free off-the-shelf OMS

18  solutions that our outside service providers have said they

19  can quickly implement.  And so it's just determining based on,

20  really, the events today, and the discussions going on on the

21  OMS, what our path forward is.  But we have a plan, which

22  we're executing on, to execute trades.

23      As the Debtor said, they are still providing access to our

24  -- their systems through the end of the case today.  And I

25  think, as Mr. Seery said, there's -- they still see trades

APP 1073

Norris - Direct                              157

1   going through the system.  That's at their goodwill, and I

2   think that's great.

3       But the OMS is an area of continued focus.  Again, we have

4   a plan to go forward or without it, but ideally we would have

5   a smooth transition there.

6   Q   So, if the OMS purchase -- the OMS system can't be

7   purchased from the Debtor, you mentioned a potential agreement

8   with Bloomberg where a new OMS system would be purchased or

9   built?  Or explain more what you mean by that.

10  A   Yeah.  So, Bloomberg has -- and this is their software,

11  the order management system through Bloomberg -- but it has

12  been highly customized over many years and has our historical

13  data in there, our rules, our Advisors' rules set up that we

14  use for trading.  And so it would take several months for us

15  to go in and code exactly how we would like it.  However, my

16  understanding is there's a backup where Bloomberg, with the

17  authorization from the Debtor, could transfer the underlying

18  data and setup.

19      Or alternatively, like I said, we offered over the weekend

20  to pay them a monetary sum to take over the Bloomberg

21  contract, and not just the OMS, but others that I think it was

22  approximately $450,000 a year in ongoing costs we would take

23  one hundred percent of and still provide them access.

24  Q   Access for a fee or access for free?

25  A   Free.  Free of charge.

APP. 1074

1   Q    Okay.  So just so that the judge knows, are we able to

2   execute trades today?

3   A    Yes.

4   Q    Will we be able to execute trades tomorrow?

5   A    Yes.

6   Q    Will we be able to execute trades into the future until we

7   either purchase or develop an OMS electronic system?

8   A    Yes.

9   Q    And in the meantime, it's being done manually, I think you

10  said?

11  A    Yep, manually.

12  Q    And do you have confidence that the manual system is going

13  to be safe and accurate?

14  A    I do.  There's -- there is multiple people involved.

15  They've actually run tests -- not test trades, but actual

16  trades, over the last couple of weeks through this system.

17  And our trader has been trading for over two decades, and this

18  is a system he used years ago before we put in place the OMS.

19  There is some --

20  Q    Stop, stop, stop, stop, stop.  What system did he use

21  years ago?  I want you to be specific.

22  A    This manual system --

23  Q    Okay.

24  A     -- that we're using today.  We call it manual. It's a

25  direct with -- with a process that we used previously.

APP. 1075

Norris - Direct                          159

1    Q    Okay.  Thank you.  I just wanted that clarification.

2         Do we have -- the Advisors, that is -- do the Advisors

3    have insurance in place for whatever it's called in your

4    business, but for basically messing up a trade?  Whether it's

5    professional negligence or O&E or whatever it is.  E&O.

6    A    Yes.  Our funds have insurance that is through ICI, which

7    is a -- they do this specifically for investment companies.

8    So, we have a -- I think it's an errors and omissions

9    insurance that covers, for example, if there was a NAV error.

10   A NAV error is if a fund made a mistake.  In addition, we have

11   NAV error correction policies, where, if it's the Advisors'

12   fault, then the Advisor would have to kick in.  But the

13   Advisor has insurance as well, as well, to cover things of

14   that nature.

15   Q    What's the policy limit?

16   A    I believe it's $5 million.  I'm not certain, but I believe

17   it's $5 million.

18   Q    Okay.  So, over the course of the last several questions,

19   I've gone through kind of various processes and services that

20   the Debtor used to provide.  Have I missed anything big-ticket

21   that you feel is of importance?

22   A    As far as essential items, no.  There are some smaller

23   items like HR, which is recruiting and hiring, those types of

24   smaller things.  Cash management, communicating with

25   custodians, where those are smaller, minor items, but aren't

APP 1975

Norris - Direct                    160

 1   -- we're able to cover internally but you didn't mention in

 2   particular.  But those are -- those are the big items.

