**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

§

§ Case No. **19-34054-sgj11**

**The Dugaboy Investment Trust et al- Appellant**

§

vs.                                                           §

**Highland Capital Management, L.P.**
**Et al-** Appellee

§                          **3:25-cv-02072-S**

§

   **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**


# Volume 5

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.  **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2.  **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3.  **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4.  **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5.  **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6.  **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru Vol. 5*

*Vol. 5*
*003493*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

2

| | | | |
|---|---|---|---|
| *Vol. 5*<br>*00 3504* | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| *00 3519* | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| *00 3521* | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| *00 3530* | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6*<br>*00 3544* | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| *00 3909* | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| Vol 6<br><br>003912 | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| Vol. 7<br><br>003936<br>Thru END of Vol 14 | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| Vol 15<br><br>011840 | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

4

Vol. 15

011855

011864

011869

011874

| | | | |
|---|---|---|---|
| | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

Vol 15

|  | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
|  | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
|  | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
|  | 8/31/2022 | 3478 | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
|  | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

011877

012039

N/A
NO PDF
AVAILAble

012047

6

*Vol. 15*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

*012050*
*012077*
*Vol. 16*
*012079*
*012357*

7

| | | | |
|---|---|---|---|
| Vol. 16 012361 | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| Vol. 17 012363 | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| 012641 | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| Vol. 18 012697 Thru End of Vol. 21 | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| Vol. 22 016732 | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| 016737 | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| 016773 | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| 016809 | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

| | | | |
|---|---|---|---|
| *Vol. 22* | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *016827* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *016830* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *016855* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *016863* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *016865* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 23* *016867* *Thru end of Vol. 25* | 6/20/2025 | 4255 *(to be submitted to Clerk on flash drive)* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| *vol. 26*  *019524* | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| *019527* | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

| | | | |
|---|---|---|---|
| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 27*<br><br>*019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Professional Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28*<br><br>*020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *VOL. 28* *020266* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *VOL. 29* *020267* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *020271* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| *020282* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *020289* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29* 020296 | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| 020298 | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| 020300 | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| 020309 | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| 020311 | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30* 020407 | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

*Vol. 31*

| | | | |
|---|---|---|---|
| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020680* | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| *020696* | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| *020808* | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| *020830* | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| *020837* | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025

Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

***Counsel for Appellant The Dugaboy Investment
Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

Norris - Cross                               181

1   something, because I still felt like that was the better plan

2   for everybody.

3       I don't know why we had to be sued, I don't know why it

4   had to be urgent, because at that point we had been working

5   for weeks and months.  And the weeks -- really good.  And the

6   only difference was Jim Dondero's access.  And it was Tuesday.

7   And they didn't even ask us, you know.

8       Anyway, so that was -- I just -- I just disagree with your

9   characterization of the process.

10          MR. MORRIS:  I move to strike, Your Honor.  It really

11  is a very simple question.

12          THE COURT:  Sustained.

13  BY MR. MORRIS:

14  Q   Did the Advisors, after the commencement of the lawsuit,

15  did the Advisors ever tell the Debtor that there was no need

16  for litigation because the Advisors had a fully-operational

17  plan that they had adopted and were prepared to implement,

18  which is exactly what the Debtor was seeking from the Court?

19  A   I don't know.

20  Q   You're not aware of that, right?

21  A   I'm not.

22  Q   You don't -- you never thought that maybe we could avoid

23  this whole thing by just sharing with the Debtor this

24  operational plan that you've described in great detail, right?

25  A   Well, on Friday, I know you put in, in a response to our

Norris - Cross                                    182

1  board and Advisors, that you were made aware that we had a

2  plan that felt good, yet there was no consideration or

3  discussion on removing the lawsuit.

4       So, I'll leave that to what counsel happened, but I would

5  have loved to not be involved.  I'm not a legal expert.  There

6  were many attorneys involved.  I wish that if that were an

7  option, it would have been raised.  But here we are today.

8  Q   Sir, not only did the Advisors not tell the Debtor that

9  they had an operational plan that could avoid the lawsuit,

10 instead, the Advisors made proposals on Friday, one of which

11 did not even include having access to the office by Mr.

12 Dondero.  Isn't that right?

13          MR. RUKAVINA:  Your Honor, I object to that question

14 as it mischaracterizes the evidence.  The question began with

15 that the Advisors never told the Debtor that they had a backup

16 plan.  I think the witness --

17          MR. MORRIS:  Your Honor, --

18          THE COURT:  Okay.  Sustained.  Rephrase.

19          MR. MORRIS:  Yeah.  No problem.

20 BY MR. MORRIS:

21 Q   So, so to the best of your knowledge, the Advisors never

22 told the Debtor that they thought litigation could be avoided

23 because they had an operational plan.  Is that right?

24 A   That's my -- that -- yeah, that's right.

25 Q   Okay.  And instead, on Friday, the Advisors continued to

APP. 1989

Norris - Cross                                183

1   try to pursue an agreement with the Debtor.  Is that right?

2   A   I don't know about the "instead."  But, yes, we tried to

3   continue reaching an agreement.

4   Q   And are you familiar with the offer that was made by the

5   Advisors to the Debtor on Friday morning?

6   A   I am.

7   Q   Did you authorize the sending of that offer to the Debtor?

8   A   The request, yes.  Me and D.C. Sauter were involved with

9   counsel, so we -- we did -- we did.

10          MR. MORRIS:  All right.  Can we please put up on the

11   screen Exhibit 19?  Can we start at the bottom, please?

12   BY MR. MORRIS:

13   Q   So, are these the Options A and B that were presented to

14   the Debtor on Friday morning?

15   A   Based on the email, yes.

16   Q   Okay.  And Option B contemplated that the Advisors would

17   completely vacate the space by the end of the month, right?

18   A   Correct.

19   Q   And that's an option that you and Mr. Sauter authorized

20   the lawyers to send to the Debtor, correct?

21   A   Yes.

22   Q   Okay.  And you had that authority from Mr. Dondero, right?

23   Mr. Dondero gave you the authority to negotiate; is that

24   correct?

25   A   He gave me the authority to negotiate in those final

Norris - Cross                              184

 1   couple of days.  There were certain things he gave me

 2   authority to negotiate on.  And specifically -- and to things

 3   that shouldn't be included on this point, we discussed this

 4   beforehand as well.  But we had authority to negotiate.

 5   Q    And you had authority to make this proposal, right?

 6   Option B?

 7   A    Ultimately, no.

 8   Q    At the time you made it, you thought you had it, right?

 9   A    Yes.

10   Q    You weren't acting outside of what you knew to be your

11   scope of authority, were you?

12   A    No.

13   Q    Okay.  Did you discuss with Mr. Sauter these two options

14   before they were delivered by your lawyers to the Debtor?

15   A    Yes.

16        MR. RUKAVINA:  Your Honor?  Your Honor?  Hold on.

17   Your Honor, Mr. Sauter is an attorney.  He's in-house

18   counsel.  So I think that to the extent that they're

19   discussing business, that's not privileged.  To the extent

20   they're discussing legal strategy, that is privileged.  So I

21   would instruct the witness to be conscious of that --

22        THE COURT:  All right.

23        MR. RUKAVINA:  -- and to not disclose attorney-client

24   privileged communications.

25        THE COURT:  All right.

Norris - Cross                                    185

```
 1   BY MR. MORRIS:
 2   Q    Sir, did you discuss these two proposals with Mr. Sauter
 3   before it was delivered by your lawyers to the Debtor?
 4   A    Yes.
 5   Q    And did Mr. Sauter also agree with the substance of these
 6   two offers that were being presented to the Debtor?
 7            MR. RUKAVINA:  Mr. Norris, can you answer that
 8   question without invading the attorney-client privilege?
 9            MR. MORRIS:  I'm just asking about the offers.  I'm
10   not asking about any legal advice or anything.  I just want to
11   be that clear.
12            MR. RUKAVINA:  That's why I'm asking Mr. Norris.  If
13   they discussed business, I don't think we have a problem.  But
14   if they discussed legal strategy, I think it's a problem.  So
15   I think the witness just has to tell us whether --
16            THE WITNESS:  There --
17            MR. RUKAVINA:  -- they discussed business or legal.
18            THE WITNESS:  There -- there was a -- there was some
19   legal -- legal strategy as well, yeah.
20            MR. RUKAVINA:  Your Honor, I would -- I would ask
21   that that -- I would object to that question on that basis,
22   that it calls for the invasion of the attorney-client
23   privilege.
24            THE COURT:  All right.  I sustain.
25            MR. MORRIS:  I'll try -- I'll try and ask the
```

1   question again, then.

2   BY MR. MORRIS:

3   Q    Mr. Norris, did Mr. Sauter agree and authorize the sending

4   of these two proposals by the Advisors' lawyers to the Debtor

5   on Friday morning?

6   A    We both agreed with that approach.

7   Q    Okay.  And you both -- is it fair to say that you both

8   believed that you were acting within the scope of authority

9   that Mr. Dondero had given you?

10  A    We thought so, and -- well, I'm sure your questions will

11  lead me to the -- to the ultimate of what happened here, but

12  yes.

13  Q    Yeah.  And this proposal didn't permit Mr. Dondero back

14  into the Highland office space; is that right?

15  A    It didn't prevent him?  Is that what you said?

16  Q    Didn't permit him.  Didn't allow him.

17  A    Option A just above did and Option B did not.

18  Q    Okay.  So, you and Mr. Sauter, as the Advisors' designated

19  negotiators, authorized the Advisors' lawyer to present as

20  Option B an option that did not permit Mr. Dondero access to

21  the Debtor's offices, right?

22  A    Yes, but gave us full access to everything else.

23  Q    Okay.  It was really --

24       (Pause.)

25            THE COURT:  Uh-oh.

Norris - Cross                              187

```
 1   BY MR. MORRIS:

 2   Q    How does Option B -- how does Option B, if you know, --

 3   A    Sorry, you froze.  You froze there for a minute, I think.

 4            THE COURT:  Yes.  I think you did.

 5            MR. MORRIS:  No, I think I just paused.

 6            THE WITNESS:  Oh, you were just thinking?  Oh, that

 7   was really talented.  Wow.

 8   BY MR. MORRIS:

 9   Q    No, it's -- it's not that good.  Do you know how Option B

10   differs from the term sheet that the Debtor provided on

11   Tuesday night?

12   A    It would not include the access -- it wouldn't include

13   access to the office for anybody.  The, as it says there, the

14   Debtor would take a hundred percent of the lease.

15   Q    Okay.  So, it was going to be complete walkaway?  The

16   Advisors were going to completely walk away at the end of the

17   month, right?

18   A    Correct.

19   Q    And that was -- that was an offer that you believed you

20   were authorized to make to the Debtor, right?

21   A    Yes.

22   Q    Okay.

23            MR. MORRIS:  Can we go two emails up to Mr.

24   Hogewood's?  Oh.  Yeah.  The one at 12:04.  Yeah.

25   BY MR. MORRIS:
```

APP. 2904

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document   Filed 00/00/00   Page 25 of 790   PageID 3505
Main Document   Page 2025 of 2722   Page 25 of 790

Norris - Cross                                    188

1   Q   Were you aware that there came a time early in the

2   afternoon that the Debtor was informed that there may need to

3   be an edit to Option B, so they pulled that back for a bit?

4   A   I wasn't aware, no.

5   Q   No?  All right.  Do you have any knowledge as to what edit

6   Mr. Hogewood was referring to in his email there?

7   A   I don't.

8   Q   Okay.  Were you aware -- did you get a copy of Mr.

9   Hogewood's email?  Was it forwarded to you?  Do you know --

10  withdrawn.  Let me ask a better question.

11      Do you know if Mr. Hogewood delivered -- withdrawn.

12      Did you know on Friday morning that Mr. Hogewood had

13  delivered the two options, the two proposals, that you and Mr.

14  Sauter had authorized?

15  A   Yes.

16  Q   Okay.

17          MR. MORRIS:  Can we go up an email or two, please?

18  BY MR. MORRIS:

19  Q   And then Mr. Hogewood wrote back and he said that he was

20  authorized to put Option B back on the table, as stated above.

21  Do you see that?

22  A   I do.

23  Q   Do you know who authorized Mr. Hogewood to put Option B

24  back on the table?

25  A   I don't remember.  I don't know.  I wasn't on the chain.

Norris - Cross                                    189

1   Q    Okay.  But it's fair to say at this point in time, midday

2   on Friday, as far as you knew, your lawyer had communicated

3   Option A and Option B to the Debtor, and they were authorized

4   to do that, right?

5   A    Yes.

6   Q    Okay.  And did you learn subsequently that there was a

7   phone call between the lawyers for the Advisors and the lawyer

8   for the Debtor during which the Debtor indicated that it was

9   prepared to accept Option B?

10  A    I don't know, no, I don't know about that.

11  Q    You were never told that?

12  A    No.  Not that there was a phone call.

13  Q    Uh-huh.  Did you learn at any point on Friday that the

14  Debtor had accepted Option B, the Option B that you and Mr.

15  Sauter had authorized the Advisors' lawyers to make?

16  A    Yes.

17  Q    Okay.  So, there did come a time when you knew that the

18  Debtor had accepted Option B, right?

19  A    Yes.

20  Q    And are you aware that, after accepting Option B, the

21  lawyers discussed turning the agreement into a settlement

22  order to resolve the litigation?

23  A    No.  I wasn't aware of that.

24  Q    Are you aware that the lawyers were discussing plans for

25  the transfer of -- by wire of cash that would be due under the

Norris - Cross                                    190

1   agreement?

2   A    I was not.

3   Q    Okay.  After the Debtor accepted Option B, the Advisors

4   withdrew it, correct?

5   A    I don't know if we with... we did withdraw it, yes.

6   Q    And after it was presented, Mr. Dondero said that he

7   hadn't personally approved it, correct?

8   A    In the terms of which -- the actual offer, yes, that's

9   correct.

10  Q    So, Mr. Dondero, having given you and Mr. Sauter the

11  authority to negotiate, learned that the Debtor had agreed to

12  your proposal pursuant to which he wouldn't be allowed access

13  to office space and he made the decision to withdraw the

14  offer, correct?

15  A    I wouldn't agree with exactly the phrasing, no.

16  Q    Sir, Mr. Dondero is the person who decided that he had not

17  approved of Option B, and that's why it was retracted,

18  correct?

19  A    That's right.

20  Q    So, on Tuesday night, the Advisors had a fully-negotiated

21  agreement for the provision -- for the transition of all of

22  the back-office and middle-office services, but for access to

23  Mr. Dondero, correct?

24  A    Correct.

25  Q    And the only reason that didn't get signed is because of

002780

 1   that issue, right?

 2   A    That's my understanding, yes.

 3   Q    And the Debtor continued to negotiate with the Advisors,

 4   even after filing the lawsuit, correct?

 5   A    Yes.

 6   Q    The Debtor was never told that the Advisors had a fully-

 7   operational plan pursuant to which it had an alternative to

 8   obtain the same services, correct?

 9   A    That's incorrect.

10   Q    After negotiations broke down, is that the moment that a

11   reference was made to alternative plans?

12   A    No.

13   Q    Sir, on Friday, you personally reached an agreement with

14   the Debtor on Plan B, right?  You authorized the making of an

15   offer that the Debtor accepted, correct?

16          MR. RUKAVINA:  Your Honor, I'm going to object at

17   this time based on a legal conclusion.  The witness is not a

18   lawyer and he's not qualified to opine on whether an

19   agreement, which to me suggests is something binding and

20   enforceable, was ever reached.

21          THE COURT:  Response?

22          MR. MORRIS:  Your Honor, I'm not looking to enforce

23   any agreement, so let me try and restate and --

24          THE COURT:  All right.  Sustained.

25          MR. MORRIS:  -- address Mr. Rukavina's --

APP. 2008

Norris - Cross                                    192

1           THE COURT:  He'll rephrase.

2           MR. MORRIS:  Yeah.

3    BY MR. MORRIS:

4    Q    Even as late as Friday, after starting the lawsuit, you

5    had made an offer.  You had authorized the making of an offer

6    that the Debtor had agreed to again, correct?

7    A    I had auth... I had said we should -- yes, I had

8    authorized the offer and then your fax saying on the

9    acceptance.  I wasn't involved in the back-and-forth

10   communication among the attorneys.

11   Q    But you knew it was accepted, subject, let's say, subject

12   to the execution of definitive documentation.  How's that?

13   A    I was told that they were willing to take the offer.  And

14   so, yes.  And --

15   Q    And sometime later that day, it got pulled because of Mr.

16   Dondero, correct?

17   A    Correct.

18   Q    And even on Saturday, the Advisors made proposals on an *a

19   la carte* basis for the provision of services, correct?

20   A    Yes.  And we have made very similar *a la carte* provisions

21   on Thursday and Wednesday, which were also rejected by the

22   Debtor.

23   Q    And -- okay.  So it wouldn't have been the full kind of

24   deal that was contemplated in the term sheet; it would have

25   been a selection of very specific services.  Do I have that

APP. 2009

Norris - Cross                                    193

1  right?

2  A    That's right.  On Wednesday, it was Oracle and Bloomberg,

3  which was authorized by Mr. Dondero.  We were to offering to

4  continue with our offer to take over the lease and all the

5  other terms, or a slim-down, which would include no disputed

6  amounts or payments, which at that time I think we called Plan

7  B or Option B.  And that was -- I believe that was Thursday.

8  Or Wednesday night.  So, yes, those continued.  And then we

9  had a similar, very similar proposal again on Sunday, with the

10 same -- very similar services to what we asked for on

11 Wednesday night or Thursday.  And those were rejected both

12 times.

13 Q    And is it fair to say that the services that the Debtor

14 was seeking -- withdrawn.

15      Is it fair to say that the services of the Advisors were

16 seeking from the Debtor on Thursday, Friday, and Saturday were

17 services that the Advisors had not yet engaged anybody else to

18 provide?

19 A    The two -- we already talked about Bloomberg and where our

20 status is there.  And on Oracle, it would be a nice to have

21 instead of transitioning, and that is more for the Advisors'

22 books and records and would be nice to have.

23 Q    So, --

24 A    Yes.

25 Q    Okay.  You have a Plan B for the new operational plan.

Norris - Cross                                    194

1   Did I hear that part right?

2   A    As I mentioned -- oh, I said our operating plan was a

3   hypothetical from -- from Mr. Rukavina, that in these other

4   events fall through, are there other people that you could

5   hire to do these services?  And I said yes.

6   Q    Okay.  So if any part of the operational plan fails, the

7   Advisors would look to third parties to provide, you know,

8   whatever service they wouldn't obtain and they wouldn't look

9   to the Debtor to provide any services, correct?

10  A    That's correct.

11  Q    Is it fair to say that, other than access to the data, the

12  Advisors will never seek any services of any kind from the

13  Debtor going forward?

14  A    As we sit here today, I believe your employees are set to

15  have three more operating business days and then will be

16  terminated, those -- the employees that services our accounts.

17  So, with the expectation that Newco will be formed, I have no

18  expectation we'll be asking for any significant services,

19  other than data, transfer of emails, et cetera.

20  Q    Well, that's a pretty qualified answer.  What do you mean

21  by no significant services?

22  A    Most of them -- well, the data, emails, et cetera, are all

23  minor items, and I think they're -- you say data, but I think

24  there's -- there's a handful of things that probably fall

25  under that data and books and records that are what I'm

Norris - Cross                                        195

1   talking about, yes.

2   Q   You know, one of the things that the Debtor is very

3   concerned about here is having no future obligation.  The

4   Debtor -- do you understand that the Debtor believes that it

5   has terminated the shared services agreements as of Friday?

6   A   I do, yes.

7   Q   Do you understand that, other than the data that it holds,

8   the Debtor wants the comfort of knowing that it has no future

9   obligations to the Advisors of any kind, other than to provide

10  access to the data?

11  A   Yeah, that's fair.  Yes, I understand that.

12  Q   As the executive vice president of the Defendants, as the

13  executive vice president of the Advisors, can you, under oath,

14  give the Debtor comfort that the Advisors will not look to the

15  Debtor for any services of any kind after today?  Other than

16  the access to the data?

17  A   Data and books and records, yes.

18  Q   Okay.  So access to data and books and records is the only

19  thing that the Advisors will look to the Debtor for at any

20  time in the future after today; is that fair?

21  A   I would say it's not fair, because to say there's not

22  other significant -- insignificant or minor items -- as Mr.

23  Dondero testified, there's usually a smooth transition.  I

24  don't anticipate there will be significant items that would

25  take a lot of your time or we need to invade you, but I would

APP 2912

Norris - Cross                                    196

1   hope there would be a fair and orderly transition.  And I

2   can't predict the minor items, but I don't think -- I can't

3   envision anything significant.

4   Q    Do you believe, as the executive vice president of the

5   Advisors, that the Debtor has an obligation to perform any

6   services for the Advisors after today, other than giving

7   access to the data and the books and records?

8   A    No.

9   Q    What happens if Newco isn't formed?  Is there any scenario

10  that you're aware of where the Advisors would look to the

11  Debtor for any services in the event that Newco is not formed?

12  A    No.  Not that I'm aware of.  I don't know.  I don't think

13  so.

14  Q    I think you mentioned earlier about the transfer of data.

15  What does the Debtor need to do, from your perspective, in

16  order to transfer the data and the books and records?

17  A    We need the Debtor to authorize its IT director to

18  transfer the data.  We stand by ready.  I sent an email to

19  your IT team asking for him to get the required approvals on

20  Friday morning, and our -- CFA, the outsource team, stands by

21  ready, at our cost, to transfer any remaining data.

22      So we just need you and Mr. Seery and -- to authorize the

23  free transfer of data.  Not necessarily you, but Mr. Seery,

24  and then your IT team and your employees can feel comfort.

25  Because over the last few weeks they have not provided any

APP. 2013
002786

Norris - Cross                                    197

1    data or any assistance providing data because they're

2    concerned.  They're concerned about their liability, they're

3    concerned about things that the Debtor has told them.  And so

4    I just -- if you and Mr. Seery can tell them any data that is

5    -- I mean, yeah, we're prepared to send a request of what we

6    need, but they need Mr. Seery, because he has been holding

7    that over them.

8    Q    And what data are you referring to specifically?

9    A    Yeah.  We're talking about historical emails, emails that

10   are held in what's called the vault.  It is files in our

11   systems.  We've been able to copy, we think, most of what we

12   have, but there is a number of records.  We would like a copy

13   of the database that backs up home (phonetic).  We'd like a

14   copy of the Bloomberg OMS, which I mentioned before.  The data

15   that backs up our data.  Just a backup copy.

16        And there's a number of other items which we'll request,

17   but these are all very simple items that don't take very long.

18   I would imagine, with proper approval, and almost no work from

19   your end, maybe your one IT guy, these can be transferred in a

20   very efficient, effective, quick manner, most of it this week

21   or within a couple days.

22   Q    Okay.

23            MR. MORRIS:  I have no further questions, Your Honor.

24            THE COURT:  All right.  Redirect?

25            THE WITNESS:  Thank you, Mr. Morris.

Norris - Redirect                              198

1           MR. MORRIS:  Thank you.

2                    REDIRECT EXAMINATION

3    BY MR. RUKAVINA:

4    Q    Mr. Norris, you mentioned that Debtor employees knew of

5    our backup plan.  Give some more specificity, meaning how and

6    why you think they knew that and who did you talk to about

7    that and when.

8    A.   Yeah.  So, the individuals authorized to discuss with me

9    were David Klos, Frank Waterhouse, Brian Collins, and J.P.

10   Two of those individuals are members of the -- well, one's

11   still an officer, two or both were officers of our funds.  And

12   so in our discussions as well throughout, I mentioned, hey,

13   we're working on backup plans.  There were aspects of those

14   they couldn't be involved in because they were negotiating for

15   the other side.  But they were aware that we were working on

16   things.

17        In addition, Mr. Seery represented they knew we were

18   taking data off or copying data off the system, leaving it all

19   on their system, and that we were backing up emails and that

20   we were working on a backup plan.

21        So I don't think it was a surprise to anybody.  Their IT

22   team knew and was very aware.  We purchased new domains.  We

23   requested domains.  We even had requested if they would

24   forward domains to ours, which I think the answer was no.  If

25   they would forward emails.

APP 2015

1    And so I don't think there was any surprise that there was

2  backup planning going on.  And so there were discussions.  It

3  wasn't -- we didn't discuss the details.  We didn't discuss

4  the details because we were entered into a negotiation with

5  millions of dollars at stake, and if I show or we discuss all

6  of our alternative plans, then there is less ability to

7  negotiate.

8  Q    Okay.

9        MR. RUKAVINA:  Mr. Vasek, if you will please pull up

10  that letter that I sent you.

11  BY MR. RUKAVINA:

12  Q    Okay.  If we have to scroll down, Mr. Norris, we can, but

13  are you familiar with this letter from the Debtor's attorneys

14  to the boards and us the evening of February 19th, Friday?

15  A    I am.

16  Q    Okay.  Is this the letter that you referenced when Mr.

17  Morris was asking you about why we didn't just tell the Debtor

18  that we had a backup plan and therefore we could dismiss this

19  litigation?

20  A    I believe so, yes.

21  Q    Okay.

22        THE COURT:  Is this an exhibit?

23        MR. RUKAVINA:  No, Your Honor.  I'm about to move for

24  its admission.  Your Honor, I'd ask that this be admitted as

25  my Exhibit O.

Norris - Redirect                    200

```
 1              THE COURT:  All right.  Any objections?

 2              MR. MORRIS:  Sorry.  No, Your Honor.

 3              THE COURT:  All right.  It'll be admitted.

 4         (Advisors' Exhibit O is received into evidence.)

 5              MR. RUKAVINA:  And Your Honor, we will --

 6              THE COURT:  You'll have to supplement the docket with

 7    it.

 8              MR. RUKAVINA:  Thank you.  We will.

 9              THE COURT:  Okay.

10              MR. RUKAVINA:  Mr. Vasek, if you'll please scroll

11    down to Page 3 of 4, the paragraph that begins, "During the

12    course of this conversation."  Actually, the next paragraph

13    that says, "We understand."

14    BY MR. RUKAVINA:

15    Q    Do you see that there, Mr. Norris?

16    A    Yes.

17    Q    Okay.

18              MR. RUKAVINA:  What is that there, Mr. Vasek?  I'm

19    seeing a square.  Okay.

20    BY MR. RUKAVINA:

21    Q    So that paragraph begins, "We understand, based on this

22    conversation, that HCMFA and NPA have made arrangements to

23    obtain the resources they need to provide the services on a

24    continuous and seamless basis to their clients, including the

25    registered investment companies to which they serve as
```

002790

Norris - Redirect                          201

 1   investment advisor.  We plan to proceed with our request for a
 2   mandatory injunction at the February 23rd, '21 hearing."  And
 3   then it keeps going.
 4       Did I read that accurately?
 5           MR. MORRIS:  Can you please --
 6           THE WITNESS:  Yes.
 7           MR. MORRIS:  -- keep going, because I think it's
 8   important?
 9           MR. RUKAVINA:  Well, you get to ask him next.
10   BY MR. RUKAVINA:
11   Q    Did I read that accurately, Mr. Norris?
12   A    Yes.
13   Q    Okay.  So tell me, then --
14           MR. RUKAVINA:  Well, strike that.  I'll move on.
15       You can leave that up, Mr. Vasek, if Mr. Morris needs to
16   use it.
17   BY MR. RUKAVINA:
18   Q    Now, do you recall you were asked about that Option A and
19   Option B from last Friday, and Option B had been withdrawn?
20   Do you recall that?
21   A    Yes.
22   Q    And do you recall that, under that Option B that was
23   withdrawn, that the Debtor accepted that Mr. Dondero wouldn't
24   be on the premises, right?
25   A    Yes.

APP 2018

Norris - Recross                                    202

1  Q    Okay.  But would NexPoint have been on the -- on the

2  premises?

3  A    No.  No.

4  Q    So, under both Option A and Option B, would Mr. Dondero

5  have been with his employees?

6  A    Yes.

7  Q    Okay.

8          MR. RUKAVINA:  I'll pass the witness.  Thank you.

9          THE COURT:  Recross?

10          MR. MORRIS:  Can we put that exhibit back up on the

11  screen, please?

12                    RECROSS-EXAMINATION

13  BY MR. MORRIS:

14  Q    First of all, sir, you have no idea what was discussed in

15  the conversation that's referenced in the first sentence,

16  correct?

17  A    I don't.  I was not a part of it.

18  Q    Okay.  Do you know if the Debtor in this instance was

19  trying to hold the Advisors' feet to the fire?

20  A    Again, I was not part of the conversation.

21  Q    So you don't know the motivation for sending this letter;

22  is that fair?

23  A    I don't.

24  Q    Can you read out loud the letter -- the --

25          MR. MORRIS:  I can't see it, actually.  Can you just

1   push it down a little bit, because I've got the little box in

2   the upper right corner?  No, the other way.  I'm sorry.  Yeah.

3   Perfect.

4   BY MR. MORRIS:

5   Q    Do you see -- can you read out loud the sentence that

6   begins, "We plan to proceed"?

7   A    (reading)  "We plan to proceed with our request for a

8   mandatory injunction at the February 23rd, 2021 hearing and

9   hope that we can submit to the Bankruptcy Court a consensual

10  order incorporating HCMFA's and NPA's acknowledgment of

11  HCMLP's right to terminate services under the shared services

12  agreement as provided for herein and their commitment to

13  provide services to their clients on a go-forward basis."

14  Q    So in fact, as of -- do you know when this -- do you know

15  when on Friday this letter was sent?

16  A    I don't know the time.

17  Q    Okay.  It's -- it's -- based on what you just saw, the

18  reference to the conversation, is it fair to say that this

19  occurred after the Debtor was informed that the Advisors were

20  withdrawing Option B?

21  A    I believe so.

22  Q    Right.  And here, in fact, the Debtor is asking the

23  Advisors to join it in providing a consensual order that would

24  resolve this motion, right?

25  A    I don't know.  They're -- it said, "hope that we can

Norris - Recross                        204

1  submit a consensual order incorporating HCMFA's and NPA's."

2  This was sent to our counsel.  So it was hoping that counsel

3  would agree to that, yes.

4  Q    Well, counsel is not going to agree to anything without

5  the client's authorization; --

6  A    Correct.

7  Q    -- is that fair?

8  A    Correct.

9  Q    And did the Advisors ever authorize their counsel to try

10  to negotiate a consensual order?

11           MR. RUKAVINA:  Your Honor, I object to that.  That's

12  clearly attorney-client privilege.

13           THE COURT:  Sustained.

14           MR. MORRIS:  All right.  I'll ask a different

15  question.

16  BY MR. MORRIS:

17  Q    Did the Advisors ever engage in negotiations with the

18  Debtor over a consensual order, as was offered by the Debtor

19  in this letter?

20  A    I defer to legal counsel on that.

21  Q    Okay.  You're not aware of any such negotiations, right?

22  A    I know there were discussions, particularly around our

23  plans over the weekend, where there were offers of something

24  related to the lawsuit.  Removal or what -- I don't know the

25  specific terms, but there were offers made, and I deferred to

Norris - Recross                         205

1   counsel on that.

2   Q   But we're here today because there is no consensual order

3   pursuant to which the Advisors would present their plan to the

4   Court and state specifically that the Debtor had no further

5   obligation, correct?

6           MR. RUKAVINA:  Your Honor, that's an irrelevant

7   question.  And again, it's litigation strategy and attorney-

8   client privilege.  And we're here today on a mandatory

9   injunction.

10          THE COURT:  Sustained.

11          MR. RUKAVINA:  Not because --

12          THE COURT:  Sustained.

13          MR. MORRIS:  Withdrawn.  I have no further questions,

14  Your Honor.

15          THE COURT:  All right.  That concludes Mr. Norris's

16  testimony.  Thank you.

17          THE WITNESS:  Thank you, Your Honor.

18          THE COURT:  All right.  What else do you have, Mr.

19  Rukavina?  Your next witness?

20          MR. RUKAVINA:  I have nothing further, Your Honor.

21  The Defendants rest on this motion.

22          THE COURT:  All right.  Mr. Morris, anything further

23  from you?

24          MR. MORRIS:  No, Your Honor.  I'm prepared to proceed

25  to closing argument.

206

1            THE COURT:  All right.  I'll hear it.

2               CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

3            MR. MORRIS:  Okay.  Your Honor, thank you for taking

4    the time to listen today.  We regret that we had to come down

5    this path, but the Debtor felt that it had no choice at the

6    time that it filed the action.

7        We think the evidence conclusively establishes that the

8    Debtor had the contractual right to terminate the shared

9    services agreements.  It exercised that right.  It exercised

10   that right after putting the world on notice that it wouldn't

11   be providing shared services after a specified period of time.

12       The Court is fully familiar with the Debtor's plan of

13   reorganization, the asset monetization plan, the downsizing of

14   employees that was expected.  And it was the Debtor who had

15   concerns about the funds, the investors, the marketplace, and,

16   frankly, the Debtor's ability to implement its own plan of

17   reorganization, as Mr. Seery so fully testified to.

18       You know, trying to do the right thing here, the Debtors

19   extended the termination date by a couple of weeks.  They

20   engaged in earnest negotiations.  I don't think there is any

21   dispute at all that the parties actually reached an agreement

22   on every single business term, every single business term,

23   except Mr. Dondero's insistence for access to the Debtor's

24   offices.

25       I think the Court is familiar with the record in this

207

1  case.  There's already an injunction in place barring him from

2  the Debtor's offices.  The reasons for that are also familiar

3  to the Court.  I don't think the Debtor was at all

4  unreasonable in taking the position that it did.

5       They did what they could, but they came to a point where

6  they couldn't continue to provide services consistent with the

7  plan of reorganization that had been presented to the Court.

8  And in order to avoid the substantial risk of being impeded

9  from executing on its plan, in order to avoid the substantial

10  risk that would have occurred had it simply exercised its

11  right and walked away -- the risk of market disruption, the

12  risk of potential involvement by the SEC -- it had no choice

13  but to file this lawsuit.

14       And honestly, Your Honor, for the life of me, I don't know

15  why they didn't try to use this wonderful operating plan as

16  negotiating leverage.  I've never heard of such a thing.  But

17  that's their choice.  We're not here today because they failed

18  to do that.  But had they done that, this lawsuit wouldn't

19  exist.

20       Had Mr. Dondero not injected himself on Wednesday and

21  decided that his access was more important than the rest of

22  it, we wouldn't be here today.

23       Had the Advisors said, when we gave them the take-it-or-

24  leave-it option on Wednesday, we're leaving it, thanks for the

25  effort, we tried hard, this stuff means a whole lot to us, but

208

 1   we have a great plan here, let's not litigate, there's no

 2   reason to do this, we wouldn't be here today.

 3       We wouldn't be here today had they not withdrawn Option B

 4   on Friday.

 5       I don't think -- again, this is summary judgment

 6   territory.  There's no dispute about the facts.  There's no

 7   dispute that, for the fourth time, the reason that we're here

 8   is because Mr. Dondero completely undermined the people who he

 9   had authorized to negotiate on behalf of the Advisors and the

10   lawyers who did diligent work, who tried very hard to bring

11   this to fruition, who were engaged in negotiations, as the

12   record shows, not just getting to a deal but going further and

13   preparing settlement documents, preparing wire transfers, only

14   to have the rug pulled out from under them again.

15       The Debtors had no knowledge of any plan whatsoever for

16   the transition of services.  I think -- I have respect for Mr.

17   Norris.  I think that he overstates things, but that's okay.

18   Everybody's allowed to -- their perspective.  But clearly,

19   there's a lot of pieces to that operating plan that aren't in

20   place.  But here, at the end of the day, Your Honor, we don't

21   care.

22       What we want to do is complete the divorce, as Mr.

23   Hogewood said.  And I've got a proposal now that, you know, I

24   hope will be acceptable to both the Court and to Mr. Rukavina.

25   And the proposal would be to allow us to submit to Your Honor

209

 1    by the end of the day tomorrow a proposed form of order that

 2    will contain a limited number of factual findings and will

 3    render this motion moot.  And it would be moot because the

 4    Advisors have now put into evidence an operational plan that

 5    they have -- that they are committed to.  They have said on

 6    the record that they no longer need any services of any kind

 7    from the Debtor, except access to the data, and we would be

 8    good with that.  We would be prepared to just say this is moot

 9    because of the operational plan that Mr. Norris described in

10    such great detail.

11        I don't want to burden the Court with a lot more.  I think

12    that that's a way to just resolve this to the satisfaction,

13    really, of everybody.

14        I'll just briefly say on the jurisdictional issue and the

15    arbitration, because they are issues out there, it's

16    inconceivable that the Court doesn't have jurisdiction here.

17    This matter concerns the Debtor greatly.  You know, we're here

18    precisely because we need the relief that we requested

19    initially, and that -- and that, apparently, the -- that was

20    the adoption and the implementation of a plan so that the

21    Debtor knew it would have no further liability.  It was the

22    Debtor's plan of reorganization that was at issue here, its

23    ability to downsize in the way it told this Court and its

24    creditors that it would do.

25        So I don't think -- I don't think there's a question of

210

 1   jurisdiction at all.

 2        And with respect to arbitration, you know, I'll note,

 3   firstly, of course, that the Advisors, they filed the claim

 4   against the Debtor.  They didn't move to lift the stay.  They

 5   haven't relied on the arbitration clause when -- when it's

 6   good for them.

 7        But more importantly, Your Honor, I don't think a motion

 8   of this type in particular is the subject of any arbitration

 9   provision.  It only applies to one of the agreements, as I

10   understand it, in any event.  But it's the arbitration clause.

11        This isn't about the interpretation of the agreement.  I

12   don't think there's any dispute about the Debtor's right to

13   terminate.  I don't think there's any dispute about any, you

14   know, language in the agreement.  There's no interpretive

15   provision of the agreement that we're talking about here.

16   What we're -- all we're talking about is making sure that, you

17   know, the Debtor wouldn't be taking on a potential liability.

18   And I've gotten comfort from Mr. Norris that we're not,

19   because, you know, Mr. Norris said that the Debtor -- that the

20   Advisors can fully perform under the advisory services

21   agreement, that there's nothing that the Debtor did to prevent

22   the Advisors from fully performing under the Advisors'

23   agreement, that they don't need any services from the Debtor

24   going forward.  And I think that's -- that really is what I

25   think appropriately does render this motion moot.

211

1        And what I would propose, again, just to be clear, is that

2    we could give a proposed order to Your Honor tomorrow at the

3    end of the day, give Mr. Rukavina until the end of the day

4    Thursday to make whatever edits he believes are appropriate,

5    and then Your Honor will do whatever Your Honor thinks is

6    best, as always.

7             THE COURT:  All right.  Well, while I like the

8    concept, and I haven't heard from Mr. Rukavina yet, I'm really

9    worried about false hope that you would prepare something, Mr.

10   Rukavina would be fine, and I'd simply sign it without much

11   time spent on it.

12       Let me start with this.  You said the order, it would be

13   something like an order resolving the motion.  It'll contain

14   certain findings of fact, you said, such as the Advisors have

15   an operating plan, the Advisors need no services from the

16   Debtor going forward except access to data.  Okay.  Would I

17   really get an order that has 14 additional findings, and if

18   so, what would those be?

19            MR. MORRIS:  I think we would just go through -- I

20   don't think that there's really any dispute as to these facts.

21   There would be no findings in there about, you know,

22   withdrawal of Plan B or we gave them an ultimatum or any --

23   there would be nothing like that, Your Honor.  It would simply

24   be:  The parties were signatories to shared services

25   agreements.  The Debtor exercised its right of termination.

212

1   The parties have agreed to extend the termination date twice.

2   The Debtor -- the Advisors have prevented -- I'm doing this

3   off the top of my head, of course -- but the Advisors have

4   prevented -- has -- have prevented -- presented uncontroverted

5   testimony that they have an operational plan pursuant to which

6   they will obtain all of the back-office and middle-office

7   services that were previously provided by the Debtor.  And in

8   case there's any failure in their plan, they have got

9   alternative arrangements with third parties and won't look to

10  the Debtor in the future for any services of any kind other

11  than the retrieval of their data.  I think that's about what

12  it would say.

13         THE COURT:  Okay.  My next question is this:  Are we

14  going to have a fight in a few days about the retrieval of the

15  data issue?  I mean, I just heard Mr. Norris say it was a no-

16  big-deal exercise, that the Debtor just needed to make its IT

17  director available and they would be standing ready to receive

18  it, and he made it sound like a no-big-deal task.

19         MR. MORRIS:  Yeah.  I guess my hope is that we would

20  be able to iron out that last wrinkle, but I think the

21  solution to that is to simply say, if the parties have a

22  dispute on that narrow issue, they come back to the Court,

23  that the Court has continuing jurisdiction to resolve any

24  dispute over -- I think it was the provision that Mr. Rukavina

25  had put up on the screen, I forget, I think it was with Mr.

APP 2029

213

1    Dondero, where the Debtor has some obligation with respect to

2    books and records.

3         THE COURT:  Well, and Mr. Seery said earlier today

4    that the Advisors can have access to the records and data, but

5    not 24 hours a day and not without a cost.  So is that going

6    to be an issue, the cost?

7         MR. MORRIS:  You know what, I have just I guess one

8    other alternative that I'm just thinking off the top of my

9    head.  Maybe put in some type of third-party neutral who can,

10   you know, to the extent that it's even necessary, and I hope

11   that it won't be because I think we've gotten a lot of

12   assurances about the lack of services that are needed going

13   forward, but perhaps we can -- perhaps the Court can appoint

14   some third party who would take the burden off of the Court of

15   any future dispute and try to resolve it that way, you know,

16   with the parties splitting the cost.  That's an alternative.

17        THE COURT:  All right.  Mr. Rukavina, what do you

18   say?

19        MR. RUKAVINA:  Your Honor, I'd like to give a

20   closing, please.

21        THE COURT:  Yes.

22         CLOSING ARGUMENT ON BEHALF OF THE ADVISORS

23        MR. RUKAVINA:  And please understand, Your Honor,

24   this is going to be a difficult closing for me to give because

25   I'm going to be rather blunt.  My bluntness should never,

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 1-5nt FileReg 03/20/25 of 2720ge 51 of 790   PageID 3531

214

1   never substitute my deep respect for this Court and for

2   bankruptcy courts and for bankruptcy jurisdiction.  I'm a

3   bankruptcy nerd.  Hopefully Your Honor knows that.  And my

4   closing is also going to be made a little bit more difficult

5   because I honestly don't understand why we're here today.

6       We are here in a lawsuit, not a negotiation before the

7   Court.  Mr. Morris and I had days to negotiate, we spoke, and

8   we didn't reach an agreement.  We are here on a six-day notice

9   mandatory injunction where now the Debtor wants to have some

10  order with some findings.  We are here today on a motion for a

11  mandatory injunction that compels my client to do something

12  where we're not told what it is to do.

13      We are not here today, Your Honor, on Count One, their

14  declaratory relief that they've terminated appropriately and

15  done nothing wrong.  We're not here today on that.  It is

16  inappropriate to make any findings on that.  That issue will

17  be resolved in due course.

18      We're not here today on any future duties.  I heard the

19  record, too.  I heard the evidence.  I can't imagine there

20  being any future duties.  But that is an advisory ruling that

21  we're not here on today.

22      So, again, we are here today on whether my client is going

23  to be enjoined to do something.  And the reason why we will

24  not agree to that --

25          THE COURT:  Can I stop you?  What I hear from the

215

1   Debtor is, in light of everything we have all heard the past

2   seven hours, and apparently things the Debtor was not

3   expecting to hear -- that is, we're ready to cut it off

4   tomorrow, today; all we need is the data -- he's happy to say,

5   okay, my request for an injunctive -- a mandatory injunction

6   is moot now.  I'm not asking the Court for that.

7       So, you know, I feel compelled to start with the pragmatic

8   possible resolution of this.  Why --

9           MR. RUKAVINA:  Your Honor?

10          THE COURT:  Why is that not an acceptable way of

11  resolving this?  He doesn't --

12          MR. RUKAVINA:  Because --

13          THE COURT:  He doesn't need an injunction, he says,

14  if we can have an order.

15          MR. RUKAVINA:  It's not -- Your Honor, I would then

16  humbly submit that why doesn't he withdraw his motion?  I

17  mean, the problem that I have, Your Honor, is that anything

18  that I agree to is going to submit my clients' internal

19  business affairs to this Court's oversight.

20      I think Your Honor asked very important questions.  What

21  happens in two or three days' time if something happens?  What

22  about these findings?  I am -- I think that this whole motion

23  is moot, but I am very worried that even a finding of mootness

24  is an exercise of jurisdiction over my clients' internal

25  affairs.

APP 2022

216

1      What I think the Court should do is dismiss this motion --

2  I'm sorry, deny this motion without commentary, without

3  findings, without conclusions.  There's still Count One and

4  Count Two which will be resolved in due course.  And you know

5  what?  If my client messes up somehow in this transition --

6  not to mention that my clients are highly reputable, they're

7  governed, they're regulated, there's other people looking at

8  this -- they can come back to Your Honor.

9      But please understand my perspective, please understand my

10  clients' perspective, because I think it's important.  We have

11  been hauled in front of this Court on allegations that we have

12  willfully failed and refused to adopt and effectuate a plan.

13  The allegations here are extreme.  They've been shared with

14  the creditors.  They've been shared with our boards, who knew

15  about this all along.  They've been shared with the SEC.

16  They've been shared publicly.

17      So I am glad that the record is now clear that these

18  allegations were baseless when made, but even if they were

19  made in good faith, they are baseless today.

20      But I don't even want the Court exonerating my clients'

21  plan.  I don't want the Court commenting on the wisdom of my

22  clients' plan.  Because we will not agree, as a nondebtor

23  party, with all respect, Your Honor, to have this Court take

24  any oversight over our affairs.  It'll lead to some future

25  dispute, some future contempt, some future sanctions, and

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document Filed 06/26/25    Page 54 of 790    PageID 3534
Main Document    Page 16 of 273

217

1   that's just not something that we as nondebtors are going to

2   consent to.

3        The Court doesn't have jurisdiction.  The Court doesn't

4   have core jurisdiction.

5        But let's put all that aside.  The four elements of an

6   injunction, Your Honor.  Where is any evidence of harm?  Mr.

7   Seery did not --

8             THE COURT:  You know what?  As long as we're not

9   going to have a consensual order here, we need to take the

10  issues you've raised, starting with subject matter

11  jurisdiction.  Okay?  If I don't have consensus, I've got to

12  examine my own subject matter jurisdiction.

13       So, on that point, do you say I apply the Fifth Circuit's

14  pre-confirmation test of bankruptcy subject matter

15  jurisdiction or post-confirmation test?

16            MR. RUKAVINA:  Your Honor, the plan has --

17            THE COURT:  Okay.  I signed the confirmation order,

18  but it's one day old.  It's still appealable.  And it's

19  nowhere close --

20            MR. RUKAVINA:  Your Honor?

21            THE COURT:  -- to going effective, I fear.  So, under

22  either test, tell me why I don't have subject matter

23  jurisdiction first.

24            MR. RUKAVINA:  I would like to argue that the pre-

25  confirmation -- that the post-confirmation test applies, but I

218

1   can't, in good faith.  The plan has not gotten -- gone

2   effective.  There still is an estate.  So, as of today, I

3   think Your Honor is dealing with the pre-confirmation

4   jurisdiction, --

5           THE COURT:  Okay.

6           MR. RUKAVINA:  -- which is definitely broader.

7           THE COURT:  Okay.

8           MR. RUKAVINA:  There is no jurisdiction, because you

9   have heard no evidence of any effect on this estate as a

10  result of this injunction being issued or not issued.  Mr.

11  Seery had every opportunity to be asked about harm,

12  interference, how does this affect the reorganization?  He did

13  not give you any.  This does not increase --

14          THE COURT:  Well, what I think I heard, and I may be

15  mixing up written pleadings, declarations, versus what he said

16  today, but what I know I heard in either the papers or his

17  oral testimony today was that the Debtor is worried about

18  exposure to liability from who knows who.

19          MR. RUKAVINA:  Okay.

20          THE COURT:  The investors in the private funds or

21  someone else for not having a smooth transition plan here and

22  cutting things off on February 28th without knowing there's a

23  plan.  Okay?  So if the estate is exposed to potential

24  liability, is that an impact on the estate being administered,

25  per *Wood v. Wood*?

219

1          MR. RUKAVINA:  Of course it is, Your Honor.  But we

2     have to go to evidence.  That's not in the evidence.  That's

3     in the brief that they filed.  It is not in Mr. Seery's

4     declaration.  It is conclusory.  It is not evidence.  There is

5     no evidence today of anyone that could sue the Debtor.  I have

6     no idea of anyone who could sue the Debtor -- pardon me --

7     regarding this.

8          THE COURT:  He did say in testimony he was worried

9     about the SEC if this was not done right.

10         MR. RUKAVINA:  Well, Your Honor, with due respect,

11    his worry is conclusory and his worry does not rise to an

12    effect.  He didn't tell you that the SEC has investigated or

13    is threatening anything.  It's a purely hypothetical worry.

14    So I do not think that Your Honor has even related-to

15    jurisdiction now that Your Honor has heard all of the

16    evidence.

17         Now, let me be clear.  Your Honor has jurisdiction over

18    Counts One and Counts Two in this lawsuit, subject to

19    arbitration, right?  That's the declaratory action as to

20    whether they terminated correctly.  That's a legitimate

21    exercise of jurisdiction.  And their monetary claim for unpaid

22    amounts:  Clearly, the Court has jurisdiction.  All I'm

23    talking about is whether the Court has jurisdiction to enjoin

24    a nondebtor party to do something.  Not -- not to not do

25    something, not a status quo injunction, but a mandatory

220

1  injunction.

2      And you have heard no evidence, Your Honor, no nexus as to

3  how the injunction that Your Honor has been asked to order is

4  going to affect the estate.  None.

5          THE COURT:  Okay.  But you say a nondebtor third

6  party.  It's not just any nondebtor third party.  Among other

7  things, it's a counterparty to executory contracts that the

8  Debtors say, you know, we either terminated these during the

9  case or they're deemed rejected, and we're wanting some

10  cooperation from the counterparty.

11      I mean, doesn't that give --

12          MR. RUKAVINA:  Okay.

13          THE COURT:  -- subject matter jurisdiction, because

14  we're talking about a counterparty to an agreement that would

15  have been governed by 365?

16          MR. RUKAVINA:  I think, Your Honor, if there is some

17  duty in those contracts or some duty in the law to act in a

18  particular manner upon termination or rejection, there would

19  be jurisdiction.

20      But just like when Your Honor ruled against us in December

21  -- Your Honor said, I find nothing in this contract that

22  provides for such a duty -- there's nothing in these contracts

23  that provides any obligation on my client.

24          THE COURT:  That is a different agreement.  That was

25  a different agreement, for the record.

002810

221

```
 1          MR. RUKAVINA:  Fair enough.

 2          THE COURT:  That was --

 3          MR. RUKAVINA:  Your Honor, fair enough.

 4          THE COURT:  That was the CLO agreements that your

 5   clients were not parties to.

 6          MR. RUKAVINA:  But Your Honor asked the right

 7   question then, and that's still the right question:  Point me

 8   to some statutory or contractual right for what you want.

 9   They have not pointed you to any.

10      So, yes, hypothetically, if these agreements -- let's just

11   assume that these agreements required post-termination good-

12   faith unwinding.  There would be jurisdiction.  But these

13   agreements don't provide any of that.  The only thing that's

14   provided is that, post-termination, the Debtor shall promptly

15   return to us our property.  And that -- there's no problem

16   with that.  We trust that the Debtor -- we heard Mr. Seery --

17   the Debtor's not going to mess that up.  It'll be done quickly

18   and painlessly, I hope.

19      That's not what they're asking for.  They're asking for

20   Your Honor to tell my client how to conduct its internal

21   business affairs, and there's nothing in these contractual

22   rights.

23      So, hypothetically, let's just assume that the Court has

24   some related-to jurisdiction.  Okay.  It's still not core

25   jurisdiction.  And these contracts have been terminated, Your
```

222

1    Honor.  There is no live contract.  No one has shown you any

2    statute or regulation that governs.  So, that's jurisdiction.

3        The same fact of no harm, the same fact of no right, goes

4    to the elements of an injunction, recalling that a mandatory

5    injunction requires a much greater, much clearer burden.

6    Again, Mr. Seery did not testify as to any harm.  He said he

7    was worried about the SEC and he said something like it might

8    make plan implementation more difficult.  Again, conclusory

9    allegations.  Those are not -- that's not evidence of

10   immediate and imminent injury.  It is certainly not evidence

11   of irreparable injury, and it is certainly not evidence of a

12   nonmonetary injury.

13       So, again, I ask -- I understand Your Honor has been in

14   this case for a long time.  I understand Your Honor has been

15   in the Acis case before that.  I understand from Your Honor's

16   confirmation ruling that you have formed certain opinions

17   about my clients, opinions that I think are unfair, quite

18   frankly, that basically conclude that we are a vexatious

19   litigant and that we are the tentacles of Mr. Dondero.  I ask

20   you to put all that aside.  Because that's what the Debtor

21   wants you -- the Debtor wants you to just reflexively conclude

22   that somehow we're nincompoops and incompetents and we need

23   court supervision.  Put all that aside, Your Honor, and just

24   ask yourself:  What am I being asked to do?  I'm being asked

25   to order a nondebtor as to how to conduct its own internal

1   business -- not even business related to the Debtor, but how

2   to conduct its own internal business -- even if we are the

3   biggest nincompoops, which absolutely is not borne out by the

4   record.

5       This is the wrong court for any such relief.  It's the

6   wrong court.

7       The reason why I showed you that letter from last Friday

8   was I thought it was -- I think Mr. Morris is an excellent

9   lawyer and I've worked very well with him, but I think that

10  the allegation is so fundamentally unfair, that somehow this

11  is our fault because we didn't tell them about a backup plan

12  and we wouldn't just consent to the entry of an order that

13  gives Your Honor jurisdiction over us.  That's unfair, Your

14  Honor.  This is an inquisition in that respect.  In that

15  respect, it's an inquisition.

16      We were sued.  We defended ourselves.  We're not -- this

17  is the fourth lawsuit, by the way, that the Debtor filed

18  against us, Your Honor.

19      And as I asked you at the confirmation hearing, what

20  evidence is there that we're vexatious?  Okay, we filed a

21  motion in front of Your Honor that was frivolous.  It

22  happened.  And we're glad that the Court didn't sanction us.

23  We're glad.  Perhaps the Court still will.  But that's it.

24  Nothing else that we've done.

25      We've been quiet in this case.  We've been minding our own

224

1    business.  We've been preparing a backup plan.  We've done

2    everything right.  And the Debtor comes to you shocked,

3    shocked, alleging that we don't have any plan, alleging that

4    the sky is falling.  And even when the Debtor learns that

5    that's not the case, we still had to go through today.

6        Why did we go through today, Your Honor?  Why did my

7    client -- why did my client have to sit here like someone that

8    had done something wrong, like a criminal defendant, and be

9    inquired as to all of its internal business practices, with

10   implications made that my client doesn't know what it's doing?

11   Why did we go through today just to have some order that's a

12   -- that provides for something?

13       They want a mandatory injunction, Your Honor.  You should

14   thumbs-up it or thumbs-down it.  And if you thumbs-up it,

15   it'll be without jurisdiction, without basis, and it'll be

16   extraordinary.

17       I can just keep talking and talking, but I'll repeating

18   the same points, Your Honor, so I thank you.

19           MR. MORRIS:  Can I just have five minutes, Your

20   Honor?

21           THE COURT:  You can.

22       REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23           MR. MORRIS:  You know, I think the Court can issue an

24   order finding that the motion is moot on its own accord.  It

25   doesn't need a consensual order to do that.  I think the Court

225

1  -- I would believe that the Court would have a factual finding
2  to support the finding of mootness.
3      But I don't really get the righteous indignation at all.
4  It's as if Mr. Rukavina didn't hear anything I said.  Because
5  we're most certainly not asking the Court -- we weren't even,
6  in the motion, asking the Court to do anything specific other
7  than direct the Advisors to adopt and implement a plan.  It
8  didn't have to be with us.  We didn't care who it was with.
9  We didn't care what the elements were.  The fact of the matter
10 is Mr. Seery testified extensively, not just about the
11 potential impact this would have on the Debtor's plan of
12 reorganization, but he testified that certain of the Debtor's
13 employees had received threats.  He testified, based on his
14 experience, that this is a highly-regulated industry, and if
15 there was -- if we walked away without any plan in place,
16 which is exactly why he said we filed this motion, that it
17 would be -- that it would be potentially catastrophic and that
18 undoubtedly the SEC would be involved.  And Mr. Rukavina
19 cannot give the Debtor any assurances that it would have no
20 liability.  Mr. Rukavina, I'm sure, is not going to allow his
21 client to indemnify the Debtor for any damages that may have
22 occurred in the future.
23     We're a little far afield here, Your Honor.  We simply
24 wanted to make sure that there was a plan in place to avoid a
25 catastrophe.  That was the irreparable harm that we were

226

```
1     looking at.  And at the end of the day, they came in -- you
2     know, I wish they had done it last week.  I wish they had told
3     us last Thursday.  I wish they had told us last Wednesday.  I
4     wish they had told us during the negotiations.  I wish they
5     had told us last Friday, instead of pulling Plan B.  I wish
6     they -- you know.  But it doesn't matter.  They don't have an
7     obligation to do that and I'm not, you know, I'm not going to
8     pretend that they do.  It would have been better if they had.
9     They didn't.  But they did, they did what the Debtor needed
10    them to do today, and that is present their plan to the Court.
11         And while we, you know, have questions about when it was
12    prepared, whether it's fulsome, they like it, and that's the
13    important part.  And they're not going to look to the Debtor
14    for any services in the future.  That's the important part.
15         The risk that Mr. Seery was concerned about has been
16    eliminated, and I, you know, appreciate that.  And that's why
17    I thought we came in here with a very rational and pragmatic
18    solution, to just -- to just -- you know, they've done what
19    we've asked for.  We've gotten the relief that we've asked
20    for.  The Advisors have sworn under oath that they have an
21    operating plan to obtain the essential services that the
22    Debtor used to provide.  That's the relief we were asking for.
23    I'm not quite sure what there is left here.
24              THE COURT:  Okay.  Thank you.
25         All right.  The first thing I'm going to say is that the
```

227

 1   Court believes it has subject matter jurisdiction, bankruptcy

 2   subject matter jurisdiction, over the requested relief.  If

 3   it's a pre-confirmation test that I am supposed to apply here

 4   -- that is, the *Wood v. Wood,* could this dispute have a

 5   conceivable effect on an estate being administered -- I find

 6   that that test is met.

 7        I think the concern of potential liability and exposure on

 8   the part of the Debtor is well-founded, even if it was not

 9   articulated to the Advisors' satisfaction today.  I think,

10   based on the litigious history here between these parties and

11   the contentiousness, I should say, between these parties

12   during this case, there is certainly a well-founded concern,

13   and certainly I think the Debtor is just being prudent,

14   worried about the SEC, investors, the Advisors, the funds,

15   someone else pointing fingers at the way the Debtor did or did

16   not act in transitioning services over.  I think that is a

17   basis for subject matter jurisdiction under the pre-

18   confirmation test.

19        If the post-confirmation test applies here, we know that

20   Fifth Circuit cases such as *In re Craig's Stores*, *In re Case*,

21   *National Gypsum*, among others, articulate the test of

22   bankruptcy subject matter jurisdiction being could the outcome

23   of the dispute bear on the implementation, the execution, or

24   the interpretation of a confirmed plan?  I think that test is

25   likewise met here.

228

1        Obviously, the plan contemplated a separation, and this

2   request for relief appears to be basically seeking some

3   supplemental -- a supplemental order to supplement the

4   confirmation order, to supplement the Debtor's attempt at

5   divorcing these parties as part of the monetization plan.

6        So I think bankruptcy subject matter jurisdiction does

7   exist here.

8        I didn't hear in oral arguments, closing arguments,

9   anything about the arbitration, but I think there's a real

10  question here whether the Advisors may have waived their right

11  to invoke the arbitration clause that's in one of the shared

12  services agreements, not both of them, by filing pleadings so

13  often, participating in this bankruptcy case so often, without

14  invoking that.

15       But again, as I see it, this adversary proceeding is

16  largely -- essentially, I should say -- asking for an order

17  supplementing the confirmation order, and it doesn't really

18  seem like a dispute *per se* under the shared services

19  agreements that have already been terminated.

20       So I think an argument can be made that there's been

21  waiver here, but even if there's not, that this is core in

22  that it bears on the plan confirmation, certainly more than a

23  dispute arising under the literal terms of the shared services

24  agreement.

25       I reserve the right to supplement and amend this, if I

229

 1   need to, in a more thorough written ruling.

 2        But anyway, based on the Court determining it does have

 3   subject matter jurisdiction here, I see it appropriate to

 4   enter an order that, based on the Court's several hours of

 5   testimony today from three different witnesses -- Mr. Seery,

 6   Mr. Dondero, Mr. Norris -- and based on many documents that

 7   have been submitted into the evidence, the Court finds that

 8   the shared services agreements were already terminated

 9   pursuant to their terms and can also be deemed rejected under

10   365 of the Code previously.

11        The Court will find that the Advisors do not need any

12   further services from the Debtor under these agreements as of

13   today's date, except access to data and records, which, based

14   on the testimony of Dustin Norris, can be easily effectuated,

15   Mr. Norris's testimony being that what the Debtor would need

16   to do to allow access to the data is authorize the Debtor's IT

17   director to transfer data and we stand ready to receive it.

18   And data would include historical emails, vault emails, files

19   in the system, and a number of other items, but, quote, there

20   would almost be no work from the Debtor's end.

21        So, believing that to be the case, I would order that the

22   Debtor stand ready between now and the 28th to provide that

23   access and that the Advisors stand ready to receive that

24   access.  And if the process extends beyond February 28th, then

25   it will have to be subject to further orders of this Court,

230

1   but the Court would expect there to be a cost if it extends

2   past February 28th.  And again, the Court would consider that

3   in a further hearing, how much cost should be imposed on the

4   Advisors.  But the advisors have represented to me through Mr.

5   Norris it's easy, it can be accomplished easily, so therefore

6   I would think it could happen between now and the 28th, and if

7   it does, no cost imposed on anyone.

8       I will further find that the Advisors have represented and

9   the Court therefore finds that there is an operating plan in

10  place for the Advisors to continue to operate uninterrupted

11  beyond today.  And again, the only thing I would envision that

12  needs to happen between today and February 28th is the access

13  to data.

14      So, having made these findings, the Court believes that

15  the request for a mandatory injunction is moot and is

16  therefore denied.

17      Are there any questions?  Mr. Morris, I want you to be the

18  scrivener, and, of course, run it by Mr. Rukavina.  But are

19  there any questions or concerns about what I've just

20  articulated?

21          MR. MORRIS:  I just have one, Your Honor.

22          THE COURT:  Uh-huh.

23          MR. MORRIS:  You made reference to rejection of the

24  contract.  From our perspective, it's not rejection.  We don't

25  want to open this up to a rejection claim of any kind.  It

231

1   really was just a termination of the agreement, in accordance

2   with the terms.  And I had put the provisions up before the

3   Court during my opening and walked Mr. Seery through.  That's

4   the basis for the --

5          THE COURT:  Okay.

6          MR. MORRIS:  -- termination of the agreement.  It's

7   not rejection at all.

8          THE COURT:  Fair point.

9          MR. RUKAVINA:  And Your Honor, there's no -- there's

10  no -- yeah, there's no problem.  There's no problem on that.

11  We do not disagree.  We do not disagree with Mr. Morris.

12         THE COURT:  Fair point.  I made the mistake of belts

13  and suspenders, trying to fill in any hole there might be.

14  But yes, I had the evidence that there was a termination of

15  both agreements on November 30th.  One of them had a 60-day

16  window before it became effective, the other a 30-day.  So

17  they are terminated.

18      All right.  Mr. Morris, anything else from you?

19         MR. MORRIS:  No.  We'll prepare a form of order.

20         THE COURT:  All right.  Mr. Rukavina, anything

21  further from you?

22         MR. RUKAVINA:  Your Honor, obviously, I have

23  questions.  I have reservations.  I need to look at whether

24  the Court's findings are going to be binding in this adversary

25  proceeding.  So, at this point in time, I'm just not prepared

APP 2048

232

1   to really say anything lest I get myself in trouble.  But I

2   thank you for your time today.

3           THE COURT:  All right.  Well, they are what they are,

4   and I hope we're not in an argument about that down the road.

5   But it seems like my hopes are always dashed when I want

6   things to be worked out.

7       I don't want you to think my calm demeanor means I am a

8   happy camper.  I am not.  I am beyond annoyed.  I mean, I

9   can't even begin to guesstimate how many wasted hours were

10  spent on the drafting Option A, Option B.  Wait.  Let me pull

11  up the exact words.  Mr. Norris confirming, We withdrew Option

12  B after the Debtor accepted it.

13      I mentioned fee-shifting once before in a different

14  context, and, of course, we haven't even gotten to the motion

15  for a show cause order declaring Mr. Dondero in contempt.  I

16  don't know if the lawyers fully appreciate how this looks.

17  Mr. Rukavina, you said that I have formed opinions that you

18  don't think are fair and made comments about vexatious

19  litigation and whatnot.  But while I continue, I promise you,

20  to have an open mind, it is days like this that make me come

21  out with statements that Mr. Dondero, repeating his own words,

22  apparently, he's going to burn the house down if he doesn't

23  get his baby back.

24      I mean, it seems so obviously transparent that he's just

25  driving the legal fees up.  It's as though he doesn't want the

APP 2049

233

```
 1    creditors to get anything, is the way this looks.  If he wants
 2    me to have a different impression, then he needs to start
 3    behaving differently.  I mean, I can't even imagine how many
 4    hundreds of thousands of dollars of legal fees were probably
 5    spent the past two weeks on Option A, Option B, and all the
 6    different sub-agreements and whatnot.  And as recently as
 7    Friday afternoon, the K&L Gates lawyer saying we have a deal,
 8    and then, oh, wait, maybe not, maybe we do, maybe we don't.
 9    And then Mr. Dondero acting like he had no clue what the K&L
10    Gates lawyers were saying as far as we have a deal.  And Mr.
11    Norris distancing himself from having seen any of that, and I
12    didn't have power.  You know, I'm sure he had a cell phone,
13    like the rest of us, that gets emails.  I'm making a
14    supposition.  I shouldn't make that.  But it just feels like
15    sickening games.
16        And again, if this keeps on, if this keeps on, one day,
17    one day, there may be an enormous attorney fee-shifting order.
18    And, of course, I would have to find bad faith, and I wouldn't
19    be surprised at all if I get there.
20        So I don't know if Mr. Dondero is listening.  I suspect,
21    if he is, he doesn't care much.  But I am --
22            MR. DONDERO:  I'm on the line, Judge.
23            THE COURT:  Okay.
24            MR. DONDERO:  I'm on the line.
25            THE COURT:  I'm glad you're on the line.  I cannot
```

APP 2959

234

1  overstate how very annoyed I am by hearing all these hours of

2  testimony and to feel like none of it was necessary.  None of

3  it was necessary.  Okay?  There could have been a consensual

4  deal --

5        MR. DONDERO:  Judge, you have to pay attention --

6  Judge, you have to pay attention to what's going on, okay?

7        THE COURT:  I am --

8        MR. DONDERO:  When I was president of Highland, --

9        THE COURT:  -- razor-sharp focused on what is going

10  on.  Okay?  I read every piece of paper.  I listen to every

11  sentence of testimony.  And what is going on --

12        MR. DONDERO:  Okay.  How about this, Your Honor?

13        THE COURT:  -- is an enormous waste of parties and

14  lawyer time and resources.  People need to get their eye on

15  the ball.  Well, certain people do have their eye on the ball,

16  but certain people do not.  Okay?  So we're done.  You've got

17  your divorce now.  Okay?  And if the operating plan is all

18  shored up, as Mr. Norris testified, it sounds like you're in

19  good shape.  All right?

20      Mr. Morris, I'll look for the order from you.

21        MR. MORRIS:  Thank you, Your Honor.

22        THE CLERK:  All rise.

23    (Pause.)

24        THE COURT:  Oh, Michael?

25    (Court confers with Clerk.)

235

```
1              THE CLERK:  Hello?  Hang on.  Mr. Morris?

2              THE COURT:  Is anyone still there?

3              THE CLERK:  Mr. Rukavina is still there.  Mr.

4    Rukavina, Mr. Morris, are you all still there?

5              MR. RUKAVINA:  Judge, this is Davor.

6              THE COURT:  All right.

7              MR. RUKAVINA:  I think we're all wondering whether

8    we're going to have the contempt hearing.

9              THE COURT:  Well, yes, that's why I came back in.

10             MR. RUKAVINA:  I can't hear you, Judge.  We can't

11   hear you.

12             THE COURT:  I realized I -- it's 4:19 Central time.

13   We are not starting the contempt hearing.

14        Mr. Morris, are you there now?

15             MR. MORRIS:  I am.  I did have one suggestion.

16             THE COURT:  All right.  I neglected to mention our

17   other setting, but we are not going to start at 4:19 Central

18   time.  Do we want to talk about scheduling on that?

19             MR. MORRIS:  I did, Your Honor.  And it's just an

20   idea, and I understand we've had a long day.  But I was going

21   to suggest if there was any way to just get their motion *in*

22   *limine* out of the way today, so that when we come back for the

23   evidentiary hearing parties are fully prepared.  If you don't

24   want to do it, that's fine.  Otherwise, I'm available at Your

25   Honor's convenience.
```

236

1           THE COURT:  All right.  I am going to have you all

2    communicate with Ms. Ellison about rescheduling that.  I have

3    no idea what my calendar looks like next week, but I'm not

4    going to do it this week.  I've got a backlog of other case

5    matters that I need to get to this week.

6           MR. MORRIS:  Okay.

7           THE COURT:  So, you know, maybe we'll do it next

8    week.  On the motion *in limine*, you've not filed a response?

9    It was just filed yesterday, so I'm guessing there's no

10   response.

11          MR. MORRIS:  Yeah.  I was going to do -- I was going

12   to do it orally.  I'm happy to do a written response, and I'm

13   happy to just proceed on the papers.  I just think it would be

14   helpful to have that, you know, or if we could put aside an

15   hour later this week to do that, because then preparing, if we

16   know the evidence is in or out, I think it'll just make the

17   trial a lot more smooth.

18          THE COURT:  All right.  I barely had time to pore

19   over it, so let me have Traci reach out to you all tomorrow

20   and let you know do I want a hearing on it or not.  I have an

21   initial reaction.  I don't know if Mr. Dondero's counsel is on

22   the phone.  I don't want to talk about this too much if he's

23   -- do we have Dondero's counsel?

24          MR. WILSON:  I'm present, Your Honor.  John Wilson.

25          THE COURT:  Okay.  I will tell you right now that,

237

```
 1   having done a quick review of it, I didn't feel inclined to
 2   grant it.  I'm going to have the TRO in front of me and I'm
 3   going to hear the evidence of what happened, and it's either
 4   going to match up as a violation of the provisions of the TRO
 5   or not.  You know, I feel -- I'm not a jury.  I can decide
 6   whether it is violative of the TRO or not.  The theme of it
 7   was, oh, it's going to have a prejudicial effect.  I mean,
 8   I've already heard about a lot of this.  So I'm inclined not
 9   to grant it.  But, again, I did a very quick look at it at
10   5:00 o'clock last night.  And that's why I asked Mr. Morris,
11   was he going to have a response, because --
12          MR. MORRIS:  Yeah.  I was planning to do it orally
13   today, Your Honor.  If I may just have until 5:00 o'clock
14   tomorrow, I'll submit an opposition that won't exceed five
15   pages.
16          THE COURT:  Okay.  So that's what we'll do.  And then
17   once I've looked at the motion more carefully, as well as the
18   response, I'll decide if I need oral argument or if I'm just
19   going to rule on the pleadings, okay, and Traci will let you
20   all know.  All right?  And again, Traci will coordinate with
21   you tomorrow or sometime this week about a resetting on the
22   contempt motion.
23      All right.  Thank you.
24          MR. MORRIS:  Thank you, Your Honor.
25          MR. WILSON:  Thank you, Your Honor.
```

APP 2954

238

1              THE CLERK:  All rise.

2         (Proceedings concluded at 4:23 p.m.)

3                         --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21       I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                    **02/24/2021**

24   _____    _____

25   Kathy Rehling, CETD-444                      Date
Certified Electronic Court Transcriber

APP 2055

239

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Morris                                                6
- By Mr. Hogewood                                            21

WITNESSES

Debtor's Witnesses

James P. Seery, Jr.
- Direct Examination by Mr. Morris                          29
- Cross-Examination by Mr. Rukavina                         68

James D. Dondero
- Direct Examination by Mr. Morris                          76
- Cross-Examination by Mr. Rukavina                         96
- Redirect Examination by Mr. Morris                       101
- Recross-Examination by Mr. Rukavina                      101

Advisors' Witnesses

Dustin Norris
- Direct Examination by Mr. Rukavina                       103
- Cross-Examination by Mr. Morris                          166
- Redirect Examination by Mr. Rukavina                     198
- Recross-Examination by Mr. Morris                        202

EXHIBITS

Debtor's Exhibits 1 through 21              Received   29
Advisors' Exhibits A through N              Received   29
Advisors' Exhibit O                         Received  200

CLOSING ARGUMENTS

- By Mr. Morris                                            206
- By Mr. Rukavina                                          213
- By Mr. Morris                                            224

RULINGS                                                    226

END OF PROCEEDINGS                                         238

INDEX                                                      239

002829
APP 2056

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Main Document   Page 2065 of 2722   Page 77 of 790   PageID 3557
Case 19-34054-sgj11  Doc 1752  Filed 01/14/21   Entered 01/15/21 13:18:04    Page 1 of 14

Docket #1752  Date Filed: 01/14/2021

# EXHIBIT 22

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

## MOTION TO APPOINT EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)

NOW INTO COURT, through undersigned counsel, comes The Dugaboy Investment Trust and Get Good Trust (jointly, "Movers") and respectfully move this Court for the appointment of an Examiner for the reasons set forth herein:

### I.

### BACKGROUND

1. On December 23, 2019, the United States Trustee filed its *United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Dkt. No. 271].  The United States Trustee's motion was denied by this Court's *Order Denying United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Dkt.

{00374930-16}

1

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 78 of 790   PageID 3558
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21   Entered 01/15/21 13:18:04   Page 2 of 14

No. 428].   Since around that time, the Debtor has been operating as a debtor-in-possession at the direction of an appointed independent board of directors.

2. On November 24, 2020, the Court approved the Debtor's *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Disclosure Statement") [Dkt. No. 1476].  As detailed in Article II.B. of the Disclosure Statement, the value of the Debtor's Assets has decreased by more than $235 million, or about 42%, from the commencement of the case to September 30, 2020.  The Debtor's Monthly Operating Report for November of 2020 reports a loss in value of $248 million [Dkt. No. 1710].

3. The Plan of Reorganization proposed by the Debtor and set for hearing on January 26, 2021 contains significant release and exculpation provisions for the management of the Debtor and the Independent Directors that are not allowable under applicable 5th Circuit law (*Opposition to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* filed by The Dugaboy Investment Trust and Get Good Trust [Dkt. No. 1667] and the *United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization* filed by the United States Trustee [Dkt. No. 1671]).

4. At a hearing held on January 8, 2021, this Court voiced a concern about costs and expenses in connection with this case.  The Court noted that it believed over sixty (60) lawyers attended the hearing and that a mere Preliminary Injunction hearing, based upon a back of the envelope calculation, cost the estate and parties in interest in excess of $300,000.00.

5. On January 12, 2021, counsel for Movers sent a letter to various counsel enlisting their support to the appointment of an Examiner to investigate various issues in this case and

APP 2058
002831

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 2062   Page 79 of 790   PageID 3559
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21   Entered 01/15/21 13:18:04   Page 3 of 14

to author a report that could be used by the Court and parties in interest. It was suggested by The Dugaboy Investment Trust that the appointment of an Examiner was a less costly means to resolve issues, as opposed to full blown litigation between the various parties and their legions of lawyers. The letter suggested that an Examiner be appointed to provide to the Court and the parties in interest a report that would address key matters. The Examiner's investigation and report would address issues and items that would not delay or cause a continuance of the confirmation hearing on the Debtor's Plan.

6. The appointment of a neutral, third party Examiner who would serve as an independent agent for the estate would be in the best interests of the Debtor and its creditors. The Examiner's investigation would alleviate the need for discovery disputes and litigation by getting to the bottom of the legitimacy of the allegations made by the parties and potential claims that may exist on behalf of the estate or against persons acting on behalf of the estate. The present claims retention statement filed by the Debtor is merely a laundry list of potential claims and parties and provides no real guidance or explanation as to the retained claims.

7. Movers will fully cooperate with the Examiner with respect to any examination of potential issues concerning the claims of or against Movers.

## II.

### REQUEST FOR RELIEF

8. Movers request that this Court appoint an Examiner in this case under section 1104(c) of the Bankruptcy Code in order to perform investigations and to prepare a report under section 1106(b). Section 1104(c) of the Bankruptcy Code states, in pertinent part:

If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the

APP 2059
002832

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document    Page 80 of 790    PageID 3560
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21    Entered 01/15/21 13:18:04    Page 4 of 14

United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor…

11 U.S.C. § 1104(c) (emphasis added).

9.  The express language of section 1104(c) and c(2) makes clear that where, as in this case, a party has previously moved for the appointment of a Chapter 11 trustee and the fixed liquidated unsecured debts exceed $5 million, the court shall appoint an Examiner at the request of a party in interest.  Id.  Even so, other courts note that an application to appoint a trustee is not a prerequisite for the appointment of an Examiner, only that no such trustee has been appointed in the case.  *Keene Corp. v. Coleman* (*In re Keene Corp.*), 164 B.R. 844, 855 (Bankr. S.D.N.Y. 1994) (looking to identical language in § 1104(b), finding that the denial of a motion to appoint a trustee is not a prerequisite to appointing an Examiner); See also *In re Residential Capital, LLC*, 474 B.R. 112, 118, 121 (Bankr. S.D.N.Y. 2012) (requiring only that a chapter 11 trustee must not have been appointed).

10.  Here, all elements for the appointment of an Examiner have been met under section 1104(c)(2) of the Bankruptcy Code: (i) the Court has not previously appointed a trustee in this case; (ii) Movers, parties in interest, move for the appointment of an Examiner prior to plan confirmation; and (iii) it is indisputable that the Debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.[1]

11.  When all such elements are met, courts have no discretion whether to grant relief, and must appoint an Examiner.  *In re Erickson Retirement Communities*, LLC, 425 B.R. 309, 313 (Bankr. N.D. Tex. 2010).  This Court in *Erickson Retirement Communities* stated:

---

[1] See Debtor's Amended Schedules E-F, Dkt. No. 1082-1, and Dkt. Nos. 1273 and 1302.

002833    APP 2080

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S    Document 15    Filed 06/06/25    Page 81 of 790    PageID 3561
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21   Entered 01/15/21 13:18:04   Page 5 of 14

"This court agrees with such courts that, where the $5 million unsecured debt threshold is met, a bankruptcy court ordinarily has no discretion.  This Court has complete discretion as to the matters that are examined."

12. The Court in *Erickson* denied the appointment of an Examiner due to the fact that "there was no allegations of wrongdoing on the part of the Debtor" at 313.  In *Erickson* the Examiner was requested to report on an "appropriate value allocation".  In this case Movers are requesting, and the Court should want, an explanation from a neutral third party as to why the assets of the Debtor had such a significant reduction in value during the case. Was it due to mismanagement or negligence? The reason for the decline in value is not an investigation that the Debtor or its counsel can make (they are not disinterested) but one that must be made by an independent third party.  The discussion in the Debtor's Disclosure Statement [Dkt. No. 1473, pgs. 28-29] is conclusory and only accounts for $90 million of the decline in value.  The balance is not explained except to assert that Covid was in part responsible.  Leading market indicators for the period between October of 2019 and October of 2020 reflect annualized growth rate for the Dow of 4.67%, the S&P 14.95% and Nasdaq 43.11%.   In light of these market gains, questions exist as to why the Debtor's Assets declined in value and whether the Debtor's management acted in a prudent fashion.

### III.

### SUGGESTED AREAS OF INQUIRY AND METHODOLOGY

13. Movers have received responses from the Debtor and the Creditors' Committee relative to Movers' letter of January 12, 2021, wherein the Debtor and the Creditors' Committee rejected joining in the Examiner motion and contended that the request was designed to

APP 2061
002834

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 115   Main Document Filed 06/06/25   Page 82 of 790   Page 82 of 790   PageID 3562
Case 19-34054-sgj11  Doc 1752  Filed 01/14/21   Entered 01/15/21 13:18:04   Page 6 of 14

delay confirmation and that the Litigation Trustee would investigate the claims possessed by the estate.  The letters received from the Debtor and the Creditors' Committee assert that the claims that have been made against the Debtor and the parties it seeks to have released and exculpated in its Plan are frivolous.  The letters go on to state that the claims will be investigated by Marc Kirschner who is a highly qualified professional.

14. The areas of inquiry suggested by Movers below will not delay confirmation of the Debtor's Plan and the suggestion that the Litigation Trustee, through the use of its counsel, will investigate the claims in a more efficient manner than a highly qualified Examiner would misses the entire point of Movers' letter.  The assertion that the Litigation Trustee will investigate all claims is inaccurate since claims against the Debtor's management are released and exculpated and are not included in any retained claims.  It is difficult to believe that the Creditors' Committee does not want to know why there is a loss of over $200 million in Asset value and whether any of that loss could be recovered from responsible parties.  Secondly, this Court, under the Plan, will have no control over the costs and expenses of the Litigation Trustee and its counsel in pursuing such litigation, and the only means of ensuring benefit to the estate for the activities of the Litigation Trustee would be to require that counsel pursing the claims on behalf of the Litigation Trustee work on a contingent fee basis.

15. The Plan filed by the Debtor contains significant releases and exculpations for the persons overseeing the Debtor's activities in the case.  Movers are troubled by the fact that the Debtor's Assets have declined in value with only a portion of the loss explained by "reserves" and forced stock sales due to margin issues.   The Court, at the Preliminary Injunction hearing, indicated that it was concerned with the dissipation in the value of

APP 2062
002835

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15    Claim Document Filed 04/06/25    Page 83 of 790    PageID 3563    Page 2065 of 2722
Case 19-34054-sgj11  Doc 1752  Filed 01/14/21    Entered 01/15/21 13:18:04    Page 7 of 14

assets.   A neutral Examiner could provide an independent view as to the loss in value and avoid costly fights over production of documents.  Is the Debtor afraid to allow a third party to review and answer the question "Why"?

16.  The Debtor should welcome an Examiner viewing the claims that it and the Litigation Trustee have against various parties.  An Examiner's report would be difficult to rebut and, in all likelihood, would bring about settlement of claims without the need for multiyear and costly litigation.

17.  Movers suggest that each party provide the Court with a written submission suggesting areas of inquiry for an Examiner's report.  The Court can then fashion the areas of inquiry such that they do not slow down the confirmation process but provide a meaningful cost savings to the creditors of the estate and the potential party litigants.

## IV.

## PRAYER FOR RELIEF

**WHEREFORE**, The Dugaboy Investment Trust and Get Good Trust request that this Court grant this motion and appoint an Examiner under section 1104(c) of the Bankruptcy Code to conduct an investigation of the propriety of the Debtor's post-petition operations, sales, and trades in accordance with section 1106(b) of the Bankruptcy Code.

 January 14, 2021

APP. 2023
002836

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-5   Filed 10/06/25   Page 84 of 790   PageID 3564
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21   Entered 01/15/21 13:18:04   Page 8 of 14

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
 *and Get Good Trust*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 14th day of January, 2021, a copy of the above and foregoing *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com, joyce.rehill@bondsellis.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com

APP 2064
002837

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document    Document    Page 2065 of 2732    Page 85 of 790    PageID 3565
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21    Entered 01/15/21 13:18:04    Page 9 of 14

- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke    robbie.clarke@bondsellis.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- Gregory V. Demo    gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com
- Casey William Doherty    casey.doherty@dentons.com, dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@dentons.com
- Douglas S. Draper    ddraper@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com, samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com, crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards    jonathan.edwards@alston.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com, amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;mary-beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com
- Warren Horn    whorn@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com

APP 2005
002838

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 16-5   Page 86 of 790   PageID 3566
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21 Entered 01/15/21 13:18:04 Page 10 of 14

- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- David Neier    dneier@winston.com, dcunsolo@winston.com;david-neier-0903@ecf.pacerpro.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel    rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Brian Patrick Shaw    shaw@roggedunngroup.com, cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade    jared.slade@alston.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com, ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

APP 2006
002839

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 26/25 of 2722   Page 87 of 790   PageID 3567
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21   Entered 01/15/21 13:18:04   Page 11 of 14

- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Donna K. Webb    donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@lfdslaw.com,
  craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com


*/s/Douglas S. Draper.*

APP 2067
002840

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Page 12 of 14   Page 88 of 790   PageID 3568
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21   Entered 01/15/21 13:18:04   Page 12 of 14

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**ORDER GRANTING THE MOTION TO**
**APPOINT EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)**

Upon consideration of the *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)*

(the "***Motion***") filed on January 14, 2021, by The Dugaboy Investment Trust and Get Good Trust

(jointly, "***Movers***") seeking an order appointing an examiner; and the Court having jurisdiction

to consider the Motion and all relief requested therein, as well as all related proceedings; and due

and sufficient notice of the Motion having been given under the circumstances; and the Court

having convened a hearing at which counsel for all interested parties had an opportunity to

appear and be heard; and good and sufficient cause appearing, the Court finds that the Motion

should be, and thereby is, Granted.

It is, therefore,

{00374942-3}                                    1

**002841**

APP 2068

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15 Main Document  Filed 06/06/25  Page 89 of 790   Page 20 of 27   PageID 3569
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21   Entered 01/15/21 13:18:04   Page 13 of 14

1.  ORDERED that an Examiner be appointed for Highland Capital Management, L.P.  in the captioned matter for the purposes set forth herein; and it is further

2.  ORDERED that the United States Trustee for the  Northern District of Texas (Dallas Division) (the "**United States Trustee**"), shall timely file its Application for Order Approving the Appointment of an Examiner and a proposed Order thereon (the "**UST Appointment Application Order**"); and it is further

3.  ORDERED that immediately upon the entry of the UST Appointment Application Order, the Examiner is authorized to investigate the matters identified in a futher order issued by this Court; and it is further

4.  ORDERED that within three (3) days of the entry of this Order, any party wishing to have a matter investigated by the Examiner shall submit in writing to this Court the following:  a) identification of the matter to be investigated; b) a reason why such investigation is necessary; and c) why such investigation of the matter identified will not delay confirmation of a plan in this Case; and it is further

5.  ORDERED that the Examiner shall have the duties, powers and responsibilities of an examiner under Section 1106(b) of the Bankruptcy Code; provided, however, that the scope of the Examiner's duties, unless expanded or limited by further order of this Court, shall be limited to the investigations identified by this Court in a Supplemental Order to be entered ; and it is further

6.  ORDERED that the Examiner shall be a "party in interest" under Section 1109 of the Bankruptcy Code with respect to matters that are within the scope of the duties set forth in this Order and shall be entitled to appear at hearings held in these cases and to be heard at such hearing with respect to matters that are within the scope of the Examiner's duties; and it is further

7.  ORDERED that nothing contained in this Order shall diminish the powers and authority of the Debtor , Committee, Reorganized Debtor and Litigation Trust under the Bankruptcy Code, including the powers to investigate transactions and entities, commence contested matters and adversary proceedings, and object to claims, and it is further

8.  ORDERED that neither communications between the Examiner and Debtor nor communications between the Examiner and the Committee shall be deemed a waiver of any attorney–client or work product privilege otherwise belonging to the Examiner, the Debtor or the Committee; and it is further

9.  ORDERED that any and all objections to the relief granted herein are overruled; and it is further

10. ORDERED that this Court shall retain exclusive jurisdiction over any dispute concerning this Order.

002842
APP 2089

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S      Document 15   Filed 06/23 of 2722   Page 90 of 790      PageID 3570
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21   Entered 01/15/21 13:18:04   Page 14 of 14

### End of Order ###


Submitted by:


*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
 *and Get Good Trust*

002843
APP 2079

# EXHIBIT 23

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | )  **Case No. 19-34054-sgj-11** |
| | )  Chapter 11 |
| | ) |
| HIGHLAND CAPITAL | )  Dallas, Texas |
| MANAGEMENT, L.P., | )  Tuesday, February 2, 2021 |
| | )  9:30 a.m. Docket |
| Debtor. | ) |
| | )  CONFIRMATION HEARING [1808] |
| | )  AGREED MOTION TO ASSUME [1624] |
| _____ | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:            Jeffrey Nathan Pomerantz
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          10100 Santa Monica Blvd.,
                           13th Floor
                          Los Angeles, CA  90067-4003
                          (310) 277-6910

For the Debtor:            John A. Morris
                          Gregory V. Demo
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          780 Third Avenue, 34th Floor
                          New York, NY  10017-2024
                          (212) 561-7700

For the Debtor:            Ira D. Kharasch
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          10100 Santa Monica Blvd.,
                           13th Floor
                          Los Angeles, CA  90067-4003
                          (310) 277-6910

For the Official Committee  Matthew A. Clemente
of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                          One South Dearborn Street
                          Chicago, IL  60603
                          (312) 853-7539

Exhibit C



2

```
 1   APPEARANCES, cont'd.:

 2   For Redeemer Committee of    Terri L. Mascherin
     the Highland Crusader        JENNER & BLOCK, LLP
 3   Fund:                        353 N. Clark Street
                                  Chicago, IL  60654-3456
 4                                (312) 923-2799

 5   For Acis Capital             Rakhee V. Patel
     Management GP, LLC:          WINSTEAD, P.C.
 6                                2728 N. Harwood Street, Suite 500
                                  Dallas, TX  75201
 7                                (214) 745-5250

 8   For UBS Securities, LLC:     Andrew Clubok
                                  LATHAM & WATKINS, LLP
 9                                555 Eleventh Street, NW,
                                    Suite 1000
10                                Washington, DC  20004
                                  (202) 637-2200
11
     For Patrick Daugherty:       Jason Patrick Kathman
12                                PRONSKE & KATHMAN, P.C.
                                  2701 Dallas Parkway, Suite 590
13                                Plano, TX  75093
                                  (214) 658-6500
14
     For HarbourVest, et al.:     Erica S. Weisgerber
15                                DEBEVOISE & PLIMPTON, LLP
                                  919 Third Avenue
16                                New York, NY  10022
                                  (212) 909-6000
17
     For James Dondero:           Clay M. Taylor
18                                John Y. Bonds, III
                                  D. Michael Lynn
19                                Bryan C. Assink
                                  BONDS ELLIS EPPICH SCHAFER
20                                  JONES, LLP
                                  420 Throckmorton Street,
21                                  Suite 1000
                                  Fort Worth, TX  76102
22                                (817) 405-6900

23   For Get Good Trust and       Douglas S. Draper
     Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
24                                650 Poydras Street, Suite 2500
                                  New Orleans, LA  70130
25                                (504) 299-3300
```

002845

3

APPEARANCES, cont'd.:

For Certain Funds and          Davor Rukavina
Advisors:                      Julian Vasek
                               MUNSCH, HARDT, KOPF & HARR
                               500 N. Akard Street, Suite 3800
                               Dallas, TX  75201-6659
                               (214) 855-7587

For Certain Funds and          A. Lee Hogewood, III
Advisors:                      K&L GATES, LLP
                               4350 Lassiter at North Hills
                                 Avenue, Suite 300
                               Raleigh, NC  27609
                               (919) 743-7306

For the NexPoint               Lauren K. Drawhorn
Parties:                       WICK PHILLIPS
                               3131 McKinney Avenue, Suite 100
                               Dallas, TX  75204
                               (214) 692-6200

For Scott Ellington,           Frances A. Smith
Isaac Leventon, Thomas         ROSS & SMITH, P.C.
Surgent, and Frank             Plaza of the Americas
Waterhouse:                    700 N. Pearl Street, Suite 1610
                               Dallas, TX  75201
                               (214) 593-4976

For Scott Ellington,           Debra A. Dandeneau
Isaac Leventon, Thomas         BAKER & MCKENZIE, LLP
Surgent, and Frank             452 Fifth Avenue
Waterhouse:                    New York, NY  10018
                               (212) 626-4875

For CLO Holdco, Ltd.:          John J. Kane
                               KANE RUSSELL COLEMAN LOGAN, P.C.
                               901 Main Street, Suite 5200
                               Dallas, TX  75202
                               (214) 777-4261

For Davis Deadman, Todd        Jason Patrick Kathman
Travers, and Paul Kauffman:    PRONSKE & KATHMAN, P.C.
                               2701 Dallas Parkway, Suite 590
                               Plano, TX  75093
                               (214) 658-6500

APP 2073

4

APPEARANCES, cont'd.:

For the United States          David G. Adams
of America (IRS):              U.S. STATES DEPARTMENT OF JUSTICE,
                                 TAX DIVISION
                               717 N. Harwood Street, Suite 400
                               Dallas, TX  75201
                               (214) 880-2432

For Highland CLO Funding,      Rebecca Matsumura
Ltd.:                          KING & SPALDING, LLP
                               500 West 2nd Street, Suite 1800
                               Austin, TX  78701
                               (512) 457-2024

For Crescent TC                Michael S. Held
Investors:                     JACKSON WALKER, LLP
                               2323 Ross Avenue, Suite 600
                               Dallas, TX  75201
                               (214) 953-5859

For the Issuer Group:          Amy K. Anderson
                               JONES WALKER, LLP
                               811 Main Street, Suite 2900
                               Houston, TX  77002
                               (713) 437-1866

Recorded by:                   Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
                               1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
                               (214) 753-2062

Transcribed by:                Kathy Rehling
                               311 Paradise Cove
                               Shady Shores, TX  76208
                               (972) 786-3063

          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

APP 2074
002847

5

1        <u>DALLAS, TEXAS - FEBRUARY 2, 2021 - 9:38 A.M.</u>

2            THE COURT:  Good morning.  Please be seated.  All

3     right.  We are ready to get started now in Highland Capital.

4     We have a confirmation hearing as well as a motion to assume

5     the non-residential real property lease at the headquarters.

6     All right.  This is Case No. 19-34054.  I know we're going to

7     have a lot of appearances today.  I think we're just down to a

8     handful of objections, but I'm nevertheless going to go ahead

9     and get formal appearances from our key parties that we've had

10    historically in this case.

11        First, for the Debtor team, do we have Mr. Pomerantz and

12    your crew?

13            MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

14    Pomerantz, along with John Morris, Ira Kharasch, and Greg

15    Demo, on behalf of the Debtor-in-Possession, Highland Capital.

16            THE COURT:  All right.  Good morning.  All right.

17    For the Unsecured Creditors' Committee team, do we have Mr.

18    Clemente and others?

19            MR. CLEMENTE:  Yes.  Good morning, Your Honor.

20    Matthew Clements; Sidley Austin; on behalf of the Official

21    Committee of Unsecured Creditors.

22            THE COURT:  All right.  I'm actually going to call a

23    roll call for the Committee members who have obviously been

24    very active during this case.  For the Redeemer Committee and

25    Crusader Fund, do we have Ms. Mascherin and her team?

6

1   (Pause.)  Okay.  We're -- if -- you must be on mute.

2              MS. MASCHERIN:  Your Honor, I apologize.

3              THE COURT:  Okay.  Go ahead.

4              MS. MASCHERIN:  I apologize, Your Honor.  I was on

5   mute and could not figure out how to unmute myself quickly.

6   Terri Mascherin; Jenner & Block; on behalf of the Redeemer

7   Committee.

8              THE COURT:  All right.  Good morning.

9       All right.  What about Acis?  Do we have Ms. Patel and

10  others for the Acis team?

11             MS. PATEL:  Good morning, Your Honor.  Rakhee Patel

12  on behalf of Acis Capital Management.

13             THE COURT:  Good morning.

14      All right.  Mr. Clubok, I see you there for the UBS team,

15  correct?

16             MR. CLUBOK:  Yes.  Good morning, Your Honor.

17             THE COURT:  Good morning.

18      All right.  For Patrick Daugherty, I think I see Mr.

19  Kathman out there, correct?

20             MR. KATHMAN:  Good morning, Your Honor.  Jason

21  Kathman on behalf of Patrick Daugherty.

22             THE COURT:  All right.  Good morning.

23      All right.  What about HarbourVest?  Anyone on the line

24  for HarbourVest?

25             MS. WEISGERBER:  Good morning, Your Honor.  Erica

002849
APR 2075

                                                                    7

 1  Weisgerber for HarbourVest.

 2          THE COURT:  All right.  Very good.

 3      All right.  Well, I'll now, I guess, turn to some of the

 4  Objectors that I haven't hit yet.  Who do we have appearing

 5  for Mr. Dondero this morning?

 6          MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

 7  of the law firm of Bonds Ellis Eppich Schaefer & Jones

 8  appearing on behalf of Mr. Dondero.  I have with me, of

 9  course, Mr. Dondero, who is in the room with me.  Dennis

10  Michael Lynn, John Bonds, and Bryan Assink are also appearing

11  on behalf of Mr. Dondero.

12          THE COURT:  All right.  Thank you, Mr. Taylor.

13      All right.  For the Dugaboy Trust and Get Good Trust, do

14  we have Mr. Draper and others?

15          MR. DRAPER:  Yes, Your Honor.  This is Douglas Draper

16  on the line.

17          THE COURT:  All right.  Good morning.

18          MR. DRAPER:  Good morning, Your Honor.

19          THE COURT:  All right.  What about what I'll call

20  Highland Fund, the Highland Funds and Advisors?  Do we have

21  Mr. Rukavina this morning, or who do we have?

22          MR. RUKAVINA:  Your Honor, good morning.  Davor

23  Rukavina and Julian Vasek for the Funds and Advisors.  I can

24  make a full appearance, but it's the parties listed on Docket

25  1670.

8

1          THE COURT:  All right.  Thank you, Mr. Rukavina.

2      All right.  What about --

3          MR. HOGEWOOD:  Your Honor?

4          THE COURT:  Go ahead.

5          MR. HOGEWOOD:  Your Honor, Lee Hogewood.  I'm sorry,

6  Your Honor.  Lee Hogewood is also here on behalf of the same

7  parties.

8          THE COURT:  All right.  Thank you, sir.

9      All right.  What about NexPoint Real Estate Partners, HCRE

10  Partners?

11          MS. DRAWHORN:  Good morning, Your Honor.  Lauren

12  Drawhorn with Wick Phillips on behalf of NexPoint Real Estate

13  Partners, LLC.  I'm also here on behalf of the NexPoint Real

14  Estate entities which are listed on Docket 1677, and NexBank,

15  which is -- their objection is 1676.

16          THE COURT:   All right.  Thank you.

17      All right.  Let's cover some of the employees.  I think I

18  see Ms. Smith out there.  Are you appearing for Mr. Ellington

19  and Mr. Leventon?

20          MS. SMITH:  Yes, Your Honor.  Frances Smith with Ross

21  & Smith, along with Debra Dandeneau of Baker McKenzie, on

22  behalf of Scott Ellington, Isaac Leventon, Thomas Surgent, and

23  Frank Waterhouse.

24          THE COURT:  All right.  Could you spell the last name

25  of your co-counsel from Baker McKenzie?  I didn't clearly get

9

 1  that.

 2        MS. SMITH:  Yes, Your Honor.  It's Debra Dandeneau,

 3  D-A-N-D-E-N-N-A-U [sic].

 4        THE COURT:  Okay.  Thank you.

 5     All right.  CLO Holdco, do we have you appearing this

 6  morning?

 7        MR. KANE:  Your Honor, John Kane on behalf of CLO

 8  Holdco.

 9        THE COURT:  Thank you, Mr. Kane.

10     All right.  I know we had a different group of current or

11  former employees -- Brad Borud, Jack Yang -- and some joining

12  parties:  Kauffman, Travers, Deadman.  Who do we have

13  appearing for those?  (Pause.)  Anyone?  If you're appearing,

14  we're not hearing you.  Go ahead.

15        MR. KATHMAN:  Good morning, Your Honor.  Jason

16  Kathman.  I represent Mr. Deadman, Mr. Travers, and Mr.

17  Kauffman as well.

18        THE COURT:  Okay.  Thank you.  And I can't remember

19  who represents Mr. Borud and Yang.  Someone separately.

20        MR. KATHMAN:  It's Mr. Winikka, Your Honor.

21        THE COURT:  Oh, Mr. Winikka.

22        MR. KATHMAN:  And I haven't scrolled through to see

23  whether he's with -- in the 120 people signed in this morning.

24  But I believe that objection has been resolved.  I think Mr.

25  Pomerantz will probably address that later.  So Mr. Winikka

10

 1    may not be appearing.

 2              THE COURT:  Okay.  All right.  Well, anyone for the

 3    IRS?

 4              MR. ADAMS:  Good morning, Your Honor.  David Adams,

 5    Department of Justice, on behalf of the United States and its

 6    agency, the Internal Revenue Service.

 7              THE COURT:  Thank you, Mr. Adams.

 8         For the U.S. Trustee, who do we have appearing this

 9    morning?  (No response.)  I'm not hearing you.  If you're

10    trying to appear, you must be on mute.  (No response.)  All

11    right.  Well, I suspect at some point we'll hear from the U.S.

12    Trustee, even though I don't hear anyone now.

13         At this point, I will open it up to anyone else who wishes

14    to appear who I failed to call.

15              MS. MATSUMURA:  Your Honor, this is Rebecca Matsumura

16    from King & Spalding representing Highland CLO Funding, Ltd.

17    Thank you.

18              THE COURT:  All right.  Thank you, Ms. Matsumura.

19    HCLOF.

20         Anyone else?

21              MR. HELD:  Your Honor, this is Michael Held with the

22    law firm of Jackson Walker, LLP on behalf of the office

23    landlord, Crescent TC Investors, LP.

24              THE COURT:  All right.  Thank you, Mr. Held.

25              MR. HELD:  Thank you, Your Honor.

APP 2080

Case 3:25-cv-02072-S   Document 15-5   Filed 06/20/25   Page 101 of 790   PageID 3581

11

1           THE COURT:  Okay.  Any other lawyer appearances?

2      All right.  Well, again, if there's anyone out there who

3  did not get to appear, maybe we'll hear from you at some point

4  as the day goes on.

5      All right.  Mr. Pomerantz, this is an important day,

6  obviously.  How did you want to begin things?

7           MR. POMERANTZ:  So, Your Honor, I have a brief

8  opening to talk about what I plan to do, and a little more

9  lengthy opening, and it'll be come clear.  So if I may

10  proceed, Your Honor?

11           THE COURT:  You may.

12           MR. POMERANTZ:  Your Honor, we're here to request

13  that the Court confirm the Debtor's Fifth Amended Plan of

14  Reorganization, as modified.  The operative documents before

15  Your Honor are the Fifth Amended Plan, as modified, that was

16  filed along with our pleadings in support of confirmation on

17  January 22nd and the minor amendments that we filed on

18  February 1st.

19      Here is my proposal on how we can proceed this morning.  I

20  would intend to provide the Court with an opening statement

21  that would last approximately 20 minutes.  And then after any

22  other party who desires to make an opening statement, I would

23  propose that the Debtor put on its evidence that it intends to

24  rely on in support of confirmation.  The evidence consists of

25  the exhibits that the Debtor filed with its witness and

1   exhibit list on January 22nd and certain amendments that we

2   filed yesterday.

3       We would also put on the testimony of the following

4   witnesses:  Jim Seery, the Debtor's chief executive officer,

5   who Your Honor is very familiar with, and also a member of

6   Strand's board of directors; John Dubel, a member of Strand's

7   board of directors; and Mark Tauber, a vice president with Aon

8   Financial Services, the Debtor's D&O broker.

9       We have also submitted the declaration of Patrick Leatham,

10  who is with KCC, the Debtor's balloting agent.  And we don't

11  intend to put Mr. Leatham on the stand, but he is available on

12  the WebEx for cross-examination, to the extent necessary.

13      I propose that I would leave the bulk of my argument,

14  which includes going through the Section 1129 requirements for

15  plan confirmation, as well as responding to the remaining

16  outstanding objections, until my closing argument.

17      With that, Your Honor, I will pause and ask the Court if

18  Your Honor has any questions before I proceed.

19          THE COURT:  I do not have questions, so your method

20  of going forward sounds appropriate.  You may go ahead.

21          MR. POMERANTZ:  Thank you, Your Honor.

22           OPENING STATEMENT ON BEHALF OF THE DEBTOR

23          MR. POMERANTZ:  As I indicated, Your Honor, we stand

24  here side by side with the Creditors' Committee asking that

25  the Court confirm the Debtor's plan of reorganization.

13

1       As Your Honor is well aware, this case started in December

2   in -- October 2019, was transferred to Your Honor's court in

3   December 2019, and has been pending for approximately 15

4   months.

5       On January 9, 2020, I stood before Your Honor seeking the

6   approval of the independent board of directors of Strand, the

7   general partner of the Debtor, pursuant to a heavily-

8   negotiated agreement with the Committee.  And as the Court has

9   remarked on occasions throughout the case, the economic

10  stakeholders in this case believed that the installation of a

11  new board consisting of highly-qualified restructuring

12  professionals and a bankruptcy judge, a former bankruptcy

13  judge, was far more attractive than the alternative, which was

14  appointment of a trustee.  And upon approval of the

15  settlement, members of the board -- principally, Mr. Seery --

16  testified that one of the board's goals was to change the

17  culture of litigation that plagued Highland in the decade

18  before filing and threatened to embroil the Debtor in

19  continued litigation if changes were not made.

20      And as Your Honor is well aware, the last 14 months have

21  not been easy.  The board took its role as an independent

22  fiduciary extremely seriously, much to the consternation of

23  the Committee at times, and more recently, to the

24  consternation of Mr. Dondero and his affiliated entities.

25      And what has the Debtor, under the leadership of the

APP 2023

14

1   board, been able to accomplish during this case?  The answer

2   is a lot more than many parties believed when the board was

3   installed.

4       The Debtor reached a settlement with the Redeemer

5   Committee, resolving disputes that had been litigated for many

6   years, in many forums, and that resulted in an arbitration

7   award that was the catalyst for the bankruptcy filing.

8       Participating in a court-ordered mediation at the end of

9   August 2020 and September, the Debtor reached agreement with

10  Acis and Josh Terry.  The Court is all too familiar with the

11  years of disputes between the Debtor and Acis and Josh Terry,

12  which spanned arbitration proceedings and an extremely

13  combative Chapter 11 that Your Honor presided over.

14      The Debtor next reached an agreement with HarbourVest

15  regarding their assertion of over $300 million of claims

16  against the estate.  The HarbourVest litigation stemmed from

17  its investment in the Acis CLOs and would have resulted in

18  complex, fact-intensive litigation which would have forced the

19  Court to revisit many of the issues addressed in the Acis

20  case.

21      And perhaps most significantly, Your Honor, the Debtor was

22  able to resolve disputes with UBS, disputes which took the

23  most time of any claim in this case, through a contested stay

24  relief motion, a hotly-contested summary judgment motion, and

25  a Rule 3018 motion.

APP 2004

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 16-5   Filed 02/05/25   Page 105 of 790   PageID 3585

15

1      While the Debtor and UBS hoped to file a 9019 motion prior

2  to the commencement of the hearing, they were not able to do

3  so.  However, I am now in a position to disclose to the Court

4  the terms of the settlement, which is the subject of

5  documentation acceptable to the Debtor and UBS.  The

6  settlement provides for, among other things, the following

7  terms:

8      UBS will receive a $50 million Class 8 general unsecured

9  claim against the Debtor.

10      UBS will receive a $25 million Class 9 subordinated

11  general unsecured claim against the Debtor.

12      UBS will receive a cash payment of $18.5 million from

13  Multi-Strat, which was a defendant and the subject of

14  fraudulent transfer claims.

15      The Debtor will use reasonable efforts to assist UBS to

16  collect its Phase I judgment against CDL Fund and assets CDL

17  Fund may have.

18      The parties will also agree to mutual and general

19  releases, subject to agreed carve-outs.

20      And, of course, the parties will not be bound until the

21  Court approves the settlement pursuant to a 9019 motion we

22  would hope to get on file shortly.

23      I am also pleased to let the Court know -- breaking news

24  -- that this morning we reached an agreement to settle Patrick

25  Daugherty's claims.  I would now like to, at the request of

16

1    Mr. Kathman, read into the record the Patrick Daugherty

2    settlement.

3        Under the Patrick Daugherty settlement, Mr. Daugherty will

4    receive a $750,000 cash payment on the effective date.  He

5    will receive an $8.25 million general unsecured claim, and he

6    will receive a $2.75 million Class 9 subordinated claim.

7        The settlement of all claims against the Debtor and its

8    affiliates -- and affiliates will be defined in the documents

9    -- with the exception of the tax claim against the Debtor, Mr.

10   Dondero, and Mr. Okada -- and for the avoidance of doubt,

11   except as I describe below, nothing in the settlement is

12   intended to affect any pending litigation Mr. Daugherty has

13   against Mr. Dondero, Scott Ellington, Isaac Leventon, Marc

14   Katz, Michael Hurst, and Hunton Andrew Kurth.

15       Mr. Daugherty will release the Debtor and its affiliates

16   and current employees for all claims and causes of action,

17   except for the agreements I identify below, and dismiss all

18   current employees as to pending actions.  We believe this only

19   applies to Thomas Surgent and no other employee is implicated.

20       Mr. Surgent and other employees, including but not limited

21   to David Klos, Frank Waterhouse, Brian Collins, Lucy Bannon,

22   and Matt Diorio, will receive releases similar to the covenant

23   in Paragraph 1D of the Acis settlement agreement, which

24   essentially provided the release would go away if they

25   assisted anyone in pursuing claims against Mr. Daugherty.

APP 2026

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Main Document   Filed 09/09/25   Page 2095 of 2722   Page 107 of 790   PageID 3587

17

1        Highland and the above-mentioned parties will accept

2    service of any subpoenas and acknowledge the jurisdiction of

3    the Delaware Chancery Court for the purposes of accepting any

4    subpoenas.  And for the avoidance of doubt, Highland will

5    accept service on behalf of the employees only in their

6    capacity as such.

7        Highland will also use material -- will use reasonable

8    efforts at no material cost to assist Daugherty in vacating a

9    Texas judgment that was issued against him.  We've also looked

10   at a form of the motion and believe we have agreed on the form

11   of the motion.

12       Highland, its affiliates, and current employees will

13   covenant and agree they will not pursue or seek to enforce the

14   injunction and the Texas judgment against Daugherty.

15       And lastly, Daugherty will not be able to settle any

16   claims for negligence or other claims that might be subject to

17   indemnification by the Debtor or any successor.

18       Accordingly, Your Honor, other than the claims of Mr.

19   Dondero and his related entities, and the unliquidated claims

20   of certain employees, substantially all claims have been

21   resolved in this case, a truly remarkable achievement.

22       Separate and apart, Your Honor, from the work done

23   resolving the claims, the Debtor, under the direction of the

24   independent board, has worked extremely hard to develop a plan

25   of reorganization.

APP 2087
002860

18

1        After the independent board got its bearings, it started

2   to work on various plan alternatives.  And the board received

3   a lot of pressure from the Committee to go straight to a plan

4   seeking to monetize assets like the one before Your Honor

5   today.  However, the board believed that before proceeding to

6   do so and go down an asset monetization path, it should

7   adequately diligence all alternatives, including a

8   continuation of the current business model, a reorganization

9   sponsored by Mr. Dondero and his affiliates, a sale of the

10  Debtor's assets, including a sale to Mr. Dondero.

11       In June 2020, plan negotiations proceeded in earnest, and

12  the Debtor started to negotiate an asset monetization plan

13  with the Committee, while still pursuing other alternatives.

14       Preparation of an asset monetization plan is not typically

15  a complicated process.  However, creating the appropriate

16  structure for a business like the Debtor's was extremely

17  complicated, because of the contractual, regulatory, tax, and

18  governance issues that had to be carefully considered.

19       At the same time the Committee negotiations were

20  proceeding down that path, Mr. Seery continued to spend

21  substantial time trying to negotiate a grand bargain plan with

22  Mr. Dondero.  It is not an exaggeration to say that over the

23  last several months Mr. Seery has dedicated hundreds of hours

24  towards a potential grand bargain plan.

25       And why did he do it?  Because he has always believed that

APP 2088

Case 3:25-cv-02072-S   Document 6-5   Filed 08/08/25   Page 109 of 790   PageID 3589

19

1   a global restructuring among all parties was the best

2   opportunity to fully and finally resolve the acrimony that

3   continued to plague the Debtor.

4          Notwithstanding Mr. Seery's and the independent board's

5   best efforts, they were not able to reach consensus on a grand

6   bargain plan, and the Debtor filed the plan, the initial plan,

7   on August 12th, which ultimately evolved into the plan before

8   the Court today.

9          The Court conducted an initial hearing on the disclosure

10  statement on October 27th, and then ultimately approved -- the

11  Court approved the disclosure statement at a hearing on

12  November 23rd.

13         While the Debtor continued to work towards resolving

14  issues with the Committee with the filed plan, Mr. Dondero,

15  beginning to finally see that the train was leaving the

16  station, started to do whatever he could to get in the way of

17  plan confirmation.

18         He objected to the Acis settlement.  When his objection

19  was overruled, he filed an appeal.

20         He objected to the HarbourVest settlement.  When his

21  objection was overruled, he had Dugaboy file an appeal.

22         He started to interfere with the Debtor's management of

23  its CLOs, stopping trades, refusing to provide support, and

24  threatening Mr. Seery and the Debtor's employees.

25         He had his Advisors and Funds that he owned and controlled

APP 2089

20

1   file motions that Your Honor said was a waste of time.

2        He had those same Funds and Advisors threaten to terminate

3   the Debtor as a manager, in blatant violation of the Court's

4   January 9, 2020 order.

5        His conduct was so egregious that it warranted entry of a

6   temporary restraining order and preliminary injunction against

7   him.  And of course, he has appealed that ruling as well.

8        But that was not all.  He brazenly threw out his phone, in

9   what the Court has remarked was spoliation of evidence, and he

10  violated the TRO in other ways, actions for which he will

11  answer for at the contempt hearing scheduled later this week.

12       And, of course, he and his pack of related entities have

13  filed a series of objections.  We have received 12 objections

14  to the plan, Your Honor, excluding three joinders.  And as I

15  mentioned, we have been pleased to report that we've been able

16  to resolve six of them:  those of the Senior Employees, those

17  of Patrick Daugherty, those of CLO Holdco, those of the IRS,

18  those of Texas Taxing Authorities, and those of Jack Young and

19  Brad Borud.

20       The CLO Holdco objection was withdrawn in connection with

21  the settlement reached with them in connection with the

22  preliminary injunction hearing that the Court heard -- started

23  to hear last week.

24       The Taxing Authorities' objections have been resolved by

25  the Debtor agreeing to make certain modifications to the plan

APP 2009

Main Document   Page 2094 of 2722

21

```
1   that were included in our filing yesterday and to include

2   certain provisions in the confirmation order to address other

3   concerns.

4       The group of employees who are referred to as the Senior

5   Employee are comprised of four individuals -- Frank

6   Waterhouse, Thomas Surgent, Scott Ellington, and Isaac

7   Leventon -- although Mr. Ellington and Mr. Leventon are no

8   longer employed by the Debtor.

9       On January 22nd, Your Honor, we filed executed

10  stipulations with Frank Waterhouse and Thomas Surgent.  These

11  stipulations were essentially the Senior Employee stipulations

12  that were referred to in the plan and the disclosure

13  statement.

14      And as part of those stipulations, the Debtor, in

15  consultation with and agreement from the Committee, agreed to

16  certain modifications of the prior version of the Senior

17  Employee stipulation with both Mr. Waterhouse and Mr. Surgent

18  that effectively reduced the compensation they needed to

19  provide for the release from 40 percent to five percent of

20  their claims.

21      The Debtor and the Committee believed the resolution with

22  Mr. Surgent and with Mr. Waterhouse was fair, given the

23  importance of these two people to the transition effort and

24  the increased reliance upon them that the Debtor would have

25  with the departure of Mr. Ellington and Mr. Leventon.  And as
```

APP 2091

22

1   a result of that agreement, Your Honor, on January 27th, Mr.

2   Waterhouse and Mr. Surgent withdrew from the Senior Employee

3   objection.

4       Subsequently, we reached agreement with Mr. Ellington and

5   Mr. Leventon to resolve the objections they raised with

6   confirmation.  And at Ms. Dandeneau's request, I would like to

7   read into the record the agreement reached with both of them,

8   and I know she will correct me if I get anything wrong.

9           THE COURT:  Okay.

10          MR. POMERANTZ:  Among other things, Mr. Ellington and

11   Mr. Leventon asserted in their objection that they were

12   entitled to have their liquidated bonus claims treated as

13   Class 7 convenience claims under the plan, under their reading

14   of the plan, and their understanding of communications with

15   Mr. Seery.  The Debtor disputed the entitlement to elect Class

16   7 based upon the terms of the plan, the disclosure statement,

17   and applicable law.  But as I said, the parties have resolved

18   this dispute.

19       Mr. Ellington asserts liquidated bonus claims in the

20   aggregate amount of $1,367,197, which, to receive convenience

21   class treatment under anybody's analysis, would have had to be

22   reduced to a million dollars.

23       Mr. Leventon asserts a liquidated bonus claim in the

24   amount of $598,198.

25       If Mr. Ellington and Mr. Leventon were entitled to be

APP 2092

Case 3:25-cv-02072-S   Document 5   Filed 08/20/25   Page 113 of 790   PageID 3593

23

1   included in the convenience class, as they claimed, they would

2   be entitled to receive 85 percent of their claim as and when

3   the claims were allowed under the plan.

4      To settle the dispute regarding whether, in fact, they

5   would be entitled to the convenience class treatment, they

6   have agreed to reduce the percentage they would otherwise be

7   entitled to receive from 85 percent to 70.125 percent.  And as

8   a result, Mr. Ellington's Class 7 convenience claim would be

9   entitled to receive $701,250 if allowed, and Mr. Leventon's

10  Class 7 convenience claim would be entitled to receive

11  $413,175.10 if allowed.

12     Mr. Ellington and Mr. Leventon would reserve the right to

13  assert that a hundred percent of their liquidated bonus claims

14  are entitled to administrative priority, and the Debtor, the

15  Committee, the estate and their successors, would reserve all

16  rights to object.

17     If anyone did object to the allowance of the liquidated

18  bonus claims and Mr. Ellington and/or Mr. Leventon prevailed

19  in such disputes, then the discount that was previously agreed

20  to -- 85 percent to 70.125 percent -- would go away and they

21  would be entitled to receive the full 85 percent payout as

22  essentially a penalty for litigating against them on their

23  allowed claims and losing.

24     As an alternative to the estate preserving the right to

25  object to the allowance of Mr. Ellington and Mr. Leventon's

APP 2023

24

1    liquidated bonus claims, the Debtor and the Committee have an

2    option to be exercised before the effective date to just agree

3    that both their claims will be allowed, and allowed as Class 7

4    convenience claims.  And if that agreement was reached, then

5    the amount of such liquidated bonus claims, they would receive

6    a payment equal to 60 percent of their allowed convenience

7    class claim.

8        In exchange, Mr. Ellington and Mr. Leventon would waive

9    their right to assert payment of a hundred percent of their

10   liquidated bonus claims as an administrative expense.

11       So, under this circumstance, Mr. Ellington would receive

12   an allowed claim of $600,000, which is 60 percent of a million

13   dollars, and Mr. Leventon will receive a payment on account of

14   his Class 7 claim of $358,918.80.

15       Under both scenarios, Mr. Ellington and Mr. Leventon would

16   preserve their paid time off claims that are treated in Class

17   6, and they would preserve their other claims in Class 8,

18   largely unliquidated indemnification claims, subject to the

19   rights of any party in interest to object to those claims.

20       Mr. Ellington will change his vote in Class 8 from

21   rejecting the plan to accepting the plan, and Mr. Leventon

22   would change his votes in Class 8 and Class 7 from rejecting

23   the plan to accepting the plan.  And Mr. Ellington and Mr.

24   Leventon would withdraw any remaining objections to

25   confirmation of the plan, and we intend to put this settlement

APP 2094

25

1  in the confirmation order.

2       Your Honor, six objections to the plan remain outstanding.

3  One objection was filed by the Office of the United States

4  Trustee, and the remaining five objections are from Mr.

5  Dondero and his related entities.  And I would like to put up

6  a demonstrative on the screen which shows how all of these

7  objections lead back to Jim Dondero.

8            THE COURT:  All right.

9            MR. POMERANTZ:  You see on the top left, Your Honor,

10  there's a box in white that says A through E, which are the

11  five remaining objections.  And you can see how they relate.

12  But all of it goes back to that orange box in the middle, Jim

13  Dondero.

14       These objections, which I will address in my closing

15  argument in detail, are not really focused on concerns that

16  creditors are being treated unfairly, and that's because Mr.

17  Dondero and his entities don't really have any valid claims.

18  Mr. Dondero owns no equity in the Debtor.  He owns the

19  Debtor's general partner, Strand, which in turn owns a quarter

20  percent of the total equity in the Debtor.  Mr. Dondero's only

21  other claim is a claim for indemnification.  And as Your Honor

22  would expect, the Debtor intends to fight that claim

23  vigorously.

24       Dugaboy and Get Good have asserted frivolous

25  administrative and unsecured claims, which I will discuss in

APP 2085

002868

26

1    more detail later.

2        Dugaboy does have an equity interest in the Debtor, but it

3    represents eighteen-hundredths of a percent of the Debtor's

4    total equity.

5        And Mr. Rukavina's clients similarly have no general

6    unsecured claims against the Debtor.  Either his clients did

7    not file proofs of claim or filed claims and then agreed to

8    have them expunged.  The only claims that his clients assert

9    is a disputed administrative claim filed by NexPoint Advisors.

10       And the objections aren't legitimately concerned about the

11   post-confirmation operations of the estate, to preserve equity

12   value, how much people are getting, whether Mr. Seery is

13   really the right person to run these estates.  That's because

14   Mr. Dondero has repeatedly told the Court that he believes his

15   offer, which doesn't come close to satisfying claims in full

16   in this case, is for fair value and that creditors, who are

17   owed more than $280 million, will not receive anywhere close

18   to the amount of their claims.

19       Rather, Mr. Dondero and his entities are concerned with

20   one thing and one thing only:  how to preserve their rights to

21   continue their frivolous litigation after confirmation against

22   the independent directors, the Claimant Trustee, the

23   Litigation Trustee, the employees, the Claimant Trust

24   Oversight Board, and anyone who will stand in their way.  For

25   Mr. Dondero, the decision is binary:  Either give him what he

27

 1  wants, or as he has told Mr. Seery, he will burn down the

 2  place.

 3       Your Honor will hear a lot of argument today about how the

 4  -- and tomorrow, in closing -- about how the injunction, the

 5  gatekeeper, and the exculpation provisions of the plan are not

 6  appropriate under applicable law.  The Debtor, of course,

 7  disagrees with these arguments, and I will address them in

 8  detail in my closing argument.

 9       But I do think it's important to focus the Court at the

10  outset on the January 9, 2020 order that the Court entered

11  which addressed some of these issues.  This order, which has

12  not been appealed, which was actually agreed to by Mr.

13  Dondero, has no expiration by its terms and will continue

14  post-confirmation, did some things that the Objectors just

15  refuse to recognize and accept.

16       It approved an exculpation for negligence for the

17  independent directors and their agents.  It provided that the

18  Court would be the gatekeeper to determine whether any claims

19  asserted for them -- against them for gross negligence and

20  willful misconduct could be pursued, and if so, provided that

21  this Court would have exclusive jurisdiction to adjudicate

22  those claims.  And it prevented Mr. Dondero and his related

23  entities from causing any related entity to terminate any

24  agreements with the Debtor.

25       I also note, Your Honor, that the Court's July 16, 2020

28

1    order approving Mr. Seery as chief executive officer and chief
2    restructuring officer included the same exculpation and
3    gatekeeping provision as contained in the January 29th --
4    January 9th order.

5        Your Honor, we have all come too far to allow Mr. Dondero
6    to make good on his promise to Mr. Seery to burn down the
7    place if he didn't get what he wanted.  The Debtor deserves
8    better, the creditors deserve better, and this Court deserves
9    better.

10       That concludes my opening argument, Your Honor.

11          THE COURT:  All right.  Thank you.  I had one follow-
12   up question about the Daugherty settlement.  You did not
13   mention, is it going to be reflected in the confirmation
14   order, is it going to be the subject of a 9019 motion, or
15   something else?

16          MR. POMERANTZ:  It'll be subject to a -- it'll be
17   subject to a 9019 motion, Your Honor.

18          THE COURT:  All right.

19          MR. POMERANTZ:  I apologize for leaving that out.

20          THE COURT:  All right.  Thank you.  Well, --

21          MR. KATHMAN:  Your --

22          THE COURT:  -- I appreciate that you stuck closely to
23   your 20-minute time estimate.

24       As far as other opening statements today, I'm going to
25   start with the objections that were resolved.  Mr. Kathman, I

Main Document   Page 2102 of 2722

29

 1   see you there.  Who will speak on behalf of Patrick Daugherty

 2   and the announced settlement?

 3            OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

 4            MR. KATHMAN:  Good morning, Your Honor.  Jason

 5   Kathman on behalf of Mr. Daugherty.

 6       Mr. Pomerantz correctly recited the bullet points of the

 7   settlement that we agreed to in principle this morning.  There

 8   was one that he did leave off that I do want to make sure that

 9   I mention and that it's read into the record.  And he read at

10   the top end that Mr. Daugherty does maintain his ability to

11   pursue his 2008 tax refund bonus claim, or tax refund

12   compensation claim.  If the Court will recall, there's a

13   contingent liability out there based on how compensation was

14   paid back in 2008 that's the subject of an IRS audit.  And so

15   the settlement expressly contemplates that those -- that that

16   claim will be preserved and Mr. Daugherty may pursue that

17   claim.  Should the IRS have an adverse ruling and we have to

18   pay money back, we get to preserve that claim.

19       And so the one thing that is preserved, Your Honor -- and

20   the same way that Mr. Pomerantz read verbatim the words, I'm

21   going to read verbatim the words that we've agreed to:

22   Daugherty maintains and may pursue the 2008 tax refund

23   compensation portion of his claim that is currently a disputed

24   contingent liability.  The Debtor and all successors reserve

25   the right to assert any and all defenses to this portion of

APP 2909

30

1    the Daugherty claim.  The litigation of this claim shall be

2    stayed until the IRS makes a final determination, provided,

3    however, Daugherty may file a motion with the Bankruptcy Court

4    seeking to have the amount of his tax claim determined for

5    reservation purposes as a "disputed claim" under the Debtor's

6    plan.  The Debtor and all successors reserve the right to

7    assert any and all defenses to any such motion.

8        So the Debtor's plan says that they can make estimations

9    for disputed claims.  There is not currently something

10   reserving this particular claim, so we wanted to make sure we

11   reserve our rights to be able to have that amount reserved

12   under the Debtor's plan.  And the Debtor obviously preserves

13   their ability to object to that.

14       With that, Your Honor, it is going to be papered up in a

15   9019, and we'll have some further things to say at the 9019

16   hearing, but didn't want to derail the Debtor's confirmation

17   hearing this morning.

18           THE COURT:  All right.  And --

19           MR. POMERANTZ:  And Mr. Kathman is -- Mr. Kathman is

20   correct.  I neglected to mention that provision, but he is --

21   he read it, and that's agreed to.

22           THE COURT:  All right.  And I did not hear anything

23   about Mr. Daugherty's vote on the plan.  Is there an agreement

24   to change or a motion to change the vote from no to yes?

25           MR. KATHMAN:  Your Honor, that wasn't, I think,

002873
APP 2409

Case 3:25-cv-02072-S   Document 65-5   Filed 06/20/25   Page 121 of 790   PageID 3601

31

1   directly -- and Mr. Pomerantz can correct me if I'm wrong, or

2   Mr. Morris, actually, probably more could -- that wasn't

3   directly addressed, but I think the answer to that is probably

4   they don't need our vote.

5            THE COURT:  Okay.

6            MR. KATHMAN:  I think they have enough votes in that

7   class to carry.

8            THE COURT:  Okay.

9            MR. KATHMAN:  But the answer directly is that that

10   wasn't specifically addressed one way or the other.

11            THE COURT:  All right.

12            MR. POMERANTZ:  That is correct, Your Honor.  We

13   would, of course, not oppose Mr. Daugherty changing his vote,

14   but as Your Honor saw in the ballot summary, we are way over

15   the amount in dollar amounts of claims.  But if they wanted to

16   change their vote, we wouldn't oppose.

17            THE COURT: All right.  Well, --

18            MR. KATHMAN:  Your Honor, I have -- I have the

19   benefit of Mr. Daugherty.  He is on -- I should note, Mr.

20   Daugherty is on the hearing this morning.  He just let me know

21   that he is willing to change his vote.  If the Debtor were to

22   so make a motion, we're fine changing our vote to in favor of

23   the plan.

24            THE COURT:  All right.  All right.  Well, we'll get

25   the ballot agent declaration or testimony later.  At one time

Case 3:25-cv-02072-S   Document 65-5   Filed 06/05/25   Page 122 of 790   PageID 3602

32

 1   when I had checked, there was a numerosity problem but not a

 2   dollar amount problem.  And it sounds like that is no longer

 3   an issue, perhaps because of the employee votes, or I don't

 4   know.

 5       But, all right.  Well, thank you.

 6           MR. POMERANTZ:  Your Honor, there is still a

 7   numerosity problem.

 8           THE COURT:  Okay.

 9           MR. POMERANTZ:  There's not a dollar amount problem.

10           THE COURT:  Okay.

11           MR. POMERANTZ:  But we'll address that and cram-down

12   in closing.

13           THE COURT:  All right.  Very good.

14       All right.  Well, I want to hear from the -- what we've

15   called the Senior Employee group.  Is Ms. Dandeneau going to

16   confirm the announcement of Mr. Pomerantz?

17           MS. DANDENEAU:  Yes, Your Honor.  I confirm that Mr.

18   Pomerantz's recitation of the terms to which we've agreed is

19   accurate.

20           THE COURT:  All right.  Very good.

21       All right.  I suppose I should circle back to UBS.  We've,

22   of course, heard in prior hearings the past few weeks that

23   there was a settlement with UBS, but Mr. Clubok, could I get

24   you to confirm what Mr. Pomerantz announced earlier about the

25   UBS settlement?

Case 3:25-cv-02072-S   Document 6-5   Filed 09/05/25   Page 123 of 790

33

```
1              MR. CLUBOK:  Yes.  Good morning again, Your Honor.
2         Yes, we have reached a settlement, and it's just -- and
3     it's been approved internally at UBS and obviously by the
4     Debtor.  It's just subject to the final documentation.  And we
5     are working very closely with the Debtor to try to do that as
6     quickly as possible.
7              THE COURT:  All right.  Thank you.
8         All right.  Well, let me go, then, to other opening
9     statements.  Is there anyone else who at this time wishes to
10    make an opening statement?  And, you know, for the pending
11    objectors, please, no more than 20 minutes.
12             MR. CLEMENTE:  Your Honor?  Your Honor, if I may,
13    it's Matt Clemente on behalf of the Committee.
14             THE COURT:  Okay.
15             MR. CLEMENTE:  I'd be very brief, but I would like to
16    make some remarks to Your Honor.  It'll be less than five
17    minutes.
18             THE COURT:  All right.  Go ahead.
19             MR. CLEMENTE:  Thank you, Your Honor.
20   OPENING STATEMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE
21             MR. CLEMENTE:  Again, for the record, Matt Clemente;
22    Sidley Austin; on behalf of the Official Committee of
23    Unsecured Creditors.
24        Your Honor, to be clear, the Committee fully supports
25    confirmation of the Debtor's plan and believes the plan is
```

APP 2103

34

1   confirmable and should be confirmed.

2       Although it has taken us quite some time to get to this

3   point, Your Honor, and as Mr. Pomerantz referred, the Debtor's

4   business is somewhat complex, the plan is remarkably

5   straightforward, Your Honor, and has only been made

6   complicated by the various objections filed by Mr. Dondero's

7   tentacles.

8       At bottom, Your Honor, the plan is designed to recognize

9   the reality of the situation that the Committee has

10  continually been expressing to Your Honor, and that is the

11  overwhelming amount of creditors in terms of dollars are

12  litigation creditors, creditors who are here entirely because

13  of the fraudulent and other conduct of Mr. Dondero and his

14  tentacles.

15      The other third-party creditors, Your Honor, by and large

16  are those collateral to these litigation claims in terms of

17  true trade creditors and service providers.

18      Recognizing this fact, Your Honor, the plan contains an

19  appropriate convenience class, which, in the Committee's view,

20  provides a fair way to capture a large number of claims and

21  appropriately recognizes the distinction between those claims

22  and the large litigation claims.  And the holders of these

23  large litigation claims, including now Mr. Daugherty, have

24  voted in favor of allowing this convenience class treatment.

25      Your Honor, after distributions are made to the

APP 2101

35

1   administrative creditors, the priority creditors, the secured

2   creditors, and the convenience creditors, the remainder goes

3   to general unsecured creditors who will control how this value

4   is realized.  These are the large litigation creditors.

5       Additionally, Your Honor, recognizing the possibility of

6   recovery in excess of general unsecured claims plus interest,

7   and to thwart, from the Committee's perspective, what would

8   have undoubtedly been an argument by one of the Dondero

9   tentacles that the general unsecured creditors could be paid

10  more than they are owed, the plan provides for a contingent

11  interest to kick in after payment in full for interests of all

12  prior claims.

13      Your Honor, this is the sum and substance of the plan.  At

14  bottom, fairly straightforward.  And the true creditors, Your

15  Honor, have voted overwhelmingly in favor of the plan.  Class

16  8 has voted to support the plan.  Class 7 has voted to accept

17  the plan.  And now I believe, with Mr. Daugherty's settlement,

18  one hundred percent in amount of Class 8, non-insider, non-

19  Dondero-controlled or (audio gap) have voted in favor of the

20  plan.

21      To be clear, as Your Honor pointed out and as Mr.

22  Pomerantz referenced, there is not numerosity in Class 8, Your

23  Honor, but that is driven, as Your Honor will see, from

24  approximately 30 no-votes of current employees who the

25  Committee believes are not owed any amounts and therefore they

36

 1    will not be receiving payments under the plan, yet they voted

 2    against the plan.  So although we have a technical cram-down

 3    plan from the Class 8 perspective, Your Honor, the plan voting

 4    reflects the reality that the economic parties in interest

 5    overwhelmingly support the plan.

 6        So, Your Honor, cutting through the machinations of the

 7    Dondero tentacles, we do have a fairly straightforward plan

 8    and a plan that the Committee believes is confirmable and

 9    should be confirmed.

10        Your Honor, since I've been in front of you for over a

11    year now, I've referred to the goals of the Committee in this

12    case, and the goals are straightforward in terms of expressing

13    them but can be difficult in reality to implement them.  The

14    Committee's goals have been two-fold:  to maximize the value

15    of the estate and therefore the recoveries for its

16    constituency, and to disentangle from the Dondero (audio gap).

17        As with all things Highland, although these goals are

18    straightforward, they're remarkably difficult to achieve,

19    given the Dondero tentacles.  However, the Committee strongly

20    believes the plan achieves these two goals.

21        First, the plan provides a credible path to maximize

22    recovery with Mr. Seery, who has gotten to know the assets and

23    who has performed skillfully and credibly throughout this very

24    difficult process.  It is a difficult set of assets and

25    complex set of assets, as Your Honor knows very well.

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Main Document   Filed 08/01/25   Page 121 of 273   Page 127 of 790   PageID 3607

37

```
 1        To be sure, there is uncertainty associated with the
 2   Debtor's projections, but that is inherent in the nature of
 3   the assets of the Debtor, and frankly, is inherent in the
 4   nature of projections themselves.  And Mr. Dondero and his
 5   tentacles will point to the downside, potentially, in those
 6   projections, but the Court will be reminded that there is also
 7   potential upside in those projections, an upside that would
 8   inure to the benefit of the general unsecured claims.
 9        Second, Your Honor, although it is seemingly impossible to
10   free yourself from the Dondero web until every single one of
11   the 2,000 barbed tentacles is painfully removed, if that's
12   even possible, Your Honor, the Reorganized Debtor, the
13   Claimant Trust, the Claimant Trustee, the Litigation Sub-
14   Trust, the Litigation Trustee, and the Oversight Board
15   construct and mechanisms is a structure that the Committee
16   believes provides the creditors with the best possibility to
17   do so, and that is to deal with what will undoubtedly be a
18   flurry of attacks from Mr. Dondero and his tentacles.
19        This is a virtual certainty, Your Honor.  The creditors
20   have seen this movie before and Your Honor has seen this movie
21   before.  They have seen Mr. Dondero make and break promises.
22   They have seen Mr. Dondero attempt to bludgeon adversaries
23   into submission in order to accept his offerings, and they
24   have heard Mr. Dondero say that which he has said in this
25   court during the preliminary injunction hearing --
```

38

1    specifically, that the Debtor's plan "is going to end up in a

2    myriad of litigation."

3        The creditors are steeled in their will to be rid of Mr.

4    Dondero, and they're confident in this structure to do so.

5        To be clear, Your Honor, what is before the Court today

6    for confirmation is the Debtor's plan, not some other plan

7    that no one supports other than Mr. Dondero and his tentacles.

8    The question isn't whether Mr. Dondero has a better proposal

9    -- and footnote, Your Honor, the answer is he does not, both

10   from a qualitative and quantitative perspective -- but whether

11   the plan before the Court is in the best interest of creditors

12   and should be confirmed.  The Committee strongly believes it

13   is, and should, and all the Committee members support

14   confirmation of the Debtor's plan.

15       Recognizing Mr. Dondero's behavior, Your Honor, and

16   threats regarding how he will behave in the future, there are

17   certain provisions in the plan that are of critical importance

18   to the creditors.  Of course, all provisions in the plan are

19   extremely important, Your Honor, but as Mr. Pomerantz

20   referenced, the creditors need the gatekeeper, exculpation,

21   and injunction provisions.

22       The reason is obvious, and is emphasized by the

23   supplemental objection filed just yesterday by some of Mr.

24   Dondero's tentacles -- namely, the Dugaboy and the Get Good

25   Trusts.  And I quote, Your Honor: "It is virtually certain

39

1   that, under the Debtor's plan, there will be years of

2   litigation in multiple adversary proceedings, appeals, and

3   collection activities, all adding substantial uncertainty and

4   delay."

5        Additionally, Your Honor has seen from the proceedings in

6   this case and has expressed frustration at numerous times at

7   the myriad and at times baseless and borderline frivolous and

8   out of touch with reality suits and objections and proceedings

9   that the Dondero tentacles bring.  The creditors need the

10  gatekeeper, exculpation, and injunction provisions to preserve

11  and protect value.  And the record, I think, to this point is

12  clear, and will be further made clear through the confirmation

13  proceedings, that the protections are appropriate and entirely

14  within this Court's authority to grant.

15       In sum, Your Honor, the Committee fully supports

16  confirmation of the plan.  The Committee believes it is

17  confirmable and should be confirmed, and two classes of

18  creditors and the overwhelming amount of creditors in terms of

19  dollars agree.

20       That's it, Your Honor.  Unless you have questions for me,

21  I have nothing further at this time.

22            THE COURT:  All right.  Thank you, Mr. Clemente.

23            MR. CLEMENTE:  Thank you, Your Honor.

24            THE COURT:  All right.  Who else wishes to be heard?

25            MR. DRAPER:  Your Honor, this is Douglas Draper.  I'd

40

 1   like to be heard.  I have a few -- I'll take five minutes, at

 2   most --

 3           THE COURT:  All right.  Go ahead.

 4           MR. DRAPER:  -- and just focus on a few things.

 5   OPENING STATEMENT ON BEHALF OF THE GET GOOD TRUST AND DUGABOY

 6                     INVESTMENT TRUST

 7           MR. DRAPER:  I'm going to focus my opening remarks on

 8   the releases, the exculpations, and channeling injunctions in

 9   the plan.  I'm not waiving my other objections, but, rather,

10   trying not to subject the Court to hearing the same argument

11   from multiple lawyers.

12       The good thing about the law is that it's absolute in

13   certain respects.  It does not matter who is asserting a legal

14   protection, the law applies it.  For example, a serial killer

15   is entitled to a *Miranda* warning and a protection against

16   unlawful search and seizure.  The law does not allow tainted

17   evidence or an unlawful admission into evidence,

18   notwithstanding the fact that the lack of admission of that

19   evidence may lead to the freeing of that serial killer.

20       Today, you must make an independent evaluation as to

21   whether the plan complies with 1129 and applicable law.  The

22   decision must be made notwithstanding the fact that it is

23   being made by a Dondero entity.  It's not being -- it must be

24   applied notwithstanding the fact that it's being made by me.

25       We contend that the plan does not meet the hurdle and

APP 2449

41

1    confirmation should be denied, notwithstanding the fact that

2    the infirmity with the plan is asserted by me and

3    notwithstanding the fact that Mr. Pomerantz and the unsecured

4    creditors have overwhelming support.

5        We all know 1141, the Barton Doctrine, and 544 -- 524

6    provide injunctions and protections for certain parties

7    associated with the Debtor.  Had the plan merely referenced

8    these sections and stated that the injunction, et cetera,

9    shall not exceed those allowed pursuant to *Pacific Lumber*, I

10   would not be making this argument.

11       Instead, we see a plan that has a definition of Exculpated

12   Parties, Released Parties, Related Parties, that exceed the

13   protections afforded by the Bankruptcy Code, the Barton

14   Doctrine, and 524.

15       We have a grant of jurisdiction and oversight that exceeds

16   that allowed under *Craig's Store*, the *Craig's Store* line of

17   cases.

18       We have releases of claims against non-debtor parties,

19   such as Strand, who is, under the Bankruptcy Code, under 723,

20   liable for the debts of the Debtor.

21       The plan, with its expansive releases, released parties,

22   grant of injunctions, exculpations and channeling injunctions,

23   are impermissible under Fifth Circuit case law.  And I would

24   ask the Court to look closely at those definitions, who is --

25   who the law allows to be exculpated and released and who the

42

1    law specifically prohibits being exculpated and released, and,

2    in fact, apply the *Pacific Lumber* line of -- case, as well as

3    524 and the Bankruptcy Code when you look at these issues.

4         Notwithstanding the overwhelming so-called support by the

5    creditors at issue, the law must be applied, and it must be

6    applied pursuant to what the Fifth Circuit requires.

7              THE COURT:  All right.  Thank you, Mr. Draper.

8         Other Objectors with opening statements?

9              MR. RUKAVINA:  Your Honor, Davor Rukavina.  Briefly?

10             THE COURT:  Okay.

11   OPENING STATEMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12             MR. RUKAVINA:  Your Honor, I represent various funds,

13   including three of which have independent boards.  The Debtor

14   manages more than $140 million of those funds, and the Debtor

15   manages around a billion dollars in CLOs.

16        Whether I am a tentacle of Mr. Dondero or not -- I'm not,

17   since there's an independent board -- the fact remains that

18   the Debtor wants to manage these assets and my clients' money

19   post-assumption and post-confirmation with effective judicial

20   immunity.  So our fundamental problem with this plan is the

21   assumption of those contracts under 365(c) and (b).  I think

22   we'll have to wait for the evidence to see what the Debtor

23   proposes and has, and I will reserve, I guess, the balance of

24   my arguments on that to closing, depending on what the

25   evidence is.

43

 1        But I don't want the Court to lose sight of the fact that

 2   what the Debtor wants to do is, in contravention of our

 3   desires, continue managing our assets post-confirmation, even

 4   as it liquidates, just to make a buck.  It's our money, Your

 5   Honor, and whether we're Dondero or not, we're a couple

 6   hundred million, probably, or more, of third-party investment

 7   professionals, pension funds, et cetera, and we should not be

 8   all tainted without evidence as a tentacle of someone whom,

 9   I'll remind everyone here, built a multi-billion dollar

10   company and made a lot of money for people.

11        The second objection, Your Honor, goes to the Class 8

12   rejection.  It sounds like there's still a problem with the

13   number of creditors, even though certain creditors have

14   switched their votes.  That raises now the fair and equitable

15   standard, together with the undue discrimination and the

16   absolute priority rule.  I think we'll have to let the

17   evidence play out, and I'll reserve the balance of my closing

18   or the balance of my remarks to closing on that issue.

19        The third issue, Your Honor, is the same exculpation and

20   release and injunction provisions that Mr. Draper raised.

21   Those are legal matters that I'll discuss at closing, but I do

22   note that the Debtor purports to prevent my clients from

23   exercising post-assumption post-confirmation rights, period.

24   And that's just inappropriate, because if the Debtor wants the

25   benefits of these agreements, well, then of course it has to

44

1    comply with the burdens.  And to say *a priori* that anything

2    that my clients might do post-confirmation would be the result

3    of a bad-faith Mr. Dondero strategy, there's no basis for that

4    and that's not the basis on which my clients' rights in the

5    future, when there is no bankruptcy estate and there is no

6    bankruptcy jurisdiction, can be enjoined.

7        And the final point, Your Honor, entails this channeling

8    injunction.  I'll talk about it during closing.  It is

9    inappropriate under 28 U.S.C. 959.  This is not a Barton

10   Doctrine trustee issue, this is a debtor-in-possession, and a

11   channeling injunction, the Court will have no jurisdiction

12   post-confirmation.

13       Thank you, Your Honor.

14           THE COURT:  All right.  Thank you.

15       Does Mr. Dondero's counsel have an opening statement?

16           MR. TAYLOR:  I do, Your Honor.  I'll keep it brief.

17   This is Clay Taylor on behalf of Mr. Dondero.

18           THE COURT:  Okay.

19           OPENING STATEMENT ON BEHALF OF JAMES D. DONDERO

20           MR. TAYLOR:  Your Honor, the plan is clear in some

21   respects, and I'm not going to belabor these points, as other

22   objecting counsel have already addressed this.  But the plan

23   does provide for non-debtor releases, and it provides for non-

24   debtor releases for parties beyond that which is allowed by

25   *Pacific Lumber* and under the Code.

APP 2171

45

1        It also provides for exculpations of non-debtor parties in

2   excess of that which is allowed under the Code and applicable

3   case law.

4        Finally -- or, not finally, but third, it requires this

5   Court to keep a broad retention of post-confirmation

6   jurisdiction that could go on for years, and that is improper.

7        Finally, it requires the parties to submit to the

8   jurisdiction of this Court via a channeling injunction, which

9   we believe is beyond that which is allowed under applicable

10  Fifth Circuit precedent.

11       What is clear, what the evidence will show -- and I

12  thought it was interesting that none of the proponents of plan

13  confirmation ever talk about what the evidence is going to

14  show.  They testified a lot before Your Honor, but they didn't

15  ever talk about what the evidence would show.  What the

16  evidence will show is this plan was solicited via a disclosure

17  statement that told all the unsecured creditors, we project

18  that you're going to receive 87 cents on the dollar on your

19  claim.

20       About two months later, and this was Friday of this past

21  week, they changed those projections, and those projections

22  then showed unsecured creditors, under a plan analysis, that

23  they were going to receive 62 cents on the dollar.  That is in

24  contrast to the liquidation analysis that had been prepared

25  just two months prior showing that, under a hypothetical

46

1    Chapter 7 liquidation analysis, that the unsecured creditors
2    would receive 65 cents on the dollar.  Obviously, 62 cents is
3    less than 65 percent.

4        Realizing they had a problem, I guess, over the weekend,
5    they changed last night, the night before confirmation, and
6    sent us some new projections that now show that the unsecured
7    creditors under a plan would receive 71 cents on the dollar.

8        Your Honor, what the evidence will show, and it is
9    Highland's burden to show this, is that -- that they meet the
10   best interests of the creditors.  And part of that is that
11   they will do better under a plan rather than under a
12   hypothetical Chapter 7.

13       Quite simply, they don't have the evidence, nor have they
14   done the analysis to be able to prove that to this Court.

15       What the evidence will also show is clear is that Mr.
16   Seery, under the plan analysis, is scheduled to receive at
17   least $3.6 million over just the first two years of this plan
18   if it doesn't go any further.  And that's just for monthly
19   payouts of $150,000 per month.  That's not including a to-be-
20   agreed-upon success fee structure, which hasn't been
21   negotiated yet.  And if it hasn't been negotiated yet, it
22   can't be analyzed yet to see if those costs would exceed their
23   benefits and therefore drive the return down such that a
24   hypothetical Chapter 7 trustee could do better.

25       There is also going to be additional costs for the

47

 1   Litigation Trustee and the fees that they are going to charge.

 2   There's going to be an Oversight Committee, and those fees are

 3   also to be negotiated.  There's also U.S. Trustee fees, which

 4   Mr. Seery tells us that he has calculated within the

 5   liquidation and plan analysis numbers, albeit both myself and

 6   Mr. Draper, as the evidence will show, have asked for the

 7   rollups that come behind the liquidation and plan analysis in

 8   each instance of the three iterations that have been done in

 9   two months, and we have been denied that information.  That

10   evidence is not going to come in before this Court, and

11   without that rollup information, this Court can't make an

12   independent verification that this meets the best interests of

13   the creditor and better than a hypothetical Chapter 7 trustee.

14       What the evidence will also show, make an assumption that,

15   under a plan analysis, that Mr. Seery will be able to generate

16   higher returns on the sale of the assets of the Highland

17   debtor and its subsidiaries, to the neighborhood of $60

18   million higher.  There is no independent verification of this.

19   There has been no due diligence done.  It was merely an

20   assumption done by Mr. Seery and his advisors, and we submit

21   that they will not have the evidence to show that they can

22   beat a Chapter 7 trustee.

23       This Court does have an alternative before it.  There is

24   an alternative plan that has been filed under seal.  The Court

25   is aware of it.  And it guarantees that creditors will receive

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65-5    FiledDocument Filed 06/23/25 of 272   Page 138 of 790    PageID 3618

48

1    at least 65 cents on the dollar.  Moreover, those claims are

2    guaranteed -- and they're going to be secured that they will

3    be paid that money.

4         MR. POMERANTZ:  Your Honor, this is under -- this is

5    under seal.  And I never interrupt somebody's argument, but

6    this plan is under seal for a reason, Your Honor, and I object

7    to any description of the terms of a plan that's not before

8    Your Honor and is under seal.

9         THE COURT:  Okay.  I sustain that objection.

10        MR. TAYLOR:  Your Honor has a means to cut the

11   Gordian knot of the litigation and appeals before it and to

12   ensure that there is certainty for creditors.  It would

13   massively reduce the administrative fee burn that is

14   contemplated under the proposed plan before the Court.  As

15   I've mentioned, it's at least $3.6 million just in monthly

16   fees for Mr. Seery alone.  All of the rest of the fees are yet

17   to be determined and to be negotiated.  I don't see how any

18   analysis could have been done regarding the administrative fee

19   burn that is going to happen over the two years and

20   potentially much further as this case draws on.

21      For those reasons alone, Your Honor, we believe that the

22   plan confirmation should be denied and this Court should look

23   at the alternatives before it.

24        MR. KATHMAN:  Can I say something before --

25        MR. TAYLOR:  Thank you, Your Honor.

APP 0148

Case 3:25-cv-02072-S   Document 15   Filed 06/23/25   Page 139 of 790   PageID 3619

49

```
 1            THE COURT:  All right.  Thank you.
 2       All right.  Have I missed any Objectors?
 3            MR. KATHMAN:  Your Honor?
 4            MS. DRAWHORN:  Yes, Your Honor.
 5            THE COURT:  Okay.  Ms. --
 6            MR. KATHMAN:  Your Honor, if I could spend just one
 7  minute, and I -- we -- I -- we filed a joinder on behalf of
 8  Mr. -- or, Jason Kathman on behalf of Davis Deadman, Todd
 9  Travers, and Paul Kauffman.
10            THE COURT:  Uh-huh.
11     OPENING STATEMENT ON BEHALF OF DAVIS DEADMAN, TODD TRAVERS,
12                     AND PAUL KAUFFMAN
13            MR. KATHMAN:  Mr. Pomerantz had noted, I think, at
14  the front end that the Debtor amended their plan that resolved
15  those objections.  I just want to say for the record that
16  those had been resolved.
17       And with that, Your Honor, may I be dismissed?
18            THE COURT:  Yes, you may.  Thank you.
19            MR. KATHMAN:  Thank you, Your Honor.
20            THE COURT:  All right.  Was Ms. Drawhorn speaking up
21  to make an opening statement?
22            MS. DRAWHORN:  Yes.
23            THE COURT:  Go ahead.
24            MS. DRAWHORN:  Yes, Your Honor.
25            THE COURT:  Go ahead.
```

APP 2119

50

1              OPENING STATEMENT ON BEHALF OF THE NEXPOINT PARTIES

2                   MS. DRAWHORN:  Just very briefly, Lauren Drawhorn on

3       behalf of NexPoint Real Estate Partners, the NexPoint Real

4       Estate entities, and NexBank.

5           Just a very brief opening.  Just wanted to note that it

6       seems that the Debtor's and the Committee's position seems to

7       be if there's some way, any way, to connect an entity to Mr.

8       Dondero, then they don't need to perform any true evaluation

9       of potential claims or that party's rights or their concerns,

10      and that results in ignoring not only the merits of many

11      claims but also the basic requirements of due process and the

12      statutes, the Bankruptcy Code, and the case law.

13          We filed objections that were focused largely on the

14      injunctions and the releases, and then also the proposed

15      subordination provisions.

16          Two of my clients, one of them has a proof of claim, and

17      while it is being disputed, that claim is out there and should

18      get -- be entitled to be pursued and defended, and many of the

19      injunctions appear to prevent my client from doing so.

20          Similarly, it was mentioned that NexBank, in the

21      demonstrative, had a terminated service agreement, but there's

22      periods of time for which no services were provided but

23      payment was made, and that's a potential admin claim that has

24      been raised.  And the injunction, again, appears to prevent my

25      clients from pursuing these claims.

51

1        So I think, despite the general response to any connection

2    to Dondero means there's no merit, that's not what we're here

3    for today.  We need to really look at the merits of all

4    potential claims and all -- the rights of all parties and the

5    -- how the injunction and release provisions prevent that and

6    how they don't comply with the required law.

7        And, of course, we join in with many of the other

8    objections, but that's my main point for the opening today.

9            THE COURT:  All right.  Thank you.

10       All right.  I think I have covered all of the at least

11   pending objections except the U.S. Trustee.  I'll check again

12   to see if someone is out there for the U.S. Trustee.  (No

13   response.)  All right.  If you're there, we're not hearing

14   you.  You're on mute.

15       Okay.  Any other attorneys out there who wish to make an

16   opening statement?

17       All right.  Well, I'll turn back to Mr. Pomerantz.  You

18   may call your first witness.

19           MR. POMERANTZ:  Okay.  I will turn the virtual podium

20   over to my partner, John Morris, who will be putting on our

21   witnesses.

22           THE COURT:  All right.  Mr. Morris, you may call your

23   first witness.

24           MR. MORRIS:  Good morning, Your Honor.  John Morris

25   from Pachulski Stang Ziehl & Jones on behalf of the Debtor.

52

1    Can you hear me okay?

2              THE COURT:  I can.

3              MR. MORRIS:  Okay.  Thank you very much.

4         The Debtor calls James Seery as its first witness.

5              THE COURT:  All right.  Mr. Seery, if you could say,

6    "Testing, one, two," please.

7              MR. SEERY:  Testing, one, two.

8              THE COURT:  All right.  Hmm, I've not picked up your

9    video yet.  Let's try it again.

10             MR. SEERY:  Testing, one, two.  Testing.

11             MR. MORRIS:  We have the audio.

12             THE COURT:  We have the audio.

13             MR. SEERY:  Oh.

14             MR. MORRIS:  There we go.

15             THE COURT:  There you are.

16             MR. SEERY:  The video should be working.

17             THE COURT:  All right.

18             MR. POMERANTZ:  Yeah.  Actually, one -- Your Honor,

19   one thing before we start.  We have Patrick Leatham from KCC.

20   He is prepared to sit on the line for the whole day until his

21   time comes.  I would just like to know if anyone intends to

22   cross-examine him or object to his declaration.  Because if

23   they don't, we could excuse Mr. Leatham.

24             THE COURT:  All right.  What about that?  Anyone

25   want to cross-examine the balloting agent?

APP 2122

53

1          MR. RUKAVINA:  Your Honor, Davor Rukavina.  I do not.

2     If the Debtor would just state, with the change of votes in

3     Class 8, what the final tally is, I see no reason to dispute

4     that, and then we can dismiss this gentleman.  But I do think

5     that we should all know, with the change of votes, what it now

6     is.

7          THE COURT:  All right.

8          MR. POMERANTZ:  We will -- we will work on that, Your

9     Honor, with the changes as a result of the settlements today,

10    and including Mr. Daugherty's client.  We can get that

11    information sometime today.

12         THE COURT:  All right.  So, Mr. Rukavina, do you

13    agree that he can be excused with that representation, or do

14    you want --

15         MR. RUKAVINA:  Yes, Your Honor.

16         THE COURT:  Okay.  All right.  So, it's Mr. Leatham?

17    You are excused if you want to drop off this video.

18       All right.  Mr. Seery, please raise your right hand.

19           JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

20         THE COURT:  All right.  Thank you.  Mr. Morris, go

21    ahead.

22         MR. MORRIS:  Thank you, Your Honor.

23       If I may, I'd like to just begin by moving my exhibits

24    into evidence so that it'll make this all go a little bit

25    smoother.

54

1         THE COURT:  All right.

2         MR. MORRIS:  And if you'll indulge me just a little

3    patience, please, because the Debtor's exhibits are found in

4    three separate places.

5         THE COURT:  Uh-huh.

6         MR. MORRIS:  And I would just take them one at a

7    time.

8       First, at Docket No. 1822, the Court will find Debtor's

9    Exhibits A through what I'm referring to as 6Z.  Six Zs.  So

10   the Debtor respectfully moves into evidence Exhibits A through

11   6Z on Docket No. 1822.

12        THE COURT:  All right.  Are there any objections?

13        MR. RUKAVINA:  Your Honor, I have a number of

14   targeted objections to all of the exhibits.  Did I hear Mr.

15   Morris say 6Z?

16        THE COURT:  Yes.

17        MR. MORRIS:  Yes.

18        MR. RUKAVINA:  Or six -- then, Your Honor, I can go

19   through my limited objections, if that pleases the Court.

20        THE COURT:  All right.  Go ahead.

21        MR. RUKAVINA:  Your Honor, Exhibit B, a transcript, B

22   as in boy.  Exhibit D, an email, D as in dog.  Exhibit E as in

23   Edward.  Moving on, Your Honor, 4D as in dog.  4E as in

24   Edward.

25        MR. MORRIS:  Slow down, please.

Case 3:25-cv-02072-S    Document 5    Filed 06/23/28 of 2732   Page 145 of 790    PageID 3625

55

 1              THE COURT:  Okay.

 2              MR. RUKAVINA:  I'm sorry.

 3              THE COURT:  You said 4D as in dog, correct?

 4              MR. RUKAVINA:  Then -- yes, Your Honor.  Then 4E as

 5    in Edward.

 6              THE COURT:  Okay.

 7              MR. RUKAVINA:  4G as in George.  Your Honor, one,

 8    two, three, four, five T.  5T as in Tom.  And then, Your

 9    Honor, one, two -- 6R.  6S.  6T as in Tom.  And 6U as in

10    under.  That's it.

11              THE COURT:  All right.  Well, Mr. Morris, do you want

12    to carve those out for now and just offer them the old-

13    fashioned way and I can rule on the objections then?

14              MR. MORRIS:  Why don't we do that?  I may just deal

15    with it at the end of the case.  But subject to those

16    objections, the Debtor then moves into evidence the balance of

17    the exhibits on Docket 1822.

18              THE COURT:  All right.  So, for the record, the Court

19    will admit all exhibits at Docket No. 1822 at this time except

20    B, D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U.

21         (Debtor's Docket 1822 exhibits, exclusive of Exhibits B,

22    D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U, are received into

23    evidence.)

24              THE COURT:  All right.  Mr. Morris, continue.

25              MR. MORRIS:  Thank you, Your Honor.

APP 2198

56

 1      Next, at Docket 1866, you'll find Debtor's Exhibits 7A

 2   through 7E, and the Debtor respectfully moves those dockets --

 3   documents into evidence.

 4           THE COURT:  All right.  Any objection?  (No

 5   response.)  Are there any objections?

 6           MR. RUKAVINA:  Your Honor, not from -- not from me.

 7           THE COURT:  All right.  Hearing no objections, the

 8   Court will admit all Debtor exhibits appearing at Docket Entry

 9   No. 1866.

10           MR. MORRIS:  Thank you, Your Honor.

11       (Debtor's Docket 1866 exhibits are received into

12   evidence.)

13           MR. MORRIS:  And finally, at Docket 1877, the Court

14   will find Debtor's Exhibits 7F through 7Q, and the Debtor

15   respectfully moves for the admission of those documents into

16   evidence.

17           THE COURT:  All right.  Any objection?

18           MR. RUKAVINA:  Your Honor, I might have to talk about

19   this with Mr. Morris, but I have 7F as any document entered in

20   the case, 7G as any document to be filed, et cetera.  Mr.

21   Morris, am I wrong about that?

22           MR. MORRIS:  I don't have that list in front of me.

23   So I'll reserve on those documents and we can talk about them

24   at a break, Your Honor.

25           THE COURT:  All right.

57

1          MR. DRAPER:  Your Honor, this is Douglas Draper.  I

2   object, and I don't have the number in front of me, it's the

3   liquidation analysis and the plan summary.  It's a summary

4   exhibit, and we've not been given the underlying documentation

5   with respect to them.  I'd ask Mr. Morris to deal with that

6   separately also.

7          MR. MORRIS:  All right.  Well, we're certainly going

8   to be moving that into evidence, so we can deal with that at

9   the time, Your Honor.

10         THE COURT:  Okay.  Which documents are they?  Which

11  exhibits are those?

12         MR. DRAPER:  I don't have the number in front -- Mr.

13  Morris, do you have the number for that exhibit?

14         MR. MORRIS:  I do, but why don't we just deal with it

15  when I -- when I get into --

16         THE COURT:  Okay.

17         MR. MORRIS:  -- into the testimony?

18         THE COURT:  I just wanted the record clear what I am

19  admitting at this time at Docket Entry No. 1877.  Or do you

20  want to just --

21         MR. MORRIS:  Okay.

22         THE COURT:  -- hold all those --

23         MR. MORRIS:  Mr. Rukavina, other than F and G, which

24  you noted, is there any objection to any of the other

25  documents on that witness and exhibit list?

Seery - Direct                                    58

1          MR. RUKAVINA:  Well, I also have H as impeachment/

2    rebuttal, I as any document offered by any other party.  So I

3    would suggest, Mr. Morris, that I have my associate confirm

4    that I have the right -- the right stuff here, and we can take

5    it up maybe during a break.  But I have F, G, H, I as so-

6    called catchalls, not any discrete exhibits.

7          MR. MORRIS:  All right.  All right, Your Honor.

8    Let's, let's just proceed.  We've got -- we took care of

9    Docket No. 1822 and 1866, and the balance we'll deal with at a

10   break, --

11         THE COURT:  All right.

12         MR. MORRIS:  -- unless they come up through

13   testimony.

14         THE COURT:  All right.  That sounds good.

15         MR. MORRIS:  Okay.  Thank you very much.  May I

16   proceed?

17         THE COURT:  You may.

18         MR. MORRIS:  Okay.

19                      DIRECT EXAMINATION

20   BY MR. MORRIS:

21   Q   Good morning, Mr. Seery.

22   A   (no response)

23   Q   Can you hear me?

24   A   Apologies.  I went on mute.  Can you hear me now?  I

25   apologize.

Seery - Direct                          59

1  Q    Yes.  Good morning.

2          MR. MORRIS:  So, let's begin, Your Honor, with just a

3  little bit of background of Mr. Seery and how he got involved

4  in the case.

5  BY MR. MORRIS:

6  Q    Mr. Seery, what's your current position with the Debtor?

7  A    I am the CEO, the CRO -- the chief restructuring officer

8  -- as well as an independent director on the Strand Advisors

9  board of directors.

10 Q    Okay.

11         MR. MORRIS:  Your Honor, I'm going to ask Mr. Seery

12 to describe a bit for his background.  For the record, you'll

13 find that Exhibits 6X, 6Y, and 6Z, on the Debtor's exhibit

14 list at Docket 1822, the resumes and *C.V.s* of the three

15 independent members of the board.  If Your Honor has any

16 question about their qualifications and their experience, that

17 evidence is already in the record.

18         THE COURT:  Okay.

19 BY MR. MORRIS:

20 Q    But Mr. Seery, without going into the detail of everything

21 that's on your *C.V.*, can you just describe for the Court

22 generally your professional background, starting, well, with

23 your time as a lawyer?

24 A    I've been involved in the restructuring, finance,

25 investing and managing of assets and banking-type assets for

APP 2129

Seery - Direct                         60

1  over 30 years.

2      I began in restructuring in real estate.  Became a lawyer,

3  and was a lawyer in private practice dealing with

4  restructuring and finance for approximately ten years, in

5  addition to time before that on the real estate side.

6      I joined Lehman Brothers on the business side in 1999,

7  where I immediately began working on the -- with a distress

8  team as a team member investing off the balance sheet, Lehman

9  Brothers assets in various types of distressed financing

10 investments.  Bonds, loans, equities.  In addition, then I

11 became the head of Lehman's loan business globally.  I ran

12 that business for the number of years.  Was one of the key

13 players in selling Lehman Brothers to Barclays in a very

14 difficult situation and structure.

15     After that, joined some of my partners, we formed a hedge

16 fund called RiverBirch Capital, about a billion and a half

17 dollar hedge fund in -- operating in -- globally, but mostly

18 U.S. stressed/distressed assets that we invested in.

19 Oftentimes, though, we would run from high-grade assets all

20 the way down to equities, different types of investors,

21 different types of investments.

22     Thereafter, I left -- was -- joined Guggenheim.  I left

23 Guggenheim, and shortly thereafter became a director at

24 Strand.

25 Q   Prior to acceptance of the positions that you described

APP 2139

Seery - Direct                                        61

1   earlier, were you at all familiar with Highland or Mr.

2   Dondero?

3   A    Yeah.  I was, yes.

4   Q    Can you just describe for the Court how you became

5   familiar with Highland and Mr. Dondero?

6   A    Highland was a customer of Lehman Brothers, and it was --

7   particularly in the loan business.  And the CLO businesses.

8   Highland was run by Mr. Dondero, and I knew of that business

9   through that --

10       (Interruption.)

11            MR. MORRIS:  Can somebody please put their device on

12   mute?

13            A VOICE:  That's Mr. Taylor.

14            THE COURT:  Mr. Taylor, you were off mute,

15   apparently, for a moment.  Make sure you're staying on mute.

16   Thank you.

17            MR. TAYLOR:  Yes.  Sorry, Your Honor.  I thought we

18   might have a hearsay objection.  I wasn't sure what the answer

19   was going to be, so I wanted to be prepared to object.

20            THE COURT:  All right.  Thank you.

21   BY MR. MORRIS:

22   Q    Did you know or meet Mr. Dondero in the course of what you

23   just described?

24   A    Yes, I did.  I believe we met once or twice over the

25   years.  There was a senior team member who handled the

1   Highland relationship.   He was quite good, quite experienced,
2   and he handled most of the Highland relationship issues.  But
3   Highland, we came across a number of times, whether it be in
4   -- I came across a number of times, whether it be in specific
5   investments we had where they would be either a competing
6   party or holding a similar interest, whether they were a
7   customer purchasing loans or securities, whether they were a
8   potential CLO customer where we were structuring some assets
9   for them.
10  Q   Okay.  And who are the two other members of the
11  independent board at Strand?
12  A   John Dubel and Russel Nelms.
13  Q   And had you had any personal experience with either of
14  those gentleman prior to this case?
15  A   I knew of Mr. Nelms and his experience as a bankruptcy
16  judge in the Northern District of Texas, and I had worked on
17  one matter with Mr. Dubel, but very, very briefly, while he
18  was the CEO of FGIC, which is a large insurer in the financial
19  insurance space that he was responsible for reorganizing and
20  ultimately winding down.
21  Q   Okay.  How did you learn about this particular case?  How
22  did you learn about the opportunity or the possibility of
23  becoming an independent director?
24  A   Initially, I was contacted by some of the creditors and
25  asked whether I was interested, and I indicated that I was.

Seery - Direct                              63

 1   Subsequently, I received a call from the Debtor's

 2   representatives as well meeting the counsel as well as the

 3   financial advisor as well as specific members of the Debtor's

 4   senior management.

 5   Q    Do you know how long in advance of the January 9th

 6   settlement you were first contacted?

 7   A    Probably four, four or five days at the most, but started

 8   working immediately at that time because it was a pretty

 9   complicated matter and the interview process would be quick

10   because of the hearing date that was coming up.

11   Q    Do you recall the names of any of the creditors who

12   reached out to you?

13   A    I spoke to counsel for UBS.  Certainly, Committee counsel.

14   I don't recall if I spoke to anybody from Jenner Block in the

15   initial interview.  And then I spoke to representatives from

16   your firm as well as Mr. Leventon and ultimately Mr.

17   Ellington.

18   Q    Did you do any due diligence before accepting the

19   appointment?

20   A    I did, yes.

21   Q    Can you describe for the Court the due diligence you did

22   before accepting your appointment as independent director?

23   A    Well, I got the petition, I read the petition, as well as

24   the first day, as well as the venue-changing motion.  In

25   addition, I went through the schedules.  Ultimately, I took a

Seery - Direct                              64

 1    look at and examined the limited partnership agreement of the
 2    Debtor, with particular focus on the indemnity provisions.  I
 3    then sat down with the Committee to get their views as part of
 4    the interview process, as well as the Debtor's counsel and
 5    Debtor's representatives.
 6    Q    Did you -- in the course of your diligence, did you come
 7    to an understanding or did you form a view as to why an
 8    independent board was being sought at that time?
 9    A    Yes, I did.
10    Q    And what view or understanding did you come to?
11    A    There was extreme antipathy from the creditors, as
12    evidenced by the venue motion and the documents around that
13    venue motion.
14         In addition, in the first day order, or affidavit, you
15    could see the issues related to Redeemer and the length of
16    time that litigation has been gone on, going on.
17         The creditors became extremely concern with Mr. Dondero
18    having any control over the operations of the Debtor and
19    wanted to make sure that either he was removed from that or
20    that -- and someone else was brought in, or that the case was
21    somehow taken over by a trustee.
22    Q    Did you form any views as to the causes of the Debtor's
23    bankruptcy filing?
24    A    The initial cause was the entry or the soon-to-be-entered
25    order related to the arbitration with Redeemer, but it was

Seery - Direct                               65

1  pretty clear from looking at the first day that there was a

2  number of litigations.  The bulk of the creditor body was made

3  up of -- on the liquidated side was made up of litigation

4  creditors.  And then the other creditors, the Committee

5  members, other than Meta-e, were significant litigation

6  creditors.

7              MR. MORRIS:  Your Honor, I think Mr. Seery was sworn

8  in, but unless -- unless you -- if you think there's a need,

9  I'm happy to have you swear Mr. Seery in again just to make

10  sure his testimony is under oath.

11             THE WITNESS:  I was sworn in.

12             THE COURT:  Yes, I swore him in.

13             MR. MORRIS:  That's what I thought.  That's what I

14  thought.  Somebody had made the suggestion to me, so I was

15  just trying to make sure, because I didn't want any unsworn

16  testimony here today.

17             THE COURT:  We did.

18             MR. MORRIS:  Okay.

19             THE COURT:  We did.

20             MR. MORRIS:  Thank you.  Thank you.

21  BY MR. MORRIS:

22  Q    Ultimately, sir, just to move this along a little bit, do

23  you recall that an agreement was reached with the UCC and Mr.

24  Dondero and the Debtor concerning governance issues?

25  A    Yes, I do.

APP 2435

Case 3:25-cv-02072-S   Document 16-5 Filed 06/13/25   Page 156 of 790   PageID 3636

Seery - Direct                                   66

1   Q    And did you accept your position as an independent

2   director at Strand as part of that corporate governance

3   settlement?

4   A    That, that was part of the appointment.  We -- the

5   independent directors were brought in to take -- really, to

6   take control of the company as independent fiduciaries.  And

7   the idea, I think, was that there was a Chapter 7 motion that

8   was about to be filed by the Committee, or at least that was

9   the representation, and the Debtor had a choice, they could

10  either accept the independent directors or they could face the

11  motion.

12       What actually happened was a little bit more complicated.

13  The creditors and the Debtor agreed on the selection of Mr.

14  Dubel and myself.  And then because they couldn't agree on the

15  third member of the independent board, they left it to Mr.

16  Dubel and myself to actually come up with a process, interview

17  candidates, and make that selection, which we did, which

18  ultimately became Mr. Nelms.

19  Q    And did all of this take place during that four- or five-

20  day period prior to January 9th?

21  A    It did, yes.

22  Q    Okay.  And let's talk about the makeup of the board.

23  You've identified the other individuals.  How would you

24  characterize the skillset and the capability of the

25  individual?

Case 3:25-cv-02072-S   Document 15-5   Filed 06/20/25   Page 157 of 790   PageID 3637

Seery - Direct                    67

1   A    Well, on paper, I think it's a pretty uniquely-constructed

2   board for this type of asset management business with the

3   diversity of these types of assets and the diversity of issues

4   that we had.

5       So, former Judge Nelms, obviously skilled in bankruptcy

6   and the law around bankruptcy, but also very skilled in

7   mediation, conflict resolution, and in particular his

8   prepetition or maybe pre-judicial experience in litigation and

9   litigation involving fiduciary duties we thought could be

10  very, very important because of the myriad of interrelated

11  issues that we could see that might arise.

12      John Dubel is an extremely well-known and respected

13  restructuring professional.  He has been dealing these kinds

14  of assignments as an independent fiduciary for, gosh, as long

15  as I can recall, but at least going back 15 to 20 years.  He

16  had experience in accounting, but he's also been the leader of

17  these kinds of organizations going through restructuring in

18  many operational type roles, and so he was a perfect fit.

19      And my experience in both restructuring as well as asset

20  management and investment I think dovetailed nicely with the

21  experience that Mr. Nelms and Mr. Dubel have.

22  Q    Okay.  Let's talk for just a moment at a high level of the

23  agreement that was reached.  Do you remember that there were

24  several documents that embodied the terms of the agreement?

25  A    Yes, I do.

Seery - Direct                                        68

1  Q   And do you remember one of them was an order that the

2  Court entered on January 9th?

3  A   Yes.

4           MR. MORRIS:  All right.  Your Honor, just for the

5  record, and we'll be looking at this, but that would be

6  document Exhibit 5Q as in queen, and that's at Docket No.

7  1822.

8  BY MR. MORRIS:

9  Q   Do you remember there was a separate term sheet, Mr.

10  Seery, that was also part of the agreement among the

11  constituents?

12  A   Yes.  There were -- I think there were a couple of term

13  sheets and stipulations, but I do recall that there was some

14  very specific term sheets with the terms.

15           MR. MORRIS:  All right.  And we'll look at that one

16  as well, Your Honor, but that can be found at Exhibit 5O as in

17  Oscar.

18  BY MR. MORRIS:

19  Q   And then, finally, do you recall that Mr. Dondero signed a

20  stipulation that was also part of the agreement?

21  A   Yes.  That was absolutely key to the agreement for the

22  creditors and perhaps the Court.  But it was really -- it

23  needed to be clear that he was signed on to this transaction.

24           MR. MORRIS:  Okay.  And we'll look at that as well.

25  That's Exhibit 7Q.  And remind me, we'll move that one into

Seery - Direct                              69

1    evidence.

2    BY MR. MORRIS:

3    Q    Did you and the other prospective independent directors

4    actually participate in the negotiation of any aspect of this

5    agreement that you've generally described?

6    A    Absolutely.  Although we hadn't been appointed yet, these

7    agreements were going to be the structure with which -- or

8    under which we would come in as independent fiduciaries.  They

9    would govern a lot of our relationships.  They would provide

10   for the protections that we required and that I required.  So

11   they were exceedingly important to me.

12   Q    Can you describe for the Court at a general level your

13   understanding of the overall structure of the corporate

14   governance settlement?

15   A    From a very high level, the settlement was -- Highland

16   Capital Partners is a limited partnership.  It's managed by

17   its general partner, Strand Advisors.  Although Strand is the

18   GP, its effective interest in Highland is minimal, about .25

19   percent of the effective partnership interest.  But it is the

20   general partner.  So it does govern the -- the partnership.

21        We came in as an independent board that would oversee and

22   control Strand Advisors and thereby, through the general

23   partner position, oversee and control HCMLP, the Debtor.

24        In addition, the Committee then overlaid what we could do

25   with respect to how we operated the business in the ordinary

Seery - Direct                              70

 1   course in Chapter 11 with a specific set of protocols that

 2   governed certain transactions that we would have to get

 3   permission from either the Committee or the Court to engage

 4   in.

 5       And in addition, Mr. Dondero, notwithstanding the

 6   insertion of the independent board at Strand, also had a set

 7   of restrictions around him, because, of course, not only was

 8   he the former control entity at Highland and Strand, he also

 9   had a hundred percent of the ownership -- indirectly, of

10   course -- of Strand and could have removed the board.  So

11   there were restrictions around what he could do with respect

12   to the board.  There were also restrictions around what he

13   could do through various entities to terminate contracts and

14   --

15   Q   All right.  We'll look at some of those in detail.  Did,

16   to the best of your recollection, did Mr. Dondero give up his

17   position as president or CEO of the Debtor?

18   A   He did, yes.

19   Q   And did he nevertheless stay on as an employee of the

20   Debtor and retain a position as portfolio manager?

21   A   He did.  At the last second, I believe it was the night

22   before, when we were actually in Dallas preparing for the

23   hearing, but Mr. Ellington raised the concern that if Dondero

24   was removed from not only the presidency but also the

25   portfolio management position, potentially there would be some

Seery - Direct                                    71

 1   agreements that might or might not be subject to Court

 2   approval that could be terminated and value would be lost.  So

 3   this was a very last-second provision.  Obviously, the -- as

 4   new estate fiduciaries, we didn't want value to be lost

 5   instantly for key man or some other reason.  And the Committee

 6   ultimately, or I guess you'd say reluctantly, agreed to that

 7   because we just didn't have time to look at any of -- any such

 8   agreements.

 9            MR. MORRIS:  All right.  Let's -- can we put up on

10   the screen, Ms. Canty, Debtor's Exhibit 5Q?

11       And this is in evidence, Your Honor.  This is the January

12   9th order.

13       And can we please go to Paragraph 8?

14   BY MR. MORRIS:

15   Q   Mr. Seery, you had mentioned just a few minutes ago that

16   there were certain restrictions that were placed on Mr.

17   Dondero.  Does Paragraph 8, to the best of your recollection,

18   provide for the substance of at least some of those

19   restrictions?

20   A   It does, yes.

21   Q   And can you just describe for the Court your understanding

22   of the restrictions that were imposed on Mr. Dondero pursuant

23   to Paragraph 8?

24   A   Well, as I recall, when Mr. Ellington came in with the

25   last-minute request, the Committee was extremely upset about

Case 3:25-cv-02072-S   Document 65   Filed 06/25/25   Page 162 of 790   PageID 3642

1   it.  We talked about it.  Obviously, we, as an independent

2   board that was going to come in, didn't know the underlying

3   contracts and couldn't really render any judgment as to

4   whether there would be value lost.  So, the Committee agreed,

5   but they wanted to make sure that Mr. Dondero still reported

6   to -- directly to the board, and if the board asked Mr.

7   Dondero to leave, he would do so.

8   Q    Okay.  Just looking at this paragraph, is it your

9   understanding that the scope and responsibilities of Mr.

10  Dondero would be determined by the board?

11  A    Yes.

12  Q    And was it your understanding that Mr. Dondero would serve

13  without compensation?

14  A    Yes.

15          MR. DRAPER:  Objection.  Leading, Your Honor.

16          THE COURT:  Overruled.

17  BY MR. MORRIS:

18  Q    Was it your understanding that Mr. Dondero's role would be

19  subject to the direct supervision, direction, and authority of

20  the board?

21  A    That's, you know, that's what the order says and that's

22  what the agreement was.  In practice, that was really going to

23  have to evolve because we were coming in very cold and

24  obviously he'd been there for --

25          (Interruption.)

Seery - Direct                                73

1          THE COURT:  All right.  Someone needs to put their

2     phone on mute.  I don't know who it is.

3     BY MR. MORRIS:

4     Q    Was it also part of the agreement that Mr. Dondero would

5     (garbled) upon the board's request?

6     A    I think I got you, but yes, that's contained in this

7     paragraph, and Mr. Dondero agreed to that.

8          THE COURT:  All right.  Whoever LC is, your phone

9     needs to be put on mute.  Okay.  Please be sensitive to

10    keeping your device on mute except for Mr. Morris and Mr.

11    Seery.

12        All right.  Go ahead.

13    BY MR. MORRIS:

14    Q    Do you recall, Mr. Seery, whether there were any

15    restrictions placed on Mr. Dondero's ability to terminate

16    agreements with the Debtor?

17    A    Yes.  That was a very specific provision as well.

18    Q    Can we take a look at Paragraph 9 below?  Is that the

19    provision that you're referring to?

20    A    That's the provision in the order.  I believe there were

21    other agreements -- certainly, discussion around it -- because

22    it was an important provision because it had been borne out of

23    some experience that Acis and Mr. Terry had had in particular.

24    So it was supposed to be broad and prevent both direct and

25    indirect termination of agreements.

APP 2143

Seery - Direct                            74

1    Q    Okay.  And do you know, do you recall that the definition

2    of related entity is contained within the term sheet that you

3    referred to earlier?

4    A    It's a pretty extensive -- I recall the definition not

5    specifically, but it's a pretty extensive definition.  It

6    includes any of the entities that he owns, that Mr. Dondero

7    owns, that Mr. Dondero controls, that Mr. Dondero manages,

8    that Mr. Dondero owns indirectly, that Mr. Dondero manages

9    indirectly, and it really covers a wide swath of those

10   entities in which he has interests and control.

11            MR. MORRIS:  All right.  Let's see if we could just

12   look at the definition specifically at Exhibit 5O as in Oscar.

13   And if we could just scroll down to the next page.

14       Now, this was -- this is part of the term sheet that was

15   filed at Docket 354.

16   BY MR. MORRIS:

17   Q    At Definition I(d), is that the definition of related

18   entity that you were referring to?

19   A    That's correct.

20   Q    Okay.  In addition to what you've described, I think you

21   also mentioned that there was a separate stipulation that Mr.

22   Dondero entered into as part of the corporate governance

23   settlement.  Do I have that right?

24   A    That's my recollection, yes.  And I believe he signed it,

25   and that was a key gating issue to the hearing that we had on

Seery - Direct                                   75

1   January 9th.
2   Q    And what do you recall about that document as being a key
3   gating issue?
4   A    The key gating issue that I recall is that it had to be
5   signed.  And I don't believe it was signed until that very
6   morning.
7        MR. MORRIS:  All right.  Can we call up Exhibit 7Q as
8   in queen?
9   BY MR. MORRIS:
10  Q    All right.  Is this the stipulation that you were
11  referring to?  We can scroll down to any portion you want.
12  A    I believe that is, yes.
13       MR. MORRIS:  Okay.  Can we just scroll down to see
14  Mr. Dondero's signature?  Yeah.  That's -- okay.
15      So, that's dated January 9th.  This was filed at Docket
16  338.  It's on the Debtor's exhibit list as Exhibit 7Q.  And
17  the Debtor would respectfully move Exhibit 7Q into evidence.
18       THE COURT:  Any objection?  All right.  7Q is
19  admitted.
20      (Debtor's Exhibit 7Q is received into evidence.)
21       MR. MORRIS:  Okay.  And if we could just scroll up a
22  page or two to the four bullet points.  Yeah, right there.  A
23  little more.
24  BY MR. MORRIS:
25  Q    Okay.  So, do you see Paragraph 10 contains the

Seery - Direct                                         76

 1    stipulation?

 2    A    Yes.

 3    Q    And as you recall, Mr. Seery, in the events leading up to

 4    the entry of the order approving the settlement, was this one

 5    of the documents that was being negotiated among -- among the

 6    parties?

 7    A    Yes, it was.

 8    Q    Okay.  You mentioned that there were certain provisions of

 9    the January 9th order that were important to you and the other

10    independent directors.  Do I have that right?

11    A    Yes.

12         MR. MORRIS:  Let's see if we can back to Exhibit 5Q,

13    please, Paragraph 4.

14    BY MR. MORRIS:

15    Q    Okay.  Paragraph 4, can you tell me what Paragraph -- what

16    Paragraph 4 is and why it was important to you?

17    A    Well, there really were four key, I guess I'll use the

18    term gating items again, for my involvement, and ultimately in

19    discussions with Mr. Nelms and Mr. Dondero -- Mr. Dubel, their

20    involvement in the matter.

21         Because of the litigious nature of the Highland operations

22    and the expectations we had for more litigation after taking a

23    look at the Acis case, we wanted to make sure that, as

24    independents coming into a situation with really no stake in

25    the particular outcome, other than trying to achieve a

Seery - Direct                          77

1   successful reorganization, that we were protected.  So, number

2   one, I looked at the limited partnership agreement.  I wanted

3   to make sure that the LPA contained broad and at least

4   standard indemnification provisions and that they would apply

5   to the board.

6       Number two, because -- that then requires you to look at

7   the indemnification provisions at Strand, because you're a

8   director of Strand, the GP.  So then we looked at those.  I

9   took a close examination of those.  They looked okay, except

10  Strand didn't have any assets other than its equity interest

11  in Highland, and if that equity interest turned out to be

12  zero, that indemnity wouldn't be very valuable.

13      So I wanted to make sure that Highland, the Debtor,

14  guaranteed the indemnity (garbled) on a postpetition basis, so

15  that if there were a failure of D&O, which I'll get to in a

16  second, or it wasn't enough, that we would have a senior claim

17  in the case, an admin claim in the case.

18      I then, of course, wanted to make sure that we had D&O

19  insurance.  This was very difficult to get, because, frankly,

20  there's a Dondero exclusion in some of the markets, we've been

21  told by our insurance brokers, and so getting the right policy

22  that would cover the independent board was difficult.  We did

23  get that.

24      And then ultimately there'll be another provision in the

25  agreement here -- I don't see it off the top of my head -- but

Seery - Direct                          78

1   a gatekeeper provision.  And that provision --

2   Q    Hold on one second, Mr. Seery, because we'd want to

3   scroll.  So Paragraph 4 and Paragraph 5, were those, were

4   those provisions put in there at the insistence of the

5   prospective independent directors?

6   A    Yes.  And remember, so the Paragraph 4, as I said, is the

7   guarantee of Strand's obligations for its indemnity.  Again,

8   Strand didn't have any money, so the Debtor had to be the one

9   purchasing the D&O for the directors and for Strand.  So those

10  are the two provisions that really worked to address my

11  concerns about the indemnities and then the D&O.

12          MR. MORRIS:  Okay.  Can we go to Paragraph 10,

13  please?  There you go.

14  BY MR. MORRIS:

15  Q    Is this the other provision that you were referring to?

16  A    This is.  It's come to be known as the gatekeeper

17  provision, but it's a provision that I actually got from other

18  cases.  Again, another very litigious case that I thought it

19  was appropriate to bring in to this case.

20      And the concept here is that when you're dealing with

21  parties that seem to be willing to engage in decade-long

22  litigation in multiple forums, not only domestically but even

23  throughout the world, it seemed important and prudent for me

24  and a requirement that I set out that somebody would have to

25  come to this Court, the court with jurisdiction over these

Seery - Direct                              79

 1   matters, to determine whether there was a colorable claim.

 2   And that colorable claim would have to show gross negligence

 3   and willful misconduct, *i.e.*, something that would not

 4   otherwise be indemnified.

 5       So it basically sets an exculpation standard for

 6   negligence.  It exculpates the directors from negligence.  And

 7   if somebody wants to bring a cause against the directors, they

 8   have to come to this Court first and get a finding that

 9   there's a colorable claim for gross negligence or willful

10   misconduct.

11   Q    Would you have accepted the engagement as an independent

12   director without the Paragraphs 4, 5, and 10 that we just

13   looked at?

14   A    No.  These were very specific requests.  The language here

15   has been 'smithed, to be sure, but I provided the original

16   language for 10 and insisted on the guaranty provision above

17   to assure that the indemnity would have some support.

18   Q    And ultimately, did the Committee and the Debtor agree to

19   provide all of the protection afforded by Paragraphs 4, 5, and

20   10?

21   A    Yes.

22   Q    Okay.

23        MR. MORRIS:  Your Honor, we're going to move on now

24   to good faith, Section 1129(e)(3), just to give you a little

25   bit of a roadmap of where we're going.

002922
APP 2149

Case 3:25-cv-02072-S   Document 65-5   Filed 06/20/25   Page 170 of 790   PageID 3650

                              Seery - Direct                    80

 1   BY MR. MORRIS:

 2   Q   Let's talk about the process that led to the plan that the

 3   Debtor is asking the Court to confirm today.  Real basic stuff

 4   at the beginning.  Can you tell me your understanding of the

 5   makeup of the UCC, of the Creditors' Committee?

 6   A   The Creditors' Committee in this case has four members.

 7   It's UBS, the Redeemer Committee, which are former holders of

 8   interests in a fund called the Crusader Fund, which was a

 9   Highland fund, who had redeemed and then had a dispute with

10   Highland.

11       And the next creditor is Mr. Terry and Acis.  We generally

12   group them as one, but the creditor is Acis.

13       And the fourth creditor is an entity called Meta-e, and

14   they provide litigation support and technical support and

15   discovery support in litigations for the Debtor, including in

16   this case now.

17   Q   All right.  Just focusing really on the early period, the

18   first few months, can you describe the early stages of the

19   negotiations with the UCC as best as you can recall?

20   A   Well, I think the early stage of the case wasn't directly

21   a negotiation; it was really trying to understand as best we

22   could the myriad of assets that we had here, the various

23   businesses that the Debtor either owned, controlled, or

24   managed, as well as the claims.

25       We went through a process of trying to understand each of

Case 3:25-cv-02072-S   Document 65-5   Filed 08/20/25   Page 171 of 790   PageID 3651

Seery - Direct                                      81

1   the claims that the Debtor -- or against the Debtor that were

2   represented by the Committee, as well as some other claims

3   that were not on the Committee.

4   Q    Was the Debtor -- I mean, was the Committee initially

5   pushing the independent board to go to a monetization plan, an

6   asset monetization plan?

7   A    Very quickly and early on, the Debtor -- the Committee

8   took a pretty aggressive approach with the Debtor and the

9   independent board.  I think the Committee's perspective, as

10  articulated to me, and where -- at least how we took it, was

11  that they'd been litigating for years and they sort of knew

12  the situation and the value of their claims, that the Debtor

13  was insolvent, in their view, and that we should be operating

14  the estate in essence for the benefit of the creditors.

15  Q    And what was the board's view in reaction to that?

16  A    We disputed it.  And the reason we disputed it was very

17  straightforward.  Save for the Redeemer claim, which at least

18  had an arbitration award, Acis and Mr. Terry didn't have any

19  specific awards, notwithstanding the results of the Acis

20  bankruptcy, and UBS, while it had a judgment, that judgment

21  was not against the Debtor.

22       So our view was, until we have our hands around these

23  claims and we determine what the validity is in our estate,

24  that we would treat the Debtor as if it were solvent.  We also

25  wanted to assess the value of the assets.  So, looking at the

APP 2151

Case 3:25-cv-02072-S   Document 65-5   Filed 06/13/25   Page 172 of 790   PageID 3652

Seery - Direct                                82

1   assets not just from a book value but what they might be

2   really worth in the market.

3   Q    And did the board in the early portion of the case

4   consider all strategic alternatives?

5   A    I don't know if we considered every strategic alternative,

6   but we certainly considered a lot of alternatives.

7   Q    Can you describe for the Court the alternatives that were

8   considered by the board before settling on the asset

9   monetization plan?

10  A    Well, early on, you know, we looked at each of the -- what

11  we would think of the large category types of ways to resolve

12  a case.  Number one, could we go through a very traditional

13  reorganization with either stretching out claims to creditors

14  after settlement or converting some of those to equity,

15  getting new equity infusions?  We considered those

16  alternatives.

17       Number two, we considered whether we should simply sell

18  the assets.  That's one of the things that the Committee was

19  pushing for.  They could be sold to third parties.  They could

20  be sold individually.  Mr. Dondero potentially could buy some

21  of the assets.  That'd be a reasonable reorganization in this

22  case.

23       We also considered whether that, you know, we would just

24  do a straight liquidation.  Is there some value to doing --

25  converting the case to a 7 and doing a straight liquidation?

Seery - Direct                                     83

1          We also considered a grand bargain plan, and this was

2     something that I worked on quite a bit.  The phrase is mine,

3     although no pride of authorship, certainly, since it didn't

4     work out.  But that perhaps we could come to an agreement with

5     the major creditors and with Mr. Dondero and then shift some

6     of the expenses in the case out further to litigate some of

7     the other claims while reorganizing around the base business.

8          And then, finally, we considered the asset monetization

9     plan, and ultimately that evolved into what we have today.

10    Q    Were there guiding principles or factors that the board

11    was focused on as it assessed these different options?

12    A    Well, the number one guiding principle was overall

13    fairness and equitable treatment of the various stakeholders.

14    So, again, at that point, we didn't know exactly what, if

15    anything, we would owe to claimants like UBS or HarbourVest or

16    even Mr. Terry and Acis.  We had a good sense of where we

17    would end up with Redeemer, I think, but we still had some

18    options and wanted to negotiate the issues related to

19    potential appeal rights that we had.  So I think that was the

20    number one overall concern.

21         But that did evolve over time.  Costs of the case were

22    exceptionally high.  And the reason they're so high is that

23    Highland was run for a long time, at least from what we can

24    tell, at an operating deficit.  Typically, what it would do is

25    run at a deficit and then sell assets to cover the shortfall,

APP 2153

Seery - Direct                                    84

1   and it would defer a whole bunch of employee -- potential

2   employee compensation.  And because of the way the environment

3   was going, particularly in the first half of the year, it

4   didn't look to us like there was going to be any great asset

5   increase that would somehow save us from the hole that was

6   being dug, the considerable amount of expenses to run the

7   case.

8   Q    Did changing the culture of litigation factor into the

9   path that the board considered?

10  A    Well, we certainly looked at the way the company had run

11  and why it got to where it is in terms of litigating.  And not

12  just litigating valid claims, but litigating any claim to the

13  *nth* degree.  And stories are legion, I won't talk about them,

14  but of Highland taking outrageous positions and then pursuing

15  them, hoping that the other side caves.

16       We determined that this estate couldn't bear that kind of

17  expense, and it wasn't fair and equitable to do that anyway.

18  So we wanted to attack the claims that we could -- and I say

19  attack; try to resolve them as swiftly as we could --

20  protecting the Debtor's interests but trying to find an

21  equitable resolution.

22       I'm not averse to litigating.  And I think when there are

23  claims that are legitimate, the Debtor should pursue them.

24  There's always -- a good settlement is always better than a

25  bad litigation.  But if there (indecipherable) to resolve

APP 2151

Case 3:25-cv-02072-S   Document 65-5   Filed 06/27/25   Page 175 of 790   PageID 3655

Seery - Direct                            85

1   them, we should -- we should pursue those.  And if we have

2   defenses, we should pursue those, and not just be held up

3   because someone else is willing to, you know, take a more

4   difficult position than we are.

5        But in this case, it really did cry out for some sort of

6   resolution on many of these cases because they were far beyond

7   -- far beyond the facts and far beyond the dollars.  There was

8   personal antipathy involved in virtually every one of the

9   unlitigated or unliquidated Committee cases.

10  Q    Did the board, as it was assessing the various strategic

11  alternatives, consider maximization of the value?

12  A    Always number one was, can we maximize value?  But that

13  has to be done within the context of the risk you're taking

14  and the time it takes.  So, not all wine ages well in a cave

15  and not all investments get to be more valuable over time.  We

16  wanted to look at each individual asset that the Debtor had,

17  each claim that the Debtor had, each defense that the Debtor

18  had, and consider the time and the costs and then try to find

19  the best way to maximize value with those multiple

20  considerations.

21  Q    How about the role and support of the UCC, how did that

22  factor into the decision-making, the Debtor's decision-making

23  as to what plan to pursue?

24  A    Well, you know, the decision-making with the UCC was

25  cumbersome and oftentimes difficult.  Sometimes our relations

Seery - Direct                              86

1   were very contentious, and sometimes they continue to be.  But
2   the Committee had significant oversight because of the
3   protocols that had been agreed to.  Some of the disputes we
4   had with the Committee found their way into the court.  Those
5   time and that cost, some of which we won, some of which we
6   lost, but those factored into our analysis.

7        But eventually we knew that we were going to need to get,
8   you know, some significant portion of the Committee to agree,
9   because, at minimum, Meta-e had a liquidated claim, and
10  Redeemer was very close to fully liquidated, so we were going
11  to need support from the Committee with whatever we tried to
12  push through.  And so that's how we negotiated with the
13  Committee from that perspective.
14  Q   Is it fair to say that the Debtor and the Committee's
15  interests because aligned upon approval of the disclosure
16  statement back at the end of November?
17  A   I don't think they became perfectly aligned, because we
18  still have, you know, some disputes around, you know,
19  implementation and things like the employee releases, which
20  were very important to me.  But I think we're largely aligned
21  and that the Committee is supportive, as Mr. Clemente said at
22  the start of this hearing, of the plan.  We negotiated at
23  arm's length with them about most of the provisions.  I would
24  say virtually everything was a relatively significant
25  negotiation, or at least there was a good faith exchange of

Seery - Direct                            87

1  views on each side and assessment of legal and financial

2  risks.  And I think at this point they're largely in support

3  of the plan.

4  Q   All right.  Let's -- you mentioned the grand bargain, and

5  I just want to spend a few minutes talking about that, how

6  that evolved.  Focusing your attention in the kind of late

7  spring/early summer, can you tell me what efforts you and the

8  board made in trying to achieve a grand bargain in that early

9  part of the case?

10 A   Well, we had -- at that point, we had reached agreement,

11 at least in principle, with Redeemer.  And the thought was --

12 my thought was that we could construct a plan, understanding

13 what the cash flows looked like and what we thought the base

14 value of the asset looked like -- and those are not just the

15 assets that are tangible assets, but the notes that are

16 collectible by the Debtor as well -- and then engage with UBS

17 in particular.  Redeemer.  To some degree, Mr. Terry.  We had

18 not yet reached any agreement with him.  But UBS, we thought

19 of as a slightly -- I don't mean this to be disparaging -- but

20 a slightly more commercial player than Acis because of the

21 history that Acis had to deal with and endure.

22     And we were hoping that we could get some sort of

23 coalescence around an agreed distribution that would require

24 those creditors to take a lot less than they might have

25 otherwise agreed, Mr. Dondero to put in more than he otherwise

APP 2457

Case 3:25-cv-02072-S   Document 65-5   Filed 06/16/25   Page 178 of 790   PageID 3658

Seery - Direct                                        88

1    thought he could put in or would be willing to put in, and

2    then we would get out to Acis and the other creditors with a

3    plan.

4         And so I built, with the team at DSI, a detailed model on

5    how the distributions could work and what the potential timing

6    could be, trying to, each time, move in a multidimensional way

7    with UBS, Redeemer, Mr. Dondero, and to some degree Acis,

8    around the respective issues for their claims.

9         Again, UBS and Acis had not been resolved and weren't

10   close, but the thought was if we could get dollar agreements

11   for distribution, perhaps we could then figure out how to

12   construct settlements of their claims.

13   Q    During this time period, did you work directly with Mr.

14   Dondero in the formulation of a potential grand bargain?

15   A    I did, yes.

16   Q    And the model that you described, did that go through a

17   number of iterations?

18   A    It went through multiple iterations.  I don't believe I

19   ever shared the model with anybody.  One of the reasons for

20   that is I didn't want -- I felt I had -- if I was going to

21   share it with Mr. Dondero, for example, I'd have to share it

22   with UBS and I'd have to share it with Redeemer.  And I wanted

23   it to be -- I wanted it to be a working model with the team at

24   DSI.  In particular, we would make, you know, adjustments on

25   an almost-daily basis.

APP 2158

Seery - Direct                                    89

1       Mr. Dondero had -- remember, he was still portfolio

2    manager at that time.  He also had a related-party interest,

3    as people have seen from some of the litigation around the

4    sales of securities.  He had access and was receiving emails

5    from the team as well as from the finance team.  So he had

6    access to the information at that point and had a view around

7    the value.  And this was more trying to adjust what those

8    distributions would look like depending on the amounts that he

9    would be willing to contribute.

10   Q    Moving on in time, did there come a time when the Debtor

11   participated in a mediation with certain of the major

12   constituents in the case?

13   A    Yes.  That was towards the end of the summer.

14   Q    And during that mediation, did the concept of a grand

15   bargain, was that put on the table?  Without discussing any

16   particulars about it, just as a matter of process, was the

17   grand bargain subject to the mediation discussions?

18   A    Well, the mediation had multiple components, so the answer

19   to the question in short is yes, but I'll go longer because I

20   tend to.  The grand bargain plan stayed in place, and that was

21   going to be an overall settlement.  The mediation was

22   initially, I think, as a main course, focused on Acis, UBS,

23   and then the third piece being the grand bargain.  And if you

24   could settle one of those claims, perhaps -- obviously, if you

25   could settle both of them, you could get to then focusing on

Seery - Direct                                              90

1   the grand bargain.

2       But even before we got to mediation, the idea of the

3   monetization plan had also been put forth.  Notwithstanding

4   that it wasn't my idea, I actually thought that it was a good

5   idea, ultimately.  Didn't initially.  And the reason for that

6   is that it set a marker for what a base expectation could be

7   for the creditors and just for Mr. Dondero.  And knowing that

8   that was out there, at least with them, that could hopefully

9   be a catalyst in the mediation for folks to say, let's see if

10  we can get our claims done and get a grand bargain done,

11  because if we don't we have this Debtor monetization plan.

12  And by that -- at that point, I don't think we had much

13  agreement with the Committee on anything, and certainly with

14  Mr. Dondero, on -- on a monetization plan.

15  Q   All right.  And let's just bring it forward from the fall,

16  post-mediation, to the present.  Has -- has -- have you and

17  the board continued discussing with Mr. Dondero the

18  possibility of a grand bargain?

19  A   Well, it's shifted.  So, the grand bargain discussions

20  really -- you had multiple phases.  So, you had pre-mediation.

21  There was the grand bargain discussions that I just described

22  previously that also involved UBS and Redeemer, and to some

23  degree Acis and Mr. Terry.  Then you have the mediation, which

24  is much more focused on the claims and whether they can fit

25  into the grand bargain with Mr. Dondero.

Case 3:25-cv-02072-S    Document 65-5    Filed 02/23/25    Page 181 of 790    PageID 3661

Seery - Direct                                      91

1      And the way that was conducted was a little bit more

2      separated, meaning the parties would talk to the mediator, the

3      mediator would then go and talk to other parties and try to

4      work a settlement on each of those components.

5           Subsequent to the mediation where we reached the agreement

6      with Acis and Mr. Terry, and we ultimately in that timeframe

7      banged out the final terms of our agreement with Redeemer, we

8      engaged with Mr. Dondero around -- I wouldn't call it the

9      grand bargain, but a different plan.  By that point, the

10     monetization plan had started to gain some traction with the

11     creditor group, and Mr. Dondero and his counsel, I believe,

12     focused on the potential of what was referred to as a pot

13     plan.  And while it has the -- it could have the ability of

14     being a resolution plan, it wasn't the grand bargain plan that

15     I had initially envisioned.  And pot plan was really a

16     misnomer, because it didn't have a whole pot, so -- so it's a

17     little bit of a hybrid.

18     Q    Did the board spend time during its meetings discussing

19     various pot plan proposals that had been put forth by Mr.

20     Dondero?

21     A    Oh, absolutely.  And not only the board.  I mean, we did

22     our own work as an independent board and then brought in our

23     professional advisors, both your firm and the DSI folks, to go

24     through analytics around the pot plan, and even before that,

25     the other plan alternatives, but we had direct discussions

Seery - Direct                                        92

 1  with Mr. Dondero and his counsel.

 2  Q    And in the last couple of months, has the board listened

 3  to presentations that were made by Mr. Dondero and his counsel

 4  concerning various forms of the pot plan?

 5  A    Yes.  At least two or three.

 6  Q    And during this time, has the board and the Debtor

 7  communicated with the Committee concerning different

 8  iterations of the proposed pot plan?

 9  A    Yes.  We've had continual discussions with the Committee

10  regarding the various iterations of the potential grand

11  bargain all the way through the pot plan.

12  Q    And during this process, did the Debtor provide Mr.

13  Dondero and his counsel with certain financial information

14  that had been requested?

15  A    Yes.  As I said, up 'til the point where he resigned and

16  was then ultimately, at the end of the year, removed from the

17  office, he had access to financial information related to the

18  Debtor and even got the information from the financial group.

19  Subsequent to that, we've provided him with requests -- with

20  financial information that was requested by his counsel.

21  Q    Okay.  Were your efforts at the grand bargain or the

22  pursuit of the pot plan successful?

23  A    No, they were not.

24  Q    Do you have an understanding as to -- just, again, without

25  going into -- into details about any particular proposal, do

Case 3:25-cv-02072-S   Document 165   Filed 08/21/25   Page 183 of 790   PageID 3663

1   you have an understanding as to what the barrier was to

2   success?

3   A    The grand bargain, we just never got the traction that we

4   needed to get that going and the sides were just far -- too

5   far apart.  And the pot plan, similarly.  Our discussions with

6   Mr. Dondero and the Committee, they're -- they're very far

7   apart.

8   Q    And is it fair to say that the Committee's lack of support

9   in either the grand bargain or the pot plan is the principal

10  cause as to why we're not talking about that today?

11  A    Well, it's -- it -- right now, we've got the plan that's

12  on file, the monetization plan.  The monetization plan has

13  gone out for creditor vote and has received support.  It

14  distributes, we think, equitably, as well as a significant

15  amount of distributions to unsecured creditors.  And there

16  really isn't an alternative that we see, based upon the

17  numbers I've seen, that competes with it or has any traction

18  with the largest creditors.

19  Q    All right.  So, now we've talked about various proposals

20  or alternatives that were considered by the board, including

21  the grand bargain and the pot plan.  Let's spend some time

22  talking about the plan that is before the Court today and how

23  we got here.  And I'd like to take you really back to the

24  beginning, if I may.

25       Tell us, tell the Court just what the board was doing in

Case 3:25-cv-02072-S   Document 65   Filed 08/06/25   Page 184 of 790   PageID 3664
Main Document   Page 2135 of 2722

Seery - Direct                                    94

1    the early months after getting appointed, because I think

2    context is important here.  What were you all doing the first

3    few months of the case?

4    A    Well, the first few months, we really were drinking from

5    the proverbial fire hose, trying to get an understanding of

6    the business, how it had been managed previously, what the

7    issues related to the different parts of the business were.

8    And then an understanding of each of the employees that were

9    working under us, what their roles were, how they performed

10   them, who sat where with respect to each of the assets, what

11   the contracts looked like, whether they be shared service or

12   management agreements.  And then we started looking at the

13   individual assets in terms of value.

14        At the same time, we were trying to get up to speed on the

15   complex nature of the claims that were in the case.  The

16   liquidated claims were relatively easy, but there had been a

17   significant amount of transfers in and out of the Debtor, and

18   then there's a myriad of relationships involving related

19   entities that we had to understand, both with respect to the

20   claims as well as with respect to the assets.

21        And so that -- those were the main things we were doing

22   for those first few months in the case.

23   Q    Just a couple months into the case, the COVID pandemic

24   reared its head.  Do you recall that?

25   A    Yes.  We had been in Dallas every day working up 'til the

Seery - Direct                                    95

1   time of the COVID and some of the shutdown orders,

2   particularly in the Northeast, and so that changed the dynamic

3   of how we could function every day.

4       Notwithstanding that, we -- we were able to manage from

5   afar, and ultimately, when there were some cases in the office

6   of COVID, we -- on the Highland side, not the related entity

7   side, but on the Highland side -- we determined that the staff

8   and the team should work from home, which they were able to do

9   quite well.

10  Q    Okay.  In those early months, do you recall that there was

11  a substantial erosion of value, at least as of the time you

12  were appointed in those first three or four months?

13  A    There was.  And I think we've heard some -- some noise

14  about what that value was and the drop in the asset value as

15  opposed to net value.  But the asset value did, did drop

16  significantly.

17  Q    Can you describe for the Court your recollection as to the

18  causes of the drop in the value that you just descried?

19  A    Yes.  The number one drop was a reservation that the board

20  took for a receivable from an entity called Hunter Mountain.

21  The quick version of this is that Hunter Mountain owns

22  Highland.  As I mentioned, while Strand is the GP, it only has

23  a quarter-percent interest in Highland.  The vast majority of

24  the interests are owned by an entity called the Hunter

25  Mountain Investment Trust in a very complicated, tax-driven

Seery - Direct                                    96

1   structure.

2       Dondero and Okada transferred their interests in Highland

3   at a high valuation to Hunter Mountain.  Hunter Mountain then

4   didn't have the money, so it, in essence, borrowed the money

5   from the Debtor in a note to pay for those interests.  There's

6   a circular running of the cash, but we were not sure where, if

7   any, where any assets are, if they would be sufficient.  So we

8   took a reservation of $58 million for that note.

9       The second biggest piece of the reduction in value was the

10  equity that was lost in the Select Equity account.  This is a

11  Debtor trading account that was managed by Mr. Dondero.  $54

12  million was lost in that account.  Basically, it was really

13  highly margined, very high leverage in that account when the

14  market volatility came in.  As it grew through January,

15  February, March, more and more margin calls.  Ultimately,

16  Jefferies, which had Safe Harbor protections -- technically,

17  the account was not a Debtor account, but they would have had

18  it anyway -- they seized that account.  $54 million in equity

19  was lost in that account.

20      The next highest amount is about $35 million, but it's

21  higher now.  That's just the bankruptcy costs, where we have

22  spent cash and Debtor assets in the case.  It was about $36 to

23  $40 million through the end of the year.  That's now higher.

24      About $30 million was lost in paying back Jefferies on the

25  asset side of the ledger in the Highland internal equity

APP 2196

Seery - Direct                                    97

1   account.  This was similar to the equity -- the Select Equity

2   account, also managed by Mr. Dondero.  Extremely highly-

3   levered coming into the market volatility of the first

4   quarter, which was exacerbated, obviously, by the COVID.  That

5   was about $30 million that was repaid in margin loan in that

6   account.

7        In addition, $25 million of equity was lost in that

8   account while Mr. Dondero was managing it.  I took over

9   effectively managing it in mid-March and worked with Jefferies

10  to keep them from seizing the account.  We've since gotten a

11  bunch of value coming back from that account, but that was the

12  amount that was lost.

13       About $10 million was lost in the Carey Limousine loan

14  transaction.  That is a -- an interesting little company.  Has

15  done a nice job -- management did a very good job coming into

16  the year, and it actually had real value, notwithstanding the

17  changeover to Uber in people's preferences.  But with the

18  COVID, it really relied on events, airport travel, executive

19  travel, and that really took a bite out of it, although, you

20  know, we're hoping to be able to restructure, we have

21  restructured it to some degree, and we're hoping that there

22  could be value there.

23       And then about $7 million was lost in equity in an entity

24  called NexPoint Hospitality Trust.  This is another extremely

25  highly-levered hospitality REIT that NexPoint manages.  It

APP 2167

Seery - Direct                                98

1   trades on the Toronto Stock Exchange.  And I think likely that

2   -- it's got a lot of issues with respect to its mortgage debt.

3   And because it was hospitality, it was really hurt by the

4   COVID.

5       And I think that's probably -- those numbers add up to

6   north of $200 million of the loss.

7   Q   All right.  Thank you for that recitation, Mr. Seery.  So,

8   turning to the spring, after all of those issues were

9   addressed, at the same time you were working on the grand

10  bargain, did the Debtor and its professionals begin

11  formulating the monetization plan that we have today?

12  A   I'm sorry, in the spring?  I lost that question.  I

13  apologize.

14  Q   That's okay.  After you dealt with everything that you

15  just described, were you doing two things at once?  Were you

16  working on the grand bargain and the asset monetization plan

17  at the same time?

18  A   Yes, that's correct.

19  Q   All right.  Can you just describe for the Court kind of,

20  you know, how the asset monetization plan evolved up until the

21  point of the mediation?

22  A   Yes.  I alluded to it earlier, but because the Debtor was

23  running an operating deficit, we were very concerned about

24  liquidity.  Highland typically runs, from a liquidity

25  perspective and a cash perspective, very close to the edge.  I

Seery - Direct                                99

1    don't feel particularly comfortable helping lead an

2    organization that's running that close to the edge.  And I was

3    very focused on the burn that we had on an operating basis, as

4    well as the professional cost burn, because for a case this

5    size it was significant.

6        The rest of the board felt similarly, and one of the

7    directors, and I'm not sure if it was Mr. Nelms or Mr. Dubel,

8    came up with the idea that we needed an alternative to

9    continuing to just burn assets while we were in this case.

10   There had to be some sort of catalyst to get the parties, both

11   Mr. Dondero as well as the creditors -- at that point, as I

12   said, we weren't settled with Acis or UBS, and we weren't,

13   frankly, close with either of them.  And so we needed what --

14   what I think the -- the idea was that we needed a catalyst to

15   have people focus on what the alternative was.  Because

16   continuing to run the case until we ran out of money was not

17   an acceptable alternative.

18       What I didn't like about the plan was it didn't have

19   anybody's support, and so I wasn't sure how we made progress

20   with it without having some Committee member or Mr. Dondero in

21   support of it.  I was outvoted, although maybe I came around

22   in the actual vote.  But ultimately, I think it was actually a

23   quite smart idea, because it did set the basis for what the

24   case would be.  Either there would be some resolution or it

25   would push towards the monetization plan, and parties could

Seery - Direct                                    100

1    then assess whether they liked the monetization plan or not.

2    That if I was going to be the Claimant Trustee or the --

3    defending the, you know, against the claims, they would have

4    the pleasure of litigating with me for some period of time.

5    Or they could come to some either grand bargain or ultimately

6    some other resolution.

7        And as we started to develop a plan and put more of a

8    framework -- more flesh around the framework, it actually

9    started to look more and more like a real viable alternative

10   to either long-term litigation or some other grand bargain if

11   we couldn't get there.

12   Q   And ultimately, did the board authorize the Debtor to file

13   its initial version of the asset monetization plan at around

14   the time of the mediation?

15   A   Yeah.  We developed it over the summer and really fleshed

16   it out in terms of how the structure would work, what the tax

17   issues were, what the governance issues were.  We did that

18   largely negotiating with ourselves, so we -- we were extremely

19   successful.  And then we filed, we filed that plan right

20   before the mediation.

21       And my recollection is that there was some concern from

22   the mediators that they thought that putting that plan out in

23   the public could upset the possibility of a grand bargain, so

24   we ended up filing that under seal.

25   Q   Do you recall what the Committee's initial reaction was to

Case 3:25-cv-02072-S   Document 6-5   Filed 02/17/23   Page 191 of 790   PageID 3671

Seery - Direct                                101

1    the asset monetization plan that you filed under seal?

2    A    Well, initially, they -- the Committee didn't like it.

3    They didn't like the governance.  They didn't like the fact

4    that it set up for those creditors who didn't litigate the

5    prospect of litigations to try to resolve their claims.  It

6    effectively cut out some of the advisory that the Committee

7    currently had.  The -- one of the driving forces behind the

8    asset monetization plan and how we initially started it is we

9    can't continue these costs, as I said.  Well, an easy way to

10   get rid of -- to reduce the costs is to get rid of half of

11   them.

12       So if you could get rid of the Committee, effectively, and

13   coalesce around an asset monetization vehicle, then if folks

14   wanted to resolve their claim, you could.  If you had to

15   litigate it, you could, but you'd have one set of lawyers that

16   the estate was paying for, one set of financial advisors the

17   estate was paying for, as opposed to multiple sets.

18   Q    In addition to the corporate governance issues that you

19   just described, did the Committee and the Debtor quickly reach

20   an agreement on the terms of the treatment of employee claims

21   and the scope of the releases for the employees?

22   A    No.  Not very quickly at all.

23   Q    Yeah.

24   A    You know, again, one of the issues in this case that

25   drives perspectives is the history that creditors have in

Seery - Direct                                    102

1   dealing with Highland and in dealing with many of the

2   employees at Highland, you know, who had worked for Mr.

3   Dondero and served at his pleasure for a long time, and how

4   they had been treated in various of their attempts to collect

5   their claims.  So the idea of giving any sort of releases to

6   the employees was anathema to -- to many of the Committee

7   members.

8       From my perspective, you know, releases are particularly

9   important because there's a *quid pro quo* leading up to the

10  confirmation of a plan, particularly with a monetization plan

11  where it's clear that the employees are all going to be or

12  largely going to be either transitioned or terminated.  If

13  they're going to keep working towards that, we either have to

14  have some sort of financial incentive or some sort of

15  assurance that their actions which are done in good faith to

16  try to pursue this give them the benefit of more than just

17  their paycheck.

18      And so we thought we were setting up the *quid pro quo* in

19  terms of work towards the monetization, bring the case home,

20  and you're entitled to a release, so long as you haven't done

21  something that was grossly negligent or willful misconduct.

22  And the Committee, I think, wanted to have a more aggressive

23  posture.

24  Q    And did those disagreements over corporate governance and

25  the employee releases kind of spill out into the public at

APP 2172

Seery - Direct                                   103

1    that disclosure statement hearing in October?

2    A    I think they spilled out at that hearing as well as in the

3    hearing either the next day or two days later around Mr.

4    Daugherty's claim.  And again, it was -- it was contentious.

5    I tend to try to reach resolution, but I tend to hold firm

6    when I think that there's a good reason, an equitable reason

7    to do so, and compromising that issue was very difficult for

8    me.

9    Q    But in the weeks that followed, did the Committee and the

10   Debtor indeed negotiate to resolve to their mutual

11   satisfaction the issues surrounding corporate governance and

12   employee releases?

13   A    We did, yes.

14   Q    And were -- was the Debtor able to get its disclosure

15   statement approved with Committee support in late November?

16   A    We did, yes.

17   Q    Can you describe for the Court generally kind of the

18   process by which the Debtor negotiated with the Committee?

19   I'll ask it as broadly as I can, and I'll focus if I need to.

20   A    Yeah.  The process was usually in group settings with the

21   independent directors, professionals, and the Committee

22   members and their professionals.  Oftentimes, then, there

23   would be certain one-off conversations if there was a

24   particular issue that was more important to one Committee

25   member or another, or if they were designated by the Committee

Seery - Direct                                    104

1    to be the point on that.  And so I negotiated on behalf of the

2    Debtor, both collectively and individually, around these

3    points.

4         The biggest issues related to governance of the Claimant

5    Trust, the separation of the Claimant Trust and the Litigation

6    Trust, which was important to me, the treatment of employees

7    between the filing -- the time we came up with the case and

8    when we were going to exit, and then how that release

9    provision would work.

10   Q    Is it fair to say that numerous iterations of the various

11   documents that embodied the plan were exchanged between the

12   Debtor and the Committee?

13   A    Yes.  There were -- there were dozens.

14   Q    Fair to say that the negotiations were arm's length?

15   A    Absolutely.  Often contentious, always professional, but I

16   do think that there were, you know, well -- good-faith views

17   held by folks on both sides.  And I think we were fortunate to

18   be able to get resolution of those, because they were

19   strongly-held views.

20   Q    Okay.  And ultimately, I think you've already testified,

21   and Mr. Clemente certainly made it clear:  Is the Debtor --

22   does the Debtor have the Committee on board for their plan

23   today?

24   A    My understanding is again -- and you heard Mr. Clemente --

25   both the Committee and each of the individual members are

APP 2174

Seery - Direct                                    105

1    supportive of the plan.

2    Q    All right.  Let's switch to Mr. Dondero and his reaction

3    to the asset monetization plan.  Can you describe for the

4    Court based on your experience and your interaction with him

5    what you interpreted Mr. Dondero's position to be?

6              A VOICE:  Objection, hearsay, or --

7              MR. DRAPER:  Objection, hearsay.  Calls for

8    speculation, Your Honor.

9              THE COURT:  Overruled.

10             THE WITNESS:  Yeah.  I had direct discussions with

11   Mr. Dondero regarding the plan, the asset monetization plan,

12   as I mentioned, direct discussions regarding a potential grand

13   bargain.  The initial view from Mr. Dondero was, and he told

14   me, that if he didn't get a plan that he agreed to, if he

15   didn't have a specific control or agreement around what got

16   paid to Acis and Mr. Terry and what got paid to Redeemer

17   specifically, that he would, quote, burn the place down.  I

18   know that because it is, excuse the pun, seared into my mind,

19   but I also wrote it down.  And that was, you know, in the

20   early summer.

21       We had subsequent discussions around the plan, and as we

22   were talking about the -- about the grand bargain or -- the

23   pot plan hadn't come out at that point -- even on a large call

24   -- the plan initially called for a transition, and still does,

25   of employees of the Debtor to a related entity to continue

Seery - Direct                                        106

1   performing services that were under the prior shared service

2   agreements that we were going to terminate.

3       But that transition is wholly dependent on Mr. Dondero.

4   And we had a call with at least five to seven people on it

5   where I said to Mr. Dondero, look, this is going to be in your

6   financial interest to agree to a smooth transition.  These

7   people have worked for you for a long time.  It's for their

8   benefit.  You portfolio-manage these funds.  It's to the

9   benefit of those funds to do this smoothly.  And if there's

10  litigation between you and the estate later, then those chips

11  will fall where they may.

12      And he told me to be prepared for a much more difficult

13  transition than I envisioned.

14      And I specifically said to him, and this one sticks in my

15  mind because I recall it, I said, don't worry, Mr. Dondero --

16  I think I used Jim -- I will be prepared.  I was a Boy Scout

17  and we spend time preparing for these kinds of things.  So

18  we're -- we would love to get done the best transition we can,

19  but we will be prepared for a difficult one.

20      So, from the start, the idea of the monetization plan was

21  not something that obviously he supported.  We did agree with

22  -- after his inquiry or request with the mediators, to file it

23  under seal while we went into the mediation.

24  BY MR. MORRIS:

25  Q   And after, after that was filed in September, early

Seery - Direct                                    107

1   October, did Mr. Dondero start to act in a way that the board

2   perceived to be against the Debtor's interests?

3   A    Certainly.  I mean, he previously had shown inclinations

4   of that, but that -- it got very aggressive as he interfered

5   with the trades we were trying to do in terms of managing the

6   CLO assets.  He took a position that postpetition, which was

7   really one of his entities taking a position, that

8   postposition a sale of life policy assets was somehow not in

9   the best interests of the funds and that we had abused our

10  position, notwithstanding that he turned it over to us with no

11  liquidity to maintain those life policies.  There were several

12  other instances.  And those led to the decision to, one, have

13  him resign, and then ultimately, after the text to me that I

14  perceived as threatening, and we've had subsequent hearings on

15  it, we asked him to leave the office.

16  Q    Okay.  Let's move back to the plan here.  Can you

17  describe, you know, generally, if you can, the purpose and

18  intent of the asset monetization plan?

19  A    Well, very simply, the main purpose is to maximize value.

20  This is not a competition between Mr. Dondero and myself.  I

21  have no stake in getting more money out of the maximization

22  other than my duty to do the job that I was hired to do.

23       So our goal is to manage the assets in what we think is

24  the best way to do that over time, and find opportunities

25  where the market is right to monetize the assets, primarily

1  through sales.  There may be other instances, depending on the
2  type of asset, whether a sale makes sense, if we can structure
3  it through some kind of distribution that's more structured.
4  Q   We've used the phrase a bunch of times already.  Can you
5  describe in your own words what an asset monetization plan is
6  in the context of the Debtor's proposal?
7  A   Well, it may be slightly an awkward moniker, but I think
8  it's not completely different than what you'd see, in some
9  respects, to a regular plan, where you equitize debt and you
10  operate the business for the benefit of the equitized debt.
11  Here, it's a little different in that we know exactly how
12  we're going to move forward.  We've effectively -- we'll
13  effectively turn the debt obligations into trust interests and
14  we will pay those as we sell down assets.  So we've got it
15  structured in a way where we can pivot depending on market
16  conditions and we'll be managing certain funds that the assets
17  sit in.
18      So there's really four assets where the assets sit, and
19  we'll manage those.  First are the ones that the Debtor owns
20  directly.  Second will be the ones that are in Restoration
21  Capital -- Restoration Capital Partners.  Third are the assets
22  in a fund called Multi-Strat.  Fourth is the direct ownership
23  interest in Cornerstone, and technically (garbled) would be
24  the -- would be the next one.
25      So we have the ability to manage these individual assets

Seery - Direct                                    109

1   and then be able to sell them in what we determine to be the

2   best way to maximize value, depending on the timing.

3   Q    And when you say that you're going to continue to operate

4   the business, do you mean that the Debtor will continue to

5   manage the assets you've just described in the same way that

6   it had prior to the petition date?

7   A    It'll be a smaller team, but that's the Debtor's business.

8   So what we won't be doing are the shared services anymore.

9   That was part of the Debtor's business.  But we will be

10  managing the assets.  So the 1.0 CLOs, we'll manage those

11  assets.  The RCP assets, we'll manage those assets.  The

12  Trussway Holdings assets, we'll managing those assets.  Each

13  of them is a little bit different.  There's things as diverse

14  as operating companies to real estate.  We'll operate, subject

15  to final agreement, but the Longhorn A and B, which are

16  separate accounts that are -- were funded and are controlled

17  by the largest -- one of the largest investors in the world.

18  And so they have agreed that we should manage those assets for

19  them.

20      So we're -- that's the business that the Debtor is in.  It

21  won't be doing all of the businesses that the Debtor was in

22  before, like the shared services, but the management of the

23  assets will be very similar.

24  Q    And why do these funds and these assets need continued

25  management?  Why aren't you just selling them?

002952

Case 3:25-cv-02072-S   Document 15-5   Filed 06/13/25   Page 200 of 790   PageID 3680

1   A    Well, in some respects, they could just be sold, but the

2   -- we believe that the value would be a lot lower.  So, a lot

3   of them are complex.  The time to sell them may not be now.

4   Some will require restructuring in some way, whether -- not

5   through a reorganization process, but some sort of structural

6   treatment to how the obligations at the individual asset are

7   treated, or the equity at the individual asset.  So we're

8   going to manage each of them and look for market opportunities

9   where we think the value can be maximized.

10          MR. MORRIS:  Your Honor, I'm about to switch to

11  another topic.  We have been going for a little bit more than

12  two and a half hours.  I'm happy to just continue if you and

13  the witness are, but I just wanted to give you a head's up

14  that I'm about to switch topics.  If you wanted to take a

15  short break, we could.  If you want me to continue, I'm happy

16  to do that, too.

17          THE COURT:  Well, let me ask you, how much longer do

18  you think you're going to take overall with Mr. Seery?

19          MR. MORRIS:  I think I'll probably have another hour

20  to an hour and a half, Your Honor.  We want to make a complete

21  factual record here.

22          THE COURT:  All right.  Well, it's 12:07 Central

23  time.  Why don't we take a 30-minute lunch break, okay?  Can

24  everybody do their lunch snack that fast?

25          MR. MORRIS:  Sure.

Seery - Direct                                    111

 1              THE COURT:  I think that would probably be the way to

 2      go.  So we'll come back -- it's now 12:08.  We'll come back at

 3      12:38 Central time and resume --

 4              MR. MORRIS:  Okay.

 5              THE COURT:  -- resume this direct testimony, okay?

 6      So, see you in 30 minutes.

 7              MR. MORRIS:  Thank you very much.

 8              THE COURT:  Okay.

 9              THE CLERK:  All rise.

10          (A recess ensued from 12:08 p.m. to 12:44 p.m.)

11              THE COURT:  We are going back on the record in the

12      Highland confirmation hearing.  It's 12:44 Central time.  I

13      took a little bit longer break than I said we would.

14          Mr. Morris and Mr. Seery, are you ready to resume?

15              MR. MORRIS:  I am, Your Honor.

16              THE WITNESS:  Yes, Your Honor.

17              THE COURT:  Okay, good.  A couple of things.  I'm

18      required to remind you you're still under oath, Mr. Seery.

19      And also, just for people's planning purposes, what I intend

20      to do is, when the direct examination of Mr. Seery is

21      finished, I'm going to allow cross-examination of the

22      Objectors in the same amount of time in the aggregate that the

23      Debtor got, okay?  So, Objectors, in the aggregate, you can

24      spend as long cross-examining as the Debtor spent examining.

25      I can figure out this is the most significant witness, so I'm

Seery - Direct                                            112

 1   assuming that Debtor's other witnesses are going to be a lot

 2   shorter than this, but --

 3           MR. MORRIS:  Yes, I promise.

 4           THE COURT:  -- that's how we'll proceed.  And I

 5   expect to finish Mr. Seery today.

 6       So, all right.  With that, you may proceed, Mr. Morris.

 7           MR. MORRIS:  Okay.

 8                   DIRECT EXAMINATION, RESUMED

 9   BY MR. MORRIS:

10   Q    Can you hear me okay, Mr. Seery?

11   A    Yes, sir.

12   Q    Okay.  Before we move on to the next topic, you spent some

13   time describing the asset monetization plan.  Would it be fair

14   to describe that as a long-term going-concern liquidation?

15   A    Long-term is subjective.  We anticipate that we'll be able

16   to monetize the assets in two years.  We could go out longer

17   to three.  There's no absolute restriction that we couldn't

18   take longer, depending on what we see in the market, but the

19   objective would be to find maximization opportunities within

20   that time period.

21   Q    Okay.  So let's turn now to the post-confirmation

22   corporate governance structure.

23       (Interruption.)

24           THE WITNESS:  Mr. Golub (phonetic), you should mute.

25           THE COURT:  Yes.  I don't know -- I didn't catch who

Seery - Direct                                113

1  that was.  But anyway, anyone other than --

2          A VOICE:  It's someone named Garrett Golub.

3          THE COURT:  -- Morris and Seery, please mute.  All

4  right.  Go ahead.

5          MR. MORRIS:  Okay.

6  BY MR. MORRIS:

7  Q    At a high level, Mr. Seery, can you please describe for

8  the Court the post-confirmation structure that's envisioned

9  under the proposed plan?

10 A    At a high level, we anticipate reorganizing HCMLP such

11 that the current parties of interest will be extinguished and,

12 in exchange, creditors will get trust interests.  There'll be

13 a trust that will sit on top of HCMLP and it will have an

14 overall responsibility for the Claimant Trust, which will be

15 the HCMLP assets plus the assets that we move into the

16 Claimant Trust, depending on structural considerations.  And

17 then a Litigation Trust, which will be a separate trust, and

18 that will roll up into the main trust.  And the main trust

19 will be where the creditors hold their interests.  And those

20 interests take the form of senior interests or junior

21 interests.

22 Q    All right.  You mentioned a Claimant Trust.  Who is

23 proposed to serve as the Claimant Trustee?

24 A    I am.

25 Q    And you mentioned a Litigation Trust.  Is there someone

Seery - Direct                                114

1   proposed to serve as the Litigation Trustee?

2   A    A gentleman named Marc Kirschner.  He's been doing these

3   kinds of things for a long time.

4   Q    Is there going to be any kind of oversight group or

5   committee?

6   A    There is an oversight committee that sits at the main

7   trust.  Into it will report Mr. Kirschner and myself.  It has

8   oversight responsibilities similar to a board of directors in

9   terms of the operations of the Claimant Trust and the

10  Litigation Trust.

11  Q    Do you have an understanding as to who the initial members

12  of the Claimant Oversight Committee?

13  A    The initial members will be each of the members of the

14  Creditors' Committee.  So, UBS, Acis, Redeemer, a

15  representative from Redeemer, and Meta-e, as well as an

16  independent named David Pauker.  So that's the initial

17  structure.

18  Q    And can you describe for the Court, how did Mr. Pauker get

19  involved in this?

20  A    He was selected by the Committee.

21  Q    Okay.  Is there -- Meta-e is a convenience class claim

22  holder.  Do I have that right?

23  A    Yeah.  They're -- they -- as I went through earlier, they

24  had a liquidated claim for litigation services.  So we

25  expected that they'll be paid off rather early in the process.

APP 2104

Seery - Direct                                115

1    At that point, we suspect they wouldn't -- they would no

2    longer be an Oversight Committee member and they would be

3    replaced by an independent.

4    Q    And do you have any understanding as to how that

5    independent will be chosen?

6    A    I believe it's chosen by the other members.

7    Q    Okay.  Can you describe your proposed compensation

8    structure as the proposed Claimant Trustee?

9    A    My compensation will be $150,000 a month, which is the

10   same compensation I have now.  In addition, we'll negotiate a

11   bonus structure with the Oversight Committee.  And that will

12   likely be a bonus not just for myself but for the entire team,

13   depending on performance.

14   Q    Okay.  And that -- and who is that negotiation going to be

15   had with?

16   A    The Oversight Committee.

17   Q    Okay.  Are you familiar with Mr. Pauker's compensation

18   structure?

19   A    I -- I've seen it.  I don't recall specifically.  I think

20   his -- from the models, I think he's about 40 or 50 grand a

21   month, something along those lines.

22   Q    Okay.  How about Mr. Kirschner?  Do you recall -- let me

23   just ask you this.  Does it refresh your recollection at all

24   if I said that 250 in year one for Mr. Pauker?

25   A    Yeah.  So maybe closer to $20,000 to $25,000 a month.  And

Seery - Direct                                        116

1    then Mr. Kirschner is a lower amount, but he would get a

2    contingency fee arrangement somewhere dependent on the

3    recoveries from his litigations.

4    Q    Okay.  You mentioned earlier that the Debtor intends to

5    continue operations at least for some period of time post-

6    effective date.  Do you have a view as to whether the post-

7    confirmation entity will have sufficient personnel to manage

8    the business?

9    A    I do, yes.

10   Q    And why is that?  What makes you believe that the Debtor

11   will have -- the post-confirmation Debtor will have sufficient

12   personnel to manage the business?

13   A    Well, we've gone through and looked at each of the assets

14   and what is required to manage those assets.  We have a lot of

15   experience doing it during the case.  The bulk of the

16   employees, who do a fine job, are really doing shared service

17   arrangements.  The direct asset management group is a smaller

18   group, and we'll be able to manage those with the team we're

19   putting together.

20   Q    Okay.  How does the ten employees compare to the original

21   plan that was set forth in the disclosure statement, if you

22   recall?

23   A    Well, we had less, and I believe the number was either two

24   or three, along with me, and then using a lot of outside

25   professional help.  But we determined that we wanted to have a

Seery - Direct                                117

1  much more robust team, based on the litigation that we're

2  seeing around the case and we expect to continue post-exit, so

3  that the team can manage those assets unfettered.

4      In addition, we were taking on the CLO management, the 1.0

5  CLO contracts.  These one -- as I've mentioned before, they're

6  not traditional CLOs in the sense that they require the same

7  hands-on management, but they do require an experienced team

8  to help manage the exposures, most of which are cross-holdings

9  in different -- in different entities or different investments

10 that Highland also has exposure to.

11 Q   In addition to the assumption of the CLO management

12 agreements, has the Debtor made any decisions regarding the

13 possibility of hiring a sub-servicer?

14 A   We have, yes.

15 Q   And did that factor into the Debtor's decision to increase

16 the number of personnel it was going to retain?

17 A   Well, we determined we weren't going to hire a sub-

18 servicer.  And I'm not sure exactly when we made that

19 determination.  We do have a TPA, which is SEI, and that's a

20 third-party administrator, to sift through the funds and

21 provide accounting supporting to those, to those funds.  So

22 that -- they will help.  We also have an outside consultant

23 that we're using, Experienced Advisory Consultants, who are

24 financial consultants who've worked in the business.  So we do

25 have those.

Seery - Direct                          118

1    But we didn't think that we would get a third-party sub-

2   servicer, as was the case in Acis, and determined that wasn't

3   in the best interest of the estate.

4   Q   Can you just shed a little light on what factors the

5   Debtor took into account in deciding not to hire a sub-

6   servicer?

7   A    Well, we primarily looked at cost, as well as control of

8   the assets, and determined that that was -- those were in the

9   best interests of the estate, to keep them managed internally.

10  We reviewed that with the Committee, and they agreed.

11  Q    Okay.

12           MR. MORRIS:  Let's turn now to the best interests of

13  creditors' test, Your Honor, 1129(a)(7), and let's talk about

14  whether the plan is in the best interests of creditors.

15  BY MR. MORRIS:

16  Q    Has the Debtor done any analysis to determine the likely

17  value to be realized in a Chapter 7 liquidation?

18  A    We have, yes.

19  Q    And has the Debtor done any analysis to determine the

20  likely recoveries under the plan?

21  A    Yes.

22  Q    Okay.  Do you recall when these projections were first

23  prepared?

24  A    We started working on projections in the fall, as we were

25  developing the monetization plan.  We filed projections, I

APP. 2488

Seery - Direct                                    119

1   believe, in November.  We've subsequently updated those

2   projections based on the claims, market condition, and value

3   of the assets.

4   Q    And were those updates provided to plan objectors last

5   week?

6   A    Yes, they were.

7   Q    Okay.  Can we refer to the projections that were in the

8   disclosure statement as the November projections?

9   A    That'd be fine.

10  Q    And can we refer to the projections that were provided to

11  the objectors last week as the January projections?

12  A    Yes.

13  Q    And as --

14  A    I think they're actually -- I think they're actually dated

15  February 1, is the most recent update.

16  Q    Okay.  And then was a further update provided yesterday

17  and filed on the docket, to the best of your knowledge?

18  A    Yes.

19  Q    All right.  We'll talk about some of the changes in those

20  projections.

21        MR. MORRIS:  Can we call up on the screen Debtor's

22  Exhibit 7D as in dog?  And this document is in evidence.  Um,

23  --

24        THE COURT:  No, this is -- oh, wait.  How many Ds is

25  it?  Seven?

APP 2489

Seery - Direct                                    120

1          MR. MORRIS:  It's 7D, so that would be on Docket
2    1866, all of which has been admitted.
3          THE COURT:  Okay.  You're right.
4          MR. MORRIS:  Okay.
5       And if we could just, I'm sorry, go to Page 3.
6    BY MR. MORRIS:
7    Q    Is there any way to look at this, Mr. Seery?  Is this the
8    January projections that were provided last week?
9    A    Yes.
10   Q    Okay.  Can you describe for the Court the process by which
11   this set of projections and the November projections were
12   prepared?  How did the Debtor go about preparing these
13   projections?
14   A    Yeah.  These are prepared what I would call bottoms-up.
15   So what we did was we looked at each of the assets that the
16   Debtor owns or manages or has a direct or indirect interest
17   in, used the values that we have for those assets, because we
18   do keep valuations for each of the assets that the Debtor owns
19   or manages in the ordinary course of business.  We then
20   adjusted those depending on what we saw as the outcomes for
21   the case, either a plan outcome or a liquidation outcome, and
22   then rolled those into the -- into the numbers that you see
23   here.
24       So the 257 and change.  And please excuse my eyesight.
25   I'm going to make this bigger.  The 257 is the estimated

002963
APP 2499

Seery - Direct                                        121

1   proceeds from monetization.  Above that, you see cash.  That's
2   our estimated cash at 131.  And we monitor those, those values
3   daily.
4   Q   And were these projections prepared under your
5   supervision?
6   A   They were, yes.
7   Q   Okay.  And who was involved in the preparation of this
8   document and other iterations of the projections?
9   A   The team at DSI.  Obviously, myself; the team at DSI; as
10  well as the, at least from a review perspective, counsel.
11  Q   All of these contain various assumptions.  Do I have that
12  right?
13  A   Yes.
14        MR. MORRIS:  Can we go to the prior page, please, I
15  think is where the assumptions are?  And let's just look at a
16  few of them.  Okay.  Can we make that a little bigger, La
17  Asia?  Okay.  Good.
18  BY MR. MORRIS:
19  Q   Why does the Debtor's projections and liquidation analysis
20  contain any assumptions?  Why, why include assumptions?
21  A   Well, all projections contain assumptions.  So an
22  assumption -- I was strangely asked the question at
23  deposition, what does that mean?  It's a thing or fact that
24  one accepts as true for the purposes of analysis.  And so in
25  terms of looking out into the future as to what the potential

APP 2191

Seery - Direct                                122

1    operation expenses will be and what the potential recoveries

2    will be, one has to make assumptions in order to be able to

3    compare apples to apples.

4    Q    And do you believe that these assumptions are reasonable?

5    A    Yes.  It would make no sense to have assumptions that

6    aren't reasonable.  I mean, and we've all seen that with

7    analysis through our respective careers.  It really should be

8    grounded in some fact and a reasonable projection on what can

9    happen in the future, based upon experience.

10   Q    Okay.  And have you personally vetted each of the

11   assumptions on this page?

12   A    Yes.

13   Q    Okay.  Let's just look at a few of them.  Let's start with

14   B.  It says, All investment assets are sold by December 31,

15   2022.  Do you see that?

16   A    Yes.

17   Q    Why did the Debtor make that assumption?

18   A    We looked at a two-year projection horizon.  We thought

19   that that was a reasonable amount of time, looking at these

20   assets, to monetize the assets.  Remember that we did go

21   through a process of the case over the last year, and we did

22   consider monetization asset events for certain of the assets

23   throughout the case, some of which we were successful on, some

24   of which we weren't, some we just determined to pull back.

25   But we do believe that, based upon our view of the market and

Seery - Direct                          123

1   where we think these assets will be positioned, that

2   monetizing them over a two-year period makes sense.

3   Q    And is it possible that it takes longer than that?

4   A    It's possible.  The -- you know, we would be wrong about

5   the market.  The -- we could go into a full-blown recession.

6   Capital could dry up.  The financing markets could turn

7   negative.  But they're extremely positive right now.  Those

8   things could happen.  But we're assuming that they won't.

9   Q    And is it possible that you complete the process on a more

10  accelerated timeframe?

11  A    That's always possible.  It's not, in my experience, a

12  good way to plan.  Luck really isn't a business strategy.  But

13  if good opportunity shows up and folks want to pay full value

14  for an asset, we certainly wouldn't turn them away just so we

15  could stretch out the time period.

16  Q    Is it fair to say that this projected time period is your

17  best estimate on the most likely timeframe needed?

18  A    It's -- I think it's the best estimate that we have based

19  upon our experience with the assets, again, and our projection

20  of the marketplace that we see now.  If things change, we'll

21  adjust it, but this is a fair estimate of when we can get the

22  monetization accomplished.

23  Q    Okay.  The next assumption relates to certain demand

24  notes.  Do you see that?

25  A    Yes.

Seery - Direct                                    124

1  Q    Can you explain to the Court what that assumption is and

2  why the Debtor believed that it was reasonable?

3  A    Well, the Debtor has certain notes that are demand notes.

4  These are all from related entities.  Most of the notes, the

5  demand notes, we have demanded, and we've commenced litigation

6  to collect.  And we assume that we're going to be able to

7  collect those.

8      Three notes that were long-term notes -- these were notes

9  with maturities in 2047 that had been stretched out a couple

10 years ago -- were defaulted recently.  And we have accelerated

11 those notes and we've asserted demands and we have commenced

12 litigation, I believe, on each of those last week to collect.

13 So we do estimate that we will collect on all of the notes

14 that we've demanded and that we've commenced action on.  So

15 the demand notes as well as the accelerated notes.

16     The next, the next bullet shows there's one Dugaboy note

17 that has not defaulted.  That also has a 2047 maturity.  I

18 believe it's about $18 million.  And we expect that one to

19 stay current, because now I think the relater parties learned

20 that when you don't pay a long-dated note, it accelerates,

21 provided the holder, which is us, wishes to accelerate it,

22 which we did.  And so that note we do not expect to be

23 collected in the time period.

24 Q    Okay.

25      MR. MORRIS:  Let's go down to M.

002967

APP 2494

Case 3:25-cv-02072-S    Document 16-5    Filed 06/09/25    Page 215 of 790    PageID 3695

Seery - Direct                              125

 1  BY MR. MORRIS:

 2  Q    M relates to certain claims.  Do you see that?

 3  A    Yes.

 4  Q    Can you just describe at a high level what assumption was

 5  made with which -- with respect to which particular claims?

 6  A    Well, we've summarized them there.  And what we've assumed

 7  is that, with respect to Class 8, IFA, which is a derivative

 8  litigation claim that seeks to hold, loosely, HCMLP liable for

 9  obligations of NexBank, is worth zero.  I think that's pretty

10  close to settling.  We assumed here $94.8 million for UBS,

11  which was the estimated amount, and $45 million for

12  HarbourVest.

13  Q    And when you say the estimated amount, are you referring

14  to the 3018 order on voting?

15  A    Yes.  We just use the estimated amount in this projection

16  based upon the 3018 order.

17  Q    Okay.  And finally, let's look at P.  P has a payout

18  schedule.  Do I have that right?

19  A    That's an estimated payout schedule, yes.

20  Q    And what do you mean by that, that it's estimated?

21  A    Based upon our projections and how we perceive being able

22  to monetize the assets and reach the valuations that we want

23  to reach, we believe we could make these distributions.

24  However, there's no requirement to make them.

25       So the first and foremost objective we have, as I said

APP 2485

Seery - Direct                    126

1   earlier, is to maximize value, and not -- it's not based on a

2   payment schedule, it's based upon the market opportunity.  And

3   we've estimated for our purposes here that we'll be able to

4   meet these distribution amounts, but there's no requirement to

5   do so.

6   Q    Okay.

7         MR. MORRIS:  Let's go to Page 3 of the document,

8   please.

9   BY MR. MORRIS:

10  Q    Can you just describe generally what this page reflects?

11  A    This is a comparison of the plan analysis and what we

12  expect to achieve under the plan and the liquidation analysis

13  if a trustee, a Chapter 7 trustee, were to take over.  And it

14  compares those two distribution amounts based upon the

15  assumptions on the prior page.

16  Q    All right.  Let's just look at some of the -- some of the

17  data points on here.  If we look at the plan analysis, what is

18  -- what is projected to be available for distribution, the

19  value that's available for distribution?

20  A    $222.6 million.

21  Q    Okay.  So, 222?  And on a claims pool that's estimated to

22  be, for this purpose, how much?

23  A    $313 million.

24  Q    And what is the distribution, the projected distribution

25  to general unsecured creditors on a percentage basis?

APP 2406

Seery - Direct                                127

1    A    On this analysis, to general unsecured creditors, it's

2    62.14 percent.  But remember, that backs out the payment to

3    the Class 7 creditors of 85 cents above.

4    Q    Okay.  And does this plan analysis include any value for

5    litigation claims?

6    A    No, it does not.

7    Q    And is that true for all forms of the Debtor's

8    projections?

9    A    That's correct, yes.

10   Q    Okay.  And let's look at the right-hand column for a

11   moment.  It says, Liquidation Analysis.  What does that column

12   represent?

13   A    That represents our estimate of what a Chapter 7 trustee

14   could achieve if it were to take over the assets, sell them,

15   and make distributions.

16   Q    Okay.  And let's just look at the comparable data points

17   there.  Under the liquidation analysis, as of -- the January

18   liquidation analysis as of last week, what was projected to be

19   available for distribution?

20   A    A hundred and -- approximately $175 million.

21   Q    Okay.  And what was the claims pool?

22   A    The claims pool was $326 million.  Recall that that's a

23   slightly larger claims pool because it doesn't back out the

24   Class 7 claims.

25   Q    Okay.  The convenience class claims?

Case 3:25-cv-02072-S   Document 15-5 Filed 06/02/25   Page 218 of 790   PageID 3698

Seery - Direct                                128

1   A    Correct.

2   Q    Okay.  And what's the projected recovery for general

3   unsecured claims under the liquidation analysis?

4   A    Based on this analysis and the assumptions, 48 (audio

5   gap).

6   Q    Okay.  Based on the Debtor's analysis, are creditors

7   expected to do better under this analysis in the -- under the

8   Debtor's plan versus the hypothetical Chapter 7 liquidation?

9   A    Yes.  Both -- both Class 7 and Class 8.

10  Q    Okay.  Now, this set of projections differs from the

11  projections that were included in the disclosure statement; is

12  that right?

13  A    That's correct.

14  Q    Okay.  Can we just talk about what the differences are

15  between the November projections that were in the disclosure

16  statement and the January projections that are up on the

17  screen?  Let's start with the monetization of assets, the

18  second line.  Do you recall if there was an increase, a

19  decrease, or did the value from the monetization of assets

20  stay the same between the November projections and the January

21  projections?

22  A    They increased from November 'til -- 'til now.

23  Q    Okay.  Can you explain to the judge why the value from the

24  monetization of assets increased from November to January?

25  A    Well, really, it's the composition of the assets and their

Seery - Direct                                    129

1    value.  So there's four main drivers.

2        The first is HarbourVest.  We had a settlement with

3    HarbourVest, which include HarbourVest transferring to the

4    Debtor $22-1/2 million of HCLOF interests.  Those have a real

5    value, and we've now included them in the -- in the asset

6    pool.  We've also included HarbourVest in the claims pool.

7        The second was we talked a little bit earlier on the

8    assumptions on the notes.  We previously had anticipated that,

9    on the long-dated notes, a collection, we -- we'd receive

10   principal and interest currently, but we wouldn't receive the

11   full amount of the principal that was due well off in the

12   future, and we would sell it a discount.

13       So the amount of the asset pool has been increased by $24

14   million, and that reflects the delta between or the change

15   between what was in the prior plan, the notes paying and then

16   being sold at a discount, and what's in the current plan,

17   which include the accelerated notes, which is a $24 million

18   note that Advisors defaulted on that we have accelerated and

19   brought action on, as well as two six -- roughly $6 million

20   notes, one from Highland Capital Real Estate and the other

21   from HCM Services.  So that's, that's additional 24.

22       In addition, Trussway, we've reexamined where Trussway is

23   in the market, both its marketplace and its performance, and

24   reassessed where the value is.  So that has increased by about

25   $10.6 million.

1    That doesn't mean that we would sell it today.  It means

2    that, when you look at the performance of the company, what we

3    think are the best opportunities in the market.  As we see the

4    marketplace with managing the company over time, we think that

5    that asset has appreciated considerably since November.

6        And then, finally, there were additional revenues that

7    flow into the model from the November analysis which would be

8    distributable, and those include revenues from the 1.0 CLOs.

9    Q    Okay.  So that accounts for the difference and the

10   increase in value from the monetization of assets.  Is there

11   also an increase in expenses from the November projections to

12   the January projections?

13   A    Yeah.  It's -- it's about -- it's around $25 million

14   additional increase.

15   Q    And can you explain to the Court what is the driver behind

16   that increase in expenses?

17   A    Yeah.  There's several drivers to that.  The first one is

18   head count.  So our head count, we've increased.  As I

19   mentioned earlier, we determined that we wanted to have a much

20   more robust management presence.  So we've increased the head

21   count, so we have a base comp, compensation, about $5 million

22   more than we initially thought.

23       Secondly, we have bonus comp.  So we've back-ended --

24   structured a backend bonus performance bonus for the team, and

25   that will run another $5 million, roughly.

Seery - Direct                              131

1        Previously, we had thought about, as you mentioned

2    earlier, the sub-servicing, but we've now talked about and we

3    have engaged a TPA, SEI, as well as experienced advisors.

4    That's another $1 to $2 million.

5        Operating expenses have increased by about $8 million,

6    based upon our assessment.  The biggest driver there is D&O,

7    which is up about $3 million.  In addition, we've gotten -- we

8    determined to keep a bunch of agreements related to data

9    collection and operations.  Those were requested by the

10   Committee, but they also serve us in performing our functions.

11   That's another couple million dollars.

12       My comp, my bonus comp was not in the prior model.  So I

13   have a bonus that has not been agreed to by the Court for the

14   bankruptcy performance.  This is not a future bonus.  And we

15   built that into the model.  Obviously, it's subject to Court

16   approval and Committee objection, and I suppose anybody else's

17   objection, but we'll -- we'll be before the Court for that.

18   But we wanted to build that into the model so that we had it

19   covered in the event that it was approved.

20   Q   Was there also a change in the assumption from November to

21   January with respect to the size of the general unsecured

22   claim pool?

23   A   Yes.  There have been -- there have been several changes

24   that have happened, and we've added those and refined the

25   claim pool numbers.

Seery - Direct                              132

1   Q    And are those changes reflected in the assumption we

2   looked at earlier, Exhibit -- Assumption M, which went through

3   certain claims that have been liquidated?

4   A    Some, some are.  That assumption, I don't believe, was --

5   it's not in front of me, but wasn't up to date.  So, that one,

6   for example, assumed UBS at the 3018 estimated amount.  We've

7   since refined that number to reflect the agreed-upon

8   transaction with UBS, which is subject to Court approval.

9   Q    Right.  But before we get to that, for purposes of the

10  January model, the one that's up on the page -- and if we need

11  to look at the prior page --

12          MR. MORRIS:  Let's go to the prior page, the

13  assumption.  Assumption M.

14  BY MR. MORRIS:

15  Q    Assume the UBS, the UBS claim at the $94.8 million, the

16  3018 number.  Do you remember that?

17  A    Yeah.  That's, that -- that's the assumption in this

18  model.  I think back in November we assumed HarbourVest at

19  zero and UBS at zero.  So we've since -- we've since refined

20  those numbers, obviously, through both the 3018 process as

21  well as the settlement with HarbourVest.

22  Q    And did the -- did the inclusion -- withdrawn.  At the

23  time that you prepared the November model -- withdrawn.  At

24  the time the Debtor prepared the November model, did it know

25  what the UBS or the HarbourVest claims would be valued at?

Seery - Direct                                133

1   A    No.  We just had our assumption back then, which was zero.

2   And now, obviously, we know.

3   Q    And so the January model took into account the settlement

4   with HarbourVest and the 3018 motion; do I have that right?

5   A    That's correct.  That's in the assumptions.

6   Q    And what was the impact on the projected recoveries to

7   general unsecured creditors from the changes that you've just

8   described, including the increase in the claims amount?

9   A    Well, when -- like any fraction, the distribution will go

10  down if the claimant pool goes up.  So, with the denominator

11  going up by the UBS and the UBS amount -- the UBS and the

12  HarbourVest amounts, the distribution percentage went down.

13  Q    Okay.  I want to focus your attention on the second line

14  where we've got the monetization of assets under the plan at

15  $258 million but under the liquidation analysis it's $192

16  million.  Do you see that?

17  A    Yes.

18  Q    Can you tell Judge Jernigan why the Debtor believes that

19  under the plan the Debtor or the post-confirmation Debtor is

20  likely to receive or recover more for the --

21       (Interruption.)

22            THE COURT:  All right.  Hang on a minute.  Where is

23  that coming from, Mike?

24            THE CLERK:  Someone is calling in.

25            THE COURT:  Okay.

Seery - Direct                                    134

1          MR. MORRIS:  Thank you.

2          THE COURT:  Mr. --

3          MR. MORRIS:  Let me restate the question.

4          THE COURT:  Yes.  Restate.

5    BY MR. MORRIS:

6    Q    Can you explain to Judge Jernigan why the Debtor believes

7    that the -- under the plan corporate structure, the Debtor is

8    likely to recover more from the monetization of assets than a

9    Chapter 7 liquidation trustee would?

10   A    Sure.  My experience is that Chapter 7 trustees will

11   generally try to move quickly to monetize assets.  They will

12   retain their own professionals, they will examine the assets,

13   and they will look to sell those assets swiftly.

14        The monetization plan does not plan to do that.  I've got

15   a year's of experience -- a year now of experience with these

16   assets, as well as we'll have a team with several years at

17   least each of experience with the assets.  We intend to look

18   for market opportunities, and think we'll be able to do it in

19   a much better fashion than a liquidating Chapter 7 trustee.

20        The nature of these assets is complex.  Many of them are

21   private equity investments in operating businesses.  Certain

22   of them are complicated real estate structures that need to be

23   dealt with.  Some of them are securities that, depending on

24   when you want to sell them, we believe there'll be better

25   times than moving quickly forward to sell them now.

1    So, with each of them, we think that we'll be able to do

2    better than a Chapter 7 trustee based upon our experience.

3    The only thing that we're level-set with a Chapter 7 trustee

4    on is that cash is cash.

5    Q    Do you have any concerns that a Chapter 7 trustee might

6    not be able to retain the same personnel that the Debtor is

7    projected to retain?

8    A    Well, again, in my experience, it would be very difficult

9    for a Chapter 7 trustee to retain the same professionals, and

10   typically they don't.

11       Secondly, retaining the individuals, I think, would be

12   very difficult for a Chapter 7 trustee, would not have a

13   relationship with them, and that gap of time and the risks

14   that they would have to take to join a Chapter 7 trustee I

15   think would lead most of them to look for different

16   opportunities.

17   Q    Okay.  One of the other things, one of the other changes I

18   think you mentioned between the November and the January

19   projections was the decision to assume the CLO management

20   contracts.  Do I have that right?

21   A    That's correct.

22   Q    And why has the Debtor decided to assume the CLO

23   management contracts?  How does that impact the analysis on

24   the screen?

25   A    Well, it does add to the expense, but it also adds to the

APP 2985

                              Seery - Direct                    136

1   proceeds.

2        When we did the HarbourVest settlement, we ended up with

3   the first significant interest in HCLOF.  HCLOF owns the vast

4   majority of the equity in Acis 7, and also owns significant

5   preferred share interests in the 1.0 CLOs.  And we think it's

6   in the best interest of the estate to keep the management of

7   those assets where we have an interest in the outcome of

8   maximizing value with the estate.

9        In addition, we're going to have employees who are going

10  to work with us to manage those specific assets, so we feel

11  like that will be something where we can control the

12  disposition much better.

13       There's also cross-interests that these CLOs have in --

14  the 1.0 CLOs have in a number of other investments that

15  Highland has.  As in all things Highland, it's interrelated,

16  and so many of the companies have direct loans from the CLOs.

17  We intend to refinance that, but we feel much more comfortable

18  and feel that there would be value maximization if we're able

19  to work directly with the Issuers as a manager while we seek

20  in those underlying investments to refinance the CLO debt.

21  Q    Has the Debtor -- has the Debtor reached an agreement with

22  the Issuers on the assumption of the CLO management

23  agreements?

24  A    Yes, we have.

25  Q    Can you describe for the Court the terms of the

Seery - Direct                                137

1   assumption?

2             MR. RUKAVINA:  Your Honor, this --

3             THE WITNESS:  Yes.

4             MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

5   would object to this as hearsay.

6             THE COURT:  Well, he has not --

7             MR. MORRIS:  It's --

8             THE COURT:  He's not said an out-of-court statement

9   yet, so I overrule.

10        Go ahead.

11            THE WITNESS:  Yeah, we -- we are going to assume the

12   CLO contracts.  We have had direct discussions with the

13   Issuers.  They have agreed.

14        The basic terms are that we're going to cure them by

15   satisfying about $500,000 of cure costs related to costs that

16   the CLO Issuers have incurred in respect of the case, and

17   we'll be able to pay that over time.

18            MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

19   would renew my objection and move to strike his answer that

20   they've agreed.  That is hearsay, an out-of-court statement

21   offered to prove the truth of the matter asserted.

22            THE COURT:  Okay.  Mr. Morris, what is your response?

23            MR. MORRIS:  He's describing an agreement.  I

24   actually think it's in the Debtor's plan that's on file

25   already.  But he's describing the terms of an agreement.  He's

APP 2207

Seery - Direct                                        138

 1    not saying what anybody said.  There's no out-of-court

 2    statement.  It's an agreement that's being described.

 3              THE COURT:  All right.  Thank you.  I overrule the

 4    objection.

 5              MR. MORRIS:  Okay.

 6    BY MR. MORRIS:

 7    Q    Does the Debtor believe that the CLO agreements will be

 8    profitable?

 9    A    Yes.

10    Q    And why does the Debtor believe that the CLO agreements

11    will be profitable to the post-confirmation estate?

12    A    Well, we don't -- we don't break out profitability on a

13    line-by-line basis.  But the simple math is that the revenues

14    from the CLO contracts which will roll in to the Debtor from

15    the management fees are more than what we anticipate the

16    actual direct costs of monitoring and managing those assets

17    would be.

18    Q    Okay.  Are you aware that yesterday the Debtor filed a

19    further revised set of projections?

20    A    I am, yes.

21    Q    All right.  Let's call those the February projections.

22              MR. MORRIS:  Can we put those on the screen?

23         It's Exhibit 7P, Your Honor.

24              THE COURT:  Okay.

25              MR. MORRIS:  All right.  I think that for some reason

Seery - Direct                                139

1    -- yeah, okay.  There we go.  Perfect.  Right there.

2        Your Honor, these are the projections that were filed

3    yesterday.  I'm going to move for the admission into evidence

4    of these projections.

5            THE COURT:  All right.

6            MR. TAYLOR:  Your Honor, this is Clay Taylor.

7            THE COURT:  Go ahead.

8            MR. TAYLOR:  We object.  These were -- these were not

9    previously provided.  They were provided on the eve of the

10   confirmation hearing, after the Debtors had already revised

11   them once and provided those on -- after close of business on

12   a Friday before Mr. Seery's deposition.  And these were

13   provided even later, certainly not within the three days

14   required by the Rule.  And therefore we move to -- that these

15   should not be allowed into evidence.

16           THE COURT:  Mr. Morris, what is your response to

17   that?

18           MR. MORRIS:  Your Honor, first of all, the January

19   projections were provided in advance of Mr. Seery's deposition

20   and he was questioned extensively on it.  These projections

21   have been updated since then, I think for the singular purpose

22   of reflecting the UBS settlement.

23       As Your Honor just saw, the prior projections included an

24   assumption based on the 3018 motion.  Since Mr. Seery's

25   deposition, UBS and the Debtor have agreed to publicly

Seery - Direct                                    140

 1   disclose the terms of the settlement, and that's reflected in
 2   these revised numbers.  I think there was one other change
 3   that Mr. Seery can testify to, but those are the only changes
 4   that were made.
 5          THE COURT:  All right.  Mr. Seery, what besides the
 6   UBS settlement do you think was put in these overnight ones?
 7          THE WITNESS:  I believe the only other change, Your
 8   Honor, was correcting a mistake.  In Assumption M, the second
 9   line is assumes RCP claims will offset against HCMLP's
10   interest in the fund and will not be paid from the Debtor's
11   assets.  That hasn't changed.
12      Basically, the Debtor got an advance from RCP that was to
13   -- for tax distributions, and did not repay it.  The RCP
14   investors are entitled to recovery of that.  So we had
15   previously backed that out.  It's about four million bucks.
16   What happened was it was just double-counted.
17          THE COURT:  Okay.
18          THE WITNESS:  So, as an additional claim, it was
19   counted as $8 million.  I think that's the only other change.
20          THE COURT:  All right.  I overrule the objection.
21   You may go forward.  I admit 7P.
22          MR. MORRIS:  Thank you, Your Honor.
23      (Debtor's Exhibit 7P is received into evidence.)
24          MR. MORRIS:  Can you just -- if we can go to the next
25   page, please.

Seery - Direct                                141

1   BY MR. MORRIS:

2   Q    So, with -- seeing that the claims pool under the plan

3   previously was $313 million, and what's the claims pool under

4   the projections up on the screen under the plan?

5   A    Two -- well, remember, there's 273 for Class 8, and then

6   you'd add in the Class 7 as well, which is the $10.2 million.

7   So the 273 went from 313 to 273 with that settlement.

8   Q    And is there any -- is there any reason for the decrease

9   other than the change from the 3018 settlement -- order figure

10  to the actual settlement amount?

11  A    For the UBS piece, no.  And then, as I mentioned, I

12  believe the other piece would have been that four million --

13  that additional $4 million that was taken out.

14  Q    And did those two changes have a -- did those two changes

15  have an impact on the projected recoveries under the plan?

16  A    Sure, particularly with respect to -- to the Class 8.

17  Those recoveries went up significantly because the denominator

18  went up.

19  Q    Okay.  Does the Debtor believe that its plan is feasible?

20  A    Yes, absolutely.

21  Q    And do you know whether the administrative priority and

22  convenience class claims will be paid in full under the

23  Debtor's plan?

24  A    Yes.  We monitor the cash very closely, so we do have

25  additional cash to raise, but we're set to reach or exceed

Seery - Direct                                    142

1    that target, so we do believe we'll be able to pay all the

2    administrative claims when they come in.  Obviously, we have

3    to see what they are.  We will be able to pay Class 7 on the

4    effective date.  Any other distributions, we expect to be able

5    to make as well.

6         So, and then it's -- then it's a question of going forward

7    with a few other claims that we have to pay over time.  We

8    have the cash flow to pay those.  Frontier, for example, we'll

9    be able to pay that claim over time in accordance with the

10   restructured terms.  If the assets that secure that claim are

11   sold, they would be paid when those assets are sold.

12   Q   Frontier, will the plan enable the Debtor to pay off the

13   Frontier secured claim?

14   A   Yes.  That's what I was explaining.  The cash flow is

15   sufficient to support the current P&I on that claim.  We will

16   be able to satisfy it from other assets if we determine not to

17   sell the asset securing the Frontier claim, or if we sell the

18   asset securing the Frontier claim we could satisfy that claim.

19   The asset far exceeds the value of the claim.

20   Q   Has the plan been proposed for the purpose of avoiding the

21   payment of any taxes?

22   A   No.  We expect all tax claims to be paid in accordance

23   with the Code, and to the extent that there are additional

24   taxes generated, we would pay them.

25   Q   Okay.  Let's just talk about Mr. Dondero for a moment

Seery - Direct                                    143

1   before we move on.  Are you aware that Mr. Dondero's counsel

2   has requested the backup to, you know, these numbers,

3   including the asset values?

4   A   It -- I'm not sure if it was his counsel or one of the

5   other related-entity counsels.

6   Q   Okay.  But you're aware that a request was made for the

7   details regarding the asset values and the other aspects of

8   this?

9   A   Yes.

10  Q   Those were -- were those formal requests or informal

11  requests?

12  A   They were certainly at my deposition.

13  Q   Right.  But you haven't seen a document request or

14  anything like that, have you?

15  A   No.

16  Q   Did the Debtor make a decision as to whether or not to

17  provide the rollup, the backup information to Mr. Dondero or

18  the entities acting on his behalf?

19  A   Yes.

20  Q   And what did the Debtor decide?

21  A   We would not do that.

22  Q   And why did the Debtor decide that?

23  A   Well, I think that's pretty standard.  The underlying

24  documentation and the specific terms of the model are very

25  specific, and they are -- they are confidential business

Seery - Direct                                      144

1    information that runs through what we expect to spend and what

2    we expect to receive and when we expect to sell assets and

3    then receive proceeds, and the prices at which we expect to

4    sell them.

5        To the extent that any entity wants to have that

6    information as a potential bidder, that would be very

7    detrimental to our ability to maximize value.  So, typically,

8    I wouldn't expect that to be given out, and I would not

9    approve it to be given out here.

10   Q    Did the Debtor disclose to Mr. Dondero's counsel or

11   counsel for one of his entities the agreement in principle

12   with UBS before the updated plan analysis was filed last

13   night?

14   A    I believe that disclosure was done a while ago, to Mr.

15   Lynn.

16   Q    So, to the best of your -- so, to the best of your

17   knowledge, the Debtor actually shared the specifics of the

18   agreement with UBS with Mr. Dondero and his counsel before

19   last night?

20   A    Yes.  I have specific personal knowledge of it because we

21   had to ask UBS for their permission, and they agreed.

22   Q    Okay.

23        MR. MORRIS:  All right.  Let's move on to 1129(b),

24   Your Honor, the cram-down portion.

25   BY MR. MORRIS:

Seery - Direct                                    145

1   Q    Are you aware, Mr. Seery, how various classes have voted

2   under the plan?

3   A    I am generally, yes.

4   Q    Okay.  Did any class vote to reject the plan, to the best

5   of your knowledge?

6   A    I don't -- I guess it depends on how you define the class.

7   I think the answer is that I don't believe that, when you

8   count the full votes of the -- the allowed claims and the

9   votes in any class, I don't believe any of the classes voted

10  to reject the plan.

11  Q    What type of claims are in Class 8?

12  A    General unsecured claims.

13  Q    And what percentage of the dollar amount of Class 8 voted

14  to accept?

15  A    It's -- I think it's near -- now with the Daugherty

16  agreements, it's near a hundred percent of the third-party

17  dollars.  I don't know the individual employees' claims off

18  the top of my head.

19  Q    All right.  And what about the number in Class 8?  Have a

20  majority voted to accept or reject in Class 8?

21  A    If you include the employee claims -- which, again, we

22  think have no dollar amounts -- then I think it's a majority

23  would have rejected.  The vast dollar amounts did accept.

24  Q    Okay.  Let's talk about those employees claims for a

25  moment.  Do you have an understanding as to the basis of the

APP 2945

Case 3:25-cv-02072-S   Document 65   Filed 02/19/25   Page 236 of 790   PageID 3716

1  claims?

2  A    Yes.

3  Q    What's your understanding of the basis of the claims?

4  A    Most of the claims are based on deferred compensation, and

5  that's the 2005 Highland Capital Management bonus plan.  And

6  that bonus plan provides certain deferred payment amounts to

7  the employees to be paid over multiple-year periods, provided

8  that they are in the seat when the payment is due.  That's the

9  vesting date.

10 Q    Okay.

11          MR. MORRIS:  Your Honor, just as a note-keeping

12 matter, the deferred compensation plan and the annual bonus

13 plan are Exhibits 6F and 6G, respectively, and they're on

14 Docket 1822.

15          THE COURT:  All right.

16 BY MR. MORRIS:

17 Q    And Mr. Seery, are you generally familiar with those

18 plans?

19 A    I am, yes.

20 Q    In order to receive benefits under the plans, are the

21 employees required to be employed at the time of vesting?

22 A    Yeah.  Our counsel refers to them, various terms, but

23 generally -- our outside labor counsel.  They're referred to

24 as seat-in-the-seat plans, meaning that your seat has to be in

25 a seat at the office at the day that the payment is due.  If

APP 2946

Seery - Direct                                    147

1   you're terminated for cause or if you resign, you're not

2   entitled to any payment.

3       So either you're there and you receive it or you're not

4   and you don't.  The only exception to that, I believe, is

5   death and disability.  Or disability.

6   Q    All right.  Did the Debtor terminate the annual bonus

7   plan?

8   A    Yes, we did.

9   Q    And in what context did the Debtor terminate the annual

10  bonus plan?

11  A    Well, we had discussion on it last week.  As Mr. Dondero

12  had also testified, the plan was to terminate all the

13  employees prior to the transition.  That's well known among

14  the employees.  The board terminated the 2005 bonus plan and

15  instead replaced it with a KERP plan that was approved by this

16  Court.

17  Q    And what was your understanding of the consequences of the

18  termination of the bonus plan for -- for purposes of the

19  claims that have been asserted by the employees who rejected

20  in Class 8?

21  A    It's clear that, under the 2005 HCMLP bonus plan, no

22  amounts are due because the plan has been terminated.

23  Q    All right.  Do you have an understanding as to when

24  payments become due under the deferred compensation -- under

25  the compensation plan?

Seery - Direct                                    148

1    A    I do, yes.

2    Q    And when are they due?

3    A    The next payments are due in May.

4    Q    And what is the Debtor intending to do with respect to the

5    objecting employees?

6    A    The Debtor will have terminated all those employees before

7    that date.

8    Q    All right.  So, what's -- what are the consequences of

9    their termination vis-à-vis their claims under the deferred

10   compensation plan?

11   A    They won't have any claims.

12   Q    Okay.  So is it the Debtor's view that the employees who

13   voted to reject in Class 8 have no valid claims under the

14   annual comp -- annual bonus plan or the deferred compensation

15   plan?

16        MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

17   With due respect, Your Honor, these employees have voted.  The

18   voting is on file.  There has been no claim objections to

19   their claims filed.  There's been no motion to designate their

20   votes filed.  So Mr. Seery's answer to this is irrelevant.

21   They have votes -- pursuant to this Court's disclosure

22   statement order, they have votes and they have counted, and

23   now Mr. Seery is attempting to basically impeach his own

24   balloting summary.

25        THE COURT:  Mr. Morris, what is your response?

Seery - Direct                                    149

 1          MR. MORRIS:  The point of cram-down, Your Honor, is
 2   it fair and equitable.  Does -- does -- is it really fair and
 3   equitable to the 99 percent of the economic interests to allow
 4   24 employees who have no valid claims to carry the day here?
 5   And this is -- that's what cram-down is about, Your Honor.
 6          THE COURT:  All right.  I overrule the objection.
 7   BY MR. MORRIS:
 8   Q    Let's talk about Class 7 for a moment, Mr. Seery.  That's
 9   the convenience class; is that right?
10   A    That's correct.
11   Q    How and why was that created?
12   A    Well, initially, that was created because we had two types
13   of creditors in the case, broadly speaking.  We had liquidated
14   claims, which were primarily trade-type creditors, and we had
15   unliquidated claims, which were the litigation-type creditors.
16   And so that class was created to deal with the liquidated
17   claims, and the Class 8 would deal with the unliquidated
18   claims, which were expected to, as we talked about earlier
19   with respect to the monetization plan, take some time to
20   resolve.
21   Q    Was the creation of the convenience class a product of
22   negotiations with the Committee?
23   A    The initial discussion on how we set it up I believe was
24   generated by the Debtor's side, but how it evolved and who
25   would be in it and how it was treated in terms of

Seery - Direct                               150

1   distributions was a product of negotiation with the Committee.

2   Q    Okay.  So how was the dollar threshold figure arrived at?

3   How did you actually determine to create a convenience class

4   at a million dollars?

5   A    It was through negotiation with the Committee.  So this

6   was one of those items that moved a fair bit, in my

7   recollection, through the many negotiations we had, heated

8   negotiations on some of these items, with the Committee.

9   Q    And are all convenience class -- all holders of

10  convenience class claims holders of claims that were

11  liquidated at the time the decision was made to create the

12  class?

13  A    I believe so.  I don't think there's been -- other than --

14  well, there -- we just had some settlements today, and I think

15  that relates to the employees, but those would be the only

16  ones that there would be disputes about, and that would roll

17  into the liquidat... the convenience class.

18  Q    Okay.  Finally, is there any circumstance under which

19  holders of Class 10 or 11, Class 10 or Class 11 claims will be

20  able to obtain a recovery under the plan?

21  A    Theoretically, there's a circumstance, and that is if

22  every other creditor in the case were to be paid in full, with

23  interest at the federal judgment rate, including Class 9,

24  which are the subordinated claims.  If those all got paid in

25  full, then theoretically the junior interest holders could

Case 3:25-cv-02072-S   Document 16-5   Filed 06/22/25   Page 241 of 790   PageID 3721

Seery - Direct                                   151

1   receive distributions.

2        However, based upon our projections, that would be wholly

3   dependent on a significant recovery in the Litigation -- by

4   the Litigation Trustee.

5   Q   Okay.  Let's move now to questions of the Debtor release

6   and the plan injunction.  Is the Debtor providing a release

7   under the plan?

8   A   Yes.

9   Q   Is anyone other than the Debtor providing a release under

10  the plan?

11  A   No.

12  Q   Who is the Debtor proposing to release under the plan?

13  A   The release parties are pretty similar to what you

14  typically would see, in my experience, in most plans.  You

15  have the independent board, myself as CEO and CRO, the

16  professional -- the Committee members, the professionals in

17  the case, and the employees that we reached agreement with

18  respect to certain of them who have signed on to a

19  stipulation, and others, get a broader release for negligence.

20  Q   Okay.  Is the Debtor aware of any facts that might give

21  rise to a colorable claim against any of the proposed release

22  parties?

23  A   Not with respect to any of the release parties.  So the --

24  obviously, I don't think there's any claims against me.  But

25  the same is true with respect to the oversight board, the

Case 3:25-cv-02072-S   Document 15   Filed 08/22/25   Page 242 of 790   PageID 3722

Seery - Direct                              152

1   independent board.

2       The Committee has been, you know, working with us hand-in-

3   glove, and I think if they thought we -- there was something

4   there, we would have heard it.

5       With respect to the professionals, we haven't seen

6   anything as an independent board.

7       And with respect to the employees' that -- general

8   negligence release, these are current employees and we have

9   been monitoring them for a year and we don't have any evidence

10  or anything to suggest that there would be a claim against

11  them.

12  Q   Are there conditions to the employees' release?

13  A   There are.  So, the employee release, as we talked about

14  earlier, was highly negotiated with the Committee.  It

15  requires that employees assist in the monetization efforts,

16  which is really on the transition and the monetization.  They

17  don't have to assist in bringing litigations against anybody,

18  so that's not part of what the provision requires.  But it

19  does require that they assist generally in our efforts to

20  monetize assets.

21      We don't think that's going to be significant, but if

22  there are individual questions or help we need, we certainly

23  would reach out to them.  If it's significant time, that will

24  be a different discussion.

25      And then with respect to the two senior employees who

APP 2322

Seery - Direct                                   153

1    signed the stipulation, they have to give up a part of their

2    distribution for their release.

3    Q    All right.  I think you just alluded to this, but has the

4    release been the subject of negotiation with the Creditors'

5    Committee?

6    A    Yeah.  We've touched on it a bunch of times, and we

7    certainly, unfortunately, let it spill over into the court a

8    couple times.  It was a hotly-negotiated piece of the plan.

9    Q    Okay.  Has the Committee indicated to the Debtor in any

10   way that anybody subject to the release is the subject of a

11   colorable claim?

12   A    Anyone subject to the release?  No.

13   Q    Yeah.  All right.  Let's talk about the plan injunction

14   for a moment.  Are you familiar with the plan injunction?

15   A    Broadly, yes.

16   Q    And what is your broad understanding of the plan

17   injunction?

18   A    Anybody who has a claim or thinks they have a claim will

19   broadly be enjoined from bringing that, other than as it's

20   satisfied under the plan or else ultimately bringing it before

21   this Court.  And that's the gatekeeper part, which is a little

22   bit of combining the two pieces.

23   Q    And what's your understanding of the purpose of the

24   injunction?

25   A    It's really to prevent vexatious litigation.  We, as

Seery - Direct                                    154

1   independent directors, stepped into what I think most people

2   would fairly say is one of the more litigious businesses and

3   enterprises that they've seen.  And we have a plan that will

4   allow us to monetize assets for the benefit of the creditor

5   body, provided we're able to do that and not have to put out

6   fires every day on different fronts.  So what we're hoping to

7   do with the injunction is ensure that we can actually fulfill

8   the purposes of the plan.

9   Q    All right.  Let's talk about some of the litigation that

10  you're referring to.

11           MR. MORRIS:  Can we put up on the screen the

12  demonstrative for the Crusader litigation?

13  BY MR. MORRIS:

14  Q    And Mr. Seery, I would just ask you to kind of describe

15  your understanding in a general way about the history of the

16  Crusader litigation.

17           MR. MORRIS:  And, Your Honor, just to be clear here,

18  this is a demonstrative exhibit.  As you can see in the

19  footnotes, it's heavily footnoted to the documents and to --

20  and, really, to the court cases themselves.  The documents on

21  the exhibit list include the dockets from each of the

22  underlying litigations.  And I just want to just have Mr.

23  Seery describe at an extremely high level some of the

24  litigation that the Debtor has confronted over the years, you

25  know, as the driver, as he just testified to, for the decision

Seery - Direct                                          155

1  to seek this gatekeeper injunction.

2          THE COURT:  All right.

3  BY MR. MORRIS:

4  Q   So, Mr. Seery, can you just describe kind of in general

5  terms the Crusader litigation?

6  A   Yeah.  I apologize to the Redeemer team for maybe not

7  doing this justice.  But this is litigation that came out of a

8  financial crisis upheaval related to this fund.  Disputes

9  arose with respect to the holders of the interests, which were

10 the -- ultimately became the Redeemers, and Highland as the

11 manager.

12     That went through initial litigation, and then into the

13 Bermuda courts, where it was subject to a scheme.  The scheme

14 required or allowed for the liquidation of the fund and then

15 distributions to the -- to the holders, and then deferred many

16 of the payments to Highland.

17     At some point, Highland, frustrated that it wasn't able to

18 get the payments, decided to just take them, and I think, you

19 know, fairly -- can be fairly described, at least by the

20 arbitration panel, as coming up with reasons that may not have

21 been wholly anchored in reality as to what its reasons were

22 for taking that money.

23     That led to further disputes with the Redeemers, who then

24 terminated Highland and brought an arbitration action against

25 Highland.  They were successful in that arbitration and

Seery - Direct                     156

1    received a $137 arbitration award.  And right up to the

2    petition date, that arbitration pursued.  When they finally

3    got their -- the arbitration award, they were going to

4    Delaware Chancery Court to file it and perfect it, and the

5    Debtor filed.

6    Q    Okay.

7         MR. MORRIS:  Let's go to the next slide, the Terry/

8    Acis slide.  If we could just open that up a little bit.  It's

9    -- as you can imagine, Your Honor, it's a little difficult to

10   kind of summarize the Acis/Terry saga in one slide, but we've

11   done the best we can.

12   BY MR. MORRIS:

13   Q    Mr. Seery, can you describe generally for Judge Jernigan,

14   who is well-versed in the matter, the broad overview of this

15   litigation?

16   A    There's clearly nothing I can tell the Court about the

17   bankruptcy that it doesn't already know.  But very quickly,

18   for the record, Mr. Terry was an employee at Highland.  He

19   also has a partnership interest in Acis, which was, in

20   essence, the Highland CLO business.  He -- and he got into a

21   dispute with Mr. Dondero regarding certain transactions that

22   Mr. Dondero wanted to enter into and Mr. Terry didn't believe

23   were appropriate for the investors.

24        Strangely, the assets that underlie that dispute are still

25   in the Highland portfolio, both Targa (phonetic) and Trussway.

Seery - Direct                              157

1    Mr. Terry was terminated, or quit, depending on whose side of

2    the argument you take.  Mr. Terry then sought compensation in

3    the arbitration pursuant to the partnership agreement.

4    Ultimately, he was awarded an arbitration award of roughly $8

5    million.

6        When he went to enforce that -- that was against Acis.

7    When he went to enforce that against Acis, which had all the

8    contracts, Highland went about, I think, terribly denuding

9    Acis and moving value.  Mr. Terry ultimately was able to file

10   an involuntary against Acis, and after a tremendous amount of

11   litigation had a plan confirmed that gave him certain rights

12   in Acis and any ability to challenge certain transactions with

13   respect to Highland that formed the basis of his claims in the

14   Highland bankruptcy.

15       That wasn't the end of the saga, because Highland

16   commenced a litigation -- well, not Highland, but HCLOF and

17   others, directed by others -- commenced litigation against Mr.

18   Terry in Guernsey, an island in the English Channel.  That

19   litigation wound its way for a couple -- probably close to two

20   years, at least a year and a half, and ultimately was -- it

21   was dismissed in Mr. Terry's favor.

22       While that was pending, litigation was commenced in New

23   York Supreme Court against Mr. Terry and virtually anybody who

24   had ever associated with him in the business, including --

25   including some of the rating agencies.  That was withdrawn as

Case 3:25-cv-02072-S   Document 65-5 Filed 08/22/25   Page 248 of 790   PageID 3728

Seery - Direct                                    158

1   part of our efforts working with DAF to try to bring a little

2   bit of sanity to the case.  But it was withdrawn without

3   prejudice.

4       But ultimately, you know, we've agreed to a claims

5   settlement, which was approved by this Court, with Acis and

6   Mr. Terry.

7   Q   All right.

8           MR. MORRIS:  How about UBS?  Can we get the UBS

9   slide?

10           THE WITNESS:  I should mention that there's other

11   litigations involving Mr. Terry and Highland individuals that

12   are outstanding, I believe, in Texas court.  We have not yet

13   had to deal with those.

14   BY MR. MORRIS:

15   Q   Okay.  Can you describe for the Court your general

16   understanding of the UBS litigation?

17   A   Again, UBS comes out of the financial crisis.  It was a

18   warehouse facility that UBS had established for Highland.  It

19   actually was a pre-crisis facility that was restructured in

20   early '08, while the markets were starting to slide but before

21   they really collapsed.  That litigation started after Highland

22   failed to make a margin call.  UBS foreclosed out -- or it

23   wasn't really a foreclosure, because it's a warehouse

24   facility, but basically closed out all the interest and sought

25   recovery from Highland for the shortfall.

APP 2228

Seery - Direct                                        159

1      Highland was one of the defendants, but there are numerous

2   defendants, including some foreign subsidiaries of Highland.

3      That case wend its way through the New York Supreme Court,

4   up and down between the Supreme and the Appellate Division,

5   which is the intermediate appellate court in New York.

6   Incredibly litigious effort over virtually every single item

7   you could possibly think of.

8      Ultimately, UBS got a judgment for $500-plus million and

9   -- plus prejudgment interest against two of the Highland

10  subsidiaries.  It then sought to commence action up -- enforce

11  its judgment through various theories against Highland.  That

12  is part of the settlement that we have -- it's been part of

13  the lift stay motion here, the 3019, as well as the 3018, and

14  as well as the ultimate settlement we've discussed today.

15  Q    Okay.  Moving on to Mr. Daugherty, can you describe for

16  the Court your understanding of the Daugherty litigation?

17  A    The Daugherty litigation goes back even further.  It did

18  -- I think the original disputes were -- or, again, started to

19  happen between Mr. Daugherty and Mr. Dondero even prior to the

20  crisis, but Mr. Dondero -- Daugherty certainly stayed with

21  Highland post-crisis.  And then when Mr. Daugherty was severed

22  or either resigned or terminated from his position, there was

23  various litigations that began between the parties very

24  intensely in state court, one of the more nasty litigations

25  that you can imagine, replete with salacious allegations and

Seery - Direct                                    160

1    press releases.

2        That litigation then led to an award originally for Mr.

3    Daugherty from HERA, which was an entity that had assets that

4    Mr. Daugherty alleges were stripped.  Mr. Daugherty had to pay

5    a judgment against Highland.  Ultimately, litigations were

6    commenced in both the state court and the Delaware Chancery

7    Court.  Those litigations, many of those continue, because

8    they're not just against the entities but specific

9    individuals.  Mr. Daugherty got a voting -- a claim allowed

10   for voting purposes in our case of $9.1 million, and we've

11   since reached an agreement with Mr. Daugherty on his claim,

12   save for a tax case which we announced earlier that relates to

13   compensation, claimed compensation with respect to a tax

14   distribution, which we have defenses for and he has claims

15   for.

16           MR. MORRIS:  All right.  We can take that down,

17   please.

18   BY MR. MORRIS:

19   Q   And let's just talk for a few minutes about some of the

20   things that have happened in this case.  Did Mr. Dondero

21   engage in conduct that caused the Debtor to seek and obtain a

22   temporary restraining order?

23   A   Yes, he did.

24   Q   And did the Debtor -- did Mr. Dondero engage in conduct

25   that caused the Debtor to seek and obtain a preliminary

Seery - Direct                               161

1   injunction against him?

2   A    Yes.

3   Q    And has the Debtor filed a motion to hold Mr. Dondero in

4   contempt for violation of the TRO?

5   A    Yes.

6   Q    Are you aware that -- of the CLO-related motion that was

7   filed in mid-December?

8   A    It's similar in that these are controlled entities that

9   brought similar types of claims against the Debtor and

10  interfered in similar ways, albeit not as directly threatening

11  with respect to the personnel of the Debtor.

12  Q    Okay.  And you're aware of how that -- that motion was

13  resolved?

14  A    I know we resolved it, and I'm drawing a blank on that.

15  But --

16  Q    All right.  Are you aware, did Mr. Daugherty also object

17  to the Acis and HarbourVest settlements, or at least either

18  him or entities acting on his behalf?

19  A    I think you meant Mr. Dondero.  I don't believe Mr.

20  Daugherty did.

21  Q    You're right.  Thank you.  Let me ask the question again.

22  Thank you for the clarification.  We're almost done.  To the

23  best of your knowledge, did Mr. Dondero or entities that he

24  controls file objections to the Acis and HarbourVest

25  settlements?

APP 2231

Seery - Direct                               162

1  A   Yes, they did.

2  Q   And we're here today with this long recitation because the

3  remaining objectors are all Mr. Dondero or entities owned or

4  controlled by him; is that right?

5  A   That's correct.

6  Q   All right.

7       MR. RUKAVINA:  Your Honor, I didn't have a chance to

8  object in time.  Entities owned or controlled by Mr. Dondero.

9  There's no evidence of that with respect to at least three of

10  my clients, and this witness has not been asked predicate

11  questions to lay a foundation.  Mr. Dondero does not own or

12  control the three retail (inaudible).  So I move to strike

13  that answer.

14       MR. MORRIS:  Your Honor, I withdraw with respect to

15  the three funds.  It's fine.

16       THE COURT:  All right.  With that withdrawal, then I

17  think that resolves the objection.

18       MR. MORRIS:  Uh, --

19       THE COURT:  Or I overrule the remaining portion.

20    Okay.  Go ahead.

21       MR. RUKAVINA:  That does, Your Honor.  Thank you.

22  BY MR. MORRIS:

23  Q   Are -- are -- is everything that you just described, Mr.

24  Seery, the basis for the Debtor's request for the gatekeeper

25  and injunction features of the plan?

Case 3:25-cv-02072-S   Document 65-5   Filed 02/26/25   Page 253 of 790   PageID 3733

Seery - Direct                          163

1   A    Well, everything I described are a part of the basis for

2   that.  I didn't describe every single basis with respect to

3   why those --

4   Q    So what are -- what are the other reasons that the Debtor

5   is seeking the gatekeeper and injunction provisions in the

6   plan?

7   A    We really do need to be able to operate the business and

8   monetize the assets without direct interference and litigation

9   threats.  We didn't go through some of the specifics, and I

10  hesitate to burden the Court again, but the email to me, the

11  email to Mr. Surgent, the testimony threatening -- effectively

12  threatening Mr. Surgent, in my opinion, by Mr. Dondero, in the

13  court in previous weeks, statements by his counsel indicating

14  that Mr. Dondero is going to sue me for hundreds of millions

15  of dollars down the road.

16       I mean, this is nonstop.  I'm an independent fiduciary.

17  I'm trying to maximize value for the estate.  I've got some

18  guy who's threatening to sue me?  It's absurd.

19            MR. MORRIS:  Your Honor, I have no further questions,

20  but what I would respectfully request is that we take just a

21  short five-minute break.  I'd like to just confer with my

22  colleagues before I pass the witness.

23            THE COURT:  All right.  Five-minute break.

24            MR. MORRIS:  Thank you, Your Honor.

25            THE CLERK:  All rise.

APP 2223

Seery - Direct                                    164

1        (A recess ensued from 1:58 p.m. to 2:06 p.m.)

2             THE CLERK:  All rise.

3             THE COURT:  All right.  Please be seated.  We're back

4    on the record in Highland.  Mr. Morris, anything else?

5             MR. MORRIS:  All right, Your Honor.  Can you hear me?

6             THE COURT:  I can, uh-huh.

7             MR. MORRIS:  Okay.  Mr. Seery, are you there?

8             THE WITNESS:  I am, yes.

9             MR. MORRIS:  I just have a few follow-up questions,

10   Your Honor, if I may.

11            THE COURT:  Okay.

12                 DIRECT EXAMINATION, RESUMED

13   BY MR. MORRIS:

14   Q    Okay.  Mr. Seery, we talked for a bit about the difference

15   between the convenience class and the general unsecured

16   claims.  Do you recall that?

17   A    Yes.

18   Q    And that's the difference between Class 7 and 8; do I have

19   that right?

20   A    Yes.

21   Q    And what is the recovery for claimants in Class 7, to the

22   best of your recollection, the convenience class?

23   A    It's 85 cents.

24   Q    And under --

25   A    On the dollar.

Seery - Direct                              165

1   Q   And under the projections that were filed last night, and

2   we can call them up on the screen if you don't have total

3   recall, do you recall what Class 8 is projected to recover now

4   that we've taken into account the UBS settlement?

5   A   Approximately 71.

6   Q   Okay.

7   A   Percent.  71 cents on the dollar.

8          THE COURT:  Okay.  The answer --

9   BY MR. MORRIS:

10  Q   Okay.  Do I this right --

11         THE COURT:  The answer was a little garbled.  Can you

12  repeat the answer, Mr. Seery?

13         THE WITNESS:  Approximately 71 cents on the dollar,

14  Your Honor.

15         THE COURT:  Okay.  Thank you.

16  BY MR. MORRIS:

17  Q   Okay.  And do I have that right, that that 71 cents

18  includes no value for potential litigation claims?

19  A   That's correct.  We didn't even put that in our

20  projections at all.

21  Q   So is it possible, depending on Mr. Kirschner's work, that

22  holders of Class 8 claims could recover an amount in excess of

23  85 percent?

24  A   It's possible, yes.

25  Q   Okay.  Are you aware that Dugaboy has suggested that the

Seery - Direct                                    166

1    Debtor should resolicit because their -- their -- the

2    projections in the November disclosure statement were

3    misleading?

4    A    I'm aware that they've made allegations along those lines,

5    yes.

6    Q    Okay.  Do you think the November projections were

7    misleading in any way?

8    A    No, not at all.

9    Q    And why not?

10   A    Well, the plan was -- the projections are for the plan,

11   and they contain assumptions.  And it was clear in the plan

12   that those assumptions could change.  So the value of the

13   assets, which aren't static, does change.  The costs aren't

14   static.  They do change.  The amount of the claims, the

15   denominator, was not static and would change.

16   Q    Okay.  And were the -- were the changes in the claims, for

17   example, changes that were all subject to public viewing, as

18   the Court ruled on 3018, as the settlement with HarbourVest

19   was announced?

20   A    Well, the plan -- the terms of the plan made clear that

21   the Class 8 claims would -- would be whatever the final

22   amounts of those claims were going to be.  We did resolve the

23   claims of HarbourVest and then ultimately the settlement

24   announced today, but in front of -- in front of the world, in

25   front of the Court, with a 9019 motion.

APP 2326

Seery - Direct                              167

1   Q    Okay.  We had finished up with some questioning about the

2   gatekeeper and the injunction provision.  Do you recall that?

3   A    Yes, I do.

4   Q    And you had testified as to the reasons why the Debtor was

5   seeking that particular protection.  Do you recall that?

6   A    Yes.

7   Q    In the absence of that protection, does the Debtor have

8   any concerns that interference by Mr. Dondero could adversely

9   impact the timing of the Debtor's plan?

10  A    Well, that's my opinion and what I testified to before.  I

11  think the -- the injunction -- the exculpation, the

12  injunction, and the gatekeeper are really critical and

13  essential elements of this plan, because we have to have the

14  ability, unfettered by litigation, particularly vexatious

15  litigation in multiple jurisdictions, we have to be able to

16  avoid that and be able to focus on monetizing the assets and

17  try to maximize value.

18  Q    Is there a concern that that value would erode if

19  resources and time and attention are diverted to the

20  litigation you've just described?

21  A    Absolutely.  The focus of the team has to be on the

22  assets' monetization, creative ways to get the most value out

23  of those assets, and not on defending itself, trying to paper

24  up some sort of litigation defense against vexatious

25  litigation, and also spending time actually defending

APP 2227

Seery - Direct                                        168

1   ourselves in various courts.

2   Q    Okay.  Last couple of questions.  If there was no

3   gatekeeper provision in the plan, would you accept appointment

4   as the Claimant Trustee?

5   A    You broke up.  No which provision?

6   Q    If there was no gatekeeper provision in the -- in the

7   confirmation order, would you accept the position as Claimant

8   Trustee?

9   A    No, I wouldn't.  Just -- just like when I came on, there

10  were -- there are some pretty essential elements that I

11  mentioned before.  One is indemnification.  Two is directors

12  and officers insurance.  And three was a gatekeeper function.

13  I want to make sure that we're not at risk, that I'm not at

14  risk, for doing my job.

15  Q    And I think you just said it, but if you were unable to

16  obtain D&O insurance, would you accept the position as

17  Claimant Trustee?

18  A    No, I would not.

19             MR. MORRIS:  I have no further questions, Your Honor.

20             THE COURT:  All right.  So, you went two hours and 34

21  minutes in total with your direct.  So we'll now pass the

22  witness for cross.  And the Objectors get an aggregate of two

23  hours and 34 minutes.

24       Who's going to go first?

25             MR. RUKAVINA:  Your Honor, Davor Rukavina.  I will.

Seery - Direct                                    169

1              THE COURT:  Okay.  Go ahead.

2              MR. RUKAVINA:  Mr. Vasek, if you can pull up Exhibit

3    6N, the ballot summary, Page 7 of 15 on the top.

4              MR. POMERANTZ:  Mr. Morris, you're not on mute.

5              MR. MORRIS:  Thank you, sir.

6              MR. RUKAVINA:  Mr. Vasek, did you hear me?  There it

7    is.

8                          CROSS-EXAMINATION

9    BY MR. RUKAVINA:

10   Q    Mr. Seery, are you familiar with this ballot tabulation

11   that was filed with the Court and that has been admitted into

12   evidence?

13   A    Yes, I believe I've seen this.

14   Q    Okay.  And this says that 31 Class 8 creditors rejected

15   and 12 Class 8 creditors accepted the plan, correct?

16   A    That's correct.

17   Q    And since then, I think we've heard that Mr. Daugherty and

18   maybe two other employees have changed their vote to an

19   accept; is that correct?

20   A    That's correct, yes.

21   Q    Okay.  Other than three, those three employees that are

22   changing, do you know of any other Class 8 creditors that are

23   changing their votes?

24   A    Mr. Daugherty is not an employee.

25   Q    I apologize.  Other than those three Class 8 creditors

APP 2239

Seery - Cross                                         170

1   that are changing their votes, do you know of any other ones

2   that are changing their votes?

3   A    No.

4   Q    Okay.  You didn't tabulate the ballots, did you?

5   A    No, I did not.

6   Q    Do you have any reason to question the accuracy of this

7   ballot summary that's been filed with the Court?

8   A    No, I do not.

9   Q    Okay.  You mentioned that many of the people that rejected

10  the plan are former employees who you don't think will

11  ultimately have allowed claims, correct?

12  A    Not ultimately.  I said they don't have them now.

13  Q    Okay.  Are you aware that the Court ordered that

14  contingent unliquidated claims be allowed to vote in an

15  estimated amount of one dollar?

16  A    I'm aware of that, yes.

17  Q    Okay.  All right.  Now, no motion to reconsider that order

18  has been filed, correct?

19  A    Not to my knowledge.

20  Q    Okay.  No objection to these rejecting employees' claims

21  have been filed yet, correct?

22  A    Correct.

23  Q    Okay.  And no motion to strike or designate their vote has

24  been filed as of now, correct?

25  A    Correct.

003013

APP 2249

Seery - Cross                                    171

1         MR. RUKAVINA:  You can take down that exhibit, Mr.

2    Vasek.

3    BY MR. RUKAVINA:

4    Q    Mr. Seery, the Debtor itself is a limited partnership; I

5    think you confirmed that earlier, correct?

6    A    Correct.

7    Q    And its sole general partner is Strand Advisors, Inc.,

8    correct?

9    A    Correct.

10   Q    And to your understanding, the Debtor, as a limited

11   partnership, is managed by its general partner, correct?

12   A    Correct.

13   Q    Okay.  And Strand, that's where the independent board of

14   you, Mr. Nelms, and Mr. Dubel -- or I apologize if I'm

15   misspelling, misstating his name -- that's where the board

16   sits, at Strand, correct?

17   A    Yes.

18   Q    Okay.  And that board has been in place since about

19   January 9, 2020?

20   A    Yes.

21   Q    Okay.  Strand is not a debtor in bankruptcy, correct?

22   A    No.

23   Q    Okay.  Do you have any understanding as to whether, under

24   non-bankruptcy law, a general partner is liable for the debts

25   of the limited partnership that it manages?

003014

Case 3:25-cv-02072-S   Document 65-5   Filed 07/28/25   Page 262 of 790   PageID 3742

                              Seery - Cross                         172

1    A    I do.

2    Q    Okay.  What's your understanding?

3    A    Typically, a general partner is liable for the debts of

4    the partnership.

5    Q    Okay.  And under the plan, Strand itself is an exculpated

6    party and a protected party and a released party for matters

7    arising after January 9, 2020, correct?

8    A    Yes.

9    Q    Okay.  You mentioned that you're the chief executive

10   officer and chief restructuring officer in this case for the

11   Debtor, correct?

12   A    For the Debtor, yes.

13   Q    Yeah.  You are not a Chapter 11 trustee, right?

14   A    No.

15   Q    Okay.  You are one of the principal authors of this plan,

16   correct?

17   A    Consultant.

18          MR. MORRIS:  Objection to the form of the question.

19          THE COURT:  Sustained.

20   BY MR. RUKAVINA:

21   Q    You are --

22          THE COURT:  Sustained.

23   BY MR. RUKAVINA:

24   Q    You are --

25          THE COURT:  Rephrase.

APP 2262

Seery - Cross                                       173

1    BY MR. RUKAVINA:

2    Q    -- one of the principal --

3              MR. RUKAVINA:  I apologize.

4    BY MR. RUKAVINA:

5    Q    You had input in creating this plan, didn't you?

6    A    I did, yes.

7    Q    Okay.  And you're familiar with the plan's provisions,

8    aren't you?

9    A    Yes.

10   Q    Okay.  And you, of course, approve of the plan, correct?

11   A    Yes.

12   Q    Okay.  And you are, of course, familiar generally with

13   what the property of the estate currently is, correct?

14   A    Yes.

15   Q    Okay.  And part of the purpose of the plan, I take it, is

16   to vest that property in the Claimant Trust in some respects

17   and the Reorganized Debtor in some respects, correct?

18   A    I don't -- I don't know if that's a fair characterization.

19   Some property -- maybe some property will stay with the

20   Debtor, some will be transferred directly to the Trust.

21   Q    Okay.  All property of the estate as it currently exists

22   will stay with the Debtor or go to the Trust, correct?

23   A    Yes.

24   Q    Okay.  And under the plan, the Creditor Trust will be

25   responsible for payment of prepetition claims, correct?

APP 2243

Seery - Cross                                        174

1   A    Yes.

2   Q    And under the plan, the Creditor Trust will be responsible

3   for the payment of postpetition pre-confirmation claims,

4   correct?

5   A    Do you mean admin claims?  I don't --

6   Q    Sure.

7   A    I don't understand your question.  I'm sorry.

8   Q    Yes.  We can call them admin claims.

9   A    Yeah.  Those -- they'll be -- they will be paid on the

10  effective date or in and around that time.  So I'm not sure if

11  that's actually going to be from the Trust, but I think it's

12  actually from the Debtor, as opposed to from the Trust.

13  Q    Okay.  But after the creation of the Claimant Trust, --

14  A    Uh-huh.

15  Q    -- whatever administrative claims are not paid by that

16  time will be assumed by and paid from the Claimant Trust,

17  correct?

18  A    I don't recall that specifically.

19  Q    Is it your testimony that the Reorganized Debtor will be

20  obligated post-effective date of the plan to pay any admin

21  claims that are then unpaid?

22          MR. MORRIS:  Objection to the form of the question.

23          THE COURT:  Sustained.  Rephrase.

24  BY MR. RUKAVINA:

25  Q    Who pays unpaid admin claims under the plan once the plan

APP 2244

Seery - Cross                                175

1   goes effective?

2   A    I believe the Debtor does.  The Reorganized Debtor.

3   Q    Okay.  The Reorganized Debtor also gets a discharge,

4   correct?

5   A    Yes.

6   Q    Okay.  And there is no bankruptcy estate left after the

7   plan goes effective, correct?

8           MR. MORRIS:  Objection to the form of the question.

9           THE COURT:  Overruled.

10          MR. RUKAVINA:  Your Honor, I have the right to know

11  what the objection to my question is.

12          THE COURT:  I overruled.

13          MR. MORRIS:  Okay.

14          THE COURT:  I overruled the objection.

15          MR. RUKAVINA:  Thank you.

16  BY MR. RUKAVINA:

17  Q    Mr. Seery, do you remember my question?

18  A    That whether there was a bankruptcy estate after the

19  effective date?

20  Q    Yes.

21  A    There wouldn't be a bankruptcy estate anymore, no.

22  Q    Okay.  Under the plan, the creditors, to the extent that

23  they have their claims allowed, the prepetition creditors,

24  they're the beneficiaries of the Claimant Trust, correct?

25  A    They are some of the beneficiaries, yes.

APP 2245

Case 3:25-cv-02072-S    Document 65-5   Filed 07/25/25    Page 266 of 790    PageID 3746

                              Seery - Cross                          176

1    Q    Okay.  And you would be the Trustee, I think you said, of
2    the Claimant Trust?
3    A    Of the Claimant Trust, yes.
4    Q    Okay.  And you will have fiduciary duties to the
5    beneficiaries of the Claimant Trust, correct?
6    A    I believe I have some, yes.
7    Q    Okay.  Well, as the Trustee, you will have some fiduciary
8    duties; you do agree with that?
9    A    That's what I said, yes.
10   Q    Okay.  What's your understanding of what those fiduciary
11   duties to the beneficiaries of the Claimant Trust will be?
12   A    I think they'll be -- they are cabined to some degree by
13   the provisions of the agreement, but generally there will be a
14   duty of care and a duty of loyalty.
15   Q    Do you feel like you'll have a duty to try to maximize
16   their recoveries?
17   A    That depends.
18   Q    On what?
19   A    My judgment on what's the -- if I'm exercising my duty of
20   care and my duty of loyalty.
21   Q    Okay.  But surely you'd like to, whether you have a duty
22   or not, you'd like to maximize their recoveries as Trustee,
23   wouldn't you?
24   A    Yes.
25   Q    Okay.  Now, in addition to the beneficiaries, which I

Seery - Cross                            177

 1   believe are the Class 8 and Class 9 creditors, the plan

 2   proposes to give non-vested contingent interests in the Trust

 3   to certain holders of limited partnership interests, correct?

 4   A    Yes.

 5   Q    Okay.  And those non-vested contingent interests would

 6   only be paid and would only vest if and when all unsecured

 7   creditors and subordinated creditors are paid in full, with

 8   interest, correct?

 9   A    Yes.

10   Q    Okay.  And those non-vested contingent interests are a

11   property interest, although they're an inchoate property

12   interest, correct?

13   A    I don't know.  I think I testified in my deposition that I

14   -- I reached for inchoate, but I'm not an expert in the

15   definitions of property interests.  I don't know if they're

16   too ethereal to be considered a property interest.

17   Q    Okay.

18           MR. RUKAVINA:  Mr. Vasek, will you please pull up Mr.

19   Seery's deposition at Page 215?  And if you'll go to Page 200

20   -- can you zoom -- can you zoom that in a little bit?  Mr.

21   Vasek, can you zoom on that?

22           MR. VASEK:  Just a moment.  There's some sort of

23   issue here.

24           MR. RUKAVINA:  Okay.  And then go to Page 216.

25   Scroll down to 216, please.

APP 29 67

Seery - Cross                              178

1              MR. VASEK:  Okay.  I can't see it, so --

2              MR. RUKAVINA:  Okay.  Stay, stay where you are.  Go

3      down one more row.

4      BY MR. RUKAVINA:

5      Q    Okay.  Mr. Seery, can you see this?

6      A    Yes.

7      Q    Okay.  So, I ask you on Line 21, "They may be a property

8      interest, but inchoate only, correct?"  And you answer, "That

9      is my belief.  I don't claim to be an expert on the different

10     types of property interests," --

11             MR. RUKAVINA:  Mr. Vasek, can you go to the next

12     page?

13     BY MR. RUKAVINA:

14     Q    (continues) "-- whether they be inchoate, reversionary,

15     ethereal.  I don't claim to be an expert on the different

16     types of property interests."

17          Do you see that answer, sir?

18     A    Yes.

19     Q    And do you stand by your answer given on Lines 23 through

20     Line 4 of the next page?

21     A    Yes.

22     Q    Okay.  And these non-vested contingency -- contingent

23     interests in the Claimant Trust, they may have some value in

24     the future, correct?

25     A    Yes.

APP 2948

Seery - Cross                                    179

1              MR. RUKAVINA:  Okay.  You can take that down, Mr.
2    Vasek.
3    BY MR. RUKAVINA:
4    Q    Have you tried to see whether anyone outside this case, or
5    anyone at all, would pay anything for those unvested
6    contingent interests to the Claimant Trust?
7    A    No.
8    Q    Okay.  Now, the Debtor is a registered investment advisor
9    under the Investment Advisers Act of 1940; is that correct?
10   A    That's correct.
11   Q    And under that Act, the Debtor owes a fiduciary duty to
12   the funds that it manages and to the investors of those funds,
13   correct?
14   A    Clearly to the funds, and generally to the investors more
15   broadly, yes.
16   Q    Okay.  And would you agree that that duty compels the
17   Debtor to look for the interests of the funds and the
18   investors of those funds ahead of its own interests?
19   A    Generally, but it's a much more fine line than what you're
20   describing.  It means you can't -- the manager can't put its
21   own interests in front of the investors and the funds.  It
22   doesn't mean that the manager subordinates its interest in the
23   -- to the investors and the funds.
24             MR. RUKAVINA:  Well, Mr. Vasek, please pull up the
25   October 20th transcript at Page 233.

Seery - Cross                                     180

1          MR. MORRIS:  What transcript is this?

2          MR. RUKAVINA:  October 20, 2019.  Mr. Vasek has the

3     docket entry.

4          MR. MORRIS:  Oh, so it's the -- Your Honor, I just do

5     want to point out that Mr. Rukavina objected, in fact, to the

6     use of trial transcripts, but we'll get to that when we put on

7     our evidence, when we finish up.

8          MR. RUKAVINA:  Well, Your Honor, I believe that

9     you're allowed to use a trial transcript to impeach testimony,

10    which is what I'm going to do now.

11        So, for that purpose, Mr. Vasek, if you could -- are you

12    on Page 233?

13         THE COURT:  And just so the record is clear, this is

14    from October 2020, not October 2019, which is, I think, what I

15    heard.  Continue.

16         MR. MORRIS:  Your --

17         MR. RUKAVINA:  Your Honor, I apologize, you did hear

18    that and I did make a mistake.  Yes, this is at Docket 1271.

19        Mr. Vasek, if you'll scroll down, please.  Okay.  No, stop

20    there.

21    BY MR. RUKAVINA:

22    Q    And you see on Line 16, sir, you're asked your

23    understanding, and then you answer, "Okay."  "And in

24    exercising those duties, the manager, under the Advisers Act,

25    has a duty to subordinate its interests to the interests of

Seery - Cross                                181

1    those investors in the CLOs, correct?"  And you answer --

2              MR. RUKAVINA:  Go down, Mr. Vasek.

3    BY MR. RUKAVINA:

4    Q    -- "I think -- I think, generally, when you think about

5    the fiduciary duty, and I think that we -- I want to make sure

6    I'm very specific about this, is that the manager has a duty,

7    fiduciary duties -- there's a whole bunch of legal analysis of

8    what they are, but they are significant -- that the manager

9    owes to the investors.  And to the extent" --

10             MR. RUKAVINA:  Scroll down, please.

11   BY MR. RUKAVINA:

12   Q    "And to the extent that the manager's interests would

13   somehow be -- somehow interfere with the investors' in the

14   CLO, he is supposed to -- he or she is supposed to subordinate

15   those to the benefit of the investors."

16        Did I read that accurately, Mr. Seery?

17   A    You did.

18   Q    Was that your testimony on October 20th last?

19   A    Yes.

20   Q    Okay.  Are you willing to revise your testimony from a few

21   minutes ago that the manager does not have to subordinate its

22   interests to the interests of the investors?

23   A    No.  I think that's very similar.

24   Q    Okay.

25   A    You left out the part about garbled up top where I said it

Seery - Cross                              182

1   was nuanced, almost exactly what I just said.  On Line 9, I

2   believe, on the prior page.

3   Q    Well, I heard you say a couple of minutes ago, and maybe I

4   misunderstood because of the WebEx nature, that the manager

5   does not have to subordinate its interests to the interests of

6   the investors.  Did I misheard you say that a few minutes ago?

7   A    I think you misheard it.  I said it's a nuanced analysis,

8   and it's -- it's pretty significant.  But the manager does

9   subordinate his general interest and assures that the CLO or

10  any of the investors' interests are paramount, but he doesn't

11  subordinate every single interest.

12       For example, and I think it's in this testimony, the

13  manager, if the fund isn't doing well, doesn't just have to

14  take his fee and not get paid.  He's allowed -- entitled to

15  take his fee.  He doesn't subordinate every single interest of

16  his.  He doesn't give up his home and his family.  So it's --

17  it's a nuanced analysis.  The interests of the manager are

18  subordinated to the interests of the investors and the fund.

19  I don't -- I don't disagree with anything I said there.  I

20  think I'm consistent.

21  Q    Okay.

22            MR. RUKAVINA:  You can take that down, Mr. Vasek.

23  BY MR. RUKAVINA:

24  Q    So, how do you describe, sir, the fiduciary duty that the

25  Debtor owes to the funds that it manages and to the investors

APP 2952

Seery - Cross                                    183

1   in those funds?

2          MR. MORRIS:  Objection to the -- to the extent it

3   calls for a legal conclusion, Your Honor.  I just want to make

4   sure we're -- we're asking a witness for his lay views.

5          THE COURT:  Okay.  I overrule the objection.  He can

6   answer.

7          THE WITNESS:  Yes.  As a manager of a fund, the

8   manager is a fiduciary to the fund, and sometimes to the

9   investors, depending on the structure of the fund.  Some funds

10  are purposely set up where the investors are actually debt-

11  holders, and their interests are much more cabined by the

12  terms of the contract, as opposed to straight equity holders.

13  But the manager has a duty to seek to maximize value of the

14  assets in the best interests of the underlying -- of the fund

15  and the underlying investors, to the extent that it can,

16  within the confines and structure of the fund.

17  BY MR. RUKAVINA:

18  Q   Okay.  And these duties as you just described them, they

19  would apply to the Reorganized Debtor, correct?

20  A   They would apply to the Reorganized Debtor to the extent

21  that it's a manager for a fund, not, for example, with respect

22  to necessarily interests -- the inchoate interests that we

23  talked about earlier.

24  Q   Sure.  And I apologize, I meant just for the fund.  And if

25  the manager, the Reorganized Debtor, breaches those duties,

Seery - Cross                          184

1  then it's possible that there's going to be liability,

2  correct?

3  A    It's possible.

4  Q    Okay.  Now, under the plan, the limited partnership

5  interests in the Reorganized Debtor will be owned by the

6  Claimant Trust, correct?

7  A    Yes.

8  Q    Okay.  And there's a new entity called New GP, LLC that

9  will be created or already has been created, correct?

10 A    Yes.

11 Q    Okay.  And that entity will hold the general partnership

12 interest in the Reorganized Debtor, correct?

13 A    I believe that's correct.

14 Q    Okay.  And that entity -- that being New GP, LLC -- will

15 also be owned by the Claimant Trust, correct?

16 A    Yes.

17 Q    Okay.  Who will manage the Reorganized Debtor?

18 A    The G -- the GP will manage the Reorganized Debtor.

19 Q    Okay.  And will there be an officer or officers of the

20 Reorganized Debtor, or will it all be managed through the GP?

21 A    It'll be managed through the GP.

22 Q    Okay.  And who will manage the GP?

23 A    Likely, I will.

24 Q    Okay.  That's the current plan, that you will?

25 A    I'll be the Claimant Trustee, and I believe that I'll be

Seery - Cross                                    185

 1   responsible for any assets that remain in the Reorganized

 2   Debtor, yes.

 3   Q    Okay.  Right now, the Debtor is managing its own assets as

 4   the Debtor-in-Possession, right?

 5   A    Yes.

 6   Q    And it is managing various funds and CLOs, right?

 7   A    Yes.

 8   Q    Okay.  And right now, the Debtor is attempting to reduce

 9   some of its assets to money, like the promissory notes that

10   you mentioned earlier that the Debtor filed suit on, correct?

11   A    Yes.

12   Q    And the Debtor is trying to reduce some of its assets to

13   money, like the promissory notes, to benefit its creditors,

14   correct?

15   A    Yes.

16   Q    Okay.  And correct me if I'm wrong, but the Committee has

17   filed various claims and causes of action against Mr. Dondero,

18   correct?

19   A    They -- they've filed some.  I haven't -- I haven't looked

20   at their (indecipherable) closely, but --

21   Q    Okay.

22   A    -- some are preserved in the case.

23   Q    You understand --

24   A    In the plan.  I'm sorry.

25   Q    You understand that the Committee is doing that for the

APP 2955

Seery - Cross                                    186

1   benefit of the estate, correct?

2   A    Yes.

3   Q    And you understand that they're also doing that for the

4   benefit of creditors, correct?

5   A    Yes.

6   Q    Okay.  And under the plan, just so that I'm clear, those

7   claims that the Committee has asserted will be preserved and

8   will vest in either the Claimant Trust or the Litigation Sub-

9   Trust, correct?

10  A    Yes.

11  Q    Okay.  And under the plan, the Reorganized Debtor would

12  continue to manage its assets, correct?

13  A    Yes.

14  Q    And it would continue to manage the Funds and the CLOs,

15  correct?

16  A    Yes.

17  Q    And the Claimant Trust would attempt to liquidate and

18  distribute to its beneficiaries the assets that are

19  transferred to it, correct?

20  A    Yes.

21  Q    Okay.  And you mentioned that the Claimant Trust will have

22  an Oversight Board comprised of five members, right?

23  A    Yes.

24  Q    And four of them will be the people that are currently on

25  the Committee, right?

Seery - Cross                                187

```
 1    A    Yes.
 2    Q    And the fifth is David Pauker, and I think you mentioned
 3    that he's independent.  David Pauker is the fifth member,
 4    right?
 5    A    Yes.
 6    Q    Who -- who is he?
 7    A    David Pauker is a very well-known professional in the
 8    restructuring world.  He's a long-time financial advisor in --
 9    in reorganizations.  He's served on numerous boards in
10    restructuring -- restructurings.
11    Q    Okay.  So, other than a different corporate structure and
12    the Claimant Trust, the monetization of assets for the benefit
13    of creditors would continue post-confirmation as now, correct?
14    A    I -- I believe so.  I'm not exactly sure what you asked
15    there.
16    Q    No one is putting in any new money under the plan, are
17    they?
18    A    No.  No.
19    Q    Okay.  There's no exit financing contingent on the plan
20    being confirmed, right?
21    A    You mean no exit -- the plan is not contingent on exit
22    financing.  I think you just mixed up your -- your financing
23    and your plan.
24    Q    I apologize.  There's no exit financing in place today,
25    correct?
```

Seery - Cross                               188

1   A    No.

2   Q    Okay.  So, post-confirmation, you are basically going to

3   continue managing the CLOs and funds and trying to monetize

4   assets for creditors the same as you are today, correct?

5   A    Similar, yes.

6   Q    Okay.  And just like the Committee has some oversight role

7   in the case, the members of the Oversight Board will have some

8   oversight role post-confirmation, correct?

9   A    Yes.

10  Q    Okay.  You don't need anything in the plan itself to

11  enable you to continue managing the Debtor and its assets,

12  correct?

13  A    I don't need anything in the plan?

14  Q    Correct.

15  A    I don't -- I don't understand the question.  Can you

16  rephrase it?

17  Q    Well, you are managing the Debtor and its assets today,

18  correct?

19  A    Yes.

20  Q    Okay.  Nothing in the plan is going to change that,

21  correct?

22  A    Well, it's going to change it a lot.

23  Q    Okay.  Well, with respect to you managing the Funds and

24  the CLOs, you don't need anything in the plan that you don't

25  have today to keep managing them, do you?

Seery - Cross                                    189

1   A    No.  The Debtor manages them, and I will -- I'm the CEO

2   and I'll be in a similar position with a different team.

3   Q    Okay.  And I believe you told me that you expect the

4   Debtor to administer the CLOs for two or three years, maybe?

5   A    However long it takes, but we expect -- our projections

6   are that we'd be able to monetize most of the assets within

7   two years.

8   Q    Does that include the CLOs?

9   A    It does, yes.

10  Q    Okay.  Now, you're going to be the person for the

11  Reorganized Debtor in charge of managing the CLOs, correct?

12  A    I'll be the person responsible for managing the

13  Reorganized Debtor.  The Reorganized Debtor will be the

14  manager of the CLOs.

15  Q    Okay.  But the buck will stop with you at the Reorganized

16  Debtor, right?

17  A    Yes.

18  Q    Okay.  You're going to have a team of employees and

19  outside professionals helping you, but ultimately, on behalf

20  of the Reorganized Debtor, you're going to be the one in

21  charge of managing the CLOs, correct?

22  A    Yes.

23  Q    Okay.  That means that you'll also be making decisions as

24  to when to sell assets of the CLOs, correct?

25  A    Yes.

Seery - Cross                                    190

1    Q    Okay.  And to be clear, the CLOs, they own their own

2    assets, whatever they are, and the Debtor just manages those

3    assets, right?

4    A    Correct.

5    Q    The Debtor doesn't directly own those assets, right?

6    A    No.

7    Q    And currently there's more than one billion dollars in CLO

8    assets that the Debtor manages?

9    A    Approximately.

10   Q    Yeah.  And the Debtor receives fees for its services,

11   correct?

12   A    Yes.

13   Q    Can you generally describe how the amount of those fees is

14   calculated and paid, if you have an understanding?

15   A    How the fees are calculated and paid?

16   Q    Yes, sir.

17   A    It's a percentage of the assets.

18   Q    Assets administered or assets sold in any given time

19   period?

20   A    Administered.

21   Q    Okay.  So the sale of CLO assets does not affect the fees

22   that the Reorganized Debtor would receive under these

23   agreements?

24        MR. MORRIS:  Objection to the form of the question.

25        THE COURT:  Over --

Seery - Cross                                    191

 1            THE WITNESS:  That's not correct.

 2            THE COURT:  Overruled.

 3    BY MR. RUKAVINA:

 4    Q    Okay.  What is not correct about that?

 5    A    When you sell the assets, the amount administered shrinks,

 6    so you have less fees.

 7            MR. RUKAVINA:  Your Honor, the answer cut out at the

 8    very end.  You have less--?

 9            THE WITNESS:  Fees.

10    BY MR. RUKAVINA:

11    Q    Fees?  I understand.  Okay.  So are you saying that there

12    is a disincentive to the Reorganized Debtor to sell assets in

13    the CLOs?

14    A    No.

15    Q    Okay.  Is there an incentive to the Reorganized Debtor to

16    sell assets in the CLOs?

17    A    To do their job correctly, yes.

18    Q    Okay.  And the Debtor wishes to assume those contracts

19    because the Debtor will get those fees going forward and

20    there'll be a profit, even after the expenses of servicing

21    those contracts are taken out, correct?

22    A    They are profitable. That's one of the reasons that we're

23    assuming, yes.

24    Q    Okay.  Now, over my objection, you testified that the CLOs

25    have agreed to the assumption of these contracts, right?

Seery - Cross                                    192

 1  A    Yes.

 2  Q    Okay.  Is there anything in the record other than your

 3  testimony here today demonstrating that?

 4  A    I believe there is, yes.

 5  Q    What do you believe there is in the record other than your

 6  testimony?

 7  A    I believe we filed a notice of assumption.

 8  Q    Okay.  My question is a little bit different.  You

 9  testified that the CLOs, over my objection, have agreed to the

10  assumption.  You did testify so, right?

11  A    Yes.

12  Q    Okay.  What is there in the record, sir, from the CLOs

13  confirming that?

14  A    You mean today's record?

15  Q    Yes, sir.

16  A    I'm the only one who's testified so far.

17  Q    Okay.  Are you aware of anything in the exhibits that

18  would confirm your testimony?

19  A    Not that I know of.

20  Q    Has there been an agreement with the CLOs that's been

21  reduced to writing?

22  A    Yes.

23  Q    So there is a written agreement with the CLOs providing

24  for assumption?

25  A    Yes.

Seery - Cross                                193

1  Q   A signed, written agreement?

2  A   No, it's -- it's email.

3  Q   Okay.  When was this email agreement reached?

4  A   Within the last couple weeks.  There's a number of back

5  and forths where that was agreed to, and I believe we filed a

6  notice of assumption.

7         MR. RUKAVINA:  Mr. Vasek, if you will please pull up

8  Mr. Seery's January 29th deposition.

9  BY MR. RUKAVINA:

10 Q   Mr. Seery, you remember me deposing you last Friday,

11 correct?

12 A   Yes.

13 Q   And you remember me asking you if there was a written

14 agreement in place with the CLOs?

15 A   I don't recall specifically.

16        MR. RUKAVINA:  Okay.  Mr. Vasek, if you would please

17 scroll to that.  Okay.  Stop there.

18 BY MR. RUKAVINA:

19 Q   Sir, you'll recall I also deposed you January 20th, right?

20 A   Yes.

21 Q   Okay.  And do you remember that we had some discussion

22 regarding whether the CLOs would consent or not?

23 A   Yes.

24 Q   Okay.  And do you remember telling me something like that

25 like you think that they will and that's still in the works on

003036

Seery - Cross                                    194

1    January 20th?

2    A    I don't recall specifically, but if you say that's what it

3    says.

4    Q    Okay.  Well, here I'm asking you on January 29th, Line 17,

5    "I asked you before and you didn't have anything in writing by

6    then, so let me ask now.  As of today, do you have anything in

7    writing from the CLOs consenting to the assumption of those

8    management agreements?"  I'm sorry.  Contracts.  Answer, "I

9    don't believe that I do.  It could be on my email I opened.  I

10   don't recall."

11             MR. RUKAVINA:  Scroll down, Mr. Vasek.

12   BY MR. RUKAVINA:

13   Q    Okay.  Then I ask, "Do you have an understanding of

14   whether those CLOs have consented in writing to the assumption

15   of the management agreements?"  And you answer, "I believe

16   they have.  The actual final docs haven't been completed, but

17   I believe they have agreed in writing, yes."

18        Then I ask --

19             MR. RUKAVINA:  Scroll down a little bit more.

20   BY MR. RUKAVINA:

21   Q    I ask, "Do you expect the final docs to be completed

22   before Tuesday's confirmation hearing?"  Answer, "I don't know

23   whether they will be done by Tuesday."

24        Did I read all of that correctly, sir?

25   A    Other than your misstatement.  The word was "unopened."

APP 2264

Seery - Cross                                          195

1   Q    Thank you.  So, let me ask you again today.  As of today,

2   is there a written agreement that has been signed by the

3   parties providing for the assumption of the CLO agreements?

4   A    When phrased the way you did, is it signed by the parties,

5   no.

6   Q    Okay.

7        MR. RUKAVINA:  You can take that down, Mr. Vasek.

8   BY MR. RUKAVINA:

9   Q    I think -- I'm not sure if you quantified this earlier,

10  but it might help.  I believe that the Reorganized Debtor

11  projects that it will generate revenue of $8.269 million post-

12  reorganization from managing the CLO contracts, correct?

13  A    It's in that neighborhood.  I did not testify to that

14  earlier.

15  Q    That's what I meant.  And when I asked you at deposition,

16  you were able to give me an estimate of how much it would cost

17  to generate that revenue, correct?

18  A    I was not?

19  Q    You were?  I'm sorry.  Let me --

20  A    Did you say I wasn't or I was?

21  Q    Let me -- I apologize.  Let me ask again.  I talk too fast

22  and I have an accent.  You have been able to give an estimate

23  of how much the Reorganized Debtor will expend to generate

24  that revenue, correct?

25  A    Yes.

APP 2205

Seery - Cross                                    196

1   Q    Okay.  Do you remember what your estimate is?

2   A    I -- I think it was around $2 million a year.  It was a

3   portion of our employees plus the contracts.

4   Q    Okay.  So, over the life of the projection at $8.2

5   million, do you remember that you projected costs of about

6   $3.5 to $4 million to generate that revenue?

7   A    If -- if you are representing that to me, I'd accept it.

8   Yes, that sounds about right.

9   Q    Well, suffice it to say you're projecting at least $4

10  million in net profit over the next two years for the

11  Reorganized Debtor from managing the CLO agreements, correct?

12  A    Net profit is not a fair, fair way to analyze it, no.

13  Q    Okay.  Are you projecting any profit for the Reorganized

14  Debtor from managing the CLO agreements post-confirmation?

15  A    Yes.

16  Q    Okay.  Do you have an estimate of what that profit is?

17  A    General overview are the contracts are profitable to about

18  the tune of $4 million over that period.

19  Q    Okay.  Thank you.  If the Reorganized Debtor makes a

20  profit post-confirmation, is it fair to say that that would

21  then be dividended up or distributed up to the partners,

22  ultimately to the Claimant Trust?

23  A    I don't think that's fair to say, no.

24  Q    Okay.  So, if the Reorganized Debtor makes a profit post-

25  confirmation, where does that profit go?

Seery - Cross                            197

1    A    The Reorganized Debtor -- what kind of profit?  I don't

2    understand your question.

3    Q    Okay.  I apologize if I'm being too simplistic about it.

4    If a business, after it takes account of its expenses to

5    generate revenue, has any money left over, would that be

6    profit to you?

7    A    Yes.

8    Q    Okay.  Do you think that the Reorganized Debtor, post-

9    confirmation, will make a profit?

10   A    I don't know.

11   Q    Okay.  Do you think that the Reorganized Debtor, post-

12   confirmation, will lose money?

13   A    I think there will be costs, and the costs will exceed the

14   -- the amount that it generates on an income basis, yes.

15   Q    Okay.  Thank you.

16         MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

17   the plan, the injunctions, and releases.  9F.

18      (Pause.)

19   BY MR. RUKAVINA:

20   Q    I apologize, Mr. Seery.

21         MR. RUKAVINA:  So, Mr. Vasek, if you'll go to the

22   bottom of the Page 51.  Stop there.

23   BY MR. RUKAVINA:

24   Q    So, I'm going to read just the first couple sentences

25   here, Mr. Seery, if you'll read it along with me.  Subject --

Seery - Cross                                    198

1   this is the bottom paragraph:  Subject in all respects to

2   Article 12(b), no enjoined party may commence or pursue a

3   claim or cause of action of any kind against any protected

4   party that arose or arises from or is related to the Chapter

5   11 case, the negotiation of the plan, the administration of

6   the plan, or property to be distributed under the plan, the

7   wind-down of the business of the Debtor or Reorganized Debtor.

8       I'd like to stop there.  Do you see that clause there, Mr.

9   Seery, talking about the wind-down of the business of the

10  Debtor or Reorganized Debtor?  Do you see that, sir?

11  A   Yes.

12  Q   Okay.  Do I understand correctly that this provision we've

13  just read means that, upon the assumption of these CLO

14  management agreements, if the counterparties to those

15  agreements want to take any action against the Reorganized

16  Debtor, they first have to go through this channeling

17  injunction?

18  A   I believe that's what it says, yes.

19  Q   Okay.  Because the wind-down of the business of the

20  Reorganized Debtor will include the management of these CLO

21  portfolio management agreements, correct?

22  A   Yes.

23  Q   Okay.  As well as the management of various funds that the

24  Debtor owns, correct?

25  A   Yes.

Seery - Cross                                   199

1   Q    Okay.  And would you agree with me that the new general
2   partner, New GP, LLC, is also a protected party under the
3   plan?
4   A    I assume it is.  I don't recall specifically.
5   Q    I believe you discussed to some degree postpetition
6   losses.  I'd like to visit a little bit about those.  Since
7   January 9th, 2020, Mr. Dondero was not an officer of the
8   Debtor, correct?
9   A    Correct.
10  Q    And since January 9th, 2020, he was no longer a director
11  of Strand, correct?
12  A    That's correct.
13  Q    Since January 9th, 2020, until he was asked to resign, he
14  was an employee, correct?
15  A    Yes.
16  Q    And about -- I'm trying to remember.  About when did he
17  resign?  October something of 2020?  Do you remember?
18  A    I don't recall.
19  Q    Okay.  Do you recall if it was in October 2020?
20  A    It was in the fall.
21  Q    Okay.  And he resigned because the independent board asked
22  him to resign, correct?
23  A    Yes.
24  Q    Okay.  And you mentioned that the estate has had a
25  postpetition drop in the value of its assets and the assets

Seery - Cross                                    200

1  that it manages.  Right?

2  A   I believe I went through the estate's assets.  The only

3  asset that wasn't a direct estate asset was the hundred

4  percent control of Select Equity Fund.  I didn't talk about

5  the Fund assets.

6  Q   Okay.  Do you recall that the disclosure statement that

7  the Court approved states that, postpetition, there was a drop

8  from approximately $566 million to $328 million in the value

9  of Debtor assets and assets under Debtor management?

10 A   Yes.  That's the $200 million I walked through earlier.

11 Q   Okay.  And I believe you mentioned some of it was due to

12 the pandemic, right?

13 A   It certainly impacted the markets.  The pandemic didn't

14 cause a specific loss.  It impacted the markets and the

15 ability to work within those markets.

16 Q   But you also believe that Mr. Dondero was responsible for

17 something like a hundred million dollars of these losses,

18 right?

19 A   Probably more.

20 Q   Okay.  Mr. Dondero is not being released or exculpated for

21 that, is he?

22 A   No.

23 Q   And while Mr. Dondero was an employee during the period of

24 these losses, he answered to you as CEO and CRO, correct?

25 A   Not during that period.  I wasn't (audio gap) until later.

Seery - Cross                                    201

1    Q    I'm sorry.  As of January 9th, 2020, were you the CEO of

2    the Debtor?

3    A    No.

4    Q    When did you become the CEO of the Debtor?

5    A    I believe the order was July 9th, retroactive to a date in

6    March.

7    Q    July 9th, 2020?

8    A    Correct.

9    Q    Okay.  And when did you become the CRO of the Debtor?

10   A    At the same time.

11   Q    Okay.  So, between January and July 2020, you were one of

12   the independent directors, correct?

13   A    Yes.

14   Q    Okay.  So, during that period of time, would Mr. Dondero

15   have answered to that independent board?

16   A    Yes.

17   Q    Okay.  Now, if someone alleges that that independent board

18   has any liability on account of Mr. Dondero's losses, that's

19   released under this plan, isn't it?

20   A    Yes.

21   Q    Okay.  And if someone alleges that Strand has any

22   liability on account of Mr. Dondero's losses, that's released

23   under this plan, correct?

24   A    Yes.

25   Q    Okay.  And if someone believes that the Debtor -- that the

Seery - Cross                                              202

1    way that the Debtor has managed the CLOs or its funds
2    postpetition gives rise to a cause of action in negligence,
3    that's also released and exculpated in the plan, correct?
4    A    I believe it would be.  I'm not positive, but I believe it
5    would be.
6    Q    Well, let's be clear.  The plan does not release or
7    exculpate you or Strand or the board for willful misconduct,
8    gross negligence, fraud, or criminal conduct, correct?
9    A    No, it does not.
10   Q    Okay.  And I'm not, just so we're clear, I'm not alleging
11   that, okay?  So I want the judge to understand I'm not
12   alleging that.  But the plan does release and exculpate for
13   negligence, right?
14   A    Yes.
15   Q    Okay.  Where do you have an understanding a cause of
16   action for breach of fiduciary duty lies on the spectrum of
17   negligence all the way to criminal conduct?
18   A    It's -- it's not -- generally not criminal, although I
19   suppose that breach of fiduciary duty could be criminal.
20   Typically, it's negligence, and that you would breach a duty
21   for either duty of care, duty of loyalty.  But it could slide
22   to willful.  And probably most of the instances where they
23   come up are where someone has done something willfully or
24   grossly negligent.
25   Q    Okay.  But -- and I would agree with you.  But there are

Seery - Cross                                    203

1   certain breaches of fiduciary duty that are possible based on

2   simple negligence, correct?

3   A    They are, and in these instances, they don't -- they don't

4   rise to actionable claims because they're indemnified by the

5   funds.

6   Q    Okay.  You have to explain that to me.  So, the negligence

7   claim is not actionable because someone is indemnifying it?

8   A    Typically, there's no way to recover because it's

9   indemnified by the fund that the investor might be in.  If it

10  goes beyond that, then it wouldn't be.

11  Q    Okay.  So there are potential negligence breach of

12  fiduciary duty claims that might be subject to these

13  exculpations and releases that would not be indemnified?

14  A    Gross negligence and willful misconduct, certainly.

15  Q    Okay.  Now, post-confirmation, post-confirmation, if the

16  Debtor, or the Reorganized Debtor, rather, engages in

17  negligence or any actionable conduct, that's when the

18  channeling injunction comes into play, right?

19  A    I don't quite understand your question.

20  Q    Okay.

21  A    Can you repeat that?

22  Q    Sure.  To your understanding, does the channeling

23  injunction we're looking at right now -- and you can read it

24  if you need to -- does it apply to purely post-confirmation

25  alleged causes of action?

Seery - Cross                                   204

1    A    It does apply to those, yes.

2    Q    Okay.  And it says that the Bankruptcy Court will have

3    sole and exclusive jurisdiction to determine whether a claim

4    or cause of action is colorable, and, only to the extent

5    legally permissible and as provided for in Article 11, shall

6    have jurisdiction to adjudicate the underlying colorable claim

7    or cause of action.

8        Do you see that, sir?

9    A    I do.

10    Q    Okay.  And this -- the Bankruptcy Court's exclusive

11    jurisdiction here, that would continue after confirmation?  Is

12    that the intent behind the plan?

13    A    It has -- it says what it says.  Will have the sole and

14    exclusive jurisdiction to determine whether a claim is

15    colorable, and then, to the extent permissible, it'll have

16    jurisdiction to adjudicate.

17    Q    Okay.  Nothing in this plan limits the period of the

18    Bankruptcy Court's inquiry to the pre-confirmation time frame,

19    correct?

20    A    I don't believe it does, no.

21    Q    Okay.  Have you taken into account the potential that this

22    bankruptcy case will eventually be closed with a final decree?

23    A    Have I taken that into account?

24    Q    Well, do you know what a final decree in Chapter 11 is?

25    A    I do.

Seery - Cross                              205

1   Q    Okay.  So, help me understand.  If there's a final decree

2   and the bankruptcy case is closed, then who do I go to,

3   because the Bankruptcy Court has exclusive jurisdiction, to

4   get this clearing injunction cleared?

5          MR. MORRIS:  Objection to the form of the question,

6   Your Honor.

7          THE COURT:  Sustained.  Rephrase.

8          MR. RUKAVINA:  Okay.

9   BY MR. RUKAVINA:

10  Q    Is it the plan's intent, Mr. Seery, that this channeling

11  injunction that we just looked at would continue to apply even

12  after a point in time in which the bankruptcy case is closed?

13  A    I don't believe so.

14         MR. RUKAVINA:  Again, Your Honor, someone -- I heard

15  someone's phone right when he answered, and I didn't hear his

16  answer, if he could please re-answer.

17         THE WITNESS:  I don't -- I don't think if the case is

18  closed that's the intention.

19  BY MR. RUKAVINA:

20  Q    Okay.  What about if there's a final decree entered?

21         MR. MORRIS:  Objection, Your Honor.  You know, the

22  document kind of speaks for itself.

23         THE COURT:  Overruled.  He can answer if he knows.

24         THE WITNESS:  Yeah.  I don't -- I don't -- I'm not

25  making a distinction between the case being closed and the

Seery - Cross                                206

1   final decree.  I believe in both instances they'll be pretty

2   close to the same time and we'll make a judgment then as to

3   how to close the case in accordance --

4   Q    Okay.

5   A    -- with the rules.

6        MR. RUKAVINA:  Mr. Vasek, if you'll please scroll up

7   to the beginning of this injunction.  A little bit higher.

8   Right there.  Right there.

9   BY MR. RUKAVINA:

10  Q    The very first clause, Mr. Seery, if you'll read with me,

11  says, Upon entry of the confirmation order -- pardon me --

12  all enjoined parties are and shall be permanently enjoined on

13  and after the effective date from taking any actions to

14  interfere with the implementation or consummation of the

15  plan.

16       Do you see that, sir?

17  A    I do, yes.

18  Q    What does interfering with the implementation or

19  consummation of the plan mean?

20  A    It means in some way taking actions to upset, distract,

21  stop, or otherwise prohibit or hurt the estate from

22  implementing or consummating the plan.

23  Q    Okay.  And is that intended -- is that clause we just

24  read and you described intended to be very broad?

25  A    I -- I think it's -- if the words have meaning, yes, that

Seery - Cross                    207

1   it should -- it's pretty broad.

2   Q    Okay.  Is the Debtor not able to state with more

3   specificity what it would believe interference with the

4   implementation or consummation of the plan would mean?

5            MR. MORRIS:  Objection to the form of the question.

6            THE COURT:  Sustained.

7            THE WITNESS:  I think it's -- I think it's --

8            THE COURT:  Sustained.

9            MR. RUKAVINA:  Okay.

10           THE WITNESS:  I'm sorry.

11  BY MR. RUKAVINA:

12  Q    Well, you just gave us four or five examples of what

13  interfering with the implementation or consummation of the

14  plan might be.  Why isn't that, those four or five examples,

15  why aren't they listed here?

16           MR. MORRIS:  Object to the form of the question.

17           MR. RUKAVINA:  Well, Your Honor, I'll withdraw it

18  and I'll argue this at closing argument.

19           THE COURT:  Okay.

20  BY MR. RUKAVINA:

21  Q    When did the Committee agree to you serving as the

22  Claimant Trustee?

23  A    In the late -- in the late fall.  I've been contemplated

24  to be the Claimant Trustee.  I'm willing to take -- if we can

25  come to an agreement.  They have their options open if we

Seery - Cross                                    208

1    can't come to an agreement on compensation.

2    Q    Okay.  And since the Committee agreed to you being the

3    Claimant Trustee, you have reached a resolution with UBS,

4    correct?

5    A    I don't think so.  I think that that was before UBS, the

6    UBS resolution was reached.

7    Q    I'm sorry.  When did you reach the UBS resolution in

8    principle with UBS?

9    A    I don't recall the exact date, but I do recall specific

10   conversations where some of the Committee members were

11   supportive.  I didn't know that UBS wasn't, but I assumed

12   that some meant not all.  And that was UBS, because I don't

13   think we had a deal yet.

14   Q    Well, let me ask the question in a little bit of a

15   different way.  Whenever the Debtor reached the agreement in

16   principle with UBS that your counsel described this morning,

17   whenever that point in time was, the Committee had already

18   agreed before that point in time to you serving as Claimant

19   Trustee, correct?

20   A    I believe so, yes.

21   Q    And is the answer the same with respect to the

22   HarbourVest settlement?

23   A    I believe so.  With HarbourVest, I believe so as well,

24   yes.

25   Q    What about the Acis settlement?

APP 2278

                              Seery - Cross                    209

 1   A    I don't believe so.  I think Acis came first.  I don't

 2   think we settled on an agreement on Claimant Trustee until

 3   after the Acis -- certainly after the Acis agreement, maybe

 4   not after the Acis 9019.  I just don't recall.

 5   Q    Okay.  And the million-dollar cutoff for convenience

 6   class creditors, that number was a negotiated amount with the

 7   Committee, correct?

 8   A    Yes.

 9   Q    Okay.  Thank you, Mr. Seery.

10            MR. RUKAVINA:  Your Honor, I'll pass the witness.

11            THE COURT:  All right.  Just for purposes of time,

12   it's 3:00 o'clock, so you went 48 minutes.

13      Who's next?

14            MR. DRAPER:  Mr. Taylor is.

15            THE COURT:  All right.  Mr. Taylor, go ahead.

16            MR. TAYLOR:  Yes, Your Honor.  At this time, what we

17   would like the Court to do, we are asking for a brief

18   continuance and to go into tomorrow, and there is a reason

19   for that and I would like to explain it.

20      Mr. Dondero has communicated an offer which we believe to

21   be a higher and better offer than what the plan analysis,

22   even in its most recent iteration that was just changed last

23   night, will yield significantly higher recoveries.  Those are

24   guaranteed recoveries.  There is a cash component to that

25   offer.  There are some debt components, but they would be

Seery - Cross                          210

 1    secured by substantially all of the assets of Highland.

 2        We believe it's a higher and better offer, that the

 3    creditors and the Creditors' Committee, Mr. Seery, who

 4    obviously has been testifying all day on the stand, may have

 5    heard some -- some inkling of it via a text or an email he

 6    might have been able to glance at, or maybe not, because he's

 7    been too busy, and that's understandable.

 8        But we do believe it is a material offer.  It is a real

 9    offer.  And for that reason, we would like to request the

10    Court's indulgence.  This has gone rather fast.  We believe

11    that in the event that it does not gain any traction, then we

12    could complete this confirmation hearing tomorrow, or it's

13    more than likely that we could.  And therefore we would

14    request a continuance until tomorrow morning beginning at

15    9:30 so all the parties can confer, consider that offer, and

16    see if it gains any traction.

17             THE COURT:  All right.

18             MR. POMERANTZ:  Your -- Your --

19             THE COURT:  Go ahead.  Mr. Morris?  Or who is going

20    to respond --

21             MR. POMERANTZ:  Your --

22             THE COURT:  -- to that?

23             MR. POMERANTZ:  Your Honor, this is Jeff --

24             THE COURT:  Mr. Pomerantz?

25             MR. POMERANTZ:  This is Jeff Pomerantz. I will

Seery - Cross                           211

 1  respond.

 2      I think right at the beginning of the hearing, or

 3  slightly after, I did receive an email from Michael Lynn

 4  extending this offer.  The email was also addressed to Mr.

 5  Clemente.  As we have told Your Honor before, if the Committee

 6  is interested in continuing negotiations with Mr. Dondero, far

 7  be it from us to stand in the way.

 8      So what I would really ask is for Mr. Clemente to respond

 9  to think if -- to see if he thinks that this offer is worthy.

10  If it's worthy and the Committee wants to consider it, we

11  would by all means support a continuance.  If it is not, I

12  think this is just a last-minute delay without a reason.  And

13  if there is no likelihood of that being acceptable or the

14  Committee wanting to engage, we would want to continue on.

15          THE COURT:  All right.  Mr. Clemente, what say you?

16          MR. CLEMENTE:  Yes.  Yes, Your Honor.  Matt Clemente

17  on behalf of the Committee.

18      Obviously, I haven't had a chance to confer with my

19  Committee members, but there's no reason to not continue the

20  confirmation hearing today.  I will be able to confer with

21  them over email, et cetera, this evening.  There's simply no

22  reason to not continue going forward at this particular point

23  in time, Your Honor.

24      So, although I haven't conferred with the Committee

25  members, that would be what I would recommend to them.  And so

APP 0284

Seery - Cross                              212

1    my view, the Committee's view, I believe, would be let's

2    continue forward and we'll discuss Mr. Dondero's proposal that

3    I know came across after opening statements this morning, you

4    know, in due course.  But I do not believe that a continuance

5    here is necessary or appropriate.

6            THE COURT:  All right.  Mr. Taylor, that request is

7    denied, so you may cross-examine.

8            MR. TAYLOR:  Yes.  (Pause.)  I'm sorry, Your Honor.

9    I have a couple people that are in my ear.  But yes, I'm ready

10   to proceed.

11           THE COURT:  Okay.

12                         CROSS-EXAMINATION

13   BY MR. TAYLOR:

14   Q    Mr. Seery, I believe you can probably largely testify from

15   your memory of the various iterations of the plan analysis

16   versus the liquidation analysis.  But to the extent that

17   you're unable to, we can certainly pull those up.

18       Mr. Seery, you put forth or Highland put forth on November

19   24th of 2020 a plan analysis versus a liquidation analysis,

20   correct?

21   A    I think that's the approximate date, yes.

22   Q    Okay.  And do you recall what the plan analysis predicted

23   the recovery to general unsecured creditors in Class 8 would

24   be at that time?

25   A    I believe it was in the 80s.

APP 2202

Seery - Cross                                213

1  Q    And approximately 87.44 percent?

2  A    That sounds close, yes.

3  Q    Okay.  And then just right before -- the evening before

4  your deposition that took place on January 29th, I believe a

5  revised plan analysis versus a liquidation analysis was

6  provided.  Do you remember that?

7  A    Yes.

8  Q    Okay.  And what was the predicted recovery to general

9  unsecured creditors under that analysis?

10 A    I believe that was --

11         MR. MORRIS:  Object to the form of the question.  I

12 just want to make sure that we're talking about the -- and

13 maybe I misunderstood the question -- plan versus liquidation.

14         THE COURT:  Okay.  Could you restate --

15         MR. TAYLOR:  I said plan analysis.

16         THE COURT:  Plan.

17         THE WITNESS:  I believe that that initially was in

18 the -- in the high 60s.

19 BY MR. TAYLOR:

20 Q    It was --

21 A    Might have been --

22 Q    -- 62.14 percent; is that correct?

23 A    Okay.  Yeah.  That sounds -- I'll take your

24 representation.  That's fine.

25 Q    Okay.  And going back to the November 28th liquidation

Seery - Cross                                    214

1   analysis, what did Highland believe that creditors in Class 8

2   would get under a liquidation analysis?

3   A    I don't recall the -- if you just tell me, I'll -- I'll --

4   if you're reading it, I'll agree with -- because I -- from my

5   memory.

6   Q    62.6 percent?  Is that correct?

7   A    That sounds about right.

8   Q    You would agree with me, would you not, that 62.6 cents on

9   the dollar is higher than 62.14 cents, correct?

10  A    Yes.

11  Q    And so at least comparing the January 28th versus -- of

12  2021 versus the November 24th of 2020, the liquidation

13  analysis actually ended up being higher than the plan

14  analysis, correct?

15  A    Yes.

16  Q    But there was -- there was some changes also in the plan

17  analysis.  I'm sorry.  There were some subsequent changes that

18  were done over the weekend that were provided on February 1st.

19  Is that correct?

20  A    Yes.

21  Q    Okay.  And what were -- give us an overview of what those

22  changes were.

23  A    What are -- what are you comparing?  What would you like

24  me to compare?

25  Q    Okay.  The January to February plan analysis, what were

APP 2204

Seery - Cross                                    215

```
 1   the changes?  Why did it go up from 62.6 to 71.3?
 2   A    The main changes, as we discussed earlier, and maybe the
 3   only major change, was the UBS claim amount, which went down
 4   significantly from the earlier iteration.  And then there was
 5   the small change related to the RCP recovery, which was a
 6   double-count.
 7   Q    Okay.  And you talked about earlier about what assumptions
 8   went into these analyses, correct?
 9   A    Yes.
10   Q    And you said these assumptions were always done after
11   careful consideration.  Is that a correct summation of what
12   you said?
13   A    I think that's fair.
14   Q    Okay.
15            MR. TAYLOR:  Mr. Assink, could you pull up the
16   November assumptions?
17   BY MR. TAYLOR:
18   Q    I believe that's coming up, Mr. Seery.  The Court.
19        (Pause.)
20            MR. TAYLOR:  And go down one page, please, Mr.
21   Assink.  Roll up.  The Assumption L.
22   BY MR. TAYLOR:
23   Q    So, these are the November assumptions, correct, Mr.
24   Seery?
25   A    I believe so, yes.
```

Seery - Cross                                    216

1   Q    Okay.  And what was the assumption that you made after

2   careful consideration regarding the claims for UBS and

3   HarbourVest?

4   A    The plan assumes zero, that was L, for those claims.

5   Q    Okay.  And ultimately what did -- and I believe you just

6   announced this today and made this public today -- what is

7   UBS's claim?  What are you proposing that it be allowed at?

8   A    $50 million in Class 8, and then they have a junior claim

9   as well.

10  Q    Okay.  And what about HarbourVest?  What kind of allowed

11  claim did they end up with?

12  A    $45 million in Class 8 and a $35 million junior claim.

13  Q    So your well-reasoned assumption, carefully considered,

14  was off by $95 million; is that correct?

15           MR. MORRIS:  Objection to the form of the question.

16           THE COURT:  Overruled.

17           THE WITNESS:  The difference between zero and those

18  numbers is $95 million, yes.

19  BY MR. TAYLOR:

20  Q    You solicited creditors of the Highland estate based upon

21  the November plan analysis and liquidation analysis that was

22  provided and that we're looking at right now, correct?

23  A    It was one of the bases, yes.  It's the plan is what --

24  what we solicited votes for, not the projections.

25  Q    But this was included within the disclosure statement; is

Seery - Cross                                217

1   that correct?

2   A    It's one of the bases.  It was included, yes.

3   Q    And this is the bases by which you believe that the best

4   interests of the creditors have been met better than a Chapter

5   7 liquidation, correct?

6   A    I believe this evidences that the best interest test would

7   be satisfied, yes.

8   Q    And so the record is very clear, for this Court and

9   anybody looking at the record, no solicitation was done of the

10  creditor body after the disclosure statement was sent out?  No

11  updates were sent, correct?

12  A    Updated projections were filed, but no solicitation was --

13  was -- there was only one solicitation.  We did not resolicit.

14  That's correct.

15  Q    Okay.  Mr. Seery, how much are you -- after this plan, or

16  if this plan is confirmed, how much are you going to be paid

17  per month to be the Trustee?

18  A    For the Trustee role, $150,000 per month is the base.

19  Q    It's a base amount?  On top of that, you're going to

20  receive some sort of bonus amount, correct?

21  A    There's two bonuses.  There's a bonus for the bankruptcy

22  case, which I'd need Court approval for, and then I'm going to

23  seek a bonus for the Trustee work, which would be a

24  combination of myself and the team for a performance bonus.

25  That's to be negotiated.

Seery - Cross                              218

1      To be fair, the Committee or the Oversight Group may not

2   agree to any change, in which case we would not have an

3   agreement.

4   Q    And what would happen if you don't come to an agreement,

5   Mr. Seery?

6   A    They would have to get a different Plan Trustee.

7   Q    Okay.  So it's certainly going to have to be greater than

8   zero, correct?

9   A    Typically.

10  Q    Is it going to be in the nature of three or four percent

11  of the sales proceeds, or have you considered that?

12  A    Oh, I'm sorry.  Yeah, you mean the bonus?  No.  I've been

13  thinking -- my apologies.  I misunderstood.  I thought you

14  meant any number.  I haven't -- I haven't had negotiation with

15  them.  I'm thinking about looking at the full recovery of the

16  team -- for the team, looking at expected performance numbers,

17  and then trying to negotiate a structure of bonus compensation

18  that would be payable to the whole team, and then allocated by

19  the CEO (garbled) which would be made.

20  Q    When predicting the expenses of the Trust going forward in

21  your projections, did you build in an amount for a bonus fee?

22  A    No.  It wouldn't be part of the expenses.  It would come

23  out at the end.

24  Q    Okay.  So those additional expenses are not shown in the

25  plan analysis, correct?

Seery - Cross                                           219

1   A    No, they're not.  It's just not going to be an expense.

2   It'll be a -- as an operating expense.  It'll be an

3   expenditure at the end out of distributions.

4   Q    Okay.  And did you subtract those from the distributions?

5   A    No.

6   Q    Okay.  A Chapter 7 trustee is not going to charge $150,000

7   or more to monetize these assets, is he?

8   A    No.

9   Q    Have you priced how much D&O insurance is going to be on a

10  go-forward basis post-confirmation?

11  A    I'm sorry.  I couldn't -- couldn't hear you.

12  Q    Sorry.  Let me get closer to my mic.  Have you priced what

13  D&O insurance is going to run the Trust on a go-forward basis

14  post-confirmation?

15  A    Yes.

16  Q    Okay.  And what are you projecting that to run?

17  A    About $3-1/2 million.

18  Q    And is that per annum for over the two-year life of this

19  plan?

20  A    Well, it's the two-year projection period, not life.  But

21  I expect that that's for the two-year projection period.

22  Q    Okay.  So approximately one point -- I'm sorry, you said

23  $3.5 million, correct?

24  A    Yes.

25  Q    Okay.  So, $1.75 million per year?

APP 2289

Case 3:25-cv-02072-S    Document 65-5    Filed 02/25/25    Page 310 of 790    PageID 3790
Main Document Page 2293 of 2722

Seery - Cross                                    220

1   A    Yes.

2   Q    On top of the minimum $1.8 million per year that you're

3   going to be paid, correct?

4   A    Well, that's -- that's the base compensation.  But, again,

5   to be fair to the Oversight Committee, they haven't approved

6   it yet.  So the Committee, the Committee reserves their rights

7   to negotiate a total package.

8   Q    And there's going to be a Litigation Trustee, correct?

9   A    Yes.

10  Q    And that Litigation Trustee is going to be paid some

11  amount of compensation, correct?

12  A    Yes.

13  Q    That has not been negotiated yet, correct?

14  A    No, I believe -- I believe the base piece has.  But his --

15  I don't know what the contingency fee or if that's been

16  negotiated yet.  I don't know.

17  Q    And what is the base fee for the Litigation Trustee?

18  A    My recollection is it was about $250,000 a year, some

19  number in that area.

20  Q    Thank you.  So, at this point, over the two-year period,

21  we're looking at approximately $3.6 million to you, $3.5

22  million to the D&O insurance, and approximately $500,000 base

23  fee to the Litigation Trustee, plus a contingency.  Is that

24  correct?

25  A    That's probably real close, yes.

APP 2209

Seery - Cross                                221

1   Q    Okay.  And how about U.S. Trustee fees?  You've estimated
2   of how much those are going to be during the two-year period,
3   correct?
4   A    They're built into the plan up 'til -- I think it's only
5   up until the actual effective date, but I don't recall the
6   specifics.
7   Q    Okay.  And U.S. Trustee fees, the case is going to stay
8   open and those are going to continue to have to be paid, even
9   after confirmation, correct?
10  A    Yes.
11  Q    Okay.  And do you have an estimate of how much those are
12  going to run per annum or over that two-year period?
13  A    I don't recall, no.
14  Q    Okay.  Well, they're provided within your projections,
15  correct?
16  A    Yes.
17  Q    Okay.  A Chapter 7 trustee would not have to incur any of
18  these costs, would they?
19  A    I don't think they'll have to incur Chapter -- U.S.
20  Trustee fees.  I don't know whether they would bring on a
21  litigation trustee or not.  I would assume, since there's --
22  appear to be valuable claims, they probably would, but perhaps
23  they would do it themselves.  So I don't know the specifics of
24  what they would do.
25  Q    In preparing your liquidation analysis, did you ask

003064
APP 2291

Case 3:25-cv-02072-S   Document 5   Filed 08/02/25   Page 312 of 790   PageID 3792

 1  Pachulski if they would be willing to work for a Chapter 7

 2  trustee if one was appointed?

 3  A    I didn't specifically ask, no.

 4  Q    Did you ask DIS, your, for lack of a better word,

 5  financial advisors in this case, if they would be willing to

 6  work with a Chapter 7 trustee?

 7  A    DSI.  No, I did not specifically ask them.

 8  Q    Okay.  All right.  Any of the accountants that you're

 9  working with, did you ask them if they would be willing to

10  work with a Chapter 7 trustee?

11  A    I didn't specifically ask them, no.

12  Q    Okay.  The proposed plan has no requirements that you

13  notice any potential sale of either Highland assets or

14  Highland subsidiary assets; is that correct?

15  A    Do you mean after the effective date?

16  Q    Yes.

17  A    No, it does not.

18  Q    In the SSP sale, which is a subsidiary of Trussway, which

19  is a subsidiary of Highland, or actually it's a sub of a sub

20  of Highland, you conducted the sale of SSP, correct?

21  A    The team did, yes.  I was part.

22  Q    All right.  That was not noticed to the creditor body; is

23  that correct?

24  A    That's correct.

25  Q    And it is the Debtor's and your position that no notice

APP 2992

Seery - Cross                                        223

1  was required because this was a sub of a sub and therefore

2  this was in the ordinary course?

3  A    Not exactly, no.

4  Q    Okay.  Then what is your position?

5  A    It was in the ordinary course.  It was -- I believe it's a

6  sub of a sub of a sub, and a significant portion of the

7  interests are owned by third parties.

8  Q    It is possible, is it not, that had you noticed this to

9  the larger creditor body, that you might have engendered a

10 competitive bidding situation that might have reached a higher

11 return for investors, correct?

12 A    The same possibility is it could have gone lower.

13 Q    But it is possible, correct?

14 A    Certainly possible.

15 Q    In fact, there is normally requirements under the

16 Bankruptcy Code and the Rules that asset sales are noticed out

17 to the creditor body, correct?

18 A    Asset sales that -- property of the estate, yes.  Other

19 than in the ordinary course, of course.

20 Q    I believe you have described Mr. Dondero as being very

21 litigious within this case; is that correct?

22 A    I believe so, yes.

23 Q    Okay.  Did Mr. Dondero initiate any litigation in this

24 case prior to September 2020?

25 A    Prior to September?  I don't believe so.  I don't know

APP 2293

Seery - Cross                                      224

 1  when he filed the claim from NexPoint.  It certainly indicated
 2  that -- I believe it was from NexPoint.  My memory is slightly
 3  off here.  He filed a claim in -- administrative claim, which
 4  effectively is like you're bringing a complaint, against HCMLP
 5  for the management of Multi-Strat and the sale of the life
 6  settlement policies out of Multi-Strat, which was conducted in
 7  the spring.
 8  Q   And wasn't Mr. Dondero seeking document production related
 9  to that sale?
10  A   No.
11  Q   Okay.  I believe that the preliminary injunction that you
12  talked about and were questioned earlier, the plan asks to
13  enjoin (garbled) party from allowing the plan to go effective.
14  Is that correct?
15  A   I'm sorry.  I didn't understand you question.  There was a
16  -- there was a bunch of interference.
17  Q   Okay.  Sure.  I'm sorry about that.  I don't know if
18  that's -- I don't think that's me, but --
19  A   It may not be.  It sounded like someone else.
20  Q   The injunction prohibits anybody from interfering with the
21  plan going effective, correct?
22  A   The plan injunction?
23  Q   Yes.
24  A   Yes.
25  Q   Okay.  Just so I'm clear, is the plan injunction

APP 2294

Seery - Cross                                225

 1  attempting to strip appellate rights of Mr. Dondero?

 2  A    No.

 3  Q    Okay.  So, if, for instance, if he were to file any appeal

 4  of an order confirming this plan, he wouldn't be in violation

 5  of that plan injunction?

 6  A    I don't think so, because the order wouldn't be final.

 7  Q    Okay.  But it -- it says upon entry of a confirmation

 8  order, you're enjoined from doing so.  So that's not the

 9  intent?

10  A    It certainly would not be my intent.  I don't think that

11  anybody had that in mind.

12  Q    Okay.  And if Mr. Dondero were to seek a stay pending

13  appeal either during that 14-day period or afterwards, is that

14  plan injunction attempting to stop that -- that sort of

15  action?

16  A    I apologize.  You're breaking up.  But I think I

17  understood your question.  No, it was -- it was your screen as

18  well.  No.  If either this Court stays its own order or a

19  higher court says that the order is stayed, then there would

20  be no way there could be any allegation that it's interfering

21  with an order if it's not effective.

22  Q    Mr. Dondero opposed the Acis sale, correct?

23  A    The Acis settlement?

24  Q    Correct.

25  A    Yes.

Seery - Cross                              226

1  Q   After he opposed the Acis settlement, the next filing Mr.
2  Dondero made was requesting that the Debtor notice the sale of
3  any assets or any major subsidiary assets.  Is that correct?
4  A   I don't recall the sequence of his filings.  I think that
5  Judge Lynn at least sent a letter to that effect.  I don't
6  recall if there is a filing to that effect.
7  Q   Did Mr. Dondero, through his counsel, attempt to resolve
8  that motion without filing anything further?
9  A   I don't recall the specifics of the motion.  I know they
10 asked for some sort of relief that -- that we thought was
11 inappropriate.
12 Q   When the Court postponed any hearing on Mr. Dondero's
13 request for relief until the eve of the confirmation hearing,
14 and Mr. Pomerantz announced that no sales were expected before
15 confirmation, did Mr. Dondero withdraw his motion?
16 A   Again, I don't recall the specifics of the motion.  I only
17 recall the letter from Judge Lynn.
18 Q   Did Mr. Dondero do anything more than object to the
19 HarbourVest deal?
20 A   Not that I know of.
21 Q   Did Mr. Dondero do anything more than respond to the
22 Defendants' injunction suit?
23        MR. MORRIS:  Objection to the form of the question.
24 I mean, -- objection to the form.
25        THE COURT:  Overruled.

Seery - Cross                              227

1              MR. TAYLOR:  I apologize.  I should have said the

2      Debtor's injunction suit.

3              THE WITNESS:  Yeah, the -- I'm not sure of the

4      specific order, but certainly the communications with me,

5      which I think are prior to the order.  The communications with

6      Mr. Surgent, which I believe are after the order.  Certain

7      communications with Mr. Waterhouse, which were oral.  Those

8      were all similarly difficult and obstreperous actions.

9      BY MR. TAYLOR:

10     Q   Has Mr. Dondero commenced any adversary proceeding or

11     litigation in this case other than filing a competing plan?

12             MR. MORRIS:  Objection to the form of the question.

13             THE COURT:  Over --

14             THE WITNESS:  Yeah, I don't --

15             THE COURT:  -- ruled.

16             THE WITNESS:  I don't believe he's commenced an

17     adversary.  I'm sorry, Judge.  I don't believe he's commenced

18     an adversary proceeding, no.

19     BY MR. TAYLOR:

20     Q   Mr. Dondero didn't file any opposition to the life

21     settlement sale, did he?

22     A   We didn't do the life settlement (garbled) Court.

23     Q   Right.  Again, that wasn't noticed through the -- this

24     Court, was it?

25     A   It was an -- the reason was it was an asset of Multi-Strat

Seery - Cross                                    228

1   Fund.  It wasn't an asset of the Debtor's.

2   Q    Okay.  Mr. Dondero did have concerns regarding the life

3   settlement sale, correct?

4   A    Yes.

5   Q    In fact, he believed that they were being sold for

6   substantially less than what could have otherwise been

7   received, correct?

8   A    He may have.

9   Q    And if you conduct any subsequent sales for less than

10  market value that might ultimately prevent the waterfall from

11  ever reaching Mr. Dondero, he would have no recourse under

12  this proposed plan to object to this sale or otherwise have

13  any comment on it.  Is that correct?

14  A    I clearly object to the thinking that that was less than

15  market value.  It was -- it was more than market value.  So I

16  don't -- I disagree with the premise of your question.

17  Q    So, I don't believe that was the question that was asked.

18  The question that was asked is, as you move forward with your

19  -- what I will characterize as a wind-down plan, not putting

20  that word in your mouth -- but as you execute forward on your

21  plan, as these sales of these assets go through, no notice is

22  going to be provided, correct?

23  A    Not necessarily.  It depends on the asset and what we

24  think of the, you know, the -- the position of the parties at

25  the time.

Seery - Cross                               229

1      If we have a -- if we have a transaction that's pending

2  that wouldn't be hurt by a notice and that we'd be able to get

3  the Court's imprimatur to maybe more better insulate, if you

4  will, against Mr. Dondero's attacks, then we may well come to

5  the Court to seek that.

6      The problem with noticing sales is that -- that it often

7  depresses value.  That's just not the way folks outside of the

8  bankruptcy world (audio gap) sales.

9  Q    So there's no requirement that either public or private

10  notice be provided, correct?

11  A    No.  Meaning it is correct.

12  Q    Okay.  And if Mr. Dondero had objections either to the

13  pricing of the sale or the manner and means by which the sale

14  was being conducted, he would be prohibited by the plan

15  injunction from bringing any objection to such sale, correct?

16  A    I believe so, yes.

17  Q    Mr. Dondero also had concerns regarding the OmniMax sale,

18  correct?

19  A    Mr. Dondero did not go along with the OmniMax sale with

20  the assets that he managed.  I don't know if he had concerns

21  with -- with our sale or OmniMax's interests.

22  Q    Did Mr. Dondero ever express to you any concern that the

23  value wasn't being maximized regarding the sale of those

24  assets?

25  A    He thought he could get more.  I don't know that he

Main Document   Page 03303 of 1722

Seery - Cross                          230

1   thought that he could get more for his assets that he was

2   managing or whether he thought he could get more for all of

3   the assets.

4   Q   Other than voicing those concerns, did Mr. Dondero file

5   any pleading with this Court attempting to block that sale?

6   A   Pleading with the Court?  No.

7           MR. TAYLOR:  Your Honor, I would like to confer with

8   my colleagues just very briefly and see if they have anything

9   further.  And even if they don't, Mr. Lynn of my firm would

10  like a very brief moment to address the Court prior to me

11  passing the witness.

12      So, if I may have a literally hopefully one-minute break

13  where I can turn my camera off and my microphone off to confer

14  with my colleagues, and then move forward?

15          THE COURT:  Okay.  Well, you can have a one-minute

16  break, but we're going to continue on with cross-examination

17  at this point.  Okay?  I'm not sure what you meant by Mr. Lynn

18  wants to raise an issue at this point.  Could you elaborate?

19          MR. TAYLOR:  I will get some elaboration during our

20  30-second to one-minute break, Your Honor.  I was just passed

21  a note.

22          THE COURT:  All right.  So, but I'll just you know,

23  --

24          A VOICE:  Your Honor?

25          THE COURT:  -- I'm inclined to continue with the

APP 2800

Seery - Cross                                   231

1    cross-examination.  You know, this isn't a time for, you know,
2    arguments or anything like that.  All right?
3        So, we'll take a one-minute break.  You can turn off your
4    audio and video for one minute, and come back.
5        (Off the record, 3:33 p.m. to 3:34 p.m.)
6            THE WITNESS:  Your Honor?
7            THE COURT:  Yes?
8            THE WITNESS:  It's Jim Seery.  Can I turn it into
9    just a two-minute break, since I've sat in my seat, and it
10   would be better for him to just continue straight through.  I
11   could use one or two minutes.
12           THE COURT:  Okay.
13           THE WITNESS:  I apologize.
14           THE COURT:  All right.  Well, it's been more than
15   minute.  Let's just say a five-minute break for everyone, and
16   we'll come back at 3:39 Central time.  Okay.
17           THE WITNESS:  Okay.  Thank you, Your Honor.  I
18   appreciate that.
19       (A recess ensued from 3:35 p.m. until 3:40 p.m.)
20           THE CLERK:  All rise.
21           THE COURT:  Please be seated.  All right.  We are
22   back on the record.  Mr. Taylor, are you there?
23           MR. TAYLOR:  I am, Your Honor.  My video is not
24   wanting to start, but my -- I believe my audio is on.
25           THE COURT:  Okay.  After you went offline for your

Seery - Cross                              232

1   one-minute break, Mr. Seery asked for a five-minute bathroom

2   break, or a couple-minute.  Anyway, we've been gone on a

3   bathroom break.  We're back now.

4          MR. TAYLOR:  Thank you.  I was actually -- I was

5   still listening with one ear, --

6          THE COURT:  Okay.

7          MR. TAYLOR:  -- Your Honor, so I understand.

8          THE COURT:  All right.

9          MR. TAYLOR:  So, thank you.

10          THE COURT:  Are you finished with cross, or no?

11          MR. TAYLOR:  Just a little bit of a follow-up.

12                 CROSS-EXAMINATION, RESUMED

13   BY MR. TAYLOR:

14   Q   Mr. Seery, you had previously testified that Mr. Dondero's

15   counsel had threatened you and/or the independent board, I was

16   not exactly sure who you were referring to, with suits, and I

17   believe you said a hundred million dollars' worth of suits and

18   getting dragged into litigation.

19          Is that still your testimony today, that you were -- you

20   were threatened with suit by this firm of a suit of over a

21   hundred million dollars?

22   A   I believe what I was told by my counsel was that, not Mr.

23   Dondero's, but one of the other counsel, who I can name, said

24   specifically that Dondero will sue Seery for hundreds of

25   millions of dollars.  We're going to take it up to the Fifth

Seery - Cross                                    233

1  Circuit, get it reversed, and he'll go after him.

2  Q    Okay.  So it was not Mr. Dondero's counsel, and you were

3  not -- is that correct?

4  A    No.  It was one of the other counsel on the phone today.

5  Q    Okay.  And you base that not upon your own personal

6  knowledge but based on some -- something else that you were

7  told, correct?

8  A    Yes.  By my counsel.

9  Q    Thank you.

10          MR. TAYLOR:  Yes, Your Honor.  We can pass the

11  witness.

12          THE COURT:  Okay.  So, you've gone, or you and Mr.

13  Rukavina collectively have gone one hour and 17 minutes.  Mr.

14  Draper, you're next.

15          MR. DRAPER:  Yes, Your Honor.  Thank you.  I

16  basically have no more than ten questions, so I gather the

17  Court will welcome that.

18          THE COURT:  Okay.

19                   CROSS-EXAMINATION

20  BY MR. DRAPER:

21  Q    Mr. Seery, has the new general partner been formed yet?

22  A    I don't know if they've been -- we've actually done the

23  formation, but it -- it would be in process.

24  Q    So it either has been formed or has not been formed?

25  A    I don't -- I don't know the answer.

Seery - Cross                                234

1    Q    Okay.  Now, going forward, Judge Nelms and Mr. Dubel will

2    have nothing to do with the Reorganized Debtor, correct?

3    A    Not necessarily, but they don't have a specific role at

4    this time.

5    Q    They won't be officers or directors of the new general

6    partner or the Reorganized Debtor, correct?

7    A    I don't -- I don't believe so, but it's not set in stone.

8    Q    All right.  Has any finance -- has any party who is the

9    beneficiary of an exculpation, a release, or the channeling

10   injunction contributed anything to this plan of reorganization

11   in terms of money?

12   A    No.

13   Q    Have you ever interviewed a trustee as to how they would

14   liquidate the assets or monetize the assets in this case?

15   A    No.

16   Q    And last question is, is there any bankruptcy prohibition

17   that you're aware of that a Chapter 7 trustee could not do

18   what you're doing?

19   A    Which -- which -- what do you mean, under the plan?

20   Q    No.  Could not monetize the assets of the estate in the

21   manner that you're attempting to monetize them.

22   A    I don't think there's a specific rule, but I just haven't

23   -- I haven't seen that before, no.  So I don't think there's a

24   specific rule that I know of.

25   Q    Okay.

Seery - Cross                              235

1              MR. DRAPER:  I have nothing further for this witness.

2              THE COURT:  All right.  I should have asked, we had a

3    couple of other objectors.  Ms. Drawhorn, did you have any

4    questions?

5              MS. DRAWHORN:  I have no questions, Your Honor.

6              THE COURT:  All right.  Were there any other

7    objectors out there that I missed that might have questions?

8         All right.  Any redirect?

9              MR. MORRIS:  Your Honor, if I may, can I -- can I

10   just take a short minute to confer with my colleagues?

11             THE COURT:  Sure.  You can --

12             MR. MORRIS:  Thank you.

13             THE COURT:  -- put you --

14             MR. MORRIS:  Two -- two minutes, Your Honor.

15             THE COURT:  Okay.

16        (Pause, 3:45 p.m. until 3:48 p.m.)

17             THE COURT:  All right.  We've been a couple of

18   minutes.  Mr. Morris?

19             MR. MORRIS:  Yes, Your Honor.

20             THE COURT:  What are --

21             MR. MORRIS:  Just, just a few points, Your Honor.

22             THE COURT:  Okay.

23             MR. MORRIS:  Hold on a sec.  You ready, Mr. Seery?

24             THE WITNESS:  I am, yes.

25                       REDIRECT EXAMINATION

Seery - Redirect                                236

1  BY MR. MORRIS:

2  Q    You were asked a number of questions about your

3  compensation.  Do you recall all that?

4  A    Yes, I do.

5  Q    And you testified to the $150,000 a month.  Do you recall

6  that?

7  A    Yes.

8  Q    Under the -- under the documentation right now, your

9  compensation is still subject to negotiation with the

10  Committee; is that right?

11  A    Yes, it is.

12  Q    Okay.  You were asked a couple of questions about the

13  conduct of Mr. Dondero.  Earlier, you testified that the

14  monetization plan was filed under seal at around the time of

15  the mediation.  Do I have that right?

16  A    Yes.  Right at the start of the mediation.

17  Q    Okay.  And is that the first time that the Debtor made the

18  constituents aware, including Mr. Dondero, that it intended to

19  use that as a catalyst towards getting to a plan?

20  A    That's the first time that we filed it, but that plan had

21  been discussed prior to that.

22  Q    And do you recall that there came a point in time where

23  you -- when the Debtor gave notice that it intended to

24  terminate the shared services agreements with the Dondero-

25  related entities?

APP 2806

Seery - Redirect                    237

1   A    Yes.

2   Q    And when did that happen?

3   A    That was about 60 -- now it's like 62 days ago.

4   Q    Uh-huh.  And you know, from your perspective, from the

5   filing of the monetization plan in August through the notice

6   of shared services, is that what you believe has contributed

7   to the resistance by Mr. Dondero to the Debtor's pursuit of

8   this plan?

9   A    Well, I think there's a number of factors that

10  contributed, but the evidence that I've seen is that when we

11  started talking about a transition, if there wasn't going to

12  be a deal, if Mr. Dondero couldn't reach a deal with the

13  creditors, we were going to push forward with the monetization

14  plan.  And the monetization plan required the transition of

15  the employees.  And indeed, it called specifically, and we had

16  testimony regarding it all through the case, about the

17  employees being terminated or transferred.

18       In order to transfer them over to an entity that's

19  related, Mr. Dondero pulls all of those strings.  And he

20  refused to engage on that.  We started in the fall.  We

21  specifically told employees of the Debtor not to engage.  They

22  couldn't spend his money, which made sense --

23            MR. TAYLOR:  Objection, Your Honor.

24            THE WITNESS:  So, very -- that that --

25            THE COURT:  Just -- there's an objection.

Seery - Redirect                          238

 1          MR. MORRIS:  There's an objection.

 2          THE WITNESS:  I'm sorry.

 3          THE COURT:  There was an objection.

 4          MR. TAYLOR:  Yes, Your Honor.  Object --

 5          THE COURT:  Go ahead.

 6          MR. TAYLOR:  Yes, Your Honor.  This is Clay, Clay

 7  Taylor.  Objection.  He's directly said Mr. Dondero told other

 8  employees *x*, and that is purely hearsay, not based upon his

 9  personal opinion, or his personal knowledge, and therefore

10  that part of the answer should be struck.

11          MR. MORRIS:  Your Honor, it's a statement against

12  interest.

13          THE COURT:  Overrule the objection.  Go ahead.

14          THE WITNESS:  Yeah.  The difficulty of transitioning

15  this business, I've equated it to doing a corporate carve-out

16  transaction on an M&A side.  It's hard, and you need

17  counterparties on the other side willing to engage.  And what

18  we went through over the weekend, on Friday, was seemingly

19  that the Funds, you know, directed by Mr. Dondero, just

20  haven't engaged.

21      We actually gave them an extra two weeks to engage,

22  because it's -- they've really been unable to do anything.  I

23  mean, hopefully, we've got the employees working in a way that

24  can -- that can foster and get around some of this

25  obstreperousness, and I've used that word before, but that's

Seery - Redirect                               239

1    what it is.  It's really an attempt to just prevent the plan

2    from going forward.

3        And at some point, the plan will go forward.  And if we

4    are unable to transition people, we will simply have to

5    terminate them.  And that is not a good outcome for those

6    employees, but it's not a good outcome for the Funds, either.

7    And the Funds, Mr. Dondero, the Advisors, the boards, nobody

8    wants to do anything except come in this court.

9    BY MR. MORRIS:

10   Q    Do you recall being asked about Mr. Dondero and certain

11   things that he didn't do and certain actions that he hadn't

12   taken?

13   A    Yes.

14   Q    By Mr. Taylor?  To the best of your recollection, did Mr.

15   Dondero personally object to the HarbourVest settlement?

16   A    I -- I don't recall if he did or if it was one of the

17   entities.

18   Q    It was Dugaboy.  Does that refresh your recollection?

19   A    Dugaboy certainly objected, yes.

20   Q    And do you understand that Dugaboy has appealed the

21   granting of the 9019 order in the HarbourVest settlement?

22   A    Yes.

23   Q    And Mr. Taylor asked you to confirm that Mr. Dondero

24   hadn't taken any action with respect to the life settlement

25   deal.  Do you remember that?

Seery - Redirect                                      240

1    A    I do.

2    Q    But are you aware that Dugaboy actually filed an

3    administrative claim relating to the alleged mismanagement of

4    the life settlement sale?

5    A    Yes, I did, I did allude to that.  I wasn't sure it was

6    Dugaboy, but -- but that was very --

7    Q    Uh-huh.

8    A    -- very early on, an objection filed in the form of an

9    administrative claim or complaint against, if you will,

10   against Highland for the management of Multi-Strat.

11   Q    Uh-huh.  And Mr. Dondero didn't personally file any motion

12   seeking to inhibit the Debtor from managing the CLO assets; is

13   that right?

14   A    No, not the CLO assets, no.

15   Q    Yeah.  But the Funds and the Advisors did.  That was the

16   hearing on December 16th.  Do you recall that?

17   A    Yeah.  That was the -- the Funds.  K&L Gates, the Funds,

18   and the various Advisors.

19   Q    All right.  Do you recall Mr. Rukavina asking you whether

20   there was any evidence in the record to support your testimony

21   that there was an agreement in place to assume the CLO

22   management agreements?

23   A    I recall the question, yes.

24   Q    Okay.

25        MR. MORRIS:  Your Honor, I'm going to ask Ms. Canty

APP 2849

Seery - Redirect                                    241

1    to put up on the screen the Debtor's omnibus reply to the plan

2    objections.

3            THE COURT:  Okay.

4            MR. MORRIS:  It was filed -- it was filed on January

5    22nd.  And if we can go, I think, to -- I think it's Paragraph

6    -- I think it's Paragraph 135 on Page 71.  Yeah.  Okay.

7    BY MR. MORRIS:

8    Q    Take a look at that, Mr. Seery.  Does that -- does that

9    statement in Paragraph 135 accurately reflect the

10   understanding that's been reached between the Debtor and the

11   CLO Issuers with respect to the Debtor's assumption of the CLO

12   management agreements?

13   A    Yes.  I think that's consistent with what I testified to

14   earlier, the substance of the agreement.

15           MR. MORRIS:  And if we can just scroll to the top,

16   just to see the date.  Or the bottom.  I guess the top.

17           THE WITNESS:  Do you mean the date of this pleading?

18   BY MR. MORRIS:

19   Q    Yeah.  So, it was filed on January 22nd, right, ten days

20   ago?  Okay.

21   A    That's correct.

22           MR. MORRIS:  I'd like to put up on the screen an

23   email, Your Honor, that I'd like to mark as Debtor's Exhibit

24   10A.  And this is --

25   BY MR. MORRIS:

Seery - Redirect                                          242

1  Q    Do you recall, Mr. Seery, you testified that the agreement

2  was reflected in an email?

3  A    Yes.

4  Q    Is this the email that you're referring to?

5           MR. MORRIS:  If we could scroll down.  Right there.

6           THE WITNESS:  Yes.

7           MR. MORRIS:  Okay.  One -- the email below.  Okay.

8  Right there.

9  BY MR. MORRIS:

10 Q    Is that the -- is that the email you had in mind?

11 A    It was the series of emails.  We -- we had a -- I think I

12 testified in the prior testimony, or my -- one of my

13 depositions, that we had had a number of conversations with

14 the Issuers and their counsel, and this was the summary of the

15 agreement that was contained in these emails.

16 Q    Okay.  And this is, this is the same date as the omnibus

17 reply that we just looked at, right, January 22nd?

18 A    That's correct.

19 Q    Okay.  You were asked a question, I think, late in your

20 cross-examination about a Chapter 7 trustee's ability to sell

21 the assets in the same way as you are proposing to do.  Do you

22 recall that testimony?

23 A    Yes.

24 Q    And I think, if I understood correctly, the question was

25 narrowly tailored to whether there was any legal impediment to

Seery - Redirect                                          243

1    a trustee doing -- performing the same functions as you.  Do I
2    have that right?
3    A   That's the question I was asked, whether the Bankruptcy
4    Code had a specific prohibition.
5    Q   Okay.  And I think, I think you testified that you weren't
6    aware of anything.  Is that right?
7    A   That's correct.
8    Q   All right.  But let's talk about practice.  Do you think a
9    Chapter 7 trustee will realize the same value as you and the
10   team that you're assembling will, in terms of maximizing value
11   and getting the maximum recovery for the assets?
12   A   No.  As I testified earlier, you know, I've been working
13   with these assets now for a year.  It's a complicated
14   structure.  The assets are all slightly different.  And
15   sometimes much more than slightly.  And the team that we're
16   going to have helping managing is familiar with the assets as
17   well.  We believe we'll be able to execute very well in the
18   markets that we (garbled).
19   Q   Do you think a Chapter 7 trustee will have a steep
20   learning curve in trying to even begin to understand the
21   nature of the assets and how to market and sell them?
22   A   I think anybody coming into this, the way this company is
23   set up, as an asset manager, and the diversity of the assets,
24   would have a steep learning curve, yes.
25   Q   Do you have any view as to whether the perception in the

APP 2313

Case 3:25-cv-02072-S    Document 15-5    Filed 06/23/25    Page 334 of 790    PageID 3814

Seery - Redirect                          244

1    marketplace of a Chapter 7 trustee taking over to sell the

2    assets will have an impact on value as compared to a post-

3    confirmation estate of the type that's being proposed under

4    the plan?

5    A    Yes, I do, and it certainly would be negative, in my

6    experience.  Typically, assets are not conducted -- asset

7    sales are not conducted through a bankruptcy court, and

8    certainly not with a Chapter 7 trustee that has to sell them,

9    and generally is viewed as having to sell them quickly.  So we

10   -- we approach each asset differently, but certainly in a way

11   that would be much more conducive to maximizing value than a

12   Chapter 7 trustee could, just by the nature of their role.

13   Q    Is it -- is it your understanding that, under the proposed

14   plan and under the proposed corporate governance structure,

15   that the Claims Oversight Committee will -- will manage you?

16   That you'll report to that Committee and that they'll have the

17   opportunity to make their assessment as to the quality of your

18   work?

19   A    Yeah, absolutely.  And that's consistent with what we've

20   done before in this case.  Even where it wasn't an asset of

21   the estate or was being sold in the ordinary course, we spent

22   time with the Committee and the Committee professionals before

23   selling assets.

24   Q    And you've worked with the Committee for over -- for a

25   year now, right?

APP 2344

Seery - Redirect                                    245

 1   A    It's over a year.

 2   Q    And the Committee is comfortable with you taking this

 3   role; is that right?

 4   A    I think they're supportive of it.  Comfortable might be

 5   not the right word choice.

 6   Q    Okay.  I appreciate the clarification.  And do you have

 7   any reason to believe that the -- that the Oversight Committee

 8   is going to allow you the unfettered discretion to do whatever

 9   you want with the assets of the Trust?

10   A    Not a chance.  Not with this group.  Nor would I want to.

11   There's no right or wrong answer for most of these things, and

12   the collaborative views from professionals and people who have

13   an economic stake in the outcome will be helpful.

14   Q    Okay.  You were asked some questions about the November

15   projections and the -- and the assumption that was made that

16   valued the HarbourVest and the UBS claims at zero.  Do you

17   recall that?

18   A    Yes.

19   Q    As of that time, was the Debtor still in active litigation

20   with both of those claim holders?

21   A    Very much so.

22   Q    And after the disclosure statement was issued, do you

23   recall that the Court entered its order on UBS's Rule 3018

24   motion?

25   A    Yes.

Seery - Redirect                                        246

1   Q    And do you recall what the -- what the claims estimate was

2   for voting purposes under that order?

3   A    It was about $95 million.  That was -- it was together

4   with the summary judgment orders of that date.  They were

5   separate orders, but that was the lone hearing.

6   Q    And was that public information, that order was publicly

7   filed on the docket; isn't that right?

8   A    Yes, it was.

9   Q    Is there anything in the world that you can think of that

10  would have prevented any claim holder from doing the math to

11  try to figure out the impact on the estimated recoveries from

12  the -- by using that 3018 claims estimate?

13  A    No.  It would have -- it would have been quite easy to do.

14  Q    And, in fact, that's what you wound up doing with respect

15  to the January projections, right?

16  A    That's correct.

17  Q    And do you recall when the HarbourVest settlement, when

18  the 9019 motion was filed?

19  A    I don't recall the actual filing.  It was subsequent to

20  the UBS, though.

21         MR. MORRIS:  Ms. Canty, if you have it, can we just

22  put it on the screen, to see if we can refresh Mr. Seery's

23  recollection?  If we could just look at the very top.

24  BY MR. MORRIS:

25  Q    Does that refresh your recollection that the 9019 motion

APP 2846

Seery - Redirect                                    247

 1  was filed on December 23rd?

 2  A   Yes, it does.  The agreement was reached before that, but

 3  it took a little bit of time to document the particulars and

 4  then to -- to get it filed.

 5  Q   And this wasn't filed under seal, to the best of your

 6  recollection, was it?

 7  A   No, no.  This was -- this was open, and we had a very open

 8  hearing about it, because it was a related-party objection.

 9  Q   And to the best of your recollection, did this 9019 motion

10  publicly disclose all of the material terms of the proposed

11  settlement?

12  A   Yes, it did.

13  Q   Can you think of anything in the world that would have

14  prevented any interested party from doing the math to figure

15  out how this particular settlement would impact the claim

16  recoveries set forth in the Debtor's disclosure statement?

17  A   No.  And just again, to be clear, the plan and the

18  projections had assumptions, but the plan was very clear that

19  the denominator was going to be determined by the total amount

20  of allowed claims.

21  Q   And, again, at the time that that was filed, you hadn't

22  reached a settlement with HarbourVest, had you?

23  A   No.

24  Q   And the order on the 3018 motion hadn't yet been filed; is

25  that right?

APP 2327

Seery - Redirect                          248

1  A    That's correct.

2  Q    Okay.  Has -- are you aware of any creditor expressing any

3  interest in trying to change their vote as a result of the

4  updates of the forecasts?

5  A    Only Mr. Daugherty.  And actually, they have a stipulation

6  with the two -- the two former employees.

7  Q    All right.  But to be fair, that wasn't -- had nothing to

8  do with the revisions to the projections?  That was just in

9  connection with their settlement; is that right?

10  A    That's correct.  As was, I suspect, Mr. Daugherty's, but

11  he'd been aware of the settlements, just like everyone else.

12  Q    Okay.  You were asked a couple of questions, I think, by

13  Mr. Rukavina about whether there is anything that you need to

14  do your job on a go-forward basis.  And I think you said no.

15  Do I -- do I have that right?  Nothing further that you need?

16  A    I -- I'm not really sure what your question means, to be

17  honest.

18  Q    Okay.  Fair enough.  To be clear, is there any chance that

19  you would accept the position as the Claimant Trustee if the

20  gatekeeper and injunction provisions of the proposed plan were

21  extracted from those documents?

22  A    No.  As I said earlier, they're integral in my view to the

23  entire plan, but they're absolutely essential to my bottom.

24  Q    Okay.  And through -- through the date of the effective

25  date, are you relying on the exculpation clause of the -- have

Seery - Redirect                    249

1   you been relying on the exculpation clause in the January 9th

2   order that you testified to at the beginning of this hearing?

3   A   Yeah.  Both the January 9th order as well as the July

4   order with respect to my CEO/CRO positions.

5   Q   Okay.

6           MR. MORRIS:  I've got nothing further, Your Honor.

7           THE COURT:  All right.  Any recross on that redirect?

8           A VOICE:  I believe Mr. Rukavina is speaking but is

9   muted, Your Honor.

10          THE COURT:  Mr. Rukavina, do you have any recross?

11          MR. RUKAVINA:  Your Honor, I do, yes.  Thank you.  I

12  apologize.

13          THE COURT:  Okay.

14          MR. RUKAVINA:  Can you hear me now?

15          THE COURT:  Yes.

16          THE WITNESS:  Yes.

17          MR. RUKAVINA:  Thank you.

18      Mr. Vasek, if you'll please pull up the Debtor's Omnibus

19  Reply, Docket 1807.  And if you'll go to Exhibit C.  Do a word

20  search for Exhibit C.  It's attached to it.  Okay.  Now scroll

21  down.  Stop there.

22                  RECROSS-EXAMINATION

23  BY MR. RUKAVINA:

24  Q   Mr. Seery, do you see what's attached as Exhibit C to the

25  Omnibus Reply, which is proposed language in the confirmation

Seery - Recross                                    250

1    order?

2    A    I see the exhibit.  I didn't know if this was -- I don't

3    know exactly what it's for.  If it's proposed language, I'll

4    accept your representation.

5              MR. RUKAVINA:  Well, scroll back up to Exhibit C, Mr.

6    Vasek.  I want to make sure that I understand what you're

7    saying.  Scroll back up.  Do the word search for where Exhibit

8    C appears first.  Start again.  Okay.  So scroll up.

9    BY MR. RUKAVINA:

10   Q    So, you'll recall Mr. Morris was asking you about the

11   paragraph in here where you outlined the terms of the

12   agreement with the CLOs.  Do you recall that testimony?

13   A    Yes.

14   Q    Okay.  And then you see it says, The Debtor and the CLOs

15   agreed to seek approval of this compromise by adding language

16   to the confirmation order.  A copy of that language is

17   attached hereto as Exhibit C and will be included in the

18   confirmation order.

19        Do you see that, sir?

20   A    I do.

21   Q    Okay.

22              MR. RUKAVINA:  Mr. Vasek, go back to Exhibit C.

23   BY MR. RUKAVINA:

24   Q    So it's correct that this Exhibit C is the referenced

25   agreement that the Debtor and the CLOs will seek approval of,

Seery - Recross                              251

1    correct?

2    A    The -- the -- it may be word-splitting, but I believe it

3    says that they've reached agreement and this is the language

4    that will evidence that agreement or embody that agreement.

5    Q    Okay.

6            MR. RUKAVINA:  Scroll down, Ms. Vasek, to the next

7    page, please.

8    BY MR. RUKAVINA:

9    Q    Real quick, do the CLOs owe the Debtor any money for the

10   management fees?

11   A    I don't -- well, the answer is there are accrued fees that

12   haven't been paid, but when they have cash they run through

13   the waterfall and pay them.

14   Q    And I believe you mentioned to me those accrued fees

15   before.  They're several million dollars, correct?

16   A    It -- I don't know right off the top of my head.  They can

17   aggregate and then they get paid down in the quarter depending

18   on the waterfall.  And it's -- it's not a fair statement by

19   either of us to say the CLOs, as if they're all the same.

20   Each one is different.

21   Q    I understand.  But as of today, you agree that the CLOs

22   collectively owe some amount of money to the Debtor in accrued

23   and unpaid management fees?

24   A    I believe that's the case.

25   Q    Okay.  And do you believe it's north of a million dollars?

Seery - Recross                                 252

1   A    I don't recall.

2   Q    Okay.

3        MR. RUKAVINA:  Well, scroll down a couple of more

4   lines, Mr. Vasek.  Stay there.

5   BY MR. RUKAVINA:

6   Q    Sir, if you'll read with me, isn't the Debtor releasing

7   each Issuer, which is the CLOs, for and from any and all

8   claims, debts, et cetera, by this provision?

9   A    Claims.  Not -- not fees, but claims.  I don't believe

10  there's any release of fees that the CLOs might owe and would

11  run through the waterfall here.

12  Q    Okay.  For and from any and all claims, debts,

13  liabilities, demands, obligations, promises, acts, agreements,

14  liens, losses, costs, and expenses, including without

15  limitation attorneys' fees and related costs, damages,

16  injuries, suits, actions, and causes of action, of whatever

17  kind or nature, whether known or unknown, suspected or

18  unsuspected, matured or unmatured, liquidated or unliquidated,

19  contingent or fixed.

20       Are you saying that that does not release whatever fees

21  have accrued and the CLOs owe?

22  A    I don't believe it would.  If it did, your client should

23  be ecstatic.  But I don't believe it does that.

24  Q    And you don't believe that it releases the CLOs of any and

25  all other obligations that they may have to the Debtor and the

APP 2322

Seery - Recross                                253

1   estate?

2   A    I -- again, I don't believe there are any, but I think

3   it's a broad release of claims away from the actual fees that

4   are generated by the Debtor.  I don't believe there's an

5   intention to release fees that have accrued.

6   Q    Have you seen this language before I showed it to you

7   right now?

8   A    I believe I have, yes.

9   Q    Okay.  Take a minute.  Can you point the Court to anywhere

10  where present or future fees under the CLO agreements are

11  excepted from the release?

12  A    I could go through, I'll take your representation, but I

13  don't believe that that's what it -- it's supposed to release

14  fees.  Again, if the fees are owed, they get paid, if there

15  are assets there to pay them.

16  Q    Okay.  This release and this settlement was never noticed

17  out as part of a 9019, was it?

18  A    I don't believe so, no.

19  Q    Okay.  So, other than bringing it up here today, this is

20  the first that the Court, at least, has heard of this,

21  correct?

22  A    Yeah, again, I don't --

23        MR. MORRIS:  Objection to the form of the question.

24        THE WITNESS:  Yeah.  I just stated before that I

25  don't think this is a -- that there claims.

APP 2323

Seery - Recross                                    254

1              THE COURT:  Wait.  Slow down.  I think --

2              MR. SEERY:  Oh, I'm sorry, Your Honor.

3              THE COURT:  -- there was an objection.  Go ahead, Mr.

4      Morris.

5              MR. MORRIS:  The notion that this is the first time

6      the Court has heard of this is just factually incorrect.

7      First of all, it's in the document from January 22nd.  Second

8      of all, Mr. Seery testified to it last week at the preliminary

9      injunction hearing.  I mean, --

10             THE COURT:  I -- I --

11             MR. MORRIS:  -- I don't know what the point of the

12     inquiry is, but there's -- this is not new news.

13             THE COURT:  Okay.  I sustain the objection.

14     BY MR. RUKAVINA:

15     Q   And Mr. Seery, can you point me to any document where

16     counsel for the CLOs has signed this particular confirmation

17     order or any other document agreeing to this language in the

18     confirmation order?

19     A   I don't think there's any document that's signed.  I think

20     we already went over that.  I think the email is evidence

21     their agreement to the general terms.  I don't see any

22     agreement with respect to this particular language.

23     Q   Well, you have no personal information?  You're going on

24     what your lawyers told you that the CLOs agreed to, correct?

25     A   That's correct.

Case 3:25-cv-02072-S   Document 65   Filed 06/23/25   Page 345 of 790   PageID 3825

                          Seery - Recross                    255

 1   Q    Okay.  You didn't personally --
 2   A    Excuse me.  That's correct with respect to this language,
 3   not with respect to the agreement.  I was on the phone when
 4   they agreed.
 5   Q    Okay.  And they agreed orally, you're saying, to basically
 6   the assumption of the CLO management agreements?
 7   A    Correct.
 8   Q    Okay.
 9        MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the
10   witness.
11        THE COURT:  All right.  Other recross?
12        MR. TAYLOR:  Yes, Your Honor, I do.
13        THE COURT:  Go ahead.
14                      RECROSS-EXAMINATION
15   BY MR. TAYLOR:
16   Q    Mr. Seery, Clay Taylor again.  You worked -- I'm sorry,
17   let me restart.  I believe you testified earlier, in response
18   to questions by Mr. Morris, that you didn't believe a Chapter
19   7 trustee would be very effective in monetizing these assets,
20   correct?
21   A    I think I said I didn't believe that the Chapter 7 trustee
22   would be as effective at monetizing the assets as the
23   Reorganized Debtor would be, and me in the role as Claimant
24   Trustee.
25   Q    And one of the reasons that you gave is you believe that

APP 2325

Seery - Recross                                    256

1    the Chapter 7 trustee had to liquidate assets so quickly that

2    it could not be effective; is that correct?

3    A    Typically, that's the case, yes.

4    Q    You worked for the Lehman trustee, correct?

5    A    That's incorrect.

6    Q    Okay.  Did you work on the Lehman case?

7    A    Did I work in the case?  No.

8    Q    Okay.  Did you -- how were you involved within -- within

9    the Lehman case?

10   A    It's a long history, but I was a relatively senior person,

11   not senior level, not senior management level person at

12   Lehman.  I ran the loan businesses and I helped a number of

13   other places and I -- in the organization.  I helped construct

14   the sale of Lehman to Barclays out of the broker-dealer and

15   then helped consummate that sale.

16   Q    Okay.  I believe, in that case, it was a SIPC -- the

17   trustee was a SIPC trustee, correct?

18   A    With respect to the broker-dealer.

19   Q    Okay.  And you believe that a SIPC trustee is very -- has

20   very similar rules with respect to asset sales; is that

21   correct?

22   A    There are some similarities, absolutely.

23   Q    Okay.  And so in that case, the trustee was in place for

24   seven years, yet you believe -- you want this Court to believe

25   that a Chapter 7 trustee has to liquidate assets in a very

APP 2326

Case 3:25-cv-02072-S   Document 16-5   Filed 06/23/25   Page 347 of 790   PageID 3827

                              Seery - Recross                          257

 1   short time frame, is that correct?

 2            MR. MORRIS:  Objection to the form of the question.

 3            THE WITNESS:  Yeah, in the Lehman case, --

 4            THE COURT:  Overruled.

 5            THE WITNESS:  I'm sorry, Judge.

 6            THE COURT:  Go ahead.

 7            THE WITNESS:  In the Lehman case, the SIPC trustee

 8   spent years litigating, not liquidating.  The broker-dealer

 9   was sold in our structured deal to Barclays, and then the SIPC

10   trustee liquidated the remainder of the estate, which was the

11   broker-dealer, but most of it had been sold to Barclays.  It

12   was really a litigation case.

13   BY MR. TAYLOR:

14   Q   But it did -- that trustee did sell off subsequent assets

15   after the initial sale, correct?

16   A   That trustee, I don't think, managed -- I don't know about

17   that.  The trustee didn't really manage any assets.  Other

18   than litigations.

19   Q   You've also testified that you didn't believe or that you

20   would not take on this role without the gatekeeper and

21   injunction -- gatekeeper role and injunction being in place;

22   is that correct?

23   A   Yes.

24   Q   And you're also familiar with the Barton Doctrine,

25   correct?

APP 2327

Case 3:25-cv-02072-S   Document 65-5   Filed 06/23/25   Page 348 of 790   PageID 3828

                                Seery - Recross                    258

1    A    I'm not.

2    Q    Okay.  Do you believe that a Chapter 7 trustee could be

3    sued by third parties without obtaining either relief from

4    this Court -- let me just stop there.  Do you believe that a

5    Chapter 7 trustee could be sued without seeking leave of this

6    Court?

7    A    I think it would be difficult.  I know that Chapter 7

8    trustees have qualified immunity, so I think, whether it would

9    be leave of this Court or it's just that there's a very high

10   bar to suing them, I'm not exactly sure.  It's not something

11   I've spent time on.

12   Q    Okay.  So a hypothetical Chapter 7 trustee would have no

13   need of the gatekeeper role or injunction if this case were

14   converted to one under Chapter 7, correct?

15   A    That's probably true.

16   Q    Thank you.

17         MR. TAYLOR:  No further questions.

18         THE COURT:  All right.  Any other recross?

19         MR. DRAPER:  Your Honor, I have nothing --

20         THE COURT:  All right.

21         MR. DRAPER:  -- further.

22         THE COURT:  All right.  I think we're done, but

23   anyone I've missed?

24      All right.  Mr. Seery, it's been a long day.  You are

25   excused from the virtual witness stand.

Seery - Recross                                     259

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  All right.  Mr. Morris, let's see if

3   there's anything else we can accomplish today.  It's 4:18

4   Central time.  Who would be your next witness?

5          MR. MORRIS:  My next witness would be John Dubel,

6   Your Honor.

7          THE COURT:  All right.  Can you give us a time

8   estimate for direct?

9          MR. MORRIS:  I wouldn't expect Mr. Dubel to be more

10  than 20 minutes or so, but I would offer the Court, if you

11  think it would be helpful, counsel for the CLO Issuers is on

12  the call, and I believe that they would be prepared to just

13  confirm for Your Honor that there is an agreement in

14  principle, just as Mr. Seery has testified to, and maybe you

15  want to hear from her.  I know she's not really a witness, but

16  she might be able to make some representations to give the

17  Court some comfort that everything Mr. Seery has said is true.

18         THE COURT:  I think that would be useful.  Is it Ms.

19  Anderson or who is it?

20         MS. ANDERSON:  That is -- it is, Your Honor.  And you

21  know, I appreciate the testimony given.  I certainly do not

22  want to testify, but thought it might be useful for the Court

23  to hear from us.

24     Amy Anderson on behalf of the Issuers from Jones Walker.

25  Schulte Roth also represents the Issuers.  And I can represent

APP 2329

260

1   to the Court that the agreement as it's represented on Docket

2   1807, as more particularly described in Exhibit C, which Your

3   Honor has seen, is the agreement reached between the Issuers

4   and the Debtor.

5        There was some testimony about fees owed, accrued fees

6   owed to the Debtor.  I certainly cannot speak to the substance

7   of each particular management agreement with each CLO.  They

8   are all distinct and unique and very lengthy documents.  I

9   will -- I can represent to the Court that any accrued fees

10  that are owed were not intended to be included in the release.

11  It is -- it is not meant to release fees owed to Highland

12  under the particular management agreements.

13       Of course, if the Court has any questions or if I can

14  provide anything further, I'm happy to.  And I will be on the

15  hearing today and tomorrow, but I thought it might be useful,

16  given the topic of the testimony this afternoon.

17           THE COURT:  All right.  That was useful.  Thank you,

18  Ms. Anderson.

19       All right.  Well, Mr. Morris, shall we go ahead and hear

20  from Mr. Dubel today, perhaps finish up a second witness?

21           MR. MORRIS:  Yeah.  I think we have the time.  I

22  think Mr. Dubel is here.  Are you here, Mr. Dubel?

23           MR. DUBEL:  I am.  Can you hear me, Your Honor?

24           THE COURT:  I can hear you, but I cannot see you.

25  Oh, now I can see you.  Please raise your right hand.

003103

Dubel - Direct                                    261

1              JOHN S. DUBEL, DEBTOR'S WITNESS, SWORN

2              THE COURT:  All right.  Thank you.  Mr. Morris, go

3    ahead.

4              MR. MORRIS:  Thank you very much, Your Honor.

5                         DIRECT EXAMINATION

6    BY MR. MORRIS:

7    Q    Mr. Dubel, can you hear me?

8    A    I can, Mr. Morris.

9    Q    Okay.  Do you have a position today with the Debtor, sir?

10   A    I am a director of Strand Advisors, Inc., which is the

11   general partner of the Debtor.

12   Q    Okay.  And can you --

13             MR. MORRIS:  Your Honor, just as a reminder, I'm

14   going to ask Mr. Dubel to describe his professional experience

15   in some detail, to put into context his testimony, but his

16   *C.V.* can be found at Exhibit 6Y as in yellow on Docket No.

17   1822.

18             THE COURT:  All right.

19   BY MR. MORRIS:

20   Q    Mr. Dubel, can you describe your professional background?

21   A    Yes.  I have approximately, almost, and I hate to say it

22   because it's making me feel old, but I have almost 40 years of

23   experience working in the restructuring industry.

24        I have served in many roles in that, both as an advisor,

25   an investor in distressed debt, and also a member of

Case 3:25-cv-02072-S   Document 65-5   Filed 06/23/25   Page 352 of 790   PageID 3832

Dubel - Direct                                         262

1  management teams, and as a director, both an independent

2  director and a non-independent director.

3      My executive roles have included the -- both an executive

4  director, chief executive officer, president, chief

5  restructuring officer, chief financial officer.  And I have

6  been involved in some of the largest Chapter 11 cases over the

7  last several decades, including cases like *WorldCom* and

8  *SunEdison*.

9  Q   Let's focus your attention for a moment just on the

10 position of independent director.  Have you served in that

11 capacity before this case?

12 A   I have.

13 Q   Can you describe for the Court some of the cases in which

14 you've served as an independent director?

15 A   Sure.  I've served as an independent director in several

16 cases that were I'll call post-reorg cases.  *Werner Company*,

17 which was the largest climbing equipment manufacturer in the

18 world, manufacturer of ladders, Werner Ladders.  You'll see

19 them on every pickup truck running around the countryside.

20     *FXI Corporation*, which is a -- one of the largest foam

21 manufacturers.  Everybody's probably slept or sat on one of

22 their products.

23     *Barneys New York*, back in 2012, when they did an out-of-

24 court restructuring.  I had previously been involved with

25 Barneys 15 years before that, and so I was called upon because

003105

Dubel - Direct                                         263

 1   of my knowledge to be an independent director in that

 2   situation.  Have had no relationship with Barneys since it

 3   emerged from Chapter 11 back in 1998.

 4        I have been the independent director in *WMC Mortgage*,

 5   which was a mortgage company owned by General Electric.

 6        And I am currently serving as an independent director in a

 7   company -- in two companies.  One, *Alpha Media*, which is a

 8   large radio station chain that recently filed Chapter 11, I

 9   believe it was late Sunday night, and I am also an independent

10   director in the *Purdue Pharma* bankruptcy, and have served

11   prior to the bankruptcy and am the chair of the special

12   independent committee of directors -- special committee of

13   independent directors in that particular situation.

14   Q    That sounds like a lot.  In terms of other fiduciary

15   capacities, I think your *C.V.* refers to Leslie Fay.  Were you

16   involved in that case, and if so, how?

17   A    I was.  That was -- for those people who may remember it,

18   that goes back into the 1993 era.  *Leslie Fay* was a large

19   apparel manufacturer, and at the time was one of the largest

20   companies that had gone through an extensive fraud.  I say at

21   the time because it was about a $180 million fraud, which

22   pales by some of the ones that have followed it.

23        I was brought in as the executive vice president in charge

24   of restructuring, chief financial officer, and was also added

25   to the board of directors.  Even though I wasn't independent,

003106
APP 2323

Dubel - Direct                                    264

1  I was added to the board of directors to have the fresh face

2  on the board in that particular situation because of the fraud

3  that had taken place.

4  Q   And --

5  A   *Sun* --

6  Q   Go ahead.

7  A   *SunEdison*, I was brought in as the CEO.  Actually,

8  initially, as the chief restructuring officer, with a mandate

9  to replace the CEO, which took place shortly after I was

10 brought on board and -- because of various issues surrounding

11 investigations by the SEC, DOJ, and allegations by the

12 creditors of fraud.  And so I was brought in to run the

13 company through its Chapter 11 process.

14      As I'd mentioned earlier, *WorldCom*, I was brought in at

15 the beginning of the case as the fresh chief financial

16 officer.  And I think everybody is familiar with what happened

17 in the *WorldCom* situation.

18 Q   All right.  Based on that experience, do you have a view

19 as to whether the appointment of independent directors is

20 unusual?

21 A   It is not.  More recently, it has -- it had been in the

22 past.  Usually, you know, they would try and take the existing

23 directors and form a special committee of the existing

24 directors.  But I think the state of the art has become more

25 where independent directors are brought in, mainly because the

APPX 2391
003107

Dubel - Direct                                    265

 1  cases have become a lot more complex in nature, and larger,
 2  and the transactions themselves are much more sophisticated.
 3  And so having somebody independent has been important for
 4  analyzing the various transactions.  And also, quite often,
 5  it's just bringing a fresh, independent voice to the company
 6  on the board.
 7  Q    Do you have an understanding as to the purpose and the
 8  role of independent directors generally in restructuring and
 9  bankruptcy cases?
10  A    Sure.  As I kind of alluded to a little bit earlier, the
11  -- probably the most critical thing is for restoring
12  confidence in the company and in the management in terms of
13  corporate governance, especially when there have been troubled
14  situations, where -- whether it's been fraud or allegations
15  made against the company and its prior management or when
16  management has left under difficult situations.
17       Also, you know, independent thought process being brought
18  to the board is very important for helping guide companies.
19  It's quite often the existing management team or the existing
20  board may get stuck in a rut, as you can say, you know, in
21  terms of their thinking on how to manage it, and having
22  somebody with restructuring experience who provides that
23  independent voice is very important to the operations.
24       In addition, having someone who can look at conflicts that
25  might arise between shareholders or shareholders and the board

APP. 2335

Dubel - Direct                    266

1    members is important.  As I mentioned earlier, the *WMC*

2    *Mortgage* situation was one where I was brought on to -- as an

3    independent member of the board to effectively negotiate an

4    agreement or a settlement between WMC and its parent, General

5    Electric.  That entity was being -- WMC was being sued for

6    billions of dollars, and there were issues as to whether or

7    not General Electric should fund those obligations.  And so

8    that was a role that is quite often occurring in today's day

9    and age.

10        In addition, evaluating transactions for companies is

11   important, whereby either the shareholders who sit on the

12   board or board members may be involved in those transactions,

13   needing an independent voice to review it.  And, you know, I

14   have served in situations.  Again, *Barneys New York* and *Alpha*

15   *Media* is another example where, as an independent director, I

16   am one of the parties responsible for evaluating those

17   transactions and making recommendations to the entire board.

18        And then, again, you know, situations where it's just

19   highly-contentious and having, as I said, having that

20   independent view brought to the table is something that is

21   very helpful in these cases.

22   Q   I appreciate the fulsomeness of the answer.  During the

23   time that you served in these various fiduciary capacities, is

24   it fair to say you spent a lot of time considering and

25   addressing issues relating to D&O and other executive

Dubel - Direct                          267

1   liability issues?

2   A    It's usually one of the things that you get involved with

3   thinking about prior to taking on the role because you want to

4   make sure that there are the appropriate protections for the

5   director.

6   Q    Can you describe for the Court some of the protections

7   that you've sought or that you've seen employed in some of the

8   cases you've worked on, including this one, by the way?

9   A    Sure.  I mean, one of the first things you look to is does

10  the company -- will the company indemnify the director for

11  serving in that capacity?  And if the company will not

12  indemnify, then there's always a question as to why not, and

13  it's probably something you don't want to get involved with.

14        Generally, that is something that I don't think I've ever

15  seen a case where there has not been indemnification.

16  Obviously, it would, you know, cause great pause or concern if

17  they weren't willing to indemnify.  But that is important.

18        Providing D&O insurance is very important.  And in most

19  situations, you know, over the last 10-15 years, if there's

20  not adequate D&O insurance -- quite often, the D&O insurance

21  has been tapped out because of claims that will -- have been

22  brought or are anticipated to be brought -- new D&O insurance

23  is something that's front and center for the minds of

24  independent directors such as myself.

25        As you -- that gets you into the case and gets you moving.

1   As you start to look towards the confirmation and exit from

2   the case, things that would be appropriate, that, you know,

3   would always be something you would want to look at would be

4   exculpation language, releases.  And in this particular case,

5   the injunction, or what Mr. Seery earlier referred to as the

6   gatekeeper clause, is something that is very important for

7   directors, both, you know, as they're thinking through it and

8   as they emerge.

9   Q    All right.  Let's shift now to this case, with that

10  background.  How did you learn about this case?

11  A    I had a party who was involved in the case reach out to me

12  in early part of December of 2019 to see if I would be

13  interested in getting involved.  I think that was about the

14  time -- it was after -- as I recall, it was after the case had

15  been moved to Dallas and when there was a -- consideration of

16  either a Chapter 11 or a Chapter 7 trustee.  I can't remember

17  exactly which it was.  But there was talk about a motion to

18  bring on a trustee and get rid of all the management and the

19  like and such.

20  Q    Can you describe in as much detail as you can recall the

21  facts and circumstances that led to your appointment as an

22  independent director?

23  A    Sure.  I, as I said, I had -- early December, I had an --

24  one of the parties involved -- had, probably within the next

25  week, probably two or three others -- that reached out to see

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 115-5 Filed 06/06/25   Page 359 of 790   PageID 3839

Dubel - Direct                                269

 1  if I would be interested in participating.  I met with the

 2  Creditors' Committee or -- I'm not sure if it was all the

 3  members, but representatives of the Creditors' Committee,

 4  along with counsel, and I believe financial advisors were

 5  involved.  They walked me through the issues.  They wanted to

 6  hear about my *C.V.*  Quite a few of them knew me, knew me well,

 7  but others wanted to hear about my background and how I would

 8  look at things as an independent director.

 9      That went through into the latter part of December.  I

10  knew that they were talking to other parties.  I think it was

11  probably right around the first of the year or so that I was

12  informed, maybe a little bit earlier than that, that I was

13  informed that Mr. Seery was one of the other parties that they

14  were talking to, and Mr. Seery and I were put in touch with

15  each other.  I had worked with Mr. Seery back probably nine

16  years earlier when I was the CEO of FGIC.  He was involved in

17  a matter that we were restructuring, and so knew him a little

18  bit and was comfortable working with him as a, you know,

19  another independent director.

20      Then we took the time that we had to to -- or, I took the

21  time to -- from the beginning, you know, the early part of

22  December, look at the docket, understand what was taking

23  place.  I -- in addition, I met with the company and its

24  advisors, in-house counsel, the folks at DSI who were at the

25  time the CRO and the company's counsel to better understand

Case 3:25-cv-02072-S   Document 16-5   Filed 08/05/25   Page 360 of 790   PageID 3840

1   some of the issues.

2       Mr. Seery and I, as I said, were both selected, and we

3   went through the process of, I guess, breaking the tie, I

4   think, if I could say it that way, amongst the creditors and

5   the Debtor as to who would be the third member of the board.

6   And we were given the opportunity to go out, interview, and

7   select the third member, which resulted in Russell Nelms'

8   appointment to the board.  And also during that time, we were

9   given the opportunity to have some input -- not a hundred

10  percent input, but some input -- on the January 9th order that

11  -- the January 9, 2020 order that was put in place appointing

12  us and giving us some of the protections that we felt were

13  appropriate and necessary in this case.

14  Q   All right.  We'll get to that in a moment, but during this

15  diligence period, did you form an understanding as to why an

16  independent board was being formed, why it was being sought?

17  A   Yes.  There was, my words, there was a lot of distrust

18  between the creditors and the management -- not the CRO, but

19  the prior management of the company -- and there had been a

20  motion brought both to obviously bring the case back to Dallas

21  from I think it was originally in Delaware and then there was

22  a motion to seek, you know, to remove management and put in a

23  trustee.

24      There had been a dozen years of litigation with one party,

25  about eight or nine years with another major party, and

APP. 2349

Case 3:25-cv-02072-S   Document 16-5   Filed 06/23/25   Page 361 of 790   PageID 3841

Dubel - Direct                          271

1  several other of the major creditors were litigants.  The

2  other, as I understood, the other creditors, main creditors in

3  the case were all lawyers who had not yet gotten paid for the

4  litigation work that they had done.  And so it was obvious

5  that this was a very -- a highly-litigious situation.

6  Q   In addition to speaking with the various constituents, did

7  you do any diligence on your own to try to understand the case

8  before you accepted the appointment?

9  A   Yes.  I went to the docket to look at all the -- not every

10  single thing that had been filed, but to try and look at all

11  the key, relevant items that had been filed, get a better

12  understanding of what was out there.  Looked at some of the

13  initial filings of the company in terms of the, you know, the

14  creditors, to understand who the creditor base was per the

15  schedules that had been filed.  Looked at the -- some of the

16  various pleadings that had been put in place.

17  Q   Did you form a view as to the causes of the bankruptcy

18  filing?

19  A   Litigation.  That was my clear view.  This company had

20  been in litigation with multiple parties, various different

21  parties, since around 2008.  Generally, you would see

22  litigation like the types that were, you know, that were here,

23  you know, you'd litigate for a while, then you'd try and

24  settle it.

25      It did not appear to me that there was any intention on

APP. 2341

Dubel - Direct                                    272

1   the -- the Debtor to settle these litigations, but would

2   rather just continue the process and proceed forward on the

3   litigation until the very last minute.  And so it was obvious

4   that this was going to -- that the Debtor was a, as I said, a

5   highly-litigious shop, and that was one of the causes,

6   obviously, the cause of the filing, along with the fact that

7   judgments were about to be entered against the Debtor.

8   Q   All right.  And in January 2020, do you recall that's when

9   the agreement was reached between the Debtor, the Committee,

10  and Mr. Dondero?

11  A    Yeah, it was the first week or so, which resulted in a

12  hearing on I believe it was January 9th in front of Judge

13  Jernigan.

14  Q   And as a part of that -- I think you testified at that

15  hearing.  Do I have that right?

16  A   I don't recall if I did.  I might have.  I might have

17  testified at a subsequent hearing.  But --

18  Q   But was --

19  A   -- I was in the courtroom for that hearing, yes.

20  Q   Was it part of that process by which you accepted the

21  appointment as independent director?

22  A   I accepted it based upon the order that had been

23  negotiated amongst the parties, the creditors, the Debtor, Mr.

24  Dondero, and others.  And that was the key thing that was --

25  and approved by the Court on that date.  And that was key for

Dubel - Direct                                        273

1   my acceptance of the role as an independent director.

2   Q    And did you and the other prospective independent

3   directors participate in the negotiation of the substance of

4   the agreement?

5   A    We did.  We didn't have a hundred percent say over it, but

6   we were able to get our voices heard.  As Mr. Seery testified

7   earlier, he was instrumental in coming up with an idea about

8   how to put in place the injunction, you know, the -- I think

9   he referred to it as the gatekeeper injunction, which was

10  obviously in this case very critical to all three of us:  Mr.

11  Seery, Mr. Nelms, and myself.

12  Q    Can you describe for the Court kind of the issues of

13  concern to you and the other prospective board members?  What

14  was it that you were focused on in terms of the negotiations?

15  A    Well, obviously, indemnification was important, but that

16  was something that was going to be granted.  Having the right

17  to obtain separate D&O insurance just for the three directors

18  was important.  We were concerned that Strand Advisors, Inc.

19  really had no assets, and so we wanted to make sure that the

20  Debtor was going to get -- was going to basically guarantee

21  the indemnification.

22       The -- because of the litigious nature and what we had

23  heard from all of the various parties involved, including

24  people inside the Debtor who we had talked with, that it would

25  be something that was important for us to make sure that the

Dubel - Direct                                    274

1   injunction, the gatekeeper injunction was put in place.

2   Q    And can you elaborate a little bit on I think you said you

3   had done some diligence and you had formed a view as to the

4   causes of the bankruptcy filing, but did this case present any

5   specific concerns or issues that you and the board members had

6   to address perhaps above and beyond what you experienced in

7   some of the other cases you described?

8   A    Well, as I said earlier, the fact that the litigation --

9   the various litigations with the creditors have been going on

10  for what I viewed as an inordinate amount of years, and that

11  it was clear from my diligence that I had done that this had

12  been directed by Mr. Dondero, to keep this moving forward in

13  the litigation, and to, in essence, just, you know, never give

14  up on the litigation.

15       It was important that the types of protections that we

16  were afforded in the January 9th order were put in place,

17  because we -- none of us -- none of the three of us, and

18  myself in particular, did not want to be in a position where

19  we would be sued and harassed through lawsuits for the next,

20  you know, ten years or so.  That's not something anybody would

21  want to sign up for.

22  Q    All right.  Let's look at the January 9th order and the

23  specific provisions I think that you're alluding to.

24            MR. MORRIS:  Can we call up Exhibit 5Q, please?

25            THE WITNESS:  Pardon me while I put my glasses on to

Dubel - Direct                                    275

1    read this.

2            MR. MORRIS:   All right.  And if we can go to

3    Paragraph 4.

4    BY MR. MORRIS:

5    Q   Is that the paragraph, sir, that was intended to address

6    the concern that you just articulated about Strand not having

7    any assets of its own?

8    A   Yes, it is.

9    Q   And can you just describe for the Court how that

10   particular provision addressed that concern?

11   A   Sure.  Since we were directors of Strand, which is the

12   general partner of the Debtor, we felt it was important that

13   the general -- that Highland, the Debtor, would provide the

14   guaranty on indemnification, because Highland had the assets

15   to back up the indemnification.

16       It was also pretty clear, from my experience in having

17   placed D&O insurance, you know, over the last 25-30 years,

18   that if there was no, you know, opportunity for

19   indemnification, putting in place insurance would be very

20   difficult or exorbitantly expensive.  So having this

21   indemnification by Highland was a very important piece of the

22   order that we were seeking.

23   Q   And the next piece is the insurance piece in Paragraph 5.

24   Do you see that?

25   A   I do.

Dubel - Direct                                      276

1    Q    Did you have any involvement in the Debtor's efforts to

2    obtain D&O insurance for the independent board?

3    A    I did.

4    Q    Can you just describe for the Court what role you played

5    and what issues came up as the Debtor sought to obtain that

6    insurance?

7    A    Sure.  The Debtors had been looking to get an insurance

8    policy in place.  They were not able to do that.  I happen to

9    have worked with an insurance broker on D&O situations in some

10   very difficult situations over the years and brought them into

11   the mix.  They were able to go out to the market and find a

12   policy that would cover us, the -- kind of the key components

13   of that policy, though, were, number one, the guaranty that

14   HCMLP would give -- I'm sorry, the guaranty that HCMLP would

15   give to Strand's obligations, and also the -- I'll call it the

16   gatekeeper provision was very important because these parties

17   did not want to have -- they wanted to have what was referred

18   to, commonly referred to as the Dondero Exclusion.

19        So while we were -- we purchased a policy that covered us,

20   it did have an exclusion, unless there were no assets left,

21   and then the what I'll call -- we refer to as kind of a Side A

22   policy would kick in.

23   Q    Okay.  What do you mean by the Dondero Exclusion?

24   A    The insurers did not want to cover the -- any litigation

25   that Mr. Dondero would bring against directors.  It was pretty

Dubel - Direct                                          277

1   commonly known in the marketplace that Mr. Dondero was very

2   litigious, and insurers were not willing to write the

3   insurance without the protections that this order afforded

4   because they did not want to be hit with frivolous -- hit with

5   claims on the policy for frivolous litigation that might be

6   brought.

7            MR. TAYLOR:  Your Honor, this is Mr. Taylor.  I've

8   got to object to the last answer.  He testified as to what the

9   insurers' belief was and what they would or would not do based

10  upon their own knowledge.  It's not within his personal

11  knowledge.  And therefore we'd move to strike.

12           THE COURT:  I overrule that objection.

13           MR. MORRIS:  Your Honor?

14           THE COURT:  I overrule the objection.

15           MR. MORRIS:  Thank you.  Thank you, Your Honor.

16  BY MR. MORRIS:

17  Q   Mr. Dubel, can you explain to the Court, in your work in

18  trying to secure the D&O insurance, what rule the gatekeeper

19  provision played in the Debtor's ability to get that?

20  A   Based upon my discussions with the insurance broker, who I

21  have worked with for 25-plus years, had that gatekeeper

22  provision not been put in place, we would not have been able

23  to get insurance.

24  Q   All right.  Let's look at the gatekeeper provision.

25           MR. MORRIS:  Can we go down to Paragraph 10, please?

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/05/25   Page 368 of 790   PageID 3848

Dubel - Direct                                    278

1   Perfect.  Right there.

2   BY MR. MORRIS:

3   Q    Is this gatekeeper provision, is this also the source of

4   the exculpation that you referred to?

5   A    Yes.

6   Q    And what's your understanding of how the exculpation and

7   gatekeeper functions together?

8   A    Well, my apologies, I'm not an attorney, so just from a

9   business point of view, the way I look at this is that, you

10  know, obviously, we're -- you know, the directors are not

11  protected from willful misconduct or gross negligence, but any

12  negligence -- you know, claims brought under negligence and

13  the likes of such, and things that might be considered

14  frivolous, would have to first go to Your Honor in the

15  Bankruptcy Court for a review to determine if they were claims

16  that should be entitled to be brought.

17  Q    If you take a look at the provision, right, do you

18  understand that nobody can bring a claim without -- in little

19  i, it says, first determining -- without the Court first

20  determining, after notice, that such claim or cause of action

21  represents a colorable claim of willful misconduct or gross

22  negligence against an indirect -- independent director.  Do

23  you see that?

24  A    I do.

25  Q    Is it your understanding that parties can only bring

Dubel - Direct                                279

1   claims for gross negligence or willful misconduct if the Court
2   makes a determination that there is a colorable claim?
3   A    That's my understanding.
4   Q    And the second --
5   A    I think they have the right -- I think they have the right
6   to go to the Court to ask if they can bring the claim, but the
7   Court has to make the determination that it's a colorable
8   claim for willful misconduct or gross negligence.
9   Q    And if the Court -- is it your understanding that if the
10  Court doesn't find that there is a colorable claim of willful
11  misconduct or gross negligence, then the claim can't be
12  brought against the independent directors?
13  A    That is my understanding, yes.
14  Q    And was -- taken together, Paragraphs 4, 5, and 10, were
15  they of importance to you and the other independent directors
16  before accepting the position?
17  A    They were absolutely critical to me and definitely
18  critical to the other directors, because we all negotiated
19  that together, and it would -- I don't -- I don't think any of
20  the three of us would have taken on this role if those
21  paragraphs had not been included in the order.
22  Q    Okay.  Just speaking for yourself personally, is there any
23  chance you would have accepted the appointment without all
24  three of those provisions?
25  A    I would not have.

Dubel - Direct                                    280

1    Q    And why is that?  In this particular case, why did you

2    personally believe that you needed all three of those

3    provisions?

4    A    Well, you know, people like myself, you know, someone

5    who's coming in as an independent director, come in in a

6    fiduciary capacity.  And, you know, we take on risks.  Now,

7    granted, in a Chapter 11 case, as the saying goes, you know,

8    it's a lot safer because everything has to be approved by the

9    Court, but there are still opportunities for parties to, in

10   essence, have mischief going on and bring nuisance lawsuits

11   that would take a lot of time and effort away from either the

12   role of our job of restructuring the entity or post-

13   restructuring, would just be nuisance things that would cost

14   us money.  And we, you know, I did not want to be involved in

15   that situation, knowing the litigious nature of Mr. Dondero

16   from the research that I had done, you know, the diligence

17   that I had done.  I did not want to subject myself to that.

18   And it has proven an appropriate and very solid order because

19   of the conduct of Mr. Dondero, as Mr. Seery has testified to

20   earlier.

21   Q    Do you have a view as to what the likely effect would be

22   on future corporate restructurings if you and your fellow

23   directors weren't able to obtain the type of protection

24   afforded in the January 9th order?

25   A    I think it would be very difficult to find qualified

Dubel - Direct                                    281

 1   people who would be willing to serve in these types of
 2   positions if they knew they had a target on their backs.  You
 3   know, it was something that was clear to us, to Mr. Seery, Mr.
 4   Nelms, myself at the time, that if we had a target -- we felt
 5   like we would have a target on our back if we didn't have
 6   these protections.
 7       It just wasn't worth the risk, the stress, the
 8   uncertainty, the potential cost to us.  And so I don't think
 9   anybody else would be, you know, willing to take on the roles
10   as an independent director with the facts and circumstances
11   and the players involved in this particular case.
12           MR. MORRIS:  I have no further questions, Your Honor.
13           THE COURT:  All right.  Pass the witness.  Let's see.
14   You went -- I'm going to give a time.  You went 32 minutes.
15   So, for cross of this witness, I'm going to limit it to an
16   aggregate of 32 minutes.  Who wants to go first?
17           MR. DRAPER:  Your Honor, this is Douglas Draper.
18   I'll be happy to go first.
19           THE COURT:  All right.
20                       CROSS-EXAMINATION
21   BY MR. DRAPER:
22   Q   Mr. Dubel, prior to your engagement, did you happen to
23   read the case of *Pacific Lumber*?
24   A   I did not.
25   Q   And were you advised about *Pacific Lumber* by somebody

Dubel - Cross                                      282

 1   other than a -- your lawyer?

 2   A   I'm not familiar with the case at all, Mr. Draper.

 3   Q   Are you aware, and you've been around a long time, that

 4   different circuits have different rules for liabilities of

 5   officers, directors, and people like that?

 6   A   I am aware that there are different, I don't know what the

 7   right term is, but precedents, I guess, in different circuits

 8   for any number of things, whether it's a sale motion or

 9   protections of officers and directors or anything.  So each

10   circuit has its own unique situations.

11   Q   And one last question.  On a go-forward, after -- if this

12   plan is confirmed and on the effective date, you will not have

13   any role whatsoever as an officer or director of the new

14   general partner, correct?

15   A   I have not been asked to.  As Mr. Seery testified, he may

16   ask for assistance or just -- in most situations that I'm

17   involved with, I may have a continuing role just as a -- I'll

18   call it an advisor or somebody to provide a history.  But at

19   this point in time, I have not been asked to have any

20   involvement.

21   Q   And based on your experience, you know that there's a

22   different liability for a director and an officer versus

23   somebody who is an advisor?

24        MR. MORRIS:  Objection to the form of the question.

25   No foundation.

Dubel - Cross                                  283

1           THE COURT:  Overruled.

2           MR. DRAPER:  Mr. Dubel has shown --

3           THE COURT:  Mr. Dubel, you can answer if you know.

4           MR. DRAPER:  Mr. Dubel, you can answer.

5           THE WITNESS:  I'm sorry, Your Honor, I didn't hear

6  you say overruled.  Thank you.

7       Mr. Draper, I apologize, could you repeat the question?

8  BY MR. DRAPER:

9  Q    The question is you know from your experience that there's

10 a different liability for somebody who is an officer or

11 director versus somebody who's an advisor?

12 A    Yes, that's my experience, which is why in several

13 situations post-reorganization, while I have not been involved

14 *per se*, and I use the term involved meaning, you know, on a

15 day-to-day basis, if someone asks me to assist, I'll usually

16 ask them to bring me in as a non -- an unpaid employee or a,

17 you know, a nominally-amount-paid employee, so that I would be

18 protected by whatever protections the company might provide.

19          MR. DRAPER:  I have nothing further for this witness,

20 Your Honor.

21          THE COURT:  All right.  Other cross?

22          MR. TAYLOR:  Yes, Your Honor.

23          MR. RUKAVINA:  Yes, Your Honor.

24          MR. TAYLOR:  Oh, go ahead, Davor.

25          MR. RUKAVINA:  No, Clay, go ahead.

Dubel - Cross                                                    284

1                         CROSS-EXAMINATION

2    BY MR. TAYLOR:

3    Q    Mr. Dubel, this is Clay Taylor here on behalf on Mr.

4    Dondero.  I believe you had previously testified in response

5    to questions from Mr. Morris that Mr. Dondero had engaged in a

6    pattern of litigious behavior; is that correct?

7    A    I believe that's the testimony I gave, yes.

8    Q    Okay.  And please give me the specific examples of which

9    cases you believe he has engaged in overly-litigious behavior.

10   A    Well, all of the cases that resulted in creditors, large

11   creditors in our bankruptcy.  That would be the UBS situation,

12   the Crusader situation which became the Redeemer Committee,

13   litigation with Mr. Daugherty, with Acis and Mr. Terry.  And

14   as I mentioned earlier, I'd, you know, been informed by

15   members of the management team that it was Mr. Dondero's style

16   to just litigate until the very end to try and grind people

17   down.

18   Q    Okay.  Was Mr. Dondero or a Highland entity the plaintiff

19   in the UBS case?

20   A    No, but what was referred -- what I was referring to was

21   the nature in which he defended it and went overboard and

22   refused to ever, you know, try and settle things in a manner

23   that would have gotten things done.  And just looking at,

24   having been involved in the restructuring industry for the

25   last 40 years, as I said, almost 40 years, and been involved

APP. 2354

Dubel - Cross                                    285

1    in many, many litigious situations, it's obvious when someone

2    is litigious, whether they're the plaintiff or the defendant.

3    Q    So are you personally familiar with the settlement

4    negotiations in the UBS case that happened pre-bankruptcy,

5    then?

6    A    I have been informed that there were settlement

7    negotiations, and subsequently determined, through discussions

8    with the parties, that they weren't really close to -- to a

9    settlement.

10   Q    But are you aware of --

11   A    Mr. Dondero might have thought they were, but they were

12   not.

13   Q    Okay.  Would you be surprised to learn if UBS had offered

14   to settle pre-bankruptcy for $7 million?

15   A    As I understand, settlements -- settlement offers pre-

16   bankruptcy had a tremendous number of -- I don't know what the

17   right term is -- things tied to it and that clearly were never

18   going to get done.

19   Q    Okay.  When you say things were tied to it, what things

20   were tied to it?

21   A    I don't know all of the settlement discussions that took

22   place, but what I was informed was that there were a lot of

23   conditions that were included in that.  And it's -- if it had

24   been an offer of $7 million and Mr. Dondero didn't settle for

25   that, there must have been a reason why.  So, you know, since

Dubel - Cross                                      286

1   the entities -- all of the entities within the Highland

2   Capital empire, if you'd call it that, were being sued for

3   almost a billion dollars.

4   Q    Okay.  And you say there was lots of conditions that were

5   tied to that.  What were the conditions?

6   A    As I said earlier, I wasn't informed of them on all the

7   prepetition settlements.  That's just what I was told, there

8   was conditions.

9   Q    Okay.  And who were you told these things by?

10  A    Both external counsel and internal counsel.  Mr.

11  Ellington, Scott Ellington, and Isaac -- the litigation

12  counsel.

13  Q    Okay.  So --

14  A    That's -- sorry.

15  Q    Okay.  In each of these cases, you were informed by your

16  views by statements that were made to you by other people?

17  A    Yes.

18  Q    Okay.

19  A    Made -- and particularly made by members of management of

20  the Debtor, which is pretty informed.

21  Q    Okay.  Which members of management were those?

22  A    As I just testified, it was Mr. Ellington, who was the

23  general -- the Debtor's general counsel, and Mr. Leventon,

24  Isaac Leventon, who was the -- I believe his title was

25  associate general counsel in charge of litigation.

Dubel - Cross                                287

1   Q    Okay.  Thank you.

2             MR. TAYLOR:  No further questions.

3             THE COURT:  All right.  Mr. Rukavina?

4                      CROSS-EXAMINATION

5   BY MR. RUKAVINA:

6   Q    Mr. Dubel, we've never met, although I think we were on

7   the phone once together.  I know you're a director, so you're

8   at the top, but having been in this case for more than a year,

9   you probably have some understanding of the assets that the

10  Debtor has, don't you?

11  A    I do, but I'm not as facile with it as Mr. Seery,

12  obviously.

13  Q    Sure.  Is it true, to your understanding, that the Debtor

14  owns various equity interests in third-party companies?

15  A    Either directly or indirectly.  That's my understanding,

16  yes.

17  Q    Okay.  Have you heard of an entity called Highland Select

18  Equity Fund, LP?

19  A    I have.

20  Q    And is that a publicly-traded company?

21  A    I'm not familiar with its nature there, no.

22  Q    Do you know how much of the equity of that entity the

23  Debtor owns?

24  A    I don't know off the top of my head, no.

25  Q    And again, these may be unfair questions because you're at

Dubel - Cross                                    288

1   the top, so I'm not trying to make you look foolish.  I'm just

2   trying to see.  Let me ask one more.  Have you heard of

3   Wright, W-R-I-G-H-T, Limited?

4           MR. MORRIS:  Objection, Your Honor.  Beyond the

5   scope.

6           MR. RUKAVINA:  Your Honor, I can recall him on my

7   direct, then.

8           THE COURT:  Yeah.  I'll --

9           MR. RUKAVINA:  But I'd just rather get it over with.

10          THE COURT:  I'll allow it.

11          MR. MORRIS:  All right.  If we're going to get rid of

12  --

13          THE COURT:  Overruled.

14          MR. MORRIS:  No, that's fine.

15  BY MR. RUKAVINA:

16  Q   Have you heard of Wright, W-R-I-G-H-T, Limited?

17  A   I think I have, but I just don't recall it, Mr. Rukavina.

18  I'm sorry, Rukavina.  Sorry.

19  Q   It's okay.  It's a --

20  A   I'm looking at your chart here, at your name here, and it

21  looks like Drukavina, so I really apologize.

22  Q   Believe it or not, it's actually a very famous name in

23  Croatia, although it means nothing here.

24      So, all of the entities that the Debtor owns equity in, I

25  guess you probably, just because, again, you're not in the

1   weeds, you can't tell us how much of that equity the Debtor

2   owns, can you?

3   A    I can't individually, no.  You know, Mr. Seery is our CEO

4   and he's responsible for the day-to-day, you know, issues.  So

5   usually we look at it more on a consolidated basis and not in

6   the, you know, down in the weeds, as you refer to it, unless

7   something specific came up.

8   Q    Well, would you remember whether, when Mr. Seery or the

9   prior CRO would provide you, as the board member, financial

10  reports, whether that included P&Ls and balance sheets and

11  financial reports for the entities that the Debtor owned

12  interests in?

13  A    We might -- we would have seen certain consolidating

14  reports that might -- that would be, you know, consolidating

15  financial statements that would be P&Ls.  Where we didn't

16  consolidate them, I'm not sure we saw the actual individual-

17  entity P&Ls on a regular basis.  We might have seen them if

18  there was a transaction taking place.  But again, you know, I

19  don't have -- I don't remember every single one of them, no.

20  Q    And you would agree with me, sir, that the Pachulski law

21  firm is an excellent restructuring, reorganization, insolvency

22  law firm, wouldn't you?

23  A    Yes, I would agree with you there.

24  Q    Okay.  And you would expect them to ensure that anything

25  that has to be filed with Her Honor is timely filed, wouldn't

Dubel - Cross                                        290

1    you?

2    A    I would expect that they would follow the rules.

3    Q    Okay.  And you have the utmost of confidence, I take it,

4    in your CRO, don't you?

5    A    I have a tremendous amount of confidence in our CEO, who

6    also happens to hold the title of CRO, yes, if that's what

7    you're referring to as, Mr. Seery.

8         (Interruption.)

9              MR. RUKAVINA:  John.

10   BY MR. RUKAVINA:

11   Q    Okay, I think -- yeah, I think I heard that you have

12   tremendous confidence in the CEO, who happens to be the CRO,

13   right?

14   A    Yes, that's the case.

15             MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

16   witness.

17             THE COURT:  All right.  Any other cross of Mr. Dubel?

18        All right.  Mr. Morris, redirect?

19             MR. MORRIS:  Yeah, just very briefly, Your Honor.

20                        REDIRECT EXAMINATION

21   BY MR. MORRIS:

22   Q    You were asked about that *Pacific Lumber* case, Mr. Dubel;

23   do you remember that?

24   A    I do remember being asked about it.

25   Q    And you weren't familiar with that case, right?

Dubel - Redirect                         291

1    A    I'm not familiar with the name of the case, no.

2    Q    But you did know that the exculpation and gatekeeping

3    provisions were going to be included in the order; is that

4    fair?

5    A    I did.

6    Q    And did you testify that you wouldn't have accepted the

7    position without it?

8    A    I did testify that way.

9    Q    And if you knew that you couldn't get those provisions in

10   the Fifth Circuit, would you ever accept a position as an

11   independent director in the Fifth Circuit on a go-forward

12   basis?

13   A    Not in a situation such as this, no.

14   Q    Okay.  Okay.

15         MR. MORRIS:  No further questions, Your Honor.

16         THE COURT:  All right.  Any recross on that narrow

17   redirect?

18       All right.  Well, Mr. Dubel, you are excused from the

19   virtual witness stand.

20         THE WITNESS:  Thank you, Your Honor.

21         THE COURT:  All right.  I want to go ahead and --

22         MR. DUBEL:  Do you mind if I turn my video off?

23         THE COURT:  I'm sorry, what?

24         MR. DUBEL:  I said, do you mind if I turn my video

25   off?

292

1        THE COURT:  No, you may.  That's fine.

2        MR. DUBEL:  Thank you, Your Honor.

3        THE COURT:  All right.  I want to break now, unless

4   there's any quick housekeeping matter.  Anything?

5        MR. MORRIS:  No, Your Honor, but I would just ask

6   all parties to let me know by email if they have any

7   objections to any of the exhibits on the witness list that was

8   filed at Docket No. 1877, because I want to begin tomorrow by

9   putting into evidence the balance of our exhibits.

10        MR. RUKAVINA:  And Your Honor, I was responsible for

11   this due to an internal mistake.  The only ones I have an

12   objection to are -- is that 7?  John, is that 7, right, 7OO --

13        MR. MORRIS:  Yes.

14        MR. RUKAVINA:  Your Honor, I only have an objection

15   to 7O and 7P, although I think -- think the Court has already

16   admitted 7P, so my objection is moot.

17        THE COURT:  I have.

18        MR. RUKAVINA:  Okay.

19        THE COURT:  So, what --

20        MR. RUKAVINA:  Then it would just be --

21        THE COURT:  Go ahead.

22        MR. RUKAVINA:  I'm sorry.  It would just be 7O.

23   Septuple O or whatever the word is.

24        THE COURT:  All right.  So I will go ahead and admit

25   7F through 7Q, with the exception of 7O.  Again, these appear

APP. 3302

293

1   at Docket Entry 1877.  And Mr. Morris, you can try to get in

2   7O the old-fashioned way if you want to.

3           MR. MORRIS:  Yeah, I'll deal with 7O and the very

4   limited number of other objections at the beginning of

5   tomorrow's hearing.

6           THE COURT:  All right.

7       (Debtor's Exhibits 7F through 7Q, with the exception of

8   7O, are received into evidence.)

9           THE COURT:  So we will reconvene at 9:30 Central time

10  tomorrow.  I think we're going to hear from the Aon, the D&O

11  broker, Mr. Tauber; is that correct?

12          MR. MORRIS:  That's right.  And that should be

13  shorter than even Mr. Dubel.

14          THE COURT:  All right.  Well, we will see you at 9:30

15  in the morning.  We are in recess.

16          MR. MORRIS:  Thank you so much.

17          THE CLERK:  All rise.

18      (Proceedings concluded at 5:09 p.m.)

19                          --oOo--

20                        CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        **02/04/2021**

24  _____        _____

    Kathy Rehling, CETD-444                         Date
25  Certified Electronic Court Transcriber

```
                                                        294

 1                                INDEX

 2   PROCEEDINGS                                           5

 3   OPENING STATEMENTS

 4   - By Mr. Pomerantz                                   12
     - By Mr. Kathman                                     29
 5   - By Mr. Clemente                                    33
     - By Mr. Draper                                      40
 6   - By Mr. Rukavina                                    42
     - By Mr. Taylor                                      44
 7   - By Mr. Kathman                                     49
     - By Ms. Drawhorn                                    50
 8
     WITNESSES
 9
     Debtor's Witnesses
10
     James P. Seery
11   - Direct Examination by Mr. Morris                   58
     - Cross-Examination by Mr. Rukavina                 169
12   - Cross-Examination by Mr. Taylor                   212
     - Cross-Examination by Mr. Draper                   233
13   - Redirect Examination by Mr. Morris                236
     - Recross-Examination by Mr. Rukavina               249
14   - Recross-Examination by Mr. Taylor                 255

15
     John S. Dubel
16   - Direct Examination by Mr. Morris                  261
     - Cross-Examination by Mr. Draper                   281
17   - Cross-Examination by Mr. Taylor                   284
     - Cross-Examination by Mr. Rukavina                 287
18   - Redirect Examination by Mr. Morris                290

19
     EXHIBITS
20
     Debtor's Docket 1822 Exhibits              Received  55
21      (exclusive of Exhibits B, D, E, 4D, 4E, 4G,
         5T, 6R, 6S, 6T, and 6U)
22   Debtor's Docket 1866 Exhibits              Received  56
     Debtors' Exhibits 7F through 7Q (exclusive of   Received 293
23      Exhibit 7O)
     Debtor's Exhibit 7P                        Received 140
24   Debtor's Exhibit 7Q                        Received  75

25
```

APP. 2364

295

INDEX
Page 2

RULINGS

Confirmation Hearing [1808] - *Continued to 2/3/2021*          293

Agreed Motion to (1) Assume Non-Residential Real Property     293
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624] -
*Continued to 2/3/2021*

END OF PROCEEDINGS                                            293

INDEX                                                    294-295

# EXHIBIT 24

# EXHIBIT N

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Filed 03/23/25    Page 387 of 790    PageID 3867
                                    Main Document    Page 2675 of 2728
Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 2 of
                                        36

EXECUTION COPY

## SERVICING AGREEMENT

This Servicing Agreement, dated as of December 21, 2006 is entered into by and among BRENTWOOD CLO, LTD., an exempted company incorporated under the laws of the Cayman Islands, with its registered office located at the offices of Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as servicer ("Highland" or, in such capacity, the "Servicer").

WITNESSETH:

WHEREAS, the Issuer and BRENTWOOD CLO, CORP. (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") intend to issue U.S.$388,700,000 of their Class A-1A Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-1A Notes"), U.S.$75,000,000 of their Class A-1B Delayed Drawdown Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-1B Notes" and, together with the Class A-1A Notes, the "Class A-1 Notes"), U.S.$51,500,000 of their Class A-2 Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-2 Notes" and, together with the Class A-1 Notes, the "Class A Notes"), U.S.$68,000,000 of their Class B Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class B Notes"), U.S.$23,800,000 of their Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class C Notes" and, together with the Class A Notes and the Class B Notes, the "Senior Notes") and the Issuer will issue U.S.$21,000,000 of the Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class D Notes" and, together with the Senior Notes, the "Notes") pursuant to the Indenture dated as of December 21, 2006 (the "Indenture"), among the Co-Issuers and Investors Bank & Trust Company, as trustee (the "Trustee") and 34,400 Class I Preference Shares, $0.01 par value (the "Class I Preference Shares"), 37,000 Class II Preference Shares, $0.01 par value, (the "Class II Preference Shares" and, together with the Class I Preference Shares, the "Preference Shares" and, together with the Notes, the "Securities") pursuant to the Preference Share Documents;

WHEREAS, pursuant to the Indenture, the Issuer intends to pledge certain Collateral Obligations, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Servicing Agreement, pursuant to which the Servicer agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral in the manner and on the terms set forth herein; and

WHEREAS, the Servicer has the capacity to provide the services required hereby and is prepared to perform such services upon the terms and conditions set forth herein.

OHS West:260124435.7

003140    APP 3867

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5-5    Filed 08/08/25    Page 388 of 790    PageID 3868
Main Document    Page 387 of 789

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 3 of
36

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.    Definitions.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"Advisers Act" shall mean the Investment Advisers Act of 1940, as amended.

"Agreement" shall mean this Servicing Agreement, as amended from time to time.

"Governing Instruments" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"HFP" shall mean collectively, Highland Financial Partners, L.P. and any subsidiary thereof.

"Independent Advisor" shall have the meaning specified in Section IV.B. of Annex 1 hereto.

"Offering Memorandum" shall mean the Offering Memorandum of the Issuer dated December 21, 2006 prepared in connection with the offering of the Securities.

"Servicer Breaches" shall have the meaning specified in Section 10(a).

"Special Procedures Obligation" shall have the meaning specified in Section IV.A. of Annex 1 hereto.

2.    General Duties of the Servicer.

(a)    The Servicer shall provide services to the Issuer as follows:

(i)    Subject to and in accordance with the terms of this Agreement and the other Transaction Documents, the Servicer shall supervise and direct the administration, acquisition and disposition of the Collateral, and shall perform on behalf of the Issuer those duties and obligations of the Servicer required by the Indenture and the other Transaction Documents, and including the furnishing of Orders, Requests and officer's certificates, and such certifications as are required of the Servicer under the Indenture with respect to permitted purchases and sales of the Collateral Obligations, Eligible Investments and other assets, and other matters, and, to the extent necessary or appropriate to perform such duties, the Servicer shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto.  The Servicer shall, subject to the terms and conditions of this Agreement and the other Transaction Documents, perform its obligations hereunder and thereunder with reasonable care, using a degree of skill and attention no less than that which the Servicer exercises with respect to comparable assets that it services or manages for others having similar objectives and restrictions, and in a manner consistent with

003141    APP. 2368

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 6-5    Filed 08/08/25    Page 389 of 790    PageID 3869
Main Document    Page 2372 of 2732

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 4 of
36

practices and procedures followed by institutional servicers or managers of national standing relating to assets of the nature and character of the Collateral for clients having similar objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the other Transaction Documents. To the extent not inconsistent with the foregoing, the Servicer shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder. The Servicer shall comply with all terms and conditions of the other Transaction Documents affecting the duties and functions to be performed hereunder. The Servicer shall not be bound to follow any amendment to any Transaction Document until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided, however, that the Servicer shall not be bound by any amendment to any Transaction Document that affects the rights, powers, obligations or duties of the Servicer unless the Servicer shall have consented thereto in writing. The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, powers, obligations or duties of the Servicer or (y) affects the amount or priority of any fees payable to the Servicer to become effective unless the Servicer has been given prior written notice of such amendment and consented thereto in writing;

(ii)    the Servicer shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the Collateral criteria set forth herein and in the Indenture;

(iii)    the Servicer shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture and any Hedge Agreement, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture; the Servicer shall undertake to determine to the extent reasonably practicable whether a Collateral Interest has become an Defaulted Collateral Obligation; and the Servicer shall monitor any Hedge Agreements and direct the Trustee on behalf of the Issuer in respect of all actions to be taken thereunder by the Issuer;

(iv)    the Servicer, subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee (x) to dispose of a Collateral Obligation, Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, (y) to acquire, as security for the Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Collateral, one or more substitute Collateral Obligations or Eligible Investments, or (z) direct the Trustee to take the following actions with respect to a Collateral Obligations or Eligible Investment:

(1)    retain such Collateral Obligations or Eligible Investment; or

(2)    dispose of such Collateral Obligations or Eligible Investment in the open market or otherwise; or

(3)    if applicable, tender such Collateral Obligations or Eligible Investment pursuant to an Offer; or

003142    APP. 2389

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 6-5   Filed 08/08/25   Page 390 of 790   PageID 3870
Main Document   Page 389 of 789

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 5 of
36

(4)     if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(5)     retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer; or

(6)     waive any default with respect to any Defaulted Collateral Obligations; or

(7)     vote to accelerate the maturity of any Defaulted Collateral Obligations; or

(8)     exercise any other rights or remedies with respect to such Collateral Obligations or Eligible Investment as provided in the related Underlying Instruments, including in connection with any workout situations, or take any other action consistent with the terms of the Indenture which is in the best interests of the Holders of the Securities;

(v)     subject to and in accordance with the terms of this Agreement and the Transaction Documents, the Servicer on behalf of the Issuer shall determine whether to enter into any additional hedging arrangements, increase or reduce the notional amounts of existing Hedge Agreements or terminate existing Hedge Agreements, and the Servicer shall use its reasonable efforts to cause the Issuer, promptly following the early termination of a Hedge Agreement (other than on a Redemption Date) and to the extent possible through application of funds received as a result of the early termination (including the proceeds of the liquidation of any collateral pledged by the hedge counterparty), to enter into a replacement Hedge Agreement

(vi)     the Servicer shall (a) on or prior to any day which is a Redemption Date, direct the Trustee to enter into contracts to dispose of the Collateral Obligation and any other Collateral pursuant to the Indenture and otherwise comply with all redemption procedures and certification requirements in the Indenture in order to allow the Trustee to effect such redemption and (b) conduct Auctions in accordance with the terms of the Indenture; and

(vii)     if the Servicer, on behalf of the Issuer, desires to make distributions of Eligible Equity Securities on any Payment Date pursuant to Section 2(e) of the Preference Shares Paying Agency Agreement, the Servicer shall so notify the Trustee and the Preference Shares Paying Agent and provide the Trustee and the Preference Shares Paying Agent (for forwarding to each Holder of the Preference Shares with respect to the applicable Record Date) details of such Eligible Equity Securities in accordance with the procedure set forth in Section 3(b) of the Preference Shares Paying Agency Agreement.

(b)     In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to

003143   APP. 2679

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-5   Filed 08/05/25   Page 391 of 790   PageID 3871
Main Document   Page 23 of 72

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 6 of
36

the Notes or the Preference Shares.  The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

        (c)       The Servicer hereby agrees to the following:

        (i)       The Servicer agrees not to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws of any jurisdiction until at least one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes issued under the Indenture; provided, however, that nothing in this clause (i) shall preclude, or be deemed to estop, the Servicer (A) from taking any action prior to the expiration of such period in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Servicer, or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding.  The provisions of this Section 2(c)(i) shall survive the termination of this Agreement.

        (ii) The Servicer shall cause each sale or purchase of any Collateral Obligations or Eligible Investment to be conducted on an arm's-length basis.

        (d)       The Servicer shall not act for the Issuer in any capacity except as provided in this Section 2.  In providing services hereunder, the Servicer may employ third parties, including its Affiliates, to render advice (including advice with respect to the servicing of the Collateral) and assistance; provided, however, that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.  Notwithstanding any other provision of this Agreement, the Servicer shall not be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

        (e)       Notwithstanding any other provision of this Agreement or the Indenture, (i) any granted signatory powers or authority granted to the Servicer on behalf of the Issuer with respect to the Special Procedures Obligations shall be conditioned upon the prior written approval of the Independent Advisor and (ii) neither the Servicer nor any Affiliate of the Servicer shall have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to the Special Procedures Obligations without the prior written approval of the Independent Advisor.

003144
APP 2871

3. <u>Brokerage</u>.

The Servicer shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Servicer may take into consideration research and other brokerage services furnished to the Servicer or its Affiliates by brokers and dealers which are not Affiliates of the Servicer. Such services may be used by the Servicer or its Affiliates in connection with its other servicing or advisory activities or operations. The Servicer may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts serviced or managed by Servicer or with accounts of the Affiliates of the Servicer, if in the Servicer's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Collateral Obligation or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Servicer (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner and consistent with its obligations hereunder and under applicable law.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Servicer may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Collateral Obligations or other Collateral to, the Placement Agent, the Trustee or any of their respective Affiliates, or any other firm.

4. <u>Additional Activities of the Servicer</u>.

Nothing herein shall prevent the Servicer or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Holders of the Securities, or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Servicer and partners, directors, officers, employees and agents of the Servicer or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a) serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and the Interest Coverage Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof;

(b) receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and the Interest Coverage Test; and <u>provided</u>, <u>further</u> that if any portion of such services are related to the purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be applied to the purchase price of such obligations; and

003145 APP 2872

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5 Filed 08/28/25   Page 393 of 790   PageID 3873
Main Document   Page 2376 of 2732

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 8 of
36

(c)      be a secured or unsecured creditor of, or hold an equity interest in, the
Issuer, its Affiliates or any issuer of any obligation included in the Collateral; provided, that in the
reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the
enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio
and the Interest Coverage Test; provided, further, that nothing in this paragraph shall be deemed to limit
the duties of the Servicer set forth in Section 2 hereof.

It is understood that the Servicer and any of its Affiliates may engage in any other
business and furnish servicing, investment management and advisory services to others, including
Persons which may have policies similar to those followed by the Servicer with respect to the Collateral
and which may own securities of the same class, or which are the same type, as the Collateral Obligations
or other securities of the issuers of Collateral Obligations. The Servicer shall be free, in its sole discretion,
to make recommendations to others, or effect transactions on behalf of itself or for others, which may be
the same as or different from those effected with respect to the Collateral.

Unless the Servicer determines in its reasonable judgment that such purchase or sale is
appropriate, the Servicer may refrain from directing the purchase or sale hereunder of securities issued by
(i) Persons of which the Servicer, its Affiliates or any of its or their officers, directors or employees are
directors or officers, (ii) Persons for which the Servicer or its Affiliate act as financial adviser or
underwriter or (iii) Persons about which the Servicer or any of its Affiliates have information which the
Servicer deems confidential or non-public or otherwise might prohibit it from trading such securities in
accordance with applicable law. The Servicer shall not be obligated to have or pursue any particular
strategy or opportunity with respect to the Collateral.

5.      Conflicts of Interest.

(a)      The Servicer shall not direct the Trustee to acquire an obligation to be
included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to
the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer
such information relating to such acquisition or sale as it may reasonably require and shall have approved
such acquisition, which approval shall not be unreasonably withheld, (ii) in the reasonable, good faith
judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a
transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii)
such transaction is permitted by the Advisers Act.

(b)      The Servicer shall not direct the Trustee to acquire an obligation to be
included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer
or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for
which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the
reasonable, good faith judgment of the Servicer, on terms no less favorable than would be obtained in a
transaction conducted on an arm's length basis between third parties unaffiliated with each other and
(ii) permitted by the Advisers Act.

(c)      The Servicer shall not undertake any transaction described in this
Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and the Code.
In addition, after the initial distribution of the Class D Notes and the Preference Shares, neither the
Servicer nor any of its affiliates (as defined in the Plan Asset Regulation) shall acquire any Class D Notes
or Preference Shares (including pursuant to the Extension Procedure or the Amendment Buy-Out Option)
unless such acquisition would not, as determined by the Trustee in reliance on representations made in the
applicable transfer certificates with respect thereto, result in persons that have represented that they are
Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of any of the Class D

003146
APP 2373

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Filed 08/05/25   Page 394 of 790   PageID 3874
Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 9 of
36

Notes, the Class I Preference Shares or the Class II Preference Shares immediately after such acquisition (determined in accordance with Section 3(42) of ERISA, the Plan Asset Regulation, the Indenture and the Preference Share Documents). The Class D Notes and the Preference Shares held as principal by the Servicer or any of its affiliates shall be disregarded and shall not be treated as outstanding for purposes of determining compliance with such 25% limitation to the extent that such person has represented that it is not a Benefit Plan Investor.

6.   Records; Confidentiality.

The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Holders of the Securities and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice. At no time shall the Servicer make a public announcement concerning the issuance of the Notes or the Preference Shares, the Servicer's role hereunder or any other aspect of the transactions contemplated by this Agreement and the other Transaction Documents. The Servicer shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of any class of Securities, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Servicer, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Servicer on a non-confidential basis, provided, that the Servicer does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto. For purposes of this Section 6, the Trustee, the Collateral Administrator and the Holders of the Securities shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Servicer, the Co-Issuers, the Trustee and the Holders of the Securities (and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

7.   Obligations of Servicer.

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Servicer shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Servicer to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's or the Co-Issuer's respective governing instruments, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement

003147   APP 2874

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 08/28/25   Page 395 of 790   PageID 3875
Main Document   Page 263 of 272

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 10 of
36

contemplated by the Indenture or (f) not be permitted by Annex 1 hereto and would subject the Issuer to U.S. federal or state income or franchise taxation or cause the Issuer to be engaged in a trade or business in the United States for U.S. federal income tax purposes. The Servicer covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

8.   <u>Compensation</u>.

(a)   The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such amounts and at such times as set forth in the Indenture. The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer. If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable with accrued interest on such later Payment Date on which funds are available therefor as provided in the Indenture.

The Servicer hereby agrees to waive the Class II Preference Share Portion of the Servicing Fees deposited by the Trustee into the Class II Preference Share Special Payment Account pursuant to the Indenture, which would otherwise be payable to the Servicer as Servicing Fees, on each Payment Date until February 3, 2008. After February 3, 2008, the Servicer may, in its sole discretion, at any time waive the Class II Preference Share Portion of its Servicing Fees then due and payable, in which event an amount equal to such waived portion will be paid by the Issuer as Class II Preference Share Special Payments pursuant to the Indenture. For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion: (i) waive all or any portion of the Servicing Fee, any funds representing the waived Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments; or (ii) defer all or any portion of the Servicing Fee, any funds representing the deferred Servicing Fees to be retained in the Collection Account, when they will become payable in the same manner and priority as their original characterization would have required unless deferred again.

(b)   The Servicer shall be responsible for the ordinary expenses incurred in the performance of its obligations under this Agreement, the Indenture and the other Transaction Documents; <u>provided</u>, <u>however</u>, that any extraordinary expenses incurred by the Servicer in the performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee and the accountants appointed by the Issuer, the reasonable expenses incurred by the Servicer to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Collateral Obligations or other unusual matters arising in the performance of its duties under this Agreement and the Indenture, any reasonable expenses incurred by the Servicer in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Servicer customarily allocates among all of the funds or portfolios that it services or manages) shall be

003148
APP 2375

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Filed 08/25/25   Page 396 of 790   PageID 3876
Main Document   Page 26 of 723

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 11 of
36

reimbursed by the Issuer to the extent funds are available therefor in accordance with and subject to the limitations contained in the Indenture.

(c)  If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Servicer shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.  Benefit of the Agreement.

The Servicer agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or the Holders of the Preference Shares, as applicable, as provided in the Indenture or the Preference Share Paying Agency Agreement, as applicable.

10.  Limits of Servicer Responsibility; Indemnification.

(a)  The Servicer assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of liability described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Servicer.  The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "Liabilities") incurred by the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, that arise out of or in connection with the performance by the Servicer of its duties under this Agreement and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement or (ii) with respect to any information included in the Offering Circular in the section entitled "The Servicer" and "Risk Factors—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Servicer" that contain any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "Servicer Breaches").  For the avoidance of doubt, the Servicer shall have no duty to independently investigate any laws not otherwise known to it in connection with its obligations under this Agreement, the Indenture and the other Transaction Documents.  The Servicer shall be deemed to have satisfied the requirements of the Indenture and this Agreement relating to not causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes (including as those requirements relate to the acquisition (including manner of acquisition), ownership, enforcement, and disposition of Collateral) to the extent the Servicer complies with the requirements set forth in Annex 1 hereto.

(b)  The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "Indemnified Parties") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses

OHS West:260124435.7                                -10-

003149
APR 2876

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 16-5   Filed 08/25/25   Page 397 of 790   PageID 3877
Main Document   Page 2380 of 2722
Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 12 of 36

(including reasonable fees and expenses of counsel) (collectively, the "Expenses") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "Actions"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with the priorities set forth in the Indenture and shall survive termination of this Agreement.

    (c)  With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Servicer, the Servicer shall cause such Indemnified Party to):

    (i)  give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

    (ii)  at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

    (iii)  at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

    (iv)  in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

    (v)  neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

    (vi)  upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such

003150   APP. 2377

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Filed 08/13/25    Page 398 of 790    PageID 3878
Main Document    Page 398 of 772

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 13 of
36

claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise. If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d)    In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e)    Notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer or the Holders of the Securities may have under any U.S. federal securities laws.

11.    No Partnership or Joint Venture.

The Issuer and the Servicer are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Servicer's relation to the Issuer shall be deemed to be that of an independent contractor.

12.    Term; Termination.

(a)    This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preference Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Holders of the Securities; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b)    Subject to Section 12(e) below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer). If the Servicer resigns, the Issuer agrees to appoint a successor Servicer to assume such duties and obligations in accordance with Section 12(e).

003151    APP. 2578

Case 19-34054-sgj11  Doc 2062  Filed 03/18/21  Entered 03/18/21 20:59:39  Desc
Case 3:25-cv-02072-S   Document 6  Filed 10/02/25   Page 399 of 790   PageID 3879
Main Document   Page 2382 of 2722

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 14 of
36

(c)     This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be registered under the provisions of the Investment Company Act, and the Issuer notifies the Servicer thereof.

(d)     If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(e) No removal or resignation of the Servicer shall be effective unless:

(i)     (A) the Issuer appoints a successor Servicer at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority (or, with respect to Class I Preference Shares held by Investors Corp. at such time, Holding Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority) other than, with respect to the Class II Preference Shares, HFP; provided that, with respect to the voting authority of Class II Preference Shares owned by HFP, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP) (each such non-excluded Preference Share, a "Voting Preference Share"), (B) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by either (x) a Super Majority of the Controlling Class of Notes (excluding any Notes held by the retiring Servicer, its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than HFP; provided that, with respect to the voting authority of Notes owned by HFP, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP and certified in writing to the Trustee by any of the "independent directors" of HFP) of HFP) (each such non-excluded Note, a "Voting Note") or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class);

(ii)     if a Majority of the Voting Preference Shares has nominated two or more successor Servicers that have been objected to pursuant to the preceding clause (i)(C) or has failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) within 60 days of the date of notice of such removal or resignation of the Servicer, (A) the Issuer appoints a successor Servicer at the written direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), (B) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by either (x) Majority of the Voting Preference Shares  or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); or

(iii)     if a Majority of the Voting Preference Shares and a Super Majority of the Controlling Class (excluding any Notes that are not Voting Notes) has

003152   APP. 2379

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 08/25/25   Page 400 of 790   PageID 3880
Main Document   Page 383 of 772

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 15 of
36

nominated two or more successor Servicers that have been objected to pursuant to the preceding clauses (i)(C) and (ii)(C) or has otherwise failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) or (ii) (C) within 120 days of the date of notice of such removal or resignation of the Servicer, (A) any Holder of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), any Holder of Voting Preference Shares or the Trustee petitions a court of competent authority to appoint a successor Servicer, (B) such court appoints a successor Servicer and (C) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture.

In addition, any successor Servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder, (ii) is legally qualified and has the capacity to act as Servicer hereunder, as successor to the Servicer under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Servicer under this Agreement and the Indenture without causing the Issuer, the Co Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor Servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor Servicer shall not cause its then current rating of any Class of Notes to be reduced or withdrawn.  No compensation payable to a successor Servicer from payments on the Collateral shall be greater than that paid to the retiring Servicer without the prior written consent of a Super Majority of the Controlling Class of Notes, a Majority of the Noteholders and a Majority of the Preference Shares.  The Issuer, the Trustee and the successor Servicer shall take such action (or cause the retiring Servicer to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Servicer, as shall be necessary to effectuate any such succession.

(f)      In the event of removal of the Servicer pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Servicer as provided under this Agreement terminate all the rights and obligations of the Servicer under this Agreement (except those that survive termination pursuant to Section 12(d) above).  Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Servicer under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor Servicer upon the appointment thereof.

13.     Delegation; Assignments.

This Agreement, and any obligations or duties of the Servicer hereunder, shall not be delegated by the Servicer, in whole or in part, except to any entity that (i) is controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) is one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability hereunder.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing

003153
APP. 2389

by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and (ii) the Rating Agency Confirmation is satisfied with respect to any such assignment. Any assignment consented to by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares shall bind the assignee hereunder in the same manner as the Servicer is bound. In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Servicer. Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares, the Servicer shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i) and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Servicer and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Servicer such documents as the Servicer shall consider reasonably necessary to effect fully such assignment. The Servicer hereby consents to the matters set forth in Article 15 of the Indenture.

14.    Termination by the Issuer for Cause.

Subject to Section 12(e) above, this Agreement shall be terminated and the Servicer shall be removed by the Issuer for cause upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below, but only if directed to do so by (1) the Trustee, acting at the direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) or (2) the Holders of a Majority of the Voting Preference Shares. For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a)    the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b)    the Servicer breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(c)    the Servicer is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Servicer in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, or the Servicer (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Servicer

003154    APP. 2581

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Filed 03/18/21    Page 402 of 790    PageID 3882
                                                                        Main Document    Page 163 of 272

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 17 of
                                                    36

or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Servicer and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Servicer without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d)     the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e)     (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Servicer shall give prompt written notice thereof to the Issuer, the Trustee and the Holders of all outstanding Notes and Preference Shares upon the Servicer's becoming aware of the occurrence of such event.

15.     Action Upon Termination.

(a)     From and after the effective date of termination of this Agreement, the Servicer shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof.  Upon the effective date of termination of this Agreement, the Servicer shall as soon as practicable:

(i)     deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral then in the custody of the Servicer; and

(ii)     deliver to the Trustee an accounting with respect to the books and records delivered to the Trustee or the successor Servicer appointed pursuant to Section 12(e) hereof.

Notwithstanding such termination, the Servicer shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Servicer in Section 16(b) hereof or from any failure of the Servicer to comply with the provisions of this Section 15.

(b)     The Servicer agrees that, notwithstanding any termination of this Agreement, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against

OHS West:260124435.7                            -16-

003155    APP. 3382

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 55   Filed 08/08/25   Page 403 of 790   PageID 3883
Main Document   Page 0336 of 2722

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 18 of 36

the Servicer or any Affiliate of the Servicer) upon receipt of appropriate indemnification and expense reimbursement.

16.   Representations and Warranties.

(a)   The Issuer hereby represents and warrants to the Servicer as follows:

(i)   The Issuer has been duly registered and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture or the Securities would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii)   The Issuer has full power and authority to execute, deliver and perform this Agreement, the other Transaction Documents and the Securities and all obligations required hereunder and thereunder and has taken all necessary action to authorize this Agreement, the other Transaction Documents and the Securities on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of this Agreement, the other Transaction Documents and the Securities and the performance of all obligations imposed upon it hereunder and thereunder.  No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the other Transaction Documents and the Securities is required by the Issuer in connection with this Agreement, the other Transaction Documents and the Securities or the execution, delivery, performance, validity or enforceability of this Agreement, the other Transaction Documents and the Securities or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against the Issuer in accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)   The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

OHS West:260124435.7                                        -17-

003156

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65    Filed 08/06/25    Page 404 of 790    PageID 3884
Main Document    Page 403 of 772

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 19 of
36

        (iv)     The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

        (v)     True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Servicer.

        The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Servicer as promptly as practicable after its adoption or execution.

        (b)     The Servicer hereby represents and warrants to the Issuer as follows:

        (i)     The Servicer is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Servicer or on the ability of the Servicer to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

        (ii)     The Servicer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the other Transaction Documents applicable to the Servicer, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and all obligations required hereunder and under the terms of the other Transaction Documents applicable to the Servicer.  No consent of any other person, including, without limitation, creditors of the Servicer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Servicer in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required hereunder or under the terms of the other Transaction Documents applicable to the Servicer.  This Agreement has been, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall be, executed and delivered by a duly authorized partner of the Servicer, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer when executed and delivered by the Servicer hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall constitute, the valid and legally binding obligations of the Servicer enforceable against the Servicer in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

003157  APP. 2384

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document    Document Filed 08/08/25    Page 405 of 790    Page 405 of 790    PageID 3885

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 20 of 36

         (iii)    The execution, delivery and performance of this Agreement and the terms of the other Transaction Documents applicable to the Servicer and the documents and instruments required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Servicer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Servicer, or the Governing Instruments of, or any securities issued by the Servicer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Servicer is a party or by which the Servicer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Servicer or its ability to perform its obligations under this Agreement and the provisions of the other Transaction Documents applicable to the Servicer, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

         (iv)    There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Servicer, threatened that, if determined adversely to the Servicer, would have a material adverse effect upon the performance by the Servicer of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

         (v)    The Servicer is a registered investment adviser under the Investment Advisers Act.

         (vi)    The Servicer is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Servicer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the provisions of the other Transaction Documents applicable to the Servicer, or the performance by the Servicer of its duties hereunder.

17.    <u>Notices</u>.

    Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

APP. 2385

003158

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 6-5    Filed 08/28/25    Page 406 of 790    PageID 3886
Main Document    Page 2385 of 2722

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 21 of
36

(a) If to the Issuer:

Brentwood CLO, Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
George Town, Grand Cayman, Cayman Islands
Telephone: (345) 945-7099
Telecopy: (345) 945-7100
Attention: The Directors

(b) If to the Servicer:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100
Telecopy: (972) 628-4147
Attention: James Dondero

(c) If to the Trustee:

Investors Bank & Trust Company
200 Claredon Street
Mailcode: EUC-108
Boston, Massachusetts 02116
Telecopy: (617 )351-4358
Attention: CDO Services – Brentwood CLO, Ltd.

(d) If to the Noteholders:

In accordance with Section 14.4 of the Indenture, at their respective addresses set forth on the Note Register.

(e) If to the Holders of the Preference Shares:

In accordance with Section 14.4 of the Indenture, to the Preference Shares Paying Agent at the address identified therein.

(f) if to the Rating Agencies:

In accordance with Section 14.3 of the Indenture, to the Rating Agencies at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

003159    APP. 2386

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 16-5    Filed 08/26/25    Page 407 of 790    PageID 3887
Main Document    Page 23 of 72

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 22 of 36

18.    Binding Nature of Agreement; Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein. The Servicer hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Servicer's obligations hereunder.

19.    Entire Agreement.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 15.1(h) of the Indenture.

20.    Conflict with the Indenture.

Subject to the last two sentences of Section 2(a)(i), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21.    Priority of Payments.

The Servicer agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22.    Governing Law.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

23.    Indulgences Not Waivers.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

003160
APP. 2387

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 6 Filed 08/26/25 Page 408 of 790   PageID 3888
Main Document   Page 23 of 27

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 23 of
36

24.   <u>Costs and Expenses</u>.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25.   <u>Titles Not to Affect Interpretation</u>.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26.   <u>Execution in Counterparts</u>.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

27.   <u>Provisions Separable</u>.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; <u>provided</u>, <u>however</u>, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28.   <u>Number and Gender</u>.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

29.   <u>Written Disclosure Statement</u>.

The Issuer and the Trustee acknowledge receipt of Part II of the Servicer's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

30.   <u>Miscellaneous</u>.

(a)   In the event that any vote is solicited with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities. In addition, with respect to any Defaulted Collateral Obligation, the Servicer, on behalf of the Issuer, may instruct the trustee for such Defaulted Collateral Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted

003161
APP. 2388

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 08/08/25   Page 409 of 790   PageID 3889
Main Document   Page 25 of 72

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 24 of
36

Collateral Obligation and any applicable law, rule or regulation in any manner permitted under the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities. In the event any Offer is made with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.

(b)      In connection with taking or omitting any action under the Indenture or this Agreement, the Servicer may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Any corporation, partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the servicing and collateral management business of the Servicer, shall be the successor to the Servicer without any further action by the Servicer, the Co-Issuers, the Trustee, the Noteholders or any other person or entity.

31.      Limitation of Liabilities.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Servicer shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby, except for any claims, losses, damages, liabilities, indemnities or other obligations caused by the gross negligence, bad faith or willful misconduct of such directors, officers, shareholders, members or incorporators of the Issuer. The obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, as applied in accordance with the Priorities of Payments pursuant to the Indenture, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive. The provisions of this section shall survive termination of this Agreement.

32.      Consent to Posting of Documents on Repository.

The Servicer hereby consents to (i) the posting of the final Offering Memorandum, the Indenture and any Hedge Agreements (collectively, the "Documents") and the periodic reports to be delivered pursuant to the Documents and any amendments or other modifications thereto on the Repository (as such term is defined in the Indenture) for use in the manner provided in the Repository; and (ii) the display of its name on the Repository in connection therewith.

003162   APP. 2389

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Filed 08/06/25   Page 410 of 790   PageID 3890
Main Document   Page 395 of 723

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 25 of
36

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date
first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
   as Servicer

By: _____
Name:            Todd Travers
Title:        Senior Portfolio Manager
           Highland Capital Management, L.P.

BRENTWOOD CLO, LTD.,
   as Issuer

By: _____
Name:
Title:

APP. 2389
003163

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 55-5   Filed 08/05/25   Page 411 of 790   PageID 3891
Main Document   Page 26 of 72

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 26 of
36

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as Servicer

By:_____
Name:
Title:

BRENTWOOD CLO, LTD.,
as Issuer

By:_____
Name:
Title:

**Chris Watler**
**Director**

APP. 2391

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65    Filed 08/06/25    Page 412 of 790    PageID 3892
Main Document    Page 26395 of 2728

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 27 of
36

**ANNEX 1**

**Certain Tax Provisions**

Unless otherwise noted, references to the Issuer in this Annex 1 include the Servicer and any other person acting on the Issuer's behalf.  Capitalized terms used but not defined herein will have the meanings ascribed to them in the Indenture.

For purposes of this Annex 1,

"Affiliate" means, with respect to a specified Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person and (b) any Person that is a member, director, officer or employee of (i) the specified Person or (ii) a Person described in clause (a) of this definition; and

"Person" means an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

Section I.    General Restrictions.

As provided in this Annex 1, the Issuer (and the Servicer acting on the Issuer's behalf) shall only purchase debt securities, interests in loans and other assets (each a "Portfolio Collateral") only in secondary-market transactions and shall not engage in any lending or underwriting activities or otherwise participate in the structuring or origination of any Portfolio Collateral.

A.    Communications and Negotiations.

1.    The Issuer will not have any communications or negotiations with the obligor of a Portfolio Collateral or a Reference Obligation (directly or indirectly through an intermediary such as the seller of such Portfolio Collateral or the Synthetic Security) in connection with the issuance or funding of such Portfolio Collateral or Reference Obligation or commitments with respect thereto, except for communications of an immaterial nature or customary due diligence communications; provided, that the Servicer may provide comments as to mistakes or inconsistencies in loan documents (including with respect to any provisions that are inconsistent with the terms and conditions of purchase of the loan by the Issuer).

2.    By way of example, permitted due diligence activities may include, but are not limited to, (a) attendance at an obligor's general "roadshow" or other presentations to investment professionals, (b) direct private discussions with personnel of the obligor, arranged by a sponsor, lead bank or other arranger, and (c) other due diligence activities of the kind customarily performed by offerees of the type of Portfolio Collateral being offered, but may not include any negotiations with the obligor, employees or agents of the obligor of any terms or conditions of the Portfolio Collateral being offered.

3.    Negotiations between the Servicer and the underwriter, placement agent or broker of a Portfolio Collateral are permitted solely to the extent that they are limited to responses to customary pre-offering period and offering period inquiries by the underwriter or placement agent (e.g., "If we offered you 10-year senior subordinated bonds of XYZ company, what spread would it require to interest you?" or "If you will not buy the bonds as offered, would you buy if

OHS West:260124435.7

003165    APP 2392

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 08/28/25   Page 413 of 790   PageID 3893
Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 28 of
36

we convinced the obligor to add a fixed charge coverage test?").  For purposes of this Section I.A., "negotiations" shall not include (i) commenting on offering documents to an unrelated underwriter or placement agent when the ability to comment was generally available to other offerees, or (ii) communicating certain objective criteria (such as the minimum yield or maturity) the Issuer generally uses in purchasing the relevant type of Portfolio Collateral.

4.      The Issuer may consent or otherwise act with respect to amendments, supplements or other modifications of the terms of any Portfolio Collateral (other than a Subsidiary Obligation (as defined in Section III)) requiring consent or action after the date on which any such Portfolio Collateral is acquired by the Issuer if (a) such amendment, supplement or modification would not constitute a Significant Modification (as defined below), (b) (i) in the reasonable judgment of the Servicer, the obligor is in financial distress and such change in terms is desirable to protect the Issuer's interest and (ii) the Portfolio Collateral is described in clause 5(b) of this Section I.A., (c) the amendment or modification would not be treated as the acquisition of a new Portfolio Collateral under paragraph 5 of this Section I.A., or (d) otherwise, if it has received advice of counsel that its involvement in such amendment, supplement or modification will not cause the Issuer to be treated as engaged in a trade or business within the United States.

A "Significant Modification" means any amendment, supplement or other modification that involves (a) a change in the stated maturity or a change in the timing of any material payment of any Portfolio Collateral (including deferral of an interest payment), that would materially alter the weighted average life of the Portfolio Collateral, (b) any change (whether positive or negative) in the yield on the Portfolio Collateral immediately prior to the modification in excess of the greater of (i) 25 basis points or (ii) 5 percent of such unmodified yield, (c) any change involving a material new extension of credit, (d) a change in the obligor of any Portfolio Collateral (as determined for purposes of section 1001 of the Code), or (e) a material change in the collateral or security for any Portfolio Collateral, including the addition or deletion of a co-obligor or guarantor that results in a material change in payment expectations.

5.      In the event the Issuer owns an interest in a Portfolio Collateral the terms of which are subsequently amended or modified, or in the case of a workout situation not described in Section III hereof, which Portfolio Collateral is subsequently exchanged for new obligations or other securities of the obligor of the Portfolio Collateral, such amendments or modifications or exchange will not be treated as the acquisition of an interest in a new Portfolio Collateral for purposes of this Annex 1, provided, that (a) the Issuer does not, directly or indirectly (through the Servicer or otherwise), seek the amendments or modifications or the exchange, or participate in negotiating the amendments or modifications or the exchange, and (b) at the time of original acquisition of the interest in the Portfolio Collateral, it was not reasonably anticipated that the terms of the Portfolio Collateral would, pursuant to a workout or other negotiation, subsequently be amended or modified.

B.      Fees.

The Issuer will not earn or receive from any Person any fee or other compensation for services, however denominated, in connection with its purchase or sale of a Portfolio Collateral or entering into a Synthetic Security; the foregoing prohibition shall not be construed to preclude the Issuer from receiving (i) commitment fees or facility maintenance fees that are received by the Issuer in connection with revolving or delayed drawdown Loans; (ii) yield maintenance and prepayment penalty fees; (iii) fees on account of the Issuer's consenting to amendments, waivers or other modifications of the terms of any items of Portfolio Collateral; (iv) fees from permitted securities lending; or (v) upfront payments in lieu of

Annex 1-2

OHS West:260124435.7

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Document 65 Filed 03/06/25 Page 414 of 790 PageID 3894
Main Document Page 413 of 723

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 29 of 36

periodic payments under a Synthetic Security. The Issuer will not provide services to any Person; the foregoing prohibition shall not be construed to preclude the Issuer from activities relating to the receipt of income described in (i) through (v) of the preceding sentence.

Section II.     <u>Loans and Forward Purchase Commitments</u>.

A.      Any understanding or commitment to purchase a loan, a participation, a loan subparticipation or a collateralized loan obligation (collectively, "<u>Loans</u>") from a seller before completion of the closing and full funding of the Loan by such seller shall only be made pursuant to a forward sale agreement at an agreed price (stated as a dollar amount or as a percentage) (a "<u>Forward Purchase Commitment</u>"), unless such understanding or commitment is not legally binding and neither the Issuer nor the Servicer is economically compelled (e.g., would otherwise be subject to a significant monetary penalty) to purchase the Loan following the completion of the closing and full funding of the Loan (i.e., the Servicer will make an independent decision whether to purchase such Loan on behalf of the Issuer after completion of the closing of the Loan) (a "<u>Non-Binding Agreement</u>").

B.      No Forward Purchase Commitment or Non-Binding Agreement shall be made until after the seller (or a transferor to such seller of such Loan) has made a legally binding commitment to fully fund such Loan to the obligor thereof (subject to customary conditions), which commitment cannot be conditioned on the Issuer's ultimate purchase of such Loan from such seller.

C.      In the event of any reduced or eliminated funding, the Issuer shall not receive any premium, fee, or other compensation in connection with having entered into the Forward Purchase Commitment or Non-Binding Agreement.

D.      The Issuer shall not close any purchase of a Loan subject to a Forward Purchase Commitment or a Non-Binding Agreement earlier than 48 hours after the time of the closing of the Loan (i.e., execution of definitive documentation), and, in the case of a Forward Purchase Commitment, the Issuer's obligation to purchase such Loan is subject to the condition that no material adverse change has occurred in the financial condition of the Loan's obligor or the relevant market on or before the relevant purchase date.

E.      The Issuer cannot have a contractual relationship with the obligor with respect to a Loan until the Issuer actually purchases the Loan.

F.      The Issuer cannot be a signatory on the original lending agreement, and cannot be obligated to fund an assignment of or a participation in a Loan, prior to the time specified in subsection D above.

Section III.     <u>Distressed Debt</u>.

A.      The Issuer may only purchase a Debt Instrument that is a Potential Workout Obligation to the extent permitted by this Section III.

B.      Neither the Issuer nor the Servicer on behalf of the Issuer shall purchase a Subsidiary Obligation from any Issuer Subsidiary.

Annex 1-3

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5-5   Filed 10/23/25   Page 415 of 790   PageID 3895
Main Document   Page 30 of 272

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 30 of 36

C.       Special Procedures for Subsidiary Obligations.

1.       Potential Workout Obligations.   On or prior to the date of acquisition, the Servicer on behalf of the Issuer shall identify each Portfolio Collateral that is a Potential Workout Obligation.

2.       Transfer of Subsidiary Obligations.   From and after the occurrence of a Workout Determination Date with respect to a Subsidiary Obligation, neither the Issuer nor the Servicer on behalf of the Issuer shall knowingly take any action in respect of such Subsidiary Obligation that may result in the Issuer being engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes.   As soon as practicable, but in any event within 30 calendar days following a Workout Determination Date, the Servicer shall cause the Issuer either (i) to sell or dispose of any Subsidiary Obligation identified on such Workout Determination Date to a Person that is not an Affiliate of the Issuer or Servicer or (ii) to assign any Subsidiary Obligation identified on such Workout Determination Date to an Issuer Subsidiary.

For purposes of this Annex 1, an "<u>Issuer Subsidiary</u>" means any wholly-owned corporate subsidiary of the Issuer to which a Special Workout Obligation may be transferred in accordance with this Annex 1.

3.       Consideration for Assignment of Subsidiary Obligations.   Consideration given by an Issuer Subsidiary for the assignment to it of Subsidiary Obligations may be in the form of cash or in the form of indebtedness of, or equity interests in, such Issuer Subsidiary.

4.       Classification of  Issuer Subsidiaries.   Each Issuer Subsidiary shall be an entity treated as a corporation for United States federal income tax purposes and formed under the laws of any state of the United States.

As used herein:

"<u>Potential Workout Obligation</u>" means any debt instrument (any such instrument, including an interest in a Loan, a "<u>Debt Instrument</u>") which, as of the date of acquisition by the Issuer or an Issuer Subsidiary, based on information specific to such Debt Instrument or the circumstances of the obligor thereof, is a Workout Obligation or, in the reasonable determination of the Servicer, has a materially higher likelihood of becoming a Workout Obligation as compared to debt obligations that par or other non-distressed debt purchasers or funds relating to that asset type customarily purchase and expect to hold to maturity.

"<u>Subsidiary Obligation</u>" means any Potential Workout Obligation (a) as to which the Issuer on any Workout Determination Date either (i) owns more than 40% of the aggregate principal amount of such class of Potential Workout Obligation outstanding or (ii) is one of the two largest holders of any class of debt of the obligor of such Potential Workout Obligation (based on the outstanding principal amount of such class of debt owned by the Issuer as a percentage of the aggregate outstanding principal amount of such class of debt) unless not fewer than three other holders and the Issuer collectively own at least 65% of such class of debt and, if the Issuer is the largest holder of such class, the Issuer's percentage of such class does not exceed the percentage held by the next largest holder of the debt by more than 5% of such class or (b) that would, upon foreclosure or exercise of similar legal remedies, result in the Issuer directly owning assets (other than securities treated as debt, equity in a partnership not engaged in a trade or business within the United States, or corporate equity for United States federal income tax

Annex 1-4

003168   APR 2385

purposes, provided in the case of corporate equity that the corporation is not a "United States real property holding corporation" within the meaning of section 897 of the Code) which are "United States real property interests" within the meaning of section 897 of the Code or which the Servicer reasonably expects it would, on behalf of the Issuer, be required to actively manage to preserve the value of the Issuer's interest therein; provided that a Potential Workout Obligation shall not be treated as a Subsidiary Obligation if the Issuer obtains a Tax Opinion that, based on all the surrounding circumstances, the activities in which the Issuer intends to engage with respect to such Potential Workout Obligation will not cause the Issuer to be treated as engaged in a trade or business for United States federal income tax purposes.

"Workout Determination Date" means any date on which, in connection with the occurrence of any event described in clauses (a) through (c), inclusive, of the definition of Workout Obligation, either (a) any material action by the Issuer is required to be taken, (b) the Servicer receives written notice that such material action shall be required or (c) the Servicer reasonably determines that the taking of such material action is likely to be required.

"Workout Obligation" means any Debt Instrument as to which the Servicer on behalf of the Issuer (a) consents to a Significant Modification in connection with the workout of a defaulted Portfolio Collateral, (b) participates in an official or unofficial committee or similar official or unofficial body in connection with a bankruptcy, reorganization, restructuring or similar proceeding, or (c) exercises, or has exercised on its behalf, rights of foreclosure or similar judicial remedies.

Section IV.   <u>Purchases from the Servicer or its Affiliates</u>.

A.   If the Servicer or an Affiliate of the Servicer acted as an underwriter, placement or other agent, arranger, negotiator or structuror, or received any fee for services (it being understood that receipts described in clauses (i) through (v) of Section I.B. are not construed as so treated), in connection with the issuance or origination of a Portfolio Collateral or was a member of the original lending syndicate with respect to the Portfolio Collateral (any such Portfolio Collateral, a "<u>Special Procedures Obligation</u>"), the Issuer will not acquire any interest in such Special Procedures Obligation (including entering into a commitment or agreement, whether or not legally binding or enforceable, to acquire such obligation directly or synthetically), from the Servicer, an Affiliate of the Servicer, or a fund managed by the Servicer, unless (i) the Special Procedures Obligation has been outstanding for at least 90 days, (ii) the holder of the Special Procedures Obligation did not identify the obligation or security as intended for sale to the Issuer within 90 days of its issuance, (iii) the price paid for such Special Procedures Obligation by the Issuer is its fair market value at the time of acquisition by the Issuer, and (iv) the transaction is proposed to, and the ultimate purchase is approved on behalf of the Issuer by, one or more Independent Advisors to the Issuer in accordance with the provisions of Section IV.B. below.  The Issuer will not acquire any Special Procedures Obligation if, immediately following such acquisition, the fair market value of all Special Procedures Obligations owned by the Issuer would constitute more than 49% of the fair market value of all of the Issuer's assets at such time.

B.   An "<u>Independent Advisor</u>" is a Person who is not an Affiliate of the Issuer, the Servicer or any fund managed by the Servicer.

1.   The Issuer may not purchase or commit to enter into any such Special Procedures Obligation without prior approval by an Independent Advisor.  If the Independent Advisor declines to approve a proposed Special Procedures Obligation, at least three months must elapse before any proposal with respect to the acquisition of debt or other obligations of the same obligor are proposed or considered.

Annex 1-5

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 08/26/25   Page 417 of 790   PageID 3897
Main Document   Page 405 of 772
Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 32 of 36

2.    The Issuer shall engage the Independent Advisor in an agreement the terms of which shall in substantial form set forth:

(a) the representation of the Independent Advisor, which the Servicer shall not know to be incorrect, that it has significant financial and commercial expertise, including substantial expertise and knowledge in and of the loan market and related investment arenas;

(b) the agreement between the Independent Advisor, the Issuer and the Servicer generally to the effect that (i) the Independent Advisor will operate pursuant to procedures consistent with maintaining his or her independence from the Servicer and its Affiliates, (ii) the Independent Advisor will have the sole authority and discretion to approve or reject purchase proposals made by the Servicer with respect to any Special Procedures Obligation, (iii) all proposals for the Issuer to acquire any Special Procedures Obligation will be first submitted to the Independent Advisor, (iii) the Servicer will prepare the materials it deems necessary to describe the Special Procedures Obligation to the Independent Advisor, (iv) the Investment Advisor will not be required to make any decision to accept or decline a Special Procedures Obligation at the price offered prior to its review of the materials prepared, plus any additional information requested by the Independent Advisor, and (v) no Independent Advisor may be proposed to be replaced by the Servicer, unless for cause or in the event of a resignation of such Independent Advisor; and

(c) such other commercially reasonable terms and conditions, including terms and conditions to the effect that (i) the Independent Advisor will be paid a reasonable fee for its services plus reimbursement of any reasonable expenses incurred in performance of his or her responsibilities, (ii) the Independent Advisor may be removed or replaced only by a majority (whether by positive act or failure to object) of the probable equity owners (as determined for United States federal income tax purposes) of the Issuer, (iii) if at any time there is more than one Independent Advisor to the Issuer, a majority of such Independent Advisors must approve any Special Procedures Obligation subject to Independent Advisor approval, (iv) an Independent Advisor may not engage, directly or indirectly, in the negotiation of the terms of any Special Procedures Obligation to be acquired by the Issuer (provided however, that an Independent Advisor may negotiate with the Servicer or the seller with respect to the price and terms of the Issuer's purchase of the Special Procedures Obligation, provided further that the Independent Advisor will not make suggestions to the Servicer or any other person about alternative or modified terms of the underlying Special Procedures Obligation on which they might be willing to approve such a Special Procedures Obligation).

3.    Any servicing agreement or other document under which the Servicer is granted signatory powers or other authority on behalf of the Issuer will provide that such powers or authority with respect to Special Procedures Obligations are conditioned upon the prior written approval of the Independent Advisor

4.    No Special Procedures Obligation will be presented to an Independent Advisor until at least 90 days have elapsed since the later of (a) the execution of final documentation and (b) the funding in whole or part of the Special Procedures Obligation and there will have been no commitment or arrangement prior to that time that the Issuer will acquire any such Special Procedures Obligation; provided, further, that if the person from whom the Issuer will acquire the

Annex 1-6

OHS West:260124435.7

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document Filed 08/26/25    Page 418 of 790    PageID 3898

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 33 of
36

Special Procedures Obligation is an Affiliate of the Servicer, such person will not be treated as owning the Special Procedures Obligation for any day during which it does not enjoy substantially all of the benefits and burdens of ownership (for example, because it has hedged its credit exposure to the Special Procedures Obligation).

5.    The Issuer will have no obligation to, or understanding that it will refund, reimburse or indemnify any person (including an Affiliate of the Servicer), directly or indirectly, for "breakage" costs or other costs or expenses incurred by such person if the Independent Advisor determines that the Issuer should decline to purchase any Special Procedures Obligation.

6.    Neither the Servicer nor any Affiliate of the Servicer will have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to Special Procedures Obligations without the prior written approval of an Independent Advisor.  Except as may be conditioned upon  such prior written approval, neither the Servicer nor any Affiliate of the Servicer may hold itself out as having signatory powers on behalf of the Issuer or authority to enter into agreements with respect to Special Procedures Obligations on behalf of the Issuer.

Section V.    Synthetic Securities.

A.    The Issuer shall not (i) acquire or enter into any Synthetic Security with respect to any Reference Obligation the direct acquisition of which would violate any provision of this Annex 1 or (ii) use Synthetic Securities as a means of making advances to the Synthetic Security Counterparty following the date on which the Synthetic Security is acquired or entered into (for the avoidance of doubt, the establishment of Synthetic Security collateral accounts and the payment of Synthetic Security Counterparties from the amounts on deposit therein, shall not constitute the making of advances).

B.    With respect to each Synthetic Security, the Issuer will not acquire or enter into any Synthetic Security that does not satisfy all of the following additional criteria unless the Servicer has first received advice of counsel that the ownership and disposition of such Synthetic Security would not cause the Issuer to be engaged in a trade or business within the United States for United States federal income tax purposes:

1.    the criteria used to determine whether to enter into any particular Synthetic Security was similar to the criteria used by the Servicer in making purchase decisions with respect to debt securities;

2.    the Synthetic Security is acquired by or entered into by the Issuer for its own account and for investment purposes with the expectation of realizing a profit from income earned on the securities (and any potential rise in their value) during the interval of time between their purchase and sale or hedging purposes and not with an intention to trade or to sell for a short-term profit;

3.    the Issuer enters into the Synthetic Security with a counterparty that is not a special purpose vehicle and is a broker-dealer or that holds itself out as in the business of entering into such contracts;

4.    neither the Issuer nor any Person acting on behalf of the Issuer advertises or publishes the Issuer's ability to enter into Synthetic Securities;

Annex 1-7

003171
APP. 3898

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65    Filed 08/26/25    Page 419 of 790    PageID 3899
Main Document    Page 264 of 273

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 34 of
36

5.      except with respect to (x) credit-linked notes or similar Synthetic Securities and (y) any other Synthetic Securities where standard form ISDA documentation is not applicable, the Synthetic Security is written on standard form ISDA documentation;

6.      the net payment from the Issuer to the Synthetic Security Counterparty is not determined based on an actual loss incurred by the Synthetic Security Counterparty or any other designated person;

7.      there exists no agreement, arrangement or understanding that (i) the Synthetic Security Counterparty is required to own or hold the related Reference Obligation while the Synthetic Security remains in effect or (ii) the Synthetic Security Counterparty is economically or practically compelled to own or hold the related physical Reference Obligation while the Synthetic Security remains in effect;

8.      the Synthetic Security provides for (i) all cash settlement, (ii) all physical settlement or (iii) the option to either cash settle or physically settle; provided that, in the latter two cases, physical settlement provides the settling party the right to settle the Synthetic Security by delivering deliverable obligations which *may* include the Reference Obligation and the settling party must not be required to deliver the related Reference Obligation upon the settlement of such Synthetic Security.

Notwithstanding the preceding paragraph, a Synthetic Security providing for physical settlement may require a party to deliver the related Reference Obligation if either:

(i)      at the time the Issuer enters into such Synthetic Security, such Reference Obligation is readily available to purchasers generally in a liquid market; or

(ii)      the advice of both United States federal income tax and insurance counsel of nationally recognized standing in the United States experienced in such matters is that, under the relevant facts and circumstances with respect to such Synthetic Security, the acquisition of such Synthetic Security will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis and should not cause the Issuer to be treated as writing insurance in the United States under the law of the state in which the Synthetic Security Counterparty is organized.

9.      the Synthetic Security is not treated by the Issuer as insurance or a financial guarantee sold by the Issuer for United States or Cayman Islands regulatory purposes.

As used herein:

"Reference Obligation" means a debt security or other obligation upon which a Synthetic Security is based.

"Synthetic Security" means any swap transaction or security, other than a participation interest in a Loan, that has payments associated with either payments of interest and/or principal on a Reference Obligation or the credit performance of a Reference Obligation.

"Synthetic Security Counterparty" means an entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor).

Annex 1-8

OHS West:260124435.7

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Filed 08/26/25    Page 420 of 790    PageID 3900
Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 35 of
36

Section VI.    Other Types of Assets.

A.    Equity Restrictions. The Issuer will not purchase any asset (directly or synthetically) that is:

1.    not treated for U.S. federal income tax purposes as debt if the issuing entity is a "partnership"(within the meaning of Section 7701(a)(2) of the Code) unless such entity is not engaged in a trade or business within the United States, or

2.    a "United States real property interest" as defined in section 897 of the Code and the Treasury Regulations promulgated thereunder.

The Issuer may cause an Issuer Subsidiary to acquire assets set forth in clause (i) or (ii) above (each, an "ETB/897 Asset") in connection with the workout of defaulted Portfolio Collaterals, so long as the acquisition of ETB/897 Assets by such Issuer Subsidiary will not cause the stock of such Issuer Subsidiary to be deemed to be an ETB/897 Asset.

B.    Revolving Loans and Delayed Drawdown Loans. All of the terms of any advance required to be made by the Issuer under any revolving or delayed drawdown Loan will be fixed as of the date of the Issuer's purchase thereof (or will be determinable under a formula that is fixed as of such date), and the Issuer and the Servicer will not have any discretion (except for consenting or withholding consent to amendments, waivers or other modifications or granting customary waivers upon default) as to whether to make advances under such revolving or delayed drawdown Loan.

C.    Securities Lending Agreements. The Issuer will not purchase any Portfolio Collateral primarily for the purpose of entering into a securities lending agreement with respect thereto.

Section VII.    General Restrictions on the Issuer.

The Issuer itself shall not:

A.    hold itself out, through advertising or otherwise, as originating Loans, lending funds, or making a market in or dealing in Loans or other assets;

B.    register as, hold itself out as, or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as, a broker-dealer, a bank, an insurance company, financial guarantor, a surety bond issuer, or a company engaged in Loan origination;

C.    knowingly take any action causing it to be treated as a bank, insurance company, or company engaged in Loan origination for purposes of any tax, securities law or other filing or submission made to any governmental authority;

D.    hold itself out, through advertising or otherwise, as originating, funding, guaranteeing or insuring debt obligations or as being willing and able to enter into transactions (either purchases or sales of debt obligations or entries into, assignments or terminations of hedging or derivative instruments, including Synthetic Securities) at the request of others;

E.    treat Synthetic Securities as insurance, reinsurance, indemnity bonds, guaranties, guaranty bonds or suretyship contracts for any purpose;

Annex 1-9

OHS West:260124435.7

003173
APP. 2480

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Filed 08/26/24    Page 421 of 790    PageID 3901

Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 36 of
36

F.    allow any non-U.S. bank or lending institution who is a holder of a Security to control or direct the Servicer's or Issuer's decision to acquire a particular asset except as otherwise allowed to such a holder, acting in that capacity, under the related indenture or acquire a Portfolio Collateral conditioned upon a particular person or entity holding Securities;

G.    acquire any asset the holding or acquisition of which the Servicer knows would cause the Issuer to be subject to income tax on a net income basis;

H.    hold any security as nominee for another person; or

I.    buy securities with the intent to subdivide them and sell the components or to buy securities and sell them with different securities as a package or unit.

Section VIII.    Tax Opinion; Amendments.

A.    In furtherance and not in limitation of this Annex 1, the Servicer shall comply with all of the provisions set forth in this Annex 1, unless, with respect to a particular transaction, the Servicer acting on behalf of the Issuer and the Trustee shall have received written advice of Skadden, Arps, Slate, Meagher & Flom LLP or Orrick, Herrington & Sutcliffe LLP or an opinion of other counsel of nationally recognized standing in the United States experienced in such matters (a "Tax Opinion"), that, under the relevant facts and circumstances with respect to such transaction, the Servicer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

B.    The provisions set forth in the Annex may be amended, eliminated or supplemented by the Servicer if the Issuer, the Servicer and the Trustee shall have received a Tax Opinion that the Servicer's compliance with such amended provisions or supplemental provisions or the failure to comply with such provisions proposed to be eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

Annex 1-10

OHS West:260124435.7

003174    APP. 2401

# EXHIBIT 25

# EXHIBIT J

APP. 2402
003175

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Filed 08/26/25    Page 423 of 790    PageID 3903
Main Document    Page 2 of 723
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 2 of
39

**EXECUTION COPY**

## SERVICING AGREEMENT

This Servicing Agreement, dated as of March 27, 2008 is entered into by and among ABERDEEN LOAN FUNDING, LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9002, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as servicer ("Highland" or, in such capacity, the "Servicer").

WITNESSETH:

WHEREAS, the Issuer and ABERDEEN LOAN FUNDING CORP. (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") intend to issue U.S.$376,000,000 of their Class A Floating Rate Senior Secured Extendable Notes due 2018 (the "Class A Notes"), U.S.$29,500,000 of their Class B Floating Rate Senior Secured Extendable Notes due 2018 (the "Class B Notes"), U.S.$25,250,000 of their Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class C Notes"), U.S.$19,250,000 of their Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class D Notes"), and the Issuer intends to issue U.S.$17,250,000 of its Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class E Notes" and together with the Class A Notes, Class B Notes, Class C Notes and Class D Notes, the "Notes") pursuant to the Indenture dated as of March 27, 2008 (the "Indenture"), among the Co-Issuers and State Street Bank and Trust Company, as trustee (the "Trustee") and the Issuer intends to issue 12,000 Class I Preference Shares, $0.01 par value (the "Class I Preference Shares") and 36,000 Class II Preference Shares, $0.01 par value (the "Class II Preference Shares" and, together with the Class I Preference Shares, the "Preference Shares" and, together with the Notes, the "Securities") pursuant to the Preference Shares Paying Agency Agreement dated as of March 27, 2008 (the "Preference Shares Paying Agency Agreement") between the Issuer and State Street Bank and Trust Company, as the Preference Shares Paying Agent, and pursuant to the Issuer's amended and restated memorandum and articles of association (the "Memorandum and Articles of Association") and certain resolutions of the board of directors of the Issuer;

WHEREAS, the Issuer intends to pledge certain Collateral Obligations, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Servicing Agreement, pursuant to which the Servicer agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral in the manner and on the terms set forth herein; and

WHEREAS, the Servicer has the capacity to provide the services required hereby and in the applicable provisions of the other Transaction Documents and is prepared to perform such services upon the terms and conditions set forth herein.

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65    Filed 06/25    Page 424 of 790    PageID 3904
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 3 of
39

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.　　Definitions.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"Agreement" shall mean this Servicing Agreement, as amended from time to time.

"Governing Instruments" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"HFP" shall mean Highland Financial Partners, L.P. (which includes, for the avoidance of doubt, any subsidiary thereof).

"Offering Memorandum" shall mean the Offering Memorandum of the Issuer dated March 27, 2008 prepared in connection with the offering of the Securities.

"Servicer Breaches" shall have the meaning specified in Section 10(a).

"Servicing Fee" shall mean, collectively, the Senior Servicing Fee, the Subordinated Servicing Fee and the Supplemental Servicing Fee.

"Transaction Documents" shall mean the Indenture, the Preference Shares Paying Agency Agreement, the Servicing Agreement and the Collateral Administration Agreement.

2.　　General Duties of the Servicer.

(a)　　The Servicer shall provide services to the Issuer as follows:

(i)　　Subject to and in accordance with the terms of this Agreement and the other Transaction Documents, the Servicer shall supervise and direct the administration, acquisition and disposition of the Collateral, and shall perform on behalf of the Issuer those duties and obligations of the Servicer required by the Indenture and the other Transaction Documents, and including the furnishing of Issuer Orders, Issuer Requests and officer's certificates, and such certifications as are required of the Servicer under the Indenture with respect to permitted purchases and sales of the Collateral Obligations, Eligible Investments and other assets, and other matters, and, to the extent necessary or appropriate to perform such duties, the Servicer shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto.  The Servicer shall, subject to the terms and conditions of this Agreement and the other Transaction Documents, perform its obligations hereunder and thereunder with reasonable care, using a degree of skill and attention no less than that which the Servicer exercises with respect to comparable assets that it services or manages for others having similar objectives and restrictions, and in a manner consistent with practices and procedures followed by institutional servicers or managers of national standing relating to assets of the nature and character of the Collateral for clients having

003177    APP. 2101

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document Filed 05/09/25   Page 425 of 790   PageID 3905
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 4 of 39

similar objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the other Transaction Documents.  To the extent not inconsistent with the foregoing, the Servicer shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder.  The Servicer shall comply with all terms and conditions of the other Transaction Documents affecting the duties and functions to be performed hereunder. The Servicer shall not be bound to follow any amendment to any Transaction Document until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided, however, that the Servicer shall not be bound by any amendment to any Transaction Document that affects the rights, powers, obligations or duties of the Servicer unless the Servicer shall have consented thereto in writing.  The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, powers, obligations or duties of the Servicer or (y) affects the amount or priority of any fees payable to the Servicer to become effective unless the Servicer has been given prior written notice of such amendment and consented thereto in writing;

        (ii)     the Servicer shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the Collateral criteria set forth herein and in the Indenture;

        (iii)     the Servicer shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture;

        (iv)     the Servicer shall undertake to determine to the extent reasonably practicable whether a Collateral Obligation has become a Defaulted Collateral Obligation;

        (v)     the Servicer, subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee (x) to dispose of a Collateral Obligation, Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, (y) to acquire, as security for the Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Collateral, one or more substitute Collateral Obligations or Eligible Investments, or (z) direct the Trustee to take the following actions with respect to a Collateral Obligation or Eligible Investment:

        (1)     retain such Collateral Obligation or Eligible Investment; or

        (2)     dispose of such Collateral Obligation or Eligible Investment in the open market or otherwise; or

        (3)     if applicable, tender such Collateral Obligation or Eligible Investment pursuant to an Offer; or

003178
APP. 2405

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65-5   Main Document   Filed 05/09/25   Page 426 of 790   Page 425 of 772   PageID 3906
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 5 of
39

(4)     if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(5)     retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer; or

(6)     waive any default with respect to any Defaulted Collateral Obligation; or

(7)     vote to accelerate the maturity of any Defaulted Collateral Obligation; or

(8)     exercise any other rights or remedies with respect to such Collateral Obligation or Eligible Investment as provided in the related Underlying Instruments, including in connection with any workout situations, or take any other action consistent with the terms of the Indenture which is in the best interests of the Holders of the Securities; and

(vi)     the Servicer shall (a) on or prior to any day which is a Redemption Date, direct the Trustee to enter into contracts to dispose of the Collateral Obligation and any other Collateral pursuant to the Indenture and otherwise comply with all redemption procedures and certification requirements in the Indenture in order to allow the Trustee to effect such redemption and (b) conduct auctions in accordance with the terms of the Indenture.

(b)     In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

(c)     The Servicer hereby agrees to the following:

(i)     The Servicer agrees not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer until the payment in full of all Notes issued under the Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments and the expiration of a period equal to the greater of (A) the applicable preference period plus one day or (B) one year and one day following the payment. Notwithstanding the foregoing, the Servicer may commence any legal action that is not a bankruptcy, insolvency, liquidation or similar proceeding against the Issuer or the Co-Issuer or any of their properties and may take any action it deems appropriate at any time in any bankruptcy, insolvency, liquidation or similar proceeding and any other Proceeding voluntarily commenced by the Issuer or the Co-Issuer or involuntarily commenced against the Issuer or the Co-Issuer by anyone other than the Servicer or any

003179   APP. 2406

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Desc
Case 3:25-cv-02072-S Document 65 Filed 06/20/25 Page 427 of 790 PageID 3907
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 6 of
39

Affiliate of the Servicer. The provisions of this Section 2(c)(i) shall survive termination of this Agreement.

(ii) The Servicer shall cause each sale or purchase of any Collateral Obligation or Eligible Investment to be conducted on an arm's-length basis.

(d) The Servicer shall not act for the Issuer in any capacity except as provided in this Section 2. In providing services hereunder, the Servicer may employ third parties, including its Affiliates, to render advice (including advice with respect to the servicing of the Collateral) and assistance; provided, however, that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties. Notwithstanding any other provision of this Agreement, the Servicer shall not be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

(e) Notwithstanding any other provision of this Agreement or the Indenture, (i) any granted signatory powers or authority granted to the Servicer on behalf of the Issuer with respect to the Special Procedures Obligations (as defined in Annex 1) shall be conditioned upon the prior written approval of the Independent Advisor (as defined in Annex 1) and (ii) neither the Servicer nor any Affiliate of the Servicer shall have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to the Special Procedures Obligations without the prior written approval of the Independent Advisor.

3. Brokerage.

The Servicer shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Servicer may take into consideration research and other brokerage services furnished to the Servicer or its Affiliates by brokers and dealers which are not Affiliates of the Servicer. Such services may be used by the Servicer or its Affiliates in connection with its other servicing or advisory activities or operations. The Servicer may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts serviced or managed by the Servicer or with accounts of the Affiliates of the Servicer, if in the Servicer's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Collateral Obligation or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Servicer (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner and consistent with its obligations hereunder and under applicable law.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Servicer may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Collateral Obligations or other Collateral to, the Initial Purchaser, the Trustee or any of their respective Affiliates, or any other firm.

003180
APP. 2407

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/25/ Page 428 of 790   PageID 3908
Main Document   Page 06425 of 7722
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 7 of 39

4. <u>Additional Activities of the Servicer.</u>

Nothing herein shall prevent the Servicer or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Holders of the Securities, or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Servicer and partners, directors, officers, employees and agents of the Servicer or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a)    serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and each Interest Coverage Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof;

(b)    receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Coverage Test; and <u>provided</u>, <u>further</u>, that if any portion of such services are related to the purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be applied to the purchase price of such obligations; and

(c)    be a secured or unsecured creditor of, or hold an equity interest in, the Issuer, its Affiliates or any issuer of any obligation included in the Collateral; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Coverage Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof.

It is understood that the Servicer and any of its Affiliates may engage in any other business and furnish servicing, investment management and advisory services to others, including Persons which may have policies similar to those followed by the Servicer with respect to the Collateral and which may own securities of the same class, or which are the same type, as the Collateral Obligations or other securities of the issuers of Collateral Obligations. The Servicer shall be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Collateral.

Unless the Servicer determines in its reasonable judgment that such purchase or sale is appropriate, the Servicer may refrain from directing the purchase or sale hereunder of securities issued by (i) Persons of which the Servicer, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) Persons for which the Servicer or its Affiliates act as financial adviser or underwriter or (iii) Persons about which the Servicer or any of its Affiliates have information which the Servicer deems confidential or non-public or otherwise might prohibit it from trading such securities in accordance with applicable law. The Servicer shall not be obligated to have or pursue any particular strategy or opportunity with respect to the Collateral.

003181
APP. 2408

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Filed 06/13/25   Page 429 of 790   PageID 3909
Main Document   Page 264 of 272
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 8 of
39

5.      Conflicts of Interest.

(a)      The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the commercially reasonable judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the United States Investment Advisers Act of 1940, as amended.

(b)      The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the commercially reasonable judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the United States Investment Advisers Act of 1940, as amended.

(c)      In addition, the Servicer shall not undertake any transaction described in this Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and Section 4975 of the Code.

6.      Records; Confidentiality.

The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Holders of the Securities and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice.  At no time shall the Servicer make a public announcement concerning the issuance of the Notes or the Preference Shares, the Servicer's role hereunder or any other aspect of the transactions contemplated by this Agreement and the other Transaction Documents. The Servicer shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of any Class of Securities, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Servicer, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Servicer on a non-confidential basis; provided, that the Servicer does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto.  For purposes of this Section 6, the Trustee, the Collateral Administrator and the Holders of the Securities shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Servicer, the Co-Issuers, the Trustee and the Holders of the Securities (and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

003182

APP. 2409

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 08/14/25   Page 430 of 790   PageID 3910
Main Document   Page 429 of 722
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 9 of 39

7.      <u>Obligations of Servicer</u>.

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Servicer shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Servicer to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's Memorandum and Articles of Association or the Co-Issuer's Certificate of Incorporation or By-Laws, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement contemplated by the Indenture or (f) not be permitted by Annex 1 hereto and would subject the Issuer to U.S. federal or state income or franchise taxation or cause the Issuer to be engaged in a trade or business in the United States for U.S. federal income tax purposes.  The Servicer covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

8.      <u>Compensation</u>.

(a)      The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such amounts and at such times as set forth in the Indenture.  The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer.  If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable on such later Payment Date on which funds are available therefor as provided in the Indenture.

With respect to any Payment Date, the Servicer may, in its sole discretion, at any time waive a portion (or all) of its Servicing Fees then due and payable.  All waived amounts will be paid to the Class II Preference Shares as Class II Preference Share Special Payments pursuant to the Indenture. For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion waive all or any portion of the Subordinated Servicing Fee or Supplemental Servicing Fee, any funds representing the waived Subordinated Servicing Fees and Supplemental Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments.

(b)      The Servicer shall be responsible for the ordinary expenses incurred in the performance of its obligations under this Agreement, the Indenture and the other Transaction Documents;  <u>provided</u>,  <u>however</u>, that any extraordinary expenses incurred by the Servicer in the

APP. 2449

003183

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document    Page 624 of 772    Page 431 of 790    PageID 3911
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 10 of
39

performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee and the accountants appointed by the Issuer, the reasonable expenses incurred by the Servicer to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Collateral Obligation or other unusual matters arising in the performance of its duties under this Agreement and the Indenture, any reasonable expenses incurred by the Servicer in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Servicer customarily allocates among all of the funds or portfolios that it services or manages, including reasonable expenses incurred with respect to any compliance requirements, including, but not limited to, compliance with the requirements of the Sarbanes-Oxley Act, related solely to the ownership or holding of any Securities by HFP or any of its subsidiaries) shall be reimbursed by the Issuer to the extent funds are available therefor in accordance with and subject to the Priority of Payments and other limitations contained in the Indenture.

(c)    If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Servicer shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.    <u>Benefit of the Agreement</u>.

The Servicer agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or the Holders of the Preference Shares, as applicable, as provided in the Indenture or the Preference Shares Paying Agency Agreement, as applicable.

10.    <u>Limits of Servicer Responsibility; Indemnification</u>.

(a)    The Servicer assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of liability described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Servicer. The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "<u>Liabilities</u>") incurred by the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, that arise out of or in connection with the performance by the Servicer of its duties under this Agreement and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement or (ii) with respect to any information included in the Offering Memorandum in the section entitled "The Servicer" that contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "<u>Servicer Breaches</u>"). For the

003184

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 08/04/25   Page 432 of 790   PageID 3912
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 11 of
39

avoidance of doubt, the Servicer shall have no duty to independently investigate any laws not otherwise known to it in connection with its obligations under this Agreement, the Indenture and the other Transaction Documents. The Servicer shall be deemed to have satisfied the requirements of the Indenture and this Agreement relating to not causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes (including as those requirements relate to the acquisition (including manner of acquisition), ownership, enforcement, and disposition of Collateral) to the extent the Servicer complies with the requirements set forth in Annex 1 hereto (unless the Servicer knows that as a result of a change in law the investment restrictions set forth in Annex 1 may no longer be relied upon).

(b) The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "Indemnified Parties") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "Expenses") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "Actions"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with, and subject to, the Priority of Payments and shall survive termination of this Agreement.

(c) With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Servicer, the Servicer shall cause such Indemnified Party to):

(i) give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii) at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii) at the Indemnifying Party's expense, cooperate and take all steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

003185

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Filed 06/16/25   Page 433 of 790   PageID 3913
Main Document   Page 12 of 39
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 12 of 39

(iv)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)    neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi)    upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise.  If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d)    In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e)    The U.S. federal securities laws impose liabilities under certain circumstances on persons who act in good faith; accordingly, notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer or the Holders of the Securities may have under any U.S. federal securities laws.

11.    <u>No Partnership or Joint Venture</u>.

The Issuer and the Servicer are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Servicer's relation to the Issuer shall be deemed to be that of an independent contractor.

003186   APP 2413

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65-5    Filed 08/06/25    Page 434 of 790    PageID 3914
Main Document    Page 13 of 39
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 13 of
39

12.    <u>Term; Termination.</u>

(a)    This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preference Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Holders of the Securities; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b)    Subject to Section 12(e) below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer).  If the Servicer resigns, the Issuer agrees to appoint a successor servicer to assume such duties and obligations in accordance with Section 12(e).

(c)    This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be registered under the provisions of the Investment Company Act, and the Issuer notifies the Servicer thereof.

(d)    If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(e)    No removal or resignation of the Servicer shall be effective unless:

(i)    (A) the Issuer appoints a successor servicer at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than, with respect to the Class II Preference Shares owned  by HFP or its subsidiaries; provided that, with respect to the voting authority of Class II Preference Shares owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP or such subsidiaries) (each such non-excluded Preference Share, a "<u>Voting Preference Share</u>"), (B) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor servicer is not objected to within 30 days after notice of such succession by either (x) a Super Majority of the Controlling Class of Notes (excluding any Notes held by the retiring Servicer, its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than HFP; provided that, with respect to the voting authority of Notes owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Trustee by any of the "independent directors" of HFP) of HFP or such subsidiaries) (each such non-excluded Note, a "<u>Voting Note</u>") or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); or

003187
APR. 2414

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65    Filed 06/23/25    Page 435 of 790    PageID 3915
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 14 of 39

(ii)  if a Majority of the Voting Preference Shares has nominated two or more successor servicers that have been objected to pursuant to the preceding clause (i)(C) or has failed to appoint a successor servicer that has not been objected to pursuant to the preceding clause (i)(C) within 60 days of the date of notice of such removal or resignation of the Servicer, (A) the Issuer appoints a successor servicer at the written direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), (B) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor servicer is not objected to within 30 days after notice of such succession by either (x) a Majority of the Voting Preference Shares (voting as a single class) or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); provided, that if a Majority of the Voting Preference Shares and a Super Majority of the Controlling Class (excluding any Notes that are not Voting Notes) have each nominated two or more successor servicers that have been objected to pursuant to the preceding clauses (i)(C) and (ii)(C) or have otherwise failed to appoint a successor servicer that has not been objected to pursuant to the preceding clause (i)(C) or (ii)(C) within 120 days of the date of notice of such removal or resignation of the Servicer, (A) any Holder of the Controlling Class (excluding any Notes that are not Voting Notes), any Holder of Voting Preference Shares or the Trustee petitions a court of competent authority to appoint a successor servicer, (B) such court appoints a successor servicer and (C) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture.

In addition, any successor servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder, (ii) is legally qualified and has the capacity to act as Servicer hereunder, as successor to the Servicer under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as successor servicer under this Agreement and the Indenture without causing the Issuer, the Co-Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor servicer shall not cause its then-current rating of any Class of Notes to be reduced or withdrawn.  No compensation payable to a successor servicer from payments on the Collateral shall be greater than that paid to the retiring Servicer without the prior written consent of a Super Majority of the Controlling Class of Notes, a Majority of the Noteholders and a Majority of the Preference Shares.  The Issuer, the Trustee and the successor servicer shall take such action (or cause the retiring Servicer to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Servicer, as shall be necessary to effectuate any such succession.

(f)  In the event of removal of the Servicer pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Servicer as provided under this Agreement terminate all the rights and obligations of the Servicer under this Agreement (except those that survive termination pursuant to Section 12(d) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Servicer under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor servicer upon the appointment thereof.

003188    APP. 2445

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5 Main Document Filed 06/25/25 Page 435 of 772 Page 436 of 790    PageID 3916
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 15 of
39

13.    <u>Delegation; Assignments</u>.

This Agreement, and any obligations or duties of the Servicer hereunder, shall not be delegated by the Servicer, in whole or in part, except to any entity that (i) is controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) is one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability hereunder.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Majority of Noteholders and the Holders of a Majority of the Preference Shares (excluding Notes and Preference Shares held by the Servicer or any of its Affiliates other than HFP) and (ii) the Rating Condition is satisfied with respect to any such assignment.  Any assignment consented to by the Issuer, a Majority of Noteholders and the Holders of Preference Shares shall bind the assignee hereunder in the same manner as the Servicer is bound.  In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Servicer.  Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, a Majority of Noteholders and the Holders of the Preference Shares, the Servicer shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i) and 15 hereof.  This Agreement shall not be assigned by the Issuer without the prior written consent of the Servicer and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture.  In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Servicer such documents as the Servicer shall consider reasonably necessary to effect fully such assignment.  The Servicer hereby consents to the matters set forth in Article 15 of the Indenture.

14.    <u>Termination by the Issuer for Cause</u>.

Subject to Section 12(e) above, this Agreement shall be terminated and the Servicer shall be removed by the Issuer for cause upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below, but only if directed to do so by the Trustee acting at the direction of (1) a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) or (2) a Majority of the Voting Preference Shares (excluding any Preference Shares that are not Voting Preference Shares).  For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a)    the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b)    the Servicer breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach

003189    APP. 2446

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Filed 08/26/25    Page 437 of 790    PageID 3917
Main Document    Page 16 of 272
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 16 of
39

or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(c)    the Servicer is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Servicer in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, or the Servicer (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Servicer or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Servicer and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Servicer without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d)    the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e)    (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Servicer shall give prompt written notice thereof to the Issuer, the Trustee and the Holders of all outstanding Notes and Preference Shares upon the Servicer's becoming aware of the occurrence of such event.

15.    Action Upon Termination.

(a)    From and after the effective date of termination of this Agreement, the Servicer shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof.  Upon the effective date of termination of this Agreement, the Servicer shall as soon as practicable:

(i)    deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral then in the custody of the Servicer; and

003190
APP 2417

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Main Document   Filed 04/08/25   Page 425 of 272   Page 438 of 790   PageID 3918
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 17 of
39

(ii)     deliver to the Trustee and the Preference Shares Paying Agent an accounting with respect to the books and records delivered to the Trustee and the Preference Shares Paying Agent or the successor servicer appointed pursuant to Section 12(e) hereof.

Notwithstanding such termination, the Servicer shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Servicer in Section 16(b) hereof or from any failure of the Servicer to comply with the provisions of this Section 15.

(b)     The Servicer agrees that, notwithstanding any termination of this Agreement, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against the Servicer or any Affiliate of the Servicer) upon receipt of appropriate indemnification and expense reimbursement.

16.     <u>Representations and Warranties</u>.

(a)     The Issuer hereby represents and warrants to the Servicer as follows:

(i)     The Issuer has been duly incorporated and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture or the Securities would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii)     The Issuer has full power and authority to execute, deliver and perform its obligations pursuant to this Agreement, the other Transaction Documents and the Securities and all obligations required hereunder and thereunder and has taken all necessary action to authorize this Agreement, the other Transaction Documents and the Securities on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of its obligations pursuant to this Agreement, the other Transaction Documents and the Securities and the performance of all obligations imposed upon it hereunder and thereunder.  No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the other Transaction Documents and the Securities is required by the Issuer in connection with this Agreement, the other Transaction Documents and the Securities or the execution, delivery, performance, validity or enforceability of this Agreement, the other Transaction Documents and the Securities or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against

003191   APP 2418

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65    Main Document    Filed 08/04/25    Page 439 of 790    Page 439 of 790    PageID 3919
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 18 of
39

the Issuer in accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)    The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

(iv)    The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

(v)    True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Servicer.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Servicer as promptly as practicable after its adoption or execution.

(b)    The Servicer hereby represents and warrants to the Issuer as follows:

(i)    The Servicer is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Servicer or on the ability of the Servicer to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(ii)    The Servicer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the other Transaction Documents applicable to the Servicer, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and all obligations required

003192    APP. 2449

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5   Filed 06/23 of 272 e 440 of 790   PageID 3920
Main Document   Page 0423
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 19 of
39

hereunder and under the terms of the other Transaction Documents applicable to the Servicer.  No consent of any other person, including, without limitation, creditors of the Servicer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Servicer in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required hereunder or under the terms of the other Transaction Documents applicable to the Servicer.  This Agreement has been, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall be, executed and delivered by a duly authorized partner of the Servicer, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer when executed and delivered by the Servicer hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall constitute, the valid and legally binding obligations of the Servicer enforceable against the Servicer in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)    The execution, delivery and performance of this Agreement and the terms of the other Transaction Documents applicable to the Servicer and the documents and instruments required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Servicer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Servicer, or the Governing Instruments of, or any securities issued by the Servicer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Servicer is a party or by which the Servicer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Servicer or its ability to perform its obligations under this Agreement and the provisions of the other Transaction Documents applicable to the Servicer, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv)    There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Servicer, threatened that, if determined adversely to the Servicer, would have a material adverse effect upon the performance by the Servicer of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(v)    The Servicer is a registered investment adviser under the Investment Advisers Act.

(vi)    The Servicer is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Servicer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement

003193   APP. 2429

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65    Filed 06/24/22    Page 441 of 790    PageID 3921
Main Document    Page 20 of 27
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 20 of
39

or the provisions of the other Transaction Documents applicable to the Servicer, or the performance by the Servicer of its duties hereunder.

17.    Notices.

Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

(a) If to the Issuer:

Aberdeen Loan Funding, Ltd.
c/o Walkers SPV Limited
Walker House
87 Mary Street
George Town, Grand Cayman, KY1-9002, Cayman Islands
Telephone: (345) 945-3727
Telecopy: (345) 945-4757
Attention: The Directors

(b) If to the Servicer:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100
Telecopy: (972) 628-4147
Attention: James Dondero

(c) If to the Trustee:

State Street Bank and Trust Company
200 Clarendon Street
Mail Code: EUC-108
Boston, Massachusetts 02116
Telecopy: (617) 351-4358
Attention: CDO Services Group

(d) If to the Noteholders:

In accordance with Section 14.3 of the Indenture, at their respective addresses set forth on the Note Register.

(e) If to the Holders of the Preference Shares:

In accordance with Section 14.3 of the Indenture, to the Preference Shares Paying Agent at the address identified therein.

-19-

APR 2021
003194

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 55    Main Document    Filed 06/25/25    Page 425 of 772    Page 442 of 790    PageID 3922
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 21 of 39

(f) if to the Rating Agencies:

In accordance with Section 14.3 of the Indenture, to the Rating Agencies at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

18.    Binding Nature of Agreement; Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein. The Servicer hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Servicer's obligations hereunder.

19.    Entire Agreement.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 15.1(h) of the Indenture.

20.    Conflict with the Indenture.

Subject to the last two sentences of Section 2(a)(i), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21.    Priority of Payments.

The Servicer agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22.    Governing Law.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

23.    Indulgences Not Waivers.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or

003195

APP. 2422

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Filed 03/04/25    Page 443 of 790    PageID 3923
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 22 of
39

partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

24.    Costs and Expenses.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25.    Titles Not to Affect Interpretation.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26.    Execution in Counterparts.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

27.    Provisions Separable.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; provided, however, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28.    Number and Gender.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

29.    Written Disclosure Statement.

The Issuer and the Trustee acknowledge receipt of Part II of the Servicer's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Investment Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

003196    APP 2423

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65    Filed 06/25 of 27 23  Page 444 of 790    PageID 3924
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 23 of
39

30.    <u>Miscellaneous</u>.

(a)    In the event that any vote is solicited with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In addition, with respect to any Defaulted Collateral Obligation, the Servicer, on behalf of the Issuer, may instruct the trustee for such Defaulted Collateral Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted Collateral Obligation and any applicable law, rule or regulation in any manner permitted under the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In the event any Offer is made with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.

(b)    In connection with taking or omitting any action under the Indenture or this Agreement, the Servicer may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Any corporation, partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the asset servicing and collateral management business of the Servicer, shall be the successor to the Servicer without any further action by the Servicer, the Co-Issuers, the Trustee, the Preference Shares Paying Agent , the Holders of the Securities or any other person or entity.

31.    <u>Limitation of Liabilities</u>.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Servicer shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby.  The obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive.  The provisions of this section shall survive termination of this Agreement.

APP 2424
003197

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15-5  Main DocumentFiled 06/23Page 2425 of 2732Page 445 of 790   PageID 3925

Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 24 of
39

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
   as Servicer

BY: STRAND ADVISORS, INC.,
   as General Partner

By: _____
Name:
Title:


ABERDEEN LOAN FUNDING, LTD.,
   as Issuer


By: _____
Name:
Title:


Servicing Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
   as Servicer

BY: STRAND ADVISORS, INC.,
   as General Partner


By:_____
Name:
Title:


ABERDEEN LOAN FUNDING, LTD.,
   as Issuer


By:_____
Name:   **John Cullinane**
Title:   Director

003199

APP 2426

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 5    Main Document Filed 06/25    Page 26 of 27 of 790    PageID 3927
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 26 of
39

## ANNEX 1

### Certain Asset Acquisition Provisions

Unless otherwise noted, references to the Issuer in this Annex 1 include the Servicer and any other person acting on the Issuer's behalf.  Capitalized terms used but not defined herein will have the meanings ascribed to them in the Indenture.

For purposes of this Annex 1,

"Affiliate" means, with respect to a specified Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person and (b) any Person that is a member, director, officer or employee of (i) the specified Person or (ii) a Person described in clause (a) of this definition; and

"Person" means an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

Section I.      <u>General Investment Restrictions</u>.

Except as may otherwise be provided in this Annex 1, the Issuer (and the Servicer acting on the Issuer's behalf) shall only purchase debt securities, interests in loans and other assets (each a "Portfolio Obligation") only in secondary-market transactions and shall not engage in any lending or underwriting activities or otherwise participate in the structuring or origination of any Portfolio Obligation.

A.      Communications and Negotiations.

1.      The Issuer will not have any communications or negotiations with the obligor of a Portfolio Obligation or a Reference Obligation (directly or indirectly through an intermediary such as the seller of such Portfolio Obligation or the Synthetic Security) in connection with the issuance or funding of such Portfolio Obligation or Reference Obligation or commitments with respect thereto, except for communications of an immaterial nature or customary due diligence communications; provided, that the Servicer may provide comments as to mistakes or inconsistencies in loan documents (including with respect to any provisions that are inconsistent with the terms and conditions of purchase of the loan by the Issuer).

2.      By way of example, permitted due diligence activities may include, but are not limited to, (a) attendance at an obligor's general "roadshow" or other presentations to investment professionals, (b) direct private discussions with personnel of the obligor, arranged by a sponsor, lead bank or other arranger, and (c) other due diligence activities of the kind customarily performed by offerees of the type of Portfolio Obligation being offered, but may not include any negotiations

Annex 1-1

APP 2427
003200

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Filed 06/25   Page 448 of 790   PageID 3928
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 27 of 39

with the obligor, employees or agents of the obligor of any terms or conditions of the Portfolio Obligation being offered.

3.      Negotiations between the Servicer and the underwriter, placement agent or broker of a Portfolio Obligation are permitted solely to the extent that they are limited to responses to customary pre-offering period and offering period inquiries by the underwriter or placement agent (e.g., "If we offered you 10-year senior subordinated bonds of XYZ company, what spread would it require to interest you?" or "If you will not buy the bonds as offered, would you buy if we convinced the obligor to add a fixed charge coverage test?").  For purposes of this Section I.A., "negotiations" shall not include (i) commenting on offering documents to an unrelated underwriter or placement agent when the ability to comment was generally available to other offerees, or (ii) communicating certain objective criteria (such as the minimum yield or maturity) the Issuer generally uses in purchasing the relevant type of Portfolio Obligation.

4.      The Issuer may consent or otherwise act with respect to amendments, supplements or other modifications of the terms of any Portfolio Obligation (other than a Subsidiary Obligation (as defined in Section III)) requiring consent or action after the date on which any such Portfolio Obligation is acquired by the Issuer if (a) such amendment, supplement or modification would not constitute a Significant Modification (as defined below), (b) (i) in the reasonable judgment of the Servicer, the obligor is in financial distress and such change in terms is desirable to protect the Issuer's interest and (ii) the Portfolio Obligation is described in clause 5(b) of this Section I.A., (c) the amendment or modification would not be treated as the acquisition of a new Portfolio Obligation under paragraph 5 of this Section I.A., or (d) otherwise, if it has received advice of counsel that its involvement in such amendment, supplement or modification will not cause the Issuer to be treated as engaged in a trade or business within the United States.

A "Significant Modification" means any amendment, supplement or other modification that involves (a) a change in the stated maturity or a change in the timing of any material payment of any Portfolio Obligation (including deferral of an interest payment), that would materially alter the weighted average life of the Portfolio Obligation, (b) any change (whether positive or negative) in the yield on the Portfolio Obligation immediately prior to the modification in excess of the greater of (i) 25 basis points or (ii) 5 percent of such unmodified yield, (c) any change involving a material new extension of credit, (d) a change in the obligor of any Portfolio Obligation, or (e) a material change in the collateral or security for any Portfolio Obligation, including the addition or deletion of a co-obligor or guarantor that results in a material change in payment expectations (all as determined for purposes of section 1001 of the Code).

5.      In the event the Issuer owns an interest in a Portfolio Obligation the terms of which are subsequently amended or modified, or in the case of a workout situation not described in Section III hereof, which Portfolio Obligation is

Annex 1-2

APP 2428
003201

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 5  Filed 08/25/25   Page 449 of 790   PageID 3929
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 28 of
39

subsequently exchanged for new obligations or other securities of the obligor of the Portfolio Obligation, such amendments or modifications or exchange will not be treated as the acquisition of an interest in a new Portfolio Obligation for purposes of this Annex 1, provided, that (a) the Issuer does not, directly or indirectly (through the Servicer or otherwise), seek the amendments or modifications or the exchange, or participate in negotiating the amendments or modifications or the exchange, and (b) at the time of original acquisition of the interest in the Portfolio Obligation, it was not reasonably anticipated that the terms of the Portfolio Obligation would, pursuant to a workout or other negotiation, subsequently be amended or modified.

B.      Fees.  The Issuer will not earn or receive from any Person any fee or other compensation for services, however denominated, in connection with its purchase or sale of a Portfolio Obligation or entering into a Synthetic Security; the foregoing prohibition shall not be construed to preclude the Issuer from receiving (i) commitment fees, facility maintenance fees or other similar fees that are received by the Issuer in connection with revolving or delayed drawdown Loans or synthetic or pre-funded letter of credit Loans; (ii) yield maintenance and prepayment penalty fees; (iii) fees on account of the Issuer's consenting to amendments, waivers or other modifications of the terms of any Portfolio Obligations; (iv) fees from permitted securities lending; or (v) upfront payments in lieu of periodic payments under a Synthetic Security.  The Issuer will not provide services to any Person; the foregoing prohibition shall not be construed to preclude the Issuer from activities relating to the receipt of income described in (i) through (v) of the preceding sentence.

Section II.      Loans and Forward Purchase Commitments.

A.      Any understanding or commitment to purchase a loan, a participation, or a loan subparticipation (collectively, "Loans") from a seller before completion of the closing and full funding of the Loan by such seller shall only be made pursuant to a forward sale agreement at an agreed price (stated as a dollar amount or as a percentage) (a "Forward Purchase Commitment"), unless such an understanding or commitment is not legally binding and neither the Issuer nor the Servicer is economically compelled (e.g., would otherwise be subject to a significant monetary penalty) to purchase the Loan following the completion of the closing and full funding of the Loan (i.e., the Servicer will make an independent decision whether to purchase such Loan on behalf of the Issuer after completion of the closing of the Loan) (a "Non-Binding Agreement").

B.      No Forward Purchase Commitment or Non-Binding Agreement shall be made until after the seller (or a transferor to such seller of such Loan) has made a legally binding commitment to fully fund such Loan to the obligor thereof (subject to customary conditions), which commitment cannot be conditioned on the Issuer's ultimate purchase of such Loan from such seller.

C.      In the event of any reduced or eliminated funding, the Issuer shall not receive any premium, fee, or other compensation in connection with having entered into the Forward Purchase Commitment or Non-Binding Agreement.

OHS West:260399223.3

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Filed 06/23/25   Page 450 of 790   PageID 3930
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 29 of
39

D.      The Issuer shall not close any purchase of a Loan subject to a Forward Purchase Commitment or a Non-Binding Agreement earlier than 48 hours after the time of the closing of the Loan (i.e., execution of definitive documentation), and, in the case of a Forward Purchase Commitment, the Issuer's obligation to purchase such Loan is subject to the condition that no material adverse change has occurred in the financial condition of the Loan's obligor or the relevant market on or before the relevant purchase date.

E.      The Issuer cannot have a contractual relationship with the obligor with respect to a Loan until the Issuer actually purchases the Loan.

F.      The Issuer cannot be a signatory on the original lending agreement, and cannot be obligated to fund an assignment of or a participation in a Loan, prior to the time specified in subsection D above.

G.      In addition to the restrictions otherwise applicable to Loans, the Issuer shall not acquire any synthetic or pre-funded letter of credit Loan unless (1) the cash collateral deposit with respect to such Loan was fully funded by a predecessor in interest with respect to such Loan; (2) the Loan is part of a credit facility that includes another Loan (other than a synthetic or pre-funded letter of credit Loan) to the same obligor, and is being acquired in connection with the acquisition of such other Loan and from the same seller as such other Loan, with the intent to hold both parts and with the amount of the other Loan being significantly in excess of the amount of the synthetic or pre-funded letter of credit Loan; (3) such synthetic or pre-funded letter of credit Loan satisfies the requirements set forth in Section VI.B., treating the synthetic or pre-funded letter of credit Loan, for this purpose, as though it were a delayed drawdown or revolving Loan; and (4) at no time may more than 5% of the aggregate principal amount of Portfolio Obligations consist of synthetic or pre-funded letter of credit Loans.

Section III.      Distressed Debt

A.      The Issuer may only purchase a Debt Instrument that is a Potential Workout Obligation to the extent permitted by this Section III.

B.      Neither the Issuer nor the Servicer on behalf of the Issuer shall purchase a Subsidiary Obligation from any Issuer Subsidiary.

C.      Special Procedures for Subsidiary Obligations.

1.      Potential Workout Obligations.   On or prior to the date of acquisition, the Servicer on behalf of the Issuer shall identify each Portfolio Obligation that is a Potential Workout Obligation.

2.      Transfer of Subsidiary Obligations.   From and after the occurrence of a Workout Determination Date with respect to a Subsidiary Obligation, neither the Issuer nor the Servicer on behalf of the Issuer shall knowingly take any action in respect of such Subsidiary Obligation that may result in the Issuer being engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes.  As soon as practicable, but in any event within

Annex 1-4

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65    Filed 06/13/25    Page 451 of 790    PageID 3931
Main Document    Page 264 of 272
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 30 of
39

30 calendar days following a Workout Determination Date, the Servicer shall cause the Issuer either (i) to sell or dispose of any Subsidiary Obligation identified on such Workout Determination Date to a Person that is not an Affiliate of the Issuer or Servicer or (ii) to assign any Subsidiary Obligation identified on such Workout Determination Date to an Issuer Subsidiary.

For purposes of this Annex 1, an "Issuer Subsidiary" means any wholly-owned corporate subsidiary of the Issuer to which a Special Workout Obligation may be transferred in accordance with this Annex 1.

3.    Consideration for Assignment of Subsidiary Obligations. Consideration given by an Issuer Subsidiary for the assignment to it of Subsidiary Obligations may be in the form of cash or in the form of indebtedness of, or equity interests in, such Issuer Subsidiary.

4.    Classification of Issuer Subsidiaries. Each Issuer Subsidiary shall be an entity treated as a corporation for United States federal income tax purposes.

As used herein:

"Potential Workout Obligation" means any debt instrument (any such instrument, including an interest in a Loan, a "Debt Instrument") which, as of the date of acquisition by the Issuer or an Issuer Subsidiary, based on information specific to such Debt Instrument or the circumstances of the obligor thereof, is a Workout Obligation or, in the reasonable determination of the Servicer, has a materially higher likelihood of becoming a Workout Obligation as compared to debt obligations that par or other non-distressed debt purchasers or funds relating to that asset type customarily purchase and expect to hold to maturity.

"Subsidiary Obligation" means any Potential Workout Obligation (a) as to which the Issuer on any Workout Determination Date either (i) owns more than 40% of the aggregate principal amount of such class of Potential Workout Obligation outstanding or (ii) is one of the two largest holders of any class of debt of the obligor of such Potential Workout Obligation (based on the outstanding principal amount of such class of debt owned by the Issuer as a percentage of the aggregate outstanding principal amount of such class of debt) unless not fewer than three other holders and the Issuer collectively own at least 65% of such class of debt and, if the Issuer is the largest holder of such class, the Issuer's percentage of such class does not exceed the percentage held by the next largest holder of the debt by more than 5% of such class or (b) that would, upon foreclosure or exercise of similar legal remedies, result in the Issuer directly owning assets (other than securities treated as debt, equity in a partnership not engaged in a trade or business within the United States, or corporate equity for United States federal income tax purposes, provided in the case of corporate equity that the corporation is not a "United States real property holding corporation" within the meaning of section 897 of the Code) which are "United States real property interests" within the meaning of section 897 of the Code or which the Servicer reasonably expects it

Annex 1-5

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65    Main Document Filed 08/25/25    Page 452 of 790    Page 453 of 790    PageID 3932
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 31 of
39

would, on behalf of the Issuer, be required to actively manage to preserve the value of the Issuer's interest therein; provided that a Potential Workout Obligation shall not be treated as a Subsidiary Obligation if the Issuer obtains a Tax Opinion that, based on all the surrounding circumstances, the activities in which the Issuer intends to engage with respect to such Potential Workout Obligation will not cause the Issuer to be treated as engaged in a trade or business for United States federal income tax purposes.

"Workout Determination Date" means any date on which, in connection with the occurrence of any event described in clauses (a) through (c), inclusive, of the definition of Workout Obligation, either (a) any material action by the Issuer is required to be taken, (b) the Servicer receives written notice that such material action shall be required or (c) the Servicer reasonably determines that the taking of such material action is likely to be required.

"Workout Obligation" means any Debt Instrument as to which the Servicer on behalf of the Issuer (a) consents to a Significant Modification in connection with the workout of a defaulted Portfolio Obligation, (b) participates in an official or unofficial committee or similar official or unofficial body in connection with a bankruptcy, reorganization, restructuring or similar proceeding, or (c) exercises, or has exercised on its behalf, rights of foreclosure or similar judicial remedies.

Section IV.    Purchases from the Servicer or its Affiliates.

A.    If the Servicer or an Affiliate of the Servicer acted as an underwriter, placement or other agent, arranger, negotiator or structuror, or received any fee for services (it being understood that receipts described in clauses (i) through (v) of Section I.B. are not construed as so treated), in connection with the issuance or origination of a Portfolio Obligation or was a member of the original lending syndicate with respect to the Portfolio Obligation (any such Portfolio Obligation, a "Special Procedures Obligation"), the Issuer will not acquire any interest in such Special Procedures Obligation (including entering into a commitment or agreement, whether or not legally binding or enforceable, to acquire such obligation directly or synthetically), from the Servicer, an Affiliate of the Servicer, or a fund managed by the Servicer, unless (i) the Special Procedures Obligation has been outstanding for at least 90 days, (ii) the holder of the Special Procedures Obligation did not identify the obligation or security as intended for sale to the Issuer within 90 days of its issuance, (iii) the price paid for such Special Procedures Obligation by the Issuer is its fair market value at the time of acquisition by the Issuer, and (iv) the transaction is proposed to, and the ultimate purchase is approved on behalf of the Issuer by, one or more Independent Advisors to the Issuer in accordance with the provisions of Section IV.B. below.  The Issuer will not acquire any Special Procedures Obligation if, immediately following such acquisition, the fair market value of all Special Procedures Obligations owned by the Issuer would constitute more than 49% of the fair market value of all of the Issuer's assets at such time.

B.    An "Independent Advisor" is a Person who is not an Affiliate of the Issuer, the Servicer or any fund managed by the Servicer.

Annex 1-6

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document Filed 06/25/25    Page 453 of 790    PageID 3933
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 32 of
39

1.      The Issuer may not purchase or commit to enter into any such Special Procedures Obligation without prior approval by an Independent Advisor. If the Independent Advisor declines to approve a proposed Special Procedures Obligation, at least three months must elapse before any proposal with respect to the acquisition of debt or other obligations of the same obligor are proposed or considered.

2.      The Issuer shall engage the Independent Advisor in an agreement the terms of which shall in substantial form set forth:

(a) the representation of the Independent Advisor, which the Servicer shall not know to be incorrect, that it has significant financial and commercial expertise, including substantial expertise and knowledge in and of the loan market and related investment arenas;

(b) the agreement between the Independent Advisor, the Issuer and the Servicer generally to the effect that (i) the Independent Advisor will operate pursuant to procedures consistent with maintaining his or her independence from the Servicer and its Affiliates, (ii) the Independent Advisor will have the sole authority and discretion to approve or reject purchase proposals made by the Servicer with respect to any Special Procedures Obligation, (iii) all proposals for the Issuer to acquire any Special Procedures Obligation will be first submitted to the Independent Advisor, (iii) the Servicer will prepare the materials it deems necessary to describe the Special Procedures Obligation to the Independent Advisor, (iv) the Investment Advisor will not be required to make any decision to accept or decline a Special Procedures Obligation at the price offered prior to its review of the materials prepared, plus any additional information requested by the Independent Advisor, and (v) no Independent Advisor may be proposed to be replaced by the Servicer, unless for cause or in the event of a resignation of such Independent Advisor; and

(c) such other commercially reasonable terms and conditions, including terms and conditions to the effect that (i) the Independent Advisor will be paid a reasonable fee for its services plus reimbursement of any reasonable expenses incurred in performance of his or her responsibilities, (ii) the Independent Advisor may be removed or replaced only by a majority (whether by positive act or failure to object) of the probable equity owners (as determined for United States federal income tax purposes) of the Issuer, (iii) if at any time there is more than one Independent Advisor to the Issuer, a majority of such Independent Advisors must approve any Special Procedures Obligation subject to Independent Advisor approval, (iv) an Independent Advisor may not engage, directly or indirectly, in the negotiation of the terms of any Special Procedures Obligation to be acquired by the Issuer (provided however, that an Independent Advisor may

OHS West:260399223.3

APP 2423

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document 5   Document Filed 06/05/25   Page 33435 of 2738   Page 454 of 790   PageID 3934
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 33 of
39

negotiate with the Servicer or the seller with respect to the price and terms of the Issuer's purchase of the Special Procedures Obligation, <u>provided further</u> that the Independent Advisor will not make suggestions to the Servicer or any other person about alternative or modified terms of the underlying Special Procedures Obligation on which they might be willing to approve such a Special Procedures Obligation).

3.      Any servicing agreement or other document under which the Servicer is granted signatory powers or other authority on behalf of the Issuer will provide that such powers or authority with respect to Special Procedures Obligations are conditioned upon the prior written approval of the Independent Advisor

.

4.      No Special Procedures Obligation will be presented to an Independent Advisor until at least 90 days have elapsed since the later of (a) the execution of final documentation and (b) the funding in whole or part of the Special Procedures Obligation and there will have been no commitment or arrangement prior to that time that the Issuer will acquire any such Special Procedures Obligation; <u>provided</u>, <u>further</u>, that the Special Procedures Obligation will not be treated as outstanding for any day on which the Issuer enjoys the benefits and burdens of ownership (for example, because any Person has hedged its credit exposure to the Special Procedures Obligation with the Issuer).

5.      The Issuer will have no obligation to, or understanding that it will refund, reimburse or indemnify any person (including an Affiliate of the Servicer), directly or indirectly, for "breakage" costs or other costs or expenses incurred by such person if the Independent Advisor determines that the Issuer should decline to purchase any Special Procedures Obligation.

6.      Neither the Servicer nor any Affiliate of the Servicer will have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to Special Procedures Obligations without the prior written approval of an Independent Advisor.  Except as may be conditioned upon  such prior written approval, neither the Servicer nor any Affiliate of the Servicer may hold itself out as having signatory powers on behalf of the Issuer or authority to enter into agreements with respect to Special Procedures Obligations on behalf of the Issuer.

Section V.      <u>Synthetic Securities</u>.

A.      The Issuer shall not (i) acquire or enter into any Synthetic Security with respect to any Reference Obligation the direct acquisition of which would violate any provision of this Annex 1 or (ii) use Synthetic Securities as a means of making advances to the Synthetic Security Counterparty following the date on which the Synthetic Security is acquired or entered into (for the avoidance of doubt, the establishment of Synthetic Security collateral accounts and the payment of Synthetic Security Counterparties from the amounts on deposit therein, shall not constitute the making of advances).

Annex 1-8

003207
APP 2491

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Filed 08/26/25   Page 455 of 790   PageID 3935
Main Document   Page 34 of 272
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 34 of
39

B.      With respect to each Synthetic Security, the Issuer will not acquire or enter into any Synthetic Security that does not satisfy all of the following additional criteria unless the Servicer has first received advice of counsel that the ownership and disposition of such Synthetic Security would not cause the Issuer to be engaged in a trade or business within the United States for United States federal income tax purposes:

1.      the criteria used to determine whether to enter into any particular Synthetic Security was similar to the criteria used by the Servicer in making purchase decisions with respect to debt securities;

2.      the Synthetic Security is acquired by or entered into by the Issuer for its own account and for investment purposes with the expectation of realizing a profit from income earned on the securities (and any potential rise in their value) during the interval of time between their purchase and sale or hedging purposes and not with an intention to trade or to sell for a short-term profit;

3.      the Issuer enters into the Synthetic Security with a counterparty that is not a special purpose vehicle and is a broker-dealer or that holds itself out as in the business of entering into such contracts;

4.      neither the Issuer nor any Person acting on behalf of the Issuer advertises or publishes the Issuer's ability to enter into Synthetic Securities;

5.      except with respect to (x) credit-linked notes or similar Synthetic Securities and (y) any other Synthetic Securities where standard form ISDA documentation is not applicable, the Synthetic Security is written on standard form ISDA documentation;

6.      the net payment from the Issuer to the Synthetic Security Counterparty is not determined based on an actual loss incurred by the Synthetic Security Counterparty or any other designated person;

7.      there exists no agreement, arrangement or understanding that (i) the Synthetic Security Counterparty is required to own or hold the related Reference Obligation while the Synthetic Security remains in effect or (ii) the Synthetic Security Counterparty is economically or practically compelled to own or hold the related physical Reference Obligation while the Synthetic Security remains in effect;

8.      the Synthetic Security provides for (i) all cash settlement, (ii) all physical settlement or (iii) the option to either cash settle or physically settle; provided that, in the latter two cases, physical settlement provides the settling party the right to settle the Synthetic Security by delivering deliverable obligations which *may* include the Reference Obligation and the settling party must not be required to deliver the related Reference Obligation upon the settlement of such Synthetic Security.

OHS West:260399223.3

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 65-5    Filed 06/25/25    Page 456 of 790    PageID 3936
Main Document    Page 35 of 273
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 35 of
39

Notwithstanding the preceding paragraph, a Synthetic Security providing for physical settlement may require a party to deliver the related Reference Obligation if either:

(i)     at the time the Issuer enters into such Synthetic Security, such Reference Obligation is readily available to purchasers generally in a liquid market; or

(ii)     the advice of both United States federal income tax and insurance counsel of nationally recognized standing in the United States experienced in such matters is that, under the relevant facts and circumstances with respect to such Synthetic Security, the acquisition of such Synthetic Security will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis and should not cause the Issuer to be treated as writing insurance in the United States under the law of the state in which the Synthetic Security Counterparty is organized.

9.     the Synthetic Security is not treated by the Issuer as insurance or a financial guarantee sold by the Issuer for United States or Cayman Islands regulatory purposes.

As used herein:

"Reference Obligation" means a debt security or other obligation upon which a Synthetic Security is based.

"Synthetic Security" means any swap transaction or security, other than a participation interest in a Loan, that has payments associated with either payments of interest and/or principal on a Reference Obligation or the credit performance of a Reference Obligation.

"Synthetic Security Counterparty" means an entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor).

Section VI.     Other Types of Assets.

A.     Equity Restrictions.  The Issuer will not purchase any asset (directly or synthetically) that is:

1.     not treated for U.S. federal income tax purposes as debt if the issuing entity is a "partnership"(within the meaning of Section 7701(a)(2) of the Code) unless such entity is not engaged in a trade or business within the United States, or

2.     a "United States real property interest" as defined in section 897 of the Code and the Treasury Regulations promulgated thereunder.

Annex 1-10

APP 2426
003209

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 55   Filed 06/24/25   Page 457 of 790   PageID 3937
Main Document   Page 36 of 272
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 36 of
39

3.       a residual interest in a  "REMIC" or an ownership interest in a "FASIT" (as such terms are as defined in the Code).

The Issuer may cause an Issuer Subsidiary to acquire assets set forth in clause (i) or (ii) above (each, an "ETB/897 Asset") in connection with the workout of defaulted Portfolio Obligations, so long as the acquisition of ETB/897 Assets by such Issuer Subsidiary will not cause the stock of such Issuer Subsidiary to be deemed to be an ETB/897 Asset.

        B.     <u>Revolving Loans and Delayed Drawdown Loans</u>.  All of the terms of any advance required to be made by the Issuer under any revolving or delayed drawdown Loan will be fixed as of the date of the Issuer's purchase thereof (or will be determinable under a formula that is fixed as of such date), and the Issuer and the Servicer will not have any discretion (except for consenting or withholding consent to amendments, waivers or other modifications or granting customary waivers upon default) as to whether to make advances under such revolving or delayed drawdown Loan.

        C.     <u>Securities Lending Agreements</u>.  The Issuer will not purchase any Portfolio Obligation primarily for the purpose of entering into a securities lending agreement with respect thereto.

        D.     <u>Exception From Secondary Market Rule for Debt Securities</u>.  Any purchase of a Portfolio Obligation other than a Loan (a "Debt Security") pursuant to a commitment, arrangement or other understanding made before or contemporaneously with completion of the closing and funding of such Debt Security issuance shall be made only in connection with one of the following:

        (i)     an underwriting of a registered public offering in which the seller has made a firm underwriting commitment to the issuer of such Debt Security where none of the Servicer or any Affiliate thereof acted as an underwriter or placement agent or participated in negotiating or structuring the terms of the Debt Security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities),

        (ii)     a private placement to qualified investors (pursuant to Rule 144A or Section 4(2) under the Securities Act or other similar arrangement) in which such Debt Security was originally issued pursuant to an offering circular, private placement memorandum, or similar offering document and none of the Servicer or any Affiliate thereof acted as a placement agent or underwriter or participated in negotiating or structuring the terms of the Debt Security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities), or

        (iii)     an acquisition of or entry into a Synthetic Obligation in accordance with Section V. above;

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Main Document Page 63445 of 272ge 458 of 790    PageID 3938
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 37 of
39

If an Affiliate of the Servicer is acting as an underwriter or placement agent or an Affiliate of the Servicer or an employee of an Affiliate of the Servicer participated in the structuring of an issuance otherwise described in clause (i) or clause (ii) of this paragraph D, one of the following additional conditions must be met:

(x)    the Servicer did not participate in negotiating or structuring the terms of the obligation or security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities) and the Issuer purchases no more than 33% of the aggregate principal amount of the tranche of securities (or other instruments) of which such Debt Security is a part and more than 50% of the aggregate principal amount of such tranche is substantially contemporaneously sold to one or more Persons unrelated to the Servicer (and who have not given the Servicer discretionary trading authority) on terms and conditions substantially the same as those on which the Issuer is to purchase,

(y)    the Servicer did not participate in negotiating or structuring the terms of the obligation or security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities) and the Issuer purchases less than 33% of the aggregate principal amount of all tranches issued as part of the transaction in which the Debt Security was issued and more than 50% of the aggregate principal amount of such tranches are substantially contemporaneously sold to one or more Persons unrelated to the Servicer (and who have not given the Servicer discretionary trading authority) on terms and conditions substantially the same as those on which the Issuer is to purchase, or

(z)    such security or obligation satisfies the requirements and procedures applicable to Special Procedures Obligations in Section IV as though it were a Loan;

provided, however, in either of (x) or (y), the Affiliate of the Servicer was (or the employees of the Affiliate of the Servicer were)  acting as an underwriter or placement agent (or otherwise participated in the structuring of such issuance) solely as, or solely as an employee of, a Permitted Affiliate (as defined below).

"Permitted Affiliate" means any Affiliate (i) that is a separate legal entity that is operated independently of the Servicer, (ii) whose personnel are not managed by and who do not report to the personnel of the Servicer, and (iii) whose personnel are not compensated based upon the performance of the Servicer.

Section VII.    <u>General Restrictions on the Issuer</u>.  The Issuer itself shall not:

A.    hold itself out, through advertising or otherwise, as originating Loans, lending funds, or making a market in or dealing in Loans or other assets;

Annex 1-12

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Main Document   Filed 06/02/25   Page 459 of 790   Page 2443 of 2723   PageID 3939
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 38 of 39

B.      register as, hold itself out as, or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as, a broker-dealer, a bank, an insurance company, financial guarantor, a surety bond issuer, or a company engaged in Loan origination;

C.      knowingly take any action causing it to be treated as a bank, insurance company, or company engaged in Loan origination for purposes of any tax, securities law or other filing or submission made to any governmental authority;

D.      hold itself out, through advertising or otherwise, as originating, funding, guaranteeing or insuring debt obligations or as being willing and able to enter into transactions (either purchases or sales of debt obligations or entries into, assignments or terminations of hedging or derivative instruments, including Synthetic Securities) at the request of others;

E.      treat Synthetic Securities as insurance, reinsurance, indemnity bonds, guaranties, guaranty bonds or suretyship contracts for any purpose;

F.      allow any non-U.S. bank or lending institution who is a holder of a Security to control or direct the Servicer's or Issuer's decision to acquire a particular asset except as otherwise allowed to such a holder, acting in that capacity, under the related indenture or acquire a Portfolio Obligation conditioned upon a particular person or entity holding Securities;

G.      acquire any asset the holding or acquisition of which the Servicer knows would cause the Issuer to be subject to income tax on a net income basis;

H.      hold any security as nominee for another person; or

I.      buy securities with the intent to subdivide them and sell the components or to buy securities and sell them with different securities as a package or unit.

Section VIII.   Tax Opinion; Amendments.

A.      In furtherance and not in limitation of this Annex 1, the Servicer shall comply with all of the provisions set forth in this Annex 1, unless, with respect to a particular transaction, the Servicer acting on behalf of the Issuer and the Trustee shall have received written advice of counsel of nationally recognized standing in the United States experienced in such matters (a "Tax Opinion"), that, under the relevant facts and circumstances with respect to such transaction, the Servicer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

B.      The provisions set forth in the Annex 1 may be amended, eliminated or supplemented by the Servicer if the Issuer, the Servicer and the Trustee shall have received a Tax Opinion that the Servicer's compliance with such amended provisions or supplemental provisions or the failure to comply with such provisions proposed to be

OHS West:260399223.3

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65   Filed 06/23   Page 460 of 790   PageID 3940
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 39 of
39

eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

OHS West:260399223.3

# EXHIBIT 26

```
                 IN THE UNITED STATES BANKRUPTCY COURT
1                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
2
                              )    Case No. 19-34054-sgj-11
3   In Re:                    )    Chapter 11
                              )
4   HIGHLAND CAPITAL          )    Dallas, Texas
    MANAGEMENT, L.P.,         )    Wednesday, February 3, 2021
5                             )    9:30 a.m. Docket
            Debtor.           )
6                             )    CONFIRMATION HEARING [1808]
                              )    AGREED MOTION TO ASSUME [1624]
7                             )
                              )    Continued from 02/02/2021
8   _____  )

9                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10               UNITED STATES BANKRUPTCY JUDGE.

11  WEBEX APPEARANCES:

12  For the Debtor:          Jeffrey Nathan Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
13                           10100 Santa Monica Blvd.,
                              13th Floor
14                           Los Angeles, CA  90067-4003
                             (310) 277-6910
15
    For the Debtor:          John A. Morris
16                           PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
17                           New York, NY  10017-2024
                             (212) 561-7700
18
    For the Debtors:         Ira D. Kharasch
19                           PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
20                            13th Floor
                             Los Angeles, CA  90067-4003
21                           (310) 277-6910

22  For the Official Committee Matthew A. Clemente
    of Unsecured Creditors:  SIDLEY AUSTIN, LLP
23                           One South Dearborn Street
                             Chicago, IL  60603
24                           (312) 853-7539

25
```

Exhibit D



003214

2

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero:            Clay M. Taylor
                                   BONDS ELLIS EPPICH SCHAFER
 3                                    JONES, LLP
                                   420 Throckmorton Street,
 4                                    Suite 1000
                                   Fort Worth, TX  76102
 5                                 (817) 405-6900

 6   For Get Good Trust and        Douglas S. Draper
     Dugaboy Investment Trust:     HELLER, DRAPER & HORN, LLC
 7                                 650 Poydras Street, Suite 2500
                                   New Orleans, LA  70130
 8                                 (504) 299-3300

 9   For Certain Funds and         Davor Rukavina
     Advisors:                     Julian Vasek
10                                 MUNSCH, HARDT, KOPF & HARR
                                   500 N. Akard Street, Suite 3800
11                                 Dallas, TX  75201-6659
                                   (214) 855-7587
12
     For the NexPoint              Lauren K. Drawhorn
13   Parties:                      WICK PHILLIPS
                                   3131 McKinney Avenue, Suite 100
14                                 Dallas, TX  75204
                                   (214) 692-6200
15
     For the U.S. Trustee:         Lisa L. Lambert
16                                 OFFICE OF THE UNITED STATES
                                     TRUSTEE
17                                 1100 Commerce Street, Room 976
                                   Dallas, TX  75242
18                                 (214) 767-8967

19   For Scott Ellington,          Debra A. Dandeneau
     Isaac Leventon, Thomas        BAKER & MCKENZIE, LLP
20   Surgent, and Frank           452 Fifth Avenue
     Waterhouse:                   New York, NY 10018
21                                 (212) 626-4875

22   For Certain Funds and         A. Lee Hogewood, III
     Advisors:                     K&L GATES, LLP
23                                 4350 Lassiter at North Hills
                                     Avenue, Suite 300
24                                 Raleigh, NC  27609
                                   (919) 743-7306

25
```

3

```
 1   Recorded by:                Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
 2                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
 3                               (214) 753-2062

 4   Transcribed by:             Kathy Rehling
                                 311 Paradise Cove
 5                               Shady Shores, TX  76208
                                 (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.
25
```

4

003217
APP 2444

| | |
|---|---|
| 1 | <u>DALLAS, TEXAS - FEBRUARY 3, 2021 - 9:38 A.M.</u> |
| 2 | THE CLERK:  All rise.  The United States Bankruptcy |
| 3 | Court for the Northern District of Texas, Dallas Division, is |
| 4 | now in session, the Honorable Stacey Jernigan presiding. |
| 5 | THE COURT:  Good morning.  Please be seated.  All |
| 6 | right.  We are ready for Day Two of the confirmation hearing |
| 7 | in Highland Capital Management, LP, Case No. 19-34054.  I'll |
| 8 | just make sure we've got the key parties at the moment.  Do we |
| 9 | have Mr. Pomerantz, Mr. Morris, for the Debtor team? |
| 10 | MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff |
| 11 | Pomerantz for the Debtors. |
| 12 | MR. MORRIS:  And I'm here as well, Your Honor. |
| 13 | THE COURT:  All right.  Good. |
| 14 | All right.  For our objecting parties, do we have Mr. |
| 15 | Taylor and your crew for Mr. Dondero? |
| 16 | MR. TAYLOR:  Yes, Your Honor. |
| 17 | THE COURT:  Good morning. |
| 18 | All right.  For Dugaboy Trust and Get Good Trust, do we |
| 19 | have Mr. Draper?  (No response.)  All right.  I do see Mr. |
| 20 | Draper.  I didn't hear an appearance.  You must be on mute. |
| 21 | MR. DRAPER:  I'm present, -- |
| 22 | THE COURT:  Okay. |
| 23 | MR. DRAPER:  -- Your Honor. |
| 24 | THE COURT:  Okay.  Good morning. |
| 25 | MR. DRAPER:  I'm present, Your Honor. |

5

1          THE COURT:  Good morning.  I heard you that time.

2     Thank you.

3       All right.  And now for what I'll call the Funds and

4     Advisors Objectors, do we have Ms. Rukavina present?

5          MR. RUKAVINA:  Yes, Your Honor.  Good morning.

6          THE COURT:  Good morning.  All right.  And I will

7     check.  Do we have Mr. Clemente or your team there?

8          MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt

9     Clemente from Sidley Austin on behalf of the Committee.

10         THE COURT:  All right.  Ms. Drawhorn, do we have you

11     there for the NexPoint Real Estate Partners and related funds?

12         MS. DRAWHORN:  Yes, Your Honor.  Good morning.

13         THE COURT:  Good morning.  All right.  Did I miss --

14     I think that captured all of our Objectors.  Anyone who I've

15     missed?

16       All right.  Well, when we recessed yesterday, Mr. Morris,

17     I think you were about to call your third witness; is that

18     correct?

19         MR. MORRIS:  It is, Your Honor.  But if I may, I'd

20     like to just address the objections to the remaining exhibits,

21     since I hope that won't take too long.

22         THE COURT:  All right.  You may.

23         MR. POMERANTZ:  Actually, Your Honor, before we go

24     there, we filed the supplemental declaration of Patrick

25     Leatham, as we indicated we would do yesterday.  We just

APP 2465

6

```
 1   wanted to get confirmation again that nobody intends to cross-
 2   examine him, so that he doesn't have to sit through the
 3   festivities today.
 4             THE COURT:  All right.  Well, I did see that you
 5   filed that.
 6        Does anyone anticipate wanting to cross-examine Mr.
 7   Leatham, the balloting agent?
 8             MR. RUKAVINA:  Your Honor, I take it that that
 9   declaration is part of the record.  As long as the Court
10   confirms that, I do not intend to call the gentlemen.
11             THE COURT:  All right.  Well, I will take judicial
12   notice of it and make it part of the record.  It appears at
13   Docket Entry No. 1887.  Again, it was filed -- well, it was
14   actually filed early this morning, I think.  So, all right.
15   So, with --
16             MR. MORRIS:  And to avoid --
17             THE COURT:  Go ahead.
18             MR. MORRIS:  To -- I was just going to say, to avoid
19   any ambiguity, Your Honor, the Debtor respectfully moves that
20   document into the evidentiary record.
21             THE COURT:  All right.  The Court will --
22        (Interruption.)
23             THE COURT:  Someone needs to put their phone on mute,
24   perhaps.  Unless someone was intentionally speaking.
25        All right.  So, I will grant that request.  Docket Entry
```

APP 2446

7

 1   No. 1887 will be part of the confirmation evidence of this

 2   hearing.

 3       (Debtor's Patrick Leatham Declaration at Docket 1887 is

 4   received into evidence.)

 5            THE COURT:  All right.  Anything else?  There were

 6   other exhibits I think you were going to talk about?

 7            MR. MORRIS:  Yeah.  Let me just go through them one

 8   at a time, if I may, Your Honor.

 9            THE COURT:  Okay.

10            MR. MORRIS:  All right.  So, I'm going to deal with

11   the transcripts that have been objected to one at a time.  And

12   I'll just take them in order.  The first one can be found at

13   Exhibit B.  It is on Docket No. 1822.

14            THE COURT:  Okay.

15            MR. MORRIS:  Exhibit B is the deposition transcript

16   from the December 16, 2020 hearing on the Advisor and the

17   Funds' motion for an order restricting the Debtor from

18   engaging in certain CLO-related transactions.

19       During that hearing, the Court heard the testimony of

20   Dustin Norris.  Mr. Norris is an executive vice president for

21   each of the Funds and each of the Advisors.

22       We would be offering the transcript for the limited

23   purposes of establishing Mr. Dondero's ownership and control

24   over the Advisors.

25       Mr. Norris also gave some pretty substantial testimony

APP 2467

8

1   concerning the so-called independent board of the Funds.

2       And as a general matter, Your Honor, to the extent that

3   the objection is on hearsay grounds, the transcript -- at

4   least the portions relating to Mr. Norris's testimony --

5   simply are not hearsay under Evidentiary Rule 801(d)(2).

6   These are statements of an opposing party, and I think we fall

7   well within that.

8       So, we would respectfully request that the Court admit

9   into the record the transcript from December 16th, at least

10   the portions of which are Mr. Norris's testimony.

11           THE COURT:  All right.  And, again, these appear at

12   -- I think I heard you say B and then E.  Is that correct?

13           MR. MORRIS:  Just B.  Just B at the moment.  B as in

14   boy.

15           THE COURT:  Okay.  Just B at the moment?

16       All right.  Any objections to that?

17           MR. RUKAVINA:  Your Honor, I had objected, but now

18   that it's offered for that limited purpose, I withdraw my

19   objection.

20           THE COURT:  All right.  Then B -- I'm sorry.  Was

21   there anyone else speaking?

22       B will be admitted.  And, again, it appears at Docket

23   Entry 1822.

24       (Debtor's Exhibit B, Docket Entry 1822, is received into

25   evidence.)

9

1              MR. MORRIS:  Okay.  Next, the next transcript can be

2    found at Exhibit 6R, and that's Docket 1866.  Exhibit 6R is

3    the transcript of the January 9, 2020 hearing where the Court

4    approved the corporate governance settlement.  We think that

5    that transcript is highly relevant, Your Honor, because it

6    reflects not only Mr. Dondero's notice and active

7    participation in the consummation of the corporate governance

8    agreement, but it also reflects the Court and the parties'

9    views and expectations that were established at that time,

10   such that if anybody contends that there's any ambiguity about

11   any aspect of the order, I believe that that would be the best

12   evidence to resolve any such disputes.

13        So, for the purpose of establishing Mr. Dondero's notice,

14   Mr. Dondero's participation, and the parties' discussions and

15   expectations with regard to every aspect of the corporate

16   governance settlement, including Mr. Dondero's stipulation,

17   the order that emerged from it, and the term sheet, we think

18   that that's properly into evidence.

19              THE COURT:  Any objection?

20        All right.  6R will be admitted.  Again, at Docket Entry

21   1822.

22        (Debtor's Exhibit 6R, Docket Entry 1822, is received into

23   evidence.)

24              MR. MORRIS:  Next, Your Honor, we've got Exhibits 6S

25   as in Sam and 6T as in Thomas.  They're companions.  And they

10

1   can be found at Docket 1866.  And those are the transcripts.

2   The first one is from the October 27th disclosure statement

3   hearing, and the second one actually is from the Patrick

4   Daugherty, I believe, lift stay motion.

5       I'll deal with the first one first, Your Honor.  We

6   believe that the transcript of the October 27th hearing goes

7   to the good faith nature of the Debtor's proposed plan.  It

8   shows that the Debtor and the Committee were not always

9   aligned on every interest.  It shows that the Committee, in

10  fact, strenuously objected to certain aspects of the then-

11  proposed plan by the Debtors.  And we just think it goes to

12  the heart of the good faith argument.

13      The transcript for the 28th, we would propose to offer for

14  the limited purpose of the commentary that you offered at the

15  end of that hearing, where Your Honor made it clear that

16  employee releases would not be -- would not likely be

17  acceptable to the Court unless there was some consideration

18  paid.

19      And it was really, frankly, Your Honor's comments that

20  helped spur the Committee and the Debtor to discuss over the

21  next few weeks the resolution of the issues concerning the

22  employee releases.

23      So we're not offering Exhibit 6T for anything having to do

24  with Mr. Daugherty or his claim, but just the latter portion

25  relating to the discussion about the employee releases.  And,

Case 3:25-cv-02072-S   Document 15-5   Filed 06/26/25   Page 471 of 790   PageID 3951
Main Document    Page 8459 of 1728

11

 1   with that, we'd move those transcripts into evidence.

 2          THE COURT:  Any objection?

 3          MR. RUKAVINA:  Your Honor, yes, I do object.  6S is

 4   hearsay, and under Rule 804(b)(1) it's admissible only if the

 5   witnesses are unavailable to be called.  There's been no

 6   suggestion that they're not.

 7      As far as 6T, what Your Honor says is not hearsay, so as

 8   long as it's just what Your Honor was saying, I do not object

 9   to 6T.  I object to the balance of it.

10          THE COURT:  Okay.  What about that objection on 6S?

11          MR. MORRIS:  Yeah.  One second, Your Honor.  I would

12   go to the residual exception to the hearsay rule under 807.

13   807 specifically applies if the statement being offered is

14   supported by sufficient guarantees of trustworthiness and it's

15   more probative on the point -- and the point here is simply to

16   help buttress the Debtor's good faith argument -- and it's

17   more probative on the point than any other evidence.  And I'm

18   not sure what better evidence there would be than an on-the-

19   record discussion between the Debtor and the Committee as to

20   the disputes they were having on the disclosure statement.

21          THE COURT:  All right.  I'm going to overrule the

22   objection and accept that 807 exception as being valid here.

23   So, I am admitting both 6S and 6T.  And for the record, I

24   think you said they appeared at 1866.  They actually appear at

25   1822.

APP 2451

12

1          MR. MORRIS:  Okay, Your Honor.  I am corrected.  It

2    is 6S and 6T, and they are indeed at 1822.  Forgive me.

3          THE COURT:  Okay.

4       (Debtor's Exhibits 6S and 6T, Docket Entry 1822, is

5    received into evidence.)

6          MR. MORRIS:  The next transcript and the last one is

7    6U, which is also at 1822.  6U is the transcript from the

8    December 10th hearing on the Debtor's motion for a TRO against

9    Mr. Dondero.  We believe the entirety of that transcript is

10   highly relevant, and it relates specifically to the Debtor's

11   request for the exculpation, gatekeeper, and injunction

12   provisions of their plan.  And on that basis, we would offer

13   that into evidence.

14         THE COURT:  Any objection?

15         MR. TAYLOR:  Yes, Your Honor.  This is Clay Taylor on

16   behalf of Mr. Dondero.

17      We do object, on the same basis that it is hearsay.  There

18   has certainly been plenty of testimony before this Court and

19   on the record as to why the Debtor believes that its plan

20   provisions are appropriate and allowable, and there's no need

21   to allow hearsay in for that.  All of the witnesses were

22   available to be called by the Debtor.  The Debtor is in the

23   midst of its case and can call whoever else it needs to call

24   to get these into evidence or to get those docs into evidence.

25   And therefore, we don't believe that any residual exception

003225

13

1   should apply.

2              THE COURT:  Mr. Morris, your response?

3              MR. MORRIS:  First, Your Honor, any statements made

4   by or on behalf of Mr. Dondero would not be hearsay under

5   801(d)(2).

6        And secondly, there is no other evidence of the Debtor's

7   motion of the -- of the argument that was had.  There is no

8   other evidence, let alone better evidence, than the transcript

9   itself.  And I believe 807 is certainly the best rule to

10  capture that.

11       It is a statement that's supported by sufficient

12  guarantees of trustworthiness.  Again, these are the litigants

13  appearing before Your Honor.  It may not be sworn testimony,

14  but I would hope that everybody is doing their best to comply

15  with the guarantee of trustworthiness in that regard, putting

16  aside advocacy.

17       And it is more probative on the point for which we're

18  offering -- and that is on the very issues of exculpation,

19  gatekeeper, and injunction -- than anything else we can offer

20  in that regard.

21             THE COURT:  All right.  I overrule the objection and

22  I will admit 6U.  Okay.

23       (Debtor's Exhibit 6U, Docket Entry 1822, is received into

24  evidence.)

25             MR. MORRIS:  All right.  Going back to the top, Your

14

1   Honor, Companions Exhibit D as in David and E as in Edward,

2   which are at Docket 1822.

3       Exhibit D is an email string that relates to the Debtor's

4   communications with the Creditors' Committee concerning a

5   transaction known as SSP, which stands for Steel Products --

6   Structural and Steel Products.  So that was an asset that the

7   Debtor was selling, trying to sell at a particular point in

8   time.  And Exhibit E is a deck that the Debtor had prepared

9   for the benefit of the UCC.

10      And if we looked that those documents, Your Honor, you'd

11  see that the Debtor was properly following the protocols that

12  were put in place in connection with the January 9th corporate

13  governance settlement.  And the Committee is being informed by

14  the Debtor of what the Debtor intends to do with that

15  particular asset.

16      And the reason that it's particularly relevant here, Your

17  Honor, is Dustin Norris had submitted a declaration in support

18  of their motion that was heard on September -- on December

19  16th.  That declaration is an exhibit to what is Exhibit A on

20  Docket 1822.  Exhibit A on the docket is the Advisor and the

21  Funds' motion.  Okay?  So, Exhibit A is the motion.  Attached

22  to that Exhibit A is an exhibit, which is Mr. Norris's

23  declaration.

24      At Paragraph 9 of Mr. Norris's declaration, he takes issue

25  with the Debtor's process for the sale of that particular

15

 1   asset.

 2       And so, having admitted already into the record Mr.

 3   Norris's declaration, we believe that these documents rebut

 4   the statements made in Mr. Norris's declaration, and indeed,

 5   were part of the transcript that has now already been admitted

 6   into evidence.  So we think the documents are needed because

 7   they were exhibits during that hearing.

 8           THE COURT:  All right.  Any objection?

 9           MR. RUKAVINA:  Your Honor, yes, I object based on

10   authenticity.  This document has not been authenticated, nor

11   has the attachment.  And on hearsay.  And I don't think that

12   the Debtor can introduce one exhibit just to introduce another

13   to rebut the first.

14           THE COURT:  Your response?

15           MR. MORRIS:  You know, in all honesty, I wish that

16   the authenticity objection had been made yesterday and I might

17   have been able to deal with that.

18       These documents have already been admitted by the Court

19   against these very same parties.  I think it would be a little

20   unfair for them now to exclude the document that they had no

21   objection to the first time around.  They clearly relate to

22   Paragraph 9 of Mr. Norris's declaration, which was admitted

23   into evidence in this case without objection.

24           THE COURT:  All right.  I overrule the objection.  D

25   and E are admitted.

16

1      (Debtor's Exhibits D and E, Docket Entry 1822, is received

2   into evidence.)

3          MR. MORRIS:  Next, Your Honor, we have Exhibits 4D as

4   in David, 4E as in Edward, and 4G as in Gregory.  And those

5   can all be found on Docket 1822.  And to just cut to the

6   chase, Your Honor, these are the K&L Gates letter that were

7   sent in late December and my firm's responses to those

8   letters.

9      Those letters are being offered, again, to support --

10  well, the Debtor contends that, in the context of this case,

11  and at the time and under the circumstances, the letters

12  constituted interference and evinces a disregard for the

13  January 9th order, for Mr. Dondero's TRO, and for the Court's

14  comments at the December 16th hearing.  And they go

15  specifically to the Debtor's request for the gatekeeper,

16  exculpation, and injunction provisions.

17     To the extent that those exhibits contain the letters that

18  were sent on behalf of the Funds and on behalf of the

19  Advisors, they would simply not be hearsay under 801(d)(2).

20  And to the extent the objection goes to my firm's response, I

21  think just as a matter of completeness the Court -- I won't

22  offer them for the truth of the matter asserted.  I'll simply

23  offer the Pachulski responses at those exhibits for the

24  purpose of stating the Debtor's position, without regard to

25  the truth of the matter asserted.

17

1           THE COURT:  All right.  Any objection?

2           MR. RUKAVINA:  Your Honor, with that understanding,

3  I'll withdraw my objection to these exhibits.

4           THE COURT:  All right.  So, 4D, 4E, and 4G are

5  admitted.

6      (Debtor's Exhibits 4D, 4E, and 4G, Docket Entry 1822, are

7  received into evidence.)

8           MR. MORRIS:  Next, Your Honor, we've got Exhibit 5T

9  as in Thomas.  That document can be found at Docket No. 1822.

10 Your Honor, that document is a schedule of a long list of

11 promissory notes that are owed to the Debtor by the Advisors,

12 Dugaboy, and Mr. Dondero.  But I think that, upon reflection,

13 I'll withdraw that exhibit.

14          THE COURT:  All right.

15     (Debtor's Exhibit 5T is withdrawn.)

16          MR. MORRIS:  And then, finally, just one last one.  I

17 think Mr. Rukavina objected to Exhibit 7O as in Oscar, which

18 can be found at Docket No. 1877.  Exhibit 7O are the documents

19 that were admitted in the January 21st hearing, and I believe

20 that they all go -- they're being offered to support the

21 Debtor's application for the gatekeeper, exculpation, and

22 injunction provisions.

23          THE COURT:  All right.  7O is being offered.  Any

24 objection?

25          MR. RUKAVINA:  Yes, Your Honor.  I do object.  Those

18

are exhibits from a separate adversary proceeding that has not
been concluded.  In fact, my witness is still on the stand in
that.

    And I'll note that that's another 20,000 pages that's very
duplicative of the current record, and we already are going to
have an unwieldy record.  So I question why Mr. Norris -- why
Mr. Morris would even need this.

    So that's my objection, Your Honor.

        MR. MORRIS:  You know what?  That's a fair point,
Your Honor.  And -- that is a fair point, and I guess what I'd
like to do is at some point this morning see if I can single
out documents that are not duplicative and come back to you
with very specific documents.  I think that's a very fair
point.

        THE COURT:  All right.

        MR. MORRIS:  And with that, Your Honor, I think we've
now addressed every single document that the Debtor has
offered into evidence, and I believe, other than the
withdrawal of --

        THE COURT:  5T.

        MR. MORRIS:  -- 5T --

        THE COURT:  Uh-huh.

        MR. MORRIS:  -- and the open question on 7O, I
believe every single document at Docket 1822, 1866, and 1877
has been admitted.  Do I have that right?

19

1          THE COURT:  All right.  Yes, because I did admit

2    yesterday 7F through 7Q, minus 7O, at 1877.  So, yes, I agree

3    with what you just said.

4          MR. RUKAVINA:  Your Honor, I apologize.  And Mr.

5    Morris.  I have that 5S -- or six -- that 5S and 6C, Legal

6    Entities List, have not been admitted.  But if I'm wrong on

7    that, then I apologize.

8          THE COURT:  Okay.  5S was part of 1866, which I

9    admitted entirely.

10       And what was the other thing?

11         MR. RUKAVINA:  I'm counting letters, Your Honor.

12   One, two, three, four.  6D, Legal Entities List, Redacted.

13         THE COURT:  Okay.  6B would have been --

14         MR. RUKAVINA:  D, Your Honor, as in dog.  I'm sorry.

15   6-dog.

16         THE COURT:  Okay.  6D, yeah, that was part of 1822

17   that I admitted *en masse* yesterday.

18         MR. MORRIS:  Yeah, I didn't hear an objection to that

19   one yesterday, and I agree, Your Honor.  My records show that

20   it was already admitted.

21         MR. RUKAVINA:  Then I apologize to the Court.

22         THE COURT:  All right.  Any --

23         MR. MORRIS:  No worries.  Let's get --

24         THE COURT:  Any other housekeeping matters before we

25   go to the next witness?

20

1        MR. MORRIS:  No, Your Honor.  Not from the Debtor.

2        THE COURT:  Anyone else?

3     All right.  Well, let's hear from the next witness.

4        MR. MORRIS:  All right, Your Honor.  The Debtor calls

5  as its next and last witness Marc Tauber.

6        THE COURT:  All right.  Mr. --

7        MR. MORRIS:  Mr. Tauber, if you're on the phone,

8  please identify yourself.

9     (No response.)

10        THE COURT:  Mr. Tauber, we're not hearing you.

11  Perhaps you are on mute.  Could you unmute your device?

12     (No response.)

13        THE COURT:  All right.  If it's a phone, you need to

14  hit *6.

15     Hmm.  Any -- do you know which caller he is?

16        THE CLERK:  I'm trying to find out.

17        THE COURT:  All right.  We've got well over a hundred

18  people, so we can't easily identify where he is at the moment.

19     All right.  Mr. Tauber, Marc Tauber?  This is Judge

20  Jernigan.  We cannot hear you, so -- all right.  Well, maybe

21  we can --

22        MR. MORRIS:  Can we just take a three-minute break

23  and let me see if I can track him down?

24        THE COURT:  Yes.  Why don't you do that?  So let's

25  take a three-minute break.

APP 2489

Case 3:25-cv-02072-S   Document 15-5   Filed 05/09/25   Page 481 of 790   PageID 3961

21

1          MR. MORRIS:  Thank you, Your Honor.

2          THE COURT:  Okay.

3      (A recess ensued from 10:02 a.m. until 10:04 a.m.)

4          MR. MORRIS:  Your Honor, if we may, he'll be dialing

5   in in a moment.  But I've been reminded that there is one more

6   exhibit.  It's the exhibit I used on rebuttal yesterday with

7   Mr. Seery.  There was the one document that was on the docket,

8   and that was the Debtor's omnibus reply to the plan

9   objections, where we looked at Paragraph 135, I believe.  And

10  we would offer that into evidence for the purpose of just

11  establishing that the Debtor had given notice no later than

12  January 22nd of its agreement in principle to assume the CLO

13  management contracts.

14      And then the second exhibit that we had offered that I

15  think I suggested could be marked as Exhibit 10A was the email

16  string between my firm and counsel for the CLO Issuers where

17  they agreed to the agreement in principle for the Debtor's

18  assumption of the CLO management contracts.

19      And we would offer both of those documents into evidence

20  as well.

21          THE COURT:  All right.  Any objections?

22      All right.  Well, I will admit them.

23      As far as this email string with the CLO Issuers that you

24  called 10A, does that appear on the docket?  I remember you

25  putting it on the screen, but, if not, you'll need to file a

22

1   supplement to the record, a supplemental exhibit.

2        MR. MORRIS:  We will, Your Honor.  We'll do that for

3   both of those exhibits.

4        THE COURT:  And then as -- okay, for both?  Because I

5   -- I've read that reply, and I could reference the docket

6   number if we need to.

7        MR. MORRIS:  We'll clean that up, Your Honor.

8        THE COURT:  Okay.

9      (Debtor's Exhibit 10A is received into evidence.)

10     (Clerk advises Court re new caller.)

11       THE COURT:  Oh, okay.  Just a minute.  I was looking

12  up something.

13     (Pause.)

14       THE COURT:  All right.  Well, you're going to file --

15  hmm, I really wanted to just reference where that reply brief

16  appears on the record.  There were a heck of a lot of things

17  filed on January 22nd.

18     (Interruption.)

19       THE COURT:  Okay.  We'll --

20       MR. MORRIS:  All right.  We're just going to need one

21  more minute with Mr. Tauber.  It's my fault, Your Honor.

22       THE COURT:  Okay.

23       MR. MORRIS:  I didn't send him easily-digestible

24  dial-in instructions.  He'll be just a moment.

25       THE COURT:  Okay.

23

1      (Court confers with Clerk regarding exhibit.)

2          THE COURT:  Oh, it's at 1807?  Okay.  So, the reply

3  brief that we talked about Paragraph 35, that is at Docket No.

4  1807.  Okay?  All right.

5      (Debtor's Omnibus Reply to Plan Objections, Docket 1807,

6  is received into evidence.)

7      (Pause.)

8          MR. TAUBER:  Hi.  It's Marc Tauber.

9          THE COURT:  All right.

10         MR. MORRIS:  Excellent.

11         THE COURT:  Mr. Tauber, this is Judge Jernigan.  I

12 can hear you, but I can't see you.  Do you have a video --

13         MR. TAUBER:  Yeah, I don't know why it's not working.

14         THE COURT:  Hmm.

15         MR. TAUBER:  I'm on WebEx all day.  Usually it works

16 no problem.

17         THE COURT:  Okay.  Well, do you want to give it

18 another try or two?

19         MR. TAUBER:  Yeah.  It looks like it's starting to

20 come up.  It's all -- pictures, so --

21         THE COURT:  Okay.

22         MR. TAUBER:  -- hopefully you'll be able to see me in

23 a second.

24         THE COURT:  Okay.  The first thing I'm going to need

25 to do is swear you in, so we'll see if the video comes up here

24

 1    in a minute.

 2            MR. TAUBER:  Okay.

 3            THE COURT:  Can you see us, Mr. Tauber?

 4            MR. TAUBER:  I can see four people.  The rest are

 5    just names still.

 6            THE COURT:  Okay.

 7            MR. TAUBER:  I can go out and try to come back in, if

 8    you think that's --

 9            THE COURT:  I'm afraid of losing you.  So, your

10    audio, is it on your phone or is it on --

11            MR. TAUBER:  No.

12            THE COURT:  -- a computer?

13            MR. TAUBER:  On the computer.  Yeah.

14            THE COURT:  Okay.  So you're coming through loud and

15    clear on your computer.

16            MR. TAUBER:  Yeah.  Like I said, we use WebEx for

17    work, so I have them on all day long without any issues,

18    typically.

19            THE COURT:  Okay.

20        (Court confers with Clerk.)

21            THE COURT:  Okay.  Our court reporter thinks it's a

22    bandwidth issue on your end, so I don't --

23            MR. TAUBER:  There's only two of us here at home on

24    the line right now, so I don't know why.  It looks like it's

25    trying to come in, and then just keeps --

                          Tauber - Direct                    25

 1             THE COURT:  I at least see your name on the screen
 2     now, which I did not before.
 3             MR. TAUBER:  Yeah.
 4             THE COURT:  So hopefully we're going to -- ah.  We
 5     got you.
 6             MR. TAUBER:  There it is.
 7             THE COURT:  All right.
 8             MR. TAUBER:  Yeah.
 9             MR. MORRIS:  There we go.
10             MR. TAUBER:  I might lose you, though.  Give me one
11     second, because I have a thing saying the WebEx meeting has
12     stopped working.  Let me close that.
13             THE COURT:  Okay.  We've still got you.  Please raise
14     your right hand.
15             MR. TAUBER:  Okay.
16                MARC TAUBER, DEBTOR'S WITNESS, SWORN
17             THE COURT:  All right.  Thank you.  Mr. Morris?
18             MR. MORRIS:  Thank you, Your Honor.
19                         DIRECT EXAMINATION
20     BY MR. MORRIS:
21     Q    Good morning, Mr. Tauber.
22     A    Good morning.
23     Q    I apologize for the delay in getting you the information.
24     Are you currently employed, sir?
25     A    Yes, sir.

APP 2405

1  Q    By whom?

2  A    Aon Financial Services.

3  Q    And does Aon Financial Services provide insurance

4  brokerage services among its services?

5  A    Yes.

6  Q    And what position do you currently hold?

7  A    Vice president.

8  Q    How long have you been a vice president at Aon?

9  A    Since October of 2019.

10  Q    Can you just describe for the Court generally your

11  professional background?

12  A    Sure.  I spent about 20 years on Wall Street, working in a

13  variety of jobs, in research, trading, and as the COO of a

14  hedge fund.  And then in 2010 I switched to the insurance

15  world.  I was an underwriter for ten-plus years for Zurich and

16  QBE.  And then in 2019 switched to the brokering side for Aon.

17  Q    And what are your duties and responsibilities as a vice

18  president at Aon?

19  A    Well, we're responsible or my team and I are responsible

20  for creating bespoke insurance programs, focusing on D&O and

21  E&O insurance for our insureds.

22  Q    And what is, for the benefit of the record, what do you

23  mean by bespoke insurance program?

24  A    Well, each client is different, so the programs and the

25  policies that we put in place might be off-the-shelf policies,

APP 2406

Tauber - Direct                        27

1   but we endorse and amend them as needed to meet the needs of

2   the individual client.

3   Q    And during your work, both as an underwriter and now as a

4   broker, have you familiarized yourself with the market for D&O

5   and E&O insurance policies?

6   A    Yes.

7   Q    All right.  Let's talk about the early part of this case.

8   Did there come a time in early 2020 when Aon was asked to

9   place insurance on behalf of the board of Strand Advisors?

10  A    Yes.

11  Q    Can you describe for the Court how that came about?

12  A    Sure.  One of our account executives, a man by the name of

13  Jim O'Neill, had a relationship with a man named John Dubel,

14  who was one of the appointees to serve on -- as a member of

15  Strand, which was being appointed, as we understood it, to be

16  the general partner of Highland Capital Management by the

17  Bankruptcy Court.  And they -- we had done -- or, Jim and John

18  had a longstanding relationship.  I had actually underwritten

19  an account for a previous appointment of John's when I was an

20  underwriter, so I had some familiarity with John as well, and

21  actually brokered a subsequent deal for John at Aon.

22       So I had, again, some familiarity with John, and we were,

23  you know, tasked with going out and finding a program for

24  Strand.

25  Q    Can you describe what happened next?  How did you go about

Tauber - Direct                                28

1  accomplishing that task?

2  A    So, there are a number of markets or insurance companies

3  that provide management liability insurance, which this was a

4  management liability-type policy.  D&O is a synonym for

5  management liability, I guess you'd say.  And we approached

6  the, I think, 14 or 15 markets that we knew to provide

7  insurance in this space and that would be willing to buy the

8  type of policy we were seeking and have interest in a risk

9  like this, which had a little hair on it.  Obviously, there

10  was the Dondero involvement, as well as the bankruptcy.

11  Q    As part of that process, did you and your firm put

12  together a package of information for prospective interested

13  parties?

14  A    Yes.

15  Q    Can you describe for the Court what was contained in the

16  package?

17  A    Had the *C.V.s*, some relevant pleadings from the case,

18  court order.  I'd have to go back and look exactly.  But sort

19  of just general, you know, general information that was

20  available about the situation at hand and Strand's

21  appointment.

22  Q    And the court order that you just mentioned, is that the

23  one that had that gatekeeper provision in it?

24  A    Correct.

25  Q    And can you explain to the Court why you and your team

Main Document  Page 24 of 72

Tauber - Direct                    29

1   decided to include the order with the gatekeeper provision in

2   the package that you were delivering to prospective carriers?

3   A   Sure.  In our initial conversations to discuss our

4   engagement, the gatekeeper function was explained to us by

5   John.  And I'm not sure who else was on the initial call.

6   And, but it was explained to us that I guess Judge Jernigan

7   would sit as the gatekeeper between any potential claimant

8   against the insureds and, you know, would basically have to

9   approve any claim that would be made against (indecipherable),

10  which would thereby prevent any frivolous claims from

11  happening.

12  Q   All right.  Let's just talk for a moment.  How did you and

13  your firm decide which underwriters to present the package to?

14  A   Again, you know, I -- my background, or my Wall Street

15  background, obviously, sort of made me have a -- it was very

16  unique for the insurance world when I switched over, so I had

17  sort of risen to a certain level of expertise within the

18  space.  And, you know, our team also is very experienced, and

19  decades of experience in the insurance world.  So we're very

20  familiar with the markets that are willing to provide these

21  types of policies and the markets that would be likely to take

22  a look at a risk such as this.

23  Q   Okay.  You mentioned that there was -- I think your words

24  were a little hair on this, and one of the things you

25  mentioned was bankruptcy.  How did the fact that Strand was

Tauber - Direct                    30

1   the general partner of a debtor in bankruptcy impact your
2   ability to solicit D&O insurance?
3   A    Well, it's just not a plain vanilla situation, so people
4   are somewhat, you know, are -- I think -- so, the type of
5   insurance, D&O insurance, that we write is very different from
6   auto insurance, as an example.  Auto insurance, people expect
7   there to be a certain amount of claims, and they expect the
8   premiums to cover the claims plus the expenses and then
9   provide them a reasonable profit on top of that.
10       Our insurance is really much more by binary.  The
11  expectation for underwriters is that they will be completing
12  ignoring -- or, avoiding risk at all costs, wherever possible.
13  So anytime there is a situation that looks a little risky, so
14  the premium might be a little higher, the deductible might be
15  a little higher, but, again, the underwriters are really
16  making a bet that they will not have a claim.  Because the
17  premiums pale in comparison to the limits that are available
18  to the policyholder.
19  Q    And so --
20  A    So, -- I'm sorry.  What were you going to say?
21  Q    I didn't mean to interrupt.
22  A    Yeah.
23  Q    Have you finished your answer?
24  A    Sure.
25  Q    Okay.  So, were some of the 14 or 15 markets that you

APP 2479

Case 3:25-cv-02072-S   Document 16-5   Main Document Filed 06/13/25   Page 491 of 790   PageID 3971

1    contacted reluctant to underwrite because there was a

2    bankruptcy ongoing?

3    A    Well, I think that probably -- I mean, there are certain

4    markets that we didn't go to in the beginning because they

5    would be very reluctant to write a risk that had that kind of

6    hair on it, based on our experience from dealing with them.

7    And, you know, I think the bankruptcy was certainly a little

8    bit of an issue.  And then, obviously, as people did their

9    research and -- or if they weren't already familiar with

10   Highland and got to know, you know, got -- I will just say for

11   a simple Google search and learned a little bit about Mr.

12   Dondero, I think there was definitely some significant

13   reluctance to write this program.

14   Q    Was the fact that the Debtor -- was the fact that the

15   Debtor is a partnership an issue that came up, in your -- in

16   your process?

17   A    There are certainly some carriers who won't write what's

18   known as general partnership liability insurance.  So, yes,

19   that is part of that.  It was part of the limiting factor in

20   terms of who we went to.

21   Q    Okay.  And, finally, you mentioned Mr. Dondero.  What role

22   did he play in your ability to obtain insurance for the Strand

23   board?

24   A    Well, that's a very significant role.  As, you know, as

25   mentioned, the underwriters are very risk-averse, so the

Tauber - Direct                          32

1  litigiousness of Mr. Dondero is a very strong red flag

2  prohibiting a number of people from writing the insurance at

3  all.  And the ones that were writing, that were willing to

4  provide options, were looking for protections from Mr.

5  Dondero.

6  Q    And what kind of protections were they looking for?

7  A    Well, the gatekeeper function was a key factor.  That was

8  really the only way we could even start a conversation with

9  any of the people that we were able to engage.  And in

10  addition, they wanted a, you know, sort of a belts and

11  suspenders additional protection of having an exclusion

12  preventing any litigation brought by or on behalf of Mr.

13  Dondero.

14  Q    Were you able to identify any carrier who was prepared to

15  underwrite D&O insurance for Strand without the gatekeeper

16  provision or without a Dondero exclusion?

17  A    We were not.

18  Q    Okay.  Let's fast-forward now.  Has your firm been

19  requested to obtain professional management insurance for the

20  contemplated post-confirmation debtor entities and individuals

21  associated with those entities?

22  A    Yes.

23  Q    Okay.  So let's just talk about the entities first, the

24  Claimant Trust and the Litigation Trust.  In response to that

25  request, have you and your team gone out into the marketplace

Tauber - Direct                          33

1    to try to find an underwriter willing to underwrite a policy

2    for those entities?

3    A    Yes.

4    Q    And have you been able to find any carrier who's willing

5    to provide coverage for the Claimant Trust and the Litigation

6    Trust?

7    A    Yes.

8    Q    And how many -- how many have expressed a willingness to

9    do that?

10   A    Two.

11   Q    And have those two carriers indicated that there would be

12   conditions to coverage for the entities?

13   A    Both will require a -- the continuation of the gatekeeper

14   function, as well as a Dondero exclusion.

15   Q    Okay.  Have you also been tasked with the responsibility

16   of trying to find coverage for the individuals associated with

17   the Claimant Trust and the Litigation Trust, meaning the

18   Claimant Trustee, the Litigation Trustee, and the Oversight

19   Board?

20   A    Yes.  So we did it concurrently.

21   Q    Okay.  So, are the two firms that you just mentioned

22   willing to provide insurance for the individuals as well as

23   the entities?

24   A    Correct.  With the same stipulations.

25   Q    They require -- they both require the gatekeeper and the

APP 2473

Tauber - Direct                          34

 1   Dondero exclusion?

 2   A    That's correct.

 3   Q    Is there any other firm who has indicated a willingness to

 4   consider providing D&O insurance for the individuals?

 5   A    There is one that is willing to do so, as long as the

 6   gatekeeper function remains in place.  They have indicated

 7   that if the gatekeeper function was to be removed, that they

 8   would then add a Dondero exclusion to their coverage.

 9   Q    So is there any insurance carrier that you're aware of who

10   is prepared to insure either the individuals or the entities

11   without a gatekeeper provision?

12   A    No.

13   Q    And that last company, I just want to make sure the record

14   is clear:  If the gatekeeper provision is overturned on appeal

15   or is otherwise not effective, do you have an understanding as

16   to what happens to the insurance coverage?

17   A    They will either add an exclusion for any claims brought

18   by or on behalf of Mr. Dondero or cancel the coverage

19   altogether.

20            MR. MORRIS:  I have no further questions, Your Honor.

21            THE COURT:  All right.  Cross of this witness?

22                        CROSS-EXAMINATION

23   BY MR. RUKAVINA:

24   Q    Mr. Tauber, I'm a little confused.  So, the insurance

25   that's being written now for the post-bankruptcy entities, did

Tauber - Cross                          35

 1    I hear you say that there is one carrier that would give that
 2    insurance subject to having a Dondero exclusion?
 3    A    So, first of all, there's nothing currently being written.
 4    We have solicited quotes.  So, just to make sure that that --
 5    I want to make sure that's clear.
 6         We have three carriers that are willing to provide varying
 7    levels of coverage.  All three will only do so with the
 8    existence of the gatekeeper function continuing to be in
 9    place.  One of the three has -- two of those three will also
10    provide the coverage with -- even with the gatekeeper function
11    and the Dondero exclusion.  The third one was not requiring a
12    Dondero exclusion unless the gatekeeper function goes away.
13    Q    Okay.  So the third one, you believe, will, whatever the
14    term is, write the insurance or provide the coverage without a
15    gatekeeper, as long as there is a strong Dondero exclusion?
16    A    No.  Their initial requirement is that the gatekeeper
17    function remains in place.  That is their preferred option.
18    If the gatekeeper function is removed, then they will add a
19    Dondero exclusion in place of the gatekeeper exclusion.  In
20    addition, that carrier is only willing to provide coverage for
21    the individuals, not for the entities.
22    Q    Okay.  Thank you.
23              MR. RUKAVINA:  I'll pass the witness, Your Honor.
24              THE COURT:  All right.  Other cross?
25              MR. TAYLOR:  Clay Taylor on behalf of Mr. Dondero.

Tauber - Cross                              36

1              THE COURT:  Okay.

2                         CROSS-EXAMINATION

3    BY MR. TAYLOR:

4    Q    Good morning, Mr. Tauber.

5    A    Good morning.

6    Q    Are you generally familiar with placing D&O insurance at

7    distressed debt level private equity firms?

8    A    I am familiar with it probably more from the underwriting

9    side, and I also worked at a fund that was distressed and had

10   to be liquidated, so I -- as the COO, so I have a fair amount

11   of familiarity, yes.

12   Q    Okay.  Before taking this to market for the first time for

13   the pre-confirmation policies that you have in place, did your

14   firm conduct any due diligence or analysis of comparing the

15   amount of litigation the Highland entities and Mr. Dondero

16   were involved in as compared to other comparable firms in the

17   marketplace?  Say, you know, Apollo, Fortress, Cerberus, other

18   similar market participants?

19   A    Well, it wouldn't really be our role as the broker.

20   That's the role of the underwriter.

21   Q    Are you familiar if any of the underwriters undertook any

22   such analysis?

23   A    I would assume that they did, since they all had concerns

24   about Mr. Dondero almost immediately.

25   Q    Do you have any -- you didn't conduct any personal due

APP 2476

Tauber - Cross                          37

1    diligence on comparing the amount of litigation that the
2    Highland entities were involved in as compared to, say,
3    Fortress, do you?
4    A    Well, again, that wouldn't really be my role as the
5    broker.  But I will say that I used to write the primary
6    insurance for Fortress Investment Group when I was at Zurich.
7    So I'm extremely familiar with Fortress, to use your example,
8    and I would say that the level of litigation at Fortress was
9    much, just out of personal knowledge, was significantly less
10   than I had encountered or than I had read about at Highland.
11   Q    That you have read about?  Is that based upon a number of
12   cases where Fortress was a plaintiff as compared to Highland
13   was a plaintiff?  Over what time period?
14   A    Again, not my role.  Not something that I've done.  I'm
15   just generally familiar with Fortress and I'm generally
16   familiar with Highland.
17   Q    All right.  So you're generally familiar and you say that
18   -- you're telling me and this Court that Fortress is involved
19   in less litigation.  Could you quantify that for me, please?
20   A    No, but it's really irrelevant to the situation at hand.
21   The issue is not my feelings whatsoever.  The issue is the
22   underwriters' feelings and their concern with Mr. Dondero, not
23   mine or anybody else's.
24   Q    So, I appreciate your answer and thank you for that, but I
25   believe the question that was before you is, have you

APP 2477

Tauber - Cross                                38

1   quantitatively -- do you have any quantitative analysis by

2   which you can back up the statement that Fortress is less

3   litigious than Highland?

4   A    I wouldn't even try, no.

5   Q    Okay.  Do you have any quantitative analysis for -- that

6   Cerberus is any less litigious than Highland?

7   A    I don't have any real knowledge of Cerberus's

8   litigiousness.

9   Q    Same question as to Apollo.

10  A    Again, the Fortress, you just happened to mention

11  Fortress, which was a special case because I used to be their

12  primary underwriter.  I don't have any specific -- I'm not a

13  claims attorney.  I don't have any specific knowledge of the

14  level of litigiousness.

15       And, again, it's not up to me, my decision.  It's the

16  underwriters' decision of whether or not they're willing to

17  write the coverage, not mine.

18  Q    You mentioned that the -- when you took this out to

19  market, it had a little hair on it.  Correct?

20  A    Correct.

21  Q    And you put together a package of materials that you sent

22  out to 14 or 15 market participants; is -- did I get that

23  correct?

24  A    Yes.

25  Q    And in that package, you had certain pleadings, including

APP 2478

Tauber - Cross                                    39

 1   the court order, correct?

 2   A    Yes.  I believe that's correct.

 3   Q    And that was after your initial conversation with John and

 4   -- where he pointed out the gatekeeper role.  Correct?

 5   A    Correct.

 6   Q    And so when you went out to market, presumably you

 7   highlighted the gatekeeper role to all the people you

 8   solicited offers from because you thought it included less

 9   risk, correct?

10   A    It offered a level of protection that was not -- that's

11   not common.  So it's, yes, it's a huge selling point for the

12   risk.

13   Q    Okay.  So, to be clear, you never went out to the market

14   to even see if you could get underwriting the first time

15   without the gatekeeper function; is that correct?

16   A    Well, it's my job as a broker to present the risk in the

17   best possible light.  So if we have a fact that makes the risk

18   a better write for the underwriters, we, of course, will

19   highlight it.  So, no, I did not do that.

20   Q    Okay.  So, the quick answer to the question is no, you did

21   not go out and solicit any bids without the gatekeeper

22   function?

23   A    Correct.

24   Q    When you have approached the market for the post-

25   confirmation potential coverage, did you approach the same 14

APP 2479

Tauber - Cross                                40

1  or 15 parties that you did before?

2  A    I don't have the two lists in front of me.  They would

3  have been vastly similar, yes.

4  Q    Okay.  And so, again, all of the 14 or 15 parties or the

5  lists that you solicited were already familiar with the

6  gatekeeper function, correct?

7  A    Yes.

8  Q    And so therefore they already had that right; they're not

9  going to trade against themselves and therefore say that,

10  without it, we'll go ahead and write coverage.  Correct?

11  A    I -- I -- it'd be hard to answer that question.  I don't

12  know.

13  Q    Okay.  Because you didn't try that, did you?

14  A    I would have had no reason to, no.

15  Q    Okay.  So you don't know if a market exists without the

16  gatekeeper function because you haven't asked, have you?

17  A    I guess that's fair, yeah.

18          MR. TAYLOR:  I have no further questions.

19          THE COURT:  All right.  Any other Objectors with

20  cross-examination?

21          MR. DRAPER:  I have no questions for the witness,

22  Your Honor.

23          THE COURT:  All right.  Anyone else?  Mr. Morris,

24  redirect?

25          MR. MORRIS:  Just one.

APP 2489

 1                    REDIRECT EXAMINATION

 2   BY MR. MORRIS:

 3   Q    One question, Mr. Tauber.  Is there any -- do all

 4   underwriters -- any underwriters for Fortress require, as a

 5   condition to underwriting the D&O insurance, require a

 6   gatekeeping provision?

 7   A    In my, you know, 11, 12 years of experience in this

 8   industry, in this space, I have never seen that gatekeeper

 9   function be available, as an underwriter or as a broker.  So,

10   no.

11            MR. MORRIS:  No further questions, Your Honor.

12            THE COURT:  Any recross on that redirect?

13       All right.  Well, Mr. Tauber, you are excused.  We thank

14   you for your testimony today.  So you can log off.

15            THE WITNESS:  Thank you.

16            THE COURT:  Okay.

17       (The witness is excused.)

18            THE COURT:  Mr. Morris, does the Debtor rest?

19            MR. MORRIS:  The Debtor does rest, Your Honor.

20            THE COURT:  All right.  Well, what are we going to

21   have from the Objectors as far as evidence?

22            MR. RUKAVINA:  Your Honor, I will be very short.  I

23   will call Mr. Seery for less than ten minutes.  I will call

24   Mr. Post for less than ten minutes.  I will have one exhibit.

25   And I think that that's it for all the Objectors, unless I'm

Case 3:25-cv-02072-S   Document 6-5   Filed 08/22/25   Page 502 of 790   PageID 3982

42

1   mistaken, gentlemen.

2           MR. TAYLOR:  Your Honor, I had one witness, Mr.

3   Sevilla, under subpoena to testify, and needed a brief moment

4   to discuss with my colleagues whether we're going to call him,

5   and if so, put him on notice that he would be coming up

6   probably about -- I don't know your schedule, Your Honor, but

7   probably, I'm guessing, either before lunch or after, and I

8   need to let him know that also.

9       So I do need a brief three to five minutes to confer with

10  my colleagues and some direction from the Court to, if we

11  decide to call him, as to when we would tell him to be

12  available.

13          THE COURT:  All right.  Well, before I get to that,

14  Mr. Draper, do you have any witnesses?

15          MR. DRAPER:  I do not.

16          THE COURT:  All right.  Well, let's see.  It's 10:34.

17  We're making good time this morning.  If Seery is truly ten

18  minutes of direct, and Post is truly ten minutes of direct,

19  and I don't know how long the documentary exhibits are going

20  to take, it sounds to me like we are very likely to get to Mr.

21  Sevilla before a lunch break.

22      So if you want to -- you know, I don't know what that

23  involves, you sending text messages or making a quick phone

24  call.  Do you need a five-minute break for that?

25          MR. TAYLOR:  Yes, Your Honor.  It involves a phone

43

1    call and an email.  Just a confirmatory phone call just to

2    make sure that the guy -- just so you know who he is, he is

3    actually a Highland employee, but he's represented by separate

4    counsel, and so we do need to go through him just because

5    that's the right thing to do.

6          THE COURT:  All right.  Well, again, I mean, I never

7    know how long cross is going to take, but I'm guessing, you

8    know, we're going to get to him in an hour or so, if not

9    sooner, it sounds like.  So, all right.  So, do we need a

10    five-minute break?

11          MR. RUKAVINA:  And Your Honor, it might make more

12    sense to make it a ten-minute break.  I suspect that Mr.

13    Taylor will be able to release his witness if he and I will

14    just be able to talk.  So I would ask the Court's indulgence

15    for a ten-minuter.

16          THE COURT:  Okay.  We'll take a ten-minute break.

17    We'll come back at 10:46 Central time.

18          THE CLERK:  All rise.

19      (A recess ensued from 10:36 a.m. until 10:46 a.m.)

20          THE CLERK:  All rise.

21          THE COURT:  Please be seated.  We're going back on

22    the record in the Highland confirmation hearing.  Are the

23    Objectors ready to proceed?

24          MR. RUKAVINA:  Your Honor, Davor Rukavina.  We are.

25          THE COURT:  All right.  Well, Mr. Rukavina, are you

Case 3:25-cv-02072-S   Document 15-5   Filed 06/25/25   Page 504 of 790   PageID 3984

44

1  going to call your witnesses first?

2         MR. RUKAVINA:  Yes, I will.  Before that, if it might

3  help the Court and Mr. Morris:  Mr. Morris, with respect to

4  that last exhibit, I do not object to the admission of any of

5  the exhibits that were admitted at that PI hearing.

6      But I do think, Your Honor, for the record, that -- and I

7  would ask Mr. Morris that he should refile those exhibits here

8  in this case, except for those that are duplicative.  Because,

9  again, there's 10,000 pages of indentures, et cetera.

10         MR. MORRIS:  Thank you very much, sir.

11      Your Honor, if that's acceptable to you, we'll do that as

12  soon as possible.

13         THE COURT:  All right.  And let me make sure the

14  record is clear.  Are we talking about what you've described

15  as 7O?  I'm getting mixed up now.  Am I --

16         MR. MORRIS:  Yes, Your Honor.

17         THE COURT:  Okay.

18         MR. MORRIS:  It's 7O, which is the documents that

19  were introduced into evidence in the prior hearing.  And Mr.

20  Rukavina is exactly right, that there is substantial overlap

21  between that and other documents that have already been

22  admitted in the record in this case.  So we'll just file an

23  abridged version of Exhibit O that only includes non-

24  duplicative documents.

25         THE COURT:  All right.  So that will be admitted, and

APP 2404

Seery - Direct                        45

1   we'll look for your filed abridged version to show up on the

2   docket.  7O.

3       (Debtor's Exhibit 7O is received into evidence as

4   specified.)

5           THE COURT:  All right.  What's next?

6           MR. RUKAVINA:  Your Honor, Jim Seery, please.  Mr.

7   James Seery.

8           THE COURT:  All right.  Mr. Seery, welcome back.

9   Please raise your right hand.

10          MR. SEERY:  Can you -- can you hear me, Your Honor?

11          THE COURT:  I can now.

12     JAMES P. SEERY, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

13          THE COURT:  All right.  Thank you.

14      Mr. Rukavina, go ahead.

15                      DIRECT EXAMINATION

16   BY MR. RUKAVINA:

17   Q   Mr. Seery, --

18          MR. RUKAVINA:  Thank you.

19   BY MR. RUKAVINA:

20   Q   Mr. Seery, good morning.

21          MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

22   the schedules.

23      What we have here, Your Honor, is Docket 247, the Debtor's

24   schedules.  I'd ask the Court to take judicial notice of it.

25          THE COURT:  All right.  The Court will do so.

Seery - Direct                                46

1   BY MR. RUKAVINA:

2   Q    Mr. Seery, are you familiar with these entities listed

3   here on the Debtor's schedules?

4   A    Generally.  Each one a little bit different.

5   Q    Okay.  Do you agree that the Debtor still owns equity

6   interests in these entities?

7   A    I believe it does, yes.

8   Q    Okay.  Is it true that none of these entities are publicly

9   traded?

10  A    I don't believe any of these are publicly-traded entities,

11  no.

12  Q    Okay.  And none of these, to your knowledge, are debtors

13  in this bankruptcy case, right?

14  A    No.  We only have one debtor in the case.

15  Q    Okay.  So, Highland Select Equity Fund, LP, the Debtor

16  owns more than 20 percent of the equity in that entity, right?

17  A    I believe the Debtor owns the majority of that entity.

18  That is a fund with an on- and offshore feeder.  And I, off

19  the top of my head, don't recall exactly how the allocations

20  of equity work.  But I believe we do.

21  Q    Does 67 percent refresh your memory?  Are you prepared to

22  say that the Debtor owns 67 percent of that equity?

23  A    I'm not prepared to say that, no.

24  Q    Okay.  Wright, Ltd.  Does the Debtor own more than 20

25  percent of that equity?

Seery - Direct                                47

1   A    There's about -- I don't recall.  There's about at least

2   25 artist, designers, or designs.  Wright, AMES, Hockney,

3   Rothco, all own in different places, and they all own in turn

4   some other thing.  So I don't know what each of them, off the

5   top of my head, own.  There's -- they're part of a myriad of

6   corporate structures here.

7   Q    Strak, Ltd.  Do you know whether the Debtor owns more than

8   20 percent of the equity of that entity?

9   A    Stark?  I don't know.

10  Q    Okay.  I don't know how to pronounce the next one.  Eamis

11  (phonetic) Ltd.  Do you know whether the Debtor owns more than

12  20 percent of that equity?

13  A    Off the top of my head, I don't recall.

14  Q    What about Maple Avenue Holdings, LLC?

15  A    I believe, I don't know if it's directly or indirectly,

16  that we own a hundred percent of that entity.  But I'm not

17  sure.

18  Q    What about Highland Capital Management Korea, Ltd.?

19  A    Effectively, Highland Capital Management is owned a

20  hundred percent.

21  Q    What about Highland Capital Management Singapore Pte.

22  Ltd.?

23  A    We are in the process of shutting it down, so I don't know

24  that -- what the equity percentages are.  It's really just a

25  question -- it's -- it's dissolved save for a signature from a

003260
APP 2487

Seery - Direct                                    48

1   Singaporean.

2   Q    Okay.  But did the Debtor own more than 20 percent of that

3   entity?

4   A    I don't know the specific allocations of equity ownership.

5   Q    Okay.  What about Pennant (phonetic) Management, LP?  Do

6   you know whether the Debtor owns or owned more than 20 percent

7   of that entity?

8   A    I don't recall, no.

9        MR. RUKAVINA:  You can take that exhibit down, Mr.

10  Vasek.

11  BY MR. RUKAVINA:

12  Q    Mr. Seery, very quick, are you familiar with Bankruptcy

13  Rule 2015.3?

14  A    I am, yes.

15  Q    Okay.  Has the Debtor filed any Rule 2015.3 statements in

16  this case?

17  A    I don't believe we have.

18  Q    Okay.

19       MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

20  witness.

21       THE COURT:  All right.  Any other Objector

22  questioning?  None from Mr. Taylor, none from Mr. Draper, none

23  from Ms. Drawhorn?

24       All right.  Any cross -- any examination from you, Mr.

25  Morris?

Seery - Cross                                        49

1              MR. MORRIS:  Just one question.

2              THE COURT:  Go ahead.

3                          CROSS-EXAMINATION

4   BY MR. MORRIS:

5   Q   Mr. Seery, do you know why the Debtor has not yet filed

6   the 2015.3 statement?

7   A   I have a recollection of it, yes.

8   Q   Can you just describe that for the Court?

9   A   When we -- when we initially filed, when the Debtor filed

10  and it was transferred over, we started trying to get all the

11  various rules completed.  There are, as the Court is aware, at

12  least a thousand and maybe more, more like three thousand,

13  entities in the total corporate structure.

14      We pushed our internal counsel to try to get that done,

15  and were never able to really get it completed.  We did not

16  have -- we were told we didn't have separate consolidating

17  statements for every entity, and it would be difficult.  And

18  just in the rush of things that happened from the first

19  quarter into the COVID into the year, we just didn't complete

20  that filing.  There was no reason for it other than we didn't

21  get it done initially and I think it fell through the cracks.

22              MR. MORRIS:  Nothing further, Your Honor.

23              THE COURT:  All right.  Anything further, Mr.

24  Rukavina?

25                          REDIRECT EXAMINATION

APP 2489

Seery - Redirect                    50

BY MR. RUKAVINA:

Q   Mr. Seery, I appreciate that answer.  But you never sought

leave from the Bankruptcy Court to postpone the deadlines for

filing 2015.3, did you?

A   No.  If it hadn't fallen through the cracks, it would have

been something we recalled and we would have done something

with it.  But, frankly, it just fell off the -- through the

cracks.  We didn't deal with it.

Q   Okay.

     MR. RUKAVINA:  Thank you, Your Honor.  Thank you, Mr.

Seery.

     THE COURT:  All right.  Any other Objector

examination?

   Mr. Morris, anything further on that point?

     MR. MORRIS:  No, thank you, Your Honor.  No further

questions.

     THE COURT:  All right.  Mr. Seery, thank you.  You're

excused once again from the witness stand.

   (The witness is excused.)

     THE COURT:  Your next witness?

     MR. SEERY:  Thank you, Your Honor.

     THE COURT:  Uh-huh.

     MR. RUKAVINA:  Your Honor, I'll call Jason Post.  Mr.

Post, if you're listening, which I believe you are, if you'll

please activate your camera.

                        Post - Direct                          51

1            THE COURT:  Mr. Post, we do not see or hear you yet.

2            MR. RUKAVINA:  Talk, Mr. Post, and I think it'll

3    focus on you.

4            MR. POST:  Yes.  Can you hear me now?

5            THE COURT:  We can hear you.  We cannot see you yet.

6    Could you say, "Testing, one, two; testing, one, two"?

7            MR. POST:  Testing, one, two.  Testing, one, two.

8            THE COURT:  There you are.  Okay.  Please raise your

9    right hand.

10      JASON POST, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

11           THE COURT:  All right.  Thank you.  You may proceed.

12                        DIRECT EXAMINATION

13   BY MR. RUKAVINA:

14   Q   Mr. Post, good morning.  State your name for the record,

15   please.

16   A   Robert Jason Post.

17   Q   How are you employed?

18   A   I'm employed by NexPoint Advisors, LP.

19   Q   What is your title?

20   A   Chief compliance officer.

21   Q   Were you ever employed by the Debtor here?

22   A   Yes.

23   Q   Between when and when?  Approximately?

24   A   I believe it was July of '08 through October of 2020.

25   Q   What was your last title while you were employed at the

APP 2491

Post - Direct                                            52

1   Debtor?

2   A    Still chief compliance officer.  For the retail funds.

3   Q    Okay.  Very, very quickly, what does a chief compliance

4   officer do?  Or what do you do?

5   A    It's multiple things.  Interaction with the regulators.

6   Adherence to prospectus and SAI limitations for the funds.

7   And then establishment of written policies and procedures to

8   prevent and detect violations of the federal securities laws

9   and then testing those on a frequent basis.

10  Q    And I believe you mentioned you're the CCO for NexPoint

11  Advisors and Highland Capital Management Fund Advisors.  Are

12  you also the CCO for any funds that they advise?

13  A    Yes.  For all the funds that they advise.

14  Q    Okay.  Does that include so-called retail funds?

15  A    Yes.  They're all retail funds.

16  Q    What is a retail fund?

17  A    It typically constitutes funds that are subject to the

18  Investment Company Act of 1940, such as open-end mutual funds,

19  closed-end funds, ETFs.

20  Q    Obviously, you know who my clients are.  Are any of my

21  clients so-called retail funds that you just described?

22  A    Yes.

23  Q    Name them, please.

24  A    You've got NexPoint Capital, Inc., Highland Income Fund,

25  and NexPoint Strategic Opportunities Fund.

APP 2492

Post - Direct                                    53

1   Q    Do those three retails funds hold any voting preference

2   shares in the CLOs that the Debtor manages?

3   A    Yes.

4           MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

5   Exhibit 2.

6       Your Honor, I believe I have a stipulation with Mr. Morris

7   that this exhibit can be admitted, so I'll move for its

8   admission.

9           MR. MORRIS:  No objection, Your Honor.

10          THE COURT:  All right.  Exhibit 2 will be admitted.

11  And let's be clear.  That appears at -- is it Docket No. --

12  let's see.  Is it 1673 that you have your -- no, no, no, no.

13  1670?  Is that where your exhibits are?

14          MR. RUKAVINA:  No, Your Honor.  It's 1863.  I think

15  we did an amended one because we numbered our exhibits instead

16  of having seventeen Os and Ps.  So it's 1863.

17          THE COURT:  1863?  Okay.  All right.  There it is.

18  Okay.  Again, this is -- I'm sorry.  I got sidetracked.  What

19  exhibit?  It's Exhibit 2, is admitted.  Okay.

20          MR. RUKAVINA:  Thank you, Your Honor.

21      (Certain Funds and Advisors' Exhibit 2 is received into

22  evidence.)

23  BY MR. RUKAVINA:

24  Q    Real quick, Mr. Seery.  What do these HIF, NSOF, NC, what

25  do they stand for?  Do they stand for the retail funds you

APP 2493

Post - Direct                                  54

1   just named?

2            MR. SEERY:  I don't think he meant me.

3            THE WITNESS:  Yeah.

4   BY MR. RUKAVINA:

5   Q    I'm sorry, Mr. Post.  I didn't hear you.

6   A    You addressed me as Mr. Seery.

7   Q    Oh.  I apologize.  What do those initials stand for?

8   A    The names of the funds that I mentioned.

9   Q    Okay.  And what do these percentages show?

10  A    The percentages show the amount of shares outstanding and

11  the preference shares that each of the respective funds hold

12  of the named CLOs.

13  Q    And those CLOs on the left there, those are the CLOs that

14  the Debtor manages pursuant to agreements, correct?

15  A    Yes.  Those are some of them, correct.

16  Q    Yes.  The ones that the retail funds you mentioned have

17  interests in, correct?

18  A    Correct.

19  Q    And what does the far-right column summarize or show?

20  A    That would be the aggregate across the three retail funds.

21  Q    In each of those CLOs?

22  A    Correct.

23  Q    Thank you.

24           MR. RUKAVINA:  Mr. Vasek, you may pull this down.

25  BY MR. RUKAVINA:

APP 2494

Post - Direct                                    55

1   Q    Mr. Post, in the aggregate, how much do those three retail

2   funds have invested in those CLOs, ballpark?

3   A    I believe it's approximately $130 million, give or take.

4   Q    Is it closer to 140 or 130?

5   A    A hundred -- I think it's 140, actually.

6   Q    Okay.  Thank you.  Who controls those three retail funds?

7   A    Ultimately, the board --

8   Q    And what --

9   A    -- of the funds.

10  Q    What is -- what do you mean by the board?  Do they have

11  independent boards?

12  A    Yes.  They have a majority independent board, the funds

13  do.

14  Q    Do you report to that board?

15  A    Yes.

16  Q    Does Mr. Dondero sit on those boards?

17  A    He does not.

18  Q    Okay.

19       MR. RUKAVINA:  I'll pass the witness, Your Honor.

20  Thank you, Mr. Post.

21       THE COURT:  All right.  Any other Objector

22  examination of Mr. Post?

23    All right.  Mr. Morris, do you have cross?

24       MR. MORRIS:  Yes, Your Honor, I do.

25       THE COURT:  Okay.

                            Post - Cross                        56

 1                        CROSS-EXAMINATION

 2   BY MR. MORRIS:

 3   Q    Mr. Post, can you hear me okay, sir?

 4   A    Yes, I can hear you.

 5   Q    Okay.  Nice to see you again.  When did you first join

 6   Highland?

 7   A    I believe it was July of '08.

 8   Q    So you've worked with the Highland family of companies for

 9   about a dozen years now; is that right?

10   A    Yes.

11   Q    And you were actually employed by the Debtor from 2008

12   until October 2020; is that right?

13   A    Correct.

14   Q    And you left at that time and went to join Mr. Dondero as

15   the chief compliance office of the Advisors; do I have that

16   right?

17   A    Yes.  I transitioned to NexPoint Advisors shortly, I

18   believe, after Mr. Dondero left, but I was already the named

19   CCO for that entity.

20   Q    Right, but your employment status changed from being an

21   employee of the Debtor to being an employee of NexPoint; is

22   that right?

23   A    Correct.

24   Q    And that happened shortly after Mr. Dondero resigned from

25   the Debtor and went to NexPoint Advisors, correct?

APP 2496

Post - Cross                                57

1  A    Correct.

2  Q    Okay.  You mentioned that the funds are controlled by

3  independent boards; do I have that right?

4  A    It's a majority independent board, correct.

5  Q    Okay.  There's no independent board member testifying in

6  this hearing, is there?

7  A    I --

8        MR. RUKAVINA:  Your Honor, Mr. Post wouldn't know

9  that, but I'll stipulate to that as a fact.

10       THE COURT:  All right.

11       MR. MORRIS:  Okay.

12 BY MR. MORRIS:

13 Q    Did you -- do you speak with the board members from time

14 to time?

15 A    Yes.

16 Q    Did you tell them that it might be best if they came and

17 identified themselves and helped persuade the Court that they

18 were, in fact, independent?

19 A    They have counsel to assist them with that determination.

20 I never mentioned anything along those line to them.

21 Q    Okay.  Can you tell me who the board members are?

22 A    Yes.  Ethan Powell, Bryan Ward, Dr. Bob Froehlich, John

23 Honis, and then Ed Constantino.  He is only a board member,

24 though, for NSOF.  NexPoint Strategic Opportunities Fund.

25 Q    All right.  Mr. Honis, is he -- has he been determined to

APP 2487

Post - Cross                            58

1  be an interested director, for purposes of the securities

2  laws?

3  A    Yes.

4  Q    Okay.  Mr. Froeh..., do you know much about his

5  background?

6  A    I believe he worked at Deutsche Bank and a couple of the

7  other -- or maybe a couple of other investment firms in the

8  past.  And he also owns a minor league baseball team.

9  Q    Do you know how long he served as a director of the funds?

10  A    I don't know, approximately.  I think maybe seven -- six,

11  seven years.

12  Q    Okay.  How about Mr. Ward?  Did Mr. Froehlich ever work

13  for Highland?

14  A    Not that I can recall.

15  Q    Did Mr. Ward ever work for Highland?

16  A    Not that I can recall.

17  Q    Do you recall how long he's been serving as a director of

18  the funds?

19  A    Mr. Ward?

20  Q    Yes.

21  A    I believe -- I'd be -- I don't recall specifically.  I

22  think it's been, you know, 10 to 12 years, give or take.

23  Q    He was a director when you got to Highland; isn't that

24  right?

25  A    He was on the board of directors.

Post - Cross                                59

1   Q    Yeah.  So fair to say that Mr. Ward has been a director

2   since at least the mid to late oughts?  2005 to 2008?

3   A    I'm sorry, you cut out.  Late what?

4   Q    The late oughts.  Withdrawn.  Is it fair to say that Mr.

5   Ward's been a director of the funds since somewhere between

6   2005 and 2008?

7   A    Again, I don't recall specifically.  You know, I joined

8   the complex, the retail complex as the named CCO in 2015, and

9   he had been serving in that role prior to that, and I believe

10  it was for probably a period of five to seven years, so that

11  sounds in line.

12  Q    Did you have a chance to review Dustin Norris's testimony

13  from the December 16th hearing?

14  A    I did not.

15  Q    Do you know -- are you aware that he testified at some

16  length regarding the relationship of each of these directors

17  to Mr. Dondero and Highland?

18  A    I didn't review anything, so I don't know what he said or

19  how long it took.

20  Q    Do you know if Mr. Powell's ever worked for Highland?

21  A    He has.

22  Q    Do you know in what capacity and during what time periods?

23  A    He was -- I think his last title was -- I believe was

24  chief product strategist, I believe.  And he was also the

25  named PM for one of -- or, a suite of ETF funds.  I think he

Post - Cross                                              60

1    was last employed maybe --from my recollection, 2014,

2    possibly.  Or 2015.  Somewhere around in there.

3    Q    Okay.  And to the best of your knowledge, did Mr. Dondero

4    appoint Mr. Powell to be the chief product strategist?

5    A    I don't -- I don't know.  I wasn't involved in the

6    decision for his appointment.  I don't know how he attained

7    that role.

8    Q    To the best of your knowledge, did Mr. Dondero appoint Mr.

9    Powell as the PM of the ETF funds?

10   A    Again, I wasn't involved in that determination, but he

11   probably would have had a role in making the determination on

12   who was the PM, along with probably some other investment

13   professionals.

14   Q    Okay.  And did Mr. Powell join the board of the funds

15   before or after he left Highland around 2015?

16   A    I can't recall specifically if he was already on the board

17   or was an interested member, but I believe he, you know, I

18   believe he joined shortly after he left.

19   Q    Okay.  So he went from being an employee and being a

20   portfolio manager at Highland to being on the board of these

21   funds.  Do I have that right?

22   A    Again, I can't recall specifically.  He may have already

23   been on the board as an interested board member.  But, you

24   know, I believe, you know, if that wasn't the case, he would

25   have joined the board shortly after leaving.

Post - Cross                                 61

1  Q    And Mr. Ward, I think you said, has been on the funds'

2  board since somewhere between 2005 and 2008.  Does that sound

3  right?

4  A    I think that was a time frame you referenced, and I think

5  that was kind of in line, walking it back.  But I don't recall

6  specifically when he joined.

7  Q    And to the best of your knowledge, have the Advisors for

8  which you serve as the chief compliance officer managed the

9  Funds for which Mr. Ward has served as a director since the

10  time he became a director?

11  A    I'm sorry.  Can you repeat the question?

12  Q    Yeah.  I'm just trying to understand if the advisors --

13  withdrawn.  The Advisors manage the Funds; do I have that

14  right?

15  A    They provide investment advice on behalf of the Funds.

16  Q    And they do that pursuant to written agreements; do I have

17  that right?

18  A    Correct.

19  Q    And is it your understanding that, for the entire time

20  that Mr. Ward has served as a member of the board of the

21  Funds, the Advisors have provided the investment advice to

22  each of those Funds?

23  A    Yes, in one form or fashion.  I believe at one period in

24  time, historically, the Advisor may have changed its name, but

25  it would have been, you know, at the end of the day, one or

APP 2501

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 65-5   Filed 06/05/25   Page 522 of 790   PageID 4002

Main Document   Page 525 of 728

Post - Cross                                    62

1   more -- one of either NexPoint Advisors or Highland Capital

2   Management Fund Advisors would have advised those Funds.

3   Q   Is it fair to say that each of the Advisors for which you

4   serve as the chief compliance officer has always been managed

5   by an Advisor owned and controlled by Mr. Dondero?

6   A   I believe so, yes.

7           MR. MORRIS:  I have no further questions, Your Honor.

8           THE COURT:  All right.  Any redirect?

9           MR. RUKAVINA:  Yes.

10          THE COURT:  Okay.  Mr. Rukavina?

11          MR. RUKAVINA:  Your Honor, was I on mute?  I

12  apologize.

13          THE COURT:  Yes.

14                  REDIRECT EXAMINATION

15  BY MR. RUKAVINA:

16  Q   Mr. Post, why did you leave Highland?

17  A   It -- because I was a HCMLP employee and it was --

18  basically, there was conflicts that were created by being an

19  employee of the Debtor and by also serving as the CCO to the

20  named Funds and the Advisors, and it coincided with Jim

21  toggling over from HCMLP to NexPoint.  It just made sense more

22  functionally and from a silo perspective for me to be the

23  named CCO for that entity since he was no longer an employee

24  of HCMLP.

25  Q   And by Jim, you mean Jim Dondero?

APP 2502

Post - Redirect/Recross                  63

1   A   Yes, sorry.  Jim Dondero.

2   Q   You're not some kind of lackey for Mr. Dondero, where you

3   go wherever he goes, are you?

4           MR. MORRIS:  Objection to the question.

5           THE WITNESS:  No.

6           THE COURT:  Overruled.  He can answer.

7           MR. RUKAVINA:  Okay.

8           THE WITNESS:  No.

9           MR. RUKAVINA:  Okay.  Thank you, Your Honor.  I'll

10  pass the witness.

11          THE COURT:  Any other Objector examination?

12      All right.  Any recross, Mr. Morris?

13                      RECROSS-EXAMINATION

14  BY MR. MORRIS:

15  Q   Just one question, sir.  The conflicts that you just

16  mentioned, they were in existence for the one-year period

17  between the petition date and the date you left; isn't that

18  right?

19  A   I think -- I believe so, and I think they became more

20  evident as, you know, time progressed.

21  Q   Okay.  But they existed on day one of the bankruptcy

22  proceeding; isn't that right?

23  A   Yes, I believe so.

24  Q   All right.

25          MR. MORRIS:  No further questions, Your Honor.

Post - Recross                              64

1          THE COURT:  All right.  Thank you, Mr. Post.  You're

2     excused from the virtual witness stand.

3          (The witness is excused.)

4          THE COURT:  All right.  Your next witness?

5          MR. RUKAVINA:  Your Honor, my exhibit has been

6     admitted, I promised I'd be short, and my evidentiary

7     presentation is done.  Thank you.

8          THE COURT:  All right.  Well, Mr. Taylor, your

9     evidence?

10         MR. TAYLOR:  First of all, given the testimony that

11    we have received just recently, we have released Mr. Sevilla

12    from his subpoena and are not going to call him.

13         With that being said, we do have some documents that we

14    would like to get into evidence.  We filed our witness and

15    exhibit list at Docket No. 1874.  I don't believe any of these

16    are controversial.  I'm trying to keep from duplicating those

17    that are already into evidence by the Debtor.  And therefore I

18    would like to offer into evidence Exhibits No. 6 through 12

19    and 17.  And that is it, Your Honor.

20         THE COURT:  Okay.  Is there any objection to Dondero

21    Exhibits 6 through 12 and 17, appearing at Docket 1874?

22         MR. MORRIS:  I just want to be clear that Exhibits 6

23    and 7, which are letters, I believe, from Mr. Lee (phonetic)

24    are not being offered for the truth of the matter asserted in

25    either letter.

APP 2504

Case 3:25-cv-02072-S   Document 16-5   Filed 05/08/25   Page 525 of 790   PageID 4005

65

```
1              MR. TAYLOR:  That is correct, Your Honor.  Just
2    merely that those requests and the words that were stated in
3    there were indeed sent on those dates.
4              MR. MORRIS:  And the same comment, Your Honor, with
5    respect to Exhibits 9 through 12, that those documents are not
6    being offered for the truth of the matter asserted.
7              MR. TAYLOR:  Again, just that those requests were
8    sent and those responses as stated were sent.
9         And I apologize.  I missed one, Your Honor.  Also No. 15.
10   6 through 12, 15, and 17.
11             MR. MORRIS:  Your Honor, the Debtor has no objection
12   to Exhibits 15, 16, and 17.
13             THE COURT:  All right.  So, so they are all admitted
14   with the representation that 6 and 9 through 12 are not being
15   offered for the truth of the matter asserted.  With that
16   representation, you have no objection, Mr. Morris?
17             MR. MORRIS:  That's right.  I do just want to get
18   confirmation that Exhibits 1 through 5 and 13 through 16 -- 13
19   and 14 are not being offered at all.
20             THE COURT:  Mr. Taylor?
21             MR. TAYLOR:  So, that -- that is correct.  1 through
22   5 would be duplicative of what has already been introduced
23   into the record by Mr. Morris, so I am not offering those.
24   And do not believe that 13 and 14 are relevant anymore, and so
25   therefore did not offer those.
```

003278

66

 1              THE COURT:  Okay.  So, with that, I have admitted 6

 2    through 12, 15, 16, and 17 at Docket Entry 1874.

 3       (Dondero Exhibits 6 through 12 and 15 through 17 are

 4    received into evidence.)

 5              THE COURT:  All right.  Anything else, Mr. Taylor?

 6              MR. TAYLOR:  No, Your Honor.  We are not calling any

 7    witnesses.

 8              THE COURT:  All right.  Mr. Draper, what about you?

 9    Any evidence?

10              MR. DRAPER:  No evidence or witnesses.  The evidence

11    that's been introduced by Mr. Taylor and Mr. Rukavina are

12    sufficient for me.

13              THE COURT:  All right.  Ms. Drawhorn, anything from

14    you?

15              MS. DRAWHORN:  No additional evidence, Your Honor.

16              THE COURT:  All right.  Well, then, Mr. Morris, did

17    you have anything in rebuttal?

18              MR. MORRIS:  No, Your Honor.  I think we can proceed

19    to closing statements.  I would just appreciate confirmation

20    by the Objecting Parties that they rest.

21              THE COURT:  All right.  Well, I guess we'll get that

22    clear if it is isn't clear.  All of the Objectors rest.

23    Confirm, yes, Mr. Rukavina?

24              MR. RUKAVINA:  Confirm.

25              THE COURT:  And Mr. Taylor?

APP 2506

Case 3:25-cv-02072-S   Document 15-5   Filed 05/01/25   Page 527 of 790   PageID 4007

67

1           MR. TAYLOR:  Confirmed, Your Honor.

2           THE COURT:  Okay.  And Draper and Drawhorn?

3           MR. DRAPER:  Yes, Your Honor.

4           MS. DRAWHORN:  Confirmed, Your Honor.

5           THE COURT:  All right.  By the way, I assume Mr.

6   Dondero has been participating this morning.  I didn't

7   actually get that clarification before we started.  Mr.

8   Taylor, is he there with you this morning?

9           MR. TAYLOR:  Your Honor, he is.  He has been

10  participating.  He is sitting directly to my left about

11  slightly more than six feet apart.

12          THE COURT:  Okay.  All right.  Good.

13      All right.  Well, let's talk about our closing arguments

14  and let me figure out, do we have -- should we break a bit

15  before starting?  I have an idea in my brain about a time

16  limitation, but before I do that, let me ask.  Mr. Morris,

17  first I'll ask you.  How much time do you think you need for a

18  closing argument?

19          MR. MORRIS:  Your Honor, --

20          MR. POMERANTZ:  Your Honor?

21          MR. MORRIS:  -- I'll defer to Mr. Pomerantz, who's

22  going to deliver that portion of our presentation today.

23          THE COURT:  All right.  Mr. Pomerantz?

24          MR. POMERANTZ:  Your Honor, I will be making -- yes,

25  Your Honor.  I will be making the majority portion of the

APP 2507

Case 3:25-cv-02072-S   Document 65-5   Filed 05/22/25   Page 528 of 790   PageID 4008

68

 1   argument.  Mr. Kharasch will be making the portion of the

 2   argument dealing with the Advisor and Funds' objection.  But I

 3   expect my closing to be quite lengthy, given the 1129

 4   requirements, all the legal issues, which I plan to spend a

 5   fair amount of time.  So I would anticipate a range of an hour

 6   and 45 minutes.

 7          THE COURT:  An hour and 45 minutes?  All right.

 8   Well, --

 9          MR. POMERANTZ:  Correct.

10          THE COURT:  I'm getting an echo.

11          MR. CLEMENTE:  Your Honor, it's Matt Clemente on

12   behalf on the Committee.  I'll have 15 minutes or less, Your

13   Honor.  Just some things I would like to touch on.

14          THE COURT:  All right.  So, two hours.  If I were to

15   --

16          MR. POMERANTZ:  And then you need, Your Honor, to add

17   Mr. Kharasch.  I think he's on.  He can indicate how long his

18   part of the closing will be.

19          THE COURT:  Mr. Kharasch?

20          MR. KHARASCH:  Yes.  I would figure my argument would

21   probably be about 20 minutes to 30 minutes.

22          THE COURT:  Okay.

23          MR. RUKAVINA:  Your Honor, let me interject something

24   that I think will help everyone out.  With the CLOs having

25   consented through their counsel to the assumption, the bulk of

69

my objection is now moot.  We no longer can and will argue

that the contracts are unassignable under 365(b) or (c)

because we do have now their consent.  So that will hopefully

help the Debtor on that issue.

MR. KHARASCH:  Your Honor, Ira Kharasch again.  I was

not anticipating that.  I believe that that will take away the

bulk of my argument.  I'm still going to be dealing with some

of the other non-assumption-type arguments raised by the CLO

Objectors, kind of dovetailing with Mr. Pomerantz's arguments

on the injunction.  But that will greatly reduce, Your Honor,

my argument.

THE COURT:  All right.  So if I say two hours of

argument for the Debtor and Creditors' Committee, Rukavina,

Taylor and Draper and Drawhorn, can you collectively manage to

share that two hours?  Have a two-hour argument in the

aggregate?  That seems fair to me.

MR. RUKAVINA:  Your Honor, I think -- I think that's

fine, Your Honor.

THE COURT:  All right.  And I guess I'll --

MR. TAYLOR:  This is Mr. Taylor.  And yes, I agree.

THE COURT:  Okay.  And Mr. Draper?

MR. DRAPER:  This is Douglas Draper.  I agree.  I

agree also, Your Honor.

THE COURT:  All right.  And I'm going to ask --

MR. POMERANTZ:  Your Honor, I --

70

1          THE COURT:  Go ahead.

2          MR. POMERANTZ:  Your Honor, we -- I think we may need

3    like two hours and ten minutes, because mine was 1:45, Mr.

4    Clemente was 15, and then Mr. Kharasch.  But we'll be around

5    that.  And I tend to speak fast, so I might even shorten mine.

6          THE COURT:  Okay.  You negotiated me up to two hours

7    and ten minutes, Debtors/Objectors, each.

8      I'm going to ask one more time.  The U.S. Trustee lobbed a

9    written objection, but we've not heard anything from the U.S.

10   Trustee.  Are you out there wanting to make an oral argument?

11         MS. LAMBERT:  Yes, Your Honor.  The United States

12   Trustee is on the line.  And we've been listening to the

13   hearing.  I can turn my video on.  I think you're --

14         THE COURT:  Yes.  I can hear you.  I can't see you.

15         MS. LAMBERT:  Okay.  All right.  And so the U.S.

16   Trustee feels that the issues about the releases have been

17   adequately joined and raised by the other parties and that

18   it's an issue of law.  The U.S. Trustee does not feel that we

19   can add to that dialogue by, you know, wasting more of the

20   Court's time.  I think it's been adequately briefed and it's

21   been adequately argued here today.

22         THE COURT:  Okay.

23         MS. LAMBERT:  And we do have an agreement to include

24   governmental release language in the order.  I understand that

25   agreement is still being honored.  That's a separate agreement

71

1   than the issue of whether the releases are precluded.  But

2   we're going to let the other people carry the water on that.

3           THE COURT:  Okay.

4           MR. POMERANTZ:  Yeah.  And that is correct.  That is

5   correct, Your Honor.  They asked for some information -- a

6   provision on government releases.  They also asked for a

7   provision regarding joint and several liability for Trustee

8   fees.

9       As I mentioned previously, the IRS has asked for a

10  provision in the confirmation order, as have the Texas Taxing

11  Authorities.

12      We have not uploaded a proposed confirmation order, but I

13  will state right now on the record that, before we do so, we

14  will, of course, give Ms. Lambert, Mr. Adams, and the Texas

15  Taxing Authorities the opportunity to review.  We expect there

16  won't be any issue because the language has already been

17  agreed to.

18          THE COURT:  All right.  Well, how about this.  It's

19  11:23 Central time.  Let's break until 12:00 noon Central

20  time, okay, so that gives everyone a little over 30 minutes to

21  have a snack and get their notes together, and we'll start

22  with closing arguments at 12:00 noon.  All right?  So we're in

23  recess until then.

24          THE CLERK:  All rise.

25      (A recess ensued from 11:24 a.m. until 12:05 p.m.)

Case 3:25-cv-02072-S    Document 5   Filed 06/05/25   Page 532 of 790    PageID 4012

1          THE COURT:  All right.  Please be seated.  All right.

2     This is Judge Jernigan.  We are back on the record in

3     Highland.  Let me make sure we have the people we need.  Do we

4     have the Pachulski team there?  Mr. Pomerantz, Mr. Kharasch?

5          MR. POMERANTZ:  Yes, you do, Your Honor.

6          THE COURT:  All right.  For our Objectors, Mr.

7     Taylor, are you there?

8          MR. TAYLOR:  Yes, Your Honor, I am.

9          THE COURT:  All right.  I see Mr. Draper there on the

10    video.  You're there.

11          MR. DRAPER:  I'm here.  Can you hear me?

12          THE COURT:  I can hear you loud and clear, yes.

13          MR. DRAPER:  Great, because I didn't -- I'm not

14    hearing, something so I apologize.

15          THE COURT:  All right.  So we have Mr. Rukavina, and

16    I think I see Mr. Hogewood there as well.  Is that correct?

17    You're ready to go forward?

18          MR. RUKAVINA:  Yes, Your Honor.

19          THE COURT:  All right.

20          MR. RUKAVINA:  Yes, Your Honor.  Good afternoon.

21          THE COURT:  All right.  And Ms. Drawhorn, you're

22    there?

23          MS. DRAWHORN:  Yes, Your Honor.

24          THE COURT:  Okay.  Committee.  Mr. Clemente, are you

25    there?

APP 2512

73

1              MR. CLEMENTE:  Yes, Your Honor.  I'm here, Your

2       Honor.

3              THE COURT:  Okay.  Very good.  All right.  So, let me

4       reiterate.  We've given two-hour and 10-minute time

5       limitations for the Debtor, and that'll be both any time you

6       reserve for rebuttal and your closing, initial closing

7       argument.  Mr. Clemente, you're going to be in that time frame

8       as well.  Okay?

9              MR. CLEMENTE:  Yes, Your Honor.

10             THE COURT:  And so, as supporters of the plan.

11          And then, of course, the Objectors, they have collectively

12      two hours and ten minutes.

13          A couple of things.  I'm going to have my law clerk, Nate,

14      who you can't see but he's to my right, he's going to keep

15      time.  I promise I won't be a jerk and cut anyone off

16      midsentence, but please don't push the limit if I say, you

17      know, "Time."

18          The other thing I will tell you is I'll probably have some

19      questions here or there.  And I've told Nate, cut off the

20      timer if we're in a question-answer session.  I won't count

21      that as part of the two hours and ten minutes.

22          All right.  So, with that, Mr. Pomerantz, you may begin.

23              CLOSING STATEMENT ON BEHALF OF THE DEBTOR

24             MR. POMERANTZ:  Thank you, Your Honor.  As Your Honor

25      is aware, the Debtor has been able to resolve all objections

003286

74

1    to confirmation other than the objection by Mr. Dondero or his

2    entities and the United States Trustee.

3        Your Honor, I have a very lengthy closing argument, given

4    the number of issues that are raised in the objections, and I

5    want to make a complete record, since I understand that

6    there's a good likelihood that (garbled) appeal.

7        With that in mind, Your Honor, I'm prepared to go through

8    each and every confirmation requirement in Section 1129.

9    However, as an alternative, I might propose that I can go

10   through each of the Section 1129 requirements that are the

11   subject of pending objections or otherwise depend upon

12   evidence that Your Honor has heard.

13            THE COURT:  Okay.

14            MR. POMERANTZ:  And of course, I'll be happy to

15   answer any questions that you have in the process.

16            THE COURT:  Okay.

17            MR. POMERANTZ:  And after my closing argument, I will

18   turn it over to Mr. Kharasch to address the Advisor and Funds'

19   objections.

20            THE COURT:  Okay.

21            MR. POMERANTZ:  Before I walk the Court through the

22   confirmation requirements, I did want to note for the Court,

23   as I did previously, that we filed an updated ballot summary

24   at Docket No. 1887.  And as reflected in the summary, Classes

25   2 and 7 have voted to accept the plan with the respective

75

 1  numerosity and amounts required.  In fact, the votes are a

 2  hundred percent.

 3     Class 8, however, has voted to reject the plan.  Seventeen

 4  creditors in Class 8 voted yes and 24 objectors, which are, I

 5  think, all but one the employees with one-dollar claims for

 6  voting purposes, voted against.

 7     In dollar amount, Class 8 has accepted the plan by 99.8

 8  percent of the claims.  And I will address the issues of the

 9  cram-down over that class a little bit later on.

10     Lastly, during the course of my presentation, I will

11  identify for the Court certain modifications we have made to

12  address the objections that were filed on January 22nd and

13  then also on February 1st.  And at the end of my presentation,

14  I will raise a couple of other modifications that I won't get

15  to during my presentation and will explain to the Court why

16  all the modifications do not require resolicitation and are

17  otherwise appropriate under Section 1127.

18     Your Honor, as Your Honor is aware, Section 1129 requires

19  the Debtors to demonstrate to the court that the plan

20  satisfies a number of statutory requirements.  1129(a)(1)

21  provides that the plan requires -- complies with all statutory

22  provisions of Title 11, and courts interpreted this provision

23  as requiring the debtor to demonstrate it complies with

24  Section 1122 and 1123.

25     With respect to classification, Your Honor, there has been

APP 2565

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Document 15   Main Document   Filed 08/05/25   Page 2529 of 2732   Page 536 of 790   PageID 4016

76

1    one objection that was raised to essentially a classification,

2    and that was raised by Mr. Dondero to Article 3C of the plan

3    on the grounds that it purports to eliminate a class that did

4    not have any claims in it as of the effective date but which

5    may later have a claim in that class.

6        I think he was primarily concerned about Class 9

7    subordinated claims.  But Mr. Dondero misunderstands the

8    provision.  It only eliminates a claim for voting purposes,

9    and if there's later a claim in that class, it will be treated

10   as the plan provides the treatment.

11       In any event, Class 9, as we know now, will be populated

12   by the HarbourVest claims, as well as the UBS claims and the

13   Patrick Daugherty claims, if the Court approves the settlement

14   approving those claims.

15       Next, Your Honor, Section 1123(a) contains seven mandatory

16   requirements that a plan must include.  Sections 1, 2, and 3

17   of 1123(a) apply to the classification of claims and where

18   they're impaired and treatment.  The plan does that.

19       There has been an objection to 1123(a)(3) raised by

20   several parties with respect to the classification and

21   treatment of subordinated claims.  The concerns stem from the

22   mistaken belief that the Debtor reserved the right to

23   subordinate claims without providing parties with notice and

24   without obtaining a court order.

25       The Debtor never intended to have unilateral ability to

Case 3:25-cv-02072-S   Document 65   Filed 05/25   Page 537 of 790   PageID 4017
Main Document   Page 2525 of 2722

77

1   subordinate claims without affording parties due process

2   rights, and we've added some clarificatory language to so

3   provide.

4       We made changes to the plan on January 22nd, and then on

5   February 1st, and the plan addresses all those issues in

6   Article 3(j) and it talks about when a claim is going to be

7   subordinated as a non-creditor.  We've also redefined the

8   definition of subordinated claims to make clear that a claim

9   is only subordinated upon entry of an order subordinating that

10  claim.

11      Mr. Dondero also objected on the grounds that the plan did

12  not contain a deadline pursuant to which the Debtor would be

13  required to seek any subordination, and we have revised

14  Article 7(b) of the plan to provide that any request to

15  subordinate a claim would have to be made on or before the

16  claim objection deadline, which is 180 days after the

17  effective date.

18      Lastly, certain former employees, Mr. Yang and Borud,

19  objection also joined by Mr. Deadman, Travers, and Kauffman,

20  objected to the inclusion of language in the definition of

21  "Subordinated Claims" that a claims arising from a Class A, B,

22  or C limited partnership is deemed automatically subordinated.

23  The concerns were that the language could broadly apply to any

24  potential claims by a former partner, and could be also read

25  to encompass claims outside the statutory scope of 510(b) or

78

1    otherwise relating to limited partnership interests.

2        While the Debtor does reserve the right to seek to

3    subordinate the claims on any basis, we have modified the plan

4    to address that concern and to address the concern that we're

5    not attempting to create any new causes of action for

6    subordination that don't otherwise exist under applicable law,

7    but it just preserves the parties' rights with respect to

8    subordination and deals with that at a later date.

9        Next, Your Honor, Section 1123(a)(5).  I skipped over

10   1123(a)(4) because there are no objections to that provision.

11            THE COURT:  Okay.

12            MR. POMERANTZ:  Section 1123(a)(5), a plan must

13   provide for adequate means of implementation.  And the plan

14   provides a detailed structure and blueprint how the Debtor's

15   operations will continue, how the assets will be monetized,

16   including the establishment of the Claimant Trust,

17   establishment of the Litigation Sub-Trust, the Reorganized

18   Debtor, the Claimant Trust Oversight Board.  And the documents

19   precisely describing how this will occur were filed as part of

20   the various plan supplements.

21       1123(a)(7), Your Honor, requires that the plan only

22   contain provisions that are consistent with the interest of

23   equity holders and creditors with respect to the manner,

24   selection, and -- of any director, officer, or trustee under

25   the plan.  And as discussed in the plan, at the disclosure

79

1    statement, and as testified to by Mr. Seery, the Committee and

2    the Debtor had arm's-length negotiations regarding the post-

3    effective date corporate governance and believe that the

4    selection of the claimant Trustee, the Litigation Sub-Trustee,

5    and the Claimant Trust Oversight Board are in the best

6    interest of stakeholders.

7        HCMFA has raised a particular objection, I think, to these

8    issues, but I will address it in the context of the

9    requirement under Section 1129(a)(5).

10       Your Honor, Section 1129(a)(2) requires that the plan

11   comply with the disclosure and solicitation requirements under

12   the plan.  Section 1125 requires that the Debtor only solicit

13   with a court-approved disclosure statement.  The Court

14   approved the disclosure statement on November 23rd, and

15   pursuant to the proofs of service on file, the plan and

16   disclosure statement were mailed, along with solicitation

17   materials that the court approved.

18       Now, there has been an objection raised by Dugaboy, and

19   also alluded to by Mr. Taylor in some of his comments before,

20   that the plan does violate 1129(a)(2) because the Debtor's

21   disclosure statement was deficient.

22       In support of that argument, Dugaboy points to the

23   reduction in the anticipated distribution to creditors from

24   the November plan analysis to the January plan analysis, and

25   argues that that reduction requires resolicitation.  However,

80

1    those arguments are not well-taken.

2        First, none of the people making these objections were

3    solicited for their vote on the plan, or if they had been,

4    they didn't vote or decided to reject the plan.  And to the

5    extent that Class 8 creditors, the distribution has gone down

6    -- that's the class that Mr. Taylor and Mr. Draper are

7    concerned about -- you don't hear the Committee, Acis,

8    Redeemer, UBS, HarbourVest, Daugherty, or the Senior Employees

9    making their argument, this argument, and they represent over

10   99 percent of the claims in that class.  And in fact, of the

11   17 Class 8 creditors that have accepted the plan, 15 are

12   represented by the parties I just mentioned.

13       So who are the two creditors that they're so concerned

14   about?  One is Contrarian, which is a claims trader that

15   actually elected to be treated in Class 7, and one is one of

16   the employees who voted to accept the plan.

17       Second, Your Honor, the argument conflates the difference

18   between adverse change to the treatment of a claim or interest

19   that would require a resolicitation under Section 1127 and a

20   change to the distribution that would not.

21       More importantly, Your Honor, the argument is specious.

22   As Mr. Seery testified yesterday, the material differences

23   between the analysis contained on November and late January

24   and the one we filed on February 1st were based on three types

25   of changes:  an update regarding the increased value of assets

APP 2529

81

```
 1   based upon events that had transpired during this period,
 2   which included an increase in asset value, no recoveries, and
 3   revenues expected to be generated by the CLO management
 4   agreements; an update to the expected costs of the Reorganized
 5   Debtor and the Claimant Trust as a result of the continued
 6   evaluation of staffing needs, operational expenses, and
 7   professional fees; and an update to reflect resolution of the
 8   HarbourVest and UBS claims.
 9        In the filing Monday, Your Honor, we updated the plan
10   projection, a liquidation analysis which revised the unsecured
11   claims based upon the UBS settlement that I was able to
12   disclose to Your Honor.  And in the filing, the distribution
13   now revised to Class 8 creditors is now 71 percent, compared
14   to the 87 percent that was in the disclosure statement that
15   went out for solicitation.
16        Your Honor, there can be no serious argument that the
17   creditors in this case were not fully aware of the potential
18   for the UBS and HarbourVest creditors receiving claims.  Your
19   Honor's UBS 3018 order granting its claim for voting purposes
20   was entered right around the time that the disclosure
21   statement was approved.  And, in fact, a last-minute addition
22   to the disclosure statement disclosed the 3018 amount,
23   although the amount did not make it to the attachment to the
24   disclosure statement.  And that reference, Your Honor, to the
25   UBS claim being allowed for voting purposes can be found at
```

APP 2521

82

1    Page 41 of Docket No. 1473.

2        And the HarbourVest settlement was filed on about December

3    23, two weeks before the voting deadline, sufficient time for

4    people to take that into consideration.

5        And as Your Honor surely knows, the hearings in this case

6    have been very well-attended by the major parties, and I

7    believe that if we went back and looked at the records of who

8    was on the WebEx system during the HarbourVest and UBS

9    hearings, you would find that representatives of basically

10   every creditor, every major creditor in this case in Class 8

11   participated.

12       Moreover, Your Honor, creditors were not guaranteed any

13   percentage recovery under the plan and disclosure statement,

14   which clearly identified the size of the claims pool as a

15   material risk.

16       Article 4(a)(7) of the disclosure statement, which is at

17   Docket 1473, is entitled "Claims Estimation" and warns

18   creditors that there can be no assurances that the Debtor's

19   claims estimates will prove correct, and that the actual

20   amount of the allowed claims may vary materially.

21       And if Dugaboy is arguing it was misled as the holder of a

22   disputed administrative claim and general unsecured claim,

23   that argument is simply preposterous.

24       Dugaboy cites several cases for the proposition that

25   deficient disclosure may warrant resolicitation, and the

83

1    Debtor agrees with the proposition as a general matter.   But

2    if one looks at the cases that were filed -- that Dugaboy

3    cited to, it will see that they are clearly inapposite and

4    distinguishable.

5        *In re Michaelson*, the Bankruptcy Court for the Eastern

6    District of California, revoked confirmation because the

7    debtor failed to disclose in the disclosure statement a mail

8    fraud indictment of the turnaround specialist who was to lead

9    the reorganization effort and a prior Chapter 7 company he

10   drove into the ground.

11       In *In re Brotby*, the Ninth Circuit BAP affirmed a decision

12   of the Bankruptcy Court that the individual debtor's decision

13   to modify its financial projections on the eve of confirmation

14   did not require a resolicitation.   And there, the financial

15   projections were off by 75 percent.

16       And in *Renegade Holdings*, the Bankruptcy Court granted a

17   motion by a group of states to revoke confirmation by the

18   debtors, who manufactured and distributed tobacco products,

19   because the debtors failed to disclose in its disclosure

20   statement that the debtor and its principals were under

21   criminal investigation for unlawful trafficking in cigarettes,

22   which was not disclosed to creditors.

23       Your Honor, none of these cases are remotely analogous to

24   this case, and they certainly do not stand for the proposition

25   that the Debtor was required to resolicit.

Case 19-34054-sgj11  Doc 2062  Filed 03/18/21  Entered 03/18/21 20:59:39  Desc
Main Document  Page 525 of 733
Case 3:25-cv-02072-S  Document 15-5  Filed 05/05/25  Page 544 of 790  PageID 4024

84

1      Next, Your Honor, the next requirement is 1129(a)(3),

2  which requires that any plan be proposed in good faith.  As

3  Mr. Seery testified at length, and the Court has personal

4  knowledge of, having presided over this case for a year, the

5  plan is the result of substantial arm's-length negotiations

6  with the Committee over a period of several months.

7      Mr. Seery testified yesterday that, soon after the board

8  was appointed, the Committee wanted to immediately pursue down

9  the path of an asset monetization plan.  However, as Mr. Seery

10 testified, the board decided that it was inappropriate to rush

11 to judgment and that it should consider all potential

12 restructuring alternatives for the Debtor.  And Mr. Seery

13 testified what those alternatives were:  a traditional

14 restructuring and continuation of the Debtor's business; a

15 potential sale of the Debtor's assets in one or more

16 transactions; an asset monetization plan like the one before

17 the Court today; and, last but not least, a grand bargain plan

18 that would involve Mr. Dondero sponsoring the plan with a

19 substantial equity infusion.

20     As Mr. Seery testified, by the early summer of 2020, the

21 Debtor decided that it was appropriate to start moving down

22 the path of an asset monetization plan while it continued to

23 work on the grand bargain plan.  Accordingly, Mr. Seery

24 testified that the Debtor commenced good-faith negotiations

25 with the Committee regarding the asset monetization plan, and

003297
APP 2524

85

1   that those negotiations took several months, were hard-fought

2   and at arm's-length, and involved substantial analysis of the

3   appropriate post-confirmation corporate structure, governance,

4   operational, regulatory, and tax issues.  And on August 12th,

5   Your Honor, the plan was filed with the Court.

6        And although the Debtor at that time had not reached an

7   agreement with the Committee on some of the most significant

8   issues, Mr. Seery testified that the independent board

9   believed that it was important to file that plan at that time,

10  a proverbial stake in the ground to act as a catalyst for

11  reaching a consensual plan with the Committee or others, which

12  it has done.

13       As Mr. Seery testified, he continued to work with Mr.

14  Dondero to try to achieve a grand bargain plan, while at the

15  same time proceeding down the path of the filed plan.

16       He testified that the parties participated in mediation at

17  the end of August and early September to try to reach an

18  agreement on a grand bargain plan, but were unsuccessful.  And

19  the Debtor proceeded on the path of the August 12th plan and

20  sought approval of its disclosure statement on August 27th,

21  2020.

22       Mr. Seery testified that, at that time, the Debtor still

23  had not reached an agreement with the Committee on certain

24  significant issues involving post-confirmation governance and

25  the scope of releases.  And as a result, after a contested

86

1    hearing, Your Honor, Your Honor did not approve the disclosure

2    statement on October 27th, but asked us to go back again to

3    try to work out the issues, and we came back on November 23rd.

4        Mr. Seery testified that the Debtor continued to negotiate

5    with the Committee to resolve the material disputes leading --

6    which led up to the November 23rd hearing, where we came in

7    with the support of the Committee.  But as Mr. Seery has also

8    testified, he has continued to try to reach a consensus on a

9    global plan, notwithstanding the approval of the disclosure

10   statement.  And he spent personally several hundred hours

11   since his appointment trying to build consensus.

12       As part of this process, Mr. Seery testified that Mr.

13   Dondero received access to substantial information regarding

14   the Debtor's assets and liabilities, most recently in

15   connection with a series of informal document requests which

16   were made at the end of December.

17       And after the Court asked the parties to again reengage in

18   efforts to try to reach a global hearing after the Debtor's

19   preliminary injunction motion, Mr. Seery testified that he and

20   the board participated in calls with Mr. Dondero and his

21   advisors and the Committee to see if common ground could be

22   attained.

23       Unfortunately, as Mr. Seery testified, the Committee and

24   Mr. Dondero were not able to reach an agreement.

25       Accordingly, Your Honor, the testimony unequivocally and

87

 1   overwhelmingly demonstrates that the plan was proposed in good

 2   faith.

 3       I expect the Objectors may argue in closing that they have

 4   filed a plan under seal that is a better alternative than that

 5   being proposed by the plan that the Debtor seeks to confirm.

 6   Your Honor, as a threshold matter, yesterday I said any

 7   mention of the specifics of the recent plan would be

 8   inappropriate.  We are not here today to debate the merits of

 9   Mr. Dondero's plan, which the Court permitted him to file

10   under seal.  He had ample opportunity to file this plan after

11   exclusivity was terminated, seek approval of a disclosure

12   statement, and, if approved, solicit votes in connection with

13   a confirmation hearing, but he failed to do so.

14       What matters today, Your Honor, is whether the Debtor's

15   plan, the plan that has been accepted by 99.8 percent of the

16   amount of creditors, and opposed only by Mr. Dondero, his

17   related entities, and certain employees, meets the

18   confirmation requirements of Section 1129, which we most

19   certainly argue it does.

20       And perhaps most importantly, Your Honor, the Court

21   remarked at the last hearing that, without the Committee's

22   support for a competing plan, Mr. Dondero's plan would be dead

23   on arrival.  And as you have heard from Mr. Clemente, Mr.

24   Dondero does not yet have the Committee's support.

25       Next, Your Honor, is Section 1129(a)(5).  That requires

88

1   that the plan disclose the identity of any director,

2   affiliate, officer, or insider of the debtor, and such

3   appointment be consistent with the best interest of creditors

4   and equity holders.  Courts have held that this section

5   requires the disclosure of the post-confirmation governance of

6   the reorganized entity.

7       HCMFA objects to the plan, arguing that it did not comply

8   with Section 1129(a)(5) because it didn't disclose the people

9   who would control and manage the Reorganized Debtor and who

10  might be a sub-servicer.  HCMFA's objection is off-base.

11  Under the plan, Mr. Seery will be the claimant Trustee and

12  Marc Kirschner will be the Litigation Trustee.  Mr. Seery

13  testified extensively about his background, and he has

14  appeared before the Court many times and the Court is familiar

15  with him.  We have also introduced his *C.V.* into evidence.

16      As he testified, he will be paid $150,000 per month,

17  subject to further negotiations with the Claimant Trust

18  Oversight Committee regarding the monthly amount and any

19  success fee and severance fee, which negotiation is expected

20  to be completed within the 45 days following the effective

21  date.

22      Mr. Seery also testified regarding the names of the

23  members of the Claimant Trust Oversight Committee, which

24  information was also contained in the plan supplement and it

25  generally includes the four members of the Committee and David

89

1  Pauker, a restructuring professional with decades of

2  restructuring experience.

3      The members of the Oversight Committee will serve without

4  compensation, except for Mr. Pauker, who Mr. Seery testified

5  will receive $250,000 in the first year and $150,000 for

6  subsequent years.

7      As set forth in the Claimant Trust agreement, if at any

8  time there is a vacant seat to be filled by another

9  independent member, their compensation will be negotiated by

10  and between the Claimant Trust Oversight Board and them.

11      Mr. Seery has also testified that he believed the Claimant

12  Trust will have sufficient personnel to manage its business.

13  Specifically, he has testified that he intends to employ

14  approximately ten of the Debtor's employees, who will be

15  sufficient to enable him to continue to operate the Debtor's

16  business, including as an advisor to the managed funds and the

17  CLOs, until the Claimant Trust is able to effectively and

18  efficiently monetize its assets for fair value, whether that

19  takes two years or whether that takes 18 months or whether

20  that takes longer.

21      Mr. Seery further testified that he believes that the

22  operations can be best conducted by the Debtor's employees.

23  And while he did consider the retention of a sub-servicer, he

24  ultimately decided, in consultation with the Committee, that

25  the monetization would be a lot more effective if done with a

90

 1   subset of the Debtor's current employees.

 2       The proposed corporate governance is also consistent with

 3   the interests of the Debtor and its stakeholders.  The Court

 4   is very familiar with Mr. Seery and the Debtor, and I believe

 5   that Mr. Clemente, when he comments, will say the Committee

 6   can think of no better person to continue managing the

 7   Claimant Trust than Mr. Seery.

 8       Mr. Kirschner is also well qualified to be the Litigation

 9   Trustee.  His *C.V.* is part of the evidence that's been

10   admitted and contains additional information regarding his

11   background.  And he will receive $40,000 a month for the first

12   three months and $20,000 a month thereafter, plus a to-be-

13   negotiated success fee.

14       There just simply can be no challenge to Mr. Seery's or

15   Mr. Kirschner's qualifications or abilities to act in a manner

16   contemplated by the plan or that their involvement is not in

17   the best interest of the estate and its creditors.

18       Your Honor, the next requirement that is objected to is

19   Section 1129(a)(7).  That, of course, requires the Debtor to

20   demonstrate that creditors will receive not less under the

21   plan than they would receive if the Debtor was to be

22   liquidated in Chapter 7.  And on February 1st, Your Honor, we

23   filed our updated liquidation analysis, which contains the

24   latest-and-greatest evidence to support that.

25       These documents, the updated documents, in connection with

91

1    the prior analysis, was provided to objecting parties in

2    advance of the January 29th deposition, and Your Honor has

3    heard the differences between the January 29th and the

4    February 1st documents being very minimal.

5        The Court heard extensive evidence and testimony from Mr.

6    Seery regarding the assumptions that went into the preparation

7    of the liquidation analysis and the differences of what

8    creditors are projected to receive under the plan as compared

9    to what they are projected to receive in a Chapter 7.

10       Such testimony also included a comparison between the

11   liquidation analysis that was filed with the plan in November,

12   the updated liquidation analysis filed on the -- or, provided

13   to parties on January 28th, and the last version, filed on

14   February 1st.

15       Mr. Seery testified that, on the revenue side, the

16   liquidation analysis was updated to include the HCLOF

17   interest, which was required as part of the settlement with

18   HarbourVest; the increase in value of certain assets,

19   including Trussway; revenue expected to be generated from

20   continued management of the CLOs; and increased recovery on

21   notes as a result of the acceleration of certain related

22   notes.

23       On the expense side, Mr. Seery testified regarding his

24   best estimate of the likely expenses to be incurred by a

25   Chapter 7 trustee -- by the Claimant Trust, including

92

1    personnel costs; professional costs, which increase because of

2    the litigious nature this case has become; and operating

3    expenses.

4        And lastly, on the claim side, Your Honor, Mr. Seery

5    testified that the claims numbers have been updated to include

6    the settlement from HarbourVest and initially the amount

7    approved to UBS pursuant to the 3018 order and then the

8    reduction at $50 million based upon the settlement announced.

9    And like the prior liquidation analysis, the current analysis

10   demonstrates that creditors will fare substantially better

11   under in Chapter -- under the plan than in Chapter 7.  In

12   fact, the projected recovery under the plan is 85 percent for

13   Class 7 creditors and 71.32 percent for Class 8 creditors, as

14   compared to 54.96 percent for all unsecured creditors in a

15   Chapter 7.

16       Mr. Seery also testified that expenses are expected to be

17   more under Chapter 11 than under Chapter 7, but he also

18   testified that the tens of millions of dollars in greater

19   revenue and asset recoveries under the plan will more than

20   offset the additional expenses.

21       As a result, the Court has more than sufficient

22   evidentiary basis to conclude that the Debtor has carried its

23   burden to prove that it meets the best interest of creditors

24   best.

25       But Mr. Dondero's counsel spent a lot of time crossing --

93

1    cross-examining Mr. Seery, in a vain attempt to demonstrate to

2    the Court that a Chapter 7 actually would be much better for

3    creditors.  And this argument has also been made by Dugaboy

4    and the Advisors and the Funds.

5        Before I address these arguments on its merits, Your

6    Honor, I just wanted to remind the Court of the Objectors --

7    these Objectors' interest in this case.  Mr. Dondero owns no

8    equity in the Debtor.  He owns a general partner.  Strand, in

9    turn, owns a quarter-percent -- a quarter of one percent of

10   the total equity in the Debtor.  And Mr. Dondero's claim, it's

11   only a claim for indemnification.  Dugaboy asserts two claims:

12   a frivolous administrative claim relating to the postpetition

13   management of a Multi-Strat, which, as an administrative

14   claim, if it's valid, would not even be affected by the best

15   interest of creditors test, because it would have to be paid

16   in full.  And he also asserts a claim that the Debtor's

17   subsidiary -- against the Debtor's subsidiary for which it

18   tries to pierce the corporate veil.

19       Just think about it.  Dugaboy, Mr. Dondero's entity, is

20   arguing that he should be able to pierce the corporate veil to

21   get at the entity that was his before the bankruptcy.

22       Dugaboy's only other interest in this case relates to a --

23   a one -- point eighteen and several-hundredths percent of the

24   equity interest of the Debtor, and that is out of the money.

25       And as I mentioned previously, Your Honor, Mr. Rukavina's

94

1    clients either didn't file any general unsecured claims or

2    filed them and withdrew them.  Their only claim is a disputed

3    administrative claim against the Debtor that was filed a week

4    ago and which, at the appropriate time, the Debtor will

5    demonstrate is without merit.

6         And I understand that, just today, NexPoint Advisors also

7    filed administrative claim.

8         So I'm not going to argue to Your Honor that these parties

9    do not have standing, although their standing is tenuous, at

10   best, to assert this argument.  The Court should keep their

11   relative interests in mind when evaluating the merits and the

12   good faith of this objection.

13        The principal objection, as I said, is that creditors will

14   do better in a Chapter 7.  Essentially, they argue that a

15   Chapter 7 trustee can liquidate the assets just as well as Mr.

16   Seery can and not require the cost structure that is included

17   in the Debtor's plan projections.  Yes, they argue that a

18   Chapter 7 will be more efficient.

19        Mr. Seery's testimony, the only testimony on the topic,

20   however, establishes that this preposterous proposition has no

21   basis in reality.  Mr. Seery testified that a Chapter 7

22   trustee's mandate would be to reduce Debtor's assets as fast

23   as possible, while he will monetize assets as and when

24   appropriate to maximize the value.

25        But even if you can assume that the Chapter 7 trustee

APR 2591

Case 3:25-cv-02072-S   Document 16-5   Filed 08/05/25   Page 555 of 790   PageID 4035

95

1    could get court authority in a Chapter 7 to operate, there are

2    several reasons Mr. Seery testified why a liquidation by a

3    Chapter 7 trustee would be far worse than the plan.

4        First, Your Honor, no matter how competent the Chapter 7

5    trustee is -- and Mr. Seery did not say he is more competent

6    than anyone else out there -- the lack of a learning curve

7    that Mr. Seery established through the 13 months in this case

8    puts Mr. Seery at such a major advantage compared to a Chapter

9    7 trustee.

10       Second, Mr. Seery questioned whether the Chapter 7 trustee

11   would be able to retain the Debtor's existing professionals,

12   even assuming they were willing to be retained.  I'm not sure

13   what's the Court's practice or the practice in the Northern

14   District, but in many districts around the country debtor's

15   counsel and professionals cannot be retained by Chapter 7

16   trustee, as general counsel, at least.

17       And I could just imagine, Your Honor, Mr. Dondero's

18   position if the Chapter 7 trustee actually sought to hire

19   Pachulski Stang and DSI.

20       Third, Your Honor, regardless of whether the Chapter 7

21   trustee obtained some operating authority, the market

22   perception will be that a Chapter 7 trustee will sell assets

23   for less value than would Mr. Seery as claimant Trustee.  Mr.

24   Seery testified to that.

25       The argument that the Objectors make that a Chapter 7

96

1    process, whereby the trustee would seek court approval of

2    assets, is better for value than a process overseen by the

3    Claimant Trust Board lacks any evidentiary basis and also is

4    contradicted by Mr. Seery's testimony.

5        In fact, Mr. Seery testified that the Chapter 7 process,

6    the public process of it, would very likely result in less

7    recovery than a sale conducted in the Claimant Trust.

8        And lastly, Mr. Seery testified that it's unlikely that

9    the ten or so valuable employees who Mr. Seery is planning to

10   heavily rely on to assist him with post-confirmation would

11   agree to a work for Chapter 7 trustee.  Your Honor is all too

12   familiar with the fights in the *Acis* case and Chapter 7

13   trustee, and it's just hard to believe that any of the

14   Highland employees would go work for the Chapter 7 trustee.

15       So why is Mr. Dugaboy -- why is Dugaboy and Mr. Dondero

16   actually making this objection and advocating for a Chapter 7?

17   It's because they would expect to buy the Debtor's assets on

18   the cheap from a Chapter 7 trustee, exactly what they've been

19   trying to do in this case.

20       Your Honor, moving right now to Section 1129(a)(11), that

21   requires the debtor to demonstrate that the plan is feasible.

22   In other words, it's not likely to be followed by a further

23   liquidation or restructuring.  Under the Fifth Circuit law,

24   the debtor need only demonstrate that the plan will have a

25   reasonable probability of success to satisfy the feasibility

97

1    requirement, and the Debtor has easily met this standard.

2        As Mr. Seery testified, the Debtor's plan contemplates

3    continued operations through which time the assets will be

4    monetized for the benefit of creditors.  The plan contemplates

5    that Class 7 creditors will be paid off shortly after the

6    effective date.  Class 8 creditors are not guaranteed any

7    recovery but will receive pro rata distributions over a period

8    of time.  Class 2, Frontier secured claim, will be paid off

9    over time, and the projections demonstrate that it will -- the

10   Debtor will have money to do so.

11       Mr. Seery testified at length regarding the assumptions

12   that went into the preparation of the projections most

13   recently filed on February 1, and based on that testimony, the

14   Debtor has clearly demonstrated that the plan is feasible.

15       Your Honor, I think that brings us to Section 1129(b).  Of

16   course, again, Your Honor, if Your Honor has any other

17   questions with the sections I'm skipping over.  I believe

18   we've adequately covered them in the briefs and I don't think

19   there's any objection.

20       But as I mentioned before, we have three classes that have

21   voted to reject the plan.  Class 8 is the general unsecured

22   claims.  They voted to reject the plan.  Yes.  Even though,

23   based upon the ballot summary, 99 percent of the amount of

24   claims in that class voted to accept the plan, approximately

25   24 employees voted to reject the plan.  And accordingly, the

98

1   Debtor cannot satisfy the numerosity requirement of Section

2   1126(c).

3       I do want to briefly recount for Your Honor Mr. Seery's

4   testimony regarding the nature of the claims of the 24

5   employees who voted to reject the plan.  And I'm not doing

6   this to argue that the votes from these contingent creditors

7   are not valid or that the Debtor doesn't need to satisfy the

8   cram-down requirements.  The Debtor understands it needs to

9   demonstrate to the Court that Section 1129(b) is satisfied for

10  the Court to confirm the plan.

11      Rather, why I do this, Your Honor, is to provide the Court

12  with context about the nature and extent of the creditors in

13  this class as the Court determines whether the plan is, in

14  fact, fair and equitable and can be crammed down to a

15  dissenting vote.

16      Mr. Seery testified that these employees originally had

17  claims under the annual bonus plan and the deferred

18  compensation plan.  And as he testified, in order for claims

19  under each of those plans to vest -- I think he referred to

20  them as be-in-the-seat plans -- the employee was required to

21  remain employed as of that date.

22      Mr. Seery testified that the Debtor terminated the annual

23  bonus plan in the middle of January and replaced it with the

24  key employee retention plan that the Court previously

25  approved.

99

1      Accordingly, Mr. Seery testified that no employee who

2   voted to reject the plan anymore has a claim on the annual

3   bonus plan.  He also testified that, with respect to the

4   deferred compensation plan, people have contingent claims

5   under that plan and that no payments are due until May 20 --

6   2021.

7      As Mr. Seery testified, if the employees who would be

8   entitled to receive payments under the deferred compensation

9   plan do not agree to enter into a separation agreement that

10  was approved by the Court, they will be terminated before May

11  and there will no -- not longer be any deferred compensation

12  due.

13      Accordingly, while the 24 employees who voted to reject

14  the plan do technically have claims at this time they have

15  voted, Mr. Seery testified the claims will go away soon.

16      I do want to point out something that's obviously

17  painfully obvious at this point, that while Class 8 voted to

18  reject the plan, the Committee, the statutory fiduciary for

19  all unsecured creditors, supports the plan enthusiastically

20  and I believe it does so unanimously.

21      The other classes to reject the plan, Your Honor, are

22  Class 11, the A limited partnerships, and none of the holders

23  in Class B and C limited partnerships voted on the plan, so

24  cram-down is required over those classes as well.  So Your

25  Honor is able to confirm the plan pursuant to the cram-down

100

1    procedures under 1129(b) if the Court determines that the plan

2    is fair and equitable and does not discriminate unfairly

3    against the rejecting classes.

4        Let's first turn to the fair and equitable requirement.  A

5    plan is fair and equitable if it follows the absolute priority

6    rule, meaning that if a class does not receive payment in

7    full, no junior class will receive anything under the plan.

8    With respect to Class 8, no junior class -- junior class to

9    Class 8 will receive payment, and here is the key point,

10   unless Class 8 is paid in full, with appropriate interest.

11   NPA and Dugaboy -- Dugaboy in a brief filed on Monday -- argue

12   that the plan does not satisfy the absolute priority rule

13   because Class 10 and Class Equity Interests have a contingent

14   right to receive property under the plan.

15       Your Honor, this argument misunderstands the absolute

16   priority rule.  Class 10 and Class Creditors will only receive

17   payment after distribution to 8 and 9, the unsecured claims

18   and the subordinated claims, are all paid in full, plus

19   interest.

20       And, in fact, Dugaboy, in its brief, to its credit, admits

21   that the argument is contrary to the Bankruptcy Court's

22   decision of Judge Gargotta in the Western District case of *In*

23   *re Introgen Therapeutics*.  There, the Court was faced with a

24   similar argument by a group of unsecured creditors who argued

25   that the debtor's plan violated the absolute priority rule

APP 2549

Case 3:25-cv-02072-S   Document 15-5   Filed 05/29/25   Page 561 of 790   PageID 4041
Main Document   Page 2544 of 2723

101

1    because equity was retaining a contingent interest that would

2    only be payable if general unsecured claims were paid in full.

3        In rejecting the argument, the Court reasoned, and I

4    quote, "The only way Class 4 will receive anything is if Class

5    3, in fact, gets paid in full, in satisfaction of

6    1129(b)(2)(B)(i)," meaning that the absolute priority rule

7    would not be an issue.  If Class 3 is not paid in full, Class

8    4's property interest is not -- is just -- is not just

9    valueless, it just doesn't exist.

10       Your Honor, this is precisely the situation in this case.

11   Equity interests will only receive a recovery if Class 8 and 9

12   are paid in full.

13       But Dugaboy attempts to escape the logical reading of the

14   absolute priority rule by claiming that *Introgen* was wrongly

15   decided and goes against the Supreme Court's decision in

16   *Ellers* (phonetic).  Dugaboy argues that because the Supreme

17   Court decided that property given to a junior class without

18   paying a senior class in full is property, even if it's

19   worthless.

20       But Dugaboy misses the point.  Like the debtor in the

21   *Introgen*, the Debtor here is not arguing that the property  --

22   the absolute priority rule is not violated because the

23   contingent trust is worthless.  Rather, the argument is that

24   the absolute priority rule is not violated; it's, in order to

25   receive anything on account of the junior -- of the equity,

APP 254

102

1   the senior creditors have to be paid a hundred percent plus

2   interest.

3        In fact, Your Honor, if the plan just didn't give any

4   recovery to the equity Class 10 and 11, I bet you Dugaboy and

5   Mr. Dondero would be arguing that it violated the absolute

6   priority rule because senior classes, unsecured creditors,

7   could potentially receive more than a hundred percent of their

8   interest.  And there's a case in the Southern District of

9   Texas, *In re MCorp*, where the Bankruptcy Court said that for a

10  plan to be confirmed, its stockholders eliminated, creditors

11  must not receive more than payment in full.

12       Excess proceeds, Your Honor, if any, have to go somewhere.

13  They can't go to creditors, so they have to go to equity.  And

14  the absolute priority rule is not violated.

15       And how is Dugaboy harmed?  They say they may want to buy

16  the contingent interests, and the lack of a marketing effort

17  violates the *LaSalle* opinion as well.  And who holds the Class

18  B and Class C partnership interests that come before Dugaboy

19  that Dugaboy is concerned may have this opportunity rather

20  than them?  Yes, it's Hunter Mountain, Your Honor, an entity,

21  like Dugaboy, that's owned and controlled by Mr. Dondero.

22       Accordingly, the argument that the plan violates the

23  absolute priority rule is actually a frivolous argument.

24       Turning now to unfair discrimination, Your Honor, Dugaboy

25  argued in its brief Monday that because the projected

103

1    distribution to unsecured creditors has gone down in the

2    recent plan projections, the discrepancy between Class 7 and

3    Class 8 is so large that that amounts to unfair

4    discrimination.

5        Again, the Court should first ask why is Dugaboy even the

6    right party to be making the objection.  Its claim against the

7    Debtor to pierce the corporate veil, as I mentioned, is

8    frivolous.  It's subject to objection.  It didn't even bother

9    to have the claim temporarily allowed for voting purposes, as

10   did other creditors who thought they had a valid claim.  Yet

11   this is another example of Mr. Dondero, through Dugaboy,

12   trying to throw as many roadblocks in front of confirmation as

13   he can.

14       But this argument, like the other ones, fails as well.

15   Class 8 contains the general unsecured creditor claims,

16   predominately litigation claims that have been pending against

17   the Debtor for years.  The Debtor was justified in treating

18   the other unsecured creditors differently.

19       Class 6 consists of the PTO claims in excess of the cap,

20   which are of different quality and nature than the other

21   claims.

22       Class 7 consists of the convenience class.  And it's

23   appropriate to bribe convenience class creditors with a

24   discount option for smaller claims to be cashed out for

25   administrative convenience.

104

1      Mr. Seery testified that when the plan was formulated, the

2  concept was to separately classify liquidated claims in small

3  amounts in Class 7 and unliquidated claims in Class 8.  Mr.

4  Seery also testified that there's a valid business

5  justification to treat the -- hold business 7 -- Class 7

6  claims differently.  These creditors had a reasonable

7  expectation of getting paid promptly, as compared to

8  litigation creditors, who would expect to be paid over time.

9      As the Court is aware, the litigation claims in Class 8

10  involve litigation that has been pending for several years in

11  the case of Acis, Daugherty, Redeemer, and more than a decade

12  in UBS.

13      And most importantly, as Mr. Seery testified, the

14  Committee and the Debtor had significant negotiation regarding

15  the classification and treatment provisions of the plan for

16  Class 7.

17      The Committee does have one constituent who is a Class 7

18  creditor.  However, the other three creditors are all in Class

19  8 and hold claims in excess of $200 million and supported the

20  separate classification and the different treatment.

21      So, Your Honor, discrimination, different treatment among

22  Class 7 and 8 is appropriate, and the different treatment is

23  not unfair.  In the February 1 projections, the Class 8

24  creditors are estimated to receive 71.32 percent of their

25  claims, but that's just an estimate.  As Mr. Seery testified,

APP 2544

105

```
 1    the number can go up based upon the value he can generate from
 2    the assets and, importantly, from litigation claims.  Class 8
 3    creditors could up end up receiving a hundred percent on
 4    account of their claims.  Class 7 creditors are fixed at 85
 5    percent.
 6        Giving Class 8 creditors the opportunity to roll the dice
 7    and potentially get more or less than the 85 percent offered
 8    to Class 7 is not at all unfair.
 9        For these reasons, Your Honor, the Court has the ability
10    and should confirm the plan pursuant to the cram-down
11    provisions of 1129(b).
12        Your Honor, I'm now going to switch from the statutory
13    requirements to all the issues raised by the release,
14    injunction, and exculpation provisions.
15        I'd just like to take a brief sip of water.
16        Dugaboy -- I will first deal with the Debtor release
17    provided in Article 9(f) of the plan, which we claim is
18    appropriate.  Dugaboy and the U.S. Trustee have objected to
19    the release contained in Article 9(f).  Dugaboy objects
20    because it believes that the Debtor release releases claims
21    that the Claimant Trust or Litigation Trust have that have not
22    yet arisen, and the U.S. Trustee objects because it believes
23    that the release is a third-party release.
24        These objections have no merit, and they should be
25    overruled.
```

Case 3:25-cv-02072-S   Document 16-5   Filed 05/25   Page 566 of 790   PageID 4046

106

1    I would like to ask Ms. Canty to put up a demonstrative

2    which contains the provision Article 9(f) of the plan.

3        Your Honor, as set forth in this Article 9(f), only the

4    Debtor is granting any release.  While that --

5            THE COURT:  And for the record, it's 9(d)?  9(d),

6    right?

7            MR. POMERANTZ:  9(d)?  9(d), correct, Your Honor.

8            THE COURT:  Yes.  Okay.

9            MR. POMERANTZ:  Sorry about that.

10           THE COURT:  Uh-huh.

11           MR. POMERANTZ:  While the release is broad, it does

12   not purport to release the claims of any third party.  The

13   Claimant Trust and the Litigation Trust are only included in

14   the release as successors of the Debtor.  The release is

15   specifically only for claims that the Debtor or the estate

16   would have been legally entitled to assert in their own right.

17       Section 1123(b)(3)(A) of the Bankruptcy Code provides that

18   a plan may provide for the settlement or adjustment of any

19   claims or interests belonging to the debtor or the estate, and

20   that's exactly what the Debtor release provides.

21       Accordingly, Dugaboy is wrong that the release effects a

22   release of claims that the Claimant Trust or the Litigation

23   Sub-Trust have that won't arise until after the effective

24   date.  And the U.S. Trustee is simply wrong; there's no third-

25   party release aspect under the release.

003319

107

1       The last point I will address on the release, Your Honor,

2    is who is being released and why and what does the evidence

3    show.  The Debtor release extends to release parties which

4    include the independent directors, Strand, for actions after

5    January 9th, Jim Seery as the CEO and CRO, the Committee,

6    members of the Committee, professionals, and employees.

7       You have heard Mr. Seery's testimony that the Debtor does

8    not believe that any claims against the parties that are

9    proposed to be released actually exist.  You have heard Mr.

10   Seery's testimony that he worked closely with the employees

11   and believes that not only have they all been instrumental in

12   getting the Debtor to the -- be on the cusp of plan

13   confirmation, but that also Mr. Seery is not aware of any

14   claims against them.

15      Moreover, as Mr. Seery testified, the release for the

16   employees is only conditional.  He testified that the

17   employees are required to assist in the monetization of assets

18   and the resolution of claims, and if they do not like -- if

19   they do not lose their release, then any Debtor claims are

20   tolled, such that could be pursued by the Litigation Trustee

21   at a future time.

22      Lastly, I'm sure that the Dondero entities will argue that

23   someone needs to investigate claims against Mr. Seery for

24   mismanagement or for, God forbid, having failed to file the

25   2015.3 statements.  Such claims are part of the continuing

108

1   harassment of Mr. Seery that the Dondero entities have

2   embarked on after it was apparent that nobody would support

3   their plan.

4        There is no evidence of any claims that exist, Your Honor.

5   In fact, the Committee and its professionals have watched the

6   Debtor through this case like a hawk.  They have not been

7   afraid to challenge the Debtor's actions in general and Mr.

8   Seery's in particular.  FTI has worked on a daily basis with

9   DSI and the company, had access to information.  When COVID

10  was happening, they were looking at trades going on on a daily

11  basis.

12       So if the Committee, whose members hold approximately $200

13  million of claims against the estate, are okay with the

14  release against the independent directors and Mr. Seery, that

15  should provide the Court with comfort to approve the releases

16  as part of the plan.

17       In summary, Your Honor, the Debtor release is entirely

18  appropriate and does not affect the release of third-party

19  claims that have not yet arisen.

20       Next, Your Honor, I want to go to the discharge.  There's

21  been objections to the discharge.  Dugaboy and NexPoint have

22  objected that the Debtor receiving a discharge under the plan

23  -- argue a debtor is liquidating.  The objection is not well

24  taken based upon Mr. Seery's testimony regarding what it is

25  the Claimant Trust and the Reorganized Debtor plan to do after

Case 3:25-cv-02072-S   Document 16-5   Filed 08/25/25   Page 569 of 790   PageID 4049
Main Document   Page 2532 of 2722

109

1    the effective date, as compared to what the limitations of a

2    discharge are under 1141(d)(3).

3         Your Honor, Article 9 of the -- 9(b) of the plan provides

4    that as -- except as otherwise expressly provided in the plan

5    or the confirmation order, upon the effective date, the Debtor

6    and its estate will be discharged or released under and to the

7    fullest extent provided under 1141(d)(A) [sic] and other

8    applicable provisions of the Bankruptcy Court.  Bankruptcy

9    Code.

10        Section 1141(d)(3) provides an exception to the discharge,

11   and I'd like to have that section put up for Your Honor at

12   this point.  Ms. Canty?

13        As this -- as the section reflects, and as the Fifth

14   Circuit has ruled in the *TH-New Orleans Limited Partnership*

15   case cited in our materials, in order to deny the debtor a

16   discharge under 1141(d)(3), three things must be true:  (1)

17   the plan provides for the liquidation of all or substantially

18   all of the property in the estate; (2) the debtor does not

19   engage in business after consummation of the plan; and (3) the

20   debtor would be denied a discharge under 727(a) of this title

21   if the case was converted to Chapter 7.  Here, only C applies.

22        With respect to A, Your Honor, while the plan does project

23   that it will take approximately two years to monetize the

24   Debtor's assets for fair value, the Debtor is just not

25   liquidating within the meaning of Section A.

APP 2549

110

1       As Mr. Seery testified, during the post-confirmation

2   period, post-effective date period, the Debtor will continue

3   to manage its funds and conduct the same type of business it

4   conducted prior to the effective date.  It'll manage the CLOs.

5   It'll manage Multi-Strat.  It'll manage Restoration Capital.

6   It'll manage the Select Fund, and it'll manage the Korea Fund.

7       The Bankruptcy Court for the Southern District of New

8   York's 2000 opinion in *Enron*, cited in our materials, is on

9   point.  There, the Court found that a debtor liquidating its

10  assets over an indefinite period of time that is likely to

11  take years is not liquidating within the meaning of Section

12  1141(b)(3)(A), justifying a denial of discharge.

13      But even if we failed A, based upon Mr. Seery's testimony,

14  we would not fail B.  The Debtor will be continuing to do what

15  it has done during the case, as it did before, as I said,

16  managing its business.  B says the debtor does not engage in

17  the business after management.  So while Mr. Seery testified

18  that it would take approximately two years, it could take

19  more, it could take less, and there is no requirement to

20  liquidate assets over a period of time.

21      Accordingly, Your Honor, the Debtor is conducting the type

22  of business contemplated by Section B so as not to just deny a

23  discharge.

24      As the Fifth Circuit said in the *TH-New Orleans* case, the

25  court granted a discharge there because it was likely that the

111

1   debtor would be liquidating its assets and conducting business

2   (indecipherable) years following a confirmation date.  And

3   this result makes sense, Your Honor, because the Debtor will

4   need the discharge and the tenant injunctions, which I'll get

5   to in a moment, in order to prevent interference with the

6   Debtor's ability to implement the terms of the plan and make

7   distributions to creditors.

8       I would now like, Your Honor, to turn to the exculpation

9   provisions, which there's been -- there's been a lot of

10  briefing on it, and I know Your Honor is very aware of the

11  exculpation provisions and the *Pacific Lumber* case.  And

12  several parties have objected to the exculpation contained in

13  the plan, based primarily on the Fifth Circuit ruling in

14  *Pacific Lumber*.

15      The exculpation provision, which is not dissimilar to what

16  is found in many plans around the country, including in plans

17  confirmed in bankruptcy courts in the Fifth Circuit, acts to

18  exculpate the exculpated parties for negligent-only acts as it

19  contains the standard carve-outs for gross negligence,

20  intentional conduct, and willful misconduct.

21      I do want to bring to the Court's attention a deletion we

22  made to the parties protected by the exculpation in the plan

23  and now -- were filed on February 1st.  The definition of

24  exculpated parties included, before February 1, not only the

25  Debtor but its direct and indirect majority-owned subsidiaries

003324

112

1   and the managed funds.  In the plan amendment, we have deleted

2   the Debtor's direct and indirect majority-owned subsidiaries

3   and managed funds from the definition and are not seeking

4   exculpation for those entities.

5       But before, Your Honor, I address *Pacific Lumber* and why

6   the Debtor believes it does not preclude the Court from

7   approving the exculpation in this case, I do want to focus on

8   something that the Objectors conveniently ignore from their

9   argument.

10      As I mentioned in my opening argument, Your Honor, the

11  independent directors were appointed pursuant to the Court's

12  order on January 9, 2020.  They have resolved many issues

13  between the Debtor and the Committee, and avoided the

14  appointment of a Chapter 11 trustee.

15      The January 9th order was specifically approved by Mr.

16  Dondero, who was in control of the Debtor at the time, and I

17  believe the transcripts that are admitted into evidence will

18  demonstrate that he was fully behind the approval of the

19  January 9th order.

20      In addition to appointing the independent directors into

21  what was sure to be a contentiously litigious case, the

22  January 9th order set the standard of care for the independent

23  directors, and specifically exculpated them from negligence.

24      You have heard Mr. Seery and Mr. Dubel testify that they

25  had input into what the order said and would have not agreed

113

 1    to be appointed as independent directors if it did not include

 2    Paragraph 10, as well as the provisions regarding

 3    indemnification and D&O insurance.

 4        I would like to put a demonstrative on the screen, which

 5    is actually Paragraph 10 of that order.  Your Honor, Paragraph

 6    10, there's two concepts embedded here.  First, it requires

 7    any parties wishing to sue the independent directors or their

 8    agents to first seek such approval from the Bankruptcy Court.

 9    Secondly, and importantly for purposes of the independent

10    directors and their agents, who would include the employees,

11    it set the standard of care for them during the Chapter 11 and

12    entitled them to exculpation for negligence.  Paragraph 10

13    says the Court will only permit a suit to go forward if such

14    claim represents a colorable claim for willful misconduct or

15    gross negligence.

16        And Your Honor, Paragraph 10 does not expire by its terms.

17        By not including negligence in the definition of what a

18    colorable claim might be, the Court has already exculpated the

19    independent directors and their agents, which include the

20    employees acting at their direction.

21        And because the independent directors and their agents are

22    exculpated under Paragraph 10, Strand needs to be exculpated

23    as well for actions occurring after January 9th.  This is

24    because a suit against Strand for conduct after the

25    independent board was appointed is effectively a suit against

114

1  the independent directors, who were the only people in control

2  of Strand at that time.

3      After the effective date, Mr. Dondero will regain control

4  of Strand, as the independent directors will be discharged.

5  And for parties able to sue Strand essentially for negligence

6  for conduct conducted by the independent directors after

7  January 9th, Strand will then be able to seek indemnification

8  from the Debtor under the Debtor's partnership agreement

9  because the partnership agreement does provide the general

10 partner is entitled to indemnification.

11     Accordingly, an exculpation for Strand is really the

12 functional equivalent of an exculpation for the independent

13 directors and the Debtor.

14     The January 9th order was not appealed, and an objection

15 to exculpation at this point as it relates to the independent

16 directors, their agents, and Strand is a collateral attack on

17 this order.  So, Your Honor, Your Honor does not even need to

18 get to the thorny issues addressed by *Pacific Lumber*.

19     However, even in the absence of the January 9th order,

20 exculpation of the independent directors and their employees,

21 as well as the other exculpated parties, is not prohibited by

22 *Pacific Lumber*.  In *Pacific Lumber*, the Fifth Circuit reversed

23 a bankruptcy court order confirming a plan because the

24 exculpation provision was too broad and included parties that

25 the Fifth Circuit thought could not be exculpated under

003327

APR 2554

115

1   Section 524(e) of the Code.

2       A close look at the issue before the Court, Your Honor,

3   the reasoning for the Court's ruling and why certain parties

4   like Committee and its members were entitled to exculpation,

5   reflects that this case does not prevent the Court from

6   approving exculpation of this case.

7       A careful read of the underlying briefs and opinions in

8   *Pacific Lumber* reveals that the concern that the Appellants

9   had in that case was the application of exculpation to non-

10  fiduciary sponsors.  There were two competing plans in the

11  case.  The first was filed by the indenture trustee.  The

12  second was filed by the debtor's parent and lender, and was

13  deemed -- called the Marathon Plan.  The Court confirmed the

14  Marathon Plan, and the indenture trustee appealed, and the

15  indenture trustee argued that the plan sponsors could not be

16  exculpated.

17      After determining that the appeal of the exculpation

18  provisions were not equitably moot, the Fifth Circuit

19  determined that exculpation was not authorized under 524(e) of

20  the Code because that section provides a discharge of the

21  debtor does not affect the liability of any other entity on

22  such debt.

23      However, and here's the important part, Your Honor:  The

24  Fifth Circuit did not say that all exculpations are prohibited

25  under the Code and authorized the exculpation of the Committee

116

1    and its members.  And why did the Court do that?  Because it

2    looked at the Committee's qualified immunity under 1103 and

3    also reasoned that Committee members are essentially

4    disinterested volunteers that should be entitled to

5    exculpation on negligence.

6        The Court also cited approvingly *Colliers* for the

7    proposition that if Committee members were not exculpated for

8    negligence and subject to suit by people who are unhappy with

9    them, they just would not serve.

10       Accordingly, the Fifth Circuit based its willingness to

11   exculpate Committee members on the strong public policy that

12   supports exculpation for those parties under those

13   circumstances.  And against this backdrop, Your Honor, there

14   are several reasons why the Court should authorize exculpation

15   in this case, notwithstanding *Pacific Lumber*.

16       First, Your Honor, the independent directors in this case

17   are analogous -- much more analogous to the Committee members

18   that the Fifth Circuit ruled were entitled to than the

19   incumbent officer and directors.

20       Your Honor has the following facts before the Court, based

21   upon the testimony of Mr. Seery and Mr. Dubel and other

22   evidence in the record.  The independent board members were

23   not part of the Highland enterprise before the Court appointed

24   them on January 9th.  The Court appointed the independent

25   directors in lieu of a Chapter 11 trustee to address what the

APP 2566

117

1   Court perceived as the serious conflicts of interest and

2   fiduciary duty concerns with current management, as identified

3   by the Committee.

4       The independent directors would not have agreed to accept

5   their role without indemnification, insurance, exculpation,

6   and the gatekeeper function provided by the January 9th order.

7       And Mr. Dubel testified regarding the significant

8   experience he has as an independent director during his 30-

9   plus years in the restructuring community, including several

10  engagements as an independent director in Chapter 11 cases.

11  And he testified that independent directors have become

12  commonplace in complex restructurings over the last several

13  years and have been appointed in many cases, including high-

14  profile cases.  We've cited to just a few of those cases in

15  our brief, but we could go on and on.

16      Mr. Dubel testified that the independent directors are a

17  critical tool in proper corporate governance and restoring

18  creditor confidence in management in modern-day

19  restructurings, and he testified that, based upon his

20  experience, independent directors expect to be indemnified by

21  the company, expect to obtain directors and officers

22  insurance, and expect to be exculpated from claims of

23  negligence when they agree to be appointed.

24      He further testified that if independent directors cannot

25  be assured that they will be exculpated for simple negligence,

118

1    he believes they will be unwilling to serve in contentious

2    cases like the one we have here, which will have a material

3    adverse effect on the Chapter 11 restructuring process as we

4    know it.

5        Based upon the foregoing testimony, Your Honor, which is

6    uncontroverted, the Court should have no problem finding that

7    the independent directors are much more analogous to the

8    Committee members in *Pacific Lumber* who the Fifth Circuit said

9    could be exculpated.

10       The facts, these facts also distinguish this case from the

11   *Dropbox v. Thru* case which Your Honor decided and which was

12   reversed on this issue by the District Court.  In neither

13   *Pacific Lumber* or *Thru* was there an argument that the policy

14   reasons that supported exculpation of Committee members also

15   supported the exculpation of the parties sought to be

16   exculpated.

17       Moreover, Your Honor, the independent directors in this

18   case were pointed as essentially as substitute for a Chapter

19   11 trustee.  There was a Chapter 11 trustee motion filed a few

20   days before, I believe, and the Court, in approving this, said

21   that you -- better than a Chapter 11 trustee.  And Chapter 11

22   Trustees are entitled to qualified immunity.  So, while, yes,

23   the independent directors aren't truly Chapter 11 trustees,

24   they are analogous.

25       Second, Your Honor, while there is language in *Pacific*

119

1    *Lumber* that says that the directors and officers of the debtor

2    are not entitled to exculpation, the issue before the Court

3    really on appeal was the plan sponsors and whether they were.

4    So I would argue that any discussion of the exculpation not

5    being available for directors and officers in the Fifth

6    Circuit opinion in *Palco* is actually dicta.

7         Third, Your Honor, as I discussed before, the *Pacific*

8    *Lumber* decision was based solely on 524(e) of the Bankruptcy

9    Code, which only says that the discharge of a claim against

10   the debtor does not affect the discharge of a third party.

11   However, the Debtor is not relying on 524(e) as the basis of

12   their exculpation.  As we outline in our brief, Your Honor, we

13   believe that the exculpation is appropriate under Section 105

14   and 1123(b)(6) as a means -- part of an implementation of the

15   plan.

16        Importantly, Your Honor, as other courts hostile to third-

17   party releases have determined, exculpation only sets a

18   standard of care for parties and is not an effort to relieve

19   fiduciaries of liability.

20        Other courts that have aligned with the Fifth Circuit and

21   rejected third-party releases, like the Ninth Circuit, have

22   recently determined exculpation has nothing to do with 524(e).

23   In *In re Blixseth*, a Ninth Circuit case decided at the end of

24   2020 cited in our materials, they examined several of their

25   circuit cases that had strongly prohibited non-consensual

120

1    third-party releases under 524(e).  But again, the Court

2    concluded that 524(e) only prohibits third parties from being

3    released from liability of a prepetition claim for which the

4    debtor receives a discharge.  The Court reasoned that the

5    exculpation clause, however, protects parties from negligence

6    claims relating to matters that occurred during the Chapter 11

7    case and has nothing to do with 524(e).

8        The Ninth Circuit, which along with the Fifth Circuit has

9    been notorious for prohibiting third-party releases, issued

10   its ruling against this backdrop and said that exculpations

11   are appropriate.

12       Your Honor, the Objectors made a point yesterday of

13   pointing out that Strand, as the Debtor's general partner, is

14   liable for the debts under applicable law.  To the extent they

15   intend to argue that the exculpation is seeking to discharge

16   any such prepetition liability, they would be wrong.  The

17   exculpation only applies to postpetition matters.  And to the

18   extent they argue that the exculpation seeks to discharge

19   Strand's potential postpetition liability, for the reasons I

20   discussed, a claim against Strand will essentially be a claim

21   against the Debtor because the Debtor will be obligated to

22   indemnify them.

23       Accordingly, Your Honor, we submit that if this matter

24   goes up to appeal to the Fifth Circuit, which it may very well

25   do, that the Fifth Circuit may very well come out the same way

Case 3:25-cv-02072-S   Document 16-5   Filed 05/23/25   Page 581 of 790   PageID 4061

121

1   as the Ninth Circuit and start relaxing the standard or

2   otherwise provide that the independent directors are much more

3   like Committee members.

4        Lastly, Your Honor, if the Court does confirm the plan,

5   which we certainly hope it will do, it will have made a

6   finding that the plan has been proposed in good faith, and in

7   doing so, the Court essentially finds that the independent

8   directors and their agents have acted appropriately and

9   consistent with their fiduciary duties, and it makes --

10   exculpation for negligence naturally flows from that finding.

11        Your Honor, I would now like to go to the injunction

12   provisions, and my argument is that the injunction provisions

13   as amended are appropriate.

14             THE COURT:  Can I stop you?

15             MR. POMERANTZ:  We received several of -- yes.

16             THE COURT:  I want to just recap a couple of things I

17   think I heard you say.  You're not asking this Court, you say,

18   to go contrary to *Pacific Lumber* per se.  You have thrown out

19   there the possibility that *Pacific Lumber* mistakenly relied on

20   524(e) in rejecting exculpations of plan sponsors.  You're

21   saying, eh, as a technical matter, I think they were wrong in

22   focusing on that statute because that statute seems to deal

23   with prepetition liability.  Okay?  Its actual wording, 524(e)

24   states, discharge of a debt of a debtor does not affect the

25   liability of any other entity on such debts.

APP 2561

 1          And reading between the lines, I think you're saying --

 2   well, maybe this isn't what you're saying, but here's what I

 3   inferred -- "debt" is defined in 101(12) to mean liability on

 4   a claim, and then "claim" is defined in 101(5) of the

 5   Bankruptcy Code as meaning right to payment.  It doesn't say

 6   as of the petition date, but I think if you look at, then,

 7   Section 502 of the Bankruptcy Code that addresses claims and

 8   interests, clearly, it seems to be referring to the

 9   prepetition time period, you know, claims and interest as of

10   the petition date.  And then -- that's 502.  And then 503

11   speaks of, for the most part, postpetition administrative

12   expenses.

13          So that was my rambling way of saying I'm understanding

14   you to say, eh, as a technical matter, we think the Fifth

15   Circuit was wrong to focus on 524(e) because when you're

16   talking about exculpation you're talking about postpetition

17   liability, not prepetition liability.  And 524(e) is talking

18   more about prepetition liability.

19          But I think what I also hear you saying is, at bottom,

20   *Pacific Lumber* was sort of a policy-driven holding where, you

21   know, we're worried about no one would ever sign up for being

22   on an unsecured creditors' committee if they could be exposed

23   to lawsuits.  They're fiduciaries, we think, for policy

24   reasons.  Exculpation is appropriate for this one group.  And

25   you're saying, well, they didn't have an independent board

APP 2562

123

1   that they were considering.  They were just considering non-

2   fiduciary plan sponsors.  And so the rationale presented by

3   *Pacific Lumber* applies equally here, and just they didn't make

4   a holding in this factual context.

5       Have I recapped what you're saying?

6           MR. POMERANTZ:  Your Honor, that's generally --

7   generally correct, with a couple of nuances.  So, yes, first,

8   I think, on a policy basis, Your Honor -- again, putting aside

9   the January 9th order, because we don't see --

10          THE COURT:  Right.  Right.

11          MR. POMERANTZ:  -- Your Honor even needs to get to

12  this issue.

13          THE COURT:  I understand.

14          MR. POMERANTZ:  But if Your Honor does get to this

15  issue, we think, as a first point, Your Honor could be totally

16  consistent with *Pacific Lumber* because there's policy reasons

17  and there was not a categorical rejection of exculpation.

18  Okay.  So if there was a categorical rejection, then it

19  wouldn't have been okay for committee members.  Okay.

20      Second argument, yes, we don't think -- we think it's part

21  of dicta.  It's not part of the holding.  We understand that

22  other courts may have not agreed, maybe your *Thru* case, which

23  Your Honor was appealed on.

24      But the third issue, our argument is all they looked at

25  was 524(e).  They said 523 -- 4(e) does not authorize it.

APP 2583

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Case 3:25-cv-02072-S   Main Document   Page 2565 of 2722   Page 584 of 790   PageID 4064

124

1    They did not say 524(e) prohibits it.

2         We think there's other provisions in the Code.  And then

3    when you basically add in the analysis that Your Honor

4    provided, which we agree with, and what 524 was -- to do,

5    524(e) just says that discharge doesn't affect.  It doesn't

6    say that under another provision of the Code or for another

7    reason you are authorized to give an exculpation.  I think

8    it's a nuance and it's a difference there.

9         And my point of bringing up the *Blixseth* case -- which, of

10   course, is Ninth Circuit and it's not binding on Your Honor,

11   it's not binding on the Fifth Circuit -- is to say, when that

12   was presented to them, they saw the distinction that 524(e)

13   has nothing to do with an exculpation.  And while, yes, the

14   Fifth Circuit hasn't ruled on that, and if the Fifth -- if

15   that argument is made to the Fifth Circuit, we don't know how

16   they would rule, I think that, based upon their analysis --

17   which, again, Your Honor, is no more than a page and a half of

18   their opinion, right, of a long, lengthy opinion on the

19   confirmation issues.  So I think, Your Honor, with the Fifth

20   Circuit, there is a good chance that based upon the developing

21   case law of exculpation, based upon the sister circuit in

22   *Blixseth* making that distinction, that there is a very good

23   chance that the Fifth Circuit would change.

24        But look, I recognize that argument requires Your Honor to

25   say, okay, this is outside and -- and what *Pacific Lumber* did

125

or didn't do.  But I think, Your Honor, there's several

potential reasons, there's several potential arguments that

you can get to the same place.

          THE COURT:  Okay.  Thank you.

          MR. POMERANTZ:  Okay.  If I may just get another

glass of -- sip of water before my time starts?

          THE COURT:  Okay.

          MR. POMERANTZ:  Okay, Your Honor.  We're now turning

to the injunction provision.  The Debtor received several

objections to the injunction provisions in -- I think I have

it right now -- Article 9(f) to the plan.  And we've modified

Article 9(f) to address certain of those concerns, and we

believe that, as modified, that the injunction provision

implements and enforces the plan's discharge, release, and

exculpation provisions to prevent parties from pursuing claims

in interest that are addressed by the plan and otherwise

interfering with consummation and implementation of the plan.

     I'd like to put up the first paragraph of the injunction

on the screen now.

     Okay, Your Honor.  The first paragraph, all it does is

prohibits the enjoined parties from taking action to interfere

with consummation or implementation of the plan.  I suspect a

sentence like that is probably in hundreds of plans in the

Fifth Circuit and elsewhere.

     Initially, to address a concern that it applied to too

126

1    many parties, the Debtor added a definition in the revised

2    plan that defines "enjoined parties," which I'd like to now

3    put that definition up on the screen.

4        The changes -- it's a little hard to read there, but you

5    have it in the -- oh, there you go.  The changes made clear

6    that only parties who have a relationship to this case, either

7    holding a claim or interest, having appeared in the case, be a

8    -- or be a party in interest, Jim Dondero, or related entity,

9    or related person of the foregoing are covered.  The claim

10   objectors argue that the word "implementation and

11   consummation" is vague, or vague and unclear.  Your Honor,

12   these terms are both defined in the Bankruptcy Code and under

13   the case law, and they're, as I said, common features of many

14   plans.

15       Section 1123(a)(5) of the Code provides that a plan shall

16   provide for its implementation, and identifies a list of items

17   that the plan can include.  Article 4 of our plan is defined

18   as "Means of Implementation of This Plan," and describes the

19   various corporate steps required to implement the provisions

20   of the plan, including canceling equity interests, creation of

21   new general partners and a limited part of the Reorganized

22   Debtor, the restatement of the limited partnership agreement,

23   and the establishment of the various trusts.

24       Paragraph 1 rightly and appropriately enjoins efforts to

25   interfere with these steps.

127

1          Nor is the term "consummation of the plan" vague.

2     "Consummation" also is a commonly-used term and has been

3     defined by the Fifth Circuit and the Code.  1102 -- 1101(2)

4     defines "Substantial Consummation" to be the transfer of

5     assets to be transferred under the plan, the assumption by the

6     debtor of the management of all the property dealt with by the

7     plan, and the commencement of distributions under the plan.

8          Section 1142 gives the Court authority to direct a party

9     to perform any act necessary for consummation of a plan.  And

10    as the Fifth Circuit, in *United States Brass Corp.*, which is

11    said in our material, states, said the Bankruptcy Court had

12    post-confirmation jurisdiction to enforce the unperformed

13    terms of a plan with respect to a matter that could affect the

14    parties' post-confirmation rights because the plan had not

15    been fully consummated.

16         And Your Honor just wrote on this issue last year in the

17    *Senior* -- the *Texas* -- the *TXMS Real Estate v. Senior Care*

18    case, and you cited to *U.S. Brass* to find that, in that case,

19    post-confirmation jurisdiction existed to resolve a dispute

20    relating to an assumed contract because the matter related to

21    interpretation, implementation, and execution of the plan.

22         Accordingly, Your Honor, neither implementation or

23    consummation are vague, and the first paragraph of the

24    injunction is necessary and appropriate to enforce the

25    Debtor's discharge.

Case 3:25-cv-02072-S   Document 5   Filed 08/25/25   Page 588 of 790   PageID 4068
Main Document   Page 575 of 732

128

1       As I said before, I will leave it to Mr. Kharasch to

2   address specifically the concerns that the Advisor and the

3   Funds have with the injunction.

4       The second and third paragraphs of the injunction, Your

5   Honor, certain parties have objected to them on the ground

6   that they constitute an improper release of the independent

7   directors as well as the release of claims against the

8   Reorganized Debtor, the Claimant Trust, and the Litigation

9   Sub-Trust, entities that will not have come into existence

10  until after the effective date.

11      We believe we have addressed these concerns by

12  modifications to the second and third paragraphs of the

13  injunction, which I would now like to put the second and third

14  paragraphs on the screen.

15      (Pause.)

16          MR. POMERANTZ:  As that is happening, Your Honor, I

17  will -- there we go.

18      We believe that the changes that were made to these

19  paragraphs should address the Objectors' concerns.

20      First, as with the first paragraph, we have created a

21  defined term of "Enjoined Parties" who are subject to the

22  injunction which is narrower than all persons, I believe, or

23  all entities that was included in the prior plan.  So we've

24  narrowed that.

25      "Enjoined Parties" are generally defined, as I mentioned

129

1    before, as entities involved in this case or related to Jim

2    Dondero, or have appeared in this case.

3         Second, we have removed independent directors from these

4    paragraphs to address the concern that the injunction was a

5    disguised third-party release.

6         Third, we have removed the Reorganized Debtor and the

7    Claimant Trust from the second paragraph and moved them to the

8    third paragraph.  We did this to make clear that the

9    Reorganized Debtor and Claimant Trust were only getting the

10   benefit of the injunction as the successors to the Debtor.  As

11   the Reorganized Debtor and the Claimant Trust receives the

12   property from the Debtor free and clear of all claims and

13   interests and equity holders under 1141(c), they are entitled

14   to the benefit of the injunction.

15        Fourth, we have addressed the concern that the injunction

16   improperly affected set-off rights.  We added language to make

17   clear that the injunction would only affect the parties' set-

18   off of an obligation owed to the Debtor to the extent that

19   that was permissible under 553 and 1141 of the Bankruptcy

20   Code.

21        In other words, we are punting the issue for another day,

22   and there's nothing in the plan that gives the Debtor any more

23   set-off rights than it otherwise has under the Bankruptcy

24   Code.

25        Lastly, Your Honor, certain Objectors have argued that the

APP 2589

130

1   injunction somehow prevents them from enforcing the rights

2   they have under the plan or the confirmation order.  We don't

3   really understand this concern, as the language leading into

4   the second paragraph of the injunction says, except as

5   expressly provided in the plan, the confirmation order, or a

6   separate order of the Bankruptcy Court.

7       With these modifications, Your Honor, the provisions do

8   nothing more than implement 1123(b)(6) and 1141 by preventing

9   parties from taking actions to interfere with the Debtor's

10  plan.

11      The Court has also heard testimony from Mr. Seery

12  regarding the importance of the injunction to implementation

13  of the plan.  He testified that he intends to monetize assets

14  in a way that will maximize value.  And to effectively do

15  that, he has testified that the Claimant Trust needs to be

16  able to pursue its objectives without interference and

17  continued harassment from Mr. Dondero and his related

18  entities.

19      In fact, Mr. Seery testified that if the Claimant Trust

20  were subject to interference by Mr. Dondero, it would take him

21  more time to monetize assets, they would be monetized for less

22  money, and creditors would be harmed.

23      If Your Honor doesn't have any questions for me on the

24  injunction provisions, I'd like to turn to the last part of

25  the injunction, which is really the gatekeeper provision.

131

1          THE COURT:  All right.  You may.

2          MR. POMERANTZ:  Your Honor, the last paragraph in

3    Article 9(f) is really not an injunction but is rather a

4    gatekeeper provision.  And as originally drafted, it'd do two

5    things:  first, it'd require that before any entity, which is

6    defined very broadly, could file an action against a protected

7    party relating to certain specified matters, the entity would

8    have to seek a determination from this Court that the claim

9    represented are colorable claim of bad faith, criminal

10   conduct, willful misconduct, fraud, or gross negligence.  The

11   specified matters to which the gatekeeper provision would

12   apply included the Chapter 11 case, negotiations regarding the

13   plan, the administration of the plan, the property to be

14   distributed under the plan, the wind-down of the Debtor's

15   business, the administration of the Claimant Trust, or

16   transactions related to the foregoing.

17        Subject to certain exceptions for Dondero-related parties,

18   protected parties were defined to include the Debtor, its

19   successors and assigns, indirect and direct, majority-owned

20   subsidiaries and managed funds, employees, Strand, Reorganized

21   Debtor, the independent directors, the Committee and its

22   members, the Claimant Trust, the Claimant Trustee, the

23   Litigation Trust, the Litigation Sub-Trustee, the members of

24   the Oversight Committee, retained professionals, the CEO and

25   CRO, and persons related to the foregoing.  Essentially,

132

1    parties related to the pre-effective-date administration of

2    the estate or the post-confirmation implementation of the

3    plan.

4        Second, the gatekeeper provision as originally presented

5    gave the Bankruptcy Court exclusive jurisdiction to adjudicate

6    any cause of action that it determined would pass through the

7    gate.  The gatekeeper provision, Your Honor, is not a release

8    in any way.  Rather, it permits enjoined parties who believe

9    they have a claim against the protected parties to pursue such

10    a claim, provided they first make a showing that the claim is

11    colorable to the Bankruptcy Court.

12        Several parties, Your Honor, objected to the Bankruptcy

13    Court having exclusive jurisdiction to adjudicate the claims

14    that pass through the gate.  The Debtor believes that the

15    Bankruptcy Court would ultimately have jurisdiction of any of

16    those claims that pass through the gate.  However, the Debtor

17    did, upon reflection, appreciate the concern that if the Court

18    agreed to that now, it would essentially be determining its

19    jurisdiction before a claim was filed.

20        Accordingly, in the January 22nd plan, Your Honor, we

21    amended the provision to provide that the Bankruptcy Court

22    will only have jurisdiction over such claims to the extent it

23    was legally permissible to do so, essentially deferring the

24    issue to a later time.

25        And as Your Honor, I believe, in one of cases called the

Case 3:25-cv-02072-S   Document 15   Filed 05/27/25   Page 593 of 790   PageID 4073

133

1    *Icing on the Cake*, the retention and jurisdiction provisions

2    in the plan only are to the extent under applicable law and

3    are quite broad and include the things that we would have the

4    Court -- have jurisdiction for the Court, otherwise

5    determined.

6        The Court made some other changes to the gatekeeper

7    provision, and I would like to place the amended gatekeeper

8    provision on the screen right now.  In addition to the change

9    I mentioned, the Debtor made the following changes:  the

10   provision is limited now to apply only to enjoined parties,

11   rather than any entity.  Than any entity.  Much narrower.  The

12   provision added the administration of the Litigation Sub-Trust

13   to the matters to which the provision would apply.  The

14   provision makes clear now that any claim, including

15   negligence, is a claim that could be sought and pursued

16   through the gatekeeper function.  And the provision made some

17   other syntax changes.

18       We believe, Your Honor, with these changes, we believe

19   that the gatekeeper provision is within the Court's

20   jurisdiction and it's appropriate to include under the plan.

21       But certain parties have argued that the Court does not

22   have the authority, the jurisdictional authority to perform

23   the gatekeeper function, separate and apart from whether it

24   has jurisdiction to adjudicate the claims that pass through

25   the gate.

APP 2573

Case 3:25-cv-02072-S   Document 65   Filed 05/27/25   Page 594 of 790   PageID 4074
Main Document   Page 2573 of 2722

134

1    Your Honor, we submit that these arguments represent a

2    fundamental misunderstanding of Bankruptcy Court jurisdiction

3    and the Court's authority to make sure the Debtor is free of

4    interference in carrying out the plan which I'll get to in a

5    couple moments.

6    As a preliminary matter, Your Honor, it is important for

7    the Court to remember that Paragraph 10 of the January 9 order

8    already contains a gatekeeper provision as it relates to the

9    independent directors and their agents.  And as I mentioned on

10   a couple of occasions, that order is not going away, it

11   doesn't expire by its terms, and it cannot be collaterally

12   attacked in this forum.

13   The Debtor does acknowledge, though, that the gatekeeper

14   provision in the plan is broader in terms of the people it

15   protects and it applies to post-confirmation matters.

16   Before I address the Court's authority to approve the

17   gatekeeper provision, I want to summarize the evidence that it

18   has heard from Mr. Seery and Mr. Tauber regarding why the

19   gatekeeper is so important a provision to the success of the

20   plan.

21   Although the Court is all too familiar with the history of

22   litigation initiated by and filed against Mr. Dondero and his

23   related affiliates, Mr. Seery spent some time on the stand

24   testifying about the litigation so the Court would have a

25   complete record for this hearing.  He testified that prior to

135

1    the petition date, the Debtor faced years of litigation from

2    Mr. Terry and Acis that led to the *Acis* bankruptcy case, which

3    Your Honor has said many times it's still in your mind.  Years

4    of litigation with the Redeemer Committee which precipitated

5    the filing of a bankruptcy case and resulted in an award very

6    critical of the Debtor's conduct.  Years of litigation with

7    UBS.  Years of litigation with Patrick Daugherty.  And we

8    placed all the dockets for all these matters before the Court.

9        Also, during the bankruptcy and after the Committee

10   essentially rejected the Debtor's pot plan proposal and

11   indicated -- and the Debtor indicated it would be terminating

12   the shared service agreements with Mr. Dondero and his related

13   entities, the Debtor was the subject of harassment from Mr.

14   Dondero and related entities which resulted in the temporary

15   restraining order against him, a preliminary injunction

16   against him, a contempt motion, which Your Honor is scheduled

17   to hear Friday, a motion by the Debtor's controlled -- by the

18   Dondero-controlled investors and funds in CLO managed --

19   managed by the Debtor, which the Court referred to that motion

20   as being frivolous and a waste of the Court's time.  Multiple

21   plan objections, most of which are focused on allowing the

22   Debtors to continue their litigation crusade against the

23   Debtor and its successors post-confirmation.  An objection to

24   the Debtor approval of the Acis order and a subsequent appeal.

25   An objection to the HarbourVest settlement and subsequent

136

 1    appeal.  A complaint and injunction against the Advisors and

 2    the Funds to prevent them from violating Paragraph 9 of the

 3    January 9th order.  And a temporary restraining order against

 4    those parties, which was by consent.

 5        Mr. Dondero's counsel tends to argue that he is the victim

 6    here and that the litigation is being commenced against him

 7    and -- instead of by him.  That response does not even deserve

 8    a response, Your Honor.  It is disingenuous.

 9        Mr. Tauber testified that he was part of the team at Aon

10    that sourced coverage for the independent directors after

11    their appointment in January 2020 and that he has over 20

12    years of underwriting experience.  He testified that at Aon he

13    builds bespoke insurance programs which are not cookie-cutter

14    programs for his clients, with an emphasis on D&O and E&O.

15    And he was asked by the independent board to obtain D&O and

16    E&O insurance after the board's appointment on January 9th.

17        Based upon the process Aon conducted in reaching out to

18    insurance carriers, Mr. Tauber testified that Aon was only

19    able to obtain D&O insurance based upon the inclusion of

20    Paragraph 10 of the January 9 order, the gatekeeper provision.

21    I know Mr. Taylor said that that was spoon-fed to the

22    insurers, but Mr. Tauber's testimony is they knew about Mr.

23    Dondero and they knew about his litigation tactics, so it is

24    not a good inference to be made from the testimony that they

25    would not have required something.  They probably would have

137

1   just said no.

2       Aon has now been -- Mr. Tauber testified that Aon has now

3   been asked to obtain D&O coverage for the Claimant Trustee,

4   the Litigation Trustee, the Oversight Committee, the members,

5   the Claimant Trust, and the Litigation Sub-Trust.  He

6   testified that he and Aon have approached the insurance

7   carriers that they believe might be interested in underwriting

8   coverage.

9       And no, he hasn't approached every D&O and E&O carrier out

10  there, and there may be, just like an investment banker

11  doesn't have to approach everyone.  They are experts in the

12  field, and he testified they approached the people they

13  thought would likely be willing or interested and potentially

14  be willing to extend coverage.  And as a result of Aon's

15  efforts, Mr. Tauber has determined that there's a continued

16  resistance to provide any coverage that does not contain an

17  exclusion for actions relating to Mr. Dondero or his related

18  entities.  And he further believes that all carriers that will

19  -- that have discussed a willingness to provide coverage will

20  only do so if there is a gatekeeper provision, and only one

21  carrier will agree to provide coverage without a Dondero

22  exclusion.

23      Mr. Tauber testified that he believes that any ultimate

24  policy will provide that if at any time the gatekeeper

25  provision is not in place, either the carrier will not cover

APP 2577

138

 1   any actions related to Mr. Dondero or his affiliates or that

 2   the coverage will be vacated or voided.

 3       Based upon the foregoing record, Your Honor, which is

 4   uncontroverted, there's ample justification on a factual basis

 5   for approval of the gatekeeper provision.

 6       I will now turn to the Court's authority to approve the

 7   gatekeeper provision.

 8       There are three alternative bases upon which the Court can

 9   approve the gatekeeper provision.  First, several provisions

10   of the Bankruptcy Code give broad authority to approve a

11   provision like the gatekeeper provision.

12       Second, the Court can analogize to the Barton Doctrine the

13   facts and circumstances in this case and authorize the Court

14   to act as a gatekeeper to prevent frivolous litigation from

15   being filed against court-appointed officers and directors and

16   those that will lead the post-confirmation monetization of the

17   estate's assets.

18       And third, Your Honor, the Court can find that Mr. Dondero

19   and his entities are vexatious litigants, and use the

20   gatekeeper provision as a sanction to prevent the filing of

21   baseless litigation designed merely to harass those in charge

22   of the estate post-confirmation.

23       So, Bankruptcy Court authority.  Your Honor, there are

24   several provisions in the Bankruptcy Code which we rely on to

25   support the Court's authority.  First, Section 1123(a)(5)

139

 1   permits the plan to approve adequate means of implementation,

 2   and contains a long, non-exclusive list.  Mr. Seery's

 3   testimony is uncontroverted that a gatekeeper provision is

 4   necessary for the adequate implementation of the plan.

 5       Second, Your Honor, 1123(b)(6) authorizes a plan to

 6   include any appropriate provision in a plan not inconsistent

 7   with any other provision in this Code.  There are not any

 8   provisions and none have been cited by the Objectors that

 9   would prohibit a gatekeeper provision.  Section 1141

10   effectively holds that the terms of a plan bind the debtor and

11   its creditors and vest property in a reorganized debtor, free

12   and clear of the interests of third parties.

13       If nothing else, Your Honor, the spirit of 1141 allows the

14   Court to prevent, in appropriate cases, vexatious litigation

15   by unhappy creditors and parties in interest from torpedoing

16   the plan.

17       1142(b), Your Honor, provides that the confirmation --

18   that, after confirmation, the Court may direct any parties to

19   perform any act necessary for the consummation of the plan,

20   and requiring the party to seek court-approval before filing

21   an action is certainly an act.

22       And lastly, Your Honor, Section 105 allows the Court to

23   enter orders necessary to order other things, enforce orders

24   of the Court like the confirmation order, and prevent an abuse

25   of process which would certainly occur if baseless litigation

Case 3:25-cv-02072-S Document 65 Filed 05/23/25 Page 600 of 790 PageID 4080

140

1   were filed against the parties in charge of the Reorganized

2   Debtor and the trust vehicles entrusted with carrying out the

3   plan.

4          Your Honor, gatekeepers are not a novel concept and have

5   been approved by courts in appropriate circumstances.  In the

6   *Madoff* cases, the Court has been the gatekeeper post-

7   confirmation to determine whether investor claims are

8   derivative or direct claims.

9          In *General Motors*, the Court has been the gatekeeper post-

10  confirmation to determine whether product liability claims are

11  proper claims against the reorganized debtor.

12         Closer to home, Judge Lynn, Mr. Dondero's counsel,

13  approved a gatekeeper provision, arguably even more far-

14  reaching than the provision here, in the *Pilgrim's Pride* case.

15  In that case, Judge Lynn held that *Pacific Lumber* prevented

16  him -- prevented the Court from approving the exculpation

17  provision in the plan.  However, he did hold that it was

18  appropriate for the Court to ensure that debtor

19  representatives are not improperly pursued for their good-

20  faith actions by requiring that any actions against the debtor

21  or its representatives, and further, on the performance of

22  their obligations as debtor-in-possession, be heard

23  exclusively before the Bankruptcy Court.

24         And *Pilgrim's Pride* is not the only case in this district

25  to include a gatekeeper provision, as Judge Houser approved

141

1    one in the *CHC Group* in 2016, which is cited in our materials.

2       The theme in all these cases, Your Honor, is that there

3    are circumstances where it is necessary and appropriate for

4    the Bankruptcy Court to act as a gatekeeper as a means of

5    reducing litigation that could interfere with a confirmed plan

6    and that a Court has the authority to approve such provisions.

7       The Objectors argue that the Bankruptcy Court does not

8    have jurisdiction to approve that provision.  The Debtor

9    understands the argument as it related to the prior provision,

10   which gave the Court exclusive jurisdiction over any claim it

11   found colorable, and we've amended the plan to address that

12   issue.  The jurisdiction to deal with those claims could be

13   left to a later day.

14      But to the extent the Objectors still pursue the

15   jurisdiction argument in light of the current provision,

16   they're really conflating two very different things:  the

17   ability to determine whether a claim is colorable and the

18   ability to adjudicate that claim if the Court determines it's

19   colorable.

20      None of the authorities cited by the Objectors hold that

21   the Court is without jurisdiction to approve a gatekeeper

22   provision like the one here.  So, rather, what they do is they

23   try to -- they argue, based upon the *Craig's Stores* case,

24   which is narrower than other circuits of post-confirmation

25   jurisdiction in the Bankruptcy Court, and argue that the

APP 2581

Case 3:25-cv-02072-S   Document 6-5   Filed 05/05/25   Page 602 of 790   PageID 4082

142

1    gatekeeper provision doesn't fall within that.  But that --

2    such reliance is misplaced, Your Honor.

3        *Craig* held that the Bankruptcy Court did not have

4    jurisdiction to adjudicate a post-confirmation dispute over a

5    private-label credit card agreement between the debtor and the

6    bank.  In declining to find jurisdiction, the Fifth Circuit

7    remarked that there was no antagonism or claim pending between

8    the parties as of the reorganization and no facts or law

9    deriving from the reorganization or the plan was necessary to

10   the claim asserted by the debtor.

11       However, in so ruling, Your Honor, the Fifth Circuit did

12   reason that post-confirmation jurisdiction in the Bankruptcy

13   Court continues to exist for matters pertaining to

14   implementation and execution of the plan.  Requiring parties

15   to seek Bankruptcy Court determination the claim is colorable

16   before embarking on litigation that will impact

17   indemnification rights and affect distributions to creditors

18   is not an expansion of jurisdiction and fits well within the

19   *Craig* reasoning.

20       Unlike the credit card agreement dispute in *Craig*, Mr.

21   Dondero and his entities have demonstrated tremendous

22   antagonism towards the Debtor.  And while the Debtor's plan

23   may be confirmed, further litigation has been threatened by

24   Mr. Dondero.  It's in the pleadings.  That's one of the

25   reasons Mr. Dondero says his plan is better.  It'll avoid

143

 1   tremendous amount of litigation.

 2       After *Craig*, the Fifth Circuit again examined the

 3   bankruptcy court's post-confirmation jurisdiction in the

 4   *Stoneridge* case in 2005.  In that case, the Fifth Circuit

 5   ruled that a bankruptcy court has post-confirmation

 6   jurisdiction to resolve a dispute between two nondebtors that

 7   could trigger indemnification claims against a liquidating

 8   trust formed as a result of a confirmed plan.

 9       And lastly, as I mentioned Your Honor's decision before,

10   the *TXMS Real Estate* case, I think just a couple of months

11   ago, it stands for the proposition that post-confirmation

12   jurisdiction exists for matters bearing on the implementation,

13   interpretation, and execution of a plan.  In that case, Your

14   Honor ruled that Your Honor had jurisdiction to resolve a

15   post-confirmation dispute between a liquidating trust formed

16   under a plan and a landlord, the result of which could

17   significantly and adversely affect the value of the

18   liquidating trust and monies available for unsecured

19   creditors.

20       And you have heard Mr. Seery testify that litigation will

21   have an adverse effect on the ability to make distributions to

22   creditors.

23       So, Your Honor, under these authorities, the Court

24   undoubtedly would have jurisdiction to act as the gatekeeper

25   for the litigation.

Case 3:25-cv-02072-S   Document 165   Filed 05/27/25   Page 604 of 790   PageID 4084

144

1    There's also an independent basis for the gatekeeper

2    provision, Your Honor, the Barton Doctrine, which the Court is

3    very familiar from your opinion in the *In re Ondova* case in

4    2017 and which provides that before a suit may be brought

5    against a trustee, leave of Court is required.  In *Ondova*, the

6    Court reviewed the history of the doctrine in connection with

7    litigation brought by a highly-litigious debtor against a

8    trustee and his professionals.  This Court noted that there

9    are several important policies followed by the doctrine,

10   including a concern for the overall integrity of the

11   bankruptcy process and the threat of trustees being distracted

12   from or intimidated from doing their jobs.  And Your Honor's

13   language still:  For example, losers in the bankruptcy process

14   might turn to other courts to try to become winners there by

15   alleging the trustee did a negligent job.

16       Your Honor, this is precisely what the Debtor is trying to

17   prevent here, Mr. Dondero and his entities from putting the

18   bad experience before Your Honor in this case behind it and

19   going to try to find better luck in a more hospitable court.

20       Your Honor, the Barton Doctrine originally only applied to

21   receivers, and over the course of time has been extended to

22   apply to various court-appointed fiduciaries, as we have cited

23   in our materials:  trustees, debtors-in-possession, officers

24   and directors, employees, and attorneys representing the

25   debtor.

145

1     And I expect the Objectors to argue that there is a

2   statutory exception to the Barton Doctrine under 28 U.S.C. 959

3   and it does not apply to acts or transactions in carrying out

4   business conducted with a property.  The exception, Your

5   Honor, is very narrow and was meant to apply for things like

6   slip-and-fall cases.  In fact, the Eleventh Circuit in the

7   *Carter v. Rodgers* case, 220 F.3d 1249 in 2000, held that

8   Section 11 -- 28 U.S.C. 959(a) does not apply to suits against

9   trustees for administering or liquidating the bankruptcy

10  estate.

11     The Objectors also argue that the gatekeeper provision

12  violates *Stern v. Marshal*.  However, as the Court acknowledged

13  in *Ondova*, the Fifth Circuit in *Villegas v. Schmidt* has

14  recognized that the Barton Doctrine remains viable post-*Stern*

15  *v. Marshal*.  The Fifth Circuit reasoned that while Barton

16  Doctrine is jurisdictional in that a court does not have

17  jurisdiction of an action if preapproval has not been

18  obtained, it does not implicate the extent of a bankruptcy

19  court's jurisdiction to adjudicate the underlying claim,

20  precisely the distinction we're making here.  The bankruptcy

21  court would be the gatekeeper for deciding whether the claim

22  passes through the gate, and then after will decide if it has

23  jurisdiction to rule on the underlying claim.

24     And this is important especially in a case like this, Your

25  Honor, where Your Honor has had extensive experience with the

APP 2585

146

1    parties and is in the best position to determine whether the

2    claims are valid or attempted to be used as harassment.

3        The Objectors will complain about the open-ended nature of

4    the gatekeeper provision, whether it will or won't apply after

5    the case is closed or a final decree is issued, and the unfair

6    burden of their rights.

7        Your Honor has a previous reported opinion where basically

8    jurisdiction does extend after a case is closed or a final

9    decree is entered, so that issue is a red herring.

10       As Your Honor is well aware, it's a decade-long -- a

11   decade of litigation against the Dondero-controlled entities

12   that caused the Highland bankruptcy.  And the Court is very

13   well aware of the litigation that occurred in *Acis*, very well

14   aware of the litigation that's occurred here that I mentioned

15   a few minutes ago.  Your Honor, it is not over, you'll be

16   presiding over the contempt hearing.

17       And if the Court needs yet another ground to approve the

18   gatekeeper provision, the Debtor submits that the procedure is

19   an appropriate sanction for Dondero's vexatious litigation

20   activities.  We cited the *In re Carroll* case in the Fifth

21   Circuit of 2017 that held that a bankruptcy court has the

22   authority to enjoin a litigant from filing any pleading in any

23   action without the prior authority from the bankruptcy court.

24       And in affirming the decision of the bankruptcy court, the

25   Fifth Circuit commented on the reasons the bankruptcy court

APP 2586

147

1  gave for its ruling.  After recounting the bad faith of

2  appellants, the bankruptcy court determined that the Carrolls'

3  true motives were to harass the trustee and thereby delay the

4  proper administration of the estate, in the hope that they

5  would be able to retain their assets or make pursuit of the

6  assets so unappealing that the trustee would be compelled to

7  settle on terms favorable to appellants.

8      Sounds familiar, Your Honor.  The same can certainly be

9  said about what Mr. Dondero is doing in this case.

10     And to make a showing that a party is vexatious litigant,

11 the Court must find that the party has a history of vexatious

12 and harassing litigation, whether the party has a good faith

13 -- the litigation or has filed it as a means to harass, the

14 burden to the Court and other parties, and the adequacy of

15 alternative sanctions.

16     And as Your Honor is well aware from all the litigation,

17 Your Honor is well, well able to make the finding required for

18 the vexatious litigation finding.

19     But here, we don't ask for the drastic sanction of

20 enjoining from any further filings.  Rather, we just ask for a

21 less-severe sanction, requiring Mr. Dondero and his entities

22 to first make a showing that he has a colorable claim.

23     The Fifth Circuit in *Baum v. Blue Moon*, 2007, did exactly

24 that.  In *Baum*, the district court barred a vexatious litigant

25 from initiating litigation without first obtaining the

003360

APPX 2587

Case 3:25-cv-02072-S   Document 65-5   Filed 05/09/25   Page 608 of 790   PageID 4088

148

1    approval of the district court.  Ultimately, the matter

2    reached the Fifth Circuit after the district court had

3    modified the pre-filing injunction to limit it to a certain

4    case, and then broadened it again based upon continued bad

5    faith conduct.

6        On appeal, the Fifth Circuit, citing several prior cases,

7    noted that a district court has the authority to impose a pre-

8    filing injunction to defer vexatious, abusive, and harassing

9    litigation.

10       And for those reasons, Your Honor, the Debtor asks the

11   Court to overrule any objections to the gatekeeper provision.

12       Your Honor, I was just going to then go to the plan

13   modification provisions, but I wanted to stop and see if you

14   had any questions at this point.

15            THE COURT:  I do not.  Let's give him a time

16   estimate, Nate.  About how --

17            THE CLERK:  Twenty.

18            MR. POMERANTZ:  I have another five or six minutes, I

19   think, based upon --

20            THE COURT:  Okay.

21            MR. POMERANTZ:  And then I'll be ready to turn it

22   over to --

23            THE COURT:  Okay.

24            MR. POMERANTZ:  -- to Mr. Kharasch.

25            THE COURT:  All right.  Yes.  You've got -- you've

APP 2588

149

1    done an hour and 33 minutes.  So you have about, I guess, 37

2    minutes left.  Okay.  Go ahead.

3         MR. POMERANTZ:  Thank you, Your Honor.

4         I would like to address the modifications of the plan that

5    were contained in our January 22nd plan and the additional

6    changes filed on February 1, several of which I have referred.

7         As a preliminary matter, Your Honor, under 1127(b), the

8    Debtor can modify a plan at any time prior to confirmation if

9    -- and not require resolicitation if there's no adverse change

10   in the treatment of claim or interest of any equity holder.

11        With that background, I won't go through the changes we

12   made that I've already discussed, but I will point out a

13   couple, Your Honor, that I would like to point out now.  We

14   have modified the plan with respect to conditions of the

15   effective date in Article 8.  First, a condition to the

16   effective date will now be entry of a final order confirming a

17   plan, as opposed just to entry of order.  And final order is

18   defined as the exhaustion of all appeals.

19        In addition, the ability to obtain directors and officers

20   insurance coverage on terms acceptable to the Debtor, the

21   Committee, the Claimant Trustee, the Claimant Trustee

22   Oversight Board, and the Litigation Trustee is now a condition

23   to the effective date.

24        The Court heard testimony today and has experienced

25   firsthand the litigiousness of Mr. Dondero and his related

150

1    entities.  And the Court heard testimony from Mr. Tauber and

2    Aon that the D&O insurance will not be available post-

3    effective date without assurances that the gatekeeper

4    provision will be in effect for the duration of the policy and

5    any run-off period.

6        Mr. Tauber further testified that he expected the final

7    terms from the insurance carrier to provide that if the

8    confirmation order was reversed on appeal and the gatekeeper

9    was removed, it would void -- it would either void the

10   directors and officers coverage or it'd result in a Dondero

11   exclusion.

12       Mr. Dondero and his entities are no strangers to the

13   appellate process, as Your Honor knows.  They appealed several

14   of your orders, and continue the tack in this case, having

15   appealed the Acis and the HarbourVest orders and the

16   preliminary injunction.  It would not surprise the Debtor if

17   Mr. Dondero and his entities appealed your confirmation order,

18   if Your Honor decides to confirm the plan.

19       The Debtor is confident that it will prevail on any appeal

20   in the confirmation order, as we believe the Debtor has made a

21   compelling case for confirmation.

22       The Debtor also believes a compelling case exists that if

23   the plan went effective without a stay pending appeal, that

24   the appeal would be equitably moot, but we understand we are

25   facing headwinds from the courts, bankruptcy court have

APP 2509

151

 1   addressed that issue before.

 2       However, given the effect a reversal would have on the

 3   availability of insurance coverage, the Claimant Trustee, the

 4   Claimant Oversight Committee, and the Litigation Trustee are

 5   just not willing to take that risk.

 6       We are hopeful that Mr. Dondero and his entities will

 7   recognize that any appeal is futile and step aside and let the

 8   plan proceed and become effective.

 9       If Mr. Dondero and his related entities do appeal the

10   confirmation order, preventing it from becoming final and

11   preventing the effective date from the occurring, the Debtor

12   intends to work closely with the Committee to ratchet down

13   costs substantially and proceed to operate and monetize assets

14   as appropriate until an order becomes final.

15       None of these modifications adversely affect the treatment

16   of claims or interests under the plan, Your Honor, and for

17   those reasons, Your Honor, we request that the Court approve

18   those modifications.

19       And with that, I would like to turn the podium over to Mr.

20   Kharasch to briefly address the remaining CLO objections.

21           THE COURT:  All right.  Mr. Kharasch?

22           CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23           MR. KHARASCH:  Good afternoon, Your Honor.  I'll be

24   as brief as possible.  I know we're under a deadline.

25       As you've heard yesterday, you've heard before in other

APP 2591

152

1    proceedings, Your Honor, the CLO Objecting Parties, the so-

2    called investors, do have rights under the CLO management

3    agreements and indentures, including contractual rights to

4    terminate the management agreements under certain

5    circumstances.

6        What they complain about today, Your Honor, is that the

7    injunction language in the plan, including the language

8    preventing actions to interfere with the implementation and

9    consummation of the plan, is so broad and ambiguous that their

10   rights are or may be improperly impacted, especially any

11   rights to remove the manager for acts of malfeasance.

12       But the Debtor is primarily relying, Your Honor, not so

13   much on the plan injunctions but on the clear provisions of

14   the January 9 order, to which Mr. Dondero consented and which

15   provides that Mr. Dondero shall not cause any of his related

16   entities to terminate any agreements with the Debtor.

17       Yes, that is a broad provision, but it is very clear, and

18   it does not even allow the CLO Objecting Parties to come to

19   court under a gatekeeper-type provision.  But that is what Mr.

20   Dondero consented to on behalf of himself and his related

21   entities.

22       Important to note, Your Honor, we are not here today to

23   litigate who is and who is not a related entity.  That will be

24   left for another day.  However, Your Honor, we have considered

25   these issues, including last night and this morning, and we

153

1   are going to propose -- well, we will modify our plan through

2   a provision in the confirmation order to provide the

3   following:  Notwithstanding anything in the plan or the

4   January 9 order, the CLO Objecting Parties will not be

5   precluded from exercising their contractual or statutory

6   rights in the CLOs based on negligence, malfeasance, or any

7   wrongdoing, but before exercising such rights shall come to

8   this Court to determine whether those rights are colorable and

9   to also determine whether they are a related entity.  If the

10   Court has jurisdiction, the Court can determine the underlying

11   colorable rights or claims.

12       This does not impact the separate settlement we have with

13   CLO Holdco, Your Honor.

14       We think that such modification addresses some of the

15   concerns raised yesterday by the objecting parties by

16   providing more clarity as to what the plan is doing and not

17   doing with respect to the plan and the January 9 order, and we

18   think it is also a fair resolution of some legitimate

19   concerns.

20       So, with that, Your Honor, we think that, with that

21   clarification that we did not have to make but are willing to

22   make, that this should fully satisfy the CLO Objecting Parties

23   with regard to their objections to the injunction and the

24   gatekeeper.

25       Thank you, Your Honor.

154

```
 1          THE COURT:  All right.  Mr. Clemente?
 2      CLOSING ARGUMENT ON BEHALF OF THE CREDITORS' COMMITTEE
 3          MR. CLEMENTE:  Yes, Your Honor.  And I actually am
 4  going to be brief.  Mr. Pomerantz's discussion, obviously, was
 5  very, very thorough, so I'm able to cut out a lot of stuff.
 6      Thank you, Your Honor.  Matt Clemente, Sidley Austin, on
 7  behalf of the Committee.
 8      The plan, Your Honor, meets the confirmation standards and
 9  should be confirmed.  Mr. Pomerantz covered a lot of ground,
10  and I will endeavor not to repeat that, but there are a few
11  points that I think the Committee wishes to emphasize.
12      Your Honor, since I first appeared in front of you, I have
13  maintained consistently that no plan can or should be
14  confirmed without the consent of the Committee.  Your Honor,
15  in her wisdom, understood this immediately, as it was obvious
16  -- it was the obvious conclusion, given the makeup of the
17  creditor body, the asset pool, and the impetus for the filing
18  of the case.
19      Unfortunately, not everyone came to this conclusion so
20  easily, and it took much hard-fought negotiations as well as a
21  defeated disclosure statement, among other things, and
22  tireless dedication and commitment by each individual
23  Committee member to drive for a value-maximizing plan that is
24  in the best interests of its constituencies and for us to get
25  to where we are today.
```

APP 2594

155

1    And where we are today, Your Honor, is at confirmation for

2    a plan that the Committee unanimously supports, which was the

3    inevitable outcome for this case from the very beginning.

4        I've also said, Your Honor, that context is critical in

5    this case.  It has been from the beginning, and it remains so

6    now.  Mr. Draper, interestingly, began his comments yesterday

7    by saying that even a serial killer is entitled to *Miranda*

8    rights.  While I will admit that at times the rhetoric in this

9    case has been heated, I have never certainly likened Mr.

10   Dondero to a serial killer.  But the record shows, and Mr.

11   Dondero's own words and actions show, that he is, in fact, a

12   serial litigator who has no hesitation at all to take any

13   position in an attempt to leverage an outcome that suits his

14   self-interest.  And he has no hesitation at all to use his

15   many tentacles in a similar fashion.

16       That is a very important context in which the Court should

17   view the remaining objections of the Dondero tentacles and

18   weigh confirmation of the Debtor's plan.

19       Against this context of a serial litigator, Your Honor, we

20   have a plan supported by each member of the Official Committee

21   of Unsecured Creditors, accepted by two classes of claims,

22   Class 2 and Class 7, and holders of almost one hundred percent

23   in amount of non-insider claims in Class 8.

24       The parties that have voted against the plan are either

25   employees who are not receiving distributions under the plan

APP 2595

156

1   or are insiders or parties related to Mr. Dondero.

2       The overwhelming number and amount of creditors who are

3   receiving distributions under this plan, therefore, have

4   accepted the plan.  The true creditors and economic parties in

5   interest have spoken, they have spoken loudly, and they have

6   spoken in favor of confirming the plan.

7       Your Honor, I'm not going to address the technical

8   requirements, as Mr. Pomerantz did that.  So I'm going to skip

9   over my remarks in that regard, except I do want to emphasize

10  the remarks regarding the gatekeeper, exculpation, and

11  injunction provisions as they're of critical importance to the

12  plan.

13      The testimony has shown and the proceedings of this case

14  has shown, again, Mr. Dondero is a serial litigator with a

15  stated goal of causing destruction and delay through

16  litigation.

17      The testimony has further shown that none of the

18  independent board members would have signed onto the role

19  without the gatekeeper and injunction provisions and the

20  indemnity from the Debtor.

21      Therefore, it follows that such provisions are necessary

22  to entice parties to serve in the Claimant Trustee and other

23  roles under the plan, which, as I remarked in my opening

24  comments, are integral to providing the structure that the

25  creditors believe is necessary to unlocking the value and

APP 2586

157

1   unlocking themselves from the Dondero web.

2       Regarding the exculpation and injunction provisions

3   specifically, Your Honor, the Court will recall that the

4   Committee raised objections to them in connection with the

5   first disclosure statement hearing.  In response, the Debtor

6   narrowed the provisions, and the Committee believes they

7   comply with the Fifth Circuit precedent, as Mr. Pomerantz ably

8   walked Your Honor through.

9       And to be clear, Your Honor, not only does the Committee

10  believe the exculpation and injunction provisions comply with

11  Fifth Circuit law, the Committee does not believe the estate

12  is harmed by such provisions, as the Committee does not

13  believe there are any cognizable claims that could or should

14  be raised that would otherwise be affected by the exculpation

15  or injunction, and, frankly, with respect to the release that

16  Mr. Pomerantz walked Your Honor through with respect to the

17  directors and the officers.

18      Regarding the gatekeeper, Your Honor, Your Honor

19  presciently approved it in her January 9th order, and the

20  developments since then only serve as further justification

21  for including it in the plan and confirmation order.  Mr.

22  Dondero is a serial and vexatious litigator, and the

23  instruments put in place under the plan to maximize value for

24  the creditors and to oversee that value-maximizing process

25  must be protected, and the gatekeeper function serves that

158

1    protection while also, importantly, as Mr. Pomerantz pointed

2    out, providing Mr. Dondero with a forum to advance any

3    legitimate claims he and his tentacles may have.

4        In short, Your Honor, the gatekeeper provision is

5    necessary to the implementation to the plan, is fair under the

6    circumstances of the case, and is therefore within this

7    Court's authority, and it is appropriate to approve.

8        Your Honor, in sum, it has been a long road to get here

9    today, but we are finally here.  And we are here, Your Honor,

10   I believe in large part as a result of the tireless efforts of

11   the individual members of my Committee, and for that I thank

12   them.

13       The Committee fully supports and unanimously supports

14   confirmation of the plan.  As demonstrated by the evidence,

15   the plan meets all the requirements of the Bankruptcy Code.

16   The Committee believes the plan is in the best interests of

17   its constituencies.  And therefore the Committee, along with

18   two classes of creditors and the overwhelming amount of

19   creditors in terms of dollars, urge you to confirm the plan.

20       That's all I have, Your Honor, but I'm happy to answer any

21   questions you may have for me.

22           THE COURT:  Okay.  Not at this time.

23       Nate, how much time --

24       (Clerk advises.)

25           THE COURT:  Twenty-five minutes remaining?  All

159

1   right.  Just so you know, you've got a collective Debtor's

2   counsel/Committee's counsel 25 minutes remaining for any

3   rebuttal, if you choose to make it.

4       Let's take a five-minute break, and then we'll hear the

5   Objectors' closing arguments.  Okay.

6           THE CLERK:  All rise.

7       (A recess ensued from 2:00 p.m. until 2:06 p.m.)

8           THE COURT:  All right.  Please be seated.  We're

9   going back on the record in Highland.  We're ready to hear the

10  Objectors' closing arguments.  Who wants to go first?

11          MR. DRAPER:  Your Honor, this -- this is Douglas

12  Draper.  I get the joy of going first.

13          THE COURT:  Okay.

14  CLOSING ARGUMENT ON BEHALF OF THE GET GOOD AND DUGABOY TRUSTS

15          MR. DRAPER:  We've heard a great deal of testimony

16  about the Debtor's belief that the circumstances in this case

17  warrant an exception to existing Fifth Circuit case law, the

18  Bankruptcy Code, and Court's post-confirmation jurisdiction.

19      I would not be standing here today objecting to the plan

20  if the Debtor didn't attempt to extend, move past and beyond

21  the Barton Doctrine, move beyond 1141, move beyond *Pacific*

22  *Lumber*.  In fact, I think I heard an argument that *Pacific*

23  *Lumber* is not applicable and this Court should disregard Fifth

24  Circuit case law.

25      Let's start with the exculpation provision.  And the focus

160

 1   of this case has been, and what we've heard over the last few

 2   days, is about the independent directors.  I understand there

 3   was an order entered earlier, the order stands, and the order

 4   is applicable in this case.  It cuts off, however, when we

 5   have a Reorganized Debtor, because these independent directors

 6   are no longer independent directors.  It cuts off when we have

 7   a new general partner.

 8       And so the protections that were afforded by that order do

 9   not need to be afforded to the new officers and new directors

10   of the new general partner.  And in fact, the protections that

11   they're entitled to are completely different than the

12   protections that were entitled -- that are covered by the

13   order that the Court has looked at.

14       Let's first focus on, however, the exculpation provision.

15   And I wanted to ask the Court to look at the exculpated

16   parties.  Have to be very careful and very interest -- and

17   focus solely on the independent directors.  But if you look at

18   the parties covered by exculpation provision, it includes the

19   professionals retained by the Debtor.  My reading of *Pacific

20   Lumber* is that neither the Creditors' Committee counsel nor

21   the Debtor can be covered by an exculpation provision.  This

22   in and of itself makes the plan non-confirmable.  This

23   exculpation provision is unwarranted and unnecessary.

24       Two, --

25           THE COURT:  Well, let's drill down on that.

161

1           MR. DRAPER:  -- we have --

2           THE COURT:  Let's drill down on that.  Mr. Pomerantz

3    says that this wasn't what they considered one way or another

4    by *Pacific Lumber*.  Debtor, debtor professionals.  Okay?  Do

5    you disagree with that?

6           MR. DRAPER:  I disagree with that.  *Pacific Lumber*

7    said you could only have releases and exculpations for the

8    Creditors' Committee members.  And the rationale behind that

9    was that those people volunteered to be part and parcel of the

10   bankruptcy process, that those parties did not get paid.

11   Here, we have two professionals who both volunteered and are

12   being paid, and are not entitled to an exculpation under

13   *Pacific Lumber*.  They're not entitled to a --

14          THE COURT:  Okay.  So you say *Pacific* --

15          MR. DRAPER:  -- release.  Now, ultimately, they --

16          THE COURT:  -- *Pacific Lumber* categorically rejected

17   all exculpations except to Creditors' Committee and its

18   members.  That's your --

19          MR. DRAPER:  I agree.  That's --

20          THE COURT:  -- interpretation of *Pacific Lumber*?

21          MR. DRAPER:  Yes.

22          THE COURT:  Okay.  All right.  So you just absolutely

23   disagree, one by one, with every one of the arguments, that it

24   was really -- the only thing before the Fifth Circuit was plan

25   sponsors, okay?  A plan proponent that I think was like a

APP 2601

162

1    competitor previously of the debtor, and I think a large

2    creditor or secured creditor.  I think those were the two plan

3    proponents.

4        So you disagree -- I'm going to, obviously, go back and

5    line-by-line pour through *Pacific Lumber*, but you disagree

6    with Mr. Pomerantz's notion that, look, it was really a page

7    and a half or two of a multipage opinion where the Fifth

8    Circuit said, no, I don't think 524(e) is authority to give

9    exculpation from postpetition liability for negligence as to

10   these two plan sponsors.  And I guess it was also -- I don't

11   know.  They say, Pachulski's briefing says it was really only

12   looking at these two plan sponsors and the Committee and its

13   members on appeal, you know, going through the briefing, and

14   in such, you can see that these were all that was presented

15   and addressed by the Fifth Circuit.  You disagree with that?

16           MR. DRAPER:  Look, I know the facts of *Pacific Lumber*

17   and they -- I know what the posture of the case was.  However,

18   the literal language by the opinion in it, it transcends just

19   a dispute in the case.  And I think the U.S. Trustee's

20   position that this exculpation provision is correct as a

21   matter of law support -- is further evidence of the fact that

22   the U.S. Trustee, as watchdog of this process, and *Pacific*

23   *Lumber* say this cannot be done, period, end of story.

24           THE COURT:  Okay.  So you, at bottom, just totally

25   disagree with Mr. Pomerantz?  You say *Pacific Lumber* is

APP 2602

163

 1   actually a very broad holding, and I guess, if such, there's a

 2   conflict among the Circuits, right?

 3              MR. DRAPER:  Well, that's okay.

 4              THE COURT:  So, --

 5              MR. DRAPER:  I mean, quite frankly, *Pacific Lumber* is

 6   binding on you.

 7              THE COURT:  Understood.

 8              MR. DRAPER:  There may be a conflict in the Circuits,

 9   and ultimately the Supreme Court may make a decision and

10   decide who's right and who's wrong.

11      But for purposes of today and for purposes of this

12   exculpation provision and for purposes of this confirmation,

13   *Pacific Lumber* is the applicable law.

14              THE COURT:  Okay.  Well, again, this is a hugely

15   important issue, although in many ways I don't understand why

16   it is, because we're just talking about postpetition acts and

17   negligence, okay?  You know, many might say it's much ado

18   about nothing, but it's front and center of your objection.

19   So I guess I'm just thinking through, if the Fifth Circuit was

20   presented these exact facts and was presented with the

21   argument, you know, the *Blixseth* case says 524(e) has nothing

22   to do with exculpation because exculpation is a postpetition

23   concept, and it's just talking about standard liability --

24   these people aren't going to be liable for negligence; they

25   can be liable for anything and everything else -- if presented

APP 2603

164

 1    with that *Blixseth* case, you know, there are several arguments

 2    that Mr. Pomerantz has made why, if you accept that 524(e)

 3    might not apply here, let's look at the reasoning, the little

 4    bit of reasoning we had of *Pacific Lumber*, that it was really

 5    a policy rationale, right?  These independent fiduciaries,

 6    strangers to the company and case, they'd never want to do

 7    this if they knew they were vulnerable for getting sued for

 8    negligence.  Mr. Pomerantz's argument is that these

 9    independent board members are exactly analogous to a

10    Committee, more than prepetition officers and directors.  What

11    do you have to say about that policy argument?

12         MR. DRAPER:  Well, I think there's a huge distinction

13    between the members of a Creditors' Committee who are

14    volunteers and are not paid versus a paid independent

15    director.  And more importantly, I think there's a huge

16    difference between a member of a Creditors' Committee who's

17    not paid and counsel for a Debtor and counsel for a Creditors'

18    Committee.

19         THE COURT:  Okay.

20         MR. DRAPER:  Look, you have -- you've --

21         THE COURT:  So, at bottom, it was all about

22    compensation to the Fifth Circuit?

23         MR. DRAPER:  Well, no.  The Fifth Circuit policy

24    decision was we want to protect a party who wants to serve and

25    do their civic duty to serve on a Creditors' Committee for no

Case 3:25-cv-02072-S    Document 15-5    Filed 08/08/25    Page 625 of 790    PageID 4105

165

1   compensation.  I agree with that.  I think it's a laudable

2   policy decision.  I think it makes sense.

3       However, the Fifth Circuit in its language basically said,

4   nobody else gets it.  It didn't say, look, you know, if there

5   are circumstances that are different, we may look at it

6   differently.  The language is absolute in the opinion.  And

7   that's what I think is binding and I think that's what the

8   case stands for.

9       And look, just so the Court is very clear, when Pachulski

10  files its fee application and the Court grants the fee

11  application, any claim against them is res judicata.  So, in

12  fact, they do have -- they do have protection.  They do have

13  the ability to get out from under.  The Court -- they're just

14  not -- they just can't get out from under through an

15  exculpation provision.  And the same goes for Mr. Clemente and

16  his firm.

17          THE COURT:  Which, --

18          MR. DRAPER:  And the same goes for DSI.

19          THE COURT:  Which, by the way, that's one reason I

20  think sometimes this is much ado about nothing.  It goes both

21  ways.  The Debtor professionals, the Committee professionals,

22  estate professionals, they're going to get cleared on the day

23  any fee app is approved, right?  I mean, there's Fifth Circuit

24  law that says --

25          MR. DRAPER:  I -- I --

APP 2605

166

1          THE COURT:  -- says that's res judicata as to any

2     future claims.

3          But I guess I'm really trying to understand, you know, at

4     bottom, I feel like the Fifth Circuit was making a holding

5     based on policy more than any directly applicable Code

6     provision.

7          I mean, it's been said, for example, that Committee

8     members, they're entitled to exculpation because of, what,

9     1103, some people argue, 1103, which subsection, (c)?  That's

10    been quoted as giving, quote, qualified immunity to

11    Committees.  But it doesn't really say that, right?  It's just

12    something you infer.

13         MR. DRAPER:  No.  Look, what I think, if you really

14    want to put the two concepts together, I think what the Fifth

15    Circuit, when they told lawyers and professionals that you

16    can't get an exculpation, was very mindful of the fact that

17    you can get released once your fee app is approved.  So, as a

18    policy, they didn't need to do it in a exculpation provision.

19    There was another methodology in which it could be done.

20         THE COURT:  Uh-huh.

21         MR. DRAPER:  And so that's -- you have to look at it

22    as holistic and not just focus on the exculpation provision.

23    Because, in fact, they recognize and they -- I'm sure they

24    knew their existing case law on res judicata, and that's why

25    they read it out.

003379
APPX 2606

167

1     So, honestly, there's no reason for Pachulski to be in

2   here.  There's no reason for Mr. Clemente to be in here.

3   There's no reason for the professionals employed by the Debtor

4   to be in here.  They have an exit not by virtue of the plan.

5          THE COURT:  But so then it boils down to the

6   independent directors and Strand post January 9th?

7          MR. DRAPER:  It boils down somewhat to them, but

8   quite frankly, there are two parts to this.  One is you have

9   an order that's in place.  I am not asking the Court to

10  overturn the order.  And quite frankly, this provision could

11  have been written to the effect that the order that was in

12  place on -- that's been presented to the Court is applicable

13  and applied.

14     However, let's parse that down.  Let's look at Mr. Seery.

15  The order that's in place solely protects the independent

16  directors acting in their capacities as independent directors.

17  If somebody's acting as -- and if you want to liken it to a

18  trustee, their protection is afforded by the Barton Doctrine,

19  and that's how the protection arises.

20     What's going on here is they're extending the provisions,

21  first of all, of the Court's order, and number two, of the

22  Barton Doctrine, which are -- which cannot be -- which should

23  not be extended.  The law limits what protections you have and

24  what protections you don't have.  And we, as lawyers -- look,

25  I'll give you the best example.  Think of all the times you

APP 2607

168

 1   had somebody write in the concept of superpriority in a cash

 2   collateral order.  And how many times have you had a lawyer

 3   rewrite the concept of the issue as to diminution in value?

 4   The Code says diminution in value, and quite frankly, a cash

 5   collateral order should just say if, to the extent there's

 6   diminution in value, just apply the Code section.  It's

 7   written there.  Smart people put it in, and Congress approved

 8   it.  And once you start getting beyond that, those things

 9   should be limited.

10       And what we have are lawyers trying to extend out by

11   definitions things that the Code limits by its reach.  That

12   goes for post-confirmation jurisdiction.  That goes for the

13   injunction.  That goes for the so-called gatekeeper provision.

14       And so, again, I would not be here if, in fact, they had

15   said, we have an injunction to the full extent allowed by the

16   Bankruptcy Code and *Pacific Lumber*.  We have an exculpation

17   provision that's allowed by virtue of the Court's order.  We

18   have the full extent and full reach of the Barton Doctrine.

19   Those are legitimate.  Once you start expanding upon that,

20   you're reaching into matters that are not authorized and not

21   allowed.

22       And then you get into 105 territory, which is always very

23   dangerous.  And that's really what's going on here.  And

24   that's the tenor of my argument and what I'm trying to say.

25   The Code gives protections.  It is not for us to extend the

169

1    protections.  It's not for us to enlarge them, even under a,

2    gee, the other party's litigious.

3        And so that's -- let's take *Craig's Store*.  Attempted to

4    limit its reach.  *Craig's Store* says once you have a confirmed

5    plan, any dispute between the parties, for -- let's take an

6    executory contract.  If there's a breach of the executory

7    contract, that's a matter to be handled aft... by another

8    court.  It's not a matter to be handled by this Court.  This

9    Court lets the parties out.

10        And in this case, it's even worse, because you basically

11    have a new general partner coming in, you have an assumption

12    of various executory contracts, and you have a -- Strand is no

13    longer present.

14        If you adopted Mr. Seery's argument, anybody who appeals a

15    decision, questions what he does or how he does it, is a

16    vexatious litigator.  That's not the case.  And the fact that

17    we are appealing a decision is a right that we have.  It

18    shouldn't be limited, and it shouldn't be held against us.

19    Courts can rule against us.  That's fine.

20        And so that's really what the focus is here and that's why

21    I gave the opening that I had.  We are willing to be bound by

22    applicable law.  And quite frankly, the concept that the

23    exigencies of a case allow a court to change what applicable

24    law is is problematic.  I gave the criminal example as a

25    reason.  And the reason was that, in certain instances, the

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-5    Main Document    Filed 08/25/25    Page 2623 of 2722    Page 630 of 790    PageID 4110

170

 1    application of law may allow a criminal to go free.  It's a

 2    problem with our system and how we work, but that's what the

 3    law does, and it is absolute in its application.

 4        Let me address the so-called gatekeeper provision.  The

 5    gatekeeper provision, in a certain sense, is recognized in the

 6    Barton Doctrine.  It's jurisdictional, and it says, to the

 7    extent you're going to litigate with somebody who served

 8    during the bankruptcy, who was a trustee, then you have to

 9    come to the bankruptcy court and pass through a gate.  It

10    doesn't say you have to pass through a gate for a reorganized

11    debtor who does something after a plan is confirmed and going

12    forward.  And so that's -- there's a distinction.

13        And if you look at Judge Summerhays' decision, which I

14    will be happy to send to the Court, in *WRT* involving -- it's

15    kind of (indecipherable) and Mr. Pauker, where, in that case,

16    the trustee, the litigation trustee, spent more litigating

17    than it had in recoveries, and Baker Hughes filed suit.  Judge

18    Summerhays said, look, the Barton Doctrine only applies to a

19    certain extent.  It is limited once you get into post-

20    confirmation matters and related-to jurisdiction.

21        And so, again, the Barton Doctrine is what it stands for.

22    We agree with it, we recognize it, and it should be applied.

23    The Barton Doctrine, however, should not be extended, should

24    not go past its reach, and should not go past the grant of

25    jurisdiction for this Court.

171

1     And so you have in here, though they have -- they have

2 tried to hide it in a limited fashion, this gatekeeper

3 provision.  The gatekeeper provision, as currently written,

4 covers post-confirmation claims that somebody has to come

5 before this Court to the extent there's a breach of a

6 contract.  That's not proper, and it's not covered by your

7 post-confirmation jurisdiction.  To the extent there's an

8 interpretation of an existing contract and an interpretation

9 of the order, you do have authority, and I don't question

10 that.

11     THE COURT:  But address Mr. Pomerantz's statement

12 that there's a difference between saying you have to go to the

13 bankruptcy court and make an argument, we have a colorable

14 claim that we would like to pursue, and having that

15 jurisdictional step required.  There's a difference between

16 that and the bankruptcy court adjudicating the claim.

17     MR. DRAPER:  Well, there are two parts to that.

18 Number one is there's an injunction in place from an action

19 taken post-confirmation against property of the estate.  We

20 all agree at that, correct?  And we believe that the

21 injunction applies to post-confirmation action against

22 property of the pre-confirmation estate.  We all agree to

23 that.

24     However, if in fact there's a breach of a contract

25 postpetition that the parties have a dispute about, that

172

 1   contract is now no longer under your purview once the contract

 2   has been assumed.  And so they shouldn't have to make a

 3   colorable claim to you that a breach of the contract has

 4   occurred.  That should be the determining factor for another

 5   court.

 6       That's, in essence, what *Craig's Store* says.  Your

 7   jurisdiction and the jurisdiction of a bankruptcy court is

 8   limited.  It's limited by *Stern vs. Marshall*.  It's limited by

 9   your ability to render findings of fact and conclusions of law

10   versus render a final decision.  That decision has been made

11   not by us, it's been made by Congress and it's been made by

12   the United States Constitution.

13          THE COURT:  All right.  And I think we all agree with

14   you regarding the holding of *Craig's Stores* and some of the

15   other post-confirmation bankruptcy subject matter jurisdiction

16   holdings.  But Mr. Pomerantz is arguing that this gatekeeping

17   function is warranted by, among other things, you know, there

18   was a district court holding, *Baum v. Blue Moon*, or a Fifth

19   Circuit case, that upheld a district court having the ability

20   to impose pre-filing injunctions in the context of a vexatious

21   litigator.  So, you know, that's a strong analogy he makes to

22   what's sought here.  What is your response to that?

23          MR. DRAPER:  My response to that is a district court

24   can do that.  A district court has jurisdiction to make that

25   decision.  And quite frankly, a district court can sanction a

APP 2612

1   vexatious litigator under Rule 11.

2        So, in fact -- again, you have to bifurcate your power

3   versus the power that a district court has.  And that

4   gatekeeper provision is allowed by a district court because

5   they had authority over the case.  You may not have authority

6   over being the gatekeeper for a post-confirmation matter that

7   you had no jurisdiction over to start with.

8             THE COURT:  Okay.

9             MR. DRAPER:  That, that's the distinction between

10  here.  That's -- what's going on here is they are -- they are

11  mashing together a whole load of concepts under the vexatious

12  litigator and the anti-Dondero function that fundamentally

13  abrogate the distinction between what your jurisdiction is

14  pre-confirmation versus your jurisdiction post-confirmation.

15  And that --

16            THE COURT:  Do you think --

17            MR. DRAPER:  -- is sacrosanct.

18            THE COURT:  Do you think Judge Lynn got it wrong in

19  *Pilgrim's Pride*?  Do you think Judge Houser got it wrong in

20  *CHC*?  Or do you think this situation is different?

21            MR. DRAPER:  There are two parts to that.  I have

22  told Judge Lynn, since I have been working with him, that I

23  think *Pilgrim's Pride* is wrongfully decided.  However, having

24  said that, *Pilgrim's Pride* and those cases dealt with claims

25  against the -- the channeling injunction affected actions

174

1   during the bankruptcy.  It did not serve as a post-

2   jurisdictional grant of jurisdiction to the bankruptcy court.

3   It did not pose as an ability -- as a limitation on a post-

4   confirmation litigator or a post-effective date litigator to

5   address a wrong done to them by an independent director of a

6   general partner.

7       In a sense, Judge Lynn's determination, and Judge Houser,

8   is consistent somewhat with the Barton Doctrine.  Now, do I

9   agree that they're right?  No.  But I understand the decision

10  and I understand the context in which it was rendered and I

11  don't have a huge problem with it.

12      So, again, let's parse what we're trying to do here.

13  Number one, we are -- we have to bifurcate post-confirmation

14  jurisdiction or post-effective date jurisdiction and what you

15  can do as a post-effective date arbiter versus what you could

16  do pre-effective date and pre-effective date claims.  And

17  again, that's the problem with what's written here.  It is

18  designed one hundred percent to expand your post-effective

19  date jurisdiction through both the gatekeeper provision and

20  the jurisdictional grant that's here from your pre-effective

21  date capability, your pre-effective date jurisdiction, and

22  your pre-effective date ability to either curb a claim or not

23  to curb a claim.  And that, that's the issue.

24      And again, let's start talking about the independent

25  directors.  I recognize, again, that there's an order there.

175

1   But if Mr. Seery -- let's take Mr. Seery -- is acting as a

2   director of Strand but is also an accountant for the Debtor

3   and makes a mistake, he would be sued in his capacity as the

4   accountant for the Debtor, not as an independent director of

5   Strand.  That distinction needs to be made.

6       What we are doing here under this plan, and what's been

7   argued by Mr. Pomerantz, is too broad a brush.  It needs to be

8   cut back.  The Court needs to take a very hard look at what's

9   being presented here.

10      And again, the Court's order is very clear.  And this is

11  binding.  I recognize that.  But the protection they got was

12  serving as an independent director.  The protection they

13  didn't get was -- let's take Mr. Seery, if Mr. Seery was

14  serving as an accountant and blew a tax return.  Those are

15  distinctions that warrant analysis and warrant looking at

16  here.  And again, it is too broad a brush that's touted here,

17  and that is why this plan on its face is not confirmable with

18  respect to both the post-confirmation jurisdiction, the

19  gatekeeper provision, the exculpation provisions.

20      And so let me address a few other things, just to address

21  them.  Number one, the argument has been made with respect to

22  the creditors and the resolicitation issue and that creditors

23  could have come in looking, seen, followed the case, and

24  basically calculated and made the same calculation that the

25  Debtor made when they filed this and put forth the new plan

APR 2615

176

1   analysis versus liquidation analysis.  And then they've also

2   made the argument, well, nobody came and complained.  Well,

3   two parts to that.

4        Number one, as you know, a disclosure statement needs to

5   be on its face and should not require a creditor to go back in

6   and monitor the record -- and quite frankly, in this record,

7   there are thousands of pages -- and do the calculation

8   himself.  This was incumbent upon the Debtor to possibly

9   resolicit when these material changes took place.

10       Number two, the recalculation has not been subject to the

11  entire creditor body seeing it.  And anybody who wanted to

12  call them would have had to have seen the document they filed

13  on February 1st and made a telephone call basically

14  contemporaneous with seeing it.

15       Those are two things.  The argument that they didn't call

16  me is just nonsensical.  There's nobody -- you, you are

17  sitting here -- and I've had a number of battles over the

18  years with Judge (indecipherable), who was -- who -- and her

19  view was, I'm here to protect the little guy who's not --

20  didn't hire counsel, who's not represented by Mr. Clemente and

21  his huge clients who have voted in favor of the plan.  It's

22  the little person, *i.e.*, the employees who would vote against

23  a plan that they so -- so desperately tried to get out from

24  under.

25            THE COURT:  Well, --

Case 3:25-cv-02072-S   Document 65-5   Filed 08/06/25   Page 637 of 790   PageID 4117
Main Document   Page 625 of 722

177

1            MR. DRAPER:  It's really a function --

2            THE COURT:  -- Mr. Pomerantz argues it's not as

3    though there was a materially adverse change in treatment; it

4    was the disbursement estimate.  And doesn't every Chapter 11

5    plan -- most Chapter 11 plans, not every -- they make an

6    estimate.  I mean, and it's, frankly, it's very often a big

7    range of recovery, right, a big range of recovery, because we

8    don't know what the allowed claims are going to compute to at

9    the end of the day.  There's obviously liquidation of assets.

10   We don't know.  Isn't this sort of like every -- not, again,

11   not every other plan, but most other plans -- where there's a

12   big range of possible estimated distributions?  I mean, this

13   wasn't a change in treatment, right?

14           MR. DRAPER:  Well, let me address that.  There are

15   two parts to that.  Most plans I see that contain some sort of

16   analysis have a range.  This one doesn't have a range.  What

17   they've done is they've buried in a footnote or assumption

18   that these numbers may change.  So had they said, look, your

19   recovery can go from 60 cents to 85 cents, God bless, they

20   probably would have been right.

21       Number two, which is more problematic to me, to be honest

22   with you, is the fact that, number one, the operating expenses

23   have increased over a hundred percent.  And number two, the

24   Debtor has made a determination post-disclosure statement and

25   pre-hearing that they're going to change their model of

APP 2617

178

1  business.

2      The original disclosure statement said we're not going to

3  get into the managing CLO part of the business and we're going

4  to let these contracts go.  However, at some point along the

5  way, they made a change.  I don't know to this day, because I

6  was never furnished the backup to the expense side.  I

7  understand what they said why they didn't give me the asset

8  side, but the expense side, they should have given me, and I

9  did ask for.

10     But, you know, what we have now is a more fundamental

11 problem with the execution of the plan and the expectation

12 that creditors -- what they're going to get, because, in fact,

13 the expense items have doubled.

14     I think creditors were entitled to know that, rather than

15 it having been sprung upon everybody, when I got it the day

16 before a deposition.  And so those are things that I think

17 warranted a change in solicitation.  Now, the result may have

18 been the same.  I don't know.  More people may have voted

19 against the plan.  More people may have opted in from Class 8

20 to Class 7, I mean, based upon that information.  That

21 information was not provided to them.

22     And so I look at two -- three things.  One is a range

23 could have been given, and they probably would have been a

24 whole lot better off.  Two, you have a material change in

25 expenses.  And three, you have a material change in business

APP 2618

179

```
 1   model.  Three things that occurred between November and this
 2   confirmation hearing.  Three things that were not known by the
 3   creditor body and not told to them.
 4             THE COURT:  Mr. Draper, I --
 5             MR. DRAPER:  Now, it may have been told --
 6             THE COURT:  I don't want to belabor this any more
 7   than I think we need to, but I've got a Creditors' Committee
 8   with very sophisticated professionals, very sophisticated
 9   members.  They're fiduciaries to this constituency.  You know,
10   you mentioned the little guy.  I'm not quite sure who is the
11   little guy in this case.  I think it's a case of all big guys.
12   But, I mean, they're fine with what's happened here.
13   Meanwhile, you -- I mean, clarify your standing here for
14   Dugaboy and Get Good.  I mean, --
15             MR. DRAPER:  I have --
16             THE COURT:  -- I know you have standing.  Mr.
17   Pomerantz did not say you don't have standing.  But in
18   pointing out the economic interests here, I think he said your
19   clients only have asserted a postpetition administrative
20   expense.  Is that correct?
21             MR. DRAPER:  No.  I have a post -- I have an -- I
22   have a claim that's been objected to.  I don't think my
23   economic --
24             THE COURT:  A claim of what amount?
25             MR. DRAPER:  I think it's $10 million.  But Mr.
```

APP 2649

180

 1   Pomerantz is right, it requires a looking through the --

 2   through the entity that I had a loan relationship with.

 3       I recognize all of those things.  I don't think that's

 4   relevant to whether my argument is correct or incorrect.  I

 5   have standing to do it.  I don't think whether my claim is 50

 6   cents or $50 million should change the Court's view of whether

 7   the claim is good or bad.

 8           THE COURT:  Well, I do want to understand, though.

 9   Okay.  So you have not asserted an administrative expense,

10   correct?

11           MR. DRAPER:  No.  There's been an administrative

12   expense that's been asserted, --

13           THE COURT:  For what?

14           MR. DRAPER:  -- but that --

15           THE COURT:  For what?

16           MR. DRAPER:  I don't have the number in front of me,

17   Your Honor.  I don't -- I don't have those numbers --

18           THE COURT:  Okay.  Well, then, --

19           MR. DRAPER:  -- in front of me.  I have asserted --

20           THE COURT:  -- what is the concept?  What is the

21   basis for it?

22           MR. DRAPER:  It deals with -- Mr. Pomerantz is

23   absolutely right as to how he's articulated it.

24           THE COURT:  I can't remember what he said.

25           MR. DRAPER:  It deals with -- it deals with a

APP 2629

181

```
 1   transaction that's unrelated to the Debtor that deals with
 2   Multi-Strat.  I agree with that.
 3            THE COURT:  Okay.  So I remember him saying piercing
 4   the corporate veil.  Your trusts -- both of them, one of them,
 5   I don't know -- engaged in a transaction with Multi-Strat that
 6   you say --
 7            MR. DRAPER:  No, that --
 8            THE COURT:  -- gave -- okay.  Well, you say Multi-
 9   Strat is liable and the Debtor is also liable?
10            MR. DRAPER:  No.  Let me make two things.  The
11   administrative claim deals with a Multi-Strat transaction that
12   took place during the bankruptcy.  My unsecured claim deals
13   with a transaction that took place prior to the bankruptcy,
14   where we lent money to another entity that then funneled money
15   out into the Debtor.  We're -- our contention is that the
16   Debtor is liable for that loan.
17            THE COURT:  All right.  So both the administrative
18   expense as well as the prepetition claim require veil-piercing
19   to establish liability of the Debtor?
20            MR. DRAPER:  Or single business enterprise.  I don't
21   necessarily have to veil-pierce.
22            THE COURT:  Okay.  I'm not even sure that single
23   business enterprise is completely available anymore in Texas,
24   by the Texas legislature doing different things, assuming
25   Texas law applies.  I don't know, maybe Delaware does.  But I
```

APP 2624

182

```
 1    -- sorry.  Just let me let that sink in a little bit.  You're

 2    -- okay.  Okay.  Let me let it --

 3            MR. DRAPER:  Your Honor, I --

 4            THE COURT:  -- sink in a little bit.

 5            MR. DRAPER:  Okay.

 6            THE COURT:  These trusts -- of which Mr. Dondero is

 7    the beneficiary ultimately, right?

 8            MR. DRAPER:  Yes.  Well, and to --

 9            THE COURT:  So, your --

10            MR. DRAPER:  Again, I have not gone up --

11            THE COURT:  The beneficiary of your client --

12            MR. DRAPER:  Mr. Dondero is --

13            THE COURT:  The beneficiary of your client is

14    ultimately hoping to succeed on the administrative expense and

15    the claim on the basis that you should disregard the

16    separateness of Highland and these other entities?

17            MR. DRAPER:  Well, let's take the --

18            THE COURT:  When he's resisted that --

19            MR. DRAPER:  -- unsecured claim.  The --

20            THE COURT:  -- in multiple pieces of litigation?

21    Right?  I'm sorry.  I'm just trying to let this sink in.

22    Okay.  If you could elaborate.  I'm sorry.  I'm talking too

23    much.  You answer me.

24            MR. DRAPER:  Okay.  What we are saying is that, in

25    essence, the party we lent the money to was a conduit for the
```

APP 2622

183

1   Debtor.

2          THE COURT:  Okay.  And who was that entity that

3   either --

4          MR. DRAPER:  Highland Select.

5          THE COURT:  -- Dugaboy or Get Good lent money to?

6          MR. DRAPER:  The Get Good claim is completely

7   different.  The Get Good claim is written as a tax claim.

8   Honestly, I haven't taken a hard look at it.  I will, once we

9   get through this, and it may be withdrawn.  The Dugaboy claim

10  is a claim that arises through a conduit loan.

11         THE COURT:  Okay.  But to which entity?

12         MR. DRAPER:  Highland Select.

13         THE COURT:  Okay.  All right.  Well, continue with

14  your argument.  I'll get my flow chart out and --

15         MR. DRAPER:  Well, let me -- again, I think I've made

16  the points that I needed to make.  I think I've done it in a

17  sense that you -- what I think the Court needs to do is take a

18  very hard look at the jurisdictional extension that's being

19  granted here.  I think the exculpation provision, in and of

20  itself, just by the mere inclusion of Pachulski and the

21  Debtor's professionals and the Committee professionals, is

22  just unconfirmable.  It has to be stricken.

23      And I think the injunction and the juris... the gatekeeper

24  provision are not allowed by applicable law.  If this plan

25  merely said, we will enforce the Barton Doctrine, we will

184

1    abide -- and this order the Court has entered stands, the

2    injunction that's provided and the rights that we have under

3    1141 stand, nobody would be objecting.  That's why the U.S.

4    Trustee has objected, because of the expansive nature of what

5    the -- what's been done in this plan.

6        And with that, I'll turn it over to Mr. Taylor or Davor.

7            THE COURT:  All right.  Who's next?

8            MR. RUKAVINA:  Your Honor, Davor Rukavina.  Can you

9    hear me?

10           THE COURT:  I can.

11     CLOSING ARGUMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12           MR. RUKAVINA:  Your Honor, thank you.  I'll try not

13   to repeat the arguments from Mr. Draper, but I do want to

14   point out a couple bigger-picture issues, I think.

15       One, the issue today is not Mr. Dondero, what he has been

16   alleged to have done, what he is alleged to do in the future.

17   The Debtor has gone out of its way to create the impression

18   that we're all tentacles, we're vexatious litigants, we're

19   frivolous litigants.  The issue today is whether this plan is

20   confirmable under 1129(a) and 1129(b).  And I think that that

21   has to be the focus.

22       Nor is the issue, I think, today any motivation behind my

23   objection or Mr. Draper's or anything else.

24       And I do take issue that my motivation or my client's

25   motivation has some ulterior motive for a competing plan or

APR 2624

185

 1   burning down the house or anything like that.  It's very, very

 2   simple.  My clients do not want $140 million of their money

 3   and their investors' money, to whom they owe fiduciary duties,

 4   to be managed by a liquidating debtor under new management

 5   without proper staffing and with an obvious conflict of

 6   interest in the form of Mr. Seery wearing two hats.

 7       I respect very much that Mr. Seery wants to monetize

 8   estate assets for the benefit of the estate creditors.  That's

 9   his job.  That's incompatible with his job under the Advisers

10   Act and, as he said, to maximize value to my clients and over

11   a billion dollars of investments in these CLOs.

12       That should not be, Your Honor, a controversial

13   proposition.  I should not be described as a tentacle or

14   vexatious because my clients don't want their money managed by

15   someone that they, in effect, did not contract with.  I may be

16   -- I may lose that argument.  The CLOs have obviously

17   consented to the assumption.  But my argument should not be

18   controversial.  It should not be painted with a broad brush of

19   somehow being done in bad faith by Mr. Dondero.

20       And in fact, Mr. Seery has admitted that the Debtor and he

21   are fiduciaries to us.  The fact that today they call us

22   things like tentacles and serial litigants and vexatious

23   litigants -- we all know what a vexatious litigant is.  We've

24   all dealt with those.  The fact that our fiduciary would call

25   us that just reconfirms that it should have no business

APP 2625

186

1    managing our or other people's money.

2        And then for what?  Mr. Seery has basically said that the

3    Debtor will make some $8.5 million in revenue from these

4    contracts, net out $4 million of expenses.  That's net profit

5    of $4.5 million.  But then they have to pay $3.5 million for

6    D&O insurance and $525,000 in cure claims.  But it's the

7    Debtor's business decision, not ours.

8        Your Honor, the second issue is the cram-down of Class 8.

9    There are two problems here:  the disparate treatment between

10   Class 7 and Class 8, which also raises classification, and

11   then the absolute priority rule.  Class 7 is a convenience

12   class claim -- is a convenience claim, Your Honor, with a $1

13   million threshold.  Objectively, that is not for

14   administrative convenience, as the Code allows.  And the only

15   evidence as to how that million dollars was arrived at was,

16   oh, it was a negotiation of the Committee.

17       There is no evidence justifying administrative

18   convenience.  Therefore, there is no evidence justifying

19   separate classification.  And on cram-down, the treatment has

20   to be fair and equitable, which *per se* it is not if there is

21   unfair discrimination.  And there is unfair discrimination,

22   because Class 8 will be paid less.

23       On the absolute priority rule, Your Honor, I think that

24   it's very simple.  I think that the Code is very clear that

25   equity cannot retain anything -- I'm sorry, equity cannot

187

1    retain any property or be given any property.  Property is the

2    key word in 1129(b), not value.  It doesn't matter that this

3    property may not have any value, although Mr. Seery said that

4    it might.  What matters is whether these unvested contingent

5    interests in the trust are property.  And Your Honor, they are

6    property.  They have to be property.  They are trust

7    interests.

8         So the absolute priority rule is violated on its face.

9    There is no evidence that unsecured creditors in Class 8 will

10   receive hundred-cent dollars.  The only evidence is that

11   they'll receive 71 cents.  Mr. Seery said there's a potential

12   upside from litigation.  He never quantified that upside.  And

13   there is zero evidence that Class 8 creditors are likely to be

14   paid hundred-cent dollars.  So, again, you have the absolute

15   priority rule issue.

16        And this construct where, okay, well, equity won't be in

17   the money unless everyone higher above is paid in full, that

18   is just a way to try to get around the dictate of the absolute

19   priority rule.  If that logic flies, then the next time I have

20   a hotel client or a Chapter 11 debtor-in-possession client

21   where my equity wants to retain ownership, I'll just create

22   something like, well, here's a trust, creditors own the trust,

23   I won't distribute any money to equity, and equity can just

24   stay in control.

25        The point again is that this is property and it's being

APP 2627

188

1   received on account of prepetition equity.

2       And there's also the control issue.  The absolute priority

3   rule, the Supreme Court is clear that control of the post-

4   confirmation equity is also subject to the absolute priority

5   rule.  Here you have the same prepetition management

6   postpetition controlling the Debtor and the assets.

7       Your Honor, the Rule 2015.3 issue, someone's going to say

8   that it's trivial.  Someone's going to accuse me of pulling

9   out nothing to make something.  Your Honor, it's not trivial.

10  That's part of the problem in this case, that this Debtor owns

11  other entities that own assets, and there's been precious

12  little window given into that during the case, during this

13  confirmation hearing, and in the disclosure statement.

14      Rule 2015.3 is mandatory.  It's a shall.  I respect very

15  much Mr. Seery's explanation that there was a lot going on

16  with the COVID and with everything and that it just fell

17  through the cracks.  That's an honest explanation.  But the

18  Rule has not been complied with.  And 1107(a) requires that

19  the debtor-in-possession comply with a trustee's duties under

20  704(a)(8).  Those duties include filing reports required by

21  the Rules.

22      So we have an 1129(a)(3) problem, Your Honor, because this

23  plan proponent has not complied with Chapter 11 and Title 11.

24  I'll leave it at that, because I suspect, again, someone will

25  accuse me of being trivial on that.  It is not trivial.  It is

189

1   a very important rule.

2       On the releases and exculpations, Your Honor, I'm not

3   going to try -- I'm not going to hopefully repeat Mr. Draper.

4   But there's a couple of huge things here with this exculpation

5   that takes it outside of any possible universe of *Pacific*

6   *Lumber*.

7       First, you have a nondebtor entity that is being

8   exculpated.  I understand the proposition that, during a

9   bankruptcy case, the professionals of a bankruptcy case might

10  be afforded some protection.  I understand that proposition.

11  But here you have Strand and its board that's a nondebtor.

12      The other thing you have that takes this outside of any

13  plausible case law is that the Debtor is exculpated from

14  business decisions, including post-confirmation.  I understand

15  that professionals in a case make decisions, and

16  professionals, at the end of the case, especially if the Court

17  is making findings about a plan's good faith, that

18  professionals making decisions on how to administer an estate

19  ought to have some protection.

20      That does not hold true for whether a debtor and its

21  professionals should have protection for how they manage their

22  business.  GM cannot be exculpated for having manufactured a

23  defective product and sold it during its bankruptcy case.

24      Here, I asked Mr. Seery whether this language in these

25  provisions, talking about whether the administration of the

190

 1  estate and the implementation of the plan includes the

 2  Debtor's management of those contracts and funds.  He said

 3  yes.  He said yes.  So if you look at the exculpation

 4  provision, it is not limited in time.  It affects, Your Honor,

 5  I'm quoting, it affects the implementation of the plan.

 6  That's going forward.

 7      So you are exculpating the Debtor and its professionals

 8  from business decisions, including post-confirmation, from

 9  negligence.  Well, isn't negligence the number one protection

10  that people that have invested a billion dollars with the

11  Debtor have?  It's cold comfort to hear, well, you can come

12  after us for gross negligence or theft.  I get that.  What

13  about negligence?  Isn't that what professionals do?  Isn't

14  that why professionals have insurance, liability insurance?

15  It's called professional negligence for malpractice.

16      So this exculpation, let there be no mistake -- I heard

17  Your Honor's view and discussion -- this is a different

18  universe, both in space and in time.

19      And we don't have to worry about *Pacific Lumber* too much

20  because we have the *Dropbox* opinion in *Thru, Inc.*  We have

21  that opinion.  Whether it's sound law or not, I don't wear the

22  robe.  But the exculpation provision in that case was

23  virtually identical.  And Your Honor, that's a 2018 U.S. Dist.

24  LEXIS 179769.  In that opinion, Judge Fish -- I don't think

25  anyone could say that Judge Fish was not a very experienced

APP. 2639

Case 3:25-cv-02072-S   Document 5   Main Document   Filed 06/23/25   Page 2632 of 2722   Page 651 of 790   PageID 4131

191

 1   district court judge -- Judge Fish found that the exculpation

 2   violated Fifth Circuit precedent.  That exculpation covered

 3   the debtor's attorneys, the debtor, the very people that Mr.

 4   Pomerantz is now saying, well, maybe the Fifth Circuit would

 5   allow an exculpation for.

 6          THE COURT:  Well, I think he is relying heavily on

 7   the analogy of independent directors to Creditors' Committee

 8   members, saying that's a different animal, if you will, than

 9   prepetition officers and directors.  And he thinks, given the

10   little bit of policy analysis put out there by the Fifth

11   Circuit, they might agree that that's analogous and worthy of

12   an exculpation.

13          MR. RUKAVINA:  And they might.  And they might.  And

14   again, I usually do debtor cases.  You know that.  I'd love to

15   be exculpated.

16          THE COURT:  But --

17          MR. RUKAVINA:  And I think, again, I do -- I do --

18          THE COURT:  -- I really want people to give me their

19   best argument of why, you know, that's just flat wrong.  And

20   Mr. Draper just said it's, you know, there's a categorical --

21          MR. RUKAVINA:  Yeah.

22          THE COURT:  -- rejection of exculpations except for

23   Committee members and Committee in *Pacific Lumber*.  And I'm

24   scratching my head on that one.  And partly the reason I am,

25   while 524(e) was thrown out there, the fact is there's nothing

APP 2631

192

1   explicitly in the Bankruptcy Code, right, that explicitly

2   permits exculpation to a Committee or Committee members.

3   There's just sort of this notion, you know, allegedly embodied

4   in 1103(c), or maybe there are cases you want to cite to me,

5   that they're fiduciaries, they're voluntary fiduciaries, they

6   ought to have qualified immunity.

7       And again, I see it as more of a policy rationale the

8   Fifth Circuit gave than pointing to a certain statute.  So if

9   it's really a policy rationale, then I think the analogy given

10  here to a newly-appointed independent board is pretty darn

11  good.

12      So tell me why I'm all wrong, why Mr. Pomerantz is all

13  wrong.

14          MR. RUKAVINA:  I am not going to tell you that you're

15  all wrong.  I'm not going to tell Mr. Pomerantz that he's all

16  wrong.  Although I am, I guess, a Dondero tentacle, I am not a

17  Mr. Draper tentacle, and I happen to disagree with him.

18  That's my right.  I respect the man very much.  I thought he

19  did a very honorable and ethical job explaining his position

20  to Your Honor.  I believe that the Fifth Circuit would approve

21  exculpations for postpetition pre-confirmation matters taken

22  by estate fiduciaries.  I do believe that they would.  And I

23  do believe that that should be the case.

24      But again, I'm telling you that this one is different.

25  It's -- Mr. Pomerantz is misdirecting you.  The estate

1    professionals manage the estate.  The Debtor manages its

2    business.  It goes out into the world and it manages business.

3    And as Your Honor knows, under that 1969 Supreme Court case,

4    of course I blanked, and under 28 U.S. 959, a debtor must

5    comply, when it's out there, with all applicable law.

6        So if the Debtor -- and I'm making this up, okay?  I am

7    making this up.  I'm not alleging anything.  But if the

8    Debtor, through actionable neglect, lost $500 million of its

9    clients' or its investor clients' money, I'm telling you that

10   under no theory can that be exculpated, and I'm telling you

11   that that's what this provision does.

12       The estate and the Debtor can release their claims.  It

13   happens all the time.  Whatever -- whatever claims the estate

14   may have against professionals, those can be released.  It's a

15   9019.  I'm not complaining about that.  Although I do think

16   that it's premature in this case, because we don't know

17   whether there's any liability for the $100 million that Mr.

18   Seery told you Mr. Dondero lost.  But in no event can business

19   -- business --

20           THE COURT:  I don't understand what you just said.

21           MR. RUKAVINA:  Your Honor, I --

22           THE COURT:  Mr. Dondero is not released --

23           MR. RUKAVINA:  -- went through Mr. Seery's --

24           THE COURT:  -- by the estate.

25           MR. RUKAVINA:  I understand.  I understand.  But we

APP. 2623

Case 3:25-cv-02072-S Document 6-5 Filed 06/27/25 Page 654 of 790 PageID 4134

194

1    all have to also understand that a board of directors and

2    officers can be liable, breaches of fiduciary duty by not

3    properly managing an employee. So I'm not suggesting -- I

4    mean, I know that there's been an examiner motion filed. I'm

5    not suggesting that we have a mini-trial. I'm not suggesting

6    there's actionable conduct. What I'm telling you is that the

7    evidence shows that there's a large postpetition loss. And

8    it's premature to prevent third parties that might have claims

9    from bringing those.

10        And then I think -- I'm not sure that Your Honor

11   understood my point. Let me try to make it again. This

12   exculpation is not limited in time. This exculpation is

13   expressly not limited in time and applies to the

14   administration of the plan post-confirmation. I don't think

15   under any theory would the Fifth Circuit or any court at the

16   appellate level allow an exculpation for purely post-

17   reorganization post-bankruptcy matters. I have nothing more

18   to tell Your Honor on exculpation.

19            THE COURT: Well, again, I -- perhaps I go down some

20   roads I really don't need to go down here, but I'm not sure I

21   read it the way you did. I thought we were just talking about

22   pre -- postpetition, pre-confirmation. Or pre-effective date.

23            MR. RUKAVINA: Your Honor, Page --

24            THE COURT: The --

25            MR. RUKAVINA: Page 48 of the plan, Section C,

195

1    Exculpation.  Romanette (iv).  The implementation of the plan.

2    And I -- and that's -- that's part of why I asked Mr. Seery

3    that yesterday.  Does the implementation of the plan, in his

4    understanding, include the Reorganized Debtor's management and

5    wind-down of the Funds, and he said yes.

6            THE COURT:  Okay.

7            MR. RUKAVINA:  So that's right there in black and

8    white.

9        It also includes the administration of the Chapter 11

10   case.  If that is defined broadly, as Mr. Seery wants it to

11   be, to define business decisions, then that also exceeds any

12   permissible exculpation.

13       So, again, I'm telling Your Honor, with due respect to you

14   and to Mr. Pomerantz, that the focus of Your Honor's

15   questioning is wrong.  The focus of Your Honor's questioning

16   should be on exculpation from what?  From business -- *i.e.*, GM

17   manufacturing and selling the car -- or from management of the

18   bankruptcy case?  Management of the bankruptcy case?  Okay.

19   Postpetition pre-confirmation managing business, never okay.

20       Your Honor, on the channeling -- and let me add, I think

21   it's very clear, there is no Barton Doctrine here.  This is

22   not a Chapter 11 trustee.  The Barton Doctrine does not

23   extend to debtors-in-possession.  And I can cite you to a

24   recent case, *In re Zaman*, 2020 Bankr. LEXIS 2361, that

25   confirms that the Barton Doctrine does not apply to a debtor-

196

1    in-possession.

2        I want to --

3            THE COURT:  Remind me of that --

4            MR. RUKAVINA:  -- discuss, Your Honor, the --

5            THE COURT:  Remind me of the facts of that case.  I

6    feel like I read it, but -- or saw it in the advance sheets,

7    maybe.

8            MR. RUKAVINA:  I honestly do not recall.  I read it a

9    few days ago, and since then, I hope Your Honor can

10   appreciate, I've been up very late trying to negotiate

11   something good in this case.

12           THE COURT:  I'd like to know --

13           MR. RUKAVINA:  So, I mean, I have the case in front

14   of me.

15           THE COURT:  I'd like to know about a holding that

16   says Barton Doctrine can't be applied in a Chapter 11 post-

17   confirmation context, if that's --

18           MR. RUKAVINA:  Well, I have it --

19           THE COURT:  -- indeed the holding.

20           MR. RUKAVINA:  I have it right in front of me here,

21   Your Honor, and I can certainly -- all I know is that this

22   case held that -- it rejected the notion that the Barton

23   Doctrine applies to a debtor-in-possession.

24           THE COURT:  Okay.

25           MR. RUKAVINA:  And maybe --

APP. 2626

197

1           THE COURT:  That --

2           MR. RUKAVINA:  There it is, right there.

3           THE COURT:  What judge?

4           MR. RUKAVINA:  Your Honor, it is the Southern

5    District of Florida, and it is the Honorable -- Your Honor, it

6    is the Honorable Mindy Mora.

7           THE COURT:  Okay.

8           MR. RUKAVINA:  M-O-R-A.

9           THE COURT:  Okay.

10          MR. RUKAVINA:  I have not had the pleasure of being

11   in front of that judge.

12      Your Honor, let me discuss the channeling injunction.

13   This is the big one for me.  This is the big one.  And I think

14   we have to begin -- and it's the big one, as I'll get to,

15   because Your Honor knows that the CLO management agreements

16   give my clients certain rights, and this injunction would

17   prevent those rights from being exercised post-confirmation.

18   It's not dissimilar from the PI hearing that we're in the

19   middle of in an adversary.

20      But I begin my analysis, again, with 28 U.S.C. 959.  Your

21   Honor, that -- the first sentence of that statute makes it

22   very clear that when it comes to carrying on a business, a

23   debtor-in-possession may be sued without leave of the court

24   appointing them.

25      So the first thing that this channel -- gatekeeper,

APP. 2637

198

1    channeling, I don't mean to miscall it -- the first thing that
2    this gatekeeping injunction does is it stands directly
3    opposite to 28 U.S.C. 959.

4         28 U.S.C. 959 also says that jury rights must be
5    preserved.  As I'll argue in a moment, this injunction also
6    affects those rights.

7         In addition to 959, we have the fundamental issue of post-
8    confirmation jurisdiction.  As Mr. Draper said, here, this
9    channeling injunction applies to post-confirmation matters.
10   Similar to my answer to you on exculpation, I can see there
11   being a place for a channeling injunction during the pendency
12   of a case or for claims that might have arisen during the
13   pendency of a case.  I cannot see that, and I don't know of
14   any court that, at least at a circuit level, that would agree
15   that this can apply post-confirmation.

16        It is, again, the equivalent of GM manufacturing a car
17   post-confirmation and having to go to bankruptcy court because
18   someone's wanting to sue it for product negligence or
19   liability.  It's unthinkable.  The reason why a debtor exits
20   bankruptcy is to go back out into the community.  It's no
21   longer under the protection of the bankruptcy court.  That's
22   what the media calls Chapter 11, it calls it the protection of
23   the court.  There's no such protection post-reorganization.
24   So, --

25             THE COURT:  Is that really analogous, Mr. Rukavina?

APP. 2638

199

1    Let's get real.  Is this really analogous --

2            MR. RUKAVINA:  It is.

3            THE COURT:  -- to GM --

4            MR. RUKAVINA:  It is.

5            THE COURT:  -- manufacturing thousands of cars?

6            MR. RUKAVINA:  It absolutely is analogous.  Because

7    this Debtor is going to assume these contracts and it is going

8    to go out there and it is going to make daily decisions

9    affecting a billion dollars of other people's money.  Each of

10   those decisions hopefully will be done correctly and make

11   everyone a lot of money, but each of those decisions is the

12   potential for claims and causes of action.

13       So it is analogous, Your Honor.  They want my clients and

14   others to come to you for purely post-confirmation matters.

15   The Court will not have that jurisdiction.  There will be no

16   bankruptcy estate, nor can the Court's limited jurisdiction to

17   ensure the implementation of the plan go to and affect a post-

18   confirmation business decision.

19       That's the distinction.  The Debtor's post-confirmation

20   business is not the implementation of a plan.  As Mr. Draper

21   said, there's a new entity.  There's a new general partner.

22   There's a new structure.  Go out there and do business,

23   Debtor.  That's what they're telling you.  They're telling you

24   this is not a liquidation because they're going to be in

25   business.  Okay.  Well, the consequence of that is that

200

1    there's no post-confirmation jurisdiction.

2        Now, Mr. Pomerantz says, and I think you asked Mr. Draper,

3    well, the jurisdiction to adjudicate whether something is

4    colorable is different from the jurisdiction to adjudicate the

5    underlying matter.  Your Honor, I don't understand that

6    argument, and I don't see a distinction.  If the Court has no

7    jurisdiction to decide the underlying matter, then how can the

8    Court have any jurisdiction to pass on any aspect of that

9    underlying matter?

10       And whether something is colorable is a fundamental issue

11   in every matter.  That's the thing that courts look at in a

12   12(b)(6), in a Rule 11 issue, in a 1927 issue.  So they're

13   going to come -- or someone is going to have to come to Your

14   Honor and present evidence and law that something is

15   colorable.  Let's say that we've said there's a breach of

16   contract.  Aren't we going to have to show you, here's the

17   contract, here's the language, here's the facts giving rise to

18   the breach, here's the elements?  And Your Honor is going to

19   have to pass on that.  And if Your Honor decides that

20   something is not colorable, then there ain't no step two.

21       And if Your Honor decides that something is colorable,

22   then isn't that going to be binding on the future proceeding?

23   And if it's going to be binding on the future proceeding, then

24   of course you're exercising jurisdiction to adjudicate an

25   aspect of that lawsuit.

APP. 2649

201

1      I don't think that that -- I don't know I can be clearer

2    than that, Your Honor, unless the Debtor has some other

3    understanding of what a colorable claim or cause of action is

4    that I'm misunderstanding.

5      And Your Honor, I would ask, when Your Honor is in

6    chambers, to look at one of these CLO management agreements.

7    I'm sure Your Honor has already.  I just pulled one out of the

8    Debtor's exhibits, Exhibit J as in Jason.  And Section 14, 14

9    talks about termination for cause.  Most of these contracts

10   are for cause.  So, Your Honor, cause includes willfully

11   breaching the agreement or violating the law, cause includes

12   fraud, cause includes a criminal matter, such as indictment.

13     So let's imagine, Your Honor, that I come to you a year

14   from now and I say, I would like to terminate this agreement

15   because I don't want the Debtor managing my $140 million

16   because of one of these causes.  What am I going to argue to

17   Your Honor?  I'm going to argue to Your Honor that those

18   causes exist.  And Your Honor is going to have to pass on

19   that.

20     And if Your Honor says they don't exist, again, I'm done.

21   I just got an effective final ruling from a federal judge that

22   my claim is without merit.  I'm done.  Your Honor has decided

23   the matter effectively, legally, and finally.

24     That's why, when Mr. Pomerantz says that the jurisdiction

25   to adjudicate the colorableness of a claim is different from

202

1   adjudicating that claim, it's not correct.  They're part of

2   the same thing, Your Honor.

3       We strenuously object to that injunction, we think it's

4   unprecedented, and we strenuously object to that injunction

5   because we are not Mr. Dondero.

6       I understand the January 9th order.  I'll let Mr.

7   Dondero's counsel talk about why that was never intended to be

8   a perpetual order.  I'll let Mr. Dondero's counsel argue as to

9   why the extension of that order *ad infinitum* in the plan is

10  illegal.

11      But even if Mr. Dondero is enjoined in perpetuity from

12  causing the related parties to terminate these agreements,

13  Your Honor, the related parties themselves are not subject to

14  that injunction.  That's why you have the preliminary

15  injunction proceeding impending in front of you on ridiculous

16  allegations of tortious interference.

17      So whether the Court enjoins Mr. Dondero or not in

18  perpetuity is a separate matter.  The question is, as you've

19  heard, at least my retail clients, they have boards.  Those

20  boards are the final decision-makers.  Mr. Dondero is not on

21  those boards.

22      In other words, it is wrong to conclude *a priori* that

23  anything that my clients do has to be at the direction of Mr.

24  Dondero.  There is no evidence of that.  The evidence is to

25  the contrary.

1     Yes, a couple of my clients, the Advisors are controlled

2  by Mr. Dondero.  Mr. Norris testified to that.  You'll not

3  find Mr. Norris anywhere testifying in that transcript that

4  Your Honor allowed into evidence that the funds, my retail

5  fund clients are controlled by Mr. Dondero.  You won't find

6  that evidence.  There was no evidence yesterday or today that

7  Mr. Dondero controls those retail funds.  The only evidence is

8  that they have independent boards.

9     So I ask the Court to see that it's a little bit of a

10  sleight of hand by the Debtor.  If I am to be enjoined or if I

11  am to have to come to Your Honor in the future as a vexatious

12  litigant or a tentacle or a frivolous litigant, whatever else

13  I've been called today, then let it be because of something

14  that I've done or failed to do, something that my client has

15  done to warrant such a serious remedy, not something that Mr.

16  Dondero is alleged to have done.

17     And what have my clients done, Your Honor?  What have we

18  done to be called vexatious litigants and serial litigants?

19  We've done nothing in this case, pretty much, until December

20  16th, when we filed a motion that was a poor motion,

21  unfortunately, the Court found it to be frivolous, and the

22  Court read us the riot act.

23     We refused, on December 22nd, we, my clients' employees,

24  to execute two trades that Mr. Dondero wanted us to execute.

25  We had no obligation to execute them.  We knew nothing about

APP. 2643

204

1    them.  And Mr. Seery -- I'm sorry.  Not Mr. Dondero, that Mr.

2    Seery wanted to execute.  And Mr. Seery closed those

3    transactions that same day.  And then a professional lawyer at

4    K&L Gates, a seasoned bankruptcy lawyer, sent three letters to

5    a seasoned professional lawyer at Pachulski, and the letters

6    were basically ignored.

7         Okay.  Those are the things that we've done.  Other than

8    that, we've defended ourselves against a TRO, we've defended

9    ourselves against a preliminary injunction, we will continue

10   to defend ourselves against a preliminary injunction, and we

11   defend ourselves against this plan because it takes away our

12   rights.  Is that vexatious litigation?  Is that, other than

13   the frivolous motion, is that frivolous litigation?

14        And we heard you loud and clear when you read us the riot

15   act on December 16th.  And I will challenge any of these

16   colleagues here today to point me to something that we have

17   filed since then that is in any way, shape, or form arguably

18   meritless.

19        So where is the evidence that my retail funds are

20   tentacles or vexatious litigants or anything else?  There is

21   no evidence, Your Honor, and the Debtor is doing its best to

22   give you smoke and mirrors to just make that mental jump from

23   Mr. Dondero to my clients, effectively an alter ego, without a

24   trial on alter ego.

25        Once these contracts are assumed, the Debtor must live

205

 1   with their consequences.  It's as simple as that.  Your Honor

 2   has so held.  Your Honor has so held forcefully in the *Texas*

 3   *Ballpark* case.  And the Court, I submit respectfully, cannot

 4   excise by an injunction a provision of a contract.

 5        Also, this injunction will -- is a permanent injunction.

 6   We know from *Zale* and other cases the Fifth Circuit does

 7   permit certain limited plan injunctions that are temporary in

 8   hundred-cent plans.  This is a permanent one.  It doesn't even

 9   pretend to be a temporary one.

10        It's also a permanent one because the Debtor knows and I

11   think the Debtor is banking on me being unable to get relief

12   in the Fifth Circuit before Mr. Seery is finished liquidating

13   these CLOs.

14        So what we are talking about today is effectively excising

15   valuable and important negotiated provisions of these

16   contracts, provisions that, although my clients are not

17   counterparties to these contracts, you've heard from at least

18   three of them we do control the requisite vote, the voting

19   percentages, to cause a termination, to remove the Debtor, or

20   to seek to enforce the Debtor's obligations under those

21   contracts.

22        And again, Your Honor, it's very simple.  Where those

23   contracts require cause, there either is cause or is not

24   cause.  If there is not cause, the Debtor has its remedies.

25   If there is cause, I'll have my remedies.  But it's not for

1    this Court post-confirmation to be making that determination.

2    That's not my decision.  That's Congress's decision.

3        So, Your Honor, for those reasons, we object, and we

4    continue to object, and we'd ask that the Court not confirm

5    this plan because it is patently unconfirmable.  Or if the

6    Court does confirm the plan, that it excise those provisions

7    of the releases, exculpations, and injunction that I just

8    mentioned as being not in line with the Fifth Circuit or

9    Supreme Court precedent.

10       Thank you.

11           THE COURT:  All right.  Can I -- I meant to ask Mr.

12   Draper this.  Can we all agree that we do not have third-party

13   releases *per se* in this plan?  Can we all agree on that?

14           MR. DRAPER:  I don't know.  I have to look at that.

15   I think what you have are exculpations and channeling

16   injunctions for third parties who have not paid for those

17   channeling injunctions or those exculpations.

18           THE COURT:  All right.

19           MR. RUKAVINA:  Your Honor, was that question -- was

20   that question solely to Mr. Draper?

21           THE COURT:  Well, no, it was to all of you.  I

22   thought we could all agree that we don't have third party

23   releases *per se*.  Okay.  There was --

24           MR. RUKAVINA:  Your Honor, we --

25           THE COURT:  -- a little bit of glossing over that in

207

 1   some of the briefing, I can't remember whose.  But we have

 2   Debtor releases, we have --

 3            MR. RUKAVINA:  Yes.

 4            THE COURT:  -- exculpations that deal with

 5   postpetition negligence only, we have injunctions, which I

 6   guess the Debtor would say merely serve to implement the plan

 7   provisions and are commonplace, but Mr. Draper would say maybe

 8   are tantamount to third-party releases.  Is that --

 9            MR. RUKAVINA:  Your Honor, I don't think --

10            THE COURT:  -- where we are?

11            MR. RUKAVINA:  -- there's any question -- I don't

12   think there's any question that the exculpation is a third-

13   party release, and that that's also what Judge Fish held in

14   the *Dropbox* case.  It says that none of the exculpated parties

15   shall have any liability on any claim.  So, --

16            THE COURT:  All right.

17            MR. RUKAVINA:  -- that necessarily --

18            THE COURT:  I get what you're saying, but I just

19   think, in common bankruptcy lingo, most people regard a third-

20   party release as when third parties are releasing -- third

21   parties meaning, for example, creditors, interest holders --

22   are releasing officers and directors and other third parties

23   for anything and everything.

24       Exculpation, I get it, it's worded in a passive voice, but

25   it is third parties releasing third parties, but for a narrow

APP. 2667

208

 1  thing, postpetition conduct that is negligent.  Okay.  So I

 2  think -- while there's technically something like a third-

 3  party release there, it's not in bankruptcy lingo what we call

 4  a third-party release.  It's an exculpation means no liability

 5  of the exculpated parties for postpetition conduct that's

 6  negligent.  So I -- anyway, I think we all agree that, I mean,

 7  can we all agree there aren't any *per se* third-party releases

 8  as that term is typically used in bankruptcy parlance?

 9      MR. RUKAVINA:  I apologize, Your Honor, and I'm not

10  trying to try your patience, but I cannot agree to that.

11  Whatever claims my client, a nondebtor, has against Strand, a

12  nondebtor, are gone.  Whether it's a release or exculpations,

13  they're gone.  So I apologize, I cannot agree to that, Your

14  Honor.

15      MR. DRAPER:  Your Honor, this is Douglas Draper.  I

16  can't agree, either.  I think it's definitional.  And quite

17  frankly, I think I'm looking at the functional effect of

18  what's here, and they appear to be third-party releases.

19      THE COURT:  Okay.  All right.  Who is making the

20  argument for Mr. Dondero?

21      MR. TAYLOR:  Your Honor, Clay Taylor appearing on

22  behalf of Mr. Dondero.

23      THE COURT:  Okay.

24      CLOSING ARGUMENT ON BEHALF OF JAMES D. DONDERO

25      MR. TAYLOR:  Your Honor, first of all, as this Court

209

 1   is well aware, this Court sits, as a bankruptcy court, as a
 2   court of equity.  It has many different tools available to it.
 3   One of those, of course, is denying confirmation of this plan
 4   because of the laws that we have discussed today and that we
 5   believe the evidence has shown, and I won't go into those.  Of
 6   course, of course, Your Honor could confirm that plan.  Yet
 7   another tool available to this Court is it can take it under
 8   advisement.
 9       To the extent that this Court decides to confirm this plan
10   and decides to confirm it today, it certainly takes a lot of
11   options off the table for all parties.  There are ongoing
12   discussions, I'm not going to go into any of the particulars
13   of those discussions, but a ruling on confirmation today would
14   effectively end that, because, absent, then, an order vacating
15   confirmation, there's a lot of eggs that can't become
16   unscrambled after a confirmation order is entered.
17       So we would respectively ask that, to the extent that the
18   Court is even considering confirmation, we don't believe it to
19   be appropriate, but at least take it under advisement for 30
20   days, or at least, in the very alternative, that it announce
21   some date which it is going to give a ruling, so that we kind
22   of know when that is going to come down, to see if any
23   positive ongoing discussions can result in more of a global
24   resolution that all parties can agree upon.
25       Addressing more the merits of the case, Your Honor, Mr.

210

 1   Dondero does indeed object to the nondebtor releases, the

 2   exculpations, the injunction.  I believe those have been

 3   covered rather extensively in the prior argument, so I wasn't

 4   going to go into those here because they've been addressed.

 5   Of course, I will endeavor to answer any questions that Your

 6   Honor may have on those.

 7       I will say I think Your Honor asked for everybody's best

 8   shot as to why this is different for a Committee member versus

 9   the independent trustees here.  I will say my best shot is,

10   first of all, *Pacific Lumber* says what it says.  I believe Mr.

11   Pomerantz has indicated their position that that language is

12   dicta and therefore not binding upon this Court.  I

13   respectfully disagree with that.  But to the extent, more

14   directly answering Your Honor's question, to me, the

15   difference is clear.  Chapter 7 trustees are a creature of

16   statute.  So are Chapter 11 trustees.  And -- as are members

17   of a Committee that are seated pursuant to the Bankruptcy

18   Code.  Those are all creatures of statute.  And the

19   independent board of trustees, while there are certainly --

20   there are some analogies that can be made, undoubtedly, but

21   they are not a creature of statute.  There is no provision for

22   them under the Bankruptcy Code.  And therefore I don't believe

23   that they should and can receive the same protections under

24   *Pacific Lumber*.

25       And so hopefully that -- that is my best shot at

003423

211

1  answering, directly answering the question that Your Honor

2  posed.

3          THE COURT:  Okay.

4          MR. DRAPER:  Mr. Dondero also has issue with the

5  overbroad continuing jurisdiction of this Court.  I believe

6  Mr. Rukavina has stated that rather succinctly, too.  Merely

7  ruling upon whatever claim is colorable or not certainly has

8  definite impacts.  If this Court has jurisdiction to do that

9  when it otherwise wouldn't have jurisdiction, it enacts an

10  expansion, a potentially impermissible expansion of this

11  Court's jurisdiction.  And for that reason, the plan should --

12  confirmation should be denied.

13     Getting into the particulars of 1129, Your Honor, there is

14  problems under 1129(a)(2).  Those are the solicitation

15  problems.  Let's just kind of look at what the evidence

16  showed.  On November 28th, there was a disclosure statement,

17  it was published to all creditors, and it said, under this

18  plan, you're going to get 87 cents.  It wasn't a range.  Now,

19  there was some assumptions that went in there, but they said,

20  under a liquidation of all these assets, you're going to get

21  62 cents.

22     The Debtors came back approximately two months later, on

23  January 28th, and said, oh, wait, we missed the boat here, and

24  actually, under the plan, you're going to get 61 cents.  And

25  under a liquidation, though, you'd only get 48.

212

1        Well, the problem is, already, two months later, they've

2   already told you they missed the boat on what the liquidation

3   analysis was just two months ago.  And two months ago, they

4   told you under a liquidation you'd get 62 cents, and now we're

5   telling you you're going to get less.  That's at least some

6   very good evidence that the best interests of the creditors

7   isn't being met, and potentially a liquidation is much better.

8        They then came back, potentially maybe realizing that

9   problem, also because some new information came in with the

10  employees, and also with UBS, which adjusted the overall

11  general unsecured claims pool, and said, well, under the plan

12  you're going to get 71 cents, and under a liquidation you're

13  going to get 55 cents.

14       In between those iterations from November to February,

15  they found $67 million more in assets.  So Mr. Seery testified

16  he believed some of that's as to market increases in values,

17  and some (garbling) investment, market -- securities.  And

18  some were just in these private equity investments.

19       There are indeed some rollups behind all of these numbers.

20  I do understand why they wouldn't want to make some of these

21  numbers public, because they might not be able to get --

22  create the upside for any particular asset class that they're

23  seeking to monetize.

24       However, we and others, including Mr. Draper, asked for

25  those rollups to be provided, and we certainly could have

213

1   taken those under seal or a confidentiality agreement, could

2   have also put those before this Court under seal and the

3   Debtor could have put those rollups before this Court under

4   seal.  It elected not to do so.

5       So, rather, what you have is the naked assumptions of this

6   is what we think we can monetize the assets, or we're not

7   going to tell you what it is, but trust me, Creditors, and

8   cool, we found $67 million worth of value in the past two

9   months, so therefore we're going to beat the liquidation

10  analysis that we previously told you just two months ago.

11      They also acknowledge that, in those two months, that

12  there was going to be about $26 million in increased costs

13  from their November analysis to their February analysis.  And

14  they included that in their projections.

15      Finally, they acknowledged, in those two months, that we

16  had previously estimated -- and they even have it in their

17  assumptions in November liquidation and plan analysis -- that

18  UBS, HarbourVest, and I believe it was Acis, were all going to

19  be valued at zero dollars, and that's what the claims were

20  going to be.  Well, they kind of missed the boat on those, and

21  they missed it by a lot.  They -- it increased all the claims

22  in the pool from $195 million to $273 million, or sorry, I

23  don't -- look at that again, but it was an increase of $95

24  million.  I'm sorry, 190 -- the claims pool increased from

25  $194 million to -- I'm sorry, Your Honor, I have too many

214

1    papers in front of me -- on November, the claims pool was 176

2    and it increased by February 1st to 273.  Therefore,

3    approximately $95, almost $100 million worth of claims that

4    they weren't anticipating that actually came in.

5        That tells you about the quality of the assumptions that

6    went into the analysis to begin with.  They missed it by 50

7    percent on what the overall claims pool was going to be.

8    That's significant.  It's material.

9        There is a lot of other assumptions that could go into

10   this document, and one of those assumptions are how much are

11   we going to be able to monetize these assets for?  One other

12   assumption is, well, how much is it going to cost during the

13   two-year life of this wind-down?  Another assumption is going

14   to be, are we actually going to be able to wind down in two

15   years?  Because if we're not, well, guess what, all those

16   costs are going to go up.  Another assumption is, well, how

17   much are those fee claims going to be over the two-year

18   period?  Again, if it goes over two years, they're going to be

19   significantly higher.  Moreover, you might have just missed

20   what the burn rate is.

21       So I think it's rather telling that the assumptions made

22   of -- all the way back of over two -- of only two months ago

23   were off by $100 million, and therefore it skewed all of the

24   plan-versus-liquidation analysis all over the board.

25       That's the only evidence that the Debtor has put forth as

215

1    to why it's in the best interest of the creditors.  And quite

2    frankly, we don't believe they have met their burden.  And it

3    is their burden to prove to Your Honor that the plan is better

4    than what a Chapter 7 trustee will -- can do.

5        What the evidence does show, as far as what the plan would

6    do as compared to a hypothetical Chapter 7 trustee, is that we

7    know for sure that the Claimant Trust base fee, just over the

8    two years, is going to be $3.6 million.

9        (Interruption.)

10           MR. TAYLOR:  I'm sorry.

11           THE COURT:  Someone needs to put their device on

12   mute.  I don't know who that was.

13           MR. TAYLOR:  Oh, I'm sorry.  I thought you said

14   something, Your Honor.

15           THE COURT:  No.

16           MR. TAYLOR:  So what we do know is the Claimant

17   Trustee base fee is going to be $3.6 million.  What we don't

18   know and what was not put into evidence because they are still

19   negotiating it is there's going to be a bonus fee on top of

20   that that's going to be paid to Mr. Seery.  Is that $2

21   million?  Is that $4 million?  Is that $10 million?  Well, we

22   don't know.  We can't perform that analysis as compared to

23   what a hypothetical Chapter 7 trustee could be.  Nor can Your

24   Honor, based upon the evidence presented.

25       And quite frankly, I don't see how one could ever conclude

216

1    -- and there are some other unknowns that we're about to go

2    over, including the Litigation Trust base fee and there are

3    collection fees, contingency fees.  Those are also to be

4    negotiated.  To be negotiated and unknown.  You can't perform

5    the analysis.  The Debtor couldn't perform the analysis

6    because those are to be negotiated, so you can't tell whether

7    a Chapter -- hypothetical Chapter 7 trustee might come out

8    better because he's not going to incur all these costs.  We

9    know that they're going to incur D&O costs.

10            THE COURT:  Let me interject right now.

11            MR. TAYLOR:  Sure.

12            THE COURT:  Again, I'm going to go back to

13    understanding who your client is arguing for.  Okay?  Again,

14    as we've said before, Mr. Pomerantz did not technically say no

15    standing, but he thought it was important to point out the

16    economic interests that our Objectors either have or don't

17    have.  Okay?

18        So I'm looking through my notes to see exactly what the

19    Dondero economic interest is.  I have something written in my

20    notes, but I'm going to let you tell me.  Tell me what his

21    economic interests are with regard to this Debtor, this

22    reorganization.

23            MR. TAYLOR:  Your Honor, I believe he has been placed

24    into Class 9, Subordinated Claims.  So to the extent that

25    there is recovery available to Class 9, he can recover on

APP. 2656

217

```
 1   those claims.
 2           THE COURT:  But what proof of claim --
 3           MR. TAYLOR:  We also have --
 4           THE COURT:  What proof of claim does he have pending
 5   at this juncture?
 6           MR. TAYLOR:  Your Honor, I would have to go back and
 7   look.  I don't have the proofs of claim register in front of
 8   me.  And I'm sorry, if I tried to speculate, I would be doing
 9   a disservice to my client and this Court by trying to
10   speculate.  I did not prepare those proofs of claim.  People
11   in my firm did.  But I would be merely speculating if I tried
12   to give you an answer off the spot.  And I apologize.  I'm
13   happy to submit a post-confirmation hearing letter --
14           THE COURT:  No, no, no.
15           MR. TAYLOR:  -- as to that.
16           THE COURT:  I'm not going to allow one more piece of
17   paper in connection with confirmation.  I thought you would be
18   able to answer that.
19           MR. TAYLOR:  I'm sorry.  I just don't want to lie to
20   Your Honor.
21           THE COURT:  What about his -- what would be an
22   indirect equity interest?
23           MR. TAYLOR:  Well, again, there are a lot of people
24   that know this org chart a lot better than me.  This is me
25   going on hearsay myself.  But I understand he also owns a lot
```

218

 1   of indirect interests in subsidiaries, some of which are

 2   majority, some of which are minority, and some of which he

 3   owns maybe directly, some of which through other entities.  So

 4   the way in which these assets could be monetized at the sub-

 5   debtor level could certainly impact his economic rights and

 6   could impact him greatly.  For instance, if the --

 7            THE COURT:  I really wanted an exact answer.

 8            MR. TAYLOR:  Mr. Seery --

 9            THE COURT:  I really wanted an exact answer, not just

10   he has an indirect interest in, you know, some of the 2,000 --

11   I'm not going to say tentacles, but --

12       I'm going to interrupt briefly, because I really want to

13   nail down the answer as best I can.  Mr. Pomerantz, can you

14   just remind me of what your answer was or statement was

15   regarding Mr. Dondero, individually, his economic stake in all

16   this?

17            MR. POMERANTZ:  He has an indemnification claim

18   that's been objected to, --

19            THE COURT:  That's the one and only --

20            MR. POMERANTZ:  -- although it's not before --

21            THE COURT:  That's the one and only pending proof of

22   claim, right?

23            MR. POMERANTZ:  That's my understanding.  And while

24   it's not before the Court, we could all imagine whether Mr.

25   Dondero's going to be entitled to indemnification.

Case 3:25-cv-02072-S   Document 65   Filed 08/08/25   Page 679 of 790   PageID 4159
Main Document   Page 2662 of 2722

219

1      He has an interest in Strand, which is the general

2   partner.

3            THE COURT:  Right.

4            MR. POMERANTZ:  And Strand owns a quarter-percent --

5   a quarter of one percent of the equity.  I believe that is all

6   of Mr. Dondero's economic interest in the Debtor.

7            THE COURT:  Okay.  So, again, I'm just trying to, you

8   know, understand who he's looking out for, for lack of a

9   better way of saying it, Mr. Taylor, in making these

10  arguments.

11           MR. TAYLOR:  So, there is also, and this is -- I'm

12  not involved in what are these going to be filed collection

13  suits, or some of which have been filed, some of which have

14  not been filed, none of which I believe the answer date has

15  been -- has passed or come to be yet.

16      But he is also a defendant in collection suits on these

17  notes, as you are undoubtedly aware.

18           THE COURT:  Okay.  He's a defendant in adversary

19  proceedings.  Okay?  That makes him a party in interest to --

20  well, I keep -- that makes him have standing to make an

21  1129(a)(7) argument?  That's why I'm going down this trail.

22  Because you've spent the last five minutes talking about, you

23  know, creditors could do better in a Chapter 7 liquidation.

24  I'm not sure he has standing to make that argument, so I'm

25  wanting you to address that squarely.

APP. 2669

220

1            MR. TAYLOR:  Your Honor, I believe he has economic

2    interests up and down the capital structure.  And I cannot

3    describe to you, without wildly speculating and potentially

4    lying to this Court, which I'm not going to do, without some

5    time to have looked at that, because I was -- I was not

6    involved in the proofs of claim and I am not his accountant.

7    So I could not do that without wildly speculating, so I just

8    -- I would like to more directly answer your question, Your

9    Honor.  I am not trying to avoid the question.  But I can't

10   honestly answer your question with true facts as we sit here

11   right now.

12           THE COURT:  All right.  But do you agree or disagree

13   with me that only parties -- the only parties that really can

14   make an 1129(a)(7) argument are holders of claims or interests

15   in impaired classes?

16           MR. TAYLOR:  Your Honor, I believe that Mr. Dondero

17   has standing to do so by virtue of claims for indemnification

18   --

19           THE COURT:  Okay.

20           MR. TAYLOR:  -- if these -- if these -- if this

21   Debtor (indecipherable) able to meet its obligations to

22   indemnify him.  And some of those are significant claims that

23   are being brought against him that could total millions, if

24   not tens of millions of dollars, just in defense costs alone,

25   that I do believe give some standing.

Case 3:25-cv-02072-S   Document 16-5   Filed 06/06/25   Page 681 of 790   PageID 4161

221

1          THE COURT:  Okay.  So, assuming you're right, you

2     think the evidence does not show this is better than a Chapter

3     7 liquidation where we would have a stranger trustee come in

4     and just, yeah, I guess, cold-turkey liquidate it all.

5          MR. TAYLOR:  Your Honor, I do believe that the

6     evidence shows that the Debtor hasn't met its burden as to

7     this.  A Chapter 7 trustee doesn't necessarily have to

8     liquidate immediately.  It can run these -- these assets.  I

9     mean, Mr. Seery is going to do it with ten people.  At one

10    time, just two months ago, he said he was going to do it with

11    three people.  A Chapter 7 trustee could certainly have a

12    limited runway, or even an extended runway, if it so asked for

13    it, to liquate these Debtors.

14         Moreover, there would be at least the requirements that

15    the Chapter 7 trustee would request the sale, tell creditors

16    about it.  And, as many courts have said, the competitive

17    bidding process is the best way to make sure that you ensure

18    the highest and best offer that you can get.

19         Mr. Seery has not committed to providing notice of sales

20    to creditors and other parties in interest, potentially

21    bringing them in as bidders.  They -- he could name a stalking

22    horse, but he has not indicated any desire to do so.  A

23    Chapter 7 trustee would endeavor to do so.

24         So I do believe that there are some advantages.  And

25    you've heard no testimony that they've performed any analysis

Case 3:25-cv-02072-S   Document 65   Filed 06/06/25   Page 682 of 790   PageID 4162

222

 1    or conducted any interviews with any Chapter 7 trustees as to

 2    whether or not this was possible or not.  They just made the

 3    naked assumption that they would do work based upon what they

 4    said was their experience.  And Mr. Seery's deposition, when

 5    it was taken and noticed as a 30(b)(6) deposition, and I

 6    believe it has been entered into evidence here, he said the

 7    last time he dealt with a Chapter 7 trustee was 11 or 13 years

 8    ago, and it was the *Lehman* case, and that was the -- a SIPC

 9    trustee.  So --

10              THE COURT:  Well, --

11              MR. TAYLOR:  -- that's the last time he had any

12    experience with it.

13              THE COURT:  -- again, I don't mean to belabor this

14    point, just like I didn't mean to belabor a few others.  But,

15    you know, there is a mechanism, yes, in Chapter 7, Section

16    704, for a trustee to seek court authority to operate a

17    business.  But it's not a statute that contemplates long-term

18    operation.  Okay?  It's just, oh, we've got a little bit of --

19    you know, we have some assets here that really require a

20    short-term operation here.

21        If it's long-term, then you convert to Chapter 11.  Okay?

22    It's just a temporary tool, Section 704.  Right?  Would you

23    agree with me?

24              MR. TAYLOR:  That's typically how it has been used.

25              THE COURT:  Okay.

APP. 2662

223

1          MR. TAYLOR:  But that's not to say that it's limited

2     in time by the statute itself.  It doesn't say that it can't

3     go for one year or two years.  That can be a short wind-down

4     period.

5          THE COURT:  But hasn't your client's argument been

6     this past several weeks that Mr. Seery is moving too fast,

7     he's wanting to sell things and he needs to hold them longer?

8     I mean, these two argument seem inconsistent to me.

9          MR. TAYLOR:  So, just because a Chapter 7 trustee has

10    been appointed doesn't mean that he has to sell them any

11    faster than Mr. Seery.

12       I think what the -- the problem with the process that has

13    been going on with Mr. Seery, my client's problem with it, is

14    not necessarily the timing but the process that Mr. Seery is

15    going through with these sales.  Provide notice, allow more

16    bidders to come in, make sure that he's getting the highest

17    and best price.  And if that happens to be Mr. Dondero who

18    offers the highest and best price, great.  And if Mr. Dondero

19    gets outbid by somebody, well, that's all the more better for

20    the estate.

21          THE COURT:  Okay.  Continue your argument.

22          MR. TAYLOR:  I believe we covered a lot of it, Your

23    Honor, and the plan analysis is all based upon their

24    assumptions that there's $257 million worth of value.  Again,

25    there's no rollup provided as to how that asset allocation is

224

1   broken out, but they consist of a couple of items.

2        First, there's the notes; and second, there's the assets.

3   The notes are either long-term or demand notes.  Those long-

4   term notes, Mr. Seery will tell you some have been validly

5   accelerated and therefore are now due and payable.  I think

6   there's arguments to the contrary.  But those long-term notes

7   probably have some both time value of money and collection

8   costs.  And then, of course, you have to discount them by

9   collectability issues, too.

10        I don't believe any analysis went into it, or at least the

11   Court was not provided any data or analysis as to what

12   discounts were applied to those notes.  And, therefore, I

13   don't think that this Court can make any determination that

14   the best interests of the creditors have been met.

15        As far as the assets that are to be monetized, again,

16   there's two sub-buckets of those assets.  There's securities

17   that are to be sold.  Some of those are semi-public securities

18   that have markets.  Those are somewhat more readily

19   ascertained.  The others are holdings in private equity

20   companies, and sometimes holdings in companies that own other

21   companies.

22        There's no evidence of the value -- empirical evidence of

23   the value of those companies, nor of the assumptions that went

24   into as to when they should be sold, how much they'd be sold

25   for.

APP. 2664

225

1      Again, I do realize the sensitive nature of such

2   information, but that could have been placed under seal.  And

3   without that information, I don't believe that the Court can

4   conduct the due diligence it's necessary to say the best

5   interest of the creditors have been met.

6      To sum up, Your Honor -- oh, I'm sorry.  One other point

7   that I did want to talk about before I summed up is, you know,

8   Mr. Pomerantz and I were listening to a different record or I

9   was totally confused as to the testimony that was put forth

10  regarding the directors and officers.  I believe the testimony

11  in the record is extremely clear that the Debtor made no

12  effort to go out and find out if it could obtain directors and

13  officers insurance without a gatekeeping injunction or a

14  channeling injunction, whatever you want to call it.  I

15  believe that his testimony was extremely clear.  He didn't

16  shop it.  He doesn't know.  And that's what the record is

17  before this Court.

18     To the extent that the Debtor wants to rely upon we can't

19  get Debtor -- or, directors and officers insurance because

20  without this gatekeeping function we just can't get it, I

21  believe the record just wholly does not support that.  The

22  testimony was at least extremely clear, as how I heard it.

23  Your Honor will have to review the record herself, but I don't

24  believe that there was much argument about it.

25     I'm sure -- as I stated in the beginning, Your Honor, this

226

1    is a court of equity.  It could deny confirmation, as I

2    believe Your Honor should, based upon the flaws in the plan.

3        If Your Honor finds that the plan as written is

4    impermissible because of any of the exculpation or the

5    gatekeeping functions that they're asking, the testimony is

6    equally clear that the independent directors would not serve

7    in -- as officers of the Reorganized Debtor.  Any plan that is

8    put forth by the Debtor has to tell the people who are going

9    to be officers going forward.  And with that naked testimony

10   before the Court, that it's simply not feasible, and I don't

11   think it is one of the possible -- where the Court can come

12   back and say, well, I can't confirm this plan as written, but

13   if you change it and rewrite it to get rid of the certain

14   offensive parts of the exculpation or the gatekeeping

15   functions, then we can confirm this plan.  And I think the

16   evidence before this Court is it's not feasible because none

17   of the directors will serve in that capacity, and therefore

18   this plan should be dead on arrival if Your Honor agrees the

19   proposed provisions do not meet *Pacific Lumber*.

20       We would ask the Court to deny confirmation, but in the

21   alternative, to at least take this under advisement.  Give us

22   a time frame -- we'd ask for 30 days -- but give us a time

23   frame of when the Court is going to rule, to allow the

24   positive conversations to move forward.

25       To that end, Your Honor, there is, indeed, a hearing on

227

```
 1    the extension of a temporary injunction and contempt that is
 2    scheduled for Friday.  I understand that the parties, at least
 3    the joint parties, will not -- will agree to, I'm sorry, will
 4    agree to the extension of the temporary injunction until such
 5    time as the Court can rule on confirmation.  I do see that
 6    there could be a lot of harm done at the Friday hearing.  We
 7    would ask that the Court additionally continue that hearing on
 8    that motion and on the injunction, and contempt, until such
 9    time as confirmation has been ruled upon.  It will be both
10    efficient and allow discussions to continue regarding
11    potential global resolution.
12        And so that is the end of my argument, Your Honor.
13          THE COURT:  All right.  Thank you.  All right.  Mr.
14    Pomerantz, do you have any rebuttal?
15        REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR
16          MR. POMERANTZ:  Yes, I do, Your Honor.  I want to
17    address a couple of comments that Mr. Taylor made towards the
18    end.  First of all -- and, actually, the beginning.
19        We think Your Honor should rule on confirmation.  Ruling
20    on confirmation and having an entered confirmation order are
21    two separate things.  We understand that a new offer was made.
22    Whether that's acceptable to the Committee -- I actually think
23    it will enhance the ability of the parties to see if they
24    could reach a deal if there's (audio gap) that Your Honor is
25    going to confirm the plan.
```

228

1       Again, doesn't mean a confirmation order has to be
2   entered, but I think, based upon my personal experience in
3   negotiating with Mr. Dondero, that your clear communication to
4   the parties that, unless something happens, you will enter a
5   confirmation order, I think will change things.  Okay?
6   Without getting into settlement discussions, things have
7   changed over the last several days, and we wish you would have
8   -- wish things would have happened sooner.  But we totally
9   disagree that Your Honor should hold your ruling for 30 days
10  or any other period of time.
11      Part of the reason I think they are making that argument
12  is because they have an examiner motion and they recognize
13  that, upon confirmation, the examiner motion is moot.  So I
14  think there's strategic reasons as well.
15      We don't think there should be a continuance of the TRO
16  hearing and of the contempt hearing.  As Your Honor recalls,
17  the contempt motion was specifically set for this time to give
18  Mr. Dondero enough time to prepare.  Your Honor was sensitive
19  to his due process concerns.  We set the TRO, the preliminary
20  injunction hearing against the Advisors and the Funds, we set
21  that, again, knowing that it would be after confirmation.
22      So we do not agree that either should be continued.
23  Again, we think the more direct, unequivocal answers Your
24  Honor can give to the parties, the better off we'll be.
25      I guess -- Mr. Taylor and I do agree that the record was

APP. 2668

229

1    clear.  I guess we just disagree on the clarity of it.  I

2    heard Mr. Tauber testify that when he went out to people, to

3    insurance carriers, after he and Aon were engaged, they all

4    talked about a Dondero exclusion.  Okay?  They weren't

5    convinced into a gatekeeper provision because it was provided

6    as part of the normal materials you would provide in a

7    bankruptcy court and trying to get D&O liability in the

8    context of a bankruptcy case.  Mr. Tauber's testimony was

9    pretty clear, that carriers wanted to have a Dondero

10   exclusion.  And, in fact, the only reason we were able to get

11   any coverage was because of the gatekeeper.

12       So, yes, the record was clear.  We just disagree.

13       I'd like to go back to Mr. Draper's comments going -- and

14   a couple of things, obviously, overlap.  I guess one of the

15   things here, it's great that everyone is coming in here as

16   different interests and different parties or whatnot.  But as

17   I mentioned, Your Honor, at the outset, and I've repeated a

18   few times, these are all -- the only people we have not been

19   able to resolve issues with are the Dondero parties and the

20   related parties.  And I recall the tentacles.  Mr. Davor

21   questioned that.  Mr. Clemente, his comments.  But the fact of

22   the matter is, Your Honor, Your Honor has heard testimony.

23   Your Honor has had hearings.  Mr. Rukavina represents the

24   Advisors and the Funds.  Your Honor has never seen the

25   independent board member testify in this case to demonstrate

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Case 3:25-cv-02072-S    Document 15-5    Filed 08/26/25    Page 690 of 790    PageID 4170

230

```
 1    how these entities are really different.  So while Mr.

 2    Rukavina does -- you know, tries his best, and I think he has

 3    limited stuff to work with, but I give him credit for doing

 4    the best he can, these are all Dondero-related entities and

 5    Your Honor has seen that.

 6         So, Your Honor, going to the resolicitation argument, it

 7    actually has taken up a lot more time than the argument is

 8    worth, for one very simple reason.  As I said in my argument,

 9    and as Mr. Taylor and Mr. Draper totally ignored, there were

10    17 creditors who voted yes, 17 creditors who were apparently

11    misled, that Mr. Draper is looking out for the little guy and

12    Mr. Taylor is fumbling over his reason for why that's

13    important to Dondero.  And of those 17 creditors that voted

14    yes, Your Honor, they were either the employees related to

15    HarbourVest, UBS, Redeemer, or Acis, except for two.  And you

16    know the other two?  One was Contrarian, a claim buyer, who,

17    yeah, elected to be in Class 7, and the other was an employee

18    with a dollar claim.

19         So the whole argument that there should be a

20    resolicitation is preposterous, Your Honor.  But to go to some

21    of the specifics in what they argued, we didn't require

22    creditors to monitor recovery.  The footnote -- as I

23    indicated, the UBS 3018 was in the disclosure statement that

24    went out.  It didn't make it to the projections.  It was

25    clearly -- and they characterize it, I think Mr. Draper
```

Case 3:25-cv-02072-S   Document 165   Filed 06/26/25   Page 691 of 790   PageID 4171

231

1  characterized it as buried in the document.  There is a

2  section that every disclosure statement is required to have

3  called Risk Factors.  This disclosure statement had that.  And

4  in the disclosure statement, it talked about the amount of

5  claims being a risk factor.

6      Mr. Draper also said that the Debtor totally changed its

7  business model from the first to the second analysis.  That is

8  incorrect.  The Debtor was always going to manage funds.  Yes,

9  did they add the CLOs?  But before, they were going to manage

10 Multi-Strat, they were going to manage Restoration Capital,

11 they were going to oversee Korea, they were going to be doing

12 the management of the funds.  So there wasn't a big change in

13 the business model, Your Honor.

14     Mr. Taylor, on the solicitation issue, says we found $67

15 million in assets.  You know, that's a disingenuous statement.

16 I think over $20 million was found because his client and

17 related entities didn't make a payment on notes and they got

18 accelerated.  So while before we would have had to wait over

19 time if they were paid, it's not surprising that Mr. Dondero

20 and his related entities just failed to basically pay the

21 notes.

22     So that was, I think, over $20 million.  And then there

23 was the HCLOF asset.  That was acquired in the HarbourVest

24 settlement.  And then there was basically an increase in some

25 value to some assets.

232

1   So there wasn't anything mysterious here.  There wasn't

2   anything that the Debtor was trying to hide.  There weren't

3   any found assets.  It was based upon different circumstances.

4       Mr. Taylor complains about the lack of rollup of assets,

5   the lack of evidence on the best interests of creditors test.

6   Your Honor, you've had extensive testimony from Mr. Seery

7   about what would happen in a Chapter 7 and what would happen

8   in a Chapter 11.  And you know why we didn't provide the

9   information to Mr. Taylor and his client on what the rollup of

10  the assets would be, and do you know why he wants them?  He

11  wants to know what the assets are so he can try to bid.

12      And there also was the allegation that the failure to

13  allow them to bid means we're going to get less in a Chapter

14  11 than a 7.  Two comments to that, Your Honor.  Number one,

15  if that was the case, a debtor would never be able to satisfy

16  the best interests of creditors test.  If the existence of a

17  public process *de facto* meant you would get more value than

18  outside, you would never be able to satisfy that.  And, quite

19  honestly, that's just not the law, Your Honor.

20      You have an Oversight Committee with over $200 million of

21  creditors who are going to watch Mr. Seery like a hawk, like

22  they have watched him during the case.  And the concern that

23  somehow, because these assets are not put into full view to

24  sell, that they will get less value, it's just not -- it's not

25  supported by the evidence at all, Your Honor.  And Mr. Seery

233

1    will make the determination.  If it makes sense to notice up

2    and provide Mr. Dondero with notice, he will.  If he doesn't,

3    he won't.

4         Your Honor, going -- oh, and then the last comment on the

5    -- that I'll make on the resolicitation and the liquidation

6    analysis is Mr. Taylor chides us and we've been criticized for

7    not disclosing more about the HarbourVest and the UBS

8    settlements and that we were off substantially.  Your Honor,

9    you've heard testimony that we were in pending litigation with

10   HarbourVest and UBS at the time.  What kind of litigant would

11   we be if we came in and said, you know, Your Honor, you know,

12   Creditors, we think the UBS claim is going to be allowed at

13   $60 million and we think the HarbourVest claim is going to be

14   allowed at $30 million?  Would that really have benefited

15   creditors and this estate, to basically, after we took the

16   position, hard negotiations and hard pleadings that we

17   prepared, and in some cases filed, that we didn't have any

18   liability?  It would have made no sense, and it would have

19   been a dereliction of our duty to actually come out and say

20   what the claims -- the claims were, or what we thought they

21   could be settled for.

22        Your Honor, going back to Mr. Draper's comments.  He

23   started with the exculpation.  First he made a comment that I

24   don't think he intended what he said, but he said that the

25   exculpation order, the January 9th order, cuts off when the

234

```
 1    independent directors go away.  I think what he meant to say
 2    is that since the three people are not going to be independent
 3    directors anymore, that basically any actions going forward by
 4    any of those three are not covered.  But let's be clear.  The
 5    January 9th order is in effect, and if at some point in the
 6    future somebody has a claim against those three gentleman, or
 7    their agents, for what they did as independent directors or
 8    their agents, that order will apply.
 9         Your Honor, we next had a discussion, or Mr. Draper and
10    you had a discussion on professionals.  I'm aware of the Fifth
11    Circuit law that says res judicata, fee applications.  I think
12    that only applies to claims that the Debtor and estate would
13    have.  It doesn't really apply to an exculpation.  But there's
14    Texas state law that I identified in our brief and we cited to
15    that limits third parties' ability to go after professionals.
16         But the bottom line is the Fifth Circuit, in *Pacific*
17    *Lumber*, didn't deal with professionals.  Your Honor was
18    correct in pushing both Mr. Taylor and Mr. Rukavina.  What
19    really that was was a policy case.  And professionals have
20    nothing to do with 524(e).  So the *Palco* and the *Pacific*
21    *Lumber* reference and explanation of 524(e) doesn't have
22    anything to do with professionals.  And we would submit, Your
23    Honor, that an exculpation, especially in a case like this, is
24    important for professionals.
25         I understand Your Honor's comments that maybe it's much
```

235

1   ado about nothing, but I'm not really sure it's much ado about

2   nothing when we have Mr. Dondero and his affiliates who,

3   notwithstanding their efforts to just claim that all they are

4   doing is trying to get a fair shake, Your Honor knows better.

5   Your Honor knows better from the years you've been litigating

6   with them, and we know better and the Debtor knows better from

7   what the independent directors have been dealing with.

8          THE COURT:  Let me ask you this, though.  I came into

9   the hearing with the impression we were just talking about

10  postpetition pre-confirmation, or pre-effective date maybe I

11  should say, was the expanse of time covered by exculpation.

12  And Mr. Rukavina said no, no, no, go back, look at, I don't

13  know, Subsection 4 of something.  It is a post-confirmation

14  concept.  What is your response to that?

15         MR. POMERANTZ:  I believe it's implementation.  And,

16  again, --

17         THE COURT:  Implementation?  Yes.

18         MR. POMERANTZ:  -- I think Mr. Rukavina -- right.  I

19  think Mr. Rukavina and Mr. Taylor and Mr. Draper have done a

20  great job trying to muddy the issues.  They talk about our

21  sleight of hand and how we're trying to do things that are way

22  beyond the bankruptcy court's jurisdiction.  We are not.  I

23  think they are trying -- what they have done throughout the

24  case is throw up enough mud.  And here's, here's the answer to

25  that question, Your Honor.  Implementation.  Okay?  We know

236

1   what implementation means.  The plan says implementation is

2   cancelation of the equity interests, creation of new general

3   partners, restatement of the limited partners, establishment

4   of the Claimant Trust and Litigation Sub-Trust.  That's the

5   implementation.

6        We are not trying to get exculpation for post-confirmation

7   activity.  Actually, my partner, Mr. Kharasch, in specifically

8   addressing Mr. Rukavina's concern, said, look, if you have a

9   problem with cause, if you have a problem, want to exercise

10  your rights, we're only asking you to come back to the Court.

11  We are not stopping you.

12       So the whole argument that the exculpation is really broad

13  and is not really -- does not really cover just the plan, the

14  approved plan, I think is a red herring.  Implementation is

15  implementation in the context of the plan.

16       And also Mr. Rukavina tries to argue that, well, it's

17  administration, it's not really you acting any operation of

18  business.  I just don't think there's any support in the case

19  law.  Your Honor has overseen this case, overseen this

20  Debtor's activities, overseen the independent directors'

21  activities, overseen Strand's activities, overseen the

22  employees' activities.  And those activities have been

23  (indecipherable) administration of the case.  And his attempt

24  to create a different category for, well, it's not

25  administration, it's operation and so it doesn't apply, I just

237

1    think is wrong.

2        Your Honor made a couple of comments about what was

3    *Pacific Lumber* doing.  It was a policy decision.  If there was

4    a bright-line rule, then nobody would be entitled to

5    exculpation.  The very fact that the Fifth Circuit said that

6    Committee members are different made -- makes it clear it was

7    -- it was policy.

8        And Mr. Taylor's comments that, well, their creation of

9    statute, Chapter 11 trustees and Committee members, that's not

10   what basically the case said.  If you look at the citation to

11   touters in the case, it was we want people to volunteer and

12   who are needed for the process.  Committee members are needed

13   for the process.  We don't want to discourage them from coming

14   in.  And the only testimony you have on the independent

15   directors is from Mr. Dubel, and he testified the importance

16   of independent directors to modern-day Chapter 11 practice,

17   the importance of exculpation, indemnification, and D&O

18   insurance.  And his testimony:  uncontroverted.  The Objectors

19   could have brought in someone to say something different, but

20   the only testimony before Your Honor is, if Your Honor does

21   not approve exculpations in cases like this, you will not get

22   independent directors and it will have an adverse effect on

23   the Chapter 11 process.

24       So, while I appreciate all the Objectors trying to say

25   bright line, trying to say *Pacific Lumber*, that is the gut

APP. 2677

238

1    reaction, right?  That's -- it's easy to say.  But Your Honor

2    will know better, from reading the cases, that's not what

3    *Pacific Lumber* says.  And for the several reasons I gave, it's

4    the reason why *Pacific Lumber* does not govern the decision in

5    this case.

6        Your Honor, Mr. Draper then started to talk about *Craig*.

7    And everyone cites *Craig* as this, you know, limiting

8    jurisdiction.  Now, we acknowledge that *Craig* and the Fifth

9    Circuit has a more limited post-confirmation jurisdiction

10   approach than the other Circuits, but it's not nonexistent.

11   And just because the Debtor is going out post-confirmation and

12   acting does not mean that the conduct that they are engaging

13   in is not -- and disputes that arise, doesn't come within the

14   Court's jurisdiction.  If that was the case, and I think Your

15   Honor recognized this, in your case it was the *TXMS* case,

16   while it's limited, more limited after confirmation, and I

17   think you even, in the case -- or, in one case of yours, said

18   that even after the case is closed there could be

19   jurisdiction.  So their just trying to argue *Craig* is just --

20   is just too much.

21       Going out of the gatekeeper, Mr. Draper tried to say we

22   are *Barton*, and that's it, and *Barton* has its limitations, et

23   cetera.  First of all, with respect to *Barton*, it is not

24   limited and doesn't include debtors-in-possession.  We have

25   cited cases in our materials where it has been applied to

239

1   debtors-in-possession.

2       So, you know, look, maybe this is a provision -- this is a

3   proposition like many in bankruptcy, you could find a

4   bankruptcy court to agree with a proposition, but there's

5   cases all over the place on that.  There's cases applying to

6   post-confirmation.  The trend has been to expand *Barton*.  But

7   the beauty of it is, Your Honor, you don't have to rely on

8   *Barton*.  *Barton* was one of our arguments.  We gave *Barton* as,

9   you know, somewhat of an analogy but somehow applying because

10  in the -- because the independent directors were like the

11  trustees.

12      But we recognize it may be going farther than *Barton* has

13  previously gone.  But the case law is clear, it is being

14  extended.  But we -- I gave you several provisions of the

15  Bankruptcy Code that authorized you to enter a gatekeeper

16  order.  None of the Objectors objected on any of those

17  grounds.  They didn't say the statutes that I cited.  And it

18  wasn't only 105, I know bankruptcy practitioners love to cite

19  105, but there were three or four others that I mentioned, and

20  they're in our brief.  There's no case that they cited that

21  said that there is no authority on the gatekeeper.

22      But what was the argument that was raised?  And I think

23  Mr. Rukavina raised it, saying, you know, look, I don't

24  understand the argument of no jurisdiction, of jurisdiction

25  for a gatekeeper but no jurisdiction for underlying cause of

240

 1   action.  Well, Mr. Rukavina should read and Your Honor should

 2   read, when you're considering the plan, the case, the *Villegas*

 3   case in the Fifth Circuit as it dealt with *Stern*.  That was

 4   particularly a case.  Does *Barton* -- is *Barton* impacted from

 5   *Stern*?  By *Stern*?  And *Stern*, we know, limits the bankruptcy

 6   court's jurisdiction.  But, no, the Fifth Circuit said, in

 7   that case, no.  Even though the bankruptcy court's

 8   jurisdiction is limited to hear the claim, there is nothing

 9   inconsistent with that and allowing the bankruptcy court to

10   act as a gatekeeper.

11       So Mr. Rukavina's argument that, well, he'll present to

12   you that there's cause and you'll find there's no cause and

13   then he will be without a remedy by someone that had

14   jurisdiction, that really sounds good but it just doesn't

15   withstand analytic scrutiny.  There is a distinction.  They

16   are glossing over the distinction.  They don't like the

17   distinction.

18       And why is that distinction -- and why is it important in

19   this case?  Again, we're not talking about garden-variety

20   people who are just involved with a debtor and will get caught

21   up in a bankruptcy.  We narrowly tailored the gatekeeper to

22   enjoined parties.  Enjoined parties are the people before Your

23   Honor, some of the people that have made the Debtor's life

24   miserable over the last few months.

25       We have every interest and desire, as does the Committee,

241

1  to go out post-confirmation and monetize these assets.  But we

2  see the clouds on the horizon.  We see all the pleadings that

3  have been filed by the Objectors saying how, if there's no

4  deal, there will be an unending amount of costs and appeals.

5  It's, you know, the point, not too subtle.  It wasn't lost on

6  us.

7      Your Honor, going to Mr. Rukavina's arguments on Class 8

8  cram down, again, it's really a hard argument to understand,

9  but first I want to make a point.  He sort of mentioned -- and

10 I'm not sure if he intends to preserve this on appeal, but it

11 was not objected to and I'll ask for a ruling on it, Your

12 Honor -- he said that there was inappropriate separate

13 classification.  That was not raised in any of the objections.

14 We don't think it was properly before the Court.  We

15 understand there's a component of that in unfair

16 discrimination in connection with a cram down, but there is no

17 objection, there was no filed objection, to the separate

18 classification of the deficiency claims and the Class 8

19 unsecured claims.

20     And if you look at the voting, you realize it wasn't done

21 for gerrymandering, because if you put both claims together,

22 both classes together, you would have had one class that voted

23 yes.

24     So I don't believe the separate classification under the

25 1129 standards is appropriate for Your Honor to consider,

242

1   other than in connection with the cram down.

2       Now, Mr. Rukavina complains that the only way the

3   convenience class was decided was by way of negotiation.  Your

4   Honor, how else do provisions like that get decided?  And who

5   was the negotiation between?  It was between the Committee.

6   And one of the benefits of a Committee process, and I

7   represent a lot of Committees, you put people in a Committee

8   that have diverse interests and they can come up with an

9   appropriate result.  And here you have that.  You had one

10  creditor who was a convenience creditor.  You have three other

11  creditors who would lose liquidity if convenience payments are

12  made.

13      Do you think that UBS, Acis and Redeemer, do you think

14  they had a desire just to pay people off?  No.  It was part of

15  a collaborative process.  So to say that there was no basis

16  and no testimony on the appropriateness to have -- and how the

17  convenience class was put together just would be wrong.

18      And with respect to the absolute priority rule, Your

19  Honor, again, there's a missing link here, okay?  These are

20  contingent interests.  They are property.  No doubt they are

21  property.  But if I did not allow those creditors or those

22  equity to have a contingent interest, the argument would have

23  been made that the plan violates the absolute priority rule.

24  And I said that in my argument.  And why would it have

25  violated the absolute priority rule?  Because there's a

243

1    potential that creditors could get over a hundred cents on the

2    dollar, plus interest.  So it's a game of gotcha, right?

3        And why do they really care?  Mr. Dugaboy said in his --

4    Mr. Draper said in his brief that Dugaboy cares because they

5    may have wanted to buy the interest.  Well, I'm sure they can

6    go to Hunter Mountain, you know, Mr. Dondero's left hand can

7    go to his right hand, and I'm sure he'd be happy to sell the

8    contingent interests.

9        And with respect to the argument that Mr. Rukavina made

10   about control, equity be in control, yeah, control is a right.

11   No doubt.  You've got -- if you're giving control to the post-

12   confirmation Debtor, that could be a right and implicate the

13   absolute priority rule.  But what is the control here?  Equity

14   is not given any rights.  Your Honor heard how the post-

15   confirmation entity is structured.  It's going to be Mr.

16   Seery, overseen by an Oversight Board.  So I really don't

17   understand the concept of control.  There just is no violation

18   of the absolute priority rule.

19       Your Honor, Mr. Rukavina then took us to task for 2000 --

20   or, for not filing the 2015.3 statement.  And if you take his

21   argument to the logical conclusion -- well, we didn't file it,

22   we didn't comply with that Rule, so we're not in compliance

23   with the Bankruptcy Code, so we can never basically get our

24   plan confirmed, right, because it's a violation and we didn't

25   file and seek an extension.

APP. 2683

244

1     That's just a preposterous argument, Your Honor.  Mr.
2  Seery poignantly told the Court, in the rush of things that
3  were going on, it wasn't filed.  Did Mr. Rukavina, before
4  yesterday, having Mr. Dubel on the stand, did he ever ask
5  where is our 2015.3 report?  He probably didn't ask it because
6  the answer -- when I told him the reason why it wasn't filed
7  before January 9 was because I don't think Mr. Dondero wanted
8  it filed, and I think that's why, as Mr. Seery testified, we
9  were having a challenging time getting that information from
10 the in-house -- in-house.
11     But, yes, should it have been filed?  Yes.  But if that is
12 all they could point to through the course of the case that
13 Mr. Seery or Mr. -- or the rest of the board did wrong, you
14 know, I think that just demonstrates they did a fine job.
15           THE COURT:  All right.
16           MR. POMERANTZ:  Your Honor?
17           THE COURT:  You've got four minutes left.
18           MR. POMERANTZ:  Oh.  Okay.  Your Honor, going to Mr.
19 Rukavina and the Strand argument that it's a nondebtor entity,
20 as I explained in my argument, the Strand -- Strand needs to
21 get exculpation or else that's a backdoor way to the Debtor.
22 Forget about the independent directors, it's a backdoor way to
23 the Debtor.  Because Mr. Dondero will be in control.  If
24 Strand is sued for post-January 9th activities, he will assert
25 an administrative claim.  And one thing from *Pacific Lumber* is

245

1   clear, the Debtor is entitled to an exculpation as part of the

2   injunction and the -- and the discharge.

3       Your Honor, Mr. Kharasch adequately addressed Mr.

4   Rukavina's comments with the gatekeeper and the gatekeeper

5   problem.  We are not seeking to stop his clients, however

6   related they may be, from exercising their rights.  We are

7   seeking a process that will not embroil the Debtor in

8   litigation going forward.  There is no problem with Your Honor

9   acting as the gatekeeper to do so.  And to the extent that

10  they are bound by the January 9th order is not really an issue

11  for today.  That'll be an issue at the temporary -- the

12  temporary -- at the preliminary injunction hearing.

13      I -- just one minute, Your Honor.

14      (Pause.)

15          MR. POMERANTZ:  Your Honor, I think I covered a lot.

16  If there's anything that any of the Objectors have mentioned

17  that I failed to respond to, I'd be happy to answer questions

18  Your Honor has.

19          THE COURT:  All right.  I guess there's, what, about

20  two minutes left, if Mr. Clemente had anything.

21      Mr. Clemente, have you drifted off?  I doubt it.  But

22  anything else from you, Mr. Clemente?

23          MR. TAYLOR:  Your Honor, I show him talking -- this

24  is Clay Taylor -- but no one's hearing him.

25          THE COURT:  Okay.  Mr. Clemente, we are not hearing

APP. 2685

246

 1    you, or I'm not seeing you.  Make sure you're not on mute.

 2              THE CLERK:  He's not on mute, Judge.

 3              THE COURT:  He's not on mute?  So we must have a

 4    bandwidth issue or something else.

 5       All right.  Mr. Clemente, still not hearing or seeing you.

 6    We'll give him another 30 seconds.

 7              THE CLERK:  He's coming up.

 8              THE COURT:  He's coming up?  Ah, I see his name now.

 9              MR. CLEMENTE:  Your Honor, can you hear me?

10              THE COURT:  I can hear you now.

11              MR. CLEMENTE:  Okay, Your Honor.  I don't know what

12    happened.  I just switched another camera, so you may not be

13    able to see me, but can you hear me?  I'll be very quick.

14              THE COURT:  Okay.  I can hear you.

15              MR. CLEMENTE:  Can you hear me?

16              THE COURT:  Yes.

17              MR. CLEMENTE:  Okay.  Thank you, Your Honor.

18    CLOSING ARGUMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

19              MR. CLEMENTE:  Two things I want to say.  First, just

20    on Class 8, I think what's important, as my comments

21    emphasized earlier, the structure of Class 8.  We must

22    remember what it is.  It's really designed so that Class 8

23    holders receive their pro rata share of what's left after

24    prior claims are paid.  That's really what Class 8 creditors

25    voted on.  That's what the disclosure provided.  They did not

247

1    vote on receiving a specific dollar or a specific recovery

2    percentage.

3        And regarding the projections and estimates, Your Honor,

4    we're talking about large litigation claims that were asserted

5    and then settled.  And given the nature of these assets, the

6    values fluctuate.  It's perfectly expected, Your Honor, and

7    indeed disclosed, that there could be wide swings in the

8    amount of claims.  That does not lead to the conclusion that

9    the plan needs to be resolicited.

10       And then, finally, Your Honor, again, Mr. Pomerantz

11   adequately addressed all the points, as he did with his

12   earlier presentation, so I'm not going to touch on them, but I

13   did want to respond to one thing that Mr. Taylor said.  And I,

14   of course, agree with Mr. Pomerantz.  The Committee believes

15   there's no reason for you to delay a ruling and would in fact

16   urge you to rule as soon as Your Honor is ready to rule.

17   Confirmation of the plan, to the extent that there are

18   conversations occurring, is not going to prevent those

19   conversations from taking place, and they can continue after

20   the plan is confirmed.  There's simply nothing inherent in

21   Your Honor confirming the plan that would prevent those

22   conversations from occurring or would ultimately prevent

23   parties from pivoting to a deal on the off-chance that one

24   should be reached.

25       So I just wanted to emphasize, Your Honor, again, Your

APP 2687

Case 3:25-cv-02072-S   Document 16-5   Filed 06/09/25   Page 708 of 790   PageID 4188

248

 1  Honor is going to rule when Your Honor rules, but the
 2  Committee would urge you to rule, and certainly the idea that
 3  there may or may not be discussions with Mr. Dondero should
 4  not at all in any way lead you to the conclusion that you
 5  shouldn't rule or that those conversations cannot continue
 6  after plan confirmation.
 7      Thank you, Your Honor.  Unless you have questions for me.
 8  And my apologies with the technology.
 9          THE COURT:  No problem.  All right.  Here's what I'm
10  going to do.  We can see you now, Mr. Clemente.
11          MR. CLEMENTE:  Oh.  I'm sorry, Your Honor.  I
12  switched to another camera again because it wasn't working.
13  So, I apologize.
14          THE COURT:  All right.  I am going to call you back
15  Monday.  What day of the week will that be?  Is that -- I
16  mean, Monday, what date, I should say.  That'll be the 8th,
17  right?  I am going to call you back Monday, this coming
18  Monday, February 8th, at 9:30 Central time, and I am going to
19  give you my ruling.  It will be a detailed oral bench ruling.
20  And I'm not going to leave you hanging on the edge of your
21  seat over the next few days.  I will tell you I'm inclined to
22  confirm this plan.  I think it meets all of the requirements
23  of 1129 and 1123 and 1122.
24      The thing that I am going to spend some time thinking
25  about between now and Monday morning is, no surprise, the

APP. 2688

Case 3:25-cv-02072-S   Document 65-5   Filed 06/09/25   Page 709 of 790   PageID 4189

249

1    propriety of the exculpations, the propriety of the plan

2    injunctions, the propriety of the gatekeeper provisions.  I

3    certainly am duty-bound to go back and reread *Pacific Lumber*,

4    to go back and read *Thru, Inc.*, and to really think hard about

5    what is happening here.

6        So, I'm pretty much down, I think, to just those three

7    issues here.  I'll talk to my law clerk.  He may remind me of

8    something else that I'm not articulating right now.  But I

9    think I'm just down to those issues.  Okay?  So it's not going

10   to be a mystery very long.  We will come back Monday, 9:30.

11   My courtroom deputy will post on the docket the WebEx

12   connection instructions as usual, and we'll go from there.

13   Now, --

14           MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

15   Pomerantz.  I have a question, and it's going to sound odd

16   coming from someone on the West Coast, but I was wondering if

17   you could do it earlier.  And the only reason I say that is,

18   the night before, I have to call in to see if I'm on jury duty

19   on Monday, and it would be helpful to me -- I assume your

20   reading the ruling would be within a half hour, 45 minutes.

21   That if you started at 9:00, if that was possible, I could

22   then get in a car, and if I'm actually called to jury duty, I

23   can get there.  Of course, I don't know if I will be called,

24   but I'd hate to miss it.

25           THE COURT:  Okay.  Well, I don't want to make you

APP. 2689

Case 3:25-cv-02072-S   Document 15-5   Filed 08/08/25   Page 710 of 790   PageID 4190
Main Document   Page 2693 of 2722

250

 1   miss jury duty.  Okay.  We will do 9:00 o'clock.

 2        MR. POMERANTZ:  Thank you, Your Honor.

 3        THE COURT:  Hopefully no one will be, you know, hung

 4   over from watching the Super Bowl.  Personally, I don't like

 5   Tom Brady, so I may be boycotting the Super Bowl.  But maybe

 6   I'll watch it.  Maybe I'll -- I'll watch it.  So we'll do it

 7   9:00 o'clock.  So 9:00 o'clock next Monday.

 8      Now, let's talk about next the currently-set hearing this

 9   Friday, February 5th, on the injunction and contempt of court

10   motion as to Mr. Dondero and the other entities.  I want to

11   continue that, and here is what I am struggling with.  The

12   only day I have next week is Friday, the 12th, and I would

13   rather not use that date because I'm pretty jam-packed Monday

14   through Thursday, unless stuff has been settled that I haven't

15   become aware of.  So let me ask two things.  First, when is

16   the examiner motion set?  I'm just wondering if there's a

17   block of time we have coming up that --

18        MR. POMERANTZ:  I believe that's March 2nd, Your

19   Honor, so that's not for another month.

20        THE COURT:  Oh, that's not for another month?  All

21   right.

22      Traci, are you on the line?  I want to ask you --

23        THE CLERK:  Yes, I am.

24        THE COURT:  What about the following week?  I know

25   Monday, the 15th, is a federal holiday, but do we have

APP. 2609

251

1    availability for -- I fear a full day is going to be needed

2    for continuing this Friday setting.

3              THE CLERK:  Wednesday, February 17th, is available.

4              THE COURT:  We've got all day on Wednesday, February

5    17th?

6              THE CLERK:  Yes.

7              THE COURT:  All right.  What about that?  I think I

8    heard Mr. Rukavina, I think he's the one who threw it out

9    there -- or maybe it was Mr. Taylor; I'm getting mixed up --

10   the possibility that they would agree to a continuation of the

11   preliminary injunction through -- well, I think you said

12   through confirmation.  Until the Court enters a confirmation

13   order.  And if I were to rule and approve confirmation Monday,

14   then we're talking about an order that might be entered sooner

15   than the 17th.  So, do you all have any --

16             MR. RUKAVINA:  Your Honor?

17             THE COURT:  -- mutually-agreeable suggestions?  If

18   not, I'm just going to set it the 12th and I'll, you know, I'm

19   killing myself, but I'll --

20             MR. TAYLOR:  Your Honor?

21             MR. RUKAVINA:  No, Your Honor.  I think Your Honor is

22   wise to do what's she's proposing.  The agreed TRO against my

23   clients expires on the 15th of February.

24             THE COURT:  Uh-huh.

25             MR. RUKAVINA:  We can easily move that back a week or

APP. 2691

252

1    a sufficient amount of time so that there's no prejudice by

2    going on the 17th, if that would be acceptable to the Debtor,

3    and then we can just pick a date that's sufficiently after the

4    PI hearing so that there's protection for everyone.

5             THE COURT:  All right.  Mr. Taylor, do you agree?

6             MR. TAYLOR:  Yes, Your Honor.  That is acceptable to

7    Mr. Dondero.

8             THE COURT:  Okay.

9             MR. TAYLOR:  We can also push it back.  Can you hear

10   me?

11            THE COURT:  Yes, I can.  Uh-huh.

12            MR. TAYLOR:  Okay.

13            THE COURT:  All right.

14            MR. POMERANTZ:  I just want to make -- I just want to

15   make sure Mr. Morris, John Morris, is on, since he's taking

16   the lead in those matters.  I don't see his picture.

17            MR. MORRIS:  I am, Jeff, and I appreciate that.  I'm

18   available, Your Honor.  We were supposed to take the

19   depositions of Mr. Leventon and Mr. Ellington tomorrow.  I

20   don't know if their counsel is on the phone.  But given Your

21   Honor's decision to adjourn the hearing from Friday, I would

22   respectfully request at this time that counsel for those two

23   individuals work with me to find a date next week in order to

24   take those depositions.

25            THE COURT:  All right.  That's --

253

1           MS. DANDENEAU:  Debra Dandeneau from --

2           THE COURT:  Go ahead.

3           MS. DANDENEAU:  This is Debra Dandeneau from Baker

4    McKenzie.  We agree, and we're happy to work with you on a

5    rescheduled time.

6           MR. MORRIS:  Thank you very much.

7           THE COURT:  All right.  All right.  So, someone had

8    filed a motion to continue Friday's hearing.  I think it was

9    your firm, Mr. Taylor.  I already had a motion pending for a

10   few days now.  So I'm going to direct you to upload an order,

11   Mr. Taylor, or someone at your firm, continuing the hearing to

12   the 17th at 9:30, with language in there that your -- the

13   injunction is continuing at least through that date.  And,

14   again, it's a continuance of the motion for contempt as well

15   as the setting on the preliminary injunction.  And, of course,

16   run that by Mr. Morris and Mr. Rukavina.

17          MR. TAYLOR:  Sure.  Your Honor, this is -- I'm not

18   handling the injunction hearing, or at least I don't think I

19   am.  But just so that I'm clear, should maybe the injunction

20   continue through the next day or something, so depending on

21   how Your Honor rules, there's not a rush to try and get an

22   order to you?

23          MR. RUKAVINA:  Your Honor, I think that Mr. Morris

24   and I can work this out.  Mr. Taylor is not involved in that

25   adversary, that's true, but Mr. Morris and I will be able to

APP. 2693

254

1    very quickly enter a proposed agreed order that extends that

2    TRO for some period of time.

3              THE COURT:  Okay.

4              MR. RUKAVINA:  I'm not going to be difficult.

5              THE COURT:  Okay.  So we'll shift to you and Mr.

6    Morris to be the scriveners.  I just -- I suggested that

7    because I thought there was a motion to link the order to that

8    had been filed by Bonds Ellis.  I may be --

9              MR. MORRIS:  There was, Your Honor.  There was an

10   emergency motion to continue.  We filed an opposition, and

11   Your Honor has not yet ruled on that motion.  You're exactly

12   right.

13             THE COURT:  Okay.  All right.

14             MR. TAYLOR:  Your Honor, this is Clay Taylor.  I will

15   make sure the right people confer with Davor and John, and

16   we'll get -- we'll link it to that motion, because that makes

17   sense, to have something to link it to.

18             THE COURT:  Okay.  Yes.  And it can be a two-

19   paragraph order, I would think.

20       All right.  And then so I'm going to see you Monday at

21   9:00 o'clock Central time with the ruling.

22       Please, don't anyone file anymore paper.  I threw that out

23   earlier today.  I've got all the paper I need.  And I will see

24   you Monday at 9:00 o'clock.  Okay?  We're adjourned.

25             MR. POMERANTZ:  Thank you, Your Honor.

255

1          THE CLERK:  All rise.

2          MR. MORRIS:  Thank you, Your Honor.

3      (Proceedings concluded at 4:34 p.m.)

4                      --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                  CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22  above-entitled matter.

23  **/s/ Kathy Rehling**                           **02/05/2021**

24  _____        _____

25  Kathy Rehling, CETD-444                      Date
Certified Electronic Court Transcriber

003468

Case 3:25-cv-02072-S   Document 16-5   Filed 10/06/25   Page 716 of 790   PageID 4196

256

INDEX

PROCEEDINGS                                                        4

WITNESSES

<u>Debtor's Witnesses</u>

Marc Tauber
- Direct Examination by Mr. Morris                               25
- Cross-Examination by Mr. Rukavina                             34
- Cross-Examination by Mr. Taylor                               36
- Redirect Examination by Mr. Morris                            41

<u>Certain Funds and Advisors' Witnesses</u>

James P. Seery
- Direct Examination by Mr. Rukavina                            45
- Cross-Examination by Mr. Morris                               49
- Redirect Examination by Mr. Rukavina                          50

Robert Jason Post
- Direct Examination by Mr. Rukavina                            51
- Cross-Examination by Mr. Morris                               56
- Redirect Examination by Mr. Rukavina                          62
- Recross-Examination by Mr. Morris                             63

EXHIBITS

Debtor's Docket 1887 - Leatham Declaration      Received    6
Debtor's Exhibit B, Docket 1822                 Received    8
Debtor's Exhibit 6R, Docket Entry 1822          Received    9
Debtor's Exhibits 6S and 6T, Docket Entry 1822  Received   12
Debtor's Exhibit 6U, Docket Entry 1822          Received   13
Debtor's Exhibits D and E, Docket Entry 1822    Received   15
Debtor's Exhibits 4D, 4E, and 4G, Docket 1822   Received   17
Debtor's Exhibit 5T, Docket 1822                Withdrawn 17
Debtor's Exhibit 10A                            Received   22
Debtor's Omnibus Reply to Plan Objections,      Received   23
   Docket 1807
Debtor's Exhibit 7O (Abridged)                  Received   44

Certain Funds and Advisors' Exhibit 2,          Received   53
   Docket Entry 1863

Dondero's Exhibits 6 through 12 and             Received   66
   15 through 17

APP. 2686

257

                              INDEX
                              Page 2

EXHIBITS, cont'd.

Judicial Notice to be Taken of Docket 1887,                    6
   Patrick Leatham Declaration

Judicial Notice to be Taken of Docket 247,                    45
   Schedules

CLOSING ARGUMENTS

- By Mr. Pomerantz                                            73
- By Mr. Kharasch                                            151
- By Mr. Clemente                                            154
- By Mr. Draper                                              159
- By Mr. Rukavina                                            184
- By Mr. Taylor                                              208
- By Mr. Pomerantz                                           227
- By Mr. Clemente                                            246

RULINGS

Confirmation Hearing [1808] - *Taken Under Advisement*       248

Agreed Motion to (1) Assume Non-Residential Real Property    248
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624] - *Taken
Under Advisement*

END OF PROCEEDINGS                                           255

INDEX                                                   256-257

APP. 2607

# EXHIBIT 27

**EXHIBIT 2**

003471
APP. 2698

## Holdings of Preference Shares[1] in CLOs

| CLO | HIF | NSOF | NC | Total |
|---|---|---|---|---|
| Aberdeen | 0% | 30.21% | 0% | **30.21%** |
| Brentwood | 0% | 40.06% | 0% | **40.06%** |
| Eastland | 31.16% | 10.53% | 0% | **41.69%** |
| Gleneagles | 9.74% | 8.52% | 0% | **18.26%** |
| Grayson | 49.10% | 10.75% | 0.63% | **60.48%** |
| Greenbriar | 0% | 53.44% | 0% | **53.44%** |
| Jasper | 0% | 17.86% | 0% | **17.86%** |
| Liberty | 0% | 10.64% | 0% | **10.64%** |
| Red River | 0% | 10.49% | 0% | **10.49%** |
| Rockwall | 6.14% | 19.57% | 0% | **25.71%** |
| Rockwall II | 14.56% | 5.65% | 0% | **20.21%** |
| Southfork | 0% | 7.30% | 0% | **7.30%** |
| Stratford | 0% | 69.05% | 0% | **69.05%** |
| Loan Funding VII (aka Valhalla) | 0% | 1.83% | 0% | **1.83%** |
| Westchester | 0% | 44.38% | 0% | **44.38%** |

---

[1] Class E Certificates for Liberty CLO, Ltd.

EXHIBIT 28

**Applications and Motions[1] filed in *In re: Highland Capital Management, L.P.*, Case No.19-bk-34054**

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 01/09/20 20 | 340 | Application to employ Hayward & Associates PLLC as Attorney | **No Response** | **Granted by Dkt. 435** |
| | 281 | Motion to compromise controversy with Official Committee of Unsecured Creditors, filed by Debtor Highland Capital Management, L.P.) | **No Response** | **Granted by Dkt. 339** |
| 01/13/20 20 | 351 | Motion to extend time to (Debtor's Motion for Entry of an Order Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure) | **No Response** | **Granted by Dkt. 459** |
| 01/15/20 20 | 359 | Agreed Motion to continue hearing on (related documents 218 Motion for relief from stay) | **No Response** | **Granted by Dkt. 361** |
| 01/17/20 20 | 370 | *Joint Motion for Continuance of Hearing on (i) Debtor's Application for an Order Authorizing the Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date, and (ii) Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date)* Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 371** |
| 01/23/20 20 | 389 | *First and Final Application for Compensation and Reimbursement of Expenses on behalf of Young Conaway Stargatt & Taylor, LLP as Co-Counsel for Official Committee of Unsecured Creditors, Creditor Comm.* | **No Response** | **Granted by Dkt. 458** |
| 01/24/20 20 | 395 | -Motion to extend or limit the exclusivity period Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 460** |
| | 396 | -Motion for expedited hearing on Exclusivity Motion | **No Response** | **Granted by Dkt. 410** |
| | 397 | -Motion to enforce *(Motion of the Debtor for the Entry of an Order Concerning the "Sealing Motion" and for a Conference Concerning the Substance, Scope and Intent of Certain Recent Rulings)* (related document(s): | **No Response** | |

---
[1] Motions for *Pro Hac Vice* admission and motions to seal have been excluded. Effort was made to include all other substantive motions and applications.

003473

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document      Page 2704 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | | | |
| 01/31/2020 | 419 | - Agreed Motion to Extend by One Hundred Twenty Days the Deadline to Assume or Reject Unexpired Nonresidential Real Property Lease) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 429 |
| | 421 | - *Debtor's Motion for an Order (i) Establishing Bar Dates for Filing Claims, Including 503(b)(9) Claims; and (ii) Approving the Form and Manner of Notice Thereof)* Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 488 |
| | 422 | -Motion for expedited hearing | No Response | Granted by Dkt. 427 |
| 02/14/2020 | 451 | Motion for relief from stay  Filed by Jennifer G. Terry, Joshua Terry | No Response | Granted by Dkt. 519 |
| 02/24/2020 | 474 | - *Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities")* Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 477 |
| | 475 | -Motion for expedited hearing | | |
| 02/27/2020 | 483 | Application to employ Deloitte Tax LLP as Other Professional Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 551 |
| 03/23/2020 | 545 | -Motion to extend time to file objection (Agreed Motion) (RE: related document(s)483 Application to employ) Filed by Creditor Committee Official Committee of Unsecured Creditors | No Response | Granted by Dkt. 548 |
| 03/31/2020 | 557 | Motion to extend time to (Debtor's Emergency Motion for an Order Extending Bar Date Deadline for Employees to File Claims) (RE: related document(s)488 Order on motion for leave) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 560 |
| 04/07/2020 | 569 | -Application for compensation *Sidley Austin LLP's First Interim Application for Compensation and Reimbursement of Expenses* for Official Committee of Unsecured Creditors, Creditor Comm. Aty, Period: 10/29/2019 to 2/29/2020 | No Response | Granted by Dkt. 661  (Amended) Granted by Dkt. 666 |
| | 570 | -Application for compensation *First Interim Application for Compensation and Reimbursement of Expenses* for FTI | No Response | Granted by Dkt. 662  (Amended) Granted by Dkt. 665 |

Page 2 of 13

003474

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 2705 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | Consulting, Inc., Financial Advisor, Period: 10/29/2019 to 2/29/2020 | | |
| 04/13/2020 | 582 | Motion for relief from stay - agreed Filed by Interested Party Hunton Andrews Kurth LLP | No Response | Granted by Dkt. 623 |
| 04/15/2020 | 590 | Motion to reclaim funds from the registry *[Motion for Remittance of Funds Held in Registry of Court]* Filed by Creditor CLO Holdco, Ltd. | No Response | Denied by Dkt. 825 |
| 04/17/2020 | 593 | Motion for relief from stay  Filed by Acis Capital Management GP, LLC, Acis Capital Management, L.P. Objections due by 5/1/2020. | 617 Response unopposed to motion filed by Interested Party James Dondero. **(05/01/2020)** | Granted by Dkt. 764 |
| 04/28/2020 | 602 | - *First Interim Application for Compensation of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from October 16, 2019 through March 31, 2020* for Foley Gardere, Foley & Lardner LLP, Special Counsel, | No Response | Granted by Dkt. 670 |
| | 604 | -Application to employ Hunton Andrews Kurth LLP as Special Counsel | No Response | Granted by Dkt. 763 |
| | 605 | -Application to employ Wilmer Cutler Pickering Hale and Dorr LLP as Special Counsel *(* | No Response | Granted by Dkt. 669 |
| | 606 | -Motion to extend or limit the exclusivity period (RE: related document(s)460 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. Objections due by 5/22/2020. | No Response | Granted by Dkt. 668 |
| | 607 | - *First Interim Application for Compensation and Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP, as Counsel for the Debtor and Debtor in Possession, for the Period From October 16, 2019 Through March 31, 2020* | No Response | Granted by Dkt. 663 |
| | 608 | - *First Interim Application for Compensation and Reimbursement of Expenses of Mercer (US) Inc., as Compensation Consultant to the Debtor for the Period From November 15, 2019 Through February 29, 2020* for Mercer (US) Inc., Consultant, | No Response | Granted by Dkt. 664 |
| | 609 | -Application for compensation *(Hayward & Associates PLLC's First Interim Application for Compensation and Reimbursement of* | No Response | Granted by Dkt. 667 |

003475

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document   Page 2706 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | *Expenses for the Period from December 10, 2019 through March 31, 2020) for Hayward & Associates PLLC, Debtor's Attorney, Period: 12/10/2019 to 3/31/2020* | | |
| 04/29/20 20 | 615 | Motion to extend time to Assume or Reject Unexpired Nonresidential Real Property Lease (RE: related document(s)429 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 616** |
| 05/20/20 20 | 644 | Motion for relief from stay *(Debtor's Motion for Relief From the Automatic Stay to Proceed With State Court Action)* Fee amount $181, Filed by Interested Parties UBS AG London Branch, UBS Securities LLC Objections due by 6/3/2020. | **No Response** | **Denied by Dkt. 765** |
| 06/11/20 20 | 733 | -Motion for leave *to File an Omnibus Reply to Objections to UBS's Motion for Relief from the Automatic Stay to Proceed With State Court* Filed by Interested Parties UBS AG London Branch, UBS Securities LLC Objections due by 7/2/2020. | **No Response** | **Granted by Dkt. 910** |
| 06/12/20 20 | 737 | Motion to extend or limit the exclusivity period Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 820** |
| 06/15/20 20 | 747 | Motion to extend time to (Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure) (RE: related document(s)459 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 816** |
| 06/23/20 20 | 774 | -Application to employ James P. Seery, Jr. as Other Professional *Debtors Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020* Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 854** |
| | 775 | -Application to employ Development Specialists, Inc. as Other Professional *Amended Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide Financial Advisory and Restructuring-Related Services, Nunc Pro Tunc to March 15, 2020* Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 853** |

003476

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 2707 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 07/08/20 20 | 808 | Motion to compel Production by the Debtor. Filed by Creditor Committee Official Committee of Unsecured Creditors Objections due by 7/29/2020. | -832 Response opposed to (related document(s): 808 Motion to compel Production by the Debtor. filed by Creditor Committee Official Committee of Unsecured Creditors) filed by Interested Party James Dondero. (07/14/2020) | **Dkt. 942**<br><br>The Discovery Motions are GRANTED to the extent specifically set forth herein and are otherwise DENIED. Except to the extent specifically set forth herein, the Objections are OVERRULED |
| 07/09/20 20 | 810<br><br>814 | -Motion for protective order *(Debtor's Motion for Entry of (i) a Protective Order, or, in the Alternative, (ii) an Order Directing the Debtor to Comply with Certain Discovery Demands Tendered by the Official Committee of Unsecured Creditors Pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034)* Filed by Debtor Highland Capital Management, L.P.<br><br>-Motion for expedited hearing (related documents 808 Motion to compel) Filed by Creditor Committee Official Committee of Unsecured Creditors | **No Response** | **Dkt. 942**<br><br>The Discovery Motions are GRANTED to the extent specifically set forth herein and are otherwise DENIED. Except to the extent specifically set forth herein, the Objections are OVERRULED |
| 07/13/20 20 | | Proof of Claim 23 filed by Acis Capital Management, LP and Acis Capital Management GP, LLC | 827-Objection to Acis Claim Filed by Interested Party James Dondero. | **N/A** |
| 07/14/20 20 | 831 | -Application for compensation *Sidley Austin LLP's Second Interim Application for Compensation and Reimbursement of Expenses* for Official Committee of Unsecured Creditors, Creditor Comm. Aty, Period: 3/1/2020 to 5/31/2020 | **No Response** | **Granted by Dkt. 1048** |
| 07/21/20 20 | 883 | Application for compensation *Second Interim Application for Compensation and Reimbursement of Expenses* for FTI Consulting, Inc., Financial Advisor, Period: 3/1/2020 to 5/31/2020 | **No Response** | **Granted by Dkt. 1051** |
| 07/22/20 20 | 886 | -Motion to extend time to assume or reject unexpired nonresidential real property lease Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 909** |

APP 2701

003477

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 2708 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 08/03/2020 | 914 | -Motion for leave *[CLO Holdco, Ltd.'s Motion for Clarification of Ruling]* Filed by Creditor CLO Holdco, Ltd. | **No Response** | **Resolved by Dkt. 935** |
| 08/06/2020 | 924 | *- Second Interim Application for Compensation and for Reimbursement of Expenses of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from April, 2020 through July 31, 2020* | **No Response** | **Granted by Dkt. 1045** |
| 08/12/2020 | 944 | Chapter 11 plan filed by Debtor Highland Capital Management, L.P. | **No Response** | |
| | 945 | -Disclosure statement filed by Debtor Highland Capital Management, L.P. | | |
| 08/13/2020 | 947 | - Joint Motion to continue hearing on (related documents 771 Objection to claim) *(Joint Motion to Continue Status Conference)* Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) | **No Response** | **Granted by Dkt. 951** |
| | 949 | - Motion to extend or limit the exclusivity period (RE: related document(s)820 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Exhibit A--Proposed Order) (Annable, Zachery) | **No Response** | **Granted by Dkt. 1092** |
| 08/18/2020 | 964 | *Hayward & Associates PLLC's Second Interim Application for Compensation and Reimbursement of Expenses for the Period from April 1, 2020 through June 30, 2020* | **No Response** | **Granted by Dkt. 1047** |
| 08/19/2020 | 971 | *- Second Interim Application for Compensation and for Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtor and Debtor in Possession for the Period from April 1, 2020 through July 31, 2020* | **No Response** | **Granted by Dkt. 1043** |
| | 972 | *- Second Interim Application for Compensation and for Reimbursement of Expenses of Mercer (US) Inc. as Compensation Consultant for the Debtor for the Period from March 1, 2020 through May 31, 2020* for Mercer (US) Inc., Consultant | **No Response** | **Granted by Dkt. 1046** |
| | 975 | *-    Consolidated Monthly and First Interim Application of Wilmer Cutler Pickering Hale and Dorr LLP for Allowance of Compensation for Services Rendered and Reimbursement of* | **No Response** | **Granted by Dkt. 1044** |

Page 6 of 13

Case 19-34054-sgj11   Doc 2062   Filed 03/18/21   Entered 03/18/21 20:59:39   Desc
Main Document      Page 2709 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | *Expenses as Regulatory and Compliance Counsel for the Period November 1, 2019 through June 30, 2020* | | |
| 09/04/2020 | 1025 | Motion to compromise controversy with Carey International, Inc. Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 1123** |
| 09/16/2020 | 1214 | Motion for partial summary judgment on proof of claim(s) 190 and 191 of UBS Securities LLC and UBS AG, London Branch filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 1526** |
| 09/23/2020 | 1087 | -Motion to compromise controversy with (A) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (B) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (C) Acis Capital Management, L.P. (Claim No. 159). Filed by Debtor Highland Capital Management, L.P. | -1121 Response opposed to Acis 9019 Motion filed by Interested Party James Dondero. **(10/05/2020)** | **Granted by Dkt. 1302** |
| | 1089 | -Motion to compromise controversy with (a) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (b) the Highland Crusader Funds (Claim No. 81). Filed by Debtor Highland Capital Management, L.P. Objections due by 10/19/2020. | **No Response** | **Granted by Dkt. 1273** |
| 09/24/2020 | 1099 | Motion for relief from stay - *Daugherty's Motion to Confirm Status of Automatic Stay, or alternatively to Modify Automatic Stay* Fee amount $181, Filed by Creditor Patrick Daugherty Objections due by 10/8/2020. | **No Response** | **Granted by Dkt. 1327** |
| 09/28/2020 | 1108 | Motion to Approve Disclosure Statement Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 1476** |
| 10/02/2020 | 1118 | - Motion to extend time to Assume or Reject Unexpired Nonresidential Real Property Lease Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 1122** |
| | 1119 | -Motion to extend time to Deadline To File An Adversary Proceeding Against CLO Holdco, Ltd. (EMERGENCY) Filed by Creditor Committee Official Committee of Unsecured Creditors | **No Response** | **Granted by Dkt. 1168** |
| | 1120 | | **No Response** | |

003479

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 2710 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | -Motion for expedited hearing (related documents 1119 Motion to extend/shorten time) Filed by Creditor Committee Official Committee of Unsecured Creditors | | |
| 10/09/2020 | 1154 | -Motion for leave to *Amend Certain Proofs of Claim* Filed by Creditor The Dugaboy Investment Trust Objections due by 10/30/2020. | **No Response** | N/A |
| 10/16/2020 | 1179 | Omnibus Objection to claim(s) of Creditor(s) Crescent Research; Hedgeye Risk Management, LLC; James D. Dondero; NexVest, LLC; James D. Dondero.. Filed by Debtor Highland Capital Management, L.P. Responses due by 11/18/2020. | **1502** Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)1179 Objection to claim). **(12/03/2020)** | **Dkt. 1537** |
| 10/18/2020 | 1207 | Motion to allow claims of *HarbourVest Pursuant to Rule 3018(A) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* Filed by Creditor HarbourVest et al Objections due by 11/9/2020. | **No Response** | |
| 10/16/2020 | 1215 | -Redeemer Committee of the Highland Crusander Fund and the Crusader Funds' Motion for partial summary judgment on proof of claim(s) 190 and 191 of UBS AG, London Branch and UBS Securities LLC filed by Interested Party Redeemer Committee of the Highland Crusader Fun and the Crusader's Funds' | **No Response** | **Resolved by Dkt. 1526** |
| 10/20/2020 | 1244 | - *Third Interim Application for Compensation and Reimbursement of Expenses* for FTI Consulting, Inc., Financial Advisor, Period: 6/1/2020 to 8/31/2020. | **No Response** | **Granted by Dkt. 1685** |
| 10/21/2020 | 1263 | Emergency Motion to continue hearing on (related documents 1080 Disclosure statement) Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 1266** |
| 10/23/2020 | 1281 | -Motion for leave - *Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018* Filed by Creditor Patrick Daugherty | **No Response** | **Granted by Dkt. 1474** |

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 2711 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 10/25/20 20 | 1289 | Amended disclosure statement filed by Debtor Highland Capital Management, L.P. (RE: related document(s)945 Disclosure statement, 1080 Disclosure statement). | **No Response** | N/A |
| 10/27/20 20 | 1296 | Application for compensation *Sidley Austin LLP's Third Interim Application for Compensation and Reimbursement of Expenses* for Official Committee of Unsecured Creditors, Creditor Comm. Atty, Period: 6/1/2020 to 8/31/2020, | **No Response** | **Granted by Dkt. 1684** |
| 11/06/20 20 | 1338 | *Motion for Temporary Allowance of Claims for voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018)* Filed by Interested Parties UBS AG London Branch, UBS Securities LLC | **No Response** | **Granted by Dkt. 1518** |
| 11/09/20 20 | 1348 | Motion to continue hearing on (related documents 1207 Motion to allow claims) Filed by Creditor HarbourVest et al | **No Response** | **Granted by Dkt. 1352** |
| 11/13/20 20 | 1384 | Amended disclosure statement filed by Debtor Highland Capital Management, L.P. (RE: related document(s)945 Disclosure statement, 1080 Disclosure statement, 1289 Disclosure statement). | **No Response** | N/A |
| 11/18/20 20 | 1424 | - Motion for leave *(Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements)* Filed by Debtor Highland Capital Management, L.P. | 1447 WITHDRAWN per # 1460 Response opposed to (related document(s): 1424 Mo tion for leave *(Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements)* filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. **(11/20/2020)** | **Granted by Dkt. 1436 & 1475** |
| | 1425 | - Motion for expedited hearing (related documents 1424 Motion for leave) *(Debtor's Motion for an Expedited Hearing on the Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreement)* Filed by Debtor Highland Capital Management, L.P. | | **Granted by Dkt. 1436** |
| 11/19/20 20 | 1439 | - WITHDRAWN per docket # 1622 Motion for leave *(James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the* | **N/A** | **Withdrawn by Dondero by Dkt. 1622** |

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 2712 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | 1443 | *Ordinary Course of Business)* Filed by Interested Party James Dondero<br><br>- Motion for expedited hearing(related documents 1439 Motion for leave) *(Request for Emergency Hearing on James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business)* Filed by Interested Party James Dondero | | **Denied by Bankruptcy Court on the Record during hearing on November 23, 2020** |
| 11/25/20 20 | 1483 | *Third and Final Application for Compensation and Reimbursement of Expenses of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from October 16, 2019 through October 31, 2020* | **No Response** | **Granted by Dkt. 1691** |
| 11/30/20 20 | 1491 | Motion for relief from stay  Filed by Creditor Patrick Daugherty | **No Response** | **Denied by Dkt. 1612** |
| 12/08/20 20 | 1528 | Motion for order imposing temporary restrictions on Debtor's ability, as portfolio manager, to initiate sales by non-debtor CLO Vehicles. Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund. | **No Response** | **Denied by Dkt. 1605** |
| 12/09/20 20 | 1530 | Motion to extend time to Time to File An Adversary Proceeding Against CLO Holdco, Ltd. (Agreed) (RE: related document(s)1168 Order (generic)) Filed by Creditor Committee Official Committee of Unsecured Creditors Objections due by 12/30/2020. | **No Response** | **Granted by Dkt. 1534** |
| 12/11/20 20 | 1544 | -Application for compensation *(First Interim Application)* for Hunton Andrews Kurth LLP, Special Counsel | **No Response** | **Granted by Dkt. 1686** |
| | 1545 | - *(Hayward & Associates PLLC's Third Interim Application for Compensation and Reimbursement of Expenses for the Period from July 1, 2020 through September 30, 2020)* for Hayward & Associates PLLC, Debtor's Attorney | **No Response** | **Granted by Dkt. 1728** |
| | 1547 | - *Third Interim Application for Compensation and for Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtor and Debtor in Possession for the Period from August 1, 2020 through November 30, 2020* | **No Response** | **Granted by Dkt. 1687** |
| | | - *Consolidated Monthly and Second Interim Application of Wilmer Cutler Pickering Hale and Dorr LLP for Allowance of* | **No Response** | **Granted by Dkt. 1715** |

003482

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 2713 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | 1552 | *Compensation for Services Rendered and Reimbursement of Expenses as Regulatory and Compliance Counsel for the Period from July 1, 2020 through November 30, 2020)* | | |
| 12/14/20 20 | 1564 | -Motion to quash *(Debtor's Emergency Motion to Quash Subpoena and for Entry of a Protective Order or, in the Alternative, for an Adjournment)* Filed by Debtor Highland Capital Management, L.P. | 1571 Objection to Motion to Quash filed by Interested Party James Dondero, . **(12/14/2020)** | **Resolved by Dkt. 1603** |
| | 1565 | - Motion for protective order *(Debtor's Emergency Motion to Quash Subpoena and for Entry of a Protective Order or, in the Alternative, for an Adjournment)* Filed by Debtor Highland Capital Management, L.P. | | **Resolved by Dkt. 1603** |
| 12/16/20 20 | 1583 | -Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s)816 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P | **No Response** | **Granted by Dkt. 1725** |
| 12/17/20 20 | 1590 | Motion to pay *(Debtor's Motion Pursuant to the Protocols for Authority for Highland Multi Strategy Credit Fund, L.P. to Prepay Loan)* Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 1746** |
| 12/23/20 20 | 1623 | -- Motion to extend time to assume unexpired nonresidential real property lease Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 1636** |
| | 1625 | -Motion to compromise controversy with HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. Filed by Debtor Highland Capital Management, L.P. | -1697 Objection to HarbourVest 9019 Motion filed by Interested Party James Dondero **(01/06/2021)** | **Granted by Dkt. 1788** |
| 12/31/20 20 | 1649 | Joint Motion to continue hearing on (related documents 1207 Motion to allow claims) Filed by Creditor HarbourVest et al | **No Response** | **Granted by Dkt. 1652** |

003483

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 2714 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 01/04/20 21 | 1655 | Application for compensation *Fourth Interim Application for Compensation and Reimbursement of Expenses* for FTI Consulting, Inc., Financial Advisor, Period: 9/1/2020 to 11/30/2020, Fee: $710,280.45, Expenses: $1,479.47. Filed by Attorney Juliana Hoffman Objections due by 1/25/2021. | **No Response** | **N/A** |
| 01/11/20 21 | 1719 | Notice *(Second Notice of (I) Executory Contracts and Unexpired Leases to Be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, If Any, and (III) Related Procedures in Connection Therewith)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1606 Support/supplemental document *(Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1472 Chapter 11 plan). | 1784 WITHDRAWN PER # 1876. Objection to (related document(s): 1719 Notice (generic) filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. **(01/20/2021)** | **N/A** |
| 01/14/20 21 | 1745 | Motion to appoint trustee*Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* Filed by Get Good Trust, The Dugaboy Investment Trust | 1756 Joinder by filed by Interested Party James Dondero **(01/15/2021)** | **Denied by Dkt. 1960** |
| 01/19/20 21 | 1777 | *Motion of the Debtor for Entry of an Order Authorizing the Debtor to Implement a Key Employee Retention Plan with Non-Insider Employees and Granting Related Relief* Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 1849** |
| 01/27/20 21 | 1853 | *Sidley Austin LLP's Fourth Interim Application for Compensation and Reimbursement of Expenses* for Official Committee of Unsecured Creditors, Creditor Comm. Aty, Period: 9/1/2020 to 11/30/2020. | **No Response** | **N/A** |
| 02/01/20 21 | 1878 | Motion to compel an Order Requiring James D. Dondero to Preserve Documents and to Identify Measures Taken to Ensure Document Preservation. Filed by Creditor Committee Official Committee of Unsecured Creditors | 1969 Objection to UCC's Preservation Motion filed by Interested Party James Dondero. **(03/03/2021)** | **N/A** |
| 02/08/20 21 | 1914 | Motion for leave *(Motion for Status Conference)* Filed by Interested Party James Dondero | **N/A** | **Denied by Dkt. 1929** |

003484

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 2715 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 02/28/20 21 | **1955** | Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan) Filed by Interested Parties Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. | **No Response** | **N/A** |
| 03/01/20 21 | **1958** | Motion for expedited hearing (related documents 1955 Motion to stay pending appeal) Filed by Interested Parties Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. | **No Response** | **N/A** |
| 03/03/20 21 | **1967** | Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan) Filed by Interested Parties Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund (Hogewood, A.) | **No Response** | **N/A** |
| 03/04/20 21 | **11973** | -Joinder by filed by Interested Party James Dondero (RE: related document(s)1955 Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan)) | **N/A** | **N/A** |

003485

Case 19-34054-sgj11     Doc 2062     Filed 03/18/21     Entered 03/18/21 20:59:39     Desc
Main Document     Page 2716 of 2722

# EXHIBIT 29

| | | Highland Capital Management, L.P. v. Dondero  20-03190-sgj | | |
|---|---|---|---|---|
| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
| 12/07/2020 | 2 | - Motion for preliminary injunction (Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero) filed by Plaintiff Highland Capital Management, L.P. | 52  Response opposed to (related document(s): 2 Motion for preliminary injunction (Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero) filed by Plaintiff Highland Capital Management, L.P.) filed by Defendant James D. Dondero. (01/07/2021) | Granted by Dkt. 59 |
| | 5 | - Motion for expedited hearing(related documents 2 Motion for preliminary injunction) (Plaintiff Highland Capital Management, L.P.'s Motion for Expedited Hearing on Its Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero) filed by Plaintiff Highland Capital Management, L.P. (Annable, Zachery). Related document(s) 6 Motion for protective order filed by Plaintiff Highland Capital Management, L.P | | Granted by Dkt. 9 |
| | 6 | - Motion for temporary restraining order filed by Plaintiff Highland Capital Management, L.P. | No Response | Granted by Dkt. 10 |
| 12/16/2020 | 24 | WITHDRAWN per a 29 Motion for leave (James Dondero's Emergency Motion to Modify Temporary Restraining Order) (related document(s) 10 Order on motion for protective order) filed by Defendant James D. Dondero | 29  Withdrawal filed by Defendant James D. Dondero (RE: related document(s)24 Motion for leave (James Dondero's Emergency Motion to Modify Temporary Restraining Order) (related document(s) 10 Order on motion for protective order)). | |
| 12/28/2020 | 32 | Motion for protective order(James Dondero's Emergency Motion for Entry of a Protective Order) filed by Defendant James D. Dondero | 34  Objection to (related document(s): 32 Motion for protective order(James Dondero's Emergency Motion for Entry of a Protective Order) filed by Defendant James D. Dondero) filed by Plaintiff Highland Capital Management, L.P. (12/28/2020) | Denied by Dkt. 38 |
| | 33 | -Motion for expedited hearing(related documents 32 Motion for protective order) (Request for Emergency Hearing) filed by Defendant James D. Dondero | | |
| 01/07/2021 | 48 | - Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO) filed by Plaintiff Highland Capital Management, L.P. | 110  Objection to (related document(s): 48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO) filed by | N/A |
| | 49 | - Brief in support filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for the TRO)) | Plaintiff Highland Capital Management, L.P.)(James Dondero's Objection and Response to-Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause and Brief in Support) filed by Defendant James D. Dondero. (02/21/2021) | N/A |
| | 51 | - Motion for expedited hearing (related documents 48 Motion for Contempt) filed by Plaintiff Highland Capital Management, L.P. | | N/A |
| 01/13/2021 | 64 | Motion for leave to appeal (related document(s): 59 Order on motion for preliminary injunction, 60 Notice of appeal filed by Defendant James D. Dondero) filed by Defendant James D. | No Response | Denied by Dkt. 111 |
| 01/27/2021 | 75 | Emergency Motion to continue hearing on (related documents 48 Motion for Contempt, 49 Brief) filed by Defendant James D. Dondero | 77  Objection to (related document(s): 75 Emergency Motion to continue hearing on (related documents 48 Motion for Contempt, 49 Brief) filed by Defendant James D. Dondero) filed by Plaintiff Highland Capital Management, L.P.. (01/29/2021) | N/A |
| 02/10/2021 | 95 | Motion to continue hearing on (related documents 48 Motion for Contempt, 49 Brief) filed by Defendant James D. Dondero | No Response | Granted by Dkt. 97 |
| 02/17/2021 | 102 | Motion to continue hearing on (related documents 48 Motion for Contempt) filed by Plaintiff Highland Capital Management, L.P | No Response | Granted by Dkt. 104 |
| 02/20/2021 | 107 | - Motion to strike (related document(s): 48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO) filed by Plaintiff Highland Capital Management, L.P., 49 Brief filed by Plaintiff Highland Capital Management, L.P.) (James Dondero's Emergency Motion in Limine and to Exclude Evidence and Argument) filed by Defendant James D. Dondero. | 115  Objection to (related document(s): 107 Motion to strike (related document(s): 48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held i filed by Defendant James D. Dondero) filed by Plaintiff Highland Capital Management, L.P. (02/24/2021) | N/A |
| | 108 | - Motion for expedited hearing(related documents 107 Motion to strike document) filed by Defendant James D. Dondero | | N/A |
| 03/02/2021 | 119 | - Motion to continue hearing on (related documents 48 Motion for Contempt) filed by Plaintiff Highland Capital Management, L.P. | No Response | Granted by Dkt. 120 |

APP. 8713

003486

Case 19-34054-sgj11    Doc 2062    Filed 03/18/21    Entered 03/18/21 20:59:39    Desc
Main Document    Page 2717 of 2722

| 03/10/2021 | 126 | Motion to continue hearing on (related documents 48 Motion for Contempt, 49 Brief, 125 Certificate of service)(Motion for Continuance of Contempt Hearing) filed by Defendant James D. Dondero (Attachments: # 1 Ex. A - Mandamus # 2 Ex. B - Letter # 3 Proposed Order) | No Response | N/A |

003487
APP. 877

# EXHIBIT 30

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### DECLARATION OF MICHAEL J. LANG IN SUPPORT OF MOVANTS' MOTION
### FOR RECUSAL PURSUANT TO 28 U.S.C. § 455

I, Michael J. Lang, declare under penalty of perjury as follows:

1.      I am more than 21 years of age and am competent to make this Declaration. I have personal

knowledge of the facts set forth herein, and they are true and correct.

2.      I am a partner at the law firm of Crawford, Wishnew & Lang PLLC and represent Movants

James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.,

The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC,

f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "<u>Movants</u>") in the

above-captioned action. I am authorized to make this Declaration in Support of Movants' Motion

for Recusal Pursuant to 28 U.S.C. § 455 (the "<u>Motion</u>").

3.      **Exhibit 1** referenced and incorporated into the Brief in Support of the Motion ("the <u>Brief</u>")

and contained in the Appendix in Support of the Motion (the "<u>Appendix</u>") (at APP. 0001-APP.

---

**DECLARATION OF MICHAEL J. LANG**                                    **PAGE 1**

0137) is a true and correct copy of a court record [ECF Dkt. 181] from the bankruptcy proceeding styled *In the Matter of: Highland Capital Management, L.P.*; Case No. 19-12239 (CSS) in the United States Bankruptcy Court for the District of Delaware.

4.     The following exhibits referenced and incorporated into the Brief and contained in the Appendix are true and correct copies of court records from this above-captioned bankruptcy proceeding styled *In Re: Highland Capital Management, L.P.*; Case No. 19-34054-sgj-11, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 2 | January 9, 2020 Debtor's Motion to Compromise Controversy with Official Committee of Unsecured Creditors Transcript | APP. 0138-APP. 0228 |
| 3 | February 19, 2020 Transcript | APP. 0229-APP. 0416 |
| 4 | December 8, 2020 Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [ECF Dkt. 1522] | APP. 0417-APP. 0442 |
| 5 | December 16, 2020 Transcript - Motion for Order Imposing Temporary Restrictions | APP. 0443-APP. 0508 |
| 9 | February 8, 2021 Transcript - Bench Ruling on Confirmation Hearing and Agreed Motion to Assume | APP. 0990-APP. 1040 |
| 10 | July 8, 2020 Transcript - Motion to Extend Exclusivity Period and Motion to Extend Time to Remove Actions | APP. 1041-APP. 1098 |
| 12 | June 30, 2020 Transcript - Motion for Remittance of Funds Held in Registry of Court filed by CLO Holdco, Ltd. [ECF Dkt. 802] | APP. 1152-APP. 1251 |
| 13 | July 21, 2020 Official Committee of Unsecured Creditors Emergency Motion to Compel Responses by the Debtor Transcript | APP. 1252-APP. 1376 |
| 14 | Applications to Employ James P. Seery and Development Specialists, Inc. Transcript [ECF Dkt. 864] | APP. 1377-APP. 1510 |
| 15 | March 4, 2020 Transcript - Hearing on Motion of The Debtor for Entry of an Order Authorizing, but not Directing, the Debtor to Cause Distributions to Certain "Related Entities" | APP. 1511-APP. 1631 |
| 16 | June 15, 2020 Transcript - UBS's Motion for Relief from the Automatic Stay to Proceed with State Court Action | APP. 1632-APP. 1758 |
| 22 | January 14, 2021 Motion to Appoint Examiner [ECF Dkt. 1752] | APP. 2057-APP. 2070 |
| 23 | February 2, 2021 Transcript of Proceedings | APP. 2071-APP. 2365 |
| 24 | Servicing Agreement – Exhibit N to the February 2, 2021 Transcript of Proceedings | APP. 2366-APP. 2401 |

**DECLARATION OF MICHAEL J. LANG**                                    **PAGE 2**

| 25 | Servicing Agreement – Exhibit J to the February 2, 2021 Transcript of Proceedings | APP. 2402-APP. 2440 |
| 26 | February 3, 2021 Transcript of Proceedings | APP. 2441-APP. 2697 |
| 27 | Chart of Holdings of Preference Shares in CLOs – Exhibit 2 from February 3, 2021 Hearing | APP. 2698-APP. 2699 |

5.      **Exhibit 11** referenced and incorporated into the Brief and contained in the Appendix (at

APP. 1099-1151) is a true and correct copy of a court record [ECF Dkt. 1186] from the proceeding

styled *In the Acis Capital Management, L.P. and Acis Capital Management GP, LLC*; Case No.

18-30264-SGJ-11 in the United States Bankruptcy Court for the Northern District of Texas, Dallas

Division.

6.      The following exhibits referenced and incorporated into the Brief and contained in the

Appendix are true and correct copies of court records from the adversary proceeding styled

*Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al.*,

Adversary Proceeding No. 21-03000-sgj, in the United States Bankruptcy Court for the Northern

District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 6 | January 6, 2021 Plaintiff Highland Capital Management, L.P.'S Verified Original Complaint for Declaratory and Injunctive Relief [ECF Dkt. 1] | APP. 0509-APP. 0527 |
| 7 | January 26, 2021 Transcript - Motion for Entry of Order Authorizing Debtor to Implement Key Employee Plan | APP. 0528-APP. 0784 |
| 17 | January 6, 2021 Debtor's Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero [ECF Dkt. 6] | APP. 1759-APP. 1776 |

7.      The following exhibit referenced and incorporated into the Brief and contained in the

Appendix is a true and correct copy of a court record from the adversary proceeding styled

*Highland Capital Management, L.P. v. James D. Dondero*, Adversary Proceeding No. 20-3190-

sgj, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

**DECLARATION OF MICHAEL J. LANG**                                    **PAGE 3**

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 8 | January 8, 2021 Transcript - Preliminary Injunction Hearing | APP. 0785-APP. 0989 |

8.      The following exhibits referenced and incorporated into the Brief and contained in the Appendix are true and correct copies of court records from the adversary proceeding styled *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al.*, Adversary Proceeding No. 21-03010-sgj, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 19 | February 17, 2021 Debtor's Memorandum of Law in Support of its Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021 [ECF Dkt. 3] | APP. 1792-APP. 1812 |
| 20 | February 24, 2021 Order on Mandatory Injunction [ECF Dkt. 25] | APP. 1813-APP. 1817 |
| 21 | February 23, 2021 Transcript - Mandatory Injunction Hearing | APP. 1818-APP. 2056 |

9.      **Exhibit 18** referenced and incorporated into the Brief and contained in the Appendix (at APP. 1777-1791) contains true and correct courtesy copies of the K&L Gates Letters (as defined in the Brief), which are attached to the Declaration of James Seery [ECF 4] in the Adversary Proceeding styled *Highland Capital Mgmt. v. Highland Capital Management Fund Advisors, L.P., et al*. Adversary No. 21-03000-sgj.

10.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

---

**DECLARATION OF MICHAEL J. LANG**                                    **PAGE 4**

Case 3:25-cv-02072-S   Document 55   Main Document   Filed 06/25/25   Page 2572 of 2733   Page 739 of 790   PageID 4219

EXECUTED ON the 18th of March, 2021 in Dallas, Dallas County, Texas.

Michael J. Lang
Declarant

003492
APP. 2749



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 22, 2021**

_____
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **CASE NO. 19-34054-SGJ-11** |
| **L.P.,** | § | **(Chapter 11)** |
| **DEBTOR.** | § | |

### ORDER DENYING MOTION TO RECUSE, PURSUANT TO 28 U.S.C. § 455

CAME ON FOR CONSIDERATION before this court the Motion of James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, the "Movants") to Recuse, Pursuant to 28 U.S.C. § 455, filed March 18, 2021, along with a supporting Brief and an Appendix that is 2,722 pages in length [DE ## 2060, 2061, & 2062] (hereinafter, the "Motion to Recuse").

1

003493

The Movants, through newly appearing counsel, Michael J. Lang of Crawford, Wishnew & Lang PLLC, argue that the assigned bankruptcy judge (the "Presiding Judge") should, after 15 months, recuse herself from presiding in the above-referenced case of Highland Capital Management, L.P. (the "Debtor" or "Highland"), whose Chapter 11 plan was recently confirmed. The Movants state that they perceive the Presiding Judge has developed animus towards James Dondero ("Mr. Dondero") and parties connected with him or deemed under his control (the "Affected Entities"). Mr. Dondero and the Affected Entities argue that the Presiding Judge's impartiality can be reasonably questioned. Specifically, they express concerns that the Presiding Judge formed negative opinions of Mr. Dondero in a prior bankruptcy case over which the Presiding Judge presided (*In re Acis Capital Management, L.P.,* Case No. 18-30264)[1]; that those opinions have carried over to the current case; the Presiding Judge has been unable to extricate those opinions from her mind; and this has resulted in an actual bias against Mr. Dondero that is prejudicing him and the Affected Entities.

Accordingly, the Movants ask that the Presiding Judge recuse herself from any future contested matters and adversary proceedings arising in the Highland case.

By way of further background, the Highland case has been pending since October 16, 2019. It was filed in the Bankruptcy Court for the District of Delaware. Venue was transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division, on motion of the Official Unsecured Creditors Committee ("Committee") on December 4, 2019. On January 9, 2020, a significant corporate governance settlement between Highland and the Committee was reached and approved by this court. The settlement involved the removal of Mr. Dondero as CEO and from all decision making at Highland, at the insistence of the

---

[1]  Acis Capital Management, L.P. ("Acis") was formerly a company in the Highland corporate organizational structure.

003494

Committee, and an entirely new corporate governance structure was imposed on the Debtor, with extensive

oversight by the Committee. This new corporate governance structure was negotiated by the Debtor under

pressure from both the Committee and the United States Trustee—both of whom expressed positions that a

Chapter 11 Trustee should be appointed in this case, due to alleged conflicts of interest and mismanagement,

among other things, attributed to Mr. Dondero. Mr. Dondero signed off on the corporate governance

settlement and this court approved it. A new three-member board has controlled the Debtor since then,

consisting of a retired bankruptcy judge (Russell Nelms); a second individual with extensive experience

serving as an independent board member of companies undergoing bankruptcy or restructuring (John

Dubel); and a third individual (later appointed CEO) with broad experience managing distressed debt

investments and other products similar to what Highland manages (James P. Seery).

After more than a year, under direction of the new board, the Debtor obtained confirmation of a

Chapter 11 Plan on February 22, 2021. The Plan was proposed after many months of contentiousness with

several large creditors and the Committee. In fact, in August 2020, the court required the key parties to

engage in mediation before two respected co-mediators (Retired Bankruptcy Judge Allan Gropper, S.D.N.Y.

and Attorney/Mediator Sylvia Mayer, Houston). The Debtor (either during or after mediation) reached key

settlements with the largest creditors in this case (including Acis, which asserted more than a $70 million

disputed claim; the Redeemer Committee for the Crusader Fund which asserted more than a $250 million

claim and had been in litigation in multiple fora with Highland and affiliates for approximately a decade; and

UBS Securities, which asserted more than a $1 billion claim and had also been in litigation with Highland

and certain affiliates for more than a decade). Mr. Dondero participated in the mediation, but settlements were

not reached with him. The Plan that this court confirmed in February 2021 was supported by the Committee

and overwhelmingly by non-insider creditors. Other large, non-insider creditors that supported the Plan,

003495

besides those mentioned above, were Patrick Daugherty (a former executive of Highland who has been in litigation with Highland and Mr. Dondero for more than a decade) and HarborVest—each of whom asserted multi-million dollar claims in this case. In any event, the Movants have appealed the confirmation order.

The Motion to Recuse comes 17 months after the Chapter 11 case was filed (although just 15 months after it was transferred to the Presiding Judge). As mentioned, it comes after confirmation of a plan. The Motion to Recuse was filed just two business days before this court is scheduled to hear a motion of the Debtor to hold Mr. Dondero in contempt of a TRO. This hearing on the motion to hold Mr. Dondero in contempt has been continued various times at his request. The underlying TRO has also been the subject of unsuccessful attempts at interlocutory appeals and is currently the subject of a petition for writ of mandamus before the Fifth Circuit.

## I.       LEGAL STANDARD APPLICABLE TO THE MOTION TO RECUSE.

Before addressing the substance of the Motion to Recuse, the court will address the governing legal authority: 28 U.S.C. § 455, Fed. R. Bankr. Pro. 5004(a), and certain case law interpreting same.

The relevant portions of 28 U.S.C. § 455 provide that:

(a)     Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b)     He shall also disqualify himself in the following circumstances:

(1)     Where he has a personal bias or prejudice concerning a party, a personal knowledge of disputed evidentiary facts concerning the proceeding;

28 U.S.C. § 455(a) & (b)(1).

4

003496

Bankruptcy Rule 5004(a) further provides that "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstance arises or, if appropriate, shall be disqualified from presiding over the case."

The court first notes that the applicable statute and rule do not expressly address timeliness.  However, one Circuit Court has stated that recusal motions must be made in a timely fashion. *Davies v. C.I.R*, 68 F.3d 1129, 1130-31 (9th Cir. 1995) (one year after a ruling was considered untimely).

The court next notes that the applicable statute and rule do not expressly state whether the presiding judge or some other judge should decide a motion to recuse/disqualify. Case authority has interpreted the provisions set forth above to give the targeted judge authority (at least initially) to decide a motion to disqualify. *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999) (a motion to recuse is committed to the discretion of the targeted judge, and the denial of such motion will only be reversed upon the showing of an abuse of discretion); *Wilborn v. Wells Fargo Bank, N.A. (In re Wilborn)*, 401 B.R. 848, 851 (Bankr. S.D.Tex. 2009) (citing *United States v. Mizell*, 88 F.3d 288, 299 (5th Cir. 1996)(the targeted judge has broad discretion in determining whether disqualification is appropriate)).

Additionally, the court notes that the applicable statute and rule do not expressly state what type of hearing a movant is entitled to, if any. Case authority has interpreted that a motion for disqualification does not necessarily confer upon a movant a right to make a record in open court, nor does it confer upon them a right to an evidentiary hearing. *Lieb v. Tillman (In re Lieb)*, 112 B.R. 830, 835-36 (Bankr. W.D. Tex. 1990).  *See generally* 13A C. Wright, A. Miller & E.

003497

Cooper, *Federal Practice and Procedure* § 3550, at 629 (a section 455 motion can be supported by an affidavit, a verified memorandum, or a statement of facts in some form). The procedure for a targeted judge to follow, as set forth in *Levitt v. University of Texas*, 847 F.2d 221, 226 (5th Cir. 1988), and as more specifically articulated in *Lieb v. Tillman*, 112 B.R. at 836, is: (a) first, the targeted judge should decide whether the "claim asserted" by the movants "rises to the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality; (b) if not, then the judge should not recuse himself; and (c) if so, another judge should "decide what the facts are," *i.e.,* hold an evidentiary hearing, and presumably then this other judge would decide whether disqualification is appropriate.

Next, with regard to evaluating a motion to recuse, the Fifth Circuit has recognized that section 455(a) claims are fact-driven, and as a result, the analysis of a particular section 455(a) claim must be guided, not by a comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the unique facts and circumstances of the particular claim at issue. *United States v. Jordan,* 49 F.3d 152, 157 (5th Cir. 1995).   As a matter of law, clashes between the court and counsel for a party is an insufficient basis for disqualification, and Circuit Courts have refused to base disqualification under Section 455 upon apparent animosity towards counsel. *In re Lieb*, 112 B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975) (holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel.")); *See also Focus Media, Inc. v. NBC (In re Focus Media),* 378 F.3d 916, 929-31 (9th Cir. 2004) (adverse rulings and negative remarks ordinarily do not support a bias challenge). Disqualification is appropriate if a reasonable person,

6

003498

knowing all of the relevant circumstances, would harbor doubts about a judge's impartiality.

*Chitmacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1165 (5th Cir. 1982).

Finally, if a movant appeals a decision not to disqualify and the district court finds the record and documents submitted to be inadequate for a determination, it may remand and direct another judge to conduct an evidentiary hearing to enlarge the record. Such procedure is consistent with *Levitt. See Lieb v.Tillman*, 112 B.R. at 836.

## II.   THE UNIQUE FACTS AND CIRCUMSTANCES APPLICABLE HERE.

First, the court determines that the Motion to Recuse is not timely.  Again, it was filed more than 15 months after the Presiding Judge was transferred the Highland case.  It comes after many dozens of orders have been issued by the court, including a confirmation order that the Movants have now appealed.  It comes on the eve of a contempt hearing. The timing does not seem to pass muster—if, indeed, timeliness is a factor, as the Ninth Circuit has suggested.

But, since the Motion to Recuse raises serious issues, the court will nevertheless analyze it as though it is timely. The court will address whether the overall circumstances might cause a reasonable observer to question or harbor doubts about the court's impartiality. Would the claims asserted in the Motion to Recuse rise to the threshold standard of raising a doubt in the mind of a reasonable observer as to the court's impartiality?

### A.  The Acis Case.

At the heart of the Motion to Recuse seems to be an assertion that the Presiding Judge gained extrajudicial knowledge and developed opinions of Mr. Dondero and the Affected Entities during the Acis case and that this has created animus or bias towards them in the Highland case and related adversary proceedings. Evaluating this contention requires some

003499

examination of just what the court heard and adjudicated in the Acis case.

Acis Capital Management, L.P. ("Acis LP"), a Delaware limited partnership, and ACIS Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware limited liability company—were two entities within the approximately 2,000-entity organizational structure of Highland that were forced into an involuntary bankruptcy case in January 2018 (for convenience, the court will collectively refer to them as "Acis"). The Presiding Judge presided over the Acis case. Mr. Dondero was the president of the two Acis Debtors, as well as the CEO of Highland at the time. The Presiding Judge's recollection is that Mr. Dondero testified **_only once_** during the lengthy Acis proceedings (during the trial on the involuntary petitions in the Spring of 2018) and, at all other times, various inhouse counsel at Highland served as the witnesses for Acis and Highland.

As far as "extrajudicial knowledge," what the Presiding Judge learned from the Acis case was largely regarding the "CLO Industry." The court learned that Highland was a pioneer, among registered investment advisors, in the securitization investment product known as a "CLO" (collateralized loan obligations) and Acis, for many years, was the vehicle through which Highland's CLO business was managed. The court learned about the typical structure of these CLOs (the various tranches of debt and the rights they enjoyed), the typical governing documents for and life span of a CLO, the typical portfolio management agreements, the shared services agreements, and the sub-advisory agreements that undergirded the whole operation. The court learned about Highland's role in these and the role of Acis, historically, and the role of an entity known as Highland CLO Funding "("HCLOF"). HCLOF is not a movant on the Motion to Recuse. If the Presiding Judge made any specific rulings with regard to Mr. Dondero or the Affected Entities during the Acis case, she cannot recall. The court certainly does recall

8

003500

accusations made by Acis against *Highland* and *HCLOF* with regard to alleged fraudulent transfers and alleged denuding of Acis assets to thwart judgment creditor Josh Terry.  The court has never ruled on the actual fraudulent transfer claims and, the Presiding Judge believes that the claims at least among Acis and Highland have been settled.

In summary, the extrajudicial knowledge—if it should be considered that—the Presiding Judge gained from the Acis case, that is now suggested to have created bias or animus, was knowledge about the highly complex CLO products industry, knowledge about the forms of agreement that typically set forth parties' rights and obligations, and some knowledge about the Highland business structure and the shared services and sub-advisory services model it typically used. The Presiding Judge at all times has been aware that Mr. Dondero was a founder of Highland, and was the President of Acis and CEO of Highland at relevant times. To be clear, a Chapter 11 Trustee was appointed in the Acis case soon after an order for relief was entered, and the Presiding Judge only recalls Mr. Dondero testifying once in court during the Acis case. The Presiding Judge has a vague recollection that deposition testimony may have been presented at another time. The court cannot recall any of the other Affected Entities ever being parties appearing in the Acis case or providing testimony.

The court notes, anecdotally, that 28 U.S.C. § 1408(2) contemplates that venue is proper over a case "in which there is a pending case under title 11 concerning such person's affiliate, general partner or partnership." Thus, it is not *per se* improper (in fact, is generally proper) for a presiding judge to preside over cases of affiliated business entities of a party. It happens all the time.

9

003501

**B. Bias or Animus, More Generally?**

More generally, the court does not believe that the provisions of 28 U.S.C. § 455 are

implicated here. The Presiding Judge does not believe she harbors, or has shown, any personal

bias or prejudice against the Movants.

As earlier mentioned, case law has held that clashes between a court and counsel for a

party is an insufficient basis for disqualification, and Circuit Courts have refused to base

disqualification under Section 455 upon apparent animosity towards counsel. *In re Lieb*, 112

B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975)

(holding that disqualification should be determined "on the basis of conduct which shows a bias

or prejudice or lack of impartiality by focusing on a party rather than counsel.")). Not only does

this court have the utmost respect for Mr. Dondero's and each of the Affected Entities' counsel,

but the court has no disrespect or animus toward Mr. Dondero on a personal level or any of the

Movants.

This court has merely addressed motions, objections, and other pleadings as they have

been presented. It has issued and enforced orders where requested and warranted. This court and

all courts sometimes use strong words as part of managing a complex and contentious case. None

of this should be interpreted as "bias" or "prejudice." It is simply about rule enforcement and

managing a docket consistent with this court's duty to the public. The court does not believe the

assertions of the Movants rise to "the threshold standard of raising a doubt in the mind of a

reasonable observer" as to the judge's impartiality.

WHEREFORE, it is hereby

ORDERED that the Motion to Recuse is denied. The court reserves the right to

10

003502

supplement or amend this ruling.

It is so ORDERED.

###END OF ORDER###

003503

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellants*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## <u>AMENDED NOTICE OF APPEAL</u>

Pursuant to 28 U.S.C. § 158(a), James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "<u>Appellants</u>"), parties-in-interest in the above styled and numbered bankruptcy case (the "<u>Bankruptcy Case</u>") of Highland Capital Management, L.P. (the "<u>Debtor</u>"), hereby file this Amended Notice of Appeal, appealing to the United States District Court for the Northern District of Texas that certain *Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455* (the "<u>Order</u>") entered by the Bankruptcy Court on March 23, 2021 at docket no. 2083 in the Bankruptcy Case.

A copy of the Order is attached hereto as **<u>Exhibit A</u>**.

The names of the parties to the Order and the contact information for their attorneys, are as follows:

---

**AMENDED NOTICE OF APPEAL**                                          **PAGE 1**

1. <u>**Appellants**</u>:

   **James Dondero;**
   **Highland Capital Management Fund Advisors, L.P.;**
   **NexPoint Advisors, L.P.;**
   **The Dugaboy Investment Trust;**
   **The Get Good Trust;** and
   **NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware**
   **limited liability company**

   <u>**Attorney**</u>:

   Michael J. Lang
   <u>mlang@cwl.law</u>
   CRAWFORD, WISHNEW & LANG PLLC
   1700 Pacific Ave, Suite 2390
   Dallas, Texas 75201
   Tel: (214) 817-4500

2. <u>**Appellee/Interested Party:**</u>

   **Hon. Stacey G. C. Jernigan**
   United States Bankruptcy Court for the Northern District of Texas
   Earle Cabell Federal Building
   1100 Commerce St., Rm. 1254
   Dallas, Texas 75242-1496

3. <u>**Notice Parties:**</u>

   **Debtor: Highland Capital Management, L.P.**

   <u>**Attorneys**</u>:

   Jeffrey N. Pomerantz
   jpomerantz@pszjlaw.com
   Ira D. Kharasch
   ikharasch@pszjlaw.com
   John A. Morris
   jmorris@pszjlaw.com
   Gregory V. Demo
   gdemo@pszjlaw.com
   PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Blvd., 13th Floor
   Los Angeles, CA 90067

---

**AMENDED NOTICE OF APPEAL**                                               **PAGE 2**

Telephone: (310) 277-6910
Facsimile: (310) 201-0760

-and-

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

**Official Committee of Unsecured Creditors**

**Attorneys**:

Penny P. Reid
pried@sidley.com
Paige Holden Montgomery
pmontgomery@sidley.com
Juliana L. Hoffman
jhoffman@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, Texas 74201
Tel: (214) 981-3300
Fax: (214) 981-3400

-and-

Matthew A. Clemente
mclemente@sidley.com
Dennis M. Twomey
dtwomey@sidley.com
Alyssa Russell
alyssa.russell@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Tel: (312) 853-7000
Fax: (312) 853-7036

**Highland Income Fund;**
**NexPoint Strategic Opportunities Fund; and**
**NexPoint Capital, Inc.**

**Attorney**:

A. Lee Hogewood, III
lee.hogewood@klgates.com
K&L GATES LLP
4350 Lassiter at North Hills Avenue, Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Fax: (919) 516-2006

Dated: April 6, 2021

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

By: */s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 6, 2021, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

*/s/ Michael J. Lang*
Michael J. Lang

# EXHIBIT A



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 22, 2021**

_____
**United States Bankruptcy Judge**

---

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | CASE NO. 19-34054-SGJ-11 |
| L.P., | § | (Chapter 11) |
| DEBTOR. | § | |

### <u>ORDER DENYING MOTION TO RECUSE,</u>
### <u>PURSUANT TO 28 U.S.C. § 455</u>

CAME ON FOR CONSIDERATION before this court the Motion of James Dondero,

Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy

Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE

Partners, LLC, a Delaware limited liability company (collectively, the "Movants") to Recuse,

Pursuant to 28 U.S.C. § 455, filed March 18, 2021, along with a supporting Brief and an

Appendix that is 2,722 pages in length [DE ## 2060, 2061, & 2062] (hereinafter, the "Motion to

Recuse").

1

003508

The Movants, through newly appearing counsel, Michael J. Lang of Crawford, Wishnew & Lang PLLC, argue that the assigned bankruptcy judge (the "Presiding Judge") should, after 15 months, recuse herself from presiding in the above-referenced case of Highland Capital Management, L.P. (the "Debtor" or "Highland"), whose Chapter 11 plan was recently confirmed. The Movants state that they perceive the Presiding Judge has developed animus towards James Dondero ("Mr. Dondero") and parties connected with him or deemed under his control (the "Affected Entities"). Mr. Dondero and the Affected Entities argue that the Presiding Judge's impartiality can be reasonably questioned. Specifically, they express concerns that the Presiding Judge formed negative opinions of Mr. Dondero in a prior bankruptcy case over which the Presiding Judge presided (*In re Acis Capital Management, L.P.,* Case No. 18-30264)[1]; that those opinions have carried over to the current case; the Presiding Judge has been unable to extricate those opinions from her mind; and this has resulted in an actual bias against Mr. Dondero that is prejudicing him and the Affected Entities.

Accordingly, the Movants ask that the Presiding Judge recuse herself from any future contested matters and adversary proceedings arising in the Highland case.

By way of further background, the Highland case has been pending since October 16, 2019. It was filed in the Bankruptcy Court for the District of Delaware. Venue was transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division, on motion of the Official Unsecured Creditors Committee ("Committee") on December 4, 2019. On January 9, 2020, a significant corporate governance settlement between Highland and the Committee was reached and approved by this court. The settlement involved the removal of Mr. Dondero as CEO and from all decision making at Highland, at the insistence of the

---

[1] Acis Capital Management, L.P. ("Acis") was formerly a company in the Highland corporate organizational structure.

003509

Committee, and an entirely new corporate governance structure was imposed on the Debtor, with extensive oversight by the Committee. This new corporate governance structure was negotiated by the Debtor under pressure from both the Committee and the United States Trustee—both of whom expressed positions that a Chapter 11 Trustee should be appointed in this case, due to alleged conflicts of interest and mismanagement, among other things, attributed to Mr. Dondero. Mr. Dondero signed off on the corporate governance settlement and this court approved it. A new three-member board has controlled the Debtor since then, consisting of a retired bankruptcy judge (Russell Nelms); a second individual with extensive experience serving as an independent board member of companies undergoing bankruptcy or restructuring (John Dubel); and a third individual (later appointed CEO) with broad experience managing distressed debt investments and other products similar to what Highland manages (James P. Seery).

After more than a year, under direction of the new board, the Debtor obtained confirmation of a Chapter 11 Plan on February 22, 2021. The Plan was proposed after many months of contentiousness with several large creditors and the Committee. In fact, in August 2020, the court required the key parties to engage in mediation before two respected co-mediators (Retired Bankruptcy Judge Allan Gropper, S.D.N.Y. and Attorney/Mediator Sylvia Mayer, Houston). The Debtor (either during or after mediation) reached key settlements with the largest creditors in this case (including Acis, which asserted more than a $70 million disputed claim; the Redeemer Committee for the Crusader Fund which asserted more than a $250 million claim and had been in litigation in multiple fora with Highland and affiliates for approximately a decade; and UBS Securities, which asserted more than a $1 billion claim and had also been in litigation with Highland and certain affiliates for more than a decade). Mr. Dondero participated in the mediation, but settlements were not reached with him. The Plan that this court confirmed in February 2021 was supported by the Committee and overwhelmingly by non-insider creditors. Other large, non-insider creditors that supported the Plan,

003510

besides those mentioned above, were Patrick Daugherty (a former executive of Highland who has been in litigation with Highland and Mr. Dondero for more than a decade) and HarborVest—each of whom asserted multi-million dollar claims in this case. In any event, the Movants have appealed the confirmation order.

The Motion to Recuse comes 17 months after the Chapter 11 case was filed (although just 15 months after it was transferred to the Presiding Judge). As mentioned, it comes after confirmation of a plan. The Motion to Recuse was filed just two business days before this court is scheduled to hear a motion of the Debtor to hold Mr. Dondero in contempt of a TRO. This hearing on the motion to hold Mr. Dondero in contempt has been continued various times at his request. The underlying TRO has also been the subject of unsuccessful attempts at interlocutory appeals and is currently the subject of a petition for writ of mandamus before the Fifth Circuit.

## I.      LEGAL STANDARD APPLICABLE TO THE MOTION TO RECUSE.

Before addressing the substance of the Motion to Recuse, the court will address the governing legal authority: 28 U.S.C. § 455, Fed. R. Bankr. Pro. 5004(a), and certain case law interpreting same.

The relevant portions of 28 U.S.C. § 455 provide that:

(a)     Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b)     He shall also disqualify himself in the following circumstances:

(1)     Where he has a personal bias or prejudice concerning a party, a personal knowledge of disputed evidentiary facts concerning the proceeding;

28 U.S.C. § 455(a) & (b)(1).

003511

Bankruptcy Rule 5004(a) further provides that "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstance arises or, if appropriate, shall be disqualified from presiding over the case."

The court first notes that the applicable statute and rule do not expressly address timeliness. However, one Circuit Court has stated that recusal motions must be made in a timely fashion. *Davies v. C.I.R*, 68 F.3d 1129, 1130-31 (9th Cir. 1995) (one year after a ruling was considered untimely).

The court next notes that the applicable statute and rule do not expressly state whether the presiding judge or some other judge should decide a motion to recuse/disqualify. Case authority has interpreted the provisions set forth above to give the targeted judge authority (at least initially) to decide a motion to disqualify. *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999) (a motion to recuse is committed to the discretion of the targeted judge, and the denial of such motion will only be reversed upon the showing of an abuse of discretion); *Wilborn v. Wells Fargo Bank, N.A. (In re Wilborn)*, 401 B.R. 848, 851 (Bankr. S.D.Tex. 2009) (citing *United States v. Mizell*, 88 F.3d 288, 299 (5th Cir. 1996)(the targeted judge has broad discretion in determining whether disqualification is appropriate)).

Additionally, the court notes that the applicable statute and rule do not expressly state what type of hearing a movant is entitled to, if any. Case authority has interpreted that a motion for disqualification does not necessarily confer upon a movant a right to make a record in open court, nor does it confer upon them a right to an evidentiary hearing. *Lieb v. Tillman (In re Lieb)*, 112 B.R. 830, 835-36 (Bankr. W.D. Tex. 1990). *See generally* 13A C. Wright, A. Miller & E.

5

Cooper, *Federal Practice and Procedure* § 3550, at 629 (a section 455 motion can be supported by an affidavit, a verified memorandum, or a statement of facts in some form). The procedure for a targeted judge to follow, as set forth in *Levitt v. University of Texas*, 847 F.2d 221, 226 (5th Cir. 1988), and as more specifically articulated in *Lieb v. Tillman*, 112 B.R. at 836, is: (a) first, the targeted judge should decide whether the "claim asserted" by the movants "rises to the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality; (b) if not, then the judge should not recuse himself; and (c) if so, another judge should "decide what the facts are," *i.e.,* hold an evidentiary hearing, and presumably then this other judge would decide whether disqualification is appropriate.

Next, with regard to evaluating a motion to recuse, the Fifth Circuit has recognized that section 455(a) claims are fact-driven, and as a result, the analysis of a particular section 455(a) claim must be guided, not by a comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the unique facts and circumstances of the particular claim at issue. *United States v. Jordan,* 49 F.3d 152, 157 (5th Cir. 1995).   As a matter of law, clashes between the court and counsel for a party is an insufficient basis for disqualification, and Circuit Courts have refused to base disqualification under Section 455 upon apparent animosity towards counsel. *In re Lieb*, 112 B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975) (holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel.")); *See also Focus Media, Inc. v. NBC (In re Focus Media),* 378 F.3d 916, 929-31 (9th Cir. 2004) (adverse rulings and negative remarks ordinarily do not support a bias challenge). Disqualification is appropriate if a reasonable person,

6

003513

knowing all of the relevant circumstances, would harbor doubts about a judge's impartiality.

*Chitmacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1165 (5th Cir. 1982).

Finally, if a movant appeals a decision not to disqualify and the district court finds the record and documents submitted to be inadequate for a determination, it may remand and direct another judge to conduct an evidentiary hearing to enlarge the record. Such procedure is consistent with *Levitt. See Lieb v. Tillman*, 112 B.R. at 836.

## II.    THE UNIQUE FACTS AND CIRCUMSTANCES APPLICABLE HERE.

First, the court determines that the Motion to Recuse is not timely.  Again, it was filed more than 15 months after the Presiding Judge was transferred the Highland case.  It comes after many dozens of orders have been issued by the court, including a confirmation order that the Movants have now appealed.  It comes on the eve of a contempt hearing. The timing does not seem to pass muster—if, indeed, timeliness is a factor, as the Ninth Circuit has suggested.

But, since the Motion to Recuse raises serious issues, the court will nevertheless analyze it as though it is timely. The court will address whether the overall circumstances might cause a reasonable observer to question or harbor doubts about the court's impartiality. Would the claims asserted in the Motion to Recuse rise to the threshold standard of raising a doubt in the mind of a reasonable observer as to the court's impartiality?

### A.  The Acis Case.

At the heart of the Motion to Recuse seems to be an assertion that the Presiding Judge gained extrajudicial knowledge and developed opinions of Mr. Dondero and the Affected Entities during the Acis case and that this has created animus or bias towards them in the Highland case and related adversary proceedings. Evaluating this contention requires some

003514

examination of just what the court heard and adjudicated in the Acis case.

Acis Capital Management, L.P. ("Acis LP"), a Delaware limited partnership, and ACIS Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware limited liability company—were two entities within the approximately 2,000-entity organizational structure of Highland that were forced into an involuntary bankruptcy case in January 2018 (for convenience, the court will collectively refer to them as "Acis"). The Presiding Judge presided over the Acis case. Mr. Dondero was the president of the two Acis Debtors, as well as the CEO of Highland at the time. The Presiding Judge's recollection is that Mr. Dondero testified *only once* during the lengthy Acis proceedings (during the trial on the involuntary petitions in the Spring of 2018) and, at all other times, various inhouse counsel at Highland served as the witnesses for Acis and Highland.

As far as "extrajudicial knowledge," what the Presiding Judge learned from the Acis case was largely regarding the "CLO Industry." The court learned that Highland was a pioneer, among registered investment advisors, in the securitization investment product known as a "CLO" (collateralized loan obligations) and Acis, for many years, was the vehicle through which Highland's CLO business was managed. The court learned about the typical structure of these CLOs (the various tranches of debt and the rights they enjoyed), the typical governing documents for and life span of a CLO, the typical portfolio management agreements, the shared services agreements, and the sub-advisory agreements that undergirded the whole operation. The court learned about Highland's role in these and the role of Acis, historically, and the role of an entity known as Highland CLO Funding "("HCLOF"). HCLOF is not a movant on the Motion to Recuse. If the Presiding Judge made any specific rulings with regard to Mr. Dondero or the Affected Entities during the Acis case, she cannot recall. The court certainly does recall

003515

accusations made by Acis against *Highland* and *HCLOF* with regard to alleged fraudulent transfers and alleged denuding of Acis assets to thwart judgment creditor Josh Terry. The court has never ruled on the actual fraudulent transfer claims and, the Presiding Judge believes that the claims at least among Acis and Highland have been settled.

In summary, the extrajudicial knowledge—if it should be considered that—the Presiding Judge gained from the Acis case, that is now suggested to have created bias or animus, was knowledge about the highly complex CLO products industry, knowledge about the forms of agreement that typically set forth parties' rights and obligations, and some knowledge about the Highland business structure and the shared services and sub-advisory services model it typically used. The Presiding Judge at all times has been aware that Mr. Dondero was a founder of Highland, and was the President of Acis and CEO of Highland at relevant times. To be clear, a Chapter 11 Trustee was appointed in the Acis case soon after an order for relief was entered, and the Presiding Judge only recalls Mr. Dondero testifying once in court during the Acis case. The Presiding Judge has a vague recollection that deposition testimony may have been presented at another time. The court cannot recall any of the other Affected Entities ever being parties appearing in the Acis case or providing testimony.

The court notes, anecdotally, that 28 U.S.C. § 1408(2) contemplates that venue is proper over a case "in which there is a pending case under title 11 concerning such person's affiliate, general partner or partnership." Thus, it is not *per se* improper (in fact, is generally proper) for a presiding judge to preside over cases of affiliated business entities of a party. It happens all the time.

003516

**B.  Bias or Animus, More Generally?**

More generally, the court does not believe that the provisions of 28 U.S.C. § 455 are implicated here. The Presiding Judge does not believe she harbors, or has shown, any personal bias or prejudice against the Movants.

As earlier mentioned, case law has held that clashes between a court and counsel for a party is an insufficient basis for disqualification, and Circuit Courts have refused to base disqualification under Section 455 upon apparent animosity towards counsel.   *In re Lieb*, 112 B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975) (holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel.")). Not only does this court have the utmost respect for Mr. Dondero's and each of the Affected Entities' counsel, but the court has no disrespect or animus toward Mr. Dondero on a personal level or any of the Movants.

This court has merely addressed motions, objections, and other pleadings as they have been presented. It has issued and enforced orders where requested and warranted. This court and all courts sometimes use strong words as part of managing a complex and contentious case. None of this should be interpreted as "bias" or "prejudice." It is simply about rule enforcement and managing a docket consistent with this court's duty to the public. The court does not believe the assertions of the Movants rise to "the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality.

WHEREFORE, it is hereby

ORDERED that the Motion to Recuse is denied. The court reserves the right to

003517

supplement or amend this ruling.

      It is so ORDERED.

###END OF ORDER###

003518

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellants*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## APPELLANTS' STATEMENT OF ISSUES ON APPEAL

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "Appellants") hereby file their *Statement of Issues on Appeal* of the *Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455* (the "Order") entered by the Bankruptcy Court on March 23, 2021 at docket no. 2083 in the above styled and numbered bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor").

## ISSUES ON APPEAL

1.    Whether the Bankruptcy Court erred in denying Appellants' *Motion to Recuse Pursuant to 28 U.S.C. § 455* (the "Motion to Recuse") as untimely.[1]

---

[1] Motion to Recuse at docket no. 2060; Brief in Support at docket no. 2061; and Appendix in Support at docket no. 2062.

2.      Whether the Bankruptcy Court erred in denying the Motion to Recuse on the merits.

Dated: April 15, 2021                            Respectfully submitted,

                                                 CRAWFORD, WISHNEW & LANG PLLC


                                                 By: */s/ Michael J. Lang*
                                                 Michael J. Lang
                                                 Texas State Bar No. 24036944
                                                 mlang@cwl.law
                                                 1700 Pacific Ave, Suite 2390
                                                 Dallas, Texas 75201
                                                 Telephone: (214) 817-4500

                                                 *Counsel for Appellants*


## CERTIFICATE OF SERVICE

The undersigned certifies that on April 15, 2021, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

                                                 */s/ Michael J. Lang*
                                                 Michael J. Lang

---

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellants*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**APPELLANTS' DESIGNATION OF ITEMS TO BE INCLUDED
IN THE RECORD ON APPEAL**

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "Appellants") hereby file their *Designation of Items to be Included in the Record on Appeal* of the *Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455* (the "Order") entered by the Bankruptcy Court on March 23, 2021 at docket no. 2083 in the above styled and numbered bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor").

Appellants request that the Clerk prepare and forward the items listed herein to the United States District Court for the Northern District of Texas for inclusion in the record in connection with this appeal.

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

1.     Notice of Appeal filed by Appellants [**Docket No. 2149**], filed April 1, 2021;

2.     Amended Notice of Appeal filed by Appellants [**Docket No. 2169**], filed April 6, 2021;

3.     *Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455* [**Docket No. 2083**], filed March 23, 2021;

4.     *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455* [**Docket  No. 2060**], filed March 18, 2021;

5.     *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Brief in Support of their Motion to Recuse Pursuant to 28 U.S.C. § 455* [**Docket  No. 2061**], filed March 18, 2021;

6.     *Appendix to James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455* [**Docket  No. 2062**], filed March 18, 2021;

7.     All docket entries kept by the bankruptcy clerk in the associated Adversary Case No. 21-03010-sgj;

8.     All docket entries kept by the bankruptcy clerk in the associated Adversary Case No. 20-03190-sgj;

9.     All docket entries kept by the bankruptcy clerk in associated Adversary Case No. 21-03000-sgj;

**Appellants further designate each of the following additional documents, items, and transcripts:**

## *Case No. 19-34054-sgj-11*

Documents and items:

| Designation No. | Docket No. | Date | Description |
|---|---|---|---|
| 10. | **68** | 12/4/2019 | Application/Motion to Employ/Retain Foley Gardere, Foley & Lardner LLP as Special Texas Counsel Filed by Highland Capital Management, L.P. |
| 11. | **474** | 2/24/2020 | Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities" |
| 12. | **590** | 4/15/2020 | Motion for Remittance of Funds Held in Registry of Court |
| 13. | **624** | 5/6/2020 | Objection to Motion for Remittance of Funds Held in Registry of Court |
| 14. | **771** | 6/23/2020 | Debtor's Objection to Proof of Claim of Acis Capital Management LP and Acis Capital Management GP, LC and Joinder in the Debtor's Objection |
| 15. | **891** | 7/23/2020 | UBS Objection to Proof of Claim of Acis Capital Management LP and Acis Capital Management GP, LC and Joinder in the Debtor's Objection |
| 16. | **928** | 8/07/2020 | Debtor's Objection to Proof of Claim of UBS Securities LLC and UBS AG, London Branch |
| 17. | **1384** | 11/13/2020 | Debtor's Amended Disclosure Statement |
| 18. | **1514** | 12/7/2020 | Adversary case 20-03190; Complaint by Highland Capital Management, L.P. against James D. Dondero. |
| 19. | **1528** | 12/8/2020 | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles. |
| 20. | **1692** | 1/6/2021 | Adversary case 21-03000; Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., CLO Holdco, Ltd. |
| 21. | **1745** | 1/14/21 | Motion to Appoint Examiner |
| 22. | **1935** | 2/17/2021 | Adversary case 21-03010; Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. |
| 23. | **1943** | 2/22/2021 | Order Confirming the Fifth Amended Chapter 11 Plan |
| 24. | **1955** | 2/28/2021 | The Advisors' Motion to Stay Pending Appeal of the |

| | | | Confirmation Order and Brief in Support Thereof |
|---|---|---|---|
| 25. | **2022** | 3/12/2021 | Debtor's Omnibus Response to Motions for Stay Pending Appeal of the Confirmation Order |
| 26. | **2084** | 3/23/2021 | Order Denying Motion to Stay Pending Appeal |

Transcripts:

| Designation No. | Docket No. | Date | Description |
|---|---|---|---|
| 27. | **1543** | 12/11/2020 | 1/9/2020 Transcript regarding Motion to Compromise Controversy |
| 28. | **479** | 2/26/2020 | Transcript regarding hearing held on 2/19/2020 (regarding Dkt. 68 - Application/Motion to Employ/Retain Foley Gardere, Foley & Lardner LLP as Special Texas Counsel) |
| 29. | **571** | 4/8/2020 | Transcript regarding hearing held on 03/04/2020 (regarding Dkt. 474 - Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities") |
| 30. | **802** | 7/2/2020 | Transcript regarding hearing held on 6/30/2020 (regarding Dkt. 590 - Motion for Remittance of Funds Held in Registry of Court) |
| 31. | **817** | 7/10/2020 | Transcript regarding hearing held on 07/08/2020 (regarding Dkt. 737 - Motion to Extend or Limit the Exclusivity Period; Dkt. 668 - Order on Motion to Extend/Shorten Time; Dkt. 747 – Motion to Extend Time; Dkt. 459 – Order on Motion to Extend/Shorten Time) |
| 32. | **864** | 7/17/2020 | Transcript regarding hearing held on 07/14/2020 (regarding Dkt. 775 - Application to Employ Development Specialists, Inc. as Other Professional Amended Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide Financial Advisory and Restructuring-Related Services, Nunc Pro Tunc to March 15, 2020) |
| 33. | **897** | 7/24/2020 | Transcript regarding hearing held on 07/21/2020 |
| 34. | **1271** | 10/23/2020 | Transcript regarding hearing held on 10/20/2020 (regarding Dkt. 1087 - Motion to Compromise Controversy with (A) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (B) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (C) Acis Capital Management, L.P. (Claim No. 159)) |
| 35. | **1285** | 10/24/2020 | Transcript regarding hearing held on 10/21/2020 |

| | | | (regarding Dkt. 1087 - Motion to Compromise Controversy with (A) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (B) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (C) Acis Capital Management, L.P. (Claim No. 159)) |
| 36. | **1610** | 12/19/2020 | Transcript regarding hearing held on 12/16/2020 (regarding Dkt. 1528 - Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles) |
| 37. | **1862** | 1/29/2021 | Transcript regarding hearing held on 01/26/2021 |
| 38. | **1917** | 2/9/2021 | Transcript regarding hearing held on 02/08/2021 (regarding Dkt. 1808 - Modified Chapter 11 Plan filed by Debtor Highland Capital Management, L.P. |
| 39. | **2073** | 3/20/2021 | Transcript regarding hearing held on 03/19/2021 (regarding Dkt. 2067 - hearing held on 3/19/2021 RE: Dkt. 1955 Motion to Stay Pending Appeal) |

### *Adversary Case No. 21-03010*

Documents and Items:

| Designation No. | Docket No. | Date | Description |
|---|---|---|---|
| 40. | **1** | 2/17/2021 | Adversary case 21-03010; Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. |
| 41. | **2** | 2/17/2021 | Motion to Compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021 |
| 42. | **3** | 2/17/2021 | Brief in Support of Motion to Compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021 |
| 43. | **4** | 2/17/2021 | Declaration of Mr. James P. Seery, Jr. in Support of Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021 |
| 44. | **5** | 2/17/2021 | Motion for Expedited Hearing on Motion to Compel |
| 45. | **20** | 2/22/2021 | Objection to Motion to Compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. (Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the |

| | | | Transition of Service filed by Plaintiff Highland Capital Management, L.P.) |
|---|---|---|---|
| 46. | **25** | 2/24/2021 | Order Dismissing Motion to Compel as Moot |

Transcripts:

| Designation No. | Docket No. | Date | Description |
|---|---|---|---|
| 47. | **26** | 2/25/2021 | Transcript regarding hearing held on 02/23/2021 (regarding Dkt. 2 - Motion to Compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021, (Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021) |

### ***Adversary Case No. 20-03190***

Documents and Items:

| Designation No. | Docket No. | Date | Description |
|---|---|---|---|
| 48. | **1** | 12/7/2020 | Complaint by Highland Capital Management, L.P. against James D. Dondero. |
| 49. | **2** | 12/7/2020 | Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero |
| 50. | **3** | 12/7/2020 | Brief in Support of Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero |
| 51. | **5** | 12/7/2020 | Motion for Expedited Hearing on Plaintiff Highland Capital Management, L.P.'s Motion for Expedited Hearing on Its Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero |
| 52. | **6** | 12/7/2020 | Motion for Temporary Restraining Order |
| 53. | **7** | 12/8/2020 | Brief in Support of Motion for a Temporary Restraining Order and Preliminary Injunction Against Mr. Dondero |
| 54. | **9** | 12/9/2020 | Order Granting Motion for Expedited Hearing |
| 55. | **10** | 12/10/2020 | Order Granting Motion for Temporary Restraining Order against James Dondero |

| 56. | **48** | 1/7/2021 | Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO |
| 57. | **49** | 1/7/2021 | Brief in Support of Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO |
| 58. | **50** | 1/7/2021 | Declaration of John A. Morris in Support of the Debtor's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO |
| 59. | **51** | 1/7/2021 | Motion for Expedited Hearing |
| 60. | **52** | 1/7/2021 | Response Opposed to Motion for Preliminary Injunction |
| 61. | **59** | 1/12/2021 | Order Granting Debtor's Motion for a Preliminary Injunction Against James Dondero |
| 62. | **110** | 2/21/2021 | Objection to Motion for Contempt Against James Dondero Regarding Violation of the Temporary Restraining Order |

Transcripts:

| Designation No. | Docket No. | Date | Description |
|---|---|---|---|
| 63. | **19** | 12/11/2020 | Transcript regarding hearing held on 12/10/2020 (regarding Dkt. 12 - TRO in Adversary case 20-03190, Complaint by Highland Capital Management, L.P. against James D. Dondero) |
| 64. | **56** | 1/11/2021 | Transcript regarding hearing held on 01/08/2021 (regarding Dkt. 2 - Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero) |
| 65. | **132** | 3/24/2021 | Motion for leave (Defendant James Dondero's Motion to Reopen Evidence to Allow for Additional Rebuttal Witness Testimony) (related document(s) 48 Motion for Contempt, 130 Court admitted exhibits, 131 Notice of hearing) filed by Defendant James D. Dondero |
| 66. | **138** | 3/25/2021 | Transcript regarding hearing held on 03/22/2021 (regarding Dkt. 48 - Motion for Contempt) |
| 67. | **139** | 3/25/2021 | Transcript regarding hearing held on 03/24/2021 (regarding Dkt. 48 – Motion for Contempt) |

*__Adversary Case No. 21-03000__*

Documents and Items:

| Designation No. | Docket No. | Date | Description |
|---|---|---|---|
| 68. | **1** | 1/6/2021 | Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., CLO Holdco, Ltd. |
| 69. | **3** | 1/6/2021 | Brief in Support of Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against Certain Entities Owned and/or Controlled by Mr. James Dondero |
| 70. | **4** | 1/6/2021 | Declaration of Mr. James P. Seery, Jr. in Support of the Debtor's Motion for a Temporary Restraining Order against Certain Entities Owned and/or Controlled by Mr. James Dondero |
| 71. | **5** | 1/6/2021 | Plaintiff's Motion for a Preliminary Injunction against Certain Entities Owned and/or Controlled by Mr. James Dondero |
| 72. | **6** | 1/6/2021 | Brief in Support of Plaintiff's Motion for a Preliminary Injunction against Certain Entities Owned and/or Controlled by Mr. James Dondero |
| 73. | **7** | 1/6/2021 | Declaration of Mr. James P. Seery, Jr. in Support of the Debtor's Motion for a Preliminary Injunction against Certain Entities Owned and/or Controlled by Mr. James Dondero |
| 74. | **8** | 1/6/2021 | Motion for Expedited Hearing on Motion for Temporary Restraining Order |
| 75. | **9** | 1/6/2021 | Motion for Temporary Restraining Order by Highland Capital Management, L.P. (RE: related document(s)1 Adversary case 21-03000. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., CLO Holdco, Ltd.) |
| 76. | **16** | 1/11/2021 | Order Granting Motion for Expedited Hearing |
| 77. | **20** | 1/13/2021 | Agreed Order Granting Motion for a TRO Against Certain Entities Owned and/or Controlled by Mr. James Dondero |
| 78. | **31** | 1/21/2021 | Objection to Plaintiff's Motion for a Preliminary Injunction against Certain Entities Owned and/or Controlled by Mr. James Dondero and Brief in |

| | | | Support |
|---|---|---|---|
| 79. | **42** | 1/23/2021 | Objection to Plaintiff's Motion for a Preliminary Injunction against Certain Entities Owned and/or Controlled by Mr. James Dondero |
| 80. | **43** | 1/24/2021 | Motion to Dismiss Adversary Proceeding |
| 81. | **47** | 1/25/2021 | Debtor's Reply to Objection and Brief Opposed to Debtor's Motion for Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero |

Transcripts:

| Designation No. | Docket No. | Date | Description |
|---|---|---|---|
| 82. | **56** | 1/28/2021 | Transcript regarding hearing held on 01/26/2021 (regarding Dkt. 5 - Motion for Preliminary Injunction) |

Dated: April 15, 2021

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

By: */s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 15, 2021, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

*/s/ Michael J. Lang*
Michael J. Lang

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In Re: HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| Debtor | § | |
| | § | |
| | § | |
| JAMES DONDERO, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-0879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

## MEMORANDUM OPINION AND ORDER

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC. f/k/a HCRE Partners, LLC's (collectively "Appellants") appeal the Bankruptcy Court's Order Denying [Appellants'] Motion to Recuse Pursuant to 28 U.S.C. § 455 which was entered March 23, 2021. *See generally* Am. Notice of Appeal (Doc. No. 1-1); Appellants' Br. (Doc. No. 16). Because the Court lacks jurisdiction over this appeal, the Court hereby **dismisses** this appeal.

ORDER – PAGE 1

003530

Case 3:35-cv-02079-39-B Document 50 Filed 02/09/22 of Page 278 of 790 Page 60 04258

I.        **Relevant Background**

Appellants filed a Motion to Recuse under § 455 with the Bankruptcy Court, asking United States Bankruptcy Judge Stacey G. C. Jernigan (the "Bankruptcy Judge") to recuse herself from presiding over the bankruptcy proceeding of Debtor Highland Capital Management, L.P.  In an 11-page Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Recusal Order"), the Bankruptcy Judge denied the Motion while also reserving the right to supplement or amend the ruling.  *See* Am. Notice of Appeal (Doc. No. 1-1) at 5-15.  The Bankruptcy Court entered the Recusal Order on March 23, 2021.  *See id.*; Appellants' Br. (Doc. No. 16).  On April 18, 2021, the Clerk of the Bankruptcy Court transmitted the Notice of Appeal filed by Appellants on April 6, 2021.  *See generally* Doc. No. 1.  It is the Recusal Order that forms the basis of this appeal.  *See id.*  Appellants designated the Bankruptcy Judge as "Appellee".  *See id.*

Before appellate briefing began, Debtor Highland Capital Management, L.P. moved the Court for leave to intervene in this appeal.  *See* Mot. to Intervene (Doc. No. 2).  Debtor Highland Capital Management, L.P. argued that it is the real party-in-interest, not the Bankruptcy Judge.  Mot. to Intervene at 3.  After the Motion to Intervene was fully briefed and ripe, the Court granted the Motion and allowed Debtor Highland Capital Management, L.P. ("Debtor/Intervenor") to file a responsive brief as accorded to an appellee under the bankruptcy rules.  *See generally* Order (Doc. No. 10).

ORDER – PAGE 2

003531

Appellants then filed their Appellants' Brief identifying and arguing two issues on appeal: (1) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 as untimely; and (2) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the merits. Appellants' Br. at 1. Intervenor/Debtor filed an Appellee's Brief in response (Doc. No. 20), and Appellants filed their Reply Brief (Doc. No. 23). The Bankruptcy Record on Appeal does not reflect that a final judgment has been entered by the Bankruptcy Court in this matter.

Upon an initial review of the appellate briefing, the Court *sua sponte* questioned its jurisdiction over this appeal. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level."). The Court issued an Order (Doc. No. 28) directing the parties to file briefs, respectively, addressing this Court's jurisdiction over an appeal of the Bankruptcy Judge's order denying a motion to recuse when final judgment has not yet been entered. The parties timely filed their respective jurisdictional briefs, and the Court has carefully considered the arguments, the applicable and binding law, and relevant portions of the record. The Court turns now to this threshold jurisdictional issue.

ORDER – PAGE 3

003532

## II.     Applicable Law

Section 455 of Chapter 28 of the United States Code provides, in relevant part, that:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> (b) He shall also disqualify himself in the following circumstances:
>    (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

28 U.S.C. § 455(a) & (b)(1).  Bankruptcy Rule 5004(a) provides that "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances arises or, if appropriate, shall be disqualified from presiding over the case."  FED. R. BANKR. P. 5004(a).

District courts have jurisdiction over appeals from the following entered by a bankruptcy judge:

> (1) from final judgments, orders, and decrees;
> (2) from interlocutory orders and decrees under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
> (3) with leave of the court , from other interlocutory orders and decrees.

28 U.S.C. § 158(a).

ORDER – PAGE 4

## III.    Analysis

### A.    Recusal Order is an Interlocutory Order and Not Immediately Appealable as a Matter of Right

It is well-established law in the Fifth Circuit that a court's order denying a recusal motion is not a final order, is not an appealable interlocutory order, and is not an appealable collateral order, therefore it is reviewable on appeal only from final judgment. *Willis v. Kroger*, 263 F.3d 163, 163 (5th Cir. 2001); *United States v. Henthorn*, 68 F.3d 465, 465 (5th Cir. 1995); *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1164 n.3 (5th Cir. 1982); *In re Corrugated Container Antitrust Litig.*, 614 F.2d 958, 960 (5th Cir. 1980); *Martin v. Driskell*, 2021 WL 4784756, at *1 (5th Cir. July 12, 2021); *In re Gordon*, 2019 WL 11816606, at *1 (5th Cir. Apr. 10, 2019); *Stancu v. Hyatt Corp./Hyatt Regency Dallas*, Civ. Action No. 3:18-CV-1737-E-BN, 2020 WL 853859, at *2 (N.D. Tex. Jan. 30, 2020), *adopted by* 2020 WL 833645 (Feb. 20, 2020)(Brown, J.); *Prather v. Dudley*, Civ. Action No. 9:06cv100, 2006 WL 3317124, at *2 (E.D. Tex. Oct. 18, 2006); *Hardy v. Fed. Express Corp.*, No. Civ.A 97-1620, 1998 WL 104686, at *1 (E.D. La. Mar. 6, 1998).  Moreover, both the Fifth Circuit and district courts in this Circuit have applied this very clear, decades-old law in appeals taken from a bankruptcy court's order denying a motion to recuse.  *In re Dorsey*, 489 F. App'x 763, 764 (5th Cir. 2012); *In re Schweitzer*, Civ. Action No. 07-4036, 2007 WL

003534

2965045, at *1 (E.D. La. Oct. 9, 2007); *In re Moerbe*, No. 03-57260-LMC/04-5043-LMC/SA-04-CA-801-FB, 2005 WL 3337634, at *3 (W.D. Tex. Sept. 1, 2005).

In this case, the Bankruptcy Record on Appeal does not establish that a final judgment has been entered. The law in the Fifth Circuit specifies that a court's order on a motion to disqualify the judge "is not an appealable final order" and "a party 'must await final judgment to appeal [a] judge's refusal to recuse.'" *In re Dorsey*, 489 F. App'x at 764 (holding court was without jurisdiction to review bankruptcy court's decision on motion to recuse because, although final judgment had been entered, the appeal of it had not yet been resolved). Appellants attempt to get around this law by arguing that the courts have considered the "finality" of an order on a motion to recuse only under 28 U.S.C. § 1291 (which applies to jurisdiction of courts of appeals over appeals from final orders of district courts) and not § 158(a) (which applies to jurisdiction of district court over appeals from bankruptcy court orders). Appellants contend this is crucial because the bankruptcy appellate statute, § 158(a), applies here and that statute contemplates the more liberal and flexible "finality" standard accorded to bankruptcy courts, rather than the finality standard under § 1291 pertaining to district court orders. Resp. Br. (Doc. No. 31) at 2-7.

The Court rejects Appellants' suggestion that the Court should or even can construe this Recusal Order under a different "finality" standard mere because the

ORDER – PAGE 6

Bankruptcy Court entered it.  There is nothing in the Court's own research, nor anything provided by Appellants, to suggest that the Court should ignore this binding precedent and apply a more liberal and flexible "finality" standard to this appeal of the Recusal Order merely because it is an order of the Bankruptcy Court.  Indeed, courts in this Circuit have not hesitated in applying this well-settled law to an appeal of a bankruptcy court order on a motion to recuse.  *See, e.g., In re Schweitzer*, 2007 WL 2965045, at *1 (court found jurisdiction lacking over appeal from bankruptcy court's order denying motion to recuse because "the law is quite clear that an order denying a motion to disqualify a judge is an interlocutory order from which no appeal lies prior to final judgment in the case."); *In re Moerbe*, 2005 WL 3337634, at *3 ("Because an order denying a motion to recuse or disqualify a judge is interlocutory, not final, and is not immediately appealable, it would seem to follow that the [the bankruptcy court's] order in this case granting recusal but denying its permanency is likewise interlocutory.").  The Court finds no justification for straying from the well-settled law in the Fifth Circuit and finds that the Bankruptcy Court's Recusal Order is not a final appealable order.

The Court also finds that the Recusal Order is not subject to the collateral order doctrine and it is not an interlocutory order that is not immediately appealable. Appellants ask the Court to treat the Recusal Order as subject to the collateral order

ORDER – PAGE 7

Case 3:25-cv-02079-D   Document 659   Filed 12/06/23   Page 784 of 790   PageID 44264

doctrine.   The Court rejects this request as there is no legal basis for doing so. Appellants again ignore very clear Fifth Circuit law that a court order denying a recusal motion is not an appealable collateral order. *Willis*, 263 F.3d at 163 (citing *Nobby Lobby*, 970 F.2d at 85-86 & n.3); *Henthorn*, 68 F.3d at 465; *Chitimacha Tribe of La.*, 690 F.2d at 1164 n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960; *In re Dorsey*, 489 F. App'x at 764; *Martin*, 2021 WL 4784756, at *1; *In re Gordon*, 2019 WL 11816606, at *1.   There is no justification to stray from this well-settled law. Moreover, the Recusal Order is not an appealable interlocutory order under § 1292(a). *Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Dorsey*, 489 F. App'x at 764.

For these reasons, the Court finds, as it must, that the Recusal Order is an interlocutory order from which no appeal lies prior to the Bankruptcy Court entering a final judgment.  *See Willis*, 263 F.3d at 163; *Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960.  Therefore, the Court lacks jurisdiction over this appeal.

### B.   Leave to Bring an Interlocutory Appeal

Appellants' last hope for their appeal is securing leave of this Court to bring an interlocutory appeal of the Recusal Order.  28 U.S.C. § 158(a)(3) (district courts may hear appeals "with leave of the court, from other interlocutory orders" of the bankruptcy court).  Appellants were required to file a motion for leave to appeal

ORDER – PAGE 8

contemporaneously with their notice of appeal. FED. R. BANKR. P. 8004(a).  The

motion for leave to appeal must also include certain contents.  *Id.* 8004(b).  Despite

these unambiguous requirements of the Bankruptcy Rules, Appellants did not comply

with them.  Their failure, however, does not foreclose the appeal entirely because

Bankruptcy Rule 8004(d) permits the Court to "treat the notice of appeal as a motion

for leave and either grant it or deny it."  FED. R. BANKR. P. 8004(c).  In their

jurisdictional brief, Appellants ask the Court to treat their Notice of Appeal as a motion

for leave to appeal should the Court find the Recusal Order is an interlocutory order.

Appellants' Resp. (Doc. No. 29) at 8.  The Court turns now to this analysis.

Section 158(a)(3) does not articulate the standard a district court must use in

deciding whether to grant leave in its discretion, but "[c]ourts in the Fifth Circuit . . .

have applied 28 U.S.C. § 1292(b), the standard governing interlocutory appeals

generally."  *In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL

524418, at *2 (N.D. Tex. Feb. 11, 2013)(Fish, SJ) (citing *In re Ichinose*, 946 F.2d 1169,

1177 (5th Cir. 1991); *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, 2011 WL 610016, at

*3 (N.D. Tex. Feb. 14, 2011)(Kinkeade, J.)); *accord Rivas v. Weisbart*, 2019 WL

5579726, at *2 (E.D. Tex. Oct. 28, 2019); *Celadon Trucking Servs., Inc. v. Moser*, 2019

WL 4226854, at *2 (E.D. Tex. Sept. 4, 2019).  There are three elements of the

§ 1292(b) standard: "(1) a controlling issue of law must be involved; (2) the question

ORDER – PAGE 9

must be one where there is substantial ground for difference of opinion; and (3) an

immediate appeal must materially advance the ultimate termination of the litigation."

*In re Ichinose*, 946 F.2d at 1177.  An appeal of an interlocutory order is appropriate only

where all three elements are satisfied.  *See In re Genter*, Civ. Action No. 3:19-CV-1951-

E, 2020 WL 3129637, at *2 (N.D. Tex. June 12, 2020)(Brown, J.) (citing *Arparicio v.

Swan Lake*, 643 F.2d 1109, 1110 n.2 (5th Cir. 1981)).  "The Fifth Circuit disfavors

interlocutory appeals and leave to appeal is sparingly granted."  *Id.* (internal citations

omitted); *In re Hallwood Energy*, 2013 WL 524418, at *2 ("[I]nterlocutory appeals are

'sparingly granted' and reserved for 'exceptional' cases.") (internal citations omitted).

The decision whether to grant an interlocutory appeal is firmly within the district

court's discretion.  *Panda Energy Int'l,* 2011 WL 610016, at *3.

    In this case, there is no controlling question of law with substantial grounds for

disagreement for which resolution would materially advance the end of the bankruptcy

litigation.  It is well-settled that a recusal motion under § 455 is left to the sound

discretion of the judge.  *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157,

1166 (5th Cir. 1982); *see In re Pendergraft*, 745 F. App'x 517, 520 (5th Cir. 2018) (citing

*Trevino v. Johnson*, 168 F.3d 173, 178 (5th Cir. 1999)).  "[C]ontrolling issue of law is

one that has 'the potential for substantially accelerating the disposition of the litigation'

and does not concern 'matters that are entrusted to the discretion of the bankruptcy

ORDER – PAGE 10

003539

court.'" *In re Moerbe*, 2005 WL 3337634, at *4 (W.D. Tex. Sept. 1, 2005) (quoting *In re Aquatic Dev. Group, Inc.*, 196 B.R. 666, 669 (S.D.N.Y. 1996)).  The Recusal Order was an exercise of the Bankruptcy Judge's discretion, so there is no controlling issue of law presented.  *Cf. In re Tullius*, 2011 WL 5006673, at *3 (W.D. Tex. Oct. 20, 2011).  Appellants also cannot satisfy the second factor because the Court cannot find there exists substantial ground for difference of opinion as to the Recusal Motion.

> [C]ourts have found substantial ground for difference of opinion where a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not yet spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.

*Ryan v. Flowserve Corp.*, 444 F.Supp.2d 718, 723-24 (N.D. Tex. 2006)(Boyle, J.) (internal citation omitted).  The Recusal Order does not fall within any of those categories.  Simply because Appellants believe the Bankruptcy Court ruled incorrectly does not demonstrate substantial ground for disagreement.  *Id.* at 724.  Finally, the third element eludes Appellants as well.  An interlocutory appeal of the Recusal Order will in no way materially advance the ultimate end to this bankruptcy matter.

The Fifth Circuit strongly disfavors interlocutory appeals and, accordingly, they are rarely granted and reserved for "exceptional cases".  *See, e.g., In re Genter*, 2020 WL 3129637, at *2.  Appellants failed to satisfy any of the three § 1292(b) criteria.  *Id.*

ORDER – PAGE 11

Therefore, in its discretion, the Court **denies** Appellants leave to take an interlocutory appeal of the Bankruptcy Court's Recusal Order.

Finally, the Court turns to the remaining arguments Appellants assert. First, the Court declines to *sua sponte* withdraw the reference of Appellants' motion for the bankruptcy judge to recuse herself. The case Appellants cite in support of this suggestion is inapposite here. In the unpublished Fifth Circuit opinion, *Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958 (5th Cir. 2003), the appellant sought leave to appeal the dismissal of his 28 U.S.C. § 2254 petition. *See generally Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958. The magistrate judge recommended dismissal the § 2254 petition and the district judge adopted the recommendation and dismissed the petition. *See id.* at *1-2. The Fifth Circuit did not address the merits of the dismissal, but, instead, *sua sponte* vacated the district court's final judgment and remanded with instructions to assign the case to a different district judge. *Id.* at *2. The Fifth Circuit's reasoning—the district judge was the spouse of the magistrate judge and the *pro se* prisoner likely did not know nor could he have reasonably known this. *Id.* Unlike the unusual and exceptional facts in *Maddox*, the Court does not find this appeal to justify *sua sponte* withdrawing the reference of and ruling on Appellants' motion to recuse.

The Court also finds no justification for treating Appellants' notice of appeal as a petition for writ of mandamus, which Appellants also request. A question of recusal

ORDER – PAGE 12

003541

is reviewable on a petition for writ of mandamus. *United States v. Gregory*, 656 F.2d 1132, 1136 (5th Cir. 1981); *In re Placid Oil Co.*, 802 F.2d 783, 786 (5th Cir. 1986); *In re Cameron Int'l Corp.*, 393 F. App'x 133, 134-35 (5th Cir. 2010). "However, the writ will not lie in the absence of exceptional circumstances, and the party seeking the writ has the burden of proving a clear and indisputable right to it." *In re Placid Oil Co.*, 802 F.2d at 786 (citing *Gregory*, 656 F.2d at 1136); *accord In re Cameron Int'l Corp.*, 393 F. App'x at 134-35. Appellants fail to make the required showing. The Court refuses to construe Appellants' appeal as a petition for writ of mandamus.

## C. Conclusion

The well-established precedent in the Fifth Circuit is that no jurisdiction lies over an appeal of a motion to recuse until final judgment has been entered. Appellants make arguments about potential inefficiency and wasted resources if they must wait to appeal the Recusal Order until the final judgment has been entered. But these arguments are not novel. The Court is certain those same arguments have been advanced in other courts considering this same issue and those courts have rejected them, as this Court does here. Appellants would have this Court carve out an exception to the well-settled law for them without any justifiable basis other than because they think the Bankruptcy Judge was wrong. Appellants must await final judgment, or other

ORDER – PAGE 13

final resolution, of their bankruptcy proceeding in order to appeal the Recusal Order.
This Court has no jurisdiction to hear this appeal.

## IV.   Conclusion

The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292(a) and the Court is **without jurisdiction** over this appeal of the Bankruptcy Court's Recusal Order.  The Court further **denies** Appellants leave to appeal the Recusal Order under § 1292(b), **denies** Appellants' request to withdraw the reference of their motion to recuse, and **denies** Appellants' request to construe their appeal as a petition for writ of mandamus.  Accordingly, the Court **dismisses** this appeal for lack of jurisdiction.

**SO ORDERED.**

Signed February 9th, 2022.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 14

003543