### UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

**In Re: Highland Capital Management, L.P.**

|  |  |  |
|---|---|---|
|  | § |  |
|  | § | Case No. **19-34054-sgj11** |

**The Dugaboy Investment Trust et al- Appellant**

|  |  |
|---|---|
|  | § |
| vs. | § |

**Highland Capital Management, L.P.**
**Et al-** Appellee

|  |  |  |
|---|---|---|
|  | § | **3:25-cv-02072-S** |
|  | § |  |

   **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

## Volume 7

## APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.  **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2.  **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3.  **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4.  **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5.  **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6.  **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru Vol. 5*

*Vol. 5*
*003493*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

2

| | | | |
|---|---|---|---|
| *Vol. 5*<br>00 3504 | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| 00 3519 | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| 00 3521 | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| 00 3530 | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6*<br>003544 | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| 003909 | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| *Vol 6*<br><br>*003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| *Vol. 7*<br><br>*003936*<br>*Thru END of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15*<br><br>*011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

4

*Vol. 15*

*011855*

*011864*

*011869*

*011874*

| | | | |
|---|---|---|---|
| | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
|---|---|---|---|
| *Vol 15* | | | |
| *011877* | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| *012039* | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3406 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| *No PDF Available N/A* | 8/31/2022 | 3478 | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| *012047* | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

| | | | |
|---|---|---|---|
| *Vol. 15* | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| *012050* | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| *012077* *Vol. 16* | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| *012079* | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| *012357* | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

| | | | |
|---|---|---|---|
| *Vol. 16*<br>*012361* | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| *Vol. 17*<br><br>*012363* | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| *012641* | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| *Vol. 18*<br><br><br><br>*012697*<br>*Thru End of Vol. 21* | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| *Vol. 22*<br>*016732* | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| *016737* | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| *016773* | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| *016809* | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

| | | | |
|---|---|---|---|
| | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery)) |
| | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4255 (to be submitted to Clerk on flash drive) | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1, #2 Exhibit 2, #3 Exhibit 3, #4 Exhibit 4, #5 Exhibit 5, #6 Exhibit 6, #7 Exhibit 7, #8 Exhibit 8, #9 Exhibit 9, #10 Exhibit 10, #11 Exhibit 11, #12 Exhibit 12, #13 Exhibit 13, #14 Exhibit 14, #15 Exhibit 15, #16 |

*Handwritten annotations:* Vol. 22; 016827; 016830; 016855; 016863; 016865; Vol. 23; 016867; Thru end of Vol. 25

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

*Vol. 26*

*019524*

*019527*

| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
|---|---|---|---|
| *Vol. 27*<br>*019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28*<br>*020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| VOL. 28<br><br>020266 | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| VOL. 29<br>020267 | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| 020271 | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| 020282 | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| 020289 | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *020296* | | | |
| *020298* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *020300* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *020309* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020311* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30* *020407* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

| | | | |
|---|---|---|---|
| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025      Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

***Counsel for Appellant The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

-------------------------------------------------------------

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

-------------------------------------------------------------

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

003936

**APPENDIX IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, L.P.'S
OBJECTION TO MOTION FOR FINAL APPEALABLE ORDER AND SUPPLEMENT
TO MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455 AND BRIEF IN SUPPORT**

| Ex. | Description | Appx. # |
|-----|-------------|---------|
| 1. | James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455 **(Bankruptcy Docket No. 2060)** | 1-5 |
| 2. | James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Brief in Support of Their Motion to Recuse Pursuant to 28 U.S.C. § 455 **(Bankruptcy Docket No. 2061)** | 6-43 |
| 3. | Appendix to James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455 **(Bankruptcy Docket No. 2062)** | 44-2766 |
| 4. | Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 **(Bankruptcy Docket No. 2083)** | 2767-2777 |
| 5. | Appellants' Response to Debtor's Motion for Leave to Intervene in Appeal of Recusal Order **(Case No. 3:21-cv-00879-K, Docket No. 5)** | 2778-2793 |
| 6. | Order on Debtor's Motion for Leave to Intervene in Appeal of Recusal Order **(Case No. 3:21-cv-00879-K, Docket No. 10)** | 2794-2797 |
| 7. | Answering Brief of Appellee Highland Capital Management, L.P. **(Case No. 3:21-cv-00879-K, Docket No. 20)** | 2798-2858 |
| 8. | Appendix in Support of Answering Brief of Appellee Highland Capital Management, L.P. **(Case No. 3:21-cv-00879-K, Docket No. 21)** | 2859-4662 |
| 9. | Memorandum Opinion and Order **(Case No. 3:21-cv-00879-K, Docket No. 28)** | 4663-4667 |
| 10. | Appellants' Response to the Court's December 10, 2021 Memorandum Opinion and Order **(Case No. 3:21-cv-00879-K, Docket No. 29)** | 4668-4678 |
| 11. | Debtor's Response to Appellants' Brief Regarding the Court's December 10, 2021 Memorandum Opinion and Order **(Case No. 3:21-cv-00879-K, Docket No. 31)** | 4679-4691 |
| 12. | Memorandum Opinion and Order **(Case No. 3:21-cv-00879-K, Docket No. 39)** | 4692-4706 |
| 13. | **Transcript of June 10, 2021 Hearing** | 4707-4798 |
| 14. | **Transcript of December 10, 2020 Hearing** | 4799-4857 |
| 15. | **Transcript of January 14, 2021 Hearing** | 4858-5031 |

| Ex. | Description | Appx. # |
|---|---|---|
| 16. | **Transcript of May 20, 2021 Hearing** | 5032-5118 |
| 17. | **Transcript of May 10, 2021 Hearing** | 5119-5174 |
| 18. | **Transcript of June 25, 2021 Hearing** | 5175-5376 |
| 19. | **Transcript of March 1, 2022 Hearing** | 5377-5463 |
| 20. | Order Approving Settlement with CPCM, LLC (Claim No. 217) and Frank Waterhouse (Claim No. 218) and Authorizing Actions Consistent Therewith **(Bankruptcy Docket No. 3328)** | 5464-5467 |
| 21. | Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith **(Bankruptcy Docket No. 3298)** | 5468-5472 |
| 22. | Order Approving Stipulation and Agreed Order Resolving Third Omnibus Objection and Certain Other Claims **(Bankruptcy Docket No. 3244)** | 5473-5483 |
| 23. | Report and Recommendation to the District Court Proposing that it: (A) Grant Defendants' Motions to Withdraw the Reference at Such Time as the Bankruptcy Court Certifies that Action is Trial Ready; But (B) Defer Pre-Trial Matters to the Bankruptcy Court **(Adv. Proc. No. 21-03076-sgj, Docket No. 151)** | 5484-5505 |
| 24. | Report and Recommendation to District Court: Court Should Grant Plaintiff's Motion for Partial Summary Judgment Against All Five Note Maker Defendants (with Respect to All Sixteen Promissory Notes) in the Above-Referenced Consolidated Note Actions **(Adv. Proc. No. 21-03003-sgj, Docket No. 191)** | 5506-5551 |
| 25. | Report and Recommendation to District Court: Court Should Grant Plaintiff's Motion for Partial Summary Judgment Against All Five Note Maker Defendants (with Respect to All Sixteen Promissory Notes) in the Above-Referenced Consolidated Note Actions **(Adv. Proc. No. 21-03004-sgj, Docket No. 163)** | 5552-5597 |
| 26. | Report and Recommendation to District Court: Court Should Grant Plaintiff's Motion for Partial Summary Judgment Against All Five Note Maker Defendants (with Respect to All Sixteen Promissory Notes) in the Above-Referenced Consolidated Note Actions **(Adv. Proc. No. 21-03005-sgj, Docket No. 207)** | 5598-5643 |
| 27. | Report and Recommendation to District Court: Court Should Grant Plaintiff's Motion for Partial Summary Judgment Against All Five Note Maker Defendants (with Respect to All Sixteen Promissory Notes) in the Above-Referenced Consolidated Note Actions **(Adv. Proc. No. 21-03007-sgj, Docket No. 208)** | 5644-5689 |
| 28. | NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC's Motion for Leave to File Amended Answer and Brief in Support **(Adv. Proc. No. 21-03007-sgj, Docket No. 16)** | 5690-5710 |

003938

| Ex. | Description | Appx. # |
|---|---|---|
| 29. | Report and Recommendation to District Court Proposing that it: (A) Grant Defendant's Motion to Withdraw the Reference at Such Time as Bankruptcy Court Certifies that Action is Trial Ready; and (B) Defer Pretrial Matters to Bankruptcy Court **(Adv. Proc. No. 21-03006-sgj, Docket No. 47)** | 5711-5723 |
| 30. | Report and Recommendation to District Court Proposing that it: (A) Grant Defendant's Motion to Withdraw the Reference at Such Time as Bankruptcy Court Certifies that Action is Trial Ready; and (B) Defer Pretrial Matters to Bankruptcy Court **(Adv. Proc. No. 21-03007-sgj, Docket No. 44)** | 5724-5736 |
| 31. | Motion to Compel Compliance with Bankruptcy Rule 2015.3 **(Bankruptcy Docket No. 2256)** | 5737-5746 |
| 32. | Order Denying Motion to Compel Compliance with Bankruptcy Rule 2015.3 **(Bankruptcy Docket No. 2812)** | 5747-5749 |
| 33. | Appellants' Response to Appellee's Motion to Dismiss Appeal as Moot **(Case No. 21-cv-02268, Docket No. 15)** | 5750-5760 |
| 34. | Order re: Appellee's Motion to Dismiss Appeal as Moot **(Case No. 21-cv-02268, Docket No. 21)** | 5761-5767 |
| 35. | Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith **(Bankruptcy Docket No. 1731)** | 5768-5790 |
| 36. | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P. (With Technical Modifications) **(Bankruptcy Docket No. 1807)** | 5791-5916 |
| 37. | Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities and UBS AG London Branch and Authorizing Actions Consistent Therewith **(Bankruptcy Docket No. 2308)** | 5917-6246 |
| 38. | Debtor's Reply in Support of its Motion for Entry of an Order (I) Authorizing the Sale and/or Forfeiture of Certain Limited Partnership Interests and Other Rights and (II) Granting Related Relief **(Bankruptcy Docket No. 2649)** | 6247-6272 |
| 39. | Debtor's Amended Reply in Support of its Motion for Entry of an Order (I) Authorizing the Sale of Certain Property and (II) Granting Related Relief **(Bankruptcy Docket No. 2656)** | 6273-6312 |
| 40. | Certificate of Service re: 1) Fifth Monthly Fee Statement of Deloitte Tax LLP for Compensation for Services Rendered as Tax Services Provider to the Debtor for the Period from January 1, 2021 Through January 31, 2021; 2) Sixth Monthly Fee Statement of Deloitte Tax LLP for Compensation for Services Rendered as Tax Services Provider to the Debtor for the Period from February 1, 2021 Through February 28, 2021; and 3) Sixth Interim Fee Application of FTI Consulting, Inc. as Financial Advisor for the Official Committee of Unsecured Creditors, for Compensation and Reimbursement of Expenses for the Period from March 1, 2021 Through and Including May 31, 2021 **(Bankruptcy Docket No. 2640)** | 6313-6321 |
| 41. | Memorandum Opinion and Order **(Case No. 21-cv-03086, Docket No. 37)** | 6322-6332 |

| Ex. | Description | Appx. # |
|---|---|---|
| 42. | Memorandum Opinion and Order **(Case No. 20-cv-03390, Docket No. 25)** | 6333-6339 |
| 43. | Opinion Dismissing in Part an Appeal from the United States Bankruptcy Court for the Northern District of Texas and Affirming Order of the Bankruptcy Court **(Case No. 21-cv-01895, Docket No. 44)** | 6340-6348 |
| 44. | Judgment Dismissing in Part an Appeal from the United States Bankruptcy Court for the Northern District of Texas and Affirming Order of the Bankruptcy Court **(Case No. 21-cv-01895, Docket No. 45)** | 6349-6351 |
| 45. | James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business **(Bankruptcy Docket No. 1439)** | 6352-6367 |
| 46. | Notice of Withdrawal of James Dondero's Motion for Entry of an Order Requiring Notice 7060-and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business and Related Notices of Subpoena **(Bankruptcy Docket No. 1622)** | 6368-6370 |
| 47. | Notice of Final Term Sheet **(Bankruptcy Docket No. 354)** | 6371-6436 |
| 48. | Notice of Debtor's Amended Operating Protocols **(Bankruptcy Docket No. 466)** | 6437-6467 |
| 49. | Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero **(Adv. Proc. No. 20-03190, Docket No. 10)** | 6468-6471 |
| 50. | Order Granting Debtor's Motion for a Preliminary Injunction Against James Dondero **(Adv. Proc. No. 20-03190, Docket No. 59)** | 6472-6477 |
| 51. | Memorandum Opinion and Order Holding Certain Parties and Their Attorneys in Civil Contempt of Court for Violation of Bankruptcy Court Orders **(Bankruptcy Docket No. 2660)** | 6478-6509 |
| 52. | **Transcript of June 8, 2021 Hearing** | 6510-6808 |
| 53. | Debtor's Second Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on June 8, 2021 **(Bankruptcy Docket No. 2454)** | 6809-7043 |
| 54. | Declaration of John A. Morris in Support of Debtor's Motion to Supplement the Record in the Contempt Hearing Held on June 8, 2021 **(Bankruptcy Docket No. 2518)** | 7044-7059 |
| 55. | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) **(Bankruptcy Docket No. 1875)** | 7060-7108 |
| 56. | James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. **(Bankruptcy Docket No. 1661)** | 7109-7117 |
| 57. | Objection of Dallas County, City of Allen, Allen ISD, City of Richardson and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. **(Bankruptcy Docket No. 1662)** | 7118-7125 |

| **Ex.** | **Description** | **Appx. #** |
|---|---|---|
| 58. | Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. **(Bankruptcy Docket No. 1666)** | 7126-7131 |
| 59. | Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization **(Bankruptcy Docket No. 1667)** | 7132-7166 |
| 60. | United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization **(Bankruptcy Docket No. 1668)** | 7167-7173 |
| 61. | Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization **(Bankruptcy Docket No. 1669)** | 7174-7200 |
| 62. | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. **(Bankruptcy Docket No. 1670)** | 7201-7251 |
| 63. | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization **(Bankruptcy Docket No. 1671)** | 7252-7258 |
| 64. | Nexpoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization **(Bankruptcy Docket No. 1673)** | 7259-7266 |
| 65. | CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt No 1670] and Supplemental Objections to Plan Confirmation **(Bankruptcy Docket No. 1675)** | 7267-7279 |
| 66. | NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization **(Bankruptcy Docket No. 1676)** | 7280-7287 |
| 67. | Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization **(Bankruptcy Docket No. 1678)** | 7288-7292 |
| 68. | **Transcript of January 8, 2021 Hearing** | 7293-7498 |
| 69. | Order Requiring James Dondero to Appear at All Hearings in the Bankruptcy Case **(Bankruptcy Docket No. 2362)** | 7499-7501 |
| 70. | Order Requiring a Trustee of The Dugaboy Investment Trust and The Get Good Trust to Appear at All Hearings in the Bankruptcy Case in Which They Take Positions **(Bankruptcy Docket No. 2458)** | 7502-7505 |
| 71. | Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020 **(Bankruptcy Docket No. 854)** | 7506-7518 |
| 72. | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (II) Granting Related Relief **(Bankruptcy Docket No. 1943)** | 7519-7680 |
| 73. | Response of Dugaboy Investment Trust to Order Requiring Disclosures **(Bankruptcy Docket No. 2541)** | 7681-7689 |
| 74. | Amended Response of Dugaboy Investment Trust to Order Requiring Disclosures **(Bankruptcy Docket No. 2545)** | 7690-7699 |
| 75. | Response of Get Good Trust to Order Requiring Disclosures **(Bankruptcy Docket No. 2542)** | 7700-7707 |

003941

| Ex. | Description | Appx. # |
|---|---|---|
| 76. | Amended Response of Get Good Trust to Order Requiring Disclosures **(Bankruptcy Docket No. 2546)** | 7708-7715 |
| 77. | Response of the Advisors to Order Requiring Disclosures **(Bankruptcy Docket No. 2543)** | 7716-7724 |
| 78. | Notice and Disclosure of NexPoint Re Entities and Highland Capital Management Services Inc. in Response to Court's Sua Sponte Order Requiring Disclosures **(Bankruptcy Docket No. 2544)** | 7725-7733 |
| 79. | **[RESERVED]** | 7734 |
| 80. | Order Denying Motion to Compel Deposition Testimony from James P. Seery, Jr. **(Adv. Proc. No. 21-03003, Docket No. 49)** | 7735-7737 |
| 81. | Notice of Removal (Filed by Scott Byron Ellington Against Patrick Daugherty) **(Adv. Proc. No. 22-03003, Docket No. 1)** | 7738-7855 |
| 82. | Order Granting Scott Ellington's Emergency Motion to Abstain and to Remand **(Adv. Proc. No. 22-03003, Docket No. 33)** | 7856-7859 |
| 83. | Order Directing Mediation **(Bankruptcy Docket No. 912)** | 7860-7866 |
| 84. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course **(Bankruptcy Docket No. 339)** | 7867-7872 |
| 85. | Second Amended Response of Dugaboy Investment Trust to Order Requiring Disclosures **(Bankruptcy Docket No. 2549)** | 7873-7882 |
| 86. | Order Requiring Disclosures **(Bankruptcy Docket No. 2460)** | 7883-7896 |

[REMAINDER OF PAGE INTENTIONALLY BLANK]

Dated: August 15, 2022.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

003943

# EXHIBIT 1

003944

Case 19-34054-sgj11 Doc 3445-1 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 5
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 27 of 1017 PageID 4706
Case 19-34054-sgj11 Doc 2060 Filed 03/18/21 Entered 03/18/21 20:34:17 Page 1 of 4

Docket #2060 Date Filed: 03/18/2021

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC, F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S <u>MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455</u>

James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors,

L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners,

LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "<u>Movants</u>")

file this Motion to Recuse (the "<u>Motion</u>") pursuant to 28 U.S.C. § 455[1] and would, in support

thereof, respectfully show the Court as follows:

1.      Brought with reluctance, this Motion is the necessary result of the undeniable animus that

the Presiding Judge (hereinafter, the "<u>Court</u>") has developed against James Dondero ("<u>Mr.</u>

<u>Dondero</u>") and the resulting prejudicial effect of that animus on Mr. Dondero, The Dugaboy Trust,

The Get Good Trust (collectively, the "<u>Trusts</u>") and any entity the Court deems connected to him

---

[1] 28 U.S.C. § 455 has been made applicable to bankruptcy judges under FED. R. BANKR. P. 5004.

**MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**



1934054210318000000000010

003945

Case 19-34054-sgj11 Doc 3445-1 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 5
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 28 of 1017    PageID 4707
Case 19-34054-sgj11 Doc 2060 Filed 03/18/21    Entered 03/18/21 20:34:17    Page 2 of 4

or under his control (collectively, the "Affected Entities").[2] While the Court has presided over many issues in this bankruptcy, numerous adversary proceedings and contested matters involving Mr. Dondero and the Affected Entities remain, in which, for the reasons described herein, the Court's impartiality can be reasonably questioned.

2.      Importantly, the Court has essentially acknowledged the foundation of this Motion already—that: the Court formed negative opinions of Mr. Dondero in a prior bankruptcy; those opinions have carried into *this* bankruptcy; and, despite best efforts, the Court has been unable to extricate those opinions from its mind. Moreover, the record in this bankruptcy reflects that the Court's negative opinions of Mr. Dondero have resulted in, if not actual bias against Mr. Dondero and the Affected Entities, the undeniable perception of bias against Mr. Dondero and the Affected Entities that impair the ability of Mr. Dondero (and the Affected Entities) to preserve their legal rights. Specifically, among other things, the record reflects that the Court has:

(a)    repeatedly made statements demonstrating the Court's unfavorable opinions about Mr. Dondero;

(b)    declared that Mr. Dondero (and, by implication, the Affected Entities and each of their licensed attorneys) are vexatious litigants based on actions taken by Mr. Dondero and the Affected Entities to: (i) defend lawsuits and motions filed against them; (ii) assert valid legal positions; and/or (iii) preserve legal rights, including on appeal;

(c)    concluded that any entity the Court deems connected to or controlled by Mr. Dondero (*i.e.*, the Affected Entities) is essentially no more than a tool of Mr. Dondero, without evidence being introduced that the corporate status of these entities should be disregarded or that they constitute a single business enterprise;[3]

(d)    summarily and/or preemptively disregarded the testimony of any witness who would testify in favor of Mr. Dondero or any of the Affected Entities, without evidentiary support, as "under [Mr. Dondero's] control" and, if the witness has any connection

---

[2] The definition of the Affected Entities includes the entities defined as "the Advisors" and "the Retail Funds" below.
[3] Specifically, the evidentiary record does not reflect, *e.g.*, that: (a) the corporate formalities have been ignored for the entities; (b) their corporate property has not been kept separate and apart; or (c) Mr. Dondero uses the companies for personal purposes.

Appx 00098
003946

Case 19-34054-sgj11 Doc 3445-1 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 5
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 29 of 1017    PageID 4708
Case 19-34054-sgj11 Doc 2060 Filed 03/18/21   Entered 03/18/21 20:34:17   Page 3 of 4

to Mr. Dondero, *per se* not credible.

3.      At the end of the day, even assuming, *arguendo*, that the Court's animus toward Mr. Dondero were justified based upon the Court's experience in the *Acis* Bankruptcy, **this Motion would be no less necessary** to safeguard the impartiality that Mr. Dondero and the Affected Entities are entitled to receive as litigants in *these* bankruptcy and adversary proceedings—regardless of Mr. Dondero's history with the Court.[4] Consequently, based on the facts stated herein and the trajectory they suggest, the only way to ensure that this required impartiality (and, of equal importance, the public perception of same) exists going forward is through recusal of this Court.

4.      For the reasons set forth above and in the Brief in Support of this Motion, which is incorporated by reference as if fully set forth herein, Movants respectfully request that the Court recuse itself from the Adversary Proceedings and any future contested matters involving Movants or any entity connected to Mr. Dondero; and grant Movants all other further relief, at law or equity, to which they are justly entitled.

---

[4] Notably, the Affected Entities' investment base includes public investors beyond Mr. Dondero.

**MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**                                    **PAGE 3**

Case 19-34054-sgj11 Doc 3445-1 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 5
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 30 of 1017    PageID 4709
Case 19-34054-sgj11 Doc 2060 Filed 03/18/21    Entered 03/18/21 20:34:17    Page 4 of 4

Dated: March 18, 2021

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

By: */s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 18, 2021, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

*/s/ Michael J. Lang*
Michael J. Lang

Appx 00085
003948

# EXHIBIT 2

003949

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 38
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 32 of 1017   PageID 4711
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21   Entered 03/18/21 20:54:16   Page 1 of 37

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC, F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**

1934054210318000000000011

¨1¤}HL5#2     +�~«

003950

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 38
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 33 of 1017   PageID 4712
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21   Entered 03/18/21 20:54:16   Page 2 of 37

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

I.     INTRODUCTION ..................................................................................................... 1

II.    BACKGROUND ....................................................................................................... 3

    A.   The risk of prejudice to Mr. Dondero in this Court has been apparent since this Bankruptcy's inception in Delaware, including by Debtor itself. ......................................... 3

    B.   The Court has acknowledged that its opinions of Mr. Dondero from the *Acis* Bankruptcy have remained cemented in the mind of the Court in this proceeding. .......... 5

    C.   The Court's (and Debtor's) actions in this proceeding have demonstrated the Court has a perceptible bias against Mr. Dondero. ..................................................................... 7

        1.   The February 19, 2020 Application to Employ Hearing ............................. 7

        2.   The December 2020 Restriction Motion ..................................................... 8

        3.   The January 2021 Examiner Motion ......................................................... 16

        4.   The February 2021 Confirmation Hearing ............................................... 17

        5.   Other Issues Demonstrating Bias ............................................................. 23

    D.   Recusal is necessary in light of the pending and future issues and proceedings. ........ 26

III.   ARGUMENTS & AUTHORITY ........................................................................... 27

IV.   PRAYER ................................................................................................................. 32

CERTIFICATE OF SERVICE ......................................................................................... 33

003951

Appx 00808

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 38
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 34 of 1017    PageID 4713
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21   Entered 03/18/21 20:54:16   Page 3 of 37

# TABLE OF AUTHORITIES

<small>CASES</small>

*Andrade v. Chojnacki*,
  338 F.3d 448, 454 (5th Cir. 2003) ........................................................... 27

*Bell v. Johnson*,
  404 F.3d 997, 1004 (6th Cir. 2005) ......................................................... 28

*Bloom v. Illinois*,
  391 U.S. 194, 205 (1968) ........................................................................ 31

*Burke v. Regalado*,
  935 F.3d 960, 1054 (10th Cir. 2019) (citations omitted) ......................... 27

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868, 877 (2009) ........................................................................ 31

*Highland Capital Mgmt. v. Highland Capital Management Fund Advisors, L.P., et al.*
  Adversary No. 21-03000-sgj .................................................................... 12

*In re Chevron U.S.A., Inc.*,
  121 F.3d 163, 165 (5th Cir. 1997) ........................................................... 29

*In re Drexel Burnham Lambert Inc.*,
  861 F.2d 1307, 1313 (2d Cir. 1988) (quoting H.R.Rep. No. 1453,
  93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 6351, 6354–55) .................................. 28

*In re Kansas Pub. Employees Retirement Sys.*,
  85 F.3d 1353, 1358 (8th Cir.1996) .......................................................... 28

*Johnson v. Mississippi*,
  403 U.S. 212, 216 (1971) (per curiam) ................................................... 31

*Liljeberg v. Health Servs. Acquisition Corp.*,
  486 U.S. 847, 805 (2001). ....................................................................... 27

*Liteky v. United States*,
  510 U.S. 540, 550 (1994) ........................................................... 28, 29, 32

*Miller v. Sam Houston State University*,
  986 F.3d 880, 893 (5th Cir. 2021) ........................................................... 29

*Offutt v. United States*,
  348 U.S. 11, 14 (1954) ............................................................................ 29

ii

003952

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 38
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 35 of 1017    PageID 4714
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 4 of 37

*United States v. Jordan*,
    49 F.3d 152, 155 (5th Cir. 1995) ............................................................................ 29

*Wilkerson v. Univ. of N. Texas By & Through Bd. of Regents*,
    878 F.3d 147, 161 (5th Cir. 2017) .......................................................................... 15

STATUTES

11 U.S.C. § 362(a) ........................................................................................................ 12

11 U.S.C. § 363(c)(1) .................................................................................................... 11

11 U.S.C. § 1104(c) ...................................................................................................... 17

11 U.S.C. §§105, 363, and 1107 .................................................................................. 10

11 U.S.C. § 1108 .......................................................................................................... 11

28 U.S.C. § 455 .............................................................................................................. 1

28 U.S.C. § 455 (a) ...................................................................................................... 27

28 U.S.C. § 455 (b)(1) ................................................................................................. 27

OTHER AUTHORITIES

H. Rep. No. 1453, 93d Cong., 2d Sess. 1 (1974), reprinted in 1974 U.S. Code Cong. & Admin.
    News 6351, 6355 ...................................................................................................... 28

Investment Advisers Act of 1940 .................................................................................. 8

RULES

FED. R. BANKR. P. 5004 ................................................................................................. 1

Appx. 03819

003953

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of 38
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 36 of 1017   PageID 4715
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21   Entered 03/18/21 20:54:16   Page 5 of 37

James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "Movants") file this Brief in Support of their Motion to Recuse (the "Motion") Pursuant to 28 U.S.C. § 455[1] and would, in support thereof, respectfully show the Court as follows:

## I.   INTRODUCTION

1.     Brought with reluctance, this Motion is the necessary result of the undeniable animus that the Presiding Judge (hereinafter, the "Court") has developed against James Dondero ("Mr. Dondero") and the resulting prejudicial effect of that animus on Mr. Dondero, The Dugaboy Trust, The Get Good Trust (collectively, the "Trusts") and any entity the Court deems connected to him or under his control (collectively, the "Affected Entities").[2] While the Court has presided over many issues in this bankruptcy, numerous adversary proceedings and contested matters involving Mr. Dondero and the Affected Entities remain, in which, for the reasons described herein, the Court's impartiality can be reasonably questioned.

2.     Importantly, the Court has essentially acknowledged the foundation of this Motion already—that: the Court formed negative opinions of Mr. Dondero in a prior bankruptcy; those opinions have carried into *this* bankruptcy; and, despite best efforts, the Court has been unable to extricate those opinions from its mind. Moreover, the record in this bankruptcy reflects that the Court's negative opinions of Mr. Dondero have resulted in, if not actual bias against Mr. Dondero

---

[1] 28 U.S.C. § 455 has been made applicable to bankruptcy judges under FED. R. BANKR. P. 5004.
[2] The definition of the Affected Entities includes the entities defined as "the Advisors" and "the Retail Funds" below.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                    **PAGE 1**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 38
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 37 of 1017    PageID 4716
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 6 of 37

and the Affected Entities, the undeniable perception of bias against Mr. Dondero and the Affected

Entities that impair the ability of Mr. Dondero (and the Affected Entities) to preserve their legal

rights. Specifically, among other things, the record reflects that the Court has:

    (a)    repeatedly made statements demonstrating the Court's unfavorable opinions about Mr. Dondero;

    (b)    declared that Mr. Dondero (and, by implication, the Affected Entities and each of their licensed attorneys) are vexatious litigants based on actions taken by Mr. Dondero and the Affected Entities to: (i) defend lawsuits and motions filed against them; (ii) assert valid legal positions; and/or (iii) preserve legal rights, including on appeal;

    (c)    concluded that any entity the Court deems connected to or controlled by Mr. Dondero (*i.e.*, the Affected Entities) is essentially no more than a tool of Mr. Dondero, without evidence being introduced that the corporate status of these entities should be disregarded or that they constitute a single business enterprise;[3]

    (d)    summarily and/or preemptively disregarded the testimony of any witness who would testify in favor of Mr. Dondero or any of the Affected Entities, without evidentiary support, as "under [Mr. Dondero's] control" and, if the witness has any connection to Mr. Dondero, *per se* not credible.

3.    At the end of the day, even assuming, *arguendo*, that the Court's animus toward Mr.

Dondero were justified based upon the Court's experience in the *Acis* Bankruptcy, **this Motion**

**would be no less necessary** to safeguard the impartiality that Mr. Dondero and the Affected

Entities are entitled to receive as litigants in *these* bankruptcy and adversary proceedings—

regardless of Mr. Dondero's history with the Court.[4] Consequently, based on the facts stated herein

and the trajectory they suggest, the only way to ensure that this required impartiality (and, of equal

---

[3] Specifically, the evidentiary record does not reflect, *e.g.*, that: (a) the corporate formalities have been ignored for the entities; (b) their corporate property has not been kept separate and apart; or (c) Mr. Dondero uses the companies for personal purposes.
[4] Notably, the Affected Entities' investment base includes public investors beyond Mr. Dondero.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**              **PAGE 2**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 8 of 38
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 38 of 1017    PageID 4717
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21   Entered 03/18/21 20:54:16   Page 7 of 37

importance, the public perception of same) exists going forward is through recusal of this Court.

## II.    BACKGROUND

**A. The risk of prejudice to Mr. Dondero in this Court has been apparent since this Bankruptcy's inception in Delaware, including by Debtor itself.**

4.      On October 16, 2019, the Debtor in this proceeding, Highland Capital Management, L.P. ("Highland" or "Debtor"), filed bankruptcy in Delaware (the "*Highland* Bankruptcy"). Debtor's counsel, Jeff Pomerantz, admitted that the bankruptcy was filed in Delaware in order to give Debtor, including its management, a "fresh start."[5] Shortly thereafter, however, the unsecured creditor's committee (the "UCC") moved to transfer the matter to the Northern District of Texas (the "Motion to Transfer").

5.      During the December 2, 2019 hearing on the Motion to Transfer, while the UCC argued that transfer to this Court was appropriate because this Court was further along in the "learning curve" than the Delaware Bankruptcy Court due to this Courts prior presiding over the bankruptcy of *Acis Capital Management, L.P.* ("Acis") (the "*Acis* Bankruptcy"),[6] Mr. Pomerantz expressly acknowledged that the UCC's *actual* motive in seeking transfer to this Court was this Court's pre-existing negative views of Debtor's management, including Mr. Dondero:

> However -- Your Honor pointed to this at the beginning, in mentioning comments about forum-shopping -- the committee and Acis are really being disingenuous, and they have not told you the real reason that they want the case before Judge Jernigan.[7] … And it's not because she's familiar with this debtor's business, this

---

[5] December 3, 2019 Transcript - Motion to Transfer, at 78:21-23 [App. 0078], a true and correct copy of which is attached hereto as **Ex. 1 [APP. 0001]** and incorporated herein by reference. *See also* the Declaration of Michael J. Lang proving up exhibits 1-27 for this Motion, a true and correct copy of which is attached hereto as **Ex. 30 [APP. 2715]** and incorporated herein by reference.

[6] **Ex. 1** at 67:9-15 [App. 0067].

[7] *Id*. at 77:18-22 [App. 0077].



Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of 38
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 39 of 1017 PageID 4718
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21 Entered 03/18/21 20:54:16 Page 8 of 37

debtor's assets, or this debtor's liabilities, because she generally is not. ***It is because she formed negative views regarding certain members of the debtor's management that the committee and Acis hope will carry over to this case***.[8]

6.      At ***that*** time, Debtor effectively acknowledged the risk that this Court's prior opinions of Mr. Dondero would improperly impact this separate, new bankruptcy and the Court would be unable to set aside the negative views of Mr. Dondero it developed in the *Acis* Bankruptcy; thus, objectively questioning the Court's impartiality. In fact, Mr. Pomerantz specifically referred to the opinions the Court developed in the *Acis* Bankruptcy as "baggage":

> The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, ***without the baggage of what happened in a previous case***, which contrary to what Acis and the committee says [*sic*], has very little to do with this debtor.[9]

7.      The Delaware Bankruptcy Court also acknowledged that it would be improper for this Court to substitute its prior knowledge, experience, or opinions from the *Acis* Bankruptcy for evidence (or, equally, as a basis to ignore contradictory evidence in the record) in this proceeding:

> Yeah, I was going to say that's kind of an interesting argument, because actually it assumes Judge Jernigan's going to ignore the rules of evidence in making factual findings, ***because you're limited to the record before you on a specific motion***. And what fact you may have learned with regard to something a person has done, maybe that goes into questions of credibility on cross-examination or direct testimony***, but to actually base your decision on a fact that's not in the record for the specific proceeding would be improper***.[10]

8.      Ultimately, the Delaware Bankruptcy Court granted the Motion to Transfer and, thus, this

---

[8] *Id.* at 78:3-8 (emphasis added) [App. 0078].
[9] *Id.* at 79:14-20 (emphasis added) [App. 0079].
[10] *Id.* at 90:15-24 (emphasis added) [App. 0090].

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                         **PAGE 4**



Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 40 of 1017 PageID 4719
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21 Entered 03/18/21 20:54:16 Page 9 of 37

bankruptcy was assigned to this Court.

**B. The Court has acknowledged that its opinions of Mr. Dondero from the *Acis* Bankruptcy have remained cemented in the mind of the Court in this proceeding.**

9.     Following the transfer, Debtor and the UCC entered into a compromise as to the management of Debtor (the "Compromise"), under which, among other things, Mr. Dondero, voluntarily surrendered all control of Debtor to an independent, three-person board appointed per the Compromise (the "Board").[11]

10.     During the January 9, 2020 hearing on the Compromise, the Court acknowledged that it: possessed opinions regarding Mr. Dondero from the *Acis* Bankruptcy; was unable to extract those opinions from its brain; and was relying on those opinions as bases for certain rulings (*e.g.*, requiring certain language be included in its order, shown below):

> Now, there is one specific thing I want to say about the role of Mr. Dondero. When Ms. Patel got up and talked about the newest language that has been added to the term sheet, she highlighted in particular the very last sentence on Page 2 of the term sheet, the sentence reading, 'Mr. Dondero shall not cause any related entity to terminate any agreements with the Debtor.' Her statement that that was important, it really resonated with me, because, you know, as I said earlier, ***I can't extract what I learned during the Acis case, it's in my brain, and we did have many moments during the Acis case where the Chapter 11 trustee came in and credibly testified that, whether it was Mr. Dondero personally or others at Highland, they were surreptitiously liquidating funds, they were changing agreements, assigning agreements to others. They were doing things behind the scenes that were impacting the value of the Debtor in a bad way. So not only do I think that language is very important, but I am going to require that language to be put in the order.***[12]

---

[11] January 9, 2020 Transcript at 14:4-11 [App. 0151], a true and correct copy of which is attached hereto as **Ex. 2 [APP. 0138]** and incorporated herein by reference. Mr. Dondero, however, remained a portfolio manager and an unpaid employee of Debtor. *Id*. *See also* **Ex. 30**.
[12] **Ex. 2** at 78:23-79:16 [App. 0215-0216] (emphasis added).

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                                **PAGE 5**



Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 41 of 1017    PageID 4720
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 10 of 37

11.    Later, the Court also indicated that it relied on knowledge of purported actions taken by

Mr. Dondero in the *Acis* Bankruptcy as "evidence" of a presumed propensity of Mr. Dondero to

engage in actions (that were allegedly taken in the *Acis* Bankruptcy) to support the required

language and threat of contempt:

> And ***I'm sure most of you can read my mind why***, but I want it crystal clear that if
> [Mr. Dondero] violates these terms, he's violated a federal court order, and
> contempt will be one of the tools available to the Court.[13]

12.    Notably, at this time, this bankruptcy had only been in front of this Court for approximately

a month. Consequently, there was nothing in the record in front of Court to justify its specific

rulings and comments related to Mr. Dondero. The Court sustained the United States Trustee's

("U.S. Trustee") attempt to use the *Acis* Bankruptcy as evidence to support the U.S. Trustee's

objection to the Compromise:

> "***I have to look at what's presented***, and is this reflective of sound business
> judgment? Is this fair and equitable? Is it in the best interest? ***So, assuming there
> are tons of bad facts here reflected in the arbitration award, reflected in other
> evidence, bad facts that might justify a trustee***, a Chapter 11 trustee, is this
> nevertheless, ***what's proposed today***, a reasonable compromise of, you know, the
> trustee arguments from the Committee could make or, you know, is this a
> reasonable framework for going forward? … ***I can assume there are terrible facts
> out there that might justify a trustee, but I'm looking at what's proposed***."[14]

13.    Nonetheless, just a short time later, the Court confirmed that, based on its knowledge from

the *Acis* Bankruptcy, it would require confirmed that it would require the above-referenced

language directed at Mr. Dondero in its order based.

---

[13] *Id*. at 80:3-6 [App. 0217] (emphasis added).
[14] *Id*. at 52:10-25 [App. 0189] (emphasis added).

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 42 of 1017    PageID 4721
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 11 of 37

**C.  The Court's (and Debtor's) actions in this proceeding have demonstrated the Court has a perceptible bias against Mr. Dondero.**

> **1.      The February 19, 2020 Application to Employ Hearing**

14.      The Court has demonstrated a predisposition against Mr. Dondero, including, for example, through its rulings discounting the testimony of demonstrably independent witnesses who testified in support of outcomes that could possibly benefit Mr. Dondero as testimony that is engineered by Mr. Dondero.

15.      For example, on February 19, 2020, the Court held a hearing on Debtor's application to retain the law firm Foley Gardere to pursue appeals of the *Acis* involuntary petition and the *Acis* confirmation order (the "Application to Employ") on behalf of Neutra Ltd. (which is a company owned by Mr. Dondero and which succeeded to the ownership of Acis). Importantly, during this hearing, former Bankruptcy Judge Russell Nelms, **one of the three independent directors appointed to Debtor's Board**, testified that, in the Board's business judgment, the Application to Employ was considered by the independent directors, and they concluded that it was in the Debtor's best interest.[15]

16.      Despite this testimony, the Court displayed a predisposition to contest positions that could possibly benefit Mr. Dondero on the pre-determined basis that any person sharing an opinion with Mr. Dondero (including, apparently, a member of the independent Board) was somehow being unduly influenced by him:

---

[15] *See* February 19, 2020 Transcript at 62:6-17 [App. 0290] (emphasis added), a true and correct copy of which is attached hereto as **Ex. 3 [APP. 0229]** and incorporated herein by reference; *see also* **Ex. 30**.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455**                                                        **PAGE 7**



Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 43 of 1017 PageID 4722
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21 Entered 03/18/21 20:54:16 Page 12 of 37

> … ***But I'm concerned that Dondero*** or certain in-house counsel has -- you know, they're smart, they're persuasive -- that -- what are the words I want to look for -- they have ***exercised their powers of persuasion*** or whatever to make the Board and the professionals think that there is some valid prospect of benefit to Highland with these appeals, ***when it's really all about Neutra, HCLOF, and Mr. Dondero. That's what I believe***.
>
> I mean, this is awkward, right, because you want to defer to the debtor-in-possession, ***but I have this long history***, and I can think through the scenarios. …And I know, you know, there are multiple ways it might play out, but I cannot believe there is a chance in the world there is economic benefit if these things get reversed. Economic benefit to Neutra: Yeah, maybe. Economic benefit to HCLOF: Well, they'll get what they want. You know, whether it's an economic benefit, I don't know. But benefit to Highland? ***I just don't think the evidence has been there to convince me it's reasonable business judgment for Highland to pay the legal fees associated with the appeal***.[16]

17.    From here, unsurprisingly, Debtor began to leverage the Court's predisposition against Mr. Dondero (*i.e.*, what Debtor had previously described as the Court's "baggage") for Debtor's own benefit. This played out in a variety of ways.[17]

### 2.    The December 2020 Restriction Motion

18.    As the Court is aware, Debtor on the one hand, and Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. (the "Advisors"),[18] on the other hand, previously

---

[16] **Ex. 3** at 177:7-178:3 [App. 0405-0406].

[17] *See also* March 4, 2020 Transcript at 34:6-35:18 [App. 1544-1545]; 50:14-52:15 [APP. 1560-1562]; 58:17-23 [APP. 1568], a true and correct copy of which is attached hereto as **Ex. 15 [APP. 1511]** and incorporated herein by reference; *see also* **Ex. 30**.

[18] Each Advisor is registered with the U.S. Securities and Exchange Commission ("SEC") as an investment advisor under the Investment Advisers Act of 1940, as amended. Each of the Advisors advises several funds, including the Retail Funds. Each of the Retail Funds is a registered investment company or business development company under the Investment Company Act of 1940 (as amended, the "1940 Act"). Each Retail Fund is overseen by a majority independent board of trustees subject to 1940 Act requirements. Those respective boards reviewed and approved, among other things, major contracts including the advisory agreement with the applicable Advisor for the respective Retail Fund. The Retail Funds do not have employees and rely on their respective Advisors, acting pursuant to an advisory agreement, to provide the services necessary for their operations.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                                                                **PAGE 8**



Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 14 of
Case 3:25-cv-02072-S  Document 15-7  Filed 10/06/25  Page 44 of 1017  PageID 4723
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21  Entered 03/18/21 20:54:16  Page 13 of 37

shared office space, and the Advisors each paid for resources and services, including in-house legal services, pursuant to shared services agreements that each of the Advisors separately entered into with Debtor.

19.   As the Court is also aware, Debtor manages more than $1 billion in assets owned by collateralized loan obligation investment vehicles ("CLOs") pursuant to certain Portfolio Management Agreements. Approximately $140 million of that amount is owned by Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (collectively, the "Retail Funds"). Although the Portfolio Management Agreements vary, they generally impose a duty on Debtor, when acting as portfolio manager, to maximize the value of the CLOs' assets for the benefit of the CLOs' noteholders and preference shareholders, such as the Retail Funds.

20.   For most of 2020, Debtor's plan with respect to the CLOs was to reject the Portfolio Management Agreements. However, in approximately October 2020, Debtor's plan changed, and Debtor wanted to assume the Portfolio Management Agreements (*i.e.*, continue managing the assets). However, Debtor's new plan also contemplated releasing all Debtor's employees and liquidating all of Debtor's assets over a two-year period. In the Advisors' and the Retail Funds' opinion, this was incompatible with the CLOs' needs (which required an investment staff) and the belief that the CLOs had more upside. Moreover, Debtor began to liquidate certain assets of the CLOs.

21.   Mr. Dondero, who, as stated above, continued to be a portfolio manager and unpaid employee of Debtor, and James Seery ("Mr. Seery"), one member Debtor's independent Board, disagreed on whether or not to liquidate the CLOs assets. Importantly, the CLOs were ***not assets of Debtor's estate*** but debt and preference equity is owned by third parties (*e.g.*, the Retail Funds,

003962

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 45 of 1017    PageID 4724
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 14 of 37

which indirectly own $140 million of same).

22.     The Advisors (on behalf of the Retail Funds and pursuant to their obligations under their respective advisory agreements) and the Retail Funds believed that Debtor's decision to liquidate underlying assets held by the CLOs did not maximize the value of the investments for the investors to whom the Advisors and the Retail Funds owed a fiduciary duty. As a result, the Advisors and the Retail Funds raised these concerns with Mr. Seery (Debtor's interim CEO) and requested that Debtor not liquidate the CLOs until the Plan confirmation (which, at that time, was scheduled for early January 2021). Debtor, a/k/a portfolio manager, declined.

23.     Consequently, on December 8, 2020, pursuant to 11 U.S.C. §§105, 363, and 1107, the Advisors and the Retail Funds (not Mr. Dondero) raised these concerns in a motion that requested the Court exercise its equitable discretion to maintain the status quo and stop Debtor from liquidating the CLOs for 30 days  (the "Restriction Motion").[19]  The Restriction Motion was necessary to legally preserve the legal issue arising from the Advisors' and the Retail Funds' belief that this action by Debtor was contrary to the best interest of their investors.

24.     On December 16, 2020, the Court held a hearing on the Restriction Motion and denied same.[20] Rather than simply denying the motion, the Court chastised counsel for the Advisors and the Retail Funds for filing the Restriction Motion (*i.e.*, for advocating a position in good faith that their clients firmly believed in).

---

[19] Dkt. 1522, a true and correct copy of which is attached hereto as **Ex.  4 [APP.  0417]** and  incorporated  herein  by reference; *see also* **Ex. 30**.

[20] *See* the December 16, 2020 Transcript, a true and correct copy of which is attached hereto as **Ex. 5 [APP. 0443]** and incorporated herein by reference. *Id.* at 63:5-13 [App. 0505]. *See also* **Ex. 30**.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455**                                                                                                      **PAGE 10**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 16 of
Case 3:25-cv-02072-S  Document 15-7  Filed 10/06/25  Page 46 of 1017  PageID 4725
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21  Entered 03/18/21 20:54:16  Page 15 of 37

25.     Going further, the Court stated that it was "dumbfounded" by the Restriction Motion and

that it agreed with Debtor's accusation that Mr. Dondero was behind the Restriction Motion,

despite the fact that the Restriction Motion was filed by separate and distinct legal entities. The

Court focused on Mr. Dondero's role with the Advisors to conclude that the Restriction Motion

was brought for an improper purpose, despite the fact that the only evidence before the court was

that the decision was made by senior management in consultation with the board of trustees and

counsel.[21] Thus, the Court implicitly concluded that the Retail Funds (some of which are publicly-

traded, highly-regulated entities) cannot independently decide to pursue action they deem in their

best interest.

26.     The Court further declared the Restriction Motion frivolous, "almost Rule 11 frivolous,"

and as having no statutory or contractual basis.[22] As stated above, these comments were made by

the Court regarding a motion that: (a) was filed in good faith by fiduciaries seeking to protect the

investments of investors; and (b) cited statutory authority which indisputably provided the Court

with the discretion to grant the requested relief therein. While the Court had every right to deny

the Restriction Motion, the Court additionally condemned Mr. Dondero, demonstrating that it

could not set aside its animus towards Mr. Dondero to consider the separate entities involved and

the actual issues being raised.

27.     In December of 2020, due to the Court's denial of the Restriction Motion, K&L Gates, as

---

[21] **Ex. 5** at 63:14-25 [App. 0505].
[22] *Id*. at 64:1-7 [App. 0506]. The statutory basis for the relief requested was section 363(c)(1) or 1108 of the
Bankruptcy Code, which generally provides that a debtor-in-possession may engage in its ordinary course of business,
"unless the court orders otherwise." That was all that was being asked.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                    **PAGE 11**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 47 of 1017    PageID 4726
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 16 of 37

counsel for the Advisors and the Retail Funds, exchanged correspondence with counsel for Debtor (the "K&L Gates Letters").[23] The K&L Gates Letters were sent for the following reasons: to reiterate the Advisors' and the Retail Funds' objection to the Debtor's handing of the Retail Funds' investments; to request, again, that Debtor not liquidate the CLOs; to reserve any rights that the Advisors and the Retail Funds might have against Debtor for failure to maximize the value of the investment as required under the Portfolio Management Agreements; and to notify Debtor that the Retail Funds, ***subject to applicable bankruptcy law*** (which would include the stay existing by reason of section 362(a) of the Bankruptcy Code and the Compromise) and the underlying agreements, intended to initiate the procedure to remove Debtor as fund manager of the CLOs.

28.     On January 6, 2021, Debtor filed a complaint for declaratory and injunctive relief against the Advisors and the Retail Funds,[24] claiming that: (a) the Advisors' purported refusal to book certain trades, which Debtor had, in actuality, already executed outside of the Advisors' process, interfered with Debtor's business and, thus, tortiously interfered with the prior sales; and (b) the K&L Gates Letters (*i.e.*, correspondence between counsel) violated the automatic stay.[25] Debtor's overall theme in the complaint was, because Mr. Dondero allegedly controlled the Retail Funds

---

[23] True and correct copies of the K&L Gates Letters are attached to the Declaration of James Seery [ECF 4] in the Adversary styled *Highland Capital Mgmt. v. Highland Capital Management Fund Advisors, L.P., et al*. Adversary No. 21-03000-sgj, courtesy copies of which are attached hereto as **Ex. 18 [APP. 1777]** and incorporated herein by reference. *See also* **Ex. 30**.

[24] *Highland Capital Mgmt. v. Highland Capital Management Fund Advisors, L.P., et al*. Adversary No. 21-03000-sgj, a true and correct copy of which is attached hereto as **Ex. 6 [APP. 0509]** and incorporated herein by reference. *See also* **Ex. 30**.

[25] *See*, Dkt. 6, a true and correct copy of which is attached hereto as **Ex. 17 [APP. 1759]** and incorporated herein by reference. *See also* **Ex. 30**. This is one of many instances where the Debtor asked for and received expedited consideration, relief not afforded to Mr. Dondero or the Affected Entities.

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 18 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 48 of 1017   PageID 4727
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21   Entered 03/18/21 20:54:16   Page 17 of 37

(he does not), the Court should presume that Mr. Dondero (rather than the independent board and its independent counsel for the Retail Funds) caused the acts complained of by Debtor (thus enabling the Court to extend the prohibitions it imposed on Mr. Dondero to the Advisors and the Retail Funds). As a result, Debtor sought to enjoin the Advisors and the Retail Funds from, among other things, exercising any contractual rights that they may have had to remove Debtor as portfolio manager (which Debtor was then seeking to assume, and ultimately did assume, under its plan) if the injunction were not granted.

29.     On January 26, 2021, the Court commenced the preliminary injunction hearing on the matter (the "Injunction Hearing").[26] The issue in the Injunction Hearing was whether the Advisors and the Retail Funds tortiously interfered with the Portfolio Management Agreements by: (1) hindering the Debtor's ability to sell certain CLO assets, (2) threatening to initiate the process for removing the Debtor as the portfolio manager of the CLOs, and (3) otherwise attempting to influence and interfere with the Debtor's decisions concerning the purchase or sale of any assets on behalf of the CLOs.[27]

30.     To obtain such an injunction, Debtor was required to, among other things, prove a substantial likelihood of success on the merits of its tortious interference claim and irreparable harm. However, during the Injunction Hearing, it should have become abundantly clear that there was no need or basis for an injunction, due, in large part, to the Debtor's concession that it did not

---

[26] A true and correct copy of the January 26, 2021 Transcript is attached hereto as **Ex. 7 [APP. 0528]** and incorporated herein by reference; *see also* **Ex. 30**.
[27] *See* Dkt. 1 in Adversary Proceeding No. 21-03000-sgj at ¶ 58.

003966

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 19 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 49 of 1017   PageID 4728
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21   Entered 03/18/21 20:54:16   Page 18 of 37

have a substantial likelihood of success on the merits via its acknowledgment that the alleged acts of interference did not actually interfere with any contract. In addition:

31.    **First**, Mr. Seery admitted that none of the alleged actions caused Debtor to breach any contract with a third party.[28] Moreover, Debtor could not assert a direct breach of contract claim because: (a) there is no claim for contemplating a prospective breach; and (b) the Advisors and the Retail Funds had no contractual obligation to settle the trade.

32.    **Second,** with respect to "hindering Debtor's ability to sell certain CLO assets," Mr. Seery admitted that every trade that he attempted to initiate in December closed.[29] In fact, the trades at issue were executed **before** Debtor even approached the Advisors, and the only thing that the Advisors did not do in connection with the trades was make a ledger entry booking the sale (which was due to the fact that Debtor had executed the trades outside of the historically-used system).[30] Moreover, Debtor itself had numerous authorized traders whose job was to settle Debtor's trades. Importantly, the Advisors had no obligation, contractual or otherwise, to perform any service for Debtor.

33.    **Third**, with respect to K&L Gates Letters' contemplation of future action "to initiate the process for removing the Debtor as portfolio manager:" (a) Debtor admitted that the K&L Gates Letters merely stated that the Advisors and the Retail Funds were "contemplating taking steps to terminate the CLO Agreements;"[31] (b) no steps would be taken without seeking relief from the

---

[28] See **Ex. 7** at 180:12-17 [App. 0707].
[29] Id. at 173:16-19 [App. 0700]; 174:1-3 [App. 0701]; 174:8-175:5 [App. 0701-0702].
[30] Id at 173:16-19 [App. 0700]; 175:1-5 [App. 0702]; 219:17-22 [App. 0746]; 220:9-17 [App. 0747].
[31] Id. at 103:21-23 [App. 0630].

Appx. 00984
003967

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 50 of 1017    PageID 4729
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 19 of 37

stay;[32] (c) no action was taken to lift the stay;[33] and (d) no action was taken to remove Debtor as

the portfolio manager.[34] Moreover, while the Debtor disputed whether the Advisors' and the Retail

Funds' right to terminate Debtor had been triggered, it never undisputed that the Advisors and the

Retail Funds, as preferred shareholders, were third party beneficiaries under the Portfolio

Management Agreements that, in certain instances, expressly provided them with a right to

terminate the Portfolio Manager.[35] Generally, one cannot tortiously interfere by exercising one's

own contractual rights.[36]

34.      ***Fourth***, while Debtor (no doubt in response to the Court's comments in the January 9,

2020 hearing regarding contempt) claimed that Mr. Dondero caused these issues, the Retail Funds

have an independent board of trustees (Mr. Dondero is not a board member).[37] The evidence in

the record showed that the decision to send the K&L Gates Letters was made by and in consultation

with two national law firms, K&L Gates and Blank Rome.[38] Consequently, Debtor's motion was

---

[32] *Id.* at 180:8-11 [APP. 0707].

[33] *Id.* 132:24-133:1 [App. 0659-0660]; 165:25-166:3 [App. 0692-0693].

[34] *Id.* 178:25-179:6 [App. 0705-0706]; 180:1-7 [App. 0707].

[35] *See* examples of Servicing Agreements at section 14 [APP. 2381-2382 and APP. 2416-2417 respectively], true and correct copies of which are attached hereto as **Exs. 24 and 25 [APP. 2366 and APP. 2402, respectively]** and incorporated herein by reference; *see also* the February 2, 2021 Transcript of Hearing at 54:6-56:12 [APP. 2124-2126] (authenticating Exs. 24 and 25), a true and correct copy of which is attached hereto as **Ex. 23 [APP. 2071]** and incorporated herein by reference; *see also* the chart of holdings of preference shares in CLOs (showing Movants are preferred shareholders), a true and correct copy of which is attached hereto as **Ex. 27 [APP. 2698]** and incorporated herein by reference; *see also* the February 3, 2021 Transcript of Hearing at 53:1-22 [APP. 2493] (authenticating Ex. 27), a true and correct copy of which is attached hereto as **Ex. 26 [APP. 2441 ]** and incorporated herein by reference. *See also* **Ex. 30**.

[36] *See, e.g., Wilkerson v. Univ. of N. Texas By & Through Bd. of Regents*, 878 F.3d 147, 161 (5th Cir. 2017) (To win, Wilkerson would have to prove that his employer interfered with his employment contract—a legal impossibility, as "one cannot tortiously interfere with one's own contract.").

[37] One fund is comprised of five individuals, four of whom satisfy the stringent independence requirements mandated by the SEC and the New York Stock Exchange. Two of the funds have four board members, three of which are independents.

[38] *See* **Ex. 7** at 208: 13-22 [App. 0735]; *see also* January 8, 2021 Transcript at 119:6-120:12 [App. 0903-0904];126:7-

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                      **PAGE 15**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 21 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 51 of 1017   PageID 4730
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21   Entered 03/18/21 20:54:16   Page 20 of 37

unnecessary and unwarranted.

35.     Nonetheless, during the Injunction Hearing, the Court again turned its focus to Mr.
Dondero (rather than the impropriety and groundlessness of Debtor's motion), warning him that
the January 9, 2020 order (described above) prohibited him from causing any related entity to
terminate an agreement with Debtor. Importantly, the Court made the implied finding that Mr.
Dondero caused the Retail Funds to send the K&L Gates Letters despite the fact that it had, in a
hearing just a week earlier, *sustained* Debtor's objections to Mr. Dondero being asked about why
the K&L Gates Letters were sent *on the grounds that: (a) Mr. Dondero lacked personal
knowledge;* (b) any answer would be hearsay; and (c) because the K&L Gates Letters (executed
by K&L Gates, not Mr. Dondero) speak for themselves.[39] **In other words, the Court had to "go
behind the letter" (which was sent by K&L Gates) in order to threaten Mr. Dondero with
sanctions after the Court's ruling sustaining the objection that the letters speak for
themselves**. Going further, the Court concluded that it was "leaning" toward finding *Mr. Dondero*
in contempt and shifting the "whole bundle of attorney's fees" to Mr. Dondero as a result of this
unwarranted motion filed by **Debtor**.[40]

### 3.     The January 2021 Examiner Motion

36.     Separately, on January 14, 2021, two trusts settled by Mr. Dondero, The Dugaboy
Investment Trust and The Get Good Trust (collectively, the "Trusts"), requested the Court exercise

---

16 [App. 0910], a true and correct copy of which is attached herein as **Ex. 8 [APP. 0785]** and incorporated herein by
reference. *See also* **Ex. 30**.
[39] **Ex. 8** at 119:6-122:25 [App. 0903-0906]. Otherwise, Mr. Dondero should have been given the opportunity to answer
the question, which the Court denied.
[40] **Ex. 7** at 251:24-252:5 [App. 0778-0779].

003969

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 52 of 1017    PageID 4731
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 21 of 37

its discretion to direct the appointment of a neutral third-party examiner pursuant to 11 U.S.C. § 1104(c) as a less costly means to resolve various issues that had arisen in this bankruptcy (the "Examiner Motion").[41] Notably, The Dugaboy Investment Trust also has significant holdings in the CLOs.

37.     The Examiner Motion was made in connection with the issues raised by the Advisors and the Retail Funds in the Restriction Motion, various objections to the proposed Plan raised by the Advisors and the Retail Funds and the U.S. Trustee (discussed below), and concerns expressed **by the Court** about costs and expenses. Moreover, when the Trusts made the Examiner Motion, they believed that the motion would cause delay or a continuance of the confirmation hearing on the Plan (defined below).[42] Notably, despite the Trusts' request, the Court elected not to set that motion for hearing on an "emergency" basis and, instead, set it for hearing long *after* the date for confirmation, rendering it moot.

### 4.  The February 2021 Confirmation Hearing

38.     On February 2 and 3, 2021, the Court held a hearing on *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [docket no. 1808], as further modified (the "Plan").  At that hearing, the Advisors and the Retail Funds, pursuant to their rights under the Portfolio Management Agreements, objected to provisions in the Plan that would eliminate or alter their legal and contractual claims against Debtor (the "Objections").

---

[41] *See* the January 14, 2021 Motion to Appoint Examiner, a true and correct copy of which is attached hereto as **Ex. 22 [APP. 2057]** and incorporated herein by reference. *See also* **Ex. 30**.
[42] *See* ECF 1752.

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 53 of 1017    PageID 4732
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 22 of 37

Additionally, Dondero, the Advisors, and the Retail Funds objected to, among other things, the

Plan's significant release and exculpation provisions for the management of Debtor—including

the Independent Directors, Debtor's professionals, the Committee, professionals retained by the

Committee, *etc.*—and the Plan's "gatekeeper" provision that prohibited lawsuits against any

exculpated party without prior permission from the Court.

39.    On February 8, 2021, the Court announced its oral ruling regarding the Plan,[43] in which

the Court did not rely solely on evidence in the record in front of it but also referred extensively to

proceedings in the ***Acis Bankruptcy***.[44] In its ruling, the Court summarily rejected ***all*** of the

Objections, decreeing them as bad faith: "[T]he Court questions the good faith of the [the Advisors

and the Retail Funds]. In fact, the Court ***has good reason to believe*** that these parties are not

objecting to protect economic interests they have in the Debtor, but to be disruptors."[45]

40.    The Court stated no basis for its "belief," but concluded that the other entities objecting to

the Plan were "controlled by" Mr. Dondero:[46]

> To be clear, the Court has allowed all of these objectors to fully present arguments
> and evidence in opposition to confirmation, even though their economic interests
> in the Debtor appear to be extremely remote and the Court questions their good
> faith. Specifically on that latter point, the Court considers them all to be marching
> pursuant to the orders of Mr. Dondero.[47]

41.    To support its conclusion, the Court disregarded witness testimony on the grounds that the

---

[43] *See* the February 8, 2021 Transcript, a true and correct copy of which is attached hereto as **Ex. 9 [APP. 0990]** and
incorporated herein by reference. *See also* **Ex. 30**.
[44] **Ex. 9** at 15:15-16:5 [App. 1004-1005].
[45] *Id.* at 20:17-20 [App. 1009] (emphasis added).
[46] *Id.* at 20:13-15 [App. 1009].
[47] *Id.* at 22:15-21 [App. 1011].

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                        **PAGE 18**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 54 of 1017 PageID 4733
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21 Entered 03/18/21 20:54:16 Page 23 of 37

witness had previously been engaged with Debtor:

> …While the evidence presented was that they have independent board members that run these companies, the Court was not convinced of their independence from Mr. Dondero.[48] None of the so-called independent board members of these entities have ever testified before the Court. Moreover, they have all been engaged with the Highland complex for many years.
>
> The witness who testified on these Objectors' behalves at confirmation, Mr. Jason Post, their chief compliance officer, resigned from Highland after more than twelve years in October 2020, at the same time that Mr. Dondero resigned or was terminated by Highland. And a prior witness recently for these entities whose testimony was made part of the record at the confirmation hearing essentially testified that Mr. Dondero controlled these entities. [49]
>
> Finally, various NexBank entities objected to the Plan. The Court does not believe they have liquidated claims. Mr. Dondero appears to be in control of these entities as well. [50]

42.    The Court then went on to question the good faith basis for the Objections based upon the perceived limited economic interest, despite the fact that each Objector had standing to object, irrespective of the size of their economic interest.[51] Indisputably, a Court must presume that anything filed by a licensed attorney, who is bound by ethical obligations, is filed in good faith unless proved otherwise. Therefore, insinuating a lack of good faith in light of this presumption suggests bias, especially when bad faith was not alleged by another party.

43.    Next, even though it had "not been asked to declare Mr. Dondero and his affiliated entities

---

[48] *Id.* at 21:22-24 [App. 1010].

[49] Notably, Jason Post resigned from Debtor and was hired by NPA because NPA and Debtor had to separate compliance programs, which was previously jointly administered.  This decision was discussed with and approved by Thomas Surgent and Mr. Seery.

[50] *Id.* at 22:12-14 [App. 1011].

[51] *Id.* [App. 1011]

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**                                                                                      **PAGE 19**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 55 of 1017 PageID 4734
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21 Entered 03/18/21 20:54:16 Page 24 of 37

as vexatious litigants *per se*,"[52] the Court summarily decreed that Mr. Dondero and other Affected Entities were "vexatious litigants"[53] in its ruling and held that objected to "gatekeeper provision "appears necessary and reasonable in light of the ***litigiousness of Mr. Dondero*** and his ***controlled entities*** that has been described at length herein."[54]

44.    In addition to **not** tied to evidence in the record from this bankruptcy, this finding of vexatious litigation does not meet the requirements set forth by the Court itself. To enjoin future filings due to vexatious litigation, the bankruptcy court must consider the circumstances of the case, including four factors: (a) the party's history of litigation; in particular, whether ***he has filed*** vexatious, harassing, or duplicative lawsuits; (b) whether the party had a good faith basis for ***pursuing the litigation***, or perhaps intended to harass; (c) the extent of the burden on the courts and other parties resulting from the party's filings; and (d) the adequacy of alternatives.[55] Here, the factors did not weigh in favor of a vexatious litigation finding, much less even being considered.

45.    ***First***, the "litigiousness" described in the Court's ruling were: (a) efforts taken by Mr. Dondero and other entities in the bankruptcy to defend against injunctions filed against them; (b) legitimate objections or responses to certain provisions in the Plan and other motions, made to preserve rights on appeal; and/or (c) lawsuits in which Mr. Dondero or other entities ***had been sued*** and were defending themselves (which, notably, Debtor—after Mr. Dondero relinquished

---

[52] *Id.* at 46:20-22 [App. 1035].
[53] *Id.* at 46:20-25 [App. 1035].
[54] *Id.* at 45-47 [App. 1034-1036] (emphasis added).
[55] *Id.* at 46:6-15 [App. 1035] (emphasis added).

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                    **PAGE 20**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 56 of 1017    PageID 4735
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 25 of 37

control of same—asserted were not frivolous or vexatious in various disclosures):

    (a)    *Acis Action*, in which Debtor filed a 65-page objection that it described as having "numerous basis" and in which USB filed an objection;[56]

    (b)    *UBS Action*, in which Debtor filed an objection to the claim and stated that it had, "meritorious defenses to most, if not all, of the UBS Claim …", [ECF 928] and in which the Redeemer Committee of the Crusader Funds also objected;[57]

    (c)    *Daugherty Action*, in which Debtor asserted that the Daugherty Claim lacked merit;[58] and

    (d)    *HarbourVest Action*, in which Debtor "vigorously defen[ded]" the HarbourVest Claims on numerous grounds.[59]

Notably, neither Mr. Dondero nor any of the Affected Entities were parties to these lawsuits.

46.    ***Second***, the record actually reflects little, if any, litigation and motion practice initiated by Mr. Dondero, individually, as referenced in the charts attached to this Motion as Exhibits 28 and 29.[60]

47.    ***Third***, the Objections were made in good faith.[61] In fact, the U.S. Trustee, whose "good faith basis" was not questioned and who was not labeled a "disruptor," asserted the some of the same objections to the exact same provisions. This demonstrates that, in fact, the record actually shows that the independent boards of the Advisors and the Retail Funds appropriately exercised their right to object to the Plan to preserve various contractual, due process, and appellate rights.

---

[56] *See* ECF 891.
[57] *See* ECF 895.
[58] *See* ECF 895.
[59] *See* Dkt. 1384.
[60] *See* Chart regarding this bankruptcy proceeding, a true and correct copy of which is attached hereto as **Ex. 28 [APP. 2700]** and incorporated herein by reference; *see also* Chart regarding the injunction proceeding, a true and correct copy of which is attached hereto as **Ex. 29 [APP. 2713]** and incorporated herein by reference; *see also* **Ex. 30.**
[61] **Ex. 9** at 23:8-11[App. 1012].

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**        **PAGE 21**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 57 of 1017 PageID 4736
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21 Entered 03/18/21 20:54:16 Page 26 of 37

48.     **Fourth**, the Court failed to address the fourth prong of the test to support a vexatious litigant finding and conducted no analysis or consideration of the burden on the Courts or any purported plaintiff or the adequacy of any alternative to the pre-suit injunction.

49.     Consequently, nothing in this the record supports a finding that Mr. Dondero is a vexatious litigant or that any of the Advisors' or the Retail Funds' independent board members would disregard their fiduciary duties simply to benefit Mr. Dondero.

50.     **Fifth**, as demonstrated herein, the record reflects that the parties are being judged by two different sets of rules that disadvantage Mr. Dondero and the Affected Entities while favoring others. While, for example, as stated above, the Court referred to the Restriction Motion as "almost Rule 11 frivolous," it has not applied the same level of scrutiny to the pleadings filed and positions taken by Debtor or other parties. This is illustrated by the mandatory injunction filed by Debtor in February 2021 seeking the limited relief of mandating the Advisors and the Retail Funds to express a transition plan after Debtor indisputably terminated the shared services agreements (indicating that it would not be providing services going forward).[62] Despite the fact that the Advisors and the Retails Funds did not contest the termination and had no obligation to share their transition plan with Debtor following its termination of the shared services agreement, and Debtor's termination of the shared services agreement posed no harm to Debtor. As a result, there was no need for the filing the mandatory injunction—much less a seven-hour evidentiary hearing on the issue.[63]

---

[62] *See* the Mandatory Injunction, a true and correct copy of which is attached hereto as **Ex. 19 [APP. 1792]** and incorporated herein by reference; *see also* **Ex. 30**.
[63] *See* the February 23, 2021 Transcript on Hearing for Mandatory Injunction, a true and correct copy of which is attached hereto as **Ex. 21 [APP. 1818]** and incorporated herein by reference; *see also* **Ex. 30**.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                    **PAGE 22**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 58 of 1017 PageID 4737
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21 Entered 03/18/21 20:54:16 Page 27 of 37

Nevertheless, the Court, who ruled Debtor's mandatory injunction moot, went beyond the pleadings and relief requested by Debtor **to issue findings of fact adverse to Mr. Dondero**[64] and, the again, specifically blamed Mr. Dondero.[65]

### 5. Other Issues Demonstrating Bias.

51. In addition to the examples above, the Court's inability to rule impartially as a result of its preconceived opinion of Mr. Dondero has manifested itself in other ways throughout this case.

52. *First*, the Court has admitted to relying upon extrajudicial information from an article that referenced "Mr. Dondero or Highland affiliates" receiving PPP loans as a basis for the Court to direct Debtor's counsel in this bankruptcy to investigate the loans and report back to it.[66] Neither Mr. Dondero nor the so-called "Highland affiliates" referred to in the article were the property of or governed by Debtor. In fact, the PPP loans had *nothing* to do with the Debtor.[67]

53. *Second*, the Court's bias against Mr. Dondero has prejudiced the legal rights of separate and distinct legal entities simply because such entities have a connection to Mr. Dondero. Specifically, with respect to the Retail Funds, regardless of whether Mr. Dondero purportedly

---

[64] *See* the order on the Mandatory Injunction, a true and correct copy of which is attached hereto as **Ex. 20 [App. 1813]** at pp. 3-5 [APP. 1815-1817] and incorporated herein by reference; *see also* **Ex. 30**.

[65] *See* **Ex. 21** at 232:3-234:19 [APP. 2049-2051].

[66] *See* July 8, 2020 Transcript at 42:10-24 [App. 1082] ("THE COURT: Okay. All right. Two more questions. And this one has been a bit of a tough one for me to decide whether I should broach this topic or not. You know, *I read the newspapers, the financial papers, just like everyone else, and I saw a headline that I wished almost I wouldn't have seen, and it was a headline about Dondero or Highland affiliates* getting three PPP loans. *And, you know, I'm only supposed to consider evidence I hear in the courtroom, right, or things I hear in the courtroom, but I've got this extrajudicial knowledge right now thanks to just keeping up on current events. I decided I needed to ask about this.* What can you tell me about this, Mr. Pomerantz? I mean, I assumed, from less-than-clear reporting, that it wasn't Highland Capital Management, LP, but I'd like to hear anything you can report about this."), a true and correct copy of which is attached hereto as **Ex. 10 [APP. 1041]** and incorporated herein by reference; *see also* **Ex. 30**.

[67] *See* July 14, 2020 Transcript at 53:17-59:3 [App. 1429-1435], a true and correct copy of which is attached hereto as **Ex. 14 [APP. 1377]** and incorporated herein by reference; *see also* **Ex. 30**.



Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 59 of 1017    PageID 4738
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 28 of 37

controlled the entities at issue, the record does not reflect that any decision at issue was made other than by a vote of the independent board of trustees (which does not include Mr. Dondero).

54.     Likewise, CLO Holdco, which is a wholly owned subsidiary of a charitable Doner Advised Fund ("DAF") established by Mr. Dondero, has an independent trustee who is a licensed attorney, Grant Scott. CLO Holdco moved to have $2.5 million in funds that indisputably belonged to CLO Holdco released from the registry of the Court.  There were no objections to the liquidation at issue. There were no objections that bona fide investors, like CLO Holdco, should not receive their portion of the funds received from the liquidation. The Court admitted that CLO Holdco's lawyer made "perfect arguments" regarding the potential legal issues and whether "holding the money in the registry of the Court that a non-debtor asserts is its property, is that tantamount to a prejudgment remedy?"[68] Despite these "perfect" arguments and the lack of objection, the Court, again concluded that Mr. Dondero was behind the CLO Holdco filing and, therefore, questioned the "good faith" basis,[69] even though the Court had, prior to that time, expressly stated that the parties reserved all rights to file motions requesting the funds be disbursed to them.[70]

55.     The Court gave the UCC 90 days to file a complaint asserting a legal basis to the funds,[71] but held that, it could not continue to withhold the funds from CLO Holdco unless the UCC proved an injunction was required to permit the Court to keep the funds (which would be unlikely because

---

[68] See June 30, 2020 Transcript at 85:17-22 [App. 1236], a true and correct copy of which is attached hereto as **Ex. 12 [APP. 1152]** and incorporated herein by reference; see also **Ex. 30**.
[69] **Ex. 12** at 82:3-11 [App. 1233]; 85:4-16 [App. 1236].
[70] See **Ex. 15** at 49:22-25[App. 1559].
[71] **Ex. 12** at 88:1-11 [App. 1239]; see also July 21, 2020 Transcript 97:13-23 [App. 1348], a true and correct copy of which is attached hereto as **Ex. 13 [APP. 1252]** and incorporated herein by reference; see also **Ex. 30**.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455**                                                                                        **PAGE 24**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 60 of 1017    PageID 4739
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 29 of 37

the UCC would be seeking quantifiable, monetary damages). After multiple extensions, the UCC

ultimately filed an adversary, but never sought injunctive relief. Still, the Court has not released

the funds to CLO Holdco and has relieved the UCC of its burden to establish the elements for

injunctive relief.[72]

56.     ***Third***, and possibly most concerning, the Court has admitted to forming conclusions about

Mr. Dondero prior to even seeing evidence. Specifically, in a September 2020 hearing in the *Acis*

Bankruptcy, an issue arose regarding a lawsuit that certain DAFs and other entities filed against

Acis (and other non-Acis or Debtor entities) concerning a post-confirmation dispute. That lawsuit

was not pending in this Court or anywhere in the Northern District of Texas; nevertheless, **the**

**Court, after admitting to having not seen the lawsuit, declared it vexatious**:

> It's just ridiculous, for lack of a better term, that Dondero and his entities would be
> doing some of the things it sounds like they're doing: Suing Moody's, for crying
> out loud, for not downgrading the Acis CLOs. ***If Mr. Dondero doesn't think that***
> ***is so transparently vexatious litigation, yeah, I'm going out there and saying that.***
> ***I haven't seen it, but, come on.***[73]

57.     It is the Court's admission that, "I haven't seen it," paired with the finding of the Court that

the suit was "transparently vexatious litigation" that illustrates, perhaps most clearly, the

increasing need for this Motion.[74]

---

[72] Needless to say, the Affected Entities and every entity that the Court believes has any affiliation with Mr. Dondero is gun-shy about filing any pleading out of fear of "sanctions" or accusations of "bad faith." Conversely, the UCC, which has not alleged any basis for the Court retaining the $2.5 million, has not been chastised or otherwise threatened.
[73] *See* September 23, 2020 Transcript at 51:10-16 [APP. 1149], a true and correct copy of which is attached hereto as **Ex. 11 [APP. 1099]** and incorporated herein by reference; *see also* **Ex. 30**.
[74] Notably, the claims against Moody's relating to its ratings concerning the CLOs were the same issues raised in various lawsuits against Moody's following the 2008 crash. The action asserting the claims was initiated by DAF, an independent charity originally funded by Highland Capital. As a primary investor in the ACIS Collateralized Loan Obligations (CLO), the DAF lost almost 80% of its investment in ACIS CLOs as Josh Terry and sub-advisor Bridge circumvented CLO indenture covenants and materially increased the risk in the portfolio. Recently, JP Morgan

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                        **PAGE 25**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 31 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 61 of 1017   PageID 4740
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21   Entered 03/18/21 20:54:16   Page 30 of 37

**D. Recusal is necessary in light of the pending and future issues and proceedings.**

58.     Importantly, there are numerous adversary proceedings currently pending before this Court

that involve Mr. Dondero, individually, or one or more of the Affected Entities (collectively, the

"Adversary Proceedings").[75]

59.     The claims in the Adversary Proceedings include various tort and breach of contract claims,

claw-back claims, and *alter ego* claims seeking to hold Mr. Dondero and the Affected Entities

liable for any recovery ordered as to other entities. In addition, the UCC has indicated that there

are more suits to come, and Debtor specifically reserved claims against over five-hundred

"Dondero related-entities and current or former employees who will be branded with the "Dondero

disciple" moniker. Naturally, each of the Adversary Proceedings will require Mr. Dondero and the

Affected Entities to take legal positions and defend themselves—actions that this Court has

indicated that is predisposed to considering vexatious (and has already threatened large fee shifting

awards on preliminary injunction matters, even where a defendant has technically prevailed), even,

as stated above, in a situation where the Court had never seen the facts, the claims or the legal

---

highlighted ACIS 3-6 as the worst performing 1094 deals outstanding in 2019 through 2020. This action sought relief
from the trustee (US Bank) for failing to properly administer the indenture and from Moody's for failing to update or
suspend ratings given the breaches described above.
[75] The Adversary Proceedings include: *Highland Capital Management L.P. v. NexPoint Advisors, L.P. et. al.*,
Adversary Proceeding No. 21-03000; *Highland Capital Management, L.P. v. Nexpoint Advisors, L.P.*, Adversary No.
21-03005,; *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors*, L.P.; Adversary
No. 21-03004; *Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*; Adversary No.
21-03006, in the United States Bankruptcy Court for the Northern District of Texas; *Highland Capital Management,
L.P. v. HCRE Partners, LLC (N/K/A Nexpoint Real Estate Partners, LLC*, Adversary No. 21-03007; *Highland Capital
Management, L.P. v. HCRE Partners, LLC (N/K/A Nexpoint Real Estate Partners, LLC)*, Adversary No. 21-03007;
*Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al.*; Adversary No. 21-
03010; *Highland Capital Management, L.P. v. James Dondero*; Adversary No. 21-03003; and *Official Committee of
Unsecured Creditors v. CLO HOLDCO, LTD, et al.*; Adversary No. 20-03195.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                    **PAGE 26**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 32 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 62 of 1017    PageID 4741
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 31 of 37

theories; or where the Court has not admonished another party for the same position or a similar assertion of its rights.

60.    For the reasons stated above, the Court has demonstrated what appears to be a high degree of antagonism toward Mr. Dondero and the Affected Entities that has grown to such a point that a reasonable question as to the Court's impartiality has arisen and must be resolved. As a result, Movants respectfully request the Court recuse itself from the Adversary Proceedings.

### III.    ARGUMENTS & AUTHORITY

61.    Section 28 U.S.C. § 455 requires a judge to be recused if the judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding,"[76] and when the court's "impartiality might reasonably be questioned."[77] These provisions afford separate, though overlapping, grounds for recusal.[78]

62.    Under section 455(a), recusal is required whenever a judge's partiality might reasonably be questioned, ***even if the judge does not have actual personal bias or prejudice***.[79] The test under § 455(a) is **_not_** whether the judge believes he or she is capable of impartiality[80] and **_not_** whether the judge actually has a bias (or actually knows of grounds requiring recusal).[81] Instead, the test is whether the "'average person on the street who knows all the relevant facts of a case'" might

---

[76] 28 U.S.C. § 455 (b)(1).
[77] 28 U.S.C. § 455 (a).
[78] *Andrade v. Chojnacki*, 338 F.3d 448, 454 (5th Cir. 2003).
[79] *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 860 n. 8 (1988); *Andrade v. Chojnacki*, 338 F.3d 448, 454 (5th Cir. 2003).
[80] *Burke v. Regalado*, 935 F.3d 960, 1054 (10th Cir. 2019) (citations omitted).
[81] *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 805 (2001)).

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455**                                                    **PAGE 27**



Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 33 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 63 of 1017    PageID 4742
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 32 of 37

*__reasonably question__* the judge's impartiality.[82] As Congress recognized when enacting section 455, litigants "ought not have to face a judge where there is a reasonable question of impartiality."[83] At its core, this statutory provision is "designed to promote public confidence in the impartiality of the judicial process."[84]

63.    The words "prejudice" and "bias" mean a favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate, either because: (a) it is undeserved; (b) it rests upon knowledge that the holder of the opinion ought not to possess; or (c) it is excessive in degree.[85]

64.    Despite holding that "judicial rulings alone *almost* never constitute a valid basis for a bias or partiality motion," the Supreme Court has also recognized that predispositions developed during the course of a trial will sometimes suffice.[86]

65.    Moreover, while the presence of an extrajudicial source is a factor in favor of finding either an appearance of partiality under section 455(a) or bias or prejudice under section 455(b)(1),[87] an extrajudicial source for a judge's opinion about a case or a party is not necessary for recusal.[88] In addition, while, ordinarily, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion," they "*__may do so__*" if they reveal an opinion that derives from an

---

[82] *In re Kansas Pub. Employees Retirement Sys.*, 85 F.3d 1353, 1358 (8th Cir.1996).
[83] H. Rep. No. 1453, 93d Cong., 2d Sess. 1 (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 6351, 6355.
[84] *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988) (quoting H.R.Rep. No. 1453, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 6351, 6354–55); *Liljeberg*, 486 U.S. at 859–60.
[85] *Liteky v. United States*, 510 U.S. 540, 550 (1994).
[86] *Liteky v. United States*, 510 U.S. 540, 554 (1994) (emphasis added).
[87] *Bell v. Johnson*, 404 F.3d 997, 1004 (6th Cir. 2005) (citations omitted).
[88] *Liteky v. United States*, 510 U.S. 540, 554-55 (1994).


003981

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 34 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 64 of 1017   PageID 4743
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21   Entered 03/18/21 20:54:16   Page 33 of 37

extrajudicial source; and ***they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible***."[89]

66.    Mr. Dondero and all other non-debtors, like every litigant, are entitled to a full and fair opportunity to make their case in an impartial forum—regardless of their history with that forum.[90] Beyond that, "fundamental to the judiciary is the public's confidence in the impartiality of our judges and the proceedings over which they preside."[91] "[J]ustice must satisfy the appearance of justice."[92] Notably, the Fifth Circuit has held that "***[i]f the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal.***"[93]

67.    Here, the facts detailed above, and incorporated herein, including but not limited to specifically paragraphs 1-60, show that the Court's conduct in this bankruptcy would lead an objective observer to reasonably question the Court's impartiality. By way of summary, the Court has:

(a)    admitted that the negative opinions about Mr. Dondero formed during the *Acis* case cannot be excised from the Court's mind;

(b)    made repeated reference to proceedings in the *Acis* case to justify findings made in this case that are not otherwise supported by *this* record and repeated negative statements about Mr. Dondero in connection with the Court's rulings;

(c)    repeatedly threatened sanctions on and questioned the good-faith basis Mr. Dondero and the Affected Entities, for (i) defending lawsuits and motions; (ii) asserting valid legal positions; and/or (iii) preserving their rights, including in the exact same manner in which others are permitted to do so (e.g., the U.S. Trustee's objections to the Plan),

---

[89] *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citation omitted) (emphasis added).
[90] *Miller v. Sam Houston State University*, 986 F.3d 880, 893 (5th Cir. 2021) (citing *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995)).
[91] *Id.*
[92] *Id.* (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).
[93] *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 165 (5th Cir. 1997) (emphasis added).

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455**                                                    **PAGE 29**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 35 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 65 of 1017    PageID 4744
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 34 of 37

even declaring Mr. Dondero and the Affected Entities as behind "vexatious" litigation the Court admits it has not actually seen; and

(d) Disregarded the presumption that related corporations of separation have institutional independence and concluded, without supporting evidence from this proceeding, that any entity the Court deems connected to or controlled by Mr. Dondero (i.e., including the highly regulated Affected Entities, which are governed by independent board members) is essentially *no more than* a tool of Mr. Dondero and that Mr. Dondero is the ultimate decision-maker behind all the motions they file and actions they take in this proceeding;[94] and

(e) disregarded the testimony of any witness with a connection to Mr. Dondero as per se less credible, which includes attorneys and persons who owe fiduciary duties and ethical obligations.[95]

68.     This Motion is not being filed because of prior adverse rulings; or because of any predispositions formed by the Court based upon **facts or evidence** introduced in the course of the current proceeding; or because of ordinary admonishments from a court to a litigant. Instead, this Motion is being filed because the facts and circumstances, including the non-exhaustive examples described above, reveal a deep-seeded antagonism toward Mr. Dondero and the Affected Entities that goes enough beyond "normal" admonishment as to render fair judgment and impartiality toward Mr. Dondero (and the required perception of same) impossible.

69.     Importantly, this Court will sit as both judge and jury in the various Adversary Proceedings

---

[94] **Ex. 7** at 254:4-25 [App. 0781].

[95] *See, e.g.*, ECF 1943 at p. 19 ("At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and Funds that the Funds have independent board members that run the Funds, but the Bankruptcy Court was not convinced of their independence from Mr. Dondero because none of the so-called independent board members have ever testified before the Bankruptcy Court and all have been engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request, and he is currently employed by Mr. Dondero."); *see also*, **Ex. 8**, The January 8, 2021 Transcript, at 175:8-176:25 [App. 0959-0960].


App. 0049
003983

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 36 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 66 of 1017    PageID 4745
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21    Entered 03/18/21 20:54:16    Page 35 of 37

(and any additional ones that are filed) and contested matters in the future, and the Court has demonstrated a willingness to retain jurisdiction whenever possible.[96] In doing so, the Court must, but appears unable to despite best efforts, set aside any prejudice or bias against Mr. Dondero in those proceedings. As demonstrated above, the Court is predisposed against Mr. Dondero (on issues that have not yet been tried and evidence that has never been entered in any proceeding in this bankruptcy) and has already disregarded the corporate separateness between Mr. Dondero and entities—which Mr. Dondero does not control—that are defendants in the Adversary Proceedings.

70.    Practically and importantly, the Court's predisposition against Mr. Dondero (and the Affected Entities), including its prior declarations of vexatiousness (and threats of sanctions) and its questioning of counsels' good faith in taking legally-supported positions, indisputably threaten the ability of counsel for Mr. Dondero (and the Affected Entities or any entity or person that is perceived to be associated or aligned with Mr. Dondero) to put forward any claim or defense or seek certain relief. In effect, counsel is now forced to choose between: (a) raising an issue to preserve it for appeal and risk sanctions; (b) waiving raising a valid issue to avoid sanctions and, thereby, committing malpractice; or (c) withdrawing from its representation.

71.    "It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process."[97] As described herein, the cumulative weight of both prejudicial comments and peremptory rulings by the Court demonstrate that the Court appears to have developed a personal bias or prejudice

_____

[96] *See, e.g.,* **Ex. 11** at 50:4-52:7 [App. 1148-1150].
[97] *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877 (2009) (internal quotation marks and citation omitted); see also *Johnson v. Mississippi*, 403 U.S. 212, 216 (1971) (per curiam) ("Trial before 'an unbiased judge' is essential to due process.") (quoting *Bloom v. Illinois*, 391 U.S. 194, 205 (1968)).

App. 00041
003984

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 37 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 67 of 1017   PageID 4746
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21   Entered 03/18/21 20:54:16   Page 36 of 37

concerning Mr. Dondero (and various entities that the Court has deemed "under his control") that now render the Court unable to be impartial and render fair judgment related to Mr. Dondero. At a minimum, that is the perception that has been created.[98]

72.     As a result, the Court should recuse itself from the Adversary Proceedings, any contested matter involving Mr. Dondero or any of the Affected Entities from acting as the "gatekeeper" in determining whether any future claim by Mr. Dondero (or any of the Affected Entities) is valid.

## IV.   PRAYER

FOR THE FOREGOING REASONS, Movants respectfully request that the Court recuse itself from the Adversary Proceedings and any future contested matters involving Movants or any entity connected to Mr. Dondero; and grant Movants all other further relief, at law or equity, to which they are justly entitled.

---

[98] *Liteky v. United States*, 510 U.S. 540, 551 (1994).

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455**                                    **PAGE 32**

Case 19-34054-sgj11 Doc 3445-2 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 68 of 1017 PageID 4747
Case 19-34054-sgj11 Doc 2061 Filed 03/18/21 Entered 03/18/21 20:54:16 Page 37 of 37

Dated: March 18, 2021

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

By: */s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500
*Counsel for Movants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 18, 2021, a true and correct copy of the above and foregoing document was served on all parties of record via the Court's e-filing system.

*/s/ Michael J. Lang*
Michael J. Lang



**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                    **PAGE 33**


003986

# EXHIBIT 3

Appx 00044

003987

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 70 of 1017   PageID 4749
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1 of 2722

Docket #2062  Date Filed: 03/18/2021

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**APPENDIX TO JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC, F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**

James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors,

L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners,

LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "Movants")

file this Appendix in support of their Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in

Support of same:

| Exhibit No. | Description | Appendix Page Nos. |
|---|---|---|
| 1 | December 2, 2019 Transcript - Motion to Transfer | APP. 0001-APP. 0137 |
| 2 | January 9, 2020 Transcript - Debtor's Motion to Compromise Controversy with Official Committee of Unsecured Creditors | APP. 0138-APP. 0228 |
| 3 | February 19, 2020 Transcript | APP. 0229-APP. 0416 |

‖1934054210318000000000012‖

003988

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 71 of 1017 PageID 4750
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2 of 2722

| 4 | December 12, 2020 Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles | APP. 0417-APP. 0442 |
|---|---|---|
| 5 | December 16, 2020 Transcript - Motion for Order Imposing Temporary Restrictions | APP. 0443-APP. 0508 |
| 6 | January 6, 2021 Plaintiff Highland Capital Management, L.P.'S Verified Original Complaint for Declaratory and Injunctive Relief | APP. 0509-APP. 0527 |
| 7 | January 26, 2021 Transcript - Motion for Entry of Order Authorizing Debtor to Implement Key Employee Plan | APP. 0528-APP. 0784 |
| 8 | January 8, 2021 Transcript - Preliminary Injunction Hearing | APP. 0785-APP. 0989 |
| 9 | February 8, 2021 Transcript - Bench Ruling on Confirmation Hearing and Agreed Motion to Assume | APP. 0990-APP. 1040 |
| 10 | July 8, 2020 Transcript - Motion to Extend Exclusivity Period and Motion to Extend Time to Remove Actions | APP. 1041-APP. 1098 |
| 11 | September 23, 2020 Transcript – Debtors' Motion to File Redacted Quarterly Reports | APP. 1099-APP. 1151 |
| 12 | June 30, 2020 Transcript - Motion for Remittance of Funds Held in Registry of Court filed by CLO Holdco, Ltd. | APP. 1152-APP. 1251 |
| 13 | July 21, 2020 Transcript - Official Committee of Unsecured Creditors Emergency Motion to Compel Production by the Debtor | APP. 1252-APP. 1376 |
| 14 | July 14, 2020 Transcript - Applications to Employ James P. Seery and Development Specialists, Inc. | APP. 1377-APP. 1510 |
| 15 | March 4, 2020 Transcript - Hearing on Motion of The Debtor for Entry of an Order Authorizing, but not Directing, the Debtor to Cause Distributions to Certain "Related Entities" | APP. 1511-APP. 1631 |
| 16 | June 15, 2020 Transcript - UBS's Motion for Relief from the Automatic Stay to Proceed with State Court Action | APP. 1632-APP. 1758 |
| 17 | January 6, 2021 Debtor's Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero | APP. 1759-APP. 1776 |
| 18 | K&L Gates Letters | APP. 1777-APP. 1791 |
| 19 | February 17, 2021 Debtor's Memorandum of Law in Support of its Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021 | APP. 1792-APP. 1812 |
| 20 | February 24, 2021 Order on Mandatory Injunction | APP. 1813-APP. 1817 |
| 21 | February 23, 2021 Mandatory Injunction Hearing Transcript | APP. 1818-APP. 2056 |
| 22 | January 14, 2021 Motion to Appoint Examiner | APP. 2057-APP. 2070 |
| 23 | February 2, 2021 Transcript of Proceedings | APP. 2071-APP. 2365 |

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 72 of 1017 PageID 4751
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 3 of 2722

| 24 | Servicing Agreement – Exhibit N from February 2, 2021 Hearing | APP. 2366-APP. 2401 |
| 25 | Servicing Agreement – Exhibit J from February 2, 2021 Hearing | APP. 2402-APP. 2440 |
| 26 | February 3, 2021 Transcript of Proceedings | APP. 2441-APP. 2697 |
| 27 | Chart of Holdings of Preference Shares in CLOs – Exhibit 2 from February 3, 2021 Hearing | APP. 2698-APP. 2699 |
| 28 | Demonstrative #1 Showing Motions in this Bankruptcy Proceeding No.19-34054-sgj-11 | APP. 2700-APP. 2712 |
| 29 | Demonstrative #1 Showing Motions in Injunction Proceeding No. 20-03190-sgj | APP. 2713-APP. 2714 |
| 30 | Declaration of Michael J. Lang | APP. 2715-APP. 2719 |

Dated: March 18, 2021

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

By: /s/ Michael J. Lang
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on March 18, 2021, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

/s/ Michael J. Lang
Michael J. Lang

003990

# EXHIBIT 1

1

```
 1

 2   UNITED STATES BANKRUPTCY COURT

 3   DISTRICT OF DELAWARE

 4   - - - - - - - - - - - - - - - - - - - -x

 5   In the Matter of:

 6   HIGHLAND CAPITAL MANAGEMENT, L.P.,      Case No.

 7            Debtor.                        19-12239(CSS)

 8   - - - - - - - - - - - - - - - - - - - -x

 9

10

11               United States Bankruptcy Court

12               824 North Market Street

13               Wilmington, Delaware

14

15               December 2, 2019

16               10:07 AM

17

18

19   B E F O R E:

20   HON. CHRISTOPHER S. SONTCHI

21   CHIEF U.S. BANKRUPTCY JUDGE

22

23   ECR OPERATOR:  LESLIE MURIN

24

25
```

eScribers, LLC | (973) 406-2250

operations@escribers.net | www.escribers.net

2

```
 1

 2   Motion for Entry of an Order (I) Authorizing Bradley D. Sharp

 3   to Act as Foreign Representative Pursuant to 11 U.S.C. Section

 4   1505 and (II) Granting Related Relief (Docket No. 68).

 5

 6   Motion of the Official Committee of Unsecured Creditors for

 7   Entry of an Order Authorizing Filing Under Seal of the Omnibus

 8   Objection of the Official Committee of Unsecured Creditors to

 9   the Debtor's (1) Motion for Final Order Authorizing Continuance

10   of the Existing Cash Management System, (II) Motion to Employ

11   and Retain Development Specialists, Inc. to Provide a Chief

12   Restructuring Officer, and (III) Precautionary Motion for

13   Approval of Protocols for "Ordinary Course" Transactions

14   (Docket No. 123).

15

16   Motion of Debtor for Entry of Interim and Final Orders

17   Authorizing Debtor to File Under Seal Portions of Its Creditor

18   Matrix Containing Employee Address Information (Docket No. 8).

19

20   Debtor's Application for an Order Authorizing the Retention and

21   Employment of Foley Gardere, Foley & Lardner LLP as Special

22   Texas Counsel, Nunc Pro Tunc to the Petition Date (Docket No.

23   69).

24

25
```

APP. 0002
003992

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 75 of 1017 PageID 4754
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 6 of 2722

Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 3 of 137

3

1

2 Debtor's Application for an Order Authorizing the Retention and

3 Employment of Lynn Pinker Cox & Hurst LLP as Special Texas

4 Litigation Counsel, Nunc Pro Tunc to the Petition Date (Docket

5 No. 70).

6

7 Motion of Debtor for Entry of Interim and Final Orders

8 Authorizing (A) Continuance of Existing Cash Management System

9 and Brokerage Relationships, (B) Continued Use of the Prime

10 Account, (C) Limited Waiver of Section 345(b) Deposit and

11 Investment Requirements, and (D) Granting Related Relief

12 (Docket No. 5).

13

14 Motion Pursuant to 11 U.S.C. Sections 105(a) and 363(b) to

15 Employ and Retain Development Specialists, Inc. to Provide a

16 Chief Restructuring Officer, Additional Personnel, and

17 Financial Advisory and Restructuring-Related Services, Nunc Pro

18 Tunc as of the Petition Date (Docket No. 75).

19

20 Precautionary Motion of the Debtor for Order Approving

21 Protocols for the Debtor to Implement Certain Transactions in

22 the Ordinary Course of Business (Docket No. 77).

23

24

25

APP. 0003

003993

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 76 of 1017    PageID 4755
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 7 of 2722

Case 19-12239-CSS    Doc 181    Filed 12/03/19    Page 4 of 137

4

1

2    Motion of the Official Committee of Unsecured Creditors for an

3    Order Transferring Venue of This Case to the United States

4    Bankruptcy Court for the Northern District of Texas (Docket No.

5    86).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Clara Rubin

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 77 of 1017 PageID 4756
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 8 of 2722

Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 5 of 137

```
                                                              5

 1

 2   A P P E A R A N C E S :

 3   PACHULSKI STANG ZIEHL & JONES LLP

 4        Attorneys for Debtor

 5   BY:   JAMES E. O'NEILL, ESQ.

 6        GREGORY DEMO, ESQ.

 7        IRA D. KHARASCH, ESQ.

 8        MAXIM LITVAK, ESQ.

 9        JOHN A. MORRIS, ESQ.

10        JEFFREY N. POMERANTZ, ESQ.

11

12

13   UNITED STATES DEPARTMENT OF JUSTICE

14        Office of the United States Trustee

15   BY:   JANE LEAMY, ESQ.

16

17

18   SIDLEY AUSTIN LLP

19        Proposed Counsel for Official Committee of Unsecured

20        Creditors

21   BY:   MATTHEW A. CLEMENTE, ESQ.

22        PENNY P. REID, ESQ.

23        DENNIS M. TWOMEY, ESQ.

24

25
```

APP. 0005
003995

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 78 of 1017 PageID 4757
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 9 of 2722

Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 6 of 137

6

```
 1
 2   YOUNG CONAWAY STARGATT & TAYLOR, LLP
 3        Attorneys for Official Committee of Unsecured Creditors
 4   BY:  SEAN M. BEACH, ESQ.
 5        KEVIN A. GUERKE, ESQ.
 6        MICHAEL R. NESTOR, ESQ.
 7
 8
 9   ASHBY & GEDDES, P.A.
10        Attorneys for Jefferies, LLC
11   BY:  WILLIAM P. BOWDEN, ESQ.
12
13
14   BLANK ROME LLP
15        Attorneys for Acis Capital Management GP, et al.
16   BY:  JOHN E. LUCIAN, ESQ.
17        JOSE F. BIBILONI, ESQ.
18
19
20   DENTONS US, LLP
21        Attorneys for Jefferies
22   BY:  LAUREN MACKSOUD, ESQ. (TELEPHONICALLY)
23        PATRICK C. MAXCY, ESQ. (TELEPHONICALLY)
24
25
```

APP. 0006

003996

```
                                                                    7

 1

 2   GIBSON, DUNN & CRUTCHER LLP

 3         Attorneys for Alvarez & Marsal

 4   BY:   MICHAEL A. ROSENTHAL, ESQ.

 5

 6

 7   JENNER & BLOCK

 8         Attorneys for Redeemer Committee of Crusader Fund

 9   BY:   MARC B. HANKIN, ESQ.

10         TERRI L. MASCHERIN, ESQ.

11

12

13   LATHAM & WATKINS, LLP

14         Attorneys for UBS Securities LLC and UBS London Bank

15   BY:   ASIF ATTARWALA, ESQ. (TELEPHONICALLY)

16         JEFF BJORK, ESQ. (TELEPHONICALLY)

17         ANDREW B. CLUBOK, ESQ. (TELEPHONICALLY)

18         KUAN HUANG, ESQ. (TELEPHONICALLY)

19         KIMBERLY A. POSIN, ESQ. (TELEPHONICALLY)

20

21

22   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

23         Attorneys for Redeemer Committee of Crusader Fund

24   BY:   CURTIS S. MILLER, ESQ.

25
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 80 of 1017 PageID 4759
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 11 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 8 of 137

8

```
 1
 2   POTTER ANDERSON & CORROON LLP
 3        Attorneys for Alvarez & Marsal
 4   BY:   JEREMY W. RYAN, ESQ.
 5
 6
 7   ROGGE DUNN GROUP, PC.
 8        Attorneys for Acis Capital Management GP, et al.
 9   BY:   BRIAN P. SHAW, ESQ.
10
11
12   SCHULTE ROTH & ZABEL LLP
13        Attorneys for CLO Entities, Intertrust Entities
14   BY:   JAMES T. BENTLEY, ESQ. (TELEPHONICALLY)
15
16
17   WINSTEAD, P.C.
18        Attorneys for Acis Capital Management GP, et al.
19   BY:   RAKHEE V. PATEL, ESQ.
20
21
22
23
24
25
```

APP. 0008
003998

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 13 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 81 of 1017   PageID 4760
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 12 of
2722
Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 9 of 137

9

1

2   ALSO PRESENT:

3       ISAAC D. LEVENTON, ESQ., Asst. General Counsel, Highland

4       Capital Management

5       FRANK WATERHOUSE, Partner and CFO, Highland Capital

6       Management

7       BRADLEY SHARP, Pres. and CEO, Development Specialists,

8       Inc.

9       FRED CARUSO, COO, Development Specialists, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APP. 0009
003999

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 82 of 1017 PageID 4761
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 13 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 10 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    10

1                   P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.

4              MR. O'NEILL:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. O'NEILL:  James O'Neill, Pachulski Stang Ziehl &

7    Jones, here today on behalf of the debtor, Highland Capital

8    Management.  With me, Your Honor, at counsel table is Jeff

9    Pomerantz, Ira Kharasch, John Morris, Greg Demo, and Max

10   Litvak, representing the debtor.  Also in the courtroom with

11   us, from our client, Isaac Leventon and Frank Waterhouse and,

12   from DSI, Brad Sharp and Fred Caruso.

13             THE COURT:  Welcome.

14             MR. O'NEILL:  Your Honor, we have a number of matters

15   on the agenda today, but we are going to proceed with item

16   number 12 on the agenda, which is the committee's venue motion.

17   So I will yield the podium to them.

18             THE COURT:  Okay.

19             MR. CLEMENTE:  Good morning, Your Honor.

20             THE COURT:  Good morning.

21             MR. CLEMENTE:  Matthew Clemente from Sidley Austin,

22   proposed counsel to the official committee of unsecured

23   creditors.  With me here today, my colleagues Dennis Twomey and

24   Penny Reid, along with our co-counsel from Young Conaway, Mike

25   Nestor and Sean Beach.

APP. 0010
004000

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 83 of 1017 PageID 4762
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 14 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 11 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.          11

 1          Your Honor, we have filed our venue motion.  We
 2   believe that venue -- it's appropriate to transfer venue to the
 3   bankruptcy court in the District of Texas for the reasons that
 4   we laid out in the motion.  Based on Your Honor's --
 5   discussions with Your Honor this morning, we understand that we
 6   would proceed with what I believe would be a short proffer from
 7   the debtor, we would have an opportunity to cross, and then we
 8   would proceed to argument from there.  If that's acceptable to
 9   Your Honor, that's --

10          THE COURT:  That's fine.  Thank you.

11          MR. CLEMENTE:  -- that's the way we'd proceed.

12          THE COURT:  Yes.

13          MR. CLEMENTE:  Thank you, Your Honor.

14          MR. POMERANTZ:  Good morning, Your Honor.  Jeff
15   Pomerantz, Pachulski Stang Ziehl & Jones, on behalf of the
16   debtor.  We'd also like at this time, Your Honor, to move into
17   evidence Exhibits A through U, except for Exhibit G.  Exhibit G
18   is one of those documents that we refer to in chambers as would
19   be subject to seal.  We don't need to refer to it in connection
20   with the venue motion.  But if Your Honor would like, I can
21   approach with a binder containing the --

22          THE COURT:  Yeah, I don't have those.

23          MR. POMERANTZ:  -- exhibits.  There have been no
24   objections to them.

25          MR. POMERANTZ:  Your Honor, if Mr. Sharp were called

APP. 0011

004001

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 84 of 1017 PageID 4763
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 15 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 12 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    12

 1  to testify, he would testify --

 2          THE COURT:  Hang --

 3          MR. POMERANTZ:  Oh, sorry.

 4          THE COURT:  Hang on.  Okay.

 5          MR. POMERANTZ:  Okay.

 6          THE COURT:  Look at the documents.  It's the first

 7  I've seen them.

 8      (Pause)

 9          THE COURT:  So you're moving A through U, except for

10  G?

11          MR. POMERANTZ:  Correct, Your Honor.

12          THE COURT:  Any objection?

13          MR. CLEMENTE:  Sorry, Your Honor, one --

14          THE COURT:  No; yeah, that's fine.

15          MR. CLEMENTE:  No objection, Your Honor.

16          THE COURT:  All right, they're admitted without

17  objection, other than G.  G is not admitted at this time.

18      (Debtors' Exhibits A through U, except for Exhibit G, were

19  hereby received into evidence, as of this date.)

20          THE COURT:  All right, you may proceed with the

21  proffer.

22          MR. POMERANTZ:  Thank you, Your Honor.

23          If Mr. Sharp were called to testify, he would testify

24  that he is the proposed chief restructuring officer of the

25  debtor; he's also the president of Development Specialists,

APP. 0012
004002

HIGHLAND CAPITAL MANAGEMENT, L.P.                    13

1  Inc., a financial advisory firm.  He would testify that he's

2  been a restructuring professional with over twenty-five years

3  of experience as a trustee, a chief restructuring officer, and

4  a financial advisor, in a myriad of industries.  He would

5  testify that he has been appointed as chief restructuring

6  officer in four cases in Delaware, including In re Variant

7  before Judge Shannon, In re Woodbridge before Judge Carey, In

8  re WL Homes before Judge Shannon, and In re Beverly Hills

9  Bancorp before Judge Carey.

10        He would testify that he has a national practice, he's

11  physically headquartered in Los Angeles, and it would be as

12  convenient for him to travel to this court in Delaware than it

13  would be for him to travel to Dallas.  He would testify that

14  the debtor's counsel, Pachulski Stang Ziehl & Jones, has

15  offices in Delaware and, if the case were transferred, the

16  debtor would need to retain local counsel in Dallas.

17        He would testify that he was initially engaged by the

18  debtor on October 7, 2019 and that, prior to his engagement as

19  a CRO, he had no prior involvement with Highland or any of its

20  senior management employees or principals.  He would testify

21  that he was introduced to Highland by Pachulski Stang Ziehl &

22  Jones.

23        He would testify that, since his engagement, he and

24  his colleague, Fred Caruso, who functions as an extension of

25  him in his role as chief restructuring officer, and other

APP. 0013

004003

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 86 of 1017 PageID 4765
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 17 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 14 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    14

 1  employees of DSI have devoted themselves to learning about the

 2  debtor's business and financial affairs, knowledge that only

 3  increases as the days go by.  He would testify that he and

 4  others from DSI have spent hundreds of hours meeting with

 5  various employees of the debtor and reviewing and accessing the

 6  debtor's books and records.  He would testify that he's been

 7  given complete access to a wealth of information by the debtor,

 8  and nothing he or his team have requested from the debtor have

 9  been withheld by them.

10       He would testify that the debtor's a limited

11  partnership organized under the laws of Delaware and that the

12  debtor's general partner, Strand Advisors, is a corporation

13  organized under Delaware law as well, and Strand is the manager

14  of the debtor.  He would testify that over ninety-nine percent

15  of the debtor's limited partnerships are held by Delaware

16  entities.

17       He would testify that the debtor owns and manages a

18  sophisticated financial-advisory-services and money-management

19  business that has assets and interests all over the world; that

20  the debtor's assets under management, including its own

21  proprietary assets and those of its clients, through various

22  related parties, exist in the United States, Asia, South

23  America, and Europe.

24       He would testify that the debtor has over two-and-a-

25  half billion dollars of assets under management and receives

APP. 0014
004004

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 87 of 1017 PageID 4766
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 18 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 15 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    15

1  management and advisory fees from a multitude of sources around

2  the world.  He would also testify that the debtor provides

3  shared services for approximately 7.5 billion of assets managed

4  by a variety of affiliated and unaffiliated entities, including

5  other affiliated registered investment advisors.

6          He would testify that although the debtor is based in

7  Dallas, the debtor's affiliates and related parties maintain

8  offices or have personnel in many international locales,

9  including Buenos Aires, Rio de Janeiro, Singapore, and Seoul.

10 He would testify that the debtor owns and manages targeted

11 funds in Korea, South America, and Singapore.

12          He would testify that the debtor's filed the motion

13 that's pending today to appoint him as foreign representative

14 in order to manage certain foreign interests, including those

15 proceedings pending in Bermuda and Cayman.  He would testify

16 that the principal assets in the United States consist of

17 custodial and noncustodial interests and investments located

18 all over the country, and that the debtor's prime brokerage

19 account that holds the bulk of the debtor's liquid assets is

20 located in New York City with Jefferies.

21          He would testify the debtor owes approximately 30

22 million dollars to Jefferies on account of margin obligations

23 that are secured by the securities in the prime account, and

24 that the debtor's other principal secured creditor, Frontier

25 State Bank, is based in Oklahoma City and is owed approximately

APP. 0015
004005

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 88 of 1017    PageID 4767
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 19 of
2722
Case 19-12239-CSS    Doc 181    Filed 12/03/19    Page 16 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    16

1  5.2 million dollars as of the petition date.

2         He would testify that one aspect of the debtor's

3  business is management advisory services in connection with

4  various investments and collateralized loan obligations, or

5  "CLOs", and that the debtor previously provided submanager,

6  subadvisory, and shared services to Acis CLOs pursuant to

7  certain contractual agreements that were terminated during the

8  course of Acis' bankruptcy in or around August 2018.  He would

9  testify that he's informed and believes that the compensation

10 structure for subadvisory and shared-service agreements is

11 different for CLOs than with other types of private equity or

12 hedge funds that the debtor manages.

13        He will testify that a focus of DSI's efforts in this

14 case will be to evaluate the appropriateness and the economics

15 of the shared-service agreements and subadvisory agreements

16 that the debtor's a party to with both affiliated and

17 unaffiliated third parties, and he would determine what

18 modifications are appropriate given the facts and

19 circumstances.

20        He would testify that, since the petition date and, he

21 believes, since August 2018, the debtor has not had any direct

22 business dealings with respect to Acis or the CLO assets for

23 which Acis serves as CLO manager, and that the debtor no longer

24 advises or subadvises any active CLOs; the debtor only has CLOs

25 that are in liquidation and in the process of monetizing their

APP. 0016
004006

HIGHLAND CAPITAL MANAGEMENT, L.P.                    17

1    underlying assets and paying off their remaining investors'

2    revenues that will decrease over time; and that the CLO portion

3    of the debtor's business provides just ten percent of the

4    debtor's revenue, which, again, will shrink over time.

5           He would testify that the debtor derives ninety

6    percent of its other revenue from managing asset classes that

7    have nothing to do with Acis, including private equity, hedge

8    fund, mutual funds, open-ended retail funds, and real-estate

9    funds.

10          He would testify that the debtors and Acis assert

11   various substantial disputed and unliquidated claims against

12   each other, and the debtor has outstanding claims against Acis

13   that total no less than eight million dollars for services

14   rendered.  He would testify that the debtor and Acis have been,

15   and continue to be, involved in highly contentious litigation,

16   including matters that are subject to multiple appeals from the

17   bankruptcy court and pending fraudulent-transfer claims brought

18   by Acis against the debtor, in Texas.  He would testify the

19   debtor is currently supporting two pending appeals of orders of

20   the Texas bankruptcy court, granting the involuntary petition

21   against Acis and confirming Acis' Chapter 11 plan that put Mr.

22   Terry in charge of Acis.

23          He would testify that, although he serves subject to

24   the debtor's ability to terminate him, he has full

25   responsibility with respect to analyzing and pursing insider

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 90 of 1017 PageID 4769
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 21 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 18 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    18

 1  transactions and is in charge of the debtor's restructuring

 2  efforts, and that he has no prior relationship with either Acis

 3  or the Texas bankruptcy court with respect to this matter.  He

 4  would testify that his goal in this case is to maximize the

 5  value of the debtor's estate for the benefit of all

 6  constituents, and he intends to evaluate all available

 7  strategic options for accomplishing the goal, and hopes to work

 8  constructively with the committee in that regard.

 9         He believes that the outcome of this case will not

10  turn on the day-to-day management of the debtor's assets but

11  instead will be driven by the debtor's ability to restructure

12  its balance sheet and maximize the value of its assets, many of

13  which are liquid.  He would testify that either he or Fred

14  Caruso would provide substantially all the testimony that would

15  be provided for the debtor in this case.

16         Lastly, he would testify that he's been on the job for

17  over a month-and-a-half, that the debtor has been following the

18  protocols set out in the motion for which approval is being

19  sought today.  He would testify the debtor's being transparent

20  with the creditors' committee, has met with and communicated

21  with FTI on many occasions, and shared a lot of information.

22  And he would testify that there have been no allegations made

23  by the committee or any other party, regarding any post-

24  petition impropriety by the debtor.

25         That concludes my proffer of Mr. Sharp's testimony.

APP. 0018
004008

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 23 of
Case 3:25-cv-02072-S  Document 15-7  F22e3 10/06/25  Page 91 of 1017  PageID 4770
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 22 of
2722
Case 19-12239-CSS  Doc 181  Filed 12/03/19  Page 19 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    19

1          THE COURT:  All right, thank you very much.

2          Does anyone wish to cross-examine the witness?

3          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

4          THE COURT:  Yes?

5          UNIDENTIFIED SPEAKER:  Yeah.

6          THE COURT:  Okay.

7          MS. REID:  Yes, Your Honor.

8          THE COURT:  Mr. Sharp, would you please take the

9   stand?  And remain standing for your affirmation.

10         THE CLERK:  Would you step up to the stand, please?

11  Raise your right hand.

12      (Witness affirmed)

13         THE CLERK:  Please state and spell your name for the

14  record.

15         THE WITNESS:  Bradley Sharp, B-R-A-D-L-E-Y; last name,

16  S-H-A-R-P.

17         THE CLERK:  Thank you.

18         THE COURT:  Very good.

19         MS. REID:  Good morning, Your Honor.  Penny Reid on

20  behalf of the creditors' committee.

21         THE COURT:  Good morning.

22         Mr. Sharp, just -- you look like a veteran, but if you

23  could stay close to the microphone, I'd appreciate it.

24         THE WITNESS:  Yes, sir.

25         THE COURT:  Thank you.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 92 of 1017 PageID 4771
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 23 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 20 of 137

1  CROSS-EXAMINATION

2  BY MS. REID:

3  Q.  Mr. Sharp, you've only met Mr. Dondero once; correct?

4  A.  That is correct.

5  Q.  And that was in Dallas; correct?

6  A.  That is correct.

7  Q.  And your team has been at the debtor's offices; correct?

8  A.  Yes.

9  Q.  And worked over a hundred hours at the debtor's offices;

10  correct?

11  A.  Yes.

12  Q.  And that's all been in Dallas; correct?

13  A.  Yes.

14  Q.  Your team has not been to a New York office; has it?

15  A.  No.

16  Q.  Has your team -- your team has not been to Korea; has it?

17  A.  No.

18  Q.  Your team has not been to Singapore; has it?

19  A.  With respect to this engagement, no.

20  Q.  Okay.  And you haven't met any employees in the Singapore

21  office; have you?

22  A.  No.

23  Q.  And under this proposed engagement, you're going to report

24  to Mr. Dondero; correct?

25  A.  Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 25 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 93 of 1017   PageID 4772
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 24 of
2722
Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 21 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    21

1           MS. REID:  We will reserve our rights to further

2   question him on the other issues, non-venue issues.

3           THE COURT:  Of course.

4           MR. SHAW:  Good morning, Your Honor.  Brian Shaw on

5   behalf of Acis Capital Management, a creditor.

6           THE COURT:  Yes, Mr. Shaw, you may proceed.

7   CROSS-EXAMINATION

8   BY MR. SHAW:

9   Q.  Mr. Sharp, you were hired nine days before the bankruptcy

10  petition was filed in this case; correct?

11  A.  Correct.

12  Q.  Other than the retention of DSI, are there any other new

13  managers at the debtor, that didn't exist prior to the

14  bankruptcy filing?

15          MR. MORRIS:  Objection.  Beyond the scope, Your Honor.

16  This should be a traditional cross.

17          THE COURT:  You're going to need to find a microphone

18  or talk into one that's in front of you.

19          MR. MORRIS:  John Morris, Pachulski Stang Ziehl &

20  Jones, for the debtor.

21          This line of questioning is beyond the scope.  This

22  should be a traditional cross.  The moving parties have called

23  no witnesses, as Your Honor is aware.

24          THE COURT:  Well, they reserved the right to call

25  witnesses based on what you did in your direct.  So I'm not

APP. 0021
004011

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 94 of 1017 PageID 4773
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 25 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 22 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    22

1  going to hold them to technicalities.

2           You may proceed.

3           MR. SHAW:  Thank you, Judge.

4           THE COURT:  Do you remember the question, Mr. Shaw?

5           THE WITNESS:  I do.

6  A.  Not that I'm aware of.

7  Q.  Okay.  So other than -- so DSI is the only difference pre-

8  petition and post-petition; is that right?

9  A.  With respect to management.  Obviously, the company's now

10 operating in bankruptcy, which is significantly different.

11 Q.  You testified, in your proffer, regarding the provision of

12 shared services and subadvisory to Acis; do you remember that

13 proffer your counsel commented about?

14 A.  I do.

15 Q.  And one of the core parts of the debtor's business is the

16 provision of shared services and subadvisory services to

17 affiliates and nonaffiliates; right?

18 A.  Yes.

19 Q.  Okay.  And so that was true for Acis and it's true for

20 current affiliates of the debtor; right?

21 A.  Yes, except for, you know, Acis was primarily CLOs, which

22 is a reducing part of the debtor's business.

23 Q.  Do you have any reason to believe that the Northern

24 District of Texas cannot hear this case expeditiously and

25 fairly?

APP. 0022

004012

HIGHLAND CAPITAL MANAGEMENT, L.P.                    23

```
 1  A.  No.

 2          MR. SHAW:  Pass the witness.

 3          THE COURT:  Any other cross-examination?

 4          Hearing none, any -- redirect; that's what it's

 5  called.  There we go.

 6          MR. MORRIS:  No, thank you, Your Honor.

 7          THE COURT:  All right.  Thank you, sir.  You may step

 8  down.

 9          THE WITNESS:  Thank you.

10          THE COURT:  Any further evidence by any party, in

11  connection with the venue motion only?

12          MR. CLEMENTE:  Your Honor, I believe we would like to

13  call Mr. Waterhouse to the stand to testify in connection with

14  the venue motion briefly.

15          THE COURT:  All right.  Mr. Waterhouse.  I thought

16  we -- there we go.  If you could please take the stand as well,

17  sir, and remain standing.

18          MR. GUERKE:  May it please the Court.  Good morning,

19  Your Honor.  Kevin Guerke on behalf of the creditors'

20  committee.

21          THE CLERK:  Please raise your right hand.

22      (Witness affirmed)

23          THE CLERK:  Please state and spell your name for the

24  record.

25          THE WITNESS:  Yes; it's Frank Waterhouse, F-R-A-N-K,
```

APP. 0023

004013

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 28 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 96 of 1017   PageID 4775
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 27 of
2722
Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 24 of 137

 1  W-A-T-E-R-H-O-U-S-E.

 2          THE CLERK:  Thank you.

 3          THE COURT:  Thank you.  Please be seated and try to

 4  remain close to the microphone, if you would, please.  It's a

 5  little awkward here.

 6          You may proceed.

 7  DIRECT EXAMINATION

 8  BY MR. GUERKE:

 9  Q.  Mr. Waterhouse, you've worked for the debtor, Highland

10  Capital Management, L.P., since 2006; correct?

11  A.  Yes.

12  Q.  You started there as a senior accountant; right?

13  A.  That is correct.

14  Q.  You were promoted to chief financial officer at the end of

15  2011; correct?

16  A.  Yes.

17  Q.  That's the title that you hold today; right?

18  A.  Yes.

19  Q.  You also currently hold the title of partner; right?

20  A.  Yes.

21  Q.  You were made partner three or four years ago; correct?

22  A.  Yes.  I mean, I don't remember the exact time but, yeah,

23  approximately three or four years ago.

24  Q.  You are an officer in Highland Affiliates; correct?

25  A.  Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 97 of 1017 PageID 4776
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 28 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 25 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 25

```
 1   Q.  James Dondero is the president of Highland Capital

 2   Management, L.P.; right?

 3   A.  Yes.

 4   Q.  Mr. Dondero owns and controls Highland's general partner,

 5   Strand Advisors, Inc.; right?

 6           MR. MORRIS:  Your Honor, I'm just going to object for

 7   the record.  This is supposed to be a rebuttal witness.  This

 8   isn't rebutting anything; it's just new facts --

 9           THE COURT:  He's laying

10           MR. MORRIS:  -- that they're seeking --

11           THE COURT:  I'm sure he's laying foundation.

12           MR. GUERKE:  I am, Your Honor.  It's background, it's

13   foundation.  It has to go (sic) with the organizational

14   structure.

15           THE COURT:  That's fine.  Objection overruled.

16   Q.  Mr. Waterhouse, Mr. Dondero owns and control Highland's

17   general partner, Strand Advisors, Inc.; correct?

18   A.  I don't remember his exact title but, yes, he is

19   president.

20   Q.  He owns a hundred percent of the equity in Strand; right?

21   A.  Yes.

22   Q.  He also has a limited-partnership interest in Highland;

23   correct?

24   A.  That is correct.

25   Q.  Mr. Dondero's the portfolio manager of all Highland funds;
```

APP. 0025
004015

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 98 of 1017 PageID 4777
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 29 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 26 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    26

 1  right?

 2          MR. MORRIS:  Objection to the form of the question.

 3          THE COURT:  Overruled.

 4          You can answer.

 5  A.  Yes, he -- he is the portfolio manager or the -- or a co-

 6  portfolio manager.  We have several funds.  I -- I -- I can't

 7  recall if he is the sole portfolio manager on every single fund

 8  or -- but he -- he -- but yes, he is -- he is a portfolio

 9  manager.

10  Q.  As the president of Highland, Mr. Dondero promoted you to

11  CFO back in 2011; right?

12  A.  Yes.  My -- my promotion was recommended by the -- the

13  former CFO and, as president, Mr. Dondero had to, you know,

14  obviously, approve that taking.

15  Q.  You report to Mr. Dondero; right?

16  A.  Yes.

17  Q.  He's your boss; correct?

18  A.  Yes.

19  Q.  And after the transition period from the old CFO to you,

20  you've reported only to Mr. Dondero; right?

21  A.  That is correct.

22  Q.  After the bankruptcy was filed, you still report to Mr.

23  Dondero; right?

24  A.  Yes.

25  Q.  And Mr. Dondero doesn't report to anyone; correct?

APP. 0026

004016

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 31 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 99 of 1017   PageID 4778
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 30 of
2722
Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 27 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    27

1   A.  Yeah, not -- not to my knowledge.  Yeah, it's correct.

2   Q.  Mr. Dondero has the ability to terminate you; right?

3   A.  Again, I -- I assume so.  Again, I think I -- I testified

4   earlier last week, I -- I -- I -- you know, again, I don't know

5   through this process -- again, I'm not -- bankruptcy is not

6   something that I -- I am, you know, a specialist.  I'm not a

7   bankruptcy attorney.  But maybe the CRO can, or Jim, or

8   something in -- in conjunction.  But I think, theoretically,

9   yes.

10  Q.  Post-bankruptcy, you don't report to Bradley Sharp; right?

11          MR. MORRIS:  Objection, Your Honor.  Same objection:

12  beyond the scope.

13          THE COURT:  Overruled.

14  A.  I do not.

15  Q.  Post-bankruptcy, you don't report to Fred Caruso; correct?

16  A.  I do not.

17  Q.  Mr. Sharp doesn't have the power to terminate your

18  employment; right?

19  A.  Again, I'll --

20          THE COURT:  Actually, he already answered that

21  question; said he wasn't sure.

22  Q.  Mr. Waterhouse, there are six groups below Mr. Dondero in

23  Highland's organizational chart; correct?

24  A.  Give or -- give or take.

25  Q.  The heads of those groups are the executive-level

APP. 0027
004017

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 100 of 1017 PageID 4779
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 31 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 28 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    28

1   management employees that you describe in your declaration that

2   was submitted in association with the first-day motions; right?

3   A.  Yes.

4   Q.  You manage one of those teams; correct?

5   A.  Yes.

6   Q.  Your team is made up of the corporate accounting folks,

7   Funding Accounting, the tax group, Valuation, Operations,

8   Retail Fund Operations, Human Resources, and IT; right?

9   A.  That -- that is correct.

10  Q.  The other Highland teams are the legal-compliance team --

11  correct?

12  A.  Yes.

13  Q.  The credit-research team; right?

14  A.  Yes.

15  Q.  Public-relations team; correct?

16  A.  Yes.

17  Q.  Private-equity team; right?

18  A.  Yes.

19  Q.  And the trading team; true?

20  A.  Yes.

21  Q.  The heads of each one of those groups report up to Mr.

22  Dondero; isn't that true?

23  A.  Yes, and we -- we -- well, and we also -- and -- but we

24  have a risk-management team as well, at Highland.  That -- that

25  risk-management team reports up through the trading team.

APP. 0028
Appx. 00075
004018

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 101 of 1017 PageID 4780
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 32 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 29 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                29

1   Q.  As the CFO, your office is in Dallas, Texas; right?

2   A.  Yes.  My -- yes, we office in -- or my office is in

3   Dallas, Texas.

4   Q.  That's been the location of your office since you joined

5   Highland; correct?

6   A.  My current location in Dallas, Texas, is not the same as

7   it was when I joined Highland Capital in October of 2006.

8   Q.  You started in 2006 and your office was in Dallas; right?

9   A.  Well, my offices were in Dallas but it was not at the same

10  location as we are currently.

11  Q.  Your current offices are also in Dallas; right?

12  A.  Yes, their address is in Dallas, Texas.

13  Q.  Over seventy Highland employees work out of Highland's

14  Dallas office; right?

15  A.  Yes.

16  Q.  Dallas is the only location where Debtor Highland

17  employees work; correct?

18  A.  Yes.

19  Q.  Mr. Dondero's office is in Dallas; true?

20  A.  Yes.

21  Q.  Members of the legal team have offices in Dallas; right?

22  A.  Yes.

23  Q.  You meet with Mr. Dondero at a minimum of once a week;

24  correct?

25  A.  Yes, give or take.

APP. 0029
004019

HIGHLAND CAPITAL MANAGEMENT, L.P.                    30

1   Q.  Usually those meetings are in his office in Dallas; right?

2   A.  Yes.

3   Q.  All the group heads that we just discussed all have

4   offices in Dallas; right?

5   A.  Yes.  We used to -- our -- our risk-management team used

6   to be officed in New York.  But yes, we -- we -- yes.

7   Q.  You mentioned New York.  There's a location in New York

8   that we discussed at your deposition; do you remember that?

9   A.  Yes.

10  Q.  That office in New York is not in Highland -- the debtor's

11  name; true?

12  A.  That is correct.

13  Q.  It's in another nondebtor-entity name; correct?

14  A.  Yes.

15  Q.  There are no Highland employees in that New York location;

16  correct?

17  A.  That is correct.

18  Q.  In the proffer that you just heard, and at your

19  deposition, there was some discussion about offices outside of

20  the United States.  Do you recall that?

21  A.  Yes.

22  Q.  The people who work in those locations are not employees

23  of the debtor, Highland Capital Management, L.P.; right?

24  A.  That's right.

25  Q.  The offices outside the U.S. are subsidiary offices with

APP. 0030

004020

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 103 of 1017 PageID 4782
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 34 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 31 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    31

```
 1   subsidiary employees; correct?
 2   A.  That is correct.
 3   Q.  You've never been to those offices; right?
 4   A.  I have not.
 5   Q.  You have members of team who include David Klos, Clifford
 6   Stoops, and some other folks; right?
 7   A.  Yes.
 8   Q.  You have standing weekly meetings with those folks --
 9           THE COURT:  All right --
10   Q.  -- right?
11           THE COURT:  -- I'm going to reprimand -- this is well
12   beyond -- I was giving you some leeway but, if this is what you
13   wanted to put on -- it's your motion, sir.  I mean, this is --
14   you're laying your foundation in your case-in-chief.  Why
15   didn't you put this on to begin with?
16           MR. GUERKE:  Your Honor, it's rebuttal to the proffer
17   that Mr. Sharp just offered.
18           THE COURT:  In what way?
19           MR. GUERKE:  Related to the organizational structure
20   and how decisions are made currently at the debtor.
21           MR. MORRIS:  Your Honor, if I may.  I don't believe
22   any aspect of the proffer went to the location of decision-
23   making.
24           THE COURT:  Would you like to reply to that?
25           MR. GUERKE:  Yes.  The proffer was made that decisions
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/10/06/25 Page 104 of 1017 PageID 4783
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 35 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 32 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    32

 1  are made in California and around the country, and around the

 2  world I believe.  And this evidence rebuts that; that the

 3  organizational structure and the day-to-day operations are

 4  still run in Dallas, Texas, as they were before bankruptcy.

 5          And, Your Honor, I have three questions, then I'll sit

 6  down.

 7          THE COURT:  Okay.  All right, I'll allow it.

 8  Q.  When you meet with people on your team that we just

 9  identified, you meet with them in Dallas; correct?

10  A.  That's correct.

11          MR. GUERKE:  Those are my only questions.  Thank you,

12  Mr. Waterhouse.

13          THE COURT:  All right.

14          THE WITNESS:  Thank you.

15          THE COURT:  That was direct.  Any further direct?

16          Yes, sir.

17          MR. SHAW:  Real briefly, Your Honor.

18  DIRECT EXAMINATION

19  BY MR. SHAW:

20  Q.  Mr. Waterhouse, as the CFO of the debtor, were you aware

21  that the debtor intended to file bankruptcy prior to the

22  filing?

23          MR. MORRIS:  Objection.  Beyond the scope.

24          MR. SHAW:  Judge, we designated any witness that they

25  designated, so I don't know that we necessarily have called --

APP. 0032
004022

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 105 of 1017 PageID 4784
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 36 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 33 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    33

1          THE COURT:  Well, yeah, but it's your motion --

2          MR. SHAW:  Correct.

3          THE COURT:  -- and you declined to put any evidence on

4   in support of your motion.  They then put on evidence in

5   opposition to your motion.  So you're limited, sir, to

6   rebutting the evidence they put on.  You had your chance to

7   make your case-in-chief; you decided not to do it.  It's not my

8   fault.

9          MR. SHAW:  My understanding was that we were -- that,

10  depending upon what the proffer was, which we -- we're not

11  aware of what the proffer was before today, that we reserved

12  the right to call Mr. Waterhouse, which I understood from our

13  chambers conference is what we exercised that right to do.  If

14  I misunderstood how procedurally we were going about it,

15  then --

16         THE COURT:  Well, I don't understand how -- that

17  doesn't make any sense to me.  You get a free shot to hear

18  their case first, and then you get to make your direct case?

19  Why would I allow that?  It's your motion.

20         MR. SHAW:  Understood.

21         THE COURT:  All right, so let's stick to rebutting

22  what they put on.

23         MR. SHAW:  Okay.

24         THE COURT:  I gave a lot of leeway to your colleague;

25  I'll give you leeway.  But I don't really want to sit through

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 106 of 1017 PageID 4785
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 37 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 34 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 34

1 forty-five minutes of direct that you could have done in the

2 first place.

3          MR. SHAW:  And I promise you, I have a very few

4 limited questions.

5          THE COURT:  All right.

6 BY MR. SHAW:

7 Q.  With regard -- where is Mr. Dondero today?

8 A.  I don't know.

9 Q.  For the shared services and subadvisory services that the

10 debtor previously provided Acis -- are you aware of those?

11 A.  I'm aware of them generally.

12 Q.  All right.  Have you ever reviewed the shared-services and

13 subadvisory agreements between Acis and Highland?

14 A.  I'm sure I reviewed them at -- at some point, but I

15 honestly can't recall.

16 Q.  How are those agreements different than the shared-

17 services and subadvisory agreements currently between the

18 debtor and various affiliates?

19          MR. MORRIS:  Objection.  No foundation.

20          MR. SHAW:  It's directly relevant to -- the foundation

21 being he said he's aware of them.  I --

22          MR. MORRIS:  The witness just testified that he's not

23 familiar with them as he sits here --

24          THE COURT:  I can't hear you.

25          MR. MORRIS:  The witness just testified that he's not

APP. 0034

004024

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 107 of 1017 PageID 4786
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 38 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 35 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                35

1  familiar with them as he sits here today.  He may have seen

2  them in some -- at some point in the past.

3          THE COURT:  Well, he can qualify the answer further.

4  Overruled.

5          You can answer.

6  A.  You know, again, I -- I don't -- I don't know.  I don't

7  have the documents in front of me.  I -- I -- like I said, I'm

8  generally aware of -- of the Acis agreements.  You know, I

9  don't have these agreements memorized to any certain degree, so

10 I -- I -- I -- I don't know specifically.

11 Q.  As -- you're familiar with the -- as the CFO, with the

12 shared-services and subadvisory agreements that govern the

13 seven billion dollars in assets under management that the

14 debtor provides for affiliates and nonaffiliates; right?

15 A.  Yes, I'm generally aware of those agreements.

16 Q.  And are those agreements typical in form?  Do they differ

17 widely in their content?

18 A.  Again, I don't know -- I mean, they -- they can.  Again,

19 it -- it depends on the nature of the services.  And -- you

20 know, it -- there isn't a standard template, I would say, for

21 shared services.  Yes, they can differ.  As I said, I don't

22 have those agreements memorized, so I can't speak as to how

23 they are similar or how they are not.

24         MR. SHAW:  Pass the witness.

25         THE COURT:  Thank you.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 108 of 1017 PageID 4787
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 39 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 36 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    36

1        I guess it'll be cross of your own witness.  Any

2   cross?

3            MR. MORRIS:  No, thank you, Your Honor.

4            THE COURT:  All right, sir, thank you.  Mr.

5   Waterhouse, you may step down.

6            THE WITNESS:  Thank you.

7            THE COURT:  You're welcome.

8            Any further evidence?

9            MS. PATEL:  Your Honor, as I referenced, we just have

10  some exhibits; I believe these to be the unobjected-to pieces

11  of it.  We -- Acis provided a witness-and-exhibit list.  These

12  are the unobjected-to exhibits, and we would just move them in.

13  And --

14           THE COURT:  Is this the ones I already have?

15           MS. PATEL:  No, Your Honor.  I believe you only have

16  the debtor's.

17           THE COURT:  Yeah.

18           MS. PATEL:  And I will apologize, Your Honor; we've

19  given debtors a copy of the exhibits.  Our -- there was

20  miscommunication.  They are not bound.

21           THE COURT:  That's fine.

22           MS. PATEL:  But they are numbered.

23           THE COURT:  All right.

24           MS. PATEL:  If I may approach?

25           THE COURT:  Yes.  Please don't hurt yourself.  It's a

HIGHLAND CAPITAL MANAGEMENT, L.P. 37

1  bit of a mess there.

2      MS. PATEL: There's a little trash back here.

3      THE COURT: These are all not objected to; is that

4  correct?

5      MS. PATEL: (Indiscernible), Your Honor, but I go

6  through them.

7      THE COURT: Are they -- okay.

8      MS. PATEL: What I've handed the Court and to opposing

9  counsel are Exhibits 1 -- Acis Exhibits 1 through 18, with the

10  exclusion of Exhibit 3 and Exhibit 9, which were objected to;

11  and then also Exhibit Numbers 24 and 25, which were not

12  objected to. We do have one additional exhibit, Your Honor,

13  that was objected to, that I would like to move in.

14      THE COURT: All right. Is there any objection to the

15  admission of the documents that counsel has represented there's

16  no objection to?

17      MR. MORRIS: No, Your Honor.

18      THE COURT: Okay. They are admitted without

19  objection.

20      (Acis' Exhibits 1 through 18, with the exception of Nos. 3

21  and 9; and Exhibits 24 and 25, were hereby received into

22  evidence, as of this date.)

23      MS. PATEL: If I may approach, Your Honor?

24      THE COURT: Yes.

25      Thank you.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 110 of 1017 PageID 4789
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 41 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 38 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    38

1        MS. PATEL:  And, Your Honor, my co-counsel will handle

2    that -- will handle it since we -- this was a late objection

3    and he prepared with respect to this; I prepared with respect

4    to argument.

5        THE COURT:  Okay.

6        Yes, sir.

7        MR. CLEMENTE:  I believe there's a hearsay objection

8    regarding this.

9        MR. MORRIS:  Relevance and hearsay, Your Honor.

10       THE COURT:  Okay.

11       MR. CLEMENTE:  Your Honor, I'll address hearsay first.

12   Federal Rule of Evidence 807 is a residual exception to the

13   hearsay rule; provides that a hearsay statement is admissible

14   if the statement is supported by sufficient guarantees of

15   trustworthiness, after considering the totality of the

16   circumstances under which it was made and evidence, if any,

17   corroborating the statement, and (2) it is more probative on

18   the point for which it is offered, than any other evidence that

19   the proponent can obtain through reasonable efforts.

20       This is an email exchange between counsel for Acis and

21   the courtroom deputy for Judge Jernigan, just requesting and

22   ask -- inquiring about the court's availability.  Everything

23   about that email supports the fact that it is -- that it is

24   authentic and that there's no question about whether or not it

25   is -- it's trustworthy.  How would we put on evidence of

APP. 0038
004028

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 111 of 1017 PageID 4790
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 42 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 39 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    39

1  whether or not Judge Jernigan in the Northern District of Texas
2  has sufficient time to hear these numerous motions that are
3  set, other than by providing something like this?  I mean, we
4  can't call or depose the courtroom deputy or the judge.  So
5  based upon that, also -- there also is an exception, under the
6  hearsay rule, to a public record.  I think this also falls
7  within that exception to the rule.  So for that reason, we
8  don't believe the hearsay objection is proper.

9          As far as relevance, it goes to the argument about
10 transfer and whether or not the transferee court can
11 expeditiously hear the matter.  And that's one of the elements
12 and one of the core questions about judicial efficiency.

13         So for those reasons, we believe that the objections
14 are not well-founded and we offer this exhibit.  And it's
15 Exhibit 26.

16         THE COURT:  Reply?

17         MR. MORRIS:  Briefly, Your Honor.

18         THE COURT:  Yes.

19         MR. MORRIS:  I'm not aware of any case where a court
20 has ever considered, let alone decided, a venue motion on the
21 availability of another court's time.  So I don't think it's
22 relevant at all.  I do think it's an out-of-court statement
23 being offered for the truth of the matter asserted, and I do
24 believe it's hearsay.

25         MR. CLEMENTE:  It most certainly is hearsay, Judge;

APP. 0039
004029

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 112 of 1017 PageID 4791
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 43 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 40 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    40

1  just to respond.  But the question is not whether it's hearsay

2  but whether it's admissible.  And of course the Court is well

3  aware that hearsay can be admissible, and one of the exceptions

4  is the exception that I outlined.

5        THE COURT:  All right, I'll overrule the objection and

6  admit the document.  It is hearsay but it clearly meets the

7  reliability aspects for the exception to hearsay.  With regard

8  to the relevance, I think its relevance is very -- well, let me

9  put it this way; I think it's tangentially relevant.  I mean,

10  it certainly is relevant whether the Northern District of Texas

11  has the ability to handle the case were it transferred there.

12  To me that's -- I don't even think that's disputed, I mean,

13  it's obvious, it's a fantastic bankruptcy court.  They're more

14  than capable of handling it.  So I -- it's probably

15  duplicative, if nothing else.

16        Also, it's very carefully written so that you don't

17  actually identify what case you're talking about.  So whether

18  the courtroom deputy realized what you were saying or not

19  saying with regard to this specific motion is obviously

20  unclear.  But I will allow it for very limited purposes.

21     (Email exchange between Acis' counsel and Hon. Jernigan's

22  courtroom deputy was hereby received into evidence as Acis'

23  Exhibit 26, for the stated limited purposes, as of this date.)

24        MR. CLEMENTE:  Thank you, Your Honor.

25        THE COURT:  Any other evidence?

APP. 0040
004030

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 113 of 1017 PageID 4792
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 44 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 41 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    41

1      I'm going to -- all right, last chance.  I'm going to

2  close the evidentiary record.

3      All right, the evidentiary record's closed.  Let's

4  take a short recess; then I'll hear argument.  We will start

5  with the movants and their supporters, and then we'll turn it

6  over to the debtor.  Okay?  We'll take a short recess.

7      UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

8      (Recess at 10:48 a.m. until 11:05 a.m.)

9      THE COURT:  Be seated.  Sorry about the delay.  We had

10  some computer difficulties.  But they're all ironed out.

11      You may proceed.

12      MR. CLEMENTE:  Thank you, Your Honor.  Again, Matthew

13  Clements from Sidley Austin, on behalf of the committee.

14      Your Honor, to begin, everything we rely on in our

15  venue argument is uncontested and uncontroverted and is in the

16  record that either the debtor's exhibits or the Asic's (sic)

17  exhibits or the record of this case, or published opinions of

18  the Dallas bankruptcy court, and which Your Honor can take

19  judicial notice of -- we believe that that record more than

20  amply carries our evidentiary burden with respect to the venue

21  motion.

22      With respect to the Sharp proffer, Your Honor, it

23  attempted to create the appearance of a debtor with operations

24  in far-flung jurisdictions, employees at nondebtor entities

25  that may be located in places other than Dallas, offices that

APP. 0041
004031

HIGHLAND CAPITAL MANAGEMENT, L.P.                42

1   may be in New York that aren't actually debtor offices.  And

2   the testimony of Mr. Waterhouse rebutted that and made clear

3   that the debtor has no employees other than in Dallas and that

4   Mr. Dondero makes all of the decisions, and he is in Dallas.

5   The nerve center of this debtor is in Dallas.  And we wanted to

6   make that clear, Your Honor, after the proffer, the rebuttal,

7   and the evidentiary record.  We believe that the evidentiary

8   record is largely uncontroverted with respect to the arguments

9   that we're going to be made (sic) in our venue motion, and that

10  Mr. Sharp's testimony has been effectively rebutted.

11          With that, Your Honor, we believe that this case is

12  atypical and presents a set of unique facts which we believe

13  are uncontroverted, that warrant transfer of venue to the

14  Dallas bankruptcy court.  And frankly, Your Honor, it does beg

15  the question as to why the debtor chose not to file in Dallas,

16  what we believe the most logical venue is, in the first

17  instance.  Let's talk about some of these unique facts here;

18  then we'll move into some of the arguments we made in our

19  motion, and then we'll talk about some of the things that the

20  debtor made (sic) in its reply.

21          First and perhaps most importantly, which is obvious

22  from the nature of this proceeding, not a single creditor or

23  party-in-interest has filed papers supporting the debtor's

24  venue in Delaware, other than, obviously, the debtor.  The

25  official committee has unanimously supported venue transfer to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 47 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 115 of 1017    PageID 4794
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 46 of
2722
Case 19-12239-CSS    Doc 181    Filed 12/03/19    Page 43 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    43

1    Dallas, Texas.  Acis, in its own capacity as creditor, has

2    joined the transfer request.  It's not surprising to us, Your

3    Honor, that no creditor has affirmatively come out in favor of

4    venue in Delaware, because the debtor is in Dallas and, in

5    fact, that is where its nerve center is.

6         Your Honor, we do believe that it's particularly

7    significant because in this case, although schedules and

8    statements have not yet been filed, the creditors' committee

9    makes up the vast majority of creditors in this case, in terms

10   of absolute dollar amounts.  There may be multiple creditors in

11   number, but the vast majority of dollar amount of creditors are

12   represented by the official committee of unsecured creditor

13   (sic).

14        There was reference to Jefferies.  They're owed thirty

15   million dollars.  There was reference to Frontier Bank.

16   They're owed five million dollars.  A single claim of one

17   committee member dwarfs that by multiples, Your Honor.  So we

18   believe the fact that no other creditor supports venue in

19   Delaware is a very significant fact, Your Honor, and is not

20   controverted.

21        Second, Your Honor, until a few months ago, the Acis

22   case, which is pending in the Dallas bankruptcy court, was an

23   affiliated case.  And again, this can be gleaned from the

24   published decisions and the record that's been put into

25   evidence.  Had this case been filed prior to confirmation of

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 116 of 1017 PageID 4795
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 47 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 44 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    44

1   the Acis plan, under Rule 1014 the Dallas bankruptcy court

2   would be the appropriate court to determine venue.  And

3   although I would never suppose to predetermine how a judge

4   would rule, I think there would have been a high probability

5   that the Dallas court would have taken venue over the debtor's

6   case.

7        This is important, Your Honor, because the third point

8   I'd like to make is that Highland and the debtor, and as we

9   have described in our papers and related attachments, and as

10  Mr. Sharp referred to in his proper -- in his proffer, has

11  itself filed an appeal, seeking to overturn the confirmed Acis

12  plan of reorganization and return the equity that was

13  distributed to Mr. Terry under that confirmed plan, to an

14  entity called Nutro (ph.).

15       Second on Nutro, Your Honor.  Nutro's wholly owned by

16  Mr. Dondero and, therefore, if Acis were returned underneath

17  Nutro, it would become an affiliate of this debtor, and Acis

18  would once again be subject to, as an initial matter, a

19  venue -- excuse me, this debtor would be subject to, as an

20  initial matter, a venue determination by the Dallas bankruptcy

21  court.  If we have a successful appeal, we would have

22  affiliated cases with dueling jurisdictions, Your Honor, and

23  the Dallas bankruptcy court, as I mentioned, would determine

24  venue.

25       On that, Your Honor, the debtor must believe -- it's

HIGHLAND CAPITAL MANAGEMENT, L.P.                45

1    not just me speculating.  The debtor must believe that there is

2    a material possibility of this occurrence, as it has been

3    seeking to employ counsel -- and you'll hear about that

4    shortly -- and expend estate resources on behalf of Nutro, a

5    nondebtor affiliate, in an attempt to have the Acis

6    confirmation order overturned, with, again, the result being

7    Acis would, again, be a debtor affiliate.  Therefore, the

8    debtor cannot argue that such possibility does not materially

9    impact the venue decision or is remote, in particular where

10   they're trying to convince the committee and this Court to use

11   estate resources to achieve that very outcome.  The debtor's

12   effectively arguing for a ruling on appeal, but the debtor is

13   an affiliate of Acis, in which case the current Chapter 11

14   proceeding should be in Dallas, Texas.

15            Fourth, Your Honor --

16            THE COURT:  Well --

17            MR. CLEMENTE:  Yes, Your Honor.

18            THE COURT:  -- let me interrupt you for a moment,

19   because that hasn't happened.  As we sit here today --

20            MR. CLEMENTE:  That's correct, Your Honor.

21            THE COURT:  -- they're not affiliates.  There seems to

22   be an assumption that, were this case to be transferred to the

23   Northern District of Texas, it would be assigned to -- sorry,

24   I'm losing my notes --

25            MR. CLEMENTE:  Judge Jernigan, Your Honor.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    46

1          THE COURT:  Jernigan, yes.  Thank you.  Sorry.  I know

2    Judge Jernigan fairly well.

3          But if they're not affiliates, isn't the case subject

4    to random assignment under the normal procedures in the

5    Northern District of Texas?  And if it's not assigned to Judge

6    Jernigan, don't your arguments about judicial knowledge and

7    experience in connection with this case fall away because

8    nobody other than Judge Jernigan has that special knowledge in

9    Texas?  And all -- what other colleagues would be able to do

10   there is simply walk down the hall and talk to her.  And of

11   course, I can pick up the phone and talk to her any time, as

12   well.

13         So I'm just teasing out this assumption that

14   definitely feels to be behind everybody's arguments, that she's

15   going to get this case.  Is there anything in the record that

16   would support that?  Is there some sort of rule I'm not aware

17   of in Texas or that I'm -- am I assuming something that's not

18   consistent with practice down there, which is that this case

19   would be randomly assigned?

20         MR. CLEMENTE:  Your Honor, I believe you are correct

21   in the sense that the case would be randomly assigned, but I

22   believe Your Honor could look at -- as I understand, there are

23   three judges located in the Dallas court district; one is

24   obviously Judge Houser.  I could be getting the name wrong.

25   But she's overseeing the Puerto Rican proceeding --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/10/06/25 Page 119 of 1017 PageID 4798
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 50 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 47 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    47

1          THE COURT:  Um-hum.

2          MR. CLEMENTE:  -- so her docket is clearly beyond --

3          THE COURT:  She's also --

4          MR. CLEMENTE:  -- full.

5          THE COURT:  -- about to retire, so I don't even know

6    if she's taking new cases.

7          MR. CLEMENTE:  Correct.  So that leaves two judges,

8    Your Honor.  And we understand -- perhaps Acis' counsel would

9    be able to expand on that, given their familiarity with the

10   Dallas bankruptcy court, but that judge is not being assigned

11   new cases, given a circumstance with that particular judge.

12         But to answer your direct question, Your Honor, I

13   believe you are correct; it would be a random assignment.  But

14   we do believe that there is a high probability it would wind up

15   with Judge Jernigan.

16         THE COURT:  But it might be a pool of one; right?

17         MR. CLEMENTE:  That is correct, Your Honor.  And even

18   if it wasn't, I think, clearly, for all the reasons we'll

19   discuss, we would have a very strong case to make that it

20   should be transferred to Judge Jernigan, even if it initially

21   got somebody else on the --

22         THE COURT:  Well, you know, I mean, if a judge were a

23   lawyer, a judge couldn't have both these cases.  A judge (sic)

24   couldn't have a case with two warring former affiliates,

25   because it would create a conflict of interest.  Now, those

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 52 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 120 of 1017 PageID 4799
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 51 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 48 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    48

1   rules don't apply to judges.  We're assumed to be above all

2   that.  But -- since we don't have clients.  But it does -- it

3   might inform someone's decision about do I really feel

4   comfortable having Acis and Highland, given the situation -- I

5   mean, they wouldn't be jointly administered, certainly, of

6   course.  They're --

7           MR. CLEMENTE:  That's correct, Your Honor.

8           THE COURT:  Again, they're not affiliates, at least as

9   we stand here today; although the debtors are trying to change

10  that, purportedly.  It might create a situation where a judge

11  might take that into consideration in deciding whether to have

12  the case or not.  And I --

13          Now, we deal all the time with jointly administered

14  affiliated cases, right, because there's always intercompany

15  debt --

16          MR. CLEMENTE:  That's correct.

17          THE COURT:  -- and we all just assume it away (ph.).

18          MR. CLEMENTE:  That's correct, Your Honor.

19          THE COURT:  But this is a little different in that

20  they're not affiliates.

21          MR. CLEMENTE:  I do think, Your --

22          THE COURT:  Again, she would -- the judge wouldn't be

23  required -- Judge Jernigan wouldn't be required -- it's not a

24  recusal issue.  It's not a disqualification issue.  It's just

25  a -- sort of something to think about in making the decision.

APP. 0048
004038

HIGHLAND CAPITAL MANAGEMENT, L.P.                    49

1          MR. CLEMENTE:  I don't disagree, Your Honor.  I do

2    think Your Honor hit on it, though.  Bankruptcy judges are

3    unique in that perspective that they're put in situations all

4    the time where a decision may impact one particular entity to

5    the detriment of another entity that's also before Your Honor

6    in connection with a particular bankruptcy proceeding.

7          THE COURT:  Yeah.

8          MR. CLEMENTE:  With that, Your Honor, I'll continue to

9    move forward.

10          THE COURT:  Yeah, please.

11          MR. CLEMENTE:  Fourth, and this gets back to the point

12    we were just discussing with Your Honor, we do not believe

13    there's any credible dispute that the Dallas court has already

14    upped the learning curve relative to this Court.  Again, not

15    that Your Honor wouldn't be able to come up to speed and that

16    Your Honor has tremendous capacity to do that, but the record

17    is clear, from our perspective, that the Dallas bankruptcy

18    court has already had to wrestle with issues involving the

19    debtor.  There has been extensive proceeding (sic) in the

20    Dallas bankruptcy court, not just the bankruptcy court but also

21    the district court, with respect to the Acis case.

22          There are several written opinions, again, that Your

23    Honor can take judicial notice of and which are also in the

24    record, that provide, after an extensive and developed factual

25    record, that Acis only operated through Debtor Highland -- the

APP. 0049

004039

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 54 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 122 of 1017    PageID 4801
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 53 of
2722
Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 50 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    50

 1   debtor, Highland.  It is clear that the Dallas court had to

 2   develop an understanding of how the debtor's complex business

 3   worked.  It is the same business as the debtor engages in here,

 4   albeit a subset.

 5           That's consistent with Mr. Sharp's testimony.  Mr.

 6   Sharp didn't say that they no longer are in the CLO business.

 7   He characterized it in a certain fashion, but the debtor

 8   clearly still manages and advises CLOs.  That is a part of the

 9   debtor's business.  That is what was at issue in the Acis

10   proceeding. And also, as Mr. Waterhouse testified to quite

11   clearly in the rebuttal, and as Mr. Sharp testified to in the

12   cross, it's the same principal actors:  Mr. Dondero and others

13   on his management team.

14           Your Honor, this case, although the idea is to get a

15   fresh start, we believe will necessary require a backward-

16   looking review of the facts.  And the Dallas court has upped

17   the learning curve from that perspective.  The committee

18   recognizes that the Dallas court would take time and determine

19   issues as presented to it.  And depending on the issue, the

20   past experience of the court will have varying degrees of

21   relevance.  But that experience is nonetheless important to the

22   committee to ensure maximum efficiency, with an entity that has

23   demonstrated itself to be highly litigious, Your Honor.  One

24   needs only to review the top-twenty list of creditors, made up

25   largely of law firms and other professionals, to make the

APP. 0050
004040

HIGHLAND CAPITAL MANAGEMENT, L.P.                    51

1   determination that the debtor is highly litigious, as well as

2   the record in this proceeding.

3          So Your Honor, those four facts, we believe, are

4   unique, and we believe that they strike in favor of

5   transferring venue to Dallas.  I do want to walk through some

6   of the arguments we made in our papers, as well, but I wanted

7   to highlight what we believe are truly distinguishing features

8   of this particular situation.

9          Your Honor, as we more fully lay out in our papers, we

10  do believe the convenience of the parties supports transfer of

11  venue.  The debtor's nerve center is in Dallas; Mr. Waterhouse

12  was clear on that.  Mr. Dondero is the portfolio manager for

13  all of the Highland funds, and he is the one-hundred-percent

14  owner of Strand.  Strand's the general partner of this debtor.

15  All decisions run through Mr. Dondero.  And it's clear that Mr.

16  Dondero and all of the other key personnel are located in

17  Dallas.

18         Your Honor, a large number of creditors are located in

19  Dallas; you need not look past the list of twenty largest

20  unsecured creditors to determine that.  There are almost a

21  majority of those creditors that are located in Texas.  While

22  the committee agrees that the overall organization with several

23  thousand affiliates is complex -- and you'll hear about that as

24  we go on this afternoon -- there's 2,000 affiliated entities

25  with Highland -- the debtor is only Highland.  And so the idea

APP. 0051

004041

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 124 of 1017 PageID 4803
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 55 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 52 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 52

1  that there may be offices in far-flung jurisdictions, those are
2  not debtor offices.

3       Your Honor, the interests of justice also support the
4  transfer of venue.  The Dallas bankruptcy court has clearly
5  invested time and resources that are applicable to this debtor.
6  In this context, the learning curve that is referred to in the
7  cases clearly favors transfer of venue to Dallas.  Although
8  this case has been pending for a while, Your Honor, there's
9  only been a first-day hearing with very limited relief granted,
10 and one brief status conference.

11      There are also economic efficiencies in Dallas.
12 Dallas is convenient for all debtor employees.  Yes, people can
13 get on planes, but it's hard to argue that being a mile-and-a-
14 half away from the courthouse isn't more convenient.

15      THE COURT:  I don't know.  Parking's tough.

16      MR. CLEMENTE:  And perhaps an overnight trip is
17 helpful for the family life, Your Honor.  It depends.

18      Dallas is convenient for the professionals.  It's easy
19 to fly in and out of Dallas, as we point out in our papers,
20 Your Honor.  There's no real, I believe, disagreement that
21 Dallas would not be convenient.

22      Additionally, Your Honor, and we think that this is a
23 unique factor as well, if the long history of Highland's
24 litigious nature is any indicator here, there will be discovery
25 disputes.  And under Rule 45, contested nonparty discovery

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 57 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 125 of 1017 PageID 4804
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 56 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 53 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    53

1  would likely occur in the Northern District in Texas, in

2  Dallas.  Given the massive number of nondebtor affiliates --

3  again, we only have 1 box here; there's, like, 2,000 others.

4  It is highly likely that nonparty discovery will become an

5  issue.

6          The fact that -- I heard Mr. Sharp testify in his

7  proffer that he believes he and Mr. Caruso will provide all of

8  the testimony.  That's great and good and well for him to think

9  that.  I think the committee's going to take a different view

10 of that, Your Honor.

11         Our own limited history in this case shows the

12 relevance of Dallas.  Two of the three depositions occurred in

13 Dallas.  I believe we informed Your Honor of that on the status

14 call that we had.  And the third didn't, only because we

15 believe Mr. Sharp was not able to travel to Dallas.

16         The justice that the debtor seeks in the Acis case,

17 Your Honor, yields a result that this places -- excuse me, Your

18 Honor.  The justice that we talked about in the appeal with

19 respect to the Acis confirmation order yields a result that

20 places this debtor in the Dallas bankruptcy court, which is

21 also in the interest of justice.

22         So, Your Honor, we believe there are several unique

23 factors.  We believe that the traditional factors, as we lay

24 out in our papers, support the transfer of venue.  And I wanted

25 to just briefly touch on some of the objections that the debtor

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 58 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 126 of 1017 PageID 4805
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 57 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 54 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                54

 1  raised to our venue motion.  First, the debtor thinks too

 2  little of the Dallas court, in asserting that we're trying to

 3  gain some type -- the committee is trying to gain some type of

 4  litigation advantage.  We have no doubt, as Your Honor has

 5  tremendous respect for the Dallas court, that the Dallas court

 6  will take each issue as it comes to it, without prejudice or

 7  predetermination.  History and experience doesn't mean

 8  prejudice or predetermination; it just means familiarity, Your

 9  Honor.  That's all it means.

10         Our point is simply that the Dallas court clearly had

11  to spend time wrestling with the debtor, how it operated, and

12  its opaque structure.  And let me spend a second on how.  As we

13  point out in our reply and, again, as the record is clear based

14  on the published opinions, Acis had no employees; it was a box.

15  And it subcontracted its management services to the debtor.

16  The Dallas court examined that contract, that subadvisory

17  agreement that Mr. Sharp and, I believe, Mr. Waterhouse

18  referred to, and had to become familiar with it.  That's clear

19  from the published opinions.  And the debtor has numerous other

20  similar contracts.

21         The Dallas court also made determinations -- and

22  these, again, are in published opinions -- whether certain of

23  the debtor's contracts with Acis were personal-services

24  contracts.  Again, they may differ, Your Honor, in terms of the

25  specifics, but these are clear examples of where the Dallas

HIGHLAND CAPITAL MANAGEMENT, L.P.                    55

1  bankruptcy court had to wrestle with contracts of Highland, the

2  way Highland operated, and the way that it was managed.

3          Additionally, Your Honor, on the point of litigation

4  advantage, as I thought about this, I think the debtor's, sort

5  of, arguments regarding a litigation advantage, frankly, worked

6  the other way.  If I may, here, for a second, Your Honor.  Mr.

7  Dondero is the sole controlling party, as the testimonies made

8  clear.  He's based in Dallas.  As we demonstrated in our

9  papers, Dallas is clearly the most efficient and convenient

10 forum for the creditors.  And the creditors have sent this

11 message loud and clear through this motion to transfer and the

12 lack of any party affirmatively supporting the debtor and venue

13 in Delaware.

14         Mr. Dondero, in our view, as he has shown in the past,

15 consistently makes decisions that are in his best interest,

16 potentially fleeing from a jurisdiction and not his creditors.

17 And we believe that fleeing from the Dallas court, that is,

18 steps away from his office -- and that is convenient for his

19 creditors and, frankly, seems to be the most logical choice of

20 venue -- again, understanding -- we don't dispute that the

21 debtor is a Delaware limited partnership.  We're not disputing

22 that.  But we're talking about what's logical.  That's the

23 point that I would like to make here, Your Honor.

24         Again, back to --

25         THE COURT:  Well, I mean --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 60 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 128 of 1017 PageID 4807
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 59 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 56 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                56

1          MR. CLEMENTE:  Yes, Your Honor.

2          THE COURT:  -- I mean, a cynic -- and after almost

3    fourteen years, maybe I'm becoming one; I don't know.  But a

4    cynic would say -- and not necessarily badly (ph.), that both

5    sides want -- are interested in forum-shopping; the debtor

6    fleeing, obviously, adverse rulings in Texas, and the creditors

7    fleeing Delaware to go back to the home of adverse rulings

8    against the debtor in Texas.  And it's six one, half dozen the

9    other.  However, at least the cases -- or some of the cases say

10   that the debtor is entitled to some deference in its forum-

11   shopping, as opposed to the creditor, in their opposition, in

12   their forum-shopping.  I'm not sure I buy that.  And as a

13   matter of fact, I've ruled previously that there is no

14   deference --

15         MR. CLEMENTE:  Correct.

16         THE COURT:  -- that should be afforded to the debtor,

17   in the EFH case.  But --

18         MR. CLEMENTE:  That's correct, Your Honor.

19         THE COURT:  -- I just throw that out there.

20         MR. CLEMENTE:  And I believe Your Honor also made a

21   point, in the EFH ruling, regarding the support of the various

22   parties for the venue.  And so I believe that is actually a

23   very strong factor that weighs in favor of transfer to --

24         THE COURT:  Well, and -- yeah, I mean --

25         MR. CLEMENTE:  -- Dallas.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 61 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 129 of 1017 PageID 4808
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 60 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 57 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    57

1       THE COURT:  -- and that case had -- the government of
2  Texas or the committee, or both, supported venue.  That case
3  probably, thankfully, would have been sent to Texas, freed up
4  five years of my life, and twenty appeals and --
5       MR. CLEMENTE:  You're stronger for it, though --
6       THE COURT:  -- everything else.
7       MR. CLEMENTE:  -- Your Honor.
8       THE COURT:  Yeah -- I don't know about that.  I'm
9  heavier, that's for sure.
10      MR. CLEMENTE:  I wish I could blame that for my
11 weight, Your Honor, but I can't.
12      Your Honor, back -- very briefly, because we did touch
13 on it already.  We do believe that the Dallas court experience
14 is highly relevant, contrary to what the debtor remarks in
15 their objection.  The debtor again tries to cast the Acis
16 bankruptcy as being narrow and only involving CLOs.  Again, the
17 testimony, I believe, showed, in -- shows, in point of fact,
18 the debtor does manage a significant number of CLOs.  Even if
19 they are in liquidation, there are still decisions that are
20 being made.  And therefore, exposure to how the debtor operated
21 with respect to CLOs is highly relevant.
22      Your Honor, I already mentioned, so I won't repeat
23 myself, that Acis was a box and it had no employees, and
24 therefore, obviously, the court had to look through to what was
25 going on at Highland in terms of how the debtor was managed.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 62 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 130 of 1017 PageID 4809
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 61 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 58 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    58

1        Your Honor, the CRO, unfortunately, I believe, for the

2    debtor, does not cleanse the venue choice.  The CRO was not

3    around.  The CRO didn't decide venue.  And as clear from the

4    testimony, the CRO reports to Mr. Dondero.  Nothing has

5    changed.  There has been no management changes.  I believe that

6    was also consistent with the testimony.  And everybody still

7    reports to Mr. Dondero, and he's located in Dallas, and Dallas

8    is the nerve center.

9        Additionally, as I mentioned, the cases will be very

10   much about the past, unfortunately, Your Honor, a time when the

11   CRO was not involved, and about transactions and conduct

12   engaged in by the debtor and Mr. Dondero in the run-up to this

13   bankruptcy.

14       In short, I believe the CRO issue is a red herring,

15   Your Honor; it doesn't erase the history the Dallas bankruptcy

16   court has with the debtor through the Acis proceeding, and it

17   doesn't erase the history of the decision-making process that

18   the debtor engaged in, in the past and currently engages in

19   today.

20       With that, Your Honor -- we already had a colloquy

21   about how we do not believe the Dallas bankruptcy court is

22   conflicted, so I won't spend any further time on that.  But I

23   would like to sum up.  Your Honor, let me be very clear.  We

24   have the utmost respect for you and for this Court, so I want

25   to make sure that Your Honor is very clear on that.  However,

HIGHLAND CAPITAL MANAGEMENT, L.P.                    59

1   the committee respectfully believes that this case presents the

2   unique combination of facts which dictate that the transfer of

3   venue to the Dallas bankruptcy court is appropriate.

4           THE COURT:  You don't need to worry.  My ego assumes

5   you have respect for me.

6        (Laughter)

7           MR. CLEMENTE:  Thank you for that, Your Honor.  Unless

8   Your Honor has any questions, I'll sit.

9           THE COURT:  I do not.  There may be others in support

10  who want to be heard.

11          Mr. Pomerantz (sic).

12          MR. LUCIAN:  Your Honor, for the record, John Lucian

13  of Blank Rome, local counsel for Acis.

14          Just during the break, we had a binder made for Your

15  Honor so that the exhibits that Ms. Patel had handed up that

16  were admitted -- I know Mr. Morris has no objection to us

17  handing that up, Your Honor.  It's the -- 1 through 26, with

18  the ones that were not admitted.  This will save you from --

19          THE COURT:  Is that these?

20          MR. LUCIAN:  Yeah.  That's the -- you got them in the

21  binder now.

22          THE COURT:  Okay.  Is this in there --

23          MR. LUCIAN:  Yeah.

24          THE COURT:  -- the email?

25          MR. LUCIAN:  Yes; 26, yes.  If you want to switch to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 64 of
Case 3:25-cv-02072-S Document 15-7 F2023/06/25 Page 132 of 1017 PageID 4811
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 63 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 60 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                60

1   that.  Perfect.

2           MS. PATEL:  Thank you, Your Honor.  For the record,

3   Rakhee Patel on behalf of Acis Capital Management, L.P., who

4   joined in the committee's motion.  And I will make reference to

5   those -- certain of those documents.  I'm generally loathe to

6   hand up big binders or big stacks of documents without telling

7   the Court of what's been handed up.  So, very briefly, Your

8   Honor, I will say, Exhibits 1 and 2 (sic) in the binder are the

9   involun -- the issue -- I'm sorry, the opinion issued by the

10  Dallas bankruptcy court, in connection with the involuntary

11  trial, and Exhibit number 2 is the opinion that was issued in

12  connection with confirmation of Acis' plan.  I would also point

13  the Court to Exhibit Number 17, which is the actual

14  confirmation order in Acis Capital Management.  And I'll make

15  reference to one other exhibit as I go through my presen -- or

16  a number of other exhibits, but -- one additional ruling by the

17  court, as I go through my presentation.

18          THE COURT:  What was the date of -- oh, okay.  Never

19  mind.  So the confirmation was late January?

20          MS. PATEL:  Yes, Your Honor.  January 31st, 2019.  And

21  the plan went effective on February 15th of 2019.

22          THE COURT:  Okay.

23          MS. PATEL:  And the Highland bankruptcy, I believe,

24  was just a little bit over eight months later.

25          And, Your Honor, I'll try not to duplicate necessarily

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 65 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 133 of 1017 PageID 4812
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 64 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 61 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    61

1  what the committee did, and I will promise to keep this as

2  brief as I can.  I'm happy to answer any questions, because

3  standing here before you is the counsel -- at least the

4  bankruptcy counsel that lived and breathed the Acis case from

5  the date that they were filed on January 30th of 2018, through

6  today.

7            Now, Your Honor -- and along with my co-counsel, Mr.

8  Shaw, who has been living and breathing, frankly, the issues

9  longer than I have, even.

10           Your Honor, I will repeat something that was in our

11 moving papers.  And I know Your Honor and Your Honor's team has

12 probably read all the moving papers. but I think this bears

13 repeating, and that is that this case is unique.  It is, in my

14 mind, exceptionally unique.  These facts are so unique, Your

15 Honor, that I would venture to say I don't think that this is

16 necessarily a case that would even possibly or remotely or even

17 tangentially open any floodgates, because these facts are so

18 different from the typical motion to transfer venue.

19           Your Honor, touching quickly on the burden-of-proof

20 issue that Your Honor referenced in your colloquy with Mr.

21 Clemente.  Your Honor, Acis concedes, obviously, the burden of

22 proof is clear that it's the preponderance of the evidence.

23 And I won't go through ad nauseum all of the factors.  I know

24 the Court is exceptionally familiar with all the factors on

25 both the convenience-of-the-parties and interest-of-justice

HIGHLAND CAPITAL MANAGEMENT, L.P.                    62

1  side.  But I would just note that, at least in the Court's

2  prior rulings, you've said that the factors are not really a

3  scorecard, that we're not counting three factors versus three

4  factors, or four versus two.

5           And I would just --

6           THE COURT:  Well, that follows with my fundamental

7  tenet, which is that any legal test with more than three

8  factors is useless.  It's just a -- it's just a question of

9  discussion.

10          MS. PATEL:  I think -- and I think this Court has wide

11  discretion with whether to transfer this case or not.

12          Your Honor, one final quick point that I'll call

13  the -- kind of the four corners or setting the table, for

14  purposes of go-forward, is back to the reference to the -- that

15  there's no real deference, necessarily, to the debtor's choice

16  of venue.  That's sort of subsumed in the burden of proof.  The

17  movant bears a burden of proof and, if they meet the

18  preponderance of the evidence, then the burden shifts.  And

19  that's really kind of where the debtor's choice of forum weighs

20  in.

21          Now, Your Honor, one other quick point is that there's

22  been a lot of discussion in the objections and the responses

23  and the replies, indicating that this whole issue is about Acis

24  as a creditor.  And what I'm here to say, Your Honor, is that

25  this, actually, the issue, the motion to transfer venue, is not

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 67 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 135 of 1017 PageID 4814
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 66 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 63 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                          63

 1   really about Acis as a creditor.  And I'm here representing

 2   Acis as a creditor.  This has been painted as there's one

 3   creditor that's driving this, and that's Acis.  That's just

 4   simply not the case, Your Honor.

 5          The reality is that you've got hundreds of millions of

 6   dollars or claims represented by the committee, as a fiduciary

 7   to those claims, that have made this motion.  This is not Acis'

 8   motion.  Yes, we did join with respect to it.  And really, it

 9   has -- that has more to do with the fact that we're the Texas

10   folks, we're the Texas creditor.  And we -- again, I and Mr.

11   Shaw lived and breathed the Texas cases.  And I'm here to stand

12   before the Court and answer any questions you may have with

13   respect to what happened, what transpired, but, more

14   importantly, what could happen on a go-forward basis.

15          Your Honor, it's important -- and I -- again, harking

16   back to this concept of this is unique.  As Your Honor noted in

17   EFH, had the committee signed on, had the Texas comptroller

18   signed on, perhaps that outcome would have been a little bit

19   different.  But here, Your Honor, we've got the committee

20   moving for transfer of venue.  And I think that's really

21   significant.  And I'll go through in a little bit sort of the

22   debt stack that we're dealing with here, and you'll see that,

23   hands down, the committee is the fulcrum debt here.  It is the

24   fulcrum debt, Your Honor.

25          Your Honor, one final quick note on forum-shopping.

APP. 0063
004053

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 68 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 136 of 1017   PageID 4815
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 67 of
2722
Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 64 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                64

 1  And there's been conversation with respect to the committee's
 2  forum-shopping, the debtor's relationship.  Look, I've read
 3  Your Honor's prior opinions and I really do think the issue
 4  boils down to -- I think it's probably neutral with respect to
 5  both sides.  As Your Honor pointed out, the debtor has the
 6  ability to choose the state of its incorporation as its venue
 7  for filing of bankruptcy.  And also, the committee has the
 8  ability to move, to transfer, pursuant to 1412, to a place that
 9  is the interest of justice and the convenience of the parties.
10  I really view that as being the -- there should be no negatives
11  cast on, frankly, either side, with respect to forum-shopping,
12  because it's kind of invited by the structure of the statute.
13          So if the case isn't about Acis as a creditor, what is
14  this case about?  Well, I -- or what is this motion about?
15  Here I really do think that -- at its heart, that this
16  particular motion to transfer, and probably motions to transfer
17  in general, boil down to the bankruptcy case itself.  So here
18  that would be -- this is all about Highland's bankruptcy and
19  where it should be administered, what makes sense.
20          And, Your Honor, I want to go through a couple of
21  different subtopics on this.  First I want to talk about the
22  business lines that the debtor engages in.  What does it do?
23  And this is all from the -- what I'm going to refer the Court
24  to is all included in the first-day declaration of Mr.
25  Waterhouse, which is Debtor's Exhibit O.

APP. 0064
004054

HIGHLAND CAPITAL MANAGEMENT, L.P.                    65

1           And, Your Honor, in Mr. Waterhouse's declaration, he

2    goes through the three kind of general lines of the debtor's

3    business.  First is proprietary trading.  And that involves

4    sort of trading with the debtor's money or leveraged money in

5    certain brokerage accounts.  And I really think that

6    proprietary trading is probably that line of business -- when

7    we're thinking about which court is best suited to oversee that

8    line of business and what's going to happen with respect to it,

9    I think that's really neutral.  I think both Delaware and

10   Dallas could adequately handle that issue.

11          The issue really becomes a lot more focused, though,

12   when we look at the other two lines of business.  The next line

13   of business is investment management services.  And this is --

14   and a big piece of that is the debtor's operation of its CLOs

15   or collateralized loan obligations.

16          If the 2018 financials -- again, I believe they're

17   contained in debtor's exhibits -- if you take a look at those

18   you'll see that as a part of investment management fee revenue,

19   a lot of the revenue that was generated is related to the

20   debtor's operation of eighteen CLOs along with some managed

21   separate accounts, et cetera.

22          Your Honor, the CLO piece and the separate accounts

23   are issues that the Dallas court was faced with through Acis'

24   bankruptcy and Highland's management of it.  And I'll borrow

25   from Mr. Clemente his phrase:  Acis was effectively a box.  It

HIGHLAND CAPITAL MANAGEMENT, L.P.                    66

1  had no employees of its own.  It only had two officers, Mr.

2  Dondero and Mr. Waterhouse, who was the treasurer of Acis,

3  until their resignation shortly after the appointment of --

4  shortly after the involuntary filings and the appointment of a

5  trustee.

6        Now, Your Honor, the other -- the last piece that's

7  also involved is shared services.  So we've got investment

8  management, and there's subpieces of it.  And I won't represent

9  to the Court that is Judge Jernigan familiar with every aspect

10  of Highland's investment management services?  No, likely not.

11  But neither is this Court.  This Court is still, very much so,

12  on the learning curve with respect to that.

13        And I would submit, Your Honor, that Judge Jernigan is

14  frankly just further along that learning curve with respect to

15  the investment management services.

16        On shared services, Your Honor, as Mr. Clemente

17  referenced, the opinions are very clear -- again, Exhibits 1

18  and 2 -- with respect to there is -- it's clear that Judge

19  Jernigan had to evaluate shared services.  And I'll kind of

20  summarize what the structure of what Judge Jernigan had to

21  evaluate was.  Again, Acis is a box.  It was provided its

22  services by Highland, pursuant to two key agreements:  a

23  subadvisory agreement and a shared-services agreement.  And

24  that shared-services agreement is relatively generic.  And all

25  that is is the subadvisory -- I like to think of it as that's

HIGHLAND CAPITAL MANAGEMENT, L.P.                    67

1  the thinking brain stuff.  That's the investment advisory.

2  Does this comply with SEC guidelines?  Should these trades be

3  made?  What does the marketplace look like?

4          Shared services, on the other hand, Your Honor, are

5  all that middle- and back-office typical type stuff.  There's

6  no real rocket science with respect to it.  It's just providing

7  infrastructure:  accounting, legal, bookkeeping functions, all

8  those things that any sort of generic business would provide.

9          And again, that is something that Judge Jernigan is

10  just more familiar with.  She is familiar with Highland's

11  business modus operandi.

12          And, Your Honor, if you look sort of across the

13  Highland structure, you will see that Acis really was just a

14  little microcosm.  It's a little template, because it gets

15  repeated throughout the Highland empire.

16          And one of the exhibits -- and forgive me; I didn't

17  bring up the other exhibit list, but multiple parties have

18  designated it, and it's the entities list.  And there's 2,000

19  entities, approximately.  I didn't count them all up.  But

20  that's a number that's been thrown around:  2,000 entities

21  under this.  And they are all each little microcosms.

22  Certainly, Judge Jernigan is further along with respect to the

23  Acis microcosm, but also with respect to the template as well.

24          Your Honor, with respect to then, therefore, economy

25  or -- judicial economy or efficiency, again, Judge Jernigan,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 72 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 140 of 1017 PageID 4819
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 71 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 68 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    68

1    further along the learning curve.

2           Your Honor, now turning then to the debt stack, as I

3    had referenced earlier -- again, this is all set forth in the

4    declaration of Mr. Waterhouse -- you've got two secured

5    lenders, Jefferies and Frontier.  And no one's heard with

6    respect to -- from them with respect to their position.  Your

7    Honor, these are two creditors that are vastly oversecured, and

8    so really they -- I'll put them as sort of neutral with respect

9    to what's going to happen in this bankruptcy case.

10          Then the next item in the debt stack that Mr.

11   Waterhouse identifies is Highland CLO Management.  Well, Your

12   Honor, it's a note that was transferred -- Highland is the

13   obligor on the note.  It's about nine-and-a-half million

14   dollars.  And it was a note that was previously held by Acis

15   and that was transferred to an entity by the name of Highland

16   CLO Management, by Mr. Dondero.

17          Highland CLO Management, in turn -- Mr. Waterhouse

18   references that there's sort of -- Highland doesn't have a

19   beneficial interest with respect to it.  But if you look at the

20   retention applications that are set for hearing a little bit

21   later today, you'll see that actually the debtors (sic) are

22   claiming there is an interest in this, that the debtor has an

23   interest in making sure that Highland CLO Management has a

24   defense when it comes to the issue of was that transfer from

25   Acis to Highland CLO Management a fraudulent transfer.

APP. 0068
004058

HIGHLAND CAPITAL MANAGEMENT, L.P.                    69

1        And again, these are issues that Judge Jernigan has
2    had to grapple with all throughout the bankruptcy case.  There
3    have been no -- there has been no adjudication that it was a
4    fraudulent transfer; but certainly she's had to evaluate it in
5    connection with four injunctions that were issued in connection
6    with the Acis case.

7        First there was a -- excuse me -- a sua sponte
8    injunction.  Second there came an ex parte injunction.  Third
9    there was a preliminary injunction.  And then fourth there was
10   a plan injunction.  And that plan injunction, Your Honor, is
11   embodied in Exhibit Number 17.  And again, all of these
12   transfers and transactions -- part of the debt stack of
13   Highland has been evaluated by Judge Jernigan.

14       Last in the debt stack, but certainly not least, Your
15   Honor, we have the general unsecureds.  And Mr. Waterhouse, in
16   his deposition that was held in Dallas, estimated that perhaps
17   the general unsecureds could be upwards of two billion dollars,
18   all told.

19       Now, just looking at the twenty largest, we're still
20   in the hundreds of millions, and we don't have the benefit of
21   schedules yet.  But this is -- this is the big dog.  This is
22   the big layer of debt.  This is who is really the fulcrum here.

23       And keep in mind, Your Honor, this is a free-fall
24   bankruptcy.  No one knows where this is going to go.  At the
25   first-day hearings, debtor's Counsel referenced that there

APP. 0069

004059

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 74 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25/23 Page 142 of 1017 PageID 4821
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 73 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 70 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    70

1    could be sales of assets and divestiture of certain things,

2    operational restructuring.  There's really no idea where this

3    case is headed.  And I think that's significant, Your Honor,

4    because this is an operational restructure or perhaps a

5    liquidation.

6         I hope not.  I hope that this is an operational

7    restructure and that all creditors can be paid either in full

8    or close to in full, but that's significant.  And the reason

9    why it's significant here is because, Your Honor, you've got

10   the fiduciary for that fulcrum debt voting with their feet with

11   what could happen -- what should happen on a plan.

12        And they're saying we think this case should be

13   administered in Texas.  And I think, again, going back to what

14   makes this case so unique, I think that's what makes it so

15   unique is that there are -- just from a dollar perspective and

16   volume perspective, the significant creditors and the committee

17   with respect to who's a fiduciary telling you, Judge, we think

18   this case should be administered in Texas.  And those votes are

19   going to be important with respect to any exit that happens

20   here.

21        Your Honor, I'll hit sort of on another factor, the

22   sort of forum's interest or a local interest in the

23   controversy.  And I concede, clearly -- and I think Your Honor

24   has referenced in the past -- Delaware, when it -- when an

25   entity is organized under Delaware law, that the forum state

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 75 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 143 of 1017 PageID 4822
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 74 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 71 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 71

1  has an interest in protecting its entities.  However, I will

2  say, I think what's different here is --

3          THE COURT:  Say that again?

4          MS. PATEL:  I'm sorry, Your Honor.  I probably

5  misstated that.  That the state of incorporation has an

6  interest in entities that are --

7          THE COURT:  Yeah, but --

8          MS. PATEL:  -- formed under its state's law.

9          THE COURT:  -- you're in the wrong court for that.

10 That's state court.  This is --

11         MS. PATEL:  I'm sorry?

12         THE COURT:  -- the --

13         MS. PATEL:  Oh, yeah.

14         THE COURT:  You're in the wrong court for that.  I

15 don't care about that.  This is --

16         MS. PATEL:  All right.

17         THE COURT:  -- this is federal court.

18         MS. PATEL:  Fair enough.  I'll take that one, then.

19         THE COURT:  This is federal court.  That's for the

20 chancery and the governor.

21         MS. PATEL:  Well, Your Honor, and going back just to

22 the issue of the unique factors here, usually, Your Honor, in a

23 motion to transfer venue, you have what I'll call relatively

24 similarly situated courts, certainly if you've got a transfer-

25 of-venue motion that was filed as early as the one that was

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 76 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 144 of 1017 PageID 4823
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 75 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 72 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    72

1  filed in this case, within the first few weeks of the case, and

2  within, I believe, two days of the committee's formation.

3          That's just not the scenario here, Your Honor.  You

4  have a bankruptcy court in Texas who is familiar with various

5  aspects of the debtor's business.  Is it familiar with every

6  aspect of the debtor's business?  No.  But that certainly can't

7  be said as to the Delaware Court either, that you are familiar

8  with every aspect of the debtor's business.

9          Your Honor, in Texas there's not only a bankruptcy

10 court, there's a district court who is familiar with all of

11 the -- with aspects of the debtor's business, and that is the

12 Honorable Judge Fitzwater.

13         And what I will say -- Your Honor was asking questions

14 with respect to the judge -- the bankruptcy judge that it would

15 be assigned to.  I'm happy to address those from my

16 perspective.  But what I will note is that every appeal that

17 stemmed out of the Acis bankruptcy case -- and there were in

18 excess of ten -- every single one was transferred ultimately to

19 Judge Fitzwater for adjudication.

20         So even if -- even if we look just one layer up from

21 the bankruptcy court to the district court, Judge Fitzwater is

22 intimately familiar.  And now we've got three -- in connection

23 with the Acis cases -- three appeals that are pending before

24 the Fifth Circuit, two of which involve Highland or a Highland-

25 related entity.

APP. 0072
004062

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 77 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 145 of 1017 PageID 4824
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 76 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 73 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 73

1    Your Honor, I want to quickly touch on the --

2    THE COURT: Is it the practice in the -- it's the

3  practice in our district court that once a district judge is

4  assigned an appeal in connection with a bankruptcy, any further

5  appeals in that bankruptcy go to that district judge. Is that

6  the practice in Texas?

7    MS. PATEL: It's the practice, Your Honor. I don't

8  believe that there's a specific local rule that says that that

9  will happen, but that's functionally what happens. And

10 sometimes you have to make a motion to transfer between two

11 courts, but invariably, it usually goes to sort of either the

12 first-filed court or kind of the first court to really get into

13 a substantive issue.

14    THE COURT: Okay.

15    MS. PATEL: Your Honor, I'll touch on a couple more

16 quick points. It is offensive to me when I read through the

17 debtor's pleadings and that there is an implication that the

18 Dallas court is somehow biased. I think of Judge Jernigan and

19 I think of this Court and I think of virtually every bankruptcy

20 court that I've ever had the privilege of appearing before as

21 being fair and impartial. And this concept of bias, that's

22 only grounded in the fact that the debtors have -- or I'm

23 sorry -- the debtor has lost a few.

24    And I will say, just to kind of forestall that easy

25 conclusion based on the opinions, I would note, in Acis'

APP. 0073
004063

HIGHLAND CAPITAL MANAGEMENT, L.P.                74

1  exhibits, if you look at Exhibit Number 12, that is -- it's an

2  email that the court sent in connection with Acis' first

3  confirmation hearing.  And that was a confirmation hearing that

4  occurred in August of 2018.  And the court ultimately denied

5  confirmation of the first sort of plan.  And there were kind of

6  three sub-plans.  But the court denied it.

7          And so again, I'm offended that there would be even an

8  implication that the court is somehow biased, because this

9  isn't a scenario where there have been only adverse rulings to

10 Highland in connection with the Acis bankruptcy case.  Judge

11 Jernigan has called the balls and strikes as she sees them,

12 Your Honor.

13         Your Honor, I'll conclude with the following, which is

14 that I would venture to guess that if this Court were in sort

15 of -- if we reversed the scenario and this Court had expended

16 hundreds of hours, hundreds of pages of opinions, untold hours

17 of its courtroom staff's time, going through and poring through

18 an exceptionally voluminous record, over 100,000 pages, and

19 having expended over forty days of courtroom time, with that

20 significant of an interest in the case and that expenditure of

21 time, I would venture to guess that this Court would want this

22 case transferred back to Delaware, if it had been filed

23 anywhere else.

24         And so I would submit to Your Honor that this Court

25 should -- this case should be transferred to Dallas for all of

APP. 0074

004064

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 79 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 147 of 1017   PageID 4826
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 78 of
2722
Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 75 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    75

1  the reasons proffered by the committee and as joined by Acis.

2  Thank you, Your Honor.

3          THE COURT:  You're welcome.

4          Anyone else in favor of the motion?

5          All right.  This time it will be short.  We're going

6  to take a very short recess, and then I'll hear from the

7  debtor.

8       (Recess at 11:50 a.m. until 12:00 p.m.)

9          THE CLERK:  All rise.

10         THE COURT:  Please be seated.  I apologize.  I know

11 it's getting warmer and warmer in here.  And we're trying to

12 contact -- we're trying to find someone in Maintenance who's

13 working today.

14         MR. POMERANTZ:  It's usually motivation to get the

15 hearings done quickly, in my experience.

16         THE COURT:  Yeah, it's -- if I take off my robe, don't

17 be offended.  I do have clothes on underneath.

18         MR. BOWDEN:  Thank you.

19         THE COURT:  I heard you, Mr. Bowden.

20         All right, go ahead.

21         MR. POMERANTZ:  Good afternoon, again, Your Honor.

22 Jeff Pomerantz, Pachulski Stang Ziehl & Jones, on behalf of the

23 debtors-in-possession (sic).  Before I go on to my prepared

24 remarks, I just want to address a couple of the points that

25 were raised by Mr. Clemente and Acis' Counsel.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 80 of

Case 3:25-cv-02072-S Document 15-7 Filed 06/25/25 Page 148 of 1017 PageID 4827

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 79 of
2722

Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 76 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 76

1     First, we are not aware of any formal statement that

2 Judge Hale, in the Northern District of Texas, is not taking

3 cases. So I think Your Honor's point was a good one. There's

4 no definite -- there's no requirement, and it may or may not be

5 that this case gets transferred, if Your Honor were to transfer

6 it.

7     Second, Your Honor, Highland has -- there have been

8 appeals made not only from confirmation of the plan but also

9 from the involuntary itself. If the involuntary appeal

10 succeeded, there wouldn't even be a bankruptcy case to be

11 related to. And in any event, the case law says that events

12 that may or may not happen in the future are not really

13 relevant to the venue analysis.

14     Lastly, Your Honor, Mr. Clemente started by saying he

15 thinks the facts are largely in dispute, and you heard Counsel

16 then go through in detail, as did Acis' Counsel, about how

17 there's no dispute that Judge Jernigan has a learning curve.

18     Of course they need to say that because that is the

19 focus and the crux of their venue-transfer argument. As I will

20 demonstrate in my comments and as the evidence is before the

21 Court, other than the opinions that were written and other than

22 the amount of time the court has spent, there is no real nexus

23 between what happened in that case and what happened in this

24 case.

25     We have no doubt that Judge Jernigan learned all about

APP. 0076

004066

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 81 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 149 of 1017 PageID 4828
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 80 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 77 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                77

1  Acis, learned all about Acis' relationship to Highland.  But

2  the real issue before Your Honor is what does that have to do

3  with this debtor, this debtor's assets and liabilities, and

4  this debtor's operations.  And as my comments will show, we

5  think that's a significantly overblown argument.

6          Your Honor, during their presentation, Counsel really

7  strayed a little bit from what the motion and the joinders sort

8  of said.  There they went through a painstaking analysis of the

9  various factors supporting venue.  I know Your Honor said that

10 over three factors, you don't find that helpful, but the courts

11 have relied on a series of factors.

12         And I think the reason why they have strayed away from

13 that and focused on the committee being the one to support the

14 transfer-of-venue motion and the facts of the Acis case is

15 because when you pare it down, the actual factors demonstrate

16 that there is no way the committee can carry its burden to

17 demonstrate that venue should be transferred.

18         However -- Your Honor pointed to this at the

19 beginning, in mentioning comments about forum-shopping -- the

20 committee and Acis are really being disingenuous, and they have

21 not told you the real reason that they want the case before

22 Judge Jernigan.

23         At the first-day hearing, Your Honor, Acis said they

24 intended to file a motion for an appointed trustee.  The

25 committee has told the debtor it intends to file a motion to

Case 19-34054-sgj11  Doc 3445-3  Filed 08/15/22   Entered 08/15/22 16:45:41   Page 82 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25/23   Page 150 of 1017   PageID 4829
Case 19-34054-sgj11  Doc 2062  Filed 03/18/21   Entered 03/18/21 20:59:39   Page 81 of
2722
Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 78 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    78

 1  appoint a trustee after this hearing.  The motion has not yet

 2  been filed, Your Honor, because they want Judge Jernigan to

 3  rule on that motion.  And it's not because she's familiar with

 4  this debtor's business, this debtor's assets, or this debtor's

 5  liabilities, because she generally is not.  It is because she

 6  formed negative views regarding certain members of the debtor's

 7  management that the committee and Acis hope will carry over to

 8  this case.

 9        The convenience of the parties and the interests of

10  justice and how this case is so unique are just a pretext.

11  They want a trustee to run the debtor, and they want Judge

12  Jernigan and not Your Honor to rule on that motion.  That, Your

13  Honor, is not a proper reason to transfer venue, but rather a

14  transparent litigation ploy.

15        Similarly, Acis also wants the case to proceed in its

16  home court where it has enjoyed success in litigating against

17  the debtor.  Your Honor mentioned the conflicts-of-interest

18  theories.  They're not just conflicts of interest between two

19  jointly administered debtors.  These go to the crux of what the

20  Acis case is about and significant claims against the debtor.

21        The Court may ask, appropriately -- and the Court

22  did -- why would the debtor file the case in Delaware?  Chapter

23  11 is all about a fresh start.  The debtor recognized concerns

24  that the creditors had with certain aspects of its pre-petition

25  conduct, and proactively appointed Brad Sharp as chief

APP. 0078
004068

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 83 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 151 of 1017 PageID 4830
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 82 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 79 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    79

1  restructuring officer with expanded powers, to oversee the

2  debtor's operations.

3         Mr. Sharp worked with the debtor and Counsel to craft

4  a protocol for transactions that would be subject to increased

5  transparency.  The debtor didn't have to do that.  As Your

6  Honor mentioned at the first-day hearing, the debtor operates

7  its business in the ordinary course.  But given the

8  circumstances surrounding this case, given the history, we

9  felt, and the CRO, importantly, felt it was important to get on

10 the table what the debtor, through the CRO, believed was

11 ordinary and what was not, so we could have a transparent

12 discussion, discussion that, while we've made headway with the

13 committee, we have not yet been able to come to an agreement.

14        The debtor filed the case in this district because it

15 wanted a judge to preside over this case that would look at

16 what's going on with this debtor, with this debtor's

17 management, this debtor's post-petition conduct, without the

18 baggage of what happened in a previous case, which contrary to

19 what Acis and the committee says, has very little to do with

20 this debtor.

21        These form insufficient grounds, Your Honor, to

22 overturn the debtor's choice of venue, and the motion should be

23 denied.

24        I would like to now walk through the statutory

25 analysis, something that Counsel avoided, because again, I

HIGHLAND CAPITAL MANAGEMENT, L.P.                    80

1   think it highlights the weakness of their argument.

2        It is clear that the Delaware venue is proper, and

3   1408 says the places where a Chapter 11 debtor can file the

4   case.  As the vast majority of debtors who file cases in this

5   district, the debtor filed here because it was domiciled in

6   Delaware.  It is a Delaware LP.  But it goes further than that.

7   99.94 percent of its LP interests are owned by Delaware

8   entities.  And the general partner, Strand Advisors, is a

9   Delaware general partner.

10       While many cases, Your Honor, before this court, rely

11  on the domicile of one affiliate to bring other non-Delaware

12  related affiliates before the court, that's not the case here.

13  All you have, virtually, are Delaware entities, through the

14  ownership structure.

15       As I will also discuss in a few moments, Your Honor,

16  domicile is not the only connection that this debtor has to

17  this district, as significant litigation matters involving the

18  debtor, including those commenced by committee members, that

19  was the catalyst to the filing, are pending in Delaware.

20  Accordingly, the committee acknowledges, as they must, that

21  Delaware is, of course, a proper venue.

22       However, they rely on 1412 which sets forth the

23  standard -- test that the movant has to meet in order to

24  transfer venue, either for the convenience of the parties or

25  the interest of the justice.

APP. 0080
004070

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 85 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 153 of 1017 PageID 4832
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 84 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 81 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    81

1        And courts, including the written opinions in this

2   district by your colleagues, most often cite to the six factors

3   in the CORCO decision in the Fifth Circuit in 1979.  And as

4   Judge Gross, in his 2016 opinion in Restaurants Acquisition

5   makes clear, the movant bears the burden of demonstrating that

6   the factors strongly weigh in favor of a transfer.

7        Similarly, Judge Gross stated in that case -- and I

8   know Your Honor may not fully subscribe -- that courts

9   generally grant substantial deference to the debtor's choice of

10  forum.

11       And in the case here, where not only do you have the

12  debtor is a Delaware entity, but virtually all of its holdings

13  are well -- are Delaware entities as well, it is even more

14  appropriate to defer to the debtor's choice of forum.  As Judge

15  Walsh said in his 1998 opinion at PWS Holding, it is a

16  fundamental legal tenet that every citizen of a state is

17  entitled to take advantage of the state and federal judicial

18  process in that state.

19       So the question before Your Honor is whether the facts

20  in this case strongly weigh in favor of a venue transfer such

21  that the Court will disregard the debtor's reasoned business

22  judgment to commence the case in this district?

23       We submit, Your Honor, that the committee and Acis

24  have not come close to meeting that standard, and the CORCO

25  factors do not support a transfer.

APP. 0081
004071

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 86 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 154 of 1017 PageID 4833
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 85 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 82 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                82

1      The first one is the proximity of creditors.  And the

2  committee is focused on the fact that the committee -- the

3  representative fiduciary of the estate -- has determined that

4  venue is appropriate.  But the factor not only looks at the

5  number of creditors, it looks at the dollar amount of the

6  creditors.  And if you analyze -- an analysis of either

7  demonstrates that convenience of the parties does not support a

8  transfer of venue in this case.

9      The debtor has two secured creditors.  Jefferies is

10  headquartered in New York City.  Frontier Bank is headquartered

11  in Oklahoma.  There was reference by Acis' Counsel to HCLOF.

12  Their secured claim is unrelated to the note that was at issue

13  in Acis, and there's nothing in the record to say that that

14  secured instrument has anything to do with the Acis case.

15  Neither of those creditors has weighed in on the motion to

16  transfer venue.

17      So let's look at the unsecured creditors.  Of the

18  twenty that were listed in the debtor's petition, seven have

19  Texas addresses.  Five of those are debtor's either current or

20  former law firms.  Two of them are in the courtroom today.  And

21  as Your Honor I'm sure appreciates, debtor professionals --

22  former debtor professionals are not usually active in

23  bankruptcy cases.  Indeed, none of them filed a notice of

24  appearance in this case.

25      The other two that have Texas addresses are the claims

APP. 0082
004072

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 155 of 1017 PageID 4834
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 86 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 83 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    83

 1   related to Acis:  the Acis claim and the Josh Terry claim.

 2   There are no other unsophisticated creditors that the Court

 3   needs to worry about that would not be able to travel to

 4   Delaware, as needed.

 5           The two largest unsecured creditors in the top twenty

 6   are the Redeemer Committee and Patrick Daugherty, each of whom

 7   had pre-petition litigation pending against the debtor that

 8   they each commenced in the Delaware Chancery Court.  And the

 9   arbitration proceeding that preceded the Redeemer chancery

10   court litigation was pending in New York City.

11           UBS, a member of the committee, listed as number

12   nineteen with a disputed and unliquidated claim, will likely

13   claim it is the largest creditor of the estate.  It is based in

14   New York.  It has litigation pending against the debtor in New

15   York, and used Latham & Watkins' DC office for that litigation.

16           And lastly, the fifth largest creditor, Your Honor,

17   Meta-e Discovery, is also on the committee.  Where is their

18   address?  Stamford, Connecticut.

19           As Judge Gross reasoned in Restaurants Acquisition, in

20   order to overcome the strong presumption in favor of the venue

21   transfer, a transfer must substantially improve the

22   administrative feasibility with respect to the creditor body as

23   a whole.  So the committee sits out there and Acis sits out

24   there saying that it's convenient for the creditors, it's much

25   more convenient in Dallas.  Their actions belie their

APP. 0083

004073

HIGHLAND CAPITAL MANAGEMENT, L.P.                84

1   statements.  All this litigation was focused on either Delaware

2   or the Northeast.  It is just simply disingenuous for them to

3   argue otherwise.

4          The next factor, Your Honor, is the proximity of the

5   debtor.  And in applying this factor, the courts focus

6   primarily on the parties who appear in court.  The debtor

7   retained Brad Sharp, and he has demonstrated its intention --

8   and the debtor has demonstrated its intention of having Mr.

9   Sharp be the face of the reorganization efforts before the

10  Court.

11         Indeed, in cases where a CRO is reported, Your Honor,

12  the CRO is more apt to testify in court than any other debtor

13  representative.  And I believe Mr. Sharp's testimony, which was

14  uncontroverted, was that he expects that he and Mr. Caruso will

15  provide the bulk of the testimony required from debtor

16  representatives during this bankruptcy case; and that's because

17  the debtor has given Mr. Sharp broad authority to evaluate the

18  propriety of post-petition transactions and to pursue and

19  analyze insider claims.

20         And at today's hearing the debtor will offer the

21  testimony of Mr. Sharp and his colleague, Mr. Caruso, to

22  support the relief requested.  They have developed a

23  substantial amount of knowledge regarding the debtor's assets,

24  liabilities, and operations, in the six weeks they've been on

25  the job; and that knowledge will continue to grow.

APP. 0084

004074

HIGHLAND CAPITAL MANAGEMENT, L.P.                    85

1          And Mr. Sharp has significant experience, as he

2     testified to, being a CRO in cases in this district; and he

3     could travel just as easily to Delaware as he can to Texas.

4          While the debtor acknowledges that other debtor

5     employees like Frank Waterhouse may be called to testify, as he

6     was today, the involvement of the debtor's personnel in this

7     court is likely to be immaterial.  And he was the only Texas

8     person called to testify in this case.  And if the committee

9     and Acis felt it was so important that representatives of the

10    debtor be -- it would be easier for them to travel to court,

11    they didn't call any witnesses in today, which is the most

12    important hearing in the case.

13         Also, Your Honor, our offices, as you know, are in

14    Delaware.  And while it's true that we practice all around the

15    country, we would need separate counsel if we were to -- if the

16    case was to be -- to move.

17         And similarly, the committee retained Young Conaway,

18    which took a significantly active role in the litigation

19    leading up to today.  That information and knowledge and

20    expertise would be lost if the case was transferred.

21         Next, Your Honor, related, is the proximity of

22    witnesses.  And a I said, the committee can't demonstrate that

23    witnesses in this case would find Texas a substantially more

24    convenient forum than this court.  And you would have expected

25    them to have subpoenaed Texas witnesses if that were so

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 158 of 1017 PageID 4837
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 89 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 86 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 86

1    important.

2         Location of assets, Your Honor, is one of the CORCO

3    factors.  And the committee makes a big point that all the

4    decision-making is in Texas and all the people are in Texas and

5    the office is in Texas.  The courts that look at location of

6    assets as being critical typically involve cases that are

7    single-asset real-estate cases, or cases that are small local

8    businesses that have significant regional connections.

9         But if you look at the debtor's assets here, it's not

10   the case.  Their assets generally include financial instruments

11   and investments in a wide variety of public stock; advisory

12   contracts; shared services; and interests in nonpublic hedge

13   funds and private equity funds.

14        The assets are located throughout the United States

15   and in Latin America, Korea, and Singapore.  And the majority

16   of the debtor's liquid assets are in New York.  We were not --

17   we don't dispute the point that there aren't significant people

18   in Dallas and that the offices are in Dallas and all the

19   employees.  We don't dispute that.  But the assets are far-

20   flung around the country, and the cases, again, that focus on

21   the assets, focus on local expertise that the court will bring

22   to bear, particularly in real-estate cases with respect to

23   valuation.  You have nothing of that here.

24        The debtor intends to use its Chapter 11 to provide

25   breathing room and to evaluate, hopefully in a constructive way

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 91 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 159 of 1017 PageID 4838
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 90 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 87 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                87

1  with the committee, how best to maximize value for the debtor's

2  assets through a consensual restructuring; and there's no

3  reason to believe why Texas rather than this court, would be a

4  more appropriate forum for this restructuring.

5          The last factor, Your Honor, is the economic

6  administration of the estate, which the courts generally point

7  to as the most important factor.  And the committee points to

8  five reasons, which is essentially retreads of its previous

9  arguments.

10          Again, they argue a higher concentration of creditors

11  in Texas and Midwest.  That's not the case, as I mentioned.

12  They argue that there's a higher concentration of professionals

13  in Texas and Midwest.  And if you look at all the

14  professionals, they're all from national firms; they're all

15  metropolitan areas that practice routinely before this Court.

16  And the concept that the flights being different and the

17  mileage being different is in any way -- is in any way

18  important, is just not -- is just not the case.

19          People practice in a global, national world, these

20  days.  And if that argument succeeded, most of the -- your

21  brethren and yourself would not have much to do, because that

22  argument could support transfers in most cases.

23          THE COURT:  Well, I think really goes to why -- I

24  mean, I know this is the standards that are generally applied,

25  but it's a case from 1979.  It's really behind the times.  I

APP. 0087
004077

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 92 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 160 of 1017 PageID 4839
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 91 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 88 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    88

1  don't think the factors reflect corporate practice of

2  bankruptcy reality of 2019.

3          MR. POMERANTZ:  And that's exactly what Judge Gross

4  said in the Caesar's opinion --

5          THE COURT:  Right.

6          MR. POMERANTZ:  -- which is cited in the material,

7  that this argument, given technology, given frequency of air --

8  ease of air travel, it's just not a relevant factor anymore.

9          And the two pages that the movants spent in the brief

10  talking to you about how many direct flights there are from LA

11  to Delaware as opposed to LA to Dallas, that, Your Honor, I

12  think is just silly.

13          The committee also argues that most creditors would

14  need to retain local counsel if they were here.  Well, if you

15  look, the case has been pending a month-and-a-half, and other

16  than notices of appearance filed by committee members, there

17  have only been two notices of appearance that have been filed

18  that are unrelated to debtor entities.  And one of those is

19  Daugherty, who commenced litigation in chancery court.  So the

20  argument that is made typically in cases where they're filed in

21  jurisdictions far off from where the debtor's operating is, is

22  that it'll be burdensome on the mom-and-pop creditor, Your

23  Honor, we don't have mom-and-pop creditors here.  And there's

24  nobody out there with material claims against the estate that

25  will not have the ability and have trouble and demonstrated the

APP. 0088
Appx. 00435
004078

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 93 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 161 of 1017 PageID 4840
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 92 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 89 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    89

1  willingness to hire Delaware Counsel.

2         The last argument --

3         THE COURT:  Even when you do have mom and -- again, to

4  comment on reality, even when you do have mom-and-pop creditors

5  in businesses that are very locally focused, general practice

6  today is to make their claims irrelevant, in that to the extent

7  they have avoidance claims, they're paid on the first day.

8  Their real concern is whether the business will continue or

9  not.

10         Now, it's certainly true that pension claims are

11  important, and proofs of claim are important.  But we have

12  many -- all courts have many procedures in place to ensure that

13  those types of creditors can participate without having to go

14  to the courthouse.

15         MR. POMERANTZ:  Yes.  So, Your Honor, Judge Gross also

16  mentioned that in the Restaurants Acquisition case, which was a

17  Texas-based --

18         THE COURT:  He's a smart guy.

19         MR. POMERANTZ:  We'll be sorry to see him go, Your

20  Honor.

21         THE COURT:  Yeah, absolutely.

22         MR. POMERANTZ:  Which was a Texas-based restaurant

23  chain that had more of a local flair.  But he made the comments

24  Your Honor made.

25         The last argument the committee makes is that Texas is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 94 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 162 of 1017 PageID 4841
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 93 of 2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 90 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    90

1   more convenient.  And this is really the crux, which I'll spend
2   some time over the next few minutes.

3          Texas is more convenient -- convenient -- because the
4   Texas bankruptcy court, where Acis is pending has, in their
5   words, already expended great time and effort familiarizing
6   itself with the debtor and its operations.  You've heard
7   statements like "learning curve".  You heard statements about
8   everything that the debtor -- that Judge Jernigan has found out
9   about this debtor, and how important and how helpful it is, and
10  how Your Honor will be behind the learning curve.  We just
11  don't buy that, Your Honor.

12         And aside from that argument, the arguments that the
13  committee makes for transfer are arguments that could be made
14  in any case before Your Honor.

15         THE COURT:  Yeah, I was going to say that's kind of an
16  interesting argument, because actually it assumes Judge
17  Jernigan's going to ignore the rules of evidence in making
18  factual findings, because you're limited to the record before
19  you on a specific motion.  And what fact you may have learned
20  with regard to something a person has done, maybe that goes
21  into questions of credibility on cross-examination or direct
22  testimony, but to actually base your decision on a fact that's
23  not in the record for the specific proceeding would be
24  improper.

25         MR. POMERANTZ:  Look, I agree, Your Honor.  And the

APP. 0090
004080

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 95 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 163 of 1017 PageID 4842
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 94 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 91 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    91

 1   familiarity with the type of business -- if I wasn't speaking

 2   to Your Honor or your brethren or many other judges around the

 3   country, I'd say well, maybe there are certain judges who

 4   haven't dealt with large financial services company, may not

 5   know what a CLO, may not know what a hedge fund is or private

 6   equity fund is.  I'm very confident that Your Honor has had

 7   many cases with sophisticated financial instruments, likely CLO

 8   obligations, so that Your Honor not only has a good base of

 9   knowledge that would give you the same base of knowledge that

10   Judge Jernigan has, but as we've also found, you are a fairly

11   quick study and that I have no doubt that you could come up-to-

12   speed without very little effort.

13         So their argument is a grossly overstated

14   interpretation of what the Acis case was about and that what

15   was learned in that case has any relevance.  As a part -- as a

16   result of the Acis plan confirmation, Acis is no longer part of

17   the debtor's organizational structure.  The debtor owns no

18   equity in Acis.  And the debtor no longer provides any advisory

19   services to Acis.

20         We admit that Judge Jernigan conducted many hearings,

21   and she issued several lengthy opinions, and she heard from a

22   variety of witnesses.  And I'm sure Your Honor -- if Your Honor

23   has not -- Your Honor might read the opinions that she wrote

24   that are attached to the exhibits, the plan confirmation

25   opinion, the arbitration opinion, the involuntary opinion; and

HIGHLAND CAPITAL MANAGEMENT, L.P.                    92

1    you will conclude, I believe, as I have concluded, that ninety-

2    five percent of that stuff has nothing to do with this debtor.

3           It focused on the CLO obligations -- CLO business, the

4    relationship, the transfers of certain assets away from Acis

5    that basically Acis is claiming were fraudulent conveyances,

6    and that was the real focus; not on any of the debtor's

7    business operations.

8           Acis was the advisory arm through which the debtor

9    structured its collateral loan portfolio.  The fees -- the

10   uncontroverted evidence is the fees generated from the CLO

11   business represent approximately ten percent of the debtor's

12   revenue and that that will reduce over time, because since the

13   market crash in 2009 the debtor has not created any new CLO

14   funds.  So there's no active management and advisory services

15   going on for the CLOs.  They're just being liquidated in the

16   normal course.  Their importance will continue to decrease.

17   And even right now, it's only ten percent.

18          The debtor generates its revenues from trading public

19   securities; its equity positions in a variety of nonpublic,

20   private-equity, and hedge funds; and advisory and back-office

21   service provided to third parties.  It is the monetization of

22   those assets that will provide the basis for the restructuring

23   of this debtor.  And Judge Jernigan's prior experience with the

24   small sliver of what the debtor's business currently is, will

25   be only marginally relevant, at all.

HIGHLAND CAPITAL MANAGEMENT, L.P. 93

1       Acis didn't have any other balance-sheet assets.  They

2  were basically an advisor of CLOs.

3       For example, Judge Jernigan has no experience or

4  knowledge surrounding the debtor's multi-strat. fund; its

5  Korean, Latin American, or Singapore private-equity

6  investments; its investments in the PetroCap funds; or the

7  other myriad of assets that are on the debtor's balance sheet

8  which Your Honor will likely will hear about in connection with

9  the hearings that will go on later.

10       The committee and Acis make a big point of arguing

11  that Judge Jernigan is familiar with the shared-service and

12  management agreements between Acis and the debtor.  However,

13  there was a lot of testimony from the podium on that.  The only

14  testimony before Your Honor is that the contracts are

15  different.  Mr. Waterhouse wasn't even familiar with the

16  contracts, couldn't provide any testimony.  But Mr. Sharp

17  testified that the type of shared-service and advisory

18  agreements for CLOs are markedly different than the type of

19  services and advisory agreements for non-CLO entities.  While

20  Acis' Counsel stood up there and said there's a template and

21  they're pretty much the same, that was purely argument.  There

22  was no evidence in the record to reflect that.

23       And in fact, the only two agreements that involved

24  Highland in the Acis case were these two agreements.  But

25  again, they're like apples and oranges.

APP. 0093

004083

HIGHLAND CAPITAL MANAGEMENT, L.P. 94

1          In any event, Your Honor, one of the matters that Mr.

2     Sharp is focusing on will be the appropriate economic

3     arrangement between the debtor and its affiliates and

4     nonaffiliates, through its shared-services and advisory

5     agreements.  That has been a focus of DSI's analysis.  The

6     committee has indicated that's something that they want to

7     focus on.  And Mr. Sharp will come up with a recommendation as

8     to what those should be, and it'll be that recommendation

9     that'll be based on the market rate for these contracts in

10    these particular businesses that will be relevant for Your

11    Honor to consider, at some point.

12         They attached a post-confirmation opinion that Judge

13    Jernigan issued with respect to denial of a motion to seek

14    arbitration regarding provisions of those agreements.  But if

15    you read that opinion carefully, you will see that the primary

16    issues in that case were whether an arbitration provision

17    actually survived, given that the last version of the agreement

18    did not have them -- there were five different iterations in

19    each of the agreements.  And after concluding that the

20    arbitration provision did survive, she ultimately ruled that

21    that notwithstanding, she would not enforce arbitration because

22    the claims were too related to the other claims that were being

23    asserted.  Again, nothing to do with the debtor's business.

24         In fact, Your Honor, after today, I have no doubt that

25    Your Honor will be a lot more familiar -- if Your Honor is not

HIGHLAND CAPITAL MANAGEMENT, L.P.                    95

1    already -- with what the debtor does.  So Your Honor will hear

2    testimony from Mr. Caruso; Your Honor will hear testimony from

3    Mr. Sharp, about various aspects of the debtor's business, what

4    it's doing, its management structure, how that structure is

5    working.  All that you will hear, which will put you in an

6    advanced state, compared to Judge Jernigan, as opposed to being

7    behind.

8          And there are other aspects of this case that are on

9    the way that have nothing to do with Acis.  For example, we

10   just filed a motion to approve ordinary-course bonuses to

11   employees.  And we may also seek approval of a KERP and a KEIP.

12   Acis had their own employees, and Judge Jernigan had no special

13   knowledge of the debtor that would put her in a better position

14   to give her an advantage over this Court in determining an

15   appropriate compensation structure.

16         It isn't that difficult.  Your Honor hears it all the

17   time:  KEIPs, KERPs.  Judge Jernigan hears it all the time.  My

18   point is, Your Honor, there's nothing that would help her, from

19   her knowledge of Acis, that would justify a transfer of venue.

20         They also stress that -- in their papers, that Judge

21   Jernigan heard a lot of testimony from debtor's management.

22   But they really don't discuss what the content of that

23   testimony is or how it's, in any event, relevant to this case.

24   They just really want to rely on the sheer volume of

25   information that they have foisted on Your Honor, citing to the

HIGHLAND CAPITAL MANAGEMENT, L.P.                    96

1   entire record, by saying there's so much; there's been hundreds

2   of pages, dozens of hearings, and then that means Judge

3   Jernigan is in a much better position.

4           If they wanted to point to specific things in the

5   record where the judge had specific knowledge, they could have.

6   They shouldn't (sic) have.  And they're trying to do this on a

7   big holistic view, but when Your Honor looks at the record, I

8   think Your Honor will conclude otherwise.

9           In any event, it's not really -- they don't explain

10  why familiarity with the debtor's management is at all

11  relevant.  Look, they clearly want a trustee in this case and

12  believe that because Judge Jernigan found debtor's management

13  to not be credible, she'll be more apt to appoint a trustee

14  than this Court.  But that argument doesn't withstand scrutiny.

15          This case is different.  This case is being managed by

16  a CRO.  This case had the debtor file a motion it didn't have

17  to file for ordinary-course protocols.  This case has -- thus

18  far, you haven't heard anything about any discovery disputes,

19  you haven't heard anything -- although you heard a couple weeks

20  ago there might be issues with cooperation, we provided a

21  substantial amount of documents, produced witnesses, in a

22  significantly accelerated time frame.  You have heard nothing

23  about that.

24          So any un-cooperation or difficulty of any -- that

25  they may have encountered in the Acis case, there's no evidence

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 101 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 169 of 1017 PageID 4848
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 100 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 97 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    97

1   that that's occurring here, for good reason; because Mr. Sharp

2   is in charge.  And although he is still reporting to Mr.

3   Dondero, as his corporate structure, Mr. Dondero can terminate

4   him, and if he terminates him, he has to give notice.  That's

5   appropriate.  That's one of the issues we address in connection

6   with the U.S. Trustee's concerns with the CRO motion.  In order

7   to file a corporate governance, he has to report.  But there

8   are certain things, as you'll hear later, that he has been

9   given primary responsibility for.

10          Your Honor, Chapter 11 is about giving a debtor a

11  fresh start, and this court is no -- this case is no exception.

12  This Court is fully capable of evaluating the veracity of the

13  debtor's witnesses; and transferring the case to Judge

14  Jernigan, when the real motivation is because of how she has

15  dealt with the prior case -- which they may not say it, but

16  that's clearly what's happening here -- would be unduly

17  prejudicial to the debtor.

18          We have nothing against Judge Jernigan.  She is a fine

19  jurist.  But in this case I think it's a challenge and there's

20  a reason why we decided to have the case filed here.

21          And then I'll also point to Your Honor the significant

22  adversity between the two estates.  Your Honor mentioned that.

23  Counsel said, well, it happens in all cases.  True.  We've been

24  involved in many, many cases with multi debtors, that they have

25  issues in intercompany claims.  That's a fact of modern

HIGHLAND CAPITAL MANAGEMENT, L.P.                    98

1   corporate life.

2          But this is different.  The whole -- one of the -- the

3   most significant asset of Acis are their claims against this

4   debtor.  How those claims are prosecuted and when they succeed,

5   may make or break the Acis case as to whether unsecured

6   creditors get paid or not.

7          In a case like this, this factor does not support a

8   transfer of venue; we argue that it supports keeping the case

9   before Your Honor so that it can maintain the separateness of

10  the estates.

11         In conclusion, Your Honor, we don't believe the

12  committee has come close to satisfying its burden that a change

13  of venue is appropriate under 1412.  And as I mentioned at the

14  beginning of my presentation, the committee's motive in

15  bringing the motion and Acis' motive in joining the motion is

16  clear.  Even though the debtor has installed a CRO with

17  expanded powers, with impeccable credentials to address

18  creditor concerns, the committee and Acis are focused on the

19  appointment of a Chapter 11 trustee and believe the transfer of

20  the case to Texas is the most likely to get that goal

21  accomplished.

22         But rather than filing the case -- or filing a trustee

23  motion here, they took their shot on a venue motion and hope

24  that Your Honor will give them a shot to do it in Texas.

25         Your Honor, for those reasons, we respectfully request

APP. 0098
Appx. 00145
004088

HIGHLAND CAPITAL MANAGEMENT, L.P.                    99

1   that Your Honor deny the motion.

2            THE COURT:  Thank you.

3            MR. POMERANTZ:  Does Your Honor have any more

4   questions?

5            THE COURT:  No.

6            MR. POMERANTZ:  Thank you, Your Honor.

7            THE COURT:  Reply?

8            MR. CLEMENTE:  Briefly, Your Honor.  I will be brief.

9   It will be a little less organized, because I'll just run

10  through some points very quickly.

11            THE COURT:  Okay.

12            MR. CLEMENTE:  First of all, on Restaurant

13  Acquisitions, I believe in that opinion, Your Honor, there were

14  creditors that supported venue in Delaware.  We do not have a

15  single creditor on the record supporting Delaware -- excuse

16  me -- supporting venue in Delaware.

17            Regarding the litigation in New York and Delaware,

18  that's a red herring, Your Honor.  They're forced creditors.

19  They were forced to bring lawsuits to achieve their view of

20  justice.  It's not relevant to whether -- the location of

21  that -- those lawsuits being in Delaware and New York.  They

22  were forced to bring those lawsuits in order to get paid by Mr.

23  Dondero and the debtor.

24            Your Honor, we didn't call witnesses this morning,

25  because we believe -- as I mentioned in my argument -- that the

HIGHLAND CAPITAL MANAGEMENT, L.P.                    100

1   uncontroverted facts support our venue-transfer motion.  The

2   other motions are their burden, Your Honor.  And so I wanted to

3   remind Your Honor of that.

4          Regarding Young Conaway, obviously, we shouldn't -- it

5   shouldn't be held against us that we decided that the smart and

6   prudent thing to do is to have able Co-Counsel advise us as we

7   proceed in front of Your Honor.  So I believe that that's

8   something that simply is of no moment.

9          The location of the assets, Your Honor, these are

10  financial instruments.  They're interests in limited

11  partnerships.  They're documents.  They're things that are

12  created by documents.  And again, it's not controverted.

13  That's all located in Dallas, Your Honor.

14         So this idea of far-flung assets throughout the

15  country just simply isn't true.  These are documents.  They're

16  interests.  They're things that exist on paper.

17         Your Honor, we have not made this about the mom-and-

18  pop creditors.  We take Your Honor's comments to heart on that.

19  As Counsel for Acis suggested, this is about the large body of

20  unsecured creditors that are sitting at the bottom of this cap

21  structure with oversecured creditors on top of it.  And this

22  large body of unsecured creditors has said we believe that

23  venue is appropriate in Dallas.

24         Regarding the rules of evidence, of course Judge

25  Jernigan is not going to ignore the rules of evidence.  But

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 105 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 173 of 1017 PageID 4852
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 104 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 101 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                101

1  we're talking about judicial efficiency.

2          For example, when I need to look at an indenture, I

3  know in article 2 it's going to have payment terms.  That's the

4  type of thing that we're talking about, Your Honor; not that

5  she's going to pre-judge or ignore the rules of evidence as she

6  makes her determinations.

7          Finally, Your Honor, two things that I would -- that I

8  would like to say.  The testimony you may hear this afternoon,

9  obviously that should not factor into what you're up the

10  learning curve today, right now, in terms of considering the

11  venue motion.  That would put the cart before the horse, I

12  think.

13          And, Your Honor, I'd be remiss if I didn't talk about

14  this ordinary-course motion that we keep hearing about.  If

15  they didn't need it, they shouldn't have filed it.  But

16  instead, what they're trying to do is create some type of

17  transparency and legitimacy around transactions that I think

18  we'll make clear, are not in the ordinary course.

19          And the final point that I would make there, Your

20  Honor; it's interesting Mr. Pomerantz referred to the multi-

21  strategy transaction.  That one is -- Your Honor, I will

22  call -- a doozy.  And you will hear more about it this

23  afternoon, to the extent Your Honor decides not (sic) to keep

24  venue.

25          With that, unless you have questions for me, I'll sit

APP. 0101

004091

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 106 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 174 of 1017 PageID 4853
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 105 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 102 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    102

1  down.

2           THE COURT:  No questions.

3           MR. CLEMENTE:  Thank you.

4           THE COURT:  Thank you.

5           MS. PATEL:  Your Honor, I'll be brief, and I won't

6  repeat anything that Mr. Clemente, on behalf of the committee,

7  said.  But I did want to just address kind of the first point

8  Mr. Pomerantz made with respect to Judge Hale, and he's not

9  aware of any formal statement that Judge Hale is not taking

10  cases.  Your Honor, that's accurate.  I'm not aware of any

11  formal statement that Judge Hale is not taking cases either.

12           So to answer Your Honor's question, in terms of random

13  assignment, in the Northern District of Texas, where I have

14  practiced my entire career, and primarily practice before the

15  courts that are there -- and I'm a former law clerk to Judge

16  Hale also -- I will say that although there may be a random

17  assignment, it is not -- absolutely not unheard of that when

18  you've got the matter -- for example, if a case were assigned

19  to Judge Hale, but Judge Houser were to hear first-day matters

20  and other significant matters, that Judge Hale would then

21  transfer that case for judicial efficiency and economy within

22  the district, to Judge Houser for further proceedings.

23           In other words, the Northern District of Texas always

24  finds the easiest way in which to handle matters.  And I am

25  confident, Your Honor, that if this matter were transferred to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 107 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 175 of 1017 PageID 4854
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 106 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 103 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    103

1    the Northern District of Texas, that despite whoever it would

2    be assigned to, that everyone is well aware of the time that

3    Judge Jernigan has spent becoming familiar with Highland, these

4    issues, and the amount of court resources that have been

5    expended, such that this case would be transferred to Judge

6    Jernigan.

7         But perhaps that's just a question for Judge Jernigan

8    and her courtroom staff or the Northern District of Texas and

9    the courtroom -- I'm sorry -- the court clerk or the staff

10   that's there.

11        Your Honor, one last very quick point.  The comment

12   was made that -- with respect to CLOs that Highland hasn't had

13   a new CLO since 2009.  That, Your Honor, is because every new

14   CLO that was issued from 2009 going forward to 2017, every one

15   of those was issued in Acis.  Acis was the structured-credit

16   arm of Highland.  It is how it issued new CLOs.

17        Indeed, it issued seven CLOs under Acis, with over two

18   billion dollars in assets under management.  The fact that

19   there have been no new CLOs since then, simply means that they

20   haven't been able to get one off the ground.

21        But make no mistake, Your Honor, the CLO business is

22   valuable enough that it is now the subject of significant

23   litigation because of all of the attempts to transfer those CLO

24   assets away.  So in terms of the court's familiarity, I would

25   submit, again, that the bankruptcy court is clearly more

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 108 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 176 of 1017   PageID 4855
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 107 of
2722
Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 104 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                104

1   familiar with a significant piece of Highland's business.

2          One last thing, Your Honor, and somewhat similar to

3   that, that Judge Jernigan was not familiar with the Korean

4   entities, the Singapore entities, or the multi-strat.  I submit

5   to Your Honor that this Court hasn't been exposed to those

6   things as well, other than conclusory statements that well,

7   we've got some Korean assets; oh, we've got some Singapore

8   assets; and we've got multi-strat; and other than Mr.

9   Waterhouse's, like, five-minute testimony at the first-day

10  hearing where I was questioning him with respect to the assets

11  which he didn't really quite know about what's inside a

12  multi-strat.

13         Other than that, this Court hasn't been exposed either

14  to those assets, so when we're looking at the broad playing

15  field rather than looking at specific assets, there is a

16  learning curve.  Judge Jernigan is further along it with

17  respect to certain things.  Otherwise both courts are similarly

18  situated or neutral to each other.  But it's those assets that

19  she is familiar with, the business model of Highland, and that

20  further along the learning curve that she is, that's what's

21  significant here, Your Honor.

22         And that will play into, clearly, what will ultimately

23  be how Highland is going to restructure.  Again, the creditors

24  here have voted with their feet in filing this transfer motion.

25  And these are the very same creditors, Your Honor, that will be

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 109 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 177 of 1017 PageID 4856
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 108 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 105 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 105

1  necessary in order for this -- if it's going to be a successful

2  restructure, they're the ones that are necessary to make it a

3  successful restructure.  Thank you.

4          THE COURT:  You're welcome.

5          All right, let's break for lunch until 1:45.  And when

6  I come back at 1:45 -- when we come back at 1:45, I am going to

7  issue an oral decision on this motion.  All right.

8      (Recess at 12:39 p.m. until 1:47 p.m.)

9          THE CLERK:  All rise.

10          THE COURT:  Please be seated.

11          Okay, good afternoon.  Thank you for coming back.  I'm

12  now prepared to rule on the motion to transfer venue, which I'm

13  going to grant.

14          So I think, as I hinted at during argument, that the

15  case law that we're kind of clinging to on motions to transfer

16  venue, really do not reflect the modern reality of Chapter 11

17  practice in the U.S. and internationally.  And I think a lot of

18  the parts of the test really don't reflect what's going on

19  generally in Chapter 11 cases.

20          The thing I take greatest umbrage -- no, "umbrage"

21  isn't the right word -- but disagree with the most is the idea

22  that there's somehow a strong presumption of the debtor's

23  choice of forum.

24          Look, every debtor that files bankruptcy -- certainly

25  every sophisticated Chapter 11 debtor that files bankruptcy --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 110 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 178 of 1017 PageID 4857
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 109 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 106 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 106

1  is engaged in forum-shopping. There is an element to that.

2  Where you file will depend on a lot of things that are unique

3  to the forum.

4       I don't think you need to be ashamed of that. I don't

5  think that's bad. As long as the venue you're choosing is

6  appropriate under the law, certainly you're going to make

7  decisions based on what the law is in that particular district,

8  perhaps even a preference to individual judges or judge in that

9  district.

10      To compound that with a strong presumption in favor of

11 the debtor is to really give a boost to the debtor's choice of

12 forum, which is made -- included in the decision-making process

13 is an element of forum-shopping, to a level that makes it very

14 difficult to overcome that presumption.

15      Of course, the creditors that file a motion to

16 transfer venue are engaged in forum-shopping themselves.

17 Otherwise, why would they be switching forums and going for a

18 different location. Again, I don't think that the word "forum-

19 shopping" should have the negative connotation that it has come

20 to have in the law. It is the reality of bankruptcy practice.

21      Now, if that's involved -- if that goes a step further

22 and somehow involves chicanery or something inappropriate just

23 from an ethical standpoint, of course that's problematic. But

24 there's absolutely no indication here whatsoever that anyone,

25 on behalf of the debtor or the creditors or the Dallas court or

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 111 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 179 of 1017   PageID 4858
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 110 of
2722
Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 107 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                 107

1    the Delaware court, is doing anything other than acting

2    appropriately.

3           The question about a motion to transfer venue is

4    whether the motion should be granted by a preponderance of the

5    evidence.  If you add a strong presumption, you're turning it

6    into a harder motion to be granted; and I don't think that's

7    appropriate.

8           However, I find the laundry list of factors that are

9    generally discussed to be irrelevant or almost irrelevant to

10   the actual issues that are going on, particularly in a case

11   like this.  And I'll get to that in a second.

12          So six of the debtors are located in Texas; UBS is

13   located in New York.  UBS is located everywhere.  Wells Fargo

14   is located everywhere.  Certainly companies have executive

15   suites.  But whether or not that should be the decision about

16   where a case should file, to me, isn't particularly clear.  It

17   depends on the facts of the case.

18          I think a more general approach that would involve

19   looking at the facts and circumstances of a case and seeing

20   whether it points to a specific jurisdiction might be a more

21   helpful way of proceeding.  And that's what this case is really

22   about.

23          This is a unique case, I think.  It is a different

24   case than those that we usually run into.  And although maybe

25   not completely different from every case, but in any event,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 112 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 180 of 1017 PageID 4859
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 111 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 108 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 108

 1  this case is very focused on responding to existing litigation.

 2  And that existing litigation of a former affiliate, as of a few

 3  months ago, and a pending appeal that could make it a current

 4  affiliate, is located in the Northern District of Texas.

 5          The judge in the Northern District of Texas has done a

 6  tremendous amount of work and has done -- issued a number of

 7  opinions, had a number of trials.  That work creates a

 8  familiarity with the facts, issues, and players in a case

 9  which, while it may not affect the actual decision based on

10  evidence on a motion-by-motion basis, certainly could color a

11  judge's approach to a case.

12          Judges are human.  Judges make judgments over time as

13  to the parties, as to the lawyers.  That's not inappropriate,

14  as long as you stick by the rules of evidence.  But it

15  certainly can color what credibility you might give to a

16  witness or to counsel.

17          I think here we have a situation where the real

18  gravitas of this case is in Dallas.  The two facts that really

19  come out to me are, in this case, the fact that the executive

20  suite is very focused and very Dallas-oriented.  It's a global

21  empire, but it's clearly focused in Dallas.  And the existing

22  litigation in the Acis bankruptcy that's been going on for some

23  time; those are the two predominant factors.

24          Everything else kind of falls away.  The creditors are

25  scattered.  The assets are scattered.  The economic

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 113 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 181 of 1017 PageID 4860
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 112 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 109 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 109

1 | administration isn't being affected one way or the other. I
2 | mean, people can get on planes and you can go to Philly or you
3 | can go to Dallas. Either way, you're stuck on American
4 | Airlines. But so be it.

5 | It can be done. And as a result, I think that the
6 | best solution here, to give the debtors a fair shot at
7 | reorganization, but to balance the creditors' rights and the
8 | creditors' desires, is to move the case to Texas.

9 | And on that latter point, just to finish up. As I
10 | said with my previous decision in EFH, it was striking in that
11 | case that only one creditor moved to transfer venue and that
12 | none of the other creditors either actively opposed or simply
13 | stayed silent with regard to that motion, including significant
14 | creditors, like the official committee.

15 | In this case, we have the opposite. We have the
16 | debtor defending its venue choice, of course. But there's a
17 | lot of silence, because there's no one else on that side. I
18 | thought it highly significant that Jefferies and -- is it
19 | Fortress?

20 | UNIDENTIFIED SPEAKER: Frontier.

21 | THE COURT: Frontier, thank you. That Jefferies and
22 | Frontier did not take a position. And no other creditors
23 | opposed the committee's motion. And the committee consists of
24 | a series of very large creditors.

25 | So I think that given these facts and circumstances,

HIGHLAND CAPITAL MANAGEMENT, L.P.                110

1  particularly the unique nature of the ongoing litigation and

2  the existing tie to Dallas, the executive suite and management,

3  principal place of business, if you will, being focused in

4  Dallas, and creditors -- as Counsel said -- voting with their

5  feet to move the case to Dallas, and applying just a good old

6  fashioned preponderance of the evidence standard, that the

7  Court should grant the motion, which I will do.

8         Now, I need an order.  And we will get the machinery

9  in place, as soon as I get the order signed, to transfer the

10  file as quickly as possible.

11         I did call Judge Jernigan prior -- right before I came

12  out -- well, right before I went and got lunch and then came

13  out -- to inform her what I was going to do, so the Dallas

14  court is aware that this is -- that this is an issue that's

15  coming their way.

16         Is there anything -- I'm not going to create a lot of

17  law of the case for Judge Jernigan on matters that don't need

18  to be decided today.  Is there anything the parties actually

19  agree on that needs to go forward today or can go forward

20  today?  If not, I'd rather just save everything for Judge

21  Jernigan to have a fresh look at.  I know that she did mention

22  that she has availability on her calendar over the next several

23  weeks.  So you should be able to get on it rather quickly, once

24  the case gets transferred.

25         We used to send big boxes in the mail to do this, but

HIGHLAND CAPITAL MANAGEMENT, L.P.                    111

 1  now it's just hitting a couple buttons on a computer to take

 2  care of that.

 3          So is there anything we could -- we need to decide?

 4          Okay.  Just a question.  Obviously there are estate

 5  professionals -- Pachulski not really a problem, since you'll

 6  stay in the case, but I'm thinking of Young Conaway -- and I

 7  don't know if there are any other firms that are Delaware firms

 8  that might fall out of the case that would be subject to the

 9  Court.  But I'll leave that for Judge Jernigan to decide

10  whether to retain them for a limited period of time or to pay

11  them or not pay them.  Hopefully, of course, they've earned

12  their money; they should be paid.

13          Yes, sir.

14          MR. KHARASCH:  Your Honor, Ira Kharasch of Pachulski.

15  I think Your Honor, there is one vital matter that you should

16  hear today and rule on.  I would think it would be generally an

17  easy motion.  It is the application to employ the CRO.  That is

18  within the debtor's business judgment, given -- as we described

19  the reasons for that, considering the concerns raised by

20  creditors.

21          I think it's critical that the CRO be formally

22  engaged.  They've done a tremendous amount of work in the past

23  six weeks.  They've been at the company full time, for a team,

24  for a month.  They have done a lot of good stuff in this case.

25  They have a lot more things to do.

HIGHLAND CAPITAL MANAGEMENT, L.P. 112

1    The CRO has been tasked under the modified -- under

2    the protocols, with broadened authority to take all kinds of

3    and accept all kinds of decision-making over key decisions of

4    this case, involving insider transactions, ordinary-course

5    transactions.  We've done a lot of work modifying the protocols

6    that relate to that.

7        This company is operating every day.  I think the CRO

8    and his team deserve some comfort that they should get employed

9    as of today, Your Honor.  I -- you know --

10       THE COURT:  Let me hear from the committee.

11       MR. CLEMENTE:  Thank you, Your Honor.  Matthew

12   Clemente on behalf of the committee.

13       Your Honor, we don't agree with that.  Again, it's not

14   about DSI being paid or not being paid.  As Your Honor

15   mentioned with Young Conaway, that isn't the issue.  But to the

16   extent Your Honor has any familiarity with the motions, they're

17   all intertwined.  The CRO is all part of the protocols that

18   they're advancing in the ordinary-course motion.

19       So this isn't about simply retaining a professional to

20   ensure that that professional gets paid.  It really is about

21   setting what I like to call concrete pillars in the ground in

22   terms of how the debtor views the case should be managed going

23   forward.  And I think based on Your Honor's ruling, that's

24   something that Judge Jernigan should be given the opportunity

25   to weigh in on.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 117 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 185 of 1017 PageID 4864
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 116 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 113 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                113

1        So again, it's not about Mr. Sharp and his firm
2    getting paid.  I don't believe that that is the issue.  They
3    can continue doing what they've been doing, up to this point,
4    just like we have, for example, at Sidley, and the rest of the
5    professionals that haven't been retained.  And I don't see why
6    that should cause a problem.
7        But we do believe that that is integrated with the
8    other suite of motions that would be before Your Honor; and we
9    think it's appropriate for Judge Jernigan to make those
10   decisions.
11       THE COURT:  All right.  Well, I don't view a retention
12   application to be an emergent basis to hear a motion anyway.
13   But I'm certainly not going to agree to sign it over objection
14   of the committee, given how I just ruled.  So --
15       MR. CLEMENTE:  Thank you, Your Honor.
16       THE COURT:  -- I'd also say.  So I'd ask the committee
17   Counsel to circulate a form of order and submit it under
18   certification of counsel.  I think the simpler the better; just
19   for the reasons set forth on the record, and it's transferred.
20   Don't put a lot of findings in there.  That'll just cause
21   trouble.  That's my belief.  But you can negotiate what you
22   want to negotiate, and as soon as that's ready, upload it,
23   inform chambers, we'll get it signed, and we'll start the
24   machinery in place.
25       MR. CLEMENTE:  Great.  Thank you very much, Your

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 118 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/10/06/25 Page 186 of 1017 PageID 4865
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 117 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 114 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P. 114

1  Honor.  We appreciate it.

2          THE COURT:  All right.  We're adjourned.

3       (Whereupon these proceedings were concluded at 2:02 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 119 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 187 of 1017 PageID 4866
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 118 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 115 of 137

115

```
 1              I N D E X

 2   WITNESS             EXAMINATION BY        PAGE

 3   Bradley Sharp       Ms. Reid              20

 4   Bradley Sharp       Mr. Shaw              21

 5   Frank Waterhouse    Mr. Guekre            24

 6   Frank Waterhouse    Mr. Shaw              32

 7

 8              E X H I B I T S

 9   DEBTOR'S        DESCRIPTION               PAGE

10   --          A thru U, except for G        12

11   ACIS'           DESCRIPTION               PAGE

12   --          Exhibits 1 through 18, with    37

13              the exception of Nos. 3 and

14              9; and Exhibits 24 and 25

15   26          Email exchange between Acis'   40

16              counsel and Hon. Jernigan's

17              courtroom deputy

18

19                 RULINGS

20                        Page     Line

21   Motion of the Official Committee of    105      13

22   Unsecured Creditors for an Order

23   Transferring Venue of this Case to the

24   United States Bankruptcy Court for the

25   Northern District of Texas, granted.
```

APP. 0115

004105

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 120 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 188 of 1017 PageID 4867
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 119 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 116 of 137

116

C E R T I F I C A T I O N

I, Clara Rubin, certify that the foregoing transcript is a true

and accurate record of the proceedings.

December 3, 2019

_____        _____

CLARA RUBIN                            DATE

eScribers, LLC

352 Seventh Avenue, Suite #604

New York, NY 10001

(973) 406-2250

operations@escribers.net

APP. 0116

004106

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 121 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 189 of 1017 PageID 4868
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 120 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 117 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                          December 2, 2019

**A**

ability (7)
  17:24;18:11;27:2;
  40:11;64:6,8;88:25
able (9)
  46:9;47:9;49:15;
  53:15;79:13;83:3;
  100:6;103:20;
  110:23
above (1)
  48:1
absolute (1)
  43:10
absolutely (3)
  89:21;102:17;
  106:24
accelerated (1)
  96:22
accept (1)
  112:3
acceptable (1)
  11:8
access (1)
  14:7
accessing (1)
  14:5
accomplished (1)
  98:21
accomplishing (1)
  18:7
Accordingly (1)
  80:20
account (3)
  15:19,22,23
accountant (1)
  24:12
accounting (3)
  28:6,7;67:7
accounts (3)
  65:5,21,22
accurate (1)
  102:10
achieve (2)
  45:11;99:19
Acis (106)
  6:15;8:8,18;16:6,
  22,23;17:7,10,12,14,
  18,21,22;18:2,21:5;
  22:12,19,21;34:10,
  13;35:8;36:11;37:9;
  38:20;43:1,21;44:1,
  11,16,17;45:5,7,13;
  48:4;49:21,25;50:9;
  53:16,19;54:14,23;
  57:15,23;58:16;
  59:13;60:3,14;61:4,
  21;62:23;63:1,2,3;
  64:13;65:25;66:2,
  21;67:13,23;68:14,
  25;69:6;72:17,23;
  74:10;75:1;77:1,14,

20,23;78:7,15,20;
79:19;81:23;82:13,
14;83:1,1,23;85:9;
90:4;91:14,16,16,18,
19,92:4,5,8;93:1,10,
12,24;95:9,12,19;
96:25;98:3,5,18;
100:19;103:15,15,
17;108:22
Acis' (17)
  16:8;17:21;37:20;
  40:21,22;47:8;
  60:12;63:7;65:23;
  73:25;74:2;75:25;
  76:16;77:1;82:11;
  93:20;98:15
acknowledges (2)
  80:20;85:4
Acquisition (3)
  81:4;83:19;89:16
Acquisitions (1)
  99:13
across (1)
  67:12
acting (1)
  107:1
actions (1)
  83:25
active (4)
  16:24;82:22;
  85:18;92:14
actively (1)
  109:12
actors (1)
  50:12
actual (4)
  60:13;77:15;
  107:10;108:9
Actually (10)
  27:20;40:17;42:1;
  56:22;62:25;68:21;
  90:16,22;94:17;
  110:18
ad (1)
  61:23
add (1)
  107:5
additional (2)
  37:12;60:16
Additionally (3)
  52:22;55:3;58:9
address (8)
  29:12;38:11;
  72:15;75:24;83:18;
  97:5;98:17;102:7
addresses (2)
  82:19,25
adequately (1)
  65:10
adjourned (1)
  114:2
adjudication (2)
  69:3;72:19

administered (6)
  48:5,13;64:19;
  70:13,18;78:19
administration (2)
  87:6;109:1
administrative (1)
  83:22
admissible (3)
  38:13;40:2,3
admission (1)
  37:15
admit (2)
  40:6;91:20
admitted (5)
  12:16,17;37:18;
  59:16,18
advanced (1)
  95:6
advancing (1)
  112:18
advantage (5)
  54:4;55:4,5;81:17;
  95:14
adverse (3)
  56:6,7;74:9
adversity (1)
  97:22
advise (1)
  100:6
advises (2)
  16:24;50:8
advisor (2)
  13:4;93:2
Advisors (5)
  14:12;15:5;25:5,
  17;80:8
advisory (12)
  13:1;15:1;16:3;
  67:1;86:11;91:18;
  92:8,14,20;93:17,19;
  94:4
affairs (1)
  14:2
affect (1)
  108:9
affected (1)
  109:1
affiliate (7)
  44:17;45:5,7,13;
  80:11;108:2,4
affiliated (7)
  15:4,5;16:16;
  43:23;44:22;48:14;
  51:24
affiliates (15)
  15:7;22:17,20;
  24:24;34:18;35:14;
  45:21;46:3;47:24;
  48:8,20;51:23;53:2;
  80:12;94:3
affirmation (1)
  19:9
affirmatively (2)

43:3;55:12
affirmed (2)
  19:12;23:22
afforded (1)
  56:16
afternoon (5)
  51:24;75:21;
  101:8,23;105:11
again (52)
  17:4;27:3,3,4,5,19;
  35:6,18,18;41:12;
  43:23;44:18;45:6,7;
  48:8,22;49:14,22;
  53:3;54:13,22,24;
  55:20,24,57:15,16;
  63:10,15;65:16;
  66:17,21;67:9,25;
  68:3;69:1,11;70:13;
  71:3;74:7;75:21;
  79:25;86:20;87:10;
  89:3;93:25;94:23;
  100:12;103:25;
  104:23;106:18;
  112:13;113:1
against (13)
  17:11,12,18,21;
  56:8;78:16,20;83:7,
  14;88:24;97:18;
  98:3;100:5
agenda (2)
  10:15,16
ago (5)
  24:21,23;43:21;
  96:20;108:3
agree (4)
  90:25;110:19;
  112:13;113:13
agreement (6)
  54:17;66:23,23,
  24;79:13;94:17
agreements (22)
  16:7,10,15,15;
  34:13,16,17;35:8,9,
  12,15,16,22;66:22;
  93:12,18,19,23,24;
  94:5,14,19
agrees (1)
  51:22
ahead (1)
  75:20
air (2)
  88:7,8
Aires (1)
  15:9
Airlines (1)
  109:4
al (3)
  6:15;8:8,18
albeit (1)
  50:4
allegations (1)
  18:22
allow (3)

32:7;33:19;40:20
almost (1)
  51:20;56:2;107:9
alone (1)
  39:20
along (8)
  10:24;61:7;65:20;
  66:14;67:22;68:1;
  104:16,20
although (11)
  15:6;17:23;43:7;
  44:3;48:9;50:14;
  52:7;96:19;97:2;
  102:16;107:24
Alvarez (2)
  7:3;8:3
always (2)
  48:14;102:23
America (3)
  14:23;15:11;86:15
American (2)
  93:5;109:3
amount (8)
  43:11;76:22;82:5;
  84:23;96:21;103:4;
  108:6;111:22
amounts (1)
  43:10
amply (1)
  41:20
analysis (5)
  76:13;77:8;79:25;
  82:6;94:5
analyze (2)
  82:6;84:19
analyzing (1)
  17:25
ANDERSON (1)
  8:2
ANDREW (1)
  7:17
Angeles (1)
  13:11
answered (1)
  27:20
anymore (1)
  88:8
apologize (2)
  36:18;75:10
appeal (8)
  44:11,21;45:12;
  53:18;72:16;73:4;
  76:9;108:3
appeals (6)
  17:16,19;57:4;
  72:23;73:5;76:8
appear (1)
  84:6
appearance (4)
  41:23;82:24;
  88:16,17
appearing (1)
  73:20

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 122 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 190 of 1017 PageID 4869
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 121 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 118 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

**apples (1)**
93:25
**applicable (1)**
52:5
**application (2)**
111:17;113:12
**applications (1)**
68:20
**applied (1)**
87:24
**apply (1)**
48:1
**applying (2)**
84:5;110:5
**appoint (3)**
15:13;78:1;96:13
**appointed (2)**
13:5;77:24;78:25
**appointment (3)**
66:3,4;98:19
**appreciate (2)**
19:23;114:1
**appreciates (1)**
82:21
**approach (5)**
11:21;36:24;
37:23;107:18;
108:11
**appropriate (15)**
11:2;16:18;44:2;
59:3;81:14;82:4;
87:4;94:2;95:15;
97:5;98:13;100:23;
106:6;107:7;113:9
**appropriately (2)**
78:21;107:2
**appropriateness (1)**
16:14
**approval (2)**
18:18;95:11
**approve (2)**
26:14;95:10
**approximately (6)**
15:3,21;25:24;23;
67:19;92:11
**apt (2)**
84:12;96:13
**arbitration (6)**
83:9;91:25;94:14,
16,20,21
**areas (1)**
87:15
**argue (6)**
45:8;52:13;84:3;
87:10,12;98:8
**argues (1)**
88:13
**arguing (2)**
45:12;93:10
**argument (21)**
11:8;38:4;39:9;
41:4,15;76:19;77:5;
80:1;87:20,22;88:7,

20;89:2,25;90:12,16;
91:13;93:21;96:14;
99:25;105:14
**arguments (9)**
42:8,18;46:6,14;
51:6;55:5;87:9;
90:12,13
**arm (2)**
92:8;103:16
**around (10)**
15:1;16:8;32:1,1;
58:3;67:20;85:14;
86:20;91:2;101:17
**arrangement (1)**
94:3
**ARSHT (1)**
7:22
**article (1)**
101:3
**ashamed (1)**
106:4
**ASHBY (1)**
6:9
**Asia (1)**
14:22
**Asic's (1)**
41:16
**aside (1)**
90:12
**ASIF (1)**
7:15
**aspect (5)**
16:2;31:22;66:9;
72:6,8
**aspects (6)**
40:7;72:5,11;
78:24;95:3,8
**assert (1)**
17:10
**asserted (2)**
39:23;94:23
**asserting (1)**
54:2
**asset (2)**
17:6;98:3
**assets (40)**
14:19,20,21,25;
15:3,16,19;16:22;
17:1;18:10,12;
35:13;70:1;77:3;
78:4;84:23;86:2,6,9,
10,14,16,19,21;87:2;
92:4,22;93:1,7;
100:9,14;103:18,24;
104:7,8,10,14,15,18;
108:25
**assigned (9)**
45:23;46:5,19,21;
47:10;72:15;73:4;
102:18;103:2
**assignment (4)**
46:4;47:13;
102:13,17

**association (1)**
28:2
**Asst (1)**
9:3
**assume (2)**
27:3;48:17
**assumed (1)**
48:1
**assumes (2)**
59:4;90:16
**assuming (1)**
46:17
**assumption (2)**
45:22;46:13
**attached (2)**
91:24;94:12
**attachments (1)**
44:9
**ATTARWALA (1)**
7:15
**attempt (1)**
45:5
**attempted (1)**
41:23
**attempts (1)**
103:23
**attorney (1)**
27:7
**Attorneys (12)**
6:3,10,15,21;7:3,8,
14,23;8:3,8,13,18
**atypical (1)**
42:12
**August (3)**
16:8,21;74:4
**Austin (2)**
10:21;41:13
**authentic (1)**
38:24
**authority (2)**
84:17;112:2
**availability (3)**
38:22;39:21;
110:22
**available (1)**
18:6
**avoidance (1)**
89:7
**avoided (1)**
79:25
**aware (17)**
21:23;22:6;32:20;
33:11;34:10,11,21;
35:8,15;39:19;40:3;
46:16;76:1;102:9,
10;103:2;110:14
**away (8)**
46:7;48:17;54:7;
55:18;77:12;92:4;
103:24;108:24
**awkward (1)**
24:5

| | **B** |

**back (14)**
26:11;37:2;49:11;
55:24;56:7;57:12;
62:14;63:16;70:13;
71:21;74:22;105:6,6,
11
**background (1)**
25:12
**back-office (2)**
67:5;92:20
**backward- (1)**
50:15
**bad (1)**
106:5
**badly (1)**
56:4
**baggage (1)**
79:18
**balance (3)**
18:12;93:7;109:7
**balance-sheet (1)**
93:1
**balls (1)**
74:11
**Bancorp (1)**
13:9
**Bank (4)**
7:14;15:25;43:15;
82:10
**bankruptcy (63)**
11:3;16:8;17:17,
20;18:3;21:9,14;
22:10;26:22;27:5,7;
32:4,21;40:13;
41:18;42:14;43:22;
44:1,20,23;47:10;
49:2,6,17,20,20;
52:4;53:20;55:1;
57:16;58:13,15,21;
59:3;60:10,23;61:4;
64:7,17,18;65:24;
68:9;69:2,24;72:4,9,
14,17,21;73:4,5,19;
74:10;76:10;82:23;
84:16;88:2;90:4;
103:25;105:24,25;
106:20;108:22
**base (3)**
90:22;91:8,9
**Based (13)**
11:4;15:6,25;
21:25;39:5;54:13;
55:8;73:25;83:13;
94:9;106:7;108:9;
112:23
**basically (2)**
92:5;93:2
**basis (4)**
63:14;92:22;
108:10;113:12

**BEACH (2)**
6:4;10:25
**bear (1)**
86:22
**bears (3)**
61:12;62:17;81:5
**become (3)**
44:17;53:4;54:18
**becomes (1)**
65:11
**becoming (2)**
56:3;103:3
**beg (1)**
42:14
**begin (2)**
31:15;41:14
**beginning (2)**
77:19;98:14
**behalf (12)**
10:7;11:15;19:20;
21:5;23:19;41:13;
45:4;60:3;75:22;
102:6;106:25;
112:12
**behind (4)**
46:14;87:25;
90:10;95:7
**belie (1)**
83:25
**belief (1)**
113:21
**believes (5)**
16:9,21;18:9;53:7;
59:1
**below (2)**
27:22
**beneficial (1)**
68:19
**benefit (2)**
18:5;69:20
**BENTLEY (1)**
8:14
**Bermuda (1)**
15:15
**best (4)**
55:15;65:7;87:1;
109:6
**better (3)**
95:13;96:3;113:18
**Beverly (1)**
13:8
**Beyond (6)**
21:15,21;27:12;
31:12;32:23;47:2
**bias (1)**
73:21
**biased (2)**
73:18;74:8
**BIBILONI (1)**
6:17
**big (9)**
60:6,6;65:14;
69:21,22;86:3;

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(2) apples - big

APP. 0118

004108

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 123 of
Case 3:25-cv-02072-S Document 15-7 2723 06/25 Page 191 of 1017 PageID 4870
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 122 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 119 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                              December 2, 2019

93:10;96:7;110:25
**billion (5)**
    14:25;15:3;35:13;
    69:17;103:18
**binder (4)**
    11:21;59:14,21;
    60:8
**binders (1)**
    60:6
**bit (6)**
    37:1;60:24;63:18,
    21;68:20;77:7
**BJORK (1)**
    7:16
**blame (1)**
    57:10
**BLANK (2)**
    6:14;59:13
**BLOCK (1)**
    7:7
**body (3)**
    83:22;100:19,22
**boil (1)**
    64:17
**boils (1)**
    64:4
**bonuses (1)**
    95:10
**bookkeeping (1)**
    67:7
**books (1)**
    14:6
**boost (1)**
    106:11
**borrow (1)**
    65:24
**boss (1)**
    26:17
**both (8)**
    16:16;47:23;56:4;
    57:2;61:25;64:5;
    65:9;104:17
**bottom (1)**
    100:20
**bound (1)**
    36:20
**BOWDEN (3)**
    6:11;75:18,19
**box (5)**
    53:3;54:14;57:23;
    65:25;66:21
**boxes (1)**
    110:25
**Brad (3)**
    10:12;78:25;84:7
**BRADLEY (3)**
    9:7;19:15;27:10
**B-R-A-D-L-E-Y (1)**
    19:15
**brain (1)**
    67:1
**break (3)**
    59:14;98:5;105:5

**breathed (2)**
    61:4;63:11
**breathing (2)**
    61:8;86:25
**brethren (2)**
    87:21;91:2
**BRIAN (2)**
    8:9;21:4
**brief (5)**
    52:10;61:2;88:9;
    99:8;102:5
**briefly (7)**
    23:14;32:17;
    39:17;53:25;57:12;
    60:7;99:8
**bring (5)**
    67:17;80:11;
    86:21;99:19,22
**bringing (1)**
    98:15
**broad (2)**
    84:17;104:14
**broadened (1)**
    112:2
**brokerage (2)**
    15:18;65:5
**brought (1)**
    17:17
**Buenos (1)**
    15:9
**bulk (2)**
    15:19;84:15
**burden (9)**
    41:20;61:21;
    62:16,17,18;77:16;
    81:5;98:12;100:2
**burden-of-proof (1)**
    61:19
**burdensome (1)**
    88:22
**business (39)**
    14:2,19;16:3,22;
    17:3;22:15,22;50:2,
    3,6,9;64:22;65:3,6,8,
    12,13;67:8,11;72:5,
    6,8,11;78:4;79:7;
    81:21;89:8;91:1;
    92:3,7,11,24;94:23;
    95:3;103:21;104:1,
    19;110:3;111:18
**businesses (3)**
    86:8;89:5;94:10
**buttons (1)**
    111:1
**buy (2)**
    56:12;90:11

**C**

**Caesar's (1)**
    88:4
**calendar (1)**
    110:22

**California (1)**
    32:1
**call (12)**
    21:24;23:13;
    33:12;39:4;53:14;
    62:12;71:23;85:11;
    99:24;101:22;
    110:11;112:21
**called (9)**
    11:25;12:23;
    21:22;23:5;32:25;
    44:14;74:11;85:5,8
**came (3)**
    69:8;110:11,12
**can (31)**
    11:20;26:4;27:7;
    35:3,5,18,21;38:19;
    39:10;40:3;41:18;
    43:23;46:11;49:23;
    52:12;61:2;70:7;
    77:16;80:3;85:3;
    89:13;97:3;98:9;
    108:15;109:2,2,3,5;
    110:19;113:3,21
**cap (1)**
    100:20
**capable (2)**
    40:14;97:12
**capacity (2)**
    43:1;49:16
**Capital (13)**
    6:15;8:8,18;9:4,5;
    10:7;21:5;24:10;
    25:1;29:7;30:23;
    60:3,14
**care (2)**
    71:15;111:2
**career (1)**
    102:14
**carefully (2)**
    40:16;94:15
**Carey (2)**
    13:7,9
**carries (1)**
    41:20
**carry (2)**
    77:16;78:7
**cart (1)**
    101:11
**CARUSO (9)**
    9:9;10:12;13:24;
    18:14;27:15;53:7;
    84:14,21;95:2
**case (149)**
    13:15;16:14;18:4,
    9,15;21:10;22:24;
    33:18,18;39:19;
    40:11,17;41:17;
    42:11;43:7,9,22,23,
    25;44:6;45:13,22;
    46:3,7,15,18,21;
    47:19,24;48:12;
    49:21;50:14;52:8;

53:11,16;56:17;57:1,
    2;59:1;61:4,13,16;
    62:11;63:4;64:13,14,
    17;68:9;69:2,6;70:3,
    12,14,18;72:1,1,17;
    74:10,20,22,25;76:5,
    10,11,23,24;77:14,
    21;78:8,10,15,20,22;
    79:8,14,15,18;80:4,
    12;81:7,11,20,22;
    82:8,14,24;84:16;
    85:8,12,16,20,23;
    86:10;87:11,18,25;
    88:15;89:16;90:14;
    91:14,15;93:24;
    94:16;95:8,23;96:11,
    15,15,16,17,25;
    97:11,13,15,19,20;
    98:5,7,8,20,22;
    102:18,21;103:5;
    105:15;107:10,16,
    17,19,21,23,24,25;
    108:1,8,11,18,19;
    109:8,11,15;110:5,
    17,24;111:6,8,24;
    112:4,22
**case-in-chief (2)**
    31:14;33:7
**cases (31)**
    13:6;44:22;47:6,
    11,23;48:14;52:7;
    56:9,9;58:9;63:11;
    72:23;76:3;80:4,10;
    82:23;84:11;85:2;
    86:6,7,7,20,22;
    87:22;88:20;91:7;
    97:23,24;102:10,11;
    105:19
**cast (2)**
    57:15;64:11
**catalyst (1)**
    80:19
**cause (2)**
    113:6,20
**Cayman (1)**
    15:15
**center (4)**
    42:5;43:5;51:11;
    58:8
**CEO (1)**
    9:7
**certain (14)**
    15:14;16:7;35:9;
    50:7;54:22;60:5;
    65:5;70:1;78:6,24;
    91:3;92:4;97:8;
    104:17
**certainly (15)**
    39:25;40:10;48:5;
    67:22;69:4,14;
    71:24;72:6;89:10;
    105:24;106:6;
    107:14;108:10,15;

113:13
**certification (1)**
    113:18
**cetera (1)**
    65:21
**CFO (7)**
    9:5;26:11,13,19;
    29:1;32:20;35:11
**chain (1)**
    89:23
**challenge (1)**
    97:19
**chambers (3)**
    11:18;33:13;
    113:23
**chance (2)**
    33:6;41:1
**chancery (4)**
    71:20;83:8,9;
    88:19
**change (2)**
    48:9;98:12
**changed (1)**
    58:5
**changes (1)**
    58:5
**Chapter (10)**
    17:21;45:13;
    78:22;80:3;86:24;
    97:10;98:19;105:16,
    19,25
**characterized (1)**
    50:7
**charge (3)**
    17:22;18:1;97:2
**chart (1)**
    27:23
**chicanery (1)**
    106:22
**chief (6)**
    12:24;13:3,5,25;
    24:14;78:25
**choice (10)**
    55:19;58:2;62:15,
    19;79:22;81:9,14;
    105:23;106:11;
    109:16
**choose (1)**
    64:6
**choosing (1)**
    106:5
**chose (1)**
    42:15
**Circuit (2)**
    72:24;81:3
**circulate (1)**
    113:17
**circumstance (1)**
    47:11
**circumstances (5)**
    16:19;38:16;79:8;
    107:19;109:25
**cite (1)**

APP. 0119
004109

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 124 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 2723 Page 192 of 1017 PageID 4871
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 123 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 120 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                           December 2, 2019

81:2
**cited (1)**
    88:6
**citing (1)**
    95:25
**citizen (1)**
    81:16
**City (4)**
    15:20,25;82:10;
    83:10
**claim (7)**
    43:16;82:12;83:1,
    1,12,13;89:11
**claiming (2)**
    68:22;92:5
**claims (17)**
    17:11,12,17;63:6,
    7;78:20;82:25;
    84:19;88:24;89:6,7,
    10;94:22,22;97:25;
    98:3,4
**classes (1)**
    17:6
**cleanse (1)**
    58:2
**clear (22)**
    42:2,6;49:17;50:1;
    51:12,15;54:13,18,
    25;55:8,11;58:3,23,
    25;61:22;66:17,18;
    80:2;81:5;98:16;
    101:18;107:16
**clearly (15)**
    40:6;47:2,18;50:8,
    11;52:4,7;54:10;
    55:9;70:23;96:11;
    97:16;103:25;
    104:22;108:21
**CLEMENTE (51)**
    10:19,21,21;11:11,
    13;12:13,15;23:12;
    38:7,11;39:25;
    40:24;41:12;45:17,
    20,25;46:20;47:2,4,
    7,17;48:7,16,18,21;
    49:1,8,11;52:16;
    56:1,15,18,20,25;
    57:5,7,10;59:7;
    61:21;65:25;66:16;
    75:25;76:14;99:8,
    12;102:3,6;112:11,
    12;113:15,25
**Clements (1)**
    41:13
**CLERK (11)**
    10:2;19:10,13,17;
    23:21,23;24:2;75:9;
    102:15;103:9;105:9
**client (1)**
    10:11
**clients (2)**
    14:21;48:2
**Clifford (1)**

31:5
**clinging (1)**
    105:15
**CLO (21)**
    8:13;16:22,23;
    17:2;50:6;65:22;
    68:11,16,17,23,25;
    91:5,7;92:3,3,10,13;
    103:13,14,21,23
**CLOs (19)**
    16:5,6,11,24,24;
    22:21;50:8;57:16,18,
    21;65:14,20;92:15;
    93:2,18;103:12,16,
    17,19
**close (6)**
    19:23;24:4;41:2;
    70:8;81:24;98:12
**closed (1)**
    41:3
**clothes (1)**
    75:17
**CLUBOK (1)**
    7:17
**co- (1)**
    26:5
**co-counsel (4)**
    10:24;38:1;61:7;
    100:6
**collateral (1)**
    92:9
**collateralized (2)**
    16:4;65:15
**colleague (3)**
    13:24;33:24;84:21
**colleagues (3)**
    10:23;46:9;81:2
**colloquy (2)**
    58:20;61:20
**color (2)**
    108:10,15
**combination (1)**
    59:2
**comfort (1)**
    112:8
**comfortable (1)**
    48:4
**coming (2)**
    105:11;110:15
**commence (1)**
    81:22
**commenced (3)**
    80:18;83:8;88:19
**comment (2)**
    89:4;103:11
**commented (1)**
    22:13
**comments (5)**
    76:20;77:4,19;
    89:23;100:18
**Committee (66)**
    6:3;7:8,23;10:22;
    18:8,20,23;19:20;

23:20;41:13;42:25;
    43:8,12,17;45:10;
    50:17,22;51:22;
    54:3;57:2;59:1;61:1;
    63:6,17,19,23;64:7;
    70:16;75:1;77:13,16,
    20,25;78:7;79:13,19;
    80:18,20;81:23;82:2,
    2;83:6,11,17,23;
    85:8,17,22;86:3;
    87:1,7;88:13,16;
    89:25;90:13;93:10;
    94:6;98:12,18;
    102:6;109:14,23;
    112:10,12;113:14,16
**committee's (7)**
    10:16;53:9;60:4;
    64:1;72:2;98:14;
    109:23
**communicated (1)**
    18:20
**companies (1)**
    107:14
**company (3)**
    91:4;111:23;112:7
**company's (1)**
    22:9
**compared (1)**
    95:6
**compensation (2)**
    16:9;95:15
**complete (1)**
    14:7
**completely (1)**
    107:25
**complex (2)**
    50:2;51:23
**comply (1)**
    67:2
**compound (1)**
    106:10
**comptroller (1)**
    63:17
**computer (1)**
    41:10;111:1
**CONAWAY (6)**
    6:2;10:24;85:17;
    100:4;111:6;112:15
**concede (1)**
    70:23
**concedes (1)**
    61:21
**concentration (2)**
    87:10,12
**concept (3)**
    63:16;73:21;87:16
**concern (1)**
    89:8
**concerns (4)**
    78:23;97:6;98:18;
    111:19
**conclude (3)**
    74:13;92:1;96:8

**concluded (2)**
    92:1;114:3
**concludes (1)**
    18:25
**concluding (1)**
    94:19
**conclusion (2)**
    73:25;98:11
**conclusory (1)**
    104:6
**concrete (1)**
    112:21
**conduct (3)**
    58:11;78:25;79:17
**conducted (1)**
    91:20
**conference (2)**
    33:13;52:10
**confident (2)**
    91:6;102:25
**confirmation (12)**
    43:25;45:6;53:19;
    60:12,14,19;74:3,3,
    5;76:8;91:16,24
**confirmed (2)**
    44:11,13
**confirming (1)**
    17:21
**conflict (1)**
    47:25
**conflicted (1)**
    58:22
**conflicts (1)**
    78:18
**conflicts-of-interest (1)**
    78:17
**conjunction (1)**
    27:8
**Connecticut (1)**
    83:18
**connection (17)**
    11:19;16:3;23:11,
    13;46:7;49:6;60:10,
    12;69:5,5;72:22;
    73:4;74:2,10;80:16;
    93:8;97:5
**connections (1)**
    86:8
**connotation (1)**
    106:19
**consensual (1)**
    87:2
**consider (1)**
    94:11
**consideration (1)**
    48:11
**considered (1)**
    39:20
**considering (3)**
    38:15;101:10;
    111:19
**consist (1)**
    15:16

**consistent (3)**
    46:18;50:5;58:6
**consistently (1)**
    55:15
**consists (1)**
    109:23
**constituents (1)**
    18:6
**constructive (1)**
    86:25
**constructively (1)**
    18:8
**contact (1)**
    75:12
**contained (1)**
    65:17
**containing (1)**
    11:21
**content (2)**
    35:17;95:22
**contentious (1)**
    17:15
**contested (1)**
    52:25
**context (1)**
    52:6
**continue (6)**
    17:15;49:8;84:25;
    89:8;92:16;113:3
**contract (1)**
    54:16
**contracts (8)**
    54:20,23,24;55:1;
    86:12;93:14,16;94:9
**contractual (1)**
    16:7
**contrary (2)**
    57:14;79:18
**control (1)**
    25:16
**controlling (1)**
    55:7
**controls (1)**
    25:4
**controversy (1)**
    70:23
**controverted (2)**
    43:20;100:12
**convenience (5)**
    51:10;64:9;78:9;
    80:24;82:7
**convenience-of-the-parties (1)**
    61:25
**convenient (13)**
    13:12;52:12,14,18,
    21;55:9,18;83:24,25;
    85:24;90:1,3,3
**conversation (1)**
    64:1
**conveyances (1)**
    92:5
**convince (1)**
    45:10

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                December 2, 2019

**COO (1)**
9:9
**cooperation (1)**
96:20
**copy (1)**
36:19
**CORCO (3)**
81:3,24;86:2
**core (2)**
22:15;39:12
**corners (1)**
62:13
**corporate (5)**
28:6;88:1;97:3,7;
98:1
**corporation (1)**
14:12
**corroborating (1)**
38:17
**CORROON (1)**
8:2
**Counsel (33)**
9:3;10:8,22;13:14,
16;22:13;37:9,15;
38:20;40:21;45:3;
47:8;59:13;61:3,4;
69:25;75:25;76:15,
16;77:6;79:3,25;
82:11;85:15;88:14;
89:1;93:20;97:23;
100:19;108:16;
110:4;113:17,18
**count (1)**
67:19
**counting (1)**
62:3
**country (6)**
15:18;32:1;85:15;
86:20;91:3;100:15
**couple (5)**
64:20;73:15;
75:24;96:19;111:1
**course (15)**
16:8;21:3;40:2;
46:11;48:6;76:18;
79:7;80:21;92:16;
100:24;101:18;
106:15,23;109:16;
111:11
**COURT (260)**
10:3,5,13,18,20;
11:3,10,12,22;12:2,
4,6,9,12,14,16,20;
13:12;17:17,20;
18:3;19:1,4,6,8,18,
21,25;21:3,6,17,24;
22:4;23:3,7,10,15,
18;24:3;25:9,11,15;
26:3;27:13,20;31:9,
11,18,24;32:7,13,15;
33:1,3,16,21,24;
34:5,24;35:3,25;
36:4,7,14,17,21,23,

25;37:3,7,8,14,18,
24;38:5,10;39:10,16,
18,19;40:2,5,13,25;
41:9,18;42:14;
43:22;44:1,2,5,21,
23;45:10,16,18,21;
46:1,23;47:1,3,5,10,
16,22;48:8,17,19,22;
49:7,10,13,14,18,20,
20,21;50:1,16,18,20;
52:4,15;53:20;54:2,
5,5,10,16,21;55:1,17,
25;56:2,16,19,24;
57:1,6,8,13,24;
58:16,21,24;59:3,4,
9,19,22,24;60:7,10,
13,17,18,22;61:24;
62:6,10;63:12;
64:23;65:7,23;66:9,
11,11;71:3,7,9,9,10,
12,14,14,17,17,19,
19;72:4,7,10,10,21,
21;73:2,3,12,12,14,
18,19,20;74:2,4,6,8,
14,15,21,24;75:3,10,
16,19;76:21,22;
78:16,21,21;80:10,
12;81:21;83:2,8,10;
84:6,10,12;85:7,10,
24;86:21;87:3,15,23;
88:5,19;89:3,18,21;
90:4,15;95:14;
96:14;97:11,12;99:2,
5,7,11;102:2,4;
103:4,9,25;104:5,13;
105:4,10;106:25;
107:1;109:21;110:7,
14;111:9;112:10;
113:16,16;114:2
**courthouse (2)**
52:14;89:14
**courtroom (10)**
10:10;38:21;39:4;
40:18,22;74:17,19;
82:20;103:8,9
**courts (11)**
71:24;73:11;
77:10;81:1,8;84:5;
86:5;87:6;89:12;
102:15;104:17
**court's (4)**
38:22;39:21;62:1;
103:24
**craft (1)**
79:3
**crash (1)**
92:13
**create (5)**
41:23;47:25;
48:10;101:16;
110:16
**created (2)**
92:13;100:12

**creates (1)**
108:7
**credentials (1)**
98:17
**credibility (2)**
90:21;108:15
**credible (2)**
49:13;96:13
**creditor (21)**
15:24;21:5;42:22;
43:1,3,12,18;56:11;
62:24;63:1,2,3,10;
64:13;83:13,16,22;
88:22;98:18;99:15;
109:11
**Creditors (50)**
6:3;10:23;43:9,10,
11;50:24;51:18,20,
21;55:10,10,16,19;
56:6;68:7;70:7,16;
78:24;82:1,5,6,9,15,
17;83:2,5,24;87:10;
88:13,23;89:4,13;
98:6;99:14,18;
100:18,20,21,22;
104:23,25;106:15,
25;108:24;109:12,
14,22,24;110:4;
111:20
**creditors' (6)**
18:20;19:20;
23:19;43:8;109:7,8
**credit-research (1)**
28:13
**critical (2)**
86:6;111:21
**CRO (21)**
13:19;27:7;58:1,2,
3,4,11,14;79:9,10;
84:11,12;85:2;
96:16;97:6;98:16;
111:17,21;112:1,7,
17
**cross (6)**
11:7;21:16,22;
36:1,2;50:12
**CROSS-EXAMINATION (4)**
20:1;21:7;23:3;
90:21
**cross-examine (1)**
19:2
**Crusader (2)**
7:8,23
**CRUTCHER (1)**
7:2
**crux (3)**
76:19;78:19;90:1
**current (6)**
22:20;29:6,11;
45:13;82:19;108:3
**currently (7)**
17:19;24:19;
29:10;31:20;34:17;

58:18;92:24
**CURTIS (1)**
7:24
**curve (12)**
49:14;50:17;52:6;
66:12,14;68:1;
76:17;90:7,10;
101:10;104:16,20
**custodial (1)**
15:17
**cynic (2)**
56:2,4

**D**

**Dallas (96)**
13:13,16;15:7;
20:5,12;29:1,3,6,8,9,
11,12,14,16,19,21;
30:1,4;32:4,9;41:18,
25;42:3,4,5,14,15;
43:1,4,22;44:1,5,20,
23;45:14;46:23;
47:10;49:13,17,20;
50:1,16,18;51:5,11,
17,19;52:4,7,11,12;
18,19,21;53:2,12,13,
15,20;54:2,5,5,10,16,
21,25;55:8,9,17;
56:25;57:13;58:7,7,
15,21;59:3;60:10;
65:10,23;69:16;
73:18;74:25;83:25;
86:18,18;88:11;
100:13,23;106:25;
108:18,21;109:3;
110:2,4,5,13
**Dallas-oriented (1)**
108:20
**date (7)**
12:19;16:1,20;
37:22;40:23;60:18;
61:5
**Daugherty (2)**
83:6;88:19
**David (1)**
31:5
**day (2)**
89:7;112:7
**days (5)**
14:3;21:9;72:2;
74:19;87:20
**day-to-day (2)**
18:10;32:3
**DC (1)**
83:15
**de (1)**
15:9
**deal (1)**
48:13
**dealing (1)**
63:22
**dealings (1)**

16:22
**dealt (2)**
91:4;97:15
**debt (10)**
48:15;63:22,23,
24;68:2,10;69:12,14,
22;70:10
**debtor (159)**
10:7,10;11:7,16;
12:25;13:16,18;14:5,
7,8,14,17,24;15:2,6,
10,21;16:5,12,21,23,
24;17:5,12,14,18,19;
18:15,17,24;21:13,
20;22:20;24:9;
29:16;30:23;31:20;
32:20,21;34:10,18;
35:14;41:6,23;42:1,
3,5,15,20,24;43:4;
44:8,17,19,25;45:1,
7,8,12;49:19,25;
50:1,3,7;51:1,14,25;
52:2,5,12;53:16,20,
25;54:1,11,15,19;
55:12,21;56:5,8,10,
16;57:14,15,18,20,
25;58:2,12,16,18;
64:5,22;68:22;
73:23;75:7;77:3,25;
78:11,17,20,22,23;
79:3,5,6,10,14,16,20;
80:3,5,16,18;81:12;
82:9,21,22;83:7,14;
84:5,6,8,12,15,17,20;
85:4,4,10;86:24;
88:18;90:6,8,9;
91:17,18;92:2,8,13,
18,23;93:12;94:3;
95:1,13;96:16;97:10,
17;98:4,16;99:23;
105:24,25;106:11,
25;109:16;112:22
**debtors (10)**
17:10;36:19;48:9;
68:21;73:22;78:19;
80:4;97:24;107:12;
109:6
**Debtors' (1)**
12:18
**debtor's (88)**
13:14;14:2,6,10,
12,15,20;15:7,12,18,
19,24;16:2,16;17:3,
4,24;18:1,5,10,11,
19;20:7,9;22:15,22;
30:10;36:16;41:16;
42:23;44:5;45:11;
50:2,9;51:11;54:23;
55:4;62:15,19;64:2,
25;65:2,4,14,17,20;
69:25;72:5,6,8,11;
73:17;77:3,4;78:4,4,
4,6;79:2,16,17,22;

APP. 0121

Appx. 004168

004111

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 126 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 194 of 1017 PageID 4873
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 125 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 122 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

81:9,14,21;82:18,19;
84:23;85:6;86:9,16;
87:1;88:21;91:17;
92:6,11,24;93:4,7;
94:23;95:3,21;96:10,
12;97:13;105:22;
106:11;111:18
**debtors-in-possession (1)**
75:23
**decide (3)**
58:3;111:3,9
**decided (5)**
33:7;39:20;97:20;
100:5;110:18
**decides (1)**
101:23
**deciding (1)**
48:11
**decision (10)**
45:9;48:3,25;49:4;
81:3;90:22;105:7;
107:15;108:9;
109:10
**decision- (1)**
31:22
**decision-making (4)**
58:17;86:4;
106:12;112:3
**decisions (10)**
31:20,25;42:4;
43:24;51:15;55:15;
57:19;106:7;112:3;
113:10
**declaration (4)**
28:1;64:24;65:1;
68:4
**declined (1)**
33:3
**decrease (2)**
17:2;92:16
**defending (1)**
109:16
**defense (1)**
68:24
**defer (1)**
81:14
**deference (4)**
56:10,14;62:15;
81:9
**definite (1)**
76:4
**definitely (1)**
46:14
**degree (1)**
35:9
**degrees (1)**
50:20
**Delaware (42)**
13:6,12,15;14:11,
13,15;42:24;43:4,19;
55:13,21;56:7;65:9;
70:24,25;72:7;
74:22;78:22;80:2,6,

6,7,9,13,19,21;81:12,
13;83:4,8;84:1;85:3,
14;88:11;89:1;
99:14,15,16,17,21;
107:1;111:7
**delay (1)**
41:9
**Demo (1)**
10:9
**demonstrate (4)**
76:20;77:15,17;
85:22
**demonstrated (5)**
50:23;55:8;84:7,8;
88:25
**demonstrates (1)**
82:7
**demonstrating (1)**
81:5
**denial (1)**
94:13
**denied (3)**
74:4,6;79:23
**Dennis (1)**
10:23
**DENTONS (1)**
6:20
**deny (1)**
99:1
**depend (1)**
106:2
**depending (2)**
33:10;50:19
**depends (3)**
35:19;52:17;
107:17
**depose (1)**
39:4
**deposition (3)**
30:8,19;69:16
**depositions (1)**
53:12
**deputy (4)**
38:21;39:4;40:18,
22
**derives (1)**
17:5
**describe (1)**
28:1
**described (2)**
44:9;111:18
**deserve (1)**
112:8
**designated (3)**
32:24,25;67:18
**desires (1)**
109:8
**despite (1)**
103:1
**detail (1)**
76:16
**determination (2)**
44:20;51:1

**determinations (2)**
54:21;101:6
**determine (5)**
16:17;44:2,22;
50:18;51:20
**determined (1)**
82:3
**determining (1)**
95:14
**detriment (1)**
49:5
**develop (1)**
50:2
**developed (2)**
49:24;84:22
**Development (3)**
9:7,9;12:25
**devoted (1)**
14:1
**dictate (1)**
59:2
**differ (3)**
35:16,21;54:24
**difference (1)**
22:7
**different (19)**
16:11;22:10;
34:16;48:19;53:9;
61:18;63:19;64:21;
71:2;87:16,17;93:15,
18;94:18;96:15;
98:2;106:18;107:23,
25
**difficult (2)**
95:16;106:14
**difficulties (1)**
41:10
**difficulty (1)**
96:24
**direct (11)**
16:21;21:25;24:7;
32:15,15,18;33:18;
34:1;47:12;88:10;
90:21
**directly (1)**
34:20
**disagree (2)**
49:1;105:21
**disagreement (1)**
52:20
**discovery (5)**
52:24,25;53:4;
83:17;96:18
**discretion (1)**
62:11
**discuss (3)**
47:19;80:15;95:22
**discussed (3)**
30:3,8;107:9
**discussing (1)**
49:12
**discussion (5)**
30:19;62:9,22;

79:12,12
**discussions (1)**
11:5
**disingenuous (2)**
77:20;84:2
**dispute (6)**
49:13;55:20;
76:15,17;86:17,19
**disputed (3)**
17:11;40:12;83:12
**disputes (2)**
52:25;96:18
**disputing (1)**
55:21
**disqualification (1)**
48:24
**disregard (1)**
81:21
**distinguishing (1)**
51:7
**distributed (1)**
44:13
**District (30)**
11:3;22:24;39:1;
40:10;45:23;46:5,
23;49:21;53:1;
72:10,21;73:3,3,5;
76:2;79:14;80:5,17;
81:2,22;85:2;102:13,
22,23;103:1,8;106:7,
9;108:4,5
**divestiture (1)**
70:1
**docket (1)**
47:2
**document (1)**
40:6
**documents (10)**
11:18;12:6;35:7;
37:15;60:5,6;96:21;
100:11,12,15
**dog (1)**
69:21
**dollar (4)**
43:10,11;70:15;
82:5
**dollars (11)**
14:25;15:22;16:1;
17:13;35:13;43:15,
16;63:6;68:14;
69:17;103:18
**domicile (2)**
80:11,16
**domiciled (1)**
80:5
**Dondero (32)**
20:3,24;25:1,4,16;
26:10,13,15,20,23,
25;27:2,22;28:22;
29:23;34:7;42:4;
44:16;50:12;51:12,
15,16;55:7,14;58:4,
7,12;66:2;68:16;

97:3,3;99:23
**Dondero's (2)**
25:25;29:19
**done (9)**
34:1;75:15;90:20;
108:5,6;109:5;
111:22,24;112:5
**doozy (1)**
101:22
**doubt (4)**
54:4;76:25;91:11;
94:24
**down (10)**
23:8;32:6;36:5;
46:10,18;63:23;64:4,
17;77:15;102:1
**dozen (1)**
56:8
**dozens (1)**
96:2
**driven (1)**
18:11
**driving (1)**
63:3
**DSI (6)**
10:12;14:1,4;
21:12;22:7;112:14
**DSI's (2)**
16:13;94:5
**dueling (1)**
44:22
**DUNN (2)**
7:2;8:7
**duplicate (1)**
60:25
**duplicative (1)**
40:15
**during (5)**
16:7;59:14;77:6;
84:16;105:14
**dwarfs (1)**
43:17

**E**

**earlier (2)**
27:4;68:3
**early (1)**
71:25
**earned (1)**
111:11
**ease (1)**
88:8
**easier (1)**
85:10
**easiest (1)**
102:24
**easily (1)**
85:3
**easy (3)**
52:18;73:24;
111:17
**economic (4)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(6) debtors-in-possession - economic

APP. 0122
004112

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 127 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 195 of 1017 PageID 4874
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 126 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 123 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                    December 2, 2019

52:11;87:5;94:2;
108:25
**economics (1)**
16:14
**economy (3)**
67:24,25;102:21
**effective (1)**
60:21
**effectively (3)**
42:10;45:12;65:25
**efficiencies (1)**
52:11
**efficiency (5)**
39:12;50:22;
67:25;101:1;102:21
**efficient (1)**
55:9
**effort (2)**
90:5;91:12
**efforts (4)**
16:13;18:2;38:19;
84:9
**EFH (4)**
56:17,21;63:17;
109:10
**ego (1)**
59:4
**eight (2)**
17:13;60:24
**eighteen (1)**
65:20
**either (15)**
18:2,13;41:16;
64:11;70:7;72:7;
73:11;80:24;82:6,
19;84:1;102:11;
104:13;109:3,12
**element (2)**
106:1,13
**elements (1)**
39:11
**else (7)**
40:15;47:21;57:6;
74:23;75:4;108:24;
109:17
**email (5)**
38:20,23;40:21;
59:24;74:2
**embodied (1)**
69:11
**emergent (1)**
113:12
**empire (2)**
67:15;108:21
**employ (2)**
45:3;111:17
**employed (1)**
112:8
**employees (20)**
13:20;14:1,5;
20:20;28:1;29:13,
17;30:15,22;31:1;
41:24;42:3;52:12;

54:14;57:23;66:1;
85:5;86:19;95:11,12
**employment (1)**
27:18
**encountered (1)**
96:25
**end (1)**
24:14
**enforce (1)**
94:21
**engaged (6)**
13:17;58:12,18;
106:1,16;111:22
**engagement (4)**
13:18,23;20:19,23
**engages (3)**
50:3;58:18;64:22
**enjoyed (1)**
78:16
**enough (2)**
71:18;103:22
**ensure (3)**
50:22;89:12;
112:20
**entire (2)**
96:1;102:14
**Entities (18)**
8:13,13;14:16;
15:4;41:24;51:24;
67:18,19,20;71:1,6;
80:8,13;81:13;
88:18;93:19;104:4,4
**entitled (2)**
56:10;81:17
**entity (8)**
44:14;49:4,5;
50:22;68:15;70:25;
72:25;81:12
**equity (8)**
16:11;17:7;25:20;
44:12;86:13;91:6,
18;92:19
**erase (2)**
58:15,17
**ESQ (22)**
6:4,5,6,11,16,17,
22,23;7:4,9,10,15,16,
17,18,19,24;8:4,9,14,
19;9:3
**essentially (1)**
87:8
**estate (8)**
18:5;45:4,11;82:3;
83:13;87:6;88:24;
111:4
**estates (2)**
97:22;98:10
**estimated (1)**
69:16
**et (4)**
6:15;8:8,18;65:21
**ethical (1)**
106:23

**Europe (1)**
14:23
**evaluate (7)**
16:14;18:6;66:19,
21;69:4;84:17;86:25
**evaluated (1)**
69:13
**evaluating (1)**
97:12
**even (19)**
40:12;47:5,17,20;
57:18;61:9,16,16;
72:20,20;74:7;
76:10;81:13;89:3,4;
92:17;93:15;98:16;
106:8
**event (5)**
76:11;94:1;95:23;
96:9;107:25
**events (1)**
76:11
**everybody (1)**
58:6
**everybody's (1)**
46:14
**everyone (1)**
103:2
**everywhere (2)**
107:13,14
**evidence (30)**
11:17;12:19;
23:10;32:2;33:3,4,6;
36:8;37:22;38:12,16,
18,25;40:22,25;
43:25;61:22;62:18;
76:20;90:17;92:10;
93:22;96:25;100:24,
25;101:5;107:5;
108:10,14;110:6
**evidentiary (5)**
41:2,3,20;42:7,7
**ex (1)**
69:8
**exact (2)**
24:22;25:18
**exactly (1)**
88:3
**EXAMINATION (2)**
24:7;32:18
**examined (1)**
54:16
**example (5)**
93:3;95:9;101:2;
102:18;113:4
**examples (1)**
54:25
**except (4)**
11:17;12:9,18;
22:21
**exception (7)**
37:20;38:12;39:5,
7;40:4,7;97:11
**exceptionally (3)**

61:14,24;74:18
**exceptions (1)**
40:3
**excess (1)**
72:18
**exchange (2)**
38:20;40:21
**exclusion (1)**
37:10
**excuse (4)**
44:19;53:17;69:7;
99:15
**executive (3)**
107:14;108:19;
110:2
**executive-level (1)**
27:25
**exercised (1)**
33:13
**Exhibit (17)**
11:17,17;12:18;
37:10,10,11,12;
39:14,15;40:23;
60:11,13,15;64:25;
67:17;69:11;74:1
**Exhibits (20)**
11:17,23;12:18;
36:10,12,19;37:9,9,
20,21;41:16,17;
59:15;60:8,16;
65:17;66:17;67:16;
74:1;91:24
**exist (3)**
14:22;21:13;
100:16
**existing (4)**
108:1,2,21;110:2
**exit (1)**
70:19
**expand (1)**
47:9
**expanded (2)**
79:1;98:17
**expected (1)**
85:24
**expects (1)**
84:14
**expeditiously (2)**
22:24;39:11
**expend (1)**
45:4
**expended (4)**
74:15,19;90:5;
103:5
**expenditure (1)**
74:20
**experience (10)**
13:3;46:7;50:20,
21;54:7;57:13;
75:15;85:1;92:23;
93:3
**expertise (2)**
85:20;86:21

**explain (1)**
96:9
**exposed (2)**
104:5,13
**exposure (1)**
57:20
**extension (1)**
13:24
**extensive (2)**
49:19,24
**extent (3)**
89:6;101:23;
112:16

**F**

**face (1)**
84:9
**faced (1)**
65:23
**fact (17)**
38:23;43:5,18,19;
53:6;56:13;57:17;
63:9;73:22;82:2;
90:19,22;93:23;
94:24;97:25;103:18;
108:19
**factor (11)**
52:23;56:23;
70:21;82:4;84:4,5;
87:5,7;88:8;98:7;
101:9
**factors (20)**
53:23,23;61:23,
24;62:2,3,4,8;71:22;
77:9,10,11,15;81:2,
6,25;86:3;88:1;
107:8;108:23
**facts (18)**
16:18;25:8;42:12,
17;50:16;51:3;59:2;
61:14,17;76:15;
77:14;81:19;100:1;
107:17,19;108:8,18;
109:25
**factual (2)**
49:24;90:18
**Fair (3)**
71:18;73:21;109:6
**fairly (1)**
22:25;46:2;91:10
**fall (2)**
46:7;111:8
**falls (2)**
39:6;108:24
**familiar (21)**
34:23;35:1,11;
54:18;61:24;66:9;
67:10,10;72:4,5,7,
10,22;78:3;93:11,15;
94:25;103:3;104:1,3,
19
**familiarity (7)**

APP. 0123

004113

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 128 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 196 of 1017 PageID 4875
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 127 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 124 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

47:9;54:8;91:1;
96:10;103:24;108:8;
112:16
**familiarizing (1)**
90:5
**family (1)**
52:17
**fantastic (1)**
40:13
**far (3)**
39:9;88:21;96:18
**far- (1)**
86:19
**far-flung (3)**
41:24;52:1;100:14
**Fargo (1)**
107:13
**fashion (1)**
50:7
**fashioned (1)**
110:6
**fault (1)**
33:8
**favor (8)**
43:3;51:4;56:23;
75:4;81:6,20;83:20;
106:10
**favors (1)**
52:7
**feasibility (1)**
83:22
**features (1)**
51:7
**February (1)**
60:21
**Federal (4)**
38:12;71:17,19;
81:17
**fee (1)**
65:18
**feel (1)**
48:3
**feels (1)**
46:14
**fees (3)**
15:1;92:9,10
**feet (3)**
70:10;104:24;
110:5
**felt (3)**
79:9,9;85:9
**few (7)**
34:3;43:21;72:1;
73:23;80:15;90:2;
108:2
**fiduciary (4)**
63:6;70:10,17;
82:3
**field (1)**
104:15
**Fifth (3)**
72:24;81:3;83:16
**file (14)**

32:21;42:15;
77:24,25;78:22;80:3,
4;96:16,17;97:7;
106:2,15;107:16;
110:10
**filed (22)**
11:1;15:12;21:10;
26:22;42:23;43:8,
25;44:11;61:5;
71:25;72:1;74:22;
78:2;79:14;80:5;
82:23;88:16,17,20;
95:10;97:20;101:15
**files (2)**
105:24,25
**filing (7)**
21:14;32:22;64:7;
80:19;98:22,22;
104:24
**filings (1)**
66:4
**final (3)**
62:12;63:25;
101:19
**Finally (1)**
101:7
**financial (8)**
13:1,4;14:2;24:14;
86:10;91:4,7;100:10
**financial-advisory-services (1)**
14:18
**financials (1)**
65:16
**find (5)**
21:17;75:12;
77:10;85:23;107:8
**findings (2)**
90:18;113:20
**finds (1)**
102:24
**fine (5)**
11:10;12:14;
25:15;36:21;97:18
**finish (1)**
109:9
**firm (2)**
13:1;113:1
**firms (5)**
50:25;82:20;
87:14;111:7,7
**first (19)**
12:6;33:18;34:2;
38:11;42:16,21;
54:1;64:21;65:3;
69:7;72:1;73:12;
74:2,5;76:1;82:1;
89:7;99:12;102:7
**first-day (8)**
28:2;52:9;64:24;
69:25;77:23;79:6;
102:19;104:9
**first-filed (1)**
73:12

**Fitzwater (3)**
72:12,19,21
**five (6)**
43:16;57:4;82:19;
87:8;92:2;94:18
**five-minute (1)**
104:9
**flair (1)**
89:23
**fleeing (4)**
55:16,17;56:6,7
**flights (2)**
87:16;88:10
**floodgates (1)**
61:17
**flung (1)**
86:20
**fly (1)**
52:19
**focus (8)**
16:13;76:19;84:5;
86:20,21;92:6;94:5,7
**focused (11)**
65:11;77:13;82:2;
84:1;89:5;92:3;
98:18;108:1,20,21;
110:3
**focusing (1)**
94:2
**foisted (1)**
95:25
**folks (4)**
28:6;31:6,8;63:10
**following (2)**
18:17;74:13
**follows (1)**
62:6
**forced (3)**
99:18,19,22
**foreign (2)**
15:13,14
**forestall (1)**
73:24
**forgive (1)**
67:16
**form (4)**
26:2;35:16;79:21;
113:17
**formal (3)**
76:1;102:9,11
**formally (1)**
111:21
**formation (1)**
72:2
**formed (2)**
71:8;78:6
**former (6)**
26:13;47:24;
82:20,22;102:15;
108:2
**forth (3)**
68:3;80:22;113:19
**Fortress (1)**

109:19
**forty (1)**
74:19
**forty-five (1)**
34:1
**forum (10)**
55:10;62:19;
70:25;81:10,14;
85:24;87:4;105:23;
106:3,12
**forum- (2)**
56:10;106:18
**forums (1)**
106:17
**forum's (1)**
70:22
**forum-shopping (9)**
56:5,12;63:25;
64:2,11;77:19;106:1,
13,16
**forward (5)**
49:9;103:14;
110:19,19;112:23
**found (3)**
90:8;91:10;96:12
**foundation (5)**
25:11,13;31:14;
34:19,20
**four (7)**
13:6;24:21,23;
51:3;62:4,13;69:5
**fourteen (1)**
56:3
**Fourth (3)**
45:15;49:11;69:9
**frame (1)**
96:22
**FRANK (4)**
9:5;10:11;23:25;
85:5
**F-R-A-N-K (1)**
23:25
**frankly (6)**
42:14;55:5,19;
61:8;64:11;66:14
**fraudulent (3)**
68:25;69:4;92:5
**fraudulent-transfer (1)**
17:17
**FRED (5)**
9:9;10:12;13:24;
18:13;27:15
**free (1)**
33:17
**freed (1)**
57:3
**free-fall (1)**
69:23
**frequency (1)**
88:7
**fresh (4)**
50:15;78:23;
97:11;110:21

**front (3)**
21:18;35:7;100:7
**Frontier (7)**
15:24;43:15;68:5;
82:10;109:20,21,22
**FTI (1)**
18:21
**fulcrum (4)**
63:23,24;69:22;
70:10
**full (5)**
17:24;47:4;70:7,8;
111:23
**fully (3)**
51:9;81:8;97:12
**functionally (1)**
73:9
**functions (2)**
13:24;67:7
**Fund (8)**
7:8,23;17:8;26:7;
28:8;91:5,6;93:4
**fundamental (2)**
62:6;81:16
**Funding (1)**
28:7
**funds (13)**
15:11;16:12;17:8,
8,9;25:25;26:6;
51:13;86:13,13;
92:14,20;93:6
**further (15)**
21:1;23:10;32:15;
35:3;36:8;58:22;
66:14;67:22;68:1;
73:4;80:6;102:22;
104:16,20;106:21
**future (1)**
76:12

## G

**gain (2)**
54:3,3
**gave (1)**
33:24
**GEDDES (1)**
6:9
**General (13)**
9:3;14:12;25:4,17;
51:14;64:17;65:2;
69:15,17;80:8,9;
89:5;107:18
**generally (12)**
34:11;35:8,15;
60:5;78:5;81:9;
86:10;87:6,24;
105:19;107:9;
111:16
**generated (2)**
65:19;92:10
**generates (1)**
92:18

APP. 0124

004114

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 129 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 197 of 1017 PageID 4876
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 128 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 125 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

generic (2)
66:24;67:8
gets (5)
49:11;67:14;76:5;
110:24;112:20
GIBSON (1)
7:2
given (18)
14:7;16:18;36:19;
47:9,11;48:4;53:2;
79:7,8;84:17;88:7,7;
94:17;97:9;109:25;
111:18;112:24;
113:14
giving (2)
31:12;97:10
gleaned (1)
43:23
global (2)
87:19;108:20
goal (3)
18:4,7;98:20
goes (7)
39:9;65:2;73:11;
80:6;87:23;90:20;
106:21
go-forward (2)
62:14;63:14
Good (18)
10:4,5,19,20;
11:14;19:18,19,21;
21:4;23:18;53:8;
75:21;76:3;91:8;
97:1;105:11;110:5;
111:24
govern (1)
35:12
governance (1)
97:7
government (1)
57:1
governor (1)
71:20
GP (3)
6:15;8:8,18
grant (3)
81:9;105:13;110:7
granted (3)
52:9;107:4,6
granting (1)
17:20
grapple (1)
69:2
gravitas (1)
108:18
great (3)
53:8;90:5;113:25
greatest (1)
105:20
Greg (1)
10:9
Gross (5)
81:4,7;83:19;88:3;

89:15
grossly (1)
91:13
ground (2)
103:20;112:21
grounded (1)
73:22
grounds (1)
79:21
GROUP (3)
8:7;28:7;30:3
groups (3)
27:22,25;28:21
grow (1)
84:25
guarantees (1)
38:14
GUERKE (9)
6:5;23:18,19;24:8;
25:12;31:16,19,25;
32:11
guess (3)
36:1;74:14,21
guidelines (1)
67:2
guy (1)
89:18

## H

Hale (7)
76:2;102:8,9,11,
16,19,20
half (3)
14:25;52:14;56:8
hall (1)
46:10
hand (4)
19:11;23:21;60:6;
67:4
handed (3)
37:8;59:15;60:7
handing (1)
59:17
handle (5)
38:1,2;40:11;
65:10;102:24
handling (1)
40:14
hands (1)
63:23
Hang (2)
12:2,4
HANKIN (1)
7:9
happen (7)
63:14;65:8;68:9;
70:11,11;73:9;76:12
happened (5)
45:19;63:13;
76:23,23;79:18
happening (1)
97:16

happens (3)
70:19;73:9;97:23
happy (2)
61:2;72:15
hard (1)
52:13
harder (1)
107:6
harking (1)
63:15
HCLOF (1)
82:11
headed (1)
70:3
headquartered (2)
13:11;82:10,10
heads (3)
27:25;28:21;30:3
headway (1)
79:12
hear (20)
22:24;33:17;
34:24;39:2,11;41:4;
45:3;51:23;75:6;
93:8;95:1,2,5;97:8;
101:8,22;102:19;
111:16;112:10;
113:12
heard (14)
30:18;53:6;59:10;
68:5;75:19;76:15;
90:6,7;91:21;95:21;
96:18,19,19,22
Hearing (12)
23:4;52:9;68:20;
74:3,3;77:23;78:1;
79:6;84:20;85:12;
101:14;104:10
hearings (5)
69:25;75:15;
91:20;93:9;96:2
hears (2)
95:16,17
hearsay (13)
38:7,9,11,13,13;
39:6,8,24,25;40:1,3,
6,7
heart (2)
64:15;100:18
heavier (1)
57:9
hedge (5)
16:12;17:7;86:12;
91:5;92:20
held (4)
14:15;68:14;
69:16;100:5
help (1)
95:18
helpful (4)
52:17;77:10;90:9;
107:21
hereby (3)

12:19;37:21;40:22
herring (2)
58:14;99:18
high (2)
44:4;47:14
higher (2)
87:10,12
Highland (53)
9:3,5;10:7;13:19,
21;24:9,24;25:1,22,
25;26:10;28:10,24;
29:5,7,13,16;30:10,
15,23;34:13;44:8;
48:4;49:25;50:1;
51:13,25,25;55:1,2;
57:25;60:23;66:22;
67:13,15;68:11,12,
15,17,18,23,25;
69:13;72:24;74:10;
76:7;77:1;93:24;
103:3,12,16;104:19,
23
Highland- (1)
72:24
Highland's (10)
25:4,16;27:23;
29:13;52:23;64:18;
65:24;66:10;67:10;
104:1
highlight (1)
51:7
highlights (1)
80:1
highly (7)
17:15;50:23;51:1;
53:4;57:14,21;
109:18
Hills (1)
13:8
hinted (1)
105:14
hire (1)
89:1
hired (1)
21:9
history (6)
52:23;53:11;54:7;
58:15,17;79:8
hit (2)
49:2;70:21
hitting (1)
111:1
hold (3)
22:1;24:17,19
Holding (1)
81:15
holdings (1)
81:12
holds (1)
15:19
holistic (1)
96:7
home (2)

56:7;78:16
Homes (1)
13:8
Hon (1)
40:21
honestly (1)
34:15
Honor (276)
10:4,8,14,19;11:1,
5,9,13,14,16,20,25;
12:11,13,15,22;19:3,
7,19;21:4,15,23;
23:6,12,19;25:6,12;
27:11;31:16,21;32:5,
17;36:3,9,15,18;
37:5,12,17,23;38:1,
9,11;39:17;40:24;
41:7,12,14,18,22;
42:6,11,14;43:3,6,
17,19,21;44:7,15,22,
25;45:15,17,20,25;
46:20,22;47:8,12,17;
48:7,18;49:1,2,5,8,
12,15,16,23;50:14,
23;51:3,9,18;52:3,8,
17,20,22;53:10,13,
17,18,22;54:4,9,24;
55:3,6,23;56:1,18,
20;57:7,11,12,22;
58:1,10,15,20,23,25;
59:7,8,12,15,17;
60:2,8,20,25;61:7,
10,11,15,19,20,21;
62:12,21,24;63:4,15,
16,19,24,25;64:5,20;
65:1,22;66:6,13,16;
67:4,12,24;68:2,7,
12;69:10,15,23;70:3,
9,21,23;71:4,21,22;
72:3,9,13;73:1,7,15;
74:12,13,24;75:2,21;
76:5,7,14;77:2,6,9,
18,23;78:2,12,13,17;
79:6,21;80:10,15;
81:8,19,23;82:21;
83:16;84:4,11;85:13,
21;86:2;87:5;88:11,
23;89:15,20,24;
90:10,11,14,25;91:2,
6,8,22,22,23;93:8,
14;94:1,11,24,25,25;
95:1,2,16,18,25;
96:7,8;97:10,21,22;
98:9,11,24,25;99:1,
3,6,8,13,18,24;100:2,
3,7,9,13,17;101:4,7,
13,20,21,23;102:5,
10,25;103:11,13,21;
104:2,5,21,25;
111:14,15;112:9,11,
13,14,16;113:8,15;
114:1
Honorable (1)

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(9) generic - Honorable

APP. 0125
004115

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

72:12

**Honor's (7)**
11:4;61:11;64:3;
76:3;100:18;102:12;
112:23
**hope (4)**
70:6,6;78:7;98:23
**hopefully (2)**
86:25;111:11
**hopes (1)**
18:7
**horse (1)**
101:11
**hours (4)**
14:4;20:9;74:16,
16
**Houser (3)**
46:24;102:19,22
**HUANG (1)**
7:18
**Human (2)**
28:8;108:12
**hundred (2)**
20:9;25:20
**hundreds (6)**
14:4;63:5;69:20;
74:16,16;96:1
**hurt (1)**
36:25

**I**

**idea (5)**
50:14;51:25;70:2;
100:14;105:21
**identified (1)**
32:9
**identifies (1)**
68:11
**identify (1)**
40:17
**ignore (3)**
90:17;100:25;
101:5
**immaterial (1)**
85:7
**impact (2)**
45:9;49:4
**impartial (1)**
73:21
**impeccable (1)**
98:17
**implication (2)**
73:17;74:8
**importance (1)**
92:16
**important (13)**
44:7;50:21;63:15;
70:19;79:9;85:9,12;
86:1;87:7,18;89:11,
11;90:9
**importantly (3)**
42:21;63:14;79:9

**improper (1)**
90:24
**impropriety (1)**
18:24
**improve (1)**
83:21
**inappropriate (2)**
106:22;108:13
**Inc (5)**
9:8,9;13:1;25:5,17
**include (2)**
31:5;86:10
**included (2)**
64:24;106:12
**including (10)**
13:6;14:20;15:4,9,
14;17:7,16;80:18;
81:1;109:13
**incorporation (2)**
64:6;71:5
**increased (1)**
79:4
**increases (1)**
14:3
**Indeed (3)**
82:23;84:11;
103:17
**indenture (1)**
101:2
**indicated (1)**
94:6
**indicating (1)**
62:23
**indication (1)**
106:24
**indicator (1)**
52:24
**Indiscernible (1)**
37:5
**individual (1)**
106:8
**industries (1)**
13:4
**inform (3)**
48:3;110:13;
113:23
**information (4)**
14:7;18:21;85:19;
95:25
**informed (2)**
16:9;53:13
**infrastructure (1)**
67:7
**initial (2)**
44:18,20
**initially (2)**
13:17;47:20
**injunction (5)**
69:8,8,9,10,10
**injunctions (1)**
69:5
**inquiring (1)**
38:22

**inside (1)**
104:11
**insider (3)**
17:25;84:19;112:4
**installed (1)**
98:16
**instance (1)**
42:17
**instead (2)**
18:11;101:16
**instrument (1)**
82:14
**instruments (3)**
86:10;91:7;100:10
**insufficient (1)**
79:21
**integrated (1)**
113:7
**intended (2)**
32:21;77:24
**intends (3)**
18:6;77:25;86:24
**intention (2)**
84:7,8
**intercompany (2)**
48:14;97:25
**interest (15)**
25:22;47:25;
53:21;55:15;64:9;
68:19,22,23;70:22,
22;71:1,6;74:20;
78:18;80:25
**interested (1)**
56:5
**interesting (2)**
90:16;101:20
**interest-of-justice (1)**
61:25
**interests (9)**
14:19;15:14,17;
52:3;78:9;80:7;
86:12;100:10,16
**international (1)**
15:8
**internationally (1)**
105:17
**interpretation (1)**
91:14
**interrupt (1)**
45:18
**Intertrust (1)**
8:13
**intertwined (1)**
112:17
**intimately (1)**
72:22
**into (14)**
11:16;12:19;
21:18;37:21;40:22;
42:18;43:24;48:11;
73:12;90:21;101:9;
104:22;107:6,24
**introduced (1)**

13:21
**invariably (1)**
73:11
**invested (1)**
52:5
**investment (7)**
15:5;65:13,18;
66:7,10,15;67:1
**investments (5)**
15:17;16:4;86:11;
93:6,6
**investors' (1)**
17:1
**invited (1)**
64:12
**involun (1)**
60:9
**involuntary (6)**
17:20;60:10;66:4;
76:9,9;91:25
**involve (3)**
72:24;86:6;107:18
**involved (6)**
17:15;58:11;66:7;
93:23;97:24;106:21
**involvement (2)**
13:19;85:6
**involves (2)**
65:3;106:22
**involving (4)**
49:18;57:16;
80:17;112:4
**Ira (2)**
10:9;111:14
**ironed (1)**
41:10
**irrelevant (3)**
89:6;107:9,9
**ISAAC (2)**
9:3;10:11
**issue (23)**
48:24,24;50:9,19;
53:5;54:6;58:14;
60:9;61:20;62:23,
25;64:3;65:10,11;
68:24;71:22;73:13;
77:2;82:12;105:7;
110:14;112:15;
113:2
**issued (10)**
60:9,11;69:5;
91:21;94:13;103:14,
15,16,17;108:6
**issues (14)**
21:2,2;49:18;
50:19;61:8;65:23;
69:1;94:16;96:20;
97:5,25;103:4;
107:10;108:8
**item (2)**
10:15;68:10
**iterations (1)**
94:18

**J**

**JAMES (3)**
8:14;10:6;25:1
**Janeiro (1)**
15:9
**January (3)**
60:19,20;61:5
**JEFF (4)**
7:16;10:8;11:14;
75:22
**Jefferies (9)**
6:10,21;15:20,22;
43:14;68:5;82:9;
109:18,21
**JENNER (1)**
7:7
**JEREMY (1)**
8:4
**Jernigan (52)**
38:21;39:1;45:25;
46:1,2,6,8;47:15,20;
48:23;66:9,13,19,20;
67:9,22,25;69:1,13;
73:18;74:11;76:17,
25;77:22;78:2,12;
90:8;91:10,20;93:3,
11;94:13;95:6,12,17,
21;96:3,12;97:14,18;
100:25;103:3,6,7;
104:3,16;110:11,17,
21;111:9;112:24;
113:9
**Jernigan's (3)**
40:21;90:17;92:23
**Jim (1)**
27:7
**job (2)**
18:16;84:25
**JOHN (4)**
6:16;10:9;21:19;
59:12
**join (1)**
63:8
**joinders (1)**
77:7
**joined (5)**
29:4,7;43:2;60:4;
75:1
**joining (1)**
98:15
**jointly (3)**
48:5,13;78:19
**Jones (6)**
10:7;11:15;13:14,
22;21:20;75:22
**JOSE (1)**
6:17
**Josh (1)**
83:1
**Judge (97)**
13:7,7,8,9;22:3;

APP. 0126

004116

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 131 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 199 of 1017 PageID 4878
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 130 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 127 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.

Case No. 19-12239(CSS)                                                    December 2, 2019

32:24;38:21;39:1,4,
25;44:3;45:25;46:2,
5,8,24;47:10,11,15,
20,22,23,23;48:10,
22,23;66:9,13,18,20;
67:9,22,25;69:1,13;
70:17;72:12,14,14,
19,21;73:3,5,18;
74:10;76:2,17,25;
77:22;78:2,11;
79:15;81:4,7,14;
83:19;88:3;89:15;
90:8,16;91:10,20;
92:23;93:3,11;
94:12;95:6,12,17,20;
96:2,5,12;97:13,18;
100:24;102:8,9,11,
15,19,19,20,22;
103:3,5,7;104:3,16;
106:8;108:5;110:11,
17,20;111:9;112:24;
113:9
**judges (9)**
46:23;47:7;48:1;
49:2;91:2,3;106:8;
108:12,12
**judge's (1)**
108:11
**judgment (2)**
81:22;111:18
**judgments (1)**
108:12
**judicial (8)**
39:12;41:19;46:6;
49:23;67:25;81:17;
101:1;102:21
**jurisdiction (2)**
55:16;107:20
**jurisdictions (4)**
41:24;44:22;52:1;
88:21
**jurist (1)**
97:19
**justice (8)**
52:3;53:16,18,21;
64:9;78:10;80:25;
99:20
**justify (1)**
95:19

**K**

**keep (4)**
61:1;69:23;
101:14,23
**keeping (1)**
98:8
**KEIP (1)**
95:11
**KEIPs (1)**
95:17
**KERP (1)**
95:11

**KERPs (1)**
95:17
**KEVIN (2)**
6:5;23:19
**key (3)**
51:16;66:22;112:3
**Kharasch (3)**
10:9;111:14,14
**KIMBERLY (1)**
7:19
**kind (12)**
62:13,19;64:12;
65:2;66:19;73:12,
24;74:5;90:15;
102:7;105:15;
108:24
**kinds (2)**
112:2,3
**Klos (1)**
31:5
**knowledge (13)**
14:2;27:1;46:6,8;
84:23,25;85:19;91:9,
9;93:4;95:13,19;
96:5
**knows (1)**
69:24
**Korea (3)**
15:11;20:16;86:15
**Korean (3)**
93:5;104:3,7
**KUAN (1)**
7:18

**L**

**LA (2)**
88:10,11
**lack (1)**
55:12
**laid (1)**
11:4
**large (5)**
51:18;91:4;
100:19,22;109:24
**largely (3)**
42:8;50:25;76:15
**largest (5)**
51:19;69:19;83:5,
13,16
**last (11)**
19:15;27:4;41:1;
66:6;69:14;87:5;
89:2,25;94:17;
103:11;104:2
**Lastly (3)**
18:16;76:14;83:16
**late (2)**
38:2;60:19
**later (4)**
60:24;68:21;93:9;
97:8
**LATHAM (2)**

7:13;83:15
**Latin (4)**
86:15;93:5
**latter (1)**
109:9
**Laughter (1)**
59:6
**laundry (1)**
107:8
**LAUREN (1)**
6:22
**law (12)**
14:13;50:25;
70:25;71:8;76:11;
82:20;102:15;
105:15;106:6,7,20;
110:17
**laws (1)**
14:11
**lawsuits (3)**
99:19,21,22
**lawyer (1)**
47:23
**lawyers (1)**
108:13
**lay (2)**
51:9;53:23
**layer (2)**
69:22;72:20
**laying (3)**
25:9,11;31:14
**leading (1)**
85:19
**learned (4)**
76:25;77:1;90:19;
91:15
**learning (3)**
14:1;49:14;50:17;
52:6;66:12,14;68:1;
76:17;90:7,10;
101:10;104:16,20
**least (5)**
48:8;56:9;61:3;
62:1;69:14
**leave (1)**
111:9
**leaves (1)**
47:7
**leeway (3)**
31:12;33:24,25
**legal (4)**
29:21;62:7;67:7;
81:16
**legal-compliance (1)**
28:10
**legitimacy (1)**
101:17
**lenders (1)**
68:5
**lengthy (1)**
91:21
**less (2)**
17:13;99:9

**level (1)**
106:13
**LEVENTON (2)**
9:3;10:11
**leveraged (1)**
65:4
**liabilities (3)**
77:3;78:5;84:24
**life (3)**
52:17;57:4;98:1
**likely (8)**
53:1,4;66:10;
83:12;85:7;91:7;
93:8;98:20
**limited (12)**
14:10,15;33:5;
34:4;40:20,23;52:9;
53:11;55:21;90:18;
100:10;111:10
**limited-partnership (1)**
25:22
**line (4)**
21:21;65:6,8,12
**lines (3)**
64:22;65:2,12
**liquid (3)**
15:19;18:13;86:16
**liquidated (1)**
92:15
**liquidation (3)**
16:25;57:19;70:5
**list (6)**
36:11;50:24;
51:19;67:17,18;
107:8
**listed (2)**
82:18;83:11
**litigating (1)**
78:16
**litigation (19)**
17:15;54:4;55:3,5;
78:14;80:17;83:7,10,
14,15;84:1;85:18;
88:19;99:17;103:23;
108:1,2,22;110:1
**litigious (3)**
50:23;51:1;52:24
**little (15)**
24:5;37:2;48:19;
54:2;60:24;63:18,
21;67:14,14,21;
68:20;77:7;79:19;
91:12;99:9
**Litvak (1)**
10:10
**lived (2)**
61:4;63:11
**living (1)**
61:8
**LLC (2)**
6:10;7:14
**LLP (8)**
6:2,14,20;7:2,13,

22;8:2,12
**loan (2)**
16:4;65:15;92:9
**loathe (1)**
60:5
**local (8)**
13:16;59:13;
70:22;73:8;86:7,21;
88:14;89:23
**locales (1)**
15:8
**locally (1)**
89:5
**located (15)**
15:17,20;41:25;
46:23;51:16,18,21;
58:7;86:14;100:13;
107:12,13,13,14;
108:4
**location (12)**
29:4,6,10,16;30:7,
15;31:22;86:2,5;
99:20;100:9;106:18
**locations (1)**
30:22
**logical (3)**
42:16;55:19,22
**London (1)**
7:14
**long (3)**
52:23;106:5;
108:14
**longer (5)**
16:23;50:6;61:9;
91:16,18
**Look (24)**
12:6;19:22;46:22;
51:19;57:24;64:2;
65:12,17;67:3,12;
68:19;72:20;74:1;
79:15;82:17;86:5,9;
87:13;88:15;90:25;
96:11;101:2;105:24;
110:21
**looking (5)**
50:16;69:19;
104:14,15;107:19
**looks (3)**
82:4,5;96:7
**Los (1)**
13:11
**losing (1)**
45:24
**lost (2)**
73:23;85:20
**lot (16)**
18:21;33:24;
62:22;65:11,19;
93:13;94:25;95:21;
105:17;106:2;
109:17;110:16;
111:24,25;112:5;
113:20

APP. 0127

004117

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 132 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 200 of 1017 PageID 4879
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 131 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 128 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

**loud (1)**
55:11
**LP (6)**
24:10;25:2;30:23;
60:3;80:6,7
**LUCIAN (6)**
6:16;59:12,12,20,
23,25
**lunch (2)**
105:5;110:12

**M**

**machinery (2)**
110:8;113:24
**MACKSOUD (1)**
6:22
**mail (1)**
110:25
**maintain (2)**
15:7;98:9
**Maintenance (1)**
75:12
**majority (5)**
43:9,11;51:21;
80:4;86:15
**makes (12)**
42:4;43:9;55:15;
64:19;70:14,14;
81:5;86:3;89:25;
90:13;101:6;106:13
**making (4)**
31:23;48:25;
68:23;90:17
**manage (3)**
15:14;28:4;57:18
**managed (6)**
15:3;55:2;57:25;
65:20;96:15;112:22
**Management (45)**
6:15;8:8,18;9:4,6;
10:8;13:20;14:20,
25;15:1;16:3;18:10;
21:5;22:9;24:10;
25:2;28:1;30:23;
35:13;50:13;54:15;
58:5;60:3,14;65:13,
18,24;66:8,10,15;
68:11,16,17,23,25;
78:7;79:17;92:14;
93:12;95:4,21;96:10,
12;103:18;110:2
**manager (8)**
14:13;16:23;
25:25;26:5,6,7,9;
51:12
**managers (1)**
21:13
**manages (4)**
14:17;15:10;
16:12;50:8
**managing (1)**
17:6

**many (12)**
15:8;18:12,21;
80:10;88:10;89:12,
12;91:2,7,20;97:24,
24
**MARC (1)**
7:9
**margin (1)**
15:22
**marginally (1)**
92:25
**markedly (1)**
93:18
**market (2)**
92:13;94:9
**marketplace (1)**
67:3
**Marsal (2)**
7:3;8:3
**MASCHERIN (1)**
7:10
**massive (1)**
53:2
**material (1)**
45:2;88:6,24
**materially (1)**
45:8
**matter (9)**
18:3;39:11,23;
44:18,20;56:13;
102:18,25;111:15
**matters (8)**
10:14;17:16;
80:17;94:1;102:19,
20,24;110:17
**Matthew (3)**
10:21;41:12;
112:11
**Max (1)**
10:9
**MAXCY (1)**
6:23
**maximize (3)**
18:4,12;87:1
**maximum (1)**
50:22
**may (38)**
12:20;21:6;22:2;
23:7,18;24:6;31:21;
35:1;36:5,24;37:23;
41:11,25;42:1;
43:10;49:4;52:1;
54:24;55:6;59:9;
63:12;76:4,4,12,12;
78:21;81:8;85:5;
90:19;91:4,5;95:11;
96:25;97:15;98:5;
101:8;102:16;108:9
**maybe (5)**
27:7;56:3;90:20;
91:3;107:24
**mean (14)**
24:22;31:13;

35:18;39:3;40:9,12;
47:22;48:5;54:7;
55:25;56:2,24;
87:24;109:2
**means (4)**
54:8,9;96:2;
103:19
**meet (5)**
29:23;32:8,9;
62:17;80:23
**meeting (2)**
14:4;81:24
**meetings (2)**
30:1;31:8
**meets (1)**
40:6
**member (2)**
43:17;83:11
**Members (5)**
29:21;31:5;78:6;
80:18;88:16
**memorized (2)**
35:9,22
**mention (1)**
110:21
**mentioned (12)**
30:7;44:23;57:22;
58:9;78:17;79:6;
87:11;89:16;97:22;
98:13;99:25;112:15
**mentioning (1)**
77:19
**mess (1)**
37:1
**message (1)**
55:11
**met (3)**
18:20;20:3,20
**Meta-e (1)**
83:17
**metropolitan (1)**
87:15
**MICHAEL (2)**
6:6;7:4
**microcosm (2)**
67:14,23
**microcosms (1)**
67:21
**microphone (3)**
19:23;21:17;24:4
**middle- (1)**
67:5
**Midwest (2)**
87:11,13
**might (9)**
47:16;48:3,10,11;
91:23;96:20;107:20;
108:15;111:8
**Mike (1)**
10:24
**mileage (1)**
87:17
**mile-and-a- (1)**

52:13
**MILLER (1)**
7:24
**million (6)**
15:22;16:1;17:13;
43:15,16;68:13
**millions (2)**
63:5;69:20
**mind (3)**
60:19;61:14;69:23
**minimum (1)**
29:23
**minutes (2)**
34:1;90:2
**miscommunication (1)**
36:20
**misstated (1)**
71:5
**mistake (1)**
103:21
**misunderstood (1)**
33:14
**model (1)**
104:19
**modern (2)**
97:25;105:16
**modifications (1)**
16:18
**modified (1)**
112:1
**modifying (1)**
112:5
**modus (1)**
67:11
**mom (1)**
89:3
**mom-and- (1)**
100:17
**mom-and-pop (3)**
88:22,23;89:4
**moment (2)**
45:18;100:8
**moments (1)**
80:15
**monetization (1)**
92:21
**monetizing (1)**
16:25
**money (3)**
65:4,4;111:12
**money-management (1)**
14:18
**month (1)**
111:24
**month-and-a-half (2)**
18:17;88:15
**months (3)**
43:21;60:24;108:3
**more (27)**
38:17;40:13;
41:19;51:9;52:14;
62:7;63:9,13;65:11;
67:10;73:15;81:13;

83:25;84:12;85:23;
87:4;89:23;90:1,3;
94:25;96:13;99:3;
101:22;103:25;
107:18,20;111:25
**morning (11)**
10:4,5,19,20;11:5,
14;19:19,21;21:4;
23:18;99:24
**MORRIS (21)**
7:22;10:9;21:15,
19,19;23:6;25:6,10;
26:2;27:11;31:21;
32:23;34:19,22,25;
36:3;37:17;38:9;
39:17,19;59:16
**most (14)**
39:25;42:16,21;
55:9,19;81:2;85:11;
87:7,20,22;88:13;
98:3,20;105:21
**motion (66)**
10:16;11:1,4,20;
15:12;18:18;23:11,
14;31:13;33:1,4,5,
19;39:20;40:19;
41:21;42:9,19;54:1;
55:11;60:4;61:18;
62:25;63:7,8;64:14,
16;71:23,25;73:10;
75:4;77:7,14,24,25;
78:1,3,12;79:22;
82:15;90:19;94:13;
95:10;96:16;97:6;
98:15,15,23,23;99:1;
100:1;101:11,14;
104:24;105:7,12;
106:15;107:3,4,6;
109:13,23;110:7;
111:17;112:18;
113:12
**motion-by-motion (1)**
108:10
**motions (7)**
28:2;39:2;64:16;
100:2;105:15;
112:16;113:8
**motivation (2)**
75:14;97:14
**motive (2)**
98:14,15
**movant (3)**
62:17;80:23;81:5
**movants (2)**
41:5;88:9
**move (9)**
11:16;36:12;
37:13;42:18;49:9;
64:8;85:16;109:8;
110:5
**moved (1)**
109:11
**moving (5)**

APP. 0128
004118

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 133 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 201 of 1017 PageID 4880
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 132 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 129 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

12:9;21:22;61:11,
12;63:20
**much (9)**
19:1;58:10;66:11;
83:24;87:21;93:21;
96:1,3;113:25
**multi (1)**
97:24
**multi- (1)**
101:20
**multiple (3)**
17:16;43:10;67:17
**multiples (1)**
43:17
**multi-strat (4)**
93:4;104:4,8,12
**multitude (1)**
15:1
**must (4)**
44:25;45:1;80:20;
83:21
**mutual (1)**
17:8
**myriad (2)**
13:4;93:7
**myself (1)**
57:23

**N**

**name (7)**
19:13,15;23:23;
30:11,13;46:24;
68:15
**narrow (1)**
57:16
**national (3)**
13:10;87:14,19
**nature (4)**
35:19;42:22;
52:24;110:1
**nauseam (1)**
61:23
**necessarily (5)**
32:25;56:4;60:25;
61:16;62:15
**necessary (3)**
50:15;105:1,2
**need (14)**
11:19;13:16;
21:17;51:19;59:4;
76:18;85:15;88:14;
101:2,15;106:4;
110:8,17;111:3
**needed (1)**
83:4
**needs (3)**
50:24;83:3;110:19
**negative (2)**
78:6;106:19
**negatives (1)**
64:10
**negotiate (2)**

113:21,22
**neither (2)**
66:11;82:15
**nerve (4)**
42:5;43:5;51:11;
58:8
**NESTOR (2)**
6:6;10:25
**neutral (4)**
64:4;65:9;68:8;
104:18
**next (25)**
15:20;20:14;
21:12;25:8;30:6,7,7,
10,15;42:1;47:6,11;
82:10;83:10,14,14;
86:16;92:13;99:17,
21;103:13,13,16,19;
107:13
**next (6)**
65:12;68:10;84:4;
85:21;90:2;110:22
**nexus (1)**
76:22
**NICHOLS (1)**
7:22
**nine (1)**
21:9
**nine-and-a-half (1)**
68:13
**nineteen (1)**
83:12
**ninety (1)**
17:5
**ninety- (1)**
92:1
**ninety-nine (1)**
14:14
**nobody (2)**
46:8;88:24
**nonaffiliates (3)**
22:17;35:14;94:4
**non-CLO (1)**
93:19
**noncustodial (1)**
15:17
**nondebtor (3)**
41:24;45:5;53:2
**nondebtor-entity (1)**
30:13
**non-Delaware (1)**
80:11
**none (3)**
23:4;82:23;109:12
**nonetheless (1)**
50:21
**nonparty (2)**
52:25;53:4
**nonpublic (2)**
86:12;92:19
**non-venue (1)**
21:2
**normal (2)**

46:4;92:16
**Northeast (1)**
84:2
**Northern (13)**
22:23;39:1;40:10;
45:23;46:5;53:1;
76:2;102:13,23;
103:1,8;108:4,5
**Nos (1)**
37:20
**note (8)**
62:1;63:25;68:12,
13,14;72:16;73:25;
82:12
**noted (1)**
63:16
**notes (1)**
45:24
**notice (4)**
41:19;49:23;
82:23;97:4
**notices (2)**
88:16,17
**notwithstanding (1)**
94:21
**number (16)**
10:14,16;43:11;
51:18;53:2;57:18;
60:11,13,16;67:20;
69:11;74:1;82:5;
83:11;108:6,7
**numbered (1)**
36:22
**Numbers (1)**
37:11
**numerous (2)**
39:2;54:19
**Nutro (4)**
44:14,15,17;45:4
**Nutro's (1)**
44:15

**O**

**object (1)**
25:6
**objected (4)**
37:3,10,12,13
**objection (20)**
12:12,15,17;
21:15;25:15;26:2;
27:11,11;32:23;
34:19;37:14,16,19;
38:2,7;39:8;40:5;
57:15;59:16;113:13
**objections (4)**
11:24;39:13;
53:25;62:22
**obligations (5)**
15:22;16:4;65:15;
91:8;92:3
**obligor (1)**
68:13

**obtain (1)**
38:19
**obvious (2)**
40:13;42:21
**Obviously (11)**
22:9;26:14;40:19;
42:24;46:24;56:6;
57:24;61:21;100:4;
101:9;111:4
**occasions (1)**
18:21
**occur (1)**
53:1
**occurred (2)**
53:12;74:4
**occurrence (1)**
45:2
**occurring (1)**
97:1
**October (2)**
13:18;29:7
**off (4)**
17:1;75:16;88:21;
103:20
**offended (2)**
74:7;75:17
**offensive (1)**
73:16
**offer (2)**
39:14;84:20
**offered (3)**
31:17;38:18;39:23
**office (14)**
20:14,21;29:1,2,2,
4,8,14,19;30:1,10;
55:18;83:15;86:5
**officed (1)**
30:6
**officer (7)**
12:24;13:3,6,25;
24:14,24;79:1
**officers (1)**
66:1
**offices (18)**
13:15;15:8;20:7,9;
29:9,11,21;30:4,19,
25,25;31:3;41:25;
42:1;52:1,2;85:13;
86:18
**Official (5)**
6:3;10:22;42:25;
43:12;109:14
**often (1)**
81:2
**of-venue (1)**
71:25
**Oklahoma (2)**
15:25;82:11
**old (2)**
26:19;110:5
**once (5)**
20:3;29:23;44:18;
73:3;110:23

**one (49)**
11:18;12:13;16:2;
21:18;22:15;28:4,
21;37:12;39:11,12;
40:3;43:16;46:23;
47:16;49:4;50:23;
52:10;56:3,8;60:15,
16;62:12,21;63:2,25;
67:16;69:24;71:18,
25;72:18,20;76:3;
77:13;80:11;82:1;
86:2;88:18;94:1;
97:5;98:2;101:21;
103:11,14,20;104:2;
109:1,11,17;111:15
**one-hundred-percent (1)**
51:13
**O'NEILL (4)**
10:4,6,6,14
**ones (3)**
36:14;59:18;105:2
**one's (1)**
68:5
**ongoing (1)**
110:1
**only (32)**
14:2;16:24;20:3;
22:7;23:11;26:20;
29:16;32:11;36:15;
49:25;50:24;51:25;
52:9;53:3,14;57:16;
66:1;72:9;73:22;
74:9;76:8;80:16;
81:11;82:4;85:7;
88:17;91:8;92:17,
25;93:13,23;109:11
**opaque (1)**
54:12
**open (1)**
61:17
**open-ended (1)**
17:8
**operandi (1)**
67:11
**operated (4)**
49:25;54:11;55:2;
57:20
**operates (1)**
79:6
**operating (3)**
22:10;88:21;112:7
**operation (2)**
65:14,20
**operational (3)**
70:2,4,6
**Operations (9)**
28:7,8;32:3;41:23;
77:4;79:2;84:24;
90:6;92:7
**opinion (11)**
60:9,11;81:4,15;
88:4;91:25,25,25;
94:12,15;99:13

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(13) much - opinion

APP. 0129
004119

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 134 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 202 of 1017 PageID 4881
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 133 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 130 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)             December 2, 2019

**opinions (14)**
41:17;49:22;
54:14,19,22;64:3;
66:17;73:25;74:16;
76:21;81:1;91:21,
23;108:7
**opportunity (2)**
11:7;112:24
**opposed (5)**
56:11;88:11;95:6;
109:12,23
**opposing (1)**
37:8
**opposite (1)**
109:15
**opposition (2)**
33:5;56:11
**options (1)**
18:7
**oral (1)**
105:7
**oranges (1)**
93:25
**order (12)**
15:14;45:6;53:19;
60:14;80:23;83:20;
97:6;99:22;105:1;
110:8,9;113:17
**orders (1)**
17:19
**ordinary (3)**
79:7,11;101:18
**ordinary-course (5)**
95:10;96:17;
101:14;112:4,18
**organization (1)**
51:22
**organizational (5)**
25:13;27:23;
31:19;32:3;91:17
**organized (4)**
14:11,13;70:25;
99:9
**others (4)**
14:4;50:12;53:3;
59:9
**otherwise (4)**
84:3;96:8;104:17;
106:17
**out (22)**
11:4;18:18;29:13;
41:10;43:3;46:13;
51:9;52:19,19;
53:24;54:13;56:19;
64:5;72:17;83:23,
23;88:24;90:8;
108:19;110:12,13;
111:8
**outcome (3)**
18:9;45:11;63:18
**outlined (1)**
40:4
**out-of-court (1)**

39:22
**outside (2)**
30:19,25
**outstanding (1)**
17:12
**over (26)**
13:2;14:14,19,24;
15:18;17:2,4;18:17;
20:9;29:13;41:6;
44:5;60:24;74:18,
19;77:10;78:7;
79:15;90:2;92:12;
95:14;103:17;
108:12;110:22;
112:3;113:13
**overall (1)**
51:22
**overblown (1)**
77:5
**overcome (2)**
83:20;106:14
**overnight (1)**
52:16
**overrule (1)**
40:5
**overruled (4)**
25:15;26:3;27:13;
35:4
**oversecured (2)**
68:7;100:21
**oversee (2)**
65:7;79:1
**overseeing (1)**
46:25
**overstated (1)**
91:13
**overturn (2)**
44:11;79:22
**overturned (1)**
45:6
**owed (3)**
15:25;43:14,16
**owes (1)**
15:21
**own (6)**
14:20;36:1;43:1;
53:11;66:1;95:12
**owned (2)**
44:15;80:7
**owner (1)**
51:14
**ownership (1)**
80:14
**owns (6)**
14:17;15:10;25:4,
16,20;91:17

**P**

**PA (1)**
6:9
**Pachulski (8)**
10:6;11:15;13:14,

21;21:19;75:22;
111:5,14
**pages (4)**
74:16,18;88:9;
96:2
**paid (9)**
70:7;89:7;98:6;
99:22;111:12;
112:14,14,20;113:2
**painstaking (1)**
77:8
**painted (1)**
63:2
**paper (1)**
100:16
**papers (10)**
42:23;44:9;51:6,9;
52:19;53:24;55:9;
61:11,12;95:20
**pare (1)**
77:15
**Parking's (1)**
52:15
**part (7)**
22:22;50:8;65:18;
69:12;91:15,16;
112:17
**parte (1)**
69:8
**participate (1)**
89:13
**particular (8)**
45:9;47:11;49:4,6;
51:8;64:16;94:10;
106:7
**particularly (5)**
43:6;86:22;
107:10,16;110:1
**parties (15)**
14:22;15:7;16:17;
21:22;51:10;56:22;
64:9;67:17;78:9;
80:24;82:7;84:6;
92:21;108:13;
110:18
**Partner (9)**
9:5;14:12;24:19,
21;25:4,17;51:14;
80:8,9
**partnership (2)**
14:11;55:21
**partnerships (2)**
14:15;100:11
**parts (2)**
22:15;105:18
**party (5)**
16:16;18:23;
23:10;55:7,12
**party-in-interest (1)**
42:23
**Pass (2)**
23:2;35:24
**past (8)**

35:2;50:20;51:19;
55:14;58:10,18;
70:24;111:22
**PATEL (27)**
8:19;36:9,15,18,
22,24;37:2,5,8,23;
38:1;59:15;60:2,3,
20,23;62:10;71:4,8,
11,13,16,18,21;73:7,
15;102:5
**PATRICK (2)**
6:23;83:6
**Pause (1)**
12:8
**pay (2)**
111:10,11
**paying (1)**
17:1
**payment (1)**
101:3
**PC (2)**
8:7,17
**pending (14)**
15:13,15;17:17,
19;43:22;52:8;
72:23;80:19;83:7,10,
14;88:15;90:4;108:3
**Penny (2)**
10:24;19:19
**pension (1)**
89:10
**people (7)**
30:22;32:8;52:12;
86:4,17;87:19;109:2
**percent (8)**
14:14;17:3,6;
25:20;80:7;92:2,11,
17
**Perfect (1)**
60:1
**perhaps (8)**
42:21;47:8;52:16;
63:18;69:16;70:4;
103:7;106:8
**period (2)**
26:19;111:10
**person (2)**
85:8;90:20
**personal-services (1)**
54:23
**personnel (3)**
15:8;51:16;85:6
**perspective (6)**
49:3,17;50:17;
70:15,16;72:16
**petition (7)**
16:1,20;17:20;
18:24;21:10;22:8;
82:18
**PetroCap (1)**
93:6
**ph (3)**
44:14;48:17;56:4

**Philly (1)**
109:2
**phone (1)**
46:11
**phrase (1)**
65:25
**physically (1)**
13:11
**pick (1)**
46:11
**piece (4)**
65:14,22;66:6;
104:1
**pieces (1)**
36:10
**pillars (1)**
112:21
**place (6)**
34:2;64:8;89:12;
110:3,9;113:24
**places (4)**
41:25;53:17,20;
80:3
**plan (13)**
17:21;44:1,12,13;
60:12,21;69:10,10;
70:11;74:5;76:8;
91:16,24
**planes (2)**
52:13;109:2
**play (1)**
104:22
**players (1)**
108:8
**playing (1)**
104:14
**pleadings (1)**
73:17
**Please (14)**
10:3;19:8,10,13;
23:16,18,21,23;24:3,
4;36:25;49:10;
75:10;105:10
**ploy (1)**
78:14
**pm (4)**
75:8;105:8,8;
114:3
**podium (2)**
10:17;93:13
**point (29)**
34:14;35:2;38:18;
44:7;49:11;52:19;
54:10,13;55:3,23;
56:21;57:17;60:12;
62:12,21;76:3;86:3,
17;87:6;93:10;
94:11;95:18;96:4;
97:21;101:19;102:7;
103:11;109:9;113:3
**pointed (2)**
64:5;77:18
**points (5)**

APP. 0130
004120

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 135 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 203 of 1017 PageID 4882
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 134 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 131 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

73:16;75:24;87:7;
99:10;107:20
**Pomerantz (23)**
10:9;11:14,15,23,
25;12:3,5,11,22;
59:11;75:14,21,22;
88:3,6;89:15,19,22;
90:25;99:3,6;
101:20;102:8
**pool (1)**
47:16
**pop (1)**
100:18
**poring (1)**
74:17
**portfolio (7)**
25:25;26:5,6,7,8;
51:12;92:9
**portion (1)**
17:2
**POSIN (1)**
7:19
**position (4)**
68:6;95:13;96:3;
109:22
**positions (1)**
92:19
**possibility (2)**
45:2,8
**possible (1)**
110:10
**possibly (1)**
61:16
**post- (1)**
18:23
**Post-bankruptcy (2)**
27:10,15
**post-confirmation (1)**
94:12
**post-petition (3)**
22:8;79:17;84:18
**potentially (1)**
55:16
**POTTER (1)**
8:2
**power (1)**
27:17
**powers (2)**
79:1;98:17
**practice (14)**
13:10;46:18;73:2,
3,6,7;85:14;87:15,
19;88:1;89:5;
102:14;105:17;
106:20
**practiced (1)**
102:14
**pre- (1)**
22:7
**preceded (1)**
83:9
**predetermination (2)**
54:7,8

**predetermine (1)**
44:3
**predominant (1)**
108:23
**preference (1)**
106:8
**pre-judge (1)**
101:5
**prejudice (2)**
54:6,8
**prejudicial (1)**
97:17
**preliminary (1)**
69:9
**prepared (4)**
38:3,3;75:23;
105:12
**pre-petition (2)**
78:24;83:7
**preponderance (4)**
61:22;62:18;
107:4;110:6
**Pres (1)**
9:7
**presen (1)**
60:15
**PRESENT (1)**
9:2
**presentation (3)**
60:17;77:6;98:14
**presented (1)**
50:19
**presents (2)**
42:12;59:1
**preside (1)**
79:15
**president (5)**
12:25;25:1,19;
26:10,13
**presumption (5)**
83:20;105:22;
106:10,14;107:5
**pretext (1)**
78:10
**pretty (1)**
93:21
**previous (3)**
79:18;87:8;109:10
**previously (4)**
16:5;34:10;56:13;
68:14
**primarily (3)**
22:21;84:6;102:14
**primary (2)**
94:15;97:9
**prime (2)**
15:18,23
**principal (4)**
15:16,24;50:12;
110:3
**principals (1)**
13:20
**prior (11)**

13:18,19;18:2;
21:13;32:21;43:25;
62:2;64:3;92:23;
97:15;110:11
**private (4)**
16:11;17:7;86:13;
91:5
**Private-equity (3)**
28:17;92:20;93:5
**privilege (1)**
73:20
**proactively (1)**
78:25
**probability (2)**
44:4;47:14
**probably (7)**
40:14;57:3;61:12;
64:4,16;65:6;71:4
**probative (1)**
38:17
**problem (2)**
111:5;113:6
**problematic (1)**
106:23
**procedurally (1)**
33:14
**procedures (2)**
46:4;89:12
**proceed (11)**
10:15;11:6,8,11;
12:20;21:6;22:2;
24:6;41:11;78:15;
100:7
**proceeding (11)**
42:22;45:14;
46:25;49:6,19;
50:10;51:2;58:16;
83:9;90:23;107:21
**proceedings (3)**
15:15;102:22;
114:3
**process (5)**
16:25;27:5;58:17;
81:18;106:12
**produced (1)**
96:21
**professional (3)**
13:2;112:19,20
**professionals (8)**
50:25;52:18;
82:21,22;87:12,14;
111:5;113:5
**proffer (15)**
11:6;12:21;18:25;
22:11,13;30:18;
31:16,22,25;33:10,
11;41:22;42:6;
44:10;53:7
**proffered (1)**
75:1
**promise (2)**
34:3;61:1
**promoted (2)**

24:14;26:10
**promotion (1)**
26:12
**proof (3)**
61:22;62:16,17
**proofs (1)**
89:11
**proper (5)**
39:8;44:10;78:13;
80:2,21
**proponent (1)**
38:19
**proposed (3)**
10:22;12:24;20:23
**proprietary (3)**
14:21;65:3,6
**propriety (1)**
84:18
**prosecuted (1)**
98:4
**protecting (1)**
71:1
**protocol (1)**
79:4
**protocols (5)**
18:18;96:17;
112:2,5,17
**provide (8)**
18:14;49:24;53:7;
67:8;84:15;86:24;
92:22;93:16
**provided (7)**
16:5;18:15;34:10;
36:11;66:21;92:21;
96:20
**provides (5)**
15:2;17:3;35:14;
38:13;91:18
**providing (2)**
39:3;67:6
**provision (4)**
22:11,16;94:16,20
**provisions (1)**
94:14
**proximity (3)**
82:1;84:4;85:21
**prudent (1)**
100:6
**public (3)**
39:6;86:11;92:18
**Public-relations (1)**
28:15
**published (5)**
41:17;43:24;
54:14,19,22
**Puerto (1)**
46:25
**purely (1)**
93:21
**purportedly (1)**
48:10
**purposes (3)**
40:20,23;62:14

**pursing (1)**
17:25
**pursuant (3)**
16:6;64:8;66:22
**pursue (1)**
84:18
**put (16)**
17:21;31:13,15;
33:3,4,6,22;38:25;
40:9;43:24;49:3;
68:8;95:5,13;
101:11;113:20
**PWS (1)**
81:15

## Q

**qualify (1)**
35:3
**quick (6)**
62:12,21;63:25;
73:16;91:11;103:11
**quickly (6)**
61:19;73:1;75:15;
99:10;110:10,23
**quite (2)**
50:10;104:11

## R

**Raise (2)**
19:11;23:21
**raised (3)**
54:1;75:25;111:19
**RAKHEE (2)**
8:19;60:3
**random (4)**
46:4;47:13;
102:12,16
**randomly (2)**
46:19,21
**rate (1)**
94:9
**rather (6)**
78:13;87:3;98:22;
104:15;110:20,23
**re (4)**
13:6,7,8,8
**read (5)**
61:12;64:2;73:16;
91:23;94:15
**ready (1)**
113:22
**Real (11)**
32:17;52:20;
62:15;67:6;76:22;
77:2,21;89:8;92:6;
97:14;108:17
**real-estate (3)**
17:8;86:7,22
**reality (5)**
63:5;88:2;89:4;
105:16;106:20

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(15) Pomerantz - reality

APP. 0131
Appx 00178
004121

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 136 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 204 of 1017 PageID 4883
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 135 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 132 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                December 2, 2019

**realized (1)**
40:18
**really (35)**
33:25;48:3;62:2,
19;63:1,8,20;64:3,
10,15;65:5,9,11;
67:13;68:8;69:22;
70:2;73:12;76:12;
77:6,20;87:23,25;
90:1;95:22,24;96:9;
104:11;105:16,18;
106:11;107:21;
108:18;111:5;
112:20
**reason (9)**
22:23;39:7;70:8;
77:12,21;78:13;
87:3;97:1,20
**reasonable (1)**
38:19
**reasoned (2)**
81:21;83:19
**reasons (8)**
11:3;39:13;47:18;
75:1;87:8;98:25;
111:19;113:19
**rebuts (1)**
32:2
**rebuttal (4)**
25:7;31:16;42:6;
50:11
**rebutted (2)**
42:2,10
**rebutting (3)**
25:8;33:6,21
**recall (3)**
26:7;30:20;34:15
**received (3)**
12:19;37:21;40:22
**receives (1)**
14:25
**recess (6)**
41:4,6,8;75:6,8;
105:8
**recognized (1)**
78:23
**recognizes (1)**
50:18
**recommendation (2)**
94:7,8
**recommended (1)**
26:12
**record (29)**
19:14;23:24;25:7;
39:6;41:2,16,17,19;
42:7,8;43:24;46:15;
49:16,24,25;51:2;
54:13;59:12;60:2;
74:18;82:13;90:18,
23;93:22;96:1,5,7;
99:15;113:19
**records (1)**
14:6

**record's (1)**
41:3
**recusal (1)**
48:24
**red (2)**
58:14;99:18
**Redeemer (4)**
7:8,23;83:6,9
**redirect (1)**
23:4
**reduce (1)**
92:12
**reducing (1)**
22:22
**refer (3)**
11:18,19;64:23
**reference (6)**
43:14,15;60:4,15;
62:14;82:11
**referenced (6)**
36:9;61:20;66:17;
68:3;69:25;70:24
**references (1)**
68:18
**referred (4)**
44:10;52:6;54:18;
101:20
**reflect (4)**
88:1;93:22;
105:16,18
**regard (6)**
18:8;34:7;40:7,19;
90:20;109:13
**regarding (11)**
18:23;22:11;38:8;
55:5;56:21;78:6;
84:23;94:14;99:17;
100:4,24
**regional (1)**
86:8
**registered (1)**
15:5
**Reid (6)**
10:24;19:7,19,19;
20:2;21:1
**relate (1)**
112:6
**related (11)**
14:22;15:7;31:19;
44:9;65:19;72:25;
76:11;80:12;83:1;
85:21;94:22
**relationship (4)**
18:2;64:2;77:1;
92:4
**relative (1)**
49:14
**relatively (2)**
66:24;71:23
**Relevance (7)**
38:9;39:9;40:8,8;
50:21;53:12;91:15
**relevant (13)**

34:20;39:22;40:9,
10;57:14,21;76:13;
88:8;92:25;94:10;
95:23;96:11;99:20
**reliability (1)**
40:7
**relied (1)**
77:11
**relief (2)**
52:9;84:22
**rely (4)**
41:14;80:10,22;
95:24
**remain (3)**
19:9;23:17;24:4
**remaining (1)**
77:1
**remarks (2)**
57:14;75:24
**remember (5)**
22:4,12;24:22;
25:18;30:8
**remind (1)**
100:3
**remiss (1)**
101:13
**remote (1)**
45:9
**remotely (1)**
61:16
**rendered (1)**
17:14
**reorganization (3)**
44:12;84:9;109:7
**repeat (3)**
57:22;61:10;102:6
**repeated (1)**
67:15
**repeating (1)**
61:13
**replies (1)**
62:23
**reply (5)**
31:24;39:16;
42:20;54:13;99:7
**report (8)**
20:23;26:15,22,
25;27:10,15;28:21;
97:7
**reported (2)**
26:20;84:11
**reporting (1)**
97:2
**reports (3)**
28:25;58:4,7
**represent (2)**
66:8;92:11
**representative (3)**
15:13;82:3;84:13
**representatives (2)**
84:16;85:9
**represented (3)**
37:15;43:12;63:6

**representing (2)**
10:10;63:1
**reprimand (1)**
31:11
**request (2)**
43:2;98:25
**requested (2)**
14:8;84:22
**requesting (1)**
38:21
**require (1)**
50:15
**required (3)**
48:23,23;84:15
**requirement (1)**
76:4
**reserve (1)**
21:1
**reserved (2)**
21:24;33:11
**residual (1)**
38:12
**resignation (1)**
66:3
**Resources (5)**
28:8;45:4,11;52:5;
103:4
**respect (43)**
16:22;17:25;18:3;
20:19;22:9;38:3,3;
41:20,22;42:8;
49:21;53:19;54:5;
57:21;58:24;59:5;
63:8,13;64:1,4,11;
65:8;66:12,14,18;
67:6,22,23,24;68:6,
6,8,19;70:17,19;
72:14;83:22;86:22;
94:13;102:8;103:12;
104:10,17
**respectfully (2)**
59:1;98:25
**respond (1)**
40:1
**responding (1)**
108:1
**responses (1)**
62:22
**responsibility (2)**
17:25;97:9
**rest (1)**
113:4
**restaurant (2)**
89:22;99:12
**Restaurants (3)**
81:4;83:19;89:16
**restructure (6)**
18:11;70:4,7;
104:23;105:2,3
**restructuring (11)**
12:24;13:2,3,5,25;
18:1;70:2;79:1;87:2,
4;92:22

**result (5)**
45:6;53:17,19;
91:16;109:5
**retail (2)**
17:8;28:8
**retain (3)**
13:16;88:14;
111:10
**retained (3)**
84:7;85:17;113:5
**retaining (1)**
112:19
**retention (3)**
21:12;68:20;
113:11
**retire (1)**
47:5
**retreads (1)**
87:8
**return (1)**
44:12
**returned (1)**
44:16
**revenue (5)**
17:4,6;65:18,19;
92:12
**revenues (2)**
17:2;92:18
**reversed (1)**
74:15
**review (2)**
50:16,24
**reviewed (2)**
34:12,14
**reviewing (1)**
14:5
**Rican (1)**
46:25
**right (71)**
12:16,20;19:1,11;
21:24;22:8,17,20;
23:7,15,21;24:12,17,
19;25:2,5,20;26:1,
11,15,20,23;27:2,10,
18;28:2,8,13,17;
29:1,8,11,14,21;
30:1,4,23,24;31:3,6,
9,10;32:7,13;33:12,
13,21;34:5,12;35:14;
36:4,23;37:14;40:5;
41:1,3;47:16;48:14;
71:16;75:5,20;88:5;
92:17;101:10;105:5,
7,21;110:11,12;
113:11;114:2
**rights (2)**
21:1;109:7
**Rio (1)**
15:9
**rise (3)**
10:2;75:9;105:9
**risk-management (3)**
28:24,25;30:5

APP. 0132

004122

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 137 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 205 of 1017 PageID 4884
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 136 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 133 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.

Case No. 19-12239(CSS)                                                    December 2, 2019

**robe** (1)
75:16
**rocket** (1)
67:6
**ROGGE** (1)
8:7
**role** (2)
13:25;85:18
**ROME** (2)
6:14;59:13
**room** (1)
86:25
**ROSENTHAL** (1)
7:4
**ROTH** (1)
8:12
**routinely** (1)
87:15
**Rule** (13)
38:12,13;39:6,7;
44:1,4;46:16;52:25;
73:8;78:3,12;
105:12;111:16
**ruled** (3)
56:13;94:20;
113:14
**rules** (6)
48:1;90:17;
100:24,25;101:5;
108:14
**ruling** (4)
45:12;56:21;
60:16;112:23
**rulings** (4)
56:6,7;62:2;74:9
**run** (5)
32:4;51:15;78:11;
99:9;107:24
**run-up** (1)
58:12
**RYAN** (1)
8:4

**S**

**sales** (1)
70:1
**Same** (8)
27:11;29:6,9;50:3,
12;91:9;93:21;
104:25
**satisfying** (1)
98:12
**save** (2)
59:18;110:20
**saying** (6)
40:18,19;70:12;
76:14;83:24;96:1
**scattered** (2)
108:25,25
**scenario** (3)
72:3;74:9,15
**schedules** (2)

43:7;69:21
**SCHULTE** (1)
8:12
**science** (1)
67:6
**scope** (4)
21:15,21;27:12;
32:23
**scorecard** (1)
62:3
**scrutiny** (1)
96:14
**seal** (1)
11:19
**SEAN** (2)
6:4;10:25
**seated** (5)
10:3;24:3;41:9;
75:10;105:10
**SEC** (1)
67:2
**Second** (7)
43:21;44:15;
54:12;55:6;69:8;
76:7;107:11
**secured** (6)
15:23,24;68:4;
82:9,12,14
**Securities** (3)
7:14;15:23;92:19
**seeing** (1)
107:19
**seek** (2)
94:13;95:11
**seeking** (3)
25:10;44:11;45:3
**seeks** (1)
53:16
**seems** (2)
45:21;55:19
**sees** (1)
74:11
**send** (1)
110:25
**senior** (2)
13:20;24:12
**sense** (3)
33:17;46:21;64:19
**sent** (3)
55:10;57:3;74:2
**Seoul** (1)
15:9
**separate** (3)
65:21,22;85:15
**separateness** (1)
98:9
**series** (2)
77:11;109:24
**serves** (2)
16:23;17:23
**service** (1)
92:21
**services** (26)

15:3;16:3,6;17:13;
22:12,16,16;34:9,9,
17;35:19,21;54:15;
65:13;66:7,10,15,16,
19,22;67:4;86:12;
91:4,19;92:14;93:19
**set** (6)
18:18;39:3;42:12;
68:3,20;113:19
**sets** (1)
80:22
**setting** (2)
62:13;112:21
**seven** (3)
35:13;82:18;
103:17
**seventy** (1)
29:13
**several** (6)
26:6;49:22;51:22;
53:22;91:21;110:22
**Shannon** (2)
13:7,8
**shared** (12)
15:3;16:6;18:21;
22:12,16;34:9;
35:21;66:7,16,19;
67:4;86:12
**shared-** (1)
34:16
**shared-service** (4)
16:10,15;93:11,17
**shared-services** (5)
34:12;35:12;
66:23,24;94:4
**SHARP** (32)
9:7;10:12;11:25;
12:23;19:8,15,22;
20:3;21:9;27:10,17;
31:17;41:22;44:10;
50:6,11;53:6,15;
54:17;78:25;79:3;
84:7,9,17,21;85:1;
93:16;94:2,7;95:3;
97:1;113:1
**S-H-A-R-P** (1)
19:16
**Sharp's** (4)
18:25;42:10;50:5;
84:13
**SHAW** (21)
8:9;21:4,4,6,8;
22:3,4;23:2;32:17,
19,24;33:2,9,20,23;
34:3,6,20;35:24;
61:8;63:11
**sheer** (1)
95:24
**sheet** (2)
18:12;93:7
**shifts** (1)
62:18
**shopping** (2)

56:11;106:19
**short** (6)
11:6;41:4,6;58:14;
75:5,6
**shortly** (3)
45:4;66:3,4
**shot** (4)
33:17;98:23,24;
109:6
**show** (1)
77:4
**showed** (1)
57:17
**shown** (1)
55:14
**shows** (2)
53:11;57:17
**shrink** (1)
17:4
**sic** (13)
25:13;41:16;42:9,
20;43:13;47:23;
49:19;59:11;60:8;
68:21;75:23;96:6;
101:23
**side** (3)
62:1;64:11;109:17
**sides** (2)
56:5;64:5
**Sidley** (3)
10:21;41:13;113:4
**sign** (1)
113:13
**signed** (4)
63:17,18;110:9;
113:23
**significant** (22)
43:7,19;57:18;
63:21;70:3,8,9,16;
74:20;78:20;80:17;
85:1;86:8,17;97:21;
98:3;102:20;103:22;
104:1,21;109:13,18
**significantly** (4)
22:10;77:5;85:18;
96:22
**silence** (1)
109:17
**silent** (1)
109:13
**silly** (1)
88:12
**similar** (3)
35:23;54:20;104:2
**similarly** (5)
71:24;78:15;81:7;
85:17;104:17
**simpler** (1)
113:18
**simply** (9)
46:10;54:10;63:4;
84:2;100:8,15;
103:19;109:12;

112:19
**Singapore** (8)
15:9,11;20:18,20;
86:15;93:5;104:4,7
**single** (5)
26:7;42:22;43:16;
72:18;99:15
**single-asset** (1)
86:7
**sit** (5)
32:5;33:25;45:19;
59:8;101:25
**sits** (4)
34:23;35:1;83:23,
23
**sitting** (1)
100:20
**situated** (2)
71:24;104:18
**situation** (4)
48:4,10;51:8;
108:17
**situations** (1)
49:3
**six** (6)
27:22;56:8;81:2;
84:24;107:12;
111:23
**sliver** (1)
92:24
**small** (2)
86:7;92:24
**smart** (2)
89:18;100:5
**sole** (2)
26:7;55:7
**solution** (1)
109:6
**somebody** (1)
47:21
**somehow** (4)
73:18;74:8;
105:22;106:22
**someone** (1)
75:12
**someone's** (1)
48:3
**sometimes** (1)
73:10
**somewhat** (1)
104:2
**soon** (2)
110:9;113:22
**sophisticated** (3)
14:18;91:7;105:25
**sorry** (11)
12:3,13;41:9;
45:23;46:1;60:9;
71:4,11;73:23;
89:19;103:9
**sort** (16)
46:16;48:25;55:4;
62:16;63:21;65:4;

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 138 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 206 of 1017 PageID 4885
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 137 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 134 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

67:8,12;68:8,18;
70:21,22;73:11;74:5,
14;77:7
**sought (1)**
18:19
**sources (1)**
15:1
**South (2)**
14:22;15:11
**speak (1)**
35:22
**SPEAKER (4)**
19:3,5;41:7;
109:20
**speaking (1)**
91:1
**special (2)**
46:8;95:12
**specialist (1)**
27:6
**Specialists (3)**
9:7,9;12:25
**specific (8)**
40:19;73:8;90:19,
23;96:4,5;104:15;
107:20
**specifically (1)**
35:10
**specifics (1)**
54:25
**speculating (1)**
45:1
**speed (2)**
49:15;91:12
**spell (2)**
19:13;23:23
**spend (4)**
54:11,12;58:22;
90:1
**spent (4)**
14:4;76:22;88:9;
103:3
**sponte (1)**
69:7
**stack (5)**
63:22;68:2,10;
69:12,14
**stacks (1)**
60:6
**staff (2)**
103:8,9
**staff's (1)**
74:17
**Stamford (1)**
83:18
**stand (6)**
19:9,10;23:13,16;
48:9;63:11
**standard (4)**
35:20;80:23;
81:24;110:6
**standards (1)**
87:24

**standing (4)**
19:9;23:17;31:8;
61:3
**standpoint (1)**
106:23
**Stang (6)**
10:6;11:15;13:14,
21;21:19;75:22
**STARGATT (1)**
6:2
**start (5)**
41:4;50:15;78:23;
97:11;113:23
**started (3)**
24:12;29:8;76:14
**State (11)**
15:25;19:13;
23:23;64:6;70:25;
71:5,10;81:16,17,18;
95:6
**stated (2)**
40:23;81:7
**statement (7)**
38:13,14,17;
39:22;76:1;102:9,11
**statements (5)**
43:8;84:1;90:7,7;
104:6
**States (4)**
14:22;15:16;
30:20;86:14
**state's (1)**
71:8
**status (2)**
52:10;53:13
**statute (1)**
64:12
**statutory (1)**
79:24
**stay (2)**
19:23;111:6
**stayed (1)**
109:13
**stemmed (1)**
72:17
**step (4)**
19:10;23:7;36:5;
106:21
**steps (1)**
55:18
**stick (2)**
33:21;108:14
**still (8)**
26:22;32:4;50:8;
57:19;58:6;66:11;
69:19;97:2
**stock (1)**
86:11
**stood (1)**
93:20
**Stoops (1)**
31:6
**Strand (7)**

14:12,13;25:5,17,
20;51:14;80:8
**Strand's (1)**
51:14
**strategic (1)**
18:7
**strategy (1)**
101:21
**strayed (2)**
77:7,12
**stress (1)**
95:20
**strike (1)**
51:4
**strikes (1)**
74:11
**striking (1)**
109:10
**strong (3)**
47:19;56:23;
83:20;105:22;
106:10;107:5
**stronger (1)**
57:5
**strongly (2)**
81:6,20
**structure (15)**
16:10;25:14;
31:19;32:3;54:12;
64:12;66:20;67:13;
80:14;91:17;95:4,4,
15;97:3;100:21
**structured (1)**
92:9
**structured-credit (1)**
103:15
**stuck (1)**
109:3
**study (1)**
91:11
**stuff (4)**
67:1,5;92:2;
111:24
**sua (1)**
69:7
**subadvises (1)**
16:24
**subadvisory (12)**
16:6,10,15;22:12,
16;34:9,13,17;35:12;
54:16;66:23,25
**subcontracted (1)**
54:15
**subject (9)**
11:19;17:16,23;
44:18,19;46:3;79:4;
103:22;111:8
**submanager (1)**
16:5
**submit (6)**
66:13;74:24;
81:23;103:25;104:4;
113:17

**submitted (1)**
28:2
**subpieces (1)**
66:8
**sub-plans (1)**
74:6
**subpoenaed (1)**
85:25
**subscribe (1)**
81:8
**subset (1)**
50:4
**subsidiary (2)**
30:25;31:1
**substantial (4)**
17:11;81:9;84:23;
96:21
**substantially (3)**
18:14;83:21;85:23
**substantive (1)**
73:13
**subsumed (1)**
62:16
**subtopics (1)**
64:21
**succeed (1)**
98:4
**succeeded (2)**
76:10;87:20
**success (1)**
78:16
**successful (3)**
44:21;105:1,3
**sufficient (2)**
38:14;39:2
**suggested (1)**
100:19
**suite (3)**
108:20;110:2;
113:8
**suited (1)**
65:7
**suites (1)**
107:15
**sum (1)**
58:23
**summarize (1)**
66:20
**support (13)**
33:4;46:16;52:3;
53:24;56:21;59:9;
77:13;81:25;82:7;
84:22;87:22;98:7;
100:1
**supported (4)**
38:14;42:25;57:2;
99:14
**supporters (1)**
41:5
**supporting (6)**
17:19;42:23;
55:12;77:9;99:15,16
**supports (4)**

38:23;43:18;
51:10;98:8
**suppose (1)**
44:3
**supposed (1)**
25:7
**sure (9)**
25:11;27:21;
34:14;56:12;57:9;
58:25;68:23;82:21;
91:22
**surprising (1)**
43:2
**surrounding (2)**
79:8;93:4
**survive (1)**
94:20
**survived (1)**
94:17
**switch (1)**
59:25
**switching (1)**
106:17

---

**T**

**table (3)**
10:8;62:13;79:10
**talk (7)**
21:18;42:17,19;
46:10,11;64:21;
101:13
**talked (1)**
53:18
**talking (5)**
40:17;55:22;
88:10;101:1,4
**tangentially (2)**
40:9;61:17
**targeted (1)**
15:10
**tasked (1)**
112:1
**tax (1)**
28:7
**TAYLOR (1)**
6:2
**team (23)**
14:8;20:7,14,16,
16,18;28:6,10,13,15,
17,19,24,25,25;
29:21;30:5;31:5;
32:8;50:13;61:11;
111:23;112:8
**teams (2)**
28:4,10
**teasing (1)**
46:13
**technicalities (1)**
22:1
**technology (1)**
88:7
**TELEPHONICALLY (8)**

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(18) sought - TELEPHONICALLY

APP. 0134

004124

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 139 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 207 of 1017 PageID 4886
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 138 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 135 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

6:22,23;7:15,16,
17,18,19;8:14
**telling (2)**
60:6;70:17
**template (4)**
35:20;67:14,23;
93:20
**ten (4)**
17:3;72:18;92:11,
17
**tenet (2)**
62:7;81:16
**terminate (4)**
17:24;27:2,17;
97:3
**terminated (1)**
16:7
**terminates (1)**
97:4
**terms (8)**
43:9;54:24;57:25;
101:3,10;102:12;
103:24;112:22
**TERRI (1)**
7:10
**Terry (3)**
17:22;44:13;83:1
**test (3)**
62:7;80:23;105:18
**testified (8)**
22:11;27:3;34:22,
25;50:10,11;85:2;
93:17
**testify (42)**
12:1,1,23,23;13:1,
5,10,13,17,20,23;
14:3,6,10,14,17,24;
15:2,6,10,12,15,21;
16:2,9,13,20;17:5,
10,14,18,23;18:4,13,
16,19,22;23:13;53:6;
84:12;85:5,8
**testimonies (1)**
55:7
**testimony (22)**
18:14,25;42:2,10;
50:5;53:8;57:17;
58:4,6;84:13,15,21;
90:22;93:13,14,16;
95:2,2,21,23;101:8;
104:9
**Texas (59)**
11:3;17:18,20;
18:3;22:24;29:1,3,6,
12;32:4;39:1;40:10;
43:1;45:14,23;46:5,
9,17;51:21;53:1;
56:6,8;57:2,3;63:9,
10,11,17;70:13,18;
72:4,9;73:6;76:2;
82:19,25;85:3,7,23,
25;86:4,4,5;87:3,11,
13;89:25;90:3,4;

98:20,24;102:13,23;
103:1,8;107:12;
108:4,5;109:8
**Texas-based (2)**
89:17,22
**thankfully (1)**
57:3
**that'll (2)**
94:9;113:20
**theoretically (1)**
27:8
**theories (1)**
78:18
**therefore (5)**
44:16;45:7;57:20,
24;67:24
**thinking (3)**
65:7;67:1;111:6
**third (5)**
16:17;44:7;53:14;
69:8;92:21
**thirty (1)**
43:14
**though (4)**
49:2;57:5;65:11;
98:16
**thought (3)**
23:15;55:4;109:18
**thousand (1)**
51:23
**three (13)**
24:21,23;32:5;
46:23;53:12;62:3,3,
7;65:2;72:22,23;
74:6;77:10
**throughout (4)**
67:15;69:2;86:14;
100:14
**throw (1)**
56:19
**thrown (1)**
67:20
**thus (1)**
96:17
**tie (1)**
110:2
**times (1)**
87:25
**title (3)**
24:17,19;25:18
**today (27)**
10:7,15,23;15:13;
18:19;24:17;33:11;
34:7;35:1;45:19;
48:9;58:19;61:6;
68:21;75:13;82:20;
85:6,11,19;89:6;
94:24;101:10;
110:18,19,20;
111:16;112:9
**today's (1)**
84:20
**told (3)**

69:18;77:21,25
**took (2)**
85:18;98:23
**top (2)**
83:5;100:21
**top-twenty (1)**
50:24
**total (1)**
17:13
**totality (1)**
38:15
**touch (4)**
53:25;57:12;73:1,
15
**touching (1)**
61:19
**tough (1)**
52:15
**trades (1)**
67:2
**trading (6)**
28:19,25;65:3,4,6;
92:18
**traditional (3)**
21:16,22;53:23
**transaction (1)**
101:21
**transactions (8)**
18:1;58:11;69:12;
79:4;84:18;101:17;
112:4,5
**transfer (47)**
11:2;39:10;42:13,
25;43:2;51:10;52:4,
7;53:24;55:11;
56:23;59:2;61:18;
62:11,15,63:20;64:8,
16,16;68:24,25;69:4;
71:23;73:10;76:5;
78:13;80:24;81:6,20,
25;82:8,16;83:21,21;
90:13;95:19;98:8,
19;102:21;103:23;
104:24;105:12,15;
106:16;107:3;
109:11;110:9
**transfer- (1)**
71:24
**transferee (1)**
39:10
**transfer-of-venue (1)**
77:14
**transferred (16)**
13:15;40:11;
45:22;47:20;68:12,
15;72:18;74:22,25;
76:5;77:17;85:20;
102:25;103:5;
110:24;113:19
**transferring (2)**
51:5;97:13
**transfers (3)**
69:12;87:22;92:4

**transition (1)**
26:19
**transparency (2)**
79:5;101:17
**transparent (3)**
18:19;78:14;79:11
**transpired (1)**
63:13
**trash (1)**
37:2
**travel (7)**
13:12,13;53:15;
83:3;85:3,10;88:8
**treasurer (1)**
66:2
**tremendous (4)**
49:16;54:5;108:6;
111:22
**trial (1)**
60:11
**trials (1)**
108:7
**tries (1)**
57:15
**trip (1)**
52:16
**trouble (2)**
88:25;113:21
**true (10)**
22:19,19;28:19,
22;29:19;30:11;
85:14;89:10;97:23;
100:15
**truly (1)**
51:7
**trustee (9)**
13:3;66:5;77:24;
78:1,11;96:11,13;
98:19,22
**Trustee's (1)**
97:6
**trustworthiness (1)**
38:15
**trustworthy (1)**
38:25
**truth (1)**
39:23
**try (2)**
24:3;60:25
**trying (8)**
45:10;48:9;54:2,3;
75:11,12;96:6;
101:16
**TUNNELL (1)**
7:22
**turn (3)**
18:10;41:5;68:17
**turning (2)**
68:2;107:5
**twenty (5)**
51:19;57:4;69:19;
82:18;83:5
**twenty-five (1)**

13:2
**two (28)**
17:19;47:7,24;
53:12;62:4;65:12;
66:1,22;68:4,7;
69:17;72:2,24;
73:10;78:18;82:9,20,
25;83:5;88:9,17;
93:23,24;97:22;
101:7;103:17;
108:18,23
**two-and-a- (1)**
14:24
**Twomey (1)**
10:23
**type (8)**
54:3,3;67:5;91:1;
93:17,18;101:4,16
**types (2)**
16:11;89:13
**typical (3)**
35:16;61:18;67:5
**typically (2)**
86:6;88:20

U

**UBS (5)**
7:14,14;83:11;
107:12,13
**ultimately (4)**
72:18;74:4;94:20;
104:22
**umbrage (2)**
105:20,20
**Um-hum (1)**
47:1
**unaffiliated (2)**
15:4;16:17
**unanimously (1)**
42:25
**unclear (1)**
40:20
**uncontested (1)**
41:15
**uncontroverted (6)**
41:15;42:8,13;
84:14;92:10;100:1
**un-cooperation (1)**
96:24
**under (22)**
14:11,13,20,25;
20:23;35:13;38:16;
39:5;44:1,13;46:4;
52:25;67:21;70:25;
71:8;98:13;103:17,
18;106:6;112:1,1;
113:17
**underlying (1)**
17:1
**underneath (2)**
44:16;75:17
**understood (2)**

APP. 0135

004125

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 140 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 208 of 1017 PageID 4887
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 139 of
2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 136 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

33:12,20
unduly (1)
97:16
unfortunately (2)
58:1,10
unheard (1)
102:17
UNIDENTIFIED (4)
19:3,5;41:7;
109:20
unique (18)
42:12,17;49:3;
51:4;52:23;53:22;
59:2;61:13,14,14;
63:16;70:14,15;
71:22;78:10;106:2;
107:23;110:1
United (4)
14:22;15:16;
30:20;86:14
Unless (2)
59:7;101:25
unliquidated (2)
17:11;83:12
unobjected-to (2)
36:10,12
unrelated (2)
82:12;88:18
Unsecured (9)
6:3;10:22;43:12;
51:20;82:17;83:5;
98:5;100:20,22
unsecureds (2)
69:15,17
unsophisticated (1)
83:2
untold (1)
74:16
up (24)
19:10;28:6,21,25;
43:9;46:11;47:14;
49:15;50:24;57:3;
58:23;59:15,17;60:6,
7;67:17,19;72:20;
85:19;93:20;94:7;
101:9;109:9;113:3
upload (1)
113:22
upon (2)
33:10;39:5
upped (2)
49:14;50:16
up-to- (1)
91:11
upwards (1)
69:17
use (2)
45:10;86:24
used (4)
30:5,5;83:15;
110:25
useless (1)
62:8

Usually (6)
30:1;71:22;73:11;
75:14;82:22;107:24
utmost (1)
58:24

V

valuable (1)
103:22
Valuation (2)
28:7;86:23
value (3)
18:5,12;87:1
Variant (1)
13:6
variety (4)
15:4;86:11;91:22;
92:19
various (9)
14:5,21;16:4;
17:11;34:18;56:21;
72:4;77:9;95:3
varying (1)
50:20
vast (3)
43:9,11;80:4
vastly (1)
68:7
venture (3)
61:15;74:14,21
venue (71)
10:16;11:1,2,2,20;
23:11,14;39:20;
41:15,20;42:9,13,16,
24,25;43:4,18;44:2,
5,19,20,24;45:9;
51:5,11;52:4,7;
53:24;54:1;55:12,
20;56:22;57:2;58:2,
3;59:3;61:18;62:16,
25;63:20;64:6;
71:23;76:13;77:9,
17;78:13;79:22;
80:2,21,24;81:20;
82:4,8,16;83:20;
95:19;98:8,13,23;
99:14,16;100:23;
101:11,24;105:12,
16;106:5,16;107:3;
109:11,16
venue-transfer (2)
76:19;100:1
veracity (1)
97:12
version (1)
94:17
versus (2)
62:3,4
veteran (1)
19:22
view (6)
53:9;55:14;64:10;

96:7;99:19;113:11
views (2)
78:6;112:22
virtually (3)
73:19;80:13;81:12
vital (1)
111:15
volume (2)
70:16;95:24
voluminous (1)
74:18
voted (1)
104:24
votes (1)
70:18
voting (2)
70:10;110:4

W

walk (3)
46:10;51:5;79:24
Walsh (1)
81:15
wants (1)
78:15
warmer (2)
75:11,11
warrant (1)
42:13
warring (1)
47:24
WATERHOUSE (24)
9:5;10:11;23:13,
15,25;24:9;25:16;
27:22;32:12,20;
33:12;36:5;42:2;
50:10;51:11;54:17;
64:25;66:2;68:4,11,
17;69:15;85:5;93:15
W-A-T-E-R-H-O-U-S-E (1)
24:1
Waterhouse's (2)
65:1;104:9
WATKINS (1)
7:13
Watkins' (1)
83:15
way (16)
11:11;31:18;40:9;
55:2,2,6;77:16;
86:25;87:17,17;
95:9;102:24;107:21;
109:1,3;110:15
weakness (1)
80:1
wealth (1)
14:7
week (2)
27:4;29:23
weekly (1)
31:8
weeks (5)

72:1;84:24;96:19;
110:23;111:23
weigh (3)
81:6,20;112:25
weighed (2)
82:15
weighs (2)
56:23;62:19
weight (1)
57:11
Welcome (4)
10:13;36:7;75:3;
105:4
well-founded (1)
39:14
Wells (1)
107:13
what's (10)
55:22;60:7;65:8;
68:9;71:2;79:16;
97:16;104:11,20;
105:18
whatsoever (1)
106:24
Whereupon (1)
114:3
whole (3)
62:23;83:23;98:2
wholly (1)
44:15
who's (2)
70:17;75:12
wide (2)
62:10;86:11
widely (1)
35:17
WILLIAM (1)
6:11
willingness (1)
89:1
wind (1)
47:14
WINSTEAD (1)
8:17
wish (2)
19:2;57:10
withheld (1)
14:9
within (5)
39:7;72:1,2;
102:21;111:18
without (7)
12:16;37:18;54:6;
60:6;79:17;89:13;
91:12
withstand (1)
96:14
witness (18)
19:2,12,15,24;
22:5;23:2,9,22,25;
25:7;32:14,24;34:22,
25;35:24;36:1,6;
108:16

witness-and-exhibit (1)
36:11
witnesses (10)
21:23,25;85:11,22,
23,25;91:22;96:21;
97:13;99:24
WL (1)
13:8
Woodbridge (1)
13:7
word (2)
105:21;106:18
words (2)
90:5;102:23
work (8)
18:7;29:13,17;
30:22;108:6,7;
111:22;112:5
worked (5)
20:9;24:9;50:3;
55:5;79:3
working (2)
75:13;95:5
world (4)
14:19;15:2;32:2;
87:19
worry (2)
59:4;83:3
wrestle (2)
49:18;55:1
wrestling (1)
54:11
written (4)
40:16;49:22;
76:21;81:1
wrong (3)
46:24;71:9,14
wrote (1)
91:23

Y

years (5)
13:2;24:21,23;
56:3;57:4
yield (1)
10:17
yields (2)
53:17,19
York (16)
15:20;20:14;30:6,
7,7,10,15;42:1;
82:10;83:10,14,15;
86:16;99:17,21;
107:13
YOUNG (6)
6:2;10:24;85:17;
100:4;111:6;112:15

Z

ZABEL (1)
8:12

APP. 0136

004126

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 141 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 209 of 1017 PageID 4888
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 140 of 2722
Case 19-12239-CSS Doc 181 Filed 12/03/19 Page 137 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

**Ziehl (6)**
   10:6;11:15;13:14,
   21;21:19;75:22

---

**1**

**1 (7)**
   37:9,9,20;53:3;
   59:17;60:8;66:17
**1:45 (3)**
   105:5,6,6
**1:47 (1)**
   105:8
**10:48 (1)**
   41:8
**100,000 (1)**
   74:18
**1014 (1)**
   44:1
**11 (10)**
   17:21;45:13;
   78:23;80:3;86:24;
   97:10;98:19;105:16,
   19,25
**11:05 (1)**
   41:8
**11:50 (1)**
   75:8
**12 (2)**
   10:16;74:1
**12:00 (1)**
   75:8
**12:39 (1)**
   105:8
**1408 (1)**
   80:3
**1412 (3)**
   64:8;80:22;98:13
**15th (1)**
   60:21
**17 (2)**
   60:13;69:11
**18 (2)**
   37:9,20
**1979 (2)**
   81:3;87:25
**1998 (1)**
   81:15

---

**2**

**2 (5)**
   38:17;60:8,11;
   66:18;101:3
**2,000 (4)**
   51:24;53:3;67:18,
   20
**2:02 (1)**
   114:3
**2006 (3)**
   24:10;29:7,8
**2009 (3)**
   92:13;103:13,14

**2011 (2)**
   24:15;26:11
**2016 (1)**
   81:4
**2017 (1)**
   103:14
**2018 (5)**
   16:8,21;61:5;
   65:16;74:4
**2019 (4)**
   13:18;60:20,21;
   88:2
**24 (2)**
   37:11,21
**25 (2)**
   37:11,21
**26 (4)**
   39:15;40:23;
   59:17,25

---

**3**

**3 (2)**
   37:10,20
**30 (1)**
   15:21
**30th (1)**
   61:5
**31st (1)**
   60:20

---

**4**

**45 (1)**
   52:25

---

**5**

**5.2 (1)**
   16:1

---

**7**

**7 (1)**
   13:18
**7.5 (1)**
   15:3

---

**8**

**807 (1)**
   38:12

---

**9**

**9 (2)**
   37:10,21
**99.94 (1)**
   80:7

APP. 0137
004127

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 142 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 210 of 1017 PageID 4889
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 141 of
2722

# EXHIBIT 2

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION


                                     )      Case No. 19-34054-sgj-11
In Re:                               )      Chapter 11
                                     )
HIGHLAND CAPITAL                     )      Dallas, Texas
MANAGEMENT, L.P.,                    )      January 9, 2020
                                     )      9:30 a.m. Docket
        Debtor.                      )
                                     )      DEBTOR'S MOTION TO COMPROMISE
                                     )      CONTROVERSY WITH OFFICIAL
                                     )      COMMITTEE OF UNSECURED
                                     )      CREDITORS [281]
_____)

                     TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:              Jeffrey N. Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                              13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

For the Debtors:             Ira D. Kharasch
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                              13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

For the Debtor:              John A. Morris
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

For the Debtors:             Melissa S. Hayward
                            Zachery Z. Annable
                            HAYWARD & ASSOCIATES, PLLC
                            10501 N. Central Expressway,
                              Suite 106
                            Dallas, TX  75231
                            (972) 755-7104
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 143 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 211 of 1017 PageID 4890
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 142 of
2722

```
                                                        2

 1   APPEARANCES, cont'd.

 2   For the Official Committee   Matthew A. Clemente
     of Unsecured Creditors:      Dennis M. Twomey
 3                                SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
 4                                Chicago, IL  60603
                                  (312) 853-7539
 5
     For the Official Committee   Penny P. Reid
 6   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
 7                                Dallas, TX  75201
                                  (214) 981-3413
 8
     For the Issuer Group:        James T. Bentley
 9   (Telephonic)                 SCHULTE ROTH & ZABEL, LLP
                                  919 Third Avenue
10                                New York, NY  10022
                                  (212) 756-2000
11
     For the Issuer Group:        James E. Bain
12   (Telephonic)                 JONES WALKER, LLP
                                  811 Main Street, Suite 2900
13                                Houston, TX  77002
                                  (713) 437-1820
14
     For Acis Capital            Rakhee V. Patel
15   Management GP, LLC:          Annmarie Antoinette Chiarello
                                  WINSTEAD, P.C.
16                                2728 N. Harwood Street, Suite 500
                                  Dallas, TX  75201
17                                (214) 745-5250

18   For Redeemer Committee of    Terri L. Mascherin
     the Highland Crusader        JENNER& BLOCK, LLP
19   Fund:                        353 N. Clark Street
     (Telephonic)                 Chicago, IL  60654-3456
20                                (312) 923-2799

21   For Redeemer Committee of    Mark B. Hankin
     the Highland Crusader        JENNER & BLOCK, LLP
22   Fund:                        919 Third Avenue
     (Telephonic)                 New York, NY  10022-3098
23                                (212) 891-1600

24

25
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 144 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/06/25    Page 212 of 1017    PageID 4891
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 143 of
2722

3

1   APPEARANCES, cont'd.:

2   For the U.S. Trustee:        Lisa L. Lambert
                                 Meredyth A. Kippes
3                                OFFICE OF THE UNITED STATES
                                   TRUSTEE
4                                1100 Commerce Street, Room 976
                                 Dallas, TX  75242
5                                (214) 767-8967

6   For Jefferies, LLC:          Patrick C. Maxcy
    (Telephonic)                 DENTONS US, LLP
7                                233 South Wacker Drive, Suite 5900
                                 Chicago, IL  60606-6361
8                                (312) 876-8000

9   For Patrick Daugherty,       Patrick Daugherty
    Pro Se:
10

    Recorded by:                 Hawaii S. Jeng
11                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
12                               Dallas, TX  75242
                                 (214) 753-2006
13

    Transcribed by:              Kathy Rehling
14                               311 Paradise Cove
                                 Shady Shores, TX  76208
15                               (972) 786-3063

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 145 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 213 of 1017 PageID 4892
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 144 of
2722

4

<pre>
 1          DALLAS, TEXAS - JANUARY 9, 2020 - 9:56 A.M.

 2          THE COURT:  All right.  Let's roll to Highland now.

 3  Let's get appearances from lawyers in the courtroom, please.

 4          MR. POMERANTZ:  Good morning, Your Honor.  Jeff

 5  Pomerantz; Pachulski Stang Ziehl & Jones.  Happy New Year,

 6  Your Honor.

 7          THE COURT:  Happy New Year.

 8          MR. POMERANTZ:  Here on behalf of the Debtor.

 9          THE COURT:  Okay.  Thank you.

10          MS. HAYWARD:  Good morning, Your Honor.  Melissa

11  Hayward and Zachery Annable on behalf of the Debtor.

12          THE COURT:  Good morning.

13          MS. LAMBERT:  Lisa Lambert, and I think Ms. Kippes

14  will be joining me, representing William Neary, the United

15  States Trustee.

16          THE COURT:  Thank you.

17          MS. CHIARELLO:  Good morning, Your Honor.  Annmarie

18  Chiarello and Rakhee Patel here on behalf of Acis Capital

19  Management, LP and Acis Capital Management GP, LLC.

20          THE COURT:  Thank you.

21          MR. CLEMENTE:  Good morning, Your Honor.  Matthew

22  Clemente from Sidley Austin on behalf of the Official

23  Committee of Unsecured Creditors.  With me today are my

24  partners Dennis Twomey and Penny Reid.

25          THE COURT:  Okay.  Good morning.  All right.  Is that
</pre>

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 146 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 214 of 1017    PageID 4893
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 145 of
2722

5

1    all of the courtroom appearances?

2        All right.  We have several people on the phone.  I think

3    most of them are just listening in.  If you're on the phone,

4    though, and you wish to appear, you may do so at this time.

5            MR. BENTLEY:  Good morning, Your Honor.  This is

6    James Bentley of Schulte Roth & Zabel.  Also on the line is my

7    co-counsel, Joseph Bain of Jones Walker.  We represent the

8    Issuers.

9            THE COURT:  Okay.  Good morning.

10           MS. MASCHERIN:  Good morning, Your Honor.  This is --

11           MR. MAXCY:  Good morning.  Patrick --

12           MS. MASCHERIN:  Good morning, Your Honor.  This is

13   Terri Mascherin of Jenner & Block.  Also on the line with me

14   is my partner, Mark Hankin.  We represent the Redeemer

15   Committee of the Highland Crusader Fund, which is one of the

16   members of the Unsecured Creditors' Committee.

17           THE COURT:  Okay.  Good morning.

18           MR. MAXCY:  Good morning, Your Honor.  This is

19   Patrick Maxcy from Dentons US, LLP on behalf of Jefferies,

20   LLC.

21           THE COURT:  Okay.  Thank you.  All right.  Well, I

22   guess that is it for the phone appearances.

23       Mr. Pomerantz, we're -- we have just one matter on the

24   calendar, the motion to compromise with the Committee.  I saw

25   two limited objections, and then a U.S. Trustee's broader

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 147 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/10/25 Page 215 of 1017 PageID 4894
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 146 of
2722

6

1  objection.  I'll start with, Do you have any of these

2  objections worked out?

3          MR. POMERANTZ:  Yes, we do.

4          THE COURT:  Okay.

5          MR. POMERANTZ:  We believe we have the Jefferies

6  objection worked out, as well as the objection of the Issuers.

7  And I'll, during the course of my presentation, alert Your

8  Honor to how that's worked out.

9          THE COURT:  Okay.

10          MR. POMERANTZ:  And then we'll have a revised order

11  that basically addresses each of their concerns, or at least

12  Jefferies' concerns, but the statements on the record for the

13  Issuers' concerns.

14          THE COURT:  Okay.  Very good.

15          MR. POMERANTZ:  Good morning again, Your Honor.  Jeff

16  Pomerantz; Pachulski, Stang, Ziehl & Jones.  I'm joined in the

17  courtroom by Ira Kharasch, Greg Demo, and John Morris from my

18  office.  I would also like to introduce the Court to the

19  proposed new members of the board of directors of Strand

20  Advisors, which is the Debtor's general partner.  They're all

21  sitting in the first row behind counsel's well.  And that's

22  Mr. James Seery, --

23          THE COURT:  Good morning.

24          MR. POMERANTZ:  -- Mr. John Dubel, --

25          THE COURT:  Good morning.

7

1          MR. POMERANTZ:  -- and the Honorable Russell Nelms.

2          THE COURT:  Yes.  I've met him before.

3          MR. POMERANTZ:  As have we.  We thought you would

4    remember him.

5      The resumes of Mr. Seery and Mr. Dubel were attached to

6    the motion filed on December 27th, and those two resumes and

7    the resume of the Honorable Judge Nelms were attached to the

8    reply that was filed last evening.  And while Mr. Seery and

9    Mr. Dubel may be new names to Your Honor, we know that you are

10   familiar with Judge Nelms, who sat with you in this district.

11         THE COURT:  Uh-huh.

12         MR. POMERANTZ:  Also in the courtroom, Your Honor, is

13   Brad Sharp, the Debtor's chief restructuring officer from DSI,

14   --

15         THE COURT:  Good morning.

16         MR. POMERANTZ:  -- and his colleague, Fred Caruso,

17   who spends most of his working hours at the Debtor's Dallas

18   headquarters.

19         THE COURT:  Good morning.

20         MR. POMERANTZ:  We have the declaration of Mr. Sharp

21   that we would move into evidence at this point in time.

22         THE COURT:  All right.  I've got a stack of paper.

23   If you have an extra copy for me to use, --

24         MS. HAYWARD:  Your Honor, may I approach with the --

25         THE COURT:  You may.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 149 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 217 of 1017   PageID 4896
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 148 of
2722

8

1          MS. HAYWARD:  Your Honor, it was filed, the

2     declaration was filed.  I'm not sure that we have a copy of --

3          MR. POMERANTZ:  Your Honor, we will also at the

4     appropriate time during my presentation, I'll bring up to Your

5     -- ask to bring up to Your Honor revisions to the term sheet

6     that was attached to the motion.

7          THE COURT:  Okay.

8          MR. POMERANTZ:  Copies have been given to Ms. Lambert

9     as well as the Committee.

10         THE COURT:  Okay.  Very good.  All right.  Well, what

11    was handed to me was the preliminary term sheet as well as the

12    CVs for the proposed new board members.  I don't see the

13    declaration --

14         MR. POMERANTZ:  Your Honor, if I may approach, I have

15    a copy.

16         THE COURT:  You may.  All right.  Very good.

17         MR. POMERANTZ:  So we would move that declaration

18    into evidence.

19         THE COURT:  All right.  The Court will admit this.

20    It was filed on the docket at 327, but I will additionally

21    admit it as Exhibit 1 today.

22       (Debtor's Exhibit 1 is received into evidence.)

23         THE COURT:  At some point in time, I want to give

24    parties the opportunity to cross-examine Mr. Sharp.  Do you

25    want to do that now, or shall we hear an opening statement?

9

1        MR. POMERANTZ:  However Your Honor prefers.  I mean,

2   maybe it's helpful to hear argument first, and then, before

3   the Trustee --

4        THE COURT:  I think I'd like to hear opening

5   statements and then we'll --

6        MR. POMERANTZ:  Thank you.

7        THE COURT:  -- make the opportunity available.  Okay.

8         OPENING STATEMENT ON BEHALF OF THE DEBTOR

9        MR. POMERANTZ:  Your Honor, by way of background, we

10   appeared before Your Honor on December 6th and December 19th.

11   And during each of those hearings, we described for the Court

12   negotiations that were underway between the Committee and the

13   Debtor which, if successful, would have -- would eliminate the

14   need for contested and uncertain and costly litigation

15   regarding the appointment of a Chapter 11 trustee and really

16   put this case in a position where the Debtor and the Committee

17   would be able to work together constructively towards

18   negotiation of a plan.

19      As a result of our hearing on December 19th, Your Honor

20   entered a scheduling order that set deadlines for either the

21   filing of a motion to approve a settlement, or alternatively,

22   the filing of one or more motions for the appointment of a

23   trustee.

24      As set forth and required by the scheduling order, we

25   filed our motion on December 27th, and in that motion we

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 151 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 219 of 1017   PageID 4898
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 150 of
2722

10

1  sought approval of a term sheet and ancillary documents

2  between the Debtor and the Committee, which I'll describe

3  shortly.

4      While a couple of items had not yet been agreed to at the

5  time the motion was filed, I'm pleased to report that over the

6  last couple of days we've been able to reach closure with the

7  Committee with respect to those items, and there would also be

8  some modifications to the term sheet, which I'll go through in

9  a few moments.

10     The motion, Your Honor, seeks approval of the term sheet,

11 which accomplishes a variety of things that, again, will allow

12 the Debtor and the Committee to put the acrimony that has

13 existed in this case for the first three months behind us and

14 allow us to focus on productive matters.  In the last 24

15 hours, as I mentioned, there have been a few changes to the

16 term sheet that I will describe.  And I would like to hand up

17 Your Honor a redline and a clean copy of the revised term

18 sheet and exhibits.  May I approach?

19          THE COURT:  All right.  You may.  Do you have an

20 extra for the law clerk?  Okay.  Thank you.

21     (Pause.)

22          MR. POMERANTZ:  Your Honor, the term sheet does a

23 number of things.  Would you like me to give Your Honor some

24 time to look through the redlines?

25          THE COURT:  No.  You may proceed.

11

1          MR. POMERANTZ:  Okay.  The term sheet does a number

2    of things.  The first thing the term sheet does is appointment

3    of an independent board at Strand Advisors.  Strand Advisors

4    is the GP of the Debtor.  The Debtor is an LP.  The Debtor

5    previously had filed a motion to approve the retention of Brad

6    Sharp as the chief restructuring officer, and that initial

7    agreement and motion contain details regarding the scope of

8    Mr. Sharp's authority and the scope of what the Debtor could

9    do without Mr. Sharp's prior consent.

10      The Committee raised concerns that the structure was not

11   sufficient to ensure that decisions were being made for the

12   Debtor only in their best interests and without any

13   inappropriate influence from Mr. Dondero.

14      To address the Committee's concerns, a focal point of the

15   settlement was the Debtor's agreement to appoint an

16   independent board of directors at Strand who would be

17   responsible for managing the operations of the Debtor.

18      Over the last few weeks, a principal aspect of the

19   negotiations between the Committee and the Debtor have been

20   discussing who should the independent directors be.

21   Conceptually, the Debtor and the Committee both agreed that

22   the board should include, first, a person with significant

23   industry experience in which the Debtor operates -- hedge

24   funds, money management; second, a person with deep

25   restructuring experience from the financial advisor side; and

12

1    third, a person with some sort of judicial or governmental

2    experience.

3        The Debtor originally provided the Committee with three

4    proposed candidates.  The Committee considered the Debtor's

5    request, but instead presented the Debtor with four different

6    candidates and asked the Debtor to choose from those four.

7    The Debtors interviewed each of those people and ultimately

8    agreed on Messrs. Dubel and Seery, who were each on the

9    original list.

10       As of the deadline to file the motion on December 27th,

11   the Committee and the Debtor had still not agreed on the

12   identity of the third board member, but the parties were

13   hopeful that an agreement could ultimately be reached and we

14   decided to go ahead and file the motion.  As I'm sure Your

15   Honor saw in the motion, it was contingent upon everyone

16   agreeing on the third board member.

17       Ultimately, the Debtor and the Committee both agreed that

18   Mr. Dubel and Mr. Seery could identify the third board member

19   out of a pool of four people:  Two of the people originally

20   requested by the Committee and two people identified by the

21   Debtor.  This week and over the weekend, Mr. Seery and Mr.

22   Dubel interviewed each of the four candidates, and ultimately

23   decided on the appointment of Judge Nelms as the third

24   independent board member.

25       The board, as it will be constituted going forward, in the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 154 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 222 of 1017   PageID 4901
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 153 of
2722

13

1   Debtor's opinion, consists of three exceptional individuals

2   who are independent of the Debtor, have a sterling reputation

3   in the community, and bring to the Debtor a variety of the

4   skills that we believe, and believe the Committee agrees,

5   gives the Debtor the best opportunity to achieve a consensual

6   restructuring and otherwise manage the affairs of the Debtor

7   in the best interests of the stakeholders.

8       It is contemplated that the Debtor will continue to retain

9   the services of DSI as the chief restructuring officer, and

10  ultimately the board will determine if it's important to

11  retain a CEO going forward.

12      The second thing that the term sheet does, Your Honor, was

13  the removal of Mr. Dondero as an officer and director of

14  Strand and eliminate all of his control over decision-making

15  of the Debtor.  The Debtor recognized early on in this case

16  that Mr. Dondero's continuing role with the Debtor in a

17  position of authority made the Committee extremely uneasy.

18  Accordingly, the term sheet provides for him removing himself

19  as an officer and director of Strand and that he would no

20  longer be in a position of control at the Debtor.

21      However, since the filing of the motion, over the last

22  several days, concerns have been raised about whether removing

23  Mr. Dondero from the business entirely would have unintended

24  consequences.  I believe I may have mentioned at prior

25  hearings that, because of his involvement as a portfolio

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 155 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 223 of 1017   PageID 4902
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 154 of
2722

14

1  manager under various contracts with third parties, that there

2  could be adverse economic consequences to the Debtor if he

3  didn't stay in some role.

4      As a result of discussions over the last 24 hours, the

5  Committee has agreed and the Debtor agreed to modify the term

6  sheet to allow the new board to decide whether to retain Mr.

7  Dondero in his capacity as a portfolio manager, provided,

8  however, that he will not receive any compensation and he will

9  agree to resign if requested by the board.

10     In any event, he will have no decision-making control at

11  all and he will report to the independent board.

12     The corporate governance documents that create the new

13  independent board of Strand also provide that Mr. Dondero, as

14  the owner of the equity in Strand, may not replace the board

15  without the Committee consent or court order.

16     The third major aspect of the term sheet, Your Honor, was

17  the agreement on operating protocols, and it really relates to

18  the ground rules for the Debtor's operations going forward and

19  when notice to the Committee is required of certain

20  transactions that would otherwise be in the ordinary course of

21  business.

22     Importantly, Your Honor, we are not trying to modify the

23  Bankruptcy Code in any way.  Any transactions out of the

24  ordinary course of business would still be subject to Your

25  Honor's approval.

15

1      However, in this case, as we indicated in the initial

2   motion we filed when the case was in Delaware, whether or not

3   something is ordinary is not straightforward in a case such as

4   the Debtor's, given the nature of the Debtor's operations.  So

5   we thought it was important to establish ground rules up

6   front, and establishing those ground rules was one of the

7   things we did initially in the case.  We had opposition from

8   the Committee, and we've worked through the opposition and

9   ultimately arrived at the operating protocols that are

10   attached to the term sheet.

11      They have been slightly modified in nonmaterial ways in

12   the documents I handed up to Your Honor.

13      They were subject to substantial negotiations between the

14   Debtor and the Committee, and we also expect them to be the

15   subject of future discussions with the Committee and the

16   independent board after the independent board takes -- takes

17   place.  Takes over.

18      Two parties in interest, Your Honor, Jefferies and a group

19   of Issuers, the CLOs, have filed comments to the term sheet,

20   which I'll describe in a few moments.

21          THE COURT:  Okay.

22          MR. POMERANTZ:  The next aspect, Your Honor, of the

23   term sheet was the provision of standing to the Creditors'

24   Committee to pursue certain insider claims.

25      During the negotiations, the Committee requested immediate

16

1    standing to investigate and potentially prosecute claims

2    against insiders to the extent those insiders were not

3    employed by the Debtor.  Granting standing at this stage of

4    the case was a difficult give by the Debtor.  However, the

5    Committee impressed upon the Debtor the importance of them

6    being able to control the filing of any actions against the

7    insiders, and the Debtor decided to accede to the Committee's

8    request.

9        It still remains the Debtor's hope that, with the creation

10   of the independent board, that the Debtor, the Committee, and

11   any insiders who might be subject to any such claims will be

12   able to come together and negotiate a consensual resolution of

13   this case.  While all parties, I'm sure, can and know how to

14   litigate, hopefully they will agree that a negotiated outcome

15   is better than a litigated outcome.

16       The next aspect of the term sheet, Your Honor, was the

17   document preservation protocols, and it provides for certain

18   procedures to be put in place to address the Committee's

19   concerns about document preservation.  They are contained in

20   an exhibit to the term sheet.  Again, slight nonmaterial

21   modifications were made in what I handed up to Your Honor.

22   And essentially they provide also for the Committee's access

23   to privileged documents to aid in their investigation and

24   prosecution of claims to which they are granted standing, and

25   also sets forth a procedure to be followed to address concerns

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 158 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 226 of 1017    PageID 4905
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 157 of
2722

17

1   if the information is subject to shared privileges by several

2   entities.

3       As I mentioned, Your Honor, three parties have filed

4   responses to the motion.  The first is Jefferies.  Jefferies

5   is a secured creditor of the Debtor with respect to its margin

6   account held at Jefferies, and also has a similar account held

7   by a non-debtor affiliate.  They have asked for clarification

8   that, one, nothing in the protocols or the motion affects its

9   rights under the underlying agreements or the safe harbor

10  provisions of the Bankruptcy Code entitling them to enforce

11  their remedies; and two, that the Debtors will not trade in

12  the prime account without Jefferies' consent, and if that

13  consent is sought and not obtained, only subject to court

14  order.

15      The Debtor has agreed to include language in the order to

16  address Jefferies' concern, and at the conclusion of my

17  presentation I'll submit to Your Honor an order and a redline

18  containing that language.

19          THE COURT:  Okay.

20          MR. POMERANTZ:  The second objection -- or not

21  objection, Your Honor -- the second statement was filed by a

22  group of Issuers of CLO obligations.

23          THE COURT:  Uh-huh.

24          MR. POMERANTZ:  And they were concerned that certain

25  aspects of the operating protocols which require notice to the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 159 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/10/06/25 Page 227 of 1017 PageID 4906
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 158 of
2722

18

1  Committee prior to the Debtor being able to take certain

2  actions could conflict with the provisions of the underlying

3  agreements which might require the Debtor to take action on a

4  more expedited basis.

5      Neither the Issuers or the Debtor are aware of any

6  potential transactions that will arise prior to the next

7  hearing before Your Honor on January 21st. We understand --

8  we were not party to these discussions between the Committee

9  and the Issuers yesterday, but we understand the way it's been

10 resolved is that the Issuers will withdraw their objection as

11 it relates to going forward today, subject to being able to

12 come back to the Court on the 21st and revisit the issue if

13 additional changes are not made acceptable to them to resolve

14 their issues and concerns.

15         THE COURT: Okay.

16         MR. POMERANTZ: But I think all parties acknowledge

17 that over the next 12 days this is a theoretical issue rather

18 than a practical issue.

19         THE COURT: Okay.

20         MR. POMERANTZ: This brings us, Your Honor, to the

21 United States Trustee's opposition, which is really the only

22 true objection to the motion that has been filed. No creditor

23 has filed an objection, no investor has filed an objection,

24 and no governmental agency -- which the U.S. Trustee in its

25 objection purports to be pursuing their interests -- has filed

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 160 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 228 of 1017   PageID 4907
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 159 of
2722

19

1   an objection, either.

2       As Your Honor probably recalls, at the December 19th

3   hearing the Trustee indicated its intent to oppose any

4   agreement between the Debtor and the Committee that would

5   involve corporate governance and to file its own motion for

6   the appointment of the trustee.  That motion is currently

7   scheduled for hearing on January 21st.  We had asked the U.S.

8   Trustee to reserve judgment on the Committee's and Debtor's

9   agreement until after we had come to an agreement and after we

10  had presented it to the Trustee, in hopes that it would

11  address their concerns.  However, as the Court told us -- as

12  the U.S. Trustee told us and Your Honor at the December 19th

13  hearing, there was nothing short of appointment of a trustee

14  that would satisfy the Trustee.

15      The comments really didn't make sense to us, and I believe

16  it perplexed Your Honor, but here we are.

17      At its core, Your Honor, the U.S. Trustee's objection is

18  really a request that the Court substitute its business

19  judgment for that of the Debtor and the Committee, the

20  Committee who represents the substantial majority of all

21  claims in this case, when both of them have decided that

22  agreeing to certain changes in corporate governance, among

23  other things, is preferable to the uncertain, costly, and

24  time-consuming litigation over a trustee, and also the

25  uncertainty, even if a trustee was appointed, on how the case

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 161 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 229 of 1017   PageID 4908
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 160 of
2722

20

1    would be administered.

2         To the contrary, under the corporate governance proposal,

3    we have three highly-qualified individuals who are poised to

4    take over management of the Debtor, and each bring with them

5    various skills that one trustee would not have.

6         The Trustee has filed its motion for appointment of a

7    trustee, and I'm sure on the 21st will argue that the Code

8    requires it.  However, that's not the issue before Your Honor

9    today.  It's not whether a trustee is appropriate.  It's

10   whether the motion and the term sheet is a sound exercise of

11   the Debtor's business judgment under Section 363, and,

12   importantly, a reasonable compromise of the pending disputes

13   between the Debtor and the Committee.

14        The Trustee's objection raises three general points, none

15   of which have any merit.  First, the Trustee argues that there

16   is a lack of disclosure of significant matters.  The first

17   aspect that the Trustee raises to, or points to, is the

18   absence of identification of the third board member and the

19   absence of disclosure of the compensation that the board

20   members will receive, which will be backstopped by the Debtor.

21        As I described before, Your Honor, the identity of the

22   third member of the board was a fluid process which was only

23   resolved earlier this week, and the Debtor did not believe

24   that it was appropriate to reach agreement on director

25   compensation until all board members could provide input.

21

 1   Last night, we filed a reply to the Trustee's objection in

 2   which we disclosed the identity of the third board member, and

 3   we'll also disclose the proposed compensation to be provided

 4   to them, which essentially is as follows.  Each member of the

 5   board will receive $60,000 a month for the first three months

 6   of the case, $50,000 a month for the next three months of the

 7   case, and the presumption thereafter would be $30,000 a month.

 8   However, people recognize that this case will look a lot

 9   differently six months from now, and while the presumption is

10   $30,000, the Debtor, the independent board members, and the

11   Committee will sit down, see how the case looks, and decide

12   whether any modifications are appropriate.

13       The amount of compensation, which at first blush may seem

14   significant, really reflects the significant amount of work

15   that the Debtor, the Committee, and the independent directors

16   anticipate will be required from them not only to get up to

17   speed about the case, but to effectively manage this complex

18   Debtor's business operations.  The directors have heard from

19   the Debtor and the Committee of all the issues, of all the

20   concerns, and this is not an enviable task that they are

21   undertaking.  The compensation they are being provided thus

22   far we believe is appropriate under the circumstances and

23   commensurate with the work that they are going to be expected

24   to complete.

25       If they are successful and they are able to achieve a

22

1  consensual restructuring here, the million and a half or so

2  that will be spent on them will be best million and a half

3  dollars I think spent in this case.

4      Your Honor, we also have updated corporate governance

5  documents which --

6      (Pause.)

7          MR. POMERANTZ:  Your Honor, may I approach with the

8  updated corporate governance documents?

9          THE COURT:  You may.  Okay.

10         MR. POMERANTZ:  As I will discuss in a moment, Your

11 Honor, there is really no need for the Court to approve the

12 corporate governance documents, as they have been executed by

13 Strand, which is not a debtor before this Court.  However,

14 there are a couple of matters in those documents that I want

15 to bring to the Court's attention that do impact on the

16 Debtor.

17         THE COURT:  Okay.

18         MR. POMERANTZ:  First, as is typical for board

19 members, Strand has agreed to indemnify the independent

20 directors to the full extent permitted by law.  The

21 independent directors have requested that the Debtors backstop

22 Strand's agreement, and the Debtor and the Committee agree,

23 and the documents so provide.

24     Strand has also committed to obtain directors and officers

25 coverage for the independent directors.  It has been located,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 164 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 232 of 1017 PageID 4911
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 163 of
2722

23

1   it's in the process of being finalized and bound, and the

2   Debtor will pay the cost of that coverage.

3        The independent directors have also asked for language in

4   the order approving the settlement that requires a party

5   seeking to assert a claim against the independent directors

6   relating to their role as an independent director to

7   demonstrate to this Court that a claim is colorable before

8   filing the claim and providing the Court with jurisdiction

9   over any such claim.  This is language that's similar in other

10  similar types of cases.

11       THE COURT:  Uh-huh.

12       MR. POMERANTZ:  That will be reflected in the order.

13       Next, the Trustee objects to the failure of the Debtor to

14  identify who the potential chief executive officer of the

15  Debtor will be.  And essentially, she's arguing that you have

16  to identify that CEO now; it has to be subject to court

17  approval.  However, there's no requirement that any company

18  retain a CEO.  It's not a corporate law requirement.  And the

19  fact that the board reserves the right to retain a CEO in the

20  future is consistent with corporate law and is not a basis to

21  deny the motion.  And in any event, normally, the retention of

22  a CEO is not a subject that is brought to the Court's

23  attention for Court approval.

24       So the lack of any clarity over the identity of the CEO is

25  a reflection of the fact that this independent board does not

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 165 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 233 of 1017 PageID 4912
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 164 of
2722

24

1    know if a CEO is required.  They will come in, they are going

2    to interview all the employees, they're going to sit down with

3    the CRO, they're going to sit down with counsel, they're going

4    to sit down with the Committee, and ultimately they will

5    decide if a CEO is to be retained.  And if a CEO is to be

6    retained, they will go through the process of identifying who

7    that CEO is.  But again, it's not a reason to deny the motion.

8         The Trustee has also argued that because the Committee is

9    not granted standing to pursue claims against current

10   employees, as opposed to former employees, that there might be

11   some statute of limitations concerns with respect to claims

12   against those employees.  The argument doesn't really make

13   sense to us.  In the standard case, the Debtor retains causes

14   of action.  And the Committee can investigate causes of

15   action.  And at some point during the case, a Committee could

16   come in and could demand that the Debtor prosecute them, and

17   if the Debtor unreasonably refuses, could seek standing before

18   the Court.

19        In this case, the Debtors agreed up front that the

20   Committee has the standing to prosecute certain claims against

21   insiders that are not employees of the Debtor, which obviates

22   the need for standing.  So we've gone one step more.  But the

23   Trustee is arguing that that leaves a void for the claims that

24   are not subject to the agreement on standing.

25        However, the term sheet provides that the board is going

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 166 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 234 of 1017   PageID 4913
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 165 of
2722

25

1   to make determinations on what employees should remain, what

2   employees should not remain.  To the extent the board

3   terminates any employees and there are claims against them,

4   then basically the Committee will have the ability to bring

5   those claims.

6       To the extent that those people aren't terminated, we have

7   no doubt that the Committee, in the course of its

8   investigation, will determine whether claims should be brought

9   against those people, and at some point in time may ask the

10  Debtor to prosecute those claims or ultimately seek standing.

11      In any event, these things are not being swept under the

12  rug.  There's no real legitimate concern that there's any

13  statute of limitations issue that will prevent those claims

14  from being prosecuted.

15      I am very much aware and have no doubt that the Committee

16  is going to be laser-focused on claims, and any concern that

17  statute of limitations is going to lapse I think is not well-

18  taken.

19      The Trustee next argues that the Court does not have the

20  jurisdiction to implement the corporate governance matters,

21  and for that reason the motion should be denied.  They -- she

22  argues that because Strand is not a debtor, that the Court has

23  no authority to appoint --

24          MS. LAMBERT:  Your Honor, I object.  The United

25  States Trustee is a he.  I am not the United States Trustee,

26

1    and the attacks *ad hominem* are inappropriate.

2         THE COURT: All right. Well, clarification, the U.S.

3    Trustee is the guy in Washington. But anyway, you may

4    proceed.

5         MR. POMERANTZ: I apologize to Ms. Lambert.

6         MS. LAMBERT: Actually, he's downstairs right now.

7    Bill Neary.

8         MR. POMERANTZ: I apologize to --

9         THE COURT: Oh, well, I thought you meant the big guy

10   in Washington. But anyway, you may proceed.

11        MR. POMERANTZ: I apologize to Ms. Lambert and no

12   offense was meant.

13        THE COURT: Okay.

14        MR. POMERANTZ: So, the U.S. Trustee argues that

15   because Strand is not a debtor that the Court has no authority

16   to appointment the independent directors and limit Mr.

17   Dondero's right to remove the independent directors. The

18   Debtor is not really seeking authority to appoint -- to have

19   court authority for the appointment of the directors at

20   Strand. Again, as I mentioned before, that authority exists

21   outside of bankruptcy. Strand is not a debtor. Strand could

22   appoint anyone it wants to carry out its responsibility as the

23   general partner of the Debtor, and it's exercising its

24   corporate authority to do so by installing a board at Strand.

25        Nor is the Debtor seeking court authority for Strand to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 168 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/06/25   Page 236 of 1017   PageID 4915
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 167 of
2722

27

```
 1   enter into the corporate governance documents.  Other than the
 2   couple of items I mentioned before, Your Honor, Strand can
 3   enter into these documents without authority from this Court.
 4   The only court authority that was required:  Debtor to
 5   backstop the indemnification obligations, Debtor to pay
 6   compensation to the board members, and Debtor to pay for the
 7   D&O policy.
 8        With respect to the Court's right to limit Mr. Dondero's
 9   ability to terminate the independent directors, the term sheet
10   contemplates the Court approving a stipulation which limits
11   Mr. Dondero's ability to terminate the independent directors,
12   and if he does in fact seek to terminate the appointment of
13   the independent directors, he would be in violation of court
14   order.  But even more importantly, Your Honor, if he decided
15   to terminate the independent directors without the Committee's
16   consent and without the Debtor's consent, I wouldn't imagine
17   it would take anyone very long to come back before Your Honor
18   and ask Your Honor to very quickly appoint a trustee.
19        Accordingly, Your Honor, I think the argument of lack of
20   jurisdiction over Strand is a red herring and should be
21   denied.
22        Lastly, Your Honor, the Trustee makes a curious argument
23   that a trustee is needed to protect all investors and
24   governmental authorities.  The Trustee argues that this case
25   demands transparency which can only be accomplished by a
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 169 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 237 of 1017   PageID 4916
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 168 of
2722

28

1   Chapter 11 trustee.

2        One thing I think the Debtor and the Committee and the

3   U.S. Trustee will agree on, this case does demand

4   transparency.  And we believe we've installed a corporate

5   governance structure, an operating protocol structure, a

6   document preservation structure, that does just that, provides

7   transparency that this Debtor has not been subject to and

8   which is quite different from the case that was before Your

9   Honor before.

10       So we believe that what the Debtor and the Committee have

11  done is not only in the interests of the Debtor, the

12  creditors, but investors and all governmental entities.

13       And no investor or governmental entity has had any

14  concerns or any problems with what is being done.  They

15  haven't filed any objection.  The U.S. Trustee apparently is

16  proceeding by proxy asserting those interests.

17       Second, nothing in the term sheet or any of the documents

18  limits the rights of investors or of governmental entities to

19  seek a trustee, to seek documents, or to do anything they

20  would -- that they would be entitled to do under the

21  Bankruptcy Code.

22       In any event, Your Honor, the fact that the Trustee

23  believes that a trustee is more appropriate, again, is an

24  argument that they can make at the January 21st hearing.  It's

25  not a basis for denial of this motion.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 170 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 238 of 1017   PageID 4917
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 169 of
2722

29

1     In conclusion, Your Honor, the only economic stakeholders

2   in this case believe that proceeding with the transactions

3   contemplated by the term sheet is in the best interest of the

4   estate, will maximize their ability to achieve a consensual

5   restructuring, and move this case through the system as

6   quickly and efficiently as possible.  The term sheet is a

7   valid exercise of the Debtor's business judgment under 363 and

8   an appropriate compromise of controversy, and the Trustee's

9   objections are really nothing more than a rehash of its

10   request for an appointment of a trustee.

11     For all these reasons, Your Honor, we request that the

12   Court overrule the U.S. Trustee's objection and approve the

13   motion.

14         THE COURT:  All right.  Well, before I hear from our

15   objectors, is there any friendly commentary?  Mr. Clemente, I

16   figured you might want to address this.

17         MR. CLEMENTE:  I do, Your Honor.  And good morning.

18         THE COURT:  Good morning.

19     OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

20                     UNSECURED CREDITORS

21         MR. CLEMENTE:  For the record, Matthew Clemente from

22   Sidley Austin on behalf of the Official committee of Unsecured

23   Creditors.  I do have some comments that I would like to make,

24   Your Honor, some, so please bear with me.  I will try and be

25   brief.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 171 of
Case 3:25-cv-02072-S     Document 15-7     Filed 10/06/25     Page 239 of 1017     PageID 4918
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 170 of
2722

30

1          THE COURT:  Okay.

2          MR. CLEMENTE:  I think as late as 1:00 o'clock in the

3    morning I wasn't sure that I would be in front of you with

4    this settlement fully in place in a manner that was

5    satisfactory to my Committee.  As I mentioned to you in my

6    prior appearances in front of you, every provision was

7    important to the Committee, and they all work together.  As

8    Your Honor can imagine, there was a lot of negotiation that

9    took place, including late in the day and early morning, to

10   come to that conclusion.

11       Some comments on our perspective as a committee, Your

12   Honor.  As an initial matter, we were absolutely not okay with

13   the governance structure that was in place when the petition

14   was filed.  As we detailed in our objections to the CRO motion

15   and the protocol motion back when the case was in Delaware,

16   the Committee has very real and identifiable concerns about

17   the Debtor's ability to dispatch its fiduciary duty.  And the

18   Committee very seriously contemplated moving for a Chapter 11

19   trustee daily.  That conversation is something that the

20   Committee continues to -- continued to engage in, Your Honor.

21   So it's something that they considered very, very carefully.

22       That was the lens through which the Committee was

23   approaching negotiations over the settlement agreement and the

24   independent director structure.  That's how they viewed it.

25   That's the backdrop against which they came to it.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 172 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 240 of 1017   PageID 4919
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 171 of
2722

31

1       The Committee had two primary goals that it had sought to

2    achieve with the settlement agreement.  The first was to

3    ensure that Mr. Dondero does not remain in a position of

4    management authority or control in any fashion with the

5    Debtor.  Goal number two was to ensure that the value of the

6    Debtor's estate is preserved and maximized.  Those two goals

7    needed to work together.

8       The Committee  believes that the carefully-crafted

9    settlement agreement achieves these objectives in a manner

10   that is more beneficial to the estate than a potential Chapter

11   11 trustee and a related fight over its appointment at this

12   time.

13      The lynchpin of the settlement, Your Honor, is the

14   appointment of the three independent directors.  And as Mr.

15   Pomerantz outlined for you, that was the subject of intense

16   discussion, negotiation, debate among the Committee and with

17   the Debtor.  But we believe that Mr. Seery, Mr. Dubel, and

18   Judge Nelms are fully independent, highly qualified, and bring

19   relevant and complementary skillsets to this board.  Mr.

20   Pomerantz referred to that, but we believe that the three

21   directors all bring unique talents and attributes that will

22   allow them to function effectively as a board and provide the

23   appropriate oversight and direction that we believe is

24   necessary here.

25      However, regardless of how independent or highly skilled

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 173 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 241 of 1017 PageID 4920
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 172 of
2722

32

1    they may be, they would be of no use if they weren't bestowed

2    with the appropriate power.  So that was another point that

3    was very important to the Committee, and we believe that the

4    settlement does this.  The settlement makes clear that the

5    independent directors are granted exclusive control over the

6    Debtor, including over all employees.  That's absolutely

7    critical to the Committee.

8        The settlement also provides that the CRO and the Debtor's

9    professionals shall report and serve at the direction of the

10   independent directors.  That is also very important.

11       And let me be clear, Your Honor, because I think you may

12   have raised this at a prior hearing:  This is not a board that

13   we expect to work at 50,000 feet, as demonstrated by the

14   compensation structure that Mr. Pomerantz outlined for you.

15   This will be a board that's hands-on, members of which will be

16   on the ground, at the Debtor, with a strong presence and a

17   clear message of who is in charge.  That is critical for this

18   Committee.

19       Additionally, as Mr. Pomerantz mentioned, the new board,

20   in consultation with the Committee, is empowered to determine

21   whether a CEO should be retained.  It's possible that one of

22   the independent directors could be that CEO, Your Honor.  But

23   we wanted to make clear that that was an important part of the

24   structure, should the board determine that that was the way it

25   wanted to go.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 174 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 242 of 1017   PageID 4921
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 173 of
2722

33

1    So, in sum, Your Honor, we believe that the independent

2  board has the clear authority and the skillset that's

3  necessary to take control and will be actively and

4  aggressively doing so.

5    But let me be clear, rest assured, Your Honor, this is not

6  going to be a board that answers to the Committee in that

7  sense.  I think that we will all be moving together

8  directionally, but it's very possible that I will be in front

9  of Your Honor arguing against a decision that this independent

10 board made.  So I want to assure Your Honor that although the

11 Committee was very active and in fact picked Mr. Seery and Mr.

12 Dubel, and then Mr. Pomerantz detailed how the third director

13 was picked, we understand who their duty -- what their duty is

14 and we also understand that they're not a rubberstamp for the

15 Committee, Your Honor.  And so I wanted to make that point to

16 you to assure Your Honor that that's not the structure that's

17 being set up here, nor are they the type of individuals that

18 would allow that to happen.

19   Additionally, Your Honor, the settlement grants the

20 Committee standing to pursue estate causes of action against

21 the related parties.  That was very important to us, Your

22 Honor.

23   And in addition to that, the settlement provides the

24 Committee access to privileged documents and sets forth a

25 discovery protocol that will assist the Committee in its

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 175 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/10/06/25 Page 243 of 1017 PageID 4922
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 174 of
2722

34

1   investigation.

2       The Committee strongly believes that Mr. Dondero's

3   repeated past behavior, that there are many questionable

4   transactions that will need to be thoroughly investigated and

5   pursued.  And so having those causes of action with the

6   economic party in interest related to those causes of action,

7   the Committee and its constituencies, we thought was very

8   important and very critical.

9       Granting standing, Your Honor, as I mentioned, avoids any

10  issues regarding who will be controlling those claims.

11      I'll touch on this in a moment, but Mr. Pomerantz talked

12  about Mr. Dondero remaining in name as an employee.  Let me

13  assure Your Honor that that is not a backdoor around the

14  Committee's ability to investigate and immediately pursue

15  claims against him should that be the course that we choose to

16  take.  So he's not part of that carve-out for current

17  employees.  That's not at all happening.  That would never be

18  something that my Committee would be comfortable with.  So I

19  wanted to make clear to Your Honor that that's not something

20  that's happening with sort of this late edition of Mr.

21  Dondero's continuing on in name as an employee.

22      Your Honor, the settlement also lays out a very detailed

23  set of operating protocols which we do believe are appropriate

24  and provides the Committee with transparency, which I've been

25  expressing to Your Honor we've needed since this case has

35

1  started.

2      Finally, as we point out in our reply and as would always

3  be the case, should new facts develop or the situation demand

4  it, the Committee reserves the right to seek a Chapter 11

5  trustee, as does any other party in interest, to the extent it

6  may be appropriate at that time.

7      In short, Your Honor, the Committee very carefully and

8  diligently weighed the independent director option versus the

9  Chapter 11 trustee option.  The Committee had very clear goals

10 in mind, as I expressed to you, and determined that those

11 goals could be achieved in a value-maximizing manner through

12 the independent director structure.

13     The negotiations were very intense, and it was only after

14 the Committee determined that each piece of the settlement was

15 to its satisfaction did it ultimately conclude that the

16 settlement maximizes value for all stakeholders while at the

17 same time protecting those stakeholders from exposure to

18 continuing insider dealing, breaches of duty, and

19 mismanagement.

20     Therefore, the Committee believes approving the settlement

21 is in the best interest of the estate, and therefore it

22 believes it should be approved.

23     I do want to offer a word about Mr. Dondero continuing as

24 an employee.  As Your Honor was aware, the term sheet as

25 originally filed provided that Mr. Dondero would, among other

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 177 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 245 of 1017   PageID 4924
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 176 of
2722

36

1  things, resign as an employee of the Debtor.  Mid to late

2  afternoon yesterday, Mr. Ellington called me and said that the

3  Debtor was now of the view that Mr. Dondero should remain on

4  as an employee in that capacity for the benefit of the estate.

5  The Committee was, very appropriately, very skeptical of this,

6  as well as the sort of last-minute offer, last-minute, you

7  know, addition, however you want to view it -- some might

8  argue retrade -- that Mr. Dondero was to leave the Debtor,

9  period.  That was our view.  That was the way that the term

10  sheet was initially structured.  And under no circumstances

11  was the Committee going to allow Mr. Dondero to have any

12  control over this Debtor.

13      Your Honor, the Committee doesn't know what, if any, the

14  consequences are of removing Mr. Dondero as an employee.  And

15  we're not conceding at all that there are any value lost by

16  removing Mr. Dondero as an employee.  Instead, what we're

17  doing is we're staying true to our structure with the

18  independent directors and we're empowering them to decide.

19  And so it's consistent with, you know, our goals of having the

20  independent director structure in place.  And under the

21  settlement as now constructed, even with this late addition or

22  adjustment, Mr. Dondero would remain as an employee in name

23  only, subject in all respects to the direction, oversight, and

24  removal by the independent board.  And importantly, should

25  they decide to do that, Mr. Dondero shall resign.  And he

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 178 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 246 of 1017   PageID 4925
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 177 of
2722

37

1   shall receive no compensation.

2       So he will not be in control of this Debtor.  The

3   independent directors are.  And he's not going to be empowered

4   to make decisions on behalf of the Debtor.  Instead, we're

5   empowering our independent directors to make those decisions

6   and determinations on behalf of the Debtor.

7       I wanted -- I thought it was important that I provide that

8   perspective to Your Honor, as this is something that came in

9   at a very, very late hour.

10      Overall, Your Honor, for the reasons I have stated and the

11  reasons in our reply, the Committee, as a fiduciary of all

12  creditors in this case, believes that the settlement is in the

13  best interests of the creditors and should be approved.  And

14  at this time, it's the better alternative than the cost,

15  delay, and uncertainty resulting from a Chapter 11 trustee

16  fight and the potential appointment of a Chapter 11 trustee.

17      It is time to put the governance issues behind us, Your

18  Honor, and to move forward to determine how to maximize value

19  for the creditors and how to get them paid.

20      Your Honor, just regarding the specific resolutions of

21  objections that Mr. Pomerantz put on the record, I agree with

22  how Mr. Pomerantz characterized those, and the Committee is

23  supportive of those resolutions as well.

24      Those are all my remarks, Your Honor, but I am happy to

25  answer any questions or address any concerns Your Honor may

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 179 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 247 of 1017   PageID 4926
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 178 of
2722

38

1   have.

2          THE COURT:  Okay.  Two follow-up questions.  First, I

3   know I asked you this at a previous hearing and you told me,

4   but your Committee, as I recall, is very well constituted.

5   Just remind me of the members.

6          MR. CLEMENTE:  Yes.

7          THE COURT:  You have a representative from the

8   Redeemer Committee, --

9          MR. CLEMENTE:  Yes, Your Honor.

10         THE COURT:  -- which is a $140 million or so

11  arbitration award?

12         MR. CLEMENTE:  Yes, Your Honor.

13         THE COURT:  Okay.  And who else is on the Committee?

14  Is an Acis representative?

15         MR. CLEMENTE:  Acis is on the Committee, Your Honor.

16         THE COURT:  Uh-huh.

17         MR. CLEMENTE:  Meta-e Discovery, who is a trade

18  vendor of the Debtor, is on the Committee.  And UBS

19  Securities, who is also --

20         THE COURT:  Okay.

21         MR. CLEMENTE:  -- a litigation claimant, is on the

22  Committee.

23     It was the U.S. Trustee in Delaware's parting gift to me

24  to name a four-member committee, Your Honor.

25     (Laughter.)

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 180 of
Case 3:25-cv-02072-S     Document 15-7     Filed 06/25     Page 248 of 1017     PageID 4927
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 179 of
2722

39

```
1          THE COURT:  Okay.  Makes it awkward at times.  And
2   then back to the Dondero subject.
3          MR. CLEMENTE:  Yes, Your Honor.
4          THE COURT:  I mean, again, both Mr. Pomerantz and you
5   clarified that the proposal now is the new board will decide
6   if he stays on, Mr. Pomerantz said as a portfolio manager.
7          MR. CLEMENTE:  That is correct, Your Honor.
8          THE COURT:  Am I -- I mean, I'm hearing that
9   correctly?
10         MR. CLEMENTE:  That is correct, Your Honor.
11         THE COURT:  So, right now, whatever officer positions
12  he has, he's technically not resigning?  Or --
13         MR. CLEMENTE:  He is resigning as an officer of the
14  company, Your Honor.
15         THE COURT:  Okay.  He's resigning?  So the board will
16  just decide, is he going to be a portfolio manager or some --
17  whatever the employee title is?
18         MR. CLEMENTE:  Or they could decide that he's not
19  necessary.
20         THE COURT:  Or not necessary?  In any event, no
21  compensation?
22         MR. CLEMENTE:  That is correct, Your Honor.
23         THE COURT:  Okay.
24         MR. CLEMENTE:  And as you can see, the term sheet
25  provides that Mr. Dondero shall not cause any related entity
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 181 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 249 of 1017 PageID 4928
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 180 of
2722

40

1    to terminate any agreements with the Debtor as well.  That was

2    language that was added last night as well.

3              THE COURT:  All right.  So they're going to make the

4    decision, does he help preserve value by staying in some

5    capacity or not?

6              MR. CLEMENTE:  That is correct, Your Honor.

7              THE COURT:  Okay.

8              MR. CLEMENTE:  That, cutting through it, that is the

9    way that ultimately the Committee views it.

10             THE COURT:  Okay.

11             MR. CLEMENTE:  And if there's an opportunity -- and

12   I'm not conceding that there is.  I'm not conceding that he

13   preserves any value.

14             THE COURT:  Uh-huh.

15             MR. CLEMENTE:  But we wanted to give the option to

16   our independent directors to make that determination.  Because

17   if there's an opportunity to preserve value, that's what we're

18   trying to achieve.

19             THE COURT:  Okay.  And I don't even know if you've

20   thought through this.  Would there be some sort of notice

21   filed on record in the case if --

22             MR. CLEMENTE:  If --

23             THE COURT:  -- if the decision is made to --

24             MR. CLEMENTE:  To -- to --

25             THE COURT:  -- hire him or keep him as a portfolio

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 182 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 250 of 1017 PageID 4929
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 181 of
2722

41

1    manager?

2          MR. CLEMENTE:  So, I think the default under the term

3    sheet, as revised, is he stays in that capacity in terms of

4    name.  The independent directors will -- they're subject to

5    his control and direction, and they could decide to remove

6    him.

7          THE COURT:  Uh-huh.

8          MR. CLEMENTE:  Perhaps if Your Honor --

9          THE COURT:  Okay.

10         MR. CLEMENTE:  We could provide notice if they make

11   the determination to remove him, but I think the default is

12   that, you know, he's in that -- he's remaining as that

13   employee name currently.  So that's the current default.

14         THE COURT:  Okay.  All right.  Thank you.

15         MR. CLEMENTE:  Thank you very much, Your Honor.

16         THE COURT:  Well, Ms. Patel, you're getting up so

17   I'll hear -- I don't know who all has been in the loop over

18   this overnight development.

19      OPENING STATEMENT ON BEHALF OF ACIS CAPITAL MANAGEMENT

20         MS. PATEL:  Your Honor, Acis has been in the loop as

21   a member of the Committee.  And I will be very brief with

22   respect to Acis's individual comments.  And I just want to be

23   clear:  Obviously, I'm here as counsel for Acis, and so this

24   is Acis's individual position.  Mr. Clemente aptly and very

25   ably handled the Committee's overall position with respect to

42

1   this.

2       But Your Honor, I just want to, on behalf of Acis, make

3   sure that, because of these developments, that's really -- I

4   really had hoped to have zero role today, but I want to make

5   sure that we're -- Acis is on record with respect to our

6   position.  And obviously, given Your Honor's knowledge and

7   oversight of the long history of Acis's bankruptcy case and

8   seeing some of the events that transpired there, I'm sure that

9   this will all, against that backdrop, make an awful lot of

10  sense.

11      But, you know, it's this continued role for Mr. Dondero

12  that is of concern.  You know, this issue even being raised

13  within like the last 48 hours by Mr. Ellington, the timing of

14  it just creates an issue.  I mean, did this -- how could this

15  possibly have come out of left field when this is such a huge

16  part of what the Debtor does in its ordinary course of

17  business, is serve as a portfolio manager, and these are

18  contracts that have been negotiated, generally speaking,

19  internally by Highland.  So the fact that if Mr. Dondero were

20  to exit the structure and there would be some potential

21  ramifications to that, I've got to wonder how much of a

22  surprise could that really have been to Highland folks.

23      But I just wanted to highlight, in connection with the

24  term sheet -- this is the preliminary term sheet that was

25  handed up Your Honor, and I believe Your Honor has a redline

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 184 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 252 of 1017 PageID 4931
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 183 of
2722

43

1    version of it as well --

2            THE COURT:  Uh-huh.

3            MS. PATEL:  -- on Page 2, with respect to the role of

4    Mr. James Dondero, there's various provisions in there.  And I

5    guess I would be remiss, Your Honor, if I didn't say, at least

6    out of the gate, Acis obviously supports the implementation of

7    this independent board of directors.  We believe all the

8    candidates are very capable and are -- we put our reliance

9    upon them.

10       Obviously, we don't concede any issues.  We'll see what

11   we're going to do.  But certainly, for the time being, we do

12   support the entry of this agreement of the settlement -- or,

13   I'm sorry, approval of the settlement agreement by the Court

14   that lets the independent board be put into place.

15       But what I'll focus the Court on, on Page 2 under the role

16   of Mr. James Dondero, it goes through various provisions as to

17   what he'll resign to -- positions he'll resign from and that

18   he will remain as an employee of the Debtor, including

19   maintaining his title as portfolio manager for all funds and

20   investment vehicles for which he currently holds that title.

21   And then it goes on to provide as to who he'll report to and

22   how he will be governed, which includes by the independent

23   board, he will receive no compensation, and that he will be

24   subject to at all times the supervision, direction, and

25   authority of the independent directors.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 185 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 253 of 1017 PageID 4932
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 184 of
2722

44

1    Again, we have faith that the independent directors will

2    oversee this and will govern his role accordingly.  However,

3    given Acis's history with how transactions have transpired at

4    Highland, we remain highly cautious with respect to what

5    happens next.

6        And to that end, Your Honor, the very last sentence there

7    on Page 2, "Mr. Dondero shall not cause any related entity to

8    terminate any agreements with the Debtor," is a key provision

9    of this that keeps Acis, as a Committee member, on board with

10   this agreement.  I wanted to highlight that and note that, in

11   the last less than 48 hours, in the last 12 hours, or maybe a

12   little bit more than that, call it 18 to be safe, that's where

13   -- that's a provision that's been -- that's where we've ended

14   up.  It's all of these issues have been going at lightning

15   speed, but I did want to just, for the record and so everybody

16   is clear, that is an important piece of this agreement to --

17   for Acis.

18       And as Your Honor knows, this Debtor, Highland, is wont to

19   try to terminate agreements and to try -- in an attempt to try

20   and transfer valuable contracts away and valuable revenue

21   stream away from an entity to an alternate entity.  And that's

22   really the heart of our concern, Your Honor.

23       So, with that, I just wanted to be clear and be on record

24   as to Acis's position.  Thank you.

25           THE COURT:  Thank you.  All right.

45

1          MR. POMERANTZ:  Your Honor, if I briefly may respond

2    to the issues with Mr. Dondero while they are fresh in Your

3    Honor's mind?

4          THE COURT:  Okay.  Okay.

5          MR. POMERANTZ:  Your Honor, look, we appreciate the

6    timing of this coming to the attention of the Committee as

7    being less than optimal.  As Your Honor can appreciate, this

8    case that's been filed three months ago, a lot of people are

9    looking very carefully at what's happening to the Debtor.

10   Investors are looking.  There was a transfer of venue.  There

11   have been a lot of reports about potential trustee motions.

12   And we believe a lot of parties are waiting to see the outcome

13   of this hearing and the trustee hearing to determine whether

14   they will determine to continue to do business with the

15   Debtor.

16      It's not only an issue of contractual rights.  It's also

17   an issue of whether investors feel comfortable on who is

18   managing, who is managing their investments.

19      This issue of Mr. Dondero's continuing role has been

20   something that at the Debtor we've continued to grapple with

21   over the last several weeks.  It's always been our thought

22   that we should do nothing that would unduly harm the company

23   from an economic standpoint.  I think the Committee shares

24   that.  That if it's determined by an independent board -- and

25   don't take current Debtor professionals, don't take current

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 187 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 255 of 1017    PageID 4934
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 186 of
2722

46

1  Debtor employees' word for it -- but if they determine that

2  there's an economic benefit by keeping him on to preserve

3  material revenue stream, they should be able to make that

4  determination.  I think that's really at the core here.  And I

5  think the Committee got ultimately comfortable with it because

6  it will be an independent board, the majority of the members

7  identified and chosen by them and accepted by the Debtor.

8       So, again, we apologize to the parties and the Court for

9  bringing this on late.  It wasn't my intent to come here and

10 present modified versions of the term sheet that hadn't been

11 filed.  But that's where we are, and that's why it has come

12 up, and that's why it's an extremely important issue, because

13 preserving whatever revenue we can for the Debtor is

14 important.

15      Now, at the end of the day, the board may either decide

16 that he doesn't preserve the revenue, or the negatives from

17 keeping him involved with the company outweigh any benefits.

18 And that's a decision they will have to make, and it'll be

19 their province to make.  So I just wanted to give Your Honor

20 that perspective.

21           THE COURT:  Okay.

22           MR. DAUGHERTY:  Your Honor, may I approach?

23           THE COURT:  Mr. Daugherty?  You may.

24      OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

25           MR. DAUGHERTY:  I apologize.  I was not planning to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 188 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/06/25   Page 256 of 1017   PageID 4935
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 187 of
2722

47

1   address the Court at all today.  I would have had my attorney

2   here for it.  But I just ask a little bit of indulgence to

3   represent myself *pro se* for this issue.

4       This is the first I've heard that Mr. Dondero would stay

5   with the company.  I think it's an awful idea.  There's a

6   litany of reasons for that.

7       By the way, I'm completely in support of this -- of this

8   board that's been chosen.  I have every confidence that

9   they'll be able to make good decisions eventually.  But

10  they're stepping into this thing new.  Obviously, I've been

11  through this in your court with *Acis* and other matters, and I

12  have deep, deep concerns about Mr. Dondero continuing in that

13  role, simply because of the influence it has on the rest of

14  the organization and the message that it sends, both

15  internally and externally, of where the company goes from

16  here.

17      So I just wanted to let you know my thoughts.  I wasn't

18  planning to make them.  I haven't filed anything.  But that's

19  where I stand.

20          THE COURT:  All right.  Thank you, Mr. Daugherty.

21      All right.  Before we hear from the U.S. Trustee, who I

22  know is going to have a lot to say, let me just circle back

23  briefly to Jefferies counsel and the CLO Issuers' counsel.

24  You heard the representations of Mr. Pomerantz earlier about,

25  well, first, in the case of Jefferies, that the Debtor has

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 189 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 257 of 1017   PageID 4936
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 188 of
2722

48

```
 1    agreed to language to address your concerns.  Do you want to

 2    weigh in on that and confirm that you're content that you're

 3    going to have language to work out your concerns?

 4               OPENING STATEMENT ON BEHALF OF JEFFERIES, LLC

 5               MR. MAXCY:  Thank you, Your Honor.  Patrick Maxcy for

 6    Jefferies.

 7          No, I don't have anything additional to add to what Mr.

 8    Pomerantz said.  The language that we have worked out will

 9    speak for itself and will be included in the order.

10               THE COURT:  All right.  Thank you.

11          And counsel for the CLO and CDO Issuers, do you confirm

12    that you would be in agreement to basically withdraw your

13    objections for now, but perhaps come back and make argument on

14    the 21st if you have not worked out language with the

15    Committee that you think works?

16               OPENING STATEMENT ON BEHALF OF THE ISSUER GROUP

17               MR. BENTLEY:  James Bentley from Schulte Roth for the

18    Issuers, Your Honor.

19           I believe the deal that Mr. Pomerantz and Mr. Clemente

20    and I have discussed was adjourning our objection to the 21st,

21    --

22               THE COURT:  Okay.

23               MR. BENTLEY:  -- rather than withdrawing it.

24               THE COURT:  Okay.

25               MR. BENTLEY:  We're -- we believe we will be able to
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 190 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 258 of 1017    PageID 4937
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 189 of
2722

49

1    come up with language acceptable to the Issuers, but we would

2    like to reserve the right to come back to the Court on our

3    limited objection if we cannot, given that our issue is really

4    -- really only relates to the 25 Issuers we represent.

5        THE COURT:  Okay.  Thank you very much.

6      All right.  Ms. Lambert?

7      OPENING STATEMENT ON BEHALF OF THE UNITED STATES TRUSTEE

8        MS. LAMBERT:  May it please the Court.  As the Debtor

9    acknowledges, the motion that they are settling, the issues

10    that they are settling, are the issues that the U.S. Trustee

11    has raised in his motion to appoint a Chapter 11 trustee.  As

12    a matter of statutory construction, Section 1104 does not

13    contemplate settlement of these issues.  1112, in contrast,

14    has a provision that if the Court finds and determines that

15    there is cause to convert a case, there are unusual

16    circumstances and the Court can find a reasonable

17    justification for the wrongdoing or the error that occurred

18    that led to cause -- for example, administrative defects in

19    1112, not filing monthly operating reports -- and that can be

20    cured.  The Court has to make a finding that those -- these

21    defects can be cured within a reasonable period of time.

22    Section 1104 contains no analog to his.

23      If the Court finds cause to direct the appointment of a

24    Chapter 11 trustee, then the Court is supposed to appoint a

25    Chapter 11 trustee.  And *Trailer Ferry* and *AWECO* both stand

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 191 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 259 of 1017 PageID 4938
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 190 of
2722

50

1   for the proposition that, on today's day, we're supposed to

2   have evidence about what the management issues are that led to

3   this agreement.  There's been no evidence.  There's been no

4   allegations in the motion for settlement.  And so the U.S.

5   Trustee is prepared to put that evidence on.

6       And Your Honor, one aspect of this is that the arbitration

7   agreement has been sealed.  And there are people on the phone.

8   I don't know who's on the phone.  The U.S. Trustee has opposed

9   the sealing of the arbitration -- not arbitration agreement,

10  the arbitration judgment -- has opposed the sealing of that.

11  And then they referenced a confidentiality order as the basis

12  to seal it.  The U.S. Trustee also opposed that

13  confidentiality motion, which was filed subsequently to the

14  motion to seal.

15      There is no confidentiality order.  An interim order was

16  entered sealing the arbitration award, but -- and the U.S.

17  Trustee has honored that by redacting all of the pleadings

18  that we filed relating to that, but it's important today for

19  the U.S. Trustee to be able to discuss it in argument, and it

20  is here -- and we have it prepared to be admitted into an

21  exhibit.

22      So, to proceed with my argument, Your Honor, I need some

23  clarification about what I can say.

24          THE COURT:  You want clarification from me on what

25  you can say?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 192 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 260 of 1017 PageID 4939
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 191 of
2722

51

1          MS. LAMBERT:  Well, I mean, either that or we need to

2     clear the room.

3          THE COURT:  I've read the arbitration award.

4          MS. LAMBERT:  Right.

5          THE COURT:  It's in my brain.

6          MS. LAMBERT:  Right.  Okay.

7          THE COURT:  Uh-huh.

8          MS. LAMBERT:  And so one of the arguments here today

9     is that the U.S. Trustee is representing the SEC and

10    representing other Government agencies and things.  No.

11    Obviously, that is not the U.S. Trustee --

12         THE COURT:  I didn't hear that.

13         MS. LAMBERT:  Okay.  The -- one of the positions has

14    been, in the papers, is, well, that we don't have standing to

15    raise their issues.  And that's true.

16         THE COURT:  Okay.

17         MS. LAMBERT:  But the problem is that the U.S.

18    Trustee has been constrained from discussing those issues with

19    the SEC.  The arbitration award is very relevant to the SEC's

20    oversight.  I anticipate the evidence today will be that the

21    SEC, after the financial crisis of 2008, imposed restrictions

22    on this Debtor on breach of fiduciary duty issues.  I

23    anticipate that the arbitration findings would be very

24    relevant to whether those issues are ongoing or not.

25         THE COURT:  Okay.  Let me weigh in.  I view the legal

52

1   standard that this Court has to weigh today as being:  Is the

2   Debtor proposing something that is reflective of sound

3   business judgment, reasonable business judgment?  And to the

4   extent this is a compromise of controversies with the

5   Committee, is this fair and equitable and in the best interest

6   of the estate?

7        And as Mr. Pomerantz has said, you know, a lot of this

8   maybe doesn't even need Court approval.  But to the extent

9   there are aspects of this that are appropriate to seek Court

10  approval on, you know, this is my task.  I have to look at

11  what's presented, and is this reflective of sound business

12  judgment?  Is this fair and equitable?  Is it in the best

13  interest?

14       So, assuming there are tons of bad facts here reflected in

15  the arbitration award, reflected in other evidence, bad facts

16  that might justify a trustee, a Chapter 11 trustee, is this

17  nevertheless, what's proposed today, a reasonable compromise

18  of, you know, the trustee arguments the Committee could make

19  or, you know, is this a reasonable framework for going

20  forward?  Okay?

21       So I guess what I'm saying is I'm confused about, you

22  know, do I need to look at the arbitration award?  Do we need

23  to have evidence of all of that?  I can assume that there are

24  terrible facts out there that might justify a trustee, but I'm

25  looking at what's proposed.  Is this a fair and equitable way

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 194 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 262 of 1017   PageID 4941
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 193 of
2722

53

1  to resolve the disputes?  Is it sound business judgment?

2  Frankly, is it a pragmatic solution here to preserve value?

3  So that's the legal standard I have in my mind here.

4          MS. LAMBERT:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MS. LAMBERT:  The standard is whether it is fair and

7  equitable to resolve the issues in the Chapter 11 trustee

8  motion, and it is the U.S. Trustee's position that they are

9  not resolved by this.  And how are they not resolved?  Number

10 one, they're not resolved because the problems that led to the

11 breach of fiduciary duty issues and findings are more

12 pervasive, both based on this Court' finding in the *Acis* case

13 and in the arbitration court's finding in Mr. Dondero.  Other

14 officers are implicated.

15         THE COURT:  But how --

16         MS. LAMBERT:  Other employees are implicated.

17         THE COURT:  Okay.  I feel like maybe we're talking at

18 each other, not getting each other.  I've got a proposed

19 solution here to totally change the playing field, if you

20 will.  Bring in incredibly qualified people to --

21         MS. LAMBERT:  Those people --

22         THE COURT:  -- to change out the, you know, the

23 person that you say breached fiduciary duties, the, you know,

24 mismanagement, whatever bad labels we have here, but bring in

25 a clean slate.

APP. 0190
Appx. 00327

54

1          MS. LAMBERT:  No, Your Honor, because employees

2    remain at the Debtor who are problematic.  The board that is

3    appointed owes a fiduciary duty to whom?  Strand.  Dondero.

4    He's still the board -- he is the sole stockholder.  Yes.  In

5    addition, --

6          THE COURT:  And they won't be taking directions from

7    him.

8          MS. LAMBERT:  In addition, --

9          THE COURT:  The term sheet is they won't be taking

10   directions from him.

11         MS. LAMBERT:  Your Honor, there is no evidence before

12   the Court today that Mr. Dondero has entered a stipulation.

13   This is part of the problem.  This continues --

14         THE COURT:  Well, if he doesn't, in five minutes the

15   Committee is going to be filing their trustee motion, right?

16         MS. LAMBERT:  Well, then we haven't saved any time or

17   any money.  This is the whole issue.  They have to put on

18   evidence that this is a resolution of issues.  We're going to

19   have the motion to appoint a Chapter 11 trustee either way.

20         THE COURT:  All right.  Well, we did have the

21   evidence of Mr. Sharp.  Would you like to cross-examine him at

22   this point?

23         MS. LAMBERT:  Your Honor, I would like to put the

24   U.S. Trustee's exhibits into evidence and then cross-examine

25   him.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 196 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 264 of 1017   PageID 4943
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 195 of
2722

55

```
1          THE COURT:  All right.  Your exhibits?

2          MR. POMERANTZ:  Your Honor, we would object to any

3    exhibits.  The Trustee has not filed an exhibit list.

4          MS. LAMBERT:  Your Honor, this matter was set on an

5    expedited basis and the Court does not require exhibit and

6    witnesses lists when a matter is filed on an expedited basis.

7    It's impossible, when a response is filed at 5:00 o'clock the

8    evening before and supplements are made in the morning of the

9    hearing, for the U.S. Trustee to put on a witness and exhibit

10   list.

11         MR. POMERANTZ:  Your Honor, we were here on the 19th.

12   We set out a briefing schedule.  And maybe it was a couple

13   days short of normal notice.  Ms. Lambert agreed to issue

14   discovery by a certain date, and she at no point said that

15   because there was 13 days' notice as opposed to longer period

16   that she couldn't comply and provide a witness list.

17       We provided with a witness list.  We provided an exhibit

18   list.  The Trustee's effort and attempt to now submit exhibits

19   and rely on maybe there were some changes this morning, that

20   just doesn't cut it, and that's not fair and that's not due

21   process.

22         THE COURT:  Okay.  I sustain the objection.  The

23   exhibits won't be admitted since there was no exhibit list.

24         MS. LAMBERT:  Your Honor, I do not have an exhibit

25   list from them.  And they --
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 197 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 265 of 1017    PageID 4944
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 196 of
2722

56

1          THE COURT:  Well, they haven't offered any.

2          MS. LAMBERT:  They put on new exhibits this morning.

3    The exhibits that the U.S. Trustee has are all things that

4    they are familiar with.

5          THE COURT:  Let me back up.  They didn't introduce

6    any exhibits.  They --

7          MS. LAMBERT:  But they introduced the declaration,

8    they introduced the supplements to the agreement that were

9    drafted this morning, they've introduced the new corporate

10   resolutions, all of which they handed me this morning.

11         THE COURT:  All right.  Well, the declaration of Mr.

12   Sharp, it's two pages long.  It is, I don't think, any kind of

13   surprise information.

14         MS. LAMBERT:  Your Honor, --

15         THE COURT:  I'll allow you to cross-examine him.

16         MS. LAMBERT:  -- the U.S. Trustee's exhibits are no

17   surprise, either.  The *Acis* opinion is no surprise to anybody

18   in this courtroom.

19         THE COURT:  Okay.  Well, what are your exhibits?

20         MS. LAMBERT:  The --

21         THE COURT:  I probably should have asked.

22         MS. LAMBERT:  The exhibits are the *Acis* opinion, the

23   arbitration awards or the determinations, both the partial and

24   the final, and the SEC's original judgment.  There are four

25   exhibits.

57

```
 1          THE COURT:  All right.  Well, Mr. Pomerantz, what
 2    would you like to say?  One of them I have obviously seen,
 3    since I wrote it.
 4          MR. POMERANTZ:  Yes, you've written it.  You wrote
 5    it.
 6        (Laughter.)
 7          MR. POMERANTZ:  Your Honor, I think this is a tempest
 8    in a teapot.  The Committee's brief that it filed in
 9    opposition to the CRO retention, the ordinary course
10    protocols, and the cash management motion had a litany of
11    description of the Redeemer litigation, of the SEC litigation.
12    There are plenty of bad facts out here.  Okay?  We have an
13    interim order to seal.  There was no hearing set today for our
14    final hearing.
15        The Trustee has objected to that order, and I suspect that
16    will be heard on the 21st.  We don't think it's appropriate to
17    introduce the Redeemer award.  However, we have read the
18    redacted provisions or portion of the U.S. Trustee's brief,
19    and we have no problem if the U.S. Trustee limits its argument
20    to the redacted portion in presenting that to the Court.
21        In other words, we don't believe that the few sentences
22    that were redacted need to be redacted.
23        However, to the extent they intend to submit the
24    arbitration award, we don't think it's appropriate, we don't
25    think it's necessary, we think Your Honor hit it right, that
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 199 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 267 of 1017   PageID 4946
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 198 of
2722

58

1    the issues today are not whether there's mismanagement at the

2    Debtor.  Okay?

3        The U.S. Trustee's position is, notwithstanding this new

4    structure, it doesn't work.  She has a trustee motion on.  She

5    can argue on the 21st that it doesn't work.  Nobody is

6    prejudicing her right to do so.

7        We think it's prejudicial, it's unfair, it's procedurally

8    improper to submit the Redeemer arbitration award and to allow

9    the Trustee to do anything other than describe exactly what

10   she has in her pleading.

11          THE COURT:  Okay.  I sustain the objection to those

12   exhibits.  Again, I've read them.  They're in my brain.  I

13   wrote one of them.  But I will allow you to cross-examine Mr.

14   Sharp.  So, Mr. Sharp, would you please come to the witness

15   stand?  Please raise your right hand.

16              BRADLEY SHARP, DEBTOR'S WITNESS, SWORN

17          THE COURT:  All right.  Please be seated.

18          MS. LAMBERT:  To clarify, Your Honor, has the Court

19   considered the *Acis* opinion and the arbitration opinions based

20   on judicial notice?

21          THE COURT:  And we're doing a lot of hair-splitting

22   here.  I'm just letting you know I -- the facts are in my

23   brain.  You can't extract them from my brain.  Okay?

24          MS. LAMBERT:  Okay.

25          THE COURT:  I know there have been a lot of bad

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 200 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 268 of 1017    PageID 4947
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 199 of
2722

Sharp - Cross                          59

1   things, arguably bad things.  But to me, the real issue here

2   today is whether this framework that has been heavily

3   negotiated with the Committee reflects reasonable business

4   judgment on the part of the Debtor, is a fair and equitable

5   resolution of the Committee's, you know, arguments in favor of

6   a trustee, and whether this makes, you know, sense going

7   forward to allow this Debtor to go forward without a trustee.

8   Okay?

9        So I really think that the evidence you want is not

10  terribly relevant.  We technically aren't here on a trustee

11  motion today.  We're here on whether a new board and the

12  terms, the protocols suggested, reflect reasonable business

13  judgment and reflect a fair compromise of arguments the

14  Committee has raised.  All right?  So I don't know how much

15  more clear I can make that.  I guess the technical answer is

16  I'm not taking judicial notice of those things for purposes of

17  today.

18       All right.  You may proceed.

19                  CROSS-EXAMINATION

20  BY MS. LAMBERT:

21  Q   Mr. Strand, can you state your name for --

22  A   Sorry.  Bradley Sharp, S-H-A-R-P.

23  Q   Sharp.  Mr. -- oh, sorry.

24  A   No relation to Strand.

25  Q   All right.  Strand is the general partner of the Debtor,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 201 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 269 of 1017 PageID 4948
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 200 of
2722

Sharp - Cross                    60

1  right?

2  A    That is correct.

3  Q    And there has been no change in the board of the Debtor

4  except Mr. Dondero's resignation; is that right?

5  A    Well, it's a little different, because the -- Strand is

6  the general partner of the Debtor.

7  Q    Yes.

8  A    So the new board will be acting and in control of the

9  Debtor.

10  Q    Yes.  And there is -- Strand is a non-debtor, correct?

11  A    That is correct.

12  Q    And the stock of the non-debtor, Strand, is owned by

13  Dondero?

14  A    Mr. Dondero owns Strand Advisors.

15  Q    In its entirety?

16  A    That is correct.

17  Q    So the board will owe a fiduciary duty to Mr. -- to Mr.

18  Dondero?

19  A    The board will have a fiduciary duty to the Debtor and to

20  Strand Advisors.

21  Q    All right.

22  A    Their duty is to the entity.

23  Q    The -- Strand, as the general partner, as an entity, owes

24  a fiduciary duty to the Debtor, right?

25          MR. MORRIS:  Objection to the extent it calls for a

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 202 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 270 of 1017 PageID 4949
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 201 of
2722

Sharp - Cross                    61

1  legal conclusion.

2         THE COURT:  Sustained.

3  BY MS. LAMBERT:

4  Q   Do you know?

5  A   As a lay person.  I'm not an attorney.

6  Q   Okay.  So you don't know what the fiduciary roles of the

7  board will be; is that right?

8  A   Well, the fiduciary board will be acting -- you know,

9  looking at it from my perspective as the chief restructuring

10 officer, the new board will be acting as the Debtor-in-

11 Possession.  And, you know, they will be directing the Debtor-

12 in-Possession.  You know, the Debtor-in-Possession has duties

13 to all parties in interest, and they will be directing the

14 Debtor.  They will be directing me as CRO.

15 Q   And, in addition, there may be a CEO, right?

16 A   That is contemplated, correct.

17 Q   It is contemplated?  It --

18 A   It is -- it is an option that the board has if they think

19 a CEO is necessary.

20 Q   But you don't know whether a CEO is going to be appointed

21 or not?

22 A   That's up to the board.

23 Q   And you don't know what the compensation for that

24 individual might be, right?

25 A   Again, that's up to the board.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 203 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/06/25    Page 271 of 1017    PageID 4950
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 202 of
2722

Sharp - Cross                        62

1   Q    Mr. Dondero is going to be an employee of the Debtor,

2   right?

3   A    That's correct.

4   Q    And Mr. Dondero started the Debtor, correct?

5   A    I believe so.

6   Q    And he also started Strand, right?

7   A    I believe that's correct.

8   Q    And he is also in control of a number of entities that the

9   Debtor does business with; is that right?

10  A    That is correct.

11  Q    Mr. Ellington is going to remain on with the Debtor?

12  A    That -- Mr. Ellington is an employee.  All employees are

13  now subject to the board.

14  Q    Okay.  And Mr. Ellington's role with the Debtor is what?

15  A    He is general counsel with the Debtor.

16  Q    And there are other in-house attorneys with the Debtor,

17  right?

18  A    That's correct.

19  Q    And who else is there currently?

20  A    I don't have the list in front of me, you know, the

21  employee list.  As of now, because obviously this is still --

22  hasn't been effected, so the board has not made any decisions

23  with respect to any employees going forward.

24  Q    And the CFO remains the same?

25  A    Yeah, that is, again, as of now.  I don't know what the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 204 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 272 of 1017 PageID 4951
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 203 of
2722

Sharp - Cross                          63

1  board is going to do, if anything.

2  Q   Do you have any anticipation of what you would recommend

3  to the board regarding the CFO?

4  A   You know, I have many recommendations I have not made to

5  the board yet.  I just met them this morning.

6  Q   Are you aware that historically this Court has found that

7  the lawyers provided bad advice to the Debtor?

8          MR. MORRIS:  Objection to the form of the question.

9          THE COURT:  Sustained.

10 BY MS. LAMBERT:

11 Q   Do you have any knowledge about whether there have been

12 findings that the law firm gave erroneous advice to the

13 Debtor?  Or, I mean, the in-house counsel gave erroneous

14 advice.

15         MR. MORRIS:  Objection to the form of the question.

16         THE COURT:  Sustained.

17         MS. LAMBERT:  Your Honor, I'm asking for the

18 foundation.

19         THE COURT:  Rephrase.

20 BY MS. LAMBERT:

21 Q   Do you -- are you aware of any concerns about the in-house

22 counsel?

23 A   Yes.

24 Q   What is your knowledge?

25 A   I have read the rulings from this Court.

Sharp - Cross                    64

1   Q    And what is your understanding of those rulings?

2   A    I don't recall specifically.  I read that early on when I

3   was first employed.  But there have been concerns with respect

4   to, you know, management of the Debtor.

5   Q    As the CRO, have you made any recommendations to change

6   employees to date?

7   A    As of now, I don't have a -- the board.  You know, the

8   board has just been employed.  We have not made

9   recommendations up to this point.  We are still -- obviously,

10  have been evaluating our position and what needs to happen.  I

11  think it's important for the Debtor at this time, a little

12  stability would be a good thing for -- until we develop the

13  direction going forward.

14  Q    Are you familiar with the compensation terms for the

15  directors?

16  A    Yes.

17  Q    And the directors are employees of Strand but paid by the

18  Debtor; is that right?

19  A    Oh, I'm not sure they're employees of Strand, but they are

20  paid by the Debtor, their compensation.  That's correct.

21  Q    And yet the compensation is technically through Strand,

22  right?

23  A    They -- they are.  They have to act through the general

24  partner of the Debtor because of the corporate structure.

25  Q    One of the portions of the agreement is that the Committee

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 206 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 274 of 1017    PageID 4953
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 205 of
2722

Sharp - Cross                          65

1  acquires litigation claims.  Are you familiar with that?

2  A   I am.

3  Q   Have you parsed out which litigation claims those might be

4  at this point?

5  A   I think the agreement says they have litigation claims

6  against insiders and related parties.  So I don't know what

7  those individual claims are.  I don't know what exists.

8  Q   Are you aware that the Committee obtains the attorney-

9  client privilege and work product privilege?

10  A   Yeah.  Subject to the terms of those agreements, correct.

11  Q   Have you gone through the documents and determined which

12  ones would fall on -- which attorney files would fall on which

13  side?

14  A   Not as of yet.

15  Q   Have you been taking direction from Mr. Dondero?

16  A   We've had -- I've had limited interaction with Mr. Dondero

17  since my retention.  You know, we have been complying with the

18  protocols that we had been negotiating with the Committee and

19  providing information to the Committee.  We have been, as a

20  result of those protocols, instructing management of the

21  company on compliance with those protocols.  So they have

22  brought to us transactions that they would like to do.  We

23  have reviewed those transactions and compared it to the

24  proposed protocols and have been enforcing those.  So if

25  management has asked to do a transaction that does not meet

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 207 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25   Page 275 of 1017   PageID 4954
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 206 of
2722

Sharp - Cross                        66

1   within those protocols, we have been declining the

2   transaction.  And that -- you know, the company has agreed

3   with that decision and accepted that decision.

4   Q    When you say management, who are you -- to whom are you

5   referring?

6   A    You know, the whole management team at the company.  In-

7   house counsel.  The CFO.  You know, I've had limited

8   interaction with Mr. Dondero.  One interaction was he did

9   question one of my decisions that I made.  We discussed it and

10  he accepted my conclusion.

11  Q    You're at the Debtor every day?

12  A    My team is.

13  Q    You are not?

14  A    I have had some travel restrictions due to a medical

15  issue, but I have three of my team there every day.

16  Q    Is Mr. Dondero there every day?

17  A    I don't know.  I don't think so.  In the few days I'm

18  there, I've not seen him.

19  Q    Is Mr. Ellington there every day?

20  A    No.

21  Q    Who on the management team is there every day?

22  A    You know, our primary interaction is with Isaac Leventon,

23  Frank Waterhouse, the CFO.  You know, primary interaction, you

24  know, with David Klos, who is the controller, in dealing with

25  the financial issues.

Sharp - Cross                      67

1      Obviously, we spend a lot -- my team spends a lot of time

2   with the head of compliance.

3   Q   Were you surprised by this addition that Mr. Dondero would

4   remain as an employee?

5   A   I can't say I was surprised.  It is an issue that we

6   struggle with, given the nature of this company's business.

7   You know, I see the change in the language and, you know, as

8   CRO, I am comfortable with it.

9   Q   So, as CRO, if Mr. Dondero is necessary now, you recognize

10  that he was necessary three weeks ago?

11  A   I'm not saying that he's necessary.  I'm saying that it is

12  important for the board to be able to make that decision.

13  Q   And it wasn't important when the settlement was filed?

14  A   It was the -- it was a struggle at the time.  I was

15  concerned at the time it was filed the unintended consequences

16  of Mr. Dondero resigning completely and disappearing, because

17  there are a significant number of funds that the Debtor deals

18  with related parties that are controlled by Mr. Dondero, and I

19  was worried about the financial impact with it.  I knew this

20  issue was important to the Committee.  And if that's something

21  that the Debtor agreed to and the Committee agreed to, so be

22  it.

23      You know, I think the last-minute compromise is acceptable

24  and appropriate.  I think the language as negotiated is going

25  to be very helpful to the Debtor.  And I think, then, it's up

Sharp - Cross                         68

1   to the board to make the decision, with full knowledge on

2   what's the best avenue forward.

3   Q   And the language as negotiated was added because, in the

4   past, there have been problems with Mr. Dondero changing or

5   terminating agreements with related entities, right?

6   A   There was that -- I've seen that -- issues raised in the

7   *Acis* case.

8           MS. LAMBERT:  No further questions.

9           THE COURT:  All right.  Any redirect?

10          MR. POMERANTZ:  Not from the Debtor.

11          THE COURT:  Anyone have examination?  No?  All right.

12   Thank you, Mr. Sharp.  You're excused.

13          THE WITNESS:  Thank you.

14      (The witness steps down.)

15          THE COURT:  All right.  Are we going to have any

16   other, I guess, witnesses, evidence?

17          CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

18          MR. POMERANTZ:  No, Your Honor.  I just had a couple

19   points.  One, Ms. Lambert mentioned that she hadn't seen a

20   copy of the stipulation referred to, which was prohibiting Mr.

21   Dondero from terminating the board.  There's a good reason for

22   her not having seen it.  I hadn't provided it to her.  It just

23   came this morning, right before the hearing.  I have one

24   signed copy.  I have other copies that I could represent, even

25   though they're unsigned, are the same, so I would like to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 210 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 278 of 1017   PageID 4957
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 209 of
2722

69

1  provide Your Honor.  I'll keep the signed copy but provide you

2  with an unsigned copy, but it's the same, and also give one to

3  the U.S. Trustee.

4          THE COURT:  But you've got a signature of Mr. Dondero

5  on that?

6          MR. POMERANTZ:  Yes, I do.

7          THE COURT:  Okay.

8          MR. POMERANTZ:  May I approach?

9          THE COURT:  You may.  Thank you.

10          MR. POMERANTZ:  Your Honor, maybe for the record it

11  would be appropriate for me to show Your Honor the signature,

12  so you could say that you've seen it?

13          THE COURT:  Yes.  Yes.

14          MR. POMERANTZ:  May I approach again?

15          THE COURT:  You may.  (Pause.)  Okay.  Thank you.

16  The record will reflect I've seen Mr. Dondero's signature.

17          MR. POMERANTZ:  Your Honor, one of the threads that

18  Ms. Lambert said to Your Honor is that there were employees

19  still remaining at the Debtor and that those employees may

20  have been involved in some wrongdoing.

21      I submit, Your Honor, if Your Honor appointed a Chapter 11

22  trustee today, what would a Chapter 11 trustee do?  A Chapter

23  11 trustee wouldn't terminate every employee at the Debtor.  A

24  Chapter 11 trustee, if he or she was doing what they should

25  do, would go down to the company, would interview members of

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 211 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 279 of 1017    PageID 4958
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 210 of
2722

70

 1    the company, senior management, and decide who should stay on

 2    and who should not stay on.

 3        That, I submit, Your Honor, is exactly what this board

 4    will do.  So the concept of there being something different

 5    done, if you have a board here or not, I don't think makes

 6    sense.

 7        And lastly, Your Honor, Ms. Lambert expressed the issue as

 8    whether it's fair and equitable to resolve the U.S. Trustee

 9    issues in this way.  I don't think that's the standard.  The

10    only fair and equitable I understand is in plan confirmation.

11    I think Your Honor said it straight, which is:  Is this a

12    valid exercise of the Debtor's business judgment and is it an

13    appropriate compromise of controversy?  That is the standard.

14    And, again, we have always acknowledged that, notwithstanding

15    how Your Honor rules today, the Trustee reserves the right to

16    come back to court and argue a trustee is appropriate on the

17    21st.

18        We believe, Your Honor, that many of the cases, in this

19    circuit and elsewhere, look to the continuing management of

20    the company and whether management issues have been addressed

21    as a significant factor in determining whether a trustee is

22    appointed.  And it'll come as no surprise, of course, if Your

23    Honor grants our motion today, this will be a lynchpin of our

24    opposition to the trustee motion.

25        But, again, those issues are for another day, and we

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 212 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25   Page 280 of 1017   PageID 4959
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 211 of
2722

71

1    believe that we have satisfied our standard, and we request

2    that Your Honor approve the motion.

3            THE COURT:  All right.  Other closing arguments?

4        CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES TRUSTEE

5            MS. LAMBERT:  Yes, Your Honor.  As the Debtor

6    acknowledges, the Court has no jurisdiction over Strand.  This

7    is a complicated structure.  A trustee avoids all of the

8    complications involved in the Court exercising jurisdiction

9    over an entity that it doesn't have jurisdiction over.

10   To enter a stock stipulation related to a non-debtor is

11   highly irregular, and Mr. Dondero is the person behind that.

12   It has happened in cases where people have been in these kinds

13   of structures, like that FSLIC used to put in these kinds of

14   structures -- there's published opinion, the *Gaubert* case --

15   where the person continued to exercise control even though

16   they had a stock trust.

17   The Court needs a person beholden to the Court.  The

18   evidence is that, historically, this Debtor has entered into

19   things that breached its fiduciary duty and resulted in self-

20   dealing and liability for the Debtor.  The evidence is that

21   these go beyond Mr. Dondero and the Court does not have

22   jurisdiction over his stock.  The Court does not have

23   jurisdiction over Strand.  The board members of Strand are not

24   employees of the Court, they're employees of Strand, a non-

25   debtor.  These members have a fiduciary duty to Strand.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 213 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 281 of 1017   PageID 4960
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 212 of
2722

72

1    Yes, Strand is the general partner of this Debtor and has

2   a fiduciary duty, but all these fiduciary duties intermix in

3   ways that result in conflicts for this case.  These conflicts

4   are unnecessary.  The Court could just appoint a trustee who

5   only owes a fiduciary duty to the members and creditors of

6   this case, as well as the next (inaudible).

7    There is no evidence that this is cheaper.  There is no

8   evidence that this is a total resolution, because issues are

9   left open, such as whether or not a CEO is going to be

10   appointed, how much that person is going to cost.

11    Finally, Your Honor, the sealing has constrained the

12   ability of some of the parties to understand what's going on

13   in this case.  And that is material to the argument about who

14   is here, because we don't know who -- that all the people who

15   would have participated in this discussion had an opportunity

16   to participate in it.

17    Yes, the creditors have a fiduciary duty, and I believe

18   that they represented to the best of their ability, but they

19   are not charged with the issues that others are charged with,

20   such as the SEC.

21    There is no evidence that the officers are disinterested.

22   Rather, the new officers are going to be conflicted by the

23   nature of their position.  There's no evidence that it's

24   cheaper.  And a trustee, if appointed, could be appointed on

25   an hourly basis.  This is a Chapter 11 trustee.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 214 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 282 of 1017 PageID 4961
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 213 of
2722

73

1    They argue that the trustee would not have the knowledge,

2  and yet they've been able to find three candidates to serve

3  for the board who are qualified.  So there's no evidence that

4  it would not be better to have a trustee for that reason as

5  well.

6    The evidence is that, historically, the Redeemer Committee

7  was set up to prevent these kinds of transactions and have

8  oversight.  Historically, the evidence is it did not work.

9  For this reason, the statute provides a solution, and the

10  Court should impose it.  The Court should deny this motion as

11  not being in the interest of the estate, as not being a sound

12  exercise of discretion, because it's really the discretion of

13  Strand, not the Debtor, and it will remain the discretion of

14  Strand, not the Debtor.

15    Thank you.

16         THE COURT:  All right.  Anyone else have comments?

17         MR. POMERANTZ:  Your Honor, just a couple of minor

18  points.

19         THE COURT:  Okay.

20          CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

21         MR. POMERANTZ:  Ms. Lambert started by saying the

22  Court doesn't have jurisdiction over Strand.  I know I just

23  handed her the stipulation, but the last paragraph of the

24  stipulation specifically says that the parties stipulate and

25  agree that the Court shall have exclusive jurisdiction over

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 215 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 283 of 1017 PageID 4962
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 214 of
2722

74

1   all matters arising from or related to the interpretation and

2   implementation of this stipulation and the adjudication of any

3   parties breaching the stipulation.

4       So the Court does have jurisdiction now that the

5   stipulation has been signed, assuming that the Court enters

6   it, so I think that addresses that issue.

7       Your Honor, the evidence of the disinterestedness of the

8   members of the board, we've provided their *curriculum vitaes*.

9   We've made representations that they have no connections with

10  the Debtor or any of the parties in interest.  We don't think

11  that, just because they become appointed and become a director

12  of Strand, that that renders them disinterested [sic], and we

13  think that the Trustee's arguments that being at a different

14  level creates different duties is just not -- is not accurate.

15  I don't think that the Committee would have had any appetite

16  for this type of structure had they believed that each of

17  these board members wouldn't feel that their fiduciary duty

18  was to the Debtor's estate.  And they all are seasoned

19  restructuring people from different aspects, all understand

20  their fiduciary duties well, and all are prepared to carry

21  them out.

22      Lastly, the Trustee points to the historic issues, and

23  specifically mentioned the Redeemer Committee and that

24  structure didn't work.  Well, I think it speaks volumes, Your

25  Honor, that not only the Redeemer Committee, are they on the

75

1  Committee and the Committee has supported this motion, but the

2  Redeemer Committee hasn't come to Your Honor and said that,

3  notwithstanding that structure that may or may not have been

4  effective, this structure is ineffective.

5      And at the end, Your Honor, the Trustee is trying to

6  replace the business judgment of the Debtor.  The Debtor is

7  entitled to deference of the judgment, again, focusing on the

8  correct standard.  And, again, the Trustee will have her day

9  in -- his day in court in connection with the ultimate trustee

10 motion on the 21st.

11     Thank you, Your Honor.

12         THE COURT:  Anyone else?

13     All right.  Well, the Court is going to note a few things

14 as part of its ruling, obviously.  The new proposed

15 independent board members for Strand, Strand obviously being

16 the general partner of the Debtor, Highland -- Mr. James

17 Seery, Mr. John Dubel, and retired Judge Russ Nelms -- are

18 highly-qualified individuals with respect to the industry.

19 Some of them with respect to restructuring.  Certainly, in the

20 case of retired Judge Nelms, with regard to fiduciary duties

21 and the Bankruptcy Code requirements.

22     These three individuals were chosen by the Creditors'

23 Committee, whose constituency is broad, whose constituency is

24 owed well over $100 million.  And they were chosen by the

25 Committee after literally months of negotiation.  Obviously,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 217 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 285 of 1017 PageID 4964
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 216 of
2722

76

1  this bankruptcy was filed in October, and it appears to this

2  Court, from the representations of counsel, that from the very

3  beginning of the case -- the Committee was, I guess, appointed

4  a week or two after the case was filed in October -- there's

5  been haggling over corporate governance of this Debtor.

6      So we have highly-qualified individuals.  We have

7  individuals who were chosen by the well-constituted Creditors'

8  Committee.  And what has been proposed to the Court is that it

9  is these independent directors that would have sole and

10  exclusive management and control of the Debtor.

11      An interesting jurisdictional argument has been made, and

12  it's one of those arguments that, frankly, you know, sounds

13  good when you first hear it, but when you really drill down

14  about the governance structure here, I mean, obviously, this

15  Debtor is a limited partnership and it acts through a general

16  partner.  It's the general partner that controls the Debtor

17  entity.  And while Strand Advisors, Inc., the general partner,

18  may not technically be in bankruptcy, it's the structure of

19  these entities such that it controls the Debtor.  So the

20  jurisdictional argument, when you drill down, feels a little

21  off.

22      Moreover, we have language in the stipulation where Strand

23  is stipulating and consenting, if you will, to this Court's

24  exercise of jurisdiction over it.

25      There are many things about the compromise here that have

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 218 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 286 of 1017    PageID 4965
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 217 of
2722

77

1   very compelling appeal.  Among them, certainly, the Committee

2   that's negotiated this term sheet retains the right at any

3   time to move for a Chapter 11 trustee if it believes there are

4   grounds.  The Committee is granted standing to pursue estate

5   claims, certain estate claims right off the bat, without

6   having to come back and ask the Court, without having to rely

7   on the Debtor to pursue that.  There are document production

8   provisions, document preservation provisions, a shared

9   privilege negotiated, that are very powerful tools for the

10  Committee, and certainly operating protocols that have been

11  negotiated regarding the Debtor's operations that are very

12  powerful tools for the Committee.

13      I said many times during the *Acis* case -- those who were

14  here will remember -- that the company, *Acis*, was not a great

15  fit for Chapter 11.  Lots of companies aren't great fits for

16  Chapter 11, I suppose, but the kind of business it was was

17  kind of tough to maneuver in Chapter 11.  Human beings and

18  their expertise create value.  And while we had a Chapter 11

19  trustee, a stranger come in and take control over Acis, you

20  know, there's great uncertainty whether that stranger is going

21  to be able to preserve value and have the smooth transition

22  into Chapter 11 that's really going to be the best fit.

23      Here, as I've said earlier, the legal standard I view as

24  controlling here is 363 and whether what has been proposed

25  reflects reasonable business judgment.  Is there a sound

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 219 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 287 of 1017    PageID 4966
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 218 of
2722

78

1  business justification for proposing the independent slate of

2  directors at the GP level for the Debtor, the protocols, the

3  negotiation with the Committee, the document sharing, the

4  standing given to them?  Does all of this reflect reasonable

5  business judgment?  And I find, quite clearly, it does.  I

6  find it to be a pragmatic solution to the Committee's concerns

7  about existing management and control.

8      And I think I used the words "fair and equitable," not

9  just Ms. Lambert, because it is also presented to the Court as

10 a 9019 compromise of disputes with the Committee, and we

11 traditionally use a fair and equitable and best interest of

12 the estate analysis in this context.  So, to the extent that

13 applies, I do find this a fair and equitable way of resolving

14 the disputes with the Committee, and I find this to be in the

15 best interest of the estate.  So I do approve this.

16     And by approving this motion, I'm approving the term sheet

17 as it's been presented, the various terms therein, the

18 exhibits thereto.  I'm specifically approving the new

19 independent directors, the document management and

20 preservation process, the standing to the Committee over

21 certain of the estate claims, the reporting requirements, the

22 operating protocols, the whole bundle of provisions.

23     Now, there is one specific thing I want to say about the

24 role of Mr. Dondero.  When Ms. Patel got up and talked about

25 the newest language that has been added to the term sheet, she

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 220 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 288 of 1017    PageID 4967
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 219 of
2722

79

1  highlighted in particular the very last sentence on Page 2 of

2  the term sheet, the sentence reading, "Mr. Dondero shall not

3  cause any related entity to terminate any agreements with the

4  Debtor."  Her statement that that was important, it really

5  resonated with me, because, you know, as I said earlier, I

6  can't extract what I learned during the *Acis* case, it's in my

7  brain, and we did have many moments during the *Acis* case where

8  the Chapter 11 trustee came in and credibly testified that,

9  whether it was Mr. Dondero personally or others at Highland,

10 they were surreptitiously liquidating funds, they were

11 changing agreements, assigning agreements to others.  They

12 were doing things behind the scenes that were impacting the

13 value of the Debtor in a bad way.

14     So not only do I think that language is very important,

15 but I am going to require that language to be put in the

16 order.  Okay?  So we're not just going to have an order

17 approving the term sheet that has that language.  I want

18 language specifically in the order.  You know, you can figure

19 out where the appropriate place to stick it in the order is,

20 but I want specific language in here regarding Mr. Dondero's

21 role.  I also -- the language in there that his role as an

22 employee of the Debtor will be subject at all times to the

23 supervision, direction, and authority of the Debtors, I want

24 that language in there as well.  Let's go ahead and put the

25 language in there that at any time, in any event, the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 221 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 289 of 1017   PageID 4968
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 220 of
2722

80

1   independent directors can determine he's no longer going to be

2   retained.  I want that in the order.

3       And I'm sure most of you can read my mind why, but I want

4   it crystal clear that if he violates these terms, he's

5   violated a federal court order, and contempt will be one of

6   the tools available to the Court.  He needs to understand

7   that.  Mr. Ellington needs to understand that.  You know, if

8   there are any games behind the scene, not only do I expect the

9   Committee  is going to come in and highlight that to the Court

10  and file a motion for a trustee or whatever, but we're going

11  to have a contempt of court issue.

12      So, anybody want to respond to that?

13          MR. POMERANTZ:  Your Honor, Jeff Pomerantz; Pachulski

14  Stang Ziehl & Jones.

15      We hear Your Honor.  What I thought I'd do now is I have a

16  clean redline of the order, of course not including the

17  provision you just requested, --

18          THE COURT:  Uh-huh.

19          MR. POMERANTZ:  -- which we will go back and upload

20  and hope to get an order signed by Your Honor today, if you're

21  around.  But to go over the other changes, the changes to

22  Jefferies, the other language changes I discussed before.  I

23  gave a copy to Ms. Lambert and to the Committee.  May I

24  approach with a --

25          THE COURT:  You may.

81

1           MR. POMERANTZ:  Thank you.

2           THE COURT:  Okay.  All right.  (Pause.)  All right.

3   The form of order looks fine to me.  Obviously, you'll add the

4   Dondero-related language, and we may have further wording

5   tweaks negotiated with the CLO Issuers.  But, again, I approve

6   all of this.  I didn't say on the record the compensation, but

7   certainly I am approving that as reasonable.  I expect these

8   three directors are going to be working very, very hard.  And

9   so, as you said, not 50,000-foot level monitoring, actually

10  rolling up sleeves on-site, so I think the compensation is

11  reasonable.

12          MR. POMERANTZ:  Thank you, Your Honor.  We will

13  submit an order shortly that includes Your Honor's language

14  requested.

15          THE COURT:  Okay.

16          MR. POMERANTZ:  Are you around this afternoon?

17          THE COURT:  I am around, --

18          MR. POMERANTZ:  Okay.

19          THE COURT:  -- so just pick up the phone or send an

20  email to Traci, my courtroom deputy, --

21          MR. POMERANTZ:  Yes.

22          THE COURT:  -- so she can tell me, "It's in your

23  queue to sign."

24          MR. POMERANTZ:  She has been extremely helpful and

25  responsive.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 223 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 291 of 1017    PageID 4970
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 222 of
2722

82

```
 1            THE COURT:  Good.  I'm glad to hear that.

 2            MR. POMERANTZ:  Yes.

 3            THE COURT:  Now, as far as future scheduling, I did

 4   have her sitting by, listening, in case we needed to discuss

 5   anything.  Obviously, we're going to have a kind of a

 6   carryover placeholder on the 21st as part of the trustee

 7   motion hearing for any remaining issues with the CLO Issuer.

 8   And, you know, that's just a placeholder if necessary to hear

 9   language controversies.

10       My courtroom deputy was concerned, because you have a lot

11   of pending motions that have just sort of sat there pending

12   because this was the big issue, right?  She wants to make sure

13   she sets anything you need a setting on.  And I don't know if

14   you want to discuss that today or go back as a group and --

15            MR. POMERANTZ:  We're happy to -- I think, you know,

16   I think that's appropriate to do.  We had the motion to

17   appoint the CRO.

18            THE COURT:  Uh-huh.

19            MR. POMERANTZ:  That was pending.  That gets resolved

20   by this motion.  We will submit an order --

21            THE COURT:  Okay.

22            MR. POMERANTZ:  -- with the new agreement that was

23   attached to the term sheet.

24       We had the cash management order which Judge Sontchi had

25   issued an interim order.  We will have a final order with
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 224 of
Case 3:25-cv-02072-S Document 15-7 F272310/06/25 Page 292 of 1017 PageID 4971
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 223 of
2722

83

1    respect to that.

2              THE COURT:  Okay.

3              MR. POMERANTZ:  We will be withdrawing the motion to

4    approve ordinary course protocols which was originally on for

5    hearing.

6              THE COURT:  Uh-huh.

7              MR. POMERANTZ:  I think on the 21st we have currently

8    set a motion to approve the retention or Mercer, which is the

9    Debtor's compensation consultant, --

10             THE COURT:  Uh-huh.

11             MR. POMERANTZ:  -- and an analog motion that was

12   originally set for today with respect to insiders, non-

13   insiders, but is on for non-insiders and insiders on the 21st,

14   --

15             THE COURT:  Uh-huh.

16             MR. POMERANTZ:  -- which is the motion to approve

17   bonuses.

18             THE COURT:  Uh-huh.

19             MR. POMERANTZ:  Of course, the Debtor's new board is

20   going to be wanting to very carefully review that.  And we are

21   going back and today having our first new board meeting with

22   the board to start bringing them up to speed.  But we

23   presently intend, subject to, obviously, their direction, to

24   go forward on the 21st.

25        We also have the retention of Lynn Pinker and Foley

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 225 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 293 of 1017    PageID 4972
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 224 of
2722

84

1   Gardere, which had been filed and was brought on for hearing

2   previously.  It had been delayed, again, for the board to look

3   at the issues.  We expect to have that on for the 21st.  And I

4   believe, I believe that would be it.

5          MS. LAMBERT:  No, Your Honor, the --

6          MR. POMERANTZ:  No?

7          MS. LAMBERT:  -- U.S. Trustee has objected to the

8   motion to seal, which was the second item on the Wilmington

9   Court's docket that got -- and it got transferred here.  The

10  U.S. Trustee has also objected to the motion for protective

11  order.  The issues overlap.  We request that they be set as

12  quickly as possible.

13         MR. POMERANTZ:  We're happy to set both of those for

14  the 21st as well.

15         THE COURT:  All right.  So I think what I'm going to

16  ask you to do is just get on the phone, one of you, with Traci

17  and just make sure she's clear on everything you need set on

18  the 21st, and then you can do a big notice of hearing, just

19  kind of listing all of these matters.

20         MR. POMERANTZ:  Your Honor, with respect to the CRO

21  motion -- order and the cash management order, I was wondering

22  if it would be helpful for my colleague Mr. Demo to go over

23  the amendments to those orders -- we would like those to be

24  entered today -- to see if Your Honor has any questions.

25         THE COURT:  All right.  That would be good.  Mr.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 226 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 294 of 1017    PageID 4973
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 225 of
2722

85

1   Clemente, did you have something first?

2          MR. CLEMENTE:  Just very quickly, Your Honor.  We had

3   filed our retention applications for the Committee

4   professionals and filed CNOs, and your office had indicated

5   you wanted to get through today, which I totally understand,

6   but I just wanted to make sure that Your Honor didn't lose

7   sight of those.  I don't believe there were any objections to

8   those, but I think your intent was probably to deal with them

9   after today, but I just wanted to --

10          THE COURT:  All right.  Yes, it was to get through

11  today.

12          MR. CLEMENTE:  Yes.

13          THE COURT:  So, since you've had plenty of time run

14  on those, you can submit orders and I'll get them signed in

15  chambers.

16          MR. CLEMENTE:  Thank you very much, Your Honor.

17  Appreciate it.

18          THE COURT:  Okay.  Thank you.  Counsel?

19          MR. DEMO:  Good afternoon, Your Honor.  Greg Demo,

20  Pachulski Stang, on behalf of the Debtor.  I'm happy to keep

21  this as brief as possible, but I think walking through the

22  cash management motion has the most changes.

23          THE COURT:  Okay.

24          MR. DEMO:  The biggest change there, and we had

25  discussed this with the United Stated Trustee in Delaware, is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 227 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 295 of 1017   PageID 4974
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 226 of
2722

86

1    that in our initial motion we disclosed that the Debtor had

2    bank accounts at BBVA and then also at NexBank.  Those

3    accounts have been moved to East West Bank, --

4              THE COURT:  Okay.

5              MR. DEMO:  -- which is a party to a depository

6    agreement with the United Stated Trustee.

7              THE COURT:  Okay.

8              MR. DEMO:  The only exception to that is a

9    certificate of deposit that is at NexBank.  It's a relatively

10   small amount of money.  It's $135,000.  But it also is pledged

11   as collateral on a lease.  So that has been -- proven

12   problematic to move.  The Trustee for Delaware did say that

13   was okay.  I would hope that the Trustee for Texas would agree

14   with that.  We did disclose it in the initial debtor

15   interview.

16      But those are the bank accounts.  The bank accounts at

17   BBVA and NexBank, with the exception of that CD, were all

18   closed as of yesterday.

19             THE COURT:  Okay.

20             MR. DEMO:  So now we are going to be using East West

21   Bank for all operating accounts, all cash, going forward.

22      The other two accounts are the account at Jefferies, which

23   is the prime brokerage account.

24             THE COURT:  Uh-huh.

25             MR. DEMO:  That account, we are keeping open.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 228 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 296 of 1017   PageID 4975
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 227 of
2722

87

1    Obviously, there have been conversations with Jefferies that

2    are going to be reflected in the proposed order on the

3    settlement, but we do propose to keep the Jefferies prime

4    brokerage account open as well.

5       And then we filed a supplement for another prime brokerage

6    account that we have at a prime broker called Maxim Group.

7    That account has $30 million in securities in it, give or

8    take, and then literally like $100 in cash.  The Debtor

9    considers that account more an investment than actual

10   operating account, but we would like to keep that account open

11   as well, just so it can continue holding those securities.

12       Jefferies and Maxim, neither of them are on the depository

13   list, so we are requesting a waiver of 345(b) for those two

14   accounts, and then also requesting a waiver of 345(b) with

15   respect to the certificate of deposit at NexBank.

16           THE COURT:  Okay.

17           MR. DEMO:  That's where we're at at cash management.

18   And I guess, sorry, one more thing.  In the original cash

19   management motion, we had a series of intercompany

20   transactions that we disclosed, and we had gotten interim

21   relief from the Delaware court to make those payments up to a

22   hundred -- or, $1.7 million.  We are below that account, and

23   on a go-forward basis, all of those intercompany transactions

24   are getting subsumed into the settlement motion and the

25   operating protocols and all of that.  But we are asking for

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 229 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 297 of 1017 PageID 4976
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 228 of
2722

88

1    final relief on the intercompany transactions that we made

2    under the interim order.

3         THE COURT: Okay. All right. Who wishes to be heard

4    on this? I don't know how much discussion we've had outside

5    the courtroom on this.

6         MS. LAMBERT: We haven't -- normally, a bond would be

7    appropriate for the Jefferies and the other small account.

8    The estate is at risk on the CD, but it's not that much money.

9    It's not worth bonding. It'll be more expensive to bond it.

10        NexBank, as you know, Your Honor, is a bank where Mr.

11   Dondero is the CEO. So that was part of the reason that

12   NexBank was carved out. But the -- so I would like them to

13   bid bonds on the Jefferies and the other account. And if we

14   -- let's carry it on those issues so that we can see how

15   expensive bonding it would be, and if it's cost-prohibitive,

16   maybe we reconsider. But in the past, the bonds haven't been

17   very expensive, relatively.

18        MR. DEMO: We're happy to discuss that with the U.S.

19   Trustee. I mean, just for the record, the Jefferies account,

20   you know, does support a margin loan. It's $80 million in

21   securities. It's $30 million at Maxim. They're SIPC. I

22   mean, it's Jefferies and, you know, another large prime

23   broker. Again, we're happy to discuss it with the Trustee. I

24   don't know that it's necessary, but we will discuss it.

25        THE COURT: Okay. Well, you all can discuss it, and

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 230 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 298 of 1017    PageID 4977
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 229 of
2722

89

```
 1    if you have an unopposed order, an agreed order, --

 2            MR. DEMO:  Uh-huh.

 3            THE COURT:  -- you can upload it and I'll sign it.

 4    Otherwise, if you need hearing time on the 21st, --

 5            MR. DEMO:  Okay.

 6            THE COURT:  -- we'll get it all figured out then and

 7    --

 8            MR. DEMO:  Okay.  All right.

 9            THE COURT:  -- resolve it then.

10            MR. DEMO:  Thank you, Your Honor.  And then I guess

11    the other motion is the CRO retention.  This one should

12    hopefully be pretty brief.  We are just filing a new proposed

13    order that attaches the engagement letter, as has been

14    modified by all of the settlement discussions.  I believe the

15    Committee is on board with that, and it's consistent.  It was

16    one of the attachments that you approved this morning in

17    connection with the settlement.

18            THE COURT:  All right.  Comments on that?

19            A VOICE:  None, Your Honor.

20            THE COURT:  Committee,  you're good?

21            MS. LAMBERT:  The U.S. Trustee had also objected to

22    the CRO motion, but it's some of the same issues that the

23    Committee raised.  And the CRO, my understanding, is now not

24    an employee of the board but totally overseen by the board,

25    and with that, we can withdraw our objection.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 231 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 299 of 1017    PageID 4978
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 230 of
2722

90

1        THE COURT:  All right.  Very good.  I'll sign your

2   order on the CRO, then.

3        MR. DEMO:  Okay.  Thank you, Your Honor.

4        THE COURT:  All right.  Well, if there's nothing

5   else, I'll be on the lookout for your orders.  And, again, if

6   you could coordinate with Traci to make sure she's clear on

7   everything you need set on the 21st.

8        MR. POMERANTZ:  Thank you very much, Your Honor.

9        THE COURT:  All right.

10       MR. CLEMENTE:  Thank you, Your Honor.

11       MR. DEMO:  Thank you, Your Honor.

12       THE CLERK:  All rise.

13    (Proceedings concluded at 11:54 a.m.)

14                    --oOo--

15

16

17

18

19

20                    CERTIFICATE

21    I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    /s/ Kathy Rehling                    12/10/2020

24   _____    _____
    Kathy Rehling, CETD-444                    Date
25   Certified Electronic Court Transcriber

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 232 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 300 of 1017    PageID 4979
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 231 of
2722

91

INDEX

PROCEEDINGS                                                              4

OPENING STATEMENTS

By Mr. Pomerantz                                                         9
By Mr. Clemente                                                         29
By Ms. Patel                                                            41
By Mr. Pomerantz                                                        45
By Mr. Daugherty                                                        46
By Mr. Maxcy                                                            48
By Mr. Bentley                                                          48
By Ms. Lambert                                                          49

WITNESSES

Debtor's Witnesses

Bradley Sharp
- Direct Testimony by Declaration                                       8
- Cross-Examination by Ms. Lambert                                     59

EXHIBITS

Debtor's Exhibits                                   Identified Received

1    Bradley Sharp Declaration                          8        8

CLOSING ARGUMENTS

By Mr. Pomerantz                                                       68
By Mr. Clemente                                                       71
By Mr. Pomerantz                                                      73

RULINGS                                                               75

END OF PROCEEDINGS                                                    90

INDEX                                                                 91

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 233 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 301 of 1017 PageID 4980
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 232 of
2722

# EXHIBIT 3

```
                IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION


                                )   Case No. 19-34054-sgj-11
In Re:                          )
                                )
HIGHLAND CAPITAL                )   Dallas, Texas
MANAGEMENT, L.P.,               )   February 19, 2020
                                )   9:30 a.m.
                                )
        Debtor.                 )
                                )   MOTIONS
_____)

                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:            Greg Demo
                           John A. Morris
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           780 Third Avenue, 34th Floor
                           New York, NY  10017-2024
                           (212) 561-7700

For the Debtor:            Jeffrey N. Pomerantz
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd., 13th
                             Floor
                           Los Angeles, CA  90067
                           (310) 277-6910

For the Debtor:            Melissa S. Hayward
                           Zachery Z. Annable
                           HAYWARD & ASSOCIATES, PLLC
                           10501 N. Central Expressway,
                             Suite 106
                           Dallas, TX  75231
                           (972) 755-7104

For the Official Committee Matthew A. Clemente
of Unsecured Creditors:    SIDLEY AUSTIN, LLP
                           One South Dearborn Street
                           Chicago, IL  60603
                           (312) 853-7539
```

Line numbers: 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 234 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 302 of 1017    PageID 4981
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 233 of
2722

2

```
 1   APPEARANCES, cont'd.:

 2   For the Official Committee  Juliana Hoffman
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
 3                               2021 McKinney Avenue, Suite 2000
                                 Dallas, TX  75201
 4                               (214) 981-3413

 5   For Acis Capital            Rakhee V. Patel
     Management GP, LLC,         Annmarie Antoinette Chiarello
 6   et al.:                     Phillip L. Lamberson
                                 WINSTEAD, P.C.
 7                               2728 N. Harwood Street, Suite 500
                                 Dallas, TX  75201
 8                               (214) 745-5250

 9   For Acis Capital            Brian Patrick Shaw
     Management GP, LLC,         ROGGE DUNN GROUP, P.C.
10   et al.:                     500 N. Akard Street, Suite 1900
                                 Dallas, TX  75201
11                               (214) 239-2707

12   For the Issuer Group:       Amy K. Anderson
                                 JONES WALKER, LLP
13                               811 Main Street, Suite 2900
                                 Houston, TX  77002
14                               (713) 437-1866

15   For the Issuer Group:       James T. Bentley
     (Telephonic)               SCHULTE ROTH & ZABEL, LLP
16                               919 Third Avenue
                                 New York, NY  10022
17                               (212) 756-2000

18   For Redeemer Committee of   Mark A. Platt
     the Highland Crusader       FROST BROWN TODD, LLC
19   Fund:                       100 Crescent Court, Suite 350
                                 Dallas, TX  75201
20                               (214) 580-5852

21   For Redeemer Committee of   Marc B. Hankin
     the Highland Crusader       JENNER & BLOCK, LLP
22   Fund:                       919 Third Avenue
     (Telephonic)               New York, NY  10022-3098
23                               (212) 891-1600

24

25
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 235 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 303 of 1017   PageID 4982
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 234 of
2722

3

 1   APPEARANCES, cont'd.:

 2   For the U.S. Trustee:        Lisa L. Lambert
                                  OFFICE OF THE UNITED STATES
 3                                  TRUSTEE
                                  1100 Commerce Street, Room 976
 4                                Dallas, TX  75242
                                  (214) 767-8967 Ext. 1080
 5
     Recorded by:                 Michael F. Edmond
 6                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
 7                                Dallas, TX  75242
                                  (214) 753-2062
 8
     Transcribed by:              Kathy Rehling
 9                                311 Paradise Cove
                                  Shady Shores, TX  76208
10                                (972) 786-3063

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

4

```
 1            DALLAS, TEXAS - FEBRUARY 19, 2020 - 9:43 A.M.

 2            THE COURT:  All right.  Well, we have Highland

 3   matters.  Let's get lawyer appearances, in the courtroom

 4   first.

 5            MR. DEMO:  Good morning, Your Honor.  Greg Demo;

 6   Pachulski Stang Ziehl & Jones, on behalf of the Debtor.  With

 7   me are Jeff Pomerantz and John Morris.

 8            THE COURT:  Okay.  Good morning.

 9            MR. POMERANTZ:  Good morning.

10            MR. CLEMENTE:  Good morning, Your Honor.  Matthew

11   Clemente and Juliana Hoffman from Sidley Austin on behalf of

12   the Official Committee of Unsecured Creditors.

13            THE COURT:  Good morning.

14            MS. HAYWARD:  Good morning, Your Honor.  Melissa

15   Hayward and Zachery Annable also on behalf of the Debtor.

16            THE COURT:  Good morning.

17            MS. LAMBERT:  Lisa Lambert with the U.S. Department

18   of Justice on behalf of the U.S. Trustee, William Neary.

19            THE COURT:  Good morning.

20            MS. PATEL:  Good morning, Your Honor.  Rakhee Patel,

21   Phil Lamberson, and Annemarie Chiarello of Winstead, P.C., and

22   also Brian Shaw of Rogge Dunn Group, on behalf of Acis Capital

23   Management, LP and Acis Capital Management, GP, LLC.

24            THE COURT:  Thank you.

25            MR. PLATT:  Good morning, Your Honor.  Mark Platt
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 237 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 305 of 1017 PageID 4984
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 236 of
2722

5

 1    from Frost Brown Todd on behalf of the Redeemer Committee of

 2    the Highland Crusader Fund.  I believe that at least Marc

 3    Hankin from Jenner & Block is on the line as well.

 4              THE COURT:  Okay.  Thank you.

 5              MS. ANDERSON:  Good morning, Your Honor.  Amy

 6    Anderson with Jones Walker on behalf of the Issuers.  And I

 7    believe Mr. James Bentley with Schulte Roth is also on the

 8    phone.

 9         And I apologize for interrupting the flow.  I would ask if

10    Mr. Bentley and I could be excused after the uncontested

11    matters are taken up this morning, just to avoid  --

12              THE COURT:  Okay.

13              MS. ANDERSON:  -- having us -- I don't want to re-

14    interrupt later, if that is all right with Your Honor.

15              THE COURT:  Okay.  That's fine.  Thank you.

16              MS. ANDERSON:  Okay.

17              THE COURT:  All right.  That looks like all the

18    courtroom appearances.  On the phone, we heard that James

19    Bentley is there.  Do you want to appear, Mr. Bentley?

20              MR. BENTLEY:  Yes, that's correct, Your Honor.  Good

21    morning.

22              THE COURT:  All right.

23              MR. BENTLEY:  Good morning, Your Honor.  James

24    Bentley; Schulte Roth & Zabel; for the Cayman Issuers.

25              THE COURT:  All right.  And someone else was there

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 238 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/06/25   Page 306 of 1017   PageID 4985
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 237 of
2722

6

1    for the Redeemer Fund.  I can't remember.  Was it Mr. Clubok

2    you said, or anyone else on the phone?

3            MR. HANKIN:  Marc Hankin from Jenner & Block, --

4            THE COURT:  Oh, okay.

5            MR. HANKIN:  -- Your Honor.

6            THE COURT:  All right.  Mr. Hankin.  Anyone else on

7    the phone who wants to appear may go ahead.

8        All right.  I guess we're good to go.  Well, I'll turn now

9    -- Mr. Demo, are you going to start us off today?

10           MR. DEMO:  Yes, Your Honor.

11           THE COURT:  Someone delivered a wonderful notebook

12   and an easy-to-follow agenda.  I appreciate whosoever hard work

13   was behind that.  It really helps us get prepared back in

14   chambers.  So, thank you.

15           MR. DEMO:  And we're happy to do it, Your Honor,

16   because, honestly, it helps us, I think, as much as it helps

17   you.

18           THE COURT:  Okay.

19           MR. DEMO:  And we do have extra copies if anybody

20   needs a copy of the agenda.

21           THE COURT:  Okay.

22           MR. DEMO:  Generally speaking, we'd kind of like to

23   go in the order of the agenda, I think, with two exceptions.

24   I know that Ms. Adams and Mr. Bentley have to move, so I

25   thought maybe we could do their objection to the settlement

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 239 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 307 of 1017 PageID 4986
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 238 of
2722

7

1    motion first.

2              THE COURT:  Okay.  So that's the carryover matter.

3              MR. DEMO:  Correct, Your Honor.

4              THE COURT:  We obviously have an order in place, but

5    we kept it open to accommodate their issues.

6              MR. DEMO:  Correct.

7              THE COURT:  Okay.

8              MR. DEMO:  And that's Item 7 on Page 7.

9              THE COURT:  All right.

10             MR. DEMO:  And I think this one -- and anybody can

11   correct if I'm wrong -- will go pretty easily.  We've come to

12   an agreement with the Objecting Parties.

13             THE COURT:  All right.

14             MR. DEMO:  We are planning on submitting, under a

15   notice, a revised copy of the operating protocols that were

16   approved by this Court in connection with the settlement that

17   addresses those Objectors' concerns.  And then once that is

18   filed, the Objecting Parties will withdraw their objection.

19             THE COURT:  All right.  Anyone wish to speak up on

20   this matter?

21        All right.  Well, as I recall, the concern had been that

22   they didn't want the agreed-upon operating protocols with the

23   Committee to somehow change contractual rights of the parties,

24   and so --

25             MR. DEMO:  That is correct, Your Honor.  And we took

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 240 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 308 of 1017   PageID 4987
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 239 of
2722

8

1    their language and we carved out a small universe of CLO

2    Issuers, --

3              THE COURT: Okay.

4              MR. DEMO:  -- exactly as they asked for.

5              THE COURT:  All right.  Well, again, I'll ask:  Does

6    anyone have any comment about this revised process?

7        All right.  Well, that sounds perfectly fine to me, so

8    we'll look for the revised copy of the operational procedures.

9              MR. DEMO:  Okay.  Great, Your Honor.

10       And then I guess the only other exception to the order of

11   the agenda --

12       (Garbled phone noises.)

13             THE COURT:  Is someone on the phone wishing to speak

14   up?  (no response)  All right.  I guess not.

15             MR. DEMO:  Yeah.  I guess the only other exception to

16   the order in the agenda is the Foley Gardere retention

17   application.

18             THE COURT:  Okay.

19             MR. DEMO:  We would like to do that last.  It is a

20   contested hearing and I think we are going to have some

21   evidence on that.

22             THE COURT:  All right.  All right.  Sounds fine.

23             MR. DEMO:  Then, I guess, just going through the

24   agenda in the order that it's written, the first one is the

25   Lynn Pinker retention application.  We had originally filed

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 241 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 309 of 1017   PageID 4988
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 240 of
2722

9

```
1   that retention application back in October.  We recently

2   withdrew it.  We're not going to go forward on it.

3           THE COURT:  All right.

4           MR. DEMO:  The second matter, and I guess the second

5   two matters, hopefully, we can take at the same time.  These

6   are two uncontested matters.  Certificates of no objection

7   have been filed for both of them.  The first is the foreign

8   representative motion.

9           THE COURT:  Yeah, and I will tell you, I don't know

10  if it's shown up on PACER yet, --

11          MR. DEMO:  Okay.

12          THE COURT:  -- but I actually already signed an order

13  on that, --

14          MR. DEMO:  Okay.

15          THE COURT:  -- as well as exclusivity.

16          MR. DEMO:  Perfect.

17          THE COURT:  But, you know, I saw the certificates of

18  no objection, but perhaps we need to talk about it in case

19  anyone wants to comment in any way.

20          MR. DEMO:  If anybody does, I mean, if you've already

21  entered them -- I know PACER was down, so I don't think we've

22  seen it yet.

23          THE COURT:  Okay.

24          MR. DEMO:  But we're fine moving on if --

25          THE COURT:  Well, yeah.  The foreign representative
```

10

1   motion looked like a no-brainer, if you will.

2          MR. DEMO:  Uh-huh.

3          THE COURT:  It was filed way back in October, right?

4          MR. DEMO:  Correct.  Right.

5          THE COURT:  And no one had ever objected.  It's just

6   that there are some foreign proceedings out there; --

7          MR. DEMO:  Right.  Right.

8          THE COURT:  -- you wanted to make sure that there was

9   a human being who had authority to act in those?

10          MR. DEMO:  Correct.

11          THE COURT:  All right.  So, if no one has any

12  comment, I did go ahead and sign the order approving that.

13          MR. DEMO:  Okay.

14          THE COURT:  Similarly, exclusivity.  I signed an

15  order on that yesterday.  In probably nine out of ten cases, I

16  would have had a hearing with evidence.

17          MR. DEMO:  Uh-huh.

18          THE COURT:  But, again, that one seemed like a no-

19  brainer.  We had no objections, and obviously you've been in

20  court a lot, with a lot of things happening.

21          MR. DEMO:  Yes.

22          THE COURT:  So it seemed like a no-brainer to give

23  more time on that.  So, does anyone have anything they wanted

24  to say about that?  (no response)  All right.

25          MR. DEMO:  Okay.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 243 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 311 of 1017 PageID 4990
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 242 of
2722

11

1          THE COURT:  So that is granted.  I can't remember,

2    off the top of my brain, what the extended time frame was.  Do

3    you want to say that on the record?  Because I've just blanked

4    out at the moment.

5        (Counsel confer.)

6          MR. DEMO:  It's -- we extended it for four months,

7    Your Honor.

8          THE COURT:  Okay.  All right.  So that was June, June

9    12th as the deadline for filing a plan, and then the

10   solicitation period would expire on August 11th, 2020.  That's

11   what I've approved.

12         MR. DEMO:  Yes.

13         THE COURT:  All right.

14         MR. DEMO:  Okay.  The next matter is the bar date

15   motion.  There was an automatic bar date set for April 8th --

16         THE COURT:  Uh-huh.

17         MR. DEMO:  -- in connection with the 341 notice.  We

18   just wanted to have procedures for filing claims approved by

19   this Court.

20         THE COURT:  Okay.

21         MR. DEMO:  You know, we filed the motion.  There are

22   no objections.  We did have some comments from the United

23   States Trustee, which we've incorporated into a redlined

24   order.

25      Something came up last night where, the way that it works

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 244 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 312 of 1017   PageID 4991
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 243 of
2722

12

1   because we have a lot of investors, is that a lot of people

2   get notice through their custodians and through the different

3   administrators.

4            THE COURT:  Uh-huh.

5            MR. DEMO:  And so we worked that into the motion.

6   The United States Trustee has asked for an extension of 45

7   days for those folks to file their claim.  We're okay with

8   that.  We're going to work with her afterwards, and we will

9   submit a revised form of order.

10           THE COURT:  Okay.  So, just to be clear, the proposed

11  deadlines, as revised, would be what?

12           MR. DEMO:  It depends on when the notice is actually

13  able to be sent out.

14           THE COURT:  Okay.

15           MR. DEMO:  We need to work through some technical

16  issues on that.

17           THE COURT:  Okay.  Ms. Lambert?

18           MS. LAMBERT:  So, Judge Jernigan, I think the Court

19  is familiar with this from when we solicit Equity Committees.

20  It's the same issue here.  You go to TD Ameritrade and then

21  they send the notice to the direct holders, but also asked

22  that they include correspondence to the TD Ameritrade or

23  Merrill Lynch equivalents saying -- instructing them to send

24  the notice of the bar date to their direct holders.

25      So we're going to agree on the phrasing of the letter.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 245 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 313 of 1017   PageID 4992
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 244 of
2722

13

1    I'm hopeful that we can attach that to the order so the Court

2    can see what it looks like.

3              THE COURT:  All right.

4              MR. DEMO:  Okay.  And we'll work through those

5    issues, Your Honor, and have something to you as soon as

6    possible.

7              THE COURT:  All right.  And you're also asking for

8    bar dates, really, bar date for 503(b)(9) claims as well?

9              MR. DEMO:  Yeah.  We don't think we're going to have

10   any.

11             THE COURT:  Okay.

12             MR. DEMO:  So it's really just out of an abundance of

13   caution.

14             THE COURT:  Okay.  All right.  Well, I'll look for

15   that form of order --

16             MR. DEMO:  Okay.

17             THE COURT:  -- and be happy to sign it as you all

18   have negotiated it.

19             MR. DEMO:  Okay.  And then skipping over Foley

20   Gardere, there is one still outstanding objection on that, so

21   we will hear that in due course.

22             THE COURT:  Okay.

23             MR. DEMO:  The next one is Item 6 on Page 6, and

24   that's the PensionDanmark motion to lift the stay.  We have an

25   agreement in principle with PensionDanmark that the Committee

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 246 of
Case 3:25-cv-02072-S    Document 15-7    Filed723.10/06/25    Page 314 of 1017    PageID 4993
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 245 of
2722

14

1   has signed off on.  We're just going through and working

2   through the paperwork.  And so we would like to just push this

3   to the next hearing date, with the expectation that we would

4   get the paperwork filed in between then and we wouldn't have

5   to have it set.

6          THE COURT:  All right.  So we will carry this to our

7   next omnibus hearing date.  I don't know if we have one

8   automatically set at this point or --

9          MR DEMO:  It's March 13th.

10          THE COURT:  March--?

11          MR. DEMO:  12th.

12          MS. HAYWARD:  11th.

13          MR. DEMO:  11th.  I'm sorry.  I was in the ballpark.

14          THE COURT:  Okay.  So, carried to March 11th, as

15   necessary.

16          MR. DEMO:  Uh-huh.

17          THE COURT:  All right.

18          MR. DEMO:  And then I guess the next thing, skipping

19   over the CLO Issuers' objection, which we already addressed,

20   --

21          THE COURT:  Uh-huh.

22          MR. DEMO:  -- is the sealing conference motion.

23          THE COURT:  Okay.

24          MR. DEMO:  And I would turn this over to my

25   colleague, John Morris.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 247 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 315 of 1017 PageID 4994
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 246 of
2722

15

1          THE COURT:  All right.

2          MR. MORRIS:  Good morning, Your Honor.  John Morris,

3    Pachulski Stang Ziehl & Jones.

4          THE COURT:  Good morning.

5          MR. MORRIS:  I hope that this doesn't take too much

6    time.  But following the last hearing that we had, the Court

7    had rendered a ruling with respect to the Committee's sealing

8    motion.  And regrettably, the Debtor and the U.S. Trustee's

9    Office were unable to agree on a form of order.  And that led

10   to kind of a back-and-forth about the scope of the protective

11   order that had been entered.

12       So, because we couldn't come to an agreement, and because

13   the Debtor had concerns about the interpretation and the

14   position, frankly, that the U.S. Trustee was taking with

15   respect to the protective order, we filed our motion for the

16   entry of an order concerning the sealing motion and for a

17   conference.  And that was filed at Docket 397.

18       The Court subsequently entered the Debtor's proposed order

19   on the sealing motion, on the Committee's sealing motion.  So

20   that's moot.

21       The only issue, to the extent there is an issue, and I'm

22   not sure that there is, but to the extent that there is an

23   issue, it was just the Debtor's desire to make clear on the

24   record that the words of the protective order are clear and

25   unambiguous and that they apply to any party who receives

16

1   documents in this bankruptcy case, whether it's in connection

2   with a contested matter or an adversary proceeding, and that

3   order applies both to documents previously received and to

4   documents that will be received in the future.

5       We had asked the U.S. Trustee's Office to make -- just to

6   agree that they would abide by the protective order.  And I'm

7   not casting aspersions, I'm not saying, you know, they're bad

8   people or anything, but we never got the crystal-clear

9   response that we needed and expected, frankly, that the order

10  says what the order says and the U.S. Trustee's Office would,

11  you know, would abide by it.

12          THE COURT:  Okay.  So, --

13          MR. MORRIS:  So that's why we asked for this status

14  conference.

15          THE COURT:  So this is more than just the issue of

16  the Redeemer Committee arbitration award --

17          MR. MORRIS:  Correct.

18          THE COURT:  -- that was the attachment to the --

19          MS. LAMBERT:  No, Your Honor.

20          THE COURT:  Wait.  Oh, okay.  Well, what I was about

21  to say is I was understanding from your presentation that you

22  thought this was about more than just the arbitration award,

23  the Redeemer Committee arbitration award that had been

24  attached to that Committee objection and that was subject to

25  the motion to seal.

17

 1      You think it is also about items marked Confidential that

 2   the U.S. Trustee received before the entry of the protective

 3   order?

 4            MR. MORRIS:  As it explicitly provides for.  And I'll

 5   just say that the concerns arise from the written

 6   communications that we received, where the U.S. Trustee's

 7   Office specifically said that they would file matters

 8   unredacted and without seal.  And we asked them to simply

 9   retract that statement, because the order says what the order

10   says.  And I think it's a fair concern that the Debtor has in

11   this regard, and it was really a very simple request.  Please,

12   please, I mean, you can't file documents unredacted and

13   without seal because there's a protective order in place.

14            THE COURT:  Okay.  Now, Ms. Lambert, you say -- what

15   were you about to say?

16            MS. LAMBERT:  First, Your Honor, I want to be clear

17   that the U.S. Trustee -- everyone in the U.S. Trustee's Office

18   intends to honor the Court's orders.  There are many things

19   that we debate hotly and that we feel animated about in terms

20   of legal advocacy, but we intend to honor both the office and

21   the individual that holds that office when the Court has made

22   a ruling.

23      The issue that is presented to the Court is what is the

24   effect of dismissing a motion to seal on the basis that it is

25   moot?  There's black-letter law that sealing should be for

18

```
 1   limited time periods and things should be unsealed --

 2           THE COURT:  Okay.  Can I stop you?  Are you saying

 3   that you think the sole issue here is just the arbitration

 4   award?

 5           MS. LAMBERT:  Yes, Your Honor.

 6           THE COURT:  Okay.  So, so --

 7           MS. LAMBERT:  And this is how it springs back to the

 8   protective order.

 9           THE COURT:  Okay.  Let me --

10           MS. LAMBERT:  The U.S. --

11           THE COURT:  Let me stop you, because what about other

12   documents besides the arbitration award that the U.S. Trustee

13   might have received prior to the Court signing the protective

14   order?

15           MS. LAMBERT:  The U.S. Trustee did not receive any

16   other items that --

17           THE COURT:  Okay.  So we are just talking about the

18   arbitration?

19           MS. LAMBERT:  We have not to this date received any

20   other items than those items --

21           THE COURT:  Okay.

22           MS. LAMBERT:  -- that were subject to the motion to

23   seal.

24           THE COURT:  Okay.

25           MS. LAMBERT:  And this is the U.S. Trustee's
```

19

1  position.  The Court --

2       THE COURT:  I will say that one of the Debtor's

3  lawyers is shaking his head.  I want to see if there's a

4  disagreement about, did the U.S. Trustee receive more items?

5  Was that --

6       MR. MORRIS:  I would say, Your Honor, I don't know

7  exactly what was delivered, because I'm, --

8       THE COURT:  Okay.

9       MR. MORRIS:  -- right, I'm part of a team.  But I do

10  know that we gave, for example, information about bonus --

11  about, you know, personnel bonus motions that is confidential.

12       MS. LAMBERT:  But the issue about what was going to

13  be filed unsealed was related to the items in the motion to

14  seal and the U.S. Trustee's attendant motion for the

15  appointment of a Chapter 11 Trustee, which had been redacted.

16       THE COURT:  Okay.  Let me -- I'm going to take a shot

17  at making this go quicker.  What I meant when I ruled that,

18  well, the objection of the Committee is moot now because it

19  was resolved by other orders; therefore, I think the motion to

20  file under seal the arbitration award is moot because it was

21  connected to the Committee's objection; you know, that was a

22  quick, off-the-cuff comment.  What I was trying to say is I

23  didn't think this needed any more court time.  There was no

24  case in controversy anymore.  I didn't know why I needed to

25  resolve an objection to the motion to file under seal.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 252 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 320 of 1017 PageID 4999
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 251 of
2722

20

1    What I meant is it's going to be like it never even

2  happened, right?  And what I probably should have done is

3  said, Committee, you want to make an oral motion to withdraw

4  your objection and withdraw your motion to seal, you know,

5  orally, I'll grant it orally and just remove it from the

6  record, so to speak.

7    And I thought we were passing off to another day whether

8  that arbitration award, if someone wanted to file it and file

9  it publicly or disclose it, they could then file a motion

10  later.

11           MR. MORRIS:  Your Honor?

12           MS. LAMBERT:  Here's the -- here's the --

13           MR. MORRIS:  Your Honor, if I may?

14           THE COURT:  Uh-huh.

15           MR. MORRIS:  You've done exactly what you've said.

16           THE COURT:  Okay.

17           MR. MORRIS:  I don't think there is an issue now.

18           THE COURT:  Okay.

19           MR. MORRIS:  I've heard from the U.S. Trustee's

20  Office what I asked for probably three times in writing, that

21  they are going to abide by the terms of the protective order.

22  With respect to the sealing order, Your Honor has entered an

23  order.  It declared the Committee's motion to seal moot, and

24  it specifically provided that anybody who's received the

25  awards has to treat them in accordance with the protective

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 253 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 321 of 1017   PageID 5000
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 252 of
2722

21

1    order.

2             THE COURT:  Yeah.

3             MR. MORRIS:  Nobody's appealed that order.

4             THE COURT:  Okay.

5             MR. MORRIS:  It's now the -- it's -- whatever the

6    U.S. Trustee's interpretation is of the law is kind of

7    irrelevant at this point because the order has been entered

8    and it hasn't been appealed.

9             THE COURT:  Okay.

10            MS. LAMBERT:  Here's the thing, Your Honor.  The case

11   law, *Omni Video*, similar things.  There are two issues.

12   Number one is whether the mootness of the underlying issue

13   means that the pleadings should be unredacted, which is black

14   letter that at some point pleadings should be unredacted and

15   made available to the public.  And the Court's ruling is that

16   by replacing the management the Court has mooted anything that

17   might be scandalous about that or that might be problematic

18   about it, and therefore --

19            THE COURT:  What is the it?  I'm not following.

20            MS. LAMBERT:  -- the arbitration award and the

21   pleadings attendant were redacted, but the --

22            THE COURT:  I haven't said anything about -- I mean,

23   I denied a Chapter 11 trustee motion because I thought the new

24   management was a correct way to go forward in this case.

25            MS. LAMBERT:  Correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 254 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 322 of 1017   PageID 5001
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 253 of
2722

22

1        THE COURT:  The arbitration award, what I meant was

2    it's like it never happened now.  And if I --

3        MS. LAMBERT:  Right.

4        THE COURT:  -- need to do an amended order saying the

5    Committee has permission to withdraw the objection and

6    withdraw the motion to seal, I'll --

7        MS. LAMBERT:  That's --

8        THE COURT:  -- I'll do that, --

9        MS. LAMBERT:  But --

10        THE COURT:  -- so there's nothing on the record to

11    make public.

12        MS. LAMBERT:  But withdrawing the motion, objection,

13    does not delete it from the record, Your Honor.

14        THE COURT:  Well, I'm going to make it so.  I'm going

15    to make it so.  And then if, one day, you or someone else --

16        MS. LAMBERT:  Your Honor, currently, --

17        THE COURT:  -- wants to be relieved from the

18    protective order and asks that it be publicly filed, I'll

19    consider --

20        MS. LAMBERT:  Your Honor?

21        THE COURT:  -- the merits of that.

22        MS. LAMBERT:  Your Honor, the thing is that the

23    Committee, when it filed its original objection, did not

24    redact.  So this information has been in the public domain for

25    months now.  And the arbitration --

23

1           THE COURT:  Wait.  Okay.  This all happened in

2    Delaware, so I don't know their procedure.  Are you saying it

3    was on the public PACER?

4           MS. LAMBERT:  They didn't redact.

5           MR. MORRIS:  No.  Your Honor, the Redeemer Award

6    (inaudible).  The order says what the order says.  It's been

7    entered.  I mean, this is the concern, is that we have this

8    never-ending debate.  I've heard -- the Debtor has heard what

9    it needed to hear, and that is the U.S. Trustee's Office will

10   abide by the terms of the protective order.

11       With respect to the Committee's motion to seal, we're done

12   with that.

13          MS. LAMBERT:  There is no --

14          MR. MORRIS:  An order has been entered.

15          MS. LAMBERT:  There is no motion to seal.  The normal

16   effect of -- the dismissal of a motion to seal on the basis

17   that it is moot is that everything attendant to that becomes

18   unredacted and unsealed.

19       In addition, there's a separate issue that the Debtor gets

20   to talk about what the amounts in the Redeemer awards were

21   unilaterally, without -- and the Committee gets to talk about

22   it unilaterally.  They've mentioned what the findings were in

23   four different spots in their objection that are not redacted.

24   And the U.S. Trustee is the only one that's held to the motion

25   to seal, which we have honored, but the --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 256 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 324 of 1017    PageID 5003
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 255 of
2722

24

 1          THE COURT:  I don't understand why we're having this

 2   discussion.  For now, I've made it a moot issue, a dead issue.

 3   The objection to which the arbitration award was attached as

 4   an exhibit became moot.  Maybe I'm not using the best legal

 5   description, but it was resolved.  And I didn't feel the need

 6   for us to have a dispute about whether that motion to seal,

 7   which related to the objection --

 8          MS. LAMBERT:  The motion to seal --

 9          THE COURT:  -- was meritorious or not.  If -- again,

10   --

11          MS. LAMBERT:  But the motion to --

12          THE COURT:  -- to me, there's an easy fix.  If you're

13   -- if you think it's necessary, I'll grant the --

14          MR. MORRIS:  Your Honor?

15          THE COURT:  This seems like wasted energy, --

16          MS. LAMBERT:  But --

17          THE COURT:  -- granting the Committee authority to

18   withdraw their objection and their motion to seal --

19          MS. LAMBERT:  But, Your Honor, --

20          THE COURT:  -- so that it's off the record.

21          MS. LAMBERT:  -- the interim sealing order didn't

22   impact just their objection.  It impacted the U.S. Trustee's

23   motion to dismiss.  It impacted the evidence.  The finding

24   that these issues are moot because they're resolved means that

25   the Court should unredact them because it's no longer

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 257 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/06/25   Page 325 of 1017   PageID 5004
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 256 of
2722

25

1   confidential.  It's no longer a problem.  If the evidence is

2   --

3          THE COURT:  Why are we having this discussion?  Why

4   is this important in this Chapter 11 case?  The arbitration

5   award may get in one day, and someone may ask me, and I may

6   say yes, I may say no.  It depends on what the legal arguments

7   are.

8          MS. LAMBERT:  It's --

9          THE COURT:  Why is this relevant right now?

10         MS. LAMBERT:  It's important to the public's

11   perception, and the U.S. Trustee is charged with making the

12   information about a case available to the public.

13         MR. MORRIS:  Your Honor, there is no motion --

14         MS. LAMBERT:  This -- these -- these arbitration --

15         MR. MORRIS:  There's no relief that's been sought.

16         MS. LAMBERT:  The arbitration awards have been

17   discussed in the press, Your Honor.  And the press --

18         THE COURT:  Well, let me just say this.  Okay?  This

19   was obviously -- there was an arbitration award.  It was never

20   confirmed with a judgment by a court.  And I am presuming -- I

21   don't need to decide today -- but I'm presuming that there is

22   some legal argument that someone feels can be made about why

23   that arbitration award is confidential.  You know, it

24   obviously --

25         MR. MORRIS:  The Committee made that argument in

26

1   their motion.

2          THE COURT:  Obviously, if there had been a judgment,

3   it all would have been out in the world.  And I will say I

4   cannot remember ever being in a situation where someone wanted

5   to keep an arbitration award confidential in a bankruptcy

6   case.  Maybe it happens.  I'm just -- I've never seen it.  So

7   if there is a day where someone wants me to find this

8   arbitration award can be made public, I may very well do it.

9   I don't know.  I'll hear the legal arguments.  But I am just

10  asking, why are we arguing about this today?

11          MS. LAMBERT:  We're arguing about it today because it

12  remains a point of interest and a point of information sharing

13  to government creditors and other creditors that are involved

14  in the case, as well as the public.

15          THE COURT:  They're not in here, the SEC or whoever

16  you're --

17          MS. LAMBERT:  Well, how would they know to be in

18  here?

19          THE COURT:  Because maybe they've seen the press that

20  you're talking about.  All right.  I don't know --

21          MR. MORRIS:  Your Honor, we -- the Debtor's heard

22  what --

23          THE COURT:  The protective order governs.  And my

24  prior order with regard to the sealing motion I think made

25  clear, but if it didn't, I'm going to say right now:  As far

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 259 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/06/25   Page 327 of 1017   PageID 5006
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 258 of
2722

27

1   as I'm concerned, the arbitration award, nothing gets unsealed

2   on the Court's docket, and no one will file it or disclose it

3   without bringing a motion, and we'll have a legal argument and

4   evidence or whatever we need and I'll rule on the issue.

5        MS. LAMBERT:  So, Your Honor, my understanding is

6   that the Court is striking the objection to the CRO that the

7   Committee filed and striking the U.S. Trustee's motion to

8   dismiss, which was redacted, and striking the evidence, and

9   those will not be on the docket available to the public at

10  all.

11       THE COURT:  That's not what I'm doing.  I don't -- I

12  don't even know -- I don't understand why you're saying that.

13       MS. LAMBERT:  Well, you can't just withdraw the

14  objection.  The objection had the exhibits attached to it.

15  The issue that the U.S. Trustee -- I'm sorry, but I'm always

16  charged with this issue -- is trying to unseal documents and

17  trying to determine the proper date for unsealing them.  They

18  attached to the arbitration award, like a motion for summary

19  judgment.  That's the practice in Delaware.  And so the issue

20  is, at what point will that become unsealed?  It's a higher

21  standard --

22       THE COURT:  The answer is no, without an order from

23  this Court.

24       MS. LAMBERT:  It is a higher standard than for

25  confidentiality.  And in addition, --

28

```
 1          THE COURT:  All right.  If you want to file a motion

 2   and we set it for hearing and we have briefing, we'll do that.

 3   But, for now, there's -- there are two orders that I will tell

 4   you on the record what they mean is, right now, the

 5   arbitration award is not to be publicly disclosed.  Not by the

 6   Court on the docket system.  Not by any person.

 7      If someone wants to publicly disclose it, they can file a

 8   motion and we'll talk about whether it's protected or not.

 9          MR. MORRIS:  Thank you.

10          THE COURT:  Whether there are grounds, legal grounds,

11   to protect it.

12          MR. MORRIS:  Thank you, Your Honor.

13          THE COURT:  I've told you I'm skeptical.  I'm

14   skeptical.  But, you know, we'll see.  Okay?

15          MS. LAMBERT:  Okay.  Your Honor, the FJC publication

16   is very clear that the Court should be trying, when issues are

17   moot, to unseal items.  And this is why our advocacy is this

18   way.  And I will move to unseal it.

19          THE COURT:  All right.

20          MR. DEMO:  For the record, Your Honor, again, Greg

21   Demo; Pachulski Stang Ziehl & Jones; for the Debtor.

22      Before we move on to the Foley retention, two quick

23   housekeeping matters.

24          THE COURT:  Uh-huh.

25          MR. DEMO:  We would like to set the next omnibus
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 261 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 329 of 1017   PageID 5008
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 260 of
2722

29

1   hearing date on April 22nd.  At that date, we would do the

2   quarterly fee applications and whatever else comes up onto the

3   docket.

4           THE COURT:  All right.  Have you run that by Traci

5   Ellison yet?

6           MR. DEMO:  We have not.

7           THE COURT:  Okay.

8           MR. DEMO:  We've talked to the Committee about it,

9   though.

10          THE COURT:  So I will call her right now.

11          MR. DEMO:  And then, I guess, Your Honor, before you

12  do that, we are actually asking for a hearing date on March

13  4th at 1:30 as well.  We're going to have an expedited motion

14  that we'll be filing, I think, this week.  So if you're going

15  to check with her, I guess it might make sense to check on

16  both of those dates.

17          THE COURT:  Okay.

18      (Court confers with Clerk telephonically.)

19          THE COURT:  Okay.  We can give you April 22nd, as you

20  requested, at 9:30.

21          MR. DEMO:  Okay.  Thank you.

22          THE COURT:  Okay.  So that's going to be an omnibus.

23      (Court confers with Clerk telephonically.)

24          THE COURT:  All right.  We can give you March 4th at

25  1:30.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 262 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 330 of 1017 PageID 5009
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 261 of
2722

30

1    How about a preview of what we're going to -- what are we

2    going to be seeing?

3            MR. DEMO: And, Your Honor, I guess we had also

4    reserved March 2nd, and we can release that date.

5            THE COURT: What? I'm sorry.

6            MR. DEMO: We had previously reserved March 2nd at

7    9:30 for the expedited motion, which I'll describe briefly in

8    a second. We don't need the March 2nd date.

9            THE COURT: So, okay.

10           MR. DEMO: Yeah.

11           THE COURT: All right. So I'll tell Traci that one

12   --

13           MR. DEMO: Yeah. Okay. Perfect. Thank you.

14           THE COURT: -- is off. Okay. What is this going to

15   be?

16           MR. DEMO: The expedited motion, we obviously run a

17   series of investment funds. From time to time, those funds,

18   either through liquidation or just through normal proceeds

19   generation, make distributions out to their investors.

20       Under the protocols, distributions out to what are

21   related, called related entities under the protocols, which

22   include Mr. Dondero, entities owned by Mr. Dondero, and

23   numerous other categories, those entities cannot receive their

24   distributions from those investment vehicles if the Committee

25   objects to those distributions unless we come to the Court and

31

1   we get Your Honor's approval.

2      That issue has come up.  We are hoping to make those

3   distributions to these related entities.  The Committee has

4   said that they will object, but they've also agreed to the

5   motion to expedite.

6            THE COURT:  All right.

7            MR. DEMO:  So that's the issue that's going to be in

8   front of Your Honor on March 4th.

9            THE COURT:  All right.  When are you going to file

10  the motion?

11           MR. DEMO:  We are hoping to file it, I think, by

12  Friday.

13           THE COURT:  Okay.  So that would be -- what are we at

14  now, the 19th?

15           MR. DEMO:  Yeah.

16           THE COURT:  Okay.  So that'd be --

17           MR. DEMO:  Yeah.  And obviously, --

18           THE COURT:  -- a couple weeks.

19           MR. DEMO:  -- yeah, we'll endeavor to get it filed as

20  soon as possible.

21           THE COURT:  Okay.

22           MR. DEMO:  And then I guess the last item, Your

23  Honor, is the Foley Gardere retention application.

24           THE COURT:  Okay.

25           MR. DEMO:  And, you know, this should be a relatively

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 264 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 332 of 1017 PageID 5011
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 263 of
2722

32

1    simple retention application.  You know, we'll get into it a

2    little bit more.  There are two objections that were

3    originally filed, one by the Committee and one by Acis.

4    Yesterday morning, the Committee withdrew their objection, so

5    the only objection to the Foley Gardere retention application

6    is by Acis.

7         In the courtroom with me are Holland O'Neil with Foley

8    Gardere -- she's the partner in charge of that representation

9    -- and then also The Honorable Russell Nelms, who's a member

10   of the Independent Board of Directors of Strand Advisors, the

11   party that manages the Debtor.  And I should be remiss if I

12   didn't mention that the two other independent directors, James

13   Seery and John Dubel, are also in the courtroom, --

14              THE COURT:  Okay.

15              MR. DEMO:  -- as is the Debtor's chief restructuring

16   officer.

17        And as I said, Your Honor, really, the only thing, the

18   only substantive thing we're here this morning on is this

19   retention application.  The retention application is under

20   Section 327 of the Bankruptcy Code, and it's to represent the

21   Debtor in three matters related to the Acis bankruptcy and the

22   resulting litigation.

23        Judge Nelms is going to be testifying in support of the

24   Foley retention this afternoon.

25              THE COURT:  Okay.

33

1          MR. DEMO:  We filed the retention application on

2     October 29th, along with the retention application of Lynn

3     Pinker.  As I mentioned earlier, the Lynn Pinker retention

4     application was withdrawn.  Two objections were filed to the

5     Foley retention:  One by the Committee, one by Acis.

6        The Committee -- or, sorry, the Debtor addressed those two

7     objections in an omnibus reply that we filed on November 21st.

8     The primary response to those objections was providing

9     additional disclosure to this Court concerning the parties

10    being represented by Foley, the proceedings in which Foley was

11    going to represent those parties, and the allocation of fees,

12    of Foley's fees, across those parties.

13       The reply disclosed, and Judge Nelms will also testify,

14    that the Debtor had originally intended to engage Foley on

15    four matters, not three.  The first matters is general matters

16    just relating to the Acis bankruptcy, status conferences,

17    proof of claim issues.  The second matter is the appeal to the

18    Fifth Circuit of the confirmation order.  The third matter was

19    the appeal, again to the Fifth Circuit, of the entry of the

20    involuntary petition.  And then the fourth matter was the

21    appeal of Winstead's retention as counsel to both Mr. Terry,

22    who is a pre-petition creditor of Acis, and Robert [sic]

23    Phelan as the Chapter 11 trustee.

24       The two appeals, the appeal of the confirmation order and

25    the appeal of the involuntary petition, have been fully

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 266 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 334 of 1017   PageID 5013
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 265 of
2722

34

1   briefed to the Fifth Circuit, and some of that briefing was

2   done, by necessity, post-petition, because of the drag in time

3   between when we filed the retention and now.  And the Fifth

4   Circuit has actually set both of those appeals for oral

5   argument.  They've been consolidated for purposes of oral

6   argument, and both of the appeals are set for March 30th, so

7   about six weeks away.

8        Now, it's an understatement to say a lot has happened in

9   this case since we filed the reply on November 21st.  One of

10  the most major things in this case, as the Court knows, is the

11  appointment of the Board of Directors.  The Board of Directors

12  was appointed on January 9th and it oversees the management of

13  the Debtor.  Judge Nelms is in this courtroom and will be

14  testifying as to what the Board did to familiarize itself with

15  the Acis litigation and with Foley's retention.  And you'll

16  hear from Judge Nelms that the Board had extensive

17  conversation with the Debtor's employees, including the

18  Debtor's internal legal team, Ms. O'Neil with Foley Gardere,

19  attorneys from Pachulski regarding the status of the Acis

20  litigation and the bankruptcy and Foley's retention.

21       You'll also hear that Judge Nelms reached out directly to

22  Josh Terry, the major party in the Acis litigation, and that

23  Judge Nelms met with both Josh Terry and Ms. Patel to discuss

24  the status of the Acis litigation.

25       And then finally you'll hear, as part of that diligence,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 267 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 335 of 1017 PageID 5014
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 266 of
2722

35

1   that the Board analyzed the economic benefit of proceeding

2   with Foley's retention in all three of those matters that I

3   mentioned and also conducted their own diligence on the claims

4   that are being raised in those matters.

5       As a result of that diligence, and I'll discuss the

6   explicit reasons later, the Board determined that it is in the

7   best interest of the Debtor and its estate to proceed with

8   Foley's retention with respect to the three matters I

9   mentioned earlier:  the Acis general bankruptcy, the appeal of

10  the confirmation order, and the appeal of the involuntary

11  petition.

12      The Debtor has also asked for Foley's assistance on

13  certain ancillary matters, like including about disclosures of

14  the Acis litigation, including what needs to go on the

15  schedules and things like that.

16      As a result of this diligence, however, the Board decided

17  to drop the Winstead appeal.  So Acis -- I'm sorry, Foley is

18  not going to be retained to challenge Winstead's retention in

19  that proceeding.  And assuming that Foley is retained, Foley

20  will prepare the papers to withdraw that objection as soon as

21  possible.

22      As a quick aside, though, you know, Foley was directed by

23  the Debtor to continue with the Winstead matter post-petition.

24  Incurred about $25,000 of fees.  And we believe that Foley was

25  working in good faith on that.  So although we're not going to

36

1   proceed with the Winstead matter, we would still ask that

2   Foley be entitled to file a fee application for those fees.

3   The Committee has agreed with this, and we have a form of

4   proposed order with the Committee that contemplates Foley's

5   payment or Foley's receiving payment for the Winstead fees of

6   $25,000.

7            THE COURT:  Wait.  You're talking about, if I approve

8   their retention, rolling that into the retention order?

9            MR. DEMO:  We are, Your Honor.

10           THE COURT:  Okay.

11           MR. DEMO:  No?

12           THE COURT:  That's a no-go, I'll tell you right now.

13           MR. DEMO:  Okay.

14           THE COURT:  I mean, --

15           MR. DEMO:  And we can, we can deal with that.

16           THE COURT:  Yeah.

17           MR. DEMO:  But I --

18           THE COURT:  I'm not going to say yes or no to any

19   fees I haven't seen.

20           MR. DEMO:  Okay.  And -- well, I'm sorry.  What's

21   going to be rolled into the order is their ability to file for

22   those fees.  Everybody would still have the right to object to

23   those fees.  You would have the right to say yes or no on

24   those fees.  The only thing that we would be asking for is

25   that they would be able to apply for those fees and that the

37

 1   fact that they weren't retained on that matter specifically

 2   would not be a basis for an objection to those fees.  So it's

 3   a little bit different.

 4             THE COURT:  Okay.

 5             MR. DEMO:  We're not trying to cut off anybody's

 6   right to object to those fees.

 7             THE COURT:  Okay.  But I don't want to put some

 8   imprimatur on their ability to ask for them.

 9             MR. DEMO:  Okay.

10             THE COURT:  Okay?  So, you know, it's just another

11   day.

12             MR. DEMO:  Yeah.

13             THE COURT:  If they ask for that in a fee app -- if I

14   approve their retention and they ask for it in a fee app,

15   we'll --

16             MR. DEMO:  Okay.  Understood, Your Honor.

17             THE COURT:  -- decide whether it's meritorious or

18   not.

19             MR. DEMO:  Okay.

20             THE COURT:  Okay.

21             MR. DEMO:  And then I guess, just moving on, you

22   know, as you'll hear from Judge Nelms, all of the elements of

23   227(e), you know, have been met.  You know, first, Foley is

24   being retained for a special purpose.  Nobody has objected on

25   that basis.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 270 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 338 of 1017   PageID 5017
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 269 of
2722

38

1     Second, Foley is not being retained to conduct the

2  Debtor's bankruptcy case.  That's my firm, Pachulski Stang.

3  Again, nobody has objected on that basis.

4     Third, Foley represented the Debtor prior to the petition

5  date on these matters.  Again, nobody has objected on that

6  basis.

7     And, fourth, you know, as Judge Nelms will testify, the

8  retention of Foley and Foley's continued prosecution of the

9  Acis matters is in the best interest of the Debtor's estate.

10     And then fifth and finally, Foley has no adverse interest

11  with respect to the matters on which it is being retained.

12     Now, as I mentioned, there were two omnibus objections

13  that were filed.  There was the Committee's objection and then

14  there was Acis's objection.  Both of these objections really

15  had one common theme, which was that there was insufficient

16  disclosure as to how the fees were going to be allocated, and,

17  honestly, whether or not Mr. James Dondero would benefit from

18  Foley's retention without paying his share of those fees.

19     Now, we had a meeting with the Committee on Friday and we

20  walked through this issue.  And as a result of that, the

21  Committee withdrew its objection.

22     What we told to the Committee is that, prior to the Acis

23  bankruptcy -- and this goes primarily to the retention -- or,

24  the prosecution of the involuntary petition appeal.  In that

25  appeal, Foley is representing just Neutra.  Foley is not

39

1    representing the Debtor.  Now, the economic benefit to the

2    estate, though, in that appeal accrues almost solely to the

3    Debtor.  It does not accrue to Neutra or to Neutra's economic

4    interest owners, which, full disclosure, are Mr. James Dondero

5    and Mr. Mark Okada.

6         The reason why the Debtor -- and you'll hear, again, hear

7    this from Judge Nelms -- believes that it's in the economic

8    best interest of its estate to pay for Neutra's fees in that

9    appeal is that, if Neutra is successful in that appeal, the

10   involuntary petition obviously will be struck, the involuntary

11   will be unwound, and the economic interest and the economic

12   ownership of Acis will revert to Neutra.

13        Upon that reversion, Highland Capital Management will be

14   reinstated as the advisor to Neutra.

15        Now, if Neutra -- I'm sorry, if Acis then generates fees,

16   those fees are going to be paid about 85 percent to satisfy

17   the contractual obligations under that advisory agreement.

18        So, on a go-forward basis, again, if Neutra is successful,

19   85 percent of the revenue generated by Acis will go to Neutra.

20   That remaining 15 percent will be used to satisfy the claim

21   that Acis -- I'm sorry, that Highland Capital Management has

22   against Acis for the pre-, post-petition, and gap period

23   services that it provided to Acis under the advisory

24   agreements.  That claim is about $8 million.

25        So, 85 percent of the revenue on a go-forward basis is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 272 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 340 of 1017    PageID 5019
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 271 of
2722

40

1    going to be used to satisfy the obligations under the

2    management agreement.  The balance of that is going to be used

3    to satisfy that $8 million claim.

4        That means that, you know, if our math is right -- and

5    obviously, the numbers are not static -- that there's not

6    going to be any contributions or any distributions to the

7    upstream equity, to Mr. Dondero or Mr. Okada, for about four

8    years.  After that four years, 85 percent of the revenue is

9    still going to go to Highland Capital Management, the Debtor,

10   under those advisory agreements.

11       So for that reason, we do believe, and Judge Nelms will

12   testify, that the true economic beneficiary of the Neutra

13   appeal of the involuntary petition is actually Highland

14   Capital Management.

15           THE COURT:  I don't want to jump ahead too much, but

16   are we going to talk today about mootness as a potential issue

17   with both of these appeals?  I mean, you know, I have to say

18   it's very compelling to me that you tell me all the briefing

19   has been done --

20           MR. DEMO:  Uh-huh.

21           THE COURT:  -- and oral argument is set in March, so

22   -- but is mootness a --

23           MR. DEMO:  We don't --

24           THE COURT:  Was there ever a motion to dismiss for

25   mootness or --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 273 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 341 of 1017    PageID 5020
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 272 of
2722

41

1          MR. DEMO:  Not that I'm aware of, Your Honor.

2          THE COURT:  Okay.

3          MR. DEMO:  And all the briefing has been done.

4          THE COURT:  Okay.

5          MR. DEMO:  Again, oral argument is set.  And as far

6   as I know, nobody has raised that issue.

7          THE COURT:  Okay.

8          MR. DEMO:  So I think that we're still proceeding as

9   to whether --

10         THE COURT:  And, again, I'm leaping ahead, but I'm

11  just -- you know, you went through the scenario --

12         MR. DEMO:  Uh-huh.

13         THE COURT:  -- to show that, you know, Dondero and --

14  if the involuntary was reversed, you know, no money would ever

15  get there.  But you're painting a picture, to me, that, again,

16  it feels a little farfetched.  But the evidence will either,

17  you know, bear it out or not.

18         MR. DEMO:  Again, the evidence, you know, I think,

19  will bear it out.

20      And I think what's important also is, when you're thinking

21  about this, is to think of the actual universe of post-

22  petition fees that Foley is going to incur for those services,

23  for the briefing of the two appeals and then for the

24  bankruptcy services, versus the actual economic gain that the

25  Debtor could and hopefully will get if those appeals are

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 274 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 342 of 1017   PageID 5021
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 273 of
2722

42

1   successful.

2           THE COURT:  Okay.

3           MR. DEMO:  So, Foley --

4           THE COURT:  And hopefully the evidence will really go

5   to this.

6           MR. DEMO:  Yes.

7           THE COURT:  I'm trying to think of -- I'm trying to

8   decide what life looks like --

9           MR. DEMO:  Right.

10          THE COURT:  -- if there is a successful reversal.

11          MR. DEMO:  Right.

12          THE COURT:  And I'm not at all clear.  So the

13  evidence and argument will hopefully make me clear.

14          MR. DEMO:  Yes.  And, honestly, Your Honor knows the

15  facts and circumstances --

16          THE COURT:  Right.

17          MR. DEMO:  -- better than me and probably better than

18  anyone.

19          THE COURT:  Uh-huh.

20          MR. DEMO:  But I think what's --

21          THE COURT:  I mean, we've had -- we had terminated

22  contracts --

23          MR. DEMO:  Right.

24          THE COURT:  -- with Highland.  We have a Reorganized

25  Debtor now, which, you know, --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 275 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 343 of 1017 PageID 5022
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 274 of
2722

43

1          MR. DEMO:  Right.

2          THE COURT:  -- has new contractual arrangements.

3          MR. DEMO:  Right.

4          THE COURT:  I just, I'm not sure how that all goes

5    away if there's a reversal.  So I'm --

6          MR. DEMO:  Right.

7          THE COURT:  I'm really wanting to drill down on the

8    benefit --

9          MR. DEMO:  Okay.  And --

10         THE COURT:  -- to Highland.

11         MR. DEMO:  And we can do that.  But I think --

12         THE COURT:  Okay.

13         MR. DEMO:  -- it's helpful to talk about --

14         THE COURT:  Uh-huh.

15         MR. DEMO:  -- the universe of fees first and then

16   talk about the related benefit for that.

17      Foley Gardere has helpfully filed two post-petition fee

18   applications.  Those fee applications disclose that, on all

19   three of these matters, Foley has billed about $330,000.  We

20   believe that Foley was probably going to bill, up through the

21   end of oral argument, about $500,000.

22      And then, you know, again -- and not getting too deep into

23   it, because I do think this is something that's better for

24   testimony because I think it goes to, you know, what the Board

25   believes is the economic benefit to the estate -- but if the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 276 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 344 of 1017 PageID 5023
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 275 of
2722

44

1　Neutra appeal is successful, if the confirmation order appeal

2　is successful, then the post-petition fees that are going to

3　accrue or we believe are going to accrue to Highland Capital

4　Management under those contracts are tens of millions of

5　dollars a year.

6　　　The post-petition and gap period and pre-petition fees

7　that we believe that Acis owes to Highland are $8 million a

8　year. And then there's the go-forward fees.

9　　　So we believe that, for spending $500,000, the benefits to

10　the estate are actually going to be in the tens of millions of

11　dollars. So, you know, even though, you know, reasonable

12　minds can differ as to the merits -- and, again, we'll put on

13　some testimony about that, although there's obviously

14　privilege issues and things like that -- the actual economic

15　benefit to the estate is $500,000 versus the possible benefit

16　of $50 million, possibly more dollars, plus the removal of a

17　substantial portion of Acis's proof of claim, which is -- I

18　think it says not less than $75 million. So you're looking

19　at, if we're successful, fees into the estate --

20　　　　　THE COURT: Well, that's a different issue, though.

21　Isn't that --

22　　　　　MR. DEMO: It is, but it --

23　　　　　THE COURT: Isn't that the Acis adversary proceeding

24　component?

25　　　　　MR. DEMO: Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 277 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25   Page 345 of 1017    PageID 5024
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 276 of
2722

45

```
 1            THE COURT:  So, --

 2            MR. DEMO:  But if the -- if the -- and, again, I

 3   don't want to get too far into this --

 4            THE COURT:  Uh-huh.

 5            MR. DEMO:  -- because I don't want to get into, you

 6   know, legal arguments that are going to be on appeal.

 7            THE COURT:  Uh-huh.

 8            MR. DEMO:  But what we believe is that, and what

 9   Judge Nelms will testify to and what you'll hear, is that if

10   the confirmation order and the involuntary petition are

11   erased, especially the involuntary petition, and we go back to

12   status quo ante, the benefit to the estate is going to be in

13   the tens of millions of dollars, at a minimum, plus the

14   possible diminution, to a large extent, of a proof of claim

15   that is not less than $75 million, and we've heard numbers of

16   up to $300 million.

17      So you're looking to spend $500,000 on these two matters

18   for a benefit to the estate that's going to be astronomically

19   more than that.  So the benefit to the estate versus the money

20   that is going out of the estate, especially since everything

21   has been briefed and set for oral argument, I guess,

22   personally, I find it difficult to not see that benefit and

23   not to see that spending that half a million dollars to

24   possibly get back $50-plus million, I just don't see how

25   that's not a benefit to the estate and how that does not
```

46

1    warrant the retention of Foley Gardere in the limited matters

2    that we're honestly asking them to be retained for.

3              THE COURT:  All right.

4              MR. DEMO:  Okay.

5              THE COURT:  I'll hear other opening statements on

6    this.

7              MR. LAMBERSON:  Good morning, Your Honor.  Phillip

8    Lamberson on behalf of Acis Capital Management.

9         First of all, let me start off with outlining exactly what

10   our limited objection relates to.  We are not objecting to the

11   Debtor retaining Foley Gardere to handle the litigation

12   matters for the Debtor.  So, for example, the Acis litigation,

13   anything related to the Acis bankruptcy, that's fine.  We

14   don't have any objection to that.

15             THE COURT:  So the mega-adversary proceeding against

16   Highland and affiliates that is stayed, --

17             MR. LAMBERSON:  Uh-huh.

18             THE COURT:  -- I have a giant Report and

19   Recommendation on my desk that was ready to go about the time

20   the Highland bankruptcy was filed -- but it's stayed:  You

21   would have no objection to Gardere defending Highland --

22             MR. LAMBERSON:  Correct.

23             THE COURT:  -- in that if ever a motion to lift stay

24   is filed and that goes forward?

25             MR. LAMBERSON:  Correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 279 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 347 of 1017    PageID 5026
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 278 of
2722

47

1          THE COURT:  Okay.

2          MR. LAMBERSON:  And, for example, I believe counsel

3    mentioned this:  To the extent that there's a status

4    conference in the Acis case or something like that, we don't

5    have any issue with Foley representing the Debtor as it

6    relates to that.

7        We don't have any objection to the representation of the

8    Debtor as it relates to the Debtor's appeal of the

9    confirmation order.  We don't have any objection to Neutra's

10   retention of Foley at all.  In fact, we don't have any basis

11   to object to Neutra's retention of Foley Gardere.  Neutra is

12   not a debtor.

13       We fully expect and anticipate that we'll be opposite

14   Foley Gardere in the appeal which is going to be argued at the

15   end of next month, as well as any matters in front of this

16   Court.

17       What we do object to is the Debtor agreeing -- frankly,

18   pre-agreeing -- to pay Foley Gardere for litigation costs

19   incurred by non-debtors, and, specifically, Neutra.  And as

20   counsel outlined, and the reply filed by the Debtors is very

21   clear on this point, Neutra is not a subsidiary of the Debtor.

22   Neutra is ultimately owned one hundred percent by Mr. Dondero

23   and Mr. Okada.

24       So why, why are we objecting?  There's a couple of

25   reasons.  Number one, this is obviously an extremely unusual

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 280 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 348 of 1017   PageID 5027
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 279 of
2722

48

1   request.  It's not really a --

2           THE COURT:  Okay.  Let me just make sure I heard you

3   correct.  The only thing that Acis is objecting to is the

4   Debtor paying fees for Gardere -- Foley Gardere's

5   representation of Neutra?

6           MR. LAMBERSON:  Correct.

7           THE COURT:  Okay.  So, --

8           MR. LAMBERSON:  Right.  And let me --

9           THE COURT:  -- you don't have a problem with Foley

10  representing the Debtor in these appeal -- well, the Debtor

11  isn't an appellant in the involuntary appeal, right?  Or no?

12          MR. LAMBERSON:  It is -- no.  So, the Debtor is an

13  appellant in the --

14          THE COURT:  The confirmation order.

15          MR. LAMBERSON:  -- confirmation order appeal.

16          THE COURT:  Uh-huh.

17          MR. LAMBERSON:  It's one of two appellants.

18          THE COURT:  Uh-huh.

19          MR. LAMBERSON:  The other one is Neutra.

20          THE COURT:  Uh-huh.

21          MR. LAMBERSON:  Neutra is the only appellant in the

22  confirmation order -- I'm sorry, in the order for relief

23  appeal.

24          THE COURT:  Okay.  So you don't have any problem with

25  Foley's retention; it's just you don't want the Debtor to pay

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 281 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 349 of 1017   PageID 5028
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 280 of
2722

49

1  Neutra's legal fees?

2          MR. LAMBERSON:  Correct.

3          THE COURT:  And there needs to be some allocation in

4  the confirmation appeal between Neutra and the Debtor, and it

5  needs to all be paid by Neutra, --

6          MR. LAMBERSON:  Correct.

7          THE COURT:  -- not the Debtor?  Okay.

8          MR. LAMBERSON:  Yeah.  That's exactly correct, Your

9  Honor.

10          THE COURT:  Okay.  Just --

11          MR. LAMBERSON:  So I wanted to be clear on that, --

12          THE COURT:  Okay.

13          MR. LAMBERSON:  -- that we're not -- we understand

14  that they're --

15          THE COURT:  Okay.

16          MR. LAMBERSON:  -- going to be our opponents going

17  forward, and we're fine with that.

18          THE COURT:  Uh-huh.

19          MR. LAMBERSON:  I actually like Mrs. O'Neil.

20      So, why are we objecting?  So, there's a couple of

21  reasons.  One is procedural and one is really more

22  substantive.  So, this is obviously a strange request under

23  Section 327.  327 is to approve counsel for the Debtor, for

24  the estate.  And this request doesn't really fit.

25      So, for example, you engage Foley Gardere.  You agree that

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 282 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 350 of 1017    PageID 5029
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 281 of
2722

50

```
 1   the Debtor is going to pay fees under 330.  Okay.  Well, how

 2   do we apply 330 in this situation, right?  What constitutes

 3   reasonable and necessary as it relates to the Debtor when the

 4   work wasn't done for the Debtor?  What constitutes a

 5   determination of whether it was beneficial to the Debtor when,

 6   again, the work wasn't done for the Debtor?

 7       There's other issues, obviously.  Who controls Neutra?

 8   It's not controlled by the Debtor.  The Debtor doesn't own any

 9   of Neutra.  Who is making litigation decisions for Neutra?

10   All we know is that the Debtor is paying the freight for

11   whatever Neutra decides to do going forward.

12       The other issue, Your Honor, and this is probably the

13   broader issue, is this decision evidences a continuation of a

14   failed litigation strategy that precipitated this bankruptcy

15   in the first place.  Right?  So, we all heard that the reason

16   Highland Capital Management had to file bankruptcy is because

17   they couldn't pay the Crusader judgment.  Right?  They had a

18   $190 million judgment, or about to be judgment against them,

19   and they couldn't pay it.

20       So let's look at the Committee.  Right?  We have a

21   Committee with four members on it.  Three of them are

22   litigants.  Three of them are in active litigation against the

23   Debtor.

24       If you look at the Top 20 List in this case, of the Top

25   10, only one of them is not a litigation creditor, and that's
```

51

1  -- I'm trying to -- is an insider creditor. The rest of the

2  Top 10 are either litigation adversaries or they're law firms

3  that were paid to fight the litigation adversaries.

4      So why is the Debtor continuing its strategy of fighting

5  every last issue, and using various instrumentalities to do

6  it, and then paying the freight for all of it? That's exactly

7  how we got to where we are today in this case.

8      So, let me address also the benefit from the Neutra

9  appeal. And, Your Honor, I think that's definitely an area

10  that we need to probe. Because, like you, I don't get it. I

11  think what they're outlining is sort of a fantasyland where

12  money is going to rain from the sky when they win this appeal,

13  or if they win this appeal. And obviously, their reply goes

14  on for pages about the benefit to the Debtor.

15      So, just using basic odds of winning -- and I'm not going

16  to go to the substance of this appeal, which I think is

17  probably worse than the basic odds -- there's a 90 percent

18  chance that the Fifth Circuit just affirms the -- Judge

19  Fitzwater's ruling. Right? I mean, there's a 90 percent

20  chance that what the Debtor gets out of this is an affirmance

21  that says, "You lose." Right?

22      But even if it's reversed, --

23          THE COURT: What are you basing that on? Because

24  Fitzwater affirmed 90 percent of the time?

25          MR. LAMBERSON: Well, so, actually, Judge -- and Ms.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 284 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 352 of 1017   PageID 5031
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 283 of
2722

52

1   Chiarello can probably address this more specifically -- Judge

2   Fitzwater actually gets affirmed, I think, more than 90

3   percent of the time, --

4            THE COURT:  Probably, yes.

5            MR. LAMBERSON:  -- but the general reversal rate at

6   the Fifth Circuit is about ten percent.  So, and that

7   obviously includes things like 1983 appeals and things like

8   that.

9        But even if it is reversed, which I think we'd all agree

10  is fairly unlikely, again, money isn't just going to start

11  raining down on Highland Capital.  So what's most likely going

12  to happen if the Fifth Circuit decides to reverse -- and let

13  me, let me point out one issue, Your Honor.  The only issue on

14  appeal, I should say the only -- there are various issues on

15  appeal, and I'll just click through them.  So, one of them is

16  whether Neutra has standing to appeal.  Right?  Whether they

17  qualify under the person aggrieved standard that the Fifth

18  Circuit uses.  That's obviously a gating issue.  And, by the

19  way, that's the basis of Judge Fitzwater's ruling affirming

20  this Court's ruling, which was basically Neutra doesn't have

21  standing to appeal the order for relief.  They're not the

22  Debtor.

23      So the first issue is whether Neutra is a person

24  aggrieved.  Okay?

25      The second issue, and this is the substantive bankruptcy

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 285 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 353 of 1017   PageID 5032
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 284 of
2722

53

 1   issue, the only substantive bankruptcy issue, is whether the

 2   order for relief should have been arbitrated.  Right?  So

 3   that's the next issue.  That would be, frankly, the issue that

 4   the Fifth Circuit would have to reverse on, is that well, yes,

 5   this should have been arbitrated.  Right?  The order for

 6   relief should have been arbitrated.

 7        And then the final issue that we raised on appeal is

 8   whether, even if Neutra has standing and even if there was

 9   some right to arbitration, whether Neutra, via the putative

10   debtor, waived its right to arbitration by waiting until

11   literally, and you'll remember this, literally the day before

12   the order for relief file started, to raise its request for

13   arbitration.  Right?

14        So, assuming that they get some reversal, what's really

15   likely to happen is that the Court, the Fifth Circuit is going

16   to send it back to you on a remand and say, This is the

17   standard you should have applied, you need to make this

18   finding, or something like that, right?  It's very unlikely

19   the Fifth Circuit is going to say, We're going to reverse and

20   we're just going to render, right, and this thing just goes

21   away forever, particularly considering that the only live

22   substantive issue is whether the order for relief should have

23   been arbitrated, right?

24        But even if Neutra wins and its relief is wholly granted,

25   well, what does that mean?  That doesn't mean that the

54

1  involuntary goes away.  It doesn't mean the order for relief

2  permanently goes away.  It means that we go arbitrate it.

3  Right?  That's what they asked for, is that we go arbitrate

4  it.  So now we go arbitrate it.  Right?

5      So, basically, if you break it down, if, in the unlikely

6  event Neutra wins on appeal, it doesn't mean the bankruptcy

7  permanently goes away.  What it means is we have more

8  litigation.  Right?  And that's what normally happens when

9  there's a reversal on appeal, right?  You relitigate the

10  issues that were litigated in the first place.

11      So this concept -- you're exactly right, Your Honor.  This

12  sounds like fantasyland.  This concept that money is just

13  going to fall out of the sky and onto Highland because Neutra

14  got a reversal is just not going to happen.

15      There's some other problems here, obviously.  Counsel just

16  spent a lot of time talking about how all of Acis's funds are

17  going to get paid to Highland.  Well, that completely misses

18  the point that Josh Terry has an eight, probably somewhere in

19  the neighborhood of maybe $12 million judgment now against

20  Acis.  They're just going to ignore that?  They're just going

21  to ignore the fact that their largest creditor has a judgment

22  against them and is just hanging out there?  That's going to

23  have some impact on what happens to all that cash flow.

24      And then, finally -- and we'll talk about this in more

25  substance when we get to the testimony -- as you recall, this

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 287 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/13/10/06/25   Page 355 of 1017   PageID 5034
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 286 of
2722

55

1   was the entire basis of the Acis case:  Mr. Dondero and

2   Highland Capital were aggressively trying to liquidate Acis

3   when we showed up in your Court asking for relief.  So what

4   makes anybody think that that isn't going to continue

5   happening if there's not a bankruptcy anymore?  Right?

6       And Your Honor will recall that you had to twice enjoin

7   Dondero affiliates, HCLOF, from liquidating the PMAs and

8   Acis's assets during the bankruptcy.  Right?  So the concept

9   that if they win on appeal and there is no bankruptcy,

10  everything just goes away and we're not in this Court at all,

11  that Acis is going to have all of these valuable PMAs and cash

12  flow and it's all going to go to the benefit of Highland, is

13  completely contrary to what happened during the Acis case and

14  what precipitated the Acis case.

15      One other issue that we raised in the objection and in the

16  Debtor's omnibus reply is what we call the DAF litigation,

17  which is litigation filed in the Southern District  of New

18  York.  And Your Honor, I think you probably remember that from

19  the pleadings.  I do want to point out that -- so this, this

20  is a serious issue for Acis.  And the reason is because,

21  contrary to what was stated in the reply -- admittedly, this

22  happened after the reply -- but contrary to what happened --

23  was stated in the reply, that litigation has now been expanded

24  to include Acis and Mr. Terry and Brigade, and with basically

25  the same allegations of CLO mismanagement that were raised in

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 288 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 356 of 1017 PageID 5035
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 287 of
2722

56

1  this Court during the confirmation hearing.

2      So this is a very significant matter to us.  We are very

3  concerned that this Debtor is involved in that and is

4  promoting it in some way.  And we want Your Honor to be aware

5  of that litigation and the actions that are taken challenging

6  your rulings in a court that's miles and miles away from here.

7      Thank you, Your Honor.

8          THE COURT:  All right.  Mr. Morris, are you ready to

9  call your witness?

10         MR. MORRIS:  Yes, I am, Your Honor.  The Debtor calls

11 Russell Nelms.

12         THE COURT:  All right.

13         MR. MORRIS:  Your Honor, I have some exhibit binders.

14 May I hand up?

15         THE COURT:  You may.  All right.  Well, odd as it is,

16 I suppose I in this context need to swear you in.

17             RUSSELL NELMS, DEBTOR'S WITNESS, SWORN

18         THE COURT:  All right.  Please be seated.

19         MR. MORRIS:  John Morris for Pachulski Stang Ziehl &

20 Jones on behalf of the Debtor, Your Honor.

21     Before we get to the testimony, the Debtor has put on its

22 exhibit list nine specific documents that are in the binder

23 before you, and the Debtor moves for the introduction of those

24 documents into evidence.

25         THE COURT:  All right.  Any objection?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 289 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 357 of 1017   PageID 5036
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 288 of
2722

Nelms - Direct                    57

1           MR. LAMBERSON:  No objections, Your Honor.

2           THE COURT:  Exhibits 1 through 9 are admitted.

3      (Debtor's Exhibits 1 through 9 are received into

4    evidence.)

5           MR. MORRIS:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7    BY MR. MORRIS:

8    Q    Mr. Nelms, do you currently have a relationship to the

9    Debtor?

10   A    I do.

11   Q    And what is that relationship?

12   A    I am one of three independent directors of the Debtor.

13   Q    And when were you appointed?

14   A    January the 9th of this year.

15   Q    Did you just listen to the opening statement on behalf of

16   Acis?

17   A    I did.

18   Q    And did you hear the reference to the DAF litigation?

19   A    I did.

20   Q    And did you hear the allegation that the Debtor somehow

21   was involved in the prosecution of the DAF litigation?

22   A    I heard that, yes.

23   Q    Okay.  Did there come a time last week that the Board

24   learned of the possibility of a filing with respect to the DAF

25   litigation?

Nelms - Direct                         58

1  A    We learned about the filing of the DAF litigation sometime

2  within the last two weeks.

3  Q    And what did the Board do in response to learning that

4  information?

5  A    Well, first of all, I -- we met with Ms. Patel and her

6  client, Josh Terry.  They expressed their concerns about the

7  DAF litigation.  And so the Board used its influence to

8  encourage the trustee of the DAF, Grant Scott, to dismiss that

9  litigation, and we have gotten Mr. Scott's commitment to

10 dismiss the litigation.

11     There's a little bit of an issue there concerning about

12 whether some of the claims can -- they may need to be

13 dismissed without -- the preference is, of course, to dismiss

14 them without prejudice, but there are some issues about that.

15 But I'm told by Mr. Scott that he's going to dismiss the

16 litigation.

17 Q    Let's go back in time before this was filed.  Did the

18 Board express its view as to whether there should be a filing

19 at all?

20 A    It was really a very brief thing.  This was probably a

21 couple weeks or so ago, kind of late in the day at the end of

22 a long, long day, one of those long days we've been having.

23 Someone brought into a board meeting I guess a copy of this

24 new DAF complaint.  It had not been filed at that time.  They

25 showed it to Mr. Dubel.  He looked at it and just kind of

Nelms - Direct                          59

1   asked what it was.  There was a brief explanation of what it

2   was.  And Mr. Dubel said, Tell them not to file this.  He

3   goes, This is only going to cause us problems.  And that's the

4   last we heard of it before it was filed.

5   Q    And what law firm filed that complaint?

6   A    That was filed by the Lynn Pinker firm.

7   Q    And after the Board learned that Lynn Pinker filed this,

8   in spite of the Board's instructions, did the Board take any

9   steps with respect to Lynn Pinker?

10  A    Well, of course, we -- one of the matters that previously

11  was before the Court was the Lynn Pinker application to be

12  retained in this case.  And I'll just say that it was -- it

13  was a factor that went into our deliberations concerning our

14  decision not to go forward with the Lynn Pinker litigation.

15  Q    So, I just want to make sure I have this right.  So the

16  Board, upon learning of a possible filing, gave instructions

17  not to do so; is that right?

18  A    It did.

19  Q    And upon learning that it was filed, it became one of the

20  factors that the Board relied upon in determining not to

21  pursue the Lynn Pinker retention; is that right?

22  A    That's correct.

23  Q    And you personally reached out to Mr. Terry and Ms. Patel

24  to discuss the issue; is that right?

25  A    Mr. Seery and I did, the two of us.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 292 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 360 of 1017   PageID 5039
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 291 of
2722

Nelms - Direct                        60

1   Q    And you used whatever influence you had to try to reach an

2   agreement for the withdrawal of that complaint without

3   prejudice; is that right?

4   A    That's correct.

5   Q    Okay.  Now, let's get back to the issues that are relevant

6   to the actual motion.  Are you aware that the Debtor has

7   sought the Court's approval to retain Foley Gardere as special

8   counsel?

9   A    I am.

10  Q    And have you reviewed the court filings with respect to

11  that motion?

12  A    Yes, I have.

13  Q    Okay.  Can you describe for the Court generally the

14  matters for which the Debtor seeks to retain Foley Gardere?

15  A    There are three matters, essentially.  One is an appeal in

16  the Fifth Circuit which concerns the entry of the order for

17  relief in the involuntary petition itself.  The second is an

18  appeal in the Fifth Circuit that concerns the confirmation of

19  the Acis plan.  And the third matter is the assertion of,

20  prosecution of a proof of claim that Highland Capital

21  Management would have in the Acis bankruptcy.

22  Q    Okay.  And are these the special purposes for which the

23  Debtor seeks to retain Foley?

24  A    Yes.

25  Q    Do you know whether there are matters that were part of

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 293 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 361 of 1017   PageID 5040
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 292 of
2722

Nelms - Direct                        61

1   the original motion but which the Debtor no longer seeks to

2   pursue?

3   A    One of the matters that was pending when we took office

4   was an appeal, and I believe it was still in the District

5   Court, and that related to an alleged conflict of interest by

6   the Winstead firm.  And so there was an objection to their

7   fees and an appeal concerning payment of Winstead fees.  And

8   the Board has decided not to go forward with that appeal.

9   Q    Okay.  So the Board -- did you hear the opening from

10  Acis's counsel that charged that the Debtor was just doing

11  more scorched-earth litigation tactics?  Did you hear that

12  charge?

13  A    I heard that, yes.

14  Q    Okay.  But yet the Board has instructed Foley not to

15  pursue the Winstead matter; is that right?

16  A    That's correct.

17  Q    And just again, for the record, why did the Board make

18  that decision?

19  A    The Board made that decision because we just thought it

20  was in the best interest of the Debtor and this estate not to

21  do that.

22  Q    And did the Debtor see any benefit to pursuing that

23  particular litigation?

24  A    You know, there -- a benefit could be articulated, but we

25  decided not to pursue it.

Nelms - Direct                              62

1   Q    Okay.  So, that, plus the Neutra appeal, are two -- I

2   mean, I apologize, withdrawn.  That, plus the DAF matter, are

3   two examples where the Board exercised its judgment not to

4   pursue pending litigation; is that fair?

5   A    That's correct.

6   Q    Okay.  Is the Board supportive of the Debtor's application

7   to retain Foley for the three matters you have described?

8   A    It is.

9   Q    And without revealing privileged communications, can you

10  describe generally the diligence that the Board conducted to

11  reach that decision?

12  A    Well, we met with some of the people that work at

13  Highland.  We met with the Debtor's attorneys, the Pachulski

14  firm.  We did have a couple of meetings with Ms. Patel and Mr.

15  Terry.  Some of us have reviewed the pleadings, some more than

16  others.  And, well, we may have done other things, but those

17  are the ones that come to mind right now.

18  Q    I don't know if you mentioned it, but did you confer with

19  Ms. O'Neil?

20  A    Oh, yes, we did.  We talked with Ms. O'Neil about it.

21  Q    Okay.  And what was the purpose of the diligence that you

22  just described for the Court?

23  A    Well, ultimately, what we as a board were trying to do was

24  to conduct kind of a cost-benefit analysis to the estate:  How

25  much will this potentially cost us?  What's the potential

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 295 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 363 of 1017 PageID 5042
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 294 of
2722

Nelms - Direct                    63

 1  upside of pursuing it?  And based upon that cost-benefit

 2  analysis, we thought that this was the best thing to do.

 3  Q   Okay.  Let's just focus on a couple of very narrow 327(e)

 4  issues.  Is the Debtor seeking to retain Foley to act as

 5  general bankruptcy counsel?

 6  A   No.

 7  Q   And which firm serves as general bankruptcy counsel?

 8  A   That would be the Pachulski firm.

 9  Q   Okay.  And do you know whether Foley Gardere represented

10  the Debtor's interest in each of the three matters that you've

11  described?

12  A   It has been representing the Debtor previously.

13  Q   Okay.  So let's talk about those three matters.  The first

14  one I believe you said was with respect to the representation

15  of the Debtor in connection with an $8 million claim that it

16  has against Acis; is that right?

17  A   That's correct.

18  Q   And is that the claim -- is that the subject of a formal

19  proof of claim?

20  A   Yes.

21  Q   Okay.

22  A   It is a claim filed in the Acis case.

23  Q   I've placed before you an exhibit binder, and I would ask

24  you to turn first to Exhibit 4.

25  A   Okay.

Nelms - Direct                              64

1    Q    And is that one of the proofs of claim that the Debtor has

2    filed against Acis?

3    A    It is.

4    Q    And you'll see that attached to the proof of claim a few

5    pages in there's a document called the Third Amended and

6    Restated Sub-Advisory Agreement.  Do you see that?

7    A    Yes.

8    Q    Do you know what that document is?  Generally?

9    A    Well, generally, I know what this document is.

10   Q    All right.  And what's your general understanding of the

11   document?

12   A    This is an advisory agreement that -- the only thing that

13   I know, I can tell you, really, about this agreement is it

14   gives rise to and generates fees that would inure to the

15   benefit of the Debtor.

16   Q    Okay.  And a few pages past that, you'll see something

17   called a Fourth Amended and Restated Shared Services

18   Agreement.  Do you see that?

19   A    Yes.

20   Q    Is it your understanding that that was another source of

21   revenue that the Debtor generated when it had this agreement

22   in place with Acis?

23   A    Yes.

24   Q    Okay.  Do you have an understanding as to, you know,

25   ballpark, what the annual fees were that the Debtor received

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 297 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 365 of 1017   PageID 5044
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 296 of
2722

Nelms - Direct                          65

1    pursuant to these agreements prior to the Acis bankruptcy?

2    A    Well, I think, prior to the bankruptcy, it was more, and

3    perhaps significantly more, than it is today.  It may have

4    been in the $12 million range per annum.  I think it's less

5    than that today.

6    Q    Okay.  And can you turn to Exhibit 5, please?  Is that

7    another proof of claim that was filed in the bankruptcy case,

8    the Acis bankruptcy case?

9    A    Yes.  This is a little bit different.  This is an

10   application for an administrative expense claim.  The prior

11   proof of claim that we looked at related to a pre-petition

12   claim that the Debtor had, then a gap period claim that the

13   Debtor had, and this is post-petition.  So this is an

14   administrative claim.  It's basically for the same services,

15   but just different time periods.

16   Q    Okay.  And who was responsible for preparing Exhibits 4,

17   5, and 6?

18   A    Ms. O'Neil and the Foley firm.

19   Q    Okay.  And has the Board reached a conclusion that it's in

20   the Debtor's best interest to retain Foley on a post-petition

21   basis to prosecute these claims?

22   A    It has.

23   Q    And why -- what's the justification for that?  Why did the

24   Board reach that decision?

25   A    Well, we believe it's in the best interest of the Debtor.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 298 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 366 of 1017    PageID 5045
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 297 of
2722

Nelms - Direct                          66

1   Obviously, a couple of things there.  I realize we may have a

2   very long road ahead of us with respect to these things.  But

3   the overall aspirational goal is to have an income stream

4   that's associated with these agreements.  The goal is to have

5   an amount of money out there that's available to pay our pre-

6   petition claims, the gap claims, the administrative claims,

7   while at the same time acknowledging that this company has the

8   obligation to satisfy and fulfill Mr. Terry's claim as well.

9   Q    All right.  Let's just focus for the moment on the three

10  proofs of claim.  The aggregate amount is approximately $8

11  million.  Do I have that right?

12  A    Yes, that's right.

13  Q    And from the Board's perspective, is the -- are those

14  claims an asset of the estate?

15  A    They are.

16  Q    And does the Board want to retain Foley for the purpose of

17  trying to recover that asset?

18  A    It does.

19  Q    And has the Board concluded that Foley is familiar with

20  these particular claims?

21  A    Foley is familiar with these claims, yes.

22  Q    And -- okay.  Let's move on, then, to the second task for

23  which the Debtor seeks approval to retain Foley, and that is

24  with respect to the confirmation order.  That's one of the

25  tasks, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 299 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 367 of 1017    PageID 5046
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 298 of
2722

Nelms - Direct                     67

1   A    It is.

2   Q    Okay.  And this is one of the Fifth Circuit arguments

3   that's scheduled for six weeks from now; is that right?

4   A    That's correct.

5   Q    Okay.  And has Foley represented the Debtor throughout the

6   proceedings that are leading up to this oral argument?

7   A    It has.

8   Q    And did Foley prepare all of the briefing in connection

9   with the arguments?

10  A    It did prepare the briefing.  It did that, in some

11  respects, along with Lynn Pinker.

12  Q    Okay.  Did you personally review the Debtor's briefs that

13  were filed in connection with the appeal?

14  A    I have reviewed those.

15  Q    Okay.  Have you reviewed every single piece of the record

16  on appeal?

17  A    I would doubt that I have.

18  Q    Okay.  Do you have a general understanding of the nature

19  of the appeal?  Of -- and this would --

20  A    Are we talking now about the confirmation appeal?

21  Q    Yes.  Just the confirmation.  Yeah.

22  Q    Well, the appeal has basically two broad elements, and the

23  first is an argument that the plan was not brought in good

24  faith.  Section 1129(a)(3).  And that goes back to the

25  arbitration issue.  Generally speaking, that because -- the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 300 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 368 of 1017   PageID 5047
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 299 of
2722

Nelms - Direct                         68

1    allegation is that because Mr. Terry refused to arbitrate,

2    then the plan was tainted by that lack of good faith.  And the

3    second issue, broad issue that's involved in that appeal has

4    to do with, oh, the injunction, the breadth and scope of the

5    injunction, which the Debtor contends is -- was improper.

6    Q    And if the Fifth Circuit reverses the underlying decision,

7    has the Board made a determination of the possible benefits

8    that the Debtor may receive?

9    A    Well, there's two aspects of that appeal.  One would be a

10   narrower decision.  I suppose, if it's just related to the

11   injunction, it's -- it's hard to quantify exactly what that

12   would mean.

13   Q    Okay.

14   A    The bigger issue, of course, has to do with the

15   arbitration.  And if the -- theoretically, at least, the

16   arbitration, if the Fifth Circuit agreed on the issue of

17   arbitration, then the argument would be that we would -- that

18   in the arbitra... well, it is true to say that -- well, I

19   think I'm kind of getting ahead of myself here.

20   Q    You are, just a bit.  Let's just focus on the confirmation

21   appeal.  That's been consolidated for oral argument purposes

22   --

23   A    It has.

24   Q    -- with the appeal of the involuntary; is that right?

25   A    That's correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 301 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 369 of 1017   PageID 5048
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 300 of
2722

Nelms - Direct                          69

1  Q    Okay.  And just to sum up this piece of it, did Foley

2  represent the Debtor with respect to all of the underlying

3  proceedings?

4  A    It did.

5  Q    And why does the Board believe it's in the Debtor's best

6  interest to retain Foley to conduct the oral argument and to

7  finish up this proceeding?

8  A    Well, first of all, I think the Court would agree with me

9  that Foley is a very competent law firm.  It's competent to do

10  the work that they've been charged to do.

11      Second, pretty much all the work on the appeal is already

12  in the can.  The only thing that's left to be done at this

13  point in time is to make the oral argument.  Obviously, if we

14  didn't go forward with the Foley firm, we'd have to find

15  somebody who could make the argument.  So, we would -- but we

16  would lose the benefit of Foley's experience that they have in

17  the case so far.

18      I think there will be a cost element that would be

19  associated with bringing somebody new up to speed with respect

20  to this.

21      So, those, generally speaking, are the benefits that we

22  see.

23  Q    Okay.  Let's turn then, finally, to the Neutra appeal.  Do

24  you have a general understanding of that matter for which the

25  Debtor seeks to retain Foley?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 302 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 370 of 1017 PageID 5049
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 301 of
2722

Nelms - Direct                    70

1  A    Yeah.  The Neutra appeal, what happened in Neutra is that

2  Neutra, to my understanding, moved to intervene in the

3  involuntary proceeding.  I think that intervention was denied.

4  And so that appeal has to do with the fact that Neutra

5  contends that it should have been permitted to intervene, that

6  the matter of collections should have been arbitrated.

7       I think that one of the issues in there is this -- in that

8  appeal is who decides on the issue of arbitrability.  Is it

9  this Court, or is it the arbitrators themselves?

10      So, those are the issues that are present in the Neutra

11 appeal.

12 Q    Okay.  Is the Debtor named a party to the appeal?

13 A    The Debtor is not a named party in the Neutra appeal.

14 Q    But the Board nevertheless wants to retain Foley on a

15 post-petition basis to prosecute that appeal; is that right?

16 A    That's correct.

17 Q    And why is that?

18 A    Well, I think both -- we recognize and I think the Fifth

19 Circuit recognizes as well that these two things, that these

20 two appeals kind of go hand-in-glove.  The 1129(a)(3) argument

21 basically is dependent upon the arbitration issue, which is

22 fleshed out in the Neutra appeal.

23      And so, at the end of the day, the way that the Board sees

24 this is that the Debtor is the most immediate beneficiary of

25 the economic benefit of the Neutra appeal.  We see the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 303 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 371 of 1017 PageID 5050
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 302 of
2722

Nelms - Direct                    71

1   possibility of an income stream there.  We see the possibility

2   of the ability to pay our claims in the Acis case.  And I

3   think -- one of the things I think that is of particular focus

4   when it comes to all of this litigation is the fact that, as I

5   understand it, Mr. Terry started out with an $8 million claim,

6   and I think he bid $1 million of that claim for the interest

7   that he got in Acis, which reduced it, say, to $7 million.

8   And I think Mr. Terry's interest now over time I believe it's

9   been reduced to somewhere between $4 to $6 million.  So

10  that's, that's a claim.

11      But in this case, Mr. Terry has filed a proof of claim for

12  $70 million.  And my understanding from our visit with Mr.

13  Terry and his counsel is that that claim could get up to $300

14  million.  And so, as a board, we look at that and what we're

15  concerned about is the migration, the alleged migration of a

16  tremendous amount of value from Highland down to Acis.  So, at

17  the end of the day, it doesn't really matter who you regard as

18  the ultimate equity owner of Acis, whether it's Mr. Terry or

19  whether it's Mr. Dondero:  The migration of that value

20  downstream to Acis is of no real benefit to Highland Capital

21  at all.

22  Q   Is this one of the issues that the Board discussed with

23  the Committee last week in connection with this motion?

24  A   Yes.  It is.

25  Q   Okay.  And let's just go back to the income stream for a

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 304 of
Case 3:25-cv-02072-S    Document 15-7    Fa2e130/06/25    Page 372 of 1017    PageID 5051
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 303 of
2722

Nelms - Direct                         72

1    second.   The income stream that the Board is hoping it will

2    get if the decision is reversed, is that income stream derived

3    from the two agreements that we just looked at?

4    A    It is.

5    Q    So those are the two very agreements that the Board would

6    look to have reinstated if it were to succeed on the appeal;

7    is that right?

8    A    Yes.

9    Q    Now, does the Board know exactly the form of relief the

10   Fifth Circuit is going to grant?

11   A    I have no earthly idea.

12   Q    Right?  But has the Board made a determination that the

13   outcome of Neutra obtaining control of Acis is one

14   possibility?

15   A    It's certainly a possibility.

16   Q    And is that the potential benefit that the Board focused

17   on in deciding to pursue this motion?

18   A    Yes.  I mean, I'm glad to adopt the percentages that Mr.

19   Terry's counsel has mentioned today.  I guess if the cost-

20   benefit analysis is that we're going to pay a couple hundred

21   thousand dollars here to get to the end of the road, and the

22   benefit is millions of dollars, well, even if our chances are

23   only ten percent, I think that's a shot worth taking.

24   Q    Thank you very much.  If the Fifth Circuit reversed,

25   because this is a point that was also made in the Acis

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 305 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/10/06/25 Page 373 of 1017 PageID 5052
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 304 of
2722

Nelms - Direct                          73

1   opening, what would happen to Mr. Terry's claim?  Or what's

2   your understanding or what's the Board's view as to whether or

3   not it would intend to satisfy Mr. Terry's claim?

4   A   I know, speaking on my behalf, that I'd -- the claim that

5   Mr. Terry got through arbitration I regard as a valid claim.

6   I think it's one that would have to be addressed no matter who

7   is in charge of paying the obligations of Neutra.

8   Q   Has the Board concluded that it's in the Debtor's best

9   interest to retain Foley for the purpose of prosecuting the

10  Neutra appeal, or at least in issuing the oral argument?

11  A   Yes.

12  Q   Okay.  And when is the argument scheduled for?

13  A   March the 30th.

14  Q   And is the fact that that's all that's left with respect

15  to this aspect of the engagement a factor that the Board took

16  into account in its decision?

17  A   Yes.

18  Q   Has the Board reached a decision as to who the real

19  economic party in interest is with respect to the Neutra

20  appeal?

21  A   Yes.  We believe ultimately that our Debtor would bear the

22  most economic interest in the outcome.  And, really, because

23  of the amount of the obligations that are owed, both to Mr.

24  Terry, to Highland Capital, by the time that you have this

25  kind of runoff of all the revenue streams, I'm not really sure

Nelms - Direct                          74

1    that there would be anything left for either Mr. Dondero or

2    Mr. Okada.

3    Q    So, --

4    A    That's -- that's a view from 50,000 feet, not even 30,000

5    feet.

6    Q    Okay.  Well, let's talk about the specific benefits,

7    potential benefits, if it's reversed on appeal.  Does the

8    Board believe it's possible that the two contracts get

9    reinstated?

10    A    It is possible.

11    Q    And is that a motivating factor in supporting this motion?

12    A    It is.

13    Q    What would happen to the $8 million claim that the Debtor

14    has against Acis right now in the Acis bankruptcy?  Does the

15    Board have a view as to what would happen to that?

16    A    It would be our aspiration to collect that claim on behalf

17    of our client, which is Highland Capital Management.

18    Q    And would -- is it the Board's expectation that if it was

19    in that position it would get paid hundred-cent dollars,

20    rather than at least a portion of it as a general unsecured

21    claim?

22    A    Again, that would be our aspiration.

23    Q    Uh-huh.  What would happen to the adversary proceeding?

24    Do you have an understanding as to what would happen in the

25    adversary proceeding with respect to Mr. Terry if the Fifth

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 307 of
Case 3:25-cv-02072-S     Document 15-7     Filed 06/25     Page 375 of 1017     PageID 5054
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 306 of
2722

Nelms - Direct                          75

1   Circuit reverses and Neutra regains control of Acis?

2   A    Well, I'm assuming -- I'm assuming that that adversary

3   proceeding would go away.

4   Q    Okay.  And would that -- is that a potential benefit to

5   the estate?

6   A    That would be a benefit to the estate if it did.

7   Q    And do all of the factors that we just discussed go into

8   the cost-benefit analysis that the Board did in deciding to

9   pursue only these three very limited aspects of the

10  engagement?

11  A    Yes.

12  Q    Okay.  Has the Board considered the potential harm to the

13  Debtor if the motion is denied?

14  A    We have.

15  Q    And have -- can you share with the Court the issues that

16  the Board has identified as potentially being adverse if the

17  motion is denied?

18  A    It's really just the other -- the flip side of the coin of

19  benefit, which is added expense, loss of the experience that

20  the Foley firm has, perhaps delay of time in finding somebody

21  else, bringing them up to speed, not just with respect to the

22  two appeals but with respect to the proof of claim.  And there

23  may be others that I'm not thinking of right now.

24  Q    Did the Board consider the potential loss of the

25  institutional knowledge that Foley has and the potential

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 308 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 376 of 1017   PageID 5055
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 307 of
2722

Nelms - Direct                          76

1    adverse impact it would have on the quality of the oral

2    argument?

3    A    It did.

4    Q    Okay.  So, two of the three matters that the Debtor seeks

5    to retain Foley for are appeals to the Fifth Circuit; is that

6    right?

7    A    Yes.

8    Q    And did those matters originate in this courtroom?

9    A    They did.

10   Q    And you were colleagues with Judge Jernigan at one time,

11   weren't you?

12   A    Yes.  We were bench colleagues for twelve years.

13   Q    And do you believe Judge Jernigan is a good judge?

14   A    I do.

15   Q    Do you believe she's a fair judge?

16   A    I do.

17   Q    Do you believe she tries to get it right every single

18   time?

19   A    I know she tries to get it right every time.

20   Q    So then why is the Board seeking to prosecute these

21   appeals of Judge Jernigan's decision?

22   A    Well, it's in the best interest of our client to do that.

23   And I have not -- I have to say there's always a little bit of

24   discomfort that comes with something like this, but I do know

25   this from my time on the bench, and that is that when you take

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 309 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 377 of 1017 PageID 5056
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 308 of
2722

Nelms - Direct                          77

1  the job that Judge Jernigan has, you take it with full

2  understanding of how the system works.  And in the system,

3  half the people lose at any one given time.  And when you

4  lose, you tend to be disappointed in the result, and the

5  result of that is that you get the right to go to the next

6  court and have someone say that the judge got it wrong.

7      So those of us that take the bench understand that that's

8  the system, and I don't think -- for the most part, we're not

9  threatened by that.  And so I, you know, as uncomfortable as

10 this may -- this may put -- a position it may put me in from

11 time to time, I think that -- I think Judge Jernigan

12 understands the roles that we all play in this system.  And so

13 --

14 Q   Just, okay, just to summarize:  If the motion is granted,

15 what's the absolute worst-case scenario here for the Debtor?

16 A   I'm sorry.  Would you say that again?

17 Q   If the motion is granted and the Debtor is allowed to

18 retain Foley for the three tasks which you have described, do

19 you have an understanding as to what -- what's the worst that

20 could happen?  They'd have to pay Foley's fees, right?

21 A   We'd have to pay -- well, subject to Judge Jernigan's

22 approval, --

23 Q   Right.

24 A   -- those fees would be paid.

25 Q   And subject to everybody's opportunity to object, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 310 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 378 of 1017 PageID 5057
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 309 of
2722

                          Nelms - Direct                    78

1   A    Right.

2   Q    But if the fees were paid at a hundred percent, nobody

3   objected and Judge Jernigan approved of them, what's the

4   maximum exposure that the Debtor has from this?

5   A    I think Foley has about $311,000, I believe, right now in

6   time.  And I think they would probably have about maybe

7   another $100,000 more.  And I know -- I hate to scoff at the

8   notion that $400,000 is a lot of -- is not a lot of money.

9   But, you know, in the grand scheme of things in this case,

10  it's -- I won't say it's a rounding error, but it's not a lot

11  of money.

12  Q    And forget about, I mean, not forget about, but in

13  addition to its relative size to the overall case, how does

14  that compare to the relative economic benefit that the Debtor

15  believes it will recover if the appeal is successful?

16  A    Well, I think the cost is -- the cost is less than half a

17  million, and the potential benefits are in the millions.

18          MR. MORRIS:  Okay.  Just one moment, Your Honor, if I

19  may?

20          THE COURT:  Okay.

21      (Pause.)

22          MR. MORRIS:  All right.  Just a few more questions,

23  Your Honor.

24          THE COURT:  Okay.

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 311 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 379 of 1017   PageID 5058
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 310 of
2722

Nelms - Direct                        79

1   Q   Mr. Nelms, did Neutra pay a portion of the fees, Foley's

2   fees prior to the petition date in connection with an April

3   litigation?  Do you know?

4   A   If they did, I'm not aware of it.

5   Q   Okay.  Do you know what would happen to the appeal if

6   there was no funding for the appeal?

7   A   Well, I think I know what the result of the appellant not

8   showing up for an appellant argument would be.

9   Q   And what would that be?

10   A   Well, I think that would be a pretty quick resolution.

11   Q   Do you think the case would be dismissed, the appeal would

12   be dismissed?

13   A   I think so.

14   Q   And would that be the loss of a potential material benefit

15   and asset of the Debtor's estate?

16   A   It would be.

17   Q   Can you think of any way to ensure the appeal is

18   prosecuted today other than making sure the Debtor funds it?

19   A   I'll put it this way.  I think the most certainty can be

20   added to this case by having the Debtor fund this matter

21   through the end of March.

22   Q   And from --

23   A   I think that's -- that's -- for the time being, that's the

24   easiest, most simple path.

25   Q   And you say for the time being.  Has the Board reached an

Nelms - Direct                       80

1   agreement to never request, from Neutra or anybody else,

2   contributions for the funding of this case?

3   A    No.  Ultimately, there is going to be at some point in

4   this case a settling of accounts between the Debtor and Mr.

5   Dondero, just as there are -- will be a settling of accounts

6   between the Debtor and other parties in interest.  We, as the

7   Board, have just chosen not to have that fight today.

8   Q    And why did the Board reach that decision?

9   A    Because we just thought it was in the best interest of the

10  Debtor to proceed that way.

11  Q    And is that because you need this appeal argued on March

12  30th?

13  A    It is.

14  Q    And that's because of all of the potential benefits that

15  you've identified; is that right?

16  A    Right.

17  Q    Okay.

18          MR. MORRIS:  I have no further questions, Your Honor.

19          THE COURT:  Okay.  Cross?

20          MR. LAMBERSON:  Yes, Your Honor.

21                      CROSS-EXAMINATION

22  BY MR. LAMBERSON:

23  Q    Good morning, Mr. Nelms.

24  A    Good morning.

25  Q    How's it to be on that side of the bench?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 313 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 381 of 1017   PageID 5060
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 312 of
2722

Nelms - Cross                          81

1   A    Not so fun.

2   Q    It's not great, right?

3           MR. LAMBERSON:  And Your Honor, we have an exhibit

4   notebook, which we're not -- we're not going to use all these

5   exhibits.  We actually -- you'll notice that there are some

6   empty tabs in here.  We downsized the exhibits from the

7   exhibit list, and I'm not going to use all these.  So I'll

8   just introduce them as I get to them.

9           THE COURT:  Okay.

10  BY MR. LAMBERSON:

11  Q    Let me pick up on your last point.

12          MS. CHIARELLO:  Your Honor, may we approach?  We have

13  binders.

14          THE COURT:  You may.

15  BY MR. LAMBERSON:

16  Q    So, let me pick up on your last point, Mr. Nelms.  So, who

17  -- who owns Neutra?

18  A    Well, if you follow the stream all the way up, it is owned

19  75 percent by Mr. Dondero and 25 percent by Mr. Okada.

20  Q    Okay.  And Mr. Dondero is one of the richest men in

21  Dallas.  Correct?

22  A    I don't know.

23  Q    Presumably?  Mr. Okada is also one of the richest men in

24  Dallas?

25  A    I don't know.  I haven't lived in Dallas in 17 years.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 314 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 382 of 1017   PageID 5061
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 313 of
2722

Nelms - Cross                        82

1   Q    Okay.  Fair enough.  But they can't -- they can't pay the

2   litigation costs for their own entity?

3   A    Well, I don't know that they -- whether they can or

4   whether they can't.

5   Q    Right.  So, are you familiar with an entity called

6   Highland CLO Funding?

7   A    Vaguely, yeah.

8   Q    Okay.  And Highland CLO Funding is one of the appellants

9   in the appeal of the confirmation order, correct?

10  A    That's correct.

11  Q    Okay.  And one of the issues on appeal is actually the

12  plan injunction that's embedded in the confirmed plan,

13  correct?

14  A    That's correct.

15  Q    Right.  And is your understanding that that's really

16  Highland CLO Funding's main appeal issue?

17  A    I think it probably would be, yes.

18  Q    Okay.  And is there any reason that Highland CLO Funding

19  can't pay Neutra's legal fees to have -- have another

20  appellant in the Fifth Circuit?

21  A    I don't know the answer to that question.

22  Q    Okay.  So, let me -- let me -- I'm going to try to keep

23  this coordinated, but my notes are a little bit over the

24  place, so I apologize in advance if I move around a little

25  bit.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 315 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 383 of 1017   PageID 5062
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 314 of
2722

Nelms - Cross                          83

1        So, you had testified earlier that -- and I'm just trying

2   to synopsize your testimony -- that you -- that the Board

3   believes the primary benefit of paying Neutra's legal expenses

4   related to the order for relief appeal and the confirmation

5   appeal is the income stream that would be evidenced by the

6   sub-advisory agreement, right?

7   A    Yes.

8   Q    Okay.  And I'm -- when I say sub-advisory agreement, I'm

9   talking about this is the attachment to the Debtor's Exhibit

10  4, which is the proof of claim.

11  A    Right.

12  Q    Right?  And so it's your understanding that the way that

13  works is Acis Capital Management, my client, is the portfolio

14  manager for a bundle of CLOs, right?

15  A    That's my understanding.

16  Q    And that before the Acis bankruptcy, the sub-advisory

17  agreement allowed Highland Capital Management to sub-advise

18  those CLOs for a fee, correct?

19  A    That's correct.

20  Q    Okay.  So, I'm going to focus on the confirmation appeal.

21  So, you understand that the plan injunction prevents the

22  liquidation of the CLOs and the Acis portfolio management

23  agreement?

24  A    That is my understanding.

25  Q    Okay.  And the reason that, frankly, we had to get the

Nelms - Cross                        84

1   plan injunction is because HCLOF three times tried to

2   liquidate, redeem the CLOs, including twice in the bankruptcy

3   case?

4   A   I understand that was an issue.  But -- I have a general

5   understanding as to what you're saying, but not a specific

6   understanding.  But I'm not disagreeing with you.

7   Q   Yeah.  Okay.  And so if the plan goes away, the plan

8   injunction goes away, then is there any reason to think that

9   HCLOF isn't going to liquidate the CLOs?

10  A   I would not know.

11  Q   And in that case, there's not going to be any cash flow

12  under the portfolio management agreements or the sub-advisory

13  agreements, right?

14  A   If you're asking me if that's a possibility, I'd say it's

15  certainly within the realm of possibilities.

16  Q   Okay.  So, staying on the confirmation appeal, so let's --

17  let's assume that, for whatever reason, the Fifth Circuit

18  decides that the confirmation order needs to be reversed and

19  they send it back down to Judge Jernigan and say, "Try again."

20  Would you agree that that would effectively reactivate the

21  Acis case?

22  A   Well, I don't know, because, you know, one of the issues

23  in the appeal is who gets to make the decision with respect to

24  arbitrability.  Because I know that it's the Appellants'

25  position that the decision as to whether or not it should be

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 317 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 385 of 1017    PageID 5064
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 316 of
2722

Nelms - Cross                          85

1  arbitrated, something such as collections, should they go to

2  be decided by the arbitrator, --

3  Q   Let me stop you, just to be clear.  I'm talking about the

4  confirmation appeal, the appeal of the confirmation order.

5  A   Uh-huh.

6  Q   Right?  Okay.  I'm not talking about the order for relief

7  appeal.

8  A   I may be conflating the two, so I'm sorry.

9  Q   Yeah, yeah, and I -- and it's -- yeah, it's -- but it is

10  confusing.  But I'm talking about the confirmation appeal.  So

11  the appeal of the Court's confirmation order confirming the --

12  I think was the third amended plan.  Okay?  So, I'm focusing

13  on that appeal only.  If the Fifth Circuit says, "Nope.  Try

14  again," then you would agree with me that that effectively

15  reactivates the Acis Chapter 11 case?

16  A   Well, I think it depends.  If you -- would you like me to

17  explain why I think it depends?

18  Q   Yeah.  Go ahead.  I don't -- because, I mean, honestly,

19  I'm not exactly sure what happened, so I would actually -- I

20  would like your opinion.

21  A   Well, given that the first issue in the confirmation

22  appeal is the issue of good faith, and the foundation of that

23  pretty much is the whole arbitration issue, if the Fifth

24  Circuit were to reverse on that basis, then I don't

25  necessarily know that it would go back to the Bankruptcy

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 318 of
Case 3:25-cv-02072-S  Document 15-7  Filed 06/25  Page 386 of 1017  PageID 5065
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 317 of
2722

Nelms - Cross                    86

1  Court.

2      If it was reversed just on the narrower issue with respect

3  to the injunction, and maybe whether the injunction was too

4  broad or something like that, --

5  Q   Uh-huh.

6  A   -- and that was the only basis for reversal, I would agree

7  with you it would go back to Bankruptcy Court.

8  Q   Okay.  So there's some possibility that a result of the

9  confirmation appeal is that the Acis Chapter 11 case is

10 reactivated and we're back in front of Judge Jernigan on that

11 case, too?

12 A   That would be a possibility.

13 Q   Okay.  And then you'd get to talk with Mr. Phelan, right?

14 That would be fun.

15 A   Right.

16 Q   So, so how much money did Highland Capital spend in the

17 Acis bankruptcy case?

18 A   I don't know.

19 Q   Was it -- it was millions and millions, right?

20 A   I don't know, but I'm -- I'm assuming it exceeded a

21 million.

22 Q   Okay.  Well, aren't there -- aren't there claims of unpaid

23 fees just in the Top 20 list, which we'll point to here in a

24 minute, in the millions of dollars that relate to the

25 attorneys that represented Highland in the bankruptcy -- in

Nelms - Cross                          87

1   the Acis bankruptcy case?

2   A    I don't know.

3   Q    Okay.  So, why, you know, assuming that a result of the

4   confirmation appeal is that the Acis bankruptcy case is

5   reactivated, how is that in Highland's best interest?  And I'm

6   not talking about Neutra, and I'm not talking about HCLOF.

7   I'm talking about Highland.

8   A    Well, the -- what would be in our best interest would be

9   to once again control the sub-advisory agreement and to

10  generate revenues for the benefit of this estate.  Use those

11  -- that revenue stream both to address any claims that

12  Highland might have, as well as Mr. Terry.  That would be the

13  benefit as we see it.

14  Q    Right.  But by the time of the confirmation order, --

15  A    But if your question is, oh, but you're going to be

16  involved in a lot of other litigation and so how does that

17  benefit, then I guess my answer to that is it's a -- my answer

18  is a "Yes, but," and but may exceed the scope of your

19  question, so I won't --

20  Q    Okay.

21  A    -- I won't give you the but answer unless you want me to

22  do it.

23  Q    That's fine.  I just -- if we go back, if we go back to

24  where we were before confirmation, I mean, I'm not talking

25  about the order for relief, I'm talking about confirmation,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 320 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 388 of 1017   PageID 5067
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 319 of
2722

Nelms - Cross                          88

1  the sub-advisory agreement had been terminated.  Highland had

2  been fired and Brigade was managing everything.

3  A    Right.

4  Q    So, there wouldn't be any cash flow going to Highland

5  based on the -- just the reversal of the confirmation order.

6  A    Well, what would have to happen, of course, is that Neutra

7  would have to -- would have to appoint us as -- would have to

8  allow us to come in under the sub-advisory agreement to

9  perform those services.

10 Q    Right.  Except that there's a trustee, right?  Robin

11 Phelan was in charge of everything.

12 A    Well, you're assuming there's still a bankruptcy.

13 Q    Right.  Yeah.  Well, I am.  I mean, again -- and maybe I'm

14 being simplistic about this, but if the confirmation order is

15 reversed, --

16       THE COURT:  Counsel is standing.  Do you have an

17 objection?

18       MR. MORRIS:  Yeah.  I do, Your Honor, to this whole

19 line of hypothetical questions.  We do understand, I think

20 everybody understands, that we don't know if the appeal will

21 be granted.  I think we do all understand that we don't know

22 what the form of relief, the exact form of relief will be.

23 But the testimony here is that the Board has decided that one

24 possible form of relief is that -- is that Neutra will regain

25 control of Acis and get these contracts reinstated, get the

APP. 0316
004306

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 321 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 389 of 1017 PageID 5068
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 320 of
2722

Nelms - Cross                          89

1    adversary proceeding dismissed, and get paid on its $8 million

2    claim.

3        If there's questions about that, I think it's relevant,

4    but I don't know why we're spending a lot of time on

5    hypotheticals with a fact witness.

6            THE COURT:  But the --

7            MR. MORRIS:  Not an expert witness.

8            THE COURT:  The business judgment of the Board of the

9    Debtor is at issue here, correct?

10           MR. MORRIS:  Correct.  Absolutely.

11           THE COURT:  Don't these hypotheticals go to, is

12   reasonable business judgment being exercised here?

13           MR. MORRIS:  I think he has to lay a foundation and

14   say, Is this -- is this a hypothetical you considered?  Is

15   this a hypothetical that you considered?  Because we're just

16   -- this is like expert testimony almost.  There is no evidence

17   that any of these factors were considered.  And at the end of

18   the day, there is no dispute that the scenario that the Board

19   is saying is worth the investment, basically, is also a

20   possibility.

21           THE COURT:  Okay.  I overrule the objection.

22           MR. LAMBERSON:  Okay.

23           THE COURT:  You can proceed.

24           MR. LAMBERSON:  And Your Honor, I'm just about done.

25           THE COURT:  Okay.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 322 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 390 of 1017   PageID 5069
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 321 of
2722

Nelms - Cross                            90

BY MR. LAMBERSON:

Q   So, okay.  So, we -- but we can agree that -- okay.  Let

me -- let me hopefully do this.  Okay.  So, I mean, I think

that's fine for the confirmation appeal, so now I want to talk

about the order for relief appeal.  Right?  So this is the

appeal of the order for relief or the -- and I stated this

earlier to the Court, but the sole substantive issue in that

appeal is whether this Court should have compelled the order

for relief to arbitration.  Is that right?

A   The sole substantive issue?  I think, if you paint with a

broad brush, yeah.  I would agree with you, yes.

Q   Okay.  Well, and again, I'm not trying to --

A   I know.  So, --

Q   I'm not trying to trap anybody.  The three issues --

A   And I'm not trying to be evasive, either.

Q   Yeah.

A   Yeah.

Q   Are the standing issue, which, in my mind, isn't really a

substantive issue.  And then there's the issue about the

arbitration of the order for relief.  And then, finally, as I

mentioned, we've raised a waiver argument that basically, if

they had a right to arbitrate, which we think they don't, they

waited too long to raise it.  Right?  Those are the three

issues.  Correct?

A   That's correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 323 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 391 of 1017    PageID 5070
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 322 of
2722

1   Q   Okay.  So, let me ask you.  And I'm not going to -- I'm

2   not going to hold this against you at the Fifth Circuit level,

3   but, I mean, do you -- do you think an order for relief is

4   subject to arbitration?

5           MR. MORRIS:  Objection, Your Honor.  Calls for a

6   legal conclusion.

7           THE COURT:  Overruled.

8           MR. LAMBERSON:  Sure it does.

9           THE COURT:  Overruled.

10          THE WITNESS:  I think the -- I think it's a -- I

11  think there's a colorable argument.

12  BY MR. LAMBERSON:

13  Q   Uh-huh.

14          MR. MORRIS:  Objection withdrawn.

15  BY MR. LAMBERSON:

16  Q   So you don't think *National Gypsum* and *Gandy* would apply

17  to an involuntary petition and order for relief?

18  A   Well, I'll put it this way.  I guess they'll apply if the

19  Fifth Circuit tells us they do.

20  Q   Right.

21  A   That's as much as I can tell you.

22  Q   Okay.  So, so if that ruling is reversed, right, as I

23  mentioned earlier -- and let me ask you, actually, another

24  thing.  So, how often, when you were a judge, how often were

25  -- I shouldn't say how often -- how many times were your

Nelms - Cross                          92

1   rulings reversed?  Just roughly?

2   A    Was I reversed?

3   Q    Yeah.

4   A    I think six.

5   Q    Not very many claims, right?

6   A    No.

7   Q    So how many times was there a reverse and a render?

8   A    I'm sorry.  Say again?

9   Q    How many times was there a reverse and a render, where

10  nothing came back to you, that basically the higher court just

11  said, It's done?

12  A    Well, it was rendered every time except on one occasion,

13  and that --

14  Q    Uh-huh.

15  A    -- *Stern v. Marshall* had just been decided, and so --

16  gosh, I can't remember the district judge.

17  Q    Okay.

18  A    One of the judges reversed but sent it back to me to

19  reconsider it under the light of the ruling in *Stern v.*

20  *Marshall*, a jurisdictional issue.  So, in all those instances,

21  it was rendered.

22  Q    Okay.  So there was nothing -- there was no issue that

23  came back to you?  The case was just resolved?

24  A    No.  No issue came back to me.

25  Q    Okay.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 325 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25   Page 393 of 1017   PageID 5072
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 324 of
2722

Nelms - Cross                           93

1  A    No, you know what, there was a second one.  I think the

2  second one was *In re Mirant*.  *Commerzbank versus* -- *MCAR v.*

3  *Commerzbank*.  That came back as well.

4  Q    Right.  Okay.  So, again, but focusing on the order for

5  relief appeal, one possibility is that the Fifth Circuit says,

6  okay, this may be subject to arbitration, and sends it back to

7  Judge Jernigan to make additional findings, apply a different

8  standard, right?  That's possible, right?

9  A    That's possible.

10 Q    Okay.  So, in that case, nothing necessarily came out of

11 the appeal, right?  Like you're just basically back in front

12 of her on the same issues?

13 A    Well, I -- that may very well be the case, but --

14 Q    Okay.  Well, let's assume that the Fifth Circuit does

15 reverse and render.  Wouldn't -- isn't what they would render

16 would be a -- compelling this case to arbitration?  Right?

17 Not that the bankruptcy goes away, disappears.  It would

18 basically be, "Should have been arbitrated.  Go arbitrate."

19 A    It's a good question, what the effect of reversing it

20 would be and sending it back, remanding it.  They -- I mean,

21 one of the things that they might decide is to say that the

22 whole issue of arbitration should be decided by an arbitrator.

23 Q    Uh-huh.

24 A    That's a possibility.

25 Q    Right.  But in that situation, the bankruptcy doesn't go

Nelms - Cross                          94

1   away.  It just moves to a different forum, right?

2   A    No, I mean, you're probably right.  That, in and of

3   itself, would not eviscerate the bankruptcy filing.

4   Q    Uh-huh.

5   A    That's true.

6   Q    And so, in that situation, the result is -- and this is --

7   that's, frankly, the best situation, is --

8   A    But, of course, I mean -- can I go back to that?  Just,

9   I'm not sure about that.  Because, after all, this was an

10  involuntary petition.

11  Q    Uh-huh.

12  A    If it was a voluntary petition, then I would certainly

13  agree with you wholeheartedly.  Inasmuch as it was an

14  involuntary petition, I'm not sure about the answer to that

15  question.

16  Q    Uh-huh.  Okay.

17  A    That's a good question.

18  Q    But you would agree with me that a possible result of even

19  a reversal of the order for relief appeal would just be more

20  litigation?

21  A    Yes.  That's certainly a possibility.

22  Q    Right.  In this Court?  Maybe in front of an arbitrator?

23  Maybe both?

24  A    Yes.  That's possible.

25  Q    Okay.  All right.  So, still focusing on the order for

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 327 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25   Page 395 of 1017   PageID 5074
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 326 of
2722

Nelms - Cross                          95

1  relief appeal, but I want to go to this idea that, again,

2  there's this cash flow stream that is going to be reinstated

3  for the benefit of Highland Capital under the sub-advisory

4  agreement.  Okay?

5  A    Right.

6  Q    All right.  So, before the Acis bankruptcy was filed,

7  Dondero, and at that time, in control of Highland, were

8  actually in the process of liquidating Acis, weren't they?

9  A    Were they in the process of liquidating Acis?

10  Q    Uh-huh.

11  A    And I take it these are the transfers that were --

12  concerning your client that prompted the filing of the

13  involuntary petition itself?

14  Q    Correct.

15  A    Is that what you're referring to as the --

16  Q    Yes.

17  A    -- liquidation?

18  Q    Yes.

19  A    Well, I certainly know that -- I understand those

20  transfers were taking place.  Now, whether you'd call that a

21  liquidation or not, I don't know, but I know what you're

22  referring to --

23  Q    Okay.

24  A    -- and I think the answer to your --

25  Q    So, --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 328 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25   Page 396 of 1017   PageID 5075
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 327 of
2722

Nelms - Cross                          96

1    A    Yeah.

2    Q    Yeah.  So there were a variety of transfers of assets away

3    from Acis before --

4    A    Right.

5    Q    -- the Acis bankruptcy filing, right?  And, actually, are

6    you aware that there was actually an agreement between

7    Highland CLO Management and Acis to transfer those PMAs to

8    HCLOF Management?

9    A    No, I'm not aware of that.

10   Q    Okay.  And as we talked about earlier, HCLOF repeatedly

11   attempted to redeem the CLOs, even during the Acis bankruptcy,

12   right?

13   A    I read about that in Judge Jernigan's opinion, so I'm

14   assuming that's the case.

15   Q    Right.  Okay.  And then -- and, in fact, if HCLOF was

16   successful, that would liquidate the CLOs and it would

17   effectively terminate the Acis portfolio management

18   agreements, right?

19   A    I don't know.

20   Q    Okay.  But if that was the case, if the portfolio

21   management agreements went away or no longer had assets to

22   manage, then the sub-advisory agreement would have no income,

23   right?

24   A    If you're asking me if that's something within the realm

25   of possibilities, I suppose so.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 329 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 397 of 1017    PageID 5076
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 328 of
2722

Nelms - Cross                          97

1   Q    Okay.  So, if, because of the appeal, the Acis bankruptcy

2   -- because of the order for relief appeal, if the bankruptcy

3   -- if the Acis bankruptcy just went entire away, just

4   disappeared, right, so Mr. Dondero would be in control of

5   Acis, not you, right?

6   A    He would be in control.  That's correct.

7   Q    Okay.  And so if he wanted to terminate the PMAs and enter

8   new PMAs with Dondero Capital Management, you couldn't keep

9   him from doing that, could you?

10  A    Well, I -- no, I could not keep him from doing that.

11  Q    Okay.  Or if he wanted to terminate the sub-advisory

12  agreement and enter into a different agreement, I mean, you

13  couldn't keep him from doing that, either, could you?

14  A    No, I couldn't.

15  Q    Right.  So what makes you think that Highland Capital

16  Management, a debtor that he lost control of, just like Acis,

17  would benefit from Acis's PMAs, when he was actively trying to

18  take Acis's PMAs away from Acis?

19  A    Well, I have -- I spoke to Mr. Dondero about this, and he

20  -- I asked him the question, and he said that he would

21  reinstate Highland under the sub-advisory agreement and the

22  shared services agreement.

23  Q    Okay.  So, on that point, you did mention earlier that, as

24  part of your -- as part of the Board's diligence, you talked

25  with Mrs. O'Neil and you talked to Pachulski.  Obviously,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 330 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 398 of 1017   PageID 5077
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 329 of
2722

Nelms - Cross                          98

1   you've analyzed the issues.  I can tell you're familiar with

2   all these, all of the pleadings.  But you also talked with

3   different Highland Capital employees about the litigation and

4   the appeals, correct?

5   A    I did.

6   Q    Okay.  Who did you talk with?

7   A    Well, I have to say that the interaction with Highland

8   employees was actually fairly abbreviated.

9   Q    Uh-huh.

10  A    We spoke very, very briefly about this with Isaac Leventon

11  on the day that we were appointed.  I don't know if the Court

12  is aware of this or not, but we spoke about it very briefly,

13  and then he was injured later that night and he really hasn't

14  been back at the office since then.  So, --

15  Q    Oh.

16  A    -- I would say, for the most part, I have relied mainly on

17  Pachulski.

18  Q    Okay.  But you did indicate you talked to Mr. Dondero as

19  well?

20  A    I talked to him about this issue about reinstatement, yes.

21           MR. LAMBERSON:  So, Your Honor, I'd like to turn to

22  --

23           THE WITNESS:  Oh, you don't have to call me Your

24  Honor.

25           THE COURT:  There are two Your Honors.

Nelms - Cross                              99

1            MR. LAMBERSON:  Your Honors.  How about that?

2            THE COURT:  Okay.

3            THE WITNESS:  Yeah, there's only one judge in the

4    court today.

5    BY MR. LAMBERSON:

6    Q   Could you turn to Exhibit 16, please?  This is Acis's

7    Exhibit 16.  I'm sorry.  Do you have that, Mr. Nelms?

8    A   I do.

9    Q   And could you identify Acis Exhibit 16?

10   A   Yes.  This is Official Form 204 in the current case, the

11   one we're here for today.

12   Q   Right.  So it's the Top 20 List of Creditors for Highland

13   Capital Management?

14   A   Yes, that's correct.

15   Q   Okay.  And have you seen Exhibit 16 before?

16   A   Pardon me?

17   Q   Have you seen Exhibit 16 before, the Top 20 List?

18   A   No, I have not seen it before.

19   Q   Okay.

20           MR. LAMBERSON:  Your Honor, we'd ask for the

21   admission of Exhibit 16.

22           THE COURT:  Any objection?

23           MR. MORRIS:  Just on relevance grounds.  Can we at

24   least establish a foundation as to which element of 327(e)

25   this goes to?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 332 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 400 of 1017   PageID 5079
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 331 of
2722

Nelms - Cross                         100

1             THE COURT:  Response?

2             MR. LAMBERSON:  Well, Your Honor, what I'm going to

3    point out is that the top ten creditors, other than an insider

4    creditor, are all litigation-based, and that the, as I pointed

5    out in my opening, the origin of this case was a bad

6    litigation strategy.

7             MR. MORRIS:  No objection to the introduction of this

8    exhibit for that limited purpose.

9             THE COURT:  All right.  It's admitted.

10       (Acis Capital Management GP, LLC's Exhibit 16 is received

11   into evidence.)

12   BY MR. LAMBERSON:

13   Q   All right.  So, Mr. Nelms, you said you hadn't seen this

14   before, but I think you'll probably be familiar with the

15   information on it generally.  So let's walk through this

16   quickly.  So, this is the Top 20 List of Creditors.  The first

17   creditor is Redeemer Committee, listed as litigation, do you

18   see that, for about $190 million?

19   A   Yes.

20   Q   And that's the arbitration award that precipitated this

21   filing, correct?

22   A   It is.

23   Q   Okay.  So the next claim is Pat Daugherty, litigation

24   claim.  It's $11.7 million.  Do you see that?

25   A   Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 333 of
Case 3:25-cv-02072-S    Document 15-7   Filed7210/06/25    Page 401 of 1017    PageID 5080
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 332 of
2722

Nelms - Cross                         101

1   Q    So, do you know what is Mr. Daugherty's history with

2   Highland Capital?  And try to keep it under five minutes.

3   A    Yeah.  Mr. Daugherty is a former employee.  And I know he

4   has some contractual disputes with the company based upon his

5   separation.

6   Q    Right.  And he's a long-time litigant with Highland

7   Capital, correct?

8   A    He is, yes.

9   Q    Yes.  So the next one is CLO HoldCo.  This is about $11.5

10  million.  CLO HoldCo is an insider of the Debtor, correct?  If

11  you know.

12  A    Is -- is it an insider?  I don't know.

13  Q    Okay.  Well, Grant Scott, the party here, is Mr. Dondero's

14  college roommate.  Do you know that?

15  A    That's my understanding, yes.

16  Q    Okay.  So, Creditor #4, McKool Smith, for two point --

17  roughly $2.1 million.  Do you see this?  This is for

18  attorneys' fees incurred by Highland Capital, correct?

19         MR. MORRIS:  Objection, Your Honor.  I still fail to

20  see how this is at all connected to any of the elements of

21  327(e) or the retention of Foley.

22         THE COURT:  Okay.  I overrule.

23  BY MR. LAMBERSON:

24  Q    So, this is -- this -- these are fees incurred by Highland

25  Capital, you know, a variety of venues, right, including this

Nelms - Cross                      102

1   one, state court fights against Mr. Terry, right?

2   A   I thought -- McKool Smith, I thought they were involved in

3   the Redeemer litigation, but they may be involved in other

4   litigation as well.

5   Q   Okay.  Fair enough.  And do you know, this claim is

6   disputed by the Debtor, correct?

7   A   Yes.

8   Q   Okay.  And do you know, obviously subject to the stay, but

9   do you know if this claim is being arbitrated or has been sent

10  to arbitration?

11  A   No, I don't know any -- no, I don't know.

12  Q   Okay.  That's fair enough.  So, then #5 -- I'll move it

13  along here.  Meta Discovery, Meta-e Discovery, they're a

14  litigation vendor, right?

15  A   I'm sorry, would you ask your question again?

16  Q   Meta-e Discovery, the next creditor.  They're a litigation

17  vendor and they provide litigation support services?

18  A   I don't know what they do.

19  Q   Okay.  Fair enough.  Foley Gardere.  Obviously, that's the

20  law firm you all are seeking to have engaged.  DLA Piper.

21  This relates to fees incurred in connection with the Terry

22  arbitration award, correct?

23  A   I think so.

24  Q   Okay.  Reid Collins.  These are fees related to the UBS

25  lawsuit, correct?

Nelms - Cross                      103

1    A    I don't know.

2    Q    Okay.  Josh and -- Joshua and Jennifer Terry.  This is a

3    litigation claim, right?  This is -- this is an IRA claim,

4    right?

5    A    It is.

6    Q    NWCC.  This is also a litigation claim?  In other words, a

7    litigant fighting with Highland?

8    A    I can only intuit that just because of the fact that it's

9    a law firm.

10   Q    Okay.  Fair enough.  So, out of the Top 20 -- or, out of

11   the Top 10 Creditors, basically, they're all litigants or

12   attorneys paid to fight litigants, with the exception of

13   Dondero's college roommate.  Right?

14   A    With the exception of what?

15   Q    Mr. Dondero's college roommate that has a claim based on

16   some entity.

17   A    Yes.  They're -- they all have some nexus to litigation.

18   Q    Okay.  And let me just ask you:  If you were able to

19   completely set aside all of Highland Capital's litigation

20   issues, right, just like -- just like the concept of the order

21   for relief appeal makes the Acis bankruptcy go away forever,

22   if you could snap your fingers and make all of Highland's

23   litigation go away forever, would Highland have any financial

24   problems at all?

25   A    Well, I don't know that I know the answer to that, but I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 336 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25/23   Page 404 of 1017   PageID 5083
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 335 of
2722

Nelms - Cross                         104

1  -- but it's certainly to say that litigation up to this point

2  has been the driving force behind its bankruptcy filing.

3  Q   Okay.  Fair enough.  Okay.  So, Mr. Nelms, would you turn

4  -- could you turn to Acis Exhibit 27?

5  A   Okay.

6  Q   Do you have that?

7  A   I do.

8  Q   Okay.  And can you identify Exhibit 27?

9  A   Yes.  My understanding is that this was the lawsuit that

10 was filed by the DAF and CLO HoldCo in the Southern District

11 of New York.

12 Q   Okay.  And so I had mentioned this in my opening, and I

13 believe counsel had asked you about what we call the DAF

14 litigation.  Is this the complaint that's the basis of the DAF

15 litigation?

16 A   Yeah, that's my understanding.  It is.

17 Q   Okay.  And I think you had testified earlier that the

18 board was actually shown a copy of this complaint, was before

19 it was filed, and --

20 A   I wouldn't call it -- I'm sorry, go ahead, ask your

21 question.

22 Q   No, no, I -- that's fine.

23 A   I wouldn't call it a board presentation.  I just remember

24 it being handed to Mr. Dubel and Mr. Dubel looking at it,

25 asking what it was, and saying, Tell them not to do this.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 337 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 405 of 1017   PageID 5084
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 336 of
2722

Nelms - Cross                         105

1    Q    Okay.  Thank you.  And -- but it's your understanding that

2    the complaint was filed anyway?

3    A    It is my understanding it was filed later.

4    Q    Okay.  And in fact, this has a file-stamp at the top,

5    which I'm sure you're very familiar with.  Correct?  Has a

6    PACER file-stamp at the top.

7    A    Right.

8    Q    Right.

9         MR. LAMBERSON:  So, Your Honor, we'd ask for the

10   admission of Exhibit 27.

11        THE COURT:  Any objection?

12        MR. MORRIS:  No objection.

13        THE COURT:  Admitted.

14   (Acis Capital Management GP, LLC's Exhibit 27 is received

15   into evidence.)

16        MR. LAMBERSON:  And I'll be relatively quick.

17   BY MR. LAMBERSON:

18   Q    I had mentioned in my opening that we -- I should say Acis

19   was concerned that Highland Capital Management had some

20   participation in this, and I probably should have been clearer

21   in saying that Highland Capital Management employees had some

22   participation in Exhibit 27.  Has the Board done any

23   investigation as to whether any Highland Capital employees

24   were involved in the preparation of Exhibit 27 or the filing

25   of Exhibit 27?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 338 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 406 of 1017    PageID 5085
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 337 of
2722

Nelms - Cross                              106

1   A    No, we have not.  At least, let me speak for myself.  I

2   haven't done that investigation.

3   Q    Uh-huh.  And your counsel had mentioned that -- I believe

4   this is correct -- your counsel had mentioned that you all had

5   reached out -- the Board, I should say -- reached out to Grant

6   Scott, who's the -- who's in control of the DAF as well as CLO

7   HoldCo, and, you know, had sort of convinced them that it

8   probably -- to dismiss this lawsuit.  Correct?

9   A    Yes.

10  Q    Okay.  And but do you -- as far as you know, it hasn't

11  been dismissed yet?

12  A    It hasn't been dismissed.  There's some kind of technical

13  things there, and I don't know if you want to go into them or

14  not, but it hasn't been dismissed, but I have a high degree of

15  certainty that this is going to get dismissed.

16  Q    Okay.  Fair enough.  And are you aware that there was

17  already a press release issued related to this lawsuit that

18  was picked up by various CLO publications?

19  A    When you say "already," are you talking about a specific

20  time?

21  Q    Well, that -- I guess what's I'm getting at is are you

22  aware that the filing of this lawsuit has already resulted in

23  various articles in CLO journals, periodicals?

24  A    I'm aware of it having appeared in one publication.

25  Q    Okay.  And so is it fair to say that the damage is already

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 339 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 407 of 1017    PageID 5086
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 338 of
2722

Nelms - Cross                                      107

1    done and that, you know, dismissal of these claims probably

2    isn't really all that -- isn't really all that significant

3    when they've already, you know, put it in the press?

4    A    I don't know if the damage has already been done or not.

5    Q    Okay.

6             MR. LAMBERSON:  Give me just a second, Your Honor.

7             THE COURT:  Okay.

8        (Pause.)

9    BY MR. LAMBERSON:

10   Q    So, there is actually one other -- there is one point.

11   And I told you in advance that I was afraid I might be jumping

12   around a little bit, so I'm going to jump around a little bit.

13   Let me go back to the order for relief appeal.  So, this is

14   the appeal of the Court's order for relief that started the

15   Acis bankruptcy.

16       One of the things you testified about related -- on your

17   direct testimony is one of the benefits, one of the potential

18   benefits, understanding we don't know what's going to happen,

19   of the order for relief appeal is that if the -- if that

20   ruling was reversed and the Acis bankruptcy went away, then

21   the adversary would go away, the adversary between Acis

22   Capital Management and Highland Capital Management.  Correct?

23   A    Well, yes.  In my opinion, the adversary opinion -- excuse

24   me, the adversary proceeding would go away.  Would a lawsuit

25   under TUFTA be avoided altogether by Mr. Terry?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 340 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 408 of 1017    PageID 5087
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 339 of
2722

Nelms - Cross                          108

1   Q    Right.

2   A    I don't know that it would take that away.

3   Q    Okay.  And that's -- you actually anticipated my question,

4   --

5   A    Uh-huh.

6   Q    -- which was:  It's fair to say that, even if the

7   adversary went away between Acis and Highland Capital

8   Management, that the -- certain of the claims in the adversary

9   -- for example, the fraudulent transfer claims or derivative

10  claims -- would not necessarily go away because they could be

11  asserted by Mr. Terry as a judgment creditor, correct?

12  A    They could, but the consequences of asserting that claim

13  outside of bankruptcy are vastly different than asserting them

14  inside of a bankruptcy case.

15  Q    Uh-huh.  Right.

16  A    At least potentially.

17  Q    And just to close the thought here, are you aware that one

18  of Acis's main arguments during the order for relief trial was

19  that we didn't need an involuntary, that Mr. Terry could just

20  go litigate all that stuff in state court?

21  A    Yeah, I think so.  I think I am aware of that.  Yes.

22  Q    Okay.  So you'd agree with me that, even on your possible

23  day on the order for relief appeal, that doesn't make the --

24  what I'll call the Terry litigation, right, the judgment

25  litigation, go away?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 341 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 409 of 1017   PageID 5088
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 340 of
2722

```
                          Nelms - Redirect                    109
```

 1  A    No.  No.  The reversal on appeal would not necessarily

 2  make the Terry litigation go away.

 3  Q    Okay.  Thank you.

 4         MR. LAMBERSON:  That's all I have, Your Honor.

 5         THE COURT:  All right.  Redirect?

 6         MR. MORRIS:  I just have a few questions, Your Honor.

 7         THE COURT:  Okay.

 8                     REDIRECT EXAMINATION

 9  BY MR. MORRIS:

10  Q    Can you turn to Exhibit 16 in your binder, sir?

11  A    Which one?

12  Q    I guess it's the Acis exhibits.

13  A    The Acis?  Okay.

14  Q    Yeah.  The List of Top 20 Creditors.

15  A    Okay.

16  Q    You were taken through each and every one of those to make

17  the point that they're largely litigation claims.  Is that

18  fair?

19  A    Say again, please?

20  Q    You were taken through many of those creditors to

21  establish that --

22  A    I was.

23  Q    -- that the Debtor was involved in a lot of litigation; is

24  that right?

25  A    It was.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 342 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 410 of 1017   PageID 5089
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 341 of
2722

Nelms - Redirect                         110

1   Q    Okay.  And the Board was appointed on January 9th; is that

2   right?

3   A    Yes.

4   Q    Did the Board have anything to do with any of the claims

5   that are set forth in Exhibit 16?

6   A    No.

7   Q    Did the Board authorize the filing of any suits that are

8   related to any of the claims that are set forth in Exhibit 16?

9   A    No.

10  Q    Did the Board direct the defense of any suits that were

11  commenced against Highland with respect to Exhibit 16?

12  A    No.

13  Q    Okay.  Has the Board been trying to diminish and eliminate

14  litigation where it thought it was in the Debtor's best

15  interests?

16  A    It has.

17  Q    And is that, for example, why the Board decided not to

18  pursue the Winstead matter?

19  A    It is.

20  Q    Is that why the Board has used its efforts to try to

21  thwart the DAF litigation?

22  A    Yes.

23  Q    Does the Debtor control DAF?

24  A    The Debtor does not control the DAF.

25  Q    Okay.  Did the Debtor authorize -- withdrawn.  Did the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 343 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 411 of 1017   PageID 5090
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 342 of
2722

                        Nelms - Redirect              111

1   Board authorize the filing of the DAF complaint?

2   A   It did not.

3   Q   Did the Board know the DAF complaint was going to be

4   filed?

5   A   Well, I mean, I know Mr. Dubel was presented with a copy

6   of the complaint.  We had noticed that that document existed.

7   But it came as somewhat of a surprise to us when it got filed.

8   Q   It came as a surprise to you?

9   A   It did.

10  Q   Because that's not what was expected after Mr. Dubel said,

11  Don't file it.  Right?

12  A   Right.

13  Q   Okay.  You were asked a bunch of questions on cross about

14  different possibilities and results and potential orders from

15  the Fifth Circuit on the assumption that the appeal was

16  granted.  Do you remember that?

17  A   Yes.

18  Q   And some of them were purported to be better or worse for

19  the Debtor.  Do you remember that?

20  A   Yes.

21  Q   If the appeal is not prosecuted, is there any chance that

22  the contracts that the Board has focused on will be

23  reinstated?

24  A   No.

25  Q   Is it fair to say that if the appeal is not prosecuted the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 344 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 412 of 1017   PageID 5091
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 343 of
2722

Nelms - Redirect                          112

 1   chances of the Debtor recovering the tens of millions of

 2   dollars of revenue will be exactly zero?

 3   A    Well, I don't know that it's exactly zero, but severely

 4   diminished.

 5   Q    Yeah.  How about getting paid a hundred-cent dollars on

 6   the $8 million claim that's in the Acis litigation?  If the

 7   appeal is not prosecuted, is there any chance that the Debtor

 8   is likely to recover hundred-cent dollars?

 9   A    Again, that possibility is severely diminished.

10   Q    Uh-huh.  How about with respect to terminating the

11   adversary proceeding in the Acis litigation?  If the appeal is

12   not prosecuted, is there any possibility of that adversary

13   proceeding just going away and being left with the arbitration

14   that you've described?

15   A    Again, a severely diminished possibility.

16   Q    You mentioned that the $8 million fraudulent transfer as

17   part of an arbitration would be very different outside of a

18   bankruptcy case.  Do you remember saying that?

19   A    I do.

20   Q    Can you explain to the Court why you believe it would be

21   different outside of a bankruptcy case?

22   A    Well, it actually goes to a case that started in my court.

23   This was the *MCAR v. Commerzbank* case in *In re Mirant*, and the

24   issue in that case, Mirant, when it filed its petition in

25   bankruptcy, was insolvent, but by the time that its bankruptcy

Nelms - Redirect                          113

1  concluded, Mirant was a solvent entity.  And so all of its

2  creditors were paid in full, but the trust that was

3  established in the *Mirant* case brought some fraudulent

4  transfer claims that were predicated on solvency, where these

5  were constructively fraudulent as opposed to actual.

6      And so the question was, if all the creditors had been

7  paid in full, is there standing to bring fraudulent transfer

8  claims that would basically not benefit creditors but would go

9  to equity?

10     I originally -- I ruled that there was no such -- that you

11 couldn't bring such a cause of action, that the satisfaction

12 of claims in full extinguished those claims.  And I do recall

13 that one of the interesting things about that case is that a

14 lady named Elizabeth Warren wrote -- or proposed -- she

15 submitted -- they submitted an expert opinion on her behalf,

16 which I wouldn't let them file because I took the position

17 that I was an expert, the expert in the Court.

18     And in any event, it turns out I wasn't the expert.  I was

19 reversed by Judge Means on that, who said that it's not

20 limited.  It went up to the Fifth Circuit, and the Fifth

21 Circuit ruled the same thing.

22     So my takeaway from all of this is that, in a bankruptcy

23 setting, as opposed to just a state court setting, that the

24 potential recovery on account of fraudulent transfers is much

25 broader, much more unlimited than it would be in the context

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 346 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 414 of 1017   PageID 5093
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 345 of
2722

Nelms - Redirect                    114

1  of a state court lawsuit.

2      So, now, there may be things that would distinguish that,

3  but that's something to be -- that's something to be troubled

4  about if you're a director of this company.

5  Q   And are these the types of things that, without, you know,

6  just divulging privileged communications, are these the type

7  of experiences and perspectives that you've shared with the

8  other board members in the context of considering the various

9  motions, the various matters for which Foley's retention is

10  sought?

11  A   Yes.

12  Q   Okay.

13          MR. MORRIS:  Just one second, Your Honor.

14          THE COURT:  Okay.

15      (Pause.)

16          MR. MORRIS:  Nothing further, Your Honor.

17          THE COURT:  All right.  Any recross on that redirect?

18          MR. LAMBERSON:  No, Your Honor.

19          THE COURT:  All right.  Thank you, Mr. Nelms.

20      (The witness steps down.)

21          THE COURT:  Any other evidence from Highland?

22          MR. MORRIS:  Your Honor, we have had admitted our

23  exhibits.  Among those exhibits are two declarations from Ms.

24  O'Neil, and so she's available in the courtroom today if

25  anybody wants to cross-examine on those issues.

O'Neil - Cross                    115

1          THE COURT:  All right.  Well, I will accept those

2    declarations as direct evidence.  Any desire to cross-examine

3    Ms. O'Neil?

4          MS. PATEL:  Yes, Your Honor.

5          THE COURT:  All right.  Ms. O'Neil, we'll go ahead

6    and swear you in on this today.

7            HOLLAND O'NEIL, DEBTOR'S WITNESS, SWORN

8          THE COURT:  All right.  Please be seated.

9                    CROSS-EXAMINATION

10   BY MS. PATEL:

11   Q    Good afternoon, Ms. O'Neil.

12   A    Good afternoon.

13   Q    Ms. O'Neil, do you concurrently represent both Highland

14   Capital Management and Neutra, which is a Cayman entity,

15   correct?

16   A    Yes.

17   Q    Okay.  There are other entities that you either represent

18   or have represented that are kind of affiliated or within the

19   Highland umbrella; is that correct?

20   A    Yes.

21   Q    Okay.  And that includes, for example, CLO HoldCo was one

22   such representation.  Isn't that right?

23   A    Previous.  Previously.

24   Q    Okay.

25   A    Not currently.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 348 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 416 of 1017    PageID 5095
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 347 of
2722

O'Neil - Cross                           116

1   Q    Okay.  So, and I believe you say that in your declaration,

2   right, that you didn't -- that you no longer represent CLO

3   HoldCo?

4   A    Correct.

5   Q    Okay.  And when did that representation cease?

6   A    It was -- it was very brief.  I came into the case after

7   the involuntary -- after the orders for relief were entered.

8   And at that time, there had been the motion to intervene that

9   included that entity, and it was determined to proceed with an

10  appeal on that motion to intervene, or the denial of the

11  motion to intervene, as well as the orders for relief.

12  Actually, there was a compendium of orders that were appealed

13  all at the same time.

14      And so, because that entity had also filed a motion to

15  intervene, we had included that in the appeal.  And at that

16  time I was retained, but then by the time we kind of analyzed

17  the issues, determined it was not necessary to proceed with

18  that appeal, then I no longer represented that entity and

19  disengaged.

20  Q    Okay.  But CLO -- to be clear, CLO HoldCo was actually an

21  appellant for the order for relief appeal that we've been

22  talking about today, correct?

23  A    Initially, yes.

24  Q    Okay.  And it still remains an appellant; it just didn't

25  file a brief in the involuntary appeal.  Isn't that right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 349 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 417 of 1017    PageID 5096
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 348 of
2722

O'Neil - Cross                          117

1  A    It has not filed any brief.  And I would have to look at

2  the record if it even filed a notice to the Fifth Circuit.  It

3  did -- was included in the notice to the District Court.  I

4  just honestly can't recall if it was included in the -- in any

5  notice to the Fifth Circuit.

6  Q    Okay.  And did you ever withdraw from your representation

7  of CLO HoldCo in the District Court appeal?

8  A    What do you mean, withdraw?

9  Q    Well, I mean, you entered an appearance.

10  A    You mean file a notice with the -- with the Court?

11  Q    Right.

12  A    I can't recall.

13  Q    Okay.  Ms. O'Neil, with respect to Neutra, you understand

14  and you've heard testimony, and I believe it's in the

15  declarations in support of the retention papers for Foley, and

16  if you need to look at that I can direct you to the exhibit

17  book, but it's -- is it your understanding that ultimately

18  Neutra is owned 75 percent by Mr. Dondero and 25 percent by

19  Mr. Okada?

20  A    Yes.

21  Q    Okay.  And Ms. O'Neil, in connection with your

22  representation of Neutra, who are the human beings that you

23  interact with?  Who directs your services?

24  A    At -- currently?  Are you --

25  Q    Just on behalf of Neutra.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 350 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 418 of 1017 PageID 5097
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 349 of
2722

                        O'Neil - Cross                    118

1   A    Predominantly, I get direction from Highland's in-house

2   counsel.

3   Q    Okay.  And who would that be?  Who are the people?

4   A    The people are Mr. J.P. Sevilla, Mr. Isaac Leventon, Ms.

5   Stephanie Vitiello.  Those are the primary individuals that

6   direct vis-à-vis Neutra.

7   Q    Okay.  Have you ever spoke with Mr. Dondero regarding your

8   representation of Neutra?

9   A    Yes.

10  Q    Okay.  And when was that?  When was the last time?

11  A    It has -- it's been a while.  Certainly, it hasn't been

12  since this bankruptcy was commenced.  I think the last time I

13  recall discussing that specifically is when we were together

14  at the mediation during the course of the bankruptcy.  And I'd

15  have to look at my calendar.  I can't recall exactly when that

16  was.

17  Q    Okay.  And what about Mr. Okada?  Have you -- when was the

18  last time you spoke with Mr. Okada?

19  A    I have never spoken with Mr. Okada.

20  Q    During the course of your entire representation of Neutra,

21  you've never spoken with Mr. Okada?

22  A    That is correct.

23  Q    Okay.  And under -- do you have an understanding of under

24  what authority Mr. Sevilla or Mr. Leventon or Ms. Vitiello

25  would have to direct your legal services on behalf of Neutra?

O'Neil - Cross                          119

 1  A    Generally, yes, through the direction from the owners of

 2  Neutra.

 3  Q    Okay.  That would be Mr. Dondero and Mr. Okada?

 4  A    Correct.

 5  Q    Okay.  And it's your understanding, then, that Mr. Dondero

 6  and Mr. Okada have directed Highland's legal department to

 7  direct your services?

 8  A    Yes.  Previously, yes.

 9  Q    Okay.  Do you have -- is there a contract between Neutra

10  and Highland, or --

11  A    I don't know.

12  Q    Okay.  Did you ever ask if there was one?

13  A    No, I did not.

14  Q    Okay.  In connection with your representation of Neutra,

15  do you bill separately for the Neutra representation?

16  A    Since the bankruptcy was -- since the Highland bankruptcy

17  was commenced, we set up a separate task code to track the

18  fees being incurred on the Neutra appeal.  Prior to the

19  bankruptcy, we did not have a reason to do that.

20  Q    Okay.  So let's talk about prior to the bankruptcy.  I

21  believe in your declaration it was disclosed that there were

22  approximately $2.1 million in billings relating to your

23  representation of Highland, Neutra, and certain of the

24  Highland Cayman entities:  Highland CLO Management, Highland

25  CLO Holdings, and HCF Advisor, amongst others.  Right?

O'Neil - Cross                      120

1    A    That sounds about right.  I might want to look at the

2    declaration just to confirm on the number, but that sounds

3    about right.

4    Q    Okay.  Well, your declaration can be found under Tab 10.

5    A    Okay.  (Pause.)  And are you referring to Paragraph 16?

6    Q    Well, if you look at Page -- at the bottom, you'll see

7    that there's page numbers, and it says Page 15 of 48.  And

8    this would be your declaration.

9    A    Oh, thank you.  I was looking at the --

10   Q    Uh-huh.  Paragraph 3.

11   A    -- at the application, that's all.  Correct.  Yes.  Thank

12   you.

13   Q    Firm-earned fees of two point -- roughly $2.15 million,

14   almost, correct?

15   A    Yes.

16   Q    Okay.  And there's about $1.4 million of that that was

17   unpaid from the pre-petition period, correct?

18   A    Correct.

19   Q    Okay.  And is it your testimony that, of the $2.15 million

20   in fees, that there was no apportionment between Highland,

21   Neutra, and the Cayman defendants?

22   A    Correct.

23   Q    Okay.  So, --

24   A    Not -- not in my account -- not through my accounting

25   processes.  Obviously, the time entries, you could parse them

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 353 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 421 of 1017 PageID 5100
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 352 of
2722

O'Neil - Cross                    121

1  out, if need be.

2  Q    Okay.  But you didn't keep your time necessarily that way,

3  where they were already apportioned and parsed?

4  A    Not under separate task codes, --

5  Q    Okay.

6  A    -- as we have done post-bankruptcy.

7  Q    So, in connection with the billings that would have

8  represented that $2.15 million, were those bills submitted to

9  Highland, to Neutra, to the Cayman defendants?

10 A    They are submitted through an e-billing process that it

11 goes through a Highland portal and -- in the aggregate.  So

12 they're submitted through that portal.

13 Q    Okay.  But the portal goes to Highland, correct?

14 A    I do not know.  I honestly -- our e-billing department

15 handles it and I just know it goes through e-billing, an e-

16 billing portal, and I don't know exactly.  I'm assuming

17 obviously it goes to Highland.  They certainly get copies of

18 it.

19 Q    Okay.  Did you or Foley ever submit a bill to Neutra?

20 A    I mean, my understanding is that, going through the

21 portal, we would go to the various parties that are affiliated

22 with Highland.

23 Q    Okay.  But you've never directly sent a bill to Neutra for

24 your representation of Neutra?

25 A    As I said, it goes through e-billing, so that could be

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 354 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 422 of 1017 PageID 5101
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 353 of
2722

O'Neil - Cross                          122

1  interpreted to go directly to them if it goes through an e-

2  billing process.

3  Q    Okay.  But I'm asking, have you ever --

4  A    I'm -- maybe I'm being hyper-technical, but I'm just --

5  Q    Right.

6  A    It's being submitted through --

7  Q    I understand, but I just -- here's where I want to just

8  direct us, is:  Have you ever addressed a bill to Neutra, Ltd.

9  care of either Mr. Dondero, Mr. Okada, or its formal business

10 address?

11 A    As I indicated, post-petition, we have been segregating

12 them under a different task code and indicating it's Neutra.

13 Pre-petition, it was all under the same invoice.

14 Q    That was submitted to Highland only?

15 A    Submitted through the e-billing process.

16 Q    To Highland only, right?

17           MR. LAMBERSON:  Objection to the form of the

18 question.  This has been asked about four times.  The witness

19 is very clear.

20           THE COURT:  Overruled.  I think she's trying to get

21 an exact answer to her question, and she feels like she's not

22 getting it.  So, overruled.

23           THE WITNESS:  Okay.  Then I apologize, Your Honor.

24 I'm not -- I just don't know technically, once it goes through

25 the e-billing, how it's distributed on the other side.  I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 355 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 423 of 1017   PageID 5102
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 354 of
2722

                         O'Neil - Cross                    123

 1   just, I honestly --

 2            THE COURT:  I think the question is, to whom was the

 3   invoice directed?

 4            THE WITNESS:  In terms of the -- not where it was

 5   sent, but who it's directed to?

 6   BY MS. PATEL:

 7   Q    Yes.

 8   A    It would have -- I believe it has the entities on it.  It

 9   definitely has Highland on it for sure.

10   Q    Okay.  Does it have Neutra on it?

11   A    Neutra is subject to the engagement letter, so it would be

12   applicable to -- if our accounting department didn't

13   technically put Neutra on it, that is not necessarily at any

14   moment being -- as the engagement letter is -- was with all

15   those parties.  So I would have to look at the invoice, if it

16   has all of the clients listed on there.  I honestly -- I just

17   can't remember right now.

18   Q    Okay.  Well, --

19   A    We do have some post-petition invoices, and you'll see

20   where they're segregated with Neutra.

21   Q    You raise an interesting point.  If Highland and Neutra

22   and the other entities are all part of the engagement letter,

23   is Neutra also liable for all of Highland's legal fees?

24   A    I don't know the answer to that.

25   Q    Okay.  Is it your position that because Highland, Neutra,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 356 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 424 of 1017    PageID 5103
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 355 of
2722

O'Neil - Cross                    124

1   and the Cayman defendants are all part of the engagement

2   letter, that Highland is responsible for Neutra's legal fees?

3   A    From my firm's standpoint?

4   Q    Yes.

5   A    I think the, you know, our perspective is that they were

6   -- we were primarily working for Highland, so the beneficial

7   work, and as I think the Court knows, most of the work here

8   was on behalf of Highland Capital Management.  And it's in our

9   engagement letter to that effect, effectively.

10  Q    Sitting here today, Ms. O'Neil, post-petition, who's

11  calling the legal shots for purposes of Neutra?

12  A    The -- well, where we have been is the process with the

13  Fifth Circuit.  The Fifth Circuit schedule was already set

14  pre-petition, and we have just been complying with the pre-

15  petition -- or, rather, that schedule, which has rolled post-

16  petition.  And so our direction pre-petition has just

17  continued in terms of proceeding with the briefing.  And so,

18  again, going back to who it was pre-petition, it's the same

19  legal team giving instructions on behalf of Neutra.

20  Q    Okay.  And if the question were to be posed, for example,

21  whether the Neutra involuntary or the order for relief appeal

22  should be dismissed, for example, who would call the legal

23  shots on that?  Who would make the decision on that?

24  A    To dismiss the appeal?

25  Q    Yeah.

O'Neil - Cross                    125

1   A    Not proceed with it up to this point?  Despite where we

2   are at this point, to just -- to just drop it?

3   Q    Yes.

4   A    It would be the owners of Neutra.

5   Q    So that would be Mr. Dondero and Mr. Okada, right?

6   A    Yes.

7   Q    Okay.  You -- Ms. O'Neil, were you in the courtroom when

8   Mr. Demo or -- and Mr. Nelms -- when Mr. Demo made the opening

9   statement and then when Mr. Nelms was testifying?

10  A    Yes.

11  Q    Okay.  And you heard, again, the opening statement and

12  then the testimony regarding the benefit to Highland of

13  Highland paying for Neutra's legal fees in connection with the

14  appeals, correct?

15  A    I did hear that, yes.

16  Q    Okay.  All right.  And can you, in your words, then,

17  articulate, from your perspective as legal counsel to both

18  entities, what the benefit is to Highland in this bankruptcy

19  for Foley's representation of Neutra and Highland paying the

20  bill for it?

21  A    I just want to make sure I'm not, you know, getting onto

22  attorney-client privileged discussions in terms of the

23  benefit.  I think I would agree with what has been stated in

24  court today.

25  Q    Okay.  So, so, and just to kind of recap that, if I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 358 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 426 of 1017   PageID 5105
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 357 of
2722

O'Neil - Cross                           126

```
 1   understand it, it's that if Neutra is successful in its appeal
 2   of the involuntary orders for relief and also its appeal of
 3   the confirmation order, then everything goes back and Highland
 4   gets this revenue stream, correct, of about $12 million, plus
 5   it gets paid on an $8 million, approximately, purported claim.
 6   Right?
 7   A    That the -- the agreements would be reinstated, which
 8   would then yield approximately that type of revenue stream as
 9   -- pursuant to the sub-advisor and sub-management agreements
10   that were in place.
11   Q    Okay.  And one of the entities -- and I know that the
12   retention application doesn't actually go to, anymore, Foley's
13   representation of the Cayman entities, but -- that's kind of
14   been put to the side.  But you do -- and you do represent
15   Highland CLO Management, correct, which is a Cayman entity?
16   A    Correct.
17   Q    All right.  And it's one of the defendants in the Acis
18   adversary proceeding, right?
19   A    And that is the only engagement that we have for that
20   party, is in conjunction with that adversary proceeding, which
21   is stayed.  So nothing is going on with that right now.
22   Q    Well, I understand that, but you --
23   A    Okay.
24   Q    My question was, you represent Highland CLO Management,
25   correct?
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 359 of
Case 3:25-cv-02072-S    Document 15-7    Fil 0/06/25    Page 427 of 1017    PageID 5106
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 358 of
2722

O'Neil - Cross                127

1    A    In that adversary proceeding.

2    Q    Okay.  So -- but you also represent it in connection with

3    -- in -- generally with the bankruptcy as well, Acis's

4    bankruptcy?

5    A    There was no involvement until the adversary proceeding,

6    until they were sued in the adversary proceeding.

7    Q    Okay.  And in the adversary proceeding, Highland CLO

8    Management was sued for a few things, correct?

9    A    In the adversary proceeding?

10   Q    Yes.

11   A    Yes.

12   Q    Okay.  Highland CLO Management, for example, received a

13   $9.5 million note that Acis was previously the holder of and

14   that was transferred after Mr. Terry's judgment, correct?

15   A    Are you asking if that was an allegation in the adversary

16   proceeding?

17   Q    Sure.

18   A    I --

19   Q    Right.

20   A    That sounds right.  That's been stayed, and I would have

21   to defer to the -- obviously, the second amended complaint and

22   the allegations therein.  So, --

23   Q    Okay.  And are you aware that your client, Highland CLO

24   Management, was also sued because it was to receive the

25   portfolio management agreements under which Acis represents --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 360 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 428 of 1017 PageID 5107
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 359 of
2722

O'Neil - Cross                    128

1   or, I'm sorry, manages the Acis CLOs?

2   A    That was -- that sounds like one of the allegations from

3   that point in time.

4   Q    Okay.  So I guess let me -- let me ask you a slightly

5   different way.  Are you aware that there was a pre-petition

6   agreement that was entered into and signed by Mr. Dondero that

7   transferred the PMAs from Acis to Highland CLO Management?

8   A    I cannot recall the -- all the evidence at the -- in

9   conjunction with that at this time, but if that's one of your

10  representations.  I wasn't representing any of the parties at

11  that time, but I do recall that there may have been some

12  evidence presented in that regard.  But I would have to look.

13  It's been a long time.  And that record is hundreds of

14  thousands of pages.  I would need to check back on that.

15  Q    Okay.  But if there were such an agreement, for example,

16  that transferred the portfolio management agreements from Acis

17  to another entity, a Cayman entity, can you agree with me,

18  then, that Mr. Dondero's ownership interest in Neutra would

19  really be of no import anymore because there wouldn't be a $12

20  million revenue stream anymore, would there, if Acis wasn't

21  the portfolio manager of the Acis CLOs?

22  A    I don't agree with the premi... at the end, when you said,

23  if Acis isn't the CLO manager, then there would be no revenue

24  stream from the CLOs if it's not reinstated as the -- as the

25  manager.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 361 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 429 of 1017   PageID 5108
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 360 of
2722

O'Neil - Cross                    129

1   Q   Okay.  So you agree that if Acis isn't the portfolio

2   manager of the Acis CLOs, there's no $12 million revenue

3   stream potential to Highland by virtue of Highland coming back

4   in as the sub-advisor and shared services provider, right?

5   A   Okay.  Now, the -- no, I don't know that that's

6   necessarily the case.

7   Q   Well, why not?

8   A   It could be appointed to be the sub-advisor, sub-manager

9   for -- through a different entity.

10  Q   Okay.  So it would basically be -- but, again, going back,

11  it would be through a different entity.  Again, Mr. Dondero's

12  ownership of Neutra would be of no import then, right?

13  A   Perhaps I'm not understanding your question.

14  Q   Well, --

15  A   I -- it's a hypothetical, and I --

16  Q   If Acis -- if Acis didn't have these portfolio management

17  agreements, it doesn't matter if Mr. Dondero wins the Neutra

18  appeal or not, right?  Because he wouldn't have control of the

19  Acis entity within which to redirect, through Acis, the sub-

20  advisory and the shared services agreements, correct?

21  A   He could direct it through another entity, as I think it's

22  been well-discussed that Highland had -- Highland had the

23  personnel to manage the CLOs.  In fact, Mr. Terry was a

24  Highland employee when he managed the CLOs.  So he could

25  certainly direct that management through another entity, even

APP. 0357
004347

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 362 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 430 of 1017 PageID 5109
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 361 of
2722

```
                        O'Neil - Cross                   130
```

1   if it wasn't Acis.  But vis-à-vis Neutra, Neutra would be --

2   well, before the confirmation of the plan, Neutra owned Acis.

3   So, vis-à-vis through Neutra, I believe your statement would

4   be correct.

5   Q    Okay.  Ms. O'Neil, also as sort of a participant during

6   the Acis bankruptcy cases --

7            MS. PATEL:  And Your Honor, I know you're intimately

8   familiar with all of these.

9   BY MS. PATEL:

10  Q    But Ms. O'Neil, do you recall the multiple attempts during

11  the bankruptcy case to effectuate what was called an optional

12  redemption, which sought to liquidate the Acis CLOs?

13  A    By HCLOF, I believe there were two instances, yes.

14  Q    Okay.  HCLOF executed those optional redemptions, correct?

15  Mr. Bill Scott, one of the independent directors?  Is that

16  right?

17  A    I believe the evidence was presented before the Court --

18  Q    Okay.

19  A    -- in that regard.

20  Q    And during the course of the -- all of those proceedings

21  with the optional redemptions, Highland was the ultimate

22  advisor to HCLOF, was it not?

23  A    I'm not sure I understand what you mean by the ultimate

24  advisor.

25  Q    Well, the technical contractual advisor was an entity by

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 363 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25   Page 431 of 1017    PageID 5110
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 362 of
2722

O'Neil - Cross                         131

1    the name of Highland HCF Advisor, right?  Is the portfolio

2    manager for Highland CLO Funding?

3    A    It has been a while since I looked at that org chart or

4    those issues, so I do not recall off the top of my head.

5    Q    Okay.  Well, you said that you interacted, for example,

6    with Neutra -- on your Neutra issues with JP Sevilla, Mr.

7    Leventon, and Stephanie Vitiello, correct?

8    A    Yes.

9    Q    Okay.  Wasn't it really, from a legal perspective, at

10   least, Mr. Sevilla, Mr. Leventon, who were all advising

11   Highland CLO Funding as well?

12   A    I don't know the answer.  You'd have to inquire of them.

13   Q    So, is it your testimony, then, that Highland had nothing

14   to do with the optional redemption notices that were issued

15   during the course of the Acis bankruptcy cases?

16   A    I'm not sure that I understand the relevance of that as to

17   whether Highland had any -- had nothing to do with it.  I

18   think they were certainly involved and were aware.  But they

19   weren't the -- independently making those determinations.

20   Q    Okay.

21   A    As you know, Ms. Patel, there were directors that were

22   involved.  They testified before this Court.  There -- HCLOF

23   was represented by counsel as well.  King & Spalding.  So

24   there were multiple parties involved.

25   Q    Okay.  So is it, again, your testimony that Highland had

```
                        O'Neil - Cross                    132
```

 1  nothing to do with the optional redemption notices that were

 2  issued during the Acis bankruptcy case?

 3       MR. MORRIS:  Objection, Your Honor.  It may be me,

 4  but I don't understand what this has to do with the Foley

 5  retention application.

 6       THE COURT:  Okay.  We do seem like we're getting a

 7  little far afield.  What's your response to that?

 8       MS. PATEL:  Your Honor, the contention has been made

 9  that if these bankruptcy appeals are somehow granted or in the

10  District Court and this Court are reversed, --

11       THE COURT:  Uh-huh.

12       MS. PATEL:  -- that these cases are going to come

13  back and that suddenly, magically, there's going to be a $12

14  million revenue stream flowing out of Acis back into Highland,

15  and they're going to be able to collect on an $8 million

16  objected-to claim.

17    I'm just trying to get to how likely is that really to

18  happen.  I mean, given the course -- and again, I know Your

19  Honor was a viewer of all of this -- of the multiple attempts

20  to try to liquidate these assets, --

21       THE COURT:  Okay.  I'll allow the question, but it'll

22  be the end of the line of questioning.  Okay?

23       MS. PATEL:  Understood.  And Your Honor, just

24  additionally, it's -- that's part of the appeal that Foley is

25  handling on the confirmation appeal.  As Mr. Nelms said, it's

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 365 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 433 of 1017   PageID 5112
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 364 of
2722

O'Neil - Cross                     133

1   also based on the plan injunction.

2          THE COURT:  All right.  She can answer the question,

3   but then we move on to another area.

4          MS. PATEL:  Okay.

5   BY MS. PATEL:

6   Q   So is it your testimony, Ms. O'Neil, that Highland had

7   absolutely nothing to do with the optional redemptions --

8   A   I did not --

9   Q   -- during the bankruptcy case?

10  A   That is not what I said.

11  Q   Okay.  So, -- and I get it.  Highland CLO Funding is a

12  different entity, and the Bankruptcy Court made findings with

13  respect to the fact that it is controlled in every way by

14  Highland.  Do you recall that finding?

15  A   Preliminary findings in conjunction with determining

16  whether there was a likelihood of success on the merits.  I do

17  recall that --

18  Q   Okay.

19  A   -- those conclusions by the Court.

20  Q   As a part of the bench memorandum in support of the

21  confirmation order, correct?

22  A   Yes.

23  Q   Okay.

24  A   Actually, I will -- I will -- I'll correct that.  I'll let

25  that -- the Court's order speak for itself.  You may have said

O'Neil - Cross                     134

1   a few things that were more or less than what the Court's

2   order said, so I'd just defer to what the Court's order said.

3   Q    Okay.  Well, part of the representation for Foley here is

4   to represent Highland and Neutra in connection with the

5   confirmation appeal, correct?

6   A    Yes.

7   Q    And part of that confirmation appeal is also -- one of the

8   grounds there is that you're appealing the plan injunction,

9   which the plan injunction is what stops the CLOs from being

10  redeemed, correct?

11  A    Correct.

12  Q    Okay.  So, how is Highland damaged by the plan injunction?

13  A    I think it's fairly obvi... again, I want to not tread too

14  much on attorney-client privilege.  But, obviously, I have yet

15  to have a client over my 30-plus years of practicing law that

16  likes to be subject to any kind of injunction.  It limits --

17  that injunction is more than just on the -- it's a very broad

18  injunction.  So I'd like -- if I had the injunction in front

19  of me, there's -- there's lots of restrictions under that

20  injunction, and that is prejudicial to Highland to be able to

21  act freely.

22  Q    Able to act freely to liquidate CLOs?

23  A    Among other things, as it may do in the ordinary course of

24  business, in its opinion, that may be beneficial to his

25  clients.

O'Neil - Cross                           135

1   Q    Okay.  Now, Ms. O'Neil, --

2   A    If I may, may I add one more thing?

3              THE COURT:  You may.

4              THE WITNESS:  Okay.  Highland, at least in that role,

5   could not liquidate CLOs.  So I think that was an improper

6   statement.  Or suggestion.

7   BY MS. PATEL:

8   Q    Okay.  Well, then, what specific actions that Highland

9   would like to take is it being damaged by the injunction?

10  A    I would need to look at the -- the injunction is very,

11  very broad.  So, anything that it can't do freely that is

12  covered by the injunction is obviously a detriment to

13  Highland.

14  Q    Okay.  Now, Ms. O'Neil, if you would turn to Tab 31 in the

15  book, --

16  A    All right.

17  Q    -- please.  And I will ask you, this is the declaration of

18  Bradley Sharp that was in support of the order authorizing the

19  retention of Foley Gardere.  Have you had an opportunity to

20  review this?

21  A    Yes.

22  Q    Any dispute with any of the statements in here?

23  A    I don't recall having a -- I don't -- I think it was

24  accurate, but --

25  Q    Okay.  Well, when you read it, did you have any disputes

O'Neil - Cross                          136

1   with the statements that were in here?

2   A    I did not see it before it was filed, so -- but having

3   read it after it was filed, I don't recall having any disputes

4   with anything that was in it.

5   Q    Okay.  And I'll turn you specifically to Paragraph 13,

6   which is found on Page 4 of 5.

7   A    Okay.

8   Q    And I'll -- well, let's look at this together.  (reading)

9   Prior to the petition date, the majority of Foley's and Lynn

10  Pinker's fees and expenses were paid by a non-debtor entity,

11  Highland CLO Funding Limited.

12      Do you see that?

13  A    Yes.

14  Q    Okay.  And were Foley's bills sent to Highland CLO

15  Funding?

16  A    Yes.

17  Q    Okay.  And is -- were those bills separate and apart from

18  the $2.15 million that we talked about earlier that were

19  remitted through the Highland e-billing system?

20  A    Separate, yes.

21  Q    Okay.  About how much in fees has Highland CLO Funding

22  paid to Foley to date?

23  A    Nothing post-petition.  Prior -- I mean, during -- from

24  the inception of the representation of Highland, probably

25  approximately -- over a million dollars, for sure.

O'Neil - Cross                    137

1  Q    Over $2 million?

2  A    I do not believe it is over $2 million.  It's somewhere

3  between $1 and $2 million.

4  Q    Okay.  And those separate matters that were billed to

5  Highland CLO Funding, how did those differ from what was

6  billed to Highland or to Neutra or to the Cayman defendants?

7  A    If it was a matter that was clearly of some benefit to

8  HCLOF, it was billed directly.  Otherwise, there was an

9  allocation billing for just the general work.  And that was

10 primarily through an indemnity agreement, as I understood it,

11 between Highland and HCLOF.

12 Q    Okay.  And who did the allocation between Highland and

13 Highland CLO Funding?

14 A    I was instructed as to what the allocation should be or

15 asked what I thought the allocation should be on any given

16 time, and I believe it was the -- it was discussed with the

17 board of HCLOF as to the allocation.

18 Q    Okay.  And who were you directed as to the categories of

19 allocation by that you just referenced?

20 A    You mean in terms of a person?

21 Q    Yes.

22 A    I most frequently discussed this with Mr. Sevilla, but

23 also had conversations with Mr. Maloney, with King & Spalding,

24 who was representing HCLOF, and occasionally would have direct

25 conversations with Mr. Maloney and Mr. Scott and Ms. Bestwick,

```
                        O'Neil - Cross                  138
```

 1  who were the two independent directors of HCLOF.

 2  Q    Okay.  And what types of work generally either were

 3  allocated or apportioned or billed in full to Highland CLO

 4  Funding.  What was the benefit there?

 5  A    The work was -- the work that was going on in the

 6  bankruptcy case.

 7  Q    Okay.  But I -- I understand that it was work in the

 8  bankruptcy case because that's where Foley represented

 9  Highland and various other entities, but I'm asking you

10  specifically:  What types of categories, and I don't -- you

11  don't have to go task by task -- but categories of work that

12  you performed for Highland or Neutra or for the Highland

13  Cayman defendants that benefited and were billed to Highland

14  CLO Funding?

15        MR. MORRIS:  Your Honor, I'm going to again assert a

16  relevance objection to any of this post-petition stuff.  This

17  is an application to retain Foley on a post-petition basis

18  for the benefits to this estate, not with respect to what

19  happened on a pre-petition basis.

20        THE COURT:  Your response?

21        MS. PATEL:  Your Honor, there's been much discussion

22  about what -- whether Neutra should have to pay this bill or

23  whether it should not have to pay its own way here.  This is

24  -- this is, in my mind, a bit of an extraordinary application

25  in that we're asking a debtor entity to pay for non-debtor

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 371 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 439 of 1017 PageID 5118
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 370 of
2722

O'Neil - Cross                          139

1    representation.

2        I want to inquire as to sort of this jumbled mix of work

3    that's been performed.  There's -- clearly, Ms. O'Neil said

4    she hasn't been paid by HCLOF post-petition, but I think we

5    need to separate out all of these representations, who's

6    controlling what, and how -- how these bills really should be

7    paid.

8                THE COURT:  How the allocation has worked --

9                MS. PATEL:  Yes.

10               THE COURT:  -- thus far?

11               MS. PATEL:  Yes, Your Honor.

12               THE COURT:  I overrule the relevance objection, but

13   let me tell you a pickle we're getting into timewise.  I have

14   a confirmation hearing starting at 1:30.  And we've gone three

15   hours on this without a bathroom break.  How much longer do

16   you think you're going to need?  Because we might have to stop

17   and come back at 2:30 if you're going to need much longer.

18               MS. PATEL:  Your Honor, I would say give me ten

19   minutes and I can wrap it up.

20               THE COURT:  Okay.  Ten minutes.

21               MS. PATEL:  Okay.

22               THE WITNESS:  I'm sorry.  What was the question?  I

23   apologize.

24   BY MS. PATEL:

25   Q   I'm trying to remember it myself, Ms. O'Neil.  The

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 372 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 440 of 1017    PageID 5119
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 371 of
2722

O'Neil - Cross                    140

1   question was, what specifically -- what -- and I don't -- you

2   don't have to go task by task.  But categorically, what was

3   the work that was performed that you would have billed

4   directly to HCLOF?

5   A    Prior to King & Spalding's involvement, you may recall

6   that we were representing HCLOF as well.  So there was direct

7   bill for the work during the bankruptcy by Foley Gardere for

8   specific work for HCLOF.

9        The -- the -- pursuant to the indemnification, as I

10  understood it, although I never read the indemnification

11  personally, that there would be an allocation between Highland

12  to HCLOF for that, for work that they performed that was of

13  benefit to HCLOF or its equity interest in the CLOs.

14       And so I was more directed as to what that allocation

15  should be vis-à-vis the work that was going on.  I think,

16  generally speaking, because the CLOs were being impacted, as

17  was well-discussed during the course of the Acis bankruptcy,

18  by the issues in the bankruptcy, by the temporary injunction

19  that were in place vis-à-vis their inability to seek an

20  optional redemption during the course of the bankruptcy, that

21  they were being significantly impacted by the actions in the

22  bankruptcy, even though they were not specifically a creditor

23  in the bankruptcy.

24  Q    So you performed services on behalf of your client,

25  Highland, that you then billed to Highland CLO Funding because

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 373 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 441 of 1017   PageID 5120
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 372 of
2722

O'Neil - Cross                      141

1  Highland CLO Funding couldn't effectuate an optional

2  redemption?

3  A   It was -- it was in conjunction with the overall

4  activities that were going on in the bankruptcy.

5  Q   Okay.

6  A   Not that specifically, no.

7  Q   All right, Ms. O'Neil.  I've only got a few minutes left.

8  So let me ask you:  Towards the end of January, did there come

9  a time where you sent me an email regarding Acis's quarterly

10 operating reports?

11 A   Yes.

12 Q   Okay.  And you copied Mr. Hurst on that email as well,

13 correct?

14 A   Correct.

15 Q   Okay.  And your email was to say, hey, can we set up a

16 time to talk because I've got -- Highland's got some questions

17 about the quarterly operating report.  Do you recall that?

18 A   Yes.

19 Q   Okay.  And again, just so we're clear, this is around end

20 of January 2020, right, after the appointment of the Board?

21 A   Yes.  You --

22 Q   Okay.

23 A   I think there's an exhibit.  One of your exhibits is that.

24 Q   There is.  If you turn to --

25 A   Or it's a portion of that email communication.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 374 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 442 of 1017    PageID 5121
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 373 of
2722

O'Neil - Cross                    142

1  Q    It is.  It's -- if you turn to Tab 28, this is sort of

2  your initial email to me, correct?

3  A    Yeah.  This is not the entire email dialogue, because --

4  Q    There were other emails afterward.

5  A    -- I did not get a response and sent a couple of emails

6  later, several days later, asking for a response.

7  Q    Right.  And I actually did respond to you after that,

8  correct?

9  A    Approximately a week later, yeah.

10  Q    Okay.  Because I was out sick, actually.

11  A    Yeah.  That's what you said.

12  Q    Right.  So, --

13  A    You didn't say sick, but you were out, so it's okay.

14  Q    Yeah.  I was out.  And so -- and I will tell you, I was

15  sick.  So I responded, albeit a little bit late, but I did

16  respond to you and say, Ms. O'Neil, could you tell me what

17  your questions are so that I can be prepared?

18      Does that sound about right?

19  A    Yeah.

20  Q    Okay.

21  A    Yes.

22  Q    And I never -- I never got a response to that.  You never

23  told me what your questions were with respect to the quarterly

24  operating report, right?

25  A    Yes.  And I --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 375 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 443 of 1017   PageID 5122
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 374 of
2722

O'Neil - Cross                        143

1  Q   Okay.

2  A   I can explain that.  Because Mr. -- I believe Mr.

3  Pomerantz said that there was a meeting that was -- and they

4  would discuss it then, so --

5  Q   Okay.

6  A   Or Mr. Demo.  I'm sorry.  Somebody from Pachulski told me

7  that that would be addressed.  Also, the status conference --

8  I mean, the questions we had were because there was a February

9  3rd status conference coming, and I wanted to see if we could

10 get some clarity so that when we appeared before the status

11 conference we could limit what we were going to be discussing

12 with the Court, if anything.

13 Q   Okay.  Well, what were -- what were the nature of your

14 questions?  Because there was a conversation between Mr. Terry

15 and myself and the Board and -- well, certain members of the

16 Board.  But what were your questions pertaining to?

17 A   Oh, okay.  Happy to discuss that.  It's kind of awkward to

18 have it in -- on this, in this --

19 Q   On Q and A.

20 A   -- forum, but --

21 Q   I hear you.

22 A   We sent -- as the Court will recall, the confirmation

23 injunction can be lifted if all the claims are paid.  So,

24 since the plan, the Acis plan was confirmed, we have been

25 tracking -- and the only way to track it is through the QORs

Case 19-34054-sgj11  Doc 3445-3  Filed 08/15/22   Entered 08/15/22 16:45:41   Page 376 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/06/25   Page 444 of 1017   PageID 5123
Case 19-34054-sgj11  Doc 2062  Filed 03/18/21   Entered 03/18/21 20:59:39   Page 375 of
2722

O'Neil - Cross                        144

1   -- what the revenues were coming in and what has been paid.

2   And so -- in terms of expenses and then claims.  And so we

3   have been -- my paralegal has been tracking this.

4        As the Court may know from looking at the record, almost

5   all of -- any other claims that were in the case were either

6   disallowed or withdrawn.  And so, really, the only claim,

7   other than Highland's, was Mr. Terry's that was really left to

8   be paid, other than administrative claims.  And I believe the

9   administrative claimants had agreed to deferral on some of

10  their payments after the effective date.

11       So we had been tracking the payments, which you can track

12  through the QORs, and it appeared that all of -- including Oak

13  Tree's most recently allowed administrative claim -- that all

14  of the administrative claims had been paid, and it appeared at

15  least approximately a half of Mr. Terry's claim had been paid.

16       When you look at the QORs, it doesn't specifically say,

17  "Here's who got what payment," but it shows the claims being

18  paid down, in addition to just general expenses of the post-

19  confirmation Debtor.  And I'm -- this is taking a little bit,

20  but in the disclosure statement to the plan, there had also

21  been plan projections that set forth the revenues that were

22  anticipated post-confirmation to pay the claims.  And so

23  likewise -- as well as the expenses, including to Brigade or

24  just general operating expenses for Acis.

25       So, likewise, through the QORs, we had been comparing

O'Neil - Cross                           145

1   those against what was in the plan projection.  And there were

2   some things that weren't matching and we simply were having

3   questions about the expenses seemed to be much higher.

4   However, the claims were being paid down, so it looked like

5   Mr. Terry was the only claimant left and was probably owed, by

6   our calculation, around $4-1/2 million, and that was the only

7   thing left to be paid.  And, but the revenues per the QOR was

8   showing cash available of over five and -- $5.3 million.

9        So, one of the things we wanted to discuss was the

10  application of using the cash to go ahead and pay down what

11  was left of Mr. Terry's claim so that the injunction could be

12  lifted.  But wanted to discuss that with you.  That was the

13  purpose of that.

14  Q   Okay.  And I guess let me back up.  One, let me kind of

15  correct you on a technical point, which is Mr. Terry's claim

16  isn't the only claim that's left outstanding.  There were also

17  law firm claims that were lodged as against Acis, correct?

18  A   I believe there were two --

19          MR. MORRIS:  Objection, Your Honor.  Just relevance.

20  I don't get it.

21          THE COURT:  Okay.  Sustained.  You've gone seven

22  minutes.  So, three more minutes and we need to wrap it up.

23          MS. PATEL:  Okay.

24  BY MS. PATEL:

25  Q   Well, I guess, Ms. O'Neil, kind of in line with the email,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 378 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25   Page 446 of 1017   PageID 5125
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 377 of
2722

O'Neil - Cross                     146

1   the email came in shortly before Acis was sued by your co-

2   counsel, Lynn Pinker, on behalf of the Charitable DAF and CLO

3   HoldCo.  Are you aware of this lawsuit?

4   A    After it was filed.  I was not aware of it before it was

5   filed.  The second one.  I had seen the first one after it was

6   filed.  I had not seen the second one until after it was

7   filed.  We have a conflict with one of the defendants in that,

8   so --

9   Q    Okay.  So, and when you say "the first one," are you

10  talking about when it was originally the Charitable DAF versus

11  U.S. Bank National Association and Moody's Investors Service?

12  A    Yes.

13  Q    Okay.  And that all involved claims by the DAF brought

14  against U.S. Bank and Moody's at the time relating to the Acis

15  bankruptcy, right?  It's claims that U.S. Bank didn't manage

16  --

17  A    Ms. --

18  Q    -- as a trustee correctly, correct?

19  A    Ms. --

20         MR. MORRIS:  Objection, Your Honor.  She's got no

21  foundation.  She said she has a conflict and wasn't involved

22  with this case.

23         THE COURT:  Sustained.

24         THE WITNESS:  That's correct.

25  BY MS. PATEL:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 379 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 447 of 1017   PageID 5126
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 378 of
2722

```
                      O'Neil - Cross                    147
```

1  Q   Okay.  I guess, Ms. O'Neil, let me just ask you:  Did you

2  have any involvement with -- if you look at Tab 27, that's a

3  copy of the lawsuit, so that we're all clear exactly which one

4  I'm asking you about.  This is the lawsuit between the

5  Charitable DAF and CLO HoldCo, your former client, versus U.S.

6  Bank National Association, Moody's Investors Service, Acis

7  Capital Management, Brigade, and Josh Terry.  Did Foley have

8  any involvement in the drafting or formulation of this

9  lawsuit?

10  A   None.

11  Q   Okay.

12        MS. PATEL:  No further questions, Your Honor.

13        THE COURT:  All right.  Any redirect?

14        MR. MORRIS:  Very briefly.

15        THE COURT:  Okay.

16                  REDIRECT EXAMINATION

17  BY MR. MORRIS:

18  Q   Ms. O'Neil, you've been representing a number of different

19  entities associated with Highland since 2018, right?

20  A   Correct.

21  Q   And are those entities identified in Plaintiff's Exhibit

22  #2 in the engagement letter?

23  A   Plaintiff's 2 or -- sorry.

24  Q   The Debtor's.

25  A   The Debtor's 2.  Okay.  Let me switch.  They are.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 380 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 448 of 1017 PageID 5127
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 379 of
2722

O'Neil - Redirect                    148

1   Q    Okay.  And since the Board has been appointed, have you

2   met with board members to discuss the status of the matters

3   that your firm has been handling?

4   A    Yes.

5   Q    And without disclosing attorney-client communications, did

6   that involve providing a history of the work that you'd done?

7   A    Yes.

8   Q    Did that involve providing a history of the work that you

9   expected to do in the future?

10  A    Yes.

11  Q    Did the Board have an opportunity to ask questions of you?

12  A    Yes.

13  Q    And did you, in fact, answer the Board's questions?

14  A    I endeavored to do so to the best of my ability, yes.

15  Q    Okay.

16  A    Or I followed up if -- with information via email if I

17  needed to get additional information.

18  Q    And is it your understanding that the Board supports your

19  retention for the purposes that were described earlier by Mr.

20  Nelms?

21  A    Yes.

22  Q    Okay.

23        MR. MORRIS:  I have nothing further, Your Honor.

24        THE COURT:  Any recross on that redirect?

25        MS. PATEL:  No, Your Honor.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 381 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 449 of 1017   PageID 5128
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 380 of
2722

O'Neil - Redirect                    149

1          THE COURT:  All right.  Ms. O'Neil, you're excused.

2          THE WITNESS:  Thank you.

3      (The witness steps down.)

4          THE COURT:  All right.  Highland, any more evidence?

5          MR. MORRIS:  No, Your Honor.  We rest.

6          THE COURT:  All right.  Is there any evidence from

7   Acis?

8          MR. LAMBERSON:  No, ma'am.

9          THE COURT:  All right.  Let's take a five-minute --

10  please, five-minute break -- and then we'll hear your closing

11  arguments.

12          THE CLERK:  All rise.

13      (A recess ensued from 12:47 p.m. until 12:56 p.m.)

14          THE CLERK:  All rise.

15          THE COURT:  All right.  Please be seated.  We're

16  going back on the record in Highland.  I'll hear closing

17  arguments.

18      I'm going to ask a question.  I need clarification --

19          MR. DEMO:  Of course.

20          THE COURT:  -- on this.  First off, in the Acis

21  adversary that's stayed in the Acis bankruptcy case, Foley,

22  it's proposed, would represent Highland.  But is Foley also

23  representing co-defendants in that adversary?  You know, I

24  think King & Spalding is representing all the co-defendants,

25  or someone else is, but am I wrong or right about that?

150

```
 1           MR. DEMO:  Yes and no, Your Honor.  I think there's

 2  been some miscommunication on that.  The adversary, as we

 3  understand it, is stayed, and because of that we are not

 4  seeking to represent -- or retain Foley in that adversary,

 5  although we will if that comes up again.  So, in the

 6  adversary, pre-petition, Foley did represent the Debtor and

 7  then a handful of other creditors who were brought into that

 8  adversary, as we understand it, as defendants.  On a go-

 9  forward basis, though, we are proposing to retain Foley on

10  three things:  General matters in the bankruptcy proceeding;

11  the appellate --

12           THE COURT:  General matters in the Acis bankruptcy

13  proceeding?

14           MR. DEMO:  Correct, Your Honor.  The appeal involving

15  the confirmation order.  And the appeal involving the Neutra

16  litigation.  And --

17           THE COURT:  Okay.  On the appeal of the involuntary,

18  --

19           MR. DEMO:  Yes, ma'am.

20           THE COURT:  -- only Neutra --

21           MR. DEMO:  That is correct.

22           THE COURT:  -- is an appellant.  Okay.  So what

23  you're asking is for authority for Highland to pay the legal

24  fees of Neutra on that?

25           MR. DEMO:  Yes, Your Honor.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 383 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 451 of 1017    PageID 5130
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 382 of
2722

151

1          THE COURT:  Okay.

2          MR. DEMO:  We are.  And we, again, to the --

3          THE COURT:  And let me -- let me -- and then the

4   appeal of the confirmation order, are the appellants Highland

5   and Neutra only, or is HCLOF an appellant?

6          MR. DEMO:  In terms of Foley's representation, it's -

7   -

8          THE COURT:  No, no, no.  Just answer the question.

9   Who are the appellants in the confirmation order?

10         MR. DEMO:  Highland, Neutra, and HCLOF.

11         THE COURT:  Okay.  Who is representing HCLOF?

12         MR. DEMO:  King & Spalding.

13         THE COURT:  Okay.  And Foley has thus far been

14  representing Neutra and Highland?

15         MR. DEMO:  Correct, Your Honor.

16         THE COURT:  Okay.  Well, okay.  You may proceed.

17         MR. DEMO:  And I will be brief.  And I think

18  ultimately this, this is a relatively simple thing, and I

19  think you've nailed it.

20      What are the benefits to the estate of -- because nobody

21  has objected, again, to Foley representing the Debtor.  What

22  are the benefits to the estate for Foley representing Neutra

23  and being paid for that by the Debtor?  And to answer that

24  question, I think you have to look to all the testimony that

25  we've heard today, and you also have to look at who's

152

1   objecting, Your Honor.  The Committee is not objecting.  There

2   is no other committee member objecting besides Acis.  The only

3   party objecting to Neutra -- or, I'm sorry, to Highland paying

4   Neutra's fees in the appeal, which, again, are a portion of

5   the $500,000 that we think is going to be incurred post-

6   petition on this, excluding today, because today has obviously

7   gone a little bit long -- the only party objecting to paying a

8   portion of that $500,000 to have Foley represent Neutra in an

9   appeal that is happening less than six weeks from now is Acis.

10      Acis is the party opponent in that.  Acis is the party

11  that stands to benefit, not just because the involuntary

12  petition will not be overturned, but because there will be a

13  lack of leverage and a lack of ability to contest their $75

14  million, which is where it started, but it keeps growing.

15  It's at $300 million now.  The only party who's objected to

16  that is Acis.  None of the other creditors have objected.

17          THE COURT:  Well, until the past 24 hours, the

18  Committee was objecting.

19          MR. DEMO:  Correct, Your Honor.  And we had a --

20  finally had a chance, with the new Board in place, to discuss

21  it with the Committee.  And the new Board explained to the

22  Committee that, in their business judgment, spending this

23  money, this $500,000 -- which, again, is going to be allocated

24  across these three matters; not all of it's going to be

25  allocated to Neutra; a portion of it is going to be allocated

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 385 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 453 of 1017    PageID 5132
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 384 of
2722

153

1   to Neutra -- $500,000 for the possibility of a recovery to the

2   estate, the possibility of the ability to challenge a $300

3   million proof of claim that impacts not just the estate but

4   the other creditors in the estate, substantially, because

5   there's only so much money here.  So, --

6           THE COURT:  Okay.  Let me ask you to recap what the

7   evidence was on benefit to Highland --

8           MR. DEMO:  On benefit --

9           THE COURT:  -- from the overturning of the order for

10  relief in Acis.

11          MR. DEMO:  In terms of the overturning of the order

12  for relief in Acis, there were -- there was testimony on the

13  possibility -- and again, it's a possibility, and we're not

14  disputing that.  Acis's attorneys said it was 10 percent.

15  That's fine.  Maybe it's 10 percent.  There was evidence

16  presented by Mr. Nelms on the possibility that if the Acis

17  involuntary is overturned, that the contracts at issue, the

18  advisory and the sub-management agreements, --

19          THE COURT:  Well, let's take it sequentially, because

20  you've got to, you know, look at benefit of the estate --

21          MR. DEMO:  Understood.

22          THE COURT:  -- versus time and cost, to some degree,

23  right?

24          MR. DEMO:  Right.

25          THE COURT:  So, Neutra wins.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 386 of
Case 3:25-cv-02072-S  Document 15-7  Filed 10/06/25  Page 454 of 1017  PageID 5133
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 385 of
2722

154

 1            MR. DEMO:  Okay.

 2            THE COURT:  Okay?  That means, according to Mr.

 3    Lamberson's argument, which I think is the correct argument,

 4    that we send to arbitration whether it's appropriate for Acis

 5    to be in a bankruptcy.

 6            MR. DEMO:  Correct, Your Honor.

 7            THE COURT:  Okay.

 8            MR. DEMO:  Well, may be correct.

 9            THE COURT:  So, --

10            MR. DEMO:  I think we did hear there's a different

11    possibility from Mr. Nelms.

12            THE COURT:  Well, what is the other possibility?

13            MR. DEMO:  Well, okay.  Understood, Your Honor.

14    Okay.

15            THE COURT:  Okay.

16            MR. DEMO:  So, say we -- assuming we send it to

17    arbitration, --

18            THE COURT:  So that means an arbitration panel is

19    convened, and at some point, many months from now, an

20    arbitration panel will either say yes or no, involuntary, you

21    know, should have gone forward.

22            MR. DEMO:  Okay.

23            THE COURT:  Okay?  Let's say the arbitration panel

24    says no, should not have gone forward.  Then what does the

25    world look like for Highland?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 387 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 455 of 1017   PageID 5134
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 386 of
2722

155

 1           MR. DEMO:  I guess, taking it a step back, Your

 2    Honor, assuming that this does go to arbitration, it also

 3    means that the involuntary petition was not entered.  If the

 4    involuntary petition was not entered, which means that the

 5    Acis equity did not go to Mr. Terry, it stayed under Neutra,

 6    at that point --

 7           THE COURT:  Wait, wait, wait.

 8           MR. DEMO:  -- you also go into arbitration.

 9           THE COURT:  Wait, wait.  Wait, wait.  So you're

10    saying that everything is wiped out in the involuntary, the

11    Acis bankruptcy case?

12           MR. DEMO:  Your Honor, and I do want to be really,

13    honestly, very, very clear about this.  I am -- I am not

14    saying anything.  I'm not -- trying very hard not to draw a

15    legal conclusion.  What I'm saying is that the Board has

16    analyzed this, the Board has applied business --

17           THE COURT:  But I'm trying to understand --

18           MR. DEMO:  -- judgment to this, and that there is a -

19    - there is a possibility.  Now, --

20           THE COURT:  I'm trying --

21           MR. DEMO:  -- obviously, reasonable minds can --

22           THE COURT:  Okay.  Here's where I'm coming from.  And

23    you can tell me if I'm analyzing this incorrectly, in your

24    view.  Okay.  We used to have this terrible Fifth Circuit case

25    -- you know, God help me if this transcript gets sent -- but

156

1    called *Pro-Snax*.  Okay?

2         MR. DEMO:  Okay.

3         THE COURT:  I think the Fifth Circuit has decided

4    itself that it was terrible, so it's not going to come back to

5    haunt me, saying that.  So, *Pro-Snax* said basically the

6    Bankruptcy Court is a Monday-morning quarterback in looking at

7    the reasonableness of fees.  You know, did it provide a

8    benefit to the estate?

9         MR. DEMO:  Uh-huh.

10        THE COURT:  And then that got reversed a few years

11   ago.  I think it was the *Woerner* case -- *Baron & Newburger*

12   *(Woerner)* -- where the Court said, no, you don't do a

13   hindsight look.  You look at, at the time fees were expensed,

14   --

15        MR. DEMO:  Uh-huh.

16        THE COURT:  -- was there something like a reasonable

17   possibility they would benefit the estate?

18        MR. DEMO:  Yes.

19        THE COURT:  Okay?  So I'm looking through it in that

20   lens, so to speak, and I'm like, what benefit to the Highland

21   estate could there be if the confirmation -- well, if the

22   order for relief is unwound or the confirmation order is

23   unwound?  And I'm not there.  I'm not there understanding any

24   benefit for Highland.

25        I can understand a benefit, maybe, for Neutra, although I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 389 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 457 of 1017    PageID 5136
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 388 of
2722

157

1  am even hard-pressed to see that, because it looks like years

2  of more litigation.

3          MR. DEMO:  And Your Honor, I mean, I do think that

4  there was -- and again, I'm not going to challenge your legal

5  conclusions -- I do think that there was evidence that in the

6  Board's business judgment they did analyze this and they see

7  it, I think, a little bit differently.

8          THE COURT:  And I should defer heavily to a Board's

9  reasonable exercise of business judgment.  I've got trouble.

10 So I'm just trying to --

11         MR. DEMO:  Understood.  And I think, when you look at

12 that business judgment, --

13         THE COURT:  Uh-huh.

14         MR. DEMO:  -- you know, obviously, I don't disagree.

15 I do think that when you have a three-person independent board

16 of this caliber who's come into a difficult situation, has

17 reviewed all of the evidence, talked to all the applicable

18 people, when things happened with the DAF litigation that they

19 didn't like, they took action to stop that.  When they looked

20 at the Winstead appeal and they said, you know, there's not a

21 benefit to the estate here, let's drop they, they dropped it.

22         THE COURT:  But again, work with --

23         MR. DEMO:  When they --

24         THE COURT:  Work with me.  Fifth Circuit reverses the

25 order for relief.  I don't think you have disagreed with

158

1  Lamberson's argument that best-case scenario in that reversal

2  scenario is that an arbitration panel now looks at, should

3  this Acis -- you know, should it have gone forward in a

4  bankruptcy?

5      MR. DEMO:  Well, I guess, Your Honor, then maybe I --

6      THE COURT:  So, in that many --

7      MR. DEMO:  -- I'm not being clear.

8      THE COURT:  -- months, let's say eight months that an

9  arbitration panel takes to decide, what happens during that

10  eight months?

11      MR. DEMO:  Well, then I guess, Your Honor, I need to

12  step back, because I have not -- absolutely not been clear.

13  If it goes to an arbitration panel, our view -- and I think

14  Ms. O'Neil's briefs to the Fifth Circuit are clear on this --

15  the arbitration panel is going to arbiter or arbitrate whether

16  or not there was a fraudulent conveyance.  It's going to

17  arbitrate how to resolve the claims.  It's not going to

18  arbitrate whether or not the involuntary petition should ever

19  have been entered.

20      THE COURT:  Wait, wait.  What does that mean?  Of

21  course.  That's the starting point of it all, right?  The

22  appeal is the Bankruptcy Court wrongly held a trial on the

23  involuntary petition and ordered for relief.  It should have

24  deferred to an arbitration panel to do that.  Isn't that

25  appeal number one that we're talking about?

159

1         MR. DEMO:  Yes, but --

2         THE COURT:  Neutra's appeal?

3         MR. DEMO:  Yes, it is.

4         THE COURT:  Okay.

5         MR. DEMO:  But I do think there's a nuance.  And I do

6  want to defer to the pleadings that were filed with the Fifth

7  Circuit, because I don't want here to get myself out in front

8  of that Fifth Circuit appeal, because obviously I do very much

9  want that appeal to go forward.  And maybe we lose and maybe

10 we win, but if we win, I think the --

11        THE COURT:  If Neutra wins.

12        MR. DEMO:  If Neutra wins, one of the outcomes -- and

13 again, I understand that, you know, reasonable minds can

14 differ that there --

15        THE COURT:  Okay.

16        MR. DEMO:  -- of the outcomes.

17        THE COURT:  But one of the outcomes.

18        MR. DEMO:  One of the outcomes is that the

19 involuntary petition is unwound, withdrawn, and the parties go

20 to arbitration on the claims.  If that were to happen, --

21        THE COURT:  Wait.  It's unwound and they go to

22 arbitration on what claims?  The claims in the adversary

23 proceeding that's been filed in Acis?

24        MR. DEMO:  Again, Your Honor, I'm not the appellate

25 lawyer here.  I mean, this is why we are here.

160

1         THE COURT:  But how do you skip over the arbitration

2    of the order for relief?  Because if Joshua Terry, who

3    commenced it, you know, he has the right now to argue to an

4    arbitration panel that this should have been in bankruptcy,

5    right?  He doesn't have to just agree that the adversary

6    proceeding is now arbitrated.  Right?

7         MR. DEMO:  Well, again, Your Honor, I don't want to

8    substitute my judgment for the judgment of the Board.  I think

9    the judgment of the Board is that there is a scenario and that

10   it's worth exploring and that it's worth the -- what we

11   honestly think is a limited amount of money to explore.

12   Because I think, if we explore that, we explore the

13   possibility, quite honestly, of taking it out of bankruptcy,

14   then, yes, in that scenario, and which we do it think is

15   possible, in that scenario, and call it whatever probability

16   you want, but if you're going to spend half a million dollars

17   to get to a scenario that could reap you -- and I don't want

18   to put a number on it -- but millions of dollars in future

19   revenue, millions of dollars in terms of --

20        THE COURT:  You're melding.  You're collapsing.  And

21   we all know as lawyers that's not how it works.  Things happen

22   sequentially, okay?

23        MR. DEMO:  Okay.  Then I guess, going --

24        THE COURT:  There's a setting aside -- well, there's

25   a reversal of the Bankruptcy Court's issuance of an order for

161

1   relief.

2          MR. DEMO:  Okay.

3          THE COURT:  And that means you should have deferred

4   to an arbitration panel, Judge Jernigan.  And so they remand

5   so that I can, consistent with that appellate ruling, say,

6   We're staying the bankruptcy and it's going to arbitration to

7   decide whether an order for relief.  Is there really any

8   realistic scenario where we skip that step?

9          MR. DEMO:  We think that there's a scenario that is

10  worth exploring.

11         THE COURT:  I feel like your colleagues are really

12  dying to chime in because they think they've got the answer to

13  my question, no offense to you.

14         MR. MORRIS:  I really -- I don't, Your Honor, but if

15  I may.

16         THE COURT:  Uh-huh.

17         MR. MORRIS:  I think Ms. O'Neil is the appellate

18  lawyer.  Maybe she should speak on this very precise point, --

19         THE COURT:  Okay.  Because --

20         MR. MORRIS:  -- if that's okay with the Court.

21         THE COURT:  Because I see many miles --

22         MR. MORRIS:  Yeah.

23         THE COURT:  -- to go before we sleep if there's a

24  reversal, and I'm trying to figure -- well, you know, we all

25  know that, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 394 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 462 of 1017    PageID 5141
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 393 of
2722

162

1           MS. O'NEIL:  Your Honor, if I may.

2           THE COURT:  Uh-huh.

3           MS. O'NEIL:  And I did not want to interrupt Mr.

4   Demo, and he's done a great job, but obviously we've been

5   involved with the appeal.

6           THE COURT:  Right.

7           MS. O'NEIL:  We've prepared the briefs.

8           THE COURT:  So how does it play out if there's a

9   reversal in favor of Neutra --

10          MS. O'NEIL:  If I may, Your Honor.

11          THE COURT:  -- of the order for relief?

12          MS. O'NEIL:  The issue on the appeal is not to send

13  the concept to arbitration of the involuntary petitions.

14          THE COURT:  Okay.

15          MS. O'NEIL:  It is that Mr. Terry was not a qualified

16  petitioner because he was bound by an arbitration, a binding

17  arbitration agreement, and that the issue that he -- by

18  proceeding with these involuntary petitions, he commenced a

19  suit, a proceeding that was, at its core, about fraudulent

20  transfers, and that that should have gone to arbitration.  And

21  to proceed and try to engage this Court's jurisdiction on

22  something that he had contractually agreed to go to

23  arbitration on was improper.

24      So, if Neutra wins on that argument, and I would encourage

25  the Court, we -- I think the briefs are in one of the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 395 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 463 of 1017    PageID 5142
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 394 of
2722

163

1   exhibits, but certainly I would provide them to the Court

2   before the Court makes a determination if it would help.  If

3   there -- if Neutra wins on that appeal, then our position

4   would be that yes, the bankruptcy is effectively void *ab*

5   *initio*, and that's what we believe the case law supports.

6        Where that would put the parties, potentially -- and

7   again, we're speculating what the Fifth Circuit may or may not

8   due to instruct this Court to do -- could reverse and render,

9   as it were, as Mr. Nelms testified happened to him previously,

10  but could instruct this Court to abstain, which I think was --

11  and that is one of the various motions and the orders that the

12  Court had denied.  All of these are wrapped up in the appeal,

13  Your Honor.  And in doing so, instruct the petitioner, Mr.

14  Terry, and Acis to go arbitrate the issue of the fraudulent

15  transfers.  That would reinstate Acis.  Acis could reinstate

16  Highland as the manager of the CLOs.

17       THE COURT:  So every single order in the Acis case

18  would be null and void?

19       MS. O'NEIL:  We believe that the case law is that it

20  would be void *ab initio*.  And now, Your Honor, practically

21  speaking, --

22       THE COURT:  Void *ab initio*?  Okay.  That could only

23  -- is that hinged to a subject matter jurisdiction, lack of

24  subject matter jurisdiction --

25       MS. O'NEIL:  Partially, that's part of the argument.

164

```
1              THE COURT:  -- theory?

2              MS. O'NEIL:  That's part of the argument.  Yes, Your

3    Honor.

4              THE COURT:  Okay.

5              MS. O'NEIL:  Practically speaking, it is our belief,

6    although it is not clear, is what I've tried to kind of convey

7    to the Court, and in conjunction with this conversation I was

8    trying to have with Mr. Terry's counsel/Acis's counsel, is

9    that we believe Mr. Terry has been paid down.  Practically

10   speaking, if that happens and he's only left with a claim or

11   currently has a claim of $4 million, $4-1/2 million, which is

12   what we think it is, or it's somewhere in that neighborhood,

13   that -- and there's sufficient cash in Acis to pay that claim

14   off -- it is a claim Judge -- Mr. Nelms testified to the fact

15   that it would need to be paid -- then there may not even need

16   to be a fraudulent transfer lawsuit because the claim would --

17   what's left of the claim would just be paid off.  And then

18   Acis -- Neutra would be back in ownership of Acis, Acis would

19   engage Highland to come back in and do what it was doing

20   before, Mr. Terry got his claim paid off, and there we are.

21             THE COURT:  Okay.

22             MR. DEMO:  That's honestly pretty much it, Your

23   Honor.  And we think that -- and the Board thinks that the

24   benefit of pursuing that is worth it, quite honestly.  And

25   they think, in their business judgment, that it's worth paying
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 397 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 465 of 1017 PageID 5144
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 396 of
2722

165

1  those Neutra fees -- which again, are a portion of the

2  $500,000, only a portion -- because that benefit accrues to

3  the estate, or could accrue to the estate in a situation

4  where, in their business judgment, it's worth going forward on

5  this.

6          THE COURT:  Okay.  The appeal -- okay.  Let me make

7  sure I heard this correctly.  The appeal of the confirmation

8  order, whereas we have Neutra only on the appeal --

9          MR. DEMO:  Correct.

10         THE COURT:  -- of the order for relief, the appeal of

11  the confirmation order is Highland, Neutra, and HCLOF.

12         MR. DEMO:  Correct.

13         THE COURT:  And King & Spalding still represents

14  HCLOF in connection with that appeal.

15         MR. DEMO:  Correct.  And they're the only law firm

16  representing HCLOF in that appeal.

17         THE COURT:  So here's what I'm struggling with.  You

18  know, what initially seemed like kind of a compelling argument

19  -- all the briefing has been done, oral argument is set in

20  March -- it feels like to me the main beneficiaries of a

21  reversal of that confirmation order are HCLOF and Neutra.

22  Foley can represent Neutra.  Neutra can pay.  King & Spalding

23  can represent HCLOF.  HCLOF can pay.  And that seems like the

24  reasonable scenario to me.

25         MR. DEMO:  And I hear that.  But I think -- and I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 398 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 466 of 1017   PageID 5145
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 397 of
2722

166

1    think Mr. Nelms --

2          THE COURT:  Because let's --

3          MR. DEMO:  -- testified to it, but --

4          THE COURT:  Work with me.  Let's say they don't

5    reverse the order for relief --

6          MR. DEMO:  Okay.

7          THE COURT:  -- but they do reverse the confirmation

8    order.

9          MR. DEMO:  Okay.

10         THE COURT:  So, Chapter 11 Trustee is in place

11   representing Highland, and he can -- I'm sorry -- he is the

12   spokesperson for the Acis, the controller of the Acis estate.

13   He might go forward with plan number four, five, whatever it

14   would be.

15         MR. DEMO:  Okay.

16         THE COURT:  Or say, I think it's time to convert this

17   to 7.  I mean I'm just trying to figure out --

18         MR. DEMO:  And I guess I do want to go back to one

19   thing, --

20         THE COURT:  Uh-huh.

21         MR. DEMO:  -- because I do not think there is another

22   economic beneficiary that would pay Neutra's fees.  I think if

23   the Debtor is not allowed to pay Neutra's fees, nobody will

24   pay Neutra's fees, and that portion of the appellate argument

25   will fall by the wayside.  Because --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 399 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 467 of 1017   PageID 5146
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 398 of
2722

167

 1          THE COURT:  So Neutra loses, but I don't see how

 2   Highland loses.  You have not painted a scenario where it's

 3   clear to me there's any economic benefit to the estate.

 4          MR. DEMO:  I would, I would, with all --

 5          THE COURT:  And you're telling me, Defer to the

 6   Board's business judgment.  But I'm --

 7          MR. DEMO:  Well, I --

 8          THE COURT:  I'm concerned that the evidence hasn't

 9   shown me --

10          MR. DEMO:  I would also ask, Your Honor, --

11          THE COURT:  -- all of the --

12          MR. DEMO:  -- in all --

13          THE COURT:  -- scenarios that lead to their

14   reasonable business judgment on this.

15          MR. DEMO:  As Ms. O'Neil just said, I mean, this is

16   above the Fifth -- to the Fifth Circuit.  The Fifth Circuit is

17   set to hear this in six weeks.  And if the Fifth Circuit rules

18   the way that Ms. O'Neil just said, I do think, and I think the

19   Board thinks -- actually, I know the Board thinks -- that

20   there is a tangible benefit to the estate here.  And so I know

21   that I'm asking you to defer to their judgment, --

22          THE COURT:  All I heard was --

23          MR. DEMO:  -- but I'm also asking just for --

24          THE COURT:  -- that they'd reinstate the sub-advisory

25   and shared services agreements.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 400 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 468 of 1017 PageID 5147
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 399 of
2722

168

1          MR. DEMO:  Which are --

2          THE COURT:  Which, by the way, Highland moved to

3    terminate, moved to compel rejection at one point during the

4    case, and then, when that didn't work, HCLOF started calling

5    for redemption.

6          MR. DEMO:  And it's not the --

7          THE COURT:  This is nuts for me --

8          MR. DEMO:  It's not -- it's not the -- Your Honor,

9    it's --

10         THE COURT:  Tell me why it's not nuts for me to think

11   --

12         MR. DEMO:  Because it's not the same Highland.

13         THE COURT:  -- that Highland would be thrilled to

14   have Acis back managing the CLOs and subcontracting with

15   Highland.  I mean, that --

16         MR. DEMO:  It's not, it's not the same Highland.  The

17   stuff that happened prior to the institution of the Board was

18   the stuff that happened prior to the institution of the Board.

19   There is new management of Highland.  That new management is

20   working very hard.  As you've seen, Your Honor, that new

21   management is willing to push back.  That new management, with

22   the DAF, which you've heard testimony of, that new management

23   is working to get that motion withdrawn.  That new management

24   is not going forward with Lynn Pinker because of actions that

25   it took that it thought subverted their control and their

169

1    management of the Debtor.  The new management decided to drop

2    an appeal that they did not think had any merit.

3        It's not the same Debtor, Your Honor.  It is a board

4    consisting of three highly-qualified people who are exercising

5    their own judgment.  So all of that stuff that happened prior

6    to January 9th, I don't want to say hey, it's a clear line in

7    the sand, but it is.  Mr. Dondero is not in control of

8    Highland Capital Management.

9              THE COURT:  But he is in control of Neutra.

10             MR. DEMO:  He is the economic beneficiary of Neutra.

11   That is correct.  But Mr. Dondero did tell Mr. Nelms, as Mr.

12   Nelms testified, that he would reinstate those contracts.  And

13   I understand that.  But again, as you've seen, Mr. Nelms and

14   the Board have been able to push back, have been able to exert

15   control, to exert influence, and to exert management over an

16   institution that is very difficult to manage.

17       And I do think that deference to that is something that

18   should very much be considered, because it's very easy to

19   think of this as Old Highland, but this is New Highland, who

20   has done an independent, objective review of these claims, who

21   has sat with Ms. O'Neil, who has sat with Pachulski, who has

22   sat with Mr. Terry and Ms. Patel and talked about this stuff,

23   and still thinks that there is a benefit here to the estate,

24   and that spending the $500,000 to pursue that benefit, which

25   is not just a benefit to Highland but it's a benefit to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 402 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 470 of 1017    PageID 5149
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 401 of
2722

170

 1  Highland other -- to Highland's other creditors, I guess, Your

 2  Honor, quite honestly, I would ask that you to defer to that

 3  new management, because it is not -- it is not Old Highland.

 4      All that stuff that people have talked about -- I mean,

 5  you've seen today in court, you've heard testimony about very

 6  qualified people working to stop that and working to put this

 7  estate into a position where it can reorganize, where it can

 8  come to agreements with its creditors, where it can work

 9  through this process, where it can come out the other side.

10      But if we take away that Board's ability to manage

11  litigation with one of their biggest creditors, whose

12  litigation claim keeps growing, all you're doing is

13  benefitting that one creditor, not to the detriment of Mr.

14  Dondero but to the detriment of the other creditors in this

15  case.

16      UBS has a claim.  Redeemer has a claim.  Meta-e has a

17  claim.  McKool's has a claim.  You can run through that whole

18  list.  And if you take away the Board's right to direct

19  litigation that is going directly to the Board's ability to

20  control runaway claims, to negotiate with creditors, and to

21  come up with an idea of how to split the pie, then, with all

22  respect, Your Honor, you are infringing on that Board's

23  business judgment and that Board's ability to reorganize this

24  case.

25      This case isn't just about --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 403 of
Case 3:25-cv-02072-S Document 15-7 F07d310/06/25 Page 471 of 1017 PageID 5150
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 402 of
2722

171

1           THE COURT: It wouldn't be taking away. And here is

2      a nuance that -- I think it is perfectly reasonable, in case

3      you don't know where I'm heading on this, for Foley to

4      represent Highland in the Acis case, in that adversary

5      proceeding, if it goes forward, because heck yeah, Highland

6      has been sued for huge amounts of money.

7           MR. DEMO: Understood.

8           THE COURT: Their claim, that is many millions, has

9      been objected to. So, heck yeah, this estate needs good

10     representation of Highland in that case, where there are many

11     unresolved issues still in the Acis case.

12          But on the appeal, I am just still lost as to how there is

13     any chance in the world Highland benefits in those appeals.

14     Neutra, heck yeah. Maybe they get their Acis back and can

15     instruct it to, you know, stop suing Highland or whatever.

16     Dondero controlling Neutra can do that. Okay? And HCLOF, it

17     doesn't want Acis to have anything to do anymore with managing

18     its equity piece of those CLOs. Sure. But how -- I mean,

19     you're telling me that there could be a scenario -- here's

20     what I'm hearing. That there is a benefit in having all those

21     fraudulent transfer claims arbitrated, I guess, not litigated

22     in the Bankruptcy or District Court, and there's a benefit in

23     having all of the management agreements, portfolio management

24     agreements reinstated. And I just, I don't see how that

25     happens anytime soon based on how I perceive a reversal of

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 404 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 472 of 1017   PageID 5151
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 403 of
2722

172

1   orders on appeal happening.

2           MR. DEMO:  And I guess I don't know what else to say

3   on that point.  We do think there's a $12 million tangible

4   benefit to reinstating those contracts.  We think there's a

5   tangible benefit to allowing Neutra to go forward with its

6   appeal.  And again, there is nobody else who I think would pay

7   that freight besides the Debtor, because that benefit, we

8   believe, goes to the Debtor.

9           THE COURT:  How many years of life are there left on

10  the CLOs that Acis manages?

11          MR. DEMO:  I would have to check, Your Honor.  I

12  don't know off the top of my head.  I can ask.  But --

13          THE COURT:  I mean, you're saying $12 million.  I

14  mean, I don't --

15          MR. DEMO:  I, you know, --

16          THE COURT:  There's not a -- I'm just not sure where

17  that number is coming from.  I never heard direct evidence of

18  that.

19          MR. DEMO:  Okay.  Well, I guess, Your Honor, I mean,

20  again, I would just ask that you defer to the business

21  judgment of the Board and allow them to position this

22  litigation in a way that best enables them to deal with every

23  creditor's claim, and not just the claims of one creditor.

24  And if they cannot fight the claims of the creditor, then they

25  can't negotiate how that pot is going to be split in a fashion

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 405 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 473 of 1017    PageID 5152
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 404 of
2722

173

1  that benefits everybody.

2      So I guess, Your Honor, I mean, I don't know what else to

3  say about the benefits of the Neutra appeal except that the

4  testimony, I think, speaks for itself.  But, you know, I --

5  and in terms of --

6          THE COURT:  Again, fight the claim of a creditor.

7  Foley can represent Highland in the adversary proceeding,

8  wherever that goes forward.

9          MR. DEMO:  Yeah.

10          THE COURT:  Probably District Court, not this Court.

11  At least some of it, if not all of it.  But anyway, I'm

12  digressing.  They can object to Acis's proof of claim.  They

13  can object to Terry's proof of claim.  I mean, --

14          MR. DEMO:  And conversely, Your Honor, if -- if --

15          THE COURT:  -- this has nothing to do with -- I mean,

16  I don't get the appeal.  I mean, I --

17          MR. DEMO:  Right.

18          THE COURT:  Neutra can appeal, HCLOF can appeal, but

19  I'm not seeing the benefit to Highland.

20          MR. DEMO:  And I guess the only thing I would say,

21  Your Honor, is if there is an improper benefit, we are not

22  saying that the fee applications are sacrosanct.  People can

23  challenge the improper benefit there.

24      And again, the settlement gave broad discretion to the

25  Committee to pursue insider claims.  So if an insider is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 406 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 474 of 1017   PageID 5153
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 405 of
2722

174

1    receiving a benefit from this, the Committee has standing to

2    pursue that.

3        So it's not a null set, Your Honor, whereas cutting off

4    the appeal now does take away that possibility.

5            THE COURT:  How would I be cutting off the appeal?

6    I'm not cutting off the appeal.  King & Spalding can go in

7    there and fight hard.  Foley can go in there and fight hard

8    for Neutra.  So, --

9            MR. DEMO:  One second, Your Honor.

10       (Counsel confer.)

11           MR. DEMO:  And I guess, you know, Your Honor, and I

12   do want to reiterate that there is no other party with an

13   economic incentive to fight the Neutra appeal the way that the

14   Debtor has an economic incentive.

15           THE COURT:  That makes no sense to me.  HCLOF is the

16   one who hated this injunction.

17           MR. DEMO:  That's not the Neutra appeal, Your Honor.

18   That's the confirmation order.

19           THE COURT:  Well, okay.  Neutra gets its company back

20   if they win.

21           MR. DEMO:  And we would get our contracts back.

22           THE COURT:  And arguably, it can control Acis, maybe,

23   okay, and it can assign management contracts to whoever it

24   wants.  That just -- and it says it'll assign them to

25   Highland.  If you can trust Jim Dondero, then Highland's going

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 407 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/23/06/25   Page 475 of 1017   PageID 5154
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 406 of
2722

175

```
 1   to benefit if Neutra wins that appeal.  Right?

 2         MR. DEMO:  Yes.  Yes, Your Honor.

 3         THE COURT:  Okay.  So that --

 4         MR. DEMO:  Highland would benefit greatly --

 5         THE COURT:  Okay.

 6         MR. DEMO:  -- if Neutra were to win that appeal.

 7         THE COURT:  Okay.  Okay.  Well, but first Neutra

 8   benefits, right?  And then --

 9         MR. DEMO:  No.

10         THE COURT:  -- Highland only secondarily benefits --

11         MR. DEMO:  I -- I --

12         THE COURT:  -- if Jim Dondero keeps his word and

13   gives the management contracts back to Highland.

14         MR. DEMO:  Jim Dondero would also have to repay the

15   $8 million in claim, even if he didn't reinstate those

16   contracts.  And that $8 million would be hundred-cent dollars.

17         THE COURT:  Okay.

18         MR. DEMO:  So, worst case, --

19         THE COURT:  It would have been nice to have him

20   testify as to all of this.

21         MR. DEMO:  Worst --

22         THE COURT:  It would be more compelling if I had him.

23         MR. DEMO:  Well, --

24         THE COURT:  Okay?  But I don't think --

25         MR. DEMO:  -- I can only do so much, Your Honor.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 408 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 476 of 1017   PageID 5155
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 407 of
2722

176

1          THE COURT:  -- that's going to happen anytime soon.

2          MR. DEMO:  But I guess worst-case scenario is that

3    it's $8 million in hundred-cent dollars.

4          THE COURT:  Okay.

5          MR. DEMO:  And that's not nothing for $500,000.  And

6    only a portion of that $500,000.

7          THE COURT:  Okay.

8          MR. DEMO:  Thank you, Your Honor.

9          THE COURT:  Okay.  Mr. Lamberson?

10         MR. LAMBERSON:  Your Honor, do you want a closing

11   from me?  Or no?

12         THE COURT:  I don't really need it.  Thank you.

13         MR. LAMBERSON:  Okay.

14         THE COURT:  Okay.

15         MR. LAMBERSON:  Because I know your hearing starts in

16   about two minutes.

17         THE COURT:  All right.  So, I just hate it that we

18   spent so much time on this.  I hate it that we spent so much

19   time, but, I mean, I understand.  I understand.  You know, I

20   think the employment application was filed pretty early in the

21   case, right, and -- October 29th.  And it was continued,

22   continued, continued, because we were getting objections from

23   the Committee, or they wanted time to look at it, I guess.

24   And now you're kind of up against the wire, right, because

25   oral arguments are set at the Fifth Circuit next month.  So I,

177

1   you know, I hate it that we were here, but I understand it.

2        But I'm concerned.  I'm concerned -- well, here's the

3   deal.  We have a great board, and I totally get that

4   Bankruptcy Courts should defer heavily to the reasonable

5   exercise of business judgment by a board.  And we've got great

6   professionals.  And we've got this case, I think, on a good

7   track as a general matter now.  But I'm concerned that Dondero

8   or certain in-house counsel has -- you know, they're smart,

9   they're persuasive -- that -- what are the words I want to

10  look for -- they have exercised their powers of persuasion or

11  whatever to make the Board and the professionals think that

12  there is some valid prospect of benefit to Highland with these

13  appeals, when it's really all about Neutra, HCLOF, and Mr.

14  Dondero.  That's what I believe.

15       I mean, this is awkward, right, because you want to defer

16  to the debtor-in-possession, but I have this long history, and

17  I can think through the scenarios.  If this is reversed, here

18  is how it will play out.  If this is reversed, here is how it

19  might play out.  And I know, you know, there are multiple ways

20  it might play out, but I cannot believe there is a chance in

21  the world there is economic benefit to Highland if these

22  things get reversed.  Economic benefit to Neutra:  Yeah,

23  maybe.  Economic benefit to HCLOF:  Well, they'll get what

24  they want.  You know, whether it's an economic benefit, I

25  don't know.  But benefit to Highland?  I just don't think the

178

1   evidence has been there to convince me it's reasonable

2   business judgment for Highland to pay the legal fees

3   associated with the appeal.

4       And even more concerning to me is a valid point was made

5   that Highland is in bankruptcy because of litigation,

6   litigation, litigation.  The past officers and directors and

7   controls' propensity to fight about everything.  This isn't a

8   balance sheet restructuring, okay?  It's not a Chapter 11

9   caused by operational problems or revenue disruption or who

10  knows what kind of disruption.  It's about years of litigation

11  finally coming home to roost.  And this just appears to be

12  more of the same, potentially.

13      Okay.  Parties have a right to appeal.  I respect that.

14  Neutra, go for it.  HCLOF, go for it.  But this estate and its

15  creditors should not bear the burden of having Highland pay

16  for that, when, again, I don't think there's any evidence to

17  suggest they could benefit at the end of the day.

18      So what I'm going to do is I'm going to approve the

19  retention of Foley to represent Highland in the Acis case.  We

20  all know the adversary is stayed right now.  It may or may not

21  ever be un-stayed, depending on what strategies people want to

22  pursue.  But Highland, I think a meritorious case has been

23  presented, and under 327(e) I will approve Foley representing

24  Highland in all Acis matters.  Okay?  The Acis bankruptcy

25  case.  The adversary proceeding, if it goes forward.  And so

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 411 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 479 of 1017 PageID 5158
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 410 of
2722

179

1   that's my ruling.

2       I will additionally rule, for the avoidance of doubt, that

3   if Foley wants to represent Neutra in the appeals and get paid

4   by Neutra, I don't have any problem with that.  In other

5   words, I'm not going to find something like there's a conflict

6   with the estate, you know, because of its simultaneous

7   representation of Neutra.  That's fine.  But I'm not going to

8   approve Highland paying anything in connection with either of

9   those appeals.  So that is the ruling of the Court.

10      Have I left any gaps here?

11          MR. DEMO:  Your Honor, just one clarification.

12          THE COURT:  Uh-huh.

13          MR. DEMO:  Foley is representing Highland Capital

14  Management in the appeal of the confirmation order to the

15  Fifth Circuit.  I just want to clarify that your ruling that

16  Highland can represent -- I'm sorry -- Foley can represent

17  Highland in all Acis matters extends to their representation

18  of Highland Capital Management in the appeal of the

19  confirmation order that's set for March 30th.

20          THE COURT:  Okay.  Let me think through that.

21          MR. DEMO:  And again, Your Honor, there's been no

22  objection to that.

23          THE COURT:  King & Spalding is in there representing

24  HCLOF.  Foley would be representing both Neutra and Highland

25  in connection with the confirmation order?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 412 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 480 of 1017   PageID 5159
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 411 of
2722

180

1        MR. DEMO:  Technically, but Neutra really has

2    nothing.  It's a coattail party in that case.  Highland

3    Capital Management, to the extent that they could bifurcate

4    Neutra, it would still be doing the exact same work.  So if

5    there is an issue there with the representation of Neutra,

6    we'd still ask that Foley be allowed to represent Highland

7    Capital Management in that appeal.

8        THE COURT:  Okay.  So you're telling me Neutra

9    doesn't really benefit from that appeal, so you want Highland

10   to pay all of the fees of Foley in connection with the

11   confirmation order appeal?

12       MR. DEMO:  All I'm asking, Your Honor, is that Foley

13   can represent Highland Capital Management in that appeal.  And

14   again, there's been no objection to that.  What happens with

15   Neutra, I, you know, I understand your position.  I am simply

16   asking for a clarification that Foley can continue

17   representing the Debtor in the Debtor's appeal of the

18   confirmation order.

19       THE COURT:  All right.  I will say yes to that, but

20   they need to be prepared to have their fees split.  I'm not

21   saying 50/50, I don't know what the percentage is, but they

22   are going to be allocated between Neutra and Highland, and

23   they should not expect to get a hundred percent of those

24   covered by Highland at the end of the day.  Okay?  There's

25   going to be a deep dive into looking at how that allocation

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 413 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 481 of 1017   PageID 5160
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 412 of
2722

181

```
 1   should work, okay?

 2           MR. DEMO:  And they will be filing fee apps,

 3   obviously, on all of the matters that they are --

 4           THE COURT:  Okay.  Anything else?

 5           MR. POMERANTZ:  One moment, Your Honor.

 6           THE COURT:  Okay.

 7      (Pause.)

 8           MR. DEMO:  Yeah.  And Your Honor, I do just want to

 9   clarify that when we talk about the involuntary petition

10   appeal, that when we talk about its effect on the fraudulent

11   conveyance action, to the extent that -- and I would like to

12   clarify your position on this, Your Honor.  Is your position

13   that the appeal of the involuntary, if successful, would have

14   no impact on the fraudulent conveyance actions in the Acis

15   litigation?

16      Because I do think that it is clear that --

17           THE COURT:  I think we don't know.  We would have to

18   see --

19           MR. DEMO:  And I guess that's -- that's --

20           THE COURT:  -- what the Fifth Circuit states.

21           MR. DEMO:  And my --

22           THE COURT:  And it may be:  Bankruptcy Court, stay

23   the proceedings and defer, send it to arbitration.  "It" being

24   re-litigation of --

25           MR. DEMO:  Understood.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 414 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 482 of 1017    PageID 5161
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 413 of
2722

182

```
1            THE COURT:  -- the involuntary.

2            MR. DEMO:  And --

3            THE COURT:  That may be, to me, a likely scenario,

4   but maybe not.

5            MR. DEMO:  And -- and --

6            THE COURT:  Maybe they'll say something else.

7            MR. DEMO:  Understood.  And I think we're honestly on

8   the same page with that.

9            THE COURT:  Uh-huh.

10           MR. DEMO:  Because to the extent that it does put it

11  into arbitration, to the extent that there is that

12  possibility, that it changes the color of those fraudulent

13  conveyance claims, changes the color of Acis's $300 million

14  proof of claim, which goes to settlement strategy, which goes

15  to the benefits to other creditors, which goes to a whole

16  panoply of other things that tie into a benefit to the estate.

17  And I don't want to re-argue what we've already argued, but I

18  think, as Your Honor said, that chance that there is going to

19  be a change to the fraudulent conveyance, either because it

20  throws them into an arbitration or because it somehow

21  otherwise colors it, is, in and of itself, a substantial

22  benefit to the estate -- leaving aside the dollars from the

23  contracts, leaving aside the $8 million proof of claim --

24  because that benefit goes to, again, that $300 million proof

25  of claim that Acis has filed, which impacts the estate, which
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 415 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 483 of 1017   PageID 5162
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 414 of
2722

183

1   impacts other creditors, and which impacts the settlement

2   mechanics in this case.

3       So to the extent that there is a chance that the

4   involuntary changes that and recolors it, there is a

5   substantial benefit to the estate in that, because it allows

6   the estate to work with creditors --

7            THE COURT:  I mean, --

8            MR. DEMO:  -- to figure out a way to settle claims in

9   a way that are --

10           THE COURT:  I get what you're saying, but guess what?

11  You can object to that $300 million proof of claim.  And we

12  might have a very interesting conversation about --

13           MR. DEMO:  What --

14           THE COURT:  Well, it's the same judge either way, but

15  -- well, I guess I don't get what you're saying.  You have the

16  ability to object to the proof of claim whether there's

17  affirmance or --

18           MR. DEMO:  Yeah.  But --

19           THE COURT:  -- reversal, right?  I'm just --

20           MR. DEMO:  We don't have a -- you know, we may not

21  have to get -- I'm sorry, Your Honor, and I'll stop it -- but

22  we may not have to get there.  Objecting to the proof of claim

23  is quali... it is quantitatively and qualitatively different

24  than a Fifth Circuit order saying that there are changes to

25  the fraudulent conveyance, there are changes to the

184

1   distribution of equity under the plan.  Maybe there is no plan

2   -- or maybe there is no bankruptcy at all.

3       Those things fundamentally change the dynamics of this

4   case in a way that's good for the estate.  And those things

5   can only happen if there's an order from the Fifth Circuit

6   entering that.  We can object all down the pipe, and we are

7   going to object, Your Honor, and I assume other people will

8   object as well.  But our objecting does not have the same

9   benefit to the estate as a Fifth Circuit opinion saying,

10  Fraudulent conveyance claims go to arbitration; saying, There

11  is no involuntary petition.

12      Now, I understand that there are questions as to the

13  probability of those things, but the fact that there is a

14  probability of those things happening and the cost to the

15  estate is a hundred thousand dollars, I understand what Your

16  Honor has said and I don't want to overstay my welcome, but I

17  do think we are -- at least maybe I am presenting it wrong --

18  but that Fifth Circuit order either way is going to calcify

19  and solidify this in ways that are beneficial to the estate

20  and beneficial to how this bankruptcy is going to progress.

21          THE COURT:  Okay.  I understand you feel passionately

22  about that, but just so you know, for future purposes or not,

23  I'm not there because, you know, among other things, we -- you

24  know, life has changed.  You know, if the Fifth Circuit says

25  reversal, not a darn thing should happen in a bankruptcy case

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 417 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 485 of 1017   PageID 5164
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 416 of
2722

185

1   of Acis, you know, it can all go to arbitration, well, that's

2   the Acis litigation, right?  But Acis has filed a proof of

3   claim now.  And are you going to tell me the Fifth Circuit is

4   going to say the arbitration that should have happened in the

5   earlier Acis case trumps, if you will, adjudication of a proof

6   of claim now in a new case?

7            MR. DEMO:  And the claims are --

8            THE COURT:  I mean, I'm just -- someone mentioned

9   *Gandy* and *National Gypsum*, and there's even a more recent

10  Fifth Circuit case dealing with arbitration which --

11           MR. DEMO:  The claims, Your Honor, are state law

12  claims if there's no bankruptcy, and I think --

13           THE COURT:  But there is a bankruptcy.  There's a

14  Highland bankruptcy now.  And there's a proof of claim --

15           MR. DEMO:  Not if the Fifth Circuit --

16           THE COURT:  -- in the Highland case.

17           MR. DEMO:  -- overturns the involuntary petition.

18           THE COURT:  Yeah.  I just -- okay.  We're just, we're

19  having academic conversations, and I'm probably guilty for

20  going down this trail.  So, anyway, is there anything further,

21  then?

22           MR. LAMBERSON:  No, Your Honor.

23           THE COURT:  I need a few orders.

24           MR. LAMBERSON:  If they want to prepare an order and

25  send it to us, we're happy to look --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 418 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 486 of 1017 PageID 5165
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 417 of
2722

186

1          THE COURT:  Okay.  Thank you all.

2      (Proceedings concluded at 1:44 p.m.)

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/20/2020**

24  _____    _____
    Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 419 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 487 of 1017    PageID 5166
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 418 of
2722

187

INDEX

PROCEEDINGS                                                          4

WITNESSES

Debtors' Witnesses

Russell F. Nelms
- Direct Examination by Mr. Morris                                  57
- Cross-Examination by Mr. Lamberson                               80
- Redirect Examination by Mr. Morris                              109

Holland O'Neil
- Direct Testimony via Declaration                                115
- Cross-Examination by Ms. Patel                                  115
- Redirect Examination by Mr. Morris                              147

EXHIBITS

Debtor's Exhibits                            Identified Received

1 through 9                                      57        57

Acis Capital Management GP's Exhibits      Identified Received

16   Top 20 List of Creditors                   99       100
27   DAF Lawsuit                               104       105

RULINGS

Motion to Compromise Controversy with Official Committee     8
of Unsecured Creditors filed by Debtor Highland Capital
Management, L.P. (carryover issues) (281) - *Revised
Operating Protocols to be Submitted*

Lynn Pinker Retention Application - *Withdrawn*               8

Foreign Representative Motion - *Order Signed*              10

Motion to Extend Exclusivity Period filed by Debtor         11
Highland Capital Management, L.P. (395)- *Order Signed*

Debtor's Motion for an Order (i) Establishing Bar Dates     13
for Filing Claims, Including 503(b)(9) Claims; and (ii)
Approving the Form and Manner of Notice Thereof (421) -
*Agreed Order to be Uploaded*

APP. 0415

004405

188

1                                INDEX
                                 Page 2
2

3    RULINGS, cont'd.

4    Motion for Relief from Stay by Creditor PensionDanmark    14
     (218) - *Continued to March 11, 2020*

5    Status Conference Re: Motion of the Debtor for the Entry    28
     of an Order Concerning the "Sealing Motion" and for a
6    Conference Concerning the Substance, Scope, and Intent
     of Certain Recent Rulings (397)
7

8    Motion to Employ/Retain Foley Gardere, Foley & Lardner    176
     LLP as Special Texas Counsel filed by Highland Capital
     Management, L.P. (68)
9

10   END OF PROCEEDINGS                                         186

11   INDEX                                                   187-188

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 4

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

James A. Wright III (*pro hac vice*)
1 Lincoln Street
Boston, MA 02110
Tel: (617) 261-3193
james.wright@klgates.com

*Counsel for Highland Capital Management Fund Advisors, L.P.,*
*NexPoint Advisors, L.P., Highland Income Fund, NexPoint*
*Strategic Opportunities Fund, and NexPoint Capital, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## MOTION FOR ORDER IMPOSING TEMPORARY
## RESTRICTIONS ON DEBTOR'S ABILITY, AS PORTFOLIO
## MANAGER, TO INITIATE SALES BY NON-DEBTOR CLO VEHICLES

Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and NexPoint

Advisors, L.P. ("**NexPoint**", and together with HCMFA, the "**Advisors**"), and Highland

Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the

1934054201208000000000010

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 422 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 490 of 1017   PageID 5169
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 421 of
2722
Case 19-34054-sgj11 Doc 1522 Filed 12/08/20   Entered 12/08/20 23:02:11   Page 2 of 11

"**Funds**"), by and through their undersigned counsel, hereby submit this motion for an order of

the Court under Bankruptcy Code §§ 105(a), 363, and 1107 imposing temporary restrictions on

Highland Capital Management, L.P.'s (the "**Debtor**") ability to initiate sales as portfolio

manager (or other similar capacity) for certain non-debtor investment vehicles (the "**CLOs**").

In support of the Motion, the Funds and Advisors submit the Declaration of Dustin Norris (the

"**Declaration**") attached hereto and state as follows:

## BACKGROUND

### A.  *General Background on the Advisors and their Advised Funds*

1.      Each Advisor is registered with the U.S. Securities and Exchange Commission

("**SEC**") as an investment advisor under the Investment Advisers Act of 1940, as amended (the

"**Advisers Act**").

2.      Each of the Advisors advises several funds, including the Funds. Each of the

Funds is a registered investment company or business development company under the

Investment Company Act of 1940 (as amended, the "**1940 Act**").

3.      As an investment company or business development company, each Fund is

overseen by a majority independent board of trustees subject to 1940 Act requirements. That

board reviews and approves contracts with one of the Advisors for the respective Fund. The

Funds do not have employees. Instead, each Fund relies on its respective Advisor, acting

pursuant to advisory agreements, to provide the services necessary to the Fund's operations.

### B.  *The CLOs*

4.      The CLOs are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland

CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO, Ltd.,

Liberty CLO, Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd.,

308324833.913

APP. 0418

004408

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 423 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 491 of 1017 PageID 5170
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 422 of
2722
Case 19-34054-sgj11 Doc 1522 Filed 12/08/20 Entered 12/08/20 23:02:11 Page 3 of 11

Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC, and Westchester CLO, Ltd.

5.     The CLOs are securitization vehicles formed to acquire and hold pools of debt obligations. They also issued various tranches of notes and preference shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations. The notes issued by the CLOs are paid according to a contractual waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preference shares.

6.     The CLOs were created many years ago. Most of the CLOs are, at this point, past their reinvestment period and have paid off all the tranches of notes or, in a few instances, all but the last and most junior tranche. Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preference shares. The repayment status of the notes in the CLOs as of November 2020 is shown on <u>Exhibit A</u> to the Declaration, and the Funds' collective ownership of the preference shares is shown on <u>Exhibit B</u> to the Declaration. As shown on <u>Exhibit B</u>, the Funds hold a majority of the preference shares in three of the CLOs, Grayson CLO, Ltd., Greenbriar CLO, Ltd., and Stratford CLO Ltd., and material interests in most of the other CLOs.

7.     The CLOs have each separately contracted for the Debtor to serve as the CLO's portfolio manager.[1] In this capacity, the Debtor is responsible, among other things, for making decisions to sell the CLOs' assets. Although the portfolio management agreements vary, the agreements generally impose a duty on the Debtor when acting as portfolio manager to maximize the value of the CLO's assets for the benefit of the CLO's noteholders and preference

---

[1] The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this Motion, the Funds and Advisors have used the term "portfolio manager" when referring to the Debtor's role for each CLO regardless of the precise title in the underlying documents.

**APP. 0419**

**004409**

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 424 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 492 of 1017    PageID 5171
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 423 of
2722
Case 19-34054-sgj11 Doc 1522 Filed 12/08/20   Entered 12/08/20 23:02:11   Page 4 of 11

shareholders.

### C.        _The Operating Protocols_

8.        As part of the resolution of certain disputes between the Debtor and the Official

Committee of Unsecured Creditors (the "**Committee**"), the Debtor is operating under the

restrictions and provisions of certain operating protocols (the "**Operating Protocols**") approved

by the Court. See Notice of Debtor's Amended Operating Protocols (Docket No. 466). Among

other things, the Operating Protocols include provisions regulating the Debtor's actions on

behalf of other entities. With respect to the CLOs, however, the Operating Protocols generally

exempt the Debtor from the regular approval process involving the Committee where the Debtor

acts as portfolio manager for the CLOs. See, e.g., Operating Protocols at § IV(B)(3)(a).

### C.        _Recent Asset Sales and the Advisors' Requests for a Temporary Pause in Sales_

9.        The Court recently approved the Debtor's Disclosure Statement for the Fifth

Amended Plan of Reorganization of Highland Capital Management, L.P. (Docket No. 1473)

(the "Disclosure Statement").

10.        The Disclosure Statement discusses the Debtor's role as portfolio manager for

the CLOs (which the Disclosure Statement defines as "Issuers") in Article II(U) (pg. 32). After

explaining the Debtor's role and noting some proofs of claim filed by the CLOs, the Disclosure

Statement states as follows:

> The Issuers have taken the position that the rejection of the Portfolio
> Management Agreements (including any ancillary documents) would result in
> material rejection damages and have encouraged the Debtor to assume such
> agreements. Nonetheless, the Issuers and the Debtor are working in good faith
> to address any outstanding issues regarding such assumption. The Portfolio
> Management Agreements may be assumed either pursuant to the Plan or by
> separate motion filed with the Bankruptcy Court.

APP. 0420

004410

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 425 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 493 of 1017   PageID 5172
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 424 of
2722
Case 19-34054-sgj11 Doc 1522 Filed 12/08/20   Entered 12/08/20 23:02:11   Page 5 of 11

The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

11.    The Financial Projections attached as Exhibit C to the Disclosure Statement make clear that, assuming confirmation of the Debtor's chapter 11 plan in its current form, the Debtor intends to liquidate its remaining assets over the next two years, concluding in December 2022.

12.    The Funds and Advisors do not agree with recent sales executed by the Debtor in certain CLOs, including sales during the historically light Thanksgiving trading week, because the Funds and Advisors view those assets as having greater value if held as long-term investments. When the Advisors became aware the Debtor was considering these transactions, NexPoint requested that the Debtor not consummate the sales.

13.    NexPoint has requested in two letters that the Debtor refrain from causing the CLOs to sell further assets without prior notice and consent of NexPoint. Counsel to the Funds and Advisors has also requested by email that the Debtor agree consensually to temporarily suspend further sales of the CLOs' assets and/or confirm that the Debtor is not presently planning further sales in the immediate future. The Debtor has refused these requests.

**D.    _HCMLP Decisions Illustrating Its Short-Term Approach_**

14.    Consistent with its proposal to liquidate all of its assets by the end of 2022 per the Disclosure Statement, HCMLP has engaged in transactions taking a short-term approach to value.

15.    In addition to the sales noted above during Thanksgiving week, during the chapter 11 case, the Debtor has directed the disposition of other assets in a manner that suggests a focus on quick monetization at the expense of maximizing returns for investors and/or the

APP. 0421
Appx. 00468
004411

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 426 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 494 of 1017 PageID 5173
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 425 of
2722
Case 19-34054-sgj11 Doc 1522 Filed 12/08/20 Entered 12/08/20 23:02:11 Page 6 of 11

estate. For example, Debtor-controlled entities sold a collective majority interest in an unsecured term loan to OmniMax International, Inc. Other non-Debtor controlled entities, advised by the Advisors, were able to secure a substantially better price for their stake in the same asset by being willing to hold it and transacting at a later date. Given the Debtor-controlled entities large ownership in the unsecured loan, the Advisors believe the Debtor was well-positioned to realize a higher price.

16.     Also, upon information and belief, the Debtor, through its wholly owned subsidiary Trussway Holdings, LLC ("**Trussway**"), consummated a sale transaction where Trussway sold a division, SSP Holdings, LLC, in which Trussway had a majority interest. Upon information and belief, the sale was conducted without a formal competitive bidding process and resulted in a loss of $10 million, despite certain metrics of SSP Holdings, LLC having improved materially since it was acquired in 2014.

## **REQUEST FOR RELIEF**

17.     The Funds and Advisors request that the Court, under Bankruptcy Code sections 105(a), 363, and 1107(a) impose a temporary restriction on the Debtor's ability, as portfolio manager, to cause the CLOs to sell assets. The Funds and Advisors request that the Court prohibit the Debtor from authorizing any such sales for a period of 30 days, absent further order of the Court.

18.     Bankruptcy Code section 363 governs the Debtor's use of estate property. 11 U.S.C. § 363. Section 363 authorizes the Debtor to use that property outside of the ordinary course of business "after notice and a hearing," and in the ordinary course of business without notice and a hearing "unless the court orders otherwise . . . ." 11 U.S.C. § 363(b-c). Bankruptcy Code section 1107(a) grants the Debtor, as debtor-in-possession, the powers of a chapter 11 trustee, subject to "such limitations or conditions as the court prescribes . . . ." 11 U.S.C.

308324633.813

APP. 0422
Appx. 00409
004412

§ 1107(a). And Bankruptcy Code section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).

19.    Consistent with these powers, the Court implemented the Operating Protocols earlier in this case regarding the Debtor's actions on behalf of other non-debtor entities. Unlike where the Debtor directs sales of assets for other entities, however, the Operating Protocols generally do not restrict the Debtor's actions as portfolio manager for the CLOs. See Operating Protocols at IV(B)(3)(a).[2] The Funds and Advisors submit that the relief requested does not conflict with the Operating Protocols, but to the extent necessary, the Funds and Advisors request that the Court modify the Operating Protocols in the limited and temporary way requested in this Motion.

20.    The Funds and Advisors seek this relief to preserve the status quo at the CLOs while the Funds and Advisors explore replacing the Debtor as portfolio manager either

---

[2] Section IV(B)(3)(a) (Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest)(Operating Requirements)(Third Party Transactions: All Stages) provides in full:

> **Except** (x) as set forth in (b) and (c) below and **(y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party,** any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(emphasis added). "Specified Entity" is defined in section I(K) of the Operating Protocols to include the CLOs referenced in this Motion.

308324633.813

APP. 0423

004413

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 428 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 496 of 1017 PageID 5175
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 427 of
2722
Case 19-34054-sgj11 Doc 1522 Filed 12/08/20 Entered 12/08/20 23:02:11 Page 8 of 11

consensually or through the contractual processes laid out in the relevant underlying agreements.

21.     In the Disclosure Statement, the Debtor states that it has not determined if it wants to continue to serve as portfolio manager for the CLOs. The Debtor also has not sought input from the Funds and Advisers, even though the Funds are among the largest stakeholders indirectly and significantly affected by the Debtor's actions with respect to the CLOs.

22.     The Advisers Act places a fiduciary duty on investment advisers comprising a duty of care and duty of loyalty. See, e.g., SEC Release No. IA-3248, "Commission Interpretation Regarding Standard of Conduct for Investment Advisers," (July 12, 2019). This means an adviser, like the Debtor, must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. See id. This combination of care and loyalty obligations has been characterized as requiring the investment adviser to act in the "best interest" of its client at all times. See SEC v. Tambone, 550 F.3d 106, 146 (1st Cir. 2008) ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund . . . ."); SEC v. Moran, 944 F. Supp. 286, 297 (S.D.N.Y. 1996) ("Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.").

23.     Although the Debtor's nominal "clients" are the CLOs themselves, the true parties in interest are the holders of beneficial interests in the CLOs, such as the Funds. Most or all of the other layers of CLO interests have been paid out, and the Funds hold either the majority or a substantial portion of most of the remaining CLO interests. In these circumstances, the Funds and the other preference shareholders are the parties who are economically affected by the Debtor's actions as portfolio manager.

24.     The Funds and Advisors believe replacing the Debtor as portfolio manager is appropriate in light of the reduced staffing the Debtor anticipates having once the Debtor's chapter 11 plan goes effective. The Funds and Advisors also believe it is appropriate in light of the Debtor's reduced investment time horizon under the chapter 11 plan. As noted above, the Debtor intends to liquidate its investments in the next two years. The Funds, on the other hand, have a much longer investment time horizon and, as a result, have very different financial incentives with respect to their investments. The Funds and Advisors accordingly believe that the Funds and the other preference shareholders would be best served by a portfolio manager with a similar long-term perspective.

25.     Upon information and belief, none of the CLOs needs liquidity at the current time, as the next quarterly waterfall payments are not due until February 2021. The Funds and Advisors accordingly submit that none of the CLOs, the other holders of preference shares and notes issued by the CLOs, or the Debtor will be harmed by the temporary restriction proposed by this Motion. Notably, the Funds and Advisors are not seeking to restrict the Debtor from performing any of its other functions for the CLOs or to modify the Debtor's compensation from the CLOs in any way.

*[Remainder of Page Intentionally Left Blank]*

308324633.813

**APP. 0425**

**004415**

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 430 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 498 of 1017 PageID 5177
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 429 of
2722
Case 19-34054-sgj11 Doc 1522 Filed 12/08/20 Entered 12/08/20 23:02:11 Page 10 of 11

## CONCLUSION

26.     For the reasons set forth above, the Funds and Advisors respectfully request that

the Court grant the relief requested in the Motion and such other and further relief as the Court

deems just and proper.

Dated:     December 8, 2020

                                        K&L GATES LLP

                                        */s/ Artoush Varshosaz*
                                        Artoush Varshosaz (TX Bar No. 24066234)
                                        1717 Main Street, Suite 2800
                                        Dallas, TX 75201
                                        Tel: (214) 939-5659
                                        artoush.varshosaz@klgates.com

                                        Stephen G. Topetzes (*pro hac vice*)
                                        1601 K Street, NW
                                        Washington, DC 20006-1600
                                        Tel: (202) 778-9328
                                        stephen.topetzes@klgates.com

                                        James A. Wright III (*pro hac vice*)
                                        1 Lincoln Street
                                        Boston, MA 02110
                                        Tel: (617) 261-3193
                                        james.wright@klgates.com

                                        *Counsel for Highland Capital Management Fund*
                                        *Advisors, L.P., NexPoint Advisors, L.P.,*
                                        *Highland Income Fund, NexPoint Strategic*
                                        *Opportunities Fund, and NexPoint Capital, Inc.*

308324533.813

APP. 0426
Appx. 004473
004416

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 431 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 499 of 1017 PageID 5178
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 430 of
2722
Case 19-34054-sgj11 Doc 1522 Filed 12/08/20 Entered 12/08/20 23:02:11 Page 11 of 11

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2020, I caused the foregoing document to be served via first class United States mail, postage prepaid and/or electronic email through the Court's CM/ECF system to the parties that consented to such service, as each are listed in the debtor's service list filed at docket entry 1442, Exhibits A and B.

This the 8th day of December, 2020

*/s/ Artoush Varshosaz*
Artoush Varshosaz

## CERTIFICATE OF CONFERENCE

I hereby certify that on December 7, 2020, I conferred with Mr. Greg Demo, counsel for the Debtors, regarding the relief requested in the motion. Mr. Demo informed me that the Debtors do not consent to the relief sought in the motion.

This the 8th day of December, 2020

*/s/ James A. Wright III*
James A. Wright III

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 432 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 500 of 1017   PageID 5179
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 431 of
2722
Case 19-34054-sgj11 Doc 1522-1 Filed 12/08/20   Entered 12/08/20 23:02:11   Page 1 of 11

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

## DECLARATION OF DUSTIN NORRIS

I, Dustin Norris, hereby declare pursuant to 28 U.S.C. § 1746, that the following is true and correct.

1.      I am the Executive Vice President of NexPoint Advisors, L.P. ("**NexPoint**").

2.      I submit this Declaration based on my personal knowledge and information supplied to me by other members of NexPoint's management. I submit this Declaration in support of the Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles (the "Motion") by NexPoint, Highland Capital Management Fund Advisors, L.P. ("**HCMFA**", and together with NexPoint, the "**Advisors**"), Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "**Funds**").

3.      The Motion concerns the following non-debtor investment vehicles: Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd., Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC, and Westchester CLO, Ltd. (collectively, the "**CLOs**").

308354413 v10

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 433 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 501 of 1017    PageID 5180
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 432 of
2722
Case 19-34054-sgj11 Doc 1522-1 Filed 12/08/20    Entered 12/08/20 23:02:11    Page 2 of 11

4.      The Funds each hold interests in the CLOs.

5.      The CLOs are securitization vehicles formed to acquire and hold pools of debt obligations. They also issued various tranches of notes and preference shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations. The notes issued by the CLOs are paid according to a contractual waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preference shares.

6.      The CLOs were created many years ago. Most of the CLOs are, at this point, past their reinvestment period and have paid off all the tranches of notes or, in a few instances, all but the last and most junior tranche. Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preference shares. The repayment status of the notes in the CLOs as of November 2020 is shown on Exhibit A hereto, and the Funds' collective ownership of the preference shares is shown on Exhibit B hereto.

7.      The CLOs have each separately contracted for Highland Capital Management, L.P. (the "**Debtor**") to serve as the CLO's portfolio manager. The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this capacity, the Debtor is responsible, among other things, for making decisions to sell the CLOs assets. Although the portfolio management agreements vary, the agreements generally impose a duty on the Debtor when acting as portfolio manager to maximize the value of the CLO's assets for the benefit of the CLO's noteholders and preference shareholders.

8.      During the chapter 11 case, the Debtor has directed the disposition of other assets in a manner that suggests a focus on quick monetization at the expense of maximizing returns for investors and/or the estate. For example, Debtor-controlled entities sold a collective majority

APP. 0429
Appx. 04476
004419

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 434 of

Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 502 of 1017    PageID 5181

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 433 of
2722

Case 19-34054-sgj11 Doc 1522-1 Filed 12/08/20    Entered 12/08/20 23:02:11    Page 3 of 11

interest in an unsecured term loan to OmniMax International, Inc. Other non-Debtor controlled entities, advised by the Advisors, were able to secure a substantially better price for their stake in the same asset by being willing to hold it and transacting at a later date. Given the Debtor-controlled entities large ownership in the unsecured loan, the Advisors believe the Debtor was well-positioned to realize a higher price.

9.      Also, upon information and belief, the Debtor, through its wholly owned subsidiary Trussway Holdings, LLC ("**Trussway**"), consummated a sale transaction where Trussway sold a division, SSP Holdings, LLC, in which Trussway had a majority interest. Upon information and belief, the sale was conducted without a formal competitive bidding process and resulted in a loss of $10 million, despite certain metrics of SSP Holdings, LLC having improved materially since it was acquired in 2014.

10.      The Advisors did not agree with the Debtor's decision to execute recent sales for certain of the CLOs, because the Advisors viewed those assets as having greater value if held as long-term investments. When the Advisors became aware the Debtor was considering these transactions, NexPoint requested that the Debtor not consummate the sales.

11.      Upon information and belief, none of the CLOs need liquidity at the current time, as the next quarterly waterfall payments are not due until February 2021.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 8th day of December, 2020, in Allen, Texas,

By:      _____
         Dustin Norris

APP. 0430

004420

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 435 of
Case 3:25-cv-02072-S      Document 15-7      Filed 10/06/25      Page 503 of 1017      PageID 5182
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 434 of
2722
Case 19-34054-sgj11 Doc 1522-1 Filed 12/08/20   Entered 12/08/20 23:02:11   Page 4 of 11

**<u>EXHIBIT A</u>**

308354413 v10

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 436 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25   Page 504 of 1017    PageID 5183
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 435 of
2722
Case 19-34054-sgj11 Doc 1522-1 Filed 12/08/20   Entered 12/08/20 23:02:11   Page 5 of 11

**CLO Note Repayment Status[1]**

Aberdeen Loan Funding, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A Notes | 00306LAA2 | $0 |
| Class B Notes | 00306LAB0 | $0 |
| Class C Notes | 00306LAC8 | $0 |
| Class D Notes | 00306LAD6 | $0 |
| Class E Notes | 00306MAA0 | $0 |
| Class I Preference Shares | 00306M201 | $12,000,000.00 |
| Class II Preference Shares | 00306M300 | $36,000,000.00 |

Brentwood CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1A Notes | 107265AA8 | $0 |
| Class A-1B Notes | 107265AM2 | $0 |
| Class A-2 Notes | 107265AC4 | $0 |
| Class B Notes | 107265AE0 | $0 |
| Class C Notes | 107265AG5 | $0 |
| Class D Notes | 107265AK5 | $10,279,258.35 |
| Class I Preference Shares | 107264202 | $34,400,000.00 |
| Class II Preference Shares | 107264400 | $37,000,000.00 |

Eastland CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1 Notes | 277345AA2 | $0 |
| Class A-2a Notes | 277345AC8 | $0 |
| Class A-2b Notes | 277345AE4 | $0 |
| Class A-3 Notes | 277345AG9 | $0 |
| Class B Notes | 277345AJ3 | $0 |
| Class C Notes | 277345AL8 | $0 |
| Class D Notes | 27734AAA1 | $3,251,287.27 |
| Class I Preference Shares | 27734A202 | $85,000,000.00 |
| Class II Preference Shares | 27734A400 | $38,500,000.00 |

---

[1] As of December 1, 2020.

308354413 v10

Gleneagles CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1 Notes | | $0 |
| Class A-2 Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Class D Notes | | $0 |
| Class 1 Combination Notes | | $0 |
| Class 2 Combination Notes | | $0 |
| Preference Shares | 37866PAB5 & G39165AA6 | $91,000,000.00 |

Grayson CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1a Notes | 389669AA0 | $0 |
| Class A-1b Notes | 389669AB8 | $0 |
| Class A-2 Notes | 389669AC6 | $0 |
| Class B Notes | 389669AD4 | $0 |
| Class C | 389669AE2 | $0 |
| Class D | 389668AA2 | $9,011,534.74 |
| Class I Preference Shares | 389669203 | $52,500,000.00 |
| Class II Preference Shares | 389669302 | $75,000,000.00 |

Greenbriar CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A Notes | 393647AA0 | $0 |
| Class B Notes | 393647AB8 | $0 |
| Class C Notes | 393647AC6 | $0 |
| Class D Notes | 393647AD4 | $0 |
| Class E Notes | 39364PAA0 | $0 |
| Class I Preference Shares | 39364P201 | $20,000,000.00 |
| Class II Preference Shares | 39364P300 | $60,000,000.00 |

Jasper CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Class D-1 Notes | | $0 |
| Class D-2 Notes | | $0 |
| Preference Shares | 471315200 | $70,000,000.00 |

308354413 v10

APP. 0433

Appx. 00489

004423

Liberty CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1a Notes | | $0 |
| Class A-1b Notes | | $0 |
| Class A-1c Notes | | $0 |
| Class A-2 Notes | | $0 |
| Class A-3 Notes | | $0 |
| Class A-4 Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Class Q-1 Notes | | $0 |
| Class P-1 Notes | | $0 |
| Class E Certificates | EP0175232 & 530360205 | $94,000,000.00 |

Red River CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A Notes | 75686VAA2 | $0 |
| Class B Notes | 75686VAB0 | $0 |
| Class C Notes | 75686VAC8 | $0 |
| Class D Notes | 75686VAD2 | $0 |
| Class E Notes | 75686XAA8 | $0 |
| Class I Preference Shares | 75686X209 | $36,000,000.00 |
| Class II Preference Shares | 75686X308 | $45,000,000.00 |

Rockwall CDO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1LA Notes | 774262AA7 | $0 |
| Class A-1LB Notes | 774262AB5 | $0 |
| Class A-2L Notes | 774262AC3 | $0 |
| Class A-3L Notes | 774262AD1 | $0 |
| Class A-4L Notes | 774262AE9 | $0 |
| Class B-1L Notes | 774262AF6 | $0 |
| Class X Notes | 774262AG4 | $0 |
| Class I Preference Shares | 774272207 | $33,200,000.00 |
| Class II Preference Shares | 774261127 | $45,000,000.00 |

308354413 v10

APP. 0434

004424

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 439 of
2723
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 507 of 1017    PageID 5186
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 438 of
2722
Case 19-34054-sgj11 Doc 1522-1 Filed 12/08/20    Entered 12/08/20 23:02:11    Page 8 of 11

Rockwall CDO II Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1LA Notes | 77426NAA1 | $0 |
| Class A-1LB Notes | 77426NAB9 | $0 |
| Class A-2L Notes | 77426NAC7 | $0 |
| Class A-3L Notes | 77426NAD5 | $0 |
| Class B-1L Notes | 77426NAE3 | $0 |
| Class B-2L Notes | 77426RAA2 | $9,838,508.11 |
| Class I Preference Shares | 77426R203 | $42,200,000.00 |
| Class II Preference Shares | 77426R401 | $44,000,000.00 |

Southfork CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1a Notes | | $0 |
| Class A-1b Notes | | $0 |
| Class A-1g Notes | | $0 |
| Class A-2 Notes | | $0 |
| Class A-3a Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Preference Shares | 84427P202 | $80,200,000.00 |
| Class I Composite Note | | $2,000,000.00 |

Stratford CLO Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1 Notes | 86280AAA5 | $0 |
| Class A-2 Notes | 86280AAC1 | $0 |
| Class B Notes | 86280AAD9 | $0 |
| Class C Notes | 86280AAE7 | $0 |
| Class D Notes | 86280AAF4 | $0 |
| Class E Notes | 86280AAG2 | $0 |
| Class I Preference Shares | 86280A202 | $17,500,000.00 |
| Class II Preference Shares | 86280A301 | $45,500,000.00 |

308354413 v10

APP. 0435
Appx. 00482
004425

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 440 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 508 of 1017    PageID 5187
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 439 of
2722
Case 19-34054-sgj11 Doc 1522-1 Filed 12/08/20    Entered 12/08/20 23:02:11    Page 9 of 11

Loan Funding VII, LLC (aka Valhalla)

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1-A Notes | | |
| Class A-2 Notes | | |
| Class B Notes | | |
| Class C-1 Notes | | |
| Class C-2 Notes | | |
| Class I Preference Shares | 91914QAA4 | $82,000,000.00 |

Westchester CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1-A Notes | 95736XAA6 | $0 |
| Class A-1-B Notes | 95736XAB4 | $0 |
| Class B Notes | 95736XAD0 | $0 |
| Class C Notes | 95736XAE8 | $0 |
| Class D Notes | 95736XAF5 | $0 |
| Class E Notes | 95736XAG3 | $9,141,575.05 |
| Class I Preference Shares | 95736T206 | $80,000,000.00 |

308354413 v10

APP. 0436
Appx. 004426
004426

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 441 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 509 of 1017    PageID 5188
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 440 of
2722
Case 19-34054-sgj11 Doc 1522-1 Filed 12/08/20    Entered 12/08/20 23:02:11    Page 10 of
11

**EXHIBIT B**

308354413 v10

### Holdings of Preference Shares[1] in CLOs

| CLO | HIF | NSOF | NC | Total |
|---|---|---|---|---|
| Aberdeen | 0% | 30.21% | 0% | **30.21%** |
| Brentwood | 0% | 40.06% | 0% | **40.06%** |
| Eastland | 31.16% | 10.53% | 0% | **41.69%** |
| Gleneagles | 9.74% | 8.52% | 0% | **18.26%** |
| Grayson | 49.10% | 10.75% | 0.63% | **60.48%** |
| Greenbriar | 0% | 53.44% | 0% | **53.44%** |
| Jasper | 0% | 17.86% | 0% | **17.86%** |
| Liberty | 0% | 10.64% | 0% | **10.64%** |
| Red River | 0% | 10.49% | 0% | **10.49%** |
| Rockwall | 6.14% | 19.57% | 0% | **25.71%** |
| Rockwall II | 14.56% | 5.65% | 0% | **20.21%** |
| Southfork | 0% | 7.30% | 0% | **7.30%** |
| Stratford | 0% | 69.05% | 0% | **69.05%** |
| Loan Funding VII (aka Valhalla) | 0% | 1.83% | 0% | **1.83%** |
| Westchester | 0% | 44.38% | 0% | **44.38%** |

---

[1] Class E Certificates for Liberty CLO, Ltd.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |

### ORDER GRANTING MOTION FOR ORDER IMPOSING TEMPORARY RESTRICTIONS ON DEBTOR'S ABILITY, AS PORTFOLIO MANAGER, TO INITIATE SALES BY NON-DEBTOR CLO VEHICLES

Upon the Motion (the "**Motion**"),[1] filed by Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and NexPoint Advisors, L.P. ("**NexPoint**," and together with HCMFA, the "**Advisors**"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "**Funds**"), seeking an order, pursuant to sections 105(a), 363, and 1107 of the Bankruptcy Code, imposing temporary restrictions on the Debtor's

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

APP. 0439

Appx. 04485

004429

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 444 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 512 of 1017   PageID 5191
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 443 of
2722
Case 19-34054-sgj11 Doc 1522-2 Filed 12/08/20   Entered 12/08/20 23:02:11   Page 2 of 4

ability to initiate sales as portfolio manager (or other similar capacity) for certain non-debtor

investment

308355009 v2

APP. 0440
Appx. 004430
004430

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 445 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25    Page 513 of 1017   PageID 5192
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 444 of
2722
Case 19-34054-sgj11 Doc 1522-2 Filed 12/08/20   Entered 12/08/20 23:02:11   Page 3 of 4

vehicles (the "**CLOs**"); and upon the Declaration of Dustin Norris (the "**Declaration**"); and the

Court, having reviewed the Motion and the Declaration; and due and sufficient notice of the

Motion having been given; and it appearing that no other or further notice need be provided; and

upon the record before the Court; and a hearing having been held on the Motion; and it appearing

to the Court that good cause exists to grant the relief requested by the Motion;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      For a period of thirty days, commencing on the date hereof, the Debtor, in its

capacity as portfolio manager or such other similar role with respect to the CLOs, is hereby

prohibited from causing the CLOs to engage in any asset sales until January ___, 2021.

3.      The Court shall retain jurisdiction over all matters involving the enforcement,

implementation and interpretation of this Order.

# # # END OF ORDER # # #

Submitted by:

K&L Gates LLP
*/s/ Artoush Varshosaz*
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

James A. Wright III (*pro hac vice*)
1 Lincoln Street
Boston, MA 02110
Tel: (617) 261-3193
james.wright@klgates.com

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 446 of
Case 3:25-cv-02072-S      Document 15-7      Filed 06/25      Page 514 of 1017      PageID 5193
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 445 of
2722
Case 19-34054-sgj11 Doc 1522-2 Filed 12/08/20   Entered 12/08/20 23:02:11   Page 4 of 4

*Counsel for Highland Capital Management Fund Advisors, L.P.,
NexPoint Advisors, L.P., Highland Income Fund, NexPoint
Strategic Opportunities Fund, and NexPoint Capital, Inc.*

308355009 v2

APP. 0442

004432

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 447 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 515 of 1017    PageID 5194
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 446 of
2722

# EXHIBIT 5

```
                     IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
 3                                    )    Case No. 19-34054-sgj-11
     In Re:                           )    Chapter 11
                                      )
 4   HIGHLAND CAPITAL                  )    Dallas, Texas
     MANAGEMENT, L.P.,                 )    Wednesday, December 16, 2020
 5                                    )    1:30 p.m. Docket
                                      )
            Debtor.                   )
 6                                    )    - MOTION FOR ORDER IMPOSING
                                      )    TEMPORARY RESTRICTIONS [1528]
 7                                    )    - DEBTOR'S EMERGENCY MOTION TO
                                      )    QUASH SUBPOENA AND FOR ENTRY
 8                                    )    OF PROTECTIVE ORDER [1564,
                                      )    1565]
 9                                    )    - JAMES DONDERO'S MOTION FOR
                                      )    ENTRY OF ORDER REQUIRING
10                                    )    NOTICE AND HEARING [1439]
                                      )
11   _____
                        TRANSCRIPT OF PROCEEDINGS
12             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                      UNITED STATES BANKRUPTCY JUDGE.
13
     WEBEX APPEARANCES:
14
     For the Debtor:              Jeffrey N. Pomerantz
15                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  10100 Santa Monica Blvd.,
16                                  13th Floor
                                  Los Angeles, CA  90067-4003
17                                (310) 277-6910

18   For the Debtor:              John A. Morris
                                  Gregory V. Demo
19                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  780 Third Avenue, 34th Floor
20                                New York, NY  10017-2024
                                  (212) 561-7700
21
     For the Official Committee   Matthew A. Clemente
22   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
23                                Chicago, IL  60603
                                  (312) 853-7539
24

25
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 448 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 516 of 1017    PageID 5195
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 447 of
2722

2

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero:          D. Michael Lynn
                                 Bryan C. Assink
 3                               BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
 4                               420 Throckmorton Street,
                                   Suite 1000
 5                               Fort Worth, TX  76102
                                 (817) 405-6900
 6
     For the Issuer Group:       James E. Bain
 7                               JONES WALKER, LLP
                                 811 Main Street, Suite 2900
 8                               Houston, TX  77002
                                 (713) 437-1820
 9
     For the NexPoint Parties:   James A. Wright, III
10                               K&L GATES
                                 State Street Financial Center
11                               One Lincoln Street
                                 Boston, MA  02111
12                               (617) 261-3193

13   For Highland CLO Funding,   Rebecca Matsumura
     Ltd.:                       KING & SPALDING, LLP
14                               500 West 2nd Street, Suite 1800
                                 Austin, TX  78701
15                               (512) 457-2024

16   Recorded by:               Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
17                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
18                               (214) 753-2062

19   Transcribed by:            Kathy Rehling
                                 311 Paradise Cove
20                               Shady Shores, TX  76208
                                 (972) 786-3063
21

22

23

24
             Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

3

```
1           DALLAS, TEXAS - DECEMBER 16, 2020 - 1:35 P.M.

2           THE COURT:  All right.  This is Judge Jernigan.  We

3     have settings in Highland.  We have -- I guess the very first

4     thing that we had set today was a motion of Dondero, Mr.

5     Dondero wanting some sort of revised procedures for "future

6     estate transactions occurring outside the ordinary course of

7     business."  Then, related to that, we received the other day

8     -- I'm not showing it on the calendar, I'm not sure if that

9     means it's moot now or not, but we had a motion for protective

10    order and a motion to quash with regard to certain depositions

11    that Mr. Dondero wanted in connection with his motion.  The

12    Debtor filed that motion to quash.  It was to quash a

13    deposition of Mr. Dubel, Mr. Nelms, Mr. Sevilla, and Mr.

14    Caruso.  And then we have the CLO Motion, what I'm calling the

15    CLO Motion, of --

16        (Interruption.)

17           THE COURT:  Okay.  Let's --

18           MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

19    The first two motions have been resolved.  And after Your

20    Honor takes appearances, I'm happy to inform the Court of the

21    proposed resolution, and there's an agreed order that we would

22    upload after the hearing.

23           THE COURT:  Okay.  Well, that is certainly music to

24    my ears.  All right.  So I was just trying to lay out the

25    program for what I thought was set, potentially three motions,
```

4

1    one of which was a deposition dispute.

2        All right.  So let's go ahead and get appearances.  Mr.

3    Pomerantz, you're obviously appearing for the Debtor team.

4            MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Or

5    good afternoon, Your Honor.  Jeff Pomerantz; Pachulski Stang

6    Ziehl & Jones.  Also on the video with me today are John

7    Morris and Greg Demo.  They will be handling the CLO Motion,

8    and I will be reporting to the Court on the resolution of Mr.

9    Dondero's motion and our corollary discovery motions.

10           THE COURT:  Okay.  All right.  Well, why don't I take

11   an appearance from Mr. Dondero next.  Mr. Lynn, I see you

12   there.

13           MR. LYNN:  Yes, Your Honor.  I am here with Bryan

14   Assink, who will replace me after the preliminaries when our

15   business is done.  Other than concurring with Mr. Pomerantz, I

16   wanted to advise Your Honor that in the last 30 minutes we

17   filed an additional motion where we're seeking a clarification

18   with respect to the temporary restraining order that the Court

19   entered last week.

20           THE COURT:  All right.  Well, I did see an email from

21   my courtroom deputy right before walking in about that motion,

22   and so that's why I was a little surprised and said "Music to

23   my ears" that there was an agreed order on the Dondero

24   motions.  But I'll get the details --

25           MR. LYNN:  Well, we're --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 451 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 519 of 1017   PageID 5198
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 450 of
2722

5

1          THE COURT:  I'll get the details about that in a

2     minute.  Let me go ahead and get the other appearances.

3        For the Movants on what I've called the CLO Motion, who do

4     we have appearing?

5          MR. WRIGHT:  Good afternoon, Your Honor.  It's James

6     Wright of K&L Gates for the -- I guess I'll call them the

7     Movant for this motion.

8          THE COURT:  Yes.  Sometimes you're referred to as the

9     Advisors and the Funds and -- but Movants on Docket Entry

10    1528.

11       All right.  For the Committee, I know you have weighed in

12    on a couple of these motions.  Who do we have?

13         MR. CLEMENTE:  Good afternoon, Your Honor.  Matt

14    Clemente with Sidley Austin on behalf of the Committee.

15         THE COURT:  All right.  Well, we have a lot of folks

16    on the phone.  I think I've covered everybody who filed a

17    pleading for today.  Is there anyone else who would like to

18    appear?  I'd really like to restrict it only to those who have

19    filed pleadings today.

20         MS. MATSUMURA:  This is Rebecca Matsumura from King &

21    Spalding representing Highland CLO Funding, Ltd.  I don't

22    expect I'll be weighing in today, but there are a couple

23    issues that I may say a sentence on, so I want to go ahead and

24    make my appearance now.

25         THE COURT:  All right.  Thank you.  Anyone else?

6

 1           MR. BAIN:  Yes, Your Honor.  Joseph Bain; Jones

 2   Walker; on behalf of the CLO Issuers.

 3           THE COURT:  All right.

 4           MR. BAIN:  And Your Honor, if we may make certain

 5   comments at the requisite time, we'd appreciate it.

 6           THE COURT:  All right.  Thank you.  Anyone else?

 7        All right.  Well, Mr. Pomerantz, let's hear about the

 8   agreements you have on the Dondero-related motions.

 9           MR. POMERANTZ:  Happy to, Your Honor.  And yes, Mr.

10   Lynn is correct, we saw also an emergency motion that came

11   through that I'll have a couple of comments at the end of my

12   presentation.

13        So, as I mentioned before, Your Honor, I'm pleased to

14   report that with respect to the two motions that Your Honor

15   scheduled for today's hearing, we have an agreement with Mr.

16   Dondero.  One was the motion of Mr. Dondero requiring

17   transactions out of the ordinary course to be brought before

18   this Court.  The second was the Debtor's motion to quash a

19   series of subpoenas that had been issued in the last two days,

20   requiring board members and others to testify.

21        As part of the agreement, we have agreed with Mr. Dondero

22   that his motion, which is presently set for today, shall be

23   continued to January 4th, which is the same date set as the

24   continued hearing on the preliminary injunction relating to

25   the TRO that Your Honor had entered last week.

7

1    As part of that agreement, the Debtor has agreed that it

2    will provide Mr. Dondero with three business days' notice

3    before selling any non-security assets from any managed funds

4    accounts through and including January 13th, which is the date

5    set for confirmation.

6    While, as the Court is aware, the Debtor doesn't believe

7    that any notice, opportunity for hearing, or an order from the

8    Court is required in connection with such transactions, as the

9    Debtor does not have any current plans to sell non-security

10   assets from managed funds before confirmation, it was willing

11   to agree to the notice requirement as essentially a way of

12   resolving the motion before Your Honor today and continuing

13   until the 4th.

14   As part of the agreement as well, Your Honor, the parties

15   have agreed that there will be no further discovery in

16   connection with the motion that is set.  That'll be no

17   additional discovery by Mr. Dondero, so he is withdrawing the

18   subpoenas as it relates to this motion, and there will be no

19   further discovery as -- by the Debtor.  As Your Honor, I

20   think, is aware, there were depositions conducted of both Mr.

21   Seery and Mr. Dondero on Monday in connection with this

22   motion, but the discovery will not happen over the next couple

23   of weeks.

24   Mr. Dondero wanted to make sure, and the Debtor didn't

25   have any opposition, that that agreement with respect to no

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 454 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 522 of 1017 PageID 5201
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 453 of
2722

8

1   discovery only relates to the pending motion before the Court.

2   And in connection with any other matters relating to this

3   bankruptcy case, Mr. Dondero would reserve the right to pursue

4   discovery, and of course the Debtors would reserve the right

5   to challenge discovery if we believed it was inappropriate or

6   unduly burdensome.

7        With respect to the motion that was just filed, Your

8   Honor, we had a chance to briefly review it.  We haven't had a

9   chance to discuss it with the board.  In any event, we don't

10  think there's an emergency.  Mr. Dondero wants the opportunity

11  to approach and communicate with the board.  I've told Mr.

12  Lynn that communications regarding the plan are to go through

13  Mr. Seery.  Mr. Seery is the Debtor's chief executive officer.

14  He's the chief restructuring officer.  And at this point, the

15  board doesn't see a reason or have a desire to meet with Mr.

16  Dondero to talk about his plan, but, again, would be happy to

17  receive any written communications that Mr. Dondero has.

18       Mr. Dondero has sought to modify the TRO to allow him to

19  speak to the board.  Again, if the board agreed to speak with

20  Mr. Dondero, that wouldn't violate the TRO, provided that

21  counsel would be present.  But at this point, the board has

22  decided that it would be inappropriate and not a good use of

23  anyone's time to have that communication and that Mr. Dondero

24  should continue to communicate through Mr. Seery, the Debtor's

25  chief executive officer.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 455 of
Case 3:25-cv-02072-S     Document 15-7     Filed 10/06/25     Page 523 of 1017     PageID 5202
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 454 of
2722

9

1       If Your Honor, after reading the motion and hearing my

2   comments, and I'm sure Judge Lynn's comments that he will make

3   to Your Honor, Your Honor wants to set it for hearing, we

4   would submit, Your Honor, there's no emergency and that a

5   hearing could be set next week, but we would think Your Honor

6   might be able to dispose of the motion just on the papers and

7   the limited argument that would go on today.

8            THE COURT:  All right.

9            MR. POMERANTZ:  Thank you, Your Honor.

10           THE COURT:  All right.  Mr. Lynn, first, could you

11  confirm the terms of the agreed order that Mr. Pomerantz just

12  announced are consistent with what you and your client

13  believed was negotiated?

14           THE CLERK:  He's on mute.

15           THE COURT:  You're on mute, sir.

16           MR. LYNN:  Mr. Pomerantz has correctly stated the

17  agreement of the parties.  I am pleased to advise Your Honor

18  that I expect that we will withdraw the motion that is

19  presently pending to be heard on January 4th, since all we

20  were asking for was notice until confirmation date.  If those

21  sales are going to take place before then, we don't have a

22  problem any longer with the pre-confirmation activity of Mr.

23  Seery.

24       With regard to the motion that we filed requesting that

25  the temporary restraining order be modified, we would point

10

 1    out, respectfully, that the independent board is the board of

 2    directors of Strand Advisors.  Strand Advisors belongs to Mr.

 3    Dondero.  It is not unreasonable for the sole stockholder of

 4    Strand Advisors to ask the board questions or present thoughts

 5    to the board or ask its advice.  Mr. Seery, on the other hand,

 6    while being a member of the board of Strand, is the chief

 7    executive officer and the chief restructuring officer of

 8    Highland, which is not the same as Strand.

 9         Furthermore, Your Honor, Mr. Dondero has been attempting

10    for several months to negotiate an arrangement by which the

11    Debtor can continue as a going concern.  It is his desire to

12    discuss further with the board as a whole what he can do in

13    that regard.  I think the Court, by directing him originally

14    to participate in the mediation that took place in September,

15    expected him to do so.  He has attempted to do so.  And while

16    he has not gotten a response from the Creditors' Committee

17    that is definitive, he has at least caught the interest of Mr.

18    Seery, though that interest may have died for a variety of

19    reasons in recent weeks.

20         And by the way, next week is fine with us.  We're not in a

21    hurry beyond that if the Court feels further discussion would

22    be useful.

23         MR. POMERANTZ:  Your Honor, just a couple of points

24    in response.

25         Mr. Dondero has the right to request an audience with the

11

1   board.  He has requested the audience with the board.  The

2   board has considered it and decided not to communicate in that

3   fashion with Mr. Dondero at this time.  There is nothing that

4   Your Honor can do in the TRO that would change that, other

5   than ordering the board to speak with Mr. Dondero, which I

6   highly doubt Your Honor would do.

7       Having said that, this board in general and Mr. Seery in

8   particular have been very supportive of an overall resolution

9   to this case, not only with the creditors, but with Mr.

10  Dondero.  Mr. Seery has spent tens if not hundreds of hours

11  over the last several months working with Mr. Dondero to try

12  to get him in a position to present something that would have

13  traction with the Unsecured Creditors.  Unfortunately, that

14  hasn't occurred.  We understand there have been communications

15  between Mr. Lynn and Mr. Clemente.  And if there is any hope

16  of a plan and any traction with the creditors, this Debtor in

17  general and Mr. Seery in particular stands ready, willing, and

18  able to do anything within the Debtor's power to help that

19  out.

20      So, it's not really the Debtor standing in the way.  It's

21  an economic agreement ultimately that needs to be reached with

22  Mr. Clemente and his constituents and Mr. Lynn.  And if that

23  can be reached, we will be the first to jump on that bandwagon

24  and do everything humanly possible to have that occur.

25      Thank you, Your Honor.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 458 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 526 of 1017 PageID 5205
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 457 of
2722

12

```
 1          THE COURT:  All right.  Well, again, I've not read
 2   the motion.  I've just seen an email that I have this motion.
 3   I'm a little bit confused.  I don't want to spend too long on
 4   this because we have another motion to get to.  But I'm a
 5   little bit confused on how Dondero wants the TRO to be
 6   modified.  If he has the right already to request an audience
 7   of the board, what is it that is problematic about the TRO
 8   that he wants modified?
 9          THE CLERK:  He's on mute.
10          THE COURT:  You're on mute.
11          MR. LYNN:  Sorry, Your Honor.  As I told you before,
12   you must forgive me, my command of technology is not great.
13      In response, I would say that I question whether it is
14   appropriate, in advance of a meeting with the board of his
15   company, that what he wants to talk about should be screened.
16   And that is what has occurred in our effort to meet by
17   telephone with the board.
18      Any such meeting would, of course, be subject to the
19   restraints that are included in the temporary restraining
20   order, in that both Mr. Pomerantz or his designee and I would
21   participate in any such discussion.  I respectfully submit
22   Strand is his.  Nobody may like that, but it is his, and he
23   ought to be able to talk to his own board.
24          THE COURT:  Is this about having a conversation
25   without the Committee's involvement?  I just don't -- hmm.  I
```

13

1    just need to see the motion.

2       Mr. Clemente, anything you want to add at this juncture?

3    Have you even reviewed the motion yet?

4              MR. CLEMENTE:  Your Honor, I apologize.  I haven't

5    actually even seen the motion.  And so I have no comment on

6    it, Your Honor.  I apologize for not having been able to look

7    at it.

8              THE COURT:  Okay.  Well, what about the agreed order

9    that's been announced?  Any comment on that?

10             MR. CLEMENTE:  Your Honor, we support the resolution

11   that Mr. Pomerantz announced on the record.

12             THE COURT:  Okay.  All right.  Well, I assume there's

13   nothing further, then, on the Dondero motions that were

14   scheduled today?

15      All right.  So I will happily accept the agreed order that

16   has been announced.  For now, we will continue the Dondero

17   motion that was Docket Entry No. 1439 to January 4th, when the

18   preliminary injunction hearing is set.  And we -- I understand

19   there are going to be no more discovery requests in connection

20   with these matters that were set today.

21      And I will review the motion that Mr. Dondero has filed

22   shortly before today's hearing in chambers later, and I will

23   have my courtroom deputy communicate to the lawyers whether I

24   see fit to set it for an emergency hearing next week or rule

25   on the pleadings or set it for January 4th.  Those are, I

14

```
 1   guess, the three possibilities I can think of that I might

 2   decide upon.

 3       So, again, I'm not making any ruling at all on a motion I

 4   haven't read yet.  So I'll -- the courtroom deputy will let

 5   you all know, if not later today, tomorrow.  Probably

 6   tomorrow, because I have a confirmation hearing set later

 7   today in another case.

 8       All right.  So, thank you all for working these issues

 9   out.  And Mr. Pomerantz, Mr. Dondero -- or, excuse me, Mr.

10   Lynn, anything further on the Dondero disputes?

11           MR. POMERANTZ:  Nothing from the Debtor, Your Honor.

12           MR. LYNN:  Your Honor, nothing from Mr. Dondero.  May

13   I be excused?

14           THE COURT:  Is anyone anticipating needing Mr.

15   Dondero's counsel for the other matter?  All right.  If not,

16   then I certainly have no problem with you dropping off the

17   line, Mr. Lynn.  Thank you.

18           MR. LYNN:  Thank you, Your Honor.

19           THE COURT:  Okay.  All right.  So let's turn next to

20   the CLO Motion.  I take it there are no agreements on this

21   one?

22           MR. POMERANTZ:  There are not, Your Honor.

23           MR. WRIGHT:  There are not, Your Honor.  I can

24   confirm that.

25           THE COURT:  All right.  Mr. Wright, do you have
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 461 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 529 of 1017 PageID 5208
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 460 of
2722

15

 1    anything you want to say as far as an opening statement before

 2    we go to the evidence?

 3            MR. WRIGHT:  I don't, Your Honor.  My intention, if

 4    it's okay with you, you asked me to bring a witness, so I do

 5    have Mr. Norris from my client, and I was going to just remind

 6    the Court who I am and state the name of all of my Movants,

 7    and then I was going to move directly to put him on the stand

 8    and go through a brief direct.

 9            THE COURT:  All right.  I think I heard Mr. Morris is

10    going to handle this phase of the hearing.

11            MR. DEMO:  And Your Honor, this is Greg Demo from

12    Pachulski on behalf of the Debtor.

13            THE COURT:  Oh, okay.

14            MR. DEMO:  We would like to make a brief opening

15    statement before we have witnesses, if that's all right with

16    Your Honor.

17            THE COURT:  All right.  I'm fine with that.  So, --

18            MR. DEMO:  All right.

19            THE COURT:  -- go ahead.

20            MR. DEMO:  All right.  Well, thank you, Your Honor.

21    Again, Greg Demo; Pachulski Stang; on behalf of the Debtor.

22        We are here today on what really amounts to the third of

23    three motions that deal with Mr. Dondero's attempts, either

24    directly or through a proxy, to transfer control away from the

25    Debtor and back to Mr. Dondero.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 462 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 530 of 1017 PageID 5209
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 461 of
2722

16

1      The current motion is filed by NexPoint Capital and

2  Highland Capital Management Fund Advisors and three of their

3  managed funds:  Highland Income Fund, NexPoint Capital, and

4  NexPoint Strategic Opportunities Funds.

5      Mr. Dondero owns and controls NexPoint Capital and

6  Highland Capital Management Fund Advisors.  While both

7  NexPoint Capital and Highland Capital Management Fund Advisors

8  are governed by boards, the boards have no investment

9  authority with respect to the funds they manage, nor was the

10  boards' approval necessary to file the motion, or obtained.

11      Mr. Dondero is the sole portfolio manager for NexPoint

12  Strategic Opportunities Fund and Highland Income Fund.  Mr.

13  Dondero is one of three portfolio managers for NexPoint

14  Capital.  Mr. Dondero's decisions are not subject to

15  oversight.

16      The Movants disclosed these facts in their recent SEC

17  filings, and there can be no dispute that Mr. Dondero is the

18  controlling figure behind the Movants in the relief being

19  sought in the motion which seeks to impede the Debtor's

20  efforts to exercise its rights as a CLO manager.

21      The fact that this motion was even filed is quite

22  surprising, since on December 7th the Debtor filed a complaint

23  and TRO based upon Mr. Dondero's unlawful efforts to frustrate

24  the Debtor's efforts to sell assets from the very CLOs that

25  are the subject of this motion.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 463 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 531 of 1017   PageID 5210
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 462 of
2722

17

1      The Court granted the TRO on December 10th.  Mr. Dondero

2   also filed a motion seeking similar relief in November, which

3   has now been adjourned to January 4th.

4      The Movants are essentially now seeking an order from this

5   Court enjoining the Debtor from exercising its rights as a CLO

6   manager and requiring the Debtor to seek the Movants' and Mr.

7   Dondero's permission to fulfill its obligations as a manager

8   for the CLOs.

9      The Movants, however, do not come right out and say this,

10   and instead couch the motion as seeking to simply pause the

11   CLOs' asset sales while the Movants and the Debtor engage in

12   discussions regarding the future of the CLOs' management.

13      In the motion, the Movants also argue the Debtor has made

14   decisions detrimental to the interests of the preference

15   shareholders because the Debtor is trying to monetize its

16   assets in a manner inconsistent with the preference shares'

17   objectives.

18      The Movants simply mischaracterize the facts, the parties'

19   respective rights under contracts, and the law.

20      First, to the extent the Movants hold interests, they hold

21   only preference shares in the CLOs and are minority investors

22   in the preference shares of 12 of the 15 CLOs at issue.  In

23   one third of the CLOs, the Movants' interests sit behind

24   senior debt which must be paid first.

25      Notably, Your Honor, no other investors in the CLOs are

18

 1   here or have expressed support for the Movants' position.

 2        Second, the Movants simply have no right under the

 3   contracts governing the CLOs to the relief they are

 4   requesting.  The CLOs are governed by a series of agreements

 5   which were agreed to long ago and dictate the rights of all

 6   investors of the CLOs.  The enforceability of those agreements

 7   is relied on by all investors, not just the Movants.

 8        Under these agreements, investment discretion is given to

 9   the CLOs' manager -- in this case, the Debtor -- and no

10   investor has the right to direct the CLO manager.  The manager

11   was chosen to manage the CLOs' assets.  No individual investor

12   was chosen to manage the CLOs' assets.

13        Simply said, there will be no evidence that the Movants

14   have the right to do what they're trying to do, and there will

15   be no evidence that the Movants' preferences with respect to

16   the CLOs' assets is in line with that of the other investors

17   in the CLOs.

18        Under the relevant agreements, if an investor is not happy

19   with a manager's performance, the investor's rights are

20   generally limited to replacing the manager.  The investors

21   here -- excuse me, the Movants here -- have not done that and

22   cannot do that.  Under the agreements, replacement requires at

23   least the majority of the preference shares that are not

24   affiliates of the managers.  In 12 of the 15 CLOs, the Movants

25   hold a substantial minority interest position.  They are not

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 465 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 533 of 1017   PageID 5212
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 464 of
2722

19

1   the majority.  In the three CLOs in which they are the

2   majority, the Movants still cannot replace the Debtor as the

3   investment manager because they are the Debtor's affiliates.

4       It is indisputable that, prior to January 9th, when Mr.

5   Dondero was removed from control of the Debtor, that the

6   Debtor, NexPoint Advisors, Highland Capital Management Fund

7   Advisors, and the three funds were the Debtor's affiliates

8   because of Mr. Dondero's common control.

9       After January 9th, where the Court removed Mr. Dondero

10  from control of the Debtor, the Debtor is arguably, under the

11  documents, not an affiliate.  However, Your Honor, the Movants

12  have disclosed in their recent proxy statements filed in 2020

13  that they still consider themselves the Debtor's affiliate,

14  and they should be bound by that statement.  The Movants, by

15  virtue of Mr. Dondero's being removed from control of the

16  Debtor, should not be able to use that removal to reassert

17  control over the CLOs that were taken away from Mr. Dondero

18  when he was removed in January 2020.

19      The Debtor believes that additional briefing may be needed

20  on this issue, and that a ruling specifically on this issue

21  and the parties' relative rights under the CLO management

22  agreements may be needed.  The Debtor reserves its right to

23  brief this issue and to bring it before this Court, either as

24  a declaratory judgment or any other procedurally-appropriate

25  motion.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 466 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 534 of 1017   PageID 5213
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 465 of
2722

20

1    Because the Debtor -- excuse me.  The Movants have no

2  right to the relief requested.  They argue that the relief is

3  justified because of the mismatch between the investors'

4  timelines and the Movants'.  This is not true.  The Movants

5  cite to three transactions to justify their statement in the

6  motion:  SSP, OmniMax, and certain recent transactions.

7    The recent transactions were the attempted sales of two

8  public equities immediately before Thanksgiving that Mr.

9  Dondero interfered with.  You'll hear testimony from Mr. Seery

10  about each of these transactions and how each was in the best

11  interest of the CLOs.

12    First, SSP.  SSP is a steel business that was suffering

13  for a number of reasons.  The Debtor's investment team

14  believed SSP should be sold since 2019.  The Debtor received

15  multiple offers for SSP, the Debtor evaluated these offers,

16  and the Debtor choose the one that was the best.  The SSP sale

17  closed in early November.

18    Notably, Your Honor, none of the CLOs held an equity

19  interest in SSP, its parent, or in Trussway.  Instead, they

20  held debt, and they got exactly what they bargained for,

21  repayment of their debt obligations in full.

22    OmniMax, Your Honor, is the second one.  It is a

23  fabricator of building materials.  The CLOs and the Movants

24  held an interest in OmniMax debt which they have been trying

25  to refinance or equitize since 2019.  That deal was intended

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 467 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 535 of 1017   PageID 5214
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 466 of
2722

21

1  to include the Movants, but instead of working with the

2  Debtor, Mr. Dondero held out and used the threat of litigation

3  against OmniMax to secure a higher price for the Movants, to

4  the detriment of the CLOs.

5      As Mr. Seery will testify, these two transactions were all

6  about maximizing value and have nothing to do with investment

7  timelines.

8      Finally, Your Honor, the Movants reference the

9  Thanksgiving transactions.  These transactions were discussed

10 in the context of Mr. Dondero's TRO.  Mr. Seery directed

11 Debtor personnel, on the advice of his investment team, to

12 sell these securities.  Mr. Dondero blocked those trades.  Now

13 the Movants argue that the reason those trades were blocked

14 was because of a mismatch between the Movants' and the

15 Debtor's investment timelines.  That is not the case.  Mr.

16 Seery will testify as to these trades.  The Debtor is an

17 investment manager and appreciates that its decisions with

18 respect to how it manages its assets are -- is a judgment

19 call.  The evidence, however, will show that the Debtor at all

20 times exercised that judgment in good faith based on all

21 available information.

22     The Movants may disagree with the Debtor's judgment, Your

23 Honor, but that is irrelevant.  The Movants have no right to

24 interfere with the Debtor's management of the CLOs.  There is

25 simply no statutory or contractual basis for this, not under

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 468 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 536 of 1017   PageID 5215
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 467 of
2722

22

1  Section 363 and not under the CLO agreements.

2      Finally, Your Honor, -- I guess not finally.  There's one

3  more point I want to make.  But Your Honor, this -- what we're

4  here on today is notably similar to the Acis bankruptcy that

5  Your Honor noted last time we were here last week.  In that

6  bankruptcy, HCLOF tried to direct the collateral manager to

7  take certain actions that HCLOF thought were in the best

8  interest of the CLOs.  In this case, the Movants, through Mr.

9  Dondero, are trying to file an action that functionally seeks

10 to direct the Debtor to take interests that the Movants

11 believe are in their best interest.  There is substantial

12 overlap between the litigation in Acis and the litigation

13 here.

14     Finally, Your Honor, the Debtor has been in discussions

15 with the CLOs' counsel on this issue.  And the Debtor has been

16 informed that the CLOs' position is that the Debtor's ability

17 to operate under the management agreements should not be

18 interfered with, not by the Movants or not by any other party.

19     Thank you, Your Honor.  With that, I will turn it over to

20 Mr. Norris.  Or, I'm sorry, Mr. Wright.

21          THE COURT:  All right.  Mr. Wright, you may call your

22 witness.

23          MR. WRIGHT:  All right, Your Honor.  Dustin Norris

24 should be -- should be dialed in and should be available on

25 screens.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 469 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 537 of 1017   PageID 5216
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 468 of
2722

Norris - Direct                    23

1          THE COURT:  Okay.  I'm going to --

2          MR. WRIGHT:  I'll pause and have him confirm that.

3          THE COURT:  I'm going to ask you, Mr. Wright, to

4   speak up or closer to your device.  I didn't hear the name of

5   your witness.

6          MR. WRIGHT:  Sure.  Sorry.  It's Dustin Norris.  I --

7   last time, you were having trouble hearing me, and so I'm

8   trying a different device this time.  I actually followed the

9   instructions that I found very helpful, so I'm trying my phone

10  in hopes that it will work better.

11         THE COURT:  All right.

12         MR. WRIGHT:  But, yeah, it's Dustin Norris.  D-U-S-T-

13  I-N, N-O-R-R -- N-O-R-R-I-S.

14         THE COURT:  All right.  Mr. Norris, can you say

15  "Testing one two" so we pick up your video?

16         MR. NORRIS:  Testing one two.

17         THE COURT:  All right.

18         MR. NORRIS:  Testing one two.

19         THE COURT:  All right.  Please raise your right hand.

20            DUSTIN NORRIS, MOVANTS' WITNESS, SWORN

21         THE COURT:  All right.  Mr. Wright, you may proceed.

22         MR. WRIGHT:  Thank you, Your Honor.

23                      DIRECT EXAMINATION

24  BY MR. WRIGHT:

25  Q   Mr. Norris, you're employed by NexPoint Advisors?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 470 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25   Page 538 of 1017   PageID 5217
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 469 of
2722

                         Norris - Direct                24

1   A    I am.  That's correct.

2   Q    And what is your title and role there?

3   A    Yeah.  I am the executive vice president of NexPoint

4   Advisors.  In that role, I oversee business development,

5   marketing, sales, investor relations.  And as far as the funds

6   advised by the advisor, I'm the liaison with the independent

7   board on the business side.

8   Q    Thank you.  Do you also have a role for Highland Capital

9   Management Fund Advisors?

10  A    I do.  I'm also the same executive vice president and

11  fulfill that same role as it pertains to business development,

12  sales, investor relations.  And in both, I'm also working on

13  product development.  So, launching, developing new products

14  and investment funds.

15  Q    Do you also have a role for Highland Income Fund, NexPoint

16  Strategic Opportunities Fund, and NexPoint Capital, Inc.?

17  A    I do.  I'm also executive vice president for each of those

18  funds.

19  Q    Thank you.  Have you ever served on the boards of these

20  three funds?

21  A    I have.  I've served as the interested trustee, sole

22  interested trustee for each of these funds.  I'm no longer the

23  board member or interested trustee, but still serve as an

24  officer, executive vice president, for each fund.

25  Q    At times, I'm going to refer to NexPoint Advisors, LP and

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 471 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 539 of 1017    PageID 5218
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 470 of
2722

Norris - Direct                    25

1   Highland Capital Management Fund Advisors, LP simply as the

2   Advisors, to avoid having to keep saying their long names.

3   And similarly with the three funds that are part of the

4   motion, I may just call them the Funds.

5       Can you explain the relationship between the Advisors and

6   the Funds, briefly?

7   A   Yeah.  So, each of these are investment companies that are

8   registered under the Investment Company Act of 1940.  So, with

9   that comes a unique relationship between an investment advisor

10  and the funds themselves.  The Funds don't have employees.

11  They rely on the investment advisor and investment advisor

12  employees.  And between the Funds and the Advisors is an

13  investment advisory agreement.  And the Funds themselves are

14  also overseen by an independent board, and that's by statute

15  by the 1940 Act.

16  Q   Okay.  And just to be clear, when you said that these are

17  -- entities are investment companies, you meant that the three

18  Funds are investment companies?

19  A   Correct.  Correct.  The three Funds are investment

20  companies.  The investment advisors are not investment

21  companies.

22  Q   Thank you.  Can you explain the role of the board for the

23  Funds?

24  A   Yeah.  So, as prescribed by the Investment Company Act of

25  1940, there are certain obligations related to an investment

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 472 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 540 of 1017    PageID 5219
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 471 of
2722

Norris - Direct                           26

1    company, and one of those is they must be overseen by an

2    independent board.  And the independent board has a

3    responsibility to oversee the -- certain material agreements,

4    including the advisory agreement.  And we meet regularly with

5    the boards.  They overseas certain processes and, again, all

6    material contracts.  And the board is, by Section 15(c) of the

7    1940 Act, required by law to annually review the capabilities

8    of the Advisor and to either approve or reject the advisory

9    contracts.  So, each year, those contracts are renewed by the

10   independent board.

11       There are certain obligations of the Fund and operations

12   that are delegated responsibility to the investment advisors.

13   That includes portfolio management and investment decisions.

14   But all those are overseen by the board.

15   Q   Okay.  And are the boards involved in the day-to-day

16   operations of the Funds?

17   A   They're not.

18   Q   Okay.  And do you know who the members of the boards of

19   these three Funds are?

20   A   I do.

21   Q   Could you share that with us?

22   A   Yeah.  So, the -- there is one interested trustee of each

23   board, and that's John Honis.  And then for the Highland

24   Income Fund and the NexPoint Strategic Opportunities Fund --

25   sorry, for NexPoint -- for Highland Income Fund and NexPoint

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 473 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 541 of 1017   PageID 5220
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 472 of
2722

Norris - Direct                    27

1  Capital, we have the same three disinterested or independent

2  trustees, and that's Bryan Ward, Dr. Bob Froehlich, and Ethan

3  Powell.  And for NexPoint Strategic Opportunities Fund, we

4  have the same four trustees, one interested, three

5  independent, but there's another fourth independent trustee,

6  Ed Constantino.

7  Q   And when you refer to independent trustees, do you mean

8  independent for purposes of the Investment Company Act of

9  1940, as amended?

10 A   That's correct.  They, by statute, they are independent

11 trustees.  They also have an independent legal counsel.  Stacy

12 Louizos represents them from Blank Rome.  And also two of

13 these Funds are listed on the New York Stock Exchange, and the

14 New York Stock Exchange has various independence requirements

15 that each independent director has met.

16 Q   Thank you.  And which are the two Funds that are listed on

17 NYSE?

18 A   The Highland Income Fund and the NexPoint Strategic

19 Opportunities Fund are both NYSE-listed.

20 Q   And I know you probably haven't memorized everybody who

21 invests in the Funds, but can you give us a general idea of

22 who invests in these Funds?

23 A   Certainly.  I definitely have not memorized them.  There

24 are thousands of individual investors in each of these Funds.

25 Part of my role overseeing investor relations and sales, I do

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 474 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 542 of 1017    PageID 5221
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 473 of
2722

Norris - Direct                    28

1   talk to a lot of those investors.  But the majority of the

2   investors in each of these Funds are individual investors.

3       As '40 Act Funds, almost anybody with a brokerage account

4   can buy them.  They have tickers, particularly the Funds that

5   are listed.  Closed-end funds.  And so, with that, it is mom-

6   and-pop investors.  It's retail investors,  including myself.

7   I've allocated my 401(k) to these funds, the majority of my

8   401(k) to these funds.  But there are also institutional

9   investors.  There's hedge funds.  There's ETFs.  There are

10  large high-net-worth individuals.  But the majority of it is

11  individual investors that have invested through their

12  brokerage firms, be it Wells Fargo, Morgan Stanley, or Cetera.

13  These are -- these are -- these are the individual investors.

14  Q    Thank you.  Does Mr. Dondero have investments in the

15  Funds?  Do you know?

16  A    He does.  He's invested in each of the Funds.

17  Q    Does he have a majority investment in any of the Funds?

18  A    He does not have a majority investment in any of the

19  Funds.

20  Q    Thank you.  Does Mr. Dondero have a control relationship

21  with the two Advisors?

22  A    Yes.  He does.  With the Advisors.

23  Q    And does he have a control relationship with the Funds?

24  A    As it pertains to portfolio management, he is a portfolio

25  manager of each Fund.  But as discussed, as I mentioned, the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 475 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 543 of 1017   PageID 5222
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 474 of
2722

Norris - Direct                          29

1   independent board on an annual basis has the ability to

2   terminate or renew our advisory contracts, and that -- that

3   dynamic removes the control, overall control, of the Funds in

4   that regard.

5   Q   Are you familiar with the motion that the Court I think

6   has accurately referred to as the CLO Motion that was filed by

7   the two Advisors and the three Funds?

8   A   Yes.  I am familiar with it.

9   Q   And I'm going to ask you a question now that I think is of

10  interest to the Court, based on the last time I was in front

11  of Judge Jernigan.  Were any employees of the Debtor involved

12  in deciding to bring this motion or in preparing the motion?

13  A   No.  None of the HCMLP employees, to my knowledge, were

14  involved in preparing or deciding to bring the motion.

15  Q   Okay.  And you investigated who was involved in preparing

16  the motion, so your knowledge is pretty good on this point?

17  A   Correct.  I have.  And none were involved, based on that

18  investigation.

19  Q   (garbled) involved in deciding to bring a motion,

20  preparing it, other than outside counsel and my firm?

21  A   Yeah.  So, the initial cause for concern was raised by Mr.

22  Dondero himself to our legal -- internal legal team and

23  compliance team.  And working together with them, myself, and

24  outside counsel, and senior management of Highland Capital

25  Management Fund Advisors, including Joe Sowin, we prepared the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 476 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 544 of 1017   PageID 5223
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 475 of
2722

```
                         Norris - Direct                    30
```

1   order.  Or, sorry, not the order, the motion.

2   Q   All right.  Thank you.  Were the boards of the three Funds

3   involved at all with bringing the motion?

4   A   They were not involved in the preparation of the motion

5   itself.  They were aware and supportive, but they did not

6   prepare the motion.

7   Q   You provided a (audio gap), correct?

8   A   Sorry.  You did cut out there.  I didn't hear the

9   question.

10  Q   I'll try again.  You provided a declaration (garbled)

11  motion, correct?

12  A   I did, yes.

13  Q   And there are two exhibits to your declaration.  There's

14  an Exhibit A and an Exhibit B.

15  A   Correct.

16  Q   Exhibit A, does this reflect the current repayment status

17  of the various CLOs as we -- as you understand it to be as of

18  December 1st?

19  A   Yes, it does.

20  Q   And does Exhibit (garbled) of the three Funds --

21          THE COURT:  Okay.  Mr. --

22  BY MR. WRIGHT:

23  Q   -- and the various CLOs, --

24          THE COURT:  Mr. Wright?

25  BY MR. WRIGHT:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 477 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 545 of 1017 PageID 5224
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 476 of
2722

                              Norris - Direct                    31

1   Q   -- as you understand it?

2           THE COURT:  Mr. Wright, time out.  Two things.

3   First, I don't know what you can do to improve --

4           MR. WRIGHT:  Sure.

5           THE COURT:  -- your connection, but you're

6   occasionally breaking up a little.

7        But second, can we be clear for myself, the record,

8   everyone else, what you're referring to right now?  We have an

9   Advis... your witness and exhibit list is at Docket 1573.  Is

10  that what I should be looking at first?

11          MR. WRIGHT:  Yes, Your Honor.  The declaration of Mr.

12  Norris.  It's Docket 1522-1.  And it's on our exhibit list.

13  It may be the only exhibit on our exhibit list, frankly.

14          THE COURT:  Okay.  So you're talking about his

15  declaration now, not the witness and exhibit list with the

16  attachments to it?  Actually, it is attached here.  Exhibit A.

17  Okay.  I'm there.  I went to Exhibit A in your attachments to

18  your exhibit list at 1573.

19       All right.  Let's try again with your question you just

20  asked.

21          MR. WRIGHT:  Sure.

22  BY MR. WRIGHT:

23  Q   So, Mr. Norris, Exhibit A, this reflects the current

24  repayment status of the CLOs that are the subject of the

25  motion as of December 1.  Correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 478 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 546 of 1017    PageID 5225
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 477 of
2722

Norris - Direct                          32

1   A    Correct.

2   Q    And then --

3          MR. WRIGHT:  Your Honor, if you turn to Exhibit B,

4   which is just a couple pages forward.

5          MR. MORRIS:  Your Honor, I would ask that this be put

6   up on the screen, if possible.

7          THE COURT:  Yes.  Can you do that, please?

8          MR. WRIGHT:  I'm sorry.  I couldn't hear that, John.

9          THE COURT:  He asked if you could --

10          MR. MORRIS:  I would --

11          THE COURT:  -- share your screen.  Can you share your

12   screen as to what you're looking at?

13          MR. WRIGHT:  Can I share my screen?  Last time I was

14   using a computer and you were having trouble hearing me, so

15   this time I'm doing it on my phone.  So my phone, no, I don't

16   have this on my phone to share my screen that way.  It's

17   Docket 1522-1, and it's the only exhibit that was on our

18   exhibit list.

19          MR. MORRIS:  No objection, Your Honor.

20          MR. WRIGHT:  All it shows is the holdings in Funds in

21   the CLOs.  That's all it is.

22          MR. MORRIS:  No objection, Your Honor.

23          THE COURT:  Okay.

24          MR. NORRIS:  I'm sorry, John.  I didn't hear.

25          THE COURT:  Give me a minute, because I was at 1573,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 479 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 547 of 1017 PageID 5226
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 478 of
2722

                        Norris - Direct                    33

 1   your witness and exhibit list.

 2        (Pause.)

 3             THE COURT:  Okay.  That's not the correct docket

 4   number.

 5             MR. MORRIS:  Your Honor?

 6             THE COURT:  Yes?

 7             MR. MORRIS:  If I may, it's John -- it's John Morris.

 8   It's Docket No. 1528.  And the declaration can be found at

 9   Page 12 of 26.

10             MR. WRIGHT:  Thank you.

11             THE COURT:  1528?

12             MR. WRIGHT:  That's bizarre, because I have a

13   printout of it and it says Docket 1522-1.

14             THE COURT:  Okay.  1528 is the -- the actual motion

15   we've set for hearing.

16             MR. MORRIS:  And it's attached to that, yes.  If you

17   -- if you go to PDF Page 12, it's the first page of the

18   declaration.

19             THE COURT:  Okay.  I'm there now.  Okay.  So we're on

20   that declaration.  And then you were having the witness look

21   first at Exhibit A to that declaration.  And then where are

22   you having him look next?  Exhibit B, which is entitled

23   "Holdings of Preferred Shares in CLOs"?

24             MR. WRIGHT:  Exhibit B, Your Honor.

25             THE COURT:  Okay.  Continue.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 480 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 548 of 1017    PageID 5227
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 479 of
2722

Norris - Direct                      34

1        MR. WRIGHT:  (garbled) I think some of the exhibits

2  that I have had the wrong docket number printed on the top,

3  and I --

4  BY MR. WRIGHT:

5  Q    Exhibit B.  So, Mr. Norris, Exhibit B to your declaration

6  shows the holdings of the preference shares of the Funds in

7  the various CLOs that are the subject of the motion, correct?

8  A    That's correct.  One clarification.  It shows the

9  percentage ownership of each of those preference share

10  tranches that each Fund owns.

11  Q    Thank you.  Mr. Norris, do the three Funds have a date by

12  which they have to liquidate their investments?

13  A    Sorry, you did skip out there.  If you could you repeat

14  the question.  I apologize.

15  Q    It's frustrating.  Do the three Funds have a date by which

16  they must liquidate their investments?

17  A    No.  They do not.

18  Q    Okay.  Can you briefly explain why the Advisors and the

19  Funds brought this motion?

20  A    Yeah.  The Advisors and the Funds were concerned with

21  certain transactions, as described in the motion.  As

22  preference share owners, we own the majority or a substantial

23  portion of the economics of most of these CLOs, and in three

24  instances the majority of the economic benefit.  And there was

25  concern with the way that the sales were executed.  And so,

Norris - Cross                               35

1   with that, we're simply asking for a temporary relief in order

2   to benefit and to maximize the recovery for our preference

3   shares that we own.

4   Q    Thank you.

5          MR. WRIGHT:  All right, Your Honor.  I have no

6   further questions for Mr. Norris, although I guess I reserve

7   the right to redirect.

8          THE COURT:  All right.  Cross-examination?

9          MR. MORRIS:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11  BY MR. MORRIS:

12  Q    Good afternoon, Mr. Norris.  Can you hear me?

13  A    I can.  Thank you, Mr. Morris.

14  Q    All right.  I'm going to go into a little bit more detail

15  about some of the topics that you discussed.  To be clear

16  here, there are five moving parties; is that right?

17  A    That's correct.  The two Advisors and the three Funds.

18  Q    And one of the advisory firms is Highland Capital

19  Management Fund Advisors, LP; is that right?

20  A    That's correct.

21  Q    And I'll refer to that as Fund Advisors; is that okay?

22  A    That's great.

23  Q    James Dondero and Mark Okada are the beneficial owners of

24  Fund Advisors, correct?

25  A    That is my understanding, yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 482 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 550 of 1017    PageID 5229
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 481 of
2722

Norris - Cross                     36

1  Q    And your understanding is that Mr. Dondero controls Fund

2  Advisors, correct?

3  A    That's correct.

4  Q    And the other advisory firm that brought the motion is

5  NexPoint Advisors, LP; is that right?

6  A    That is correct.

7  Q    And Mr. Dondero is the beneficial owner of NexPoint; is

8  that right?

9  A    A family trust where Jim is the sole beneficiary, I

10  believe, controls or owns NexPoint Advisors.

11  Q    Okay.  And Mr. Dondero --

12  A    Or 99.9 percent of NexPoint Advisors.

13  Q    Thank you for the clarification.  Mr. Dondero controls

14  NexPoint; is that right?

15  A    Correct.

16  Q    All right.  And I'm going to refer to Fund Advisors and

17  NexPoint as the Advisors going forward; is that fair?

18  A    That's fair.

19  Q    Each of the Advisors manages certain funds; is that right?

20  A    That is correct.

21  Q    And three of those funds that are managed by the Advisors

22  are the Movants on this motion, correct?

23  A    Correct.

24  Q    All right.  The Advisors caused these three Funds to

25  invest in CLOs that are managed by the Debtor; is that right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 483 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 551 of 1017   PageID 5230
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 482 of
2722

Norris - Cross                     37

1   A    The portfolio managers working for the Advisors did.

2   That's correct.

3   Q    And Mr. Dondero is the portfolio manager of the Highland

4   Income Fund; is that right?

5   A    He is one of the portfolio managers for that Fund.

6   Q    And he's also --

7   A    I believe there are two.

8   Q    And he's also a portfolio manager of NexPoint Capital,

9   Inc., one of the Movants here, right?

10  A    That is correct.

11  Q    And he's also the portfolio manager of NexPoint Strategic

12  Opportunities Fund, another Movant; is that right?

13  A    Yes.  That is correct.

14  Q    Okay.  And I think you testified earlier that each of

15  these Funds has a board.  Is that right?

16  A    That is correct.

17  Q    But the boards don't make investment decisions for the

18  Funds, do they?

19  A    They do not.  They have delegated that authority.

20  Q    And that authority to make investment decisions is

21  delegated to the Advisors; is that right?

22  A    Yes.

23  Q    Okay.  And none of the boards of the Funds who are Movants

24  here adopted any resolution authorizing the Funds to file this

25  motion; is that right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 484 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 552 of 1017    PageID 5231
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 483 of
2722

Norris - Cross                        38

1   A    To my knowledge, that is correct.

2   Q    And in fact, the boards were not required to approve the

3   filing of this motion, correct?

4   A    I'm not -- I believe that's a legal question, but to my

5   knowledge, there was not a requirement of the board to -- or,

6   to adopt a resolution for that.

7   Q    Okay.  Let's talk a little bit about your background.  I

8   think you testified that you're the executive vice president

9   at NexPoint Advisors, one of the Movants.  Is that right?

10  A    That's right.

11  Q    Who's the president of NexPoint Advisors, LP?

12  A    Mr. Dondero.

13  Q    And you report directly to him; is that right?

14  A    I do.

15  Q    You're also the executive vice president of Fund Advisors,

16  another Movant; is that right?

17  A    Correct.

18  Q    And Mr. Dondero is the president of Fund Advisors; is that

19  right?

20  A    He is not.  There is no president of Fund Advisors.  But

21  he -- yeah.

22  Q    You're the president of another entity called NexPoint

23  Securities; is that right?

24  A    That's correct.

25  Q    And you're also the executive vice president of the 11 or

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 485 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/06/25   Page 553 of 1017   PageID 5232
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 484 of
2722

Norris - Cross                      39

1   12 funds that are managed by the Advisors here, right?

2   A   Yes.  That is correct.

3   Q   Okay.  You've been working for Highland Capital Management

4   or other Highland-related entities for a little more than a

5   decade; is that right?

6   A   That's correct.  Since June 2010.

7   Q   Okay.  Now, you don't personally make any investment

8   decisions for -- for the Funds.  Is that right?

9   A   That's correct.

10  Q   And you don't hold yourself out as an investment manager,

11  do you?

12  A   I do not.

13  Q   And you've never worked for a CLO, have you?

14  A   Never worked for a -- for a C -- employed by a CLO.

15  Worked on accounting, various other aspects, but never worked

16  for a CLO.

17  Q   Okay.  You referred earlier to the declaration that you've

18  submitted in support of the motion.  Do you remember that?

19  A   I do.

20  Q   I've got an assistant on the line here.

21       MR. MORRIS:  Ms. Cantey, can we put up onto the

22  screen Debtor's Exhibit C, which I believe was Mr. Norris's

23  declaration?  And if we could go to Page 12 of 26.  Oh, all

24  right.

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 486 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 554 of 1017 PageID 5233
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 485 of
2722

Norris - Cross                           40

1   Q    And, again, Mr. Norris, as we did in the deposition

2   yesterday, I'll remind you of the difficulty of doing a

3   virtual examination.  And if at any time I ask you a question

4   about your declaration that prompts you to think you need to

5   see another portion of the declaration, will you let me know

6   that?

7   A    Yes, I will.

8   Q    Okay.  Because I'm not here to test your memory.  I'm just

9   here to ask you certain questions.  So please let me know if

10  you need to see something that's not on the screen itself.

11       You didn't write any portion of this declaration; is that

12  right?

13  A    I did not.

14  Q    And you didn't provide any substantive comments to the

15  declaration as drafted because you agreed with -- with the

16  declaration as written by others; is that fair?

17  A    Correct.

18  Q    And all of the key information in your declaration was

19  supplied by NexPoint's management; isn't that right?

20  A    Correct.

21  Q    The individuals who provided the information that's in

22  your declaration include D.C. Sauter, Jason Post, Mr. Dondero,

23  and outside counsel at K&L Gates; is that right?

24  A    Correct.

25  Q    And Mr. Sauter is in-house counsel at the Advisors; is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 487 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 555 of 1017 PageID 5234
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 486 of
2722

Norris - Cross                    41

1   that right?

2   A    That is right.

3   Q    And Mr. Post is the chief compliance officer at NexPoint;

4   is that right?

5   A    That's correct.

6   Q    The whole idea for this motion initiated with Mr. Dondero;

7   isn't that right?

8   A    The concern, yes, the concern originated, and his concern

9   was voiced to our legal and compliance team.

10  Q    Okay.

11        MR. MORRIS:  Can we take the declaration down for --

12  oh, actually, no, I'm sorry, leave it there, and let's talk

13  about Exhibit B.  Now we can all see it.  If you can scroll

14  down to Exhibit B, please.  Okay.

15  BY MR. MORRIS:

16  Q    This page is attached to your declaration, right?

17  A    That's correct.

18  Q    And this page is intended to show the percentage of

19  preferred shares owned by each of the Movant Funds and the 15

20  different CLOs, right?

21  A    That's right.

22  Q    And the Debtor is the portfolio manager for each of these

23  CLOs; is that right?

24  A    Yes.

25  Q    And it's your understanding that the Debtor's management

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 488 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 556 of 1017   PageID 5235
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 487 of
2722

Norris - Cross                      42

1   of the CLOs on this page is governed by written agreements

2   between the Debtor and each of the CLOs, right?

3   A    Yes.

4   Q    None of the Movants are parties to the agreements between

5   the Debtor and each of the CLOs pursuant to which the Debtor

6   serves as portfolio manager; is that correct?

7   A    I believe that is correct.  One, I think, important --

8   even though they're not subject to the agreement, they are the

9   -- they have the economic ownership of each of these CLOs.

10  Q    But they're not party to the agreement; is that right?

11  A    Not that I'm aware of.

12  Q    Okay.  And in preparing for this motion and preparing for

13  your testimony, you didn't personally review any of the

14  agreements between the Debtor and any of the CLOs listed on

15  this page, right?

16  A    No.  I relied on legal counsel for that review.

17  Q    Okay.  And, but even though you didn't review the

18  agreements, it's your understanding that among the

19  responsibilities that the Debtor has as the portfolio manager

20  is buying and selling assets on behalf of the CLOs; is that

21  right?

22  A    Yes.  And I believe I specifically stated in my statement,

23  if you want to turn to it, what I (audio gap) to regarding the

24  CLOs' duties under the agreements.

25  Q    Okay.  It's your understanding, in fact, that nobody other

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 489 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 557 of 1017   PageID 5236
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 488 of
2722

Norris - Cross                        43

1   than the Debtor has the right or the authority to buy and sell

2   assets on behalf of the CLOs listed on Exhibit B, correct?

3   A   That's my understanding.

4   Q   Okay.  And it's also your understanding, your specific

5   understanding, that holders of preferred shares do not make

6   investment decisions on behalf of the CLO; is that right?

7   A   Correct.

8   Q   And that's something that the Advisors knew when they

9   decided to invest in the CLOs on behalf of the Movant Funds;

10  is that fair?

11  A   That's right.  And at that time, the knowledge in the

12  purchase was with Highland Capital Management, LP and the

13  portfolio management team at that time.

14  Q   And it's still with Highland Capital Management, LP; isn't

15  that right?

16  A   That's correct.  I'm not sure that the portfolio

17  management team looks the same, but it was HCMLP.

18  Q   Okay.  Let's just look at this document for a second.  The

19  first column has the list of the CLOs in which the Movant

20  Funds have invested; is that right?

21  A   Correct.

22  Q   And the second column, HIF, that stands for Highland

23  Income Fund; is that right?

24  A   Yes, sir.

25  Q   And Highland Income Fund is one of the Funds who are the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 490 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 558 of 1017 PageID 5237
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 489 of
2722

Norris - Cross                               44

1  Movants here, right?

2  A    That is correct.

3  Q    And the percentages below that show the percentage of the

4  preference shares of each of the CLOs that that particular

5  fund holds; is that right?

6  A    That's right.

7  Q    And then the third column relates to NexPoint Strategic

8  Opportunities Fund, one of the Movants here; is that right?

9  A    That's correct.

10  Q    And the next column, the fourth column, relates to

11  NexPoint Capital, Inc.'s holding of preference shares in the

12  15 CLOs, right?

13  A    That's right.

14  Q    So, NexPoint Capital doesn't hold any preference shares in

15  any of the CLOs except for a less-than-one-percent interest in

16  Grayson; am I reading that correctly?

17  A    Yes, that's correct.

18  Q    Okay.  And then the last column is intended to show the

19  aggregate portion or percentage of preference shares that the

20  three moving Funds have in each of the 15 CLOs; is that right?

21  A    Yes, that's right.

22  Q    Okay.  Am I reading this correctly that, for 12 of the 15

23  Funds, the moving Funds own less than a majority of the

24  outstanding preferred shares?

25  A    Yes, that's correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 491 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25   Page 559 of 1017    PageID 5238
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 490 of
2722

Norris - Cross                        45

1   Q    And is it also -- am I also reading this correctly to

2   conclude that the moving Funds owned less than 70 percent of

3   every one of these CLOs; is that right?

4   A    That's correct.

5   Q    You don't know who owns the preferred shares in the CLOs

6   that are not owned by the Movant Funds, do you?

7   A    I don't know any -- any specific owners.

8   Q    And some of these CLOs still have notes that are

9   outstanding; is that right?

10  A    Yes.  Very small amounts as a percentage of the overall

11  CLO original capital structure, but yes, some still have small

12  --

13  Q    So, --

14  A    -- notes.  Small amounts of notes.

15  Q    Okay.  I'm sorry to interrupt.  If we looked at Exhibit A,

16  if we took the time to look at Exhibit A, Exhibit A would

17  show, for each of the 15 CLOs, which of those CLOs still had

18  notes outstanding and the amount of out -- the dollar value of

19  those notes.  Is that right?

20  A    That's correct.

21  Q    Okay.  And your understanding is that -- your

22  understanding -- withdrawn.  The payment -- the distributions

23  from the CLOs are made pursuant to a waterfall; is that right?

24  A    Yes, that's correct.

25  Q    And your understanding of the waterfall process is that

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 492 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 560 of 1017   PageID 5239
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 491 of
2722

Norris - Cross                        46

1   the notes that are still outstanding at any CLO must be paid

2   -- must be paid in full before the preferred shares receive

3   any recovery; is that right?

4   A    So, I would say that my understanding is slightly

5   different.  It's going to be dependent on each indenture.

6   But, in general, interest payments are made to the debt

7   holders, and anything extra is then allocated to the equity.

8   But ultimate recovery, to your point, would be once those --

9   once the debt is paid off.  And that's the critical thing

10  here, where the preference shares here now with most of these

11  CLOs almost all the way wound down, with the exception of a

12  small piece of debt.  The equity owns the lion's share of the

13  economic interest of every one of these CLOs.  And I think

14  that's important.

15  Q    Okay.  Some of the CLOs still have outstanding notes.  Is

16  that right?

17  A    Yes.  As we discussed on -- Exhibit A will have the notes

18  that are -- that are remaining on those.

19  Q    And you don't know who holds the notes in the other CLOs,

20  right?

21  A    I don't.

22  Q    The only holders of preferred shares that are pursuing

23  this motion are the three Funds managed by the Advisors,

24  right?

25  A    In this motion, yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 493 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 561 of 1017   PageID 5240
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 492 of
2722

Norris - Cross                         47

1   Q    You're not aware of any holder of preferred shares

2   pursuing this motion other than the three Funds managed by the

3   Advisors, correct?

4   A    No, I'm not aware of any others.

5   Q    You didn't personally inform any holder of preferred

6   shares, other than the Funds that are the Movants, that this

7   motion would be filed, did you?

8   A    No, I did not.

9   Q    You're not aware of any steps taken by either of the

10  Advisors to provide notice to holders of preferred shares that

11  this motion was going to be filed, are you?

12  A    I'm not, no.

13  Q    And you're not aware of any attempt that was made to

14  obtain the consent of all of the holders of the preferred

15  shares to seek the relief sought in this motion, correct?

16  A    That's correct.

17  Q    You don't have any personal knowledge, personal knowledge,

18  as to whether any holder of preferred shares other than the

19  Funds managed by the Advisors wants the relief sought in the

20  motion, correct?

21  A    Correct.

22  Q    You don't have any personal knowledge as to whether any of

23  the CLOs that are subject to the contracts that you described

24  want the relief that's being requested in this motion, right?

25  A    That's correct.  I have not spoken or been involved at all

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 494 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25/25   Page 562 of 1017   PageID 5241
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 493 of
2722

Norris - Cross                    48

1   directly with the CLOs.  I'm representing the Funds.

2   Q   Okay.  Now, two of the Funds, two of the three Movant

3   Funds, I believe you testified are publicly traded; is that

4   right?

5   A   That's correct.

6   Q   And that's the Highland Income Fund and the NexPoint

7   Strategic Opportunities Fund; is that right?

8   A   That's right.  That's right.

9   Q   And because they are publicly-traded, the shareholders in

10  those two funds can sell their shares any time the market is

11  open; is that right?

12  A   If they're willing to take the price that the market is

13  willing to give, yes.

14  Q   Yes.

15  A   Between market hours.

16  Q   And if they -- if they don't like the way the assets that

17  are -- that the Funds have been invested, one of the things

18  they could do is simply sell their shares, right?

19  A   Yes.

20  Q   And the third fund, the shareholders in the third fund

21  have the right to sell out not on a public market but on a

22  quarterly basis; is that right?

23  A   Correct.

24  Q   That third Movant Fund is NexPoint Capital; do I have that

25  right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 495 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 563 of 1017    PageID 5242
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 494 of
2722

Norris - Cross                          49

1    A    Correct.

2    Q    So they also have the ability to exit if they don't like

3    management on a quarterly basis; is that right?

4    A    Correct.

5    Q    All right.  Can we turn to Paragraph -- Paragraphs 8 and 9

6    of your declaration?  Okay.  Paragraph 8 describes a

7    transaction that's been referred to as OmniMax; is that right?

8    A    Yes.

9    Q    And Paragraph 9 refers to a transaction involving SSP

10   Holdings, LLC; do I have that right?

11   A    That's correct.

12   Q    Do you know what SSP stands for?

13   A    See if we say it in there.  SSP Holdings, LLC.

14   Q    Right.  Do you know what SSP stands for?

15   A    I don't.  Something Steel Products.  I --

16   Q    Okay.  You don't need to guess.  These are the only two

17   transactions that the Movants question; is that right?

18   A    These transactions, as well as certain transactions around

19   Thanksgiving time.

20   Q    Okay.  We'll talk about those.  But those transactions

21   about -- around Thanksgiving time aren't in your declaration,

22   are they?

23   A    Not specifically mentioned by name.

24   Q    Okay.  Let's talk about the two that are mentioned by

25   name, Trussway and SSP.  The Movants do not contend that

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 496 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 564 of 1017   PageID 5243
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 495 of
2722

Norris - Cross                    50

1   either transaction was the product of fraudulent conduct, do

2   they?

3   A    No.

4   Q    The Movants do not contend that the Debtor breached any

5   agreement by effectuating these transactions, do they?

6   A    I don't believe so.

7   Q    In fact, the Movants do not contend that the Debtor

8   violated any agreement at any time in the management of the

9   CLOs listed on Exhibit B; is that right?

10  A    That's right.

11  Q    The Movants don't even question the Debtor's business

12  judgment, only the results of the trans -- of these two

13  transactions.  Is that right?

14  A    That's right.  And results is the key here and the

15  approach.

16  Q    I see.  And the reason the Movants do not question the

17  Debtor's business judgment is because you don't know what

18  factor or factors the Debtor considered in executing these

19  transactions, right?

20  A    That's right.  I can't look into the mind or know the

21  business judgment and the inputs that went into this.  We do

22  know the outcomes.  And to us, that's troubling, right, as the

23  owners of the lion's share or the majority or even significant

24  amounts of the economic ownership of the CLOs.  And having

25  insight into those transactions, as mentioned in my statement,

Norris - Cross                    51

1    really just trying to maximize recoveries for our Funds.

2         MR. MORRIS:  Your Honor, I move to strike the portion

3    of his answer following that which was responsive to the

4    question.

5         THE COURT:  All right.  I grant that motion.

6         MR. MORRIS:  Okay.

7    BY MR. MORRIS:

8    Q    Sir, you never asked the Debtor what factors it considered

9    in making these trades, right?

10   A    I did not.

11   Q    And you have no reason to believe that anyone on behalf of

12   the Movants ever asked the Debtor why it executed these

13   trades, right?

14   A    I don't have any knowledge.  There could have been

15   somebody from -- from the Movants.  But I did not.

16   Q    Okay.  On OmniMax, the Movants disagree with the price at

17   which the Debtor effectuated the trade, right?

18   A    Correct.

19   Q    And I believe there was a meeting of the boards of the

20   Funds back in August at which Mr. Seery appeared.  Do I have

21   that right?

22   A    I believe it was August, but he did appear.

23   Q    And the purpose of the appearance was so that Mr. Seery

24   could give an update on the bankruptcy; is that right?

25   A    That's correct, and on the services provided by Highland

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 498 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 566 of 1017   PageID 5245
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 497 of
2722

Norris - Cross                          52

1  Capital Management, LP to our Advisor.  Advisors.  They

2  provide various shared services.

3  Q    And it was during that meeting that Mr. Seery forthrightly

4  told the boards the price at which he was planning to execute

5  the OmniMax transaction, correct?

6  A    Correct.

7  Q    The transaction hadn't yet occurred, right?

8  A    I'm not sure if it had been finalized.  He had a price,

9  and these -- these things are negotiated.  This was, I

10 believe, a company in restructuring.  So I don't know whether

11 it had been transacted or not.

12 Q    Okay.  The board didn't ask Mr. Seery not to execute the

13 transaction, did it?

14 A    Not to my knowledge.  The board wouldn't -- I don't think

15 the board would have that authority, either.

16 Q    Okay.  But it's here asking the Court to cause the Debtor

17 to pause in the execution of any trades in the CLOs; is that

18 right?

19 A    I think the order speaks in that regard.

20 Q    Yeah.  Okay.  Let's talk about the SSP transaction for a

21 moment.  It's your understanding that Trussway Holdings, LLC

22 owned a majority interest in SSP Holdings, LLC, right?  That's

23 in Paragraph 9.

24 A    Yes.  The statement in Paragraph 9 is what I believe is

25 correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 499 of
Case 3:25-cv-02072-S    Document 15-7   Filed 10/06/25    Page 567 of 1017    PageID 5246
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 498 of
2722

Norris - Cross                    53

1   Q    Okay.  And it's also your understanding that Trussway is a

2   wholly-owned subsi... I'm sorry, that SSP Holdings is a

3   wholly-owned subsidiary -- withdrawn.  It's also your

4   understanding that Trussway is a wholly-owned subsidiary of

5   the Debtor, right?

6   A    Yes.

7   Q    But Trussway is not a debtor in bankruptcy, right?

8   A    I'm not sure.

9   Q    Okay.  You have no reason to believe that; is that fair?

10  A    That it's not a debtor in bankruptcy?  That Trussway is

11  not in bankruptcy itself?

12  Q    Correct.

13  A    Yeah.  I have no knowledge of Trussway's situation.

14  Q    Okay.  But you -- but according to your declaration that

15  was prepared by the Advisors' management team, Trussway and

16  not the Debtor owned SSP Holdings, LLC.  Is that right?

17  A    I'm looking here at the statement just to make sure.

18  Q    Sure.

19       (Pause.)

20  A    I -- again, I -- the statement is correct, and I believe

21  speaks for itself regarding entity ownership.

22  Q    The only things you know about the SSP transaction are,

23  one, that you believe it was made without a formal bidding

24  process; and two, that it resulted in a $10 million loss.  Is

25  that right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 500 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 568 of 1017   PageID 5247
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 499 of
2722

Norris - Cross                    54

1   A    Correct.

2   Q    Okay.  But, again, neither you, or to the best of your

3   knowledge, anybody at Advisors, ever spoke with anybody at the

4   Debtor about the circumstances concerning either of the

5   transactions, right?

6   A    I don't know the conversations that were had at anyone

7   else from our Advisors, but this is the knowledge that -- that

8   I have.

9   Q    Okay.  And it's the only knowledge you have, right?  You

10  don't know anything about the SSP transaction other than those

11  two facts, right?

12  A    Correct.

13  Q    In fact, I think you testified yesterday that you've been

14  very remote from the SSP transaction, right?

15  A    That's correct.

16  Q    And that it's not a transaction that you have much

17  knowledge on.  Fair?

18  A    Fair.

19  Q    Let's just talk briefly about the transactions that

20  occurred (garbled) Thanksgiving.  They're not specifically

21  referred to in your declaration; is that right?

22  A    That's correct.

23  Q    And you have no knowledge about any transaction that Mr.

24  Seery wanted to execute around Thanksgiving; is that right?

25  A    I know there were transactions and there were concerns

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 501 of
Case 3:25-cv-02072-S    Document 15-7   Filed 10/06/25    Page 569 of 1017   PageID 5248
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 500 of
2722

Norris - Cross                        55

1    from our management team, but I'm not aware of what the

2    transactions were.

3    Q    In fact, you can't even identify the assets that Mr. Seery

4    wanted to sell around Thanksgiving, or at least you couldn't

5    at the time of your deposition yesterday.  Is that right?

6    A    That's correct.

7    Q    And you have no knowledge as to why Mr. Seery wanted to

8    make those particular trades at around Thanksgiving?

9    A    No, I don't.

10   Q    And in fact, you don't even know if the transactions that

11   Mr. Seery wanted to close around Thanksgiving ever in fact

12   closed.  Is that fair?

13   A    Correct.

14   Q    Okay.  Let's just -- let's just finish up with a few

15   questions about the boards.

16          MR. MORRIS:  Ms. Cantey, can we put up Debtor's

17   Exhibit EEEE?  Four E's, Your Honor.  Thank you.

18   BY MR. MORRIS:

19   Q    This particular page identifies the directors for each of

20   the three Movant Funds; is that right?

21   A    Let me take a look and confirm.  (Pause.)  Yes.  That

22   looks correct.

23   Q    Okay.  And this was prepared by the Movants; is that

24   right?

25   A    I'm not sure who prepared it.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 502 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 570 of 1017    PageID 5249
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 501 of
2722

Norris - Cross                          56

 1  Q   Okay.  To the best of your knowledge, does this document

 2  accurately reflect the composition of the boards of each of

 3  the three Movant Funds?

 4  A   Yes, it does.

 5  Q   Okay.  John Honis, I think you mentioned him earlier.

 6  He's on all three boards.  Is that right?

 7  A   That's correct.  And the reason being we have a unitary

 8  board structure, so -- which is very common in '40 Act Fund

 9  land, where the board sits, for efficiency purposes, on

10  multiple fund boards, and there's a lot of economies of scale

11  from an operating standpoint.  So, yes, they sit on multiple

12  boards.

13  Q   Okay.  And for purposes of the '40 Act, Mr. Honis has been

14  deemed to be an interested trustee.  Is that right?

15  A   That's correct.

16  Q   Okay.  But you don't specifically know what facts caused

17  that designation; you only know that the designation exists.

18  Right?

19  A   That's right.  And I know they are disclosed in the proxy

20  -- or, in the -- the relative filings related to those Funds.

21  Q   Okay.  Three other people are common to all three of the

22  Movant Funds.  I think you've got Dr. Froehlich, Ethan Powell,

23  --

24  A   Froehlich.

25  Q   Froehlich.  Ethan Powell and Bryan Ward.  Right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 503 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 571 of 1017   PageID 5250
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 502 of
2722

Norris - Cross                      57

1    A    That is correct.

2    Q    Okay.  All three of those individuals actually serve on

3    the 11 or 12 boards that you mentioned earlier that are

4    managed by the Advisors, right?

5    A    Yes, that is correct.

6    Q    And they're the same Funds for which you serve as an

7    executive vice president, right?

8    A    Yes.  That's correct.

9    Q    So, for all of the Funds that are managed by the Advisors,

10   you serve as executive vice president and all four of these

11   directors -- trustees serve as trustees on the boards, right?

12   A    Yes, that's correct.

13   Q    Okay.  In exchange for serving on all of these boards, the

14   three individuals -- Dr. Froehlich, Mr. Ward, and Mr. Powell

15   -- each receive $150,000 a year for services across the

16   Highland complex; is that right?

17   A    That's correct.

18   Q    Dr. Froehlich has been serving as a board member across

19   the Highland complex for seven or eight years now; is that

20   right?

21   A    That's correct.

22   Q    Mr. --

23   A    I believe it's about seven or eight years.

24   Q    And Mr. Powell, he actually was employed by Highland or

25   related entities from about 2007 or 2008 until 2015, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 504 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 572 of 1017   PageID 5251
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 503 of
2722

Norris - Cross                          58

1   A    That's correct.

2   Q    And Mr. Ward, the third of the independent trustees, he's

3   been serving as a board member on various Highland-related

4   funds on a continuous basis since about 2004.  Do I have that

5   right?

6   A    Yeah, I believe that's correct.

7   Q    Okay.  Just a couple of final questions.  You would agree,

8   would you not, sir, that portfolio managers have an obligation

9   to effectuate transactions concerning the assets that they

10  manage based on their business judgment?

11  A    Yes.  And in accordance with whatever governing documents

12  govern the fund structure.

13  Q    And you would personally expect a portfolio manager to

14  execute a transaction that he or she reasonably believes in

15  good faith and in their business judgment would maximize value

16  for the CLO, even if the CLO did not need cash at that

17  particular time.  Is that right?

18  A    I think it would come down to the governing documents.

19  And I think what you're getting at here is, in this instance,

20  these sales and the intent of the portfolio manager.  And our

21  view, again, is -- and the request for the motion is simply

22  there is a lot at play here.  Several negotiations.  And in

23  order to maximize returns, simply asking for a pause on

24  transactions.

25  Q    All right.  Let me -- let me ask the question again, and I

Norris - Cross                    59

1  would ask that you please listen carefully to the question.

2  You would expect a portfolio manager would execute a

3  transaction that he or she believes maximizes value, even if

4  the CLO didn't need cash at that particular moment in time.

5  Correct?

6  A    Yeah.  As long as that is maximizing value for the

7  stakeholders, and in the instance of a CLO, the economic

8  interest is owned by the equity holders.  So, to their

9  benefit, yes, that -- that would be the idea.

10          MR. MORRIS:  Your Honor, I have no further questions.

11          THE COURT:  Any redirect, Mr. Wright?

12          MR. WRIGHT:  Only briefly, Your Honor.

13                    REDIRECT EXAMINATION

14 BY MR. WRIGHT:

15 Q   Mr. Norris, I think you were asked at one point about how

16 long you'd been working for Highland Capital Management, which

17 there's -- there's Highland Capital Management Fund Advisors

18 and then there's Highland Capital Management, LP, Debtor.  And

19 I wanted to give you an opportunity to just explain when and

20 what years you worked for HCMLP and then when and what years

21 you worked for NexPoint Advisors or Highland Capital

22 Management Fund Advisors.

23 A    Yes.  From June 2010, I was employed by Highland Capital

24 Management, LP, until July or August of 2012, at which time I

25 was then hired by Highland Capital Management Fund Advisors,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 506 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 574 of 1017 PageID 5253
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 505 of
2722

Norris - Redirect                    60

1  not HCML -- no longer employed by HCMLP, and have worked since

2  that time for HCMFA and NexPoint Advisors and not for the

3  Debtor, HCMLP.

4  Q    Okay.  So -- and I'm sorry if I missed a year, but it's

5  been about ten years since you had worked for HCMLP or been an

6  employee of HCMLP, correct?

7  A    Yeah.  It's been over eight years since I have left

8  employment by HCMLP.  Ten and a half years ago, I started

9  working for HCMLP, and then two years after that transitioned

10  away and started working for the Advisors that are part of

11  this motion.

12  Q    Thank you for clarifying.

13           MR. WRIGHT:  Your Honor, I hope -- you directed us to

14  have a witness here today, and so we do.  And I know that you

15  had asked me at the last hearing some questions about the

16  involvement of people at HCMLP, which I tried to address with

17  Mr. Norris in my direct.  But I, you know, I do want to make

18  sure that we've answered any questions that you have.

19           THE COURT:  All right.  Yes, that's fine.  Are you

20  -- does that conclude your redirect?

21           MR. WRIGHT:  It does, Your Honor.

22           THE COURT:  Any recross, Mr. Morris, on that

23  redirect?

24           MR. MORRIS:  No, thank you, Your Honor.

25           THE COURT:  All right, then.  That concludes the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 507 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 575 of 1017   PageID 5254
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 506 of
2722

61

1    testimony of Mr. Norris.

2        Any other evidence, Mr. Wright?

3            MR. WRIGHT:  I do not, Your Honor, although I guess I

4    would offer the Exhibit A and Exhibit B to Mr. Norris's

5    declaration --

6            THE COURT:  Any objection to that?

7            MR. WRIGHT:  -- into evidence.

8            MR. MORRIS:  No, Your Honor.

9            THE COURT:  All right.  Those are admitted.

10       (Movants' Exhibits A and B are received into evidence.)

11           THE COURT:  All right.  Well, Mr. Morris, did you

12   want to put on any evidence?

13           MR. MORRIS:  Does the -- do the Movants rest, Your

14   Honor?

15           THE COURT:  I understood that they rest.  Correct,

16   Mr. Wright?

17           MR. WRIGHT:  That's correct, Your Honor.

18           MR. MORRIS:  Your Honor, I would move, effectively,

19   for a directed verdict here.  The Movants have the burden of

20   establishing a *prima facie* case to entitlement to the relief

21   that's been requested, and they have failed to meet that

22   burden.  The Debtor has -- we -- the undisputed facts are the

23   Debtor has the contractual right, and indeed, the obligation,

24   to serve as the portfolio manager of the CLOs pursuant to

25   written agreements.

62

1       The Movants are not parties to those agreements.  The

2  testimony is undisputed that there are many holders of

3  preferred shares and notes that have had no notice of this

4  proceeding that will undoubtedly be impacted by the tying of

5  the hands of the portfolio manager.  The chart that was

6  attached as Exhibit B expressly shows just what a large

7  portion of interested parties and people who would be affected

8  by this motion are not -- they didn't get notice.  There was

9  no attempt to get notice.  There was no attempt to get their

10  consent.  All of that testimony is now in the record, and I

11  think due process alone would prevent the entry or even the

12  consideration of an order of this type.

13       There is nothing improper that's been alleged.  There is

14  no -- there is no allegation of fraud.  There is no allegation

15  of breach of contract of any kind.  There's not even a

16  question of business judgment.  The Movants didn't even do

17  their diligence to ask the Debtor why they made these

18  transactions.  There is nothing in the record that shows that

19  the Debtor, as the portfolio manager of the CLOs, did anything

20  improper.

21       The only thing that the Movants care about is that they

22  don't like the results in two particular trades.  I don't

23  think that that meets their burden of persuasion that the

24  Court should enter an order of this type, and I would like to

25  relieve Mr. Seery of the burden, frankly, and the Court, of

63

1    having to put on testimony to justify transactions that really

2    aren't even being questioned, Your Honor.

3        So the Debtor would respectfully move for the denial of

4    the motion and the relief sought therein.

5            THE COURT:  All right.  Your request for a directed

6    verdict, something equivalent to a directed verdict here, is

7    granted.  I agree that the Movant has wholly failed to meet

8    its burden of proof here today to show the Court, persuade the

9    Court that, as Mr. Morris said, I should essentially tie the

10   hands of the Debtor as a portfolio manager here, as stated.

11   Nothing improper has been alleged.  There has been no showing

12   of a statutory right here, or a contractual right here, on the

13   part of the Movants.

14       I am -- I'm utterly dumbfounded, really.  I agree with the

15   -- I was going to say innuendo; not really innuendo -- I agree

16   with part of the theme, I think, asserted by the Debtor here

17   today that this is Mr. Dondero, through different entities,

18   through a different motion.  I feel like he sidestepped the

19   requirement that I stated last week that if we had a contested

20   hearing on his motion, Dondero's motion, that I was going to

21   require Mr. Dondero to testify.  He apparently worked out an

22   eleventh hour agreement with the Debtor on his motion to avoid

23   that.  But, again, these so-called CLO Motions very clearly,

24   very clearly, in this Court's view, were pursued at his sole

25   direction here.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 510 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 578 of 1017   PageID 5257
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 509 of
2722

64

```
 1      This is almost Rule 11 frivolous to me.  You know, we're
 2   -- we didn't have a Rule 11 motion filed, and, you know, I
 3   guess, frankly, I'm glad that a week before the holidays begin
 4   we don't have that, but that's how bad I think it was, Mr.
 5   Wright and Mr. Norris.  This is a very, very frivolous motion.
 6   Again, no statutory basis for it.  No contractual basis.  You
 7   know, you didn't even walk me through the provisions of the
 8   contracts.  I guess that would have been fruitless.  But you
 9   haven't even shown something equitable, some lack of
10   reasonable business judgment.
11      Bluntly, don't waste my time with this kind of thing
12   again.  You wasted my time.  We have 70 people on the video.
13   Utter waste of time.
14      All right.  So, motion is denied.  Mr. Morris, please
15   upload an order.
16          MR. MORRIS:  Thank you, Your Honor.
17          THE COURT:  All right.  Do we have any other business
18   to accomplish today?
19          MR. POMERANTZ:  I don't think so, Your Honor.  I know
20   we will see you tomorrow in connection with Mr. Daugherty's
21   relief from stay motion.
22          THE COURT:  Well, yeah, we do have that.  Okay.  We
23   will see you tomorrow.  We stand adjourned.
24          MR. CLEMENTE:  Thank you, Your Honor.
25          MR. MORRIS:  Thank you, Your Honor.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 511 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 579 of 1017    PageID 5258
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 510 of
2722

65

1          THE CLERK:  All rise.

2          (Proceedings concluded at 3:05 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                      CERTIFICATE

20     I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
21 above-entitled matter.

22   **/s/ Kathy Rehling**                    **12/17/2020**

23 _____    _____

Kathy Rehling, CETD-444                    Date
24 Certified Electronic Court Transcriber

25

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 512 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 580 of 1017   PageID 5259
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 511 of
2722

66

INDEX

PROCEEDINGS                                                        3

WITNESSES

Movants' Witnesses

Dustin Norris
- Direct Examination by Mr. Wright                               23
- Cross-Examination by Mr. Morris                                35
- Redirect Examination by Mr. Wright                             59

EXHIBITS

Movants' Exhibits A and B                            Received   61

RULINGS

Debtor's Emergency Motion to Quash Subpoena and for             13
Entry of a Protective Order or, in the Alternative,
for an Adjournment (1564, 1565) - *Agreed Order*

James Dondero's Motion for Entry of an Order Requiring          13
Notice and Hearing for Future Estate Transactions
Occurring Outside the Ordinary Course of Business (1439)
- *Continued to 01/04/2021*

Motion for Directed Verdict - *Granted*                         63

Motion for Order Imposing Temporary Restrictions on            63
Debtor's Ability, as Portfolio Manager, to Initiate Sales
by Non-Debtor CLO Vehicles Highland Capital Management Fund
Advisors, L.P., Highland Fixed Income Fund, NexPoint
Advisors, L.P., NexPoint Capital, Inc., NexPoint Strategic
Opportunities Fund (1528) - *Denied*

END OF PROCEEDINGS                                               65

INDEX                                                           66

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APP. 0508

004498

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 513 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 581 of 1017    PageID 5260
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 512 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21    Entered 01/06/21 16:43:34    Page 1 of 19

# EXHIBIT 6

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § § | _____ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., | § § § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 514 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 582 of 1017    PageID 5261
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 513 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21    Entered 01/06/21 16:43:34    Page 2 of 19

| | |
|---|---|
| HIGHLAND INCOME FUND, NEXPOINT STRATEGIC OPPORTUNITIES FUND, NEXPOINT CAPITAL, INC., AND CLO HOLDCO, LTD., | § § § § |
| Defendants. | |

### PLAINTIFF HIGHLAND CAPITAL MANAGEMENT, L.P.'S VERIFIED ORIGINAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Plaintiff" or the "Debtor"), by its undersigned counsel, files this *Original Complaint for Declaratory and Injunctive Relief* (the "Complaint") against defendants Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NPA," and together with HCMFA, the "Advisors"), Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc. (collectively, the "Funds"), and CLO Holdco, Ltd. ("CLO Holdco" and together with the Advisors and the Funds, the "Defendants") seeking declaratory and injunctive relief pursuant to sections 105(a) and 362 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of its Complaint, the Debtor alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

### PRELIMINARY STATEMENT

1. Mr. James Dondero ("Mr. Dondero") directly or indirectly owns and/or controls each of the Defendants. The Defendants have interfered with, and impeded, the Debtor's business, and they have threatened to initiate a process aimed at removing the Debtor as the portfolio manager of certain collateralized loan obligation vehicles ("CLOs") – although they have refused to actually bring a motion to lift the automatic stay for that purpose, thereby

APP. 0510

004500

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 515 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 583 of 1017    PageID 5262
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 514 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21   Entered 01/06/21 16:43:34   Page 3 of 19

contributing to the necessity of these proceedings.  The Funds invested in certain of the CLOs at

the direction of the Advisors.  CLO Holdco also invested in the CLOs.

2.     As alleged below, the Defendants have damaged the Debtor and threaten to upset

the status quo by interfering with the Debtor's contractual rights.

3.     Thus, the Debtor seeks damages, declaratory relief, and an order preliminarily and

permanently enjoining the Defendants from: (a) interfering with or otherwise impeding, directly

or indirectly, the Debtor's business, including but not limited to the Debtor's (i) management of

the CLOs, (ii) decisions concerning the purchase or sale of any assets on behalf of the CLOs, or

(iii) contractual right to serve as the portfolio manager (or other similar title) of the CLOs; (b)

otherwise violating section 362(a) of the Bankruptcy Code; (c) seeking to terminate the portfolio

management agreements and/or servicing agreements between the Debtor and the CLOs ((a)-(c),

the "Prohibited Conduct"), (d) conspiring, colluding, or collaborating with (x) Mr. Dondero, (y)

any entity owned and/or controlled by Mr. Dondero, and/or (z) any person or entity acting on

behalf of Mr. Dondero or any entity owned and/or controlled by him, to, directly or indirectly,

engage in any Prohibited Conduct, and (e) engaging in any Prohibited Conduct with respect to

any of the Successor Parties (as that term is defined below).

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and § 1334(b).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(A) and (O).

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

APP. 0511
Appx. 00558
004501

6.      This adversary proceeding is commenced pursuant to Bankruptcy Rules 7001 and

7065, Bankruptcy Code sections 105(a) and 362, 28 U.S.C. §§ 2201 and 2202, and applicable

Delaware law.

## THE PARTIES

7.      Plaintiff is a limited liability partnership formed under the laws of Delaware with

a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8.      Upon information and belief, HCMFA is a limited partnership with offices

located in Dallas, Texas.

9.      Upon information and belief, NPA is a limited partnership with offices located in

Dallas, Texas.

10.     Upon information and belief, Highland Income Fund is an investment fund

managed by HCMFA in Dallas, Texas.

11.     Upon information and belief, NexPoint Strategic Opportunities Fund is an

investment fund managed by NPA in Dallas, Texas.

12.     Upon information and belief, NexPoint Capital, Inc. is an investment fund

managed by NPA in Dallas, Texas

13.     Upon information and belief, CLO Holdco is a holding company that is directly or

indirectly owned and/or managed by Mr. Dondero and others acting on his behalf in Dallas,

Texas.

## CASE BACKGROUND

14.     On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

APP. 0512

004502

District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

15.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members: (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch (collectively, "UBS"), and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

16.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

17.     The Debtor has continued to operate and manage its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in this chapter 11 case.

18.     On November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan"). The Court has scheduled a confirmation hearing on the Plan for January 13, 2021. If confirmed, the Debtor will be succeeded by the Reorganized Debtor and Plan will create a Claimant Trust and a Litigation Sub-Trust (as those terms are defined in the Plan) (the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust are collectively referred to herein as the "Successor Entities," and together with the Successor Entities' directors, officers, employees, professionals, and agents, including but not limited to the Claimant Trustee and the Litigation Trustee (as those terms are defined in the Plan), and any professionals engaged by the Claimant Trustee and Litigation Trustee, the "Successor Parties").

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:41851.8 36027/002

APP. 0513

Appx. 00509

004503

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 518 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 586 of 1017   PageID 5265
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 517 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21   Entered 01/06/21 16:43:34   Page 6 of 19

## STATEMENT OF FACTS

A.   **Mr. James Dondero Owns and/or Controls Each of the Defendants**

19.    Mr. Dondero directly or indirectly owns and/or effectively controls each of the Defendants.

### *The Advisors and the Funds*

20.    On December 16, 2020, Mr. Dustin Norris ("Mr. Norris") testified under oath in support of the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1528] that was brought by the Advisors and Funds (the "Restriction Motion").

21.    Mr. Norris is the Executive Vice President of each the Advisors and each of the Funds.

22.    During the hearing on the Restriction Motion (the "Hearing"), Mr. Norris testified that Mr. Dondero (a) directly or indirectly owns and controls each of the Advisors, and (b) is the portfolio manager of each of the Funds, each of which is advised by one of the Advisors.

23.    Mr. Norris's testimony is corroborated by, among other things, (a) the Funds' public filings with the Securities and Exchange Commission in which each of the Funds disclosed that the Advisors were owned and controlled by Mr. Dondero, and that Mr. Dondero was the portfolio manager for each of the Funds, and (b) the assertion in a letter dated December 31, 2020, sent on behalf of the Advisors and the Funds, that "Mr. Dondero is the lead (and in some cases the sole) portfolio manager for certain of the Funds.  He is intimately involved in the day-to-day operations and investment decisions regarding those Funds and the operations of the Advisors."

### *CLO Holdco*

DOCS_NY:41851.8 36027/002

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 519 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 587 of 1017 PageID 5266
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 518 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21 Entered 01/06/21 16:43:34 Page 7 of 19

24.     CLO Holdco is a wholly-owned and controlled subsidiary of the DAF.  On information and belief, the DAF is managed by the Charitable DAF Holdco, Ltd. ("<u>DAF Holdco</u>"), which is the managing member of the DAF.

25.     On information and belief, DAF Holdco is owned by three different charitable foundations:  Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. (collectively, the "<u>Highland Foundations</u>").  On information and belief, Mr. Dondero is the president and one of the three directors of each of the Highland Foundations.  On information and belief, Mr. Grant Scott ("<u>Mr. Scott</u>"), is an intellectual property lawyer based in Raleigh, North Carolina, Mr. Dondero's college roommate, is also an officer and director of each of the Highland Foundations.

26.     Although the Debtor is the non-discretionary investment advisor to the DAF, the Debtor does not have the right or ability to control or direct the DAF or CLO Holdco.  Instead, on information and belief, the DAF takes and considers investment and payment advice from the Debtor, but ultimate decisions are in the control of Mr. Scott who acts substantially at Mr. Dondero's direction.

**B.      This Court has Entered Two Orders that are Implicated by the Defendants' Actions and Threatened Actions**

27.     This Court has entered two Orders that are relevant to the injunctive relief sought by the Debtor.

28.     On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "<u>Settlement Motion</u>").  On January 9, 2019, this Court entered an Order granting the Settlement Motion [Docket No. 339] (the "<u>Settlement Order</u>").

APP. 0515

004505

29.    As part of the Settlement Order, this Court also approved a term sheet (the "Term Sheet") [Docket No. 354-1] between the Debtor and the Official Committee of Unsecured Creditors (the "Committee") pursuant to which Mr. John S. Dubel, Mr. Russell Nelms, and Mr. Seery were appointed to the Board.

30.    As required by the Term Sheet, on January 9, 2020, Mr. James Dondero resigned from his roles as an officer and director of Strand and as the Debtor's President and Chief Executive Officer.

31.    Among other things, the Settlement Order directed Mr. Dondero not to "cause any Related Entity to terminate any agreements with the Debtor."

32.    Each of the Defendants is a "Related Entity" as defined in the Term Sheet because each of the Defendants is directly or indirectly owned and/or controlled by Mr. Dondero and/or Mr. Scott.

33.    Defendants' actions and threatened actions also implicate the *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* [Adv. Pro. No. 20-03190-sgj, Docket No. 10], entered on December 10, 2020 (the "TRO" and together with the Settlement Order, the "Orders").

34.    Pursuant to the TRO, the Court temporarily enjoined and restrained Mr. Dondero from, among other things, "interfering with or otherwise impeding, directly or indirectly, the Debtor's business" and from "causing, encouraging, or conspiring with (a) any entity owned or controlled by [Mr. Dondero], and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct [as defined in the TRO]," including interfering or impeding the Debtor's business.

DOCS_NY:41851.8 36027/002

APP. 0516

004506

C. **Defendants Interfere with and Impede the Debtor's Business and Threaten to Terminate the Debtor's Management Contracts**

35. In addition to filing the Restriction Motion, on at least four separate occasions the Defendants have either interfered with and impeded the Debtor's business or have threatened to do so by initiating the process for removing the Debtor as the portfolio manager of the CLOs. Such conduct violates the Orders and flouts the Court's decision on the Restriction Motion and the Court's observations made at the Hearing.

36. *First*, on December 22, 2020, employees of NPA and HCMFA interfered with and impeded the Debtor's business by refusing to settle the CLOs' sale of AVYA and SKY securities that Mr. Seery had personally authorized. The Advisors engaged in this conduct notwithstanding (a) the denial of the Restriction Motion and the Court's pointed comments during that Hearing on the Restriction Motion, and (b) Mr. Norris's sworn acknowledgments on behalf of the Advisors and Funds during the Hearing that (i) the Debtor's management of the CLOs is governed by written contracts as to which none of the Advisors or Funds are parties; (ii) the Debtor has the exclusive duty and responsibility to buy and sell assets on behalf of the CLOs; and (iii) as the Advisors knew when they invested in the CLOs on behalf of the Funds, that holders of preference shares (such as the Funds) have no right to make investment decisions on behalf of the CLOs.

37. Notably, the Advisors' interference with trades that Mr. Seery authorized on behalf of the CLOs is the same type of conduct that led the Court to impose the TRO against Mr. Dondero. *See Declaration of Mr. James P. Seery, Jr. in Support of Debtor's Motion for a Temporary Restraining Order Against Mr. James Dondero* [Adv. Pro. No. Docket No. 4] ¶¶21-23, Ex. 8.

DOCS_NY:41851.8 36027/002

APP. 0517

Appx. 00564

004507

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 522 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 590 of 1017   PageID 5269
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 521 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21   Entered 01/06/21 16:43:34   Page 10 of 19

38.     *Second*, also on December 22, 2020, the Defendants wrote to the Debtor and renewed their "request" that the Debtor refrain from selling any assets on behalf of the CLOs until the confirmation hearing (the "December 22 Letter").   In support of their "request," the Debtor re-asserted almost verbatim the arguments advanced in connection with the Restriction Motion – all of which were soundly rejected by the Court.

39.     The Debtor responded on December 24, 2020, demanding that Defendants withdraw their December 22 Letter and confirm that neither the Defendants nor anyone acting on their behalf will take any further steps to interfere with the Debtor's directions as the CLOs' portfolio manager by the close of business on December 28, 2020.   The Defendants failed to comply with the Debtor's demands.

40.     *Third*, the Defendants threatened to seek to remove the Debtor as the portfolio manager of the CLOs.   Specifically, in a letter dated December 23, 2020 (the "December 23 Letter"), the Defendants informed the Debtor that one or more of them "intend to notify the relevant trustee and/or issuers that the process of removing the Debtor as fund manager should be initiated, subject to and with due deference for the applicable provisions of the United State Bankruptcy Code, including the automatic stay of Section 362."

41.     The Debtor responded to the December 23 Letter the next day and advised the Defendants that the Settlement Order prohibited the termination of the Debtor's management agreements with the CLOs, and that there was no factual, legal, or contractual basis to remove the Debtor as the CLOs' portfolio manager in any event.   The Debtor demanded that the Defendants withdraw their December 23 Letter and commit not to take any actions, directly or indirectly, to terminate the CLO management agreements, by the close of business on December 28, 2020.  The Defendants failed to comply with the Debtor's demands.

DOCS_NY:41851.8 36027/002

APP. 0518
Appx. 00505
004508

42.     Because Mr. Dondero owns and/or effectively controls the Defendants, the Debtor forwarded the correspondence between the Debtor and the Defendants, including the Defendant's Letters, to Mr. Dondero's counsel.  In response, Mr. Dondero's counsel contended that "[w]hile there are relationships between my client and some of the movants, I believe they are separate entities and should be treated as such."

43.     On December 30, 2020, the Debtor specifically requested that the Defendants promptly bring the matters to the Court for resolution by bringing a motion to terminate the CLO management agreements and for related relief, or the Debtors would be forced to commence an action for declaratory relief and bring this Motion in order to bring clarity to the Debtor's contractual rights.  In response, Defendants' counsel would not commit to bring any motion, only that they would file an objection to Debtor's plan of reorganization.  The Debtor believes that its disputes with the Defendants can and must be promptly resolved.

44.     **Finally,** because Mr. Dondero continues to interfere with the Debtor's business and engage in disruptive behavior, the Debtor gave notice to Mr. Dondero on December 23, 2020, that the Debtor would evict him and terminate all services provided to him, as of December 30, 2020.  On December 31, 2020, counsel to the Advisors and the Funds sent a letter to Debtor's counsel (the "December 31 Letter" and together with the December 22 Letter and December 23 Letter, the "Defendants' Letters") contending that the Debtor's decision to remove Mr. Dondero from the Debtor's offices and services was damaging the Advisors and the Funds and implied that the Debtor would be economically responsible for such damage.

45.     On January 4, 2021, the Debtor responded to the December 31 Letter by noting that (a) Mr. Dondero did not seek judicial relief, make any of the contentions the advanced in the December 31 Letter, or even complain to the Debtor, (b) no action was taken against Entities,

APP. 0519

004309

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 524 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 592 of 1017    PageID 5271
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 523 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21    Entered 01/06/21 16:43:34    Page 12 of 19

only against Mr. Dondero, (c) Mr. Dondero was given reasonable notice of his eviction and the termination of the Debtor's services to him, such that he could have and should have made alternative arrangements to avoid any disruption, and (d) nothing prevents Mr. Dondero from continuing to work on behalf of the Entities.  The Debtor also noted that it will take all steps to protect its interests against any further frivolous claims and threats made by the Defendants.

46.    Upon information and belief, Mr. Dondero has taken no steps to cause the Defendants – entities that he owns and/or effectively controls and that are each a "Related Entity" under the Term Sheet – to comply with the Debtor's demands made in response to the Defendants' Letters.

### FIRST CLAIM FOR RELIEF

### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

47.    The Debtor repeats and realleges each of the allegations in each of the foregoing paragraphs as though fully set forth herein.

48.    A bona fide, actual, present dispute exists between the Plaintiff and the Defendants concerning their respective rights and obligations concerning the CLOs.

49.    A judgment declaring the parties' respective rights and obligations will resolve their disputes.

50.    Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- Each of the Defendants is directly or indirectly controlled by Mr. Dondero;

- Each of the Defendants is an "affiliate" of the Debtor for purposes of the CLO Management Agreements;

- The Plaintiff has the exclusive contractual right to manage the CLOs;

- The Plaintiff has the exclusive duty and responsibility to buy and sell assets on behalf of the CLOs;

DOCS_NY:41851.8 36027/002

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 525 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 593 of 1017    PageID 5272
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 524 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21    Entered 01/06/21 16:43:34    Page 13 of 19

- Holders of preference shares have no right to make investment decisions on behalf of the CLOs;

- The Debtor's decision to evict Mr. Dondero from the Debtor's offices, and to terminate the provision of services to him, did not violate any contract with, or duty owed to, any of the Defendants; and

- The demands and requests set forth in Defendants' Letters constitute interference with the Plaintiff's business and management of the CLOs.

.

## SECOND CLAIM FOR RELIEF

### (Violation of the automatic stay under section § 362(a) of the Bankruptcy Code)

51.     The Debtor repeats and realleges each of the allegations in each of the foregoing paragraphs as though fully set forth herein.

52.     The Defendants' interference with the Plaintiff's contractual rights and course of dealing violates the automatic stay pursuant to § 362(a) of the Bankruptcy Code.

53.     To the extent Defendants engaged in such conduct after the entry of the Court's Order on the Restriction Motion, such conduct was willful.

54.     The Plaintiff is entitled to damages in an amount to be determined at trial arising from, and related to, the Defendants' violation of the automatic stay.

## THIRD CLAIM FOR RELIEF

### (Tortious Interference with Contract)

55.     The Debtor repeats and realleges each of the allegations in each of the foregoing paragraphs as though fully set forth herein.

56.     Since November 2020, Defendants have tortuously interfered with the Debtor's CLO management contracts.

DOCS_NY:41851.8 36027/002

APP. 0521

004511

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 526 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 594 of 1017    PageID 5273
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 525 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21    Entered 01/06/21 16:43:34    Page 14 of 19

57.     The Debtors' CLO management contracts constitute are valid contracts, and, upon information and belief, the Debtor knows of the terms and conditions of such contracts because they were prepared and executed at Mr. Dondero's direction.

58.     The Defendants have willfully and intentionally impeded the Debtor's ability to fulfill its contractual duties and obligations pursuant to its CLO management contracts, by, among other things, (1) hindering the Debtor's ability to sell certain CLO assets, (2) threatening to initiate the process for removing the Debtor as the portfolio manager of the CLOs, and (3) otherwise attempting to influence and interfere with the Debtor's decisions concerning the purchase or sale of any assets on behalf of the CLOs.

59.     Defendants' conduct has proximately caused, and will continue to cause, damage and loss to the Debtor's estate.

60.     The Plaintiff is entitled to damages in an amount to be determined at trial arising from, and related to, the Defendants' tortious interference with its CLO management contracts.

## FOURTH CLAIM FOR RELIEF

### (For Injunctive Relief -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7065)

61.     The Debtor repeats and realleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

62.     Pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 7065, the Debtor seeks a preliminary and permanent injunction enjoining Defendants from (1) engaging in any Prohibited Conduct, and (2) conspiring, colluding, or collaborating with (a) Mr. Dondero, (b) any entity owned and/or controlled by Mr. Dondero, and/or (c) any person or entity acting on behalf of Mr. Dondero or any entity owned and/or controlled by him, to, directly or indirectly, engage in any Prohibited Conduct.

APP. 0522
Appx. 00589
004512

63.    Bankruptcy Code section 105(a) authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

64.    Bankruptcy Rule 7065 incorporates by reference rule 65 of the Federal Rules of Civil Procedure and authorizes the Court to issue injunctive relief in adversary proceedings.

65.    The interference and threats described herein are embodied in written communications and are without any justification, and constitute willful and intentional interferences with the Debtor's management contracts that, if not prohibited, will cause the Debtor irreparable damages; the Debtor is therefore likely to prevail on its underlying claim for tortious interference with contract.

66.    In the absence of injunctive relief, the Debtor will be irreparably harmed because Defendants are likely to engage in some or all of the Prohibited Conduct, thereby interfering with the Debtor's operations, management of assets, and contractual obligations, all to the detriment of the Debtor, its estate, its creditors and the creditors and stakeholders of the Successor Entities.

67.    In light of, among other things, (a) the Debtor's status as a debtor in bankruptcy subject to the jurisdiction of this Court, (b) the Settlement Order and Term Sheet, (c) Mr. Dondero's resignations as the Debtor's President and CEO and later as portfolio manager and an employee, (d) the authority vested in the Board and Mr. Seery, as CEO and CRO, (e) the TRO, (f) Mr. Norris's testimony during the Hearing, and (g) the Court's denial of the Restriction Motion, there is no legal or equitable basis for Defendants to engage in any of the Prohibited Conduct, and the balance of the equities strongly favors the Debtor in the request to enjoin Defendants from engaging in any Prohibited Conduct.

DOCS_NY:41851.8 36027/002

APP. 0523

Appx. 00579

004513

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 528 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 596 of 1017    PageID 5275
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 527 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21    Entered 01/06/21 16:43:34    Page 16 of 19

68.    Injunctive relief would serve the public interest by re-enforcing the implicit mandate in the Bankruptcy Code that debtors and their successors are to be managed and controlled only by court-authorized representatives, free from threats and coercion.

69.    Based on the foregoing, the Debtor requests that the Court preliminarily and permanently enjoin Defendants from engaging in any Prohibited Conduct or from causing, encouraging, or conspiring with Mr. Dondero, or any entity controlled by Mr. Dondero or agent acting on Mr. Dondero's behalf, from engaging in any Prohibited Conduct.

DOCS_NY:41851.8 36027/002

APP. 0524
004314

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 529 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 597 of 1017   PageID 5276
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 528 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21   Entered 01/06/21 16:43:34   Page 17 of 19

**PRAYER**

WHEREFORE, the Debtor prays for judgment as follows:

(a) On the First Cause of Action, a judgment declaring that: (i) each of the Defendants is directly or indirectly controlled by Mr. Dondero, (ii) each of the Defendants is an "affiliate" of the Debtor for purposes of the CLO Management Agreements; (iii) the Plaintiff has the exclusive contractual right to manage the CLOs; (iv) the Plaintiff has the exclusive duty and responsibility to buy and sell assets on behalf of the CLOs; (v) holders of preference shares have no right to make investment decisions on behalf of the CLOs; (vi) the Debtor's decision to evict Mr. Dondero from the Debtor's offices, and to terminate the provision of services to him, did not violate any contract with, or duty owed to, any of the Defendants; and (vii) the demands and requests set forth in Defendants' Letters constitute interference with the Plaintiff's business and management of the CLOs;

(b) On the Second Cause of Action, damages in an amount to be determined at trial arising from Defendants' violation of the automatic stay;

(c) On the Third Cause of Action, damages in an amount to be determined at trial arising from the Defendants' tortious interference with the Plaintiff's CLO management contracts;

(d) On the Fourth Cause of Action, a preliminary and permanent injunction enjoining Defendants from conspiring, colluding, or collaborating with (a) Mr. Dondero, (b) any entity owned and/or controlled by Mr. Dondero, and/or (c) any person or entity acting on behalf of Mr. Dondero or any entity owned and/or controlled by him, to, directly or indirectly, engage in any Prohibited Conduct;

(h) For such other and further relief as this Court deems just and proper.

DOCS_NY:41851.8 36027/002

APP. 0525
Appx. 00672
004315

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 530 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/06/25    Page 598 of 1017    PageID 5277
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 529 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21   Entered 01/06/21 16:43:34   Page 18 of 19

Dated: January 6, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Plaintiff Highland Capital Management, L.P.*

DOCS_NY:41851.8 36027/002

**APP. 0526**

**004516**

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 531 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/06/25   Page 599 of 1017   PageID 5278
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 530 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21   Entered 01/06/21 16:43:34   Page 19 of 19

## **VERIFICATION**

I have read the foregoing <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF</u> and know its contents.

    ••     I am a party to this action.  The matters stated in it are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

    ☒     I am the Chief Executive Officer and Chief Restructuring Officer of Highland Capital Management, L.P., the Plaintiff in this action, and am authorized to make this verification for and on behalf of the Plaintiff, and I make this verification for that reason.  I have read the foregoing document(s).  I am informed and believe and on that ground allege that the matters stated in it are true.

    ••     I am one of the attorneys of record for _____, a party to this action.  Such party is absent from the county in which I have my office, and I make this verification for and on behalf of that party for that reason.  I have read the foregoing document(s).  I am informed and believe and on that ground allege that the matters stated in it are true.

I certify and declare under penalty of perjury under the laws of the United States that the foregoing is true and correct as of this 6th day of January 2021.


                                    */s/ James P. Seery, Jr.*
                                      James P. Seery, Jr.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 532 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 600 of 1017    PageID 5279
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 531 of
2722

# EXHIBIT 7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
| | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | Tuesday, January 26, 2021 |
| | ) | 9:30 a.m. Docket |
| Debtor. | ) | |
| | ) | MOTION FOR ENTRY OF ORDER |
| | ) | AUTHORIZING DEBTOR TO |
| | ) | IMPLEMENT KEY EMPLOYEE |
| | ) | PLAN [1777] |
| _____ | ) | |
| | ) | |
| HIGHLAND CAPITAL | ) | **Adversary Proceeding 21-3000-sjg** |
| MANAGEMENT, L.P., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | PLAINTIFF'S MOTION FOR A |
| | ) | PRELIMINARY INJUNCTION AGAINST |
| HIGHLAND CAPITAL | ) | CERTAIN ENTITIES OWNED AND/OR |
| MANAGEMENT FUND ADVISORS, | ) | CONTROLLED BY MR. JAMES |
| L.P., et al. | ) | DONDERO [5] |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:          Jeffrey Nathan Pomerantz
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         10100 Santa Monica Blvd.,
                          13th Floor
                         Los Angeles, CA  90067-4003
                         (310) 277-6910

For the Debtor:          John A. Morris
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         780 Third Avenue, 34th Floor
                         New York, NY  10017-2024
                         (212) 561-7700

2

```
1    APPEARANCES, cont'd.:

2    For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:      SIDLEY AUSTIN, LLP
3                                 One South Dearborn Street
                                  Chicago, IL  60603
4                                 (312) 853-7539

5    For CLO Holdco, Ltd.:        John J. Kane
                                  KANE RUSSELL COLEMAN LOGAN, P.C.
6                                 901 Main Street, Suite 5200
                                  Dallas, TX  75202
7                                 (214) 777-4261

8    For Certain Defendants:      Davor Rukavina
                                  Julian Vasek
9                                 MUNSCH, HARDT, KOPF & HARR
                                  500 N. Akard Street, Suite 3800
10                                Dallas, TX  75201-6659
                                  (214) 855-7587
11
12   For Certain Defendants:      A. Lee Hogewood, III
                                  Emily Mather
13                                K&L GATES, LLP
                                  4350 Lassiter at North Hills
14                                  Avenue, Suite 300
                                  Raleigh, NC  27609
15                                (919) 743-7306

16   For James D. Dondero:        John T. Wilson
                                  BONDS ELLIS EPPICH SCHAFER
17                                  JONES, LLP
                                  420 Throckmorton Street,
18                                  Suite 1000
                                  Fort Worth, TX  76102
19                                (817) 405-6900

20   For the U.S. Trustee:        Lisa L. Lambert
                                  OFFICE OF THE UNITED STATES
21                                  TRUSTEE
                                  1100 Commerce Street, Room 976
22                                Dallas, TX  75242
                                  (214) 767-8967

23   Recorded by:                 Michael F. Edmond, Sr.
                                  UNITED STATES BANKRUPTCY COURT
24                                1100 Commerce Street, 12th Floor
                                  Dallas, TX  75242
25                                (214) 753-2062
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 534 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 602 of 1017   PageID 5281
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 533 of
2722

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

APP. 0530
Appx 00575
004320

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 535 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/10/06/25 Page 603 of 1017 PageID 5282
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 534 of
2722

4

1      DALLAS, TEXAS - JANUARY 26, 2021 - 9:40 A.M.

2          THE COURT:  All right.  We have Highland settings

3  this morning:  a Motion for Approval of a KERP, which I didn't

4  see objections to, and then a Preliminary Injunction hearing.

5  Let me get appearances from the parties who have filed

6  pleadings.

7       For the Debtor team, I see Mr. Morris.  Who do we have

8  appearing?

9          MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

10  Pomerantz and John Morris appearing on behalf of the Debtor.

11  I will handle the KERP motion, which we'll propose goes first

12  and quickly, and then Mr. Morris will handle the adversary

13  proceeding.

14          THE COURT:  All right.  Very good.

15       All right.  Let me get appearances from the Defendants in

16  the preliminary injunction matter.  Do we have Mr. Kane or

17  someone for CLO Holdco?

18          MR. KANE:  Yes, Your Honor.  John Kane for CLO

19  Holdco, Ltd.

20          THE COURT:  All right.  What about for the Funds and

21  Advisors?  I guess we have a couple of law firms involved.

22  Who do we have appearing for the K&L Gates firm?

23          MR. HOGEWOOD:  Good morning, Your Honor.  This is Lee

24  Hogewood with K&L Gates, and also with our firm appearing

25  today is Emily Mather.

5

1          THE COURT:  Okay.  I didn't get Emily's last name.

2    Could you repeat that?

3          MR. HOGEWOOD:  I'm sorry, Your Honor.  Emily Mather,

4    M-A-T-H-E-R.

5          THE COURT:  Thank you.

6       All right.  For the Munsch Hardt team, do we have Mr.

7    Rukavina or someone else appearing?

8          MR. RUKAVINA:  Your Honor, good morning.  This is

9    Davor Rukavina.  I represent all of the Defendants in the

10   adversary except CLO Holdco.

11      Pursuant to the Court's instructions, Mr. Dondero is also

12   present here in my conference room, so he is here.  He is not

13   on the camera, but he is here.

14         THE COURT:  Okay.  All right.  And does Mr. Dondero

15   have counsel, his individual counsel appearing today?

16         MR. WILSON:  Your Honor, John Wilson for Jim Dondero.

17         THE COURT:  Okay.  Thank you.  Do we have Creditors'

18   Committee lawyers on the phone today?

19         MR. CLEMENTE:  Yes, Your Honor.  Good morning.

20   Matthew Clemente; Sidley Austin; on behalf of the Official

21   Committee of Unsecured Creditors.

22         THE COURT:  All right.  Thank you.

23      All right.  Well, obviously, if any other lawyer is dying

24   to chime in at some point today, I will consider letting that

25   happen.  But, again, I think we've got the parties who have

6

1    filed pleadings having appeared at this point.  So, let's turn

2    to the KERP motion.  Mr. Pomerantz?

3         MR. POMERANTZ:  Yes, Your Honor.  Good morning again.

4    On January 19th, the Debtor filed its motion for approval of a

5    Key Employee Retention Program which would substitute out its

6    annual bonus plan.

7        We have not received any opposition to the motion,

8    although the United States Trustee did ask some questions

9    which we are prepared to address in connection with the

10   proposed proffer of Mr. Seery's testimony.  I'm happy to make

11   a full presentation of the motion to Your Honor, if you would

12   like, or I could just present Mr. Seery's proffer, which I

13   should -- which I believe will establish the factual predicate

14   and the evidence to support the motion.

15        THE COURT:  All right.  Let's just go straight to the

16   proffer, please.

17         MR. POMERANTZ:  Okay.  Thank you, Your Honor.

18          PROFFER OF TESTIMONY OF JAMES P. SEERY

19        MR. POMERANTZ:  Mr. Seery is on the video today, and

20   if he was called to testify he would testify that his name is

21   James P. Seery, Jr. and that he is the chief executive officer

22   and chief restructuring officer of Highland Capital

23   Management.

24       He would also testify that he was one of the independent

25   directors appointed to the Court on January 9th, 2020.

7

1   Because of his role with the Debtor, he is familiar with the

2   company's day-to-day operations, including its -- the

3   company's employee and wage benefit and bonus plans relating

4   to the employees.

5       He would testify that he has been involved in the

6   negotiation and drafting of the company's plan of

7   reorganization, and is familiar with the expected operation of

8   the Claimant Trust and Reorganized Debtor post-confirmation in

9   connection with the plan.

10      He would testify that the plan generally provides for the

11  monetization of the company's assets for the benefit of

12  creditors and stakeholders, and he would testify that, as part

13  of the plan process, he worked closely with DSI, the company's

14  financial advisor, to assess both the costs of the Debtor's

15  current employee base and the projected cost of operations in

16  connection with the Reorganized Debtor and Claimant Trust

17  following the effective date.

18      He would testify that, to ensure the continued smooth

19  operation of the company in connection with the continuation

20  and consummation of the plan for the benefit of all

21  stakeholders, that he worked with DSI to determine the

22  appropriate staffing needs necessary for the company's

23  remaining operations.

24      He would testify that he analyzed the current employees to

25  determine which, if any, would need to be continued to be

8

1  retained by the Debtor and operate during the Reorganized

2  Debtor and Claimant Trust period following the effective date

3  of the plan.

4      He would testify as part of that analysis he reviewed the

5  roles and functions of the non-insider employees with respect

6  to the services that they needed, and he reviewed the wages,

7  benefits, and bonuses for those remaining non-insider

8  employees necessary for those functions.

9      He would testify, that based upon his review, the company

10  determined that it was in the best interests of the estate to

11  terminate the existing annual bonus plan, as it was no longer

12  necessary to effectively incentivize the remaining non-insider

13  employees who would be terminated prior to being entitled to

14  any further payments under the annual bonus plan.

15      He would testify that, instead, the company developed a

16  new retention plan that was designed to incentivize the non-

17  insider employees to remain with the company for as long as

18  they are needed to assist in the effectuation of the plan.

19      He would testify that Mr. Waterhouse and Surgent, arguably

20  two insiders of the Debtor, are not eligible for the retention

21  plan, and that's not because there is any concern regarding

22  their loyalty, but the Debtor is looking at ways to

23  appropriately incentivize and compensate those people as

24  appropriate in the future.

25      He would testify that there are a few persons on the list

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 540 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 608 of 1017   PageID 5287
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 539 of
2722

9

1   of people who are part of the retention plan with a title that

2   includes director or manager; however, he would testify that

3   none of those individuals are corporate officers or directors

4   of the Debtors -- the Debtor, and that the titles are for

5   convenience only.  He would testify that the individuals who

6   are employed in these roles do not have any authority

7   whatsoever to make any decisions on behalf of the Debtor.

8       He would testify that in connection with the new retention

9   plan, the non-insider employees may be offered the opportunity

10  to enter into a termination agreement with the company that

11  will provide specified benefits and payments in return for the

12  non-insider employee remaining as an employee in good standing

13  with the company through the separation date.

14      He would testify that a key component of the retention

15  plan is that non-insider employees will be entitled to the

16  specific bonus payments provided that they do not voluntarily

17  terminate their employment with the Debtor prior to the

18  separation date and are not terminated for cause.

19      He would testify that that is in contrast to the existing

20  or the prior annual bonus plan, which provided that non-

21  insider employees would not receive their bonus payments if

22  they were not employed by the Debtor on the vesting date for

23  any reason except on account of disability, including

24  termination without cause.

25      Mr. Seery would further testify that the retention plan is

10

1   being offered to approximately 53 employees, and the projected

2   aggregate amount of payments under the retention plan is

3   approximately $1,481,000, which is $32,000 approximately less

4   than the amount that would have been paid to such employees

5   under the annual bonus plan.

6       He would testify that the retention plan includes 20

7   employees who are not entitled to benefits under the annual

8   bonus plan.  Fourteen employees are entitled to receive more

9   under the retention plan than they would have received under

10  the annual bonus plan.

11      With respect to the 20 employees I've previously mentioned

12  who are not otherwise entitled to receive anything under the

13  annual bonus plan, the vast majority of those -- 18 -- will be

14  entitled to payments of $2,500 each, and the other two

15  entitled to payments of $10,000 and $7,500, respectively.

16      Mr. Seery would testify that he believes that these

17  additional payments are reasonable in light of the current

18  status of the company and the value to be added to the estate

19  through the retention of these employees, and that this plan

20  is more accurately and narrowly-tailored to achieve the

21  company's reorganization goals.

22      On this basis, Your Honor, Mr. Seery would testify that he

23  presented the proposed retention plan to the independent

24  directors and they agreed with Mr. Seery's assessment that

25  entry into the retention plan was in the best interests of the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 542 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 610 of 1017 PageID 5289
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 541 of
2722

11

1  estate and its creditors.

2     He would also testify that he had negotiations with the

3  Creditors' Committee and its advisors regarding the retention

4  plan and that the Committee is supportive of the retention

5  plan.

6     And that would conclude my proffer of testimony from Mr.

7  Seery, Your Honor.

8          THE COURT:  All right.  Mr. Seery, if you could say

9  "Testing, one, two" so we can catch your audio and video,

10 please?

11         MR. SEERY:  Testing, one, two, Your Honor.

12         THE COURT:  All right.  There you are.  Please raise

13 your right hand.

14         JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

15         THE COURT:  All right.  Thank you.  Is there anyone

16 who has questions at this time for Mr. Seery?

17    (No response.0

18         THE COURT:  All right.  Well, I'll just double-check

19 with the Committee.  It's been represented that you all are in

20 support of this.  Mr. Clemente, if you could confirm that on

21 the record?

22         MR. CLEMENTE:  That's correct, Your Honor.  The

23 Committee has no objection to the motion, so Mr. Pomerantz's

24 statements are accurate.

25         THE COURT:  All right.  Anyone else?

12

1          MS. LAMBERT:  This is Lisa Lambert for the United

2    States Trustee.  The U.S. Trustee has reviewed the actual data

3    about the comparatives, and the U.S. Trustee, based on the

4    stipulations, has no objection.

5          THE COURT:  All right.  Thank you.  Anyone else?

6      All right.  Well, the Court will approve this motion.

7    First, while the notice was expedited, the Court finds that it

8    was sufficient under the circumstances.  We are many months

9    into the case, it's been vetted by the Committee, and the

10   Court is satisfied with the level of notice here.

11     The Court finds that this is a KERP that is justified by

12   all the facts and circumstance of this case, to use the

13   wording of Section 503(c)(3) of the Bankruptcy Code.  There

14   also appears to be a very sound business purpose justifying

15   the proposed KERP.  It appears to be reasonable in all ways,

16   and fair under the circumstances, so I do approve it.

17     All right.  So if you all will get the order uploaded

18   electronically, I will promise to sign it promptly.

19          MR. POMERANTZ:  We will do so, Your Honor.  Thank

20   you.

21          THE COURT:  All right.  So, the preliminary

22   injunction.  Mr. Morris, I heard you were going to be taking

23   the lead on that, so go ahead.

24          MR. MORRIS:  Indeed.  Good morning, Your Honor.  John

25   Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 544 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 612 of 1017    PageID 5291
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 543 of
2722

13

1          THE COURT:  Good morning.

2          MR. MORRIS:  A few items before I give what I hope

3  will be an informative opening statement.  I trust that Your

4  Honor has not had the opportunity, because it was just filed a

5  moment ago, to see that the Debtor filed on the docket notice

6  of a settlement with CLO Holdco, Ltd., one of the Defendants

7  here today.

8          THE COURT:  I have not seen that.  Okay.

9          MR. MORRIS:  Right.  So you'll find that at Docket

10 1838.

11         THE COURT:  Okay.

12         MR. MORRIS:  It really is a very simple settlement,

13 Your Honor.  In exchange for the withdrawal of CLO Holdco's

14 objection to the Debtor's plan of reorganization, the Debtor

15 is dismissing CLO Holdco from this adversary proceeding with

16 prejudice.  There are, you know, some other bells and whistles

17 there, the most important of which to the Debtor is simply

18 that, under the CLO management agreements, most of them but

19 not all of them require that a level of cause be established

20 before the contracts can be terminated, and CLO Holdco has

21 agreed that, before it seeks to terminate a contract for

22 cause, there will be a gating provision or a gatekeeping

23 provision that requires them to come to this Court to simply

24 establish whether or not there is a colorable claim -- not for

25 a determination on the merits, but simply to protect the

14

1   Debtor from frivolous lawsuits.

2      So that's really the sum and substance of it.  Mr. Kane is

3   on the line now, and if I've either inaccurately or

4   incompletely characterized the settlement, I'm sure he'll take

5   the opportunity to supplement the record.  But we don't see

6   any need, really, to go through a full 9019 motion here.

7   There's no releases.  There's no exchange of money.  It's the

8   withdrawal of a plan objection in consideration for the

9   dismissal of an injunctive proceeding.

10      So we did want to alert you to that.  And as a result,

11   there was one witness that we intended to call today, Grant

12   Scott.  Mr. Scott is the director of CLO Holdco.  And with the

13   resolution of the issues between the Debtor and CLO Holdco, we

14   have no intention of calling Mr. Scott today.  But I'd like to

15   give Mr. Kane an opportunity to be heard just in case he's got

16   anything to add.

17         THE COURT:  All right.  Mr. Kane, can you confirm?

18   Do you have anything to change about what you heard?

19         MR. KANE:  Your Honor, I do not.  The settlement

20   agreement speaks for itself.  We did reach an agreement with

21   Debtor's counsel and the Debtor yesterday evening, fairly late

22   in the evening.  Mr. Morris's synopsis of the proposed

23   settlement is accurate.  The Debtor has agreed to dismiss CLO

24   Holdco from the preliminary injunction adversary proceeding

25   with prejudice.

15

1          THE COURT:  All right.  Well, thank you.  I've pulled

2     it up on my screen.  It's very short and to the point.  And I

3     agree with the comment of Mr. Morris that I don't think a

4     formal 9019 motion is required here, given no consideration is

5     going back and forth, or releases.  It's just exactly as you

6     described orally.  So, I appreciate that.  It simplifies a

7     little bit what we have set today.  And we will accept this

8     settlement as being in place as we roll forward.  All right?

9     Thank you.

10          MR. MORRIS:  Thank you, Your Honor.

11       So, before I get to the substance of the argument, I would

12     like to take care of some housekeeping items relative to

13     today's proceedings.

14          THE COURT:  Okay.

15          MR. MORRIS:  You know, this has been a bit of a

16     challenge for me personally, and it's going to be a little bit

17     of a challenge today for Ms. Canty, my assistant, in part

18     because it's almost like Groundhog's Day.  This is, I think,

19     the third time that we're covering some of the same issues.

20     We had covered them the first time on December 16th in

21     connection with what I'll now just simply refer to as the

22     Defendants, the Defendants' motion to try to limit the Debtor

23     from trading the CLO assets.  We heard a lot of what we're

24     going to hear today again on January 8th in connection with

25     the preliminary injunction motion against Mr. Dondero.  And so

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 547 of
Case 3:25-cv-02072-S    Document 15-7    Fi272d 10/06/25    Page 615 of 1017    PageID 5294
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 546 of
2722

16

1   there's already a ton of evidence in the record.  We do

2   believe that we need to present our evidence today, but one of

3   the challenges that we'll face, and I think we'll be able to

4   do it efficiently, Your Honor, is there may just be some back

5   and forth between various documents.  But everything's gone

6   pretty smoothly, and I'm optimistic we'll get through that

7   part of it today.

8        So I want to deal with the exhibits themselves, Your

9   Honor.  As you may have seen, there have been a number of

10  different filings relating to the Debtor's exhibits for this

11  particular motion, and I just want to go through the exhibits

12  and make sure that we're all on the same page here.  I want to

13  tell the Court exactly what happened and why and where we are

14  today.

15       The Debtor timely filed its original witness and exhibit

16  list on January 22nd.  They filed that witness and exhibit

17  list at Docket 39 in this Adversary Proceeding 21-3000.  The

18  exhibit list referenced Exhibits A through I'll just say

19  AAAAA.  It was a lot of exhibits, and somebody had the wise

20  idea to convert them to numbers, but it wasn't me, so I can't

21  take credit.  But we're left with letters, and they go from A

22  through AAAAA.

23       After filing that initial exhibit list, we realized that

24  --

25       (Interruption.)

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 548 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25   Page 616 of 1017    PageID 5295
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 547 of
2722

17

1          THE COURT:  All right.  Does someone have their

2      device unmuted?  Okay.  It went away.  Go ahead, Mr. Morris.

3          MR. MORRIS:  Thank you.  So, shortly after filing

4      that initial exhibit list, we realized that we forgot to file

5      among the exhibits AAAAA.  So at Docket #40 in the adversary

6      proceeding, the Court can find Debtor's Exhibit AAAAA.

7          And then we're going to -- I'm going to refer in a few

8      minutes -- I'm going to use in a few minutes some

9      demonstrative exhibits, and I'm going to use them again with

10     Mr. Seery.  And these exhibits concern trading in AVYA and SKY

11     securities that you've heard about previously.

12         But I'm pointing that out now because I'm kind of old

13     school, Your Honor, and I won't use a demonstrative exhibit if

14     it doesn't have the evidence in the record.  And what we

15     realized, Your Honor, is we made two additional mistakes on

16     Friday with all the papers that we filed.  The backup for

17     these demonstratives was mistakenly included on the exhibit

18     list for the confirmation hearing as opposed to the

19     preliminary injunction hearing.  That was error number one.

20     And error number two, we hadn't redacted the information to

21     show only the SKY and AVYA.

22         And that's why, Your Honor, at Docket #48, you will find

23     our amended exhibit list that includes what we have identified

24     as Exhibits BBBBB as in boy through SSSSS as in Sam.  And

25     those exhibits, Your Honor, are the backup to the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 549 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/10/06/25    Page 617 of 1017    PageID 5296
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 548 of
2722

18

1   demonstrative exhibits.  I don't expect to use them at all,

2   but I do believe strongly that one should not use a

3   demonstrative exhibit unless the evidence is in the record to

4   support it, and now it is.

5       So that's why, Your Honor, I do appreciate your court

6   staff.  I do appreciate Your Honor.  I think you either had

7   before you and you may have signed an order on redacting.

8   This is what it was all about.  It was just to make sure we

9   had the proper evidence in the record, so I appreciate that.

10      At this time, Your Honor, I think, just because I'll be

11  referring to it in the opening, the Debtor would move for the

12  admission into evidence of Exhibits A through SSSSS.

13          THE COURT:  All right.  Is there any objection?

14          MR. RUKAVINA:  Your Honor, there is.  Your Honor, I

15  object to UUUU.  I'll object to VVVV as in Victor.  I object

16  to AAAAA.  That's it, Your Honor.

17      I will note that there are several exhibits in here of

18  relevance to CLO Holdco that may not be relevant to my

19  clients, but those are my limited objections for now.

20          THE COURT:  All right.  Before we ask the nature of

21  your objection, let me ask Mr. Morris:  Shall we just --

22          MR. MORRIS:  Yeah.

23          THE COURT:  -- carve these out for now, and then if

24  you want to offer them the old-fashioned way, we'll hear the

25  objection then?

19

1          MR. MORRIS:  Yes, although I can make it very clear

2    that UUUU should not be in there precisely because it's

3    demonstrative.  We had talked that yesterday and I agreed; I

4    just forgot that.  UUUU should not be part of the record.

5          THE COURT:  Okay.  And so you'll just decide later do

6    you want to offer VVVV and AAAAA the old-fashioned way?

7          MR. MORRIS:  Correct.

8          THE COURT:  All right.  So, for the record, I am

9    admitting by stipulation -- with three exceptions I'll note --

10   all of the exhibits of the Debtor that appear at Exhibits 39

11   and, well, and 48.  And we're carving out of that admission

12   UUUU, VVVV, and AAAAA, which actually appears at Exhibit --

13   Docket Entry 40.  Those are not admitted at this time.

14       (Debtor's Exhibits A through SSSSS, exclusive of Exhibits

15   UUUU, VVVV, and AAAAA, are received into evidence.)

16         THE COURT:  All right.  Go ahead, Mr. Morris.

17         MR. MORRIS:  Yes.

18         MR. RUKAVINA:  Well, Your Honor, while we're talking

19   about housekeeping -- Mr. Morris, I apologize.  Is there more

20   housekeeping?

21         MR. MORRIS:  I'd like to continue.  I was going to

22   describe the witnesses.

23           OPENING STATEMENT ON BEHALF OF THE DEBTOR

24         MR. MORRIS:  So, Your Honor, the Debtor is going to

25   call three witnesses today.  The first witness will be Mr.

20

1    Dondero, the second will be Jason Post, and then the third

2    will be Mr. Seery.

3        Obviously, Mr. Dondero and Mr. Seery are very familiar to

4    the Court and they will cover much but not all of the same

5    ground that you've heard previously.

6        Mr. Post, I believe, is a new witness appearing in this

7    court for the first time.  I understand that he is the chief

8    compliance officer of each of the Debtors [sic].  He had

9    worked at Highland Capital Management, the Debtor, for more

10   than a decade, I believe, but moved over to NexPoint to work

11   with Mr. Dondero shortly after Mr. Dondero resigned from

12   Highland Capital on or about October 10th last year.

13       So those are the three witnesses that we plan to present

14   today, and I'd like to describe briefly kind of what we think

15   the evidence will show.

16       The theme from our perspective here, Your Honor, is that

17   this is a case that is about power and not rights.  The Debtor

18   brings this motion for preliminary injunction in order to

19   protect itself from the interference of Mr. Dondero and the

20   Defendants, entities that there will be no dispute he owns and

21   controls.

22       You may have read in the papers, and I suspect you will

23   hear today from the Defendants, the clarion call for

24   contractual rights and the need for this Court to protect

25   their contractual rights.  This is a red herring, Your Honor.

21

1   There are no contractual rights at issue here.  What Mr.

2   Dondero and the Defendants really want is to maintain control,

3   or at least to deny Mr. Seery from exercising the Debtor's

4   valuable contractual rights.  If there are any contractual

5   rights at issue here, it is the Debtor's.  The Debtor is the

6   party to the CLO management agreements, and it's those very

7   rights that are being infringed upon.

8       This was supposed to have been resolved 53 or 54 weeks ago

9   now, Your Honor, when Mr. Dondero agreed and this Court

10  ordered that Mr. Dondero could not use related entities to

11  terminate any of the Debtor's agreements.  There is no dispute

12  that each of the Defendants is a related entity for purposes

13  of the January 9th order, since Mr. Dondero and Mr. Norris

14  have already testified that the Defendants are owned and/or

15  controlled by Mr. Dondero.

16      Notwithstanding the plain language of the January 9th

17  order, which Mr. Dondero not only agreed to, but it may be one

18  of the very few orders in this case that he hasn't appealed,

19  notwithstanding the plain language, Your Honor, he persists,

20  and that is why we are here.

21      How do we know that this is about power and not rights?

22  How do we know that everything that's going to be described

23  for you, what the evidence is going to show that this is about

24  power and not rights, is very simple.  Mr. Dondero and Mr.

25  Post will testify -- I'm just going to give four, five, six

22

1    examples here -- are going to testify that Mr. Seery's AVYA

2    trades were not in the Funds' best interests.  It's an

3    irrelevant point, Your Honor.  There is no contractual right

4    that gives them the ability to terminate because they don't

5    like trades that are being made.  They can sell.  If they

6    don't like it, they can sell.  That's what's really funny

7    about this.

8        But what's -- what makes it even more clear that this is

9    about power and not rights is the evidence is going to show

10   that Mr. Dondero sold AVYA shares throughout 2020.  He sold

11   those shares right up until the day he resigned.  And yet six

12   days after resigning, NexPoint sends a letter saying, Don't

13   sell any assets.

14       Ms. Canty, can we put up Exhibit number -- Demonstrative

15   Exhibit 1, please?

16       Okay, Your Honor.  We have redacted this to shield from

17   public disclosure the name of each fund that's trading, but

18   the backup, as I alluded to earlier, in Exhibits BBBBB through

19   SSSSS, some portion of those documents, that's where these

20   demonstrative figures come from.

21       And as you can see, beginning on January 29, 2000,

22   continuing through the bottom of the page, October 9th, 2020,

23   when Mr. Dondero left Highland Capital, he traded millions and

24   millions and millions of dollars in AVYA stock.

25       Can we go to Demonstrative Exhibit #2, please?

23

1      This chart is really -- no, I apologize if I -- the other

2  one.  The AVYA trading activity chart.  Yeah.

3      This one is really interesting, Your Honor, because it

4  shows the trading throughout the year of AVYA stock, and you

5  can see the brown bars there represent Mr. Dondero's trades.

6  And you can see just how many trades there are.  There are

7  over a million shares, I think, if you added it up.  They're

8  represented by the brown bars.  You can see him selling AVYA

9  stock throughout the period, sometimes at a price really near

10 its bottom.

11     And then Mr. Seery tries and actually does sell some stock

12 toward the end of the year.  That's the green bars on the

13 right.  A very, very tiny amount compared to Mr. Dondero.  And

14 he sells it at a substantially greater price than Mr. Dondero

15 sold the AVYA stock.  And yet they're here telling you, Your

16 Honor, that somehow Mr. Seery is mismanaging the CLOs and they

17 disagree with what he's doing and he's not acting in the best

18 interests of the investors.  That's what they want -- but this

19 is what the evidence shows, Your Honor.

20     With respect to SKY, if we could go to the next slide,

21 please.

22     So this is SKY.  Now, Mr. Dondero did not trade any SKY

23 securities, but Mr. Seery did.  And this was another security

24 -- and we'll get to the evidence in a moment -- that Mr.

25 Dondero interfered with and tried to stop.  So Mr. Seery

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 555 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 623 of 1017 PageID 5302
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 554 of
2722

24

 1    succeeded sometimes and he was stopped sometimes, but the

 2    point is, Your Honor, look at the price that Mr. Seery sold.

 3          And remember, you heard this before and you're going to

 4    hear it again.  Nobody from the Defendants ever asked Mr.

 5    Seery, Why do you want to trade this?  Not that they even had

 6    to.  Not that Mr. Seery needs to defend himself, frankly.

 7    He's got the authority under the management contracts to act

 8    in the way that he thinks is in the best interest.  But look

 9    at this chart.  He made these sales, Your Honor, at more than

10    twice the price of the bottom.

11          How can they have any credibility?  How can Mr. Dondero

12    and Mr. Post come into this courtroom and assert that Mr.

13    Seery is doing anything other than a fabulous job?  He is

14    selling at the top of the market.  Because they think that

15    some high -- in the future, it's going to go higher?  It's

16    prudent, Your Honor.

17          Mr. Seery is going to tell you the work that he did.  He

18    is going to give you the rationale for his decisions.  And the

19    only conclusion that I hope and believe the Court will be able

20    to reach is that these were not only rational decisions but

21    they were prudent, taking some money off the table when the

22    stock was near its high.

23          That's how we know, this is more evidence how we know this

24    is about power.  It's not about rights.  It's not about

25    justice.  It's not about anything having to do with anything

25

 1   other than Mr. Dondero wanting to maintain control.

 2        How else do we know?  What other evidence is there that

 3   this is about power and not rights?  Again, the timing.  The

 4   calendar here is going to be very, very important.  The first

 5   demand from NexPoint from the Defendants that Mr. Seery stop

 6   trading came on October 16th.  It was less than a week after

 7   Mr. Dondero -- like, where does this come from?  There's no

 8   right to demand stopping of trading.  You don't get to do it.

 9   And they're going to minimize it.  They're going to spend the

10   whole day, Your Honor, either -- either focusing on the law or

11   trying to minimize.  And they'll say, well, it was just a

12   request, Your Honor.  And if it was a third-party request, I

13   bet Mr. Seery -- Mr. Seery is going to tell you, if it was a

14   third party, he wouldn't care.  But when you put all of this

15   together, it is oppressive.  It is an exertion -- it's an

16   attempt at exertion of control.  That's how it's perceived and

17   that's actually what happened.

18        Do you need more evidence?  Again, they'll talk about

19   termination for cause and how they have the right and the

20   Court -- you, Your Honor, don't have the power to infringe

21   upon their contractual rights.  But there will be no evidence.

22   Absolutely none.  Mr. Post is going to tell you, in fact, that

23   he has no evidence of any breach, of any default, of any

24   reason whatsoever that cause might exist for the termination

25   of these contracts.  That's how you know this is about power

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 557 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 625 of 1017 PageID 5304
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 556 of
2722

26

1   and not rights.

2       Last point on the issue of power versus rights:  Who were

3   the counterparties to the CLO agreements?  Did the CLO Issuers

4   -- where are they?  They're not here.  They're not here to

5   tell the Court that Mr. Seery is breaching his duty.  They're

6   not here to tell the Court that the Debtor is in default.  In

7   fact, what Mr. Seery is going to tell you, and it won't be

8   rebutted, is that the CLO Issuers are close to finalizing a

9   deal that will permit the Debtor to assume the CLO management

10  contracts.

11      Mr. Post or Mr. Dondero might get up on the stand today

12  and say, oh, because people have left the firm, that somehow

13  they don't have the ability to service the contracts anymore.

14  You know who doesn't believe that?  The contractual

15  counterparty, the Issuers.  It's about power, Your Honor.

16  It's not about rights.

17      There is substantial evidence that warrants the imposition

18  of a preliminary injunction, substantial evidence, much of

19  which you've heard already.

20      The October and November letters demanding or requesting

21  that the Debtor halt trades.  There's no right to that.

22      Mr. Dondero's interference with the support of Joe Sowin,

23  the Advisors' trader, around Thanksgiving, when they actively

24  moved in.  And it's in the emails.  It's in the record.  We'll

25  put in the record again.

27

1     And then he made the threat to Thomas Surgent -- Mr.

2  Dondero made the threat to Thomas Surgent about potential

3  personal liability.

4     The ridiculous -- remember the ridiculous motion that was

5  heard on December 16th, a motion so devoid of factual or legal

6  basis that the Court granted the Debtor a directed verdict and

7  dismissed the motion as frivolous?  Notably, neither Mr.

8  Dondero nor Mr. Post testified at that hearing.  Yet, within a

9  week, Your Honor -- the hearing was on a Wednesday.  The

10  hearing was on Wednesday, December 16th.  The Court entered

11  the order on Friday, December 18th.  On Monday, December 21st,

12  the next business day, Mr. Dondero and Mr. Post and the

13  lawyers for the Defendants held conference calls to figure out

14  what to do next.

15     And the very next day, the evidence is going to show --

16  it's already in the record -- Mr. Dondero again actively

17  stopped Mr. Seery's trades from being effectuated.  They sent

18  their first letter.  This is less than a week after that

19  hearing, Your Honor.  They sent another letter asking the

20  Debtor -- again, they requested -- minimize -- this is what

21  you're going to hear:  Well, we just sent a letter requesting

22  no more trading.

23     What happened the next day, December 23rd?  They send

24  another letter and they say, We're thinking about terminating

25  the contracts.  Now we think we're going to terminate the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 559 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 627 of 1017   PageID 5306
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 558 of
2722

28

1    contracts.  And we just want to let you know we're thinking

2    about terminating the contracts.

3        And we call them -- and Mr. Seery is going to testify to

4    this -- we say, What are you doing?  Every time we just said,

5    Please withdraw your letter.  There's no basis for doing this.

6    Leave us alone and let us do our job.  They wouldn't -- they

7    refused to withdraw the letter.

8        And finally -- again, Mr. Seery will testify to this -- we

9    told them, If you think you really have a basis for

10   terminating the contract, make your motion to lift the stay.

11   And if you don't, the Debtor will file the motion that brings

12   us here today.

13       And that's how we got here, because they continued to

14   interfere with the trading.  They continued to send these

15   specious letters that are implicit threats.  Mr. Seery is

16   going to tell you that every one of these, he -- is an

17   implicit threat.  We asked them, Just withdraw the letters and

18   stop it.  We asked them to make their own motion if you think

19   so strongly of it.  They wouldn't do that, either.  They just

20   want it hanging out there.  They just want it all hanging out

21   there over Mr. Seery's head so that he knows somebody's --

22   somebody's watching and somebody's planning, you know, to take

23   action.

24       It's not right, Your Honor.  They have no right to any of

25   this.  There's nothing in the contract that allows them to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 560 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 628 of 1017 PageID 5307
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 559 of
2722

29

1    make even a good-faith -- to make any claim that they have

2    cause to terminate the contract.  They have no right under any

3    circumstances to stop Mr. Seery from trading.

4        What they are going to tell you is there's no agreement

5    between the Advisors and the Debtor that requires the Advisors

6    to execute the trades.  And they're right about that.  They're

7    actually right about that.  But here's the thing, Your Honor.

8    What Mr. Seery is going to tell you is that Advisors has the

9    trading desk.  For more than a decade, they executed the

10   trades.  Through the entirety of this bankruptcy case, until

11   Mr. Dondero left Highland, they executed the trades.  Even

12   after Mr. Dondero left Highland in October, they continued to

13   execute the trades.  And on December 22nd, they fold their

14   hands and they say, Nope, I don't care about the course of

15   dealing, I don't care what impact it has, you can't make me do

16   it.  So Mr. Seery has tried end-arounds, and that'll be in the

17   record, too, and that's when the threats to Surgent come.

18   That's when the threat to Surgent come, when we try to do the

19   workaround.  Cannot do it.

20       This is just not right, Your Honor.  It's just not right.

21   There's order -- there's the January 9th order.  There was the

22   TRO that was in effect that we're going to hear about again,

23   because that TRO not only applied to Mr. Dondero, it prevented

24   him from conspiring with or even encouraging a related entity

25   from engaging in prohibited conduct.  And that prohibited

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 561 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 629 of 1017   PageID 5308
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 560 of
2722

30

1  conduct, as Your Honor knows, because it's your order, is

2  plain and as unambiguous as can possibly be:  Don't interfere

3  with the Debtor's business.  It's all we're asking for.  It's

4  the only reason we're here today.

5      Interestingly, Your Honor, probably the best piece of

6  evidence that I'll put in front of you today are going to be

7  the words out of Mr. Post's mouth, because basically what he's

8  going to tell you is that, as chief compliance officer, he has

9  never once in the history of his employment told Mr. Dondero

10  to stop.  In fact, what he's going to tell you is that he

11  defers to the investment professionals, and that but for the

12  TRO that is consensually in place today, it would depend on

13  the facts and circumstances as to whether or not he actually

14  does anything as chief compliance officer to stop this

15  conduct.  Depends on the -- maybe he can explain to Your Honor

16  what facts and circumstances he thinks, as chief compliance

17  officer, would allow the Advisors to interfere with the

18  Debtor's business.  It'll be interesting to hear him answer

19  that question.

20      That's all I have, Your Honor.  I look forward to

21  presenting the evidence today.  I'd like this done once and

22  for all.  It's time to move on.  And the Debtor -- the Debtor

23  is in bankruptcy.  Your Honor, I think, has every power, every

24  right, and frankly, you know -- I feel very strongly about

25  this, obviously, Your Honor -- the Debtor needs the breathing

31

1   space and to be left alone so it can do its job.  And we'll

2   respectfully request at the end of this that the Court enter

3   an order allowing it to do so.

4       Thank you, Your Honor.

5           THE COURT:  All right.  We were hearing some

6   distortion there, I'm not sure where it was coming from, but

7   we'll try to keep it reined in.

8       Mr. Rukavina, your opening statement.

9           MR. RUKAVINA:  Your Honor, thank you.  Can the Court

10  hear me?

11          THE COURT:  Yes.

12      OPENING STATEMENT ON BEHALF OF CERTAIN DEFENDANTS

13          MR. RUKAVINA:  Your Honor, I think it's important

14  first to note a few obvious things.  One, what we're talking

15  about today is enjoining future rights, future rights under a

16  contract.  Hearing Mr. Morris's opening, it sounds like we're

17  trying a breach of contract case.  There is no declaratory

18  relief sought for whether there is grounds for a breach of

19  contract case.  And prior to assumption and prior to

20  confirmation, the automatic stay applies.

21      So let me be clear that what they're asking the Court to

22  do today is to excise from these contracts our rights in the

23  future, effectively for all time, as I'll explain.

24      The second thing that merits real consideration is that it

25  is the Funds, Your Honor, not the Advisors, it is the Funds

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 563 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 631 of 1017   PageID 5310
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 562 of
2722

32

1    that have the right to remove the Debtor as manager.

2        Those Funds, as you will hear, have independent boards.

3    Mr. Dondero doesn't own those Funds.  He's not on those

4    boards.  He doesn't control them.

5        When Mr. Morris talks about Mr. Norris's prior testimony,

6    that testimony was limited to the Advisors.  And yes, Mr.

7    Dondero does own the Advisors, and Mr. Dondero, while I won't

8    say controls the Advisors, certainly has a lot of input.  That

9    is not the case for the Funds, which are the ones with the

10   contractual powers here to remove the Debtor.

11       You will hear that those -- that that board or those

12   boards meet frequently, they have independent counsel, and

13   they take separate actions, including very recently where they

14   did not do something that was advised and acted independently.

15       And the third thing that makes this case different and

16   that all of us should bear in mind is that we're talking today

17   about other people's money.  There's more than one billion

18   dollars of investment funds, retirement funds, pension funds,

19   firefighter funds, school funds, wealthy individuals, having

20   nothing in the world to do with Mr. Dondero or anyone in this

21   case.

22       So what we're talking about here today, Your Honor, is

23   that if my retirement manager files bankruptcy, that I for all

24   time would be effectively enjoined from removing him, no

25   matter what he may do in the future, just because he needs

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 564 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 632 of 1017 PageID 5311
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 563 of
2722

33

1  that revenue.

2     That is an absolutely inappropriate use of a preliminary

3  injunction.  It is the modification of a contract that the

4  Debtor seeks to assume, and there is going to be no evidence

5  on the underlying elements that the Court must consider.

6     I say that, Your Honor, because I'm new to -- I'm late to

7  this case but I have studied in detail what Your Honor did in

8  the *Acis* case.  And I think that we have to qualitatively

9  differentiate today from *Acis*.  In *Acis*, there were

10 allegations of fraudulent transfer.  When Your Honor enjoined

11 future actions, I believe in part it was because the

12 legitimate owner of those rights might not have been having

13 those rights.

14    So that was a very important difference.  Here, there's no

15 question that we have more than billion dollars of other

16 people's funds at issue.

17    Also in *Acis*, as confirmed by the District Court, there

18 was the exercise of an optional redemption right, which could

19 have very well been used as a weapon to strip the manager of

20 its rights.  That's not the case here today.  We are talking

21 about removing the Debtor in the future -- not today, not

22 prior to assumption, in the future -- for such things as if

23 the Debtor commits fraud, if Mr. Seery is indicted for

24 felonies, if the Debtor absconds with our funds.  We are

25 talking about potential hypothetical actions in the future

APP. 0560
Appx. 00807

004550

34

1   that are not even ripe based on the Debtor's potential

2   wrongful actions, not based anything on our motivations or our

3   intentions.

4        So this is a different case than Your Honor has heard so

5   far in these cases.  And what it boils down to, Your Honor, is

6   will the Court give judicial immunity to the post-assumption,

7   post-confirmation Debtor over the next two or three years as

8   it manages and liquidates more than a billion dollars of other

9   people's funds?  It is their money at issue.

10       So, in order to do this, the Debtor first has to tell Your

11   Honor that it has a likelihood of merits on the success [sic]

12   of some claim.  The Debtor cannot just come to you -- because

13   the Debtor knows Your Honor's opinion on 105(a) and the

14   Supreme Court law -- and the Debtor cannot just say, Judge,

15   please give us an injunction because it's convenient or

16   because we don't want to comply with our obligations.  So they

17   concoct a tortious interference claim.  They argue that there

18   is an automatic stay violation, which, as Your Honor knows,

19   all of us bankruptcy lawyers take most seriously.  And they

20   argue that, well, whatever Mr. Dondero has been enjoined from

21   doing, somehow we *a priori* are also enjoined.  Basically, an

22   alter ego with no facts, law, trial, or due process.

23       On the tortious interference, Your Honor will hear

24   absolute evidence that cannot be refuted that all that we did,

25   all that we did was we refused, our employees refused to make

35

 1   a ministerial entry into a computer program of two trades that

 2   Mr. Seery authorized.  Those trades closed exactly as Mr.

 3   Seery wanted.  Those trades closed, were executed, before Mr.

 4   Seery asked our employees to do his bidding.  And the reason

 5   why our employees were instructed not to do what Mr. Seery

 6   wanted was because our chief compliance officer looked at it,

 7   those employees looked at it, and they all said, What is this?

 8   Our internal protocols were not followed.  We don't know

 9   anything about these trades.  We have fiduciary duties, we

10   have SEC obligations, and Mr. Seery has his own employees whom

11   he can instruct to enter these two trades into the computer

12   and our employees aren't going to do it.  It's as simple as

13   that.

14       Mr. Dondero did not command that decision.  Mr. Dondero

15   did not instruct that decision.

16       Our employees not doing what Mr. Seery requested of them

17   is not tortious interference.  It is not interference as a

18   matter of law.  There was no breach of contract as a result.

19       So the two elements -- two of the elements required for

20   tortious interference, there will be zero evidence on.  But in

21   the bigger picture, what they're talking about again is

22   restraining our rights in the future.  And whether -- whether

23   we are party to these contracts or a third-party beneficiary,

24   it doesn't matter, because we are not a stranger to these

25   contracts.  These contracts expressly give us rights.  And a

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 567 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 635 of 1017   PageID 5314
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 566 of
2722

36

1   party exercising their right under a contract, it could be

2   breaching that contract, but it cannot be tortious

3   interference as a matter of law.

4       And if Your Honor is concerned about us tortiously

5   interfering in the future, then the Court should enjoin us

6   from tortious interference in the future, not excise from the

7   contract the remedies that the Debtor must accept if it wants

8   to assume these contracts.

9       Moving to the automatic stay issue, the sole and exclusive

10  argument for why we violated the stay is because our counsel,

11  a seasoned, gentlemanly bankruptcy lawyer of many years'

12  experience, sent two letters to seasoned veteran bankruptcy

13  lawyers for the Debtor.  Communications.  Communications

14  amongst counsel.

15      The first, the December 22nd letter, is a request:  Okay,

16  we lost in front of Judge Jernigan, Judge Jernigan called our

17  motion frivolous, we get that, but we ask you to please stop

18  trading until the plan is confirmed.  A request which the

19  Debtor ignored.  Or that's not true, didn't ignore:  refused

20  to comply with.

21      The second letter, a day later, after various

22  communications, was:  Okay, we are going to initiate the

23  process of terminating you as the servicer.

24      Mr. Dondero had nothing in the world to do with these

25  letters.  Mr. Dondero did not direct these letters.  This was

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 568 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 636 of 1017 PageID 5315
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 567 of
2722

37

1  professional advice from outside counsel and the independent

2  boards of the Advisors believing that their fiduciary duty

3  compelled that.

4      And guess what, that letter even said:  subject to the

5  automatic stay.  You heard from Mr. Morris that they basically

6  said, File your stay motion.

7      Our follow-up letter clarified anything that we might do

8  is subject to the automatic stay.  We never said we're going

9  to act in a way that the stay doesn't permit.  We said we're

10  going to come to this Court first.

11      But even all that, all those communications, while it may

12  be interesting, are irrelevant, because we never took any

13  action.  You will hear that we never communicated with the

14  CLOs, the Trustees, or the Issuers, anything like we went over

15  with the Debtor, anything like, Please start the process of

16  removing the Debtor.  We have done nothing of the sort, we

17  will do nothing of the sort, precisely because of the

18  automatic stay.

19      So I equate this, Your Honor, to your average home lender

20  whose lawyer sends a letter to the borrower saying, You don't

21  have insurance; we're going to start the process of

22  foreclosure.  You're past due on your post-petition adequate

23  protection payments; we're going to start the foreclosure

24  process; we're going to go seek a list of stay.  That is not

25  actionable.  It is not a stay violation.  Those are

38

1   communications, not actions.  And that is precisely what

2   seasoned professional counsel should be doing.

3       And now, Your Honor, we move to the Mr. Dondero issue.

4   The argument is, well, on January the 9th, Mr. Dondero,

5   apparently for all time, in perpetuity, agreed that he will

6   not cause the related entities to terminate these agreements.

7   And then the argument is, well, the Court entered a TRO

8   against Mr. Dondero and the Court entered a preliminary

9   injunction against Mr. Dondero.  Okay?

10      I don't see where the problem is.  Mr. Dondero is

11  prohibited from causing us to terminate these agreements.

12  There are many ways, with independent boards, that Mr. Dondero

13  has nothing to do with that.  And he will have nothing to do

14  with that in the future.  So if the concern is enjoining us

15  because of an injunction against Mr. Dondero, enjoin Mr.

16  Dondero.  Just like if the concern is that we're going to

17  tortiously interfere, you enjoin us from tortious

18  interference.  Or if we're going to violate the stay, enjoin

19  us from violating the stay.  But do not for all time assume

20  that any right that we may exercise in the future will

21  necessarily be tainted and the corrupt product of Mr.

22  Dondero's instructions.  You will see today on the evidence

23  that that has not happened and it will not happen.

24      And whatever Mr. Dondero may have agreed to, we are

25  separate entities.  Again, the Funds have -- are not

39

1  controlled or owned, and Mr. Dondero is not on the board.  So

2  whatever he may have agreed to is between the Court and the

3  Debtor and him, but he never agreed to that on behalf of the

4  Funds.  He never agreed to that on behalf of the Advisors, who

5  have their own independent fiduciary duties and duties under

6  the law.

7      So, Your Honor, there will be no substantial likelihood of

8  success on the merits.  There will be no likelihood of success

9  on the merits.  And I'm talking about the post-assumption,

10 post-confirmation time frame.  The issue is fundamentally

11 different pre-assumption and pre-confirmation.  But post-

12 assumption and post-confirmation, the Debtor will not show a

13 likelihood of success on the merits.  The Debtor will not show

14 any irreparable injury.  None.

15     Mr. Seery will testify that managing these agreements for

16 the coming couple or three years will have some value to the

17 Debtor.  He doesn't know what the profitability of that is to

18 the Debtor.  You will hear that, in fact, managing these

19 contracts for the next two years does not bring any

20 profitability to the Debtor.  The Debtor will lose money

21 managing of them.  But whatever damages there are are monetary

22 damages, and monetary damages are not an irreparable injury as

23 a matter of law.

24     Now, the Debtor says, well, the Court can enter an

25 injunction in the aid of restructuring, but this injunction

40

1   will happen after restructuring.

2       On the balance of harm and public interest, Your Honor, I

3   think we're dealing with more than a billion dollars of clean,

4   innocent third-party funds.  The balance of harm here weighs

5   against granting this injunction.  If we try to do anything in

6   the post-confirmation world, the Debtor has all of its rights

7   and remedies to contest what we do.  If we do it wrong, we're

8   liable in contract or in tort, there's monetary damages, and

9   the Debtor has already successfully organized.

10      But if the Debtor does something wrong in the future and

11  we cannot take action to stop a gross mismanagement or a

12  denution [sic] of the Debtor or an abscondence with funds,

13  then think about the harm to the innocent investors here.

14  Because if we even go to court, your Court, any court, we will

15  be in violation of a federal court injunction.

16      Your Honor, this is not the appropriate purpose of an

17  injunction for the preservation of the status quo.  The status

18  quo, by definition, cannot extend post-assumption or post-

19  confirmation.  This is not a proper exercise of equity.  We

20  have done nothing wrong, we have threatened to do nothing

21  wrong, and we will do nothing wrong to justify forever being

22  prejudiced and enjoined from exercising our contractual and

23  statutory rights.

24      Your Honor, this TRO extends through February the 15th.

25  We asked the Debtor to continue this hearing.  We asked the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 572 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 640 of 1017   PageID 5319
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 571 of
2722

41

1    Debtor to go to our independent boards and seek approval of

2    the same settlement that the Debtor has with CLO Holdco, which

3    we learned about last night.  We simply haven't had the time

4    to get those boards aligned up and present a settlement to

5    them.  We're trying to put together a competing plan.

6        Your Honor, there is no reason to go forward today except,

7    like Mr. Morris said, power.  Power.  Mr. Seery's power, Your

8    Honor.  Not ours.  Mr. Seery's power in perpetuity or for

9    judicial immunity, get out of jail free card.  Thank you.

10           THE COURT:  All right.  Mr. Morris, you may call your

11   witness.

12           MR. MORRIS:  Yeah.  I just want to make a motion to

13   strike the notion of a get out of jail free card.  I

14   appreciated everything counsel had to say, but I think that's

15   a little -- a little over the top.

16       We call Mr. James Dondero, please.

17           THE COURT:  Mr. Dondero, --

18           MR. RUKAVINA:  Your Honor, bear with me.

19           THE COURT:  Okay.

20           MR. RUKAVINA:  Your Honor, bear with me.  I'm going

21   to get out of this chair.  Mr. Dondero will get in this chair.

22   And so that there's no reverberation, I will be sitting next

23   to Mr. Dondero in case I have to make any objections.

24           THE COURT:  Okay.  All right.  Good morning, Mr.

25   Dondero.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 573 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 641 of 1017   PageID 5320
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 572 of
2722

Dondero - Direct                    42

1           MR. DONDERO:  Good morning.

2           THE COURT:  Please raise your right hand.

3              JAMES DONDERO, DEBTOR'S WITNESS, SWORN

4           THE COURT:  Thank you.  Mr. Morris, go ahead.

5           MR. MORRIS:  May I proceed, Your Honor?

6           THE COURT:  Yes.

7                       DIRECT EXAMINATION

8    BY MR. MORRIS:

9    Q    Good morning, Mr. Dondero.  Okay.  John Morris; Pachulski,

10   Stang, Ziehl & Jones; for the Debtor.  Can you hear me okay,

11   sir?

12   A    Yes.

13   Q    There are no board members here on behalf of any of the

14   Funds to testify or offer any evidence; isn't that right?

15   A    Not that I'm aware of.

16   Q    Okay.  And you knew the hearing was going to be today on

17   the preliminary injunction, right?

18   A    Yes.

19   Q    And you had an opportunity to confer with the boards of

20   the Funds in advance of this hearing, right?

21   A    No.

22   Q    There's no -- there's no -- no board member is expected to

23   testify, fair?

24   A    Correct.

25   Q    So the Court isn't going to hear any evidence as to the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 574 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 642 of 1017   PageID 5321
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 573 of
2722

Dondero - Direct                    43

```
 1  board's perception of what's happening here, right?

 2  A    Not that I'm aware of.

 3  Q    Okay.  Until January 9th, 2020, you controlled the debtor

 4  Highland Capital Management, LP; isn't that right?

 5  A    I don't remember exactly when these -- when the

 6  independent board was put in place, but up until around that

 7  time, I believe.

 8  Q    Okay.  So, January 2020?

 9  A    Yes.

10  Q    And during that month, you completed an agreement with the

11  Creditors' Committee where you ceded control of the Debtor

12  pursuant to a court order, right?

13  A    Pursuant to a court ...?  I thought it was pursuant to a

14  negotiation where they would have fiduciary responsibility to

15  the estate in my absence.  That's -- that's what I think the

16  (garbled).

17  Q    Okay.  You're aware -- so you entered into an agreement

18  with the Creditors' Committee pursuant to which you ceded

19  control of the Debtor, right?

20        MR. RUKAVINA:  Your Honor, I'll object.  That

21  agreement speaks for itself.  And if Mr. Morris wants to

22  present it to Mr. Dondero, he can.

23        THE COURT:  Um, --

24        MR. MORRIS:  Sure.  Ms. Canty, can we please put up

25  --
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 575 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 643 of 1017   PageID 5322
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 574 of
2722

Dondero - Direct                    44

1          THE COURT:  All right.  Well, I --

2          MR. MORRIS:  I'm happy to put it up, Your Honor.

3          THE COURT:  I overrule that objection.  You can ask.

4    And then if he's not sure, you can present the agreement.  All

5    right?  Go ahead.

6          MR. MORRIS:  Okay.

7    BY MR. MORRIS:

8    Q    Mr. Dondero, is there any doubt in your mind that in

9    January of 2020 you gave up control of Highland in favor of an

10   independent board at the Strand Advisors level?

11   A    No.  I -- yes, I agree with that.

12   Q    Okay.  And do you recall that, in connection with that

13   agreement, the Court entered an order?

14   A    Several orders.  Which one?

15   Q    Okay.

16         MR. MORRIS:  Can we please put up Docket No. 339?

17         MS. CANTY:  Sure, just one second.

18         MR. RUKAVINA:  And you have it here.

19      John, I have the order if just want Mr. Dondero to review

20   it.

21         MR. MORRIS:  I think -- I think everybody should have

22   the benefit of seeing it.  But thank you very much.

23      Your Honor, while we take this moment, can you just remind

24   me of when the Court needs to take a break today, so that I'm

25   mindful of that and respectful of your time?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 576 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 644 of 1017   PageID 5323
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 575 of
2722

Dondero - Direct                    45

1           THE COURT:  11:30.

2           MR. MORRIS:  Okay.  And what time will we reconvene?

3           THE COURT:  Well, I have said 1:00.  I hope it can be

4    a little sooner, but let's just plan on 1:00, okay, so there's

5    no confusion.

6           MR. MORRIS:  Okay.  All right.  All right.  So, on

7    the screen here, we have Exhibit OOOO, which is in the record.

8    BY MR. MORRIS:

9    Q    This is an order that was entered by the Court on January

10   9th, 2020.  Do you see that, sir?

11   A    Yes.

12          MR. MORRIS:  Can we scroll down to Paragraph 9,

13   please?  (Pause.)  Are you having problems, Ms. Canty?

14          MS. CANTY:  It's on the screen.  You can't see it?

15          MR. MORRIS:  Yeah.  Can you scroll down to Paragraph

16   9?

17          MS. CANTY:  It's on Paragraph --

18          MR. MORRIS:  That's on Page 2, I believe.

19          MS. CANTY:  Yeah, I have it up.  I'm not sure what

20   the disconnect is, because I can see it on my screen.  I'm

21   going to stop it and reshare it.

22          MR. MORRIS:  Thank you very much.

23      (Pause.)

24          MS. CANTY:  Do you see it now?

25          MR. MORRIS:  Okay.  Beautiful.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 577 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 645 of 1017    PageID 5324
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 576 of
2722

```
                        Dondero - Direct                    46
```

1   BY MR. MORRIS:

2   Q   Mr. Dondero, if you'd just read Paragraph 9 out loud.

3   A   (reading)  Mr. Dondero shall not cause any related entity

4   to terminate any agreements with the Debtor.

5   Q   Okay.  So you understood, as part of the corporate

6   governance settlement pursuant to which you avoided the

7   imposition of a trustee, that you agreed that you wouldn't

8   cause any related entity to terminate any agreements with the

9   Debtor, right?

10  A   Uh, --

11  Q   Is that correct?  You understood that paragraph?

12  A   Yes.

13  Q   Okay.  And you didn't appeal this particular order, did

14  you, sir?

15  A   I -- I believe I've refuted -- I've adhered to that order

16  entirely.

17  Q   Okay.  NexPoint Advisors LP, is one of the defendants in

18  this matter, right?

19  A   Yes.

20      (Pause.)

21  Q   Can you hear me, sir?

22  A   Yes.  Yes, I said, "Yes."

23          MR. NICHOLSON:  Well, John, did you -- did you ask a

24  question?  Because you went offline for a few seconds there.

25          MR. MORRIS:  I asked whether NexPoint Advisors, LP

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 578 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 646 of 1017   PageID 5325
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 577 of
2722

Dondero - Direct                          47

1   was an advisory firm.

2          THE WITNESS:  Yes.

3   BY MR. MORRIS:

4   Q   And you have a direct or indirect ownership interest in

5   NexPoint Advisors, LP, correct?

6   A   Yes.

7   Q   And you understand that, based on that direct or indirect

8   ownership interest, NexPoint Advisors, LP is a related entity

9   under Paragraph 9 of this order, right?

10  A   Yes.

11  Q   Okay.  Highland Capital Management Fund Advisors, LP is

12  one of the other defendants in this case, right?

13  A   Yes.

14  Q   And we'll refer to that entity as Fund Advisors; is that

15  fair?

16  A   Yes.

17  Q   And we'll refer to Fund Advisors together with NexPoint

18  Advisors, LP as the Advisors; is that fair?

19  A   Yes.

20  Q   Okay.  Fund Advisors is also an advisory firm; is that

21  (audio gap)?

22  A   I missed that last question.

23          MR. RUKAVINA:  John, you're freezing up on us.  Is it

24  on our end, Your Honor, or is it on Mr. Morris's end?

25          MR. MORRIS:  Just let me know -- just let me know

Dondero - Direct                     48

1   when it happens.

2           THE COURT:  Yes.  I'm hearing him.  But go ahead, Mr.

3   Morris.  Let's try again.

4           MR. MORRIS:  Okay.

5   BY MR. MORRIS:

6   Q    You have a direct or indirect ownership interest in Fund

7   Advisors, correct, sir?

8   A    Yes.

9   Q    (audio garbled)  And based on that direct or indirect

10  interest, you would agree that Fund Advisors is a related

11  entity for purposes of this order, correct?

12  A    Yes.

13  Q    In addition to your ownership interest, you're also the

14  president of Fund Advisors; is that (audio gap)?

15          THE COURT:  All right.  Now --

16          THE WITNESS:  I believe so.

17          THE COURT:  Yes.  Now I'm starting to have some

18  trouble, Mr. Morris.  Every once in a while, you're freezing

19  towards the end of a sentence.  So I don't know what can be

20  done, but it's --

21          MR. MORRIS:  All right.  Let me know if that

22  continues.

23          THE COURT:  Okay.

24  BY MR. MORRIS:

25  Q    To use your words -- to use your words, Mr. Dondero, it's

APP. 0575

004565

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 580 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 648 of 1017   PageID 5327
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 579 of
2722

Dondero - Direct                    49

1   fair to say that you generally control Fund Advisors, right?

2   A    Yes.

3   Q    And based on that, you acknowledge that Fund Advisors is a

4   related entity under the Court's order, correct?

5   A    Yes.

6   Q    And together, the Advisors that you own and control manage

7   certain investment funds, correct?

8   A    Yes.

9   Q    And three of those funds are defendants in this case,

10  correct?

11  A    Yes.

12  Q    And you are the portfolio manager of each of those funds;

13  is that right?

14  A    I believe so.

15  Q    Okay.  Let's talk about the events that led to this

16  matter.  CLO stands for Collateralized Loan Obligations,

17  correct?

18  A    I'm sorry.  Repeat that, please?

19  Q    Sure.  CLO stands for Collateralized Loan Obligations,

20  correct?

21  A    Yes.

22  Q    Years ago, the Advisors that you own and control caused

23  the investment funds that they manage to buy the interests in

24  CLOs that are managed by the Debtor, correct?

25  A    Yes.  Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 581 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/30/25   Page 649 of 1017   PageID 5328
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 580 of
2722

Dondero - Direct                         50

1   Q    Okay.  And those Funds still hold an equity interest

2   today, correct?

3   A    Yes.

4   Q    And K&L Gates is one of the law firms that represents the

5   Advisors and the Funds that are managed by the Advisors,

6   correct?

7   A    Yes.

8   Q    You would agree that the Debtor is party to certain

9   contracts that give it the right and the responsibility to

10  manage certain CLO assets, right?

11  A    Yes.

12  Q    And you recall that --

13        MR. RUKAVINA:  Your Honor, Mr. Morris is frozen on

14  our end.

15        THE COURT:  Yes.  Mr. Morris, you just froze.

16        MR. RUKAVINA:  We heard nothing, Mr. Morris.

17        THE COURT:  Yes.

18        MR. MORRIS:  Okay.

19  BY MR. MORRIS:

20  Q    Sir, do you recall that you resigned from the Debtor on or

21  around October 10th, 2020?

22  A    Yes.

23  Q    Okay.  And shortly thereafter, K&L Gates sent a couple of

24  letters to the Debtor on behalf of the Advisors and the Funds,

25  correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 582 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 650 of 1017   PageID 5329
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 581 of
2722

Dondero - Direct                    51

1   A    Yes.

2   Q    Okay.

3        MR. MORRIS:  Can we take a look at these?  These are

4   documents that were admitted into evidence in a different

5   matter, but they're actually referred to in his prior

6   testimony, which is in evidence in this case.  So I would just

7   ask Ms. Canty to go to Trial Exhibit B, which was filed in the

8   Adversary Proceeding 20-3190 at Docket 46.  And for the

9   record, it's PDF Page #184 out of 270.  I just want to take a

10  look at these two letters.

11  BY MR. MORRIS:

12  Q    Okay.  Do you see this letter, sir?

13  A    Yes.

14  Q    And NexPoint is one of the defendants here; is that right?

15  A    Yes.

16  Q    And that's one of the Advisors that you own and generally

17  control, correct?

18  A    Yes.

19  Q    And so this letter is sent less than a week after you've

20  left Highland Capital Management, right?

21  A    Yes.

22  Q    Do you recall this particular letter?

23  A    No.

24  Q    Can -- you're familiar with the substance of this letter

25  and the other one that was sent in November, correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 583 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 651 of 1017    PageID 5330
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 582 of
2722

Dondero - Direct                         52

1  A    Could you pull it a little higher and let me read it?

2  Q    Yes.  Sure.

3          MR. RUKAVINA:  If this is an exhibit, I can show it

4  to him as an exhibit, Mr. Morris.

5          MR. MORRIS:  I don't know that this is one of the

6  marked exhibits.  It's one of the exhibits that's used within

7  his prior testimony.  So, but I want to give Mr. Dondero a

8  chance to review it.  And please let us know if you need to

9  scroll further down.

10         (Pause.)

11         MR. RUKAVINA:  You're going to have to scroll down.

12         THE WITNESS:  Scroll down a little further, please.

13         (Pause.)

14         MR. RUKAVINA:  Mr. Morris, can you please scroll

15 down?  Neither Mr. Dondero nor I can read the balance.

16 BY MR. MORRIS:

17 Q    There you go.  (Pause.)  So, you see at the top of the

18 page there there is a reference to the sale of assets and a,

19 quote, "a rush to sell these assets at fire sale prices."  Is

20 that what you think -- did you think that Mr. Seery was

21 selling (audio garbled) CLO assets at fire sale prices in

22 October 2020, --

23         MR. RUKAVINA:  Your Honor, --

24         MR. MORRIS:  -- less than a week after --

25         MR. RUKAVINA:  Your Honor, I'll object.  We did not

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 584 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 652 of 1017   PageID 5331
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 583 of
2722

Dondero - Direct                    53

1   hear Mr. Morris's question.

2            THE COURT:  All right.  Could you repeat the

3   question?

4            MR. MORRIS:  Okay.  Yes, Your Honor.

5   BY MR. MORRIS:

6   Q   Mr. Dondero, on or about October 16th, did you personally

7   believe that Mr. Seery was in a rush to sell CLO assets at

8   fire sale prices?

9   A   I believe he had no business purpose to sell any of the

10  assets, which I believe he stated that to Joe Sowin, our

11  trader.  I -- I -- there was no business purpose stated or

12  ever given or obvious from the sales.  And --

13  Q   Okay.

14  A   -- I (indecipherable) draft this letter.

15  Q   Okay.

16            MR. MORRIS:  I move to strike, Your Honor.  It's a

17  very simple question --

18            THE COURT:  Sustained.

19            MR. MORRIS:  -- and it has to do solely with Mr.

20  Dondero's state of mind.

21  BY MR. MORRIS:

22  Q   Mr. Dondero, on or about October 16th, did you personally

23  believe that Mr. Seery was in a rush to sell CLO assets at

24  fire sale prices?

25  A   He was in a rush to sell them for some reason with no

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 585 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 653 of 1017   PageID 5332
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 584 of
2722

Dondero - Direct                      54

1    business purpose.  I don't know the reason.

2           THE COURT:  All right.  Can you --

3    BY MR. MORRIS:

4    Q   Okay.  And you never asked him, right?

5           THE COURT:  Yes.  Yes or no answer, Mr. Dondero.

6           THE WITNESS:  Never asked him.

7           MR. MORRIS:  Okay.  Can we turn to the next exhibit,

8    which is Exhibit C on that same docket?

9        (Pause.)

10   BY MR. MORRIS:

11   Q   While we're waiting, can you just read the last sentence

12   of the paragraph that ends at the top of the page, Mr.

13   Dondero, beginning, "Accordingly"?

14   A   (reading)  Accordingly, we hereby request that no CLO

15   assets be sold without prior notice and prior consent from the

16   Advisors.

17   Q   Are you aware of any contractual provision pursuant to

18   which the Funds or the Advisors can -- can expect that the

19   Debtor will refrain from any -- selling any assets without

20   giving prior notice and obtaining prior consent from those

21   entities?

22   A   I think the documents have an overall good-faith/fair-

23   dealing clause which would cover something like this, I

24   believe.

25   Q   Your -- is it your testimony, sir, that the duty of good

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 586 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 654 of 1017 PageID 5333
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 585 of
2722

Dondero - Direct                          55

1   faith and fair dealing requires the Debtor to give notice to

2   the Advisors and to obtain the Advisors' prior consent before

3   they can sell any CLO assets?

4   A    Well, I think -- yes, I do.  I think --

5   Q    All right.

6   A    Yes.  Yeah.

7   Q    Okay.  And then the next month, another letter was sent by

8   NexPoint to Mr. Seery.  Do you recall that?

9   A    Not specifically.  If you bring it up, we can talk about

10  it.

11        MR. MORRIS:  Can we scroll down a little bit?

12      (Pause.)

13        MS. CANTY:  John, are you talking to me?  I was

14  frozen out.  I just got back on.  I apologize.

15        MR. MORRIS:  That's okay.  Can we just scroll down so

16  Mr. Dondero can see more of this particular letter?

17        MS. CANTY:  Okay.

18        MR. MORRIS:  Okay.

19  BY MR. MORRIS:

20  Q    Can you just read out loud, Mr. Dondero, out loud the last

21  two sentences, please, beginning with, "We understand"?

22  A    (reading)  We understand that Charitable DAF Holdco, Ltd.

23  has made a similar request.  Accordingly, we hereby re-urge

24  our request that no CLO assets be sold without prior notice to

25  and prior consent from the Advisors.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 587 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 655 of 1017   PageID 5334
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 586 of
2722

Dondero - Direct                    56

1   Q    What's the Charitable DAF Holdco, Ltd.?

2   A    I think that's who you settled with yesterday.

3   Q    Do you have an interest in that entity?

4   A    No.  It's a bona fide charity.  It was one of the largest

5   in Dallas before it got cut in half by Acis.

6   Q    Does -- are you familiar with the Get Good and the Dugaboy

7   Investment Trusts?

8           MR. RUKAVINA:  Your Honor, at this time I would

9   object to relevance.  I don't see what this has to do with

10  tortious interference and stay violation on December 22nd and

11  December 23rd, 2020.

12          THE COURT:  Response?

13          MR. MORRIS:  Your Honor, I'm trying to establish that

14  Charitable DAF Holdco, Ltd. is another entity in which Mr.

15  Dondero holds a beneficial interest.

16          THE COURT:  Okay.  Overrule the objection.

17          MR. RUKAVINA:  John, you're not only frozen, now

18  you're off.

19          MR. MORRIS:  Yeah, I can see myself.  You can't hear

20  me?

21          MR. RUKAVINA:  We can now, but Your Honor, we lost

22  Mr. Morris for a bit there.

23          THE COURT:  All right.  I think we were --

24          MR. MORRIS:  Okay.

25          THE COURT:  -- waiting on an answer from Mr. Dondero,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 588 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 656 of 1017    PageID 5335
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 587 of
2722

Dondero - Direct                    57

1   actually.

2          THE WITNESS:  We didn't hear the question at --

3   BY MR. MORRIS:

4   Q   Sure.  Are you familiar with the Get Good and Dugaboy

5   Investment Trusts?

6   A   Yes.

7   Q   Are you the beneficiary of those trusts?

8          MR. RUKAVINA:  Your Honor, again, objection to

9   relevance.  These are non-parties, and what his personal

10  interests are has no relevance to this.

11         THE COURT:  Overruled.

12         THE WITNESS:  The Get Good Trust, Get -- I believe

13  those are defective grantor trusts.  I don't believe I have

14  any interest whatsoever in those.  Dugaboy is a perpetual

15  Delaware trust.  I don't know how that's set up, but I believe

16  I do have an interest there until I pass.

17  BY MR. MORRIS:

18  Q   In fact, you're -- you're the sole beneficiary of the

19  Dugaboy Investment Trust, right?

20  A   Until I pass.  It's a -- it's a estate planning trust.

21  Q   I appreciate that.  And the Dugaboy and the Get Good

22  Trusts are the owners of the Charitable DAF Holdco Ltd.,

23  correct?

24  A   No.  Not as far as I know.

25  Q   Okay.

Dondero - Direct                    58

1  A    (garbled) time at all.

2  Q    All right.  So we just looked at these two letters, sir.

3  And you were familiar with the substance of the letters before

4  they were sent, right?

5  A    Uh, just --

6           MR. MORRIS:  You can take it down, Ms. Canty.

7           THE WITNESS:  Just generally.  Again, I wasn't

8  involved directly with the letters.

9  BY MR. MORRIS:

10 Q    You were aware of the letters before they were sent,

11 right?

12 A    Yes.

13 Q    And you discussed the substance of the letters with

14 NexPoint, correct?

15 A    Not the substance of the letters, just the substance of

16 the issue.

17 Q    You actually discussed the substance of the letters with

18 NexPoint, correct?

19 A    I -- Again, I remember it being the substance of the

20 issue.  Generally, at most, the substance of the letters.

21 Q    And you discussed the substance of the letters with the

22 Advisors' internal counsel, too, right?

23 A    The sub -- generally, the substance, yes, but more the

24 issue than the letter.

25 Q    Okay.  If I pull up your transcript from the TRO hearing,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 590 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 658 of 1017   PageID 5337
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 589 of
2722

Dondero - Direct                        59

1   would that refresh your recollection that you discussed the

2   substance of these letters with NexPoint and with the

3   Advisors' internal counsel?

4   A   I'd like to clarify with the testimony I just gave.

5   Q   Okay.  Would you -- do you have any reason to believe that

6   you did not previously testify that you discussed the

7   substance of the letters with NexPoint and with NexPoint

8   Advisors' internal counsel?

9   A   I repeat the same testimony.  Generally.  Like, those

10  letters that you put on the screen, I have no recollection of

11  those specifically.

12          MR. MORRIS:  Ms. Canty, can we please call up on the

13  screen Exhibit NNNN, which was the transcript from the January

14  8th, 2021 preliminary injunction hearing?

15          MR. RUKAVINA:  Mr. Morris, just one sec.  I'm trying

16  to find it on paper.

17          MR. MORRIS:  Yeah.  It's four Ns.

18          MR. RUKAVINA:  One, two, three, four.  (inaudible)

19  put that on the screen.

20          MS. CANTY:  John, I'm not sure what's going on, but

21  it won't come up on the screen.  I've tried three times.  I'm

22  going to keep trying.

23          MR. MORRIS:  All right.  I have it in front of me.

24  Do you have it, too?

25          MR. RUKAVINA:  Yes, the witness has it --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 591 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 659 of 1017    PageID 5338
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 590 of
2722

Dondero - Direct                          60

1            MR. MORRIS:  Okay.

2            MR. RUKAVINA:  -- in front of him.  This is NNNN,

3  just to confirm?

4            MR. MORRIS:  Yes.  And it is the January 8th

5  transcript.

6  BY MR. MORRIS:

7  Q   Mr. Dondero, were you asked these questions and did you

8  give these answers?  Question:  Are you familiar with --

9            MR. RUKAVINA:  Where are you, John?  Where are you?

10  Where are you?  We -- we -- we --

11            MR. MORRIS:  I apologize.  Page 40.  I'm going to

12  read Page 40, Lines 1 through 14.

13            MR. RUKAVINA:  Okay.  He has it in front of him, if

14  you just want him to read it.

15  BY MR. MORRIS:

16  Q   Did you give these answers at Page 40, beginning Line 1:

17      "Q   And were you -- and you were familiar, you were

18      aware of these letters before they were sent; is that

19      correct?

20      "A   Yes.

21      "Q   And you generally discussed the substance of these

22      letters with NexPoint; is that right?

23      "A   Generally, yes.

24      "Q   You  discussed  the  letters  with  the  internal

25      counsel; is that right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 592 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 660 of 1017   PageID 5339
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 591 of
2722

Dondero - Direct                    61

1        "A   Yes.

2        "Q   That's D.C. Sauter?

3        "A   Yes.

4        "Q   And you have been on some calls with K&L Gates

5        about these letters, right?

6        "A   I believe so.

7        "Q   And you knew these letters were being sent,

8        correct?

9        "A   Yeah.  They're -- they're reported.

10   Q   Did you give those answers to those questions at the prior

11   hearing?

12   A   I -- I believe it's what I -- it's almost exactly what I

13   just said, but yes.

14   Q   And you supported the sending of the letters; isn't that

15   right?

16   A   Absolutely.

17   Q   And you encouraged the sending of the letters, right?

18   A   Absolutely.

19   Q   Around Thanksgiving, you learned that Mr. Seery had given

20   a direction to sell certain securities owned by CLOs managed

21   by the Debtor, correct?

22   A   Yes.

23   Q   And when you learned that, you personally intervened to

24   stop the trades, correct?

25   A   Yes.

Dondero - Direct                    62

1   Q   Let's -- I want to look at that email string that we

2   looked at once before.  It can be found at Trial Exhibit D

3   found on Docket No. 46 in the adversary proceeding. It's PDF

4   Number -- it's PDF Page 189 of two (garbled).

5           MR. RUKAVINA:  Did you catch that?

6           THE COURT:  Which -- which exhibit number -- letter

7   is it?

8           MR. MORRIS:  It's on the docket in the Adversary

9   Proceeding 20-3190.  And in that adversary proceeding, at

10  Docket No. 46, you've got the Debtor's exhibit list.  And

11  Exhibit D, which can be found at PDF Page 189 of 270, is the

12  email string I'm looking for.

13     I apologize, Your Honor.  It wasn't until I was reading

14  the transcript yesterday that I realized I needed these

15  documents.  But they are in the record.  Obviously, they're

16  referred to in the transcript that is in the record.

17          THE COURT:  Okay.

18          MR. RUKAVINA:  Your Honor, I would like to interject

19  for the record here that this is the first time my clients

20  have been sued.  They have a right to be confronted with the

21  witnesses and testimony and evidence against them.  So if Mr.

22  Morris wants to introduce this as an exhibit here today,

23  that's one thing, but I object to any notion that there's a

24  prior record that is going to tie my clients' hands.  It might

25  tie Mr. Dondero's hands, but not my clients' hands.

                        Dondero - Direct                    63

1           MR. MORRIS:  I'd move for the introduction into

2    evidence of this document that has emails not only from Mr.

3    Dondero, but from Joe Sowin, the head trader of the

4    Defendants.

5           MR. RUKAVINA:  And Your Honor, I have no problem with

6    that admission.  I just want to make it clear that we're not

7    conceding that whatever happened in this case previous to this

8    is a part of today's record.  That's all.  So I do not have a

9    problem with the admission of this.  I would, however, ask

10   you, Mr. Morris, to have someone email it to us so that I can

11   use it today if I need to.

12          THE COURT:  All right.

13          MR. MORRIS:  Okay.  Will do.

14          THE COURT:  So, I'll --

15          MR. MORRIS:  We'll do that at the --

16          THE COURT:  I'll admit it into evidence.  You'll need

17   to not only email it Mr. Rukavina, but you'll need to file a

18   supplement to your exhibit and witness list after the hearing

19   showing the admission of --

20          MR. RUKAVINA:  And Mr. Morris, if you could email it

21   to Mr. -- if you could email it to Mr. Vasek as well, because

22   obviously I can't get to it now.  Thank you.

23          MR. MORRIS:  Sure.

24          THE COURT:  All right.  So this --

25          MR. MORRIS:  Okay.  So, --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 595 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 663 of 1017   PageID 5342
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 594 of
2722

Dondero - Direct                    64

1          THE COURT:  For the record, let's just be clear what

2    the record is -- this is going to be called on the record.  I

3    think you are up to SSSSS, so this would be TTTTT when you

4    file it on the record.  All right?  Go ahead.

5          MR. MORRIS:  Thank you very much, Your Honor.

6        (Debtor's Exhibit TTTTT is received into evidence.)

7    BY MR. MORRIS:

8    Q   Mr. Dondero, you recall looking at this email string at

9    the last hearing, right?

10   A   Yes.

11   Q   Let's start at the bottom, please, with Mr. Covitz's

12   email.

13       (Pause.)

14          MR. RUKAVINA:  Hey, John, real quick, now we've lost

15   you.  We've lost you and we're not seeing anything from your

16   assistant.  Do you have the email, Mr. Vasek?

17          MR. MORRIS:  I'm here.  Can you hear me?

18          MS. CANTY:  I'm here.  (garbled) on the screen.

19          MR. MORRIS:  Yeah.  Can we scroll down to the bottom?

20          MS. CANTY: I did.  I don't know why it's not showing

21   on you guys' screen.

22          MR. MORRIS:  Hopefully this gets fixed.  Yeah.  We've

23   never had this problem before, Your Honor.  I'm not sure what

24   the issue is, but I do apologize.

25          THE COURT:  All right.  Well, I can hear you, but we

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 596 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 664 of 1017 PageID 5343
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 595 of
2722

Dondero - Direct                           65

1    don't see movement of the exhibit.

2              MR. MORRIS:  Yeah.  When I began earlier today by

3    suggesting that this was going to be challenging, this was not

4    one of the challenges I anticipated.

5              THE COURT:  Okay.  All right.

6              MR. RUKAVINA:  Do you have the email yet?

7              MS. CANTY: I'm sorry.  I don't know what's happening

8    on this end.  I have three streams of Internet going, and I

9    don't think it's the Internet.  I don't know what's going on.

10             MR. MORRIS:  Hmm.

11             MR. RUKAVINA:  Yeah, John, what I'm suggesting is

12   that you have an associate email it to Mr. Vasek immediately

13   and then we can present it to Mr. Dondero.

14             MR. MORRIS:  I'll tell you what.  While that -- one

15   more try.

16             MR. CANTY:  Can you see it now?

17             MR. MORRIS:  Okay.  Yes.

18   BY MR. MORRIS:

19   Q   All right.  Mr. Dondero, Hunter Covitz is an employee of

20   the Debtor, right?

21             MR. RUKAVINA:  Hold on a sec.  Hold on a sec.

22        Your Honor, I believe that I have the right to see the

23   full email here.  I believe that Mr. Dondero does.  And we've

24   just seen the first little bit and now some middle piece.

25             THE COURT:  All right.  So are you saying --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 597 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 665 of 1017   PageID 5344
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 596 of
2722

Dondero - Direct                    66

1        MR. MORRIS:  And in the order that --

2        THE COURT:  -- you want to see the whole string?

3        MR. RUKAVINA:  Well, I think -- Mr. Dondero, do you

4   need to see the whole string?  I don't know what this is, but

5   maybe you do.

6        MR. DONDERO:  It depends on what the question is.  I

7   can answer some questions off of this email.

8        THE COURT:  Okay, let's go.

9        MR. MORRIS:  Yeah.

10  BY MR. MORRIS:

11  Q    All right.  So, for the moment, Mr. Covitz is an employee

12  of the Debtor, correct?

13  A    Yes.

14  Q    And he's the author of this email in front of us, correct?

15  A    Yes.

16  Q    And Mr. Covitz helps to manage the CLO assets on behalf of

17  the Debtor, correct?

18  A    Yes.

19  Q    Mr. Covitz is giving directions to Matt Pearson and Joe

20  Sowin to sell certain securities held by the CLOs, correct?

21  A    Yes.

22  Q    And if we can scroll up, I think we can see that you

23  received a copy of this email?

24       (Pause, 11:15 a.m.)

25           MR. MORRIS:  What I would like to do instead, we'll

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 598 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 666 of 1017    PageID 5345
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 597 of
2722

Dondero - Direct                        67

1  take a break in about 15 or 20 (audio gap).  When we

2  disconnect, we'll get a better connection after the break.

3  And in the interim, I've got testimony that I would like

4  that's already been admitted into the record but there's

5  portions of which I would like to read into the record from

6  Dustin Norris, who is the executive vice president for each of

7  the Defendants.  And maybe it would be easiest for me to do

8  that.

9           THE COURT:  Okay.

10          MR. MORRIS:  All right.  On Docket No. 39.

11          MR. RUKAVINA:  Your Honor, I apologize.  Your Honor,

12  I apologize.  We did not hear --

13          MR. MORRIS:  I'm going to read into the record a

14  portion of Mr. Norris' testimony from the December 16th

15  hearing.

16          MR. RUKAVINA:  Your Honor, I do not see that

17  transcript in the exhibits.  If Mr. Morris could give me an

18  exhibit.

19          MR. MORRIS:  Exhibit B as in boy.

20          MR. RUKAVINA:  Thank you.

21          MR. MORRIS:  All right.  Instead of putting it on the

22  screen, if we could take the exhibit down, Ms. Canty.  He can

23  just follow along.  Beginning at Page 38, Line 7 through  -- 7

24  through 17.

25      Are you there, Mr. Rukavina?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 599 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 667 of 1017   PageID 5346
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 598 of
2722

Dondero - Direct                          68

1          MR. RUKAVINA:  I am.  Thank you.  I have it in front

2    of Mr. Dondero.

3          MR. MORRIS:  Okay.  Page 38, Lines 7 through 17:

4      "Q   I think you testified that you're one of the

5      executive vice presidents at NexPoint Advisors, one of

6      the Movants.  Is that right?

7      "A   That's right.

8      "Q   Who is the president of NexPoint Advisors, LP?

9      "A   Mr. Dondero.

10     "Q   And you report directly to him; is that right?

11     "A   I do.

12     "Q   You're also the executive vice president of Fund

13     Advisors, another Movant; is that right?

14     "A   Correct."

15         MR. MORRIS:  Beginning on Page 38, Line 25:

16     "Q   You're also the executive vice president (audio

17     gap) that are managed by the Advisors here, right?

18     "A   Yes.  That is correct."

19         MR. MORRIS:  Then going back to Page 35, beginning at

20   Line 15:

21     "Q   To be clear here, there are five moving parties;

22     is that right?

23     "A   That's correct.  The two Advisors and the three

24     Funds.

25     "Q   And one of the advisory firms is Highland Capital

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 600 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 668 of 1017   PageID 5347
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 599 of
2722

Dondero - Direct                           69

1      Management Fund Advisors, LP; is that right?

2      "A   That's correct.

3      "Q   And I'll refer to that as Fund Advisors; is that

4      okay?

5      "A   That's great.

6      "Q   James Dondero and Mark Okada are the beneficial

7      owners of Fund Advisors, correct?

8      "A   That is my understanding.

9      "Q   And your understanding is that Mr. Dondero

10     controls Fund Advisors, correct?

11     "A   That's correct.

12     "Q   And the other advisory firm that brought the

13     motion is NexPoint Advisors, LP; is that right?

14     "A   That is correct.

15     "Q   And Mr. Dondero is the beneficial owner of

16     NexPoint; is that right?

17     "A   A family trust where Jim is the sole beneficiary,

18     I believe, controls or owns NexPoint Advisors.

19     "Q   Okay.  And Mr. Dondero --

20     "A   Or 99 percent of NexPoint Advisors.

21     "Q   Mr. Dondero controls NexPoint; is that right?

22     "A   Correct."

23        MR. MORRIS:  Continuing at Line 16 on Page 36:

24     "Q   All right.  And I'm going to refer to Fund

25     Advisors and NexPoint as the Advisors going forward; is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 601 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 669 of 1017   PageID 5348
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 600 of
2722

Dondero - Direct                          70

1      that fair?

2      "A    That's fair.

3      "Q    Each  of  the  Advisors  manages  certain  funds;  is

4      that right?

5      "A    That is correct.

6      "Q    And three of those funds that are managed by the

7      Advisors are Movants on this motion, correct?

8      "A    Correct.

9      "Q    All right.  The Advisors caused these three Funds

10     to  invest  in  CLOs  that  are  managed  by  the  Debtor;  is

11     that right?"

12     "A    --"

13          MR. RUKAVINA:  Your Honor, I object.  Is there a

14     question at the end of this?  I mean, Mr. Dondero can't

15     possibly remember all this and then be asked a question.

16          MR. MORRIS:  He doesn't have to answer any questions.

17     I'm just reading the evidence into the record.

18          THE COURT:  Okay.

19          MR. RUKAVINA:  Your Honor?

20          MR. MORRIS:  Since we're having difficulty --

21          MR. RUKAVINA:  Your Honor, that's a matter for

22     summation.  That's -- this is a question and answer, I submit.

23          THE COURT:  Well, I overrule.

24          MR. MORRIS:  Your Honor, here's -- here's --

25          THE COURT:  This has been admitted into --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 602 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 670 of 1017   PageID 5349
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 601 of
2722

Dondero - Direct                          71

1          MR. MORRIS:  Yeah.

2          THE COURT:  -- evidence.  And if he wants to

3    highlight to the Court portions of the evidence, he can.

4        Go ahead.

5          MR. MORRIS:  Thank you, Your Honor.

6        "A   The portfolio managers working for the Advisors

7        did.  That's correct.

8        "Q   And Mr. Dondero is the portfolio manager of the

9        Highland Income Fund; is that right?

10       "A   He is one of the portfolio managers for that Fund.

11       "Q   And he's also --

12       "A   I believe there are two.

13       "Q   And he's also a portfolio manager of NexPoint

14       Capital, Inc., one of the Movants here, right?

15       "A   That is correct.

16       "Q   And he's also the portfolio manager of NexPoint

17       Strategic Opportunities Fund, another Movant; is that

18       right?

19       "A   Yes.  That is correct."

20         MR. MORRIS:  Going to Line -- Page 41, Lines 6

21   through 9:

22       "Q   The whole idea for this motion initiated with Mr.

23       Dondero; isn't that right?

24       "A   The concern, yes, the concern originated, and his

25       concern was voiced to our legal and compliance team."

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 603 of
Case 3:25-cv-02072-S   Document 15-7   Filed7210/06/25   Page 671 of 1017   PageID 5350
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 602 of
2722

Dondero - Direct                     72

1          MR. MORRIS:  Page 42, Lines 4 through 11:

2     "Q   None of the Movants are parties to the agreements

3     between the Debtor and each of the Debtors pursuant --

4     each of the CLOs pursuant to which the Debtor serves as

5     portfolio manager; is that correct?

6     "A   I believe that is correct.   One, I think,

7     important -- even though they're not (audio gap), they

8     are the -- they have the economic ownership of each of

9     these CLOs.

10    "Q   But they're not party to the agreement; is that

11    right?

12    "A   Not that I am aware of."

13         MR. MORRIS:  Page 42, Line 25:

14    "Q   Okay.   It's your understanding, in fact, that

15    nobody other than the Debtor has the right or the

16    authority to buy and sell assets on behalf of the CLOs

17    listed on Exhibit B, correct?

18    "A   That is my understanding.

19    "Q   Okay.   And it's also your understanding, your

20    specific understanding, that holders of preferred

21    shares do not make investment decisions on behalf of

22    the CLO; is that right?

23    "A   (audio gap)

24    "Q   And that's something the Advisors knew when they

25    decided to invest in the CLOs on behalf of the Movant

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 604 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25   Page 672 of 1017   PageID 5351
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 603 of
2722

Dondero - Direct                          73

1    Funds; is that fair?

2    "A    That's right.  And at that time, the knowledge in

3    the purchase was with Highland Capital Management, LP

4    and the portfolio management team at the time.

5    "Q    And it's still with Highland Capital Management,

6    LP; isn't that right?

7    "A    That's correct.  I'm not sure that the portfolio

8    management team looks the same, but it was HCMLP."

9         MR. MORRIS:  Moving on to Page 46, Line 22:

10   "Q    The  only  holders  of  preferred  shares  that  are

11   pursuing this motion are the three Funds managed by the

12   Advisors, right?

13   "A    In this motion, yes.

14   "Q    You're not aware of any holder of preferred shares

15   pursuing this motion other than the three Funds managed

16   by the Advisors, correct?

17   "A    No, I'm not aware of any others.

18   "Q    You  didn't  personally  inform  any  holder  of

19   preferred  shares,  other  than  the  Funds  that  are  the

20   Movants, that this  motion would be filed, did you?

21   "A    No, I did not.

22   "Q    You're not aware of any steps taken by either of

23   the Advisors to provide notice to holders of preferred

24   shares that this motion was going to be filed, are you?

25   "A    I'm not, no.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 605 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 673 of 1017    PageID 5352
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 604 of
2722

Dondero - Direct                      74

1      "Q   And you're not aware of any attempt that was made

2      to obtain the consent of all of the noteholder -- of

3      all the holders of the preferred shares to seek the

4      relief that is sought in this motion, correct?

5      "A   That's correct.

6      "Q   You don't have any personal knowledge, personal

7      knowledge, as to whether any holder of preferred shares

8      other than the Funds managed by the Advisors wants the

9      relief sought in this motion, correct?

10     "A   Correct.

11     "Q   You don't have any personal knowledge as to

12     whether any of the CLOs that are subject to the

13     contracts that you described want the relief that's

14     being requested in this motion, right?

15     "A   That's correct.  I have not spoken or been

16     involved at all directly with the CLOs.   I'm

17     representing the Funds."

18         MR. MORRIS:  Moving to Page 49.  I just have a bit

19     more, Your Honor.  Page 49, Line 9.  And this is the reference

20     to his declaration.

21     "Q   And Paragraph 9 refers to a transaction involving

22     SSP Holdings, LLC; do I have that right?

23     "A   That's correct.

24     "Q   Do you know what SSP stands for?

25     "A   See if we say it in there.  SSP Holdings, LLC.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 606 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 674 of 1017    PageID 5353
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 605 of
2722

Dondero - Direct                     75

1      "Q   Right.  Do you know what SSP stands for?

2      "A   I don't.  Something Steel Products.  I --

3      "Q   Okay.  You don't need to guess.  These are the

4      only two transactions that the Movants question; is

5      that right?

6      "A   These  transactions,  as  well  as  certain

7      transactions around Thanksgiving time.

8      "Q   Okay.  We'll talk about those.  But those

9      transactions about -- around Thanksgiving time aren't

10     in your (audio gap)?

11     "A   Not specifically mentioned by name.

12     "Q   Okay.  Let's talk about the two that are mentioned

13     by name, Trussway and SSP.  The Movants do not contend

14     that either transaction was the product of fraudulent

15     conduct, do they?

16     "A   No.

17     "Q   The  Movants  do  not  contend  that  the  Debtor

18     breached  any  agreement  by  effectuating  these

19     transactions, do they?

20     "A   I don't believe so.

21     "Q   In fact, the Movants do not contend that the

22     Debtor  violated  any  agreement  at  any  time  in  the

23     management of the CLOs listed on Exhibit B; is that

24     right?

25     "A   That's right.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 607 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 675 of 1017    PageID 5354
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 606 of
2722

Dondero - Direct                          76

1    "Q   The Movants don't even question the Debtor's

2    business judgment, only the results of the trans -- of

3    these two transactions.  Is that right?

4    "A   That's right.  And the results is the key here,

5    and the approach."

6        MR. MORRIS:  Moving on to Page 51, Line 8:

7    "Q   Sir, you never asked the Debtor what factors it

8    considered in making these trades, right?

9    "A   I did not.

10   "Q   And you have no reason to believe that anyone on

11   behalf of the Movants ever asked the Debtor why it

12   executed these (audio gap), right?

13   "A   I don't have any knowledge.  There could have been

14   somebody from (audio gap) Movants.  But I do not."

15       MR. MORRIS:  Page 54, Line 19:

16   "Q   Let's just talk briefly about the transactions

17   that occurred (garbled) Thanksgiving.  They're not

18   specifically referred to in your declaration; is that

19   right?

20   "A   That's correct.

21   "Q   And you have no knowledge about any transaction

22   that Mr. Seery wanted to execute around Thanksgiving;

23   is that right?

24   "A   I know there were transactions and there were

25   concerns from our management team, but I'm not aware of

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 608 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 676 of 1017    PageID 5355
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 607 of
2722

Dondero - Direct                          77

1    what those transactions were.

2    "Q    In fact, you can't even identify the assets that

3    Mr. Seery wanted to sell around Thanksgiving, or at

4    least you couldn't at the time of your deposition

5    yesterday.  Is that right?

6    "A    That's correct.

7    "Q    And you have no knowledge as to why Mr. Seery

8    wanted to make particular trades around Thanksgiving?

9    "A    No, I don't.

10   "Q    And in fact, you don't even know if the

11   transactions that Mr. Seery wanted to close around

12   Thanksgiving ever in fact closed.  Is that fair?

13   "A    Correct."

14        MR. MORRIS:  Last one.  Page 56, Line 1:

15   "Q    Okay.  To the best of your knowledge, does this

16   document accurately reflect the composition of the

17   boards of each of the three Movant Funds?

18   "A    Yes, it does.

19   "Q    Okay.  John Honis, I think you mentioned him

20   earlier.  He's on all three boards.  Is that right?

21   "A    Yeah, that's correct.  And the reason we're --

22   we're being -- we have a unitary board structure, so --

23   which is very common in '40 Act Fund land, where the

24   board sits, for efficiency purposes, on multiple fund

25   boards, and there's a lot of economies of scale from an

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 609 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 677 of 1017    PageID 5356
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 608 of
2722

Dondero - Direct                    78

1    operating standpoint.  So, yes, they sit on multiple

2    boards.

3    "Q   Okay.  And for purposes of the '40 Act, Mr. Honis

4    has been deemed to be an interested trustee.  Is that

5    right?

6    "A   That's correct.

7    "Q   Okay.  But you don't specifically know what (audio

8    gap) caused that designation; you only know that the

9    designation exists.  Right?

10   "A   That's right.  And I know they are disclosed in

11   the proxy -- or, in the -- the relative filings related

12   to those Funds.

13   "Q   Okay.  Three other people are common to all three

14   Movant Funds.  I think you've got Dr. Froehlich, Ethan

15   Powell, --

16       MR. MORRIS:  I think he -- pronunciation.

17   "A   Froehlich.

18   "Q   Ethan Powell and Bryan Ward.  Right?

19   "A   That is correct.

20   "Q   Okay.  All three of those individuals actually

21   serve on the 11 or 12 boards that you mentioned earlier

22   that are managed by the Advisors, right?

23   "A   That is correct.

24   "Q   And they're the same Funds for which you serve as

25   the executive vice president, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 610 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 678 of 1017    PageID 5357
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 609 of
2722

Dondero - Direct                          79

 1        "A   This is correct -- yes.  That's correct.

 2        "Q   So, for all of the Funds that are managed by the

 3     Advisors, you serve as executive vice president and all

 4     four of these directors -- trustees serve as trustees

 5     on the boards, right?

 6        "A   Yes, that's correct.

 7        "Q   Okay.  In exchange for serving on all of these

 8     boards, the three individuals -- Dr. Froehlich, Mr.

 9     Ward, and Mr. Powell  -- each receive $150,000 a year

10     for services across the Highland complex; is that

11     right?

12        "A   That's correct.

13        "Q   Dr. Froehlich has been serving as a board member

14     across the Highland complex for seven or eight years

15     now; is that right?

16        "A   That's correct.

17        "Q   Mr. --

18        "A   I believe it's about seven or eight years.

19        "Q   Mr. Powell, he actually was employed by Highland

20     related -- Highland or related entities from about 2007

21     or 2008 until 2015, right?

22        "A   That's correct.

23        "Q   And Mr. Ward, the third of the independent

24     trustees, he's been serving on a board or various of --

25     on various Highland-related funds on a continuous basis

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 611 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 679 of 1017   PageID 5358
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 610 of
2722

Dondero - Direct                   80

1      since about 2004.  Do I have that right?

2      "A    Yeah, I believe that's correct."

3           MR. MORRIS:  Your Honor, that concludes the reading

4      of the portions of Mr. Norris's testimony that I wanted to

5      present to the Court.

6      I know it's 11:30 now, and I would respectfully request

7      that we simply adjourn and let Your Honor tend to your

8      business.

9           THE COURT:  Okay.

10          MR. MORRIS:  And hopefully when we come back at 1:00

11     o'clock, we'll have a better connection.

12          THE COURT:  All right.  So, we are going to go into

13     recess until 1:00 o'clock Central.  Mike, can people just stay

14     connected, or should they --

15          THE CLERK:  Yes.  They can stay.  Yes.

16          THE COURT:  You can stay or reconnect, whichever you

17     want.  But we'll see you at 1:00.

18          MR. MORRIS:  Thank you, Your Honor.

19          THE CLERK:  All rise.

20      (A luncheon recess ensued from 11:33 a.m. until 1:37 p.m.)

21          THE CLERK:  All rise.  The United States Bankruptcy

22     Court for the Northern District of Texas, Dallas Division, is

23     now in session, the Honorable Stacey Jernigan presiding.

24          THE COURT:  Good afternoon.  Please be seated.

25     Apologies.  I was a little ambitious in my time estimate.  So,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 612 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 680 of 1017 PageID 5359
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 611 of
2722

Dondero - Direct                     81

1   anyway, I didn't have any control over getting in and out of

2   Parkland Hospital, so I'm just grateful to be here.

3       All right.  We were in the middle of direct examination of

4   Mr. Dondero.  Mr. Morris, are you ready to proceed?

5           MR. MORRIS:  I am, Your Honor, and I'm hopeful that

6   the computer issues have resolved themselves.  It remains to

7   be seen once we try.  If problems arise again, I plan on just

8   putting this on mute and dialing in through the telephone,

9   kind of the other alternative.

10          THE COURT:  All right.

11          MR. MORRIS:  So (garbled) and I apologize to Mr.

12  Dondero, too.  I know I'm testing his patience.  But it's not

13  for any reason other than technological.

14          THE COURT:  All right.

15          MR. MORRIS:  And Your Honor, you don't have to

16  apologize for keeping us waiting.  That's okay.

17          THE COURT:  Okay.

18          MR. MORRIS:  But thank you.

19          THE COURT:  All right.  Mr. Dondero, --

20          MR. MORRIS:  All right.  So, --

21          THE WITNESS:  Yeah.

22          THE COURT:  I was just going to remind you, I have to

23  remind you you're still under oath.

24      Are you ready, Mr. Morris?

25          MR. MORRIS:  I am, Your Honor.

```
                        Dondero - Direct                    82

 1              THE COURT:  All right.  You may proceed.

 2              MR. MORRIS:  And we're going to begin with the

 3   document that we had difficulty scrolling through earlier,

 4   which we have now sent to counsel, and that would be what was

 5   marked as Exhibit D on Docket No. 46.

 6              THE COURT:  All right.

 7              MR. MORRIS:  That's the email string that we had seen

 8   earlier that I think Your Honor admitted into evidence.  Do I

 9   have that right?

10              THE COURT:  Yes.

11              MR. MORRIS:  Okay.

12                   DIRECT EXAMINATION, RESUMED

13   BY MR. MORRIS:

14   Q   So, let's just start at the bottom and see if we can do

15   this more easily, Mr. Dondero.  And again, I apologize for

16   keeping you waiting before.  Starting at the bottom, that's an

17   email from Hunter Covitz.  Do you see that?

18   A   Yeah, I see it.

19   Q   And he's an employee of the Debtor, right?

20   A   Yes.

21   Q   And your understanding is that Mr. Covitz actually helps

22   the Debtor manage the CLO assets, right?

23   A   Yes.

24   Q   And in this email, Mr. Covitz is giving directions to Matt

25   Pearson and Joe Sowin regarding certain securities held by the
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 614 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 682 of 1017 PageID 5361
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 613 of
2722

Dondero - Direct                          83

1   CLOs, right?

2   A    Yes.

3   Q    And if we could scroll up, hopefully, we can see that you

4   received a copy of this email.

5        MR. MORRIS:  Yeah.  Right there.

6   BY MR. MORRIS:

7   Q    Do you see that?

8   A    Yes.

9   Q    And then -- and then you instructed the recipients of Mr.

10  Covitz's email not to sell the SKY securities as had been

11  instructed by Mr. Seery, correct?

12  A    Yes.

13  Q    And you understood when you gave that instruction that the

14  people on the email were trying to execute trades that Mr.

15  Seery had authorized, correct?

16  A    Incorrect.

17  Q    You didn't know that, sir?

18  A    What I knew was that Seery had not authorized the trade,

19  he had orchestrated the trade.  Hunter is not an analyst with

20  any particular knowledge.  I called Hunter, why would he sell

21  those?  And he said Seery told him to sell those.  So it

22  wasn't that Seery authorized Hunter trading it.  It was Seery

23  told Hunter to trade it, which is -- which is a material

24  difference in my mind.

25  Q    Okay.  So I'll ask you again.  At the time you gave the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 615 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 683 of 1017 PageID 5362
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 614 of
2722

Dondero - Direct                          84

 1  instruction, "No, do not," you knew that you were stopping

 2  trades that had been authorized and directed by Mr. Seery,

 3  correct?

 4  A    Yes.

 5  Q    You didn't speak with Mr. Seery before sending this email,

 6  did you?

 7  A    No.

 8  Q    And you took no steps to seek the Debtor's consent before

 9  instructing the recipients of this email to stop executing the

10  SKY transactions.  Is that right?

11  A    I'm sorry.  I missed the first part of that question.

12  Q    Okay.  You took no steps to seek the Debtor's consent

13  before instructing the recipients of this email to stop

14  executing the SKY transactions that were authorized by Mr.

15  Seery, correct?

16  A    I don't -- I'm not sure I was permitted to talk to Seery

17  at this point, but I don't recall specifically, no.

18  Q    You didn't seek consent, did you, before stopping these

19  trades?

20  A    No.

21  Q    Okay.  In response to your instruction --

22          MR. MORRIS:  If we could scroll up to the next

23  response.

24  BY MR. MORRIS:

25  Q    You see the response from Mr. Pearson?

004601

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 616 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 684 of 1017   PageID 5363
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 615 of
2722

Dondero - Direct                          85

1   A    Yes.

2   Q    And in response to your instructions, Mr. Pearson canceled

3   all of the SKY and AVYA sales that the Debtor had directed but

4   which had not yet been executed, right?

5   A    Yes.

6   Q    Okay.

7            MR. MORRIS:  Can we scroll up to the next email,

8   please?

9   BY MR. MORRIS:

10  Q    And you responded again, right?  That's your response?

11  A    Yes.

12  Q    Can you read your response out loud, please?

13  A    (reading) HFAM and DAF have instructed Highland in writing

14  not to sell any CLO underlying assets.  There is potential

15  liability.  Don't do it again, please.

16  Q    And the writings that you refer to there are the two

17  letters that we looked at earlier, the October 16 and the

18  November 24 letter, right?

19  A    I believe so.  If not, if there's a third or fourth

20  letter, all the letters in aggregate.

21  Q    All right.  And you, you interpreted those letters not as

22  requests but, as you tell the recipients of your email here,

23  that they were actually instructions, right?

24  A    That was -- that was my choice of words.  I don't know if

25  I thought about it that clearly.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 617 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 685 of 1017    PageID 5364
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 616 of
2722

Dondero - Direct                          86

1  Q    Okay.  But the reci... you have no reason to believe that

2  the recipient of this email wouldn't understand that you

3  believed that Highland had been instructed not to do these

4  trades, right?

5  A    I'm sorry.  Can you ask that again?  I had no reason to

6  believe what?

7  Q    That's okay.  I'll move on.  At this juncture, the

8  reference to potential liability was intended for Mr. Pearson,

9  right?

10  A    Frankly, when you violate the Advisers Act, the CFO has

11  liability.  I mean, I'm sorry, the chief compliance officer

12  has liability, and anybody who has an awareness that it

13  violates the Advisers Act has potential liability also.

14  Q    And is it -- is it your testimony and your position that

15  Mr. Pearson had potential liability under the Advisers Act for

16  carrying out Mr. Seery's trade requests?

17  A    Yes, once he was informed that the underlying investors

18  didn't want assets sold and Seery had stated he had no

19  business purpose in selling those assets.

20        MR. MORRIS:  I move to strike the latter part of the

21  answer, Your Honor.  Mr. Dondero has testified repeatedly

22  multiple times that he has never communicated with Mr. Seery

23  about why he wanted to make these transactions.

24        THE COURT:  I grant that.

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 618 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 686 of 1017    PageID 5365
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 617 of
2722

Dondero - Direct                          87

1    Q    Mr. Sowin responded and indicated that he would follow

2    your instructions, right, if we scroll to the next email?

3    A    I'm sorry.  What part are you saying, or what part are you

4    referring to?

5    Q    Mr. Sowin.  Who is Mr. Sowin?

6    A    He's Matt Pearson's boss.  He's the head trader.

7    Q    And he works for the Advisors, right?

8    A    Yes.

9    Q    He's one of your employees, right?

10   A    Yes.

11   Q    Mr. Sowin followed your instructions as set forth in this

12   email, right?

13   A    He did a bunch of things, but, yes, I believe -- yes,

14   that's a fair way to characterize.

15   Q    And the only information that you know of that he's

16   relying upon to state that Compliance should never have

17   approved this order was your email that preceded it, right?

18   A    No.

19   Q    No?  There's nothing else on this email other than your

20   email that preceded it, correct?

21   A    Correct.

22   Q    Okay.  A few days later, you learned that Mr. Seery was

23   trying a workaround to effectuate the trades anyway, right?

24   A    I believe so.

25        MR. MORRIS:  Can we scroll up to the next email?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 619 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 687 of 1017   PageID 5366
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 618 of
2722

Dondero - Direct                          88

1  BY MR. MORRIS:

2  Q   This is your response to Mr. Surgent, right?

3  A   Yes.

4  Q   Now, Mr. Surgent hasn't written anything.  He is not part

5  of this conversation, is he?

6  A   No.

7  Q   But you bring him into the conversation, right?

8  A   Because he's the chief compliance officer at Highland,

9  yes.

10 Q   He's not -- he's not the chief compliance officer for the

11 Advisors.  He's the chief compliance officer for a company

12 that you no longer work for, right?

13 A   Correct, but he has personal liability for violations of

14 the Advisers Act.

15 Q   Okay.  And you thought it was your responsibility to

16 remind him of that, right?

17 A   It was my view of the situation, and at least he could

18 evaluate it himself if I reminded him of it, yes.

19 Q   Uh-huh.  What does it mean to do a workaround?  What did

20 you mean by that?

21 A   There's a concept in compliance called you can't do

22 something indirectly that you can't do directly, and that's

23 what I was referring to there.

24 Q   Does that mean that he was trying to effectuate the trade

25 without the assistance of the Advisors?

Dondero - Direct                         89

1   A    I believed he was trying to do it without compliance and

2   without proper regard for investors, so that's why I described

3   it as a workaround.

4            MR. MORRIS:  I move to strike.

5            THE COURT:  Sustained.

6   BY MR. MORRIS:

7   Q    I'm asking you a very specific question.

8            MR. MORRIS:  Can I have a ruling, Your Honor?  Thank

9   you.

10           THE COURT:  Yes.

11  BY MR. MORRIS:

12  Q    Did you, when you used the phrase workaround, did you mean

13  that he was trying to effectuate the trade without relying on

14  the Advisors' employees?

15  A    No.

16  Q    Okay.  But you found out about the trade and you thought

17  it was a good idea to send Mr. Surgent this email, right?

18  A    Yes.

19  Q    Can you read the last line of your email?

20  A    (reading)  You might want to remind him and yourself that

21  the chief compliance officer has personal liability.

22  Q    Personal liability for effectuating a trade that Mr. Seery

23  had authorized, correct?

24  A    For violating the Advisers Act, is what I meant.

25  Q    Uh-huh.  Did you report anybody to the SEC?

Dondero - Direct                        90

1   A    I would be happy to if it's permitted by the Court.

2   Q    But you didn't -- you never asked the Court to do that,

3   right?

4   A    No.

5   Q    It didn't seem important enough for you to take that step,

6   right?  But you wanted -- you had to make sure that you told

7   Mr. Surgent that he might be personally liable, right?  That

8   was what you needed to do?

9   A    Could you repeat that question, please?

10  Q    You needed to make sure that Mr. Surgent knew that you

11  were threatening him with personal liability if he followed

12  Mr. Seery's instructions, right?

13  A    No.

14  Q    As a factual matter, you never asked Mr. Seery why he

15  wanted to make these trades, right?

16  A    I asked Joe Sowin to ask him.

17  Q    As a factual matter, you never asked Mr. Seery why he

18  wanted to make these trades, correct?

19  A    I believe I wasn't permitted to talk to him.

20  Q    In November 2020?  What would have prevented that?

21  A    I believe Scott Ellington was the go-between at that

22  point in time.

23  Q    Is it your testimony that you never spoke with Jim Seery

24  in November 2020?

25  A    I believe in an unauthorized fashion, the day after

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 622 of
Case 3:25-cv-02072-S    Document 15-7   Filed 10/06/25    Page 690 of 1017    PageID 5369
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 621 of
2722

Dondero - Direct                    91

1   Thanksgiving I talked to him, but that's the only day I can

2   remember.

3   Q    Should we call up the email where you threatened him not

4   to do it again?

5   A    That was an email.

6   Q    Ah.  So you could communicate by email?  Did you ever send

7   Mr. Seery an email and say, Why do you want to do these

8   trades?

9   A    No.

10  Q    But somehow you thought you couldn't even speak to him?

11  You couldn't speak to him but you can send him emails?  That's

12  the world that you live in, right?  That's what you think?

13  A    I have no comment on that.

14  Q    All right.  So, after this exchange, --

15       MR. MORRIS:  And this is what I read out-of-order

16  before, Your Honor.  We moved to the December 16th hearing.

17  BY MR. MORRIS:

18  Q    And you remember, Mr. Dondero, that the Defendants made

19  that motion that asked the Court to stop the Debtor from

20  trading in the CLO assets?  Do you remember that?

21  A    I'm sorry.  You're asking me do I remember letters were

22  sent?  Yes.

23  Q    No.  Do you remember that there was a hearing in mid-

24  December?

25  A    Yes.

APP. 0618

004608

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 623 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 691 of 1017    PageID 5370
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 622 of
2722

                        Dondero - Direct                    92

1  Q   Okay.

2          MR. MORRIS:  And Your Honor, for the record, Exhibit

3  A is the Debtor -- is the Defendants' motion.  Exhibit B is

4  the transcript that we had looked at earlier or that I had

5  read portions of earlier.

6          THE COURT:  Okay.

7          MR. MORRIS:  And Exhibit C is the order that the

8  Court entered denying the Defendants' motion.

9      Can we call up Exhibit C, please?

10 BY MR. MORRIS:

11 Q   All right.  Do you see --

12         MR. MORRIS:  If we could scroll to the very top,

13 please.  All right.

14 BY MR. MORRIS:

15 Q   Do you see this document is dated December 18th, sir?

16 A   Yes.

17 Q   And if we scroll down, this is the order denying the

18 motion of the Advisors and the Funds for an order trying to

19 temporarily restrict the Debtor's ability as portfolio manager

20 from initiating sales.  Do you see that?

21 A   Yes.

22 Q   Okay.  So, this is December 18th.  And if you'll recall,

23 the TRO was issued against you on December 10th.  Do you

24 remember that?

25 A   I don't believe it was the 10th.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 624 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/25   Page 692 of 1017   PageID 5371
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 623 of
2722

1   Q   Okay.  It was in December, and it was just before this.

2   Is that fair?

3   A   I believe there was an intent, and then the actual filing

4   I think was much later.  I don't have -- I don't have the

5   knowledge.  I don't have the knowledge of when the TRO was put

6   in place.

7   Q   Okay.  (Pause.)  Okay.  We talked earlier about how you

8   interfered with Mr. Seery's trading activities around

9   Thanksgiving.  Do you remember that?

10  A   Yes, I do.  I do remember the trading then, also.

11  Q   Okay.  And do you remember that just before Christmas you

12  interfered with Mr. Seery's tradings again?

13  A   Yes.

14  Q   Okay.

15          MR. MORRIS:  If we can call up Exhibit K from Docket

16  No. 46, which I have shared with counsel?

17          THE WITNESS:  You know what?

18  BY MR. MORRIS:

19  Q   Yeah.

20  A   Let's handle these each incident one at a time.  And I

21  don't want to use the word "interfering" or accept the word

22  "interfering" as an answer because I think my participation in

23  each situation was very different.

24          MR. MORRIS:  All right.  Can we scroll down?

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 625 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 693 of 1017   PageID 5372
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 624 of
2722

Dondero - Direct                         94

1  Q   This is a letter that my firm wrote to Mr. Lynn.  Mr. Lynn

2  is your lawyer.  Is that right?

3  A   Yes.

4          MR. MORRIS:  And if we could start down at the first

5  page.  We've seen these letter before.  A little further.

6  BY MR. MORRIS:

7  Q   Do you see there is a reference there to the Debtor's

8  management of CLOs?

9  A   Yes.

10  Q   And there is a recitation of the history that we talked

11  about a bit earlier.  If we -- if we look further in that

12  paragraph to around Thanksgiving, when you intervened to block

13  the trades.

14  A   Yes, I see that sentence.

15  Q   Okay.

16          MR. MORRIS:  And then if we can go to the next page,

17  the next paragraph.  Yeah, that's where.

18  BY MR. MORRIS:

19  Q   Then we referred to the December 16th hearing, right?  And

20  then the next paragraph says, "On December 22, 2020" --

21          MR. MORRIS:  Can you scroll down just a little bit?

22  Nope, the other way.  Yeah, right there.

23  BY MR. MORRIS:

24  Q   "On December 22, 2020, employees of NPA and HCMFA" --

25  those are the Advisors, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 626 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 694 of 1017    PageID 5373
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 625 of
2722

Dondero - Direct                        95

1  A    Yes.

2  Q    -- "notified the Debtor that they would not settle the

3  CLO's sale of the AVYA and SKY security."  Have I read that

4  correctly?

5  A    Yes.

6  Q    All right.  On or about December 22nd, you personally

7  instructed employees of the Advisors not to trade the SKY and

8  AVYA securities that Mr. Seery had authorized.  Is that right?

9  A    No.

10 Q    You personally instructed, on or about December 22, 2020,

11 employees of those Advisors to stop doing the trades that Mr.

12 Seery had authorized with respect to SKY and AVYA, right?

13 A    No.  You know, we need to look at source documents.  My

14 recollection is I encouraged Compliance to look at those

15 trades.  But I'm willing to be -- I'm willing to be -- get

16 source documents again, if you'd like.

17 Q    All right.  My source document is your prior testimony.

18        MR. MORRIS:  Can we please call up Exhibit NNNN at

19 Page 73?  Beginning at Line 2?  Okay.

20 BY MR. MORRIS:

21 Q    Page 73, beginning at Line 2, did you give the following

22 answer to my question?

23     "Q    And  you  personally  instructed,  on  or  about

24     December 22nd, 2020, employees of those Advisors to

25     stop doing the trades that Mr. Seery had authorized

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 627 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 695 of 1017   PageID 5374
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 626 of
2722

Dondero - Direct                    96

1       with respect to SKY and AVYA, right?

2       "A   Yeah.   Maybe we're splitting hairs here, but I

3       instructed them not to trade them.   I never gave

4       instructions not to settle the trades that occurred,

5       but that's a different ball of wax."

6   Q   Did you give that answer, sir?

7   A   I believe I confused dates or misspoke there, but I did

8   give that answer.

9   Q   Okay.  Thank you.  Stated a different way, you personally

10  instructed the Advisors' employees not to execute the trades

11  that Mr. Seery had authorized but which had not yet been made,

12  right?

13  A   No.  Not -- not on December 22nd.  That was in November.

14  November 22nd, I did not do that.

15  Q   Okay.

16      MR. MORRIS:  Can we go to Page 76, please?  Line 15.

17  BY MR. MORRIS:

18  Q   Did you give this answer to my question?

19      "Q   And you would agree with me, would you not, that

20      you instructed the employees of the Advisors not to

21      execute the very trades that Mr. Seery identifies in

22      this email, correct?

23      "A   Yes."

24  Q   Did you give that answer, sir?

25  A   Well, like I said, I -- I confused the Thanksgiving

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 628 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 696 of 1017   PageID 5375
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 627 of
2722

Dondero - Direct                      97

1  trades, the week of Thanksgiving, with my more nuanced

2  responses to later trades.

3          MR. MORRIS:  I move to strike, Your Honor.  It's a

4  very simple question.

5          THE COURT:  Granted.

6  BY MR. MORRIS:

7  Q   Did you give that answer to my question, sir?

8  A   I -- yes, I did.

9  Q   Thank you.  Now, all of this is just a week after that

10  December 16th hearing, right?

11  A   Yes.

12  Q   And right after that hearing, the K&L Gates firm sent, on

13  behalf of the Defendants, more letters to the Debtors, right?

14  A   Yes.

15          MR. MORRIS:  Can we please pull up the first letter?

16  It's Exhibit DDDD.  And if we can go not to our response but

17  to the original letter that was sent that's attached to this.

18  I think it is Exhibit A.  Right there.

19  BY MR. MORRIS:

20  Q   That's the first of the letters, December 22, 2020.  Do

21  you see that?

22  A   Yes.

23          MR. MORRIS:  And can we scroll down to the end of the

24  letter to see what the request is here?  Right there.

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 629 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 697 of 1017   PageID 5376
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 628 of
2722

Dondero - Direct                              98

1  Q    Can you read the end of that letter right there, sir?

2  A    (reading)  Sincerely, A. Lee Hogewood, III.

3  Q    Nice.  I meant the actual substance.

4  A    (reading)  For the foregoing and other reasons, we request

5  that no further CLO transactions occur, at least until the

6  issues raised by and addressed in the Debtor's plan are

7  resolved at the confirmation hearing.

8  Q    Okay.  And that's similar in substance to the letter that

9  was sent on behalf of the Defendants on October 16th that you

10 saw and approved, right?

11 A    I did not see and approve.

12 Q    All right.  The record will speak for itself.  And it's

13 similar in substance to the letter that was sent on November

14 24th by the K&L Gates clients on behalf of the Defendants,

15 right?

16 A    I don't know.

17 Q    We looked at it before.  Should we get it again?

18 A    It's a -- all the letters, as far as I understand, were

19 similar in requesting that the -- the beneficial owners of the

20 CLOs were requesting that no wholesale liquidation of their

21 assets occur.  That's how I understand it.

22 Q    And that's --

23 A    You asked my understanding.  That's my understanding.

24 Q    Okay.  And notwithstanding the request in this letter,

25 when you were -- when you were talking to the traders at your

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 630 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 698 of 1017    PageID 5377
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 629 of
2722

Dondero - Direct                              99

1   shop, you actually told them that the Debtor was instructed

2   not to do these trades, right?

3   A    Are you parsing "instructed" versus "requested"?  I don't

4   understand the question.

5   Q    I am, in fact.  You used a very different phrase when

6   speaking to your employees than you did -- then your lawyers

7   did when they wrote to the Debtor, right?

8   A    It seems to be a difference, yes.

9   Q    Okay.  So, this is on December 22nd.  Now, the night

10  before, you participated in a meeting with Grant Scott and

11  with the lawyers for the Defendants, right, to talk about what

12  you guys were going to do with respect to the Debtor's

13  management of the CLOs.  Isn't that right?

14  A    I don't remember specifically.

15  Q    Okay.  But is it fair to say it's true, is it not, that

16  during the week leading up to Christmas you participated in

17  several phone calls with the K&L Gates firm and with other

18  members of the Defendants' -- the Advisors, Mr. Sowin or Mr.

19  Post or Mr. Sauter, and the lawyers, right?  You were all

20  together talking about these issues during the week before

21  Christmas, right?

22         MR. RUKAVINA:  Your Honor, I'm going to object.  If

23  counsel is asking what was discussed with counsel present for

24  the purpose of legal advice, that is an inappropriate

25  question.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 631 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25   Page 699 of 1017    PageID 5378
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 630 of
2722

Dondero - Direct                          100

```
1              THE COURT:  Okay.

2              MR. MORRIS:  I'm certainly not.  I'm asking if the

3     conversations took place.

4              MR. RUKAVINA:  And the conversations -- the question

5     was, did they discuss what to do with respect to the CLOs?

6     That would be privileged, Your Honor.  If they discussed

7     football, that's not privileged, but what to do with the CLO

8     management agreements is privileged.

9              THE COURT:  Okay.  I sustain.

10             MR. MORRIS:  Can we please call up Exhibit TT?  I'm

11    sorry, TTT.  Nope, TTTT.  TTTT.  Can you scroll down a bit?

12    Right there.

13    BY MR. MORRIS:

14    Q   Do you see -- this is an email from Grant Scott to Scott

15    Ellington; do you see that?

16    A   Yes.

17    Q   And at this point, Mr. Ellington is still working for the

18    Debtor, right?

19    A   Yes.  I believe he was settlement counsel.

20    Q   Uh-huh.  And do you see that this is an email that refers

21    to your availability for a 9:00 a.m. call?

22    A   Yes.

23    Q   And do you see that there's a question as to whether the

24    K&L people can make it?

25    A   Yes.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 632 of
Case 3:25-cv-02072-S    Document 15-7   Filed 10/06/25   Page 700 of 1017   PageID 5379
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 631 of
2722

Dondero - Direct                    101

1  Q    And you understand that refers to K&L Gates, right?

2  A    I -- I guess so.

3  Q    And so does this refresh your recollection that at or

4  around Christmas, or in the days leading up to Christmas, you

5  participated in calls with Mr. Scott, with Scott Ellington,

6  and with the K&L Gates folks?

7  A    I -- I don't know.  I don't know if -- if I actually did

8  or not.  But I was highly concerned with inappropriate

9  behavior.

10 Q    And you were available -- and did you tell somebody that

11 you were available for this call on the morning of the 23rd?

12 A    I don't know.

13 Q    This is the day after you stopped the trades, right?

14 A    Again, I didn't stop the trades on the 23rd.

15 Q    You stopped them on the 22nd, right?

16 A    No, I stopped them on the week of Thanksgiving.

17        MR. MORRIS:  Can we go back to Exhibit NNNN, the

18 transcript?  Page 73?

19 BY MR. MORRIS:

20 Q    Let me see if I can refresh your recollection.  Tab 2.

21 Did you give this answer to this question:

22        "Q    And  you  personally  instructed,  on  or  about

23        December 22, 2020, employees of those Advisors to stop

24        doing  the  trades  that  Mr.  Seery  had  authorized  with

25        respect to SKY and AVYA, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 633 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 701 of 1017   PageID 5380
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 632 of
2722

                        Dondero - Direct                    102

1        "A    Yeah.   Maybe we're splitting hairs here, but I

2        instructed them not to trade them."

3   Q    Did you give that answer to the question?

4   A    Yes.

5   Q    Okay.

6   A    But we -- we corrected.

7   Q    All right.  You didn't correct it at the preliminary

8   injunction hearing, did you?

9   A    No, I did not.

10  Q    Okay.  So as far as the Court knows as of this moment,

11  that's the only testimony that you've ever given on the topic,

12  right?

13  A    I'm trying to give some now.

14  Q    Okay.  And on December 22nd, that's the date that the

15  first letter was also sent, right, we just looked at?

16  A    All right.  Okay.

17  Q    You agree with that, right?

18  A    I don't remember the date on the letter.  If you want to

19  pull it up, I'll say it is the 22nd or the 23rd, whatever it

20  says.  I don't know.

21  Q    Sure.

22        MR. MORRIS:  Let's go back to DDDD, please.  And if

23  we can just go to the top of the letter.  Thank you.

24  BY MR. MORRIS:

25  Q    K&L Gates.  December 22nd.  That's the letter, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 634 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 702 of 1017 PageID 5381
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 633 of
2722

Dondero - Direct                    103

1   A    Yes.

2   Q    And according to the testimony that you gave at the

3   preliminary injunction hearing on January 8th, that's the day

4   that you also stopped AVYA and SKY trades, right?

5   A    I'm not agreeing to that testimony.  I am changing the

6   testimony.

7   Q    Okay.  And then we just saw that other exhibit where they

8   were trying to arrange a phone call with you, the K&L Gates

9   lawyers, and Mr. Ellington and Grant Scott for the 23rd.  Do

10  you remember that one we just looked at?

11  A    Yes.

12  Q    And then later on the day on the 23rd, K&L Gates sends

13  another letter, right?

14          MR. MORRIS:  Can we call up EEEE?  And can we scroll

15  to the Exhibit A, to our response?  Right there.

16  BY MR. MORRIS:

17  Q    That's the 23rd.  Do you see that letter?

18  A    Yes.

19  Q    Again, this is one week after the hearing, right?

20  A    Yes.

21  Q    Okay.  And this is a letter where K&L Gates states on

22  behalf of the Defendants that they are contemplating taking

23  steps to terminate the CLO management agreements, right?

24  A    I don't know.  Can you scroll down, if you want to ask me

25  --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 635 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 703 of 1017   PageID 5382
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 634 of
2722

```
                          Dondero - Direct              104
```

1   Q    Sure.

2          MR. MORRIS:  Can we flip to the next page, please?

3   Keep going.  Right there.

4   BY MR. MORRIS:

5   Q    Can you read the first sentence of the paragraph

6   beginning, "Consequently"?

7   A    (reading)  Consequently, in addition to our request of

8   yesterday, where appropriate and consistent with the

9   underlying contractual provisions, one or more of the entities

10  above intend to notify the relevant Trustees and/or Issuers

11  that the process of removing the Debtor as fund manager should

12  be initiated, subject to and with due deference to the

13  applicable provisions of the United States Bankruptcy Code,

14  including the automatic stay of Section 362.

15  Q    Okay.  So, on December 23rd, the Defendants told the

16  Debtor that they intended to notify the relevant Trustees

17  and/or the Issuers that the process of removing the Debtor as

18  the fund manager should be initiated, right?

19  A    That's what it says.

20  Q    And then the K&L Gates firm sent yet another letter to the

21  Debtor, right?  Do you remember that?

22  A    No.

23          MR. MORRIS:  Can we get up FFFF, please?

24  BY MR. MORRIS:

25  Q    This is dated December 31st.  Do you see that?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 636 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 704 of 1017    PageID 5383
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 635 of
2722

Dondero - Direct                 105

1  A    Yes.

2         MR. MORRIS:  Can we scroll down a bit?

3  BY MR. MORRIS:

4  Q    Do you recall this is the letter where they claim that

5  they've been damaged by the Debtor's eviction of you from the

6  Highland offices?

7  A    I don't remember specifically, but that's true.

8  Q    Okay.  So we just saw these three letters, in addition to

9  your -- the -- at least the testimony you gave regarding your

10 conduct on the 22nd of December.  You were aware that all of

11 these letters were being sent by K&L Gates, correct?

12 A    Yes, generally.

13 Q    And you were supportive of the sending of these letters,

14 right?

15 A    Absolutely.  They were appropriate.

16 Q    And you pushed and encouraged the chief compliance officer

17 and the general counsel to send these letters, right?

18 A    I'd like to think that they believed and they acted

19 largely on their own judgment, but I strongly believed it was

20 a violation of the Advisers Act, and stated that numerous

21 times.

22 Q    Sir, you pushed and encouraged the chief compliance

23 officer and the general counsel to send these letters,

24 correct?

25 A    No, I wouldn't use those words.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 637 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 705 of 1017 PageID 5384
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 636 of
2722

Dondero - Direct                    106

1   Q   Do you understand that the Debtor demanded that the K&L

2   Gates clients or the Defendants withdraw these letters?

3   A   I believe they requested it.  I didn't -- I didn't know

4   the former, what you mean by demand, but --

5   Q   Well, it's fair to say you never instructed the K&L Gates

6   clients or the Defendants to withdraw these letters, right?

7   A   No.  I still believe they are appropriate and accurate.  I

8   wouldn't withdraw them today.

9   Q   Okay.  Sir, throughout 2020, when you were still the

10  portfolio manager at Highland Capital Management, it's true

11  that you sold AVYA shares on numerous occasions on behalf of

12  both the CLOs and on behalf of the Funds outside of the

13  holdings of the CLOs?

14  A   Always with a business purpose, yes.  That is still a

15  small percentage of our total AVYA holdings, and we still

16  liked AVYA.

17  Q   Sir, I'm going to ask you just one more time.  In 2020,

18  you sold AVYA stock many times on behalf of the CLOs and on

19  behalf of the Funds?

20  A   Yes.

21  Q   Thank you.

22          MR. MORRIS:  No further questions, Your Honor.

23          THE COURT:  All right.  Mr. Rukavina?

24          MR. RUKAVINA:  Your Honor, I will reserve my

25  questions to my case in chief, and I would request a very

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 638 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 706 of 1017   PageID 5385
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 637 of
2722

Dondero - Direct                    107

1    short restroom break.

2              THE COURT:  All right.  Mr. Dondero, we're --

3              MR. RUKAVINA:  And I do mean short.  I will --

4              THE COURT:  I'm sorry.  What?

5              MR. RUKAVINA:  And I do mean short, Your Honor.  I

6    just need to run and be back -- I can be back in three

7    minutes.

8              MR. MORRIS:  No problem, Your Honor.

9              THE COURT:  Okay.  You're finished for now, Mr.

10   Dondero, but you're going to be recalled, so hang tight.

11       Your next witness, Mr. Morris?

12             MR. MORRIS:  The Debtor calls Jason Post.

13             MR. RUKAVINA:  Your Honor, may I be excused to run to

14   the restroom and Mr. Vasek take over for a few minutes?

15             THE COURT:  Oh.  Okay.  I'm sorry.  If you made that

16   request, I didn't hear you.  So that's fine.

17       All right.  Mr. Post, --

18             MR. MORRIS:  Your Honor, can we just -- I apologize

19   for interrupting.  Can we just direct Mr. Dondero not to speak

20   with anybody about anything at any time?  Not by phone, not by

21   text, not by email, not by meeting, not by anything?  Because

22   he's still on the stand.

23             MR. RUKAVINA:  Well, Your Honor, anything at any

24   time.  I think I know that Mr. Morris is being facetious, but

25   if he's trying to get the rule invoked, that's different.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 639 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 707 of 1017   PageID 5386
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 638 of
2722

Post - Direct                    108

```
 1          MR. MORRIS:  Okay.  I'm trying to get the rule
 2   invoked.
 3          THE COURT:  Okay.  All right.  I'm not going to make
 4   that instruction.  All right.  So, --
 5          MR. RUKAVINA:  I've got to run to the restroom.  I'll
 6   be -- listen for the instructions.
 7          THE COURT:  Jason Post, you've been called to the
 8   witness stand.  Could you say, "Testing, one, two"?
 9          MR. POST:  (Indiscernible.)
10          THE COURT:  All right.  Please raise --
11          MR. POST:  Testing, one, two.
12          THE COURT:  Thank you.  Please raise your right hand.
13              JASON POST, DEBTOR'S WITNESS, SWORN
14          THE COURT:  All right.  Mr. Morris, go ahead.
15                       DIRECT EXAMINATION
16   BY MR. MORRIS:
17   Q   Good afternoon, Mr. Post.  We met the other day.  Do you
18   remember that?
19   A   I do.
20   Q   Okay.  So, again, just to remind you, my name is John
21   Morris.  I'm an attorney at Pachulski, Stang, Ziehl & Jones.
22   We represent the Debtor here.  You're the chief compliance
23   officer for each of the Defendants; is that right?
24   A   I am.
25   Q   And in your role as the chief compliance officer, your job
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 640 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 708 of 1017 PageID 5387
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 639 of
2722

Post - Direct                    109

1  is to act as a liaison between regulatory bodies and internal

2  working groups with respect to the rules and regulations for

3  the funds advised by the Advisors; is that correct?

4  A    Correct, that's -- that's the (inaudible).  Correct.

5  Q    All right.  And internally, you report to Mr. Dondero.

6  Isn't that right?

7  A    Correct.

8  Q    And you've been working with Mr. Dondero since 2008 when

9  you joined Highland Capital Management, correct?

10 A    I worked at Mr. Dondero's firm since 2008, but I reported

11 to other direct reports during that time outside of Mr.

12 Dondero.  I started to report to him directly in October of

13 2020.

14 Q    Okay.

15 A    (overspoken)

16 Q    But you've -- you've worked at Highland -- you worked at

17 Highland since 2008, fair?

18 A    Yes.

19 Q    Okay.  And you were employed by Highland up until October

20 2020, correct?

21 A    Yes.

22 Q    Okay.  And at that time, Mr. Dondero left and he went to

23 NexPoint and you went to NexPoint.  Is that right?

24 A    Shortly after Mr. Dondero left Highland, I transitioned

25 over to NexPoint.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 641 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 709 of 1017   PageID 5388
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 640 of
2722

Post - Direct                    110

1   Q    And that's where Mr. Dondero is, right?

2   A    Correct.

3   Q    Okay.  You joined Highland in 2008, and in around 2011 you

4   joined Highland's internal legal and compliance team, correct?

5   A    That's correct.

6   Q    And in 2015, while still employed by Highland, Mr. Dondero

7   appointed you as the chief compliance officer of the Advisors

8   and the Funds, right?

9   A    Technically, the retail board appointed me the CCO of the

10  Funds, and then I was appointed internally.  I believe Mr.

11  Dondero was part of that decision for the Advisors.

12  Q    Had you ever worked with the retail boards before that?

13  A    There was about -- I worked with them for about a year

14  prior to that.

15  Q    Okay.  And you've served as the CCO, the chief compliance

16  officer, of each of the Advisors and each of the Funds since

17  September 2015 on a continuous basis, right?

18  A    That is correct.

19  Q    You know Thomas Surgent; is that right?

20  A    I do.

21  Q    Mr. Surgent has been the Debtor's chief compliance officer

22  since around 2013 or 2014; is that right?

23  A    I believe -- uh -- I -- I think that's correct.  It may be

24  a year or two off.  He took the role after the former CO

25  resigned, which I don't know if that was 2011 or 2012.  I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 642 of
Case 3:25-cv-02072-S    Document 15-7   Filed 10/06/25    Page 710 of 1017    PageID 5389
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 641 of
2722

Post - Direct                    111

1    can't recall specifically.

2    Q    Okay.  But he's been -- he's been in that position for a

3    long time, right?  Fair enough?

4    A    Yes, that's fair.

5    Q    And during the whole time that you were employed by

6    Highland and serving as the chief compliance officer for the

7    Funds and the Advisors, you reported to Mr. Surgent?

8    A    Internally.  Yes, that's correct.

9    Q    Yeah.  And you respect Mr. Surgent; isn't that right?

10   A    During the time I reported to him, yes.

11   Q    Yeah.  And you believed that he did his job well, right?

12   A    As far as I could see, yes.

13   Q    You viewed it as -- you viewed him as a mentor, did you

14   not?

15   A    Yes.  I mean, when I joined the legal compliance team, you

16   know, he was there.  He was a senior member on the team.  And

17   he, you know, helped educate me, along with other, you know,

18   external sources, et cetera, on the compliance function.

19   Q    Uh-huh.  He trained you for the work you're doing now,

20   right?

21   A    With respect to the on-the-job training, yes.

22   Q    Uh-huh.  Despite all of that, throughout all the

23   proceedings, the court hearings, all of the issues that we're

24   talking about in this case, you never, ever stopped to discuss

25   any of these issues with your former mentor, Mr. Surgent; is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 643 of
Case 3:25-cv-02072-S    Document 15-7   Filed 10/06/25   Page 711 of 1017   PageID 5390
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 642 of
2722

Post - Direct                            112

1   that right?

2   A    The -- with respect to, for example, the trade (garbled)

3   that you were talking about earlier?

4   Q    Let's do it this way.  From the time that you left

5   Highland until today, you've never discussed with Mr. Surgent

6   Mr. Seery's trades; is that right?

7   A    I believe there was a discussion after -- I can't recall

8   exactly the context.  There was a discussion after the trades

9   in the November time frame.  And then I believe there was a --

10  I responded to an email exchange in the December time frame

11  regarding booking of the trades.

12  Q    Sir, you -- you've never spoken with Mr. Surgent about any

13  issue concerning the Debtor's management of the CLOs, correct?

14  A    I don't recall directly, no.

15  Q    In fact, you're not aware of anyone acting on behalf of

16  the Advisors or the Funds who has reached out to Mr. Surgent

17  to get his views on any of the issues related to this motion.

18  Isn't that right?

19  A    I believe previously there's correspondence that Mr.

20  Dondero had with Surgent.  But aside from that, I'm not aware

21  of any.

22  Q    Is that the email where he reminded him of his personal

23  liability?  Is that the one you're thinking of?

24  A    Correct.

25  Q    Yeah.  Do you know of any other communication -- do you

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 644 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 712 of 1017   PageID 5391
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 643 of
2722

Post - Direct                              113

1   know of any other communication that any of the Defendants had

2   with Mr. Surgent concerning the Debtor's management of the

3   CLOs?

4   A    With Mr. Surgent directly, I don't -- I don't -- I don't

5   believe so.

6   Q    Yeah.  You graduated from Baylor; is that right?

7   A    Correct.

8   Q    But you don't have any certifications or licenses

9   applicable to your work, correct?

10  A    Correct.

11  Q    You don't have any specialized training or education

12  that's relevant to your work as a chief compliance officer,

13  correct?

14  A    Correct.

15  Q    Your job -- your training is limited to on-the-job

16  training; isn't that right?

17  A    That is correct.

18  Q    You've never spoken at any conferences on compliance

19  matters, have you?

20  A    Spoken, no.  Attended, yes.

21  Q    You don't recall presenting any papers at any compliance-

22  related conferences, do you?

23  A    That is correct.

24  Q    You've never published anything in connection with your

25  work as a compliance officer; isn't that right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 645 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 713 of 1017   PageID 5392
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 644 of
2722

Post - Direct                              114

1   A    Not that I can recall.

2   Q    Let's talk about the CLO management agreements briefly.

3   You're aware that the Debtor is party to certain management

4   agreements pursuant to which it serves as the portfolio

5   manager for certain CLOs, correct?

6   A    Correct.

7   Q    And until your lawyers recently asked you to review them,

8   you last had reason to review a CLO management agreement about

9   five or six years ago; isn't that right?

10  A    I believe that's correct.

11  Q    And the request from your lawyers to look at the CLO

12  management agreements, that request came in late November/

13  early December; isn't that right?

14  A    I believe that's around the right time frame.

15  Q    And the portions of the management agreements that you

16  read were the portions that your counsel asked you to read;

17  isn't that right?

18  A    Correct.

19  Q    And other than the general recollection of having read

20  something about the rights of preference shareholders, you

21  don't recall much about the agreements at all; isn't that

22  right?

23  A    I mean, the agreements are very lengthy in nature.  You

24  know, I think it was probably rights that the preference

25  shareholders had, and, you know, possibly indemnification

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 646 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 714 of 1017   PageID 5393
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 645 of
2722

Post - Direct                    115

1   provisions.  But aside from that, I don't recall anything else

2   specifically right now.

3   Q   As the chief compliance officer of the Advisors and the

4   Funds, you don't know whether any of them are party to the CLO

5   management agreements between the Debtors and -- between the

6   Debtor and the Issuers, correct?

7        MR. RUKAVINA:  And Your Honor, I would just object to

8   the extent that that calls for a legal conclusion.  This

9   witness is not a lawyer.

10       THE COURT:  Overruled.

11       THE WITNESS:  I'm sorry.  Can you repeat the

12  question, please?

13  BY MR. MORRIS:

14  Q   Sure.  As the chief compliance officer for each of the

15  Defendants, you don't know whether any of them are party to

16  the CLO management agreements between the Debtor and the

17  Issuers, correct?

18  A   They're not the named collateral manager, but they're a

19  security holder of the CLOs, so they should be entitled to,

20  you know, the rights that those security holders are afforded

21  under those agreements.

22       MR. MORRIS:  I move to strike, Your Honor.

23       THE COURT:  Granted.

24  BY MR. MORRIS:

25  Q   All right.  So, now, Mr. Post, I know this is difficult,

Post - Direct                    116

 1  and I do appreciate that it's difficult just to focus on the

 2  question.  Your counsel will have the opportunity to ask you

 3  whatever he wants.  But I would respectfully request that you

 4  listen to my question and only answer my question.  It really

 5  is very likely to require just a yes or no answer.

 6      So, let me try again.  As the chief compliance officer of

 7  the Advisors and the Funds, you don't know whether any of them

 8  are a party to the CLO management agreements between the

 9  Debtor and the Issuers, correct?

10  A   I don't believe they are, correct.

11  Q   Okay.  Let's talk about that prior hearing.  Now, by the

12  way, Mr. Post, did you listen in to Mr. Dondero's testimony

13  earlier?

14          MR. RUKAVINA:  Mr. Post was here with me --

15          MR. MORRIS:  Yeah.

16          MR. RUKAVINA:  -- as my representative..

17          MR. MORRIS:  Okay.  I -- there's no problem.  I just

18  -- I just -- that way there's some background and he has some

19  context.  That's the only reason I asked.

20  BY MR. MORRIS:

21  Q   You're aware that the Funds and the Advisors previously

22  filed a motion in the Bankruptcy Court asking the Court to

23  institute a pause in the Debtor's ability to sell CLO assets,

24  correct?

25  A   Correct.

Post - Direct                    117

1  Q    And you recall that that happened in mid-December, around

2  December 16th; is that right?

3  A    That sounds correct.

4  Q    And in connection with that motion, you provided

5  information to counsel that they requested from you, right?

6  A    Yes.  I was part of the working -- internal working group,

7  with internal and external counsel.

8  Q    Other than providing that information, you generally

9  agreed with the position being taken that it wasn't in the

10  best interest of the Funds involved for Highland to make any

11  trades; isn't that right?

12  A    Yes.  And that was based off of discussions with the

13  investment professionals.

14  Q    And the investment professionals are Mr. Sowin and Mr.

15  Dondero, correct?

16  A    Correct.

17  Q    Okay.  So you're the chief compliance officer, and they

18  made a motion that was based on the idea that the fund

19  manager, Highland Capital Management, shouldn't trade any

20  assets in the CLOs.  Do I have that right?

21  A    I believe that's what the motion contained.

22  Q    But you don't even remember who authorized the filing of

23  the motion; isn't that right?

24  A    I believe it was pursuant to discussions internally and

25  with external counsel, and I believe Mr. Norris signed the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 649 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 717 of 1017    PageID 5396
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 648 of
2722

Post - Direct                                118

1  filing, if I -- if I recall correctly.

2  Q   Sir, you don't remember who authorized the filing of the

3  motion, correct?

4  A   It -- it was pursuant to a discussion with the investment

5  professionals and counsel, and it was in the best interest of

6  the Funds to make the filing.  So I think it was a

7  collaborative determination.

8           MR. MORRIS:  I move to strike, Your Honor.

9           THE COURT:  Granted.

10          MR. MORRIS:  Ms. Canty, can we please pull up Mr.

11 Post's deposition transcript?  And let's go to Page 35.  Line

12 21.  Okay.

13 BY MR. MORRIS:

14 Q   Do you remember giving the following answer to the

15 following question:

16     "Q   Who authorized the filing of this motion?

17     "A   I can't recall specifically who authorized it."

18 Q   Did you give that answer to my question just the other

19 day?

20 A   That's -- that's what it says there, yes.

21 Q   And it says that because that's, in fact, what you

22 testified to under oath the other day, right?

23 A   Correct.

24 Q   Okay.  And the one thing that you know for certain is that

25 you didn't authorize the filing of the motion; isn't that

Post - Direct                    119

1  right?

2  A    I didn't sign anything in connection with the filing.

3  Q    All right.  Listen carefully to my question.  The one

4  thing that you're certain of is that you did not authorize the

5  filing of the motion as the chief compliance officer of the

6  Debtors, correct?

7  A    Correct.

8  Q    Okay.  But you did participate in conversations with Mr.

9  Dondero and counsel concerning the motion; is that fair?

10  A    There were conversations with Mr. Dondero initially, and

11  then the conversations were then more so with internal and

12  external counsel in terms of the filing.

13  Q    Okay.  So they started just with Mr. Dondero, and then

14  they moved on to counsel.  Is that what you're saying?

15  A    I can't recall specifically.  It may have been part of a

16  discussion internally with internal counsel and Mr. Dondero.

17  I just -- I can't recall the specifics.

18  Q    Okay.  But Mr. Dondero certainly supported the filing of

19  the motion, right?

20  A    Yes.  From an investment perspective, it was in the best

21  interest of the Funds in terms of the sales that were

22  occurring.

23  Q    Okay.

24         MR. MORRIS:  I move to strike.

25         THE COURT:  Granted.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 651 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 719 of 1017   PageID 5398
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 650 of
2722

```
                        Post - Direct                120
```

1  BY MR. MORRIS:

2  Q   It's a very simple question.  Mr. Dondero supported the

3  filing of the motion; is that correct?

4  A   Yes.

5  Q   You did not file a declaration in support of the motion;

6  is that correct?

7  A   Me personally, no.

8  Q   Okay.  So you're the chief compliance officer of the

9  Defendants; is that right?

10  A   Correct.

11  Q   But instead of you filing a declaration, Mr. Norris filed

12  the declaration.  Do I have that right?

13  A   Correct.  My understanding is one person needs to sign the

14  declaration.

15  Q   And remind me, what is Mr. Norris's position?  He's the

16  executive vice president, right?

17  A   Correct.

18  Q   What responsibilities does he have?  Does he have trading

19  responsibility?

20  A   He does not.

21  Q   Does he have compliance responsibility?

22  A   Not directly, no.

23  Q   Does he have investment responsibility?

24  A   He's familiar with the composition of the portfolios in

25  his role as a product strategy team member.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 652 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 720 of 1017    PageID 5399
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 651 of
2722

Post - Direct                          121

1   Q    Does he have investment responsibility, sir?

2   A    He is not making direct investments for the -- for the

3   Funds.

4   Q    Okay.  So he doesn't -- and he's not a compliance person,

5   right?

6   A    Correct.

7   Q    And he's not a lawyer, right?

8   A    Correct.

9   Q    But nevertheless, as the chief compliance officer, you

10  believed that Mr. Norris's declaration contained all of the

11  information that was relevant to support the motion, right?

12  A    It was a determin... or a collaborative determination in

13  conjunction with counsel.  But I, you know, I don't -- yeah,

14  it was -- it was a collaborative determination.  There were

15  multiple elements that went into that -- the letter.

16  Q    Okay.  You believed that the motion and Mr. Norris's

17  declaration contained all the relevant facts that supported

18  the Advisors and the Funds' requests to the Court, correct?

19  A    Yes.

20  Q    In fact, you believed that Mr. Norris was the most

21  knowledgeable person to testify on behalf of the Movants;

22  isn't that right?

23  A    I think it was -- he was identified pursuant to

24  discussions with counsel to be the most knowledgeable.

25  Q    I'm going to ask you just about you and not counsel.  You

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 653 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/06/25    Page 721 of 1017    PageID 5400
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 652 of
2722

Post - Direct                                       122

1   believed at the time that Mr. Norris was the most

2   knowledgeable witness to testify on behalf of the Movants;

3   isn't that right?

4   A    Yes.

5   Q    And you didn't testify -- not only didn't you submit a

6   declaration, but you didn't testify at the hearing, did you?

7   A    Correct on both.

8   Q    Okay.  And you listened to parts of the hearing, but not

9   all of it, because you were busy doing other stuff, right?

10  A    Correct.

11  Q    You didn't listen to Mr. Norris's testimony at all, right?

12  A    I don't believe I did.

13  Q    You didn't listen to the Court when the Court rendered its

14  decision, did you?

15  A    I don't -- I don't believe I did.

16  Q    And you didn't read the transcript from the hearing, did

17  you?

18  A    I don't -- correct.  I did not.

19  Q    Okay.  So in your capacity as the chief compliance

20  officer, you didn't believe that you should take the time to

21  review the transcript, did you?

22  A    Correct.  I mean, just it was filed based off of the

23  belief that the -- that the trades weren't in the best

24  interest, and I -- and no, I didn't read it personally.

25  Q    And you didn't believe, in -- that in your capacity as the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 654 of
Case 3:25-cv-02072-S  Document 15-7  Filed 06/25  Page 722 of 1017  PageID 5401
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 653 of
2722

                          Post - Direct                    123

1   CCO, the chief compliance officer, that it was in the scope of

2   your responsibility to listen to the hearing, correct?

3   A   I was -- I wasn't asked to listen, and quite frankly, I

4   don't -- I don't recall if I remember the timing, but I did

5   not listen.

6   Q   Okay.  And in your capacity as the chief compliance

7   officer, you didn't believe that it was in the scope of your

8   responsibilities to listen to the hearing; isn't that right?

9   A   Correct.

10  Q   And because you didn't listen to the hearing or review the

11  transcript, you were unaware of what the Court said or how

12  Judge Jernigan described the motion or the people involved in

13  presenting the case on behalf of the Defendants, right?

14  A   Correct, but I -- I believe I probably would have received

15  some guidance from counsel who attended or listened to the

16  hearing.

17  Q   Well, after the hearing was over, you did speak to Mr.

18  Norris, right?

19  A   Very briefly.

20  Q   In fact, --

21  A   Very --

22  Q   In fact, the only thing you can remember about your

23  conversation with Mr. Norris following the hearing was

24  discussing with him how long the hearing took.  Isn't that

25  right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 655 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 723 of 1017   PageID 5402
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 654 of
2722

Post - Direct                           124

1   A    Correct, because I -- I believe I heard it was a short

2   hearing.

3   Q    And that's -- that's all -- that's all you asked Mr.

4   Norris about, about the hearing, right?  That's all you

5   remember talking to him about?

6   A    I believe so, correct.

7   Q    You don't recall discussing with Mr. Norris any other

8   aspect of the hearing other than the length of time it took to

9   conduct, correct?

10  A    I don't recall specifically.

11  Q    And you have no recollection of ever discussing with Mr.

12  Dondero what happened at the hearing, right?

13  A    I don't think I talked with Jim, Jim Dondero about that.

14  Q    Nor did you talk to Mr. Dondero about the Court's ruling;

15  isn't that right?

16  A    Correct.

17  Q    Okay.  Let's talk about the events that occurred after the

18  hearing, in the two weeks following the hearing.  The

19  Defendants for which you serve as the chief compliance officer

20  sent three separate letters to the Defendant [sic], correct?

21  A    If you could bring them up, I can confirm.

22  Q    Sure.

23         MR. MORRIS:  Let's start with DDDD, please.  Okay.

24  Okay.  Can we scroll to the attachment, please?

25  BY MR. MORRIS:

Post - Direct                    125

1   Q    All right.  So this is the first letter, Mr. Post.  Do you

2   recall, on or about December 22nd, the K&L Gates firm sent, on

3   behalf of the Advisors and Funds for which you serve as the

4   chief compliance officer, a letter to the Debtors?

5   A    Yes.

6   Q    Okay.

7          MR. MORRIS:  And can we call the next exhibit?  I

8   guess it's EEEE.

9       And I don't mean to be quick about these.  If there's any

10  reason that you want to read them, I wasn't planning on asking

11  any questions about the substance of the letters of this

12  witness.

13  BY MR. MORRIS:

14  Q    But Mr. Post, I don't mean to be quick here.  So if you

15  think there's a benefit to you to reading the letters, please

16  let me know.

17      Do you see, December 23rd, the next day, another letter

18  was sent by K&L Gates?

19  A    Yes.

20  Q    Okay.  And do you recall generally that the Advisors and

21  Funds for which you serve as chief compliance officer told the

22  -- told the Debtor that they were going to begin the process

23  of seeking to terminate the CLO management agreements?

24  A    I believe -- I believe that was contained in the letter,

25  so long as it was done in compliance with the Court.

Post - Direct                           126

1  Q   Uh-huh.  And do you remember there was a third letter that

2  was sent?

3  A   If you wouldn't mind pulling it up.

4  Q   Yeah, not at all.

5        MR. MORRIS:  Can we get the December 31st letter?  I

6  think it might be -- yeah.

7  BY MR. MORRIS:

8  Q   Now, here's the December 31st letter.  Do you remember the

9  December 31st letter was the one where K&L Gates suggested

10 that the Advisors and the Funds had suffered damages because

11 the Debtor evicted Mr. Dondero from the Highland suite of

12 offices?

13 A   I -- I had heard of that letter being drafted, but I don't

14 recall -- I obviously don't recall a specific date.  But if it

15 says December 31st, --

16 Q   Okay.  Mr. Dondero was one of the main voices in the

17 decision to send these letters, correct?

18 A   He was part of the preliminary conversation and expressed

19 his opinion, and then myself and others internally, and with

20 external counsel, then worked to draft the letters.

21        THE COURT:  All right.  Mr. Post, I am going to

22 interject.  I have heard Mr. Morris give you this instruction

23 many times.  Maybe it's time for me to.  Maybe it's past time

24 for me to.

25    Most of his questions simply require a yes or no answer.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 658 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 726 of 1017 PageID 5405
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 657 of
2722

Post - Direct                    127

1  If you feel like there are other things that you want to

2  supplement your testimony with, Mr. Rukavina is going to have

3  a chance to question you, and that would be the situation

4  where maybe you could give more fulsome answers.  But please

5  listen to the question.  If it's a yes or no answer, that's

6  all we want you to give right now.  Okay?  Got it?

7        THE WITNESS:  Understood.

8        THE COURT:  Okay.

9        MR. MORRIS:  Thank you, Your Honor.

10  BY MR. MORRIS:

11  Q   Mr. Post, Mr. Dondero was one of the main voices in the

12  decision to send the letters; isn't that correct?

13  A   He was a voice.

14        THE COURT:  That was not a yes --

15  BY MR. MORRIS:

16  A   And he was -- he --

17        THE COURT:  Okay.

18        THE WITNESS:  I'm --

19        THE COURT:  Please, just a yes or no answer, okay?

20        THE WITNESS:  No.

21        MR. MORRIS:  Okay.  Can we go to Mr. Post's

22  transcript, please, Page 47?  Line 22?

23     And Your Honor, when we pull it up on the screen, there is

24  an objection, and I would respectfully request that the Court

25  rule on the objection before I read the question and the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 659 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 727 of 1017    PageID 5406
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 658 of
2722

Post - Direct                          128

1    answer.

2              THE COURT:  All right.

3              MR. MORRIS:  So if we could just call up Page 47

4    beginning at Line 22.

5              MR. RUKAVINA:  Page 47, Line 22.

6              THE COURT:  Okay.

7              MR. MORRIS:  One moment.  Give her a moment.  She's

8    not there.

9              MR. RUKAVINA:  Do you remember what exhibit this is?

10             MR. MORRIS:  Yeah.  There it is.  Beginning at Line

11   22, "Do you know?"  And there is Mr. Rukavina's objection.

12             MR. RUKAVINA:  Your Honor, it's very simple.  He

13   can't go into Mr. Dondero's head.  But he -- but if Mr.

14   Dondero told him something, that's different.  So I think

15   counsel can rephrase the question and it's perfectly fine, but

16   he can't go into Mr. Dondero's state of mind.

17             MR. MORRIS:  Your Honor, I'm not asking for Mr.

18   Dondero's state of mind.  I'm asking for Mr. Post's knowledge.

19   "Do you know?"

20             THE COURT:  Okay.  I'll overrule the objection.  He

21   can answer.

22   BY MR. MORRIS:

23   Q   All right.  So, Mr. Post, do you remember giving this

24   answer to the following question:

25       "Q   Do  you  know  whether  Mr.  Dondero  supported  the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 660 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 728 of 1017   PageID 5407
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 659 of
2722

Post - Direct                    129

1      sending of each of these three letters?

2      "A    I don't -- I don't recall specifically.  I think

3      he had his views on certain of the transactions that

4      were occurring, and he wasn't in agreement with those

5      transactions, as one of the main voices."

6   Q   Do you see that?

7   A   I do.

8   Q   Does that refresh your recollection that Mr. -- that you

9   testified that Mr. Dondero was one of the main voices?

10  A   Yes.

11  Q   Okay.  Mr. Dondero --

12          MR. MORRIS:  You can take that down now for the

13  moment, please.

14  BY MR. MORRIS:

15  Q   Mr. Dondero had his views on certain of the transactions

16  that were occurring, and he wasn't in agreement with those

17  transactions.  Isn't that right?

18  A   Yes.

19  Q   All right.  Going back to the letters that we just looked

20  at quickly, you recall the Debtor responded to each of those

21  letters, but as the chief compliance officer, you couldn't

22  really recall what the Debtor said in response.  Is that fair?

23  A   I'm -- I believe they -- I'm sorry.  I can't recall

24  specifically without seeing the letters.

25  Q   Okay.  So you don't recall that, in response, the Debtor

Post - Direct                    130

1   requested that the Advisors and the Funds withdraw the

2   letters, right?

3   A   I believe that was requested in the letters.

4   Q   Okay.  But the Funds and the Advisors didn't comply with

5   that request, right?

6   A   To my knowledge, they have not withdrawn the letters.

7   Q   You do recall that the Debtor specifically asked the

8   Defendants to file their lift stay motion so that they could

9   finally resolve the issue of whether or not the Advisors and

10  the Funds could actually terminate the agreement, right?

11  A   I -- I'm sorry.  Can you repeat that question, please?

12  Q   Do you recall that the Funds and the Advisors informed the

13  Debtor that they were going to initiate steps to terminate the

14  CLO management agreements, including moving to lift the stay?

15  A   I think they indicated that they were going to take steps,

16  but it would be pursuant to what was permitted in the court.

17  Q   And do you remember that the Debtor specifically asked the

18  Defendants to do exactly that, to bring this matter to a

19  conclusion, to file the motion so that the Court could resolve

20  the issue of whether or not they had a right to terminate the

21  agreement?  You remember that, right?

22          MR. RUKAVINA:  Objection, compound, Your Honor.

23          THE WITNESS:  I can't --

24          THE COURT:  I'm sorry.

25          MR. MORRIS:  I can't recall.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 662 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 730 of 1017    PageID 5409
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 661 of
2722

Post - Direct                        131

1          THE COURT:  Was there an objection?

2          MR. RUKAVINA:  Yes, Your Honor.  That's four

3   questions in one.  That's compound.

4          MR. MORRIS:  I'll rephrase, Your Honor.

5          THE COURT:  Okay.  And let me interject a minute.

6   Mr. Post, you have this habit of not looking squarely at the

7   camera but looking over to your right.  And in a normal

8   courtroom setting, that might be fine, but I have no way of

9   knowing if some lawyer or some other person is -- you're

10  looking at them and they're somehow instructing you.  I would

11  certainly hope that's not what's going on, but it just kind of

12  leaves room for me to wonder when you're not looking squarely

13  at the camera.  So can you start looking squarely at the

14  camera, please?

15         MR. RUKAVINA:  Your Honor, I can explain that, and

16  certainly there's no funny business going on.  There are two

17  cameras on Mr. Post.  One is on a laptop.  We're looking at

18  the Court on the big camera.  I'm sitting behind Mr. Post.  So

19  if the Court would prefer that Mr. Post look directly into the

20  laptop, then that's what he'll do, or if the Court would

21  prefer that he look into the big camera.

22         THE COURT:  Okay.  Well, I prefer he look into the

23  big camera just because it --

24         MR. RUKAVINA:  So keep looking there?  Yeah.

25         THE COURT:  No, no, no, no.  Okay.  I don't know what

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 663 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 731 of 1017   PageID 5410
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 662 of
2722

Post - Direct                    132

1   -- I thought -- okay.  Do you see what I'm seeing?  I don't

2   know if you can see what I'm seeing.

3           MR. MORRIS:  Yes.

4           THE COURT:  I'm seeing the left side of his face.

5           THE WITNESS:  I'm sorry.  I'll just look at the

6   laptop.  Sorry.  I was -- I was looking at who was speaking to

7   me.

8           THE COURT:  Okay.  Well, I don't --

9           MR. MORRIS:  Okay.

10          THE COURT:  I don't know the setup, so it was

11  confusing to me.

12      All right.  This is better.  Thank you.

13          THE WITNESS:  Yeah.  I apologize.

14          MR. RUKAVINA:  We'll focus on the laptop, Judge.

15  BY MR. MORRIS:

16  Q   All right.  So the question, Mr. Post, is:  You do recall

17  that the Debtor specifically asked the Defendants to file

18  their motion to lift the stay so that the issue could finally

19  be resolved; isn't that right?

20  A   I can't recall that specifically.

21  Q   You believe that may be one of the options that the Debtor

22  specifically proposed, right?

23  A   It -- yes.

24  Q   Okay.  But the Defendants never filed their lift stay

25  motion to terminate the agreements; isn't that right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 664 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 732 of 1017   PageID 5411
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 663 of
2722

Post - Direct                    133

1   A   I don't believe so.

2   Q   Right.  So the Debtor filed its complaint and its request

3   for the injunction, right?

4   A   Correct.

5   Q   As the CO -- as the CCO, you may have reviewed the

6   Debtor's complaint and motion, but you can't recall, given all

7   the documentation that's involved, right?

8   A   Correct.

9   Q   You can't recall any facts that the Debtor asserted in

10  support of its motion; isn't that right?

11  A   I can't recall specifically.  Correct.

12  Q   But the one thing you do know is that the Debtor's motion

13  is based on its entitlement to transact business pursuant to

14  their arrangement with the CLOs as collateral manager,

15  correct?

16  A   Yes.

17  Q   Now, you heard that there was supposed to be an initial

18  hearing on the Debtor's motion for a temporary restraining

19  order against the Defendants, right?

20  A   Correct.

21  Q   But you don't believe the motion for the TRO got heard,

22  and you presume it got resolved, right?

23  A   I don't believe it was heard.

24  Q   Okay.  And you understand that there is a TRO in place

25  now, pursuant to which the Advisors and the Funds are

```
                      Post - Direct                    134
```

1   prevented from interfering with the Debtor's execution of its

2   rights under the CLO management agreements, right?

3   A    Correct.

4   Q    Before the TRO was resolved, you weren't personally

5   involved in the process of deciding what witnesses would be

6   called and what exhibits would be offered into evidence; is

7   that right?

8   A    No.

9            MR. MORRIS:  During the deposition, Your Honor,

10  subject to correction from Mr. Rukavina, I believe that the

11  Defendants and the Debtor reached the following two

12  stipulations.

13       First, the Defendants and the Debtor stipulate that Mr.

14  Post was not going to be called as a witness at the TRO

15  hearing.

16           MR. RUKAVINA:  That is correct.

17           MR. MORRIS:  And second, the Defendants and the

18  Debtor stipulate that the Defendants were not going to offer

19  into evidence any exhibits other than those specifically

20  listed on their witness and exhibit list.

21           MR. RUKAVINA:  That being the witness and exhibit

22  list filed before the TRO.  That is correct.

23           MR. MORRIS:  Okay.

24  BY MR. MORRIS:

25  Q    Let's talk about Mr. Seery for a minute.  You know who Mr.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 666 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 734 of 1017    PageID 5413
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 665 of
2722

                        Post - Direct                    135

1    Seery is, correct?

2    A    Correct.

3    Q    You understand he's an independent director and the CEO of

4    the Debtor, right?

5    A    Correct.

6    Q    And you also understand that his -- in his capacity as the

7    Debtor's CEO, Mr. Seery is authorized to sell certain

8    securities and assets that are owned by the CLOs, correct?

9    A    Correct.

10   Q    In your opinion as the CCO, the chief compliance officer

11   of the Advisors and the Funds, Mr. Seery has the knowledge and

12   experience to trade securities on behalf of the CLOs, correct?

13   A    Correct.

14   Q    But you don't believe that it's in the Funds' best

15   interest for Mr. Seery to sell SKY and AVYA securities, right?

16   A    Correct.

17   Q    But even though you reached that decision about Mr. Seery,

18   you have no knowledge as to whether Mr. Dondero ever traded

19   either of those securities before he resigned from Highland;

20   isn't that right?

21   A    I saw some trades that were shown on the screen earlier.

22   I don't think I recalled at the time I was asked on Friday.

23   Q    As of the time -- as of Friday, you had no knowledge as to

24   whether Mr. Dondero had traded in AVYA securities prior to his

25   departure from Highland, correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 667 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 735 of 1017   PageID 5414
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 666 of
2722

Post - Direct                          136

1   A    Correct.

2   Q    And before, before forming your view as the chief

3   compliance officer that Mr. Seery's trading of AVYA was not in

4   the best interest of the Funds, you made no effort to see if

5   Mr. Dondero had sold the exact same securities Mr. Seery was

6   selling, correct?

7   A    Correct.

8   Q    And the sole source of information that you relied upon to

9   reach your opinion that the trades weren't in the best

10  interest of the Funds is Jim Dondero and Joe Sowin, correct?

11  A    I'm sorry.  Can you repeat that?  You kind of cut out at

12  the beginning.

13  Q    Sure.  And please, any time that happens, let me know.  We

14  had some problems this morning.

15       The sole source of information that you relied upon to

16  reach your opinion that the trades weren't in the best

17  interest of the funds is Jim Dondero and Joe Sowin; isn't that

18  correct?

19  A    Correct.  They're the investment professionals, yes.

20  Q    And you have no understanding as to why Mr. Seery wanted

21  to sell the AVYA and SKY securities, do you?

22  A    I was told that -- I don't know why he wanted to sell them

23  personally, correct.

24  Q    Okay.  In fact, before reaching your conclusion as the CCO

25  that Mr. Seery's trades were not in the best interest of the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 668 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 736 of 1017    PageID 5415
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 667 of
2722

Post - Direct                     137

1  Fund, you did not undertake any investigation of any kind to

2  try to determine why Mr. Seery wanted to sell AVYA or SKY

3  stock, correct?

4  A   Correct.  I didn't reach out to Mr. Seery.

5  Q   All right.  You believe that Mr. Dondero and Mr. Sowin's

6  opinion that Mr. Seery's trades aren't in the Funds' best

7  interest should be heard pursuant to the Advisers Act, right?

8  A   Correct.

9  Q   Specifically, Section 2000 -- 206 of the Advisers Act,

10  right?

11  A   Correct.

12  Q   Have you ever read Section 206 of the Advisers Act?

13  A   Yes.

14  Q   Okay.

15      MR. MORRIS:  Ms. Canty, can you please put up the

16  demonstrative for Section 206 of the Advisers Act?

17      MR. RUKAVINA:  Your Honor, the witness just asked me

18  for water.  Nothing more.

19      THE COURT:  Okay.

20      MR. MORRIS:  Yeah.  No problem.

21  BY MR. MORRIS:

22  Q   I've put on the screen Section 206 of the Advisers Act,

23  Mr. Post.  Can you please tell the Court what provision of 206

24  you believe Mr. Seery allegedly breached when he sought to

25  sell AVYA and SKY securities?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 669 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 737 of 1017   PageID 5416
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 668 of
2722

Post - Direct                       138

1    A    It would be Number 4.

2    Q    Do you believe that Mr. Seery engaged in fraudulent,

3    deceptive, or manipulative practices by trying to trade AVYA

4    and SKY securities?

5    A    The -- as collateral manager for the CLOs, they're

6    supposed to maximize returns for the preference shares, which

7    we didn't believe the sales reflected that, and so they

8    weren't acting, --

9             THE COURT:  Okay.

10            THE WITNESS:  -- you know, pursuant to their duties

11   --

12            THE COURT:  Here I -- here I go --

13            THE WITNESS:  -- under the collateral management --

14            THE COURT:  Here I go again.  Here you go again.

15            THE WITNESS:  I'm sorry.

16            THE COURT:  It really was a yes or no question.  All

17   right?

18   BY MR. MORRIS:

19   Q    You're the -- you're the chief compliance officer, right?

20   A    Yes.

21   Q    And this is the provision in Section 4 that you cite to as

22   the provision that Mr. Seery violated when he attempted to

23   sell SKY and AVYA securities, correct?

24   A    Yes.

25   Q    Did Mr. Seery engage in an act, practice, or course of

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 670 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 738 of 1017 PageID 5417
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 669 of
2722

Post - Direct                    139

1    business which was fraudulent when he looked to sell those

2    securities?

3    A    No.

4    Q    Do you believe that Mr. Seery engaged in an act, a

5    practice, or a course of business which was deceptive when he

6    went to sell the SKY and the AVYA securities?

7    A    Yes.

8    Q    Who did he deceive?

9    A    The investors of the CLOs, --

10   Q    How?

11   A    -- the preference shareholders.

12   Q    How?

13   A    By selling securities that the preference shareholder

14   investors believed had further upside to them.

15   Q    Did he lie to them?

16   A    I don't believe he talked to the investors.

17   Q    But you're putting your reputation on the line here and

18   you're swearing under oath that Mr. Seery deceptively tried to

19   sell SKY and AVYA securities?

20   A    I believe that based off of a review and discussion with

21   counsel.

22   Q    Do you think he was manipulative?

23   A    No.

24   Q    Did you -- did you check in with the SEC to tell them that

25   you had a bad actor here?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 671 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 739 of 1017   PageID 5418
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 670 of
2722

```
                         Post - Direct                  140
```

1   A    No.

2   Q    You first formed your view that the Debtor violated

3   Section 206 of the Advisers Act after the sales started to

4   occur in the CLOs, correct?

5   A    Correct.

6   Q    But you don't know when the sales actually started, right?

7   A    I believe there were sales --

8   Q    And I assume, since you were the chief compliance officer

9   since 2015, you don't believe that Mr. Dondero's sale of AVYA

10  stock was deceptive, right?

11  A    You would have to ask Mr. Dondero that, but I believe he

12  was selling for cash, cash needs for other funds.

13         MR. MORRIS:  Okay.  I move to strike.  I'm asking him

14  not --

15         THE COURT:  Sustained.

16  BY MR. MORRIS:

17  Q    I'm asking about you.  I'm asking about you.  You're the

18  chief compliance officer, right?

19  A    Yes.

20  Q    And you don't believe that when Mr. Dondero sold AVYA

21  stock that he was engaged in deceptive practices, do you?

22  A    No.

23  Q    And that's because you don't even know whether he sold

24  AVYA stock; isn't that right?

25  A    On Friday, I -- that is correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 672 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 740 of 1017    PageID 5419
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 671 of
2722

Post - Direct                        141

1  Q    In fact, the only reason you learned that Mr. Seery wanted

2  to sell AVYA and SKY stock is because Mr. Dondero told you;

3  isn't that right?

4  A    I believe I was forwarded the email after -- after there

5  was communications on the sales.

6  Q    And that's the email where Mr. Dondero told Mr. Surgent

7  that he had personal liability, correct?

8  A    I -- I believe it was an email prior to that about were

9  trades being requested and Mr. Dondero responding.

10 Q    You're familiar with the email where Mr. Dondero

11 interfered with Mr. Seery's trades?

12 A    Yes.

13 Q    Okay.  And you're aware that Mr. Dondero told Mr. Surgent

14 that he faced potential liability if he continued to follow

15 Mr. Seery's instructions, correct?

16 A    Correct.  Based off of Mr. Dondero's view.

17 Q    Notwithstanding all of that, in your capacity as the chief

18 compliance officer, you don't believe it's ever appropriate

19 for an investor to step in and impede transactions that have

20 been authorized by the portfolio manager unless the contract

21 permits the investor to step in; isn't that right?

22 A    I believe -- I'm sorry, can you repeat that, please?

23 There was a lot of question.

24 Q    Sure.  Sure.  In your capacity as the chief compliance

25 officer, you don't believe it's ever appropriate for an

Post - Direct                    142

1   investor to step in and impede transactions that were

2   authorized by the portfolio manager unless the contract

3   permits the investor to do so; isn't that correct?  Isn't that

4   correct?

5   A    Yes.

6   Q    Okay.  I know you're not a lawyer, but you are the chief

7   compliance officer of the Funds; isn't that right?

8   A    Correct.

9   Q    And you can't point to anything in any contract that gives

10  Mr. Dondero the right to step in and impede transactions that

11  have been authorized by Mr. Seery; isn't that correct?

12  A    He's entitled rights as preference shareholders for the --

13  for the Funds that hold those preference shareholders.  So,

14  indirectly, he should be afforded those rights as portfolio

15  manager for those Funds.

16  Q    Sir, you can't point to anything in any contract that

17  gives Mr. Dondero the right to step in and impede transactions

18  that have been authorized by Mr. Seery; isn't that correct?

19  A    Correct.

20  Q    Okay.  But yet you have never told Mr. Dondero that he

21  should not interfere with Mr. Seery's trades; isn't that a

22  fact?

23  A    Correct.

24  Q    In fact, you never personally took any steps at any time

25  to make sure that there would be no further interference with

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 674 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 742 of 1017   PageID 5421
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 673 of
2722

Post - Direct                   143

1   the Debtor's trading activities; isn't that correct?

2   A   Correct.

3   Q   And that's because you believe, as the chief compliance

4   officer of the Funds, that Mr. Dondero should have the leeway

5   to make the determination as to whether or not the

6   transactions are appropriate; isn't that correct?

7   A   He should be able to be heard in the transactions that are

8   being made, correct.

9   Q   Sir, not to be heard, but to make the determination.  Let

10  me ask the question again.  You believe, as the CO -- CCO of

11  the Funds, that Mr. Dondero should have the leeway to make the

12  determination as to whether or not the transactions are

13  appropriate; isn't that correct?

14  A   Yes.

15  Q   Okay.  And you completely deferred to Mr. Dondero; isn't

16  that right?

17  A   For the investment determination, yes.

18  Q   And based on that deference, you never took any steps at

19  any time to make sure no one on behalf of the Advisors or the

20  Funds impeded or stopped transactions authorized by Mr. Seery,

21  correct?

22  A   Correct.

23  Q   You understand there's a TRO in place today that prevents

24  Mr. Dondero and the Advisors and the Funds from interfering

25  with Mr. Seery's trading activities; isn't that right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 675 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 743 of 1017    PageID 5422
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 674 of
2722

Post - Direct                           144

1          MR. RUKAVINA:  I'm going to object to that, Your

2   Honor, to the extent that calls for a legal conclusion.  And I

3   do think it mischaracterizes the testimony.  I'm sorry.  The

4   TRO.

5          THE COURT:  Overruled.

6   BY MR. MORRIS:

7   Q   You can answer, sir.  Would you like me to repeat the

8   question?

9   A   Yes, please.

10  Q   You understand that there is a TRO in place -- TRO in

11  place today that prevents Mr. Dondero, the Advisors, and the

12  Funds from interfering with Mr. Seery's trading activities on

13  behalf of the CLOs, correct?

14  A   Correct.

15  Q   But in the absence of the TRO, in your view, whether you

16  tell Mr. Dondero not to interfere with Mr. Seery's trades

17  depends on the facts and circumstances that exist at the time,

18  right?

19  A   Correct.  From a -- yes.

20  Q   Okay.  And up until this point, there have been no facts

21  and circumstances that have caused you to tell Mr. Dondero not

22  to interfere with Mr. Seery's trades on behalf of the CLOs,

23  correct?

24  A   He can't because of the TRO.

25  Q   Correct.  But if the TRO wasn't in place, it's possible

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 676 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 744 of 1017    PageID 5423
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 675 of
2722

Post - Direct                    145

1   that you wouldn't take any steps to stop Mr. Dondero from

2   impeding Mr. Seery's trades; isn't that right?

3   A    I mean, if Mr. Dondero or other investment professionals

4   have a view, that they should be -- they should have a right

5   to be heard as preference shareholders of the CLOs.

6   Q    Okay.  But if the TRO wasn't in place, you wouldn't act to

7   stop Mr. Dondero from interfering or impeding the Debtor's

8   trades on behalf of the CLO; isn't that right?

9   A    He would -- if he would be permitted to talk to Mr. Seery.

10  Q    Okay.  Prior to the imposition of the TRO, you took no

11  steps to stop Mr. Dondero from interfering with Mr. Seery's

12  trades, correct?

13  A    Correct.

14  Q    And if the TRO wasn't in place, it's possible you wouldn't

15  take any steps to stop Mr. Dondero from impeding -- impeding

16  Mr. Seery's trades again; isn't that right?

17  A    If there's an investment rationale as to why they feel the

18  trades shouldn't be done, I -- again, I feel like Mr. Dondero

19  or the other investment professionals should be able to raise

20  those points with Mr. Seery.

21  Q    Do you think they should be able to stop the trades?

22  A    I -- I -- I think they should be able to question the

23  trades.  But flat-out stop them, I'd probably say no.

24  Q    Then why didn't you do anything before the TRO was

25  entered?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 677 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 745 of 1017 PageID 5424
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 676 of
2722

Post - Direct                    146

1  A   Um, I'm sorry, can you repeat the -- do anything in -- in

2  what manner?

3  Q   Why didn't you take any steps before the TRO was entered

4  to stop Mr. Dondero from interfering and stopping and impeding

5  the Debtor's trades?

6  A   I think, as I recall, there was only one -- one set of

7  trades in question that he stepped in on.

8  Q   So, one is okay?  How about two?

9  A   Or, sorry.  There were two trades on one day that -- that,

10 you know, he questioned.  Or stepped in on.  I don't -- I

11 don't recall him stopping any other trades thereafter.

12 Q   That's all you know about, right?

13 A   Correct.

14 Q   And with that knowledge, it never occurred to you to tell

15 Mr. Dondero to knock it off, did it?

16 A   He believed the trades weren't in the best interest for

17 the investors, so I did not.

18 Q   And that's what you mean by deferring to him; isn't that

19 right?

20 A   From the investment perspective, yes.

21 Q   Thank you for your -- thank you for your honesty.  As the

22 CCO, you have never communicated with the Issuers about the

23 Debtor's performance under the CLO management agreements;

24 isn't that right?

25 A   Correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 678 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 746 of 1017    PageID 5425
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 677 of
2722

Post - Direct                    147

1   Q   And that's because you didn't believe it was in your

2   responsibility as the CCO to check with the Issuers to see if

3   the Issuers believed that the Debtor was in compliance with

4   the CLO management agreements, correct?

5   A   That communication would have involved counsel and that

6   communication didn't occur.  I wouldn't have reached out to

7   them directly.

8   Q   Yeah.  You didn't believe it was within your

9   responsibility as the chief compliance officer to communicate

10  with the Issuers to see if they had any views as to Mr.

11  Seery's performance as portfolio manager, correct?

12  A   Correct, because it would have involved me working with

13  counsel and there was never direction to do that.

14  Q   As the chief compliance officer of the Defendants, you

15  have no idea if anyone on behalf of the Advisors or the Funds

16  ever asked the Issuers whether they believed the Debtor was in

17  default under the CLO management agreements, correct?

18  A   Correct.

19  Q   As the CCO, you have no idea if anyone on behalf of the

20  Advisors or the Funds ever asked the Issuers whether they

21  believed was in breach under the CLO management agreements,

22  correct?

23  A   Correct.  I believe there was a call that I wasn't a part

24  of, that it was just involving lawyers, that I don't know what

25  was discussed on the call.  So, correct.

                              Post - Direct                          148

 1   Q    As the CCO, you have no idea if anyone on behalf of the

 2   Advisors or Funds ever asked the Issuers whether they believed

 3   it was appropriate to try to take steps to terminate the CLO

 4   management agreements; isn't that right?

 5   A    Correct.

 6   Q    None of the Issuers joined any of the letters that were

 7   sent on behalf of the Funds and the Advisors, right?

 8   A    I didn't -- I don't recall seeing their names listed.

 9   Q    As the CCO, you don't have any understanding as to what

10   the standard is for terminating the CLO management agreements

11   unless you get legal advice; isn't that right?

12   A    Yes.  It was -- it would be a discussion with counsel,

13   given the complexity of the agreements.

14   Q    But as a factual matter, you're not aware of any facts

15   that would support the termination of the CLO management

16   agreements except that there were trades that Mr. Dondero

17   didn't think were in the best interests of the Funds; isn't

18   that right?

19   A    Yes.  And because the belief was those trades weren't

20   maximizing value for the preference shareholders.

21           MR. MORRIS:  I move to strike everything after the

22   word yes, Your Honor.

23           THE COURT:  Granted.

24           MR. MORRIS:  I have no further questions.

25           THE COURT:  All right.  Mr. Rukavina?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 680 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 748 of 1017   PageID 5427
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 679 of
2722

Post - Direct                         149

1        MR. RUKAVINA:  Your Honor, I'll reserve my questions

2   for my case in chief.

3        THE COURT:  All right.  Mr. Post, that concludes your

4   testimony for now.  Stick around.

5     Mr. Morris?

6        MR. MORRIS:  Your Honor, last witness, and I hope

7   it's rather brief, actually.  The Debtor calls James Seery.

8        MR. RUKAVINA:  Your Honor, may we have a brief

9   restroom break, all of us in this room, before we start the

10  next witness?

11       THE COURT:  All right.  We'll take a five-minute

12  restroom break.  I know part of the long day is because of my

13  commitment at the lunch hour, but you all did estimate three

14  or four hours for this hearing, right?  That's what I recall.

15       MR. MORRIS:  We did.

16       MR. RUKAVINA:  Your Honor, I was never consulted on a

17  time estimate.  I had no idea that someone said three to four

18  hours.

19       THE COURT:  All right.

20       MR. MORRIS:  And part -- part of that is my fault and

21  the technological problems we had this morning, so I take

22  responsibility for that, Your Honor, and I sincerely

23  apologize.

24       THE COURT:  Okay.  Well, just so you know, we cannot

25  come back tomorrow.  I've got two -- too booked today tomorrow

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 681 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 749 of 1017    PageID 5428
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 680 of
2722

150

1    to come back, so --

2              MR. MORRIS:  I don't expect Mr. Seery to be more than

3    about 15 minutes.

4              THE COURT:  Okay.  We'll take a five-minute break.

5              THE CLERK:  All rise.

6         (A recess ensued from 3:22 p.m. until 3:32 p.m.)

7              THE CLERK:  All rise.

8              THE COURT:  All right.  Please be seated.  I wanted

9    to clarify one thing I said, just so no one is confused.  I

10   know that originally you had today, Wednesday, and Thursday,

11   26th, 27th, and 28th, for confirmation.  So if anyone thought,

12   oh, we're coming back tomorrow on this if we don't finish,

13   because originally you had all three of those days, you know,

14   as soon as we continued the confirmation hearing, we started

15   filling in Wednesday.  So we have three different Chapter 11

16   case matters set tomorrow.  And so it was, you know, you give

17   up time and we have people usually wanting to get that time,

18   so that's what happened.

19        But anyway, people, we'll talk fast and we'll get it done

20   today, right?

21             MR. RUKAVINA:  Your Honor, my -- Your Honor?  Oh,

22   wait.  I need to --

23             THE COURT:  Ooh, it sounds like you're in a cave.

24   Let's get those headphones on.

25             MR. MORRIS:  I promise to be as quick as I can, Your

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 682 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 750 of 1017 PageID 5429
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 681 of
2722

151

1    Honor.

2           THE COURT:  Okay.  Mr. Rukavina, were you trying to

3    say something?

4           MR. RUKAVINA:  I was, Your Honor.  Can you hear me?

5           THE COURT:  Yes.

6           MR. RUKAVINA:  This darn video.  Too many -- Your

7    Honor, we have an agreed TRO that goes through February the

8    15th.  And I'm certainly not suggesting taking any more of the

9    Court's time than is necessary, but I cannot commit to

10   finishing today, especially because Mr. Morris has taken so

11   much time.  So I think we will do our best, but I just want

12   the Court to know that there's no urgency to this, and if we

13   have to come back at some point after Tuesday or Wednesday,

14   there's no possible harm to the Debtor.

15          MR. MORRIS:  Your Honor, it's my hope that we can get

16   this done, and I think the sooner we begin the better.

17          THE COURT:  Okay.  Well, we're going to try to get it

18   done.  All right, Mr. Seery.  You've called Mr. Seery to the

19   stand now?

20          MR. MORRIS:  Yes, Your Honor.  The Debtor calls James

21   Seery.

22          THE COURT:  All right.  Mr. Seery, please raise your

23   right hand.

24            JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

25          THE COURT:  All right.  Thank you.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 683 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 751 of 1017   PageID 5430
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 682 of
2722

                        Seery - Direct                   152

 1            MR. MORRIS:  May I proceed?

 2            THE COURT:  You may.

 3            MR. MORRIS:  Thank you, Your Honor.

 4                        DIRECT EXAMINATION

 5    BY MR. MORRIS:

 6    Q    Good afternoon, Mr. Seery.  Can you hear me okay?

 7    A    I can, yes.

 8    Q    Okay.  Let's just cut to the chase here.  You're the CEO

 9    of the Debtor; is that right?

10    A    That's correct.

11    Q    And in that capacity, do you understand that the Debtor is

12    party to contracts pursuant to which it manages certain CLO

13    assets?

14    A    Yes.

15    Q    And are you personally involved in the management of those

16    assets?

17    A    Yes.

18    Q    Do you have any prior experience managing other people's

19    money or other people's assets?

20    A    Yes.

21    Q    Can you please explain to the Court your experience and

22    your knowledge as to investing other people's money?

23    A    Yes.  I was a finance lawyer -- I'll go quickly, if it's

24    okay.  I can fill in later, if you like.  I was a finance and

25    bankruptcy lawyer for ten years before I went to Lehman on the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 684 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 752 of 1017    PageID 5431
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 683 of
2722

Seery - Direct                    153

1    business side in 1999.

2         In that role, I started immediately in distressed

3    investing.  I worked as part of a team of analysts and traders

4    to build distressed positions in prop (phonetic) business,

5    trading Lehman Brothers balance sheet at the time.  This was

6    in 1999 and 2000.  We were one of the most significant

7    investors on the Street, and I was part of that team, and a

8    leading part of the team, putting on significant investments

9    of our balance sheet, which was Lehman's money, into different

10   kinds of stressed, distressed, high yield investments.  That

11   included bonds, that included loans, unsecured, subordinated.

12   Sometimes equity.  Typically, we stayed in credit, but a lot

13   of this was very distressed credit, which often ended up as

14   reorg equity.

15        After that, I began running different teams for making

16   distressed loans to companies that no one else would lend

17   money to.  These investments were significant, anywhere from

18   fifty to a billion dollars.  Some of the largest transactions

19   in the world at the time were transactions I ran, like a

20   rescue loan to PG&E for a billion dollars.  That was in 2000.

21        After that, I continued to grow my career there, running

22   distressed investments.  In 2005, I took over the loan

23   business at Lehman.  That included all high-grade loans, high-

24   yield loans, trading and sales of those loans; managing that

25   portfolio, which was in excess of $10 or $20 billion,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 685 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 753 of 1017 PageID 5432
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 684 of
2722

Seery - Direct                    154

1  depending on the time; exposure both in committed transactions

2  as well as funded loans; the hedging of that portfolio;

3  traders and salespeople working for me.  In addition, I had

4  significant responsibility for the distressed book, as well as

5  all restructuring business at Lehman.

6     After Lehman, I -- and I was one of the people who sold

7  Lehman -- I became a senior investing partner at RiverBirch

8  Capital.  We were about a billion and a half dollar long/short

9  investor, mostly stressed and distressed, but a lot of high-

10 grade trades as well, particularly in preferred stocks.  That

11 was a global business, but primarily U.S., Europe, some Asian

12 investments as well.

13    Since then, I've gotten to Highland.  I've been

14 responsible for Highland's investments.  After the first

15 quarter, when the performance managed by Mr. Dondero was

16 absolutely disastrous -- we lost about $80 million in equity

17 securities, positions that he managed, about $50 million in

18 the Select Equity Fund, and about $30 million in the -- in the

19 Highland internal account.  After Jefferies seized the Select

20 account, I took over the --

21       A VOICE:  I think Mr. Seery has sort of gone beyond

22 the question of his background.

23       THE WITNESS:  He's asked me if I was experienced in

24 investing other people's money.  I was giving that background.

25 But we -- I can stop or I can keep going, if you like.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 686 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 754 of 1017   PageID 5433
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 685 of
2722

```
                        Seery - Direct                    155

 1            THE COURT:  Okay.  If that was an objection, --
 2            MR. MORRIS:  Let's --
 3            THE COURT:  -- I overrule it.  Go ahead.
 4            THE WITNESS:  I've been managing that portfolio.  In
 5   addition, after Mr. Dondero left, but I actually started
 6   looking at it before that, started taking over the CLO
 7   portfolio, or taking a look at it, frankly.  We have a -- we
 8   have an experienced professional sitting on top of it, Hunter
 9   Covitz, who manages the day-to-day exposure.  But those
10   portfolios -- we call them CLOs, Your Honor, but I think
11   you've heard testimony before, they're not really.  Acis 7 is
12   a CLO.  The 1.0 CLOs are very old investment vehicles that are
13   primarily structured as, right now, closed-end investment
14   funds.  They don't have the typical diverse portfolio of loans
15   that a CLO has.  They have mostly reorg equity or positions in
16   real estate and in MGM.  So the -- the securities we've been
17   talking about in these trades are publicly-traded liquid
18   securities that Highland took as post-reorganization equity.
19   Q    Thank you, Mr. Seery.  Let's cut to the chase on the AVYA
20   and the SKY.  Nobody seems to have asked you this question,
21   but did you -- have you looked to sell AVYA and SKY securities
22   since the time that Mr. Dondero left in October?
23   A    I have, yes.
24   Q    Can you please explain to the Court your investment
25   rationale, the reason why you wanted to sell -- let's just
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 687 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 755 of 1017   PageID 5434
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 686 of
2722

Seery - Direct                      156

1   take them one at a time.  Let's start with AVYA.  In the last

2   couple of months, why have you wanted to sell AVYA?

3   A    Well, the original impetus to sell AVYA came from Mr.

4   Covitz when it started moving up as a post-reorg security in

5   the communications space that had -- had really performed

6   extremely poorly post its Chapter 11.  Mr. Covitz over the

7   summer felt we should start lightening up on that position.  I

8   agreed.  He did that.  And Mr. Dondero eventually cut him off.

9        As it got to the fall, what I did was I got Mr. Covitz, as

10  well as then the analyst -- the analyst on that is Kunal

11  Sachdev.  That's the Highland analyst on the position -- as

12  well as Joe Sowin and Matthew Gray, who's another senior

13  analyst.  And I looked at all of the equity positions in the

14  CLOs and wondered why we had them.  What was the view?  Were

15  they worth keeping?

16       Primarily, the ones we looked at were four of the post-

17  reorg equities that were liquid.  A company called Vistra, a

18  company called Arch Coal.  Vistra is the old TXU, a well-known

19  bankruptcy.  Arch Coal, another well-known bankruptcy.  Avaya,

20  a bankruptcy; and Sky Champion, a less -- less-known

21  bankruptcy but came out of there.

22       Mr. Gray is the analyst on Vistra and Arch.  We

23  determined, based upon his recommendations, not to sell those.

24  Mr. Sachdev was the analyst on Avaya, and he believed that it

25  had reached its peak, and even though it could continue to go

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 688 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 756 of 1017 PageID 5435
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 687 of
2722

Seery - Direct                157

1   up or down -- stocks often do that -- he did not think that

2   the value was there.  His recommendation was to sell.

3       Mr. Sowin was in those meetings.  Prior testimony to the

4   contrary or any statements that were said before are

5   completely false, they're completely made up, so I know it's

6   frustrating and I apologize for -- for being frustrated.

7       So we decided that we would sell the Sky Champion.  A

8   pretty simple answer.  Highland didn't have an analyst.

9   Literally didn't have an analyst.  Nobody had a view as to

10  what the stock was.  It just sat in there, in two CLOs,

11  without anybody paying any attention to it.

12      I had Matthew Gray take a look.  He felt that it was at

13  fair value.  I did my own work on it, felt it was at fair

14  value, notwithstanding some good tailwinds in -- secular

15  tailwinds in the home building space, and determined that that

16  CLO should sell those securities.

17  Q   Thank you, sir.  Prior to his departure at Highland, did

18  Mr. Dondero have responsibility over the management of any of

19  the CLO assets?

20  A   He did, yes.

21  Q   And do you understand, do you know whether Mr. Dondero

22  sold AVYA securities on behalf of the CLOs and on behalf of

23  the Funds during the time that he was employed as the

24  portfolio manager from January until October 2020?

25  A   I do.  And he did sell those securities.  The chart you

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 689 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 757 of 1017    PageID 5436
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 688 of
2722

                            Seery - Direct                    158

1   put up, based upon our business record, is accurate, and he

2   engaged in significant sales of those securities throughout

3   the year.

4   Q    Okay.

5        MR. MORRIS:  Can we please put upon Demonstrative #1?

6   BY MR. MORRIS:

7   Q    Okay.  And can you just explain to the Court what this

8   document is?

9   A    It's a trade report, one of Highland's -- this shows the

10  whole platform, so it's the aggregate sales.  The name of the

11  email -- I apologize, I forgot the system; it just left my

12  mind.  But the email you saw before is anybody on the platform

13  used for various trades if they're part of a trading group.

14  And that's to make sure that, across the portfolio, in its

15  corporate platform, you aren't running into either compliance

16  problems or allocation problems that could lead to a

17  compliance problem.

18  Q    So this shows sales of Avaya on these particular dates.

19  The trade is -- the trade symbol is AVYA.  This is a liquid

20  security.  Trades in, you know, liquid equity markets.  I

21  believe its average trading volume is somewhere about a

22  million and a half a day, approximately.  So you have a trade

23  date.  You have the type of transaction.  It could be a buy or

24  a sell.  These are all sales.  The quantity.  And then the

25  price.  And then it would have the Fund, and then the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 690 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/10/06/25 Page 758 of 1017 PageID 5437
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 689 of
2722

Seery - Direct                    159

1   aggregate dollars, which is simply multiplying the price times

2   the quantity.

3   Q   And if we just scroll down to the end of the document,

4   October 9th, is that around the time that Mr. Dondero left

5   Highland?

6   A   Right around that time.  This was coming into a number of

7   hearings that we thought it was most important to have Mr.

8   Dondero depart, particularly in light of some of the positions

9   that he and his companies were taking vis-à-vis the Debtor.

10          MR. MORRIS:  Can we put up Demonstrative Exhibit #2,

11  please?

12  BY MR. MORRIS:

13  Q   Can you explain to the Court what this is?

14  A   Uh, --

15          MR. MORRIS:  And again, just for -- just for the

16  record -- sorry to interrupt, Mr. Seery -- the backup for this

17  information can be found at Debtor's Exhibits BBBBB to SSSSS

18  BY MR. MORRIS:

19  Q   Go ahead, sir.  Could you explain to the Court what this

20  is?

21  A   Yeah.  This is just a pretty straightforward chart showing

22  the bars being sales and the lines being the -- the closing

23  sale price of a buy on that day.  And so you can see, you

24  know, with the market fallout in the early part of the year,

25  AVYA hit a low, but like most of the securities in the market,

Seery - Direct                          160

 1  it has come back very strongly.  And you see Mr. Dondero's

 2  trades earlier in the year, the rest of it during the middle

 3  part of the year, sales in the third quarter, and then, when

 4  he's gone, I began selling in November and December.

 5  Q    Now, so is it fair to say that Mr. Dondero and the

 6  Defendants didn't completely impede and stop the Debtor from

 7  selling AVYA shares?

 8  A    That's fair.  What -- there's a little bit of confusion.

 9  The way the trading desk worked previously is that you have

10  these separate companies but they're not really separate

11  companies.  HCFMA is populated by about seven employees.  Many

12  of them have functions across a number of different companies.

13  HCFMA exists solely because Highland funds it.  They haven't

14  paid fees of about three million bucks this year.  They owe

15  $10 million related to a disastrous bailout of what was an

16  open-end fund called Global Al a couple years ago where the

17  SEC, you know, came in and took significant action, almost

18  shut significant parts of Highland down.  And these traders do

19  the trading of all the equities across the platform.

20      So I typically would call them, and this is how we worked

21  in the spring when I took over the internal account after the

22  seizure by Jefferies of Mr. Dondero's management of the Select

23  Equity account.  I would work with Joe Sowin as the trader,

24  make decisions on what we wanted to do for the day, he would

25  execute those trades by going out in the market with a broker,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 692 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25   Page 760 of 1017   PageID 5439
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 691 of
2722

Seery - Direct                          161

1   selling them to -- to the dealer on the other side, run it

2   through our automated system, and then the trades get closed

3   with the back office.

4       So there's the trade, which is your agreement to buy or

5   sell at a particular dollar price.  That gets inputted into

6   the OMS system, and then from there it's the back office takes

7   over, and then ultimately securities are delivered versus

8   payment to the counterparty.

9   Q   Okay.  And can you just describe, you know, in one or two

10  sentences, your interpretation of this chart and how your

11  sales and the green bars compare to Mr. Dondero's sales and

12  the brown bars?

13  A   Well, the two simple obvious answers are, one, they're

14  smaller, and two, they're at higher prices.

15  Q   Okay.  You also traded, since Mr. Dondero's departure,

16  securities known as SKY; is that right?

17  A   That's correct.  It's Sky Champion Corp.  The ticker is

18  SKY.

19  Q   And did Mr. -- to the best of your knowledge, Dr. Mr.

20  Dondero trade in SKY securities prior to his departure?

21  A   I don't believe so.  As I said earlier, we didn't appear

22  to have an analyst on that for some time.  I don't even know

23  how far back it goes.  It was a bit of an orphan security

24  sitting in the portfolio.  It's only -- it was only in two of

25  the CLOs.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 693 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 761 of 1017   PageID 5440
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 692 of
2722

Seery - Direct                              162

1    Q    Okay.

2            MR. MORRIS:  Can we please put up Demonstrative #3,

3    please?  Okay.

4    BY MR. MORRIS:

5    Q    And can you just explain to the judge what's depicted on

6    this page?

7    A    Again, similar to the last chart, you have the dollar

8    price of the security at the close each day, throughout the

9    year, and then the green bar showing where we began to sell

10   securities for those CLOs.

11   Q    And so, again, is it fair to say that Mr. Dondero and the

12   Defendants haven't completely stopped the Debtor from engaging

13   in SKY transactions?

14   A    That's correct.  What we did was the so-called workaround

15   previously mentioned, was that we decided that I would have to

16   do the trading directly.  So I'd literally look at the stock

17   each day, talk to the broker at Jefferies, determine what

18   level to sell at, communicate with him throughout the day,

19   work through transactions.  Then he reports in whether he's

20   been able to sell and execute on our behalf.  When he's done

21   that, then we have the back office manually enter the trades,

22   as opposed to doing it from the automated trading desk, and

23   then have those trades close.  So, so far, knock on wood, we

24   haven't failed on any trades.

25   Q    Okay.

Seery - Direct                          163

1          MR. MORRIS:  We can the demonstrative down, please.

2   BY MR. MORRIS:

3   Q    Just two more topics here, sir.  Can we talk briefly about

4   what efforts, if any, the Debtors have made to avoid this

5   litigation?  I'll just ask them one at a time.  Has the Debtor

6   made any attempt to transfer the CLO management agreements to

7   the Defendants or to others?

8   A    Well, our original construct of our plan was to do that.

9   We've since determined, when we tried to do that, we got

10  virtually no response from the Dondero interests.  The

11  structure of the original thought of the plan was if we didn't

12  get a grand bargain we would effectively transition a

13  significant part of the business to Dondero entities, they

14  would assume employee responsibilities and the operations, and

15  then assure that the third-party funds were not impacted.

16      As I think I testified on the -- I can't recall if it was

17  the deposition or my prior testimony in court -- Mr. Dondero,

18  true to his word, told me that would be very difficult, he

19  would not agree, and he has made that very difficult.

20      So we examined it.  We've determined that we're going to

21  maintain the CLOs and assume them.  But we originally tried to

22  contemplate a way to assign those management agreements.

23  We've had --

24  Q    All right.

25  A    -- significant discussions with the CLO Issuers, and

Seery - Direct                          164

1   they're supportive of us retaining them.

2   Q    Okay.  You were on the -- you've been participating or

3   listening in to the hearing throughout the day; is that right?

4   A    I have, yes.  I apologize.  I didn't leave the screen on

5   because I didn't want to suck up bandwidth.

6   Q    Are you familiar with all of the K&L Gates letters that

7   that were reviewed today?

8   A    I am, yes.

9   Q    Did the Debtor request that the Defendants withdraw those

10  letters?

11  A    Yes, we did.

12  Q    Had the Defendants withdrawn those letters, might that

13  have avoided this whole litigation?

14  A    I think it would have.  What we wanted to have here is a

15  withdrawal of the letters and an agreement by the clients for

16  the -- the K&L Gates clients that they wouldn't interfere with

17  the operations of the Debtor and our drive towards a plan.

18  They could take their legal positions and object to the plan,

19  if they like, but interfering on a day-to-day basis was

20  unacceptable to us in terms of trying to operate this business

21  in the most efficient manner.

22      We specifically requested that they do that.  This is, I

23  don't think, lost on anybody, certainly not on me in my

24  experience here for years:  These entities are all dominated

25  and controlled by Mr. Dondero, and each of these attacks is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 696 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 764 of 1017 PageID 5443
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 695 of
2722

Seery - Direct                          165

1  specifically coordinated for the purpose of diverting the

2  Debtor, causing confusion, and forcing us to spend estate

3  resources.

4  Q    Do you know if the Debtor also asked the Defendants to

5  avoid this whole injunction proceeding by simply filing their

6  motion to lift the stay and see if they could actually win a

7  motion to terminate the contract?

8  A    Well, what we did was we contemplated the best, most

9  efficient way out, and it was either withdrawing the

10  agreement; if they didn't agree, then we'd said you should

11  file your stay motion immediately and let's have this

12  determined.  We told them, short of that, if they weren't

13  willing to do that, then we would have to put this in front of

14  the Court to try to make sure that we could operate the

15  business.

16  Q   All right.  So, just to summarize, you attempted to sell

17  the CLO management agreements, but were unable to do so; is

18  that right?

19  A    I would say assign.  We would have looked for a payment,

20  there is a cure payment that we have to make, but we didn't

21  we didn't conduct an auction for the CLO assets.

22  Q    And to the best of your knowledge, the Defendants never

23  withdrew the letters; is that right?

24  A    They did not.

25  Q    And to the best of your knowledge, the Debtors -- the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 697 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 765 of 1017 PageID 5444
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 696 of
2722

Seery - Direct                166

1   Defendants never brought their contemplated lift stay motion,

2   right?

3   A   They have not, no.

4   Q   And so why did the Debtor bring this action?

5   A   Well, quite clearly, to try to prevent the managers and

6   Mr. Dondero and the Funds from interfering with the way that

7   we operate the business.  We intend to continue to manage the

8   CLOs, we intend to assume those contracts, we intend to manage

9   them post-confirmation, after exit from bankruptcy.  And

10  causing confusion among the employees, preventing the Debtor

11  from consummating trades in the ordinary course, deferring

12  those transactions, we thought put the estate at significant

13  risk, in addition to the cost.

14  Q   Did you hear Mr. Rukavina in the opening suggest that

15  these might, in fact, be money-losing contracts?

16  A   I did, yes.

17  Q   Why would the Debtor want to assume money-losing

18  contracts?

19  A   They're not money losing contracts.

20  Q   And why, why do you say that?

21  A   They generate fee income.  So the fees on each of these

22  CLOs get paid to the Debtor.  Now, not all of these CLOs, as I

23  mentioned earlier, are -- none of them are ordinary CLOs,

24  other than Acis 7.  But not all -- because they don't all have

25  liquid assets that are able to pay their fees each quarter,

Seery - Direct                    167

1  some are deferred.  There are some CLOs that will probably

2  never pay any deferred fee because they are underwater.  Those

3  are not CLOs that Mr. Dondero or the Funds own any of.  That's

4  not really a surprise.  But we will continue to manage those

5  and look for ways to exit for those investors who are

6  noteholders who are underwater in those CLOs.

7  Q    Okay.  Can you describe for the Court the Debtor's

8  contentions as to how the conduct that has been adduced

9  through today's evidence, how is the Debtor harmed by Mr.

10  Dondero's interference in the trades and the sending of these

11  letters?

12  A    I think it's clear in terms of operational risk.  Being

13  forced to construct a workaround to consummate trades that we

14  think are in the best interest of the Funds.

15      It's telling not only that neither Mr. Dondero nor Mr.

16  Sowin nor -- Mr. Sowin was on the calls and agreed to the

17  analyst view, by the way -- nor anybody from MHF ever asked me

18  a question, their lawyers in the deposition never asked me why

19  we were selling these securities.  They simply want to get in

20  the way, cause additional risk to the estate, and cause

21  additional exposure with respect to legal fees, divert our

22  attention from trying to consummate the case.  I think that's,

23  in my opinion, that's pretty clear.

24  Q    Is there any concern on the part of the Debtor that

25  that Mr. Dondero's emails and conduct is creating uncertainty

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 699 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 767 of 1017   PageID 5446
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 698 of
2722

Seery - Direct                          168

1  among the staff as to who's in charge?

2  A    I think they did initially, and if they continued, they

3  would.  Right now, the workaround is working pretty well.  We

4  still do keep Mr. Sowin on the emails to make sure that, you

5  know, from a compliance perspective, that our sales, he knows

6  about; that we're not stepping on each other's markets, if you

7  will; that we're not getting in the way that -- in the way if

8  he wants to sell assets from a different MHF other managed

9  asset holding, but we do have a workaround that works right

10 now.

11      I think the biggest risk is, because it's much more

12 manual, you have risk of so-called fat-finger trades, where

13 you think you're selling a thousand and you sell 10,000, you

14 think you're executing a sale and you're executing a buy, you

15 think you're executing from an account that has the securities

16 and end up selling short from an account that doesn't.  So

17 we've got to be very careful of that, but the team is doing

18 that now.  There certainly was confusion at the start.

19 Q    And can you just explain to the Court your view as to how

20 the Debtor is able to -- how the Debtor will be able to

21 service the contract on a go-forward basis?

22 A    The CLO contracts?

23 Q    Yes.

24 A    We'll have a team of folks able to manage these assets

25 with professionals that are experienced credit analysts,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 700 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 768 of 1017   PageID 5447
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 699 of
2722

Seery - Direct                    169

1   equity analysts.  I think we'll be able to manage this --

2   these assets in a pretty straightforward manner.  It's not

3   going to be very difficult.

4   Q    Has the Debtor been harmed through the diversion of your

5   personal attention as CEO in responding to all of this?

6   A    I like to think that I can juggle a lot of different

7   things.  I would prefer not to have to be looking at the

8   securities levels each day and feeding out securities that we

9   determine to sell through the broker at Jefferies, who,

10  notwithstanding, is doing a great job.  It's the job of the

11  trader to actually do that and day-to-day -- throughout the

12  day monitor the markets and look for the best place to sell.

13       So do I think I'm getting the best execution?  I think the

14  trader at Jefferies is excellent.  Do I think if a trader on

15  the Highland side was involved every step of the way, I think

16  it would be better.

17  Q    Have the Debtor's professionals' attention and resources

18  been diverted to deal with all of this stuff?

19  A    That -- I think that's -- that's quite clear as well.

20  It's a significant expense.

21  Q    Okay.

22          MR. MORRIS:  Your Honor, I have no further questions

23  of this witness.

24          THE COURT:  All right.  Mr. Rukavina?

25          MR. HOGEWOOD:  Your Honor, if you please, Lee

Seery - Cross                          170

1   Hogewood from North Carolina.  You've admitted me *pro hac*

2   *vice.*  If I may do cross-examination, I would appreciate it.

3           THE COURT:  All right.  Go ahead.

4           MR. HOGEWOOD:  Thank you, Your Honor.

5                     CROSS-EXAMINATION

6   BY MR. HOGEWOOD:

7   Q   Mr. Seery, let me ask you about the letters that came from

8   our firm, and especially from me, beginning on December 22nd.

9   I think you spoke about those generally.  If you need them to

10  be called up, I think my questions will be crisp as to the

11  letters generally, but we could certainly look at them

12  specifically, if need be.

13      There was initially a letter dated December 22nd, 2020,

14  that's Debtor's Exhibit DDDD, at Docket 39.  I take it you've

15  read that letter?

16  A   I have, yes.

17  Q   And it's fair to say that was a request you had seen

18  before?

19  A   I don't think that's fair to say, no.

20  Q   You had not seen a request to discontinue trades until the

21  confirmation hearing?

22  A   I don't believe so, no.

23  Q   Okay.  So that, that was the first time a request had been

24  made not to trade in the CLO securities prior to confirmation?

25           MR. MORRIS:  Objection to the form of the question.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 702 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 770 of 1017   PageID 5449
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 701 of
2722

Seery - Cross                           171

1           THE COURT:  Overruled.

2           THE WITNESS:  I --

3           THE COURT:  Go ahead.  You can answer.

4           THE WITNESS:  I don't recall you sending me a letter

5   before that, but I -- if you have, then I apologize.  I

6   thought I was pretty familiar with them, but I don't recall

7   you sending me that request previously.

8   BY MR. HOGEWOOD:

9   Q   Okay.  I'm sorry.  That was the first request you had

10  received from me, is that -- that's correct?

11  A   Yes.

12  Q   But there had been prior requests of a similar nature?

13  A   Not to my recollection.  Is there a letter?

14  Q   All right.  Well, let me -- let me move on.  You

15  weren't intimidated by my letter, were you?

16  A   Was I intimidated by your letter?  No, I was not

17  intimidated.

18  Q   And it didn't cause -- the letter itself did not cause you

19  or the Debtor to alter your investment strategy?

20  A   It did not, no.

21  Q   And it did not cause you or the Debtor to refrain from

22  operating the company in the manner that you perceived to be

23  in its best interest?

24  A   It did not.

25  Q   It did not cause you to change any of your trading

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 703 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 771 of 1017    PageID 5450
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 702 of
2722

Seery - Cross                                172

1   decisions?

2   A    No.

3   Q    You and your counsel responded -- or, your counsel

4   responded to the letter a couple of days later; isn't that

5   correct?

6   A    Yes.

7   Q    And the response rejected the request that had been made

8   and demanded that the letter be withdrawn; is that right?

9   A    Yes.

10  Q    So the range of communication is a set of lawyers

11  representing adverse parties asserting their respective

12  positions?  Is that a fair characterization of that set of

13  communications?

14  A    No.

15  Q    Okay.  Would you characterize it differently?

16  A    Yes.

17  Q    All right.  How so?

18  A    I believe you sent a letter with no good-faith basis,

19  knowing what the contracts say as an experienced lawyer,

20  knowing there was not cause, yet still making the same

21  threats, basically couching them as a request.  But I don't

22  think there was any good-faith exchange of ideas.  No one even

23  asked me why I was making the trades.  I think you were aware

24  of that.

25  Q    You -- but you testified that, nonetheless, the letter did

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 704 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25   Page 772 of 1017   PageID 5451
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 703 of
2722

Seery - Cross                         173

1   not cause you to conduct yourself in any other manner than you

2   would have conducted had you not received the letter; isn't

3   that right?

4   A    That's correct.

5   Q    So I think there's some confusion, then, and I just want

6   to clear this up.  There was earlier testimony, both at your

7   deposition, that -- that my clients actually interfered with

8   and caused trades not to occur on or around December 22nd and

9   23rd of 2020.  And that's not correct.

10          MR. MORRIS:  Objection.  Your Honor, the evidence is

11  in the record.

12          MR. HOGEWOOD:  Okay.  Well, let me --

13          THE COURT:  All right.  You're going to have to

14  rephrase.

15  BY MR. HOGEWOOD:

16  Q    Yeah.  Let me -- let me say it differently.  Focusing

17  solely on December of 2020, every trade that you initiated

18  closed; isn't that correct?

19  A    Every trade.  Yes.  We did not fail one trade.

20  Q    Okay.  And so the issue that you have raised in your

21  pleading is that there were -- there was an expectation that

22  employees of my clients would book trades, which is

23  essentially a backroom operation, after the trade has closed.

24  Isn't that right?

25  A    That's incorrect.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 705 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 773 of 1017   PageID 5452
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 704 of
2722

Seery - Cross                          174

1   Q    Okay.  So, once again, let me just get -- there were no

2   trades that you initiated that failed to close; is that right?

3   A    That's correct.

4   Q    And nothing that was done by the Defendants resulted in a

5   trade that you wished to make in December of 2020 to fail to

6   occur or fail to close; isn't that right?

7   A    That incorrect.

8   Q    So you initiated a trade that did not close?

9   A    Yes.

10  Q    In December of 2020?  And when was that?

11  A    I believe that's the case, yes.

12  Q    And specifically what trade did not close that you

13  initiated?

14  A    I'd have to check the notes, but the specific trades were

15  my attempt to initiate the trade with the desk.  Then the

16  trading desk goes into the market and makes the sale.  Once

17  it's inputted into the order management system, referred to as

18  an OMS, then it gets processed for closing.  In November and

19  in December, Mr. Dondero instructed those employees not to

20  initiate those trades.  So there was never an agreement.  When

21  I initiated a trade, which was the workaround you saw referred

22  to, I quite simply called Jefferies directly and I had the

23  back-office folks manually input it instead of the trading

24  desk.

25       Sorry.  I just wanted to make sure we cleared that up.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 706 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 774 of 1017   PageID 5453
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 705 of
2722

Seery - Cross                          175

1   Q   No, just -- that -- that's helpful to understand.  But I

2   think, focusing again solely on December, every trade you

3   initiated closed?

4   A   Every trade that I actually went and made in the market

5   closed.

6   Q   And indeed, if --

7        MR. HOGEWOOD:  I observed your demonstrative

8   exhibits, and if I could ask that the one related to the Avaya

9   trades be called up, Mr. Morris.  is that possible?

10       MR. MORRIS:  Yeah, sure.  Is that the first one with

11  Mr. Dondero's trades, or do you want the chart?

12       MR. HOGEWOOD:  The -- the -- I think it was your

13  Demonstrative #2 that showed the timeline of the trades.

14       MR. MORRIS:  Yeah.  You bet.

15     (Pause.)

16       MR. HOGEWOOD:  Thank you.  Thank you very much.

17  BY MR. HOGEWOOD:

18  Q   So, just so I understand this document, the bottom axis is

19  the passage of time, and when we get into the period between

20  November of 2020 and the end of 2020, 12/31/2020, there are --

21  there's a green bar that has the numbers 50,000 at the top of

22  it.  That reflects what, Mr. Seery?  The number of shares or

23  the dollar amount of the trades?

24  A   Number of shares.

25  Q   And while this is not date-specific, do you know when

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 707 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 775 of 1017   PageID 5454
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 706 of
2722

Seery - Cross                              176

 1  those sets of $50,000 trades happened?  Or --

 2  A   I don't --

 3  Q   -- 50,000 shares trades happened?

 4  A   I don't know the specific dates off the top of my head,

 5  no.

 6  Q   But looking at it just in comparison to the calendar, that

 7  -- that's awfully close to December 22nd and 23rd, is it not?

 8  A   It appears to be, yes.

 9         MR. HOGEWOOD:  And Mr. Morris, if the I guess it's

10  the SKY document could be pulled up as well?  I just want to

11  be clear --

12         MR. MORRIS:  Demonstrative #3, please.

13         MR. HOGEWOOD:  Yes.  Thank you.

14  BY MR. HOGEWOOD:

15  Q   The  timeline on this demonstrative is similar, is it not?

16  A   Yes, it is.

17  Q   It's showing trades by day throughout the course of the

18  year?

19  A   That's correct.

20  Q   And again, there are a significant number of trades in SKY

21  on what looks awfully close to the few days before Christmas

22  of 2020; is that right?

23  A   That's correct.

24  Q   Okay.  And this is the period of time that we're talking

25  about there being interference by the Defendants' employees;

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 708 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 776 of 1017   PageID 5455
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 707 of
2722

Seery - Cross                          177

1   is that right?

2   A    Yes.

3   Q    Okay.  I'll move on.  So, the next letter in question was

4   one that came the day after, on December 23rd.  Again, that

5   was a letter from me to your counsel.  Do you recall that

6   letter?

7   A    Yes.

8   Q    And the letter of the 23rd, if we need to look at it, is

9   the EEEE, Docket 39.  You read that letter as well?

10  A    Yes.

11  Q    And you disagreed with the position taken in the letter?

12  A    I'm trying to remember the specific position in that one.

13  Was that the one threatening to try to terminate the CLOs

14  without having checked whether there's cause?  I just don't

15  recall.

16  Q    Why don't we call it up, if we can?

17          MR. HOGEWOOD:  Mr. Morris, if you could help us,

18  because it's one of your exhibits, that would be great.  But

19  Ms. Mather has got it up, so that's great.

20  BY MR. HOGEWOOD:

21  Q    Mr. Seery, can you see the December 23rd letter?

22  A    I can, yes.

23  Q    And I think you referred to it as a threat to terminate

24  the portfolio management contracts?

25  A    I wasn't sure.  That's why I was just asking if this was

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 709 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 777 of 1017   PageID 5456
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 708 of
2722

Seery - Cross                        178

 1   that one.  I don't -- I don't recall.

 2   Q    Right.  And if you review the first page and the second

 3   page, does that confirm your recollection that that is the one

 4   related to portfolio management contracts?

 5   A    I can't see the second page.  I believe it is.  I'm not

 6   trying to --

 7   Q    Yeah, no, --

 8   A    If you represent, I'll accept it.

 9   Q    Take your time.

10   A    (Pause.)  Yes.

11   Q    Okay.  And I think you already said this:  You strenuously

12   disagreed with the positions stated in the letter?

13   A    Yes.

14   Q    But again, you were not intimidated by the letter?

15   A    Intimidated?  No.

16   Q    The letter didn't cause you to change your investment

17   strategy?

18   A    No.

19   Q    It didn't cause you to trade or not trade in a particular

20   manner?

21   A    No.

22   Q    You continued to function the Debtor's operations as you

23   deemed appropriate?

24   A    Yes.

25   Q    To your knowledge, no CLO or Issuer has taken any steps to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 710 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 778 of 1017    PageID 5457
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 709 of
2722

Seery - Cross                         179

1   remove the Debtor as the portfolio manager?

2   A    The CLO or the Issuers?

3   Q    Yeah.  No one's -- no one's taken a position that you

4   should -- that the Debtor should be removed as a portfolio

5   manager?

6   A    Not -- not from the Issuers, no.

7   Q    And -- or, I'm sorry.  And so when you -- when you brought

8   a distinction between the Issuer and the CLO, are you -- are

9   you referring to CLO Holdco?

10  A    No.

11  Q    Okay.  Has a CLO taken steps to remove the Debtor as a

12  portfolio manager?

13  A    The CLO is the Issuer.

14  Q    Okay.

15  A    So the answer is no.

16  Q    Okay.  So no one has -- no one has acted to take any -- to

17  do anything as it relates to the removal of the Debtor as the

18  portfolio manager?

19        MR. MORRIS:  Objection to the form of the question.

20        THE COURT:  Overruled.

21        THE WITNESS:  I'm quite sure the CLO Issuers haven't,

22  as they agreed and we've been working with them on an

23  assumption.  With respect to what your clients have done, I

24  don't know.

25  BY MR. HOGEWOOD:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 711 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 779 of 1017   PageID 5458
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 710 of
2722

Seery - Cross                          180

1  Q   But you don't have any evidence that my clients have taken

2  any action in violation of the automatic stay to -- to move or

3  encourage the removal of the Debtor as the portfolio manager,

4  do you?

5  A   Other than the letter?  No.

6  Q   Other than the letter between me and your counsel?

7  A   Correct.

8  Q   All right.  So, and that letter expressly states that any

9  of those actions that would be taken are subject to the

10 automatic stay and the Bankruptcy Code; is that right?

11 A   That's correct.

12 Q   And as we sit here today, the Debtor is not in breach of

13 any contract with any of the Issuers; is that right?

14 A   That's correct.

15 Q   And the letter didn't cause the Debtor to breach any

16 contract with any Issuer, did it?

17 A   Did not.

18 Q   And I think you've already testified today and you also

19 testified in deposition that you anticipate that the -- all of

20 the CLOs will consent to the assumption of the portfolio

21 management agreements in the context of confirmation; is that

22 right?

23 A   Yes.

24 Q   And the plan supplement that you recently filed, you

25 provide a mechanism by which the issue of for-cause

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 712 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25   Page 780 of 1017   PageID 5459
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 711 of
2722

Seery - Cross                    181

1   termination is to be resolved, do you not?

2   A    I don't recall if there's a specific provision in the plan

3   supplement.  We certainly have, either in the plan or in the

4   plan supplement, a provision related to the gatekeeper

5   function.

6   Q    And that's similar to the settlement that you entered into

7   with CLO Holdco in terms of resolving both their objection to

8   confirmation and the lawsuit against them today; is that

9   right?

10  A    I believe it's similar.

11  Q    Okay.  And the gatekeeper is the Bankruptcy Court to

12  determine, short of a full-blown trial, that if cause exists,

13  isn't that correct, under the plan?

14  A    Among other functions, yes.

15  Q    So if the Court confirms the plan, then the concerns that

16  you have are resolved by the gatekeeper function that is the

17  subject of this motion; is that right?

18  A    I think it depends on the contents of the confirmation

19  order.

20  Q    And if the Court denies confirmation, then the stay

21  remains in effect and the letter related to the removal of the

22  portfolio manager was expressly subject to the stay; isn't

23  that right?

24  A    If the letter says it's subject to the stay?  It does say

25  that, but it says other false things as well, so I'm not sure

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 713 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 781 of 1017   PageID 5460
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 712 of
2722

Seery - Cross                    182

1   -- I don't know exactly what you're asking me there.

2   Q    All right.  It wasn't a very good question, frankly.

3        Your counsel responded to the December 23rd letter as well

4   and demanded a retraction; isn't that right?

5   A    Yes.

6   Q    And that was sort of a separate (audio gap) with counsel?

7   A    I'm sorry.  You broke up for a second there, sir.  I'm

8   sorry.

9   Q    I'm sorry.  That -- that' -- let's just skip that.  You

10  had testified that neither letter was withdrawn?

11  A    I believe that's correct, yes.

12  Q    Are you familiar -- and -- are you familiar with the fact

13  that, in the response letters, your counsel insisted that

14  there be a response and withdrawal by not later than, I

15  believe, 5:00 on December 28th?  Do you recall that?

16  A    I don't recall that specifically, but I accept your

17  representation.

18  Q    And do you know whether or not there was a response dated

19  December 28th?

20  A    I don't believe there was a written response.  I don't --

21  I don't recall.

22  Q    All right.

23       MR. HOGEWOOD:  Ms. Mather, can you call up

24  Defendant's Exhibit 84, which is at Docket 45, please?  Thank

25  you.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 714 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 782 of 1017   PageID 5461
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 713 of
2722

Seery - Cross                          183

1   BY MR. HOGEWOOD:

2   Q   So, Mr. Seery, have you ever seen this letter dated

3   December 28?

4   A   I believe I have, yes.

5   Q   And this letter was not attached to the complaint nor your

6   declaration nor the request for a TRO or preliminary

7   injunction, was it?

8   A   If you say it wasn't.  I don't recall specifically.

9   Q   Okay.  So, you, by seeing this, you realize now there was

10  a response by the 28th.  Is that right?

11  A   Yes.

12  Q   And in the -- let me just direct your attention to the

13  final sentence of the first paragraph.  It says -- it makes

14  once again clear that the -- any efforts to remove the Debtor

15  as manager would be subject to applicable orders of the

16  pending bankruptcy case, provisions of the Bankruptcy Code,

17  and specifically, the automatic stay.  Do you see that?

18  A   I apologize.  I don't see it.  Which paragraph?

19  Q   I'm at the very last sentence of the first paragraph.

20  There's a sentence that --

21  A   (reading)  Subject to applicable orders in the pending

22  bankruptcy case, provisions of the Bankruptcy Code,

23  specifically, the automatic stay.

24      I read that, yes.

25  Q   Yes.  Okay.  There was some testimony about the letter

Seery - Cross                           184

1  related to Mr. Dondero's eviction.  I don't intend to belabor

2  that.  But once again, that was a letter between counsel, was

3  it not?

4  A    I believe it -- I believe it was.  I don't recall

5  specifically now.  I assume -- I assume all of these were

6  directed to counsel.

7  Q    Right.  And again, the fact that counsel wrote a letter

8  requesting that the eviction not occur did not change your

9  process and you proceeded with the eviction, did you not?

10 A    I think the letter came after Mr. Dondero was no longer

11 permitted.  Eviction is an odd word.  He was no longer an

12 employee, so employee not being able to come into the office

13 and hang around and disrupt business isn't exactly an

14 eviction.  So I disagree with your characterization there.

15 Q    Okay.  Well, so I'll just leave that.  I mean, the --

16 since this exchange of letters, are you aware -- I mean, there

17 was some testimony about the Debtors presenting the Defendants

18 with the choice of either filing a motion for relief from stay

19 or this injunction proceeding would be brought.  Isn't that

20 right?

21 A    Yes.

22 Q    And no motion for relief from stay was filed, and

23 therefore this injection proceeding was brought.  Is that

24 correct?

25 A    Yes.

APP. 0711

004701

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 716 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 784 of 1017    PageID 5463
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 715 of
2722

Seery - Cross                       185

1   Q    So the other thing that you know was filed by the

2   Defendants was an objection to confirmation, which was due on

3   January 5th of 2020, correct?

4   A    I'm sorry, Mr. Hogewood.  You broke up.  Did you say the

5   other paper or pleading that was filed?

6   Q    The pleading that was filed by the -- these who are

7   Defendants as well as other parties to this case was an

8   objection to confirmation, the deadline for which was January

9   5, 2020.  Are you familiar that an objection to confirmation

10  was filed?

11  A    I'm familiar that one was filed, yes.

12  Q    And so the objection to confirmation raised many of these

13  same issues regarding the circumstances under which the

14  various CLO agreements could be assumed; isn't that right?

15  A    I'm not aware of the specifics of the objection.

16  Q    Okay.  But nonetheless, my client was under no obligation

17  to initiate yet another motion or lawsuit or pleading against

18  the Debtor beyond objecting to confirmation, was it?

19  A    An obligation?  No.

20  Q    And since the objection to confirmation has been filed,

21  there have been a number of pleadings filed in the case.  We

22  obviously were required to respond to the motion for

23  preliminary injunction, and it says there's been an objection

24  filed to that.  Are you aware of that?

25  A    That -- that you objected to the preliminary injunction?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 717 of
Case 3:25-cv-02072-S    Document 15-7   Filed 10/06/25    Page 785 of 1017    PageID 5464
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 716 of
2722

Seery - Cross                    186

1   Q   Yes.

2   A   Yes, yes, I'm aware of that.

3   Q   And --

4   A   I'm very aware.

5   Q   And you're aware that there was a proposed settlement with

6   HarbourVest; is that correct?

7   A   We have an approved settlement with HarbourVest.

8   Q   Right.  And there were objections filed to that particular

9   -- or, to that particular settlement agreement, were there

10  not?

11  A   Yes.

12  Q   But none of my clients participated in that objection, did

13  they?

14  A   I don't recall the specifics of your clients versus the

15  other Dondero entities, but I'm certain Mr. Dondero

16  participated.

17  Q   But the De... the parties that we represent did not object

18  to the settlement?

19  A   I don't recall specifically.

20  Q   Okay.  And another motion that was filed was for an

21  examiner.  Isn't that correct?

22  A   I believe that's the case, yes.

23  Q   Yeah.  And my clients didn't join that motion, either?

24  A   No.  It's a bit of whack-a-mole, but they did not -- they

25  did not -- I don't -- I don't know.  To be honest, I don't

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 718 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 786 of 1017   PageID 5465
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 717 of
2722

Seery - Cross                          187

1   know if they did or not.

2   Q   All right.  Toward the end of your testimony, you were

3   giving some information about the value of these management

4   contracts in terms of income over the course of the coming

5   year or two.  What is the projected revenue with respect to

6   these management contracts?

7   A   Do you mean the CLO 1.0 management contracts?

8   Q   Yes.

9   A   They generate about four-and-a-half to five million

10  dollars a year, depending on the asset base in total, but

11  that's accrual, as I mentioned earlier.  It doesn't all come

12  in in cash.  It depends on the waterfall.  Expect about two-

13  and-a-half to 2.7 million to come in per year during the

14  course of the projected time period.

15      (Echoing.)

16  Q   Have you done any sort of profitability analysis on the

17  management contracts?

18  A   Not specifically on those contracts, no.  We look at the

19  --

20  Q   Okay.

21  A   -- aggregate of the Debtor's receipts versus its costs.

22  Q   Can you -- so, --

23      MR. HOGEWOOD:  Ms. Mather, can you call up the

24  disclosure statement?  This is Docket 1473.  And in

25  particular, Page 176.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 719 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 787 of 1017   PageID 5466
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 718 of
2722

Seery - Cross                      188

1   BY MR. HOGEWOOD:

2   Q   So, I'm, Mr. Seery, I'm trying to square the 779 for the

3   month ended -- month period ended in March '21 and no further

4   revenue coming in on management fees with what you just said.

5   A   I'm not -- I'm not sure why.  This should -- certainly

6   should have the management fees according to the CLOs if this

7   was included in the assumption of those.  We have revenue,

8   they do generate revenue, they currently generate and they

9   will continue to generate.

10  Q   But this is the disclosure statement approved by the

11  Court, right?

12  A   Yes.  I'll have to come back and check why that for the

13  year doesn't have it, unless we were assuming that we wouldn't

14  receive any into the -- into this vehicle.  I just, I don't

15  know the answer.

16        MR. HOGEWOOD:  Your Honor, that's all the questions I

17  have.  Thank you very much.

18        THE COURT:  All right.  Redirect?

19        MR. MORRIS:  Can we just leave this up on the screen

20  for a second, very quickly, for Mr. Seery?  Can we put the

21  document back?

22                  REDIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q   Mr. Seery, do you recall that the disclosure statement was

25  approved back in November?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 720 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 788 of 1017   PageID 5467
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 719 of
2722

Seery - Redirect                    189

1   A    Yes.

2           THE COURT:  Could you repeat the question?  I

3   couldn't hear it.

4           MR. MORRIS:  Yeah.  That is -- I don't know if

5   somebody's phone is not on mute.

6           THE COURT:  Yes.  Please put your device on mute if

7   you're not the one talking.  Okay.  Someone did.  Go ahead.

8           MR. MORRIS:  Thank you.

9   BY MR. MORRIS:

10  Q    Mr. Seery, do you recall that this disclosure statement

11  was approved back in November?

12  A    Yeah.  What I'd said earlier was that I'm not sure if the

13  -- this plan projection conforms with our decision to maintain

14  the CLO management contracts, and so there certainly should be

15  revenue, while it comes in quarterly on the management fee,

16  the base management fee.  And it's not always -- each CLO is

17  not always able to pay it in cash.  It will depend on our

18  ability to monetize assets, because they don't -- a lot of the

19  assets are not cash-generative.  Some are.  For example, the

20  Trussway loan is cash generative.  The CCS loan is not.

21       But I'm just not sure why this doesn't show the management

22  fees at all.  At least for the whole year, we certainly will

23  have them, unless this is prior to the determination to assume

24  those agreements.

25  Q    Okay.  So if the assumption in November was that the

Seery - Redirect                    190

1  agreements would be assigned, there would be no revenue shown.

2  Is that fair?

3  A    That would have been the assumption prior to us

4  determining that we wanted to assume them, yes.

5  Q    Okay.  And do you recall whether the Debtor became more

6  convinced that it would assume the contracts rather than

7  assign them before or after the disclosure statement was

8  approved?

9  A    I don't recall the specific timing, but a number of things

10  happened around this time.  First, the Dondero entities were

11  unwilling to even engage on assignment because they were on a

12  much more aggressive, quote, blow up the place strategy.

13  That's Mr. Dondero's quote.

14      Number two, we settled with HarbourVest, and that

15  significantly increased the value of maintaining the CLO

16  management.  The HarbourVest --  or the HCLOF entities own

17  significant preferred shares in the 1.0 CLO structures, and

18  having management of those and being able to monetize those in

19  accordance with the agreement, maximizing value for the

20  benefit of HCLOF, would be far, far better for the estate than

21  letting these assets just sit.  We're not trying to drive the

22  price down, because we wouldn't be in the business of trying

23  to buy back those securities on the cheap.  We're in the

24  business of trying to maximize value.

25  Q    All right.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 722 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 790 of 1017   PageID 5469
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 721 of
2722

Seery - Examination by the Court          191

1          MR. MORRIS:  I have nothing further, Your Honor.

2          THE COURT:  Any recross on that redirect?

3          MR. HOGEWOOD:  No, thank you, Your Honor.  Appreciate

4    the opportunity to appear before you.

5          THE COURT:  All right.  Thank you.

6       Mr. Seery, before we let you go, I have a couple of

7    follow-up questions.

8                     EXAMINATION BY THE COURT

9          THE COURT:  These CLOs, I mean, you've said a couple

10   of times they're not really traditional CLOs, except for the

11   Acis 7 one.  But I have this question.  I've learned back in

12   the Acis case most of what I know about CLOs, I suppose.  And

13   what the witnesses told me there were they typically had a 12-

14   year life, and then, yeah, there was some period, you know,

15   the first five years, seven years, something like that, where

16   it was in a reinvestment/refinancing phase, but then after

17   that, you know, we couldn't do that anymore and it was kind of

18   heading towards wind-down.

19      Anyway, my long-winded question is:  Do these CLOs work

20   generally like that or not?  Because you said they're

21   atypical.

22          THE WITNESS:  They -- they --

23          THE COURT:  Go ahead.

24          THE WITNESS:  They used to.

25          THE COURT:  Okay.

APP. 0718

004708

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 723 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 791 of 1017    PageID 5470
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 722 of
2722

Seery - Examination by the Court                 192

1      THE WITNESS:  So these are extremely old.  These go

2  back to 2006, '07, '08.  These are very old CLOs.  So they're

3  far beyond their investment periods.  Some of them are coming

4  up on their maturities on their debt.  Many of them don't have

5  any debt at all.

6      So you'll recall, Your Honor, that a CLO is a vehicle

7  where you take x-hundred million -- we'll use 400 for fun --

8  million dollars.  You ramp up $400 million of assets.  You

9  sell off, for our purposes, $350 million of securities.  You

10  have the AAA securities, the AAs, all the way down.  And then

11  you have these preference shares.

12      During a period of time, as cash is generated in the CLO,

13  the CLO is entitled to reinvest it.  And that keeps it going.

14  And then it gets beyond its reinvestment period and it's in

15  what folks usually refer to as its harvest period.  That's

16  when oftentimes, depending on where rates are, depending on

17  asset value, the rates for the debt obligations or the rate

18  you can receive on your assets, you may see refinancings or

19  resets.  Otherwise, the CLOs begin to wind down.  They have --

20  they don't have a life, like a partnership with a final date,

21  but there's maturities on the debt and then there's an

22  expectation that they would wind down.

23      These CLOs -- which typically CLOs only invest in

24  performing loans, and oftentimes, particularly Highland -- and

25  I could regale you with stories how Highland would take

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 724 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 792 of 1017 PageID 5471
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 723 of
2722

Seery - Examination by the Court                    193

1   virtually non-interest-bearing, seventh lien debt -- that's a

2   bit of an exaggeration -- but just to keep the fees going, and

3   not actually convert to equity.  A lot of these, that wasn't

4   an option, so they've converted to equity.  So I just have one

5   that I happen to have on my screen, Your Honor, Gleneagles.

6   The assets in Gleneagles (echoing) are 16 -- MGMs.

7            THE COURT:  Okay.  Someone needs to put their phone

8   on mute.  All right.  I'm sorry.

9            THE WITNESS:  So it has -- it has -- the specifics

10  aren't particularly important, but its assets are -- just this

11  one I just pulled up; they're all a little different, and --

12  but mostly the same -- MGM stock.  This is MGM Studios, which

13  you read about with James Bond, a very valuable asset.  Across

14  the Highland platform, there's roughly $500 million worth of

15  stock.  It doesn't pay off any income.  So if it had debt --

16  and I'm not sure if Gleneagles still has any; I'd have to

17  switch screens; I don't believe it does; if it does, it's

18  small -- it wouldn't get any income-generating -- that's not

19  income generating asset.

20       Vistra, which is the TXU stock I talked about before, is

21  the next biggest asset.  Skyline Corporation, which was the

22  one we were selling.  That's no longer in there.  TCI

23  portfolio, which is a Dondero real estate asset it has, it's

24  an old Las Vegas and Phoenix, Arizona real estate

25  developments.  Not income-generating.  Not that they don't

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 725 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 793 of 1017   PageID 5472
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 724 of
2722

Seery - Examination by the Court                194

1  have value, but this is much more like what would be referred

2  to as a closed-end fund.  It's not going to go out and buy

3  anything.  It can't.  It can only generate cash by selling

4  assets, give that cash to the trustee, and then the trustee

5  pays it through the waterfall.  And that's the way all of

6  these CLOs work.

7      Now, some of them do have debt.  And some of them have a

8  lot of debt, and the preferred shares will never be worth any

9  money, so we refer to those as being underwater.  No surprise,

10 the Dondero-related entities don't own any of those junior

11 securities.

12     The -- some do have debt.  A lot of that debt is going to

13 get paid off in the first half of the year because there'll be

14 refinancings at Trussway and a refinancing at Cornerstone.

15 They own debt, and that'll generate cash.  It'll go to the

16 CLOs, go to the trustee.  First it goes to pay the obligations

17 for the outstanding debt of the CLO, and then the asset

18 dollars, they get put through the waterfall to pay the more

19 junior securities.

20         THE COURT:  Okay.  And --

21         THE WITNESS:  And I --

22         THE COURT:  The --

23         THE WITNESS:  I was going to give you -- I contrast

24 that to a more typical CLO, which is whether it's beyond its

25 investment period or not, will have something like 150 to 250,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 726 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 794 of 1017 PageID 5473
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 725 of
2722

Seery - Examination by the Court          195

1   sometimes more, loans in it.  150 would be on the loan side.

2   It'll own -- own those in smaller amounts.  It has

3   requirements as to what its concentrations are in different

4   buckets of types of assets.  It has to return -- it has to

5   have an income-generating ability to satisfy certain covenants

6   in its debt obligations and in the indenture.  And then it

7   will, once it gets past its investment period, it will start

8   to harvest those assets.

9       There are different ways for the CLO manager to swap

10  assets, to stay in compliance, to extend out the tenure, but

11  usually markets start to move and there's some reason for the

12  CLO manager to do something like a reset or a refinancing or

13  to call the CLO.

14      So you'll see a number -- there was one this week, and

15  there'll be a number because of the conditions in the market

16  -- of CLOs called by the, effectively, the equity, saying,

17  Great time to sell, I don't need the short income, call the

18  CLO, do a BWIC or some other way to get dollars for all of the

19  assets, pay off all of my debt, and give me the balance of the

20  proceeds.

21          THE COURT:  Okay.  All right.  And the plan

22  contemplates that these will all be wound down over a two-year

23  period, correct?

24          THE WITNESS:  It's not a hard -- it's not a hard

25  period.

Seery - Examination by the Court                196

1          THE COURT:  Okay.

2          THE WITNESS:  So it's not a two-year period.  We're

3     going to -- we're going to manage these assets, as any asset

4     manager would, and we've had direct discussions with some of

5     the underlying holders, including one of the biggest investors

6     in the world who's an investor in the CLO but also has a

7     couple separate accounts which they want us to manage, and

8     we'll look for opportunities, depending on the market.  We're

9     not going to -- we're not going to just sell.  It's not a

10    liquidation.  We're going to find opportunities where, if we

11    believe it's the right value, we'll sell.  That doesn't mean

12    we'll sell it all in a big chunk.  We may manage pieces.  We

13    may hold on to some.

14       Some of them may perform -- some of the assets may

15    actually do things differently than others.  For example,

16    Cornerstone, for unknown reasons, has $60 million of MGM

17    stock, not an asset that you'd think you'd stuff into a

18    healthcare business, but this is Highland.  That may be sold

19    before, for example, Gleneagles sells its MGM.  It'll just

20    depend on, you know, market and the need of the specific

21    investor.

22         THE COURT:  All right.  Thank you.  That's all the

23    questions I have.

24         THE WITNESS:  Thank you, Your Honor.

25         THE COURT:  All right.  So, Mr. Seery, I think we're

Seery - Examination by the Court          197

1    done with you, but we hope you'll stick around for however

2    longer this goes.

3             THE WITNESS:  I will indeed.

4             THE COURT:  Okay.

5             THE WITNESS:  Thank you.

6             THE COURT:  Does the Debtor rest, Mr. Morris?

7             MR. MORRIS:  Yes, Your Honor.  There were those

8    couple of documents that we had used from the different docket

9    that we'll certainly put on the docket with the supplement

10   witness and exhibit list.  I just wanted to point that out.

11   And I, you know, I don't recall, frankly, if I moved into

12   evidence each of those extras, and I'm happy to go through it,

13   but it's very important to me that those documents be part of

14   the record.  So --

15            THE COURT:  Okay.  I think what you added was TTTTT,

16   and I think I admitted it.  You moved to admit it, and I said

17   yes, but you're going to have to file it on the docket --

18            MR. MORRIS:  Yeah.

19            THE COURT:  -- as a supplemental exhibit.

20            MR. MORRIS:  Right.  And then there were the couple

21   from the other -- let me see if I can get them.

22            THE COURT:  I admitted everything else that you filed

23   on the docket except UUUU, VVVV, and AAAAA.

24            MR. HOGEWOOD:  Yeah.  And that's fine.

25          Can we, Ms. Canty, going from Docket No. 46, can we just

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 729 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 797 of 1017   PageID 5476
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 728 of
2722

198

1  call up Exhibit K to make sure that that's in evidence?

2  Docket 46 from the Dondero adversary proceeding.

3      Okay.  So this was the letter, Your Honor, that I used

4  earlier today with Mr. Dondero.  If you scroll down, where I

5  examined him on the trading.  This is what led into the

6  December 22nd trading, if you go to the next page.  So if it's

7  not in evidence, I would respectfully request that this

8  document be admitted into evidence, Your Honor.

9          MR. RUKAVINA:  Your Honor, I object.  This document

10  is hearsay of Mr. Pomerantz.

11          THE COURT:  Okay.

12          MR. MORRIS:  Mr. Dondero has already -- I'm sorry,

13  Your Honor.

14          THE COURT:  Okay.  So this is -- I wholesale-admitted

15  all of your exhibits with those three carved out that I

16  mentioned.  So you're saying I've not admitted this one yet?

17          MR. MORRIS:  I just don't recall, because this wasn't

18  on the exhibit list. I will point out that we had no objection

19  to the entry into the evidence of all of K&L Gates letters,

20  and I'm really a little surprised, having heard the testimony

21  from Mr. Dondero on this particular letter, that there would

22  be an objection.  But I would respectfully request that it be

23  admitted as an exception to the hearsay rule.

24          THE COURT:  All right.  Well, I'm going to overrule

25  the objection.  I'll admit it.

199

1      So, again, it has to be supplemented on the docket.

2      (Debtor's Exhibit K is received into evidence)

3          MR. MORRIS:  Yes.  And there's just one other

4    document, Your Honor, from that same docket.  It's Exhibit D,

5    Ms. Canty.  I just want to make sure that's in the record as

6    well.  And I do apologize again, Your Honor.

7          THE COURT:  Okay.

8          MR. MORRIS:  I didn't realize until I was reading --

9          THE COURT:  We're getting terrible distortion.   I

10   don't know where it's coming from, but --

11         MR. MORRIS:  Okay.  And this is, this is the email

12   that I -- it's Mr. Dondero's own statement, so it's not even

13   hearsay, but I just want to make sure this is part of the

14   evidentiary record, Your Honor.  So I move for the admission

15   of this document as well to our exhibit list.

16         MR. RUKAVINA:  I believe this document has been

17   admitted.  I believe -- I believe --

18      (Echoing.)

19         MR. RUKAVINA:  Is that us?  Testing.

20         THE COURT:  All right.  Mike, where is that coming

21   from?

22      (Clerk advises.)

23         THE COURT:  Okay.  Mike thinks it's Mr. Morris, but

24   -- so put yourself on mute.

25      Mr. Rukavina, go ahead.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 731 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 799 of 1017   PageID 5478
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 730 of
2722

200

```
1            MR. RUKAVINA:  Your Honor, I think this exhibit is in
2   already.  If it's not, no objection.
3            THE COURT:  All right.  So it will be admitted, and
4   again, you need to file it as a supplement, Mr. Morris.
5        (Debtor's Exhibit D is received into evidence)
6            MR. MORRIS:  Yeah.  Thank you, Your Honor.  The
7   Debtor rests.
8            THE COURT:  All right.  Mr. Rukavina, I want to go a
9   while longer, so let's at least -- do you have Mr. Dondero as
10  well as Mr. Post?
11           MR. RUKAVINA:  I do, Your Honor.  I have both.
12           THE COURT:  Okay.  Well, let's go.  You may call your
13  witness.
14           MR. RUKAVINA:  Your Honor, we'll call Jason Post.
15           THE COURT:  All right.  Mr. Post, I swore you in
16  earlier and I consider you still under oath.  Do you
17  understand that?
18           MR. POST:  I do.
19           THE COURT:  All right.  Go ahead.
20       JASON POST, DEFENDANTS' WITNESS, PREVIOUSLY SWORN
21           MR. RUKAVINA:  Oh, turn on the video.  Can you see
22  how to do that?  Is Jason on the video?  Okay.  All right.
23  Mr. Post?  Hold on a second.  I'm hearing myself.
24           THE WITNESS:  I'm hearing the same.
25           MR. RUKAVINA:  Let me turn down my volume.  Testing.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 732 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 800 of 1017    PageID 5479
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 731 of
2722

Post - Direct                    201

1   Okay.  Mr. Post, can you hear me?

2           THE WITNESS:  Yes.

3           MR. RUKAVINA:  Okay.

4                    DIRECT EXAMINATION

5   BY MR. RUKAVINA:

6   Q    You were asked about some of your background and

7   qualifications.  Just so that the record is clear, you are the

8   chief compliance officer for both two Advisors and each of the

9   Funds, correct?

10  A    Correct.

11  Q    And I think we refer to these three defendant funds as

12  retail funds; is that correct?

13  A    Correct.

14  Q    Describe what we mean or what you mean by a retail fund.

15  A    I look at it two ways.  There's private funds, which are

16  institutional in nature, and retail funds, which are comprised

17  of open-end funds, closed-end funds, BDCs, ETFs, and that

18  constitutes the suite of funds that are advised by Highland

19  Capital Management Fund Advisors and NexPoint Advisors.  And

20  they generally have a broad swath of investors, including

21  institutional investors, but also, you know, just regular mom-

22  and-pop investors.

23  Q    Okay.  So, for the Highland -- I'm sorry, for the three

24  retail funds, how much in ballpark investments do they have in

25  the CLOs that are at issue today?  Ballpark.

Post - Direct                          202

1    A    Maybe call it a hundred million, ballpark.  Or a hundred

2    million, give or take.

3    Q    Okay.  And for all of the CLOs that Highland manages that

4    the Advisors and other Funds have an interest in, do you have

5    an estimate of how much it manages of CLO assets?

6    A    I believe it's approximately a billion, a little over a

7    billion that HCMLP manages for its CLO assets.

8    Q    Do you have an estimate of how many individual investors

9    there are in the three retail funds?

10   A    I -- thousands.  I don't have an exact number.

11   Q    Okay.  And I think you mentioned some of the types.  Do

12   you have any names of the types of investors that Her Honor

13   might know or have heard of before?

14   A    Off the top of my head, I do not, just -- but they're

15   generally constituted or characterized of the investor types

16   that I mentioned earlier.

17   Q    Okay.  Now, these three retail funds, do they own voting

18   preference shares in any of the CLOs that the Debtor manages?

19   A    Yes.

20   Q    Okay.  Do they own a majority in any of those CLOs' voting

21   preference shares?

22   A    In aggregate, across the three, they would.

23   Q    Okay.

24   A    With other CLOs.

25   Q    What are those three CLOs, sir?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 734 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 802 of 1017   PageID 5481
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 733 of
2722

Post - Direct                      203

1   A    I believe it's Greenbrier, Graceland, and Stratford, if I

2   recall correctly.

3        MR. RUKAVINA:  Your Honor, have you received a

4   couriered binder of our exhibits?

5        THE COURT:  I have.  I've got them right here.

6        MR. RUKAVINA:  Now I can't hear the judge.  What's

7   she saying?

8        THE COURT:  Yes.  I've got them.

9        MR. RUKAVINA:  I think you're on mute, Judge.

10       MR. VASEK:  No, you turned your volume down.

11       MR. RUKAVINA:  Oh.  I apologize, Your Honor.

12       So, Mr. Vasek, if you'll please put Exhibit 2 up.

13  BY MR. RUKAVINA:

14  Q    Mr. Post, are you the custodian of records for the Funds

15  and Advisors?

16  A    Yes.  We're required to keep records of ownership and

17  trades for the Funds involved.

18  Q    And you are an actual officer of these Funds and Advisors,

19  correct?

20  A    Correct.

21  Q    Okay.  Are you familiar with this Exhibit 2?

22  A    I am.

23  Q    Did you participate in pulling together the underlying

24  information with others to prepare Exhibit 2?

25  A    I did.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 735 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 803 of 1017   PageID 5482
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 734 of
2722

Post - Direct                    204

1    Q    Does Exhibit 2 accurately reflect the current ownership of

2    the various CLOs by the three retail funds that are --

3    A    At the time it was put together, I believe it did.

4    Q    And approximately when was that?

5    A    I believe it was in the November time frame, middle of

6    November, end of November.

7    Q    Do you have reason to believe that the numbers we're

8    referring to would be materially different today?

9    A    I don't believe they would be materially different.

10            MR. RUKAVINA:  Your Honor, I move for the admission

11   of Exhibit 2 as a summary of underlying data.

12            THE COURT:  All right.  Any objection?

13            MR. MORRIS:  Yes, Your Honor.  It's hearsay.  I

14   understand that the witness has testified to it, but just as I

15   put in the backup for my demonstrative, where's the backup?

16   We're just supposed to take his word for it?  There's no

17   ability to check this.  This is not evidence.  It's a

18   demonstrative.

19            THE COURT:  All right.  Mr. Rukavina, do you have

20   backup?

21            MR. RUKAVINA:  Let me ask the witness a couple more

22   questions.

23   BY MR. RUKAVINA:

24   Q    What would be the backup for this Exhibit 2?

25   A    We'd have to pull the holdings from the intranet and that

Post - Direct                                   205

1  would identify the quantity that's held by each of the

2  respective funds and then an aggregate that, over the

3  preference shares outstanding, would give you the percentages

4  that are outlined in this exhibit.

5  Q    Okay.  And is that a database that you have personal

6  access and authority over?

7  A    I have personal access to it.  Yes.

8  Q    Okay.

9         MR. MORRIS:  Your Honor, *voir dire*?

10  BY MR. RUKAVINA:

11  Q    Can you easily take that data from a computer and show it

12  to the Court here today?

13  A    Yes.  It would just require the CUSIPs for each of the

14  preference shares and then plug it into the intranet and then

15  that would provide a screenshot of the ownership of the CLOs.

16  Q    And is this what that is, basically?

17  A    This is an aggregation -- or, this is a percentage of the

18  shares outstanding, the preference shares.  So what would be

19  shown on the intranet would be the quantity and then you'd

20  have to tie that back to the shares outstanding and that would

21  give you the percentages that are shown on this exhibit.

22         MR. MORRIS:  *Voir dire*, Your Honor?

23         THE COURT:  I'm sorry?

24         MR. MORRIS:  May I inquire before this --

25         THE COURT:  Mr. Morris, is that you?  Okay.  You want

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 737 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 805 of 1017   PageID 5484
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 736 of
2722

Post - Voir Dire                          206

 1   to take him on *voir dire*?

 2              MR. MORRIS:  Yes.

 3              THE COURT:  Go ahead.  Uh-huh.

 4                      VOIR DIRE EXAMINATION

 5   BY MR. MORRIS:

 6   Q   Yes.  Mr. Post, did you prepare this document?

 7   A   I provided information and the document was ultimately

 8   prepared by counsel.

 9   Q   So you didn't personally prepare this, right?

10   A   I didn't personally put this chart together.

11   Q   And you didn't personally make the calculations on this

12   chart, right?

13   A   I would have supplied or assisted in supplying the

14   holdings with reference to the shares outstanding and then

15   they would have done the math to place the percentages.

16   Q   I'm asking a very specific question.  You didn't do the

17   calculations necessary to come up with the percentages on this

18   chart, right?

19   A   Me personally, no, I did not.

20   Q   And you can't verify that this chart is accurate, can you?

21   A   I provided, provided the information.  Then it's a

22   mathematical calculation.

23   Q   Okay.  You didn't take any steps to determine the accuracy

24   of this chart, right?   You relied on others?

25   A   There's a -- I would have cross -- you know, maybe cross-

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 738 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 806 of 1017    PageID 5485
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 737 of
2722

Post - Voir Dire                    207

1   referenced some of the percentages against another spreadsheet
2   that was -- that we had internally.
3   Q   Sir, I didn't want to know what you would have done.  You
4   didn't do anything to confirm the accuracy of all of the
5   numbers on this page, correct?
6   A   I believe I may have spot-checked a couple of them.  I
7   can't recall specifically.
8           MR. MORRIS:  Your Honor, not only don't we have the
9   backup, but this witness isn't even competent to testify to
10  the accuracy of the chart.  I renew my objection.
11          THE COURT:  All right.  I sustain the objection.
12          MR. RUKAVINA:  Your Honor, I'll --
13          THE COURT:  It's not allowed.
14          MR. RUKAVINA:  Going back to the -- take that down.
15          THE COURT:  All right.  Mr. Rukavina, we're -- our
16  connection to your office is suddenly not very good.  Both you
17  and Mr. Post are very hard to hear.  So let's see what we can
18  to improve.
19          MR. RUKAVINA:  Is it a question of loudness or
20  quality?
21          THE COURT:  Quality.  And I heard you fine just then,
22  but -- so let's try again.
23                  DIRECT EXAMINATION, RESUMED
24  BY MR. RUKAVINA:
25  Q   Mr. Post, let's go back to those retail funds.  How are

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 739 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 807 of 1017   PageID 5486
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 738 of
2722

 1  those funds managed at the top level?

 2  A    They're overseen by a board of trustees.

 3  Q    Okay.  Do you interact with that board of trustees

 4  periodically?

 5  A    I do.

 6  Q    Okay.  Approximately how often?

 7  A    At least quarterly, and generally intervening periods.

 8  I'd probably say anywhere from every five to six weeks, if not

 9  more frequent.

10  Q    Have you been communicating with them more frequently

11  recently?

12  A    Yes.

13  Q    As the CCO of the funds, who do you ultimately report to?

14  A    The board.

15  Q    Is Mr. Dondero on any of those boards?

16  A    He is not.

17  Q    Okay.  Are those boards capable, to your experience, of

18  making independent decisions?

19          MR. MORRIS:  Objection to the form of the question.

20          THE COURT:  Overruled.

21          THE WITNESS:  I think the question, is are they

22  capable of making independent determinations?  Yes.

23  BY MR. RUKAVINA:

24  Q    Okay.  Explain the interaction between the Fund Advisors

25  and the retail funds.  What -- what does the one do for the

Post - Direct                                209

1   other, if you will?

2   A    I'm sorry.  Can you repeat that?  I didn't -- I didn't

3   hear the question.

4   Q    So, we have the three retail funds.

5   A    Yes.

6   Q    What relationship, if any, is there between the two

7   Advisor defendants and any retail fund defendants?

8   A    So, there's an investment advisory agreement that the

9   Funds have entered into with the investment advisor, and the

10  investment advisor performs investment functions on behalf of

11  those Funds, along with other noninvestment functions.

12  Q    Okay.  So is it fair to conclude that, for investment

13  purposes, the Advisors make pretty much all, if not all,

14  decisions for the three Funds?

15  A    Yes.

16  Q    Okay.  What about other matters that the board might

17  consider?  Do the Funds make -- I'm sorry.  Do the Advisors

18  make other decisions for the Funds, or is it an advisory role?

19  A    The Advisors may make other decisions or recommendations,

20  which they then set forth to the board for their approval, if

21  needed.

22  Q    Okay.  Does the board have independent counsel?

23  A    They do.

24  Q    Okay.  Have you interacted before?

25  A    I have.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 741 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 809 of 1017    PageID 5488
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 740 of
2722

Post - Direct                                      210

1   Q    And is it fair to conclude that the board not only is

2   capable of making independent decisions but has made

3   independent decisions recently?

4            MR. MORRIS:  Objection.  Leading.

5            THE COURT:  Sustained.

6            THE WITNESS:  They have.

7            MR. RUKAVINA:  Okay.

8            THE COURT:  That was --

9            MR. RUKAVINA:  And we'll get --

10           THE COURT:  You don't answer.

11           MR. RUKAVINA:  Go into that in another bit.

12           THE WITNESS:  Oh.  Sorry.

13           MR. RUKAVINA:  Okay.

14  BY MR. RUKAVINA:

15  Q    Explain to the Court what your role as the chief

16  compliance officer for the Advisors and the Funds is.

17  A    I think, as you mentioned earlier, it's interaction with

18  the board.  Also with regulatory bodies to the extent

19  examinations occur.  It could be to ensure oversight and

20  compliance with a fund's prospectus and SAI limitations, and

21  then it's establishing policies and procedures and ensuring

22  that those policies and procedures are adequate to detect any

23  sort of violations that could occur by the Funds.

24  Q    And are you an attorney?

25  A    I am not.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 742 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 810 of 1017    PageID 5489
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 741 of
2722

Post - Direct                          211

1   Q    Do you frequently work with attorneys?

2   A    I do.

3   Q    Both in-house and external?

4   A    Yes.

5   Q    Good.  And do you frequently rely on the advice of

6   counsel?

7   A    I do.  At times will present, you know, if there is a

8   question or an issue, present the background to either

9   internal or external counsel and then request their advice on

10  certain matters.

11  Q    So when counsel was asking about why you wouldn't appear

12  at a hearing or listen to a hearing or read a transcript of a

13  hearing, are those the kinds of things that you would rely on

14  counsel?

15  A    Yes.  If counsel were to tell me to, you know, attend the

16  hearing, I would have attended the hearing.

17  Q    Okay.  Does -- do the Funds and Advisors also have in-

18  house counsel?

19  A    Yes.

20  Q    I think we established that's D.C. Sauter?

21  A    He's been the primary point of in-house counsel more

22  recently, I'd say, within the past three to four months.

23  Q    Okay.  And would you expect that perhaps he would be

24  attending hearings and reading transcripts instead of you for

25  some of these litigated matters?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 743 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 811 of 1017   PageID 5490
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 742 of
2722

```
                        Post - Direct                    212
```

1           MR. MORRIS:  Objection to the form of the question.

2           THE COURT:  Overruled.

3           MR. MORRIS:  Leading.

4           THE COURT:  Overruled.

5           THE WITNESS:  I believe he would be.

6    BY MR. RUKAVINA:

7    Q   Okay.  Well, the implication was made, Mr. Post, that

8    somehow you were negligent as CCO by not following the

9    December 16th hearing.  I'd like to know, --

10          THE COURT:  Okay.  Could you -- could you repeat --

11   BY MR. RUKAVINA:

12   Q   -- Did you have counsel at the hearing and did you hear

13   from --

14          THE COURT:  Mr. Rukavina, start over with your

15   question.  It was a little hard to hear.

16          MR. RUKAVINA:  Okay.

17   BY MR. RUKAVINA:

18   Q   Mr. Post, the implication had been made that, because you

19   weren't at the December 16th hearing and because you had not

20   read the transcript, that you were somehow deficient as a CCO.

21   I'd like to know, Did you have the benefit of outside

22   counsel's views both before and after that hearing as to that

23   hearing and what happened?

24   A   Yes.

25   Q   It's not that you put your head in the sand and ignored

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 744 of
Case 3:25-cv-02072-S     Document 15-7    Filed 10/06/25     Page 812 of 1017     PageID 5491
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 743 of
2722

Post - Direct                           213

1  what's happening, is it?

2  A    That is correct.

3  Q    Okay.  And is it fair to say that when you deal with

4  compliance, you deal with complicated statutes and

5  regulations?

6  A    That is correct.

7  Q    Okay.

8       MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

9  (garbled).

10     (Pause.)

11 BY MR. RUKAVINA:

12 Q    Okay.  Taking you back to Mr. Morris's questions, do you

13 recall Mr. Morris asking you whether you believe that any of

14 the trades that were being discussed were deceptive?

15       MR. MORRIS:  Hold on one second, Your Honor.  What

16 exhibit is this?

17       THE COURT:  I don't know.  What is it?

18       MR. RUKAVINA:  Can you hear me, Mr. Post?

19       THE WITNESS:  They're asking a question as to what

20 exhibit this is.

21       MR. RUKAVINA:  Your Honor, this is not an exhibit.

22 This is a Commission Interpreting Regarding Standard of

23 Conduct for Investment Advisors, an SEC regulation in

24 conjunction with 17 CFR 276.

25       THE COURT:  Okay.  How are we --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 745 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 813 of 1017   PageID 5492
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 744 of
2722

```
                    Post - Direct                214
```

1          MR. RUKAVINA:  So, Your Honor, these are the actual

2    regulations.

3          THE COURT:  I mean, it's -- okay.  The answer to the

4    question is it's not an exhibit.  You have pulled up 17 CFR

5    part 276.  Is that what the answer is?

6          MR. RUKAVINA:  Yes, Your Honor.  And I haven't

7    offered this as an exhibit.

8          THE COURT:  All right.

9          MR. MORRIS:  You have -- Your Honor, I don't know why

10   this is being put up on the screen now.  It's not an exhibit.

11   It's not in the record like a couple of those that I had.  I

12   used the statute that he relied on to cross-examine him with

13   the 206.  I don't know what this is.  I don't know if it's

14   accurate.  I don't know anything about it.

15         MR. RUKAVINA:  Your Honor, this is a rule and

16   regulation.  This is not an exhibit.  If it is an exhibit, I

17   haven't moved to admit it yet.  I'm going to use this to

18   refresh his memory and explain why he believed that the

19   actions were deceptive, a door opened solely by Mr. Morris.

20         MR. MORRIS:  His recollection hasn't -- there's no

21   need to refresh it yet.  He hasn't even answered a question

22   where he says, "I don't remember."

23         THE COURT:  Okay.  I sustain the objection here.  I

24   mean, you can ask him a question, but, again, it's kind of

25   hard for us to tell what this is, actually.  I mean,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 746 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 814 of 1017   PageID 5493
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 745 of
2722

Post - Direct                      215

1   Commission Interpretation Regarding Standard of Conduct for

2   Investment Advisors.  I mean, is this actually a -- I mean,

3   it's not a statute.  I'm not even sure it's a reg.  It's --

4        MR. MORRIS:  Okay.

5        THE COURT:  I don't know what it is.  So, --

6        MR. RUKAVINA:  Your Honor, we'll lay a predicate

7   later.  First, let me ask some other questions.

8   BY MR. RUKAVINA:

9   Q   Again, you recall that you were asked whether, pursuant to

10  Section 206 of the Advisers Act, you believed the trades that

11  have been discussed were deceptive.  Do you recall?

12  A   Yes.

13  Q   Okay.  And you answered that you believed that they were

14  deceptive?

15  A   Correct.  I did.

16  Q   As the CCO, do you have an understanding of what role, if

17  any, conflicts of interest play in an advisor's duties under

18  the Advisers Act?

19  A   Yes.

20  Q   Okay.  What is your understanding?

21  A   All -- all known material conflicts of interests need to

22  be disclosed -- need to be disclosed by the advisor to the

23  underlying investors.

24  Q   Okay.  And why, why do those conflicts of interests have

25  to be disclosed?

Post - Direct                                216

1  A    Because an advisor could have a view that may deviate from

2  the underlying investors' view of how the portfolio could be

3  managed and in contradiction to it.

4  Q    And do you have an understanding as to whether, pursuant

5  to your experience as the CEO [sic], the Advisers Act and the

6  SEC regulations (garbled) it require an advisor to adopt the

7  principal's goals as opposed to his or her own goals?

8         MR. MORRIS:  Objection to the form of the question.

9  Your Honor, he has not been offered as an expert.  He

10 shouldn't be permitted to provide -- this is -- this would be,

11 at best, expert testimony.  I asked him 30 different questions

12 about his background.  He's got no training.  He's got no

13 licenses.  He's taken no special courses.  He doesn't have

14 anything except on-the-job training.  This is not right.

15        MR. RUKAVINA:  Your Honor, Mr. Morris got to ask yes-

16 and-no questions all day, leading questions, and the witness

17 was told that he could explain his answers.  The Court told

18 him that.  And I am trying to explain his answer as to why he

19 believed that these transactions were deceptive, especially

20 because the allegation is that we willfully and intentionally

21 violated the stay by sending letters that this witness

22 authorized.  So understanding his understanding is very

23 important to Your Honor's determination of the actual --

24        THE COURT:  Well, I sustain the objection.

25        MR. RUKAVINA:  And Mr. Morris opened this door.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 748 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25   Page 816 of 1017    PageID 5495
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 747 of
2722

Post - Direct                            217

```
 1        THE COURT:  You can ask him why he thought the
 2   actions were deceptive, but he's starting to go into what may
 3   or may not be CFRs and conflicts of interest.  No.  This is
 4   going well beyond asking him, Why do you think it was
 5   deceptive?  And I agree:  It's straying into expert testimony.
 6   BY MR. RUKAVINA:
 7   Q   Mr. Post, you are familiar with the December 22nd AVYA
 8   and SKY sales and transactions which you were asked about by
 9   Mr. Morris and that you previously have testified about,
10   correct?
11   A   Correct.
12   Q   Okay.  How are you familiar with those sales and
13   transactions as they were occurring?  How did you learn about
14   them?
15   A   There was some internal email correspondence.  If I recall
16   from memory, at the bottom it provided fill information that
17   Jefferies provided to, I believe, Mr. Seery and others on the
18   email.  And then it kind of worked its way up to get the
19   trades that had been executed administratively booked into the
20   OMS.
21   Q   Why did you get involved with those transactions?
22   A   They were requesting that employees of HCMFA book those --
23   I'm sorry, Highland Capital Management Fund Advisors -- book
24   those into the system.  And those employees were not a party
25   to the trade.  I don't believe --
```

Post - Direct                          218

1    Q    Well, let me pause you.  Let me pause you.  Those two

2    employees, who were they?

3    A    Joe Sowin and Matt Pearson.

4    Q    Were they at that time employees of the Debtor?

5    A    They were not.

6    Q    Okay.  So, how did you come to learn about this ask that

7    those two employees book -- book it?

8    A    I believe there was an email that was sent to me, or I was

9    on it.  I can't recall specifically.

10   Q    Okay.  And did you undertake any review as to whether

11   those two employees should or should not do what was being

12   asked of them?

13   A    Once it was brought to my attention, I discussed with -- I

14   looked at it.  It looked like, pursuant to prior

15   correspondence with -- that Joe Sowin made, he wasn't aware of

16   the trades.

17        You know, I also had a discussion with K&L based off of --

18   our legal counsel based off of a prior letter that was sent,

19   and just it didn't -- it didn't look right that they would be

20   booking trades on behalf of the two Advisors that are named in

21   the letters when they had nothing to do with it and weren't --

22   weren't a part of any of the pre-trade compliance checks, et

23   cetera.

24   Q    What is a pre-trade compliance check?

25   A    Well, there's an electronic system, a -- or a management

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 750 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 818 of 1017   PageID 5497
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 749 of
2722

Post - Direct                          219

1   system we have, the OMS, which is called Verda (phonetic).

2   And generally, trades are entered into the system by the

3   portfolio manager, and they then go through pre-trade

4   compliance checks.  And once those compliance checks are

5   passed, they're then routed to the trading desk for direction

6   or execution, where the executing brokers and the trading desk

7   will then monitor that execution over the course of the day.

8   And at the conclusion of the trading day, those trades, if

9   they weren't already allocated, would be allocated, and then a

10  trade would be sent to custodian prime brokers to identify the

11  trades that occurred in the respective Funds for those -- or,

12  on that day, and then they would then be dropped into the

13  database and our -- the settlement team would kind of work to

14  settle those trades or ensure that those trades were settled

15  based off of the stipulated time frame for settlement on the

16  trades.

17  Q   So, in all that course of a transaction, what exactly was

18  it that those two employees of the Advisors were being asked

19  to do on behalf of the Debtor?  What exactly were they being

20  asked to do?

21  A   To just book them in the system because they are trades

22  that already have been executed.

23  Q   Did you stop that?

24  A   I believe I responded and said, you know, it -- they're

25  employees of, if I recall, employees of one of the named

Post - Direct                    220

1   Advisors, and believe those trades are in the best interest of

2   those Advisors, and separately, you know, the Debtor has

3   designated operators/traders that should be able to enter

4   those trades as well, aside from Mr. Sowin and Matt Pearson.

5   Q    So can you think of any reason why Mr. Seery would ask

6   your employees, as with his own employees, to book these

7   trades?

8   A    I believe based off of past practice.

9   Q    Okay.  But nevertheless, those two trades did not comply

10  with internal compliance?

11  A    They weren't run through the OMS.  We try and route trades

12  through the order management system because there's pre-trade

13  compliance checks that can be performed, and it reduces any

14  sort of back-end reallocation or trade errors that may occur

15  as a result of, you know, trades being entered after the fact,

16  because quantities could be, you know, referenced incorrectly

17  or funds could be identified incorrectly.

18  Q    Based on prior practices, have these internal policies

19  been followed when perhaps employees of the Debtor asked

20  employees of the Advisors to take a particular action in the

21  course of a transaction?

22  A    Yes.

23  Q    When internal practices are not followed, what is your

24  job?  What are you supposed to do?

25  A    When internal practices are followed, --

Post - Direct                                221

1   Q    Are not followed.

2   A    Oh.  Not followed?  To the extent that they're not

3   followed, we would question, you know, number one, why weren't

4   they followed?  You know, we -- we try and have all trades

5   booked in the OMS so that the necessary checks could be

6   performed, and as I mentioned earlier, to avoid any

7   reallocation or trade errors.  So I would then question, you

8   know, why was this done outside of the system?

9   Q    And if you did not get an appropriate response back to

10  your question, what are you supposed to do?

11  A    If I didn't get an appropriate response, would, you know,

12  research it further and elevate it to senior management and/or

13  any of the board if it was ultimately an issue.

14  Q    Are you supposed to stop trades or stop the process if you

15  see something that you believe is not compliant with your

16  obligations and the fiduciary obligations of the Advisors?

17  A    Yes.

18  Q    Have you done that in the past?

19  A    Yes.

20  Q    Have you done that frequently, or infrequently?

21  A    I would say it's -- it's infrequent, but they do occur.

22  For example, if a fund is trading in a security that it's not

23  permitted to invest in based off of a prospectus limitation,

24  it would get flagged in the OMS and we would then not permit

25  the trade to go forward because it could cause the breach to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 753 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25   Page 821 of 1017    PageID 5500
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 752 of
2722

                          Post - Direct                          222

1   go further offsides or it could cause it to go offsides.

2   Q   Okay.  And these December 22nd trades, were they the type

3   of, in your past experience, problematic trades like you have

4   interfered or stopped or intervened to stop in other

5   situations in the past?  Do you understand my question?  That

6   was an inartful question.  Do you understand it?

7   A   If the question is because they were done outside of the

8   system?

9   Q   Yes.

10  A   And repeatedly?

11  Q   Yes.

12  A   I would have raised the question with the trading desk or

13  the portfolio manager as to why that's being done, because it

14  was not in -- not consistent with how we instruct trades be

15  booked.

16  Q   Did Mr. Dondero, for these December 22nd transactions,

17  tell these two employees not to book the trades?

18          THE COURT:  Okay.  Please repeat the question.  It

19  was garbled.

20          MR. RUKAVINA:  Thank you, Your Honor.

21  BY MR. RUKAVINA:

22  Q   For these December 22nd trades, did Mr. Dondero tell those

23  two employees not to book the trades?

24          MR. MORRIS:  I object, Your Honor.  No foundation.

25  This witness has no personal knowledge to testify to this --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 754 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 822 of 1017    PageID 5501
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 753 of
2722

Post - Direct                          223

1   to answer this question.

2           THE COURT:  Overruled.  If he knows.

3           THE WITNESS:  I do not know.

4   BY MR. RUKAVINA:

5   Q    Okay.  Do you have a reason to believe that he did?

6   A    I don't know.  I just saw the email traffic and Mr. Sowin,

7   I believe, was questioning the trades, you know, more in the

8   sense that he wasn't aware of them.  So, I don't -- I don't

9   know what kind of conversations, what happened in the

10  background, just that he -- he didn't recognized that rates.

11  Q    Let me try it this way.  You determined that these trade

12  would have violated the Advisors' policies and procedures,

13  correct?

14  A    Yes, because they were done outside of the OMS.

15  Q    Did Mr. Dondero tell you to come to that conclusion?

16  A    He did not.

17  Q    Did Mr. Dondero pressure you to come to that conclusion?

18  A    He did not.  He had indicated that there -- there are

19  these trades, and you should take a look at it from a legal

20  compliance perspective, which I did.

21  Q    And you talked to K&L Gates?

22  A    Correct.

23  Q    And when Mr. Dondero told you to look at these trades, did

24  he suggest to you in any way, shape, or form what you should

25  conclude or decide to do, if anything, with respect to these

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 755 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/10/06/25   Page 823 of 1017   PageID 5502
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 754 of
2722

Post - Direct                                    224

1  trades?

2  A    I don't believe so.

3  Q    Okay.  Let's go back to that question about your view that

4  some of what Mr. Seery was doing was deceptive under the 1940

5  Investors Act.  When did you form that view?

6  A    I believe it was after it was identified that there was

7  not (inaudible) on certain of the trades that were entered

8  into at the end of the November time frame, the SKY and AVYA

9  trades.

10 Q    And why did you form the opinion that those trades that

11 Mr. Seery was attempting to do or had done were deceptive

12 under the statute that Mr. Morris asked you about?

13 A    It was pursuant to reviewing them and supplemental

14 discussion.  A review with the portfolio managers and then

15 supplemental discussion with K&L be it from a (inaudible)

16 perspective, through, you know, perform in the best interest

17 of your clients, it was expressed that, at least with respect

18 to preference shareholders, they were supposed to maximize

19 value, and those sales, they're not really maximizing value.

20      And it was also identified that the Debtor was planning to

21 liquidate the CLOs based off of a filing within the Court

22 within a few-year period.  And the investors -- or, the Funds

23 that invested and the preference shareholders, or preference

24 shares, had a longer-time view in those assets.

25      So the sales, coupled with the short duration, or the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 756 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25   Page 824 of 1017   PageID 5503
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 755 of
2722

Post - Direct                    225

1  anticipated, you know, two-year duration, didn't line up with

2  the investment objective that they were seeking to maximize

3  returns.

4  Q   To your understanding and your experience, does the

5  servicer of the CLOs owe fiduciary duties to anyone?

6        THE COURT:  Okay.  I cannot -- someone is flipping

7  paper.  Please stop flipping paper.  Okay.  Repeat your

8  question, Mr. Rukavina.

9        MR. RUKAVINA:  Thank you, Your Honor.

10 BY MR. RUKAVINA:

11 Q   In your experience and in your knowledge, does the

12 servicer of the CLOs owe fiduciary duties to anyone?

13 A   They should, yeah, the underlying investors in the CLO,

14 whether it be the Debtor or the equity holders.

15 Q   Do the Advisors owe fiduciary duties to anyone?

16        MR. MORRIS:  Your Honor, I'm sorry, I apologize.  I

17 really do move to strike.  He's not a lawyer.  There is no

18 foundation.  He's not here as an expert.  There's no basis for

19 this witness to be talking about who owes who fiduciary

20 duties.  I don't even think that's the law, what's just been

21 stated.

22        THE COURT:  Okay.  I sustain.

23        MR. RUKAVINA:  Okay.

24 BY MR. RUKAVINA:

25 Q   Well, let me make it very easy, then.  Do you have an

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 757 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 825 of 1017    PageID 5504
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 756 of
2722

Post - Direct                          226

1   understanding as to whether Advisors subject to the 1940 Act

2   owe a fiduciary duty?

3   A    Yes.

4   Q    Do you have an understanding of how a conflict of interest

5   plays into a fiduciary duty?

6   A    Yes.

7   Q    What is your understanding?

8   A    If there's a material conflict of interest, it should be

9   disclosed.

10  Q    And what did you conclude with respect to Mr. Seery and

11  the Debtor once the Debtor stated that it will liquidate

12  within two years?

13  A    That's not the investment horizon that the underlying

14  preference shareholders have, especially with respect to the

15  underlying assets held in those CLOs.  More or less, you're --

16  they're now put on a clock, and those preference shareholders

17  may have a longer-term view on the underlying assets of those

18  CLOs.

19  Q    Let's move on to those December 22nd and December twenty

20  -- well, let me strike that.  You heard Mr. Seery testify that

21  those December 22nd trades closed, correct?

22  A    I did.

23  Q    And did you independently look at whether that's true?

24  A    I did.

25  Q    And what did you conclude?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 758 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 826 of 1017    PageID 5505
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 757 of
2722

Post - Direct                                227

1  A    They showed a sale in the -- on the intranet.

2  Q    Okay.  Let's move on to the December 22nd and December

3  23rd letters.  Are you familiar with those letters from K&L

4  Gates to counsel for the Debtor?

5  A    I am.

6  Q    And did you participate in preparing those letters?

7  A    I did.

8  Q    Okay.  And I think Mr. Morris asked you and I think you

9  testified you supported or agreed with the sending of those

10 letters.  Is that generally accurate?

11 A    Yes.

12 Q    Why?  Why did you support sending those letters?

13 A    It wasn't in the best interest of the Funds pursuant to

14 discussions with the portfolio managers and the investment

15 objectives that they were looking to seek any of those

16 investment in the preference -- preference securities and

17 CLOs.

18 Q    Was that a purpose that you were trying to achieve by

19 sending those?

20         THE COURT:  Repeat the question.

21         THE WITNESS:  Ah, --

22         THE COURT:  Repeat the question.

23 BY MR. RUKAVINA:

24 Q    Was that a purpose that you were trying to achieve by

25 sending those letters?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 759 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 827 of 1017   PageID 5506
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 758 of
2722

Post - Direct                          228

1    A    Yes.  I believe there was something towards the end of one

2    or both letters that said, to the extent, you know,

3    transactions occur, if, for lack of better words, a courtesy

4    heads up could be given to the Funds and the Advisor.

5    Q    Did you intend in any way to intimidate the Debtor by

6    authorizing or supporting the sending of those letters?

7    A    No.

8    Q    Did you intend in any way to violate the automatic stay by

9    sending those letters?

10   A    No.

11   Q    Were you trying to engage the Debtor in a dialogue at that

12   time as to what to do with these CLO management agreements?

13   A    Yes.  I believe that was stated at one -- at the end of

14   one or both of the letters.

15   Q    And I think Mr. Morris discussed with you that the Debtor

16   sent back letters asking you to withdraw these two letters.

17   Do you recall that discussion?

18   A    Yes.

19   Q    And do you recall saying that we never withdrew these

20   letters, right?

21   A    Correct.

22   Q    Why did we not withdraw these letters?

23   A    Because we don't believe that the trades that are being

24   entered into are in the best interest of the shareholders --

25   *i.e.*, the Funds.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 760 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 828 of 1017   PageID 5507
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 759 of
2722

Post - Direct                    229

1  Q    To your knowledge, did we ever, or did you ever,

2  communicate to the Trustees or Issuers anything in the nature

3  of instructing them to terminate the CLO management agreements

4  with the Debtor?

5  A    I did not.

6  Q    To your knowledge, did anyone, for the Funds or Advisors?

7  A    I don't believe so.

8  Q    Did you or anyone to your knowledge communicate to the

9  Issuers or Trustees that the process of removing the Debtor as

10 manager should commence?

11 A    I don't believe so.

12 Q    Okay.  To your knowledge, have any of the Issuers or

13 Trustees undertaken any steps to remove the Debtor or

14 terminate these contracts?

15        MR. MORRIS:  Objection to the extent it calls for the

16 conduct or knowledge of the Issuers.

17        THE COURT:  Overruled.  He can answer if he knows.

18        THE WITNESS:  I don't believe so.

19 BY MR. RUKAVINA:

20 Q    Had they, is that something that you would have expected

21 them to inform the Funds of?

22 A    Yes.  The Funds would have received some type of

23 notification if there was a new Advisor on the CLOs.

24 Q    So, other than these two letters -- let me stop there.

25 Did any discussion of trying to terminate these contracts

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 761 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 829 of 1017    PageID 5508
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 760 of
2722

                        Post - Direct                    230

1    basically cease with the sending of these two letters and the

2    Debtor's responsive letters?

3    A    That's my understanding, yes.

4    Q    Okay.  And we never did file a motion for lift stay.  Can

5    you explain to the judge why we didn't file a motion for

6    relief from the stay?

7    A    It's my understanding that the intent was that the

8    management of the CLOs was going to be heard in conjunction

9    with the confirmation hearing.

10   Q    And do you recall when that confirmation hearing was

11   originally set for?

12   A    I believe it was supposed to start today.  Or tomorrow.

13   Q    Well, wasn't it earlier in January?  Around January 11th?

14   A    Uh, I -- I don't recall specifically.

15          MR. RUKAVINA:  Mr. Vasek, if we could pull up the

16   Form CLO agreement.  What exhibit is that?

17       (Pause.  Counsel confer.)

18          MR. RUKAVINA:  No, that's not.

19          THE COURT:  Can I ask what we're about to start

20   doing?

21          MR. RUKAVINA:  Eight.

22          THE COURT:  Can I ask what we are about to start

23   doing?

24          MR. RUKAVINA:  Your Honor, I apologize.  I'm trying

25   to find one of the CLO portfolio management agreements.  I'm

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 762 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 830 of 1017   PageID 5509
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 761 of
2722

Post - Direct                              231

1   trying to pull it up for you.

2           THE COURT:  Okay.

3           MR. RUKAVINA:  It should be in your binder.

4           THE COURT:  All right.  Well, --

5           MR. RUKAVINA:  Where is it, Julian?

6           MR. VASEK:  It should be 8.

7           MR. RUKAVINA:  I'm sorry?

8           MR. VASEK:  8.

9           MR. RUKAVINA:  Your Honor, it's Exhibit 8 in your

10  binder.

11          THE COURT:  Exhibit --

12  BY MR. RUKAVINA:

13  Q    And Mr. Post, you have that in front of you, right?

14          MR. RUKAVINA:  Mr. Vasek, if you'll go to Page 14,

15  please.  Section 14.  Termination by the Issuer for Cause.

16          MR. VASEK:  Okay.

17          MR. RUKAVINA:  Your Honor, the contract speaks for

18  itself, and I'm not about to read the contract to the Court.

19  The Court can read.  I want to ask him certain questions about

20  this.  And you'll note that the contract gives the requisite

21  holders of voting preference shares certain rights.

22          MR. MORRIS:  Your Honor, respectfully, the witness

23  has testified that he hadn't seen any of these contracts for

24  five or six years, until the lawyers asked him to look at it,

25  and they told him which specific provisions to look at.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 763 of
Case 3:25-cv-02072-S   Document 15-7   Filed 2706/25   Page 831 of 1017   PageID 5510
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 762 of
2722

                         Post - Direct                    232

1      The document does speak for itself.  Counsel should just

2   make it part of his closing argument.  There's no evidence

3   that there's a quote/unquote Form CLO Management Agreement.

4   And I would just respectfully suggest that this is better

5   saved for closing argument.

6          THE COURT:  Yes.  What are we going to do here?  He

7   did not seem like he was an expert on these CLOs in his

8   earlier testimony.  He hadn't read much of them until

9   recently.  So where are we going with this?

10         MR. RUKAVINA:  Well, Your Honor, the question, again,

11  is -- can you hear me?  The question again is, Are we going to

12  be enjoined from exercising any rights in the future, so I

13  would like to take the witness through the importance from a

14  regulatory perspective and a fiduciary perspective of some of

15  these rights.  If Your Honor thinks that that's for closing

16  argument, that's fine.  But I will note that that Your Honor

17  allowed Mr. Morris for some forty minutes to read prior

18  testimony into the record.

19         MR. MORRIS:  I'm happy to respond if Your Honor needs

20  me to.

21         THE COURT:  Go ahead.

22         MR. MORRIS:  There is a complete difference, Your

23  Honor.  To read statements against interest, to read defense's

24  own sworn statements that they made at a prior proceeding, as

25  opposed to trying to get a witness who has admitted that he's

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 764 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 832 of 1017   PageID 5511
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 763 of
2722

Post - Direct                          233

1    not familiar with these documents, to try to convince the

2    Court that they said something that the witness doesn't have

3    any personal knowledge or expertise about.  It's completely

4    different.

5         THE COURT:  All right.  I sustain the objection.  You

6    can make whatever argument you want in the closing arguments

7    about whatever provisions of whichever CLO agreements justify

8    actions.  I guess that's where we're going.

9         MR. RUKAVINA:  Then, if you could pull up Exhibit 78,

10   and if Your Honor could turn to Exhibit 78.

11        THE COURT:  All right.

12        MR. RUKAVINA:  Is this a confidential -- Julian, what

13   does it mean, it's confidential?  78.  Is this confidential?

14        MR. VASEK:  It says confidential on the --

15        MR. RUKAVINA:  Your Honor, apparently this is a

16   confidential document, so how does the Court want to proceed

17   on this WebEx?

18        THE COURT:  All right.  We're stopping.  We're

19   stopping.  We have protocols in place in this case, and people

20   usually file motions to present things under seal or

21   redactions.  My patience is shot, so we're going to stop.

22   Let's talk about where we go from here.

23        MR. MORRIS:  If I may, Your Honor?

24        THE COURT:  Yes.

25        MR. MORRIS:  John Morris from Pachulski Stang --

234

1              THE COURT:  Uh-huh.

2              MR. MORRIS:  -- for the Debtor.

3              MR. RUKAVINA:  We filed this under seal, right?

4              MR. MORRIS:  We were --

5              MR. RUKAVINA:  Oh, I thought we had.

6              MR. MORRIS:  -- hoping that we would get this

7    finished today, Your Honor, and the Debtor was really hoping

8    to get a ruling before confirmation.  But given all that's in

9    front of us, including the contempt hearing next Friday, just

10   a couple of days after the confirmation hearing, I think the

11   Debtor at this point is prepared to agree, if it's okay with

12   the Defendants' counsel, to push this to the following week,

13   since the -- you know, with the understanding that everybody

14   stipulate on the record that the TRO stays in place.  And if

15   we could have this particular motion heard, I guess, somewhere

16   -- it's the week of February 8th, the Debtor would consent to

17   that.

18             THE COURT:  All right.  Do we already have a --

19             MR. RUKAVINA:  Your Honor, can the Court --

20             THE COURT:  -- setting that week?  Because I know we

21   have confirmation, what, are we set for the 2nd, 3rd, and 4th?

22   Three days next week.

23             MR. MORRIS:  I believe -- yeah.  I think it's just

24   two, Your Honor.  I think --

25             THE COURT:  Okay.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 766 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 834 of 1017   PageID 5513
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 765 of
2722

235

1          MR. MORRIS:  -- confirmation is the 2nd and the 3rd,

2    and then I think the 5th is the contempt hearing.  I'm not

3    aware, but I don't -- I don't profess to know the entirety of

4    the calendar.  I'm not aware of anything that's on for the

5    following week.

6          THE COURT:  Does it make sense to continue this to

7    the 5th?  Because the issues are so overlapping here.  I feel

8    like it's been a contempt hearing half of today, actually.

9          MR. MORRIS:  Yeah.

10         THE COURT:  So, shall we just set it for -- is it

11   Friday, the 5th?

12         MR. MORRIS:  It is.

13         THE COURT:  At 9:30?

14         MR. MORRIS:  And I think that's a great idea, yeah.

15   Yeah.

16         THE COURT:  What do you want to say about that, Mr.

17   Rukavina?

18         MR. RUKAVINA:  Thank you, Your Honor.  We're fine

19   with that.

20       Let me just point out, so that if the Court is impatient

21   or frustrated, we did move Exhibit 78 to be filed under seal.

22   The Court did enter an order allowing it to be filed under

23   seal.  So that the Court doesn't think that somehow we were

24   negligent in that.

25       But February the 5th works for us.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 767 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 835 of 1017   PageID 5514
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 766 of
2722

236

1            THE COURT:  Okay.  All right.  So I have an

2    unredacted clean copy up here, which, if and when I admit it,

3    we will put it under seal in our exhibit room, or I guess our

4    electronic exhibit room.

5        So, we'll come back on the 5th at 9:30.  But I am not -- I

6    am not done.  Yes, I am frustrated.  Yes, I'm impatient.  I

7    have asked myself "Why are we here?" so many times today.  Why

8    are we here?  I mean, I've had this conversation before.  I

9    mean, we had a, as you know, a very lengthy hearing on the

10   motion for a TRO or preliminary injunction against Mr. Dondero

11   personally.  And I think it was Mr. Morris who said, it's a

12   little bit like Groundhog Day.  You know, that was actually a

13   more flattering way of describing it than I might have.  I

14   might have said this is reminding me of Albert Einstein's

15   definition of insanity.  You all know what I'm talking about?

16   When you're doing the same thing over and over again and

17   expecting a different result.

18       And, you know, no offense, Mr. Dondero, if you're still

19   there listening, but that's what it feels like to me.  I mean,

20   it is -- it's the same thing over and over again.  And we've

21   spent very, very, very little time talking about the January

22   9th, 2020 corporate governance settlement agreement.  Of

23   course, it was mentioned extensively in the pleadings, at

24   least by the Debtor.  But, you know, I've heard all of this

25   evidence today, and I'm going to hear more evidence,

237

1    apparently, on the 5th.  But Paragraph -- was it 9? --

2    Paragraph 9 of the January 9th, 2020 settlement agreement.

3    The order directed Mr. Dondero not to "cause any related

4    entity to terminate any agreements with the Debtor."

5         And, you know, I thought to myself as I was reading,

6    preparing for this hearing, that, you know, I seem to remember

7    those words meant so, so much to me.  And then this reply

8    brief was filed by the Debtor at 6:00 or 7:00 o'clock last

9    night, and it gave an excerpt of the transcript, the hearing

10   where I approved this corporate governance settlement

11   agreement, and I said, that language is so important to me

12   because of my history in the *Acis* case, I want it in the

13   order.  I don't even -- I don't want it merely in the term

14   sheet, and then, of course, the order cross-references,

15   approves the term sheet.  I want that in the order.  Because,

16   you know, I knew, even with this highly-qualified independent

17   board of directors, and even with this very sophisticated

18   Creditors' Committee with very sophisticated professionals

19   monitoring everything that happened, and having not just the

20   monitoring rights but the standing to pursue things, I knew,

21   even with this great system that had been negotiated in the

22   January term sheet, there was the possibility of things

23   happening through Dondero-controlled entities indirectly.  And

24   so that's why we had that Paragraph 9.  So, --

25        (Interruption.)

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 769 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 837 of 1017    PageID 5516
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 768 of
2722

238

```
1          THE COURT:  I don't know what that was I just heard,
2    but someone needs to put me on mute.
3       So, I mean, we've heard a lot.  We've heard a lot, but --
4          MR. DONDERO:  Hello?  Your Honor?  Your Honor?
5          THE COURT:  Okay.  I --
6          MR. DONDERO:  Hi.  Jim Dondero.
7          THE COURT:  Oh, okay.  I'm still talking.  I'm still
8    talking.  But I --
9          MR. DONDERO:  Okay.
10         THE COURT:  But I said --
11         MR. DONDERO:  I'm sorry.
12         THE COURT:  I said at the hearing on the preliminary
13   injunction as to Mr. Dondero personally, do you remember what
14   I said, I said life changed when you put your company in
15   Chapter 11.  And, you know, even if you had stayed on as
16   president of the Debtor, life changed.  Okay?  Because you're
17   a debtor-in-possession.  You have to say, "Mother, may I?" to
18   the Court.  Creditors get to object to things.  So things
19   changed.
20      But things really, really, really changed, you know, they
21   changed in October 2019, and then they changed dramatically in
22   January 2020, when independent board members were put in place
23   and you were taken out of management.
24      So, the reason I'm coming back to that concept is this:
25   I've heard a lot about the preferred shareholders didn't like
```

239

```
 1   the trades Mr. Seery was implementing, the sale of AVYA, the
 2   sale of SKY.  They didn't like it.  Well, I mean, I hate to
 3   say something flippant like tough luck, but really:  Tough
 4   luck.  Okay?  We all know that with a company like this, with
 5   a company like Acis, it's complicated, right?  Because you've
 6   got a fiduciary duty to your creditors to maximize value of
 7   the estate so creditors get paid in Chapter 11, right?  But
 8   meanwhile, you know, you've got to have fiduciary duties, I
 9   don't know if it's directly to preferred shareholders or just
10   to the CLOs.  But whatever it is, you know, there may be
11   differing views that individual preferred shareholders have.
12   But Mr. Seery is in charge.  The Debtor is in charge.  You
13   don't like it, I'm sorry, but he's in charge.
14        So, you know, I thought, am I going to come in here today
15   and see all kinds of specific contractual references, where, I
16   don't know, somehow you have an argument that you can control
17   buys and sells?  Of course, in this case, it would just be
18   sells at this point.  You know, no.  I knew I wasn't going to
19   see that.  And I haven't.
20        So I don't know what I'm going to hear more on the 5th
21   that is going to tilt me a different way, but right now, if I
22   had to rule right now, this would be a total no-brainer to
23   issue this preliminary injunction.  Okay?  I feel like it's
24   been teed up almost like find Dondero in contempt, find these
25   entities in contempt.  What I'm here on today is whether I
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 771 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 839 of 1017    PageID 5518
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 770 of
2722

240

 1   should issue a preliminary injunction, and the December

 2   letters, the emails, the communications, they lead me to

 3   believe that this preliminary injunction is needed because

 4   someone doesn't understand that Mr. Seery is in charge and the

 5   preferred shareholders, the Funds, the Advisors, they don't

 6   have the ability to interfere with what he's doing in running

 7   the company.

 8       And the threats of we're going to, you know, direct -- we

 9   may direct the CLO Issuer to terminate the Debtor:  I mean,

10   it's just -- there's no sound business justification for that.

11   Okay?  I don't know what we're doing, where we're going.

12       Mr. Dondero, I said to you in December, you know, I really

13   wanted to encourage good-faith negotiations on your possible

14   pot plan because I thought you wanted to save your baby.  But

15   the more I hear, the more I feel you're just trying to burn

16   the house down.  Okay?  Maybe it's an either/or proposition

17   with you:  I'll either get my company back or I'll burn the

18   house down.  That's what it feels like.  And I have no choice

19   but to enter preliminary injunctions with this kind of

20   behavior.

21       So, I'm very frustrated.  I'm very frustrated.  I don't

22   know if anyone wants to say anything or we just end it on this

23   frustrating note.

24       Mr. Rukavina, did you want to let your client speak, or

25   no?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 772 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/23 10/06/25 Page 840 of 1017 PageID 5519
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 771 of
2722

241

1          MR. RUKAVINA:  Your Honor?

2          THE COURT:  Not your client.

3          MR. RUKAVINA:  No, but --

4          THE COURT:  The client representative.

5          MR. RUKAVINA:  Your Honor, I take issue with what the

6    Court has said, but we did file a motion yesterday to file a

7    plan under seal.  It is -- Mr. Dondero, can you mute your

8    phone?  The Court should have seen that by now.  It is a pot

9    plan with much more cash consideration.  We have discussed it

10   with the Debtor and the Committee.  We are in earnest

11   negotiations.  I have no reason to believe or disbelieve that

12   we're close to a settlement.

13       But recall what I said at the beginning.  We asked the

14   Debtor to continue this hearing.  We said, You have a TRO that

15   ends February the 15th.  Why are you doing this?  Well, the

16   Debtor did it to smear Mr. Dondero on a very carefully crafted

17   record, without telling you the other half of it.  And when I

18   tried to have Mr. Post explain it, opposing counsel won't let

19   me even tell you our views.  So there is a competing plan.  We

20   want to try --

21         THE COURT:  You tried to get him to testify about

22   comments to CFRs when he has shown no expertise whatsoever --

23         MR. RUKAVINA:  That's fine.

24         THE COURT:  -- to permit that.

25         MR. RUKAVINA:  And I understand, Your Honor.  I don't

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 773 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 841 of 1017   PageID 5520
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 772 of
2722

242

1   want -- Your Honor has made her evidentiary rulings.  I'm not

2   here to second-guess them.

3       I'm telling you that Mr. Dondero -- and more importantly,

4   the other companies, *i.e.*, NexPoint -- we heard you loud and

5   clear.  We did not just send forward some cocktail-napkin term

6   sheet.  I spent the weekend and Friday preparing a

7   comprehensive plan and disclosure statement.  I hope that the

8   Court will allow it to be filed under seal.  Exclusivity has

9   expired.  I am asking to file it under seal only.

10          THE COURT:  Tell me what utility that has.  What

11  utility does that have if you don't have one plan supporter?

12  I mean, where are we going with this?  I have invited, I have

13  encouraged, I have directed good-faith negotiations with the

14  Committee.  If you don't have the Committee on board, what

15  utility is there in allowing you to file a plan under seal?

16          MR. RUKAVINA:  Well, if it's filed under seal, Your

17  Honor, then, really, no one is going to be prejudiced or hurt.

18  But we have not been told --

19          THE COURT:  Then why --

20          MR. RUKAVINA:  -- from the Committee --

21          THE COURT:  Then why are we doing it?  Help me to

22  understand the strategy.  Maybe I'm just naïve.

23          MR. RUKAVINA:  Your Honor, there is no strategy and

24  the Court is not naïve.  Pursuant to an agreement of the

25  Committee and the Debtor, I sent that draft plan to them over

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 774 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 842 of 1017   PageID 5521
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 773 of
2722

243

1   the weekend, and they agree it's not solicitation.  It has not

2   gone to the creditors.  No one has seen it.

3       The reason why we sent it to the Committee and the Debtor

4   was to foster ongoing negotiations.  We had negotiations last

5   night.  The Committee and the Debtor had negotiations last

6   night.  We've been promised a response in the next couple of

7   days, and we have a follow-up meeting scheduled for Thursday.

8       The reason why I wanted the plan filed under seal is so

9   that there is a record of what is being discussed so the U.S.

10  Trustee can see it, if she wants to, and so that other key

11  constituents, if they want to or have a reason to, can see it.

12      But I agree with you:  That plan ain't going nowhere if we

13  don't have some material creditor support.  We won't know that

14  for a couple more days.

15      So my only point in saying this to Your Honor is that we

16  are working earnestly, we are increasing our consideration, we

17  have heard you loud and clear, and all the parties are

18  negotiating.

19      Again, we did not want this hearing to happen today

20  because it's a step backwards from negotiations, not a step

21  forward.  Thank you.

22          MR. POMERANTZ:  Your Honor, may I be heard?

23          THE COURT:  Go ahead, Mr. Pomerantz.  Go ahead.

24          MR. POMERANTZ:  Mr. Rukavina sent us over the plan,

25  and we had no problem with it being sent to the Committee.  He

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 775 of
Case 3:25-cv-02072-S    Document 15-7   Filed 10/06/25    Page 843 of 1017   PageID 5522
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 774 of
2722

244

1    then sent us over the motion.  Now, aside from the fact that

2    the motion contains some statements which the Debtor strongly

3    disagrees with, with respect to the ability of administrative

4    claims or other claims to be assumed, but putting that aside,

5    we were concerned that the filing of a plan on the docket,

6    unsealed, would be a distraction.

7        Having said that, we also saw utility in the plan being

8    put in the hands of the largest creditors so that they can

9    evaluate what was being proposed.

10       We told Mr. Rukavina we have no problem if the plan was

11   filed under seal, stayed under seal until after confirmation,

12   and then, in exchange, we would agree to something that we

13   don't think we had to agree:  That he could send the plan to

14   UBS, to Acis, to Redeemer, to Meta-e, to HarbourVest, and

15   Daugherty.  Essentially, all the players in the case.  Mr.

16   Rukavina said he would consider that, and then just filed his

17   motion.

18       We don't have any problem with him doing that still,

19   sending it to the six creditors so they can look at it.  We

20   don't think it should be unsealed on the docket.

21       And the discussion of status of negotiations, Your Honor,

22   as we've told you many times before, we would love there to be

23   a plan.  We would love there to be support of a plan.  Mr.

24   Dondero asked to approach the board and speak to the board

25   yesterday.  We heard him out.  The plan essentially is the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 776 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 844 of 1017   PageID 5523
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 775 of
2722

245

1  same document and the same term sheet, I think, that has been

2  floating around for several weeks.

3      Having said that, we said, We are not going to stand in

4  the way of Mr. Dondero and the Creditors' Committee.  And if

5  the Creditors' Committee and Mr. Dondero have a meeting of the

6  minds, if there's any desire of them to have more time, we

7  would be supportive of it.  I'll let Mr. Clemente respond as

8  to whether there's any negotiation -- (echoing.)  But when Mr.

9  Rukavina said that last night there were negotiations between

10 the Debtor and Mr. Dondero, that's just not accurate.  We, we

11 look at ourselves as the honest broker.  But at the end of the

12 day, as Your Honor has remarked many times throughout this

13 case and just remarked a few moments ago, unless the

14 Creditors' Committee supports this plan, it is DOA.  And we

15 have communicated that several times to Mr. Dondero and his

16 team.

17     So, I just wanted to speak to correct the record.  We're,

18 again, supportive of a plan if there can be one.  But at this

19 point, we haven't seen anything, the parties coming any closer

20 or any more negotiations, and we just have to get confirmed

21 sooner rather than later (echoing), prepared to go forward.

22          MR. CLEMENTE:  Your Honor, it's Matt Clemente at

23 Sidley.  I'm happy to make some comments to Your Honor, --

24          THE COURT:  Okay.

25          MR. CLEMENTE:  -- if you -- if you wish.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 777 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 845 of 1017    PageID 5524
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 776 of
2722

246

1            THE COURT:  Please do.

2            MR. CLEMENTE:  I think it's fair to say that the

3    Committee believes the plan needs to go forward next week,

4    Your Honor.  We have, of course, taken your direction very

5    seriously, and we very seriously consider all of the

6    communications we get from Mr. Dondero.  There exists still a

7    material value gap in what is being offered under Mr.

8    Dondero's plan, as well as a quality of the value.

9        So, Your Honor, while we continue to consider the plan and

10    what we receive from Mr. Dondero, I do not want to leave Your

11    Honor with the impression that the Committee feels like we are

12    close to an agreement, and we anticipate going forward with

13    the plan next week.

14        That being said, we of course will respond to Mr. Dondero

15    as we review the plan, but as I sit here today, I don't

16    believe that we are close.  But, again, the Committee will

17    continue to review it, and we should anticipate going forward

18    with confirmation next week.

19            THE COURT:  All right.  So, you don't have any

20    problem with the plan being filed under seal?

21            MR. CLEMENTE:  Your Honor, we -- the Committee does

22    have the plan, and I guess I'm not sure I'd see the point of

23    having it filed it under seal.  I think it serves to confuse

24    issues.  But, you know, hearing what Your Honor said earlier,

25    I don't think we need to continue to bring different fights in

247

```
1   front of Your Honor, so I'm not sure that I see necessarily

2   the harm in a plan being filed under seal, again, with the

3   idea that, you know, why bring -- continue to bring fights to

4   Your Honor if we don't need to?

5           THE COURT:  All right.

6           MR. CLEMENTE:  But what I do think is clear, Your

7   Honor, that I do want to express to you is that the

8   representations in that motion the Committee do not believe

9   are accurate.  We do not believe that there's been a

10  significant value increase.  We do not believe that we are

11  close.  That would be the point that I would make in

12  connection with a response to that motion.  So, but in terms

13  of filing it under seal, I'm not sure the Committee has a

14  strong feeling that that should not happen.

15          THE COURT:  Yes.

16          MR. RUKAVINA:  And Your Honor, very quickly, --

17          THE COURT:  The words --

18          MR. RUKAVINA:  -- I never represented that we're

19  close.

20          THE COURT:  The words I remember in the motion were

21  significant value increase, something to that effect.  But

22  also more recovery than the plan that's on file.

23      (Echoing.)

24          THE COURT:  So I was kind of darn curious to see it

25  just for that.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 779 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/06/25   Page 847 of 1017   PageID 5526
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 778 of
2722

248

1          MR. RUKAVINA:  And Your Honor, obviously, because

2    there's many people on this call, I don't want to run afoul of

3    any kind of procedures.  I'd be happy to walk Your Honor

4    through, but I can't, not with 90 people on the call.

5          THE COURT:  Right.

6          MR. RUKAVINA:  I did not represent that we're close

7    to a settlement in that motion, and I did not send the plan to

8    those people that Mr. Pomerantz mentioned.

9        So, right now, the Committee, the Debtor, and the

10   employees, because they requested it after Mr. Pomerantz

11   approved it, have what I would like to file under seal.  I'm

12   not suggesting here today that it go any farther than being

13   filed under seal, but at least it be there for some record.

14         THE COURT:  Well, didn't you -- did I dream this? --

15   didn't you say that there would be something like 48 hours for

16   people to object or then it would be filed not under seal?

17   Did I dream that?

18         MR. RUKAVINA:  Your Honor, that was my proposal, and

19   Your Honor can certainly reject that.  Mr. Pomerantz asked

20   that the plan should never be unsealed pending confirmation of

21   the Debtor's plan.  I have a different proposal.  Your Honor

22   will rule and we'll comply with Your Honor's ruling.

23         MR. DONDERO:  Jim Dondero here.  Can I have two --

24   two quick minutes and just say two quick things?

25         THE COURT:  Well, only if your counsel permits it.  I

249

1  don't want to get in --

2         MR. RUKAVINA:  I just don't -- yeah.  Mr. Dondero, if

3  you would please just not describe the substance, the economic

4  substance of our proposed plan, not with so many people on the

5  line.

6         MR. DONDERO:  Sure.  I just want to make two quick

7  points.  I couldn't apologize more for taking the Court's time

8  today.  It wasn't our 'druthers.  You heard, I think, at least

9  five or six hours from the Debtor.  You never once heard them

10  say that their activities didn't violate the Advisers Act.

11  And they never once said that violating the Advisers Act

12  wasn't a big deal.  You know, they never said that.

13     What they tried to say, oh, we have these other contracts.

14  Let's try and turn this into an injunction against Dondero

15  interfering.  But they never -- they never denied that Dondero

16  and the NexPoint team was trying to do what was in the best

17  interest of investors and that they had violated the Advisers

18  Act.

19     I think, in normal course, each side would have had an

20  expert and you could have opined on whether it was a violation

21  of the Advisers Act, but they know they did something wrong so

22  they're trying to make it an injunction against me.   Okay.

23  That's all I have to say about that point.

24     As far as the alternative plan, Your Honor, we heard you

25  loud and clear.  And the economics that we put forward, I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 781 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 849 of 1017 PageID 5528
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 780 of
2722

250

1  can't talk them about specifically, but they're at least 20

2  percent better than what the Debtor has put forward as far as

3  a plan.  And what we put forward is elegant, it's simpler, it

4  treats the employees fairly, it gives the business continuity,

5  it gives investors continuity, and it's not just a harsh,

6  punitive liquidation that's going to end up in a myriad of

7  litigation.

8      We're paying a premium, it's a capitulation price, to try

9  and get to some kind of settlement.  And I encourage you to

10  look at it.  It's elegant.  It's straightforward.  It's

11  simple.  And now that you've encouraged and gotten us up to a

12  number that's well in excess of the Debtor, maybe a little

13  pressure on other people to treat employees fairly, maybe not

14  liquidate a business that's important in Dallas, that has been

15  a big business for a number of years, doing enormous good

16  things for a lot of people.

17      You know, we went into bankruptcy with $450 million of

18  assets and almost no debt.  And we've been driven into the

19  ground by the process.  And then the plan is to just harshly

20  liquidate going forward.  I -- I -- it's crazy.  I don't know

21  what else to do to stop the train other than what we've

22  offered.

23          THE COURT:  All right.  Well, I hear what you're

24  saying, and I do, just because -- I don't know if you left the

25  room or not, but we did have discussion of Section 206 of the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 782 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 850 of 1017    PageID 5529
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 781 of
2722

251

1   Investment Advisers Act today.  It was put on the screen.  Mr.

2   Post was asked what was unlawful as far as what had happened

3   here, what was going on here, what was fraudulent, deceptive,

4   or manipulative, in parsing through the words of the statute.

5   And he said Mr. Seery engaged in deceptive acts because he

6   wasn't trying to maximize value.  Okay?  I'm not an expert on

7   the Investment Advisers Act, but I know that that was not a

8   deceptive act.

9       And so I'll allow the plan to be filed under seal, but

10  it's not going to be unsealed absent an order of the Court.

11  Okay?  So we'll just leave it at that for now.  And while I

12  still encourage good-faith negotiations here, I've said it

13  umpteen times, where you're tired of the cliché, probably:

14  The train is leaving the station.  And if you want the Court

15  to have patience in the process and if you want the parties to

16  cooperate in good faith, it might help if we didn't have

17  things like Dugaboy and Get Good Trust filing a motion for an

18  examiner 15 months into the case.

19      I mean, it feels to me, Mr. Dondero, whether I'm right or

20  wrong, that it's like you've got a twofold approach here:  I

21  either get the company back or I burn the house down.  And I'm

22  telling you right now, if we don't have agreements, --

23          MR. DONDERO:  That's not true.

24          THE COURT:  -- if we don't have agreements and we

25  come back on the 5th for a continuation of this hearing and a

252

1  motion to hold you in contempt, you know, I'm leaning right

2  now, based on what I've heard so far, and I know I haven't

3  heard everything, but I'm leaning right now towards finding

4  contempt and shifting a whole bundle of attorneys' fees.

5  That, to me, seems like the likely place we're heading.

6      I mean, I commented at the December hearing on the

7  preliminary injunction against you personally that it had been

8  like a $250,000 hearing, I figured, okay, just guesstimating

9  everybody's billable rate times the hours we spent.  Well,

10 here we were again, and I know we've got all this time outside

11 the courtroom preparing, taking depositions.  I mean, what

12 else is a judge to think except, by God, let's drive up

13 administrative expenses as much as we can; if we can't win,

14 we're going to go down fighting?  That's what this looks like.

15 Okay?  So if it's not really what's going on, then you've got

16 to work hard to change my perceptions at this point.

17         MR. RUKAVINA:  Your Honor, I hear everything what

18 you're saying, and I'm going to discuss it very bluntly with

19 my clients.  But we're being asked not to exercise contract

20 rights in the future.  This is not a contempt hearing.  And

21 Your Honor, we did ask and offered the estate a million

22 dollars, found money, plus to waive almost all our plan

23 objections, if they would just put this case on pause for 30

24 days.

25      So we are trying.  We are trying creative solutions here.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 784 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 852 of 1017    PageID 5531
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 783 of
2722

253

1  We know that the train is leaving.  We've put our money where

2  our mouth is.  We will continue trying.  But Your Honor, this

3  is not a contempt proceeding, and my clients are not Mr.

4  Dondero.  You've heard they're independent boards.

5          MR. POMERANTZ:  I can't leave that last comment

6  without a response.  Yes, there was an offer of a million

7  dollars, by an entity that owes the estate multiples of that.

8  So they are offering to pay us something that they already owe

9  us.  So Mr. Rukavina continues try to do this.  We will not

10 stand for it.

11         MR. RUKAVINA:  That is not a fair statement, sir.  I

12 misrepresented nothing.  We were offering you a million

13 dollars, with no conditions, earned upon receipt, with no

14 credit, no deduction for any of our liability.  So you're free

15 to say no, sir, but you're not going to tell the judge that I

16 misrepresented something.

17         THE COURT:  All right.

18         MR. POMERANTZ:  Should tell the Court --

19         THE COURT:  You know what?

20         MR. POMERANTZ:  -- that that entity owed the Debtor.

21         THE COURT:  You know what?  You know what?  I am more

22 focused on, Mr. Rukavina, your comment that this Court can't

23 enjoin your clients from exercising contractual rights when,

24 again, in January of 2020, the representation was made and it

25 was ordered, "Mr. Dondero shall not cause any related entity

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 785 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 853 of 1017    PageID 5532
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 784 of
2722

254

1  to terminate any agreements with the Debtor."  Okay?  That was

2  -- go back and look at the transcript.  That was so meaningful

3  to me.

4      We were facing a possible trustee.  And that's what I did

5  in the *Acis* case.  Okay?  I had a Chapter 11 trustee.  And it

6  was not a perfect fit, to be sure.  But it is where we were

7  heading in this case, had the lawyers and parties not

8  negotiated what they did.  That was a very important

9  provision, convincing me that, you know what, I think the

10  structure they've got will be better than a trustee.  And it

11  has, for the most part.  But the fees have gone out the roof,

12  and I lay that at the feet of Mr. Dondero, for the most part.

13  Okay?  We have a bomb thrown every five minutes by either him

14  personally or the Dugaboy or the Get Good Trust or the Funds

15  or the Advisors or I don't know who else.  Okay?

16      So the train is leaving the station, unless you all come

17  to me and say, okay, we've maybe got a -- Mr. Pomerantz's word

18  -- grand solution here.  Okay?  If you get there in the next

19  few days, wonderful.  Okay?  But I don't know what else to say

20  except I'm tired of the carpet-bombing, and if I had to rule

21  this minute, there would be a huge amount of fee-shifting for

22  what we went through today, for what we went through in

23  December, for the restriction motion that, after I called it

24  frivolous, the lawyers were sending letters pretty much

25  regurgitating the same arguments.  All right.  So, not a happy

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 786 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 854 of 1017   PageID 5533
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 785 of
2722

255

1    camper.

2        But upload your order on the motion to seal the plan.

3    And, again, it's not going to be unsealed absent a further

4    order of the Court.  And if you all come to me next week and

5    say, hey, we've got something in the works here, okay, I'll

6    consider unsealing it and letting you go down a different

7    path.  But I'm not naïve.  I feel like this is just more

8    burning the house down, maybe.  I don't know.  I hope I'm

9    wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10   see you next week.

11          MR. POMERANTZ:  Thank you, Your Honor.

12          MR. MORRIS:  Thank you, Your Honor.

13          THE COURT:  All right.  We're adjourned.

14          MR. RUKAVINA:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16       (Proceedings concluded at 6:08 p.m.)

17                        --oOo--

18

19

20                      CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    /s/ Kathy Rehling                    01/28/2021

24   _____    _____
     Kathy Rehling, CETD-444                     Date
25   Certified Electronic Court Transcriber

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 787 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 855 of 1017   PageID 5534
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 786 of
2722

256

INDEX

PROCEEDINGS                                                      4

OPENING STATEMENTS

- By Mr. Morris                                                 19
- By Mr. Rukavina                                              31

WITNESSES

Debtor's Witnesses

James P. Seery
- Proffer of Direct Testimony by Mr. Pomerantz                  6

James D. Dondero
- Direct Examination by Mr. Morris                             42

Jason Post
- Direct Examination by Mr. Morris                            108

James P. Seery, Recalled
- Direct Examination by Mr. Morris                            152
- Cross-Examination by Mr. Hogewood                           170
- Redirect Examination by Mr. Morris                          188
- Examination by the Court                                    191

Defendants' Witnesses

Jason Post
- Direct Examination by Mr. Rukavina                          201
  Voir Dire Examination by Mr. Morris                         206
  Direct Examination, Resumed, by Mr. Rukavina                207

EXHIBITS

Debtor's Exhibits A through SSSSS (exclusive of   Received  19
  Exhibits UUUU, VVVV, and AAAAA)
Debtor's Exhibit D (Email)                        Received 200
Debtor's Exhibit K (Letter)                       Received 198
Debtor's Exhibit TTTTT                            Received  64

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 788 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 856 of 1017    PageID 5535
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 787 of
2722

257

INDEX
Page 2

RULINGS

<u>19-34054-sgj11 - Highland Capital Management, L.P.</u>

Motion of the Debtor for Entry of an Order             12
Authorizing the Debtor to Implement a Key Employee
Retention Plan with Non-Insider Employees and
Granting Related Relief filed by Debtor Highland
Capital Management, L.P. (1777) - *Granted*

<u>21-03000-sgj - Highland Capital Management, L.P. v.
Highland Capital Management Fund Advisors, L.P. et al.</u>

Agreed Settlement with CLO Holdco, Ltd.               15

Plaintiff's Motion for a Preliminary Injunction       233
against Certain Entities Owned and/or Controlled
by Mr. James Dondero (5) - *Continued*

END OF PROCEEDINGS                                    255

INDEX                                              256-257

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 789 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 857 of 1017 PageID 5536
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 788 of
2722

# EXHIBIT 8

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

2

| | | |
|---|---|---|
| 3 | In Re: ) | **Case No. 19-34054-sgj-11** |
| | ) | Chapter 11 |
| | ) | |
| 4 | HIGHLAND CAPITAL ) | Dallas, Texas |
| | MANAGEMENT, L.P., ) | Friday, January 8, 2021 |
| 5 | ) | 9:30 a.m. Docket |
| | ) | |
| 6 | Debtor. ) | |
| | _____ ) | |
| | ) | |
| 7 | HIGHLAND CAPITAL ) | **Adversary Proceeding 20-3190-sgj** |
| | MANAGEMENT, L.P., ) | |
| 8 | ) | |
| | Plaintiff, ) | PRELIMINARY INJUNCTION |
| 9 | ) | HEARING [#2] |
| | v. ) | |
| 10 | ) | |
| | JAMES D. DONDERO, ) | |
| 11 | ) | |
| | Defendant. ) | |
| 12 | _____ ) | |

13

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

14

15

WEBEX/TELEPHONIC APPEARANCES:

16

For the Debtor/Plaintiff:    Jeffrey N. Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
17                           10100 Santa Monica Blvd.,
                              13th Floor
18                           Los Angeles, CA  90067-4003
                             (310) 277-6910

19

For the Debtor/Plaintiff:    John A. Morris
20                           PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
21                           New York, NY  10017-2024
                             (212) 561-7700

22

23

24

25

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 790 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 858 of 1017    PageID 5537
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 789 of
2722

2

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero,        D. Michael Lynn
     Defendant:                John Y. Bonds, III
 3                             Bryan C. Assink
                               BONDS ELLIS EPPICH SCHAFER
 4                                JONES, LLP
                               420 Throckmorton Street,
 5                                Suite 1000
                               Fort Worth, TX  76102
 6                             (817) 405-6900

 7   For the Official Committee Matthew A. Clemente
     of Unsecured Creditors:   SIDLEY AUSTIN, LLP
 8                             One South Dearborn Street
                               Chicago, IL  60603
 9                             (312) 853-7539

10   For the Funds and         Davor Rukavina
     Advisors:                 MUNSCH HARDT KOPF & HARR, P.C.
11                             500 N. Akard Street, Suite 3800
                               Dallas, TX  75201-6659
12                             (214) 855-7554

13   For Certain Employees:    Frances A. Smith
                               ROSS & SMITH, P.C.
14                             Plaza of the Americas
                               700 N. Pearl Street, Suite 1610
15                             Dallas, TX  75201
                               (214) 593-4976
16
     Recorded by:              Michael F. Edmond, Sr.
17                             UNITED STATES BANKRUPTCY COURT
                               1100 Commerce Street, 12th Floor
18                             Dallas, TX  75242
                               (214) 753-2062
19
     Transcribed by:           Kathy Rehling
20                             311 Paradise Cove
                               Shady Shores, TX  76208
21                             (972) 786-3063

22

23

24
          Proceedings recorded by electronic sound recording;
25            transcript produced by transcription service.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 791 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 859 of 1017   PageID 5538
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 790 of
2722

3

1          DALLAS, TEXAS - JANUARY 8, 2021 - 9:41 A.M.

2          THE COURT:  All right.  We are here for Highland

3     Capital Management, L.P. versus James Dondero, a preliminary

4     injunction hearing.  This is Adversary 20-3190.

5        All right.  Let's start out by getting appearances from

6     counsel.  First, for the Plaintiff/Debtor, who do we have

7     appearing?

8          MR. MORRIS:  Your Honor, John Morris; Pachulski Stang

9     Ziehl & Jones.  I'm here with my partner, Jeff Pomerantz, and

10    others.

11         THE COURT:  All right.  Good morning.  All right.

12    For Mr. Dondero, who do we have appearing?

13         MR. LYNN:  Michael Lynn, together with John Bonds,

14    for Mr. Dondero.

15         THE COURT:  Good morning.

16       All right.  I know we have a lot of parties in interest

17    represented on the video or phone today.  I'm not going to go

18    through a roll call, other than I'll see if we have the

19    Committee, the Unsecured Creditors' Committee counsel on the

20    line.  Do we have anyone appearing for them?

21         MR. CLEMENTE:  Yes, good morning, Your Honor.

22    Matthew Clemente from Sidley Austin on behalf of the

23    Committee.

24         THE COURT:  Okay.  Thank you.  All right.

25         MR. CLEMENTE:  Thank you, Your Honor.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 792 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 860 of 1017   PageID 5539
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 791 of
2722

4

1          THE COURT:  Well, as I said, I'm not going to do a

2     roll call.  I don't think we had any specific parties in

3     interest, you know, file a pleading, or any other parties

4     other than the Debtor and Mr. Dondero in this adversary.  So

5     I'll just let the others kind of listen in without appearing.

6        All right.  Mr. Morris, are you going to start us off this

7     morning with, I don't know, an opening statement or any

8     housekeeping matters?

9          MR. MORRIS:  I have both an opening statement and

10    housekeeping matters.  I just wanted to see if Mr. Pomerantz

11    has anything he wants to convey to the Court before I begin.

12         MR. POMERANTZ:  (garbled)

13         THE COURT:  Mr. Pomerantz, if you could take your

14    device off mute, please.

15         THE CLERK:  He's off mute.  I don't know what --

16         THE COURT:  Okay.  Well, we're showing you're not on

17    mute, but we can't hear you.  What now?

18         THE CLERK:  He's not on mute now.  He's --

19         THE COURT:  Okay.  Go ahead, Mr. Pomerantz.

20       (Pause.)

21         THE CLERK:  He's not coming through.

22         THE COURT:  We're -- you're not coming through, and

23    we're not sure what the problem is.  We're not showing you on

24    mute.

25       (Pause.)

5

1           THE COURT:  All right.  Should we have him call back

2    in on his phone?  All right.  If you could, if you have a

3    phone, maybe you can try calling in on your phone and speak

4    through your phone, not your computer.

5           MR. MORRIS:  You know what, Your Honor?  I'm going to

6    proceed, and Mr. Pomerantz will address the Court at the

7    conclusion of the hearing on the motion.

8           THE COURT:  Okay.  Very good.  We usually hear him

9    loud and clear, so I don't know what's going on this morning.

10   Go ahead, Mr. Morris.

11          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

12          MR. MORRIS:  Yes.  Thank you very much, Your Honor.

13   John Morris; Pachulski Stang; for the Debtor.

14      We are here this morning, Your Honor, on the Debtor's

15   motion for preliminary injunction against Mr. Dondero.  We

16   filed last night also an emergency motion for an order to show

17   cause as to why this Court should not hold Mr. Dondero in

18   contempt of court --

19          THE COURT:  All right.

20          MR. MORRIS:  -- for violating a previously-issued

21   TRO.

22          THE COURT:  Yes.  Let me just interject, in case

23   there's any confusion by anyone.  I am not going to hear the

24   motion for show cause order this morning.  While I understand

25   you think there might be some efficiency and overlap in

6

1  evidence, it's not enough notice.  So we'll talk about

2  scheduling that at the end of the presentations this morning.

3  All right?

4         MR. MORRIS:  Thank you for addressing that, Your

5  Honor.

6         THE COURT:  Okay.

7         MR. MORRIS:  Your Honor, then let's just proceed

8  right to the preliminary injunction motion.  There is ample

9  evidence to support the Debtor's motion for a preliminary

10  injunction.  There would have been substantial evidence to

11  support it based on the conduct that occurred prior to the

12  issuance of the TRO, but the conduct that did occur following

13  the TRO only emphasizes the urgent need for an injunction in

14  this case.

15     I want to begin by just telling Your Honor what evidence

16  we intend to introduce here today.  We filed at Docket 46 in

17  the adversary proceeding our witness and exhibit list.  The

18  exhibit list contains Exhibits A through Y.  And at the

19  appropriate time, I will move for the admission into evidence

20  of those exhibits.

21     The exhibit list and the witness list also identifies

22  three witnesses for today.  Mr. Dondero.  Mr. Dondero is here

23  today.  Notwithstanding Your Honor's comments on December 10th

24  and on December 16th, when I deposed him on Tuesday he was

25  unsure whether he was going to come here today to testify.

7

1    And he will inform Your Honor of that on cross-examination.

2    And so the Debtor was forced to prepare and serve a subpoena

3    to make sure that he was here today.  But Mr. Dondero is here

4    today.

5        Following the conclusion of Mr. Dondero's deposition on

6    Tuesday, and based in part on the evidence adduced during that

7    deposition, the Debtor terminated for cause Scott Ellington

8    and Isaac Leventon.  We had asked counsel for those former

9    employees to accept service of a trial subpoena so that they

10   would appear today.  We were told that they would do so if we

11   gave them a copy of the transcript of Mr. Dondero's

12   deposition.

13       We thought that was inappropriate and we declined to do

14   so, and they declined to accept service of the subpoenas.  We

15   have spent two days with a professional process server

16   attempting to effectuate service of the trial subpoenas for

17   Mr. Ellington and Mr. Leventon, but we were unsuccessful in

18   doing that.  So we'll only have one witness today, unless we

19   have cause to call anybody on rebuttal, and that witness will

20   be Mr. Dondero.

21       I want to talk for a few moments as to what Mr. Dondero

22   will testify to and what the evidence will show.  Mr. Dondero

23   will testify that he never read the TRO, Your Honor.  He will

24   testify that he didn't participate in the motion on the

25   hearing for the TRO, that he never read Mr. Seery's

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 796 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 864 of 1017   PageID 5543
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 795 of
2722

8

1  declaration in support of the Debtor's motion for the TRO,

2  that he never bothered to read the transcript of the

3  proceedings on December 10th so that he could understand the

4  evidence that was being used against him.  He had no knowledge

5  of the terms of the TRO when he was deposed on Tuesday.

6      And that's the backdrop of what we're doing here today,

7  because he didn't know what he was enjoined from doing, other

8  than speaking to employees.  He actually did testify and he

9  will testify that he knew he wasn't supposed to speak with the

10  Debtor's employees, but he spoke with the Debtor's employees

11  in all kinds of ways, as the evidence will show.

12      The evidence will also show that Mr. Dondero violated the

13  TRO by throwing away the cell phone that the company bought

14  and paid for after the TRO was entered into.  He's going to be

15  unable to tell you who threw it away.  He's going to be unable

16  to tell you who gave the order to throw it away.  He's going

17  to be unable to tell you when after the TRO was entered the

18  phone was thrown away.

19      But we do have as one fact and as I believe one violation

20  of the TRO --

21          MR. POMERANTZ:  So, I'm on a WebEx.

22          MR. MORRIS:  Jeff, --

23          THE COURT:  Mr. Pomerantz, we heard you.  We heard

24  you say something.  So, apparently, you got your audio

25  working.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 797 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 865 of 1017    PageID 5544
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 796 of
2722

9

```
1     All right.  Mr. Morris, continue.

2          MR. MORRIS:  Yeah.  And what Mr. Dondero may tell

3   you, Your Honor, is that it's really Mr. Seery's fault that

4   the phone got thrown away, because Mr. Seery announced that

5   all of the employees were going to be terminated at the end of

6   January, and because Mr. Seery did that, he and I believe Mr.

7   Ellington thought it was appropriate to just throw their

8   phones away, without getting the Debtor's consent, without

9   informing the Debtor, and switching the phone numbers that

10  were in the Debtor's account to their own personal names.  So

11  that's Item No. 1.

12     Item No. 2 -- and this is in no particular order, Your

13  Honor.  I don't want you to think that I'm bringing these

14  things up in terms of priority.  But they're just the order in

15  which they came up in the deposition, and so I'm just

16  following it as well.

17     Item No. 2 is trespass.  On December 22nd, you will hear

18  evidence that Mr. Dondero personally intervened to yet again

19  stop trades that Mr. Seery was trying to effectuate in his

20  capacity as portfolio managers of the CLOs.  He did that just

21  six days after Your Honor dismissed as frivolous a motion

22  brought by the very Advisors and Funds that he owns and

23  controls.

24     Therefore, the very next day, the Debtor sent him a

25  letter, sent through counsel a letter, evicting him from the
```

10

1   premises, demanding the return of the phone, and telling him

2   that he had to be out by December 30th.

3       I was stunned, Your Honor, stunned, when I took his

4   deposition on Tuesday and he was sitting in Highland's

5   offices.  He hadn't asked for permission to be there.  He

6   hadn't obtained consent to be there.  But he just doesn't care

7   what the Debtor has to say here.  He just doesn't.

8       I don't know when he got there or when he left.  I don't

9   know if he spoke to anybody while he was there.  But he just

10  took it upon himself to show up in the Debtor's office,

11  notwithstanding the very explicit eviction notice that he got

12  on December 23rd.

13      Mr. Dondero, as I mentioned, clearly violated the TRO by

14  knowingly and intentionally and purposely interfering with the

15  Debtor's trading as the portfolio manager of the CLOs.  This

16  has just gone on too long.  There have been multiple hearings

17  on this matter, but he doesn't care.  So he gave the order to

18  stop trades that Mr. Seery had effectuated.  That's a clear

19  violation of the TRO, and it certainly supports the imposition

20  of a preliminary injunction.

21      Mr. Seery -- Mr. Dondero is going to testify that multiple

22  letters -- that I'm going to refer to them, Your Honor, as the

23  K&L Gates Parties, and those are the two Advisors and the

24  three investment funds and CLO Holdco that are all owned and/

25  or controlled by Mr. Dondero -- after that hearing on the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 799 of
Case 3:25-cv-02072-S    Document 15-7   Filed 10/06/25   Page 867 of 1017   PageID 5546
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 798 of
2722

11

```
 1   16th, K&L Gates, the K&L Gates Parties sent not one, not two,
 2   but three separate letters.  They said they may take steps to
 3   terminate the CLO management agreements.  After we evicted Mr.
 4   Dondero, sent a letter suggesting that we would be held liable
 5   for damages because we were interfering with their business.
 6        And Mr. Dondero is going to tell you, Your Honor, that he
 7   encouraged the sending of those letters, that he approved of
 8   those letters, that he thought those letters were the right
 9   things to send to the Debtor, even after -- even with the
10   knowledge of what happened on December 16th.
11        He's going to tell you he knew about that hearing and he
12   still, he still approves of those letters, and never bothered
13   to exercise his control to have those letters withdrawn upon
14   the Debtor's request.  We asked them to withdraw it, and when
15   they wouldn't do it, Your Honor, that's what prompted the
16   filing of yet another adversary proceeding.  And we're going
17   to have another TRO hearing next Wednesday because they won't
18   stop.
19        Next, a preliminary injunction should issue because Mr.
20   Dondero violated the TRO by communicating with the Debtor's
21   employees to coordinate their legal strategy against the
22   Debtor.  The evidence will show, in documents and in
23   testimony, that on December 12th, while he was prohibited from
24   speaking to any employee except in the context of shared
25   services, you're going to see the documents and you're going
```

12

1    to hear the evidence that on December 12th Scott Ellington was

2    actively involved in identifying a witness to support Mr.

3    Dondero's interests at the December 16th hearing.

4        You will receive evidence that on December 15th Mr.

5    Ellington and Mr. Leventon collaborated with Mr. Dondero's

6    lawyers to prepare a common interest agreement.

7        You will hear evidence that on the next day, December

8    16th, the day of that hearing, that Mr. Dondero solicited Mr.

9    Ellington's help to coordinate all of the lawyers representing

10   Mr. Dondero's interests, telling Mr. Ellington that he needed

11   to show leadership, and Mr. Ellington readily agreed to do

12   just that.

13       You will hear evidence that on December 23rd Mr. Ellington

14   and Grant Scott communicated in connection with calls that

15   were being scheduled with Mr. Dondero and with K&L Gates, the

16   very K&L Gates Clients who filed the frivolous motion that was

17   heard on December 16th and that persisted in sending multiple

18   letters threatening the Debtor thereafter.

19       You will hear evidence that late in December Mr. Dondero

20   sought contact information for Mr. Ellington and Mr.

21   Leventon's lawyer, and he will tell you that he did it for the

22   explicit purpose of advancing their mutual shared interest

23   agreement, while they were employed by the Debtor.  While they

24   were employed by the Debtor.

25       Finally, you will hear evidence, and it will not be

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 801 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 869 of 1017   PageID 5548
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 800 of
2722

13

1   disputed, you will see the evidence, it's on the documents,

2   that Mr. Dondero personally intervened to stop the Debtor from

3   producing the financial statements of Get Good and Dugaboy,

4   two entities that he controls, that the U.C.C. had been asking

5   for for some time, that the Debtor had been asking of its

6   employees for some time to produce.  And it was only when we

7   got, frankly, the discovery from Mr. Dondero when there's a

8   text message that says, Not without a subpoena.

9       The documents are on the Debtor's system.  We just don't

10  know where they are because they're hidden someplace.  But Mr.

11  Dondero knows where they are.  He can certainly force -- he

12  can certainly get them produced.  And one of the things we'll

13  be asking for when we seek the contempt motion is the

14  production of those very documents.

15      So, Your Honor, that's what the evidence is going to show.

16  I don't think there's going to be any question that a

17  preliminary injunction ought to issue.  But I do want to spend

18  just a few minutes rebutting some of the assertions made in

19  the filing by Mr. Dondero last night.

20      Of course, they offer no evidence.  There is no

21  declaration.  There is no document.  There is merely argument.

22  It's been that way throughout this case.  For a year, Mr.

23  Dondero has never stood before Your Honor to tell you why

24  something was wrong being done to him, why -- he hasn't

25  offered to be here at all, and he's here today, again, only

14

1  because he got a subpoena.  That's the only reason we know

2  he's here today.

3      So let's just spend a few minutes talking about the

4  assertions made in the document last night.  Mr. Dondero

5  complains about the scope of the injunction, and I say to

6  myself, in all seriousness, Are you kidding me?  You didn't

7  even read the TRO and you're going to be concerned about what

8  the scope of the injunction is?  You didn't even have enough

9  respect for the Court to read the TRO and we're going to worry

10  about the scope of some future injunction?  Doesn't make any

11  sense to me.

12      But let's talk about the specific arguments that they

13  make.

14      Third parties.  They're concerned that somehow third

15  parties don't have notice of the injunction.  Your Honor,

16  third parties are not impacted by the injunction.  The only

17  third parties that are impacted by the injunction are those

18  that are owned and/or controlled by Mr. Dondero.  If he

19  doesn't tell them, that's his breach of duty.  He created the

20  Byzantine empire of over 2,000 entities, and he wants the

21  Debtor to have the burden of notifying all of them so that

22  they can all come in here and make 2,000 arguments as to why

23  they shouldn't be enjoined?

24      He owns and controls them.  They are the only third

25  parties who are impacted by this proposed preliminary

15

1   injunction, and he has the responsibility, he has the duty to

2   inform them, because he owns and controls them.

3       We know of the K&L Gates Parties.  We know Get Good and

4   Dugaboy are in this courtroom.  We know CLO Holdco.  So many

5   of these parties have been so -- they're on the phone now.

6   They don't have notice?  It is insulting, frankly, to suggest

7   that the Debtor somehow has some obligation to figure out who

8   Mr. Dondero owns and controls.  He should know that.  That's

9   number one.

10      Number two, there is a statement in there about employees

11  and how he should be able to speak with them about personal

12  and routine matters.  As to that, Your Honor, he has forfeited

13  that opportunity.  He cannot be trusted.  There cannot be any

14  communication because nobody can police it.  And so we think a

15  complete bar to any discussion with any employee, except as it

16  relates to shared services -- because we do have a contractual

17  obligation; that's what was in it -- ought to be barred.

18  That's number one.

19      Number two, there's a reference in the objection to Mr.

20  Dondero's personal assistant.  I'd like to know who that is,

21  Your Honor.  I wasn't aware that he still was using a personal

22  assistant at the Debtor.  I want to know specifically who that

23  is.  I don't know that they -- you know, I just -- we need to

24  cut that off.  And he should not be communicating with any

25  employee.  The Debtor should not be paying for his personal

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 804 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 872 of 1017    PageID 5551
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 803 of
2722

16

1   assistant.

2       It's offensive to think that he's still doing that,

3   particularly after he was terminated or his resignation was

4   requested back in October precisely because his interests were

5   adverse to the Debtor.

6       Number three, he's concerned that the Debtor is somehow

7   preventing him from speaking to former employees.  We now

8   know, Your Honor, that that's a, I'm sure, a very specific

9   reference to Mr. Ellington and Mr. Leventon.  Right?  He wants

10  a green light to be able to do that.  And you know, I'll leave

11  it to Your Honor as to whether that's appropriate.  I'll leave

12  it to their counsel as to whether, going forward, colluding

13  together against the Debtor at this point in time is in

14  anybody's best interest.  But I will -- what I will demand in

15  the preliminary injunction is a very explicit statement that

16  Mr. Ellington and Mr. Leventon are not to share any

17  confidential or privileged information that they received in

18  their capacity as general counsel and assistant general

19  counsel of the Debtor.

20      The pot plan.  He's afraid somehow the order is going to

21  prevent him from pursuing the pot plan.  He's had over a year

22  to pursue this pot plan, Your Honor.  Frankly, I don't, you

23  know, I don't know what to say.  He has never made a proposal

24  that has gotten any traction with the only people who matter.

25  And it's not the Debtor.  It's the creditors.  It's the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 805 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 873 of 1017    PageID 5552
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 804 of
2722

17

1    Creditors' Committee.

2        If you want to put in an exception that he can call Matt

3    Clemente, I don't mean to put this on Mr. Clemente, he can

4    decide whether or not that's appropriate, but the creditors

5    are the only ones who matter here.  Your Honor, it's not the

6    Debtor.

7        And I'll let Mr. Dondero's counsel explain to Your Honor

8    why he thinks he still needs to pursue a pot plan, and Your

9    Honor can decide.  I trust Your Honor to decide what

10   boundaries and what guardrails might be appropriate for him to

11   continue to pursue his pot plan.

12       That's all I have, Your Honor.  Not much.

13             THE COURT:  All right.

14             MR. MORRIS:  But I think there's going to be --

15   there's going to be an awful lot of evidence.  This is going

16   to be a lengthy examination.  I ask the Court for your

17   patience.

18             THE COURT:  I've got --

19             MR. MORRIS:  But that's all I have.

20             THE COURT:  I've got all day, if we need it.

21             MR. MORRIS:  Okay.

22             THE COURT:  I hope we don't, but I've got all day if

23   we need it.  All right.

24             MR. MORRIS:  That's what I have, Your Honor.

25             THE COURT:  All right.  Mr. Dondero's counsel, your

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 806 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 874 of 1017 PageID 5553
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 805 of
2722

18

1  opening statement?

2        MR. BONDS:  Your Honor, I would reserve my opening

3  statement to the end of the hearing.

4     I would also point out that anything that Mr. Morris just

5  said was not evidence, and we think that the evidence will

6  show completely differently than argued or articulated by Mr.

7  Morris.

8        THE COURT:  All right.

9        MR. BONDS:  That's all.

10        THE COURT:  Thank you, Mr. Bonds.

11     Mr. Morris, you may call your witness.

12        MR. MORRIS:  The Debtor calls James Dondero.

13        THE COURT:  All right.  Mr. Dondero, this is Judge

14  Jernigan.  I would ask you to say, "Testing, one, two," so we

15  pick up your video so I can swear you in.

16     All right.  Mr. Dondero, if you're speaking up, we're not

17  hearing you, so please make sure you're unmuted and have your

18  video --

19     (Echoing.)

20        MR. DONDERO:  Hello.  One, two.

21        THE COURT:  Okay.  We got you.

22        MR. DONDERO:  One, two three.

23        THE COURT:  We got you now.

24        JAMES D. DONDERO, PLAINTIFF'S WITNESS, SWORN

25        THE COURT:  All right.  Thank you.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 807 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 875 of 1017 PageID 5554
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 806 of
2722

Dondero - Direct                    19

 1      Mr. Morris, go ahead.

 2           MR. MORRIS:  Thank you, Your Honor.

 3      (Echoing.)

 4           THE COURT:  I'm going to ask everyone except Mr.

 5  Dondero and Mr. Morris to put your device on mute.  We're

 6  getting a little distortion.

 7      All right.  Go ahead.

 8                     DIRECT EXAMINATION

 9  BY MR. MORRIS:

10  Q    Good morning, Mr. Dondero.  Can you hear me?

11  A    Yes.

12      (Echoing.)

13           THE COURT:  Ooh.  Okay.  We're having a little echo

14  when you speak, Mr. Dondero.  Do you have -- well, first, you

15  have headphones.  That always helps.

16      (Echoing.)

17           THE COURT:  Okay.  That may help as well.

18      (Pause.)

19           THE COURT:  Okay.  Let's try again.  If you could

20  say, "Testing, one, two."

21           THE WITNESS:  Is that better?

22           THE COURT:  That is better, yes.

23      All right.  Go ahead.

24           THE WITNESS:  Okay.  Great.

25           MR. MORRIS:  Thank you.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 808 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 876 of 1017    PageID 5555
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 807 of
2722

                        Dondero - Direct                    20

 1  BY MR. MORRIS:

 2  Q    Can you hear me, Mr. Dondero?

 3  A    You're a bit faint.  Give me one second.  Okay.  Got you.

 4  Q    Okay.  Thank you.  Who is in the room with you right now?

 5  A    Bonds, Lynn, and a tech.

 6         A VOICE:  Bryan Assink.

 7         THE WITNESS:  Oh, is Assink here?  Oh, okay, I'm

 8  sorry.  All right.  I'm sorry.  Bonds, Lynn, and Bryan Assink.

 9  BY MR. MORRIS:

10  Q    Okay.  You're testifying today pursuant to a subpoena,

11  correct?

12  A    Yes.

13  Q    Okay.

14         MR. MORRIS:  And Your Honor, that subpoena can be

15  found at Docket No. 44 in the adversary proceeding.

16         THE COURT:  All right.

17  BY MR. MORRIS:

18  Q    In the absence of a subpoena, in the absence of a

19  subpoena, you didn't know if you would show up to testify at

20  this hearing; is that right?

21  A    I -- I do what my counsel directs me to do, and I didn't

22  know at that time whether they would direct me to come or not.

23  Q    Okay.  And when I -- when I deposed you earlier this week,

24  you agreed that you may or may not testify; is that right?

25  A    It depends on what counsel instructs me to do, correct.  I

                          Dondero - Direct                    21

1   didn't know at the time.

2   Q   Okay.  And you didn't mention anything about counsel when

3   I asked you the questions earlier this week, correct?

4   A   That was the undertone in almost all my answers, that I

5   relied on counsel.

6           MR. MORRIS:  Your Honor, I move to strike.  I'm

7   asking very specific questions.  And if I need to go to the

8   deposition transcript, I'm happy to do that.

9           THE COURT:  All --

10          MR. MORRIS:  Just going forward, Your Honor, this is

11  cross-examination.  It's really yes or no at this point.

12  That's what I would request, anyway.

13          THE COURT:  All right.  Mr. Dondero, do you

14  understand --

15      (Echoing.)

16          THE COURT:  Do you understand what Mr. Morris was

17  raising there?  We really need you to give specific answers --

18  and usually they're going to be yes or no answers -- to Mr.

19  Morris's questioning.  Okay?  So let's try again.  Mr. Morris,

20  go ahead.

21          THE WITNESS:  Yeah.

22  BY MR. MORRIS:

23  Q   Mr. Dondero, you're aware that Judge Jernigan granted the

24  Debtor's request for a TRO against you on December 10th,

25  correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 810 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 878 of 1017    PageID 5557
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 809 of
2722

Dondero - Direct                    22

```
 1   A    Yes.

 2   Q    But you never reviewed the declaration that Mr. Seery

 3   filed in support of the Debtor's motion for a TRO, correct?

 4   A    I relied on counsel.

 5   Q    Sir, you never reviewed the declaration that Mr. Seery

 6   filed in support of the Debtor's motion for a TRO, correct?

 7   A    Correct.

 8   Q    You didn't even know the substance of what Mr. Seery

 9   alleged in his declaration at the time that I deposed you on

10   Tuesday, correct?

11   A    Correct.

12   Q    And that's because you didn't even think about the fact

13   that the Debtor was seeking a TRO against you; isn't that

14   right?

15   A    No.

16   Q    That's not right?

17   A    No.

18   Q    All right.

19        MR. MORRIS:  Your Honor, could I ask my assistant,

20   Ms. Canty, to put up on the screen what had been designated as

21   the Debtor's Exhibit Z in connection with the motion for

22   contempt?  Exhibit Z is the transcript from Tuesday's hearing.

23        THE COURT:  All right.

24        MR. MORRIS:  And I would like to -- I'd like to

25   cross-examine Mr. Dondero on his testimony on Tuesday.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 811 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 879 of 1017 PageID 5558
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 810 of
2722

Dondero - Direct                      23

```
 1           THE COURT:  All right.  You may.
 2           MR. MORRIS:  Can we put up Page 15, please?  And go
 3   to Lines 15 through 17.
 4   BY MR. MORRIS:
 5   Q   Sir, you recall being deposed on Tuesday by my -- by me,
 6   correct?
 7   A   Yes.
 8   Q   Okay.  Did you hear this question and did you hear this
 9   answer?
10       "Q   Did you care that the Debtor was seeking a TRO
11       against you?
12       "A   I didn't think about it."
13   Q   Is that -- is that your testimony from the other day?
14   A   Yes.
15   Q   You didn't dial in to the hearing when the Court
16   considered the Debtor's motion for a TRO against you, did you?
17   A   I -- I don't recall.  I don't think so.
18   Q   You never read the transcript in order to understand what
19   took place in this courtroom when Judge Jernigan decided to
20   enter a TRO against you; isn't that right?
21   A   I relied on counsel, which has been my testimony all
22   along.
23           MR. MORRIS:  Can we go to Page 13 of the transcript,
24   please?  Beginning at Line 24.
25   BY MR. MORRIS:
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 812 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 880 of 1017   PageID 5559
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 811 of
2722

Dondero - Direct                   24

1  Q    (reading)

2      "Q   Did you read a transcript of the hearing?

3      "A   No."

4  Q   Did you testify on Tuesday that you did not read a

5  transcript of the hearing?

6  A   Yes.

7  Q   In fact, as of at least last Tuesday, you hadn't even

8  bothered to read the TRO that this Court entered against you.

9  Isn't that right?

10      MR. BONDS:  Your Honor, I'm going to object.

11     (Echoing.)

12      THE COURT:  Okay.  We're getting that echo from you

13  now, Mr. Bonds.  So maybe you need to turn your volume down a

14  little.  But what is the basis for your objection?

15     (Echoing.)

16      MR. BONDS:  Leading and rhetorical.

17      MR. MORRIS:  I think it's because they're in the same

18  room.

19      THE COURT:  Okay.  Do you have -- I don't know what

20  you're doing.  I guess you're moving to a different room?

21      MR. BONDS:  I am, Your Honor.

22      THE COURT:  Okay.

23     (Echoing.)

24      THE COURT:  Okay.  I'm waiting for the objection

25  basis.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 813 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 881 of 1017   PageID 5560
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 812 of
2722

Dondero - Direct                         25

1          MR. BONDS:  The basis of the objection, Your Honor,

2   is that --

3      (Echoing.)

4          THE COURT:  Okay.  We're going to have to do

5   something different here.  We can't have this issue for the

6   entire hearing.  Do you need to get a tech person in there, or

7   maybe call in on your phone?  I don't know.

8          MR. BONDS:  Your Honor, I'm going into the conference

9   room.

10     (Pause.)

11         THE COURT:  Okay.  Are we going to try again here?

12         MR. BONDS:  Yes.  Is this working?

13         THE COURT:  Yes.

14         MR. BONDS:  Perfect.  Your Honor, my objection is

15  that Mr. Dondero has already testified that he relied on his

16  lawyers.  I don't know where Mr. Morris is going with this,

17  but it's pretty clear that Mr. Dondero simply relies on his

18  lawyers to tell him what happened.  I don't know that that's

19  that different than any other layperson.

20         MR. MORRIS:  Your Honor, if this is --

21         THE COURT:  Well, --

22         MR. MORRIS:  If I may?

23         THE COURT:  Yes.

24         MR. MORRIS:  I believe it's terribly relevant to know

25  how seriously Mr. Dondero takes this Court and this Court's

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 814 of
Case 3:25-cv-02072-S    Document 15-7   Filed 06/25    Page 882 of 1017   PageID 5561
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 813 of
2722

Dondero - Direct                    26

1   proceedings and this Court's orders.  If the Court decides

2   that it doesn't matter whether or not he read the transcript,

3   you're the fact-finder and you'll make that decision.  But I

4   believe it's at least relevant.

5           THE COURT:  Okay.  I agree and I overrule the

6   objection.

7       Go ahead.

8   BY MR. MORRIS:

9   Q   Mr. Dondero, as of at least Tuesday, you never bothered to

10  read the TRO that was entered against you, correct?

11  A   I'm sorry.  We're dealing with some tech stuff here for a

12  second.  Can you repeat the question?

13  Q   Yes.

14      (Echoing.)

15  Q   As of Tuesday, you had not bothered to read the TRO that

16  was entered against you?

17      (Echoing.)

18          MR. MORRIS:  Your Honor, can we take a break?  I

19  can't do this.  I just --

20          THE COURT:  Okay.  I agree.  Okay.  Mr. Bonds, what

21  do we need to do to fix these technical problems?  Do I need

22  to get my IT guy in here and help you?  This is terrible.

23  This connection is terrible.  And I understand people have

24  technical problems sometimes, but we've been doing these video

25  hearings since March, so --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 815 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 883 of 1017   PageID 5562
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 814 of
2722

Dondero - Direct                      27

1              MR. BONDS:  Your Honor, I have simply gone to another

2     conference room.  The Debtor (garbled) I think that Mr.

3     Dondero should be fine.

4              THE COURT:  Okay.  I don't know what you said except

5     that you think Mr. Dondero should be fine.  I --

6              MR. MORRIS:  Is there anybody in that room with a

7     cell phone on, Mr. Dondero?

8              THE WITNESS:  No.

9              MR. BONDS:  And I'm completely over in --

10             THE COURT:  Okay.

11             MR. MORRIS:  Can I try and proceed?

12             THE COURT:  Try to proceed.

13             MR. MORRIS:  Okay.

14        (Echoing.)

15    BY MR. MORRIS:

16    Q   Mr. Dondero, as of Tuesday you only had a general view of

17    what this Court restrained you from doing; is that correct?

18        (Echoing.)

19             MR. MORRIS:  I'd still -- I -- there's too much

20    noise, Your Honor.  I can't do it.

21             THE COURT:  Okay.  We're going to take a five-minute

22    break.  Mr. Bonds, can you get a technical person there to

23    work through these problems?

24        And Mike, let's get Bruce up here to --

25             THE CLERK:  It's because they're in the same room.

Dondero - Direct                    28

1    That's the problem.

2              THE COURT:  They're -- they're --

3              THE CLERK:  Judge Jernigan, this is Traci.  Bruce is

4    on his way up there.

5              THE COURT:  Thank you.

6        Mike, explain it to me, because I don't understand.

7    You're saying if they have two devices on in the same room?

8              THE CLERK:  The same -- that's the problem.  They're

9    so close.  And they're trying to use the same device, give it

10   back to you.

11             A VOICE:  He has a phone on in the room.

12             MR. MORRIS:  I asked that question.

13             THE COURT:  Okay.

14             MR. MORRIS:  Please instruct the witness to exclude

15   everybody from the room, to turn off all electronic devices

16   except the device that's being used for this (garbled).  At

17   least have --

18             THE COURT:  All right.  So, the consensus of more

19   technical people than me is you've got two devices on in the

20   same room and that's what's causing the distortion and echo.

21   So I don't know if it's somebody's phone that needs to be

22   turned off or if you have two iPads or laptops.

23        (Court confers with Clerk.)

24        (Pause.)

25             MR. BONDS:  I think I'm unmuted.  Can people hear me?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 817 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 885 of 1017 PageID 5564
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 816 of
2722

Dondero - Direct                    29

1           THE WITNESS:  Yes.

2      (Pause.)

3           THE COURT:  Okay.  Bruce, can you walk their office

4  through?  They have, I think, two devices in the same room.

5  It's a horrible echo.  So, Mr. Bonds or some --

6           MR. BONDS:  Yes, Your Honor.

7           THE COURT:  We have a lawyer and the lawyer's client

8  who is testifying right now in the same room.

9           I.T. STAFF:  Uh-huh.

10          THE COURT:  And --

11          I.T. STAFF:  Yeah.  Yeah.  Because -- is one a call-

12  in user on a telephone?

13          THE COURT:  I don't know.  I don't --

14          I.T. STAFF:  Yeah.  Whatever's coming -- the audio is

15  feeding back in.  They need to separate if they're both on.

16  Or just use one and the attorney can slide over and the client

17  can --

18          THE COURT:  Okay.

19          I.T. STAFF:  -- go in his place.  Just use one --

20          THE COURT:  Our IT person is confirming what everyone

21  else has been saying, that you really can only have one device

22  in the same room.  It's just unavoidable, the echoing.

23          I.T. STAFF:  Unless everybody has --

24          THE COURT:  Unless everyone has headphones on.

25          I.T. STAFF:  Right.

Dondero - Direct                    30

1           THE COURT:  So we either need everyone to have

2    headphones on, or one device in the room.  And you all,

3    awkward as it is, just have to share.  Or I guess you could

4    have two laptops, but one person has to --

5           I.T. STAFF:  Has to have a headset.

6           THE COURT:  Has to --

7           I.T. STAFF:  Because the other one, the audio is

8    going to be feeing into the microphone of the other one.

9           THE COURT:  Okay.  So, Mr. Bonds, I don't know if

10   you've heard any of that, but --

11          THE CLERK:  He needs to unmute himself.

12          THE COURT:  You're on mute, Mr. Bonds.

13          MR. BONDS:  I'm sorry, Your Honor.  I'm going to sit

14   next to Mr. Dondero and answer any questions that may come up.

15          THE COURT:  Okay.

16          MR. BONDS:  If any objections --

17          THE COURT:  Okay.  So we're going to have one device?

18          MR. BONDS:  Yes.

19          THE COURT:  Okay.  Let's try again.

20      Okay.  Go ahead, Mr. Morris.

21   BY MR. MORRIS:

22   Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

23          THE COURT:  I didn't hear you, Mr. Morris.  What?

24   BY MR. MORRIS:

25   Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 819 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 887 of 1017   PageID 5566
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 818 of
2722

```
                           Dondero - Direct                    31
```

 1   A    I have no idea.

 2   Q    Is Mr. Leventon listening to this hearing?

 3   A    I have no idea.  I haven't spoken with him.

 4   Q    Okay.  So let's try again.  At least as of today, you

 5   never bothered to read the TRO that was entered against you,

 6   correct?

 7   A    Correct.

 8   Q    As of Tuesday, you only had a general understanding of

 9   what the Court restrained you from doing, correct?

10        (Echoing.)

11   A    I had an adequate understanding.

12   Q    You had a what?

13   A    Adequate understanding.

14   Q    Your understanding --

15            A VOICE:  Your Honor?

16   BY MR. MORRIS:

17   Q    -- was that you were prohibited from speaking to the

18   Debtor's board without counsel and from speaking to the

19   Debtor's employees; is that right?

20   A    No.

21   Q    Okay.

22            MR. MORRIS:  Can we go to Page 13, Line 8, please?

23   BY MR. MORRIS:

24   Q    Were you asked this question and did you give this answer?

25        "Q    Tell me your understanding of what the temporary

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 820 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 888 of 1017    PageID 5567
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 819 of
2722

Dondero - Direct                        32

1       restraining order restrains you from doing.

2       "A   To talk to Independent Board directly or talking

3       directly with employees.

4       "Q   Is there any other aspect of the temporary

5       restraining order that you're aware of that would

6       otherwise constrain or restrain your conduct?

7       "A   Those are the points I (garbled)."

8    Q   Did you give those answers to the questions that I asked?

9    A   Yes.

10   Q   And even with that general understanding, you went ahead

11   and communicated directly (garbled) employees many, many, many

12   times after the TRO was entered?

13   A   Only with regard to shared services, pot plan, and

14   Ellington, the settlement counsel.

15   Q   Does the restraining order permit you to speak with

16   Debtor's employees about the pot plan?

17       (Echoing.)

18           THE COURT:  Mr. Morris, let me stop.

19           MR. MORRIS:  Yeah.  I appreciate that, Your Honor.

20           THE COURT:  Even --

21           MR. MORRIS:  It's not working.

22           THE COURT:  Even your sound is not coming through

23   clearly.  And I think it's the echo coming out of their

24   speakers, Mr. Dondero and Mr. Bonds' speakers.  But before we

25   conclude that, would you turn off your video and ask your

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 821 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 889 of 1017    PageID 5568
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 820 of
2722

Dondero - Direct                          33

 1  question again and see if it's any better, just to confirm

 2  it's not a bandwidth issue on your end?  I doubt it is, but --

 3  okay.  So, try asking your question again, and I'm going to

 4  see if it's still distorted.

 5  BY MR. MORRIS:

 6  Q    There's nothing in the TRO that permitted you to speak

 7  with Debtor employees about the pot plan, correct?

 8          THE COURT:  Okay.  Mr. Morris, it's not at your end.

 9  It's -- it's their end.  Okay.  So you can turn your video

10  back on.

11      Mr. Bonds?

12          MR. BONDS:  Yes, ma'am.

13          THE COURT:  You all are going to have to use earbuds,

14  apparently.  We're getting -- we're getting a feedback loop,

15  okay?  Whenever Mr. Morris talks or I talk, we're hearing

16  ourselves echo through your speakers.

17          MR. BONDS:  Can you check right now to see if it's

18  true, if we're experiencing the same problem?

19          THE WITNESS:  In other words, is this better?  We

20  unplugged the cord here.

21          THE COURT:  Well, when you all speak, it's -- it's

22  better now.  But when --

23          MR. MORRIS:  It is better.

24          THE COURT:  But when Mr. Morris asks a question, it's

25  echoing through your speakers.  But I don't hear myself

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 822 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 890 of 1017   PageID 5569
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 821 of
2722

Dondero - Direct                         34

 1  echoing through your speakers.

 2          I.T. STAFF:  Can Mr. Morris say something, please?

 3          THE COURT:  Mr. Morris, say something.

 4          MR. MORRIS:  They may have solved the problem.  They

 5  may have solved the problem.  How's that?

 6          THE COURT:  Okay.  I think the problem is solved,

 7  whatever you did, so let's try once again.

 8       Go ahead, Mr. Morris.  Repeat your last question.  I

 9  didn't hear it.

10  BY MR. MORRIS:

11  Q   Mr. Dondero, the temporary restraining order doesn't

12  permit you to speak with the Debtor's employees about a pot

13  plan; isn't that right?

14  A   There was a presentation on the pot plan given to the

15  Independent Board after the restraining order was put in

16  place.  What are you implying, that that wasn't proper?

17          MR. MORRIS:  Your Honor, I move to strike.  It's a

18  very simple question.

19          THE COURT:  Okay.  Sustained.  If you could just

20  answer the specific question, Mr. Dondero.

21          THE WITNESS:  I don't know.

22  BY MR. MORRIS:

23  Q   Fair enough.  Sir, let's talk about some of the events

24  that led up to the imposition of the TRO.  I appreciate the

25  fact that you hadn't read Mr. Seery's declaration or any of

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 823 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 891 of 1017   PageID 5570
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 822 of
2722

Dondero - Direct                        35

1   the evidence that was submitted in connection with the TRO, so

2   let's spend some time talking about that now.  CLO stands for

3   Collateralized Loan Obligation, correct?

4   A    Yes.

5   Q    And the Debtor is party to certain contracts that give it

6   the exclusive right and responsibility to manage certain CLOs,

7   correct?

8   A    Yes.

9   Q    NexPoint Advisors, LP is an advisory firm.  Do I have that

10  right?

11  A    Yes.

12  Q    And we can refer to that, that firm, as NexPoint; is that

13  fair?

14  A    Yes.

15  Q    You have a direct or indirect ownership interest in

16  NexPoint, correct?

17  A    Yes.

18  Q    You're the president of NexPoint; isn't that right?

19  A    Yes.

20  Q    And as the president of NexPoint, it's fair to say that

21  you control that entity, correct?

22  A    To a certain extent.

23  Q    Sir, as the president of NexPoint, it's fair to say that

24  you control that entity, correct?

25  A    To a certain extent.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 824 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 892 of 1017    PageID 5571
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 823 of
2722

Dondero - Direct                        36

1        MR. MORRIS:  Can we go to Page 18 of the transcript,

2   please?  Lines 19 and 21.

3   BY MR. MORRIS:

4   Q    Were you asked this question and did you give this answer?

5        "Q   As the president of NexPoint, it's fair to say

6        that you control that entity?

7        "A   Generally."

8   Q    Is that the right answer that you gave the other day?

9   A    I think it's similar to what I just said, yeah, yeah.

10  Q    Sir, you're familiar with Highland Capital Management Fund

11  Advisors, LP; is that right?

12  A    Yes.

13  Q    And we'll call that Fund Advisors; is that fair?

14  A    Yes.

15  Q    And we'll refer to Fund Advisors and NexPoint together as

16  the Advisors; is that okay?

17  A    Yes.

18  Q    Fund Advisors is also an advisory firm, correct?

19  A    Yes.

20  Q    You have a direct or indirect ownership interest in Fund

21  Advisors, correct?

22  A    Yes.

23  Q    You're the president of Fund Advisors, correct?

24  A    Yes.

25  Q    And you also have an ownership interest in the general

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 825 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 893 of 1017   PageID 5572
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 824 of
2722

```
                        Dondero - Direct                  37
```

1  partner of Fund Advisors; isn't that right?

2  A    I believe so.

3  Q    It's fair to say that you control Fund Advisors, correct?

4  A    Generally.

5  Q    NexPoint and Fund Advisors manage certain investments

6  funds; is that right?

7  A    Yes.

8  Q    Among the funds that they manage are High Point Income

9  Fund; is that right?

10 A    I don't think that's a name that we manage.

11 Q    Let's put it this way.  There are three funds that are

12 represented by K&L Gates that are managed by the Advisors,

13 correct?

14 A    I don't know.

15 Q    Okay.  You're the portfolio manager of the investment

16 funds advised by NexPoint and Fund Advisors, correct?

17 A    Largely.

18 Q    And NexPoint and Fund Advisors caused the investment funds

19 that they manage to invest in CLOs that are managed by the

20 Debtors, correct?

21 A    Years ago, they bought the equity interests, if that -- if

22 that's what you're asking me, in various CLOs.

23 Q    The two Advisors that you own and control caused the

24 investment funds to purchase interests in CLOs that are

25 managed by the Debtor, correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 826 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 894 of 1017   PageID 5573
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 825 of
2722

Dondero - Direct                    38

1   A    Not recently.  Not recently.  Years ago.  Yes.

2   Q    And they still hold those interests today, correct?

3   A    Yes.

4   Q    And K&L Gates represents all of those entities, correct?

5   A    Yes.

6   Q    And we'll call those the K&L Gates Clients; is that fair?

7   A    Yes.

8   Q    Before the TRO was entered, the K&L Gates Clients sent two

9   letters to the Debtor concerning the Debtor's management of

10  certain CLOs, right?

11  A    Yes.

12  Q    Okay.

13          MR. MORRIS:  Your Honor, I just want to take a moment

14  now, because we're going to start to look at some documents.

15  The Debtor would respectfully move into evidence Exhibits A

16  through Y that are on their exhibit list.

17          THE COURT:  All right.

18          MR. BONDS:  Your Honor, we have no objection.

19          THE COURT:  A through Y are admitted.  And for the

20  record, these appear at Docket No. 46 in this adversary.

21      (Plaintiff's Exhibits A through Y are received into

22  evidence.)

23          MR. MORRIS:  Okay.  Can we please put up Exhibit B as

24  in boy?  (Pause.)  Ms. Canty?  If you need a moment, just let

25  us know.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 827 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 895 of 1017   PageID 5574
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 826 of
2722

Dondero - Direct                         39

1          MS. CANTY:  Yeah.  I'm pulling it up right now.

2          MR. MORRIS:  Thank you.  (Pause.)  Can you scroll

3   down just a bit?

4   BY MR. MORRIS:

5   Q   All right.  Can you see this letter was sent on October

6   16th?

7   A   Yes.

8   Q   And we see the entities that are reflected on this letter.

9   We've got Highland Capital Management, LP.  That's the

10  question that they're asking.  And the questions and the

11  statements are being asserted on behalf of NexPoint Advisors,

12  LP.  Do you see that?

13  A   Yes.

14  Q   And Highland Capital Management Fund Advisors, LP.  Those

15  are the two Advisors that you own and control, correct?

16  A   Control to a large extent.

17  Q   Okay.

18          MR. MORRIS:  And can we put up Exhibit C, please?

19  BY MR. MORRIS:

20  Q   This is a second letter sent by NexPoint on November 24th.

21  Do you see that?

22  A   Yes.

23  Q   Okay.  And you're familiar with the substance of these

24  letters, correct?

25  A   Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 828 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 896 of 1017    PageID 5575
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 827 of
2722

                            Dondero - Direct                    40

 1   Q    And you were familiar -- you were aware of these letters

 2   before they were sent.  Is that correct?

 3   A    Yes.

 4   Q    And you generally discussed the substance of these letters

 5   with NexPoint; is that right?

 6   A    Generally, yes.

 7   Q    And you discussed the substance of the letters with the

 8   Advisors' internal counsel; is that right?

 9   A    Yes.

10   Q    That's D.C. Sauter?

11   A    Yes.

12   Q    And you have been on some calls with K&L Gates about these

13   letters, right?

14   A    I believe so.

15   Q    And you knew these letters were being sent, correct?

16   A    Yeah, they're -- they're reported.

17   Q    You knew these letters for being sent; isn't that right,

18   sir?

19   A    Yes.

20   Q    And you didn't object to the sending of these letters,

21   correct?

22   A    No.

23   Q    In fact, you supported the sending of these letters.  Is

24   that right?

25   A    Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 829 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 897 of 1017   PageID 5576
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 828 of
2722

Dondero - Direct                    41

1   Q   And you have never directed NexPoint to withdraw these

2   letters, correct?

3   A   No.

4   Q   Around Thanksgiving, you learned that Mr. Seery had given

5   a direction to sell certain securities owned by the CLOs

6   managed by the Debtors, correct?

7   A   Yes.

8   Q   And when you learned that, you personally intervened to

9   stop the trades, correct?

10  A   Yes.  I believe they were inappropriate.

11       MR. MORRIS:  I move to strike the latter part of the

12  answer, Your Honor.

13       THE COURT:  It's stricken.

14       MR. MORRIS:  Can we put up Exhibit D, please?

15  BY MR. MORRIS:

16  Q   We looked at this email string the other day.  Do you

17  recall that?

18  A   Yes.

19       MR. MORRIS:  Can we start at the bottom, please?

20  BY MR. MORRIS:

21  Q   There's an email from Hunter Covitz.  Do you see that?

22  A   Yes.

23  Q   Now, this is November 24th.  It's before the TRO.  Is that

24  fair?

25  A   Yes.

Dondero - Direct                    42

1  Q   Mr. Covitz is an employee of the Debtor, right?

2  A   I believe so.

3  Q   And Mr. Covitz helps manage the CLOs on behalf of the

4  Debtor.  Is that your understanding?

5  A   Yes.

6  Q   And Mr. Covitz in this email is giving directions to Matt

7  Pearson and Joe Sowin to sell certain securities held by the

8  CLOs.  Is that correct?

9  A   No.  He's giving Jim Seery's direction.

10        MR. BONDS:  And Your Honor, I'm going to object.

11  This is all before the TRO was ever entered.  It doesn't have

12  anything to do with today's hearing.

13        THE COURT:  Overruled.

14        MR. MORRIS:  May I respond, Your Honor?

15        THE COURT:  I --

16        MR. MORRIS:  Okay.  Thank you.

17        THE COURT:  I think it's relevant.  Go ahead.

18        MR. MORRIS:  Thank you.  Okay.

19  BY MR. MORRIS:

20  Q   Mr. Seery is the CEO of the Debtor; is that right?

21  A   Yes.

22  Q   And the Debtor is the contractual party with the CLOs

23  charged with the exclusive responsibility of managing the

24  CLOs, correct?

25  A   I don't believe so.  The Debtor is in default of the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 831 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 899 of 1017   PageID 5578
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 830 of
2722

Dondero - Direct                    43

1    agreements.

2            MR. MORRIS:  I move to strike, Your Honor.

3            THE COURT:  Sustained.

4    BY MR. MORRIS:

5    Q    Sir, the Debtor has the exclusive contractual right and

6    obligation to manage the CLOs, correct?

7    A    I don't agree with that.

8    Q    Okay.

9            MR. MORRIS:  Can we scroll up to the -- just --

10   BY MR. MORRIS:

11   Q    Do you see that Mr. Pearson acknowledges receipt of Mr.

12   Covitz's email?

13   A    Yes.

14   Q    And you received a copy of Mr. Covitz's email, did you --

15   did you not?

16   A    Yes.

17           MR. MORRIS:  Can you scroll up a little bit, please?

18   BY MR. MORRIS:

19   Q    And can you just read for Judge Jernigan your response

20   that you provided to Mr. Pearson, Mr. Covitz, and Mr. Sowin on

21   November 24th?

22   A    (reading)  No, do not.

23   Q    You instructed the recipients of Mr. Covitz's email not to

24   sell the SKY securities as had been specifically instructed by

25   Mr. Seery, correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 832 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 900 of 1017   PageID 5579
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 831 of
2722

Dondero - Direct                        44

1  A    Yes.

2  Q    And you understood when you gave that instruction that the

3  people on the email were trying to execute trades that Mr.

4  Seery had authorized, correct?

5  A    No.  I -- no, that isn't how I would describe it.

6         MR. MORRIS:  A second, Your Honor?

7         THE COURT:  Okay.

8      (Pause.)

9  BY MR. MORRIS:

10  Q    Sir, when you gave the instruction reflected in this

11  email, you knew that you were stopping trades that were

12  authorized and directed by Mr. Seery, correct?

13  A    I don't think -- I -- I wasn't -- I wasn't sure at the

14  moment I did that.  I didn't find out until later that it was

15  Seery who directed it.

16         MR. MORRIS:  Can we please go back to the deposition

17  transcript, Debtor's Exhibit Z, at Page 42?  Line 12.

18  BY MR. MORRIS:

19  Q    Were you asked this question and did you give this answer?

20      "Q   At the time that you gave the instruction, "No, do

21      not," you knew that you were stopping trades that had

22      been authorized and directed by Mr. Seery, correct?

23      "A    Yes."

24  Q    Did you give that answer to my question on Tuesday?

25  A    I'd like to clarify it, but yes, I did give that answer.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 833 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 901 of 1017 PageID 5580
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 832 of
2722

Dondero - Direct                    45

```
1   Q   Okay.  You didn't speak with Mr. Seery before sending your

2   instructions interfering with his trade, the trades that he

3   had authorized, correct?

4   A   No, I did not.

5   Q   And you took no steps to seek the Debtor's consent before

6   instructing the recipients of your email to stop executing the

7   SKY transactions that had been authorized by Mr. Seery,

8   correct?

9   A   I'm sorry.  Can you repeat the question?

10  Q   You took no steps to seek the Debtor's consent before

11  stepping in to stop the trades that Mr. Seery had authorized,

12  correct?

13  A   I took other actions instead.

14  Q   Okay.  But you didn't seek the Debtor's consent?  That's

15  not one of the actions you took, right?

16  A   No, I educated the traders as to why it was inappropriate.

17          MR. MORRIS:  I move to strike, Your Honor.

18          THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q   Sir, did you seek the Debtor's consent before stepping in

21  to stop the trades that Mr. Seery had authorized?

22  A   No, I did not seek consent.

23  Q   In response to your instruction, Mr. Pearson canceled all

24  of the trades that Mr. Seery had authorized, correct?

25  A   Yes.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 834 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 902 of 1017   PageID 5581
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 833 of
2722

Dondero - Direct                         46

1           MR. MORRIS:  Can we go back to the exhibit, please?

2   And if we could just scroll -- stop right there.

3   BY MR. MORRIS:

4   Q   That's -- that's Mr. Pearson's response to your email,

5   confirming that he had canceled both the SKY and the AVAYA

6   trades that had not yet been executed, correct?

7   A   Yes.

8           MR. MORRIS:  Can we scroll to the response to that?

9   BY MR. MORRIS:

10  Q   Is this your response?

11  A   Yes.

12  Q   Can you read that aloud, please?

13  A   (reading)  HFAM and DAF have instructed Highland in

14  writing not to sell any CLO underlying assets.  There is

15  potential liability.  Don't do it again, please.

16  Q   The writings that you're referring to are the two letters

17  from NexPoint, Exhibits B and C that we just looked at,

18  correct?

19  A   Yeah.  There might have been a third letter.  I don't

20  know.  But, yes, generally, those letters.

21  Q   Okay.  And at this juncture, the reference to potential

22  liability was a statement intended for Mr. Pearson.  Is that

23  correct?

24  A   Um, I -- no.  Pearson wouldn't have had any personal

25  liability.  It was -- it was meant for the -- there was

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 835 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 903 of 1017   PageID 5582
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 834 of
2722

Dondero - Direct                         47

1  potential liability to the Debtor or to the compliance

2  officers at the Debtor.

3          MR. MORRIS:  Can we go to Page 45 of the deposition

4  transcript, please?  Line -- beginning at Line 11, through 18.

5  BY MR. MORRIS:

6  Q   Did I ask these questions and did you give these answers?

7      "Q   Do  you  see  the  reference  there  in  the  latter

8       portion  of  your  email,  'There  is  potential  liability.

9       Don't do it again'?

10      "A   Yes.

11      "Q   Who  was  the  intended  recipient  of  that  message?

12      "A   At this juncture, it's Matt Pearson, I believe."

13  Q   Did you give those answers to my questions on Tuesday?

14  A   Yeah.  That's not inconsistent.

15          MR. MORRIS:  Let's go back to the email, please.

16  BY MR. MORRIS:

17  Q   Mr. Sowin responded to your email; is that right?

18          MR. MORRIS:  Can we scroll up?

19  BY MR. MORRIS:

20  Q   Okay.  Who's Mr. Sowin?

21  A   He's the head trader.

22  Q   Who's he employed by?

23  A   I believe he's employed by HFAM but not the Debtor.

24  Q   Okay.  So he's -- he's somebody who's employed by one of

25  the Advisors; is that right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 836 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 904 of 1017    PageID 5583
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 835 of
2722

Dondero - Direct                    48

1   A    I believe so.

2   Q    And Mr. Sowin responded to your email and he indicated

3   that he would follow your instructions.  Is that right?

4   A    Yeah.  He understands that it's inappropriate.  That's

5   what he's reflecting.  Yes.

6           MR. MORRIS:  I move to strike, Your Honor.

7           THE COURT:  Sustained.

8   BY MR. MORRIS:

9   Q    Sir, Mr. Sowin responded and indicated that he would

10  follow your instructions, correct?

11  A    (no audible response)

12  Q    Did you answer?  I'm sorry.

13  A    No, I didn't answer.  It's -- I don't know if you could

14  expressly say that from that email.  Maybe we should read the

15  email.

16          MR. MORRIS:  Let's just move on, Your Honor.

17          THE COURT:  Okay.

18  BY MR. MORRIS:

19  Q    A few days later, you learned -- you learned that Mr.

20  Seery was trying a workaround to effectuate the trades anyway,

21  correct?

22  A    I believe so.

23  Q    Uh-huh.  And when you learned that, you wrote to Thomas

24  Surgent; is that right?

25  A    I -- I believe so.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 837 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 905 of 1017    PageID 5584
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 836 of
2722

Dondero - Direct                              49

```
 1  Q   I don't -- I don't mean to -- this is not a test here.

 2          MR. MORRIS:  Can we just scroll up to the next email,

 3  please?  Okay.  Stop right there.

 4  BY MR. MORRIS:

 5  Q   When you -- when you learned that Mr. Seery was trying a

 6  workaround, you wrote to Mr. Surgent when you learned that,

 7  right?

 8  A   Yes.

 9  Q   And Mr. Surgent is an employee of the Debtor; is that

10  correct?

11  A   I believe he's still the chief compliance officer of the

12  Debtor.

13  Q   Okay.  Now, as a factual matter, you never asked Mr. Seery

14  why he wanted to make these trades; isn't that right?

15  A   I -- I did not.

16  Q   Okay.  And before the TRO was entered, there was nothing

17  that prevented you from picking up the phone and asking Mr.

18  Seery why he wanted to make these trades, correct?

19  A   That's not true.

20          MR. MORRIS:  One second, please, Your Honor.

21          THE COURT:  Okay.

22      (Pause.)

23          MR. MORRIS:  Can we go to Page 60 of the transcript?

24  Mr. Bonds says -- beginning at Line 14.  There is an objection

25  there, Your Honor, and I would ask that the Court rule on the
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 838 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 906 of 1017    PageID 5585
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 837 of
2722

Dondero - Direct                    50

1  objection before I read from the transcript.

2          THE COURT:  Okay.

3          MR. MORRIS:  There you go.

4          THE COURT:  (sotto voce)  (reading)  Is there

5  anything that you're aware of that prevented you from picking

6  up the phone and asking Mr. Seery for his business

7  justification for these trades prior to December 10.

8  Objection, form.

9      I overrule the objection to the form of that question.

10         MR. MORRIS:  Okay.

11 BY MR. MORRIS:

12 Q   Mr. Dondero, were you asked this question and did you give

13 this answer?

14     "Q   Is there anything that you're aware of that

15     prevented you from picking up the phone and asking Mr.

16     Seery for his business justification for these trades

17     prior to December 10, 2010?

18     "A   No.  I expressed my disapproval via email."

19 Q   Is that right?

20 A   I'd like to adjust that answer to the answer I just gave.

21 Q   Okay.

22         MR. MORRIS:  And I move to strike.

23 BY MR. MORRIS:

24 Q   I'm just asking you if that's the answer you gave on

25 Tuesday.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 839 of
Case 3:25-cv-02072-S  Document 15-7  Filed 10/06/25  Page 907 of 1017  PageID 5586
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 838 of
2722

Dondero - Direct                          51

1              THE COURT:  Sustained.

2              THE WITNESS:  Yes.

3    BY MR. MORRIS:

4    Q    Thank you.  Now, you wrote to Mr. Surgent because you

5    wanted to remind him of his personal liability for regulatory

6    breaches and for doing things that aren't in the best interest

7    of investors, correct?

8    A    Yes.

9    Q    And you actually thought about this and you -- because you

10   didn't believe that Mr. Surgent had extra insurance and

11   indemnities like Mr. Seery, right?

12   A    No.

13   Q    Didn't you testify to that the other day?

14   A    I don't remember, but that isn't the only reason.

15   Q    I didn't ask you if it was the only reason.  Listen

16   carefully to my question.  Did you send this email because you

17   -- because you wanted to remind him of his personal liability

18   for regulatory breaches and for doing things that aren't in

19   the -- I apologize.  Withdrawn.

20       You did not believe at the time that you sent this email

21   that he, Mr. Surgent, had insurance and indemnities like Mr.

22   Seery, correct?

23   A    Yes.

24   Q    Okay.

25              MR. MORRIS:  Can we go back to the email, please?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 840 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 908 of 1017 PageID 5587
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 839 of
2722

Dondero - Direct                           52

1   BY MR. MORRIS:

2   Q   Can you just read the entirety of your email to Mr.

3   Surgent out loud?

4   A   (reading)  I understand Seery is working on a workaround

5   to trade these securities anyway, trades that contradict

6   investor desires and have no business purpose or investment

7   rationale.  You might want to remind him and yourself that the

8   chief compliance officer has personal liability.

9   Q   Okay.  That's -- that's the message you wanted to convey

10  to Mr. Surgent, right?

11  A   Yes.

12  Q   And, again, you never bothered to ask Mr. Seery what his

13  businessperson -- purpose or investment rationale was,

14  correct?

15  A   I -- I didn't believe I could talk to him directly.

16  Q   This is before the --

17  A   That's why I never picked up the phone.

18  Q   Okay.  You intended to convey the message to Mr. Surgent

19  that, by following Mr. Seery's orders to execute the trades,

20  that Mr. Surgent faced personal liability, correct?

21  A   Yes, he does.

22  Q   And that's the message you wanted to send to him, right?

23  A   It's a true and accurate message, yes.

24  Q   Okay.  Just a few days earlier, you also threatened Mr.

25  Seery, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 841 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 909 of 1017   PageID 5588
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 840 of
2722

                          Dondero - Direct                    53

 1  A    I wouldn't use the word "threatened."

 2  Q    Okay.  Let's let -- let's let it speak for itself.

 3          MR. MORRIS:  Can we go to Exhibit E, please?  Keep

 4  scrolling down just a bit.

 5  BY MR. MORRIS:

 6  Q    This is an email that you sent to Mr. Seery on November

 7  24th.  And as always, Mr. Dondero -- this is the third time

 8  we're meeting -- if there's something in the document that you

 9  need to see, please just let me know, because I don't -- I

10  don't mean to test your memory if the document can help

11  refresh your recollection.

12          MR. MORRIS:  Can we just scroll up a little bit

13  further to the top to see the date?

14  BY MR. MORRIS:

15  Q    Okay.  So, Jim, there, JD, who is that?

16  A    That's me.

17  Q    Okay.  And can you tell by the substance of the email, of

18  the text messages, this is communications between you and Mr.

19  Seery, right?

20  A    Yes.

21  Q    Okay.  And you see that it's dated November 24th there?

22  A    Yes.  Right after we were discussing the pipeline.  Or

23  right when we were working on the pipeline.

24  Q    Okay.

25          MR. MORRIS:  Can you scroll down a little bit,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 842 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 910 of 1017    PageID 5589
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 841 of
2722

Dondero - Direct                        54

1  please?

2  BY MR. MORRIS:

3  Q    At 5:26 p.m., you sent Mr. Seery a text, correct?

4  A    Yes.

5  Q    Can you read that, please?

6  A    (reading)  Be careful what you do.  Last warning.

7  Q    Okay.  This was a warning telling Mr. Seery to stop

8  selling assets out of the CLOs or the beneficial owners would

9  take more significant action against him, correct?

10 A    It was a general statement that what he was doing was

11 regulatorily inappropriate and ethically inappropriate and he

12 was in breach of the contracts he was operating.

13 Q    Neither you nor any entity owned or controlled by you are

14 parties to the contracts you just referred to; isn't that

15 correct?

16 A    I believe they're indirectly parties to those contracts,

17 especially when they're in default.

18 Q    Neither you nor any entity owned or controlled by you is a

19 signatory to any CLO management contract pursuant to which the

20 Debtor is a party, correct?

21 A    I -- I don't know and I don't want to make legal

22 conclusions on that.

23 Q    Okay.  At the deposition the other day, some of the things

24 that you suggested the beneficial owners of the CLO interests

25 might do against Mr. Seery and the Debtor are class action

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 843 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 911 of 1017   PageID 5590
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 842 of
2722

Dondero - Direct                    55

1   lawsuits.  Is that right?

2   A   I -- I did not suggest the entities I control would do

3   that.  If anybody on this call were to call a class action

4   lawsuit -- a class action law firm and tell them what's been

5   going on with the CLOs, I think a class action law firm would

6   file it on their own regard, not on the behalf of my entities.

7         MR. MORRIS:  I move to strike, Your Honor.

8         THE COURT:  Sustained.

9   BY MR. MORRIS:

10  Q   Let's talk about that cell phone.  Okay?  Until at least

11  December 10th, the day the TRO was entered, you had a cell

12  phone that was bought and paid by the Debtor, right?

13  A   Yes.

14  Q   But sometime after December 10th, your phone was disposed

15  of or thrown in the garbage; is that right?

16  A   Yes.

17  Q   And you don't know when after December 10th the cell phone

18  that was the Debtor's property was disposed of, right?

19  A   I don't believe at that point it was the Debtor's

20  property.  I think I paid it off in full and the Debtor had

21  announced that they were canceling everybody's cell phones so

22  it was appropriate for me to get another one.

23        MR. MORRIS:  I move to strike, Your Honor.

24        THE COURT:  Sustained.

25        MR. BONDS:  Your Honor, at some point, I mean, Mr.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 844 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 912 of 1017   PageID 5591
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 843 of
2722

                        Dondero - Direct                    56

1   Morris just ought to go on and testify.

2          MR. MORRIS:  No, this is Mr. Dondero's testimony,

3   Your Honor.  He gave it the other day.  I'm just asking him to

4   confirm it, basically.

5          THE COURT:  Okay.  I overrule the objection, if any

6   there was, on the part of Mr. Bonds.

7   BY MR. MORRIS:

8   Q   Sometime after December 10th, the cell phone that prior to

9   that time had been owned and paid for by the Debtor was thrown

10  in the garbage or otherwise disposed of, correct?

11  A   Yes.

12  Q   And you don't know when after December 10th that was --

13  the phone was disposed of, correct?

14  A   It was on or about that date, I'm sure.

15  Q   Well, we know it was after December 10th, right?

16  A   Okay.  Or about that date.

17  Q   You testified the other day that you just don't know who

18  made the decision to throw your phone away, right?

19  A   I could find out, but I don't know.  I would have to talk

20  to employees.

21  Q   Did you make any request of the Debtor since your

22  deposition to try to find out the answer as to who made the

23  decision to throw your phone away?

24  A   No.

25  Q   How did you learn that your phone was thrown away?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 845 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 913 of 1017   PageID 5592
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 844 of
2722

Dondero - Direct                      57

1   A    As I testified, it's standard operating procedures every

2   time a senior executive gets a new phone.

3   Q    Hmm.  You don't know exactly who threw the phone away; is

4   that right?

5   A    No, but I can find out.

6   Q    Okay.  I'm just asking -- I'm not asking you to find out.

7   I'm just asking you if you know.  Do you know who threw your

8   phone away?

9   A    No.

10  Q    Do you know who made the decision to throw your phone

11  away?

12  A    It -- there wasn't a decision.  It was standard operating

13  procedure.

14       MR. MORRIS:  I move to strike.

15       THE COURT:  Sustained.

16  BY MR. MORRIS:

17  Q    You and Mr. Ellington disposed of your phones at the same

18  time, correct?

19  A    I don't have specific awareness regarding what Mr.

20  Ellington did with his phone.

21  Q    It never occurred to you to get the Debtor's consent

22  before throwing the phone that they had purchased away, right?

23  A    I'm not permitted to talk to the Debtor.

24  Q    Sir, it never occurred to you to get the Debtor's consent

25  before throwing the phone away, correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 846 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 914 of 1017   PageID 5593
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 845 of
2722

Dondero - Direct                          58

 1  A   I'm going to stick with the answer I just gave.

 2          MR. MORRIS:  Can we go to Page 75 of the transcript?

 3  Lines 12 through 15.  There is an objection there, Your Honor.

 4  I would respectfully request that the Court rule on the

 5  objection before I read the testimony.

 6          THE COURT:  Okay.  Starting at Line 12?

 7          MR. MORRIS:  12.

 8          THE COURT:  (sotto voce)  (reading)  Did it ever

 9  occur to you to get the Debtor's consent before doing this?

10  Objection, form.

11      That objection is overruled.

12  BY MR. MORRIS:

13  Q   All right.  Mr. Dondero, did you give this answer to my

14  question on Tuesday?

15      "Q   Did it ever occur to you to get the Debtor's

16      consent before doing this?

17      "A   No."

18  A   Yes, I gave that testimony.

19  Q   Okay.  And you also had the phone number changed from the

20  Debtor's account to your own personal account; is that right?

21  A   The phone number changed?  The phone number stayed the

22  same.

23  Q   But you had the number changed from the Debtor's account

24  to your own personal account, correct?

25  A   The Debtor said they wouldn't pay for it anymore.  Who

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 847 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 915 of 1017    PageID 5594
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 846 of
2722

```
                          Dondero - Direct                   59
```

1    else could I change it to?

2              MR. MORRIS:  Your Honor, I move to strike.  It's a

3    very simple question.

4              THE COURT:  Sustained.

5    BY MR. MORRIS:

6    Q    I'll ask it one more time, Mr. Dondero.  You had the phone

7    number changed from the Debtor's account to your personal

8    account, correct?

9    A    I didn't change the number.  I had the billing changed to

10   my personal account versus the company account.

11   Q    And you never asked the Debtor for permission to do that,

12   correct?

13   A    No.

14   Q    And you never told Debtor you were doing that, correct?

15   A    No.

16   Q    And nobody ever told Mr. Seery or anybody at my firm that

17   the phone was being thrown in the garbage, correct?

18   A    Well, --

19             MR. BONDS:  To the extent he knows.

20             THE WITNESS:  Yeah.  I have no idea.  But I didn't.

21   BY MR. MORRIS:

22   Q    You didn't believe it was necessary to give the Debtor

23   notice that you were taking the phone number for your own

24   personal account and throwing the phone in the garbage,

25   correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 848 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 916 of 1017   PageID 5595
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 847 of
2722

Dondero - Direct                         60

1    A    Correct.

2    Q    The phone --

3             MR. BONDS:  Your Honor, I'm going to object.  He --

4    Mr. Dondero did not testify he personally threw the phone in

5    the garbage.

6             MR. MORRIS:  Withdrawn.

7             THE COURT:  Okay.

8    BY MR. MORRIS:

9    Q    Mr. Dondero, the phone was in Highland's offices on

10   December 10th, the date the TRO was in effect, correct?

11   A    I -- I don't -- I -- I -- I don't know.  You know, I don't

12   know.  It's -- I remember going over to -- well, anyway, I --

13   I don't know.  We'll leave it at that.

14            MR. MORRIS:  Can we go to Exhibit G, please?

15   BY MR. MORRIS:

16   Q    Who's Jason Rothstein, while we wait?

17   A    Jason, Jason is our -- is the Highland head of technology.

18   Q    Okay.  And did you text with him from time to time?  On or

19   about December 10th?

20   A    Yes.

21   Q    Okay.

22            MR. MORRIS:  Can we just scroll up a little bit?

23   BY MR. MORRIS:

24   Q    Is that Mr. Rothstein there?

25   A    Yes.  Yeah.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 849 of
Case 3:25-cv-02072-S    Document 15-7   Filed 10/06/25   Page 917 of 1017   PageID 5596
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 848 of
2722

Dondero - Direct                      61

1    Q    Okay.  And do you see that there's a text message that you

2    sent to him on December 10th, right at the top?  Can you read

3    -- can you read the text message Mr. Rothstein --

4    A    He sent that to me.  At the top.

5    Q    I apologize.  Thank you for the correction.  Can you read

6    what Mr. Rothstein told you on December 10th?

7    A    That my old phone is in the top drawer of Tara's desk.

8    Q    And who's Tara?

9    A    My assistant.

10   Q    Is she still your assistant today?

11   A    Yes.

12   Q    And has she been serving as your assistant since the TRO

13   was entered into on December 10th?

14   A    Yes.

15   Q    Okay.  Is it fair to say that you were informed on

16   December 10th that the phone was not thrown in the garbage,

17   had not been disposed of, but was instead sitting in Tara's

18   desk?

19   A    As of that moment, yes.

20   Q    Okay.  And it's also fair to say that, as of December

21   10th, Mr. Rothstein didn't take it upon himself to throw your

22   old phone in the garbage, right?

23   A    Not as of that moment.  But like I said, I can find out

24   how it was disposed of.

25   Q    If you were curious to do that, would you have done that

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 850 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 918 of 1017   PageID 5597
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 849 of
2722

Dondero - Direct                    62

1   before today?

2   A    I haven't been curious.

3   Q    Thank you very much.  Someone you can't identify made the

4   decision after December 10th to throw the phone in the garbage

5   without asking the Debtor for permission or seeking the

6   Debtor's consent, correct?

7        MR. BONDS:  I'm going to object, Your Honor.  To the

8   extent that the witness knows, he can answer.

9        THE COURT:  I -- I didn't hear --

10       THE WITNESS:  I don't know.

11       THE COURT:  I didn't hear what your objection was,

12  Mr. Bonds.  Repeat.

13       MR. BONDS:  Your Honor, my objection was along the

14  lines of to the extent that the witness knows, he could

15  testify, but if he doesn't know, he doesn't need to speculate.

16       THE COURT:  All right.  Well, I don't hear an

17  objection there, but go ahead, Mr. Dondero, if you have

18  knowledge and can answer the question.

19       THE WITNESS:  I don't know.

20  BY MR. MORRIS:

21  Q    Do you recall that the Debtor subsequently gave notice to

22  you to vacate its offices and to return its cell phone?

23  A    I don't know.

24  Q    Did you ever --

25  A    I know I -- I know I was told to vacate the offices.  I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 851 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 919 of 1017    PageID 5598
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 850 of
2722

Dondero - Direct                         63

1   didn't see the specific --

2   Q    Uh-huh.  Your lawyer -- your lawyers never told that

3   Debtor that the cell phone had been disposed of or thrown in

4   the garbage, consistent with company practice, right?

5   A    I don't know.

6        MR. MORRIS:  Can we put up Exhibit K, please?

7   BY MR. MORRIS:

8   Q    This is the letter that my firm sent to your lawyer on

9   December 23rd.  Do you see that?

10  A    Yeah, I see it.

11  Q    Okay.

12       MR. MORRIS:  Can we scroll down a little bit?  Keep

13  going.  Okay.  Stop right there.

14  BY MR. MORRIS:

15  Q    Do you see that it says that, as a result of the conduct

16  described above, that the Debtor "has concluded that Mr.

17  Dondero's presence at the HCMLP office suite and his access to

18  all telephonic and information services provided by HCMLP are

19  too disruptive"?

20  A    Yeah, I see it.

21  Q    And this is the letter that gave you notice that you had

22  to vacate the premises by December 30th, correct?

23  A    I believe so.

24       MR. MORRIS:  Can we scroll down a little bit?

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 852 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 920 of 1017   PageID 5599
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 851 of
2722

Dondero - Direct                          64

1   Q    You see at the bottom there's a reference to a defined

2   term of "cell phones"?

3   A    Yes.

4   Q    And it says that the Debtor "will also terminate Mr.

5   Dondero's cell phone plan and those cell phone plans

6   associated with parties providing personal services to Mr.

7   Dondero."  Do you see that?

8   A    Yes.  Yeah.

9   Q    Have I read that accurately?

10  A    Yes.

11  Q    And then my colleagues went on to write, "HCMLP demands

12  that Mr. Dondero immediately turn over the cell phones to

13  HCMLP by delivering them to you, Mr. Lynn."  Do you see that?

14  A    Yes.

15  Q    Have I read that accurately?

16  A    Yes.

17  Q    The last sentence on the page begins, "The cell phones

18  and."

19          MR. MORRIS:  And let's scroll down further.

20  BY MR. MORRIS:

21  Q    "The cell phones and the accounts are property of HCMLP.

22  HCMLP further demands that Mr. Dondero refrain from deleting

23  or wiping any information or messages on the cell phone.

24  HCMLP, as the owner of the account and cell phones, intends to

25  recover all information related to the cell phones and

                    Dondero - Direct                    65

1  accounts, and reserves the right to use the business-related

2  information."  Have I read that accurately?

3  A    Yes.

4  Q    Okay.  We were a couple of weeks too late, huh?

5  A    It sounds like it.

6  Q    Yeah.  Because the phones were already in the garbage,

7  right?

8  A    Yes.

9  Q    Uh-huh.  But that's not what Mr. Lynn told the Debtor on

10 your behalf, right?

11 A    I don't know.

12 Q    Mr. Lynn -- all right.  Let's -- let's see what Mr. Lynn

13 said.

14         MR. MORRIS:  Can we go to Exhibit U, please?

15 BY MR. MORRIS:

16 Q    It took Mr. Lynn six days to write a one-paragraph letter

17 in response, right?  December 29th, he responded?

18         MR. MORRIS:  Can we scroll down a bit?

19 BY MR. MORRIS:

20 Q    Let me read beginning with the second sentence of the

21 first substantive paragraph.  "We are at present not sure of

22 the location of the cell phone issued to Mr. Dondero by the

23 Debtor, but we are not prepared to turn it over without

24 ensuring the privacy of the attorney-client communications."

25 And then he goes on.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 854 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 922 of 1017    PageID 5601
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 853 of
2722

Dondero - Direct                          66

1      Have I read that correctly?

2    A    Yes.

3    Q    Okay.  So Mr. Lynn didn't say anything about the phone

4    being thrown in the garbage, right?

5    A    No.

6    Q    He didn't say that it was disposed of, did he?

7    A    No.

8    Q    He didn't refer to any company practice or policy, right?

9    A    No.

10   Q    Mr. Lynn's not a liar, is he?

11   A    No, he's not.

12   Q    He's a decent and honest professional.  Wouldn't you agree

13   with that?

14   A    Yes.

15   Q    And is it fair to say that he conveyed only the

16   information that he had at the time?

17   A    I don't know.

18   Q    Do you have any reason to believe that Mr. Lynn would

19   withhold from the Debtor the information that the cell phone

20   had been thrown in the garbage, consistent with company

21   practice?

22   A    No, I don't believe he would withhold whatever he knew.

23   Q    All right.  Let's talk about -- let's talk about other

24   matters.  You do know, sir, do you not, that the Debtor is

25   subject to the Bankruptcy Court's jurisdiction?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 855 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 923 of 1017   PageID 5602
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 854 of
2722

Dondero - Direct                       67

1    A    Yes.

2    Q    Okay.  And we just saw in the December 23rd letter that

3    the Debtor demanded that you vacate their offices a week

4    later, right?

5    A    Yes.

6    Q    And you knew that at or around the time the letter was

7    sent on December 23rd, correct?

8    A    I -- I don't remember when I knew.

9    Q    Well, in fact, in fact, you or through counsel asked for

10   an accommodation and asked for an extension of time to

11   December 31st; isn't that right?

12   A    I had to pack up 30 years of stuff in three days.  I -- I

13   know we asked for some forbearance.  I don't think we got any.

14   I don't remember the details.  I don't understand why it's

15   important.

16   Q    Okay.  It was actually -- withdrawn.  The Debtor actually

17   gave you seven days' notice, right?  They sent the letter on

18   December 23rd and asked you to vacate on December 30th,

19   correct?

20   A    I don't -- I don't remember.  But, again, I think the

21   initial response was it was inconsistent with shared services

22   agreement.  No Highland employees are coming into the office

23   anyway.  So kicking me out of my office was -- seemed

24   vindictive and overreaching.  And we tried to get some, you

25   know, forbearance.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 856 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 924 of 1017   PageID 5603
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 855 of
2722

Dondero - Direct                    68

1   Q    Okay.

2            MR. MORRIS:  I move to strike, Your Honor.

3            THE COURT:  Sustained.

4   BY MR. MORRIS:

5   Q    Mr. Dondero, you were given seven days' notice before --

6   before you were going to be barred from the Debtor's office,

7   correct?

8   A    I don't know.

9   Q    Okay.

10           MR. MORRIS:  Can we go back to Exhibit K, please?

11  Oh, actually, it's okay.

12  BY MR. MORRIS:

13  Q    We just read, actually, the piece from the Debtor's letter

14  of December 23rd barring you from the Debtor's office.  Do you

15  remember that?  And we can go back and look at it if you want.

16  A    Yes.

17  Q    Was there anything ambiguous that you recall about the

18  Debtor's demand that you not enter their offices after

19  December 30th?

20  A    Ambiguous?  I can tell you what my understanding was or I

21  can tell you what the letter says.  What would you like to

22  know?

23  Q    I'd just like to know if, as you sit here right now, you

24  believe there was anything ambiguous about the Debtor's demand

25  that you vacate the offices as of December 30th?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 857 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 925 of 1017    PageID 5604
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 856 of
2722

Dondero - Direct                              69

1  A    I mean, I did vacate the offices as of December 30th.

2  Q    Correct.  And you knew that -- and you were complying with

3  the Debtor's demand you do that, right?

4  A    Well, with the Court's demand, I guess.

5  Q    Okay.  And it's your understanding that you would not be

6  permitted in the Debtor's offices after that time, correct?

7  A    Um, (pause), uh, I don't know how to answer that question.

8  I knew I wouldn't be residing in the offices anymore.  But for

9  legitimate business purposes, to visit the people at NexPoint

10 who were in the office, since there are no Highland people in

11 the office, or to handle a deposition, you know, there was

12 nothing I thought inappropriate about that.

13 Q    Did the Debtor tell you that they would allow you to enter

14 the offices any time you just believed that it would be

15 appropriate to do that?

16 A    I used my business judgment.

17         MR. MORRIS:  I move to strike.

18 BY MR. MORRIS:

19 Q    I'm asking you a very --

20         THE COURT:  Sustained.

21 BY MR. MORRIS:

22 Q    -- specific question, sir.  Did the Debtor ever tell you

23 that they -- that you would be permitted to enter their

24 offices after December 30th if you, in your own personal

25 discretion, believed it to be appropriate?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 858 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 926 of 1017   PageID 5605
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 857 of
2722

Dondero - Direct                      70

1  A    No.

2  Q    Did the Debtor provide you any exception to their demand

3  that you vacate the offices, without access, by and after

4  December 30th?

5  A    I always do what I think is appropriate and in the best

6  interests.  I don't know.  I didn't know the specifics of the

7  Debtor's -- okay, yeah, what the specifics of the Debtor was.

8  Q    Despite the unambiguous nature of the Debtor's demands

9  letter, on Tuesday you just walked right into the Debtor's

10  office and sat for the deposition, correct?

11  A    I believe that was reasonable, yes.

12  Q    Okay.  But you didn't -- you didn't have the Debtor's

13  approval to do that, correct?

14  A    We didn't have technology to do it anywhere else, so if

15  the deposition was going to occur, it had to occur there.

16  Q    Sir, --

17         MR. MORRIS:  Move to strike.

18         THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q    And I ask you to just listen very carefully.  And if it's

21  not clear to you, please let me know.  You did not have the

22  Debtor's approval to enter their offices on Tuesday to give

23  your deposition, correct?

24  A    No.

25  Q    And you did not even bother to ask the Debtor for

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 859 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 927 of 1017   PageID 5606
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 858 of
2722

Dondero - Direct                       71

1   permission, correct?

2   A    I'm prohibited from contacting them, so no, I did not.

3   Q    Okay.  Let's talk about other events that occurred after

4   the entry of the TRO.  We talked earlier about how you

5   interfered with Mr. Seery's trading activities on behalf of

6   the CLOs around Thanksgiving.  Do you remember that?

7   A    Yes.

8   Q    But after the TRO was entered, the K&L Gates Clients also

9   interfered with the Debtor's trading activities, correct?

10  A    No.

11         MR. MORRIS:  Can we go to Exhibit K, please?  Can we

12  start at the first page?  And scroll down just a bit.

13  BY MR. MORRIS:

14  Q    Do you see there's an explanation there about the Debtor's

15  management of CLOs?

16  A    Yes.

17  Q    And there's a recitation of the history that we talked

18  about earlier, where around Thanksgiving you intervened to

19  block those trades?

20  A    Yes.

21  Q    And then the next paragraph refers to the prior motion

22  that was brought by the CLO entities?  I mean, the K&L Gates

23  entities, right?

24  A    Yes.

25  Q    And you were aware of that motion at the time it was made,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 860 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 928 of 1017 PageID 5607
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 859 of
2722

Dondero - Direct                          72

1   right?

2   A    Yes.

3   Q    And you were supportive of the making of that motion,

4   right?

5   A    Supportive?  Yes.

6            MR. MORRIS:  And scroll down to the next paragraph,

7   please.

8   BY MR. MORRIS:

9   Q    Okay.  So, my colleague wrote that, "On December 22nd,

10  2020, employees of NPA and HCMFA notified the Debtor that they

11  would not settle the CLO sale of the AVAYA and SKY

12  securities."  Have I read that right?

13  A    Yes.

14  Q    And that took place six days after the motion that the

15  Court characterized as frivolous was denied on December 16th?

16  A    Yes.  I wasn't aware of that, for what that's worth.

17  Q    Okay.  You personally instructed the employees --

18  withdrawn.  NPA -- that refers to NexPoint, correct?

19  A    Yes.

20  Q    That's an entity you own and control, right?

21  A    I -- largely.

22  Q    And that's one of the Advisors we defined earlier, right?

23  A    Yes.

24  Q    And HCMFA, that's Fund Advisors, another advisory firm

25  that you own and control, correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 861 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 929 of 1017   PageID 5608
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 860 of
2722

Dondero - Direct                         73

1  A    Yes.

2  Q    And you personally instructed, on or about December 22nd,

3  2020, employees of those Advisors to stop doing the trades

4  that Mr. Seery had authorized with respect SKY and AVAYA,

5  right?

6  A    Yeah.  Maybe we're splitting hairs here, but I instructed

7  them not to trade them.  I never gave instructions not to

8  settle trades that occurred.  But that's a different ball of

9  wax.

10 Q    Okay.  But you did instruct them not to execute trades

11 that had not been made yet, right?

12 A    Yeah.  Trades that I thought were inappropriate, for no

13 business purpose, I -- I told them not to execute.

14 Q    Okay.  You actually learned that Mr. Seery wanted to

15 effectuate these trades the Friday before, right?

16 A    I don't know, but what did I do?  When did I know it?

17 What did I do?  When I knew things are inappropriate, I

18 reacted immediately.  I don't -- I don't -- whenever --

19 whenever I found out about inappropriate things, I reacted to

20 the best of my ability.

21 Q    Okay.

22         MR. MORRIS:  I move to strike, Your Honor.

23         THE COURT:  Sustained.

24     Mr. Dondero, I'm going to -- I'm going to interject some

25 instructions once again here.  Remember we talked about early

Dondero - Direct                      74

1   on, and I know you've testified before, but I'll repeat it:

2   You need to just give direct yes or no answers.

3       And let me just say that we see witnesses all the time do

4   what you're doing here, and that is they feel they need to say

5   more than yes or no.  They feel the need to clarify or

6   supplement the yes or no answer they give.  And just to remind

7   you how this works, your lawyer, Mr. Bonds, is going to be

8   given the opportunity when Mr. Morris is through to ask you

9   all the questions he wants, and that will be your chance to

10  clarify yes and no answers to the extent he asks you to

11  revisit certain of these questions and answers.  Okay?

12      So I'm going to remind you once again:  yes or no or

13  direct -- you know, other appropriate direct answers.  Mr.

14  Bonds can let you clarify later.  All right?

15      Mr. Morris, continue.

16          MR. MORRIS:  Okay.  Thank you, Your Honor.

17      Can we please put up on the screen Exhibit L?  And at the,

18  I guess, the bottom of Page 1.

19  BY MR. MORRIS:

20  Q   This is an email string.  And --

21          MR. MORRIS:  Go to the email below that, please.

22  Yeah.  Okay.  Right there.

23  BY MR. MORRIS:

24  Q   This is an email from Mr. Seery dated December 18th at

25  (garbled) :30 p.m.  Do you see that?

Dondero - Direct                     75

1   A   Yes.

2   Q   And in the substantive portion of his email, continuing on

3   to the next page, he's giving instructions to sell certain SKY

4   and AVAYA securities that are held by CLOs, correct?

5   A   Yes.

6   Q   And Mr. Sowin forwarded this email to you, right?

7   A   Yes.

8            MR. MORRIS:   If we can scroll up.

9   BY MR. MORRIS:

10  Q   And you forwarded it to Mr. Ellington, right?  I'm sorry.

11  Let's just give Ms. Canty a chance.

12           MR. MORRIS:   Keep scrolling up.

13  BY MR. MORRIS:

14  Q   So, Mr. Sowin forwarded it to you at 3:34 p.m.  Do you see

15  that?

16  A   Yes.

17  Q   And if we scroll up, you turn around and give it to Mr.

18  Ellington a few minutes later, right?

19  A   Yes.

20  Q   So that you and Mr. Ellington and Mr. Sowin are all aware

21  that Mr. Seery wants to sell AVAYA and SKY securities on

22  behalf of the CLOs, right?

23  A   Yes.

24  Q   Why did you decide to forward this email to Mr. Ellington?

25  A   Ellington's role has been of settlement counsel that

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 864 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/06/25   Page 932 of 1017   PageID 5611
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 863 of
2722

Dondero - Direct                    76

1  supposedly everybody is able to talk to to try and bridge some

2  kind of settlement.  Ellington, I thought, should be aware of

3  things that would make settlement more difficult or create

4  liabilities for the Debtor.  And so I thought it was

5  appropriate for him to know.

6  Q    Okay.  This is the email that caused you to put a stop to

7  the trades that Mr. Seery wanted to effectuate, correct?

8  A    This is the -- I'm sorry.  Ask the question again.  This

9  is the email that what?

10 Q    This is -- this is how you learned that Mr. Seery wanted

11 to effectuate rates in AVAYA and SKY securities, right?

12 A    I -- I learned about it pretty early on of him trading it.

13 I don't know if it was this email or -- or one of the others.

14 But yes, it was from -- it was from Joe Sowin.

15 Q    And you would agree with me, would you not, that you

16 personally instructed the employees of the Advisors not to

17 execute the very trades that Mr. Seery identifies in this

18 email, correct?

19 A    Yes.

20 Q    At no time after December 10th, when the TRO was entered

21 into, did you instruct the employees of the Funds that you own

22 and control not to interfere or impede the Debtor's management

23 of the CLOs, correct?

24        MR. BONDS:  Can you repeat the question?  I'm sorry.

25 BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 865 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25   Page 933 of 1017    PageID 5612
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 864 of
2722

Dondero - Direct                     77

1  Q   At no time after December 10th, when the TRO was entered,

2  did Mr. Dondero instruct any employee of either of the

3  Advisors that he owns and controls not to interfere or impede

4  with the Debtor's business and management of the CLOs,

5  correct?

6  A   I did not.

7  Q   Okay.  Neither you nor anybody that you know of ever

8  provided a copy of the TRO to the employees of the Advisors

9  that you own and control, correct?

10  A   I don't know.

11  Q   Okay.  After the TRO was entered, the K -- after the TRO

12  was entered, and after the hearing on December 16th, the K&L

13  Gates Clients sent three more letters to the Debtor, right?

14  A   Yes.

15  Q   Okay.

16        MR. MORRIS:  Your Honor, those are Exhibits M as in

17  Mary, N as in Nancy, and X as in x-ray.

18          THE COURT:  Okay.

19        MR. MORRIS:  Unless the witness thinks there is a

20  need to look at them specifically -- oh, let me just ask a

21  couple of questions.

22  BY MR. MORRIS:

23  Q   Mr. Dondero, in those letters, it's your understanding

24  that the K&L Gates Clients again requested that the Debtor not

25  trade any securities on behalf of the CLOs, right?

Dondero - Direct                    78

1   A    Yes.

2   Q    And it's your understanding that in those letters the K&L

3   Gates Clients suggested that they might seek to terminate the

4   CLO management agreements to which the Debtor was a party,

5   correct?

6   A    I don't know specifically, but that wouldn't surprise me.

7   Q    Okay.

8   A    So, --

9   Q    Is it your understanding that the K&L Gates Clients also

10  sent the letter a Debtor -- the Debtor a letter in which they

11  asserted that your eviction from the offices might cause them

12  damages and harm?

13  A    I know there was objections to me -- I assume so.  I don't

14  know specifically.

15  Q    And you were aware of these letters at the time that they

16  were being sent, right?

17  A    I'm sorry, what?

18  Q    You were aware of these letters at the time they were

19  being sent by the K&L Gates Clients, right?

20  A    Generally, yes.

21  Q    And you were generally supportive of the sending of those

22  letters, right?

23  A    I'm always supportive of doing what we believe is the

24  right thing, yes.

25  Q    And in this case, you were supportive of the sending of

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 867 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 935 of 1017   PageID 5614
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 866 of
2722

Dondero - Direct                          79

1    these three letters, correct?

2    A    I -- yes.

3    Q    In fact, you pushed and encouraged the chief compliance

4    officer and the general counsel to send these letters, right?

5    A    I push them to do the right thing.  I didn't push them

6    specifically.

7    Q    Okay.  At the time the letters were sent, you were aware

8    that the K&L Gates Clients had filed that motion that was

9    heard on the 16th of December, correct?

10   A    Yes.

11   Q    And you were aware that they advanced the very same --

12   withdrawn.  You're aware that in the letters they advance some

13   of the very same arguments that Judge Jernigan had dismissed

14   as frivolous just six days earlier, right?

15   A    I wasn't at the hearing.  I don't know if it was the same

16   arguments or similar arguments.  I -- I can't -- I can't

17   corroborate the similarity or contrast the differences between

18   the two.

19   Q    All right.  So it's fair to say, then, that you were

20   supportive of the sending of these letters, you were aware of

21   the December 16 argument, but you didn't take the time to see

22   whether or not any of the arguments being advanced in the

23   letters were consistent or any different from the arguments

24   that were made at the December 16th hearing, correct?

25   A    Correct.  I wasn't directly involved, but still believed

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 868 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 936 of 1017   PageID 5615
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 867 of
2722

Dondero - Direct                        80

1    that fundamentally Seery's behavior was wrong.

2    Q    You never instructed the K&L Gates Clients to withdraw the

3    three letters that were sent after December 10th, correct?

4    A    No.

5    Q    And you're aware that the Debtor had demanded that those

6    letters be withdrawn or it would seek a temporary restraining

7    order against the K&L Gates Clients, correct?

8    A    I'm not aware of the back and forth.

9    Q    Okay.  Let's talk about your communications with Mr.

10   Ellington and Mr. Leventon.  You communicated with them on

11   numerous occasions after December 16th, correct?

12   A    No.

13   Q    No, you didn't communicate with them many times after

14   December 10th?

15   A    You're lumping in Ellington and Isaac, and numerous times

16   is a bad clarifier, so the answer is no.

17   Q    I appreciate that.  You communicated many times with Mr.

18   Ellington after December 10th, right?

19   A    Not -- not outside shared services, pot plan, and him

20   being the go-between between me and Seery.  I would say

21   virtually none.

22   Q    Okay.  On Saturday, December 12th, two days after the

23   temporary restraining order was entered against you, Mr.

24   Ellington was involved in discussions with your personal

25   counsel about who would serve as a witness at the upcoming

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 869 of
Case 3:25-cv-02072-S Document 15-7 Filed 10/06/25 Page 937 of 1017 PageID 5616
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 868 of
2722

Dondero - Direct                      81

1   December 16th hearing, correct?

2   A    I don't -- I don't remember.

3   Q    Let's see if we can refresh your recollection.

4           MR. MORRIS:  Can we please put up Exhibit P?  Can we

5   scroll down?  Okay.

6   BY MR. MORRIS:

7   Q    Do you see where Mr. Lynn writes you an email on Saturday,

8   December 12th, and he says, among other things, it looks like

9   trial?

10  A    Yes.

11  Q    And then if we scroll up a little bit, he wrote further,

12  "That said, we must have a witness now."  Have I read that

13  accurately?

14  A    Yes.

15  Q    Okay.

16          MR. MORRIS:  Can we scroll back up?

17  BY MR. MORRIS:

18  Q    And this is Mr. Ellington's response, right?

19  A    Yes.

20  Q    Can you read Mr. Ellington's response for Judge Jernigan?

21  A    (reading)  It will be J.P. Sevilla.  I'll tell him that he

22  needs to contact you first thing in the morning.

23  Q    Is it your testimony that this email relates to --

24  withdrawn.  Mr. Ellington is not your personal lawyer, right?

25  A    No.  Mr. Ellington has been functioning as settlement

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 870 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25   Page 938 of 1017    PageID 5617
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 869 of
2722

Dondero - Direct                    82

1  counsel, trying to bridge settlement, --

2  Q   Okay.

3  A   -- which is what this email looks like to me.

4  Q   Okay.  I'll let -- I'll let the judge --

5        MR. MORRIS:  I move to strike, Your Honor.

6        THE COURT:  Sustained.

7  BY MR. MORRIS:

8  Q   So, after the TRO was entered, you and Mr. Ellington not

9  only communicated but Mr. Ellington was actively involved in

10  identifying witnesses to testify on behalf of your interests

11  at the December 16th hearing, correct?

12  A   I -- I don't know what the witness was for, but I believe

13  Ellington was doing his job as settlement counsel, trying to

14  facilitate settlement.  I don't -- I have no reason to think

15  this was anything more nefarious.

16  Q   Okay.  You looked to Mr. Ellington for leadership in

17  coordinating with all of the lawyers who were working for you

18  and your personal interests, right?

19  A   I'm not agreeing with that.

20  Q   No?  All right.

21        MR. MORRIS:  Let's look at the next exhibit.  I think

22  it's Exhibit Q.  And if we could stop right there.

23  BY MR. MORRIS:

24  Q   There's an email from Douglas Draper, do you see that, on

25  December 16th?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 871 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 939 of 1017   PageID 5618
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 870 of
2722

Dondero - Direct                          83

1   A    Yes.

2   Q    So this is after the TRO was entered into, right?

3   A    I believe so.

4   Q    And Mr. Draper represents Get Good and Dugaboy; is that

5   right?

6   A    I believe so.

7   Q    And he was new to the case at that moment in time, right?

8   A    On or about, I believe so.

9   Q    And he was looking to -- he was looking for a joint

10  meeting among all of the lawyers representing your personal

11  interests, right?

12  A    No.  I think he was trying to coordinate -- coordinate or

13  understand whatever.  But not everybody -- he doesn't just

14  talk to lawyers around my interests.  I mean, and he hasn't

15  sought agreements with just lawyers reflecting my interests.

16  Q    You forwarded Mr. Draper's email to Mr. Ellington, right?

17  A    Yes.

18  Q    But you can't remember why you did that, right, or at

19  least -- withdrawn.  You couldn't remember as of Tuesday's

20  deposition why you forwarded this email to Mr. Ellington,

21  right?

22  A    Not specifically.  But, again, Ellington is settlement

23  counsel.

24       MR. MORRIS:  I move to strike, Your Honor, after the

25  initial phrase "Not specifically."

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 872 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 940 of 1017 PageID 5619
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 871 of
2722

```
                          Dondero - Direct                    84

  1              THE COURT:  Sustained.

  2              MR. MORRIS:  Can we scroll up a little bit, please?

  3    BY MR. MORRIS:

  4    Q    Mr. Lynn responded initially with a reference to the

  5    assumption that a particular lawyer was with K&L Gates, right?

  6    A    Yes.

  7              MR. MORRIS:  And if we could scroll up a little bit.

  8    BY MR. MORRIS:

  9    Q    That's where you forward this email to Mr. Ellington,

 10    right?

 11    A    Yes.

 12    Q    And can you read to Judge Jernigan what you wrote at 1:33

 13    p.m.?

 14    A    (reading)  I'm going to need you to provide leadership

 15    here.

 16    Q    But at least as of Tuesday's deposition, you couldn't

 17    remember why you needed Mr. Ellington to provide leadership,

 18    right?

 19    A    Correct.  Nor if he did.

 20              MR. MORRIS:  I move to strike the latter portion of

 21    the answer, Your Honor.

 22              THE COURT:  Sustained.

 23    BY MR. MORRIS:

 24    Q    So you have no --

 25         (Echoing.)
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 873 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 941 of 1017   PageID 5620
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 872 of
2722

Dondero - Direct                        85

1              MR. MORRIS:  We're getting --

2              THE WITNESS:  Can I -- can I hold -- can I hold on

3    for one second here?  Can I just put you guys on mute, please?

4              MR. MORRIS:  Sure.

5         (Pause.)

6              THE COURT:  All right.

7              THE CLERK:  John, there's some feedback again.  I'm

8    sorry.

9              MR. MORRIS:  That's okay.

10             THE COURT:  Mr. Bonds, --

11             MR. MORRIS:  We lost Mr. --

12             THE COURT:  Mr. Bonds, what's going on?

13             MR. MORRIS:  We've lost -- the screen --

14             THE COURT:  You know you can't counsel your client in

15   the middle of court testimony.  I thought maybe Mr. Dondero

16   had some non-legal thing going on in the background.  Mr.

17   Bonds?

18             MR. BONDS:  Your Honor, I -- I did not in any way

19   counsel Mr. Dondero.

20             THE COURT:  Okay.  Well, I'll take your

21   representation on that.  Are we ready to go forward?

22             MR. MORRIS:  I'll readily accept Mr. Bonds'

23   representation as well, Your Honor.

24             THE COURT:  Okay.

25             MR. MORRIS:  But I'd ask that it not happen again.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 874 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 942 of 1017 PageID 5621
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 873 of
2722

Dondero - Direct                    86

1          THE COURT:  Well, fair enough.  I think Mr. Bonds

2    understands.

3    BY MR. MORRIS:

4    Q   Mr. Dondero, you have no recollection of why you forwarded

5    this email to Mr. Ellington and why you told him you needed

6    him to provide leadership, correct?

7    A   Correct.

8          MR. MORRIS:  And if we can scroll up, can we just see

9    how Mr. Ellington responded?

10   BY MR. MORRIS:

11   Q   All right.  And can you just read for Judge Jernigan what

12   Mr. Ellington said on December 16th in response to your

13   statement that you're going to need him to provide leadership

14   here?

15   A   (reading)  On it.

16   Q   Thank you.  In your deposition, you testified without

17   qualification that Scott Ellington and Isaac Leventon did not

18   participate in the drafting of a joint interest or mutual

19   defense agreement.  Do you recall that testimony?

20   A   Yes, as far as I knew.

21   Q   And you also testified that you never discussed with

22   either of them the topic of a joint defense or mutual defense

23   agreement; is that right?

24   A   Correct.  That was Draper.

25   Q   Okay.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 875 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/10/25   Page 943 of 1017   PageID 5622
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 874 of
2722

Dondero - Direct                          87

1          MR. MORRIS: Can we put up Exhibit 11, please?  I

2     apologize.  It's Exhibit W.  Okay.  Can we stop right there?

3     BY MR. MORRIS:

4     Q   This is an email between some of your counsel and Mr.

5     Ellington.  Do you see that?

6     A   Yes.

7     Q   And a common interest agreement is attached to the

8     communication.  Is that a fair reading of the portion of the

9     exhibit that's on the screen?

10    A   Yes.

11         MR. MORRIS: And can we scroll to the top of the

12    exhibit, please?

13    BY MR. MORRIS:

14    Q   And do you see that there is an email exchange between Mr.

15    Ellington and Mr. Leventon concerning the common interest

16    agreement?

17    A   Yes.

18    Q   Okay.  So it's your testimony that this email may exist

19    but you had no idea that Mr. Ellington and Mr. Leventon were

20    working with your lawyers to draft a common interest

21    agreement?  Is that your testimony?

22    A   I wasn't part of this.  It looks to me like they were just

23    included in a -- a final draft.  And, again, Ellington is

24    settlement counsel.  I -- but I don't want to speculate why or

25    what they were doing.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 876 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 944 of 1017   PageID 5623
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 875 of
2722

Dondero - Direct                    88

1   Q   Do you remember that I asked you a few questions the other

2   day about Multi-Strat financial statements and whether or not

3   you'd ever given -- you'd ever received any of those documents

4   from Mr. Ellington and Mr. Leventon?

5   A   Yes.

6   Q   Okay.  And you testified under oath that you never got any

7   financial information, including balance sheets, concerning

8   Multi-Strat from either of those lawyers, correct?

9   A   I -- hmm.  I -- I don't remember.  Yeah, I don't remember.

10  I may have to clarify that, but I don't remember.

11  Q   You testified under oath the other day that you wouldn't

12  even think to ask them for financial information relating to

13  Multi-Strat because it's not natural for them to have it,

14  right?

15  A   I -- I'm sorry.

16         THE WITNESS:  Your Honor, do I just have to answer

17  these questions yes or no, or is that the -- can I clarify at

18  all, or can I --

19         THE COURT:  Well, I mean, if the question simply

20  directs a yes or no answer, that's correct, you just answer

21  yes or no.  And I think this one did.

22      Again, your lawyer is going to have the chance to do

23  follow-up examination later.

24  BY MR. MORRIS:

25  Q   So let me try again.  During your deposition, you

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 877 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 945 of 1017    PageID 5624
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 876 of
2722

Dondero - Direct                          89

1   testified under oath without qualification that you never got

2   any financial information, including balance sheets,

3   concerning Multi-Strat from Scott Ellington or Isaac Leventon,

4   correct?

5   A    I believe I might have misspoken there.

6   Q    Okay.  But that was your testimony the other day, right?

7   A    Yes.

8   Q    And today, you believe you might have gotten that

9   information from them, right?

10  A    Only because Ellington was supposed to be the go-between

11  and I couldn't go directly to somebody.  But he wouldn't

12  normally have that information, which is what I was saying.

13          MR. MORRIS:  Your Honor, I have an exhibit that's not

14  on the Debtor's exhibit list, and I was going to use it for

15  impeachment purposes to establish the fact that Mr. Ellington

16  and Mr. Leventon in fact gave to Mr. Dondero, after December

17  10th, financial information concerning Multi-Strat, which Mr.

18  Dondero had previously denied receiving.  May I -- may I use

19  that document to impeach Mr. Dondero?

20          THE COURT:  You may.

21          MR. BONDS:  Your Honor, I'm going to object.  This is

22  pretty clearly something that should have been disclosed and

23  it wasn't.

24          THE COURT:  Well, he says it's purely to impeach the

25  testimony that Mr. Dondero just now gave.  So we'll -- we'll

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 878 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 946 of 1017   PageID 5625
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 877 of
2722

Dondero - Direct                    90

1   see the document and, you know, I'll either agree with that

2   being impeachment or not.  So, he may proceed.

3           MR. BONDS:  Your Honor, I think that the testimony

4   -- Your Honor, I'm sorry.  I think that the testimony that was

5   (inaudible) given was that he thought that he may have talked

6   to Scott or Isaac, not that he did not.

7           MR. MORRIS:  Your Honor, if I may, the testimony the

8   other day was unequivocal and unambiguous that not only didn't

9   he get this information from the two lawyers, but that he had

10  no reason to believe he would ever get the information from

11  those two lawyers.

12      I appreciate the fact that Mr. Dondero today is suggesting

13  that he may have, but I -- I would still like to use this

14  document to refresh his recollection and to impeach even the

15  possibility that he's giving this qualified testimony that he

16  may have.

17          THE COURT:  All right.

18          MR. MORRIS:  There's no doubt that he did.

19          THE COURT:  I overrule the objection.  You can go

20  forward.

21          MR. MORRIS:  Can we please put up on the screen -- I

22  believe it's Debtor's Exhibit AA.  And if we can scroll down,

23  please.  And just stop, yeah, towards the top.  All right.

24  Stop right there.

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 879 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 947 of 1017   PageID 5626
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 878 of
2722

Dondero - Direct                    91

1   Q    Do you see in the first email Mr. Klos -- he's an employee

2   of the Debtor, right?

3   A    Yes.

4   Q    And he provides Multi-Strat balance sheet and financial

5   information to Mr. Leventon, Mr. Ellington, and Mr.

6   Waterhouse.  Do you see that?

7   A    Yes.  He's the person I would normally go to.

8   Q    Okay.  And they're all Debtor employees, right?

9   A    Yes.

10  Q    Okay.  And then Mr. Leventon sends it to you and Mr.

11  Ellington on February 4th, 2020; is that correct?

12  A    Yes.

13  Q    And this is confidential information; is that fair?

14  A    No.

15  Q    Okay.  Let's -- let's talk about the next --

16  A    No, it's not -- wait, wait, hold on a second.  Judge, I

17  need to clarify this.  I -- it's not confidential information.

18  It's available to every investor, of which I was one of them.

19  Okay?  So, let's -- let's not mischaracterize this as some

20  corporate secret.

21  Q    Okay.  You interfered with the Debtor's production of

22  documents; isn't that right?

23  A    No.

24  Q    Several times in the last year, various entities have

25  requested that Dugaboy produce its financial statements,

Dondero - Direct                      92

1  correct?

2  A    Dugaboy is my personal trust.  It's not an entity of the

3  Debtor in any form or fashion.

4  Q    Sir, you're aware that several times in the last year

5  various entities requested that the Debtor produce Dugaboy

6  financial information, correct?

7  A    The Debtor is not in a position to do it.  I -- I don't

8  know if it's been several times or whatever, but it's not

9  appropriate.

10         MR. MORRIS:  I move to strike, Your Honor.

11         THE COURT:  Sustained.

12  BY MR. MORRIS:

13  Q    I'll try one more time.  If we need to go to the

14  transcript, we can.  It's a very simple question.  You knew

15  and you know that several times in the last year various

16  entities have requested that the Debtor produce Dugaboy

17  financial statements, correct?

18  A    Yes.

19  Q    Do you recall at the deposition the other day I asked you

20  whether you had ever discussed with Mr. Ellington and Mr.

21  Leventon whether or not the Dugaboy financial statements

22  needed to be produced, and you were directed not to answer the

23  question by counsel and you followed those directions?

24  A    Yes.

25  Q    But you communicated with at least one employee concerning

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 881 of
Case 3:25-cv-02072-S    Document 15-7   Filed 10/06/25   Page 949 of 1017   PageID 5628
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 880 of
2722

Dondero - Direct                           93

1  the production of the Dugaboy financial statements, correct?

2  A   Yes.

3  Q   And that's Melissa Schroth; is that right?

4  A   Yes.

5  Q   She's an executive accountant employed by the Debtor,

6  right?

7  A   Yes.

8  Q   And on December 16th, after the TRO was entered into, you

9  instructed Ms. Schroth not to produce the Dugaboy financials

10 without a subpoena, correct?

11 A   That was the advice I had gotten from counsel, yes.

12 Q   Okay.  The Dugaboy and Get Good financial statements are

13 on the Debtor's platform, correct?

14 A   I do not know.

15 Q   There is no shared services agreement between Dugaboy or

16 Get Good and the Debtor, correct?

17 A   I don't know.

18 Q   You're not aware of any; is that fair?

19 A   Yes.

20 Q   Okay.

21     MR. MORRIS:  Can we put on the screen Exhibit R?  And

22 can you scroll down a bit?

23 BY MR. MORRIS:

24 Q   Okay.  That's Melissa Schroth at the top there; is that

25 right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 882 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 950 of 1017 PageID 5629
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 881 of
2722

Dondero - Direct                94

1   A    Yes.

2   Q    And these are texts that you exchanged with her after the

3   TRO was entered into, correct?

4   A    Yes.

5        MR. MORRIS:  Can we scroll down a little bit?

6   BY MR. MORRIS:

7   Q    And do you see on December 16th you sent Ms. Schroth an

8   email -- I apologize -- a text that says, "No Dugaboy details

9   without subpoena"?

10  A    Yeah.

11  Q    But you can't remember why you sent this text, correct?

12  At least you couldn't as of Tuesday?

13  A    I believe it was on advice of counsel.

14  Q    But that's not what you said on Tuesday, correct?

15  A    I don't remember.

16  Q    You sent this text even though you knew that various

17  entities had requested the Dugaboy financials, but you have no

18  recollection of ever talking to anyone at any time about the

19  production of those documents, right?

20  A    Can you repeat the question?

21  Q    I'll move on.  Let me just -- last topic, and then I'm

22  going to respectfully request that we just take a short break.

23  You're familiar with the law firm of Baker & McKenzie; is that

24  right?

25       (Echoing.)

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 883 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 951 of 1017   PageID 5630
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 882 of
2722

                            Dondero - Direct                    95

1    A    I'm sorry.  You broke up on us there.

2    Q    No problem.  You're familiar with the law firm Baker &

3    McKenzie, correct?

4    A    Yes.

5    Q    That firm has never -- never represented you or any entity

6    in which you have an ownership interest, correct?

7    A    Correct.

8    Q    But in December, the Employee Group, of which Mr. Leventon

9    and Mr. Ellington was a part, was considering changing counsel

10   from Winston & Strawn to Baker & McKenzie, right?

11   A    I believe so.

12   Q    And you asked -- and because of that, you specifically

13   asked Mr. Leventon for the contact information for the lawyers

14   at Baker & McKenzie, right?

15   A    I believe so.

16   Q    Okay.

17        MR. MORRIS:  Can we put up Exhibit S, please?

18   BY MR. MORRIS:

19   Q    And who is that email sent from?  I apologize.  Withdrawn.

20   Who is that text message exchange with?

21   A    Isaac Leventon.

22   Q    Okay.  And Mr. Leventon was an employee of the Debtor

23   after December 10th, correct?

24   A    Yes.

25        MR. MORRIS:  Can we scroll down a little bit?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 884 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 952 of 1017 PageID 5631
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 883 of
2722

Dondero - Direct                               96

1   BY MR. MORRIS:

2   Q    And on December 22nd, you asked Mr. Leventon for the

3   contact information at Baker & McKenzie, correct?

4   A    Yes.

5   Q    And the reason you asked Mr. Leventon for the contact

6   information, that was in connection with the shared defense or

7   mutual defense agreement, right?

8   A    I -- I don't remember why.  It might have just been for my

9   records.  I don't know.

10  Q    The only reason that you could think of for asking for

11  this information was for the shared defense or mutual defense

12  agreement, correct?

13  A    I -- no, it -- I don't know and I don't want to speculate.

14  I don't want to -- I don't want to speculate.  I -- did -- I

15  don't think I ever got -- I don't know what your point is.

16       MR. MORRIS:  May we please go back to the transcript

17  at Page 136?  At the bottom, Line 23.

18  BY MR. MORRIS:

19  Q    Were you asked this question and did you give this answer?

20       "Q   Do  you  recall  asking  Isaac  Leventon  for  the

21       contact  information  for  the  --  for  the  lawyers  at

22       Bakers & McKenzie?

23       "A   I -- I don't -- I don't -- it might have been for

24       part  of  the  shared  defense,  mutual  defense  whatever

25       agreement, but that's -- that's the only reason I would

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 885 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 953 of 1017   PageID 5632
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 884 of
2722

Dondero - Direct                      97

1      have asked for it."

2    Q   Did you give that answer to my question?

3    A   Yeah.  I shouldn't have speculated.

4    Q   Okay.  But that's the answer you gave the other day; is

5    that right?

6    A   I shouldn't have speculated.  That's my answer today.

7    Q   And today -- withdrawn.  In fact, you wanted the Baker

8    contact information in order to help Mr. Draper coordinate the

9    mutual defense agreement, correct?

10   A   I don't want to speculate.

11          MR. MORRIS:  Can we go to Page 139, please?  Lines 2

12   to 5.

13   BY MR. MORRIS:

14   Q   Did you -- did you hear this question and did you give

15   this answer on Tuesday?

16      "Q   Why did you want the Baker & McKenzie contact

17      information?

18      "A   I was trying to help Draper coordinate the mutual

19      shared defense agreement, period."

20   Q   Did you give that answer to my question on Tuesday?

21   A   Yes.

22          MR. MORRIS:  Your Honor, I'd respectfully request a

23   short break to see if I've got anything more.

24          THE COURT:  All right.  Well, I was going to ask you

25   how much more do you think you have.  We've been going almost

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 886 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 954 of 1017   PageID 5633
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 885 of
2722

Dondero - Direct                    98

1  two hours.

2     So we'll take a break.  Let's make it a ten-minute break.

3  And then, depending on how much more you have and how much Mr.

4  Bonds is going to have, we'll figure out are we going to need

5  a lunch break in just a bit.

6     All right.  So it's 12:00 noon Central.  We'll come back

7  at 12:10.  Ten minutes.

8          MR. MORRIS:  Your Honor, may I have an instruction of

9  the witness not to check his phone for any purposes, not to

10 make -- not to communicate with anybody until -- until his

11 testimony is completed?

12          THE COURT:  All right.  Any -- any --

13          MR. BONDS:  Your Honor, he's going to speak with me.

14          THE COURT:  Pardon?

15          MR. BONDS:  I assumed he will speak to me about just

16 general events.  I mean, I don't want to be in breach of some

17 order.

18          MR. MORRIS:  Yeah.  I would -- I would -- I would ask

19 for -- you know, it's not -- he's on the stand.  He's still on

20 the stand.

21          THE COURT:  Yeah.  He --

22          MR. MORRIS:  He shouldn't be conferring with counsel,

23 either.  No disrespect to Mr. Bonds at all.

24          THE COURT:  Exactly.  I mean, you all can talk about,

25 you know, the national champion football game or whatever, but

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 887 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 955 of 1017    PageID 5634
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 886 of
2722

Dondero - Direct                          99

```
 1   it would be counseling your client in the middle of testimony

 2   if you -- if you talk about this case at the moment.  So, you

 3   know, --

 4           MR. BONDS:  I understand, Your Honor.

 5           THE COURT:  All right.

 6           MR. BONDS:  I just didn't want to be --

 7           THE COURT:  All right.  So now we'll come back at

 8   12:11.

 9           THE CLERK:  All rise.

10           MR. MORRIS:  Thank you, Your Honor.

11       (A recess ensued from 12:01 p.m. until 12:12 p.m.

12           THE CLERK:  All rise.

13           THE COURT:  Please be seated.  This is Judge

14   Jernigan.  We're going back on the record in Highland Capital

15   versus Dondero.  We have taken an 11-minute break.  It looks

16   like we have Mr. Dondero and counsel back.  And Mr. Morris,

17   are you out there, ready to proceed?

18           MR. MORRIS:  I am, Your Honor.  And I do have just a

19   few more questions.

20           THE COURT:  Okay.  I'm sorry.  Mr. Lynn, I see you're

21   there in the room with Mr. Dondero.  Now, did you want to --

22           MR. LYNN:  Here's Mr. Bonds.  I apologize.  He was in

23   the restroom.

24           THE COURT:  Okay.  All right.  Everyone ready to

25   proceed?
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 888 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 956 of 1017 PageID 5635
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 887 of
2722

Dondero - Direct                    100

1          MR. MORRIS:  Yes, Your Honor.

2          THE COURT:  Okay.  Mr. Morris, go ahead.

3          MR. MORRIS:  Thank you, Your Honor.

4                DIRECT EXAMINATION, RESUMED

5    BY MR. MORRIS:

6    Q    Can you hear me, Mr. Dondero?

7    A    Yes.

8    Q    Did you ever discuss the request of any party to produce

9    the financial statements of Get Good and Dugaboy with Scott

10   Ellington?

11   A    Not that I recall.

12   Q    Did you ever communicate with Mr. Leventon on the subject

13   matter of whether or not the financial statements for Get Good

14   and Dugaboy needed to be produced by the Debtor?

15   A    No.

16   Q    Those are the two questions that you were directed not to

17   answer the other day, right?

18   A    I don't remember.

19   Q    Okay.  You mentioned that Mr. Ellington serves in some

20   capacity as settlement counsel.  Do I have that right?

21   A    Yes.

22   Q    Do you know if there's any exception in the TRO that

23   permits you to communicate directly with Mr. Ellington in his

24   so-called capacity as settlement counsel?

25   A    There was no change in his status in the TRO.  It's -- and

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 889 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 957 of 1017   PageID 5636
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 888 of
2722

Dondero - Direct                    101

1   I think he was still used by both the Debtor and by me in that

2   function.

3   Q   You said that -- you testified earlier that you understood

4   that you were prohibited from speaking with the Debtor's

5   employees, correct?

6   A   Except for -- except for with regard to the pot plan,

7   shared services, and Ellington as settlement counsel.  But I

8   continued to talk to employees about the pot plan as recently

9   as the end of the year, and I continued to talk to employees

10  about shared services based on the shared services proposal

11  that was sent to Ellington and forwarded to me as recently as

12  two days ago.

13  Q   You never -- you never read the TRO, right?

14  A   No.

15       MR. MORRIS:  Can we have it put up on the screen?  I

16  don't know the exhibit number, Ms. Canty, but hopefully it's

17  clear on the exhibit list.

18       MS. CANTY:  I'm sorry, John.  Can you repeat what

19  you're looking for?

20       MR. MORRIS:  The TRO.  (Pause.)  Can we scroll down

21  to Paragraph 2, please?  Okay.

22  BY MR. MORRIS:

23  Q   I appreciate the fact that you've never seen this before,

24  Mr. Dondero, but let me know if I'm reading Section 2(c)

25  correctly.  "James Dondero is temporarily enjoined and

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 890 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 958 of 1017    PageID 5637
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 889 of
2722

Dondero - Direct                              102

1   refrained from" -- subparagraph (c) -- "communicating with any

2   of the Debtor's employees, except for specifically -- except

3   as it specifically relates to shared services currently

4   provided to affiliates owned or controlled by Mr. Dondero."

5        Have I read that correctly?

6   A    Yes.

7   Q    Does that provide for any exceptions concerning the pot

8   plan?

9   A    The Independent Board requested a meeting on the pot plan.

10  Q    Okay.  But does it -- I appreciate that, and we'll talk

11  about that in a moment, but my question is very specifically

12  looking at the order.  And I, again, appreciate that you've

13  never seen it before.  But looking at the order now, is there

14  any exception for you to communicate with the Debtor's

15  employees concerning the pot plan?

16  A    I would think the pot plan would fall under that, since

17  some of the pot plan value is coming from affiliated entities

18  that are subject to the shared services agreement.  I would

19  think that would be reasonable, again, plus the -- well, it

20  was the subject of a meeting with the Independent Board at the

21  end of the month.

22  Q    Okay.

23  A    I still think it's the best alternative for this estate.

24  Q    Okay.  Did you -- did you ever -- did you ever ask

25  anybody, on your behalf, have asked the Debtors whether they

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 891 of
Case 3:25-cv-02072-S  Document 15-7  Filed 06/25  Page 959 of 1017  PageID 5638
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 890 of
2722

Dondero - Direct                     103

1  agreed with what you believed was a reasonable interpretation

2  of the restraining order?

3  A    I did not.

4  Q    Okay.  And let's just deal with the notion of settlement

5  counsel.  Do you see anywhere in this TRO -- and if you want

6  to read anything more, please let me know -- do you see

7  anything in this TRO that would permit you to speak with Mr.

8  Ellington in his so-called role as settlement counsel?

9  A    Well, I would say, more importantly, I don't see anything

10 that takes away his role as settlement counsel, which was

11 formally done six months ago.

12 Q    Okay.  I did read Section 2(c) correctly, right?

13 A    Yes.

14 Q    And the only exception that's in Judge Jernigan's

15 restraining order that she entered against you relates to

16 shared services.  Have I read that correctly?

17 A    Yes.

18 Q    Okay.  Let's talk about the pot plan for a moment.  After

19 the TRO was entered, you were interested in continuing to

20 pursue the pot plan; is that right?

21 A    I still believe it's the best possible result for this

22 estate.

23 Q    And you sought a forum with the Debtor's board, correct?

24 A    Yes.

25 Q    And you knew that you couldn't speak directly with any

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 892 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 960 of 1017   PageID 5639
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 891 of
2722

Dondero - Direct                    104

1  member of the Debtor's board unless your counsel and the

2  Debtor's counsel was -- was present at the same time.

3  Correct?

4  A    Yeah.  As a matter of fact, I didn't go.  I just had

5  counsel go.

6  Q    And the Debtor's board gave Mr. Lynn a forum for him to

7  present your pot plan after the TRO was entered.  Isn't that

8  right?

9  A    I believe so.

10  Q    And are you aware that the Debtor's board spent more than

11  an hour and a half with Mr. Lynn talking about your pot plan

12  after the TRO was entered?

13  A    Yes.

14  Q    And is it fair to say that, notwithstanding Mr. Lynn's

15  goodwill and Mr. Lynn's efforts to try to get to a successful

16  resolution here, the terms on which the pot plan were offered

17  were unacceptable to the Debtor?

18  A    I wasn't there.  I -- I don't know.

19  Q    The Debtor never made a counteroffer, did it?

20  A    Not that I heard.

21  Q    You'll admit, will you not, that over the last year you or

22  others acting on behalf -- on your behalf have made various

23  pot plan proposals to the Official Committee of Unsecured

24  Creditors?

25  A    Quite generous pot plans that I think will exceed any

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 893 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 961 of 1017   PageID 5640
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 892 of
2722

                         Dondero - Direct                    105

1    other recoveries.

2    Q    Okay.  So you're aware that your pot plan was delivered

3    either by you or on your behalf to the U.C.C., correct?

4    A    I -- some were.  Some, I don't know.

5    Q    Okay.  Has the U.C.C. ever made a counterproposal to you?

6    A    Nope.

7              MR. MORRIS:  I have no further questions, Your Honor.

8              THE COURT:  All right.  Pass the witness.

9         Mr. Bonds, do you have any time estimate for me,

10   guesstimate?

11             MR. BONDS:  My guess is, Your Honor, it'll be about

12   an hour.  I would hope that we could take some type of a

13   break, just because I'm a diabetic and need to have some --

14             THE COURT:  All right.  Well, --

15             MR. MORRIS:  I have no objection, Your Honor.

16   Whatever suits the Court.  I'm willing to accommodate Mr.

17   Bonds always.

18             THE COURT:  Okay.  Let's take a 45-minute break.

19   Forty-five minutes.  So, it's 12:22.  We'll come back at seven

20   minutes after 1:00 Central time.

21        All right.  We're in recess.

22             THE CLERK:  All rise.

23        (A luncheon recess ensued from 12:23 p.m. to 1:15 p.m.)

24             THE CLERK:  All rise.

25             THE COURT:  Please be seated.  This is Judge

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 894 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 962 of 1017   PageID 5641
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 893 of
2722

Dondero - Cross                         106

1    Jernigan.  We are going back on the record in Highland Capital

2    Management versus Dondero.  We took a lunch break.  And when

3    we broke, Mr. Bonds was going to have the chance to examine

4    Mr. Dondero.

5        Let me just make sure we have, first, Mr. Dondero and Mr.

6    Bonds.  Are you there?

7            MR. BONDS:  Yes, we are.

8            THE COURT:  All right.  Very good.  I don't see your

9    video yet, but -- there you are.  All right.  Mr. Morris, are

10   you there?

11           MR. MORRIS:  I am here.  Can you hear me, Your Honor?

12           THE COURT:  I can.  All right.

13           MR. MORRIS:  Thank you.

14           THE COURT:  Well, we've got lots of other people, but

15   that's all I'll make sure we have at this moment.  All right.

16   Mr. Bonds, you may proceed.

17       And, Mr. Dondero, I know you know this, but I'm required

18   to remind you you're still under oath.

19       Okay, go ahead.

20                        CROSS-EXAMINATION

21   BY MR. BONDS:

22   Q    Before you resigned as portfolio manager, how long had you

23   had with Highland Capital Management?

24   A    Since inception in 1994.

25   Q    Okay.  And how long have your offices been at the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 895 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 963 of 1017   PageID 5642
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 894 of
2722

Dondero - Cross                    107

1   Crescent?

2   A    Eight years.

3   Q    Okay.  Before you resigned as portfolio manager, did you

4   spend a lot of time in the office?

5   A    Yes.  I spent every business day this -- or 2020,

6   including COVID, in the office.

7   Q    Okay.  And this is the first time that you are not in the

8   office, is that right, in decades?

9   A    Yes.

10  Q    Can you tell us about the shared services agreement that

11  exists between the Debtor and the other entities in which you

12  have an interest?

13  A    NexPoint, NexBank, the DAF, HFAM, primarily.  I don't know

14  what other entities paid.  Shared services, which is typical

15  in finance, for centralized tax, accounting, RICO function, so

16  that we don't have to have redundant, multiple high-paid

17  people in different entities.  We'd have them centralized and

18  with collective experience and collective functionality.  And

19  so, historically and recently, they pay Highland for those --

20  fees for those services.  And I, as a non-paid employee, or a

21  non-employee of Highland but a paid employee of NexBank -- of

22  NexPoint, was -- and my occupancy and support were part of

23  those shared services agreement.

24  Q    What do those agreements allow those entities to do?

25  A    Would it allow those entities to do?  Well, to access the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 896 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 964 of 1017    PageID 5643
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 895 of
2722

Dondero - Cross                          108

1  Highland functionality as appropriate, because most of those

2  entities, as is typical in finance, did not have their own

3  functionality, legal, tax, and -- legal, tax, and accounting,

4  but although they've been -- they've been building it lately

5  in anticipation of the pot plan not going through at Highland.

6  Q   Okay.  Do those agreements allow you to share office space

7  with --

8           MR. MORRIS:  Objection --

9           THE WITNESS:  Yes.

10          MR. MORRIS:  -- to the form of the question, Your

11  Honor.  I think the exhibits and the agreements themselves

12  would be the best evidence.  They're not in evidence.  They

13  haven't been offered in evidence.  I have no way to challenge

14  the witness on anything he's saying.  And on that basis, I'd

15  -- it's not fair to the Plaintiff.

16          THE COURT:  All right.  Mr. Bonds, can I ask you to

17  repeat your question?  It was muffled and I was about to ask

18  you to repeat it before I got the objection.  So, repeat the

19  question so I can --

20          MR. BONDS:  Okay.  I'm going to repeat it and amend

21  it.

22          THE COURT:  Okay.

23  BY MR. BONDS:

24  Q   Is it your understanding that those agreements allow you

25  to share office space with the Debtor?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 897 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 965 of 1017    PageID 5644
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 896 of
2722

Dondero - Cross                            109

 1  A    Yes.  Virtually all of NexPoint's employees share the
 2  Highland office space as part of a shared services agreement.
 3  Q    Do those agreements allow you to share -- I'm sorry,
 4  excuse me.  Strike that.  What else do they allow?
 5  A    Typically is used in coordination of systems, servers,
 6  software, cloud software, Internet software, office software,
 7  tax, accounting, and legal functionality are all part of the
 8  shared services agreement, although, you know, much of -- much
 9  of that was stripped, you know, four or five months ago,
10  especially legal functionality and the accounting
11  functionality, without the concurrent adjustment in the
12  building.
13  Q    Okay.  And you previously testified that you generally
14  control NexPoint; is that correct?
15  A    Generally.  And the distinction I was trying to make is,
16  you know, following the financial crisis in '08, compliance
17  and the chief compliance officer has personal liability. along
18  with the rest of the C Suite, and operates independently, with
19  primary loyalty to the regulatory bodies.  And they're --
20  they're not controlled, bamboozled, or segued away from their
21  responsibility.  And at all times, they're supposed to be
22  doing what they believe is right, regulatorily-compliant, and
23  in the best interest of investors.
24      So that was the distinction I was drawing between, A, what
25  I was trying to remind Thomas of, that he should be

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 898 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 966 of 1017 PageID 5645
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 897 of
2722

Dondero - Cross                    110

1   independent of Seery, in terms of following what he believes

2   is correct and regulatory-compliant.  And I don't have to push

3   the NexPoint compliance people and general counsel to do

4   anything specific, nor could I.  They are supposed to do what

5   is right from a regulatory investor standpoint, and I believe

6   that's what they've done.

7   Q   All right.  And what do you mean by the term or the usage

8   of the word "generally"?

9   A   Well, that's the distinction I was just drawing.  I mean,

10  generally, on regular business strategy, you know, major

11  investments, you know, other business items, I'm in control of

12  those entities.  But in terms of the content and allegations,

13  regulatory opinions that come from compliance and the general

14  counsel, that is their best views on their own, knowing they

15  have compliance obligations and personal liability.

16  Q   Do you believe that NexPoint and its other owners and

17  interest holders have rights independent from your own in this

18  case?

19  A   Right, yes, and obligations, and responsibilities to

20  investors.  I believe the attempt by the Debtor or Seery to

21  hide behind contracts that the Debtor has with the CLOs are --

22  are a spurious, incomplete argument.  You know, they're not in

23  compliance with those contracts.  Bankruptcy alone is an event

24  of default.  Not having the key man -- the key men, the

25  required requisite professionals that they're obligated to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 899 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 967 of 1017 PageID 5646
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 898 of
2722

Dondero - Cross                    111

1   contractually have working at the Debtor is a clear breach, in

2   violation of those CLO contracts.  Not having adequate staff

3   or investment professionals to analyze, evaluate, or follow

4   the investments in the portfolio is a clear violation.  And

5   specifically telling investors in the marketplace that you

6   plan to terminate all employees, a date certain January 24th,

7   is a proclamation that you're not going to be in any form able

8   to be a qualified registered investment advisor or qualified

9   in any which way to manage the portfolio or be in compliance

10  with the CLO contracts.

11      I would -- I would further add that the selling of the

12  securities, and the SKY securities, represent incomplete

13  intentional incurring of loss against the investors.  You have

14  securities that are less liquid with, you know, restructured

15  securities that have been owned for ten years, and they were

16  sold during the most illiquid weeks of the year, the couple

17  days before and after Thanksgiving, couple days before and

18  after Christmas, where the investors could have gotten 10 or

19  15 percent more on their monies if they were just sold in a

20  normal week.  It's -- it's preposterous to me.  It's

21  consistent with Seery not being an investment (garbled).

22      But it's preposterous to me that -- that this treatment of

23  investors is allowed or being camouflaged as some kind of

24  contractual obligation, when the investors have said these

25  funds are clearly in transition and the manager clearly is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 900 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 968 of 1017   PageID 5647
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 899 of
2722

                     Dondero - Cross                    112

1    incapable of managing them.  You know, please don't transact

2    until the transition is complete.  But Jim Seery has traded

3    every day, including -- I don't know about today, but every

4    day this week, selling securities for no investment rationale

5    and no business purpose.

6    Q    Are you also portfolio manager for NexPoint?

7    A    Yeah, I'm a portfolio manager for the closed-end retail

8    funds, which do have a higher fiduciary obligation than

9    anything on the institutional side.  I'm a portfolio manager

10   for those '40 Act funds that are the primary owners of the

11   CLOs that Seery is selling securities in for some unknown

12   reason.

13   Q    And what shared service agreements exist between NexPoint

14   and the Debtor?

15   A    Those are the shared service agreements I spoke of.  I

16   don't want to repeat myself.

17   Q    And I'm going to call Highland Capital Management Fund

18   Advisors, LP just Fund Advisors.  Is that okay with you?

19   A    Yes.

20   Q    Okay.  And you testified generally -- that you generally

21   control Fund Advisors; is that correct?

22   A    Yes.

23   Q    Do you believe that Fund Advisors and its owners and

24   interest holders have rights independent from your own in this

25   case?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 901 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 969 of 1017    PageID 5648
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 900 of
2722

Dondero - Cross                        113

1   A    Yes.

2   Q    Are you the portfolio manager for Fund Advisors?

3   A    Yes.

4   Q    What shared services agreements exist between Fund

5   Advisors and the Debtor?

6          MR. MORRIS:  Objection, Your Honor.  The agreements

7   themselves are the best evidence of the existence in terms of

8   any agreement between the Debtor and these entities.

9          MR. BONDS:  Your Honor, I can fix that.

10         THE COURT:  Okay.

11  BY MR. BONDS:

12  Q    I'm just asking:  What is your understanding, Mr. Dondero,

13  of the shared service agreements between the Debtor and Fund

14  Advisors?

15  A    It's similar to the agreement I mentioned earlier.  It

16  covers a broad range of centralized services historically

17  provided by Highland, but now those, while still paying

18  smaller than historic fees, those entities now have been

19  required to incur the expenses of duplicating those functions.

20  Q    Okay.  Do you recall the email string dated November 24th

21  regarding SKY equity that the Debtor talked about?

22  A    Yes.

23  Q    What did you mean when you sent that email about the

24  trade?  What did you mean, I'm sorry?

25  A    I was trying to inform the traders, and once they knew --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 902 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/25 Page 970 of 1017 PageID 5649
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 901 of
2722

Dondero - Cross                    114

1  they weren't willing to do the trades anymore once they knew

2  that the underlying investors had requested that their

3  accounts not being traded until the transition be -- until the

4  transition of the CLOs was effectuated.

5      It's -- it's standard by, you know, statute or

6  understanding, in the money and management business, when

7  you're moving accounts from one asset manager to another, and

8  someone requests that you don't do anything to their account,

9  you don't trade it whimsically.  And so I was -- I was making

10  sure the traders knew that the underlying investors had

11  requested that no trades occur in their accounts.

12      And then I believed it was a clear violation of the

13  Registered Investment Adviser's Act.  I believe that people

14  involved at a senior level or at a compliance level could have

15  material liability, and could create material liability for

16  the Debtor.  And I think if, as I said before, I think if

17  anybody on this call were to call the SEC, they would start on

18  audit on this.

19      MR. MORRIS:  Your Honor, I move to strike the first

20  portion of the answer prior to when he started to describe

21  what he believes and what he thinks.  The first portion of the

22  answer was devoted to testifying about what is in the

23  knowledge of the people who he was communicating with.

24  There's no evidence.  Mr. Dondero, of course, was free to call

25  any witness he wanted.  He could have called the chief

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 903 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 971 of 1017   PageID 5650
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 902 of
2722

Dondero - Cross                    115

1   compliance officer.  He could have called the general counsel.

2   He could have called all the people he's now testifying on

3   behalf of, and he did not.

4        So I move to strike anything in the record that purports

5   to reflect or suggest the knowledge on behalf of any party

6   other than Mr. Dondero.

7            THE COURT:  Okay.  I'm --

8            MR. BONDS:  Let me rephrase -- Your Honor, I'm going

9   to rephrase the question.

10           THE COURT:  Okay.  Very well.

11           MR. BONDS:  I'm sorry.

12           THE COURT:  So the motion to strike is granted.  If

13  you're going to rephrase, go ahead.

14           MR. BONDS:  Okay.

15  BY MR. BONDS:

16  Q   Mr. Dondero, what did you mean when you said -- that the

17  emails about the trade?

18  A   Okay.  I'll give my intention by sending emails to stop

19  the trade and my basis for those emails.  My intentions were

20  to inform the traders and to inform the compliance people that

21  I believe there was a trade that wasn't in the best interest

22  of the employees that had no business purpose for its

23  occurring.  And the people involved weren't aware that the

24  investors had sent over requests not to trade their accounts

25  while they were in transition.

004889

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 904 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 972 of 1017    PageID 5651
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 903 of
2722

Dondero - Cross                        116

 1       So I made the traders aware of that.  I made compliance

 2   aware of that also.  And it's my belief, based on 30 years'

 3   experience in the industry, that it is entirely inappropriate

 4   to trade the accounts of investors that are in transition, and

 5   especially when you're not -- you're not contractually -- you

 6   are contractually in default with that client, to trade their

 7   account whimsically, for no business purpose.  And I thought

 8   it was a clear breach of both regulatory, ethical, and

 9   fairness with regard to the investors.

10       So I -- what did you know, when did you know it, what did

11   you do?  I did what I felt was the right thing, which I try

12   and do every day, and made all the relevant parties aware of

13   what was going on.

14   Q    Mr. Dondero, do you recall the text message you sent to

15   Mr. Seery in which you said, "Be careful what you do"?

16   A    Yes.

17   Q    What did you mean by that message?

18   A    It's -- I even said, Last warning.  I mean, I -- he's

19   doing things against the interests of investors.  He's

20   purposely incurring losses by trading in days and weeks and

21   time of the year, the day before and after Thanksgiving, where

22   any novice knows the markets are illiquid and anybody who can

23   read a computer screen can see you get ten percent less --

24   five or ten percent less than you would the week before or the

25   week after.  And with as much professional umbrage as

Dondero - Cross                        117

1  possible, I was recommending that he stop.

2  Q   Did you intend to personally threaten Mr. Seery in any

3  way?

4  A    No.  It was bad -- bad intentional professional acts

5  against the interests of investors that flow through to '40

6  Act retail mom-and-pop investors.  I was trying to prevent

7  those losses and those bad acts from occurring.  And I believe

8  everybody who's -- everybody around that issue should be

9  ashamed of themselves, in my opinion.

10 Q   Do you now regret sending the text?

11 A    No.  No, I mean, I could have worded it differently.  I

12 was angry on behalf of the investors.

13 Q   And Mr. Dondero, you have management ownership interest in

14 that entity; is that right?

15 A   Yes.

16 Q   Do you believe the interests or other entities in which

17 you are involved are independent from your personal rights in

18 this case?

19 A   Yes.

20 Q   And do you believe you caused anyone to violate the TRO?

21 A    No.  I've been -- I've been very conscious to just try and

22 champion the thing that -- things that I think are important

23 and the things that I've been tasked to do, like an attractive

24 pot plan to help resolve this case.  I spend time on that.

25 But every once in a while, do I have to access, let's say,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 906 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 974 of 1017 PageID 5653
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 905 of
2722

Dondero - Cross                    118

1   David Klos, who is the person who put the model together, who

2   has been working on it for six or nine months, and no one else

3   S has a copy of?  Yes.  Yeah, I have to -- I have to access

4   him.  I don't believe that's the -- inappropriate or in any

5   way violating the spirit of the TRO.

6       I believe settlement in this case is only going to happen

7   with somebody fostering communication.  And Ellington's role,

8   which I thought was a good one and I thought he was performing

9   well as settlement counsel, was an important role.  And I used

10  him for things like -- and Seery also used him for things.  As

11  recently as two days before Ellington was fired, Seery gave

12  him a shared services proposal to negotiate with me.

13  Ellington has always been the go-between from a settlement and

14  a legal standpoint.  I think his role there was -- it was

15  valued.  To try to honor the TRO was things like Multi-Strat,

16  that I didn't remember correctly.  Ninety percent of the time

17  or for the last 20 years I would have gone directly to

18  Accounting and Dave Klos for it, but I purposely went to

19  settlement counsel in terms of Ellington in order to get the

20  Multi-Strat information which we needed in order to put the

21  pot plan together that we went to the Independent Board with

22  at the end of December.

23  Q   (faintly)  And do you recall the questions that Debtor's

24  counsel had regarding the letters sent by K&L Gates to clients

25  of the Debtor?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 907 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 975 of 1017   PageID 5654
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 906 of
2722

Dondero - Cross                        119

1           MR. MORRIS:  I'm sorry, Your Honor.  I had trouble

2    hearing that question.

3           THE COURT:  Please repeat.

4           MR. BONDS:  Sure.

5    BY MR. BONDS:

6    Q    Do you recall the questions Debtor's counsel had regarding

7    the letters sent by K&L Gates to the clients of the Debtor --

8    to the Debtor?

9    A    Yes.

10   Q    You testified on direct that the letters were sent to do

11   the right thing; is that correct?

12   A    Yes.

13   Q    What did you mean by that?

14   A    I don't want to repeat too much of what I just said, but

15   the Debtor has a contract to manage the CLOs, which in no way

16   is it not in default of.  It doesn't have the staff.  It

17   doesn't have the expertise.  Seery has no historic knowledge

18   on the investments.  The investment staff of Highland has been

19   gutted, with me being gone, with Mark Okada being gone, with

20   Trey Parker being gone, with John Poglitsch being gone.

21        And there's -- there's a couple analysts that are a year

22   or two out of school.  The overall portfolio is in no way

23   being understood, managed, or monitored.  And for it to be

24   amateur hour, incurring losses for no business purpose, when

25   the investors have requested numerous times for their account

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 908 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 976 of 1017    PageID 5655
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 907 of
2722

Dondero - Cross                         120

1  not to be traded, is crazy to me.  Where the investors say, We

2  just want our account left alone.  We just want to keep the

3  exposure.  And Jim Seery decides no, there's -- I'm going to

4  turn it into cash for no reason.  I'm just going to sell your

5  assets and turn them to cash and incur losses by doing it the

6  week of Thanksgiving and the week of Christmas.  I think it's

7  -- it's shameful.  I'm glad the compliance people and the

8  general counsel at HFAM and NexPoint saw it the same way.  I

9  didn't edit their letters, proof their letters, tell them how

10 to craft their letters.  They did that themselves, with

11 regulatory counsel and personal liability.  They put forward

12 those letters.

13          MR. MORRIS:  Your Honor (garbled) the testimony that

14 Mr. Dondero just gave about these people saw it.  They're not

15 here to testify how they saw it.  We know that Mr. Dondero

16 personally saw and approved the letters before they went out.

17 He can testify what he thinks, what he believes.  I have no

18 problem with that.  But there should be no evidence in the

19 record of what the compliance people thought, believed,

20 understood, anything like that.  It's not right.

21          THE COURT:  All right.  That's essentially a --

22          MR. BONDS:  Your Honor?

23          THE COURT:  -- a hearsay objection, I would say, or

24 lack of personal knowledge, perhaps.  Mr. Bonds, what is your

25 response?

Dondero - Cross                    121

1          MR. BONDS:  Your Honor, my response would be that

2    there are several exhibits the Debtor introduced today that

3    stand for the proposition that the compliance officers were

4    concerned.  So I think there is ample evidence of that in the

5    record.

6          THE COURT:  I didn't --

7          MR. MORRIS:  Your Honor, the letter --

8          THE COURT:  I did not understand what you said is in

9    the record.  Say again.

10          MR. BONDS:  Your Honor, I'm sorry.  The -- there are

11    -- there are references that are replete in the record that

12    have to do with the compliance officers' understanding of the

13    transactions.

14          THE COURT:  I don't know what you're referring to.

15          THE WITNESS:  Your Honor?

16          THE COURT:  I've got a lot of exhibits.  You're going

17    to have to point out what you think --

18          THE WITNESS:  Can I -- can I -- can I -- can I answer

19    for -- that for a second?  The letters that were signed by the

20    compliance people or by the businesspeople at NexPoint and

21    HFAM objecting to the transactions, those letters were their

22    beliefs, their researched beliefs.  They weren't --

23          THE COURT:  Okay.

24          THE WITNESS:  -- micromanaged by me.  You know, they

25    weren't -- I agree with them, but those weren't my beliefs

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 910 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 978 of 1017    PageID 5657
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 909 of
2722

Dondero - Cross                              122

 1    that they've stated.  Those were their own beliefs and their

 2    own research, --

 3              THE COURT:  All right.

 4              THE WITNESS:  -- and the record should reflect --

 5              THE COURT:  This is clearly hearsay.  I mean, it's

 6    one thing to have a letter, but to go behind the letter and

 7    say, you know, what the beliefs inherent in the words were is

 8    inadmissible.  All right?  So I strike that.

 9              THE WITNESS:  Maybe ask your question again.

10    BY MR. BONDS:

11    Q    Yeah.  What is your understanding of the rights that these

12    parties had and what do you believe that was intended to be

13    conveyed by the compliance officers?

14              MR. MORRIS:  Objection.  Calls -- calls for Mr.

15    Dondero to divine the intent of third parties.  Hearsay.

16              THE COURT:  I sustain.

17              MR. BONDS:  Your Honor, --

18              MR. MORRIS:  No foundation.

19              MR. BONDS:  -- I don't agree.  I think that this is

20    asking Mr. Dondero what he thinks.

21              MR. MORRIS:  The letters speak for themselves, Your

22    Honor.

23              THE COURT:  Okay.  I sustain --

24              MR. MORRIS:  And Mr. --

25              THE COURT:  I sustain the objection.

Dondero - Cross                    123

1          MR. MORRIS:  All right.  Thank you.

2          THE WITNESS:  Ask me what I know.  Or ask me what my

3    concerns --

4    BY MR. BONDS:

5    Q    Let me ask you this.  What were your concerns relating to

6    the compliance officers' exhibit?

7    A    My concerns regarding the transaction, the transactions,

8    which may repeat what I've said before, but I do want to make

9    sure it gets in the record.  So if we have to make a -- these

10   were my concerns, whether or not they were the compliance

11   people's concerns.  I believe they were, and I believe they

12   were similar, but I'm just going to say these are -- these

13   were my concerns.

14        The Debtor, with its contractual -- with its contract with

15   the CLOs, were in no way -- was in no way compliant with that

16   contract or not in default of that contract.  Bankruptcy is a

17   reason for default.  Not having the key men specified in the

18   contract currently employed by the Advisor is a violation.

19   Not having adequate investment staff to manage the portfolio

20   is a violation of that contract.  Announcing that you're

21   laying off everybody and will no longer be a registered

22   investment advisor is proclaiming that you, if you even have

23   any -- any -- pretend that you're qualified or in compliance

24   with the contract now, you're broadcasting that you won't be

25   in three weeks, are -- are all mean that you're not in good

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 912 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 980 of 1017   PageID 5659
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 911 of
2722

Dondero - Cross                    124

1   standing.  Okay?  Number one.

2       Number two, when the investors know that it's in

3   transition, you're not in compliance as a manager, you're not

4   going to be an RIA in three weeks, the accounts are going to

5   have to transition to somebody else in three weeks, and the

6   investors ask you, Please don't trade my accounts between now

7   and then, that is -- that is a -- if it's not a *per se*, it's

8   an ethical and a spirit violation of any relationship between

9   an investor and an asset manager.

10      To then sell assets -- not replace assets, just sell

11  assets for cash -- and purposely do it on the least liquid

12  days of the year -- the day before Thanksgiving, the day after

13  Thanksgiving, the week of Christmas, this past week, whatever

14  -- to purposely incur losses so that the investors suffer ten

15  or fifteen percent losses that other -- on each of those sales

16  that they wouldn't otherwise have to incur, and for no stated

17  business purpose, for no investment rationale, with no staff

18  to even say whether the investment is potentially going up or

19  down, is -- is -- is -- I've never seen anything else like it.

20      And I will stand up and say it every day:  I'm glad the

21  letters went out from HFAM and from NexPoint.  I would never

22  recommend they get retracted.  And I believe everybody who

23  signed those letters meant everything in those letters.  And I

24  believe the letters are correct.  And I believe the whole

25  selling of CLO assets is a travesty.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 913 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 981 of 1017   PageID 5660
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 912 of
2722

Dondero - Cross                    125

1    My personal opinion, we need an examiner or somebody here

2    to look at this junk and look at some of the junk that

3    occurred earlier this year.  This -- this stuff is

4    unbelievable to me.

5    Q    Generally, who holds interests in the CLOs?

6    A    A vast majority of the CLOs that we're speaking of that

7    Seery has been selling the assets of are owned by the two

8    mutual funds, the two '40 Act -- the two '40 Act mutual funds

9    and the DAF.  Between them, I think out of -- eleven out of

10   the sixteen CLOs, they own a vast majority, and then I think,

11   whatever, two or three they own a hundred percent, and I think

12   two or three they own a significant minority.

13       And just because they don't own a hundred percent doesn't

14   somehow allow a registered investment advisor to take

15   advantage of an investor.  And I -- I've never understood that

16   defense.  I wouldn't be able -- in my role of 30 years, I

17   wouldn't be able to tell that to an investor, that, hey, you

18   had a contract with us, we did something that wasn't in your

19   best interest, but we got away with it because you didn't own

20   a hundred percent, you only owned eighty percent.

21           MR. MORRIS:  Your Honor, I move to strike.  There's

22   no contract between the Debtor and Mr. Dondero's -- and the

23   entities that he owns and controls for purposes of the CLO.

24   The only contract is between the Debtor and the CLOs

25   themselves.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 914 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 982 of 1017    PageID 5661
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 913 of
2722

Dondero - Cross                         126

1          THE COURT:  All right.  Well, I overrule whatever

2   objection that is.  Again, if you want to bring something out

3   on cross-examination or through Mr. Seery, you know, you're

4   entitled to do that.

5      All right.  Please continue.

6   BY MR. BONDS:

7   Q   Do you believe these letters were sent by the Funds to the

8   Advisors because they are trying to protect the independent

9   entities?

10  A   They're trying to protect their investors.  They were

11  trying to protect their regulatory liability for activities

12  they see that are not in the best interests of investors.

13          MR. MORRIS:  Objection, Your Honor.  I move to

14  strike.  He's again testifying as to the intent of the people

15  who sent the letters who are not here to testify today.

16          THE COURT:  Sustained.

17  BY MR. BONDS:

18  Q   Mr. Dondero, what is your belief as to the letters that

19  were sent by the Funds and Advisor?  Is -- are they trying to

20  protect their independent interests?

21          MR. MORRIS:  Objection, Your Honor.  Asked and

22  answered.

23          THE COURT:  Sustained.

24          THE WITNESS:  Ask me --

25  BY MR. BONDS:

APP. 0910
004900

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 915 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 983 of 1017   PageID 5662
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 914 of
2722

Dondero - Cross                    127

1   Q   What is your understanding of why the letters were sent?

2              MR. MORRIS:  Objection, Your Honor.  Asked and

3   answered.

4              THE COURT:  Sustained.

5   BY MR. BONDS:

6   Q   Mr. Dondero, would you have sent the letters?

7   A   I would have sent the letters exactly or very similar or

8   probably even more strongly than the letters were stated, for

9   the purposes of protecting investors, to protecting mom-and-

10  pop mutual fund investors from incurring unnecessary losses by

11  an entity that was no longer in compliance with their -- with

12  their asset management contract and because the investors had

13  requested that their account just be frozen until it was

14  transitioned.

15     That's why I would have sent the letter.  That's why I

16  believe the letter should be sent.  That's why I'm happy they

17  were sent.  That's why we've never retracted.

18  Q   Mr. Dondero, who is Jason Rothstein?

19             THE COURT:  I did not hear the question.

20             THE WITNESS:  Jason -- Jason --

21             MR. BONDS:  Who --

22             THE COURT:  Please repeat.

23             MR. BONDS:  Yes.  I asked Mr. Dondero who Jason

24  Rothstein was.

25             THE WITNESS:  Jason Rothstein heads up our systems

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 916 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 984 of 1017   PageID 5663
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 915 of
2722

Dondero - Cross                           128

1  department at Highland Capital.

2  BY MR. BONDS:

3  Q   Can you explain what your text message to Mr. Rothstein

4  was about?

5  A   Which text message?  The one where it was in the drawer?

6  Q   Yeah.

7  A   Uh, --

8  Q   And that was actually from him, not you.

9  A   Yeah.  That was from him.  I think he transferred icons or

10  set up personal stuff to the new phone, and he was just saying

11  that the old phone was in Tara's drawer.

12  Q   And you don't know whether -- what's happened to the

13  phones, do you?

14  A   No.  Like I said, I believe they've been destroyed, but I

15  -- I can find out.  I mean, I can query and find out who

16  destroyed it, if that's important.

17  Q   And you understood that you were not supposed to talk to

18  the Debtor's employees; is that correct?

19  A   Like I said, except for my roles regarding shared

20  services, the pot plan, and trying to reach some type of

21  settlement, I've had painfully few conversations with the

22  Debtor's employees.

23  Q   When you talked to certain employees, did you think it was

24  an -- under an exception to the TRO, like shared services,

25  related to the pot plan, or settlement communications?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 917 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 985 of 1017   PageID 5664
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 916 of
2722

Dondero - Cross                    129

1   A    Yes.

2          MR. MORRIS:  Your Honor, I move to strike.  Mr.

3   Dondero never read the TRO.  He's got no basis to say what the

4   TRO required and didn't require.

5          MR. BONDS:  That wasn't the -- that wasn't the

6   question.

7          THE COURT:  Okay.

8          MR. BONDS:  I'm sorry.

9          THE COURT:  Okay.  Rephrase the question, please.

10          MR. BONDS:  Okay.  I'm sorry.

11   BY MR. BONDS:

12   Q    When you talked to these -- to certain employees, did you

13   think it was under an exception to the TRO, like shared

14   services, relating to the pot plan, or settlement

15   communications?

16   A    Yes.  Absolutely.

17          MR. MORRIS:  I object.  No foundation.

18          THE COURT:  Sustained.

19   BY MR. BONDS:

20   Q    Mr. Dondero, do you understand -- did your lawyers explain

21   to you the TRO?

22   A    Yes.

23   Q    And who was the lawyer that explained the TRO to you?

24          MR. MORRIS:  Your Honor, I don't know if we're

25   getting into a waiver of privilege, but I just want to tell

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 918 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 986 of 1017    PageID 5665
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 917 of
2722

Dondero - Cross                          130

1  you that my antenna are up very high.

2         THE COURT:  Okay.  Mine are as well, Mr. Bonds.  Are

3  you about to waive the privilege?

4         MR. BONDS:  No, Your Honor, I am not.

5         THE COURT:  Okay.  Well, it sounded like perhaps we

6  were about to have the witness testify about conversations he

7  had with lawyers.

8         MR. BONDS:  I'm sorry, Your Honor.  That was not my

9  intention.  Again, I'm asking Mr. Dondero to explain for us

10 his contact with -- or, his impression of the TRO.

11 BY MR. BONDS:

12 Q   What did the TRO mean to you?

13 A   The TRO meant to me that I was precluded from talking to

14 Highland employees -- which, again, very few, if any, were

15 coming into the office.  I was not talking to Highland

16 employees with any regularity anyway.  But there was an

17 exception with regard to Scott Ellington regard -- Scott

18 Ellington in terms of him functioning as settlement attorney

19 to try and bridge the U.C.C., the Independent Board, Jim

20 Seery, other people, and things that impacted me or other

21 entities.

22     I also viewed that there was an exception for the pot

23 plan, which had been presented and gone over as recently as

24 December 18th and 20th.  And -- or December 18th, I think, was

25 the date.

APP. 0914
004904

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 919 of
Case 3:25-cv-02072-S   Document 15-7   Filed 10/06/25   Page 987 of 1017   PageID 5666
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 918 of
2722

Dondero - Cross                    131

1      And you know what, I want to clarify a characterization of

2   the pot plan.  I still believe it's the best and most likely

3   alternative for this estate in the long run.  I think what

4   we've proposed numerous times is more generous than what

5   anyone will receive in a liquidation and in a more timely

6   fashion.

7      And the last time we presented it to the Independent

8   Board, the Independent Board thought it was attractive and

9   thought we should go forward with it to the U.C.C. and other

10  parties.

11          MR. MORRIS:  Your Honor, I move to strike the last

12  portion of the answer that purports to describe what the

13  Independent Board thought.

14          THE COURT:  Well, --

15          MR. MORRIS:  No foundation.  Hearsay.

16          THE COURT:  What is your response to the hearsay

17  objection, Mr. Bonds?

18          MR. BONDS:  Your Honor, I don't have one.

19          THE COURT:  Okay.  I sustain.

20  BY MR. BONDS:

21  Q   What exceptions did you believe there were for

22  communications with employees?

23  A   Okay.  Thank you.  Yeah.  Like I said, I covered Scott

24  Ellington and settlement counsel.  I covered the pot plan.

25  Q   Okay.

Dondero - Cross                          132

1   A   My -- my view of the pot plan as -- my view of the pot

2   plan was that it was very attractive, and I had received

3   encouragement to go forward with it as something that should

4   be workable.  That's my testimony on that.

5       And then -- and we talk about negotiating shared services.

6   So, there's shared services in terms of overlap in

7   functionality, but there's also, in terms of negotiating the

8   shared services agreement, which, as I said, was something

9   that Ellington was put in charge of three or four days ago by

10  Jim Seery to negotiate with us.  And he reached out to me to

11  negotiate it.  And I think the Pachulski deadline on it was

12  three days later.  That whole process was something that I

13  viewed as separate from the TRO, especially since it was

14  initiated by Jim Seery, DSI, et cetera, and consistent with

15  what Scott Ellington's role had been for the last six, nine

16  months.

17  Q   As to the Debtor's request that you vacate the office

18  space, did you comply with this request?

19  A   Yes.

20  Q   What did you think that vacating meant?

21  A   I moved out all my -- my personal items to a new office at

22  NexBank.

23  Q   (faintly)  And, in fact, did you work on the last day over

24  to 3:00 a.m.?

25  A   Yes.  4:00.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 921 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 989 of 1017   PageID 5668
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 920 of
2722

Dondero - Cross                          133

1          THE COURT:  Mr. Bonds, I didn't hear your question.

2     I didn't hear your question.

3          MR. BONDS:  Okay.  I'm sorry.

4     BY MR. BONDS:

5     Q   Did -- isn't it true that you worked through the night, to

6     3:00 or 4:00 a.m., to vacate the premises?

7     A   Yes.  Until 4:00 a.m. on the last day, to organize and

8     pack up all my stuff, yes.

9     Q   Did you think your presence in the office, with no other

10    employees there, violated the spirit of the TRO?

11    A   No.  I thought it was over the top and meant to tweak me,

12    but, yeah, there's no -- there's not Debtor employees coming

13    in since COVID.

14    Q   (faintly)  Okay.  And you thought you could talk to Mr.

15    Ellington and -- as settlement counsel; is that correct?

16         MR. MORRIS:  I'm having trouble hearing it, Your

17    Honor.

18         THE WITNESS:  Yes.

19         THE COURT:  Yeah.  We're -- Mr. Bonds, please make

20    sure you speak into the device.

21         MR. BONDS:  I'm sorry.  I'll try to get closer.

22    Okay.  I asked the Debtor -- or I, excuse me, I asked Mr.

23    Dondero if he thought he could talk to Ellington as a go-

24    between or settlement counsel.  And I asked him if that was

25    correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 922 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 990 of 1017    PageID 5669
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 921 of
2722

Dondero - Cross                      134

1          THE WITNESS:  Yes.  For settlement, shared services,

2    the pot plan.  Nothing that interrupts or affects the Debtor,

3    but for those purposes, as has consistently occurred for the

4    last six months.

5    BY MR. BONDS:

6    Q    Okay.  And you saw the texts and emails presented by the

7    Debtor between you and Mr. Leventon; is that correct?

8    A    The one regarding Multi-Strat?

9    Q    Yes.

10   A    Yes.

11   Q    In your understanding, did you believe those

12   communications were allowed under the TRO?

13   A    Well, yes.  And, again, to clarify my -- my contrasting

14   testimony, I would never typically have gone to them for that

15   kind of information, but to be compliant with the TRO, for

16   Multi-Strat information, which I needed in order to put

17   together the pot plan that the Independent Board audienced on

18   December 18, I needed the information on Multi-Strat, and I

19   requested it as appropriate through settlement counsel

20   Ellington.  And I think Ellington requested it from Isaac, who

21   requested it from David Klos.

22        The whole purpose, I believe -- my belief is the whole

23   purpose of this TRO is to make it impossible for us to get

24   information to come up with alternatives other than a -- the

25   plan proposed by Jim Seery.  It's our -- if -- if -- without

Dondero - Cross                      135

1  Ellington in the go-between, which he's now no longer an

2  employee, I assume the only way we get any information,

3  balance sheet or anything from Highland Capital, is with a

4  subpoena.

5      And as much as I've tried to engage or make an attractive

6  pot plan for everybody, each one of them has been a complete

7  shot in the dark, without even knowing the assets and

8  liabilities of Highland, but just estimating where they were

9  or were likely to be.

10 Q   Do you believe your text message with Leventon caused any

11 harm to the Debtor's business?

12 A   No.  It potentially fostered a pot plan, because, you have

13 to know, the pot plan needed -- one of the aspects of the pot

14 plan was the --

15 Q   Do you still want to advocate for your pot plan?

16 A   I think that's eventually where we ultimately end up.  Or

17 -- or should end up.  Otherwise, I fear it's going to be an

18 extended, drawn-out process.

19 Q   And how much did you initially propose to pay creditors in

20 this case?

21 A   The most recent -- the most recent pot plan?

22 Q   No.  The -- initially.

23 A   The initial pot plan, I believe, was $160 million.

24 Q   And what about the notes?

25 A   There was $90 [million] of cash and I believe $70

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 924 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 992 of 1017    PageID 5671
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 923 of
2722

Dondero - Cross                          136

1   [million] of notes.

2   Q    And what is Multi-Strat?

3   A    Multi-Strat is a fund that's managed by Highland.  They

4   used to have $40 or $50 million in value.  It used to contain

5   a lot of life settlement policies.  And I believe now has $5

6   or $6 million of value, after assets have been sold.

7   Q    Do you recall the email Debtor's counsel presented

8   regarding the balance sheet today?

9   A    The balance sheet of Multi-Strat?

10  Q    Correct.

11  A    Yes.

12  Q    Do you believe you were entitled to see that document?

13  A    Yes.  It's just -- again, for the pot plan, I needed it.

14  But also I'm an investor in that fund and I'm entitled to it.

15  It's -- there was nothing in there that was improper or

16  untoward or in any way damaged the Debtor.

17  Q    And you recall the request for documents sent by the

18  Debtor; is that correct?

19  A    On my -- my personal estate plan?

20  Q    No, on Multi-Strat.

21  A    The Debtor's request on -- I'm sorry.  What was that?

22  Q    The Debtor sent you a request for Multi-Strat.  For Duga

23  -- I'm sorry.

24  A    For Dugaboy?  Okay.

25  Q    Dugaboy.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 925 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 993 of 1017    PageID 5672
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 924 of
2722

Dondero - Cross                137

1  A    Yeah.  There's -- there's personal estate planning trusts.

2  Some are active.  Some are inactive.  Some have been around

3  for 15 years.  But they're -- they're not assets or anything

4  that's related to the estate.  And that was -- that was my

5  text to Melissa that said, you know, Not without a subpoena.

6  Q    Mr. Dondero, if you remember back on Exhibit K, there was

7  some request that you terminate your offices at the Crescent,

8  and I think you were given seven days' notice to do that.  Do

9  you know if Christmas occurred during that time?

10 A    I believe it did.

11 Q    So, if Christmas and Christmas Eve are both holidays, how

12 many days, business days, did they give you to terminate or to

13 get out of the space?

14 A    There would have been three business days.  It was Monday

15 through Wednesday that I moved out.

16         MR. BONDS:  Your Honor, I'll pass the witness.

17         THE COURT:  All right.  Mr. Morris?

18         THE WITNESS:  Take a break.  I hope.

19         MR. BONDS:  Your Honor, I'm sorry, can I take a ten-

20 minute break?  I think that I'm going to be through, but I

21 don't know.

22         THE COURT:  All right.  I'll give you a ten-minute

23 break.

24         MR. BONDS:  All right.  Thank you, Your Honor.

25         THE COURT:  We're coming back at 2:15.

Dondero - Cross                      138

     1          THE CLERK:  All rise.

     2      (A recess ensued from 2:06 p.m. until 2:16 p.m.)

     3          THE CLERK:  All rise.

     4          THE COURT:  All right.  Please be seated.  We're back

     5  on the record in Highland versus Dondero.  Mr. Bonds, do you

     6  have more examination?

     7          MR. BONDS:  Your Honor, I have one question.

     8          THE COURT:  Okay.

     9          MR. BONDS:  And that's --

    10          MR. LYNN:  And one more witness.

    11          MR. BONDS:  And one more witness.

    12                CROSS-EXAMINATION, RESUMED

    13  BY MR. BONDS:

    14  Q   Do you think that Scott Ellington and Isaac Leventon were

    15  treated appropriately by the Debtor?

    16  A   No, I do not.  I don't think they've been treated fairly,

    17  nor do I think other senior employees have been treated

    18  fairly.  I've never seen a bankruptcy like this where, during

    19  complex unwinding of 20 years of various different entities

    20  and structures, relying on the staff, working them hard,

    21  working overtime, a lot of investment professionals like

    22  lawyers and DSI just putting their name on the work of stuff

    23  that was done by internal employees, getting to the end of the

    24  year, trying to pay people zero bonuses and retract prior

    25  years' bonuses, and try and come up with legal charges against

1  those people is unusual to this case and my experience, in the

2  bankruptcies we've been involved in, where typically

3  management teams get paid multiples of current salary to stay

4  on and be the experts.

5      I also think they were put in difficult spots from the

6  very beginning.  It was Jim Seery that made Scott Ellington

7  the settlement counsel six, seven months ago.  It was a

8  broadly-defined role that was never retracted, never adjusted,

9  never modified, yet somehow he and Isaac violated it.  I don't

10  know.  I haven't spoken to them since they've been terminated.

11  They aren't allowed to speak to me, from what I hear.  But I

12  wish them luck in their claims.

13          THE COURT:  Okay.  You pass the witness?

14          MR. BONDS:  Yes, Your Honor.

15          THE COURT:  All right.  Mr. Morris, do you have

16  further examination?

17          MR. MORRIS:  Just a few questions.

18                    REDIRECT EXAMINATION

19  BY MR. BONDS:

20  Q   Mr. Dondero, you knew about this hearing for some time,

21  right?

22  A   No.

23  Q   When did you first learn this hearing was going to take

24  place?

25  A   Two days ago.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 928 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 996 of 1017   PageID 5675
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 927 of
2722

Dondero - Redirect                    140

```
1    Q    Two days ago?

2    A    When was the depo, three days ago?  Whatever.

3    Q    And you didn't know prior to the deposition that we would

4    be having a hearing today on the Debtor's motion for a

5    preliminary injunction?

6    A    No.  I thought it was going to be postponed or canceled.

7    I was waiting for the text last night.

8    Q    You had an opportunity to call any witness in the world

9    you wanted to today, right?

10   A    I guess.

11   Q    You could have called -- you could have called the chief

12   compliance officer at the Advisors if you thought the Court

13   should hear from him as to the compliance issues that you've

14   testified to, right?

15   A    I think their letters stand on their own.

16   Q    Okay.  So you didn't think that it was important for the

17   Court to hear from Mr. Sowin directly, correct?

18   A    Sowin is a trader.

19   Q    I'm sorry.  Who's the chief compliance officer of the

20   Advisors?

21   A    Jason Post, as far as NexPoint is concerned.  He's the one

22   that would have been behind the K&L -- K&L letters.

23   Q    And he is not here today to testify, right?

24   A    I think his letters stand on their own and I think

25   everybody should read them, make sure they read them.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 929 of
Case 3:25-cv-02072-S    Document 15-7    Filed 10/06/25    Page 997 of 1017    PageID 5676
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 928 of
2722

                         Dondero - Redirect                    141

1  Q    Okay.  But Mr. Post is not here to answer any questions;

2  is that right?

3  A    I don't know if there are any questions beyond what's

4  obviously stated in the letters.  You should read the letters

5  carefully.  They're -- they're -- they talk about clear

6  violations.

7           MR. MORRIS:  Your Honor, I move to strike.  It's a

8  very simple question.

9           THE COURT:  Sustained.  That was another yes or no

10 answer, Mr. Dondero.  Go ahead.

11           THE WITNESS:  I'm sorry.

12 BY MR. MORRIS:

13 Q    Mr. Dondero, Mr. Post is not here to testify in order to

14 explain to the Court what he thinks the regulatory issues are,

15 correct?

16 A    He's not here today.

17 Q    And you could have called him as a witness, correct?

18 A    Yes.

19 Q    And you thought Mr. Ellington and Mr. Leventon were

20 treated unfairly, right?

21 A    Yes.

22 Q    And there's no reason why they couldn't have come today to

23 testify, correct?

24 A    I guess they could have.

25 Q    And there's no reason why anybody on behalf of the K&L

Dondero - Redirect                    142

1  Gates clients couldn't have been here to testify, correct?

2  A    I didn't deem it necessary, I guess.

3  Q    Okay.  You could have offered into evidence, at least

4  offered into evidence, any document you wanted, right?

5  A    Yes.

6  Q    And you could have offered the judge, for example, the

7  shared services agreement, the shared services agreements for

8  which you gave the Court your understanding, right?

9  A    Which shared services, the one that Seery gave Ellington

10 three days ago or the original one from years ago?

11 Q    Any of the ones -- any of the ones that you have referred

12 to today.  You could have given any of them to the judge,

13 right?

14 A    Correct.

15 Q    And you didn't, right?

16 A    I did not.

17 Q    In fact, there's not a single piece of evidence in the

18 record that corroborates anything you say; isn't that right?

19 A    I -- I believe all those documents are in the record.

20 They're just not in the record of this TRO.  But they're all

21 --

22 Q    Oh.

23 A    They're all in the record.

24 Q    Do you remember that there was a hearing on December 16th?

25 I think you -- you testified that you're fully aware of that

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 931 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 999 of 1017   PageID 5678
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 930 of
2722

Dondero - Redirect                    143

1   hearing that was brought by the K&L Gates Clients.  Do you

2   remember that?

3   A    Yes.

4   Q    Who testified at that hearing on behalf of the K&L Gates

5   Clients?  Dustin Norris?

6   A    I believe -- I believe Dustin Norris testified.

7   Q    Uh-huh.  And what's Mr. Norris's role at the Advisors?

8   A    He's one of the senior managers.

9   Q    Is he a compliance officer?

10  A    No.

11  Q    Is he a trader?

12  A    No.  But he's one of the senior managers.

13  Q    Okay.  They could have called anybody they wanted, to the

14  best of your understanding, right?

15  A    I don't think they got a chance to.  Wasn't it an

16  abbreviated hearing?

17  Q    They offered Mr. Norris as a witness.  Do you understand

18  that?

19  A    I -- all I -- I wasn't there.  I didn't attend virtually.

20  I -- but I did know that Norris testified.  But I don't know

21  who else was called, wasn't called, was going to be called,

22  was on the witness list.  I have no awareness.

23  Q    Okay.  You were pretty critical of the trades that Mr.

24  Seery wanted to make that you interfered to stop, right?

25  A    I think he's subsequently done most of those trades.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 932 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/25   Page 1000 of 1017   PageID 5679
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 931 of
2722

Dondero - Redirect                    144

1   Q    And you called them preposterous because he wanted to do

2   it around Thanksgiving or around Christmas, at least based on

3   your testimony, correct?

4   A    That's when it did occur.

5   Q    And is it your testimony -- is it your testimony that

6   every single person in the world who trades securities near a

7   holiday is making a preposterous trade?

8   A    I think it's amateur and not what an investment

9   professional would do.

10  Q    So you never trade on holidays; is that your testimony?

11  You've never done it once in your life?

12  A    Very rarely, unless there's another overriding reason.

13  And there was no overriding reasons, period.

14  Q    How would you know that when you didn't even ask Mr. Seery

15  why he wanted to make the trades?

16  A    I asked Joe Sowin, who asked Jim Seery.  And Joe Sowin

17  said that Jim Seery just said for risk reduction.

18          MR. MORRIS:  I move to strike on the grounds that

19  it's hearsay, Your Honor.

20          THE COURT:  Sustained.

21  BY MR. MORRIS:

22  Q    You never asked Mr. Seery why he wanted to make the

23  trades, correct?

24  A    I'm not allowed to talk to Mr. Seery.

25  Q    You certainly were around Thanksgiving; isn't that right?

Dondero - Redirect                    145

1   A    I don't know.

2   Q    There was no TRO in place at that time, correct?

3   A    That's true.

4   Q    You're pretty critical of Mr. Seery and his capabilities;

5   is that right?

6   A    He's a lawyer.  He's not an investment professional.

7   Q    Did you object to his appointment as the CEO of the

8   Debtor?

9   A    No.

10   Q    Have you made any motion to the Court to have him removed

11   as unqualified?

12   A    Not yet.

13   Q    Okay.  But with all the knowledge of all the preposterous

14   things that he's been doing for months now, you haven't done

15   it, right?

16   A    No.

17   Q    When you -- when -- before you threw the phone in the

18   garbage, did you back it up?

19   A    No.

20   Q    Did it occur to you that maybe you should save the data?

21   A    No.

22   Q    You said that the only way you think you might be able to

23   get information going forward is through a subpoena.  Do I

24   have that right?

25   A    I mean, that's how it seems.  I mean, it seems at every

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 934 of
Case 3:25-cv-02072-S      Document 15-7     Filed 06/25      Page 1002 of 1017      PageID 5681
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 933 of
2722

Dondero - Redirect                    146

1   turn -- and now with Scott Ellington being gone and Isaac

2   being gone -- I have no idea how the Debtor is ever going to

3   defend against UBS.

4          THE COURT:  I did not --

5          THE WITNESS:  I have no idea how --

6          THE COURT:  I didn't hear the answer after with

7   Ellington and Leventon being gone.  I didn't hear the rest of

8   the answer.  Could you repeat?

9          THE WITNESS:  I said I have no idea how the Debtor is

10  ever going to defend itself against UBS.  But I also have no

11  idea how we're ever going to get any information or ever push

12  forward any kind of settlement without having any access to

13  information or anybody to talk to.

14  BY MR. MORRIS:

15  Q   Do you trust Judge Lynn?

16      (Echoing.)

17  A   Yes.

18  Q   Is he a good advocate?

19  A   Yes.  If anybody returns his phone calls.

20  Q   Do you recall that on October 24th Judge Lynn specifically

21  asked my law firm to provide information on your behalf in

22  connection with the Debtor's financial information, their

23  assets and their liabilities?

24  A   Yes.

25  Q   Do you recall that the Debtor simply asked that you

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 935 of
Case 3:25-cv-02072-S    Document 15-7    Filed 07/30/06/25    Page 1003 of 1017    PageID 5682
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 934 of
2722

                              Dondero - Redirect                        147

1   acknowledge in an email between and among counsel that you

2   would abide by the confidentiality agreement that was entered

3   by the Court?

4   A    I wasn't involved in those details.

5   Q    Didn't you send an email in which you agreed to receive

6   the financial information subject to the protective order that

7   this Court entered?

8   A    I'm sure I would.  I just don't remember.

9   Q    That was a condition that the Debtors made.  That doesn't

10  refresh your recollection?

11  A    I'm not denying it.  I just don't remember, and --

12  Q    Okay.  And --

13  A    (overspoken)

14  Q    I'm sorry, I don't mean to cut you off.  And in fact, on

15  December 30th, the day you were supposed to vacate the office,

16  the Debtor voluntarily provided to Judge Lynn all of the

17  information that had been requested on your behalf without the

18  need for a subpoena, right?

19  A    Yeah.  It took a week.  It's 40,000 pages of mixed

20  gobbledygook that we're -- we're going through.  But it should

21  provide enough information for us to negotiate a pot plan if

22  anybody so chose.

23  Q    So you didn't need to (echoing) the 40,000 pages of

24  financial information from the Debtor; all you needed was an

25  agreement that you would abide by the protective order.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 936 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 1004 of 1017    PageID 5683
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 935 of
2722

Dondero - Redirect                        148

1   Correct?

2   A    I think that was the first thing that was ever produced on

3   request that I can remember.  But yes.

4   Q    And it was just a week ago, right?

5   A    Yes.

6         MR. MORRIS:  I have no further questions, Your Honor.

7         THE COURT:  All right.  Mr. Bonds, do you have

8   anything else?

9         MR. BONDS:  I do not, Your Honor, as to this witness.

10  I have one other witness.

11        THE COURT:  All right.

12        MR. MORRIS:  Your Honor, I don't know who they plan

13  on calling, but he's not on the witness list.

14        THE COURT:  All right.  Well, --

15        MR. BONDS:  Your Honor, this other witness --

16        THE COURT:  Just a moment.  This concludes, for the

17  record, Mr. Dondero's testimony.  But, obviously, stick

18  around, because we're going to have a lot to talk about when

19  this is finished as far as the evidence.

20      All right.  Now, who are you wanting to call that you did

21  not identify?

22        MR. BONDS:  I'd like to call Mike Lynn for the

23  purpose -- or, to -- as a rebuttal witness.

24        THE COURT:  Lawyer as witness?

25        MR. MORRIS:  Your Honor?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 937 of
Case 3:25-cv-02072-S    Document 15-7    Filed 2010/06/25    Page 1005 of 1017    PageID 5684
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 936 of
2722

149

1          THE COURT:  Well, you know, first off, rebuttal of

2     what?  Rebuttal --

3          MR. MORRIS:  Exactly.  He's going to rebut his own

4     client, Your Honor?  He's going to rebut his own client?

5     There's only been one witness to testify here.  He was on

6     their exhibit list.  How do they call a witness to rebut their

7     own client?

8          THE COURT:  Yes.  What -- I don't --

9          MR. BONDS:  Your Honor?

10         THE COURT:  Go ahead.

11         MR. BONDS:  Mr. Morris testified or attempted to

12    testify that the pot plan didn't gain any traction.  We will

13    submit Mike Lynn on that issue.

14         THE COURT:  No.

15         MR. MORRIS:  Your Honor?

16         THE COURT:  I'm not going to allow a lawyer to

17    testify to rebut lawyer argument.  That's very inappropriate,

18    in my view.  So, not going to happen.

19         MR. LYNN:  (garbled)

20         MR. BONDS:  Your Honor, he would be a fact witness to

21    discussions with the other side.

22         MR. MORRIS:  Your Honor, I strenuously object.

23    They're -- he's only rebutting -- my questions are not

24    evidence.  The only evidence in the record is Mr. Dondero's

25    testimony.  Mr. Dondero is their client.  Mr. Dondero was on

150

 1   their witness list.  They should not be permitted to call any

 2   witness, with all due respect to Mr. Lynn, to rebut their own

 3   witness.

 4          THE COURT:  All right.

 5          MR. BONDS:  Your Honor, we're not rebutting our

 6   witness.  We are rebutting the testimony that Mr. Morris gave.

 7          THE COURT:  Mr. Morris is a lawyer.  He makes

 8   argument.  He asks questions.  He was not a witness today.

 9   Okay?

10      So if you want to say whatever you want to say as lawyers

11   in closing arguments, then obviously you can do that.  But I'm

12   not going to allow a lawyer to be a witness to rebut something

13   another lawyer said in argument or in a question.  I -- it's

14   -- so, I disallow that.

15      Anything else, then?

16          MR. BONDS:  No.

17          THE COURT:  Okay.  And while we're talking about

18   procedure, actually, Mr. Morris, it's the Debtor's motion, and

19   I'm not even sure that's all of your evidence.  So, do you

20   have any more evidence as Movant?

21          MR. MORRIS:  No, Your Honor.  The Plaintiff and the

22   Debtor rest.

23          THE COURT:  All right.  So, at the risk of repeating,

24   now that the Movant has rested, it would be Mr. Dondero's

25   chance to put on supplemental evidence.  But what I'm hearing

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 939 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/25    Page 1007 of 1017    PageID 5686
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 938 of
2722

151

```
 1   from Mr. Morris is there were no witnesses identified on your
 2   witness list?
 3            MR. BONDS:  Other than Mr. Dondero, Your Honor.
 4            THE COURT:  Okay.  All right.  Well, was there any
 5   stipulated documentary evidence that -- that you had --
 6            MR. BONDS:  No, Your Honor.
 7            THE COURT:  All right.  Well, I guess we're done with
 8   evidence.
 9       Mr. Morris, your closing argument?
10            MR. MORRIS:  All right.  Before I get to that, Your
11   Honor, I just want to make a very brief statement.  When the
12   Debtor objected to Mr. Dondero's emergency motion for a
13   protective order, the Debtor stated that it sought discovery
14   from Mr. Dondero to determine whether Mr. Dondero may have
15   violated the TRO by interfering and impeding the Debtor's
16   business, including by potentially colluding with UBS.  After
17   that motion was decided, both Mr. Dondero and UBS produced
18   documents to the Debtor.
19       Based on the review of that information, the Debtor found
20   no evidence that Mr. Dondero and UBS colluded to purchase
21   redeemed limited partnership interests of Multi-Strat, nor any
22   inappropriate conduct by UBS or its counsel.
23       The Debtor appreciates the opportunity to clear that part
24   of the record.
25            THE COURT:  All right.
```

152

1          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

2          MR. MORRIS:  Now, with respect to the motion at hand

3    today, Your Honor, I want to take you back just about a month

4    ago to December 10th, 2020.  At that time, we had a hearing on

5    the Debtor's motion for a TRO.  The motion had been filed in

6    advance.  Mr. Dondero had filed an objection.  He had concerns

7    about the scope and the language of the terms of the proposed

8    TRO.

9       And at that hearing, Your Honor, if you'll recall, you

10   listened carefully to the arguments that were made on behalf

11   of Mr. Dondero.  You heard carefully -- you listened carefully

12   to the proposed changes that he sought to make.  And you went

13   through that proposed TRO word by word, Paragraph 2 and 3, and

14   you read them out loud, and you made decisions at that time as

15   to whether the Court believed any portion of that was

16   ambiguous or whether it was clear.  You made determinations at

17   that time whether or not the provisions were reasonable.

18      Mr. Dondero wasn't there.  He didn't read the transcript.

19   He has no idea what you said.  But his lawyers were there, and

20   they had an opportunity to object and they had an opportunity

21   to make comments, and the order is what the order is.  And for

22   whatever reason, Mr. Dondero chose not to read it, or,

23   frankly, even understand it, based on his testimony.

24      The fact is, Your Honor, the one thing that the evidence

25   shows very clearly here is that Mr. Dondero thinks that he is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 941 of
Case 3:25-cv-02072-S   Document 15-7   Filed 06/06/25   Page 1009 of 1017   PageID 5688
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 940 of
2722

153

1   the judge.  He believes that he is the decider.  He believes

2   that he decides what the TRO means, even though he never read

3   it.  He believes that he decides what exceptions exist in the

4   TRO, even though he never read it.

5      He believes that he decides that it's okay to ditch the

6   Debtor's cell phone without even seeking, let alone obtaining,

7   the Debtor's consent.  I guess he decides that he can ditch

8   the phone and trash it without seeking to back it up or

9   informing the Debtor.

10      Mr. Dondero believes that he gets to decide that it's okay

11   to take a deposition from the Debtor's office, even when the

12   Debtor specifically says you're evicted and you're not allowed

13   to have access.

14      Mr. Dondero believes that he gets to decide that Mr. Seery

15   has no justification for making trades, even though he

16   couldn't take the time to pick up the phone or otherwise

17   inquire as to why Mr. Seery wanted to do that.

18      Mr. Seery -- Mr. Dondero believes that he is the arbiter

19   and the decision-maker and gets to decide to stop trades,

20   notwithstanding the TRO, notwithstanding the CLO agreements

21   that he is not a party to, that his entities are not a party

22   to.

23      Mr. Dondero thinks that he gets to decide that the Debtor

24   has breached the agreements with the CLOs.  He gets to decide

25   that the Debtor is in default under those agreements.  He gets

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 942 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 1010 of 1017 PageID 5689
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 941 of
2722

154

 1  to decide that it's perfectly fine for Ellington and Leventon

 2  to support his interests while they have obvious duties of

 3  loyalty to the Debtor.

 4      It is not right, Your Honor.  It is not right.  I stood

 5  here, I sat here, about four hours ago, five hours ago, and

 6  told the Court what the evidence was going to show, and it

 7  showed every single thing that I expected it to show and

 8  everything I just described for the Court about Mr. Dondero's

 9  belief that he's the decider.

10      He's not the decider, Your Honor.  You are.  And you made

11  a decision on June -- on December 10th that he ignored.

12      There is ample evidence in the record to support the

13  imposition of a preliminary injunction.  And Your Honor, I'm

14  putting everybody on notice now that we're amending our

15  complaint momentarily to add all of the post-petition parties,

16  because this has to stop.  The threats have to stop.  The

17  interference has to stop.  Mr. Dondero can always make a

18  proposal if he thinks that there's something that will capture

19  the imagination and the approval -- more importantly, the

20  approval -- of the Debtor's creditors.  We have no interest in

21  stopping him from doing that.  He's got very able and

22  honorable counsel, and he can go to them and through them any

23  time he wants.

24      But the record is crystal clear here that, notwithstanding

25  Your Honor's order, one entered after serious deliberation, is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 943 of
Case 3:25-cv-02072-S     Document 15-7    Filed 06/25    Page 1011 of 1017    PageID 5690
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 942 of
2722

155

```
 1   of no meaning to him.  And we'll be back at the Court's

 2   convenience on the Debtor's motion to hold him in contempt.

 3   It'll just be a repeat of what we've heard today, because,

 4   frankly, the evidence is exactly the same.

 5        With that, Your Honor, unless you have any questions, the

 6   Debtor rests.

 7            THE COURT:  All right.  I do not.

 8        Mr. Bonds?

 9            MR. BONDS:  Your Honor, we would like to divide our

10   time between Mike Lynn and myself.  Is that a problem?

11            THE COURT:  That's fine.  Go ahead.

12            MR. LYNN:  Are we on mute?

13            MR. BONDS:  No.

14            CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

15            MR. LYNN:  Your Honor, I'm taking a leaf out of Mr.

16   Phelan's book.  I happened to read the confirmation hearing in

17   the Acis case regarding what was referred to as Clients A, B,

18   and C.  And Mr. Phelan, who testified, really gave an oral

19   argument to the Court which was very persuasive and very

20   thorough.  So I'm going to sort of do the reverse, because I

21   hope that the Court would find useful some information

22   regarding the pot plan about which you've heard many words

23   spoken but very little to do with what that plan was or how it

24   came about.

25        The pot plan was proposed by Mr. Dondero for the first
```

156

 1   time in September of 2020, shortly after the conclusion of the

 2   first round of mediations.  Though there had been versions of

 3   it before, and lesser versions, the pot plan was finally in

 4   the form that would more or less survive it in September.

 5   Under the pot plan, Mr. Dondero proposed to come up with $90

 6   million of cash and $70 million in promissory notes, and that

 7   was to form a pot which creditors would share in.

 8       The proposal was provided to the Debtor and then shared

 9   with the Committee.  Mr. Seery responded with a degree, a

10   degree only, of enthusiasm to the pot plan, and indeed

11   provided a counter-term sheet to the pot plan.  He also, so he

12   said, and I believe him, approached the Committee and said

13   this is a proposal to be taken seriously.

14       He proposed some improvements in his view to the pot plan.

15   No response was received from the Creditors' Committee at that

16   time.

17       After going back and forth with the Debtor -- and Mr.

18   Seery, not unreasonably, was unwilling to propose the pot plan

19   without some support on the Creditors' Committee -- I

20   contacted Matt Clemente.  We had a nice conversation.  And at

21   that time, Mr. Clemente raised two particular concerns.  The

22   $160 million, which creditors did not think was enough, was

23   not enough, in part, because that included no consideration

24   for the acquisition of promissory notes executed some by Mr.

25   Dondero and some by entities controlled by Mr. Dondero, which

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 945 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 1013 of 1017 PageID 5692
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 944 of
2722

157

1  notes total approximately $90 million.

2      The second concern was that Mr. Dondero would get a

3  release under the plan. During that call, I said the issue of

4  the notes is subject to negotiation and might well result in a

5  transfer of those notes, possibly with some amendments, to the

6  pot, and that Mr. Dondero was prepared, in all likelihood, to

7  forego a release.

8      Mr. Clemente agreed to get back to me. He did. And he

9  said to me, I have talked to the Committee about this and they

10  would like you to go to or they want you to go first to Mr.

11  Seery, work off of his revised timesheet -- or term sheet,

12  sorry -- and after you have reached an agreement with him,

13  come to us, come to the Committee, and we'll negotiate with

14  you.

15      Now, I might have agreed that that was a reasonable

16  approach if there were a possibility that Mr. Seery would

17  propose a plan without the agreement of creditors. But the

18  way I took it was that the Committee was saying go make a deal

19  with Seery and then we'll start negotiating, and we know,

20  correctly, that Mr. Seery will not propose a plan that does

21  not have our support.

22      So, effectively, we get to go through two rounds of

23  negotiations, even though effectively everything that is in

24  the estate, everything -- causes of action against Mr.

25  Dondero, promissory notes from Mr. Dondero -- everything that

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 946 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/06/25    Page 1014 of 1017    PageID 5693
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 945 of
2722

158

1    they would get under a plan or under a liquidation, they would

2    get under the pot plan.

3        Now, I wanted you to know that, Your Honor, not because

4    I'm now trying to get you or anyone else to sell the pot plan.

5    But I think it's important that Your Honor know that Mr.

6    Dondero's approach in this case has not been a hostile

7    approach.

8        I know the Court had what it found to be an unsatisfactory

9    experience with Mr. Dondero in the *Acis* case.  But from the

10   time I became involved in this case and Mr. Bonds became

11   involved, we have been quiet, we have said nothing, and we've

12   done virtually nothing in the case, up until the time after

13   the mediation, when negotiations regarding a pot plan broke

14   down.

15       Since that time, regrettably, there has been a good deal

16   of hostility, and it's spreading.  I would like to see it stop

17   spreading.  I will do what I can to make it stop spreading.

18   But I need others to help me on that.  And it's my hope that I

19   can count on the Pachulski law firm, the Sidley law firm, and

20   the firms representing the major creditors to help make that

21   happen.

22       I do not think, and I would submit that it is not to the

23   benefit of the estate, it is not to the likely workout of this

24   case, that it would be best served by entering a preliminary

25   injunction, which it appears to me prevents Mr. Dondero from

159

1   saying good morning to one of the employees of the Debtor that

2   he knows.

3        It seems to me, Your Honor, that the injunction, by its

4   terms, as Mr. Morris would have it, is an injunction that

5   would prevent Mr. Dondero from discussing politics with Mr.

6   Ellington.  And it seems to me that an injunction that broad,

7   that extensive, and one which lasts, as far as I can tell,

8   until infinity, that such an injunction is not the right thing

9   to do, given, if nothing else, the First Amendment to the

10  United States Constitution.

11       That will conclude my presentation, and I will turn it

12  over to the wiser and better-spoken colleague, John Bonds.

13  Thank you, Your Honor.

14            THE COURT:  Thank you.  Mr. Bonds, what else do you

15  have to say?

16            CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

17            MR. BONDS:  Your Honor, has the Debtor met the

18  requirements for the issuance of a preliminary injunction?  We

19  submit that they have not.  And the Fifth Circuit's rules are

20  fairly clear as to the awarding of a preliminary injunction.

21       First, let's look at the type of preliminary injunction

22  that the Debtor would like you to enter today.  It provides

23  that Mr. Dondero cannot talk to any employee, regardless of

24  what is being communicated.  Mr. Dondero can pass an employee

25  on the street, but he can't acknowledge the employee, with

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 948 of
Case 3:25-cv-02072-S Document 15-7 Filed 06/06/25 Page 1016 of 1017 PageID 5695
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 947 of
2722

160

1  whom he may have worked for years. Nor can he talk to his

2  personal assistants, again, which he has worked with for

3  years. Does that violate the First Amendment of the

4  Constitution?

5      What about the shared services agreement? What about the

6  pot plan which he is advocating as a means of reorganizing the

7  Debtor? Not the liquidation proposed by the Debtor. Can Mr.

8  Dondero communicate with creditors about the pot plan and the

9  other proposals without violating the TRO or the preliminary

10 injunction which deals with interfering with the Debtor's

11 business?

12     Your Honor, I think it's important to note that a

13 preliminary injunction is an extraordinary remedy that may

14 only be awarded upon a clear showing that the Plaintiff is

15 entitled to such relief. Plaintiffs are entitled to a

16 preliminary injunction if they show, one, a substantial

17 likelihood that they will prevail on the merits of their

18 claims; two, a substantial threat that they will suffer an

19 irreparable injury if the injunction is not granted; three,

20 their threatened injury outweighs the harm to the estate or

21 the other party; and four, the public interest will not be

22 disserved, misserved, if the preliminary injunction is

23 granted.

24     The party seeking the preliminary injunction bears the

25 burden of persuasion on all four requirements. We believe

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 949 of
Case 3:25-cv-02072-S    Document 15-7    Filed 06/06/25    Page 1017 of 1017    PageID 5696
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 948 of
2722

161

 1   that the Debtor today has failed to carry its burden of

 2   persuasion of proof with regard to the second element, which

 3   I'm going to refer to as the irreparable injury requirement.

 4   In order to show irreparable harm to the Court, the Plaintiff

 5   must prove that if the District Court denied the grant of a

 6   preliminary injunction, irreparable harm would be the result.

 7   Injuries are irreparable only when they cannot be undone

 8   through monetary remedies.  There is no evidence before the

 9   Court today that Mr. Dondero cannot respond to any judgment

10   that is rendered against him by this Court.

11       Your Honor, this preliminary injunction does not involve

12   real property.  Unlike the *Saldana* case, this request for the

13   issuance of a preliminary injunction involves personal

14   property only.  The request that Mr. Dondero cease and desist

15   all contact with employees is just wrong and may violate the

16   First Amendment of the Constitution, as I previously stated.

17       We have other concerns regarding the issuance of a

18   preliminary injunction.  We feel that the preliminary

19   injunction is too broad.  It lacks a beginning and an end.

20   When does the preliminary injunction terminate?  What about

21   the former employees?  Once they are terminated, can Mr.

22   Dondero speak to them?  What about the pot plan?  Is it gone

23   forever?  Can Mr. Dondero talk with the mediators about the

24   pot plan?  Can Mr. Dondero speak with the members of the

25   U.C.C.?