**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

§
§   Case No. **19-34054-sgj11**

**The Dugaboy Investment Trust et al- Appellant**

§
vs.                                                            §

**Highland Capital Management, L.P.**
**Et al-** Appellee

§                    **3:25-cv-02072-S**
§

   **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**


# Volume 9

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2. **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3. **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4. **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5. **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6. **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru vol. 5*

*Vol 5*
*003493*

2

| | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
|---|---|---|---|
| | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

Vol. 5
003504
003519
003521
003530
Vol 6
003544
003909

| | | | |
|---|---|---|---|
| *Vol 6*<br><br>*003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| *Vol. 7*<br><br>*003936*<br>*Thru End of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15*<br><br>*011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

4

| | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
|---|---|---|---|
| *vol. 15* | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| *011855* | | | |
| *011864* | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| *011869* | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| *011874* | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

*Vol 15*

| | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
|---|---|---|---|
| *011877* | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| *012039* | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3406 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| *No PDF Available* | 8/31/2022 | 3478 *N/A* | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| *012047* | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*Vol. 15*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

*012050*

*012077*

*Vol. 16*

*012079*

*012357*

| | | | |
|---|---|---|---|
| *Vol. 16*<br>*012361* | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| *Vol. 17*<br>*012363* | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| *012641* | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| *Vol. 18*<br>*012697*<br>*Thru End of Vol. 21* | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| *Vol. 22*<br>*016732* | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| *016737* | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| *016773* | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| *016809* | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

*Vol. 22*

| | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
|---|---|---|---|
| | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery)) |
| | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4255 (to be submitted to Clerk on flash drive) | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

*016827*

*016830*

*016855*

*016863*

*016865*

*Vol. 23*

*016867*

*Thru end of Vol. 25*

9

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| *vol. 26* *019524* | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| *019527* | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

| | | | |
|---|---|---|---|
| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 27*<br><br>*019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28*<br><br>*020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)).    (Attachments:    #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| VOL. 28<br><br>020266 | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| VOL. 29<br><br>020267 | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| 020271 | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| 020282 | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| 020289 | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29* / *020296* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *020298* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *020300* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *020309* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020311* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30* / *020407* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
|---|---|---|---|
| *VOL. 31* | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| *020686* | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| *020696* | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| *020808* | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| *020830* | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

*020837*

Dated: August 18, 2025

Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1950
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 18 of 1017    PageID 6731
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1949 of 2722

Norris - Direct                          129

1   there's a large corporate office over at Crescent Court here

2   in Uptown Dallas, right?

3   A    That's correct.

4   Q    And the lease, obviously, just to speed things up, the

5   lease is in the name of the Debtor, but for many years

6   NexPoint and other employees have been on premises, correct?

7   A    Yes.  We've been there since they opened the space.  I

8   believe it was February 2012 when we moved there.  Maybe

9   February 2011.  But our Advisors have been there in that space

10  since then.

11  Q    Okay.  So how was the future of this lease and resulting

12  lease payments resolved as part of this tentative agreement as

13  of last Tuesday?

14  A    Yeah.  So, it was a 75/25 split, where the Debtor would

15  pay 25 percent and we would pay 75 percent for the remaining

16  lease term, which was approximately 14 months.

17  Q    And approximately how much would our 75 percent over 14

18  months have amounted to?

19  A    I believe that's approximately one -- between $1-1/2 and

20  $2 million.

21  Q    Okay.  Now, we'll talk about this in some detail later,

22  but there are certain third-party software and information

23  providers -- Bloomberg, for example -- that the Debtor uses

24  that we have access to under the agreements but that the

25  Debtor must pay the third parties for, correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1951
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 19 of 1017   PageID 6732
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1950 of 2722

Norris - Direct                          130

1              MR. MORRIS:  Your Honor, I just object.  Again, if

2    Mr. Rukavina wants to testify -- this is not a question.  This

3    is testimony.

4              MR. RUKAVINA:  Your Honor, --

5              MR. MORRIS:  I mean, there's no foundation.  There's

6    nothing.

7              THE COURT:  Sustained.

8              MR. RUKAVINA:  Okay.  Very well.

9    BY MR. RUKAVINA:

10   Q   Mr. Norris, does the Debtor -- or, did the Debtor provide,

11   pursuant to shared services agreements, access to third-party

12   software platforms?

13   A   Yes.  They did.  There was a number of agreements --

14   Q   Stop.  Stop.

15   A   -- that were --

16   Q   Stop.  Stop.  Stop.  Were these some of the things that

17   you were negotiating with the Debtor as you were negotiating

18   that transition of services?

19   A   Yes.

20   Q   Name a few of the most important of these third-party

21   service providers that you were negotiating with the Debtor.

22   A   Yeah.  Bloomberg, particularly the order management system

23   of Bloomberg.  Oracle, which is an accounting system, to name

24   a few.  Those were the most important ones.

25   Q   Describe with some more specificity, please, what the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1952
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 20 of 1017 PageID 6733
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 1951 of 2722

Norris - Direct                              131

1   order management system is.  OMS.

2   A    Yeah.  An order management system is an operating system

3   that allows you to trade various funds and asset classes all

4   through one system.  And so we have a number of funds, we have

5   a number of asset classes we trade, which include loans,

6   bonds, and equities.  And so trading all of that through a

7   system that then sorts it, allocates it, and does it all in an

8   efficient manner -- in addition, it incorporates various rules

9   and metrics for trading and efficiency -- so it's very

10  customized, it's very customized for the rules related to our

11  funds, very customized for the rules related to what we trade

12  for our Advisors, and it's been used primarily by the traders

13  from our Advisors or employed by our Advisors.

14      So that's what the OMS is.  And it's Bloomberg that has

15  the software, and it's been customized directly with

16  Bloomberg.

17  Q    Okay.  Did you come to an agreement with the Debtor as to

18  how the future costs or license fees for these platforms and

19  services would be allocated between the Debtor and the

20  Advisors?

21  A    We did.  It would be, for most of them, which is

22  approximately a hundred contracts, is about -- is a 60/40

23  allocation.  We would pay 60 percent and they would pay 40

24  percent.  There are some of them that they said they didn't

25  use that we agreed we would pay a hundred percent of.  But

Norris - Direct                   132

1   most of them are a 60/40 split.

2   Q   Okay.  And did you calculate approximately how much in

3   payments pursuant to that formula we would make, the Advisors

4   would make in the future under the draft agreement?

5   A   Yeah.  So, it is approximately $240,000 per month,

6   inclusive of the lease.  So, exclusive of the lease, it was

7   about $120,000 per month.

8       In addition, there were one-time payments for annual

9   payments, which I think was around $200,000 or $300,000.

10      So it is a -- it's a couple million dollars over the life

11  of the contract.

12  Q   Okay.  And to fast forward to last Tuesday, the one issue

13  that had not been resolved was Mr. Dondero's physical presence

14  on the premises, correct?

15  A   That's right.  That's right.

16  Q   Was this a last-second issue or had this been discussed

17  for some time?

18  A   No, it wasn't a last-second issue.  We actually included

19  it in our first multiple drafts or responses to their term

20  sheet.  We got the term sheet on the 29th of January and it

21  did not include any specifics around Mr. Dondero's access, but

22  we added that in early drafts of the term sheet and it was

23  removed by their counsel and reinserted in the -- I know there

24  was discussion between counsel on various aspects of it.  It

25  was removed from what was their final version, and maybe even

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1954
Case 3:25-cv-02072-S    Document 15-9    Filed 06/30/25    Page 22 of 1017    PageID 6735
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1953 of 2722

Norris - Direct                    133

1   the draft before that, but it was added in by us again as --

2   for all the reasons we mentioned before.  We thought it needed

3   to be stated explicitly in the agreement.  And the attorneys

4   had discussed that it could be handled --

5   Q    Let's not talk about -- yeah, let's not talk about the

6   attorney discussions.

7   A    Okay.

8   Q    You heard Mr. Seery say that the Debtor refused to permit

9   Mr. Dondero onto the premises and you heard him say why.  Did

10  the Advisors offer any compromise on this access issue?

11  A    We did.

12  Q    What was that offer?

13  A    So, we offered to -- and in all this, it's thinking, what

14  are the employees from the Debtor that are going to be using

15  this?  We haven't even really received a good understanding of

16  who that is.

17       However, we offered to take approximately 25 percent of

18  the office.  And there is a clear area where we could build a

19  wall.  They could have their own separate access, their own

20  separate restrooms, their own separate entrance, where they

21  wouldn't have any involvement or connection to us.  And so we

22  also offered with that, whenever you need access to the other

23  portion, let us know.  We can even have Jim Dondero leave, if

24  you're concerned.

25       And so that was one option.  We could build a wall.  And

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1955
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 23 of 1017   PageID 6736
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1954 of 2722

Norris - Direct                        134

1  we even put that in the written agreement.  We will build a

2  wall at our expense.  That was the -- that was the -- what our

3  offer was.

4  Q   How did the Debtor respond to that offer?

5  A   They removed it from the agreement and they told us that

6  we had until 6:00 p.m. to sign their agreement with no Dondero

7  access or they would file a lawsuit.

8  Q   And this was last Tuesday?

9  A   This was Tuesday.

10 Q   Okay.  Were you able to respond by their deadline, which

11 they -- then they later moved to midnight of that same day?

12 A   I'm not sure if there was a response.  It was handled

13 between attorneys.  Our counsel.  I had -- just as Mr. Dondero

14 stated, I had rolling blackouts in my home from 2:00 a.m. on

15 Monday until Thursday.  I -- I and D.C. were aware of the

16 offer, as was our counsel, and I believe there was a -- and I

17 believe there was a response from our counsel in time, but I'm

18 not -- I wasn't certain at the time.  I knew that, as well,

19 there was an extension, but I didn't find out until the next

20 day because I did not have power.

21 Q   And ultimately, the Debtor either rejected that last offer

22 or let the offer expire by not accepting it.  It doesn't

23 matter which.  But is that accurate?

24         MR. MORRIS:  Objection to the form --

25         THE WITNESS:  Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1956
Case 3:25-cv-02072-S    Document 15-9   Filed 06/06/25    Page 24 of 1017    PageID 6737
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1955 of 2722

Norris - Direct                    135

1        MR. MORRIS:  -- of the question.

2        MR. RUKAVINA:  Your Honor, I'll ask it a different

3   way.

4        THE COURT:  Sustained.

5        MR. RUKAVINA:  I'll ask it a different way.

6   BY MR. RUKAVINA:

7   Q    Did the Advisors accept the Debtor's last offer made on

8   Tuesday of last week, the one you just referenced?

9   A    No.

10  Q    Why?

11  A    As explained, I think, clearly by Mr. Dondero as well, it

12  did not have the provisions that we thought necessary.  And

13  when you think about this, we were going to be required to pay

14  significant dollars for an office space where our president

15  and principal was not permitted.

16       We had an option to go other -- elsewhere, right?  Here,

17  we're in a separation experience.  This agreement that they

18  had, they had told us early on it was fill-or-kill.  They told

19  us early on that it was not *a la carte*.  When we pushed them

20  on that a couple weeks later, they said, well, the only thing

21  that's not negotiable is the office, right?  If you want

22  everything else, you've got to have the office.  That was in a

23  discussion with various attorneys on the phone.

24       And so, with this, we knew this was a kind of take-it-or-

25  leave-it offer, and we could have gone elsewhere.  And we had

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1957
Case 3:25-cv-02072-S    Document 15-9    Filed 03/06/25    Page 25 of 1017    PageID 6738
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 1956 of 2722

Norris - Direct                    136

1    already been preparing, in the event that we couldn't have a

2    deal, to go elsewhere.  And so, with that, if they were not

3    going to permit -- which we thought was very reasonable,

4    specifically with all of the additions, you know, the

5    consideration -- sorry, my battery is about to die on my

6    computer.  I'm plugging in the charger here.

7        So, with all of those considerations, we couldn't sign

8    that deal, especially as -- without that key access.

9    Q    You personally, Dustin Norris, now, personally, as an

10   officer and a fiduciary, did you think that it was appropriate

11   or inappropriate that Mr. Dondero be allowed on the premises

12   in the future?

13   A    I thought it would be appropriate for him to be there.

14   Q    Why?

15   A    So, I've been working for Mr. Dondero for a long time.  I

16   know the way he operates, and I know that the way that he

17   manages his organization, which is a complex organization, he

18   needs to be there in person.  We haven't been in the office

19   because of a -- a disregard for COVID.  We are an essential

20   business, and we have been, as a financial services business.

21   But the way we operate is very in-person, and that's how Jim

22   operates.

23       In addition, I've never heard of a situation where the

24   principal or the control person of a company -- there's no

25   question that Mr. Dondero controls the organization -- cannot

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1958
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 26 of 1017   PageID 6739
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1957 of
2722

                         Norris - Direct                    137

1   be there in person.

2        And so, from that perspective, given and knowing all of

3   our other plans, given the ability for many people to

4   relocate, given the abundance of office space elsewhere, if we

5   were forced to accept an agreement that did not allow Mr.

6   Dondero for the next 14 months to be there in person, it was

7   -- it was going to be a challenge for us from a business

8   perspective.

9   Q    Do customers or investors or prospective customers and

10  investors come to the offices historically to meet with the

11  Advisors and their personnel?

12  A    Pre-COVID, yes.  Regularly.

13  Q    Okay.  Would Mr. Dondero participate in those meetings?

14  A    He would, yes.

15  Q    Were you concerned that him being unable to participate in

16  those meetings would affect future business and profitability?

17  A    Yeah.  I think if you look at this -- key investors come

18  in and see this big cavernous open office and ask why the

19  manager of the funds is not even allowed to be in your office,

20  you know, or is that impacting the way you operate, then yes,

21  I think he needs to interact with people that are coming

22  through the office.

23  Q    He has not been in the office since about the beginning of

24  this year; is that correct?

25  A    Correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1959
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 27 of 1017   PageID 6740
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1958 of
2722

Norris - Direct                    138

1   Q    Do you feel like that has caused any harm or disruption to

2   the Advisors' business?

3   A    Yeah.  I don't know that I would characterize it as harm,

4   but it has been disruption, right?  I'm -- the way that we

5   operate, having Jim there, being able to have consistent,

6   regular meetings in person, which for me were multiple times

7   per day on a regular basis, and many others, it was

8   disruptive.  Being able to reach him, how to reach him.  Do I

9   need to get in my car and drive to another location where he's

10  at, which I did on many occasions.  We typically get people

11  together very quickly in groups:  Let's go talk to Jim.  And

12  that becomes a challenge to get things done quickly and in an

13  efficient manner.

14      So it has been a disruption, and it's not something that

15  we would desire to do, if we had the choice, for another 14

16  months.

17  Q    Okay.  Now let's talk about the backup plan, please.  I

18  guess let's start with:  What is our backup plan?  Well, let

19  me start with this.

20  A    Yeah.

21  Q    Do we have a backup plan?

22  A    And I think the key now, instead of calling it a backup

23  plan, is an operating plan.

24  Q    Okay.

25  A    For --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1960
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 28 of 1017    PageID 6741
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1959 of 2722

Norris - Direct                          139

1   Q    Do --

2   A    -- several weeks, --

3   Q    Let me -- let me -- that's a very good point.  Prior to a

4   few days ago, did we have a backup plan in place for what we

5   would do if we were not able to enter into a transition

6   services agreement with the Debtor?

7   A    We did, yes.  And --

8   Q    Since when -- let me -- let me direct you.  Let me direct

9   you.  Since when did we have that backup plan?

10  A    Yeah.  So, the backup plan -- the backup plan began many

11  months ago, but as I mentioned earlier, it began in earnest in

12  the end of January, right?  And over the last month

13  especially, we've been putting in place all of the required

14  systems and processes and procedures in order to continue

15  doing all the duties under our advisory agreements.  And that

16  includes all of the services that are provided for the Debtor

17  -- by the Debtor.

18      And our backup plan, a big part of that included the

19  transition, and it still includes the transition of those

20  employees to Newco.  We are in active negotiations and believe

21  that Newco, once those employees are terminated on the 28th,

22  they will be able to perform their same duties on March 1st of

23  this year.

24      And so we expect those services to happen.  In the

25  interim, we've prepared for and have contingency plans in

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1961
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 29 of 1017   PageID 6742
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1960 of 2722

Norris - Direct                    140

1   place in order to do all that we need to do.  We have systems

2   and servers that are set up in an SEC-compliant manner.  We

3   are operating on a new email system.  We have our files --

4   Q    Let's go --

5   A    -- that are essential.

6   Q    Let's go step by step here so that the judge --

7   A    Yeah.

8   Q    -- has a very clear picture of what all is involved.  So

9   I'm going to try to break it down.  I think both you and Mr.

10  Seery talked about back-office and middle-office services.

11  What are those?  What does that refer to in the industry?

12  A    Yeah.  So, back-office -- back-office and middle-office

13  includes HR, IT.  Accounting is a big part of that back-office

14  services.  And in regards to our funds, it is the oversight of

15  the accounting process on a day-to-day basis and on a monthly

16  and quarterly basis, for annual reports, for audits.  It's the

17  day-to-day valuation services that are provided to our funds.

18  And so those are the key functions.  It's legal and compliance

19  as well --

20  Q    So let's --

21  A    -- the Debtor has been providing for our funds.

22  Q    Let's go step by step.  So let's assume that I'm -- I want

23  to invest in your fund.  In a retail fund, pardon me.  Am I

24  able to pop up daily or almost instant information regarding

25  its assets, its valuations, et cetera?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1962
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 30 of 1017   PageID 6743
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1961 of 2722

Norris - Direct                        141

1   A   Yes.  So, most of our --

2   Q   Is that -- is that --

3   A   -- funds --

4   Q   Is that part of what you were just describing about

5   valuation and accounting services on a real-time basis?

6   A   Yes, it's part.  It's more of the oversight function.

7   Q   Okay.

8   A   We outsource the daily processing and NAV-striking, or the

9   actual accounting, day-to-day accounting, to an outside third

10  party called SEI.  And the Debtor had provided oversight

11  function as well as valuation services for that daily

12  accounting process.

13  Q   Okay.  So the Debtor, for accounting, wasn't actually

14  crunching the numbers every day; it'll -- supervising third

15  parties.  And that's been the historical norm, correct?

16  A   That's correct.  I actually --

17  Q   Now, let's --

18  A   -- years ago filled that function.

19  Q   Okay.  So let's -- so how are we, the Advisors, today,

20  compensating for the lack of the Debtor's back-office and

21  middle-office services, or how are we transitioning from that

22  today?

23  A   Yeah.  So, a key part of that is the transition to Newco,

24  right, and as well that is planned for next week.  However, in

25  the interim, we have very good plans and processes in place.

Norris - Direct                     142

1   We have -- on the accounting front, on a day-to-day basis, we

2   have added our key personnel, our accounting teams, which has

3   been actually bulked up in recent years.  We have a number of

4   publicly-traded REITS that have SOX-compliant processes and

5   procedures.

6       And the CFO of our real estate platform, Brian Mitts, used

7   to be the principal financial officer of all of these funds.

8   He continues to be and operates as the principal financial

9   officer for one of them, or had been throughout all of this

10  time, and is a participant in all of the board meetings and

11  regular valuation processes.  In addition, he has a team of

12  accountants.

13      And so they are now copied on all the day-to-day

14  accounting emails from our third-party providers.  They have

15  been for several days.

16      In addition, as a backup measure, we hired on a consulting

17  basis the former senior accounting manager who worked until

18  April of about two years ago for the Debtor, providing these

19  same services to our funds.  And so, on a contract basis, he's

20  there as needed.

21      In addition, we have received from the Debtor a list of

22  employees, if they're needed, that we could hire.  There's

23  about seven of them in the accounting and operations

24  functions.  They gave us permission last week to do so.  And

25  one for valuation.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1964
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 32 of 1017   PageID 6745
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1963 of 2722

Norris - Direct                    143

 1    So, those functions, if they're needed in the interim

 2  period before Newco is in place, we'll have those.

 3    In addition, from an IT perspective, which is an important

 4  part here, they maintain -- the Debtor maintained our systems

 5  and servers.  We have contracted --

 6  Q   Let's not -- let's not -- we'll talk --

 7  A   Yeah.

 8  Q   We'll talk about -- we'll talk about IT momentarily.

 9  A   Yeah.

10  Q   You mentioned -- so you just discussed accounting.  What

11  about -- and I think you -- did your discussion right now

12  include transition of the valuation services?

13  A   Yeah.  So, in that regard, --

14  Q   Okay.  What about -- what about -- what about legal,

15  transition of legal services and compliance, regulatory

16  compliance?

17  A   Yeah.  That -- as I had mentioned before, the services we

18  had been receiving from the Debtor have slimmed down

19  dramatically, and particularly around legal services.  We

20  still had been receiving significant support from Lauren

21  Thedford, who is a very reliable team member of the Debtor.

22  She was also serving as an officer of the funds, of our funds,

23  until Friday, when she resigned.  But we have in place with

24  SEI, they provide admini... regulatory and legal admin

25  services to us, and have all along.  They're prepared to step

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1965
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 33 of 1017    PageID 6746
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1964 of
2722

Norris - Direct                    144

1   up in her absence.

2       And also K&L Gates, who already serves as advisor counsel

3   and fund counsel, is set and has been already picking up the

4   slack and prepared to do anything that Lauren was doing.  She

5   is a valuable team member.  We hope that as we transition to

6   Newco that she'll be able to, as mentioned earlier, step back

7   on as an officer of the funds.

8   Q    Now let's talk about IT, information technology.  What

9   services was the Debtor providing to the Advisors in the

10  nature of IT under the shared services agreements?

11  A    Yeah.  So, our IT equipment, our computers, our screens,

12  were their property, or at least that's -- that's the --

13  that's what -- it's in their name.  Not all of it, but some of

14  it.  In addition, they provide IT support.  So if we have an

15  IT problem, we need to call the IT guy, they provide that.

16  They provide support for the servers.  They own the servers.

17  They own the system.  Or at least that's what -- that's what

18  their -- their claim is.  And so they provide all of those

19  kind of IT functions for us, or had until this past weekend.

20  Q    Does that include email?

21  A    That's right.  They -- they --

22  Q    Does that include -- hold on.

23  A    We have a number of --

24  Q    Hold on.  Hold on.  Does that include Internet -- does

25  that include Internet connectivity?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1966
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 34 of 1017   PageID 6747
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1965 of 2722

Norris - Direct                         145

1   A    It included the Internet connections at work.  It included

2   the phones.  It included our emails and email servers and the

3   --

4   Q    What about --

5   A    -- domain that, even though they're in our names -- yeah.

6   Q    That's what I was going to ask next.  What about domain

7   names?  How are those handled?

8   A    They have claimed that those are theirs as well, that the

9   domains we use for our websites and for our emails are theirs.

10  Q    Okay.  And what about electronic data, just a wealth of

11  internal books and records, kind of corporate data?  Did the

12  Debtor provide --

13  A    Yeah.

14  Q    -- any services with respect to that?

15  A    Yeah.  So, they retain all of the data that we use on

16  their networks and servers, and all of that is stored on

17  shared drives and on their system or on the computers that are

18  owned by them.  And so even though they're our books and

19  records, I believe you read earlier the provisions of the data

20  provision, and so that is all stored on their systems.

21  Q    Okay.  So we just kind of discussed the universe of the IT

22  services that the Debtor provided.  Did we miss anything or is

23  that kind of the stuff that really matters?

24  A    I think that -- I think that covers the --

25  Q    Okay.

Case 19-34054-sgj11  Doc 3445-3  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1967
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 35 of 1017    PageID 6748
Case 19-34054-sgj11  Doc 2062  Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1966 of
2722

Norris - Direct                      146

1  A    -- the main items.

2  Q    How is that being handled by the Advisors today, or how is

3  that -- or has it been transitioned from the Debtor?

4  A    Yeah.  So, largely, we are handling it on our own and

5  through a third-party provider.  So, we have bought and

6  purchased our own domain names.  We've transitioned our emails

7  to those new domain names.  We have made copies of our data,

8  or a lot of our data.  There's still some stuff we need.  But

9  our essential data.  And we have transitioned to a new server

10 and systems that are -- that are secured and perform through

11 this third party who does this for a number of asset managers,

12 for endowments.  And the way he has set it up is in an SEC-

13 compliant matter.  So, dual authentication.  All of the things

14 that you would expect from a security standpoint are in place.

15 And we are operating starting on -- we were mirroring for a

16 couple weeks, but on our own beginning on Saturday, when the

17 shared services were terminated, and have been sending those

18 emails from those -- the new systems and servers.

19 Q    So that was going to be my next question.  Is it that we

20 just did this (snaps fingers) Saturday like that, or did we

21 actually have a mirroring in place for quite some time?

22 A    Yeah, we have for -- been working on this for multiple

23 weeks with the outside IT service provider, and it's been done

24 in phases.  And so we've been -- we had a certain small

25 portion of the people start early, they tested it out, and

```
                        Norris - Direct                   147
```

1  then we rolled it out more broadly over the last couple of

2  weeks.

3  Q    Who is that third-party IT provider?  What was that --

4  A    Siepe.

5  Q    Is that -- that's not proprietary information, is it?

6  A    It's not.

7  Q    Okay.  Who is the third-party provider?

8  A    It's Siepe.  And they're a outsource --

9  Q    Well, let me -- let me -- let me --

10 A    -- provider --

11 Q    Let me --

12 A    Yeah.

13 Q    Let me direct you.  Will you please spell Siepe?  I'm not

14 even sure how to spell it.  And then tell the Court what Siepe

15 is and what it does.

16 A    Siepe, it's S-I-E-P-E, and I believe it's Italian for

17 hedge, and they are an outsourced IT and IT development

18 provider.  And it was actually started by a former member of

19 -- a former employee of Highland about a decade ago, I

20 believe.  He spun out and created his own firm.  And they do

21 this for a number of asset managers, including for Highland.

22 So they understand our systems.  They understand their

23 systems.  They're intimately familiar with what we need.

24 They've been servicing our Advisors for years and have created

25 a lot of the connections that we have with outside service

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1969
Case 3:25-cv-02072-S  Document 15-9  Filed 06/06/25  Page 37 of 1017  PageID 6750
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 1968 of 2722

Norris - Direct                          148

1   providers.

2   Q   This ain't their first rodeo?

3   A   No.  I would think -- it would be -- have been challenging

4   to do it without Siepe, and -- but they were able to execute

5   very quickly because they knew and were already operating with

6   us for years.

7   Q   So can investors, clients, in these funds today get on the

8   Internet and get whatever information they were able to get a

9   week ago, can they still get that today regarding their

10  investments?

11  A   Yes, they can.  And I would add one other thing here,

12  important, is the investors, all of their books and records

13  and the data related to our advi... to our funds, the

14  accounting data and the client data, are held at third

15  parties.  So we have a third-party transfer agent that has all

16  of the information on client records.  That is -- they don't

17  come to us for their client statements.  They go to our

18  transfer agent.

19      In addition, our accounting functions, those data and

20  files are all on their systems.

21      And so as far as we're talking about data and what they

22  can come to us, they never come to us for their systems and

23  their data.  If they want to know what the value is, they can

24  go to  Morningstar.com or Yahoo Finance and see daily the

25  pricing of our funds, which are published daily, even

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1970
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 38 of 1017   PageID 6751
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1969 of 2722

Norris - Direct                    149

1   yesterday, published there for them.  But their actual client

2   data is held at third-party administrators.

3   Q    The point being, do you, other than maybe a change in the

4   email address, the point being do you think that investors or

5   clients or customers are even aware of the transition away

6   from the Debtor in the last few days?

7   A    Based on business interaction --

8            MR. MORRIS:  Object to the form of the question.

9            THE COURT:  I'm sorry, was there an objection?

10           MR. MORRIS:  There is an objection.  To the extent

11   the question is asking for what other people think or believe

12   or perceive, I think that's improper.  No foundation.

13           THE COURT:  All right.  I sustain.

14   BY MR. RUKAVINA:

15   Q    Have you received any complaints from investors or

16   customers or clients in the last few days about their ability

17   to do anything with respect to their investments?

18   A    Not that I'm aware of, no.

19   Q    Okay.

20           THE COURT:  All right.  Mr. Rukavina, it's about

21   1:00.  How many more minutes do you have?

22           MR. RUKAVINA:  I don't think I have more than ten

23   minutes, Your Honor.  Fifteen minutes, tops.

24           THE COURT:  Okay.  Well, we need to take a lunch

25   break, so we're just going to break here.  It is 1:00 o'clock.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1971
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 39 of 1017    PageID 6752
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1970 of
2722

Norris - Direct                    150

 1   I'm advised that my 1:30 matter is going to take maybe ten

 2   minutes.  So we will convene -- let me get a clarification.

 3       If we reconvene at 1:45, Mike, do we need to hang up?  Do

 4   we need to terminate this and --

 5           THE CLERK:  Yes.  We need to terminate this because

 6   she's already gotten one set up at 1:30, the other one.

 7           THE COURT:  Okay.

 8           THE CLERK:  So they could probably just call in to

 9   that one.  We just need to get them the information.  Let me

10   see if I can contract Traci, see what the best way.  Because,

11   like I said, we've already got one for them.

12           THE COURT:  Okay.

13           THE CLERK:  So this one is going to end.

14           THE COURT:  All right.  So just stay, I guess,

15   connected.  Is that what you're saying?

16           THE CLERK:  Yes, stay connected.

17           THE COURT:  Yes, stay connected.  We'll come back at

18   1:45.  And my staff will let you know if by chance we need to

19   terminate this and reconnect.  But I think you can just stay

20   connected.  Operate under that assumption for now.

21       All right.  So I will see you at 1:45.

22           MR. MORRIS:  Thank you, Your Honor.

23           THE CLERK:  All rise.

24           MR. POMERANTZ:  Thank you.

25       (A luncheon recess ensued from 1:01 p.m. to 2:14 p.m.)

Norris - Direct                    151

1          THE COURT:  Mr. Rukavina was examining Mr. -- I was

2     about to say Dustin -- Mr. Norris.  So, are you ready to

3     proceed, Mr. Rukavina?  You said you had a few more minutes.

4          MR. RUKAVINA:  Your Honor?  Pardon me.  Your Honor,

5     I'm ready.  Mr. Norris, can you hear me?

6          THE WITNESS:  Yes, I can.  Thank you.

7          THE COURT:  All right.  Mr. Norris, I'll remind you

8     you are still under oath from your prior swearing in.

9       All right.  You may proceed.

10          THE WITNESS:  Thank you.

11                DIRECT EXAMINATION, RESUMED

12    BY MR. RUKAVINA:

13    Q   Mr. Norris, I think before we broke we rounded off a

14    discussion about the previously backup/now-operational plan

15    for IT and electronic data.  I'd like to move on now to office

16    space.

17    A   Okay.

18    Q   What is the current status and plan for the Advisors to

19    have office space, both for their current employees and for

20    the Newco employees?

21    A   Yeah.  So, from our perspective, we've been in talks with

22    an organization that's willing to sublease a space that is

23    approximately -- close to our current space.  And that is the

24    current plan.

25       In the interim period, all of our employees are working

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1973
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 41 of 1017 PageID 6754
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 1972 of 2722

Norris - Direct                              152

1   remotely, and are doing so without any major issues.  They're

2   able to -- in this COVID environment, fortunately, there are

3   systems and processes that have already been built out and

4   we've been able to transition to that without any issues.

5   Major issues.  Without any major issues.

6   Q   Is there any temporary office space available this week

7   for, you know, meetings or anything that might have to happen

8   in-person?

9   A   Yeah.  So, I'm actually sitting in a temporary office

10  space for a meeting.  A company we have a relationship with is

11  allowing -- and -- office space here.

12  Q   Okay.  What about hardware, like computers, routers, all

13  of that stuff you testified earlier, most of which was the

14  Debtor's property that I'm taking it we left on the Debtor's

15  premises when we vacated Friday?  What's the status of --

16          MR. MORRIS:  Your Honor, objection.  Again, I don't

17  know what the testimony is and the references to "we".

18  There's no -- there's no evidence in the record that anything

19  was left behind.  There's no evidence of any of this.

20          MR. RUKAVINA:  I'll start again, Your Honor.

21          THE COURT:  All right.  Sustained.

22  BY MR. RUKAVINA:

23  Q   Mr. Norris, you've heard Mr. Dondero testify or Mr. Seery

24  testify that the employees of the Advisors that were onsite at

25  Crescent Court vacated.  Did you hear that testimony?

Norris - Direct                    153

1   A    Yes.

2   Q    Is that accurate testimony?

3   A    That is accurate.  We all moved out by the end of day on

4   Friday.

5   Q    That's Friday, the 19th of February?

6   A    Correct.

7   Q    Did any employees, to your knowledge, or did you see

8   anyone take any equipment, machinery, et cetera, that was not

9   property of the Advisors?

10  A    Yeah.  So, we were informed that we would have access to

11  the systems, as they testified to earlier, until today.  So we

12  held onto those.  They never told us they needed our laptops.

13  They never told us to leave our stuff, or their stuff.  And so

14  we're prepared to provide those and return those.  And we are

15  actually operating now independent of those IT resources,

16  being laptops, et cetera, and screens.

17       So, there were a number of laptops that were assigned to

18  us that we purchased just in the last few months, about 15 of

19  them.  A number of screens as well.  We took those, and those

20  continue to be used.

21       For essential personnel, we had, over the last several

22  weeks, purchased additional laptops.  As you know, laptops --

23  you may know laptops are in short supply, and so we ordered

24  them for the essential people that did not have a computer at

25  home, so that they could be operating.  Those were outfitted

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1975
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 43 of 1017   PageID 6756
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1974 of 2722

Norris - Direct                          154

1  and ready, many of them picked up last week, some picked up

2  this morning.  And those that didn't have a laptop ready, we

3  ensured that they had home access and are able to log in

4  through the cloud.  So, all of our systems are hosted by AWS,

5  which is an Amazon system, set up so that we can remote login

6  through a VPN connection.  So, our employees are able to

7  access their email and our systems through there.

8  Q   Okay.  To the extent any of the Advisors' employees are in

9  possession of computer equipment that belongs to the Debtor,

10 will that be returned promptly?

11 A   Yes.  As they request it, it will be, yes.

12 Q   Okay.  Have the Advisors offered to purchase for cash

13 money those used laptops and other equipment?

14 A   We have, yes.

15 Q   Did the Debtor accept?

16 A   It was part of our, as we referred to earlier, a slimmed-

17 down proposal over the weekend, which was very minimal, and it

18 included the laptops.  And we offered a sum for that, and the

19 OMS system.  The sum we offered was $300,000, and we also

20 offered to take one hundred percent of the OMS invoice going

21 forward, and offered the Debtor to continue using that, as we

22 know they -- we believe they may or may not need use for it.

23 But we offered that over the weekend, and they simply

24 responded with, We don't even know why you need this.  And the

25 answer was their offer was still on the table, with no access

Norris - Direct                    155

1  to Jim, and the whole agreement.

2  Q   So, the Debtor wouldn't negotiate on an *a la carte*

3  purchase?

4  A   No.  We offered, actually, last Thursday as well, once we

5  had received the -- kind of the -- Wednesday or Thursday, I

6  can't remember the exact date, after the court filing had been

7  made, for a small, very slimmed-down, which was primarily the

8  OMS and certain data items, which they came back with some

9  counters which weren't workable.  And then again, throughout

10 the weekend, I worked all day Saturday.  They said they would

11 be willing to consider a slim-down, but send them an

12 agreement, and -- something that Jim Dondero had explicitly

13 agreed to.  And we spent all day, discussed with Jim, and sent

14 them to them Sunday morning, to which they -- they did not

15 agree to.

16 Q   Okay.  Did they counter, or did they just say no?

17 A   I think that the -- the counter was the offer from Friday,

18 and I can't remember which one it was.  But there was a

19 counter, but it was not what Jim had authorized.

20 Q   Okay.  Let's move onto the third-party software that we

21 discussed before, Bloomberg, OMS, or Oracle.  What is the

22 current status of that vis-à-vis our transition plan?

23 A   Yeah.  So, from a trading perspective, trading has been

24 done outside of OMS in the past, right?  And if you look at --

25 it's not as easy.  There's also -- so, we have a manual

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1977
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 45 of 1017 PageID 6758
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 1976 of 2722

Norris - Direct                    156

1   process in place that we're able to, and that we've tested,

2   that we're able to perform from a trading perspective, where

3   our traders interface directly with the brokers, where they're

4   able to manually input the trade.  They're able to be

5   communicated to our custodians and our accountants, and then

6   that is able to be settled manually.

7       So, that's not ideal.  We would like to have an order

8   management system.  That said, I know there's discussions with

9   the Debtor, more employees of DSI, about getting copies of

10  their OMS for the data that is ours within the OMS, or

11  allowing us to get that data in order to actually enter into

12  an agreement separately with Bloomberg, which we've been

13  discussing with Bloomberg.  And Bloomberg is willing, with

14  their approval, to get that copy and set it up without any

15  setup fees for us, and we would have a new instance of that

16  OMS.

17      Separately, there are some other free off-the-shelf OMS

18  solutions that our outside service providers have said they

19  can quickly implement.  And so it's just determining based on,

20  really, the events today, and the discussions going on on the

21  OMS, what our path forward is.  But we have a plan, which

22  we're executing on, to execute trades.

23      As the Debtor said, they are still providing access to our

24  -- their systems through the end of the case today.  And I

25  think, as Mr. Seery said, there's -- they still see trades

Norris - Direct                         157

1    going through the system.  That's at their goodwill, and I

2    think that's great.

3        But the OMS is an area of continued focus.  Again, we have

4    a plan to go forward or without it, but ideally we would have

5    a smooth transition there.

6    Q    So, if the OMS purchase -- the OMS system can't be

7    purchased from the Debtor, you mentioned a potential agreement

8    with Bloomberg where a new OMS system would be purchased or

9    built?  Or explain more what you mean by that.

10   A    Yeah.  So, Bloomberg has -- and this is their software,

11   the order management system through Bloomberg -- but it has

12   been highly customized over many years and has our historical

13   data in there, our rules, our Advisors' rules set up that we

14   use for trading.  And so it would take several months for us

15   to go in and code exactly how we would like it.  However, my

16   understanding is there's a backup where Bloomberg, with the

17   authorization from the Debtor, could transfer the underlying

18   data and setup.

19       Or alternatively, like I said, we offered over the weekend

20   to pay them a monetary sum to take over the Bloomberg

21   contract, and not just the OMS, but others that I think it was

22   approximately $450,000 a year in ongoing costs we would take

23   one hundred percent of and still provide them access.

24   Q    Access for a fee or access for free?

25   A    Free.  Free of charge.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1979
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 47 of 1017 PageID 6760
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 1978 of 2722

                          Norris - Direct                    158

1  Q    Okay.  So just so that the judge knows, are we able to
2  execute trades today?
3  A    Yes.
4  Q    Will we be able to execute trades tomorrow?
5  A    Yes.
6  Q    Will we be able to execute trades into the future until we
7  either purchase or develop an OMS electronic system?
8  A    Yes.
9  Q    And in the meantime, it's being done manually, I think you
10  said?
11  A    Yep, manually.
12  Q    And do you have confidence that the manual system is going
13  to be safe and accurate?
14  A    I do.  There's -- there is multiple people involved.
15  They've actually run tests -- not test trades, but actual
16  trades, over the last couple of weeks through this system.
17  And our trader has been trading for over two decades, and this
18  is a system he used years ago before we put in place the OMS.
19  There is some --
20  Q    Stop, stop, stop, stop, stop.  What system did he use
21  years ago?  I want you to be specific.
22  A    This manual system --
23  Q    Okay.
24  A     -- that we're using today.  We call it manual. It's a
25  direct with -- with a process that we used previously.

Norris - Direct                         159

1    Q    Okay.  Thank you.  I just wanted that clarification.

2         Do we have -- the Advisors, that is -- do the Advisors

3    have insurance in place for whatever it's called in your

4    business, but for basically messing up a trade?  Whether it's

5    professional negligence or O&E or whatever it is.  E&O.

6    A    Yes.  Our funds have insurance that is through ICI, which

7    is a -- they do this specifically for investment companies.

8    So, we have a -- I think it's an errors and omissions

9    insurance that covers, for example, if there was a NAV error.

10   A NAV error is if a fund made a mistake.  In addition, we have

11   NAV error correction policies, where, if it's the Advisors'

12   fault, then the Advisor would have to kick in.  But the

13   Advisor has insurance as well, as well, to cover things of

14   that nature.

15   Q    What's the policy limit?

16   A    I believe it's $5 million.  I'm not certain, but I believe

17   it's $5 million.

18   Q    Okay.  So, over the course of the last several questions,

19   I've gone through kind of various processes and services that

20   the Debtor used to provide.  Have I missed anything big-ticket

21   that you feel is of importance?

22   A    As far as essential items, no.  There are some smaller

23   items like HR, which is recruiting and hiring, those types of

24   smaller things.  Cash management, communicating with

25   custodians, where those are smaller, minor items, but aren't

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1981
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 49 of 1017   PageID 6762
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1980 of 2722

Norris - Direct                    160

1   -- we're able to cover internally but you didn't mention in

2   particular.  But those are -- those are the big items.

3   Q    And do you have confidence or a lack of confidence that

4   your backup plan, now the operating plan, is going to succeed?

5   A    I do.  It's not the path that we all wanted to go down,

6   right, as we wanted to have a transition.  We wanted to have

7   all these systems and software, as evidenced by trying again

8   to have the Bloomberg OMS through the weekend.  It's not going

9   to be perfect, but I feel like we have everything in place to

10  do the job that we're required to do.

11       And we've tried to put in place, you know, controls to

12  mitigate risks wherever possible, and so I feel confident in

13  the plan.  I've spent weeks and weeks losing sleep,

14  coordinating, you know, stressing over these items as a backup

15  plan, in addition to trying to negotiate an agreement.  I've

16  had a team of senior people across our firm who are from each

17  area of our firm.  I have spoken with Debtor employees to

18  consider what additional risks do we need to consider.  And so

19  I think it's been very well-thought-out.  And I mentioned the

20  last several weeks, that was when, again, when it became an

21  earnest necessity to ensure we had something.

22       Prior to that, you know, in December and November, we

23  received a list of all agreements.  We reviewed a list of all

24  of our agreements, all the Debtor's agreements.  And so we

25  were thoughtful already then what we needed.  And so as we had

Norris - Direct                   161

1    to then execute quickly, we knew exactly what was necessary

2    and what the Debtor was providing us.  And so, as well, with

3    this transition agreement, there's about a hundred or so

4    services in there, and discussing what were essential and what

5    were not, what we could enter into by ourselves and what we

6    couldn't.  And almost every one of them we could have entered

7    into ourselves.  We would have loved to -- and I think we

8    would have had a cost savings, and it would have been a

9    benefit to them -- to reach this broad agreement, but for the

10   one remaining issue that neither Jim would approve.

11        So, we tried.  We went through the, as I said earlier, a

12   thousand line items.  We negotiated, I believe, in good faith

13   all along the way.  Whenever -- an ultimatum was given to us

14   on Tuesday.  I continued pushing all the way through Friday,

15   all the way through the weekend, and this is what I wanted.

16   But along the way, we were preparing in every way for the

17   backup, because I have '40 Act registered mutual funds, I have

18   a board who's demanded it, and we were trying in every way to

19   be able to continue these services in the event that HCMLP

20   would no longer provide them.

21   Q   I think we've established that the Debtor will be

22   terminating the employees, some employees as of February the

23   28th.  Do you expect to hire those employees through Newco

24   come March 1?

25   A   Yeah.  So, to make an adjustment there, there are about

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1983
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 51 of 1017   PageID 6764
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1982 of 2722

Norris - Direct                              162

1   eight to ten employees that are investment professionals that

2   we would need to hire directly at our Advisor.  Earlier on in

3   the process, there was a question of whether we hire all

4   employees directly, whether Newco hires them, whether Newco is

5   owned by Jim or whether it's an independent business.  The

6   current plan, which has been the last couple of months, is

7   that Newco would be independent, they'd be run by an

8   independent management team.  We would -- we would be --

9   provide -- providing them or entering into a shared services

10  agreement.

11      And so our full understanding and expectation is that

12  those employees for Newco will be hired or anticipated to be

13  hired after they're terminated on the 28th.  All of that, I

14  know, is in negotiations, but I believe that is what the

15  Debtor is willing to do, and that those eight or ten employees

16  will be hired by us once they're terminated.

17  Q   So, approximately how many employees, through Newco or

18  directly, do you expect to hire on or about March 1?

19  A   I think there's approximately fifty or so.  I know that

20  the Debtor is considering adding, I believe, somewhere around

21  five to ten employees, or taking those.  I think we have -- we

22  have not heard or been told.  We've been asked -- we've asked

23  several times.  They haven't told us who those employees are.

24  But I think we have a pretty good idea.

25      But at this point, we think that the majority of the

Norris - Direct                         163

1   people providing services to us in the back office and middle

2   office, again, because they'll want -- I believe they'll want

3   or are going to be handful of front-office people that help

4   with private equity and winding down those assets.  But the

5   bulk, if not all, of the back-office personnel will transfer

6   over to Newco, with a handful of the investment professionals

7   to us.

8   Q   Do you have any concern or is there anything outstanding

9   that would give you concern that that will not happen on or

10  about March 1?

11  A   I sure hope it does, but one thing that may cause me --

12  maybe the only thing that may cause me concern is they have

13  twice moved back or maybe three times moved back the

14  termination dates.  Now clearly know that our plan is to

15  involve Newco and all those employees to continue providing

16  services.

17       In the event that happens, we're prepared to continue.

18  The items that we're covering in the interim period are the

19  essential items.  There's a number of services that -- that

20  Newco would provide that are not essential for the operations

21  of our funds.  They include things like tax services for our

22  advisor or the books and records of our advisor, like the HR

23  recruiting services.  You know, those could wait, or we could

24  contract them elsewhere.

25       And so -- but I do hope -- and our -- we don't anticipate

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1985
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 53 of 1017   PageID 6766
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1984 of 2722

Norris - Direct                    164

1    any disruption here.  I know that they've said that Newco can

2    hire whoever they want.  I think that that's going to be

3    smooth and orderly.

4    Q    Well, so let me ask, let me ask -- I'm down to two or

5    three more questions, but let me ask a worst-case scenario

6    question.  Come tomorrow or come Friday, you realize that you

7    can't do OMS manually; for some reason, the Debtor doesn't

8    release its employees; all of your planning turns out to have

9    been inadequate, and essential functions are not able to get

10   done:  Are there third-party providers that could immediately

11   step in and provide basically every service that the Debtor is

12   currently providing to the Advisors in such an event?

13   A    There are.  I think the trading -- I think we have a good

14   plan.  But to your point, your promise, if we couldn't pull it

15   off or there were issues, you can outsource trading.  You can

16   outsource that.  It's not a turn-on-the-switch, but we do have

17   and have had discussions with service providers there.

18        In the end, if Newco didn't work out, there are other

19   service providers, which I know that people in our team and

20   the Debtor have talked to, to provide outsourced accounting

21   oversight.  There are -- there's multiple options.  We just

22   have not --

23   Q    So is it fair to say, is it fair to say that you have

24   currently a Plan B to your Plan B?

25   A    Yeah, well, there is, yes, but I feel very good about our

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1986
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 54 of 1017    PageID 6767
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1985 of 2722

                              Norris - Direct                    165

1   current Plan B that we've implemented, to the extent I don't

2   think we're going to need that.  But if there is a lack of

3   cooperation for some reason, we do have other options to

4   outsource those services.

5   Q    Okay.  My final question --

6   A    Again, I don't anticipate -- I don't -- I don't -- I don't

7   think that's going to be the case, but --

8   Q    My final question, Mr. Norris.  This backup plan and now

9   the operational plan that you have, was it in any way

10  motivated, sped up, anything by the filing of this lawsuit?

11  A    No.  I think one thing the finalization -- the filing of

12  the lawsuit did was make us realize that the backup plan we

13  had been working on was absolutely needed.  I felt very good

14  about where we were at that point, and we were prepared to

15  move forward.

16      It did change that I, over the next six days, me and

17  several other of the critical employees that have been working

18  on the backup plan would be involved in preparing for this

19  exact situation.  Instead of continuing those discussions, I'd

20  rather be boots on the ground, dealing with my employees, the

21  senior management team and everyone else.  Luckily, you know,

22  after my deposition, before my deposition yesterday, I was

23  involved in how is everything going.  We had checkpoints and

24  touchpoints.  We had calls in the afternoon.

25      Fortunately, there were no significant issues, but there

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1987
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 55 of 1017    PageID 6768
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1986 of 2722

Norris - Direct     166

1  were a lot of minor issues.  There were things that needed to

2  be approved or people had questions.  But that, I think, is

3  the only thing that changed here.  It's -- we had to -- now we

4  knew that, okay, they're going to pull the plug because of

5  this.

6   At that point, I was not expecting that really to happen

7  at that point, that that would be the issue.

8  Q Well, Mr. Norris, --

9  A But luckily, we had planned for it.

10  Q Mr. Norris, if an allegation is made that it was the

11  filing of this lawsuit that somehow spurred us into taking our

12  responsibilities seriously, would you agree with any such

13  allegation?

14  A No.  I would disagree.

15  Q Thank you.

16    MR. RUKAVINA:  I'll pass the witness.

17    THE COURT:  All right.  Mr. Morris?

18    THE WITNESS:  I can't hear you.  I think you might be

19  on mute, Mr. Morris.

20   (Pause.)

21       CROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q Got it.  Can you hear me now?

24  A I can, yes.

25  Q Okay.  Super.  I have a few questions, sir.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1988
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 56 of 1017 PageID 6769
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 1987 of 2722

Norris - Cross                    167

1   A    Yes.

2   Q    You spent a fair amount of time testifying about how

3   poorly the Debtor was performing under the shared services

4   agreements last October and November.  Do you remember that?

5   A    I remember I testified.  I wouldn't say it was some time,

6   but yes.

7   Q    You specifically mentioned the October and the November

8   time frame, right?

9   A    Correct.  I believe so.

10  Q    And you said that during that October and November time

11  frame, there were lots of conflicts of interest that were

12  arising; is that right?

13  A    I don't remember my specific wording, but if it's part of

14  the record, then yes.

15  Q    Uh-huh.  And you said that the Advisors weren't getting

16  the same level of services that they thought they were

17  entitled to; isn't that right?

18  A    That's correct.

19  Q    And you thought -- and the Advisors thought long and hard

20  about terminating, about taking the initiative and terminating

21  the shared services agreement, right?

22  A    I don't know if I used the word "long and hard", but yes,

23  we did consider and discuss the termination of the shared

24  services agreements.

25  Q    And the reason that you decided in October and November

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1989
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 57 of 1017   PageID 6770
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1988 of
2722

Norris - Cross                    168

1  not to do that is because you knew there was an order in place

2  that prevented a Dondero-related entity from terminating an

3  agreement.  Isn't that right?

4  A    That's -- that's one of the reasons, yes.

5  Q    That's the only reason you identified before; isn't that

6  right?

7  A    I believe so.

8  Q    And that --

9  A    That was a determining -- that was a make-or-break point,

10 yes.

11 Q    And it was a -- and that was false testimony; isn't that

12 right?

13 A    No.

14 Q    Well, just a month later, in December, the Advisors sent a

15 letter to the Debtor threatening to terminate the CLO

16 management agreement; isn't that right?

17         MR. RUKAVINA:  Your Honor, I'll object to that, it's

18 not in the evidence, and I'll object on the basis of the best

19 evidence rule.

20         THE COURT:  Response?

21         MR. MORRIS:  You can answer, sir.

22         THE COURT:  Response?

23         MR. RUKAVINA:  Your Honor, I didn't hear a response.

24         MR. MORRIS:  The witness is the executive vice

25 president of the Advisors.  The Advisors were the subject of a

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1990
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 58 of 1017    PageID 6771
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1989 of
2722

Norris - Cross                         169

1   preliminary injunction proceeding.  During that proceeding,

2   against these very same Defendants, this letter was admitted

3   into evidence where they -- where the Advisors did exactly

4   what Mr. Norris said they would never do because they didn't

5   think they had the authority to do that.  Mr. Norris is the

6   best evidence right now, Your Honor.

7            THE COURT:  Okay.  I overrule the objection.

8            MR. MORRIS:  Your Honor, that's not --

9            THE COURT:  I overrule the objection.  I remember the

10   evidence from the December hearing.  So he can answer.

11           THE WITNESS:  Yeah, so can you repeat the question,

12   just so I make sure I answer appropriately?

13   BY MR. MORRIS:

14   Q    Sure.  In December, the funds and the Advisors for which

15   you serve as the executive vice president, on, I think,

16   December 23rd, sent a letter to the Debtor threatening to

17   terminate, right?  Threatening to use what authority they

18   thought they had to go in and terminate the CLO management

19   agreements.  Isn't that right?

20   A    I was not involved in the drafting of the letter, but my

21   understanding is there was no threat.  It was -- and I believe

22   the letter even said, subject to court approval or stay or

23   process.  I would love for -- if there is a letter, if you

24   want to bring it up, but I wasn't directly involved with the

25   letter.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1991
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 59 of 1017   PageID 6772
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1990 of
2722

Norris - Cross                          170

1    Q   And the Advisors didn't send a letter to the Debtor in

2    October or November saying, We want to terminate the agreement

3    subject to whatever you just said.  In fact, you concluded

4    that you couldn't do it because of the injunction, right?

5    A   Correct.

6    Q   Yeah.  You've spent an awful lot of time talking about

7    this operational plan that the Advisors have today.  It was a

8    much more modest plan during your deposition yesterday; isn't

9    that right?

10   A   I wouldn't --

11        MR. RUKAVINA:  Your Honor, I'll object --

12        THE COURT:  I'm sorry?

13        MR. RUKAVINA:  I object to that characterization.

14        THE COURT:  You object to --

15        MR. RUKAVINA:  Your Honor, I'll --

16        THE COURT:  -- the charac...

17        MR. RUKAVINA:  I'll withdraw that.  I'll withdraw

18   that objection, Your Honor.

19        THE COURT:  All right.  Go ahead.

20        THE WITNESS:  No, I answered the questions in the

21   manner that you asked them in the deposition.  I don't think

22   that you asked for detailed descriptions.  In fact, I know you

23   didn't.  And so there was a lot more than what I discussed in

24   my deposition yesterday.

25   BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1992
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 60 of 1017   PageID 6773
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1991 of 2722

Norris - Cross                    171

1   Q   Okay.

2   A   Nothing -- there's nothing that -- nothing that conflicts

3   with what I said yesterday.

4   Q   James Palmer was hired to provide accounting and audit

5   services yesterday on a contract basis, correct?

6   A   He was hired yesterday, yes.  And that was, yes, part of

7   the additional oversight for our accounting function.  We're

8   handling a lot of that internally, but Mr. Palmer was

9   experienced with our platform and with our funds, and we

10  thought it was prudent, in the -- if needed, to have somebody

11  on call.  And our board actually requested it.  And so that's

12  a -- you know, that is someone who we feel very comfortable

13  with providing those services.

14          MR. MORRIS:  I move to strike everything after "Yes,"

15  Your Honor.

16          THE COURT:  Sustained.

17  BY MR. MORRIS:

18  Q   Okay.  I'm going to ask you, sir.  This is cross-

19  examination.  I'm going to ask you leading questions that are

20  intended to elicit a yes or no answer.

21  A   Got it.

22  Q   Your counsel will have the opportunity to redirect if he

23  think it's necessary.

24      So, let me ask the question again.  Mr. Palmer was hired

25  by the Advisors to provide audit and accounting services

                          Norris - Cross                    172

1   yesterday.  Isn't that correct?

2   A    No.

3   Q    Yesterday was his first day on the job.  Isn't that right?

4   A    He is a contract employee.  So we didn't hire him.

5   Q    Okay.  You did testify yesterday that yesterday was the

6   first day he was providing services that had been provided by

7   the Debtor.  Is that fair?

8   A    Yes.

9   Q    Okay.  And Siepe is another entity that the Debtor had a

10  -- that the Advisors had a prior relationship, right?

11  A    Correct.

12  Q    And you don't have an agreement with Newco today, do you?

13  A    Not yet.

14  Q    So, Newco is not providing any services today, right?

15  A    No.

16  Q    And you don't have office space today, right?

17  A    Not yet.

18  Q    Okay.  So, when the sun rose on Saturday morning, to use

19  the same analogy, I guess, you'd been kicked out of the house

20  and you had no place to go.  Is that fair?

21  A    No.

22  Q    Everybody's working remotely right now, right?

23  A    Yes.

24  Q    And the Advisors have no lease for any office space on a

25  long-term basis, right?

APP. 1989

005979

Norris - Cross                    173

1  A    No, but we've toured space and have a -- we are ready to

2  sign a sublease as soon as we're ready.

3  Q    Okay.  But you didn't have that as of Friday; is that

4  fair?

5  A    No.

6  Q    Okay.  And you -- and you're doing trading now on --

7  A    Actually, can I make a -- can I make a correction?  I --

8  you said you didn't have that.  I said we had done a tour, and

9  I had done a tour before Friday, and that we had a lot lined

10  up, and I had them asking us, Are you ready to execute, will

11  you be here Monday?

12      So, that was there.  Again, realizing we were going to be,

13  hopefully, the plan was to reach a full agreement with you,

14  but having that backup plan in place, not to sign a lease and

15  spend the money unless we knew we weren't going to be able to

16  be in the office space.  So that's why.

17  Q    All right.  So let me ask the question again.  As of

18  Friday, the Advisors had no place to go at the end of the

19  extended shared services period, correct?

20  A    I disagree with that.

21  Q    Okay.  They don't have an -- does the Advisors have an

22  address today?

23  A    We have an address, yes.

24  Q    Yeah?  Where is the address?

25  A    So, we -- we have been -- we have a -- so we have a -- our

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1995
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 63 of 1017   PageID 6776
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1994 of 2722

Norris - Cross                    174

1  NexPoint Securities has an office on McKinney Avenue in

2  Dallas, which is where we -- we have an ability to send our

3  mail to and to have an office, which is where we intend to

4  actually be subleasing.

5  Q    Okay.  But you don't have a sublease today, and that

6  address isn't the address of the Advisors, right?

7  A    It is all but in place, waiting to not spend the

8  significant expenditure in the event that we could, which our

9  plan was to hope to reach an agreement.

10 Q    Okay.  And you're doing trades manually?  Do I have that

11 right?

12 A    It is -- we call it a manual process, but it involves like

13 -- there's a certain -- it doesn't involve the OMS system.

14 That's right.

15 Q    And when your operational plan is fully in place, would

16 you expect it to have an OMS system?

17 A    Yes.

18 Q    But your operational plan today doesn't have one of the

19 pieces that you expect it to have in the future; is that

20 right?

21 A    It has -- it has a usable option, but no.  We're close to

22 entering into an OMS, and that's not the long term.  Yeah.  We

23 aren't going to be doing a manual -- our manual process

24 forever.

25 Q    Yeah.  But you're very, very, very happy with your

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1996
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 64 of 1017   PageID 6777
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1995 of
2722

Norris - Cross                          175

1   operational plan, right?  You're very proud of it?

2   A   Given the constraints we were working under, I feel it's

3   -- it is a plan that works.  Would I think that the

4   alternative with what we were negotiating would be better?

5   Probably.  Would it be better to have access to our systems,

6   to our computers, without having to turn them back into you?

7   Yes, absolutely.

8       So I don't remember the word you just used, but I think

9   very happy or very pleased, I wouldn't say that.  I would say

10  it is functional, it helps us do our duty and our job, and

11  we're going to get back to that ideal.  And the reason I

12  negotiated all the way through the week and all the way

13  through the weeks and all the way through the weekend is

14  because there was a better alternative, which was a negotiated

15  settlement.

16  Q   All right.  We'll talk about that in a moment.  But

17  notwithstanding the fact that there may have been a better

18  alternative, as of today the Advisors have adopted and

19  implemented an operating plan for the provision of all of the

20  same back-office and middle-office services that the Debtor

21  previously provided, correct?

22  A   To cover -- and I would say they do, yes.

23  Q   Okay.

24  A   Yes.

25  Q   And as of today, the Advisors are fully able to perform

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1997
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 65 of 1017   PageID 6778
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1996 of 2722

Norris - Cross                    176

1    under their shared -- under their advisory agreements with the

2    funds; is that correct?

3    A    Yes.

4    Q    There is nothing the Debtor has done that has prevented

5    the Advisors from fully performing under their advisory

6    committee -- advisory agreements with the funds, correct?

7    A    It took great effort over the last several months, but no,

8    not that I'm aware of.

9    Q    Okay.  Other than access to the data, there are no

10   services that the Advisors need from the Debtor.  Is that

11   correct?

12   A    No, but the peaceful transition of the data is important,

13   right?  We have, as you mentioned, we have most of the data we

14   need, but the peaceful transition of the data and the files in

15   the systems -- not the systems, but the data backups of the

16   systems -- will be critical, yes.

17   Q    Okay.  But other than data, there are no services that the

18   Debtor needs to provide to the Advisors as of today, correct?

19   A    Not that I know of.

20   Q    And having been as involved in the process as you've been,

21   you would know if there was a service that the Debtor had to

22   provide to the Advisors today; isn't that right?

23   A    Yes.

24   Q    Okay.  And you don't know of any service that the Debtor

25   needs to provide to the Advisors as of today, right?

005983

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1998
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 66 of 1017   PageID 6779
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1997 of 2722

                              Norris - Cross                    177

1   A    I don't.  We mentioned data.  I think one of those --

2   well, I'll leave it as yes.

3   Q    Okay.

4   A    Yeah.

5   Q    Did you have this plan in place, this operational plan,

6   was that -- were all of the pieces in place last Tuesday

7   night?  No.  Withdrawn.

8       Were all of those pieces in place as of January 31st,

9   2021?

10  A    No.

11  Q    So is it fair to say that the Debtor didn't -- that the

12  Advisors did not have an operational plan that would permit

13  them to obtain all of the same services that the Debtor had

14  been providing under the shared services agreement as of

15  October -- as of January 31st?

16  A    No.

17  Q    They did have a plan in place at that time to get those

18  services?  Is that what you're saying?

19  A    Yes.  There was a plan, a Plan B.  It wasn't nearly what

20  Plan B is today because we've -- we've had multiple additional

21  weeks to ensure that everything's in place, but we had Plan B.

22  But at the time -- maybe I'll leave it there.  But at the

23  time, there was good faith negotiations up to that point,

24  where Plan A looked like it was going to happen.  And so that

25  was the full expectation with a backup plan which was not as

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1999
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 67 of 1017   PageID 6780
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1998 of 2722

                              Norris - Cross                    178

1   intricate.

2   Q   Did the Advisors ever inform the Debtor at any time during

3   the negotiations that they had an operational plan pursuant to

4   which it could obtain the same middle- and back-office

5   services that the Debtor had been providing?

6   A   If you include your Debtor employees, then yes.

7   Q   Did you ever use it as a point of negotiation?  Did you

8   ever try to tell the Debtor, you know, if you guys don't agree

9   to our terms, we're going to walk away, because we've got this

10  fully-operational plan to get the same services that you guys

11  are providing?  You're not the only game in town?

12  A   I never used that kind of exact approach, no.

13  Q   Did you use any approach where you relied on the

14  operational plan as leverage to try to drive a better deal

15  with the Debtor?

16  A   No.  I don't think so.

17  Q   No?  Okay.  And fast-forward to that Tuesday night when

18  the Debtor said take the plan without Mr. Dondero or we're

19  going to sue you.  You remember that, right?

20  A   Yes.

21  Q   And every aspect of the agreement was in place except for

22  Mr. Dondero, right?

23  A   Except for his access to the office, --

24  Q   And the --

25  A   -- yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2000
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 68 of 1017   PageID 6781
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1999 of
2722

Norris - Cross                          179

1   Q    And the Debtor had told you time and time again, every

2   time it appeared in a document, they removed it, and they told

3   you every single time no access for Mr. Dondero, right?

4   A    No.

5   Q    Did you have any reason to believe that that was ever

6   going to change?

7   A    I did.  And I said no to your last question, right?  I

8   didn't say yes.  I said no to your last question, that --

9   Q    And did the Advisors make a decision to reject the

10  Debtor's offer for the sole reason that Mr. Dondero wouldn't

11  be permitted access?

12  A    That was the last point.  As mentioned, every other point

13  was agreed to.

14  Q    And why didn't the -- why didn't the Advisors -- did the

15  Advisors -- withdrawn.

16       Did the Advisors say to the Debtor, we get it, you're not

17  going to let Mr. Dondero in, but that's a line in the sand for

18  us?  But please, there's no need for a lawsuit.  We've got a

19  wonderful operating plan ready to go.  You're asking the Court

20  to force us to adopt and implement the plan, we have one right

21  here, so let's not litigate.  Let's just walk away and let

22  bygones be bygones.  Did you ever offer to get rid of the

23  lawsuit by showing the Debtor your plan?

24  A    We would have loved to have gotten rid of the lawsuit, but

25  I didn't see it until it was filed.  When the ultimatum was

Norris - Cross                          180

1    given, we had rolling blackouts.  My home didn't have

2    electricity rolling from 2:00 a.m. on Monday until Thursday.

3    And so by the time there was -- and everybody else, inclusive

4    of our attorney, Mr. Rukavina.  And so to say that I -- I

5    received it Thursday or Wednesday morning, when one of your

6    employees forwarded it to us.  I hadn't seen drafts.  Maybe

7    our counsel had.  But we didn't even have a chance to say, oh,

8    let us -- let us pull this because we read what your report

9    was.  The Advisors didn't even have a chance to respond.  At

10   least that is my understanding.  I never had a chance to

11   respond.  I never saw it.  Maybe counsel did.

12   Q    Well, you saw the lawsuit eventually, didn't you?

13   A    I did.

14   Q    Did you ever -- did the Advisors -- after you saw the

15   lawsuit, did the Advisors ever call up the Debtor and say,

16   hey, look, let's not litigate?  We have exactly what you want.

17   We've got this fully-operational plan that provides us with

18   everything we need.  You don't need to do anything further.

19   Did you ever say that to the Debtor?

20   A    No, because the back -- the -- we still wanted to reach an

21   agreement.  That was the goal.  And it was a surprise for us

22   to have a shock, we're going to pull this or we're going to

23   sue you on Tuesday evening.  And so, no, we still -- I -- and

24   that's why I negotiated and continued to work all the way

25   through the end of the week and through the weekend on

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2002
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 70 of 1017 PageID 6783
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2001 of
2722

Norris - Cross                         181

1   something, because I still felt like that was the better plan

2   for everybody.

3       I don't know why we had to be sued, I don't know why it

4   had to be urgent, because at that point we had been working

5   for weeks and months.  And the weeks -- really good.  And the

6   only difference was Jim Dondero's access.  And it was Tuesday.

7   And they didn't even ask us, you know.

8       Anyway, so that was -- I just -- I just disagree with your

9   characterization of the process.

10          MR. MORRIS:  I move to strike, Your Honor.  It really

11  is a very simple question.

12          THE COURT:  Sustained.

13  BY MR. MORRIS:

14  Q   Did the Advisors, after the commencement of the lawsuit,

15  did the Advisors ever tell the Debtor that there was no need

16  for litigation because the Advisors had a fully-operational

17  plan that they had adopted and were prepared to implement,

18  which is exactly what the Debtor was seeking from the Court?

19  A   I don't know.

20  Q   You're not aware of that, right?

21  A   I'm not.

22  Q   You don't -- you never thought that maybe we could avoid

23  this whole thing by just sharing with the Debtor this

24  operational plan that you've described in great detail, right?

25  A   Well, on Friday, I know you put in, in a response to our

Norris - Cross                    182

1  board and Advisors, that you were made aware that we had a

2  plan that felt good, yet there was no consideration or

3  discussion on removing the lawsuit.

4      So, I'll leave that to what counsel happened, but I would

5  have loved to not be involved.  I'm not a legal expert.  There

6  were many attorneys involved.  I wish that if that were an

7  option, it would have been raised.  But here we are today.

8  Q   Sir, not only did the Advisors not tell the Debtor that

9  they had an operational plan that could avoid the lawsuit,

10  instead, the Advisors made proposals on Friday, one of which

11  did not even include having access to the office by Mr.

12  Dondero.  Isn't that right?

13         MR. RUKAVINA:  Your Honor, I object to that question

14  as it mischaracterizes the evidence.  The question began with

15  that the Advisors never told the Debtor that they had a backup

16  plan.  I think the witness --

17         MR. MORRIS:  Your Honor, --

18         THE COURT:  Okay.  Sustained.  Rephrase.

19         MR. MORRIS:  Yeah.  No problem.

20  BY MR. MORRIS:

21  Q   So, so to the best of your knowledge, the Advisors never

22  told the Debtor that they thought litigation could be avoided

23  because they had an operational plan.  Is that right?

24  A   That's my -- that -- yeah, that's right.

25  Q   Okay.  And instead, on Friday, the Advisors continued to

Norris - Cross                        183

1   try to pursue an agreement with the Debtor.  Is that right?

2   A   I don't know about the "instead."  But, yes, we tried to

3   continue reaching an agreement.

4   Q   And are you familiar with the offer that was made by the

5   Advisors to the Debtor on Friday morning?

6   A   I am.

7   Q   Did you authorize the sending of that offer to the Debtor?

8   A   The request, yes.  Me and D.C. Sauter were involved with

9   counsel, so we -- we did -- we did.

10          MR. MORRIS:  All right.  Can we please put up on the

11   screen Exhibit 19?  Can we start at the bottom, please?

12   BY MR. MORRIS:

13   Q   So, are these the Options A and B that were presented to

14   the Debtor on Friday morning?

15   A   Based on the email, yes.

16   Q   Okay.  And Option B contemplated that the Advisors would

17   completely vacate the space by the end of the month, right?

18   A   Correct.

19   Q   And that's an option that you and Mr. Sauter authorized

20   the lawyers to send to the Debtor, correct?

21   A   Yes.

22   Q   Okay.  And you had that authority from Mr. Dondero, right?

23   Mr. Dondero gave you the authority to negotiate; is that

24   correct?

25   A   He gave me the authority to negotiate in those final

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2005
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 73 of 1017    PageID 6786
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2004 of
2722

Norris - Cross                    184

1    couple of days.  There were certain things he gave me

2    authority to negotiate on.  And specifically -- and to things

3    that shouldn't be included on this point, we discussed this

4    beforehand as well.  But we had authority to negotiate.

5    Q    And you had authority to make this proposal, right?

6    Option B?

7    A    Ultimately, no.

8    Q    At the time you made it, you thought you had it, right?

9    A    Yes.

10   Q    You weren't acting outside of what you knew to be your

11   scope of authority, were you?

12   A    No.

13   Q    Okay.  Did you discuss with Mr. Sauter these two options

14   before they were delivered by your lawyers to the Debtor?

15   A    Yes.

16          MR. RUKAVINA:  Your Honor?  Your Honor?  Hold on.

17       Your Honor, Mr. Sauter is an attorney.  He's in-house

18   counsel.  So I think that to the extent that they're

19   discussing business, that's not privileged.  To the extent

20   they're discussing legal strategy, that is privileged.  So I

21   would instruct the witness to be conscious of that --

22          THE COURT:  All right.

23          MR. RUKAVINA:  -- and to not disclose attorney-client

24   privileged communications.

25          THE COURT:  All right.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2006
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 74 of 1017 PageID 6787
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2005 of 2722

Norris - Cross                              185

1   BY MR. MORRIS:

2   Q    Sir, did you discuss these two proposals with Mr. Sauter

3   before it was delivered by your lawyers to the Debtor?

4   A    Yes.

5   Q    And did Mr. Sauter also agree with the substance of these

6   two offers that were being presented to the Debtor?

7           MR. RUKAVINA:  Mr. Norris, can you answer that

8   question without invading the attorney-client privilege?

9           MR. MORRIS:  I'm just asking about the offers.  I'm

10  not asking about any legal advice or anything.  I just want to

11  be that clear.

12          MR. RUKAVINA:  That's why I'm asking Mr. Norris.  If

13  they discussed business, I don't think we have a problem.  But

14  if they discussed legal strategy, I think it's a problem.  So

15  I think the witness just has to tell us whether --

16          THE WITNESS:  There --

17          MR. RUKAVINA:  -- they discussed business or legal.

18          THE WITNESS:  There -- there was a -- there was some

19  legal -- legal strategy as well, yeah.

20          MR. RUKAVINA:  Your Honor, I would -- I would ask

21  that that -- I would object to that question on that basis,

22  that it calls for the invasion of the attorney-client

23  privilege.

24          THE COURT:  All right.  I sustain.

25          MR. MORRIS:  I'll try -- I'll try and ask the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2007
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 75 of 1017   PageID 6788
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2006 of 2722

Norris - Cross                    186

1   question again, then.

2   BY MR. MORRIS:

3   Q   Mr. Norris, did Mr. Sauter agree and authorize the sending

4   of these two proposals by the Advisors' lawyers to the Debtor

5   on Friday morning?

6   A   We both agreed with that approach.

7   Q   Okay.  And you both -- is it fair to say that you both

8   believed that you were acting within the scope of authority

9   that Mr. Dondero had given you?

10  A   We thought so, and -- well, I'm sure your questions will

11  lead me to the -- to the ultimate of what happened here, but

12  yes.

13  Q   Yeah.  And this proposal didn't permit Mr. Dondero back

14  into the Highland office space; is that right?

15  A   It didn't prevent him?  Is that what you said?

16  Q   Didn't permit him.  Didn't allow him.

17  A   Option A just above did and Option B did not.

18  Q   Okay.  So, you and Mr. Sauter, as the Advisors' designated

19  negotiators, authorized the Advisors' lawyer to present as

20  Option B an option that did not permit Mr. Dondero access to

21  the Debtor's offices, right?

22  A   Yes, but gave us full access to everything else.

23  Q   Okay.  It was really --

24      (Pause.)

25          THE COURT:  Uh-oh.

```
                        Norris - Cross                 187

 1  BY MR. MORRIS:

 2  Q   How does Option B -- how does Option B, if you know, --

 3  A   Sorry, you froze.  You froze there for a minute, I think.

 4          THE COURT:  Yes.  I think you did.

 5          MR. MORRIS:  No, I think I just paused.

 6          THE WITNESS:  Oh, you were just thinking?  Oh, that

 7  was really talented.  Wow.

 8  BY MR. MORRIS:

 9  Q   No, it's -- it's not that good.  Do you know how Option B

10  differs from the term sheet that the Debtor provided on

11  Tuesday night?

12  A   It would not include the access -- it wouldn't include

13  access to the office for anybody.  The, as it says there, the

14  Debtor would take a hundred percent of the lease.

15  Q   Okay.  So, it was going to be complete walkaway?  The

16  Advisors were going to completely walk away at the end of the

17  month, right?

18  A   Correct.

19  Q   And that was -- that was an offer that you believed you

20  were authorized to make to the Debtor, right?

21  A   Yes.

22  Q   Okay.

23          MR. MORRIS:  Can we go two emails up to Mr.

24  Hogewood's?  Oh.  Yeah.  The one at 12:04.  Yeah.

25  BY MR. MORRIS:
```

Norris - Cross                        188

1   Q   Were you aware that there came a time early in the

2   afternoon that the Debtor was informed that there may need to

3   be an edit to Option B, so they pulled that back for a bit?

4   A   I wasn't aware, no.

5   Q   No?  All right.  Do you have any knowledge as to what edit

6   Mr. Hogewood was referring to in his email there?

7   A   I don't.

8   Q   Okay.  Were you aware -- did you get a copy of Mr.

9   Hogewood's email?  Was it forwarded to you?  Do you know --

10  withdrawn.  Let me ask a better question.

11      Do you know if Mr. Hogewood delivered -- withdrawn.

12      Did you know on Friday morning that Mr. Hogewood had

13  delivered the two options, the two proposals, that you and Mr.

14  Sauter had authorized?

15  A   Yes.

16  Q   Okay.

17          MR. MORRIS:  Can we go up an email or two, please?

18  BY MR. MORRIS:

19  Q   And then Mr. Hogewood wrote back and he said that he was

20  authorized to put Option B back on the table, as stated above.

21  Do you see that?

22  A   I do.

23  Q   Do you know who authorized Mr. Hogewood to put Option B

24  back on the table?

25  A   I don't remember.  I don't know.  I wasn't on the chain.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2010
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 78 of 1017   PageID 6791
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2009 of
2722

Norris - Cross                    189

1   Q   Okay.  But it's fair to say at this point in time, midday

2   on Friday, as far as you knew, your lawyer had communicated

3   Option A and Option B to the Debtor, and they were authorized

4   to do that, right?

5   A   Yes.

6   Q   Okay.  And did you learn subsequently that there was a

7   phone call between the lawyers for the Advisors and the lawyer

8   for the Debtor during which the Debtor indicated that it was

9   prepared to accept Option B?

10  A   I don't know, no, I don't know about that.

11  Q   You were never told that?

12  A   No.  Not that there was a phone call.

13  Q   Uh-huh.  Did you learn at any point on Friday that the

14  Debtor had accepted Option B, the Option B that you and Mr.

15  Sauter had authorized the Advisors' lawyers to make?

16  A   Yes.

17  Q   Okay.  So, there did come a time when you knew that the

18  Debtor had accepted Option B, right?

19  A   Yes.

20  Q   And are you aware that, after accepting Option B, the

21  lawyers discussed turning the agreement into a settlement

22  order to resolve the litigation?

23  A   No.  I wasn't aware of that.

24  Q   Are you aware that the lawyers were discussing plans for

25  the transfer of -- by wire of cash that would be due under the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2011
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 79 of 1017   PageID 6792
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2010 of
2722

Norris - Cross                         190

1   agreement?

2   A    I was not.

3   Q    Okay.  After the Debtor accepted Option B, the Advisors

4   withdrew it, correct?

5   A    I don't know if we with... we did withdraw it, yes.

6   Q    And after it was presented, Mr. Dondero said that he

7   hadn't personally approved it, correct?

8   A    In the terms of which -- the actual offer, yes, that's

9   correct.

10  Q    So, Mr. Dondero, having given you and Mr. Sauter the

11  authority to negotiate, learned that the Debtor had agreed to

12  your proposal pursuant to which he wouldn't be allowed access

13  to office space and he made the decision to withdraw the

14  offer, correct?

15  A    I wouldn't agree with exactly the phrasing, no.

16  Q    Sir, Mr. Dondero is the person who decided that he had not

17  approved of Option B, and that's why it was retracted,

18  correct?

19  A    That's right.

20  Q    So, on Tuesday night, the Advisors had a fully-negotiated

21  agreement for the provision -- for the transition of all of

22  the back-office and middle-office services, but for access to

23  Mr. Dondero, correct?

24  A    Correct.

25  Q    And the only reason that didn't get signed is because of

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2012
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 80 of 1017   PageID 6793
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2011 of 2722

Norris - Cross                191

1   that issue, right?

2   A    That's my understanding, yes.

3   Q    And the Debtor continued to negotiate with the Advisors,

4   even after filing the lawsuit, correct?

5   A    Yes.

6   Q    The Debtor was never told that the Advisors had a fully-

7   operational plan pursuant to which it had an alternative to

8   obtain the same services, correct?

9   A    That's incorrect.

10  Q    After negotiations broke down, is that the moment that a

11  reference was made to alternative plans?

12  A    No.

13  Q    Sir, on Friday, you personally reached an agreement with

14  the Debtor on Plan B, right?  You authorized the making of an

15  offer that the Debtor accepted, correct?

16         MR. RUKAVINA:  Your Honor, I'm going to object at

17  this time based on a legal conclusion.  The witness is not a

18  lawyer and he's not qualified to opine on whether an

19  agreement, which to me suggests is something binding and

20  enforceable, was ever reached.

21         THE COURT:  Response?

22         MR. MORRIS:  Your Honor, I'm not looking to enforce

23  any agreement, so let me try and restate and --

24         THE COURT:  All right.  Sustained.

25         MR. MORRIS:  -- address Mr. Rukavina's --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2013
Case 3:25-cv-02072-S    Document 15-9    Filed 06/25    Page 81 of 1017    PageID 6794
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2012 of 2722

Norris - Cross                          192

1              THE COURT:  He'll rephrase.

2              MR. MORRIS:  Yeah.

3     BY MR. MORRIS:

4     Q    Even as late as Friday, after starting the lawsuit, you

5     had made an offer.  You had authorized the making of an offer

6     that the Debtor had agreed to again, correct?

7     A    I had auth... I had said we should -- yes, I had

8     authorized the offer and then your fax saying on the

9     acceptance.  I wasn't involved in the back-and-forth

10    communication among the attorneys.

11    Q    But you knew it was accepted, subject, let's say, subject

12    to the execution of definitive documentation.  How's that?

13    A    I was told that they were willing to take the offer.  And

14    so, yes.  And --

15    Q    And sometime later that day, it got pulled because of Mr.

16    Dondero, correct?

17    A    Correct.

18    Q    And even on Saturday, the Advisors made proposals on an *a

19    la carte* basis for the provision of services, correct?

20    A    Yes.  And we have made very similar *a la carte* provisions

21    on Thursday and Wednesday, which were also rejected by the

22    Debtor.

23    Q    And -- okay.  So it wouldn't have been the full kind of

24    deal that was contemplated in the term sheet; it would have

25    been a selection of very specific services.  Do I have that

Norris - Cross                          193

1  right?

2  A    That's right.  On Wednesday, it was Oracle and Bloomberg,

3  which was authorized by Mr. Dondero.  We were to offering to

4  continue with our offer to take over the lease and all the

5  other terms, or a slim-down, which would include no disputed

6  amounts or payments, which at that time I think we called Plan

7  B or Option B.  And that was -- I believe that was Thursday.

8  Or Wednesday night.  So, yes, those continued.  And then we

9  had a similar, very similar proposal again on Sunday, with the

10 same -- very similar services to what we asked for on

11 Wednesday night or Thursday.  And those were rejected both

12 times.

13 Q    And is it fair to say that the services that the Debtor

14 was seeking -- withdrawn.

15      Is it fair to say that the services of the Advisors were

16 seeking from the Debtor on Thursday, Friday, and Saturday were

17 services that the Advisors had not yet engaged anybody else to

18 provide?

19 A    The two -- we already talked about Bloomberg and where our

20 status is there.  And on Oracle, it would be a nice to have

21 instead of transitioning, and that is more for the Advisors'

22 books and records and would be nice to have.

23 Q    So, --

24 A    Yes.

25 Q    Okay.  You have a Plan B for the new operational plan.

Norris - Cross                          194

1  Did I hear that part right?

2  A    As I mentioned -- oh, I said our operating plan was a

3  hypothetical from -- from Mr. Rukavina, that in these other

4  events fall through, are there other people that you could

5  hire to do these services?  And I said yes.

6  Q    Okay.  So if any part of the operational plan fails, the

7  Advisors would look to third parties to provide, you know,

8  whatever service they wouldn't obtain and they wouldn't look

9  to the Debtor to provide any services, correct?

10 A    That's correct.

11 Q    Is it fair to say that, other than access to the data, the

12 Advisors will never seek any services of any kind from the

13 Debtor going forward?

14 A    As we sit here today, I believe your employees are set to

15 have three more operating business days and then will be

16 terminated, those -- the employees that services our accounts.

17 So, with the expectation that Newco will be formed, I have no

18 expectation we'll be asking for any significant services,

19 other than data, transfer of emails, et cetera.

20 Q    Well, that's a pretty qualified answer.  What do you mean

21 by no significant services?

22 A    Most of them -- well, the data, emails, et cetera, are all

23 minor items, and I think they're -- you say data, but I think

24 there's -- there's a handful of things that probably fall

25 under that data and books and records that are what I'm

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2016
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 84 of 1017   PageID 6797
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2015 of 2722

Norris - Cross                    195

1  talking about, yes.

2  Q   You know, one of the things that the Debtor is very

3  concerned about here is having no future obligation.  The

4  Debtor -- do you understand that the Debtor believes that it

5  has terminated the shared services agreements as of Friday?

6  A   I do, yes.

7  Q   Do you understand that, other than the data that it holds,

8  the Debtor wants the comfort of knowing that it has no future

9  obligations to the Advisors of any kind, other than to provide

10  access to the data?

11  A   Yeah, that's fair.  Yes, I understand that.

12  Q   As the executive vice president of the Defendants, as the

13  executive vice president of the Advisors, can you, under oath,

14  give the Debtor comfort that the Advisors will not look to the

15  Debtor for any services of any kind after today?  Other than

16  the access to the data?

17  A   Data and books and records, yes.

18  Q   Okay.  So access to data and books and records is the only

19  thing that the Advisors will look to the Debtor for at any

20  time in the future after today; is that fair?

21  A   I would say it's not fair, because to say there's not

22  other significant -- insignificant or minor items -- as Mr.

23  Dondero testified, there's usually a smooth transition.  I

24  don't anticipate there will be significant items that would

25  take a lot of your time or we need to invade you, but I would

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2017
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 85 of 1017   PageID 6798
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2016 of
2722

Norris - Cross                  196

1   hope there would be a fair and orderly transition.  And I

2   can't predict the minor items, but I don't think -- I can't

3   envision anything significant.

4   Q    Do you believe, as the executive vice president of the

5   Advisors, that the Debtor has an obligation to perform any

6   services for the Advisors after today, other than giving

7   access to the data and the books and records?

8   A    No.

9   Q    What happens if Newco isn't formed?  Is there any scenario

10  that you're aware of where the Advisors would look to the

11  Debtor for any services in the event that Newco is not formed?

12  A    No.  Not that I'm aware of.  I don't know.  I don't think

13  so.

14  Q    I think you mentioned earlier about the transfer of data.

15  What does the Debtor need to do, from your perspective, in

16  order to transfer the data and the books and records?

17  A    We need the Debtor to authorize its IT director to

18  transfer the data.  We stand by ready.  I sent an email to

19  your IT team asking for him to get the required approvals on

20  Friday morning, and our -- CFA, the outsource team, stands by

21  ready, at our cost, to transfer any remaining data.

22      So we just need you and Mr. Seery and -- to authorize the

23  free transfer of data.  Not necessarily you, but Mr. Seery,

24  and then your IT team and your employees can feel comfort.

25  Because over the last few weeks they have not provided any

                            Norris - Cross                    197

1   data or any assistance providing data because they're

2   concerned.  They're concerned about their liability, they're

3   concerned about things that the Debtor has told them.  And so

4   I just -- if you and Mr. Seery can tell them any data that is

5   -- I mean, yeah, we're prepared to send a request of what we

6   need, but they need Mr. Seery, because he has been holding

7   that over them.

8   Q    And what data are you referring to specifically?

9   A    Yeah.  We're talking about historical emails, emails that

10  are held in what's called the vault.  It is files in our

11  systems.  We've been able to copy, we think, most of what we

12  have, but there is a number of records.  We would like a copy

13  of the database that backs up home (phonetic).  We'd like a

14  copy of the Bloomberg OMS, which I mentioned before.  The data

15  that backs up our data.  Just a backup copy.

16       And there's a number of other items which we'll request,

17  but these are all very simple items that don't take very long.

18  I would imagine, with proper approval, and almost no work from

19  your end, maybe your one IT guy, these can be transferred in a

20  very efficient, effective, quick manner, most of it this week

21  or within a couple days.

22  Q    Okay.

23            MR. MORRIS:  I have no further questions, Your Honor.

24            THE COURT:  All right.  Redirect?

25            THE WITNESS:  Thank you, Mr. Morris.

```
                          Norris - Redirect                    198

 1          MR. MORRIS:  Thank you.

 2                     REDIRECT EXAMINATION

 3   BY MR. RUKAVINA:

 4   Q    Mr. Norris, you mentioned that Debtor employees knew of

 5   our backup plan.  Give some more specificity, meaning how and

 6   why you think they knew that and who did you talk to about

 7   that and when.

 8   A.   Yeah.  So, the individuals authorized to discuss with me

 9   were David Klos, Frank Waterhouse, Brian Collins, and J.P.

10   Two of those individuals are members of the -- well, one's

11   still an officer, two or both were officers of our funds.  And

12   so in our discussions as well throughout, I mentioned, hey,

13   we're working on backup plans.  There were aspects of those

14   they couldn't be involved in because they were negotiating for

15   the other side.  But they were aware that we were working on

16   things.

17        In addition, Mr. Seery represented they knew we were

18   taking data off or copying data off the system, leaving it all

19   on their system, and that we were backing up emails and that

20   we were working on a backup plan.

21        So I don't think it was a surprise to anybody.  Their IT

22   team knew and was very aware.  We purchased new domains.  We

23   requested domains.  We even had requested if they would

24   forward domains to ours, which I think the answer was no.  If

25   they would forward emails.
```

Norris - Redirect                              199

1    And so I don't think there was any surprise that there was

2    backup planning going on.  And so there were discussions.  It

3    wasn't -- we didn't discuss the details.  We didn't discuss

4    the details because we were entered into a negotiation with

5    millions of dollars at stake, and if I show or we discuss all

6    of our alternative plans, then there is less ability to

7    negotiate.

8    Q    Okay.

9         MR. RUKAVINA:  Mr. Vasek, if you will please pull up

10   that letter that I sent you.

11   BY MR. RUKAVINA:

12   Q    Okay.  If we have to scroll down, Mr. Norris, we can, but

13   are you familiar with this letter from the Debtor's attorneys

14   to the boards and us the evening of February 19th, Friday?

15   A    I am.

16   Q    Okay.  Is this the letter that you referenced when Mr.

17   Morris was asking you about why we didn't just tell the Debtor

18   that we had a backup plan and therefore we could dismiss this

19   litigation?

20   A    I believe so, yes.

21   Q    Okay.

22         THE COURT:  Is this an exhibit?

23         MR. RUKAVINA:  No, Your Honor.  I'm about to move for

24   its admission.  Your Honor, I'd ask that this be admitted as

25   my Exhibit O.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2021
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 89 of 1017   PageID 6802
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2020 of 2722

```
                        Norris - Redirect               200

 1          THE COURT:  All right.  Any objections?

 2          MR. MORRIS:  Sorry.  No, Your Honor.

 3          THE COURT:  All right.  It'll be admitted.

 4       (Advisors' Exhibit O is received into evidence.)

 5          MR. RUKAVINA:  And Your Honor, we will --

 6          THE COURT:  You'll have to supplement the docket with

 7   it.

 8          MR. RUKAVINA:  Thank you.  We will.

 9          THE COURT:  Okay.

10          MR. RUKAVINA:  Mr. Vasek, if you'll please scroll

11   down to Page 3 of 4, the paragraph that begins, "During the

12   course of this conversation."  Actually, the next paragraph

13   that says, "We understand."

14   BY MR. RUKAVINA:

15   Q   Do you see that there, Mr. Norris?

16   A   Yes.

17   Q   Okay.

18          MR. RUKAVINA:  What is that there, Mr. Vasek?  I'm

19   seeing a square.  Okay.

20   BY MR. RUKAVINA:

21   Q   So that paragraph begins, "We understand, based on this

22   conversation, that HCMFA and NPA have made arrangements to

23   obtain the resources they need to provide the services on a

24   continuous and seamless basis to their clients, including the

25   registered investment companies to which they serve as
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2022
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 90 of 1017   PageID 6803
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2021 of
2722

Norris - Redirect                        201

1  investment advisor.  We plan to proceed with our request for a

2  mandatory injunction at the February 23rd, '21 hearing."  And

3  then it keeps going.

4      Did I read that accurately?

5          MR. MORRIS:  Can you please --

6          THE WITNESS:  Yes.

7          MR. MORRIS:  -- keep going, because I think it's

8  important?

9          MR. RUKAVINA:  Well, you get to ask him next.

10  BY MR. RUKAVINA:

11  Q   Did I read that accurately, Mr. Norris?

12  A   Yes.

13  Q   Okay.  So tell me, then --

14          MR. RUKAVINA:  Well, strike that.  I'll move on.

15      You can leave that up, Mr. Vasek, if Mr. Morris needs to

16  use it.

17  BY MR. RUKAVINA:

18  Q   Now, do you recall you were asked about that Option A and

19  Option B from last Friday, and Option B had been withdrawn?

20  Do you recall that?

21  A   Yes.

22  Q   And do you recall that, under that Option B that was

23  withdrawn, that the Debtor accepted that Mr. Dondero wouldn't

24  be on the premises, right?

25  A   Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2023
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 91 of 1017   PageID 6804
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2022 of
2722

Norris - Recross                    202

1    Q   Okay.  But would NexPoint have been on the -- on the

2    premises?

3    A   No.  No.

4    Q   So, under both Option A and Option B, would Mr. Dondero

5    have been with his employees?

6    A   Yes.

7    Q   Okay.

8            MR. RUKAVINA:  I'll pass the witness.  Thank you.

9            THE COURT:  Recross?

10           MR. MORRIS:  Can we put that exhibit back up on the

11   screen, please?

12                       RECROSS-EXAMINATION

13   BY MR. MORRIS:

14   Q   First of all, sir, you have no idea what was discussed in

15   the conversation that's referenced in the first sentence,

16   correct?

17   A   I don't.  I was not a part of it.

18   Q   Okay.  Do you know if the Debtor in this instance was

19   trying to hold the Advisors' feet to the fire?

20   A   Again, I was not part of the conversation.

21   Q   So you don't know the motivation for sending this letter;

22   is that fair?

23   A   I don't.

24   Q   Can you read out loud the letter -- the --

25           MR. MORRIS:  I can't see it, actually.  Can you just

Norris - Recross                             203

 1  push it down a little bit, because I've got the little box in

 2  the upper right corner?  No, the other way.  I'm sorry.  Yeah.

 3  Perfect.

 4  BY MR. MORRIS:

 5  Q   Do you see -- can you read out loud the sentence that

 6  begins, "We plan to proceed"?

 7  A   (reading)  "We plan to proceed with our request for a

 8  mandatory injunction at the February 23rd, 2021 hearing and

 9  hope that we can submit to the Bankruptcy Court a consensual

10  order incorporating HCMFA's and NPA's acknowledgment of

11  HCMLP's right to terminate services under the shared services

12  agreement as provided for herein and their commitment to

13  provide services to their clients on a go-forward basis."

14  Q   So in fact, as of -- do you know when this -- do you know

15  when on Friday this letter was sent?

16  A   I don't know the time.

17  Q   Okay.  It's -- it's -- based on what you just saw, the

18  reference to the conversation, is it fair to say that this

19  occurred after the Debtor was informed that the Advisors were

20  withdrawing Option B?

21  A   I believe so.

22  Q   Right.  And here, in fact, the Debtor is asking the

23  Advisors to join it in providing a consensual order that would

24  resolve this motion, right?

25  A   I don't know.  They're -- it said, "hope that we can

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2025
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 93 of 1017   PageID 6806
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2024 of
2722

Norris - Recross                          204

1  submit a consensual order incorporating HCMFA's and NPA's."

2  This was sent to our counsel.  So it was hoping that counsel

3  would agree to that, yes.

4  Q    Well, counsel is not going to agree to anything without

5  the client's authorization; --

6  A    Correct.

7  Q    -- is that fair?

8  A    Correct.

9  Q    And did the Advisors ever authorize their counsel to try

10 to negotiate a consensual order?

11        MR. RUKAVINA:  Your Honor, I object to that.  That's

12 clearly attorney-client privilege.

13        THE COURT:  Sustained.

14        MR. MORRIS:  All right.  I'll ask a different

15 question.

16 BY MR. MORRIS:

17 Q    Did the Advisors ever engage in negotiations with the

18 Debtor over a consensual order, as was offered by the Debtor

19 in this letter?

20 A    I defer to legal counsel on that.

21 Q    Okay.  You're not aware of any such negotiations, right?

22 A    I know there were discussions, particularly around our

23 plans over the weekend, where there were offers of something

24 related to the lawsuit.  Removal or what -- I don't know the

25 specific terms, but there were offers made, and I deferred to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2026
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 94 of 1017   PageID 6807
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2025 of
2722

```
                         Norris - Recross                    205
```

1   counsel on that.

2   Q   But we're here today because there is no consensual order

3   pursuant to which the Advisors would present their plan to the

4   Court and state specifically that the Debtor had no further

5   obligation, correct?

6         MR. RUKAVINA:  Your Honor, that's an irrelevant

7   question.  And again, it's litigation strategy and attorney-

8   client privilege.  And we're here today on a mandatory

9   injunction.

10         THE COURT:  Sustained.

11         MR. RUKAVINA:  Not because --

12         THE COURT:  Sustained.

13         MR. MORRIS:  Withdrawn.  I have no further questions,

14   Your Honor.

15         THE COURT:  All right.  That concludes Mr. Norris's

16   testimony.  Thank you.

17         THE WITNESS:  Thank you, Your Honor.

18         THE COURT:  All right.  What else do you have, Mr.

19   Rukavina?  Your next witness?

20         MR. RUKAVINA:  I have nothing further, Your Honor.

21   The Defendants rest on this motion.

22         THE COURT:  All right.  Mr. Morris, anything further

23   from you?

24         MR. MORRIS:  No, Your Honor.  I'm prepared to proceed

25   to closing argument.

206

1          THE COURT:  All right.  I'll hear it.

2              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

3          MR. MORRIS:  Okay.  Your Honor, thank you for taking

4     the time to listen today.  We regret that we had to come down

5     this path, but the Debtor felt that it had no choice at the

6     time that it filed the action.

7       We think the evidence conclusively establishes that the

8     Debtor had the contractual right to terminate the shared

9     services agreements.  It exercised that right.  It exercised

10    that right after putting the world on notice that it wouldn't

11    be providing shared services after a specified period of time.

12       The Court is fully familiar with the Debtor's plan of

13    reorganization, the asset monetization plan, the downsizing of

14    employees that was expected.  And it was the Debtor who had

15    concerns about the funds, the investors, the marketplace, and,

16    frankly, the Debtor's ability to implement its own plan of

17    reorganization, as Mr. Seery so fully testified to.

18       You know, trying to do the right thing here, the Debtors

19    extended the termination date by a couple of weeks.  They

20    engaged in earnest negotiations.  I don't think there is any

21    dispute at all that the parties actually reached an agreement

22    on every single business term, every single business term,

23    except Mr. Dondero's insistence for access to the Debtor's

24    offices.

25       I think the Court is familiar with the record in this

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2028
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 96 of 1017   PageID 6809
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2027 of 2722

207

1   case.  There's already an injunction in place barring him from

2   the Debtor's offices.  The reasons for that are also familiar

3   to the Court.  I don't think the Debtor was at all

4   unreasonable in taking the position that it did.

5        They did what they could, but they came to a point where

6   they couldn't continue to provide services consistent with the

7   plan of reorganization that had been presented to the Court.

8   And in order to avoid the substantial risk of being impeded

9   from executing on its plan, in order to avoid the substantial

10  risk that would have occurred had it simply exercised its

11  right and walked away -- the risk of market disruption, the

12  risk of potential involvement by the SEC -- it had no choice

13  but to file this lawsuit.

14       And honestly, Your Honor, for the life of me, I don't know

15  why they didn't try to use this wonderful operating plan as

16  negotiating leverage.  I've never heard of such a thing.  But

17  that's their choice.  We're not here today because they failed

18  to do that.  But had they done that, this lawsuit wouldn't

19  exist.

20       Had Mr. Dondero not injected himself on Wednesday and

21  decided that his access was more important than the rest of

22  it, we wouldn't be here today.

23       Had the Advisors said, when we gave them the take-it-or-

24  leave-it option on Wednesday, we're leaving it, thanks for the

25  effort, we tried hard, this stuff means a whole lot to us, but

208

1    we have a great plan here, let's not litigate, there's no

2    reason to do this, we wouldn't be here today.

3        We wouldn't be here today had they not withdrawn Option B

4    on Friday.

5        I don't think -- again, this is summary judgment

6    territory.  There's no dispute about the facts.  There's no

7    dispute that, for the fourth time, the reason that we're here

8    is because Mr. Dondero completely undermined the people who he

9    had authorized to negotiate on behalf of the Advisors and the

10   lawyers who did diligent work, who tried very hard to bring

11   this to fruition, who were engaged in negotiations, as the

12   record shows, not just getting to a deal but going further and

13   preparing settlement documents, preparing wire transfers, only

14   to have the rug pulled out from under them again.

15       The Debtors had no knowledge of any plan whatsoever for

16   the transition of services.  I think -- I have respect for Mr.

17   Norris.  I think that he overstates things, but that's okay.

18   Everybody's allowed to -- their perspective.  But clearly,

19   there's a lot of pieces to that operating plan that aren't in

20   place.  But here, at the end of the day, Your Honor, we don't

21   care.

22       What we want to do is complete the divorce, as Mr.

23   Hogewood said.  And I've got a proposal now that, you know, I

24   hope will be acceptable to both the Court and to Mr. Rukavina.

25   And the proposal would be to allow us to submit to Your Honor

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2030
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 98 of 1017    PageID 6811
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2029 of 2722

209

1    by the end of the day tomorrow a proposed form of order that

2    will contain a limited number of factual findings and will

3    render this motion moot.  And it would be moot because the

4    Advisors have now put into evidence an operational plan that

5    they have -- that they are committed to.  They have said on

6    the record that they no longer need any services of any kind

7    from the Debtor, except access to the data, and we would be

8    good with that.  We would be prepared to just say this is moot

9    because of the operational plan that Mr. Norris described in

10   such great detail.

11       I don't want to burden the Court with a lot more.  I think

12   that that's a way to just resolve this to the satisfaction,

13   really, of everybody.

14       I'll just briefly say on the jurisdictional issue and the

15   arbitration, because they are issues out there, it's

16   inconceivable that the Court doesn't have jurisdiction here.

17   This matter concerns the Debtor greatly.  You know, we're here

18   precisely because we need the relief that we requested

19   initially, and that -- and that, apparently, the -- that was

20   the adoption and the implementation of a plan so that the

21   Debtor knew it would have no further liability.  It was the

22   Debtor's plan of reorganization that was at issue here, its

23   ability to downsize in the way it told this Court and its

24   creditors that it would do.

25       So I don't think -- I don't think there's a question of

210

1    jurisdiction at all.

2        And with respect to arbitration, you know, I'll note,

3    firstly, of course, that the Advisors, they filed the claim

4    against the Debtor.  They didn't move to lift the stay.  They

5    haven't relied on the arbitration clause when -- when it's

6    good for them.

7        But more importantly, Your Honor, I don't think a motion

8    of this type in particular is the subject of any arbitration

9    provision.  It only applies to one of the agreements, as I

10   understand it, in any event.  But it's the arbitration clause.

11       This isn't about the interpretation of the agreement.  I

12   don't think there's any dispute about the Debtor's right to

13   terminate.  I don't think there's any dispute about any, you

14   know, language in the agreement.  There's no interpretive

15   provision of the agreement that we're talking about here.

16   What we're -- all we're talking about is making sure that, you

17   know, the Debtor wouldn't be taking on a potential liability.

18   And I've gotten comfort from Mr. Norris that we're not,

19   because, you know, Mr. Norris said that the Debtor -- that the

20   Advisors can fully perform under the advisory services

21   agreement, that there's nothing that the Debtor did to prevent

22   the Advisors from fully performing under the Advisors'

23   agreement, that they don't need any services from the Debtor

24   going forward.  And I think that's -- that really is what I

25   think appropriately does render this motion moot.

211

1       And what I would propose, again, just to be clear, is that

2    we could give a proposed order to Your Honor tomorrow at the

3    end of the day, give Mr. Rukavina until the end of the day

4    Thursday to make whatever edits he believes are appropriate,

5    and then Your Honor will do whatever Your Honor thinks is

6    best, as always.

7            THE COURT:  All right.  Well, while I like the

8    concept, and I haven't heard from Mr. Rukavina yet, I'm really

9    worried about false hope that you would prepare something, Mr.

10   Rukavina would be fine, and I'd simply sign it without much

11   time spent on it.

12      Let me start with this.  You said the order, it would be

13   something like an order resolving the motion.  It'll contain

14   certain findings of fact, you said, such as the Advisors have

15   an operating plan, the Advisors need no services from the

16   Debtor going forward except access to data.  Okay.  Would I

17   really get an order that has 14 additional findings, and if

18   so, what would those be?

19           MR. MORRIS:  I think we would just go through -- I

20   don't think that there's really any dispute as to these facts.

21   There would be no findings in there about, you know,

22   withdrawal of Plan B or we gave them an ultimatum or any --

23   there would be nothing like that, Your Honor.  It would simply

24   be:  The parties were signatories to shared services

25   agreements.  The Debtor exercised its right of termination.

212

1  The parties have agreed to extend the termination date twice.

2  The Debtor -- the Advisors have prevented -- I'm doing this

3  off the top of my head, of course -- but the Advisors have

4  prevented -- has -- have prevented -- presented uncontroverted

5  testimony that they have an operational plan pursuant to which

6  they will obtain all of the back-office and middle-office

7  services that were previously provided by the Debtor.  And in

8  case there's any failure in their plan, they have got

9  alternative arrangements with third parties and won't look to

10 the Debtor in the future for any services of any kind other

11 than the retrieval of their data.  I think that's about what

12 it would say.

13         THE COURT:  Okay.  My next question is this:  Are we

14 going to have a fight in a few days about the retrieval of the

15 data issue?  I mean, I just heard Mr. Norris say it was a no-

16 big-deal exercise, that the Debtor just needed to make its IT

17 director available and they would be standing ready to receive

18 it, and he made it sound like a no-big-deal task.

19         MR. MORRIS:  Yeah.  I guess my hope is that we would

20 be able to iron out that last wrinkle, but I think the

21 solution to that is to simply say, if the parties have a

22 dispute on that narrow issue, they come back to the Court,

23 that the Court has continuing jurisdiction to resolve any

24 dispute over -- I think it was the provision that Mr. Rukavina

25 had put up on the screen, I forget, I think it was with Mr.

213

1    Dondero, where the Debtor has some obligation with respect to

2    books and records.

3            THE COURT:  Well, and Mr. Seery said earlier today

4    that the Advisors can have access to the records and data, but

5    not 24 hours a day and not without a cost.  So is that going

6    to be an issue, the cost?

7            MR. MORRIS:  You know what, I have just I guess one

8    other alternative that I'm just thinking off the top of my

9    head.  Maybe put in some type of third-party neutral who can,

10   you know, to the extent that it's even necessary, and I hope

11   that it won't be because I think we've gotten a lot of

12   assurances about the lack of services that are needed going

13   forward, but perhaps we can -- perhaps the Court can appoint

14   some third party who would take the burden off of the Court of

15   any future dispute and try to resolve it that way, you know,

16   with the parties splitting the cost.  That's an alternative.

17           THE COURT:  All right.  Mr. Rukavina, what do you

18   say?

19           MR. RUKAVINA:  Your Honor, I'd like to give a

20   closing, please.

21           THE COURT:  Yes.

22            CLOSING ARGUMENT ON BEHALF OF THE ADVISORS

23           MR. RUKAVINA:  And please understand, Your Honor,

24   this is going to be a difficult closing for me to give because

25   I'm going to be rather blunt.  My bluntness should never,

214

```
 1   never substitute my deep respect for this Court and for

 2   bankruptcy courts and for bankruptcy jurisdiction.  I'm a

 3   bankruptcy nerd.  Hopefully Your Honor knows that.  And my

 4   closing is also going to be made a little bit more difficult

 5   because I honestly don't understand why we're here today.

 6       We are here in a lawsuit, not a negotiation before the

 7   Court.  Mr. Morris and I had days to negotiate, we spoke, and

 8   we didn't reach an agreement.  We are here on a six-day notice

 9   mandatory injunction where now the Debtor wants to have some

10   order with some findings.  We are here today on a motion for a

11   mandatory injunction that compels my client to do something

12   where we're not told what it is to do.

13       We are not here today, Your Honor, on Count One, their

14   declaratory relief that they've terminated appropriately and

15   done nothing wrong.  We're not here today on that.  It is

16   inappropriate to make any findings on that.  That issue will

17   be resolved in due course.

18       We're not here today on any future duties.  I heard the

19   record, too.  I heard the evidence.  I can't imagine there

20   being any future duties.  But that is an advisory ruling that

21   we're not here on today.

22       So, again, we are here today on whether my client is going

23   to be enjoined to do something.  And the reason why we will

24   not agree to that --

25               THE COURT:  Can I stop you?  What I hear from the
```

215

1  Debtor is, in light of everything we have all heard the past

2  seven hours, and apparently things the Debtor was not

3  expecting to hear -- that is, we're ready to cut it off

4  tomorrow, today; all we need is the data -- he's happy to say,

5  okay, my request for an injunctive -- a mandatory injunction

6  is moot now.  I'm not asking the Court for that.

7      So, you know, I feel compelled to start with the pragmatic

8  possible resolution of this.  Why --

9           MR. RUKAVINA:  Your Honor?

10          THE COURT:  Why is that not an acceptable way of

11  resolving this?  He doesn't --

12          MR. RUKAVINA:  Because --

13          THE COURT:  He doesn't need an injunction, he says,

14  if we can have an order.

15          MR. RUKAVINA:  It's not -- Your Honor, I would then

16  humbly submit that why doesn't he withdraw his motion?  I

17  mean, the problem that I have, Your Honor, is that anything

18  that I agree to is going to submit my clients' internal

19  business affairs to this Court's oversight.

20      I think Your Honor asked very important questions.  What

21  happens in two or three days' time if something happens?  What

22  about these findings?  I am -- I think that this whole motion

23  is moot, but I am very worried that even a finding of mootness

24  is an exercise of jurisdiction over my clients' internal

25  affairs.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2037
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 105 of 1017   PageID 6818
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2036 of
2722

216

1      What I think the Court should do is dismiss this motion --

2   I'm sorry, deny this motion without commentary, without

3   findings, without conclusions.  There's still Count One and

4   Count Two which will be resolved in due course.  And you know

5   what?  If my client messes up somehow in this transition --

6   not to mention that my clients are highly reputable, they're

7   governed, they're regulated, there's other people looking at

8   this -- they can come back to Your Honor.

9      But please understand my perspective, please understand my

10  clients' perspective, because I think it's important.  We have

11  been hauled in front of this Court on allegations that we have

12  willfully failed and refused to adopt and effectuate a plan.

13  The allegations here are extreme.  They've been shared with

14  the creditors.  They've been shared with our boards, who knew

15  about this all along.  They've been shared with the SEC.

16  They've been shared publicly.

17     So I am glad that the record is now clear that these

18  allegations were baseless when made, but even if they were

19  made in good faith, they are baseless today.

20     But I don't even want the Court exonerating my clients'

21  plan.  I don't want the Court commenting on the wisdom of my

22  clients' plan.  Because we will not agree, as a nondebtor

23  party, with all respect, Your Honor, to have this Court take

24  any oversight over our affairs.  It'll lead to some future

25  dispute, some future contempt, some future sanctions, and

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2038
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 106 of 1017   PageID 6819
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2037 of 2722

217

1  that's just not something that we as nondebtors are going to

2  consent to.

3      The Court doesn't have jurisdiction.  The Court doesn't

4  have core jurisdiction.

5      But let's put all that aside.  The four elements of an

6  injunction, Your Honor.  Where is any evidence of harm?  Mr.

7  Seery did not --

8          THE COURT:  You know what?  As long as we're not

9  going to have a consensual order here, we need to take the

10  issues you've raised, starting with subject matter

11  jurisdiction.  Okay?  If I don't have consensus, I've got to

12  examine my own subject matter jurisdiction.

13      So, on that point, do you say I apply the Fifth Circuit's

14  pre-confirmation test of bankruptcy subject matter

15  jurisdiction or post-confirmation test?

16          MR. RUKAVINA:  Your Honor, the plan has --

17          THE COURT:  Okay.  I signed the confirmation order,

18  but it's one day old.  It's still appealable.  And it's

19  nowhere close --

20          MR. RUKAVINA:  Your Honor?

21          THE COURT:  -- to going effective, I fear.  So, under

22  either test, tell me why I don't have subject matter

23  jurisdiction first.

24          MR. RUKAVINA:  I would like to argue that the pre-

25  confirmation -- that the post-confirmation test applies, but I

218

1    can't, in good faith.  The plan has not gotten -- gone

2    effective.  There still is an estate.  So, as of today, I

3    think Your Honor is dealing with the pre-confirmation

4    jurisdiction, --

5              THE COURT:  Okay.

6              MR. RUKAVINA:  -- which is definitely broader.

7              THE COURT:  Okay.

8              MR. RUKAVINA:  There is no jurisdiction, because you

9    have heard no evidence of any effect on this estate as a

10   result of this injunction being issued or not issued.  Mr.

11   Seery had every opportunity to be asked about harm,

12   interference, how does this affect the reorganization?  He did

13   not give you any.  This does not increase --

14             THE COURT:  Well, what I think I heard, and I may be

15   mixing up written pleadings, declarations, versus what he said

16   today, but what I know I heard in either the papers or his

17   oral testimony today was that the Debtor is worried about

18   exposure to liability from who knows who.

19             MR. RUKAVINA:  Okay.

20             THE COURT:  The investors in the private funds or

21   someone else for not having a smooth transition plan here and

22   cutting things off on February 28th without knowing there's a

23   plan.  Okay?  So if the estate is exposed to potential

24   liability, is that an impact on the estate being administered,

25   per *Wood v. Wood*?

219

 1        MR. RUKAVINA:  Of course it is, Your Honor.  But we

 2    have to go to evidence.  That's not in the evidence.  That's

 3    in the brief that they filed.  It is not in Mr. Seery's

 4    declaration.  It is conclusory.  It is not evidence.  There is

 5    no evidence today of anyone that could sue the Debtor.  I have

 6    no idea of anyone who could sue the Debtor -- pardon me --

 7    regarding this.

 8        THE COURT:  He did say in testimony he was worried

 9    about the SEC if this was not done right.

10        MR. RUKAVINA:  Well, Your Honor, with due respect,

11    his worry is conclusory and his worry does not rise to an

12    effect.  He didn't tell you that the SEC has investigated or

13    is threatening anything.  It's a purely hypothetical worry.

14    So I do not think that Your Honor has even related-to

15    jurisdiction now that Your Honor has heard all of the

16    evidence.

17       Now, let me be clear.  Your Honor has jurisdiction over

18    Counts One and Counts Two in this lawsuit, subject to

19    arbitration, right?  That's the declaratory action as to

20    whether they terminated correctly.  That's a legitimate

21    exercise of jurisdiction.  And their monetary claim for unpaid

22    amounts:  Clearly, the Court has jurisdiction.  All I'm

23    talking about is whether the Court has jurisdiction to enjoin

24    a nondebtor party to do something.  Not -- not to not do

25    something, not a status quo injunction, but a mandatory

220

1    injunction.

2        And you have heard no evidence, Your Honor, no nexus as to

3    how the injunction that Your Honor has been asked to order is

4    going to affect the estate.  None.

5            THE COURT:  Okay.  But you say a nondebtor third

6    party.  It's not just any nondebtor third party.  Among other

7    things, it's a counterparty to executory contracts that the

8    Debtors say, you know, we either terminated these during the

9    case or they're deemed rejected, and we're wanting some

10   cooperation from the counterparty.

11       I mean, doesn't that give --

12           MR. RUKAVINA:  Okay.

13           THE COURT:  -- subject matter jurisdiction, because

14   we're talking about a counterparty to an agreement that would

15   have been governed by 365?

16           MR. RUKAVINA:  I think, Your Honor, if there is some

17   duty in those contracts or some duty in the law to act in a

18   particular manner upon termination or rejection, there would

19   be jurisdiction.

20       But just like when Your Honor ruled against us in December

21   -- Your Honor said, I find nothing in this contract that

22   provides for such a duty -- there's nothing in these contracts

23   that provides any obligation on my client.

24           THE COURT:  That is a different agreement.  That was

25   a different agreement, for the record.

221

1           MR. RUKAVINA:  Fair enough.

2           THE COURT:  That was --

3           MR. RUKAVINA:  Your Honor, fair enough.

4           THE COURT:  That was the CLO agreements that your

5    clients were not parties to.

6           MR. RUKAVINA:  But Your Honor asked the right

7    question then, and that's still the right question:  Point me

8    to some statutory or contractual right for what you want.

9    They have not pointed you to any.

10      So, yes, hypothetically, if these agreements -- let's just

11   assume that these agreements required post-termination good-

12   faith unwinding.  There would be jurisdiction.  But these

13   agreements don't provide any of that.  The only thing that's

14   provided is that, post-termination, the Debtor shall promptly

15   return to us our property.  And that -- there's no problem

16   with that.  We trust that the Debtor -- we heard Mr. Seery --

17   the Debtor's not going to mess that up.  It'll be done quickly

18   and painlessly, I hope.

19      That's not what they're asking for.  They're asking for

20   Your Honor to tell my client how to conduct its internal

21   business affairs, and there's nothing in these contractual

22   rights.

23      So, hypothetically, let's just assume that the Court has

24   some related-to jurisdiction.  Okay.  It's still not core

25   jurisdiction.  And these contracts have been terminated, Your

222

```
1    Honor.  There is no live contract.  No one has shown you any

2    statute or regulation that governs.  So, that's jurisdiction.

3        The same fact of no harm, the same fact of no right, goes

4    to the elements of an injunction, recalling that a mandatory

5    injunction requires a much greater, much clearer burden.

6    Again, Mr. Seery did not testify as to any harm.  He said he

7    was worried about the SEC and he said something like it might

8    make plan implementation more difficult.  Again, conclusory

9    allegations.  Those are not -- that's not evidence of

10   immediate and imminent injury.  It is certainly not evidence

11   of irreparable injury, and it is certainly not evidence of a

12   nonmonetary injury.

13       So, again, I ask -- I understand Your Honor has been in

14   this case for a long time.  I understand Your Honor has been

15   in the Acis case before that.  I understand from Your Honor's

16   confirmation ruling that you have formed certain opinions

17   about my clients, opinions that I think are unfair, quite

18   frankly, that basically conclude that we are a vexatious

19   litigant and that we are the tentacles of Mr. Dondero.  I ask

20   you to put all that aside.  Because that's what the Debtor

21   wants you -- the Debtor wants you to just reflexively conclude

22   that somehow we're nincompoops and incompetents and we need

23   court supervision.  Put all that aside, Your Honor, and just

24   ask yourself:  What am I being asked to do?  I'm being asked

25   to order a nondebtor as to how to conduct its own internal
```

223

1  business -- not even business related to the Debtor, but how

2  to conduct its own internal business -- even if we are the

3  biggest nincompoops, which absolutely is not borne out by the

4  record.

5       This is the wrong court for any such relief.  It's the

6  wrong court.

7       The reason why I showed you that letter from last Friday

8  was I thought it was -- I think Mr. Morris is an excellent

9  lawyer and I've worked very well with him, but I think that

10 the allegation is so fundamentally unfair, that somehow this

11 is our fault because we didn't tell them about a backup plan

12 and we wouldn't just consent to the entry of an order that

13 gives Your Honor jurisdiction over us.  That's unfair, Your

14 Honor.  This is an inquisition in that respect.  In that

15 respect, it's an inquisition.

16      We were sued.  We defended ourselves.  We're not -- this

17 is the fourth lawsuit, by the way, that the Debtor filed

18 against us, Your Honor.

19      And as I asked you at the confirmation hearing, what

20 evidence is there that we're vexatious?  Okay, we filed a

21 motion in front of Your Honor that was frivolous.  It

22 happened.  And we're glad that the Court didn't sanction us.

23 We're glad.  Perhaps the Court still will.  But that's it.

24 Nothing else that we've done.

25      We've been quiet in this case.  We've been minding our own

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2045
Case 3:25-cv-02072-S Document 15-9 Filed 06/27/25 Page 113 of 1017 PageID 6826
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2044 of 2722

224

1  business.  We've been preparing a backup plan.  We've done

2  everything right.  And the Debtor comes to you shocked,

3  shocked, alleging that we don't have any plan, alleging that

4  the sky is falling.  And even when the Debtor learns that

5  that's not the case, we still had to go through today.

6      Why did we go through today, Your Honor?  Why did my

7  client -- why did my client have to sit here like someone that

8  had done something wrong, like a criminal defendant, and be

9  inquired as to all of its internal business practices, with

10 implications made that my client doesn't know what it's doing?

11 Why did we go through today just to have some order that's a

12 -- that provides for something?

13     They want a mandatory injunction, Your Honor.  You should

14 thumbs-up it or thumbs-down it.  And if you thumbs-up it,

15 it'll be without jurisdiction, without basis, and it'll be

16 extraordinary.

17     I can just keep talking and talking, but I'll repeating

18 the same points, Your Honor, so I thank you.

19         MR. MORRIS:  Can I just have five minutes, Your

20 Honor?

21         THE COURT:  You can.

22     REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23         MR. MORRIS:  You know, I think the Court can issue an

24 order finding that the motion is moot on its own accord.  It

25 doesn't need a consensual order to do that.  I think the Court

225

1    -- I would believe that the Court would have a factual finding

2    to support the finding of mootness.

3         But I don't really get the righteous indignation at all.

4    It's as if Mr. Rukavina didn't hear anything I said.  Because

5    we're most certainly not asking the Court -- we weren't even,

6    in the motion, asking the Court to do anything specific other

7    than direct the Advisors to adopt and implement a plan.  It

8    didn't have to be with us.  We didn't care who it was with.

9    We didn't care what the elements were.  The fact of the matter

10   is Mr. Seery testified extensively, not just about the

11   potential impact this would have on the Debtor's plan of

12   reorganization, but he testified that certain of the Debtor's

13   employees had received threats.  He testified, based on his

14   experience, that this is a highly-regulated industry, and if

15   there was -- if we walked away without any plan in place,

16   which is exactly why he said we filed this motion, that it

17   would be -- that it would be potentially catastrophic and that

18   undoubtedly the SEC would be involved.  And Mr. Rukavina

19   cannot give the Debtor any assurances that it would have no

20   liability.  Mr. Rukavina, I'm sure, is not going to allow his

21   client to indemnify the Debtor for any damages that may have

22   occurred in the future.

23        We're a little far afield here, Your Honor.  We simply

24   wanted to make sure that there was a plan in place to avoid a

25   catastrophe.  That was the irreparable harm that we were

226

1  looking at.  And at the end of the day, they came in -- you

2  know, I wish they had done it last week.  I wish they had told

3  us last Thursday.  I wish they had told us last Wednesday.  I

4  wish they had told us during the negotiations.  I wish they

5  had told us last Friday, instead of pulling Plan B.  I wish

6  they -- you know.  But it doesn't matter.  They don't have an

7  obligation to do that and I'm not, you know, I'm not going to

8  pretend that they do.  It would have been better if they had.

9  They didn't.  But they did, they did what the Debtor needed

10  them to do today, and that is present their plan to the Court.

11      And while we, you know, have questions about when it was

12  prepared, whether it's fulsome, they like it, and that's the

13  important part.  And they're not going to look to the Debtor

14  for any services in the future.  That's the important part.

15      The risk that Mr. Seery was concerned about has been

16  eliminated, and I, you know, appreciate that.  And that's why

17  I thought we came in here with a very rational and pragmatic

18  solution, to just -- to just -- you know, they've done what

19  we've asked for.  We've gotten the relief that we've asked

20  for.  The Advisors have sworn under oath that they have an

21  operating plan to obtain the essential services that the

22  Debtor used to provide.  That's the relief we were asking for.

23  I'm not quite sure what there is left here.

24          THE COURT:  Okay.  Thank you.

25      All right.  The first thing I'm going to say is that the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2048
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 116 of 1017 PageID 6829
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2047 of 2722

227

1   Court believes it has subject matter jurisdiction, bankruptcy

2   subject matter jurisdiction, over the requested relief.  If

3   it's a pre-confirmation test that I am supposed to apply here

4   -- that is, the *Wood v. Wood,* could this dispute have a

5   conceivable effect on an estate being administered -- I find

6   that that test is met.

7       I think the concern of potential liability and exposure on

8   the part of the Debtor is well-founded, even if it was not

9   articulated to the Advisors' satisfaction today.  I think,

10  based on the litigious history here between these parties and

11  the contentiousness, I should say, between these parties

12  during this case, there is certainly a well-founded concern,

13  and certainly I think the Debtor is just being prudent,

14  worried about the SEC, investors, the Advisors, the funds,

15  someone else pointing fingers at the way the Debtor did or did

16  not act in transitioning services over.  I think that is a

17  basis for subject matter jurisdiction under the pre-

18  confirmation test.

19      If the post-confirmation test applies here, we know that

20  Fifth Circuit cases such as *In re Craig's Stores*, *In re Case*,

21  *National Gypsum*, among others, articulate the test of

22  bankruptcy subject matter jurisdiction being could the outcome

23  of the dispute bear on the implementation, the execution, or

24  the interpretation of a confirmed plan?  I think that test is

25  likewise met here.

228

1       Obviously, the plan contemplated a separation, and this

2   request for relief appears to be basically seeking some

3   supplemental -- a supplemental order to supplement the

4   confirmation order, to supplement the Debtor's attempt at

5   divorcing these parties as part of the monetization plan.

6       So I think bankruptcy subject matter jurisdiction does

7   exist here.

8       I didn't hear in oral arguments, closing arguments,

9   anything about the arbitration, but I think there's a real

10  question here whether the Advisors may have waived their right

11  to invoke the arbitration clause that's in one of the shared

12  services agreements, not both of them, by filing pleadings so

13  often, participating in this bankruptcy case so often, without

14  invoking that.

15      But again, as I see it, this adversary proceeding is

16  largely -- essentially, I should say -- asking for an order

17  supplementing the confirmation order, and it doesn't really

18  seem like a dispute *per se* under the shared services

19  agreements that have already been terminated.

20      So I think an argument can be made that there's been

21  waiver here, but even if there's not, that this is core in

22  that it bears on the plan confirmation, certainly more than a

23  dispute arising under the literal terms of the shared services

24  agreement.

25      I reserve the right to supplement and amend this, if I

229

1  need to, in a more thorough written ruling.

2      But anyway, based on the Court determining it does have

3  subject matter jurisdiction here, I see it appropriate to

4  enter an order that, based on the Court's several hours of

5  testimony today from three different witnesses -- Mr. Seery,

6  Mr. Dondero, Mr. Norris -- and based on many documents that

7  have been submitted into the evidence, the Court finds that

8  the shared services agreements were already terminated

9  pursuant to their terms and can also be deemed rejected under

10 365 of the Code previously.

11     The Court will find that the Advisors do not need any

12 further services from the Debtor under these agreements as of

13 today's date, except access to data and records, which, based

14 on the testimony of Dustin Norris, can be easily effectuated,

15 Mr. Norris's testimony being that what the Debtor would need

16 to do to allow access to the data is authorize the Debtor's IT

17 director to transfer data and we stand ready to receive it.

18 And data would include historical emails, vault emails, files

19 in the system, and a number of other items, but, quote, there

20 would almost be no work from the Debtor's end.

21     So, believing that to be the case, I would order that the

22 Debtor stand ready between now and the 28th to provide that

23 access and that the Advisors stand ready to receive that

24 access.  And if the process extends beyond February 28th, then

25 it will have to be subject to further orders of this Court,

230

1   but the Court would expect there to be a cost if it extends

2   past February 28th.  And again, the Court would consider that

3   in a further hearing, how much cost should be imposed on the

4   Advisors.  But the advisors have represented to me through Mr.

5   Norris it's easy, it can be accomplished easily, so therefore

6   I would think it could happen between now and the 28th, and if

7   it does, no cost imposed on anyone.

8       I will further find that the Advisors have represented and

9   the Court therefore finds that there is an operating plan in

10  place for the Advisors to continue to operate uninterrupted

11  beyond today.  And again, the only thing I would envision that

12  needs to happen between today and February 28th is the access

13  to data.

14      So, having made these findings, the Court believes that

15  the request for a mandatory injunction is moot and is

16  therefore denied.

17      Are there any questions?  Mr. Morris, I want you to be the

18  scrivener, and, of course, run it by Mr. Rukavina.  But are

19  there any questions or concerns about what I've just

20  articulated?

21          MR. MORRIS:  I just have one, Your Honor.

22          THE COURT:  Uh-huh.

23          MR. MORRIS:  You made reference to rejection of the

24  contract.  From our perspective, it's not rejection.  We don't

25  want to open this up to a rejection claim of any kind.  It

231

1   really was just a termination of the agreement, in accordance

2   with the terms.  And I had put the provisions up before the

3   Court during my opening and walked Mr. Seery through.  That's

4   the basis for the --

5           THE COURT:  Okay.

6           MR. MORRIS:  -- termination of the agreement.  It's

7   not rejection at all.

8           THE COURT:  Fair point.

9           MR. RUKAVINA:  And Your Honor, there's no -- there's

10  no -- yeah, there's no problem.  There's no problem on that.

11  We do not disagree.  We do not disagree with Mr. Morris.

12          THE COURT:  Fair point.  I made the mistake of belts

13  and suspenders, trying to fill in any hole there might be.

14  But yes, I had the evidence that there was a termination of

15  both agreements on November 30th.  One of them had a 60-day

16  window before it became effective, the other a 30-day.  So

17  they are terminated.

18      All right.  Mr. Morris, anything else from you?

19          MR. MORRIS:  No.  We'll prepare a form of order.

20          THE COURT:  All right.  Mr. Rukavina, anything

21  further from you?

22          MR. RUKAVINA:  Your Honor, obviously, I have

23  questions.  I have reservations.  I need to look at whether

24  the Court's findings are going to be binding in this adversary

25  proceeding.  So, at this point in time, I'm just not prepared

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2053
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 121 of 1017   PageID 6834
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2052 of 2722

232

1   to really say anything lest I get myself in trouble.  But I

2   thank you for your time today.

3        THE COURT:  All right.  Well, they are what they are,

4   and I hope we're not in an argument about that down the road.

5   But it seems like my hopes are always dashed when I want

6   things to be worked out.

7     I don't want you to think my calm demeanor means I am a

8   happy camper.  I am not.  I am beyond annoyed.  I mean, I

9   can't even begin to guesstimate how many wasted hours were

10  spent on the drafting Option A, Option B.  Wait.  Let me pull

11  up the exact words.  Mr. Norris confirming, We withdrew Option

12  B after the Debtor accepted it.

13    I mentioned fee-shifting once before in a different

14  context, and, of course, we haven't even gotten to the motion

15  for a show cause order declaring Mr. Dondero in contempt.  I

16  don't know if the lawyers fully appreciate how this looks.

17  Mr. Rukavina, you said that I have formed opinions that you

18  don't think are fair and made comments about vexatious

19  litigation and whatnot.  But while I continue, I promise you,

20  to have an open mind, it is days like this that make me come

21  out with statements that Mr. Dondero, repeating his own words,

22  apparently, he's going to burn the house down if he doesn't

23  get his baby back.

24    I mean, it seems so obviously transparent that he's just

25  driving the legal fees up.  It's as though he doesn't want the

233

 1   creditors to get anything, is the way this looks.  If he wants

 2   me to have a different impression, then he needs to start

 3   behaving differently.  I mean, I can't even imagine how many

 4   hundreds of thousands of dollars of legal fees were probably

 5   spent the past two weeks on Option A, Option B, and all the

 6   different sub-agreements and whatnot.  And as recently as

 7   Friday afternoon, the K&L Gates lawyer saying we have a deal,

 8   and then, oh, wait, maybe not, maybe we do, maybe we don't.

 9   And then Mr. Dondero acting like he had no clue what the K&L

10   Gates lawyers were saying as far as we have a deal.  And Mr.

11   Norris distancing himself from having seen any of that, and I

12   didn't have power.  You know, I'm sure he had a cell phone,

13   like the rest of us, that gets emails.  I'm making a

14   supposition.  I shouldn't make that.  But it just feels like

15   sickening games.

16       And again, if this keeps on, if this keeps on, one day,

17   one day, there may be an enormous attorney fee-shifting order.

18   And, of course, I would have to find bad faith, and I wouldn't

19   be surprised at all if I get there.

20       So I don't know if Mr. Dondero is listening.  I suspect,

21   if he is, he doesn't care much.  But I am --

22           MR. DONDERO:  I'm on the line, Judge.

23           THE COURT:  Okay.

24           MR. DONDERO:  I'm on the line.

25           THE COURT:  I'm glad you're on the line.  I cannot

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2055
Case 3:25-cv-02072-S Document 15-9 Filed 06/25/25 Page 123 of 1017 PageID 6836
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2054 of
2722

234

1   overstate how very annoyed I am by hearing all these hours of

2   testimony and to feel like none of it was necessary. None of

3   it was necessary. Okay? There could have been a consensual

4   deal --

5           MR. DONDERO: Judge, you have to pay attention --

6   Judge, you have to pay attention to what's going on, okay?

7           THE COURT: I am --

8           MR. DONDERO: When I was president of Highland, --

9           THE COURT: -- razor-sharp focused on what is going

10  on. Okay? I read every piece of paper. I listen to every

11  sentence of testimony. And what is going on --

12          MR. DONDERO: Okay. How about this, Your Honor?

13          THE COURT: -- is an enormous waste of parties and

14  lawyer time and resources. People need to get their eye on

15  the ball. Well, certain people do have their eye on the ball,

16  but certain people do not. Okay? So we're done. You've got

17  your divorce now. Okay? And if the operating plan is all

18  shored up, as Mr. Norris testified, it sounds like you're in

19  good shape. All right?

20      Mr. Morris, I'll look for the order from you.

21          MR. MORRIS: Thank you, Your Honor.

22          THE CLERK: All rise.

23      (Pause.)

24          THE COURT: Oh, Michael?

25      (Court confers with Clerk.)

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2056
Case 3:25-cv-02072-S Document 15-9 Filed 06/13/25 Page 124 of 1017 PageID 6837
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2055 of 2722

235

```
 1              THE CLERK:  Hello?  Hang on.  Mr. Morris?
 2              THE COURT:  Is anyone still there?
 3              THE CLERK:  Mr. Rukavina is still there.  Mr.
 4    Rukavina, Mr. Morris, are you all still there?
 5              MR. RUKAVINA:  Judge, this is Davor.
 6              THE COURT:  All right.
 7              MR. RUKAVINA:  I think we're all wondering whether
 8    we're going to have the contempt hearing.
 9              THE COURT:  Well, yes, that's why I came back in.
10              MR. RUKAVINA:  I can't hear you, Judge.  We can't
11    hear you.
12              THE COURT:  I realized I -- it's 4:19 Central time.
13    We are not starting the contempt hearing.
14         Mr. Morris, are you there now?
15              MR. MORRIS:  I am.  I did have one suggestion.
16              THE COURT:  All right.  I neglected to mention our
17    other setting, but we are not going to start at 4:19 Central
18    time.  Do we want to talk about scheduling on that?
19              MR. MORRIS:  I did, Your Honor.  And it's just an
20    idea, and I understand we've had a long day.  But I was going
21    to suggest if there was any way to just get their motion in
22    limine out of the way today, so that when we come back for the
23    evidentiary hearing parties are fully prepared.  If you don't
24    want to do it, that's fine.  Otherwise, I'm available at Your
25    Honor's convenience.
```

236

 1          THE COURT:  All right.  I am going to have you all

 2    communicate with Ms. Ellison about rescheduling that.  I have

 3    no idea what my calendar looks like next week, but I'm not

 4    going to do it this week.  I've got a backlog of other case

 5    matters that I need to get to this week.

 6          MR. MORRIS:  Okay.

 7          THE COURT:  So, you know, maybe we'll do it next

 8    week.  On the motion *in limine*, you've not filed a response?

 9    It was just filed yesterday, so I'm guessing there's no

10    response.

11          MR. MORRIS:  Yeah.  I was going to do -- I was going

12    to do it orally.  I'm happy to do a written response, and I'm

13    happy to just proceed on the papers.  I just think it would be

14    helpful to have that, you know, or if we could put aside an

15    hour later this week to do that, because then preparing, if we

16    know the evidence is in or out, I think it'll just make the

17    trial a lot more smooth.

18          THE COURT:  All right.  I barely had time to pore

19    over it, so let me have Traci reach out to you all tomorrow

20    and let you know do I want a hearing on it or not.  I have an

21    initial reaction.  I don't know if Mr. Dondero's counsel is on

22    the phone.  I don't want to talk about this too much if he's

23    -- do we have Dondero's counsel?

24          MR. WILSON:  I'm present, Your Honor.  John Wilson.

25          THE COURT:  Okay.  I will tell you right now that,

237

1    having done a quick review of it, I didn't feel inclined to

2    grant it.  I'm going to have the TRO in front of me and I'm

3    going to hear the evidence of what happened, and it's either

4    going to match up as a violation of the provisions of the TRO

5    or not.  You know, I feel -- I'm not a jury.  I can decide

6    whether it is violative of the TRO or not.  The theme of it

7    was, oh, it's going to have a prejudicial effect.  I mean,

8    I've already heard about a lot of this.  So I'm inclined not

9    to grant it.  But, again, I did a very quick look at it at

10   5:00 o'clock last night.  And that's why I asked Mr. Morris,

11   was he going to have a response, because --

12           MR. MORRIS:  Yeah.  I was planning to do it orally

13   today, Your Honor.  If I may just have until 5:00 o'clock

14   tomorrow, I'll submit an opposition that won't exceed five

15   pages.

16           THE COURT:  Okay.  So that's what we'll do.  And then

17   once I've looked at the motion more carefully, as well as the

18   response, I'll decide if I need oral argument or if I'm just

19   going to rule on the pleadings, okay, and Traci will let you

20   all know.  All right?  And again, Traci will coordinate with

21   you tomorrow or sometime this week about a resetting on the

22   contempt motion.

23       All right.  Thank you.

24           MR. MORRIS:  Thank you, Your Honor.

25           MR. WILSON:  Thank you, Your Honor.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2059
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 127 of 1017 PageID 6840
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2058 of 2722

238

1        THE CLERK:  All rise.

2      (Proceedings concluded at 4:23 p.m.)

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/24/2021**

24   _____    _____
     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

239

INDEX

PROCEEDINGS                                                         3

OPENING STATEMENTS

- By Mr. Morris                                                     6
- By Mr. Hogewood                                                 21

WITNESSES

Debtor's Witnesses

James P. Seery, Jr.
- Direct Examination by Mr. Morris                               29
- Cross-Examination by Mr. Rukavina                              68

James D. Dondero
- Direct Examination by Mr. Morris                               76
- Cross-Examination by Mr. Rukavina                              96
- Redirect Examination by Mr. Morris                            101
- Recross-Examination by Mr. Rukavina                           101

Advisors' Witnesses

Dustin Norris
- Direct Examination by Mr. Rukavina                            103
- Cross-Examination by Mr. Morris                               166
- Redirect Examination by Mr. Rukavina                          198
- Recross-Examination by Mr. Morris                             202

EXHIBITS

Debtor's Exhibits 1 through 21               Received  29
Advisors' Exhibits A through N               Received  29
Advisors' Exhibit O                          Received 200

CLOSING ARGUMENTS

- By Mr. Morris                                                 206
- By Mr. Rukavina                                               213
- By Mr. Morris                                                 224

RULINGS                                                         226

END OF PROCEEDINGS                                              238

INDEX                                                           239

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2061
Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/25    Page 129 of 1017    PageID 6842
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2060 of 2722
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21    Entered 01/15/21 13:18:04    Page 1 of 14

Docket #1752  Date Filed: 01/14/2021

# EXHIBIT 22

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

## MOTION TO APPOINT EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)

NOW INTO COURT, through undersigned counsel, comes The Dugaboy Investment Trust and Get Good Trust (jointly, "Movers") and respectfully move this Court for the appointment of an Examiner for the reasons set forth herein:

### I.

### BACKGROUND

1. On December 23, 2019, the United States Trustee filed its *United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Dkt. No. 271].  The United States Trustee's motion was denied by this Court's *Order Denying United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Dkt.

{00374930-16}                                          1

APP. 2057

006047

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2062

Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/25    Page 130 of 1017    PageID 6843

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2061 of 2722

Case 19-34054-sgj11 Doc 1752 Filed 01/14/21    Entered 01/15/21 13:18:04    Page 2 of 14

No. 428].    Since around that time, the Debtor has been operating as a debtor-in-possession at the direction of an appointed independent board of directors.

2.    On November 24, 2020, the Court approved the Debtor's *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Disclosure Statement") [Dkt. No. 1476].  As detailed in Article II.B. of the Disclosure Statement, the value of the Debtor's Assets has decreased by more than $235 million, or about 42%, from the commencement of the case to September 30, 2020.  The Debtor's Monthly Operating Report for November of 2020 reports a loss in value of $248 million [Dkt. No. 1710].

3.    The Plan of Reorganization proposed by the Debtor and set for hearing on January 26, 2021 contains significant release and exculpation provisions for the management of the Debtor and the Independent Directors that are not allowable under applicable 5th Circuit law (*Opposition to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* filed by The Dugaboy Investment Trust and Get Good Trust [Dkt. No. 1667] and the *United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization* filed by the United States Trustee [Dkt. No. 1671]).

4.    At a hearing held on January 8, 2021, this Court voiced a concern about costs and expenses in connection with this case.  The Court noted that it believed over sixty (60) lawyers attended the hearing and that a mere Preliminary Injunction hearing, based upon a back of the envelope calculation, cost the estate and parties in interest in excess of $300,000.00.

5.    On January 12, 2021, counsel for Movers sent a letter to various counsel enlisting their support to the appointment of an Examiner to investigate various issues in this case and

2

to author a report that could be used by the Court and parties in interest.  It was suggested by The Dugaboy Investment Trust that the appointment of an Examiner was a less costly means to resolve issues, as opposed to full blown litigation between the various parties and their legions of lawyers.  The letter suggested that an Examiner be appointed to provide to the Court and the parties in interest a report that would address key matters. The Examiner's investigation and report would address issues and items that would not delay or cause a continuance of the confirmation hearing on the Debtor's Plan.

6.    The appointment of a neutral, third party Examiner who would serve as an independent agent for the estate would be in the best interests of the Debtor and its creditors.  The Examiner's investigation would alleviate the need for discovery disputes and litigation by getting to the bottom of the legitimacy of the allegations made by the parties and potential claims that may exist on behalf of the estate or against persons acting on behalf of the estate.   The present claims retention statement filed by the Debtor is merely a laundry list of potential claims and parties and provides no real guidance or explanation as to the retained claims.

7.    Movers will fully cooperate with the Examiner with respect to any examination of potential issues concerning the claims of or against Movers.

## II.

### REQUEST FOR RELIEF

8.    Movers request that this Court appoint an Examiner in this case under section 1104(c) of the Bankruptcy Code in order to perform investigations and to prepare a report under section 1106(b).  Section 1104(c) of the Bankruptcy Code states, in pertinent part:

If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the

APP. 2059

Appx. 02106

006049

United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor…

11 U.S.C. § 1104(c) (emphasis added).

9. The express language of section 1104(c) and c(2) makes clear that where, as in this case, a party has previously moved for the appointment of a Chapter 11 trustee and the fixed liquidated unsecured debts exceed $5 million, the court shall appoint an Examiner at the request of a party in interest.  Id.  Even so, other courts note that an application to appoint a trustee is not a prerequisite for the appointment of an Examiner, only that no such trustee has been appointed in the case.  *Keene Corp. v. Coleman* (*In re Keene Corp.*), 164 B.R. 844, 855 (Bankr. S.D.N.Y. 1994) (looking to identical language in § 1104(b), finding that the denial of a motion to appoint a trustee is not a prerequisite to appointing an Examiner); See also *In re Residential Capital, LLC*, 474 B.R. 112, 118, 121 (Bankr. S.D.N.Y. 2012) (requiring only that a chapter 11 trustee must not have been appointed).

10. Here, all elements for the appointment of an Examiner have been met under section 1104(c)(2) of the Bankruptcy Code: (i) the Court has not previously appointed a trustee in this case; (ii) Movers, parties in interest, move for the appointment of an Examiner prior to plan confirmation; and (iii) it is indisputable that the Debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.[1]

11. When all such elements are met, courts have no discretion whether to grant relief, and must appoint an Examiner.  *In re Erickson Retirement Communities*, LLC, 425 B.R. 309, 313 (Bankr. N.D. Tex. 2010).  This Court in *Erickson Retirement Communities* stated:

---

[1] See Debtor's Amended Schedules E-F, Dkt. No. 1082-1, and Dkt. Nos. 1273 and 1302.

{00374930-16}    4

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2065

Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 133 of 1017    PageID 6846

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2064 of 2722

Case 19-34054-sgj11 Doc 1752 Filed 01/14/21   Entered 01/15/21 13:18:04   Page 5 of 14

"This court agrees with such courts that, where the $5 million unsecured debt threshold is met, a bankruptcy court ordinarily has no discretion. This Court has complete discretion as to the matters that are examined."

12. The Court in *Erickson* denied the appointment of an Examiner due to the fact that "there was no allegations of wrongdoing on the part of the Debtor" at 313. In *Erickson* the Examiner was requested to report on an "appropriate value allocation". In this case Movers are requesting, and the Court should want, an explanation from a neutral third party as to why the assets of the Debtor had such a significant reduction in value during the case. Was it due to mismanagement or negligence? The reason for the decline in value is not an investigation that the Debtor or its counsel can make (they are not disinterested) but one that must be made by an independent third party. The discussion in the Debtor's Disclosure Statement [Dkt. No. 1473, pgs. 28-29] is conclusory and only accounts for $90 million of the decline in value. The balance is not explained except to assert that Covid was in part responsible. Leading market indicators for the period between October of 2019 and October of 2020 reflect annualized growth rate for the Dow of 4.67%, the S&P 14.95% and Nasdaq 43.11%. In light of these market gains, questions exist as to why the Debtor's Assets declined in value and whether the Debtor's management acted in a prudent fashion.

## III.

## SUGGESTED AREAS OF INQUIRY AND METHODOLOGY

13. Movers have received responses from the Debtor and the Creditors' Committee relative to Movers' letter of January 12, 2021, wherein the Debtor and the Creditors' Committee rejected joining in the Examiner motion and contended that the request was designed to

APP. 2061
Appx. 02106
006051



delay confirmation and that the Litigation Trustee would investigate the claims possessed by the estate. The letters received from the Debtor and the Creditors' Committee assert that the claims that have been made against the Debtor and the parties it seeks to have released and exculpated in its Plan are frivolous. The letters go on to state that the claims will be investigated by Marc Kirschner who is a highly qualified professional.

14. The areas of inquiry suggested by Movers below will not delay confirmation of the Debtor's Plan and the suggestion that the Litigation Trustee, through the use of its counsel, will investigate the claims in a more efficient manner than a highly qualified Examiner would misses the entire point of Movers' letter. The assertion that the Litigation Trustee will investigate all claims is inaccurate since claims against the Debtor's management are released and exculpated and are not included in any retained claims. It is difficult to believe that the Creditors' Committee does not want to know why there is a loss of over $200 million in Asset value and whether any of that loss could be recovered from responsible parties. Secondly, this Court, under the Plan, will have no control over the costs and expenses of the Litigation Trustee and its counsel in pursuing such litigation, and the only means of ensuring benefit to the estate for the activities of the Litigation Trustee would be to require that counsel pursing the claims on behalf of the Litigation Trustee work on a contingent fee basis.

15. The Plan filed by the Debtor contains significant releases and exculpations for the persons overseeing the Debtor's activities in the case. Movers are troubled by the fact that the Debtor's Assets have declined in value with only a portion of the loss explained by "reserves" and forced stock sales due to margin issues. The Court, at the Preliminary Injunction hearing, indicated that it was concerned with the dissipation in the value of

APP. 2062
006052



assets.   A neutral Examiner could provide an independent view as to the loss in value and avoid costly fights over production of documents.  Is the Debtor afraid to allow a third party to review and answer the question "Why"?

16.  The Debtor should welcome an Examiner viewing the claims that it and the Litigation Trustee have against various parties.  An Examiner's report would be difficult to rebut and, in all likelihood, would bring about settlement of claims without the need for multiyear and costly litigation.

17.  Movers suggest that each party provide the Court with a written submission suggesting areas of inquiry for an Examiner's report.  The Court can then fashion the areas of inquiry such that they do not slow down the confirmation process but provide a meaningful cost savings to the creditors of the estate and the potential party litigants.

## IV.

### PRAYER FOR RELIEF

**WHEREFORE**, The Dugaboy Investment Trust and Get Good Trust request that this Court grant this motion and appoint an Examiner under section 1104(c) of the Bankruptcy Code to conduct an investigation of the propriety of the Debtor's post-petition operations, sales, and trades in accordance with section 1106(b) of the Bankruptcy Code.

January 14, 2021

**APP. 2063**

**006053**

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2068

Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/25    Page 136 of 1017    PageID 6849

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2067 of 2722

Case 19-34054-sgj11 Doc 1752 Filed 01/14/21    Entered 01/15/21 13:18:04    Page 8 of 14

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
 *and Get Good Trust*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 14th day of January, 2021, a copy of the above and foregoing *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com, joyce.rehill@bondsellis.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com

- Candice Marie Carson   Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello   achiarello@winstead.com
- Shawn M. Christianson   schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke   robbie.clarke@bondsellis.com
- Matthew A. Clemente   mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com
- Megan F. Clontz   mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok   andrew.clubok@lw.com
- Leslie A. Collins   lcollins@hellerdraper.com
- David Grant Crooks   dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- Gregory V. Demo   gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com
- Casey William Doherty   casey.doherty@dentons.com, dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@dentons.com
- Douglas S. Draper   ddraper@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn   lauren.drawhorn@wickphillips.com, samantha.tandy@wickphillips.com
- Vickie L. Driver   Vickie.Driver@crowedunlevy.com, crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards   jonathan.edwards@alston.com
- Jason Alexander Enright   jenright@winstead.com
- Robert Joel Feinstein   rfeinstein@pszjlaw.com
- Matthew Gold   courts@argopartners.net
- Bojan Guzina   bguzina@sidley.com
- Thomas G. Haskins   thaskins@btlaw.com
- Melissa S. Hayward   MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held   mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse   ghesse@HuntonAK.com, amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman   jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood   lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;mary-beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com
- Warren Horn   whorn@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com

APP. 2065

006055

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2070
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 138 of 1017    PageID 6851
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2069 of 2722
Case 19-34054-sgj11 Doc 1752 Filed 01/14/21    Entered 01/15/21 13:18:04    Page 10 of 14

- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- David Neier    dneier@winston.com, dcunsolo@winston.com;david-neier-0903@ecf.pacerpro.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel    rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Brian Patrick Shaw    shaw@roggedunngroup.com, cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade    jared.slade@alston.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com, ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

APP. 2066
Appx. 02143
006056

- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Donna K. Webb    donna.webb@usdoj.gov, brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@lfdslaw.com, craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

*/s/Douglas S. Draper.*

APP. 2067

006057

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**ORDER GRANTING THE MOTION TO
APPOINT EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)**

Upon consideration of the *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)*

(the "***Motion***") filed on January 14, 2021, by The Dugaboy Investment Trust and Get Good Trust

(jointly, "***Movers***") seeking an order appointing an examiner; and the Court having jurisdiction

to consider the Motion and all relief requested therein, as well as all related proceedings; and due

and sufficient notice of the Motion having been given under the circumstances; and the Court

having convened a hearing at which counsel for all interested parties had an opportunity to

appear and be heard; and good and sufficient cause appearing, the Court finds that the Motion

should be, and thereby is, Granted.

It is, therefore,

{00374942-3}                                        1

1.  ORDERED that an Examiner be appointed for Highland Capital Management, L.P. in the captioned matter for the purposes set forth herein; and it is further

2.  ORDERED that the United States Trustee for the Northern District of Texas (Dallas Division) (the "*United States Trustee*"), shall timely file its Application for Order Approving the Appointment of an Examiner and a proposed Order thereon (the "*UST Appointment Application Order*"); and it is further

3.  ORDERED that immediately upon the entry of the UST Appointment Application Order, the Examiner is authorized to investigate the matters identified in a futher order issued by this Court; and it is further

4.  ORDERED that within three (3) days of the entry of this Order, any party wishing to have a matter investigated by the Examiner shall submit in writing to this Court the following: a) identification of the matter to be investigated; b) a reason why such investigation is necessary; and c) why such investigation of the matter identified will not delay confirmation of a plan in this Case; and it is further

5.  ORDERED that the Examiner shall have the duties, powers and responsibilities of an examiner under Section 1106(b) of the Bankruptcy Code; provided, however, that the scope of the Examiner's duties, unless expanded or limited by further order of this Court, shall be limited to the investigations identified by this Court in a Supplemental Order to be entered ; and it is further

6.  ORDERED that the Examiner shall be a "party in interest" under Section 1109 of the Bankruptcy Code with respect to matters that are within the scope of the duties set forth in this Order and shall be entitled to appear at hearings held in these cases and to be heard at such hearing with respect to matters that are within the scope of the Examiner's duties; and it is further

7.  ORDERED that nothing contained in this Order shall diminish the powers and authority of the Debtor , Committee, Reorganized Debtor and Litigation Trust under the Bankruptcy Code, including the powers to investigate transactions and entities, commence contested matters and adversary proceedings, and object to claims, and it is further

8.  ORDERED that neither communications between the Examiner and Debtor nor communications between the Examiner and the Committee shall be deemed a waiver of any attorney–client or work product privilege otherwise belonging to the Examiner, the Debtor or the Committee; and it is further

9.  ORDERED that any and all objections to the relief granted herein are overruled; and it is further

10. ORDERED that this Court shall retain exclusive jurisdiction over any dispute concerning this Order.



APP. 2069

006059

### End of Order ###

Submitted by:


*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
 *and Get Good Trust*

**APP. 2070**
**Appx. 02147**
**006060**

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2075
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 143 of 1017 PageID 6856
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2074 of 2722

# EXHIBIT 23

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2

 3                                    )    Case No. 19-34054-sgj-11
      In Re:                          )    Chapter 11
                                      )
 4    HIGHLAND CAPITAL                 )    Dallas, Texas
      MANAGEMENT, L.P.,                )    Tuesday, February 2, 2021
 5                                    )    9:30 a.m. Docket
                                      )
 6           Debtor.                   )
                                      )    CONFIRMATION HEARING [1808]
                                      )    AGREED MOTION TO ASSUME [1624]
 7    _____)

 8                         TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
 9                     UNITED STATES BANKRUPTCY JUDGE.

10    WEBEX APPEARANCES:

11    For the Debtor:              Jeffrey Nathan Pomerantz
                                   PACHULSKI STANG ZIEHL & JONES, LLP
12                                 10100 Santa Monica Blvd.,
                                     13th Floor
13                                 Los Angeles, CA  90067-4003
                                   (310) 277-6910
14
      For the Debtor:              John A. Morris
15                                 Gregory V. Demo
                                   PACHULSKI STANG ZIEHL & JONES, LLP
16                                 780 Third Avenue, 34th Floor
                                   New York, NY  10017-2024
17                                 (212) 561-7700

18    For the Debtor:              Ira D. Kharasch
                                   PACHULSKI STANG ZIEHL & JONES, LLP
19                                 10100 Santa Monica Blvd.,
                                     13th Floor
20                                 Los Angeles, CA  90067-4003
                                   (310) 277-6910
21
      For the Official Committee   Matthew A. Clemente
22    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
23                                 Chicago, IL  60603
                                   (312) 853-7539
24

25
```

Exhibit C



Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2076
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 144 of 1017 PageID 6857
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2075 of 2722

2

```
 1   APPEARANCES, cont'd.:

 2   For Redeemer Committee of    Terri L. Mascherin
     the Highland Crusader        JENNER & BLOCK, LLP
 3   Fund:                        353 N. Clark Street
                                  Chicago, IL  60654-3456
 4                                (312) 923-2799

 5   For Acis Capital            Rakhee V. Patel
     Management GP, LLC:         WINSTEAD, P.C.
 6                               2728 N. Harwood Street, Suite 500
                                 Dallas, TX  75201
 7                               (214) 745-5250

 8   For UBS Securities, LLC:    Andrew Clubok
                                 LATHAM & WATKINS, LLP
 9                               555 Eleventh Street, NW,
                                   Suite 1000
10                               Washington, DC  20004
                                 (202) 637-2200
11
     For Patrick Daugherty:      Jason Patrick Kathman
12                               PRONSKE & KATHMAN, P.C.
                                 2701 Dallas Parkway, Suite 590
13                               Plano, TX  75093
                                 (214) 658-6500
14
     For HarbourVest, et al.:    Erica S. Weisgerber
15                               DEBEVOISE & PLIMPTON, LLP
                                 919 Third Avenue
16                               New York, NY  10022
                                 (212) 909-6000
17
     For James Dondero:          Clay M. Taylor
18                               John Y. Bonds, III
                                 D. Michael Lynn
19                               Bryan C. Assink
                                 BONDS ELLIS EPPICH SCHAFER
20                                 JONES, LLP
                                 420 Throckmorton Street,
21                                 Suite 1000
                                 Fort Worth, TX  76102
22                               (817) 405-6900

23   For Get Good Trust and      Douglas S. Draper
     Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
24                               650 Poydras Street, Suite 2500
                                 New Orleans, LA  70130
25                               (504) 299-3300
```

3

APPEARANCES, cont'd.:

1

2  For Certain Funds and         Davor Rukavina
   Advisors:                     Julian Vasek
3                                MUNSCH, HARDT, KOPF & HARR
                                 500 N. Akard Street, Suite 3800
4                                Dallas, TX 75201-6659
                                 (214) 855-7587

5  For Certain Funds and         A. Lee Hogewood, III
   Advisors:                     K&L GATES, LLP
6                                4350 Lassiter at North Hills
                                   Avenue, Suite 300
7                                Raleigh, NC 27609
                                 (919) 743-7306
8

9  For the NexPoint              Lauren K. Drawhorn
   Parties:                      WICK PHILLIPS
                                 3131 McKinney Avenue, Suite 100
10                               Dallas, TX 75204
                                 (214) 692-6200
11

12 For Scott Ellington,          Frances A. Smith
   Isaac Leventon, Thomas        ROSS & SMITH, P.C.
   Surgent, and Frank            Plaza of the Americas
13 Waterhouse:                   700 N. Pearl Street, Suite 1610
                                 Dallas, TX 75201
14                               (214) 593-4976

15 For Scott Ellington,          Debra A. Dandeneau
   Isaac Leventon, Thomas        BAKER & MCKENZIE, LLP
16 Surgent, and Frank            452 Fifth Avenue
   Waterhouse:                   New York, NY 10018
17                               (212) 626-4875

18 For CLO Holdco, Ltd.:         John J. Kane
                                 KANE RUSSELL COLEMAN LOGAN, P.C.
19                               901 Main Street, Suite 5200
                                 Dallas, TX 75202
20                               (214) 777-4261

21 For Davis Deadman, Todd       Jason Patrick Kathman
   Travers, and Paul Kauffman:   PRONSKE & KATHMAN, P.C.
22                               2701 Dallas Parkway, Suite 590
                                 Plano, TX 75093
23                               (214) 658-6500

24

25

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2078
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 146 of 1017 PageID 6859
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2077 of 2722

4

1   APPEARANCES, cont'd.:

2   For the United States        David G. Adams
    of America (IRS):            U.S. STATES DEPARTMENT OF JUSTICE,
3                                  TAX DIVISION
                                 717 N. Harwood Street, Suite 400
4                                Dallas, TX  75201
                                 (214) 880-2432
5
    For Highland CLO Funding,    Rebecca Matsumura
6   Ltd.:                        KING & SPALDING, LLP
                                 500 West 2nd Street, Suite 1800
7                                Austin, TX  78701
                                 (512) 457-2024
8
    For Crescent TC              Michael S. Held
9   Investors:                   JACKSON WALKER, LLP
                                 2323 Ross Avenue, Suite 600
10                               Dallas, TX  75201
                                 (214) 953-5859
11
    For the Issuer Group:        Amy K. Anderson
12                               JONES WALKER, LLP
                                 811 Main Street, Suite 2900
13                               Houston, TX  77002
                                 (713) 437-1866
14
    Recorded by:                 Michael F. Edmond, Sr.
15                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
16                               Dallas, TX  75242
                                 (214) 753-2062
17
    Transcribed by:              Kathy Rehling
18                               311 Paradise Cove
                                 Shady Shores, TX  76208
19                               (972) 786-3063

20

21

22

23

24          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
25

006064

5

1              DALLAS, TEXAS - FEBRUARY 2, 2021 - 9:38 A.M.

2          THE COURT:  Good morning.  Please be seated.  All

3    right.  We are ready to get started now in Highland Capital.

4    We have a confirmation hearing as well as a motion to assume

5    the non-residential real property lease at the headquarters.

6    All right.  This is Case No. 19-34054.  I know we're going to

7    have a lot of appearances today.  I think we're just down to a

8    handful of objections, but I'm nevertheless going to go ahead

9    and get formal appearances from our key parties that we've had

10   historically in this case.

11      First, for the Debtor team, do we have Mr. Pomerantz and

12   your crew?

13          MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

14   Pomerantz, along with John Morris, Ira Kharasch, and Greg

15   Demo, on behalf of the Debtor-in-Possession, Highland Capital.

16          THE COURT:  All right.  Good morning.  All right.

17   For the Unsecured Creditors' Committee team, do we have Mr.

18   Clemente and others?

19          MR. CLEMENTE:  Yes.  Good morning, Your Honor.

20   Matthew Clements; Sidley Austin; on behalf of the Official

21   Committee of Unsecured Creditors.

22          THE COURT:  All right.  I'm actually going to call a

23   roll call for the Committee members who have obviously been

24   very active during this case.  For the Redeemer Committee and

25   Crusader Fund, do we have Ms. Mascherin and her team?

6

1    (Pause.)  Okay.  We're -- if -- you must be on mute.

2            MS. MASCHERIN:  Your Honor, I apologize.

3            THE COURT:  Okay.  Go ahead.

4            MS. MASCHERIN:  I apologize, Your Honor.  I was on

5    mute and could not figure out how to unmute myself quickly.

6    Terri Mascherin; Jenner & Block; on behalf of the Redeemer

7    Committee.

8            THE COURT:  All right.  Good morning.

9        All right.  What about Acis?  Do we have Ms. Patel and

10   others for the Acis team?

11           MS. PATEL:  Good morning, Your Honor.  Rakhee Patel

12   on behalf of Acis Capital Management.

13           THE COURT:  Good morning.

14       All right.  Mr. Clubok, I see you there for the UBS team,

15   correct?

16           MR. CLUBOK:  Yes.  Good morning, Your Honor.

17           THE COURT:  Good morning.

18       All right.  For Patrick Daugherty, I think I see Mr.

19   Kathman out there, correct?

20           MR. KATHMAN:  Good morning, Your Honor.  Jason

21   Kathman on behalf of Patrick Daugherty.

22           THE COURT:  All right.  Good morning.

23       All right.  What about HarbourVest?  Anyone on the line

24   for HarbourVest?

25           MS. WEISGERBER:  Good morning, Your Honor.  Erica

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2081
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 149 of 1017 PageID 6862
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2080 of 2722

7

1  Weisgerber for HarbourVest.

2         THE COURT: All right. Very good.

3     All right. Well, I'll now, I guess, turn to some of the

4  Objectors that I haven't hit yet. Who do we have appearing

5  for Mr. Dondero this morning?

6         MR. TAYLOR: Good morning, Your Honor. Clay Taylor

7  of the law firm of Bonds Ellis Eppich Schaefer & Jones

8  appearing on behalf of Mr. Dondero. I have with me, of

9  course, Mr. Dondero, who is in the room with me. Dennis

10 Michael Lynn, John Bonds, and Bryan Assink are also appearing

11 on behalf of Mr. Dondero.

12        THE COURT: All right. Thank you, Mr. Taylor.

13    All right. For the Dugaboy Trust and Get Good Trust, do

14 we have Mr. Draper and others?

15        MR. DRAPER: Yes, Your Honor. This is Douglas Draper

16 on the line.

17        THE COURT: All right. Good morning.

18        MR. DRAPER: Good morning, Your Honor.

19        THE COURT: All right. What about what I'll call

20 Highland Fund, the Highland Funds and Advisors? Do we have

21 Mr. Rukavina this morning, or who do we have?

22        MR. RUKAVINA: Your Honor, good morning. Davor

23 Rukavina and Julian Vasek for the Funds and Advisors. I can

24 make a full appearance, but it's the parties listed on Docket

25 1670.

8

```
 1              THE COURT:  All right.  Thank you, Mr. Rukavina.
 2         All right.  What about --
 3              MR. HOGEWOOD:  Your Honor?
 4              THE COURT:  Go ahead.
 5              MR. HOGEWOOD:  Your Honor, Lee Hogewood.  I'm sorry,
 6    Your Honor.  Lee Hogewood is also here on behalf of the same
 7    parties.
 8              THE COURT:  All right.  Thank you, sir.
 9         All right.  What about NexPoint Real Estate Partners, HCRE
10    Partners?
11              MS. DRAWHORN:  Good morning, Your Honor.  Lauren
12    Drawhorn with Wick Phillips on behalf of NexPoint Real Estate
13    Partners, LLC.  I'm also here on behalf of the NexPoint Real
14    Estate entities which are listed on Docket 1677, and NexBank,
15    which is -- their objection is 1676.
16              THE COURT:  All right.  Thank you.
17         All right.  Let's cover some of the employees.  I think I
18    see Ms. Smith out there.  Are you appearing for Mr. Ellington
19    and Mr. Leventon?
20              MS. SMITH:  Yes, Your Honor.  Frances Smith with Ross
21    & Smith, along with Debra Dandeneau of Baker McKenzie, on
22    behalf of Scott Ellington, Isaac Leventon, Thomas Surgent, and
23    Frank Waterhouse.
24              THE COURT:  All right.  Could you spell the last name
25    of your co-counsel from Baker McKenzie?  I didn't clearly get
```

9

```
 1   that.
 2          MS. SMITH:  Yes, Your Honor.  It's Debra Dandeneau,
 3   D-A-N-D-E-N-N-A-U [sic].
 4          THE COURT:  Okay.  Thank you.
 5      All right.  CLO Holdco, do we have you appearing this
 6   morning?
 7          MR. KANE:  Your Honor, John Kane on behalf of CLO
 8   Holdco.
 9          THE COURT:  Thank you, Mr. Kane.
10      All right.  I know we had a different group of current or
11   former employees -- Brad Borud, Jack Yang -- and some joining
12   parties:  Kauffman, Travers, Deadman.  Who do we have
13   appearing for those?  (Pause.)  Anyone?  If you're appearing,
14   we're not hearing you.  Go ahead.
15          MR. KATHMAN:  Good morning, Your Honor.  Jason
16   Kathman.  I represent Mr. Deadman, Mr. Travers, and Mr.
17   Kauffman as well.
18          THE COURT:  Okay.  Thank you.  And I can't remember
19   who represents Mr. Borud and Yang.  Someone separately.
20          MR. KATHMAN:  It's Mr. Winikka, Your Honor.
21          THE COURT:  Oh, Mr. Winikka.
22          MR. KATHMAN:  And I haven't scrolled through to see
23   whether he's with -- in the 120 people signed in this morning.
24   But I believe that objection has been resolved.  I think Mr.
25   Pomerantz will probably address that later.  So Mr. Winikka
```

10

1    may not be appearing.

2           THE COURT:  Okay.  All right.  Well, anyone for the

3    IRS?

4           MR. ADAMS:  Good morning, Your Honor.  David Adams,

5    Department of Justice, on behalf of the United States and its

6    agency, the Internal Revenue Service.

7           THE COURT:  Thank you, Mr. Adams.

8       For the U.S. Trustee, who do we have appearing this

9    morning?  (No response.)  I'm not hearing you.  If you're

10   trying to appear, you must be on mute.  (No response.)  All

11   right.  Well, I suspect at some point we'll hear from the U.S.

12   Trustee, even though I don't hear anyone now.

13      At this point, I will open it up to anyone else who wishes

14   to appear who I failed to call.

15          MS. MATSUMURA:  Your Honor, this is Rebecca Matsumura

16   from King & Spalding representing Highland CLO Funding, Ltd.

17   Thank you.

18          THE COURT:  All right.  Thank you, Ms. Matsumura.

19   HCLOF.

20      Anyone else?

21          MR. HELD:  Your Honor, this is Michael Held with the

22   law firm of Jackson Walker, LLP on behalf of the office

23   landlord, Crescent TC Investors, LP.

24          THE COURT:  All right.  Thank you, Mr. Held.

25          MR. HELD:  Thank you, Your Honor.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2085
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 153 of 1017   PageID 6866
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2084 of
2722

11

1          THE COURT:  Okay.  Any other lawyer appearances?

2      All right.  Well, again, if there's anyone out there who

3  did not get to appear, maybe we'll hear from you at some point

4  as the day goes on.

5      All right.  Mr. Pomerantz, this is an important day,

6  obviously.  How did you want to begin things?

7          MR. POMERANTZ:  So, Your Honor, I have a brief

8  opening to talk about what I plan to do, and a little more

9  lengthy opening, and it'll be come clear.  So if I may

10 proceed, Your Honor?

11         THE COURT:  You may.

12         MR. POMERANTZ:  Your Honor, we're here to request

13 that the Court confirm the Debtor's Fifth Amended Plan of

14 Reorganization, as modified.  The operative documents before

15 Your Honor are the Fifth Amended Plan, as modified, that was

16 filed along with our pleadings in support of confirmation on

17 January 22nd and the minor amendments that we filed on

18 February 1st.

19     Here is my proposal on how we can proceed this morning.  I

20 would intend to provide the Court with an opening statement

21 that would last approximately 20 minutes.  And then after any

22 other party who desires to make an opening statement, I would

23 propose that the Debtor put on its evidence that it intends to

24 rely on in support of confirmation.  The evidence consists of

25 the exhibits that the Debtor filed with its witness and

006071

12

1   exhibit list on January 22nd and certain amendments that we

2   filed yesterday.

3       We would also put on the testimony of the following

4   witnesses:  Jim Seery, the Debtor's chief executive officer,

5   who Your Honor is very familiar with, and also a member of

6   Strand's board of directors; John Dubel, a member of Strand's

7   board of directors; and Mark Tauber, a vice president with Aon

8   Financial Services, the Debtor's D&O broker.

9       We have also submitted the declaration of Patrick Leatham,

10  who is with KCC, the Debtor's balloting agent.  And we don't

11  intend to put Mr. Leatham on the stand, but he is available on

12  the WebEx for cross-examination, to the extent necessary.

13      I propose that I would leave the bulk of my argument,

14  which includes going through the Section 1129 requirements for

15  plan confirmation, as well as responding to the remaining

16  outstanding objections, until my closing argument.

17      With that, Your Honor, I will pause and ask the Court if

18  Your Honor has any questions before I proceed.

19          THE COURT:  I do not have questions, so your method

20  of going forward sounds appropriate.  You may go ahead.

21          MR. POMERANTZ:  Thank you, Your Honor.

22            OPENING STATEMENT ON BEHALF OF THE DEBTOR

23          MR. POMERANTZ:  As I indicated, Your Honor, we stand

24  here side by side with the Creditors' Committee asking that

25  the Court confirm the Debtor's plan of reorganization.

13

```
 1      As Your Honor is well aware, this case started in December

 2   in -- October 2019, was transferred to Your Honor's court in

 3   December 2019, and has been pending for approximately 15

 4   months.

 5      On January 9, 2020, I stood before Your Honor seeking the

 6   approval of the independent board of directors of Strand, the

 7   general partner of the Debtor, pursuant to a heavily-

 8   negotiated agreement with the Committee.  And as the Court has

 9   remarked on occasions throughout the case, the economic

10   stakeholders in this case believed that the installation of a

11   new board consisting of highly-qualified restructuring

12   professionals and a bankruptcy judge, a former bankruptcy

13   judge, was far more attractive than the alternative, which was

14   appointment of a trustee.  And upon approval of the

15   settlement, members of the board -- principally, Mr. Seery --

16   testified that one of the board's goals was to change the

17   culture of litigation that plagued Highland in the decade

18   before filing and threatened to embroil the Debtor in

19   continued litigation if changes were not made.

20      And as Your Honor is well aware, the last 14 months have

21   not been easy.  The board took its role as an independent

22   fiduciary extremely seriously, much to the consternation of

23   the Committee at times, and more recently, to the

24   consternation of Mr. Dondero and his affiliated entities.

25      And what has the Debtor, under the leadership of the
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2088
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 156 of 1017   PageID 6869
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2087 of 2722

14

1   board, been able to accomplish during this case?  The answer

2   is a lot more than many parties believed when the board was

3   installed.

4       The Debtor reached a settlement with the Redeemer

5   Committee, resolving disputes that had been litigated for many

6   years, in many forums, and that resulted in an arbitration

7   award that was the catalyst for the bankruptcy filing.

8       Participating in a court-ordered mediation at the end of

9   August 2020 and September, the Debtor reached agreement with

10  Acis and Josh Terry.  The Court is all too familiar with the

11  years of disputes between the Debtor and Acis and Josh Terry,

12  which spanned arbitration proceedings and an extremely

13  combative Chapter 11 that Your Honor presided over.

14      The Debtor next reached an agreement with HarbourVest

15  regarding their assertion of over $300 million of claims

16  against the estate.  The HarbourVest litigation stemmed from

17  its investment in the Acis CLOs and would have resulted in

18  complex, fact-intensive litigation which would have forced the

19  Court to revisit many of the issues addressed in the Acis

20  case.

21      And perhaps most significantly, Your Honor, the Debtor was

22  able to resolve disputes with UBS, disputes which took the

23  most time of any claim in this case, through a contested stay

24  relief motion, a hotly-contested summary judgment motion, and

25  a Rule 3018 motion.

15

1       While the Debtor and UBS hoped to file a 9019 motion prior

2   to the commencement of the hearing, they were not able to do

3   so.  However, I am now in a position to disclose to the Court

4   the terms of the settlement, which is the subject of

5   documentation acceptable to the Debtor and UBS.  The

6   settlement provides for, among other things, the following

7   terms:

8       UBS will receive a $50 million Class 8 general unsecured

9   claim against the Debtor.

10      UBS will receive a $25 million Class 9 subordinated

11  general unsecured claim against the Debtor.

12      UBS will receive a cash payment of $18.5 million from

13  Multi-Strat, which was a defendant and the subject of

14  fraudulent transfer claims.

15      The Debtor will use reasonable efforts to assist UBS to

16  collect its Phase I judgment against CDL Fund and assets CDL

17  Fund may have.

18      The parties will also agree to mutual and general

19  releases, subject to agreed carve-outs.

20      And, of course, the parties will not be bound until the

21  Court approves the settlement pursuant to a 9019 motion we

22  would hope to get on file shortly.

23      I am also pleased to let the Court know -- breaking news

24  -- that this morning we reached an agreement to settle Patrick

25  Daugherty's claims.  I would now like to, at the request of

16

1   Mr. Kathman, read into the record the Patrick Daugherty

2   settlement.

3        Under the Patrick Daugherty settlement, Mr. Daugherty will

4   receive a $750,000 cash payment on the effective date.  He

5   will receive an $8.25 million general unsecured claim, and he

6   will receive a $2.75 million Class 9 subordinated claim.

7        The settlement of all claims against the Debtor and its

8   affiliates -- and affiliates will be defined in the documents

9   -- with the exception of the tax claim against the Debtor, Mr.

10  Dondero, and Mr. Okada -- and for the avoidance of doubt,

11  except as I describe below, nothing in the settlement is

12  intended to affect any pending litigation Mr. Daugherty has

13  against Mr. Dondero, Scott Ellington, Isaac Leventon, Marc

14  Katz, Michael Hurst, and Hunton Andrew Kurth.

15       Mr. Daugherty will release the Debtor and its affiliates

16  and current employees for all claims and causes of action,

17  except for the agreements I identify below, and dismiss all

18  current employees as to pending actions.  We believe this only

19  applies to Thomas Surgent and no other employee is implicated.

20       Mr. Surgent and other employees, including but not limited

21  to David Klos, Frank Waterhouse, Brian Collins, Lucy Bannon,

22  and Matt Diorio, will receive releases similar to the covenant

23  in Paragraph 1D of the Acis settlement agreement, which

24  essentially provided the release would go away if they

25  assisted anyone in pursuing claims against Mr. Daugherty.

17

1      Highland and the above-mentioned parties will accept

2    service of any subpoenas and acknowledge the jurisdiction of

3    the Delaware Chancery Court for the purposes of accepting any

4    subpoenas.  And for the avoidance of doubt, Highland will

5    accept service on behalf of the employees only in their

6    capacity as such.

7      Highland will also use material -- will use reasonable

8    efforts at no material cost to assist Daugherty in vacating a

9    Texas judgment that was issued against him.  We've also looked

10   at a form of the motion and believe we have agreed on the form

11   of the motion.

12     Highland, its affiliates, and current employees will

13   covenant and agree they will not pursue or seek to enforce the

14   injunction and the Texas judgment against Daugherty.

15     And lastly, Daugherty will not be able to settle any

16   claims for negligence or other claims that might be subject to

17   indemnification by the Debtor or any successor.

18     Accordingly, Your Honor, other than the claims of Mr.

19   Dondero and his related entities, and the unliquidated claims

20   of certain employees, substantially all claims have been

21   resolved in this case, a truly remarkable achievement.

22     Separate and apart, Your Honor, from the work done

23   resolving the claims, the Debtor, under the direction of the

24   independent board, has worked extremely hard to develop a plan

25   of reorganization.

18

1     After the independent board got its bearings, it started

2    to work on various plan alternatives.  And the board received

3    a lot of pressure from the Committee to go straight to a plan

4    seeking to monetize assets like the one before Your Honor

5    today.  However, the board believed that before proceeding to

6    do so and go down an asset monetization path, it should

7    adequately diligence all alternatives, including a

8    continuation of the current business model, a reorganization

9    sponsored by Mr. Dondero and his affiliates, a sale of the

10   Debtor's assets, including a sale to Mr. Dondero.

11     In June 2020, plan negotiations proceeded in earnest, and

12   the Debtor started to negotiate an asset monetization plan

13   with the Committee, while still pursuing other alternatives.

14     Preparation of an asset monetization plan is not typically

15   a complicated process.  However, creating the appropriate

16   structure for a business like the Debtor's was extremely

17   complicated, because of the contractual, regulatory, tax, and

18   governance issues that had to be carefully considered.

19     At the same time the Committee negotiations were

20   proceeding down that path, Mr. Seery continued to spend

21   substantial time trying to negotiate a grand bargain plan with

22   Mr. Dondero.  It is not an exaggeration to say that over the

23   last several months Mr. Seery has dedicated hundreds of hours

24   towards a potential grand bargain plan.

25     And why did he do it?  Because he has always believed that

19

1   a global restructuring among all parties was the best

2   opportunity to fully and finally resolve the acrimony that

3   continued to plague the Debtor.

4        Notwithstanding Mr. Seery's and the independent board's

5   best efforts, they were not able to reach consensus on a grand

6   bargain plan, and the Debtor filed the plan, the initial plan,

7   on August 12th, which ultimately evolved into the plan before

8   the Court today.

9        The Court conducted an initial hearing on the disclosure

10  statement on October 27th, and then ultimately approved -- the

11  Court approved the disclosure statement at a hearing on

12  November 23rd.

13       While the Debtor continued to work towards resolving

14  issues with the Committee with the filed plan, Mr. Dondero,

15  beginning to finally see that the train was leaving the

16  station, started to do whatever he could to get in the way of

17  plan confirmation.

18       He objected to the Acis settlement.  When his objection

19  was overruled, he filed an appeal.

20       He objected to the HarbourVest settlement.  When his

21  objection was overruled, he had Dugaboy file an appeal.

22       He started to interfere with the Debtor's management of

23  its CLOs, stopping trades, refusing to provide support, and

24  threatening Mr. Seery and the Debtor's employees.

25       He had his Advisors and Funds that he owned and controlled

20

1    file motions that Your Honor said was a waste of time.

2        He had those same Funds and Advisors threaten to terminate

3    the Debtor as a manager, in blatant violation of the Court's

4    January 9, 2020 order.

5        His conduct was so egregious that it warranted entry of a

6    temporary restraining order and preliminary injunction against

7    him.  And of course, he has appealed that ruling as well.

8        But that was not all.  He brazenly threw out his phone, in

9    what the Court has remarked was spoliation of evidence, and he

10   violated the TRO in other ways, actions for which he will

11   answer for at the contempt hearing scheduled later this week.

12       And, of course, he and his pack of related entities have

13   filed a series of objections.  We have received 12 objections

14   to the plan, Your Honor, excluding three joinders.  And as I

15   mentioned, we have been pleased to report that we've been able

16   to resolve six of them:  those of the Senior Employees, those

17   of Patrick Daugherty, those of CLO Holdco, those of the IRS,

18   those of Texas Taxing Authorities, and those of Jack Young and

19   Brad Borud.

20       The CLO Holdco objection was withdrawn in connection with

21   the settlement reached with them in connection with the

22   preliminary injunction hearing that the Court heard -- started

23   to hear last week.

24       The Taxing Authorities' objections have been resolved by

25   the Debtor agreeing to make certain modifications to the plan

21

1    that were included in our filing yesterday and to include

2    certain provisions in the confirmation order to address other

3    concerns.

4        The group of employees who are referred to as the Senior

5    Employee are comprised of four individuals -- Frank

6    Waterhouse, Thomas Surgent, Scott Ellington, and Isaac

7    Leventon -- although Mr. Ellington and Mr. Leventon are no

8    longer employed by the Debtor.

9        On January 22nd, Your Honor, we filed executed

10   stipulations with Frank Waterhouse and Thomas Surgent.  These

11   stipulations were essentially the Senior Employee stipulations

12   that were referred to in the plan and the disclosure

13   statement.

14       And as part of those stipulations, the Debtor, in

15   consultation with and agreement from the Committee, agreed to

16   certain modifications of the prior version of the Senior

17   Employee stipulation with both Mr. Waterhouse and Mr. Surgent

18   that effectively reduced the compensation they needed to

19   provide for the release from 40 percent to five percent of

20   their claims.

21       The Debtor and the Committee believed the resolution with

22   Mr. Surgent and with Mr. Waterhouse was fair, given the

23   importance of these two people to the transition effort and

24   the increased reliance upon them that the Debtor would have

25   with the departure of Mr. Ellington and Mr. Leventon.  And as

22

1    a result of that agreement, Your Honor, on January 27th, Mr.

2    Waterhouse and Mr. Surgent withdrew from the Senior Employee

3    objection.

4        Subsequently, we reached agreement with Mr. Ellington and

5    Mr. Leventon to resolve the objections they raised with

6    confirmation.  And at Ms. Dandeneau's request, I would like to

7    read into the record the agreement reached with both of them,

8    and I know she will correct me if I get anything wrong.

9            THE COURT:  Okay.

10           MR. POMERANTZ:  Among other things, Mr. Ellington and

11   Mr. Leventon asserted in their objection that they were

12   entitled to have their liquidated bonus claims treated as

13   Class 7 convenience claims under the plan, under their reading

14   of the plan, and their understanding of communications with

15   Mr. Seery.  The Debtor disputed the entitlement to elect Class

16   7 based upon the terms of the plan, the disclosure statement,

17   and applicable law.  But as I said, the parties have resolved

18   this dispute.

19       Mr. Ellington asserts liquidated bonus claims in the

20   aggregate amount of $1,367,197, which, to receive convenience

21   class treatment under anybody's analysis, would have had to be

22   reduced to a million dollars.

23       Mr. Leventon asserts a liquidated bonus claim in the

24   amount of $598,198.

25       If Mr. Ellington and Mr. Leventon were entitled to be

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2097
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 165 of 1017   PageID 6878
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2096 of 2722

23

 1   included in the convenience class, as they claimed, they would

 2   be entitled to receive 85 percent of their claim as and when

 3   the claims were allowed under the plan.

 4       To settle the dispute regarding whether, in fact, they

 5   would be entitled to the convenience class treatment, they

 6   have agreed to reduce the percentage they would otherwise be

 7   entitled to receive from 85 percent to 70.125 percent.  And as

 8   a result, Mr. Ellington's Class 7 convenience claim would be

 9   entitled to receive $701,250 if allowed, and Mr. Leventon's

10   Class 7 convenience claim would be entitled to receive

11   $413,175.10 if allowed.

12       Mr. Ellington and Mr. Leventon would reserve the right to

13   assert that a hundred percent of their liquidated bonus claims

14   are entitled to administrative priority, and the Debtor, the

15   Committee, the estate and their successors, would reserve all

16   rights to object.

17       If anyone did object to the allowance of the liquidated

18   bonus claims and Mr. Ellington and/or Mr. Leventon prevailed

19   in such disputes, then the discount that was previously agreed

20   to -- 85 percent to 70.125 percent -- would go away and they

21   would be entitled to receive the full 85 percent payout as

22   essentially a penalty for litigating against them on their

23   allowed claims and losing.

24       As an alternative to the estate preserving the right to

25   object to the allowance of Mr. Ellington and Mr. Leventon's

24

```
 1   liquidated bonus claims, the Debtor and the Committee have an
 2   option to be exercised before the effective date to just agree
 3   that both their claims will be allowed, and allowed as Class 7
 4   convenience claims.  And if that agreement was reached, then
 5   the amount of such liquidated bonus claims, they would receive
 6   a payment equal to 60 percent of their allowed convenience
 7   class claim.
 8       In exchange, Mr. Ellington and Mr. Leventon would waive
 9   their right to assert payment of a hundred percent of their
10   liquidated bonus claims as an administrative expense.
11       So, under this circumstance, Mr. Ellington would receive
12   an allowed claim of $600,000, which is 60 percent of a million
13   dollars, and Mr. Leventon will receive a payment on account of
14   his Class 7 claim of $358,918.80.
15       Under both scenarios, Mr. Ellington and Mr. Leventon would
16   preserve their paid time off claims that are treated in Class
17   6, and they would preserve their other claims in Class 8,
18   largely unliquidated indemnification claims, subject to the
19   rights of any party in interest to object to those claims.
20       Mr. Ellington will change his vote in Class 8 from
21   rejecting the plan to accepting the plan, and Mr. Leventon
22   would change his votes in Class 8 and Class 7 from rejecting
23   the plan to accepting the plan.  And Mr. Ellington and Mr.
24   Leventon would withdraw any remaining objections to
25   confirmation of the plan, and we intend to put this settlement
```

25

1   in the confirmation order.

2       Your Honor, six objections to the plan remain outstanding.

3   One objection was filed by the Office of the United States

4   Trustee, and the remaining five objections are from Mr.

5   Dondero and his related entities.  And I would like to put up

6   a demonstrative on the screen which shows how all of these

7   objections lead back to Jim Dondero.

8           THE COURT:  All right.

9           MR. POMERANTZ:  You see on the top left, Your Honor,

10  there's a box in white that says A through E, which are the

11  five remaining objections.  And you can see how they relate.

12  But all of it goes back to that orange box in the middle, Jim

13  Dondero.

14      These objections, which I will address in my closing

15  argument in detail, are not really focused on concerns that

16  creditors are being treated unfairly, and that's because Mr.

17  Dondero and his entities don't really have any valid claims.

18  Mr. Dondero owns no equity in the Debtor.  He owns the

19  Debtor's general partner, Strand, which in turn owns a quarter

20  percent of the total equity in the Debtor.  Mr. Dondero's only

21  other claim is a claim for indemnification.  And as Your Honor

22  would expect, the Debtor intends to fight that claim

23  vigorously.

24      Dugaboy and Get Good have asserted frivolous

25  administrative and unsecured claims, which I will discuss in

26

1   more detail later.

2       Dugaboy does have an equity interest in the Debtor, but it

3   represents eighteen-hundredths of a percent of the Debtor's

4   total equity.

5       And Mr. Rukavina's clients similarly have no general

6   unsecured claims against the Debtor.  Either his clients did

7   not file proofs of claim or filed claims and then agreed to

8   have them expunged.  The only claims that his clients assert

9   is a disputed administrative claim filed by NexPoint Advisors.

10      And the objections aren't legitimately concerned about the

11  post-confirmation operations of the estate, to preserve equity

12  value, how much people are getting, whether Mr. Seery is

13  really the right person to run these estates.  That's because

14  Mr. Dondero has repeatedly told the Court that he believes his

15  offer, which doesn't come close to satisfying claims in full

16  in this case, is for fair value and that creditors, who are

17  owed more than $280 million, will not receive anywhere close

18  to the amount of their claims.

19      Rather, Mr. Dondero and his entities are concerned with

20  one thing and one thing only:  how to preserve their rights to

21  continue their frivolous litigation after confirmation against

22  the independent directors, the Claimant Trustee, the

23  Litigation Trustee, the employees, the Claimant Trust

24  Oversight Board, and anyone who will stand in their way.  For

25  Mr. Dondero, the decision is binary:  Either give him what he

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2101
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 169 of 1017 PageID 6882
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2100 of 2722

27

1  wants, or as he has told Mr. Seery, he will burn down the

2  place.

3      Your Honor will hear a lot of argument today about how the

4  -- and tomorrow, in closing -- about how the injunction, the

5  gatekeeper, and the exculpation provisions of the plan are not

6  appropriate under applicable law.  The Debtor, of course,

7  disagrees with these arguments, and I will address them in

8  detail in my closing argument.

9      But I do think it's important to focus the Court at the

10 outset on the January 9, 2020 order that the Court entered

11 which addressed some of these issues.  This order, which has

12 not been appealed, which was actually agreed to by Mr.

13 Dondero, has no expiration by its terms and will continue

14 post-confirmation, did some things that the Objectors just

15 refuse to recognize and accept.

16     It approved an exculpation for negligence for the

17 independent directors and their agents.  It provided that the

18 Court would be the gatekeeper to determine whether any claims

19 asserted for them -- against them for gross negligence and

20 willful misconduct could be pursued, and if so, provided that

21 this Court would have exclusive jurisdiction to adjudicate

22 those claims.  And it prevented Mr. Dondero and his related

23 entities from causing any related entity to terminate any

24 agreements with the Debtor.

25     I also note, Your Honor, that the Court's July 16, 2020

28

 1   order approving Mr. Seery as chief executive officer and chief

 2   restructuring officer included the same exculpation and

 3   gatekeeping provision as contained in the January 29th --

 4   January 9th order.

 5       Your Honor, we have all come too far to allow Mr. Dondero

 6   to make good on his promise to Mr. Seery to burn down the

 7   place if he didn't get what he wanted.  The Debtor deserves

 8   better, the creditors deserve better, and this Court deserves

 9   better.

10       That concludes my opening argument, Your Honor.

11         THE COURT:  All right.  Thank you.  I had one follow-

12   up question about the Daugherty settlement.  You did not

13   mention, is it going to be reflected in the confirmation

14   order, is it going to be the subject of a 9019 motion, or

15   something else?

16         MR. POMERANTZ:  It'll be subject to a -- it'll be

17   subject to a 9019 motion, Your Honor.

18         THE COURT:  All right.

19         MR. POMERANTZ:  I apologize for leaving that out.

20         THE COURT:  All right.  Thank you.  Well, --

21         MR. KATHMAN:  Your --

22         THE COURT:  -- I appreciate that you stuck closely to

23   your 20-minute time estimate.

24       As far as other opening statements today, I'm going to

25   start with the objections that were resolved.  Mr. Kathman, I

29

```
 1   see you there.  Who will speak on behalf of Patrick Daugherty

 2   and the announced settlement?

 3         OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

 4            MR. KATHMAN:  Good morning, Your Honor.  Jason

 5   Kathman on behalf of Mr. Daugherty.

 6       Mr. Pomerantz correctly recited the bullet points of the

 7   settlement that we agreed to in principle this morning.  There

 8   was one that he did leave off that I do want to make sure that

 9   I mention and that it's read into the record.  And he read at

10   the top end that Mr. Daugherty does maintain his ability to

11   pursue his 2008 tax refund bonus claim, or tax refund

12   compensation claim.  If the Court will recall, there's a

13   contingent liability out there based on how compensation was

14   paid back in 2008 that's the subject of an IRS audit.  And so

15   the settlement expressly contemplates that those -- that that

16   claim will be preserved and Mr. Daugherty may pursue that

17   claim.  Should the IRS have an adverse ruling and we have to

18   pay money back, we get to preserve that claim.

19       And so the one thing that is preserved, Your Honor -- and

20   the same way that Mr. Pomerantz read verbatim the words, I'm

21   going to read verbatim the words that we've agreed to:

22   Daugherty maintains and may pursue the 2008 tax refund

23   compensation portion of his claim that is currently a disputed

24   contingent liability.  The Debtor and all successors reserve

25   the right to assert any and all defenses to this portion of
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2104
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 172 of 1017 PageID 6885
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2103 of 2722

30

1  the Daugherty claim.  The litigation of this claim shall be

2  stayed until the IRS makes a final determination, provided,

3  however, Daugherty may file a motion with the Bankruptcy Court

4  seeking to have the amount of his tax claim determined for

5  reservation purposes as a "disputed claim" under the Debtor's

6  plan.  The Debtor and all successors reserve the right to

7  assert any and all defenses to any such motion.

8      So the Debtor's plan says that they can make estimations

9  for disputed claims.  There is not currently something

10 reserving this particular claim, so we wanted to make sure we

11 reserve our rights to be able to have that amount reserved

12 under the Debtor's plan.  And the Debtor obviously preserves

13 their ability to object to that.

14     With that, Your Honor, it is going to be papered up in a

15 9019, and we'll have some further things to say at the 9019

16 hearing, but didn't want to derail the Debtor's confirmation

17 hearing this morning.

18         THE COURT:  All right.  And --

19         MR. POMERANTZ:  And Mr. Kathman is -- Mr. Kathman is

20 correct.  I neglected to mention that provision, but he is --

21 he read it, and that's agreed to.

22         THE COURT:  All right.  And I did not hear anything

23 about Mr. Daugherty's vote on the plan.  Is there an agreement

24 to change or a motion to change the vote from no to yes?

25         MR. KATHMAN:  Your Honor, that wasn't, I think,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2105
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 173 of 1017 PageID 6886
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2104 of 2722

31

1  directly -- and Mr. Pomerantz can correct me if I'm wrong, or

2  Mr. Morris, actually, probably more could -- that wasn't

3  directly addressed, but I think the answer to that is probably

4  they don't need our vote.

5          THE COURT:  Okay.

6          MR. KATHMAN:  I think they have enough votes in that

7  class to carry.

8          THE COURT:  Okay.

9          MR. KATHMAN:  But the answer directly is that that

10  wasn't specifically addressed one way or the other.

11          THE COURT:  All right.

12          MR. POMERANTZ:  That is correct, Your Honor.  We

13  would, of course, not oppose Mr. Daugherty changing his vote,

14  but as Your Honor saw in the ballot summary, we are way over

15  the amount in dollar amounts of claims.  But if they wanted to

16  change their vote, we wouldn't oppose.

17          THE COURT:  All right.  Well, --

18          MR. KATHMAN:  Your Honor, I have -- I have the

19  benefit of Mr. Daugherty.  He is on -- I should note, Mr.

20  Daugherty is on the hearing this morning.  He just let me know

21  that he is willing to change his vote.  If the Debtor were to

22  so make a motion, we're fine changing our vote to in favor of

23  the plan.

24          THE COURT:  All right.  All right.  Well, we'll get

25  the ballot agent declaration or testimony later.  At one time

32

1   when I had checked, there was a numerosity problem but not a

2   dollar amount problem.  And it sounds like that is no longer

3   an issue, perhaps because of the employee votes, or I don't

4   know.

5       But, all right.  Well, thank you.

6           MR. POMERANTZ:  Your Honor, there is still a

7   numerosity problem.

8           THE COURT:  Okay.

9           MR. POMERANTZ:  There's not a dollar amount problem.

10          THE COURT:  Okay.

11          MR. POMERANTZ:  But we'll address that and cram-down

12  in closing.

13          THE COURT:  All right.  Very good.

14      All right.  Well, I want to hear from the -- what we've

15  called the Senior Employee group.  Is Ms. Dandeneau going to

16  confirm the announcement of Mr. Pomerantz?

17          MS. DANDENEAU:  Yes, Your Honor.  I confirm that Mr.

18  Pomerantz's recitation of the terms to which we've agreed is

19  accurate.

20          THE COURT:  All right.  Very good.

21      All right.  I suppose I should circle back to UBS.  We've,

22  of course, heard in prior hearings the past few weeks that

23  there was a settlement with UBS, but Mr. Clubok, could I get

24  you to confirm what Mr. Pomerantz announced earlier about the

25  UBS settlement?

33

```
 1              MR. CLUBOK:  Yes.  Good morning again, Your Honor.
 2         Yes, we have reached a settlement, and it's just -- and
 3    it's been approved internally at UBS and obviously by the
 4    Debtor.  It's just subject to the final documentation.  And we
 5    are working very closely with the Debtor to try to do that as
 6    quickly as possible.
 7              THE COURT:  All right.  Thank you.
 8         All right.  Well, let me go, then, to other opening
 9    statements.  Is there anyone else who at this time wishes to
10    make an opening statement?  And, you know, for the pending
11    objectors, please, no more than 20 minutes.
12              MR. CLEMENTE:  Your Honor?  Your Honor, if I may,
13    it's Matt Clemente on behalf of the Committee.
14              THE COURT:  Okay.
15              MR. CLEMENTE:  I'd be very brief, but I would like to
16    make some remarks to Your Honor.  It'll be less than five
17    minutes.
18              THE COURT:  All right.  Go ahead.
19              MR. CLEMENTE:  Thank you, Your Honor.
20    OPENING STATEMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE
21              MR. CLEMENTE:  Again, for the record, Matt Clemente;
22    Sidley Austin; on behalf of the Official Committee of
23    Unsecured Creditors.
24         Your Honor, to be clear, the Committee fully supports
25    confirmation of the Debtor's plan and believes the plan is
```

34

1    confirmable and should be confirmed.

2         Although it has taken us quite some time to get to this

3    point, Your Honor, and as Mr. Pomerantz referred, the Debtor's

4    business is somewhat complex, the plan is remarkably

5    straightforward, Your Honor, and has only been made

6    complicated by the various objections filed by Mr. Dondero's

7    tentacles.

8         At bottom, Your Honor, the plan is designed to recognize

9    the reality of the situation that the Committee has

10   continually been expressing to Your Honor, and that is the

11   overwhelming amount of creditors in terms of dollars are

12   litigation creditors, creditors who are here entirely because

13   of the fraudulent and other conduct of Mr. Dondero and his

14   tentacles.

15        The other third-party creditors, Your Honor, by and large

16   are those collateral to these litigation claims in terms of

17   true trade creditors and service providers.

18        Recognizing this fact, Your Honor, the plan contains an

19   appropriate convenience class, which, in the Committee's view,

20   provides a fair way to capture a large number of claims and

21   appropriately recognizes the distinction between those claims

22   and the large litigation claims.  And the holders of these

23   large litigation claims, including now Mr. Daugherty, have

24   voted in favor of allowing this convenience class treatment.

25        Your Honor, after distributions are made to the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2109
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 177 of 1017 PageID 6890
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2108 of 2722

35

1 administrative creditors, the priority creditors, the secured

2 creditors, and the convenience creditors, the remainder goes

3 to general unsecured creditors who will control how this value

4 is realized. These are the large litigation creditors.

5     Additionally, Your Honor, recognizing the possibility of

6 recovery in excess of general unsecured claims plus interest,

7 and to thwart, from the Committee's perspective, what would

8 have undoubtedly been an argument by one of the Dondero

9 tentacles that the general unsecured creditors could be paid

10 more than they are owed, the plan provides for a contingent

11 interest to kick in after payment in full for interests of all

12 prior claims.

13     Your Honor, this is the sum and substance of the plan. At

14 bottom, fairly straightforward. And the true creditors, Your

15 Honor, have voted overwhelmingly in favor of the plan. Class

16 8 has voted to support the plan. Class 7 has voted to accept

17 the plan. And now I believe, with Mr. Daugherty's settlement,

18 one hundred percent in amount of Class 8, non-insider, non-

19 Dondero-controlled or (audio gap) have voted in favor of the

20 plan.

21     To be clear, as Your Honor pointed out and as Mr.

22 Pomerantz referenced, there is not numerosity in Class 8, Your

23 Honor, but that is driven, as Your Honor will see, from

24 approximately 30 no-votes of current employees who the

25 Committee believes are not owed any amounts and therefore they

36

 1   will not be receiving payments under the plan, yet they voted

 2   against the plan.  So although we have a technical cram-down

 3   plan from the Class 8 perspective, Your Honor, the plan voting

 4   reflects the reality that the economic parties in interest

 5   overwhelmingly support the plan.

 6       So, Your Honor, cutting through the machinations of the

 7   Dondero tentacles, we do have a fairly straightforward plan

 8   and a plan that the Committee believes is confirmable and

 9   should be confirmed.

10       Your Honor, since I've been in front of you for over a

11   year now, I've referred to the goals of the Committee in this

12   case, and the goals are straightforward in terms of expressing

13   them but can be difficult in reality to implement them.  The

14   Committee's goals have been two-fold:  to maximize the value

15   of the estate and therefore the recoveries for its

16   constituency, and to disentangle from the Dondero (audio gap).

17       As with all things Highland, although these goals are

18   straightforward, they're remarkably difficult to achieve,

19   given the Dondero tentacles.  However, the Committee strongly

20   believes the plan achieves these two goals.

21       First, the plan provides a credible path to maximize

22   recovery with Mr. Seery, who has gotten to know the assets and

23   who has performed skillfully and credibly throughout this very

24   difficult process.  It is a difficult set of assets and

25   complex set of assets, as Your Honor knows very well.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2111
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 179 of 1017 PageID 6892
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2110 of 2722

37

```
 1        To be sure, there is uncertainty associated with the
 2   Debtor's projections, but that is inherent in the nature of
 3   the assets of the Debtor, and frankly, is inherent in the
 4   nature of projections themselves.  And Mr. Dondero and his
 5   tentacles will point to the downside, potentially, in those
 6   projections, but the Court will be reminded that there is also
 7   potential upside in those projections, an upside that would
 8   inure to the benefit of the general unsecured claims.
 9        Second, Your Honor, although it is seemingly impossible to
10   free yourself from the Dondero web until every single one of
11   the 2,000 barbed tentacles is painfully removed, if that's
12   even possible, Your Honor, the Reorganized Debtor, the
13   Claimant Trust, the Claimant Trustee, the Litigation Sub-
14   Trust, the Litigation Trustee, and the Oversight Board
15   construct and mechanisms is a structure that the Committee
16   believes provides the creditors with the best possibility to
17   do so, and that is to deal with what will undoubtedly be a
18   flurry of attacks from Mr. Dondero and his tentacles.
19        This is a virtual certainty, Your Honor.  The creditors
20   have seen this movie before and Your Honor has seen this movie
21   before.  They have seen Mr. Dondero make and break promises.
22   They have seen Mr. Dondero attempt to bludgeon adversaries
23   into submission in order to accept his offerings, and they
24   have heard Mr. Dondero say that which he has said in this
25   court during the preliminary injunction hearing --
```

38

1  specifically, that the Debtor's plan "is going to end up in a

2  myriad of litigation."

3      The creditors are steeled in their will to be rid of Mr.

4  Dondero, and they're confident in this structure to do so.

5      To be clear, Your Honor, what is before the Court today

6  for confirmation is the Debtor's plan, not some other plan

7  that no one supports other than Mr. Dondero and his tentacles.

8  The question isn't whether Mr. Dondero has a better proposal

9  -- and footnote, Your Honor, the answer is he does not, both

10 from a qualitative and quantitative perspective -- but whether

11 the plan before the Court is in the best interest of creditors

12 and should be confirmed.  The Committee strongly believes it

13 is, and should, and all the Committee members support

14 confirmation of the Debtor's plan.

15     Recognizing Mr. Dondero's behavior, Your Honor, and

16 threats regarding how he will behave in the future, there are

17 certain provisions in the plan that are of critical importance

18 to the creditors.  Of course, all provisions in the plan are

19 extremely important, Your Honor, but as Mr. Pomerantz

20 referenced, the creditors need the gatekeeper, exculpation,

21 and injunction provisions.

22     The reason is obvious, and is emphasized by the

23 supplemental objection filed just yesterday by some of Mr.

24 Dondero's tentacles -- namely, the Dugaboy and the Get Good

25 Trusts.  And I quote, Your Honor:  "It is virtually certain

39

1    that, under the Debtor's plan, there will be years of

2    litigation in multiple adversary proceedings, appeals, and

3    collection activities, all adding substantial uncertainty and

4    delay."

5         Additionally, Your Honor has seen from the proceedings in

6    this case and has expressed frustration at numerous times at

7    the myriad and at times baseless and borderline frivolous and

8    out of touch with reality suits and objections and proceedings

9    that the Dondero tentacles bring.  The creditors need the

10   gatekeeper, exculpation, and injunction provisions to preserve

11   and protect value.  And the record, I think, to this point is

12   clear, and will be further made clear through the confirmation

13   proceedings, that the protections are appropriate and entirely

14   within this Court's authority to grant.

15        In sum, Your Honor, the Committee fully supports

16   confirmation of the plan.  The Committee believes it is

17   confirmable and should be confirmed, and two classes of

18   creditors and the overwhelming amount of creditors in terms of

19   dollars agree.

20        That's it, Your Honor.  Unless you have questions for me,

21   I have nothing further at this time.

22             THE COURT:  All right.  Thank you, Mr. Clemente.

23             MR. CLEMENTE:  Thank you, Your Honor.

24             THE COURT:  All right.  Who else wishes to be heard?

25             MR. DRAPER:  Your Honor, this is Douglas Draper.  I'd

40

1   like to be heard.  I have a few -- I'll take five minutes, at

2   most --

3           THE COURT:  All right.  Go ahead.

4           MR. DRAPER:  -- and just focus on a few things.

5   OPENING STATEMENT ON BEHALF OF THE GET GOOD TRUST AND DUGABOY

6                       INVESTMENT TRUST

7           MR. DRAPER:  I'm going to focus my opening remarks on

8   the releases, the exculpations, and channeling injunctions in

9   the plan.  I'm not waiving my other objections, but, rather,

10  trying not to subject the Court to hearing the same argument

11  from multiple lawyers.

12      The good thing about the law is that it's absolute in

13  certain respects.  It does not matter who is asserting a legal

14  protection, the law applies it.  For example, a serial killer

15  is entitled to a *Miranda* warning and a protection against

16  unlawful search and seizure.  The law does not allow tainted

17  evidence or an unlawful admission into evidence,

18  notwithstanding the fact that the lack of admission of that

19  evidence may lead to the freeing of that serial killer.

20      Today, you must make an independent evaluation as to

21  whether the plan complies with 1129 and applicable law.  The

22  decision must be made notwithstanding the fact that it is

23  being made by a Dondero entity.  It's not being -- it must be

24  applied notwithstanding the fact that it's being made by me.

25      We contend that the plan does not meet the hurdle and

41

1   confirmation should be denied, notwithstanding the fact that

2   the infirmity with the plan is asserted by me and

3   notwithstanding the fact that Mr. Pomerantz and the unsecured

4   creditors have overwhelming support.

5       We all know 1141, the Barton Doctrine, and 544 -- 524

6   provide injunctions and protections for certain parties

7   associated with the Debtor.  Had the plan merely referenced

8   these sections and stated that the injunction, et cetera,

9   shall not exceed those allowed pursuant to *Pacific Lumber*, I

10  would not be making this argument.

11      Instead, we see a plan that has a definition of Exculpated

12  Parties, Released Parties, Related Parties, that exceed the

13  protections afforded by the Bankruptcy Code, the Barton

14  Doctrine, and 524.

15      We have a grant of jurisdiction and oversight that exceeds

16  that allowed under *Craig's Store*, the *Craig's Store* line of

17  cases.

18      We have releases of claims against non-debtor parties,

19  such as Strand, who is, under the Bankruptcy Code, under 723,

20  liable for the debts of the Debtor.

21      The plan, with its expansive releases, released parties,

22  grant of injunctions, exculpations and channeling injunctions,

23  are impermissible under Fifth Circuit case law.  And I would

24  ask the Court to look closely at those definitions, who is --

25  who the law allows to be exculpated and released and who the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2116
Case 3:25-cv-02072-S Document 15-9 Filed 06/27/25 Page 184 of 1017 PageID 6897
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2115 of 2722

42

1   law specifically prohibits being exculpated and released, and,

2   in fact, apply the *Pacific Lumber* line of -- case, as well as

3   524 and the Bankruptcy Code when you look at these issues.

4        Notwithstanding the overwhelming so-called support by the

5   creditors at issue, the law must be applied, and it must be

6   applied pursuant to what the Fifth Circuit requires.

7            THE COURT:  All right.  Thank you, Mr. Draper.

8        Other Objectors with opening statements?

9            MR. RUKAVINA:  Your Honor, Davor Rukavina.  Briefly?

10           THE COURT:  Okay.

11     OPENING STATEMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12           MR. RUKAVINA:  Your Honor, I represent various funds,

13  including three of which have independent boards.  The Debtor

14  manages more than $140 million of those funds, and the Debtor

15  manages around a billion dollars in CLOs.

16       Whether I am a tentacle of Mr. Dondero or not -- I'm not,

17  since there's an independent board -- the fact remains that

18  the Debtor wants to manage these assets and my clients' money

19  post-assumption and post-confirmation with effective judicial

20  immunity.  So our fundamental problem with this plan is the

21  assumption of those contracts under 365(c) and (b).  I think

22  we'll have to wait for the evidence to see what the Debtor

23  proposes and has, and I will reserve, I guess, the balance of

24  my arguments on that to closing, depending on what the

25  evidence is.

43

1    But I don't want the Court to lose sight of the fact that

2  what the Debtor wants to do is, in contravention of our

3  desires, continue managing our assets post-confirmation, even

4  as it liquidates, just to make a buck.  It's our money, Your

5  Honor, and whether we're Dondero or not, we're a couple

6  hundred million, probably, or more, of third-party investment

7  professionals, pension funds, et cetera, and we should not be

8  all tainted without evidence as a tentacle of someone whom,

9  I'll remind everyone here, built a multi-billion dollar

10  company and made a lot of money for people.

11    The second objection, Your Honor, goes to the Class 8

12  rejection.  It sounds like there's still a problem with the

13  number of creditors, even though certain creditors have

14  switched their votes.  That raises now the fair and equitable

15  standard, together with the undue discrimination and the

16  absolute priority rule.  I think we'll have to let the

17  evidence play out, and I'll reserve the balance of my closing

18  or the balance of my remarks to closing on that issue.

19    The third issue, Your Honor, is the same exculpation and

20  release and injunction provisions that Mr. Draper raised.

21  Those are legal matters that I'll discuss at closing, but I do

22  note that the Debtor purports to prevent my clients from

23  exercising post-assumption post-confirmation rights, period.

24  And that's just inappropriate, because if the Debtor wants the

25  benefits of these agreements, well, then of course it has to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2118
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 186 of 1017 PageID 6899
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2117 of 2722

44

1   comply with the burdens.  And to say *a priori* that anything

2   that my clients might do post-confirmation would be the result

3   of a bad-faith Mr. Dondero strategy, there's no basis for that

4   and that's not the basis on which my clients' rights in the

5   future, when there is no bankruptcy estate and there is no

6   bankruptcy jurisdiction, can be enjoined.

7       And the final point, Your Honor, entails this channeling

8   injunction.  I'll talk about it during closing.  It is

9   inappropriate under 28 U.S.C. 959.  This is not a Barton

10  Doctrine trustee issue, this is a debtor-in-possession, and a

11  channeling injunction, the Court will have no jurisdiction

12  post-confirmation.

13      Thank you, Your Honor.

14          THE COURT:  All right.  Thank you.

15      Does Mr. Dondero's counsel have an opening statement?

16          MR. TAYLOR:  I do, Your Honor.  I'll keep it brief.

17  This is Clay Taylor on behalf of Mr. Dondero.

18          THE COURT:  Okay.

19          OPENING STATEMENT ON BEHALF OF JAMES D. DONDERO

20          MR. TAYLOR:  Your Honor, the plan is clear in some

21  respects, and I'm not going to belabor these points, as other

22  objecting counsel have already addressed this.  But the plan

23  does provide for non-debtor releases, and it provides for non-

24  debtor releases for parties beyond that which is allowed by

25  *Pacific Lumber* and under the Code.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2119
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 187 of 1017 PageID 6900
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2118 of 2722

45

1       It also provides for exculpations of non-debtor parties in

2   excess of that which is allowed under the Code and applicable

3   case law.

4       Finally -- or, not finally, but third, it requires this

5   Court to keep a broad retention of post-confirmation

6   jurisdiction that could go on for years, and that is improper.

7       Finally, it requires the parties to submit to the

8   jurisdiction of this Court via a channeling injunction, which

9   we believe is beyond that which is allowed under applicable

10  Fifth Circuit precedent.

11      What is clear, what the evidence will show -- and I

12  thought it was interesting that none of the proponents of plan

13  confirmation ever talk about what the evidence is going to

14  show.  They testified a lot before Your Honor, but they didn't

15  ever talk about what the evidence would show.  What the

16  evidence will show is this plan was solicited via a disclosure

17  statement that told all the unsecured creditors, we project

18  that you're going to receive 87 cents on the dollar on your

19  claim.

20      About two months later, and this was Friday of this past

21  week, they changed those projections, and those projections

22  then showed unsecured creditors, under a plan analysis, that

23  they were going to receive 62 cents on the dollar.  That is in

24  contrast to the liquidation analysis that had been prepared

25  just two months prior showing that, under a hypothetical

46

1   Chapter 7 liquidation analysis, that the unsecured creditors

2   would receive 65 cents on the dollar.  Obviously, 62 cents is

3   less than 65 percent.

4       Realizing they had a problem, I guess, over the weekend,

5   they changed last night, the night before confirmation, and

6   sent us some new projections that now show that the unsecured

7   creditors under a plan would receive 71 cents on the dollar.

8       Your Honor, what the evidence will show, and it is

9   Highland's burden to show this, is that -- that they meet the

10  best interests of the creditors.  And part of that is that

11  they will do better under a plan rather than under a

12  hypothetical Chapter 7.

13      Quite simply, they don't have the evidence, nor have they

14  done the analysis to be able to prove that to this Court.

15      What the evidence will also show is clear is that Mr.

16  Seery, under the plan analysis, is scheduled to receive at

17  least $3.6 million over just the first two years of this plan

18  if it doesn't go any further.  And that's just for monthly

19  payouts of $150,000 per month.  That's not including a to-be-

20  agreed-upon success fee structure, which hasn't been

21  negotiated yet.  And if it hasn't been negotiated yet, it

22  can't be analyzed yet to see if those costs would exceed their

23  benefits and therefore drive the return down such that a

24  hypothetical Chapter 7 trustee could do better.

25      There is also going to be additional costs for the

47

 1   Litigation Trustee and the fees that they are going to charge.

 2   There's going to be an Oversight Committee, and those fees are

 3   also to be negotiated.  There's also U.S. Trustee fees, which

 4   Mr. Seery tells us that he has calculated within the

 5   liquidation and plan analysis numbers, albeit both myself and

 6   Mr. Draper, as the evidence will show, have asked for the

 7   rollups that come behind the liquidation and plan analysis in

 8   each instance of the three iterations that have been done in

 9   two months, and we have been denied that information.  That

10   evidence is not going to come in before this Court, and

11   without that rollup information, this Court can't make an

12   independent verification that this meets the best interests of

13   the creditor and better than a hypothetical Chapter 7 trustee.

14       What the evidence will also show, make an assumption that,

15   under a plan analysis, that Mr. Seery will be able to generate

16   higher returns on the sale of the assets of the Highland

17   debtor and its subsidiaries, to the neighborhood of $60

18   million higher.  There is no independent verification of this.

19   There has been no due diligence done.  It was merely an

20   assumption done by Mr. Seery and his advisors, and we submit

21   that they will not have the evidence to show that they can

22   beat a Chapter 7 trustee.

23       This Court does have an alternative before it.  There is

24   an alternative plan that has been filed under seal.  The Court

25   is aware of it.  And it guarantees that creditors will receive

48

1  at least 65 cents on the dollar.  Moreover, those claims are

2  guaranteed -- and they're going to be secured that they will

3  be paid that money.

4          MR. POMERANTZ:  Your Honor, this is under -- this is

5  under seal.  And I never interrupt somebody's argument, but

6  this plan is under seal for a reason, Your Honor, and I object

7  to any description of the terms of a plan that's not before

8  Your Honor and is under seal.

9          THE COURT:  Okay.  I sustain that objection.

10         MR. TAYLOR:  Your Honor has a means to cut the

11  Gordian knot of the litigation and appeals before it and to

12  ensure that there is certainty for creditors.  It would

13  massively reduce the administrative fee burn that is

14  contemplated under the proposed plan before the Court.  As

15  I've mentioned, it's at least $3.6 million just in monthly

16  fees for Mr. Seery alone.  All of the rest of the fees are yet

17  to be determined and to be negotiated.  I don't see how any

18  analysis could have been done regarding the administrative fee

19  burn that is going to happen over the two years and

20  potentially much further as this case draws on.

21     For those reasons alone, Your Honor, we believe that the

22  plan confirmation should be denied and this Court should look

23  at the alternatives before it.

24         MR. KATHMAN:  Can I say something before --

25         MR. TAYLOR:  Thank you, Your Honor.

49

```
 1            THE COURT:  All right.  Thank you.

 2       All right.  Have I missed any Objectors?

 3            MR. KATHMAN:  Your Honor?

 4            MS. DRAWHORN:  Yes, Your Honor.

 5            THE COURT:  Okay.  Ms. --

 6            MR. KATHMAN:  Your Honor, if I could spend just one

 7   minute, and I -- we -- I -- we filed a joinder on behalf of

 8   Mr. -- or, Jason Kathman on behalf of Davis Deadman, Todd

 9   Travers, and Paul Kauffman.

10            THE COURT:  Uh-huh.

11    OPENING STATEMENT ON BEHALF OF DAVIS DEADMAN, TODD TRAVERS,

12                     AND PAUL KAUFFMAN

13            MR. KATHMAN:  Mr. Pomerantz had noted, I think, at

14   the front end that the Debtor amended their plan that resolved

15   those objections.  I just want to say for the record that

16   those had been resolved.

17       And with that, Your Honor, may I be dismissed?

18            THE COURT:  Yes, you may.  Thank you.

19            MR. KATHMAN:  Thank you, Your Honor.

20            THE COURT:  All right.  Was Ms. Drawhorn speaking up

21   to make an opening statement?

22            MS. DRAWHORN:  Yes.

23            THE COURT:  Go ahead.

24            MS. DRAWHORN:  Yes, Your Honor.

25            THE COURT:  Go ahead.
```

50

1        OPENING STATEMENT ON BEHALF OF THE NEXPOINT PARTIES

2            MS. DRAWHORN:  Just very briefly, Lauren Drawhorn on

3    behalf of NexPoint Real Estate Partners, the NexPoint Real

4    Estate entities, and NexBank.

5        Just a very brief opening.  Just wanted to note that it

6    seems that the Debtor's and the Committee's position seems to

7    be if there's some way, any way, to connect an entity to Mr.

8    Dondero, then they don't need to perform any true evaluation

9    of potential claims or that party's rights or their concerns,

10   and that results in ignoring not only the merits of many

11   claims but also the basic requirements of due process and the

12   statutes, the Bankruptcy Code, and the case law.

13       We filed objections that were focused largely on the

14   injunctions and the releases, and then also the proposed

15   subordination provisions.

16       Two of my clients, one of them has a proof of claim, and

17   while it is being disputed, that claim is out there and should

18   get -- be entitled to be pursued and defended, and many of the

19   injunctions appear to prevent my client from doing so.

20       Similarly, it was mentioned that NexBank, in the

21   demonstrative, had a terminated service agreement, but there's

22   periods of time for which no services were provided but

23   payment was made, and that's a potential admin claim that has

24   been raised.  And the injunction, again, appears to prevent my

25   clients from pursuing these claims.

51

1    So I think, despite the general response to any connection

2    to Dondero means there's no merit, that's not what we're here

3    for today.  We need to really look at the merits of all

4    potential claims and all -- the rights of all parties and the

5    -- how the injunction and release provisions prevent that and

6    how they don't comply with the required law.

7        And, of course, we join in with many of the other

8    objections, but that's my main point for the opening today.

9            THE COURT:  All right.  Thank you.

10       All right.  I think I have covered all of the at least

11   pending objections except the U.S. Trustee.  I'll check again

12   to see if someone is out there for the U.S. Trustee.  (No

13   response.)  All right.  If you're there, we're not hearing

14   you.  You're on mute.

15       Okay.  Any other attorneys out there who wish to make an

16   opening statement?

17       All right.  Well, I'll turn back to Mr. Pomerantz.  You

18   may call your first witness.

19           MR. POMERANTZ:  Okay.  I will turn the virtual podium

20   over to my partner, John Morris, who will be putting on our

21   witnesses.

22           THE COURT:  All right.  Mr. Morris, you may call your

23   first witness.

24           MR. MORRIS:  Good morning, Your Honor.  John Morris

25   from Pachulski Stang Ziehl & Jones on behalf of the Debtor.

52

1  Can you hear me okay?

2         THE COURT:  I can.

3         MR. MORRIS:  Okay.  Thank you very much.

4      The Debtor calls James Seery as its first witness.

5         THE COURT:  All right.  Mr. Seery, if you could say,

6  "Testing, one, two," please.

7         MR. SEERY:  Testing, one, two.

8         THE COURT:  All right.  Hmm, I've not picked up your

9  video yet.  Let's try it again.

10         MR. SEERY:  Testing, one, two.  Testing.

11         MR. MORRIS:  We have the audio.

12         THE COURT:  We have the audio.

13         MR. SEERY:  Oh.

14         MR. MORRIS:  There we go.

15         THE COURT:  There you are.

16         MR. SEERY:  The video should be working.

17         THE COURT:  All right.

18         MR. POMERANTZ:  Yeah.  Actually, one -- Your Honor,

19  one thing before we start.  We have Patrick Leatham from KCC.

20  He is prepared to sit on the line for the whole day until his

21  time comes.  I would just like to know if anyone intends to

22  cross-examine him or object to his declaration.  Because if

23  they don't, we could excuse Mr. Leatham.

24         THE COURT:  All right.  What about that?  Anyone

25  want to cross-examine the balloting agent?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2127
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 195 of 1017 PageID 6908
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2126 of 2722

53

1           MR. RUKAVINA:  Your Honor, Davor Rukavina.  I do not.

2   If the Debtor would just state, with the change of votes in

3   Class 8, what the final tally is, I see no reason to dispute

4   that, and then we can dismiss this gentleman.  But I do think

5   that we should all know, with the change of votes, what it now

6   is.

7           THE COURT:  All right.

8           MR. POMERANTZ:  We will -- we will work on that, Your

9   Honor, with the changes as a result of the settlements today,

10  and including Mr. Daugherty's client.  We can get that

11  information sometime today.

12          THE COURT:  All right.  So, Mr. Rukavina, do you

13  agree that he can be excused with that representation, or do

14  you want --

15          MR. RUKAVINA:  Yes, Your Honor.

16          THE COURT:  Okay.  All right.  So, it's Mr. Leatham?

17  You are excused if you want to drop off this video.

18      All right.  Mr. Seery, please raise your right hand.

19          JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

20          THE COURT:  All right.  Thank you.  Mr. Morris, go

21  ahead.

22          MR. MORRIS:  Thank you, Your Honor.

23      If I may, I'd like to just begin by moving my exhibits

24  into evidence so that it'll make this all go a little bit

25  smoother.

54

1          THE COURT:  All right.

2          MR. MORRIS:  And if you'll indulge me just a little

3     patience, please, because the Debtor's exhibits are found in

4     three separate places.

5          THE COURT:  Uh-huh.

6          MR. MORRIS:  And I would just take them one at a

7     time.

8       First, at Docket No. 1822, the Court will find Debtor's

9     Exhibits A through what I'm referring to as 6Z.  Six Zs.  So

10    the Debtor respectfully moves into evidence Exhibits A through

11    6Z on Docket No. 1822.

12         THE COURT:  All right.  Are there any objections?

13         MR. RUKAVINA:  Your Honor, I have a number of

14    targeted objections to all of the exhibits.  Did I hear Mr.

15    Morris say 6Z?

16         THE COURT:  Yes.

17         MR. MORRIS:  Yes.

18         MR. RUKAVINA:  Or six -- then, Your Honor, I can go

19    through my limited objections, if that pleases the Court.

20         THE COURT:  All right.  Go ahead.

21         MR. RUKAVINA:  Your Honor, Exhibit B, a transcript, B

22    as in boy.  Exhibit D, an email, D as in dog.  Exhibit E as in

23    Edward.  Moving on, Your Honor, 4D as in dog.  4E as in

24    Edward.

25         MR. MORRIS:  Slow down, please.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2129
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 197 of 1017 PageID 6910
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2128 of 2722

55

1          THE COURT:  Okay.

2          MR. RUKAVINA:  I'm sorry.

3          THE COURT:  You said 4D as in dog, correct?

4          MR. RUKAVINA:  Then -- yes, Your Honor.  Then 4E as

5   in Edward.

6          THE COURT:  Okay.

7          MR. RUKAVINA:  4G as in George.  Your Honor, one,

8   two, three, four, five T.  5T as in Tom.  And then, Your

9   Honor, one, two -- 6R.  6S.  6T as in Tom.  And 6U as in

10  under.  That's it.

11         THE COURT:  All right.  Well, Mr. Morris, do you want

12  to carve those out for now and just offer them the old-

13  fashioned way and I can rule on the objections then?

14         MR. MORRIS:  Why don't we do that?  I may just deal

15  with it at the end of the case.  But subject to those

16  objections, the Debtor then moves into evidence the balance of

17  the exhibits on Docket 1822.

18         THE COURT:  All right.  So, for the record, the Court

19  will admit all exhibits at Docket No. 1822 at this time except

20  B, D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U.

21      (Debtor's Docket 1822 exhibits, exclusive of Exhibits B,

22  D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U, are received into

23  evidence.)

24         THE COURT:  All right.  Mr. Morris, continue.

25         MR. MORRIS:  Thank you, Your Honor.

56

1     Next, at Docket 1866, you'll find Debtor's Exhibits 7A

2  through 7E, and the Debtor respectfully moves those dockets --

3  documents into evidence.

4          THE COURT:  All right.  Any objection?  (No

5  response.)  Are there any objections?

6          MR. RUKAVINA:  Your Honor, not from -- not from me.

7          THE COURT:  All right.  Hearing no objections, the

8  Court will admit all Debtor exhibits appearing at Docket Entry

9  No. 1866.

10         MR. MORRIS:  Thank you, Your Honor.

11     (Debtor's Docket 1866 exhibits are received into

12  evidence.)

13         MR. MORRIS:  And finally, at Docket 1877, the Court

14  will find Debtor's Exhibits 7F through 7Q, and the Debtor

15  respectfully moves for the admission of those documents into

16  evidence.

17         THE COURT:  All right.  Any objection?

18         MR. RUKAVINA:  Your Honor, I might have to talk about

19  this with Mr. Morris, but I have 7F as any document entered in

20  the case, 7G as any document to be filed, et cetera.  Mr.

21  Morris, am I wrong about that?

22         MR. MORRIS:  I don't have that list in front of me.

23  So I'll reserve on those documents and we can talk about them

24  at a break, Your Honor.

25             THE COURT:  All right.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2131
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 199 of 1017 PageID 6912
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2130 of 2722

57

1          MR. DRAPER:  Your Honor, this is Douglas Draper.  I

2     object, and I don't have the number in front of me, it's the

3     liquidation analysis and the plan summary.  It's a summary

4     exhibit, and we've not been given the underlying documentation

5     with respect to them.  I'd ask Mr. Morris to deal with that

6     separately also.

7          MR. MORRIS:  All right.  Well, we're certainly going

8     to be moving that into evidence, so we can deal with that at

9     the time, Your Honor.

10          THE COURT:  Okay.  Which documents are they?  Which

11     exhibits are those?

12          MR. DRAPER:  I don't have the number in front -- Mr.

13     Morris, do you have the number for that exhibit?

14          MR. MORRIS:  I do, but why don't we just deal with it

15     when I -- when I get into --

16          THE COURT:  Okay.

17          MR. MORRIS:  -- into the testimony?

18          THE COURT:  I just wanted the record clear what I am

19     admitting at this time at Docket Entry No. 1877.  Or do you

20     want to just --

21          MR. MORRIS:  Okay.

22          THE COURT:  -- hold all those --

23          MR. MORRIS:  Mr. Rukavina, other than F and G, which

24     you noted, is there any objection to any of the other

25     documents on that witness and exhibit list?

```
                        Seery - Direct                    58
```

1          MR. RUKAVINA:  Well, I also have H as impeachment/

2    rebuttal, I as any document offered by any other party.  So I

3    would suggest, Mr. Morris, that I have my associate confirm

4    that I have the right -- the right stuff here, and we can take

5    it up maybe during a break.  But I have F, G, H, I as so-

6    called catchalls, not any discrete exhibits.

7          MR. MORRIS:  All right.  All right, Your Honor.

8    Let's, let's just proceed.  We've got -- we took care of

9    Docket No. 1822 and 1866, and the balance we'll deal with at a

10   break, --

11         THE COURT:  All right.

12         MR. MORRIS:  -- unless they come up through

13   testimony.

14         THE COURT:  All right.  That sounds good.

15         MR. MORRIS:  Okay.  Thank you very much.  May I

16   proceed?

17         THE COURT:  You may.

18         MR. MORRIS:  Okay.

19                      DIRECT EXAMINATION

20   BY MR. MORRIS:

21   Q    Good morning, Mr. Seery.

22   A    (no response)

23   Q    Can you hear me?

24   A    Apologies.  I went on mute.  Can you hear me now?  I

25   apologize.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2133
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 201 of 1017 PageID 6914
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2132 of 2722

```
                        Seery - Direct                      59
```

1   Q   Yes.  Good morning.

2           MR. MORRIS:  So, let's begin, Your Honor, with just a

3   little bit of background of Mr. Seery and how he got involved

4   in the case.

5   BY MR. MORRIS:

6   Q   Mr. Seery, what's your current position with the Debtor?

7   A   I am the CEO, the CRO -- the chief restructuring officer

8   -- as well as an independent director on the Strand Advisors

9   board of directors.

10  Q   Okay.

11          MR. MORRIS:  Your Honor, I'm going to ask Mr. Seery

12  to describe a bit for his background.  For the record, you'll

13  find that Exhibits 6X, 6Y, and 6Z, on the Debtor's exhibit

14  list at Docket 1822, the resumes and *C.V.s* of the three

15  independent members of the board.  If Your Honor has any

16  question about their qualifications and their experience, that

17  evidence is already in the record.

18          THE COURT:  Okay.

19  BY MR. MORRIS:

20  Q   But Mr. Seery, without going into the detail of everything

21  that's on your *C.V.*, can you just describe for the Court

22  generally your professional background, starting, well, with

23  your time as a lawyer?

24  A   I've been involved in the restructuring, finance,

25  investing and managing of assets and banking-type assets for

Seery - Direct                         60

1   over 30 years.

2        I began in restructuring in real estate.  Became a lawyer,

3   and was a lawyer in private practice dealing with

4   restructuring and finance for approximately ten years, in

5   addition to time before that on the real estate side.

6        I joined Lehman Brothers on the business side in 1999,

7   where I immediately began working on the -- with a distress

8   team as a team member investing off the balance sheet, Lehman

9   Brothers assets in various types of distressed financing

10  investments.  Bonds, loans, equities.  In addition, then I

11  became the head of Lehman's loan business globally.  I ran

12  that business for the number of years.  Was one of the key

13  players in selling Lehman Brothers to Barclays in a very

14  difficult situation and structure.

15       After that, joined some of my partners, we formed a hedge

16  fund called RiverBirch Capital, about a billion and a half

17  dollar hedge fund in -- operating in -- globally, but mostly

18  U.S. stressed/distressed assets that we invested in.

19  Oftentimes, though, we would run from high-grade assets all

20  the way down to equities, different types of investors,

21  different types of investments.

22       Thereafter, I left -- was -- joined Guggenheim.  I left

23  Guggenheim, and shortly thereafter became a director at

24  Strand.

25  Q    Prior to acceptance of the positions that you described

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2135
Case 3:25-cv-02072-S Document 15-9 Filed 06/27/25 Page 203 of 1017 PageID 6916
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2134 of
2722

Seery - Direct                           61

1    earlier, were you at all familiar with Highland or Mr.

2    Dondero?

3    A    Yeah.  I was, yes.

4    Q    Can you just describe for the Court how you became

5    familiar with Highland and Mr. Dondero?

6    A    Highland was a customer of Lehman Brothers, and it was --

7    particularly in the loan business.  And the CLO businesses.

8    Highland was run by Mr. Dondero, and I knew of that business

9    through that --

10        (Interruption.)

11        MR. MORRIS:  Can somebody please put their device on

12   mute?

13        A VOICE:  That's Mr. Taylor.

14        THE COURT:  Mr. Taylor, you were off mute,

15   apparently, for a moment.  Make sure you're staying on mute.

16   Thank you.

17        MR. TAYLOR:  Yes.  Sorry, Your Honor.  I thought we

18   might have a hearsay objection.  I wasn't sure what the answer

19   was going to be, so I wanted to be prepared to object.

20        THE COURT:  All right.  Thank you.

21   BY MR. MORRIS:

22   Q    Did you know or meet Mr. Dondero in the course of what you

23   just described?

24   A    Yes, I did.  I believe we met once or twice over the

25   years.  There was a senior team member who handled the

```
                        Seery - Direct                    62
```

1  Highland relationship.   He was quite good, quite experienced,

2  and he handled most of the Highland relationship issues.   But

3  Highland, we came across a number of times, whether it be in

4  -- I came across a number of times, whether it be in specific

5  investments we had where they would be either a competing

6  party or holding a similar interest, whether they were a

7  customer purchasing loans or securities, whether they were a

8  potential CLO customer where we were structuring some assets

9  for them.

10 Q    Okay.  And who are the two other members of the

11 independent board at Strand?

12 A    John Dubel and Russel Nelms.

13 Q    And had you had any personal experience with either of

14 those gentleman prior to this case?

15 A    I knew of Mr. Nelms and his experience as a bankruptcy

16 judge in the Northern District of Texas, and I had worked on

17 one matter with Mr. Dubel, but very, very briefly, while he

18 was the CEO of FGIC, which is a large insurer in the financial

19 insurance space that he was responsible for reorganizing and

20 ultimately winding down.

21 Q    Okay.  How did you learn about this particular case?  How

22 did you learn about the opportunity or the possibility of

23 becoming an independent director?

24 A    Initially, I was contacted by some of the creditors and

25 asked whether I was interested, and I indicated that I was.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2137
Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/25    Page 205 of 1017    PageID 6918
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2136 of
2722

Seery - Direct                         63

1   Subsequently, I received a call from the Debtor's

2   representatives as well meeting the counsel as well as the

3   financial advisor as well as specific members of the Debtor's

4   senior management.

5   Q    Do you know how long in advance of the January 9th

6   settlement you were first contacted?

7   A    Probably four, four or five days at the most, but started

8   working immediately at that time because it was a pretty

9   complicated matter and the interview process would be quick

10  because of the hearing date that was coming up.

11  Q    Do you recall the names of any of the creditors who

12  reached out to you?

13  A    I spoke to counsel for UBS.  Certainly, Committee counsel.

14  I don't recall if I spoke to anybody from Jenner Block in the

15  initial interview.  And then I spoke to representatives from

16  your firm as well as Mr. Leventon and ultimately Mr.

17  Ellington.

18  Q    Did you do any due diligence before accepting the

19  appointment?

20  A    I did, yes.

21  Q    Can you describe for the Court the due diligence you did

22  before accepting your appointment as independent director?

23  A    Well, I got the petition, I read the petition, as well as

24  the first day, as well as the venue-changing motion.  In

25  addition, I went through the schedules.  Ultimately, I took a

Seery - Direct                          64

1  look at and examined the limited partnership agreement of the

2  Debtor, with particular focus on the indemnity provisions.  I

3  then sat down with the Committee to get their views as part of

4  the interview process, as well as the Debtor's counsel and

5  Debtor's representatives.

6  Q    Did you -- in the course of your diligence, did you come

7  to an understanding or did you form a view as to why an

8  independent board was being sought at that time?

9  A    Yes, I did.

10 Q    And what view or understanding did you come to?

11 A    There was extreme antipathy from the creditors, as

12 evidenced by the venue motion and the documents around that

13 venue motion.

14     In addition, in the first day order, or affidavit, you

15 could see the issues related to Redeemer and the length of

16 time that litigation has been gone on, going on.

17     The creditors became extremely concern with Mr. Dondero

18 having any control over the operations of the Debtor and

19 wanted to make sure that either he was removed from that or

20 that -- and someone else was brought in, or that the case was

21 somehow taken over by a trustee.

22 Q    Did you form any views as to the causes of the Debtor's

23 bankruptcy filing?

24 A    The initial cause was the entry or the soon-to-be-entered

25 order related to the arbitration with Redeemer, but it was

Seery - Direct                         65

1  pretty clear from looking at the first day that there was a

2  number of litigations.  The bulk of the creditor body was made

3  up of -- on the liquidated side was made up of litigation

4  creditors.  And then the other creditors, the Committee

5  members, other than Meta-e, were significant litigation

6  creditors.

7          MR. MORRIS:  Your Honor, I think Mr. Seery was sworn

8  in, but unless -- unless you -- if you think there's a need,

9  I'm happy to have you swear Mr. Seery in again just to make

10 sure his testimony is under oath.

11         THE WITNESS:  I was sworn in.

12         THE COURT:  Yes, I swore him in.

13         MR. MORRIS:  That's what I thought.  That's what I

14 thought.  Somebody had made the suggestion to me, so I was

15 just trying to make sure, because I didn't want any unsworn

16 testimony here today.

17         THE COURT:  We did.

18         MR. MORRIS:  Okay.

19         THE COURT:  We did.

20         MR. MORRIS:  Thank you.  Thank you.

21 BY MR. MORRIS:

22 Q   Ultimately, sir, just to move this along a little bit, do

23 you recall that an agreement was reached with the UCC and Mr.

24 Dondero and the Debtor concerning governance issues?

25 A    Yes, I do.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2140
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 208 of 1017 PageID 6921
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2139 of 2722

Seery - Direct                    66

1  Q    And did you accept your position as an independent

2  director at Strand as part of that corporate governance

3  settlement?

4  A    That, that was part of the appointment. We -- the

5  independent directors were brought in to take -- really, to

6  take control of the company as independent fiduciaries. And

7  the idea, I think, was that there was a Chapter 7 motion that

8  was about to be filed by the Committee, or at least that was

9  the representation, and the Debtor had a choice, they could

10  either accept the independent directors or they could face the

11  motion.

12      What actually happened was a little bit more complicated.

13  The creditors and the Debtor agreed on the selection of Mr.

14  Dubel and myself. And then because they couldn't agree on the

15  third member of the independent board, they left it to Mr.

16  Dubel and myself to actually come up with a process, interview

17  candidates, and make that selection, which we did, which

18  ultimately became Mr. Nelms.

19  Q    And did all of this take place during that four- or five-

20  day period prior to January 9th?

21  A    It did, yes.

22  Q    Okay. And let's talk about the makeup of the board.

23  You've identified the other individuals. How would you

24  characterize the skillset and the capability of the

25  individual?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2141
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 209 of 1017   PageID 6922
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2140 of
2722

Seery - Direct                    67

1   A    Well, on paper, I think it's a pretty uniquely-constructed

2   board for this type of asset management business with the

3   diversity of these types of assets and the diversity of issues

4   that we had.

5        So, former Judge Nelms, obviously skilled in bankruptcy

6   and the law around bankruptcy, but also very skilled in

7   mediation, conflict resolution, and in particular his

8   prepetition or maybe pre-judicial experience in litigation and

9   litigation involving fiduciary duties we thought could be

10  very, very important because of the myriad of interrelated

11  issues that we could see that might arise.

12       John Dubel is an extremely well-known and respected

13  restructuring professional.  He has been dealing these kinds

14  of assignments as an independent fiduciary for, gosh, as long

15  as I can recall, but at least going back 15 to 20 years.  He

16  had experience in accounting, but he's also been the leader of

17  these kinds of organizations going through restructuring in

18  many operational type roles, and so he was a perfect fit.

19       And my experience in both restructuring as well as asset

20  management and investment I think dovetailed nicely with the

21  experience that Mr. Nelms and Mr. Dubel have.

22  Q    Okay.  Let's talk for just a moment at a high level of the

23  agreement that was reached.  Do you remember that there were

24  several documents that embodied the terms of the agreement?

25  A    Yes, I do.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2142
Case 3:25-cv-02072-S Document 15-9 Filed 06/27/23 Filed 06/06/25 Page 210 of 1017 PageID 6923
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2141 of 2722

Seery - Direct                    68

1   Q    And do you remember one of them was an order that the

2   Court entered on January 9th?

3   A    Yes.

4          MR. MORRIS:  All right.  Your Honor, just for the

5   record, and we'll be looking at this, but that would be

6   document Exhibit 5Q as in queen, and that's at Docket No.

7   1822.

8   BY MR. MORRIS:

9   Q    Do you remember there was a separate term sheet, Mr.

10  Seery, that was also part of the agreement among the

11  constituents?

12  A    Yes.  There were -- I think there were a couple of term

13  sheets and stipulations, but I do recall that there was some

14  very specific term sheets with the terms.

15         MR. MORRIS:  All right.  And we'll look at that one

16  as well, Your Honor, but that can be found at Exhibit 5O as in

17  Oscar.

18  BY MR. MORRIS:

19  Q    And then, finally, do you recall that Mr. Dondero signed a

20  stipulation that was also part of the agreement?

21  A    Yes.  That was absolutely key to the agreement for the

22  creditors and perhaps the Court.  But it was really -- it

23  needed to be clear that he was signed on to this transaction.

24         MR. MORRIS:  Okay.  And we'll look at that as well.

25  That's Exhibit 7Q.  And remind me, we'll move that one into

Seery - Direct                              69

1   evidence.

2   BY MR. MORRIS:

3   Q    Did you and the other prospective independent directors

4   actually participate in the negotiation of any aspect of this

5   agreement that you've generally described?

6   A    Absolutely.  Although we hadn't been appointed yet, these

7   agreements were going to be the structure with which -- or

8   under which we would come in as independent fiduciaries.  They

9   would govern a lot of our relationships.  They would provide

10  for the protections that we required and that I required.  So

11  they were exceedingly important to me.

12  Q    Can you describe for the Court at a general level your

13  understanding of the overall structure of the corporate

14  governance settlement?

15  A    From a very high level, the settlement was -- Highland

16  Capital Partners is a limited partnership.  It's managed by

17  its general partner, Strand Advisors.  Although Strand is the

18  GP, its effective interest in Highland is minimal, about .25

19  percent of the effective partnership interest.  But it is the

20  general partner.  So it does govern the -- the partnership.

21       We came in as an independent board that would oversee and

22  control Strand Advisors and thereby, through the general

23  partner position, oversee and control HCMLP, the Debtor.

24       In addition, the Committee then overlaid what we could do

25  with respect to how we operated the business in the ordinary

1    course in Chapter 11 with a specific set of protocols that

2    governed certain transactions that we would have to get

3    permission from either the Committee or the Court to engage

4    in.

5        And in addition, Mr. Dondero, notwithstanding the

6    insertion of the independent board at Strand, also had a set

7    of restrictions around him, because, of course, not only was

8    he the former control entity at Highland and Strand, he also

9    had a hundred percent of the ownership -- indirectly, of

10   course -- of Strand and could have removed the board.  So

11   there were restrictions around what he could do with respect

12   to the board.  There were also restrictions around what he

13   could do through various entities to terminate contracts and

14   --

15   Q   All right.  We'll look at some of those in detail.  Did,

16   to the best of your recollection, did Mr. Dondero give up his

17   position as president or CEO of the Debtor?

18   A   He did, yes.

19   Q   And did he nevertheless stay on as an employee of the

20   Debtor and retain a position as portfolio manager?

21   A   He did.  At the last second, I believe it was the night

22   before, when we were actually in Dallas preparing for the

23   hearing, but Mr. Ellington raised the concern that if Dondero

24   was removed from not only the presidency but also the

25   portfolio management position, potentially there would be some

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2145
Case 3:25-cv-02072-S   Document 15-9   Filed 06/27/25   Page 213 of 1017   PageID 6926
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2144 of 2722

Seery - Direct                        71

1    agreements that might or might not be subject to Court

2    approval that could be terminated and value would be lost.  So

3    this was a very last-second provision.  Obviously, the -- as

4    new estate fiduciaries, we didn't want value to be lost

5    instantly for key man or some other reason.  And the Committee

6    ultimately, or I guess you'd say reluctantly, agreed to that

7    because we just didn't have time to look at any of -- any such

8    agreements.

9              MR. MORRIS:  All right.  Let's -- can we put up on

10   the screen, Ms. Canty, Debtor's Exhibit 5Q?

11       And this is in evidence, Your Honor.  This is the January

12   9th order.

13       And can we please go to Paragraph 8?

14   BY MR. MORRIS:

15   Q   Mr. Seery, you had mentioned just a few minutes ago that

16   there were certain restrictions that were placed on Mr.

17   Dondero.  Does Paragraph 8, to the best of your recollection,

18   provide for the substance of at least some of those

19   restrictions?

20   A   It does, yes.

21   Q   And can you just describe for the Court your understanding

22   of the restrictions that were imposed on Mr. Dondero pursuant

23   to Paragraph 8?

24   A   Well, as I recall, when Mr. Ellington came in with the

25   last-minute request, the Committee was extremely upset about

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2146
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 214 of 1017   PageID 6927
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2145 of 2722

1  it.  We talked about it.  Obviously, we, as an independent

2  board that was going to come in, didn't know the underlying

3  contracts and couldn't really render any judgment as to

4  whether there would be value lost.  So, the Committee agreed,

5  but they wanted to make sure that Mr. Dondero still reported

6  to -- directly to the board, and if the board asked Mr.

7  Dondero to leave, he would do so.

8  Q   Okay.  Just looking at this paragraph, is it your

9  understanding that the scope and responsibilities of Mr.

10 Dondero would be determined by the board?

11 A   Yes.

12 Q   And was it your understanding that Mr. Dondero would serve

13 without compensation?

14 A   Yes.

15         MR. DRAPER:  Objection.  Leading, Your Honor.

16         THE COURT:  Overruled.

17 BY MR. MORRIS:

18 Q   Was it your understanding that Mr. Dondero's role would be

19 subject to the direct supervision, direction, and authority of

20 the board?

21 A   That's, you know, that's what the order says and that's

22 what the agreement was.  In practice, that was really going to

23 have to evolve because we were coming in very cold and

24 obviously he'd been there for --

25         (Interruption.)

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2147
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 215 of 1017   PageID 6928
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2146 of
2722

Seery - Direct                          73

1        THE COURT:  All right.  Someone needs to put their

2   phone on mute.  I don't know who it is.

3   BY MR. MORRIS:

4   Q    Was it also part of the agreement that Mr. Dondero would

5   (garbled) upon the board's request?

6   A    I think I got you, but yes, that's contained in this

7   paragraph, and Mr. Dondero agreed to that.

8        THE COURT:  All right.  Whoever LC is, your phone

9   needs to be put on mute.  Okay.  Please be sensitive to

10  keeping your device on mute except for Mr. Morris and Mr.

11  Seery.

12       All right.  Go ahead.

13  BY MR. MORRIS:

14  Q    Do you recall, Mr. Seery, whether there were any

15  restrictions placed on Mr. Dondero's ability to terminate

16  agreements with the Debtor?

17  A    Yes.  That was a very specific provision as well.

18  Q    Can we take a look at Paragraph 9 below?  Is that the

19  provision that you're referring to?

20  A    That's the provision in the order.  I believe there were

21  other agreements -- certainly, discussion around it -- because

22  it was an important provision because it had been borne out of

23  some experience that Acis and Mr. Terry had had in particular.

24  So it was supposed to be broad and prevent both direct and

25  indirect termination of agreements.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2148
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 216 of 1017 PageID 6929
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2147 of 2722

Seery - Direct                          74

1   Q    Okay.  And do you know, do you recall that the definition

2   of related entity is contained within the term sheet that you

3   referred to earlier?

4   A    It's a pretty extensive -- I recall the definition not

5   specifically, but it's a pretty extensive definition.  It

6   includes any of the entities that he owns, that Mr. Dondero

7   owns, that Mr. Dondero controls, that Mr. Dondero manages,

8   that Mr. Dondero owns indirectly, that Mr. Dondero manages

9   indirectly, and it really covers a wide swath of those

10  entities in which he has interests and control.

11          MR. MORRIS:  All right.  Let's see if we could just

12  look at the definition specifically at Exhibit 5O as in Oscar.

13  And if we could just scroll down to the next page.

14      Now, this was -- this is part of the term sheet that was

15  filed at Docket 354.

16  BY MR. MORRIS:

17  Q    At Definition I(d), is that the definition of related

18  entity that you were referring to?

19  A    That's correct.

20  Q    Okay.  In addition to what you've described, I think you

21  also mentioned that there was a separate stipulation that Mr.

22  Dondero entered into as part of the corporate governance

23  settlement.  Do I have that right?

24  A    That's my recollection, yes.  And I believe he signed it,

25  and that was a key gating issue to the hearing that we had on

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2149
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 217 of 1017 PageID 6930
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2148 of
2722

Seery - Direct                          75

1   January 9th.

2   Q   And what do you recall about that document as being a key

3   gating issue?

4   A   The key gating issue that I recall is that it had to be

5   signed.  And I don't believe it was signed until that very

6   morning.

7           MR. MORRIS:  All right.  Can we call up Exhibit 7Q as

8   in queen?

9   BY MR. MORRIS:

10  Q   All right.  Is this the stipulation that you were

11  referring to?  We can scroll down to any portion you want.

12  A   I believe that is, yes.

13          MR. MORRIS:  Okay.  Can we just scroll down to see

14  Mr. Dondero's signature?  Yeah.  That's -- okay.

15      So, that's dated January 9th.  This was filed at Docket

16  338.  It's on the Debtor's exhibit list as Exhibit 7Q.  And

17  the Debtor would respectfully move Exhibit 7Q into evidence.

18          THE COURT:  Any objection?  All right.  7Q is

19  admitted.

20      (Debtor's Exhibit 7Q is received into evidence.)

21          MR. MORRIS:  Okay.  And if we could just scroll up a

22  page or two to the four bullet points.  Yeah, right there.  A

23  little more.

24  BY MR. MORRIS:

25  Q   Okay.  So, do you see Paragraph 10 contains the

Seery - Direct                          76

1    stipulation?

2    A    Yes.

3    Q    And as you recall, Mr. Seery, in the events leading up to

4    the entry of the order approving the settlement, was this one

5    of the documents that was being negotiated among -- among the

6    parties?

7    A    Yes, it was.

8    Q    Okay.  You mentioned that there were certain provisions of

9    the January 9th order that were important to you and the other

10   independent directors.  Do I have that right?

11   A    Yes.

12        MR. MORRIS:  Let's see if we can back to Exhibit 5Q,

13   please, Paragraph 4.

14   BY MR. MORRIS:

15   Q    Okay.  Paragraph 4, can you tell me what Paragraph -- what

16   Paragraph 4 is and why it was important to you?

17   A    Well, there really were four key, I guess I'll use the

18   term gating items again, for my involvement, and ultimately in

19   discussions with Mr. Nelms and Mr. Dondero -- Mr. Dubel, their

20   involvement in the matter.

21        Because of the litigious nature of the Highland operations

22   and the expectations we had for more litigation after taking a

23   look at the Acis case, we wanted to make sure that, as

24   independents coming into a situation with really no stake in

25   the particular outcome, other than trying to achieve a

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2151
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 219 of 1017   PageID 6932
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2150 of 2722

Seery - Direct                          77

1   successful reorganization, that we were protected.  So, number

2   one, I looked at the limited partnership agreement.  I wanted

3   to make sure that the LPA contained broad and at least

4   standard indemnification provisions and that they would apply

5   to the board.

6        Number two, because -- that then requires you to look at

7   the indemnification provisions at Strand, because you're a

8   director of Strand, the GP.  So then we looked at those.  I

9   took a close examination of those.  They looked okay, except

10  Strand didn't have any assets other than its equity interest

11  in Highland, and if that equity interest turned out to be

12  zero, that indemnity wouldn't be very valuable.

13       So I wanted to make sure that Highland, the Debtor,

14  guaranteed the indemnity (garbled) on a postpetition basis, so

15  that if there were a failure of D&O, which I'll get to in a

16  second, or it wasn't enough, that we would have a senior claim

17  in the case, an admin claim in the case.

18       I then, of course, wanted to make sure that we had D&O

19  insurance.  This was very difficult to get, because, frankly,

20  there's a Dondero exclusion in some of the markets, we've been

21  told by our insurance brokers, and so getting the right policy

22  that would cover the independent board was difficult.  We did

23  get that.

24       And then ultimately there'll be another provision in the

25  agreement here -- I don't see it off the top of my head -- but

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2152
Case 3:25-cv-02072-S Document 15-9 Filed 06/27/25 Page 220 of 1017 PageID 6933
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2151 of 2722

Seery - Direct                                    78

1  a gatekeeper provision.  And that provision --

2  Q   Hold on one second, Mr. Seery, because we'd want to

3  scroll.  So Paragraph 4 and Paragraph 5, were those, were

4  those provisions put in there at the insistence of the

5  prospective independent directors?

6  A   Yes.  And remember, so the Paragraph 4, as I said, is the

7  guarantee of Strand's obligations for its indemnity.  Again,

8  Strand didn't have any money, so the Debtor had to be the one

9  purchasing the D&O for the directors and for Strand.  So those

10  are the two provisions that really worked to address my

11  concerns about the indemnities and then the D&O.

12        MR. MORRIS:  Okay.  Can we go to Paragraph 10,

13  please?  There you go.

14  BY MR. MORRIS:

15  Q   Is this the other provision that you were referring to?

16  A   This is.  It's come to be known as the gatekeeper

17  provision, but it's a provision that I actually got from other

18  cases.  Again, another very litigious case that I thought it

19  was appropriate to bring in to this case.

20     And the concept here is that when you're dealing with

21  parties that seem to be willing to engage in decade-long

22  litigation in multiple forums, not only domestically but even

23  throughout the world, it seemed important and prudent for me

24  and a requirement that I set out that somebody would have to

25  come to this Court, the court with jurisdiction over these

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2153
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 221 of 1017 PageID 6934
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2152 of 2722

Seery - Direct                          79

1  matters, to determine whether there was a colorable claim.

2  And that colorable claim would have to show gross negligence

3  and willful misconduct, *i.e.*, something that would not

4  otherwise be indemnified.

5      So it basically sets an exculpation standard for

6  negligence.  It exculpates the directors from negligence.  And

7  if somebody wants to bring a cause against the directors, they

8  have to come to this Court first and get a finding that

9  there's a colorable claim for gross negligence or willful

10  misconduct.

11  Q   Would you have accepted the engagement as an independent

12  director without the Paragraphs 4, 5, and 10 that we just

13  looked at?

14  A   No.  These were very specific requests.  The language here

15  has been 'smithed, to be sure, but I provided the original

16  language for 10 and insisted on the guaranty provision above

17  to assure that the indemnity would have some support.

18  Q   And ultimately, did the Committee and the Debtor agree to

19  provide all of the protection afforded by Paragraphs 4, 5, and

20  10?

21  A   Yes.

22  Q   Okay.

23      MR. MORRIS:  Your Honor, we're going to move on now

24  to good faith, Section 1129(e)(3), just to give you a little

25  bit of a roadmap of where we're going.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2154
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 222 of 1017 PageID 6935
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2153 of 2722

Seery - Direct                    80

1   BY MR. MORRIS:

2   Q   Let's talk about the process that led to the plan that the

3   Debtor is asking the Court to confirm today.  Real basic stuff

4   at the beginning.  Can you tell me your understanding of the

5   makeup of the UCC, of the Creditors' Committee?

6   A    The Creditors' Committee in this case has four members.

7   It's UBS, the Redeemer Committee, which are former holders of

8   interests in a fund called the Crusader Fund, which was a

9   Highland fund, who had redeemed and then had a dispute with

10  Highland.

11      And the next creditor is Mr. Terry and Acis.  We generally

12  group them as one, but the creditor is Acis.

13      And the fourth creditor is an entity called Meta-e, and

14  they provide litigation support and technical support and

15  discovery support in litigations for the Debtor, including in

16  this case now.

17  Q   All right.  Just focusing really on the early period, the

18  first few months, can you describe the early stages of the

19  negotiations with the UCC as best as you can recall?

20  A    Well, I think the early stage of the case wasn't directly

21  a negotiation; it was really trying to understand as best we

22  could the myriad of assets that we had here, the various

23  businesses that the Debtor either owned, controlled, or

24  managed, as well as the claims.

25      We went through a process of trying to understand each of

Seery - Direct                           81

1   the claims that the Debtor -- or against the Debtor that were

2   represented by the Committee, as well as some other claims

3   that were not on the Committee.

4   Q    Was the Debtor -- I mean, was the Committee initially

5   pushing the independent board to go to a monetization plan, an

6   asset monetization plan?

7   A    Very quickly and early on, the Debtor -- the Committee

8   took a pretty aggressive approach with the Debtor and the

9   independent board.  I think the Committee's perspective, as

10  articulated to me, and where -- at least how we took it, was

11  that they'd been litigating for years and they sort of knew

12  the situation and the value of their claims, that the Debtor

13  was insolvent, in their view, and that we should be operating

14  the estate in essence for the benefit of the creditors.

15  Q    And what was the board's view in reaction to that?

16  A    We disputed it.  And the reason we disputed it was very

17  straightforward.  Save for the Redeemer claim, which at least

18  had an arbitration award, Acis and Mr. Terry didn't have any

19  specific awards, notwithstanding the results of the Acis

20  bankruptcy, and UBS, while it had a judgment, that judgment

21  was not against the Debtor.

22       So our view was, until we have our hands around these

23  claims and we determine what the validity is in our estate,

24  that we would treat the Debtor as if it were solvent.  We also

25  wanted to assess the value of the assets.  So, looking at the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2156
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 224 of 1017   PageID 6937
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2155 of
2722

Seery - Direct                         82

1 | assets not just from a book value but what they might be
2 | really worth in the market.
3 | Q   And did the board in the early portion of the case
4 | consider all strategic alternatives?
5 | A   I don't know if we considered every strategic alternative,
6 | but we certainly considered a lot of alternatives.
7 | Q   Can you describe for the Court the alternatives that were
8 | considered by the board before settling on the asset
9 | monetization plan?
10 | A   Well, early on, you know, we looked at each of the -- what
11 | we would think of the large category types of ways to resolve
12 | a case.  Number one, could we go through a very traditional
13 | reorganization with either stretching out claims to creditors
14 | after settlement or converting some of those to equity,
15 | getting new equity infusions?  We considered those
16 | alternatives.
17 |     Number two, we considered whether we should simply sell
18 | the assets.  That's one of the things that the Committee was
19 | pushing for.  They could be sold to third parties.  They could
20 | be sold individually.  Mr. Dondero potentially could buy some
21 | of the assets.  That'd be a reasonable reorganization in this
22 | case.
23 |     We also considered whether that, you know, we would just
24 | do a straight liquidation.  Is there some value to doing --
25 | converting the case to a 7 and doing a straight liquidation?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2157
Case 3:25-cv-02072-S Document 15-9 Filed 06/13/25 Page 225 of 1017 PageID 6938
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2156 of 2722

Seery - Direct                    83

1    We also considered a grand bargain plan, and this was

2    something that I worked on quite a bit.  The phrase is mine,

3    although no pride of authorship, certainly, since it didn't

4    work out.  But that perhaps we could come to an agreement with

5    the major creditors and with Mr. Dondero and then shift some

6    of the expenses in the case out further to litigate some of

7    the other claims while reorganizing around the base business.

8        And then, finally, we considered the asset monetization

9    plan, and ultimately that evolved into what we have today.

10   Q    Were there guiding principles or factors that the board

11   was focused on as it assessed these different options?

12   A    Well, the number one guiding principle was overall

13   fairness and equitable treatment of the various stakeholders.

14   So, again, at that point, we didn't know exactly what, if

15   anything, we would owe to claimants like UBS or HarbourVest or

16   even Mr. Terry and Acis.  We had a good sense of where we

17   would end up with Redeemer, I think, but we still had some

18   options and wanted to negotiate the issues related to

19   potential appeal rights that we had.  So I think that was the

20   number one overall concern.

21       But that did evolve over time.  Costs of the case were

22   exceptionally high.  And the reason they're so high is that

23   Highland was run for a long time, at least from what we can

24   tell, at an operating deficit.  Typically, what it would do is

25   run at a deficit and then sell assets to cover the shortfall,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2158
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/06/25   Page 226 of 1017   PageID 6939
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2157 of
2722

Seery - Direct                              84

1   and it would defer a whole bunch of employee -- potential

2   employee compensation.  And because of the way the environment

3   was going, particularly in the first half of the year, it

4   didn't look to us like there was going to be any great asset

5   increase that would somehow save us from the hole that was

6   being dug, the considerable amount of expenses to run the

7   case.

8   Q   Did changing the culture of litigation factor into the

9   path that the board considered?

10  A   Well, we certainly looked at the way the company had run

11  and why it got to where it is in terms of litigating.  And not

12  just litigating valid claims, but litigating any claim to the

13  *nth* degree.  And stories are legion, I won't talk about them,

14  but of Highland taking outrageous positions and then pursuing

15  them, hoping that the other side caves.

16      We determined that this estate couldn't bear that kind of

17  expense, and it wasn't fair and equitable to do that anyway.

18  So we wanted to attack the claims that we could -- and I say

19  attack; try to resolve them as swiftly as we could --

20  protecting the Debtor's interests but trying to find an

21  equitable resolution.

22      I'm not averse to litigating.  And I think when there are

23  claims that are legitimate, the Debtor should pursue them.

24  There's always -- a good settlement is always better than a

25  bad litigation.  But if there (indecipherable) to resolve

Seery - Direct                         85

1    them, we should -- we should pursue those.  And if we have

2    defenses, we should pursue those, and not just be held up

3    because someone else is willing to, you know, take a more

4    difficult position than we are.

5        But in this case, it really did cry out for some sort of

6    resolution on many of these cases because they were far beyond

7    -- far beyond the facts and far beyond the dollars.  There was

8    personal antipathy involved in virtually every one of the

9    unlitigated or unliquidated Committee cases.

10   Q    Did the board, as it was assessing the various strategic

11   alternatives, consider maximization of the value?

12   A    Always number one was, can we maximize value?  But that

13   has to be done within the context of the risk you're taking

14   and the time it takes.  So, not all wine ages well in a cave

15   and not all investments get to be more valuable over time.  We

16   wanted to look at each individual asset that the Debtor had,

17   each claim that the Debtor had, each defense that the Debtor

18   had, and consider the time and the costs and then try to find

19   the best way to maximize value with those multiple

20   considerations.

21   Q    How about the role and support of the UCC, how did that

22   factor into the decision-making, the Debtor's decision-making

23   as to what plan to pursue?

24   A    Well, you know, the decision-making with the UCC was

25   cumbersome and oftentimes difficult.  Sometimes our relations

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2160
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 228 of 1017   PageID 6941
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2159 of 2722

Seery - Direct                              86

1   were very contentious, and sometimes they continue to be.  But

2   the Committee had significant oversight because of the

3   protocols that had been agreed to.  Some of the disputes we

4   had with the Committee found their way into the court.  Those

5   time and that cost, some of which we won, some of which we

6   lost, but those factored into our analysis.

7        But eventually we knew that we were going to need to get,

8   you know, some significant portion of the Committee to agree,

9   because, at minimum, Meta-e had a liquidated claim, and

10  Redeemer was very close to fully liquidated, so we were going

11  to need support from the Committee with whatever we tried to

12  push through.  And so that's how we negotiated with the

13  Committee from that perspective.

14  Q   Is it fair to say that the Debtor and the Committee's

15  interests because aligned upon approval of the disclosure

16  statement back at the end of November?

17  A   I don't think they became perfectly aligned, because we

18  still have, you know, some disputes around, you know,

19  implementation and things like the employee releases, which

20  were very important to me.  But I think we're largely aligned

21  and that the Committee is supportive, as Mr. Clemente said at

22  the start of this hearing, of the plan.  We negotiated at

23  arm's length with them about most of the provisions.  I would

24  say virtually everything was a relatively significant

25  negotiation, or at least there was a good faith exchange of

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 2161
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 229 of 1017   PageID 6942
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 2160 of
2722

Seery - Direct                          87

1   views on each side and assessment of legal and financial

2   risks.  And I think at this point they're largely in support

3   of the plan.

4   Q    All right.  Let's -- you mentioned the grand bargain, and

5   I just want to spend a few minutes talking about that, how

6   that evolved.  Focusing your attention in the kind of late

7   spring/early summer, can you tell me what efforts you and the

8   board made in trying to achieve a grand bargain in that early

9   part of the case?

10  A    Well, we had -- at that point, we had reached agreement,

11  at least in principle, with Redeemer.  And the thought was --

12  my thought was that we could construct a plan, understanding

13  what the cash flows looked like and what we thought the base

14  value of the asset looked like -- and those are not just the

15  assets that are tangible assets, but the notes that are

16  collectible by the Debtor as well -- and then engage with UBS

17  in particular.  Redeemer.  To some degree, Mr. Terry.  We had

18  not yet reached any agreement with him.  But UBS, we thought

19  of as a slightly -- I don't mean this to be disparaging -- but

20  a slightly more commercial player than Acis because of the

21  history that Acis had to deal with and endure.

22       And we were hoping that we could get some sort of

23  coalescence around an agreed distribution that would require

24  those creditors to take a lot less than they might have

25  otherwise agreed, Mr. Dondero to put in more than he otherwise

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2162
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 230 of 1017 PageID 6943
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2161 of 2722

Seery - Direct                    88

1  thought he could put in or would be willing to put in, and

2  then we would get out to Acis and the other creditors with a

3  plan.

4      And so I built, with the team at DSI, a detailed model on

5  how the distributions could work and what the potential timing

6  could be, trying to, each time, move in a multidimensional way

7  with UBS, Redeemer, Mr. Dondero, and to some degree Acis,

8  around the respective issues for their claims.

9      Again, UBS and Acis had not been resolved and weren't

10 close, but the thought was if we could get dollar agreements

11 for distribution, perhaps we could then figure out how to

12 construct settlements of their claims.

13 Q   During this time period, did you work directly with Mr.

14 Dondero in the formulation of a potential grand bargain?

15 A   I did, yes.

16 Q   And the model that you described, did that go through a

17 number of iterations?

18 A   It went through multiple iterations.  I don't believe I

19 ever shared the model with anybody.  One of the reasons for

20 that is I didn't want -- I felt I had -- if I was going to

21 share it with Mr. Dondero, for example, I'd have to share it

22 with UBS and I'd have to share it with Redeemer.  And I wanted

23 it to be -- I wanted it to be a working model with the team at

24 DSI.  In particular, we would make, you know, adjustments on

25 an almost-daily basis.

Seery - Direct                         89

1      Mr. Dondero had -- remember, he was still portfolio

2    manager at that time.  He also had a related-party interest,

3    as people have seen from some of the litigation around the

4    sales of securities.  He had access and was receiving emails

5    from the team as well as from the finance team.  So he had

6    access to the information at that point and had a view around

7    the value.  And this was more trying to adjust what those

8    distributions would look like depending on the amounts that he

9    would be willing to contribute.

10   Q    Moving on in time, did there come a time when the Debtor

11   participated in a mediation with certain of the major

12   constituents in the case?

13   A    Yes.  That was towards the end of the summer.

14   Q    And during that mediation, did the concept of a grand

15   bargain, was that put on the table?  Without discussing any

16   particulars about it, just as a matter of process, was the

17   grand bargain subject to the mediation discussions?

18   A    Well, the mediation had multiple components, so the answer

19   to the question in short is yes, but I'll go longer because I

20   tend to.  The grand bargain plan stayed in place, and that was

21   going to be an overall settlement.  The mediation was

22   initially, I think, as a main course, focused on Acis, UBS,

23   and then the third piece being the grand bargain.  And if you

24   could settle one of those claims, perhaps -- obviously, if you

25   could settle both of them, you could get to then focusing on

APP. 2159

006149

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2164
Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/25    Page 232 of 1017    PageID 6945
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2163 of 2722

                            Seery - Direct                    90

1   the grand bargain.

2       But even before we got to mediation, the idea of the

3   monetization plan had also been put forth.  Notwithstanding

4   that it wasn't my idea, I actually thought that it was a good

5   idea, ultimately.  Didn't initially.  And the reason for that

6   is that it set a marker for what a base expectation could be

7   for the creditors and just for Mr. Dondero.  And knowing that

8   that was out there, at least with them, that could hopefully

9   be a catalyst in the mediation for folks to say, let's see if

10  we can get our claims done and get a grand bargain done,

11  because if we don't we have this Debtor monetization plan.

12  And by that -- at that point, I don't think we had much

13  agreement with the Committee on anything, and certainly with

14  Mr. Dondero, on -- on a monetization plan.

15  Q   All right.  And let's just bring it forward from the fall,

16  post-mediation, to the present.  Has -- has -- have you and

17  the board continued discussing with Mr. Dondero the

18  possibility of a grand bargain?

19  A   Well, it's shifted.  So, the grand bargain discussions

20  really -- you had multiple phases.  So, you had pre-mediation.

21  There was the grand bargain discussions that I just described

22  previously that also involved UBS and Redeemer, and to some

23  degree Acis and Mr. Terry.  Then you have the mediation, which

24  is much more focused on the claims and whether they can fit

25  into the grand bargain with Mr. Dondero.

Seery - Direct                               91

1       And the way that was conducted was a little bit more

2   separated, meaning the parties would talk to the mediator, the

3   mediator would then go and talk to other parties and try to

4   work a settlement on each of those components.

5       Subsequent to the mediation where we reached the agreement

6   with Acis and Mr. Terry, and we ultimately in that timeframe

7   banged out the final terms of our agreement with Redeemer, we

8   engaged with Mr. Dondero around -- I wouldn't call it the

9   grand bargain, but a different plan.  By that point, the

10  monetization plan had started to gain some traction with the

11  creditor group, and Mr. Dondero and his counsel, I believe,

12  focused on the potential of what was referred to as a pot

13  plan.  And while it has the -- it could have the ability of

14  being a resolution plan, it wasn't the grand bargain plan that

15  I had initially envisioned.  And pot plan was really a

16  misnomer, because it didn't have a whole pot, so -- so it's a

17  little bit of a hybrid.

18  Q   Did the board spend time during its meetings discussing

19  various pot plan proposals that had been put forth by Mr.

20  Dondero?

21  A   Oh, absolutely.  And not only the board.  I mean, we did

22  our own work as an independent board and then brought in our

23  professional advisors, both your firm and the DSI folks, to go

24  through analytics around the pot plan, and even before that,

25  the other plan alternatives, but we had direct discussions

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2166
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 234 of 1017   PageID 6947
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2165 of 2722

Seery - Direct                                92

1   with Mr. Dondero and his counsel.

2   Q   And in the last couple of months, has the board listened

3   to presentations that were made by Mr. Dondero and his counsel

4   concerning various forms of the pot plan?

5   A   Yes.  At least two or three.

6   Q   And during this time, has the board and the Debtor

7   communicated with the Committee concerning different

8   iterations of the proposed pot plan?

9   A   Yes.  We've had continual discussions with the Committee

10  regarding the various iterations of the potential grand

11  bargain all the way through the pot plan.

12  Q   And during this process, did the Debtor provide Mr.

13  Dondero and his counsel with certain financial information

14  that had been requested?

15  A   Yes.  As I said, up 'til the point where he resigned and

16  was then ultimately, at the end of the year, removed from the

17  office, he had access to financial information related to the

18  Debtor and even got the information from the financial group.

19  Subsequent to that, we've provided him with requests -- with

20  financial information that was requested by his counsel.

21  Q   Okay.  Were your efforts at the grand bargain or the

22  pursuit of the pot plan successful?

23  A   No, they were not.

24  Q   Do you have an understanding as to -- just, again, without

25  going into -- into details about any particular proposal, do

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2167
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 235 of 1017   PageID 6948
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2166 of
2722

Seery - Direct                                    93

1   you have an understanding as to what the barrier was to

2   success?

3   A    The grand bargain, we just never got the traction that we

4   needed to get that going and the sides were just far -- too

5   far apart.  And the pot plan, similarly.  Our discussions with

6   Mr. Dondero and the Committee, they're -- they're very far

7   apart.

8   Q    And is it fair to say that the Committee's lack of support

9   in either the grand bargain or the pot plan is the principal

10  cause as to why we're not talking about that today?

11  A    Well, it's -- it -- right now, we've got the plan that's

12  on file, the monetization plan.  The monetization plan has

13  gone out for creditor vote and has received support.  It

14  distributes, we think, equitably, as well as a significant

15  amount of distributions to unsecured creditors.  And there

16  really isn't an alternative that we see, based upon the

17  numbers I've seen, that competes with it or has any traction

18  with the largest creditors.

19  Q    All right.  So, now we've talked about various proposals

20  or alternatives that were considered by the board, including

21  the grand bargain and the pot plan.  Let's spend some time

22  talking about the plan that is before the Court today and how

23  we got here.  And I'd like to take you really back to the

24  beginning, if I may.

25       Tell us, tell the Court just what the board was doing in

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2168
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 236 of 1017   PageID 6949
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2167 of 2722

Seery - Direct                          94

1    the early months after getting appointed, because I think

2    context is important here.  What were you all doing the first

3    few months of the case?

4    A    Well, the first few months, we really were drinking from

5    the proverbial fire hose, trying to get an understanding of

6    the business, how it had been managed previously, what the

7    issues related to the different parts of the business were.

8    And then an understanding of each of the employees that were

9    working under us, what their roles were, how they performed

10   them, who sat where with respect to each of the assets, what

11   the contracts looked like, whether they be shared service or

12   management agreements.  And then we started looking at the

13   individual assets in terms of value.

14       At the same time, we were trying to get up to speed on the

15   complex nature of the claims that were in the case.  The

16   liquidated claims were relatively easy, but there had been a

17   significant amount of transfers in and out of the Debtor, and

18   then there's a myriad of relationships involving related

19   entities that we had to understand, both with respect to the

20   claims as well as with respect to the assets.

21       And so that -- those were the main things we were doing

22   for those first few months in the case.

23   Q    Just a couple months into the case, the COVID pandemic

24   reared its head.  Do you recall that?

25   A    Yes.  We had been in Dallas every day working up 'til the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2169
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 237 of 1017   PageID 6950
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2168 of 2722

Seery - Direct                              95

1  time of the COVID and some of the shutdown orders,

2  particularly in the Northeast, and so that changed the dynamic

3  of how we could function every day.

4      Notwithstanding that, we -- we were able to manage from

5  afar, and ultimately, when there were some cases in the office

6  of COVID, we -- on the Highland side, not the related entity

7  side, but on the Highland side -- we determined that the staff

8  and the team should work from home, which they were able to do

9  quite well.

10 Q   Okay.  In those early months, do you recall that there was

11 a substantial erosion of value, at least as of the time you

12 were appointed in those first three or four months?

13 A   There was.  And I think we've heard some -- some noise

14 about what that value was and the drop in the asset value as

15 opposed to net value.  But the asset value did, did drop

16 significantly.

17 Q   Can you describe for the Court your recollection as to the

18 causes of the drop in the value that you just descried?

19 A   Yes.  The number one drop was a reservation that the board

20 took for a receivable from an entity called Hunter Mountain.

21 The quick version of this is that Hunter Mountain owns

22 Highland.  As I mentioned, while Strand is the GP, it only has

23 a quarter-percent interest in Highland.  The vast majority of

24 the interests are owned by an entity called the Hunter

25 Mountain Investment Trust in a very complicated, tax-driven

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2170
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 238 of 1017   PageID 6951
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2169 of 2722

Seery - Direct                                96

1  structure.

2      Dondero and Okada transferred their interests in Highland

3  at a high valuation to Hunter Mountain.  Hunter Mountain then

4  didn't have the money, so it, in essence, borrowed the money

5  from the Debtor in a note to pay for those interests.  There's

6  a circular running of the cash, but we were not sure where, if

7  any, where any assets are, if they would be sufficient.  So we

8  took a reservation of $58 million for that note.

9      The second biggest piece of the reduction in value was the

10  equity that was lost in the Select Equity account.  This is a

11  Debtor trading account that was managed by Mr. Dondero.  $54

12  million was lost in that account.  Basically, it was really

13  highly margined, very high leverage in that account when the

14  market volatility came in.  As it grew through January,

15  February, March, more and more margin calls.  Ultimately,

16  Jefferies, which had Safe Harbor protections -- technically,

17  the account was not a Debtor account, but they would have had

18  it anyway -- they seized that account.  $54 million in equity

19  was lost in that account.

20      The next highest amount is about $35 million, but it's

21  higher now.  That's just the bankruptcy costs, where we have

22  spent cash and Debtor assets in the case.  It was about $36 to

23  $40 million through the end of the year.  That's now higher.

24      About $30 million was lost in paying back Jefferies on the

25  asset side of the ledger in the Highland internal equity

1   account.  This was similar to the equity -- the Select Equity

2   account, also managed by Mr. Dondero.  Extremely highly-

3   levered coming into the market volatility of the first

4   quarter, which was exacerbated, obviously, by the COVID.  That

5   was about $30 million that was repaid in margin loan in that

6   account.

7       In addition, $25 million of equity was lost in that

8   account while Mr. Dondero was managing it.  I took over

9   effectively managing it in mid-March and worked with Jefferies

10  to keep them from seizing the account.  We've since gotten a

11  bunch of value coming back from that account, but that was the

12  amount that was lost.

13      About $10 million was lost in the Carey Limousine loan

14  transaction.  That is a -- an interesting little company.  Has

15  done a nice job -- management did a very good job coming into

16  the year, and it actually had real value, notwithstanding the

17  changeover to Uber in people's preferences.  But with the

18  COVID, it really relied on events, airport travel, executive

19  travel, and that really took a bite out of it, although, you

20  know, we're hoping to be able to restructure, we have

21  restructured it to some degree, and we're hoping that there

22  could be value there.

23      And then about $7 million was lost in equity in an entity

24  called NexPoint Hospitality Trust.  This is another extremely

25  highly-levered hospitality REIT that NexPoint manages.  It

Seery - Direct                         98

1    trades on the Toronto Stock Exchange.  And I think likely that

2    -- it's got a lot of issues with respect to its mortgage debt.

3    And because it was hospitality, it was really hurt by the

4    COVID.

5        And I think that's probably -- those numbers add up to

6    north of $200 million of the loss.

7    Q    All right.  Thank you for that recitation, Mr. Seery.  So,

8    turning to the spring, after all of those issues were

9    addressed, at the same time you were working on the grand

10   bargain, did the Debtor and its professionals begin

11   formulating the monetization plan that we have today?

12   A    I'm sorry, in the spring?  I lost that question.  I

13   apologize.

14   Q    That's okay.  After you dealt with everything that you

15   just described, were you doing two things at once?  Were you

16   working on the grand bargain and the asset monetization plan

17   at the same time?

18   A    Yes, that's correct.

19   Q    All right.  Can you just describe for the Court kind of,

20   you know, how the asset monetization plan evolved up until the

21   point of the mediation?

22   A    Yes.  I alluded to it earlier, but because the Debtor was

23   running an operating deficit, we were very concerned about

24   liquidity.  Highland typically runs, from a liquidity

25   perspective and a cash perspective, very close to the edge.  I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2173
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 241 of 1017   PageID 6954
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2172 of
2722

Seery - Direct                            99

1    don't feel particularly comfortable helping lead an

2    organization that's running that close to the edge.  And I was

3    very focused on the burn that we had on an operating basis, as

4    well as the professional cost burn, because for a case this

5    size it was significant.

6         The rest of the board felt similarly, and one of the

7    directors, and I'm not sure if it was Mr. Nelms or Mr. Dubel,

8    came up with the idea that we needed an alternative to

9    continuing to just burn assets while we were in this case.

10   There had to be some sort of catalyst to get the parties, both

11   Mr. Dondero as well as the creditors -- at that point, as I

12   said, we weren't settled with Acis or UBS, and we weren't,

13   frankly, close with either of them.  And so we needed what --

14   what I think the -- the idea was that we needed a catalyst to

15   have people focus on what the alternative was.  Because

16   continuing to run the case until we ran out of money was not

17   an acceptable alternative.

18        What I didn't like about the plan was it didn't have

19   anybody's support, and so I wasn't sure how we made progress

20   with it without having some Committee member or Mr. Dondero in

21   support of it.  I was outvoted, although maybe I came around

22   in the actual vote.  But ultimately, I think it was actually a

23   quite smart idea, because it did set the basis for what the

24   case would be.  Either there would be some resolution or it

25   would push towards the monetization plan, and parties could

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2174
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 242 of 1017 PageID 6955
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2173 of 2722

Seery - Direct                    100

1  then assess whether they liked the monetization plan or not.

2  That if I was going to be the Claimant Trustee or the --

3  defending the, you know, against the claims, they would have

4  the pleasure of litigating with me for some period of time.

5  Or they could come to some either grand bargain or ultimately

6  some other resolution.

7      And as we started to develop a plan and put more of a

8  framework -- more flesh around the framework, it actually

9  started to look more and more like a real viable alternative

10 to either long-term litigation or some other grand bargain if

11 we couldn't get there.

12 Q   And ultimately, did the board authorize the Debtor to file

13 its initial version of the asset monetization plan at around

14 the time of the mediation?

15 A   Yeah.  We developed it over the summer and really fleshed

16 it out in terms of how the structure would work, what the tax

17 issues were, what the governance issues were.  We did that

18 largely negotiating with ourselves, so we -- we were extremely

19 successful.  And then we filed, we filed that plan right

20 before the mediation.

21     And my recollection is that there was some concern from

22 the mediators that they thought that putting that plan out in

23 the public could upset the possibility of a grand bargain, so

24 we ended up filing that under seal.

25 Q   Do you recall what the Committee's initial reaction was to

Seery - Direct                          101

1   the asset monetization plan that you filed under seal?

2   A   Well, initially, they -- the Committee didn't like it.

3   They didn't like the governance.  They didn't like the fact

4   that it set up for those creditors who didn't litigate the

5   prospect of litigations to try to resolve their claims.  It

6   effectively cut out some of the advisory that the Committee

7   currently had.  The -- one of the driving forces behind the

8   asset monetization plan and how we initially started it is we

9   can't continue these costs, as I said.  Well, an easy way to

10  get rid of -- to reduce the costs is to get rid of half of

11  them.

12      So if you could get rid of the Committee, effectively, and

13  coalesce around an asset monetization vehicle, then if folks

14  wanted to resolve their claim, you could.  If you had to

15  litigate it, you could, but you'd have one set of lawyers that

16  the estate was paying for, one set of financial advisors the

17  estate was paying for, as opposed to multiple sets.

18  Q   In addition to the corporate governance issues that you

19  just described, did the Committee and the Debtor quickly reach

20  an agreement on the terms of the treatment of employee claims

21  and the scope of the releases for the employees?

22  A   No.  Not very quickly at all.

23  Q   Yeah.

24  A   You know, again, one of the issues in this case that

25  drives perspectives is the history that creditors have in

APP. 2171

Appx. 02218

006161

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2176
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/06/25   Page 244 of 1017   PageID 6957
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2175 of 2722

Seery - Direct                          102

1    dealing with Highland and in dealing with many of the

2    employees at Highland, you know, who had worked for Mr.

3    Dondero and served at his pleasure for a long time, and how

4    they had been treated in various of their attempts to collect

5    their claims.  So the idea of giving any sort of releases to

6    the employees was anathema to -- to many of the Committee

7    members.

8         From my perspective, you know, releases are particularly

9    important because there's a *quid pro quo* leading up to the

10   confirmation of a plan, particularly with a monetization plan

11   where it's clear that the employees are all going to be or

12   largely going to be either transitioned or terminated.  If

13   they're going to keep working towards that, we either have to

14   have some sort of financial incentive or some sort of

15   assurance that their actions which are done in good faith to

16   try to pursue this give them the benefit of more than just

17   their paycheck.

18        And so we thought we were setting up the *quid pro quo* in

19   terms of work towards the monetization, bring the case home,

20   and you're entitled to a release, so long as you haven't done

21   something that was grossly negligent or willful misconduct.

22   And the Committee, I think, wanted to have a more aggressive

23   posture.

24   Q    And did those disagreements over corporate governance and

25   the employee releases kind of spill out into the public at

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2177
Case 3:25-cv-02072-S   Document 15-9   Filed 03/06/25   Page 245 of 1017   PageID 6958
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2176 of 2722

Seery - Direct                    103

1   that disclosure statement hearing in October?

2   A    I think they spilled out at that hearing as well as in the

3   hearing either the next day or two days later around Mr.

4   Daugherty's claim.  And again, it was -- it was contentious.

5   I tend to try to reach resolution, but I tend to hold firm

6   when I think that there's a good reason, an equitable reason

7   to do so, and compromising that issue was very difficult for

8   me.

9   Q    But in the weeks that followed, did the Committee and the

10  Debtor indeed negotiate to resolve to their mutual

11  satisfaction the issues surrounding corporate governance and

12  employee releases?

13  A    We did, yes.

14  Q    And were -- was the Debtor able to get its disclosure

15  statement approved with Committee support in late November?

16  A    We did, yes.

17  Q    Can you describe for the Court generally kind of the

18  process by which the Debtor negotiated with the Committee?

19  I'll ask it as broadly as I can, and I'll focus if I need to.

20  A    Yeah.  The process was usually in group settings with the

21  independent directors, professionals, and the Committee

22  members and their professionals.  Oftentimes, then, there

23  would be certain one-off conversations if there was a

24  particular issue that was more important to one Committee

25  member or another, or if they were designated by the Committee

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2178
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 246 of 1017   PageID 6959
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2177 of 2722

Seery - Direct                           104

1   to be the point on that.  And so I negotiated on behalf of the

2   Debtor, both collectively and individually, around these

3   points.

4        The biggest issues related to governance of the Claimant

5   Trust, the separation of the Claimant Trust and the Litigation

6   Trust, which was important to me, the treatment of employees

7   between the filing -- the time we came up with the case and

8   when we were going to exit, and then how that release

9   provision would work.

10  Q    Is it fair to say that numerous iterations of the various

11  documents that embodied the plan were exchanged between the

12  Debtor and the Committee?

13  A    Yes.  There were -- there were dozens.

14  Q    Fair to say that the negotiations were arm's length?

15  A    Absolutely.  Often contentious, always professional, but I

16  do think that there were, you know, well -- good-faith views

17  held by folks on both sides.  And I think we were fortunate to

18  be able to get resolution of those, because they were

19  strongly-held views.

20  Q    Okay.  And ultimately, I think you've already testified,

21  and Mr. Clemente certainly made it clear:  Is the Debtor --

22  does the Debtor have the Committee on board for their plan

23  today?

24  A    My understanding is again -- and you heard Mr. Clemente --

25  both the Committee and each of the individual members are

                              Seery - Direct                    105

 1   supportive of the plan.

 2   Q    All right.  Let's switch to Mr. Dondero and his reaction

 3   to the asset monetization plan.  Can you describe for the

 4   Court based on your experience and your interaction with him

 5   what you interpreted Mr. Dondero's position to be?

 6             A VOICE:  Objection, hearsay, or --

 7             MR. DRAPER:  Objection, hearsay.  Calls for

 8   speculation, Your Honor.

 9             THE COURT:  Overruled.

10             THE WITNESS:  Yeah.  I had direct discussions with

11   Mr. Dondero regarding the plan, the asset monetization plan,

12   as I mentioned, direct discussions regarding a potential grand

13   bargain.  The initial view from Mr. Dondero was, and he told

14   me, that if he didn't get a plan that he agreed to, if he

15   didn't have a specific control or agreement around what got

16   paid to Acis and Mr. Terry and what got paid to Redeemer

17   specifically, that he would, quote, burn the place down.  I

18   know that because it is, excuse the pun, seared into my mind,

19   but I also wrote it down.  And that was, you know, in the

20   early summer.

21        We had subsequent discussions around the plan, and as we

22   were talking about the -- about the grand bargain or -- the

23   pot plan hadn't come out at that point -- even on a large call

24   -- the plan initially called for a transition, and still does,

25   of employees of the Debtor to a related entity to continue

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2180
Case 3:25-cv-02072-S    Document 15-9    Filed 06/25    Page 248 of 1017    PageID 6961
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2179 of 2722

Seery - Direct                                106

1  performing services that were under the prior shared service

2  agreements that we were going to terminate.

3      But that transition is wholly dependent on Mr. Dondero.

4  And we had a call with at least five to seven people on it

5  where I said to Mr. Dondero, look, this is going to be in your

6  financial interest to agree to a smooth transition.  These

7  people have worked for you for a long time.  It's for their

8  benefit.  You portfolio-manage these funds.  It's to the

9  benefit of those funds to do this smoothly.  And if there's

10 litigation between you and the estate later, then those chips

11 will fall where they may.

12     And he told me to be prepared for a much more difficult

13 transition than I envisioned.

14     And I specifically said to him, and this one sticks in my

15 mind because I recall it, I said, don't worry, Mr. Dondero --

16 I think I used Jim -- I will be prepared.  I was a Boy Scout

17 and we spend time preparing for these kinds of things.  So

18 we're -- we would love to get done the best transition we can,

19 but we will be prepared for a difficult one.

20     So, from the start, the idea of the monetization plan was

21 not something that obviously he supported.  We did agree with

22 -- after his inquiry or request with the mediators, to file it

23 under seal while we went into the mediation.

24 BY MR. MORRIS:

25 Q    And after, after that was filed in September, early

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2181
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 249 of 1017   PageID 6962
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2180 of 2722

Seery - Direct                    107

1   October, did Mr. Dondero start to act in a way that the board

2   perceived to be against the Debtor's interests?

3   A    Certainly.  I mean, he previously had shown inclinations

4   of that, but that -- it got very aggressive as he interfered

5   with the trades we were trying to do in terms of managing the

6   CLO assets.  He took a position that postpetition, which was

7   really one of his entities taking a position, that

8   postposition a sale of life policy assets was somehow not in

9   the best interests of the funds and that we had abused our

10  position, notwithstanding that he turned it over to us with no

11  liquidity to maintain those life policies.  There were several

12  other instances.  And those led to the decision to, one, have

13  him resign, and then ultimately, after the text to me that I

14  perceived as threatening, and we've had subsequent hearings on

15  it, we asked him to leave the office.

16  Q    Okay.  Let's move back to the plan here.  Can you

17  describe, you know, generally, if you can, the purpose and

18  intent of the asset monetization plan?

19  A    Well, very simply, the main purpose is to maximize value.

20  This is not a competition between Mr. Dondero and myself.  I

21  have no stake in getting more money out of the maximization

22  other than my duty to do the job that I was hired to do.

23      So our goal is to manage the assets in what we think is

24  the best way to do that over time, and find opportunities

25  where the market is right to monetize the assets, primarily

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2182
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 250 of 1017 PageID 6963
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2181 of 2722

Seery - Direct                               108

1  through sales.  There may be other instances, depending on the

2  type of asset, whether a sale makes sense, if we can structure

3  it through some kind of distribution that's more structured.

4  Q   We've used the phrase a bunch of times already.  Can you

5  describe in your own words what an asset monetization plan is

6  in the context of the Debtor's proposal?

7  A   Well, it may be slightly an awkward moniker, but I think

8  it's not completely different than what you'd see, in some

9  respects, to a regular plan, where you equitize debt and you

10  operate the business for the benefit of the equitized debt.

11  Here, it's a little different in that we know exactly how

12  we're going to move forward.  We've effectively -- we'll

13  effectively turn the debt obligations into trust interests and

14  we will pay those as we sell down assets.  So we've got it

15  structured in a way where we can pivot depending on market

16  conditions and we'll be managing certain funds that the assets

17  sit in.

18      So there's really four assets where the assets sit, and

19  we'll manage those.  First are the ones that the Debtor owns

20  directly.  Second will be the ones that are in Restoration

21  Capital -- Restoration Capital Partners.  Third are the assets

22  in a fund called Multi-Strat.  Fourth is the direct ownership

23  interest in Cornerstone, and technically (garbled) would be

24  the -- would be the next one.

25      So we have the ability to manage these individual assets

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2183
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 251 of 1017 PageID 6964
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2182 of 2722

Seery - Direct                           109

1   and then be able to sell them in what we determine to be the

2   best way to maximize value, depending on the timing.

3   Q   And when you say that you're going to continue to operate

4   the business, do you mean that the Debtor will continue to

5   manage the assets you've just described in the same way that

6   it had prior to the petition date?

7   A   It'll be a smaller team, but that's the Debtor's business.

8   So what we won't be doing are the shared services anymore.

9   That was part of the Debtor's business.  But we will be

10  managing the assets.  So the 1.0 CLOs, we'll manage those

11  assets.  The RCP assets, we'll manage those assets.  The

12  Trussway Holdings assets, we'll managing those assets.  Each

13  of them is a little bit different.  There's things as diverse

14  as operating companies to real estate.  We'll operate, subject

15  to final agreement, but the Longhorn A and B, which are

16  separate accounts that are -- were funded and are controlled

17  by the largest -- one of the largest investors in the world.

18  And so they have agreed that we should manage those assets for

19  them.

20      So we're -- that's the business that the Debtor is in.  It

21  won't be doing all of the businesses that the Debtor was in

22  before, like the shared services, but the management of the

23  assets will be very similar.

24  Q   And why do these funds and these assets need continued

25  management?  Why aren't you just selling them?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2184
Case 3:25-cv-02072-S    Document 15-9    Filed 06/25    Page 252 of 1017    PageID 6965
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2183 of 2722

                          Seery - Direct                    110

1   A    Well, in some respects, they could just be sold, but the

2   -- we believe that the value would be a lot lower.  So, a lot

3   of them are complex.  The time to sell them may not be now.

4   Some will require restructuring in some way, whether -- not

5   through a reorganization process, but some sort of structural

6   treatment to how the obligations at the individual asset are

7   treated, or the equity at the individual asset.  So we're

8   going to manage each of them and look for market opportunities

9   where we think the value can be maximized.

10           MR. MORRIS:  Your Honor, I'm about to switch to

11  another topic.  We have been going for a little bit more than

12  two and a half hours.  I'm happy to just continue if you and

13  the witness are, but I just wanted to give you a head's up

14  that I'm about to switch topics.  If you wanted to take a

15  short break, we could.  If you want me to continue, I'm happy

16  to do that, too.

17           THE COURT:  Well, let me ask you, how much longer do

18  you think you're going to take overall with Mr. Seery?

19           MR. MORRIS:  I think I'll probably have another hour

20  to an hour and a half, Your Honor.  We want to make a complete

21  factual record here.

22           THE COURT:  All right.  Well, it's 12:07 Central

23  time.  Why don't we take a 30-minute lunch break, okay?  Can

24  everybody do their lunch snack that fast?

25           MR. MORRIS:  Sure.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2185
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 253 of 1017   PageID 6966
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2184 of
2722

Seery - Direct                    111

 1          THE COURT:  I think that would probably be the way to

 2     go.  So we'll come back -- it's now 12:08.  We'll come back at

 3     12:38 Central time and resume --

 4          MR. MORRIS:  Okay.

 5          THE COURT:  -- resume this direct testimony, okay?

 6     So, see you in 30 minutes.

 7          MR. MORRIS:  Thank you very much.

 8          THE COURT:  Okay.

 9          THE CLERK:  All rise.

10      (A recess ensued from 12:08 p.m. to 12:44 p.m.)

11          THE COURT:  We are going back on the record in the

12     Highland confirmation hearing.  It's 12:44 Central time.  I

13     took a little bit longer break than I said we would.

14       Mr. Morris and Mr. Seery, are you ready to resume?

15          MR. MORRIS:  I am, Your Honor.

16          THE WITNESS:  Yes, Your Honor.

17          THE COURT:  Okay, good.  A couple of things.  I'm

18     required to remind you you're still under oath, Mr. Seery.

19     And also, just for people's planning purposes, what I intend

20     to do is, when the direct examination of Mr. Seery is

21     finished, I'm going to allow cross-examination of the

22     Objectors in the same amount of time in the aggregate that the

23     Debtor got, okay?  So, Objectors, in the aggregate, you can

24     spend as long cross-examining as the Debtor spent examining.

25     I can figure out this is the most significant witness, so I'm

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2186
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 254 of 1017   PageID 6967
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2185 of 2722

Seery - Direct                    112

1   assuming that Debtor's other witnesses are going to be a lot

2   shorter than this, but --

3           MR. MORRIS:  Yes, I promise.

4           THE COURT:  -- that's how we'll proceed.  And I

5   expect to finish Mr. Seery today.

6       So, all right.  With that, you may proceed, Mr. Morris.

7           MR. MORRIS:  Okay.

8                   DIRECT EXAMINATION, RESUMED

9   BY MR. MORRIS:

10  Q   Can you hear me okay, Mr. Seery?

11  A   Yes, sir.

12  Q   Okay.  Before we move on to the next topic, you spent some

13  time describing the asset monetization plan.  Would it be fair

14  to describe that as a long-term going-concern liquidation?

15  A   Long-term is subjective.  We anticipate that we'll be able

16  to monetize the assets in two years.  We could go out longer

17  to three.  There's no absolute restriction that we couldn't

18  take longer, depending on what we see in the market, but the

19  objective would be to find maximization opportunities within

20  that time period.

21  Q   Okay.  So let's turn now to the post-confirmation

22  corporate governance structure.

23      (Interruption.)

24          THE WITNESS:  Mr. Golub (phonetic), you should mute.

25          THE COURT:  Yes.  I don't know -- I didn't catch who

Seery - Direct                          113

1    that was.  But anyway, anyone other than --

2               A VOICE:  It's someone named Garrett Golub.

3               THE COURT:  -- Morris and Seery, please mute.  All

4    right.  Go ahead.

5               MR. MORRIS:  Okay.

6    BY MR. MORRIS:

7    Q    At a high level, Mr. Seery, can you please describe for

8    the Court the post-confirmation structure that's envisioned

9    under the proposed plan?

10   A    At a high level, we anticipate reorganizing HCMLP such

11   that the current parties of interest will be extinguished and,

12   in exchange, creditors will get trust interests.  There'll be

13   a trust that will sit on top of HCMLP and it will have an

14   overall responsibility for the Claimant Trust, which will be

15   the HCMLP assets plus the assets that we move into the

16   Claimant Trust, depending on structural considerations.  And

17   then a Litigation Trust, which will be a separate trust, and

18   that will roll up into the main trust.  And the main trust

19   will be where the creditors hold their interests.  And those

20   interests take the form of senior interests or junior

21   interests.

22   Q    All right.  You mentioned a Claimant Trust.  Who is

23   proposed to serve as the Claimant Trustee?

24   A    I am.

25   Q    And you mentioned a Litigation Trust.  Is there someone

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2188
Case 3:25-cv-02072-S    Document 15-9   Filed 06/23/25    Page 256 of 1017    PageID 6969
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2187 of 2722

Seery - Direct                          114

1   proposed to serve as the Litigation Trustee?

2   A    A gentleman named Marc Kirschner.  He's been doing these

3   kinds of things for a long time.

4   Q    Is there going to be any kind of oversight group or

5   committee?

6   A    There is an oversight committee that sits at the main

7   trust.  Into it will report Mr. Kirschner and myself.  It has

8   oversight responsibilities similar to a board of directors in

9   terms of the operations of the Claimant Trust and the

10  Litigation Trust.

11  Q    Do you have an understanding as to who the initial members

12  of the Claimant Oversight Committee?

13  A    The initial members will be each of the members of the

14  Creditors' Committee.  So, UBS, Acis, Redeemer, a

15  representative from Redeemer, and Meta-e, as well as an

16  independent named David Pauker.  So that's the initial

17  structure.

18  Q    And can you describe for the Court, how did Mr. Pauker get

19  involved in this?

20  A    He was selected by the Committee.

21  Q    Okay.  Is there -- Meta-e is a convenience class claim

22  holder.  Do I have that right?

23  A    Yeah.  They're -- they -- as I went through earlier, they

24  had a liquidated claim for litigation services.  So we

25  expected that they'll be paid off rather early in the process.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2189
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 257 of 1017 PageID 6970
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2188 of 2722

Seery - Direct                    115

1    At that point, we suspect they wouldn't -- they would no

2    longer be an Oversight Committee member and they would be

3    replaced by an independent.

4    Q    And do you have any understanding as to how that

5    independent will be chosen?

6    A    I believe it's chosen by the other members.

7    Q    Okay.  Can you describe your proposed compensation

8    structure as the proposed Claimant Trustee?

9    A    My compensation will be $150,000 a month, which is the

10   same compensation I have now.  In addition, we'll negotiate a

11   bonus structure with the Oversight Committee.  And that will

12   likely be a bonus not just for myself but for the entire team,

13   depending on performance.

14   Q    Okay.  And that -- and who is that negotiation going to be

15   had with?

16   A    The Oversight Committee.

17   Q    Okay.  Are you familiar with Mr. Pauker's compensation

18   structure?

19   A    I -- I've seen it.  I don't recall specifically.  I think

20   his -- from the models, I think he's about 40 or 50 grand a

21   month, something along those lines.

22   Q    Okay.  How about Mr. Kirschner?  Do you recall -- let me

23   just ask you this.  Does it refresh your recollection at all

24   if I said that 250 in year one for Mr. Pauker?

25   A    Yeah.  So maybe closer to $20,000 to $25,000 a month.  And

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2190
Case 3:25-cv-02072-S    Document 15-9   Filed 06/23/06/25    Page 258 of 1017    PageID 6971
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2189 of
2722

Seery - Direct                              116

1   then Mr. Kirschner is a lower amount, but he would get a

2   contingency fee arrangement somewhere dependent on the

3   recoveries from his litigations.

4   Q    Okay.  You mentioned earlier that the Debtor intends to

5   continue operations at least for some period of time post-

6   effective date.  Do you have a view as to whether the post-

7   confirmation entity will have sufficient personnel to manage

8   the business?

9   A    I do, yes.

10  Q    And why is that?  What makes you believe that the Debtor

11  will have -- the post-confirmation Debtor will have sufficient

12  personnel to manage the business?

13  A    Well, we've gone through and looked at each of the assets

14  and what is required to manage those assets.  We have a lot of

15  experience doing it during the case.  The bulk of the

16  employees, who do a fine job, are really doing shared service

17  arrangements.  The direct asset management group is a smaller

18  group, and we'll be able to manage those with the team we're

19  putting together.

20  Q    Okay.  How does the ten employees compare to the original

21  plan that was set forth in the disclosure statement, if you

22  recall?

23  A    Well, we had less, and I believe the number was either two

24  or three, along with me, and then using a lot of outside

25  professional help.  But we determined that we wanted to have a

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2191
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 259 of 1017   PageID 6972
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2190 of 2722

                              Seery - Direct                    117

 1   much more robust team, based on the litigation that we're

 2   seeing around the case and we expect to continue post-exit, so

 3   that the team can manage those assets unfettered.

 4       In addition, we were taking on the CLO management, the 1.0

 5   CLO contracts.  These one -- as I've mentioned before, they're

 6   not traditional CLOs in the sense that they require the same

 7   hands-on management, but they do require an experienced team

 8   to help manage the exposures, most of which are cross-holdings

 9   in different -- in different entities or different investments

10   that Highland also has exposure to.

11   Q   In addition to the assumption of the CLO management

12   agreements, has the Debtor made any decisions regarding the

13   possibility of hiring a sub-servicer?

14   A   We have, yes.

15   Q   And did that factor into the Debtor's decision to increase

16   the number of personnel it was going to retain?

17   A   Well, we determined we weren't going to hire a sub-

18   servicer.  And I'm not sure exactly when we made that

19   determination.  We do have a TPA, which is SEI, and that's a

20   third-party administrator, to sift through the funds and

21   provide accounting supporting to those, to those funds.  So

22   that -- they will help.  We also have an outside consultant

23   that we're using, Experienced Advisory Consultants, who are

24   financial consultants who've worked in the business.  So we do

25   have those.

Seery - Direct                              118

1      But we didn't think that we would get a third-party sub-

2   servicer, as was the case in Acis, and determined that wasn't

3   in the best interest of the estate.

4   Q   Can you just shed a little light on what factors the

5   Debtor took into account in deciding not to hire a sub-

6   servicer?

7   A   Well, we primarily looked at cost, as well as control of

8   the assets, and determined that that was -- those were in the

9   best interests of the estate, to keep them managed internally.

10  We reviewed that with the Committee, and they agreed.

11  Q   Okay.

12      MR. MORRIS:  Let's turn now to the best interests of

13  creditors' test, Your Honor, 1129(a)(7), and let's talk about

14  whether the plan is in the best interests of creditors.

15  BY MR. MORRIS:

16  Q   Has the Debtor done any analysis to determine the likely

17  value to be realized in a Chapter 7 liquidation?

18  A   We have, yes.

19  Q   And has the Debtor done any analysis to determine the

20  likely recoveries under the plan?

21  A   Yes.

22  Q   Okay.  Do you recall when these projections were first

23  prepared?

24  A   We started working on projections in the fall, as we were

25  developing the monetization plan.  We filed projections, I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2193
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 261 of 1017   PageID 6974
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2192 of 2722

Seery - Direct                    119

1    believe, in November.  We've subsequently updated those

2    projections based on the claims, market condition, and value

3    of the assets.

4    Q    And were those updates provided to plan objectors last

5    week?

6    A    Yes, they were.

7    Q    Okay.  Can we refer to the projections that were in the

8    disclosure statement as the November projections?

9    A    That'd be fine.

10   Q    And can we refer to the projections that were provided to

11   the objectors last week as the January projections?

12   A    Yes.

13   Q    And as --

14   A    I think they're actually -- I think they're actually dated

15   February 1, is the most recent update.

16   Q    Okay.  And then was a further update provided yesterday

17   and filed on the docket, to the best of your knowledge?

18   A    Yes.

19   Q    All right.  We'll talk about some of the changes in those

20   projections.

21          MR. MORRIS:  Can we call up on the screen Debtor's

22   Exhibit 7D as in dog?  And this document is in evidence.  Um,

23   --

24          THE COURT:  No, this is -- oh, wait.  How many Ds is

25   it?  Seven?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2194
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 262 of 1017   PageID 6975
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2193 of 2722

Seery - Direct                          120

1          MR. MORRIS:  It's 7D, so that would be on Docket

2   1866, all of which has been admitted.

3          THE COURT:  Okay.  You're right.

4          MR. MORRIS:  Okay.

5      And if we could just, I'm sorry, go to Page 3.

6   BY MR. MORRIS:

7   Q   Is there any way to look at this, Mr. Seery?  Is this the

8   January projections that were provided last week?

9   A   Yes.

10  Q   Okay.  Can you describe for the Court the process by which

11  this set of projections and the November projections were

12  prepared?  How did the Debtor go about preparing these

13  projections?

14  A   Yeah.  These are prepared what I would call bottoms-up.

15  So what we did was we looked at each of the assets that the

16  Debtor owns or manages or has a direct or indirect interest

17  in, used the values that we have for those assets, because we

18  do keep valuations for each of the assets that the Debtor owns

19  or manages in the ordinary course of business.  We then

20  adjusted those depending on what we saw as the outcomes for

21  the case, either a plan outcome or a liquidation outcome, and

22  then rolled those into the -- into the numbers that you see

23  here.

24      So the 257 and change.  And please excuse my eyesight.

25  I'm going to make this bigger.  The 257 is the estimated

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2195
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 263 of 1017   PageID 6976
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2194 of
2722

Seery - Direct                    121

1  proceeds from monetization.  Above that, you see cash.  That's

2  our estimated cash at 131.  And we monitor those, those values

3  daily.

4  Q    And were these projections prepared under your

5  supervision?

6  A    They were, yes.

7  Q    Okay.  And who was involved in the preparation of this

8  document and other iterations of the projections?

9  A    The team at DSI.  Obviously, myself; the team at DSI; as

10 well as the, at least from a review perspective, counsel.

11 Q    All of these contain various assumptions.  Do I have that

12 right?

13 A    Yes.

14       MR. MORRIS:  Can we go to the prior page, please, I

15 think is where the assumptions are?  And let's just look at a

16 few of them.  Okay.  Can we make that a little bigger, La

17 Asia?  Okay.  Good.

18 BY MR. MORRIS:

19 Q    Why does the Debtor's projections and liquidation analysis

20 contain any assumptions?  Why, why include assumptions?

21 A    Well, all projections contain assumptions.  So an

22 assumption -- I was strangely asked the question at

23 deposition, what does that mean?  It's a thing or fact that

24 one accepts as true for the purposes of analysis.  And so in

25 terms of looking out into the future as to what the potential

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2196
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 264 of 1017 PageID 6977
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2195 of 2722

Seery - Direct                    122

1  operation expenses will be and what the potential recoveries

2  will be, one has to make assumptions in order to be able to

3  compare apples to apples.

4  Q    And do you believe that these assumptions are reasonable?

5  A    Yes.  It would make no sense to have assumptions that

6  aren't reasonable.  I mean, and we've all seen that with

7  analysis through our respective careers.  It really should be

8  grounded in some fact and a reasonable projection on what can

9  happen in the future, based upon experience.

10 Q    Okay.  And have you personally vetted each of the

11 assumptions on this page?

12 A    Yes.

13 Q    Okay.  Let's just look at a few of them.  Let's start with

14 B.  It says, All investment assets are sold by December 31,

15 2022.  Do you see that?

16 A    Yes.

17 Q    Why did the Debtor make that assumption?

18 A    We looked at a two-year projection horizon.  We thought

19 that that was a reasonable amount of time, looking at these

20 assets, to monetize the assets.  Remember that we did go

21 through a process of the case over the last year, and we did

22 consider monetization asset events for certain of the assets

23 throughout the case, some of which we were successful on, some

24 of which we weren't, some we just determined to pull back.

25 But we do believe that, based upon our view of the market and

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2197
Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/06/25    Page 265 of 1017    PageID 6978
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2196 of
2722

Seery - Direct                          123

1  where we think these assets will be positioned, that

2  monetizing them over a two-year period makes sense.

3  Q   And is it possible that it takes longer than that?

4  A   It's possible.  The -- you know, we would be wrong about

5  the market.  The -- we could go into a full-blown recession.

6  Capital could dry up.  The financing markets could turn

7  negative.  But they're extremely positive right now.  Those

8  things could happen.  But we're assuming that they won't.

9  Q   And is it possible that you complete the process on a more

10  accelerated timeframe?

11  A   That's always possible.  It's not, in my experience, a

12  good way to plan.  Luck really isn't a business strategy.  But

13  if good opportunity shows up and folks want to pay full value

14  for an asset, we certainly wouldn't turn them away just so we

15  could stretch out the time period.

16  Q   Is it fair to say that this projected time period is your

17  best estimate on the most likely timeframe needed?

18  A   It's -- I think it's the best estimate that we have based

19  upon our experience with the assets, again, and our projection

20  of the marketplace that we see now.  If things change, we'll

21  adjust it, but this is a fair estimate of when we can get the

22  monetization accomplished.

23  Q   Okay.  The next assumption relates to certain demand

24  notes.  Do you see that?

25  A   Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2198
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 266 of 1017   PageID 6979
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2197 of
2722

                          Seery - Direct                    124

1   Q    Can you explain to the Court what that assumption is and

2   why the Debtor believed that it was reasonable?

3   A    Well, the Debtor has certain notes that are demand notes.

4   These are all from related entities.  Most of the notes, the

5   demand notes, we have demanded, and we've commenced litigation

6   to collect.  And we assume that we're going to be able to

7   collect those.

8        Three notes that were long-term notes -- these were notes

9   with maturities in 2047 that had been stretched out a couple

10  years ago -- were defaulted recently.  And we have accelerated

11  those notes and we've asserted demands and we have commenced

12  litigation, I believe, on each of those last week to collect.

13  So we do estimate that we will collect on all of the notes

14  that we've demanded and that we've commenced action on.  So

15  the demand notes as well as the accelerated notes.

16       The next, the next bullet shows there's one Dugaboy note

17  that has not defaulted.  That also has a 2047 maturity.  I

18  believe it's about $18 million.  And we expect that one to

19  stay current, because now I think the relater parties learned

20  that when you don't pay a long-dated note, it accelerates,

21  provided the holder, which is us, wishes to accelerate it,

22  which we did.  And so that note we do not expect to be

23  collected in the time period.

24  Q    Okay.

25            MR. MORRIS:  Let's go down to M.

Seery - Direct                         125

1   BY MR. MORRIS:

2   Q    M relates to certain claims.  Do you see that?

3   A    Yes.

4   Q    Can you just describe at a high level what assumption was

5   made with which -- with respect to which particular claims?

6   A    Well, we've summarized them there.  And what we've assumed

7   is that, with respect to Class 8, IFA, which is a derivative

8   litigation claim that seeks to hold, loosely, HCMLP liable for

9   obligations of NexBank, is worth zero.  I think that's pretty

10  close to settling.  We assumed here $94.8 million for UBS,

11  which was the estimated amount, and $45 million for

12  HarbourVest.

13  Q    And when you say the estimated amount, are you referring

14  to the 3018 order on voting?

15  A    Yes.  We just use the estimated amount in this projection

16  based upon the 3018 order.

17  Q    Okay.  And finally, let's look at P.  P has a payout

18  schedule.  Do I have that right?

19  A    That's an estimated payout schedule, yes.

20  Q    And what do you mean by that, that it's estimated?

21  A    Based upon our projections and how we perceive being able

22  to monetize the assets and reach the valuations that we want

23  to reach, we believe we could make these distributions.

24  However, there's no requirement to make them.

25       So the first and foremost objective we have, as I said

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2200
Case 3:25-cv-02072-S Document 15-9 Filed 03/06/25 Page 268 of 1017 PageID 6981
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2199 of 2722

Seery - Direct                    126

1    earlier, is to maximize value, and not -- it's not based on a

2    payment schedule, it's based upon the market opportunity.  And

3    we've estimated for our purposes here that we'll be able to

4    meet these distribution amounts, but there's no requirement to

5    do so.

6    Q    Okay.

7         MR. MORRIS:  Let's go to Page 3 of the document,

8    please.

9    BY MR. MORRIS:

10   Q    Can you just describe generally what this page reflects?

11   A    This is a comparison of the plan analysis and what we

12   expect to achieve under the plan and the liquidation analysis

13   if a trustee, a Chapter 7 trustee, were to take over.  And it

14   compares those two distribution amounts based upon the

15   assumptions on the prior page.

16   Q    All right.  Let's just look at some of the -- some of the

17   data points on here.  If we look at the plan analysis, what is

18   -- what is projected to be available for distribution, the

19   value that's available for distribution?

20   A    $222.6 million.

21   Q    Okay.  So, 222?  And on a claims pool that's estimated to

22   be, for this purpose, how much?

23   A    $313 million.

24   Q    And what is the distribution, the projected distribution

25   to general unsecured creditors on a percentage basis?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2201
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 269 of 1017   PageID 6982
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2200 of 2722

Seery - Direct                    127

1   A    On this analysis, to general unsecured creditors, it's

2   62.14 percent.  But remember, that backs out the payment to

3   the Class 7 creditors of 85 cents above.

4   Q    Okay.  And does this plan analysis include any value for

5   litigation claims?

6   A    No, it does not.

7   Q    And is that true for all forms of the Debtor's

8   projections?

9   A    That's correct, yes.

10  Q    Okay.  And let's look at the right-hand column for a

11  moment.  It says, Liquidation Analysis.  What does that column

12  represent?

13  A    That represents our estimate of what a Chapter 7 trustee

14  could achieve if it were to take over the assets, sell them,

15  and make distributions.

16  Q    Okay.  And let's just look at the comparable data points

17  there.  Under the liquidation analysis, as of -- the January

18  liquidation analysis as of last week, what was projected to be

19  available for distribution?

20  A    A hundred and -- approximately $175 million.

21  Q    Okay.  And what was the claims pool?

22  A    The claims pool was $326 million.  Recall that that's a

23  slightly larger claims pool because it doesn't back out the

24  Class 7 claims.

25  Q    Okay.  The convenience class claims?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2202
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 270 of 1017 PageID 6983
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2201 of 2722

Seery - Direct                    128

1   A    Correct.

2   Q    Okay.  And what's the projected recovery for general

3   unsecured claims under the liquidation analysis?

4   A    Based on this analysis and the assumptions, 48 (audio

5   gap).

6   Q    Okay.  Based on the Debtor's analysis, are creditors

7   expected to do better under this analysis in the -- under the

8   Debtor's plan versus the hypothetical Chapter 7 liquidation?

9   A    Yes.  Both -- both Class 7 and Class 8.

10  Q    Okay.  Now, this set of projections differs from the

11  projections that were included in the disclosure statement; is

12  that right?

13  A    That's correct.

14  Q    Okay.  Can we just talk about what the differences are

15  between the November projections that were in the disclosure

16  statement and the January projections that are up on the

17  screen?  Let's start with the monetization of assets, the

18  second line.  Do you recall if there was an increase, a

19  decrease, or did the value from the monetization of assets

20  stay the same between the November projections and the January

21  projections?

22  A    They increased from November 'til -- 'til now.

23  Q    Okay.  Can you explain to the judge why the value from the

24  monetization of assets increased from November to January?

25  A    Well, really, it's the composition of the assets and their

Seery - Direct                          129

1    value.  So there's four main drivers.

2        The first is HarbourVest.  We had a settlement with

3    HarbourVest, which include HarbourVest transferring to the

4    Debtor $22-1/2 million of HCLOF interests.  Those have a real

5    value, and we've now included them in the -- in the asset

6    pool.  We've also included HarbourVest in the claims pool.

7        The second was we talked a little bit earlier on the

8    assumptions on the notes.  We previously had anticipated that,

9    on the long-dated notes, a collection, we -- we'd receive

10   principal and interest currently, but we wouldn't receive the

11   full amount of the principal that was due well off in the

12   future, and we would sell it a discount.

13       So the amount of the asset pool has been increased by $24

14   million, and that reflects the delta between or the change

15   between what was in the prior plan, the notes paying and then

16   being sold at a discount, and what's in the current plan,

17   which include the accelerated notes, which is a $24 million

18   note that Advisors defaulted on that we have accelerated and

19   brought action on, as well as two six -- roughly $6 million

20   notes, one from Highland Capital Real Estate and the other

21   from HCM Services.  So that's, that's additional 24.

22       In addition, Trussway, we've reexamined where Trussway is

23   in the market, both its marketplace and its performance, and

24   reassessed where the value is.  So that has increased by about

25   $10.6 million.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2204
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 272 of 1017   PageID 6985
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2203 of 2722

Seery - Direct                          130

1    That doesn't mean that we would sell it today.  It means

2    that, when you look at the performance of the company, what we

3    think are the best opportunities in the market.  As we see the

4    marketplace with managing the company over time, we think that

5    that asset has appreciated considerably since November.

6        And then, finally, there were additional revenues that

7    flow into the model from the November analysis which would be

8    distributable, and those include revenues from the 1.0 CLOs.

9    Q    Okay.  So that accounts for the difference and the

10   increase in value from the monetization of assets.  Is there

11   also an increase in expenses from the November projections to

12   the January projections?

13   A    Yeah.  It's -- it's about -- it's around $25 million

14   additional increase.

15   Q    And can you explain to the Court what is the driver behind

16   that increase in expenses?

17   A    Yeah.  There's several drivers to that.  The first one is

18   head count.  So our head count, we've increased.  As I

19   mentioned earlier, we determined that we wanted to have a much

20   more robust management presence.  So we've increased the head

21   count, so we have a base comp, compensation, about $5 million

22   more than we initially thought.

23       Secondly, we have bonus comp.  So we've back-ended --

24   structured a backend bonus performance bonus for the team, and

25   that will run another $5 million, roughly.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2205
Case 3:25-cv-02072-S    Document 15-9    Filed 06/13/25    Page 273 of 1017    PageID 6986
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2204 of
2722

Seery - Direct                         131

1      Previously, we had thought about, as you mentioned

2   earlier, the sub-servicing, but we've now talked about and we

3   have engaged a TPA, SEI, as well as experienced advisors.

4   That's another $1 to $2 million.

5      Operating expenses have increased by about $8 million,

6   based upon our assessment.  The biggest driver there is D&O,

7   which is up about $3 million.  In addition, we've gotten -- we

8   determined to keep a bunch of agreements related to data

9   collection and operations.  Those were requested by the

10  Committee, but they also serve us in performing our functions.

11  That's another couple million dollars.

12     My comp, my bonus comp was not in the prior model.  So I

13  have a bonus that has not been agreed to by the Court for the

14  bankruptcy performance.  This is not a future bonus.  And we

15  built that into the model.  Obviously, it's subject to Court

16  approval and Committee objection, and I suppose anybody else's

17  objection, but we'll -- we'll be before the Court for that.

18  But we wanted to build that into the model so that we had it

19  covered in the event that it was approved.

20  Q    Was there also a change in the assumption from November to

21  January with respect to the size of the general unsecured

22  claim pool?

23  A    Yes.  There have been -- there have been several changes

24  that have happened, and we've added those and refined the

25  claim pool numbers.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2206
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 274 of 1017 PageID 6987
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2205 of 2722

Seery - Direct                                    132

1  Q    And are those changes reflected in the assumption we

2  looked at earlier, Exhibit -- Assumption M, which went through

3  certain claims that have been liquidated?

4  A    Some, some are.  That assumption, I don't believe, was --

5  it's not in front of me, but wasn't up to date.  So, that one,

6  for example, assumed UBS at the 3018 estimated amount.  We've

7  since refined that number to reflect the agreed-upon

8  transaction with UBS, which is subject to Court approval.

9  Q    Right.  But before we get to that, for purposes of the

10 January model, the one that's up on the page -- and if we need

11 to look at the prior page --

12         MR. MORRIS:  Let's go to the prior page, the

13 assumption.  Assumption M.

14 BY MR. MORRIS:

15 Q    Assume the UBS, the UBS claim at the $94.8 million, the

16 3018 number.  Do you remember that?

17 A    Yeah.  That's, that -- that's the assumption in this

18 model.  I think back in November we assumed HarbourVest at

19 zero and UBS at zero.  So we've since -- we've since refined

20 those numbers, obviously, through both the 3018 process as

21 well as the settlement with HarbourVest.

22 Q    And did the -- did the inclusion -- withdrawn.  At the

23 time that you prepared the November model -- withdrawn.  At

24 the time the Debtor prepared the November model, did it know

25 what the UBS or the HarbourVest claims would be valued at?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2207
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/25   Page 275 of 1017   PageID 6988
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2206 of
2722

Seery - Direct                              133

1    A    No.  We just had our assumption back then, which was zero.

2    And now, obviously, we know.

3    Q    And so the January model took into account the settlement

4    with HarbourVest and the 3018 motion; do I have that right?

5    A    That's correct.  That's in the assumptions.

6    Q    And what was the impact on the projected recoveries to

7    general unsecured creditors from the changes that you've just

8    described, including the increase in the claims amount?

9    A    Well, when -- like any fraction, the distribution will go

10   down if the claimant pool goes up.  So, with the denominator

11   going up by the UBS and the UBS amount -- the UBS and the

12   HarbourVest amounts, the distribution percentage went down.

13   Q    Okay.  I want to focus your attention on the second line

14   where we've got the monetization of assets under the plan at

15   $258 million but under the liquidation analysis it's $192

16   million.  Do you see that?

17   A    Yes.

18   Q    Can you tell Judge Jernigan why the Debtor believes that

19   under the plan the Debtor or the post-confirmation Debtor is

20   likely to receive or recover more for the --

21        (Interruption.)

22             THE COURT:  All right.  Hang on a minute.  Where is

23   that coming from, Mike?

24             THE CLERK:  Someone is calling in.

25             THE COURT:  Okay.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2208
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/06/25   Page 276 of 1017   PageID 6989
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2207 of
2722

```
                       Seery - Direct                     134
```

 1          MR. MORRIS:  Thank you.

 2          THE COURT:  Mr. --

 3          MR. MORRIS:  Let me restate the question.

 4          THE COURT:  Yes.  Restate.

 5   BY MR. MORRIS:

 6   Q    Can you explain to Judge Jernigan why the Debtor believes

 7   that the -- under the plan corporate structure, the Debtor is

 8   likely to recover more from the monetization of assets than a

 9   Chapter 7 liquidation trustee would?

10   A    Sure.  My experience is that Chapter 7 trustees will

11   generally try to move quickly to monetize assets.  They will

12   retain their own professionals, they will examine the assets,

13   and they will look to sell those assets swiftly.

14       The monetization plan does not plan to do that.  I've got

15   a year's of experience -- a year now of experience with these

16   assets, as well as we'll have a team with several years at

17   least each of experience with the assets.  We intend to look

18   for market opportunities, and think we'll be able to do it in

19   a much better fashion than a liquidating Chapter 7 trustee.

20       The nature of these assets is complex.  Many of them are

21   private equity investments in operating businesses.  Certain

22   of them are complicated real estate structures that need to be

23   dealt with.  Some of them are securities that, depending on

24   when you want to sell them, we believe there'll be better

25   times than moving quickly forward to sell them now.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2209
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 277 of 1017 PageID 6990
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2208 of 2722

Seery - Direct                                        135

1      So, with each of them, we think that we'll be able to do

2   better than a Chapter 7 trustee based upon our experience.

3   The only thing that we're level-set with a Chapter 7 trustee

4   on is that cash is cash.

5   Q    Do you have any concerns that a Chapter 7 trustee might

6   not be able to retain the same personnel that the Debtor is

7   projected to retain?

8   A    Well, again, in my experience, it would be very difficult

9   for a Chapter 7 trustee to retain the same professionals, and

10  typically they don't.

11      Secondly, retaining the individuals, I think, would be

12  very difficult for a Chapter 7 trustee, would not have a

13  relationship with them, and that gap of time and the risks

14  that they would have to take to join a Chapter 7 trustee I

15  think would lead most of them to look for different

16  opportunities.

17  Q    Okay.  One of the other things, one of the other changes I

18  think you mentioned between the November and the January

19  projections was the decision to assume the CLO management

20  contracts.  Do I have that right?

21  A    That's correct.

22  Q    And why has the Debtor decided to assume the CLO

23  management contracts?  How does that impact the analysis on

24  the screen?

25  A    Well, it does add to the expense, but it also adds to the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2210
Case 3:25-cv-02072-S Document 15-9 Filed 06/13/06/25 Page 278 of 1017 PageID 6991
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2209 of 2722

Seery - Direct                    136

1    proceeds.

2        When we did the HarbourVest settlement, we ended up with

3    the first significant interest in HCLOF.  HCLOF owns the vast

4    majority of the equity in Acis 7, and also owns significant

5    preferred share interests in the 1.0 CLOs.  And we think it's

6    in the best interest of the estate to keep the management of

7    those assets where we have an interest in the outcome of

8    maximizing value with the estate.

9        In addition, we're going to have employees who are going

10   to work with us to manage those specific assets, so we feel

11   like that will be something where we can control the

12   disposition much better.

13       There's also cross-interests that these CLOs have in --

14   the 1.0 CLOs have in a number of other investments that

15   Highland has.  As in all things Highland, it's interrelated,

16   and so many of the companies have direct loans from the CLOs.

17   We intend to refinance that, but we feel much more comfortable

18   and feel that there would be value maximization if we're able

19   to work directly with the Issuers as a manager while we seek

20   in those underlying investments to refinance the CLO debt.

21   Q    Has the Debtor -- has the Debtor reached an agreement with

22   the Issuers on the assumption of the CLO management

23   agreements?

24   A    Yes, we have.

25   Q    Can you describe for the Court the terms of the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2211
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 279 of 1017 PageID 6992
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2210 of
2722

Seery - Direct                    137

1    assumption?

2           MR. RUKAVINA:  Your Honor, this --

3           THE WITNESS:  Yes.

4           MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

5    would object to this as hearsay.

6           THE COURT:  Well, he has not --

7           MR. MORRIS:  It's --

8           THE COURT:  He's not said an out-of-court statement

9    yet, so I overrule.

10       Go ahead.

11          THE WITNESS:  Yeah, we -- we are going to assume the

12   CLO contracts.  We have had direct discussions with the

13   Issuers.  They have agreed.

14      The basic terms are that we're going to cure them by

15   satisfying about $500,000 of cure costs related to costs that

16   the CLO Issuers have incurred in respect of the case, and

17   we'll be able to pay that over time.

18          MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

19   would renew my objection and move to strike his answer that

20   they've agreed.  That is hearsay, an out-of-court statement

21   offered to prove the truth of the matter asserted.

22          THE COURT:  Okay.  Mr. Morris, what is your response?

23          MR. MORRIS:  He's describing an agreement.  I

24   actually think it's in the Debtor's plan that's on file

25   already.  But he's describing the terms of an agreement.  He's

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2212
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 280 of 1017 PageID 6993
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2211 of 2722

Seery - Direct                    138

1  not saying what anybody said.  There's no out-of-court

2  statement.  It's an agreement that's being described.

3          THE COURT:  All right.  Thank you.  I overrule the

4  objection.

5          MR. MORRIS:  Okay.

6  BY MR. MORRIS:

7  Q   Does the Debtor believe that the CLO agreements will be

8  profitable?

9  A   Yes.

10 Q   And why does the Debtor believe that the CLO agreements

11 will be profitable to the post-confirmation estate?

12 A   Well, we don't -- we don't break out profitability on a

13 line-by-line basis.  But the simple math is that the revenues

14 from the CLO contracts which will roll in to the Debtor from

15 the management fees are more than what we anticipate the

16 actual direct costs of monitoring and managing those assets

17 would be.

18 Q   Okay.  Are you aware that yesterday the Debtor filed a

19 further revised set of projections?

20 A   I am, yes.

21 Q   All right.  Let's call those the February projections.

22          MR. MORRIS:  Can we put those on the screen?

23     It's Exhibit 7P, Your Honor.

24          THE COURT:  Okay.

25          MR. MORRIS:  All right.  I think that for some reason

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2213
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 281 of 1017 PageID 6994
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2212 of 2722

Seery - Direct                              139

1   -- yeah, okay.  There we go.  Perfect.  Right there.

2       Your Honor, these are the projections that were filed

3   yesterday.  I'm going to move for the admission into evidence

4   of these projections.

5           THE COURT:  All right.

6           MR. TAYLOR:  Your Honor, this is Clay Taylor.

7           THE COURT:  Go ahead.

8           MR. TAYLOR:  We object.  These were -- these were not

9   previously provided.  They were provided on the eve of the

10  confirmation hearing, after the Debtors had already revised

11  them once and provided those on -- after close of business on

12  a Friday before Mr. Seery's deposition.  And these were

13  provided even later, certainly not within the three days

14  required by the Rule.  And therefore we move to -- that these

15  should not be allowed into evidence.

16          THE COURT:  Mr. Morris, what is your response to

17  that?

18          MR. MORRIS:  Your Honor, first of all, the January

19  projections were provided in advance of Mr. Seery's deposition

20  and he was questioned extensively on it.  These projections

21  have been updated since then, I think for the singular purpose

22  of reflecting the UBS settlement.

23      As Your Honor just saw, the prior projections included an

24  assumption based on the 3018 motion.  Since Mr. Seery's

25  deposition, UBS and the Debtor have agreed to publicly

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2214
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 282 of 1017 PageID 6995
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2213 of
2722

Seery - Direct                    140

1   disclose the terms of the settlement, and that's reflected in

2   these revised numbers.  I think there was one other change

3   that Mr. Seery can testify to, but those are the only changes

4   that were made.

5           THE COURT:  All right.  Mr. Seery, what besides the

6   UBS settlement do you think was put in these overnight ones?

7           THE WITNESS:  I believe the only other change, Your

8   Honor, was correcting a mistake.  In Assumption M, the second

9   line is assumes RCP claims will offset against HCMLP's

10  interest in the fund and will not be paid from the Debtor's

11  assets.  That hasn't changed.

12     Basically, the Debtor got an advance from RCP that was to

13  -- for tax distributions, and did not repay it.  The RCP

14  investors are entitled to recovery of that.  So we had

15  previously backed that out.  It's about four million bucks.

16  What happened was it was just double-counted.

17          THE COURT:  Okay.

18          THE WITNESS:  So, as an additional claim, it was

19  counted as $8 million.  I think that's the only other change.

20          THE COURT:  All right.  I overrule the objection.

21  You may go forward.  I admit 7P.

22          MR. MORRIS:  Thank you, Your Honor.

23     (Debtor's Exhibit 7P is received into evidence.)

24          MR. MORRIS:  Can you just -- if we can go to the next

25  page, please.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2215
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 283 of 1017 PageID 6996
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2214 of 2722

Seery - Direct                               141

1  BY MR. MORRIS:

2  Q   So, with -- seeing that the claims pool under the plan

3  previously was $313 million, and what's the claims pool under

4  the projections up on the screen under the plan?

5  A   Two -- well, remember, there's 273 for Class 8, and then

6  you'd add in the Class 7 as well, which is the $10.2 million.

7  So the 273 went from 313 to 273 with that settlement.

8  Q   And is there any -- is there any reason for the decrease

9  other than the change from the 3018 settlement -- order figure

10  to the actual settlement amount?

11  A   For the UBS piece, no.  And then, as I mentioned, I

12  believe the other piece would have been that four million --

13  that additional $4 million that was taken out.

14  Q   And did those two changes have a -- did those two changes

15  have an impact on the projected recoveries under the plan?

16  A   Sure, particularly with respect to -- to the Class 8.

17  Those recoveries went up significantly because the denominator

18  went up.

19  Q   Okay.  Does the Debtor believe that its plan is feasible?

20  A   Yes, absolutely.

21  Q   And do you know whether the administrative priority and

22  convenience class claims will be paid in full under the

23  Debtor's plan?

24  A   Yes.  We monitor the cash very closely, so we do have

25  additional cash to raise, but we're set to reach or exceed

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2216
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 284 of 1017   PageID 6997
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2215 of 2722

Seery - Direct                                    142

1   that target, so we do believe we'll be able to pay all the

2   administrative claims when they come in.  Obviously, we have

3   to see what they are.  We will be able to pay Class 7 on the

4   effective date.  Any other distributions, we expect to be able

5   to make as well.

6       So, and then it's -- then it's a question of going forward

7   with a few other claims that we have to pay over time.  We

8   have the cash flow to pay those.  Frontier, for example, we'll

9   be able to pay that claim over time in accordance with the

10  restructured terms.  If the assets that secure that claim are

11  sold, they would be paid when those assets are sold.

12  Q   Frontier, will the plan enable the Debtor to pay off the

13  Frontier secured claim?

14  A   Yes.  That's what I was explaining.  The cash flow is

15  sufficient to support the current P&I on that claim.  We will

16  be able to satisfy it from other assets if we determine not to

17  sell the asset securing the Frontier claim, or if we sell the

18  asset securing the Frontier claim we could satisfy that claim.

19  The asset far exceeds the value of the claim.

20  Q   Has the plan been proposed for the purpose of avoiding the

21  payment of any taxes?

22  A   No.  We expect all tax claims to be paid in accordance

23  with the Code, and to the extent that there are additional

24  taxes generated, we would pay them.

25  Q   Okay.  Let's just talk about Mr. Dondero for a moment

Seery - Direct                           143

 1   before we move on.  Are you aware that Mr. Dondero's counsel

 2   has requested the backup to, you know, these numbers,

 3   including the asset values?

 4   A    It -- I'm not sure if it was his counsel or one of the

 5   other related-entity counsels.

 6   Q    Okay.  But you're aware that a request was made for the

 7   details regarding the asset values and the other aspects of

 8   this?

 9   A    Yes.

10   Q    Those were -- were those formal requests or informal

11   requests?

12   A    They were certainly at my deposition.

13   Q    Right.  But you haven't seen a document request or

14   anything like that, have you?

15   A    No.

16   Q    Did the Debtor make a decision as to whether or not to

17   provide the rollup, the backup information to Mr. Dondero or

18   the entities acting on his behalf?

19   A    Yes.

20   Q    And what did the Debtor decide?

21   A    We would not do that.

22   Q    And why did the Debtor decide that?

23   A    Well, I think that's pretty standard.  The underlying

24   documentation and the specific terms of the model are very

25   specific, and they are -- they are confidential business

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2218
Case 3:25-cv-02072-S    Document 15-9   Filed 06/25   Page 286 of 1017   PageID 6999
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2217 of 2722

Seery - Direct                        144

1  information that runs through what we expect to spend and what

2  we expect to receive and when we expect to sell assets and

3  then receive proceeds, and the prices at which we expect to

4  sell them.

5      To the extent that any entity wants to have that

6  information as a potential bidder, that would be very

7  detrimental to our ability to maximize value.  So, typically,

8  I wouldn't expect that to be given out, and I would not

9  approve it to be given out here.

10 Q   Did the Debtor disclose to Mr. Dondero's counsel or

11 counsel for one of his entities the agreement in principle

12 with UBS before the updated plan analysis was filed last

13 night?

14 A   I believe that disclosure was done a while ago, to Mr.

15 Lynn.

16 Q   So, to the best of your -- so, to the best of your

17 knowledge, the Debtor actually shared the specifics of the

18 agreement with UBS with Mr. Dondero and his counsel before

19 last night?

20 A   Yes.  I have specific personal knowledge of it because we

21 had to ask UBS for their permission, and they agreed.

22 Q   Okay.

23      MR. MORRIS:  All right.  Let's move on to 1129(b),

24 Your Honor, the cram-down portion.

25 BY MR. MORRIS:

Seery - Direct                                145

1  Q   Are you aware, Mr. Seery, how various classes have voted

2  under the plan?

3  A   I am generally, yes.

4  Q   Okay.  Did any class vote to reject the plan, to the best

5  of your knowledge?

6  A   I don't -- I guess it depends on how you define the class.

7  I think the answer is that I don't believe that, when you

8  count the full votes of the -- the allowed claims and the

9  votes in any class, I don't believe any of the classes voted

10 to reject the plan.

11 Q   What type of claims are in Class 8?

12 A   General unsecured claims.

13 Q   And what percentage of the dollar amount of Class 8 voted

14 to accept?

15 A   It's -- I think it's near -- now with the Daugherty

16 agreements, it's near a hundred percent of the third-party

17 dollars.  I don't know the individual employees' claims off

18 the top of my head.

19 Q   All right.  And what about the number in Class 8?  Have a

20 majority voted to accept or reject in Class 8?

21 A   If you include the employee claims -- which, again, we

22 think have no dollar amounts -- then I think it's a majority

23 would have rejected.  The vast dollar amounts did accept.

24 Q   Okay.  Let's talk about those employees claims for a

25 moment.  Do you have an understanding as to the basis of the

```
                         Seery - Direct                      146
```

1   claims?

2   A    Yes.

3   Q    What's your understanding of the basis of the claims?

4   A    Most of the claims are based on deferred compensation, and

5   that's the 2005 Highland Capital Management bonus plan.  And

6   that bonus plan provides certain deferred payment amounts to

7   the employees to be paid over multiple-year periods, provided

8   that they are in the seat when the payment is due.  That's the

9   vesting date.

10  Q    Okay.

11          MR. MORRIS:  Your Honor, just as a note-keeping

12  matter, the deferred compensation plan and the annual bonus

13  plan are Exhibits 6F and 6G, respectively, and they're on

14  Docket 1822.

15          THE COURT:  All right.

16  BY MR. MORRIS:

17  Q    And Mr. Seery, are you generally familiar with those

18  plans?

19  A    I am, yes.

20  Q    In order to receive benefits under the plans, are the

21  employees required to be employed at the time of vesting?

22  A    Yeah.  Our counsel refers to them, various terms, but

23  generally -- our outside labor counsel.  They're referred to

24  as seat-in-the-seat plans, meaning that your seat has to be in

25  a seat at the office at the day that the payment is due.  If

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2221
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 289 of 1017   PageID 7002
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2220 of 2722

Seery - Direct                          147

1   you're terminated for cause or if you resign, you're not

2   entitled to any payment.

3        So either you're there and you receive it or you're not

4   and you don't.  The only exception to that, I believe, is

5   death and disability.  Or disability.

6   Q   All right.  Did the Debtor terminate the annual bonus

7   plan?

8   A   Yes, we did.

9   Q   And in what context did the Debtor terminate the annual

10  bonus plan?

11  A   Well, we had discussion on it last week.  As Mr. Dondero

12  had also testified, the plan was to terminate all the

13  employees prior to the transition.  That's well known among

14  the employees.  The board terminated the 2005 bonus plan and

15  instead replaced it with a KERP plan that was approved by this

16  Court.

17  Q   And what was your understanding of the consequences of the

18  termination of the bonus plan for -- for purposes of the

19  claims that have been asserted by the employees who rejected

20  in Class 8?

21  A   It's clear that, under the 2005 HCMLP bonus plan, no

22  amounts are due because the plan has been terminated.

23  Q   All right.  Do you have an understanding as to when

24  payments become due under the deferred compensation -- under

25  the compensation plan?

Seery - Direct                      148

1   A    I do, yes.

2   Q    And when are they due?

3   A    The next payments are due in May.

4   Q    And what is the Debtor intending to do with respect to the

5   objecting employees?

6   A    The Debtor will have terminated all those employees before

7   that date.

8   Q    All right.  So, what's -- what are the consequences of

9   their termination vis-à-vis their claims under the deferred

10  compensation plan?

11  A    They won't have any claims.

12  Q    Okay.  So is it the Debtor's view that the employees who

13  voted to reject in Class 8 have no valid claims under the

14  annual comp -- annual bonus plan or the deferred compensation

15  plan?

16       MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

17  With due respect, Your Honor, these employees have voted.  The

18  voting is on file.  There has been no claim objections to

19  their claims filed.  There's been no motion to designate their

20  votes filed.  So Mr. Seery's answer to this is irrelevant.

21  They have votes -- pursuant to this Court's disclosure

22  statement order, they have votes and they have counted, and

23  now Mr. Seery is attempting to basically impeach his own

24  balloting summary.

25       THE COURT:  Mr. Morris, what is your response?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2223
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 291 of 1017 PageID 7004
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2222 of 2722

Seery - Direct                    149

1         MR. MORRIS:  The point of cram-down, Your Honor, is

2    it fair and equitable.  Does -- does -- is it really fair and

3    equitable to the 99 percent of the economic interests to allow

4    24 employees who have no valid claims to carry the day here?

5    And this is -- that's what cram-down is about, Your Honor.

6         THE COURT:  All right.  I overrule the objection.

7    BY MR. MORRIS:

8    Q   Let's talk about Class 7 for a moment, Mr. Seery.  That's

9    the convenience class; is that right?

10   A   That's correct.

11   Q   How and why was that created?

12   A   Well, initially, that was created because we had two types

13   of creditors in the case, broadly speaking.  We had liquidated

14   claims, which were primarily trade-type creditors, and we had

15   unliquidated claims, which were the litigation-type creditors.

16   And so that class was created to deal with the liquidated

17   claims, and the Class 8 would deal with the unliquidated

18   claims, which were expected to, as we talked about earlier

19   with respect to the monetization plan, take some time to

20   resolve.

21   Q   Was the creation of the convenience class a product of

22   negotiations with the Committee?

23   A   The initial discussion on how we set it up I believe was

24   generated by the Debtor's side, but how it evolved and who

25   would be in it and how it was treated in terms of

Seery - Direct                          150

1   distributions was a product of negotiation with the Committee.

2   Q    Okay.  So how was the dollar threshold figure arrived at?

3   How did you actually determine to create a convenience class

4   at a million dollars?

5   A    It was through negotiation with the Committee.  So this

6   was one of those items that moved a fair bit, in my

7   recollection, through the many negotiations we had, heated

8   negotiations on some of these items, with the Committee.

9   Q    And are all convenience class -- all holders of

10  convenience class claims holders of claims that were

11  liquidated at the time the decision was made to create the

12  class?

13  A    I believe so.  I don't think there's been -- other than --

14  well, there -- we just had some settlements today, and I think

15  that relates to the employees, but those would be the only

16  ones that there would be disputes about, and that would roll

17  into the liquidat... the convenience class.

18  Q    Okay.  Finally, is there any circumstance under which

19  holders of Class 10 or 11, Class 10 or Class 11 claims will be

20  able to obtain a recovery under the plan?

21  A    Theoretically, there's a circumstance, and that is if

22  every other creditor in the case were to be paid in full, with

23  interest at the federal judgment rate, including Class 9,

24  which are the subordinated claims.  If those all got paid in

25  full, then theoretically the junior interest holders could

Seery - Direct                    151

1  receive distributions.

2      However, based upon our projections, that would be wholly

3  dependent on a significant recovery in the Litigation -- by

4  the Litigation Trustee.

5  Q    Okay.  Let's move now to questions of the Debtor release

6  and the plan injunction.  Is the Debtor providing a release

7  under the plan?

8  A    Yes.

9  Q    Is anyone other than the Debtor providing a release under

10  the plan?

11  A    No.

12  Q    Who is the Debtor proposing to release under the plan?

13  A    The release parties are pretty similar to what you

14  typically would see, in my experience, in most plans.  You

15  have the independent board, myself as CEO and CRO, the

16  professional -- the Committee members, the professionals in

17  the case, and the employees that we reached agreement with

18  respect to certain of them who have signed on to a

19  stipulation, and others, get a broader release for negligence.

20  Q    Okay.  Is the Debtor aware of any facts that might give

21  rise to a colorable claim against any of the proposed release

22  parties?

23  A    Not with respect to any of the release parties.  So the --

24  obviously, I don't think there's any claims against me.  But

25  the same is true with respect to the oversight board, the

Seery - Direct                    152

1  independent board.

2      The Committee has been, you know, working with us hand-in-

3  glove, and I think if they thought we -- there was something

4  there, we would have heard it.

5      With respect to the professionals, we haven't seen

6  anything as an independent board.

7      And with respect to the employees' that -- general

8  negligence release, these are current employees and we have

9  been monitoring them for a year and we don't have any evidence

10 or anything to suggest that there would be a claim against

11 them.

12 Q   Are there conditions to the employees' release?

13 A   There are.  So, the employee release, as we talked about

14 earlier, was highly negotiated with the Committee.  It

15 requires that employees assist in the monetization efforts,

16 which is really on the transition and the monetization.  They

17 don't have to assist in bringing litigations against anybody,

18 so that's not part of what the provision requires.  But it

19 does require that they assist generally in our efforts to

20 monetize assets.

21     We don't think that's going to be significant, but if

22 there are individual questions or help we need, we certainly

23 would reach out to them.  If it's significant time, that will

24 be a different discussion.

25     And then with respect to the two senior employees who

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2227
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 295 of 1017 PageID 7008
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2226 of 2722

Seery - Direct                    153

1  signed the stipulation, they have to give up a part of their

2  distribution for their release.

3  Q    All right.  I think you just alluded to this, but has the

4  release been the subject of negotiation with the Creditors'

5  Committee?

6  A    Yeah.  We've touched on it a bunch of times, and we

7  certainly, unfortunately, let it spill over into the court a

8  couple times.  It was a hotly-negotiated piece of the plan.

9  Q    Okay.  Has the Committee indicated to the Debtor in any

10 way that anybody subject to the release is the subject of a

11 colorable claim?

12 A    Anyone subject to the release?  No.

13 Q    Yeah.  All right.  Let's talk about the plan injunction

14 for a moment.  Are you familiar with the plan injunction?

15 A    Broadly, yes.

16 Q    And what is your broad understanding of the plan

17 injunction?

18 A    Anybody who has a claim or thinks they have a claim will

19 broadly be enjoined from bringing that, other than as it's

20 satisfied under the plan or else ultimately bringing it before

21 this Court.  And that's the gatekeeper part, which is a little

22 bit of combining the two pieces.

23 Q    And what's your understanding of the purpose of the

24 injunction?

25 A    It's really to prevent vexatious litigation.  We, as

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2228
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/25   Page 296 of 1017   PageID 7009
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2227 of 2722

Seery - Direct                    154

1   independent directors, stepped into what I think most people

2   would fairly say is one of the more litigious businesses and

3   enterprises that they've seen.  And we have a plan that will

4   allow us to monetize assets for the benefit of the creditor

5   body, provided we're able to do that and not have to put out

6   fires every day on different fronts.  So what we're hoping to

7   do with the injunction is ensure that we can actually fulfill

8   the purposes of the plan.

9   Q   All right.  Let's talk about some of the litigation that

10  you're referring to.

11        MR. MORRIS:  Can we put up on the screen the

12  demonstrative for the Crusader litigation?

13  BY MR. MORRIS:

14  Q   And Mr. Seery, I would just ask you to kind of describe

15  your understanding in a general way about the history of the

16  Crusader litigation.

17        MR. MORRIS:  And, Your Honor, just to be clear here,

18  this is a demonstrative exhibit.  As you can see in the

19  footnotes, it's heavily footnoted to the documents and to --

20  and, really, to the court cases themselves.  The documents on

21  the exhibit list include the dockets from each of the

22  underlying litigations.  And I just want to just have Mr.

23  Seery describe at an extremely high level some of the

24  litigation that the Debtor has confronted over the years, you

25  know, as the driver, as he just testified to, for the decision

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2229
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 297 of 1017   PageID 7010
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2228 of
2722

Seery - Direct                          155

1    to seek this gatekeeper injunction.

2            THE COURT:  All right.

3    BY MR. MORRIS:

4    Q    So, Mr. Seery, can you just describe kind of in general

5    terms the Crusader litigation?

6    A    Yeah.  I apologize to the Redeemer team for maybe not

7    doing this justice.  But this is litigation that came out of a

8    financial crisis upheaval related to this fund.  Disputes

9    arose with respect to the holders of the interests, which were

10   the -- ultimately became the Redeemers, and Highland as the

11   manager.

12       That went through initial litigation, and then into the

13   Bermuda courts, where it was subject to a scheme.  The scheme

14   required or allowed for the liquidation of the fund and then

15   distributions to the -- to the holders, and then deferred many

16   of the payments to Highland.

17       At some point, Highland, frustrated that it wasn't able to

18   get the payments, decided to just take them, and I think, you

19   know, fairly -- can be fairly described, at least by the

20   arbitration panel, as coming up with reasons that may not have

21   been wholly anchored in reality as to what its reasons were

22   for taking that money.

23       That led to further disputes with the Redeemers, who then

24   terminated Highland and brought an arbitration action against

25   Highland.  They were successful in that arbitration and

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2230
Case 3:25-cv-02072-S    Document 15-9    Filed 06/13/25    Page 298 of 1017    PageID 7011
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2229 of 2722

Seery - Direct                                    156

1   received a $137 arbitration award.  And right up to the

2   petition date, that arbitration pursued.  When they finally

3   got their -- the arbitration award, they were going to

4   Delaware Chancery Court to file it and perfect it, and the

5   Debtor filed.

6   Q    Okay.

7            MR. MORRIS:  Let's go to the next slide, the Terry/

8   Acis slide.  If we could just open that up a little bit.  It's

9   -- as you can imagine, Your Honor, it's a little difficult to

10  kind of summarize the Acis/Terry saga in one slide, but we've

11  done the best we can.

12  BY MR. MORRIS:

13  Q    Mr. Seery, can you describe generally for Judge Jernigan,

14  who is well-versed in the matter, the broad overview of this

15  litigation?

16  A    There's clearly nothing I can tell the Court about the

17  bankruptcy that it doesn't already know.  But very quickly,

18  for the record, Mr. Terry was an employee at Highland.  He

19  also has a partnership interest in Acis, which was, in

20  essence, the Highland CLO business.  He -- and he got into a

21  dispute with Mr. Dondero regarding certain transactions that

22  Mr. Dondero wanted to enter into and Mr. Terry didn't believe

23  were appropriate for the investors.

24       Strangely, the assets that underlie that dispute are still

25  in the Highland portfolio, both Targa (phonetic) and Trussway.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2231
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 299 of 1017 PageID 7012
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2230 of 2722

Seery - Direct                    157

1   Mr. Terry was terminated, or quit, depending on whose side of

2   the argument you take.  Mr. Terry then sought compensation in

3   the arbitration pursuant to the partnership agreement.

4   Ultimately, he was awarded an arbitration award of roughly $8

5   million.

6       When he went to enforce that -- that was against Acis.

7   When he went to enforce that against Acis, which had all the

8   contracts, Highland went about, I think, terribly denuding

9   Acis and moving value.  Mr. Terry ultimately was able to file

10  an involuntary against Acis, and after a tremendous amount of

11  litigation had a plan confirmed that gave him certain rights

12  in Acis and any ability to challenge certain transactions with

13  respect to Highland that formed the basis of his claims in the

14  Highland bankruptcy.

15      That wasn't the end of the saga, because Highland

16  commenced a litigation -- well, not Highland, but HCLOF and

17  others, directed by others -- commenced litigation against Mr.

18  Terry in Guernsey, an island in the English Channel.  That

19  litigation wound its way for a couple -- probably close to two

20  years, at least a year and a half, and ultimately was -- it

21  was dismissed in Mr. Terry's favor.

22      While that was pending, litigation was commenced in New

23  York Supreme Court against Mr. Terry and virtually anybody who

24  had ever associated with him in the business, including --

25  including some of the rating agencies.  That was withdrawn as

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2232
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 300 of 1017 PageID 7013
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2231 of 2722

Seery - Direct                    158

1   part of our efforts working with DAF to try to bring a little

2   bit of sanity to the case.  But it was withdrawn without

3   prejudice.

4       But ultimately, you know, we've agreed to a claims

5   settlement, which was approved by this Court, with Acis and

6   Mr. Terry.

7   Q   All right.

8           MR. MORRIS:  How about UBS?  Can we get the UBS

9   slide?

10          THE WITNESS:  I should mention that there's other

11  litigations involving Mr. Terry and Highland individuals that

12  are outstanding, I believe, in Texas court.  We have not yet

13  had to deal with those.

14  BY MR. MORRIS:

15  Q   Okay.  Can you describe for the Court your general

16  understanding of the UBS litigation?

17  A   Again, UBS comes out of the financial crisis.  It was a

18  warehouse facility that UBS had established for Highland.  It

19  actually was a pre-crisis facility that was restructured in

20  early '08, while the markets were starting to slide but before

21  they really collapsed.  That litigation started after Highland

22  failed to make a margin call.  UBS foreclosed out -- or it

23  wasn't really a foreclosure, because it's a warehouse

24  facility, but basically closed out all the interest and sought

25  recovery from Highland for the shortfall.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2233
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 301 of 1017   PageID 7014
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2232 of 2722

Seery - Direct                    159

1      Highland was one of the defendants, but there are numerous

2   defendants, including some foreign subsidiaries of Highland.

3      That case wend its way through the New York Supreme Court,

4   up and down between the Supreme and the Appellate Division,

5   which is the intermediate appellate court in New York.

6   Incredibly litigious effort over virtually every single item

7   you could possibly think of.

8      Ultimately, UBS got a judgment for $500-plus million and

9   -- plus prejudgment interest against two of the Highland

10  subsidiaries.  It then sought to commence action up -- enforce

11  its judgment through various theories against Highland.  That

12  is part of the settlement that we have -- it's been part of

13  the lift stay motion here, the 3019, as well as the 3018, and

14  as well as the ultimate settlement we've discussed today.

15  Q   Okay.  Moving on to Mr. Daugherty, can you describe for

16  the Court your understanding of the Daugherty litigation?

17  A   The Daugherty litigation goes back even further.  It did

18  -- I think the original disputes were -- or, again, started to

19  happen between Mr. Daugherty and Mr. Dondero even prior to the

20  crisis, but Mr. Dondero -- Daugherty certainly stayed with

21  Highland post-crisis.  And then when Mr. Daugherty was severed

22  or either resigned or terminated from his position, there was

23  various litigations that began between the parties very

24  intensely in state court, one of the more nasty litigations

25  that you can imagine, replete with salacious allegations and

Seery - Direct                         160

1    press releases.

2        That litigation then led to an award originally for Mr.

3    Daugherty from HERA, which was an entity that had assets that

4    Mr. Daugherty alleges were stripped.  Mr. Daugherty had to pay

5    a judgment against Highland.  Ultimately, litigations were

6    commenced in both the state court and the Delaware Chancery

7    Court.  Those litigations, many of those continue, because

8    they're not just against the entities but specific

9    individuals.  Mr. Daugherty got a voting -- a claim allowed

10   for voting purposes in our case of $9.1 million, and we've

11   since reached an agreement with Mr. Daugherty on his claim,

12   save for a tax case which we announced earlier that relates to

13   compensation, claimed compensation with respect to a tax

14   distribution, which we have defenses for and he has claims

15   for.

16            MR. MORRIS:  All right.  We can take that down,

17   please.

18   BY MR. MORRIS:

19   Q   And let's just talk for a few minutes about some of the

20   things that have happened in this case.  Did Mr. Dondero

21   engage in conduct that caused the Debtor to seek and obtain a

22   temporary restraining order?

23   A   Yes, he did.

24   Q   And did the Debtor -- did Mr. Dondero engage in conduct

25   that caused the Debtor to seek and obtain a preliminary

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2235
Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/25    Page 303 of 1017    PageID 7016
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2234 of 2722

Seery - Direct                    161

1    injunction against him?

2    A    Yes.

3    Q    And has the Debtor filed a motion to hold Mr. Dondero in

4    contempt for violation of the TRO?

5    A    Yes.

6    Q    Are you aware that -- of the CLO-related motion that was

7    filed in mid-December?

8    A    It's similar in that these are controlled entities that

9    brought similar types of claims against the Debtor and

10   interfered in similar ways, albeit not as directly threatening

11   with respect to the personnel of the Debtor.

12   Q    Okay.  And you're aware of how that -- that motion was

13   resolved?

14   A    I know we resolved it, and I'm drawing a blank on that.

15   But --

16   Q    All right.  Are you aware, did Mr. Daugherty also object

17   to the Acis and HarbourVest settlements, or at least either

18   him or entities acting on his behalf?

19   A    I think you meant Mr. Dondero.  I don't believe Mr.

20   Daugherty did.

21   Q    You're right.  Thank you.  Let me ask the question again.

22   Thank you for the clarification.  We're almost done.  To the

23   best of your knowledge, did Mr. Dondero or entities that he

24   controls file objections to the Acis and HarbourVest

25   settlements?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2236
Case 3:25-cv-02072-S Document 15-9 Filed 06/13/25 Page 304 of 1017 PageID 7017
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2235 of 2722

Seery - Direct                    162

1   A   Yes, they did.

2   Q   And we're here today with this long recitation because the

3   remaining objectors are all Mr. Dondero or entities owned or

4   controlled by him; is that right?

5   A   That's correct.

6   Q   All right.

7           MR. RUKAVINA:  Your Honor, I didn't have a chance to

8   object in time.  Entities owned or controlled by Mr. Dondero.

9   There's no evidence of that with respect to at least three of

10  my clients, and this witness has not been asked predicate

11  questions to lay a foundation.  Mr. Dondero does not own or

12  control the three retail (inaudible).  So I move to strike

13  that answer.

14          MR. MORRIS:  Your Honor, I withdraw with respect to

15  the three funds.  It's fine.

16          THE COURT:  All right.  With that withdrawal, then I

17  think that resolves the objection.

18          MR. MORRIS:  Uh, --

19          THE COURT:  Or I overrule the remaining portion.

20      Okay.  Go ahead.

21          MR. RUKAVINA:  That does, Your Honor.  Thank you.

22  BY MR. MORRIS:

23  Q   Are -- are -- is everything that you just described, Mr.

24  Seery, the basis for the Debtor's request for the gatekeeper

25  and injunction features of the plan?

Seery - Direct                         163

1  A    Well, everything I described are a part of the basis for

2  that.  I didn't describe every single basis with respect to

3  why those --

4  Q    So what are -- what are the other reasons that the Debtor

5  is seeking the gatekeeper and injunction provisions in the

6  plan?

7  A    We really do need to be able to operate the business and

8  monetize the assets without direct interference and litigation

9  threats.  We didn't go through some of the specifics, and I

10 hesitate to burden the Court again, but the email to me, the

11 email to Mr. Surgent, the testimony threatening -- effectively

12 threatening Mr. Surgent, in my opinion, by Mr. Dondero, in the

13 court in previous weeks, statements by his counsel indicating

14 that Mr. Dondero is going to sue me for hundreds of millions

15 of dollars down the road.

16     I mean, this is nonstop.  I'm an independent fiduciary.

17 I'm trying to maximize value for the estate.  I've got some

18 guy who's threatening to sue me?  It's absurd.

19        MR. MORRIS:  Your Honor, I have no further questions,

20 but what I would respectfully request is that we take just a

21 short five-minute break.  I'd like to just confer with my

22 colleagues before I pass the witness.

23        THE COURT:  All right.  Five-minute break.

24        MR. MORRIS:  Thank you, Your Honor.

25        THE CLERK:  All rise.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2238
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 306 of 1017   PageID 7019
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2237 of 2722

Seery - Direct                    164

```
 1        (A recess ensued from 1:58 p.m. to 2:06 p.m.)

 2             THE CLERK:  All rise.

 3             THE COURT:  All right.  Please be seated.  We're back

 4    on the record in Highland.  Mr. Morris, anything else?

 5             MR. MORRIS:  All right, Your Honor.  Can you hear me?

 6             THE COURT:  I can, uh-huh.

 7             MR. MORRIS:  Okay.  Mr. Seery, are you there?

 8             THE WITNESS:  I am, yes.

 9             MR. MORRIS:  I just have a few follow-up questions,

10    Your Honor, if I may.

11             THE COURT:  Okay.

12                  DIRECT EXAMINATION, RESUMED

13    BY MR. MORRIS:

14    Q    Okay.  Mr. Seery, we talked for a bit about the difference

15    between the convenience class and the general unsecured

16    claims.  Do you recall that?

17    A    Yes.

18    Q    And that's the difference between Class 7 and 8; do I have

19    that right?

20    A    Yes.

21    Q    And what is the recovery for claimants in Class 7, to the

22    best of your recollection, the convenience class?

23    A    It's 85 cents.

24    Q    And under --

25    A    On the dollar.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2239
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 307 of 1017 PageID 7020
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2238 of
2722

Seery - Direct                    165

1   Q    And under the projections that were filed last night, and

2   we can call them up on the screen if you don't have total

3   recall, do you recall what Class 8 is projected to recover now

4   that we've taken into account the UBS settlement?

5   A    Approximately 71.

6   Q    Okay.

7   A    Percent.  71 cents on the dollar.

8            THE COURT:  Okay.  The answer --

9   BY MR. MORRIS:

10  Q    Okay.  Do I this right --

11           THE COURT:  The answer was a little garbled.  Can you

12  repeat the answer, Mr. Seery?

13           THE WITNESS:  Approximately 71 cents on the dollar,

14  Your Honor.

15           THE COURT:  Okay.  Thank you.

16  BY MR. MORRIS:

17  Q    Okay.  And do I have that right, that that 71 cents

18  includes no value for potential litigation claims?

19  A    That's correct.  We didn't even put that in our

20  projections at all.

21  Q    So is it possible, depending on Mr. Kirschner's work, that

22  holders of Class 8 claims could recover an amount in excess of

23  85 percent?

24  A    It's possible, yes.

25  Q    Okay.  Are you aware that Dugaboy has suggested that the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2240
Case 3:25-cv-02072-S Document 15-9 Filed 06/13/06/25 Page 308 of 1017 PageID 7021
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2239 of 2722

Seery - Direct                          166

1   Debtor should resolicit because their -- their -- the

2   projections in the November disclosure statement were

3   misleading?

4   A    I'm aware that they've made allegations along those lines,

5   yes.

6   Q    Okay.  Do you think the November projections were

7   misleading in any way?

8   A    No, not at all.

9   Q    And why not?

10  A    Well, the plan was -- the projections are for the plan,

11  and they contain assumptions.  And it was clear in the plan

12  that those assumptions could change.  So the value of the

13  assets, which aren't static, does change.  The costs aren't

14  static.  They do change.  The amount of the claims, the

15  denominator, was not static and would change.

16  Q    Okay.  And were the -- were the changes in the claims, for

17  example, changes that were all subject to public viewing, as

18  the Court ruled on 3018, as the settlement with HarbourVest

19  was announced?

20  A    Well, the plan -- the terms of the plan made clear that

21  the Class 8 claims would -- would be whatever the final

22  amounts of those claims were going to be.  We did resolve the

23  claims of HarbourVest and then ultimately the settlement

24  announced today, but in front of -- in front of the world, in

25  front of the Court, with a 9019 motion.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2241
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 309 of 1017   PageID 7022
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2240 of 2722

Seery - Direct                        167

1  Q   Okay.  We had finished up with some questioning about the

2  gatekeeper and the injunction provision.  Do you recall that?

3  A   Yes, I do.

4  Q   And you had testified as to the reasons why the Debtor was

5  seeking that particular protection.  Do you recall that?

6  A   Yes.

7  Q   In the absence of that protection, does the Debtor have

8  any concerns that interference by Mr. Dondero could adversely

9  impact the timing of the Debtor's plan?

10 A   Well, that's my opinion and what I testified to before.  I

11 think the -- the injunction -- the exculpation, the

12 injunction, and the gatekeeper are really critical and

13 essential elements of this plan, because we have to have the

14 ability, unfettered by litigation, particularly vexatious

15 litigation in multiple jurisdictions, we have to be able to

16 avoid that and be able to focus on monetizing the assets and

17 try to maximize value.

18 Q   Is there a concern that that value would erode if

19 resources and time and attention are diverted to the

20 litigation you've just described?

21 A   Absolutely.  The focus of the team has to be on the

22 assets' monetization, creative ways to get the most value out

23 of those assets, and not on defending itself, trying to paper

24 up some sort of litigation defense against vexatious

25 litigation, and also spending time actually defending

Seery - Direct                         168

1   ourselves in various courts.

2   Q   Okay.  Last couple of questions.  If there was no

3   gatekeeper provision in the plan, would you accept appointment

4   as the Claimant Trustee?

5   A   You broke up.  No which provision?

6   Q   If there was no gatekeeper provision in the -- in the

7   confirmation order, would you accept the position as Claimant

8   Trustee?

9   A   No, I wouldn't.  Just -- just like when I came on, there

10  were -- there are some pretty essential elements that I

11  mentioned before.  One is indemnification.  Two is directors

12  and officers insurance.  And three was a gatekeeper function.

13  I want to make sure that we're not at risk, that I'm not at

14  risk, for doing my job.

15  Q   And I think you just said it, but if you were unable to

16  obtain D&O insurance, would you accept the position as

17  Claimant Trustee?

18  A   No, I would not.

19          MR. MORRIS:  I have no further questions, Your Honor.

20          THE COURT:  All right.  So, you went two hours and 34

21  minutes in total with your direct.  So we'll now pass the

22  witness for cross.  And the Objectors get an aggregate of two

23  hours and 34 minutes.

24      Who's going to go first?

25          MR. RUKAVINA:  Your Honor, Davor Rukavina.  I will.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2243
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 311 of 1017 PageID 7024
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2242 of 2722

Seery - Direct                    169

 1          THE COURT:  Okay.  Go ahead.

 2          MR. RUKAVINA:  Mr. Vasek, if you can pull up Exhibit

 3   6N, the ballot summary, Page 7 of 15 on the top.

 4          MR. POMERANTZ:  Mr. Morris, you're not on mute.

 5          MR. MORRIS:  Thank you, sir.

 6          MR. RUKAVINA:  Mr. Vasek, did you hear me?  There it

 7   is.

 8                     CROSS-EXAMINATION

 9   BY MR. RUKAVINA:

10   Q    Mr. Seery, are you familiar with this ballot tabulation

11   that was filed with the Court and that has been admitted into

12   evidence?

13   A    Yes, I believe I've seen this.

14   Q    Okay.  And this says that 31 Class 8 creditors rejected

15   and 12 Class 8 creditors accepted the plan, correct?

16   A    That's correct.

17   Q    And since then, I think we've heard that Mr. Daugherty and

18   maybe two other employees have changed their vote to an

19   accept; is that correct?

20   A    That's correct, yes.

21   Q    Okay.  Other than three, those three employees that are

22   changing, do you know of any other Class 8 creditors that are

23   changing their votes?

24   A    Mr. Daugherty is not an employee.

25   Q    I apologize.  Other than those three Class 8 creditors

Seery - Cross                              170

1  that are changing their votes, do you know of any other ones

2  that are changing their votes?

3  A    No.

4  Q    Okay.  You didn't tabulate the ballots, did you?

5  A    No, I did not.

6  Q    Do you have any reason to question the accuracy of this

7  ballot summary that's been filed with the Court?

8  A    No, I do not.

9  Q    Okay.  You mentioned that many of the people that rejected

10 the plan are former employees who you don't think will

11 ultimately have allowed claims, correct?

12 A    Not ultimately.  I said they don't have them now.

13 Q    Okay.  Are you aware that the Court ordered that

14 contingent unliquidated claims be allowed to vote in an

15 estimated amount of one dollar?

16 A    I'm aware of that, yes.

17 Q    Okay.  All right.  Now, no motion to reconsider that order

18 has been filed, correct?

19 A    Not to my knowledge.

20 Q    Okay.  No objection to these rejecting employees' claims

21 have been filed yet, correct?

22 A    Correct.

23 Q    Okay.  And no motion to strike or designate their vote has

24 been filed as of now, correct?

25 A    Correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2245
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 313 of 1017 PageID 7026
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2244 of 2722

Seery - Cross                               171

1          MR. RUKAVINA:  You can take down that exhibit, Mr.

2   Vasek.

3   BY MR. RUKAVINA:

4   Q    Mr. Seery, the Debtor itself is a limited partnership; I

5   think you confirmed that earlier, correct?

6   A    Correct.

7   Q    And its sole general partner is Strand Advisors, Inc.,

8   correct?

9   A    Correct.

10  Q    And to your understanding, the Debtor, as a limited

11  partnership, is managed by its general partner, correct?

12  A    Correct.

13  Q    Okay.  And Strand, that's where the independent board of

14  you, Mr. Nelms, and Mr. Dubel -- or I apologize if I'm

15  misspelling, misstating his name -- that's where the board

16  sits, at Strand, correct?

17  A    Yes.

18  Q    Okay.  And that board has been in place since about

19  January 9, 2020?

20  A    Yes.

21  Q    Okay.  Strand is not a debtor in bankruptcy, correct?

22  A    No.

23  Q    Okay.  Do you have any understanding as to whether, under

24  non-bankruptcy law, a general partner is liable for the debts

25  of the limited partnership that it manages?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2246
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 314 of 1017   PageID 7027
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2245 of 2722

```
                        Seery - Cross                    172
```

1   A    I do.

2   Q    Okay.  What's your understanding?

3   A    Typically, a general partner is liable for the debts of

4   the partnership.

5   Q    Okay.  And under the plan, Strand itself is an exculpated

6   party and a protected party and a released party for matters

7   arising after January 9, 2020, correct?

8   A    Yes.

9   Q    Okay.  You mentioned that you're the chief executive

10  officer and chief restructuring officer in this case for the

11  Debtor, correct?

12  A    For the Debtor, yes.

13  Q    Yeah.  You are not a Chapter 11 trustee, right?

14  A    No.

15  Q    Okay.  You are one of the principal authors of this plan,

16  correct?

17  A    Consultant.

18          MR. MORRIS:  Objection to the form of the question.

19          THE COURT:  Sustained.

20  BY MR. RUKAVINA:

21  Q    You are --

22          THE COURT:  Sustained.

23  BY MR. RUKAVINA:

24  Q    You are --

25          THE COURT:  Rephrase.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2247
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 315 of 1017   PageID 7028
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2246 of 2722

Seery - Cross                          173

1  BY MR. RUKAVINA:

2  Q    -- one of the principal --

3        MR. RUKAVINA:  I apologize.

4  BY MR. RUKAVINA:

5  Q    You had input in creating this plan, didn't you?

6  A    I did, yes.

7  Q    Okay.  And you're familiar with the plan's provisions,

8  aren't you?

9  A    Yes.

10 Q    Okay.  And you, of course, approve of the plan, correct?

11 A    Yes.

12 Q    Okay.  And you are, of course, familiar generally with

13 what the property of the estate currently is, correct?

14 A    Yes.

15 Q    Okay.  And part of the purpose of the plan, I take it, is

16 to vest that property in the Claimant Trust in some respects

17 and the Reorganized Debtor in some respects, correct?

18 A    I don't -- I don't know if that's a fair characterization.

19 Some property -- maybe some property will stay with the

20 Debtor, some will be transferred directly to the Trust.

21 Q    Okay.  All property of the estate as it currently exists

22 will stay with the Debtor or go to the Trust, correct?

23 A    Yes.

24 Q    Okay.  And under the plan, the Creditor Trust will be

25 responsible for payment of prepetition claims, correct?

```
                        Seery - Cross                    174
```

1   A    Yes.

2   Q    And under the plan, the Creditor Trust will be responsible

3   for the payment of postpetition pre-confirmation claims,

4   correct?

5   A    Do you mean admin claims?  I don't --

6   Q    Sure.

7   A    I don't understand your question.  I'm sorry.

8   Q    Yes.  We can call them admin claims.

9   A    Yeah.  Those -- they'll be -- they will be paid on the

10  effective date or in and around that time.  So I'm not sure if

11  that's actually going to be from the Trust, but I think it's

12  actually from the Debtor, as opposed to from the Trust.

13  Q    Okay.  But after the creation of the Claimant Trust, --

14  A    Uh-huh.

15  Q    -- whatever administrative claims are not paid by that

16  time will be assumed by and paid from the Claimant Trust,

17  correct?

18  A    I don't recall that specifically.

19  Q    Is it your testimony that the Reorganized Debtor will be

20  obligated post-effective date of the plan to pay any admin

21  claims that are then unpaid?

22          MR. MORRIS:  Objection to the form of the question.

23          THE COURT:  Sustained.  Rephrase.

24  BY MR. RUKAVINA:

25  Q    Who pays unpaid admin claims under the plan once the plan

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2249
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 317 of 1017   PageID 7030
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2248 of
2722

Seery - Cross                    175

1   goes effective?

2   A    I believe the Debtor does.  The Reorganized Debtor.

3   Q    Okay.  The Reorganized Debtor also gets a discharge,

4   correct?

5   A    Yes.

6   Q    Okay.  And there is no bankruptcy estate left after the

7   plan goes effective, correct?

8          MR. MORRIS:  Objection to the form of the question.

9          THE COURT:  Overruled.

10         MR. RUKAVINA:  Your Honor, I have the right to know

11  what the objection to my question is.

12         THE COURT:  I overruled.

13         MR. MORRIS:  Okay.

14         THE COURT:  I overruled the objection.

15         MR. RUKAVINA:  Thank you.

16  BY MR. RUKAVINA:

17  Q    Mr. Seery, do you remember my question?

18  A    That whether there was a bankruptcy estate after the

19  effective date?

20  Q    Yes.

21  A    There wouldn't be a bankruptcy estate anymore, no.

22  Q    Okay.  Under the plan, the creditors, to the extent that

23  they have their claims allowed, the prepetition creditors,

24  they're the beneficiaries of the Claimant Trust, correct?

25  A    They are some of the beneficiaries, yes.

Seery - Cross                    176

1   Q    Okay.  And you would be the Trustee, I think you said, of

2   the Claimant Trust?

3   A    Of the Claimant Trust, yes.

4   Q    Okay.  And you will have fiduciary duties to the

5   beneficiaries of the Claimant Trust, correct?

6   A    I believe I have some, yes.

7   Q    Okay.  Well, as the Trustee, you will have some fiduciary

8   duties; you do agree with that?

9   A    That's what I said, yes.

10  Q    Okay.  What's your understanding of what those fiduciary

11  duties to the beneficiaries of the Claimant Trust will be?

12  A    I think they'll be -- they are cabined to some degree by

13  the provisions of the agreement, but generally there will be a

14  duty of care and a duty of loyalty.

15  Q    Do you feel like you'll have a duty to try to maximize

16  their recoveries?

17  A    That depends.

18  Q    On what?

19  A    My judgment on what's the -- if I'm exercising my duty of

20  care and my duty of loyalty.

21  Q    Okay.  But surely you'd like to, whether you have a duty

22  or not, you'd like to maximize their recoveries as Trustee,

23  wouldn't you?

24  A    Yes.

25  Q    Okay.  Now, in addition to the beneficiaries, which I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2251
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 319 of 1017   PageID 7032
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2250 of 2722

Seery - Cross                           177

1   believe are the Class 8 and Class 9 creditors, the plan

2   proposes to give non-vested contingent interests in the Trust

3   to certain holders of limited partnership interests, correct?

4   A    Yes.

5   Q    Okay.  And those non-vested contingent interests would

6   only be paid and would only vest if and when all unsecured

7   creditors and subordinated creditors are paid in full, with

8   interest, correct?

9   A    Yes.

10  Q    Okay.  And those non-vested contingent interests are a

11  property interest, although they're an inchoate property

12  interest, correct?

13  A    I don't know.  I think I testified in my deposition that I

14  -- I reached for inchoate, but I'm not an expert in the

15  definitions of property interests.  I don't know if they're

16  too ethereal to be considered a property interest.

17  Q    Okay.

18        MR. RUKAVINA:  Mr. Vasek, will you please pull up Mr.

19  Seery's deposition at Page 215?  And if you'll go to Page 200

20  -- can you zoom -- can you zoom that in a little bit?  Mr.

21  Vasek, can you zoom on that?

22        MR. VASEK:  Just a moment.  There's some sort of

23  issue here.

24        MR. RUKAVINA:  Okay.  And then go to Page 216.

25  Scroll down to 216, please.

Seery - Cross                    178

1          MR. VASEK:  Okay.  I can't see it, so --

2          MR. RUKAVINA:  Okay.  Stay, stay where you are.  Go

3    down one more row.

4    BY MR. RUKAVINA:

5    Q   Okay.  Mr. Seery, can you see this?

6    A   Yes.

7    Q   Okay.  So, I ask you on Line 21, "They may be a property

8    interest, but inchoate only, correct?"  And you answer, "That

9    is my belief.  I don't claim to be an expert on the different

10   types of property interests," --

11         MR. RUKAVINA:  Mr. Vasek, can you go to the next

12   page?

13   BY MR. RUKAVINA:

14   Q   (continues) "-- whether they be inchoate, reversionary,

15   ethereal.  I don't claim to be an expert on the different

16   types of property interests."

17       Do you see that answer, sir?

18   A   Yes.

19   Q   And do you stand by your answer given on Lines 23 through

20   Line 4 of the next page?

21   A   Yes.

22   Q   Okay.  And these non-vested contingency -- contingent

23   interests in the Claimant Trust, they may have some value in

24   the future, correct?

25   A   Yes.

Seery - Cross                    179

1         MR. RUKAVINA:  Okay.  You can take that down, Mr.
2    Vasek.
3    BY MR. RUKAVINA:
4    Q    Have you tried to see whether anyone outside this case, or
5    anyone at all, would pay anything for those unvested
6    contingent interests to the Claimant Trust?
7    A    No.
8    Q    Okay.  Now, the Debtor is a registered investment advisor
9    under the Investment Advisers Act of 1940; is that correct?
10   A    That's correct.
11   Q    And under that Act, the Debtor owes a fiduciary duty to
12   the funds that it manages and to the investors of those funds,
13   correct?
14   A    Clearly to the funds, and generally to the investors more
15   broadly, yes.
16   Q    Okay.  And would you agree that that duty compels the
17   Debtor to look for the interests of the funds and the
18   investors of those funds ahead of its own interests?
19   A    Generally, but it's a much more fine line than what you're
20   describing.  It means you can't -- the manager can't put its
21   own interests in front of the investors and the funds.  It
22   doesn't mean that the manager subordinates its interest in the
23   -- to the investors and the funds.
24         MR. RUKAVINA:  Well, Mr. Vasek, please pull up the
25   October 20th transcript at Page 233.

Seery - Cross                         180

1          MR. MORRIS:  What transcript is this?

2          MR. RUKAVINA:  October 20, 2019.  Mr. Vasek has the

3     docket entry.

4          MR. MORRIS:  Oh, so it's the -- Your Honor, I just do

5     want to point out that Mr. Rukavina objected, in fact, to the

6     use of trial transcripts, but we'll get to that when we put on

7     our evidence, when we finish up.

8          MR. RUKAVINA:  Well, Your Honor, I believe that

9     you're allowed to use a trial transcript to impeach testimony,

10    which is what I'm going to do now.

11        So, for that purpose, Mr. Vasek, if you could -- are you

12    on Page 233?

13         THE COURT:  And just so the record is clear, this is

14    from October 2020, not October 2019, which is, I think, what I

15    heard.  Continue.

16         MR. MORRIS:  Your --

17         MR. RUKAVINA:  Your Honor, I apologize, you did hear

18    that and I did make a mistake.  Yes, this is at Docket 1271.

19        Mr. Vasek, if you'll scroll down, please.  Okay.  No, stop

20    there.

21    BY MR. RUKAVINA:

22    Q   And you see on Line 16, sir, you're asked your

23    understanding, and then you answer, "Okay."  "And in

24    exercising those duties, the manager, under the Advisers Act,

25    has a duty to subordinate its interests to the interests of

Seery - Cross                    181

1   those investors in the CLOs, correct?"  And you answer --

2           MR. RUKAVINA:  Go down, Mr. Vasek.

3   BY MR. RUKAVINA:

4   Q   -- "I think -- I think, generally, when you think about

5   the fiduciary duty, and I think that we -- I want to make sure

6   I'm very specific about this, is that the manager has a duty,

7   fiduciary duties -- there's a whole bunch of legal analysis of

8   what they are, but they are significant -- that the manager

9   owes to the investors.  And to the extent" --

10          MR. RUKAVINA:  Scroll down, please.

11  BY MR. RUKAVINA:

12  Q   "And to the extent that the manager's interests would

13  somehow be -- somehow interfere with the investors' in the

14  CLO, he is supposed to -- he or she is supposed to subordinate

15  those to the benefit of the investors."

16      Did I read that accurately, Mr. Seery?

17  A   You did.

18  Q   Was that your testimony on October 20th last?

19  A   Yes.

20  Q   Okay.  Are you willing to revise your testimony from a few

21  minutes ago that the manager does not have to subordinate its

22  interests to the interests of the investors?

23  A   No.  I think that's very similar.

24  Q   Okay.

25  A   You left out the part about garbled up top where I said it

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2256
Case 3:25-cv-02072-S Document 15-9 Filed 06/27/25 Page 324 of 1017 PageID 7037
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2255 of 2722

Seery - Cross                          182

1  was nuanced, almost exactly what I just said.  On Line 9, I

2  believe, on the prior page.

3  Q   Well, I heard you say a couple of minutes ago, and maybe I

4  misunderstood because of the WebEx nature, that the manager

5  does not have to subordinate its interests to the interests of

6  the investors.  Did I misheard you say that a few minutes ago?

7  A   I think you misheard it.  I said it's a nuanced analysis,

8  and it's -- it's pretty significant.  But the manager does

9  subordinate his general interest and assures that the CLO or

10 any of the investors' interests are paramount, but he doesn't

11 subordinate every single interest.

12      For example, and I think it's in this testimony, the

13 manager, if the fund isn't doing well, doesn't just have to

14 take his fee and not get paid.  He's allowed -- entitled to

15 take his fee.  He doesn't subordinate every single interest of

16 his.  He doesn't give up his home and his family.  So it's --

17 it's a nuanced analysis.  The interests of the manager are

18 subordinated to the interests of the investors and the fund.

19 I don't -- I don't disagree with anything I said there.  I

20 think I'm consistent.

21 Q   Okay.

22      MR. RUKAVINA:  You can take that down, Mr. Vasek.

23 BY MR. RUKAVINA:

24 Q   So, how do you describe, sir, the fiduciary duty that the

25 Debtor owes to the funds that it manages and to the investors

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2257
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 325 of 1017   PageID 7038
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2256 of
2722

Seery - Cross                          183

1   in those funds?

2          MR. MORRIS:  Objection to the -- to the extent it

3   calls for a legal conclusion, Your Honor.  I just want to make

4   sure we're -- we're asking a witness for his lay views.

5          THE COURT:  Okay.  I overrule the objection.  He can

6   answer.

7          THE WITNESS:  Yes.  As a manager of a fund, the

8   manager is a fiduciary to the fund, and sometimes to the

9   investors, depending on the structure of the fund.  Some funds

10  are purposely set up where the investors are actually debt-

11  holders, and their interests are much more cabined by the

12  terms of the contract, as opposed to straight equity holders.

13  But the manager has a duty to seek to maximize value of the

14  assets in the best interests of the underlying -- of the fund

15  and the underlying investors, to the extent that it can,

16  within the confines and structure of the fund.

17  BY MR. RUKAVINA:

18  Q   Okay.  And these duties as you just described them, they

19  would apply to the Reorganized Debtor, correct?

20  A   They would apply to the Reorganized Debtor to the extent

21  that it's a manager for a fund, not, for example, with respect

22  to necessarily interests -- the inchoate interests that we

23  talked about earlier.

24  Q   Sure.  And I apologize, I meant just for the fund.  And if

25  the manager, the Reorganized Debtor, breaches those duties,

Seery - Cross                    184

1   then it's possible that there's going to be liability,

2   correct?

3   A    It's possible.

4   Q    Okay.  Now, under the plan, the limited partnership

5   interests in the Reorganized Debtor will be owned by the

6   Claimant Trust, correct?

7   A    Yes.

8   Q    Okay.  And there's a new entity called New GP, LLC that

9   will be created or already has been created, correct?

10  A    Yes.

11  Q    Okay.  And that entity will hold the general partnership

12  interest in the Reorganized Debtor, correct?

13  A    I believe that's correct.

14  Q    Okay.  And that entity -- that being New GP, LLC -- will

15  also be owned by the Claimant Trust, correct?

16  A    Yes.

17  Q    Okay.  Who will manage the Reorganized Debtor?

18  A    The G -- the GP will manage the Reorganized Debtor.

19  Q    Okay.  And will there be an officer or officers of the

20  Reorganized Debtor, or will it all be managed through the GP?

21  A    It'll be managed through the GP.

22  Q    Okay.  And who will manage the GP?

23  A    Likely, I will.

24  Q    Okay.  That's the current plan, that you will?

25  A    I'll be the Claimant Trustee, and I believe that I'll be

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2259
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/06/25   Page 327 of 1017   PageID 7040
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2258 of 2722

Seery - Cross                    185

1   responsible for any assets that remain in the Reorganized

2   Debtor, yes.

3   Q   Okay.  Right now, the Debtor is managing its own assets as

4   the Debtor-in-Possession, right?

5   A   Yes.

6   Q   And it is managing various funds and CLOs, right?

7   A   Yes.

8   Q   Okay.  And right now, the Debtor is attempting to reduce

9   some of its assets to money, like the promissory notes that

10  you mentioned earlier that the Debtor filed suit on, correct?

11  A   Yes.

12  Q   And the Debtor is trying to reduce some of its assets to

13  money, like the promissory notes, to benefit its creditors,

14  correct?

15  A   Yes.

16  Q   Okay.  And correct me if I'm wrong, but the Committee has

17  filed various claims and causes of action against Mr. Dondero,

18  correct?

19  A   They -- they've filed some.  I haven't -- I haven't looked

20  at their (indecipherable) closely, but --

21  Q   Okay.

22  A   -- some are preserved in the case.

23  Q   You understand --

24  A   In the plan.  I'm sorry.

25  Q   You understand that the Committee is doing that for the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2260
Case 3:25-cv-02072-S    Document 15-9    Filed 06/13/25    Page 328 of 1017    PageID 7041
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2259 of
2722

Seery - Cross                              186

1   benefit of the estate, correct?

2   A    Yes.

3   Q    And you understand that they're also doing that for the

4   benefit of creditors, correct?

5   A    Yes.

6   Q    Okay.  And under the plan, just so that I'm clear, those

7   claims that the Committee has asserted will be preserved and

8   will vest in either the Claimant Trust or the Litigation Sub-

9   Trust, correct?

10  A    Yes.

11  Q    Okay.  And under the plan, the Reorganized Debtor would

12  continue to manage its assets, correct?

13  A    Yes.

14  Q    And it would continue to manage the Funds and the CLOs,

15  correct?

16  A    Yes.

17  Q    And the Claimant Trust would attempt to liquidate and

18  distribute to its beneficiaries the assets that are

19  transferred to it, correct?

20  A    Yes.

21  Q    Okay.  And you mentioned that the Claimant Trust will have

22  an Oversight Board comprised of five members, right?

23  A    Yes.

24  Q    And four of them will be the people that are currently on

25  the Committee, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2261
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 329 of 1017   PageID 7042
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2260 of 2722

Seery - Cross                    187

1   A    Yes.

2   Q    And the fifth is David Pauker, and I think you mentioned

3   that he's independent.  David Pauker is the fifth member,

4   right?

5   A    Yes.

6   Q    Who -- who is he?

7   A    David Pauker is a very well-known professional in the

8   restructuring world.  He's a long-time financial advisor in --

9   in reorganizations.  He's served on numerous boards in

10  restructuring -- restructurings.

11  Q    Okay.  So, other than a different corporate structure and

12  the Claimant Trust, the monetization of assets for the benefit

13  of creditors would continue post-confirmation as now, correct?

14  A    I -- I believe so.  I'm not exactly sure what you asked

15  there.

16  Q    No one is putting in any new money under the plan, are

17  they?

18  A    No.  No.

19  Q    Okay.  There's no exit financing contingent on the plan

20  being confirmed, right?

21  A    You mean no exit -- the plan is not contingent on exit

22  financing.  I think you just mixed up your -- your financing

23  and your plan.

24  Q    I apologize.  There's no exit financing in place today,

25  correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2262
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 330 of 1017 PageID 7043
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2261 of 2722

Seery - Cross                    188

1  A    No.

2  Q    Okay.  So, post-confirmation, you are basically going to

3  continue managing the CLOs and funds and trying to monetize

4  assets for creditors the same as you are today, correct?

5  A    Similar, yes.

6  Q    Okay.  And just like the Committee has some oversight role

7  in the case, the members of the Oversight Board will have some

8  oversight role post-confirmation, correct?

9  A    Yes.

10  Q    Okay.  You don't need anything in the plan itself to

11  enable you to continue managing the Debtor and its assets,

12  correct?

13  A    I don't need anything in the plan?

14  Q    Correct.

15  A    I don't -- I don't understand the question.  Can you

16  rephrase it?

17  Q    Well, you are managing the Debtor and its assets today,

18  correct?

19  A    Yes.

20  Q    Okay.  Nothing in the plan is going to change that,

21  correct?

22  A    Well, it's going to change it a lot.

23  Q    Okay.  Well, with respect to you managing the Funds and

24  the CLOs, you don't need anything in the plan that you don't

25  have today to keep managing them, do you?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2263
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 331 of 1017   PageID 7044
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2262 of 2722

Seery - Cross                          189

```
 1   A    No.  The Debtor manages them, and I will -- I'm the CEO
 2   and I'll be in a similar position with a different team.
 3   Q    Okay.  And I believe you told me that you expect the
 4   Debtor to administer the CLOs for two or three years, maybe?
 5   A    However long it takes, but we expect -- our projections
 6   are that we'd be able to monetize most of the assets within
 7   two years.
 8   Q    Does that include the CLOs?
 9   A    It does, yes.
10   Q    Okay.  Now, you're going to be the person for the
11   Reorganized Debtor in charge of managing the CLOs, correct?
12   A    I'll be the person responsible for managing the
13   Reorganized Debtor.  The Reorganized Debtor will be the
14   manager of the CLOs.
15   Q    Okay.  But the buck will stop with you at the Reorganized
16   Debtor, right?
17   A    Yes.
18   Q    Okay.  You're going to have a team of employees and
19   outside professionals helping you, but ultimately, on behalf
20   of the Reorganized Debtor, you're going to be the one in
21   charge of managing the CLOs, correct?
22   A    Yes.
23   Q    Okay.  That means that you'll also be making decisions as
24   to when to sell assets of the CLOs, correct?
25   A    Yes.
```

006249

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2264
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 332 of 1017   PageID 7045
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2263 of 2722

Seery - Cross                              190

1  Q    Okay.  And to be clear, the CLOs, they own their own

2  assets, whatever they are, and the Debtor just manages those

3  assets, right?

4  A    Correct.

5  Q    The Debtor doesn't directly own those assets, right?

6  A    No.

7  Q    And currently there's more than one billion dollars in CLO

8  assets that the Debtor manages?

9  A    Approximately.

10  Q    Yeah.  And the Debtor receives fees for its services,

11  correct?

12  A    Yes.

13  Q    Can you generally describe how the amount of those fees is

14  calculated and paid, if you have an understanding?

15  A    How the fees are calculated and paid?

16  Q    Yes, sir.

17  A    It's a percentage of the assets.

18  Q    Assets administered or assets sold in any given time

19  period?

20  A    Administered.

21  Q    Okay.  So the sale of CLO assets does not affect the fees

22  that the Reorganized Debtor would receive under these

23  agreements?

24          MR. MORRIS:  Objection to the form of the question.

25          THE COURT:  Over --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2265
Case 3:25-cv-02072-S Document 15-9 Filed 06/25/25 Page 333 of 1017 PageID 7046
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2264 of
2722

Seery - Cross                          191

1              THE WITNESS:  That's not correct.

2              THE COURT:  Overruled.

3    BY MR. RUKAVINA:

4    Q    Okay.  What is not correct about that?

5    A    When you sell the assets, the amount administered shrinks,

6    so you have less fees.

7              MR. RUKAVINA:  Your Honor, the answer cut out at the

8    very end.  You have less--?

9              THE WITNESS:  Fees.

10   BY MR. RUKAVINA:

11   Q    Fees?  I understand.  Okay.  So are you saying that there

12   is a disincentive to the Reorganized Debtor to sell assets in

13   the CLOs?

14   A    No.

15   Q    Okay.  Is there an incentive to the Reorganized Debtor to

16   sell assets in the CLOs?

17   A    To do their job correctly, yes.

18   Q    Okay.  And the Debtor wishes to assume those contracts

19   because the Debtor will get those fees going forward and

20   there'll be a profit, even after the expenses of servicing

21   those contracts are taken out, correct?

22   A    They are profitable. That's one of the reasons that we're

23   assuming, yes.

24   Q    Okay.  Now, over my objection, you testified that the CLOs

25   have agreed to the assumption of these contracts, right?

```
                        Seery - Cross                    192
 1   A    Yes.
 2   Q    Okay.  Is there anything in the record other than your
 3   testimony here today demonstrating that?
 4   A    I believe there is, yes.
 5   Q    What do you believe there is in the record other than your
 6   testimony?
 7   A    I believe we filed a notice of assumption.
 8   Q    Okay.  My question is a little bit different.  You
 9   testified that the CLOs, over my objection, have agreed to the
10   assumption.  You did testify so, right?
11   A    Yes.
12   Q    Okay.  What is there in the record, sir, from the CLOs
13   confirming that?
14   A    You mean today's record?
15   Q    Yes, sir.
16   A    I'm the only one who's testified so far.
17   Q    Okay.  Are you aware of anything in the exhibits that
18   would confirm your testimony?
19   A    Not that I know of.
20   Q    Has there been an agreement with the CLOs that's been
21   reduced to writing?
22   A    Yes.
23   Q    So there is a written agreement with the CLOs providing
24   for assumption?
25   A    Yes.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2267
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 335 of 1017    PageID 7048
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2266 of
2722

```
                        Seery - Cross                 193

 1    Q    A signed, written agreement?

 2    A    No, it's -- it's email.

 3    Q    Okay.  When was this email agreement reached?

 4    A    Within the last couple weeks.  There's a number of back

 5    and forths where that was agreed to, and I believe we filed a

 6    notice of assumption.

 7            MR. RUKAVINA:  Mr. Vasek, if you will please pull up

 8    Mr. Seery's January 29th deposition.

 9    BY MR. RUKAVINA:

10    Q    Mr. Seery, you remember me deposing you last Friday,

11    correct?

12    A    Yes.

13    Q    And you remember me asking you if there was a written

14    agreement in place with the CLOs?

15    A    I don't recall specifically.

16            MR. RUKAVINA:  Okay.  Mr. Vasek, if you would please

17    scroll to that.  Okay.  Stop there.

18    BY MR. RUKAVINA:

19    Q    Sir, you'll recall I also deposed you January 20th, right?

20    A    Yes.

21    Q    Okay.  And do you remember that we had some discussion

22    regarding whether the CLOs would consent or not?

23    A    Yes.

24    Q    Okay.  And do you remember telling me something like that

25    like you think that they will and that's still in the works on
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2268
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 336 of 1017   PageID 7049
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2267 of 2722

Seery - Cross                        194

1   January 20th?

2   A    I don't recall specifically, but if you say that's what it

3   says.

4   Q    Okay.  Well, here I'm asking you on January 29th, Line 17,

5   "I asked you before and you didn't have anything in writing by

6   then, so let me ask now.  As of today, do you have anything in

7   writing from the CLOs consenting to the assumption of those

8   management agreements?"  I'm sorry.  Contracts.  Answer, "I

9   don't believe that I do.  It could be on my email I opened.  I

10  don't recall."

11       MR. RUKAVINA:  Scroll down, Mr. Vasek.

12  BY MR. RUKAVINA:

13  Q    Okay.  Then I ask, "Do you have an understanding of

14  whether those CLOs have consented in writing to the assumption

15  of the management agreements?"  And you answer, "I believe

16  they have.  The actual final docs haven't been completed, but

17  I believe they have agreed in writing, yes."

18       Then I ask --

19       MR. RUKAVINA:  Scroll down a little bit more.

20  BY MR. RUKAVINA:

21  Q    I ask, "Do you expect the final docs to be completed

22  before Tuesday's confirmation hearing?"  Answer, "I don't know

23  whether they will be done by Tuesday."

24       Did I read all of that correctly, sir?

25  A    Other than your misstatement.  The word was "unopened."

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2269
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 337 of 1017   PageID 7050
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2268 of 2722

                            Seery - Cross                    195

1    Q    Thank you.  So, let me ask you again today.  As of today,

2    is there a written agreement that has been signed by the

3    parties providing for the assumption of the CLO agreements?

4    A    When phrased the way you did, is it signed by the parties,

5    no.

6    Q    Okay.

7              MR. RUKAVINA:  You can take that down, Mr. Vasek.

8    BY MR. RUKAVINA:

9    Q    I think -- I'm not sure if you quantified this earlier,

10   but it might help.  I believe that the Reorganized Debtor

11   projects that it will generate revenue of $8.269 million post-

12   reorganization from managing the CLO contracts, correct?

13   A    It's in that neighborhood.  I did not testify to that

14   earlier.

15   Q    That's what I meant.  And when I asked you at deposition,

16   you were able to give me an estimate of how much it would cost

17   to generate that revenue, correct?

18   A    I was not?

19   Q    You were?  I'm sorry.  Let me --

20   A    Did you say I wasn't or I was?

21   Q    Let me -- I apologize.  Let me ask again.  I talk too fast

22   and I have an accent.  You have been able to give an estimate

23   of how much the Reorganized Debtor will expend to generate

24   that revenue, correct?

25   A    Yes.

Seery - Cross                          196

1    Q    Okay.  Do you remember what your estimate is?

2    A    I -- I think it was around $2 million a year.  It was a

3    portion of our employees plus the contracts.

4    Q    Okay.  So, over the life of the projection at $8.2

5    million, do you remember that you projected costs of about

6    $3.5 to $4 million to generate that revenue?

7    A    If -- if you are representing that to me, I'd accept it.

8    Yes, that sounds about right.

9    Q    Well, suffice it to say you're projecting at least $4

10   million in net profit over the next two years for the

11   Reorganized Debtor from managing the CLO agreements, correct?

12   A    Net profit is not a fair, fair way to analyze it, no.

13   Q    Okay.  Are you projecting any profit for the Reorganized

14   Debtor from managing the CLO agreements post-confirmation?

15   A    Yes.

16   Q    Okay.  Do you have an estimate of what that profit is?

17   A    General overview are the contracts are profitable to about

18   the tune of $4 million over that period.

19   Q    Okay.  Thank you.  If the Reorganized Debtor makes a

20   profit post-confirmation, is it fair to say that that would

21   then be dividended up or distributed up to the partners,

22   ultimately to the Claimant Trust?

23   A    I don't think that's fair to say, no.

24   Q    Okay.  So, if the Reorganized Debtor makes a profit post-

25   confirmation, where does that profit go?

Seery - Cross                      197

1  A    The Reorganized Debtor -- what kind of profit?  I don't

2  understand your question.

3  Q    Okay.  I apologize if I'm being too simplistic about it.

4  If a business, after it takes account of its expenses to

5  generate revenue, has any money left over, would that be

6  profit to you?

7  A    Yes.

8  Q    Okay.  Do you think that the Reorganized Debtor, post-

9  confirmation, will make a profit?

10  A    I don't know.

11  Q    Okay.  Do you think that the Reorganized Debtor, post-

12  confirmation, will lose money?

13  A    I think there will be costs, and the costs will exceed the

14  -- the amount that it generates on an income basis, yes.

15  Q    Okay.  Thank you.

16        MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

17  the plan, the injunctions, and releases.  9F.

18     (Pause.)

19  BY MR. RUKAVINA:

20  Q    I apologize, Mr. Seery.

21        MR. RUKAVINA:  So, Mr. Vasek, if you'll go to the

22  bottom of the Page 51.  Stop there.

23  BY MR. RUKAVINA:

24  Q    So, I'm going to read just the first couple sentences

25  here, Mr. Seery, if you'll read it along with me.  Subject --

Seery - Cross                    198

1  this is the bottom paragraph:  Subject in all respects to

2  Article 12(b), no enjoined party may commence or pursue a

3  claim or cause of action of any kind against any protected

4  party that arose or arises from or is related to the Chapter

5  11 case, the negotiation of the plan, the administration of

6  the plan, or property to be distributed under the plan, the

7  wind-down of the business of the Debtor or Reorganized Debtor.

8      I'd like to stop there.  Do you see that clause there, Mr.

9  Seery, talking about the wind-down of the business of the

10 Debtor or Reorganized Debtor?  Do you see that, sir?

11 A   Yes.

12 Q   Okay.  Do I understand correctly that this provision we've

13 just read means that, upon the assumption of these CLO

14 management agreements, if the counterparties to those

15 agreements want to take any action against the Reorganized

16 Debtor, they first have to go through this channeling

17 injunction?

18 A   I believe that's what it says, yes.

19 Q   Okay.  Because the wind-down of the business of the

20 Reorganized Debtor will include the management of these CLO

21 portfolio management agreements, correct?

22 A   Yes.

23 Q   Okay.  As well as the management of various funds that the

24 Debtor owns, correct?

25 A   Yes.

Seery - Cross                          199

1   Q    Okay.  And would you agree with me that the new general

2   partner, New GP, LLC, is also a protected party under the

3   plan?

4   A    I assume it is.  I don't recall specifically.

5   Q    I believe you discussed to some degree postpetition

6   losses.  I'd like to visit a little bit about those.  Since

7   January 9th, 2020, Mr. Dondero was not an officer of the

8   Debtor, correct?

9   A    Correct.

10  Q    And since January 9th, 2020, he was no longer a director

11  of Strand, correct?

12  A    That's correct.

13  Q    Since January 9th, 2020, until he was asked to resign, he

14  was an employee, correct?

15  A    Yes.

16  Q    And about -- I'm trying to remember.  About when did he

17  resign?  October something of 2020?  Do you remember?

18  A    I don't recall.

19  Q    Okay.  Do you recall if it was in October 2020?

20  A    It was in the fall.

21  Q    Okay.  And he resigned because the independent board asked

22  him to resign, correct?

23  A    Yes.

24  Q    Okay.  And you mentioned that the estate has had a

25  postpetition drop in the value of its assets and the assets

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2274
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 342 of 1017   PageID 7055
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2273 of 2722

Seery - Cross                              200

1    that it manages.  Right?

2    A   I believe I went through the estate's assets.  The only

3    asset that wasn't a direct estate asset was the hundred

4    percent control of Select Equity Fund.  I didn't talk about

5    the Fund assets.

6    Q   Okay.  Do you recall that the disclosure statement that

7    the Court approved states that, postpetition, there was a drop

8    from approximately $566 million to $328 million in the value

9    of Debtor assets and assets under Debtor management?

10   A   Yes.  That's the $200 million I walked through earlier.

11   Q   Okay.  And I believe you mentioned some of it was due to

12   the pandemic, right?

13   A   It certainly impacted the markets.  The pandemic didn't

14   cause a specific loss.  It impacted the markets and the

15   ability to work within those markets.

16   Q   But you also believe that Mr. Dondero was responsible for

17   something like a hundred million dollars of these losses,

18   right?

19   A   Probably more.

20   Q   Okay.  Mr. Dondero is not being released or exculpated for

21   that, is he?

22   A   No.

23   Q   And while Mr. Dondero was an employee during the period of

24   these losses, he answered to you as CEO and CRO, correct?

25   A   Not during that period.  I wasn't (audio gap) until later.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2275
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 343 of 1017 PageID 7056
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2274 of 2722

Seery - Cross                                201

1  Q   I'm sorry.  As of January 9th, 2020, were you the CEO of

2  the Debtor?

3  A   No.

4  Q   When did you become the CEO of the Debtor?

5  A   I believe the order was July 9th, retroactive to a date in

6  March.

7  Q   July 9th, 2020?

8  A   Correct.

9  Q   Okay.  And when did you become the CRO of the Debtor?

10 A   At the same time.

11 Q   Okay.  So, between January and July 2020, you were one of

12 the independent directors, correct?

13 A   Yes.

14 Q   Okay.  So, during that period of time, would Mr. Dondero

15 have answered to that independent board?

16 A   Yes.

17 Q   Okay.  Now, if someone alleges that that independent board

18 has any liability on account of Mr. Dondero's losses, that's

19 released under this plan, isn't it?

20 A   Yes.

21 Q   Okay.  And if someone alleges that Strand has any

22 liability on account of Mr. Dondero's losses, that's released

23 under this plan, correct?

24 A   Yes.

25 Q   Okay.  And if someone believes that the Debtor -- that the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2276
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 344 of 1017   PageID 7057
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2275 of 2722

Seery - Cross                                202

1  way that the Debtor has managed the CLOs or its funds

2  postpetition gives rise to a cause of action in negligence,

3  that's also released and exculpated in the plan, correct?

4  A    I believe it would be.  I'm not positive, but I believe it

5  would be.

6  Q    Well, let's be clear.  The plan does not release or

7  exculpate you or Strand or the board for willful misconduct,

8  gross negligence, fraud, or criminal conduct, correct?

9  A    No, it does not.

10 Q    Okay.  And I'm not, just so we're clear, I'm not alleging

11 that, okay?  So I want the judge to understand I'm not

12 alleging that.  But the plan does release and exculpate for

13 negligence, right?

14 A    Yes.

15 Q    Okay.  Where do you have an understanding a cause of

16 action for breach of fiduciary duty lies on the spectrum of

17 negligence all the way to criminal conduct?

18 A    It's -- it's not -- generally not criminal, although I

19 suppose that breach of fiduciary duty could be criminal.

20 Typically, it's negligence, and that you would breach a duty

21 for either duty of care, duty of loyalty.  But it could slide

22 to willful.  And probably most of the instances where they

23 come up are where someone has done something willfully or

24 grossly negligent.

25 Q    Okay.  But -- and I would agree with you.  But there are

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2277
Case 3:25-cv-02072-S Document 15-9 Filed 06/13/25 Page 345 of 1017 PageID 7058
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2276 of 2722

Seery - Cross                    203

1  certain breaches of fiduciary duty that are possible based on

2  simple negligence, correct?

3  A    They are, and in these instances, they don't -- they don't

4  rise to actionable claims because they're indemnified by the

5  funds.

6  Q    Okay.  You have to explain that to me.  So, the negligence

7  claim is not actionable because someone is indemnifying it?

8  A    Typically, there's no way to recover because it's

9  indemnified by the fund that the investor might be in.  If it

10  goes beyond that, then it wouldn't be.

11  Q    Okay.  So there are potential negligence breach of

12  fiduciary duty claims that might be subject to these

13  exculpations and releases that would not be indemnified?

14  A    Gross negligence and willful misconduct, certainly.

15  Q    Okay.  Now, post-confirmation, post-confirmation, if the

16  Debtor, or the Reorganized Debtor, rather, engages in

17  negligence or any actionable conduct, that's when the

18  channeling injunction comes into play, right?

19  A    I don't quite understand your question.

20  Q    Okay.

21  A    Can you repeat that?

22  Q    Sure.  To your understanding, does the channeling

23  injunction we're looking at right now -- and you can read it

24  if you need to -- does it apply to purely post-confirmation

25  alleged causes of action?

Seery - Cross                          204

1    A    It does apply to those, yes.

2    Q    Okay.  And it says that the Bankruptcy Court will have

3    sole and exclusive jurisdiction to determine whether a claim

4    or cause of action is colorable, and, only to the extent

5    legally permissible and as provided for in Article 11, shall

6    have jurisdiction to adjudicate the underlying colorable claim

7    or cause of action.

8        Do you see that, sir?

9    A    I do.

10   Q    Okay.  And this -- the Bankruptcy Court's exclusive

11   jurisdiction here, that would continue after confirmation?  Is

12   that the intent behind the plan?

13   A    It has -- it says what it says.  Will have the sole and

14   exclusive jurisdiction to determine whether a claim is

15   colorable, and then, to the extent permissible, it'll have

16   jurisdiction to adjudicate.

17   Q    Okay.  Nothing in this plan limits the period of the

18   Bankruptcy Court's inquiry to the pre-confirmation time frame,

19   correct?

20   A    I don't believe it does, no.

21   Q    Okay.  Have you taken into account the potential that this

22   bankruptcy case will eventually be closed with a final decree?

23   A    Have I taken that into account?

24   Q    Well, do you know what a final decree in Chapter 11 is?

25   A    I do.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2279
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 347 of 1017 PageID 7060
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2278 of 2722

Seery - Cross                           205

1  Q   Okay.  So, help me understand.  If there's a final decree

2  and the bankruptcy case is closed, then who do I go to,

3  because the Bankruptcy Court has exclusive jurisdiction, to

4  get this clearing injunction cleared?

5          MR. MORRIS:  Objection to the form of the question,

6  Your Honor.

7          THE COURT:  Sustained.  Rephrase.

8          MR. RUKAVINA:  Okay.

9  BY MR. RUKAVINA:

10 Q   Is it the plan's intent, Mr. Seery, that this channeling

11 injunction that we just looked at would continue to apply even

12 after a point in time in which the bankruptcy case is closed?

13 A   I don't believe so.

14         MR. RUKAVINA:  Again, Your Honor, someone -- I heard

15 someone's phone right when he answered, and I didn't hear his

16 answer, if he could please re-answer.

17         THE WITNESS:  I don't -- I don't think if the case is

18 closed that's the intention.

19 BY MR. RUKAVINA:

20 Q   Okay.  What about if there's a final decree entered?

21         MR. MORRIS:  Objection, Your Honor.  You know, the

22 document kind of speaks for itself.

23         THE COURT:  Overruled.  He can answer if he knows.

24         THE WITNESS:  Yeah.  I don't -- I don't -- I'm not

25 making a distinction between the case being closed and the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2280
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/06/25   Page 348 of 1017   PageID 7061
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2279 of 2722

Seery - Cross                    206

 1   final decree.  I believe in both instances they'll be pretty

 2   close to the same time and we'll make a judgment then as to

 3   how to close the case in accordance --

 4   Q    Okay.

 5   A    -- with the rules.

 6        MR. RUKAVINA:  Mr. Vasek, if you'll please scroll up

 7   to the beginning of this injunction.  A little bit higher.

 8   Right there.  Right there.

 9   BY MR. RUKAVINA:

10   Q    The very first clause, Mr. Seery, if you'll read with me,

11   says, Upon entry of the confirmation order -- pardon me --

12   all enjoined parties are and shall be permanently enjoined on

13   and after the effective date from taking any actions to

14   interfere with the implementation or consummation of the

15   plan.

16        Do you see that, sir?

17   A    I do, yes.

18   Q    What does interfering with the implementation or

19   consummation of the plan mean?

20   A    It means in some way taking actions to upset, distract,

21   stop, or otherwise prohibit or hurt the estate from

22   implementing or consummating the plan.

23   Q    Okay.  And is that intended -- is that clause we just

24   read and you described intended to be very broad?

25   A    I -- I think it's -- if the words have meaning, yes, that

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2281
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 349 of 1017 PageID 7062
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2280 of 2722

Seery - Cross                              207

1   it should -- it's pretty broad.

2   Q   Okay.  Is the Debtor not able to state with more

3   specificity what it would believe interference with the

4   implementation or consummation of the plan would mean?

5           MR. MORRIS:  Objection to the form of the question.

6           THE COURT:  Sustained.

7           THE WITNESS:  I think it's -- I think it's --

8           THE COURT:  Sustained.

9           MR. RUKAVINA:  Okay.

10          THE WITNESS:  I'm sorry.

11  BY MR. RUKAVINA:

12  Q   Well, you just gave us four or five examples of what

13  interfering with the implementation or consummation of the

14  plan might be.  Why isn't that, those four or five examples,

15  why aren't they listed here?

16          MR. MORRIS:  Object to the form of the question.

17          MR. RUKAVINA:  Well, Your Honor, I'll withdraw it

18  and I'll argue this at closing argument.

19          THE COURT:  Okay.

20  BY MR. RUKAVINA:

21  Q   When did the Committee agree to you serving as the

22  Claimant Trustee?

23  A   In the late -- in the late fall.  I've been contemplated

24  to be the Claimant Trustee.  I'm willing to take -- if we can

25  come to an agreement.  They have their options open if we

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2282
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 350 of 1017   PageID 7063
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2281 of 2722

Seery - Cross                      208

1  can't come to an agreement on compensation.

2  Q   Okay.  And since the Committee agreed to you being the

3  Claimant Trustee, you have reached a resolution with UBS,

4  correct?

5  A   I don't think so.  I think that that was before UBS, the

6  UBS resolution was reached.

7  Q   I'm sorry.  When did you reach the UBS resolution in

8  principle with UBS?

9  A   I don't recall the exact date, but I do recall specific

10  conversations where some of the Committee members were

11  supportive.  I didn't know that UBS wasn't, but I assumed

12  that some meant not all.  And that was UBS, because I don't

13  think we had a deal yet.

14  Q   Well, let me ask the question in a little bit of a

15  different way.  Whenever the Debtor reached the agreement in

16  principle with UBS that your counsel described this morning,

17  whenever that point in time was, the Committee had already

18  agreed before that point in time to you serving as Claimant

19  Trustee, correct?

20  A   I believe so, yes.

21  Q   And is the answer the same with respect to the

22  HarbourVest settlement?

23  A   I believe so.  With HarbourVest, I believe so as well,

24  yes.

25  Q   What about the Acis settlement?

Seery - Cross                     209

1  A    I don't believe so.  I think Acis came first.  I don't

2  think we settled on an agreement on Claimant Trustee until

3  after the Acis -- certainly after the Acis agreement, maybe

4  not after the Acis 9019.  I just don't recall.

5  Q    Okay.  And the million-dollar cutoff for convenience

6  class creditors, that number was a negotiated amount with the

7  Committee, correct?

8  A    Yes.

9  Q    Okay.  Thank you, Mr. Seery.

10      MR. RUKAVINA:  Your Honor, I'll pass the witness.

11      THE COURT:  All right.  Just for purposes of time,

12  it's 3:00 o'clock, so you went 48 minutes.

13     Who's next?

14      MR. DRAPER:  Mr. Taylor is.

15      THE COURT:  All right.  Mr. Taylor, go ahead.

16      MR. TAYLOR:  Yes, Your Honor.  At this time, what we

17  would like the Court to do, we are asking for a brief

18  continuance and to go into tomorrow, and there is a reason

19  for that and I would like to explain it.

20    Mr. Dondero has communicated an offer which we believe to

21  be a higher and better offer than what the plan analysis,

22  even in its most recent iteration that was just changed last

23  night, will yield significantly higher recoveries.  Those are

24  guaranteed recoveries.  There is a cash component to that

25  offer.  There are some debt components, but they would be

Seery - Cross                              210

1  secured by substantially all of the assets of Highland.

2      We believe it's a higher and better offer, that the

3  creditors and the Creditors' Committee, Mr. Seery, who

4  obviously has been testifying all day on the stand, may have

5  heard some -- some inkling of it via a text or an email he

6  might have been able to glance at, or maybe not, because he's

7  been too busy, and that's understandable.

8      But we do believe it is a material offer.  It is a real

9  offer.  And for that reason, we would like to request the

10 Court's indulgence.  This has gone rather fast.  We believe

11 that in the event that it does not gain any traction, then we

12 could complete this confirmation hearing tomorrow, or it's

13 more than likely that we could.  And therefore we would

14 request a continuance until tomorrow morning beginning at

15 9:30 so all the parties can confer, consider that offer, and

16 see if it gains any traction.

17            THE COURT:  All right.

18            MR. POMERANTZ:  Your -- Your --

19            THE COURT:  Go ahead.  Mr. Morris?  Or who is going

20 to respond --

21            MR. POMERANTZ:  Your --

22            THE COURT:  -- to that?

23            MR. POMERANTZ:  Your Honor, this is Jeff --

24            THE COURT:  Mr. Pomerantz?

25            MR. POMERANTZ:  This is Jeff Pomerantz.  I will

```
                         Seery - Cross                    211
```

1   respond.

2       I think right at the beginning of the hearing, or

3   slightly after, I did receive an email from Michael Lynn

4   extending this offer.  The email was also addressed to Mr.

5   Clemente.  As we have told Your Honor before, if the Committee

6   is interested in continuing negotiations with Mr. Dondero, far

7   be it from us to stand in the way.

8       So what I would really ask is for Mr. Clemente to respond

9   to think if -- to see if he thinks that this offer is worthy.

10  If it's worthy and the Committee wants to consider it, we

11  would by all means support a continuance.  If it is not, I

12  think this is just a last-minute delay without a reason.  And

13  if there is no likelihood of that being acceptable or the

14  Committee wanting to engage, we would want to continue on.

15          THE COURT:  All right.  Mr. Clemente, what say you?

16          MR. CLEMENTE:  Yes.  Yes, Your Honor.  Matt Clemente

17  on behalf of the Committee.

18      Obviously, I haven't had a chance to confer with my

19  Committee members, but there's no reason to not continue the

20  confirmation hearing today.  I will be able to confer with

21  them over email, et cetera, this evening.  There's simply no

22  reason to not continue going forward at this particular point

23  in time, Your Honor.

24      So, although I haven't conferred with the Committee

25  members, that would be what I would recommend to them.  And so

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2286
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 354 of 1017   PageID 7067
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2285 of
2722

Seery - Cross                         212

1   my view, the Committee's view, I believe, would be let's

2   continue forward and we'll discuss Mr. Dondero's proposal that

3   I know came across after opening statements this morning, you

4   know, in due course.  But I do not believe that a continuance

5   here is necessary or appropriate.

6           THE COURT:  All right.  Mr. Taylor, that request is

7   denied, so you may cross-examine.

8           MR. TAYLOR:  Yes.  (Pause.)  I'm sorry, Your Honor.

9   I have a couple people that are in my ear.  But yes, I'm ready

10  to proceed.

11          THE COURT:  Okay.

12                       CROSS-EXAMINATION

13  BY MR. TAYLOR:

14  Q   Mr. Seery, I believe you can probably largely testify from

15  your memory of the various iterations of the plan analysis

16  versus the liquidation analysis.  But to the extent that

17  you're unable to, we can certainly pull those up.

18      Mr. Seery, you put forth or Highland put forth on November

19  24th of 2020 a plan analysis versus a liquidation analysis,

20  correct?

21  A   I think that's the approximate date, yes.

22  Q   Okay.  And do you recall what the plan analysis predicted

23  the recovery to general unsecured creditors in Class 8 would

24  be at that time?

25  A   I believe it was in the 80s.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2287
Case 3:25-cv-02072-S    Document 15-9   Filed 06/23/25   Page 355 of 1017   PageID 7068
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2286 of 2722

                    Seery - Cross                    213

1   Q    And approximately 87.44 percent?

2   A    That sounds close, yes.

3   Q    Okay.  And then just right before -- the evening before

4   your deposition that took place on January 29th, I believe a

5   revised plan analysis versus a liquidation analysis was

6   provided.  Do you remember that?

7   A    Yes.

8   Q    Okay.  And what was the predicted recovery to general

9   unsecured creditors under that analysis?

10  A    I believe that was --

11       MR. MORRIS:  Object to the form of the question.  I

12  just want to make sure that we're talking about the -- and

13  maybe I misunderstood the question -- plan versus liquidation.

14       THE COURT:  Okay.  Could you restate --

15       MR. TAYLOR:  I said plan analysis.

16       THE COURT:  Plan.

17       THE WITNESS:  I believe that that initially was in

18  the -- in the high 60s.

19  BY MR. TAYLOR:

20  Q    It was --

21  A    Might have been --

22  Q    -- 62.14 percent; is that correct?

23  A    Okay.  Yeah.  That sounds -- I'll take your

24  representation.  That's fine.

25  Q    Okay.  And going back to the November 28th liquidation

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2288
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/25   Page 356 of 1017   PageID 7069
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2287 of
2722

Seery - Cross                              214

1   analysis, what did Highland believe that creditors in Class 8

2   would get under a liquidation analysis?

3   A   I don't recall the -- if you just tell me, I'll -- I'll --

4   if you're reading it, I'll agree with -- because I -- from my

5   memory.

6   Q   62.6 percent?  Is that correct?

7   A   That sounds about right.

8   Q   You would agree with me, would you not, that 62.6 cents on

9   the dollar is higher than 62.14 cents, correct?

10  A   Yes.

11  Q   And so at least comparing the January 28th versus -- of

12  2021 versus the November 24th of 2020, the liquidation

13  analysis actually ended up being higher than the plan

14  analysis, correct?

15  A   Yes.

16  Q   But there was -- there was some changes also in the plan

17  analysis.  I'm sorry.  There were some subsequent changes that

18  were done over the weekend that were provided on February 1st.

19  Is that correct?

20  A   Yes.

21  Q   Okay.  And what were -- give us an overview of what those

22  changes were.

23  A   What are -- what are you comparing?  What would you like

24  me to compare?

25  Q   Okay.  The January to February plan analysis, what were

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2289
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 357 of 1017   PageID 7070
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2288 of 2722

Seery - Cross                                215

1   the changes?  Why did it go up from 62.6 to 71.3?

2   A    The main changes, as we discussed earlier, and maybe the

3   only major change, was the UBS claim amount, which went down

4   significantly from the earlier iteration.  And then there was

5   the small change related to the RCP recovery, which was a

6   double-count.

7   Q    Okay.  And you talked about earlier about what assumptions

8   went into these analyses, correct?

9   A    Yes.

10  Q    And you said these assumptions were always done after

11  careful consideration.  Is that a correct summation of what

12  you said?

13  A    I think that's fair.

14  Q    Okay.

15          MR. TAYLOR:  Mr. Assink, could you pull up the

16  November assumptions?

17  BY MR. TAYLOR:

18  Q    I believe that's coming up, Mr. Seery.  The Court.

19      (Pause.)

20          MR. TAYLOR:  And go down one page, please, Mr.

21  Assink.  Roll up.  The Assumption L.

22  BY MR. TAYLOR:

23  Q    So, these are the November assumptions, correct, Mr.

24  Seery?

25  A    I believe so, yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2290
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/25   Page 358 of 1017   PageID 7071
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2289 of 2722

Seery - Cross                                        216

1   Q    Okay.  And what was the assumption that you made after

2   careful consideration regarding the claims for UBS and

3   HarbourVest?

4   A    The plan assumes zero, that was L, for those claims.

5   Q    Okay.  And ultimately what did -- and I believe you just

6   announced this today and made this public today -- what is

7   UBS's claim?  What are you proposing that it be allowed at?

8   A    $50 million in Class 8, and then they have a junior claim

9   as well.

10  Q    Okay.  And what about HarbourVest?  What kind of allowed

11  claim did they end up with?

12  A    $45 million in Class 8 and a $35 million junior claim.

13  Q    So your well-reasoned assumption, carefully considered,

14  was off by $95 million; is that correct?

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Overruled.

17          THE WITNESS:  The difference between zero and those

18  numbers is $95 million, yes.

19  BY MR. TAYLOR:

20  Q    You solicited creditors of the Highland estate based upon

21  the November plan analysis and liquidation analysis that was

22  provided and that we're looking at right now, correct?

23  A    It was one of the bases, yes.  It's the plan is what --

24  what we solicited votes for, not the projections.

25  Q    But this was included within the disclosure statement; is

```
                         Seery - Cross                    217
```

1   that correct?

2   A    It's one of the bases.  It was included, yes.

3   Q    And this is the bases by which you believe that the best

4   interests of the creditors have been met better than a Chapter

5   7 liquidation, correct?

6   A    I believe this evidences that the best interest test would

7   be satisfied, yes.

8   Q    And so the record is very clear, for this Court and

9   anybody looking at the record, no solicitation was done of the

10  creditor body after the disclosure statement was sent out?  No

11  updates were sent, correct?

12  A    Updated projections were filed, but no solicitation was --

13  was -- there was only one solicitation.  We did not resolicit.

14  That's correct.

15  Q    Okay.  Mr. Seery, how much are you -- after this plan, or

16  if this plan is confirmed, how much are you going to be paid

17  per month to be the Trustee?

18  A    For the Trustee role, $150,000 per month is the base.

19  Q    It's a base amount?  On top of that, you're going to

20  receive some sort of bonus amount, correct?

21  A    There's two bonuses.  There's a bonus for the bankruptcy

22  case, which I'd need Court approval for, and then I'm going to

23  seek a bonus for the Trustee work, which would be a

24  combination of myself and the team for a performance bonus.

25  That's to be negotiated.

Seery - Cross                      218

1      To be fair, the Committee or the Oversight Group may not

2   agree to any change, in which case we would not have an

3   agreement.

4   Q   And what would happen if you don't come to an agreement,

5   Mr. Seery?

6   A   They would have to get a different Plan Trustee.

7   Q   Okay.  So it's certainly going to have to be greater than

8   zero, correct?

9   A   Typically.

10  Q   Is it going to be in the nature of three or four percent

11  of the sales proceeds, or have you considered that?

12  A   Oh, I'm sorry.  Yeah, you mean the bonus?  No.  I've been

13  thinking -- my apologies.  I misunderstood.  I thought you

14  meant any number.  I haven't -- I haven't had negotiation with

15  them.  I'm thinking about looking at the full recovery of the

16  team -- for the team, looking at expected performance numbers,

17  and then trying to negotiate a structure of bonus compensation

18  that would be payable to the whole team, and then allocated by

19  the CEO (garbled) which would be made.

20  Q   When predicting the expenses of the Trust going forward in

21  your projections, did you build in an amount for a bonus fee?

22  A   No.  It wouldn't be part of the expenses.  It would come

23  out at the end.

24  Q   Okay.  So those additional expenses are not shown in the

25  plan analysis, correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2293
Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/25    Page 361 of 1017    PageID 7074
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2292 of 2722

Seery - Cross                        219

1  A    No, they're not.  It's just not going to be an expense.

2  It'll be a -- as an operating expense.  It'll be an

3  expenditure at the end out of distributions.

4  Q    Okay.  And did you subtract those from the distributions?

5  A    No.

6  Q    Okay.  A Chapter 7 trustee is not going to charge $150,000

7  or more to monetize these assets, is he?

8  A    No.

9  Q    Have you priced how much D&O insurance is going to be on a

10 go-forward basis post-confirmation?

11 A    I'm sorry.  I couldn't -- couldn't hear you.

12 Q    Sorry.  Let me get closer to my mic.  Have you priced what

13 D&O insurance is going to run the Trust on a go-forward basis

14 post-confirmation?

15 A    Yes.

16 Q    Okay.  And what are you projecting that to run?

17 A    About $3-1/2 million.

18 Q    And is that per annum for over the two-year life of this

19 plan?

20 A    Well, it's the two-year projection period, not life.  But

21 I expect that that's for the two-year projection period.

22 Q    Okay.  So approximately one point -- I'm sorry, you said

23 $3.5 million, correct?

24 A    Yes.

25 Q    Okay.  So, $1.75 million per year?

APP. 2289

006279

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2294
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 362 of 1017 PageID 7075
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2293 of 2722

1    A    Yes.

2    Q    On top of the minimum $1.8 million per year that you're

3    going to be paid, correct?

4    A    Well, that's -- that's the base compensation.  But, again,

5    to be fair to the Oversight Committee, they haven't approved

6    it yet.  So the Committee, the Committee reserves their rights

7    to negotiate a total package.

8    Q    And there's going to be a Litigation Trustee, correct?

9    A    Yes.

10   Q    And that Litigation Trustee is going to be paid some

11   amount of compensation, correct?

12   A    Yes.

13   Q    That has not been negotiated yet, correct?

14   A    No, I believe -- I believe the base piece has.  But his --

15   I don't know what the contingency fee or if that's been

16   negotiated yet.  I don't know.

17   Q    And what is the base fee for the Litigation Trustee?

18   A    My recollection is it was about $250,000 a year, some

19   number in that area.

20   Q    Thank you.  So, at this point, over the two-year period,

21   we're looking at approximately $3.6 million to you, $3.5

22   million to the D&O insurance, and approximately $500,000 base

23   fee to the Litigation Trustee, plus a contingency.  Is that

24   correct?

25   A    That's probably real close, yes.

Seery - Cross                        221

1   Q   Okay.  And how about U.S. Trustee fees?  You've estimated

2   of how much those are going to be during the two-year period,

3   correct?

4   A   They're built into the plan up 'til -- I think it's only

5   up until the actual effective date, but I don't recall the

6   specifics.

7   Q   Okay.  And U.S. Trustee fees, the case is going to stay

8   open and those are going to continue to have to be paid, even

9   after confirmation, correct?

10  A   Yes.

11  Q   Okay.  And do you have an estimate of how much those are

12  going to run per annum or over that two-year period?

13  A   I don't recall, no.

14  Q   Okay.  Well, they're provided within your projections,

15  correct?

16  A   Yes.

17  Q   Okay.  A Chapter 7 trustee would not have to incur any of

18  these costs, would they?

19  A   I don't think they'll have to incur Chapter -- U.S.

20  Trustee fees.  I don't know whether they would bring on a

21  litigation trustee or not.  I would assume, since there's --

22  appear to be valuable claims, they probably would, but perhaps

23  they would do it themselves.  So I don't know the specifics of

24  what they would do.

25  Q   In preparing your liquidation analysis, did you ask

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2296
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 364 of 1017   PageID 7077
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2295 of 2722

Seery - Cross                          222

1   Pachulski if they would be willing to work for a Chapter 7

2   trustee if one was appointed?

3   A    I didn't specifically ask, no.

4   Q    Did you ask DIS, your, for lack of a better word,

5   financial advisors in this case, if they would be willing to

6   work with a Chapter 7 trustee?

7   A    DSI.  No, I did not specifically ask them.

8   Q    Okay.  All right.  Any of the accountants that you're

9   working with, did you ask them if they would be willing to

10  work with a Chapter 7 trustee?

11  A    I didn't specifically ask them, no.

12  Q    Okay.  The proposed plan has no requirements that you

13  notice any potential sale of either Highland assets or

14  Highland subsidiary assets; is that correct?

15  A    Do you mean after the effective date?

16  Q    Yes.

17  A    No, it does not.

18  Q    In the SSP sale, which is a subsidiary of Trussway, which

19  is a subsidiary of Highland, or actually it's a sub of a sub

20  of Highland, you conducted the sale of SSP, correct?

21  A    The team did, yes.  I was part.

22  Q    All right.  That was not noticed to the creditor body; is

23  that correct?

24  A    That's correct.

25  Q    And it is the Debtor's and your position that no notice

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2297
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 365 of 1017 PageID 7078
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2296 of 2722

Seery - Cross                           223

1   was required because this was a sub of a sub and therefore

2   this was in the ordinary course?

3   A    Not exactly, no.

4   Q    Okay.  Then what is your position?

5   A    It was in the ordinary course.  It was -- I believe it's a

6   sub of a sub of a sub, and a significant portion of the

7   interests are owned by third parties.

8   Q    It is possible, is it not, that had you noticed this to

9   the larger creditor body, that you might have engendered a

10  competitive bidding situation that might have reached a higher

11  return for investors, correct?

12  A    The same possibility is it could have gone lower.

13  Q    But it is possible, correct?

14  A    Certainly possible.

15  Q    In fact, there is normally requirements under the

16  Bankruptcy Code and the Rules that asset sales are noticed out

17  to the creditor body, correct?

18  A    Asset sales that -- property of the estate, yes.  Other

19  than in the ordinary course, of course.

20  Q    I believe you have described Mr. Dondero as being very

21  litigious within this case; is that correct?

22  A    I believe so, yes.

23  Q    Okay.  Did Mr. Dondero initiate any litigation in this

24  case prior to September 2020?

25  A    Prior to September?  I don't believe so.  I don't know

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2298
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 366 of 1017   PageID 7079
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2297 of
2722

Seery - Cross                    224

1    when he filed the claim from NexPoint.  It certainly indicated

2    that -- I believe it was from NexPoint.  My memory is slightly

3    off here.  He filed a claim in -- administrative claim, which

4    effectively is like you're bringing a complaint, against HCMLP

5    for the management of Multi-Strat and the sale of the life

6    settlement policies out of Multi-Strat, which was conducted in

7    the spring.

8    Q    And wasn't Mr. Dondero seeking document production related

9    to that sale?

10   A    No.

11   Q    Okay.  I believe that the preliminary injunction that you

12   talked about and were questioned earlier, the plan asks to

13   enjoin (garbled) party from allowing the plan to go effective.

14   Is that correct?

15   A    I'm sorry.  I didn't understand you question.  There was a

16   -- there was a bunch of interference.

17   Q    Okay.  Sure.  I'm sorry about that.  I don't know if

18   that's -- I don't think that's me, but --

19   A    It may not be.  It sounded like someone else.

20   Q    The injunction prohibits anybody from interfering with the

21   plan going effective, correct?

22   A    The plan injunction?

23   Q    Yes.

24   A    Yes.

25   Q    Okay.  Just so I'm clear, is the plan injunction

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2299
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 367 of 1017   PageID 7080
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2298 of 2722

Seery - Cross                          225

1   attempting to strip appellate rights of Mr. Dondero?

2   A    No.

3   Q    Okay.  So, if, for instance, if he were to file any appeal

4   of an order confirming this plan, he wouldn't be in violation

5   of that plan injunction?

6   A    I don't think so, because the order wouldn't be final.

7   Q    Okay.  But it -- it says upon entry of a confirmation

8   order, you're enjoined from doing so.  So that's not the

9   intent?

10  A    It certainly would not be my intent.  I don't think that

11  anybody had that in mind.

12  Q    Okay.  And if Mr. Dondero were to seek a stay pending

13  appeal either during that 14-day period or afterwards, is that

14  plan injunction attempting to stop that -- that sort of

15  action?

16  A    I apologize.  You're breaking up.  But I think I

17  understood your question.  No, it was -- it was your screen as

18  well.  No.  If either this Court stays its own order or a

19  higher court says that the order is stayed, then there would

20  be no way there could be any allegation that it's interfering

21  with an order if it's not effective.

22  Q    Mr. Dondero opposed the Acis sale, correct?

23  A    The Acis settlement?

24  Q    Correct.

25  A    Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2300
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 368 of 1017 PageID 7081
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2299 of
2722

Seery - Cross                    226

1  Q    After he opposed the Acis settlement, the next filing Mr.

2  Dondero made was requesting that the Debtor notice the sale of

3  any assets or any major subsidiary assets.  Is that correct?

4  A    I don't recall the sequence of his filings.  I think that

5  Judge Lynn at least sent a letter to that effect.  I don't

6  recall if there is a filing to that effect.

7  Q    Did Mr. Dondero, through his counsel, attempt to resolve

8  that motion without filing anything further?

9  A    I don't recall the specifics of the motion.  I know they

10  asked for some sort of relief that -- that we thought was

11  inappropriate.

12  Q    When the Court postponed any hearing on Mr. Dondero's

13  request for relief until the eve of the confirmation hearing,

14  and Mr. Pomerantz announced that no sales were expected before

15  confirmation, did Mr. Dondero withdraw his motion?

16  A    Again, I don't recall the specifics of the motion.  I only

17  recall the letter from Judge Lynn.

18  Q    Did Mr. Dondero do anything more than object to the

19  HarbourVest deal?

20  A    Not that I know of.

21  Q    Did Mr. Dondero do anything more than respond to the

22  Defendants' injunction suit?

23        MR. MORRIS:  Objection to the form of the question.

24  I mean, -- objection to the form.

25        THE COURT:  Overruled.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2301
Case 3:25-cv-02072-S    Document 15-9   Filed 06/23/25   Page 369 of 1017   PageID 7082
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2300 of 2722

Seery - Cross                    227

1          MR. TAYLOR:  I apologize.  I should have said the

2    Debtor's injunction suit.

3          THE WITNESS:  Yeah, the -- I'm not sure of the

4    specific order, but certainly the communications with me,

5    which I think are prior to the order.  The communications with

6    Mr. Surgent, which I believe are after the order.  Certain

7    communications with Mr. Waterhouse, which were oral.  Those

8    were all similarly difficult and obstreperous actions.

9    BY MR. TAYLOR:

10   Q   Has Mr. Dondero commenced any adversary proceeding or

11   litigation in this case other than filing a competing plan?

12         MR. MORRIS:  Objection to the form of the question.

13         THE COURT:  Over --

14         THE WITNESS:  Yeah, I don't --

15         THE COURT:  -- ruled.

16         THE WITNESS:  I don't believe he's commenced an

17   adversary.  I'm sorry, Judge.  I don't believe he's commenced

18   an adversary proceeding, no.

19   BY MR. TAYLOR:

20   Q   Mr. Dondero didn't file any opposition to the life

21   settlement sale, did he?

22   A   We didn't do the life settlement (garbled) Court.

23   Q   Right.  Again, that wasn't noticed through the -- this

24   Court, was it?

25   A   It was an -- the reason was it was an asset of Multi-Strat

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2302
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 370 of 1017   PageID 7083
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2301 of 2722

Seery - Cross                          228

1   Fund.  It wasn't an asset of the Debtor's.

2   Q    Okay.  Mr. Dondero did have concerns regarding the life

3   settlement sale, correct?

4   A    Yes.

5   Q    In fact, he believed that they were being sold for

6   substantially less than what could have otherwise been

7   received, correct?

8   A    He may have.

9   Q    And if you conduct any subsequent sales for less than

10  market value that might ultimately prevent the waterfall from

11  ever reaching Mr. Dondero, he would have no recourse under

12  this proposed plan to object to this sale or otherwise have

13  any comment on it.  Is that correct?

14  A    I clearly object to the thinking that that was less than

15  market value.  It was -- it was more than market value.  So I

16  don't -- I disagree with the premise of your question.

17  Q    So, I don't believe that was the question that was asked.

18  The question that was asked is, as you move forward with your

19  -- what I will characterize as a wind-down plan, not putting

20  that word in your mouth -- but as you execute forward on your

21  plan, as these sales of these assets go through, no notice is

22  going to be provided, correct?

23  A    Not necessarily.  It depends on the asset and what we

24  think of the, you know, the -- the position of the parties at

25  the time.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2303
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 371 of 1017   PageID 7084
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2302 of
2722

Seery - Cross                                    229

1    If we have a -- if we have a transaction that's pending

2  that wouldn't be hurt by a notice and that we'd be able to get

3  the Court's imprimatur to maybe more better insulate, if you

4  will, against Mr. Dondero's attacks, then we may well come to

5  the Court to seek that.

6    The problem with noticing sales is that -- that it often

7  depresses value.  That's just not the way folks outside of the

8  bankruptcy world (audio gap) sales.

9  Q    So there's no requirement that either public or private

10 notice be provided, correct?

11 A    No.  Meaning it is correct.

12 Q    Okay.  And if Mr. Dondero had objections either to the

13 pricing of the sale or the manner and means by which the sale

14 was being conducted, he would be prohibited by the plan

15 injunction from bringing any objection to such sale, correct?

16 A    I believe so, yes.

17 Q    Mr. Dondero also had concerns regarding the OmniMax sale,

18 correct?

19 A    Mr. Dondero did not go along with the OmniMax sale with

20 the assets that he managed.  I don't know if he had concerns

21 with -- with our sale or OmniMax's interests.

22 Q    Did Mr. Dondero ever express to you any concern that the

23 value wasn't being maximized regarding the sale of those

24 assets?

25 A    He thought he could get more.  I don't know that he

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2304
Case 3:25-cv-02072-S    Document 15-9    Filed 06/13/25    Page 372 of 1017    PageID 7085
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2303 of
2722

Seery - Cross                          230

1  thought that he could get more for his assets that he was

2  managing or whether he thought he could get more for all of

3  the assets.

4  Q    Other than voicing those concerns, did Mr. Dondero file

5  any pleading with this Court attempting to block that sale?

6  A    Pleading with the Court?  No.

7            MR. TAYLOR:  Your Honor, I would like to confer with

8  my colleagues just very briefly and see if they have anything

9  further.  And even if they don't, Mr. Lynn of my firm would

10 like a very brief moment to address the Court prior to me

11 passing the witness.

12     So, if I may have a literally hopefully one-minute break

13 where I can turn my camera off and my microphone off to confer

14 with my colleagues, and then move forward?

15           THE COURT:  Okay.  Well, you can have a one-minute

16 break, but we're going to continue on with cross-examination

17 at this point.  Okay?  I'm not sure what you meant by Mr. Lynn

18 wants to raise an issue at this point.  Could you elaborate?

19           MR. TAYLOR:  I will get some elaboration during our

20 30-second to one-minute break, Your Honor.  I was just passed

21 a note.

22           THE COURT:  All right.  So, but I'll just you know,

23 --

24           A VOICE:  Your Honor?

25           THE COURT:  -- I'm inclined to continue with the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2305
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 373 of 1017   PageID 7086
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2304 of 2722

```
                        Seery - Cross                    231
```

 1  cross-examination.  You know, this isn't a time for, you know,

 2  arguments or anything like that.  All right?

 3      So, we'll take a one-minute break.  You can turn off your

 4  audio and video for one minute, and come back.

 5      (Off the record, 3:33 p.m. to 3:34 p.m.)

 6          THE WITNESS:  Your Honor?

 7          THE COURT:  Yes?

 8          THE WITNESS:  It's Jim Seery.  Can I turn it into

 9  just a two-minute break, since I've sat in my seat, and it

10  would be better for him to just continue straight through.  I

11  could use one or two minutes.

12          THE COURT:  Okay.

13          THE WITNESS:  I apologize.

14          THE COURT:  All right.  Well, it's been more than

15  minute.  Let's just say a five-minute break for everyone, and

16  we'll come back at 3:39 Central time.  Okay.

17          THE WITNESS:  Okay.  Thank you, Your Honor.  I

18  appreciate that.

19      (A recess ensued from 3:35 p.m. until 3:40 p.m.)

20          THE CLERK:  All rise.

21          THE COURT:  Please be seated.  All right.  We are

22  back on the record.  Mr. Taylor, are you there?

23          MR. TAYLOR:  I am, Your Honor.  My video is not

24  wanting to start, but my -- I believe my audio is on.

25          THE COURT:  Okay.  After you went offline for your

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2306
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 374 of 1017 PageID 7087
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2305 of 2722

Seery - Cross                    232

1   one-minute break, Mr. Seery asked for a five-minute bathroom

2   break, or a couple-minute. Anyway, we've been gone on a

3   bathroom break. We're back now.

4           MR. TAYLOR: Thank you. I was actually -- I was

5   still listening with one ear, --

6           THE COURT: Okay.

7           MR. TAYLOR: -- Your Honor, so I understand.

8           THE COURT: All right.

9           MR. TAYLOR: So, thank you.

10          THE COURT: Are you finished with cross, or no?

11          MR. TAYLOR: Just a little bit of a follow-up.

12              CROSS-EXAMINATION, RESUMED

13  BY MR. TAYLOR:

14  Q   Mr. Seery, you had previously testified that Mr. Dondero's

15  counsel had threatened you and/or the independent board, I was

16  not exactly sure who you were referring to, with suits, and I

17  believe you said a hundred million dollars' worth of suits and

18  getting dragged into litigation.

19      Is that still your testimony today, that you were -- you

20  were threatened with suit by this firm of a suit of over a

21  hundred million dollars?

22  A   I believe what I was told by my counsel was that, not Mr.

23  Dondero's, but one of the other counsel, who I can name, said

24  specifically that Dondero will sue Seery for hundreds of

25  millions of dollars. We're going to take it up to the Fifth

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2307
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 375 of 1017   PageID 7088
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2306 of 2722

Seery - Cross                          233

1    Circuit, get it reversed, and he'll go after him.

2    Q   Okay.  So it was not Mr. Dondero's counsel, and you were

3    not -- is that correct?

4    A   No.  It was one of the other counsel on the phone today.

5    Q   Okay.  And you base that not upon your own personal

6    knowledge but based on some -- something else that you were

7    told, correct?

8    A   Yes.  By my counsel.

9    Q   Thank you.

10         MR. TAYLOR:  Yes, Your Honor.  We can pass the

11   witness.

12         THE COURT:  Okay.  So, you've gone, or you and Mr.

13   Rukavina collectively have gone one hour and 17 minutes.  Mr.

14   Draper, you're next.

15         MR. DRAPER:  Yes, Your Honor.  Thank you.  I

16   basically have no more than ten questions, so I gather the

17   Court will welcome that.

18         THE COURT:  Okay.

19                    CROSS-EXAMINATION

20   BY MR. DRAPER:

21   Q   Mr. Seery, has the new general partner been formed yet?

22   A   I don't know if they've been -- we've actually done the

23   formation, but it -- it would be in process.

24   Q   So it either has been formed or has not been formed?

25   A   I don't -- I don't know the answer.

Seery - Cross                                234

1    Q    Okay.  Now, going forward, Judge Nelms and Mr. Dubel will

2    have nothing to do with the Reorganized Debtor, correct?

3    A    Not necessarily, but they don't have a specific role at

4    this time.

5    Q    They won't be officers or directors of the new general

6    partner or the Reorganized Debtor, correct?

7    A    I don't -- I don't believe so, but it's not set in stone.

8    Q    All right.  Has any finance -- has any party who is the

9    beneficiary of an exculpation, a release, or the channeling

10   injunction contributed anything to this plan of reorganization

11   in terms of money?

12   A    No.

13   Q    Have you ever interviewed a trustee as to how they would

14   liquidate the assets or monetize the assets in this case?

15   A    No.

16   Q    And last question is, is there any bankruptcy prohibition

17   that you're aware of that a Chapter 7 trustee could not do

18   what you're doing?

19   A    Which -- which -- what do you mean, under the plan?

20   Q    No.  Could not monetize the assets of the estate in the

21   manner that you're attempting to monetize them.

22   A    I don't think there's a specific rule, but I just haven't

23   -- I haven't seen that before, no.  So I don't think there's a

24   specific rule that I know of.

25   Q    Okay.

                        Seery - Cross                    235

 1          MR. DRAPER:  I have nothing further for this witness.

 2          THE COURT:  All right.  I should have asked, we had a

 3   couple of other objectors.  Ms. Drawhorn, did you have any

 4   questions?

 5          MS. DRAWHORN:  I have no questions, Your Honor.

 6          THE COURT:  All right.  Were there any other

 7   objectors out there that I missed that might have questions?

 8      All right.  Any redirect?

 9          MR. MORRIS:  Your Honor, if I may, can I -- can I

10   just take a short minute to confer with my colleagues?

11          THE COURT:  Sure.  You can --

12          MR. MORRIS:  Thank you.

13          THE COURT:  -- put you --

14          MR. MORRIS:  Two -- two minutes, Your Honor.

15          THE COURT:  Okay.

16      (Pause, 3:45 p.m. until 3:48 p.m.)

17          THE COURT:  All right.  We've been a couple of

18   minutes.  Mr. Morris?

19          MR. MORRIS:  Yes, Your Honor.

20          THE COURT:  What are --

21          MR. MORRIS:  Just, just a few points, Your Honor.

22          THE COURT:  Okay.

23          MR. MORRIS:  Hold on a sec.  You ready, Mr. Seery?

24          THE WITNESS:  I am, yes.

25                     REDIRECT EXAMINATION

                              Seery - Redirect                    236

1   BY MR. MORRIS:

2   Q    You were asked a number of questions about your

3   compensation.  Do you recall all that?

4   A    Yes, I do.

5   Q    And you testified to the $150,000 a month.  Do you recall

6   that?

7   A    Yes.

8   Q    Under the -- under the documentation right now, your

9   compensation is still subject to negotiation with the

10  Committee; is that right?

11  A    Yes, it is.

12  Q    Okay.  You were asked a couple of questions about the

13  conduct of Mr. Dondero.  Earlier, you testified that the

14  monetization plan was filed under seal at around the time of

15  the mediation.  Do I have that right?

16  A    Yes.  Right at the start of the mediation.

17  Q    Okay.  And is that the first time that the Debtor made the

18  constituents aware, including Mr. Dondero, that it intended to

19  use that as a catalyst towards getting to a plan?

20  A    That's the first time that we filed it, but that plan had

21  been discussed prior to that.

22  Q    And do you recall that there came a point in time where

23  you -- when the Debtor gave notice that it intended to

24  terminate the shared services agreements with the Dondero-

25  related entities?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2311
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 379 of 1017 PageID 7092
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2310 of
2722

Seery - Redirect                    237

1   A   Yes.

2   Q   And when did that happen?

3   A   That was about 60 -- now it's like 62 days ago.

4   Q   Uh-huh.  And you know, from your perspective, from the

5   filing of the monetization plan in August through the notice

6   of shared services, is that what you believe has contributed

7   to the resistance by Mr. Dondero to the Debtor's pursuit of

8   this plan?

9   A   Well, I think there's a number of factors that

10  contributed, but the evidence that I've seen is that when we

11  started talking about a transition, if there wasn't going to

12  be a deal, if Mr. Dondero couldn't reach a deal with the

13  creditors, we were going to push forward with the monetization

14  plan.  And the monetization plan required the transition of

15  the employees.  And indeed, it called specifically, and we had

16  testimony regarding it all through the case, about the

17  employees being terminated or transferred.

18      In order to transfer them over to an entity that's

19  related, Mr. Dondero pulls all of those strings.  And he

20  refused to engage on that.  We started in the fall.  We

21  specifically told employees of the Debtor not to engage.  They

22  couldn't spend his money, which made sense --

23          MR. TAYLOR:  Objection, Your Honor.

24          THE WITNESS:  So, very -- that --

25          THE COURT:  Just -- there's an objection.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2312
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 380 of 1017   PageID 7093
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2311 of
2722

```
                        Seery - Redirect                    238
```

1          MR. MORRIS:  There's an objection.

2          THE WITNESS:  I'm sorry.

3          THE COURT:  There was an objection.

4          MR. TAYLOR:  Yes, Your Honor.  Object --

5          THE COURT:  Go ahead.

6          MR. TAYLOR:  Yes, Your Honor.  This is Clay, Clay

7    Taylor.  Objection.  He's directly said Mr. Dondero told other

8    employees *x*, and that is purely hearsay, not based upon his

9    personal opinion, or his personal knowledge, and therefore

10   that part of the answer should be struck.

11         MR. MORRIS:  Your Honor, it's a statement against

12   interest.

13         THE COURT:  Overrule the objection.  Go ahead.

14         THE WITNESS:  Yeah.  The difficulty of transitioning

15   this business, I've equated it to doing a corporate carve-out

16   transaction on an M&A side.  It's hard, and you need

17   counterparties on the other side willing to engage.  And what

18   we went through over the weekend, on Friday, was seemingly

19   that the Funds, you know, directed by Mr. Dondero, just

20   haven't engaged.

21      We actually gave them an extra two weeks to engage,

22   because it's -- they've really been unable to do anything.  I

23   mean, hopefully, we've got the employees working in a way that

24   can -- that can foster and get around some of this

25   obstreperousness, and I've used that word before, but that's

```
                          Seery - Redirect                    239
```

1   what it is.  It's really an attempt to just prevent the plan

2   from going forward.

3        And at some point, the plan will go forward.  And if we

4   are unable to transition people, we will simply have to

5   terminate them.  And that is not a good outcome for those

6   employees, but it's not a good outcome for the Funds, either.

7   And the Funds, Mr. Dondero, the Advisors, the boards, nobody

8   wants to do anything except come in this court.

9   BY MR. MORRIS:

10  Q    Do you recall being asked about Mr. Dondero and certain

11  things that he didn't do and certain actions that he hadn't

12  taken?

13  A    Yes.

14  Q    By Mr. Taylor?  To the best of your recollection, did Mr.

15  Dondero personally object to the HarbourVest settlement?

16  A    I -- I don't recall if he did or if it was one of the

17  entities.

18  Q    It was Dugaboy.  Does that refresh your recollection?

19  A    Dugaboy certainly objected, yes.

20  Q    And do you understand that Dugaboy has appealed the

21  granting of the 9019 order in the HarbourVest settlement?

22  A    Yes.

23  Q    And Mr. Taylor asked you to confirm that Mr. Dondero

24  hadn't taken any action with respect to the life settlement

25  deal.  Do you remember that?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2314
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 382 of 1017   PageID 7095
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2313 of
2722

```
                          Seery - Redirect                   240
```

1   A    I do.

2   Q    But are you aware that Dugaboy actually filed an

3   administrative claim relating to the alleged mismanagement of

4   the life settlement sale?

5   A    Yes, I did, I did allude to that.  I wasn't sure it was

6   Dugaboy, but -- but that was very --

7   Q    Uh-huh.

8   A    -- very early on, an objection filed in the form of an

9   administrative claim or complaint against, if you will,

10  against Highland for the management of Multi-Strat.

11  Q    Uh-huh.  And Mr. Dondero didn't personally file any motion

12  seeking to inhibit the Debtor from managing the CLO assets; is

13  that right?

14  A    No, not the CLO assets, no.

15  Q    Yeah.  But the Funds and the Advisors did.  That was the

16  hearing on December 16th.  Do you recall that?

17  A    Yeah.  That was the -- the Funds.  K&L Gates, the Funds,

18  and the various Advisors.

19  Q    All right.  Do you recall Mr. Rukavina asking you whether

20  there was any evidence in the record to support your testimony

21  that there was an agreement in place to assume the CLO

22  management agreements?

23  A    I recall the question, yes.

24  Q    Okay.

25        MR. MORRIS:  Your Honor, I'm going to ask Ms. Canty

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2315
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 383 of 1017 PageID 7096
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2314 of 2722

Seery - Redirect                          241

1  to put up on the screen the Debtor's omnibus reply to the plan

2  objections.

3           THE COURT:  Okay.

4           MR. MORRIS:  It was filed -- it was filed on January

5  22nd.  And if we can go, I think, to -- I think it's Paragraph

6  -- I think it's Paragraph 135 on Page 71.  Yeah.  Okay.

7  BY MR. MORRIS:

8  Q    Take a look at that, Mr. Seery.  Does that -- does that

9  statement in Paragraph 135 accurately reflect the

10 understanding that's been reached between the Debtor and the

11 CLO Issuers with respect to the Debtor's assumption of the CLO

12 management agreements?

13 A    Yes.  I think that's consistent with what I testified to

14 earlier, the substance of the agreement.

15          MR. MORRIS:  And if we can just scroll to the top,

16 just to see the date.  Or the bottom.  I guess the top.

17          THE WITNESS:  Do you mean the date of this pleading?

18 BY MR. MORRIS:

19 Q    Yeah.  So, it was filed on January 22nd, right, ten days

20 ago?  Okay.

21 A    That's correct.

22          MR. MORRIS:  I'd like to put up on the screen an

23 email, Your Honor, that I'd like to mark as Debtor's Exhibit

24 10A.  And this is --

25 BY MR. MORRIS:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2316
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 384 of 1017   PageID 7097
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2315 of
2722

Seery - Redirect                           242

1   Q    Do you recall, Mr. Seery, you testified that the agreement

2   was reflected in an email?

3   A    Yes.

4   Q    Is this the email that you're referring to?

5        MR. MORRIS:  If we could scroll down.  Right there.

6        THE WITNESS:  Yes.

7        MR. MORRIS:  Okay.  One -- the email below.  Okay.

8   Right there.

9   BY MR. MORRIS:

10  Q    Is that the -- is that the email you had in mind?

11  A    It was the series of emails.  We -- we had a -- I think I

12  testified in the prior testimony, or my -- one of my

13  depositions, that we had had a number of conversations with

14  the Issuers and their counsel, and this was the summary of the

15  agreement that was contained in these emails.

16  Q    Okay.  And this is, this is the same date as the omnibus

17  reply that we just looked at, right, January 22nd?

18  A    That's correct.

19  Q    Okay.  You were asked a question, I think, late in your

20  cross-examination about a Chapter 7 trustee's ability to sell

21  the assets in the same way as you are proposing to do.  Do you

22  recall that testimony?

23  A    Yes.

24  Q    And I think, if I understood correctly, the question was

25  narrowly tailored to whether there was any legal impediment to

                              Seery - Redirect                    243

1   a trustee doing -- performing the same functions as you.  Do I

2   have that right?

3   A    That's the question I was asked, whether the Bankruptcy

4   Code had a specific prohibition.

5   Q    Okay.  And I think, I think you testified that you weren't

6   aware of anything.  Is that right?

7   A    That's correct.

8   Q    All right.  But let's talk about practice.  Do you think a

9   Chapter 7 trustee will realize the same value as you and the

10  team that you're assembling will, in terms of maximizing value

11  and getting the maximum recovery for the assets?

12  A    No.  As I testified earlier, you know, I've been working

13  with these assets now for a year.  It's a complicated

14  structure.  The assets are all slightly different.  And

15  sometimes much more than slightly.  And the team that we're

16  going to have helping managing is familiar with the assets as

17  well.  We believe we'll be able to execute very well in the

18  markets that we (garbled).

19  Q    Do you think a Chapter 7 trustee will have a steep

20  learning curve in trying to even begin to understand the

21  nature of the assets and how to market and sell them?

22  A    I think anybody coming into this, the way this company is

23  set up, as an asset manager, and the diversity of the assets,

24  would have a steep learning curve, yes.

25  Q    Do you have any view as to whether the perception in the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2318
Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/06/25    Page 386 of 1017    PageID 7099
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2317 of
2722

Seery - Redirect                          244

1   marketplace of a Chapter 7 trustee taking over to sell the

2   assets will have an impact on value as compared to a post-

3   confirmation estate of the type that's being proposed under

4   the plan?

5   A    Yes, I do, and it certainly would be negative, in my

6   experience.  Typically, assets are not conducted -- asset

7   sales are not conducted through a bankruptcy court, and

8   certainly not with a Chapter 7 trustee that has to sell them,

9   and generally is viewed as having to sell them quickly.  So we

10  -- we approach each asset differently, but certainly in a way

11  that would be much more conducive to maximizing value than a

12  Chapter 7 trustee could, just by the nature of their role.

13  Q    Is it -- is it your understanding that, under the proposed

14  plan and under the proposed corporate governance structure,

15  that the Claims Oversight Committee will -- will manage you?

16  That you'll report to that Committee and that they'll have the

17  opportunity to make their assessment as to the quality of your

18  work?

19  A    Yeah, absolutely.  And that's consistent with what we've

20  done before in this case.  Even where it wasn't an asset of

21  the estate or was being sold in the ordinary course, we spent

22  time with the Committee and the Committee professionals before

23  selling assets.

24  Q    And you've worked with the Committee for over -- for a

25  year now, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2319
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 387 of 1017   PageID 7100
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2318 of 2722

Seery - Redirect                      245

1    A    It's over a year.

2    Q    And the Committee is comfortable with you taking this

3    role; is that right?

4    A    I think they're supportive of it.  Comfortable might be

5    not the right word choice.

6    Q    Okay.  I appreciate the clarification.  And do you have

7    any reason to believe that the -- that the Oversight Committee

8    is going to allow you the unfettered discretion to do whatever

9    you want with the assets of the Trust?

10   A    Not a chance.  Not with this group.  Nor would I want to.

11   There's no right or wrong answer for most of these things, and

12   the collaborative views from professionals and people who have

13   an economic stake in the outcome will be helpful.

14   Q    Okay.  You were asked some questions about the November

15   projections and the -- and the assumption that was made that

16   valued the HarbourVest and the UBS claims at zero.  Do you

17   recall that?

18   A    Yes.

19   Q    As of that time, was the Debtor still in active litigation

20   with both of those claim holders?

21   A    Very much so.

22   Q    And after the disclosure statement was issued, do you

23   recall that the Court entered its order on UBS's Rule 3018

24   motion?

25   A    Yes.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2320
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 388 of 1017 PageID 7101
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2319 of 2722

Seery - Redirect                                    246

1  Q   And do you recall what the -- what the claims estimate was

2  for voting purposes under that order?

3  A   It was about $95 million.  That was -- it was together

4  with the summary judgment orders of that date.  They were

5  separate orders, but that was the lone hearing.

6  Q   And was that public information, that order was publicly

7  filed on the docket; isn't that right?

8  A   Yes, it was.

9  Q   Is there anything in the world that you can think of that

10  would have prevented any claim holder from doing the math to

11  try to figure out the impact on the estimated recoveries from

12  the -- by using that 3018 claims estimate?

13  A   No.  It would have -- it would have been quite easy to do.

14  Q   And, in fact, that's what you wound up doing with respect

15  to the January projections, right?

16  A   That's correct.

17  Q   And do you recall when the HarbourVest settlement, when

18  the 9019 motion was filed?

19  A   I don't recall the actual filing.  It was subsequent to

20  the UBS, though.

21         MR. MORRIS:  Ms. Canty, if you have it, can we just

22  put it on the screen, to see if we can refresh Mr. Seery's

23  recollection?  If we could just look at the very top.

24  BY MR. MORRIS:

25  Q   Does that refresh your recollection that the 9019 motion

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2321
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 389 of 1017   PageID 7102
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2320 of 2722

Seery - Redirect                           247

1  was filed on December 23rd?

2  A   Yes, it does.  The agreement was reached before that, but

3  it took a little bit of time to document the particulars and

4  then to -- to get it filed.

5  Q   And this wasn't filed under seal, to the best of your

6  recollection, was it?

7  A   No, no.  This was -- this was open, and we had a very open

8  hearing about it, because it was a related-party objection.

9  Q   And to the best of your recollection, did this 9019 motion

10 publicly disclose all of the material terms of the proposed

11 settlement?

12 A   Yes, it did.

13 Q   Can you think of anything in the world that would have

14 prevented any interested party from doing the math to figure

15 out how this particular settlement would impact the claim

16 recoveries set forth in the Debtor's disclosure statement?

17 A   No.  And just again, to be clear, the plan and the

18 projections had assumptions, but the plan was very clear that

19 the denominator was going to be determined by the total amount

20 of allowed claims.

21 Q   And, again, at the time that that was filed, you hadn't

22 reached a settlement with HarbourVest, had you?

23 A   No.

24 Q   And the order on the 3018 motion hadn't yet been filed; is

25 that right?

                          Seery - Redirect                    248

1   A    That's correct.

2   Q    Okay.  Has -- are you aware of any creditor expressing any

3   interest in trying to change their vote as a result of the

4   updates of the forecasts?

5   A    Only Mr. Daugherty.  And actually, they have a stipulation

6   with the two -- the two former employees.

7   Q    All right.  But to be fair, that wasn't -- had nothing to

8   do with the revisions to the projections?  That was just in

9   connection with their settlement; is that right?

10  A    That's correct.  As was, I suspect, Mr. Daugherty's, but

11  he'd been aware of the settlements, just like everyone else.

12  Q    Okay.  You were asked a couple of questions, I think, by

13  Mr. Rukavina about whether there is anything that you need to

14  do your job on a go-forward basis.  And I think you said no.

15  Do I -- do I have that right?  Nothing further that you need?

16  A    I -- I'm not really sure what your question means, to be

17  honest.

18  Q    Okay.  Fair enough.  To be clear, is there any chance that

19  you would accept the position as the Claimant Trustee if the

20  gatekeeper and injunction provisions of the proposed plan were

21  extracted from those documents?

22  A    No.  As I said earlier, they're integral in my view to the

23  entire plan, but they're absolutely essential to my bottom.

24  Q    Okay.  And through -- through the date of the effective

25  date, are you relying on the exculpation clause of the -- have

Seery - Redirect                                     249

1   you been relying on the exculpation clause in the January 9th

2   order that you testified to at the beginning of this hearing?

3   A    Yeah.  Both the January 9th order as well as the July

4   order with respect to my CEO/CRO positions.

5   Q    Okay.

6            MR. MORRIS:  I've got nothing further, Your Honor.

7            THE COURT:  All right.  Any recross on that redirect?

8            A VOICE:  I believe Mr. Rukavina is speaking but is

9   muted, Your Honor.

10           THE COURT:  Mr. Rukavina, do you have any recross?

11           MR. RUKAVINA:  Your Honor, I do, yes.  Thank you.  I

12  apologize.

13           THE COURT:  Okay.

14           MR. RUKAVINA:  Can you hear me now?

15           THE COURT:  Yes.

16           THE WITNESS:  Yes.

17           MR. RUKAVINA:  Thank you.

18      Mr. Vasek, if you'll please pull up the Debtor's Omnibus

19  Reply, Docket 1807.  And if you'll go to Exhibit C.  Do a word

20  search for Exhibit C.  It's attached to it.  Okay.  Now scroll

21  down.  Stop there.

22                    RECROSS-EXAMINATION

23  BY MR. RUKAVINA:

24  Q    Mr. Seery, do you see what's attached as Exhibit C to the

25  Omnibus Reply, which is proposed language in the confirmation

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2324
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 392 of 1017 PageID 7105
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2323 of 2722

Seery - Recross                              250

1  order?

2  A    I see the exhibit.  I didn't know if this was -- I don't

3  know exactly what it's for.  If it's proposed language, I'll

4  accept your representation.

5          MR. RUKAVINA:  Well, scroll back up to Exhibit C, Mr.

6  Vasek.  I want to make sure that I understand what you're

7  saying.  Scroll back up.  Do the word search for where Exhibit

8  C appears first.  Start again.  Okay.  So scroll up.

9  BY MR. RUKAVINA:

10 Q    So, you'll recall Mr. Morris was asking you about the

11 paragraph in here where you outlined the terms of the

12 agreement with the CLOs.  Do you recall that testimony?

13 A    Yes.

14 Q    Okay.  And then you see it says, The Debtor and the CLOs

15 agreed to seek approval of this compromise by adding language

16 to the confirmation order.  A copy of that language is

17 attached hereto as Exhibit C and will be included in the

18 confirmation order.

19      Do you see that, sir?

20 A    I do.

21 Q    Okay.

22          MR. RUKAVINA:  Mr. Vasek, go back to Exhibit C.

23 BY MR. RUKAVINA:

24 Q    So it's correct that this Exhibit C is the referenced

25 agreement that the Debtor and the CLOs will seek approval of,

Seery - Recross                          251

1  correct?

2  A    The -- the -- it may be word-splitting, but I believe it

3  says that they've reached agreement and this is the language

4  that will evidence that agreement or embody that agreement.

5  Q    Okay.

6       MR. RUKAVINA:  Scroll down, Ms. Vasek, to the next

7  page, please.

8  BY MR. RUKAVINA:

9  Q    Real quick, do the CLOs owe the Debtor any money for the

10  management fees?

11  A    I don't -- well, the answer is there are accrued fees that

12  haven't been paid, but when they have cash they run through

13  the waterfall and pay them.

14  Q    And I believe you mentioned to me those accrued fees

15  before.  They're several million dollars, correct?

16  A    It -- I don't know right off the top of my head.  They can

17  aggregate and then they get paid down in the quarter depending

18  on the waterfall.  And it's -- it's not a fair statement by

19  either of us to say the CLOs, as if they're all the same.

20  Each one is different.

21  Q    I understand.  But as of today, you agree that the CLOs

22  collectively owe some amount of money to the Debtor in accrued

23  and unpaid management fees?

24  A    I believe that's the case.

25  Q    Okay.  And do you believe it's north of a million dollars?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2326
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 394 of 1017   PageID 7107
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2325 of
2722

Seery - Recross                     252

1   A    I don't recall.

2   Q    Okay.

3         MR. RUKAVINA:  Well, scroll down a couple of more

4   lines, Mr. Vasek.  Stay there.

5   BY MR. RUKAVINA:

6   Q   Sir, if you'll read with me, isn't the Debtor releasing

7   each Issuer, which is the CLOs, for and from any and all

8   claims, debts, et cetera, by this provision?

9   A    Claims.  Not -- not fees, but claims.  I don't believe

10  there's any release of fees that the CLOs might owe and would

11  run through the waterfall here.

12  Q    Okay.  For and from any and all claims, debts,

13  liabilities, demands, obligations, promises, acts, agreements,

14  liens, losses, costs, and expenses, including without

15  limitation attorneys' fees and related costs, damages,

16  injuries, suits, actions, and causes of action, of whatever

17  kind or nature, whether known or unknown, suspected or

18  unsuspected, matured or unmatured, liquidated or unliquidated,

19  contingent or fixed.

20      Are you saying that that does not release whatever fees

21  have accrued and the CLOs owe?

22  A    I don't believe it would.  If it did, your client should

23  be ecstatic.  But I don't believe it does that.

24  Q    And you don't believe that it releases the CLOs of any and

25  all other obligations that they may have to the Debtor and the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2327
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 395 of 1017   PageID 7108
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2326 of
2722

Seery - Recross                    253

1   estate?

2   A   I -- again, I don't believe there are any, but I think

3   it's a broad release of claims away from the actual fees that

4   are generated by the Debtor.  I don't believe there's an

5   intention to release fees that have accrued.

6   Q   Have you seen this language before I showed it to you

7   right now?

8   A   I believe I have, yes.

9   Q   Okay.  Take a minute.  Can you point the Court to anywhere

10  where present or future fees under the CLO agreements are

11  excepted from the release?

12  A   I could go through, I'll take your representation, but I

13  don't believe that that's what it -- it's supposed to release

14  fees.  Again, if the fees are owed, they get paid, if there

15  are assets there to pay them.

16  Q   Okay.  This release and this settlement was never noticed

17  out as part of a 9019, was it?

18  A   I don't believe so, no.

19  Q   Okay.  So, other than bringing it up here today, this is

20  the first that the Court, at least, has heard of this,

21  correct?

22  A   Yeah, again, I don't --

23          MR. MORRIS:  Objection to the form of the question.

24          THE WITNESS:  Yeah.  I just stated before that I

25  don't think this is a -- that there claims.

Seery - Recross                    254

1          THE COURT:  Wait.  Slow down.  I think --

2          MR. SEERY:  Oh, I'm sorry, Your Honor.

3          THE COURT:  -- there was an objection.  Go ahead, Mr.

4     Morris.

5          MR. MORRIS:  The notion that this is the first time

6     the Court has heard of this is just factually incorrect.

7     First of all, it's in the document from January 22nd.  Second

8     of all, Mr. Seery testified to it last week at the preliminary

9     injunction hearing.  I mean, --

10          THE COURT:  I -- I --

11          MR. MORRIS:  -- I don't know what the point of the

12     inquiry is, but there's -- this is not new news.

13          THE COURT:  Okay.  I sustain the objection.

14     BY MR. RUKAVINA:

15     Q    And Mr. Seery, can you point me to any document where

16     counsel for the CLOs has signed this particular confirmation

17     order or any other document agreeing to this language in the

18     confirmation order?

19     A    I don't think there's any document that's signed.  I think

20     we already went over that.  I think the email is evidence

21     their agreement to the general terms.  I don't see any

22     agreement with respect to this particular language.

23     Q    Well, you have no personal information?  You're going on

24     what your lawyers told you that the CLOs agreed to, correct?

25     A    That's correct.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2329
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 397 of 1017   PageID 7110
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2328 of
2722

Seery - Recross                             255

1   Q   Okay.  You didn't personally --

2   A   Excuse me.  That's correct with respect to this language,

3   not with respect to the agreement.  I was on the phone when

4   they agreed.

5   Q   Okay.  And they agreed orally, you're saying, to basically

6   the assumption of the CLO management agreements?

7   A   Correct.

8   Q   Okay.

9         MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

10  witness.

11        THE COURT:  All right.  Other recross?

12        MR. TAYLOR:  Yes, Your Honor, I do.

13        THE COURT:  Go ahead.

14                    RECROSS-EXAMINATION

15  BY MR. TAYLOR:

16  Q   Mr. Seery, Clay Taylor again.  You worked -- I'm sorry,

17  let me restart.  I believe you testified earlier, in response

18  to questions by Mr. Morris, that you didn't believe a Chapter

19  7 trustee would be very effective in monetizing these assets,

20  correct?

21  A   I think I said I didn't believe that the Chapter 7 trustee

22  would be as effective at monetizing the assets as the

23  Reorganized Debtor would be, and me in the role as Claimant

24  Trustee.

25  Q   And one of the reasons that you gave is you believe that

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2330
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 398 of 1017 PageID 7111
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2329 of 2722

1   the Chapter 7 trustee had to liquidate assets so quickly that

2   it could not be effective; is that correct?

3   A    Typically, that's the case, yes.

4   Q    You worked for the Lehman trustee, correct?

5   A    That's incorrect.

6   Q    Okay.  Did you work on the Lehman case?

7   A    Did I work in the case?  No.

8   Q    Okay.  Did you -- how were you involved within -- within

9   the Lehman case?

10  A    It's a long history, but I was a relatively senior person,

11  not senior level, not senior management level person at

12  Lehman.  I ran the loan businesses and I helped a number of

13  other places and I -- in the organization.  I helped construct

14  the sale of Lehman to Barclays out of the broker-dealer and

15  then helped consummate that sale.

16  Q    Okay.  I believe, in that case, it was a SIPC -- the

17  trustee was a SIPC trustee, correct?

18  A    With respect to the broker-dealer.

19  Q    Okay.  And you believe that a SIPC trustee is very -- has

20  very similar rules with respect to asset sales; is that

21  correct?

22  A    There are some similarities, absolutely.

23  Q    Okay.  And so in that case, the trustee was in place for

24  seven years, yet you believe -- you want this Court to believe

25  that a Chapter 7 trustee has to liquidate assets in a very

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2331
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 399 of 1017   PageID 7112
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2330 of
2722

Seery - Recross                          257

1    short time frame, is that correct?

2            MR. MORRIS:  Objection to the form of the question.

3            THE WITNESS:  Yeah, in the Lehman case, --

4            THE COURT:  Overruled.

5            THE WITNESS:  I'm sorry, Judge.

6            THE COURT:  Go ahead.

7            THE WITNESS:  In the Lehman case, the SIPC trustee

8    spent years litigating, not liquidating.  The broker-dealer

9    was sold in our structured deal to Barclays, and then the SIPC

10   trustee liquidated the remainder of the estate, which was the

11   broker-dealer, but most of it had been sold to Barclays.  It

12   was really a litigation case.

13   BY MR. TAYLOR:

14   Q   But it did -- that trustee did sell off subsequent assets

15   after the initial sale, correct?

16   A   That trustee, I don't think, managed -- I don't know about

17   that.  The trustee didn't really manage any assets.  Other

18   than litigations.

19   Q   You've also testified that you didn't believe or that you

20   would not take on this role without the gatekeeper and

21   injunction -- gatekeeper role and injunction being in place;

22   is that correct?

23   A   Yes.

24   Q   And you're also familiar with the Barton Doctrine,

25   correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2332
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 400 of 1017   PageID 7113
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2331 of 2722

Seery - Recross                    258

1   A    I'm not.

2   Q    Okay.  Do you believe that a Chapter 7 trustee could be

3   sued by third parties without obtaining either relief from

4   this Court -- let me just stop there.  Do you believe that a

5   Chapter 7 trustee could be sued without seeking leave of this

6   Court?

7   A    I think it would be difficult.  I know that Chapter 7

8   trustees have qualified immunity, so I think, whether it would

9   be leave of this Court or it's just that there's a very high

10  bar to suing them, I'm not exactly sure.  It's not something

11  I've spent time on.

12  Q    Okay.  So a hypothetical Chapter 7 trustee would have no

13  need of the gatekeeper role or injunction if this case were

14  converted to one under Chapter 7, correct?

15  A    That's probably true.

16  Q    Thank you.

17          MR. TAYLOR:  No further questions.

18          THE COURT:  All right.  Any other recross?

19          MR. DRAPER:  Your Honor, I have nothing --

20          THE COURT:  All right.

21          MR. DRAPER:  -- further.

22          THE COURT:  All right.  I think we're done, but

23  anyone I've missed?

24      All right.  Mr. Seery, it's been a long day.  You are

25  excused from the virtual witness stand.

Seery - Recross                        259

1           THE WITNESS:  Thank you, Your Honor.

2           THE COURT:  All right.  Mr. Morris, let's see if

3    there's anything else we can accomplish today.  It's 4:18

4    Central time.  Who would be your next witness?

5           MR. MORRIS:  My next witness would be John Dubel,

6    Your Honor.

7           THE COURT:  All right.  Can you give us a time

8    estimate for direct?

9           MR. MORRIS:  I wouldn't expect Mr. Dubel to be more

10   than 20 minutes or so, but I would offer the Court, if you

11   think it would be helpful, counsel for the CLO Issuers is on

12   the call, and I believe that they would be prepared to just

13   confirm for Your Honor that there is an agreement in

14   principle, just as Mr. Seery has testified to, and maybe you

15   want to hear from her.  I know she's not really a witness, but

16   she might be able to make some representations to give the

17   Court some comfort that everything Mr. Seery has said is true.

18          THE COURT:  I think that would be useful.  Is it Ms.

19   Anderson or who is it?

20          MS. ANDERSON:  That is -- it is, Your Honor.  And you

21   know, I appreciate the testimony given.  I certainly do not

22   want to testify, but thought it might be useful for the Court

23   to hear from us.

24       Amy Anderson on behalf of the Issuers from Jones Walker.

25   Schulte Roth also represents the Issuers.  And I can represent

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2334
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 402 of 1017   PageID 7115
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2333 of 2722

260

1  to the Court that the agreement as it's represented on Docket

2  1807, as more particularly described in Exhibit C, which Your

3  Honor has seen, is the agreement reached between the Issuers

4  and the Debtor.

5     There was some testimony about fees owed, accrued fees

6  owed to the Debtor.  I certainly cannot speak to the substance

7  of each particular management agreement with each CLO.  They

8  are all distinct and unique and very lengthy documents.  I

9  will -- I can represent to the Court that any accrued fees

10  that are owed were not intended to be included in the release.

11  It is -- it is not meant to release fees owed to Highland

12  under the particular management agreements.

13     Of course, if the Court has any questions or if I can

14  provide anything further, I'm happy to.  And I will be on the

15  hearing today and tomorrow, but I thought it might be useful,

16  given the topic of the testimony this afternoon.

17          THE COURT:  All right.  That was useful.  Thank you,

18  Ms. Anderson.

19     All right.  Well, Mr. Morris, shall we go ahead and hear

20  from Mr. Dubel today, perhaps finish up a second witness?

21          MR. MORRIS:  Yeah.  I think we have the time.  I

22  think Mr. Dubel is here.  Are you here, Mr. Dubel?

23          MR. DUBEL:  I am.  Can you hear me, Your Honor?

24          THE COURT:  I can hear you, but I cannot see you.

25  Oh, now I can see you.  Please raise your right hand.

```
                            Dubel - Direct                    261

 1              JOHN S. DUBEL, DEBTOR'S WITNESS, SWORN

 2         THE COURT:  All right.  Thank you.  Mr. Morris, go

 3   ahead.

 4         MR. MORRIS:  Thank you very much, Your Honor.

 5                      DIRECT EXAMINATION

 6   BY MR. MORRIS:

 7   Q    Mr. Dubel, can you hear me?

 8   A    I can, Mr. Morris.

 9   Q    Okay.  Do you have a position today with the Debtor, sir?

10   A    I am a director of Strand Advisors, Inc., which is the

11   general partner of the Debtor.

12   Q    Okay.  And can you --

13         MR. MORRIS:  Your Honor, just as a reminder, I'm

14   going to ask Mr. Dubel to describe his professional experience

15   in some detail, to put into context his testimony, but his

16   C.V. can be found at Exhibit 6Y as in yellow on Docket No.

17   1822.

18         THE COURT:  All right.

19   BY MR. MORRIS:

20   Q    Mr. Dubel, can you describe your professional background?

21   A    Yes.  I have approximately, almost, and I hate to say it

22   because it's making me feel old, but I have almost 40 years of

23   experience working in the restructuring industry.

24        I have served in many roles in that, both as an advisor,

25   an investor in distressed debt, and also a member of
```

Dubel - Direct                    262

1  management teams, and as a director, both an independent

2  director and a non-independent director.

3       My executive roles have included the -- both an executive

4  director, chief executive officer, president, chief

5  restructuring officer, chief financial officer.  And I have

6  been involved in some of the largest Chapter 11 cases over the

7  last several decades, including cases like *WorldCom* and

8  *SunEdison*.

9  Q    Let's focus your attention for a moment just on the

10 position of independent director.  Have you served in that

11 capacity before this case?

12 A    I have.

13 Q    Can you describe for the Court some of the cases in which

14 you've served as an independent director?

15 A    Sure.  I've served as an independent director in several

16 cases that were I'll call post-reorg cases.  *Werner Company*,

17 which was the largest climbing equipment manufacturer in the

18 world, manufacturer of ladders, Werner Ladders.  You'll see

19 them on every pickup truck running around the countryside.

20      *FXI Corporation*, which is a -- one of the largest foam

21 manufacturers.  Everybody's probably slept or sat on one of

22 their products.

23      *Barneys New York*, back in 2012, when they did an out-of-

24 court restructuring.  I had previously been involved with

25 Barneys 15 years before that, and so I was called upon because

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2337
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 405 of 1017 PageID 7118
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2336 of 2722

Dubel - Direct                          263

1  of my knowledge to be an independent director in that

2  situation.  Have had no relationship with Barneys since it

3  emerged from Chapter 11 back in 1998.

4      I have been the independent director in *WMC Mortgage*,

5  which was a mortgage company owned by General Electric.

6      And I am currently serving as an independent director in a

7  company -- in two companies.  One, *Alpha Media*, which is a

8  large radio station chain that recently filed Chapter 11, I

9  believe it was late Sunday night, and I am also an independent

10 director in the *Purdue Pharma* bankruptcy, and have served

11 prior to the bankruptcy and am the chair of the special

12 independent committee of directors -- special committee of

13 independent directors in that particular situation.

14 Q   That sounds like a lot.  In terms of other fiduciary

15 capacities, I think your *C.V.* refers to Leslie Fay.  Were you

16 involved in that case, and if so, how?

17 A   I was.  That was -- for those people who may remember it,

18 that goes back into the 1993 era.  *Leslie Fay* was a large

19 apparel manufacturer, and at the time was one of the largest

20 companies that had gone through an extensive fraud.  I say at

21 the time because it was about a $180 million fraud, which

22 pales by some of the ones that have followed it.

23     I was brought in as the executive vice president in charge

24 of restructuring, chief financial officer, and was also added

25 to the board of directors.  Even though I wasn't independent,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2338
Case 3:25-cv-02072-S   Document 15-9   Filed 07/06/25   Page 406 of 1017   PageID 7119
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2337 of 2722

Dubel - Direct                               264

1   I was added to the board of directors to have the fresh face

2   on the board in that particular situation because of the fraud

3   that had taken place.

4   Q    And --

5   A    *Sun* --

6   Q    Go ahead.

7   A    *SunEdison*, I was brought in as the CEO.  Actually,

8   initially, as the chief restructuring officer, with a mandate

9   to replace the CEO, which took place shortly after I was

10  brought on board and -- because of various issues surrounding

11  investigations by the SEC, DOJ, and allegations by the

12  creditors of fraud.  And so I was brought in to run the

13  company through its Chapter 11 process.

14       As I'd mentioned earlier, *WorldCom*, I was brought in at

15  the beginning of the case as the fresh chief financial

16  officer.  And I think everybody is familiar with what happened

17  in the *WorldCom* situation.

18  Q    All right.  Based on that experience, do you have a view

19  as to whether the appointment of independent directors is

20  unusual?

21  A    It is not.  More recently, it has -- it had been in the

22  past.  Usually, you know, they would try and take the existing

23  directors and form a special committee of the existing

24  directors.  But I think the state of the art has become more

25  where independent directors are brought in, mainly because the

Dubel - Direct                    265

1   cases have become a lot more complex in nature, and larger,

2   and the transactions themselves are much more sophisticated.

3   And so having somebody independent has been important for

4   analyzing the various transactions.  And also, quite often,

5   it's just bringing a fresh, independent voice to the company

6   on the board.

7   Q    Do you have an understanding as to the purpose and the

8   role of independent directors generally in restructuring and

9   bankruptcy cases?

10  A    Sure.  As I kind of alluded to a little bit earlier, the

11  -- probably the most critical thing is for restoring

12  confidence in the company and in the management in terms of

13  corporate governance, especially when there have been troubled

14  situations, where -- whether it's been fraud or allegations

15  made against the company and its prior management or when

16  management has left under difficult situations.

17       Also, you know, independent thought process being brought

18  to the board is very important for helping guide companies.

19  It's quite often the existing management team or the existing

20  board may get stuck in a rut, as you can say, you know, in

21  terms of their thinking on how to manage it, and having

22  somebody with restructuring experience who provides that

23  independent voice is very important to the operations.

24       In addition, having someone who can look at conflicts that

25  might arise between shareholders or shareholders and the board

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2340
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 408 of 1017 PageID 7121
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2339 of 2722

Dubel - Direct                    266

1  members is important.  As I mentioned earlier, the *WMC*
2  *Mortgage* situation was one where I was brought on to -- as an
3  independent member of the board to effectively negotiate an
4  agreement or a settlement between WMC and its parent, General
5  Electric.  That entity was being -- WMC was being sued for
6  billions of dollars, and there were issues as to whether or
7  not General Electric should fund those obligations.  And so
8  that was a role that is quite often occurring in today's day
9  and age.
10     In addition, evaluating transactions for companies is
11  important, whereby either the shareholders who sit on the
12  board or board members may be involved in those transactions,
13  needing an independent voice to review it.  And, you know, I
14  have served in situations.  Again, *Barneys New York* and *Alpha*
15  *Media* is another example where, as an independent director, I
16  am one of the parties responsible for evaluating those
17  transactions and making recommendations to the entire board.
18     And then, again, you know, situations where it's just
19  highly-contentious and having, as I said, having that
20  independent view brought to the table is something that is
21  very helpful in these cases.
22  Q   I appreciate the fulsomeness of the answer.  During the
23  time that you served in these various fiduciary capacities, is
24  it fair to say you spent a lot of time considering and
25  addressing issues relating to D&O and other executive

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2341
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 409 of 1017   PageID 7122
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2340 of 2722

Dubel - Direct                                    267

1   liability issues?

2   A    It's usually one of the things that you get involved with

3   thinking about prior to taking on the role because you want to

4   make sure that there are the appropriate protections for the

5   director.

6   Q    Can you describe for the Court some of the protections

7   that you've sought or that you've seen employed in some of the

8   cases you've worked on, including this one, by the way?

9   A    Sure.  I mean, one of the first things you look to is does

10  the company -- will the company indemnify the director for

11  serving in that capacity?  And if the company will not

12  indemnify, then there's always a question as to why not, and

13  it's probably something you don't want to get involved with.

14       Generally, that is something that I don't think I've ever

15  seen a case where there has not been indemnification.

16  Obviously, it would, you know, cause great pause or concern if

17  they weren't willing to indemnify.  But that is important.

18       Providing D&O insurance is very important.  And in most

19  situations, you know, over the last 10-15 years, if there's

20  not adequate D&O insurance -- quite often, the D&O insurance

21  has been tapped out because of claims that will -- have been

22  brought or are anticipated to be brought -- new D&O insurance

23  is something that's front and center for the minds of

24  independent directors such as myself.

25       As you -- that gets you into the case and gets you moving.

Dubel - Direct                    268

1   As you start to look towards the confirmation and exit from

2   the case, things that would be appropriate, that, you know,

3   would always be something you would want to look at would be

4   exculpation language, releases.  And in this particular case,

5   the injunction, or what Mr. Seery earlier referred to as the

6   gatekeeper clause, is something that is very important for

7   directors, both, you know, as they're thinking through it and

8   as they emerge.

9   Q   All right.  Let's shift now to this case, with that

10  background.  How did you learn about this case?

11  A   I had a party who was involved in the case reach out to me

12  in early part of December of 2019 to see if I would be

13  interested in getting involved.  I think that was about the

14  time -- it was after -- as I recall, it was after the case had

15  been moved to Dallas and when there was a -- consideration of

16  either a Chapter 11 or a Chapter 7 trustee.  I can't remember

17  exactly which it was.  But there was talk about a motion to

18  bring on a trustee and get rid of all the management and the

19  like and such.

20  Q   Can you describe in as much detail as you can recall the

21  facts and circumstances that led to your appointment as an

22  independent director?

23  A   Sure.  I, as I said, I had -- early December, I had an --

24  one of the parties involved -- had, probably within the next

25  week, probably two or three others -- that reached out to see

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2343
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/06/25   Page 411 of 1017   PageID 7124
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2342 of 2722

Dubel - Direct                    269

1   if I would be interested in participating.  I met with the

2   Creditors' Committee or -- I'm not sure if it was all the

3   members, but representatives of the Creditors' Committee,

4   along with counsel, and I believe financial advisors were

5   involved.  They walked me through the issues.  They wanted to

6   hear about my *C.V.*  Quite a few of them knew me, knew me well,

7   but others wanted to hear about my background and how I would

8   look at things as an independent director.

9       That went through into the latter part of December.  I

10  knew that they were talking to other parties.  I think it was

11  probably right around the first of the year or so that I was

12  informed, maybe a little bit earlier than that, that I was

13  informed that Mr. Seery was one of the other parties that they

14  were talking to, and Mr. Seery and I were put in touch with

15  each other.  I had worked with Mr. Seery back probably nine

16  years earlier when I was the CEO of FGIC.  He was involved in

17  a matter that we were restructuring, and so knew him a little

18  bit and was comfortable working with him as a, you know,

19  another independent director.

20      Then we took the time that we had to to -- or, I took the

21  time to -- from the beginning, you know, the early part of

22  December, look at the docket, understand what was taking

23  place.  I -- in addition, I met with the company and its

24  advisors, in-house counsel, the folks at DSI who were at the

25  time the CRO and the company's counsel to better understand

Dubel - Direct                    270

1    some of the issues.

2        Mr. Seery and I, as I said, were both selected, and we

3    went through the process of, I guess, breaking the tie, I

4    think, if I could say it that way, amongst the creditors and

5    the Debtor as to who would be the third member of the board.

6    And we were given the opportunity to go out, interview, and

7    select the third member, which resulted in Russell Nelms'

8    appointment to the board.  And also during that time, we were

9    given the opportunity to have some input -- not a hundred

10   percent input, but some input -- on the January 9th order that

11   -- the January 9, 2020 order that was put in place appointing

12   us and giving us some of the protections that we felt were

13   appropriate and necessary in this case.

14   Q    All right.  We'll get to that in a moment, but during this

15   diligence period, did you form an understanding as to why an

16   independent board was being formed, why it was being sought?

17   A    Yes.  There was, my words, there was a lot of distrust

18   between the creditors and the management -- not the CRO, but

19   the prior management of the company -- and there had been a

20   motion brought both to obviously bring the case back to Dallas

21   from I think it was originally in Delaware and then there was

22   a motion to seek, you know, to remove management and put in a

23   trustee.

24       There had been a dozen years of litigation with one party,

25   about eight or nine years with another major party, and

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2345
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 413 of 1017   PageID 7126
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2344 of 2722

Dubel - Direct                    271

1    several other of the major creditors were litigants.  The

2    other, as I understood, the other creditors, main creditors in

3    the case were all lawyers who had not yet gotten paid for the

4    litigation work that they had done.  And so it was obvious

5    that this was a very -- a highly-litigious situation.

6    Q    In addition to speaking with the various constituents, did

7    you do any diligence on your own to try to understand the case

8    before you accepted the appointment?

9    A    Yes.  I went to the docket to look at all the -- not every

10   single thing that had been filed, but to try and look at all

11   the key, relevant items that had been filed, get a better

12   understanding of what was out there.  Looked at some of the

13   initial filings of the company in terms of the, you know, the

14   creditors, to understand who the creditor base was per the

15   schedules that had been filed.  Looked at the -- some of the

16   various pleadings that had been put in place.

17   Q    Did you form a view as to the causes of the bankruptcy

18   filing?

19   A    Litigation.  That was my clear view.  This company had

20   been in litigation with multiple parties, various different

21   parties, since around 2008.  Generally, you would see

22   litigation like the types that were, you know, that were here,

23   you know, you'd litigate for a while, then you'd try and

24   settle it.

25        It did not appear to me that there was any intention on

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2346
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 414 of 1017   PageID 7127
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2345 of 2722

Dubel - Direct                         272

1  the -- the Debtor to settle these litigations, but would

2  rather just continue the process and proceed forward on the

3  litigation until the very last minute.  And so it was obvious

4  that this was going to -- that the Debtor was a, as I said, a

5  highly-litigious shop, and that was one of the causes,

6  obviously, the cause of the filing, along with the fact that

7  judgments were about to be entered against the Debtor.

8  Q   All right.  And in January 2020, do you recall that's when

9  the agreement was reached between the Debtor, the Committee,

10 and Mr. Dondero?

11 A   Yeah, it was the first week or so, which resulted in a

12 hearing on I believe it was January 9th in front of Judge

13 Jernigan.

14 Q   And as a part of that -- I think you testified at that

15 hearing.  Do I have that right?

16 A   I don't recall if I did.  I might have.  I might have

17 testified at a subsequent hearing.  But --

18 Q   But was --

19 A   -- I was in the courtroom for that hearing, yes.

20 Q   Was it part of that process by which you accepted the

21 appointment as independent director?

22 A   I accepted it based upon the order that had been

23 negotiated amongst the parties, the creditors, the Debtor, Mr.

24 Dondero, and others.  And that was the key thing that was --

25 and approved by the Court on that date.  And that was key for

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2347
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/25   Page 415 of 1017   PageID 7128
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2346 of
2722

Dubel - Direct                      273

1    my acceptance of the role as an independent director.

2    Q    And did you and the other prospective independent

3    directors participate in the negotiation of the substance of

4    the agreement?

5    A    We did.  We didn't have a hundred percent say over it, but

6    we were able to get our voices heard.  As Mr. Seery testified

7    earlier, he was instrumental in coming up with an idea about

8    how to put in place the injunction, you know, the -- I think

9    he referred to it as the gatekeeper injunction, which was

10   obviously in this case very critical to all three of us:  Mr.

11   Seery, Mr. Nelms, and myself.

12   Q    Can you describe for the Court kind of the issues of

13   concern to you and the other prospective board members?  What

14   was it that you were focused on in terms of the negotiations?

15   A    Well, obviously, indemnification was important, but that

16   was something that was going to be granted.  Having the right

17   to obtain separate D&O insurance just for the three directors

18   was important.  We were concerned that Strand Advisors, Inc.

19   really had no assets, and so we wanted to make sure that the

20   Debtor was going to get -- was going to basically guarantee

21   the indemnification.

22       The -- because of the litigious nature and what we had

23   heard from all of the various parties involved, including

24   people inside the Debtor who we had talked with, that it would

25   be something that was important for us to make sure that the

Dubel - Direct                         274

1    injunction, the gatekeeper injunction was put in place.

2    Q   And can you elaborate a little bit on I think you said you

3    had done some diligence and you had formed a view as to the

4    causes of the bankruptcy filing, but did this case present any

5    specific concerns or issues that you and the board members had

6    to address perhaps above and beyond what you experienced in

7    some of the other cases you described?

8    A   Well, as I said earlier, the fact that the litigation --

9    the various litigations with the creditors have been going on

10   for what I viewed as an inordinate amount of years, and that

11   it was clear from my diligence that I had done that this had

12   been directed by Mr. Dondero, to keep this moving forward in

13   the litigation, and to, in essence, just, you know, never give

14   up on the litigation.

15       It was important that the types of protections that we

16   were afforded in the January 9th order were put in place,

17   because we -- none of us -- none of the three of us, and

18   myself in particular, did not want to be in a position where

19   we would be sued and harassed through lawsuits for the next,

20   you know, ten years or so.  That's not something anybody would

21   want to sign up for.

22   Q   All right.  Let's look at the January 9th order and the

23   specific provisions I think that you're alluding to.

24            MR. MORRIS:  Can we call up Exhibit 5Q, please?

25            THE WITNESS:  Pardon me while I put my glasses on to

Dubel - Direct                    275

1    read this.

2         MR. MORRIS:   All right.  And if we can go to

3    Paragraph 4.

4    BY MR. MORRIS:

5    Q   Is that the paragraph, sir, that was intended to address

6    the concern that you just articulated about Strand not having

7    any assets of its own?

8    A   Yes, it is.

9    Q   And can you just describe for the Court how that

10   particular provision addressed that concern?

11   A   Sure.  Since we were directors of Strand, which is the

12   general partner of the Debtor, we felt it was important that

13   the general -- that Highland, the Debtor, would provide the

14   guaranty on indemnification, because Highland had the assets

15   to back up the indemnification.

16       It was also pretty clear, from my experience in having

17   placed D&O insurance, you know, over the last 25-30 years,

18   that if there was no, you know, opportunity for

19   indemnification, putting in place insurance would be very

20   difficult or exorbitantly expensive.  So having this

21   indemnification by Highland was a very important piece of the

22   order that we were seeking.

23   Q   And the next piece is the insurance piece in Paragraph 5.

24   Do you see that?

25   A   I do.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2350
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 418 of 1017   PageID 7131
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2349 of 2722

Dubel - Direct                    276

1   Q    Did you have any involvement in the Debtor's efforts to

2   obtain D&O insurance for the independent board?

3   A    I did.

4   Q    Can you just describe for the Court what role you played

5   and what issues came up as the Debtor sought to obtain that

6   insurance?

7   A    Sure.  The Debtors had been looking to get an insurance

8   policy in place.  They were not able to do that.  I happen to

9   have worked with an insurance broker on D&O situations in some

10  very difficult situations over the years and brought them into

11  the mix.  They were able to go out to the market and find a

12  policy that would cover us, the -- kind of the key components

13  of that policy, though, were, number one, the guaranty that

14  HCMLP would give -- I'm sorry, the guaranty that HCMLP would

15  give to Strand's obligations, and also the -- I'll call it the

16  gatekeeper provision was very important because these parties

17  did not want to have -- they wanted to have what was referred

18  to, commonly referred to as the Dondero Exclusion.

19       So while we were -- we purchased a policy that covered us,

20  it did have an exclusion, unless there were no assets left,

21  and then the what I'll call -- we refer to as kind of a Side A

22  policy would kick in.

23  Q    Okay.  What do you mean by the Dondero Exclusion?

24  A    The insurers did not want to cover the -- any litigation

25  that Mr. Dondero would bring against directors.  It was pretty

Dubel - Direct                              277

1   commonly known in the marketplace that Mr. Dondero was very

2   litigious, and insurers were not willing to write the

3   insurance without the protections that this order afforded

4   because they did not want to be hit with frivolous -- hit with

5   claims on the policy for frivolous litigation that might be

6   brought.

7          MR. TAYLOR:  Your Honor, this is Mr. Taylor.  I've

8   got to object to the last answer.  He testified as to what the

9   insurers' belief was and what they would or would not do based

10  upon their own knowledge.  It's not within his personal

11  knowledge.  And therefore we'd move to strike.

12         THE COURT:  I overrule that objection.

13         MR. MORRIS:  Your Honor?

14         THE COURT:  I overrule the objection.

15         MR. MORRIS:  Thank you.  Thank you, Your Honor.

16  BY MR. MORRIS:

17  Q   Mr. Dubel, can you explain to the Court, in your work in

18  trying to secure the D&O insurance, what rule the gatekeeper

19  provision played in the Debtor's ability to get that?

20  A   Based upon my discussions with the insurance broker, who I

21  have worked with for 25-plus years, had that gatekeeper

22  provision not been put in place, we would not have been able

23  to get insurance.

24  Q   All right.  Let's look at the gatekeeper provision.

25         MR. MORRIS:  Can we go down to Paragraph 10, please?

                        Dubel - Direct                        278

1   Perfect.  Right there.

2   BY MR. MORRIS:

3   Q   Is this gatekeeper provision, is this also the source of

4   the exculpation that you referred to?

5   A   Yes.

6   Q   And what's your understanding of how the exculpation and

7   gatekeeper functions together?

8   A   Well, my apologies, I'm not an attorney, so just from a

9   business point of view, the way I look at this is that, you

10  know, obviously, we're -- you know, the directors are not

11  protected from willful misconduct or gross negligence, but any

12  negligence -- you know, claims brought under negligence and

13  the likes of such, and things that might be considered

14  frivolous, would have to first go to Your Honor in the

15  Bankruptcy Court for a review to determine if they were claims

16  that should be entitled to be brought.

17  Q   If you take a look at the provision, right, do you

18  understand that nobody can bring a claim without -- in little

19  i, it says, first determining -- without the Court first

20  determining, after notice, that such claim or cause of action

21  represents a colorable claim of willful misconduct or gross

22  negligence against an indirect -- independent director.  Do

23  you see that?

24  A   I do.

25  Q   Is it your understanding that parties can only bring

Dubel - Direct                    279

1   claims for gross negligence or willful misconduct if the Court

2   makes a determination that there is a colorable claim?

3   A    That's my understanding.

4   Q    And the second --

5   A    I think they have the right -- I think they have the right

6   to go to the Court to ask if they can bring the claim, but the

7   Court has to make the determination that it's a colorable

8   claim for willful misconduct or gross negligence.

9   Q    And if the Court -- is it your understanding that if the

10  Court doesn't find that there is a colorable claim of willful

11  misconduct or gross negligence, then the claim can't be

12  brought against the independent directors?

13  A    That is my understanding, yes.

14  Q    And was -- taken together, Paragraphs 4, 5, and 10, were

15  they of importance to you and the other independent directors

16  before accepting the position?

17  A    They were absolutely critical to me and definitely

18  critical to the other directors, because we all negotiated

19  that together, and it would -- I don't -- I don't think any of

20  the three of us would have taken on this role if those

21  paragraphs had not been included in the order.

22  Q    Okay.  Just speaking for yourself personally, is there any

23  chance you would have accepted the appointment without all

24  three of those provisions?

25  A    I would not have.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2354
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/06/25   Page 422 of 1017   PageID 7135
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2353 of 2722

                              Dubel - Direct                    280

1   Q    And why is that?  In this particular case, why did you

2   personally believe that you needed all three of those

3   provisions?

4   A    Well, you know, people like myself, you know, someone

5   who's coming in as an independent director, come in in a

6   fiduciary capacity.  And, you know, we take on risks.  Now,

7   granted, in a Chapter 11 case, as the saying goes, you know,

8   it's a lot safer because everything has to be approved by the

9   Court, but there are still opportunities for parties to, in

10  essence, have mischief going on and bring nuisance lawsuits

11  that would take a lot of time and effort away from either the

12  role of our job of restructuring the entity or post-

13  restructuring, would just be nuisance things that would cost

14  us money.  And we, you know, I did not want to be involved in

15  that situation, knowing the litigious nature of Mr. Dondero

16  from the research that I had done, you know, the diligence

17  that I had done.  I did not want to subject myself to that.

18  And it has proven an appropriate and very solid order because

19  of the conduct of Mr. Dondero, as Mr. Seery has testified to

20  earlier.

21  Q    Do you have a view as to what the likely effect would be

22  on future corporate restructurings if you and your fellow

23  directors weren't able to obtain the type of protection

24  afforded in the January 9th order?

25  A    I think it would be very difficult to find qualified

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2355
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 423 of 1017   PageID 7136
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2354 of
2722

Dubel - Direct                              281

1   people who would be willing to serve in these types of

2   positions if they knew they had a target on their backs.  You

3   know, it was something that was clear to us, to Mr. Seery, Mr.

4   Nelms, myself at the time, that if we had a target -- we felt

5   like we would have a target on our back if we didn't have

6   these protections.

7       It just wasn't worth the risk, the stress, the

8   uncertainty, the potential cost to us.  And so I don't think

9   anybody else would be, you know, willing to take on the roles

10  as an independent director with the facts and circumstances

11  and the players involved in this particular case.

12           MR. MORRIS:  I have no further questions, Your Honor.

13           THE COURT:  All right.  Pass the witness.  Let's see.

14  You went -- I'm going to give a time.  You went 32 minutes.

15  So, for cross of this witness, I'm going to limit it to an

16  aggregate of 32 minutes.  Who wants to go first?

17           MR. DRAPER:  Your Honor, this is Douglas Draper.

18  I'll be happy to go first.

19           THE COURT:  All right.

20                    CROSS-EXAMINATION

21  BY MR. DRAPER:

22  Q   Mr. Dubel, prior to your engagement, did you happen to

23  read the case of *Pacific Lumber*?

24  A   I did not.

25  Q   And were you advised about *Pacific Lumber* by somebody

Dubel - Cross                              282

1   other than a -- your lawyer?

2   A    I'm not familiar with the case at all, Mr. Draper.

3   Q    Are you aware, and you've been around a long time, that

4   different circuits have different rules for liabilities of

5   officers, directors, and people like that?

6   A    I am aware that there are different, I don't know what the

7   right term is, but precedents, I guess, in different circuits

8   for any number of things, whether it's a sale motion or

9   protections of officers and directors or anything.  So each

10  circuit has its own unique situations.

11  Q    And one last question.  On a go-forward, after -- if this

12  plan is confirmed and on the effective date, you will not have

13  any role whatsoever as an officer or director of the new

14  general partner, correct?

15  A    I have not been asked to.  As Mr. Seery testified, he may

16  ask for assistance or just -- in most situations that I'm

17  involved with, I may have a continuing role just as a -- I'll

18  call it an advisor or somebody to provide a history.  But at

19  this point in time, I have not been asked to have any

20  involvement.

21  Q    And based on your experience, you know that there's a

22  different liability for a director and an officer versus

23  somebody who is an advisor?

24         MR. MORRIS:  Objection to the form of the question.

25  No foundation.

Dubel - Cross                          283

1           THE COURT:  Overruled.

2           MR. DRAPER:  Mr. Dubel has shown --

3           THE COURT:  Mr. Dubel, you can answer if you know.

4           MR. DRAPER:  Mr. Dubel, you can answer.

5           THE WITNESS:  I'm sorry, Your Honor, I didn't hear

6  you say overruled.  Thank you.

7       Mr. Draper, I apologize, could you repeat the question?

8  BY MR. DRAPER:

9  Q   The question is you know from your experience that there's

10 a different liability for somebody who is an officer or

11 director versus somebody who's an advisor?

12 A   Yes, that's my experience, which is why in several

13 situations post-reorganization, while I have not been involved

14 *per se*, and I use the term involved meaning, you know, on a

15 day-to-day basis, if someone asks me to assist, I'll usually

16 ask them to bring me in as a non -- an unpaid employee or a,

17 you know, a nominally-amount-paid employee, so that I would be

18 protected by whatever protections the company might provide.

19          MR. DRAPER:  I have nothing further for this witness,

20 Your Honor.

21          THE COURT:  All right.  Other cross?

22          MR. TAYLOR:  Yes, Your Honor.

23          MR. RUKAVINA:  Yes, Your Honor.

24          MR. TAYLOR:  Oh, go ahead, Davor.

25          MR. RUKAVINA:  No, Clay, go ahead.

Dubel - Cross                          284

1                        CROSS-EXAMINATION

2  BY MR. TAYLOR:

3  Q   Mr. Dubel, this is Clay Taylor here on behalf on Mr.

4  Dondero.  I believe you had previously testified in response

5  to questions from Mr. Morris that Mr. Dondero had engaged in a

6  pattern of litigious behavior; is that correct?

7  A   I believe that's the testimony I gave, yes.

8  Q   Okay.  And please give me the specific examples of which

9  cases you believe he has engaged in overly-litigious behavior.

10 A   Well, all of the cases that resulted in creditors, large

11 creditors in our bankruptcy.  That would be the UBS situation,

12 the Crusader situation which became the Redeemer Committee,

13 litigation with Mr. Daugherty, with Acis and Mr. Terry.  And

14 as I mentioned earlier, I'd, you know, been informed by

15 members of the management team that it was Mr. Dondero's style

16 to just litigate until the very end to try and grind people

17 down.

18 Q   Okay.  Was Mr. Dondero or a Highland entity the plaintiff

19 in the UBS case?

20 A   No, but what was referred -- what I was referring to was

21 the nature in which he defended it and went overboard and

22 refused to ever, you know, try and settle things in a manner

23 that would have gotten things done.  And just looking at,

24 having been involved in the restructuring industry for the

25 last 40 years, as I said, almost 40 years, and been involved

Dubel - Cross                                285

1  in many, many litigious situations, it's obvious when someone

2  is litigious, whether they're the plaintiff or the defendant.

3  Q   So are you personally familiar with the settlement

4  negotiations in the UBS case that happened pre-bankruptcy,

5  then?

6  A   I have been informed that there were settlement

7  negotiations, and subsequently determined, through discussions

8  with the parties, that they weren't really close to -- to a

9  settlement.

10 Q   But are you aware of --

11 A   Mr. Dondero might have thought they were, but they were

12 not.

13 Q   Okay.  Would you be surprised to learn if UBS had offered

14 to settle pre-bankruptcy for $7 million?

15 A   As I understand, settlements -- settlement offers pre-

16 bankruptcy had a tremendous number of -- I don't know what the

17 right term is -- things tied to it and that clearly were never

18 going to get done.

19 Q   Okay.  When you say things were tied to it, what things

20 were tied to it?

21 A   I don't know all of the settlement discussions that took

22 place, but what I was informed was that there were a lot of

23 conditions that were included in that.  And it's -- if it had

24 been an offer of $7 million and Mr. Dondero didn't settle for

25 that, there must have been a reason why.  So, you know, since

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2360
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 428 of 1017   PageID 7141
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2359 of 2722

Dubel - Cross                          286

1   the entities -- all of the entities within the Highland

2   Capital empire, if you'd call it that, were being sued for

3   almost a billion dollars.

4   Q    Okay.  And you say there was lots of conditions that were

5   tied to that.  What were the conditions?

6   A    As I said earlier, I wasn't informed of them on all the

7   prepetition settlements.  That's just what I was told, there

8   was conditions.

9   Q    Okay.  And who were you told these things by?

10  A    Both external counsel and internal counsel.  Mr.

11  Ellington, Scott Ellington, and Isaac -- the litigation

12  counsel.

13  Q    Okay.  So --

14  A    That's -- sorry.

15  Q    Okay.  In each of these cases, you were informed by your

16  views by statements that were made to you by other people?

17  A    Yes.

18  Q    Okay.

19  A    Made -- and particularly made by members of management of

20  the Debtor, which is pretty informed.

21  Q    Okay.  Which members of management were those?

22  A    As I just testified, it was Mr. Ellington, who was the

23  general -- the Debtor's general counsel, and Mr. Leventon,

24  Isaac Leventon, who was the -- I believe his title was

25  associate general counsel in charge of litigation.

```
                        Dubel - Cross                    287
```

1    Q   Okay.  Thank you.

2            MR. TAYLOR:  No further questions.

3            THE COURT:  All right.  Mr. Rukavina?

4                    CROSS-EXAMINATION

5    BY MR. RUKAVINA:

6    Q   Mr. Dubel, we've never met, although I think we were on

7    the phone once together.  I know you're a director, so you're

8    at the top, but having been in this case for more than a year,

9    you probably have some understanding of the assets that the

10   Debtor has, don't you?

11   A   I do, but I'm not as facile with it as Mr. Seery,

12   obviously.

13   Q   Sure.  Is it true, to your understanding, that the Debtor

14   owns various equity interests in third-party companies?

15   A   Either directly or indirectly.  That's my understanding,

16   yes.

17   Q   Okay.  Have you heard of an entity called Highland Select

18   Equity Fund, LP?

19   A   I have.

20   Q   And is that a publicly-traded company?

21   A   I'm not familiar with its nature there, no.

22   Q   Do you know how much of the equity of that entity the

23   Debtor owns?

24   A   I don't know off the top of my head, no.

25   Q   And again, these may be unfair questions because you're at

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2362
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 430 of 1017   PageID 7143
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2361 of 2722

```
                        Dubel - Cross                    288

 1   the top, so I'm not trying to make you look foolish.  I'm just

 2   trying to see.  Let me ask one more.  Have you heard of

 3   Wright, W-R-I-G-H-T, Limited?

 4            MR. MORRIS:  Objection, Your Honor.  Beyond the

 5   scope.

 6            MR. RUKAVINA:  Your Honor, I can recall him on my

 7   direct, then.

 8            THE COURT:  Yeah.  I'll --

 9            MR. RUKAVINA:  But I'd just rather get it over with.

10            THE COURT:  I'll allow it.

11            MR. MORRIS:  All right.  If we're going to get rid of

12   --

13            THE COURT:  Overruled.

14            MR. MORRIS:  No, that's fine.

15   BY MR. RUKAVINA:

16   Q   Have you heard of Wright, W-R-I-G-H-T, Limited?

17   A   I think I have, but I just don't recall it, Mr. Rukavina.

18   I'm sorry, Rukavina.  Sorry.

19   Q   It's okay.  It's a --

20   A   I'm looking at your chart here, at your name here, and it

21   looks like Drukavina, so I really apologize.

22   Q   Believe it or not, it's actually a very famous name in

23   Croatia, although it means nothing here.

24        So, all of the entities that the Debtor owns equity in, I

25   guess you probably, just because, again, you're not in the
```

Dubel - Cross                             289

1   weeds, you can't tell us how much of that equity the Debtor

2   owns, can you?

3   A    I can't individually, no.  You know, Mr. Seery is our CEO

4   and he's responsible for the day-to-day, you know, issues.  So

5   usually we look at it more on a consolidated basis and not in

6   the, you know, down in the weeds, as you refer to it, unless

7   something specific came up.

8   Q    Well, would you remember whether, when Mr. Seery or the

9   prior CRO would provide you, as the board member, financial

10  reports, whether that included P&Ls and balance sheets and

11  financial reports for the entities that the Debtor owned

12  interests in?

13  A    We might -- we would have seen certain consolidating

14  reports that might -- that would be, you know, consolidating

15  financial statements that would be P&Ls.  Where we didn't

16  consolidate them, I'm not sure we saw the actual individual-

17  entity P&Ls on a regular basis.  We might have seen them if

18  there was a transaction taking place.  But again, you know, I

19  don't have -- I don't remember every single one of them, no.

20  Q    And you would agree with me, sir, that the Pachulski law

21  firm is an excellent restructuring, reorganization, insolvency

22  law firm, wouldn't you?

23  A    Yes, I would agree with you there.

24  Q    Okay.  And you would expect them to ensure that anything

25  that has to be filed with Her Honor is timely filed, wouldn't

Dubel - Cross                              290

1   you?

2   A    I would expect that they would follow the rules.

3   Q    Okay.  And you have the utmost of confidence, I take it,

4   in your CRO, don't you?

5   A    I have a tremendous amount of confidence in our CEO, who

6   also happens to hold the title of CRO, yes, if that's what

7   you're referring to as, Mr. Seery.

8        (Interruption.)

9            MR. RUKAVINA:  John.

10  BY MR. RUKAVINA:

11  Q    Okay, I think -- yeah, I think I heard that you have

12  tremendous confidence in the CEO, who happens to be the CRO,

13  right?

14  A    Yes, that's the case.

15           MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

16  witness.

17           THE COURT:  All right.  Any other cross of Mr. Dubel?

18      All right.  Mr. Morris, redirect?

19           MR. MORRIS:  Yeah, just very briefly, Your Honor.

20                   REDIRECT EXAMINATION

21  BY MR. MORRIS:

22  Q    You were asked about that *Pacific Lumber* case, Mr. Dubel;

23  do you remember that?

24  A    I do remember being asked about it.

25  Q    And you weren't familiar with that case, right?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2365
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 433 of 1017   PageID 7146
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2364 of
2722

```
                        Dubel - Redirect                 291
```

1  A   I'm not familiar with the name of the case, no.

2  Q   But you did know that the exculpation and gatekeeping

3  provisions were going to be included in the order; is that

4  fair?

5  A   I did.

6  Q   And did you testify that you wouldn't have accepted the

7  position without it?

8  A   I did testify that way.

9  Q   And if you knew that you couldn't get those provisions in

10  the Fifth Circuit, would you ever accept a position as an

11  independent director in the Fifth Circuit on a go-forward

12  basis?

13  A   Not in a situation such as this, no.

14  Q   Okay.  Okay.

15       MR. MORRIS:  No further questions, Your Honor.

16       THE COURT:  All right.  Any recross on that narrow

17  redirect?

18    All right.  Well, Mr. Dubel, you are excused from the

19  virtual witness stand.

20       THE WITNESS:  Thank you, Your Honor.

21       THE COURT:  All right.  I want to go ahead and --

22       MR. DUBEL:  Do you mind if I turn my video off?

23       THE COURT:  I'm sorry, what?

24       MR. DUBEL:  I said, do you mind if I turn my video

25  off?

006351

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2366
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 434 of 1017   PageID 7147
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2365 of
2722

292

1           THE COURT:  No, you may.  That's fine.

2           MR. DUBEL:  Thank you, Your Honor.

3           THE COURT:  All right.  I want to break now, unless

4    there's any quick housekeeping matter.  Anything?

5           MR. MORRIS:  No, Your Honor, but I would just ask

6    all parties to let me know by email if they have any

7    objections to any of the exhibits on the witness list that was

8    filed at Docket No. 1877, because I want to begin tomorrow by

9    putting into evidence the balance of our exhibits.

10          MR. RUKAVINA:  And Your Honor, I was responsible for

11   this due to an internal mistake.  The only ones I have an

12   objection to are -- is that 7?  John, is that 7, right, 7OO --

13          MR. MORRIS:  Yes.

14          MR. RUKAVINA:  Your Honor, I only have an objection

15   to 7O and 7P, although I think -- think the Court has already

16   admitted 7P, so my objection is moot.

17          THE COURT:  I have.

18          MR. RUKAVINA:  Okay.

19          THE COURT:  So, what --

20          MR. RUKAVINA:  Then it would just be --

21          THE COURT:  Go ahead.

22          MR. RUKAVINA:  I'm sorry.  It would just be 7O.

23   Septuple O or whatever the word is.

24          THE COURT:  All right.  So I will go ahead and admit

25   7F through 7Q, with the exception of 7O.  Again, these appear

293

1    at Docket Entry 1877.  And Mr. Morris, you can try to get in

2    7O the old-fashioned way if you want to.

3         MR. MORRIS:  Yeah, I'll deal with 7O and the very

4    limited number of other objections at the beginning of

5    tomorrow's hearing.

6         THE COURT:  All right.

7       (Debtor's Exhibits 7F through 7Q, with the exception of

8    7O, are received into evidence.)

9         THE COURT:  So we will reconvene at 9:30 Central time

10   tomorrow.  I think we're going to hear from the Aon, the D&O

11   broker, Mr. Tauber; is that correct?

12        MR. MORRIS:  That's right.  And that should be

13   shorter than even Mr. Dubel.

14        THE COURT:  All right.  Well, we will see you at 9:30

15   in the morning.  We are in recess.

16        MR. MORRIS:  Thank you so much.

17        THE CLERK:  All rise.

18      (Proceedings concluded at 5:09 p.m.)

19                     --oOo--

20                    CERTIFICATE

21      I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    /s/ Kathy Rehling                    02/04/2021

24   _____      _____
     Kathy Rehling, CETD-444                    Date
25   Certified Electronic Court Transcriber

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2368
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 436 of 1017   PageID 7149
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2367 of 2722

294

INDEX

PROCEEDINGS                                                    5

OPENING STATEMENTS

- By Mr. Pomerantz                                           12
- By Mr. Kathman                                             29
- By Mr. Clemente                                            33
- By Mr. Draper                                              40
- By Mr. Rukavina                                            42
- By Mr. Taylor                                              44
- By Mr. Kathman                                             49
- By Ms. Drawhorn                                            50

WITNESSES

Debtor's Witnesses

James P. Seery
- Direct Examination by Mr. Morris                           58
- Cross-Examination by Mr. Rukavina                         169
- Cross-Examination by Mr. Taylor                           212
- Cross-Examination by Mr. Draper                           233
- Redirect Examination by Mr. Morris                        236
- Recross-Examination by Mr. Rukavina                       249
- Recross-Examination by Mr. Taylor                         255

John S. Dubel
- Direct Examination by Mr. Morris                          261
- Cross-Examination by Mr. Draper                           281
- Cross-Examination by Mr. Taylor                           284
- Cross-Examination by Mr. Rukavina                         287
- Redirect Examination by Mr. Morris                        290

EXHIBITS

Debtor's Docket 1822 Exhibits                      Received  55
   (exclusive of Exhibits B, D, E, 4D, 4E, 4G,
    5T, 6R, 6S, 6T, and 6U)
Debtor's Docket 1866 Exhibits                      Received  56
Debtors' Exhibits 7F through 7Q (exclusive of      Received 293
   Exhibit 7O)
Debtor's Exhibit 7P                                Received 140
Debtor's Exhibit 7Q                                Received  75

295

INDEX
Page 2

RULINGS

Confirmation Hearing [1808] - *Continued to 2/3/2021*          293

Agreed Motion to (1) Assume Non-Residential Real Property     293
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624] -
*Continued to 2/3/2021*

END OF PROCEEDINGS                                            293

INDEX                                                    294-295

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2370
Case 3:25-cv-02072-S Document 15-9 Filed 06/27/23/06/25 Page 438 of 1017 PageID 7151
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2369 of 2722

# EXHIBIT 24

# EXHIBIT N

EXECUTION COPY

## SERVICING AGREEMENT

This Servicing Agreement, dated as of December 21, 2006 is entered into by and among BRENTWOOD CLO, LTD., an exempted company incorporated under the laws of the Cayman Islands, with its registered office located at the offices of Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as servicer ("Highland" or, in such capacity, the "Servicer").

WITNESSETH:

WHEREAS, the Issuer and BRENTWOOD CLO, CORP. (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") intend to issue U.S.$388,700,000 of their Class A-1A Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-1A Notes"), U.S.$75,000,000 of their Class A-1B Delayed Drawdown Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-1B Notes" and, together with the Class A-1A Notes, the "Class A-1 Notes"), U.S.$51,500,000 of their Class A-2 Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-2 Notes" and, together with the Class A-1 Notes, the "Class A Notes"), U.S.$68,000,000 of their Class B Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class B Notes"), U.S.$23,800,000 of their Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class C Notes" and, together with the Class A Notes and the Class B Notes, the "Senior Notes") and the Issuer will issue U.S.$21,000,000 of the Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class D Notes" and, together with the Senior Notes, the "Notes") pursuant to the Indenture dated as of December 21, 2006 (the "Indenture"), among the Co-Issuers and Investors Bank & Trust Company, as trustee (the "Trustee") and 34,400 Class I Preference Shares, $0.01 par value (the "Class I Preference Shares") and 37,000 Class II Preference Shares, $0.01 par value (the "Class II Preference Shares" and, together with the Class I Preference Shares, the "Preference Shares" and, together with the Notes, the "Securities") pursuant to the Preference Share Documents;

WHEREAS, pursuant to the Indenture, the Issuer intends to pledge certain Collateral Obligations, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Servicing Agreement, pursuant to which the Servicer agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral in the manner and on the terms set forth herein; and

WHEREAS, the Servicer has the capacity to provide the services required hereby and is prepared to perform such services upon the terms and conditions set forth herein.

APP. 2367

006357

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.    Definitions.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"Advisers Act" shall mean the Investment Advisers Act of 1940, as amended.

"Agreement" shall mean this Servicing Agreement, as amended from time to time.

"Governing Instruments" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"HFP" shall mean collectively, Highland Financial Partners, L.P. and any subsidiary thereof.

"Independent Advisor" shall have the meaning specified in Section IV.B. of Annex 1 hereto.

"Offering Memorandum" shall mean the Offering Memorandum of the Issuer dated December 21, 2006 prepared in connection with the offering of the Securities.

"Servicer Breaches" shall have the meaning specified in Section 10(a).

"Special Procedures Obligation" shall have the meaning specified in Section IV.A. of Annex 1 hereto.

2.    General Duties of the Servicer.

(a)    The Servicer shall provide services to the Issuer as follows:

(i)    Subject to and in accordance with the terms of this Agreement and the other Transaction Documents, the Servicer shall supervise and direct the administration, acquisition and disposition of the Collateral, and shall perform on behalf of the Issuer those duties and obligations of the Servicer required by the Indenture and the other Transaction Documents, and including the furnishing of Orders, Requests and officer's certificates, and such certifications as are required of the Servicer under the Indenture with respect to permitted purchases and sales of the Collateral Obligations, Eligible Investments and other assets, and other matters, and, to the extent necessary or appropriate to perform such duties, the Servicer shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto. The Servicer shall, subject to the terms and conditions of this Agreement and the other Transaction Documents, perform its obligations hereunder and thereunder with reasonable care, using a degree of skill and attention no less than that which the Servicer exercises with respect to comparable assets that it services or manages for others having similar objectives and restrictions, and in a manner consistent with

APP. 2368

006358

practices and procedures followed by institutional servicers or managers of national standing relating to assets of the nature and character of the Collateral for clients having similar objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the other Transaction Documents.  To the extent not inconsistent with the foregoing, the Servicer shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder.  The Servicer shall comply with all terms and conditions of the other Transaction Documents affecting the duties and functions to be performed hereunder. The Servicer shall not be bound to follow any amendment to any Transaction Document until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; <u>provided, however,</u> that the Servicer shall not be bound by any amendment to any Transaction Document that affects the rights, powers, obligations or duties of the Servicer unless the Servicer shall have consented thereto in writing.  The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, powers, obligations or duties of the Servicer or (y) affects the amount or priority of any fees payable to the Servicer to become effective unless the Servicer has been given prior written notice of such amendment and consented thereto in writing;

(ii)    the Servicer shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the Collateral criteria set forth herein and in the Indenture;

(iii)    the Servicer shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture and any Hedge Agreement, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture; the Servicer shall undertake to determine to the extent reasonably practicable whether a Collateral Interest has become an Defaulted Collateral Obligation; and the Servicer shall monitor any Hedge Agreements and direct the Trustee on behalf of the Issuer in respect of all actions to be taken thereunder by the Issuer;

(iv)    the Servicer, subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee (x) to dispose of a Collateral Obligation, Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, (y) to acquire, as security for the Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Collateral, one or more substitute Collateral Obligations or Eligible Investments, or (z) direct the Trustee to take the following actions with respect to a Collateral Obligations or Eligible Investment:

(1)    retain such Collateral Obligations or Eligible Investment; or

(2)    dispose of such Collateral Obligations or Eligible Investment in the open market or otherwise; or

(3)    if applicable, tender such Collateral Obligations or Eligible Investment pursuant to an Offer; or

APP. 2369

006359

(4) if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(5) retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer; or

(6) waive any default with respect to any Defaulted Collateral Obligations; or

(7) vote to accelerate the maturity of any Defaulted Collateral Obligations; or

(8) exercise any other rights or remedies with respect to such Collateral Obligations or Eligible Investment as provided in the related Underlying Instruments, including in connection with any workout situations, or take any other action consistent with the terms of the Indenture which is in the best interests of the Holders of the Securities;

(v) subject to and in accordance with the terms of this Agreement and the Transaction Documents, the Servicer on behalf of the Issuer shall determine whether to enter into any additional hedging arrangements, increase or reduce the notional amounts of existing Hedge Agreements or terminate existing Hedge Agreements, and the Servicer shall use its reasonable efforts to cause the Issuer, promptly following the early termination of a Hedge Agreement (other than on a Redemption Date) and to the extent possible through application of funds received as a result of the early termination (including the proceeds of the liquidation of any collateral pledged by the hedge counterparty), to enter into a replacement Hedge Agreement

(vi) the Servicer shall (a) on or prior to any day which is a Redemption Date, direct the Trustee to enter into contracts to dispose of the Collateral Obligation and any other Collateral pursuant to the Indenture and otherwise comply with all redemption procedures and certification requirements in the Indenture in order to allow the Trustee to effect such redemption and (b) conduct Auctions in accordance with the terms of the Indenture; and

(vii) if the Servicer, on behalf of the Issuer, desires to make distributions of Eligible Equity Securities on any Payment Date pursuant to Section 2(e) of the Preference Shares Paying Agency Agreement, the Servicer shall so notify the Trustee and the Preference Shares Paying Agent and provide the Trustee and the Preference Shares Paying Agent (for forwarding to each Holder of the Preference Shares with respect to the applicable Record Date) details of such Eligible Equity Securities in accordance with the procedure set forth in Section 3(b) of the Preference Shares Paying Agency Agreement.

(b) In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to

APP. 2370

006360

the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

(c)     The Servicer hereby agrees to the following:

(i)     The Servicer agrees not to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws of any jurisdiction until at least one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes issued under the Indenture; provided, however, that nothing in this clause (i) shall preclude, or be deemed to estop, the Servicer (A) from taking any action prior to the expiration of such period in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Servicer, or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding. The provisions of this Section 2(c)(i) shall survive the termination of this Agreement.

(ii) The Servicer shall cause each sale or purchase of any Collateral Obligations or Eligible Investment to be conducted on an arm's-length basis.

(d)     The Servicer shall not act for the Issuer in any capacity except as provided in this Section 2. In providing services hereunder, the Servicer may employ third parties, including its Affiliates, to render advice (including advice with respect to the servicing of the Collateral) and assistance; provided, however, that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties. Notwithstanding any other provision of this Agreement, the Servicer shall not be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

(e)     Notwithstanding any other provision of this Agreement or the Indenture, (i) any granted signatory powers or authority granted to the Servicer on behalf of the Issuer with respect to the Special Procedures Obligations shall be conditioned upon the prior written approval of the Independent Advisor and (ii) neither the Servicer nor any Affiliate of the Servicer shall have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to the Special Procedures Obligations without the prior written approval of the Independent Advisor.

APP. 2371

006361

3.    Brokerage.

The Servicer shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Servicer may take into consideration research and other brokerage services furnished to the Servicer or its Affiliates by brokers and dealers which are not Affiliates of the Servicer. Such services may be used by the Servicer or its Affiliates in connection with its other servicing or advisory activities or operations. The Servicer may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts serviced or managed by Servicer or with accounts of the Affiliates of the Servicer, if in the Servicer's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Collateral Obligation or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Servicer (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner and consistent with its obligations hereunder and under applicable law.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Servicer may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Collateral Obligations or other Collateral to, the Placement Agent, the Trustee or any of their respective Affiliates, or any other firm.

4.    Additional Activities of the Servicer.

Nothing herein shall prevent the Servicer or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Holders of the Securities, or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Servicer and partners, directors, officers, employees and agents of the Servicer or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a)    serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and the Interest Coverage Test; provided, further, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof;

(b)    receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and the Interest Coverage Test; and provided, further that if any portion of such services are related to the purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be applied to the purchase price of such obligations; and

APP. 2372

006362

(c)      be a secured or unsecured creditor of, or hold an equity interest in, the Issuer, its Affiliates or any issuer of any obligation included in the Collateral; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and the Interest Coverage Test; provided, further, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof.

It is understood that the Servicer and any of its Affiliates may engage in any other business and furnish servicing, investment management and advisory services to others, including Persons which may have policies similar to those followed by the Servicer with respect to the Collateral and which may own securities of the same class, or which are the same type, as the Collateral Obligations or other securities of the issuers of Collateral Obligations. The Servicer shall be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Collateral.

Unless the Servicer determines in its reasonable judgment that such purchase or sale is appropriate, the Servicer may refrain from directing the purchase or sale hereunder of securities issued by (i) Persons of which the Servicer, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) Persons for which the Servicer or its Affiliate act as financial adviser or underwriter or (iii) Persons about which the Servicer or any of its Affiliates have information which the Servicer deems confidential or non-public or otherwise might prohibit it from trading such securities in accordance with applicable law. The Servicer shall not be obligated to have or pursue any particular strategy or opportunity with respect to the Collateral.

5.      Conflicts of Interest.

(a)      The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the reasonable, good faith judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Advisers Act.

(b)      The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the reasonable, good faith judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Advisers Act.

(c)      The Servicer shall not undertake any transaction described in this Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and the Code. In addition, after the initial distribution of the Class D Notes and the Preference Shares, neither the Servicer nor any of its affiliates (as defined in the Plan Asset Regulation) shall acquire any Class D Notes or Preference Shares (including pursuant to the Extension Procedure or the Amendment Buy-Out Option) unless such acquisition would not, as determined by the Trustee in reliance on representations made in the applicable transfer certificates with respect thereto, result in persons that have represented that they are Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of any of the Class D

APP. 2373

Annex 02429

006363

Notes, the Class I Preference Shares or the Class II Preference Shares immediately after such acquisition (determined in accordance with Section 3(42) of ERISA, the Plan Asset Regulation, the Indenture and the Preference Share Documents). The Class D Notes and the Preference Shares held as principal by the Servicer or any of its affiliates shall be disregarded and shall not be treated as outstanding for purposes of determining compliance with such 25% limitation to the extent that such person has represented that it is not a Benefit Plan Investor.

6.    Records; Confidentiality.

The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Holders of the Securities and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice. At no time shall the Servicer make a public announcement concerning the issuance of the Notes or the Preference Shares, the Servicer's role hereunder or any other aspect of the transactions contemplated by this Agreement and the other Transaction Documents. The Servicer shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of any class of Securities, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Servicer, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Servicer on a non-confidential basis, provided, that the Servicer does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto. For purposes of this Section 6, the Trustee, the Collateral Administrator and the Holders of the Securities shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Servicer, the Co-Issuers, the Trustee and the Holders of the Securities (and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

7.    Obligations of Servicer.

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Servicer shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Servicer to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's or the Co-Issuer's respective governing instruments, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement

APP. 2374

006364

contemplated by the Indenture or (f) not be permitted by Annex 1 hereto and would subject the Issuer to U.S. federal or state income or franchise taxation or cause the Issuer to be engaged in a trade or business in the United States for U.S. federal income tax purposes. The Servicer covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

        8.    <u>Compensation</u>.

        (a)    The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such amounts and at such times as set forth in the Indenture. The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer. If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable with accrued interest on such later Payment Date on which funds are available therefor as provided in the Indenture.

        The Servicer hereby agrees to waive the Class II Preference Share Portion of the Servicing Fees deposited by the Trustee into the Class II Preference Share Special Payment Account pursuant to the Indenture, which would otherwise be payable to the Servicer as Servicing Fees, on each Payment Date until February 3, 2008. After February 3, 2008, the Servicer may, in its sole discretion, at any time waive the Class II Preference Share Portion of its Servicing Fees then due and payable, in which event an amount equal to such waived portion will be paid by the Issuer as Class II Preference Share Special Payments pursuant to the Indenture. For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

        In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion: (i) waive all or any portion of the Servicing Fee, any funds representing the waived Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments; or (ii) defer all or any portion of the Servicing Fee, any funds representing the deferred Servicing Fees to be retained in the Collection Account, when they will become payable in the same manner and priority as their original characterization would have required unless deferred again.

        (b)    The Servicer shall be responsible for the ordinary expenses incurred in the performance of its obligations under this Agreement, the Indenture and the other Transaction Documents; <u>provided</u>, <u>however</u>, that any extraordinary expenses incurred by the Servicer in the performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee and the accountants appointed by the Issuer, the reasonable expenses incurred by the Servicer to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Collateral Obligations or other unusual matters arising in the performance of its duties under this Agreement and the Indenture, any reasonable expenses incurred by the Servicer in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Servicer customarily allocates among all of the funds or portfolios that it services or manages) shall be

APP. 2375

006365

reimbursed by the Issuer to the extent funds are available therefor in accordance with and subject to the limitations contained in the Indenture.

(c)     If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Servicer shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.     Benefit of the Agreement.

The Servicer agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or the Holders of the Preference Shares, as applicable, as provided in the Indenture or the Preference Share Paying Agency Agreement, as applicable.

10.     Limits of Servicer Responsibility; Indemnification.

(a)     The Servicer assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of liability described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Servicer. The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "Liabilities") incurred by the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, that arise out of or in connection with the performance by the Servicer of its duties under this Agreement and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement or (ii) with respect to any information included in the Offering Circular in the section entitled "The Servicer" and "Risk Factors—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Servicer" that contain any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "Servicer Breaches"). For the avoidance of doubt, the Servicer shall have no duty to independently investigate any laws not otherwise known to it in connection with its obligations under this Agreement, the Indenture and the other Transaction Documents. The Servicer shall be deemed to have satisfied the requirements of the Indenture and this Agreement relating to not causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes (including as those requirements relate to the acquisition (including manner of acquisition), ownership, enforcement, and disposition of Collateral) to the extent the Servicer complies with the requirements set forth in Annex 1 hereto.

(b)     The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "Indemnified Parties") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses

APP. 2376

006366

(including reasonable fees and expenses of counsel) (collectively, the "Expenses") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "Actions"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with the priorities set forth in the Indenture and shall survive termination of this Agreement.

(c)    With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Servicer, the Servicer shall cause such Indemnified Party to):

(i)    give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii)    at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)    at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iv)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)    neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi)    upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such

APP. 2377

Appx. 02424

006367

claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise. If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d)     In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e)     Notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer or the Holders of the Securities may have under any U.S. federal securities laws.

11.   No Partnership or Joint Venture.

The Issuer and the Servicer are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Servicer's relation to the Issuer shall be deemed to be that of an independent contractor.

12.   Term; Termination.

(a)     This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preference Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Holders of the Securities; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b)     Subject to Section 12(e) below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer). If the Servicer resigns, the Issuer agrees to appoint a successor Servicer to assume such duties and obligations in accordance with Section 12(e).

APP. 2378

006368

(c)     This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be registered under the provisions of the Investment Company Act, and the Issuer notifies the Servicer thereof.

(d)     If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(e) No removal or resignation of the Servicer shall be effective unless:

(i)     (A) the Issuer appoints a successor Servicer at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority (or, with respect to Class I Preference Shares held by Investors Corp. at such time, Holding Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority) other than, with respect to the Class II Preference Shares, HFP; provided that, with respect to the voting authority of Class II Preference Shares owned by HFP, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP) (each such non-excluded Preference Share, a "Voting Preference Share"), (B) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by either (x) a Super Majority of the Controlling Class of Notes (excluding any Notes held by the retiring Servicer, its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than HFP; provided that, with respect to the voting authority of Notes owned by HFP, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP and certified in writing to the Trustee by any of the "independent directors" of HFP) of HFP) (each such non-excluded Note, a "Voting Note") or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class);

(ii)     if a Majority of the Voting Preference Shares has nominated two or more successor Servicers that have been objected to pursuant to the preceding clause (i)(C) or has failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) within 60 days of the date of notice of such removal or resignation of the Servicer, (A) the Issuer appoints a successor Servicer at the written direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), (B) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by either (x) Majority of the Voting Preference Shares  or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); or

(iii)     if a Majority of the Voting Preference Shares and a Super Majority of the Controlling Class (excluding any Notes that are not Voting Notes) has

APP. 2379

Annex 02426

006369

nominated two or more successor Servicers that have been objected to pursuant to the preceding clauses (i)(C) and (ii)(C) or has otherwise failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) or (ii) (C) within 120 days of the date of notice of such removal or resignation of the Servicer, (A) any Holder of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), any Holder of Voting Preference Shares or the Trustee petitions a court of competent authority to appoint a successor Servicer, (B) such court appoints a successor Servicer and (C) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture.

In addition, any successor Servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder, (ii) is legally qualified and has the capacity to act as Servicer hereunder, as successor to the Servicer under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Servicer under this Agreement and the Indenture without causing the Issuer, the Co Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor Servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor Servicer shall not cause its then current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor Servicer from payments on the Collateral shall be greater than that paid to the retiring Servicer without the prior written consent of a Super Majority of the Controlling Class of Notes, a Majority of the Noteholders and a Majority of the Preference Shares. The Issuer, the Trustee and the successor Servicer shall take such action (or cause the retiring Servicer to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Servicer, as shall be necessary to effectuate any such succession.

(f) In the event of removal of the Servicer pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Servicer as provided under this Agreement terminate all the rights and obligations of the Servicer under this Agreement (except those that survive termination pursuant to Section 12(d) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Servicer under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor Servicer upon the appointment thereof.

13.  Delegation; Assignments.

This Agreement, and any obligations or duties of the Servicer hereunder, shall not be delegated by the Servicer, in whole or in part, except to any entity that (i) is controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) is one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability hereunder.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing

APP. 2380

006370

by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and (ii) the Rating Agency Confirmation is satisfied with respect to any such assignment.  Any assignment consented to by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares shall bind the assignee hereunder in the same manner as the Servicer is bound.  In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Servicer.  Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares, the Servicer shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i) and 15 hereof.  This Agreement shall not be assigned by the Issuer without the prior written consent of the Servicer and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture.  In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Servicer such documents as the Servicer shall consider reasonably necessary to effect fully such assignment.  The Servicer hereby consents to the matters set forth in Article 15 of the Indenture.

       14.      <u>Termination by the Issuer for Cause</u>.

Subject to Section 12(e) above, this Agreement shall be terminated and the Servicer shall be removed by the Issuer for cause upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below, but only if directed to do so by (1) the Trustee, acting at the direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) or (2) the Holders of a Majority of the Voting Preference Shares.  For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a)    the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b)    the Servicer breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(c)    the Servicer is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Servicer in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, or the Servicer (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Servicer

APP. 2381

006371

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2386
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 454 of 1017 PageID 7167
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2385 of 2722
Case 19-34054-sgj11 Doc 1822-14 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 17 of 36

or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Servicer and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Servicer without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d) the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e) (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Servicer shall give prompt written notice thereof to the Issuer, the Trustee and the Holders of all outstanding Notes and Preference Shares upon the Servicer's becoming aware of the occurrence of such event.

15. Action Upon Termination.

(a) From and after the effective date of termination of this Agreement, the Servicer shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof. Upon the effective date of termination of this Agreement, the Servicer shall as soon as practicable:

(i) deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral then in the custody of the Servicer; and

(ii) deliver to the Trustee an accounting with respect to the books and records delivered to the Trustee or the successor Servicer appointed pursuant to Section 12(e) hereof.

Notwithstanding such termination, the Servicer shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Servicer in Section 16(b) hereof or from any failure of the Servicer to comply with the provisions of this Section 15.

(b) The Servicer agrees that, notwithstanding any termination of this Agreement, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against

OHS West:260124435.7                                -16-

APP. 2382
Annex 02429
006372

the Servicer or any Affiliate of the Servicer) upon receipt of appropriate indemnification and expense reimbursement.

16.    Representations and Warranties.

(a)    The Issuer hereby represents and warrants to the Servicer as follows:

(i)    The Issuer has been duly registered and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture or the Securities would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii)    The Issuer has full power and authority to execute, deliver and perform this Agreement, the other Transaction Documents and the Securities and all obligations required hereunder and thereunder and has taken all necessary action to authorize this Agreement, the other Transaction Documents and the Securities on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of this Agreement, the other Transaction Documents and the Securities and the performance of all obligations imposed upon it hereunder and thereunder. No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the other Transaction Documents and the Securities is required by the Issuer in connection with this Agreement, the other Transaction Documents and the Securities or the execution, delivery, performance, validity or enforceability of this Agreement, the other Transaction Documents and the Securities or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against the Issuer in accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)    The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

APP. 2383

006373

(iv)    The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

(v)    True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Servicer.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Servicer as promptly as practicable after its adoption or execution.

(b)    The Servicer hereby represents and warrants to the Issuer as follows:

(i)    The Servicer is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Servicer or on the ability of the Servicer to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(ii)    The Servicer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the other Transaction Documents applicable to the Servicer, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and all obligations required hereunder and under the terms of the other Transaction Documents applicable to the Servicer.  No consent of any other person, including, without limitation, creditors of the Servicer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Servicer in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required hereunder or under the terms of the other Transaction Documents applicable to the Servicer.  This Agreement has been, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall be, executed and delivered by a duly authorized partner of the Servicer, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer when executed and delivered by the Servicer hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall constitute, the valid and legally binding obligations of the Servicer enforceable against the Servicer in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

APP. 2384

006374

(iii)   The execution, delivery and performance of this Agreement and the terms of the other Transaction Documents applicable to the Servicer and the documents and instruments required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Servicer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Servicer, or the Governing Instruments of, or any securities issued by the Servicer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Servicer is a party or by which the Servicer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Servicer or its ability to perform its obligations under this Agreement and the provisions of the other Transaction Documents applicable to the Servicer, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv)   There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Servicer, threatened that, if determined adversely to the Servicer, would have a material adverse effect upon the performance by the Servicer of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(v)   The Servicer is a registered investment adviser under the Investment Advisers Act.

(vi)   The Servicer is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Servicer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the provisions of the other Transaction Documents applicable to the Servicer, or the performance by the Servicer of its duties hereunder.

17.   Notices.

Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

APP. 2385

006375

(a) If to the Issuer:

Brentwood CLO, Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
George Town, Grand Cayman, Cayman Islands
Telephone: (345) 945-7099
Telecopy: (345) 945-7100
Attention: The Directors

(b) If to the Servicer:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100
Telecopy: (972) 628-4147
Attention: James Dondero

(c) If to the Trustee:

Investors Bank & Trust Company
200 Claredon Street
Mailcode: EUC-108
Boston, Massachusetts 02116
Telecopy: (617 )351-4358
Attention: CDO Services – Brentwood CLO, Ltd.

(d) If to the Noteholders:

In accordance with Section 14.4 of the Indenture, at their respective addresses set forth on the Note Register.

(e) If to the Holders of the Preference Shares:

In accordance with Section 14.4 of the Indenture, to the Preference Shares Paying Agent at the address identified therein.

(f) if to the Rating Agencies:

In accordance with Section 14.3 of the Indenture, to the Rating Agencies at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

APP. 2386

006376

18.    Binding Nature of Agreement; Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein. The Servicer hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Servicer's obligations hereunder.

19.    Entire Agreement.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 15.1(h) of the Indenture.

20.    Conflict with the Indenture.

Subject to the last two sentences of Section 2(a)(i), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21.    Priority of Payments.

The Servicer agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22.    Governing Law.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

23.    Indulgences Not Waivers.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

APP. 2387

006377

24.    Costs and Expenses.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25.    Titles Not to Affect Interpretation.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26.    Execution in Counterparts.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

27.    Provisions Separable.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; provided, however, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28.    Number and Gender.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

29.    Written Disclosure Statement.

The Issuer and the Trustee acknowledge receipt of Part II of the Servicer's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

30.    Miscellaneous.

(a)    In the event that any vote is solicited with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities. In addition, with respect to any Defaulted Collateral Obligation, the Servicer, on behalf of the Issuer, may instruct the trustee for such Defaulted Collateral Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted

APP. 2388

006378

Collateral Obligation and any applicable law, rule or regulation in any manner permitted under the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities. In the event any Offer is made with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.

(b)   In connection with taking or omitting any action under the Indenture or this Agreement, the Servicer may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Any corporation, partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the servicing and collateral management business of the Servicer, shall be the successor to the Servicer without any further action by the Servicer, the Co-Issuers, the Trustee, the Noteholders or any other person or entity.

31.   Limitation of Liabilities.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Servicer shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby, except for any claims, losses, damages, liabilities, indemnities or other obligations caused by the gross negligence, bad faith or willful misconduct of such directors, officers, shareholders, members or incorporators of the Issuer. The obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, as applied in accordance with the Priorities of Payments pursuant to the Indenture, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive. The provisions of this section shall survive termination of this Agreement.

32.   Consent to Posting of Documents on Repository.

The Servicer hereby consents to (i) the posting of the final Offering Memorandum, the Indenture and any Hedge Agreements (collectively, the "Documents") and the periodic reports to be delivered pursuant to the Documents and any amendments or other modifications thereto on the Repository (as such term is defined in the Indenture) for use in the manner provided in the Repository; and (ii) the display of its name on the Repository in connection therewith.

APP. 2389

006379

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as Servicer

By:_____
Name:
Title:         Todd Travers
          Senior Portfolio Manager
       Highland Capital Management, L.P.

BRENTWOOD CLO, LTD.,
as Issuer

By:_____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as Servicer

By:_____
Name:
Title:

BRENTWOOD CLO, LTD.,
as Issuer

By:_____
Name:
Title:

**Chris Watler**
**Director**

## ANNEX 1

### Certain Tax Provisions

Unless otherwise noted, references to the Issuer in this Annex 1 include the Servicer and any other person acting on the Issuer's behalf. Capitalized terms used but not defined herein will have the meanings ascribed to them in the Indenture.

For purposes of this Annex 1,

"Affiliate" means, with respect to a specified Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person and (b) any Person that is a member, director, officer or employee of (i) the specified Person or (ii) a Person described in clause (a) of this definition; and

"Person" means an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

Section I.    General Restrictions

As provided in this Annex 1, the Issuer (and the Servicer acting on the Issuer's behalf) shall only purchase debt securities, interests in loans and other assets (each a "Portfolio Collateral") only in secondary-market transactions and shall not engage in any lending or underwriting activities or otherwise participate in the structuring or origination of any Portfolio Collateral.

A.    Communications and Negotiations.

1.    The Issuer will not have any communications or negotiations with the obligor of a Portfolio Collateral or a Reference Obligation (directly or indirectly through an intermediary such as the seller of such Portfolio Collateral or the Synthetic Security) in connection with the issuance or funding of such Portfolio Collateral or Reference Obligation or commitments with respect thereto, except for communications of an immaterial nature or customary due diligence communications; provided, that the Servicer may provide comments as to mistakes or inconsistencies in loan documents (including with respect to any provisions that are inconsistent with the terms and conditions of purchase of the loan by the Issuer).

2.    By way of example, permitted due diligence activities may include, but are not limited to, (a) attendance at an obligor's general "roadshow" or other presentations to investment professionals, (b) direct private discussions with personnel of the obligor, arranged by a sponsor, lead bank or other arranger, and (c) other due diligence activities of the kind customarily performed by offerees of the type of Portfolio Collateral being offered, but may not include any negotiations with the obligor, employees or agents of the obligor of any terms or conditions of the Portfolio Collateral being offered.

3.    Negotiations between the Servicer and the underwriter, placement agent or broker of a Portfolio Collateral are permitted solely to the extent that they are limited to responses to customary pre-offering period and offering period inquiries by the underwriter or placement agent (e.g., "If we offered you 10-year senior subordinated bonds of XYZ company, what spread would it require to interest you?" or "If you will not buy the bonds as offered, would you buy if

Annex 1-1

OHS West:260124435.7

we convinced the obligor to add a fixed charge coverage test?"). For purposes of this Section I.A., "negotiations" shall not include (i) commenting on offering documents to an unrelated underwriter or placement agent when the ability to comment was generally available to other offerees, or (ii) communicating certain objective criteria (such as the minimum yield or maturity) the Issuer generally uses in purchasing the relevant type of Portfolio Collateral.

4.      The Issuer may consent or otherwise act with respect to amendments, supplements or other modifications of the terms of any Portfolio Collateral (other than a Subsidiary Obligation (as defined in Section III)) requiring consent or action after the date on which any such Portfolio Collateral is acquired by the Issuer if (a) such amendment, supplement or modification would not constitute a Significant Modification (as defined below), (b) (i) in the reasonable judgment of the Servicer, the obligor is in financial distress and such change in terms is desirable to protect the Issuer's interest and (ii) the Portfolio Collateral is described in clause 5(b) of this Section I.A., (c) the amendment or modification would not be treated as the acquisition of a new Portfolio Collateral under paragraph 5 of this Section I.A., or (d) otherwise, if it has received advice of counsel that its involvement in such amendment, supplement or modification will not cause the Issuer to be treated as engaged in a trade or business within the United States.

A "Significant Modification" means any amendment, supplement or other modification that involves (a) a change in the stated maturity or a change in the timing of any material payment of any Portfolio Collateral (including deferral of an interest payment), that would materially alter the weighted average life of the Portfolio Collateral, (b) any change (whether positive or negative) in the yield on the Portfolio Collateral immediately prior to the modification in excess of the greater of (i) 25 basis points or (ii) 5 percent of such unmodified yield, (c) any change involving a material new extension of credit, (d) a change in the obligor of any Portfolio Collateral (as determined for purposes of section 1001 of the Code), or (e) a material change in the collateral or security for any Portfolio Collateral, including the addition or deletion of a co-obligor or guarantor that results in a material change in payment expectations.

5.      In the event the Issuer owns an interest in a Portfolio Collateral the terms of which are subsequently amended or modified, or in the case of a workout situation not described in Section III hereof, which Portfolio Collateral is subsequently exchanged for new obligations or other securities of the obligor of the Portfolio Collateral, such amendments or modifications or exchange will not be treated as the acquisition of an interest in a new Portfolio Collateral for purposes of this Annex 1, provided, that (a) the Issuer does not, directly or indirectly (through the Servicer or otherwise), seek the amendments or modifications or the exchange, or participate in negotiating the amendments or modifications or the exchange, and (b) at the time of original acquisition of the interest in the Portfolio Collateral, it was not reasonably anticipated that the terms of the Portfolio Collateral would, pursuant to a workout or other negotiation, subsequently be amended or modified.

B.      Fees.

The Issuer will not earn or receive from any Person any fee or other compensation for services, however denominated, in connection with its purchase or sale of a Portfolio Collateral or entering into a Synthetic Security; the foregoing prohibition shall not be construed to preclude the Issuer from receiving (i) commitment fees or facility maintenance fees that are received by the Issuer in connection with revolving or delayed drawdown Loans; (ii) yield maintenance and prepayment penalty fees; (iii) fees on account of the Issuer's consenting to amendments, waivers or other modifications of the terms of any items of Portfolio Collateral; (iv) fees from permitted securities lending; or (v) upfront payments in lieu of

OHS West:260124435.7

periodic payments under a Synthetic Security. The Issuer will not provide services to any Person; the foregoing prohibition shall not be construed to preclude the Issuer from activities relating to the receipt of income described in (i) through (v) of the preceding sentence.

Section II.    Loans and Forward Purchase Commitments.

A.    Any understanding or commitment to purchase a loan, a participation, a loan subparticipation or a collateralized loan obligation (collectively, "Loans") from a seller before completion of the closing and full funding of the Loan by such seller shall only be made pursuant to a forward sale agreement at an agreed price (stated as a dollar amount or as a percentage) (a "Forward Purchase Commitment"), unless such an understanding or commitment is not legally binding and neither the Issuer nor the Servicer is economically compelled (e.g., would otherwise be subject to a significant monetary penalty) to purchase the Loan following the completion of the closing and full funding of the Loan (i.e., the Servicer will make an independent decision whether to purchase such Loan on behalf of the Issuer after completion of the closing of the Loan) (a "Non-Binding Agreement").

B.    No Forward Purchase Commitment or Non-Binding Agreement shall be made until after the seller (or a transferor to such seller of such Loan) has made a legally binding commitment to fully fund such Loan to the obligor thereof (subject to customary conditions), which commitment cannot be conditioned on the Issuer's ultimate purchase of such Loan from such seller.

C.    In the event of any reduced or eliminated funding, the Issuer shall not receive any premium, fee, or other compensation in connection with having entered into the Forward Purchase Commitment or Non-Binding Agreement.

D.    The Issuer shall not close any purchase of a Loan subject to a Forward Purchase Commitment or a Non-Binding Agreement earlier than 48 hours after the time of the closing of the Loan (i.e., execution of definitive documentation), and, in the case of a Forward Purchase Commitment, the Issuer's obligation to purchase such Loan is subject to the condition that no material adverse change has occurred in the financial condition of the Loan's obligor or the relevant market on or before the relevant purchase date.

E.    The Issuer cannot have a contractual relationship with the obligor with respect to a Loan until the Issuer actually purchases the Loan.

F.    The Issuer cannot be a signatory on the original lending agreement, and cannot be obligated to fund an assignment of or a participation in a Loan, prior to the time specified in subsection D above.

Section III.    Distressed Debt.

A.    The Issuer may only purchase a Debt Instrument that is a Potential Workout Obligation to the extent permitted by this Section III.

B.    Neither the Issuer nor the Servicer on behalf of the Issuer shall purchase a Subsidiary Obligation from any Issuer Subsidiary.

Annex 1-3

APP. 2394
Annex 2344

006384

C.      Special Procedures for Subsidiary Obligations.

1.      Potential Workout Obligations. On or prior to the date of acquisition, the Servicer on behalf of the Issuer shall identify each Portfolio Collateral that is a Potential Workout Obligation.

2.      Transfer of Subsidiary Obligations. From and after the occurrence of a Workout Determination Date with respect to a Subsidiary Obligation, neither the Issuer nor the Servicer on behalf of the Issuer shall knowingly take any action in respect of such Subsidiary Obligation that may result in the Issuer being engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes. As soon as practicable, but in any event within 30 calendar days following a Workout Determination Date, the Servicer shall cause the Issuer either (i) to sell or dispose of any Subsidiary Obligation identified on such Workout Determination Date to a Person that is not an Affiliate of the Issuer or Servicer or (ii) to assign any Subsidiary Obligation identified on such Workout Determination Date to an Issuer Subsidiary.

For purposes of this Annex 1, an "Issuer Subsidiary" means any wholly-owned corporate subsidiary of the Issuer to which a Special Workout Obligation may be transferred in accordance with this Annex 1.

3.      Consideration for Assignment of Subsidiary Obligations. Consideration given by an Issuer Subsidiary for the assignment to it of Subsidiary Obligations may be in the form of cash or in the form of indebtedness of, or equity interests in, such Issuer Subsidiary.

4.      Classification of Issuer Subsidiaries. Each Issuer Subsidiary shall be an entity treated as a corporation for United States federal income tax purposes and formed under the laws of any state of the United States.

As used herein:

"Potential Workout Obligation" means any debt instrument (any such instrument, including an interest in a Loan, a "Debt Instrument") which, as of the date of acquisition by the Issuer or an Issuer Subsidiary, based on information specific to such Debt Instrument or the circumstances of the obligor thereof, is a Workout Obligation or, in the reasonable determination of the Servicer, has a materially higher likelihood of becoming a Workout Obligation as compared to debt obligations that par or other non-distressed debt purchasers or funds relating to that asset type customarily purchase and expect to hold to maturity.

"Subsidiary Obligation" means any Potential Workout Obligation (a) as to which the Issuer on any Workout Determination Date either (i) owns more than 40% of the aggregate principal amount of such class of Potential Workout Obligation outstanding or (ii) is one of the two largest holders of any class of debt of the obligor of such Potential Workout Obligation (based on the outstanding principal amount of such class of debt owned by the Issuer as a percentage of the aggregate outstanding principal amount of such class of debt) unless not fewer than three other holders and the Issuer collectively own at least 65% of such class of debt and, if the Issuer is the largest holder of such class, the Issuer's percentage of such class does not exceed the percentage held by the next largest holder of the debt by more than 5% of such class or (b) that would, upon foreclosure or exercise of similar legal remedies, result in the Issuer directly owning assets (other than securities treated as debt, equity in a partnership not engaged in a trade or business within the United States, or corporate equity for United States federal income tax

OHS West:260124435.7

APP. 2395

Annex-02142

006385

purposes, provided in the case of corporate equity that the corporation is not a "United States real property holding corporation" within the meaning of section 897 of the Code) which are "United States real property interests" within the meaning of section 897 of the Code or which the Servicer reasonably expects it would, on behalf of the Issuer, be required to actively manage to preserve the value of the Issuer's interest therein; provided that a Potential Workout Obligation shall not be treated as a Subsidiary Obligation if the Issuer obtains a Tax Opinion that, based on all the surrounding circumstances, the activities in which the Issuer intends to engage with respect to such Potential Workout Obligation will not cause the Issuer to be treated as engaged in a trade or business for United States federal income tax purposes.

"Workout Determination Date" means any date on which, in connection with the occurrence of any event described in clauses (a) through (c), inclusive, of the definition of Workout Obligation, either (a) any material action by the Issuer is required to be taken, (b) the Servicer receives written notice that such material action shall be required or (c) the Servicer reasonably determines that the taking of such material action is likely to be required.

"Workout Obligation" means any Debt Instrument as to which the Servicer on behalf of the Issuer (a) consents to a Significant Modification in connection with the workout of a defaulted Portfolio Collateral, (b) participates in an official or unofficial committee or similar official or unofficial body in connection with a bankruptcy, reorganization, restructuring or similar proceeding, or (c) exercises, or has exercised on its behalf, rights of foreclosure or similar judicial remedies.

Section IV.    Purchases from the Servicer or its Affiliates.

A.    If the Servicer or an Affiliate of the Servicer acted as an underwriter, placement or other agent, arranger, negotiator or structuror, or received any fee for services (it being understood that receipts described in clauses (i) through (v) of Section I.B. are not construed as so treated), in connection with the issuance or origination of a Portfolio Collateral or was a member of the original lending syndicate with respect to the Portfolio Collateral (any such Portfolio Collateral, a "Special Procedures Obligation"), the Issuer will not acquire any interest in such Special Procedures Obligation (including entering into a commitment or agreement, whether or not legally binding or enforceable, to acquire such obligation directly or synthetically), from the Servicer, an Affiliate of the Servicer, or a fund managed by the Servicer, unless (i) the Special Procedures Obligation has been outstanding for at least 90 days, (ii) the holder of the Special Procedures Obligation did not identify the obligation or security as intended for sale to the Issuer within 90 days of its issuance, (iii) the price paid for such Special Procedures Obligation by the Issuer is its fair market value at the time of acquisition by the Issuer, and (iv) the transaction is proposed to, and the ultimate purchase is approved on behalf of the Issuer by, one or more Independent Advisors to the Issuer in accordance with the provisions of Section IV.B. below.  The Issuer will not acquire any Special Procedures Obligation if, immediately following such acquisition, the fair market value of all Special Procedures Obligations owned by the Issuer would constitute more than 49% of the fair market value of all of the Issuer's assets at such time.

B.    An "Independent Advisor" is a Person who is not an Affiliate of the Issuer, the Servicer or any fund managed by the Servicer.

1.    The Issuer may not purchase or commit to enter into any such Special Procedures Obligation without prior approval by an Independent Advisor.  If the Independent Advisor declines to approve a proposed Special Procedures Obligation, at least three months must elapse before any proposal with respect to the acquisition of debt or other obligations of the same obligor are proposed or considered.

Annex 1-5

2.     The Issuer shall engage the Independent Advisor in an agreement the terms of which shall in substantial form set forth:

(a) the representation of the Independent Advisor, which the Servicer shall not know to be incorrect, that it has significant financial and commercial expertise, including substantial expertise and knowledge in and of the loan market and related investment arenas;

(b) the agreement between the Independent Advisor, the Issuer and the Servicer generally to the effect that (i) the Independent Advisor will operate pursuant to procedures consistent with maintaining his or her independence from the Servicer and its Affiliates, (ii) the Independent Advisor will have the sole authority and discretion to approve or reject purchase proposals made by the Servicer with respect to any Special Procedures Obligation, (iii) all proposals for the Issuer to acquire any Special Procedures Obligation will be first submitted to the Independent Advisor, (iii) the Servicer will prepare the materials it deems necessary to describe the Special Procedures Obligation to the Independent Advisor, (iv) the Investment Advisor will not be required to make any decision to accept or decline a Special Procedures Obligation at the price offered prior to its review of the materials prepared, plus any additional information requested by the Independent Advisor, and (v) no Independent Advisor may be proposed to be replaced by the Servicer, unless for cause or in the event of a resignation of such Independent Advisor; and

(c) such other commercially reasonable terms and conditions, including terms and conditions to the effect that (i) the Independent Advisor will be paid a reasonable fee for its services plus reimbursement of any reasonable expenses incurred in performance of his or her responsibilities, (ii) the Independent Advisor may be removed or replaced only by a majority (whether by positive act or failure to object) of the probable equity owners (as determined for United States federal income tax purposes) of the Issuer, (iii) if at any time there is more than one Independent Advisor to the Issuer, a majority of such Independent Advisors must approve any Special Procedures Obligation subject to Independent Advisor approval, (iv) an Independent Advisor may not engage, directly or indirectly, in the negotiation of the terms of any Special Procedures Obligation to be acquired by the Issuer (provided however, that an Independent Advisor may negotiate with the Servicer or the seller with respect to the price and terms of the Issuer's purchase of the Special Procedures Obligation, provided further that the Independent Advisor will not make suggestions to the Servicer or any other person about alternative or modified terms of the underlying Special Procedures Obligation on which they might be willing to approve such a Special Procedures Obligation).

3.     Any servicing agreement or other document under which the Servicer is granted signatory powers or other authority on behalf of the Issuer will provide that such powers or authority with respect to Special Procedures Obligations are conditioned upon the prior written approval of the Independent Advisor

4.     No Special Procedures Obligation will be presented to an Independent Advisor until at least 90 days have elapsed since the later of (a) the execution of final documentation and (b) the funding in whole or part of the Special Procedures Obligation and there will have been no commitment or arrangement prior to that time that the Issuer will acquire any such Special Procedures Obligation; provided, further, that if the person from whom the Issuer will acquire the

Annex 1-6

APP. 2397

006387

Special Procedures Obligation is an Affiliate of the Servicer, such person will not be treated as owning the Special Procedures Obligation for any day during which it does not enjoy substantially all of the benefits and burdens of ownership (for example, because it has hedged its credit exposure to the Special Procedures Obligation).

5.      The Issuer will have no obligation to, or understanding that it will refund, reimburse or indemnify any person (including an Affiliate of the Servicer), directly or indirectly, for "breakage" costs or other costs or expenses incurred by such person if the Independent Advisor determines that the Issuer should decline to purchase any Special Procedures Obligation.

6.      Neither the Servicer nor any Affiliate of the Servicer will have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to Special Procedures Obligations without the prior written approval of an Independent Advisor.  Except as may be conditioned upon  such prior written approval, neither the Servicer nor any Affiliate of the Servicer may hold itself out as having signatory powers on behalf of the Issuer or authority to enter into agreements with respect to Special Procedures Obligations on behalf of the Issuer.

Section V.      Synthetic Securities.

A.      The Issuer shall not (i) acquire or enter into any Synthetic Security with respect to any Reference Obligation the direct acquisition of which would violate any provision of this Annex 1 or (ii) use Synthetic Securities as a means of making advances to the Synthetic Security Counterparty following the date on which the Synthetic Security is acquired or entered into (for the avoidance of doubt, the establishment of Synthetic Security collateral accounts and the payment of Synthetic Security Counterparties from the amounts on deposit therein, shall not constitute the making of advances).

B.      With respect to each Synthetic Security, the Issuer will not acquire or enter into any Synthetic Security that does not satisfy all of the following additional criteria unless the Servicer has first received advice of counsel that the ownership and disposition of such Synthetic Security would not cause the Issuer to be engaged in a trade or business within the United States for United States federal income tax purposes:

1.      the criteria used to determine whether to enter into any particular Synthetic Security was similar to the criteria used by the Servicer in making purchase decisions with respect to debt securities;

2.      the Synthetic Security is acquired by or entered into by the Issuer for its own account and for investment purposes with the expectation of realizing a profit from income earned on the securities (and any potential rise in their value) during the interval of time between their purchase and sale or hedging purposes and not with an intention to trade or to sell for a short-term profit;

3.      the Issuer enters into the Synthetic Security with a counterparty that is not a special purpose vehicle and is a broker-dealer or that holds itself out as in the business of entering into such contracts;

4.      neither the Issuer nor any Person acting on behalf of the Issuer advertises or publishes the Issuer's ability to enter into Synthetic Securities;

OHS West:260124435.7

APP. 2398

Annex 02345

006388

5.    except with respect to (x) credit-linked notes or similar Synthetic Securities and (y) any other Synthetic Securities where standard form ISDA documentation is not applicable, the Synthetic Security is written on standard form ISDA documentation;

6.    the net payment from the Issuer to the Synthetic Security Counterparty is not determined based on an actual loss incurred by the Synthetic Security Counterparty or any other designated person;

7.    there exists no agreement, arrangement or understanding that (i) the Synthetic Security Counterparty is required to own or hold the related Reference Obligation while the Synthetic Security remains in effect or (ii) the Synthetic Security Counterparty is economically or practically compelled to own or hold the related physical Reference Obligation while the Synthetic Security remains in effect;

8.    the Synthetic Security provides for (i) all cash settlement, (ii) all physical settlement or (iii) the option to either cash settle or physically settle; provided that, in the latter two cases, physical settlement provides the settling party the right to settle the Synthetic Security by delivering deliverable obligations which *may* include the Reference Obligation and the settling party must not be required to deliver the related Reference Obligation upon the settlement of such Synthetic Security.

Notwithstanding the preceding paragraph, a Synthetic Security providing for physical settlement may require a party to deliver the related Reference Obligation if either:

(i)    at the time the Issuer enters into such Synthetic Security, such Reference Obligation is readily available to purchasers generally in a liquid market; or

(ii)    the advice of both United States federal income tax and insurance counsel of nationally recognized standing in the United States experienced in such matters is that, under the relevant facts and circumstances with respect to such Synthetic Security, the acquisition of such Synthetic Security will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis and should not cause the Issuer to be treated as writing insurance in the United States under the law of the state in which the Synthetic Security Counterparty is organized.

9.    the Synthetic Security is not treated by the Issuer as insurance or a financial guarantee sold by the Issuer for United States or Cayman Islands regulatory purposes.

As used herein:

"Reference Obligation" means a debt security or other obligation upon which a Synthetic Security is based.

"Synthetic Security" means any swap transaction or security, other than a participation interest in a Loan, that has payments associated with either payments of interest and/or principal on a Reference Obligation or the credit performance of a Reference Obligation.

"Synthetic Security Counterparty" means an entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor).

Annex 1-8

OHS West:260124435.7

Section VI.    <u>Other Types of Assets.</u>

A.    Equity Restrictions.  The Issuer will not purchase any asset (directly or synthetically) that is:

1.    not treated for U.S. federal income tax purposes as debt if the issuing entity is a "partnership"(within the meaning of Section 7701(a)(2) of the Code) unless such entity is not engaged in a trade or business within the United States, or

2.    a "United States real property interest" as defined in section 897 of the Code and the Treasury Regulations promulgated thereunder.

The Issuer may cause an Issuer Subsidiary to acquire assets set forth in clause (i) or (ii) above (each, an "ETB/897 Asset") in connection with the workout of defaulted Portfolio Collaterals, so long as the acquisition of ETB/897 Assets by such Issuer Subsidiary will not cause the stock of such Issuer Subsidiary to be deemed to be an ETB/897 Asset.

B.    Revolving Loans and Delayed Drawdown Loans.  All of the terms of any advance required to be made by the Issuer under any revolving or delayed drawdown Loan will be fixed as of the date of the Issuer's purchase thereof (or will be determinable under a formula that is fixed as of such date), and the Issuer and the Servicer will not have any discretion (except for consenting to or withholding consent to amendments, waivers or other modifications or granting customary waivers upon default) as to whether to make advances under such revolving or delayed drawdown Loan.

C.    Securities Lending Agreements.  The Issuer will not purchase any Portfolio Collateral primarily for the purpose of entering into a securities lending agreement with respect thereto.

Section VII.    <u>General Restrictions on the Issuer.</u>

The Issuer itself shall not:

A.    hold itself out, through advertising or otherwise, as originating Loans, lending funds, or making a market in or dealing in Loans or other assets;

B.    register as, hold itself out as, or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as, a broker-dealer, a bank, an insurance company, financial guarantor, a surety bond issuer, or a company engaged in Loan origination;

C.    knowingly take any action causing it to be treated as a bank, insurance company, or company engaged in Loan origination for purposes of any tax, securities law or other filing or submission made to any governmental authority;

D.    hold itself out, through advertising or otherwise, as originating, funding, guaranteeing or insuring debt obligations or as being willing and able to enter into transactions (either purchases or sales of debt obligations or entries into, assignments or terminations of hedging or derivative instruments, including Synthetic Securities) at the request of others;

E.    treat Synthetic Securities as insurance, reinsurance, indemnity bonds, guaranties, guaranty bonds or suretyship contracts for any purpose;

OHS West:260124435.7

     F.     allow any non-U.S. bank or lending institution who is a holder of a Security to control or direct the Servicer's or Issuer's decision to acquire a particular asset except as otherwise allowed to such a holder, acting in that capacity, under the related indenture or acquire a Portfolio Collateral conditioned upon a particular person or entity holding Securities;

     G.     acquire any asset the holding or acquisition of which the Servicer knows would cause the Issuer to be subject to income tax on a net income basis;

     H.     hold any security as nominee for another person; or

     I.     buy securities with the intent to subdivide them and sell the components or to buy securities and sell them with different securities as a package or unit.

Section VIII.     <u>Tax Opinion; Amendments</u>.

     A.     In furtherance and not in limitation of this Annex 1, the Servicer shall comply with all of the provisions set forth in this Annex 1, unless, with respect to a particular transaction, the Servicer acting on behalf of the Issuer and the Trustee shall have received written advice of Skadden, Arps, Slate, Meagher & Flom LLP or Orrick, Herrington & Sutcliffe LLP or an opinion of other counsel of nationally recognized standing in the United States experienced in such matters (a "Tax Opinion"), that, under the relevant facts and circumstances with respect to such transaction, the Servicer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

     B.     The provisions set forth in the Annex may be amended, eliminated or supplemented by the Servicer if the Issuer, the Servicer and the Trustee shall have received a Tax Opinion that the Servicer's compliance with such amended provisions or supplemental provisions or the failure to comply with such provisions proposed to be eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

APP. 2401

006391

# EXHIBIT 25

# EXHIBIT J

APP. 2402

006392

**EXECUTION COPY**

## SERVICING AGREEMENT

This Servicing Agreement, dated as of March 27, 2008 is entered into by and among ABERDEEN LOAN FUNDING, LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9002, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as servicer ("Highland" or, in such capacity, the "Servicer").

WITNESSETH:

WHEREAS, the Issuer and ABERDEEN LOAN FUNDING CORP. (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") intend to issue U.S.$376,000,000 of their Class A Floating Rate Senior Secured Extendable Notes due 2018 (the "Class A Notes"), U.S.$29,500,000 of their Class B Floating Rate Senior Secured Extendable Notes due 2018 (the "Class B Notes"), U.S.$25,250,000 of their Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class C Notes"), U.S.$19,250,000 of their Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class D Notes"), and the Issuer intends to issue U.S.$17,250,000 of its Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class E Notes" and together with the Class A Notes, Class B Notes, Class C Notes and Class D Notes, the "Notes") pursuant to the Indenture dated as of March 27, 2008 (the "Indenture"), among the Co-Issuers and State Street Bank and Trust Company, as trustee (the "Trustee") and the Issuer intends to issue 12,000 Class I Preference Shares, $0.01 par value (the "Class I Preference Shares") and 36,000 Class II Preference Shares, $0.01 par value (the "Class II Preference Shares" and, together with the Class I Preference Shares, the "Preference Shares" and, together with the Notes, the "Securities") pursuant to the Preference Shares Paying Agency Agreement dated as of March 27, 2008 (the "Preference Shares Paying Agency Agreement") between the Issuer and State Street Bank and Trust Company, as the Preference Shares Paying Agent, and pursuant to the Issuer's amended and restated memorandum and articles of association (the "Memorandum and Articles of Association") and certain resolutions of the board of directors of the Issuer;

WHEREAS, the Issuer intends to pledge certain Collateral Obligations, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Servicing Agreement, pursuant to which the Servicer agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral in the manner and on the terms set forth herein; and

WHEREAS, the Servicer has the capacity to provide the services required hereby and in the applicable provisions of the other Transaction Documents and is prepared to perform such services upon the terms and conditions set forth herein.

APP. 2403

Annex 02159

006393

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.    <u>Definitions</u>.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"<u>Agreement</u>" shall mean this Servicing Agreement, as amended from time to time.

"<u>Governing Instruments</u>" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"<u>HFP</u>" shall mean Highland Financial Partners, L.P. (which includes, for the avoidance of doubt, any subsidiary thereof).

"<u>Offering Memorandum</u>" shall mean the Offering Memorandum of the Issuer dated March 27, 2008 prepared in connection with the offering of the Securities.

"<u>Servicer Breaches</u>" shall have the meaning specified in Section 10(a).

"<u>Servicing Fee</u>" shall mean, collectively, the Senior Servicing Fee, the Subordinated Servicing Fee and the Supplemental Servicing Fee.

"<u>Transaction Documents</u>" shall mean the Indenture, the Preference Shares Paying Agency Agreement, the Servicing Agreement and the Collateral Administration Agreement.

2.    <u>General Duties of the Servicer</u>.

(a)    The Servicer shall provide services to the Issuer as follows:

(i)    Subject to and in accordance with the terms of this Agreement and the other Transaction Documents, the Servicer shall supervise and direct the administration, acquisition and disposition of the Collateral, and shall perform on behalf of the Issuer those duties and obligations of the Servicer required by the Indenture and the other Transaction Documents, and including the furnishing of Issuer Orders, Issuer Requests and officer's certificates, and such certifications as are required of the Servicer under the Indenture with respect to permitted purchases and sales of the Collateral Obligations, Eligible Investments and other assets, and other matters, and, to the extent necessary or appropriate to perform such duties, the Servicer shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto.  The Servicer shall, subject to the terms and conditions of this Agreement and the other Transaction Documents, perform its obligations hereunder and thereunder with reasonable care, using a degree of skill and attention no less than that which the Servicer exercises with respect to comparable assets that it services or manages for others having similar objectives and restrictions, and in a manner consistent with practices and procedures followed by institutional servicers or managers of national standing relating to assets of the nature and character of the Collateral for clients having

APP. 2404

Annex 02454

006394

similar objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the other Transaction Documents.  To the extent not inconsistent with the foregoing, the Servicer shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder.  The Servicer shall comply with all terms and conditions of the other Transaction Documents affecting the duties and functions to be performed hereunder.  The Servicer shall not be bound to follow any amendment to any Transaction Document until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided, however, that the Servicer shall not be bound by any amendment to any Transaction Document that affects the rights, powers, obligations or duties of the Servicer unless the Servicer shall have consented thereto in writing.  The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, powers, obligations or duties of the Servicer or (y) affects the amount or priority of any fees payable to the Servicer to become effective unless the Servicer has been given prior written notice of such amendment and consented thereto in writing;

(ii)     the Servicer shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the Collateral criteria set forth herein and in the Indenture;

(iii)     the Servicer shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture;

(iv)     the Servicer shall undertake to determine to the extent reasonably practicable whether a Collateral Obligation has become a Defaulted Collateral Obligation;

(v)     the Servicer, subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee (x) to dispose of a Collateral Obligation, Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, (y) to acquire, as security for the Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Collateral, one or more substitute Collateral Obligations or Eligible Investments, or (z) direct the Trustee to take the following actions with respect to a Collateral Obligation or Eligible Investment:

(1)     retain such Collateral Obligation or Eligible Investment; or

(2)     dispose of such Collateral Obligation or Eligible Investment in the open market or otherwise; or

(3)     if applicable, tender such Collateral Obligation or Eligible Investment pursuant to an Offer; or

APP. 2405

006395

(4)    if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(5)    retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer; or

(6)    waive any default with respect to any Defaulted Collateral Obligation; or

(7)    vote to accelerate the maturity of any Defaulted Collateral Obligation; or

(8)    exercise any other rights or remedies with respect to such Collateral Obligation or Eligible Investment as provided in the related Underlying Instruments, including in connection with any workout situations, or take any other action consistent with the terms of the Indenture which is in the best interests of the Holders of the Securities; and

(vi)    the Servicer shall (a) on or prior to any day which is a Redemption Date, direct the Trustee to enter into contracts to dispose of the Collateral Obligation and any other Collateral pursuant to the Indenture and otherwise comply with all redemption procedures and certification requirements in the Indenture in order to allow the Trustee to effect such redemption and (b) conduct auctions in accordance with the terms of the Indenture.

(b)    In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares.  The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

(c)    The Servicer hereby agrees to the following:

(i)    The Servicer agrees not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer until the payment in full of all Notes issued under the Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments and the expiration of a period equal to the greater of (A) the applicable preference period plus one day or (B) one year and one day following the payment. Notwithstanding the foregoing, the Servicer may commence any legal action that is not a bankruptcy, insolvency, liquidation or similar proceeding against the Issuer or the Co-Issuer or any of their properties and may take any action it deems appropriate at any time in any bankruptcy, insolvency, liquidation or similar proceeding and any other Proceeding voluntarily commenced by the Issuer or the Co-Issuer or involuntarily commenced against the Issuer or the Co-Issuer by anyone other than the Servicer or any

APP. 2406

Annex 02453

006396

Affiliate of the Servicer. The provisions of this Section 2(c)(i) shall survive termination of this Agreement.

(ii) The Servicer shall cause each sale or purchase of any Collateral Obligation or Eligible Investment to be conducted on an arm's-length basis.

(d) The Servicer shall not act for the Issuer in any capacity except as provided in this Section 2. In providing services hereunder, the Servicer may employ third parties, including its Affiliates, to render advice (including advice with respect to the servicing of the Collateral) and assistance; provided, however, that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties. Notwithstanding any other provision of this Agreement, the Servicer shall not be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

(e) Notwithstanding any other provision of this Agreement or the Indenture, (i) any granted signatory powers or authority granted to the Servicer on behalf of the Issuer with respect to the Special Procedures Obligations (as defined in Annex 1) shall be conditioned upon the prior written approval of the Independent Advisor (as defined in Annex 1) and (ii) neither the Servicer nor any Affiliate of the Servicer shall have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to the Special Procedures Obligations without the prior written approval of the Independent Advisor.

3.    Brokerage.

The Servicer shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Servicer may take into consideration research and other brokerage services furnished to the Servicer or its Affiliates by brokers and dealers which are not Affiliates of the Servicer. Such services may be used by the Servicer or its Affiliates in connection with its other servicing or advisory activities or operations. The Servicer may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts serviced or managed by the Servicer or with accounts of the Affiliates of the Servicer, if in the Servicer's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Collateral Obligation or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Servicer (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner and consistent with its obligations hereunder and under applicable law.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Servicer may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Collateral Obligations or other Collateral to, the Initial Purchaser, the Trustee or any of their respective Affiliates, or any other firm.

APP. 2407

Annex 02154

006397

4. <u>Additional Activities of the Servicer</u>.

Nothing herein shall prevent the Servicer or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Holders of the Securities, or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Servicer and partners, directors, officers, employees and agents of the Servicer or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a) serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and each Interest Coverage Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof;

(b) receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Coverage Test; and <u>provided</u>, <u>further</u>, that if any portion of such services are related to the purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be applied to the purchase price of such obligations; and

(c) be a secured or unsecured creditor of, or hold an equity interest in, the Issuer, its Affiliates or any issuer of any obligation included in the Collateral; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Coverage Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof.

It is understood that the Servicer and any of its Affiliates may engage in any other business and furnish servicing, investment management and advisory services to others, including Persons which may have policies similar to those followed by the Servicer with respect to the Collateral and which may own securities of the same class, or which are the same type, as the Collateral Obligations or other securities of the issuers of Collateral Obligations. The Servicer shall be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Collateral.

Unless the Servicer determines in its reasonable judgment that such purchase or sale is appropriate, the Servicer may refrain from directing the purchase or sale hereunder of securities issued by (i) Persons of which the Servicer, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) Persons for which the Servicer or its Affiliates act as financial adviser or underwriter or (iii) Persons about which the Servicer or any of its Affiliates have information which the Servicer deems confidential or non-public or otherwise might prohibit it from trading such securities in accordance with applicable law. The Servicer shall not be obligated to have or pursue any particular strategy or opportunity with respect to the Collateral.

APP. 2408

Annex 02155

006398

5. <u>Conflicts of Interest</u>.

(a) The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the commercially reasonable judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the United States Investment Advisers Act of 1940, as amended.

(b) The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the commercially reasonable judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the United States Investment Advisers Act of 1940, as amended.

(c) In addition, the Servicer shall not undertake any transaction described in this Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and Section 4975 of the Code.

6. <u>Records; Confidentiality</u>.

The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Holders of the Securities and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice. At no time shall the Servicer make a public announcement concerning the issuance of the Notes or the Preference Shares, the Servicer's role hereunder or any other aspect of the transactions contemplated by this Agreement and the other Transaction Documents. The Servicer shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of any Class of Securities, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Servicer, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Servicer on a non-confidential basis; <u>provided</u>, that the Servicer does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto. For purposes of this Section 6, the Trustee, the Collateral Administrator and the Holders of the Securities shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Servicer, the Co-Issuers, the Trustee and the Holders of the Securities (and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

APP. 2409

006399

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2414
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 482 of 1017 PageID 7195
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2413 of 2722
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 9 of 39

       7.    <u>Obligations of Servicer</u>.

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Servicer shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Servicer to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's Memorandum and Articles of Association or the Co-Issuer's Certificate of Incorporation or By-Laws, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement contemplated by the Indenture or (f) not be permitted by Annex 1 hereto and would subject the Issuer to U.S. federal or state income or franchise taxation or cause the Issuer to be engaged in a trade or business in the United States for U.S. federal income tax purposes. The Servicer covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

       8.    <u>Compensation</u>.

(a)    The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such amounts and at such times as set forth in the Indenture. The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer. If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable on such later Payment Date on which funds are available therefor as provided in the Indenture.

With respect to any Payment Date, the Servicer may, in its sole discretion, at any time waive a portion (or all) of its Servicing Fees then due and payable. All waived amounts will be paid to the Class II Preference Shares as Class II Preference Share Special Payments pursuant to the Indenture. For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion waive all or any portion of the Subordinated Servicing Fee or Supplemental Servicing Fee, any funds representing the waived Subordinated Servicing Fees and Supplemental Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments.

(b)    The Servicer shall be responsible for the ordinary expenses incurred in the performance of its obligations under this Agreement, the Indenture and the other Transaction Documents; <u>provided</u>, <u>however</u>, that any extraordinary expenses incurred by the Servicer in the

APP. 2410
Annex_02457
006400

performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee and the accountants appointed by the Issuer, the reasonable expenses incurred by the Servicer to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Collateral Obligation or other unusual matters arising in the performance of its duties under this Agreement and the Indenture, any reasonable expenses incurred by the Servicer in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Servicer customarily allocates among all of the funds or portfolios that it services or manages, including reasonable expenses incurred with respect to any compliance requirements, including, but not limited to, compliance with the requirements of the Sarbanes-Oxley Act, related solely to the ownership or holding of any Securities by HFP or any of its subsidiaries) shall be reimbursed by the Issuer to the extent funds are available therefor in accordance with and subject to the Priority of Payments and other limitations contained in the Indenture.

(c)     If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Servicer shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.     Benefit of the Agreement.

The Servicer agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or the Holders of the Preference Shares, as applicable, as provided in the Indenture or the Preference Shares Paying Agency Agreement, as applicable.

10.     Limits of Servicer Responsibility; Indemnification.

(a)     The Servicer assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of liability described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Servicer. The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "Liabilities") incurred by the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, that arise out of or in connection with the performance by the Servicer of its duties under this Agreement and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement or (ii) with respect to any information included in the Offering Memorandum in the section entitled "The Servicer" that contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "Servicer Breaches"). For the

APP. 2411

Annex 02158

006401

avoidance of doubt, the Servicer shall have no duty to independently investigate any laws not otherwise known to it in connection with its obligations under this Agreement, the Indenture and the other Transaction Documents. The Servicer shall be deemed to have satisfied the requirements of the Indenture and this Agreement relating to not causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes (including as those requirements relate to the acquisition (including manner of acquisition), ownership, enforcement, and disposition of Collateral) to the extent the Servicer complies with the requirements set forth in Annex 1 hereto (unless the Servicer knows that as a result of a change in law the investment restrictions set forth in Annex 1 may no longer be relied upon).

(b)     The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "Indemnified Parties") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "Expenses") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "Actions"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with, and subject to, the Priority of Payments and shall survive termination of this Agreement.

(c)     With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Servicer, the Servicer shall cause such Indemnified Party to):

(i)     give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii)     at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)     at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

APP. 2412

Annex_02459

006402

(iv)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)    neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi)    upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise.  If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d)    In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e)    The U.S. federal securities laws impose liabilities under certain circumstances on persons who act in good faith; accordingly, notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer or the Holders of the Securities may have under any U.S. federal securities laws.

11.    No Partnership or Joint Venture.

The Issuer and the Servicer are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Servicer's relation to the Issuer shall be deemed to be that of an independent contractor.

APP. 2413

006403

12. <u>Term; Termination</u>.

(a)     This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preference Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Holders of the Securities; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b)     Subject to Section 12(e) below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer). If the Servicer resigns, the Issuer agrees to appoint a successor servicer to assume such duties and obligations in accordance with Section 12(e).

(c)     This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be registered under the provisions of the Investment Company Act, and the Issuer notifies the Servicer thereof.

(d)     If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(e)     No removal or resignation of the Servicer shall be effective unless:

(i)     (A) the Issuer appoints a successor servicer at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than, with respect to the Class II Preference Shares owned by HFP or its subsidiaries; provided that, with respect to the voting authority of Class II Preference Shares owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP or such subsidiaries) (each such non-excluded Preference Share, a "<u>Voting Preference Share</u>"), (B) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor servicer is not objected to within 30 days after notice of such succession by either (x) a Super Majority of the Controlling Class of Notes (excluding any Notes held by the retiring Servicer, its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than HFP; provided that, with respect to the voting authority of Notes owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Trustee by any of the "independent directors" of HFP) of HFP or such subsidiaries) (each such non-excluded Note, a "<u>Voting Note</u>") or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); or

APP. 2414

006404

(ii)     if a Majority of the Voting Preference Shares has nominated two or more successor servicers that have been objected to pursuant to the preceding clause (i)(C) or has failed to appoint a successor servicer that has not been objected to pursuant to the preceding clause (i)(C) within 60 days of the date of notice of such removal or resignation of the Servicer, (A) the Issuer appoints a successor servicer at the written direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), (B) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor servicer is not objected to within 30 days after notice of such succession by either (x) a Majority of the Voting Preference Shares (voting as a single class) or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); provided, that if a Majority of the Voting Preference Shares and a Super Majority of the Controlling Class (excluding any Notes that are not Voting Notes) have each nominated two or more successor servicers that have been objected to pursuant to the preceding clauses (i)(C) and (ii)(C) or have otherwise failed to appoint a successor servicer that has not been objected to pursuant to the preceding clause (i)(C) or (ii)(C) within 120 days of the date of notice of such removal or resignation of the Servicer, (A) any Holder of the Controlling Class (excluding any Notes that are not Voting Notes), any Holder of Voting Preference Shares or the Trustee petitions a court of competent authority to appoint a successor servicer, (B) such court appoints a successor servicer and (C) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture.

In addition, any successor servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder, (ii) is legally qualified and has the capacity to act as Servicer hereunder, as successor to the Servicer under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as successor servicer under this Agreement and the Indenture without causing the Issuer, the Co-Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor servicer shall not cause its then-current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor servicer from payments on the Collateral shall be greater than that paid to the retiring Servicer without the prior written consent of a Super Majority of the Controlling Class of Notes, a Majority of the Noteholders and a Majority of the Preference Shares. The Issuer, the Trustee and the successor servicer shall take such action (or cause the retiring Servicer to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Servicer, as shall be necessary to effectuate any such succession.

(f)     In the event of removal of the Servicer pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Servicer as provided under this Agreement terminate all the rights and obligations of the Servicer under this Agreement (except those that survive termination pursuant to Section 12(d) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Servicer under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor servicer upon the appointment thereof.

APP. 2415

Annex 02192

006405

13.  Delegation; Assignments.

This Agreement, and any obligations or duties of the Servicer hereunder, shall not be delegated by the Servicer, in whole or in part, except to any entity that (i) is controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) is one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability hereunder.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Majority of Noteholders and the Holders of a Majority of the Preference Shares (excluding Notes and Preference Shares held by the Servicer or any of its Affiliates other than HFP) and (ii) the Rating Condition is satisfied with respect to any such assignment. Any assignment consented to by the Issuer, a Majority of Noteholders and the Holders of Preference Shares shall bind the assignee hereunder in the same manner as the Servicer is bound. In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Servicer. Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, a Majority of Noteholders and the Holders of the Preference Shares, the Servicer shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i) and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Servicer and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Servicer such documents as the Servicer shall consider reasonably necessary to effect fully such assignment. The Servicer hereby consents to the matters set forth in Article 15 of the Indenture.

14.  Termination by the Issuer for Cause.

Subject to Section 12(e) above, this Agreement shall be terminated and the Servicer shall be removed by the Issuer for cause upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below, but only if directed to do so by the Trustee acting at the direction of (1) a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) or (2) a Majority of the Voting Preference Shares (excluding any Preference Shares that are not Voting Preference Shares). For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a)  the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b)  the Servicer breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach

APP. 2416

Annex_02163

006406

or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(c)    the Servicer is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Servicer in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, or the Servicer (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Servicer or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Servicer and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Servicer without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d)    the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e)    (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Servicer shall give prompt written notice thereof to the Issuer, the Trustee and the Holders of all outstanding Notes and Preference Shares upon the Servicer's becoming aware of the occurrence of such event.

15.    Action Upon Termination.

(a)    From and after the effective date of termination of this Agreement, the Servicer shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof.   Upon the effective date of termination of this Agreement, the Servicer shall as soon as practicable:

(i)    deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral then in the custody of the Servicer; and

APP. 2417

Annex 02404

006407

(ii)     deliver to the Trustee and the Preference Shares Paying Agent an accounting with respect to the books and records delivered to the Trustee and the Preference Shares Paying Agent or the successor servicer appointed pursuant to Section 12(e) hereof.

Notwithstanding such termination, the Servicer shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Servicer in Section 16(b) hereof or from any failure of the Servicer to comply with the provisions of this Section 15.

(b)     The Servicer agrees that, notwithstanding any termination of this Agreement, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against the Servicer or any Affiliate of the Servicer) upon receipt of appropriate indemnification and expense reimbursement.

16.     <u>Representations and Warranties</u>.

(a)     The Issuer hereby represents and warrants to the Servicer as follows:

(i)     The Issuer has been duly incorporated and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture or the Securities would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii)     The Issuer has full power and authority to execute, deliver and perform its obligations pursuant to this Agreement, the other Transaction Documents and the Securities and all obligations required hereunder and thereunder and has taken all necessary action to authorize this Agreement, the other Transaction Documents and the Securities on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of its obligations pursuant to this Agreement, the other Transaction Documents and the Securities and the performance of all obligations imposed upon it hereunder and thereunder.  No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the other Transaction Documents and the Securities is required by the Issuer in connection with this Agreement, the other Transaction Documents and the Securities or the execution, delivery, performance, validity or enforceability of this Agreement, the other Transaction Documents and the Securities or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against

APP. 2418

006408

the Issuer in accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)     The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

(iv)     The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

(v)     True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Servicer.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Servicer as promptly as practicable after its adoption or execution.

(b)     The Servicer hereby represents and warrants to the Issuer as follows:

(i)     The Servicer is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Servicer or on the ability of the Servicer to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(ii)     The Servicer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the other Transaction Documents applicable to the Servicer, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and all obligations required

APP. 2419

006409

hereunder and under the terms of the other Transaction Documents applicable to the Servicer. No consent of any other person, including, without limitation, creditors of the Servicer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Servicer in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required hereunder or under the terms of the other Transaction Documents applicable to the Servicer. This Agreement has been, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall be, executed and delivered by a duly authorized partner of the Servicer, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer when executed and delivered by the Servicer hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall constitute, the valid and legally binding obligations of the Servicer enforceable against the Servicer in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)     The execution, delivery and performance of this Agreement and the terms of the other Transaction Documents applicable to the Servicer and the documents and instruments required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Servicer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Servicer, or the Governing Instruments of, or any securities issued by the Servicer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Servicer is a party or by which the Servicer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Servicer or its ability to perform its obligations under this Agreement and the provisions of the other Transaction Documents applicable to the Servicer, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv)     There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Servicer, threatened that, if determined adversely to the Servicer, would have a material adverse effect upon the performance by the Servicer of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(v)     The Servicer is a registered investment adviser under the Investment Advisers Act.

(vi)     The Servicer is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Servicer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement

APP. 2420
Appx. 02405
006410

or the provisions of the other Transaction Documents applicable to the Servicer, or the performance by the Servicer of its duties hereunder.

17.    <u>Notices</u>.

Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

(a) If to the Issuer:

Aberdeen Loan Funding, Ltd.
c/o Walkers SPV Limited
Walker House
87 Mary Street
George Town, Grand Cayman, KY1-9002, Cayman Islands
Telephone: (345) 945-3727
Telecopy: (345) 945-4757
Attention: The Directors

(b) If to the Servicer:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100
Telecopy: (972) 628-4147
Attention: James Dondero

(c) If to the Trustee:

State Street Bank and Trust Company
200 Clarendon Street
Mail Code: EUC-108
Boston, Massachusetts 02116
Telecopy: (617) 351-4358
Attention: CDO Services Group

(d) If to the Noteholders:

In accordance with Section 14.3 of the Indenture, at their respective addresses set forth on the Note Register.

(e) If to the Holders of the Preference Shares:

In accordance with Section 14.3 of the Indenture, to the Preference Shares Paying Agent at the address identified therein.

APP. 2421
Appx. 02468
006411

(f) if to the Rating Agencies:

In accordance with Section 14.3 of the Indenture, to the Rating Agencies at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

18.    <u>Binding Nature of Agreement; Successors and Assigns</u>.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein.  The Servicer hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Servicer's obligations hereunder.

19.    <u>Entire Agreement</u>.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 15.1(h) of the Indenture.

20.    <u>Conflict with the Indenture</u>.

Subject to the last two sentences of Section 2(a)(i), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21.    <u>Priority of Payments</u>.

The Servicer agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22.    <u>Governing Law</u>.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

23.    <u>Indulgences Not Waivers</u>.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or

APP. 2422

006412

partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

24.    Costs and Expenses.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25.    Titles Not to Affect Interpretation.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26.    Execution in Counterparts.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

27.    Provisions Separable.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; provided, however, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28.    Number and Gender.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

29.    Written Disclosure Statement.

The Issuer and the Trustee acknowledge receipt of Part II of the Servicer's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Investment Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

APP. 2423

Annex_02470

006413

30.   Miscellaneous.

(a)   In the event that any vote is solicited with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In addition, with respect to any Defaulted Collateral Obligation, the Servicer, on behalf of the Issuer, may instruct the trustee for such Defaulted Collateral Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted Collateral Obligation and any applicable law, rule or regulation in any manner permitted under the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In the event any Offer is made with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.

(b)   In connection with taking or omitting any action under the Indenture or this Agreement, the Servicer may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Any corporation, partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the asset servicing and collateral management business of the Servicer, shall be the successor to the Servicer without any further action by the Servicer, the Co-Issuers, the Trustee, the Preference Shares Paying Agent , the Holders of the Securities or any other person or entity.

31.   Limitation of Liabilities.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Servicer shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby.  The obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive.  The provisions of this section shall survive termination of this Agreement.

APP. 2424

Annex 0347

006414

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
   as Servicer

BY: STRAND ADVISORS, INC.,
   as General Partner

By:_____
Name:
Title:

ABERDEEN LOAN FUNDING, LTD.,
   as Issuer

By:_____
Name:
Title:

Servicing Agreement

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2430
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 498 of 1017   PageID 7211
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2429 of 2722
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 25 of 39

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as Servicer

BY: STRAND ADVISORS, INC.,
as General Partner

By:_____
Name:
Title:

ABERDEEN LOAN FUNDING, LTD.,
as Issuer

By:_____
Name: **John Cullinane**
Title: Director

Servicing Agreement

APP. 2426
Appx. 02473
006416

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2431
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 499 of 1017 PageID 7212
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2430 of 2722
Case 19-34054-sgj11 Doc 1822-10 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 26 of 39

**ANNEX 1**

Certain Asset Acquisition Provisions

Unless otherwise noted, references to the Issuer in this Annex 1 include the Servicer and any other person acting on the Issuer's behalf. Capitalized terms used but not defined herein will have the meanings ascribed to them in the Indenture.

For purposes of this Annex 1,

"Affiliate" means, with respect to a specified Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person and (b) any Person that is a member, director, officer or employee of (i) the specified Person or (ii) a Person described in clause (a) of this definition; and

"Person" means an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

Section I.    General Investment Restrictions.

Except as may otherwise be provided in this Annex 1, the Issuer (and the Servicer acting on the Issuer's behalf) shall only purchase debt securities, interests in loans and other assets (each a "Portfolio Obligation") only in secondary-market transactions and shall not engage in any lending or underwriting activities or otherwise participate in the structuring or origination of any Portfolio Obligation.

A.    Communications and Negotiations.

1.    The Issuer will not have any communications or negotiations with the obligor of a Portfolio Obligation or a Reference Obligation (directly or indirectly through an intermediary such as the seller of such Portfolio Obligation or the Synthetic Security) in connection with the issuance or funding of such Portfolio Obligation or Reference Obligation or commitments with respect thereto, except for communications of an immaterial nature or customary due diligence communications; provided, that the Servicer may provide comments as to mistakes or inconsistencies in loan documents (including with respect to any provisions that are inconsistent with the terms and conditions of purchase of the loan by the Issuer).

2.    By way of example, permitted due diligence activities may include, but are not limited to, (a) attendance at an obligor's general "roadshow" or other presentations to investment professionals, (b) direct private discussions with personnel of the obligor, arranged by a sponsor, lead bank or other arranger, and (c) other due diligence activities of the kind customarily performed by offerees of the type of Portfolio Obligation being offered, but may not include any negotiations

Annex 1-1

APP. 2427
Annex 02474
006417

with the obligor, employees or agents of the obligor of any terms or conditions of the Portfolio Obligation being offered.

3. Negotiations between the Servicer and the underwriter, placement agent or broker of a Portfolio Obligation are permitted solely to the extent that they are limited to responses to customary pre-offering period and offering period inquiries by the underwriter or placement agent (e.g., "If we offered you 10-year senior subordinated bonds of XYZ company, what spread would it require to interest you?" or "If you will not buy the bonds as offered, would you buy if we convinced the obligor to add a fixed charge coverage test?"). For purposes of this Section I.A., "negotiations" shall not include (i) commenting on offering documents to an unrelated underwriter or placement agent when the ability to comment was generally available to other offerees, or (ii) communicating certain objective criteria (such as the minimum yield or maturity) the Issuer generally uses in purchasing the relevant type of Portfolio Obligation.

4. The Issuer may consent or otherwise act with respect to amendments, supplements or other modifications of the terms of any Portfolio Obligation (other than a Subsidiary Obligation (as defined in Section III)) requiring consent or action after the date on which any such Portfolio Obligation is acquired by the Issuer if (a) such amendment, supplement or modification would not constitute a Significant Modification (as defined below), (b) (i) in the reasonable judgment of the Servicer, the obligor is in financial distress and such change in terms is desirable to protect the Issuer's interest and (ii) the Portfolio Obligation is described in clause 5(b) of this Section I.A., (c) the amendment or modification would not be treated as the acquisition of a new Portfolio Obligation under paragraph 5 of this Section I.A., or (d) otherwise, if it has received advice of counsel that its involvement in such amendment, supplement or modification will not cause the Issuer to be treated as engaged in a trade or business within the United States.

A "Significant Modification" means any amendment, supplement or other modification that involves (a) a change in the stated maturity or a change in the timing of any material payment of any Portfolio Obligation (including deferral of an interest payment), that would materially alter the weighted average life of the Portfolio Obligation, (b) any change (whether positive or negative) in the yield on the Portfolio Obligation immediately prior to the modification in excess of the greater of (i) 25 basis points or (ii) 5 percent of such unmodified yield, (c) any change involving a material new extension of credit, (d) a change in the obligor of any Portfolio Obligation, or (e) a material change in the collateral or security for any Portfolio Obligation, including the addition or deletion of a co-obligor or guarantor that results in a material change in payment expectations (all as determined for purposes of section 1001 of the Code).

5. In the event the Issuer owns an interest in a Portfolio Obligation the terms of which are subsequently amended or modified, or in the case of a workout situation not described in Section III hereof, which Portfolio Obligation is

OHS West:260399223.3

subsequently exchanged for new obligations or other securities of the obligor of the Portfolio Obligation, such amendments or modifications or exchange will not be treated as the acquisition of an interest in a new Portfolio Obligation for purposes of this Annex 1, provided, that (a) the Issuer does not, directly or indirectly (through the Servicer or otherwise), seek the amendments or modifications or the exchange, or participate in negotiating the amendments or modifications or the exchange, and (b) at the time of original acquisition of the interest in the Portfolio Obligation, it was not reasonably anticipated that the terms of the Portfolio Obligation would, pursuant to a workout or other negotiation, subsequently be amended or modified.

B.     Fees.  The Issuer will not earn or receive from any Person any fee or other compensation for services, however denominated, in connection with its purchase or sale of a Portfolio Obligation or entering into a Synthetic Security; the foregoing prohibition shall not be construed to preclude the Issuer from receiving (i) commitment fees, facility maintenance fees or other similar fees that are received by the Issuer in connection with revolving or delayed drawdown Loans or synthetic or pre-funded letter of credit Loans; (ii) yield maintenance and prepayment penalty fees; (iii) fees on account of the Issuer's consenting to amendments, waivers or other modifications of the terms of any Portfolio Obligations; (iv) fees from permitted securities lending; or (v) upfront payments in lieu of periodic payments under a Synthetic Security.  The Issuer will not provide services to any Person; the foregoing prohibition shall not be construed to preclude the Issuer from activities relating to the receipt of income described in (i) through (v) of the preceding sentence.

Section II.     Loans and Forward Purchase Commitments.

A.     Any understanding or commitment to purchase a loan, a participation, or a loan subparticipation (collectively, "Loans") from a seller before completion of the closing and full funding of the Loan by such seller shall only be made pursuant to a forward sale agreement at an agreed price (stated as a dollar amount or as a percentage) (a "Forward Purchase Commitment"), unless such an understanding or commitment is not legally binding and neither the Issuer nor the Servicer is economically compelled (e.g., would otherwise be subject to a significant monetary penalty) to purchase the Loan following the completion of the closing and full funding of the Loan (i.e., the Servicer will make an independent decision whether to purchase such Loan on behalf of the Issuer after completion of the closing of the Loan) (a "Non-Binding Agreement").

B.     No Forward Purchase Commitment or Non-Binding Agreement shall be made until after the seller (or a transferor to such seller of such Loan) has made a legally binding commitment to fully fund such Loan to the obligor thereof (subject to customary conditions), which commitment cannot be conditioned on the Issuer's ultimate purchase of such Loan from such seller.

C.     In the event of any reduced or eliminated funding, the Issuer shall not receive any premium, fee, or other compensation in connection with having entered into the Forward Purchase Commitment or Non-Binding Agreement.

Annex 1-3

OHS West:260399223.3

D. The Issuer shall not close any purchase of a Loan subject to a Forward Purchase Commitment or a Non-Binding Agreement earlier than 48 hours after the time of the closing of the Loan (i.e., execution of definitive documentation), and, in the case of a Forward Purchase Commitment, the Issuer's obligation to purchase such Loan is subject to the condition that no material adverse change has occurred in the financial condition of the Loan's obligor or the relevant market on or before the relevant purchase date.

E. The Issuer cannot have a contractual relationship with the obligor with respect to a Loan until the Issuer actually purchases the Loan.

F. The Issuer cannot be a signatory on the original lending agreement, and cannot be obligated to fund an assignment of or a participation in a Loan, prior to the time specified in subsection D above.

G. In addition to the restrictions otherwise applicable to Loans, the Issuer shall not acquire any synthetic or pre-funded letter of credit Loan unless (1) the cash collateral deposit with respect to such Loan was fully funded by a predecessor in interest with respect to such Loan; (2) the Loan is part of a credit facility that includes another Loan (other than a synthetic or pre-funded letter of credit Loan) to the same obligor, and is being acquired in connection with the acquisition of such other Loan and from the same seller as such other Loan, with the intent to hold both parts and with the amount of the other Loan being significantly in excess of the amount of the synthetic or pre-funded letter of credit Loan; (3) such synthetic or pre-funded letter of credit Loan satisfies the requirements set forth in Section VI.B., treating the synthetic or pre-funded letter of credit Loan, for this purpose, as though it were a delayed drawdown or revolving Loan; and (4) at no time may more than 5% of the aggregate principal amount of Portfolio Obligations consist of synthetic or pre-funded letter of credit Loans.

Section III.     Distressed Debt

A. The Issuer may only purchase a Debt Instrument that is a Potential Workout Obligation to the extent permitted by this Section III.

B. Neither the Issuer nor the Servicer on behalf of the Issuer shall purchase a Subsidiary Obligation from any Issuer Subsidiary.

C. Special Procedures for Subsidiary Obligations.

1. Potential Workout Obligations. On or prior to the date of acquisition, the Servicer on behalf of the Issuer shall identify each Portfolio Obligation that is a Potential Workout Obligation.

2. Transfer of Subsidiary Obligations. From and after the occurrence of a Workout Determination Date with respect to a Subsidiary Obligation, neither the Issuer nor the Servicer on behalf of the Issuer shall knowingly take any action in respect of such Subsidiary Obligation that may result in the Issuer being engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes. As soon as practicable, but in any event within

Annex 1-4

APP. 2430

Annex 1-455

006420

30 calendar days following a Workout Determination Date, the Servicer shall cause the Issuer either (i) to sell or dispose of any Subsidiary Obligation identified on such Workout Determination Date to a Person that is not an Affiliate of the Issuer or Servicer or (ii) to assign any Subsidiary Obligation identified on such Workout Determination Date to an Issuer Subsidiary.

For purposes of this Annex 1, an "Issuer Subsidiary" means any wholly-owned corporate subsidiary of the Issuer to which a Special Workout Obligation may be transferred in accordance with this Annex 1.

3.    Consideration for Assignment of Subsidiary Obligations. Consideration given by an Issuer Subsidiary for the assignment to it of Subsidiary Obligations may be in the form of cash or in the form of indebtedness of, or equity interests in, such Issuer Subsidiary.

4.    Classification of Issuer Subsidiaries.  Each Issuer Subsidiary shall be an entity treated as a corporation for United States federal income tax purposes.

As used herein:

"Potential Workout Obligation" means any debt instrument (any such instrument, including an interest in a Loan, a "Debt Instrument") which, as of the date of acquisition by the Issuer or an Issuer Subsidiary, based on information specific to such Debt Instrument or the circumstances of the obligor thereof, is a Workout Obligation or, in the reasonable determination of the Servicer, has a materially higher likelihood of becoming a Workout Obligation as compared to debt obligations that par or other non-distressed debt purchasers or funds relating to that asset type customarily purchase and expect to hold to maturity.

"Subsidiary Obligation" means any Potential Workout Obligation (a) as to which the Issuer on any Workout Determination Date either (i) owns more than 40% of the aggregate principal amount of such class of Potential Workout Obligation outstanding or (ii) is one of the two largest holders of any class of debt of the obligor of such Potential Workout Obligation (based on the outstanding principal amount of such class of debt owned by the Issuer as a percentage of the aggregate outstanding principal amount of such class of debt) unless not fewer than three other holders and the Issuer collectively own at least 65% of such class of debt and, if the Issuer is the largest holder of such class, the Issuer's percentage of such class does not exceed the percentage held by the next largest holder of the debt by more than 5% of such class or (b) that would, upon foreclosure or exercise of similar legal remedies, result in the Issuer directly owning assets (other than securities treated as debt, equity in a partnership not engaged in a trade or business within the United States, or corporate equity for United States federal income tax purposes, provided in the case of corporate equity that the corporation is not a "United States real property holding corporation" within the meaning of section 897 of the Code) which are "United States real property interests" within the meaning of section 897 of the Code or which the Servicer reasonably expects it

Annex 1-5

APP. 2431
Annex 02428
006421

would, on behalf of the Issuer, be required to actively manage to preserve the value of the Issuer's interest therein; provided that a Potential Workout Obligation shall not be treated as a Subsidiary Obligation if the Issuer obtains a Tax Opinion that, based on all the surrounding circumstances, the activities in which the Issuer intends to engage with respect to such Potential Workout Obligation will not cause the Issuer to be treated as engaged in a trade or business for United States federal income tax purposes.

"Workout Determination Date" means any date on which, in connection with the occurrence of any event described in clauses (a) through (c), inclusive, of the definition of Workout Obligation, either (a) any material action by the Issuer is required to be taken, (b) the Servicer receives written notice that such material action shall be required or (c) the Servicer reasonably determines that the taking of such material action is likely to be required.

"Workout Obligation" means any Debt Instrument as to which the Servicer on behalf of the Issuer (a) consents to a Significant Modification in connection with the workout of a defaulted Portfolio Obligation, (b) participates in an official or unofficial committee or similar official or unofficial body in connection with a bankruptcy, reorganization, restructuring or similar proceeding, or (c) exercises, or has exercised on its behalf, rights of foreclosure or similar judicial remedies.

Section IV.    Purchases from the Servicer or its Affiliates.

A.    If the Servicer or an Affiliate of the Servicer acted as an underwriter, placement or other agent, arranger, negotiator or structuror, or received any fee for services (it being understood that receipts described in clauses (i) through (v) of Section I.B. are not construed as so treated), in connection with the issuance or origination of a Portfolio Obligation or was a member of the original lending syndicate with respect to the Portfolio Obligation (any such Portfolio Obligation, a "Special Procedures Obligation"), the Issuer will not acquire any interest in such Special Procedures Obligation (including entering into a commitment or agreement, whether or not legally binding or enforceable, to acquire such obligation directly or synthetically), from the Servicer, an Affiliate of the Servicer, or a fund managed by the Servicer, unless (i) the Special Procedures Obligation has been outstanding for at least 90 days, (ii) the holder of the Special Procedures Obligation did not identify the obligation or security as intended for sale to the Issuer within 90 days of its issuance, (iii) the price paid for such Special Procedures Obligation by the Issuer is its fair market value at the time of acquisition by the Issuer, and (iv) the transaction is proposed to, and the ultimate purchase is approved on behalf of the Issuer by, one or more Independent Advisors to the Issuer in accordance with the provisions of Section IV.B. below.  The Issuer will not acquire any Special Procedures Obligation if, immediately following such acquisition, the fair market value of all Special Procedures Obligations owned by the Issuer would constitute more than 49% of the fair market value of all of the Issuer's assets at such time.

B.    An "Independent Advisor" is a Person who is not an Affiliate of the Issuer, the Servicer or any fund managed by the Servicer.

Annex 1-6

1.    The Issuer may not purchase or commit to enter into any such Special Procedures Obligation without prior approval by an Independent Advisor. If the Independent Advisor declines to approve a proposed Special Procedures Obligation, at least three months must elapse before any proposal with respect to the acquisition of debt or other obligations of the same obligor are proposed or considered.

2.    The Issuer shall engage the Independent Advisor in an agreement the terms of which shall in substantial form set forth:

(a) the representation of the Independent Advisor, which the Servicer shall not know to be incorrect, that it has significant financial and commercial expertise, including substantial expertise and knowledge in and of the loan market and related investment arenas;

(b) the agreement between the Independent Advisor, the Issuer and the Servicer generally to the effect that (i) the Independent Advisor will operate pursuant to procedures consistent with maintaining his or her independence from the Servicer and its Affiliates, (ii) the Independent Advisor will have the sole authority and discretion to approve or reject purchase proposals made by the Servicer with respect to any Special Procedures Obligation, (iii) all proposals for the Issuer to acquire any Special Procedures Obligation will be first submitted to the Independent Advisor, (iii) the Servicer will prepare the materials it deems necessary to describe the Special Procedures Obligation to the Independent Advisor, (iv) the Investment Advisor will not be required to make any decision to accept or decline a Special Procedures Obligation at the price offered prior to its review of the materials prepared, plus any additional information requested by the Independent Advisor, and (v) no Independent Advisor may be proposed to be replaced by the Servicer, unless for cause or in the event of a resignation of such Independent Advisor; and

(c) such other commercially reasonable terms and conditions, including terms and conditions to the effect that (i) the Independent Advisor will be paid a reasonable fee for its services plus reimbursement of any reasonable expenses incurred in performance of his or her responsibilities, (ii) the Independent Advisor may be removed or replaced only by a majority (whether by positive act or failure to object) of the probable equity owners (as determined for United States federal income tax purposes) of the Issuer, (iii) if at any time there is more than one Independent Advisor to the Issuer, a majority of such Independent Advisors must approve any Special Procedures Obligation subject to Independent Advisor approval, (iv) an Independent Advisor may not engage, directly or indirectly, in the negotiation of the terms of any Special Procedures Obligation to be acquired by the Issuer (provided however, that an Independent Advisor may

Annex 1-7

APP. 2433
Annex 02489
006423

negotiate with the Servicer or the seller with respect to the price and terms of the Issuer's purchase of the Special Procedures Obligation, <u>provided further</u> that the Independent Advisor will not make suggestions to the Servicer or any other person about alternative or modified terms of the underlying Special Procedures Obligation on which they might be willing to approve such a Special Procedures Obligation).

3.      Any servicing agreement or other document under which the Servicer is granted signatory powers or other authority on behalf of the Issuer will provide that such powers or authority with respect to Special Procedures Obligations are conditioned upon the prior written approval of the Independent Advisor

.

4.      No Special Procedures Obligation will be presented to an Independent Advisor until at least 90 days have elapsed since the later of (a) the execution of final documentation and (b) the funding in whole or part of the Special Procedures Obligation and there will have been no commitment or arrangement prior to that time that the Issuer will acquire any such Special Procedures Obligation; provided, further, that the Special Procedures Obligation will not be treated as outstanding for any day on which the Issuer enjoys the benefits and burdens of ownership (for example, because any Person has hedged its credit exposure to the Special Procedures Obligation with the Issuer).

5.      The Issuer will have no obligation to, or understanding that it will refund, reimburse or indemnify any person (including an Affiliate of the Servicer), directly or indirectly, for "breakage" costs or other costs or expenses incurred by such person if the Independent Advisor determines that the Issuer should decline to purchase any Special Procedures Obligation.

6.      Neither the Servicer nor any Affiliate of the Servicer will have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to Special Procedures Obligations without the prior written approval of an Independent Advisor. Except as may be conditioned upon such prior written approval, neither the Servicer nor any Affiliate of the Servicer may hold itself out as having signatory powers on behalf of the Issuer or authority to enter into agreements with respect to Special Procedures Obligations on behalf of the Issuer.

Section V.      Synthetic Securities.

A.      The Issuer shall not (i) acquire or enter into any Synthetic Security with respect to any Reference Obligation the direct acquisition of which would violate any provision of this Annex 1 or (ii) use Synthetic Securities as a means of making advances to the Synthetic Security Counterparty following the date on which the Synthetic Security is acquired or entered into (for the avoidance of doubt, the establishment of Synthetic Security collateral accounts and the payment of Synthetic Security Counterparties from the amounts on deposit therein, shall not constitute the making of advances).

OHS West:260399223.3

B.      With respect to each Synthetic Security, the Issuer will not acquire or enter into any Synthetic Security that does not satisfy all of the following additional criteria unless the Servicer has first received advice of counsel that the ownership and disposition of such Synthetic Security would not cause the Issuer to be engaged in a trade or business within the United States for United States federal income tax purposes:

1.      the criteria used to determine whether to enter into any particular Synthetic Security was similar to the criteria used by the Servicer in making purchase decisions with respect to debt securities;

2.      the Synthetic Security is acquired by or entered into by the Issuer for its own account and for investment purposes with the expectation of realizing a profit from income earned on the securities (and any potential rise in their value) during the interval of time between their purchase and sale or hedging purposes and not with an intention to trade or to sell for a short-term profit;

3.      the Issuer enters into the Synthetic Security with a counterparty that is not a special purpose vehicle and is a broker-dealer or that holds itself out as in the business of entering into such contracts;

4.      neither the Issuer nor any Person acting on behalf of the Issuer advertises or publishes the Issuer's ability to enter into Synthetic Securities;

5.      except with respect to (x) credit-linked notes or similar Synthetic Securities and (y) any other Synthetic Securities where standard form ISDA documentation is not applicable, the Synthetic Security is written on standard form ISDA documentation;

6.      the net payment from the Issuer to the Synthetic Security Counterparty is not determined based on an actual loss incurred by the Synthetic Security Counterparty or any other designated person;

7.      there exists no agreement, arrangement or understanding that (i) the Synthetic Security Counterparty is required to own or hold the related Reference Obligation while the Synthetic Security remains in effect or (ii) the Synthetic Security Counterparty is economically or practically compelled to own or hold the related physical Reference Obligation while the Synthetic Security remains in effect;

8.      the Synthetic Security provides for (i) all cash settlement, (ii) all physical settlement or (iii) the option to either cash settle or physically settle; provided that, in the latter two cases, physical settlement provides the settling party the right to settle the Synthetic Security by delivering deliverable obligations which *may* include the Reference Obligation and the settling party must not be required to deliver the related Reference Obligation upon the settlement of such Synthetic Security.

Annex 1-9

Notwithstanding the preceding paragraph, a Synthetic Security providing for physical settlement may require a party to deliver the related Reference Obligation if either:

(i) at the time the Issuer enters into such Synthetic Security, such Reference Obligation is readily available to purchasers generally in a liquid market; or

(ii) the advice of both United States federal income tax and insurance counsel of nationally recognized standing in the United States experienced in such matters is that, under the relevant facts and circumstances with respect to such Synthetic Security, the acquisition of such Synthetic Security will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis and should not cause the Issuer to be treated as writing insurance in the United States under the law of the state in which the Synthetic Security Counterparty is organized.

9. the Synthetic Security is not treated by the Issuer as insurance or a financial guarantee sold by the Issuer for United States or Cayman Islands regulatory purposes.

As used herein:

"Reference Obligation" means a debt security or other obligation upon which a Synthetic Security is based.

"Synthetic Security" means any swap transaction or security, other than a participation interest in a Loan, that has payments associated with either payments of interest and/or principal on a Reference Obligation or the credit performance of a Reference Obligation.

"Synthetic Security Counterparty" means an entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor).

Section VI.    Other Types of Assets.

A.    Equity Restrictions.  The Issuer will not purchase any asset (directly or synthetically) that is:

1. not treated for U.S. federal income tax purposes as debt if the issuing entity is a "partnership"(within the meaning of Section 7701(a)(2) of the Code) unless such entity is not engaged in a trade or business within the United States, or

2. a "United States real property interest" as defined in section 897 of the Code and the Treasury Regulations promulgated thereunder.

Annex 1-10

APP. 2436
Annex 02493
006426

   3. a residual interest in a "REMIC" or an ownership interest in a "FASIT" (as such terms are as defined in the Code).

The Issuer may cause an Issuer Subsidiary to acquire assets set forth in clause (i) or (ii) above (each, an "ETB/897 Asset") in connection with the workout of defaulted Portfolio Obligations, so long as the acquisition of ETB/897 Assets by such Issuer Subsidiary will not cause the stock of such Issuer Subsidiary to be deemed to be an ETB/897 Asset.

   B. <u>Revolving Loans and Delayed Drawdown Loans</u>.  All of the terms of any advance required to be made by the Issuer under any revolving or delayed drawdown Loan will be fixed as of the date of the Issuer's purchase thereof (or will be determinable under a formula that is fixed as of such date), and the Issuer and the Servicer will not have any discretion (except for consenting or withholding consent to amendments, waivers or other modifications or granting customary waivers upon default) as to whether to make advances under such revolving or delayed drawdown Loan.

   C. <u>Securities Lending Agreements</u>.  The Issuer will not purchase any Portfolio Obligation primarily for the purpose of entering into a securities lending agreement with respect thereto.

   D. <u>Exception From Secondary Market Rule for Debt Securities</u>.  Any purchase of a Portfolio Obligation other than a Loan (a "Debt Security") pursuant to a commitment, arrangement or other understanding made before or contemporaneously with completion of the closing and funding of such Debt Security issuance shall be made only in connection with one of the following:

   (i) an underwriting of a registered public offering in which the seller has made a firm underwriting commitment to the issuer of such Debt Security where none of the Servicer or any Affiliate thereof acted as an underwriter or placement agent or participated in negotiating or structuring the terms of the Debt Security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities),

   (ii) a private placement to qualified investors (pursuant to Rule 144A or Section 4(2) under the Securities Act or other similar arrangement) in which such Debt Security was originally issued pursuant to an offering circular, private placement memorandum, or similar offering document and none of the Servicer or any Affiliate thereof acted as a placement agent or underwriter or participated in negotiating or structuring the terms of the Debt Security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities), or

   (iii) an acquisition of or entry into a Synthetic Obligation in accordance with Section V. above;

Annex 1-11

If an Affiliate of the Servicer is acting as an underwriter or placement agent or an Affiliate of the Servicer or an employee of an Affiliate of the Servicer participated in the structuring of an issuance otherwise described in clause (i) or clause (ii) of this paragraph D, one of the following additional conditions must be met:

(x)     the Servicer did not participate in negotiating or structuring the terms of the obligation or security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities) and the Issuer purchases no more than 33% of the aggregate principal amount of the tranche of securities (or other instruments) of which such Debt Security is a part and more than 50% of the aggregate principal amount of such tranche is substantially contemporaneously sold to one or more Persons unrelated to the Servicer (and who have not given the Servicer discretionary trading authority) on terms and conditions substantially the same as those on which the Issuer is to purchase,

(y)     the Servicer did not participate in negotiating or structuring the terms of the obligation or security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities) and the Issuer purchases less than 33% of the aggregate principal amount of all tranches issued as part of the transaction in which the Debt Security was issued and more than 50% of the aggregate principal amount of such tranches are substantially contemporaneously sold to one or more Persons unrelated to the Servicer (and who have not given the Servicer discretionary trading authority) on terms and conditions substantially the same as those on which the Issuer is to purchase, or

(z)     such security or obligation satisfies the requirements and procedures applicable to Special Procedures Obligations in Section IV as though it were a Loan;

provided, however, in either of (x) or (y), the Affiliate of the Servicer was (or the employees of the Affiliate of the Servicer were) acting as an underwriter or placement agent (or otherwise participated in the structuring of such issuance) solely as, or solely as an employee of, a Permitted Affiliate (as defined below).

"Permitted Affiliate" means any Affiliate (i) that is a separate legal entity that is operated independently of the Servicer, (ii) whose personnel are not managed by and who do not report to the personnel of the Servicer, and (iii) whose personnel are not compensated based upon the performance of the Servicer.

Section VII.   <u>General Restrictions on the Issuer</u>.  The Issuer itself shall not:

A.     hold itself out, through advertising or otherwise, as originating Loans, lending funds, or making a market in or dealing in Loans or other assets;

Annex 1-12

OHS West:260399223.3

B.     register as, hold itself out as, or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as, a broker-dealer, a bank, an insurance company, financial guarantor, a surety bond issuer, or a company engaged in Loan origination;

C.     knowingly take any action causing it to be treated as a bank, insurance company, or company engaged in Loan origination for purposes of any tax, securities law or other filing or submission made to any governmental authority;

D.     hold itself out, through advertising or otherwise, as originating, funding, guaranteeing or insuring debt obligations or as being willing and able to enter into transactions (either purchases or sales of debt obligations or entries into, assignments or terminations of hedging or derivative instruments, including Synthetic Securities) at the request of others;

E.     treat Synthetic Securities as insurance, reinsurance, indemnity bonds, guaranties, guaranty bonds or suretyship contracts for any purpose;

F.     allow any non-U.S. bank or lending institution who is a holder of a Security to control or direct the Servicer's or Issuer's decision to acquire a particular asset except as otherwise allowed to such a holder, acting in that capacity, under the related indenture or acquire a Portfolio Obligation conditioned upon a particular person or entity holding Securities;

G.     acquire any asset the holding or acquisition of which the Servicer knows would cause the Issuer to be subject to income tax on a net income basis;

H.     hold any security as nominee for another person; or

I.     buy securities with the intent to subdivide them and sell the components or to buy securities and sell them with different securities as a package or unit.

Section VIII.   Tax Opinion; Amendments.

A.     In furtherance and not in limitation of this Annex 1, the Servicer shall comply with all of the provisions set forth in this Annex 1, unless, with respect to a particular transaction, the Servicer acting on behalf of the Issuer and the Trustee shall have received written advice of counsel of nationally recognized standing in the United States experienced in such matters (a "Tax Opinion"), that, under the relevant facts and circumstances with respect to such transaction, the Servicer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

B.     The provisions set forth in the Annex 1 may be amended, eliminated or supplemented by the Servicer if the Issuer, the Servicer and the Trustee shall have received a Tax Opinion that the Servicer's compliance with such amended provisions or supplemental provisions or the failure to comply with such provisions proposed to be

OHS West:260399223.3

eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

Annex 1-14

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2445
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 513 of 1017 PageID 7226
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2444 of 2722

# EXHIBIT 26

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION

                                      )   Case No. 19-34054-sgj-11
    In Re:                            )   Chapter 11
                                      )
    HIGHLAND CAPITAL                   )   Dallas, Texas
    MANAGEMENT, L.P.,                  )   Wednesday, February 3, 2021
                                      )   9:30 a.m. Docket
              Debtor.                 )
                                      )   CONFIRMATION HEARING [1808]
                                      )   AGREED MOTION TO ASSUME [1624]
                                      )
                                      )   Continued from 02/02/2021
    _____)

                         TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                   UNITED STATES BANKRUPTCY JUDGE.

    WEBEX APPEARANCES:

    For the Debtor:              Jeffrey Nathan Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                 10100 Santa Monica Blvd.,
                                  13th Floor
                                 Los Angeles, CA  90067-4003
                                 (310) 277-6910

    For the Debtor:              John A. Morris
                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                 780 Third Avenue, 34th Floor
                                 New York, NY  10017-2024
                                 (212) 561-7700

    For the Debtors:             Ira D. Kharasch
                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                 10100 Santa Monica Blvd.,
                                  13th Floor
                                 Los Angeles, CA  90067-4003
                                 (310) 277-6910

    For the Official Committee   Matthew A. Clemente
    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                 One South Dearborn Street
                                 Chicago, IL  60603
                                 (312) 853-7539
```

Exhibit D

2

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero:          Clay M. Taylor
                                 BONDS ELLIS EPPICH SCHAFER
 3                                  JONES, LLP
                                 420 Throckmorton Street,
 4                                  Suite 1000
                                 Fort Worth, TX  76102
 5                               (817) 405-6900

 6   For Get Good Trust and      Douglas S. Draper
     Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
 7                               650 Poydras Street, Suite 2500
                                 New Orleans, LA  70130
 8                               (504) 299-3300

 9   For Certain Funds and       Davor Rukavina
     Advisors:                   Julian Vasek
10                               MUNSCH, HARDT, KOPF & HARR
                                 500 N. Akard Street, Suite 3800
11                               Dallas, TX  75201-6659
                                 (214) 855-7587
12
     For the NexPoint            Lauren K. Drawhorn
13   Parties:                    WICK PHILLIPS
                                 3131 McKinney Avenue, Suite 100
14                               Dallas, TX  75204
                                 (214) 692-6200
15
     For the U.S. Trustee:       Lisa L. Lambert
16                               OFFICE OF THE UNITED STATES
                                    TRUSTEE
17                               1100 Commerce Street, Room 976
                                 Dallas, TX  75242
18                               (214) 767-8967

19   For Scott Ellington,        Debra A. Dandeneau
     Isaac Leventon, Thomas      BAKER & MCKENZIE, LLP
20   Surgent, and Frank          452 Fifth Avenue
     Waterhouse:                 New York, NY 10018
21                               (212) 626-4875

22   For Certain Funds and       A. Lee Hogewood, III
     Advisors:                   K&L GATES, LLP
23                               4350 Lassiter at North Hills
                                    Avenue, Suite 300
24                               Raleigh, NC  27609
                                 (919) 743-7306
25
```

006432

3

```
 1   Recorded by:              Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
 2                             1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
 3                             (214) 753-2062

 4   Transcribed by:           Kathy Rehling
                               311 Paradise Cove
 5                             Shady Shores, TX  76208
                               (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24           Proceedings recorded by electronic sound recording;
                 transcript produced by transcription service.
25
```

4

1          DALLAS, TEXAS - FEBRUARY 3, 2021 - 9:38 A.M.

2          THE CLERK:  All rise.  The United States Bankruptcy

3   Court for the Northern District of Texas, Dallas Division, is

4   now in session, the Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6   right.  We are ready for Day Two of the confirmation hearing

7   in Highland Capital Management, LP, Case No. 19-34054.  I'll

8   just make sure we've got the key parties at the moment.  Do we

9   have Mr. Pomerantz, Mr. Morris, for the Debtor team?

10          MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

11   Pomerantz for the Debtors.

12          MR. MORRIS:  And I'm here as well, Your Honor.

13          THE COURT:  All right.  Good.

14      All right.  For our objecting parties, do we have Mr.

15   Taylor and your crew for Mr. Dondero?

16          MR. TAYLOR:  Yes, Your Honor.

17          THE COURT:  Good morning.

18      All right.  For Dugaboy Trust and Get Good Trust, do we

19   have Mr. Draper?  (No response.)  All right.  I do see Mr.

20   Draper.  I didn't hear an appearance.  You must be on mute.

21          MR. DRAPER:  I'm present, --

22          THE COURT:  Okay.

23          MR. DRAPER:  -- Your Honor.

24          THE COURT:  Okay.  Good morning.

25          MR. DRAPER:  I'm present, Your Honor.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2449
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 517 of 1017   PageID 7230
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2448 of 2722

5

1          THE COURT:  Good morning.  I heard you that time.

2   Thank you.

3      All right.  And now for what I'll call the Funds and

4   Advisors Objectors, do we have Ms. Rukavina present?

5          MR. RUKAVINA:  Yes, Your Honor.  Good morning.

6          THE COURT:  Good morning.  All right.  And I will

7   check.  Do we have Mr. Clemente or your team there?

8          MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt

9   Clemente from Sidley Austin on behalf of the Committee.

10          THE COURT:  All right.  Ms. Drawhorn, do we have you

11   there for the NexPoint Real Estate Partners and related funds?

12          MS. DRAWHORN:  Yes, Your Honor.  Good morning.

13          THE COURT:  Good morning.  All right.  Did I miss --

14   I think that captured all of our Objectors.  Anyone who I've

15   missed?

16      All right.  Well, when we recessed yesterday, Mr. Morris,

17   I think you were about to call your third witness; is that

18   correct?

19          MR. MORRIS:  It is, Your Honor.  But if I may, I'd

20   like to just address the objections to the remaining exhibits,

21   since I hope that won't take too long.

22          THE COURT:  All right.  You may.

23          MR. POMERANTZ:  Actually, Your Honor, before we go

24   there, we filed the supplemental declaration of Patrick

25   Leatham, as we indicated we would do yesterday.  We just

6

 1   wanted to get confirmation again that nobody intends to cross-

 2   examine him, so that he doesn't have to sit through the

 3   festivities today.

 4           THE COURT:  All right.  Well, I did see that you

 5   filed that.

 6       Does anyone anticipate wanting to cross-examine Mr.

 7   Leatham, the balloting agent?

 8           MR. RUKAVINA:  Your Honor, I take it that that

 9   declaration is part of the record.  As long as the Court

10   confirms that, I do not intend to call the gentlemen.

11           THE COURT:  All right.  Well, I will take judicial

12   notice of it and make it part of the record.  It appears at

13   Docket Entry No. 1887.  Again, it was filed -- well, it was

14   actually filed early this morning, I think.  So, all right.

15   So, with --

16           MR. MORRIS:  And to avoid --

17           THE COURT:  Go ahead.

18           MR. MORRIS:  To -- I was just going to say, to avoid

19   any ambiguity, Your Honor, the Debtor respectfully moves that

20   document into the evidentiary record.

21           THE COURT:  All right.  The Court will --

22       (Interruption.)

23           THE COURT:  Someone needs to put their phone on mute,

24   perhaps.  Unless someone was intentionally speaking.

25       All right.  So, I will grant that request.  Docket Entry

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2451
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 519 of 1017   PageID 7232
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2450 of 2722

7

1    No. 1887 will be part of the confirmation evidence of this

2    hearing.

3        (Debtor's Patrick Leatham Declaration at Docket 1887 is

4    received into evidence.)

5            THE COURT:  All right.  Anything else?  There were

6    other exhibits I think you were going to talk about?

7            MR. MORRIS:  Yeah.  Let me just go through them one

8    at a time, if I may, Your Honor.

9            THE COURT:  Okay.

10           MR. MORRIS:  All right.  So, I'm going to deal with

11   the transcripts that have been objected to one at a time.  And

12   I'll just take them in order.  The first one can be found at

13   Exhibit B.  It is on Docket No. 1822.

14           THE COURT:  Okay.

15           MR. MORRIS:  Exhibit B is the deposition transcript

16   from the December 16, 2020 hearing on the Advisor and the

17   Funds' motion for an order restricting the Debtor from

18   engaging in certain CLO-related transactions.

19       During that hearing, the Court heard the testimony of

20   Dustin Norris.  Mr. Norris is an executive vice president for

21   each of the Funds and each of the Advisors.

22       We would be offering the transcript for the limited

23   purposes of establishing Mr. Dondero's ownership and control

24   over the Advisors.

25       Mr. Norris also gave some pretty substantial testimony

8

1   concerning the so-called independent board of the Funds.

2       And as a general matter, Your Honor, to the extent that

3   the objection is on hearsay grounds, the transcript -- at

4   least the portions relating to Mr. Norris's testimony --

5   simply are not hearsay under Evidentiary Rule 801(d)(2).

6   These are statements of an opposing party, and I think we fall

7   well within that.

8       So, we would respectfully request that the Court admit

9   into the record the transcript from December 16th, at least

10  the portions of which are Mr. Norris's testimony.

11          THE COURT:  All right.  And, again, these appear at

12  -- I think I heard you say B and then E.  Is that correct?

13          MR. MORRIS:  Just B.  Just B at the moment.  B as in

14  boy.

15          THE COURT:  Okay.  Just B at the moment?

16      All right.  Any objections to that?

17          MR. RUKAVINA:  Your Honor, I had objected, but now

18  that it's offered for that limited purpose, I withdraw my

19  objection.

20          THE COURT:  All right.  Then B -- I'm sorry.  Was

21  there anyone else speaking?

22      B will be admitted.  And, again, it appears at Docket

23  Entry 1822.

24      (Debtor's Exhibit B, Docket Entry 1822, is received into

25  evidence.)

9

1          MR. MORRIS:  Okay.  Next, the next transcript can be

2    found at Exhibit 6R, and that's Docket 1866.  Exhibit 6R is

3    the transcript of the January 9, 2020 hearing where the Court

4    approved the corporate governance settlement.  We think that

5    that transcript is highly relevant, Your Honor, because it

6    reflects not only Mr. Dondero's notice and active

7    participation in the consummation of the corporate governance

8    agreement, but it also reflects the Court and the parties'

9    views and expectations that were established at that time,

10   such that if anybody contends that there's any ambiguity about

11   any aspect of the order, I believe that that would be the best

12   evidence to resolve any such disputes.

13       So, for the purpose of establishing Mr. Dondero's notice,

14   Mr. Dondero's participation, and the parties' discussions and

15   expectations with regard to every aspect of the corporate

16   governance settlement, including Mr. Dondero's stipulation,

17   the order that emerged from it, and the term sheet, we think

18   that that's properly into evidence.

19          THE COURT:  Any objection?

20       All right.  6R will be admitted.  Again, at Docket Entry

21   1822.

22       (Debtor's Exhibit 6R, Docket Entry 1822, is received into

23   evidence.)

24          MR. MORRIS:  Next, Your Honor, we've got Exhibits 6S

25   as in Sam and 6T as in Thomas.  They're companions.  And they

10

```
 1    can be found at Docket 1866.  And those are the transcripts.
 2    The first one is from the October 27th disclosure statement
 3    hearing, and the second one actually is from the Patrick
 4    Daugherty, I believe, lift stay motion.
 5        I'll deal with the first one first, Your Honor.  We
 6    believe that the transcript of the October 27th hearing goes
 7    to the good faith nature of the Debtor's proposed plan.  It
 8    shows that the Debtor and the Committee were not always
 9    aligned on every interest.  It shows that the Committee, in
10    fact, strenuously objected to certain aspects of the then-
11    proposed plan by the Debtors.  And we just think it goes to
12    the heart of the good faith argument.
13        The transcript for the 28th, we would propose to offer for
14    the limited purpose of the commentary that you offered at the
15    end of that hearing, where Your Honor made it clear that
16    employee releases would not be -- would not likely be
17    acceptable to the Court unless there was some consideration
18    paid.
19        And it was really, frankly, Your Honor's comments that
20    helped spur the Committee and the Debtor to discuss over the
21    next few weeks the resolution of the issues concerning the
22    employee releases.
23        So we're not offering Exhibit 6T for anything having to do
24    with Mr. Daugherty or his claim, but just the latter portion
25    relating to the discussion about the employee releases.  And,
```

11

1   with that, we'd move those transcripts into evidence.

2           THE COURT:  Any objection?

3           MR. RUKAVINA:  Your Honor, yes, I do object.  6S is

4   hearsay, and under Rule 804(b)(1) it's admissible only if the

5   witnesses are unavailable to be called.  There's been no

6   suggestion that they're not.

7       As far as 6T, what Your Honor says is not hearsay, so as

8   long as it's just what Your Honor was saying, I do not object

9   to 6T.  I object to the balance of it.

10          THE COURT:  Okay.  What about that objection on 6S?

11          MR. MORRIS:  Yeah.  One second, Your Honor.  I would

12  go to the residual exception to the hearsay rule under 807.

13  807 specifically applies if the statement being offered is

14  supported by sufficient guarantees of trustworthiness and it's

15  more probative on the point -- and the point here is simply to

16  help buttress the Debtor's good faith argument -- and it's

17  more probative on the point than any other evidence.  And I'm

18  not sure what better evidence there would be than an on-the-

19  record discussion between the Debtor and the Committee as to

20  the disputes they were having on the disclosure statement.

21          THE COURT:  All right.  I'm going to overrule the

22  objection and accept that 807 exception as being valid here.

23  So, I am admitting both 6S and 6T.  And for the record, I

24  think you said they appeared at 1866.  They actually appear at

25  1822.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2456
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 524 of 1017 PageID 7237
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2455 of 2722

12

1        MR. MORRIS:  Okay, Your Honor.  I am corrected.  It

2   is 6S and 6T, and they are indeed at 1822.  Forgive me.

3        THE COURT:  Okay.

4      (Debtor's Exhibits 6S and 6T, Docket Entry 1822, is

5   received into evidence.)

6        MR. MORRIS:  The next transcript and the last one is

7   6U, which is also at 1822.  6U is the transcript from the

8   December 10th hearing on the Debtor's motion for a TRO against

9   Mr. Dondero.  We believe the entirety of that transcript is

10  highly relevant, and it relates specifically to the Debtor's

11  request for the exculpation, gatekeeper, and injunction

12  provisions of their plan.  And on that basis, we would offer

13  that into evidence.

14        THE COURT:  Any objection?

15        MR. TAYLOR:  Yes, Your Honor.  This is Clay Taylor on

16  behalf of Mr. Dondero.

17      We do object, on the same basis that it is hearsay.  There

18  has certainly been plenty of testimony before this Court and

19  on the record as to why the Debtor believes that its plan

20  provisions are appropriate and allowable, and there's no need

21  to allow hearsay in for that.  All of the witnesses were

22  available to be called by the Debtor.  The Debtor is in the

23  midst of its case and can call whoever else it needs to call

24  to get these into evidence or to get those docs into evidence.

25  And therefore, we don't believe that any residual exception

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2457
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 525 of 1017 PageID 7238
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2456 of 2722

13

1   should apply.

2           THE COURT:  Mr. Morris, your response?

3           MR. MORRIS:  First, Your Honor, any statements made

4   by or on behalf of Mr. Dondero would not be hearsay under

5   801(d)(2).

6       And secondly, there is no other evidence of the Debtor's

7   motion of the -- of the argument that was had.  There is no

8   other evidence, let alone better evidence, than the transcript

9   itself.  And I believe 807 is certainly the best rule to

10  capture that.

11      It is a statement that's supported by sufficient

12  guarantees of trustworthiness.  Again, these are the litigants

13  appearing before Your Honor.  It may not be sworn testimony,

14  but I would hope that everybody is doing their best to comply

15  with the guarantee of trustworthiness in that regard, putting

16  aside advocacy.

17      And it is more probative on the point for which we're

18  offering -- and that is on the very issues of exculpation,

19  gatekeeper, and injunction -- than anything else we can offer

20  in that regard.

21          THE COURT:  All right.  I overrule the objection and

22  I will admit 6U.  Okay.

23      (Debtor's Exhibit 6U, Docket Entry 1822, is received into

24  evidence.)

25          MR. MORRIS:  All right.  Going back to the top, Your

14

1    Honor, Companions Exhibit D as in David and E as in Edward,

2    which are at Docket 1822.

3        Exhibit D is an email string that relates to the Debtor's

4    communications with the Creditors' Committee concerning a

5    transaction known as SSP, which stands for Steel Products --

6    Structural and Steel Products.  So that was an asset that the

7    Debtor was selling, trying to sell at a particular point in

8    time.  And Exhibit E is a deck that the Debtor had prepared

9    for the benefit of the UCC.

10       And if we looked that those documents, Your Honor, you'd

11   see that the Debtor was properly following the protocols that

12   were put in place in connection with the January 9th corporate

13   governance settlement.  And the Committee is being informed by

14   the Debtor of what the Debtor intends to do with that

15   particular asset.

16       And the reason that it's particularly relevant here, Your

17   Honor, is Dustin Norris had submitted a declaration in support

18   of their motion that was heard on September -- on December

19   16th.  That declaration is an exhibit to what is Exhibit A on

20   Docket 1822.  Exhibit A on the docket is the Advisor and the

21   Funds' motion.  Okay?  So, Exhibit A is the motion.  Attached

22   to that Exhibit A is an exhibit, which is Mr. Norris's

23   declaration.

24       At Paragraph 9 of Mr. Norris's declaration, he takes issue

25   with the Debtor's process for the sale of that particular

15

1   asset.

2      And so, having admitted already into the record Mr.

3   Norris's declaration, we believe that these documents rebut

4   the statements made in Mr. Norris's declaration, and indeed,

5   were part of the transcript that has now already been admitted

6   into evidence.  So we think the documents are needed because

7   they were exhibits during that hearing.

8           THE COURT:  All right.  Any objection?

9           MR. RUKAVINA:  Your Honor, yes, I object based on

10  authenticity.  This document has not been authenticated, nor

11  has the attachment.  And on hearsay.  And I don't think that

12  the Debtor can introduce one exhibit just to introduce another

13  to rebut the first.

14          THE COURT:  Your response?

15          MR. MORRIS:  You know, in all honesty, I wish that

16  the authenticity objection had been made yesterday and I might

17  have been able to deal with that.

18      These documents have already been admitted by the Court

19  against these very same parties.  I think it would be a little

20  unfair for them now to exclude the document that they had no

21  objection to the first time around.  They clearly relate to

22  Paragraph 9 of Mr. Norris's declaration, which was admitted

23  into evidence in this case without objection.

24          THE COURT:  All right.  I overrule the objection.  D

25  and E are admitted.

16

1     (Debtor's Exhibits D and E, Docket Entry 1822, is received

2   into evidence.)

3         MR. MORRIS:   Next, Your Honor, we have Exhibits 4D as

4   in David, 4E as in Edward, and 4G as in Gregory.  And those

5   can all be found on Docket 1822.  And to just cut to the

6   chase, Your Honor, these are the K&L Gates letter that were

7   sent in late December and my firm's responses to those

8   letters.

9     Those letters are being offered, again, to support --

10   well, the Debtor contends that, in the context of this case,

11   and at the time and under the circumstances, the letters

12   constituted interference and evinces a disregard for the

13   January 9th order, for Mr. Dondero's TRO, and for the Court's

14   comments at the December 16th hearing.  And they go

15   specifically to the Debtor's request for the gatekeeper,

16   exculpation, and injunction provisions.

17     To the extent that those exhibits contain the letters that

18   were sent on behalf of the Funds and on behalf of the

19   Advisors, they would simply not be hearsay under 801(d)(2).

20   And to the extent the objection goes to my firm's response, I

21   think just as a matter of completeness the Court -- I won't

22   offer them for the truth of the matter asserted.  I'll simply

23   offer the Pachulski responses at those exhibits for the

24   purpose of stating the Debtor's position, without regard to

25   the truth of the matter asserted.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2461
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 529 of 1017   PageID 7242
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2460 of 2722

17

1          THE COURT:  All right.  Any objection?

2          MR. RUKAVINA:  Your Honor, with that understanding,

3     I'll withdraw my objection to these exhibits.

4          THE COURT:  All right.  So, 4D, 4E, and 4G are

5     admitted.

6        (Debtor's Exhibits 4D, 4E, and 4G, Docket Entry 1822, are

7     received into evidence.)

8          MR. MORRIS:  Next, Your Honor, we've got Exhibit 5T

9     as in Thomas.  That document can be found at Docket No. 1822.

10    Your Honor, that document is a schedule of a long list of

11    promissory notes that are owed to the Debtor by the Advisors,

12    Dugaboy, and Mr. Dondero.  But I think that, upon reflection,

13    I'll withdraw that exhibit.

14         THE COURT:  All right.

15       (Debtor's Exhibit 5T is withdrawn.)

16         MR. MORRIS:  And then, finally, just one last one.  I

17    think Mr. Rukavina objected to Exhibit 7O as in Oscar, which

18    can be found at Docket No. 1877.  Exhibit 7O are the documents

19    that were admitted in the January 21st hearing, and I believe

20    that they all go -- they're being offered to support the

21    Debtor's application for the gatekeeper, exculpation, and

22    injunction provisions.

23         THE COURT:  All right.  7O is being offered.  Any

24    objection?

25         MR. RUKAVINA:  Yes, Your Honor.  I do object.  Those

18

1   are exhibits from a separate adversary proceeding that has not

2   been concluded.  In fact, my witness is still on the stand in

3   that.

4       And I'll note that that's another 20,000 pages that's very

5   duplicative of the current record, and we already are going to

6   have an unwieldy record.  So I question why Mr. Norris -- why

7   Mr. Morris would even need this.

8       So that's my objection, Your Honor.

9           MR. MORRIS:  You know what?  That's a fair point,

10  Your Honor.  And -- that is a fair point, and I guess what I'd

11  like to do is at some point this morning see if I can single

12  out documents that are not duplicative and come back to you

13  with very specific documents.  I think that's a very fair

14  point.

15          THE COURT:  All right.

16          MR. MORRIS:  And with that, Your Honor, I think we've

17  now addressed every single document that the Debtor has

18  offered into evidence, and I believe, other than the

19  withdrawal of --

20          THE COURT:  5T.

21          MR. MORRIS:  -- 5T --

22          THE COURT:  Uh-huh.

23          MR. MORRIS:  -- and the open question on 7O, I

24  believe every single document at Docket 1822, 1866, and 1877

25  has been admitted.  Do I have that right?

19

1      THE COURT:  All right.  Yes, because I did admit

2  yesterday 7F through 7Q, minus 7O, at 1877.  So, yes, I agree

3  with what you just said.

4      MR. RUKAVINA:  Your Honor, I apologize.  And Mr.

5  Morris.  I have that 5S -- or six -- that 5S and 6C, Legal

6  Entities List, have not been admitted.  But if I'm wrong on

7  that, then I apologize.

8      THE COURT:  Okay.  5S was part of 1866, which I

9  admitted entirely.

10    And what was the other thing?

11     MR. RUKAVINA:  I'm counting letters, Your Honor.

12  One, two, three, four.  6D, Legal Entities List, Redacted.

13     THE COURT:  Okay.  6B would have been --

14     MR. RUKAVINA:  D, Your Honor, as in dog.  I'm sorry.

15  6-dog.

16     THE COURT:  Okay.  6D, yeah, that was part of 1822

17  that I admitted *en masse* yesterday.

18     MR. MORRIS:  Yeah, I didn't hear an objection to that

19  one yesterday, and I agree, Your Honor.  My records show that

20  it was already admitted.

21     MR. RUKAVINA:  Then I apologize to the Court.

22     THE COURT:  All right.  Any --

23     MR. MORRIS:  No worries.  Let's get --

24     THE COURT:  Any other housekeeping matters before we

25  go to the next witness?

20

```
1          MR. MORRIS:  No, Your Honor.  Not from the Debtor.

2          THE COURT:  Anyone else?

3      All right.  Well, let's hear from the next witness.

4          MR. MORRIS:  All right, Your Honor.  The Debtor calls

5  as its next and last witness Marc Tauber.

6          THE COURT:  All right.  Mr. --

7          MR. MORRIS:  Mr. Tauber, if you're on the phone,

8  please identify yourself.

9      (No response.)

10         THE COURT:  Mr. Tauber, we're not hearing you.

11  Perhaps you are on mute.  Could you unmute your device?

12     (No response.)

13         THE COURT:  All right.  If it's a phone, you need to

14  hit *6.

15     Hmm.  Any -- do you know which caller he is?

16         THE CLERK:  I'm trying to find out.

17         THE COURT:  All right.  We've got well over a hundred

18  people, so we can't easily identify where he is at the moment.

19     All right.  Mr. Tauber, Marc Tauber?  This is Judge

20  Jernigan.  We cannot hear you, so -- all right.  Well, maybe

21  we can --

22         MR. MORRIS:  Can we just take a three-minute break

23  and let me see if I can track him down?

24         THE COURT:  Yes.  Why don't you do that?  So let's

25  take a three-minute break.
```

21

1          MR. MORRIS:  Thank you, Your Honor.

2          THE COURT:  Okay.

3      (A recess ensued from 10:02 a.m. until 10:04 a.m.)

4          MR. MORRIS:  Your Honor, if we may, he'll be dialing

5   in in a moment.  But I've been reminded that there is one more

6   exhibit.  It's the exhibit I used on rebuttal yesterday with

7   Mr. Seery.  There was the one document that was on the docket,

8   and that was the Debtor's omnibus reply to the plan

9   objections, where we looked at Paragraph 135, I believe.  And

10  we would offer that into evidence for the purpose of just

11  establishing that the Debtor had given notice no later than

12  January 22nd of its agreement in principle to assume the CLO

13  management contracts.

14      And then the second exhibit that we had offered that I

15  think I suggested could be marked as Exhibit 10A was the email

16  string between my firm and counsel for the CLO Issuers where

17  they agreed to the agreement in principle for the Debtor's

18  assumption of the CLO management contracts.

19      And we would offer both of those documents into evidence

20  as well.

21          THE COURT:  All right.  Any objections?

22      All right.  Well, I will admit them.

23      As far as this email string with the CLO Issuers that you

24  called 10A, does that appear on the docket?  I remember you

25  putting it on the screen, but, if not, you'll need to file a

22

 1   supplement to the record, a supplemental exhibit.

 2           MR. MORRIS:  We will, Your Honor.  We'll do that for

 3   both of those exhibits.

 4           THE COURT:  And then as -- okay, for both?  Because I

 5   -- I've read that reply, and I could reference the docket

 6   number if we need to.

 7           MR. MORRIS:  We'll clean that up, Your Honor.

 8           THE COURT:  Okay.

 9       (Debtor's Exhibit 10A is received into evidence.)

10       (Clerk advises Court re new caller.)

11           THE COURT:  Oh, okay.  Just a minute.  I was looking

12   up something.

13       (Pause.)

14           THE COURT:  All right.  Well, you're going to file --

15   hmm, I really wanted to just reference where that reply brief

16   appears on the record.  There were a heck of a lot of things

17   filed on January 22nd.

18       (Interruption.)

19           THE COURT:  Okay.  We'll --

20           MR. MORRIS:  All right.  We're just going to need one

21   more minute with Mr. Tauber.  It's my fault, Your Honor.

22           THE COURT:  Okay.

23           MR. MORRIS:  I didn't send him easily-digestible

24   dial-in instructions.  He'll be just a moment.

25           THE COURT:  Okay.

23

1       (Court confers with Clerk regarding exhibit.)

2           THE COURT:  Oh, it's at 1807?  Okay.  So, the reply

3    brief that we talked about Paragraph 35, that is at Docket No.

4    1807.  Okay?  All right.

5       (Debtor's Omnibus Reply to Plan Objections, Docket 1807,

6    is received into evidence.)

7       (Pause.)

8           MR. TAUBER:  Hi.  It's Marc Tauber.

9           THE COURT:  All right.

10          MR. MORRIS:  Excellent.

11          THE COURT:  Mr. Tauber, this is Judge Jernigan.  I

12   can hear you, but I can't see you.  Do you have a video --

13          MR. TAUBER:  Yeah, I don't know why it's not working.

14          THE COURT:  Hmm.

15          MR. TAUBER:  I'm on WebEx all day.  Usually it works

16   no problem.

17          THE COURT:  Okay.  Well, do you want to give it

18   another try or two?

19          MR. TAUBER:  Yeah.  It looks like it's starting to

20   come up.  It's all -- pictures, so --

21          THE COURT:  Okay.

22          MR. TAUBER:  -- hopefully you'll be able to see me in

23   a second.

24          THE COURT:  Okay.  The first thing I'm going to need

25   to do is swear you in, so we'll see if the video comes up here

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2468
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 536 of 1017   PageID 7249
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2467 of 2722

24

1    in a minute.

2           MR. TAUBER:  Okay.

3           THE COURT:  Can you see us, Mr. Tauber?

4           MR. TAUBER:  I can see four people.  The rest are

5    just names still.

6           THE COURT:  Okay.

7           MR. TAUBER:  I can go out and try to come back in, if

8    you think that's --

9           THE COURT:  I'm afraid of losing you.  So, your

10   audio, is it on your phone or is it on --

11          MR. TAUBER:  No.

12          THE COURT:  -- a computer?

13          MR. TAUBER:  On the computer.  Yeah.

14          THE COURT:  Okay.  So you're coming through loud and

15   clear on your computer.

16          MR. TAUBER:  Yeah.  Like I said, we use WebEx for

17   work, so I have them on all day long without any issues,

18   typically.

19          THE COURT:  Okay.

20      (Court confers with Clerk.)

21          THE COURT:  Okay.  Our court reporter thinks it's a

22   bandwidth issue on your end, so I don't --

23          MR. TAUBER:  There's only two of us here at home on

24   the line right now, so I don't know why.  It looks like it's

25   trying to come in, and then just keeps --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2469
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 537 of 1017   PageID 7250
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2468 of 2722

Tauber - Direct                    25

1          THE COURT:  I at least see your name on the screen

2    now, which I did not before.

3          MR. TAUBER:  Yeah.

4          THE COURT:  So hopefully we're going to -- ah.  We

5    got you.

6          MR. TAUBER:  There it is.

7          THE COURT:  All right.

8          MR. TAUBER:  Yeah.

9          MR. MORRIS:  There we go.

10          MR. TAUBER:  I might lose you, though.  Give me one

11   second, because I have a thing saying the WebEx meeting has

12   stopped working.  Let me close that.

13          THE COURT:  Okay.  We've still got you.  Please raise

14   your right hand.

15          MR. TAUBER:  Okay.

16              MARC TAUBER, DEBTOR'S WITNESS, SWORN

17          THE COURT:  All right.  Thank you.  Mr. Morris?

18          MR. MORRIS:  Thank you, Your Honor.

19                   DIRECT EXAMINATION

20   BY MR. MORRIS:

21   Q   Good morning, Mr. Tauber.

22   A   Good morning.

23   Q   I apologize for the delay in getting you the information.

24   Are you currently employed, sir?

25   A   Yes, sir.

```
                        Tauber - Direct                    26

 1   Q    By whom?

 2   A    Aon Financial Services.

 3   Q    And does Aon Financial Services provide insurance

 4   brokerage services among its services?

 5   A    Yes.

 6   Q    And what position do you currently hold?

 7   A    Vice president.

 8   Q    How long have you been a vice president at Aon?

 9   A    Since October of 2019.

10   Q    Can you just describe for the Court generally your

11   professional background?

12   A    Sure.  I spent about 20 years on Wall Street, working in a

13   variety of jobs, in research, trading, and as the COO of a

14   hedge fund.  And then in 2010 I switched to the insurance

15   world.  I was an underwriter for ten-plus years for Zurich and

16   QBE.  And then in 2019 switched to the brokering side for Aon.

17   Q    And what are your duties and responsibilities as a vice

18   president at Aon?

19   A    Well, we're responsible or my team and I are responsible

20   for creating bespoke insurance programs, focusing on D&O and

21   E&O insurance for our insureds.

22   Q    And what is, for the benefit of the record, what do you

23   mean by bespoke insurance program?

24   A    Well, each client is different, so the programs and the

25   policies that we put in place might be off-the-shelf policies,
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2471
Case 3:25-cv-02072-S    Document 15-9    Filed 06/25    Page 539 of 1017    PageID 7252
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2470 of 2722

Tauber - Direct                              27

1  but we endorse and amend them as needed to meet the needs of

2  the individual client.

3  Q    And during your work, both as an underwriter and now as a

4  broker, have you familiarized yourself with the market for D&O

5  and E&O insurance policies?

6  A    Yes.

7  Q    All right.  Let's talk about the early part of this case.

8  Did there come a time in early 2020 when Aon was asked to

9  place insurance on behalf of the board of Strand Advisors?

10  A    Yes.

11  Q    Can you describe for the Court how that came about?

12  A    Sure.  One of our account executives, a man by the name of

13  Jim O'Neill, had a relationship with a man named John Dubel,

14  who was one of the appointees to serve on -- as a member of

15  Strand, which was being appointed, as we understood it, to be

16  the general partner of Highland Capital Management by the

17  Bankruptcy Court.  And they -- we had done -- or, Jim and John

18  had a longstanding relationship.  I had actually underwritten

19  an account for a previous appointment of John's when I was an

20  underwriter, so I had some familiarity with John as well, and

21  actually brokered a subsequent deal for John at Aon.

22      So I had, again, some familiarity with John, and we were,

23  you know, tasked with going out and finding a program for

24  Strand.

25  Q    Can you describe what happened next?  How did you go about

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2472
Case 3:25-cv-02072-S    Document 15-9    Filed 06/13/25    Page 540 of 1017    PageID 7253
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2471 of
2722

Tauber - Direct                    28

1  accomplishing that task?

2  A    So, there are a number of markets or insurance companies

3  that provide management liability insurance, which this was a

4  management liability-type policy.  D&O is a synonym for

5  management liability, I guess you'd say.  And we approached

6  the, I think, 14 or 15 markets that we knew to provide

7  insurance in this space and that would be willing to buy the

8  type of policy we were seeking and have interest in a risk

9  like this, which had a little hair on it.  Obviously, there

10 was the Dondero involvement, as well as the bankruptcy.

11 Q    As part of that process, did you and your firm put

12 together a package of information for prospective interested

13 parties?

14 A    Yes.

15 Q    Can you describe for the Court what was contained in the

16 package?

17 A    Had the *C.V.s*, some relevant pleadings from the case,

18 court order.  I'd have to go back and look exactly.  But sort

19 of just general, you know, general information that was

20 available about the situation at hand and Strand's

21 appointment.

22 Q    And the court order that you just mentioned, is that the

23 one that had that gatekeeper provision in it?

24 A    Correct.

25 Q    And can you explain to the Court why you and your team

                        Tauber - Direct                    29

 1  decided to include the order with the gatekeeper provision in

 2  the package that you were delivering to prospective carriers?

 3  A    Sure.  In our initial conversations to discuss our

 4  engagement, the gatekeeper function was explained to us by

 5  John.  And I'm not sure who else was on the initial call.

 6  And, but it was explained to us that I guess Judge Jernigan

 7  would sit as the gatekeeper between any potential claimant

 8  against the insureds and, you know, would basically have to

 9  approve any claim that would be made against (indecipherable),

10  which would thereby prevent any frivolous claims from

11  happening.

12  Q    All right.  Let's just talk for a moment.  How did you and

13  your firm decide which underwriters to present the package to?

14  A    Again, you know, I -- my background, or my Wall Street

15  background, obviously, sort of made me have a -- it was very

16  unique for the insurance world when I switched over, so I had

17  sort of risen to a certain level of expertise within the

18  space.  And, you know, our team also is very experienced, and

19  decades of experience in the insurance world.  So we're very

20  familiar with the markets that are willing to provide these

21  types of policies and the markets that would be likely to take

22  a look at a risk such as this.

23  Q    Okay.  You mentioned that there was -- I think your words

24  were a little hair on this, and one of the things you

25  mentioned was bankruptcy.  How did the fact that Strand was

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2474
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 542 of 1017   PageID 7255
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2473 of 2722

Tauber - Direct                    30

1   the general partner of a debtor in bankruptcy impact your

2   ability to solicit D&O insurance?

3   A    Well, it's just not a plain vanilla situation, so people

4   are somewhat, you know, are -- I think -- so, the type of

5   insurance, D&O insurance, that we write is very different from

6   auto insurance, as an example.  Auto insurance, people expect

7   there to be a certain amount of claims, and they expect the

8   premiums to cover the claims plus the expenses and then

9   provide them a reasonable profit on top of that.

10       Our insurance is really much more by binary.  The

11  expectation for underwriters is that they will be completing

12  ignoring -- or, avoiding risk at all costs, wherever possible.

13  So anytime there is a situation that looks a little risky, so

14  the premium might be a little higher, the deductible might be

15  a little higher, but, again, the underwriters are really

16  making a bet that they will not have a claim.  Because the

17  premiums pale in comparison to the limits that are available

18  to the policyholder.

19  Q    And so --

20  A    So, -- I'm sorry.  What were you going to say?

21  Q    I didn't mean to interrupt.

22  A    Yeah.

23  Q    Have you finished your answer?

24  A    Sure.

25  Q    Okay.  So, were some of the 14 or 15 markets that you

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2475
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 543 of 1017 PageID 7256
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2474 of 2722

Tauber - Direct                          31

1  contacted reluctant to underwrite because there was a

2  bankruptcy ongoing?

3  A   Well, I think that probably -- I mean, there are certain

4  markets that we didn't go to in the beginning because they

5  would be very reluctant to write a risk that had that kind of

6  hair on it, based on our experience from dealing with them.

7  And, you know, I think the bankruptcy was certainly a little

8  bit of an issue.  And then, obviously, as people did their

9  research and -- or if they weren't already familiar with

10 Highland and got to know, you know, got -- I will just say for

11 a simple Google search and learned a little bit about Mr.

12 Dondero, I think there was definitely some significant

13 reluctance to write this program.

14 Q   Was the fact that the Debtor -- was the fact that the

15 Debtor is a partnership an issue that came up, in your -- in

16 your process?

17 A   There are certainly some carriers who won't write what's

18 known as general partnership liability insurance.  So, yes,

19 that is part of that.  It was part of the limiting factor in

20 terms of who we went to.

21 Q   Okay.  And, finally, you mentioned Mr. Dondero.  What role

22 did he play in your ability to obtain insurance for the Strand

23 board?

24 A   Well, that's a very significant role.  As, you know, as

25 mentioned, the underwriters are very risk-averse, so the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2476
Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/25    Page 544 of 1017    PageID 7257
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2475 of 2722

Tauber - Direct                              32

1  litigiousness of Mr. Dondero is a very strong red flag

2  prohibiting a number of people from writing the insurance at

3  all.  And the ones that were writing, that were willing to

4  provide options, were looking for protections from Mr.

5  Dondero.

6  Q    And what kind of protections were they looking for?

7  A    Well, the gatekeeper function was a key factor.  That was

8  really the only way we could even start a conversation with

9  any of the people that we were able to engage.  And in

10 addition, they wanted a, you know, sort of a belts and

11 suspenders additional protection of having an exclusion

12 preventing any litigation brought by or on behalf of Mr.

13 Dondero.

14 Q    Were you able to identify any carrier who was prepared to

15 underwrite D&O insurance for Strand without the gatekeeper

16 provision or without a Dondero exclusion?

17 A    We were not.

18 Q    Okay.  Let's fast-forward now.  Has your firm been

19 requested to obtain professional management insurance for the

20 contemplated post-confirmation debtor entities and individuals

21 associated with those entities?

22 A    Yes.

23 Q    Okay.  So let's just talk about the entities first, the

24 Claimant Trust and the Litigation Trust.  In response to that

25 request, have you and your team gone out into the marketplace

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 2477
Case 3:25-cv-02072-S  Document 15-9  Filed 06/25  Page 545 of 1017  PageID 7258
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 2476 of
2722

```
                            Tauber - Direct                    33
```

1  to try to find an underwriter willing to underwrite a policy

2  for those entities?

3  A    Yes.

4  Q    And have you been able to find any carrier who's willing

5  to provide coverage for the Claimant Trust and the Litigation

6  Trust?

7  A    Yes.

8  Q    And how many -- how many have expressed a willingness to

9  do that?

10  A    Two.

11  Q    And have those two carriers indicated that there would be

12  conditions to coverage for the entities?

13  A    Both will require a -- the continuation of the gatekeeper

14  function, as well as a Dondero exclusion.

15  Q    Okay.  Have you also been tasked with the responsibility

16  of trying to find coverage for the individuals associated with

17  the Claimant Trust and the Litigation Trust, meaning the

18  Claimant Trustee, the Litigation Trustee, and the Oversight

19  Board?

20  A    Yes.  So we did it concurrently.

21  Q    Okay.  So, are the two firms that you just mentioned

22  willing to provide insurance for the individuals as well as

23  the entities?

24  A    Correct.  With the same stipulations.

25  Q    They require -- they both require the gatekeeper and the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2478
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 546 of 1017   PageID 7259
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2477 of 2722

Tauber - Direct                              34

1   Dondero exclusion?

2   A    That's correct.

3   Q    Is there any other firm who has indicated a willingness to

4   consider providing D&O insurance for the individuals?

5   A    There is one that is willing to do so, as long as the

6   gatekeeper function remains in place.  They have indicated

7   that if the gatekeeper function was to be removed, that they

8   would then add a Dondero exclusion to their coverage.

9   Q    So is there any insurance carrier that you're aware of who

10  is prepared to insure either the individuals or the entities

11  without a gatekeeper provision?

12  A    No.

13  Q    And that last company, I just want to make sure the record

14  is clear:  If the gatekeeper provision is overturned on appeal

15  or is otherwise not effective, do you have an understanding as

16  to what happens to the insurance coverage?

17  A    They will either add an exclusion for any claims brought

18  by or on behalf of Mr. Dondero or cancel the coverage

19  altogether.

20        MR. MORRIS:  I have no further questions, Your Honor.

21        THE COURT:  All right.  Cross of this witness?

22                    CROSS-EXAMINATION

23  BY MR. RUKAVINA:

24  Q    Mr. Tauber, I'm a little confused.  So, the insurance

25  that's being written now for the post-bankruptcy entities, did

```
                         Tauber - Cross                    35
```

 1   I hear you say that there is one carrier that would give that

 2   insurance subject to having a Dondero exclusion?

 3   A   So, first of all, there's nothing currently being written.

 4   We have solicited quotes.  So, just to make sure that that --

 5   I want to make sure that's clear.

 6      We have three carriers that are willing to provide varying

 7   levels of coverage.  All three will only do so with the

 8   existence of the gatekeeper function continuing to be in

 9   place.  One of the three has -- two of those three will also

10   provide the coverage with -- even with the gatekeeper function

11   and the Dondero exclusion.  The third one was not requiring a

12   Dondero exclusion unless the gatekeeper function goes away.

13   Q   Okay.  So the third one, you believe, will, whatever the

14   term is, write the insurance or provide the coverage without a

15   gatekeeper, as long as there is a strong Dondero exclusion?

16   A   No.  Their initial requirement is that the gatekeeper

17   function remains in place.  That is their preferred option.

18   If the gatekeeper function is removed, then they will add a

19   Dondero exclusion in place of the gatekeeper exclusion.  In

20   addition, that carrier is only willing to provide coverage for

21   the individuals, not for the entities.

22   Q   Okay.  Thank you.

23            MR. RUKAVINA:  I'll pass the witness, Your Honor.

24            THE COURT:  All right.  Other cross?

25            MR. TAYLOR:  Clay Taylor on behalf of Mr. Dondero.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2480
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 548 of 1017   PageID 7261
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2479 of
2722

Tauber - Cross                         36

1           THE COURT:  Okay.

2                       CROSS-EXAMINATION

3   BY MR. TAYLOR:

4   Q    Good morning, Mr. Tauber.

5   A    Good morning.

6   Q    Are you generally familiar with placing D&O insurance at

7   distressed debt level private equity firms?

8   A    I am familiar with it probably more from the underwriting

9   side, and I also worked at a fund that was distressed and had

10  to be liquidated, so I -- as the COO, so I have a fair amount

11  of familiarity, yes.

12  Q    Okay.  Before taking this to market for the first time for

13  the pre-confirmation policies that you have in place, did your

14  firm conduct any due diligence or analysis of comparing the

15  amount of litigation the Highland entities and Mr. Dondero

16  were involved in as compared to other comparable firms in the

17  marketplace?  Say, you know, Apollo, Fortress, Cerberus, other

18  similar market participants?

19  A    Well, it wouldn't really be our role as the broker.

20  That's the role of the underwriter.

21  Q    Are you familiar if any of the underwriters undertook any

22  such analysis?

23  A    I would assume that they did, since they all had concerns

24  about Mr. Dondero almost immediately.

25  Q    Do you have any -- you didn't conduct any personal due

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2481
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 549 of 1017   PageID 7262
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2480 of
2722

Tauber - Cross                          37

1   diligence on comparing the amount of litigation that the

2   Highland entities were involved in as compared to, say,

3   Fortress, do you?

4   A    Well, again, that wouldn't really be my role as the

5   broker.  But I will say that I used to write the primary

6   insurance for Fortress Investment Group when I was at Zurich.

7   So I'm extremely familiar with Fortress, to use your example,

8   and I would say that the level of litigation at Fortress was

9   much, just out of personal knowledge, was significantly less

10  than I had encountered or than I had read about at Highland.

11  Q    That you have read about?  Is that based upon a number of

12  cases where Fortress was a plaintiff as compared to Highland

13  was a plaintiff?  Over what time period?

14  A    Again, not my role.  Not something that I've done.  I'm

15  just generally familiar with Fortress and I'm generally

16  familiar with Highland.

17  Q    All right.  So you're generally familiar and you say that

18  -- you're telling me and this Court that Fortress is involved

19  in less litigation.  Could you quantify that for me, please?

20  A    No, but it's really irrelevant to the situation at hand.

21  The issue is not my feelings whatsoever.  The issue is the

22  underwriters' feelings and their concern with Mr. Dondero, not

23  mine or anybody else's.

24  Q    So, I appreciate your answer and thank you for that, but I

25  believe the question that was before you is, have you

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2482
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 550 of 1017   PageID 7263
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2481 of 2722

Tauber - Cross                    38

1   quantitatively -- do you have any quantitative analysis by

2   which you can back up the statement that Fortress is less

3   litigious than Highland?

4   A    I wouldn't even try, no.

5   Q    Okay.  Do you have any quantitative analysis for -- that

6   Cerberus is any less litigious than Highland?

7   A    I don't have any real knowledge of Cerberus's

8   litigiousness.

9   Q    Same question as to Apollo.

10  A    Again, the Fortress, you just happened to mention

11  Fortress, which was a special case because I used to be their

12  primary underwriter.  I don't have any specific -- I'm not a

13  claims attorney.  I don't have any specific knowledge of the

14  level of litigiousness.

15       And, again, it's not up to me, my decision.  It's the

16  underwriters' decision of whether or not they're willing to

17  write the coverage, not mine.

18  Q    You mentioned that the -- when you took this out to

19  market, it had a little hair on it.  Correct?

20  A    Correct.

21  Q    And you put together a package of materials that you sent

22  out to 14 or 15 market participants; is -- did I get that

23  correct?

24  A    Yes.

25  Q    And in that package, you had certain pleadings, including

Tauber - Cross                    39

1  the court order, correct?

2  A    Yes.  I believe that's correct.

3  Q    And that was after your initial conversation with John and

4  -- where he pointed out the gatekeeper role.  Correct?

5  A    Correct.

6  Q    And so when you went out to market, presumably you

7  highlighted the gatekeeper role to all the people you

8  solicited offers from because you thought it included less

9  risk, correct?

10  A    It offered a level of protection that was not -- that's

11  not common.  So it's, yes, it's a huge selling point for the

12  risk.

13  Q    Okay.  So, to be clear, you never went out to the market

14  to even see if you could get underwriting the first time

15  without the gatekeeper function; is that correct?

16  A    Well, it's my job as a broker to present the risk in the

17  best possible light.  So if we have a fact that makes the risk

18  a better write for the underwriters, we, of course, will

19  highlight it.  So, no, I did not do that.

20  Q    Okay.  So, the quick answer to the question is no, you did

21  not go out and solicit any bids without the gatekeeper

22  function?

23  A    Correct.

24  Q    When you have approached the market for the post-

25  confirmation potential coverage, did you approach the same 14

APP. 2479

Appx. 02526

006469

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2484
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 552 of 1017 PageID 7265
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2483 of 2722

Tauber - Cross                          40

1    or 15 parties that you did before?

2    A    I don't have the two lists in front of me.  They would

3    have been vastly similar, yes.

4    Q    Okay.  And so, again, all of the 14 or 15 parties or the

5    lists that you solicited were already familiar with the

6    gatekeeper function, correct?

7    A    Yes.

8    Q    And so therefore they already had that right; they're not

9    going to trade against themselves and therefore say that,

10   without it, we'll go ahead and write coverage.  Correct?

11   A    I -- I -- it'd be hard to answer that question.  I don't

12   know.

13   Q    Okay.  Because you didn't try that, did you?

14   A    I would have had no reason to, no.

15   Q    Okay.  So you don't know if a market exists without the

16   gatekeeper function because you haven't asked, have you?

17   A    I guess that's fair, yeah.

18          MR. TAYLOR:  I have no further questions.

19          THE COURT:  All right.  Any other Objectors with

20   cross-examination?

21          MR. DRAPER:  I have no questions for the witness,

22   Your Honor.

23          THE COURT:  All right.  Anyone else?  Mr. Morris,

24   redirect?

25          MR. MORRIS:  Just one.

Tauber - Redirect                    41

1                     REDIRECT EXAMINATION

2  BY MR. MORRIS:

3  Q    One question, Mr. Tauber.  Is there any -- do all

4  underwriters -- any underwriters for Fortress require, as a

5  condition to underwriting the D&O insurance, require a

6  gatekeeping provision?

7  A    In my, you know, 11, 12 years of experience in this

8  industry, in this space, I have never seen that gatekeeper

9  function be available, as an underwriter or as a broker.  So,

10  no.

11           MR. MORRIS:  No further questions, Your Honor.

12           THE COURT:  Any recross on that redirect?

13      All right.  Well, Mr. Tauber, you are excused.  We thank

14  you for your testimony today.  So you can log off.

15           THE WITNESS:  Thank you.

16           THE COURT:  Okay.

17       (The witness is excused.)

18           THE COURT:  Mr. Morris, does the Debtor rest?

19           MR. MORRIS:  The Debtor does rest, Your Honor.

20           THE COURT:  All right.  Well, what are we going to

21  have from the Objectors as far as evidence?

22           MR. RUKAVINA:  Your Honor, I will be very short.  I

23  will call Mr. Seery for less than ten minutes.  I will call

24  Mr. Post for less than ten minutes.  I will have one exhibit.

25  And I think that that's it for all the Objectors, unless I'm

42

1   mistaken, gentlemen.

2           MR. TAYLOR:  Your Honor, I had one witness, Mr.

3   Sevilla, under subpoena to testify, and needed a brief moment

4   to discuss with my colleagues whether we're going to call him,

5   and if so, put him on notice that he would be coming up

6   probably about -- I don't know your schedule, Your Honor, but

7   probably, I'm guessing, either before lunch or after, and I

8   need to let him know that also.

9       So I do need a brief three to five minutes to confer with

10  my colleagues and some direction from the Court to, if we

11  decide to call him, as to when we would tell him to be

12  available.

13          THE COURT:  All right.  Well, before I get to that,

14  Mr. Draper, do you have any witnesses?

15          MR. DRAPER:  I do not.

16          THE COURT:  All right.  Well, let's see.  It's 10:34.

17  We're making good time this morning.  If Seery is truly ten

18  minutes of direct, and Post is truly ten minutes of direct,

19  and I don't know how long the documentary exhibits are going

20  to take, it sounds to me like we are very likely to get to Mr.

21  Sevilla before a lunch break.

22      So if you want to -- you know, I don't know what that

23  involves, you sending text messages or making a quick phone

24  call.  Do you need a five-minute break for that?

25          MR. TAYLOR:  Yes, Your Honor.  It involves a phone

43

1   call and an email.  Just a confirmatory phone call just to

2   make sure that the guy -- just so you know who he is, he is

3   actually a Highland employee, but he's represented by separate

4   counsel, and so we do need to go through him just because

5   that's the right thing to do.

6         THE COURT:  All right.  Well, again, I mean, I never

7   know how long cross is going to take, but I'm guessing, you

8   know, we're going to get to him in an hour or so, if not

9   sooner, it sounds like.  So, all right.  So, do we need a

10  five-minute break?

11        MR. RUKAVINA:  And Your Honor, it might make more

12  sense to make it a ten-minute break.  I suspect that Mr.

13  Taylor will be able to release his witness if he and I will

14  just be able to talk.  So I would ask the Court's indulgence

15  for a ten-minuter.

16        THE COURT:  Okay.  We'll take a ten-minute break.

17  We'll come back at 10:46 Central time.

18        THE CLERK:  All rise.

19     (A recess ensued from 10:36 a.m. until 10:46 a.m.)

20        THE CLERK:  All rise.

21        THE COURT:  Please be seated.  We're going back on

22  the record in the Highland confirmation hearing.  Are the

23  Objectors ready to proceed?

24        MR. RUKAVINA:  Your Honor, Davor Rukavina.  We are.

25        THE COURT:  All right.  Well, Mr. Rukavina, are you

44

1    going to call your witnesses first?

2           MR. RUKAVINA:  Yes, I will.  Before that, if it might

3    help the Court and Mr. Morris:  Mr. Morris, with respect to

4    that last exhibit, I do not object to the admission of any of

5    the exhibits that were admitted at that PI hearing.

6        But I do think, Your Honor, for the record, that -- and I

7    would ask Mr. Morris that he should refile those exhibits here

8    in this case, except for those that are duplicative.  Because,

9    again, there's 10,000 pages of indentures, et cetera.

10          MR. MORRIS:  Thank you very much, sir.

11       Your Honor, if that's acceptable to you, we'll do that as

12   soon as possible.

13          THE COURT:  All right.  And let me make sure the

14   record is clear.  Are we talking about what you've described

15   as 7O?  I'm getting mixed up now.  Am I --

16          MR. MORRIS:  Yes, Your Honor.

17          THE COURT:  Okay.

18          MR. MORRIS:  It's 7O, which is the documents that

19   were introduced into evidence in the prior hearing.  And Mr.

20   Rukavina is exactly right, that there is substantial overlap

21   between that and other documents that have already been

22   admitted in the record in this case.  So we'll just file an

23   abridged version of Exhibit O that only includes non-

24   duplicative documents.

25          THE COURT:  All right.  So that will be admitted, and

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2489
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 557 of 1017   PageID 7270
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2488 of
2722

Seery - Direct                          45

1    we'll look for your filed abridged version to show up on the

2    docket.  7O.

3        (Debtor's Exhibit 7O is received into evidence as

4    specified.)

5            THE COURT:  All right.  What's next?

6            MR. RUKAVINA:  Your Honor, Jim Seery, please.  Mr.

7    James Seery.

8            THE COURT:  All right.  Mr. Seery, welcome back.

9    Please raise your right hand.

10           MR. SEERY:  Can you -- can you hear me, Your Honor?

11           THE COURT:  I can now.

12     JAMES P. SEERY, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

13           THE COURT:  All right.  Thank you.

14       Mr. Rukavina, go ahead.

15                    DIRECT EXAMINATION

16   BY MR. RUKAVINA:

17   Q   Mr. Seery, --

18           MR. RUKAVINA:  Thank you.

19   BY MR. RUKAVINA:

20   Q   Mr. Seery, good morning.

21           MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

22   the schedules.

23       What we have here, Your Honor, is Docket 247, the Debtor's

24   schedules.  I'd ask the Court to take judicial notice of it.

25           THE COURT:  All right.  The Court will do so.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2490
Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/06/25    Page 558 of 1017    PageID 7271
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2489 of 2722

Seery - Direct                          46

1  BY MR. RUKAVINA:

2  Q    Mr. Seery, are you familiar with these entities listed

3  here on the Debtor's schedules?

4  A    Generally.  Each one a little bit different.

5  Q    Okay.  Do you agree that the Debtor still owns equity

6  interests in these entities?

7  A    I believe it does, yes.

8  Q    Okay.  Is it true that none of these entities are publicly

9  traded?

10  A    I don't believe any of these are publicly-traded entities,

11  no.

12  Q    Okay.  And none of these, to your knowledge, are debtors

13  in this bankruptcy case, right?

14  A    No.  We only have one debtor in the case.

15  Q    Okay.  So, Highland Select Equity Fund, LP, the Debtor

16  owns more than 20 percent of the equity in that entity, right?

17  A    I believe the Debtor owns the majority of that entity.

18  That is a fund with an on- and offshore feeder.  And I, off

19  the top of my head, don't recall exactly how the allocations

20  of equity work.  But I believe we do.

21  Q    Does 67 percent refresh your memory?  Are you prepared to

22  say that the Debtor owns 67 percent of that equity?

23  A    I'm not prepared to say that, no.

24  Q    Okay.  Wright, Ltd.  Does the Debtor own more than 20

25  percent of that equity?

Seery - Direct                          47

1  A    There's about -- I don't recall.  There's about at least

2  25 artist, designers, or designs.  Wright, AMES, Hockney,

3  Rothco, all own in different places, and they all own in turn

4  some other thing.  So I don't know what each of them, off the

5  top of my head, own.  There's -- they're part of a myriad of

6  corporate structures here.

7  Q    Strak, Ltd.  Do you know whether the Debtor owns more than

8  20 percent of the equity of that entity?

9  A    Stark?  I don't know.

10 Q    Okay.  I don't know how to pronounce the next one.  Eamis

11 (phonetic) Ltd.  Do you know whether the Debtor owns more than

12 20 percent of that equity?

13 A    Off the top of my head, I don't recall.

14 Q    What about Maple Avenue Holdings, LLC?

15 A    I believe, I don't know if it's directly or indirectly,

16 that we own a hundred percent of that entity.  But I'm not

17 sure.

18 Q    What about Highland Capital Management Korea, Ltd.?

19 A    Effectively, Highland Capital Management is owned a

20 hundred percent.

21 Q    What about Highland Capital Management Singapore Pte.

22 Ltd.?

23 A    We are in the process of shutting it down, so I don't know

24 that -- what the equity percentages are.  It's really just a

25 question -- it's -- it's dissolved save for a signature from a

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2492
Case 3:25-cv-02072-S    Document 15-9    Filed 06/25    Page 560 of 1017    PageID 7273
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2491 of 2722

Seery - Direct                          48

1   Singaporean.

2   Q   Okay.  But did the Debtor own more than 20 percent of that

3   entity?

4   A   I don't know the specific allocations of equity ownership.

5   Q   Okay.  What about Pennant (phonetic) Management, LP?  Do

6   you know whether the Debtor owns or owned more than 20 percent

7   of that entity?

8   A   I don't recall, no.

9        MR. RUKAVINA:  You can take that exhibit down, Mr.

10  Vasek.

11  BY MR. RUKAVINA:

12  Q   Mr. Seery, very quick, are you familiar with Bankruptcy

13  Rule 2015.3?

14  A   I am, yes.

15  Q   Okay.  Has the Debtor filed any Rule 2015.3 statements in

16  this case?

17  A   I don't believe we have.

18  Q   Okay.

19       MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

20  witness.

21       THE COURT:  All right.  Any other Objector

22  questioning?  None from Mr. Taylor, none from Mr. Draper, none

23  from Ms. Drawhorn?

24       All right.  Any cross -- any examination from you, Mr.

25  Morris?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2493
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 561 of 1017   PageID 7274
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2492 of
2722

Seery - Cross                        49

1          MR. MORRIS:  Just one question.

2          THE COURT:  Go ahead.

3                    CROSS-EXAMINATION

4   BY MR. MORRIS:

5   Q    Mr. Seery, do you know why the Debtor has not yet filed

6   the 2015.3 statement?

7   A    I have a recollection of it, yes.

8   Q    Can you just describe that for the Court?

9   A    When we -- when we initially filed, when the Debtor filed

10  and it was transferred over, we started trying to get all the

11  various rules completed.  There are, as the Court is aware, at

12  least a thousand and maybe more, more like three thousand,

13  entities in the total corporate structure.

14      We pushed our internal counsel to try to get that done,

15  and were never able to really get it completed.  We did not

16  have -- we were told we didn't have separate consolidating

17  statements for every entity, and it would be difficult.  And

18  just in the rush of things that happened from the first

19  quarter into the COVID into the year, we just didn't complete

20  that filing.  There was no reason for it other than we didn't

21  get it done initially and I think it fell through the cracks.

22          MR. MORRIS:  Nothing further, Your Honor.

23          THE COURT:  All right.  Anything further, Mr.

24  Rukavina?

25                    REDIRECT EXAMINATION

Seery - Redirect                          50

1   BY MR. RUKAVINA:

2   Q   Mr. Seery, I appreciate that answer.  But you never sought

3   leave from the Bankruptcy Court to postpone the deadlines for

4   filing 2015.3, did you?

5   A   No.  If it hadn't fallen through the cracks, it would have

6   been something we recalled and we would have done something

7   with it.  But, frankly, it just fell off the -- through the

8   cracks.  We didn't deal with it.

9   Q   Okay.

10        MR. RUKAVINA:  Thank you, Your Honor.  Thank you, Mr.

11  Seery.

12        THE COURT:  All right.  Any other Objector

13  examination?

14     Mr. Morris, anything further on that point?

15        MR. MORRIS:  No, thank you, Your Honor.  No further

16  questions.

17        THE COURT:  All right.  Mr. Seery, thank you.  You're

18  excused once again from the witness stand.

19     (The witness is excused.)

20        THE COURT:  Your next witness?

21        MR. SEERY:  Thank you, Your Honor.

22        THE COURT:  Uh-huh.

23        MR. RUKAVINA:  Your Honor, I'll call Jason Post.  Mr.

24  Post, if you're listening, which I believe you are, if you'll

25  please activate your camera.

```
                        Post - Direct                    51
```

```
  1            THE COURT:  Mr. Post, we do not see or hear you yet.

  2            MR. RUKAVINA:  Talk, Mr. Post, and I think it'll

  3    focus on you.

  4            MR. POST:  Yes.  Can you hear me now?

  5            THE COURT:  We can hear you.  We cannot see you yet.

  6    Could you say, "Testing, one, two; testing, one, two"?

  7            MR. POST:  Testing, one, two.  Testing, one, two.

  8            THE COURT:  There you are.  Okay.  Please raise your

  9    right hand.

 10       JASON POST, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

 11            THE COURT:  All right.  Thank you.  You may proceed.

 12                       DIRECT EXAMINATION

 13    BY MR. RUKAVINA:

 14    Q   Mr. Post, good morning.  State your name for the record,

 15    please.

 16    A   Robert Jason Post.

 17    Q   How are you employed?

 18    A   I'm employed by NexPoint Advisors, LP.

 19    Q   What is your title?

 20    A   Chief compliance officer.

 21    Q   Were you ever employed by the Debtor here?

 22    A   Yes.

 23    Q   Between when and when?  Approximately?

 24    A   I believe it was July of '08 through October of 2020.

 25    Q   What was your last title while you were employed at the
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2496
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 564 of 1017   PageID 7277
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2495 of 2722

Post - Direct                          52

1  Debtor?

2  A    Still chief compliance officer.  For the retail funds.

3  Q    Okay.  Very, very quickly, what does a chief compliance

4  officer do?  Or what do you do?

5  A    It's multiple things.  Interaction with the regulators.

6  Adherence to prospectus and SAI limitations for the funds.

7  And then establishment of written policies and procedures to

8  prevent and detect violations of the federal securities laws

9  and then testing those on a frequent basis.

10 Q    And I believe you mentioned you're the CCO for NexPoint

11 Advisors and Highland Capital Management Fund Advisors.  Are

12 you also the CCO for any funds that they advise?

13 A    Yes.  For all the funds that they advise.

14 Q    Okay.  Does that include so-called retail funds?

15 A    Yes.  They're all retail funds.

16 Q    What is a retail fund?

17 A    It typically constitutes funds that are subject to the

18 Investment Company Act of 1940, such as open-end mutual funds,

19 closed-end funds, ETFs.

20 Q    Obviously, you know who my clients are.  Are any of my

21 clients so-called retail funds that you just described?

22 A    Yes.

23 Q    Name them, please.

24 A    You've got NexPoint Capital, Inc., Highland Income Fund,

25 and NexPoint Strategic Opportunities Fund.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2497
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 565 of 1017   PageID 7278
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2496 of 2722

Post - Direct                              53

1    Q   Do those three retails funds hold any voting preference

2    shares in the CLOs that the Debtor manages?

3    A   Yes.

4            MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

5    Exhibit 2.

6        Your Honor, I believe I have a stipulation with Mr. Morris

7    that this exhibit can be admitted, so I'll move for its

8    admission.

9            MR. MORRIS:  No objection, Your Honor.

10           THE COURT:  All right.  Exhibit 2 will be admitted.

11   And let's be clear.  That appears at -- is it Docket No. --

12   let's see.  Is it 1673 that you have your -- no, no, no, no.

13   1670?  Is that where your exhibits are?

14           MR. RUKAVINA:  No, Your Honor.  It's 1863.  I think

15   we did an amended one because we numbered our exhibits instead

16   of having seventeen Os and Ps.  So it's 1863.

17           THE COURT:  1863?  Okay.  All right.  There it is.

18   Okay.  Again, this is -- I'm sorry.  I got sidetracked.  What

19   exhibit?  It's Exhibit 2, is admitted.  Okay.

20           MR. RUKAVINA:  Thank you, Your Honor.

21       (Certain Funds and Advisors' Exhibit 2 is received into

22   evidence.)

23   BY MR. RUKAVINA:

24   Q   Real quick, Mr. Seery.  What do these HIF, NSOF, NC, what

25   do they stand for?  Do they stand for the retail funds you

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2498
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 566 of 1017 PageID 7279
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2497 of 2722

Post - Direct                            54

1    just named?

2          MR. SEERY:  I don't think he meant me.

3          THE WITNESS:  Yeah.

4    BY MR. RUKAVINA:

5    Q    I'm sorry, Mr. Post.  I didn't hear you.

6    A    You addressed me as Mr. Seery.

7    Q    Oh.  I apologize.  What do those initials stand for?

8    A    The names of the funds that I mentioned.

9    Q    Okay.  And what do these percentages show?

10   A    The percentages show the amount of shares outstanding and

11   the preference shares that each of the respective funds hold

12   of the named CLOs.

13   Q    And those CLOs on the left there, those are the CLOs that

14   the Debtor manages pursuant to agreements, correct?

15   A    Yes.  Those are some of them, correct.

16   Q    Yes.  The ones that the retail funds you mentioned have

17   interests in, correct?

18   A    Correct.

19   Q    And what does the far-right column summarize or show?

20   A    That would be the aggregate across the three retail funds.

21   Q    In each of those CLOs?

22   A    Correct.

23   Q    Thank you.

24         MR. RUKAVINA:  Mr. Vasek, you may pull this down.

25   BY MR. RUKAVINA:

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2499
Case 3:25-cv-02072-S    Document 15-9   Filed 06/25   Page 567 of 1017   PageID 7280
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2498 of 2722

Post - Direct                        55

1   Q    Mr. Post, in the aggregate, how much do those three retail

2   funds have invested in those CLOs, ballpark?

3   A    I believe it's approximately $130 million, give or take.

4   Q    Is it closer to 140 or 130?

5   A    A hundred -- I think it's 140, actually.

6   Q    Okay.  Thank you.  Who controls those three retail funds?

7   A    Ultimately, the board --

8   Q    And what --

9   A    -- of the funds.

10  Q    What is -- what do you mean by the board?  Do they have

11  independent boards?

12  A    Yes.  They have a majority independent board, the funds

13  do.

14  Q    Do you report to that board?

15  A    Yes.

16  Q    Does Mr. Dondero sit on those boards?

17  A    He does not.

18  Q    Okay.

19       MR. RUKAVINA:  I'll pass the witness, Your Honor.

20  Thank you, Mr. Post.

21       THE COURT:  All right.  Any other Objector

22  examination of Mr. Post?

23     All right.  Mr. Morris, do you have cross?

24       MR. MORRIS:  Yes, Your Honor, I do.

25       THE COURT:  Okay.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2500
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 568 of 1017   PageID 7281
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2499 of
2722

Post - Cross                          56

1               CROSS-EXAMINATION

2   BY MR. MORRIS:

3   Q    Mr. Post, can you hear me okay, sir?

4   A    Yes, I can hear you.

5   Q    Okay.  Nice to see you again.  When did you first join

6   Highland?

7   A    I believe it was July of '08.

8   Q    So you've worked with the Highland family of companies for

9   about a dozen years now; is that right?

10  A    Yes.

11  Q    And you were actually employed by the Debtor from 2008

12  until October 2020; is that right?

13  A    Correct.

14  Q    And you left at that time and went to join Mr. Dondero as

15  the chief compliance office of the Advisors; do I have that

16  right?

17  A    Yes.  I transitioned to NexPoint Advisors shortly, I

18  believe, after Mr. Dondero left, but I was already the named

19  CCO for that entity.

20  Q    Right, but your employment status changed from being an

21  employee of the Debtor to being an employee of NexPoint; is

22  that right?

23  A    Correct.

24  Q    And that happened shortly after Mr. Dondero resigned from

25  the Debtor and went to NexPoint Advisors, correct?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2501
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 569 of 1017   PageID 7282
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2500 of 2722

Post - Cross                          57

1    A    Correct.

2    Q    Okay.  You mentioned that the funds are controlled by

3    independent boards; do I have that right?

4    A    It's a majority independent board, correct.

5    Q    Okay.  There's no independent board member testifying in

6    this hearing, is there?

7    A    I --

8         MR. RUKAVINA:  Your Honor, Mr. Post wouldn't know

9    that, but I'll stipulate to that as a fact.

10        THE COURT:  All right.

11        MR. MORRIS:  Okay.

12   BY MR. MORRIS:

13   Q    Did you -- do you speak with the board members from time

14   to time?

15   A    Yes.

16   Q    Did you tell them that it might be best if they came and

17   identified themselves and helped persuade the Court that they

18   were, in fact, independent?

19   A    They have counsel to assist them with that determination.

20   I never mentioned anything along those line to them.

21   Q    Okay.  Can you tell me who the board members are?

22   A    Yes.  Ethan Powell, Bryan Ward, Dr. Bob Froehlich, John

23   Honis, and then Ed Constantino.  He is only a board member,

24   though, for NSOF.  NexPoint Strategic Opportunities Fund.

25   Q    All right.  Mr. Honis, is he -- has he been determined to

Post - Cross                           58

```
 1   be an interested director, for purposes of the securities
 2   laws?
 3   A    Yes.
 4   Q    Okay.  Mr. Froeh..., do you know much about his
 5   background?
 6   A    I believe he worked at Deutsche Bank and a couple of the
 7   other -- or maybe a couple of other investment firms in the
 8   past.  And he also owns a minor league baseball team.
 9   Q    Do you know how long he served as a director of the funds?
10   A    I don't know, approximately.  I think maybe seven -- six,
11   seven years.
12   Q    Okay.  How about Mr. Ward?  Did Mr. Froehlich ever work
13   for Highland?
14   A    Not that I can recall.
15   Q    Did Mr. Ward ever work for Highland?
16   A    Not that I can recall.
17   Q    Do you recall how long he's been serving as a director of
18   the funds?
19   A    Mr. Ward?
20   Q    Yes.
21   A    I believe -- I'd be -- I don't recall specifically.  I
22   think it's been, you know, 10 to 12 years, give or take.
23   Q    He was a director when you got to Highland; isn't that
24   right?
25   A    He was on the board of directors.
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2503
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/06/25   Page 571 of 1017   PageID 7284
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2502 of 2722

```
                          Post - Cross                         59
```

1   Q    Yeah.  So fair to say that Mr. Ward has been a director

2   since at least the mid to late oughts?  2005 to 2008?

3   A    I'm sorry, you cut out.  Late what?

4   Q    The late oughts.  Withdrawn.  Is it fair to say that Mr.

5   Ward's been a director of the funds since somewhere between

6   2005 and 2008?

7   A    Again, I don't recall specifically.  You know, I joined

8   the complex, the retail complex as the named CCO in 2015, and

9   he had been serving in that role prior to that, and I believe

10  it was for probably a period of five to seven years, so that

11  sounds in line.

12  Q    Did you have a chance to review Dustin Norris's testimony

13  from the December 16th hearing?

14  A    I did not.

15  Q    Do you know -- are you aware that he testified at some

16  length regarding the relationship of each of these directors

17  to Mr. Dondero and Highland?

18  A    I didn't review anything, so I don't know what he said or

19  how long it took.

20  Q    Do you know if Mr. Powell's ever worked for Highland?

21  A    He has.

22  Q    Do you know in what capacity and during what time periods?

23  A    He was -- I think his last title was -- I believe was

24  chief product strategist, I believe.  And he was also the

25  named PM for one of -- or, a suite of ETF funds.  I think he

Post - Cross                          60

1  was last employed maybe --from my recollection, 2014,

2  possibly.  Or 2015.  Somewhere around in there.

3  Q   Okay.  And to the best of your knowledge, did Mr. Dondero

4  appoint Mr. Powell to be the chief product strategist?

5  A   I don't -- I don't know.  I wasn't involved in the

6  decision for his appointment.  I don't know how he attained

7  that role.

8  Q   To the best of your knowledge, did Mr. Dondero appoint Mr.

9  Powell as the PM of the ETF funds?

10 A   Again, I wasn't involved in that determination, but he

11 probably would have had a role in making the determination on

12 who was the PM, along with probably some other investment

13 professionals.

14 Q   Okay.  And did Mr. Powell join the board of the funds

15 before or after he left Highland around 2015?

16 A   I can't recall specifically if he was already on the board

17 or was an interested member, but I believe he, you know, I

18 believe he joined shortly after he left.

19 Q   Okay.  So he went from being an employee and being a

20 portfolio manager at Highland to being on the board of these

21 funds.  Do I have that right?

22 A   Again, I can't recall specifically.  He may have already

23 been on the board as an interested board member.  But, you

24 know, I believe, you know, if that wasn't the case, he would

25 have joined the board shortly after leaving.

Post - Cross                    61

1   Q    And Mr. Ward, I think you said, has been on the funds'

2   board since somewhere between 2005 and 2008.  Does that sound

3   right?

4   A    I think that was a time frame you referenced, and I think

5   that was kind of in line, walking it back.  But I don't recall

6   specifically when he joined.

7   Q    And to the best of your knowledge, have the Advisors for

8   which you serve as the chief compliance officer managed the

9   Funds for which Mr. Ward has served as a director since the

10  time he became a director?

11  A    I'm sorry.  Can you repeat the question?

12  Q    Yeah.  I'm just trying to understand if the advisors --

13  withdrawn.  The Advisors manage the Funds; do I have that

14  right?

15  A    They provide investment advice on behalf of the Funds.

16  Q    And they do that pursuant to written agreements; do I have

17  that right?

18  A    Correct.

19  Q    And is it your understanding that, for the entire time

20  that Mr. Ward has served as a member of the board of the

21  Funds, the Advisors have provided the investment advice to

22  each of those Funds?

23  A    Yes, in one form or fashion.  I believe at one period in

24  time, historically, the Advisor may have changed its name, but

25  it would have been, you know, at the end of the day, one or

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2506
Case 3:25-cv-02072-S    Document 15-9    Filed 06/13/25    Page 574 of 1017    PageID 7287
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2505 of 2722

Post - Cross                                 62

1    more -- one of either NexPoint Advisors or Highland Capital

2    Management Fund Advisors would have advised those Funds.

3    Q    Is it fair to say that each of the Advisors for which you

4    serve as the chief compliance officer has always been managed

5    by an Advisor owned and controlled by Mr. Dondero?

6    A    I believe so, yes.

7            MR. MORRIS:  I have no further questions, Your Honor.

8            THE COURT:  All right.  Any redirect?

9            MR. RUKAVINA:  Yes.

10           THE COURT:  Okay.  Mr. Rukavina?

11           MR. RUKAVINA:  Your Honor, was I on mute?  I

12   apologize.

13           THE COURT:  Yes.

14                    REDIRECT EXAMINATION

15   BY MR. RUKAVINA:

16   Q    Mr. Post, why did you leave Highland?

17   A    It -- because I was a HCMLP employee and it was --

18   basically, there was conflicts that were created by being an

19   employee of the Debtor and by also serving as the CCO to the

20   named Funds and the Advisors, and it coincided with Jim

21   toggling over from HCMLP to NexPoint.  It just made sense more

22   functionally and from a silo perspective for me to be the

23   named CCO for that entity since he was no longer an employee

24   of HCMLP.

25   Q    And by Jim, you mean Jim Dondero?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2507
Case 3:25-cv-02072-S    Document 15-9    Filed 06/25    Page 575 of 1017    PageID 7288
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2506 of 2722

Post - Redirect/Recross                63

1  A   Yes, sorry.  Jim Dondero.

2  Q   You're not some kind of lackey for Mr. Dondero, where you

3  go wherever he goes, are you?

4            MR. MORRIS:  Objection to the question.

5            THE WITNESS:  No.

6            THE COURT:  Overruled.  He can answer.

7            MR. RUKAVINA:  Okay.

8            THE WITNESS:  No.

9            MR. RUKAVINA:  Okay.  Thank you, Your Honor.  I'll

10  pass the witness.

11            THE COURT:  Any other Objector examination?

12      All right.  Any recross, Mr. Morris?

13                      RECROSS-EXAMINATION

14  BY MR. MORRIS:

15  Q   Just one question, sir.  The conflicts that you just

16  mentioned, they were in existence for the one-year period

17  between the petition date and the date you left; isn't that

18  right?

19  A   I think -- I believe so, and I think they became more

20  evident as, you know, time progressed.

21  Q   Okay.  But they existed on day one of the bankruptcy

22  proceeding; isn't that right?

23  A   Yes, I believe so.

24  Q   All right.

25            MR. MORRIS:  No further questions, Your Honor.

Post - Recross                    64

1          THE COURT:  All right.  Thank you, Mr. Post.  You're

2   excused from the virtual witness stand.

3       (The witness is excused.)

4          THE COURT:  All right.  Your next witness?

5          MR. RUKAVINA:  Your Honor, my exhibit has been

6   admitted, I promised I'd be short, and my evidentiary

7   presentation is done.  Thank you.

8          THE COURT:  All right.  Well, Mr. Taylor, your

9   evidence?

10          MR. TAYLOR:  First of all, given the testimony that

11   we have received just recently, we have released Mr. Sevilla

12   from his subpoena and are not going to call him.

13       With that being said, we do have some documents that we

14   would like to get into evidence.  We filed our witness and

15   exhibit list at Docket No. 1874.  I don't believe any of these

16   are controversial.  I'm trying to keep from duplicating those

17   that are already into evidence by the Debtor.  And therefore I

18   would like to offer into evidence Exhibits No. 6 through 12

19   and 17.  And that is it, Your Honor.

20          THE COURT:  Okay.  Is there any objection to Dondero

21   Exhibits 6 through 12 and 17, appearing at Docket 1874?

22          MR. MORRIS:  I just want to be clear that Exhibits 6

23   and 7, which are letters, I believe, from Mr. Lee (phonetic)

24   are not being offered for the truth of the matter asserted in

25   either letter.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2509
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 577 of 1017   PageID 7290
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2508 of 2722

65

 1          MR. TAYLOR:  That is correct, Your Honor.  Just

 2   merely that those requests and the words that were stated in

 3   there were indeed sent on those dates.

 4          MR. MORRIS:  And the same comment, Your Honor, with

 5   respect to Exhibits 9 through 12, that those documents are not

 6   being offered for the truth of the matter asserted.

 7          MR. TAYLOR:  Again, just that those requests were

 8   sent and those responses as stated were sent.

 9       And I apologize.  I missed one, Your Honor.  Also No. 15.

10   6 through 12, 15, and 17.

11          MR. MORRIS:  Your Honor, the Debtor has no objection

12   to Exhibits 15, 16, and 17.

13          THE COURT:  All right.  So, so they are all admitted

14   with the representation that 6 and 9 through 12 are not being

15   offered for the truth of the matter asserted.  With that

16   representation, you have no objection, Mr. Morris?

17          MR. MORRIS:  That's right.  I do just want to get

18   confirmation that Exhibits 1 through 5 and 13 through 16 -- 13

19   and 14 are not being offered at all.

20          THE COURT:  Mr. Taylor?

21          MR. TAYLOR:  So, that -- that is correct.  1 through

22   5 would be duplicative of what has already been introduced

23   into the record by Mr. Morris, so I am not offering those.

24   And do not believe that 13 and 14 are relevant anymore, and so

25   therefore did not offer those.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2510
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 578 of 1017 PageID 7291
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2509 of 2722

66

1          THE COURT:  Okay.  So, with that, I have admitted 6

2     through 12, 15, 16, and 17 at Docket Entry 1874.

3          (Dondero Exhibits 6 through 12 and 15 through 17 are

4     received into evidence.)

5          THE COURT:  All right.  Anything else, Mr. Taylor?

6          MR. TAYLOR:  No, Your Honor.  We are not calling any

7     witnesses.

8          THE COURT:  All right.  Mr. Draper, what about you?

9     Any evidence?

10          MR. DRAPER:  No evidence or witnesses.  The evidence

11     that's been introduced by Mr. Taylor and Mr. Rukavina are

12     sufficient for me.

13          THE COURT:  All right.  Ms. Drawhorn, anything from

14     you?

15          MS. DRAWHORN:  No additional evidence, Your Honor.

16          THE COURT:  All right.  Well, then, Mr. Morris, did

17     you have anything in rebuttal?

18          MR. MORRIS:  No, Your Honor.  I think we can proceed

19     to closing statements.  I would just appreciate confirmation

20     by the Objecting Parties that they rest.

21          THE COURT:  All right.  Well, I guess we'll get that

22     clear if it is isn't clear.  All of the Objectors rest.

23     Confirm, yes, Mr. Rukavina?

24          MR. RUKAVINA:  Confirm.

25          THE COURT:  And Mr. Taylor?

67

```
 1            MR. TAYLOR:  Confirmed, Your Honor.

 2            THE COURT:  Okay.  And Draper and Drawhorn?

 3            MR. DRAPER:  Yes, Your Honor.

 4            MS. DRAWHORN:  Confirmed, Your Honor.

 5            THE COURT:  All right.  By the way, I assume Mr.

 6   Dondero has been participating this morning.  I didn't

 7   actually get that clarification before we started.  Mr.

 8   Taylor, is he there with you this morning?

 9            MR. TAYLOR:  Your Honor, he is.  He has been

10   participating.  He is sitting directly to my left about

11   slightly more than six feet apart.

12            THE COURT:  Okay.  All right.  Good.

13        All right.  Well, let's talk about our closing arguments

14   and let me figure out, do we have -- should we break a bit

15   before starting?  I have an idea in my brain about a time

16   limitation, but before I do that, let me ask.  Mr. Morris,

17   first I'll ask you.  How much time do you think you need for a

18   closing argument?

19            MR. MORRIS:  Your Honor, --

20            MR. POMERANTZ:  Your Honor?

21            MR. MORRIS:  -- I'll defer to Mr. Pomerantz, who's

22   going to deliver that portion of our presentation today.

23            THE COURT:  All right.  Mr. Pomerantz?

24            MR. POMERANTZ:  Your Honor, I will be making -- yes,

25   Your Honor.  I will be making the majority portion of the
```

68

1  argument. Mr. Kharasch will be making the portion of the

2  argument dealing with the Advisor and Funds' objection. But I

3  expect my closing to be quite lengthy, given the 1129

4  requirements, all the legal issues, which I plan to spend a

5  fair amount of time. So I would anticipate a range of an hour

6  and 45 minutes.

7       THE COURT: An hour and 45 minutes? All right.

8  Well, --

9       MR. POMERANTZ: Correct.

10       THE COURT: I'm getting an echo.

11       MR. CLEMENTE: Your Honor, it's Matt Clemente on

12  behalf on the Committee. I'll have 15 minutes or less, Your

13  Honor. Just some things I would like to touch on.

14       THE COURT: All right. So, two hours. If I were to

15  --

16       MR. POMERANTZ: And then you need, Your Honor, to add

17  Mr. Kharasch. I think he's on. He can indicate how long his

18  part of the closing will be.

19       THE COURT: Mr. Kharasch?

20       MR. KHARASCH: Yes. I would figure my argument would

21  probably be about 20 minutes to 30 minutes.

22       THE COURT: Okay.

23       MR. RUKAVINA: Your Honor, let me interject something

24  that I think will help everyone out. With the CLOs having

25  consented through their counsel to the assumption, the bulk of

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2513
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 581 of 1017 PageID 7294
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2512 of 2722

69

1  my objection is now moot.  We no longer can and will argue

2  that the contracts are unassignable under 365(b) or (c)

3  because we do have now their consent.  So that will hopefully

4  help the Debtor on that issue.

5      MR. KHARASCH:  Your Honor, Ira Kharasch again.  I was

6  not anticipating that.  I believe that that will take away the

7  bulk of my argument.  I'm still going to be dealing with some

8  of the other non-assumption-type arguments raised by the CLO

9  Objectors, kind of dovetailing with Mr. Pomerantz's arguments

10  on the injunction.  But that will greatly reduce, Your Honor,

11  my argument.

12      THE COURT:  All right.  So if I say two hours of

13  argument for the Debtor and Creditors' Committee, Rukavina,

14  Taylor and Draper and Drawhorn, can you collectively manage to

15  share that two hours?  Have a two-hour argument in the

16  aggregate?  That seems fair to me.

17      MR. RUKAVINA:  Your Honor, I think -- I think that's

18  fine, Your Honor.

19      THE COURT:  All right.  And I guess I'll --

20      MR. TAYLOR:  This is Mr. Taylor.  And yes, I agree.

21      THE COURT:  Okay.  And Mr. Draper?

22      MR. DRAPER:  This is Douglas Draper.  I agree.  I

23  agree also, Your Honor.

24      THE COURT:  All right.  And I'm going to ask --

25      MR. POMERANTZ:  Your Honor, I --

70

```
 1                THE COURT:  Go ahead.

 2                MR. POMERANTZ:  Your Honor, we -- I think we may need

 3     like two hours and ten minutes, because mine was 1:45, Mr.

 4     Clemente was 15, and then Mr. Kharasch.  But we'll be around

 5     that.  And I tend to speak fast, so I might even shorten mine.

 6                THE COURT:  Okay.  You negotiated me up to two hours

 7     and ten minutes, Debtors/Objectors, each.

 8          I'm going to ask one more time.  The U.S. Trustee lobbed a

 9     written objection, but we've not heard anything from the U.S.

10     Trustee.  Are you out there wanting to make an oral argument?

11                MS. LAMBERT:  Yes, Your Honor.  The United States

12     Trustee is on the line.  And we've been listening to the

13     hearing.  I can turn my video on.  I think you're --

14                THE COURT:  Yes.  I can hear you.  I can't see you.

15                MS. LAMBERT:  Okay.  All right.  And so the U.S.

16     Trustee feels that the issues about the releases have been

17     adequately joined and raised by the other parties and that

18     it's an issue of law.  The U.S. Trustee does not feel that we

19     can add to that dialogue by, you know, wasting more of the

20     Court's time.  I think it's been adequately briefed and it's

21     been adequately argued here today.

22                THE COURT:  Okay.

23                MS. LAMBERT:  And we do have an agreement to include

24     governmental release language in the order.  I understand that

25     agreement is still being honored.  That's a separate agreement
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2515
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 583 of 1017    PageID 7296
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2514 of
2722

71

```
1   than the issue of whether the releases are precluded.  But

2   we're going to let the other people carry the water on that.

3          THE COURT:  Okay.

4          MR. POMERANTZ:  Yeah.  And that is correct.  That is

5   correct, Your Honor.  They asked for some information -- a

6   provision on government releases.  They also asked for a

7   provision regarding joint and several liability for Trustee

8   fees.

9      As I mentioned previously, the IRS has asked for a

10  provision in the confirmation order, as have the Texas Taxing

11  Authorities.

12     We have not uploaded a proposed confirmation order, but I

13  will state right now on the record that, before we do so, we

14  will, of course, give Ms. Lambert, Mr. Adams, and the Texas

15  Taxing Authorities the opportunity to review.  We expect there

16  won't be any issue because the language has already been

17  agreed to.

18         THE COURT:  All right.  Well, how about this.  It's

19  11:23 Central time.  Let's break until 12:00 noon Central

20  time, okay, so that gives everyone a little over 30 minutes to

21  have a snack and get their notes together, and we'll start

22  with closing arguments at 12:00 noon.  All right?  So we're in

23  recess until then.

24         THE CLERK:  All rise.

25     (A recess ensued from 11:24 a.m. until 12:05 p.m.)
```

72

```
1          THE COURT:  All right.  Please be seated.  All right.
2   This is Judge Jernigan.  We are back on the record in
3   Highland.  Let me make sure we have the people we need.  Do we
4   have the Pachulski team there?  Mr. Pomerantz, Mr. Kharasch?
5          MR. POMERANTZ:  Yes, you do, Your Honor.
6          THE COURT:  All right.  For our Objectors, Mr.
7   Taylor, are you there?
8          MR. TAYLOR:  Yes, Your Honor, I am.
9          THE COURT:  All right.  I see Mr. Draper there on the
10  video.  You're there.
11         MR. DRAPER:  I'm here.  Can you hear me?
12         THE COURT:  I can hear you loud and clear, yes.
13         MR. DRAPER:  Great, because I didn't -- I'm not
14  hearing, something so I apologize.
15         THE COURT:  All right.  So we have Mr. Rukavina, and
16  I think I see Mr. Hogewood there as well.  Is that correct?
17  You're ready to go forward?
18         MR. RUKAVINA:  Yes, Your Honor.
19         THE COURT:  All right.
20         MR. RUKAVINA:  Yes, Your Honor.  Good afternoon.
21         THE COURT:  All right.  And Ms. Drawhorn, you're
22  there?
23         MS. DRAWHORN:  Yes, Your Honor.
24         THE COURT:  Okay.  Committee.  Mr. Clemente, are you
25  there?
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2517
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 585 of 1017   PageID 7298
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2516 of 2722

73

```
 1         MR. CLEMENTE:  Yes, Your Honor.  I'm here, Your
 2    Honor.
 3         THE COURT:  Okay.  Very good.  All right.  So, let me
 4    reiterate.  We've given two-hour and 10-minute time
 5    limitations for the Debtor, and that'll be both any time you
 6    reserve for rebuttal and your closing, initial closing
 7    argument.  Mr. Clemente, you're going to be in that time frame
 8    as well.  Okay?
 9         MR. CLEMENTE:  Yes, Your Honor.
10         THE COURT:  And so, as supporters of the plan.
11      And then, of course, the Objectors, they have collectively
12    two hours and ten minutes.
13      A couple of things.  I'm going to have my law clerk, Nate,
14    who you can't see but he's to my right, he's going to keep
15    time.  I promise I won't be a jerk and cut anyone off
16    midsentence, but please don't push the limit if I say, you
17    know, "Time."
18      The other thing I will tell you is I'll probably have some
19    questions here or there.  And I've told Nate, cut off the
20    timer if we're in a question-answer session.  I won't count
21    that as part of the two hours and ten minutes.
22      All right.  So, with that, Mr. Pomerantz, you may begin.
23         CLOSING STATEMENT ON BEHALF OF THE DEBTOR
24         MR. POMERANTZ:  Thank you, Your Honor.  As Your Honor
25    is aware, the Debtor has been able to resolve all objections
```

74

1   to confirmation other than the objection by Mr. Dondero or his

2   entities and the United States Trustee.

3       Your Honor, I have a very lengthy closing argument, given

4   the number of issues that are raised in the objections, and I

5   want to make a complete record, since I understand that

6   there's a good likelihood that (garbled) appeal.

7       With that in mind, Your Honor, I'm prepared to go through

8   each and every confirmation requirement in Section 1129.

9   However, as an alternative, I might propose that I can go

10  through each of the Section 1129 requirements that are the

11  subject of pending objections or otherwise depend upon

12  evidence that Your Honor has heard.

13          THE COURT:  Okay.

14          MR. POMERANTZ:  And of course, I'll be happy to

15  answer any questions that you have in the process.

16          THE COURT:  Okay.

17          MR. POMERANTZ:  And after my closing argument, I will

18  turn it over to Mr. Kharasch to address the Advisor and Funds'

19  objections.

20          THE COURT:  Okay.

21          MR. POMERANTZ:  Before I walk the Court through the

22  confirmation requirements, I did want to note for the Court,

23  as I did previously, that we filed an updated ballot summary

24  at Docket No. 1887.  And as reflected in the summary, Classes

25  2 and 7 have voted to accept the plan with the respective

75

1    numerosity and amounts required.  In fact, the votes are a

2    hundred percent.

3        Class 8, however, has voted to reject the plan.  Seventeen

4    creditors in Class 8 voted yes and 24 objectors, which are, I

5    think, all but one the employees with one-dollar claims for

6    voting purposes, voted against.

7        In dollar amount, Class 8 has accepted the plan by 99.8

8    percent of the claims.  And I will address the issues of the

9    cram-down over that class a little bit later on.

10       Lastly, during the course of my presentation, I will

11   identify for the Court certain modifications we have made to

12   address the objections that were filed on January 22nd and

13   then also on February 1st.  And at the end of my presentation,

14   I will raise a couple of other modifications that I won't get

15   to during my presentation and will explain to the Court why

16   all the modifications do not require resolicitation and are

17   otherwise appropriate under Section 1127.

18       Your Honor, as Your Honor is aware, Section 1129 requires

19   the Debtors to demonstrate to the court that the plan

20   satisfies a number of statutory requirements.  1129(a)(1)

21   provides that the plan requires -- complies with all statutory

22   provisions of Title 11, and courts interpreted this provision

23   as requiring the debtor to demonstrate it complies with

24   Section 1122 and 1123.

25       With respect to classification, Your Honor, there has been

76

1    one objection that was raised to essentially a classification,

2    and that was raised by Mr. Dondero to Article 3C of the plan

3    on the grounds that it purports to eliminate a class that did

4    not have any claims in it as of the effective date but which

5    may later have a claim in that class.

6        I think he was primarily concerned about Class 9

7    subordinated claims.  But Mr. Dondero misunderstands the

8    provision.  It only eliminates a claim for voting purposes,

9    and if there's later a claim in that class, it will be treated

10   as the plan provides the treatment.

11       In any event, Class 9, as we know now, will be populated

12   by the HarbourVest claims, as well as the UBS claims and the

13   Patrick Daugherty claims, if the Court approves the settlement

14   approving those claims.

15       Next, Your Honor, Section 1123(a) contains seven mandatory

16   requirements that a plan must include.  Sections 1, 2, and 3

17   of 1123(a) apply to the classification of claims and where

18   they're impaired and treatment.  The plan does that.

19       There has been an objection to 1123(a)(3) raised by

20   several parties with respect to the classification and

21   treatment of subordinated claims.  The concerns stem from the

22   mistaken belief that the Debtor reserved the right to

23   subordinate claims without providing parties with notice and

24   without obtaining a court order.

25       The Debtor never intended to have unilateral ability to

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2521
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25/23   Page 589 of 1017   PageID 7302
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2520 of 2722

77

1  subordinate claims without affording parties due process

2  rights, and we've added some clarificatory language to so

3  provide.

4      We made changes to the plan on January 22nd, and then on

5  February 1st, and the plan addresses all those issues in

6  Article 3(j) and it talks about when a claim is going to be

7  subordinated as a non-creditor.  We've also redefined the

8  definition of subordinated claims to make clear that a claim

9  is only subordinated upon entry of an order subordinating that

10  claim.

11      Mr. Dondero also objected on the grounds that the plan did

12  not contain a deadline pursuant to which the Debtor would be

13  required to seek any subordination, and we have revised

14  Article 7(b) of the plan to provide that any request to

15  subordinate a claim would have to be made on or before the

16  claim objection deadline, which is 180 days after the

17  effective date.

18      Lastly, certain former employees, Mr. Yang and Borud,

19  objection also joined by Mr. Deadman, Travers, and Kauffman,

20  objected to the inclusion of language in the definition of

21  "Subordinated Claims" that a claims arising from a Class A, B,

22  or C limited partnership is deemed automatically subordinated.

23  The concerns were that the language could broadly apply to any

24  potential claims by a former partner, and could be also read

25  to encompass claims outside the statutory scope of 510(b) or

78

1    otherwise relating to limited partnership interests.

2        While the Debtor does reserve the right to seek to

3    subordinate the claims on any basis, we have modified the plan

4    to address that concern and to address the concern that we're

5    not attempting to create any new causes of action for

6    subordination that don't otherwise exist under applicable law,

7    but it just preserves the parties' rights with respect to

8    subordination and deals with that at a later date.

9        Next, Your Honor, Section 1123(a)(5).  I skipped over

10   1123(a)(4) because there are no objections to that provision.

11            THE COURT:  Okay.

12            MR. POMERANTZ:  Section 1123(a)(5), a plan must

13   provide for adequate means of implementation.  And the plan

14   provides a detailed structure and blueprint how the Debtor's

15   operations will continue, how the assets will be monetized,

16   including the establishment of the Claimant Trust,

17   establishment of the Litigation Sub-Trust, the Reorganized

18   Debtor, the Claimant Trust Oversight Board.  And the documents

19   precisely describing how this will occur were filed as part of

20   the various plan supplements.

21       1123(a)(7), Your Honor, requires that the plan only

22   contain provisions that are consistent with the interest of

23   equity holders and creditors with respect to the manner,

24   selection, and -- of any director, officer, or trustee under

25   the plan.  And as discussed in the plan, at the disclosure

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2523
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 591 of 1017    PageID 7304
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2522 of
2722

79

1   statement, and as testified to by Mr. Seery, the Committee and

2   the Debtor had arm's-length negotiations regarding the post-

3   effective date corporate governance and believe that the

4   selection of the claimant Trustee, the Litigation Sub-Trustee,

5   and the Claimant Trust Oversight Board are in the best

6   interest of stakeholders.

7       HCMFA has raised a particular objection, I think, to these

8   issues, but I will address it in the context of the

9   requirement under Section 1129(a)(5).

10      Your Honor, Section 1129(a)(2) requires that the plan

11  comply with the disclosure and solicitation requirements under

12  the plan.  Section 1125 requires that the Debtor only solicit

13  with a court-approved disclosure statement.  The Court

14  approved the disclosure statement on November 23rd, and

15  pursuant to the proofs of service on file, the plan and

16  disclosure statement were mailed, along with solicitation

17  materials that the court approved.

18      Now, there has been an objection raised by Dugaboy, and

19  also alluded to by Mr. Taylor in some of his comments before,

20  that the plan does violate 1129(a)(2) because the Debtor's

21  disclosure statement was deficient.

22      In support of that argument, Dugaboy points to the

23  reduction in the anticipated distribution to creditors from

24  the November plan analysis to the January plan analysis, and

25  argues that that reduction requires resolicitation.  However,

80

1   those arguments are not well-taken.

2       First, none of the people making these objections were

3   solicited for their vote on the plan, or if they had been,

4   they didn't vote or decided to reject the plan.  And to the

5   extent that Class 8 creditors, the distribution has gone down

6   -- that's the class that Mr. Taylor and Mr. Draper are

7   concerned about -- you don't hear the Committee, Acis,

8   Redeemer, UBS, HarbourVest, Daugherty, or the Senior Employees

9   making their argument, this argument, and they represent over

10  99 percent of the claims in that class.  And in fact, of the

11  17 Class 8 creditors that have accepted the plan, 15 are

12  represented by the parties I just mentioned.

13      So who are the two creditors that they're so concerned

14  about?  One is Contrarian, which is a claims trader that

15  actually elected to be treated in Class 7, and one is one of

16  the employees who voted to accept the plan.

17      Second, Your Honor, the argument conflates the difference

18  between adverse change to the treatment of a claim or interest

19  that would require a resolicitation under Section 1127 and a

20  change to the distribution that would not.

21      More importantly, Your Honor, the argument is specious.

22  As Mr. Seery testified yesterday, the material differences

23  between the analysis contained on November and late January

24  and the one we filed on February 1st were based on three types

25  of changes:  an update regarding the increased value of assets

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2525
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 593 of 1017   PageID 7306
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2524 of 2722

81

1  based upon events that had transpired during this period,

2  which included an increase in asset value, no recoveries, and

3  revenues expected to be generated by the CLO management

4  agreements; an update to the expected costs of the Reorganized

5  Debtor and the Claimant Trust as a result of the continued

6  evaluation of staffing needs, operational expenses, and

7  professional fees; and an update to reflect resolution of the

8  HarbourVest and UBS claims.

9      In the filing Monday, Your Honor, we updated the plan

10  projection, a liquidation analysis which revised the unsecured

11  claims based upon the UBS settlement that I was able to

12  disclose to Your Honor.  And in the filing, the distribution

13  now revised to Class 8 creditors is now 71 percent, compared

14  to the 87 percent that was in the disclosure statement that

15  went out for solicitation.

16      Your Honor, there can be no serious argument that the

17  creditors in this case were not fully aware of the potential

18  for the UBS and HarbourVest creditors receiving claims.  Your

19  Honor's UBS 3018 order granting its claim for voting purposes

20  was entered right around the time that the disclosure

21  statement was approved.  And, in fact, a last-minute addition

22  to the disclosure statement disclosed the 3018 amount,

23  although the amount did not make it to the attachment to the

24  disclosure statement.  And that reference, Your Honor, to the

25  UBS claim being allowed for voting purposes can be found at

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2526
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 594 of 1017 PageID 7307
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2525 of 2722

82

1    Page 41 of Docket No. 1473.

2        And the HarbourVest settlement was filed on about December

3    23, two weeks before the voting deadline, sufficient time for

4    people to take that into consideration.

5        And as Your Honor surely knows, the hearings in this case

6    have been very well-attended by the major parties, and I

7    believe that if we went back and looked at the records of who

8    was on the WebEx system during the HarbourVest and UBS

9    hearings, you would find that representatives of basically

10   every creditor, every major creditor in this case in Class 8

11   participated.

12       Moreover, Your Honor, creditors were not guaranteed any

13   percentage recovery under the plan and disclosure statement,

14   which clearly identified the size of the claims pool as a

15   material risk.

16       Article 4(a)(7) of the disclosure statement, which is at

17   Docket 1473, is entitled "Claims Estimation" and warns

18   creditors that there can be no assurances that the Debtor's

19   claims estimates will prove correct, and that the actual

20   amount of the allowed claims may vary materially.

21       And if Dugaboy is arguing it was misled as the holder of a

22   disputed administrative claim and general unsecured claim,

23   that argument is simply preposterous.

24       Dugaboy cites several cases for the proposition that

25   deficient disclosure may warrant resolicitation, and the

83

1   Debtor agrees with the proposition as a general matter.  But

2   if one looks at the cases that were filed -- that Dugaboy

3   cited to, it will see that they are clearly inapposite and

4   distinguishable.

5       *In re Michaelson*, the Bankruptcy Court for the Eastern

6   District of California, revoked confirmation because the

7   debtor failed to disclose in the disclosure statement a mail

8   fraud indictment of the turnaround specialist who was to lead

9   the reorganization effort and a prior Chapter 7 company he

10  drove into the ground.

11      In *In re Brotby*, the Ninth Circuit BAP affirmed a decision

12  of the Bankruptcy Court that the individual debtor's decision

13  to modify its financial projections on the eve of confirmation

14  did not require a resolicitation.  And there, the financial

15  projections were off by 75 percent.

16      And in *Renegade Holdings*, the Bankruptcy Court granted a

17  motion by a group of states to revoke confirmation by the

18  debtors, who manufactured and distributed tobacco products,

19  because the debtors failed to disclose in its disclosure

20  statement that the debtor and its principals were under

21  criminal investigation for unlawful trafficking in cigarettes,

22  which was not disclosed to creditors.

23      Your Honor, none of these cases are remotely analogous to

24  this case, and they certainly do not stand for the proposition

25  that the Debtor was required to resolicit.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2528
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 596 of 1017   PageID 7309
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2527 of 2722

84

```
 1        Next, Your Honor, the next requirement is 1129(a)(3),
 2   which requires that any plan be proposed in good faith.  As
 3   Mr. Seery testified at length, and the Court has personal
 4   knowledge of, having presided over this case for a year, the
 5   plan is the result of substantial arm's-length negotiations
 6   with the Committee over a period of several months.
 7        Mr. Seery testified yesterday that, soon after the board
 8   was appointed, the Committee wanted to immediately pursue down
 9   the path of an asset monetization plan.  However, as Mr. Seery
10   testified, the board decided that it was inappropriate to rush
11   to judgment and that it should consider all potential
12   restructuring alternatives for the Debtor.  And Mr. Seery
13   testified what those alternatives were:  a traditional
14   restructuring and continuation of the Debtor's business; a
15   potential sale of the Debtor's assets in one or more
16   transactions; an asset monetization plan like the one before
17   the Court today; and, last but not least, a grand bargain plan
18   that would involve Mr. Dondero sponsoring the plan with a
19   substantial equity infusion.
20        As Mr. Seery testified, by the early summer of 2020, the
21   Debtor decided that it was appropriate to start moving down
22   the path of an asset monetization plan while it continued to
23   work on the grand bargain plan.  Accordingly, Mr. Seery
24   testified that the Debtor commenced good-faith negotiations
25   with the Committee regarding the asset monetization plan, and
```

85

1   that those negotiations took several months, were hard-fought

2   and at arm's-length, and involved substantial analysis of the

3   appropriate post-confirmation corporate structure, governance,

4   operational, regulatory, and tax issues.  And on August 12th,

5   Your Honor, the plan was filed with the Court.

6       And although the Debtor at that time had not reached an

7   agreement with the Committee on some of the most significant

8   issues, Mr. Seery testified that the independent board

9   believed that it was important to file that plan at that time,

10  a proverbial stake in the ground to act as a catalyst for

11  reaching a consensual plan with the Committee or others, which

12  it has done.

13      As Mr. Seery testified, he continued to work with Mr.

14  Dondero to try to achieve a grand bargain plan, while at the

15  same time proceeding down the path of the filed plan.

16      He testified that the parties participated in mediation at

17  the end of August and early September to try to reach an

18  agreement on a grand bargain plan, but were unsuccessful.  And

19  the Debtor proceeded on the path of the August 12th plan and

20  sought approval of its disclosure statement on August 27th,

21  2020.

22      Mr. Seery testified that, at that time, the Debtor still

23  had not reached an agreement with the Committee on certain

24  significant issues involving post-confirmation governance and

25  the scope of releases.  And as a result, after a contested

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2530
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 598 of 1017   PageID 7311
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2529 of 2722

86

1    hearing, Your Honor, Your Honor did not approve the disclosure

2    statement on October 27th, but asked us to go back again to

3    try to work out the issues, and we came back on November 23rd.

4        Mr. Seery testified that the Debtor continued to negotiate

5    with the Committee to resolve the material disputes leading --

6    which led up to the November 23rd hearing, where we came in

7    with the support of the Committee.  But as Mr. Seery has also

8    testified, he has continued to try to reach a consensus on a

9    global plan, notwithstanding the approval of the disclosure

10   statement.  And he spent personally several hundred hours

11   since his appointment trying to build consensus.

12       As part of this process, Mr. Seery testified that Mr.

13   Dondero received access to substantial information regarding

14   the Debtor's assets and liabilities, most recently in

15   connection with a series of informal document requests which

16   were made at the end of December.

17       And after the Court asked the parties to again reengage in

18   efforts to try to reach a global hearing after the Debtor's

19   preliminary injunction motion, Mr. Seery testified that he and

20   the board participated in calls with Mr. Dondero and his

21   advisors and the Committee to see if common ground could be

22   attained.

23       Unfortunately, as Mr. Seery testified, the Committee and

24   Mr. Dondero were not able to reach an agreement.

25       Accordingly, Your Honor, the testimony unequivocally and

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2531
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 599 of 1017 PageID 7312
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2530 of 2722

87

1  overwhelmingly demonstrates that the plan was proposed in good

2  faith.

3      I expect the Objectors may argue in closing that they have

4  filed a plan under seal that is a better alternative than that

5  being proposed by the plan that the Debtor seeks to confirm.

6  Your Honor, as a threshold matter, yesterday I said any

7  mention of the specifics of the recent plan would be

8  inappropriate.  We are not here today to debate the merits of

9  Mr. Dondero's plan, which the Court permitted him to file

10 under seal.  He had ample opportunity to file this plan after

11 exclusivity was terminated, seek approval of a disclosure

12 statement, and, if approved, solicit votes in connection with

13 a confirmation hearing, but he failed to do so.

14     What matters today, Your Honor, is whether the Debtor's

15 plan, the plan that has been accepted by 99.8 percent of the

16 amount of creditors, and opposed only by Mr. Dondero, his

17 related entities, and certain employees, meets the

18 confirmation requirements of Section 1129, which we most

19 certainly argue it does.

20     And perhaps most importantly, Your Honor, the Court

21 remarked at the last hearing that, without the Committee's

22 support for a competing plan, Mr. Dondero's plan would be dead

23 on arrival.  And as you have heard from Mr. Clemente, Mr.

24 Dondero does not yet have the Committee's support.

25     Next, Your Honor, is Section 1129(a)(5).  That requires

88

1   that the plan disclose the identity of any director,

2   affiliate, officer, or insider of the debtor, and such

3   appointment be consistent with the best interest of creditors

4   and equity holders.  Courts have held that this section

5   requires the disclosure of the post-confirmation governance of

6   the reorganized entity.

7       HCMFA objects to the plan, arguing that it did not comply

8   with Section 1129(a)(5) because it didn't disclose the people

9   who would control and manage the Reorganized Debtor and who

10  might be a sub-servicer.  HCMFA's objection is off-base.

11  Under the plan, Mr. Seery will be the claimant Trustee and

12  Marc Kirschner will be the Litigation Trustee.  Mr. Seery

13  testified extensively about his background, and he has

14  appeared before the Court many times and the Court is familiar

15  with him.  We have also introduced his *C.V.* into evidence.

16      As he testified, he will be paid $150,000 per month,

17  subject to further negotiations with the Claimant Trust

18  Oversight Committee regarding the monthly amount and any

19  success fee and severance fee, which negotiation is expected

20  to be completed within the 45 days following the effective

21  date.

22      Mr. Seery also testified regarding the names of the

23  members of the Claimant Trust Oversight Committee, which

24  information was also contained in the plan supplement and it

25  generally includes the four members of the Committee and David

89

1   Pauker, a restructuring professional with decades of

2   restructuring experience.

3       The members of the Oversight Committee will serve without

4   compensation, except for Mr. Pauker, who Mr. Seery testified

5   will receive $250,000 in the first year and $150,000 for

6   subsequent years.

7       As set forth in the Claimant Trust agreement, if at any

8   time there is a vacant seat to be filled by another

9   independent member, their compensation will be negotiated by

10  and between the Claimant Trust Oversight Board and them.

11      Mr. Seery has also testified that he believed the Claimant

12  Trust will have sufficient personnel to manage its business.

13  Specifically, he has testified that he intends to employ

14  approximately ten of the Debtor's employees, who will be

15  sufficient to enable him to continue to operate the Debtor's

16  business, including as an advisor to the managed funds and the

17  CLOs, until the Claimant Trust is able to effectively and

18  efficiently monetize its assets for fair value, whether that

19  takes two years or whether that takes 18 months or whether

20  that takes longer.

21      Mr. Seery further testified that he believes that the

22  operations can be best conducted by the Debtor's employees.

23  And while he did consider the retention of a sub-servicer, he

24  ultimately decided, in consultation with the Committee, that

25  the monetization would be a lot more effective if done with a

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2534
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 602 of 1017   PageID 7315
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2533 of 2722

90

1   subset of the Debtor's current employees.

2       The proposed corporate governance is also consistent with

3   the interests of the Debtor and its stakeholders.  The Court

4   is very familiar with Mr. Seery and the Debtor, and I believe

5   that Mr. Clemente, when he comments, will say the Committee

6   can think of no better person to continue managing the

7   Claimant Trust than Mr. Seery.

8       Mr. Kirschner is also well qualified to be the Litigation

9   Trustee.  His *C.V.* is part of the evidence that's been

10  admitted and contains additional information regarding his

11  background.  And he will receive $40,000 a month for the first

12  three months and $20,000 a month thereafter, plus a to-be-

13  negotiated success fee.

14      There just simply can be no challenge to Mr. Seery's or

15  Mr. Kirschner's qualifications or abilities to act in a manner

16  contemplated by the plan or that their involvement is not in

17  the best interest of the estate and its creditors.

18      Your Honor, the next requirement that is objected to is

19  Section 1129(a)(7).  That, of course, requires the Debtor to

20  demonstrate that creditors will receive not less under the

21  plan than they would receive if the Debtor was to be

22  liquidated in Chapter 7.  And on February 1st, Your Honor, we

23  filed our updated liquidation analysis, which contains the

24  latest-and-greatest evidence to support that.

25      These documents, the updated documents, in connection with

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2535
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 603 of 1017 PageID 7316
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2534 of 2722

91

1  the prior analysis, was provided to objecting parties in

2  advance of the January 29th deposition, and Your Honor has

3  heard the differences between the January 29th and the

4  February 1st documents being very minimal.

5      The Court heard extensive evidence and testimony from Mr.

6  Seery regarding the assumptions that went into the preparation

7  of the liquidation analysis and the differences of what

8  creditors are projected to receive under the plan as compared

9  to what they are projected to receive in a Chapter 7.

10     Such testimony also included a comparison between the

11 liquidation analysis that was filed with the plan in November,

12 the updated liquidation analysis filed on the -- or, provided

13 to parties on January 28th, and the last version, filed on

14 February 1st.

15     Mr. Seery testified that, on the revenue side, the

16 liquidation analysis was updated to include the HCLOF

17 interest, which was required as part of the settlement with

18 HarbourVest; the increase in value of certain assets,

19 including Trussway; revenue expected to be generated from

20 continued management of the CLOs; and increased recovery on

21 notes as a result of the acceleration of certain related

22 notes.

23     On the expense side, Mr. Seery testified regarding his

24 best estimate of the likely expenses to be incurred by a

25 Chapter 7 trustee -- by the Claimant Trust, including

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2536
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 604 of 1017   PageID 7317
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2535 of 2722

92

1  personnel costs; professional costs, which increase because of

2  the litigious nature this case has become; and operating

3  expenses.

4       And lastly, on the claim side, Your Honor, Mr. Seery

5  testified that the claims numbers have been updated to include

6  the settlement from HarbourVest and initially the amount

7  approved to UBS pursuant to the 3018 order and then the

8  reduction at $50 million based upon the settlement announced.

9  And like the prior liquidation analysis, the current analysis

10 demonstrates that creditors will fare substantially better

11 under in Chapter -- under the plan than in Chapter 7.  In

12 fact, the projected recovery under the plan is 85 percent for

13 Class 7 creditors and 71.32 percent for Class 8 creditors, as

14 compared to 54.96 percent for all unsecured creditors in a

15 Chapter 7.

16      Mr. Seery also testified that expenses are expected to be

17 more under Chapter 11 than under Chapter 7, but he also

18 testified that the tens of millions of dollars in greater

19 revenue and asset recoveries under the plan will more than

20 offset the additional expenses.

21      As a result, the Court has more than sufficient

22 evidentiary basis to conclude that the Debtor has carried its

23 burden to prove that it meets the best interest of creditors

24 best.

25      But Mr. Dondero's counsel spent a lot of time crossing --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2537
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 605 of 1017   PageID 7318
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2536 of 2722

93

1  cross-examining Mr. Seery, in a vain attempt to demonstrate to

2  the Court that a Chapter 7 actually would be much better for

3  creditors.  And this argument has also been made by Dugaboy

4  and the Advisors and the Funds.

5      Before I address these arguments on its merits, Your

6  Honor, I just wanted to remind the Court of the Objectors --

7  these Objectors' interest in this case.  Mr. Dondero owns no

8  equity in the Debtor.  He owns a general partner.  Strand, in

9  turn, owns a quarter-percent -- a quarter of one percent of

10 the total equity in the Debtor.  And Mr. Dondero's claim, it's

11 only a claim for indemnification.  Dugaboy asserts two claims:

12 a frivolous administrative claim relating to the postpetition

13 management of a Multi-Strat, which, as an administrative

14 claim, if it's valid, would not even be affected by the best

15 interest of creditors test, because it would have to be paid

16 in full.  And he also asserts a claim that the Debtor's

17 subsidiary -- against the Debtor's subsidiary for which it

18 tries to pierce the corporate veil.

19     Just think about it.  Dugaboy, Mr. Dondero's entity, is

20 arguing that he should be able to pierce the corporate veil to

21 get at the entity that was his before the bankruptcy.

22     Dugaboy's only other interest in this case relates to a --

23 a one -- point eighteen and several-hundredths percent of the

24 equity interest of the Debtor, and that is out of the money.

25     And as I mentioned previously, Your Honor, Mr. Rukavina's

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2538
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 606 of 1017   PageID 7319
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2537 of 2722

94

 1   clients either didn't file any general unsecured claims or

 2   filed them and withdrew them.  Their only claim is a disputed

 3   administrative claim against the Debtor that was filed a week

 4   ago and which, at the appropriate time, the Debtor will

 5   demonstrate is without merit.

 6       And I understand that, just today, NexPoint Advisors also

 7   filed administrative claim.

 8       So I'm not going to argue to Your Honor that these parties

 9   do not have standing, although their standing is tenuous, at

10   best, to assert this argument.  The Court should keep their

11   relative interests in mind when evaluating the merits and the

12   good faith of this objection.

13       The principal objection, as I said, is that creditors will

14   do better in a Chapter 7.  Essentially, they argue that a

15   Chapter 7 trustee can liquidate the assets just as well as Mr.

16   Seery can and not require the cost structure that is included

17   in the Debtor's plan projections.  Yes, they argue that a

18   Chapter 7 will be more efficient.

19       Mr. Seery's testimony, the only testimony on the topic,

20   however, establishes that this preposterous proposition has no

21   basis in reality.  Mr. Seery testified that a Chapter 7

22   trustee's mandate would be to reduce Debtor's assets as fast

23   as possible, while he will monetize assets as and when

24   appropriate to maximize the value.

25       But even if you can assume that the Chapter 7 trustee

95

1  could get court authority in a Chapter 7 to operate, there are

2  several reasons Mr. Seery testified why a liquidation by a

3  Chapter 7 trustee would be far worse than the plan.

4       First, Your Honor, no matter how competent the Chapter 7

5  trustee is -- and Mr. Seery did not say he is more competent

6  than anyone else out there -- the lack of a learning curve

7  that Mr. Seery established through the 13 months in this case

8  puts Mr. Seery at such a major advantage compared to a Chapter

9  7 trustee.

10      Second, Mr. Seery questioned whether the Chapter 7 trustee

11 would be able to retain the Debtor's existing professionals,

12 even assuming they were willing to be retained.  I'm not sure

13 what's the Court's practice or the practice in the Northern

14 District, but in many districts around the country debtor's

15 counsel and professionals cannot be retained by Chapter 7

16 trustee, as general counsel, at least.

17      And I could just imagine, Your Honor, Mr. Dondero's

18 position if the Chapter 7 trustee actually sought to hire

19 Pachulski Stang and DSI.

20      Third, Your Honor, regardless of whether the Chapter 7

21 trustee obtained some operating authority, the market

22 perception will be that a Chapter 7 trustee will sell assets

23 for less value than would Mr. Seery as claimant Trustee.  Mr.

24 Seery testified to that.

25      The argument that the Objectors make that a Chapter 7

96

1   process, whereby the trustee would seek court approval of

2   assets, is better for value than a process overseen by the

3   Claimant Trust Board lacks any evidentiary basis and also is

4   contradicted by Mr. Seery's testimony.

5       In fact, Mr. Seery testified that the Chapter 7 process,

6   the public process of it, would very likely result in less

7   recovery than a sale conducted in the Claimant Trust.

8       And lastly, Mr. Seery testified that it's unlikely that

9   the ten or so valuable employees who Mr. Seery is planning to

10  heavily rely on to assist him with post-confirmation would

11  agree to a work for Chapter 7 trustee.  Your Honor is all too

12  familiar with the fights in the *Acis* case and Chapter 7

13  trustee, and it's just hard to believe that any of the

14  Highland employees would go work for the Chapter 7 trustee.

15      So why is Mr. Dugaboy -- why is Dugaboy and Mr. Dondero

16  actually making this objection and advocating for a Chapter 7?

17  It's because they would expect to buy the Debtor's assets on

18  the cheap from a Chapter 7 trustee, exactly what they've been

19  trying to do in this case.

20      Your Honor, moving right now to Section 1129(a)(11), that

21  requires the debtor to demonstrate that the plan is feasible.

22  In other words, it's not likely to be followed by a further

23  liquidation or restructuring.  Under the Fifth Circuit law,

24  the debtor need only demonstrate that the plan will have a

25  reasonable probability of success to satisfy the feasibility

97

1    requirement, and the Debtor has easily met this standard.

2        As Mr. Seery testified, the Debtor's plan contemplates

3    continued operations through which time the assets will be

4    monetized for the benefit of creditors.  The plan contemplates

5    that Class 7 creditors will be paid off shortly after the

6    effective date.  Class 8 creditors are not guaranteed any

7    recovery but will receive pro rata distributions over a period

8    of time.  Class 2, Frontier secured claim, will be paid off

9    over time, and the projections demonstrate that it will -- the

10   Debtor will have money to do so.

11       Mr. Seery testified at length regarding the assumptions

12   that went into the preparation of the projections most

13   recently filed on February 1, and based on that testimony, the

14   Debtor has clearly demonstrated that the plan is feasible.

15       Your Honor, I think that brings us to Section 1129(b).  Of

16   course, again, Your Honor, if Your Honor has any other

17   questions with the sections I'm skipping over.  I believe

18   we've adequately covered them in the briefs and I don't think

19   there's any objection.

20       But as I mentioned before, we have three classes that have

21   voted to reject the plan.  Class 8 is the general unsecured

22   claims.  They voted to reject the plan.  Yes.  Even though,

23   based upon the ballot summary, 99 percent of the amount of

24   claims in that class voted to accept the plan, approximately

25   24 employees voted to reject the plan.  And accordingly, the

98

1    Debtor cannot satisfy the numerosity requirement of Section

2    1126(c).

3         I do want to briefly recount for Your Honor Mr. Seery's

4    testimony regarding the nature of the claims of the 24

5    employees who voted to reject the plan.  And I'm not doing

6    this to argue that the votes from these contingent creditors

7    are not valid or that the Debtor doesn't need to satisfy the

8    cram-down requirements.  The Debtor understands it needs to

9    demonstrate to the Court that Section 1129(b) is satisfied for

10   the Court to confirm the plan.

11        Rather, why I do this, Your Honor, is to provide the Court

12   with context about the nature and extent of the creditors in

13   this class as the Court determines whether the plan is, in

14   fact, fair and equitable and can be crammed down to a

15   dissenting vote.

16        Mr. Seery testified that these employees originally had

17   claims under the annual bonus plan and the deferred

18   compensation plan.  And as he testified, in order for claims

19   under each of those plans to vest -- I think he referred to

20   them as be-in-the-seat plans -- the employee was required to

21   remain employed as of that date.

22        Mr. Seery testified that the Debtor terminated the annual

23   bonus plan in the middle of January and replaced it with the

24   key employee retention plan that the Court previously

25   approved.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2543
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 611 of 1017 PageID 7324
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2542 of 2722

99

1    Accordingly, Mr. Seery testified that no employee who

2  voted to reject the plan anymore has a claim on the annual

3  bonus plan.  He also testified that, with respect to the

4  deferred compensation plan, people have contingent claims

5  under that plan and that no payments are due until May 20 --

6  2021.

7    As Mr. Seery testified, if the employees who would be

8  entitled to receive payments under the deferred compensation

9  plan do not agree to enter into a separation agreement that

10  was approved by the Court, they will be terminated before May

11  and there will no -- not longer be any deferred compensation

12  due.

13    Accordingly, while the 24 employees who voted to reject

14  the plan do technically have claims at this time they have

15  voted, Mr. Seery testified the claims will go away soon.

16    I do want to point out something that's obviously

17  painfully obvious at this point, that while Class 8 voted to

18  reject the plan, the Committee, the statutory fiduciary for

19  all unsecured creditors, supports the plan enthusiastically

20  and I believe it does so unanimously.

21    The other classes to reject the plan, Your Honor, are

22  Class 11, the A limited partnerships, and none of the holders

23  in Class B and C limited partnerships voted on the plan, so

24  cram-down is required over those classes as well.  So Your

25  Honor is able to confirm the plan pursuant to the cram-down

100

1    procedures under 1129(b) if the Court determines that the plan

2    is fair and equitable and does not discriminate unfairly

3    against the rejecting classes.

4        Let's first turn to the fair and equitable requirement.  A

5    plan is fair and equitable if it follows the absolute priority

6    rule, meaning that if a class does not receive payment in

7    full, no junior class will receive anything under the plan.

8    With respect to Class 8, no junior class -- junior class to

9    Class 8 will receive payment, and here is the key point,

10   unless Class 8 is paid in full, with appropriate interest.

11   NPA and Dugaboy -- Dugaboy in a brief filed on Monday -- argue

12   that the plan does not satisfy the absolute priority rule

13   because Class 10 and Class Equity Interests have a contingent

14   right to receive property under the plan.

15       Your Honor, this argument misunderstands the absolute

16   priority rule.  Class 10 and Class Creditors will only receive

17   payment after distribution to 8 and 9, the unsecured claims

18   and the subordinated claims, are all paid in full, plus

19   interest.

20       And, in fact, Dugaboy, in its brief, to its credit, admits

21   that the argument is contrary to the Bankruptcy Court's

22   decision of Judge Gargotta in the Western District case of *In*

23   *re Introgen Therapeutics*.  There, the Court was faced with a

24   similar argument by a group of unsecured creditors who argued

25   that the debtor's plan violated the absolute priority rule

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2545
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 613 of 1017 PageID 7326
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2544 of 2722

101

1  because equity was retaining a contingent interest that would

2  only be payable if general unsecured claims were paid in full.

3      In rejecting the argument, the Court reasoned, and I

4  quote, "The only way Class 4 will receive anything is if Class

5  3, in fact, gets paid in full, in satisfaction of

6  1129(b)(2)(B)(i)," meaning that the absolute priority rule

7  would not be an issue.  If Class 3 is not paid in full, Class

8  4's property interest is not -- is just -- is not just

9  valueless, it just doesn't exist.

10     Your Honor, this is precisely the situation in this case.

11 Equity interests will only receive a recovery if Class 8 and 9

12 are paid in full.

13     But Dugaboy attempts to escape the logical reading of the

14 absolute priority rule by claiming that *Introgen* was wrongly

15 decided and goes against the Supreme Court's decision in

16 *Ellers* (phonetic).  Dugaboy argues that because the Supreme

17 Court decided that property given to a junior class without

18 paying a senior class in full is property, even if it's

19 worthless.

20     But Dugaboy misses the point.  Like the debtor in the

21 *Introgen*, the Debtor here is not arguing that the property  --

22 the absolute priority rule is not violated because the

23 contingent trust is worthless.  Rather, the argument is that

24 the absolute priority rule is not violated; it's, in order to

25 receive anything on account of the junior -- of the equity,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2546
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 614 of 1017 PageID 7327
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2545 of 2722

102

1  the senior creditors have to be paid a hundred percent plus

2  interest.

3      In fact, Your Honor, if the plan just didn't give any

4  recovery to the equity Class 10 and 11, I bet you Dugaboy and

5  Mr. Dondero would be arguing that it violated the absolute

6  priority rule because senior classes, unsecured creditors,

7  could potentially receive more than a hundred percent of their

8  interest.  And there's a case in the Southern District of

9  Texas, *In re MCorp*, where the Bankruptcy Court said that for a

10  plan to be confirmed, its stockholders eliminated, creditors

11  must not receive more than payment in full.

12      Excess proceeds, Your Honor, if any, have to go somewhere.

13  They can't go to creditors, so they have to go to equity.  And

14  the absolute priority rule is not violated.

15      And how is Dugaboy harmed?  They say they may want to buy

16  the contingent interests, and the lack of a marketing effort

17  violates the *LaSalle* opinion as well.  And who holds the Class

18  B and Class C partnership interests that come before Dugaboy

19  that Dugaboy is concerned may have this opportunity rather

20  than them?  Yes, it's Hunter Mountain, Your Honor, an entity,

21  like Dugaboy, that's owned and controlled by Mr. Dondero.

22      Accordingly, the argument that the plan violates the

23  absolute priority rule is actually a frivolous argument.

24      Turning now to unfair discrimination, Your Honor, Dugaboy

25  argued in its brief Monday that because the projected

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2547
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 615 of 1017   PageID 7328
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2546 of 2722

103

 1  distribution to unsecured creditors has gone down in the

 2  recent plan projections, the discrepancy between Class 7 and

 3  Class 8 is so large that that amounts to unfair

 4  discrimination.

 5      Again, the Court should first ask why is Dugaboy even the

 6  right party to be making the objection.  Its claim against the

 7  Debtor to pierce the corporate veil, as I mentioned, is

 8  frivolous.  It's subject to objection.  It didn't even bother

 9  to have the claim temporarily allowed for voting purposes, as

10  did other creditors who thought they had a valid claim.  Yet

11  this is another example of Mr. Dondero, through Dugaboy,

12  trying to throw as many roadblocks in front of confirmation as

13  he can.

14      But this argument, like the other ones, fails as well.

15  Class 8 contains the general unsecured creditor claims,

16  predominately litigation claims that have been pending against

17  the Debtor for years.  The Debtor was justified in treating

18  the other unsecured creditors differently.

19      Class 6 consists of the PTO claims in excess of the cap,

20  which are of different quality and nature than the other

21  claims.

22      Class 7 consists of the convenience class.  And it's

23  appropriate to bribe convenience class creditors with a

24  discount option for smaller claims to be cashed out for

25  administrative convenience.

104

1      Mr. Seery testified that when the plan was formulated, the

2   concept was to separately classify liquidated claims in small

3   amounts in Class 7 and unliquidated claims in Class 8.  Mr.

4   Seery also testified that there's a valid business

5   justification to treat the -- hold business 7 -- Class 7

6   claims differently.  These creditors had a reasonable

7   expectation of getting paid promptly, as compared to

8   litigation creditors, who would expect to be paid over time.

9      As the Court is aware, the litigation claims in Class 8

10  involve litigation that has been pending for several years in

11  the case of Acis, Daugherty, Redeemer, and more than a decade

12  in UBS.

13      And most importantly, as Mr. Seery testified, the

14  Committee and the Debtor had significant negotiation regarding

15  the classification and treatment provisions of the plan for

16  Class 7.

17      The Committee does have one constituent who is a Class 7

18  creditor.  However, the other three creditors are all in Class

19  8 and hold claims in excess of $200 million and supported the

20  separate classification and the different treatment.

21      So, Your Honor, discrimination, different treatment among

22  Class 7 and 8 is appropriate, and the different treatment is

23  not unfair.  In the February 1 projections, the Class 8

24  creditors are estimated to receive 71.32 percent of their

25  claims, but that's just an estimate.  As Mr. Seery testified,

105

1   the number can go up based upon the value he can generate from

2   the assets and, importantly, from litigation claims.  Class 8

3   creditors could up end up receiving a hundred percent on

4   account of their claims.  Class 7 creditors are fixed at 85

5   percent.

6       Giving Class 8 creditors the opportunity to roll the dice

7   and potentially get more or less than the 85 percent offered

8   to Class 7 is not at all unfair.

9       For these reasons, Your Honor, the Court has the ability

10  and should confirm the plan pursuant to the cram-down

11  provisions of 1129(b).

12      Your Honor, I'm now going to switch from the statutory

13  requirements to all the issues raised by the release,

14  injunction, and exculpation provisions.

15      I'd just like to take a brief sip of water.

16      Dugaboy -- I will first deal with the Debtor release

17  provided in Article 9(f) of the plan, which we claim is

18  appropriate.  Dugaboy and the U.S. Trustee have objected to

19  the release contained in Article 9(f).  Dugaboy objects

20  because it believes that the Debtor release releases claims

21  that the Claimant Trust or Litigation Trust have that have not

22  yet arisen, and the U.S. Trustee objects because it believes

23  that the release is a third-party release.

24      These objections have no merit, and they should be

25  overruled.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2550
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 618 of 1017   PageID 7331
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2549 of 2722

106

1    I would like to ask Ms. Canty to put up a demonstrative

2  which contains the provision Article 9(f) of the plan.

3    Your Honor, as set forth in this Article 9(f), only the

4  Debtor is granting any release.  While that --

5         THE COURT:  And for the record, it's 9(d)?  9(d),

6  right?

7         MR. POMERANTZ:  9(d)?  9(d), correct, Your Honor.

8         THE COURT:  Yes.  Okay.

9         MR. POMERANTZ:  Sorry about that.

10         THE COURT:  Uh-huh.

11         MR. POMERANTZ:  While the release is broad, it does

12  not purport to release the claims of any third party.  The

13  Claimant Trust and the Litigation Trust are only included in

14  the release as successors of the Debtor.  The release is

15  specifically only for claims that the Debtor or the estate

16  would have been legally entitled to assert in their own right.

17    Section 1123(b)(3)(A) of the Bankruptcy Code provides that

18  a plan may provide for the settlement or adjustment of any

19  claims or interests belonging to the debtor or the estate, and

20  that's exactly what the Debtor release provides.

21    Accordingly, Dugaboy is wrong that the release effects a

22  release of claims that the Claimant Trust or the Litigation

23  Sub-Trust have that won't arise until after the effective

24  date.  And the U.S. Trustee is simply wrong; there's no third-

25  party release aspect under the release.

107

```
1        The last point I will address on the release, Your Honor,

2    is who is being released and why and what does the evidence

3    show.  The Debtor release extends to release parties which

4    include the independent directors, Strand, for actions after

5    January 9th, Jim Seery as the CEO and CRO, the Committee,

6    members of the Committee, professionals, and employees.

7        You have heard Mr. Seery's testimony that the Debtor does

8    not believe that any claims against the parties that are

9    proposed to be released actually exist.  You have heard Mr.

10   Seery's testimony that he worked closely with the employees

11   and believes that not only have they all been instrumental in

12   getting the Debtor to the -- be on the cusp of plan

13   confirmation, but that also Mr. Seery is not aware of any

14   claims against them.

15       Moreover, as Mr. Seery testified, the release for the

16   employees is only conditional.  He testified that the

17   employees are required to assist in the monetization of assets

18   and the resolution of claims, and if they do not like -- if

19   they do not lose their release, then any Debtor claims are

20   tolled, such that could be pursued by the Litigation Trustee

21   at a future time.

22       Lastly, I'm sure that the Dondero entities will argue that

23   someone needs to investigate claims against Mr. Seery for

24   mismanagement or for, God forbid, having failed to file the

25   2015.3 statements.  Such claims are part of the continuing
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2552
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 620 of 1017    PageID 7333
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2551 of 2722

108

1    harassment of Mr. Seery that the Dondero entities have

2    embarked on after it was apparent that nobody would support

3    their plan.

4        There is no evidence of any claims that exist, Your Honor.

5    In fact, the Committee and its professionals have watched the

6    Debtor through this case like a hawk.  They have not been

7    afraid to challenge the Debtor's actions in general and Mr.

8    Seery's in particular.  FTI has worked on a daily basis with

9    DSI and the company, had access to information.  When COVID

10   was happening, they were looking at trades going on on a daily

11   basis.

12       So if the Committee, whose members hold approximately $200

13   million of claims against the estate, are okay with the

14   release against the independent directors and Mr. Seery, that

15   should provide the Court with comfort to approve the releases

16   as part of the plan.

17       In summary, Your Honor, the Debtor release is entirely

18   appropriate and does not affect the release of third-party

19   claims that have not yet arisen.

20       Next, Your Honor, I want to go to the discharge.  There's

21   been objections to the discharge.  Dugaboy and NexPoint have

22   objected that the Debtor receiving a discharge under the plan

23   -- argue a debtor is liquidating.  The objection is not well

24   taken based upon Mr. Seery's testimony regarding what it is

25   the Claimant Trust and the Reorganized Debtor plan to do after

109

1    the effective date, as compared to what the limitations of a

2    discharge are under 1141(d)(3).

3        Your Honor, Article 9 of the -- 9(b) of the plan provides

4    that as -- except as otherwise expressly provided in the plan

5    or the confirmation order, upon the effective date, the Debtor

6    and its estate will be discharged or released under and to the

7    fullest extent provided under 1141(d)(A) [sic] and other

8    applicable provisions of the Bankruptcy Court.  Bankruptcy

9    Code.

10       Section 1141(d)(3) provides an exception to the discharge,

11   and I'd like to have that section put up for Your Honor at

12   this point.  Ms. Canty?

13       As this -- as the section reflects, and as the Fifth

14   Circuit has ruled in the *TH-New Orleans Limited Partnership*

15   case cited in our materials, in order to deny the debtor a

16   discharge under 1141(d)(3), three things must be true:  (1)

17   the plan provides for the liquidation of all or substantially

18   all of the property in the estate; (2) the debtor does not

19   engage in business after consummation of the plan; and (3) the

20   debtor would be denied a discharge under 727(a) of this title

21   if the case was converted to Chapter 7.  Here, only C applies.

22       With respect to A, Your Honor, while the plan does project

23   that it will take approximately two years to monetize the

24   Debtor's assets for fair value, the Debtor is just not

25   liquidating within the meaning of Section A.

110

```
 1        As Mr. Seery testified, during the post-confirmation

 2   period, post-effective date period, the Debtor will continue

 3   to manage its funds and conduct the same type of business it

 4   conducted prior to the effective date.  It'll manage the CLOs.

 5   It'll manage Multi-Strat.  It'll manage Restoration Capital.

 6   It'll manage the Select Fund, and it'll manage the Korea Fund.

 7        The Bankruptcy Court for the Southern District of New

 8   York's 2000 opinion in Enron, cited in our materials, is on

 9   point.  There, the Court found that a debtor liquidating its

10   assets over an indefinite period of time that is likely to

11   take years is not liquidating within the meaning of Section

12   1141(b)(3)(A), justifying a denial of discharge.

13        But even if we failed A, based upon Mr. Seery's testimony,

14   we would not fail B.  The Debtor will be continuing to do what

15   it has done during the case, as it did before, as I said,

16   managing its business.  B says the debtor does not engage in

17   the business after management.  So while Mr. Seery testified

18   that it would take approximately two years, it could take

19   more, it could take less, and there is no requirement to

20   liquidate assets over a period of time.

21        Accordingly, Your Honor, the Debtor is conducting the type

22   of business contemplated by Section B so as not to just deny a

23   discharge.

24        As the Fifth Circuit said in the TH-New Orleans case, the

25   court granted a discharge there because it was likely that the
```

111

1   debtor would be liquidating its assets and conducting business

2   (indecipherable) years following a confirmation date.  And

3   this result makes sense, Your Honor, because the Debtor will

4   need the discharge and the tenant injunctions, which I'll get

5   to in a moment, in order to prevent interference with the

6   Debtor's ability to implement the terms of the plan and make

7   distributions to creditors.

8       I would now like, Your Honor, to turn to the exculpation

9   provisions, which there's been -- there's been a lot of

10  briefing on it, and I know Your Honor is very aware of the

11  exculpation provisions and the *Pacific Lumber* case.  And

12  several parties have objected to the exculpation contained in

13  the plan, based primarily on the Fifth Circuit ruling in

14  *Pacific Lumber*.

15      The exculpation provision, which is not dissimilar to what

16  is found in many plans around the country, including in plans

17  confirmed in bankruptcy courts in the Fifth Circuit, acts to

18  exculpate the exculpated parties for negligent-only acts as it

19  contains the standard carve-outs for gross negligence,

20  intentional conduct, and willful misconduct.

21      I do want to bring to the Court's attention a deletion we

22  made to the parties protected by the exculpation in the plan

23  and now -- were filed on February 1st.  The definition of

24  exculpated parties included, before February 1, not only the

25  Debtor but its direct and indirect majority-owned subsidiaries

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2556
Case 3:25-cv-02072-S   Document 15-9   Filed 06/13/25   Page 624 of 1017   PageID 7337
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2555 of 2722

112

1   and the managed funds.  In the plan amendment, we have deleted

2   the Debtor's direct and indirect majority-owned subsidiaries

3   and managed funds from the definition and are not seeking

4   exculpation for those entities.

5       But before, Your Honor, I address *Pacific Lumber* and why

6   the Debtor believes it does not preclude the Court from

7   approving the exculpation in this case, I do want to focus on

8   something that the Objectors conveniently ignore from their

9   argument.

10      As I mentioned in my opening argument, Your Honor, the

11  independent directors were appointed pursuant to the Court's

12  order on January 9, 2020.  They have resolved many issues

13  between the Debtor and the Committee, and avoided the

14  appointment of a Chapter 11 trustee.

15      The January 9th order was specifically approved by Mr.

16  Dondero, who was in control of the Debtor at the time, and I

17  believe the transcripts that are admitted into evidence will

18  demonstrate that he was fully behind the approval of the

19  January 9th order.

20      In addition to appointing the independent directors into

21  what was sure to be a contentiously litigious case, the

22  January 9th order set the standard of care for the independent

23  directors, and specifically exculpated them from negligence.

24      You have heard Mr. Seery and Mr. Dubel testify that they

25  had input into what the order said and would have not agreed

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2557
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 625 of 1017   PageID 7338
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2556 of 2722

113

1    to be appointed as independent directors if it did not include

2    Paragraph 10, as well as the provisions regarding

3    indemnification and D&O insurance.

4        I would like to put a demonstrative on the screen, which

5    is actually Paragraph 10 of that order.  Your Honor, Paragraph

6    10, there's two concepts embedded here.  First, it requires

7    any parties wishing to sue the independent directors or their

8    agents to first seek such approval from the Bankruptcy Court.

9    Secondly, and importantly for purposes of the independent

10   directors and their agents, who would include the employees,

11   it set the standard of care for them during the Chapter 11 and

12   entitled them to exculpation for negligence.  Paragraph 10

13   says the Court will only permit a suit to go forward if such

14   claim represents a colorable claim for willful misconduct or

15   gross negligence.

16       And Your Honor, Paragraph 10 does not expire by its terms.

17       By not including negligence in the definition of what a

18   colorable claim might be, the Court has already exculpated the

19   independent directors and their agents, which include the

20   employees acting at their direction.

21       And because the independent directors and their agents are

22   exculpated under Paragraph 10, Strand needs to be exculpated

23   as well for actions occurring after January 9th.  This is

24   because a suit against Strand for conduct after the

25   independent board was appointed is effectively a suit against

114

1   the independent directors, who were the only people in control

2   of Strand at that time.

3       After the effective date, Mr. Dondero will regain control

4   of Strand, as the independent directors will be discharged.

5   And for parties able to sue Strand essentially for negligence

6   for conduct conducted by the independent directors after

7   January 9th, Strand will then be able to seek indemnification

8   from the Debtor under the Debtor's partnership agreement

9   because the partnership agreement does provide the general

10  partner is entitled to indemnification.

11      Accordingly, an exculpation for Strand is really the

12  functional equivalent of an exculpation for the independent

13  directors and the Debtor.

14      The January 9th order was not appealed, and an objection

15  to exculpation at this point as it relates to the independent

16  directors, their agents, and Strand is a collateral attack on

17  this order.  So, Your Honor, Your Honor does not even need to

18  get to the thorny issues addressed by *Pacific Lumber*.

19      However, even in the absence of the January 9th order,

20  exculpation of the independent directors and their employees,

21  as well as the other exculpated parties, is not prohibited by

22  *Pacific Lumber*.  In *Pacific Lumber*, the Fifth Circuit reversed

23  a bankruptcy court order confirming a plan because the

24  exculpation provision was too broad and included parties that

25  the Fifth Circuit thought could not be exculpated under

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2559
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 627 of 1017 PageID 7340
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2558 of 2722

115

1   Section 524(e) of the Code.

2       A close look at the issue before the Court, Your Honor,

3   the reasoning for the Court's ruling and why certain parties

4   like Committee and its members were entitled to exculpation,

5   reflects that this case does not prevent the Court from

6   approving exculpation of this case.

7       A careful read of the underlying briefs and opinions in

8   *Pacific Lumber* reveals that the concern that the Appellants

9   had in that case was the application of exculpation to non-

10  fiduciary sponsors.  There were two competing plans in the

11  case.  The first was filed by the indenture trustee.  The

12  second was filed by the debtor's parent and lender, and was

13  deemed -- called the Marathon Plan.  The Court confirmed the

14  Marathon Plan, and the indenture trustee appealed, and the

15  indenture trustee argued that the plan sponsors could not be

16  exculpated.

17      After determining that the appeal of the exculpation

18  provisions were not equitably moot, the Fifth Circuit

19  determined that exculpation was not authorized under 524(e) of

20  the Code because that section provides a discharge of the

21  debtor does not affect the liability of any other entity on

22  such debt.

23      However, and here's the important part, Your Honor:  The

24  Fifth Circuit did not say that all exculpations are prohibited

25  under the Code and authorized the exculpation of the Committee

116

1    and its members.  And why did the Court do that?  Because it

2    looked at the Committee's qualified immunity under 1103 and

3    also reasoned that Committee members are essentially

4    disinterested volunteers that should be entitled to

5    exculpation on negligence.

6        The Court also cited approvingly *Colliers* for the

7    proposition that if Committee members were not exculpated for

8    negligence and subject to suit by people who are unhappy with

9    them, they just would not serve.

10       Accordingly, the Fifth Circuit based its willingness to

11   exculpate Committee members on the strong public policy that

12   supports exculpation for those parties under those

13   circumstances.  And against this backdrop, Your Honor, there

14   are several reasons why the Court should authorize exculpation

15   in this case, notwithstanding *Pacific Lumber*.

16       First, Your Honor, the independent directors in this case

17   are analogous -- much more analogous to the Committee members

18   that the Fifth Circuit ruled were entitled to than the

19   incumbent officer and directors.

20       Your Honor has the following facts before the Court, based

21   upon the testimony of Mr. Seery and Mr. Dubel and other

22   evidence in the record.  The independent board members were

23   not part of the Highland enterprise before the Court appointed

24   them on January 9th.  The Court appointed the independent

25   directors in lieu of a Chapter 11 trustee to address what the

117

1    Court perceived as the serious conflicts of interest and

2    fiduciary duty concerns with current management, as identified

3    by the Committee.

4        The independent directors would not have agreed to accept

5    their role without indemnification, insurance, exculpation,

6    and the gatekeeper function provided by the January 9th order.

7        And Mr. Dubel testified regarding the significant

8    experience he has as an independent director during his 30-

9    plus years in the restructuring community, including several

10   engagements as an independent director in Chapter 11 cases.

11   And he testified that independent directors have become

12   commonplace in complex restructurings over the last several

13   years and have been appointed in many cases, including high-

14   profile cases.  We've cited to just a few of those cases in

15   our brief, but we could go on and on.

16       Mr. Dubel testified that the independent directors are a

17   critical tool in proper corporate governance and restoring

18   creditor confidence in management in modern-day

19   restructurings, and he testified that, based upon his

20   experience, independent directors expect to be indemnified by

21   the company, expect to obtain directors and officers

22   insurance, and expect to be exculpated from claims of

23   negligence when they agree to be appointed.

24       He further testified that if independent directors cannot

25   be assured that they will be exculpated for simple negligence,

118

1   he believes they will be unwilling to serve in contentious

2   cases like the one we have here, which will have a material

3   adverse effect on the Chapter 11 restructuring process as we

4   know it.

5       Based upon the foregoing testimony, Your Honor, which is

6   uncontroverted, the Court should have no problem finding that

7   the independent directors are much more analogous to the

8   Committee members in *Pacific Lumber* who the Fifth Circuit said

9   could be exculpated.

10      The facts, these facts also distinguish this case from the

11  *Dropbox v. Thru* case which Your Honor decided and which was

12  reversed on this issue by the District Court.  In neither

13  *Pacific Lumber* or *Thru* was there an argument that the policy

14  reasons that supported exculpation of Committee members also

15  supported the exculpation of the parties sought to be

16  exculpated.

17      Moreover, Your Honor, the independent directors in this

18  case were pointed as essentially as substitute for a Chapter

19  11 trustee.  There was a Chapter 11 trustee motion filed a few

20  days before, I believe, and the Court, in approving this, said

21  that you -- better than a Chapter 11 trustee.  And Chapter 11

22  Trustees are entitled to qualified immunity.  So, while, yes,

23  the independent directors aren't truly Chapter 11 trustees,

24  they are analogous.

25      Second, Your Honor, while there is language in *Pacific*

119

1   *Lumber* that says that the directors and officers of the debtor

2   are not entitled to exculpation, the issue before the Court

3   really on appeal was the plan sponsors and whether they were.

4   So I would argue that any discussion of the exculpation not

5   being available for directors and officers in the Fifth

6   Circuit opinion in *Palco* is actually dicta.

7       Third, Your Honor, as I discussed before, the *Pacific*

8   *Lumber* decision was based solely on 524(e) of the Bankruptcy

9   Code, which only says that the discharge of a claim against

10  the debtor does not affect the discharge of a third party.

11  However, the Debtor is not relying on 524(e) as the basis of

12  their exculpation.  As we outline in our brief, Your Honor, we

13  believe that the exculpation is appropriate under Section 105

14  and 1123(b)(6) as a means -- part of an implementation of the

15  plan.

16      Importantly, Your Honor, as other courts hostile to third-

17  party releases have determined, exculpation only sets a

18  standard of care for parties and is not an effort to relieve

19  fiduciaries of liability.

20      Other courts that have aligned with the Fifth Circuit and

21  rejected third-party releases, like the Ninth Circuit, have

22  recently determined exculpation has nothing to do with 524(e).

23  In *In re Blixseth*, a Ninth Circuit case decided at the end of

24  2020 cited in our materials, they examined several of their

25  circuit cases that had strongly prohibited non-consensual

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2564
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 632 of 1017   PageID 7345
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2563 of 2722

120

1    third-party releases under 524(e).  But again, the Court

2    concluded that 524(e) only prohibits third parties from being

3    released from liability of a prepetition claim for which the

4    debtor receives a discharge.  The Court reasoned that the

5    exculpation clause, however, protects parties from negligence

6    claims relating to matters that occurred during the Chapter 11

7    case and has nothing to do with 524(e).

8        The Ninth Circuit, which along with the Fifth Circuit has

9    been notorious for prohibiting third-party releases, issued

10   its ruling against this backdrop and said that exculpations

11   are appropriate.

12       Your Honor, the Objectors made a point yesterday of

13   pointing out that Strand, as the Debtor's general partner, is

14   liable for the debts under applicable law.  To the extent they

15   intend to argue that the exculpation is seeking to discharge

16   any such prepetition liability, they would be wrong.  The

17   exculpation only applies to postpetition matters.  And to the

18   extent they argue that the exculpation seeks to discharge

19   Strand's potential postpetition liability, for the reasons I

20   discussed, a claim against Strand will essentially be a claim

21   against the Debtor because the Debtor will be obligated to

22   indemnify them.

23       Accordingly, Your Honor, we submit that if this matter

24   goes up to appeal to the Fifth Circuit, which it may very well

25   do, that the Fifth Circuit may very well come out the same way

121

1  as the Ninth Circuit and start relaxing the standard or

2  otherwise provide that the independent directors are much more

3  like Committee members.

4      Lastly, Your Honor, if the Court does confirm the plan,

5  which we certainly hope it will do, it will have made a

6  finding that the plan has been proposed in good faith, and in

7  doing so, the Court essentially finds that the independent

8  directors and their agents have acted appropriately and

9  consistent with their fiduciary duties, and it makes --

10  exculpation for negligence naturally flows from that finding.

11      Your Honor, I would now like to go to the injunction

12  provisions, and my argument is that the injunction provisions

13  as amended are appropriate.

14          THE COURT:  Can I stop you?

15          MR. POMERANTZ:  We received several of -- yes.

16          THE COURT:  I want to just recap a couple of things I

17  think I heard you say.  You're not asking this Court, you say,

18  to go contrary to *Pacific Lumber* per se.  You have thrown out

19  there the possibility that *Pacific Lumber* mistakenly relied on

20  524(e) in rejecting exculpations of plan sponsors.  You're

21  saying, eh, as a technical matter, I think they were wrong in

22  focusing on that statute because that statute seems to deal

23  with prepetition liability.  Okay?  Its actual wording, 524(e)

24  states, discharge of a debt of a debtor does not affect the

25  liability of any other entity on such debts.

122

 1      And reading between the lines, I think you're saying --

 2  well, maybe this isn't what you're saying, but here's what I

 3  inferred -- "debt" is defined in 101(12) to mean liability on

 4  a claim, and then "claim" is defined in 101(5) of the

 5  Bankruptcy Code as meaning right to payment.  It doesn't say

 6  as of the petition date, but I think if you look at, then,

 7  Section 502 of the Bankruptcy Code that addresses claims and

 8  interests, clearly, it seems to be referring to the

 9  prepetition time period, you know, claims and interest as of

10  the petition date.  And then -- that's 502.  And then 503

11  speaks of, for the most part, postpetition administrative

12  expenses.

13      So that was my rambling way of saying I'm understanding

14  you to say, eh, as a technical matter, we think the Fifth

15  Circuit was wrong to focus on 524(e) because when you're

16  talking about exculpation you're talking about postpetition

17  liability, not prepetition liability.  And 524(e) is talking

18  more about prepetition liability.

19      But I think what I also hear you saying is, at bottom,

20  *Pacific Lumber* was sort of a policy-driven holding where, you

21  know, we're worried about no one would ever sign up for being

22  on an unsecured creditors' committee if they could be exposed

23  to lawsuits.  They're fiduciaries, we think, for policy

24  reasons.  Exculpation is appropriate for this one group.  And

25  you're saying, well, they didn't have an independent board

123

 1  that they were considering.  They were just considering non-

 2  fiduciary plan sponsors.  And so the rationale presented by

 3  *Pacific Lumber* applies equally here, and just they didn't make

 4  a holding in this factual context.

 5      Have I recapped what you're saying?

 6          MR. POMERANTZ:  Your Honor, that's generally --

 7  generally correct, with a couple of nuances.  So, yes, first,

 8  I think, on a policy basis, Your Honor -- again, putting aside

 9  the January 9th order, because we don't see --

10          THE COURT:  Right.  Right.

11          MR. POMERANTZ:  -- Your Honor even needs to get to

12  this issue.

13          THE COURT:  I understand.

14          MR. POMERANTZ:  But if Your Honor does get to this

15  issue, we think, as a first point, Your Honor could be totally

16  consistent with *Pacific Lumber* because there's policy reasons

17  and there was not a categorical rejection of exculpation.

18  Okay.  So if there was a categorical rejection, then it

19  wouldn't have been okay for committee members.  Okay.

20      Second argument, yes, we don't think -- we think it's part

21  of dicta.  It's not part of the holding.  We understand that

22  other courts may have not agreed, maybe your *Thru* case, which

23  Your Honor was appealed on.

24      But the third issue, our argument is all they looked at

25  was 524(e).  They said 523 -- 4(e) does not authorize it.

124

1    They did not say 524(e) prohibits it.

2        We think there's other provisions in the Code.  And then

3    when you basically add in the analysis that Your Honor

4    provided, which we agree with, and what 524 was -- to do,

5    524(e) just says that discharge doesn't affect.  It doesn't

6    say that under another provision of the Code or for another

7    reason you are authorized to give an exculpation.  I think

8    it's a nuance and it's a difference there.

9        And my point of bringing up the *Blixseth* case -- which, of

10    course, is Ninth Circuit and it's not binding on Your Honor,

11    it's not binding on the Fifth Circuit -- is to say, when that

12    was presented to them, they saw the distinction that 524(e)

13    has nothing to do with an exculpation.  And while, yes, the

14    Fifth Circuit hasn't ruled on that, and if the Fifth -- if

15    that argument is made to the Fifth Circuit, we don't know how

16    they would rule, I think that, based upon their analysis --

17    which, again, Your Honor, is no more than a page and a half of

18    their opinion, right, of a long, lengthy opinion on the

19    confirmation issues.  So I think, Your Honor, with the Fifth

20    Circuit, there is a good chance that based upon the developing

21    case law of exculpation, based upon the sister circuit in

22    *Blixseth* making that distinction, that there is a very good

23    chance that the Fifth Circuit would change.

24        But look, I recognize that argument requires Your Honor to

25    say, okay, this is outside and -- and what *Pacific Lumber* did

125

1    or didn't do.  But I think, Your Honor, there's several

2    potential reasons, there's several potential arguments that

3    you can get to the same place.

4            THE COURT:  Okay.  Thank you.

5            MR. POMERANTZ:  Okay.  If I may just get another

6    glass of -- sip of water before my time starts?

7            THE COURT:  Okay.

8            MR. POMERANTZ:  Okay, Your Honor.  We're now turning

9    to the injunction provision.  The Debtor received several

10   objections to the injunction provisions in -- I think I have

11   it right now -- Article 9(f) to the plan.  And we've modified

12   Article 9(f) to address certain of those concerns, and we

13   believe that, as modified, that the injunction provision

14   implements and enforces the plan's discharge, release, and

15   exculpation provisions to prevent parties from pursuing claims

16   in interest that are addressed by the plan and otherwise

17   interfering with consummation and implementation of the plan.

18       I'd like to put up the first paragraph of the injunction

19   on the screen now.

20       Okay, Your Honor.  The first paragraph, all it does is

21   prohibits the enjoined parties from taking action to interfere

22   with consummation or implementation of the plan.  I suspect a

23   sentence like that is probably in hundreds of plans in the

24   Fifth Circuit and elsewhere.

25       Initially, to address a concern that it applied to too

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2570
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 638 of 1017 PageID 7351
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2569 of 2722

126

1   many parties, the Debtor added a definition in the revised

2   plan that defines "enjoined parties," which I'd like to now

3   put that definition up on the screen.

4       The changes -- it's a little hard to read there, but you

5   have it in the -- oh, there you go. The changes made clear

6   that only parties who have a relationship to this case, either

7   holding a claim or interest, having appeared in the case, be a

8   -- or be a party in interest, Jim Dondero, or related entity,

9   or related person of the foregoing are covered. The claim

10  objectors argue that the word "implementation and

11  consummation" is vague, or vague and unclear. Your Honor,

12  these terms are both defined in the Bankruptcy Code and under

13  the case law, and they're, as I said, common features of many

14  plans.

15      Section 1123(a)(5) of the Code provides that a plan shall

16  provide for its implementation, and identifies a list of items

17  that the plan can include. Article 4 of our plan is defined

18  as "Means of Implementation of This Plan," and describes the

19  various corporate steps required to implement the provisions

20  of the plan, including canceling equity interests, creation of

21  new general partners and a limited part of the Reorganized

22  Debtor, the restatement of the limited partnership agreement,

23  and the establishment of the various trusts.

24      Paragraph 1 rightly and appropriately enjoins efforts to

25  interfere with these steps.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2571
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 639 of 1017 PageID 7352
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2570 of
2722

127

1    Nor is the term "consummation of the plan" vague.

2    "Consummation" also is a commonly-used term and has been

3    defined by the Fifth Circuit and the Code. 1102 -- 1101(2)

4    defines "Substantial Consummation" to be the transfer of

5    assets to be transferred under the plan, the assumption by the

6    debtor of the management of all the property dealt with by the

7    plan, and the commencement of distributions under the plan.

8    Section 1142 gives the Court authority to direct a party

9    to perform any act necessary for consummation of a plan. And

10   as the Fifth Circuit, in *United States Brass Corp.*, which is

11   said in our material, states, said the Bankruptcy Court had

12   post-confirmation jurisdiction to enforce the unperformed

13   terms of a plan with respect to a matter that could affect the

14   parties' post-confirmation rights because the plan had not

15   been fully consummated.

16   And Your Honor just wrote on this issue last year in the

17   *Senior* -- the *Texas* -- the *TXMS Real Estate v. Senior Care*

18   case, and you cited to *U.S. Brass* to find that, in that case,

19   post-confirmation jurisdiction existed to resolve a dispute

20   relating to an assumed contract because the matter related to

21   interpretation, implementation, and execution of the plan.

22   Accordingly, Your Honor, neither implementation or

23   consummation are vague, and the first paragraph of the

24   injunction is necessary and appropriate to enforce the

25   Debtor's discharge.

128

1      As I said before, I will leave it to Mr. Kharasch to

2   address specifically the concerns that the Advisor and the

3   Funds have with the injunction.

4      The second and third paragraphs of the injunction, Your

5   Honor, certain parties have objected to them on the ground

6   that they constitute an improper release of the independent

7   directors as well as the release of claims against the

8   Reorganized Debtor, the Claimant Trust, and the Litigation

9   Sub-Trust, entities that will not have come into existence

10  until after the effective date.

11     We believe we have addressed these concerns by

12  modifications to the second and third paragraphs of the

13  injunction, which I would now like to put the second and third

14  paragraphs on the screen.

15     (Pause.)

16         MR. POMERANTZ:  As that is happening, Your Honor, I

17  will -- there we go.

18     We believe that the changes that were made to these

19  paragraphs should address the Objectors' concerns.

20     First, as with the first paragraph, we have created a

21  defined term of "Enjoined Parties" who are subject to the

22  injunction which is narrower than all persons, I believe, or

23  all entities that was included in the prior plan.  So we've

24  narrowed that.

25     "Enjoined Parties" are generally defined, as I mentioned

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2573
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 641 of 1017 PageID 7354
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2572 of 2722

129

1  before, as entities involved in this case or related to Jim

2  Dondero, or have appeared in this case.

3      Second, we have removed independent directors from these

4  paragraphs to address the concern that the injunction was a

5  disguised third-party release.

6      Third, we have removed the Reorganized Debtor and the

7  Claimant Trust from the second paragraph and moved them to the

8  third paragraph.  We did this to make clear that the

9  Reorganized Debtor and Claimant Trust were only getting the

10  benefit of the injunction as the successors to the Debtor.  As

11  the Reorganized Debtor and the Claimant Trust receives the

12  property from the Debtor free and clear of all claims and

13  interests and equity holders under 1141(c), they are entitled

14  to the benefit of the injunction.

15      Fourth, we have addressed the concern that the injunction

16  improperly affected set-off rights.  We added language to make

17  clear that the injunction would only affect the parties' set-

18  off of an obligation owed to the Debtor to the extent that

19  that was permissible under 553 and 1141 of the Bankruptcy

20  Code.

21      In other words, we are punting the issue for another day,

22  and there's nothing in the plan that gives the Debtor any more

23  set-off rights than it otherwise has under the Bankruptcy

24  Code.

25      Lastly, Your Honor, certain Objectors have argued that the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2574
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 642 of 1017 PageID 7355
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2573 of 2722

130

1  injunction somehow prevents them from enforcing the rights

2  they have under the plan or the confirmation order.  We don't

3  really understand this concern, as the language leading into

4  the second paragraph of the injunction says, except as

5  expressly provided in the plan, the confirmation order, or a

6  separate order of the Bankruptcy Court.

7       With these modifications, Your Honor, the provisions do

8  nothing more than implement 1123(b)(6) and 1141 by preventing

9  parties from taking actions to interfere with the Debtor's

10 plan.

11      The Court has also heard testimony from Mr. Seery

12 regarding the importance of the injunction to implementation

13 of the plan.  He testified that he intends to monetize assets

14 in a way that will maximize value.  And to effectively do

15 that, he has testified that the Claimant Trust needs to be

16 able to pursue its objectives without interference and

17 continued harassment from Mr. Dondero and his related

18 entities.

19      In fact, Mr. Seery testified that if the Claimant Trust

20 were subject to interference by Mr. Dondero, it would take him

21 more time to monetize assets, they would be monetized for less

22 money, and creditors would be harmed.

23      If Your Honor doesn't have any questions for me on the

24 injunction provisions, I'd like to turn to the last part of

25 the injunction, which is really the gatekeeper provision.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2575
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 643 of 1017   PageID 7356
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2574 of 2722

131

1           THE COURT:  All right.  You may.

2           MR. POMERANTZ:  Your Honor, the last paragraph in

3   Article 9(f) is really not an injunction but is rather a

4   gatekeeper provision.  And as originally drafted, it'd do two

5   things:  first, it'd require that before any entity, which is

6   defined very broadly, could file an action against a protected

7   party relating to certain specified matters, the entity would

8   have to seek a determination from this Court that the claim

9   represented are colorable claim of bad faith, criminal

10  conduct, willful misconduct, fraud, or gross negligence.  The

11  specified matters to which the gatekeeper provision would

12  apply included the Chapter 11 case, negotiations regarding the

13  plan, the administration of the plan, the property to be

14  distributed under the plan, the wind-down of the Debtor's

15  business, the administration of the Claimant Trust, or

16  transactions related to the foregoing.

17      Subject to certain exceptions for Dondero-related parties,

18  protected parties were defined to include the Debtor, its

19  successors and assigns, indirect and direct, majority-owned

20  subsidiaries and managed funds, employees, Strand, Reorganized

21  Debtor, the independent directors, the Committee and its

22  members, the Claimant Trust, the Claimant Trustee, the

23  Litigation Trust, the Litigation Sub-Trustee, the members of

24  the Oversight Committee, retained professionals, the CEO and

25  CRO, and persons related to the foregoing.  Essentially,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2576
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 644 of 1017   PageID 7357
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2575 of
2722

132

1  parties related to the pre-effective-date administration of

2  the estate or the post-confirmation implementation of the

3  plan.

4      Second, the gatekeeper provision as originally presented

5  gave the Bankruptcy Court exclusive jurisdiction to adjudicate

6  any cause of action that it determined would pass through the

7  gate.  The gatekeeper provision, Your Honor, is not a release

8  in any way.  Rather, it permits enjoined parties who believe

9  they have a claim against the protected parties to pursue such

10  a claim, provided they first make a showing that the claim is

11  colorable to the Bankruptcy Court.

12      Several parties, Your Honor, objected to the Bankruptcy

13  Court having exclusive jurisdiction to adjudicate the claims

14  that pass through the gate.  The Debtor believes that the

15  Bankruptcy Court would ultimately have jurisdiction of any of

16  those claims that pass through the gate.  However, the Debtor

17  did, upon reflection, appreciate the concern that if the Court

18  agreed to that now, it would essentially be determining its

19  jurisdiction before a claim was filed.

20      Accordingly, in the January 22nd plan, Your Honor, we

21  amended the provision to provide that the Bankruptcy Court

22  will only have jurisdiction over such claims to the extent it

23  was legally permissible to do so, essentially deferring the

24  issue to a later time.

25      And as Your Honor, I believe, in one of cases called the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2577
Case 3:25-cv-02072-S    Document 15-9    Filed 06/23/25    Page 645 of 1017    PageID 7358
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2576 of 2722

133

1    *Icing on the Cake*, the retention and jurisdiction provisions

2    in the plan only are to the extent under applicable law and

3    are quite broad and include the things that we would have the

4    Court -- have jurisdiction for the Court, otherwise

5    determined.

6        The Court made some other changes to the gatekeeper

7    provision, and I would like to place the amended gatekeeper

8    provision on the screen right now.  In addition to the change

9    I mentioned, the Debtor made the following changes:  the

10   provision is limited now to apply only to enjoined parties,

11   rather than any entity.  Than any entity.  Much narrower.  The

12   provision added the administration of the Litigation Sub-Trust

13   to the matters to which the provision would apply.  The

14   provision makes clear now that any claim, including

15   negligence, is a claim that could be sought and pursued

16   through the gatekeeper function.  And the provision made some

17   other syntax changes.

18       We believe, Your Honor, with these changes, we believe

19   that the gatekeeper provision is within the Court's

20   jurisdiction and it's appropriate to include under the plan.

21       But certain parties have argued that the Court does not

22   have the authority, the jurisdictional authority to perform

23   the gatekeeper function, separate and apart from whether it

24   has jurisdiction to adjudicate the claims that pass through

25   the gate.

134

```
1      Your Honor, we submit that these arguments represent a

2   fundamental misunderstanding of Bankruptcy Court jurisdiction

3   and the Court's authority to make sure the Debtor is free of

4   interference in carrying out the plan which I'll get to in a

5   couple moments.

6      As a preliminary matter, Your Honor, it is important for

7   the Court to remember that Paragraph 10 of the January 9 order

8   already contains a gatekeeper provision as it relates to the

9   independent directors and their agents.  And as I mentioned on

10  a couple of occasions, that order is not going away, it

11  doesn't expire by its terms, and it cannot be collaterally

12  attacked in this forum.

13     The Debtor does acknowledge, though, that the gatekeeper

14  provision in the plan is broader in terms of the people it

15  protects and it applies to post-confirmation matters.

16     Before I address the Court's authority to approve the

17  gatekeeper provision, I want to summarize the evidence that it

18  has heard from Mr. Seery and Mr. Tauber regarding why the

19  gatekeeper is so important a provision to the success of the

20  plan.

21     Although the Court is all too familiar with the history of

22  litigation initiated by and filed against Mr. Dondero and his

23  related affiliates, Mr. Seery spent some time on the stand

24  testifying about the litigation so the Court would have a

25  complete record for this hearing.  He testified that prior to
```

135

 1    the petition date, the Debtor faced years of litigation from

 2    Mr. Terry and Acis that led to the *Acis* bankruptcy case, which

 3    Your Honor has said many times it's still in your mind.  Years

 4    of litigation with the Redeemer Committee which precipitated

 5    the filing of a bankruptcy case and resulted in an award very

 6    critical of the Debtor's conduct.  Years of litigation with

 7    UBS.  Years of litigation with Patrick Daugherty.  And we

 8    placed all the dockets for all these matters before the Court.

 9         Also, during the bankruptcy and after the Committee

10    essentially rejected the Debtor's pot plan proposal and

11    indicated -- and the Debtor indicated it would be terminating

12    the shared service agreements with Mr. Dondero and his related

13    entities, the Debtor was the subject of harassment from Mr.

14    Dondero and related entities which resulted in the temporary

15    restraining order against him, a preliminary injunction

16    against him, a contempt motion, which Your Honor is scheduled

17    to hear Friday, a motion by the Debtor's controlled -- by the

18    Dondero-controlled investors and funds in CLO managed --

19    managed by the Debtor, which the Court referred to that motion

20    as being frivolous and a waste of the Court's time.  Multiple

21    plan objections, most of which are focused on allowing the

22    Debtors to continue their litigation crusade against the

23    Debtor and its successors post-confirmation.  An objection to

24    the Debtor approval of the Acis order and a subsequent appeal.

25    An objection to the HarbourVest settlement and subsequent

136

 1   appeal.  A complaint and injunction against the Advisors and

 2   the Funds to prevent them from violating Paragraph 9 of the

 3   January 9th order.  And a temporary restraining order against

 4   those parties, which was by consent.

 5       Mr. Dondero's counsel tends to argue that he is the victim

 6   here and that the litigation is being commenced against him

 7   and -- instead of by him.  That response does not even deserve

 8   a response, Your Honor.  It is disingenuous.

 9       Mr. Tauber testified that he was part of the team at Aon

10   that sourced coverage for the independent directors after

11   their appointment in January 2020 and that he has over 20

12   years of underwriting experience.  He testified that at Aon he

13   builds bespoke insurance programs which are not cookie-cutter

14   programs for his clients, with an emphasis on D&O and E&O.

15   And he was asked by the independent board to obtain D&O and

16   E&O insurance after the board's appointment on January 9th.

17       Based upon the process Aon conducted in reaching out to

18   insurance carriers, Mr. Tauber testified that Aon was only

19   able to obtain D&O insurance based upon the inclusion of

20   Paragraph 10 of the January 9 order, the gatekeeper provision.

21   I know Mr. Taylor said that that was spoon-fed to the

22   insurers, but Mr. Tauber's testimony is they knew about Mr.

23   Dondero and they knew about his litigation tactics, so it is

24   not a good inference to be made from the testimony that they

25   would not have required something.  They probably would have

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2581
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 649 of 1017 PageID 7362
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2580 of 2722

137

1    just said no.

2        Aon has now been -- Mr. Tauber testified that Aon has now

3    been asked to obtain D&O coverage for the Claimant Trustee,

4    the Litigation Trustee, the Oversight Committee, the members,

5    the Claimant Trust, and the Litigation Sub-Trust.  He

6    testified that he and Aon have approached the insurance

7    carriers that they believe might be interested in underwriting

8    coverage.

9        And no, he hasn't approached every D&O and E&O carrier out

10   there, and there may be, just like an investment banker

11   doesn't have to approach everyone.  They are experts in the

12   field, and he testified they approached the people they

13   thought would likely be willing or interested and potentially

14   be willing to extend coverage.  And as a result of Aon's

15   efforts, Mr. Tauber has determined that there's a continued

16   resistance to provide any coverage that does not contain an

17   exclusion for actions relating to Mr. Dondero or his related

18   entities.  And he further believes that all carriers that will

19   -- that have discussed a willingness to provide coverage will

20   only do so if there is a gatekeeper provision, and only one

21   carrier will agree to provide coverage without a Dondero

22   exclusion.

23       Mr. Tauber testified that he believes that any ultimate

24   policy will provide that if at any time the gatekeeper

25   provision is not in place, either the carrier will not cover

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2582
Case 3:25-cv-02072-S Document 15-9 Filed 06/25/25 Page 650 of 1017 PageID 7363
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2581 of 2722

138

1  any actions related to Mr. Dondero or his affiliates or that

2  the coverage will be vacated or voided.

3      Based upon the foregoing record, Your Honor, which is

4  uncontroverted, there's ample justification on a factual basis

5  for approval of the gatekeeper provision.

6      I will now turn to the Court's authority to approve the

7  gatekeeper provision.

8      There are three alternative bases upon which the Court can

9  approve the gatekeeper provision.  First, several provisions

10 of the Bankruptcy Code give broad authority to approve a

11 provision like the gatekeeper provision.

12     Second, the Court can analogize to the Barton Doctrine the

13 facts and circumstances in this case and authorize the Court

14 to act as a gatekeeper to prevent frivolous litigation from

15 being filed against court-appointed officers and directors and

16 those that will lead the post-confirmation monetization of the

17 estate's assets.

18     And third, Your Honor, the Court can find that Mr. Dondero

19 and his entities are vexatious litigants, and use the

20 gatekeeper provision as a sanction to prevent the filing of

21 baseless litigation designed merely to harass those in charge

22 of the estate post-confirmation.

23     So, Bankruptcy Court authority.  Your Honor, there are

24 several provisions in the Bankruptcy Code which we rely on to

25 support the Court's authority.  First, Section 1123(a)(5)

139

1   permits the plan to approve adequate means of implementation,

2   and contains a long, non-exclusive list.  Mr. Seery's

3   testimony is uncontroverted that a gatekeeper provision is

4   necessary for the adequate implementation of the plan.

5       Second, Your Honor, 1123(b)(6) authorizes a plan to

6   include any appropriate provision in a plan not inconsistent

7   with any other provision in this Code.  There are not any

8   provisions and none have been cited by the Objectors that

9   would prohibit a gatekeeper provision.  Section 1141

10  effectively holds that the terms of a plan bind the debtor and

11  its creditors and vest property in a reorganized debtor, free

12  and clear of the interests of third parties.

13      If nothing else, Your Honor, the spirit of 1141 allows the

14  Court to prevent, in appropriate cases, vexatious litigation

15  by unhappy creditors and parties in interest from torpedoing

16  the plan.

17      1142(b), Your Honor, provides that the confirmation --

18  that, after confirmation, the Court may direct any parties to

19  perform any act necessary for the consummation of the plan,

20  and requiring the party to seek court-approval before filing

21  an action is certainly an act.

22      And lastly, Your Honor, Section 105 allows the Court to

23  enter orders necessary to order other things, enforce orders

24  of the Court like the confirmation order, and prevent an abuse

25  of process which would certainly occur if baseless litigation

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2584
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 652 of 1017 PageID 7365
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2583 of 2722

140

1    were filed against the parties in charge of the Reorganized

2    Debtor and the trust vehicles entrusted with carrying out the

3    plan.

4        Your Honor, gatekeepers are not a novel concept and have

5    been approved by courts in appropriate circumstances.  In the

6    *Madoff* cases, the Court has been the gatekeeper post-

7    confirmation to determine whether investor claims are

8    derivative or direct claims.

9        In *General Motors*, the Court has been the gatekeeper post-

10   confirmation to determine whether product liability claims are

11   proper claims against the reorganized debtor.

12       Closer to home, Judge Lynn, Mr. Dondero's counsel,

13   approved a gatekeeper provision, arguably even more far-

14   reaching than the provision here, in the *Pilgrim's Pride* case.

15   In that case, Judge Lynn held that *Pacific Lumber* prevented

16   him -- prevented the Court from approving the exculpation

17   provision in the plan.  However, he did hold that it was

18   appropriate for the Court to ensure that debtor

19   representatives are not improperly pursued for their good-

20   faith actions by requiring that any actions against the debtor

21   or its representatives, and further, on the performance of

22   their obligations as debtor-in-possession, be heard

23   exclusively before the Bankruptcy Court.

24       And *Pilgrim's Pride* is not the only case in this district

25   to include a gatekeeper provision, as Judge Houser approved

141

1  one in the *CHC Group* in 2016, which is cited in our materials.

2      The theme in all these cases, Your Honor, is that there

3  are circumstances where it is necessary and appropriate for

4  the Bankruptcy Court to act as a gatekeeper as a means of

5  reducing litigation that could interfere with a confirmed plan

6  and that a Court has the authority to approve such provisions.

7      The Objectors argue that the Bankruptcy Court does not

8  have jurisdiction to approve that provision.  The Debtor

9  understands the argument as it related to the prior provision,

10 which gave the Court exclusive jurisdiction over any claim it

11 found colorable, and we've amended the plan to address that

12 issue.  The jurisdiction to deal with those claims could be

13 left to a later day.

14     But to the extent the Objectors still pursue the

15 jurisdiction argument in light of the current provision,

16 they're really conflating two very different things:  the

17 ability to determine whether a claim is colorable and the

18 ability to adjudicate that claim if the Court determines it's

19 colorable.

20     None of the authorities cited by the Objectors hold that

21 the Court is without jurisdiction to approve a gatekeeper

22 provision like the one here.  So, rather, what they do is they

23 try to -- they argue, based upon the *Craig's Stores* case,

24 which is narrower than other circuits of post-confirmation

25 jurisdiction in the Bankruptcy Court, and argue that the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2586
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 654 of 1017   PageID 7367
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2585 of 2722

142

1  gatekeeper provision doesn't fall within that.  But that --

2  such reliance is misplaced, Your Honor.

3      *Craig* held that the Bankruptcy Court did not have

4  jurisdiction to adjudicate a post-confirmation dispute over a

5  private-label credit card agreement between the debtor and the

6  bank.  In declining to find jurisdiction, the Fifth Circuit

7  remarked that there was no antagonism or claim pending between

8  the parties as of the reorganization and no facts or law

9  deriving from the reorganization or the plan was necessary to

10  the claim asserted by the debtor.

11      However, in so ruling, Your Honor, the Fifth Circuit did

12  reason that post-confirmation jurisdiction in the Bankruptcy

13  Court continues to exist for matters pertaining to

14  implementation and execution of the plan.  Requiring parties

15  to seek Bankruptcy Court determination the claim is colorable

16  before embarking on litigation that will impact

17  indemnification rights and affect distributions to creditors

18  is not an expansion of jurisdiction and fits well within the

19  *Craig* reasoning.

20      Unlike the credit card agreement dispute in *Craig*, Mr.

21  Dondero and his entities have demonstrated tremendous

22  antagonism towards the Debtor.  And while the Debtor's plan

23  may be confirmed, further litigation has been threatened by

24  Mr. Dondero.  It's in the pleadings.  That's one of the

25  reasons Mr. Dondero says his plan is better.  It'll avoid

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2587
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 655 of 1017 PageID 7368
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2586 of 2722

143

1  tremendous amount of litigation.

2      After *Craig*, the Fifth Circuit again examined the

3  bankruptcy court's post-confirmation jurisdiction in the

4  *Stoneridge* case in 2005.  In that case, the Fifth Circuit

5  ruled that a bankruptcy court has post-confirmation

6  jurisdiction to resolve a dispute between two nondebtors that

7  could trigger indemnification claims against a liquidating

8  trust formed as a result of a confirmed plan.

9      And lastly, as I mentioned Your Honor's decision before,

10  the *TXMS Real Estate* case, I think just a couple of months

11  ago, it stands for the proposition that post-confirmation

12  jurisdiction exists for matters bearing on the implementation,

13  interpretation, and execution of a plan.  In that case, Your

14  Honor ruled that Your Honor had jurisdiction to resolve a

15  post-confirmation dispute between a liquidating trust formed

16  under a plan and a landlord, the result of which could

17  significantly and adversely affect the value of the

18  liquidating trust and monies available for unsecured

19  creditors.

20      And you have heard Mr. Seery testify that litigation will

21  have an adverse effect on the ability to make distributions to

22  creditors.

23      So, Your Honor, under these authorities, the Court

24  undoubtedly would have jurisdiction to act as the gatekeeper

25  for the litigation.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2588
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 656 of 1017 PageID 7369
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2587 of 2722

144

1    There's also an independent basis for the gatekeeper

2    provision, Your Honor, the Barton Doctrine, which the Court is

3    very familiar from your opinion in the *In re Ondova* case in

4    2017 and which provides that before a suit may be brought

5    against a trustee, leave of Court is required.  In *Ondova*, the

6    Court reviewed the history of the doctrine in connection with

7    litigation brought by a highly-litigious debtor against a

8    trustee and his professionals.  This Court noted that there

9    are several important policies followed by the doctrine,

10   including a concern for the overall integrity of the

11   bankruptcy process and the threat of trustees being distracted

12   from or intimidated from doing their jobs.  And Your Honor's

13   language still:  For example, losers in the bankruptcy process

14   might turn to other courts to try to become winners there by

15   alleging the trustee did a negligent job.

16     Your Honor, this is precisely what the Debtor is trying to

17   prevent here, Mr. Dondero and his entities from putting the

18   bad experience before Your Honor in this case behind it and

19   going to try to find better luck in a more hospitable court.

20     Your Honor, the Barton Doctrine originally only applied to

21   receivers, and over the course of time has been extended to

22   apply to various court-appointed fiduciaries, as we have cited

23   in our materials:  trustees, debtors-in-possession, officers

24   and directors, employees, and attorneys representing the

25   debtor.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2589
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 657 of 1017 PageID 7370
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2588 of 2722

145

1      And I expect the Objectors to argue that there is a

2   statutory exception to the Barton Doctrine under 28 U.S.C. 959

3   and it does not apply to acts or transactions in carrying out

4   business conducted with a property.  The exception, Your

5   Honor, is very narrow and was meant to apply for things like

6   slip-and-fall cases.  In fact, the Eleventh Circuit in the

7   *Carter v. Rodgers* case, 220 F.3d 1249 in 2000, held that

8   Section 11 -- 28 U.S.C. 959(a) does not apply to suits against

9   trustees for administering or liquidating the bankruptcy

10  estate.

11     The Objectors also argue that the gatekeeper provision

12  violates *Stern v. Marshal*.  However, as the Court acknowledged

13  in *Ondova*, the Fifth Circuit in *Villegas v. Schmidt* has

14  recognized that the Barton Doctrine remains viable post-*Stern*

15  *v. Marshal*.  The Fifth Circuit reasoned that while Barton

16  Doctrine is jurisdictional in that a court does not have

17  jurisdiction of an action if preapproval has not been

18  obtained, it does not implicate the extent of a bankruptcy

19  court's jurisdiction to adjudicate the underlying claim,

20  precisely the distinction we're making here.  The bankruptcy

21  court would be the gatekeeper for deciding whether the claim

22  passes through the gate, and then after will decide if it has

23  jurisdiction to rule on the underlying claim.

24     And this is important especially in a case like this, Your

25  Honor, where Your Honor has had extensive experience with the

146

1   parties and is in the best position to determine whether the

2   claims are valid or attempted to be used as harassment.

3        The Objectors will complain about the open-ended nature of

4   the gatekeeper provision, whether it will or won't apply after

5   the case is closed or a final decree is issued, and the unfair

6   burden of their rights.

7        Your Honor has a previous reported opinion where basically

8   jurisdiction does extend after a case is closed or a final

9   decree is entered, so that issue is a red herring.

10       As Your Honor is well aware, it's a decade-long -- a

11  decade of litigation against the Dondero-controlled entities

12  that caused the Highland bankruptcy.  And the Court is very

13  well aware of the litigation that occurred in *Acis*, very well

14  aware of the litigation that's occurred here that I mentioned

15  a few minutes ago.  Your Honor, it is not over, you'll be

16  presiding over the contempt hearing.

17       And if the Court needs yet another ground to approve the

18  gatekeeper provision, the Debtor submits that the procedure is

19  an appropriate sanction for Dondero's vexatious litigation

20  activities.  We cited the *In re Carroll* case in the Fifth

21  Circuit of 2017 that held that a bankruptcy court has the

22  authority to enjoin a litigant from filing any pleading in any

23  action without the prior authority from the bankruptcy court.

24       And in affirming the decision of the bankruptcy court, the

25  Fifth Circuit commented on the reasons the bankruptcy court

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2591
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 659 of 1017 PageID 7372
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2590 of 2722

147

1  gave for its ruling.  After recounting the bad faith of

2  appellants, the bankruptcy court determined that the Carrolls'

3  true motives were to harass the trustee and thereby delay the

4  proper administration of the estate, in the hope that they

5  would be able to retain their assets or make pursuit of the

6  assets so unappealing that the trustee would be compelled to

7  settle on terms favorable to appellants.

8       Sounds familiar, Your Honor.  The same can certainly be

9  said about what Mr. Dondero is doing in this case.

10      And to make a showing that a party is vexatious litigant,

11 the Court must find that the party has a history of vexatious

12 and harassing litigation, whether the party has a good faith

13 -- the litigation or has filed it as a means to harass, the

14 burden to the Court and other parties, and the adequacy of

15 alternative sanctions.

16      And as Your Honor is well aware from all the litigation,

17 Your Honor is well, well able to make the finding required for

18 the vexatious litigation finding.

19      But here, we don't ask for the drastic sanction of

20 enjoining from any further filings.  Rather, we just ask for a

21 less-severe sanction, requiring Mr. Dondero and his entities

22 to first make a showing that he has a colorable claim.

23      The Fifth Circuit in *Baum v. Blue Moon*, 2007, did exactly

24 that.  In *Baum*, the district court barred a vexatious litigant

25 from initiating litigation without first obtaining the

148

1   approval of the district court.  Ultimately, the matter

2   reached the Fifth Circuit after the district court had

3   modified the pre-filing injunction to limit it to a certain

4   case, and then broadened it again based upon continued bad

5   faith conduct.

6       On appeal, the Fifth Circuit, citing several prior cases,

7   noted that a district court has the authority to impose a pre-

8   filing injunction to defer vexatious, abusive, and harassing

9   litigation.

10      And for those reasons, Your Honor, the Debtor asks the

11  Court to overrule any objections to the gatekeeper provision.

12      Your Honor, I was just going to then go to the plan

13  modification provisions, but I wanted to stop and see if you

14  had any questions at this point.

15          THE COURT:  I do not.  Let's give him a time

16  estimate, Nate.  About how --

17          THE CLERK:  Twenty.

18          MR. POMERANTZ:  I have another five or six minutes, I

19  think, based upon --

20          THE COURT:  Okay.

21          MR. POMERANTZ:  And then I'll be ready to turn it

22  over to --

23          THE COURT:  Okay.

24          MR. POMERANTZ:  -- to Mr. Kharasch.

25          THE COURT:  All right.  Yes.  You've got -- you've

149

1   done an hour and 33 minutes.  So you have about, I guess, 37

2   minutes left.  Okay.  Go ahead.

3           MR. POMERANTZ:  Thank you, Your Honor.

4       I would like to address the modifications of the plan that

5   were contained in our January 22nd plan and the additional

6   changes filed on February 1, several of which I have referred.

7       As a preliminary matter, Your Honor, under 1127(b), the

8   Debtor can modify a plan at any time prior to confirmation if

9   -- and not require resolicitation if there's no adverse change

10  in the treatment of claim or interest of any equity holder.

11      With that background, I won't go through the changes we

12  made that I've already discussed, but I will point out a

13  couple, Your Honor, that I would like to point out now.  We

14  have modified the plan with respect to conditions of the

15  effective date in Article 8.  First, a condition to the

16  effective date will now be entry of a final order confirming a

17  plan, as opposed just to entry of order.  And final order is

18  defined as the exhaustion of all appeals.

19      In addition, the ability to obtain directors and officers

20  insurance coverage on terms acceptable to the Debtor, the

21  Committee, the Claimant Trustee, the Claimant Trustee

22  Oversight Board, and the Litigation Trustee is now a condition

23  to the effective date.

24      The Court heard testimony today and has experienced

25  firsthand the litigiousness of Mr. Dondero and his related

150

1    entities.  And the Court heard testimony from Mr. Tauber and

2    Aon that the D&O insurance will not be available post-

3    effective date without assurances that the gatekeeper

4    provision will be in effect for the duration of the policy and

5    any run-off period.

6        Mr. Tauber further testified that he expected the final

7    terms from the insurance carrier to provide that if the

8    confirmation order was reversed on appeal and the gatekeeper

9    was removed, it would void -- it would either void the

10   directors and officers coverage or it'd result in a Dondero

11   exclusion.

12       Mr. Dondero and his entities are no strangers to the

13   appellate process, as Your Honor knows.  They appealed several

14   of your orders, and continue the tack in this case, having

15   appealed the Acis and the HarbourVest orders and the

16   preliminary injunction.  It would not surprise the Debtor if

17   Mr. Dondero and his entities appealed your confirmation order,

18   if Your Honor decides to confirm the plan.

19       The Debtor is confident that it will prevail on any appeal

20   in the confirmation order, as we believe the Debtor has made a

21   compelling case for confirmation.

22       The Debtor also believes a compelling case exists that if

23   the plan went effective without a stay pending appeal, that

24   the appeal would be equitably moot, but we understand we are

25   facing headwinds from the courts, bankruptcy court have

151

1  addressed that issue before.

2      However, given the effect a reversal would have on the

3  availability of insurance coverage, the Claimant Trustee, the

4  Claimant Oversight Committee, and the Litigation Trustee are

5  just not willing to take that risk.

6      We are hopeful that Mr. Dondero and his entities will

7  recognize that any appeal is futile and step aside and let the

8  plan proceed and become effective.

9      If Mr. Dondero and his related entities do appeal the

10  confirmation order, preventing it from becoming final and

11  preventing the effective date from the occurring, the Debtor

12  intends to work closely with the Committee to ratchet down

13  costs substantially and proceed to operate and monetize assets

14  as appropriate until an order becomes final.

15      None of these modifications adversely affect the treatment

16  of claims or interests under the plan, Your Honor, and for

17  those reasons, Your Honor, we request that the Court approve

18  those modifications.

19      And with that, I would like to turn the podium over to Mr.

20  Kharasch to briefly address the remaining CLO objections.

21          THE COURT:  All right.  Mr. Kharasch?

22            CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23          MR. KHARASCH:  Good afternoon, Your Honor.  I'll be

24  as brief as possible.  I know we're under a deadline.

25      As you've heard yesterday, you've heard before in other

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2596
Case 3:25-cv-02072-S Document 15-9 Filed 06/13/25 Page 664 of 1017 PageID 7377
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2595 of 2722

152

1  proceedings, Your Honor, the CLO Objecting Parties, the so-

2  called investors, do have rights under the CLO management

3  agreements and indentures, including contractual rights to

4  terminate the management agreements under certain

5  circumstances.

6      What they complain about today, Your Honor, is that the

7  injunction language in the plan, including the language

8  preventing actions to interfere with the implementation and

9  consummation of the plan, is so broad and ambiguous that their

10  rights are or may be improperly impacted, especially any

11  rights to remove the manager for acts of malfeasance.

12     But the Debtor is primarily relying, Your Honor, not so

13  much on the plan injunctions but on the clear provisions of

14  the January 9 order, to which Mr. Dondero consented and which

15  provides that Mr. Dondero shall not cause any of his related

16  entities to terminate any agreements with the Debtor.

17     Yes, that is a broad provision, but it is very clear, and

18  it does not even allow the CLO Objecting Parties to come to

19  court under a gatekeeper-type provision.  But that is what Mr.

20  Dondero consented to on behalf of himself and his related

21  entities.

22     Important to note, Your Honor, we are not here today to

23  litigate who is and who is not a related entity.  That will be

24  left for another day.  However, Your Honor, we have considered

25  these issues, including last night and this morning, and we

153

1   are going to propose -- well, we will modify our plan through

2   a provision in the confirmation order to provide the

3   following:  Notwithstanding anything in the plan or the

4   January 9 order, the CLO Objecting Parties will not be

5   precluded from exercising their contractual or statutory

6   rights in the CLOs based on negligence, malfeasance, or any

7   wrongdoing, but before exercising such rights shall come to

8   this Court to determine whether those rights are colorable and

9   to also determine whether they are a related entity.  If the

10  Court has jurisdiction, the Court can determine the underlying

11  colorable rights or claims.

12      This does not impact the separate settlement we have with

13  CLO Holdco, Your Honor.

14      We think that such modification addresses some of the

15  concerns raised yesterday by the objecting parties by

16  providing more clarity as to what the plan is doing and not

17  doing with respect to the plan and the January 9 order, and we

18  think it is also a fair resolution of some legitimate

19  concerns.

20      So, with that, Your Honor, we think that, with that

21  clarification that we did not have to make but are willing to

22  make, that this should fully satisfy the CLO Objecting Parties

23  with regard to their objections to the injunction and the

24  gatekeeper.

25      Thank you, Your Honor.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2598
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 666 of 1017 PageID 7379
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2597 of
2722

154

1          THE COURT:  All right.  Mr. Clemente?

2     CLOSING ARGUMENT ON BEHALF OF THE CREDITORS' COMMITTEE

3          MR. CLEMENTE:  Yes, Your Honor.  And I actually am

4     going to be brief.  Mr. Pomerantz's discussion, obviously, was

5     very, very thorough, so I'm able to cut out a lot of stuff.

6         Thank you, Your Honor.  Matt Clemente, Sidley Austin, on

7     behalf of the Committee.

8         The plan, Your Honor, meets the confirmation standards and

9     should be confirmed.  Mr. Pomerantz covered a lot of ground,

10    and I will endeavor not to repeat that, but there are a few

11    points that I think the Committee wishes to emphasize.

12        Your Honor, since I first appeared in front of you, I have

13    maintained consistently that no plan can or should be

14    confirmed without the consent of the Committee.  Your Honor,

15    in her wisdom, understood this immediately, as it was obvious

16    -- it was the obvious conclusion, given the makeup of the

17    creditor body, the asset pool, and the impetus for the filing

18    of the case.

19        Unfortunately, not everyone came to this conclusion so

20    easily, and it took much hard-fought negotiations as well as a

21    defeated disclosure statement, among other things, and

22    tireless dedication and commitment by each individual

23    Committee member to drive for a value-maximizing plan that is

24    in the best interests of its constituencies and for us to get

25    to where we are today.

155

1    And where we are today, Your Honor, is at confirmation for

2   a plan that the Committee unanimously supports, which was the

3   inevitable outcome for this case from the very beginning.

4    I've also said, Your Honor, that context is critical in

5   this case.  It has been from the beginning, and it remains so

6   now.  Mr. Draper, interestingly, began his comments yesterday

7   by saying that even a serial killer is entitled to *Miranda*

8   rights.  While I will admit that at times the rhetoric in this

9   case has been heated, I have never certainly likened Mr.

10  Dondero to a serial killer.  But the record shows, and Mr.

11  Dondero's own words and actions show, that he is, in fact, a

12  serial litigator who has no hesitation at all to take any

13  position in an attempt to leverage an outcome that suits his

14  self-interest.  And he has no hesitation at all to use his

15  many tentacles in a similar fashion.

16    That is a very important context in which the Court should

17  view the remaining objections of the Dondero tentacles and

18  weigh confirmation of the Debtor's plan.

19    Against this context of a serial litigator, Your Honor, we

20  have a plan supported by each member of the Official Committee

21  of Unsecured Creditors, accepted by two classes of claims,

22  Class 2 and Class 7, and holders of almost one hundred percent

23  in amount of non-insider claims in Class 8.

24    The parties that have voted against the plan are either

25  employees who are not receiving distributions under the plan

156

1    or are insiders or parties related to Mr. Dondero.

2        The overwhelming number and amount of creditors who are

3    receiving distributions under this plan, therefore, have

4    accepted the plan.  The true creditors and economic parties in

5    interest have spoken, they have spoken loudly, and they have

6    spoken in favor of confirming the plan.

7        Your Honor, I'm not going to address the technical

8    requirements, as Mr. Pomerantz did that.  So I'm going to skip

9    over my remarks in that regard, except I do want to emphasize

10   the remarks regarding the gatekeeper, exculpation, and

11   injunction provisions as they're of critical importance to the

12   plan.

13       The testimony has shown and the proceedings of this case

14   has shown, again, Mr. Dondero is a serial litigator with a

15   stated goal of causing destruction and delay through

16   litigation.

17       The testimony has further shown that none of the

18   independent board members would have signed onto the role

19   without the gatekeeper and injunction provisions and the

20   indemnity from the Debtor.

21       Therefore, it follows that such provisions are necessary

22   to entice parties to serve in the Claimant Trustee and other

23   roles under the plan, which, as I remarked in my opening

24   comments, are integral to providing the structure that the

25   creditors believe is necessary to unlocking the value and

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2601
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 669 of 1017   PageID 7382
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2600 of 2722

157

1    unlocking themselves from the Dondero web.

2        Regarding the exculpation and injunction provisions

3    specifically, Your Honor, the Court will recall that the

4    Committee raised objections to them in connection with the

5    first disclosure statement hearing.  In response, the Debtor

6    narrowed the provisions, and the Committee believes they

7    comply with the Fifth Circuit precedent, as Mr. Pomerantz ably

8    walked Your Honor through.

9        And to be clear, Your Honor, not only does the Committee

10   believe the exculpation and injunction provisions comply with

11   Fifth Circuit law, the Committee does not believe the estate

12   is harmed by such provisions, as the Committee does not

13   believe there are any cognizable claims that could or should

14   be raised that would otherwise be affected by the exculpation

15   or injunction, and, frankly, with respect to the release that

16   Mr. Pomerantz walked Your Honor through with respect to the

17   directors and the officers.

18       Regarding the gatekeeper, Your Honor, Your Honor

19   presciently approved it in her January 9th order, and the

20   developments since then only serve as further justification

21   for including it in the plan and confirmation order.  Mr.

22   Dondero is a serial and vexatious litigator, and the

23   instruments put in place under the plan to maximize value for

24   the creditors and to oversee that value-maximizing process

25   must be protected, and the gatekeeper function serves that

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2602
Case 3:25-cv-02072-S Document 15-9 Filed 06/27/25 Page 670 of 1017 PageID 7383
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2601 of 2722

158

1   protection while also, importantly, as Mr. Pomerantz pointed

2   out, providing Mr. Dondero with a forum to advance any

3   legitimate claims he and his tentacles may have.

4       In short, Your Honor, the gatekeeper provision is

5   necessary to the implementation to the plan, is fair under the

6   circumstances of the case, and is therefore within this

7   Court's authority, and it is appropriate to approve.

8       Your Honor, in sum, it has been a long road to get here

9   today, but we are finally here.  And we are here, Your Honor,

10  I believe in large part as a result of the tireless efforts of

11  the individual members of my Committee, and for that I thank

12  them.

13      The Committee fully supports and unanimously supports

14  confirmation of the plan.  As demonstrated by the evidence,

15  the plan meets all the requirements of the Bankruptcy Code.

16  The Committee believes the plan is in the best interests of

17  its constituencies.  And therefore the Committee, along with

18  two classes of creditors and the overwhelming amount of

19  creditors in terms of dollars, urge you to confirm the plan.

20      That's all I have, Your Honor, but I'm happy to answer any

21  questions you may have for me.

22          THE COURT:  Okay.  Not at this time.

23      Nate, how much time --

24      (Clerk advises.)

25          THE COURT:  Twenty-five minutes remaining?  All

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2603
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 671 of 1017 PageID 7384
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2602 of 2722

159

1   right.  Just so you know, you've got a collective Debtor's

2   counsel/Committee's counsel 25 minutes remaining for any

3   rebuttal, if you choose to make it.

4        Let's take a five-minute break, and then we'll hear the

5   Objectors' closing arguments.  Okay.

6             THE CLERK:  All rise.

7        (A recess ensued from 2:00 p.m. until 2:06 p.m.)

8             THE COURT:  All right.  Please be seated.  We're

9   going back on the record in Highland.  We're ready to hear the

10  Objectors' closing arguments.  Who wants to go first?

11            MR. DRAPER:  Your Honor, this -- this is Douglas

12  Draper.  I get the joy of going first.

13            THE COURT:  Okay.

14   CLOSING ARGUMENT ON BEHALF OF THE GET GOOD AND DUGABOY TRUSTS

15            MR. DRAPER:  We've heard a great deal of testimony

16  about the Debtor's belief that the circumstances in this case

17  warrant an exception to existing Fifth Circuit case law, the

18  Bankruptcy Code, and Court's post-confirmation jurisdiction.

19       I would not be standing here today objecting to the plan

20  if the Debtor didn't attempt to extend, move past and beyond

21  the Barton Doctrine, move beyond 1141, move beyond *Pacific*

22  *Lumber*.  In fact, I think I heard an argument that *Pacific*

23  *Lumber* is not applicable and this Court should disregard Fifth

24  Circuit case law.

25       Let's start with the exculpation provision.  And the focus

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2604
Case 3:25-cv-02072-S Document 15-9 Filed 06/27/25 Page 672 of 1017 PageID 7385
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2603 of 2722

160

1   of this case has been, and what we've heard over the last few

2   days, is about the independent directors.  I understand there

3   was an order entered earlier, the order stands, and the order

4   is applicable in this case.  It cuts off, however, when we

5   have a Reorganized Debtor, because these independent directors

6   are no longer independent directors.  It cuts off when we have

7   a new general partner.

8        And so the protections that were afforded by that order do

9   not need to be afforded to the new officers and new directors

10  of the new general partner.  And in fact, the protections that

11  they're entitled to are completely different than the

12  protections that were entitled -- that are covered by the

13  order that the Court has looked at.

14       Let's first focus on, however, the exculpation provision.

15  And I wanted to ask the Court to look at the exculpated

16  parties.  Have to be very careful and very interest -- and

17  focus solely on the independent directors.  But if you look at

18  the parties covered by exculpation provision, it includes the

19  professionals retained by the Debtor.  My reading of *Pacific

20  Lumber* is that neither the Creditors' Committee counsel nor

21  the Debtor can be covered by an exculpation provision.  This

22  in and of itself makes the plan non-confirmable.  This

23  exculpation provision is unwarranted and unnecessary.

24       Two, --

25            THE COURT:  Well, let's drill down on that.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2605
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 673 of 1017 PageID 7386
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2604 of 2722

161

1        MR. DRAPER:  -- we have --

2        THE COURT:  Let's drill down on that.  Mr. Pomerantz

3   says that this wasn't what they considered one way or another

4   by *Pacific Lumber*.  Debtor, debtor professionals.  Okay?  Do

5   you disagree with that?

6        MR. DRAPER:  I disagree with that.  *Pacific Lumber*

7   said you could only have releases and exculpations for the

8   Creditors' Committee members.  And the rationale behind that

9   was that those people volunteered to be part and parcel of the

10  bankruptcy process, that those parties did not get paid.

11  Here, we have two professionals who both volunteered and are

12  being paid, and are not entitled to an exculpation under

13  *Pacific Lumber*.  They're not entitled to a --

14       THE COURT:  Okay.  So you say *Pacific* --

15       MR. DRAPER:  -- release.  Now, ultimately, they --

16       THE COURT:  -- *Pacific Lumber* categorically rejected

17  all exculpations except to Creditors' Committee and its

18  members.  That's your --

19       MR. DRAPER:  I agree.  That's --

20       THE COURT:  -- interpretation of *Pacific Lumber*?

21       MR. DRAPER:  Yes.

22       THE COURT:  Okay.  All right.  So you just absolutely

23  disagree, one by one, with every one of the arguments, that it

24  was really -- the only thing before the Fifth Circuit was plan

25  sponsors, okay?  A plan proponent that I think was like a

162

1    competitor previously of the debtor, and I think a large

2    creditor or secured creditor. I think those were the two plan

3    proponents.

4        So you disagree -- I'm going to, obviously, go back and

5    line-by-line pour through *Pacific Lumber*, but you disagree

6    with Mr. Pomerantz's notion that, look, it was really a page

7    and a half or two of a multipage opinion where the Fifth

8    Circuit said, no, I don't think 524(e) is authority to give

9    exculpation from postpetition liability for negligence as to

10   these two plan sponsors. And I guess it was also -- I don't

11   know. They say, Pachulski's briefing says it was really only

12   looking at these two plan sponsors and the Committee and its

13   members on appeal, you know, going through the briefing, and

14   in such, you can see that these were all that was presented

15   and addressed by the Fifth Circuit. You disagree with that?

16       MR. DRAPER: Look, I know the facts of *Pacific Lumber*

17   and they -- I know what the posture of the case was. However,

18   the literal language by the opinion in it, it transcends just

19   a dispute in the case. And I think the U.S. Trustee's

20   position that this exculpation provision is correct as a

21   matter of law support -- is further evidence of the fact that

22   the U.S. Trustee, as watchdog of this process, and *Pacific

23   Lumber* say this cannot be done, period, end of story.

24       THE COURT: Okay. So you, at bottom, just totally

25   disagree with Mr. Pomerantz? You say *Pacific Lumber* is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2607
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 675 of 1017 PageID 7388
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2606 of 2722

163

1  actually a very broad holding, and I guess, if such, there's a

2  conflict among the Circuits, right?

3          MR. DRAPER:  Well, that's okay.

4          THE COURT:  So, --

5          MR. DRAPER:  I mean, quite frankly, *Pacific Lumber* is

6  binding on you.

7          THE COURT:  Understood.

8          MR. DRAPER:  There may be a conflict in the Circuits,

9  and ultimately the Supreme Court may make a decision and

10  decide who's right and who's wrong.

11    But for purposes of today and for purposes of this

12  exculpation provision and for purposes of this confirmation,

13  *Pacific Lumber* is the applicable law.

14          THE COURT:  Okay.  Well, again, this is a hugely

15  important issue, although in many ways I don't understand why

16  it is, because we're just talking about postpetition acts and

17  negligence, okay?  You know, many might say it's much ado

18  about nothing, but it's front and center of your objection.

19  So I guess I'm just thinking through, if the Fifth Circuit was

20  presented these exact facts and was presented with the

21  argument, you know, the *Blixseth* case says 524(e) has nothing

22  to do with exculpation because exculpation is a postpetition

23  concept, and it's just talking about standard liability --

24  these people aren't going to be liable for negligence; they

25  can be liable for anything and everything else -- if presented

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2608
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 676 of 1017   PageID 7389
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2607 of 2722

164

 1   with that *Blixseth* case, you know, there are several arguments

 2   that Mr. Pomerantz has made why, if you accept that 524(e)

 3   might not apply here, let's look at the reasoning, the little

 4   bit of reasoning we had of *Pacific Lumber*, that it was really

 5   a policy rationale, right?  These independent fiduciaries,

 6   strangers to the company and case, they'd never want to do

 7   this if they knew they were vulnerable for getting sued for

 8   negligence.  Mr. Pomerantz's argument is that these

 9   independent board members are exactly analogous to a

10   Committee, more than prepetition officers and directors.  What

11   do you have to say about that policy argument?

12          MR. DRAPER:  Well, I think there's a huge distinction

13   between the members of a Creditors' Committee who are

14   volunteers and are not paid versus a paid independent

15   director.  And more importantly, I think there's a huge

16   difference between a member of a Creditors' Committee who's

17   not paid and counsel for a Debtor and counsel for a Creditors'

18   Committee.

19          THE COURT:  Okay.

20          MR. DRAPER:  Look, you have -- you've --

21          THE COURT:  So, at bottom, it was all about

22   compensation to the Fifth Circuit?

23          MR. DRAPER:  Well, no.  The Fifth Circuit policy

24   decision was we want to protect a party who wants to serve and

25   do their civic duty to serve on a Creditors' Committee for no

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2609
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 677 of 1017 PageID 7390
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2608 of 2722

165

1  compensation. I agree with that. I think it's a laudable

2  policy decision. I think it makes sense.

3      However, the Fifth Circuit in its language basically said,

4  nobody else gets it. It didn't say, look, you know, if there

5  are circumstances that are different, we may look at it

6  differently. The language is absolute in the opinion. And

7  that's what I think is binding and I think that's what the

8  case stands for.

9      And look, just so the Court is very clear, when Pachulski

10  files its fee application and the Court grants the fee

11  application, any claim against them is res judicata. So, in

12  fact, they do have -- they do have protection. They do have

13  the ability to get out from under. The Court -- they're just

14  not -- they just can't get out from under through an

15  exculpation provision. And the same goes for Mr. Clemente and

16  his firm.

17          THE COURT: Which, --

18          MR. DRAPER: And the same goes for DSI.

19          THE COURT: Which, by the way, that's one reason I

20  think sometimes this is much ado about nothing. It goes both

21  ways. The Debtor professionals, the Committee professionals,

22  estate professionals, they're going to get cleared on the day

23  any fee app is approved, right? I mean, there's Fifth Circuit

24  law that says --

25          MR. DRAPER: I -- I --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2610
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 678 of 1017 PageID 7391
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2609 of 2722

166

1          THE COURT:  -- says that's res judicata as to any

2     future claims.

3        But I guess I'm really trying to understand, you know, at

4     bottom, I feel like the Fifth Circuit was making a holding

5     based on policy more than any directly applicable Code

6     provision.

7        I mean, it's been said, for example, that Committee

8     members, they're entitled to exculpation because of, what,

9     1103, some people argue, 1103, which subsection, (c)?  That's

10    been quoted as giving, quote, qualified immunity to

11    Committees.  But it doesn't really say that, right?  It's just

12    something you infer.

13         MR. DRAPER:  No.  Look, what I think, if you really

14    want to put the two concepts together, I think what the Fifth

15    Circuit, when they told lawyers and professionals that you

16    can't get an exculpation, was very mindful of the fact that

17    you can get released once your fee app is approved.  So, as a

18    policy, they didn't need to do it in a exculpation provision.

19    There was another methodology in which it could be done.

20         THE COURT:  Uh-huh.

21         MR. DRAPER:  And so that's -- you have to look at it

22    as holistic and not just focus on the exculpation provision.

23    Because, in fact, they recognize and they -- I'm sure they

24    knew their existing case law on res judicata, and that's why

25    they read it out.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2611
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 679 of 1017   PageID 7392
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2610 of 2722

167

1    So, honestly, there's no reason for Pachulski to be in

2    here.  There's no reason for Mr. Clemente to be in here.

3    There's no reason for the professionals employed by the Debtor

4    to be in here.  They have an exit not by virtue of the plan.

5        THE COURT:  But so then it boils down to the

6    independent directors and Strand post January 9th?

7        MR. DRAPER:  It boils down somewhat to them, but

8    quite frankly, there are two parts to this.  One is you have

9    an order that's in place.  I am not asking the Court to

10   overturn the order.  And quite frankly, this provision could

11   have been written to the effect that the order that was in

12   place on -- that's been presented to the Court is applicable

13   and applied.

14       However, let's parse that down.  Let's look at Mr. Seery.

15   The order that's in place solely protects the independent

16   directors acting in their capacities as independent directors.

17   If somebody's acting as -- and if you want to liken it to a

18   trustee, their protection is afforded by the Barton Doctrine,

19   and that's how the protection arises.

20       What's going on here is they're extending the provisions,

21   first of all, of the Court's order, and number two, of the

22   Barton Doctrine, which are -- which cannot be -- which should

23   not be extended.  The law limits what protections you have and

24   what protections you don't have.  And we, as lawyers -- look,

25   I'll give you the best example.  Think of all the times you

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2612
Case 3:25-cv-02072-S Document 15-9 Filed 06/13/25 Page 680 of 1017 PageID 7393
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2611 of 2722

168

1  had somebody write in the concept of superpriority in a cash

2  collateral order.  And how many times have you had a lawyer

3  rewrite the concept of the issue as to diminution in value?

4  The Code says diminution in value, and quite frankly, a cash

5  collateral order should just say if, to the extent there's

6  diminution in value, just apply the Code section.  It's

7  written there.  Smart people put it in, and Congress approved

8  it.  And once you start getting beyond that, those things

9  should be limited.

10     And what we have are lawyers trying to extend out by

11  definitions things that the Code limits by its reach.  That

12  goes for post-confirmation jurisdiction.  That goes for the

13  injunction.  That goes for the so-called gatekeeper provision.

14     And so, again, I would not be here if, in fact, they had

15  said, we have an injunction to the full extent allowed by the

16  Bankruptcy Code and *Pacific Lumber*.  We have an exculpation

17  provision that's allowed by virtue of the Court's order.  We

18  have the full extent and full reach of the Barton Doctrine.

19  Those are legitimate.  Once you start expanding upon that,

20  you're reaching into matters that are not authorized and not

21  allowed.

22     And then you get into 105 territory, which is always very

23  dangerous.  And that's really what's going on here.  And

24  that's the tenor of my argument and what I'm trying to say.

25  The Code gives protections.  It is not for us to extend the

169

```
 1   protections.  It's not for us to enlarge them, even under a,

 2   gee, the other party's litigious.

 3       And so that's -- let's take Craig's Store.  Attempted to

 4   limit its reach.  Craig's Store says once you have a confirmed

 5   plan, any dispute between the parties, for -- let's take an

 6   executory contract.  If there's a breach of the executory

 7   contract, that's a matter to be handled aft... by another

 8   court.  It's not a matter to be handled by this Court.  This

 9   Court lets the parties out.

10       And in this case, it's even worse, because you basically

11   have a new general partner coming in, you have an assumption

12   of various executory contracts, and you have a -- Strand is no

13   longer present.

14       If you adopted Mr. Seery's argument, anybody who appeals a

15   decision, questions what he does or how he does it, is a

16   vexatious litigator.  That's not the case.  And the fact that

17   we are appealing a decision is a right that we have.  It

18   shouldn't be limited, and it shouldn't be held against us.

19   Courts can rule against us.  That's fine.

20       And so that's really what the focus is here and that's why

21   I gave the opening that I had.  We are willing to be bound by

22   applicable law.  And quite frankly, the concept that the

23   exigencies of a case allow a court to change what applicable

24   law is is problematic.  I gave the criminal example as a

25   reason.  And the reason was that, in certain instances, the
```

170

1   application of law may allow a criminal to go free.  It's a

2   problem with our system and how we work, but that's what the

3   law does, and it is absolute in its application.

4       Let me address the so-called gatekeeper provision.  The

5   gatekeeper provision, in a certain sense, is recognized in the

6   Barton Doctrine.  It's jurisdictional, and it says, to the

7   extent you're going to litigate with somebody who served

8   during the bankruptcy, who was a trustee, then you have to

9   come to the bankruptcy court and pass through a gate.  It

10  doesn't say you have to pass through a gate for a reorganized

11  debtor who does something after a plan is confirmed and going

12  forward.  And so that's -- there's a distinction.

13      And if you look at Judge Summerhays' decision, which I

14  will be happy to send to the Court, in *WRT* involving -- it's

15  kind of (indecipherable) and Mr. Pauker, where, in that case,

16  the trustee, the litigation trustee, spent more litigating

17  than it had in recoveries, and Baker Hughes filed suit.  Judge

18  Summerhays said, look, the Barton Doctrine only applies to a

19  certain extent.  It is limited once you get into post-

20  confirmation matters and related-to jurisdiction.

21      And so, again, the Barton Doctrine is what it stands for.

22  We agree with it, we recognize it, and it should be applied.

23  The Barton Doctrine, however, should not be extended, should

24  not go past its reach, and should not go past the grant of

25  jurisdiction for this Court.

171

1    And so you have in here, though they have -- they have

2    tried to hide it in a limited fashion, this gatekeeper

3    provision.  The gatekeeper provision, as currently written,

4    covers post-confirmation claims that somebody has to come

5    before this Court to the extent there's a breach of a

6    contract.  That's not proper, and it's not covered by your

7    post-confirmation jurisdiction.  To the extent there's an

8    interpretation of an existing contract and an interpretation

9    of the order, you do have authority, and I don't question

10   that.

11          THE COURT:  But address Mr. Pomerantz's statement

12   that there's a difference between saying you have to go to the

13   bankruptcy court and make an argument, we have a colorable

14   claim that we would like to pursue, and having that

15   jurisdictional step required.  There's a difference between

16   that and the bankruptcy court adjudicating the claim.

17          MR. DRAPER:  Well, there are two parts to that.

18   Number one is there's an injunction in place from an action

19   taken post-confirmation against property of the estate.  We

20   all agree at that, correct?  And we believe that the

21   injunction applies to post-confirmation action against

22   property of the pre-confirmation estate.  We all agree to

23   that.

24          However, if in fact there's a breach of a contract

25   postpetition that the parties have a dispute about, that

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2616
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 684 of 1017 PageID 7397
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2615 of 2722

172

1   contract is now no longer under your purview once the contract

2   has been assumed.  And so they shouldn't have to make a

3   colorable claim to you that a breach of the contract has

4   occurred.  That should be the determining factor for another

5   court.

6       That's, in essence, what *Craig's Store* says.  Your

7   jurisdiction and the jurisdiction of a bankruptcy court is

8   limited.  It's limited by *Stern vs. Marshall*.  It's limited by

9   your ability to render findings of fact and conclusions of law

10  versus render a final decision.  That decision has been made

11  not by us, it's been made by Congress and it's been made by

12  the United States Constitution.

13          THE COURT:  All right.  And I think we all agree with

14  you regarding the holding of *Craig's Stores* and some of the

15  other post-confirmation bankruptcy subject matter jurisdiction

16  holdings.  But Mr. Pomerantz is arguing that this gatekeeping

17  function is warranted by, among other things, you know, there

18  was a district court holding, *Baum v. Blue Moon*, or a Fifth

19  Circuit case, that upheld a district court having the ability

20  to impose pre-filing injunctions in the context of a vexatious

21  litigator.  So, you know, that's a strong analogy he makes to

22  what's sought here.  What is your response to that?

23          MR. DRAPER:  My response to that is a district court

24  can do that.  A district court has jurisdiction to make that

25  decision.  And quite frankly, a district court can sanction a

006602

173

1    vexatious litigator under Rule 11.

2        So, in fact -- again, you have to bifurcate your power

3    versus the power that a district court has.  And that

4    gatekeeper provision is allowed by a district court because

5    they had authority over the case.  You may not have authority

6    over being the gatekeeper for a post-confirmation matter that

7    you had no jurisdiction over to start with.

8            THE COURT:  Okay.

9            MR. DRAPER:  That, that's the distinction between

10   here.  That's -- what's going on here is they are -- they are

11   mashing together a whole load of concepts under the vexatious

12   litigator and the anti-Dondero function that fundamentally

13   abrogate the distinction between what your jurisdiction is

14   pre-confirmation versus your jurisdiction post-confirmation.

15   And that --

16           THE COURT:  Do you think --

17           MR. DRAPER:  -- is sacrosanct.

18           THE COURT:  Do you think Judge Lynn got it wrong in

19   *Pilgrim's Pride*?  Do you think Judge Houser got it wrong in

20   *CHC*?  Or do you think this situation is different?

21           MR. DRAPER:  There are two parts to that.  I have

22   told Judge Lynn, since I have been working with him, that I

23   think *Pilgrim's Pride* is wrongfully decided.  However, having

24   said that, *Pilgrim's Pride* and those cases dealt with claims

25   against the -- the channeling injunction affected actions

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2618
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/25   Page 686 of 1017   PageID 7399
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2617 of 2722

174

1  during the bankruptcy.  It did not serve as a post-

2  jurisdictional grant of jurisdiction to the bankruptcy court.

3  It did not pose as an ability -- as a limitation on a post-

4  confirmation litigator or a post-effective date litigator to

5  address a wrong done to them by an independent director of a

6  general partner.

7      In a sense, Judge Lynn's determination, and Judge Houser,

8  is consistent somewhat with the Barton Doctrine.  Now, do I

9  agree that they're right?  No.  But I understand the decision

10  and I understand the context in which it was rendered and I

11  don't have a huge problem with it.

12      So, again, let's parse what we're trying to do here.

13  Number one, we are -- we have to bifurcate post-confirmation

14  jurisdiction or post-effective date jurisdiction and what you

15  can do as a post-effective date arbiter versus what you could

16  do pre-effective date and pre-effective date claims.  And

17  again, that's the problem with what's written here.  It is

18  designed one hundred percent to expand your post-effective

19  date jurisdiction through both the gatekeeper provision and

20  the jurisdictional grant that's here from your pre-effective

21  date capability, your pre-effective date jurisdiction, and

22  your pre-effective date ability to either curb a claim or not

23  to curb a claim.  And that, that's the issue.

24      And again, let's start talking about the independent

25  directors.  I recognize, again, that there's an order there.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2619
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/25 Page 687 of 1017 PageID 7400
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2618 of 2722

175

1  But if Mr. Seery -- let's take Mr. Seery -- is acting as a

2  director of Strand but is also an accountant for the Debtor

3  and makes a mistake, he would be sued in his capacity as the

4  accountant for the Debtor, not as an independent director of

5  Strand.  That distinction needs to be made.

6      What we are doing here under this plan, and what's been

7  argued by Mr. Pomerantz, is too broad a brush.  It needs to be

8  cut back.  The Court needs to take a very hard look at what's

9  being presented here.

10     And again, the Court's order is very clear.  And this is

11  binding.  I recognize that.  But the protection they got was

12  serving as an independent director.  The protection they

13  didn't get was -- let's take Mr. Seery, if Mr. Seery was

14  serving as an accountant and blew a tax return.  Those are

15  distinctions that warrant analysis and warrant looking at

16  here.  And again, it is too broad a brush that's touted here,

17  and that is why this plan on its face is not confirmable with

18  respect to both the post-confirmation jurisdiction, the

19  gatekeeper provision, the exculpation provisions.

20     And so let me address a few other things, just to address

21  them.  Number one, the argument has been made with respect to

22  the creditors and the resolicitation issue and that creditors

23  could have come in looking, seen, followed the case, and

24  basically calculated and made the same calculation that the

25  Debtor made when they filed this and put forth the new plan

176

1  analysis versus liquidation analysis.  And then they've also

2  made the argument, well, nobody came and complained.  Well,

3  two parts to that.

4       Number one, as you know, a disclosure statement needs to

5  be on its face and should not require a creditor to go back in

6  and monitor the record -- and quite frankly, in this record,

7  there are thousands of pages -- and do the calculation

8  himself.  This was incumbent upon the Debtor to possibly

9  resolicit when these material changes took place.

10      Number two, the recalculation has not been subject to the

11 entire creditor body seeing it.  And anybody who wanted to

12 call them would have had to have seen the document they filed

13 on February 1st and made a telephone call basically

14 contemporaneous with seeing it.

15      Those are two things.  The argument that they didn't call

16 me is just nonsensical.  There's nobody -- you, you are

17 sitting here -- and I've had a number of battles over the

18 years with Judge (indecipherable), who was -- who -- and her

19 view was, I'm here to protect the little guy who's not --

20 didn't hire counsel, who's not represented by Mr. Clemente and

21 his huge clients who have voted in favor of the plan.  It's

22 the little person, *i.e.*, the employees who would vote against

23 a plan that they so -- so desperately tried to get out from

24 under.

25           THE COURT:  Well, --

177

```
1           MR. DRAPER:  It's really a function --

2           THE COURT:  -- Mr. Pomerantz argues it's not as

3    though there was a materially adverse change in treatment; it

4    was the disbursement estimate.  And doesn't every Chapter 11

5    plan -- most Chapter 11 plans, not every -- they make an

6    estimate.  I mean, and it's, frankly, it's very often a big

7    range of recovery, right, a big range of recovery, because we

8    don't know what the allowed claims are going to compute to at

9    the end of the day.  There's obviously liquidation of assets.

10   We don't know.  Isn't this sort of like every -- not, again,

11   not every other plan, but most other plans -- where there's a

12   big range of possible estimated distributions?  I mean, this

13   wasn't a change in treatment, right?

14          MR. DRAPER:  Well, let me address that.  There are

15   two parts to that.  Most plans I see that contain some sort of

16   analysis have a range.  This one doesn't have a range.  What

17   they've done is they've buried in a footnote or assumption

18   that these numbers may change.  So had they said, look, your

19   recovery can go from 60 cents to 85 cents, God bless, they

20   probably would have been right.

21       Number two, which is more problematic to me, to be honest

22   with you, is the fact that, number one, the operating expenses

23   have increased over a hundred percent.  And number two, the

24   Debtor has made a determination post-disclosure statement and

25   pre-hearing that they're going to change their model of
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2622
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 690 of 1017   PageID 7403
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2621 of 2722

178

1   business.

2       The original disclosure statement said we're not going to

3   get into the managing CLO part of the business and we're going

4   to let these contracts go.  However, at some point along the

5   way, they made a change.  I don't know to this day, because I

6   was never furnished the backup to the expense side.  I

7   understand what they said why they didn't give me the asset

8   side, but the expense side, they should have given me, and I

9   did ask for.

10      But, you know, what we have now is a more fundamental

11  problem with the execution of the plan and the expectation

12  that creditors -- what they're going to get, because, in fact,

13  the expense items have doubled.

14      I think creditors were entitled to know that, rather than

15  it having been sprung upon everybody, when I got it the day

16  before a deposition.  And so those are things that I think

17  warranted a change in solicitation.  Now, the result may have

18  been the same.  I don't know.  More people may have voted

19  against the plan.  More people may have opted in from Class 8

20  to Class 7, I mean, based upon that information.  That

21  information was not provided to them.

22      And so I look at two -- three things.  One is a range

23  could have been given, and they probably would have been a

24  whole lot better off.  Two, you have a material change in

25  expenses.  And three, you have a material change in business

179

```
1    model.  Three things that occurred between November and this

2    confirmation hearing.  Three things that were not known by the

3    creditor body and not told to them.

4              THE COURT:  Mr. Draper, I --

5              MR. DRAPER:  Now, it may have been told --

6              THE COURT:  I don't want to belabor this any more

7    than I think we need to, but I've got a Creditors' Committee

8    with very sophisticated professionals, very sophisticated

9    members.  They're fiduciaries to this constituency.  You know,

10   you mentioned the little guy.  I'm not quite sure who is the

11   little guy in this case.  I think it's a case of all big guys.

12   But, I mean, they're fine with what's happened here.

13   Meanwhile, you -- I mean, clarify your standing here for

14   Dugaboy and Get Good.  I mean, --

15             MR. DRAPER:  I have --

16             THE COURT:  -- I know you have standing.  Mr.

17   Pomerantz did not say you don't have standing.  But in

18   pointing out the economic interests here, I think he said your

19   clients only have asserted a postpetition administrative

20   expense.  Is that correct?

21             MR. DRAPER:  No.  I have a post -- I have an -- I

22   have a claim that's been objected to.  I don't think my

23   economic --

24             THE COURT:  A claim of what amount?

25             MR. DRAPER:  I think it's $10 million.  But Mr.
```

180

1  Pomerantz is right, it requires a looking through the --

2  through the entity that I had a loan relationship with.

3     I recognize all of those things.  I don't think that's

4  relevant to whether my argument is correct or incorrect.  I

5  have standing to do it.  I don't think whether my claim is 50

6  cents or $50 million should change the Court's view of whether

7  the claim is good or bad.

8         THE COURT:  Well, I do want to understand, though.

9  Okay.  So you have not asserted an administrative expense,

10 correct?

11        MR. DRAPER:  No.  There's been an administrative

12 expense that's been asserted, --

13        THE COURT:  For what?

14        MR. DRAPER:  -- but that --

15        THE COURT:  For what?

16        MR. DRAPER:  I don't have the number in front of me,

17 Your Honor.  I don't -- I don't have those numbers --

18        THE COURT:  Okay.  Well, then, --

19        MR. DRAPER:  -- in front of me.  I have asserted --

20        THE COURT:  -- what is the concept?  What is the

21 basis for it?

22        MR. DRAPER:  It deals with -- Mr. Pomerantz is

23 absolutely right as to how he's articulated it.

24        THE COURT:  I can't remember what he said.

25        MR. DRAPER:  It deals with -- it deals with a

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2625
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 693 of 1017   PageID 7406
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2624 of 2722

181

1  transaction that's unrelated to the Debtor that deals with

2  Multi-Strat.  I agree with that.

3          THE COURT:  Okay.  So I remember him saying piercing

4  the corporate veil.  Your trusts -- both of them, one of them,

5  I don't know -- engaged in a transaction with Multi-Strat that

6  you say --

7          MR. DRAPER:  No, that --

8          THE COURT:  -- gave -- okay.  Well, you say Multi-

9  Strat is liable and the Debtor is also liable?

10         MR. DRAPER:  No.  Let me make two things.  The

11 administrative claim deals with a Multi-Strat transaction that

12 took place during the bankruptcy.  My unsecured claim deals

13 with a transaction that took place prior to the bankruptcy,

14 where we lent money to another entity that then funneled money

15 out into the Debtor.  We're -- our contention is that the

16 Debtor is liable for that loan.

17         THE COURT:  All right.  So both the administrative

18 expense as well as the prepetition claim require veil-piercing

19 to establish liability of the Debtor?

20         MR. DRAPER:  Or single business enterprise.  I don't

21 necessarily have to veil-pierce.

22         THE COURT:  Okay.  I'm not even sure that single

23 business enterprise is completely available anymore in Texas,

24 by the Texas legislature doing different things, assuming

25 Texas law applies.  I don't know, maybe Delaware does.  But I

182

1    -- sorry.  Just let me let that sink in a little bit.  You're

2    -- okay.  Okay.  Let me let it --

3              MR. DRAPER:  Your Honor, I --

4              THE COURT:  -- sink in a little bit.

5              MR. DRAPER:  Okay.

6              THE COURT:  These trusts -- of which Mr. Dondero is

7    the beneficiary ultimately, right?

8              MR. DRAPER:  Yes.  Well, and to --

9              THE COURT:  So, your --

10             MR. DRAPER:  Again, I have not gone up --

11             THE COURT:  The beneficiary of your client --

12             MR. DRAPER:  Mr. Dondero is --

13             THE COURT:  The beneficiary of your client is

14   ultimately hoping to succeed on the administrative expense and

15   the claim on the basis that you should disregard the

16   separateness of Highland and these other entities?

17             MR. DRAPER:  Well, let's take the --

18             THE COURT:  When he's resisted that --

19             MR. DRAPER:  -- unsecured claim.  The --

20             THE COURT:  -- in multiple pieces of litigation?

21   Right?  I'm sorry.  I'm just trying to let this sink in.

22   Okay.  If you could elaborate.  I'm sorry.  I'm talking too

23   much.  You answer me.

24             MR. DRAPER:  Okay.  What we are saying is that, in

25   essence, the party we lent the money to was a conduit for the

183

1   Debtor.

2          THE COURT:  Okay.  And who was that entity that

3   either --

4          MR. DRAPER:  Highland Select.

5          THE COURT:  -- Dugaboy or Get Good lent money to?

6          MR. DRAPER:  The Get Good claim is completely

7   different.  The Get Good claim is written as a tax claim.

8   Honestly, I haven't taken a hard look at it.  I will, once we

9   get through this, and it may be withdrawn.  The Dugaboy claim

10  is a claim that arises through a conduit loan.

11         THE COURT:  Okay.  But to which entity?

12         MR. DRAPER:  Highland Select.

13         THE COURT:  Okay.  All right.  Well, continue with

14  your argument.  I'll get my flow chart out and --

15         MR. DRAPER:  Well, let me -- again, I think I've made

16  the points that I needed to make.  I think I've done it in a

17  sense that you -- what I think the Court needs to do is take a

18  very hard look at the jurisdictional extension that's being

19  granted here.  I think the exculpation provision, in and of

20  itself, just by the mere inclusion of Pachulski and the

21  Debtor's professionals and the Committee professionals, is

22  just unconfirmable.  It has to be stricken.

23      And I think the injunction and the juris... the gatekeeper

24  provision are not allowed by applicable law.  If this plan

25  merely said, we will enforce the Barton Doctrine, we will

184

1    abide -- and this order the Court has entered stands, the

2    injunction that's provided and the rights that we have under

3    1141 stand, nobody would be objecting.  That's why the U.S.

4    Trustee has objected, because of the expansive nature of what

5    the -- what's been done in this plan.

6        And with that, I'll turn it over to Mr. Taylor or Davor.

7            THE COURT:  All right.  Who's next?

8            MR. RUKAVINA:  Your Honor, Davor Rukavina.  Can you

9    hear me?

10            THE COURT:  I can.

11      CLOSING ARGUMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12            MR. RUKAVINA:  Your Honor, thank you.  I'll try not

13    to repeat the arguments from Mr. Draper, but I do want to

14    point out a couple bigger-picture issues, I think.

15        One, the issue today is not Mr. Dondero, what he has been

16    alleged to have done, what he is alleged to do in the future.

17    The Debtor has gone out of its way to create the impression

18    that we're all tentacles, we're vexatious litigants, we're

19    frivolous litigants.  The issue today is whether this plan is

20    confirmable under 1129(a) and 1129(b).  And I think that that

21    has to be the focus.

22        Nor is the issue, I think, today any motivation behind my

23    objection or Mr. Draper's or anything else.

24        And I do take issue that my motivation or my client's

25    motivation has some ulterior motive for a competing plan or

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2629
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 697 of 1017   PageID 7410
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2628 of 2722

185

1   burning down the house or anything like that.  It's very, very

2   simple.  My clients do not want $140 million of their money

3   and their investors' money, to whom they owe fiduciary duties,

4   to be managed by a liquidating debtor under new management

5   without proper staffing and with an obvious conflict of

6   interest in the form of Mr. Seery wearing two hats.

7       I respect very much that Mr. Seery wants to monetize

8   estate assets for the benefit of the estate creditors.  That's

9   his job.  That's incompatible with his job under the Advisers

10  Act and, as he said, to maximize value to my clients and over

11  a billion dollars of investments in these CLOs.

12      That should not be, Your Honor, a controversial

13  proposition.  I should not be described as a tentacle or

14  vexatious because my clients don't want their money managed by

15  someone that they, in effect, did not contract with.  I may be

16  -- I may lose that argument.  The CLOs have obviously

17  consented to the assumption.  But my argument should not be

18  controversial.  It should not be painted with a broad brush of

19  somehow being done in bad faith by Mr. Dondero.

20      And in fact, Mr. Seery has admitted that the Debtor and he

21  are fiduciaries to us.  The fact that today they call us

22  things like tentacles and serial litigants and vexatious

23  litigants -- we all know what a vexatious litigant is.  We've

24  all dealt with those.  The fact that our fiduciary would call

25  us that just reconfirms that it should have no business

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2630
Case 3:25-cv-02072-S Document 15-9 Filed 06/27/25 06/25 Page 698 of 1017 PageID 7411
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2629 of 2722

186

1  managing our or other people's money.

2      And then for what?  Mr. Seery has basically said that the

3  Debtor will make some $8.5 million in revenue from these

4  contracts, net out $4 million of expenses.  That's net profit

5  of $4.5 million.  But then they have to pay $3.5 million for

6  D&O insurance and $525,000 in cure claims.  But it's the

7  Debtor's business decision, not ours.

8      Your Honor, the second issue is the cram-down of Class 8.

9  There are two problems here:  the disparate treatment between

10  Class 7 and Class 8, which also raises classification, and

11  then the absolute priority rule.  Class 7 is a convenience

12  class claim -- is a convenience claim, Your Honor, with a $1

13  million threshold.  Objectively, that is not for

14  administrative convenience, as the Code allows.  And the only

15  evidence as to how that million dollars was arrived at was,

16  oh, it was a negotiation of the Committee.

17      There is no evidence justifying administrative

18  convenience.  Therefore, there is no evidence justifying

19  separate classification.  And on cram-down, the treatment has

20  to be fair and equitable, which *per se* it is not if there is

21  unfair discrimination.  And there is unfair discrimination,

22  because Class 8 will be paid less.

23      On the absolute priority rule, Your Honor, I think that

24  it's very simple.  I think that the Code is very clear that

25  equity cannot retain anything -- I'm sorry, equity cannot

187

1   retain any property or be given any property.  Property is the

2   key word in 1129(b), not value.  It doesn't matter that this

3   property may not have any value, although Mr. Seery said that

4   it might.  What matters is whether these unvested contingent

5   interests in the trust are property.  And Your Honor, they are

6   property.  They have to be property.  They are trust

7   interests.

8       So the absolute priority rule is violated on its face.

9   There is no evidence that unsecured creditors in Class 8 will

10  receive hundred-cent dollars.  The only evidence is that

11  they'll receive 71 cents.  Mr. Seery said there's a potential

12  upside from litigation.  He never quantified that upside.  And

13  there is zero evidence that Class 8 creditors are likely to be

14  paid hundred-cent dollars.  So, again, you have the absolute

15  priority rule issue.

16      And this construct where, okay, well, equity won't be in

17  the money unless everyone higher above is paid in full, that

18  is just a way to try to get around the dictate of the absolute

19  priority rule.  If that logic flies, then the next time I have

20  a hotel client or a Chapter 11 debtor-in-possession client

21  where my equity wants to retain ownership, I'll just create

22  something like, well, here's a trust, creditors own the trust,

23  I won't distribute any money to equity, and equity can just

24  stay in control.

25      The point again is that this is property and it's being

188

1    received on account of prepetition equity.

2        And there's also the control issue.  The absolute priority

3    rule, the Supreme Court is clear that control of the post-

4    confirmation equity is also subject to the absolute priority

5    rule.  Here you have the same prepetition management

6    postpetition controlling the Debtor and the assets.

7        Your Honor, the Rule 2015.3 issue, someone's going to say

8    that it's trivial.  Someone's going to accuse me of pulling

9    out nothing to make something.  Your Honor, it's not trivial.

10   That's part of the problem in this case, that this Debtor owns

11   other entities that own assets, and there's been precious

12   little window given into that during the case, during this

13   confirmation hearing, and in the disclosure statement.

14       Rule 2015.3 is mandatory.  It's a shall.  I respect very

15   much Mr. Seery's explanation that there was a lot going on

16   with the COVID and with everything and that it just fell

17   through the cracks.  That's an honest explanation.  But the

18   Rule has not been complied with.  And 1107(a) requires that

19   the debtor-in-possession comply with a trustee's duties under

20   704(a)(8).  Those duties include filing reports required by

21   the Rules.

22       So we have an 1129(a)(3) problem, Your Honor, because this

23   plan proponent has not complied with Chapter 11 and Title 11.

24   I'll leave it at that, because I suspect, again, someone will

25   accuse me of being trivial on that.  It is not trivial.  It is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2633
Case 3:25-cv-02072-S   Document 15-9   Filed 06/27/25   Page 701 of 1017   PageID 7414
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2632 of 2722

189

1   a very important rule.

2       On the releases and exculpations, Your Honor, I'm not

3   going to try -- I'm not going to hopefully repeat Mr. Draper.

4   But there's a couple of huge things here with this exculpation

5   that takes it outside of any possible universe of *Pacific*

6   *Lumber*.

7       First, you have a nondebtor entity that is being

8   exculpated.  I understand the proposition that, during a

9   bankruptcy case, the professionals of a bankruptcy case might

10  be afforded some protection.  I understand that proposition.

11  But here you have Strand and its board that's a nondebtor.

12      The other thing you have that takes this outside of any

13  plausible case law is that the Debtor is exculpated from

14  business decisions, including post-confirmation.  I understand

15  that professionals in a case make decisions, and

16  professionals, at the end of the case, especially if the Court

17  is making findings about a plan's good faith, that

18  professionals making decisions on how to administer an estate

19  ought to have some protection.

20      That does not hold true for whether a debtor and its

21  professionals should have protection for how they manage their

22  business.  GM cannot be exculpated for having manufactured a

23  defective product and sold it during its bankruptcy case.

24      Here, I asked Mr. Seery whether this language in these

25  provisions, talking about whether the administration of the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2634
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 702 of 1017 PageID 7415
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2633 of
2722

190

1  estate and the implementation of the plan includes the

2  Debtor's management of those contracts and funds.  He said

3  yes.  He said yes.  So if you look at the exculpation

4  provision, it is not limited in time.  It affects, Your Honor,

5  I'm quoting, it affects the implementation of the plan.

6  That's going forward.

7      So you are exculpating the Debtor and its professionals

8  from business decisions, including post-confirmation, from

9  negligence.  Well, isn't negligence the number one protection

10 that people that have invested a billion dollars with the

11 Debtor have?  It's cold comfort to hear, well, you can come

12 after us for gross negligence or theft.  I get that.  What

13 about negligence?  Isn't that what professionals do?  Isn't

14 that why professionals have insurance, liability insurance?

15 It's called professional negligence for malpractice.

16     So this exculpation, let there be no mistake -- I heard

17 Your Honor's view and discussion -- this is a different

18 universe, both in space and in time.

19     And we don't have to worry about *Pacific Lumber* too much

20 because we have the *Dropbox* opinion in *Thru, Inc.*  We have

21 that opinion.  Whether it's sound law or not, I don't wear the

22 robe.  But the exculpation provision in that case was

23 virtually identical.  And Your Honor, that's a 2018 U.S. Dist.

24 LEXIS 179769.  In that opinion, Judge Fish -- I don't think

25 anyone could say that Judge Fish was not a very experienced

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2635
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 703 of 1017   PageID 7416
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2634 of 2722

191

1   district court judge -- Judge Fish found that the exculpation

2   violated Fifth Circuit precedent.  That exculpation covered

3   the debtor's attorneys, the debtor, the very people that Mr.

4   Pomerantz is now saying, well, maybe the Fifth Circuit would

5   allow an exculpation for.

6          THE COURT:  Well, I think he is relying heavily on

7   the analogy of independent directors to Creditors' Committee

8   members, saying that's a different animal, if you will, than

9   prepetition officers and directors.  And he thinks, given the

10  little bit of policy analysis put out there by the Fifth

11  Circuit, they might agree that that's analogous and worthy of

12  an exculpation.

13         MR. RUKAVINA:  And they might.  And they might.  And

14  again, I usually do debtor cases.  You know that.  I'd love to

15  be exculpated.

16         THE COURT:  But --

17         MR. RUKAVINA:  And I think, again, I do -- I do --

18         THE COURT:  -- I really want people to give me their

19  best argument of why, you know, that's just flat wrong.  And

20  Mr. Draper just said it's, you know, there's a categorical --

21         MR. RUKAVINA:  Yeah.

22         THE COURT:  -- rejection of exculpations except for

23  Committee members and Committee in *Pacific Lumber*.  And I'm

24  scratching my head on that one.  And partly the reason I am,

25  while 524(e) was thrown out there, the fact is there's nothing

192

1   explicitly in the Bankruptcy Code, right, that explicitly

2   permits exculpation to a Committee or Committee members.

3   There's just sort of this notion, you know, allegedly embodied

4   in 1103(c), or maybe there are cases you want to cite to me,

5   that they're fiduciaries, they're voluntary fiduciaries, they

6   ought to have qualified immunity.

7        And again, I see it as more of a policy rationale the

8   Fifth Circuit gave than pointing to a certain statute.  So if

9   it's really a policy rationale, then I think the analogy given

10  here to a newly-appointed independent board is pretty darn

11  good.

12       So tell me why I'm all wrong, why Mr. Pomerantz is all

13  wrong.

14           MR. RUKAVINA:  I am not going to tell you that you're

15  all wrong.  I'm not going to tell Mr. Pomerantz that he's all

16  wrong.  Although I am, I guess, a Dondero tentacle, I am not a

17  Mr. Draper tentacle, and I happen to disagree with him.

18  That's my right.  I respect the man very much.  I thought he

19  did a very honorable and ethical job explaining his position

20  to Your Honor.  I believe that the Fifth Circuit would approve

21  exculpations for postpetition pre-confirmation matters taken

22  by estate fiduciaries.  I do believe that they would.  And I

23  do believe that that should be the case.

24       But again, I'm telling you that this one is different.

25  It's -- Mr. Pomerantz is misdirecting you.  The estate

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2637
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 705 of 1017 PageID 7418
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2636 of 2722

193

 1  professionals manage the estate.  The Debtor manages its

 2  business.  It goes out into the world and it manages business.

 3  And as Your Honor knows, under that 1969 Supreme Court case,

 4  of course I blanked, and under 28 U.S. 959, a debtor must

 5  comply, when it's out there, with all applicable law.

 6      So if the Debtor -- and I'm making this up, okay?  I am

 7  making this up.  I'm not alleging anything.  But if the

 8  Debtor, through actionable neglect, lost $500 million of its

 9  clients' or its investor clients' money, I'm telling you that

10  under no theory can that be exculpated, and I'm telling you

11  that that's what this provision does.

12      The estate and the Debtor can release their claims.  It

13  happens all the time.  Whatever -- whatever claims the estate

14  may have against professionals, those can be released.  It's a

15  9019.  I'm not complaining about that.  Although I do think

16  that it's premature in this case, because we don't know

17  whether there's any liability for the $100 million that Mr.

18  Seery told you Mr. Dondero lost.  But in no event can business

19  -- business --

20          THE COURT:  I don't understand what you just said.

21          MR. RUKAVINA:  Your Honor, I --

22          THE COURT:  Mr. Dondero is not released --

23          MR. RUKAVINA:  -- went through Mr. Seery's --

24          THE COURT:  -- by the estate.

25          MR. RUKAVINA:  I understand.  I understand.  But we

194

1   all have to also understand that a board of directors and

2   officers can be liable, breaches of fiduciary duty by not

3   properly managing an employee.  So I'm not suggesting -- I

4   mean, I know that there's been an examiner motion filed.  I'm

5   not suggesting that we have a mini-trial.  I'm not suggesting

6   there's actionable conduct.  What I'm telling you is that the

7   evidence shows that there's a large postpetition loss.  And

8   it's premature to prevent third parties that might have claims

9   from bringing those.

10      And then I think -- I'm not sure that Your Honor

11  understood my point.  Let me try to make it again.  This

12  exculpation is not limited in time.  This exculpation is

13  expressly not limited in time and applies to the

14  administration of the plan post-confirmation.  I don't think

15  under any theory would the Fifth Circuit or any court at the

16  appellate level allow an exculpation for purely post-

17  reorganization post-bankruptcy matters.  I have nothing more

18  to tell Your Honor on exculpation.

19          THE COURT:  Well, again, I -- perhaps I go down some

20  roads I really don't need to go down here, but I'm not sure I

21  read it the way you did.  I thought we were just talking about

22  pre -- postpetition, pre-confirmation.  Or pre-effective date.

23          MR. RUKAVINA:  Your Honor, Page --

24          THE COURT:  The --

25          MR. RUKAVINA:  Page 48 of the plan, Section C,

195

1  Exculpation. Romanette (iv). The implementation of the plan.

2  And I -- and that's -- that's part of why I asked Mr. Seery

3  that yesterday. Does the implementation of the plan, in his

4  understanding, include the Reorganized Debtor's management and

5  wind-down of the Funds, and he said yes.

6        THE COURT: Okay.

7        MR. RUKAVINA: So that's right there in black and

8  white.

9     It also includes the administration of the Chapter 11

10  case. If that is defined broadly, as Mr. Seery wants it to

11  be, to define business decisions, then that also exceeds any

12  permissible exculpation.

13     So, again, I'm telling Your Honor, with due respect to you

14  and to Mr. Pomerantz, that the focus of Your Honor's

15  questioning is wrong. The focus of Your Honor's questioning

16  should be on exculpation from what? From business -- *i.e.*, GM

17  manufacturing and selling the car -- or from management of the

18  bankruptcy case? Management of the bankruptcy case? Okay.

19  Postpetition pre-confirmation managing business, never okay.

20     Your Honor, on the channeling -- and let me add, I think

21  it's very clear, there is no Barton Doctrine here. This is

22  not a Chapter 11 trustee. The Barton Doctrine does not

23  extend to debtors-in-possession. And I can cite you to a

24  recent case, *In re Zaman*, 2020 Bankr. LEXIS 2361, that

25  confirms that the Barton Doctrine does not apply to a debtor-

196

1    in-possession.

2        I want to --

3            THE COURT:  Remind me of that --

4            MR. RUKAVINA:  -- discuss, Your Honor, the --

5            THE COURT:  Remind me of the facts of that case.  I

6    feel like I read it, but -- or saw it in the advance sheets,

7    maybe.

8            MR. RUKAVINA:  I honestly do not recall.  I read it a

9    few days ago, and since then, I hope Your Honor can

10   appreciate, I've been up very late trying to negotiate

11   something good in this case.

12           THE COURT:  I'd like to know --

13           MR. RUKAVINA:  So, I mean, I have the case in front

14   of me.

15           THE COURT:  I'd like to know about a holding that

16   says Barton Doctrine can't be applied in a Chapter 11 post-

17   confirmation context, if that's --

18           MR. RUKAVINA:  Well, I have it --

19           THE COURT:  -- indeed the holding.

20           MR. RUKAVINA:  I have it right in front of me here,

21   Your Honor, and I can certainly -- all I know is that this

22   case held that -- it rejected the notion that the Barton

23   Doctrine applies to a debtor-in-possession.

24           THE COURT:  Okay.

25           MR. RUKAVINA:  And maybe --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2641
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 709 of 1017 PageID 7422
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2640 of 2722

197

1          THE COURT:  That --

2          MR. RUKAVINA:  There it is, right there.

3          THE COURT:  What judge?

4          MR. RUKAVINA:  Your Honor, it is the Southern

5    District of Florida, and it is the Honorable -- Your Honor, it

6    is the Honorable Mindy Mora.

7          THE COURT:  Okay.

8          MR. RUKAVINA:  M-O-R-A.

9          THE COURT:  Okay.

10         MR. RUKAVINA:  I have not had the pleasure of being

11   in front of that judge.

12       Your Honor, let me discuss the channeling injunction.

13   This is the big one for me.  This is the big one.  And I think

14   we have to begin -- and it's the big one, as I'll get to,

15   because Your Honor knows that the CLO management agreements

16   give my clients certain rights, and this injunction would

17   prevent those rights from being exercised post-confirmation.

18   It's not dissimilar from the PI hearing that we're in the

19   middle of in an adversary.

20       But I begin my analysis, again, with 28 U.S.C. 959.  Your

21   Honor, that -- the first sentence of that statute makes it

22   very clear that when it comes to carrying on a business, a

23   debtor-in-possession may be sued without leave of the court

24   appointing them.

25       So the first thing that this channel -- gatekeeper,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2642
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 710 of 1017   PageID 7423
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2641 of 2722

198

1   channeling, I don't mean to miscall it -- the first thing that

2   this gatekeeping injunction does is it stands directly

3   opposite to 28 U.S.C. 959.

4       28 U.S.C. 959 also says that jury rights must be

5   preserved.  As I'll argue in a moment, this injunction also

6   affects those rights.

7       In addition to 959, we have the fundamental issue of post-

8   confirmation jurisdiction.  As Mr. Draper said, here, this

9   channeling injunction applies to post-confirmation matters.

10  Similar to my answer to you on exculpation, I can see there

11  being a place for a channeling injunction during the pendency

12  of a case or for claims that might have arisen during the

13  pendency of a case.  I cannot see that, and I don't know of

14  any court that, at least at a circuit level, that would agree

15  that this can apply post-confirmation.

16      It is, again, the equivalent of GM manufacturing a car

17  post-confirmation and having to go to bankruptcy court because

18  someone's wanting to sue it for product negligence or

19  liability.  It's unthinkable.  The reason why a debtor exits

20  bankruptcy is to go back out into the community.  It's no

21  longer under the protection of the bankruptcy court.  That's

22  what the media calls Chapter 11, it calls it the protection of

23  the court.  There's no such protection post-reorganization.

24  So, --

25          THE COURT:  Is that really analogous, Mr. Rukavina?

199

1    Let's get real.  Is this really analogous --

2             MR. RUKAVINA:  It is.

3             THE COURT:  -- to GM --

4             MR. RUKAVINA:  It is.

5             THE COURT:  -- manufacturing thousands of cars?

6             MR. RUKAVINA:  It absolutely is analogous.  Because

7    this Debtor is going to assume these contracts and it is going

8    to go out there and it is going to make daily decisions

9    affecting a billion dollars of other people's money.  Each of

10   those decisions hopefully will be done correctly and make

11   everyone a lot of money, but each of those decisions is the

12   potential for claims and causes of action.

13       So it is analogous, Your Honor.  They want my clients and

14   others to come to you for purely post-confirmation matters.

15   The Court will not have that jurisdiction.  There will be no

16   bankruptcy estate, nor can the Court's limited jurisdiction to

17   ensure the implementation of the plan go to and affect a post-

18   confirmation business decision.

19       That's the distinction.  The Debtor's post-confirmation

20   business is not the implementation of a plan.  As Mr. Draper

21   said, there's a new entity.  There's a new general partner.

22   There's a new structure.  Go out there and do business,

23   Debtor.  That's what they're telling you.  They're telling you

24   this is not a liquidation because they're going to be in

25   business.  Okay.  Well, the consequence of that is that

200

 1   there's no post-confirmation jurisdiction.

 2       Now, Mr. Pomerantz says, and I think you asked Mr. Draper,

 3   well, the jurisdiction to adjudicate whether something is

 4   colorable is different from the jurisdiction to adjudicate the

 5   underlying matter.  Your Honor, I don't understand that

 6   argument, and I don't see a distinction.  If the Court has no

 7   jurisdiction to decide the underlying matter, then how can the

 8   Court have any jurisdiction to pass on any aspect of that

 9   underlying matter?

10       And whether something is colorable is a fundamental issue

11   in every matter.  That's the thing that courts look at in a

12   12(b)(6), in a Rule 11 issue, in a 1927 issue.  So they're

13   going to come -- or someone is going to have to come to Your

14   Honor and present evidence and law that something is

15   colorable.  Let's say that we've said there's a breach of

16   contract.  Aren't we going to have to show you, here's the

17   contract, here's the language, here's the facts giving rise to

18   the breach, here's the elements?  And Your Honor is going to

19   have to pass on that.  And if Your Honor decides that

20   something is not colorable, then there ain't no step two.

21       And if Your Honor decides that something is colorable,

22   then isn't that going to be binding on the future proceeding?

23   And if it's going to be binding on the future proceeding, then

24   of course you're exercising jurisdiction to adjudicate an

25   aspect of that lawsuit.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2645
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 713 of 1017 PageID 7426
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2644 of 2722

201

1    I don't think that that -- I don't know I can be clearer

2    than that, Your Honor, unless the Debtor has some other

3    understanding of what a colorable claim or cause of action is

4    that I'm misunderstanding.

5    And Your Honor, I would ask, when Your Honor is in

6    chambers, to look at one of these CLO management agreements.

7    I'm sure Your Honor has already. I just pulled one out of the

8    Debtor's exhibits, Exhibit J as in Jason. And Section 14, 14

9    talks about termination for cause. Most of these contracts

10   are for cause. So, Your Honor, cause includes willfully

11   breaching the agreement or violating the law, cause includes

12   fraud, cause includes a criminal matter, such as indictment.

13   So let's imagine, Your Honor, that I come to you a year

14   from now and I say, I would like to terminate this agreement

15   because I don't want the Debtor managing my $140 million

16   because of one of these causes. What am I going to argue to

17   Your Honor? I'm going to argue to Your Honor that those

18   causes exist. And Your Honor is going to have to pass on

19   that.

20   And if Your Honor says they don't exist, again, I'm done.

21   I just got an effective final ruling from a federal judge that

22   my claim is without merit. I'm done. Your Honor has decided

23   the matter effectively, legally, and finally.

24   That's why, when Mr. Pomerantz says that the jurisdiction

25   to adjudicate the colorableness of a claim is different from

202

 1   adjudicating that claim, it's not correct.  They're part of

 2   the same thing, Your Honor.

 3       We strenuously object to that injunction, we think it's

 4   unprecedented, and we strenuously object to that injunction

 5   because we are not Mr. Dondero.

 6       I understand the January 9th order.  I'll let Mr.

 7   Dondero's counsel talk about why that was never intended to be

 8   a perpetual order.  I'll let Mr. Dondero's counsel argue as to

 9   why the extension of that order *ad infinitum* in the plan is

10   illegal.

11       But even if Mr. Dondero is enjoined in perpetuity from

12   causing the related parties to terminate these agreements,

13   Your Honor, the related parties themselves are not subject to

14   that injunction.  That's why you have the preliminary

15   injunction proceeding impending in front of you on ridiculous

16   allegations of tortious interference.

17       So whether the Court enjoins Mr. Dondero or not in

18   perpetuity is a separate matter.  The question is, as you've

19   heard, at least my retail clients, they have boards.  Those

20   boards are the final decision-makers.  Mr. Dondero is not on

21   those boards.

22       In other words, it is wrong to conclude *a priori* that

23   anything that my clients do has to be at the direction of Mr.

24   Dondero.  There is no evidence of that.  The evidence is to

25   the contrary.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2647
Case 3:25-cv-02072-S   Document 15-9   Filed 06/23/06/25   Page 715 of 1017   PageID 7428
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2646 of 2722

203

1    Yes, a couple of my clients, the Advisors are controlled

2  by Mr. Dondero.  Mr. Norris testified to that.  You'll not

3  find Mr. Norris anywhere testifying in that transcript that

4  Your Honor allowed into evidence that the funds, my retail

5  fund clients are controlled by Mr. Dondero.  You won't find

6  that evidence.  There was no evidence yesterday or today that

7  Mr. Dondero controls those retail funds.  The only evidence is

8  that they have independent boards.

9    So I ask the Court to see that it's a little bit of a

10 sleight of hand by the Debtor.  If I am to be enjoined or if I

11 am to have to come to Your Honor in the future as a vexatious

12 litigant or a tentacle or a frivolous litigant, whatever else

13 I've been called today, then let it be because of something

14 that I've done or failed to do, something that my client has

15 done to warrant such a serious remedy, not something that Mr.

16 Dondero is alleged to have done.

17    And what have my clients done, Your Honor?  What have we

18 done to be called vexatious litigants and serial litigants?

19 We've done nothing in this case, pretty much, until December

20 16th, when we filed a motion that was a poor motion,

21 unfortunately, the Court found it to be frivolous, and the

22 Court read us the riot act.

23    We refused, on December 22nd, we, my clients' employees,

24 to execute two trades that Mr. Dondero wanted us to execute.

25 We had no obligation to execute them.  We knew nothing about

204

1   them.  And Mr. Seery -- I'm sorry.  Not Mr. Dondero, that Mr.

2   Seery wanted to execute.  And Mr. Seery closed those

3   transactions that same day.  And then a professional lawyer at

4   K&L Gates, a seasoned bankruptcy lawyer, sent three letters to

5   a seasoned professional lawyer at Pachulski, and the letters

6   were basically ignored.

7        Okay.  Those are the things that we've done.  Other than

8   that, we've defended ourselves against a TRO, we've defended

9   ourselves against a preliminary injunction, we will continue

10  to defend ourselves against a preliminary injunction, and we

11  defend ourselves against this plan because it takes away our

12  rights.  Is that vexatious litigation?  Is that, other than

13  the frivolous motion, is that frivolous litigation?

14       And we heard you loud and clear when you read us the riot

15  act on December 16th.  And I will challenge any of these

16  colleagues here today to point me to something that we have

17  filed since then that is in any way, shape, or form arguably

18  meritless.

19       So where is the evidence that my retail funds are

20  tentacles or vexatious litigants or anything else?  There is

21  no evidence, Your Honor, and the Debtor is doing its best to

22  give you smoke and mirrors to just make that mental jump from

23  Mr. Dondero to my clients, effectively an alter ego, without a

24  trial on alter ego.

25       Once these contracts are assumed, the Debtor must live

205

1   with their consequences.  It's as simple as that.  Your Honor

2   has so held.  Your Honor has so held forcefully in the *Texas*

3   *Ballpark* case.  And the Court, I submit respectfully, cannot

4   excise by an injunction a provision of a contract.

5       Also, this injunction will -- is a permanent injunction.

6   We know from *Zale* and other cases the Fifth Circuit does

7   permit certain limited plan injunctions that are temporary in

8   hundred-cent plans.  This is a permanent one.  It doesn't even

9   pretend to be a temporary one.

10       It's also a permanent one because the Debtor knows and I

11   think the Debtor is banking on me being unable to get relief

12   in the Fifth Circuit before Mr. Seery is finished liquidating

13   these CLOs.

14       So what we are talking about today is effectively excising

15   valuable and important negotiated provisions of these

16   contracts, provisions that, although my clients are not

17   counterparties to these contracts, you've heard from at least

18   three of them we do control the requisite vote, the voting

19   percentages, to cause a termination, to remove the Debtor, or

20   to seek to enforce the Debtor's obligations under those

21   contracts.

22       And again, Your Honor, it's very simple.  Where those

23   contracts require cause, there either is cause or is not

24   cause.  If there is not cause, the Debtor has its remedies.

25   If there is cause, I'll have my remedies.  But it's not for

206

1   this Court post-confirmation to be making that determination.

2   That's not my decision.  That's Congress's decision.

3       So, Your Honor, for those reasons, we object, and we

4   continue to object, and we'd ask that the Court not confirm

5   this plan because it is patently unconfirmable.  Or if the

6   Court does confirm the plan, that it excise those provisions

7   of the releases, exculpations, and injunction that I just

8   mentioned as being not in line with the Fifth Circuit or

9   Supreme Court precedent.

10      Thank you.

11          THE COURT:  All right.  Can I -- I meant to ask Mr.

12  Draper this.  Can we all agree that we do not have third-party

13  releases *per se* in this plan?  Can we all agree on that?

14          MR. DRAPER:  I don't know.  I have to look at that.

15  I think what you have are exculpations and channeling

16  injunctions for third parties who have not paid for those

17  channeling injunctions or those exculpations.

18          THE COURT:  All right.

19          MR. RUKAVINA:  Your Honor, was that question -- was

20  that question solely to Mr. Draper?

21          THE COURT:  Well, no, it was to all of you.  I

22  thought we could all agree that we don't have third party

23  releases *per se*.  Okay.  There was --

24          MR. RUKAVINA:  Your Honor, we --

25          THE COURT:  -- a little bit of glossing over that in

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2651
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 719 of 1017 PageID 7432
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2650 of 2722

207

1    some of the briefing, I can't remember whose. But we have

2    Debtor releases, we have --

3              MR. RUKAVINA: Yes.

4              THE COURT: -- exculpations that deal with

5    postpetition negligence only, we have injunctions, which I

6    guess the Debtor would say merely serve to implement the plan

7    provisions and are commonplace, but Mr. Draper would say maybe

8    are tantamount to third-party releases. Is that --

9              MR. RUKAVINA: Your Honor, I don't think -- we

10             THE COURT: -- where we are?

11             MR. RUKAVINA: -- there's any question -- I don't

12   think there's any question that the exculpation is a third-

13   party release, and that that's also what Judge Fish held in

14   the *Dropbox* case. It says that none of the exculpated parties

15   shall have any liability on any claim. So, --

16             THE COURT: All right.

17             MR. RUKAVINA: -- that necessarily --

18             THE COURT: I get what you're saying, but I just

19   think, in common bankruptcy lingo, most people regard a third-

20   party release as when third parties are releasing -- third

21   parties meaning, for example, creditors, interest holders --

22   are releasing officers and directors and other third parties

23   for anything and everything.

24         Exculpation, I get it, it's worded in a passive voice, but

25   it is third parties releasing third parties, but for a narrow

208

1   thing, postpetition conduct that is negligent.  Okay.  So I

2   think -- while there's technically something like a third-

3   party release there, it's not in bankruptcy lingo what we call

4   a third-party release.  It's an exculpation means no liability

5   of the exculpated parties for postpetition conduct that's

6   negligent.  So I -- anyway, I think we all agree that, I mean,

7   can we all agree there aren't any *per se* third-party releases

8   as that term is typically used in bankruptcy parlance?

9          MR. RUKAVINA:  I apologize, Your Honor, and I'm not

10  trying to try your patience, but I cannot agree to that.

11  Whatever claims my client, a nondebtor, has against Strand, a

12  nondebtor, are gone.  Whether it's a release or exculpations,

13  they're gone.  So I apologize, I cannot agree to that, Your

14  Honor.

15         MR. DRAPER:  Your Honor, this is Douglas Draper.  I

16  can't agree, either.  I think it's definitional.  And quite

17  frankly, I think I'm looking at the functional effect of

18  what's here, and they appear to be third-party releases.

19         THE COURT:  Okay.  All right.  Who is making the

20  argument for Mr. Dondero?

21         MR. TAYLOR:  Your Honor, Clay Taylor appearing on

22  behalf of Mr. Dondero.

23         THE COURT:  Okay.

24     CLOSING ARGUMENT ON BEHALF OF JAMES D. DONDERO

25         MR. TAYLOR:  Your Honor, first of all, as this Court

209

1   is well aware, this Court sits, as a bankruptcy court, as a

2   court of equity.  It has many different tools available to it.

3   One of those, of course, is denying confirmation of this plan

4   because of the laws that we have discussed today and that we

5   believe the evidence has shown, and I won't go into those.  Of

6   course, of course, Your Honor could confirm that plan.  Yet

7   another tool available to this Court is it can take it under

8   advisement.

9       To the extent that this Court decides to confirm this plan

10  and decides to confirm it today, it certainly takes a lot of

11  options off the table for all parties.  There are ongoing

12  discussions, I'm not going to go into any of the particulars

13  of those discussions, but a ruling on confirmation today would

14  effectively end that, because, absent, then, an order vacating

15  confirmation, there's a lot of eggs that can't become

16  unscrambled after a confirmation order is entered.

17      So we would respectfully ask that, to the extent that the

18  Court is even considering confirmation, we don't believe it to

19  be appropriate, but at least take it under advisement for 30

20  days, or at least, in the very alternative, that it announce

21  some date which it is going to give a ruling, so that we kind

22  of know when that is going to come down, to see if any

23  positive ongoing discussions can result in more of a global

24  resolution that all parties can agree upon.

25      Addressing more the merits of the case, Your Honor, Mr.

210

1  Dondero does indeed object to the nondebtor releases, the

2  exculpations, the injunction.  I believe those have been

3  covered rather extensively in the prior argument, so I wasn't

4  going to go into those here because they've been addressed.

5  Of course, I will endeavor to answer any questions that Your

6  Honor may have on those.

7      I will say I think Your Honor asked for everybody's best

8  shot as to why this is different for a Committee member versus

9  the independent trustees here.  I will say my best shot is,

10 first of all, *Pacific Lumber* says what it says.  I believe Mr.

11 Pomerantz has indicated their position that that language is

12 dicta and therefore not binding upon this Court.  I

13 respectfully disagree with that.  But to the extent, more

14 directly answering Your Honor's question, to me, the

15 difference is clear.  Chapter 7 trustees are a creature of

16 statute.  So are Chapter 11 trustees.  And -- as are members

17 of a Committee that are seated pursuant to the Bankruptcy

18 Code.  Those are all creatures of statute.  And the

19 independent board of trustees, while there are certainly --

20 there are some analogies that can be made, undoubtedly, but

21 they are not a creature of statute.  There is no provision for

22 them under the Bankruptcy Code.  And therefore I don't believe

23 that they should and can receive the same protections under

24 *Pacific Lumber*.

25     And so hopefully that -- that is my best shot at

211

1   answering, directly answering the question that Your Honor

2   posed.

3          THE COURT:  Okay.

4          MR. DRAPER:  Mr. Dondero also has issue with the

5   overbroad continuing jurisdiction of this Court.  I believe

6   Mr. Rukavina has stated that rather succinctly, too.  Merely

7   ruling upon whatever claim is colorable or not certainly has

8   definite impacts.  If this Court has jurisdiction to do that

9   when it otherwise wouldn't have jurisdiction, it enacts an

10   expansion, a potentially impermissible expansion of this

11   Court's jurisdiction.  And for that reason, the plan should --

12   confirmation should be denied.

13      Getting into the particulars of 1129, Your Honor, there is

14   problems under 1129(a)(2).  Those are the solicitation

15   problems.  Let's just kind of look at what the evidence

16   showed.  On November 28th, there was a disclosure statement,

17   it was published to all creditors, and it said, under this

18   plan, you're going to get 87 cents.  It wasn't a range.  Now,

19   there was some assumptions that went in there, but they said,

20   under a liquidation of all these assets, you're going to get

21   62 cents.

22      The Debtors came back approximately two months later, on

23   January 28th, and said, oh, wait, we missed the boat here, and

24   actually, under the plan, you're going to get 61 cents.  And

25   under a liquidation, though, you'd only get 48.

212

 1      Well, the problem is, already, two months later, they've

 2   already told you they missed the boat on what the liquidation

 3   analysis was just two months ago.  And two months ago, they

 4   told you under a liquidation you'd get 62 cents, and now we're

 5   telling you you're going to get less.  That's at least some

 6   very good evidence that the best interests of the creditors

 7   isn't being met, and potentially a liquidation is much better.

 8      They then came back, potentially maybe realizing that

 9   problem, also because some new information came in with the

10   employees, and also with UBS, which adjusted the overall

11   general unsecured claims pool, and said, well, under the plan

12   you're going to get 71 cents, and under a liquidation you're

13   going to get 55 cents.

14      In between those iterations from November to February,

15   they found $67 million more in assets.  So Mr. Seery testified

16   he believed some of that's as to market increases in values,

17   and some (garbling) investment, market -- securities.  And

18   some were just in these private equity investments.

19      There are indeed some rollups behind all of these numbers.

20   I do understand why they wouldn't want to make some of these

21   numbers public, because they might not be able to get --

22   create the upside for any particular asset class that they're

23   seeking to monetize.

24      However, we and others, including Mr. Draper, asked for

25   those rollups to be provided, and we certainly could have

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2657
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 725 of 1017 PageID 7438
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2656 of 2722

213

1  taken those under seal or a confidentiality agreement, could

2  have also put those before this Court under seal and the

3  Debtor could have put those rollups before this Court under

4  seal.  It elected not to do so.

5      So, rather, what you have is the naked assumptions of this

6  is what we think we can monetize the assets, or we're not

7  going to tell you what it is, but trust me, Creditors, and

8  cool, we found $67 million worth of value in the past two

9  months, so therefore we're going to beat the liquidation

10  analysis that we previously told you just two months ago.

11      They also acknowledge that, in those two months, that

12  there was going to be about $26 million in increased costs

13  from their November analysis to their February analysis.  And

14  they included that in their projections.

15      Finally, they acknowledged, in those two months, that we

16  had previously estimated -- and they even have it in their

17  assumptions in November liquidation and plan analysis -- that

18  UBS, HarbourVest, and I believe it was Acis, were all going to

19  be valued at zero dollars, and that's what the claims were

20  going to be.  Well, they kind of missed the boat on those, and

21  they missed it by a lot.  They -- it increased all the claims

22  in the pool from $195 million to $273 million, or sorry, I

23  don't -- look at that again, but it was an increase of $95

24  million.  I'm sorry, 190 -- the claims pool increased from

25  $194 million to -- I'm sorry, Your Honor, I have too many

214

1  papers in front of me -- on November, the claims pool was 176

2  and it increased by February 1st to 273. Therefore,

3  approximately $95, almost $100 million worth of claims that

4  they weren't anticipating that actually came in.

5      That tells you about the quality of the assumptions that

6  went into the analysis to begin with. They missed it by 50

7  percent on what the overall claims pool was going to be.

8  That's significant. It's material.

9      There is a lot of other assumptions that could go into

10  this document, and one of those assumptions are how much are

11  we going to be able to monetize these assets for? One other

12  assumption is, well, how much is it going to cost during the

13  two-year life of this wind-down? Another assumption is going

14  to be, are we actually going to be able to wind down in two

15  years? Because if we're not, well, guess what, all those

16  costs are going to go up. Another assumption is, well, how

17  much are those fee claims going to be over the two-year

18  period? Again, if it goes over two years, they're going to be

19  significantly higher. Moreover, you might have just missed

20  what the burn rate is.

21      So I think it's rather telling that the assumptions made

22  of -- all the way back of over two -- of only two months ago

23  were off by $100 million, and therefore it skewed all of the

24  plan-versus-liquidation analysis all over the board.

25      That's the only evidence that the Debtor has put forth as

215

1  to why it's in the best interest of the creditors.  And quite

2  frankly, we don't believe they have met their burden.  And it

3  is their burden to prove to Your Honor that the plan is better

4  than what a Chapter 7 trustee will -- can do.

5      What the evidence does show, as far as what the plan would

6  do as compared to a hypothetical Chapter 7 trustee, is that we

7  know for sure that the Claimant Trust base fee, just over the

8  two years, is going to be $3.6 million.

9      (Interruption.)

10         MR. TAYLOR:  I'm sorry.

11         THE COURT:  Someone needs to put their device on

12  mute.  I don't know who that was.

13         MR. TAYLOR:  Oh, I'm sorry.  I thought you said

14  something, Your Honor.

15         THE COURT:  No.

16         MR. TAYLOR:  So what we do know is the Claimant

17  Trustee base fee is going to be $3.6 million.  What we don't

18  know and what was not put into evidence because they are still

19  negotiating it is there's going to be a bonus fee on top of

20  that that's going to be paid to Mr. Seery.  Is that $2

21  million?  Is that $4 million?  Is that $10 million?  Well, we

22  don't know.  We can't perform that analysis as compared to

23  what a hypothetical Chapter 7 trustee could be.  Nor can Your

24  Honor, based upon the evidence presented.

25      And quite frankly, I don't see how one could ever conclude

216

1  -- and there are some other unknowns that we're about to go

2  over, including the Litigation Trust base fee and there are

3  collection fees, contingency fees. Those are also to be

4  negotiated. To be negotiated and unknown. You can't perform

5  the analysis. The Debtor couldn't perform the analysis

6  because those are to be negotiated, so you can't tell whether

7  a Chapter -- hypothetical Chapter 7 trustee might come out

8  better because he's not going to incur all these costs. We

9  know that they're going to incur D&O costs.

10         THE COURT: Let me interject right now.

11         MR. TAYLOR: Sure.

12         THE COURT: Again, I'm going to go back to

13  understanding who your client is arguing for. Okay? Again,

14  as we've said before, Mr. Pomerantz did not technically say no

15  standing, but he thought it was important to point out the

16  economic interests that our Objectors either have or don't

17  have. Okay?

18     So I'm looking through my notes to see exactly what the

19  Dondero economic interest is. I have something written in my

20  notes, but I'm going to let you tell me. Tell me what his

21  economic interests are with regard to this Debtor, this

22  reorganization.

23         MR. TAYLOR: Your Honor, I believe he has been placed

24  into Class 9, Subordinated Claims. So to the extent that

25  there is recovery available to Class 9, he can recover on

217

1    those claims.

2            THE COURT:  But what proof of claim --

3            MR. TAYLOR:  We also have --

4            THE COURT:  What proof of claim does he have pending

5    at this juncture?

6            MR. TAYLOR:  Your Honor, I would have to go back and

7    look.  I don't have the proofs of claim register in front of

8    me.  And I'm sorry, if I tried to speculate, I would be doing

9    a disservice to my client and this Court by trying to

10   speculate.  I did not prepare those proofs of claim.  People

11   in my firm did.  But I would be merely speculating if I tried

12   to give you an answer off the spot.  And I apologize.  I'm

13   happy to submit a post-confirmation hearing letter --

14           THE COURT:  No, no, no.

15           MR. TAYLOR:  -- as to that.

16           THE COURT:  I'm not going to allow one more piece of

17   paper in connection with confirmation.  I thought you would be

18   able to answer that.

19           MR. TAYLOR:  I'm sorry.  I just don't want to lie to

20   Your Honor.

21           THE COURT:  What about his -- what would be an

22   indirect equity interest?

23           MR. TAYLOR:  Well, again, there are a lot of people

24   that know this org chart a lot better than me.  This is me

25   going on hearsay myself.  But I understand he also owns a lot

218

1   of indirect interests in subsidiaries, some of which are

2   majority, some of which are minority, and some of which he

3   owns maybe directly, some of which through other entities.  So

4   the way in which these assets could be monetized at the sub-

5   debtor level could certainly impact his economic rights and

6   could impact him greatly.  For instance, if the --

7           THE COURT:  I really wanted an exact answer.

8           MR. TAYLOR:  Mr. Seery --

9           THE COURT:  I really wanted an exact answer, not just

10   he has an indirect interest in, you know, some of the 2,000 --

11   I'm not going to say tentacles, but --

12       I'm going to interrupt briefly, because I really want to

13   nail down the answer as best I can.  Mr. Pomerantz, can you

14   just remind me of what your answer was or statement was

15   regarding Mr. Dondero, individually, his economic stake in all

16   this?

17           MR. POMERANTZ:  He has an indemnification claim

18   that's been objected to, --

19           THE COURT:  That's the one and only --

20           MR. POMERANTZ:  -- although it's not before --

21           THE COURT:  That's the one and only pending proof of

22   claim, right?

23           MR. POMERANTZ:  That's my understanding.  And while

24   it's not before the Court, we could all imagine whether Mr.

25   Dondero's going to be entitled to indemnification.

219

1     He has an interest in Strand, which is the general

2   partner.

3          THE COURT:  Right.

4          MR. POMERANTZ:  And Strand owns a quarter-percent --

5   a quarter of one percent of the equity.  I believe that is all

6   of Mr. Dondero's economic interest in the Debtor.

7          THE COURT:  Okay.  So, again, I'm just trying to, you

8   know, understand who he's looking out for, for lack of a

9   better way of saying it, Mr. Taylor, in making these

10  arguments.

11         MR. TAYLOR:  So, there is also, and this is -- I'm

12  not involved in what are these going to be filed collection

13  suits, or some of which have been filed, some of which have

14  not been filed, none of which I believe the answer date has

15  been -- has passed or come to be yet.

16    But he is also a defendant in collection suits on these

17  notes, as you are undoubtedly aware.

18         THE COURT:  Okay.  He's a defendant in adversary

19  proceedings.  Okay?  That makes him a party in interest to --

20  well, I keep -- that makes him have standing to make an

21  1129(a)(7) argument?  That's why I'm going down this trail.

22  Because you've spent the last five minutes talking about, you

23  know, creditors could do better in a Chapter 7 liquidation.

24  I'm not sure he has standing to make that argument, so I'm

25  wanting you to address that squarely.

220

1        MR. TAYLOR:  Your Honor, I believe he has economic

2    interests up and down the capital structure.  And I cannot

3    describe to you, without wildly speculating and potentially

4    lying to this Court, which I'm not going to do, without some

5    time to have looked at that, because I was -- I was not

6    involved in the proofs of claim and I am not his accountant.

7    So I could not do that without wildly speculating, so I just

8    -- I would like to more directly answer your question, Your

9    Honor.  I am not trying to avoid the question.  But I can't

10   honestly answer your question with true facts as we sit here

11   right now.

12        THE COURT:  All right.  But do you agree or disagree

13   with me that only parties -- the only parties that really can

14   make an 1129(a)(7) argument are holders of claims or interests

15   in impaired classes?

16        MR. TAYLOR:  Your Honor, I believe that Mr. Dondero

17   has standing to do so by virtue of claims for indemnification

18   --

19        THE COURT:  Okay.

20        MR. TAYLOR:  -- if these -- if these -- if this

21   Debtor (indecipherable) able to meet its obligations to

22   indemnify him.  And some of those are significant claims that

23   are being brought against him that could total millions, if

24   not tens of millions of dollars, just in defense costs alone,

25   that I do believe give some standing.

221

1          THE COURT: Okay. So, assuming you're right, you

2    think the evidence does not show this is better than a Chapter

3    7 liquidation where we would have a stranger trustee come in

4    and just, yeah, I guess, cold-turkey liquidate it all.

5          MR. TAYLOR: Your Honor, I do believe that the

6    evidence shows that the Debtor hasn't met its burden as to

7    this. A Chapter 7 trustee doesn't necessarily have to

8    liquidate immediately. It can run these -- these assets. I

9    mean, Mr. Seery is going to do it with ten people. At one

10   time, just two months ago, he said he was going to do it with

11   three people. A Chapter 7 trustee could certainly have a

12   limited runway, or even an extended runway, if it so asked for

13   it, to liquate these Debtors.

14      Moreover, there would be at least the requirements that

15   the Chapter 7 trustee would request the sale, tell creditors

16   about it. And, as many courts have said, the competitive

17   bidding process is the best way to make sure that you ensure

18   the highest and best offer that you can get.

19      Mr. Seery has not committed to providing notice of sales

20   to creditors and other parties in interest, potentially

21   bringing them in as bidders. They -- he could name a stalking

22   horse, but he has not indicated any desire to do so. A

23   Chapter 7 trustee would endeavor to do so.

24      So I do believe that there are some advantages. And

25   you've heard no testimony that they've performed any analysis

222

1    or conducted any interviews with any Chapter 7 trustees as to

2    whether or not this was possible or not.  They just made the

3    naked assumption that they would do work based upon what they

4    said was their experience.  And Mr. Seery's deposition, when

5    it was taken and noticed as a 30(b)(6) deposition, and I

6    believe it has been entered into evidence here, he said the

7    last time he dealt with a Chapter 7 trustee was 11 or 13 years

8    ago, and it was the *Lehman* case, and that was the -- a SIPC

9    trustee.  So --

10           THE COURT:  Well, --

11           MR. TAYLOR:  -- that's the last time he had any

12   experience with it.

13           THE COURT:  -- again, I don't mean to belabor this

14   point, just like I didn't mean to belabor a few others.  But,

15   you know, there is a mechanism, yes, in Chapter 7, Section

16   704, for a trustee to seek court authority to operate a

17   business.  But it's not a statute that contemplates long-term

18   operation.  Okay?  It's just, oh, we've got a little bit of --

19   you know, we have some assets here that really require a

20   short-term operation here.

21      If it's long-term, then you convert to Chapter 11.  Okay?

22   It's just a temporary tool, Section 704.  Right?  Would you

23   agree with me?

24           MR. TAYLOR:  That's typically how it has been used.

25           THE COURT:  Okay.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2667
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 735 of 1017 PageID 7448
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2666 of 2722

223

1          MR. TAYLOR:  But that's not to say that it's limited

2     in time by the statute itself.  It doesn't say that it can't

3     go for one year or two years.  That can be a short wind-down

4     period.

5          THE COURT:  But hasn't your client's argument been

6     this past several weeks that Mr. Seery is moving too fast,

7     he's wanting to sell things and he needs to hold them longer?

8     I mean, these two argument seem inconsistent to me.

9          MR. TAYLOR:  So, just because a Chapter 7 trustee has

10    been appointed doesn't mean that he has to sell them any

11    faster than Mr. Seery.

12       I think what the -- the problem with the process that has

13    been going on with Mr. Seery, my client's problem with it, is

14    not necessarily the timing but the process that Mr. Seery is

15    going through with these sales.  Provide notice, allow more

16    bidders to come in, make sure that he's getting the highest

17    and best price.  And if that happens to be Mr. Dondero who

18    offers the highest and best price, great.  And if Mr. Dondero

19    gets outbid by somebody, well, that's all the more better for

20    the estate.

21         THE COURT:  Okay.  Continue your argument.

22         MR. TAYLOR:  I believe we covered a lot of it, Your

23    Honor, and the plan analysis is all based upon their

24    assumptions that there's $257 million worth of value.  Again,

25    there's no rollup provided as to how that asset allocation is

224

1    broken out, but they consist of a couple of items.

2        First, there's the notes; and second, there's the assets.

3    The notes are either long-term or demand notes.  Those long-

4    term notes, Mr. Seery will tell you some have been validly

5    accelerated and therefore are now due and payable.  I think

6    there's arguments to the contrary.  But those long-term notes

7    probably have some both time value of money and collection

8    costs.  And then, of course, you have to discount them by

9    collectability issues, too.

10       I don't believe any analysis went into it, or at least the

11   Court was not provided any data or analysis as to what

12   discounts were applied to those notes.  And, therefore, I

13   don't think that this Court can make any determination that

14   the best interests of the creditors have been met.

15       As far as the assets that are to be monetized, again,

16   there's two sub-buckets of those assets.  There's securities

17   that are to be sold.  Some of those are semi-public securities

18   that have markets.  Those are somewhat more readily

19   ascertained.  The others are holdings in private equity

20   companies, and sometimes holdings in companies that own other

21   companies.

22       There's no evidence of the value -- empirical evidence of

23   the value of those companies, nor of the assumptions that went

24   into as to when they should be sold, how much they'd be sold

25   for.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2669
Case 3:25-cv-02072-S Document 15-9 Filed 06/25/25 Page 737 of 1017 PageID 7450
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2668 of 2722

225

1    Again, I do realize the sensitive nature of such

2    information, but that could have been placed under seal.  And

3    without that information, I don't believe that the Court can

4    conduct the due diligence it's necessary to say the best

5    interest of the creditors have been met.

6    To sum up, Your Honor -- oh, I'm sorry.  One other point

7    that I did want to talk about before I summed up is, you know,

8    Mr. Pomerantz and I were listening to a different record or I

9    was totally confused as to the testimony that was put forth

10   regarding the directors and officers.  I believe the testimony

11   in the record is extremely clear that the Debtor made no

12   effort to go out and find out if it could obtain directors and

13   officers insurance without a gatekeeping injunction or a

14   channeling injunction, whatever you want to call it.  I

15   believe that his testimony was extremely clear.  He didn't

16   shop it.  He doesn't know.  And that's what the record is

17   before this Court.

18   To the extent that the Debtor wants to rely upon we can't

19   get Debtor -- or, directors and officers insurance because

20   without this gatekeeping function we just can't get it, I

21   believe the record just wholly does not support that.  The

22   testimony was at least extremely clear, as how I heard it.

23   Your Honor will have to review the record herself, but I don't

24   believe that there was much argument about it.

25   I'm sure -- as I stated in the beginning, Your Honor, this

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2670
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 738 of 1017   PageID 7451
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2669 of
2722

226

 1  is a court of equity.  It could deny confirmation, as I

 2  believe Your Honor should, based upon the flaws in the plan.

 3      If Your Honor finds that the plan as written is

 4  impermissible because of any of the exculpation or the

 5  gatekeeping functions that they're asking, the testimony is

 6  equally clear that the independent directors would not serve

 7  in -- as officers of the Reorganized Debtor.  Any plan that is

 8  put forth by the Debtor has to tell the people who are going

 9  to be officers going forward.  And with that naked testimony

10  before the Court, that it's simply not feasible, and I don't

11  think it is one of the possible -- where the Court can come

12  back and say, well, I can't confirm this plan as written, but

13  if you change it and rewrite it to get rid of the certain

14  offensive parts of the exculpation or the gatekeeping

15  functions, then we can confirm this plan.  And I think the

16  evidence before this Court is it's not feasible because none

17  of the directors will serve in that capacity, and therefore

18  this plan should be dead on arrival if Your Honor agrees the

19  proposed provisions do not meet *Pacific Lumber*.

20      We would ask the Court to deny confirmation, but in the

21  alternative, to at least take this under advisement.  Give us

22  a time frame -- we'd ask for 30 days -- but give us a time

23  frame of when the Court is going to rule, to allow the

24  positive conversations to move forward.

25      To that end, Your Honor, there is, indeed, a hearing on

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2671
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 739 of 1017 PageID 7452
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2670 of 2722

227

1  the extension of a temporary injunction and contempt that is

2  scheduled for Friday. I understand that the parties, at least

3  the joint parties, will not -- will agree to, I'm sorry, will

4  agree to the extension of the temporary injunction until such

5  time as the Court can rule on confirmation. I do see that

6  there could be a lot of harm done at the Friday hearing. We

7  would ask that the Court additionally continue that hearing on

8  that motion and on the injunction, and contempt, until such

9  time as confirmation has been ruled upon. It will be both

10 efficient and allow discussions to continue regarding

11 potential global resolution.

12    And so that is the end of my argument, Your Honor.

13    THE COURT: All right. Thank you. All right. Mr.

14 Pomerantz, do you have any rebuttal?

15    REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

16    MR. POMERANTZ: Yes, I do, Your Honor. I want to

17 address a couple of comments that Mr. Taylor made towards the

18 end. First of all -- and, actually, the beginning.

19    We think Your Honor should rule on confirmation. Ruling

20 on confirmation and having an entered confirmation order are

21 two separate things. We understand that a new offer was made.

22 Whether that's acceptable to the Committee -- I actually think

23 it will enhance the ability of the parties to see if they

24 could reach a deal if there's (audio gap) that Your Honor is

25 going to confirm the plan.

228

1      Again, doesn't mean a confirmation order has to be

2   entered, but I think, based upon my personal experience in

3   negotiating with Mr. Dondero, that your clear communication to

4   the parties that, unless something happens, you will enter a

5   confirmation order, I think will change things.  Okay?

6   Without getting into settlement discussions, things have

7   changed over the last several days, and we wish you would have

8   -- wish things would have happened sooner.  But we totally

9   disagree that Your Honor should hold your ruling for 30 days

10  or any other period of time.

11      Part of the reason I think they are making that argument

12  is because they have an examiner motion and they recognize

13  that, upon confirmation, the examiner motion is moot.  So I

14  think there's strategic reasons as well.

15      We don't think there should be a continuance of the TRO

16  hearing and of the contempt hearing.  As Your Honor recalls,

17  the contempt motion was specifically set for this time to give

18  Mr. Dondero enough time to prepare.  Your Honor was sensitive

19  to his due process concerns.  We set the TRO, the preliminary

20  injunction hearing against the Advisors and the Funds, we set

21  that, again, knowing that it would be after confirmation.

22      So we do not agree that either should be continued.

23  Again, we think the more direct, unequivocal answers Your

24  Honor can give to the parties, the better off we'll be.

25      I guess -- Mr. Taylor and I do agree that the record was

229

1    clear.  I guess we just disagree on the clarity of it.  I

2    heard Mr. Tauber testify that when he went out to people, to

3    insurance carriers, after he and Aon were engaged, they all

4    talked about a Dondero exclusion.  Okay?  They weren't

5    convinced into a gatekeeper provision because it was provided

6    as part of the normal materials you would provide in a

7    bankruptcy court and trying to get D&O liability in the

8    context of a bankruptcy case.  Mr. Tauber's testimony was

9    pretty clear, that carriers wanted to have a Dondero

10   exclusion.  And, in fact, the only reason we were able to get

11   any coverage was because of the gatekeeper.

12        So, yes, the record was clear.  We just disagree.

13        I'd like to go back to Mr. Draper's comments going -- and

14   a couple of things, obviously, overlap.  I guess one of the

15   things here, it's great that everyone is coming in here as

16   different interests and different parties or whatnot.  But as

17   I mentioned, Your Honor, at the outset, and I've repeated a

18   few times, these are all -- the only people we have not been

19   able to resolve issues with are the Dondero parties and the

20   related parties.  And I recall the tentacles.  Mr. Davor

21   questioned that.  Mr. Clemente, his comments.  But the fact of

22   the matter is, Your Honor, Your Honor has heard testimony.

23   Your Honor has had hearings.  Mr. Rukavina represents the

24   Advisors and the Funds.  Your Honor has never seen the

25   independent board member testify in this case to demonstrate

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2674
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 742 of 1017 PageID 7455
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2673 of 2722

230

1  how these entities are really different.  So while Mr.

2  Rukavina does -- you know, tries his best, and I think he has

3  limited stuff to work with, but I give him credit for doing

4  the best he can, these are all Dondero-related entities and

5  Your Honor has seen that.

6      So, Your Honor, going to the resolicitation argument, it

7  actually has taken up a lot more time than the argument is

8  worth, for one very simple reason.  As I said in my argument,

9  and as Mr. Taylor and Mr. Draper totally ignored, there were

10  17 creditors who voted yes, 17 creditors who were apparently

11  misled, that Mr. Draper is looking out for the little guy and

12  Mr. Taylor is fumbling over his reason for why that's

13  important to Dondero.  And of those 17 creditors that voted

14  yes, Your Honor, they were either the employees related to

15  HarbourVest, UBS, Redeemer, or Acis, except for two.  And you

16  know the other two?  One was Contrarian, a claim buyer, who,

17  yeah, elected to be in Class 7, and the other was an employee

18  with a dollar claim.

19      So the whole argument that there should be a

20  resolicitation is preposterous, Your Honor.  But to go to some

21  of the specifics in what they argued, we didn't require

22  creditors to monitor recovery.  The footnote -- as I

23  indicated, the UBS 3018 was in the disclosure statement that

24  went out.  It didn't make it to the projections.  It was

25  clearly -- and they characterize it, I think Mr. Draper

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2675
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 743 of 1017 PageID 7456
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2674 of 2722

231

1   characterized it as buried in the document. There is a

2   section that every disclosure statement is required to have

3   called Risk Factors. This disclosure statement had that. And

4   in the disclosure statement, it talked about the amount of

5   claims being a risk factor.

6       Mr. Draper also said that the Debtor totally changed its

7   business model from the first to the second analysis. That is

8   incorrect. The Debtor was always going to manage funds. Yes,

9   did they add the CLOs? But before, they were going to manage

10  Multi-Strat, they were going to manage Restoration Capital,

11  they were going to oversee Korea, they were going to be doing

12  the management of the funds. So there wasn't a big change in

13  the business model, Your Honor.

14      Mr. Taylor, on the solicitation issue, says we found $67

15  million in assets. You know, that's a disingenuous statement.

16  I think over $20 million was found because his client and

17  related entities didn't make a payment on notes and they got

18  accelerated. So while before we would have had to wait over

19  time if they were paid, it's not surprising that Mr. Dondero

20  and his related entities just failed to basically pay the

21  notes.

22      So that was, I think, over $20 million. And then there

23  was the HCLOF asset. That was acquired in the HarbourVest

24  settlement. And then there was basically an increase in some

25  value to some assets.

232

```
 1      So there wasn't anything mysterious here.  There wasn't
 2   anything that the Debtor was trying to hide.  There weren't
 3   any found assets.  It was based upon different circumstances.
 4      Mr. Taylor complains about the lack of rollup of assets,
 5   the lack of evidence on the best interests of creditors test.
 6   Your Honor, you've had extensive testimony from Mr. Seery
 7   about what would happen in a Chapter 7 and what would happen
 8   in a Chapter 11.  And you know why we didn't provide the
 9   information to Mr. Taylor and his client on what the rollup of
10   the assets would be, and do you know why he wants them?  He
11   wants to know what the assets are so he can try to bid.
12      And there also was the allegation that the failure to
13   allow them to bid means we're going to get less in a Chapter
14   11 than a 7.  Two comments to that, Your Honor.  Number one,
15   if that was the case, a debtor would never be able to satisfy
16   the best interests of creditors test.  If the existence of a
17   public process de facto meant you would get more value than
18   outside, you would never be able to satisfy that.  And, quite
19   honestly, that's just not the law, Your Honor.
20      You have an Oversight Committee with over $200 million of
21   creditors who are going to watch Mr. Seery like a hawk, like
22   they have watched him during the case.  And the concern that
23   somehow, because these assets are not put into full view to
24   sell, that they will get less value, it's just not -- it's not
25   supported by the evidence at all, Your Honor.  And Mr. Seery
```

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2677
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 745 of 1017   PageID 7458
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2676 of 2722

233

 1  will make the determination.  If it makes sense to notice up

 2  and provide Mr. Dondero with notice, he will.  If he doesn't,

 3  he won't.

 4      Your Honor, going -- oh, and then the last comment on the

 5  -- that I'll make on the resolicitation and the liquidation

 6  analysis is Mr. Taylor chides us and we've been criticized for

 7  not disclosing more about the HarbourVest and the UBS

 8  settlements and that we were off substantially.  Your Honor,

 9  you've heard testimony that we were in pending litigation with

10  HarbourVest and UBS at the time.  What kind of litigant would

11  we be if we came in and said, you know, Your Honor, you know,

12  Creditors, we think the UBS claim is going to be allowed at

13  $60 million and we think the HarbourVest claim is going to be

14  allowed at $30 million?  Would that really have benefited

15  creditors and this estate, to basically, after we took the

16  position, hard negotiations and hard pleadings that we

17  prepared, and in some cases filed, that we didn't have any

18  liability?  It would have made no sense, and it would have

19  been a dereliction of our duty to actually come out and say

20  what the claims -- the claims were, or what we thought they

21  could be settled for.

22      Your Honor, going back to Mr. Draper's comments.  He

23  started with the exculpation.  First he made a comment that I

24  don't think he intended what he said, but he said that the

25  exculpation order, the January 9th order, cuts off when the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2678
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 746 of 1017   PageID 7459
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2677 of 2722

234

1  independent directors go away.  I think what he meant to say

2  is that since the three people are not going to be independent

3  directors anymore, that basically any actions going forward by

4  any of those three are not covered.  But let's be clear.  The

5  January 9th order is in effect, and if at some point in the

6  future somebody has a claim against those three gentleman, or

7  their agents, for what they did as independent directors or

8  their agents, that order will apply.

9      Your Honor, we next had a discussion, or Mr. Draper and

10  you had a discussion on professionals.  I'm aware of the Fifth

11  Circuit law that says res judicata, fee applications.  I think

12  that only applies to claims that the Debtor and estate would

13  have.  It doesn't really apply to an exculpation.  But there's

14  Texas state law that I identified in our brief and we cited to

15  that limits third parties' ability to go after professionals.

16      But the bottom line is the Fifth Circuit, in *Pacific*

17  *Lumber*, didn't deal with professionals.  Your Honor was

18  correct in pushing both Mr. Taylor and Mr. Rukavina.  What

19  really that was was a policy case.  And professionals have

20  nothing to do with 524(e).  So the *Palco* and the *Pacific*

21  *Lumber* reference and explanation of 524(e) doesn't have

22  anything to do with professionals.  And we would submit, Your

23  Honor, that an exculpation, especially in a case like this, is

24  important for professionals.

25      I understand Your Honor's comments that maybe it's much

235

1    ado about nothing, but I'm not really sure it's much ado about

2    nothing when we have Mr. Dondero and his affiliates who,

3    notwithstanding their efforts to just claim that all they are

4    doing is trying to get a fair shake, Your Honor knows better.

5    Your Honor knows better from the years you've been litigating

6    with them, and we know better and the Debtor knows better from

7    what the independent directors have been dealing with.

8            THE COURT:  Let me ask you this, though.  I came into

9    the hearing with the impression we were just talking about

10   postpetition pre-confirmation, or pre-effective date maybe I

11   should say, was the expanse of time covered by exculpation.

12   And Mr. Rukavina said no, no, no, go back, look at, I don't

13   know, Subsection 4 of something.  It is a post-confirmation

14   concept.  What is your response to that?

15           MR. POMERANTZ:  I believe it's implementation.  And,

16   again, --

17           THE COURT:  Implementation?  Yes.

18           MR. POMERANTZ:  -- I think Mr. Rukavina -- right.  I

19   think Mr. Rukavina and Mr. Taylor and Mr. Draper have done a

20   great job trying to muddy the issues.  They talk about our

21   sleight of hand and how we're trying to do things that are way

22   beyond the bankruptcy court's jurisdiction.  We are not.  I

23   think they are trying -- what they have done throughout the

24   case is throw up enough mud.  And here's, here's the answer to

25   that question, Your Honor.  Implementation.  Okay?  We know

236

```
1    what implementation means.  The plan says implementation is
2    cancelation of the equity interests, creation of new general
3    partners, restatement of the limited partners, establishment
4    of the Claimant Trust and Litigation Sub-Trust.  That's the
5    implementation.
6        We are not trying to get exculpation for post-confirmation
7    activity.  Actually, my partner, Mr. Kharasch, in specifically
8    addressing Mr. Rukavina's concern, said, look, if you have a
9    problem with cause, if you have a problem, want to exercise
10   your rights, we're only asking you to come back to the Court.
11   We are not stopping you.
12       So the whole argument that the exculpation is really broad
13   and is not really -- does not really cover just the plan, the
14   approved plan, I think is a red herring.  Implementation is
15   implementation in the context of the plan.
16       And also Mr. Rukavina tries to argue that, well, it's
17   administration, it's not really you acting any operation of
18   business.  I just don't think there's any support in the case
19   law.  Your Honor has overseen this case, overseen this
20   Debtor's activities, overseen the independent directors'
21   activities, overseen Strand's activities, overseen the
22   employees' activities.  And those activities have been
23   (indecipherable) administration of the case.  And his attempt
24   to create a different category for, well, it's not
25   administration, it's operation and so it doesn't apply, I just
```

237

1   think is wrong.

2       Your Honor made a couple of comments about what was

3   *Pacific Lumber* doing.  It was a policy decision.  If there was

4   a bright-line rule, then nobody would be entitled to

5   exculpation.  The very fact that the Fifth Circuit said that

6   Committee members are different made -- makes it clear it was

7   -- it was policy.

8       And Mr. Taylor's comments that, well, their creation of

9   statute, Chapter 11 trustees and Committee members, that's not

10  what basically the case said.  If you look at the citation to

11  touters in the case, it was we want people to volunteer and

12  who are needed for the process.  Committee members are needed

13  for the process.  We don't want to discourage them from coming

14  in.  And the only testimony you have on the independent

15  directors is from Mr. Dubel, and he testified the importance

16  of independent directors to modern-day Chapter 11 practice,

17  the importance of exculpation, indemnification, and D&O

18  insurance.  And his testimony:  uncontroverted.  The Objectors

19  could have brought in someone to say something different, but

20  the only testimony before Your Honor is, if Your Honor does

21  not approve exculpations in cases like this, you will not get

22  independent directors and it will have an adverse effect on

23  the Chapter 11 process.

24      So, while I appreciate all the Objectors trying to say

25  bright line, trying to say *Pacific Lumber*, that is the gut

238

1   reaction, right?  That's -- it's easy to say.  But Your Honor

2   will know better, from reading the cases, that's not what

3   *Pacific Lumber* says.  And for the several reasons I gave, it's

4   the reason why *Pacific Lumber* does not govern the decision in

5   this case.

6        Your Honor, Mr. Draper then started to talk about *Craig*.

7   And everyone cites *Craig* as this, you know, limiting

8   jurisdiction.  Now, we acknowledge that *Craig* and the Fifth

9   Circuit has a more limited post-confirmation jurisdiction

10  approach than the other Circuits, but it's not nonexistent.

11  And just because the Debtor is going out post-confirmation and

12  acting does not mean that the conduct that they are engaging

13  in is not -- and disputes that arise, doesn't come within the

14  Court's jurisdiction.  If that was the case, and I think Your

15  Honor recognized this, in your case it was the *TXMS* case,

16  while it's limited, more limited after confirmation, and I

17  think you even, in the case -- or, in one case of yours, said

18  that even after the case is closed there could be

19  jurisdiction.  So their just trying to argue *Craig* is just --

20  is just too much.

21       Going out of the gatekeeper, Mr. Draper tried to say we

22  are *Barton*, and that's it, and *Barton* has its limitations, et

23  cetera.  First of all, with respect to *Barton*, it is not

24  limited and doesn't include debtors-in-possession.  We have

25  cited cases in our materials where it has been applied to

239

1  debtors-in-possession.

2      So, you know, look, maybe this is a provision -- this is a

3  proposition like many in bankruptcy, you could find a

4  bankruptcy court to agree with a proposition, but there's

5  cases all over the place on that.  There's cases applying to

6  post-confirmation.  The trend has been to expand *Barton*.  But

7  the beauty of it is, Your Honor, you don't have to rely on

8  *Barton*.  *Barton* was one of our arguments.  We gave *Barton* as,

9  you know, somewhat of an analogy but somehow applying because

10 in the -- because the independent directors were like the

11 trustees.

12     But we recognize it may be going farther than *Barton* has

13 previously gone.  But the case law is clear, it is being

14 extended.  But we -- I gave you several provisions of the

15 Bankruptcy Code that authorized you to enter a gatekeeper

16 order.  None of the Objectors objected on any of those

17 grounds.  They didn't say the statutes that I cited.  And it

18 wasn't only 105, I know bankruptcy practitioners love to cite

19 105, but there were three or four others that I mentioned, and

20 they're in our brief.  There's no case that they cited that

21 said that there is no authority on the gatekeeper.

22     But what was the argument that was raised?  And I think

23 Mr. Rukavina raised it, saying, you know, look, I don't

24 understand the argument of no jurisdiction, of jurisdiction

25 for a gatekeeper but no jurisdiction for underlying cause of

240

1   action.  Well, Mr. Rukavina should read and Your Honor should

2   read, when you're considering the plan, the case, the *Villegas*

3   case in the Fifth Circuit as it dealt with *Stern*.  That was

4   particularly a case.  Does *Barton* -- is *Barton* impacted from

5   *Stern*?  By *Stern*?  And *Stern*, we know, limits the bankruptcy

6   court's jurisdiction.  But, no, the Fifth Circuit said, in

7   that case, no.  Even though the bankruptcy court's

8   jurisdiction is limited to hear the claim, there is nothing

9   inconsistent with that and allowing the bankruptcy court to

10  act as a gatekeeper.

11      So Mr. Rukavina's argument that, well, he'll present to

12  you that there's cause and you'll find there's no cause and

13  then he will be without a remedy by someone that had

14  jurisdiction, that really sounds good but it just doesn't

15  withstand analytic scrutiny.  There is a distinction.  They

16  are glossing over the distinction.  They don't like the

17  distinction.

18      And why is that distinction -- and why is it important in

19  this case?  Again, we're not talking about garden-variety

20  people who are just involved with a debtor and will get caught

21  up in a bankruptcy.  We narrowly tailored the gatekeeper to

22  enjoined parties.  Enjoined parties are the people before Your

23  Honor, some of the people that have made the Debtor's life

24  miserable over the last few months.

25      We have every interest and desire, as does the Committee,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2685
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 753 of 1017 PageID 7466
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2684 of 2722

241

1   to go out post-confirmation and monetize these assets. But we

2   see the clouds on the horizon. We see all the pleadings that

3   have been filed by the Objectors saying how, if there's no

4   deal, there will be an unending amount of costs and appeals.

5   It's, you know, the point, not too subtle. It wasn't lost on

6   us.

7        Your Honor, going to Mr. Rukavina's arguments on Class 8

8   cram down, again, it's really a hard argument to understand,

9   but first I want to make a point. He sort of mentioned -- and

10  I'm not sure if he intends to preserve this on appeal, but it

11  was not objected to and I'll ask for a ruling on it, Your

12  Honor -- he said that there was inappropriate separate

13  classification. That was not raised in any of the objections.

14  We don't think it was properly before the Court. We

15  understand there's a component of that in unfair

16  discrimination in connection with a cram down, but there is no

17  objection, there was no filed objection, to the separate

18  classification of the deficiency claims and the Class 8

19  unsecured claims.

20       And if you look at the voting, you realize it wasn't done

21  for gerrymandering, because if you put both claims together,

22  both classes together, you would have had one class that voted

23  yes.

24       So I don't believe the separate classification under the

25  1129 standards is appropriate for Your Honor to consider,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2686
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 754 of 1017 PageID 7467
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2685 of 2722

242

1  other than in connection with the cram down.

2      Now, Mr. Rukavina complains that the only way the

3  convenience class was decided was by way of negotiation.  Your

4  Honor, how else do provisions like that get decided?  And who

5  was the negotiation between?  It was between the Committee.

6  And one of the benefits of a Committee process, and I

7  represent a lot of Committees, you put people in a Committee

8  that have diverse interests and they can come up with an

9  appropriate result.  And here you have that.  You had one

10 creditor who was a convenience creditor.  You have three other

11 creditors who would lose liquidity if convenience payments are

12 made.

13     Do you think that UBS, Acis and Redeemer, do you think

14 they had a desire just to pay people off?  No.  It was part of

15 a collaborative process.  So to say that there was no basis

16 and no testimony on the appropriateness to have -- and how the

17 convenience class was put together just would be wrong.

18     And with respect to the absolute priority rule, Your

19 Honor, again, there's a missing link here, okay?  These are

20 contingent interests.  They are property.  No doubt they are

21 property.  But if I did not allow those creditors or those

22 equity to have a contingent interest, the argument would have

23 been made that the plan violates the absolute priority rule.

24 And I said that in my argument.  And why would it have

25 violated the absolute priority rule?  Because there's a

243

1    potential that creditors could get over a hundred cents on the

2    dollar, plus interest.  So it's a game of gotcha, right?

3         And why do they really care?  Mr. Dugaboy said in his --

4    Mr. Draper said in his brief that Dugaboy cares because they

5    may have wanted to buy the interest.  Well, I'm sure they can

6    go to Hunter Mountain, you know, Mr. Dondero's left hand can

7    go to his right hand, and I'm sure he'd be happy to sell the

8    contingent interests.

9         And with respect to the argument that Mr. Rukavina made

10   about control, equity be in control, yeah, control is a right.

11   No doubt.  You've got -- if you're giving control to the post-

12   confirmation Debtor, that could be a right and implicate the

13   absolute priority rule.  But what is the control here?  Equity

14   is not given any rights.  Your Honor heard how the post-

15   confirmation entity is structured.  It's going to be Mr.

16   Seery, overseen by an Oversight Board.  So I really don't

17   understand the concept of control.  There just is no violation

18   of the absolute priority rule.

19        Your Honor, Mr. Rukavina then took us to task for 2000 --

20   or, for not filing the 2015.3 statement.  And if you take his

21   argument to the logical conclusion -- well, we didn't file it,

22   we didn't comply with that Rule, so we're not in compliance

23   with the Bankruptcy Code, so we can never basically get our

24   plan confirmed, right, because it's a violation and we didn't

25   file and seek an extension.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2688
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 756 of 1017   PageID 7469
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2687 of 2722

244

1    That's just a preposterous argument, Your Honor.  Mr.

2   Seery poignantly told the Court, in the rush of things that

3   were going on, it wasn't filed.  Did Mr. Rukavina, before

4   yesterday, having Mr. Dubel on the stand, did he ever ask

5   where is our 2015.3 report?  He probably didn't ask it because

6   the answer -- when I told him the reason why it wasn't filed

7   before January 9 was because I don't think Mr. Dondero wanted

8   it filed, and I think that's why, as Mr. Seery testified, we

9   were having a challenging time getting that information from

10   the in-house -- in-house.

11    But, yes, should it have been filed?  Yes.  But if that is

12   all they could point to through the course of the case that

13   Mr. Seery or Mr. -- or the rest of the board did wrong, you

14   know, I think that just demonstrates they did a fine job.

15             THE COURT:  All right.

16             MR. POMERANTZ:  Your Honor?

17             THE COURT:  You've got four minutes left.

18             MR. POMERANTZ:  Oh.  Okay.  Your Honor, going to Mr.

19   Rukavina and the Strand argument that it's a nondebtor entity,

20   as I explained in my argument, the Strand -- Strand needs to

21   get exculpation or else that's a backdoor way to the Debtor.

22   Forget about the independent directors, it's a backdoor way to

23   the Debtor.  Because Mr. Dondero will be in control.  If

24   Strand is sued for post-January 9th activities, he will assert

25   an administrative claim.  And one thing from *Pacific Lumber* is

245

1    clear, the Debtor is entitled to an exculpation as part of the

2    injunction and the -- and the discharge.

3        Your Honor, Mr. Kharasch adequately addressed Mr.

4    Rukavina's comments with the gatekeeper and the gatekeeper

5    problem.  We are not seeking to stop his clients, however

6    related they may be, from exercising their rights.  We are

7    seeking a process that will not embroil the Debtor in

8    litigation going forward.  There is no problem with Your Honor

9    acting as the gatekeeper to do so.  And to the extent that

10   they are bound by the January 9th order is not really an issue

11   for today.  That'll be an issue at the temporary -- the

12   temporary -- at the preliminary injunction hearing.

13       I -- just one minute, Your Honor.

14       (Pause.)

15           MR. POMERANTZ:  Your Honor, I think I covered a lot.

16   If there's anything that any of the Objectors have mentioned

17   that I failed to respond to, I'd be happy to answer questions

18   Your Honor has.

19           THE COURT:  All right.  I guess there's, what, about

20   two minutes left, if Mr. Clemente had anything.

21       Mr. Clemente, have you drifted off?  I doubt it.  But

22   anything else from you, Mr. Clemente?

23           MR. TAYLOR:  Your Honor, I show him talking -- this

24   is Clay Taylor -- but no one's hearing him.

25           THE COURT:  Okay.  Mr. Clemente, we are not hearing

246

1    you, or I'm not seeing you.  Make sure you're not on mute.

2            THE CLERK:  He's not on mute, Judge.

3            THE COURT:  He's not on mute?  So we must have a

4    bandwidth issue or something else.

5        All right.  Mr. Clemente, still not hearing or seeing you.

6    We'll give him another 30 seconds.

7            THE CLERK:  He's coming up.

8            THE COURT:  He's coming up?  Ah, I see his name now.

9            MR. CLEMENTE:  Your Honor, can you hear me?

10            THE COURT:  I can hear you now.

11            MR. CLEMENTE:  Okay, Your Honor.  I don't know what

12    happened.  I just switched another camera, so you may not be

13    able to see me, but can you hear me?  I'll be very quick.

14            THE COURT:  Okay.  I can hear you.

15            MR. CLEMENTE:  Can you hear me?

16            THE COURT:  Yes.

17            MR. CLEMENTE:  Okay.  Thank you, Your Honor.

18    CLOSING ARGUMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

19            MR. CLEMENTE:  Two things I want to say.  First, just

20    on Class 8, I think what's important, as my comments

21    emphasized earlier, the structure of Class 8.  We must

22    remember what it is.  It's really designed so that Class 8

23    holders receive their pro rata share of what's left after

24    prior claims are paid.  That's really what Class 8 creditors

25    voted on.  That's what the disclosure provided.  They did not

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2691
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 759 of 1017 PageID 7472
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2690 of 2722

247

1   vote on receiving a specific dollar or a specific recovery

2   percentage.

3        And regarding the projections and estimates, Your Honor,

4   we're talking about large litigation claims that were asserted

5   and then settled. And given the nature of these assets, the

6   values fluctuate. It's perfectly expected, Your Honor, and

7   indeed disclosed, that there could be wide swings in the

8   amount of claims. That does not lead to the conclusion that

9   the plan needs to be resolicited.

10       And then, finally, Your Honor, again, Mr. Pomerantz

11  adequately addressed all the points, as he did with his

12  earlier presentation, so I'm not going to touch on them, but I

13  did want to respond to one thing that Mr. Taylor said. And I,

14  of course, agree with Mr. Pomerantz. The Committee believes

15  there's no reason for you to delay a ruling and would in fact

16  urge you to rule as soon as Your Honor is ready to rule.

17  Confirmation of the plan, to the extent that there are

18  conversations occurring, is not going to prevent those

19  conversations from taking place, and they can continue after

20  the plan is confirmed. There's simply nothing inherent in

21  Your Honor confirming the plan that would prevent those

22  conversations from occurring or would ultimately prevent

23  parties from pivoting to a deal on the off-chance that one

24  should be reached.

25       So I just wanted to emphasize, Your Honor, again, Your

248

1  Honor is going to rule when Your Honor rules, but the

2  Committee would urge you to rule, and certainly the idea that

3  there may or may not be discussions with Mr. Dondero should

4  not at all in any way lead you to the conclusion that you

5  shouldn't rule or that those conversations cannot continue

6  after plan confirmation.

7      Thank you, Your Honor.  Unless you have questions for me.

8  And my apologies with the technology.

9          THE COURT:  No problem.  All right.  Here's what I'm

10 going to do.  We can see you now, Mr. Clemente.

11         MR. CLEMENTE:  Oh.  I'm sorry, Your Honor.  I

12 switched to another camera again because it wasn't working.

13 So, I apologize.

14         THE COURT:  All right.  I am going to call you back

15 Monday.  What day of the week will that be?  Is that -- I

16 mean, Monday, what date, I should say.  That'll be the 8th,

17 right?  I am going to call you back Monday, this coming

18 Monday, February 8th, at 9:30 Central time, and I am going to

19 give you my ruling.  It will be a detailed oral bench ruling.

20 And I'm not going to leave you hanging on the edge of your

21 seat over the next few days.  I will tell you I'm inclined to

22 confirm this plan.  I think it meets all of the requirements

23 of 1129 and 1123 and 1122.

24     The thing that I am going to spend some time thinking

25 about between now and Monday morning is, no surprise, the

249

1    propriety of the exculpations, the propriety of the plan

2    injunctions, the propriety of the gatekeeper provisions.   I

3    certainly am duty-bound to go back and reread *Pacific Lumber*,

4    to go back and read *Thru, Inc.*, and to really think hard about

5    what is happening here.

6        So, I'm pretty much down, I think, to just those three

7    issues here.  I'll talk to my law clerk.  He may remind me of

8    something else that I'm not articulating right now.  But I

9    think I'm just down to those issues.  Okay?  So it's not going

10   to be a mystery very long.  We will come back Monday, 9:30.

11   My courtroom deputy will post on the docket the WebEx

12   connection instructions as usual, and we'll go from there.

13   Now, --

14            MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

15   Pomerantz.  I have a question, and it's going to sound odd

16   coming from someone on the West Coast, but I was wondering if

17   you could do it earlier.  And the only reason I say that is,

18   the night before, I have to call in to see if I'm on jury duty

19   on Monday, and it would be helpful to me -- I assume your

20   reading the ruling would be within a half hour, 45 minutes.

21   That if you started at 9:00, if that was possible, I could

22   then get in a car, and if I'm actually called to jury duty, I

23   can get there.  Of course, I don't know if I will be called,

24   but I'd hate to miss it.

25            THE COURT:  Okay.  Well, I don't want to make you

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2694
Case 3:25-cv-02072-S Document 15-9 Filed 06/13/25 Page 762 of 1017 PageID 7475
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2693 of 2722

250

1  miss jury duty.  Okay.  We will do 9:00 o'clock.

2          MR. POMERANTZ:  Thank you, Your Honor.

3          THE COURT:  Hopefully no one will be, you know, hung

4  over from watching the Super Bowl.  Personally, I don't like

5  Tom Brady, so I may be boycotting the Super Bowl.  But maybe

6  I'll watch it.  Maybe I'll -- I'll watch it.  So we'll do it

7  9:00 o'clock.  So 9:00 o'clock next Monday.

8      Now, let's talk about next the currently-set hearing this

9  Friday, February 5th, on the injunction and contempt of court

10  motion as to Mr. Dondero and the other entities.  I want to

11  continue that, and here is what I am struggling with.  The

12  only day I have next week is Friday, the 12th, and I would

13  rather not use that date because I'm pretty jam-packed Monday

14  through Thursday, unless stuff has been settled that I haven't

15  become aware of.  So let me ask two things.  First, when is

16  the examiner motion set?  I'm just wondering if there's a

17  block of time we have coming up that --

18          MR. POMERANTZ:  I believe that's March 2nd, Your

19  Honor, so that's not for another month.

20          THE COURT:  Oh, that's not for another month?  All

21  right.

22      Traci, are you on the line?  I want to ask you --

23          THE CLERK:  Yes, I am.

24          THE COURT:  What about the following week?  I know

25  Monday, the 15th, is a federal holiday, but do we have

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2695
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 763 of 1017 PageID 7476
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2694 of 2722

251

 1  availability for -- I fear a full day is going to be needed

 2  for continuing this Friday setting.

 3          THE CLERK:  Wednesday, February 17th, is available.

 4          THE COURT:  We've got all day on Wednesday, February

 5  17th?

 6          THE CLERK:  Yes.

 7          THE COURT:  All right.  What about that?  I think I

 8  heard Mr. Rukavina, I think he's the one who threw it out

 9  there -- or maybe it was Mr. Taylor; I'm getting mixed up --

10  the possibility that they would agree to a continuation of the

11  preliminary injunction through -- well, I think you said

12  through confirmation.  Until the Court enters a confirmation

13  order.  And if I were to rule and approve confirmation Monday,

14  then we're talking about an order that might be entered sooner

15  than the 17th.  So, do you all have any --

16          MR. RUKAVINA:  Your Honor?

17          THE COURT:  -- mutually-agreeable suggestions?  If

18  not, I'm just going to set it the 12th and I'll, you know, I'm

19  killing myself, but I'll --

20          MR. TAYLOR:  Your Honor?

21          MR. RUKAVINA:  No, Your Honor.  I think Your Honor is

22  wise to do what's she's proposing.  The agreed TRO against my

23  clients expires on the 15th of February.

24          THE COURT:  Uh-huh.

25          MR. RUKAVINA:  We can easily move that back a week or

252

1   a sufficient amount of time so that there's no prejudice by

2   going on the 17th, if that would be acceptable to the Debtor,

3   and then we can just pick a date that's sufficiently after the

4   PI hearing so that there's protection for everyone.

5           THE COURT:  All right.  Mr. Taylor, do you agree?

6           MR. TAYLOR:  Yes, Your Honor.  That is acceptable to

7   Mr. Dondero.

8           THE COURT:  Okay.

9           MR. TAYLOR:  We can also push it back.  Can you hear

10  me?

11          THE COURT:  Yes, I can.  Uh-huh.

12          MR. TAYLOR:  Okay.

13          THE COURT:  All right.

14          MR. POMERANTZ:  I just want to make -- I just want to

15  make sure Mr. Morris, John Morris, is on, since he's taking

16  the lead in those matters.  I don't see his picture.

17          MR. MORRIS:  I am, Jeff, and I appreciate that.  I'm

18  available, Your Honor.  We were supposed to take the

19  depositions of Mr. Leventon and Mr. Ellington tomorrow.  I

20  don't know if their counsel is on the phone.  But given Your

21  Honor's decision to adjourn the hearing from Friday, I would

22  respectfully request at this time that counsel for those two

23  individuals work with me to find a date next week in order to

24  take those depositions.

25          THE COURT:  All right.  That's --

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2697
Case 3:25-cv-02072-S    Document 15-9    Filed 06/06/25    Page 765 of 1017    PageID 7478
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2696 of 2722

253

1          MS. DANDENEAU:  Debra Dandeneau from --

2          THE COURT:  Go ahead.

3          MS. DANDENEAU:  This is Debra Dandeneau from Baker

4     McKenzie.  We agree, and we're happy to work with you on a

5     rescheduled time.

6          MR. MORRIS:  Thank you very much.

7          THE COURT: All right.  All right.  So, someone had

8     filed a motion to continue Friday's hearing.  I think it was

9     your firm, Mr. Taylor.  I already had a motion pending for a

10    few days now.  So I'm going to direct you to upload an order,

11    Mr. Taylor, or someone at your firm, continuing the hearing to

12    the 17th at 9:30, with language in there that your -- the

13    injunction is continuing at least through that date.  And,

14    again, it's a continuance of the motion for contempt as well

15    as the setting on the preliminary injunction.  And, of course,

16    run that by Mr. Morris and Mr. Rukavina.

17         MR. TAYLOR:  Sure.  Your Honor, this is -- I'm not

18    handling the injunction hearing, or at least I don't think I

19    am.  But just so that I'm clear, should maybe the injunction

20    continue through the next day or something, so depending on

21    how Your Honor rules, there's not a rush to try and get an

22    order to you?

23         MR. RUKAVINA:  Your Honor, I think that Mr. Morris

24    and I can work this out.  Mr. Taylor is not involved in that

25    adversary, that's true, but Mr. Morris and I will be able to

254

1    very quickly enter a proposed agreed order that extends that

2    TRO for some period of time.

3              THE COURT:  Okay.

4              MR. RUKAVINA:  I'm not going to be difficult.

5              THE COURT:  Okay.  So we'll shift to you and Mr.

6    Morris to be the scriveners.  I just -- I suggested that

7    because I thought there was a motion to link the order to that

8    had been filed by Bonds Ellis.  I may be --

9              MR. MORRIS:  There was, Your Honor.  There was an

10   emergency motion to continue.  We filed an opposition, and

11   Your Honor has not yet ruled on that motion.  You're exactly

12   right.

13             THE COURT:  Okay.  All right.

14             MR. TAYLOR:  Your Honor, this is Clay Taylor.  I will

15   make sure the right people confer with Davor and John, and

16   we'll get -- we'll link it to that motion, because that makes

17   sense, to have something to link it to.

18             THE COURT:  Okay.  Yes.  And it can be a two-

19   paragraph order, I would think.

20        All right.  And then so I'm going to see you Monday at

21   9:00 o'clock Central time with the ruling.

22        Please, don't anyone file anymore paper.  I threw that out

23   earlier today.  I've got all the paper I need.  And I will see

24   you Monday at 9:00 o'clock.  Okay?  We're adjourned.

25             MR. POMERANTZ:  Thank you, Your Honor.

255

1          THE CLERK:  All rise.

2          MR. MORRIS:  Thank you, Your Honor.

3      (Proceedings concluded at 4:34 p.m.)

4                          --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
        the electronic sound recording of the proceedings in the
22      above-entitled matter.

23      **/s/ Kathy Rehling**                      **02/05/2021**

24      _____    _____
        Kathy Rehling, CETD-444                      Date
25      Certified Electronic Court Transcriber

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2700
Case 3:25-cv-02072-S   Document 15-9   Filed 06/06/25   Page 768 of 1017   PageID 7481
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2699 of 2722

256

INDEX

PROCEEDINGS                                                          4

WITNESSES

Debtor's Witnesses

Marc Tauber
- Direct Examination by Mr. Morris                                  25
- Cross-Examination by Mr. Rukavina                                 34
- Cross-Examination by Mr. Taylor                                   36
- Redirect Examination by Mr. Morris                                41

Certain Funds and Advisors' Witnesses

James P. Seery
- Direct Examination by Mr. Rukavina                                45
- Cross-Examination by Mr. Morris                                   49
- Redirect Examination by Mr. Rukavina                              50

Robert Jason Post
- Direct Examination by Mr. Rukavina                                51
- Cross-Examination by Mr. Morris                                   56
- Redirect Examination by Mr. Rukavina                              62
- Recross-Examination by Mr. Morris                                 63

EXHIBITS

Debtor's Docket 1887 - Leatham Declaration     Received    6
Debtor's Exhibit B, Docket 1822                Received    8
Debtor's Exhibit 6R, Docket Entry 1822         Received    9
Debtor's Exhibits 6S and 6T, Docket Entry 1822 Received   12
Debtor's Exhibit 6U, Docket Entry 1822         Received   13
Debtor's Exhibits D and E, Docket Entry 1822   Received   15
Debtor's Exhibits 4D, 4E, and 4G, Docket 1822  Received   17
Debtor's Exhibit 5T, Docket 1822               Withdrawn  17
Debtor's Exhibit 10A                           Received   22
Debtor's Omnibus Reply to Plan Objections,     Received   23
   Docket 1807
Debtor's Exhibit 7O (Abridged)                 Received   44

Certain Funds and Advisors' Exhibit 2,         Received   53
   Docket Entry 1863

Dondero's Exhibits 6 through 12 and            Received   66
   15 through 17

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2701
Case 3:25-cv-02072-S Document 15-9 Filed 06/23/06/25 Page 769 of 1017 PageID 7482
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2700 of 2722

257

1                          INDEX
2                         Page 2

3    EXHIBITS, cont'd.

4    Judicial Notice to be Taken of Docket 1887,          6
        Patrick Leatham Declaration
5
     Judicial Notice to be Taken of Docket 247,           45
6       Schedules

7    CLOSING ARGUMENTS

8    - By Mr. Pomerantz                                   73
     - By Mr. Kharasch                                    151
9    - By Mr. Clemente                                    154
     - By Mr. Draper                                      159
10   - By Mr. Rukavina                                    184
     - By Mr. Taylor                                      208
11   - By Mr. Pomerantz                                   227
     - By Mr. Clemente                                    246
12

13   RULINGS

14   Confirmation Hearing [1808] - *Taken Under Advisement*   248

15   Agreed Motion to (1) Assume Non-Residential Real Property   248
     Lease with Crescent TC Investors, LP upon Confirmation of
16   Plan and (II) Extend Assumption Deadline [1624] - *Taken*
     *Under Advisement*
17

18   END OF PROCEEDINGS                                   255

19   INDEX                                                256-257

20

21

22

23

24

25

# EXHIBIT 27

**EXHIBIT 2**

### Holdings of Preference Shares[1] in CLOs

| CLO | HIF | NSOF | NC | Total |
|---|---|---|---|---|
| Aberdeen | 0% | 30.21% | 0% | **30.21%** |
| Brentwood | 0% | 40.06% | 0% | **40.06%** |
| Eastland | 31.16% | 10.53% | 0% | **41.69%** |
| Gleneagles | 9.74% | 8.52% | 0% | **18.26%** |
| Grayson | 49.10% | 10.75% | 0.63% | **60.48%** |
| Greenbriar | 0% | 53.44% | 0% | **53.44%** |
| Jasper | 0% | 17.86% | 0% | **17.86%** |
| Liberty | 0% | 10.64% | 0% | **10.64%** |
| Red River | 0% | 10.49% | 0% | **10.49%** |
| Rockwall | 6.14% | 19.57% | 0% | **25.71%** |
| Rockwall II | 14.56% | 5.65% | 0% | **20.21%** |
| Southfork | 0% | 7.30% | 0% | **7.30%** |
| Stratford | 0% | 69.05% | 0% | **69.05%** |
| Loan Funding VII (aka Valhalla) | 0% | 1.83% | 0% | **1.83%** |
| Westchester | 0% | 44.38% | 0% | **44.38%** |

---

[1] Class E Certificates for Liberty CLO, Ltd.

## Applications and Motions[1] filed in *In re: Highland Capital Management, L.P.*, Case No.19-bk-34054

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 01/09/20 20 | 340 | Application to employ Hayward & Associates PLLC as Attorney | No Response | **Granted by Dkt. 435** |
| | 281 | Motion to compromise controversy with Official Committee of Unsecured Creditors, filed by Debtor Highland Capital Management, L.P.) | No Response | **Granted by Dkt. 339** |
| 01/13/20 20 | 351 | Motion to extend time to (Debtor's Motion for Entry of an Order Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure) | No Response | **Granted by Dkt. 459** |
| 01/15/20 20 | 359 | Agreed Motion to continue hearing on (related documents 218 Motion for relief from stay) | No Response | **Granted by Dkt. 361** |
| 01/17/20 20 | 370 | *Joint Motion for Continuance of Hearing on (i) Debtor's Application for an Order Authorizing the Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date, and (ii) Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date)* Filed by Debtor Highland Capital Management, L.P. | No Response | **Granted by Dkt. 371** |
| 01/23/20 20 | 389 | First and Final Application for Compensation and Reimbursement of Expenses on behalf of Young Conaway Stargatt & Taylor, LLP as Co-Counsel for Official Committee of Unsecured Creditors, Creditor Comm. | No Response | **Granted by Dkt. 458** |
| 01/24/20 20 | 395 | -Motion to extend or limit the exclusivity period Filed by Debtor Highland Capital Management, L.P. | No Response | **Granted by Dkt. 460** |
| | 396 | -Motion for expedited hearing on Exclusivity Motion | No Response | |
| | 397 | -Motion to enforce (*Motion of the Debtor for the Entry of an Order Concerning the "Sealing Motion" and for a Conference Concerning the Substance, Scope and Intent of Certain Recent Rulings*) (related document(s): | No Response | **Granted by Dkt. 410** |

---

[1] Motions for *Pro Hac Vice* admission and motions to seal have been excluded. Effort was made to include all other substantive motions and applications.

Page 1 of 13

APP. 2700
Appx. 02747

006690

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2704 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 01/31/20 20 | 419 | - Agreed Motion to Extend by One Hundred Twenty Days the Deadline to Assume or Reject Unexpired Nonresidential Real Property Lease) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 429 |
| | 421 | - Debtor's Motion for an Order (i) Establishing Bar Dates for Filing Claims, Including 503(b)(9) Claims; and (ii) Approving the Form and Manner of Notice Thereof) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 488 |
| | 422 | -Motion for expedited hearing | No Response | Granted by Dkt. 427 |
| 02/14/20 20 | 451 | Motion for relief from stay. Filed by Jennifer G. Terry, Joshua Terry | No Response | Granted by Dkt. 519 |
| 02/24/20 20 | 474 | - Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities") Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 477 |
| | 475 | -Motion for expedited hearing | | |
| 02/27/20 20 | 483 | Application to employ Deloitte Tax LLP as Other Professional Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 551 |
| 03/23/20 20 | 545 | -Motion to extend time to file objection (Agreed Motion) (RE: related document(s)483 Application to employ) Filed by Creditor Committee Official Committee of Unsecured Creditors | No Response | Granted by Dkt. 548 |
| 03/31/20 20 | 557 | Motion to extend time to (Debtor's Emergency Motion for an Order Extending Bar Date Deadline for Employees to File Claims) (RE: related document(s)488 Order on motion for leave) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 560 |
| 04/07/20 20 | 569 | -Application for compensation Sidley Austin LLP's First Interim Application for Compensation and Reimbursement of Expenses for Official Committee of Unsecured Creditors, Creditor Comm. Atty, Period: 10/29/2019 to 2/29/2020 | No Response | Granted by Dkt. 661 (Amended) Granted by Dkt. 666 |
| | 570 | -Application for compensation First Interim Application for Compensation and Reimbursement of Expenses for FTI | No Response | Granted by Dkt. 662 (Amended) Granted by Dkt. 665 |

APP. 2701
Appx. 02748

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2705 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | Consulting, Inc., Financial Advisor, Period: 10/29/2019 to 2/29/2020 | | |
| 04/13/2020 | 582 | Motion for relief from stay - agreed Filed by Interested Party Hunton Andrews Kurth LLP | No Response | Granted by Dkt. 623 |
| 04/15/2020 | 590 | Motion to reclaim funds from the registry *Motion for Remittance of Funds Held in Registry of Court*) Filed by Creditor CLO Holdco, Ltd. | No Response | Denied by Dkt. 825 |
| 04/17/2020 | 593 | Motion for relief from stay Filed by Acis Capital Management GP, LLC, Acis Capital Management, L.P. Objections due by 5/1/2020. | 617 Response unopposed to motion filed by Interested Party James Dondero. (05/01/2020) | Granted by Dkt. 764 |
| 04/28/2020 | 602 | - *First Interim Application for Compensation of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from October 16, 2019 through March 31, 2020* for Foley Gardere, Foley & Lardner LLP, Special Counsel, | No Response | Granted by Dkt. 670 |
| | 604 | -Application to employ Hunton Andrews Kurth LLP as Special Counsel | No Response | Granted by Dkt. 763 |
| | 605 | -Application to employ Wilmer Cutler Pickering Hale and Dorr LLP as Special Counsel ( | No Response | Granted by Dkt. 669 |
| | 606 | -Motion to extend or limit the exclusivity period (RE: related document(s)460 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. Objections due by 5/22/2020. | No Response | Granted by Dkt. 668 |
| | 607 | - *First Interim Application for Compensation and Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP, as Counsel for the Debtor and Debtor in Possession, for the Period From October 16, 2019 Through March 31, 2020* | No Response | Granted by Dkt. 663 |
| | 608 | - *First Interim Application for Compensation and Reimbursement of Expenses of Mercer (US) Inc., as Compensation Consultant to the Debtor for the Period From November 15, 2019 Through February 29, 2020* for Mercer (US) Inc., Consultant, | No Response | Granted by Dkt. 664 |
| | 609 | -Application for compensation (*Hayward & Associates PLLC's First Interim Application for Compensation and Reimbursement of* | No Response | Granted by Dkt. 667 |

Page 3 of 13

**APP. 2702**
**Appx. 02749**

006692

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2706 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | *Expenses for the Period from December 10, 2019 through March 31, 2020)* for Hayward & Associates PLLC, Debtor's Attorney, Period: 12/10/2019 to 3/31/2020 | | |
| 04/29/20 20 | 615 | Motion to extend time to Assume or Reject Unexpired Nonresidential Real Property Lease (RE: related document(s)429 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 616 |
| 05/20/20 20 | 644 | Motion for relief from stay (UBS's Motion for Relief From the Automatic Stay to Proceed With State Court Action) Fee amount $181, Filed by Interested Parties UBS AG London Branch, UBS Securities LLC Objections due by 6/3/2020. | No Response | Denied by Dkt. 765 |
| 06/11/20 20 | 733 | -Motion for leave to File an Omnibus Reply to Objections to UBS's Motion for Relief from the Automatic Stay to Proceed With State Court Filed by Interested Parties UBS AG London Branch, UBS Securities LLC Objections due by 7/2/2020. | No Response | Granted by Dkt. 910 |
| 06/12/20 20 | 737 | Motion to extend or limit the exclusivity period Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 820 |
| 06/15/20 20 | 747 | Motion to extend time to (Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure) (RE: related document(s)459 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 816 |
| 06/23/20 20 | 774 | -Application to employ James P. Seery, Jr. as Other Professional Debtors Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020 Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 854 |
| | 775 | -Application to employ Development Specialists, Inc. as Other Professional Amended Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide Financial Advisory and Restructuring-Related Services, Nunc Pro Tunc to March 15, 2020 Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 853 |

APP. 2703
Appx. 02750

006693

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 07/08/20 20 | 808 | Motion to compel Production by the Debtor. Filed by Creditor Committee Official Committee of Unsecured Creditors Objections due by 7/29/2020. | -832 Response opposed to (related document(s): 808 Moti on to compel Production by the Debtor. filed by Creditor Committee Official Committee of Unsecured Creditors) filed by Interested Party James Dondero. (07/14/2020) | **Dkt. 942**<br><br>The Discovery Motions are GRANTED to the extent specifically set forth herein and are otherwise DENIED. Except to the extent specifically set forth herein, the Objections are OVERRULED |
| 07/09/20 20 | 810 | -Motion for protective order (*Debtor's Motion for Entry of (i) a Protective Order, or, in the Alternative, (ii) an Order Directing the Debtor to Comply with Certain Discovery Demands Tendered by the Official Committee of Unsecured Creditors Pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034*) Filed by Debtor Highland Capital Management, L.P. | No Response | **Dkt. 942**<br><br>The Discovery Motions are GRANTED to the extent specifically set forth herein and are otherwise DENIED. Except to the extent specifically set forth herein, the Objections are OVERRULED |
| | 814 | -Motion for expedited hearing (related documents 808 Motion to compel) Filed by Creditor Committee Official Committee of Unsecured Creditors | | |
| 07/13/20 20 | | Proof of Claim 23 filed by Acis Capital Management, LP and Acis Capital Management GP, LLC | 827-Objection to Acis Claim Filed by Interested Party James Dondero. | N/A |
| 07/14/20 20 | 831 | -Application for compensation *Sidley Austin LLP's Second Interim Application for Compensation and Reimbursement of Expenses* for Official Committee of Unsecured Creditors, Creditor Comm. Atty, Period: 3/1/2020 to 5/31/2020 | No Response | Granted by Dkt. 1048 |
| 07/21/20 20 | 883 | Application for compensation *Second Interim Application for Compensation and Reimbursement of Expenses* for FTI Consulting, Inc., Financial Advisor, Period: 3/1/2020 to 5/31/2020 | No Response | Granted by Dkt. 1051 |
| 07/22/20 20 | 886 | -Motion to extend time to assume or reject unexpired nonresidential real property lease Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 909 |

APP. 2704
Appx. 02751

006694

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2708 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 08/03/20 | 914 | -Motion for leave [CLO Holdco, Ltd.'s Motion for Clarification of Ruling] Filed by Creditor CLO Holdco, Ltd. | No Response | Resolved by Dkt. 935 |
| 08/06/20 | 924 | - Second Interim Application for Compensation and for Reimbursement of Expenses of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from April, 2020 through July 31, 2020 | No Response | Granted by Dkt. 1045 |
| 08/12/20 | 944 | Chapter 11 plan filed by Debtor Highland Capital Management, L.P. | No Response | |
| | 945 | -Disclosure statement filed by Debtor Highland Capital Management, L.P. | | |
| 08/13/20 | 947 | - Joint Motion to continue hearing on (related documents 771 Objection to claim) (Joint Motion to Continue Status Conference) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) | No Response | Granted by Dkt. 951 |
| | 949 | - Motion to extend or limit the exclusivity period (RE: related document(s)920 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Exhibit A--Proposed Order) (Annable, Zachery) | No Response | Granted by Dkt. 1092 |
| 08/18/20 | 964 | Hayward & Associates PLLC's Second Interim Application for Compensation and Reimbursement of Expenses for the Period from April 1, 2020 through June 30, 2020 | No Response | Granted by Dkt. 1047 |
| 08/19/20 | 971 | - Second Interim Application for Compensation and for Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtor and Debtor in Possession for the Period from April 1, 2020 through July 31, 2020 | No Response | Granted by Dkt. 1043 |
| | 972 | - Second Interim Application for Compensation and for Reimbursement of Expenses of Mercer (US) Inc. as Compensation Consultant for the Debtor for the Period from March 1, 2020 through May 31, 2020 for Mercer (US) Inc., Consultant | No Response | Granted by Dkt. 1046 |
| | 975 | - Consolidated Monthly and First Interim Application of Wilmer Cutler Pickering Hale and Dorr LLP for Allowance of Compensation for Services Rendered and Reimbursement of | No Response | Granted by Dkt. 1044 |

Page 6 of 13

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2709 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | *Expenses as Regulatory and Compliance Counsel for the Period November 1, 2019 through June 30, 2020* | | |
| 09/04/20 20 | 1025 | Motion to compromise controversy with Carey International, Inc. Filed by Debtor Highland Capital Management, L.P. | No Response | **Granted by Dkt. 1123** |
| 09/16/20 20 | 1214 | Motion for partial summary judgment on proof of claim(s) 190 and 191 of UBS Securities LLC and UBS AG, London Branch filed by Debtor Highland Capital Management, L.P. | No Response | **Granted by Dkt. 1526** |
| 09/23/20 20 | 1087 | -Motion to compromise controversy with (A) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (B) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (C) Acis Capital Management, L.P. (Claim No. 159), Filed by Debtor Highland Capital Management, L.P. | -1121 Response opposed to Acis 9019 Motion filed by Interested Party James Dondero. (10/05/2020) | **Granted by Dkt. 1302** |
| | 1089 | -Motion to compromise controversy with (a) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (b) the Highland Crusader Funds (Claim No. 81). Filed by Debtor Highland Capital Management, L.P. Objections due by 10/19/2020. | No Response | **Granted by Dkt. 1273** |
| 09/24/20 20 | 1099 | Motion for relief from stay - *Daugherty's Motion to Confirm Status of Automatic Stay, or alternatively to Modify Automatic Stay Fee amount $181*, Filed by Creditor Patrick Daugherty Objections due by 10/8/2020. | No Response | **Granted by Dkt. 1327** |
| 09/28/20 20 | 1108 | Motion to Approve Disclosure Statement Filed by Debtor Highland Capital Management, L.P. | No Response | **Granted by Dkt. 1476** |
| 10/02/20 20 | 1118 | - Motion to extend time to Assume or Reject Unexpired Nonresidential Real Property Lease Filed by Debtor Highland Capital Management, L.P. | No Response | **Granted by Dkt. 1122** |
| | 1119 | -Motion to extend time to Deadline To File An Adversary Proceeding Against CLO Holdco, Ltd. (EMERGENCY) Filed by Creditor Committee Official Committee of Unsecured Creditors | No Response | **Granted by Dkt. 1168** |
| | 1120 | | No Response | |

APP. 2706
Appx. 02753

006696

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2710 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | -Motion for expedited hearing (related documents 1119 Motion to extend/shorten time) Filed by Creditor Committee Official Committee of Unsecured Creditors | | |
| 10/09/20 20 | 1154 | -Motion for leave to *Amend Certain Proofs of Claim* Filed by Creditor The Dugaboy Investment Trust Objections due by 10/30/2020. | **No Response** | N/A |
| 10/16/20 20 | 1179 | Omnibus Objection to claim(s) of Creditor(s) Crescent Research; Hedgeye Risk Management, LLC; James D. Dondero; NexVest, LLC; James D. Dondero.. Filed by Debtor Highland Capital Management, L.P. Responses due by 11/18/2020. | **1502** Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)1179 Obj ection to claim). **(12/03/2020)** | **Dkt. 1537** |
| 10/18/20 20 | 1207 | Motion to allow claims of *HarbourVest Pursuant to Rule 3018(A) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* Filed by Creditor HarbourVest et al Objections due by 11/9/2020. | **No Response** | |
| 10/16/20 20 | 1215 | -Redeemer Committee of the Highland Crusander Fund and the Crusader Funds' Motion for partial summary judgment on proof of claim(s) 190 and 191 of UBS AG, London Branch and UBS Securities LLC filed by Interested Party Redeemer Committee of the Highland Crusader Fun and the Crusader's Funds' | **No Response** | **Resolved by Dkt. 1526** |
| 10/20/20 20 | 1244 | - *Third Interim Application for Compensation and Reimbursement of Expenses* for FTI Consulting, Inc., Financial Advisor, Period: 6/1/2020 to 8/31/2020. | **No Response** | **Granted by Dkt. 1685** |
| 10/21/20 20 | 1263 | Emergency Motion to continue hearing on (related documents 1080 Disclosure statement) Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 1266** |
| 10/23/20 20 | 1281 | -Motion for leave - *Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018* Filed by Creditor Patrick Daugherty | **No Response** | **Granted by Dkt. 1474** |

Page 8 of 13

APP. 2707
Appx. 02754

006697

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2711 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 10/25/20 20 | 1289 | Amended disclosure statement filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1945 Disclosure statement, 1080 Disclosure statement). | **No Response** | N/A |
| 10/27/20 20 | 1296 | Application for compensation *Sidley Austin LLP's Third Interim Application for Compensation and Reimbursement of Expenses* for Official Committee of Unsecured Creditors, Creditor Comm. Atty, Period: 6/1/2020 to 8/31/2020. | **No Response** | **Granted by Dkt. 1684** |
| 11/06/20 20 | 1338 | *Motion for Temporary Allowance of Claims for voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018)* Filed by Interested Parties UBS AG London Branch, UBS Securities LLC | **No Response** | **Granted by Dkt. 1518** |
| 11/09/20 20 | 1348 | Motion to continue hearing on (related documents 1207 Motion to allow claims) Filed by Creditor HarbourVest et al | **No Response** | **Granted by Dkt. 1352** |
| 11/13/20 20 | 1384 | Amended disclosure statement filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1945 Disclosure statement, 1289 Disclosure statement). | **No Response** | N/A |
| 11/18/20 20 | 1424 | - Motion for leave *(Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements)* Filed by Debtor Highland Capital Management, L.P. | 1447 WITHDRAWN per # 1460 Response opposed to (related document(s): 1424 Mo tion for leave *(Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements)* filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. **(11/20/2020)** | **Granted by Dkt. 1436 & 1475** |
| | 1425 | - Motion for expedited hearing (related documents 1424 Motion for leave) *(Debtor's Motion for an Expedited Hearing on the Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreement)* Filed by Debtor Highland Capital Management, L.P. | | **Granted by Dkt. 1436** |
| 11/19/20 20 | 1439 | - WITHDRAWN per docket # 1622 Motion for leave *(James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the* | N/A | **Withdrawn by Dondero by Dkt. 1622** |

Page 9 of 13

APP. 2708
Appx. 02755

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2712 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | *Ordinary Course of Business)* Filed by Interested Party James Dondero | | |
| | 1443 | - Motion for expedited hearing(related documents 1439 Motion for leave) (Request for Emergency Hearing on James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business) Filed by Interested Party James Dondero | | **Denied by Bankruptcy Court on the Record during hearing on November 23, 2020** |
| 11/25/20 20 | 1483 | *Third and Final Application for Compensation and Reimbursement of Expenses of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from October 16, 2019 through October 31, 2020* | No Response | Granted by Dkt. 1691 |
| 11/30/20 20 | 1491 | Motion for relief from stay  Filed by Creditor Patrick Daugherty | No Response | Denied by Dkt. 1612 |
| 12/08/20 20 | 1528 | Motion for order imposing temporary restrictions on Debtor's ability, as portfolio manager, to initiate sales by non-debtor CLO Vehicles. Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund. | No Response | Denied by Dkt. 1605 |
| 12/09/20 20 | 1530 | Motion to extend time to Time to File An Adversary Proceeding Against CLO Holdco, Ltd. (Agreed) (RE: related document(s)1168 Order (generic)) Filed by Creditor Committee Official Committee of Unsecured Creditors Objections due by 12/30/2020. | No Response | Granted by Dkt. 1534 |
| 12/11/20 20 | 1544 | -Application for compensation (First Interim Application) for Hunton Andrews Kurth LLP, Special Counsel | No Response | Granted by Dkt. 1686 |
| | 1545 | - (Hayward & Associates PLLC's Third Interim Application for Compensation and Reimbursement of Expenses for the Period from July 1, 2020 through September 30, 2020) for Hayward & Associates PLLC, Debtor's Attorney | No Response | Granted by Dkt. 1728 |
| | 1547 | - *Third Interim Application for Compensation and for Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtor and Debtor in Possession for the Period from August 1, 2020 through November 30, 2020* | No Response | Granted by Dkt. 1687 |
| | | - Consolidated Monthly and Second Interim Application of Wilmer Cutler Pickering Hale and Dorr LLP for Allowance of | No Response | Granted by Dkt. 1715 |

APP. 2709
Appx. 02756

006699

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2713 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | 1552 | *Compensation for Services Rendered and Reimbursement of Expenses as Regulatory and Compliance Counsel for the Period from July 1, 2020 through November 30, 2020)* | | |
| 12/14/20 20 | 1564 | -Motion to quash *(Debtor's Emergency Motion to Quash Subpoena and for Entry of a Protective Order or, in the Alternative, for an Adjournment)* Filed by Debtor Highland Capital Management, L.P. | 1571 Objection to Motion to Quash filed by Interested Party James Dondero, . (12/14/2020) | **Resolved by Dkt. 1603** |
| | 1565 | - Motion for protective order *(Debtor's Emergency Motion to Quash Subpoena and for Entry of a Protective Order or, in the Alternative, for an Adjournment)* Filed by Debtor Highland Capital Management, L.P. | | **Resolved by Dkt. 1603** |
| 12/16/20 20 | 1583 | -Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s)816 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P | No Response | **Granted by Dkt. 1725** |
| 12/17/20 20 | 1590 | Motion to pay *(Debtor's Motion Pursuant to the Protocols for Authority for Highland Multi Strategy Credit Fund, L.P. to Prepay Loan)* Filed by Debtor Highland Capital Management, L.P. | No Response | **Granted by Dkt. 1746** |
| 12/23/20 20 | 1623 | -- Motion to extend time to assume unexpired nonresidential real property lease Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 1636** |
| | 1625 | -Motion to compromise controversy with HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. Filed by Debtor Highland Capital Management, L.P. | 1697 Objection to HarbourVest 9019 Motion filed by Interested Party James Dondero (01/06/2021) | **Granted by Dkt. 1788** |
| 12/31/20 20 | 1649 | Joint Motion to continue hearing on (related documents 1207 Motion to allow claims) Filed by Creditor HarbourVest et al | No Response | **Granted by Dkt. 1652** |

APP. 2710
Appx. 02757

006700

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2714 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 01/04/20 21 | 1655 | Application for compensation *Fourth Interim Application for Compensation and Reimbursement of Expenses for FTI Consulting, Inc.*, Financial Advisor, Period: 9/1/2020 to 11/30/2020, Fee: $710,280.45, Expenses: $1,479.47. Filed by Attorney Juliana Hoffman Objections due by 1/25/2021. | No Response | N/A |
| 01/11/20 21 | 1719 | Notice *(Second Notice of (I) Executory Contracts and Unexpired Leases to Be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, If Any, and (III) Related Procedures in Connection Therewith)* filed by Debtor Highland Capital Management, L.P.. (RE: related document(s)1606 Support/supplemental document *(Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.)* filed by Debtor Highland Capital Management, L.P.. (RE: related document(s)1472 Chapter 11 plan). | 1784 WITHDRAWN PER # 1876. Objection to (related document(s): 1719 Notice (generic) filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (01/20/2021) | N/A |
| 01/14/20 21 | 1745 | Motion to appoint trustee *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* Filed by Get Good Trust, The Dugaboy Investment Trust | 1756 Joinder by filed by Interested Party James Dondero (01/15/2021) | Denied by Dkt. 1960 |
| 01/19/20 21 | 1777 | Motion *of the Debtor for Entry of an Order Authorizing the Debtor to Implement a Key Employee Retention Plan with Non-Insider Employees and Granting Related Relief)* Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1849 |
| 01/27/20 21 | 1853 | *Sidley Austin LLP's Fourth Interim Application for Compensation and Reimbursement of Expenses for Official Committee of Unsecured Creditors*, Creditor Comm. Atty, Period: 9/1/2020 to 11/30/2020. | No Response | N/A |
| 02/01/20 21 | 1878 | Motion to compel an Order Requiring James D. Dondero to Preserve Documents and to Identify Measures Taken to Ensure Document Preservation. Filed by Creditor Committee Official Committee of Unsecured Creditors | 1969 Objection to UCC's Preservation Motion filed by Interested Party James Dondero. (03/03/2021) | N/A |
| 02/08/20 21 | 1914 | Motion for leave *(Motion for Status Conference)* Filed by Interested Party James Dondero | N/A | Denied by Dkt. 1929 |

APP. 2711
Appx. 02758

006701

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2715 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 02/28/2021 | 1955 | Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan) Filed by Interested Parties Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. | No Response | N/A |
| 03/01/2021 | 1958 | Motion for expedited hearing (related documents 1955 Motion to stay pending appeal) Filed by Interested Parties Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. | No Response | N/A |
| 03/03/2021 | 1967 | Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan) Filed by Interested Parties Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund (Hogewood, A.) | No Response | N/A |
| 03/04/2021 | 11973 | -Joinder by filed by Interested Party James Dondero (RE: related document(s)1955 Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan)) | N/A | N/A |

APP. 2712
Appx. 02759

006702

**EXHIBIT 29**

### Highland Capital Management, L.P. v. Dondero 20-03190-sgj

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 12/07/2020 | 2 | - Motion for preliminary injunction (Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero) filed by Plaintiff Highland Capital Management, L.P. | 52 Response opposed to (related document(s)) 2 Motion for preliminary injunction (Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero) filed by Plaintiff Highland Capital Management, L.P.) filed by Defendant James D. Dondero. (01/07/2021) | Granted by Dkt. 59 |
| | 5 | - Motion for expedited hearing/related document/s 2 Motion for preliminary injunction (Plaintiff Highland Capital Management, L.P.'s Motion for Expedited Hearing on Its Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero) filed by Plaintiff Highland Capital Management, L.P. (Annable, Zachery). Related document(s) 6 Motion for protective order filed by Plaintiff Highland Capital Management, L.P. | | Granted by Dkt. 9 |
| | 6 | - Motion for temporary restraining order filed by Plaintiff Highland Capital Management, L.P. | No Response | Granted by Dkt. 10 |
| 12/16/2020 | 24 | WITHDRAWN per # 29 Motion for leave (James Dondero's Emergency Motion to Modify Temporary Restraining Order) (related document(s) 10 Order on motion for protective order) filed by Defendant James D. Dondero | 29 Withdrawal filed by Defendant James D. Dondero (RE: related document(s)24 Motion for leave (James Dondero's Emergency Motion to Modify Temporary Restraining Order) (related document(s) 10 Order on motion for protective order)). | |
| 12/28/2020 | 32 | Motion for protective order(James Dondero's Emergency Motion for Entry of a Protective Order) filed by Defendant James D. Dondero | 34 Objection to (related document(s) 32 Motion for protective order(James Dondero's Emergency Motion for Entry of a Protective Order) filed by Defendant James D. Dondero) filed by Plaintiff Highland Capital Management, L.P. (12/28/2020) | Denied by Dkt. 38 |
| | 33 | - Motion for expedited hearing/related documents 32 Motion for protective order (Request for Emergency Hearing) filed by Defendant James D. Dondero | | |
| 01/07/2021 | 48 | Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held In Civil Contempt for Violating the TRO) filed by Plaintiff Highland Capital Management, L.P. | 110 Objection to (related document(s) 48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO) filed by Plaintiff Highland Capital Management, L.P.)(James Dondero's Objection and Response to Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause and Brief in Support) filed by Defendant James D. Dondero. (02/21/2021) | N/A |
| | 49 | - Brief in support filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO) | | N/A |
| | 51 | - Motion for expedited hearing/related documents 48 Motion for Contempt) filed by Plaintiff Highland Capital Management, L.P. | | N/A |
| 01/13/2021 | 64 | Motion for leave to appeal (related document(s) 59 Order on motion for preliminary injunction, 60 Notice of appeal filed by Defendant James D. Dondero) filed by Defendant James D. | No Response | Denied by Dkt. 111 |
| 01/27/2021 | 75 | Emergency Motion to continue hearing on (related documents 48 Motion for Contempt, 49 Brief) filed by Defendant James D. Dondero | 77 Objection to (related document(s) 75 Emergency Motion to continue hearing on (related documents 48 Motion for Contempt, 49 Brief) filed by Defendant James D. Dondero) filed by Plaintiff Highland Capital Management, L.P. (01/28/2021) | N/A |
| 02/10/2021 | 95 | Motion to continue hearing on (related documents 48 Motion for Contempt, 49 Brief) filed by Defendant James D. Dondero | No Response | Granted by Dkt. 97 |
| 02/17/2021 | 102 | Motion to continue hearing on (related documents 48 Motion for Contempt) filed by Plaintiff Highland Capital Management, L.P. | No Response | Granted by Dkt. 104 |
| 02/20/2021 | 107 | Motion to strike (related document(s) 48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO) filed by Plaintiff Highland Capital Management, L.P.) (James Dondero's Emergency Motion in Limine and to Exclude Evidence and Argument) filed by Defendant James D. Dondero. | 115 Objection to (related document(s) 107 Motion to strike (related document(s) 48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held by Defendant James D. Dondero) filed by Plaintiff Highland Capital Management, L.P. (02/24/2021) | N/A |
| | 108 | - Motion for expedited hearing/related documents 107 Motion to strike document) filed by Defendant James D. Dondero | | N/A |
| 03/02/2021 | 119 | Motion to continue hearing on (related documents 48 Motion for Contempt) filed by Plaintiff Highland Capital Management, L.P. | No Response | Granted by Dkt. 120 |

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2717 of 2722

| | | | |
|---|---|---|---|
| 03/10/2021 | 126 | Motion to continue hearing on (related document(s) 48 Motion for Contempt, 49 Brief, 125 Certificate of service)(Motion for Continuance of Contempt Hearing) filed by Defendant James D. Dondero (Attachments: # 1 Ex. A - Mandamus # 1 Ex. A - Mandamus # 2 Ex. B - Letter # 3 Proposed Order) | No Response | N/A |

APP. 2714
Appx. 02761

# EXHIBIT 30

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF MICHAEL J. LANG IN SUPPORT OF MOVANTS' MOTION
## FOR RECUSAL PURSUANT TO 28 U.S.C. § 455

I, Michael J. Lang, declare under penalty of perjury as follows:

1.    I am more than 21 years of age and am competent to make this Declaration. I have personal knowledge of the facts set forth herein, and they are true and correct.

2.    I am a partner at the law firm of Crawford, Wishnew & Lang PLLC and represent Movants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "Movants") in the above-captioned action. I am authorized to make this Declaration in Support of Movants' Motion for Recusal Pursuant to 28 U.S.C. § 455 (the "Motion").

3.    **Exhibit 1** referenced and incorporated into the Brief in Support of the Motion ("the Brief") and contained in the Appendix in Support of the Motion (the "Appendix") (at APP. 0001-APP.

---

006705

0137) is a true and correct copy of a court record [ECF Dkt. 181] from the bankruptcy proceeding styled *In the Matter of: Highland Capital Management, L.P.*; Case No. 19-12239 (CSS) in the United States Bankruptcy Court for the District of Delaware.

4. The following exhibits referenced and incorporated into the Brief and contained in the Appendix are true and correct copies of court records from this above-captioned bankruptcy proceeding styled *In Re: Highland Capital Management, L.P.*; Case No. 19-34054-sgj-11, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 2 | January 9, 2020 Debtor's Motion to Compromise Controversy with Official Committee of Unsecured Creditors Transcript | APP. 0138-APP. 0228 |
| 3 | February 19, 2020 Transcript | APP. 0229-APP. 0416 |
| 4 | December 8, 2020 Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [ECF Dkt. 1522] | APP. 0417-APP. 0442 |
| 5 | December 16, 2020 Transcript - Motion for Order Imposing Temporary Restrictions | APP. 0443-APP. 0508 |
| 9 | February 8, 2021 Transcript - Bench Ruling on Confirmation Hearing and Agreed Motion to Assume | APP. 0990-APP. 1040 |
| 10 | July 8, 2020 Transcript - Motion to Extend Exclusivity Period and Motion to Extend Time to Remove Actions | APP. 1041-APP. 1098 |
| 12 | June 30, 2020 Transcript - Motion for Remittance of Funds Held in Registry of Court filed by CLO Holdco, Ltd. [ECF Dkt. 802] | APP. 1152-APP. 1251 |
| 13 | July 21, 2020 Official Committee of Unsecured Creditors Emergency Motion to Compel Production by the Debtor Transcript | APP. 1252-APP. 1376 |
| 14 | Applications to Employ James P. Seery and Development Specialists, Inc. Transcript [ECF Dkt. 864] | APP. 1377-APP. 1510 |
| 15 | March 4, 2020 Transcript - Hearing on Motion of The Debtor for Entry of an Order Authorizing, but not Directing, the Debtor to Cause Distributions to Certain "Related Entities" | APP. 1511-APP. 1631 |
| 16 | June 15, 2020 Transcript - UBS's Motion for Relief from the Automatic Stay to Proceed with State Court Action | APP. 1632-APP. 1758 |
| 22 | January 14, 2021 Motion to Appoint Examiner [ECF Dkt. 1752] | APP. 2057-APP. 2070 |
| 23 | February 2, 2021 Transcript of Proceedings | APP. 2071-APP. 2365 |
| 24 | Servicing Agreement – Exhibit N to the February 2, 2021 Transcript of Proceedings | APP. 2366-APP. 2401 |

**DECLARATION OF MICHAEL J. LANG**        **PAGE 2**

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2721
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 789 of 1017 PageID 7502
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2720 of 2722

| 25 | Servicing Agreement – Exhibit J to the February 2, 2021 Transcript of Proceedings | APP. 2402-APP. 2440 |
| 26 | February 3, 2021 Transcript of Proceedings | APP. 2441-APP. 2697 |
| 27 | Chart of Holdings of Preference Shares in CLOs – Exhibit 2 from February 3, 2021 Hearing | APP. 2698-APP. 2699 |

5.      **Exhibit 11** referenced and incorporated into the Brief and contained in the Appendix (at APP. 1099-1151) is a true and correct copy of a court record [ECF Dkt. 1186] from the proceeding styled *In the Acis Capital Management, L.P. and Acis Capital Management GP, LLC*; Case No. 18-30264-SGJ-11 in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

6.      The following exhibits referenced and incorporated into the Brief and contained in the Appendix are true and correct copies of court records from the adversary proceeding styled *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al.*, Adversary Proceeding No. 21-03000-sgj, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 6 | January 6, 2021 Plaintiff Highland Capital Management, L.P.'S Verified Original Complaint for Declaratory and Injunctive Relief [ECF Dkt. 1] | APP. 0509-APP. 0527 |
| 7 | January 26, 2021 Transcript - Motion for Entry of Order Authorizing Debtor to Implement Key Employee Plan | APP. 0528-APP. 0784 |
| 17 | January 6, 2021 Debtor's Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero [ECF Dkt. 6] | APP. 1759-APP. 1776 |

7.      The following exhibit referenced and incorporated into the Brief and contained in the Appendix is a true and correct copy of a court record from the adversary proceeding styled *Highland Capital Management, L.P. v. James D. Dondero*, Adversary Proceeding No. 20-3190-sgj, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

---

**DECLARATION OF MICHAEL J. LANG**                                                    **PAGE 3**

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 8 | January 8, 2021 Transcript - Preliminary Injunction Hearing | APP. 0785-APP. 0989 |

8.      The following exhibits referenced and incorporated into the Brief and contained in the Appendix are true and correct copies of court records from the adversary proceeding styled *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al.*, Adversary Proceeding No. 21-03010-sgj, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 19 | February 17, 2021 Debtor's Memorandum of Law in Support of its Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021 [ECF Dkt. 3] | APP. 1792-APP. 1812 |
| 20 | February 24, 2021 Order on Mandatory Injunction [ECF Dkt. 25] | APP. 1813-APP. 1817 |
| 21 | February 23, 2021 Transcript - Mandatory Injunction Hearing | APP. 1818-APP. 2056 |

9.      **Exhibit 18** referenced and incorporated into the Brief and contained in the Appendix (at APP. 1777-1791) contains true and correct courtesy copies of the K&L Gates Letters (as defined in the Brief), which are attached to the Declaration of James Seery [ECF 4] in the Adversary Proceeding styled *Highland Capital Mgmt. v. Highland Capital Management Fund Advisors, L.P., et al.* Adversary No. 21-03000-sgj.

10.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

---

**DECLARATION OF MICHAEL J. LANG**                                              **PAGE 4**

EXECUTED ON the 18th of March, 2021 in Dallas, Dallas County, Texas.

Michael J. Lang
Declarant

**APP. 2719**

**Appx. 22706**

**006709**

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1 of 11
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 792 of 1017 PageID 7505
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21 Entered 03/23/21 12:05:38 Page 1 of 11

Docket #2083 Date Filed: 03/23/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed March 22, 2021

United States Bankruptcy Judge

---

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **CASE NO. 19-34054-SGJ-11** |
| **L.P.,** | § | **(Chapter 11)** |
| **DEBTOR.** | § | |

## ORDER DENYING MOTION TO RECUSE, PURSUANT TO 28 U.S.C. § 455

CAME ON FOR CONSIDERATION before this court the Motion of James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, the "Movants") to Recuse, Pursuant to 28 U.S.C. § 455, filed March 18, 2021, along with a supporting Brief and an Appendix that is 2,722 pages in length [DE ## 2060, 2061, & 2062] (hereinafter, the "Motion to Recuse").

1



1934054210323000000000003

The Movants, through newly appearing counsel, Michael J. Lang of Crawford, Wishnew & Lang PLLC, argue that the assigned bankruptcy judge (the "Presiding Judge") should, after 15 months, recuse herself from presiding in the above-referenced case of Highland Capital Management, L.P. (the "Debtor" or "Highland"), whose Chapter 11 plan was recently confirmed. The Movants state that they perceive the Presiding Judge has developed animus towards James Dondero ("Mr. Dondero") and parties connected with him or deemed under his control (the "Affected Entities"). Mr. Dondero and the Affected Entities argue that the Presiding Judge's impartiality can be reasonably questioned. Specifically, they express concerns that the Presiding Judge formed negative opinions of Mr. Dondero in a prior bankruptcy case over which the Presiding Judge presided (*In re Acis Capital Management, L.P.,* Case No. 18-30264)[1]; that those opinions have carried over to the current case; the Presiding Judge has been unable to extricate those opinions from her mind; and this has resulted in an actual bias against Mr. Dondero that is prejudicing him and the Affected Entities.

Accordingly, the Movants ask that the Presiding Judge recuse herself from any future contested matters and adversary proceedings arising in the Highland case.

By way of further background, the Highland case has been pending since October 16, 2019. It was filed in the Bankruptcy Court for the District of Delaware. Venue was transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division, on motion of the Official Unsecured Creditors Committee ("Committee") on December 4, 2019. On January 9, 2020, a significant corporate governance settlement between Highland and the Committee was reached and approved by this court. The settlement involved the removal of Mr. Dondero as CEO and from all decision making at Highland, at the insistence of the

---

[1]  Acis Capital Management, L.P. ("Acis") was formerly a company in the Highland corporate organizational structure.

Appx. 32768

006711

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 11
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 794 of 1017 PageID 7507
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21 Entered 03/23/21 12:05:38 Page 3 of 11

Committee, and an entirely new corporate governance structure was imposed on the Debtor, with extensive oversight by the Committee. This new corporate governance structure was negotiated by the Debtor under pressure from both the Committee and the United States Trustee—both of whom expressed positions that a Chapter 11 Trustee should be appointed in this case, due to alleged conflicts of interest and mismanagement, among other things, attributed to Mr. Dondero. Mr. Dondero signed off on the corporate governance settlement and this court approved it. A new three-member board has controlled the Debtor since then, consisting of a retired bankruptcy judge (Russell Nelms); a second individual with extensive experience serving as an independent board member of companies undergoing bankruptcy or restructuring (John Dubel); and a third individual (later appointed CEO) with broad experience managing distressed debt investments and other products similar to what Highland manages (James P. Seery).

After more than a year, under direction of the new board, the Debtor obtained confirmation of a Chapter 11 Plan on February 22, 2021. The Plan was proposed after many months of contentiousness with several large creditors and the Committee. In fact, in August 2020, the court required the key parties to engage in mediation before two respected co-mediators (Retired Bankruptcy Judge Allan Gropper, S.D.N.Y. and Attorney/Mediator Sylvia Mayer, Houston). The Debtor (either during or after mediation) reached key settlements with the largest creditors in this case (including Acis, which asserted more than a $70 million disputed claim; the Redeemer Committee for the Crusader Fund which asserted more than a $250 million claim and had been in litigation in multiple fora with Highland and affiliates for approximately a decade; and UBS Securities, which asserted more than a $1 billion claim and had also been in litigation with Highland and certain affiliates for more than a decade). Mr. Dondero participated in the mediation, but settlements were not reached with him. The Plan that this court confirmed in February 2021 was supported by the Committee and overwhelmingly by non-insider creditors. Other large, non-insider creditors that supported the Plan,

3

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 11
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 795 of 1017 PageID 7508
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21 Entered 03/23/21 12:05:38 Page 4 of 11

besides those mentioned above, were Patrick Daugherty (a former executive of Highland who has been in litigation with Highland and Mr. Dondero for more than a decade) and HarborVest—each of whom asserted multi-million dollar claims in this case. In any event, the Movants have appealed the confirmation order.

The Motion to Recuse comes 17 months after the Chapter 11 case was filed (although just 15 months after it was transferred to the Presiding Judge). As mentioned, it comes after confirmation of a plan. The Motion to Recuse was filed just two business days before this court is scheduled to hear a motion of the Debtor to hold Mr. Dondero in contempt of a TRO. This hearing on the motion to hold Mr. Dondero in contempt has been continued various times at his request. The underlying TRO has also been the subject of unsuccessful attempts at interlocutory appeals and is currently the subject of a petition for writ of mandamus before the Fifth Circuit.

## I.      LEGAL STANDARD APPLICABLE TO THE MOTION TO RECUSE.

Before addressing the substance of the Motion to Recuse, the court will address the governing legal authority: 28 U.S.C. § 455, Fed. R. Bankr. Pro. 5004(a), and certain case law interpreting same.

The relevant portions of 28 U.S.C. § 455 provide that:

(a)      Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b)      He shall also disqualify himself in the following circumstances:

(1)      Where he has a personal bias or prejudice concerning a party, a personal knowledge of disputed evidentiary facts concerning the proceeding;

28 U.S.C. § 455(a) & (b)(1).

Appx. 02779
006713

Bankruptcy Rule 5004(a) further provides that "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstance arises or, if appropriate, shall be disqualified from presiding over the case."

The court first notes that the applicable statute and rule do not expressly address timeliness.  However, one Circuit Court has stated that recusal motions must be made in a timely fashion.  *Davies v. C.I.R*, 68 F.3d 1129, 1130-31 (9th Cir. 1995) (one year after a ruling was considered untimely).

The court next notes that the applicable statute and rule do not expressly state whether the presiding judge or some other judge should decide a motion to recuse/disqualify. Case authority has interpreted the provisions set forth above to give the targeted judge authority (at least initially) to decide a motion to disqualify. *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999) (a motion to recuse is committed to the discretion of the targeted judge, and the denial of such motion will only be reversed upon the showing of an abuse of discretion); *Wilborn v. Wells Fargo Bank, N.A. (In re Wilborn)*, 401 B.R. 848, 851 (Bankr. S.D.Tex. 2009) (citing *United States v. Mizell*, 88 F.3d 288, 299 (5th Cir. 1996)(the targeted judge has broad discretion in determining whether disqualification is appropriate)).

Additionally, the court notes that the applicable statute and rule do not expressly state what type of hearing a movant is entitled to, if any. Case authority has interpreted that a motion for disqualification does not necessarily confer upon a movant a right to make a record in open court, nor does it confer upon them a right to an evidentiary hearing. *Lieb v. Tillman (In re Lieb)*, 112 B.R. 830, 835-36 (Bankr. W.D. Tex. 1990).   *See generally* 13A C. Wright, A. Miller & E.

Appx. 3771

006714

Cooper, *Federal Practice and Procedure* § 3550, at 629 (a section 455 motion can be supported by an affidavit, a verified memorandum, or a statement of facts in some form). The procedure for a targeted judge to follow, as set forth in *Levitt v. University of Texas*, 847 F.2d 221, 226 (5th Cir. 1988), and as more specifically articulated in *Lieb v. Tillman*, 112 B.R. at 836, is: (a) first, the targeted judge should decide whether the "claim asserted" by the movants "rises to the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality; (b) if not, then the judge should not recuse himself; and (c) if so, another judge should "decide what the facts are," *i.e.,* hold an evidentiary hearing, and presumably then this other judge would decide whether disqualification is appropriate.

Next, with regard to evaluating a motion to recuse, the Fifth Circuit has recognized that section 455(a) claims are fact-driven, and as a result, the analysis of a particular section 455(a) claim must be guided, not by a comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the unique facts and circumstances of the particular claim at issue. *United States v. Jordan,* 49 F.3d 152, 157 (5th Cir. 1995). As a matter of law, clashes between the court and counsel for a party is an insufficient basis for disqualification, and Circuit Courts have refused to base disqualification under Section 455 upon apparent animosity towards counsel. *In re Lieb*, 112 B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975) (holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel.")); *See also Focus Media, Inc. v. NBC (In re Focus Media),* 378 F.3d 916, 929-31 (9th Cir. 2004) (adverse rulings and negative remarks ordinarily do not support a bias challenge). Disqualification is appropriate if a reasonable person,

006715

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 11
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 798 of 1017 PageID 7511
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21 Entered 03/23/21 12:05:38 Page 7 of 11

knowing all of the relevant circumstances, would harbor doubts about a judge's impartiality. *Chitmacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1165 (5th Cir. 1982).

Finally, if a movant appeals a decision not to disqualify and the district court finds the record and documents submitted to be inadequate for a determination, it may remand and direct another judge to conduct an evidentiary hearing to enlarge the record. Such procedure is consistent with *Levitt. See Lieb v.Tillman*, 112 B.R. at 836.

## II.     THE UNIQUE FACTS AND CIRCUMSTANCES APPLICABLE HERE.

First, the court determines that the Motion to Recuse is not timely. Again, it was filed more than 15 months after the Presiding Judge was transferred the Highland case. It comes after many dozens of orders have been issued by the court, including a confirmation order that the Movants have now appealed. It comes on the eve of a contempt hearing. The timing does not seem to pass muster—if, indeed, timeliness is a factor, as the Ninth Circuit has suggested.

But, since the Motion to Recuse raises serious issues, the court will nevertheless analyze it as though it is timely. The court will address whether the overall circumstances might cause a reasonable observer to question or harbor doubts about the court's impartiality. Would the claims asserted in the Motion to Recuse rise to the threshold standard of raising a doubt in the mind of a reasonable observer as to the court's impartiality?

### A. The Acis Case.

At the heart of the Motion to Recuse seems to be an assertion that the Presiding Judge gained extrajudicial knowledge and developed opinions of Mr. Dondero and the Affected Entities during the Acis case and that this has created animus or bias towards them in the Highland case and related adversary proceedings. Evaluating this contention requires some

App. 02773
006716

examination of just what the court heard and adjudicated in the Acis case.

Acis Capital Management, L.P. ("Acis LP"), a Delaware limited partnership, and ACIS
Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware limited liability company—were
two entities within the approximately 2,000-entity organizational structure of Highland that were
forced into an involuntary bankruptcy case in January 2018 (for convenience, the court will
collectively refer to them as "Acis"). The Presiding Judge presided over the Acis case. Mr.
Dondero was the president of the two Acis Debtors, as well as the CEO of Highland at the time.
The Presiding Judge's recollection is that Mr. Dondero testified **only once** during the lengthy
Acis proceedings (during the trial on the involuntary petitions in the Spring of 2018) and, at all
other times, various inhouse counsel at Highland served as the witnesses for Acis and Highland.

As far as "extrajudicial knowledge," what the Presiding Judge learned from the Acis case
was largely regarding the "CLO Industry." The court learned that Highland was a pioneer,
among registered investment advisors, in the securitization investment product known as a
"CLO" (collateralized loan obligations) and Acis, for many years, was the vehicle through which
Highland's CLO business was managed. The court learned about the typical structure of these
CLOs (the various tranches of debt and the rights they enjoyed), the typical governing
documents for and life span of a CLO, the typical portfolio management agreements, the shared
services agreements, and the sub-advisory agreements that undergirded the whole operation. The
court learned about Highland's role in these and the role of Acis, historically, and the role of an
entity known as Highland CLO Funding "("HCLOF"). HCLOF is not a movant on the Motion to
Recuse. If the Presiding Judge made any specific rulings with regard to Mr. Dondero or the
Affected Entities during the Acis case, she cannot recall. The court certainly does recall

Appx. 02774

006717

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 9 of 11
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 800 of 1017   PageID 7513
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21   Entered 03/23/21 12:05:38   Page 9 of 11

accusations made by Acis against **Highland** and **HCLOF** with regard to alleged fraudulent transfers and alleged denuding of Acis assets to thwart judgment creditor Josh Terry.  The court has never ruled on the actual fraudulent transfer claims and, the Presiding Judge believes that the claims at least among Acis and Highland have been settled.

In summary, the extrajudicial knowledge—if it should be considered that—the Presiding Judge gained from the Acis case, that is now suggested to have created bias or animus, was knowledge about the highly complex CLO products industry, knowledge about the forms of agreement that typically set forth parties' rights and obligations, and some knowledge about the Highland business structure and the shared services and sub-advisory services model it typically used. The Presiding Judge at all times has been aware that Mr. Dondero was a founder of Highland, and was the President of Acis and CEO of Highland at relevant times. To be clear, a Chapter 11 Trustee was appointed in the Acis case soon after an order for relief was entered, and the Presiding Judge only recalls Mr. Dondero testifying once in court during the Acis case. The Presiding Judge has a vague recollection that deposition testimony may have been presented at another time. The court cannot recall any of the other Affected Entities ever being parties appearing in the Acis case or providing testimony.

The court notes, anecdotally, that 28 U.S.C. § 1408(2) contemplates that venue is proper over a case "in which there is a pending case under title 11 concerning such person's affiliate, general partner or partnership." Thus, it is not *per se* improper (in fact, is generally proper) for a presiding judge to preside over cases of affiliated business entities of a party. It happens all the time.

9

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 801 of 1017 PageID 7514
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21 Entered 03/23/21 12:05:38 Page 10 of 11

### B. Bias or Animus, More Generally?

More generally, the court does not believe that the provisions of 28 U.S.C. § 455 are implicated here. The Presiding Judge does not believe she harbors, or has shown, any personal bias or prejudice against the Movants.

As earlier mentioned, case law has held that clashes between a court and counsel for a party is an insufficient basis for disqualification, and Circuit Courts have refused to base disqualification under Section 455 upon apparent animosity towards counsel. *In re Lieb*, 112 B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975) (holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel.")). Not only does this court have the utmost respect for Mr. Dondero's and each of the Affected Entities' counsel, but the court has no disrespect or animus toward Mr. Dondero on a personal level or any of the Movants.

This court has merely addressed motions, objections, and other pleadings as they have been presented. It has issued and enforced orders where requested and warranted. This court and all courts sometimes use strong words as part of managing a complex and contentious case. None of this should be interpreted as "bias" or "prejudice." It is simply about rule enforcement and managing a docket consistent with this court's duty to the public. The court does not believe the assertions of the Movants rise to "the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality.

WHEREFORE, it is hereby

ORDERED that the Motion to Recuse is denied. The court reserves the right to

supplement or amend this ruling.

It is so ORDERED.

###END OF ORDER###

Appx. 32757

006720

# EXHIBIT 5

Appx. 02578

006721

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 16
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 804 of 1017   PageID 7517
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 1 of 10   PageID 106

Docket #0005  Date Filed: 5/17/2021

**IN THE UNITED STATES DISTICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| JAMES DONDERO, *et al*., | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

**APPELLANTS' RESPONSE TO DEBTOR'S MOTION FOR LEAVE TO INTERVENE**
**IN APPEAL OF RECUSAL ORDER**

James Dondero ("Mr. Dondero"), Highland Capital Management Fund Advisors, L.P.,

NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real

Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company

(collectively, "Appellants") file this *Response* (the "*Response*") to Highland Capital Management,

L.P.'s ( "Debtor") *Motion for Leave to Intervene in Appeal of Recusal Order* (the "*Motion to*

*Intervene*").[1] Appellants respectfully state as follows:

I.     **BACKGROUND**

**A. Procedural Background**

1.     On October 16, 2019, Debtor filed a voluntary petition for relief under chapter 11 of the

Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the

---

[1] Dkt 2.



APPELLANTS' RESPONSE TO DEBTOR'S MOTION TO INTERV



Appx. 02579

006722

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 16
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 805 of 1017 PageID 7518
Case 3:21-cv-00879-K Document 5 Filed 05/17/21 Page 2 of 10 PageID 109

"Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

2.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee"). The Committee then moved to transfer the Highland Bankruptcy Case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").

3.     At the hearing on the Committee's Motion to Transfer, the Pachulski firm, counsel for Debtor, expressly acknowledged that the Committee's motive in seeking transfer of the Highland Bankruptcy Case to the Bankruptcy Court was to take advantage of the Bankruptcy Court's preexisting negative views of Debtor's management, including, notably, Mr. Dondero:

> However -- Your Honor pointed to this at the beginning, in mentioning comments about forum-shopping -- the committee and Acis are really being disingenuous, and they have not told you the real reason that they want the case before Judge Jernigan.7 ... And it's not because she's familiar with this debtor's business, this debtor's assets, or this debtor's liabilities, because she generally is not. ***It is because she formed negative views regarding certain members of the debtor's management that the committee and Acis hope will carry over to this case***.[2]
>
> ****
> The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, ***without the baggage of what happened in a previous case***, which contrary to what Acis and the committee says [*sic*], has very little to do with this debtor.[3]

4.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to the Bankruptcy Court.[4]

## B.  The *Motion to Recuse*

5.     As the Bankruptcy Court has essentially acknowledged, the Bankruptcy Court carried

---

[2] *See* B.R. Dkt. 2062, the *Appendix to the Motion to Recuse* at Exhibit 1 at 77:18-78:8 [App. 0077-0078] (emphasis added).

[3] *Id.* at 79:14-20 [App. 0079] (emphasis added).

[4] *See* B.R. Dkt. 186.

---

Appx. 02589
006723

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 16
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 806 of 1017    PageID 7519
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 3 of 10   PageID 110

negative opinions of Mr. Dondero into the Highland Bankruptcy Case that it cannot extricate from its mind.

6.      Moreover, the record in the Highland Bankruptcy Case reflects that these negative opinions have resulted in, if not actual bias against Mr. Dondero (as well as any entity the Bankruptcy Court deems connected to him or under his control (collectively, the "Affected Entities")):[5] (a) the undeniable **perception** of bias against Mr. Dondero and the Affected Entities; and (b) distinct and regular favoritism toward Debtor and other parties (or, at a minimum, the undeniable **perception** of such favoritism).

7.      Specifically, among other things, the record in the Highland Bankruptcy Case reflects that the Bankruptcy Court's bias began to manifest itself in late 2020 and early 2021 as the Bankruptcy Court:

(a)      Repeatedly made statements demonstrating its unfavorable opinions about Mr. Dondero;

(b)      Declared that Mr. Dondero (and, by implication, the Affected Entities and each of their licensed attorneys) are vexatious litigants based on Mr. Dondero and the Affected Entities actions in: (i) defending lawsuits and motions filed against them; (ii) asserting valid legal positions; and/or (iii) preserving legal rights, including on appeal;

(c)      Reasonably appears to have prejudged an issue of fact in the Adversary Proceedings (defined below) by concluding that any entity connected to Mr. Dondero (*i.e.*, the Affected Entities) is essentially Mr. Dondero himself, without evidence being introduced that support disregarding the corporate status of these entities;

(d)      Summarily and/or preemptively disregarded the testimony of any witness who would testify in favor of Appellants, without evidentiary support, as "under [Mr. Dondero's] control" and, if the witness has any connection to Mr. Dondero, *per se* not credible; and

(e)      Entered findings of fact and granted remedies against Appellants that the

---

[5] The term "Affected Entities" should be understood to include Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.,, Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc.

---

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 5 of 16
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 807 of 1017   PageID 7520
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 4 of 10   PageID 111

opposing party did not seek, thus depriving Appellants of due process rights.

8.      This bias (or equally problematic perception of bias) has and will continue to impair the ability of Appellants to adequately preserve and protect their legal rights and interests.

9.      Consequently, on March 18, 2021, Appellants moved to recuse Presiding Judge Jernigan (the "*Motion to Recuse*")[6] from the below adversary proceedings (the "Adversary Proceedings"):

| Adversary Proceeding | File Date |
|---|---|
| *UCC v. CLO Holdco Ltd., et al.; Adversary No. 20-03195* | 12/17/2020 |
| *HCMLP v. NexPoint Advisors, L.P., et al.; Adversary No. 21-03000* | 1/6/2021 |
| *HCMLP v. Dondero; Adversary No. 21-03003* | 1/22/2021 |
| *HCMLP v. HCMFA; Adversary No. 21-03004* | 1/22/2021 |
| *HCMLP v. NexPoint Advisors, L.P.; Adversary No. 21-03005* | 1/22/2021 |
| *HCMLP v. HCM; Adversary No. 21-03006* | 1/22/2021 |
| *HCMLP v. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC; Adversary No. 21-03007* | 1/22/2021 |
| *HCMLP v. HCMFA; Adversary No. 21-03010* | 2/17/2021 |
| *HCMLP v. Dondero; Adversary No. 20-03190* | 12/7/2020 |

10.     Notably, while the Bankruptcy Court had presided over many issues in the Highland Bankruptcy Case at the time of the *Motion to Recuse*, Appellants' *Motion to Recuse* sought relief related to recently filed and future, stand-alone Adversary Proceedings, *i.e.*, **proceedings in which institutional knowledge is not required**. Indeed, as shown above, before the Bankruptcy Court's "institutional knowledge" became advantageous for Debtor, Debtor aptly referred to it as "baggage."

11.     Moreover, the Bankruptcy Court has not made any substantive rulings in those Adversary Proceedings, and the defendants therein have moved to withdraw the reference in most, if not all,

---

[6] *See* B.R. Dkt. 2060-2062.

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of 16
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 808 of 1017   PageID 7521
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 5 of 10   PageID 112

of those cases on the grounds that most of the claims are based on state law.

## C. The *Recusal Order* and Debtor's Intentional Inaction

12.     On March 19, 2021, the morning after Appellants filed the *Motion to Recuse*, the Bankruptcy Court acknowledged receiving the *Motion to Recuse* in a hearing on a separate issue and stated to all present (which included Debtor) that it would review the *Motion to Recuse* and let the parties know whether responsive pleadings would be necessary.[7]

13.     The Bankruptcy Court's statements that morning clearly indicated that it would likely deny the *Motion to Recuse sua sponte*. Nonetheless, no party, including Debtor, sought to oppose the *Motion to Recuse*; or request time to file a response; or indicate that they, in any way, objected to the foreshadowed ruling without the opportunity to advocate for their interest and create a record. This silence continued in the days following the hearing.

14.     On March 23, 2021, the Bankruptcy Court, as it indicated it would, *sue sponte* denied Appellants' *Motion to Recuse* on three grounds (the "*Recusal Order*"): (a) the *Motion to Recuse* was untimely;[8] (b) the Bankruptcy Court's subjective belief that it was not biased ("[t]he Presiding Judge does not believe she harbors, or has shown, any personal bias or prejudice against the Movants");[9] and (c) criticism of counsel (which was not a ground that Appellants asserted in the *Motion to Recuse*) did not justify recusal.[10]

15.     Appellants timely filed a *Notice of Appeal* of the *Recusal Order* and, since no other party

---

[7] *See* an excerpted copy of the Transcript from March 19, 2021 hearing at 78:3-12 ("All right. Okay. And then there's -- I don't know if the apparently new counsel who has filed a motion of recusal is on the line, but I'll just tell people I will let you all know by the end of today if I think I need a hearing on that or I think I need to give other parties in interest the opportunity to weigh in on that. But I don't think it's going to stop me from going forward, just based on the very quick summary I got from one of my law clerks this morning. But I'll let you know by the end of the day today if I think I need to set that for hearing or need responsive pleadings."), a true and correct copy of which is attached hereto as **Exhibit 1 to this *Response*** and incorporated herein by reference.
[8] B.R. Dkt. 2883 at p. 7.
[9] B.R. Dkt. 2883 at p. 10.
[10] *Id.*

---

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 16
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 809 of 1017    PageID 7522
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 6 of 10   PageID 113

had filed any response to the *Motion to Recuse* (or indicated any position in favor or opposing the *Motion to Recuse*), Appellants listed the Bankruptcy Court as the interested party to the appeal and Debtor (and others) as "Notice Parties."[11] Then, after discussions with the Clerk for the Bankruptcy Court, who had filed correspondence in the Bankruptcy Case requesting Appellants amend their *Notice of Appeal* to add an Appellee, Appellants named the Bankruptcy Court as "Appellee" in an *Amended Notice of Appeal*.[12]

## II.    RESPONSE TO DEBTOR'S *MOTION TO INTERVENE*

16.    In a footnote (fn. 2) to the *Motion to Intervene*, Debtor overstates that Appellants are unopposed to its *Motion to Intervene*.

17.    When counsel for Debtor conferred with counsel for Appellants, counsel for Appellants indicated Appellants would not be opposed to Debtor **seeking intervention** in this appeal of the *Recusal Order*. Specifically, what counsel for Appellants did not oppose was Debtor's request to intervene and defend the *Recusal Oder* against appeal **on the grounds stated by the Bankruptcy Court in the Recusal Order**.

18.    Counsel for Appellants did not indicate that Appellants were unopposed to Debtor using intervention as a back-door attempt to make arguments that Debtor knowingly and intentionally refused to make in response to the *Motion to Recuse* in the Bankruptcy Court.

19.    Regardless, Debtor, as shown herein, has failed to show that intervention is necessary, and Debtor should not be allowed to, through intervention, raise new arguments that it did not previously present to the Bankruptcy Court (or offer new grounds for denying the *Motion to Recuse* that were not raised by the Bankruptcy Court in its own *Recusal Order*).

20.    ***First***, Debtor asserts that it "would face substantial adverse consequences if the Recusal

---

[11] B.R. Dkt. 2149.
[12] *See* B.R. Dkt. 2169; Dkt. 1-1.

Order is overturned on appeal and Judge Jernigan is removed from the Bankruptcy Case."[13] In support of this statement, Debtor asserts that the Bankruptcy Court has issued 2,500 opinions and orders in the Highland Bankruptcy Case (and its various contested matters) and makes the conclusory statement that recusing Judge Jernigan from the Adversary Proceedings would somehow jeopardize the "successful implementation" of Debtor's reorganization plan. However, none of the Bankruptcy Court's institutional knowledge affects the trial of the pending and future Adversary Proceedings referenced above, which can and should stand alone and be determined on a case-by-new-case basis.

21.      More importantly, the core issues on appeal here are: (a) whether "a reasonable man, cognizant of the relevant circumstances surrounding [the Bankruptcy Court's] failure to recuse, would harbor legitimate doubts about that judge's impartiality;"[14] and (b) whether the Bankruptcy Court should be recused from sitting as the judge and jury in the various Adversary Proceedings listed above. Respectfully, Appellants, like every litigant, are entitled to a full and fair opportunity to make their case in a fair and impartial forum.[15]

22.      Under § 455(a), this Court must objectively address the requirements of § 455(a) and, if after such an objective analysis, this Court determines that a reasonable person would question the Bankruptcy Court's impartiality, then recusal is mandatory. Indeed, Debtor's insistence that the Bankruptcy Court's "institutional knowledge" (the same knowledge Debtor previously admitted was biased "baggage") is ***required*** for the Adversary Proceedings only further supports the positions taken by Appellants in the *Motion to Recuse*.

23.      ***Second***, while Debtor contends that its interest will not be adequately protected if it is not

---

[13] Dkt. 2 at ¶ 18.
[14] *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir.1999).
[15] *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 893 (5th Cir. 2021).

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of 16
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 811 of 1017    PageID 7524
Case 3:21-cv-00879-K    Document 5    Filed 05/17/21    Page 8 of 10    PageID 115

permitted to intervene, *Debtor, as shown above, made no attempt to oppose the Motion to Recuse or to represent Debtor's interests in the Bankruptcy Court*—including when the Bankruptcy Court specifically raised the *Motion to Recuse* at a hearing involving Debtor and indicated the likely reality that the Bankruptcy Court would reject the motion without hearing or responsive pleadings.

24.    Moreover, Debtor's claim that this appeal will go unopposed absent its intervention as an "appellant"[16] also lacks merit. Appellants have the burden irrespective of any intervention. As stated above, if a reasonable person would question the Bankruptcy Court's impartiality, then recusal is mandatory.

25.    ***Third***, in the *Motion to Intervene*, Debtor provides only conclusory statements as to why participating in this appeal as an *amicus curiae* would be inadequate. Debtor does not explain how filing an amicus brief enabling this Court to view the matter from Debtor's perspective would be insufficient. On the contrary, numerous cases support the proposition that allowing a proposed intervenor to file an amicus brief is an adequate alternative to permissive intervention.[17]

26.    Instead, Debtor states that "although intervention was not sought in the Bankruptcy Court, the Debtor seeks intervention in this Appeal in order to bring relevant issues and facts from the record to the District Court's attention."[18] Notably, as stated above, Debtor never requested that the Bankruptcy Court permit Debtor to respond to the *Motion to Recuse* before ruling, despite the Court's clear indication that it was going to rule on the *Motion to Recuse*. Moreover, Debtor never filed a notice of appeal, and it did not file or intervene to designate the record. In short, Debtor has

---

[16] Dkt. 2 at ¶ 23 ("Based on the foregoing, the Debtor respectfully requests that this Court grant leave for the Debtor to intervene in the instate Appeal, that it be given reasonable opportunity to supplement the record, and that it otherwise *be treated as an "Appellant" for all purposes,* as if originally named as such in the Notice of Appeal.").

[17] *See McHenry v. Comm'r*, 677 F.3d 214, 227 (4th Cir. 2012); *Ruthardt v. United States*, 303 F.3d 375, 386 (1st Cir.2002); *Mumford Cove Ass'n v. Town of Groton*, 786 F.2d 530, 535 (2d Cir.1986); *Bush v. Viterna*, 740 F.2d 350, 359 (5th Cir.1984); *Brewer v. Republic Steel Corp.*, 513 F.2d 1222, 1225 (6th Cir.1975).

[18] Dkt. 2 at ¶21.

---

Appx. 02586

006729

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 812 of 1017 PageID 7525
Case 3:21-cv-00879-K Document 5 Filed 05/17/21 Page 9 of 10 PageID 116

provided no justification for the arguments contained or the relief requested in the *Motion to Intervene*.

27.     Nonetheless, weeks after making no effort to "advocate for its own interests" in the Bankruptcy Court, it now appears that Debtor is seeking intervention in order to create new arguments it declined to make to the Bankruptcy Court. Debtor cannot use the intervention process this way. To the extent Debtor intervenes, it is stepping into the shoes of the Bankruptcy Court, and it is bound by the Bankruptcy Court's analysis, the Bankruptcy Court's basis, and the Bankruptcy Court's reasoning as stated in the *Recusal Order* denying the *Motion to Recuse*.

28.     As a result, Debtor has failed to satisfy the requirements for intervention.

29.     Moreover, while Appellants do not oppose Debtor filing a brief as an amicus to give this Court Debtor's perspective, Debtor should not be allowed to assert, for the first time on appeal, new arguments that Debtor did not present to the Bankruptcy Court and that the Bankruptcy Court did not raise in its *Recusal Order*. This Court cannot consider such additional grounds to determine whether the Bankruptcy Court abused its discretion in denying Appellants' *Motion to Recuse*.

### III.     <u>CONCLUSION</u>

FOR THE FOREGOING REASONS, Appellants respectfully request the Court deny the relief requested in the *Motion to Intervene* or, alternatively, limit Debtor's intervention to defending the Bankruptcy Court's *Recusal Order* on the grounds stated and the basis set forth in that order.

Appx. 02787
006730

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 813 of 1017 PageID 7526
Case 3:21-cv-00879-K Document 5 Filed 05/17/21 Page 10 of 10 PageID 117

Dated: May 17, 2021          Respectfully submitted,

By: */s/ Michael J. Lang*       
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on May 17, 2021, a true and correct copy of the above and foregoing document was served on all parties and counsel of record via the Court's e-filing system.

*/s/ Michael J. Lang*    
Michael J. Lang

Appx. 02788

006731

# EXHIBIT 1

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
 2                              DALLAS DIVISION

 3                                   )    Case No. 19-34054-sgj-11
      In Re:                         )    Chapter 11
 4                                   )
      HIGHLAND CAPITAL               )    Dallas, Texas
      MANAGEMENT, L.P.,              )    Friday, March 19, 2021
 5                                   )    9:30 a.m. Docket
                                     )
 6            Debtor.                )
                                     )    MOTIONS TO STAY
 7                                   )    PENDING APPEAL
      _____)

 8                          TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
 9                    UNITED STATES BANKRUPTCY JUDGE.

10    WEBEX APPEARANCES:

11    For the Debtor:             Jeffrey Nathan Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
12                                10100 Santa Monica Blvd.,
                                   13th Floor
13                                Los Angeles, CA  90067-4003
                                  (310) 277-6910

14
      For the Debtor:             John A. Morris
15                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  780 Third Avenue, 34th Floor
16                                New York, NY  10017-2024
                                  (212) 561-7700

17
      For the Official Committee  Matthew A. Clemente
18    of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
19                                Chicago, IL  60603
                                  (312) 853-7539

20
      For James Dondero:          Clay M. Taylor
21                                BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
22                                420 Throckmorton Street,
                                   Suite 1000
23                                Fort Worth, TX  76102
                                  (817) 405-6900

24

25
```

2

```
 1    APPEARANCES, cont'd.:

 2    For Get Good Trust and       Douglas S. Draper
      Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
 3                                 650 Poydras Street, Suite 2500
                                   New Orleans, LA  70130
 4                                 (504) 299-3300

 5    For Certain Funds and        Davor Rukavina
      Advisors:                    MUNSCH, HARDT, KOPF & HARR
 6                                 500 N. Akard Street, Suite 3800
                                   Dallas, TX  75201-6659
 7                                 (214) 855-7587

 8    For Certain Funds and        A. Lee Hogewood, III
      Advisors:                    K&L GATES, LLP
 9                                 4350 Lassiter at North Hills
                                    Avenue, Suite 300
10                                 Raleigh, NC  27609
                                   (919) 743-7306
11
12    Recorded by:                 Michael F. Edmond, Sr.
                                   UNITED STATES BANKRUPTCY COURT
13                                 1100 Commerce Street, 12th Floor
                                   Dallas, TX  75242
14                                 (214) 753-2062

15    Transcribed by:              Kathy Rehling
                                   311 Paradise Cove
16                                 Shady Shores, TX  76208
                                   (972) 786-3063
17

18

19

20

21

22

23

24            Proceedings recorded by electronic sound recording;
                 transcript produced by transcription service.
25
```

78

1  9:30 unless someone notifies my courtroom deputy over the

2  weekend that the Fifth Circuit has said stop, you can't.

3      All right.  Okay.  And then there's -- I don't know if the

4  apparently new counsel who has filed a motion of recusal is on

5  the line, but I'll just tell people I will let you all know by

6  the end of today if I think I need a hearing on that or I

7  think I need to give other parties in interest the opportunity

8  to weigh in on that.  But I don't think it's going to stop me

9  from going forward, just based on the very quick summary I got

10 from one of my law clerks this morning.  But I'll let you know

11 by the end of the day today if I think I need to set that for

12 hearing or need responsive pleadings.

13     All right.  The last thing before I'm late for my

14 engagement is, Mr. Pomerantz, at some point -- no, this is the

15 next-to-last thing.  At some point, you said we have a hearing

16 next week on a preliminary injunction adversary as to the

17 Funds.  Is that next week?

18         MR. POMERANTZ:  Your Honor, I may have misspoke.  I

19 think it's the 29th.

20         THE COURT:  Okay.

21         MR. POMERANTZ:  I could be corrected if I'm wrong.

22 So, --

23         THE COURT:  Okay.  So, with that, I'm going to offer

24 you this.  Traci, correct me if I'm wrong:  I don't think we

25 have anything set right now on Wednesday of next week,

Case 3:21-cv-00879-K   Document 5-1   Filed 05/17/21   Page 4 of 5   PageID 121

81

1   by today and then their exhibits by 3:00 p.m. Central Tuesday,

2   along with any briefs.

3          THE COURT:  Okay.  So that sounds reasonable.  By the

4   end of today, the witness and exhibit list, or did we just

5   want to say witness --

6          MR. POMERANTZ:  The witness list by the end of today.

7          THE COURT:  Just the witness list.

8          MR. POMERANTZ:  Just the witness list.

9          THE COURT:  3:00 p.m. Central time Tuesday for the

10  exhibit list, with exhibits filed, and any briefing.  Anyone

11  have any contrary views?

12     Okay.  That will be the ruling, then.  And I'll see you

13  Monday, I guess.  We're adjourned.

14          THE CLERK:  All rise.

15          MR. POMERANTZ:  Thank you, Your Honor.

16          MR. RUKAVINA:  Thank you.

17     (Proceedings concluded at 12:20 p.m.)

18                          --oOo--

19

20                        CERTIFICATE

21     I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        03/19/2021

24  _____    _____

    Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 16 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 818 of 1017    PageID 7531

Case 3:21-cv-00879-K   Document 5-1   Filed 05/17/21   Page 5 of 5   PageID 122

                                                                          82

                                    INDEX
 1
     PROCEEDINGS                                                           3
 2
     OPENING STATEMENTS
 3
     - By Mr. Hogewood                                                     6
 4   - By Mr. Rukavina                                                    11
     - By Mr. Taylor                                                      16
 5   - By Mr. Draper                                                      18
     - By Mr. Pomerantz                                                   19
 6   - By Mr. Clemente                                                    54

 7
     WITNESSES
 8
     -none-
 9
     EXHIBITS
10
     Movants' Exhibits' A through M                      Received 20
11   Debtor's Exhibits 1 through 33                      Received 21

12   RULINGS                                                             66

13
         Motion to Stay Pending Appeal filed by Interested
14       Party Highland Capital Management Fund Advisors, LP,
         Interested Party NexPoint Advisors, LP (1955) - *Denied*
15
         Motion to Stay Pending Appeal filed by Interested Party
16       Highland Global Allocation Fund, Interested Party
         Highland Income Fund, Interested Party NexPoint Capital,
17       Inc., Interested Party NexPoint Strategic Opportunities
         Fund (1967) - *Denied*
18
         Joinder by James Dondero to Highland Capital Management
19       Fund Advisors, LP and NexPoint Advisors, LP's Motion for
         Stay Pending Appeal (1973) - *Denied*
20
         Joinder by Creditor Get Good Trust, Creditor The Dugaboy
21       Investment Trust to Motions for Stay Pending Appeal of
         the Court's Order Confirming the Debtor's Fifth
22       Amended Plan (1971) - *Denied*

23   END OF PROCEEDINGS                                                   81

24   INDEX                                                                82

25

# EXHIBIT 6

Appx. 02794
006737

Case 19-34054-sgj11 Doc 3445-6 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 4
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 820 of 1017 PageID 7533
Case 3:21-cv-00879-K Document 10 Filed 06/10/21 Page 1 of 3 PageID 9524
Docket #0010 Date Filed: 6/10/2021

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P. | § | |
| | § | |
| _____ | | |
| In re: | § | |
| | § | |
| JAMES DONDERO, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-0879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

## <u>ORDER</u>

Before the Court is Debtor Highland Capital Management, L.P.'s Motion for

Leave to Intervene in Appeal of Recusal Order ("Motion") (Doc. No. 2). The Court

has considered the Motion, the Response, the Reply, the supporting documentation,

and the applicable law. The Court **GRANTS** Debtor Highland Capital Management,

L.P.'s Motion.

On March 18, 2021, Appellants James Dondero, Highland Capital Management

Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get

ORDER – PAGE 1


1934054210610000000000025

Appx. 02795

006738

Case 19-34054-sgj11 Doc 3445-6 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 4
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 821 of 1017    PageID 7534
Case 3:21-cv-00879-K   Document 10   Filed 06/10/21   Page 2 of 3   PageID 9525

Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC (collectively, "Appellants") filed a Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Motion to Recuse"). R. on Appeal, Volume 10 (Doc. No. 9-10) at 2338. On March 22, 2021, United States Bankruptcy Judge Stacey G. C. Jernigan issued an order denying the Motion to Recuse ("Order"). *Id.*, Volume 1 (Doc. No. 9-1) at 31. Appellants filed their Notice of Appeal as to Judge Jernigan's Order on April 1, 2021, and their Amended Notice of Appeal on April 6, 2021. *Id.* at 1, 16. In their Notices of Appeal, Appellants named Judge Jernigan as the Appellee. *See id.* Debtor filed the instant Motion for Leave to Intervene seeking leave to intervene and to be treated as "Appellee" and also that Debtor be allowed to supplement the appellate record. Appellants filed a Response (Doc. No. 5), opposing Debtor's request to intervene and, alternatively, asking the Court to limit any permitted intervention to defending those reasons stated in the Order. Debtor then filed a Reply (Doc. No. 6).

Federal Rule of Bankruptcy Procedure 8013 addresses, in relevant part, intervening in a bankruptcy appeal. FED. R. BANKR. P. 8013. Rule 8013(g) provides:

> Unless a statute provides otherwise, an entity that seeks to intervene in an appeal pending in the district court or BAP must move for leave to intervene and serve a copy of the motion on the parties to the appeal. The motion or other notice of intervention authorized by statute must be filed within 30 days after the appeal is docketed. It must concisely state the movant's interest, the grounds for intervention, whether intervention was sought in the bankruptcy court, why intervention is being sought at this stage of the

ORDER – PAGE 2

proceeding, and why participating in an amicus curiae would not be adequate.

FED. R. BANKR. P. 8013(g).  Section 1109 of the Bankruptcy Code permits a "party of interest, including the debtor," to raise and appear and "be heard on any issue in a case under this chapter."  11 U.S.C. § 1109.

The Court finds that Debtor has established the requirements for intervening in this bankruptcy appeal.  *See* Fed. R. Bankr. P. 8013(g).  Therefore, the Court **grants** Debtor leave to intervene.  Intervenor-Debtor may file a responsive brief, as accorded to an Appellee under the Bankruptcy Rules, in response to any appellate brief on the merits that Appellants may file.  *See* Fed. R. Bank. P. 8018.  Intervenor-Debtor may also designate additional items to be included in the appellate record.  Intervenor-Debtor **must supplement the record within 14 days from the date of this Order**.

The Court **denies** all other relief.

**SO ORDERED.**

Signed June 10th, 2021.

*Ed Kinkeade*
_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE

APPX 02787

006740

# EXHIBIT 7

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 61
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 824 of 1017 PageID 7537
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 1 of 60 PageID 10087
Docket #0020 Date Filed: 7/28/2021

Case No. 3:21-cv-00879-K

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY
INVESTMENT TRUST, THE GET GOOD TRUST, AND NEXPOINT REAL
ESTATE PARTNERS, LLC,

<u>Appellants,</u>

v.

HON. STACEY G. C. JERNIGAN AND HIGHLAND CAPITAL
MANAGEMENT, L.P.

<u>Appellees.</u>

On Appeal from the United States Bankruptcy Court
Northern District of Texas, Dallas Division
The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court

In re: Highland Capital Management, L.P.
Case No. 19-34054 (Jointly Administered)

ANSWERING BRIEF OF APPELLEE
HIGHLAND CAPITAL MANAGEMENT, L.P.



006742

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 61
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 825 of 1017 PageID 7538
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 2 of 60 PageID 10688

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        jelkin@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Appellee*

DOCS_NY:43746.7 36027/002

Appx. 02809

006743

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 61
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 826 of 1017   PageID 7539
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 3 of 60   PageID 10689

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................................1

I.   STATEMENT OF ISSUES AND STANDARD OF REVIEW ........................2

II.  SUMMARY OF THE RESPONSE ..................................................................3

III. STATEMENT OF FACTS ...............................................................................6

A. The Bankruptcy Court Presides Over the Acis Bankruptcy Case, and the Delaware Court Transfers this Case to the Bankruptcy Court for that Very Reason ...............................................................................6

B. Appellants File the Recusal Motion ...........................................................11

1.  The December 2019 Transfer Motion ...................................................12

2.  The January 2020 Settlement Hearing ..................................................12

3.  The February 19, 2020 Application to Employ Hearing .......................13

4.  The December 2020 Restriction Motion ................................................16

5.  The January 2021 Hearing on the Debtor's Motion for Injunctive Relief .....................................................................................20

6.  The February 2021 Confirmation Hearing .............................................22

7.  Article Referencing PPP Loans .............................................................28

8.  Mandatory Injunction ............................................................................29

C. The Bankruptcy Court Denies the Recusal Motion .....................................31

D. Appellants Appeal the Bankruptcy Court's Recusal Order .........................32

IV. SUMMARY OF THE ARGUMENT ..................................................................33

V.  ARGUMENT .....................................................................................................35

A. The Bankruptcy Court Properly Exercised Its Discretion in Finding the Recusal Motion Was Untimely .................................................35

B. The Bankruptcy Court Properly Exercised Its Discretion in Denying the Recusal Motion on the Merits .................................................43

1.  There Is No Extrajudicial Bias Present Here .........................................45

2.  The Bankruptcy Court Does Not Harbor Deep-Seated Antagonism Toward Appellants ..............................................................49

CONCLUSION ..............................................................................................................52

Appx 02804

006744

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 61
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 827 of 1017   PageID 7540
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 4 of 60   PageID 10690

# TABLE OF AUTHORITIES

## CASES

*Andrade v. Chojnacki*,
  338 F.3d 448 (5th Cir. 2003) ........................................................ passim

*Apple v. Jewish Hosp. & Med. Ctr.*,
  829 F.2d 326 (2d Cir. 1987) ..................................................................39

*Bossart v. Havis*,
  389 B.R. 511 (S.D. Tex.), aff'd sub nom. *In re Bossart*, 296 F. App'x 398
  (5th Cir. 2008) ..................................................................................3

*Brown v. Oil States Skagit Smatco*,
  664 F.3d 71 (5th Cir. 2011) ...................................................................46

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009) .............................................................................49

*Conkling v. Turner*,
  138 F.3d 577 (5th Cir. 1998) ........................................................... 45, 46

*Da Silva Moore v. Publicis Groupe*,
  868 F. Supp. 2d 137 (S.D.N.Y. 2012) ............................................. 38, 40

*Davis v. Board of School Comm'rs*,
  517 F.2d 1044 (5th Cir. 1975) ...............................................................32

*Delesdernier v. Porterie*,
  666 F.2d 116 (5th Cir. 1982) .................................................................36

*Garcia v. Woman's Hosp. of Texas*,
  143 F.3d 227 (5th Cir. 1998) .................................................................51

*Grambling University Nat. Alumni Ass'n v. Board of Sup'rs for La. System*,
  286 Fed.Appx. 864 (5th Cir. 2008) ......................................................35

*Henderson v. Department of Public Safety and Corrections*,
  901 F.2d 1288 (5th Cir. 1990) ....................................................... 48, 51

*Hill v. Breazeale*,
  197 Fed.Appx. 331 (5th Cir. 2006) ............................................... 37, 43

*Hill v. Schilling*,
  495 Fed. Appx. 480 (5th Cir. 2012) ................................... 2, 3, 35, 42

*Hill v. Schilling*,
  No. 3:07–CV–2020–L, 2014 WL 1516193, (N.D. Tex. Apr. 17, 2014) ..............38

*Hirczy v. Hamilton*,
  190 Fed. Appx. 357 (5th Cir. 2006) ............................................. 39, 43

*In re Chevron U.S.A., Inc.*,
  121 F.3d 163 (5th Cir. 1997) .................................................................49

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 61
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 828 of 1017 PageID 7541
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 5 of 60 PageID 10691

*In re Ramba, Inc.*,
    416 F.3d 394 (5th Cir. 2005) ..................................................................3
*Johnson v. Mississippi*,
    403 U.S. 212 (1971) ...........................................................................49
*Lieb v. Tillman (In re Lieb)*,
    112 B.R. 830 (Bankr. W.D.Tex 1990) .................................................32
*Liteky v. U.S.*,
    510 U.S. 540 (1994) ..................................................................... passim
*Love v. Tyson Foods, Inc.*,
    677 F.3d 258 (5th Cir. 2012) ..................................................................3
*Marshall v. Jerrico*,
    446 U.S. 238 (1980) ...........................................................................48
*Martin v. Monumental Life Ins. Co.*,
    240 F.3d 223 (3d Cir. 2001) ................................................................42
*Miller v. Sam Houston State University*,
    986 F.3d 880 (5th Cir. 2021) ...............................................................48
*Preston v. Tenet Healthsystem Memorial Med. Ctr., Inc.*,
    485 F.3d 793 (5th Cir. 2007) ..................................................................3
*Travelers Ins. Co. v. Liljeberg Enters., Inc.*,
    38 F.3d 1404 (5th Cir. 1994) ...............................................................35
*U.S. v. Jordan*,
    49 F.3d 152 (5th Cir. 1995) .................................................................44
*U.S. v. Olis*,
    571 F.Supp.2d 777 (5th Cir. 2008) ......................................................41
*U.S. v. Sanford*,
    157 F.3d 987 (5th Cir. 1998) ................................................... 35, 36, 38
*U.S. v. Williams*,
    127 Fed. Appx. 736 (5th Cir. 2005) .....................................................51
*U.S. v. York*,
    888 F.2d 1050 (5th Cir. 1989) .............................................................42
*United States v. Bremers*,
    195 F.3d 221 (5th Cir. 1999) ...............................................................43
*United States v. Landerman*,
    109 F.3d 1053 (5th Cir. 1997) .............................................................51
*Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*,
    948 F.2d 1436 (5th Cir. 1991) .............................................................44
*Weisshaus v. Fagan*,
    456 Fed.Appx. 23 (2d Cir. 2012) .................................................. 40, 42

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 61
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 829 of 1017 PageID 7542
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 6 of 60 PageID 10692

**STATUTES**

11 U.S.C. § 330 .......................................................................................................14

28 U.S.C. § 455 ................................................................................................... passim

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 8 of 61
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 830 of 1017    PageID 7543
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 7 of 60   PageID 10693

# CORPORATE DISCLOSURE STATEMENT

Appellee Highland Capital Management, L.P. is a limited partnership, the general partner of which is Strand Advisors, Inc., a privately held corporation. No publicly held corporation owns 10% or more of the interest in either entity.

1

Appx. 02805
006748

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of 61
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 831 of 1017 PageID 7544
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 8 of 60 PageID 10694

Appellee Highland Capital Management, L.P. ("Highland" or the "Debtor"),
the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy
case (the "Bankruptcy Case"), hereby submits its Answering Brief to the Opening
Brief of appellants James Dondero ("Mr. Dondero"), Highland Capital Management
Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NPA," and together
with HCMFA, the "Advisors"), The Dugaboy Investment Trust ("Dugaboy"), The
Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts"), and
NexPoint Real Estate Partners, LLC (collectively, "Appellants") in respect of their
appeal from the *Order Denying Motion to Recuse, Pursuant to 28 U.S.C. § 455,* (*see*
R. 31)[1] (the "Recusal Order"), entered by the United States Bankruptcy Court for
the Northern District of Texas (the "Bankruptcy Court") on March 18, 2021.

## I.     STATEMENT OF ISSUES AND STANDARD OF REVIEW

The issue on appeal is whether the Bankruptcy Court properly exercised its
discretion in denying Appellants' *Motion to Recuse, Pursuant to 28 U.S.C. § 455*,
(*see* R. 2338) (the "Recusal Motion"). The standard of review for a denial of a
motion to recuse is abuse of discretion. *See Andrade v. Chojnacki*, 338 F.3d 448,
454 (5th Cir. 2003); *Hill v. Schilling*, 495 Fed. Appx. 480, 483 (5th Cir. 2012).
"[D]eference ... is the hallmark of abuse-of-discretion review." *Love v. Tyson Foods,*

---

[1] Refers to Appellants' Record on Appeal [Docket No. 9]. Any reference to "Supp.
R." refers to Appellants' Supplemental Record [Docket No. 19].

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 832 of 1017 PageID 7545
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 9 of 60 PageID 10695

*Inc.*, 677 F.3d 258, 262 (5th Cir. 2012). "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Hill*, 495 Fed. Appx. at 483 (internal quotations omitted). "A finding of fact is clearly erroneous only when although there may be evidence to support it, the reviewing court on the entire [record] is left with the definite and firm conviction that a mistake has been committed." *Preston v. Tenet Healthsystem Memorial Med. Ctr., Inc.*, 485 F.3d 793, 796–97 (5th Cir. 2007) (internal quotations omitted). "Stated differently, a 'factual finding is not clearly erroneous if it is plausible in the light of the record read as a whole.'" *Bossart v. Havis*, 389 B.R. 511, 515 (S.D. Tex.), *aff'd sub nom. In re Bossart*, 296 Fed. App'x 398 (5th Cir. 2008) (quoting *In re Ramba, Inc.*, 416 F.3d 394, 402 (5th Cir. 2005)). For the reasons below, the Bankruptcy Court properly exercised its discretion in denying the Recusal Motion.

## II.   SUMMARY OF THE RESPONSE

Under Mr. Dondero's direction, the Debtor was forced to file for bankruptcy in October 2019 to protect itself from an avalanche of adverse rulings entered against Highland and Dondero-controlled affiliates. For nearly a decade, courts and arbitration panels in Texas, Delaware, New York, and in foreign jurisdictions such as the Cayman Islands, Bermuda, and Guernsey, issued a series of rulings against Mr. Dondero and his enterprise, some with stinging rebukes.

DOCS_NY:43746.7 36027/002

006750

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 11 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 833 of 1017   PageID 7546
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 10 of 60   PageID 10696

Now, over a year after the Debtor's bankruptcy proceeding was transferred to the Bankruptcy Court,[2] Appellants complain that the Bankruptcy Court is biased against Mr. Dondero, as if no other judge or fact-finder had previously ruled against him and the entities he controls.  Appellants base their appeal on snippets of out-of-context quotes and on eight specific rulings out of the dozens entered by the Bankruptcy Court, while ignoring the mountain of evidence justifying that Court's rulings.

While Appellants' egregious omissions of evidence and other portions of the record are addressed below, it is noteworthy that Appellants have appealed only one of the eight orders and judgments they complain of.  If the Bankruptcy Court's bias and prejudice was as open and notorious as Appellants now contend, Appellants would have appealed all of them, and their failure to do so is telling.

Rather than seeking disqualification "at the earliest possible moment," as litigants are required under applicable Fifth Circuit precedent, Appellants sat on their hands for almost a year and a half after supposedly first concluding that the Bankruptcy Court was biased.  According to Appellants, the Debtor first expressed these concerns in the fall of 2019 when—then under Mr. Dondero's control—it opposed a motion to transfer venue to the Bankruptcy Court on the express basis that

---

[2] "Bankruptcy Court" refers to the United States Bankruptcy Court for the Northern District of Texas, The Hon. Stacey G. C. Jernigan presiding.

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 834 of 1017 PageID 7547
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 11 of 60 PageID 10697

it was not objective.  App. Brief ¶¶ 1-2.  Appellants contend that the Bankruptcy

Court's bias was on full display during hearings held on (i) January 9, 2020, (ii)

February 19, 2020, (iii) June 30, 2020, (iv) July 8, 2020, and (v) September 2020.

*Id.* ¶¶ 3-6, 24-26.  Rather than seek recusal at any time during 2020, Appellants

waited until mid-March 2021 (after at least three additional adverse rulings were

entered against them),[3] days before the Bankruptcy Court was to conduct an

evidentiary hearing on the Debtor's motion to hold Mr. Dondero in contempt of

court.[4]  Based on Appellants' collective failure to promptly seek disqualification, the

Bankruptcy Court properly denied the Recusal Motion as "untimely."

Appellants have not—and cannot—meet their heavy burden of proving that

the Bankruptcy Court abused its discretion in denying the Recusal Motion on the

---

[3] Appellants contend that the Bankruptcy Court's rulings and comments in (a) December 2020, (b) January 2021, and (c) and early February 2021, all conveyed bias and prejudice.  App. Brief ¶¶ 7-22.

[4] Notably, Appellants *do not* contend that the Bankruptcy Court exhibited any bias or prejudice against Mr. Dondero with respect to its (a) *Order Granting Debtor's Motion for Temporary Restraining Order Against James Dondero*, entered on December 10, 2020 (R. 7233) ("Mr. Dondero's TRO"), or its (b) *Order Granting Debtor's Motion for Preliminary Injunction Against James Dondero*, entered on January 12, 2021 (R. 7382).  The Bankruptcy Court held an evidentiary hearing on the Debtor's contempt motion promptly after denying the Recusal Motion and on June 7, 2021, issued a 55-page *Memorandum Opinion and Order Granting in Part Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged Violation of TRO* (*see* Supp. R. 474) (the "Contempt Order").  The Contempt Order included an exhaustive recitation of facts and over 170 detailed footnotes as well as (ironically) express findings in Mr. Dondero's favor that mitigated the consequences of the Contempt Order.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 835 of 1017 PageID 7548
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 12 of 60 PageID 10698

merits. Seen in context, the record demonstrates that (a) numerous courts and tribunals have consistently ruled against Mr. Dondero and his enterprise, thereby demonstrating that the Bankruptcy Court does not stand alone, (b) the Bankruptcy Court's rulings and orders are unassailable (as evidenced by, among other things, Appellants' decision to appeal only one of those complained of), (c) there is ***no*** evidence presented of extrajudicial bias or prejudice, and (d) no objective person would find that Mr. Dondero and his enterprise are the victims of improper judicial conduct rising to the extraordinary remedy of recusal.

## III.    <u>STATEMENT OF FACTS</u>

**A.**    <u>The Bankruptcy Court Presides Over the Acis Bankruptcy Case, and the Delaware Court Transfers this Case to the Bankruptcy Court for that Very Reason</u>

Between 2008 and October 16, 2019, courts and arbitration panels in multiple domestic and foreign jurisdictions handed down a plethora of judgments and orders against Mr. Dondero, the Debtor, and other entities then under Mr. Dondero's control.[5]

For example, in March 2019, a blue-ribbon arbitration panel issued a 56-page decision in which it (a) rejected nearly every argument advanced by the Debtor and

---

[5] An overview of some of the prepetition litigation involving the Debtor and other Dondero-related parties is set forth in the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1473 (Bankr. N.D. Tex. Nov. 24, 2020) at 20-24 (Appx. 1:31-35).

Appx. 02819
006753

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 836 of 1017 PageID 7549
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 13 of 60 PageID 10699

made highly critical assessments of the credibility of Highland's witnesses, (b) found that the Debtor had breached its fiduciary duties to its investors, breached certain agreements, and engaged in other wrongful conduct, and (c) rendered an award against the Debtor in excess of $150 million.[6] Just two months later, in an unrelated case, the Chancery Court in the state of Delaware (i) found that the Dondero-related defendants improperly withheld dozens of documents in discovery on privilege grounds, and (ii) ruled that there was "a reasonable basis to believe that a fraud has been perpetrated" such that the Chancery Court applied the "crime-fraud exception" to the attorney-client privilege in any event.[7]

The adverse rulings against Mr. Dondero and his controlled entities are legion—and have resulted in the imposition of judgments and awards totaling more than $1 billion (inclusive of interest). The Bankruptcy Court had no involvement in any of these cases.

---

[6] *See Partial Final Award* rendered in the arbitration captioned *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.*, Case No. 01-16-0002-6927. (Appx. 2:181-242). The Partial Final Award was incorporated into the arbitration panel's final award (Appx. 3:244-266), and a hearing in the Delaware Chancery Court to have the award confirmed was about to begin when Mr. Dondero caused the Debtor to file for bankruptcy protection for the purpose of gaining the protection of the automatic stay.

[7] *Daugherty v. Highland Capital Management, L.P.*, C.A. No. 2018-0488-MTZ, May 17, 2019 transcript (bench ruling on motion to compel production of documents) at 10-15. (Appx. 4:277-282). The Dondero-related defendants made three desperate but unsuccessful attempts to overturn or stay the Chancery Court's rulings. *See Order Denying Application to Certify Interlocutory Appeal*, entered in C.A. No. 2018-0488-MTZ on July 8, 2019 ¶ K-L. (Appx. 5:366-378).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 837 of 1017 PageID 7550
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 14 of 60 PageID 10700

The Bankruptcy Court's experience with Mr. Dondero and the Debtor began in January 2018, when it was assigned a case captioned *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) (the "Acis Bankruptcy"). The Acis Bankruptcy was involuntarily commenced by Joshua Terry, a former Highland executive who had obtained an arbitration award against the Acis entities then under Mr. Dondero's control, but who could not collect on the judgment because Mr. Dondero allegedly orchestrated a fraudulent transfer of assets that left the Acis debtors judgment proof. Mr. Dondero and Mr. Terry were the chief antagonists in the highly contested Acis Bankruptcy, and the Bankruptcy Court made numerous credibility findings against Mr. Dondero and his associates before confirming a plan of reorganization that effectively transferred control of a valuable business from Mr. Dondero and Highland to Mr. Terry.[8]

With various judgment creditors bearing down, on October 16, 2019, the Debtor filed this case in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court") expecting it to be a more hospitable forum. Less

---

[8] *See*, *e.g.*, (a) *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11, Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) (Appx. 7:540-543); and (b) *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified,* Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) (Appx. 8:545-773).

than two weeks later, on November 1, 2019, the Official Committee of Unsecured

Creditors (the "UCC") filed their *Motion for an Order Transferring Venue of this

Case to the United States Bankruptcy Court for the Northern District of Texas,* Case

No. 19-12239 (CSS), Docket No. 86 (Bankr. D. Del. Nov. 11, 2019) (Appx. 6:380-

538)[9] (the "Transfer Motion"). The UCC laid out its intentions in filing the Transfer

Motion:

> [T]he Dallas Bankruptcy Court is already intimately familiar with the
> Debtor's principals and complex organizational structure [because the
> Acis Bankruptcy is pending in that Court]. Specifically, the Dallas
> Bankruptcy Court has (a) heard multiple days' worth of material
> testimony from the Debtor's principal owner (James Dondero), the
> Debtor's minority owner (Mark Okada), the Debtor's general counsel,
> at least two assistant general counsels, and numerous other employees
> of the Debtor and other witnesses; and (b) issued at least six published
> opinions . . . [The Bankruptcy Court is] intimately familiar with the
> Debtor's business, principal owner, and key executives. For these
> reasons, the Dallas Bankruptcy Court is uniquely positioned to
> oversee this chapter 11 case.

(*Id.* ¶ 2).

The Delaware Court agreed. During a December 2, 2019 hearing, the

Delaware Court stated that it would grant the Transfer Motion, reasoning:

> This is a unique case … [T]his case is very focused on responding to
> existing [Acis] litigation. And that existing litigation of a former
> affiliate, as of a few months ago, and a pending appeal that could make
> it a current affiliate, is located in the Northern District of Texas. The
> [Bankruptcy Court] has done a tremendous amount of work and has

---

[9] Refers to the Debtor's appendix filed with this brief.

Appx. 02813

006756

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 839 of 1017 PageID 7552
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 16 of 60 PageID 10702

… issued a number of opinions, had a number of trials. That work creates a familiarity with the facts, issues, and players in a case …

(R. 2488:23-35-2499:1-11).

Mr. Dondero and Appellants knew **on December 2, 2019** that they were being sent back to the very Bankruptcy Court that took a justifiably stern view of Mr. Dondero and his associates.[10] Indeed, that is exactly why the Debtor (then under Mr. Dondero's control) opposed the Transfer Motion.[11]

Fully cognizant that he would soon face a Bankruptcy Court with substantial knowledge of (some of) his business practices, Mr. Dondero never caused the Debtor to (a) appeal the Delaware Court's order granting the Transfer Motion, or (b) seek the Bankruptcy Court's recusal on the basis of bias or prejudice (at least not until March 2021).

---

[10] Mr. Dondero and entities controlled by him appealed the Acis confirmation order, but the appeals were denied by the United States District Court for the Northern District of Texas and the United States Court of Appeals for the Fifth Circuit. *See* (a) *Opinion* affirming Confirmation Order Case No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18, 2019) (Appx. 9:775-858); (b) *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17, 2021) (Appx. 10:860-863).

[11] *See Objection of the Debtor to Motion of Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 118 (Bankr. D. Del. Nov. 12, 2019) (Appx. 11:865-891).

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 840 of 1017 PageID 7553
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 17 of 60 PageID 10703

## B. <u>Appellants File the Recusal Motion</u>

On March 18, 2021, Appellants filed their Recusal Motion requesting that the Bankruptcy Court recuse itself from any adversary proceedings and future contested matters involving Appellants or any entity connected to Mr. Dondero. In their Recusal Motion, Appellants argue that the Bankruptcy Court is "predisposed against Mr. Dondero" because it: (i) had "negative opinions about Mr. Dondero formed during the Acis case;" (ii) "made repeated reference to proceedings in the Acis case to justify findings made in this case" and made "repeated negative statements about Mr. Dondero;" (iii) "threatened sanctions on" Appellants and "questioned the good-faith basis" of certain of their positions; (iv) declared Appellants "vexatious" litigants; (v) concluded that an entity "connected to or controlled by Mr. Dondero" is "no more than a tool of Mr. Dondero;" and (vi) purportedly disregarded "the testimony of any witness with a connection to Mr. Dondero as *per se* less credible." Recusal Motion ¶ 67. In support of their Recusal Motion, Appellants cite to a number of proceedings that occurred between December 2019 and February 2021 in an attempt to show that the Bankruptcy Court's comments and rulings demonstrate a "deep-seeded antagonism" toward Appellants resulting from "extrajudicial" bias emanating from the Acis Bankruptcy. *See id.* ¶ 68. Appellants mischaracterize the facts of these hearings by cherry-picking quotes out of context and by ignoring the considerable evidence underlying each of the orders at issue.

DOCS_NY:43746.7 36027/002

Appx. 02815

006758

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 19 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 841 of 1017   PageID 7554
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 18 of 60   PageID 10704

### 1.     The December 2019 Transfer Motion

Appellants argue that "the risk of prejudice to Mr. Dondero in this [Bankruptcy] Court has been apparent since this Bankruptcy's inception in Delaware," citing to comments made during the hearing on the Transfer Motion where Debtor's counsel "expressly acknowledged that the UCC's actual motive in seeking transfer to [the Bankruptcy Court] was [that] Court's pre-existing negative views" of Mr. Dondero from the Acis Bankruptcy.  Recusal Motion ¶¶ 4-5.  As noted *supra*, Mr. Dondero controlled the Debtor and directed its counsel to oppose the Transfer Motion on this basis during the December 2, 2019 hearing.  The Delaware Court rejected this argument, and in fact relied on the Bankruptcy Court's extensive familiarity with the parties as one of the bases for transferring venue of the Highland Bankruptcy Case to the Bankruptcy Court. (*See* R. 2488).

### 2.     The January 2020 Settlement Hearing

Appellants cite to the Bankruptcy Court's comments made during a January 9, 2020 hearing as evidence of the Bankruptcy Court's alleged bias toward Mr. Dondero resulting from the Acis Bankruptcy. Recusal Motion ¶¶9-13.  On January 9, 2020, the Bankruptcy Court held an evidentiary hearing, (R. 2519), on the *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*), Case No. 19-34054-sgj11, Docket No. 281 (Bankr. N.D. Tex.

Dec. 27, 2019) (Appx. 12:893-992) (the "Settlement Motion"). The settlement set forth in the Settlement Motion was prompted by (a) concerns expressed by the UCC about the integrity of the Debtor's management (under Mr. Dondero's stewardship) due to its history of self-dealing, creditor avoidance asset transfers, and other breaches of fiduciary duty, and (b) the possibility that the UCC might seek the appointment of a trustee.

The Bankruptcy Court entered an order granting the Settlement Motion (R. 7291) (the "Settlement Order"). Pursuant to the Settlement Order, Mr. Dondero, the Debtor's founder and former CEO, voluntarily surrendered control of the Debtor to an independent board of three directors, Russell Nelms, John Dubel, and James P. Seery, Jr. (the "Board"). The Settlement Order directed Mr. Dondero not to "cause any Related Entity to terminate any agreements with the Debtor." (R. 7293). In finding that this "language is very important" to protect the Debtor, the Bankruptcy Court noted that in the Acis Bankruptcy, "Mr. Dondero was surreptitiously liquidating funds," and "doing things behind the scenes that were impacting the value of the Debtor in a bad way." (R. 2597). Mr. Dondero did not object to this language and signed off on the Settlement Order.

### 3.   **The February 19, 2020 Application to Employ Hearing**

Appellants cite to the February 19, 2020, hearing on the Debtor's *Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley &*

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 843 of 1017 PageID 7556
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 20 of 60 PageID 10706

*Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Foley Application") (R. 415) as another example of the Bankruptcy Court's "predisposition against Mr. Dondero." Recusal Motion ¶¶ 14-15. Appellants argue that the Bankruptcy Court discounted "the testimony of demonstrably independent witnesses who testified" in support of the Foley Application on a "pre-determined basis that any person sharing an opinion with Mr. Dondero … was somehow being unduly influenced by him." Recusal Motion ¶¶ 14-16. Appellants mischaracterize the facts of this hearing.

Through the Foley Application, the Debtor sought to retain Foley on behalf of both the Debtor *and* a non-Debtor entity, Neutra Ltd. ("Neutra"), in the appeal of the Acis confirmation order and related matters (the "Acis Appeal"). In support of the Foley Application, the Debtor disclosed that: (i) Neutra was wholly owned by Mr. Dondero and his partner, Mark Okada, and (ii) the Debtor intended to pay for Foley's representation of Neutra in the Acis Appeal.[12] The UCC and Acis objected

---

[12] The Debtor justified its payment of Neutra's fees under 11 U.S.C. § 330 (which does not allow the payment of non-debtor legal fees) by arguing, *inter alia*, that if Neutra were successful in its appeal of the involuntary petition entered in the Acis Bankruptcy (a) the Acis Bankruptcy would be unwound, (b) the equity in Acis would return to the Debtor, (c) the Debtor would regain the benefit of certain management fees that were otherwise being paid to Acis for the benefit of its new owner, Mr. Terry, and (d) the Debtor would have negotiating leverage with respect to Acis' $75 million claim against the Debtor's estate. *See* R. 2761:10-25-R. 2762:1-16. *See* (i) *Debtor's Omnibus Reply in Support of (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date,* Case No. 19-12239 (CSS),

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 844 of 1017 PageID 7557
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 21 of 60 PageID 10707

to the Foley Application on the ground that the Debtor should not be permitted to use estate assets to support Neutra, a Dondero-controlled entity.[13]

Russell Nelms testified in support of the Application. Mr. Nelms was subject to a lengthy cross-examination which undermined the Debtor's arguments. (R. 2666-2723). The Bankruptcy Court approved the Debtor's retention of Foley, but determined that the evidence was insufficient to justify expending estate assets to pay the legal fees of Neutra, a non-Debtor entity in which the Debtor held no interest. (R. 2785-2790). The Bankruptcy Court's ruling on the Foley Application was not, as Appellants contend, premised on any "pre-determined" bias toward Mr. Dondero to "contest positions that could benefit Mr. Dondero." (App. Brief ¶ 16). It was

---

*Docket No. 159 (Bankr. D. Del. Nov. 21, 2019) (Appx. 13:994-1258), and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date, Case No. 19-12239 (CSS), Docket No. 70 (Bankr. D. Del. Oct. 29, 2019) (Appx. 14:1260-1296).*

[13] *See* (i) *Limited Objection to the Debtor's: (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date,* Case No. 19-12239 (CSS), Docket No. 116 (Bankr. D. Del. Nov. 12, 2019) (Appx. 15:1298-1391); *Limited Objection of the Official Committee of Unsecured Creditors to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP and Lynn Piker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date,* Case No. 19-12239 (CSS), Docket No. 120 (Bankr. D. Del. Nov. 12, 2019) (Appx. 16:1393-1398).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 23 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 845 of 1017   PageID 7558
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 22 of 60   PageID 10708

based on its determination that the Debtor failed to prove that the estate would benefit by paying a non-Debtor's legal fees, as required by applicable law.

Neither Mr. Dondero nor Neutra appealed the Bankruptcy Court's evidence-based order on the Foley Application.

### 4.    The December 2020 Restriction Motion

Appellants cite to certain of Judge Jernigan's comments and rulings made at the conclusion of an evidentiary hearing held on December 16, 2020 (the "December Hearing") [14] as evidence of bias.   Appellants argue that the Bankruptcy Court improperly denied their Restriction Motion as "frivolous," despite being filed in "good faith." (Recusal Motion ¶¶ 18-26).

In their Restriction Motion, the movants (*i.e.*, the Advisors and certain investment funds managed by the Advisors (the "Retail Funds," and with the Advisors, the "Movants")) asked the Bankruptcy Court to "impose a temporary restriction on the Debtor's ability, as portfolio manager, to cause CLOs to sell assets." (Restriction Motion ¶ 17).   The Movants called as their only witness Dustin Norris, the Executive Vice President of each of the Movants ("Mr. Norris").   During the December Hearing, Mr. Norris made the following admissions:

---

[14] The December Hearing was held in connection with that certain *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles*, (R. 2798), brought by the Advisors and the Retail Funds (the "Restriction Motion").

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 846 of 1017 PageID 7559
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 23 of 60 PageID 10709

## The Debtor Had the Exclusive Contractual Right to Buy and Sell CLO Assets

- The Debtor is the portfolio manager for each of the CLOs in which the Advisors caused the Retail Funds to invest (December 2020 Transcript at 41:18-24) (R. 6265);
- The Debtor's management of the CLOs is governed by written agreements (*id.* at 41:25-42:3) (R. 6265-6266);
- None of the Movants are parties to the Debtor's CLO management agreements (*id.* at 42:4-11) (R. 6266);
- The Debtor, as the CLO Portfolio Manager, has the responsibility to buy and sell assets on behalf of the CLOs (*id.* at 42:12-24) (R. 6266);
- Nobody other than the Debtor has any right or authority to buy and sell assets in the CLOs in which the Retails Funds invested (*id.* at 42:25-43:3) (R. 6266-6267); and
- Holders of preferred CLO shares, such as the Retail Funds, "do not make investment decisions on behalf of the CLOs" and the Advisors knew that when they caused the Retail Funds to make their investments (*id.* at 43:4-17) (R. 6267).

## The Movants Did Not Accuse the Debtor of Any Wrongdoing

- The Movants did not allege or contend that the Debtor (a) engaged in fraudulent conduct; (b) breached any agreement by effectuating any transactions; or (c) violated any CLO management agreement (*id.* at 49:5-50:10) (R. 6273-6274); and
- The Movants did not question the Debtor's business judgment nor could they since they did not know why the Debtor executed the transactions and never even asked (*id.* at 50:11-51:15) (R. 6274-6275).

## Mr. Dondero Controls the Movants and Caused the Restriction Motion to Be Filed

- Mr. Dondero owns and controls the Advisors (*id.* at 28:20-22) (R. 6252); (35:14-36:15) (R. 6259-6260);
- The Advisors manage the Retail Funds; Mr. Dondero serves as the Portfolio Manager of each of the Retail Funds and caused the Retail Funds to invest in the CLOs managed by the Debtor (*id.* at 28:23-29:4) (R. 6252-6253), 36:16-22 (R. 6260);

17

Appx. 02821
006764

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 847 of 1017 PageID 7560
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 24 of 60 PageID 10710

- The "whole idea" for the Restriction Motion initiated with Mr. Dondero (*id.* at 29:19-22 (R. 6253), 41:6-10 (R. 6265)); and
- The Retail Funds' Boards did not authorize the filing of the Restriction Motion (*id.* at 37:23-38:6 (R. 6261-6262).

## Mr. Norris Was Not a Competent Witness and Had No Credibility

- Mr. Norris admitted that he does not make investment decisions, is not an investment manager, and has never worked for a CLO (*id.* at 39:7-16) (R. 6263);
- Mr. Norris (a) did not write his Declaration filed in support of the Restriction Motion, (b) did not provide any substantive comments to his Declaration, and (c) relied on the Advisors' "management" (including Mr. Dondero) for all "key information" in his Declaration (*id.* at 40:11-24) (R. 6264); and
- Mr. Norris did not bother to review the very CLO management agreements the Movants were seeking to interfere with (*id.* at 42:12-16) (R. 6266).

## The Movants Did Not Notify Any Other CLO Investors of the Restriction Motion

- The Movants hold (a) less than 50% of the preferred interests in 12 of the 15 CLOs at issue, and (b) less than 70% of the preferred interests in the other three CLOs at issue (*id.* at 44:22-45:7) (R. 6268-6269);
- Yet, the Restriction Motion was pursued solely on behalf of the Movants (*id.* at 46:22-25) (R. 6270);
- The Movants did not notify any other holder of CLO interests of the Restriction Motion and made no attempt to do so (*id.* at 47:1-12) (R. 6271);
- The Movants made no attempt to obtain the consent of all of the holders of the preferred shares to seek the relief sought in the Restriction Motion (*id.* at 47:13-16 (R. 6271));
- Mr. Norris did not know whether any other holder of CLO preferred shares wanted the relief sought in the Restriction Motion (*id.* at 47:17-21) (R. 6271);
- Mr. Norris did not know whether the Debtor's counterparties in the CLO management agreements (*i.e.*, the CLOs) wanted the relief sought in the Restriction Motion (*id.* at 47:22-48:1) (R. 6271-6272); and

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 848 of 1017 PageID 7561
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 25 of 60 PageID 10711

- Mr. Norris had no personal knowledge of the two transactions described in his Declaration; he testified that he was "very remote" and he didn't have "much knowledge." (*id.* at 53:22-55:13) (R. 6277-6279).

Based, in large part, on Mr. Norris's testimony, the Bankruptcy Court (a) found that there was no factual or legal basis for the Restriction Motion, and (b) declared the Restriction Motion "frivolous," and (c) granted the Debtor's motion for a directed verdict. (December Hearing Transcript at 64:1-7) (R. 6287). While Appellants contend that the "Bankruptcy Court inscrutably blamed Mr. Dondero" for the Restriction Motion, (App. Brief ¶ 11), Mr. Norris provided all the evidence the Court needed to reach its conclusion:

> Q: The whole idea for this motion initiated with Mr. Dondero; isn't that right?
>
> A: The concern, yes, the concern originated, and his concern was voiced to our legal and compliance team.

(*Id.* at 41:6-9) (R. 6265).[15]

The Restriction Motion was a misguided effort by Mr. Dondero and his associates to exert control over the Debtor. The Motion was frivolous.

---

[15] *See also id.* at 29:21-22 ("the initial cause for concern was raised by Mr. Dondero himself") (R. 6253); 28:20-22 (Mr. Dondero has a control relationship with the Advisors) (R. 6252); 26:11-17 (responsibility for the Retail Funds' portfolio management and investment decisions are delegated to the Advisors) (R. 6250); 35:14-36:15 (Mr. Dondero owns and controls the Advisors); (R. 6259-6260); 37:23-38:6 (the Retail Funds' Boards did not authorize the filing of the Restriction Motion) (R. 6261-6262).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 849 of 1017 PageID 7562
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 26 of 60 PageID 10712

### 5. The January 2021 Hearing on the Debtor's Motion for Injunctive Relief

Unchastened by the debacle of the December Hearing, Mr. Dondero caused the Advisors and Retails Funds to continue to interfere with and unjustifiably threaten the Debtor. Consequently, on January 6, 2021, the Debtor filed its *Verified Original Complaint for Declaratory and Injunctive Relief* against the Advisors and Retail Funds (R. 1962) seeking injunctive relief after they interfered with the Debtor's trading activities and sent the Debtor a flurry of written correspondence (the "K&L Gates Letters") (R. 4158-4160, 4161-4163) threatening to terminate the Debtor's CLO management agreements and asserting specious claims. (R. 8069). The Bankruptcy Court held an exhaustive evidentiary hearing on the TRO Motion on January 26, 2021 (the "TRO Hearing"), during which it admitted voluminous documentary evidence and assessed the credibility of multiple witnesses, including that of Mr. Dondero. (*See* TRO Hearing Transcript) (R. 6291). At the conclusion of the TRO Hearing, the Bankruptcy Court determined that the TRO was necessary to protect the Debtor's interests pending a hearing on the preliminary injunction. (*See id.)*

Appellants cite to certain aspects of the TRO Hearing as evidence of the Bankruptcy Court's bias against Mr. Dondero while minimizing their conduct and

DOCS_NY:43746.7 36027/002

006767

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 850 of 1017 PageID 7563
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 27 of 60 PageID 10713

noting that the Debtor did not prove specific damages. (App. Brief ¶¶ 12-17.)[16] But, consistent with the balance of the Recusal Motion, Appellants fail to disclose keys facts that caused the Bankruptcy Court to focus on Mr. Dondero: (a) the evidence established that he controlled the Advisors and Retails Funds and was involved in all of the acts complained of, and (b) their conduct implicated two court orders.

**First**, the Settlement Order expressly prohibited Mr. Dondero from "caus[ing] any Related Entity to terminate any agreements with the Debtor." (Settlement Order ¶ 9). The evidence established that the Advisors were "Related Entities" for purposes of the Settlement Order,[17] yet the K&L Gates Letters expressly and improperly threatened to seek to terminate the Debtor's CLO management agreements.

**Second**, Mr. Dondero's TRO enjoined him from, among other things, "causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly"

---

[16] Notably, the Debtor never attempted to prove damages during the TRO Hearing as it would have undermined its claim for equitable relief.

[17] This fact was (a) first established during the December Hearing (*see supra* at 12), (b) was confirmed at the TRO Hearing, and (c) was subsequently admitted to by the Advisors as part of the resolution of the adversary proceeding. *See Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11, Docket No. 2590 (Bankr. N.D. Tex. July 20, 2021) Ex. A ¶ 2(c) (*see* Appx. 17:1408) (settlement agreement in which each of the Advisors represents and warrants that it (i) is controlled by Mr. Dondero and (ii) is a "Related Party" for purposes of paragraph 9 of the Settlement Order).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 851 of 1017 PageID 7564
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 28 of 60 PageID 10714

making express or implied threats against the Debtor or interfering with the Debtor's business. (*See* R. 7235). Yet, that is precisely what the evidence showed Mr. Dondero did. (*TRO Hearing Transcript* at 42:9-107:10) (R. 6332-6397).

Given the evidence and the clear and unambiguous orders in effect, it would have been shocking if the Bankruptcy Court ignored Mr. Dondero and instead treated the Advisors and Retail Funds as if they were independent third-party actors. Mr. Dondero controlled the Advisors and the Retail Funds. He clearly "caused" or "encouraged" or "conspired" with them to engage in wrongful conduct. The Court's focus on Mr. Dondero was entirely justified—particularly when seen in the context of the applicable Bankruptcy Court orders that the Appellants pretend did not exist.

### 6. <u>The February 2021 Confirmation Hearing</u>

Appellants cite to the February 2021 confirmation hearing on the Debtor's Plan[18] (the "<u>February 2021 Confirmation Hearing</u>") in support of their argument that the Bankruptcy Court was biased against Appellants. *See* Recusal Motion ¶¶ 38-50. Appellants principally contend that during the February 2021 Confirmation Hearing, the Bankruptcy Court: (i) "summarily rejected ***all*** of the objections" to the Plan when such objections were no different than those raised by the U.S. Trustee whose good faith was "not questioned;" (ii) found the objections were not asserted in good faith,

---

[18] Refers to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* (as amended, the "<u>Plan</u>").

Appx. 02826
006769

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 852 of 1017 PageID 7565
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 29 of 60 PageID 10715

(iii) concluded, "without basis," that the entity Appellants were "controlled by Mr. Dondero"; (iv) disregarded witness testimony of Mr. Jason Post on the ground that the witness had left the Debtor's employ to work for one of the Advisors; and (v) wrongfully accused of Appellants of being "vexatious litigants." *See id.*

First, Appellants' confirmation objections were far more extensive than those filed by the U.S. Trustee, and included objections to (i) plan provisions that had no impact on them as they held no claims in the subject classes (the absolute priority rule), (ii) the assumption of certain executory contracts to which they were not party (the actual contract counterparties had consented to assumption of the contracts by the Debtor), and (iii) common plan provisions like debtor releases, plan supplements and a plan injunction.[19]

Moreover, the Bankruptcy Court included Appellants in the process by considering their objections. (R. 2085 ¶¶ 18-19); (R. 2102-2104). Appellants'

---

[19] Appellants did not include their objections to confirmation in the record on appeal. They can be found at Bankruptcy Docket Nos. 1661 (Dondero) (Appx. 18:1423-1430), 1667 (Trusts) (Appx. 19:1432-1465), 1670 (Funds and Advisors) (Appx. 20:1467-1516), and 1673 (NexPoint Real Estate Partners) (Appx. 21:1518-1524). The *Limited Objection of the U.S. Trustee* is at Docket No. 1671(Appx. 22:1526-1531). All Appellants' objections to confirmation were addressed at length in the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (Appx. 23:1533-1600) and *Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management* [Docket No. 1807] (Appx. 24:1602-1726) and by the Bankruptcy Court in its February 8, 2021 oral ruling on confirmation (R. 3371) and in the Confirmation Order (R. 2085).

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 853 of 1017 PageID 7566
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 30 of 60 PageID 10716

objections were not overruled "summarily." Rather, the Bankruptcy Court conducted a two-day evidentiary hearing, at the conclusion of which it made detailed findings of fact and conclusions of law supporting the overruling of all the objections, including those of Appellants. Appellants were not treated any differently than any other objector at the February 2021 Confirmation Hearing.

The Bankruptcy Court also did not "disregard" the testimony of Mr. Post "solely" because Mr. Post had left the employ of the Debtor to work for the Advisors. This only was one of many factors the Bankruptcy Court considered in determining that Mr. Post's testimony was not credible. For instance:

    1.    Mr. Post testified at the confirmation hearing on behalf of both the Advisors and the Funds. (February 2021 Confirmation Hearing Transcript at 51:12 (R. 4872)). For twelve years, Mr. Post served as the Assistant Chief Compliance Officer ("CCO") for the Debtor, the Advisors and the Retail Funds, but left to become the CCO for the Advisors and the Retail Funds contemporaneously with Mr. Dondero leaving the Debtor. (*Id.* at 56:14-57:1). Mr. Post had no knowledge about the relationship between the board members for each of the Retail Funds and either the Debtor (during the years it was controlled by Mr. Dondero) or Mr. Dondero, and no board member (who presumably had knowledge and who Appellants contend are independent

actors) ever testified at any hearing or proceeding. (*Id.* at 57-61) (R. 4878-4882).

2.      Mr. Post testified that the Advisors manage and provide investment advice to the Retail Funds, and that the Advisors have been owned and controlled by Mr. Dondero for the entire period of time he served in the capacity of assistant CCO for the various entities. (*Id.* at 61:12-62:6) (R. 4882-4883).

3.      Mr. Post testified that he left the Debtor because of "conflicts that were created by being an employee of the Debtor and by also serving as the assistant CCO to the named Funds and the Advisors, and it coincided with Jim [Dondero] toggling over from HCMLP [the Debtor] to NexPoint [one of the Advisors]. It just made sense more functionally and from a silo perspective for me to be the named CCO for that entity since he [Mr. Dondero] was no longer an employee of HCMLP [the Debtor]." (*Id.* at 62:16-63:8) (R. 4883-4884). On cross-examination, Mr. Post acknowledged that the conflicts he mentioned had existed as of the Petition Date but claimed they had become "more evident as time progressed." (*Id.* at 63:15-23) (R. 4884).

Based on this testimony, the Bankruptcy Court concluded that Mr. Post had left the employ of the Debtor to follow Mr. Dondero, that the alleged conflicts only became an issue when Mr. Dondero started his feud with the Debtor, and that his

Appx. 02829

006772

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 855 of 1017 PageID 7568
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 32 of 60 PageID 10718

testimony about the alleged independence of the Retail Funds' boards was not within the scope of his knowledge and was contradicted by the prior testimony of Mr. Norris, as discussed below.

In finding Mr. Post's testimony not to be credible, the Bankruptcy Court also considered the testimony of Mr. Dustin Norris.[20] Mr. Post acknowledged that he had never reviewed Mr. Norris's testimony and was unaware of the nature or extent of his testimony. (February 3, 2021 Confirmation Hearing Transcript at 59:12-19) (R. 4880). Mr. Norris testified that Mr. Dondero had a control relationship with the Advisors, and that he is a portfolio manager for each of the Retail Funds, but that relationship is subject to the annual review by the Funds' boards. (*Id*. at 28:20-29:4) (R. 6252-6253).

Mr. Norris acknowledged that the Advisors were owned and controlled by Mr. Dondero. (February 3, 2021 Confirmation Hearing Transcript at 35:14-36:15) (R. 6259-6260). Mr. Norris further acknowledged that the Retail Funds are managed by the Advisors, the Advisors control the Retail Funds' investment decisions, and Mr. Dondero is either the (or one of the) portfolio managers of each of the Retail Funds. (*Id*. at 36:19-37:13) (R. 6260-6261). Mr. Norris further testified that the Funds' boards make no investment decisions, (*id*. at 37:14-22) (R. 6261), and did not participate in or approve the filing of the motion then at issue because it wasn't part

---

[20] (*See id.* at 63) (R. 6287).

Appx. 02839
006773

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 856 of 1017 PageID 7569
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 33 of 60 PageID 10719

of their duties. (*Id.* at 37:23-38:6) (R. 6261-6262). Mr. Norris testified that the directors were nearly identical for the dozen or so funds managed by the Advisors (who were controlled by Mr. Dondero), including the Retail Funds, and that many of the board members had, at various times, worked for Mr. Dondero at the Debtor or otherwise had long-standing relationships with him. (*Id.* at 55:19-58:6) (R. 6279-6282). Based on this evidence, the Bankruptcy Court determined that the Advisors and the Retail Funds were controlled by Mr. Dondero. The Bankruptcy Court's conclusion in this regard was thus not based, as Appellants represent, on the Bankruptcy Court's "disregard" of Mr. Post's testimony, but rather the entirety of the evidence presented and credibility of all witnesses.

Appellants' allegation that the Bankruptcy Court unfairly determined them to be "vexatious litigants" is equally unfounded. The Bankruptcy Court did not actually find Appellants to be "vexatious litigants." Rather, as part of the Court's analysis of the legal basis for approving the Plan's Gatekeeper Provision, the Bankruptcy Court determined that a court may approve a gatekeeper provision when the evidence shows a party may be subject to extensive and frivolous litigation. (Confirmation Order ¶¶ 80-81) (R. 2142-2143); (R. 6548 at 45:12-47:17 R. 6592-6594). The Debtor presented such evidence, and, accordingly, the Bankruptcy Court took judicial notice of all the actions that had been filed by Appellants through objections, appeals or adversary proceedings, as well as all the litigation the Debtor

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 857 of 1017 PageID 7570
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 34 of 60 PageID 10720

was forced to participate in due to the actions of Mr. Dondero and his related entities.[21] For the convenience of the Court, the Debtor has summarized all this litigation in a chart that was filed as an exhibit to *Debtor's Reply in Support of the Debtor's Motion to Enforce the Order of Reference*, Case No. 21-842 [Docket No. 43] and is included herein. (*See* Appx. 29:1786-1797).[22] The chart was created from the public record in this Bankruptcy Case which is part of the confirmation record. Based on this evidence, the Bankruptcy Court determined that the Gatekeeper Provision was necessary and appropriate to protect the Debtor from litigation of the type and magnitude that had been filed during the case. The vexatious litigant analogy was only one part of the legal basis for the Bankruptcy Court's approval of the Plan Gatekeeper Provision. (R. 6548 at 45:12-47:17 R. 6592-6594).

### 7.    Article Referencing PPP Loans

Appellants contend that the Bankruptcy Court's inquiries into COVID-related "PPP loans" was evidence of bias against Mr. Dondero. Recusal Motion ¶ 52. As fully disclosed by the Bankruptcy Court, the inquiries were prompted by an extrajudicial source (a newspaper article) that purportedly noted that "Mr. Dondero

---

[21] The exhibits entered into the record at the confirmation hearing included the dockets from certain specified litigation as well as all documents and exhibits on the docket of the bankruptcy case and all exhibits necessary for impeachment. *See Debtor's Witness and Exhibit Lists for Confirmation Hearing* (as amended) (Docket Nos. 1822, 1866, 1877 and 1895) (Appx. 25:1728-1740; Appx. 26:1742-1754; Appx. 27:1756-1769; and Appx. 28:1771-1784).

[22] This chart reflects the status of Dondero-related litigation as of July 13, 2021.

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 858 of 1017 PageID 7571
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 35 of 60 PageID 10721

or affiliates" received PPP loans. Because of the vagueness of the article, the Bankruptcy Court sought information about the Debtor and ordered it to disclose any PPP loans it had received. The Debtor responded to the court at a subsequent hearing that the Debtor had not obtained any PPP loans. Neither Mr. Dondero nor any of his affiliated entities were asked to provide any information, no action was taken against them and the issue was never raised in court again. Appellants' reliance on this event is emblematic of the lack of merit – and candor -- in the Recusal Motion and this appeal.

### 8. <u>Mandatory Injunction</u>

Appellants cite to the February 23, 2021 hearing on the Debtor's motion for a mandatory injunction (the "<u>Mandatory Injunction</u>"). (Recusal Motion ¶ 27). The Mandatory Injunction related to Appellants' failure to provide for a transition of the services previously provided by the Debtor under certain shared service agreements (the "<u>SSAs</u>"). Historically, the Debtor had provided back and middle office support to certain of the Appellants under the SSAs, including the Advisors. The Debtor publicly disclosed that it would be materially reducing its work force and would no longer provide services under the SSAs. Consistent therewith, the Debtor exercised its contractual rights to terminate the SSAs in November 2020 with the termination of the Advisors' SSAs becoming effective January 31, 2021. (R. 4178). The Advisors, which manage a series of retail funds, failed to adopt or implement a

Appx. 02923

006776

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 859 of 1017 PageID 7572
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 36 of 60 PageID 10722

transition plan that would replace the services provided under the SSAs and allow them to manage their funds without risk of default following termination of the SSAs. (*See id.*)  Because the Advisors manage retail, (*i.e.*, "mom and pop,") money, the Debtor was rightfully concerned that there would be significant legal and regulatory exposure both to the Advisors and the Debtor if the Advisors' funds could not operate and, to prevent a catastrophic result, the Debtor agreed to a series of extensions of the SSAs.  This position was untenable.  To avert the potential liability and to extricate itself from its unwanted contractual relationship with the Advisors, the Debtor sought, on an emergency basis, an order requiring the Advisors to implement a transition plan by the end of February before the Debtor would be forced to reduce its workforce and be unable to provide services under the SSAs. (*Id.*)  Thus, this Mandatory Injunction was not "frivolous," as Appellants imply, (*see* Recusal Motion ¶ 50), but wholly necessary to protect the Debtor's estate from significant loss or risk of litigation.  During the hearing, the Advisors (for the first time) stated unequivocally that they had adopted an operating plan to obtain or provide all services previously provided by the Debtor under the SSAs and could manage their funds without the Debtor's assistance. (*See* R. 4199-4437).  Having credited the Advisors' testimony, the Bankruptcy Court issued its order finding the Debtor's motion for a Mandatory Injunction "moot." (R. 4194-98).

DOCS_NY:43746.7 36027/002

Appx. 02334
006777

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 860 of 1017 PageID 7573
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 37 of 60 PageID 10723

**C.** **The Bankruptcy Court Denies the Recusal Motion**

On March 23, 2021, the Bankruptcy Court issued its Recusal Order denying the Recusal Motion on the grounds that it was (i) not "timely," and (ii) without merit. Regarding timeliness, the Bankruptcy Court found that "the timing does not seem to pass muster," reasoning that the Recusal Motion (i) "was filed more than 15 months after" the Case was transferred to the Bankruptcy Court; (ii) "comes after many dozens of orders have been issued by the [Bankruptcy] Court," and (iii) "comes on the eve of a contempt hearing." (Recusal Order at 7). The Bankruptcy Court further found that, even if the Recusal Motion had been timely, recusal was not warranted on the merits.

The Bankruptcy Court noted that Appellants' allegations of "extrajudicial" bias resulting from the Acis Bankruptcy were "at the heart of the" Recusal Motion. (Recusal Order at 7). The Bankruptcy Court explained that it did not form any animus or bias toward Appellants during the Acis Bankruptcy and concluded that any knowledge learned from the Acis Bankruptcy did not constitute "extrajudicial" knowledge warranting recusal. (*Id.*)

The Bankruptcy Court also found that "more generally," it does not harbor, and has not shown, any "personal bias or prejudice" against Appellants. (Recusal Order at 10). The Bankruptcy Court explained that it "has merely addressed motions, objections and other pleadings as they have been presented," and "has

31

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 39 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 861 of 1017   PageID 7574
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 38 of 60   PageID 10724

issued and enforced orders where requested and warranted." *Id.*  The Bankruptcy

Court noted that: "This court and all courts sometimes use strong words as part of

managing a complex and contentious case. None of this should be interpreted as

'bias' or 'prejudice." *Id.*  The Bankruptcy Court reasoned that "clashes between a

court and counsel for a party [are] an insufficient basis for disqualification under

Section 455. (Citing *Lieb v. Tillman (In re Lieb)*, 112 B.R. 830, 835-36 (Bankr. W.D.

Tex 1990) (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th

Cir. 1975) (holding that disqualification should be determined "on the basis of

conduct which shows a bias or prejudice or lack of impartiality by focusing on a

party rather than counsel."))  To that end, the Bankruptcy Court explained, it has

"the utmost respect for [Appellants]" and it has "no disrespect for Mr. Dondero on

a personal level or any of the [Appellants]." (*Id.*)

Accordingly, the Bankruptcy Court determined, in an exercise of its

discretion, that Appellants' assertions did not "rise to the threshold standard of

raising a doubt in the mind of a reasonable observer as to" the Bankruptcy Court's

impartiality.  (Recusal Order at 10).

## D.   **Appellants Appeal the Bankruptcy Court's Recusal Order**

On April 1, 2021, Appellants appealed the Bankruptcy Court's Recusal Order

on the grounds that (i) the Recusal Motion was "timely" and (ii) the Bankruptcy

Court "erred in denying the Recusal Motion on the merits." (App. Brief at 19-20).

DOCS_NY:43746.7 36027/002

006779

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 862 of 1017 PageID 7575
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 39 of 60 PageID 10725

In support of their appeal, Appellants argue that the Bankruptcy Court abused its discretion in finding that the Recusal Motion was untimely because, in pertinent part: (i) "timeliness is not an express condition of a recusal motion under § 455," and (ii) the Bankruptcy Court's bias "did not manifest itself until late 2020 and early 2021." (*Id.* at 19). Appellants further argue that: (i) the Bankruptcy Court exhibits "deep-seated antagonism toward" Appellants "that went well beyond 'normal' admonishment," (*id.* at 20), and (ii) even if there is a "lack of extrajudicial knowledge, it is not fatal" to the Recusal Motion because "Appellants are entitled a full and fair opportunity to make their case in an impartial forum." (*Id.* at 19-20). For the reasons that follow, the Bankruptcy Court properly exercised its discretion in denying the Recusal Motion.

## IV.    <u>SUMMARY OF THE ARGUMENT</u>

The Bankruptcy Court properly exercised its discretion in denying the Recusal Motion pursuant to 28 U.S.C. § 455 ("<u>Section 455</u>") on the grounds that it was (i) untimely and, independently, (ii) without merit. First, the Bankruptcy Court properly applied the "timeliness" requirement to Section 455, as mandated by the statute and applicable case law. In order to be timely, a party must move for recusal at the "earliest moment" after learning the facts forming the basis for recusal. The Bankruptcy Court properly determined that the Recusal Motion was untimely because Appellants waited 15 months to bring the Recusal Motion, after dozens of

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 863 of 1017 PageID 7576
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 40 of 60 PageID 10726

orders had been issued by the Bankruptcy Court, and on the eve of a hearing on a pending contempt motion against Mr. Dondero.

The Bankruptcy Court also properly exercised its discretion in finding that, had the Recusal Motion been timely, it was without merit on the grounds that: (i) there was no "extrajudicial" bias present, and (ii) the facts of this case do not rise to the extreme circumstance of showing a "deep seated antagonism" toward Appellants warranting recusal. The law is clear that recusal is not warranted where comments or opinions formed by the court result from events that transpire during current or prior proceedings, *i.e.*, intrajudicial bias, unless the movant can demonstrate such comments rise to the rare level of a "deep-seated antagonism" or "favoritism." Here, there was no "extrajudicial" source forming the Bankruptcy Court's alleged "bias." Rather, all events cited by Appellants relate to either judicial rulings or judicial comments, or "intrajudicial" sources. These types of events are nearly exempt from recusal. There is also no evidence of the Bankruptcy Court's "deep seated antagonism" toward Appellants such that a reasonable person would question its impartiality in this Case. Based on the entirety of the proceedings, the exceptional and rare remedy of recusal is not warranted.

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 864 of 1017 PageID 7577
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 41 of 60 PageID 10727

# V.    <u>ARGUMENT</u>

## A.   <u>The Bankruptcy Court Properly Exercised Its Discretion in Finding the Recusal Motion Was Untimely</u>

The Bankruptcy Court properly exercised its discretion in denying the Motion to Recuse on the basis that it was untimely. Appellants argue that the Bankruptcy Court abused its discretion in finding that the Recusal Motion was untimely principally on the grounds that: (i) "timeliness is not an express condition of a recusal motion under § 455," (ii) the Bankruptcy Court's bias "did not manifest itself until late 2020 and early 2021," and (iii) that the Debtor's motion for contempt against Mr. Dondero was "pending" when Appellants filed the Recusal Motion is "irrelevant." (*See* App. Brief. ¶¶ 36-44). Appellants' arguments are without merit.

As the Bankruptcy Court correctly stated, recusal motions brought under Section 455(a) must be "timely." *Hill*, 495 Fed. App'x at 483; *see also Grambling Univ. Nat'l Alumni Ass'n v. Board of Supervisors for La. System*, 286 Fed. App'x 864, 867 (5th Cir. 2008) (noting that while "[s]ection 455 does not contain an explicit timeliness requirement … this Court has consistently inferred such a requirement") (citing *U.S. v. Sanford*, 157 F.3d 987, 988 (5th Cir. 1998)). "The timeliness rule requires that 'one seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification.'" *Sanford*, 157 F.3d at 988–89 (quoting *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994)).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 865 of 1017 PageID 7578
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 42 of 60 PageID 10728

"The most egregious delay—the closest thing to *per se* untimeliness—occurs when a party already knows the facts purportedly showing an appearance of impropriety but waits until after an adverse decision has been made by the judge before raising the issue of recusal." *Sanford*, 157 F.3d at 988–89. Courts have "rejected recusal challenges on appeal when the challenger waited to see if he liked an outcome before springing the recusal issue," and "rejected other challenges on appeal as simply too late under the facts to be timely." *Id.* at 989; *see also Delesdernier v. Porterie*, 666 F.2d 116, 122 (5th Cir. 1982) ("Congress did not enact § 455(a) to allow counsel to make a game of the federal judiciary's ethical obligations; we should seek to preserve the integrity of the statute by discouraging bad faith manipulation of its rules for litigious advantage.") The Bankruptcy Court, therefore, correctly applied the "timeliness" requirement in analyzing the Recusal Motion.

The Bankruptcy Court also properly exercised its discretion in determining that the Motion to Recuse was "untimely" because it was filed: (i) "more than 15 months after the case was transferred to the Bankruptcy Court," (b) "after many dozens of orders" were issued by the Bankruptcy Court, and (iii) "on the eve of a contempt hearing." (Recusal Order at 7).

As the Bankruptcy Court found, Appellants learned about the facts purportedly showing an "appearance of impropriety" fifteen (15) months before

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 866 of 1017 PageID 7579
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 43 of 60 PageID 10729

filing their Motion to Recuse. *See, e.g.*, Recusal Motion ¶ 1 (discussing Appellants' awareness of Bankruptcy Court's alleged "pre-existing, negative views of" Mr. Dondero during December 2, 2019 Motion to Transfer hearing); *id.* at 3 (alleging that the "prejudice to Mr. Dondero has been apparent since the inception of this Case").[23]  Appellants learned about the Bankruptcy Court's purported "bias" in open court around this same time. *See id.* ¶ 3 (citing Bankruptcy Court's language from January 9, 2020 hearing as evidence of bias).  Appellants cite to adverse decisions rendered by the Bankruptcy Court from as early as February 2020, which they contend show its "predisposition against Mr. Dondero." *See id.* ¶¶ 5-6.

Despite learning the requisite facts giving rise to their Recusal Motion as early as December 2019, and throughout the following 15 months, Appellants did not move to recuse until March 2021.  During these 15 months, the Bankruptcy Court expended significant judicial resources overseeing the Bankruptcy Case and Appellants' litigation.  Appellants fail to offer any credible explanation for their delay in bringing the Recusal Motion at any point after the first moments of learning of the Bankruptcy Court's purported "bias" over one year ago.  This, alone, constitutes "*per se* untimeless." *See Hill v. Breazeale*, 197 Fed. App'x 331, 335 (5th Cir. 2006) (holding district court did not abuse its discretion in denying motion to recuse as untimely where party "waited, for no given reason, to raise the issue until

---

[23] *See also supra* at 5-7.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 867 of 1017 PageID 7580
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 44 of 60 PageID 10730

after the district court ruled against him"); *Sanford*, 157 F.3d at 989 (affirming

district court's denial of recusal motion as untimely where party "knew of the facts

purportedly causing an appearance of impropriety," but waited until after an adverse

decision to raise the recusal issue); *Grambling*, 286 Fed. App'x at 867-88 (affirming

denial of recusal motion as "*per se*" untimely where "despite having knowledge of

the facts underlying its recusal argument," party "did not immediately move to have

this case assigned to a judge from another division or district and instead allowed

the case to linger … for nearly ten months. When the [party] finally acted, it did so

only after [the judge] had dismissed its claims"); *Hill v. Schilling*, No. 3:07–CV–

2020–L, 2014 WL 1516193, at *3 (N.D. Tex. Apr. 17, 2014) (affirming judge's

finding that motion to recuse was untimely where it was brought "some eleven

months after [plaintiff] and his counsel first became aware of the" facts giving rise

to alleged perception of bias); *Da Silva Moore v. Publicis Groupe*, 868 F. Supp. 2d

137, 155 (S.D.N.Y. 2012) ("Plaintiffs here had the requisite knowledge no later than

January 4, 2012, but the recusal request did not come until nearly three months

later," noting "I have made no efforts to hide my views, relationships or affiliations.

If plaintiffs truly believed that any of these issues, individually or collectively,

created a bias or the appearance of partiality, they should have promptly moved for

my recusal.")

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 46 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 868 of 1017    PageID 7581
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 45 of 60    PageID 10731

Based on their own pleading and allegations, Appellants' contention that the Bankruptcy Court's bias "did not manifest itself until late 2020 and early 2021" is without merit. (App. Brief ¶¶ 38-42). Such an assertion also contradicts Appellants' own argument that the Bankruptcy Court's "bias" against Mr. Dondero was "apparent" from this Case's inception. (*See* Recusal Motion ¶ 3). Even assuming it was not until "late 2020" that such a "manifestation" of bias presented itself, the Recusal Motion would still be untimely because Appellants waited several months to bring the Recusal Motion, during which time the Bankruptcy Court held evidentiary hearings for injunctive relief in *three* separate adversary proceedings as well as a two-day contested confirmation hearing—all of which involved some or all of the Appellants. As discussed *supra*, this is precisely the type of delay that courts routinely find "untimely." *See Hirczy v. Hamilton*, 190 Fed. App'x 357, 360 (5th Cir. 2006) (affirming district court's denial of motion to recuse as "untimely" where party "learned directly" from the judge in open court of potential bias, yet "he waited over two months until and after the adverse decision to file his motion to recuse" further noting that because motion was untimely, "a substantive review for abuse of discretion is unnecessary"); *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 334 (2d Cir. 1987) (motion untimely where party waited two months after events giving rise to charge of bias or prejudice before making its recusal motion);

39

Appx. 02843
006786

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 47 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 869 of 1017 PageID 7582
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 46 of 60 PageID 10732

*Da Silva*, 868 F. Supp. 2d at 155. Appellants otherwise offer no credible legal or factual basis in support of their "manifestation" argument. [24]

The Bankruptcy Court also appropriately considered the fact that the Recusal Motion came on the "eve of the contempt hearing." (Recusal Order at 7); *see Weisshaus v. Fagan,* 456 Fed. App'x 23, 34 (2d Cir. 2012) (noting that "[a]lthough there was no dispositive ruling as to [defendant] at the time [plaintiff] brought her recusal motion, the district court aptly noted that the motion came on the heels of its direction that [plaintiff] submit to a deposition, thus strongly suggesting that the motion was a mere fall-back position in response to an adverse ruling."); *Da Silva*, 868 F. Supp. 2d at 154 (denying recusal motion where "[i]t appears that plaintiffs are improperly using the recusal motion as a 'fall-back position' to an unfavorable ruling.")

Appellants' remaining contentions regarding "timeliness" are equally frivolous. Nevertheless, they warrant a response. Appellants' attempt to distinguish the Bankruptcy Court's cite to *Davies* is in vain. Appellants assert that *Davies* "does not support the Order" because there, a party moved to recuse "almost a year after an adverse ruling." (App. Brief ¶¶ 36-37 (quoting *Davies,* 68 F.3d at 1130-31)). But that is exactly what happened here. *See supra* at 27-29. As alleged by Appellants,

---

[24] The only case Appellants cite in support of this contention is *Davies*—the same case they try to distinguish from the present facts, (*see* App. Brief ¶ 37), and a case which does not even support that statement.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 870 of 1017 PageID 7583
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 47 of 60 PageID 10733

the Recusal Motion was filed more than one year after (a) an adverse ruling was granted (*i.e.*, the Transfer Motion) in December 2019 (App. Brief ¶¶1-2); (b) the Bankruptcy Court improperly relied on its opinions of Mr. Dondero to include certain provisions in the Settlement Order on January 9, 2020 (*id.* at ¶¶3-4); and (c) the Bankruptcy Court's bias allegedly caused it reached conclusions without evidence and render an adverse ruling in connection with the February 2020 hearing on the Foley Application (*id.* ¶¶ 5-6).

Finally, Appellants' cite to the Delaware Bankruptcy Court's statements regarding the "presumption" that the Bankruptcy Court would follow the "rules of evidence" early in the Case, (App. Brief. ¶ 9), is entirely irrelevant for purposes of this Appeal, and should be disregarded by the Court.[25] Indeed, Appellants' failure to appeal any of the orders complain of (other than the Confirmation Order) demonstrates that Appellants themselves generally find no fault in the actual conclusions reached and orders entered by the Bankruptcy Court.

In light of the expansive nature of this Case and the Bankruptcy Court's extensive knowledge of the proceedings that it has overseen throughout the last 21 months, interests of judicial economy also support the Bankruptcy Court's denial of the Recusal Motion. *See U.S. v. Olis*, 571 F. Supp. 2d 777 (5th Cir. 2008) (affirming

---

[25] Nothing in the Recusal Motion alleges the Bankruptcy Court has failed to follow the Federal Rules of Evidence.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 49 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 871 of 1017 PageID 7584
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 48 of 60 PageID 10734

denial of recusal motion as untimely where party was aware of facts stated in recusal motion "well before he filed" the motion, noting that party "had duty to file [ ] motion for recusal before the court's judicial resources were spent on resolution of motions" and party "neither argues nor explains why his delay" was reasonable); *Hill*, 495 Fed. App'x at 484 ("Particularly in light of the expansive nature of these proceedings, considerations of judicial economy likewise countenance our conclusion that the district court did not abuse its discretion"); *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989) ("The motivation behind a timeliness requirement [for Section 455] is [] to a large extent one of judicial economy"); *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001) ("After a massive proceeding such as this, when the court has invested substantial judicial resources and there is indisputably no evidence of prejudice, a motion for recusal of a trial judge should be supported by substantial justification, not fanciful illusion"); *Weisshaus*, 456 Fed. App'x at 34 (affirming district court's denial of recusal motion as untimely where party "waited almost nineteen months" to file the recusal motion, at which point the district court had already expended substantial judicial resources overseeing and adjudicating" the parties' claims).

Accordingly, the Bankruptcy Court was well within its discretion in finding Appellants' Recusal Motion untimely. For this reason alone, the Recusal Motion was properly denied. *See Hill*, 495 Fed. App'x at 482 (affirming denial of recusal

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 872 of 1017 PageID 7585
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 49 of 60 PageID 10735

motion solely because it was "untimely," noting "[b]ecause we affirm on the basis

of untimeliness, we do not reach the merits of the recusal issue"); *Hirczy*, 190 Fed.

App'x at 360 (noting that because recusal motion was untimely, "a substantive

review for abuse of discretion is unnecessary."); *Andrade*, 338 F.3d at 459

("[U]ntimely motions to recuse are ordinarily rejected.")

### B. The Bankruptcy Court Properly Exercised Its Discretion in Denying the Recusal Motion on the Merits

Even if the Recusal Motion had been timely, the Bankruptcy Court did not

abuse its discretion in denying Appellants' Motion to Recuse on the merits.  A

motion for recusal is committed to the sound discretion of the district court. *Hill*,

197 Fed. Appx'x at 335.  "The judge abuses [their] discretion in denying recusal

where a reasonable [person], cognizant of the relevant circumstances surrounding

[the] judge's failure to recuse, would harbor legitimate doubts about that judge's

impartiality." *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999).

Pursuant to Section 455:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned.

(b) [They] shall also disqualify [themselves] in the following circumstances:

(1) Where [they] has a personal bias or prejudice concerning a party, a personal knowledge of disputed evidentiary facts concerning the proceeding.

28 U.S.C. § 455(a) and (b)(1).

DOCS_NY:43746.7 36027/002

Appx. 02867
006790

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 873 of 1017 PageID 7586
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 50 of 60 PageID 10736

"The standard for bias is not 'subjective,' as it once was, but, rather, 'objective.'" *Andrade*, 338 F.3d at 454-55 (citing *Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*, 948 F.2d 1436, 1448 (5th Cir. 1991)). In other words, it "is with reference to the 'well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person' that the objective standard is currently established." *Id.* (quoting *United States v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995)). "Another maxim is that review should entail a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents." *Id.* at 455. Finally, the common-law doctrine called the "extrajudicial source rule" under Section 455 "divides events occurring or opinions expressed in the course of judicial proceedings from those that take place outside of the litigation context and holds that the former rarely require recusal." *Id.* Ultimately, to succeed in an appeal of a denial of a recusal motion, the appellant must: (1) demonstrate that the alleged comment, action, or circumstance was of "extrajudicial" origin, (2) place the offending event into the context of the entire trial, and (3) do so by an "objective" observer's standard. They must also demonstrate that the "district court's refusal to recuse was not merely erroneous, but, rather, an abuse of discretion." *Id.* at 456-62.

As the Bankruptcy Court properly determined, none of the circumstances requiring disqualification under Section 455 are present here.

DOCS_NY:43746.7 36027/002

Appx. 02848
006791

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 52 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 874 of 1017 PageID 7587
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 51 of 60 PageID 10737

### 1. There Is No Extrajudicial Bias Present Here

The Bankruptcy Court correctly found that any knowledge learned from the Acis Bankruptcy is insufficient to constitute "extrajudicial" knowledge warranting recusal. (*See* Recusal Order at 9). The core of Appellants' argument on appeal is that the Bankruptcy Court's "extrajudicial" bias toward Appellants stemmed from opinions formed during the Acis Bankruptcy. (*See* App. Brief. ¶¶ 3-4). Appellants' argument is frivolous.

As articulated by the most prominent Supreme Court case on recusal, "[o]pinions formed by the judge on the basis of facts of prior proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Conkling v. Turner*, 138 F.3d 577, 592 (5th Cir. 1998) ("As a general rule, for purposes of recusal, a judge's 'personal' knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification") (internal quotations omitted). Rather, opinions or beliefs formed from events on the record or from prior proceedings, or "intrajudicial" opinions, are subject to a "deferential" review, and are the "type of opinions/expressions that *Liteky* holds nearly exempt from causing recusal." *Andrade*, 338 F.3d at 460-62.

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 53 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 875 of 1017 PageID 7588
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 52 of 60 PageID 10738

Any opinion allegedly formed by the Bankruptcy Court from the Acis Bankruptcy, a prior proceeding, is thus not contemplated by the "extrajudicial" source rule and is precisely the type of opinion that is exempt from warranting recusal. *See Litkey*, 510 U.S. at 555; *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 81 (5th Cir. 2011) (affirming denial of motion for recusal where "the only facts the [judge] learned about [party's] conduct were learned from judicial proceedings in the instant case and in previous cases"); *Conkling*, 138 F.3d at 592 ("As a general rule, for purposes of recusal, a judge's 'personal' knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification") (internal quotations omitted).[26]

For these same reasons, Appellants' reliance on the Bankruptcy Court's rulings as evidence of "antagonism" is equally deficient. (*See, e.g.*, App. Brief ¶¶ 55-56). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion … and can only in the rarest circumstances evidence the degree of favoritism or antagonism required … when no extrajudicial source is involved." *Liteky*, 510 U.S. at 555. Here, Appellants rely on various rulings issued by the

---

[26] Appellants rely on only one allegedly "extrajudicial" source relating to the Bankruptcy Court's inquiries into COVID-related "PPP loans." (App. Brief. ¶ 24). However, as noted *supra*, the Bankruptcy Court took no action against Mr. Dondero or any of the Appellants and did not even ask them to respond.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 54 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 876 of 1017   PageID 7589
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 53 of 60   PageID 10739

Bankruptcy Court to demonstrate "bias." *See* App. Brief. ¶¶ 7-11 (citing to Bankruptcy Court's grant in part and denial in part on Foley Application; *id.* ¶¶ 12-17 (citing to Bankruptcy Court's denial of Appellants' Restriction Motion), *id.* ¶¶ 27-28 (citing to Bankruptcy Court's grant of Debtor's TRO Motion against Advisors and Funds); *id.* ¶ 57 (citing to Bankruptcy Court's holding that Debtor's motion for Mandatory Injunction against Advisors and Funds was "moot"); *id.* ¶ 57 (citing to Bankruptcy Court's denial of Dugaboy's motion to compel the Debtor to file "unduly burdensome" financial reports); *id.* ¶ 58 (citing June 17 Order requiring Appellants to disclose inter alia, whether they are "creditors" of the Debtor and Mr. Dondero's ownership interest in entities "with ties to Mr. Dondero").  These rulings, none of which involve an extrajudicial source, simply do not rise to the rare circumstance of evidencing the degree of antagonism warranted for recusal.  *See Liteky*, 510 U.S. at 555 ("Almost invariably, judicial rulings are proper grounds for appeal, not for recusal"); *Andrade*, 338 F.3d at 456 (denying recusal based on judicial rulings where events cited "are embodied in judicial actions that Appellants could have, but did not, appeal").  Appellants fail to even address the established law set forth under *Liteky*, which plainly forecloses their remedy of recusal, and instead merely cite to *Liteky* in a few footnotes while twisting its holdings. (*See* App. Brief ¶¶ 54-55 fn. 114, 115, 117).  Simply put, Appellants offer no credible legal or factual basis for recusal. *See Henderson v. Dep't of Pub. Safety and Corrs.*, 901 F.2d 1288,

Appx. 22651

006794

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 55 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 877 of 1017 PageID 7590
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 54 of 60 PageID 10740

1296 (5th Cir. 1990) ("[E]ven the most superficial research would have put [the party] on notice that the factual circumstances he alleged were not grounds for recusal" under *Liteky*, noting "there is absolutely no case authority cited by [party] to the contrary.")

Appellants' "due process" argument that "even a lack of extrajudicial knowledge is not fatal because Appellants are entitled to make their case in an impartial forum," App Brief. ¶¶50, 54, is frivolous and should be summarily rejected by the Court. Appellants fail to support any notion of a "due process" violation. Nor could they. The record of this Case shows the great extent to which the Bankruptcy Court has respected the due process rights of Appellants, notwithstanding their limited, if any, skin in the game. The cases cited by Appellants in support of their contention are entirely inapplicable. *Miller v. Sam Houston State Univ.,* 986 F.3d 880, 893 (5th Cir. 2021) does not address the standard for "recusal" under Section 455 or the "extrajudicial" source rule. Rather, *Miller* deals with whether a case should be reassigned to a different district court judge on remand after the original judge did not give plaintiff the opportunity for discovery and *sua sponte* dismissed a plaintiff's claim of sex discrimination and retaliation under the Fair Labor Standers Act. *Marshall v. Jerrico*, 446 U.S. 238 (1980) also does not address recusal motions, but deals with whether the "reimbursement provision of the [Fair Labor Standards] Act violate the Due Process Clause." *Id.* at 243. Appellants' remaining case cites on

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 878 of 1017 PageID 7591
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 55 of 60 PageID 10741

this point are equally irrelevant.[27]  The types of exceptional circumstances warranting recusal in those cases are not present here.  Appellants otherwise offer no legal basis in support of their argument.  Accordingly, the Bankruptcy Court properly exercised its discretion in finding that there was no "extrajudicial" source warranting recusal.

**2.** **The Bankruptcy Court Does Not Harbor Deep-Seated Antagonism Toward Appellants**

The Bankruptcy Court also properly exercised its discretion in finding that it did not harbor any "deep-seated antagonism" toward Appellants such that it would raise "doubt in the mind of a reasonable observer" as to the Bankruptcy Court's impartiality. (Recusal Order at 10).  Appellants contend that the Bankruptcy Court's "repeated negative statements about Mr. Dondero" and "reference to proceedings in the Acis Bankruptcy to justify findings made in the Highland" case justify recusal. (App. Brief ¶¶ 51-58).  Appellants' arguments are without merit.

---

[27] For example, the Court in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), reversed a denial of a recusal motion as a "matter of due process" where, following entry of a $50 million judgment against a corporation in favor of the CEO, that CEO contributed $3 million to help elect the same judge who the CEO knew would preside over corporation's appeal.  The Court in *Johnson v. Mississippi*, 403 U.S. 212 (1971), found recusal of a judge was necessary where that judge "was a defendant in one of petitioner's civil rights suits and a losing party at that."  *Id.* at 215.  The Court in *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 167 (5th Cir. 1997), denied a petition for writ of mandamus challenging denial of recusal premised on racist remarks, where, although a "reasonable person might indeed harbor doubts about the trial judge's impartiality" in a "racially-charged case such as the instant one," the judge had already presided over the case for so long such that recusal at that stage "would be unprecedented."

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 57 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 879 of 1017 PageID 7592
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 56 of 60 PageID 10742

"Judicial remarks that are critical or disapproving of, or even hostile to, counsel for the parties or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555. In support of their argument that the Bankruptcy Court harbored "bias" toward Appellants, Appellants refer to a number of the Bankruptcy Court's remarks regarding, *inter alia*: (i) the "importance" of the language in Settlement Order and Mr. Dondero abiding by its terms, (App. Brief ¶¶ 3-4), (ii) its "concern" regarding Mr. Dondero's appeal of Acis, (*id.* ¶ 6), (iii) the Restriction Motion as "frivolous," (*id.* ¶ 11); and (iv) its reminder to Mr. Dondero that the Settlement Order prohibits him from terminating the Debtor's agreements after evidence established that he was likely behind the K&L Gates Letters, (*id.* ¶ 17).

In relying on such statements, Appellants again disregard the law on recusal. *See Andrade*, 338 F.3d at 459 (affirming denial of recusal motion premised on judge's negative comments made on the record – including describing a witness as "crazy, murdering son-of-a-bitch" and referring to parties' attempt to introduce certain evidence as "bullcrap," – noting that appellants "brief omits citing the most prominent Supreme Court statement on point (citing *Liteky*, 510, U.S. at 555)). As the Bankruptcy Court properly found, Appellants' cited remarks are, at best, "clashes between a court and counsel," and such remarks are "simply insufficient" for recusal. (Recusal Order at 10). *See United States v. Landerman*, 109 F.3d 1053, 1066 (5th

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 58 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 880 of 1017 PageID 7593
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 57 of 60 PageID 10743

Cir. 1997) (affirming denial of motion to recuse where district judge allowed "the Government more leeway during its questioning and did interrupt defense counsel's questioning more often than the Government's questioning"); *Garcia v. Woman's Hosp. of Texas*, 143 F.3d 227, 230 (5th Cir. 1998) (affirming denial of motion to recuse where district judge had made unflattering comments about plaintiff's ability to prove her case).

Based on the entirety of the proceedings before the Bankruptcy Court, in which all events raised by Appellants relate to either the Bankruptcy Court's knowledge of prior proceedings or the Bankruptcy Court's remarks during these proceedings, the exceptional remedy of recusal is not warranted. *See United States v. Williams*, 127 Fed. App'x 736, 737-38 (5th Cir. 2005) ("As our review of the entire context of the judicial proceedings in which the events challenged in this case arose reveals no disqualifying judicial bias, we conclude that there was no abuse of discretion in the district court's denial of [the] recusal motion"); *Henderson*, 901 F.2d at 1296 (affirming court's denial of recusal motion, where "none of the circumstances requiring disqualification under § 455 are present here" and "the trial judge was well within his discretion in finding that the motion for recusal was not well founded, either in fact or in law.") The Bankruptcy Court, therefore, properly exercised its discretion in finding that Appellants' assertions do not "rise to the

DOCS_NY:43746.7 36027/002

threshold standard of raising doubt in the mind of a reasonable observer' as to the judge's impartiality." (Recusal Order at 10).

Accordingly, the Bankruptcy Court was well within its discretion in denying the Recusal Motion on the merits.

## **CONCLUSION**

For the foregoing reasons, the Debtor respectfully requests that this Court affirm the Recusal Order.

DOCS_NY:43746.7 36027/002

006799

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 60 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 882 of 1017 PageID 7595
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 59 of 60 PageID 10745

Dated: July 28, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
     rfeinstein@pszjlaw.com
     jmorris@pszjlaw.com
     gdemo@pszjlaw.com
     jelkin@pszjlaw.com
     hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 61 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 883 of 1017 PageID 7596
61
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 60 of 60 PageID 10746

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 8015</u>

This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B)(i) because, according to Microsoft Word, it contains 12,803 words, excluding the portions of the document exempted by Fed. R. Bankr. P. 8015(g).


By: */s/ Zachery Z. Annable*
Zachery Z. Annable

DOCS_NY:43746.7 36027/002



# EXHIBIT 8

Appx. 02859
006802

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 885 of 1017 PageID 7598
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1 of 1803 PageID 10747
Docket #0021 Date Filed: 7/28/2021

Case No. 3:21-cv-00879-K

---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

---

## JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, AND NEXPOINT REAL ESTATE PARTNERS, LLC,

### Appellants,

### v.

## HON. STACEY G. C. JERNIGAN AND HIGHLAND CAPITAL MANAGEMENT, L.P.

### Appellees.

---

### On Appeal from the United States Bankruptcy Court
### Northern District of Texas, Dallas Division
### The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court

### In re: Highland Capital Management, L.P.
### Case No. 19-34054 (Jointly Administered)

---

## APPENDIX IN SUPPORT OF ANSWERING BRIEF OF
## APPELLEE HIGHLAND CAPITAL MANAGEMENT, L.P.

---



1934054210728000000000007

Appx 02809

006803

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 886 of 1017 PageID 7599
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 2 of 1803 PageID 10748

Appellee Highland Capital Management, L.P. ("Highland" or the "Debtor"),

the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy

case (the "Bankruptcy Case"), hereby files this appendix in support of the Answering

Brief of Appellee Highland Capital Management, L.P. (the "Brief").

## TABLE OF CONTENTS

| Appx. | Description |
|---|---|
| 1. | *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1473 (Bankr. N.D. Tex. Nov. 24, 2020) |
| 2. | *Partial Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (March 6, 2019) |
| 3. | *Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (April 29, 2019) |
| 4. | *May 17, 2019 Transcript,* Daugherty v. Highland Capital Management, L.P., C.A. No. 2018-0488-MTZ (Del. Ch. May 17, 2019) |
| 5. | *Order Denying Application to Certify Interlocutory Appeal,* C.A. No. 2018-0488-MTZ (Del. Ch. July 8, 2019) |
| 6. | *Motion for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 86 (Bankr. D. Del. Nov. 11, 2019) |
| 7. | *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11, Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) |
| 8. | *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified*, Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 887 of 1017 PageID 7600
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 3 of 1803 PageID 10749

| 9. | *Opinion* affirming Confirmation Order, Case No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18, 2019) |
|---|---|
| 10. | *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17, 2021) |
| 11. | *Objection of the Debtor to Motion of Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 118 (Bankr. D. Del. Nov. 12, 2019) |
| 12. | *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, Case No. 19-34054-sgj11, Docket No. 281 (Bankr. N.D. Tex. Dec. 27, 2019) |
| 13. | *Debtor's Omnibus Reply in Support of (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 159 (Bankr. D. Del. Nov. 21, 2019) |
| 14. | *Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 70 (Bankr. D. Del. Oct. 29, 2019) |
| 15. | *Limited Objection to the Debtor's: (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 116 (Bankr. D. Del. Nov. 12, 2019) |
| 16. | *Limited Objection of the Official Committee of Unsecured Creditors to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP and Lynn Piker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 120 (Bankr. D. Del. Nov. 12, 2019) |

DOCS_NY:43760.2 36027/002

Appx. 02882
006805

| 17. | *Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11, Docket No. 2590 (Bankr. N.D. Tex. July 20, 2021) |
|---|---|
| 18. | *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1661 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 19. | *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* filed by Get Good Trust, The Dugaboy Investment Trust, Case No. 19-34054-sgj11, Docket No. 1667 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 20. | *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund, Case No. 19-34054-sgj11, Docket No. 1670 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 21. | *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)*, Case No. 19-34054-sgj11, Docket No. 1673 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 22. | *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization*, Case No. 19-34054-sgj11, Docket No. 1671 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 23. | *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1814 (Bankr. N.D. Tex. Jan. 22, 2021) |
| 24. | *Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management,* |

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 889 of 1017 PageID 7602
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 5 of 1803 PageID 10751

|     |                                                                                                                                                                                                 |
| --- | ----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|     | Case No. 19-34054-sgj11, Docket No. 1807 (Bankr. N.D. Tex. Jan. 22, 2021)                                                                                                                        |
| 25. | *Debtor's Witness and Exhibit List with Respect to Confirmation Hearing to be Held on January 26, 2021*, Case No. 19-34054-sgj11, Docket No. 1822 (Bankr. N.D. Tex. Jan. 22, 2021)               |
| 26. | *Debtor's Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 2, 2021*, Case No. 19-34054-sgj11, Docket No. 1866 (Bankr. N.D. Tex. Jan. 29, 2021)       |
| 27. | *Debtor's Second Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 2, 2021*, Case No. 19-34054-sgj11, Docket No. 1877 (Bankr. N.D. Tex. Feb. 1, 2021) |
| 28. | *Debtor's Third Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 3, 2021*, Case No. 19-34054-sgj11, Docket No. 1895 (Bankr. N.D. Tex. Feb. 4, 2021)  |
| 29. | *Summary of Dondero Entity Litigation*, Case No. 3:19-cv-00842-B, Docket No. 43 at 546-557 (N.D. Tex. July 13, 2021)                                                                             |

4

Appx. 02864
006807

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 890 of 1017    PageID 7603
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 6 of 1803    PageID 10752

Respectfully submitted,

Dated:  July 28, 2021            **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 8 of
Case 3:25-cv-02072-S     Document 15-9     Filed 10/06/25     Page 891 of 1017   PageID 7604
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 7 of 1803   PageID 10753

# APPENDIX 1

**Appellee Appx. 00001**



Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 892 of 1017    PageID 7605
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 8 of 1803    PageID 10754
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 1 of 178

Docket #1473  Date Filed: 11/24/2020

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | |

**DISCLOSURE STATEMENT FOR THE FIFTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.**

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054201124000000000002
**Appellee Appx. 00002**
Appx. 02887

006810

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 10 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 893 of 1017   PageID 7606
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 9 of 1803   PageID 10755
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 2 of 178

**ARTICLE I. EXECUTIVE SUMMARY** ...................................................................6

    **A.**    **Summary of the Plan** ...................................................................6

    **B.**    **An Overview of the Chapter 11 Process** ................................8

    **C.**    **Purpose and Effect of the Plan** ...............................................8

        1.    The Plan of Reorganization .........................................8

        2.    Plan Overview ...............................................................9

        3.    Voting on the Plan ......................................................10

        4.    Confirmation of the Plan ...........................................11

        5.    Confirming and Effectuating the Plan .....................12

        6.    Rules of Interpretation ...............................................12

        7.    Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests...................12

        8.    Instructions and Procedures for Voting .....................14

        9.    The Confirmation Hearing .........................................15

        10.    The Deadline for Objecting to Confirmation of the Plan ..........................16

        11.    Notice Parties .............................................................16

        12.    Effect of Confirmation of the Plan ...........................16

    **D.**    **Effectiveness of the Plan** ........................................................17

    **E.**    **RISK FACTORS** ....................................................................17

**ARTICLE II. BACKGROUND TO THE CHAPTER 11 CASE AND SUMMARY OF BANKRUPTCY PROCEEDINGS TO DATE** ................17

    **A.**    **Description and History of the Debtor's Business** ...............17

    **B.**    **The Debtor's Corporate Structure** ......................................17

    **C.**    **Business Overview** ...................................................................18

    **D.**    **Prepetition Capital Structure** ................................................18

        1.    Jefferies Margin Borrowings (Secured).....................18

        2.    The Frontier Bank Loan (Secured) ...........................19

        3.    Other Unsecured Obligations ....................................19

**Appellee Appx. 00003**

**Appx. 02868**

**006811**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 894 of 1017 PageID 7607
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 10 of 1803 PageID 10756
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 3 of 178

|  |  | 4. | Equity Interests | 20 |
|  | E. | SEC Filings | | 20 |
|  | F. | Events Leading Up to the Debtor's Bankruptcy Filings | | 20 |
|  | G. | Additional Prepetition Litigation | | 21 |
|  | H. | The Debtor's Bankruptcy Proceeding | | 24 |
|  | I. | First Day Relief | | 24 |
|  | J. | Other Procedural and Administrative Motions | | 25 |
|  | K. | United States Trustee | | 25 |
|  | L. | Appointment of Committee | | 26 |
|  | M. | Meeting of Creditors | | 26 |
|  | N. | Schedules, Statements of Financial Affairs, and Claims Bar Date | | 26 |
|  | O. | Governance Settlement with the Committee | | 27 |
|  | P. | Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer | | 27 |
|  | Q. | Mediation | | 28 |
|  | R. | Postpetition Settlements | | 28 |
|  |  | 1. | Settlement with Acis and the Terry Parties | 28 |
|  |  | 2. | Settlement with the Redeemer Committee | 29 |
|  | S. | Certain Outstanding Material Claims | | 30 |
|  | T. | Treatment of Shared Service and Sub-Advisory Agreements | | 31 |
|  | U. | Portfolio Managements with Issuer Entities | | 32 |
|  | V. | Resignation of James Dondero | | 33 |
|  | W. | Exclusive Periods for Filing a Plan and Soliciting Votes | | 33 |
|  | X. | Negotiations with Constituents | | 34 |
|  | Y. | Highland Capital Management, L.P. Retirement Plan and Trust | | 34 |
| ARTICLE III. | SUMMARY OF THE PLAN | | | 35 |
|  | A. | Administrative and Priority Tax Claims | | 35 |
|  |  | 1. | Administrative Expense Claims | 35 |
|  |  | 2. | Professional Fee Claims | 36 |
|  |  | 3. | Priority Tax Claims | 37 |
|  | B. | Classification and Treatment of Classified Claims and Equity Interests | | 37 |

Appellee Appx. 00004
Appx 02809
006812

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 12 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 895 of 1017   PageID 7608
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 11 of 1803   PageID 10757
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 4 of 178

| | | | |
|---|---|---|---|
| | 1. | Summary | 37 |
| | 2. | Elimination of Vacant Classes | 38 |
| | 3. | Impaired/Voting Classes | 38 |
| | 4. | Unimpaired/Non-Voting Classes | 38 |
| | 5. | Impaired/Non-Voting Classes | 38 |
| | 6. | Cramdown | 39 |
| C. | | Classification and Treatment of Claims and Equity Interests | 39 |
| | 1. | Class 1 – Jefferies Secured Claim | 39 |
| | 2. | Class 2 – Frontier Secured Claim | 39 |
| | 3. | Class 3 – Other Secured Claims | 40 |
| | 4. | Class 4 – Priority Non-Tax Claims | 40 |
| | 5. | Class 5 – Retained Employee Claims | 41 |
| | 6. | Class 6 – PTO Claims | 41 |
| | 7. | Class 7 – Convenience Claims | 41 |
| | 8. | Class 8 – General Unsecured Claims | 42 |
| | 9. | Class 9 – Subordinated Claims | 43 |
| | 10. | Class 10 – Class B/C Limited Partnership Interests | 44 |
| | 11. | Class 11 – Class A Limited Partnership Interests | 44 |
| D. | | Special Provision Governing Unimpaired Claims | 45 |
| E. | | Subordinated Claims | 45 |
| F. | | Means for Implementation of the Plan | 45 |
| | 1. | Summary | 45 |
| | 2. | The Claimant Trust | 46 |
| | (a) | Creation and Governance of the Claimant Trust and Litigation Sub-Trust. | 46 |
| | (a) | Claimant Trust Oversight Committee | 47 |
| | (b) | Purpose of the Claimant Trust. | 48 |

- iii -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:25-cv-02072-S    Document 15-9    Fil&d04/06/25    Page 896 of 1017    PageID 7609
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 12 of 1803    PageID 10758
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 5 of 178

| | | | |
|---|---|---|---|
| (c) | *Purpose of the Litigation Sub-Trust.* | | 48 |
| (d) | *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* | | 48 |
| (e) | *Compensation and Duties of Trustees.* | | 50 |
| (f) | *Cooperation of Debtor and Reorganized Debtor.* | | 50 |
| (g) | *United States Federal Income Tax Treatment of the Claimant Trust.* | | 50 |
| (h) | *Tax Reporting.* | | 50 |
| (i) | *Claimant Trust Assets.* | | 51 |
| (j) | *Claimant Trust Expenses.* | | 51 |
| (k) | *Trust Distributions to Claimant Trust Beneficiaries.* | | 51 |
| (l) | *Cash Investments.* | | 51 |
| (m) | *Dissolution of the Claimant Trust and Litigation Sub-Trust.* | | 52 |
| 3. | The Reorganized Debtor | | 52 |
| (a) | *Corporate Existence* | | 52 |
| (b) | *Cancellation of Equity Interests and Release* | | 53 |
| (c) | *Issuance of New Partnership Interests* | | 53 |
| (d) | *Management of the Reorganized Debtor* | | 53 |
| (e) | *Vesting of Assets in the Reorganized Debtor* | | 53 |
| (f) | *Purpose of the Reorganized Debtor* | | 54 |
| (g) | *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets* | | 54 |
| 4. | Company Action | | 54 |
| 5. | Release of Liens, Claims and Equity Interests | | 55 |
| 6. | Cancellation of Notes, Certificates and Instruments | | 55 |
| 7. | Cancellation of Existing Instruments Governing Security Interests | | 56 |

Appellee Appx. 00006

Appx. 02874

006814

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 14 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 897 of 1017   PageID 7610
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 13 of 1803   PageID 10759
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 6 of 178

8.   Control Provisions ....................................................................56

9.   Treatment of Vacant Classes ......................................................56

10.  Plan Documents .........................................................................56

11.  Highland Capital Management, L.P. Retirement Plan and
     Trust.........................................................................................56

A.   **Treatment of Executory Contracts and Unexpired Leases**...........................57

1.   Assumption, Assignment, or Rejection of Executory Contracts
     and Unexpired Leases................................................................57

2.   Claims Based on Rejection of Executory Contracts or
     Unexpired Leases.......................................................................58

3.   Cure of Defaults for Assumed or Assigned Executory
     Contracts and Unexpired Leases ................................................58

B.   **Provisions Governing Distributions**.............................................................59

1.   Dates of Distributions ...............................................................59

2.   Distribution Agent .....................................................................60

3.   Cash Distributions .....................................................................60

4.   Disputed Claims Reserve............................................................60

5.   Distributions from the Disputed Claims Reserve ......................61

6.   Rounding of Payments ...............................................................61

7.   *De Minimis* Distribution .............................................................61

8.   Distributions on Account of Allowed Claims ............................62

9.   General Distribution Procedures................................................62

10.  Address for Delivery of Distributions .......................................62

11.  Undeliverable Distributions and Unclaimed Property...............62

12.  Withholding Taxes.....................................................................63

13.  Setoffs ......................................................................................63

14.  Surrender of Cancelled Instruments or Securities .....................63

15.  Lost, Stolen, Mutilated or Destroyed Securities ........................63

Appellee Appx. 00007

Appx. 02872

006815

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 898 of 1017 PageID 7611
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 14 of 1803 PageID 10760
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 7 of 178

**C.**    **Procedures for Resolving Contingent, Unliquidated and Disputed Claims** ...................................................................................64

    1.    Filing of Proofs of Claim ...............................................................64

    2.    Disputed Claims ...........................................................................64

    3.    Procedures Regarding Disputed Claims or Disputed Equity Interests ........................................................................................64

    4.    Allowance of Claims and Equity Interests ...................................64

*Allowance of Claims* ...........................................................................64

*Estimation* .........................................................................................65

*Disallowance of Claims* .....................................................................65

**D.**    **Effectiveness of the Plan** .......................................................................66

    1.    Conditions Precedent to the Effective Date ................................66

    2.    Waiver of Conditions ...................................................................67

    3.    Effect of Non-Occurrence of Conditions to Effectiveness ..........67

    4.    Dissolution of the Committee .......................................................67

**E.**    **Exculpation, Injunction, and Related Provisions** ....................................68

    1.    General .........................................................................................68

    3.    Exculpation ..................................................................................69

    4.    Releases by the Debtor ................................................................70

    5.    Preservation of Rights of Action .................................................71

*Maintenance of Causes of Action* ......................................................71

*Preservation of All Causes of Action Not Expressly Settled or Released* .........................................................................................72

    6.    Injunction .....................................................................................72

    7.    Term of Injunctions or Stays .......................................................73

    8.    Continuance of January 9 Order ..................................................73

**F.**    **Article XII.D of the Plan** .......................................................................74

**G.**    **Binding Nature of Plan** .........................................................................74

**H.**    **Statutory Requirements for Confirmation of the Plan** ...........................74

    1.    Best Interests of Creditors Test ...................................................75

**Appellee Appx. 00008**

**Appx. 02873**

**006816**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 16 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 899 of 1017   PageID 7612
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 15 of 1803   PageID 10761
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 8 of 178

2.   Liquidation Analysis..................................................................75

3.   Feasibility .................................................................................76

4.   Valuation....................................................................................77

5.   Acceptance by Impaired Classes ...............................................77

6.   Confirmation Without Acceptance by Impaired Classes..........78

7.   No Unfair Discrimination ..........................................................78

8.   Fair and Equitable Test .............................................................78

**ARTICLE IV. RISK FACTORS**...........................................................79

A.   **Certain Bankruptcy Law and Other Considerations**...................79

1.   Parties in Interest May Object to the Debtor's Classification of
     Claims and Equity Interests, or Designation as Unimpaired....79

2.   The Debtor May Not Be Able to Secure Confirmation of the
     Plan. ..........................................................................................79

3.   The Conditions Precedent to the Effective Date of the Plan
     May Not Occur. ..........................................................................80

4.   Continued Risk Following Effectiveness. .................................80

5.   The Effective Date May Not Occur. ..........................................80

6.   The Chapter 11 Case May Be Converted to Cases Under
     Chapter 7 of the Bankruptcy Code ...........................................81

7.   Claims Estimation......................................................................81

8.   The Financial Information Contained Herein is Based on the
     Debtor's Books and Records and, Unless Otherwise Stated,
     No Audit was Performed. ...........................................................81

B.   **Risks Related to Recoveries under the Plan**.................................81

1.   The Reorganized Debtor and/or Claimant Trust May Not Be
     Able to Achieve the Debtor's Projected Financial Results .......81

2.   Claim Contingencies Could Affect Creditor Recoveries...........82

3.   If Approved, the Debtor Release Could Release Claims
     Against Potential Defendants of Estate Causes of Action With
     Respect to Which the Claimant Trust Would Otherwise Have
     Recourse ....................................................................................82

Appellee Appx. 00009

Appx 02874

006817

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 17 of
Case 3:25-cv-02072-S   Document 15-9   Filed 04/06/25   Page 900 of 1017   PageID 7613
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 16 of 1803   PageID 10762
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 9 of 178

**C.**    **Investment Risk Disclaimer** ................................................................ 82

    1.    Investment Risks in General. ...................................................... 82

    2.    General Economic and Market Conditions and Issuer Risk. ...... 82

**D.**    **Disclosure Statement Disclaimer** ...................................................... 83

    1.    The Information Contained Herein is for Disclosure Purposes
       Only. ............................................................................................ 83

    2.    This Disclosure Statement was Not Approved by the SEC. ....... 83

    3.    This Disclosure Statement Contains Forward-Looking
       Statements. .................................................................................. 83

    4.    No Legal or Tax Advice is Provided to You by This
       Disclosure Statement. .................................................................. 83

    5.    No Admissions Are Made by This Disclosure Statement. .......... 84

    6.    No Reliance Should Be Placed on Any Failure to Identify
       Litigation Claims or Projected Objections. ................................. 84

    7.    Nothing Herein Constitutes a Waiver of Any Right to Object
       to Claims or Equity Interests or Recover Transfers and Assets. .............. 84

    8.    The Information Used Herein was Provided by the Debtor and
       was Relied Upon by the Debtor's Advisors. ............................... 84

    9.    The Disclosure Statement May Contain Inaccuracies. .............. 84

    10.   No Representations Made Outside the Disclosure Statement
       Are Authorized. .......................................................................... 85

**ARTICLE V. ALTERNATIVES TO CONFIRMATION AND
EFFECTIVENESS OF THE PLAN**...................................................................... 85

**ARTICLE VI. U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN**................................................................................................................ 85

**A.**    **Consequences to the Debtor**.................................................................. 86

    1.    Cancellation of Debt ................................................................... 86

    2.    Transfer of Assets ....................................................................... 87

**B.**    **U.S. Federal Income Tax Treatment of the Claimant Trust** ............ 87

**C.**    **Consequences to Holders of Allowed Claims** ..................................... 88

    1.    Recognized Gain or Loss............................................................ 88

Appellee Appx. 00010
Appx. 02875
006818

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 18 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 901 of 1017    PageID 7614
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 17 of 1803    PageID 10763
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 10 of 178

2.    Distribution in Discharge of Accrued Unpaid Interest ..............................89

3.    Information Reporting and Withholding ...................................................89

D.    Treatment of the Disputed Claims Reserve.......................................................89

ARTICLE VII. RECOMMENDATION ...................................................................90

Appellee Appx. 00011
Appx. 02876
006819

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-9 Filed 06/25 Page 902 of 1017 PageID 7615
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 18 of 1803 PageID 10764
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 11 of 178

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned cases (the "Debtor"), is sending you this document and the accompanying materials (the "Disclosure Statement") because you are a creditor or interest holder in connection with the *Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management, L.P.*, dated November 24, 2020, as the same may be amended from time to time (the "Plan").[2] The Debtor has filed a voluntary petition under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

This Disclosure Statement has not yet been approved by the Bankruptcy Court as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code. The Debtor intends to seek an order or orders of the Bankruptcy Court (a) approving this Disclosure Statement as containing adequate information and (b) confirming the Plan.

A copy of the Plan is attached hereto as **Exhibit A**.

The Debtor believes that the Plan is fair and equitable, will maximize the value of the Debtor's Estate, and is in the best interests of the Debtor and its constituents. Notably, the Plan provides for the transfer of the majority of the Debtor's Assets to a Claimant Trust. The balance of the Debtor's Assets, including the management of the Managed Funds, will remain with the Reorganized Debtor. The Reorganized Debtor will be managed by New GP LLC – a wholly-owned subsidiary of the Claimant Trust. This structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets.

The Claimant Trust, the Litigation Trust, or the Reorganized Debtor, as applicable, will institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without any further order of the Bankruptcy Court, and the Claimant Trust and Reorganized Debtor, as applicable, will sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets and resolve all Claims, except as otherwise provided in the Plan, the Claimant Trust Agreement, or the Reorganized Limited Partnership Agreement.

---

**IMPORTANT INFORMATION ABOUT THIS
DISCLOSURE STATEMENT FOR YOU TO READ**

---

**The Debtor is providing the information in this Disclosure Statement to Holders of Claims and Equity Interests in connection with the Debtor's Plan. Nothing in this Disclosure Statement may be relied upon or used by any Entity for any purpose other than with respect to confirmation of the Plan. The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.**

**This Disclosure Statement has not been filed for approval with the Securities and Exchange Commission ("SEC") or any state authority and neither the SEC nor any state authority has passed upon the accuracy or adequacy of this Disclosure Statement or upon**

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

- 1 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 903 of 1017 PageID 7616
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 19 of 1803 PageID 10765
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 12 of 178

the merits of the Plan. Any representation to the contrary is a criminal offense. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The Debtor considers all statements regarding anticipated or future matters to be forward-looking statements. Forward-looking statements may include statements about:

- the effects of insolvency proceedings on the Debtor's business and relationships with its creditors;

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- financial strategy, budget, projections, and operating results;

- variation from projected operating and financial data;

- substantial capital requirements;

- availability and terms of capital;

- plans, objectives, and expectations;

- the adequacy of the Debtor's capital resources and liquidity; and

- the Claimant Trust's or the Reorganized Debtor's ability to satisfy future cash obligations.

Statements concerning these and other matters are not guarantees of the Claimant Trust's or Reorganized Debtor's future performance. There are risks, uncertainties, and other important factors that could cause the Claimant Trust's or Reorganized Debtor's actual performance or achievements to be different from those that may be projected. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and is not necessarily in accordance with federal or state securities laws or other similar laws.

Appellee Appx. 00013
Appx. 02878
006821

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 904 of 1017 PageID 7617
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 20 of 1803 PageID 10766
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 13 of 178

No legal or tax advice is provided to you by this Disclosure Statement. The Debtor urges each Holder of a Claim or an Equity Interest to consult with its own advisers with respect to any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein.

Pachulski Stang Ziehl & Jones LLP ("PSZ&J") is general insolvency counsel to the Debtor. Development Specialists, Inc. ("DSI") is the Debtor's financial advisor. PSZ&J, DSI, and the Independent Board (as defined below) have relied upon information provided by the Debtor in connection with preparation of this Disclosure Statement. PSZ&J has not independently verified the information contained herein.

This Disclosure Statement contains, among other things, summaries of the Plan, the management of the Reorganized Debtor, the Claimant Trust, certain statutory provisions, certain events in the Debtor's Chapter 11 Case, and certain documents related to the Plan that are attached hereto and incorporated herein by reference or that may be filed later with the Plan Supplement. Although the Debtor believes that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that the summaries do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any conflict, inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern and control for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtor's management. The Debtor does not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtor relied on financial data derived from the Debtor's books and records and on various assumptions regarding the Debtor's business. The Debtor's management has reviewed the financial information provided in this Disclosure Statement. Although the Debtor has used its reasonable business judgment to ensure the accuracy of this financial information, the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been audited (unless otherwise expressly provided herein) and no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtor's business and its, the Reorganized Debtor's, and the Claimant Trust's future results. The Debtor expressly cautions readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver. Rather, this Disclosure Statement shall constitute a statement made in settlement negotiations related to potential contested matters, potential adversary proceedings and other pending or threatened litigation or actions.

Appellee Appx. 00014
Appx. 02879
006822

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 905 of 1017    PageID 7618
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 21 of 1803   PageID 10767
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 14 of 178

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in the Disclosure Statement.  Except as provided under the Plan, the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, may seek to investigate, file and prosecute Claims and Causes of Action and may object to Claims or Equity Interests after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies any such Claims or Equity Interests or objections to Claims or Equity Interests on the terms specified in the Plan.

The Debtor is generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted.  Although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so. Holders of Claims and Equity Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since the Disclosure Statement was sent.  Information contained herein is subject to completion, modification, or amendment.  The Debtor reserves the right to file an amended or modified Plan and related Disclosure Statement from time to time.

The Debtor has not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement.  The Debtor has not authorized any representations concerning the Debtor or the value of its property other than as set forth in this Disclosure Statement.

Holders of Claims or Equity Interests must rely on their own evaluation of the Debtor and their own analyses of the terms of the Plan in considering the Plan. Importantly, each Holder of a Claim should review the Plan in its entirety and consider carefully all of the information in this Disclosure Statement and any exhibits hereto, including the risk factors described in greater detail in ARTICLE IV herein, "Risk Factors."

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Equity Interests in, the Debtor will be bound by the terms of the Plan and the transactions contemplated thereby.

The effectiveness of the Plan is subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to become effective will be satisfied (or waived).

Appellee Appx. 00015
Appx. 02889
006823

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 23 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 906 of 1017    PageID 7619
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 22 of 1803   PageID 10768
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 15 of 178

## <u>EXHIBITS</u>

**EXHIBIT A** – Plan of Reorganization

**EXHIBIT B** – Organizational Chart of the Debtor

**EXHIBIT C** – Liquidation Analysis/Financial Projections

> THE DEBTOR HEREBY ADOPTS AND INCORPORATES EACH EXHIBIT
> ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH
> FULLY SET FORTH HEREIN.

Appellee Appx. 00016
Appx. 02584
006824

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 24 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 907 of 1017   PageID 7620
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 23 of 1803   PageID 10769
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 16 of 178

**ARTICLE I.**
<u>**EXECUTIVE SUMMARY**</u>

**This Disclosure Statement is provided for informational purposes only.**

**In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distributions to the Debtor's creditors and interest holders.  The Debtor believes that any delay in confirmation of the Plan would result in significant administrative expenses resulting in less value available to the Debtor's constituents.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan.  Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.**

This Executive Summary is being provided to Holders of Allowed Claims and Equity Interests as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (including all exhibits attached hereto and to the Plan and the Plan Supplement), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan.  Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization or liquidation.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.  This Disclosure Statement includes, without limitation, information about:

- the Debtor's operating and financial history;

- the significant events that have occurred to date;

- the Confirmation process; and

- the terms and provisions of the Plan, including key aspects of the Claimant Trust and the Reorganized Debtor, certain effects of Confirmation of the Plan, certain risk factors relating to the Plan, and the manner in which distributions will be made under the Plan.

The Debtor believes that any alternative to Confirmation of the Plan would result in significant delays, litigation, and additional costs, and ultimately would diminish the Debtor's value.  **Accordingly, the Debtor strongly supports confirmation of the Plan.**

**A.       Summary of the Plan**

The Plan represents a significant achievement for the Debtor.  As discussed herein, the Plan provides that the Claimant Trust will receive the majority of the Debtor's assets, including Causes of Action.  The assets being transferred to the Claimant Trust are referred to, collectively, as the Claimant Trust Assets.  The Claimant Trust will – for the benefit of the Claimant Trust

- 6 -

Beneficiaries – monetize the Claimant Trust Assets, pursue the Causes of Action, and work to conclude the various lawsuits and litigation claims pending against the Estate.

The Plan also provides for the reorganization of the Debtor. This will be accomplished by the cancellation of the Debtor's current Equity Interests, which consist of partnership interests held by: The Dugaboy Investment Trust;[3] the Hunter Mountain Investment Trust ("Hunter Mountain"); Mark Okada, personally and through family trusts; and Strand, the Debtor's general partner. On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. The Reorganized Debtor will be managed by the Claimant Trust, as the managing member of New GP LLC.

The Reorganized Debtor will oversee the monetization of the Reorganized Debtor Assets, which consist of, among other Assets, the management of the Managed Funds. The net proceeds from the Reorganized Debtor Assets will ultimately be distributed to the Claimant Trust and available for distribution to the Claimant Trust Beneficiaries.

The following is an overview of certain other material terms of the Plan:

- Allowed Priority Non-Tax Claims will be paid in full;

- Allowed Retained Employee Claims will be Reinstated;

- Allowed Convenience Claims will receive the lesser of (i) 85% of their Allowed Claim or (ii) such Holder's Pro Rata share of the Convenience Claims Cash Pool (*i.e.*, $13,150,000). Holders of Convenience Claims can elect the treatment provided to General Unsecured Claims by making the GUC Election on their Ballots;

- Allowed General Unsecured Claims and Allowed Subordinated Claims will receive their Pro Rata share of Claimant Trust Interests. The Claimant Trust Interests distributed to Allowed General Unsecured Claims will be senior to those distributed to Allowed Subordinated Claims as set forth in the Claimant Trust Agreement. Holders of General Unsecured Claims that are liquidated as of the Confirmation Date can elect the treatment provided to Convenience Class Election by reducing their Claims to $1,000,000 and making the Convenience Class Election on their Ballots; and

- Allowed Class B/C Limited Partnership Interests and Allowed Class A Limited Partnership Interests will receive their Pro Rata share of the Contingent Claimant Trust Interests.

---

[3] The Dugaboy Investment Trust is a Delaware trust created to manage the assets of James Dondero and his family.

Appellee Appx. 00018
Appx. 02983
006826

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 26 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 909 of 1017   PageID 7622
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 25 of 1803   PageID 10771
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 18 of 178

**B.      An Overview of the Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11 of the Bankruptcy Code, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors, and other parties in interest.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The commencement of a Chapter 11 case creates an estate comprised of all of the legal and equitable interests of a debtor in property as of the date that the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession," unless the bankruptcy court orders the appointment of a trustee.  The filing of a bankruptcy petition also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business.  Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the consummation of a plan of reorganization or liquidation, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation.  Please see ARTICLE II for a discussion of the U.S. Trustee and the statutory committees.

Upon the commencement of a chapter 11 bankruptcy case, all creditors and equity interest holders generally have standing to be heard on any issue in the chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan is the principal objective of a chapter 11 case. The plan sets forth the means of satisfying the claims against and equity interests in the debtor.

**C.      Purpose and Effect of the Plan**

1.      The Plan of Reorganization

The Debtor is reorganizing pursuant to chapter 11 of the Bankruptcy Code.  As a result, the Confirmation of the Plan means that the Debtor's business will continue to operate following confirmation of the Plan through the Claimant Trust and the Reorganized Debtor to monetize assets for distribution to Holders of Allowed Claims.  The Claimant Trust will hold the Claimant Trust Assets and manage the efficient monetization of, the Claimant Trust Assets.  The Claimant Trust will also manage the Reorganized Debtor through the Claimant Trust's ownership of the Reorganized Debtor's general partner, New GP LLC.  The Claimant Trust will also be the sole limited partner in the Reorganized Debtor.  The Reorganized Debtor will manage the wind down

Appellee Appx. 00019
Appx. 02884
006827

of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. The Claimant Trust will also establish a Litigation Sub-Trust in accordance with the Plan, which will also be for the benefit of the Claimant Trust Beneficiaries. The Litigation Sub-Trust will receive the Estate Claims. The Litigation Trustee shall be the exclusive trustee of the Estate Claims included in the Claimant Trust Assets subject to oversight by the Claimant Trust Oversight Committee

A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

2.    Plan Overview

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtor. For classification and treatment of Claims and Equity Interests, the Plan designates Classes of Claims and Classes of Equity Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

The following chart briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.[4] Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for eight Classes of Claims against and/or Equity Interests in the Debtor.

**The projected recoveries set forth in the table below are estimates only and therefore are subject to change. For a complete description of the Debtor's classification and treatment of Claims or Equity Interests, reference should be made to the entire Plan and the risk factors described in ARTICLE IV below. For certain classes of Claims, the actual amount of Allowed Claims could be materially different than the estimated amounts shown in the table below.**

---

[4] This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description.

Appellee Appx. 00020

Appx. 02885

006828

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 28 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 911 of 1017    PageID 7624
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 27 of 1803    PageID 10773
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 20 of 178

| Class | Type of Claim or Interest | Estimated Prepetition Claim Amount [1] | Impaired | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Jefferies Secured Claim | $0.00 | No | No | 100% |
| 2 | Frontier Secured Claim[2] | $5,209,964 | Yes | Yes | 100% |
| 3 | Other Secured Claims | $551,116 | No | No | 100% |
| 4 | Priority Non-Tax Claim | $16,489 | No | No | 100% |
| 5 | Retained Employee Claim | $0 | No | No | 100% |
| 6 | PTO Claims [3] | $1,181,886 | No | No | 100% |
| 7 | Convenience Claims[4] | $12,064,333 | Yes | Yes | 85.00% |
| 8 | General Unsecured Claims[5] | $180,442,199 | Yes | Yes | 85.31% |
| 9 | Subordinated Claims | Undetermined | Yes | Yes | Undetermined |
| 10 | Class B/C Limited Partnership Interests | N/A | Yes | Yes | Undetermined |
| 11 | Class A Limited Partnership Interests | N/A | Yes | Yes | Undetermined |

[1] Excludes Priority Tax Claims and certain other unclassified amounts totaling approximately $1.1 million owed to Joshua and Jennifer Terry and Acis under a settlement agreement.

[2] Excludes interest accrued postpetition estimated at $318,000, which will be paid on the Effective Date. The Liquidation Analysis/Financial Projections provide for the payment of postpetition interest.

[3] Represents outstanding PTO Claims as of September 30, 2020. PTO Claims are subject to adjustment depending on the amount of actual prepetition PTO Claims outstanding as of the Effective Date. PTO claims are accounted for in the Liquidation Analysis/Financial Projections as an administrative claim and will be paid out in ordinary courses pursuant to applicable state law.

[4] Represents the estimated gross prepetition amount of Convenience Claims with a total payout amount estimated at 85% of $12.06 million, or $10.25 million. This number includes approximately $1.113 million of potential Rejection Claims and assumes that Holders of Allowed General Unsecured Claims that are each less than $2.50 million opt into the Convenience Class.

[5] Assumes no recovery for UBS, the HarbourVest Entities, IFA, Hunter Mountain, and an Allowed Claim of only $3,722,019 for Mr. Daugherty (each as discussed further below). Assumes $1.440 million of potential rejection damage claims. The Liquidation Analysis/Financial Projections assume Highland RCP, LP and Highland RCP Offshore, LP offset their Claim of $4.4 million against amounts owed to the Debtor.

    3.    <u>Voting on the Plan</u>

Under the Bankruptcy Code, acceptance of a plan by a Class of Claims or Equity Interests is determined by calculating the number and the amount of Claims voting to accept, based on the actual total Allowed Claims or Equity Interests voting on the Plan. Acceptance by a Class of Claims requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan. Acceptance by a Class of Equity Interests requires at least two-thirds in amount of the total Allowed Equity Interests in the Class to vote in favor of the Plan.

Appellee Appx. 00021
Appx. 02886
006829

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 29 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 912 of 1017   PageID 7625
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 28 of 1803   PageID 10774
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 21 of 178

Under the Bankruptcy Code, only Classes of Claims or Equity Interests that are "Impaired" and that are not deemed as a matter of law to have rejected a plan under Section 1126 of the Bankruptcy Code are entitled to vote to accept or reject the Plan.  Any Class that is "Unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted the Plan.  As set forth in Section 1124 of the Bankruptcy Code, a Class is "Impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that Class are modified or altered.

Pursuant to the Plan, Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims and Equity Interests in those Classes are entitled to vote to accept or reject the Plan.  Whether a Holder of a Claim or Equity Interest in Class 2 and Class 7 through Class 11 may vote to accept or reject the Plan will also depend on whether the Holder held such Claim or Equity Interest as of November 23, 2020 (the "Voting Record Date").  The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

Pursuant to the Plan, Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, there are no Classes that will not receive or retain any property and no Classes are deemed to reject the Plan.

4.      Confirmation of the Plan

(a)      Confirmation Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

The confirmation of a plan by the Bankruptcy Court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

(b)      The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Debtor will provide notice of the Confirmation Hearing to all necessary parties.  The Confirmation Hearing may be adjourned from time to time without further notice except for an

- 11 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 913 of 1017    PageID 7626
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 29 of 1803    PageID 10775
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 22 of 178

announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

     5.       <u>Confirming and Effectuating the Plan</u>

It is a condition to the Effective Date of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtor and the Official Committee of Unsecured Creditors (the "<u>Committee</u>").  Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of the Plan.

     6.       <u>Rules of Interpretation</u>

The following rules for interpretation and construction shall apply to this Disclosure Statement:  (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

     7.       <u>Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests</u>

As set forth above, Holders of Claims in Class 1 and Class 3 through Class 6 are not entitled to vote on the Plan.  As a result, such parties will not receive solicitation packages or ballots but, instead, will receive this a notice of non-voting status, a notice of the Confirmation Hearing, and instructions on how to receive a copy of the Plan and Disclosure Statement.

The Debtor, with the approval of the Bankruptcy Court, has engaged Kurtzman Carson Consultants LLC (the "<u>Voting Agent</u>") to serve as the voting agent to process and tabulate Ballots for each Class entitled to vote on the Plan and to generally oversee the voting process. The following materials shall constitute the solicitation package (the "<u>Solicitation Package</u>"):

- This Disclosure Statement, including the Plan and all other Exhibits annexed thereto;

Appellee Appx. 00023
Appx. 02888
006831

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 914 of 1017 PageID 7627
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 30 of 1803 PageID 10776
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 23 of 178

- The Bankruptcy Court order approving this Disclosure Statement (the "<u>Disclosure Statement Order</u>") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "<u>Confirmation Hearing Notice</u>");

- A single Ballot, to be used in voting to accept or to reject the Plan and applicable instructions with respect thereto (the "<u>Voting Instructions</u>");

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtor, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order. The Solicitation Package is also available at the Debtor's restructuring website at www.kccllc.net/hcmlp.

On November 13, 2020, the Debtor filed the Plan Supplement [D.I. 1389] that included, among other things, the form of Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Reorganized Limited Partnership Agreement, New GP LLC Documents, the New Frontier Note, the Senior Employee Stipulation, and the identity of the initial members of the Claimant Trust Oversight Committee. The Plan Supplement also includes a schedule of the Causes of Action that will be retained after the Effective Date. The Plan Supplement may be supplemented or amended through and including December 18, 2020. If the Plan Supplement is supplemented, such supplemented documents will be made available on the Debtor's restructuring website at www.kccllc.net/hcmlp.

If you are the Holder of a Claim or Equity Interest and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to Kurtzman Carson Consultants LLC, via email at HighlandInfo@kccllc.com and reference "Highland Capital Management, L.P." in the subject line or by telephone at toll free: (877) 573-3984, or international: (310) 751-1829. If your Claim or Equity Interest is subject to a pending claim objection and you wish to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim or Equity Interest for voting purposes or you will not be entitled to vote to accept or reject the Plan. Any such motion must be filed so that it is heard in sufficient time prior to the Voting Deadline to allow for your vote to be tabulated.

**THE DEBTOR, THE REORGANIZED DEBTOR, AND THE CLAIMANT TRUSTEE, AS APPLICABLE, RESERVE THE RIGHT THROUGH THE CLAIM OBJECTION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM OR EQUITY INTEREST FOR DISTRIBUTION PURPOSES.**

Appellee Appx. 00024
Appx. 02389
006832

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 32 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 915 of 1017    PageID 7628
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 31 of 1803   PageID 10777
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 24 of 178

8.    <u>Instructions and Procedures for Voting</u>

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtor or the Voting Agent.  No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed November 23, 2020, as the Voting Record Date for the determination of the Holders of Claims and Equity Interests who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.  The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is January 5, 2021 at 5:00 p.m. (prevailing Central Time) (the "<u>Voting Deadline</u>")**.  In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and received no later than the Voting Deadline at the following address, as applicable:

**If by first class mail, personal delivery, or overnight mail to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

**If by electronic voting:**

**You may submit your Ballot via the Balloting Agent's online portal.  Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.  IMPORTANT NOTE: You will need the Unique Electronic Ballot ID Number and the Unique Electronic Ballot PIN Number set forth on your customized ballot in order to vote via the Balloting Agent's online portal.  Each Electronic Ballot ID Number is to be used solely for voting on those Claims or Interests on your electronic ballot.  You must complete and submit an electronic ballot for each Electronic Ballot ID Number you receive, as applicable.  Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.**

Only the Holders of Claims and Equity Interests in Class 2 and Class 7 through Class 11 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline.  Each Holder of a Claim and Equity Interest must vote its entire Claim or Equity Interest, as applicable, within a particular Class either to accept or reject the Plan and may not split such votes.  If multiple Ballots are received from the same Holder with respect to the same Claim or Equity Interest prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to

**Appellee Appx. 00025**
**Appx. 02899**
**006833**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 916 of 1017 PageID 7629
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 32 of 1803 PageID 10778
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 25 of 178

reflect that voter's intent and will supersede and revoke any prior Ballot. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific instructions provided on each Ballot.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR EQUITY INTEREST IN THE CLASSES ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or Equity Interest, (b) the Solicitation Package that you have received, or (c) the amount of your Claim or Equity Interest, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or Exhibits to such documents, please contact the Voting Agent at the address specified above. Copies of the Plan, Disclosure Statement and other documents filed in this Chapter 11 Case may be obtained free of charge on the Voting Agent's website at www.kccllc.net/hcmlp or by calling toll free at: (877) 573-3984, or international at: (310) 751-1829. You may also obtain copies of pleadings filed in the Debtor's case for a fee via PACER at pacer.uscourts.gov. Subject to any rules or procedures that have or may be implemented by the Court as a result of the COVID 19 Pandemic, documents filed in this case may be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Central Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, Earle Cabell Federal Building, 1100 Commerce Street, Room 1254, Dallas, Texas 75242-1496.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") by January 11, 2021. The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTOR URGES HOLDERS OF CLAIMS AND EQUITY INTERESTS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

9. The Confirmation Hearing

**The Bankruptcy Court has scheduled Confirmation Hearing Dates on January 13, 2021, and January 14, 2021, at 9:30 a.m. prevailing Central time.** The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtor without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

Appellee Appx. 00026
Appx. 02891
006834

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 34 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 917 of 1017   PageID 7630
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 33 of 1803   PageID 10779
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 26 of 178

10. <u>The Deadline for Objecting to Confirmation of the Plan</u>

**The Bankruptcy Court has set a deadline of January 5, 2021, at 5:00 p.m. prevailing Central time, for the filing of objections to confirmation of the Plan (the "Confirmation Objection Deadline")**. Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the objecting party and the amount and nature of the Claim of such Entity or the amount of Equity Interests held by such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "<u>Notice Parties</u>").

**CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE. INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING APPROVED BY THE BANKRUPTCY COURT.**

11. <u>Notice Parties</u>

- Debtor: Highland Capital Management, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 (Attn: James P. Seery, Jr.);

- Counsel to the Debtor: Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067-4003 (Attn: Jeffrey Pomerantz, Esq.; Ira Kharasch, Esq., and Gregory Demo, Esq.);

- Counsel to the Committee: Sidley Austin, LLP, One South Dearborn, Chicago, Illinois 60603 (Attn: Matthew Clemente, Esq., and Alyssa Russell, Esq.); and

- Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242 (Attn: Lisa Lambert, Esq.).

12. <u>Effect of Confirmation of the Plan</u>

The Plan contains certain provisions relating to (a) the compromise and settlement of Claims and Equity Interests; (b) exculpation of certain parties; and (c) the release of claims against certain parties by the Debtor.

**The Plan shall bind all Holders of Claims against and Equity Interests in the Debtor to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder (i) will receive or retain any property or interest in property under the Plan, (ii) has filed a proof of claim in the Chapter 11 Case, or (iii) did not vote to accept or reject the Plan.**

- 16 -

Appellee Appx. 00027
Appx. 02892
006835

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 918 of 1017 PageID 7631
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 34 of 1803 PageID 10780
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 27 of 178

**D.      Effectiveness of the Plan**

It will be a condition to the Effective Date of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will go into effect on the Effective Date.

**E.      RISK FACTORS**

**Each Holder of a Claim or an Equity Interest is urged to consider carefully all of the information in this Disclosure Statement, including the risk factors described in ARTICLE IV herein titled, "Risk Factors."**

**ARTICLE II.**
**BACKGROUND TO THE CHAPTER 11 CASE AND SUMMARY OF**
**BANKRUPTCY PROCEEDINGS TO DATE**

**A.      Description and History of the Debtor's Business**

Prior to the Petition Date, the Debtor was a multibillion-dollar global alternative investment manager founded in 1993 by James Dondero and Mark Okada.  A pioneer in the leveraged loan market, the firm evolved over twenty-five years, building on its credit expertise and value-based approach to expand into other asset classes.

As of the Petition Date, the Debtor operated a diverse investment platform, serving both institutional and retail investors worldwide.  In addition to high-yield credit, the Debtor's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built around specialized teams. Additionally, the Debtor provided shared services to its affiliated registered investment advisers.

**B.      The Debtor's Corporate Structure**

The Debtor is headquartered in Dallas, Texas.  The Debtor itself is a Delaware limited partnership and one of the principal operating arms of the Debtor's business.  As of the Petition Date, the Debtor employed approximately 76 people, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel.

Pursuant to various contractual arrangements, the Debtor, as of the Petition Date, provided money management and advisory services for approximately $2.5 billion of assets under management shared services for approximately $7.5 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors. None of these affiliates filed for Chapter 11 protection.  As of September 30, 2020, the Debtor provided money management and advisory services for approximately $1.641 billion of assets under management and shared services for approximately $7.136 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.  Further, on the Petition Date, the value of the Debtor's Assets was approximately

Appellee Appx. 00028
Appx. 02893
006836

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 36 of
Case 3:25-cv-02072-S    Document 15-9    Filed 04/06/25    Page 919 of 1017    PageID 7632
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 35 of 1803    PageID 10781
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 28 of 178

$566.5 million. As of September 30, 2020, the total value of Debtor's Assets totaled approximately $328.3 million.

The drop in the value of the Debtor's Assets and assets under management was caused, in part, by the COVID-19 global pandemic. Specifically, the decline was the result of, among other things, the drop in value of the Debtor's assets generally, the loss of value in the Prime Accounts discussed below, the professional and other costs associated with the Chapter 11 Case, and the reserve of approximately $59 million against a loan receivable listed as an asset.

| Asset | | 10/16/2019 | 9/30/2020 |
|---|---|---|---|
| Investments (FV)[1] | | $232,620,000 | $109,479,000 |
| Investments (Equity) | | $161,819,000 | $101,213,000 |
| Cash/Cash Equivalents | | $2,529,000 | $5,888,000 |
| Management/Incentive Fees Receivable | | $2,579,000 | $3,350,000 |
| Fixed Assets, net | | $3,754,000 | $2,823,000 |
| Loan Receivables | | $151,901,000 | $93,445,000[2] |
| Other Assets | | $11,311,000 | $12,105,000 |
| | Totals | $566,513,000 | $328,302,000 |

[1] Includes decrease in value of assets, costs of Chapter 11 Cases, and assets sold to satisfy liabilities.

[2] Net of reserve of $59 million.

The Debtor's organizational chart is attached hereto as Exhibit B. The organizational chart is not all inclusive and certain entities have been excluded for the sake of brevity.

**C.    Business Overview**

The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course held through its prime brokerage account at Jefferies, LLC ("Jefferies"), as described in additional detail below. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and distribute those proceeds to the Debtor in the ordinary course of business. During calendar year 2018, the Debtor's stand-alone annual revenue totaled approximately $50 million. During calendar year 2019, the Debtor's stand-alone revenue totaled approximately $36.1 million.

**D.    Prepetition Capital Structure**

1.    Jefferies Margin Borrowings (Secured)

The Debtor is party to that certain *Prime Brokerage Customer Agreement* with Jefferies dated May 24, 2013 (the "Brokerage Agreement"). Pursuant to the terms of the Brokerage Agreement and related documents, the Debtor maintains a prime brokerage account with

- 18 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 37 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 920 of 1017    PageID 7633
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 36 of 1803    PageID 10782
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 29 of 178

Jefferies (the "Prime Account").  A prime brokerage account is a unique type of brokerage account that allows sophisticated investors to, among other things, borrow both money on margin to purchase securities and common stock to facilitate short positions.  A prime brokerage account also serves as a custodial account and holds client securities in the prime broker's street name.

As of the Petition Date, the Debtor held approximately $57 million of equity in liquid and illiquid securities (the "Securities") in the Prime Account.  Pursuant to the Brokerage Agreement, the Debtor granted a lien in favor of Jefferies in the Securities and all of the proceeds thereof.

However, because of the economic distress caused by the COVID-19 global pandemic, the value of the Securities held in the Prime Account dropped since the Petition Date, and Jefferies has exerted significant pressure on the Debtor to liquidate the Securities to satisfy margin calls.  As of September 30, 2020, the equity value of the Securities in the Prime Account was approximately $23.3 million, and the Debtor owed no amounts to Jefferies.  The Debtor has been actively selling Securities to cover operating expenses and professional fees.

### 2.    The Frontier Bank Loan (Secured)

The Debtor and Frontier State Bank ("Frontier Bank") are parties to that certain *Loan Agreement* dated as of August 17, 2015 (the "Original Frontier Loan Agreement"), pursuant to which Frontier Bank loaned to the Debtor the aggregate principal amount of $9.5 million.  On March 29, 2018, the Debtor and Frontier Bank entered into that certain First Amended and Restated Loan Agreement (the "Amended Frontier Loan Agreement"), amending and superseding the Original Frontier Loan Agreement.  Pursuant to the Amended Frontier Loan Agreement, Frontier Bank made an additional $1 million loan to the Debtor (together with the borrowings under the Original Frontier Loan Agreement, the "Frontier Loan").  The Frontier Loan matures on August 17, 2021.

Pursuant to that certain Security and Pledge Agreement dated August 17, 2015, between Frontier Bank and the Debtor, as amended by the Amended Frontier Loan Agreement, the Debtor's obligations under the Frontier Loan are secured by 171,724 shares of voting common stock of MGM Holdings, Inc. (collectively, the "Frontier Collateral").

The aggregate principal balance of the Frontier Loan was approximately $5.2 million.  As of September 30, 2020, the value of the Frontier Collateral was approximately $13.1 million, and approximately $318,000 in postpetition interest had accrued.

### 3.    Other Unsecured Obligations

As discussed below, the Plan provides for four Classes of unsecured claims:  (i) PTO Claims, (ii) the Convenience Claims, (iii) the General Unsecured Claims, and (iv) the Subordinated Claims.

The Debtor has various substantial litigation claims asserted against it, which have been classified as General Unsecured Claims.  In addition, as of the Petition Date, the Debtor had ordinary course trade debt, unaccrued employee bonus obligations and loan repayment, and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 38 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 921 of 1017    PageID 7634
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 37 of 1803    PageID 10783
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 30 of 178

contractual commitments to various affiliated and unaffiliated non-Debtor entities for capital calls, contributions, and other potential reimbursement or funding obligations that were potentially in the tens of millions of dollars. The Debtor is still assessing these claims and its liability for such amounts. These Claims have been classified as Convenience Claims and Subordinated Claims.

4.    Equity Interests

The Debtor is a Delaware limited partnership. As of the Petition Date, the Debtor had three classes of limited partnership interest (Class A, Class B, and Class C). The Class A interests were held by The Dugaboy Investment Trust, Mark Okada, personally and through family trusts, and Strand, the Debtor's general partner. The Class B and C interests were held by Hunter Mountain.

In the aggregate, the Debtor's limited partnership interests were held: (a) 99.5% by Hunter Mountain; (b) 0.1866% by The Dugaboy Investment Trust, (c) 0.0627% by Mark Okada, personally and through family trusts, and (d) 0.25% by Strand.

**E.    SEC Filings**

The Debtor is an investment adviser registered with the SEC as required by the Investment Advisers Act of 1940. As a registered investment adviser, the Debtor is required to file (at least annually) a Form ADV. The Debtor's current Form ADV is available at https://adviserinfo.sec.gov/.

Following the Effective Date, it is anticipated that the Reorganized Debtor will maintain its registration with the SEC as a registered investment adviser.

**F.    Events Leading Up to the Debtor's Bankruptcy Filings**

The Chapter 11 Case was precipitated by the rendering of an Arbitration Award (as that term is defined below) against the Debtor on May 9, 2019, by a panel of the American Arbitration Association (the "Panel"), in favor of the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee").

The Debtor was formerly the investment manager for the Highland Crusader Funds (the "Crusader Funds") that were formed between 2000 and 2002. In September and October 2008, as the financial markets in the United States began to fail, the Debtor was flooded with redemption requests from Crusader Funds' investors, as the Crusader Funds' assets lost significant value.

On October 15, 2008, the Debtor placed the Crusader Funds in wind-down, thereby compulsorily redeeming the Crusader Funds' limited partnership interests. The Debtor also declared that it would liquidate the Crusader Funds' remaining assets and distribute the proceeds to investors.

However, disputes concerning the distribution of the assets arose among certain investors. After several years of negotiations, a Joint Plan of Distribution of the Crusader Funds

Appellee Appx. 00031
Appx. 02886
006839

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 39 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 922 of 1017    PageID 7635
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 38 of 1803    PageID 10784
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 31 of 178

(the "Crusader Plan"), and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors (the "Crusader Scheme"), were adopted in Bermuda and became effective in August 2011.  As part of the Crusader Plan and the Crusader Scheme, the Redeemer Committee was elected from among the Crusader Funds' investors to oversee the Debtor's management of the Crusader Funds.

Between October 2011 and January 2013, in accordance with the Crusader Plan and the Crusader Scheme, the Debtor distributed in excess of $1.2 billion to the Crusader Funds' investors.  The Debtor distributed a further $315.3 million through June 2016.

However, disputes subsequently arose between the Redeemer Committee and the Debtor.  On July 5, 2016, the Redeemer Committee (a) terminated and replaced the Debtor as investment manager of the Crusader Fund, (b) commenced an arbitration against the Debtor (the "Arbitration"), and (c) commenced litigation in Delaware Chancery Court, to, among other things, obtain a status quo order in aid of the arbitration, which order was subsequently entered.

Following an evidentiary hearing, the Panel issued (a) a *Partial Final Award,* dated March 6, 2019 (the "March Award"), (b) a *Disposition of Application for Modification of Award,* dated March 14, 2019 (the "Modification Award"), and (c) a *Final Award,* dated May 9, 2019 (the "Final Award" and together with the March Award and the Modification Award, the "Arbitration Award").  Pursuant to the Arbitration Award, the Redeemer Committee was awarded gross damages against the Debtor in the aggregate amount of $136,808,302; as of the Petition Date, the total value of the Arbitration Award was $190,824,557, inclusive of interest

Prior to the Petition Date, the Redeemer Committee moved in the Chancery Court to confirm the Arbitration Award.  For its part, the Debtor moved to vacate parts of the Final Award contending that certain aspects were procedurally improper.  The Redeemer Committee's motion to confirm the Arbitration Award and the Debtor's motion to vacate were fully briefed and were scheduled to be heard by the Chancery Court on the day the Debtor filed for bankruptcy

On the Petition Date, the Debtor believed that the aggregate value of its assets exceeded the amount of its liabilities; however, the Debtor filed the Chapter 11 Case because it did not have sufficient liquidity to immediately satisfy the Award or post a supersedeas bond necessary to pursue an appeal.

## G.    Additional Prepetition Litigation

In addition to the litigation with the Redeemer Committee described above, the Debtor, both directly and through certain subsidiaries, affiliates, and related entities, was party to substantial prepetition litigation.  Although the Debtor disputes the allegations raised in this litigation and believes it has substantial defenses, this litigation has resulted in substantial Claims against the Debtor's Estate, each of which has been classified as a General Unsecured Claim.  To the extent that these litigation Claims cannot be resolved consensually, they will be litigated by the Claimant Trustee or Reorganized Debtor, as applicable.  The Debtor's major prepetition litigation is as follows:

Appellee Appx. 00032
Appx. 02897
006840

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 923 of 1017 PageID 7636
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 39 of 1803 PageID 10785
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 32 of 178

- **Redeemer Committee**: The dispute with the Redeemer Committee is described in ARTICLE II.F above. As discussed in ARTICLE II.R, the Bankruptcy Court entered an order approving a settlement that resolves the Redeemer Committee's claims against the Estate; however, that order is currently subject to appeal.

- **Acis Capital Management, L.P., & Acis Capital Management GP, LLC**: On January 30, 2018, Joshua Terry filed involuntary bankruptcy petitions against both Acis Capital Management, L.P. ("Acis LP") and its general partner, Acis Capital Management GP, LLC ("Acis GP," and collectively with Acis LP, "Acis") in the Bankruptcy Court for the Northern District of Texas, Dallas Division, the Honorable Judge Jernigan presiding (the same judge presiding over the Chapter 11 Case), Case No. 18-30264-SGJ (the "Acis Case"). Mr. Terry had been an employee of the Debtor and a limited partner of Acis LP. Mr. Terry was terminated in June 2016, and obtained a multi-million dollar arbitration award against Acis. Overruling various objections, the Bankruptcy Court entered the orders for relief for the Acis debtors in April 2018, and a chapter 11 trustee was appointed. The Debtor filed a proof of claim against Acis and an administrative claim. Acis disputes the Debtor's claim, and the Debtor has not received any distributions on its claim to date. On January 31, 2019, Acis's chapter 11 plan was confirmed, and Mr. Terry become the sole owner of reorganized Acis. Several appeals remain pending, including an appeal of the entry of the Acis orders for relief and the Acis confirmation order.

  The Acis trustee commenced a lawsuit against the Debtor, among others, alleging fraudulent conveyance and other causes of action in relation to the Debtor's alleged prepetition effort to control and transfer away Acis's assets to avoid paying Mr. Terry's claim. After the confirmation of the Acis plan, reorganized Acis allegedly supplanted the Acis Trustee as plaintiff and filed an amended complaint against the Debtor and other defendants, which claims comprise Acis's pending proof of claim against the Debtor.

  As discussed in ARTICLE II.R, the Bankruptcy Court entered an order approving a settlement that resolves Acis's claims against the Estate; however, that order is currently subject to appeal.

- **UBS Securities LLC and UBS AG London Branch**: UBS Securities LLC ("UBS Securities") filed a proof of claim in the amount of $1,039,957,799.40 [Claim No. 190] (the "UBS Securities Claim"), and UBS AG, London Branch ("UBS London," and together with UBS Securities, "UBS") filed a substantively identical proof of claim in the amount of $1,039,957,799.40 [Claim No. 191] (the "UBS London Claim" and together with the UBS Securities Claim, the "UBS Claim"). The UBS Claim was based on the amount of a judgment UBS received on a breach of contract claim against funds related to the Debtor that were unable to honor margin calls in 2008. Although the Debtor had no obligation under UBS's contracts with the funds, UBS alleges the Debtor is liable for the judgment because it (i) breached an alleged duty to ensure that the funds could pay UBS, (ii) caused or permitted $233 million in alleged fraudulent transfers to be made by

Appellee Appx. 00033
Appx. 02898
006841

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 41 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 924 of 1017    PageID 7637
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 40 of 1803    PageID 10786
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 33 of 178

Highland Financial Partners, L.P. ("HFP") in March 2009, and (iii) is an alter ego of the funds. The Debtor believes there are meritorious defenses to most, if not all, of the UBS Claim for numerous reasons, including: (i) decisions by the New York Appellate Division that limited UBS's claims to the March 2009 transfers that it alleges were fraudulent; (ii) those decisions should also apply to any alter ego claim (which at this time has not been formally asserted against the Debtor); (iii) UBS settled claims relating to $172 million of the $233 million in alleged fraudulent transfers and the Debtor is covered by the release; and (iv) the March 2009 transfers were in any event part of a wholly legitimate transaction that did not target UBS and for which HFP received fair consideration. Those and several additional defenses are described in the *Debtor's Objection to Proofs of Claim 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 928].

On October 19, 2020, both the Debtor and the Redeemer Committee filed motions seeking partial summary judgment of the UBS Claim, which, if granted, will significantly decrease the UBS Claim.[5] UBS responded to these motions on November 6, 2020 [D.I. 1341]. On November 20, 2020, the Bankruptcy Court granted partial summary judgment in favor of the Debtor and the Redeemer Committee. It is anticipated that the Bankruptcy Court will enter a formal order within the next couple of weeks.

- Patrick Daugherty: Patrick Daugherty has Filed a Proof of Claim for "at least $37,483,876.62" [Claim Nos. 67; 77] (the "Daugherty Claim").[6] Mr. Daugherty is a former limited partner and employee of the Debtor. The Daugherty Claim has three components, and Mr. Daugherty asserts claims: (1) for indemnification for any taxes Mr. Daugherty is required to pay as a result of the IRS audit of the Debtor's 2008-2009 tax return; (2) for defamation arising from a 2017 press release posted by the Debtor; and (3) arising from a pending Delaware lawsuit against the Debtor, which seeks to recover a judgment of $2.6 million in respect of Highland Employee Retention Assets ("HERA"), plus interest, from assets Mr. Daugherty claims were fraudulently transferred to the Debtor. The Daugherty Claim also seeks (a) the value of Mr. Daugherty's asserted interest in HERA, which he values at approximately $26 million; and (b) indemnification for fees incurred in the Delaware action and in previous litigation in Texas State Court. The Debtor believes that the Daugherty Claim should be allowed in the amount of

---

[5] See *Debtor's Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1180]; *Debtor's Opening Brief in Support of Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1181]; *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1183]; and *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Brief in Support of Motion for Partial Summary Judgment and Joinder in the Debtor's Motion for Partial Summary Judgment on Proof of Claim No. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1186].

[6] On October 23, 2020, Mr. Daugherty filed *Patrick Hagaman Daugherty's Motion for Leave to Amend Proof of Claim No. 77* [D.I. 1280] pursuant to which Mr. Daugherty has asked leave to amend the Daugherty Claim to assert damages of $40,710,819.42. On November 17, 2020, the Bankruptcy Court approved Mr. Daugherty's request to amend the Daugherty Claim from the bench.

- 23 -

Appellee Appx. 00034
Appx. 02899
006842

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 925 of 1017 PageID 7638
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 41 of 1803 PageID 10787
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 34 of 178

$3,722,019; however, the Debtor believes, for various reasons, that the balance of the Daugherty Claim lacks merit. The Debtor's defenses to the Daugherty Claim are described in the *Debtor's (i) Objection to Claim No. 77 of Patrick Hagaman Daugherty and (ii) Complaint to Subordinate Claim of Patrick Hagaman Daugherty* [D.I. 1008].

### H.      The Debtor's Bankruptcy Proceeding

On October 16, 2019, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). On December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Chapter 11 Case to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").[7] The Debtor continues to operate its business and manage its properties as debtor-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

An immediate effect of commencement of the Chapter 11 Case was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts, the enforcement of liens against property of the Debtor, and the continuation of litigation against the Debtor during the pendency of the Chapter 11 Case. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the later of the Effective Date and the date indicated in any order providing for the implementation of such stay or injunction.

### I.      First Day Relief

On or about the Petition Date, the Debtor filed certain "first day" motions and applications (the "First Day Motions") with the Delaware Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of this Chapter 11 Case and to facilitate the Debtor's transition to debtor-in-possession status. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Frank Waterhouse in Support of First Day Motions* [D.I. 11] (the "First Day Declaration"). At a hearing on October 19, 2019, the Delaware Bankruptcy Court granted virtually all of the relief initially requested in the First Day Motions [D.I. 39, 40, 42-44].

The Delaware Bankruptcy Court subsequently entered an order authorizing the Debtor to pay critical vendor claims on a final basis [D.I. 168]. Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Bankruptcy Court entered an order authorizing the Debtor to continue its cash management system on a final basis [D.I. 379]

The First Day Motions, the First Day Declaration, and all orders for relief granted in this case can be viewed free of charge at https://www.kccllc.net/hcmlp.

---

[7] All docket reference numbers refer to the docket maintained by the Bankruptcy Court.

- 24 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:25-cv-02072-S    Document 15-9    Filed 04/06/25    Page 926 of 1017    PageID 7639
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 42 of 1803    PageID 10788
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 35 of 178

**J.    Other Procedural and Administrative Motions**

On and after the Petition Date, the Debtor also filed a number of motions and applications to retain professionals and to streamline the administration of the Chapter 11 Case, including:

- <u>Interim Compensation Motion</u>.  On October 29, 2019, the Debtor filed the *Debtor's Motion Pursuant o Sections 105(a), 330 and 331 of the Bankruptcy Code for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 72] (the "<u>Interim Compensation Motion</u>").  The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to section 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to section 330 and 331 of the Bankruptcy Code.  On November 14, 2019, the Delaware Bankruptcy Court entered an order granting the Interim Compensation Motion [D.I. 141].

- Ordinary Course Professionals.  On October 29, 2019, the Debtor filed the Motion of the Debtor for an Order Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course of Business [D.I. 75] (the "OCP Motion").  The OCP Motion sought authority for the Debtor to retain and compensate certain professionals in the ordinary course of its business.  On November 26, 2019, the Delaware Bankruptcy Court entered an order granting the OCP Motion [D.I. 176].

- <u>Retention Applications</u>.  During the course of the chapter 11 case, the Delaware Bankruptcy Court or Bankruptcy Court, as applicable, have approved a number of applications by the Debtor seeking to retain certain professionals pursuant to sections 327, 328 and/or 363 of the Bankruptcy Code, including Pachulski Stang Ziehl & Jones LLP as legal counsel [D.I. 183], Development Specialists, Inc. as chief restructuring officer and financial advisor [D.I. 342], Kurtzman Carson Consultants LLC as administrative advisor [D.I. 74], Mercer (US) Inc. as compensation consultant [D.I. 381], Hayward & Associates PLLC as local counsel [D.I. 435], Foley Gardere, Foley & Lardner LLP as special Texas counsel [D.I. 513], Deloitte Tax LLP as tax services provider [D.I. 551], Wilmer Cutler Pickering Hale and Dorr LLP as regulatory and compliance counsel [D.I. 669], and Hunton Andrews Kurth LLP as special tax counsel [D.I. 763].

**K.    United States Trustee**

While the Chapter 11 Case was pending in the Delaware Bankruptcy Court, the U.S. Trustee for Region 3 appointed Jane Leamy as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "<u>Delaware U.S. Trustee</u>").  Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Delaware U.S. Trustee no longer represented the U.S. Trustee, and the U.S. Trustee for Region 6 appointed Lisa Lambert as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "<u>Texas U.S. Trustee</u>," and together with the

Appellee Appx. 00036
Appx. 02094
006844

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 927 of 1017    PageID 7640
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 43 of 1803    PageID 10789
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 36 of 178

Delaware U.S. Trustee, the "U.S. Trustee").  The Debtor has worked cooperatively to address concerns and comments from the U.S. Trustee's office during this Chapter 11 Case.

**L.    Appointment of Committee**

On October 29, 2019, the Delaware U.S. Trustee appointed the Committee in this Chapter 11 Case [D.I. 65].  The members of the Committee are (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP, LLP.  Meta-E Discovery is a vendor to the Debtor.  The other members of the Committee are litigants in prepetition litigation with the Debtor as described in ARTICLE II.G.  The Bankruptcy Court approved the retention of Sidley Austin LLP as counsel to the Committee [D.I. 334], Young Conaway Stargatt & Taylor, LLP as Delaware co-counsel to the Committee [D.I. 337], and FTI Consulting, Inc. as financial advisor to the Committee [D.I. 336].

**M.    Meeting of Creditors**

The meeting of creditors under section 341(a) of the Bankruptcy Code was initially scheduled for November 20, 2019, at 9:30 a.m. (prevailing Eastern Time) at the J. Caleb Boggs Federal Building, 844 N. King Street, Room 3209, Wilmington, Delaware 19801, and was rescheduled to December 3, 2019, at 10:30 a.m. (prevailing Eastern Time).  At the meeting of creditors, the Delaware U.S. Trustee and creditors asked questions of a representative of the Debtor.

Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Texas U.S. Trustee scheduled an additional meeting of creditors under section 341(a) for January 9, 2020, at 11:00 a.m. (prevailing Central Time) at the Office of the U.S. Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242, at the conclusion of that meeting, the Texas U.S. Trustee continued the meeting to January 22, 2020.  The Texas U.S. Trustee and creditors asked questions of a representative of the Debtor at the January 9 and January 22,  2020 meetings.

**N.    Schedules, Statements of Financial Affairs, and Claims Bar Date**

The Debtor filed its Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules") on December 19, 2019 [D.I. 247-248].  A creditor whose Claim is set forth in the Schedules and not identified as contingent, unliquidated or disputed may have elected to file a proof of claim against the Debtor.

The Bankruptcy Court established (i) April 8, 2020 as the deadline for Creditors (other than governmental units) to file proofs of claim against the Debtor; (ii) April 13, 2020, as the deadline for any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code), (iii) April 23, 2020, and as the deadline for any investors in any fund managed by the Debtor to file proofs of claim against the Debtor; and (iv) May 26, 2020 as the deadline for the Debtor's employees to file proofs of claim against the Debtor pursuant to and accordance with Court's order entered on April 3, 2020 [D.I. 560].[8]  Consequently, the bar date for filing proofs

---

[8] During the course of its Chapter 11 Case, the Debtor entered into stipulations to extend the Bar Date for certain other claimants or potential claimants.

Appellee Appx. 00037
Appx. 02002
006845

of claims has passed and any claims filed after the applicable bar date will be considered late filed.

**O.      Governance Settlement with the Committee**

On January 9, 2020, the Bankruptcy Court entered the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [D.I. 339] (the "Settlement Order").

Among other things, the Settlement Order approved a term sheet (the "Term Sheet") agreed to by the Debtor and the Committee pursuant to which the Debtor agreed to abide by certain protocols governing the production of documents and certain protocols governing the operation of the Debtor's business (the "Operating Protocols"). Under the Operating Protocols, the Debtor agreed to seek consent from the Committee prior to entering into certain "Transactions" (as defined in the Operating Protocols. The Operating Protocols were amended on February 21, 2020, with the consent of the Committee [D.I. 466].

Pursuant to the Term Sheet, the Debtor also granted the Committee standing to pursue certain estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and the Related Entities (as defined in the Operating Protocols) (collectively, the "Estate Claims"). To the extent permitted, the Estate Claims and the ability to pursue the Estate Claims are being transferred to either the Claimant Trust or Litigation Sub-Trust pursuant to the Plan.

In connection with the Settlement Order, an independent board of directors was also appointed at Strand, the Debtor's general partner (the "Independent Board"). The members of the Independent Board are John S. Dubel, James P. Seery, Jr., and Russell Nelms. The Independent Board was tasked with managing the Debtor's operations during the Chapter 11 Case and facilitating a reorganization or orderly liquidation of the Debtor's Estate.

**P.      Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer**

Following their appointment in January 2020, the Independent Board determined that it would be more efficient for the Debtor to have a traditional corporate management structure, i.e. a fully engaged chief executive officer supervised by the Independent Board. The Independent Board ultimately determined that Mr. Seery – a member of the Independent Board – had the requisite experience and expertise to lead the Debtor. On June 23, 2020, the Debtor filed *Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020* [D.I. 774] (the "Seery Retention Motion") to retain Mr. Seery as chief executive officer, chief restructuring officer, and foreign representative.

The Bankruptcy Court entered an order approving the Seery Retention Motion on July 16, 2020 [D.I. 854]. Mr. Seery was retained as the Debtor's chief executive officer and the duties of Bradley Sharp of DSI as the Debtor's chief restructuring officer and foreign representative were transferred to Mr. Seery.

Appellee Appx. 00038

Appx. 02998

006846

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 46 of
Case 3:25-cv-02072-S    Document 15-9    Filed 04/06/25    Page 929 of 1017    PageID 7642
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 45 of 1803   PageID 10791
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 38 of 178

**Q.     Mediation**

On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [D.I. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation and appointed Sylvia Mayer and Allan Gropper as the mediators (the "Mediators"). The mediation began on August 27, 2020, and is still open as of the date of this Disclosure Statement

**R.     Postpetition Settlements**

1.     Settlement with Acis and the Terry Parties

With the assistance of the Mediators, on September 9, 2020, (i) the Debtor, (ii) Acis LP, (iii) Acis GP, and (iv) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, and Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan (together, the "Terry Parties") executed that certain Settlement Agreement and General Release. On September 23, 2020, the Debtor filed the *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* [D.I. 1087] (the "Acis Settlement Motion").

The Settlement Agreement and General Release contain the following material terms, among others:

- The proof of claim filed by Acis [Claim No. 23] will be Allowed in the amount of $23,000,000 as a General Unsecured Claim.

- On the Effective Date of the Plan (or any other plan of reorganization confirmed by the Bankruptcy Court), the Debtor will pay in cash to:

  o     Mr. and Mrs. Terry in the amount of $425,000 plus 10% simple interest (calculated on the basis of a 360-day year from and including June 30, 2016), in full and complete satisfaction of the proof of claim filed by the Terry Parties [Claim No. 156];

  o     Acis LP in the amount of $97,000, which amount represents the legal fees incurred by Acis LP with respect to the N*WCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018), in full and complete satisfaction of the proof of claim filed by Acis LP [Claim No. 159]; and

  o     Mr. Terry in the amount of $355,000 in full and complete satisfaction of the legal fees assessed against Highland CLO Funding, Ltd., in *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey;

Appellee Appx. 00039
Appx. 02004
006847

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 47 of
Case 3:25-cv-02072-S    Document 15-9    Filed 06/25    Page 930 of 1017    PageID 7643
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 46 of 1803    PageID 10792
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 39 of 178

The Settlement Agreement also provides that within five days of the Bankruptcy Court's approval of the Settlement Agreement and the General Release, the Debtor will move to withdraw, with prejudice, the proofs of claim that the Debtor filed in the Acis bankruptcy cases and the motion filed by the Debtor in the Acis bankruptcy cases seeking an administrative claim for postpetition services provided to Acis.

On October 5, 2020, James Dondero filed an objection to the Acis Settlement Motion [D.I. 1121] (the "Dondero Objection"). On October 28, 2020, the Bankruptcy Court entered an order approving the Acis Settlement Motion and overruling the Dondero Objection in its entirety [DI.I. 1347]. On November 9, 2020, Mr. Dondero filed a notice of his intent to appeal the order approving the Acis Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Acis Settlement Motion and related documents for additional information on the Settlement Agreement and General Release.

2.    Settlement with the Redeemer Committee

The Debtor, Eames, Ltd., the Redeemer Committee, and the Crusader Funds (collectively, the "Settling Parties") executed a settlement (the "Redeemer Stipulation"). The Redeemer Stipulation was also executed, solely with respect to paragraphs 10 through 15 thereof, by Hockney, Ltd., Strand,  Highland CDO Opportunity Master Fund, L.P., Highland Credit Strategies Master Fund, L.P., Highland Credit Opportunities CDO, L.P., House Hanover, LLC, and Alvarez & Marsal CRF Management, LLC (collectively, the "Additional Release Parties"). On September 23, 2020, the Debtor filed *Debtor's Motion for Entry of an Order Approving Settlements with (A) the Redeemer Committee of the Highland Crusader Funds (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [D.I. 1089] seeking approval of the Redeemer Stipulation (the "Redeemer Settlement Motion").

The Redeemer Stipulation contains the following material terms, among others:

- The proof of claim filed by the Redeemer Committee [Claim No. 72] will be Allowed in the amount of $137,696,610 as a General Unsecured Claim;

- The proof of claim filed by the Crusader Funds [Claim No. 81] will be Allowed in the amount of $50,000 as a General Unsecured Claim;

- The Debtor and Eames, Ltd., each (a) consented to the cancellation of certain interests in the Crusader Funds held by them, and (b) agreed that they will not object to the cancellation of certain interests in the Crusader Funds held by the Charitable Donor Advised Fund;4

- The Debtor and Eames each acknowledged that they will not receive any portion of certain reserved distributions, and the Debtor further acknowledged that it will not receive any payments from the Crusader Funds in respect of any deferred fees, distribution fees, or management fees;

- 29 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 931 of 1017 PageID 7644
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 47 of 1803 PageID 10793
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 40 of 178

- The Debtor and the Redeemer Committee agreed to a form of amendment to the shareholders' agreement for Cornerstone Healthcare Group and to a process to monetize Cornerstone Healthcare Group;

- Upon the effective date of the Redeemer Stipulation, the Settling Parties and the Additional Release Parties shall exchange releases as set forth in the Redeemer Stipulation; and

- All litigation between the Debtor, Eames, Ltd., and the Additional Highland Release Parties (as defined in the Redeemer Stipulation) on the one hand, and the Redeemer Committee and the Crusader Funds, on the other hand, will cease.

On October 16, 2020, UBS filed an objection to the Redeemer Settlement Motion [D.I. 1190] (the "UBS Objection"). On October 22, 2020, the Bankruptcy Court entered an order approving the Redeemer Settlement Motion and overruling the UBS Objection in its entirety [DI.I. 1273]. On November 6, 2020, UBS filed a notice of its intent to appeal the order approving the Redeemer Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Redeemer Settlement Motion and related documents for additional information on the Redeemer Stipulation.

**S.     Certain Outstanding Material Claims**

As discussed above, April 8, 2020, was the general bar date for filing proofs of claim. The Debtor has begun the process of resolving those Claims. Although each Claim represents a potential liability of the Estate, the Debtor believes that, in addition to UBS's Claim, the Claims filed by Integrated Financial Associates, Inc. ("IFA"), the HarbourVest Entities,[9] and Hunter Mountain represent the largest unresolved Claims against the Estate.

- IFA Proof of Claim. IFA filed a proof of claim [Claim No. 93] (the "IFA Claim") seeking damages in the amount of $241,002,696.73 arising from the purported joint control of the Debtor and NexBank, SSB, and the Debtor's management of various lenders to IFA. The Debtor believes that IFA's claim should be disallowed in its entirety. IFA's claim and the Debtor's defenses thereto are described in greater detail in the *Objection to Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 868]. On October 4, 2020, the Bankruptcy Court entered the *Order Approving Stipulation Regarding Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 1126], which capped the IFA Claim, for all purposes, at $8,000,000.

- HarbourVest Entities Proofs of Claim. The HarbourVest Entities are investors in Highland CLO Funding, Ltd. ("HCLOF") and filed proofs of claim against the

---

[9] "HarbourVest Entities" means HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

Appellee Appx. 00041
Appx. 02006
006849

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 49 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 180 Page 932 of 1017 PageID 7645
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 48 of 1803 PageID 10794
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 41 of 178

Debtor's Estate [Claim No. 143, 147, 149, 150, 153, 154] (the "HarbourVest Claims"). The Debtor included an assertion of "no liability" in respect of the HarbourVest Claims in its Debtor's *First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No-Liability Claims; and (f) Insufficient Documentation Claims* [D.I. 906]. HarbourVest provided a response in its *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [D.I. 1057]. The HarbourVest Entities' response argued that the Debtor's objection should be overruled, and set forth allegations in support of claims under federal and state law and Guernsey law, including claims for fraud, violations of securities laws, breaches of fiduciary duties, and RICO violations. The Debtor intends to vigorously defend the HarbourVest Claims on various grounds, including, among others, the failure to state a claim upon which relief can be granted, the lack of reasonable reliance, the lack of misrepresentations, the lack of reasonable reliance, the failure to mitigate damages, the parties' agreements bar or otherwise limit the Debtor's liability, and waiver and estoppel. The HarbourVest Entities invested approximately $80 million in HCLOF but seek an allowed claim in excess of $300 million dollars (after giving effect to treble damages for the alleged RICO violations).

- <u>Hunter Mountain Proof of Claim</u>. Hunter Mountain is one of the Debtor's limited partners. Hunter Mountain filed a proof of claim [Claim No. 152] seeking a $60,298,739 indemnification claim against the Debtor because of the Debtor's alleged failures to make priority distributions to Hunter Mountain under the Debtor's Partnership Agreement. The Debtor believes that it has meritorious defenses to Hunter Mountain's claim. Hunter Mountain's claim and the Debtor's defenses to such claim are described in greater detail in the *Debtor's (i) Objection to Claim No. 152 of Hunter Mountain Investment Trust and (ii) Complaint to Subordinate Claim of Hunter Mountain Investment Trust and for Declaratory Relief* [D.I. 995]. The Debtor believes that Hunter Mountain's proof of claim should either be disallowed in its entirety or subordinated in its entirety.

In addition to the foregoing, the UBS Claim (in the amount of $1,039,957,799.40) and the Daugherty Claim (in the amount of $40,710,819.42) remain outstanding. As set forth above, partial summary judgment on the UBS Claim was granted in favor of the Debtor and the Redeemer Committee on November 20, 2020, and a formal order is expected to be entered within the next couple of weeks.

The Daugherty Claim has been allowed for voting purposes only in the amount of $9,134,019 [D.I. 1422]. In a bench ruling on November 20, 2020, the Bankruptcy Court allowed UBS Claims for voting purposes only in the amount of $94,761,076 [D.I. 1646].

## T. Treatment of Shared Service and Sub-Advisory Agreements

As discussed in the Plan, the Reorganized Debtor will manage the wind down of the Managed Funds. However, it is not anticipated that either the Reorganized Debtor or the

Appellee Appx. 00042
Appx. 02907
006850

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 50 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 933 of 1017    PageID 7646
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 49 of 1803    PageID 10795
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 42 of 178

Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities[10] pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.

Currently, the Debtor receives approximately $2.2 million per month in revenue from such contracts. However, in order to service those contracts, the Debtor must maintain a full staff and the cost of providing services under such contracts, among other factors, has historically resulted in a net loss to the Debtor. As such, the Debtor does not believe that assuming these contracts would benefit the Estate.

Further, the contracts generally contain anti-assignment provisions which the Debtor believes may be enforceable under 11 U.S.C. § 365(c). These provisions, therefore, would arguably prevent the assignment of such contracts without the consent of the Debtor's contract counterparty. However, even if 11 U.S.C. § 365(c) would not prevent assignment, the contracts are generally terminable at will by either party. As such, assuming and assigning such contracts without the consent of the contract counterparty would be of nominal or no benefit to the Estate. It is doubtful that any assignee would provide consideration to the Debtor for the assignment of such contract as the contract counterparty could simply terminate the contract immediately following assignment. As such, the Debtor does not believe that there is any benefit to the Estate in attempting to assign these contracts.

Notwithstanding the foregoing disclosure, the Debtor is currently assessing whether it is both possible and in the best interests of the Estate to assume and assign such shared services and sub-advisory agreements to a Related Entity.

During the course of this Chapter 11 Case, Mr. Daugherty stated that he would be willing to assume the Debtor's obligations under the shared service and sub-advisory contracts. The Independent Directors reviewed Mr. Daugherty's proposal and for the foregoing reasons, among others, determined that it was not workable and would provide no benefit to the Estate.

**U.      Portfolio Managements with Issuer Entities**

The Debtor is party to certain portfolio management agreements (including any ancillary agreements relating thereto collectively being the "Portfolio Management Agreements" and each a "Portfolio Management Agreement") with ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd. (each an "Issuer"  and collectively the "Issuers") wherein the Debtor agreed to generally provide certain services to each Issuer in the Debtor's capacity as a portfolio manager in exchange for certain fees as described in the applicable Portfolio Management Agreement.

---

[10] For the avoidance of doubt, the Debtor does not consider any of the Issuers (as defined herein) to be a Related Entity.

Appellee Appx. 00043
Appx. 02908
006851

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 934 of 1017 PageID 7647
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 50 of 1803 PageID 10796
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 43 of 178

The Issuers filed proofs of claim [Claim No. 165, 168, and 169] asserting claims against the Debtor for damages arising from, relating to or otherwise concerning (i) such Issuer's Portfolio Management Agreement(s) with the Debtor, including, without limitation, failure to perform or other breach of the Portfolio Management Agreement(s), rejection of the Portfolio Management Agreement(s), any cure amount as a result of assumption of the Portfolio Management Agreement(s), any adequate assurance of future performance as a result of assumption of the Portfolio Management Agreement(s), and any failure to provide and pay for indemnification or other obligations under the Portfolio Management Agreement(s); and (ii) the action or inaction of the Debtor to the detriment of such Issuer (collectively, the "Issuer Claims"). The Debtor believes that it has satisfied its obligations to the Issuers; that the Issuer Claims lack merit; and that the Debtor will have no liability with respect to the Issuer Claims. However, such proofs of claim remain outstanding.

The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.

The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

**V.      Resignation of James Dondero**

On October 9, 2020, Mr. Dondero resigned as an employee and portfolio manager of the Debtor.

**W.      Exclusive Periods for Filing a Plan and Soliciting Votes**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

The Debtor filed motions to extend the exclusive period, and the Bankruptcy Court entered the following orders granting such applications:

- Order Granting Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 460];

- Agreed Order Extending Exclusive Periods by Thirty Days [D.I. 668];

Appellee Appx. 00044
Appx. 02909
006852

- Order Granting Debtor's Third Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Further Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 820]; and

- Order Further Extending the Debtor's Exclusive Period for Solicitation of Acceptance of a Chapter 11 Plan [D.I. 1092].

Pursuant to the foregoing orders, the Bankruptcy Court extended the exclusivity period through June 12, 2020, for the filing of a plan, which was subsequently extended through July 13, 2020, and again through August 12, 2020. The Bankruptcy Court also extended the exclusivity period for the solicitation of votes to accept such plan through August 11, 2020, which was subsequently extended through September 10, 2020, and again through October 13, 2020, and December 4, 2020.

## X.    Negotiations with Constituents

The Debtor, Mr. Dondero, and certain of the creditors have been negotiating a consensual reorganization plan for the Debtor that contemplates the Debtor continuing its business largely in its current form. Those negotiations have yet to reach conclusion but are continuing, and the negotiations were part of the previously discussed mediation. There is no certainty that those negotiations will reach a consensual resolution of the Debtor's bankruptcy case.

## Y.    Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461.

The Debtor is the contributing sponsor of the Pension Plan. As such, the PBGC asserts that Debtor is liable to contribute to the Pension Plan the amounts necessary to satisfy the minimum funding standards in ERISA and the Internal Revenue Code of 1986, as amended ("IRC"). *See* 29 U.S.C. §§ 1082, 1083; 26 U.S.C. §§ 412, 430. As the sponsor of the Pension Plan, the PBGC asserts Debtor is also liable for insurance premiums owed to PBGC. *See* 29 U.S.C. §§ 1306, 1307. The PBGC asserts that any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are also jointly and severally liable with the Debtor for such obligations relating to the Pension Plan.

The Pension Benefit Guaranty Corporation ("PBGC"), the federal agency that administers the pension insurance program under Title IV of ERISA, filed contingent proofs of claims against the Debtors for (1) the Pension Plan's potential underfunded benefit liabilities; (2) the potential unliquidated unpaid minimum funding contributions owed to the Pension Plan; and (3) the potential unliquidated insurance premiums owed to PBGC. The PBGC acknowledges that, as of the date of this Disclosure Statement, there is nothing currently owed by the Debtor to the PBGC.

The Debtor reserves the right to contest any claims filed by the PBGC for any reason.

- 34 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 53 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 936 of 1017 PageID 7649
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 52 of 1803 PageID 10798
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 45 of 178

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

No provision contained in the Disclosure Statement, the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof), shall be construed as discharging, releasing, exculpating, or relieving any person or entity, including the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, government policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions for satisfaction, release, injunction, exculpation, and discharge of claims in the Plan, Confirmation Order, or the Bankruptcy Code.

### ARTICLE III.
### SUMMARY OF THE PLAN

---

**THIS ARTICLE III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

---

**A.    Administrative and Priority Tax Claims**

1.    Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 54 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 937 of 1017    PageID 7650
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 53 of 1803    PageID 10799
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 46 of 178

relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

2.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

Appellee Appx. 00047
Appx. 02312
006835

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 55 of
Case 3:25-cv-02072-S    Document 15-9    Filed 04/06/25    Page 938 of 1017    PageID 7651
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 54 of 1803    PageID 10800
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41    Page 47 of 178

3.    <u>Priority Tax Claims</u>

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**B.    Classification and Treatment of Classified Claims and Equity Interests**

1.    <u>Summary</u>

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

Appellee Appx. 00048
Appx. 02213
006856

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 56 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 939 of 1017    PageID 7652
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 55 of 1803    PageID 10801
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 48 of 178

### Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

2.    Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

3.    Impaired/Voting Classes

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

Please refer to "Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests" and "Instructions and Procedures for Voting" in ARTICLE I.C.7 and ARTICLE I.C.8 for a discussion of how the how votes on the Plan will be solicited and tabulated.

4.    Unimpaired/Non-Voting Classes

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

5.    Impaired/Non-Voting Classes

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

- 38 -

Appellee Appx. 00049
Appx. 02314
006857

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 57 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 940 of 1017    PageID 7653
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 56 of 1803    PageID 10802
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 49 of 178

6.    <u>Cramdown</u>

If any Class of Claims or Equity Interests is deemed to reject the Plan or does not vote to accept the Plan, the Debtor may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms of the Plan and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**C.    Classification and Treatment of Claims and Equity Interests**

1.    *Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

2.    *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- 39 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 58 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 941 of 1017    PageID 7654
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 57 of 1803    PageID 10803
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 50 of 178

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

  The New Frontier Note will include the following terms:  (i) an extension of the maturity date to December 31, 2022; (ii) quarterly interest only payments; (iii) a payment on the New Frontier Note equal to fifty percent of the outstanding principal on December 31, 2021, if the New Frontier Note is not paid in full on or prior to such date; (iv) mandatory prepayments from the proceeds of the sale of any collateral securing the New Frontier Note; and (v) the payment of fees and expenses incurred in negotiating the terms of the New Frontier Note.

3.    <u>*Class 3 – Other Secured Claims*</u>

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

4.    <u>*Class 4 – Priority Non-Tax Claims*</u>

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

Appellee Appx. 00051
Appx. 02916
006839

- *Impairment and Voting*: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

5. <u>*Class 5 – Retained Employee Claims*</u>

- *Classification*: Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*: Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

6. <u>*Class 6 – PTO Claims*</u>

- *Classification*: Class 6 consists of the PTO Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*: Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

  "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

7. <u>*Class 7 – Convenience Claims*</u>

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is

Appellee Appx. 00052

Appx. 02917

006860

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 60 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 943 of 1017    PageID 7656
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 59 of 1803    PageID 10805
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 52 of 178

Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

*"Convenience Claim"* means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

*"Convenience Claim Pool"* means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein.  Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

By making the GUC Election on their Ballots, each Holder of a Convenience Claim can elect the treatment provided to General Unsecured Claims.

8. <u>*Class 8 – General Unsecured Claims*</u>

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes the Convenience Class Election.

Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and

- 42 -

Appellee Appx. 00053
Appx. 02918
006861

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 61 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 944 of 1017 PageID 7657
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 60 of 1803 PageID 10806
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 53 of 178

will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

  "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

  "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

9. <u>*Class 9 – Subordinated Claims*</u>

- *Classification*:  Class 9 consists of the Subordinated Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject the Plan.

  "*Subordinated Claim*" means any Claim that (i) is or may be subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court or (ii) arises from a

- 43 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 62 of
Case 3:25-cv-02072-S    Document 15-9    Filed 04/06/25    Page 945 of 1017    PageID 7658
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 61 of 1803    PageID 10807
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 54 of 178

Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest.

10. _Class 10 – Class B/C Limited Partnership Interests_

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject the Plan.

11. _Class 11 – Class A Limited Partnership Interests_

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

Appellee Appx. 00055
Appx. 02929
006863

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 63 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 946 of 1017    PageID 7659
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 62 of 1803    PageID 10808
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 55 of 178

- • *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject the Plan.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**E.    Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**F.    Means for Implementation of the Plan**

1.    <u>Summary</u>

The Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Appellee Appx. 00056
Appx. 02824
006864

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 64 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 947 of 1017    PageID 7660
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 63 of 1803   PageID 10809
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 56 of 178

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement.  Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in the Plan and the Claimant Trust Agreement.

    2.    <u>The Claimant Trust</u>[11]

    (a)    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries.  Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets.  The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust.  Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims.  The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee.  The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant

---

[11] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Appellee Appx. 00057
Appx. 02922
006865

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 65 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 948 of 1017    PageID 7661
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 64 of 1803    PageID 10810
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 57 of 178

Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement.  The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust.  Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement.  After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee.  The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement.  The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution.  Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

(a)    *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members.  Four of the five members will be representatives of the members of the Committee:  (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery.  The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor.  The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement.  The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement.  Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

Appellee Appx. 00058
Appx 02323
006866

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 66 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 949 of 1017 PageID 7662
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 65 of 1803 PageID 10811
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 58 of 178

(b)     *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in the Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in Article IV.C of the Plan.

(c)     *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

(d)     *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

- the payment of the Claimant Trust Expenses;

- the payment of other reasonable expenses of the Claimant Trust;

- the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

- the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

- the orderly monetization of the Claimant Trust Assets;

- litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

- the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

Appellee Appx. 00059
Appx. 02934
006867

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 67 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 950 of 1017    PageID 7663
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 66 of 1803    PageID 10812
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 59 of 178

• the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

• the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expenses and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee.

The Litigation Sub-Trust Agreement generally will provide for, among other things:

• the payment of other reasonable expenses of the Litigation Sub-Trust;

• the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

• the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

- 49 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 68 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 951 of 1017    PageID 7664
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 67 of 1803   PageID 10813
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 60 of 178

(e)    *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(f)    *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

(g)    *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(h)    *Tax Reporting.*

The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

Appellee Appx. 00061
Appx. 02926
006869

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 69 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 952 of 1017 PageID 7665
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 68 of 1803 PageID 10814
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 61 of 178

The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

(i)    *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in the Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

(j)    *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

(k)    *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

(l)    *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are

- 51 -

Appellee Appx. 00062
Appx. 02325
006870

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 70 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 953 of 1017    PageID 7666
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 69 of 1803    PageID 10815
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 62 of 178

investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

(m)    *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

3.    The Reorganized Debtor

(a)    *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

Appellee Appx. 00063
Appx. 02928
006871

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 71 of
Case 3:25-cv-02072-S   Document 15-9   Filed 04/06/25   Page 954 of 1017   PageID 7667
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 70 of 1803   PageID 10816
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 63 of 178

(b)    *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

(c)    *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

(d)    *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC.  The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

(e)    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

Appellee Appx. 00064
Appx. 02929
006872

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 72 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 955 of 1017   PageID 7668
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 71 of 1803   PageID 10817
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 64 of 178

(f)     *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court

(g)     *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in Article IV.B.1 of the Plan, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

4.     <u>Company Action</u>

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement

Appellee Appx. 00065
Appx. 02939
006873

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 73 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 956 of 1017 PageID 7669
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 72 of 1803 PageID 10818
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 65 of 178

of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

### 5. Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

### 6. Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the

Appellee Appx. 00066
Appx. 02931
006874

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 74 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 957 of 1017    PageID 7670
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 73 of 1803    PageID 10819
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 66 of 178

cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

7.    Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

8.    Control Provisions

To the extent that there is any inconsistency between the Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, the Plan shall control.

9.    Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under Article III.C of the Plan shall receive no Plan Distributions.

10.    Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I of the Plan) and fully enforceable as if stated in full herein.

11.    Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal

Appellee Appx. 00067
Appx. 02932
006875

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 75 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 958 of 1017 PageID 7671
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 74 of 1803 PageID 10820
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 67 of 178

Revenue Code (the "<u>IRC</u>"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

A.    **Treatment of Executory Contracts and Unexpired Leases**

    1.    <u>Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases</u>

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan Supplement, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Effective Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts

Appellee Appx. 00068
Appx. 02938
006876

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 76 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 959 of 1017   PageID 7672
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 75 of 1803   PageID 10821
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 68 of 178

and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [D.I. 1122].

2.  Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Effective Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to the Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

3.  Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with the Plan and setting forth the proposed cure amount (if any).

Appellee Appx. 00069
Appx. 02994
006877

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 77 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 960 of 1017    PageID 7673
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 76 of 1803    PageID 10822
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 69 of 178

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to Article V.C of the Plan shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to Article V.C of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## B.    Provisions Governing Distributions

### 1.    Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in the Plan. Except as otherwise provided in the Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to the Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

Appellee Appx. 00070
Appx. 02935
006878

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 78 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 961 of 1017    PageID 7674
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 77 of 1803   PageID 10823
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 70 of 178

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

2.    Distribution Agent

Except as provided herein, all distributions under the Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

3.    Cash Distributions

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

4.    Disputed Claims Reserve

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

As used above, "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant

Appellee Appx. 00071
Appx. 02936
006879

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 79 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 962 of 1017    PageID 7675
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 78 of 1803    PageID 10824
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 71 of 178

Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

"*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

HarbourVest and Mr. Daugherty have objected to the mechanisms for calculating the amount of the Disputed Claims Reserve with respect to the HarbourVest Claim and the Daugherty Claim, respectively, and intend to press their objections at the hearing for confirmation of the Plan.

5.    Distributions from the Disputed Claims Reserve

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

6.    Rounding of Payments

Whenever the Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under the Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under the Plan.

7.    *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under the Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in Article VI.I of the Plan within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall

Appellee Appx. 00072
Appx. 02935
006880

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 80 of
Case 3:25-cv-02072-S  Document 15-9  Filed 10/06/25  Page 963 of 1017  PageID 7676
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 79 of 1803  PageID 10825
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20  Entered 11/24/20 10:24:41  Page 72 of 178

revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

        8.     <u>Distributions on Account of Allowed Claims</u>

Except as otherwise agreed by the Holder of a particular Claim or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

        9.     <u>General Distribution Procedures</u>

The Distribution Agent shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under the Plan shall not be subject to any claim by any Person.

        10.    <u>Address for Delivery of Distributions</u>

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

        11.    <u>Undeliverable Distributions and Unclaimed Property</u>

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under the Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

Appellee Appx. 00073
Appx. 02938
006881

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 81 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 180 Page 964 of 1017 PageID 7677
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 80 of 1803 PageID 10826
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 73 of 178

12. <u>Withholding Taxes</u>

In connection with the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under the Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

13. <u>Setoffs</u>

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

14. <u>Surrender of Cancelled Instruments or Securities</u>

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to Article IV of the Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

15. <u>Lost, Stolen, Mutilated or Destroyed Securities</u>

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any

- 63 -

Appellee Appx. 00074
Appx. 02939
006882

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 82 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 965 of 1017    PageID 7678
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 81 of 1803    PageID 10827
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 74 of 178

damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest.  Upon compliance with Article VI.O of the Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**C.      Procedures for Resolving Contingent, Unliquidated and Disputed Claims**

      1.      <u>Filing of Proofs of Claim</u>

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

      2.      <u>Disputed Claims</u>

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest or any other appropriate motion or adversary proceeding with respect thereto, which shall be litigated to Final Order or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of the Plan.

      3.      <u>Procedures Regarding Disputed Claims or Disputed Equity Interests</u>

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

      4.      <u>Allowance of Claims and Equity Interests</u>

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

*Allowance of Claims*

After the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and

**Appellee Appx. 00075**
**Appx. 02949**
**006883**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 83 of
Case 3:25-cv-02072-S   Document 15-9   Filed 06/25   Page 966 of 1017   PageID 7679
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 82 of 1803   PageID 10828
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 75 of 178

defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

### *Estimation*

Subject to the other provisions of the Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with the Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

### *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

Appellee Appx. 00076
Appx. 02944
006884

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 84 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 967 of 1017   PageID 7680
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 83 of 1803   PageID 10829
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 76 of 178

**D.**     **Effectiveness of the Plan**

1.     <u>Conditions Precedent to the Effective Date</u>

The Effective Date of the Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of Article VIII.B of the Plan of the following:

- the Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to the Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have been entered, not subject to stay pending appeal, and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate the Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in the Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under the Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; (iii) the implementation of the Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under the Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

- All documents and agreements necessary to implement the Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

Appellee Appx. 00077
Appx. 02942
006885

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 85 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 968 of 1017    PageID 7681
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 84 of 1803   PageID 10830
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 77 of 178

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement the Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Professional Fee Reserve shall be funded pursuant to the Plan in an amount determined by the Debtor in good faith.

2.   <u>Waiver of Conditions</u>

The conditions to effectiveness of the Plan set forth in Article VIII of the Plan (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate the Plan.  The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

3.   <u>Effect of Non-Occurrence of Conditions to Effectiveness</u>

Unless waived as set forth in Article VIII.B of the Plan, if the Effective Date of the Plan does not occur within twenty calendar days of entry of the Confirmation Order, the Debtor may withdraw the Plan and, if withdrawn, the Plan shall be of no further force or effect.

4.   <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto).  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

Appellee Appx. 00078
Appx 02943
006886

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 86 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 969 of 1017    PageID 7682
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 85 of 1803    PageID 10831
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 78 of 178

E.     **Exculpation, Injunction, and Related Provisions**

1.     General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

For purposes of the following provisions:

- "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

- "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

- "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO

- 68 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 970 of 1017 PageID 7683
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 86 of 1803 PageID 10832
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 79 of 178

Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

2. <u>Discharge of Claims</u>

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

3. <u>Exculpation</u>

Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

Appellee Appx. 00080
Appx. 02945
006888

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 88 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 971 of 1017    PageID 7684
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 87 of 1803    PageID 10833
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 80 of 178

4.      Releases by the Debtor

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to Article IX.D of the Plan (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with

Appellee Appx. 00081
Appx. 02946
006889

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 89 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 972 of 1017    PageID 7685
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 88 of 1803    PageID 10834
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 81 of 178

respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to Article IX.D of the Plan will vest and the Employee will be indefeasibly released pursuant to Article IX.D of the Plan if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

In addition to the obligations set forth in Article IX.D of the Plan, as additional consideration for the foregoing releases, the Senior Employees will waive their rights to certain deferred compensation owed to them by the Debtor.  As of the date hereof, the total deferred compensation owed to the Senior Employees was approximately $3.9 million, which will be reduced by approximately $2.2 million to approximately $1.7 million.   That reduction is composed of a reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.

As of the date of this Disclosure Statement, the Debtor has not identified any Causes of Action against any Released Parties.  However, as set forth above, during the Chapter 11 Case, the Committee was granted sole standing to investigate and pursue the Estate Claims, which may include Causes of Action against certain of the Released Parties.  As of the date of this Disclosure Statement, the Committee has not identified any Estate Claims against any Released Parties.  The Debtor currently believes that there are no material Estate Claims or other Causes of Action against any Released Party.

5.      Preservation of Rights of Action

*Maintenance of Causes of Action*

Except as otherwise provided in the Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as

Appellee Appx. 00082
Appx. 02917
006890

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 973 of 1017 PageID 7686
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 89 of 1803 PageID 10835
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 82 of 178

appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

*Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

6.     <u>Injunction</u>

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective Related Persons, are permanently enjoined, on and after the Effective Date, with respect to such Claims and Equity Interests, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any

Appellee Appx. 00083
Appx. 02948
006891

judgment, award, decree, or order against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or against property or interests in property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The injunctions set forth herein shall extend to any successors of the Debtor, the Reorganized Debtor, and the Claimant Trust and their respective property and interests in property.

**Subject in all respects to Article XII. D of the Plan, no Entity may commence or pursue a claim or cause of action of any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; *provided, however,* the foregoing will not apply to Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  As set forth in Article XI of the Plan, the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted.**

7.      Term of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

8.      Continuance of January 9 Order

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course,* entered by the Bankruptcy Court on

Appellee Appx. 00084

Appx. 02949

006892

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 92 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 975 of 1017    PageID 7688
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 91 of 1803    PageID 10837
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 84 of 178

January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date until the dissolution of each of the Claimant Trust and the Litigation Trust.

**F.      Article XII.D of the Plan**

Article XII.D of the Plan provides that, notwithstanding anything in the Plan to the contrary, nothing in the Plan will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**G.      Binding Nature of Plan**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in Article IX of the Plan, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a)

**H.      Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtor believes that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtor has complied and will comply with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Debtor's bankruptcy case, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the

Appellee Appx. 00085
Appx. 02959
006893

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 93 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 976 of 1017   PageID 7689
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 92 of 1803   PageID 10838
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 85 of 178

approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor thereto under the Plan;

- The Debtor has paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits, if applicable.

1.    <u>Best Interests of Creditors Test</u>

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that each holder of a claim or equity interest in each impaired class:  (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.   To make these findings, the Bankruptcy Court must:  (a) estimate the net Cash proceeds (the "<u>Liquidation Proceeds</u>") that a chapter 7 trustee would generate if the Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (b) determine the distribution (the "<u>Liquidation Distribution</u>") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

2.    <u>Liquidation Analysis</u>

Any liquidation analysis, including the estimation of Liquidation Proceeds and Liquidation Distributions, with respect to the Debtor (the "<u>Liquidation Analysis</u>") is subject to numerous assumptions and there can be no guarantee that the Liquidation Analysis will be accurate.  No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims and Equity Interests  at the projected amounts of Allowed Claims

Appellee Appx. 00086
Appx. 02951
006894

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 94 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 977 of 1017    PageID 7690
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 93 of 1803   PageID 10839
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 86 of 178

and Equity Interests set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims and Equity Interests that represents its best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims and Equity Interests.  The estimate of the amount of Allowed Claims and Equity Interests set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any Plan Distribution to be made on account of Allowed Claims and Equity Interests under the Plan and Disclosure Statement.

The full Liquidation Analysis is attached hereto as **Exhibit C**.

Furthermore, any chapter 7 trustee appointed in a chapter 7 liquidation would have to confront all of the issues described in this Disclosure Statement, including the prepetition litigation claims.  This process would be significantly time-consuming and costly, and reduce any recoveries available to the Debtor's Estate.  The Debtor believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of executory contracts in connection with the cessation of the Debtor's operations, and (iii) the failure to realize greater value from all of the Debtor's assets.

Therefore, the Debtor believes that confirmation of the Plan will provide each Holder of a Claim with a greater recovery than such Holder would receive pursuant to the liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

3.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, or any successor to the Debtor, unless the plan contemplates such liquidation or reorganization.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of the Claimant Trust and the Reorganized Debtor to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business.  A copy of the financial projections prepared by the Debtor is attached hereto as **Exhibit C**.

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtor analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtor believes that its available Cash and any additional proceeds from the Debtor's Assets will be sufficient to allow the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, to make all payments required to be made under the Plan.  Accordingly, the Debtor believes that the Plan is feasible.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 95 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 978 of 1017    PageID 7691
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 94 of 1803   PageID 10840
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 87 of 178

4.     <u>Valuation</u>

In order to provide information and full disclosure to parties in interest regarding the Debtor's assets, the Debtor estimates that its value and the total value of its Assets, as of September 30, 2020, was approximately $328.3 million.

5.     <u>Acceptance by Impaired Classes</u>

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accepts the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (i) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default— (a) cures any such default that occurred before or after the commencement of the Chapter 11 Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (b) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (d) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders.  Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of equity interests as acceptance by holders of at least two-thirds in amount of the allowed interests of such class.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims or Equity Interests in any voting class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Class, and without considering whether the Plan "discriminates unfairly" with respect to such Class, as both standards are described herein.

Appellee Appx. 00088
Appx. 02958
006896

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 96 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 979 of 1017    PageID 7692
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 95 of 1803   PageID 10841
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 88 of 178

6.     <u>Confirmation Without Acceptance by Impaired Classes</u>

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtor's request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

7.     <u>No Unfair Discrimination</u>

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

8.     <u>Fair and Equitable Test</u>

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed

Appellee Appx. 00089
Appx. 02954
006897

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 97 of
Case 3:25-cv-02072-S Document 15-9 Filed 06/06/25 Page 980 of 1017 PageID 7693
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 96 of 1803 PageID 10842
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 89 of 178

amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests rejects the Plan, the Debtor reserves the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.C of the Plan.

The Debtor believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

**ARTICLE IV.**
**RISK FACTORS**

> **ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.**

**A.      Certain Bankruptcy Law and Other Considerations**

    1.      <u>Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests, or Designation as Unimpaired.</u>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Holders of Claims or Equity Interests or the Bankruptcy Court will reach the same conclusion.

There is also a risk that the Holders of Claims or Equity Interests could object to the Debtor's designation of Claims or Equity Interests as Unimpaired, and the Bankruptcy Court could reach the same conclusion.

    2.      <u>The Debtor May Not Be Able to Secure Confirmation of the Plan.</u>

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a

- 79 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 98 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 981 of 1017   PageID 7694
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 97 of 1803   PageID 10843
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 90 of 178

need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

> 3.    The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

> 4.    Continued Risk Following Effectiveness.

Even if the Effective Date of the Plan occurs, the Debtor, the Reorganized Debtor, and Claimant Trust will continue to face a number of risks, including certain risks that are beyond its control, such as changes in assets, asset values, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of liquidation reflecting the Plan will achieve the Debtor's stated goals.

In addition, at the outset of the Chapter 11 Case, the Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtor will have retained the exclusive right to propose the Plan upon filing its petition. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's stated goals.

> 5.    The Effective Date May Not Occur.

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

Appellee Appx. 00091
Appx. 02956
006899

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 99 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 982 of 1017 PageID 7695
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 98 of 1803 PageID 10844
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 91 of 178

6. The Chapter 11 Case May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than selling the assets in an orderly and controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

7. Claims Estimation

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

8. The Financial Information Contained Herein is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit was Performed.

**The financial information contained in this Disclosure Statement has not been audited**. In preparing this Disclosure Statement, the Debtor relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtor has used its reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement and, while the Debtor believes that such financial information fairly reflects its financial condition, the Debtor is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**B.     Risks Related to Recoveries under the Plan**

1. The Reorganized Debtor and/or Claimant Trust May Not Be Able to Achieve the Debtor's Projected Financial Results

The Reorganized Debtor or Claimant Trust, as applicable, may not be able to achieve their projected financial results. The Financial Projections represent the best estimate of the Debtor's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtor or Claimant Trust, as well as the United States and world economies in general, and the investment industry in which the Debtor operates. The Debtor's Financial Projections include key assumptions on (i) target asset monetization values, (ii) timing of asset monetization, and (iii) costs to effectuate the Plan. In terms of achieving target asset monetization values, the Debtor faces issues including investment assets with cross-ownership across related entities and challenges associated with

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 100 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 983 of 1017 PageID 7696
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 99 of 1803 PageID 10845
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 92 of 178

collecting notes due from affiliates. The Debtor's Financial Projections anticipate that all investment assets will be sold by 2022, which may be at risk due to the semi-liquid or illiquid nature of the Debtor's assets, as well as general market conditions, including the sustained impact of COVID-19. Costs are based on estimates and may increase with delays or any other unforeseen factor. If the Reorganized Debtor or Claimant Trust do not achieve their projected financial results, the recovery for Claimant Trust Beneficiaries may be negatively affected and the Claimant Trust may lack sufficient liquidity after the Effective Date.

2.     Claim Contingencies Could Affect Creditor Recoveries

The estimated Claims and projected creditor recoveries set forth in this Disclosure Statement are based on various assumptions the actual amount of Allowed Claims may differ from the estimates. Should one or more of the underlying assumptions ultimately prove incorrect, the actual Allowed amounts of Claims may vary materially from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

3.     If Approved, the Debtor Release Could Release Claims Against Potential Defendants of Estate Causes of Action With Respect to Which the Claimant Trust Would Otherwise Have Recourse

The Claimant Trust Assets will include, among other things, Causes of Action, including Estate Claims that will be assigned to the Litigation Sub-Trust. The Committee's investigation of potential Estate Claims is still ongoing. Because the Committee has not concluded its investigation as of the date hereof, and such investigation will be transferred to the Litigation Trustee, there is no certainty of whether there are viable Estate Claims against any of the Released Parties. In the event there are viable Estate Claims against any of the Released Parties, such claims cannot be pursued for the ultimate benefit of Claimant Trust Beneficiaries if the Debtor Release is approved.

**C.     Investment Risk Disclaimer**

1.     Investment Risks in General.

The Reorganized Debtor is and will remain a registered investment adviser under the Investment Advisers Act of 1940, and the Reorganized Debtor will continue advising the Managed Funds. No guarantee or representation is made that the Reorganized Debtor's or the Managed Funds' investment strategy will be successful, and investment results may vary substantially over time.

2.     General Economic and Market Conditions and Issuer Risk.

Any investment in securities carries certain market risks. Investments by the Reorganized Debtor, the Managed Funds, or the Claimant Trust may decline in value for any number of reasons over which none of the Managed Funds, the Reorganized Debtor, the Claimant Trust, or the Claimant Trustee may have control, including changes in the overall

Appellee Appx. 00093
Appx. 02958
006901

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 101 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 984 of 1017 PageID 7697
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 100 of 1803 PageID 10846
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 93 of 178

market and other general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws, currency exchange rates and controls and national, international political circumstances (including wars and security operations), and acts of God (including pandemics like COVID-19). The value of the Managed Funds or the assets held by the Reorganized Debtor or Claimant Trust may also decline as a result of factors pertaining to particular securities held by the Managed Funds, Reorganized Debtor, or Claimant Trust, as applicable, such as perception or changes in the issuer's management, the market for the issuer's products or services, sources of supply, technological changes within the issuer's industry, the availability of additional capital and labor, general economic conditions, political conditions, acts of God, and other similar conditions. All of these factors may affect the level and volatility of security prices and the liquidity and the value of the securities held by the Managed Fund, Reorganized Debtor, or Claimant Trust. Unexpected volatility or illiquidity could impair the Managed Funds', Reorganized Debtor's, or Claimant Trust's profitability or result in it suffering losses.

**D.      Disclosure Statement Disclaimer**

> 1.      <u>The Information Contained Herein is for Disclosure Purposes Only.</u>

The information contained in this Disclosure Statement is for purposes of disclosure in connection with the Plan and may not be relied upon for any other purposes.

> 2.      <u>This Disclosure Statement was Not Approved by the SEC.</u>

Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

> 3.      <u>This Disclosure Statement Contains Forward-Looking Statements.</u>

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.

> 4.      <u>No Legal or Tax Advice is Provided to You by This Disclosure Statement.</u>

**This Disclosure Statement is not legal or tax advice to you**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

Appellee Appx. 00094
Appx. 02959
006902

5.    No Admissions Are Made by This Disclosure Statement.

The information and statements contained in this Disclosure Statement will neither (i) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (ii) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, the Claimant Trust, Holders of Allowed Claims or Equity Interests, or any other parties in interest.

6.    No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtor or the Reorganized Debtor or Claimant Trustee, as applicable, may seek to investigate, file and prosecute litigation rights and claims against any third parties and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims or Equity Interests.

7.    Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets.

The Debtor, the Reorganized Debtor, the Claimant Trustee, or any party in interest, as the case may be, reserve any and all rights to object to that Holder's Allowed Claim regardless of whether any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

8.    The Information Used Herein was Provided by the Debtor and was Relied Upon by the Debtor's Advisors.

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9.    The Disclosure Statement May Contain Inaccuracies.

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, the information contained in this Disclosure Statement is as of the date of the Disclosure Statement and does not address events that may occur after such date. The Debtor may update this Disclosure Statement but is not required to do so.

Appellee Appx. 00095
Appx. 02909
006903

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 103 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 986 of 1017   PageID 7699
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 102 of 1803   PageID 10848
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 95 of 178

          10.    <u>No Representations Made Outside the Disclosure Statement Are Authorized.</u>

No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  You should promptly report unauthorized representations or inducements to the counsel to the Debtor and the U.S. Trustee.

## ARTICLE V.
## ALTERNATIVES TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtor's assets.  If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan.  In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

## ARTICLE VI.
## U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

Implementation of the Plan will have federal, state, local or foreign tax consequences to the Debtor and Holders of Equity Interests as well as Holders of Claims.  No tax opinion or ruling has been sought or will be obtained with respect to any tax consequences of the Plan, and the following discussion does not constitute and is not intended to constitute either a tax opinion or tax advice to any person.

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtor and to Holders of Claims.  This discussion assumes that each Holder of Claims is for United States federal income tax purposes:

- An individual who is a citizen or resident of the United States for federal income tax purposes;

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- any other person that is subject to U.S. federal income taxation on a net income basis.

- an estate the income of which is subject to United States federal income tax without regard to its source; or

- a trust (1) that is subject to the primary supervision of a United States court and the control of one or more United States persons or (2) that has a valid election in effect under applicable treasury regulations to be treated as a United States person.

- 85 -

Appellee Appx. 00096
Appx. 02961
006904

This discussion also assumes that each Holder holds the Claims as capital assets under Section 1221 of the Internal Revenue Code.

The summary provides general information only and does not purport to address all of the federal income tax consequences that may be applicable to the Debtor or to any particular Holder of Claims in light of such Holder's own individual circumstances. In particular, the summary does not address the federal income tax consequences of the Plan to Holders of Claims that may be subject to special rules, such as non-U.S. persons, insurance companies, financial institutions, regulated investment companies, broker-dealers, persons who acquired Claims as part of a straddle, hedge, conversion transaction or other integrated transaction, or persons who acquired Claims in connection with the performance of services; persons who hold Claims through a partnership or other pass-through entity and tax-exempt organizations. The summary does not address foreign, state, local, estate or gift tax consequences of the Plan, nor does it address the federal income tax consequences to Holders of Equity Interests.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), the final, temporary and proposed Treasury regulations promulgated thereunder, judicial decisions and administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, judicial decision or administrative action. Moreover, due to a lack of definitive authority, substantial uncertainties exist with respect to various tax consequences of the Plan.

**THE TAX CONSEQUENCES TO THE HOLDERS OF CLAIMS OR EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

A.      **Consequences to the Debtor**

It is anticipated that the consummation of the Plan will not result in any federal income tax liability to the Debtor. The Debtor is a partnership for federal income tax purposes. Therefore, the income and loss of the Debtor is passed-through to the Holders of its Equity Interests, and the Debtor does not pay federal income tax.

1.      Cancellation of Debt

Generally, the discharge of a debt obligation of a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income that must be included in the debtor's income. Due to the nature of the Impaired Claims, it is anticipated that

- 86 -

Appellee Appx. 00097

Appx. 02992

006905

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 105 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 988 of 1017   PageID 7701
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 104 of 1803   PageID 10850
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 97 of 178

the Debtor will not recognize any material amount of COD income.  If any such COD income is recognized, it will be passed-through to the Holders of its Equity Interests, and the Holders of such Equity Interest generally will be required to include such amounts in income, unless a Holder is entitled to exclude such amounts from income under Section 108 of the Internal Revenue Code, based on the Holder's individual circumstances.

    2.    <u>Transfer of Assets</u>

Pursuant to the Plan, the Debtor's assets (including the Claimant Trust Assets and Reorganized Debtor Assets) will be transferred directly or indirectly to the Claimant Trust.  For federal income tax purposes, any such assets transferred to the Claimant Trust will be deemed to have been transferred to the Claimant Trust Beneficiaries followed by the transfer by such Holders to the Claimant Trust of such assets in exchange for the respective Holders' beneficial interests in the Claimant Trust.  The Claimant Trust thereafter will be treated as a grantor trust for federal income tax purposes.  See U.S. Federal Income Tax Treatment of the Claimant Trust, below.

The Debtor's transfer of its assets pursuant to the Plan will constitute a taxable disposition of such assets.  As discussed above, the Debtor is a partnership for federal income tax purposes.  Any gain or loss recognized as a result of the taxable disposition of such assets will be passed through to the Holders of Equity Interests in the Debtor.  The Debtor will not be required to pay any tax as a result of such disposition.

**B.**    **U.S. Federal Income Tax Treatment of the Claimant Trust**

It is intended that the Claimant Trust will be treated as a "grantor trust" for U.S. federal income tax purposes.  In general, a grantor trust is not a separate taxable entity.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Consistent with the requirements of Revenue Procedure 94-45, the Claimant Trust Agreement requires all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the Debtor's assets to the Claimant Trust as (i) a transfer of such assets to the Claimant Trust Beneficiaries (to the extent of the value of their respective interests in the applicable Claimant Trust Assets) followed by (ii) a transfer of such assets by such beneficiaries to the Claimant Trust (to the extent of the value of their respective interests in the applicable Claimant Trust Assets), with the beneficiaries being treated as the grantors and owners of the Claimant Trust.

The Plan and the Claimant Trust Agreement generally provide that the Claimant Trust Beneficiaries must value the assets of the Claimant Trust consistently with the values determined by the Claimant Trustee for all U.S. federal income tax purposes.  As soon as possible after the Effective Date, the Claimant Trustee, based upon his good faith determination after consultation with his counsel and other advisors, shall inform the beneficiaries in writing as to his estimate of the value of the assets transferred to the Claimant Trust and the value of such assets allocable to each Class of beneficiaries.

Consistent with the treatment of the Claimant Trust as a grantor trust, the Claimant Trust Agreement will require each beneficiary to report on its U.S. federal income tax return its allocable share of the Claimant Trust's income, gain, loss or deduction that reflects the

Appellee Appx. 00098
Appx. 02963
006906

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 106 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 989 of 1017    PageID 7702
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 105 of 1803    PageID 10851
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 98 of 178

beneficiary's interest in the interim and final distributions to be made by the Claimant Trust. Furthermore, certain of the assets of the Claimant Trust will be interests in the Reorganized Debtor, which will be a partnership for U.S. federal income tax purposes. The income, gain, loss or deduction of the Reorganized Debtor will also flow through the Claimant Trust to the beneficiaries of the Claimant Trust. Therefore, a beneficiary may incur a federal income tax liability with respect to its allocable share of the income of the Claimant Trust (including the income of the Reorganized Debtor) whether or not the Claimant Trust has made any distributions to such beneficiary. The character of items of income, gain, deduction, and credit to any beneficiary and the ability of such beneficiary to benefit from any deduction or losses will depend on the particular situation of such beneficiary. The interests of the beneficiaries may shift from time to time as the result of the allowance or disallowance of claims that have not been allowed at the Effective Date, which could give rise to tax consequences both to the Holders of claims that have, and have not been, allowed at the Effective Date. The Claimant Trustee will file with the IRS tax returns for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each beneficiary a separate statement setting forth such beneficiary's share of items of Trust income, gain, loss, deduction, or credit. Each beneficiary will be required to report such items on its U.S. federal income tax return. Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of distributions from the Claimant Trust.

The discussion above assumes that the Claimant Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Claimant Trust and the beneficiaries could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Claimant Trust).

**C.    Consequences to Holders of Allowed Claims**

1.    <u>Recognized Gain or Loss</u>

In general, each Holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest). In general, the "amount realized" by a Holder will equal the sum of any cash and the aggregate fair market value of any property received by such Holder pursuant to the Plan (for example, such Holder's undivided beneficial interest in the assets of the Claimant Trust). A Holder that receives or is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its receipt or deemed receipt. See U.S. Federal Income Tax Treatment of the Claimant Trust, above for more information regarding the tax treatment of the Claimant Trust Interests.

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at

Appellee Appx. 00099
Appx. 02964
006907

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 107 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 990 of 1017 PageID 7703
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 106 of 1803 PageID 10852
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 99 of 178

a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction.

A Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Allowed Claim may be entitled to a deduction for U.S. federal income tax purposes. The rules governing the character, timing and amount of such a deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

2.  Distribution in Discharge of Accrued Unpaid Interest

Pursuant to the Plan, a distribution received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes. In general, to the extent that an amount received (whether cash or other property) by a Holder of a claim is received in satisfaction of interest that accrued during its holding period, such amount will be taxable to the Holder as interest income if not previously included in the Holder's gross income. Conversely, a Holder generally recognizes a deductible loss to the extent that it does not receive payment of interest that has previously been included in its income. Holders of Claims are urged to consult their tax advisors regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

3.  Information Reporting and Withholding

All distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding tax requirements. Under federal income tax law, interest, dividends, and other reportable payments, may, under certain circumstances, be subject to "backup withholding" (currently at a rate of up to 24%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**D.  Treatment of the Disputed Claims Reserve**

Pursuant to the Plan, the Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity. Such taxes will be paid out of the Disputed Claims Reserve and therefore may reduce amounts paid to Holders of Allowed Claims from the Claimant Trust. If the Claimant Trustee does not make such an election to treat the Disputed Claims Reserve as a separate taxable entity, the net income, if any, earned in the Disputed Claims Reserve will be taxable to the Holders of Allowed Claims in accordance with

Appellee Appx. 00100
Appx. 02985
006908

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 108 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 991 of 1017    PageID 7704
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 107 of 1803    PageID 10853
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 100 of
178

the principles discussed above under the heading "U.S. Federal Income Tax Treatment of the Claimant Trust", possibly in advance of any distributions to the Holders.

**AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE PLAN.**

### ARTICLE VII.
### RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distribution to the Debtor's creditors and interest holders. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan. Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.

Appellee Appx. 00101
Appx. 02906
006909

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 109 of
180
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 992 of 1017    PageID 7705
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 108 of 1803   PageID 10854
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 101 of
178

Dated:  November 24, 2020

Respectfully submitted,

HIGHLAND CAPITAL MANAGEMENT, L.P.

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.Com:

*Counsel for the Debtor and Debtor-in-Possession*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 110 of
Case 3:25-cv-02072-S      Document 15-9      Filed 10/06/25      Page 993 of 1017      PageID 7706
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 109 of 1803   PageID 10855
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 102 of
178

## EXHIBIT A

**PLAN OF REORGANIZATION**

Appellee Appx. 00103

Appx. 02068

006911

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 111 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 994 of 1017   PageID 7707
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 110 of 1803   PageID 10856
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 103 of
178

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) |
|  | ) Case No. 19-34054-sgj11 |
| Debtor. | ) |
|  | ) |

**FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
CAPITAL MANAGEMENT, L.P.**

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**Appellee Appx. 00104**
**006912**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 112 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 995 of 1017    PageID 7708
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 111 of 1803   PageID 10857
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 104 of
178

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ................................................. 1

    A.    Rules of Interpretation, Computation of Time and Governing Law ..................... 1

    B.    Defined Terms ................................................................................................. 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

    A.    Administrative Expense Claims ........................................................................ 16

    B.    Professional Fee Claims ................................................................................... 17

    C.    Priority Tax Claims ........................................................................................ 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS AND EQUITY INTERESTS ........................................................................ 18

    A.    Summary ...................................................................................................... 18

    B.    Summary of Classification and Treatment of Classified Claims and Equity Interests ........................................................................................... 18

    C.    Elimination of Vacant Classes ........................................................................ 18

    D.    Impaired/Voting Classes ................................................................................ 19

    E.    Unimpaired/Non-Voting Classes .................................................................... 19

    F.    Impaired/Non-Voting Classes ......................................................................... 19

    G.    Cramdown ..................................................................................................... 19

    H.    Classification and Treatment of Claims and Equity Interests ............................ 19

    I.    Special Provision Governing Unimpaired Claims ............................................ 24

    J.    Subordinated Claims ...................................................................................... 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ..................................... 24

    A.    Summary ...................................................................................................... 24

    B.    The Claimant Trust ........................................................................................ 25

    1.    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.* ............................................................................................................. 25

    2.    *Claimant Trust Oversight Committee* ................................................. 26

Appellee Appx. 00105
Appx. 02979
006913

**Page**

3.     *Purpose of the Claimant Trust.* ................................................................27

4.     *Purpose of the Litigation Sub-Trust.* ........................................................27

5.     *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* ...............28

6.     *Compensation and Duties of Trustees.* .....................................................29

7.     *Cooperation of Debtor and Reorganized Debtor.* ....................................29

8.     *United States Federal Income Tax Treatment of the Claimant Trust.* ...............30

9.     *Tax Reporting.* ........................................................................................30

10.    *Claimant Trust Assets.* ............................................................................30

11.    *Claimant Trust Expenses.* ........................................................................31

12.    *Trust Distributions to Claimant Trust Beneficiaries.* ................................31

13.    *Cash Investments.* ...................................................................................31

14.    *Dissolution of the Claimant Trust and Litigation Sub-Trust.* ....................31

C.     The Reorganized Debtor ..........................................................................32

1.     *Corporate Existence* ................................................................................32

2.     *Cancellation of Equity Interests and Release* ...........................................32

3.     *Issuance of New Partnership Interests* .....................................................32

4.     *Management of the Reorganized Debtor* ..................................................32

5.     *Vesting of Assets in the Reorganized Debtor* ............................................33

6.     *Purpose of the Reorganized Debtor* .........................................................33

7.     *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer
       of Reorganized Debtor Assets* ..................................................................33

D.     Company Action ......................................................................................34

E.     Release of Liens, Claims and Equity Interests...........................................34

F.     Cancellation of Notes, Certificates and Instruments...................................35

G.     Cancellation of Existing Instruments Governing Security Interests..................35

- iii -

**Page**

H.  Control Provisions ........................................................................................................35

I.  Treatment of Vacant Classes ........................................................................................36

J.  Plan Documents .............................................................................................................36

K.  Highland Capital Management, L.P. Retirement Plan and Trust .......................36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES .......................................................................................................37

A.  Assumption, Assignment, or Rejection of Executory Contracts and
Unexpired Leases ...........................................................................................................37

B.  Claims Based on Rejection of Executory Contracts or Unexpired
Leases .............................................................................................................................38

C.  Cure of Defaults for Assumed or Assigned Executory Contracts and
Unexpired Leases ...........................................................................................................38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................39

A.  Dates of Distributions ...................................................................................................39

B.  Distribution Agent .........................................................................................................40

C.  Cash Distributions .........................................................................................................40

D.  Disputed Claims Reserve ..............................................................................................40

E.  Distributions from the Disputed Claims Reserve ........................................................40

F.  Rounding of Payments ...................................................................................................41

G.  *De Minimis* Distribution ...............................................................................................41

H.  Distributions on Account of Allowed Claims ...............................................................41

I.  General Distribution Procedures ..................................................................................41

J.  Address for Delivery of Distributions ...........................................................................41

K.  Undeliverable Distributions and Unclaimed Property .................................................42

L.  Withholding Taxes .........................................................................................................42

M.  Setoffs ...........................................................................................................................42

- iv -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 115 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 998 of 1017 PageID 7711
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 114 of 1803 PageID 10860
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 107 of
178

**Page**

N.  Surrender of Cancelled Instruments or Securities ...................................................43

O.  Lost, Stolen, Mutilated or Destroyed Securities .....................................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS.............................................43

A.  Filing of Proofs of Claim ........................................................................................43

B.  Disputed Claims.......................................................................................................43

C.  Procedures Regarding Disputed Claims or Disputed Equity Interests .................44

D.  Allowance of Claims and Equity Interests..............................................................44

1.  *Allowance of Claims* ...............................................................................................44

2.  *Estimation* ..............................................................................................................44

3.  *Disallowance of Claims* .........................................................................................45

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ........................................................45

A.  Conditions Precedent to the Effective Date ...........................................................45

B.  Waiver of Conditions...............................................................................................46

C.  Effect of Non-Occurrence of Conditions to Effectiveness .....................................47

D.  Dissolution of the Committee ..................................................................................47

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................47

A.  General.....................................................................................................................47

B.  Discharge of Claims.................................................................................................47

C.  Exculpation ..............................................................................................................48

D.  Releases by the Debtor.............................................................................................48

E.  Preservation of Rights of Action.............................................................................50

1.  *Maintenance of Causes of Action* ........................................................................50

2.  *Preservation of All Causes of Action Not Expressly Settled or Released* ...........50

F.  Injunction ................................................................................................................50

**Appellee Appx. 00108**
**Appx. 02073**
006916

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 116 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 999 of 1017    PageID 7712
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 115 of 1803    PageID 10861
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 108 of
178

**Page**

G. Term of Injunctions or Stays.................................................................................51

H. Continuance of January 9 Order ...........................................................................52

ARTICLE X. BINDING NATURE OF PLAN ..................................................................52

ARTICLE XI. RETENTION OF JURISDICTION .............................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ...........................................................54

A. Payment of Statutory Fees and Filing of Reports ................................................54

B. Modification of Plan ..............................................................................................55

C. Revocation of Plan ................................................................................................55

D. Obligations Not Changed.......................................................................................55

E. Entire Agreement ..................................................................................................55

F. Closing of Chapter 11 Case ...................................................................................55

G. Successors and Assigns..........................................................................................56

H. Reservation of Rights ............................................................................................56

I. Further Assurances ................................................................................................56

J. Severability ...........................................................................................................57

K. Service of Documents ...........................................................................................57

L. Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
the Bankruptcy Code..............................................................................................58

M. Governing Law .....................................................................................................58

N. Tax Reporting and Compliance ............................................................................58

O. Exhibits and Schedules .........................................................................................59

P. Controlling Document ...........................................................................................59

Appellee Appx. 00109
Appx. 02074
006917

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan.  The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein.  There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents.  All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 118 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 1001 of 1017   PageID 7714
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 117 of 1803   PageID 10863
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 110 of
178

(h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**B.** **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.  "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.  "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.  "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.  "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.  "*Affiliate*" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code and also includes any other Entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such affiliate.  For the purposes of this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.  "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not

2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 119 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 1002 of 1017   PageID 7715
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 118 of 1803   PageID 10864
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 111 of
178

unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.   "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.   "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.   "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.   "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.   "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.   "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.   "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.   "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15.   "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

Appellee Appx. 00112

Appx. 02975

006920

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 120 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 1003 of 1017 PageID 7716
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 119 of 1803 PageID 10865
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 112 of
178

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

Appellee Appx. 00113
Appx. 02978
006921

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 121 of
Case 3:25-cv-02072-S    Document 15-9    Filed 04/06/25    Page 1004 of 1017    PageID 7717
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 120 of 1803    PageID 10866
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 113 of
178

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

Appellee Appx. 00114
Appx. 02979
006922

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 122 of
Case 3:25-cv-02072-S Document 15-9 Filed 04/06/25 Page 1005 of 1017 PageID 7718
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 121 of 1803 PageID 10867
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 114 of
178

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. *"Convenience Claim"* means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all

Appellee Appx. 00115
Appx. 02989
006923

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 123 of
Case 3:25-cv-02072-S Document 15-9 Filed 04/06/25 Page 1006 of 1017 PageID 7719
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 122 of 1803 PageID 10868
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 115 of
178

distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

Appellee Appx. 00116
Appx. 02984
006924

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 124 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 1007 of 1017   PageID 7720
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 123 of 1803   PageID 10869
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 116 of
178

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

57. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

58. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

59. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

60. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

61. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the

8

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 125 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 1008 of 1017 PageID 7721
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 124 of 1803 PageID 10870
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 117 of
178

Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

62. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

63. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

64. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

65. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

66. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

67. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

68. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

69. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

70. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

71. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

9

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 126 of
Case 3:25-cv-02072-S Document 15-9 Filed 04/06/25 Page 1009 of 1017 PageID 7722
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 125 of 1803 PageID 10871
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 118 of
178

72. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

73. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

74. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

75. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

76. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

77. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

78. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

79. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

80. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement. As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

81. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

82. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

Appellee Appx. 00119
Appx. 02984
006927

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 127 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 1010 of 1017    PageID 7723
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 126 of 1803    PageID 10872
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 119 of
178

83. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

84. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

85. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

86. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

87. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

88. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

89. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

90. "*Petition Date*" means October 16, 2019.

91. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

92. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

93. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

94. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of

Appellee Appx. 00120
Appx. 02985
006928

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 128 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 1011 of 1017 PageID 7724
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 127 of 1803 PageID 10873
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 120 of
178

Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

95. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

96. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

97. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

98. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

99. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

100. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

101. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

102. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

103. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

Appellee Appx. 00121
Appx. 02986
006929

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 129 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 1012 of 1017   PageID 7725
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 128 of 1803   PageID 10874
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 121 of
178

104.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

105.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

106.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

107.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

108.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

109.    "*Related Entity*" means, without duplication, (a) James Dondero, (b) Mark Okada, (c) Grant Scott, (d) Hunter Covitz, (e) any entity or person that was an insider of the

**Appellee Appx. 00122**

**006930**

Debtor on the Petition Date under Section 101(31) of the Bankruptcy Code, including any non-statutory insider, (f) any entity that, after the Effective Date, is controlled directly or indirectly by James Dondero, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, and (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries.

110. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present and former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, employees, subsidiaries, divisions, management companies, and other representatives, in each case solely in their capacity as such.

111. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

112. "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

113. "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

114. "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

115. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

116. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

117. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

118. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the

14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 131 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 1014 of 1017    PageID 7727
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 130 of 1803    PageID 10876
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 123 of
178

creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

119.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

120.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

121.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

122.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

123.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

124.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

125.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

126.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

127.    "*Subordinated Claim*" means any Claim that (i) is or may be subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court or (ii) arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest.

128.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

129.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

130.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

Appellee Appx. 00124
Appx. 02989
006932

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 132 of
Case 3:25-cv-02072-S   Document 15-9   Filed 10/06/25   Page 1015 of 1017   PageID 7728
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 131 of 1803   PageID 10877
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 124 of
178

131.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

132.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

133.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

134.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

135.    "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### A.    Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

Appellee Appx. 00125
Appx. 02999
006933

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 133 of
Case 3:25-cv-02072-S    Document 15-9    Filed 10/06/25    Page 1016 of 1017    PageID 7729
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 132 of 1803   PageID 10878
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 125 of
178

**B.    Professional Fee Claims**

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

**C.    Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

Appellee Appx. 00126
Appx. 02991
006934

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 134 of
Case 3:25-cv-02072-S Document 15-9 Filed 10/06/25 Page 1017 of 1017 PageID 7730
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 133 of 1803 PageID 10879
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 126 of
178

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.**     **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**     **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

**C.**     **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of

Appellee Appx. 00127
Appx. 02992
006935