 3   Q   And do you have confidence or a lack of confidence that

 4   your backup plan, now the operating plan, is going to succeed?

 5   A   I do.  It's not the path that we all wanted to go down,

 6   right, as we wanted to have a transition.  We wanted to have

 7   all these systems and software, as evidenced by trying again

 8   to have the Bloomberg OMS through the weekend.  It's not going

 9   to be perfect, but I feel like we have everything in place to

10   do the job that we're required to do.

11       And we've tried to put in place, you know, controls to

12   mitigate risks wherever possible, and so I feel confident in

13   the plan.  I've spent weeks and weeks losing sleep,

14   coordinating, you know, stressing over these items as a backup

15   plan, in addition to trying to negotiate an agreement.  I've

16   had a team of senior people across our firm who are from each

17   area of our firm.  I have spoken with Debtor employees to

18   consider what additional risks do we need to consider.  And so

19   I think it's been very well-thought-out.  And I mentioned the

20   last several weeks, that was when, again, when it became an

21   earnest necessity to ensure we had something.

22       Prior to that, you know, in December and November, we

23   received a list of all agreements.  We reviewed a list of all

24   of our agreements, all the Debtor's agreements.  And so we

25   were thoughtful already then what we needed.  And so as we had

APP. 1977

Norris - Direct                          161

1    to then execute quickly, we knew exactly what was necessary

2    and what the Debtor was providing us.  And so, as well, with

3    this transition agreement, there's about a hundred or so

4    services in there, and discussing what were essential and what

5    were not, what we could enter into by ourselves and what we

6    couldn't.  And almost every one of them we could have entered

7    into ourselves.  We would have loved to -- and I think we

8    would have had a cost savings, and it would have been a

9    benefit to them -- to reach this broad agreement, but for the

10   one remaining issue that neither Jim would approve.

11       So, we tried.  We went through the, as I said earlier, a

12   thousand line items.  We negotiated, I believe, in good faith

13   all along the way.  Whenever -- an ultimatum was given to us

14   on Tuesday.  I continued pushing all the way through Friday,

15   all the way through the weekend, and this is what I wanted.

16   But along the way, we were preparing in every way for the

17   backup, because I have '40 Act registered mutual funds, I have

18   a board who's demanded it, and we were trying in every way to

19   be able to continue these services in the event that HCMLP

20   would no longer provide them.

21   Q    I think we've established that the Debtor will be

22   terminating the employees, some employees as of February the

23   28th.  Do you expect to hire those employees through Newco

24   come March 1?

25   A    Yeah.  So, to make an adjustment there, there are about

APP. 1978

Norris - Direct                           162

1    eight to ten employees that are investment professionals that

2    we would need to hire directly at our Advisor.  Earlier on in

3    the process, there was a question of whether we hire all

4    employees directly, whether Newco hires them, whether Newco is

5    owned by Jim or whether it's an independent business.  The

6    current plan, which has been the last couple of months, is

7    that Newco would be independent, they'd be run by an

8    independent management team.  We would -- we would be --

9    provide -- providing them or entering into a shared services

10   agreement.

11       And so our full understanding and expectation is that

12   those employees for Newco will be hired or anticipated to be

13   hired after they're terminated on the 28th.  All of that, I

14   know, is in negotiations, but I believe that is what the

15   Debtor is willing to do, and that those eight or ten employees

16   will be hired by us once they're terminated.

17   Q   So, approximately how many employees, through Newco or

18   directly, do you expect to hire on or about March 1?

19   A   I think there's approximately fifty or so.  I know that

20   the Debtor is considering adding, I believe, somewhere around

21   five to ten employees, or taking those.  I think we have -- we

22   have not heard or been told.  We've been asked -- we've asked

23   several times.  They haven't told us who those employees are.

24   But I think we have a pretty good idea.

25       But at this point, we think that the majority of the

APP 1979

Norris - Direct                          163

1   people providing services to us in the back office and middle

2   office, again, because they'll want -- I believe they'll want

3   or are going to be handful of front-office people that help

4   with private equity and winding down those assets.  But the

5   bulk, if not all, of the back-office personnel will transfer

6   over to Newco, with a handful of the investment professionals

7   to us.

8   Q   Do you have any concern or is there anything outstanding

9   that would give you concern that that will not happen on or

10  about March 1?

11  A   I sure hope it does, but one thing that may cause me --

12  maybe the only thing that may cause me concern is they have

13  twice moved back or maybe three times moved back the

14  termination dates.  Now clearly know that our plan is to

15  involve Newco and all those employees to continue providing

16  services.

17      In the event that happens, we're prepared to continue.

18  The items that we're covering in the interim period are the

19  essential items.  There's a number of services that -- that

20  Newco would provide that are not essential for the operations

21  of our funds.  They include things like tax services for our

22  advisor or the books and records of our advisor, like the HR

23  recruiting services.  You know, those could wait, or we could

24  contract them elsewhere.

25      And so -- but I do hope -- and our -- we don't anticipate

Norris - Direct                                164

1   any disruption here.  I know that they've said that Newco can

2   hire whoever they want.  I think that that's going to be

3   smooth and orderly.

4   Q   Well, so let me ask, let me ask -- I'm down to two or

5   three more questions, but let me ask a worst-case scenario

6   question.  Come tomorrow or come Friday, you realize that you

7   can't do OMS manually; for some reason, the Debtor doesn't

8   release its employees; all of your planning turns out to have

9   been inadequate, and essential functions are not able to get

10  done:  Are there third-party providers that could immediately

11  step in and provide basically every service that the Debtor is

12  currently providing to the Advisors in such an event?

13  A   There are.  I think the trading -- I think we have a good

14  plan.  But to your point, your promise, if we couldn't pull it

15  off or there were issues, you can outsource trading.  You can

16  outsource that.  It's not a turn-on-the-switch, but we do have

17  and have had discussions with service providers there.

18      In the end, if Newco didn't work out, there are other

19  service providers, which I know that people in our team and

20  the Debtor have talked to, to provide outsourced accounting

21  oversight.  There are -- there's multiple options.  We just

22  have not --

23  Q   So is it fair to say, is it fair to say that you have

24  currently a Plan B to your Plan B?

25  A   Yeah, well, there is, yes, but I feel very good about our

Norris - Direct                    165

1    current Plan B that we've implemented, to the extent I don't

2    think we're going to need that.  But if there is a lack of

3    cooperation for some reason, we do have other options to

4    outsource those services.

5    Q    Okay.  My final question --

6    A    Again, I don't anticipate -- I don't -- I don't -- I don't

7    think that's going to be the case, but --

8    Q    My final question, Mr. Norris.  This backup plan and now

9    the operational plan that you have, was it in any way

10   motivated, sped up, anything by the filing of this lawsuit?

11   A    No.  I think one thing the finalization -- the filing of

12   the lawsuit did was make us realize that the backup plan we

13   had been working on was absolutely needed.  I felt very good

14   about where we were at that point, and we were prepared to

15   move forward.

16        It did change that I, over the next six days, me and

17   several other of the critical employees that have been working

18   on the backup plan would be involved in preparing for this

19   exact situation.  Instead of continuing those discussions, I'd

20   rather be boots on the ground, dealing with my employees, the

21   senior management team and everyone else.  Luckily, you know,

22   after my deposition, before my deposition yesterday, I was

23   involved in how is everything going.  We had checkpoints and

24   touchpoints.  We had calls in the afternoon.

25        Fortunately, there were no significant issues, but there

Norris - Direct                                  166

1   were a lot of minor issues.  There were things that needed to

2   be approved or people had questions.  But that, I think, is

3   the only thing that changed here.  It's -- we had to -- now we

4   knew that, okay, they're going to pull the plug because of

5   this.

6       At that point, I was not expecting that really to happen

7   at that point, that that would be the issue.

8   Q   Well, Mr. Norris, --

9   A   But luckily, we had planned for it.

10  Q   Mr. Norris, if an allegation is made that it was the

11  filing of this lawsuit that somehow spurred us into taking our

12  responsibilities seriously, would you agree with any such

13  allegation?

14  A   No.  I would disagree.

15  Q   Thank you.

16          MR. RUKAVINA:  I'll pass the witness.

17          THE COURT:  All right.  Mr. Morris?

18          THE WITNESS:  I can't hear you.  I think you might be

19  on mute, Mr. Morris.

20      (Pause.)

21                      CROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q   Got it.  Can you hear me now?

24  A   I can, yes.

25  Q   Okay.  Super.  I have a few questions, sir.

Norris - Cross                              167

1    A    Yes.

2    Q    You spent a fair amount of time testifying about how

3    poorly the Debtor was performing under the shared services

4    agreements last October and November.  Do you remember that?

5    A    I remember I testified.  I wouldn't say it was some time,

6    but yes.

7    Q    You specifically mentioned the October and the November

8    time frame, right?

9    A    Correct.  I believe so.

10   Q    And you said that during that October and November time

11   frame, there were lots of conflicts of interest that were

12   arising; is that right?

13   A    I don't remember my specific wording, but if it's part of

14   the record, then yes.

15   Q    Uh-huh.  And you said that the Advisors weren't getting

16   the same level of services that they thought they were

17   entitled to; isn't that right?

18   A    That's correct.

19   Q    And you thought -- and the Advisors thought long and hard

20   about terminating, about taking the initiative and terminating

21   the shared services agreement, right?

22   A    I don't know if I used the word "long and hard", but yes,

23   we did consider and discuss the termination of the shared

24   services agreements.

25   Q    And the reason that you decided in October and November

Norris - Cross                         168

 1   not to do that is because you knew there was an order in place

 2   that prevented a Dondero-related entity from terminating an

 3   agreement.  Isn't that right?

 4   A    That's -- that's one of the reasons, yes.

 5   Q    That's the only reason you identified before; isn't that

 6   right?

 7   A    I believe so.

 8   Q    And that --

 9   A    That was a determining -- that was a make-or-break point,

10   yes.

11   Q    And it was a -- and that was false testimony; isn't that

12   right?

13   A    No.

14   Q    Well, just a month later, in December, the Advisors sent a

15   letter to the Debtor threatening to terminate the CLO

16   management agreement; isn't that right?

17            MR. RUKAVINA:  Your Honor, I'll object to that, it's

18   not in the evidence, and I'll object on the basis of the best

19   evidence rule.

20            THE COURT:  Response?

21            MR. MORRIS:  You can answer, sir.

22            THE COURT:  Response?

23            MR. RUKAVINA:  Your Honor, I didn't hear a response.

24            MR. MORRIS:  The witness is the executive vice

25   president of the Advisors.  The Advisors were the subject of a

APP. 1985

Norris - Cross                                        169

 1   preliminary injunction proceeding.  During that proceeding,

 2   against these very same Defendants, this letter was admitted

 3   into evidence where they -- where the Advisors did exactly

 4   what Mr. Norris said they would never do because they didn't

 5   think they had the authority to do that.  Mr. Norris is the

 6   best evidence right now, Your Honor.

 7           THE COURT:  Okay.  I overrule the objection.

 8           MR. MORRIS:  Your Honor, that's not --

 9           THE COURT:  I overrule the objection.  I remember the

10   evidence from the December hearing.  So he can answer.

11           THE WITNESS:  Yeah, so can you repeat the question,

12   just so I make sure I answer appropriately?

13   BY MR. MORRIS:

14   Q   Sure.  In December, the funds and the Advisors for which

15   you serve as the executive vice president, on, I think,

16   December 23rd, sent a letter to the Debtor threatening to

17   terminate, right?  Threatening to use what authority they

18   thought they had to go in and terminate the CLO management

19   agreements.  Isn't that right?

20   A   I was not involved in the drafting of the letter, but my

21   understanding is there was no threat.  It was -- and I believe

22   the letter even said, subject to court approval or stay or

23   process.  I would love for -- if there is a letter, if you

24   want to bring it up, but I wasn't directly involved with the

25   letter.

Norris - Cross                                    170

1   Q    And the Advisors didn't send a letter to the Debtor in

2   October or November saying, We want to terminate the agreement

3   subject to whatever you just said.  In fact, you concluded

4   that you couldn't do it because of the injunction, right?

5   A    Correct.

6   Q    Yeah.  You've spent an awful lot of time talking about

7   this operational plan that the Advisors have today.  It was a

8   much more modest plan during your deposition yesterday; isn't

9   that right?

10  A    I wouldn't --

11          MR. RUKAVINA:  Your Honor, I'll object --

12          THE COURT:  I'm sorry?

13          MR. RUKAVINA:  I object to that characterization.

14          THE COURT:  You object to --

15          MR. RUKAVINA:  Your Honor, I'll --

16          THE COURT:  -- the charac...

17          MR. RUKAVINA:  I'll withdraw that.  I'll withdraw

18  that objection, Your Honor.

19          THE COURT:  All right.  Go ahead.

20          THE WITNESS:  No, I answered the questions in the

21  manner that you asked them in the deposition.  I don't think

22  that you asked for detailed descriptions.  In fact, I know you

23  didn't.  And so there was a lot more than what I discussed in

24  my deposition yesterday.

25  BY MR. MORRIS:

Norris - Cross                          171

1   Q    Okay.

2   A    Nothing -- there's nothing that -- nothing that conflicts

3   with what I said yesterday.

4   Q    James Palmer was hired to provide accounting and audit

5   services yesterday on a contract basis, correct?

6   A    He was hired yesterday, yes.  And that was, yes, part of

7   the additional oversight for our accounting function.  We're

8   handling a lot of that internally, but Mr. Palmer was

9   experienced with our platform and with our funds, and we

10  thought it was prudent, in the -- if needed, to have somebody

11  on call.  And our board actually requested it.  And so that's

12  a -- you know, that is someone who we feel very comfortable

13  with providing those services.

14          MR. MORRIS:  I move to strike everything after "Yes,"

15  Your Honor.

16          THE COURT:  Sustained.

17  BY MR. MORRIS:

18  Q    Okay.  I'm going to ask you, sir.  This is cross-

19  examination.  I'm going to ask you leading questions that are

20  intended to elicit a yes or no answer.

21  A    Got it.

22  Q    Your counsel will have the opportunity to redirect if he

23  think it's necessary.

24          So, let me ask the question again.  Mr. Palmer was hired

25  by the Advisors to provide audit and accounting services

Norris - Cross                                    172

1  yesterday.  Isn't that correct?

2  A    No.

3  Q    Yesterday was his first day on the job.  Isn't that right?

4  A    He is a contract employee.  So we didn't hire him.

5  Q    Okay.  You did testify yesterday that yesterday was the

6  first day he was providing services that had been provided by

7  the Debtor.  Is that fair?

8  A    Yes.

9  Q    Okay.  And Siepe is another entity that the Debtor had a

10 -- that the Advisors had a prior relationship, right?

11 A    Correct.

12 Q    And you don't have an agreement with Newco today, do you?

13 A    Not yet.

14 Q    So, Newco is not providing any services today, right?

15 A    No.

16 Q    And you don't have office space today, right?

17 A    Not yet.

18 Q    Okay.  So, when the sun rose on Saturday morning, to use

19 the same analogy, I guess, you'd been kicked out of the house

20 and you had no place to go.  Is that fair?

21 A    No.

22 Q    Everybody's working remotely right now, right?

23 A    Yes.

24 Q    And the Advisors have no lease for any office space on a

25 long-term basis, right?

                        Norris - Cross                        173

1   A    No, but we've toured space and have a -- we are ready to

2   sign a sublease as soon as we're ready.

3   Q    Okay.  But you didn't have that as of Friday; is that

4   fair?

5   A    No.

6   Q    Okay.  And you -- and you're doing trading now on --

7   A    Actually, can I make a -- can I make a correction?  I --

8   you said you didn't have that.  I said we had done a tour, and

9   I had done a tour before Friday, and that we had a lot lined

10  up, and I had them asking us, Are you ready to execute, will

11  you be here Monday?

12       So, that was there.  Again, realizing we were going to be,

13  hopefully, the plan was to reach a full agreement with you,

14  but having that backup plan in place, not to sign a lease and

15  spend the money unless we knew we weren't going to be able to

16  be in the office space.  So that's why.

17  Q    All right.  So let me ask the question again.  As of

18  Friday, the Advisors had no place to go at the end of the

19  extended shared services period, correct?

20  A    I disagree with that.

21  Q    Okay.  They don't have an -- does the Advisors have an

22  address today?

23  A    We have an address, yes.

24  Q    Yeah?  Where is the address?

25  A    So, we -- we have been -- we have a -- so we have a -- our

APP. 1989

Norris - Cross                                        174

1    NexPoint Securities has an office on McKinney Avenue in

2    Dallas, which is where we -- we have an ability to send our

3    mail to and to have an office, which is where we intend to

4    actually be subleasing.

5    Q    Okay.  But you don't have a sublease today, and that

6    address isn't the address of the Advisors, right?

7    A    It is all but in place, waiting to not spend the

8    significant expenditure in the event that we could, which our

9    plan was to hope to reach an agreement.

10   Q    Okay.  And you're doing trades manually?  Do I have that

11   right?

12   A    It is -- we call it a manual process, but it involves like

13   -- there's a certain -- it doesn't involve the OMS system.

14   That's right.

15   Q    And when your operational plan is fully in place, would

16   you expect it to have an OMS system?

17   A    Yes.

18   Q    But your operational plan today doesn't have one of the

19   pieces that you expect it to have in the future; is that

20   right?

21   A    It has -- it has a usable option, but no.  We're close to

22   entering into an OMS, and that's not the long term.  Yeah.  We

23   aren't going to be doing a manual -- our manual process

24   forever.

25   Q    Yeah.  But you're very, very, very happy with your

Norris - Cross                                175

1    operational plan, right?  You're very proud of it?

2    A    Given the constraints we were working under, I feel it's

3    -- it is a plan that works.  Would I think that the

4    alternative with what we were negotiating would be better?

5    Probably.  Would it be better to have access to our systems,

6    to our computers, without having to turn them back into you?

7    Yes, absolutely.

8         So I don't remember the word you just used, but I think

9    very happy or very pleased, I wouldn't say that.  I would say

10   it is functional, it helps us do our duty and our job, and

11   we're going to get back to that ideal.  And the reason I

12   negotiated all the way through the week and all the way

13   through the weeks and all the way through the weekend is

14   because there was a better alternative, which was a negotiated

15   settlement.

16   Q    All right.  We'll talk about that in a moment.  But

17   notwithstanding the fact that there may have been a better

18   alternative, as of today the Advisors have adopted and

19   implemented an operating plan for the provision of all of the

20   same back-office and middle-office services that the Debtor

21   previously provided, correct?

22   A    To cover -- and I would say they do, yes.

23   Q    Okay.

24   A    Yes.

25   Q    And as of today, the Advisors are fully able to perform

Norris - Cross                                176

1   under their shared -- under their advisory agreements with the

2   funds; is that correct?

3   A    Yes.

4   Q    There is nothing the Debtor has done that has prevented

5   the Advisors from fully performing under their advisory

6   committee -- advisory agreements with the funds, correct?

7   A    It took great effort over the last several months, but no,

8   not that I'm aware of.

9   Q    Okay.  Other than access to the data, there are no

10  services that the Advisors need from the Debtor.  Is that

11  correct?

12  A    No, but the peaceful transition of the data is important,

13  right?  We have, as you mentioned, we have most of the data we

14  need, but the peaceful transition of the data and the files in

15  the systems -- not the systems, but the data backups of the

16  systems -- will be critical, yes.

17  Q    Okay.  But other than data, there are no services that the

18  Debtor needs to provide to the Advisors as of today, correct?

19  A    Not that I know of.

20  Q    And having been as involved in the process as you've been,

21  you would know if there was a service that the Debtor had to

22  provide to the Advisors today; isn't that right?

23  A    Yes.

24  Q    Okay.  And you don't know of any service that the Debtor

25  needs to provide to the Advisors as of today, right?

Norris - Cross                                177

1    A    I don't.  We mentioned data.  I think one of those --

2    well, I'll leave it as yes.

3    Q    Okay.

4    A    Yeah.

5    Q    Did you have this plan in place, this operational plan,

6    was that -- were all of the pieces in place last Tuesday

7    night?  No.  Withdrawn.

8         Were all of those pieces in place as of January 31st,

9    2021?

10   A    No.

11   Q    So is it fair to say that the Debtor didn't -- that the

12   Advisors did not have an operational plan that would permit

13   them to obtain all of the same services that the Debtor had

14   been providing under the shared services agreement as of

15   October -- as of January 31st?

16   A    No.

17   Q    They did have a plan in place at that time to get those

18   services?  Is that what you're saying?

19   A    Yes.  There was a plan, a Plan B.  It wasn't nearly what

20   Plan B is today because we've -- we've had multiple additional

21   weeks to ensure that everything's in place, but we had Plan B.

22   But at the time -- maybe I'll leave it there.  But at the

23   time, there was good faith negotiations up to that point,

24   where Plan A looked like it was going to happen.  And so that

25   was the full expectation with a backup plan which was not as

APP. 1994

Norris - Cross                          178

 1   intricate.

 2   Q    Did the Advisors ever inform the Debtor at any time during

 3   the negotiations that they had an operational plan pursuant to

 4   which it could obtain the same middle- and back-office

 5   services that the Debtor had been providing?

 6   A    If you include your Debtor employees, then yes.

 7   Q    Did you ever use it as a point of negotiation?  Did you

 8   ever try to tell the Debtor, you know, if you guys don't agree

 9   to our terms, we're going to walk away, because we've got this

10   fully-operational plan to get the same services that you guys

11   are providing?  You're not the only game in town?

12   A    I never used that kind of exact approach, no.

13   Q    Did you use any approach where you relied on the

14   operational plan as leverage to try to drive a better deal

15   with the Debtor?

16   A    No.  I don't think so.

17   Q    No?  Okay.  And fast-forward to that Tuesday night when

18   the Debtor said take the plan without Mr. Dondero or we're

19   going to sue you.  You remember that, right?

20   A    Yes.

21   Q    And every aspect of the agreement was in place except for

22   Mr. Dondero, right?

23   A    Except for his access to the office, --

24   Q    And the --

25   A    -- yes.

Norris - Cross                                179

1   Q    And the Debtor had told you time and time again, every

2   time it appeared in a document, they removed it, and they told

3   you every single time no access for Mr. Dondero, right?

4   A    No.

5   Q    Did you have any reason to believe that that was ever

6   going to change?

7   A    I did.  And I said no to your last question, right?  I

8   didn't say yes.  I said no to your last question, that --

9   Q    And did the Advisors make a decision to reject the

10  Debtor's offer for the sole reason that Mr. Dondero wouldn't

11  be permitted access?

12  A    That was the last point.  As mentioned, every other point

13  was agreed to.

14  Q    And why didn't the -- why didn't the Advisors -- did the

15  Advisors -- withdrawn.

16       Did the Advisors say to the Debtor, we get it, you're not

17  going to let Mr. Dondero in, but that's a line in the sand for

18  us?  But please, there's no need for a lawsuit.  We've got a

19  wonderful operating plan ready to go.  You're asking the Court

20  to force us to adopt and implement the plan, we have one right

21  here, so let's not litigate.  Let's just walk away and let

22  bygones be bygones.  Did you ever offer to get rid of the

23  lawsuit by showing the Debtor your plan?

24  A    We would have loved to have gotten rid of the lawsuit, but

25  I didn't see it until it was filed.  When the ultimatum was

APP 1906

 1   given, we had rolling blackouts.  My home didn't have

 2   electricity rolling from 2:00 a.m. on Monday until Thursday.

 3   And so by the time there was -- and everybody else, inclusive

 4   of our attorney, Mr. Rukavina.  And so to say that I -- I

 5   received it Thursday or Wednesday morning, when one of your

 6   employees forwarded it to us.  I hadn't seen drafts.  Maybe

 7   our counsel had.  But we didn't even have a chance to say, oh,

 8   let us -- let us pull this because we read what your report

 9   was.  The Advisors didn't even have a chance to respond.  At

10   least that is my understanding.  I never had a chance to

11   respond.  I never saw it.  Maybe counsel did.

12   Q    Well, you saw the lawsuit eventually, didn't you?

13   A    I did.

14   Q    Did you ever -- did the Advisors -- after you saw the

15   lawsuit, did the Advisors ever call up the Debtor and say,

16   hey, look, let's not litigate?  We have exactly what you want.

17   We've got this fully-operational plan that provides us with

18   everything we need.  You don't need to do anything further.

19   Did you ever say that to the Debtor?

20   A    No, because the back -- the -- we still wanted to reach an

21   agreement.  That was the goal.  And it was a surprise for us

22   to have a shock, we're going to pull this or we're going to

23   sue you on Tuesday evening.  And so, no, we still -- I -- and

24   that's why I negotiated and continued to work all the way

25   through the end of the week and through the weekend on

APP. 1987