**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

§

§ Case No. **19-34054-sgj11**

**The Dugaboy Investment Trust et al- Appellant**

§

vs.                                        §

**Highland Capital Management, L.P.**
**Et al-** Appellee

§                    **3:25-cv-02072-S**

§

  **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

# Volume 10

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2. **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3. **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4. **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5. **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6. **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru Vol. 5*

*Vol. 5*
*003493*

2

| | | | |
|---|---|---|---|
| *Vol. 5*<br>*00 3504* | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| *00 3519* | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| *00 3521* | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| *00 3530* | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6*<br>*00 3544* | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| *00 3909* | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| *Vol 6*<br><br>*003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| *Vol. 7*<br><br>*003936*<br>*Thru END of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15*<br><br>*011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| *vol. 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| *011855* | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| *011864* | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| *011869* | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| *011874* | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| *Vol 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| *011877* | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| *012039* | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| *012047* | 8/31/2022 *N/A* *NO PDF AVAILABLE* | 3478 | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| *012047* | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*Vol. 15*

| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
|---|---|---|---|
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

*012050*

*012077*
*Vol. 16*
*012079*

*012357*

7

*Vol. 16*
*O12361*

| | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
|---|---|---|---|

*Vol. 17*
*O12363*

| | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |

*O126411*

| | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |

*Vol. 18*

*O12697*
*Thru END of Vol. 21*

| | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |

*Vol. 22*
*O16732*

| | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |

*O16737*

| | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |

*O16773*

| | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |

*O16809*

| | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

| | | | |
|---|---|---|---|
| *Vol. 22* | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *016827* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *016830* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *016855* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *016863* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *016865* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 23* *016867* *Thru end of Vol. 25* | 6/20/2025 | 4255 **(to be submitted to Clerk on flash drive)** | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| *Vol. 26*<br><br>*019524* | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| *019527* | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
|---|---|---|---|
| *Vol. 27* *019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28* *020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *Vol. 28*<br><br>*020266* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *Vol. 29*<br><br>*020267* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *020271* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust). Entered on 6/27/2025 (Okafor, M.) |
| *020282* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *020289* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *020296* | | | |
| *020298* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *020300* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *020309* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020311* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30* *020407* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

VOL. 31

020680

020696

020808

020830

020837

| | | | |
|---|---|---|---|
| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| 7/21/2025 | 4333 | | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| 7/21/2025 | 4334 | | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| 8/4/2025 | 4353 | | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| 8/5/2025 | 4359 | | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| 8/15/2025 | 4372 | | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025        Respectfully submitted,

**WINSTON & STRAWN LLP**

By: /s/ Geoffrey S. Harper

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 135 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 18 of 1017 PageID 7748
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 134 of 1803 PageID 10880
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 127 of
178

voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.  Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.  Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.  Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.  Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.  Classification and Treatment of Claims and Equity Interests**

*1.  Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan

19

**Appellee Appx. 00128**

**Appx. 02993**

**006936**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 136 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 19 of 1017 PageID 7749
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 135 of 1803 PageID 10881
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 128 of
178

pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2. *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3. *Class 3 – Other Secured Claims*

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4. *Class 4 – Priority Non-Tax Claims*

- *Classification*: Class 4 consists of the Priority Non-Tax Claims.

Appellee Appx. 00129
Appx. 02994
006937

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.    *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

**Appellee Appx. 00130**

**Appx. 02995**

006938

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 138 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 21 of 1017    PageID 7751
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 137 of 1803   PageID 10883
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 130 of
178

7.    *Class 7 – Convenience Claims*

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    *Class 8 – General Unsecured Claims*

- *Classification*: Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.    *Class 9 – Subordinated Claims*

- *Classification*: Class 9 consists of the Subordinated Claims.

22

**Appellee Appx. 00131**

**Appx. 02986**

**006939**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 139 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 22 of 1017    PageID 7752
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 138 of 1803    PageID 10884
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 131 of
178

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.   <u>*Class 10 – Class B/C Limited Partnership Interests*</u>

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

23

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 140 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 23 of 1017   PageID 7753
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 139 of 1803   PageID 10885
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 132 of
178

11.   _Class 11 – Class A Limited Partnership Interests_

- _Classification_:  Class 11 consists of the Class A Limited Partnership Interests.

- _Treatment_:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- _Impairment and Voting_:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

**I.**   **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.**   **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

### ARTICLE IV.
### MEANS FOR IMPLEMENTATION OF THIS PLAN

**A.**   **Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

24

**Appellee Appx. 00133**
**Appx. 02098**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 141 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 24 of 1017 PageID 7754
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 140 of 1803 PageID 10886
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 133 of
178

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.** **The Claimant Trust**[2]

> *1.*   *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Appellee Appx. 00134
Appx. 02999
006942

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 142 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 25 of 1017   PageID 7755
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 141 of 1803   PageID 10887
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 134 of
178

rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.        *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be

Appellee Appx. 00135
Appx. 03009
006943

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 143 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 26 of 1017   PageID 7756
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 142 of 1803   PageID 10888
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 135 of
178

overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members.  Four of the five members will be representatives of the members of the Committee:  (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery.  The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor.  The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement.  The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement.  Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

   3.      *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

   4.      *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims.  Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

Appellee Appx. 00136
Appx. 03031
006944

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 144 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 27 of 1017   PageID 7757
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 143 of 1803   PageID 10889
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 136 of
178

5.        *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)       the payment of the Claimant Trust Expenses;

(ii)      the payment of other reasonable expenses of the Claimant Trust;

(iii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)      the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)       the orderly monetization of the Claimant Trust Assets;

(vi)      litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)     the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)    the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)      the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expenses and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court.  Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee.  In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee.

28

**Appellee Appx. 00137**
**Appx 03092**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 145 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 28 of 1017 PageID 7758
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 144 of 1803 PageID 10890
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 137 of
178

The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)     the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.     _Compensation and Duties of Trustees._

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.     _Cooperation of Debtor and Reorganized Debtor._

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

Appellee Appx. 00138
Appx. 03093
006946

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 146 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 29 of 1017   PageID 7759
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 145 of 1803   PageID 10891
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 138 of
178

8.        *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests.  Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.        *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.       *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the

Appellee Appx. 00139
Appx. 03064
006947

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 147 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 30 of 1017   PageID 7760
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 146 of 1803   PageID 10892
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 139 of
178

Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.        _Claimant Trust Expenses._

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.        _Trust Distributions to Claimant Trust Beneficiaries._

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, _provided_ that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.        _Cash Investments._

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; _provided, however,_ that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.        _Dissolution of the Claimant Trust and Litigation Sub-Trust._

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the

Appellee Appx. 00140
Appx. 03085
006948

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 148 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 31 of 1017   PageID 7761
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 147 of 1803   PageID 10893
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 140 of
178

Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

**C.**     <u>**The Reorganized Debtor**</u>

      *1.*         <u>*Corporate Existence*</u>

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

      *2.*         <u>*Cancellation of Equity Interests and Release*</u>

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

      *3.*         <u>*Issuance of New Partnership Interests*</u>

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

      *4.*         <u>*Management of the Reorganized Debtor*</u>

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC.  The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant

Appellee Appx. 00141
Appx. 03006
006949

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 149 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 32 of 1017 PageID 7762
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 148 of 1803 PageID 10894
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 141 of
178

Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.  *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.  *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.  *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust

Appellee Appx. 00142
Appx. 006950
006950

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 150 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 33 of 1017   PageID 7763
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 149 of 1803   PageID 10895
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 142 of
178

will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.**     **Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

**E.**     **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the

34

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 151 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 34 of 1017    PageID 7764
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 150 of 1803    PageID 10896
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 143 of
178

Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### F.    Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### G.    Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### H.    Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

Appellee Appx. 00144
Appx. 03009
006932

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 152 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 35 of 1017 PageID 7765
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 151 of 1803 PageID 10897
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 144 of
178

**I.**     **Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

**J.**     **Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

**K.**     **Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

**Appellee Appx. 00145**
**Appx. 03819**
006953

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 153 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 36 of 1017    PageID 7766
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 152 of 1803    PageID 10898
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 145 of
178

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**    **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan Supplement, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Effective Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assignments and assignments.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.  To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Appellee Appx. 00146
Appx. 03381
006954

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 154 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 37 of 1017 PageID 7767
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 153 of 1803 PageID 10899
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 146 of
178

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

### B.   Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Effective Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

### C.   Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts

**Appellee Appx. 00147**

**Appx. 03812**

**006955**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 155 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 38 of 1017    PageID 7768
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 154 of 1803    PageID 10900
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 147 of
178

or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

Appellee Appx. 00148
Appx. 03813
006956

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 156 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 39 of 1017   PageID 7769
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 155 of 1803   PageID 10901
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 148 of
178

**B.**     **Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.   The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

**C.**     **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

**D.**     **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

**E.**     **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.   To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.   For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

**Appellee Appx. 00149**
Appx. 03814
006957

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 157 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 40 of 1017 PageID 7770
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 156 of 1803 PageID 10902
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 149 of
178

**F.     Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

**G.     *De Minimis* Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**H.     Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**I.     General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

**J.     Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

Appellee Appx. 00150
Appx. 03815
006958

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 158 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 41 of 1017   PageID 7771
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 157 of 1803   PageID 10903
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 150 of
178

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

**K.**     **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.**     **Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.**     **Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to

**Appellee Appx. 00151**
**Appx. 03816**
**006959**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 159 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 42 of 1017 PageID 7772
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 158 of 1803 PageID 10904
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 151 of
178

such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.**      **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

**O.**      **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

**A.**      **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.**      **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest or any other appropriate motion or adversary proceeding with respect thereto, which shall be litigated to Final Order or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such

**Appellee Appx. 00152**

**006960**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 160 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 43 of 1017   PageID 7773
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 159 of 1803   PageID 10905
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 152 of
178

Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the
amount compromised for purposes of this Plan.

### C.   Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed
Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity
Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim
or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by
stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of
the Claim or Equity Interest.

### D.   Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an
Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a
distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

### *1.   Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized
Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and
defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim.
Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to
the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity
Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity
Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has
entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case
allowing such Claim or Equity Interest.

### *2.   Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and
the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at
any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity
Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or
unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of
the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157
and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or
unliquidated Claim, including during the litigation concerning any objection to any Claim or
Equity Interest or during the pendency of any appeal relating to any such objection.  All of the
aforementioned objection, estimation and resolution procedures are cumulative and not exclusive
of one another.  Claims or Equity Interests may be estimated and subsequently compromised,
settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights
and objections of all parties are reserved in connection with any such estimation proceeding.

**Appellee Appx. 00153**

**Appx. 02018**

**006981**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 161 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 44 of 1017   PageID 7774
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 160 of 1803   PageID 10906
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 153 of
178

3.      *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**ARTICLE VIII.
EFFECTIVENESS OF THIS PLAN**

**A.      Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have been entered, not subject to stay pending appeal, and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering

Appellee Appx. 00154
Appx. 02019
006962

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 162 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 45 of 1017 PageID 7775
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 161 of 1803 PageID 10907
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 154 of
178

into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

**B.    Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized

46

006963

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 163 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 46 of 1017 PageID 7776
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 162 of 1803 PageID 10908
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 155 of
178

Debtor, or the Claimant Trust, as applicable.

**C.** **Effect of Non-Occurrence of Conditions to Effectiveness**

Unless waived as set forth in ARTICLE VIII.B, if the Effective Date of this Plan does not occur within twenty calendar days of entry of the Confirmation Order, the Debtor may withdraw this Plan and, if withdrawn, the Plan shall be of no further force or effect.

**D.** **Dissolution of the Committee**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

**ARTICLE IX.**
**EXCULPATION, INJUNCTION AND RELATED PROVISIONS**

**A.** **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

**B.** **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose

Appellee Appx. 00156
Appx. 02021
006964

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 164 of 1804
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 47 of 1017    PageID 7777
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 163 of 1803    PageID 10909
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 156 of 178

before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## C.    <u>Exculpation</u>

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have to incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D.    <u>Releases by the Debtor</u>

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal

Appellee Appx. 00157
Appx. 02922
006965

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 165 of 1804
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 48 of 1017 PageID 7778
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 164 of 1803 PageID 10910
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 157 of 178

misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims

Appellee Appx. 00158
Appx. 02923
006966

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 166 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 49 of 1017   PageID 7779
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 165 of 1803   PageID 10911
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 158 of
178

brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

**E.      Preservation of Rights of Action**

*1.      Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

*2.      Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.      Injunction**

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest,

**Appellee Appx. 00159**

**Appx. 02024**

**006967**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 167 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 50 of 1017 PageID 7780
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 166 of 1803 PageID 10912
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 159 of
178

along with their respective Related Persons, are permanently enjoined, on and after the Effective Date, with respect to such Claims and Equity Interests, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or against property or interests in property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The injunctions set forth herein shall extend to any successors of the Debtor, the Reorganized Debtor, and the Claimant Trust and their respective property and interests in property.

**Subject in all respects to ARTICLE XII.D, no Entity may commence or pursue a claim or cause of action of any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party;** *provided, however,* **the foregoing will not apply to Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. As set forth in ARTICLE XI, the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted.**

G.    <u>Term of Injunctions or Stays</u>

Unless otherwise provided in this Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

Appellee Appx. 00160
Appx. 02025
006968

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 168 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 51 of 1017   PageID 7781
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 167 of 1803   PageID 10913
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 160 of
178

**H.** **Continuance of January 9 Order**

Unless otherwise provided in this Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date until the dissolution of each of the Claimant Trust and the Litigation Trust.

## ARTICLE X.
## BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan as legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

Appellee Appx. 00161
Appx. 02026
006969

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 169 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 52 of 1017    PageID 7782
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 168 of 1803   PageID 10914
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 161 of
178

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

**Appellee Appx. 00162**
**Appx. 03925**
**006970**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 170 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 53 of 1017 PageID 7783
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 169 of 1803 PageID 10915
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 162 of
178

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

**A.** **Payment of Statutory Fees and Filing of Reports**

All outstanding Statutory Fees shall be paid on the Effective Date. All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed. The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

Appellee Appx. 00163
Appx. 03926
006971

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 171 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 54 of 1017 PageID 7784
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 170 of 1803 PageID 10916
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 163 of
178

**B.   Modification of Plan**

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

**C.   Revocation of Plan**

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

**D.   Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**E.   Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**F.   Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

Appellee Appx. 00164
Appx. 03929
006972

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 172 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 55 of 1017 PageID 7785
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 171 of 1803 PageID 10917
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 164 of
178

**G.**    <u>**Successors and Assigns**</u>

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**H.**    <u>**Reservation of Rights**</u>

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

**I.**    <u>**Further Assurances**</u>

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order. On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

Appellee Appx. 00165
Appx. 006973

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 173 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 56 of 1017   PageID 7786
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 172 of 1803   PageID 10918
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 165 of
178

**J.**      **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.**      **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

**If to the Claimant Trust:**

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
           Ira D. Kharasch, Esq.
           Gregory V. Demo, Esq.

**Appellee Appx. 00166**

**006974**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 174 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 57 of 1017 PageID 7787
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 173 of 1803 PageID 10919
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 166 of
178

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn: Jeffrey N. Pomerantz, Esq.
Ira D. Kharasch, Esq.
Gregory V. Demo, Esq.

**L.** **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.** **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.** **Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

Appellee Appx. 00167
Appx. 03932
006973

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 175 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 58 of 1017   PageID 7788
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 174 of 1803   PageID 10920
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 167 of
178

**O.**     **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**     **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Appellee Appx. 00168
Appx. 03923
006976

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 176 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 59 of 1017   PageID 7789
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 175 of 1803   PageID 10921
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 168 of
178

Dated:  November 24, 2020

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief
Restructuring Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 177 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 60 of 1017    PageID 7790
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 176 of 1803   PageID 10922
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 169 of
178

**EXHIBIT B**

**ORGANIZATIONAL CHART OF THE DEBTOR**

155183.2
DOCS_NY:40478.29 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 178 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 177 of 1803    PageID 10923

Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 170 of 178



Appellee Appx. 00171

Appx 03926

006979

**EXHIBIT C**

**LIQUIDATION ANALYSIS/FINANCIAL PROJECTIONS**

155183.2
DOCS_NY:40478.29 36027/002

Appellee Appx. 00172

Appx. 03935

006980

*Highland Capital Management, L.P.*
*Disclaimer For Financial Projections*

 

This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

This Memorandum includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 181 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 180 of 1803    PageID 10926

Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 173 of 178

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A.  Plan effective date is January 31 ,2021.

B.  All investment assets are sold by December 31, 2022.

C.  All demand notes are collected in the year 2021.

D.  All notes receivable with maturity dates beyond 12/31/2022 are sold in Q4 2022; in interim interest income and principal payments are collected as they become due.

E.  Fixed assets used in daily business operations are sold in February 2021.

F.  Accrual for employee bonuses as of January 2021 are reversed and not paid.

G.  All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter

H.  Post-effective date, the reorganized Debtor would retain three HCMLP employees as contractors to help monetize the remaining assets.

I.  Litigation Trustee budget is $6,500,000.

J.  Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.

K.  Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100% of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or interest of junior priority.

L.  Plan assumes zero allowed claims for UBS, IFA, the HarbourVest entities (collectively "HV") and Hunter Mountain Investment Trust ("HM").

M.  Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for UBS, IFA, HM and HV. Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

N.  With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.

O.  Class 7  payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $9.96 million.

P.  See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date:

  o  By September 30, 2021 - $50,000,000

  o  By March 31, 2022 – additional $50,000,000

  o  By June 30, 2022 – additional $25,000,000

  o  All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

**Highland Capital Management, L.P.**
*Plan Analysis Vs. Liquidation Analysis*
*(US $000's)*

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 | $        25,076 | $        25,076 |
| Estimated proceeds from monetization of assets [1][2] | 190,445 | 149,197 |
| Estimated expenses through final distribution[1][3] | (33,642) | (36,232) |
| Total estimated $ available for distribution | 181,879 | 138,042 |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,078) | (1,078) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,463) | (5,463) |
| Class 3 - Other Secured Claims | (551) | (551) |
| Class 4 – Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims | - | - |
| Class 7 – Convenience Claims [7][8][9] | (10,255) | - |
| Subtotal | (27,937) | (17,682) |
| Estimated amount remaining for distribution to general unsecured claims | 153,942 | 120,359 |
| Class 8 – General Unsecured Claims [8][10] | 176,049 | 192,258 |
| Subtotal | 176,049 | 192,258 |
| % Distribution to general unsecured claims | 87.44% | 62.60% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated Claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C Limited Partnership Interests | *no distribution* | *no distribution* |
| Class 11 – Class A Limited Partnership Interest | *no distribution* | *no distribution* |

*Footnotes:*
[1] Assumes Chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee
  Assumes Chapter 7 Trustee engages new professionals to help liquidate assets
[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable
[3] Estimated expenses through final distribution exclude non-cash expenses:
  Depreciation of $462 thousand in 2021
[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court
[5] Represents $4.7 million in unpaid professional fees and $4.5 million in timing of payments to vendors
[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold
[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million
[8] Class 7 includes $1.1 million estimate for aggregate contract rejections damage and Class 8 includes $1.4 million for contract rejection damages
[9] Assumes 3 claimants with allowed claims less than $2.5 million opt into Class 7 along with claims of Senior Employees
[10] Class estimates $0 allowed claim for the following creditors: IFA, HV, HM and UBS; assumes RCP claims offset against HCMLP interest in RCP fund

*Notes:*
*All claim amounts are estimated as of November 20, 2020 and subject to change*

11/13/2020

Appellee Appx. 00175

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 183 of
1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 182 of 1803   PageID 10928
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 175 of
178

**Highland Capital Management, L.P.**
**Balance Sheet**
**(US $000's)**

| | Actual Jun-20 | Actual Sep-20 | Forecast ---> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 28,342 | $ 4,934 | $ 96,913 | $ 90,428 | $ 106,803 | $ 52,322 | $ 23,641 | $ 21,344 | $ - |
| Other Current Assets | 13,182 | 13,651 | 10,559 | 9,629 | 7,746 | 7,329 | 5,396 | 6,054 | 6,723 | 7,406 | - |
| Investment Assets | 320,912 | 305,961 | 261,333 | 258,042 | 133,026 | 81,793 | 54,159 | 54,159 | 54,159 | 54,159 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 26,226 | $ 19,138 | $ 19,280 | $ 2,891 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 126,365 | 126,343 | 121,950 | | | | | | | | |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 - Frontier Secured Claim | - | - | - | 5,210 | - | - | - | - | - | - | - |
| Class 3 - Other Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 - PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 176,049 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| Class 9 – Subordinated Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 126,365 | 126,343 | 121,950 | 181,259 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| **TOTAL LIABILITIES** | $ 152,591 | $ 145,481 | $ 141,230 | 184,150 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| | | | | | | | | | | | |
| Partners' Capital | 199,551 | 182,842 | 161,596 | 89,802 | 61,635 | 53,501 | 40,309 | 36,486 | 33,473 | 31,860 | (22,107) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |

11/13/2020
**Appellee Appx. 00176**
DEBTORS3384
006984

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 184 of 1804

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 183 of 1803   PageID 10929

Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 176 of 178

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

| | Actual Jan 2020 to June 2020 Total | Actual 3 month ended Sept 2020 | Forecast ---> 3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,651 | $ 11,173 | $ 779 | $ - | $ - | $ - | $ 779 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,263 | - | - | - | 1,263 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 113 | - | - | - | 113 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,779 | $ 30,401 | $ 2,154 | $ - | $ - | $ - | $ 2,154 |
| | | | | | | | | | |
| Operating Expenses [1] | 13,328 | 9,171 | 9,079 | 31,579 | 8,428 | 1,646 | 1,807 | 2,655 | 14,536 |
| | | | | | | | | | |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,301) | $ (1,177) | $ (6,274) | $ (1,646) | $ (1,807) | $ (2,655) | $ (12,381) |
| | | | | | | | | | |
| Professional Fees | 17,522 | 7,707 | 7,741 | 32,971 | 5,450 | 5,058 | 2,048 | 1,605 | 14,160 |
| | | | | | | | | | |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,057 | 4,878 | (59,016) | 573 | 423 | 423 | (57,598) |
| | | | | | | | | | |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (8,985) | $ (29,270) | $ (70,741) | $ (6,130) | $ (3,432) | $ (3,837) | $ (84,139) |
| | | | | | | | | | |
| Realized and Unrealized Gain/(Loss) | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (763) | 522 | - | - | (241) |
| Net Realized (Loss) on Sale of Investment | (28,418) | 1,549 | (12,167) | (39,036) | (290) | 19 | (4,702) | (8,006) | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,929) | (7,450) | - | (37,380) | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | (94) | (94) | - | (22,578) | - | (1,349) | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (12,262) | $ (158,992) | $ (1,053) | $ (22,037) | $ (4,702) | $ (9,355) | $ (37,147) |
| | | | | | | | | | |
| Net Income | $ (150,307) | $ (16,708) | $ (21,247) | $ (188,262) | $ (71,794) | $ (28,167) | $ (8,134) | $ (13,192) | $ (121,287) |

*Footnotes:*
[1] Operating expenses include an adjustment in January 2021 to account
   for expenses that have not been accrued or paid prior to effective date.
[2] Other income and expenses of $61.2 million in January 2021 includes:
   [a] $77.7 million was expensed to record for the increase of
      allowed claims.
   [b] Income of $15.8 million for the accrued, but unpaid payroll liability related to
      the Debtor's deferred bonus programs amount written-off.

11/13/2020

**Appellee Appx. 00177**
**006985**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 185 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 184 of 1803    PageID 10930

Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 177 of 178

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

| | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
|---|---|---|---|---|---|---|
| | | | | Forecast —> | | |
| **Revenue** | | | | | | |
| Management Fees | $ - | $ - | $ - | $ - | $ - | 779 |
| Shared Service Fees | - | - | - | - | - | 1,263 |
| Other Income | - | - | - | - | - | 113 |
| Total revenue | $ - | $ - | $ - | $ - | $ - | 2,154 |
| Operating Expenses | 1,443 | 643 | 758 | 1,088 | 3,932 | 18,468 |
| Income/(loss) From Operations | $ (1,443) | $ (643) | $ (758) $ | (1,088) | $ (3,932) | (16,314) |
| Professional Fees | 2,788 | 2,788 | 1,288 | 1,288 | 8,153 | 22,313 |
| Other Income/(Expenses) | 408 | 419 | 434 | 184 | 1,444 | (56,154) |
| Operating Gain/(Loss) | $ (3,823) $ | (3,013) $ | (1,613) $ | (2,193) | $ (10,641) | $ (94,780) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (51,775) | (51,775) | (52,016) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (51,775) | $ (51,775) | $ (88,922) |
| **Net Income** | $ (3,823) $ | (3,013) $ | (1,613) $ | (53,967) | $ (62,415) | $ (183,702) |

11/13/2020

Appellee Appx. 00178

006986

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 186 of 1804

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 185 of 1803   PageID 10931

Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 178 of 178

*Highland Capital Management, L.P.*
*Cash Flow Indirect*
*(US $000's)*

| | | Forecast ----> | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
| Net (Loss) Income | $ | (16,708) | $ (21,247) | $ (71,794) | $ (28,167) | $ (8,134) | $ (13,192) | $ (3,823) | $ (3,013) | $ (1,613) | $ (53,967) |
| **Cash Flow from Operating Activity** | | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | | |
| Depreciation and amortization | | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/ loss | | - | - | 763 | (522) | - | - | - | - | - | 51,775 |
| Investment realized (gain)/ loss | | (1,549) | 12,262 | 290 | 22,559 | 4,702 | 9,355 | - | - | - | - |
| Unrealized (gain) / loss | | (9,150) | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | | (470) | 3,092 | 930 | 1,884 | 417 | 1,933 | (658) | (669) | (684) | 2,010 |
| Increase (Decrease) in Current Liabilities | | (7,110) | (4,251) | (54,172) | (2,891) | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | | (34,757) | (9,913) | (123,752) | (6,907) | (3,015) | (1,904) | (4,481) | (3,681) | (2,297) | (182) |
| | | | | | | | | | | | |
| **Cash Flow From Investing Activities** | | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | | - | - | 250 | 1,639 | - | - | - | - | - | - |
| Proceeds from Investment Assets | | 25,650 | 32,366 | 3,002 | 102,457 | 46,531 | 18,278 | - | - | - | 7,780 |
| Net Cash Increase / (Decrease) - Investing Activities | | 25,650 | 32,366 | 3,252 | 104,096 | 46,531 | 18,278 | - | - | - | 7,780 |
| | | | | | | | | | | | |
| **Cash Flow from Financing Activities** | | | | | | | | | | | |
| Claims payable | | - | - | (73,997) | - | - | - | - | - | - | - |
| Claim reclasses/(paid) | | - | - | 181,259 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| Maple Avenue Holdings | | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | | - | - | 97,092 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| | | | | | | | | | | | |
| Net Change in Cash | $ | (9,107) | $ 22,454 | $ (23,408) | $ 91,979 | $ (6,484) | $ 16,374 | $ (54,481) | $ (28,681) | $ (2,297) | $ (21,344) |
| Beginning Cash | | 14,994 | 5,888 | 28,342 | 4,934 | 96,913 | 90,428 | 106,803 | 52,322 | 23,641 | 21,344 |
| Ending Cash | $ | 5,887 | $ 28,342 | $ 4,934 | $ 96,913 | $ 90,428 | $ 106,803 | $ 52,322 | $ 23,641 | $ 21,344 | $ - |

11/13/2020

**Appellee Appx. 00179**

**Image 01844**

006987

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 187 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 70 of 1017 PageID 7800
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 186 of 1803 PageID 10932

# APPENDIX 2

Appellee Appx. 00180

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 188 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 71 of 1017    PageID 7801
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 187 of 1803   PageID 10933

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

Claimant,

v.                                              Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

Respondent.

### PARTIAL FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

I.      Introduction
   A.      The Parties
        1.      Claimant is a Committee of Redeemers in the Highland Crusader Fund (the "Committee"). Pursuant to the Joint Plan of Distribution of the Crusader Funds ("the Plan") and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors ("the Scheme")[1], HC300, the Committee was elected from among the investors in the Crusader Fund to oversee the management of the Crusader Fund by Highland Capital Management, L.P. (Highland Capital). The Plan and the Scheme are the governing documents which contain the arbitration agreements giving rise to this arbitration. The Committee is represented by Terri Mascherin, Andrew Vail, and Shaun Van Horn of Jenner & Block LLP.

        2.      Respondent, or Highland, is an investment manager and, until July 2016, served as such for the Highland Crusader Funds ("Crusader Funds" or the "Funds") that were formed between 2000 and 2002. The Funds consisted of one "Onshore Fund" and two "Offshore Funds," and the capital that was raised through these entities was pooled into a "Master

---

[1] The Plan was implemented with respect to Highland Crusader Offshore Funds by a "Scheme of Arrangement" ("Scheme") sanctioned by the Supreme Court of Bermuda. The Scheme incorporates the Plan and, unless otherwise noted, the Plan and Scheme contain effectively identical provisions. Unless the context requires otherwise, we will refer primarily to the Plan.

1

Appx. 03046
006989

Fund." The capital was invested primarily in "undervalued senior secured loans and other securities of financially troubled firms" among other asset types. HC-17, at HC-117.0010[2]. Highland is represented by Gary Cruciani, Travis DeArmand, Michael Fritz of McKool Smith, LLP.

B.    The Arbitrators

1.    The three arbitrators, whose appointment was formalized by the International Center for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"), were David M. Brodsky, Chair, John S. Martin, Jr., and Michael D. Young.

II.   Background of the Dispute

A.    The 2008 Financial Crisis

1.    From 2000 until 2007, the Crusader Funds had double-digit annual returns, but in September and October 2008, as the financial markets in the United States began to fail, Highland Capital was flooded with redemption requests from Crusader Fund investors, as the Crusader Funds' assets lost significant value.

2.    On October 15, 2008, Highland Capital placed the Crusader Funds in wind-down, "compulsorily redeeming" Crusader Fund's limited partnership interests. Highland Capital also declared that it would liquidate the remaining assets and distribute the proceeds to investors. However, disputes over the appropriate distribution of the assets arose between those investors who had voluntarily redeemed their interests earlier in 2008 but had not yet been paid their redemption amount ("Prior Redeemers") and those who were compulsorily redeemed in October 2008 ("Compulsory Redeemers") (collectively, the "Redeemers").

B.    The Plan and Scheme

1.    At about the same time, an investor raised allegations of misconduct by Highland Capital and filed a wind-up petition in the Supreme Court of Bermuda. In 2011, after several years of negotiations among the Prior Redeemers, Compulsory Redeemers, and Highland, the Plan and Scheme were adopted and became effective in August 2011. The adoption of the Scheme and Plan was to "enable the orderly management, sale, and distribution of the assets" by Highland and the right of the Redeemers Committee to oversee Highland's services. HC-300 at 300.017.

---

[2] There are three sets of exhibits that will be referred to herein, Joint Exhibits (referred to as JX- —), Redeemer Committee Exhibits (RC- —), and Highland Capital Exhibits (HC- __).

**Appellee Appx. 00182**

**Appx. 02947**

**006990**

2.      Central to the Scheme and Plan was the role of the Redeemer Committee, which was created so as to allow the investors in the Funds to have a greater level of influence over the affairs of Highland Capital than an ordinary creditors' committee would have in the liquidation of the Fund; that increased "level of influence" was particularly manifest in the Committee's ability to approve or disapprove of actions that Highland was contemplating taking, right of first refusal on other activities Highland wished to engage in, and the Committee's ability to terminate the services of Highland on 30 days' notice "with or without Cause."   HC-300 at 300.016. Thus, the relationship between the Redeemer Committee and Highland, although grounded in contract, was designed to become one of mutual cooperation and confidence.

3.      Pursuant to §2.04 of the Plan, a ten-person committee of Crusader Fund investors, composed of five representatives of the Prior Redeemers and five representatives of the Compulsory Redeemers, was created. HC-300, § 2.04. As part of the Plan and Scheme, Highland Capital continued to serve as the investment manager for the Crusader Funds. As part of its duties as investment manager, Highland Capital was to liquidate fund assets and distribute the proceeds to the Crusader Fund investors pursuant to an agreed 43-month distribution schedule. In addition, as an incentive to Highland in its liquidation of assets, the Scheme and Plan provided that the Deferred Fees would be paid to Highland if it completed the full liquidation.

4.      It is not disputed that, between October 2011 and January 2013, Highland Capital distributed in excess of $1.2 billion to the Crusader Fund investors. It is also not disputed that the Crusader Funds were not completely liquidated when Highland paid itself the Deferred Fees in January and April 2016 and the Funds remain unliquidated as of the time of these hearings.

C.      The Arbitration Agreement

1.      Sections 2.09 and 9.03 set forth the terms and conditions by which these disputes are to be resolved in arbitration. Section 2.09 provides, in relevant part, that "in the event of a dispute between the Crusader Funds or the Redeemer Committee and HCMLP, ... the applicable representatives shall confer in god faith in an attempt to resolve the dispute...If the dispute cannot be resolved by mediation it will be referred to arbitration in accordance with Section 9.03."

2.      Section 9.03 provides, in relevant part, that "Any dispute referred to in Section 2.09...shall be subject to and decided by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof pursuant to applicable law. Arbitration shall be conducted in New York, New York."

D.      Termination of Highland Capital and Ensuing Litigation

**Appellee Appx. 00183**

**Appx. 03048**

**006991**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 191 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 74 of 1017 PageID 7804
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 190 of 1803 PageID 10936

1.     For reasons set forth below, disputes began to arise between the Redeemer Committee and Highland Capital, culminating in the termination of Highland Capital as investment manager by letter and notice dated July 5, 2016, for cause and without cause, with termination being effective on August 4, 2016, RC-318. Highland Capital was replaced as investment manager by Alvarez & Marsal CRT Management, LLC ("A&M"). JX-31.

2.     On July 5, 2016, the Committee filed a Notice of Claim before the AAA, commencing an arbitration against Highland, RC-319, and also commenced litigation in Delaware Chancery Court, inter alia, to obtain a status quo order in aid of the arbitration. On July 8, 2016, a Vice Chancellor entered an oral status quo order in aid of this arbitration, pending the adjudication of the Committee's request for interim relief by an AAA arbitrator on an emergency basis pursuant to AAA Rule 38. On August 2, 2016, an Emergency Interim Order was entered by an Emergency Arbitrator appointed by the ICDR, which order replicated the oral status quo order entered in Delaware Chancery Court.

3.     On July 21, 2016, Highland filed its Answering Statement, denying the claims and asserting affirmative defenses.

E.     The Arbitration

1.     This Tribunal was established as of October 31, 2016. The parties consented to the appointment of the Tribunal.

2.     On October 14, 2016, Claimant filed an Amended Notice of Claim, seeking specific performance, injunctive relief, declaratory relief, money damages, and disgorgement arising out of the allegedly willful misconduct and violations of fiduciary and contractual duties by Highland Capital as investment manager of the Highland Crusader Fund. Claimant sought four species of relief: (a) an award requiring Highland Capital to provide to the Committee all information about the Fund and its assets as required by Section 2.05 of the Plan and Section 4.6 of the Scheme; (b) an award of money damages, including disgorgement, for Highland Capital's allegedly willful misconduct and breaches of its fiduciary and contractual duties, and for any unjust enrichment; (c) an injunction requiring Highland to return the so-called Deferred Fees and Distribution Fees to the Crusader Fund; and (d) declarations that the Consenting Compulsory Redeemers are entitled to payment of the Deferred Fee Account, and that Highland is not entitled to advancement of expenses and legal fees.

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 192 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 75 of 1017    PageID 7805
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 191 of 1803    PageID 10937

3.      On December 14, 2016, Respondent filed a motion for partial summary adjudication, seeking dismissal of those claims seeking monetary damages, seeking relief as both breaches of contract and of fiduciary duties, and seeking relief barred by the applicable Statute of Limitations; by Order of March 1, 2017, we denied such motions without prejudice to their being renewed upon the development of a fuller record.

4.      On February 16, 2017, Claimant filed a motion for partial summary adjudication, seeking an order compelling Highland to comply with its alleged contractual obligation under the Plan and Scheme to provide the Committee with the Crusader Fund's books, records and other information from 2011 to 2016. By Order, dated April 21, 2017, we entered a Partial Final Award, granting the relief sought by Claimant, and ordering Highland, inter alia, to produce non-privileged documents, as described in the Order.

5.      On April 11, 2017, Respondent moved for Summary Adjudication of its counterclaim for advancement to defend against the claims brought by the Claimant in the Arbitration and in the parallel Delaware action, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., C.A. No. 12533-VCG (Del. Ch.) (the "Delaware Action").  Respondent sought a mandatory injunction requiring the Fund to escrow and segregate Crusader Fund assets to cover its indemnification and advancement rights.  By Order and Partial Final Award in favor of Claimant, dated July 20, 2017, we denied Highland's motions for advancement in this Arbitration and in the parallel Delaware Action and for the mandatory injunction, on the ground that the "inter-party indemnification exception" applies.

6.      On December 8, 2017, Highland moved to amend its Counterclaims against the Redeemer Committee of the Highland Crusader Fund and for leave to file a third party demand for arbitration against Alvarez & Marsal CRF Management, LLC ("A&M CRF"), Alvarez & Marsal North America, LLC ("A&M NA"), and House Hanover, LLC ("House Hanover").  On January 11, 2018, following a pre-hearing conference call, Respondent filed a revised proposed amended Counterclaim against the Committee alone, raising counterclaims of breach of the covenant of good faith and fair dealing in the its performance and enforcement of the Plan, breach of its fiduciary duty, and aiding and abetting the breach of fiduciary duty by A&M CRF, A&M NA and House Hanover.

Appellee Appx. 00185
Appx. 02050
006993

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 193 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 76 of 1017    PageID 7806
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 192 of 1803    PageID 10938

7.    By Order dated January 25, 2018, we granted the motion to amend Highland's counterclaims that raised direct claims of breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing arising out of the so-called Deferred Fees allegedly owed to Highland, and denied the balance of Highland's request for leave to file Counterclaims and Third Party Claims.

8.    On February 1, 2018, Respondent filed an Amended Answer and Counterclaims, seeking an order that the Committee account to Highland as an investor therein for all payments, gains, profits, and advantages obtained as a result of the Committee's alleged wrongful actions; that the Committee pay money damages, disgorge, and make restitution to Highland for damages arising from the Committee's alleged breaches of contract, breaches of the covenant of good faith and fair dealing, and breaches of fiduciary duty, including by awarding Highland the Deferred Fees allegedly improperly withheld, as well as an award of Highland's fees and expenses, including reasonable attorneys' fees incurred in this action; and such other relief as the Panel deems fair and equitable.

9.    On February 15, 2018, Claimant moved to strike portions of the Counterclaims on the grounds that certain of the new pleadings went beyond the limitations set by the Panel in the January 25 Order by including allegations that relate directly to claims the Panel had ordered not be included in the revised Counterclaim.  By Order dated April 1, 2018, we granted the motion of the Claimant to strike portions of the Counterclaim and directed Respondent to submit a revised Counterclaim to Claimant and the Panel.

10.    By Order dated March 19, 2018, we directed that "any party wishing to make a motion shall write a letter to the Panel, with copy to opposing counsel, seeking permission to make such motion…"

11.    By letter dated March 28, 2018, Highland requested permission to file a motion for partial summary adjudication with respect to the Committee's breach of fiduciary duty claims that accrued before July 5, 2013, which Highland contends are barred by the statute of limitations.  By Order dated April 5, 2018, relying upon AAA Commercial Arbitration Rule 33, we denied Highland's application to make a motion for partial summary adjudication, without prejudice to their doing so at the close of the Committee's main case at the hearing, if such factual and legal issues were briefed in the Pre-Hearing Briefs.

12.    On April 5, 2018, Respondent filed its revised Amended Counterclaims, seeking relief, as earlier, for alleged breaches of contract, of fiduciary duty, and of the covenant of good faith and fair dealing.

6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 194 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 77 of 1017   PageID 7807
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 193 of 1803   PageID 10939

13.     On July 12, 2018, Highland moved to strike what it characterized as a new claim by the Committee.  The Committee opposed the motion. By Order dated July 22, 2018, the motion to strike was denied.

14.     On August 19, 2018, after a series of discovery motions were decided, the Parties entered into a Joint Proposed Pre-Hearing Consent Order, which was So Ordered by the Panel.

F.     Hearing Dates and Witnesses

1.     An evidentiary hearing was held in New York, N. Y. on September 12-14, 17-18, 20-21, and 24-25, 2018.

2.     Claimant presented the oral testimony of Eric Felton, Burke Montgomery, David Morehead, and Brian Zambie, all Members of the Redeemer Committee; Steven Varner, Alvarez & Marsal ("A&M"); Robert Collins, PriceWaterhouseCoopers; and two experts, Scott Meadow, Analysis Group; and Basil Imburgia, FTI Consulting.

3.     Respondent presented the oral testimony of Isaac Leventon, Esq., Highland internal counsel; Brant Behr, Redeemer Committee Member; Matt Jameson, formerly employed by Highland Capital; Scott Ellington, General Counsel, Highland Capital; the deposition testimony of Thomas Sargent, the Compliance Officer of Highland; and two experts, James Finkel, Duff and Phelps, and Karl Snow, Bates and White.

G.     Post-Hearing

1.     On October 24, 2018, Claimant filed its Post-Hearing Memorandum on its Claims and Respondent filed its Post-Hearing Memorandum on its Counterclaim.

2.     On November 17, 2018, Claimant filed its Reply to Respondent's Post-Hearing Memorandum and Respondent filed its Reply to Claimant's Post-Hearing Memorandum.

3.     On November 30, 2018, the Panel heard closing arguments from counsel to the Parties.

4.     On December 10, 2018, the Parties filed Supplemental Post-Trial Memoranda, dealing with questions asked by the Panel during closing arguments.

5.     On December 12, 2018, the record was declared closed.

7

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 195 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 78 of 1017 PageID 7808
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 194 of 1803 PageID 10940

6. On January 5, 2019, at the request of the Panel, the Parties consented to the adjournment of the timing of the award from January 11, 2019 to February 28, 2019. On February 25, at the request of the Panel, the Parties consented to the extension of the deadline to March 7, 2019.

H.    Issues to be Determined

1. Claimant has pleaded four claims of breaches of fiduciary duty and of breaches of contract, arising out of similar fact patterns, as follows:

   a)    The taking of the Deferred Fees;
   b)    The payment of Distribution Fees;
   c)    The purchase of Plan claims without Redeemer Committee approval; and
   d)    The transfer of Barclays' Fund interests without Redeemer Committee approval.

2. Separately, Claimant has pleaded claims of breach of fiduciary duty, as follows:

   a)    Engaging in related party transactions without Redeemer Committee approval
   b)    Refusing to settle claims brought by Credit Suisse;
   c)    Refusing to resolve the claims brought by UBS, which included a Temporary Restraining Order ("TRO"); and
   d)    Failing to make a good faith effort to sell the Cornerstone asset.

3. In addition, Claimant seeks a declaratory judgment that there should be an immediate distribution of the Deferred Fee Account to the Consenting Compulsory Redeemers.

4. Respondent has pleaded one counterclaim against the Redeemer Committee, alleging that the Committee breached its contractual and fiduciary duties by delaying liquidation of the Fund's assets after July 2016, and depriving Respondent of its right to receive the remaining funds in the Deferred Fees account payable upon complete liquidation of the Fund.

8

Appellee Appx. 00188
Appx. 02953
006996

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 196 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 79 of 1017    PageID 7809
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 195 of 1803    PageID 10941

5.    Both Claimant and Respondent have also made claims for the recovery of their attorneys' fees and costs.

I.    Applicable Law

1.    At the outset, we address which law applies to which claims. It is not in dispute that Claimant's breach of contract claims are governed by the law of New York State. However, Claimant contends that the law of New York State also applies to the breach of fiduciary duty claims, as the breaches are claimed to arise from Highland's relationship with the Fund and its investors under the Plan, which provides for New York law. Respondent argues that any fiduciary duties owed by Highland arise under its services as investment manager of the Crusader Fund, and, thus, are governed by the law governing the Fund's Governing Documents, the state of Delaware.

2.    Although there are few, if any, significant differences between New York and Delaware regarding fiduciary duties of entities in the position of Highland vis-a-vis its investors and the Committee, we find that the governing law on the breach of fiduciary duty claims is most appropriately that of New York, the state whose law governs regarding the Plan and rights of the parties under the Plan.

III.    Discussion of The Issues

A.    We recognize and appreciate the exemplary efforts by counsel for each Party. The results set forth herein are not a reflection of any difference in the quality of those presentations, but of our review of the evidentiary record and of the relevant law.

B.    Taking of Deferred Fees

1.    When the Plan and Scheme were adopted, a prominent feature was the creation of a Deferred Fee Account which was designed to provide an incentive to Highland to liquidate expeditiously the Crusader Fund of its assets. Deferred Fees were annual performance fees payable to Highland but deferred until, as, and when there would be a "complete liquidation" of the Crusader Funds' assets," Scheme §1.5.2, Plan §2.02, HC-300.

9

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 197 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 80 of 1017  PageID 7810
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 196 of 1803  PageID 10942

2.      The evidence is uncontested that, as of the close of the hearing record in this matter, the Crusader Funds have not been completely liquidated. It is also uncontested that, on January 21 and April 6, 2016, Highland distributed to itself a total of $32,313,000 in Deferred Fees. JX-25 at 14; JX-26 at 13.  Highland's stated rationale, or "position," for making the payment without there first having been complete liquidation was set forth in the financial statements of the Funds for the year-end 2015, issued on April 22, 2016: the UBS TRO "prevented the full liquidation" and that Highland "would have received the Deferred Fees…but-for the impact of the restraining order still in place." Thus, Highland "believe[d] its right to receive the [Deferred Fees] crystalized as of the date the [TRO] was lifted," or January 21, 2016, JX-025.0010.

3.      The core of Highland's position was that, in January 2016, it sought, received, and relied on the advice of its outside counsel Akin Gump that the UBS TRO created an impossibility for it to have earned the Deferred Fees, thus allowing the self-payment. However, based upon the evidence heard, we do not find that Highland relied upon any such advice in executing its plan to take the Deferred Fees.

4.      We find that in January 2016, Highland's CEO James Dondero raised the possibility of taking the Deferred Fees before complete liquidation with Thomas Surgent, a Deputy General Counsel and Chief Compliance Officer at Highland, who then discussed the idea with Highland's General Counsel, Scott Ellington. Surgent Dep. 133:4-19.  Mr. Ellington testified that, in January 2016, he and others spoke on several occasions with lawyers from Akin Gump regarding the premature taking of the Deferred Fees, and that he received the advice that "the deferred fees could be taken under the circumstances," that it was a "calculated risk," and that, if successfully challenged, Highland would owe only "nominal interest." Tr. 10 167:14-168:25; 167:14-168:25.

5.      However, Mr. Ellington's testimony is not supported by the hourly billing records of Akin Gump, which do not show any time being billed in January 2016 for anything having to do with this or any other Highland-related issue. RC-523; Tr. 11 136:9-14. Furthermore, Highland's Assistant General Counsel, Isaac Leventon, testified that neither he, nor, he was certain, anyone else at Highland, consulted with outside counsel in January 2016 regarding taking the Deferred Fees.  Tr. 7 236:11-24.   When Highland executed on its "position" by paying itself the Deferred Fees in January and again in early April, Highland did not disclose the self-payment to its independent auditor or the Redeemer Committee.

Appellee Appx. 00190
Appx. 02955
006998

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 198 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 81 of 1017 PageID 7811
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 197 of 1803 PageID 10943

6.     It was not until April 11, 2016, almost a week after it took the second tranche of Deferred Fees that Highland belatedly informed its independent auditor, PriceWaterhouse Coopers (PwC), of what it had done by sending it draft financial statements for the year ending December 31, 2015, in which Highland disclosed, without explanation, a "change … related to how [they were] … treating the deferred fee distribution." RC-288. On April 12, a meeting was held between Highland and PwC, at which PwC sought an explanation from Highland for the change in position and asked for a memorandum from Highland's counsel and a "copy of the letter that was sent [to the Redeemers Committee] notifying them of the position," JX-28.

7.     On April 12, Highland proceeded to have, apparently for the first time in 2016, discussions with Akin Gump about a justification for its taking the Deferred Fees prior to "complete liquidation." According to Akin Gump's billable time records, on April 12, there was a telephone "call with Thomas Surgent regarding interpretation of distribution plan and charging of fees during period of TRO." Following that call, on April 19, there was another call with Mr. Surgent and Mr. Leventon "regarding audit disclosures with respect to legal doctrine applicable to fee dispute…," following which an Akin Gump attorney started to draft a memo on the "impossibility" issue. After further calls and discussions regarding the drafting of the disclosure to the auditor, a memorandum was finalized and sent to PwC on April 22, 2016, the day that the financials were issued. See RC-523; Tr. 11 136:9-14.)

8.     Although Mr. Ellington testified the Akin Gump memo was "entirely generated by Akin Gump," without any participation by anyone from Highland, Tr. 10 189:14-21, there is contrary and indisputable evidence that, in fact, someone at Highland drafted footnotes to the financials that were then provided to Akin Gump and appear in the Akin Gump memo, see Tr. 7 283:19-284:9; compare RC-289 with HC-277. Further, Mr. Leventon exchanged with Akin Gump and commented upon at least four separate drafts of the Akin Gump memo before it was finalized. RC-291; RC-295; -RC300; RC-302; JX-29; Tr. 7 291:4-295:19.

9.     We find that Highland made a deliberate and calculated decision to make no disclosure to the Committee of the actual taking of the Deferred Fees until the issuance of the 2015 financial statements on April 22, 2016, but that, in the course of communicating with PwC about its "position," Highland allowed PwC to conclude that it had informed the Redeemer Committee of its position regarding the payment of the Deferred Fees, and did not correct the misimpression. RC-441. It did so to induce PwC to provide the opinion Highland needed to have clean financials.

11

Appellee Appx. 00191
Appx. 02966
006999

10.     This was not the first time that Highland had sought to use the so-called "impossibility defense" as a basis for suspending its obligations under the Plan. In 2013, Highland had proposed to use the doctrine in an attempt to avoid making distributions pursuant to the Realization Schedule, attached to the Plan and Scheme. Highland's then-outside counsel, Christopher Panos, now a federal bankruptcy judge, was asked to provide an opinion to allow such action but he expressed strong reservations about the use of that doctrine in an affirmative context, RC-153.

11.     Thereafter, Highland tried to secure another opinion that would be more supportive of its position and received a PowerPoint presentation from Akin Gump in November 2014, HC-356, that provided some additional arguments but, ultimately, focused on the doctrine being able to be used only as a defense, see, e.g., HC-356 at 16.

12.     Finally, when in early 2015, Highland asserted to Committee counsel that, by reason of the UBS TRO, "all applicable distribution dates, distribution thresholds and fees payable" were tolled, by reason of the UBS TRO, JX-22, Committee counsel had strongly rejected such use of the TRO to attempt to justify Highland's failure to meet "either the Realisation Schedule or the distribution threshold for the Deferred Fee Account." RC-219.

13.     Notwithstanding two prior and unsuccessful attempts to use the doctrine to evade its obligations, Highland was not deterred and in late 2015 and early 2016, with the assistance of its inside counsel, but not on the advice of Akin Gump, planned for and then executed on the strategy to take the Deferred Fees.

14.     Under New York law, the doctrine of impossibility does not create an affirmative right to engage in any conduct; rather, under certain circumstances, it acts as a defense to claims of breach of contract. When an unforeseeable event, such as an injunction, occurs, and the actions of the non-performing contract party have not contributed to the occurrence, and the occurrence renders the performance of a contractual obligation objectively impossible, a party's contractual obligation can be excused. Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d 900, 902 (1987) ("While such defenses [as impossibility] have been recognized in the common law, they have been applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances"); JJ. Cassone Bakery, Inc. v. Consolidated Edison Co. of New York, Inc., 168 Misc.2d 272, 278, 638 N.Y.S.2d 898 (N.Y. Sup. 1996), rev'd in part on other grounds, 240 A.D.2d 634, 659 N.Y.S.2d 293 (2d Dept. 1997).  Absent such factors, the doctrine of impossibility is not available to excuse a party's performance and cannot be used to justify affirmative conduct.

12

**Appellee Appx. 00192**

**007000**

15.     Highland attempts to squeeze itself into the four conditions, but its effort fails.  First, Highland argues that it is defending itself against accusations of breach of contract by invoking, defensively, the impossibility defense.  But it is Highland's illegitimate use of the impossibility defense to justify an affirmative act — the taking of the Deferred Fees — that is under attack, not its citation of the impossibility defense in 2018 as a defense to its breach of contract in 2016.

16.     Highland also argues that the TRO "rendered the complete liquidation of the Fund under the Plan's Realization Schedule objectively impossible." Closing Brief at 61. But Highland confuses the Realization Schedule which deals with timely distributions with the Deferred Fees which come into play only upon complete liquidation of the Fund with no deadline. Plan §2.02; Scheme §1.5.2.  In any case, when the UBS TRO was dissolved on January 21, 2016, there was nothing that prevented Highland from completing the liquidation.

13

**Appellee Appx. 00193**

**Appx. 02058**

**007001**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 201 of
Case 3:25-cv-02072-S Document 15-10 1804 10/06/25 Page 84 of 1017 PageID 7814
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 200 of 1803 PageID 10946

17.     None of the factors allowing the doctrine of impossibility apply to the taking of the Deferred Fees. Indeed, we find that Highland — and its inside counsel —knew none of the factors were applicable when Highland asserted the defense. First, the UBS TRO was not unforeseeable; in fact, as Mr. Panos had advised his client in 2013, "UBS had already filed suit and was threatening to get an injunction at the time of the approval of the Scheme." Second, Highland's own acts gave rise to the UBS TRO, as it was UBS's accusation of Highland's fraudulent transfer of assets that gave rise to the TRO, as Mr. Panos again had advised Highland. Third, as Mr. Leventon himself testified at the hearings, "the TRO did not do away with Highland's obligation to complete liquidation of the fund." Tr. 7 262:6-10. Finally, the doctrine of impossibility gives rise to no affirmative rights to take action in violation of a contract. Once again, Mr. Panos had given this critical advice to Highland in 2013.

18.     We have considered the other elements of Highland's defense to this claim and find them similarly wanting. We find that Highland's paying itself the Deferred Fees in 2016 constituted a breach of both the Scheme and Plan. Given that finding, we need not reach the issue of whether the self-payment also constituted a breach of fiduciary duty by Highland to the Committee.

19.     As to remedy, under New York law, damages may be awarded for a breach of contract based upon the damages suffered by the claimant. Here, the damage suffered is the full amount of the Deferred Fees prematurely taken, plus prejudgment interest from the date of the taking. "Prejudgment interest is generally granted 'in order to compensate the injured party for the loss, over a period of time, of the use of the property to which it was entitled.'" Panix Prods., Ltd v. Lewis, 2003 WL 21659370, at *2 (S.D.N.Y. 2003)(citing Lewis v. S.L. & E., Inc. 831 F.2d 37, 40 (2d Cir.1987)). Although Respondent has raised good arguments as to why the interest rate should be nominal at best, we exercise our discretion to award statutory pre-judgment interest at 9% from the date of the taking, so as to measure as accurately as possible the totality of the damage that we perceive the Fund suffered by reason of the Deferred Fees being taken prematurely.

20.     Respondent also argues that the Tribunal lacks the authority to order a return of the moneys taken. But measuring the damages suffered by the Fund by referencing the full amount of the Deferred Fees taken is not the same as literally ordering a return of the moneys. It is an appropriate measure of the damages because the Fees were to have stayed within the Fund until they were appropriately earned, and while in the Fund, they were to serve as a protection and cushion against creditors. In addition, very importantly, keeping the Deferred Fees was to have acted as an incentive to Highland to complete liquidation of the portfolio, an event that had not occurred when Highland was terminated and still has not occurred. Taking the Deferred Fees deprived the investors of all of those benefits. The Deferred Fees in the amount of $33,313,000 should be returned in full, and with full statutory interest of 9% from the dates of taking in January and April 2016 through the date of this Partial Final Award.

14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 202 of
Case 3:25-cv-02072-S Document 15-10 ꜰꜰꜰꜰ 10/06/25 Page 85 of 1017 PageID 7815
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 201 of 1803 PageID 10947

C. Distribution Fees

1. Under the Plan, Highland was to receive fees in the amount of 125 basis points based on "all amounts actually Distributed to Redeemers during each quarter following the Effective Date . . . provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over.)" (Emphasis added) (Plan §2.01; Scheme §4.4.)

2. Claimant alleges that Highland breached the provisions of the Plan by paying itself distribution fees totaling $14.5 million despite not having "actually" distributed to the Redeemers each quarter the minimum required to have been paid by the Realisation Schedule (Plan Appx. A). The Committee alleges that Highland paid itself distribution fees eight times, but that the only time Highland met or exceeded the goals set by the Realization Schedule was in the quarters ending January 31, 2013, and April 30, 2013. Other than those two quarters, Claimant contends that Highland missed the target in every other time period. Claimant also charged Highland with a breach of fiduciary duty, arising out of similar facts.

3. The Committee alleges that six of the distribution fee payments were improper because Highland improperly calculated the amount paid to the Redeemers in one or more of the following ways: (1) in treating Deferred Fees as Distributions; (2) in withholding tax obligations from payments to Redeemers, but counted them for purposes of qualifying for its fee; (3) in improperly including amounts that it reserved to pay Barclays, amounts used to pay the Barclays settlement, and amounts paid to its affiliate Eames in its calculation of Distributions; and (4) in borrowing on margin and improperly treating such borrowings as "excess cash" under the Plan and, therefore, as Distributions.

4. In addition, Claimant argues that if Highland missed any quarterly hurdle set in the Realisation Schedule, its deficiency would carry over to the next quarter, giving Highland an accordingly higher hurdle, or watermark, to meet in that next quarter. In other words, Claimant urges that the Realisation Schedule was intended to be cumulative.

5. Cumulative Quarterly Hurdles

a) Starting with the last issue first, the language in the Plan in question is as follows: "HCMLP will receive fees in cash ... (b) provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over)." HC-300 at 74 (emphasis added). Plan §2.01.

15

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 203 of
Case 3:25-cv-02072-S    Document 15-10    1804 10/06/25    Page 86 of 1017    PageID 7816
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 202 of 1803    PageID 10948

b)      Claimant argues that, although the foregoing language is not explicit regarding both the positive and negative cumulative nature of the Realisation Schedule, there is evidence sufficient to establish that requirement from the text itself and from the testimony of those who negotiated the clause in the Plan, citing the testimony of Mr. Montgomery ("The Realisation Schedule was a cumulative concept. 100 million during one period, 100 million to the next, 200 million during the next. . . . it was designed to be cumulative. It was a stack.") Tr. 3 307:5-19.  The Committee also points out that Highland kept internal accounting schedules that treated the Schedule as cumulative, including RC-364 at pp. 10, 23, 36, 49, 62, 75, 88, 101, 114, 127, 140; see also Tr. 4 196:17-197:19; Tr. 9 256:14-259.

c)      Finally, the Committee urges that there would be "perverse incentives" if Highland were allowed to treat the Schedule as cumulative if it got ahead of the distribution schedule but not if it fell behind, because if Highland knew it could not make a quarterly target, it would have the incentive to skip that quarter and wait until the next quarter where it would meet the Realisation Schedule for only that quarter. This would have the undesirable effect of delaying liquidation but not adversely affecting Highland's receipt of incentive fees.

d)      Highland strongly urges that the clause in question is unambiguous in requiring only a positive carry-forward, with no hint that a failure to meet a quarterly hurdle imposed an obligation to reach a high water mark that would meet both the prior hurdle and the present quarterly hurdle. In addition, Highland argues that, as Mr. Montgomery conceded on cross-examination, the Plan could have contained a cumulative shortfall provision, but that the inclusion of such language was never discussed with Highland, Tr. 3 at 308:7-13, and such could have been incorporated into the Plan had that been the Parties' intent.

e)      Highland also criticizes the Committee's "perverse incentive" argument, arguing, first, that Highland was highly incentivized to liquidate as quickly as possible so it could receive Distribution Fees during the pendency of the 36-month Realisation Schedule (§2.02) and obtain the $10 million Deferred Fee by distributing $1.7 billion within 43 months of the Plan's Effective Date (§6.02); and, secondly, "if Highland fell too far behind," it would lose its incentive to continue expeditious liquidation of the Fund's assets. Respondent's Post-Hearing Brief at 57. See Tr. Day 12 at 169:3-18 (Snow).

16

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 204 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 87 of 1017   PageID 7817
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 203 of 1803   PageID 10949

f)      In interpreting the section of the Plan, it is significant that the language regarding a positive carry-forward appears in a parenthetical phrase, not in the main operative text. Without considering the parenthetical, we read the main operative text as setting a test that Highland has to meet — each quarter, assets "equal to or in excess of the amount scheduled in the Realisation Schedule" must be distributed to Redeemers, or else Highland will not "receive fees in cash" that quarter.  Thus, each separate quarter, Highland has to make a required distribution or will not be paid fees.  But if each quarter there is a test that Highland has to meet, it would defeat the purpose of the quarterly test for Highland to be able to garner fees by just meeting the goal for one particular quarter without regard to how it had performed the prior quarter. Without a reward or a penality each quarter dependent upon whether it met (or exceeded) the goal, Highland could undermine the objective of the clause. The supplemental parenthetical phrase simply makes explicit one benefit to Highland of overachieving such quarterly goal. We conclude that §2.01 requires both a positive and negative cumulative process.

g)      To read it otherwise would create a perverse incentive of encouraging Highland to skip quarters. The contrary is not true: by having both a positive and negative cumulative obligation, Highland loses no incentive to continue to liquidate, perhaps at a faster pace than it in fact adopted, if it were to fall behind.

h)      Though we reach our conclusion without need to rely on extrinsic evidence, we note that our interpretation is supported by Mr. Montgomery's testimony regarding Highland's request to include a parenthetical to make clear that it would not lose the benefit of an over-distribution and could carry it forward. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).

D.      Deferred Fees as Distributions
1.      With respect to Highland's treating Deferred Fees as Distributions, the Committee urges that Deferred Fees being reserved in an account for possible later distribution were not amounts "actually Distributed" or the kind of Distributions made to Redeemers as part of the return to them of their investment.

2.      Highland defends on the basis that the Committee's position that Deferred Fees should not be included in calculating Distribution Fees is inconsistent with the parties' course of performance. From the outset, Highland argues that it included Deferred Fees in its calculation of Distribution Fees and gave written notice of its inclusion to the Committee on at least four occasions. HC-552; HC-591; HC-592; HC-593. However, Highland is not making the argument that the Plan was amended by what it says was its known conduct.

17

3.      Highland also argues that its successor, A&M, also included Deferred Fees in its calculation of Distribution Fees based upon the substantively identical language in the A&M investment management agreement, HC-56 at 6, and received a Distribution Fee based on that calculation in October 2016.

4.      We find that whether Highland's conduct was disclosed to the Committee or whatever A&M may have done are both irrelevant to the issue in this case, because, as we analyze the evidence adduced, the only relevant issue is whether including Deferred Fees in the calculation of Distribution Fees is authorized by the language of the Plan, and we find that it is not.

5.      The Plan sets forth a program of fees capable of being paid to Highland: if Highland met certain quarterly goals of distributions made to Redeemers, as set forth in the Realisation Schedule, it was entitled to receipt of certain Distribution Fees; if it distributed at least $1.7 billion to the Redeemers prior to the 43d month following the Effective Date, it was entitled to receive payment of the fees in the Deferred Fee Account in accordance with Section 2.02 of the Plan.

6.      The Plan distinguished what Highland had to do to qualify to receive each category of Fees. With respect to Deferred Fees, the Plan provides that "Highland shall not be deemed to be a Redeemer in respect of the deferred fees." We read that sentence as making clear that Highland's setting aside of Deferred Fees into a account that it might eventually be able to draw upon should not be construed as a form of distribution such that, if it were a Redeemer, it could be construed as an "actual" distribution.  Because Highland is not "deemed to be a Redeemer," its payment to a fund is not equivalent to a Distribution to an investor.

7.      We find that this language is not ambiguous and does not allow for the practice used by Highland to beef up the amount of Distribution Fees it received.

18

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 206 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 89 of 1017 PageID 7819
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 205 of 1803 PageID 10951

E.    Withholding Taxes as Distributions

1.    The evidence at the hearing was that, as required in the Plan, HC-300 at 80, Highland took into account the amount of taxes that should be withheld and paid those amounts to the appropriate taxing authorities; however, Highland also included those withheld amounts in the calculation of amounts "actually" distributed to Redeemers. The Committee contends that such withheld amounts were not "actually Distributed to Redeemers," and points out that, in fact, only a subset of Redeemers — the Offshore Fund investors — were subject to tax withholding, RC-62; Tr. 9 275:5-23, while some investors were nonprofits that did not pay taxes at all, Tr. 12 167:5-24. The Committee also points out that, when first informed in 2012 that Highland had counted tax withholdings toward the May 1, 2012 Distribution, the Committee objected, demanding successfully that Highland make up that shortfall. RC-68; Tr. 3 301:6-12; Tr. 9 278:4-279:16.

2.    Highland makes two points in its defense: first, tax withholdings made on behalf of an employee are considered "compensation," so tax withholdings for Crusader investors should also be treated in a "common-sense manner" as "distributions" to those investors; and second, Highland disclosed its methodology in at least one monthly report in November 2013, HC-591 at 14 (Nov. 2013 Summary Report), to which the Committee never objected.

3.    We need not consider either of these defenses because we find the language of the Plan supports the treatment by Highland of these amounts. As stated above, "Distributions" is defined as "Amounts to be paid to Redeemers under the Plan, including amounts to be paid to Redeemers under the Scheme..." §1.01. The operative language regarding withholding for taxes is as follows: "In connection with ... all Distributions to be made hereunder, the Crusader Funds shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any ... taxing authority, and all Distributions hereunder shall be subject to any such withholding ... requirements. The Crusader Funds are hereby authorized to take any and all actions that may be necessary or appropriate to comply with any such requirements."

4.    Read together, we find that "the amounts paid to Redeemers" were "subject to ... withholding requirements" and thus, were appropriately included within the calculation of amounts distributed to Redeemers, even if, in fact, it was an indirect payment. We find for Highland on this branch of the Committee's claim.

19

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 207 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 90 of 1017   PageID 7820
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 206 of 1803   PageID 10952

F.      Payments to Barclays and Eames as Distributions

1.      In 2006 and 2007, Barclays and a Highland affiliate entered into two securities transactions — a prepaid forward transaction and an accreting strike option transaction.  In connection with those two transactions, Barclays became an investor in the Highland Funds. JX-5. In late 2008, Barclays submitted redemptions for its full interests in the Highland Funds, which Highland did not honor. Litigation between Barclays and Highland entities ensued. When the Plan and Scheme were adopted, Barclays did not consent and became what it is referred to as a Non-Consenting Redeemer. HC-300, at HC-300.0075.

2.      Thereafter, when Fund assets were disposed of and amounts distributed to Redeemers, no amounts were actually paid to Barclays; instead, amounts equivalent to those that Barclays would have received if it was a Consenting Redeemer were paid into the Redeemer Trust Account. That Account was set up for the purpose of segregating the deposited funds so they could be "used to pay all costs of HCM-Related Parties and the Redeemer Committee to defend, respond to, settle and satisfy any Claims by Crusader Fund Redeemers excluding Plan Claims ("Redeemer Claims") and … to defend, respond to, settle and satisfy any such Redeemer Claims in advance of any amounts otherwise properly available for such purposes out of the assets of the Crusader Funds."  Plan 6.01.

3.      Notwithstanding such amounts remained in a designated account at a major financial institution, Highland treated such reserves as "actual" Distributions and paid itself fees based on the amounts reserved. The Committee argues that amounts reserved in the Redeemer Trust Account were not "actually Distributed" and that fees taken by Highland for such deposits were taken in breach of the Plan.

4.      We find that Highland's treatment of the reserves as Distributions violated the terms of the Plan.

5.      In July 2012, Highland, Barclays, and other entities entered into a settlement agreement, resolving all of the claims between and among them. JX-5. As part of the settlement, Barclays received both the cash reserved since August 2011 and several additional cash distributions expected between July and December 2012, essentially the exact distribution amounts that it was entitled to as a Consenting Redeemer. Tr. Day 9 at 146:12-19 (Palmer); HC-275; HC Demo 10 at 4.  Pursuant to the settlement, Barclays became a Consenting Redeemer, see JX-5 at 12 (§ 11.3). Highland treated such portion of the settlement payments as "Distributions" and paid itself the fees associated with that amount of Distributions. The Committee contends that any payments to Barclays were in settlement of various claims, in exchange for which there was a "relinquishment and/or abandonment" of all of Barclays' rights and interests in the Highland Funds, JX-5 at 3, and, thus, such payments were not Distributions.

20

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 208 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 91 of 1017   PageID 7821
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 207 of 1803   PageID 10953

6.      Finally, as part of the settlement, the two limited partner interests that Barclays had in the Funds were transferred to a newly-formed and wholly-owned affiliate of Highland, Eames; amounts equivalent to what Barclays would have received as an investor after the settlement were paid to Eames, totaling $35.1 million, and Highland treated such amounts as Distributions and paid itself the appropriate fees.  The Committee urges that the transfer of LP interests was in violation of Section 2.05(f) which gives that the Committee "the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims," HC-300, and that the transfer was explicitly disapproved, RC-79 ("The Crusader Redeemer Committee does not believe that Highland has the right to take assignment of Barclays' interest in the Crusader Fund. The Committee believes its approval is required for any such assignment under the Plan/Scheme, and the Committee is not willing to approve that assignment."). Furthermore, the Barclays Settlement Agreement provided that the settlement was subject to Highland's receiving all necessary approvals under the Crusader Plan of Liquidation, which the Committee contends Highland did not receive. HC-330, §12.3.2, at HC-330.0014.

7.      Highland argues, first, that the Committee's right to approve or disapprove of the transfer of interests under Section 2.05(f) is not applicable because under Section 2.05(g)[3], the Barclays settlement did not give Barclays more than it would have received as a Consenting Compulsory Redeemer; that, in any case, 2.05(f) is subject to the "reasonableness" test under Section 2.07[4]; and, finally, that it was entitled to keep the LP interests because the LP interests were in the Redeemer Trust account, citing to HC-275. We find that Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer. Its rejection was reasonable in that it was acting in the best interests of the other investors to have a smaller investment base that would have a greater portion of the asset distributions. The accounting ledger maintained by Highland, which created much confusion at the hearing, was not evidence that the LP interests were in the Redeemer Trust account; we agree with the Committee that the spreadsheet was an accounting convenience for Highland.

8.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

---

[3] "The Redeemer Committee will have, subject to the execution and delivery of customary and reasonable confidentiality agreements:... (g) the authority to approve or disapprove any settlement by the Crusader Funds with Barclays that would be in excess of what Barclays would receive as a Consenting Compulsory Redeemer..."

[4] "The approval of the Redeemer Committee with respect to any matter submitted for approval under Sections 2.05 or 2.06 shall not be unreasonably withheld."

Appellee Appx. 00201
Appx. 03006
007009

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 209 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 92 of 1017   PageID 7822
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 208 of 1803   PageID 10954

9.     We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

10.     Finally, we find that when Barclays received the amounts, as part of the Settlement Agreement, that had been set aside in 2012 as if Barclays was then a Consenting Redeemer, it did not receive such amounts as Distributions "actually" paid to a Redeemer but rather as part of the Settlement amount. Although Barclays was "deemed" to have become a "Consenting Redeemer," it had that status only for the moment in time sufficient to transfer its LP interests to Eames. As the Settlement Agreement noted, "certain payments will be made by the Highland Entities to Barclays … in consideration of the settlement of the Claims hereunder and the assignment, relinquishment and/or abandonment by Barclays of all rights and interests it had in the Fund Interests…" HC-330 at HC-330.0003. Highland breached the Plan by treating the amounts paid to Barclays as if they had been received as a Consenting Compulsory Redeemer as Distributions.

11.     We conclude that it was improper for Highland to include in the calculation of the amounts distributed to the Redeemers:

    a)     The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

    b)     The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims; and

    c)     The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames.

22

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 210 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 93 of 1017 PageID 7823
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 209 of 1803 PageID 10955

G.    Margin Borrowings as Distributions

1.    In January and April 2012, Highland caused the Fund to borrow $60 million from its Jefferies brokerage account to distribute to Redeemers. The Committee contends that it did so because Highland had not liquidated enough assets to meet the Realisation Schedule. After learning about the loans in September 2012, the Committee protested and directed Mr. Dondero at the September 2012 meeting to take no further margin loans without its consent. Tr. 2 353:2-22; RC-85; JX-8. The Committee contends that Highland's taking such margin loans to reach the Realisation Schedule and then paying itself Distribution Fees based on having reached the quarterly goal with the assistance of the margin borrowing breached the Plan because the margin borrowing did not constitute Excess Cash resulting from the liquidation of assets from which Distributions must come. Plan §§1.01, 3.01; Scheme §§2.4.1, 2.4.2.

2.    Highland maintains that, as it was authorized under the Plan, to engage in margin borrowing, and that amounts were actually distributed to the Redeemers, such payments to the Redeemers were appropriately treated as Distributions qualifying it to receive Distribution Fees.

3.    We find that such margin borrowings, which were authorized under the Plan, did not qualify as the type of Distribution that would entitle Highland to receive a Distribution Fee. The plain language of the Plan requires that any Distribution Fee be paid to Highland only upon the appropriate amount of Excess Cash having been accumulated from the sale of "assets equal to or in excess of the amount scheduled in the Realisation Schedule…" The "assets" referred to are the "assets, respectively, of the Onshore Fund, Offshore Fund I and Offshore Fund II…" §2.01. No such assets were sold and therefore no Excess Cash was accumulated to be distributed to the Redeemers.

Appellee Appx. 00203
Appx. 03068
007011

4. The Committees expert, Mr. Imburgia, determined that the result of Highland's including the above improper items in the calculation of Distributions to Redeemers in calculating its entitlement to Distribution Fees, resulted in Highland paying itself Distribution Fees to which it was not entitled by an overpayment of $14,452,275 in Distribution Fees. The Committee is entitled to judgment in that amount plus interest at the rate of 9% from the date of each improper fee. RX 408, Schedule 2.1

H.    Purchase of Plan Claims[5]

1. From December 2013 through January 2016, Highland purchased twenty-seven Plan Claims from Crusader investors for itself, without the approval of the Committee [ Tr. 5 50:5-8.] The Committee contends that such purchases breached the Plan, because if it had known that the Plan Claims were available for sale, it would have exercised its ROFR. Tr. 3 163:11-24; Tr. 4 389:3-390:23. The Committee urges that the UBS TRO, said by Highland to block any purchases by the Fund during its pendency, does not in fact bar such purchases; in any event, the Committee points out that it is conceded that the Fund had assets other than the allegedly restrained assets with which to make purchases outside of the restrained assets. The Committee seeks damages equivalent to the value of the Claims at the time they were sold, any profits or benefits realized by Highland, and pre-judgment interest at 9%, for a total of $8,897,899 plus interest.

2. Highland raises a number of defenses. First, it argues that, during the period that the TRO was in effect, the Committee agreed with the advice given by the Fund's (and Highland's) counsel in the UBS case, Lackey Hershman, that the TRO, at minimum, prevented the Fund from spending cash to buy-out other investors before UBS's claims were resolved. See Tr. Day 7 at 319:17-332:3. Thus, Highland contends that the Committee cannot prove it would have purchased the Claims had they been offered to it.

---

[5] Plan §1.01: "Plan Claim. The claim of a Redeemer to payment of, or based upon, the Redemption Amount relating to the redemption of its shares or withdrawal of its capital account balance, as the case may be, in the Crusader Funds as detailed in Section 4.01."

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 212 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 95 of 1017 PageID 7825
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 211 of 1803 PageID 10957

3.     But the record doesn't support that interpretation. First, refuting the idea that the Committee agreed with the advice being relayed to them is the exchange of correspondence between counsel for the Committee counsel and Highland set forth in RC-360, in which Committee counsel rejected the advice said to have been received from outside counsel, and stated how the Plan Claims should be dealt with if Highland were to persist in asserting that the TRO so blocked the Committee's exercise of its ROFR: "the Committee does not agree with Highland's interpretation of the UBS TRO because the expenditure of money to redeem interests is not a "Distribution" and, in any event, if Highland feels strongly that it cannot use the Funds' assets in this way, any acquisition of the interests by Highland or an affiliate is subject to the Committee's exercising its rights under Section 5.04 when the TRO is lifted or when the interests can, in Highland's opinion, be acquired by the Fund consistent with the UBS TRO. Otherwise, the Committee did not approve of the transfer of the Scheme Claims." RC-360 at 87-88.

4.     Furthermore, before the TRO, when presented with the opportunity to purchase Plan Claims, the Committee exercised its right of first refusal (ROFR) on five occasions, see RC-358. During the pendency of the TRO, the Committee was informed about only five of twenty-eight Plan Claims purchases and disapproved each of the purchases by Highland, but the disapprovals were ignored. The Committee informed Highland that it disagreed about the scope of the TRO but that if Highland, as Fund Manager believed the TRO prevented the Fund from purchasing the Plan Claims, then it would be consistent with the Committee's ROFR for the right to be exercised when the TRO was lifted. HC-580.

5.     We find that the Committee would have exercised its ROFR if it had been given full information and had not Highland been preventing the exercise of the ROFR by invoking the TRO and misrepresenting to buyers that it had the ROFR.

25

**Appellee Appx. 00205**
**Appx. 03079**
**007013**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 213 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 96 of 1017  PageID 7826
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 212 of 1803  PageID 10958

6.      As a second defense, Highland contends that during the period that the UBS TRO was in effect, it relied on advice of counsel that the TRO prevented the Crusader Fund from acquiring any Plan Claims, thus opening the door for Highland to purchase the Plan Claims that would otherwise have been subject to the Committee's ROFR under §§2.05(f)[6] and 5.04[7] of the Plan.

7.      Mr. Leventon testified that the TRO was obtained by UBS in response to UBS's allegation that Crusader Funds had participated in a fraudulent transfer of assets from a UBS debtor; the TRO restricted transfer of assets but because those assets had been acquired about four years previously and disposed of in the ordinary course of business, "the UBS TRO was essentially designed to 'collateralize' UBS against the March 25, 2009 asset transfer. And if they couldn't be collateralized with those exact assets and the exact actual cash ... or cash equivalent, then it had to be collateralized with something else. And that something else was the assets of the fund." Day 7 at 328:12-20.  That testimony would suggest that from the moment that the TRO went into effect, the Fund was under constraints not to purchase any Plan Claims or other assets.

8.      But this explanation is not convincing.  Regarding the advice received from Lackey Hershman, Mr. Leventon testified that the majority of the advice received was orally and over time, and that the advice was "an evolving interpretation" that "crystallized...in the first quarter of 2014." Id. at 330:9-17.  The advice consisted of "a bunch of verbal conversations, but a lot of that advice is embodied in that memo [HC259] that Lackey wrote to the Crusader Fund. Because we wanted the Committee to understand our quandary."  Day 7 at 319:17-332:3 (Emphasis added).

---

[6] Plan §2.07(f): "The Redeemer Committee shall have ... the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims; provided that such proposed assignment or transfer shall be deemed to be rejected if not affirmatively approved in writing within 30 days of submission to the Redeemer Committee..."

[7] Plan § 5.04: "No assignment or transfer of a Plan Claim after the Effective Date may be purchased by [Highland] or its affiliates without such Plan Claim first being offered to, and rejected by, the Crusader Funds."

Appellee Appx. 00206
007014

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 214 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 97 of 1017    PageID 7827
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 213 of 1803    PageID 10959

9.     The Lackey Hershman memo, dated July 23, 2014, HC-259, deals only with the practical consequences of seeking an amendment to the UBS TRO while an appeal was pending, and does not provide any advice regarding the scope or interpretation of the UBS TRO.[8]  Notably, there is no other document from Lackey Hershman presented at the hearing, even including emails, that supports Mr. Leventon's explanation.

10.     Perhaps in recognition of the thin basis for its claim that it relied on the advice of counsel, Highland requests that the Panel draw no inferences from the "relatively few written communications on this issue," because there was, Highland contends, "unrebutted testimony" of the "contemporaneous advice of counsel." Highland points to a letter from an internal counsel at Highland to the Committee that cites advice from outside counsel regarding the effect of the TRO on the Committee's ability to purchase Plan Claims, RC-360 ("outside counsel to HCMLP has advised that the temporary restraining order which has been imposed by the Court in UBS Securities LLC et al. v. Highland Capital Management, L.P. prohibits the Crusader Funds from purchasing the Scheme Claims using assets of the Crusader Funds").

11.     The statement by internal counsel is the type of hearsay that was received in evidence only because this was an arbitration but to which, under the circumstances, we accord little substantive weight. We find more persuasive the absence of any writing, even an e-mail, directly from the law firm regarding the scope of the TRO and restrictions against the Fund using its assets to purchase Plan Claims or similar items.

12.     Further, we find that, even before the TRO went into effect, and thus well before any advice from counsel would have been received, Highland was laying the groundwork for purchasing the Plan Claims for itself and bypassing the Committee's ROFR.

---

[8] On questioning by members of the Panel, Mr. Leventon referred to the Lackey Hershman memo in broad terms:

"As set forth in the Lackey memorandum, which we all have, Lackey reported that UBS said that, Crusader and Highland Credit Strategies could neither distribute cash to anybody, nor sell assets, nor make any payments outside of the normal course of business...ARBITRATOR BRODSKY: Is the Lackey Hershman memo you're referring to the one that is HC-259, dated July 23, 2014? THE WITNESS: I believe that's correct. ARBITRATOR BRODSKY: I don't see any reference to conversations relayed to you by counsel about what UBS said. I see a sentence on page RC-3208 at the top, it says, "UBS counsel stated that they're not willing to enter into such a stipulation unless Crusader provided detailed discovery of its cash and asset holdings," et cetera, et cetera. Is that what you were referring to? THE WITNESS: Yes. They were not willing to modify the TRO in order to permit the sale of assets unless Credit Strategies, Crusader and other defendants handed over detailed financial information that they would not otherwise be entitled to in discovery. And we were advised that that was a prohibitive risk."

Day 8 170:10-17, 173:4-174:7.

**Appellee Appx. 00207**

**007015**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 215 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 98 of 1017    PageID 7828
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 214 of 1803   PageID 10960

13.     On May 29, 2013, Highland caused the Board of the Master Fund, which it controlled, to adopt a resolution, as follows:  "Whereas, ... (2) certain investors from time-to-time desire to sell their interests as redeemed, unpaid shareholders, in the Company ... (any such shares, 'Offered Shares'); (3) one or more principal accounts (the "Related Accounts') in which James Dondero ... and/or Highland ... have material, direct and indirect, financial and ownership interests, have enters a bid to purchase certain of Offered Shares; (4) the bid of the Related Account(s) is equal to or greater than the highest bid; ...Now Therefore Resolved That (1) the undersigned Directors hereby consent to the Proposed Transaction and any future transfers of Offered Shares to the Related Account(s)..." RC-276 at 5; Tr. 7 63:25-68:14.

14.     This pre-approval of transfers of interests in the Fund to Mr. Dondero, Highland, or its affiliates does not reference the Committee's ROFR, but it enabled Highland, falsely, to claim that it had a ROFR.  Using that Resolution, Mr. Leventon informed multiple investors interested in possible transfers of their interests, that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. RC276[9]; RC280; RC434. This conduct alone constituted a breach of the Plan, because it deprived the Committee from having any insight into the transactions as to which the Plan gave them rights to purchase the underlying interests.

15.     Furthermore, by the time Highland received the Lackey Hershman memo in July 23, 2014, Highland had purchased fourteen Plan Claims, nine of which were not disclosed to the Committee. Thereafter, Highland purchased another thirteen Plan Claims without any disclosure to the Committee. Mr. Leventon testified that the only reason for Highland not to consult the Committee about the 27 purchases in 2013, 2014, and 2015 was its interpretation of the TRO. Day 7, 172:2-10.

16.     Additional actions by Highland further demonstrate that the reliance on the TRO was a facade, designed to enable Highland to attempt to purchase a majority interest in the Fund without the Committee's knowledge. In May 2014 and again in January 2016, Highland hired a broker to solicit all Fund investors, except those who were on the Committee, to buy their interests at half or approximately half of the NAV that Highland had itself set. RC417; Tr. 7 95:8-20, 96:8-23; RC425.

---

[9] "By way of Written Resolution, the Board of Directors of [the Fund] determined that if the Investment Manager or an affiliate offers to purchase the shares in the Fund, then that bid shall be accepted if it is the highest bid. See Written Resolution of the Directors of the Fund dated May 29, 2013. The Board may, in its absolute discretion, approve transfers. ... Accordingly, the Investment Manager, as authorized by the applicable documents, hereby bids 60.25 cents of NAV for purchase of 100% of Crown Alpha's capital balance as of the November 2015 NAV date"

28

Appellee Appx. 00208
Appx. 03073
007016

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 216 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 99 of 1017    PageID 7829
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 215 of 1803   PageID 10961

17.    The broker, Wake2O, used talking points drafted by Highland that misrepresented on whose behalf Wake2O was acting, represented, without apparent foundation, that the offering price of 50% or 55% of NAV was "[t]he current best market bid" and that price would go down in the future, and, finally, that the TRO prevented the Fund from making distributions and that the Fund held many illiquid assets. RC420; Tr. 7 101:4-11 ("Q: And so one of the things that Highland wanted Wake to convey to investors was, hey, you might want to sell your interest in Crusader because right now there's this TRO and you're not going to be able to get any distributions, right?  A.· · That's probably a fair paraphrasing.").

18.    Throughout Wake2O's engagements, it was under pressure from Highland's CEO to pursue investors so that Highland could obtain a greater share of the Fund. See, e.g., RC-250 ("[K]eep pushing as much and many as quickly as possible....")(August 2015); and RC-426 ("Our CEO is keen on starting the process as soon as possible. Please let us know if we can start Monday.") (January 2016); Tr. 7 135:6-137:18.

19.    It was also in this period that Highland undertook a renewed effort to keep the Redeemers Committee in the dark about their purchasing activities. Mr. Leventon was significantly involved in providing direction, as well as drafting talking points, to Wake2O to "reach out to all non-committee members,"  (emphasis added); Tr. 7 146:16-149:7.  Highland offered Wake2O an incentive fee to acquire interests representing $200 million of NAV, but made clear to Wake2O that they should try to achieve that goal without contacting members of the Redeemer Committee. Tr. 7 157:13-161:2. The amount of $200 million was not an accidental target; it was just $4 million of NAV more than what the Redeemer Committee held, Tr. 7 155:15-23.  Wake2O's efforts resulted in the acquisition by Highland of a significant number of Plan Claims, amounting to just shy of $200 million, RC418; RC360; RC419; RC422; RC423; RC424.

**Appellee Appx. 00209**
**Appx. 03071**
007017

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 217 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 100 of 1017  PageID 7830
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 216 of 1803  PageID 10962

20.     Finally, Highland continued misrepresenting to investors that it had a ROFR and never mentioned in its communications that the Committee was the entity actually possessing that right.  Mr. Leventon was the principal instrument through which this misrepresentation and omission were communicated, Tr. 55:19-25 ("Q.·Mr. Leventon, have you ever sent an e-mail to an investor telling the investor that Highland Capital has a right of first refusal in the event the investor wants to sell its interest in the fund? A. With respect to the Crusader Fund, I don't recall having done so."); but see RC-276; RC-280; RC434; Tr. 7 74:22-76:23.)[10]

21.     Based upon the testimony at the hearing, we have serious doubts about the scope of the advice given, if any.  In addition, as now conceded, there were adequate untainted funds under the control of the Crusader Funds to have enabled the Committee to exercise its ROFR as to the Plain Claims, had they been informed in a timely way, as mandated by the Plan. 10/24/18 Highland Ltr. to Panel at 2; RC-408 at 37.

22.     Further, from our examination of the language[11] in the TRO, we conclude that the restrained assets were narrowly circumscribed, and the broad position taken by Highland was not well-grounded. The TRO restrained the Crusader Fund only from transferring or disposing of property received, or its cash equivalent, in March 2009 "from Highland Financial Partners, L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009." JX13; RC134. The TRO did not preclude the Fund's sale of unrestricted assets or use of a significant amount of cash in the Fund. JX13.

23.     We also find that Highland's reliance on the UBS TRO was pretextual to support Highland's true goal of benefiting itself over the interests of the Fund and the Committee. We find that Highland breached the Plan and Scheme by its actions and injured the Committee by its breach. We also found that Highland breached its fiduciary duty to the Committee by so acting.

---

[10] It appears that Mr. Leventon was also involved in a misrepresentation to the Committee about the purchase of a Plan Claim after the TRO had expired. In June 2016, he requested the Committee's approval for the purchase of a Plan Claim by an entity he described as a third party that was not affiliated with Highland. But in the course of soliciting the sale of the Plan Claim, Mr. Leventon represented that Highland was exercising a ROFR on behalf of itself or its affiliates. Tr. 7 87:6-89:11; RC-434. In fact, we find that the third party, Charitable DAF Fund, L.P. ("DAF"), was an affiliate of Highland. RC-435; Tr. 7 82:1384:21.  Based on what Mr. Leventon stated, the Committee approved the transfer. RC-316.

[11] "ORDERED, that pending the hearing on this motion, Defendants Highland Crusader Offshore Partners, L.P., and Highland Credit Strategies Master Fund, L.P., are temporarily restrained from transferring or otherwise disposing of property received (or if property has already been transferred or disposed to, the cash equivalent) in March 2009 from Highland Financial Partner,s L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009."

**Appellee Appx. 00210**

**Appx. 03075**

**007018**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 218 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 101 of 1017 PageID 7831
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 217 of 1803 PageID 10963

24.     In the calculation of damages owed to the Redeemer Committee by Highland, we
have assumed that any Plan or Scheme Claims purchased by Highland would have been
purchased at the same discounted price as Highland did. However, the damages methodology
used by the Committee's expert witness on damages makes the assumption that the fair
market value of each of the Plan Claims was the NAV that Highland had established in each
of the relevant months. We do not adopt this methodology because of the uncertainty as to
whether a discount should be applied to the NAV in calculating the appropriate fair market
value.

25.     Rather, we adopt the alternative approach suggested by the Committee, which is
rescission.  We order Highland to transfer the 28 Plan or Scheme Claims to the Redeemer
Committee, to pay to the Committee whatever financial benefits Highland received from the
28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%,
from the date of each purchase. We will leave the hearing open until the parties have
worked out the exact financial details to comply with this order.

I.     Related Party Transactions

1.     The Committee contends that Highland breached its fiduciary duties by engaging in
multiple related-party transactions without seeking or gaining the approval of the
Committee  The Plan provision in questions requires the Committee's approval of "all
transactions between the Crusader Funds and any other HCM-Related Party, while it serves
as investment manager of the Crusader Funds, including any 'cross trade' between the
Crusader Funds and any other account managed or advised by HCMLP," Plan §2.06; Scheme
§4.7.1 (emphasis added).

2.     First, we must resolve the interpretation question left open by the Order of March 1,
2017, denying Respondent's motion for partial summary adjudication regarding these claims.
We found that the language cited above was ambiguous because while Respondent argued
that "Crusader Funds" is defined as meaning only four entities, the Master Fund, Onshore
Fund, Offshore Fund I and Offshore Fund II, Id., § 1.01, and does not include Crusader Fund
"portfolio companies" and other affiliated "entities," Claimant argued that if Crusader Fund
meant only those four entities, there would be no meaning to the "including 'cross trades'
language of §2.06, because none of the four entities directly owns assets and thus could not
engage in cross trades with each other or with any other account managed by Highland.
Thus, the language 'including "cross trades" must refer to entities broader than just the
defined entities within Crusader Funds, or else that portion of §2.06(a) prohibiting cross
trades would be read out of the Plan. Accordingly, we denied without prejudice the motion
to dismiss the breach of contract and fiduciary duty claims based on the so-called affiliate
transactions until after the record has been more fully developed.

31

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 219 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 102 of 1017    PageID 7832
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 218 of 1803    PageID 10964

3.      At the hearing, testimony was taken from two Redeemer Committee members, Messrs. Montgomery and Behr, regarding the drafting of the section in question. Mr. Montgomery testified that he negotiated the terms of the Plan with Michael Colvin, who was then Highland's General Counsel, telling him that the Committee "needed a related-party transaction prohibition, and he agreed to that. And the understanding was that it included everything on the Highland side and everything on the Crusader side… we thought there was agreement that it was including everything on the Highland side and everything on the Crusader side…" Tr. 2, 234:2-6, 235:2-5. Although in response to a question from a member of the Panel, Mr. Montgomery could not recall the specific language he and Mr. Colvin used to convey this understanding, and on cross-examination, he could not provide a reason for how the specific clause was drafted on this point, we credit Mr. Montgomery's testimony on this point.

4.      Although of limited evidentiary significance, Mr. Behr's testimony that before the adoption of the Plan and Scheme he had had discussions with someone at Highland, whom he recalled was Mr. Colvin, about concerns regarding Highland expensing board fees paid to its portfolio companies, Tr. 9 76:17-25, 77:2, supported Mr. Montgomery's testimony, cited above, that the subject of prohibiting certain related party transactions was part of the negotiations over the Plan. His recollection was supported in part by his contemporaneous notes of having raised that subject in the negotiations. HC508 at 142.

Appellee Appx. 00212

007020

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 220 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 103 of 1017    PageID 7833
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 219 of 1803    PageID 10965

5.       In addition, the Committee makes the point that the occasional course of conduct between the parties before the relationship between the parties became a matter of some dispute reflected the belief that the Plan and Scheme required that Highland seek the Committee's approval before engaging in transactions that involved entities other than the four specific Crusader Fund entities in the definition. See, e.g., Tr. 4 213:6-9.[12] Under the established law relating to contract interpretation, "How the parties perform a contract necessarily is manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed." Gulf Ins. Co. v. Transatlantic Reinsurance Co., 886 N.Y.S.2d 133, 143 (First Dept. 2009);  "[T]he parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.' … 'Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.'" Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (First Dept. 1999).

6.       Based on the foregoing evidence, we resolve the ambiguity in favor of a broad definition of the term "Crusader Funds" to include not only the four specific entities named in §2.06 but also the Crusader Fund "portfolio companies" and other affiliated "entities. The Committee contends that Highland engaged in two types of transactions that required but did not receive its consent: (1) transactions between Highland affiliates and Fund portfolio companies, and (2) transactions directly between Highland affiliates and the Fund entities.

J.    Related Party Transactions with Portfolio Companies.

1.       The Committee contends that Highland breached §2.06 by causing Fund portfolio companies to pay board fees, advisory fees and D&O insurance premiums.

2.       Highland responds that transactions between Highland affiliates and Fund portfolio companies were expressly disclosed to the Fund's investors, see HC-230 at 34-36, and that the investors specifically agreed such transactions were permissible, see HC-118 at 7. Accordingly, Highland urges that there can be no fiduciary duty breaches.

3.       Furthermore, Highland urges that the claims arose in 2011 or 2012, and in any case were disclosed to Highland counsel by April 6, 2013, JX-12, and, thus, would be barred by the three-year statute of limitations. Highland characterizes the proof regarding such claims as failing to establish more than the occurrence of "isolated or sporadic acts."

---

[12] We note that one of Highland's outside counsel also occasionally used the term "Crusader Funds" or "Crusader" when describing transactions between portfolio companies and Highland affiliates, RC83 at 2-3; see JX12; JX10.

Appellee Appx. 00213
Appx. 03978
007021

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 221 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 104 of 1017 PageID 7834
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 220 of 1803 PageID 10966

4.     The Committee claims that the statute of limitations should be tolled under the "continuing violation doctrine," which applies where "separate violations of the same type, or character, are repeated over time," and not where the claims are "based on a single decision that results in lasting negative effects." Moses v. Revlon, 2016 U.S. Dist. LEXIS 106431, *18 (S.D.N.Y. 2016).  Under prevailing New York law, "The continuing violations doctrine 'will toll the limitations period to the date of the commission of the last wrongful act where there is a series of continuing wrongs.' Shelton v. Elite Model Mgt., 11 Misc.3d 345, 361 (Sup Ct, New York County 2005); 78/79 York Assoc. v. Rand, 175 Misc.2d 960, 966 (Civ Ct, New York County 1998) … However, 'it will only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct.' Selkirk v. State of New York, 249 A.D.2d 818, 819 (3d Dept 1998)." Pankin v. Perlongo, 2012 WL 7868667, at *2 (Sup. Ct. N.Y. Cnty. 2012).

5.     The evidence brought forth by the Committee failed to show that the payments made by Highland for insurance premiums or for advisory fees were parts of a series of continuing wrongs. Rather, there appear to have been a series of discrete payments made in no regular or consistent pattern and in no similar amounts.[13] Under the circumstances, we find in favor of Highland on these claims. We do not reach the issue of whether disclosure to investors would bar a claim for breach of fiduciary duty.

K.     Related Party Transactions with Highland Affiliates

1.     The Committee contends that in 2013 and 2014, without seeking its permission as required under §2.06, Highland sold shares in four CLO assets held by the Master Fund, known as Eastland CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., and Stratford CLO, Ltd. (the "CLOs"), in what it characterizes as "pre-approved" transactions to Highland affiliates, without seeking the Committee's approval, as required by §2.06(a), which, as noted above, prohibits "any 'cross-trades' between the Crusader Funds and any other account managed or advised by HCMLP."

2.     The proof at the hearing showed that, with no disclosure to the Committee, Highland sold CLOs to brokers it used for other securities transactions who, within a very short time of purchasing the CLOs, sold some or all of the CLOs to Highland affiliates.[14] The Committee urges that such sales were breaches of fiduciary duty as well as breaches of the Plan.

---

[13] Insurance premiums were paid on behalf of four entities (American Home Patient, Inc., Cornerstone Healthcare, Nex-Tech Aerospace, and Trussway Holdings) in 2011 and 2012; no payment to any of the entities was the same as to any other entity. RC355, Schedule 6.1. As to the portfolio company advisory fees, various fees were paid over varying years between 2011 and 2016 by six different portfolio entities to Barrier or NexBank as advisors; with the exception of two years for one of the entities, each payment of an advisory fee was of a different amount.

[14] As set forth in the Expert Report of Basil Imburgia, RC408, Highland engaged in the following transactions:
- It sold 32,500 shares of Grayson CLO at a settlement amounts of $560 and $570 per share, of which $25,500 were sold to NexPoint, with a reported value of $570 per share, Table 19;
- It sold 32,250 shares of Eastland CLO at settlement amounts of $611.40 and $613.90, of which 25,250 were sold to NexPoint, with a reported value of $730 and $670, Table 20;

34

3.      Highland contends that the sales in question were not cross trades but were rather "market-bearing transactions" between Highland and an independent financial institution, which then sold to a Highland affiliate. But this contention is belied by the fact that the transactions bore all of the hallmarks of pre-arranged trades, designed to avoid obtaining the consent of the Committee. See JX-30 at 3 ("Trading assets between two affiliated accounts through a broker may be considered a Cross Trade…"). Indeed, Mr. Dondero, the Chief Executive Officer, is heard on a tape made by then-Chief Portfolio Manager Joshua Terry, suggesting "run[ning a CLO trade] through some broker," RC-263A. By using a middleman between itself and its affiliate, Highland sought to avoid the description of a "cross trade," but the reality is that the transactions were effectively cross trades and we will treat them as such.

4.      That said, however, the substance of the transaction, arguably, benefitted the Committee, because assets of the Fund were liquidated, which was a principal goal of the Plan and Scheme.  Yet the problem with these transactions is that Highland had a perfectly clear path to effectuate these trades without any question being raised as to their bona fides – it could have sought the consent of the Committee under §2.06, which consent could not be unreasonably withheld under §2.07, HC-300. We find that Highland's failure to do so constitutes a breach of the Plan.

5.      We are left with the question of whether Highland's roundabout trading method caused any damage to the Fund.  It appears Highland sold the CLOs to a broker for one value and then the broker turned around and sold the CLOs to the Highland affiliate for a higher value. Thus, the Fund received less than it was entitled to receive had the transaction been done without the middleman, and the damage to the Fund is the difference in the two values. While the Committee's expert Basil Imburgia did not use that methodology to calculate the damages associated with these trades, the information on the price paid to the funds and the price paid to the broker is set forth in the expert report of Highland's expert, Mr. Snow, HC-526 at 41.  The Committee contends that the difference is approximately $450,000. The Committee is entitled to judgment for the amount of the difference with interest from the date of the sale from the funds, Since none of the experts did the appropriate calculation, as with other items, we leave it for the parties to confer and agree upon the total amount of damages including 9% interest and we will leave the record open to resolve that amount.

---

- It sold 31,000 shares of Greenbriar at settlement amounts of $713.60 and $665.00, of which all of the shares were sold to NexPoint at reported values of $730.00 and $670.00, Table 21; and
- It sold 31,500 shares of Stratford at settlement amounts of $661.70 and $660.00, of which 25,500 were sold to NexPoint at reported values of $724.49 and $665.00, Schedule 22.

35

Appellee Appx. 00215

Appx. 03989

007023

L.      Failure to Settle Credit Suisse Trades/Litigation

1.      The Committee contends that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, both by failing to settle two trades Highland made on behalf of the Fund in September 2008 with Credit Suisse (relating to the purchase from Credit Suisse of syndicated loans in the amount of $23.5/9 for properties known as Goldfield and Westgate) and by failing to settle the litigation initiated by Credit Suisse in July 2013 regarding the same trades. The Committee asserts that, despite clear legal authority requiring that Highland settle the trades and the subsequent litigation, Highland refused to do so because it sought to use its refusal to settle the trades and litigation as leverage against Credit Suisse with respect to other claims not involving the Fund that Highland had against Credit Suisse. Thus, the Committee contends Highland put its own interests ahead of the interests of the Fund. Consequently, the Committee further alleges, that by its delaying the settlement of the trades and then of the litigation, Highland caused the Fund to incur seven-plus years of statutory interest that could have been avoided but which the Fund had to pay in January 2016 when the trades and the litigation were ultimately settled.

2.      Highland poses multiple defenses to the Committee contentions. First, Highland argues that the Committee's claim first accrued in 2008 when it allegedly failed to settle the trades and therefore was released by Section 7.01 of the Plan,[15] releasing Highland from all claims, known or unknown, "from the beginning of the world to the Effective Date" of the Plan in August 2011. Second, Highland contends that even if this claim was resurrected after the effective date of the Plan and Scheme, said claim would have arisen in 2011 and was thus barred by the three years statute of limitations for breach of fiduciary duty claims. Third, Highland argues that it did not breach its fiduciary duty as it was only exercising its legitimate business judgment in not settling the trades or the litigation and that the Committee has otherwise failed to show that Highland committed willful misconduct in this regard. Finally, Highland asserts that if the Tribunal finds that it breached its fiduciary duty, any damages that might be owing should be at a reduced amount from what the Committee claims.

---

[15] Section 7.01 provides, as follows: "Section7.01. Upon the Effective Date, each of the Consenting Redeemers, for themselves and on behalf of any of their respective officers, directors, shareholders, partners, members, employees, affiliates, investors, agents and representatives and any other person or entity entitled to assert a Claim (defined below) by, through, under, or on behalf of any Consenting Redeemer, hereby releases each of the HCM-Related Parties and each of the other Consenting Redeemers, from any and all accounts, actions, agreements, causes of action, claims, contracts, covenants, controversies, damages, debts, demands, executions, expenses, judgments, liabilities, obligations, omissions, promises, representations, and fights to payment, and all other liabilities of every kind, nature and description whatsoever, liquidated and unliquidated, fixed and contingent, matured and unmatured, disputed and undisputed, legal and equitable, state and federal, secured and unsecured, accrued and unaccmed, known and unknown, choate and inchoate (each, a "Claim"), which each Consenting Redeemer has, may have or ever had against any or all of the HCM-Related Parties and the other Consenting Redeemers from the beginning of the world to the Effective Date related to each of the Crusader

**Appellee Appx. 00216**

**Appx. 03994**

**007024**

---

Funds, including without limitation its administration and wind-down; provided, however, that such release shall not operate to release any claims arising from this Plan or based on larceny within the meaning of Section 155.05 of the New York Penal Code ("Larceny Claims"), provided that such exception shall not apply to Larceny Claims within the scope of knowledge of the releasing party as of the Effective Date. The benefit of the release in this Section 7.01, as it related to the HCM-Related Parties, is held in trust by the Crusader Funds for the HCM-Related Parties, and the Crusader Funds hereby assign the benefit of the release in this Section 7.01 in their favor."

37

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 225 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 108 of 1017  PageID 7838
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 224 of 1803  PageID 10970

3.      With respect to the issue of the release, the Tribunal concludes that Section 7.01 releases any claims that the Committee might have with respect to the failure by Highland to settle the Credit Suisse trades through the Effective Date of the Plan, but the Committee has not released any claims that arose after the Effective Date of the Plan. The Tribunal need not decide whether the continuous post-August 2011 failure to settle the trades automatically gives rise to new post-Effective Date claims; once Credit Suisse commenced litigation in July 2013 and the Committee renewed its demand that Highland settle the trades  and the litigation, and once Highland again failed to do so, a new claim arose, at least as of that point in time. This new claim would not be released under Section 7.01 since it arose after the Effective Date of the Plan. Accordingly, Tribunal views Highland's continuous failure to settle the trades and litigation after July 2013 (until January 2016, and subject to the temporary withdrawal by the Committee of its demand that Highland settle the trades and litigation in September of 2013, as discussed below) as the potentially actionable conduct that the Tribunal will analyze below.

4.      As to the statute of limitations issue, the Tribunal agrees with Highland that a three years statute of limitations applies to breach of fiduciary duty claims and therefore any conduct outside the three years limitations period is not actionable.  The Committee filed in this Arbitration its breach of fiduciary claim with respect to the unsettled Credit Suisse trades and litigation on July 5, 2016. Consequently, given the application of the statute of limitations, any claim for relief for any period prior to July 5, 2013 is barred by the statute of limitations and the Tribunal will not consider conduct prior to this date to be actionable nor will it consider any claim for damages for the period prior to July 5, 2013.

5.      The Tribunal finds that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, by failing to settle the two subject trades with Credit Suisse. The Tribunal finds that, whatever strategy Highland intended or whatever judgment calls it made, or purported to make, with respect to the settlement of these trades, it was under a clear legal obligation to settle the trades but failed to do so.

Appellee Appx. 00218
Appx. 02983
007026

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 226 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 109 of 1017   PageID 7839
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 225 of 1803   PageID 10971

6.      Highland's then General Counsel admitted to at least a general awareness of the legal obligation under the LSTA regime to settle trades promptly (and to litigate later if there is a dispute regarding same). Tr. 10 288:2-12, 290:13-22, 291:15-20; and there is other evidence to the same effect. See, e.g., JX-12 at RC00100770-771. Despite this clear legal obligation, and despite Committee requests that it do so, Highland refused to settle the trades in order to provide itself with leverage vis-a-vis Credit Suisse on another dispute. Even if, as argued by Highland, its prevailing on this other dispute would advantage the Fund, once the Committee demanded that Highland settle the trades, as it first did during the limitations period on August 7, 2013, Highland should have done so given both the acknowledged weakness in its defenses and that its purported goal in not doing so at least primarily advantaged itself and not the Fund (even if the Fund might have gained some marginal potential advantage if Highland prevailed in the other dispute). In light of the preceding, Highland's refusal to settle the trades constitutes willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors.

7.      The Tribunal finds that the actionable willful misconduct by Highland for which damages will be due occurred during the period September 8, 2014 through January 14, 2016. The reason for the end date is clear and undisputed: on that date, Highland caused the Fund to pay for the trades and the interest due. As for the start date, the earliest possible start date, in light of the above analysis, is August 7, 2013 which is when the Committee first demanded during the limitations period that the trades be settled. But, in September 2013, counsel for the parties interacted and the Committee withdrew its demand that Highland settle the trades. HC-476a. The Committee argues that it was not apprised by Highland of relevant information at the time, and therefore the Fund should not be bound by its agent's withdrawal of the demand, but the Tribunal concludes that, notwithstanding Highland's failure to provide this information, the Committee's counsel independently analyzed the relevant issues and the Committee is responsible for the decisions flowing from that analysis. On or around September 8, 2014, after the trial court entered summary judgment in favor of Credit Suisse in the litigation, the Committee reinstated its demand that Highland settle the trades; since Highland did not do so until January 14, 2016, it is, under our analysis above, responsible for damages accruing during the period from September 8, 2014 through January 14, 2016.

Appellee Appx. 00219
Appx. 03984
007027

8.      The Tribunal adopts the damages theory advanced by the Committee: the pre-judgment interest that the Fund had to pay during September 8, 2014 through January 14, 2016, minus the gain it achieved during the same period by virtue of having the use of the subject $23.5 million. However, neither party presented a damages analysis consistent with the preceding parameter. Accordingly, the Tribunal directs that the Parties jointly confer to calculate an amount of damages that takes into account the following parameters: (i) the damages period is between September 8, 2014 and January 14 , 2016; (ii) the 9% statutory interest (ordered by the New York State Supreme Court in September 2014) is to be applied on a simple basis to the total principal amount due ($23.5 million); (iii) the amount of the "off-set" is to be calculated using the factor utilized by Claimant's expert – the Treasury Yield Rates for the damages periods specified in (i); and (iv) 9% statutory, pre-judgment interest is to be applied on a simple basis to the result of the calculations in (i) – (iii) from January 14, 2016 to the date of this Partial Final Award.

M.      The Delay in Settling the UBS Litigation

1.      As noted above, Highland, Crusader and Credit Strategies were parties to an action commenced by UBS which alleged that certain securities had been fraudulently transferred by Highland to the funds. As a result, the funds were enjoined from transferring the subject assets during the course of the litigation.

2.      In May 2015, UBS, Highland, Crusader and Credit Strategies reached an agreement in principle to settle the litigation. Under the terms of that agreement Crusader was to pay UBS $25 million and Highland was to pay $35.75 million. A separate agreement between the Committee and Highland provided that, no sooner than December 30, 2016, Highland could recapture $33.75 million through incentive fees that could be generated through the liquidation of Crusader assets. RC-227.

3.      The settlement agreement was to be finalized on May 30, 2015, but Highland refused to go through with the settlement because Credit Strategies would not release claims against Highland. Tr. 3 21:10-22:3; Tr. 3 24:16-25:6; Tr. 10 316:20-317:23. Ultimately the Committee negotiated a its own settlement, pursuant to which Crusader paid UBS $25 million on July 1, 2015, and an additional amount of $30 million on December 29, 2015.

4.      The Committee argues that, had Highland not blown up the original settlement, it would not have had to pay the $30 million to UBS on December 29, 2015, and it would have retained those funds at least until December 30, 2016, when that amount might have been transferred to Highland if it had earned that amount in incentive fees. The Committee, therefore, seeks as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

40

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 228 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 111 of 1017    PageID 7841
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 227 of 1803   PageID 10973

5.      Highland denies that it has any liability and asserts that is protected by the business judgment rule. It also argues that 9% interest is not appropriate. Further, Highland urges that the Committee's expert did not otherwise account for the fact that Highland might have earned $33.75 million in incentive compensation and, therefore, there was a net benefit to the fund.

6.      There is no basis for Highland's claim that its conduct is protected by the business judgment rule. In deciding whether or not to settle the UBS litigation, Highland was acting as a fiduciary with respect to Crusader and had a fiduciary duty not to place its own interests above that of Crusader. As the New York Court of Appeals stated in Birnbaum v. Birnbaum, 73 N.Y. 461, 466 (1989):"It is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interest the fiduciary is to protect . . . . This is a sensitive and ' inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a  fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty. (Citations omitted.)"

7.      Thus, Highland was not free to place its own interests above that of Crusader and had an obligation to settle UBS's claims against Crusader regardless of its concerns about possible claims against it by Credit Strategies.

8.      There can be no question that Highland's action in refusing to settle with UBS resulted in Crusader being deprived the use of $30 million in cash between July 1, 2015 and December 30, 2016, the first day on which Highland would have been entitled to receive any of the incentive fees. Here, as with the Deferred Fees, it is appropriate to award interest on that amount at the rate of 9% to compensate Crusader for that loss.

**Appellee Appx. 00221**

**007029**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 229 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 112 of 1017   PageID 7842
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 228 of 1803   PageID 10974

9.      The problem with Highland's claim that it might have earned an incentive fees of $33.75 million is that Highland offered no evidence that would suggest that its incentives fees would ever have reached even the $30 million amount that the Committee is willing to concede might have been reached. Since the original settlement agreement was negotiated at a time when there was no plan in place to terminate Highland as the fund manager, the incentive fee structure was based on events that would ultimately occur in periods after the Committee terminated Highland. Since neither party made any effort at the hearing to calculate incentive fees, it seems apparent that such a calculation was not possible. In these circumstances, the Committee's assumption that Highland would have earned $30 million in incentive fees by December 29, 2016 is generous and there is no basis for a finding that Highland would have earned more than that in incentive fees.

10.     We award Claimant as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

N.      Cornerstone

1.      Highland Cornerstone Healthcare Group ("Cornerstone") is a company that owns Long Term Acute Care (LTAC) hospitals in which the Fund owns a minority equity interest. At the time of the adoption of the Plan and Scheme, Highland owned or controlled 100% of the shares of Cornerstone. Two groups of funds, Crusader Funds and Highland Credit Strategies Fund ("Credit Strat"), owned more than 50% of the shares of Cornerstone. Between 2011 and 2013, Highland was secretly engaged in the process of valuing and, eventually, selling the interest held by Credit Strat in Cornerstone. In September 2013, after a process in which the Credit Strat Redeemer Committee was kept completely in the dark as to the sales process that was underway, and which was later found to be unfair to the investors in Credit Strat, see RC-306, Highland arranged for the purchase of Credit Strat's interest by Cornerstone itself at the price of $2,956.03 per share, see JX-16. This price was below the most recent mark set by Highland, and below the value of between $3,424 and $4,434 per share that Highland's investment bankers, Houlihan Lokey, found to be fair for the purchase of the minority interest, see HC-431.

42

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 230 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 113 of 1017 PageID 7843
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 229 of 1803 PageID 10975

2.      Following the purchase of the Credit Strat interest, the Crusader Funds owned 41.8%
of Cornerstone, see RC-138 at 7. The Crusader Funds learned of the sale and made known
their interest to Highland in having their interest in Cornerstone sold.  But when Highland
offered to buy their interest for the same price of $2,956.03 per share as the Credit Strat
interest, the Committee engaged Ernst & Young ("E&Y") as its advisor to analyze the offer
and prepare a response. E&Y prepared two analyses of the value of the Cornerstone asset.
The first, HC-577, found that, as of the fall of 2013, "Cornerstone's offer to purchase
Crusader's share for $43.8 mm is below Crusader's current carrying value and at the low end
of the range of values developed in this Report" and that "based on information provided and
reviewed to date it would appear that the lower end of the range is more reasonable to
expect that (sic) the higher end of the range," Id. at 5.

3.      The Committee then requested that E&Y prepare a supplemental report, and, in
January 2014, E&Y rendered a second report, finding that Cornerstone underperformed
expectations for 2013 and that the changes occurring in the healthcare field were creating
uncertainty in the industry in which Cornerstone operated.  HC-577 at 19. E&Y reduced its
range to $44 million to $63 million, by imposing a discount from its prior range as of year-
end 2013 by 10% to 25%. In discussions with counsel to the Committee, E&Y suggested
countering with a purchase price in the range of $50 million to $54 million "for negotiation
purposes." Id.

4.      Thereafter, on March 28, 2014, after the Committee had considered its options, it
made a counter-offer within the range suggested by E&Y at $52,342,188, or $3,529 per share,
plus a 50% recapture provision in the event of a sale within three years. JX-18.  The counter-
offer was at the 2013 year-end market value, as calculated by Highland. Id. Highland never
responded to this counter-offer despite repeated overtures to Highland by the Committee,
and despite the desire of the Claimant Redeemer Committee and the mandate of the Scheme
and Plan to liquidate all of the assets of the Crusader Fund, the interest in Cornerstone held
by the Crusader Funds has not been sold.

5.      Claimant contends that the failure of Highland, during the period it was the
investment manager of the Funds, to make any good faith effort to sell the Funds' shares in
Cornerstone, constituted a breach of fiduciary duty.

6.      As part of its claim of breach of fiduciary duty, the Committee urges that Highland is
collaterally estopped from denying the findings of the arbitration tribunal in the arbitration
brought by the Redeemer Committee of Credit Strat arbitration tribunal regarding, inter alia,
the Cornerstone transaction. RC-306 (4/6/16 Credit Strategies Fund Final Award).

43

7.    In particular, as it bears on this dispute, the Committee contends that Highland is estopped from denying the following findings: (1) Highland controlled Cornerstone; (2) the per share price at which Highland sold Credit Strat's interest was unfair; and (3) a price of $3,929 per share was a fair price, based upon the Houlihan Lokey valuation.

8.    Highland contends that the Credit Strat Tribunal's findings do not bind Highland in this proceeding, because the two arbitration proceedings deal with "fundamentally different" issues, such that collateral estoppel does not apply.

9.    First, Highland urges that the Credit Strat Tribunal was dealing with the ramifications of a consummated sale, where it found that Highland controlled both Cornerstone's offer and Credit Strat's acceptance. HC-220 at 8, 30, whereas in this proceeding, the evidence is that Cornerstone made an offer to the Committee, but Highland had no role in the Crusader Fund's evaluation of or counter to that offer and no sale occurred.

10.    Secondly, Highland points out that in Credit Strat, the retention of Houlihan Lokey and the entire process that Houlihan Lokey engaged in was a secret that the Credit Strat Committee was unaware of, whereas, in this proceeding, the Houlihan report as well as other financial information was made available to the Crusader Committee, HC-577 at 577.0002, Tr. Day 5 at 114:12-117:18 (Zambie).

11.    The doctrine of collateral estoppel requires that an issue being litigated in the second case be the same as was fully litigated by the same party in the first action. Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir. 2002) ("[C]ollateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication. It may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate.") (internal quotations and citations omitted).

12.    Although there are differences in the way in which the sale process took place, we do not find that such differences obscure the fact that some issues are substantially identical in both proceedings.

44

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 232 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 115 of 1017    PageID 7845
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 231 of 1803    PageID 10977

13.     The principal finding that we think is binding on Highland in this proceeding is that the price of $3,929 per share, based upon Houlihan Lokey's valuation, was a fair price. Claimant also argues that Respondent is bound by the finding that the offering price Highland made for the Credit Strat position, which was the same price as offered to the Redeemers Committee here, was unfair. But we think that finding would fly in the face of Claimant's own adviser, E&Y, who found that such a price was at the low end of a fair range. Accordingly, we do not think it appropriate to adopt such a finding as binding in this proceeding.

14.     Highland also contends that, with respect to the possible sale of the Cornerstone interest, it was not in a fiduciary relationship with the Committee, which was relying on EY for negotiating assistance, not on Highland, as Highland was sitting opposite to the Committee in the negotiation.  Tr. Day 5 at 116:10-117:18 (Zambie).

15.     While the Committee was not relying on Highland for financial advice or guidance with respect to Cornerstone in the period between the Fall of 2013, when an offer of $2,956.03 per share was made, and the early Spring of 2014, when the counter-proposal were made, the Committee did rely on Highland, in its role as investment manager, both before and after those dates, to liquidate the Fund as rapidly as possible.

16.     But by Highland's choosing to have the Crusader Funds, along with several other entities controlled by Highland, invest in Cornerstone, Highland voluntarily placed itself in a conflict position: it owed fiduciary obligations to the Crusader Funds to maximize the liquidation process, while being the control person of Cornerstone whose own interests were to have any purchase price be as low as possible. As investment manager, Highland was obligated to be fully responsible to the Committee, but could not do so as long as it also continued to play an active role as controlling party of Cornerstone with respect to the Committee's desire to sell.

17.     The hearing record is that, other than making the offer in September 2013, Highland took no steps to market or sell the Fund's interest in Cornerstone. Tr. 1 347:16-349:2; 364:12-22.  At meetings held with representatives of the Committee, the Committee asked about plans to sell assets and Highland never discussed, or appeared to have a plan by which it proposed to sell the Cornerstone asset. Tr. 1 349:4-22; 365:13-17; Tr. 4 55:14-20; RC-317 at 2("Mr. Jameson noted that for the remainder of the portfolio, formal strategies for disposition are not in place.").  When Committee representatives met periodically with Jim Dondero, the CEO, he made it clear that he ran the sales operation completely and did not wish to be questioned or have the portfolio managers questioned as to the timing of any particular sale.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 233 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 116 of 1017 PageID 7846
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 232 of 1803 PageID 10978

18.     We find that Highland had a fiduciary duty not to place its own interests above that of Crusader, Birnbaum v. Birnbaum, 73 N.Y. at 466 (1989), but rather to subordinate its own economic interests behind its fiduciary obligation to the Crusader Funds. Guth v. Loft, 5 A.2d 503, 510 (Del. 1939) ("The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."); Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del.1983) ("There is no dilution of [fiduciary] obligation where one holds dual or multiple directorships."); see also Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618 (Del. 2013).  Highland's failure to subordinate its own interests to those of the Committee led directly to its failure to engage in a fair negotiating process with the Committee. By failing to do so, Highland breached its fiduciary duty to the Fund.  Caruso v. Metex Corp., 1992 WL 237299, at *16 (E.D.N.Y. July 30, 1992), People ex rel. Spitzer v. Grasso, 50 A.D.3d 535, 546 (1st Dep't 2008). That breach of fiduciary duty was a continuing offense through the period of time that Highland was the investment manager of the Crusader Fund, as Highland never itself took, or authorized Cornerstone to take, any action in response to the counter-offer that was made in February 2014.

19.     Highland argues that the Committee must overcome the business judgment rule that "the defendant [fiduciaries] have acted on an informed basis and in the honest belief they acted in the best interest of the [client]," citing CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd., No. 03 CIV. 7936 (DAB), 2007 WL 2915181, at *4 (S.D.N.Y. Oct. 4, 2007), in turn citing Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984)("While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made 'on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company,' unless the plaintiff shows that the presumption does not apply.").

20.     But here, we find that Highland's decisions regarding the purchase of the Cornerstone shares from the Crusader Funds — from the offer to purchase, the ignoring of the counteroffer, and the failure to engage in or authorize a negotiation process — were made with the willful intent to benefit itself and not the Crusader Funds investors. See JX-19; Tr. 1 379:17-380:8.  The Business Judgment Rule does not protect Highland or its officers from scrutiny for alleged breaches of fiduciary duty under these circumstances.

**Appellee Appx. 00226**

007034

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 234 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 117 of 1017 PageID 7847
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 233 of 1803 PageID 10979

21.     The question then is what is the appropriate price at which the sale should take place. "[I]n determining whether a fiduciary has acted prudently, a court may examine a fiduciary's conduct throughout the entire period during which the investment at issue was held. The court may then determine, within that period, the 'reasonable time' within which divesture of the imprudently held investment should have occurred. What constitutes a reasonable time will vary from case to case and is not fixed or arbitrary. The test remains 'the diligence and prudence of prudent and intelligent [persons] in the management of their own affairs' (id., at 511 [citations omitted])." Matter of Estate of Janes, 90 N.Y.2d 4, 54 (1997); Public Service Co. of Colorado v. Chase Manhattan Bank, N.A., 577 F.Supp. 92, 107 (S.D.N.Y.1983) (Lumbard, CJ, sitting by designation)("where there is no sale, it is impossible to fix exactly the moment by which the loan should have been sold or the amount that could have been obtained; "[p]robably the only rule is that the court will use its common sense and determine what under all the circumstances it is fair to say that the trustee ought to have received if he had done his duty in selling the property within a reasonable time," (quoting Scott on Trusts)).

22.     To satisfy its obligation under the Plan to liquidate the Fund's assets as rapidly and as fairly as possible, Highland did not have "to cause Cornerstone to purchase the Fund's Cornerstone shares for a specific price and at the specific time demanded by the Committee…," Highland Post-Hearing Brief at 11, but it did have a duty to place the Funds' interest above its own and to obtain the best price possible for the Funds' Cornerstone interest. Thus, when it decided it wished to make an offer to purchase the Funds' Cornerstone shares, it was obligated to do so at the fair market value and not to attempt to take advantage of the fact that it had placed the funds in a position where it was the only available buyer.

23.     Highland argues that it makes no sense to assess damages based upon a hypothetical sale of the Cornerstone asset, because, first, since the shares have never been sold, there is no realized loss; and, second, "other than Cornerstone's $43.8 million offer, there is no evidence of any other willing buyer for Cornerstone's assets at any price."

24.     We reject the first argument because it ignores what we have found to be the breach of fiduciary duty —the obligation to pursue and consummate a sale at a fair and reasonable price. The Fund was damaged by reason of Highland's failure to fulfill that obligation.

Appellee Appx. 00227
Appx. 03092
007035

25.     As to the second argument, Highland defeats its own argument by pointing out that, in the real world, there is only Cornerstone available as a buyer. But, because of Highland's own financial objectives, there has been no indication since April 2014 when it failed to authorize a counteroffer that Highland was interested in directing Cornerstone, which it controlled, to make an offer to purchase the shares at anything other than a bargain basement and unfair price.

26.     Using our equitable powers, we believe that a fair price can be derived by using the fair market value of the shares of $3,929 per share, based upon Houlihan's valuation prepared on July 15, 2013, adjusted downward by 10-25% by the year-end discount caused by several factors cited by E&Y. The average of that discount results in a fair market valuation of $3,241.43, which amount is what we find should have been offered to pay for the Cornerstone shares.

27.     We order that Highland pay to the Committee $3,241.43 per share, or $48,070,407, and order that the Committee simultaneously cause the Crusader Fund to surrender its interest in Cornerstone to Highland.

28.     With respect to an award of pre-judgment interest, "[a]lthough an action for breach of fiduciary duty is generally considered of an equitable nature, '[e]ven on [such] a claim with equitable underpinnings ... prejudgment interest [is] mandatory where the only relief sought was compensatory damages.' Lewis v. S.L. & E., Inc. 831 F.2d 37, 39 (2d Cir.1987) (citing Spector v. Mermelstein, 485 F.2d 474, 481 (2d Cir.1973))(emphasis added).

29.     Regarding the rate of pre-judgment interest to be applied, Claimant argues for the application of New York's statutory rate of interest of 9% as most appropriate. Under CPLR §5001(a), "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." See 212 Inv. Corp. v. Kaplan, 16 Misc. 3d 1125(A), at *9 (Sup. Ct. N.Y. Cnty. 2007); Panix Prods., Ltd v. Lewis, id; Summa Corp. v. Trans World Airlines, 540 A.2d 403, 409 (Del. 1988).

30.     Under CPLR §5004, New York applies pre-judgment interest at 9%, simple annual interest. Under the circumstances here, where the breach of fiduciary duty deprived the investors of the Crusader Funds of a significant distribution and partial return of their equity, we exercise our "broad discretion, subject to principles of fairness, in fixing the rate to be applied," Summa Corp. v. Trans World Airlines, Inc., id., and we award interest at the statutory rate of 9%, simple annual interest, pursuant to New York law, from April 15, 2014, through the date of this Partial Final Award. We pick this date as it is the date by which we believe Highland and/or Cornerstone (as controlled by Highland) should have responded to the Committee offer.

IV.     The Return of the Deferred Fees

48

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 236 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 119 of 1017 PageID 7849
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 235 of 1803 PageID 10981

A.     Under §§2.02 and 6.02 of the Plan, if Highland distributed $1.7 billion within 43 months of the Plan's Effective Date, Highland could obtain $10 million in Deferred Fees that had been placed in the special account at the outset to incentivize Highland's rapid liquidation. There is no question that Highland did not meet that goal by the 43rd month and, thus, in Count Three of its Amended Demand, the Committee seeks the immediate return to the Fund of those proceeds by a declaration that the Fund should distribute the right to receive payment in respect of the funds in the Deferred Fee Account to the Consenting Compulsory Redeemers.

B.     Highland objects on the ground that the UBS TRO eliminated the 47-month schedule applicable to the Deferred Fee Account, invoking the Impossibility Doctrine, discussed in detail above, and argues that, upon the eventual complete liquidation of the Fund, it will be entitled to the $10 million in the Deferred Fee Account.

C.     For reasons set forth earlier, we reject the argument that, under the Impossibility Doctrine, Highland was relieved of the requirement that it achieve complete liquidation of the Fund within 43 months, and, thus, is entitled to the $10 million in Deferred Fees upon complete liquidation. Highland had the opportunity to achieve the complete liquidation despite the duration of the UBS TRO, but chose, for its own reasons, not to do so. The Impossibility Doctrine does not provide a basis for granting Highland affirmative relief.

D.     We order the return to the Crusader Fund the $10 million in the Deferred Fee Account.

V.     Counterclaims

A.     Respondent has brought two principal counterclaims: first, it seeks to recover the remainder of Deferred Fees to which it says it is entitled now because Claimant should have completed the complete liquidation of the Fund's assets by December 31, 2017, at the latest; and, second, it seeks damages against the Committee for breach of the Plan and of its fiduciary duties to Highland by failing to oversee A&M's liquidation of Fund assets and for approving, without adequate, if any, scrutiny, A&M's fees, said to be exorbitant.

B.     As to the breach of fiduciary duty claim, the fiduciary duty relation is said to arise from Highland's status as an investor in the Crusader Funds. Highland's Post-Hearing Brief at at 3-5. However, we have previously stricken those portions of Highland's Amended Counterclaim that alleged it was suing as an investor. Panel Order, April 1, 2018, at 4. Furthermore, even assuming that, as an investor, Highland had standing to bring a claim for breach of fiduciary duty, as stated below, we find that no breach of duty has been proved with respect to any of the allegations in Respondent's Amended Counterclaim.

Appellee Appx. 00229
Appx. 03994
007037

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 237 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 120 of 1017   PageID 7850
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 236 of 1803   PageID 10982

C.      Specifically, we have examined the record thoroughly and, aside from the testimony of Highland's expert, James Finkel, and its former portfolio manager, Mr. Jameson, there is insufficient evidence of a purposeful and wrongful delay in liquidation or a failure by the Committee to oversee and scrutinize A&M's performance, nor any activity of A&M that the Committee aided and abetted that was proved wrongful.

D.      Mr. Finkel had a distinguished thirty-plus year career in capital markets, investment banking, and investment advisory work, including as a liquidator of the assets of alternative investment funds. But his opinion that Highland or any reasonable manager or liquidator would have completed liquidation by the end of 2017, at the latest, was not based on anything more than his unverified judgment, and not on a close examination of the facts in this record. For example, he conceded that, in reaching his opinions, he didn't consider the amount of information A&M provided to investors, didn't review A&M's time records or evaluate the quality of the work performed by A&M, and didn't consider the consequences of the lack of cooperation of Highland with A&M, among other critical deficiencies. Tr.10 367:10-372:3. Similarly, his opinion that, because of what he regarded as a flawed compensation structure, A&M's primary focus was on the time it spent on projects, rather than on results achieved, was based on one assumption that time-based work is, inevitably, less likely to be focused, an assumption that we reject as a sound basis of criticism of A&M's contribution. We find that Mr. Finkel's opinions were not soundly based and we reject them.

Appellee Appx. 00230

007038

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 238 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 121 of 1017 PageID 7851
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 237 of 1803 PageID 10983

E.    Mr. Jameson worked for Highland for almost seven years as co-head of Private Equity, responsible for sourcing and executing private equity investments and monetizing existing portfolio companies. He testified that he was aware of the UBS TRO and had been advised that he could not sell assets during its pendency. He was aware that Cornerstone did not comply with requests by A&M for information but did not think he had the power to direct Cornerstone to do so Tr 10 28:18-30:3. He also testified that, had Highland remained as its investment manager, it would have sold the Cornerstone asset by December 31, 2017, and that Highland Capital's purchase of Cornerstone from the Crusader Fund at a negotiated price around the mark set by Highland would have been logical. Tr. 10 30:4-35:23. He also testified, in response to questioning by the Tribunal, that little, if anything, would have changed in Highland's ability to negotiate a sale with the Committee when it was replaced by A&M as its investment manager, Tr. 10 119:8-121:23.  On balance, despite Mr. Jameson's on-the-ground role as portfolio manager, his testimony did not support the allegations of Highland in its counterclaims; if anything, his intimate understanding of the Cornerstone asset and how Highland controlled the process by which Cornerstone was or wasn't being marketed supported the Committee's contentions that Highland could have negotiated a fair disposition of the Cornerstone asset had it chosen to do so.

F.    As to an alleged delay in the liquidation of the Fund's assets, the weight of the credible evidence is that Highland, not A&M, was responsible for any delay in liquidating the balance of the assets in the Crusader Fund after Highland was discharged and A&M was retained.

1.    We note that we have previously found that Highland, after refusing to respond to numerous requests by the Committee for books and records, should make a thorough search of its books and records and produce all non-privileged documents in its possession, custody, or control on certain relevant topics. Thus, we rejected several arguments put up by Highland to prevent the Committee and A&M from gaining access to critical books and records. Order and Partial Award, April 21, 2017.

**Appellee Appx. 00231**

**007039**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 239 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 122 of 1017    PageID 7852
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 238 of 1803   PageID 10984

2.     But, even when ordered to do so, Highland again refused to produce documents on at least two other occasions, requiring additional motions addressed to this Tribunal, Order, June 20, 2017; Order, October 21, 2017.

3.     In addition, there was unrebutted testimony that Highland produced "hundreds of thousands" of documents in single-page PDF format, requiring the better part of three or more months of A&M's time to correlate and organize. Tr. 6 25:4-19.

4.     By contrast, other than Mr. Finkel's testimony, there was little or no evidence of A&M's procrastinating or proceeding with deliberate slowness or that the Committee failed in its oversight of A&M.

5.     We have considered all of the other factual and legal arguments made by Highland in support of its counterclaims and conclude that Highland is not entitled to recover the remaining Deferred Fees being held in the Fund's cash account and that the Committee did not breach Sections 2.02 of the Plan and 1.5.2 of the Scheme, the covenant of good faith and fair dealing, or its fiduciary duties to Highland and other investors. We dismiss Highland's counterclaims in their entirety.

VI.   Attorneys' Fees and Other Costs

A.     Both parties have requested attorneys' fees relating to all claims asserted in the Amended Demand, Highland's Answer, Highland's Amended Counterclaims, and Claimant's Answer to the Counterclaims. Am. Dem. at 53-54; Highland Answer, October 16, 2016, at 21-22; Highland Am. Counterclaim, April 15, 2018; Committee Answer to Counterclaims. Under AAA Commercial Arbitration Rules, Rule 47(d)(ii), those mutual demands for attorneys' fees submitted the issue to arbitration and gave this Panel the authority to award attorneys' fees, in its discretion. AAA Rule 47(d)(ii). "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." R.F. Lafferty & Co., Inc. v. Winter, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted).

B.     The Committee urges that an award of attorneys' fees to it is justified by Highland's having "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," InterChem 59 Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005) (citation omitted), and that the record shows numerous examples of Highland acting in bad faith.

52

**Appellee Appx. 00232**
Appx. 03087
007040

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 240 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 123 of 1017 PageID 7853
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 239 of 1803 PageID 10985

C.      Highland acknowledges the Tribunal's discretion to order an award of attorneys' fees but opposes an imposition of attorneys' fees here. First, Highland argues that denying the Committee's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." HC-300 at 86. But this section of the Plan does not deal with the issue of fee-shifting being ordered by an arbitral tribunal. Nor, given Rule 47(d)(ii), would an order of this Tribunal shifting the responsibility of fees from one party to another be contrary to the so-called American rule, as both parties have sought this relief which is authorized under the prevailing rules of this Tribunal.

D.      Second, Highland urges that the only basis upon which the Committee is seeking an award is that Highland allegedly engaged in bad faith and vexatious conduct, citing only InterChem Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005). Highland points out that the Court in InterChem Asia justified an arbitrator's imposition of an award of attorneys' fees because of one party's "bad faith" conduct during the arbitration, principally concerning discovery issues. Here, the Committee cites seven examples of alleged bad faith, but only one dealt with such conduct during the arbitration, "failing to provide the Committee with the books and records of the Fund, resulting in an extensive discovery process, producing records as single-paged TIFs, and resulting in a Panel ruling against them," citing the Tribunal's Panel Opinion and Final Partial Award, dated April 17, 2017.

E.      We are exercising our discretion to grant Claimant's request for attorneys' fees and costs and to deny Respondent's request for the same relief. We do not base our award on any concern of bad faith or oppressive conduct by Highland's able trial counsel, who acted professionally throughout these proceedings. However, with respect to each of the claims on which we have determined that the Committee is entitled to prevail, we have noted above the many occasions where, during the time it was investment manager and thereafter, Highland engaged in conduct that breached the Plan, breached fiduciary duties, involved secrecy, misrepresentations, and false statements by the most senior executives, and constituted willful misconduct. Furthermore, large portions of the defense set forth by Highland's witnesses were unworthy of belief and reflect the fact that Highland knew that it had no legitimate defense to many of the Committee's claims. Accordingly, in our discretion, based on the foregoing, we award Claimant its legal fees and costs for the litigation of this arbitration.

VII.    CONCLUSION AND AWARD

A.      With respect to the claims below for which we find liability and direct the payment of damages and interest, if the Parties are not able to agree on the amount of damages or interest, we direct them to submit simultaneous briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award; there will be no reply briefs unless otherwise directed.

B.      We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of contract claims as follows:

Appellee Appx. 00233
Appx. 03098
0070̄41

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 241 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 124 of 1017 PageID 7854
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 240 of 1803 PageID 10986

1.     The taking of the Deferred Fees: We order that, within twenty (20) days of the date of this Partial Final Award, Respondent, Highland Capital Management, pay to the Claimant the Deferred Fees in the amount of $33,313,000, with statutory interest of 9%, calculated on a simple basis, from the dates of taking in January and April 2016 through the date of this Partial Final Award.

2.     The payment of Distribution Fees: As found above, with respect to each of the following categories, we find that the Respondent is liable for damages in the amount set forth in the Expert Report of Claimant's damages expert, Basil Imburgia, $14,452,275, plus 9% interest, calculated on a simple basis, from the respective dates such Fees were taken:

a)     The Distribution Fees attributable to the payment of Deferred Fees;

b)     The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

c)     The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims;

d)     The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames;

e)     The Distribution Fees attributable to the amount of margin borrowings; and

f)     The Distribution Fees attributable to the cumulative nature of the calculation, as discussed above.

Appellee Appx. 00234
Appx. 03099
007042

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 242 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 125 of 1017 PageID 7855
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 241 of 1803 PageID 10987

C.     We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of fiduciary duty claims as follows:

1.     Engaging in related party transactions without Redeemer Committee approval:

2.     Purchase of Plan claims without Redeemer Committee approval: Within twenty (20) days of the date of this Partial Final Award, we order Respondent, Highland Capital Management, to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase, calculated on a simple basis;

3.     Sale of CLO interests - The Committee is entitled to judgment for the amount of the difference between the sale and repurchase prices with interest from the date of the sale from the funds. We direct the Parties promptly to confer and agree upon the total amount of damages including 9% interest, calculated on a simple basis; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

4.     Failure to settle Credit Suisse claims: We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on this claim and direct the Parties promptly to confer to calculate an amount of damages that takes into account the parameters set forth in the body of this Award; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

5.     The UBS litigation: We find in favor of Claimant, Redeemers Committee of the Highland Crusader Fund, and award damages in the amount of 9% simple interest on $30 million from December 29, 2015 to December 30, 2016, which shall be paid to the Redeemer Committee by Highland Capital Management within twenty (20) days of the date of this Partial Final Award; and

6.     The Cornerstone Asset: We find in favor of Claimant and direct Highland Capital Management, within twenty (20) days of the date of this Partial Final Award, to pay the Redeemer Committee the amount of $48,070,407, plus interest at 9%, on simple basis, in return for which the Fund will transfer title to the shares to Highland.

D.     We grant Claimant's request for a declaratory judgment, seeking the immediate distribution of the Deferred Fee Account, and order the payment of the $10 million in the Account to the Committee for disbursal to the Consenting Compulsory Redeemers within twenty (20) days of the date of this Partial Final Award.

55

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 243 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 126 of 1017 PageID 7856
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 242 of 1803 PageID 10988

E.      We find against Respondent on its counterclaim and dismiss the counterclaim with
prejudice.

F.      We grant Claimant's request for reasonable attorneys' fees and costs and deny Respondent's
request for an award of attorneys' fees and costs. With respect to the amount of fees and expenses
that Claimant seeks, the parties should promptly confer to determine whether they can agree on an
amount. If the parties can not agree, Claimant shall file an affidavit or petition setting out its claim
with appropriate documentation within fifteen (15) days of the date of this Award, unless counsel
agree otherwise. Respondent shall respond within fifteen (15) days thereafter, unless counsel agree
otherwise. There will be no reply opportunity absent leave of the Tribunal.

G.      We will leave the hearing open until all issues set forth above have been agreed upon by the
Parties or decided by the Tribunal.

**Appellee Appx. 00236**
**007044**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 244 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 127 of 1017    PageID 7857
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 243 of 1803   PageID 10989

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

54

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 245 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 128 of 1017 PageID 7858
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 244 of 1803 PageID 10990

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair


_____
John S. Martin, Jr.


_____
Michael D. Young

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 246 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 129 of 1017 PageID 7859
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 245 of 1803 PageID 10991

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair


_____
John S. Martin, Jr.


_____
Michael D. Young

Appellee Appx. 00239

007047
Appx. 03464

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 247 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 130 of 1017    PageID 7860
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 246 of 1803    PageID 10992

State of NEW YORK                    )

                                     )    SS:

County of NEW YORK                   )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in
and who executed this instrument, which is our Partial Final Award.


__3/6/19__                           _____
Date                                 David M. Brodsky, Chairperson



State of NEW YORK                    )

                                     )    SS:

County of NEW YORK                   )


On this __6__ day of MARCH, 2019, before me personally came and appeared David M. Brodsky, to
me known and known to me to be the individual described in and who executed the foregoing
instrument and he acknowledged to me that he executed the same.


_____
Notary Public


MEENA M. GULATI
Notary Public, State of New York
No. 01GU5015872
Qualified in New York County
Commission Expires August 2, 2021


55

Appellee Appx. 00240
Appx. 03185
007048

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 248 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 131 of 1017 PageID 7861
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 247 of 1803 PageID 10993

State of FLORIDA          )

                          )   SS:

County of LEE             )

I, JOHN S. MARTIN, JR.,, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

Date  March 5, 2019                    _____
                                       John S. Martin, Jr.

State of Florida          )

                          )   SS:

County of Lee             )

On this 5th day of MARCH, 2019, before me personally came and appeared John S. Martin, Jr.,, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 249 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 132 of 1017 PageID 7862
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 248 of 1803 PageID 10994

State of NEW YORK )

                        ) SS:

County of NEW YORK )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and
who executed this instrument, which is our Partial Final Award.

_3-5-19_
Date

_Michael Young_
Michael D. Young

State of NEW YORK )

                        ) SS:

County of NEW YORK )

On this _5_ day of MARCH, 2019, before me personally came and appeared Michael D. Young, to me
known and known to me to be the individual described in and who executed the foregoing instrument and
he acknowledged to me that he executed the same.

_Vickie L. Johnston_
Notary Public
VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 20

1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 250 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 133 of 1017    PageID 7863
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 249 of 1803   PageID 10995

# APPENDIX 3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 251 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 134 of 1017 PageID 7864
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 250 of 1803 PageID 10996

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

---

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

                    Claimant,

v.                             Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                    Respondent.

---

## FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

    A. On March 6, 2019, we issued a Partial Final Award, finding Respondent Highland Capital Management, L.P. ("Respondent") liable in a number of respects and awarding damages, interest, attorneys' fees, and costs to Claimant Redeemer Committee of the Highland Crusader Fund ("Claimant"), as described, in relevant part, below. We "le[ft] the hearing open until all issues set forth ... have been agreed upon by the Parties or decided by the Tribunal."

    B. In response to an email from Claimant, dated March 7, 2019, seeking clarification on an apparent omission from the Partial Final Award, we issued a Disposition of Application for Modification of Award dated March 14, 2019 ("Modification of Award").[1]

    C. This Final Award incorporates the Partial Final Award and the Modification of Award (together, the "Partial Award"). We re-adopt all prior findings and conclusions of the Partial Award, except as specifically modified hereinafter.

    D. We have before us the following:

---

[1] The Modification of Award referred to Rule R-46 of the AAA Commercial Arbitration Rules, instead of Rule R-50, as the basis for the modification of a clerical error, relying upon the predecessor version of Rule R-50. The substantive text of old Rule R-46 and present Rule R-50 are the same.

1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 252 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 135 of 1017 PageID 7865
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 251 of 1803 PageID 10997

a. Respondent's Memorandum, dated March 17, 2019, requesting that (1) the Panel withdraw its Modification of Award entered on March 16, 2019; (2) cease any further attempts to award additional damages, attorneys' fees, or costs that are not expressly set forth in the Partial Award; and (3) reconfirm that the hearing and all evidence is closed and the Panel is not empowered to take any further action beyond the issuance of its Partial Award ("Respondent's March 17 Memorandum").

b. Claimant's Submission Regarding Fees and Costs, dated March 21, 2019, made pursuant to Rules R-28, R-47, R-53, R-54, and R-55, AAA Commercial Arbitration Rules, seeking an award of $11,865,181.28 in attorneys' fees and costs, including Claimant's attorneys' fees, AAA administrative fees, arbitration expenses, fees incurred by A&M, expert fees, and Panel compensation paid by the Respondent Highland on behalf of the Committee in this arbitration ("Claimant's Fee Submission").

c. Claimant's Application, dated March 25, 2019, made pursuant to Rule 50, AAA Commercial Arbitration Rules, to modify the Partial Award, issued by this Panel on March 6, 2019 (Claimant's March 25 Application").

d. Claimant's and Respondent's Joint Submission on Damages dated April 5, 2019, in which the Parties agreed on the mathematical calculation of the amount of damages and interest contained in the Partial Award and Modification of Award, subject to Highland's objections to the inclusion of any damages awards that were not specified in the Partial Award and subject to objections on two specific issues: (1) whether the Eames residual LP interests would be extinguished; and (2) whether prejudgment interest awarded by the Panel will continue to run after March 6, 2019 until the earlier of the date the amount awarded is paid to the Committee for the benefit of the Fund, or the date on which a Final Judgment is issued on the Award ("Joint Submission").

e. Respondent's Memorandum dated April 5, 2019 opposing the motion to modify the Partial Award; and opposing any award for damages, attorneys' fees, or costs ("Respondent's April 5 Memorandum").

f. Claimant's Memorandum dated April 5, 2019 arguing that (1) the Panel should award further damages in connection with the Barclays claim measured by the Fund's loss of the residual value of the Eames LP interests, either by extinguishing the former Barclays LP interests, or alternatively, by awarding an appropriate amount of damages to compensate the Fund for loss of the value of those interests, which the Committee puts at $11,589,474; and (2) the Panel should award prejudgment interest through the date the Award is paid or final judgment is entered ("Claimant's April 5 Memorandum").

g. On April 10, 2019, Respondent sought leave, which we granted on consent, to file an additional Memorandum on two issues raised by Claimant in its April 5

2

Memorandum, namely, that Claimant adds a new and improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019; and that Claimant has provided a new and improper damages calculation relating to the extinguishment of the Eames LP interests.

h. Having reopened the record on March 6, 2019, for additional submissions, as described above, we deem the record closed as of April 10, 2019.

E. Issues

  a. Fees and costs

    1. In the Partial Award, we evaluated the competing claims made by Claimant and Respondent regarding an award of fees, which both sides had sought in their pleadings. As we noted in the Partial Award, ¶VI.A, 52, AAA Commercial Arbitration Rule R-47 (d)(ii) authorizes the Arbitrator to award attorneys' fees if, as here, "all parties have requested such an award . . . " "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." *R.F. Lafferty & Co., Inc. v. Winter*, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted); *In re U.S. Offshore, Inc. and Seabulk Offshore Ltd.*, 753 F. Supp. 86, 92 (S.D.N.Y. 1990) ("If both parties sought attorney's fees, . . . then both parties agreed *pro tanto* to submit that issue to arbitration, and the arbitrators had jurisdiction to consider that issue and to award them.")."

    2. During closing oral arguments, Respondent did not mention its own request for an award of fees, but "*acknowledge[d] the Tribunal's discretion* to order an award of attorneys' fees…" Indeed, Respondent made oral and written closing arguments that conceded that it was "*not disputing the discretion that the Panel has* [to award fees]." Tr. 13 444:2-3 (emphasis added). In its closing slides, Respondent also urged that "The Panel *should exercise its discretion in applying the American Rule*." Respondent Closing Slides at 261 (emphasis added).

    3. Respondent also argued that denying the Claimant's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." Second, Respondent urged that the only basis upon which Claimant seeking an award is that Respondent allegedly engaged in bad faith and vexatious conduct.

3

4. Respondent now chooses to oppose the grant of fees on grounds distinctly different from those set forth above. It belatedly argues an alleged lack of proof and the Panel's being *functus officio* to award fees.

   1. Respondent argues that the Panel "found that the evidence in the record was insufficient to determine many of the Committee's claims for damages, as well as its claims for costs and fees." Resp. April 5 Mem. 14.

   2. But that is incorrect; we did not find any insufficiency; instead, with no objection, we adopted a well-recognized method of dealing with attorneys' fees and costs by deciding entitlement before amount. See *Franco v. Dweck*, 87 N.Y.3d 5 (2018) ("Contrary to respondents' contention, the final award did not run afoul of the doctrine of *functus officio*, which precludes an arbitrator from altering in substance a prior award (see *Matter of Wolff & Munier [Diesel Constr. Co.]*, 41 A.D.2d 618, 340 N.Y.S.2d 455 [1st Dept. 1973] ). As the partial final award *expressly reserved* the issue of attorneys' fees, it cannot bar a *subsequent* award of those fees (see *Shimon v. Silberman*, 26 Misc.3d 910, 914–915, 891 N.Y.S.2d 891 [Sup. Ct., Kings County 2009] )."

5. Accordingly, we reject Respondent's new positions. From at least the time the pre-hearing briefs, witness lists, and list of exhibits were mutually filed, it was clear that whichever side that was going to seek attorneys' fees if it prevailed was reserving on the specific rates and amounts of legal fees, as well as costs and expenses, many of which had not yet been incurred. To do otherwise would be a waste of resources. Not once did Respondent ever raise the question of proof regarding attorneys' fees and costs; by its silence and conduct, Respondent consented to the process regarding proof of attorneys' fees that the Panel was following, see CCA Guide to Best Practices in Commercial Arbitration (3d edition), 246.

6. Second, we explicitly denominated the award of March 6 as a "Partial Final Award," making clear to the Parties that the arbitral proceeding was still ongoing. We also explicitly left the hearing open so that the Parties could meet and confer or make submissions, including providing additional evidence, "until *all issues* set forth ... have been agreed upon by the Parties or decided by the Tribunal." Under these circumstances, the doctrine of *functus officio* does not apply. *Kennecott Utah Copper Corp. V. Becker*, 186 F.3d 1261, 1270-71 & n.4 (10th Cir. 1999) (*Functus*

4

Appellee Appx. 00247

007055

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 255 of
Case 3:25-cv-02072-S    Document 15-10    Fil₁e₈d₀₄10/06/25    Page 138 of 1017    PageID 7868
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 254 of 1803   PageID 11000

*officio* provides that, "once an arbitrator has issued a *final* award and thus discharged his or her office, that arbitrator lacks any continuing power to revise the award or issue a new one.")(emphasis added).

i.  Accordingly, we turn to an examination of the application for attorneys' fees and costs, sought by Claimant:

    a.  Claimant seeks the following in fees and costs:

        i.  Jenner & Block Fees - $9,278,248.99

            1.  In support of its fee application, Claimant has provided detailed time records, billing records, and a declaration of Andrew Vail, a partner of Jenner & Block, that establishes that records were maintained on a contemporaneous basis, that time billed on duplicative, inefficient, or extraneous to the arbitral proceeding was excluded from the application, and that hourly rates, and a fixed-fee discount, where applicable, were discounted by 15%. Vail Declaration ¶¶13–18. The hourly rates are shown to be comparable to rates charged by other similar firms and consistent with prevailing market rates for attorneys of similar high levels of expertise and experience. We note that Respondent does not object to the amount sought, except on the bases previously discussed. We find the request for legal fees to be reasonable, especially given the complex factual and legal setting, and grant Claimant's application.

        ii.  FTI Expert Fees - $1,274,853.26; and A&M Arbitration Fees - $655,160.00

            1.  In support of the FTI fees, Claimant submitted a declaration, with supporting exhibits, of Mr. Vail, who affirmed that the fees reflected "services that were necessary for the Committee to prosecute its claims against [Respondent] and to defend against [Respondent's] counterclaims, and … the amounts charged for such services were reasonable given the necessity of those services." Vail Declaration ¶26.

5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 256 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 139 of 1017    PageID 7869
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 255 of 1803    PageID 11001

2.  In support of the A&M Arbitration Fees, Claimant has provided the declaration of Steven Varner, a Managing Director of A&M, who affirms that A&M maintained billing records on a contemporaneous basis for its services throughout the course of this arbitration, but did not keep detailed descriptions of its billed time for specific matters within that engagement. He further affirmed that he and another managing director compiled a "conservative estimate of the time that A&M personnel spent on matters that were specifically required in connection with HCMLP's failure to timely provide A&M with books and records relating to the Fund." That work totaled approximately $655,160.00, after discounts were applied to their normal billing rates. Varner Declaration ¶¶6, 7, and 10.

3.  Claimant is not seeking recovery for over $140,000 in attorneys' fees and costs for A&M's counsel to pursue information from Cornerstone pursuant to Del. Code Ann. tit. 8 § 220. Varner Declaration ¶8.

4.  Respondent principally opposes the fees of FTI and A&M on the grounds that "while the AAA Rules permit the award of certain expenses (e.g. administrative costs and Panel compensation), they are much more restrictive when it comes to witness costs for the parties. In fact, Rule 54 expressly divides expenses into two categories: (i) witness expenses—which are to be borne by the party presenting the witness; and (ii) '[a]ll other expenses'—which may be apportioned by the arbitrator(s)."

5.  While acknowledging some dispute among the courts as to whether Rule R-54 permits a prevailing party to recover its expert witness fees, Claimant urges that the weight of authority provides that both consulting and testifying witness fees are recoverable under the AAA's rules, citing *Dealer Comp*.

6

*Servs., Inc. v. Hammonasset Ford Lincoln-Mercury, Inc.*, 2008 WL 5378065, at *2, *4 (S.D. Tex. Dec. 22, 2008) (confirming final arbitration award that included expert witness fees); *In re Pos'tive Produc, Inc. v Thermal C/M Services, Inc.*, 2011 WL 13220365, at *4 (N.Y. Sup. Ct. Nov. 18, 2011) (confirming award that included "expert fees and costs"); and *Cardno Int'l Pty, Ltd. v. Merino*, 2017 WL 6034172 (S.D. Fla. Oct. 30, 2017).

6. Rule 47(a) gives the Tribunal the power to "grant any remedy or relief that the arbitrator deems *just and equitable* and within the scope of the agreement of the parties…", while Rule 47(c) provides that "In the final award, the arbitrator *shall* assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator *may apportion* such fees, expenses, and compensation among the parties in such amounts *as the arbitrator determines is appropriate*." (Emphasis added.) Parsing these sections in conjunction with R-54 leads us to conclude that we have the power to award the expenses of the arbitration, including expert fees, as we deem just, equitable, and appropriate. *White Springs Agric. Chemicals, Inc. v. Glawson Investments Corp.*, No. 3:07-CV-752-J-25JRK, 2010 WL 11507082, at *4 (M.D. Fla. Sept. 13, 2010) (confirming award where tribunal awarded prevailing party its expert fees), *aff'd*, 660 F.3d 1277 (11th Cir. 2011).

7. Under the complex circumstances presented here, we find that the experts were essential to the prosecution of the Claimant's case and that their services, and consequent fees, were a necessary obligation the Claimant was bound to its members to undertake in its pursuit of the claims against Respondent.

7

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 258 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 141 of 1017    PageID 7871
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 257 of 1803    PageID 11003

8. We note, specifically with respect to the A&M fees, that a large portion of the fees appear to relate to "time spent organizing the tens of thousands of individual page PDF files that HCMLP provided as books and records instead of complete documents." Varner Declaration ¶7.

9. From our observations at the hearing and our review of the reported rates and fees of FTI and A&M, we conclude that such fees were fair and reasonable and we find that it would be "just and equitable" and "appropriate" relief to award Claimant all of the expert fees it seeks, and we do so.

iii. Respondent does not object to the following categories of fees sought by Claimant:

1. AAA Administrative Costs - $64,750.00;
2. Court Reporter Hr'g Costs - $114,697.77;
3. Court Reporter Dep. Costs - $28,890.04; and
4. AAA Panel Compensation - $448,581.22 (to date).

b. Accordingly, in our discretion, we award Claimant the total sought in fees, costs, and expenses, as detailed and updated in section F. below.

b. Claimant's Motion for Modification of the Partial Final Award
   i. On March 25, 2019, Claimant moved, pursuant to AAA Rule 50, to modify the Partial Final Award in several respects.

1. First, with respect to the Partial Final Award regarding the finding of liability of Respondent with respect to the Barclays LP interests, Claimant moved to correct a clerical error that resulted in the omission of a Barclays damages paragraph from the Partial Final Award by modifying that Award to include the paragraph set forth in the Panel's March 14, 2019 Modification of Award.

2. Second, also pursuant to Rule 50, Claimant moved that the Panel modify the award to address other clerical, typographical, and computational errors in the Partial Final Award.

3. AAA Rule 50 provides in relevant part, as follows: "R-50. Modification of Award. Within 20 calendar days after the

8

transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto."

4. With respect to the Barclays issues, Respondent contends both that Rule 50 does not apply and that the doctrine of *functus officio* divests the Panel of the power to modify the Partial Final Award, as the Panel would be adding an "additional award" that "represents an entirely new award of $34 million in damages not included in the [Partial Final Award] ... constitut[ing] a material revision of the award."(Respondent's April 5 Memorandum at 5).

5. First, we are not adding an "additional award," as it is clear from the structure of the Partial Final Award that a paragraph was missing from the damages portion; all other findings of liability were accompanied by a section delineating the applicable damages except for the finding of a breach of the Plan and Scheme by reason of the transfer of LP interests to Eames. In other words, we found liability in two respects but omitted a paragraph regarding the remedy for Respondent's breach of the Plan and Scheme that we had found with respect to the transfer, without the required Committee approval, of Barclays' fund interests to itself through entities it controlled as part of the settlement. That omission is a classic example of a clerical error.

6. Second, although the effect of the Modification was to add additional damages to the award against the Respondent, the Panel did not "materially revise" the Partial Final Award since liability had already been found.

7. In addition, as previously discussed, the doctrine of *functus officio* "provides that, *while an arbitrator may correct clerical, typographical, or computational errors in a final award, he has no power to revisit the merits of the award after it has issued...*" *Int'l Broth. Of Elec. Workers, Local Union 824 v. Verizon Florida, LLC*, 803 F.3d 1241, 1250 (11th Cir. 2015). However, we did not issue a final award; it was explicitly labeled a Partial Final Award and was explicitly subject to being supplemented by subsequent presentations of damages analyses by both Parties.

9

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 260 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 143 of 1017  PageID 7873
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 259 of 1803  PageID 11005

8. Finally, there is ample case law for the proposition that the Panel is not divested of power, even when issuing a final award, from correcting clerical, typographical, or computational errors. See *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 472-73 (5th Cir. 2012); *E. Seaboard Const. Co., Inc. v. Gray Const., Inc.*, 553 F.3d 1, 5-6 (1st Cir. 2008).

9. Respondent also argues that the Panel is barred from correcting the Partial Final Award by AAA Rule 45, which provides that "The award shall be made ... no later than 30 calendar days from the date of closing the hearing..." Respondent urges that "the parties agreed that the final award would be made on or before March 7, 2019. Accordingly, any award made after that date is untimely and beyond the scope of the Panel's authority." (Resp. April 5 Mem. at 7). But, once again, this argument ignores the explicit nature of the March 6 Partial Final Award, which "le[ft] the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal."

10. Respondent also argues that we are "reopening" the record in violation of AAA Rule 40. That rule provides, in relevant part, as follows: "The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award..."

11. We acknowledge that a communication from the AAA, dated December 12, 2018, stated that the "no additional evidence is to be submitted and that the hearings are declared closed as of December 12, 2018," but this statement was subsequently withdrawn by the previously-quoted language of the Partial Final Award where we explicitly left the record open "until all issues set forth ... have been agreed upon by the Parties or decided by the Tribunal."

12. That language is equivalent to the language that "we will reopen the hearing." *Int'l Bhd. of Teamsters Local 959 v. Horizon Lines of Alaska, LLC*, 22 F. Supp. 3d 1005, 1007–08 (D. Alaska 2014) ("Where an arbitrator specifically retains jurisdiction to resolve disputes regarding damages, that indicates that the arbitrator did not intend the award to be Final. Put simply, an arbitration award that postpones the determination of a remedy should not constitute

Appellee Appx. 00253
Appx. 02148
007061

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 261 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 144 of 1017 PageID 7874
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 260 of 1803 PageID 11006

a final and binding award"); *Golden v. Lim*, 2016 WL 520302, at *3, *9 (E.D. Mich. Feb. 10, 2016)(holding that the arbitrator had the authority under the AAA Rules to reopen the hearing to accept further submissions on attorneys' fees).

13. Second, even if the relief sought required a reopening of the record, Rule 40 authorizes the Panel to do so "upon the application of a party," so long as doing so did not violate "the specific time agreed to by the parties in the arbitration agreement" for the making of the award. No such time period is set forth in the arbitration agreement. Finally, we interpret Rule 40 to be speaking to the instance of reopening the hearing after the final award is made, which is, again, not the situation we are in.

ii. We grant Claimant's application under AAA Rule 50[2] and formally correct the clerical error by re-adopting the additional paragraph, previously included in the Panel's March 16 Modification of Award, as follows:

1. "Insert the following paragraph at page 54, immediately after VII.B.2.f: "3. The transfer of Barclays Fund interests: By transferring, without the required Committee approval, Barclays' fund interests to itself through entities it controlled as part of the settlement, Highland breached the Plan and Scheme. We award the Committee damages measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value. In Table 11, Version 2, Claimant's damages expert, Basil Imburgia, calculated that such an amount totaled $34,661,749. RC-522. As with other amounts awarded, the Parties are to confer to determine the actual amount of damages including the 9% interest to date."

iii. Claimant also moves under Rule 50 to correct four other clerical errors, set forth below, as to which Respondent does not object. The motion is granted; the clerical errors are set forth below and corrected as noted:

1. The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

---

[2] We acknowledge Respondent's interesting linguistic analysis of the differences between ICDR Article 33 and AAA Rule 50, see Respondent April 5 Memorandum at 5-6, but we deny the underlying premise that what we are being asked to do is to make an "additional award as to claims, counterclaims, or setoffs presented but omitted from the award." We had found liability as to two claims involving the Barclays LP interests but omitted the damages component of one of the two liability findings. That does not constitute an award as to a claim argued by Claimant but omitted from the partial final award.

**Appellee Appx. 00254**

007062

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 262 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 145 of 1017   PageID 7875
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 261 of 1803   PageID 11007

2. The Partial Final Award reference to the amount of improper
Distribution Fees calculated by Mr. Imburgia as $14,452,275
(Partial Final Award at 24, 54) is corrected to read "$14,457,275."

3. The Partial Final Award reference to the amount of "$23.5/9" and
"$23.5 million" (Partial Final Award at 36, 40) is corrected to read
"$23,938,568."

4. The Partial Final Award reference to the incentive period as ending
on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is
corrected to read "September 30, 2016."

iv. Eames

1. In the March 6 Partial Final Award, as modified herein, we found
Respondent liable for having transferred the Barclays LP interests
to an entity which it wholly controlled, Eames [LLC].[3] We
awarded damages "measured by the benefits Highland received in
excess of the amount it would have been entitled to receive from
the Redeemer Trust Account because Barclays claim was settled
for less than its value." We estimated — but did not find — that
amount by referring to a damages calculation by Claimant's
damages expert, Basil Imburgia, who "calculated that such an
amount totaled $34,661,749. RC-522." "As with other amounts
awarded," we directed "the Parties ... to confer to determine the
actual amount of damages including the 9% interest to date."

2. The Parties have conferred and disagree as to the appropriate
amount of damages for Respondent's breach of the Plan and
Scheme. Claimant asserts that the appropriate amount of damages
is $29,609,015, which is lower than the amount estimated by its
expert and cited in the Partial Final Award, because "the value of
the Barclays interests which [Respondent] now controls through
Eames is expressly excluded, as it would be extinguished and that
value would be spread amongst the remaining Fund investors."
Claimant April 5 Memorandum, 5.

3. Thus, Claimant urges that "the Panel should either (1) award
$29,609,015 and order the extinguishment of the Barclays LP
interests owned and controlled by Highland, or (2) award
$29,609,015 plus the current value of those LP interests, which its

---

[3] We found, and it is not disputed, that Highland controls Eames through an entity, Hockney, Ltd., that
Highland wholly owns, and which, along with Eames, was created solely for the purpose of holding the
Barclays LP interests for Highland's financial benefit. JX24; Tr. Day 8 83:21-86:13; Tr. Day 9 144:21-25,
220:18-25.)

Appellee Appx. 00255
Appx. 02129
007063

damages expert estimates to be $11,589,474. Claimant April 5 Mem. at 10; Imburgia April 5 Declaration, ¶15.

4. Respondent urges that the "March 16 Modification contains specific language awarding the Committee a specific amount of monetary damages." However, as discussed above, that is not what the Panel did. We directed the Parties to confer on the exact amount to be awarded and to come to the Panel if they could not agree.

5. Respondent further argues that nowhere in the March 6 Partial Final Award or the March 16 Modification did the Panel award Claimant equitable relief concerning the Barclays Claim, and that had the Panel wanted to do so, it knew how to do so.

6. Respondent goes on to argue that Eames is not a party to this arbitration, and, therefore, the Panel lacks the authority to issue an award determining Eames' legal rights and obligations." Even if the Panel determines that the remaining equity interest should have been extinguished at the time of the 2012 settlement, "the fact remains that the equity interest was transferred to—and is still held by—Eames." Respondent April 5 Memorandum, 21-22.

7. Finally, in its April 10 submission, Respondent objects to the Claimant's calculation of interest on any award regarding Barclays or the other claims, to wit, Claimant's April 5 Request adds an improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019.

8. We disagree with Respondent's arguments except as relating to the compounding of interest sought by Claimant, which we discuss more fully below. First, when we found that "Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer," we sought a remedy to deprive Respondent of the benefits that it had received illegitimately, or, in other words, to void the Eames transaction and put the parties back into the position they should have been in. Respondent may not benefit in the future by its breach of the Plan and Scheme, and the illegitimate transaction it engaged in, by forfeiting some, but receiving future, benefits through its absolute control of the entity it created, Eames.

13

Appellee Appx. 00256

Appx. 02124

007064

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 264 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 147 of 1017 PageID 7877
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 263 of 1803 PageID 11009

9. Second, although Eames is not a party in this proceeding, that is
   irrelevant to the relief we grant. The operating party throughout all
   of the machinations that resulted in the transfer of Barclays' LP
   interests to an entity it created solely for the purpose of holding
   such interests was, and remains, Respondent. It is completely
   within its power to unwind the transfer and re-transfer those
   interests back to the Fund for the benefit of its investors, as we
   now order.

10. Regarding the appropriate amount upon which to award interest,
    for reasons set forth below, we reject Claimant's argument that
    $29,609,015 is the appropriate amount upon which to award
    interest, as to do so would be to violated well-settled law in New
    York regarding pre-judgment interest, CPLR §§5003-5004.

11. We award Claimant monetary damages against Respondent in the
    amount of $21,768,743, plus 9% simple prejudgment interest from
    the date of the breach until the earlier of either (1) the date the
    amount awarded is paid to Claimant for the benefit of the Fund, or
    (2) the date on which a court of competent jurisdiction enters a
    final judgment upon this Award.

12. We further order that Respondent take all necessary steps to cause
    the improperly taken Fund LP interests currently owned and
    controlled by Respondent through Eames, Ltd to be returned to
    Claimant within sixty (60) days from the date of transmittal of this
    Final Award to the Parties.

v. Interest

1. In the March 6 Partial Final Award, we awarded damages and
   interest through the date of that award, but then, as already referred
   to, directed the Parties to confer regarding all damages and interest
   issues. Claimant now urges that we award 9% prejudgment
   interest on the damage amounts awarded until the earlier of: (1) the
   date on which the amounts due are paid to the Committee for the
   benefit of the Fund; or (2) the date on which a court of competent
   jurisdiction enters a final judgment on the Final Award.

2. However, as Respondent points out, Claimant is, in effect, arguing
   for a compounding of interest upon interest. We agree. The effect
   of Claimant's interest calculations would violate New York law, as
   an award of 9% interest post-March 6 on an amount that already
   includes 9% interest from the breach through March 6, would
   amount to compound interest after March 6, 2019. "[T]he statutory

14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 265 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 148 of 1017 PageID 7878
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 264 of 1803 PageID 11010

scheme [in New York] for awarding …, where applicable, prejudgment interest, does not provide for compound interest." *520 East 81st Street Associates* v. *State of New York*, 19 AD3d 24 (2005).

3. Respondent also contends that the March 6 Partial Final Award contained specific language awarding interest "through the date of this Partial Final Award"— i.e., March 6, 2019, and that awarding interest through any other date would constitute an untimely modification of the Partial Final Award.

4. We disagree with Respondent that changing the termination date of prejudgment interest would constitute an untimely modification. Although the Partial Final Award did use the date of March 6 as a reference point for calculation of interest, that fact is not determinative of this issue. We also explicitly left open calculations of damages and interest until the Parties had fully conferred on the extremely complex financial calculations that had to be made. Among the calculations was a further calculation of interest. It is not an unlawful modification of the Partial Final Award to make, as we do here, a final award on all damages and interest issues based upon a final record.

5. Furthermore, failing to continue the running of interest through payment or entry of a final judgment could well, under the circumstances presented here, result in Fund investors with no compensation for their documented losses during that time, as well as provide an incentive to Respondent to prolong the confirmation process. We have already had occasion to comment on Respondent's tactics of putting forth witnesses who were "unworthy of belief" and an "[il]legitimate defense to many of the Committee's claims." Partial Award ¶VI(E). We will not adopt a result that would allow Respondent to impose more hardships on the Fund Investors.

6. We award Claimant 9% prejudgment simple interest on all sums awarded from the dates of each breach through the earlier of the date paid or the entry of a final judgment.

F. FINAL AWARD

a. We reaffirm the findings of fact, conclusions of law, and findings of liability as set forth in the March 6 Partial Award, and make the following awards with respect to such findings and conclusions:

Appellee Appx. 00258
Appx 02128
007066

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 266 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 149 of 1017 PageID 7879
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 265 of 1803 PageID 11011

i. Claimant's Application to modify the Partial Final Award is granted pursuant to the Disposition of Application for Modification dated March 14, 2019.

ii. Claimant's Motion to Correct Errors is granted, on consent; the clerical errors are set forth below and corrected as noted:

    1. The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

    2. The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

    3. The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

    4. The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

    5. In all other respects, the Partial Final Award dated March 6, 2019 and the Disposition of Application for Modification dated March 14, 2019 are reaffirmed and incorporated by reference.

iii. For the Deferred Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the Deferred Fees in the amount of $32,313,000 as directed in the Partial Final Award, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

iv. For the Distribution Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $14,457,275, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

v. For the Taking of Plan Claims, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21,

Appellee Appx. 00259

Appx. 02124

007067

2019, the amount of $3,106,414. The Panel further orders that LP interests identified in RC411 be transferred to Claimant for the benefit of the Crusader Fund or that Claimant cause the Fund to extinguish those claims. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to $3,106,414 beginning on March 7, 2019 and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vi.  For the CLO Trades Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $449,375.00. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple, from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vii.  For the Credit Suisse Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,735,411. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple on that sum, from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

viii.  For the UBS Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,041,664. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of breach until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

ix.  For the Cornerstone Claim, the Panel awards the following relief: the Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $48,070,407 for the sale of the Crusader Fund's shares in Cornerstone. The Panel also awards pre-prejudgment interest at the New York statutory rate of 9% simple on that sum from the date of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award. When the amount awarded for the Cornerstone claim is paid by Respondent, Claimant shall cause the Crusader Fund to tender its Cornerstone shares to Respondent.

Appellee Appx. 00260

Appx. 02125

007068

 x. For the Barclays Claim, the Panel awards the following relief:

  1. The Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $21,768,743. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

  2. Further to the Barclays Claim, the Panel orders that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be transferred to Claimant for the benefit of the Crusader Fund within sixty (60) days from the date of transmittal of this Final Award to the Parties, or, alternatively, that Claimant cause the Fund to extinguish those interests.

 xi. For Claimant's Application for Legal Fees, Costs, and Expenses, we award Claimant $11,351,850.06 in fees, costs, and expenses as per the following:

  1. Jenner & Block Fees - $9,278,248.99;
  2. FTI Expert Fees - $1,274,853.26;
  3. A&M Arbitration Fees - $655,160.00;
  4. Court Reporter Hr'g Costs - $114,697.77;
  5. Court Reporter Dep. Costs - $28,890.04

 xii. The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$94,693.88 and the compensation and expenses of the Tribunal totaling US$887,427.89 shall be borne by Respondent. Therefore, Respondent shall reimburse Claimant the additional sum of US$514,163.97, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

G. We have carefully considered, although not discussed in their entirety herein, all arguments made by Claimant and Respondent. Any other claims or requests for relief, made by either Party, are denied.

**Appellee Appx. 00261**

**Appx. 02126**

**007069**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 269 of 180
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 152 of 1017 PageID 7882
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 268 of 1803 PageID 11014

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

David M. Brodsky, Chair

John S. Martin, Jr.

Michael D. Young

Appellee Appx. 00262
Appx. 03425
007070

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 270 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 153 of 1017 PageID 7883
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 269 of 1803 PageID 11015

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____
        David M. Brodsky, Chair

_____
        John S. Martin, Jr.

_____
        Michael D. Young

Appellee Appx. 00263
Appx. 003128
007071

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 271 of
Case 3:25-cv-02072-S Document 15-10 1803410/06/25 Page 154 of 1017 PageID 7884
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 270 of 1803 PageID 11016

State of New York     )
                        )  SS:
County of New York    )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____5/9/19_____
Date

_____
David M. Brodsky, Chairperson

State of New York     )
                        )  SS:
County of New York    )

On this __9__ day of May, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ISAIAS MATEO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6274151
Qualified in New York County
My Commission Expires 12-31-2020

20

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 272 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 155 of 1017    PageID 7885
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 271 of 1803    PageID 11017

State of Florida    )
                    )  SS:

County of Lee    )

I, John S. Martin, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our     Final Award.

_Date April 29,2019

_____

John S. Martin, Jr., Arbitrator


State of Florida    )
                    )  SS:

County of Lee    )

On this 29th day of April, 2019, before me personally came and appeared John S. Martin, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____

Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

21

Appellee Appx. 00265

007073

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 273 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 156 of 1017 PageID 7886
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 272 of 1803 PageID 11018

State of New York    )
                           )   SS:

County of New York   )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our        Final Award.

_____4/29/19_____
Date

_____Michael Young_____
Michael D. Young, Arbitrator


State of New York    )
                           )   SS:

County of New York   )

On this 29 day of April, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____Vickie L. Johnston_____
Notary Public

**VICKIE L. JOHNSTON**
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 2()

Appellee Appx. 00266
Appx. 007074

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 274 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 157 of 1017    PageID 7887
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 273 of 1803   PageID 11019

# APPENDIX 4

Appellee Appx. 00267

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 275 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 158 of 1017   PageID 7888
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 274 of 1803   PageID 11020

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                        :
                                          :
               Plaintiff,                 :
                                          :
        v                                 :   C. A. No.
                                          :   2017-0488-MTZ
HIGHLAND CAPITAL MANAGEMENT, L.P.,        :
HIGHLAND EMPLOYEE RETENTION ASSETS        :
LLC, HIGHLAND ERA MANAGEMENT LLC, and     :
JAMES DONDERO,                            :
                                          :
               Defendants,                :
                                          :
        and                               :
                                          :
HIGHLAND EMPLOYEE RETENTION ASSETS        :
LLC,                                      :
                                          :
               Nominal Defendant.         :

                        - - -

                  Chancery Courtroom No. 12D
                  Leonard L. Williams Justice Center
                  500 North King Street
                  Wilmington, Delaware
                  Friday, May 17, 2019
                  1:30 p.m.

                        - - -

BEFORE:  HON. MORGAN T. ZURN, Vice Chancellor

                        - - -

RULINGS OF THE COURT ON PLAINTIFF'S MOTION TO COMPEL
          AND MOTIONS FOR COMMISSIONS
ORAL ARGUMENT AND RULINGS OF THE COURT ON PLAINTIFF'S
MOTION FOR STATUS QUO ORDER AND DEFENDANTS' MOTION TO
DISMISS COUNT IX OF SECOND AMENDED VERIFIED COMPLAINT
-------------------------------------------------------
            CHANCERY COURT REPORTERS
        Leonard L. Williams Justice Center
        500 North King Street - Suite 11400
            Wilmington, Delaware 19801
                (302) 255-0533

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 276 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 159 of 1017    PageID 7889
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 275 of 1803   PageID 11021

```
                                                              2

1   APPEARANCES:

2        THOMAS A. UEBLER, ESQ.
         JOSEPH L. CHRISTENSEN, ESQ.
3        McCollom D'Emilio Smith Uebler LLC
            for Plaintiff
4

5        JOHN L. REED, ESQ.
         DLA Piper LLP (US)
6              -and-
         MARC D. KATZ, ESQ.
7        of the Texas Bar
         DLA Piper LLP (US)
8           for Defendants

9

10                              - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

Appellee Appx. 00269
007077

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 277 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 160 of 1017 PageID 7890
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 276 of 1803 PageID 11022

3

1                    THE COURT:  Good afternoon.  Please be

2     seated.

3                         First I wanted to acknowledge, we have

4     an honored guest with us today.  We have the Honorable

5     Essam Yahyaoui, who is a judge from Tunisia.  He

6     presides over the commercial chamber of Tunisia's

7     First Instance Court.  So he's here to observe with

8     his colleagues.

9                         Welcome, sir.

10                        All right.  I'm going to start with

11    the motion to compel, and then we'll move on to the

12    motion for commission.  And then there may be

13    questions, and maybe take a break and regroup and we

14    can move on with the other motions.

15                        I'm going to grant Daugherty's motion

16    to compel in part.  For simplicity, I'm going to refer

17    to Abrams & Bayliss as A&B.  And I see four categories

18    of documents at issue here.  The first is regarding

19    the initiation, negotiation, and establishment of A&B

20    as Highland's escrow agent.  The second is regarding

21    A&B's legal work during the pendency of the Texas

22    action to determine whether and how Daugherty might

23    access the escrowed assets.  The third is A&B's work

24    responding to the Texas subpoena.  And the fourth is

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 278 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 161 of 1017 PageID 7891
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 277 of 1803 PageID 11023

4

1    documents regarding A&B's resignation as Highland's

2    escrow agent.

3                    I grant the motion to compel as to

4    Categories 1, 2, and 4 for one of two reasons.

5                    The first reason is unfortunately my

6    *in camera* review confirmed Daugherty's fear that

7    Highland is improperly withholding documents in

8    Categories 1 and 4 illustrating A&B's service and

9    resignation as escrow agent, which are nonprivileged

10   materials.

11                   In a hearing on September 18, 2018,

12   concerning an earlier subpoena, Vice Chancellor

13   Glasscock stated that "... information regarding the

14   actions of Abrams & Bayliss in connection with its

15   operation of the escrow as agents of Highland, HERA,

16   those documents, that information is relevant, and it

17   doesn't appear to me to be generally privileged."

18   That's a quote from the transcript.

19                   Highland has been adamant that it was

20   only withholding documents that implicated its role as

21   legal counsel, and not in its role as escrow agent.

22   For example, on page 28 of the transcript from the

23   April 12th argument, Highland's counsel stated that,

24   "We do not assert any privilege based solely on Abrams

Appellee Appx. 00271
Appx. 03426
007079

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 279 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 162 of 1017 PageID 7892
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 278 of 1803 PageID 11024

5

1    & Bayliss's roles as escrow agents.  It's purely

2    because they have the dual roles both as escrow agents

3    and also legal counsel, that when they were in the

4    capacity of legal counsel, those communications were

5    privileged."

6                At that argument, I requested the

7    documents and stated I would review them *in camera*.  I

8    expressed my frustration that I had already given

9    Highland multiple chances, and invited it to redo its

10   privilege log for a final time.

11               In reviewing the documents, I

12   concluded that more than 70 documents that were

13   withheld based on claims of privilege or work product

14   protection were improperly withheld.  Those documents

15   were Privilege Log No. 1 through 25, 27 through 29,

16   35, 36, 41, 54, 56, 62, 85 through 87, and 336 through

17   372.

18               This represents nearly 20 percent of

19   the 372 documents in the log.  But even that doesn't

20   tell the full story, because more than 200 of the

21   listed documents were simply attachments to e-mails

22   collecting documents in response to the Texas

23   subpoena.  Excluding those, more than 50 percent of

24   the documents listed were improperly withheld as

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 280 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 163 of 1017 PageID 7893
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 279 of 1803 PageID 11025

6

1    privileged.

2                    Documents regarding A&B's nonlegal

3    work and resignation as escrow agent are not

4    privileged or work product because when A&B agreed to

5    be an escrow agent, it stepped into a nonlegal role

6    despite its status as a law firm.

7                    The cases are clear on that point.

8    *Northeast Credit Union v. CUMIS*: "It is well

9    understood ... that the services of an escrow agent,

10   even when that escrow agent is an attorney, are not

11   legal services." *CCS Associates v. Altman*: "[C]ourts

12   have specifically held that an attorney in the role of

13   escrow agent does not transform communications

14   pertaining to the administration of the escrow account

15   into privileged documents." The first case is from

16   the District of New Hampshire, and the second one is

17   from the Eastern District of Pennsylvania.

18                   These non-Delaware decisions more

19   specifically enunciate a principle common in our own

20   law.  Including an attorney, or having an attorney

21   perform nonlegal work, does not attach the privilege

22   to the communications or the work.  That is because

23   "... the attorney-client privilege protects legal

24   advice only, [and] not business or personal advice."

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 281 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 164 of 1017 PageID 7894
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 280 of 1803 PageID 11026

7

```
 1   That's a quote from MPEG v. Dell from this court in

 2   2013.

 3               And as Vice Chancellor Laster said in

 4   the Facebook Class C Reclassification litigation,

 5   "Making the lawyer the point person creates a pretext

 6   for invoking the attorney-client privilege, but it is

 7   only a pretext."  That's from his December 12th, 2016

 8   order in Case No. 12286-VCL.

 9               Categories 1 and 4 reflect

10   communications between A&B and Highland concerning the

11   start of the escrow relationship, or A&B resigning as

12   escrow agent.  To be sure, there were legal

13   ramifications and issues regarding the work A&B was

14   doing in setting up and then ending the escrow

15   relationship.  But any legal component of A&B's

16   escrow-related work was secondary to the role as

17   escrow agent.  A&B was a contractual counterparty with

18   Highland under the escrow agreement, and each had

19   obligations under that agreement.

20               A&B did perform legal work on the

21   escrow issue.  For example, A&B attorneys analyzed

22   what document 351 on the log calls the "HERA

23   Strategy."  But that legal advice was not for the

24   benefit of Highland, who was A&B's contractual
```

Appellee Appx. 00274
Appx 03129
007082

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 282 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 165 of 1017  PageID 7895
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 281 of 1803  PageID 11027

8

1   counterparty.  A&B could potentially claim that its

2   attorneys were providing legal services to A&B as

3   escrow agent.  But that is not what is before me; A&B

4   has claimed no privilege.  The only issue is whether

5   Highland can claim a privilege and withhold the

6   communications containing A&B's legal analysis

7   regarding its service as escrow agent.

8              I think an example here might be

9   helpful.  If Highland had retained a bank or other

10  repository to act as escrow agent rather than a law

11  firm, the result would be more clear.  If the

12  employees of that non-law firm escrow agent

13  communicated internally about the relationship or the

14  contract, it would not be privileged.

15             If those employees received legal

16  advice from attorneys about how to structure the

17  escrow, what the terms of the escrow agreement meant,

18  or how it could fulfill Highland's request to unwind

19  the escrow and transfer the assets back, Highland

20  could not claim that the in-house or outside counsel

21  retained by the escrow agent was providing legal

22  advice for Highland's benefit.  It would be much

23  clearer that the attorneys were providing legal advice

24  to, and for the benefit of, the escrow agent, not its

Appellee Appx. 00275
Appx. 03149
007083

9

1    contractual counterparty, Highland.

2                    The facts here are more muddied

3    because there are only lawyers involved because

4    Highland selected a law firm, that otherwise

5    represented Highland, to act as escrow agent.  But the

6    result should be the same.  A&B's privilege over its

7    in-house advice regarding its conduct under the escrow

8    agreement does not belong to Highland just because A&B

9    is itself Highland's attorney.

10                   The next question is one of remedy for

11   improperly withholding so many of the documents as

12   privileged.  Waiver "... has been characterized as a

13   'harsh result' typically only justified 'in cases of

14   the most egregious conduct by the party claiming the

15   privilege.'"  That's from *TCV v. TradingScreen*.

16                   "If a party falls substantially short

17   of the well-established requirements, then waiver is

18   an appropriate consequence that helps dissuade parties

19   from engaging in dilatory tactics."  That's from

20   *Mechel Bluestone v. James C. Justice Companies*.

21                   Daugherty has been dogged in his

22   pursuit of these documents, and Highland was just as

23   resolute in refusing to produce them.  Vice Chancellor

24   Glasscock said last September these types of documents

Appellee Appx. 00276

007084

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 284 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 167 of 1017   PageID 7897
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 283 of 1803   PageID 11029

10

1   are not privileged.  I gave Highland multiple

2   opportunities to address this.  Because Highland stuck

3   by its position and continued to assert such a large

4   percentage of improper privilege assertions while

5   claiming it was producing documents concerning A&B's

6   role as escrow agent, any privilege related to that

7   topic is waived, and a full waiver of Highland's

8   privilege could be an appropriate consequence.

9                But I am reluctant to go that far

10  because Categories 2 and 3 were properly withheld and

11  logged adequately.  Category 2 relates to a memorandum

12  A&B prepared analyzing avenues available for Daugherty

13  to pursue the escrowed assets.  This work started in

14  February 2014.  Category 3 relates to efforts to

15  collect documents in response to the subpoena for the

16  Texas case.  I conclude Highland's unjustified

17  withholding of other documents related to the escrow

18  was not so egregious as to waive any privilege over

19  these two sets of documents.

20                This brings me to the crime-fraud

21  exception.  If Categories 1 and 4 were privileged, I

22  would conclude that the crime-fraud exception applies

23  and so A&B should produce those documents regardless.

24  I reach the same conclusion for Category 2, the subset

Appellee Appx. 00277
007085

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 285 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 168 of 1017 PageID 7898
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 284 of 1803 PageID 11030

11

1   of documents related to A&B's 2014 memorandum that

2   were privileged and properly logged.

3                    Rule of Evidence 502(d)(1) says that

4   "There is no privilege ... If the services of the

5   lawyer were sought or obtained to enable or aid anyone

6   to commit or plan to commit what the client knew or

7   reasonably should have known to be a crime or fraud."

8                    To fall within this exception, "... a

9   mere allegation of fraud is not sufficient; there must

10  be a prima facie showing that a reasonable basis

11  exists to believe a fraud has been perpetrated or

12  attempted."  That's from *Princeton Insurance Company*

13  *v. Vergano.*  That case also explains that "... when a

14  client seeks out an attorney for the purpose of

15  obtaining advice that will aid the client in carrying

16  out a crime or a fraudulent scheme, the client has

17  abused the attorney-client relationship and stripped

18  that relationship of its confidential status."

19                    The client must intend the

20  communications to be used as a bases for the fraud.

21  "The advice must advance, or the client must intend

22  the advice to advance the client's ... fraudulent

23  purpose."  That's from *Buttonwood Tree Partners v.*

24  *R.L. Polk.*

Appellee Appx. 00278
007086

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 286 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 169 of 1017   PageID 7899
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 285 of 1803   PageID 11031

12

1            As Chief Justice Strine wrote while

2    Vice Chancellor in *Princeton Insurance v. Vergano*,

3    "The quintessential circumstance [when this exception

4    applies] is when the client obtains the advice of the

5    lawyer in order to help shape a future course of

6    criminal or fraudulent activity.  This is the classic

7    situation when the privilege gives way, as the

8    societal purpose of the confidential relationship has

9    been entirely subverted, with the client seeking the

10   expertise of someone learned in the law not so as to

11   comply with the law or mitigate legitimately the

12   consequences of his prior behavior, but to craft a

13   course of future unlawful behavior in the most

14   insidiously effective manner."

15           Here, there is a reasonable basis to

16   believe a fraud has been perpetrated.  Daugherty's

17   claim for fraudulent conveyance survived a motion to

18   dismiss, and I will refer the parties to Vice

19   Chancellor Glasscock's January 16, 2018 opinion on

20   that point.

21           The question is whether Highland

22   sought the services of attorneys to enable or aid it

23   in furtherance of that fraud.  I believe there is a

24   reasonable basis to believe that as well.  Highland's

Appellee Appx. 00279
Appx 03144
007087

13

1    attorney at Andrews Kurth contacted A&B almost

2    immediately after the Texas judgment became final and

3    nonappealable.  That's at Exhibit K.

4                    Highland claims A&B then provided it

5    legal advice interpreting the escrow agreement, and

6    A&B resigned as escrow agent intending to cause, and

7    in fact causing, the assets to return to

8    Highland/HERA.  That is the transfer that Daugherty

9    claims was fraudulent.

10                   This was not the first legal work A&B

11   performed in pursuit of keeping the escrowed assets

12   from Daugherty.  Starting in February 2014, it

13   analyzed Daugherty's ability to get at the assets

14   while the appeal was pending.  Because that appears to

15   be the beginning of the efforts that culminated in the

16   allegedly fraudulent acts, the crime-fraud exception

17   strips the privilege from these documents.

18                   Daugherty has made a *prima facie*

19   showing that a reasonable basis exists to believe that

20   a fraud has been perpetrated, and that Highland sought

21   A&B to serve as escrow agent and to provide legal

22   analysis in furtherance of that fraud; specifically,

23   to protect the escrowed assets from Daugherty while

24   the Texas case was pending, and then to transfer them

Appellee Appx. 00280

Appx. 03145

007088

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 288 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 171 of 1017    PageID 7901
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 287 of 1803  PageID 11033

14

1   back to Highland after the Texas verdict was

2   finalized.  I conclude any privilege Highland claims

3   over A&B's legal advice regarding the escrow

4   arrangement and A&B's resignation has been stripped

5   under the crime-fraud exception.

6                    I want to be clear on what I am not

7   saying.  I am not saying that a fraud claim merely

8   surviving a motion to dismiss permits the supposed

9   victim to invade the defendant's privilege for any

10  legal advice the defendant received in regards to the

11  underlying transaction or act.  This is a unique case

12  in which it presently appears that the law firm that

13  provided the legal advice, one, was a contractual

14  counterparty to the defendant in the very contract

15  under which the fraudulent transfer was allegedly

16  made; two, provided legal advice interpreting that

17  agreement and charting the course for the transfer;

18  and, three, implemented its own advice to effectuate

19  the transfer.

20                    On these allegations, which are

21  supported by the documents I have reviewed, it appears

22  the defendant sought the firm's legal advice to

23  further the alleged fraud based on the terms of the

24  contract to which the defendant and the firm were

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 289 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 172 of 1017 PageID 7902
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 288 of 1803 PageID 11034

15

1   parties.  Based on these uncommon facts, the

2   crime-fraud exception applies here.

3                Accordingly, the privilege is either

4   nonexistent or waived as I just described for

5   Categories 1, 2, 4; in other words, all documents

6   regarding A&B's service as escrow agent.  The

7   crime-fraud exception also applies to documents in

8   these categories designated as work product, under

9   *Playtex v. Columbia* out of the Superior Court.

10               I find that Category 3, regarding the

11  Texas subpoena, was properly logged as privileged, and

12  that the crime-fraud exception does not reach those

13  documents.  Daugherty has not alleged that the

14  subpoena response was in furtherance of the fraud.

15  Category 3 comprises the families associated with

16  lines 91 through 327, which are the parent e-mails

17  attaching documents collected in response to a

18  subpoena.

19               Mr. Katz, is any of that unclear?

20               MR. KATZ:  No, Your Honor.  It's

21  clear.

22               THE COURT:  Mr. Uebler, any questions?

23               MR. UEBLER:  No questions, Your Honor.

24  Thank you.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 290 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 173 of 1017 PageID 7903
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 289 of 1803 PageID 11035

16

1                    THE COURT:   Thank you.

2                    We'll turn to the motion for

3      commissions.

4                    Daugherty seeks commissions to take

5      the depositions of James C. Bookhout and Marc D. Katz,

6      both of DLA Piper.  I will refer to Mr. Bookhout and

7      Mr. Katz collectively as "the requested deponents."

8      Both requested deponents represented Highland in its

9      dispute with Daugherty in Texas, beginning in 2012,

10     and Mr. Katz and his colleagues at DLA represent

11     Highland in this action as well.  Daugherty seeks fact

12     testimony from the requested deponents on five topics,

13     all pertaining to the events surrounding the escrow as

14     alleged in Daugherty's operative complaint.

15                   The discovery Daugherty seeks is

16     clearly within the bounds of Court of Chancery

17     Rule 26.  And, based on the privilege log Highland

18     produced for the escrow-related documents, the

19     requested deponents have personal knowledge of at

20     least some of the escrow events.

21                   The parties disagree on the threshold

22     standard for evaluating whether counsel can be

23     deposed.  Highland contends this court has adopted the

24     *Shelton* test, while Daugherty points to a series of

Appellee Appx. 00283

007091

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 291 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 174 of 1017 PageID 7904
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 290 of 1803 PageID 11036

17

1  standards from *Rainbow Navigation*, *Sealy Mattress*,

2  *Kaplan & Wyatt*, and *Dart*.

3              I note that in a transcript ruling

4  from 2018 in *LendUS, LLC v. Goede*, Vice Chancellor

5  Glasscock considered in the first instance whether it

6  was necessary to gather the evidence sought from

7  counsel, given the risk of disqualification. I agree

8  this is a threshold consideration present in all the

9  cases the parties have cited. And I conclude, like

10  Vice Chancellor Glasscock did in *LendUS*, that

11  Daugherty has not made a sufficient showing that he

12  needs to depose Mr. Bookhout and Mr. Katz at this

13  juncture.

14              As I just explained in my ruling on

15  Daugherty's motion to compel, Daugherty will receive

16  A&B's documents regarding the escrow. Daugherty can

17  also depose the escrow agents. He can depose the

18  Highland principals who were involved. And I do not

19  see that any of this has happened yet. He should

20  pursue those avenues before pursuing one that

21  jeopardizes Highland's choice of counsel. His motions

22  for commission for the proposed deponents are denied

23  without prejudice.

24              I am mindful that trial is scheduled

Appellee Appx. 00284

007092

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 292 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 175 of 1017 PageID 7905
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 291 of 1803 PageID 11037

18

1    for September, and that -- if Daugherty renews his

2    motions after taking the rest of the fact discovery --

3    the risk of disqualification carries more prejudice to

4    Highland the closer we get to trial.  I also note that

5    the discovery cutoff in this case is June 28, 2019.  I

6    am, therefore, interspersing an intermediate discovery

7    cutoff.

8                    Escrow discovery, including

9    depositions of fact witnesses other than the requested

10   deponents, must be complete by June 14th, 2019, and

11   Daugherty must make any renewed motion for commission

12   by June 17, 2019, with briefing on that motion to be

13   expedited.

14                   The burden this timeframe places on

15   both parties I think is appropriate in light of the

16   requested deponents' apparent knowledge of significant

17   aspects of Daugherty's allegations, and in light of

18   the desire to protect Highland's choice of counsel.

19   Any renewed motion by Daugherty must demonstrate what

20   gaps in the record he needs to fill, and why he

21   believes the requested deponents can fill those gaps.

22                   Mr. Uebler, is any of that unclear?

23                   MR. UEBLER:  Your Honor, nothing is

24   unclear about that ruling, but I do have a question

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 293 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 176 of 1017   PageID 7906
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 292 of 1803   PageID 11038

19

1   about the escrow agent depositions.  Can the parties

2   assume that the ruling that the Court has made with

3   respect to the documents will also apply to deposition

4   testimony? in other words, categories that may be

5   subject to privilege such as the subpoena response,

6   but all other escrow-related categories would

7   presumably be fair game and not subject to privilege

8   in a deposition?

9                   THE COURT:  That's correct, at least

10  as to A&B.  I note that we haven't really tested the

11  boundaries of where my ruling might go with regard to

12  DLA.  And I think that's probably another conversation

13  we would need to have.

14                  MR. UEBLER:  Understood.  Thank you.

15                  THE COURT:  Thank you.

16                  Mr. Katz, is any of that unclear?

17                  MR. KATZ:  No, Your Honor.  That's

18  clear.

19                  THE COURT:  I'll give you-all maybe

20  ten minutes to kind of regroup a little bit, and then

21  I'll hear the motion for status quo order first.

22                  We're in recess.

23        (Recess taken from 1:53 p.m. until 2:00 p.m.)

24                  THE COURT:  Mr. Uebler?

Appellee Appx. 00286
Appx 02151
007094

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 294 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 177 of 1017 PageID 7907
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 293 of 1803 PageID 11039

20

1                    MR. UEBLER:  Your Honor, my colleague,

2       Mr. Christensen, is going to argue the status quo

3       motion.  But I'd just like to point out, we had an

4       issue with our File & Serve converting Word documents

5       to pdf, and it would drop the occasional citation in

6       footnotes.  I don't know if it's our system or theirs.

7       But, in any event, we've brought revised copies of our

8       papers with all the citations for the Court.

9                    THE COURT:  Thank you.

10                   MR. UEBLER:  You're welcome.

11                   MR. CHRISTENSEN:  Good afternoon, Your

12      Honor.  Joseph Christensen from McCollom D'Emilio for

13      the plaintiff, Pat Daugherty.

14                   I just want to start very briefly with

15      how we got here.  Your Honor is familiar with the

16      facts, so I won't go over that in too much detail.

17      But I do want to highlight some of the additional

18      points that we included in our briefing related to

19      what Highland was saying about these assets during the

20      Texas action.

21                   So Thomas Surgent, during the Texas

22      action, he was the chief compliance officer of

23      Highland.  During the Texas action, he testified that

24      the assets listed in the escrow agreement were being

Appellee Appx. 00287
Appx. 02152
007095

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 295 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 178 of 1017    PageID 7908
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 294 of 1803   PageID 11040

21

1    held for Pat's benefit for his interest in HERA.

2    These are all from Exhibit V.  That one is at page 15

3    of 53.

4              Jim Dondero, the head of Highland,

5    testified that Pat's share of all the assets,

6    including the cash, is in escrow.  He also testified

7    that Pat's *pro rata* share of all the assets, including

8    the cash, are all sitting in escrow.  There's been

9    nothing deducted or removed from Pat's account.  And

10   he also said that the escrow agreement was to protect

11   Pat Daugherty.

12             The point of all these statements was

13   to convince everybody who would listen that these

14   assets were being held for Pat Daugherty, and that if

15   he prevailed in the Texas action, he would obtain

16   those assets.  And we haven't done anything with them.

17   We haven't offset any legal expenses, which is also

18   noted in our reply brief.

19             Coupled with the statements that Pat

20   continued to hold the HERA units, this was a clear

21   expression that Highland was trying to convince people

22   that they intended to hold onto these assets but give

23   them to Pat if he prevailed in the Texas action.

24             In HERA's closing argument its counsel

Appellee Appx. 00288

007096

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 296 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 179 of 1017 PageID 7909
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 295 of 1803 PageID 11041

22

1    said, "If Pat Daugherty happens to prevail in his

2    lawsuit against Lane, Patrick and HERA you heard Jim

3    Dondero testify he gets his interest, which is

4    currently escrowed in the third-party escrow account,

5    all of it."

6                    And the jury clearly believed that the

7    escrow meant to preserve Daugherty's interest.  One of

8    the questions the jury sent back to the judge in the

9    Texas action referred to his -- that is Pat's -- HERA

10   units currently in escrow.  That's the third to the

11   last page in Exhibit U.

12                   The defendants now say, "Well, sure,

13   Pat continued to be an owner of HERA, but there was

14   never anything in HERA, at least during the Texas

15   action and before the Texas action."  Which reminds me

16   of a scene from my life at a movie theater with my two

17   sons, where the younger one was complaining that his

18   brother wouldn't give him the box of candy.  He asked

19   me to intervene, and I told him to give him the box of

20   candy, at which point the older brother emptied the

21   candy into his popcorn and gave him the empty box.

22                   That's exactly what happened here.

23   When they told everyone they were holding assets for

24   Pat's benefit, they would now have you believe that

Appellee Appx. 00289
Appx 02154
007097

23

1    what they really meant was that he was just entitled

2    to an empty box, and they had no intention -- and Pat

3    should have known that they never had any intention of

4    ever letting him have them.

5                        There are two possibilities to explain

6    the contrast between what they said during the Texas

7    action and what they're saying now.  One is that they

8    knew at the time that they were never going to give

9    them back.  The other is that they believed at the

10   time and were sincere in saying that they would give

11   them back, but they later changed their mind.

12                       Under either of those circumstances,

13   Daugherty prevails on at least one of his claims.  If

14   they changed their mind but initially intended it, his

15   promissory estoppel claim is very strong.  If they

16   never intended from the beginning to give them to him,

17   then his fraud and unjust enrichment claims are

18   equally strong.  The status quo order should be

19   entered to make sure that they can't do either of

20   those things this time.

21                       I think that's all the background we

22   need, except for a clarification on what Daugherty is

23   seeking.  He is seeking those assets.  His relief --

24   Your Honor will note that we did not include in our

Appellee Appx. 00290

Appx 02155

007098

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 298 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 181 of 1017   PageID 7911
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 297 of 1803   PageID 11043

24

```
 1   briefing any discussion of our claims for
 2   indemnification.  Our indemnification claim is
 3   effectively a monetary relief sort of claim.  But we
 4   did discuss promissory estoppel, unjust enrichment,
 5   and fraudulent transfer.  Each one of those theories
 6   includes potential relief divesting those assets from
 7   whoever holds them, which brings me to the next point,
 8   which is that we do not know where these assets are.
 9              We have asked the defendants where
10   these assets are; were they ever transferred after
11   December 2016.  They told us they would not provide
12   any information on those requests.  And that's at our
13   Exhibit L, Request No. 8 and 11, and Exhibit W, our
14   Request No. 34 and 37.
15              THE COURT:  I'm certainly not inviting
16   more or different motions.  But isn't the remedy for
17   that a motion to compel instead of a motion for a
18   status quo order?
19              MR. CHRISTENSEN:  It would be.  And we
20   are not seeking through this status quo order
21   effectively a back door to answering these requests
22   for documents and interrogatories.  But the fact that
23   they will not tell us where these assets are is
24   consistent with the prior behavior in the Texas action
```

Appellee Appx. 00291
Appx. 02156
007099

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 299 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 182 of 1017   PageID 7912
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 298 of 1803   PageID 11044

25

1   and gives us a lot of pause about waiting until the

2   end of this trial.

3              So we started out this case with -- I

4   guess I should first turn to the defendants' argument

5   that the Court doesn't have power to enter this status

6   quo order.  Clearly it does.  The kind of relief that

7   we're seeking is in aid of the ultimate relief that we

8   are seeking.  Because we are trying to obtain or move

9   particular assets, we are seeking the status quo order

10  to make sure those assets are still available for the

11  court to issue an effective ruling at the end of this

12  case.

13             THE COURT:  And how do you get around

14  the *Hillsboro* and *HEM* cases that discourage

15  intermediate injunctive relief for the purpose of

16  preserving assets?

17             MR. CHRISTENSEN:  Well, I think

18  generally the cases are referring to when you're

19  seeking monetary relief.  And that's not what we're

20  doing in this case.  And I think the history is

21  probably the most important point in this situation.

22             One simply cannot ignore that the very

23  assets and the very parties in this litigation -- the

24  reason we're here is because we were chasing after

Appellee Appx. 00292

007100

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 300 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 183 of 1017 PageID 7913
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 299 of 1803 PageID 11045

26

1   these assets that we believe we obtained the right to

2   in the previous action.  So it's a unique situation.

3   None of the cases involve the same parties and the

4   same assets.

5                  And the cases -- even the cases that

6   have history as a basis for granting the status quo

7   order, none of them have this kind of sort of clear

8   evidence that there was a fraud and moving of assets

9   to defeat a judgment in an earlier iteration of the

10  dispute between the parties.

11                 THE COURT:  And how does that sort of

12  long history or long series of allegations of fraud

13  and hiding assets, how does that square up with the

14  requirement that the harm to be prevented by the

15  status quo order be imminent?

16                 MR. CHRISTENSEN:  The imminence, Your

17  Honor, to be frank, is probably the most difficult

18  aspect of our situation to square with the law.

19  Because -- in part because they haven't told us

20  whether things have been transferred, where things

21  are, we cannot give Your Honor very many facts about

22  some imminent action that is going to take place.

23                 But at the same time, we -- again, we

24  started as a frog in a pot at a very high temperature

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 301 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 184 of 1017   PageID 7914
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 300 of 1803   PageID 11046

27

1    having come out of the experience in Texas.  Then

2    adding to that was the fact that they will not tell us

3    where these assets are.  They will not tell us whether

4    they are currently in a solvent entity or not.  They

5    will not really just come out and say whether those

6    assets are still in Highland or not.  There's a

7    suggestion in their brief that can be read as a

8    representation that they are in the Highland and never

9    have left, but they also make the argument in their

10   brief that the assets never went over to Abrams &

11   Bayliss; that during the whole time that Abrams &

12   Bayliss was holding the assets, that really Highland

13   held the assets, retained legal title, and Abrams &

14   Bayliss was simply holding onto them in trust.  We

15   don't know if something like that is happening in this

16   case either.

17              On top of that, we had -- and what

18   spurred us to action was the affidavit of Highland

19   saying that they did not have current assets to

20   satisfy the judgment in the *Crusader Redeemer* action.

21   So that's on the front end of that judgment.  We, at

22   this point, don't know what Highland is going to look

23   like from a solvency standpoint on the back end of

24   that after those assets have gone out the door, and so

Appellee Appx. 00294
Appx. 03159
007102

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 302 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 185 of 1017   PageID 7915
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 301 of 1803   PageID 11047

28

1   at some point we have to act.  We need to act before

2   the end of this case.

3              We didn't believe that we had enough

4   imminence at the beginning of this case that we would

5   get a status quo order or a preliminary injunction.

6   But when they filed that affidavit saying that in a

7   cash flow basis they were insolvent for purposes of

8   satisfying a judgment, against the backdrop of all the

9   history, it starts to look like we're doing a replay

10  of what happened in Texas.

11             Your Honor referred to, I think, a

12  memo from Abrams & Bayliss talking about the HERA

13  strategy.  And what we're afraid of is that there is a

14  HERA Strategy Version 2 that we do not know about

15  right now and they just won't tell us.  So at some

16  point, in order to avoid them doing the same thing

17  again, we have to act.  We can't, unfortunately,

18  identify when they're going to do that in the same

19  clean kind of way that one often can in a status quo

20  or preliminary injunction case.  But the danger, I

21  would submit, is just as high as in those cases.

22             I've talked some about the history.

23  And the defendants do talk about three of the cases

24  that we talked about regarding the history.  They

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 303 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 186 of 1017 PageID 7916
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 302 of 1803 PageID 11048

29

1    address the *Crusader Redeemer* action that Your Honor

2    is familiar with, the *UBS* litigation, and the *Acis*.

3    The ones that they don't mention are *Trussway*, for

4    example.

5              *Trussway*, in this court under Vice

6    Chancellor Glasscock, he actually already found that

7    the kind of history that one would have to establish

8    to obtain a status quo order was found with respect to

9    these principals. He said he took into account the

10   "... prior history of the controllers of the entities

11   in examining equitable matters that come before us."

12   And true to the way he is, he said, "... I would just

13   as soon not list all the reasons I have that make me

14   suspicious that a remedy will not be available here

15   ...."  "But I think it suffices to say that I have

16   experience with other cases involving the principals

17   here."  And he went on.  That's from page 40 of

18   Exhibit S, which is the transcript in the *Trussway*

19   action.

20             On the next page he said that, "...

21   given ... some of the factors that I've mentioned,

22   including the Acis bankruptcy and my other experiences

23   with the principals here ... there is a reasonable

24   probability that without some action, any victory will

Appellee Appx. 00296
007104

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 304 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 187 of 1017 PageID 7917
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 303 of 1803 PageID 11049

                                                                    30

 1  be a Pyrrhic victory."

 2                  THE COURT:  It sounds like what you're

 3  suggesting is that given the track record of Highland

 4  in this action and in other actions, that you're

 5  suggesting that the imminence requirements be

 6  dispensed with because of what's going on here.

 7                  MR. CHRISTENSEN:  I don't think I

 8  would say that, Your Honor.  I would say that given

 9  the caginess on discovery, we are not able to identify

10  the moment of imminence.  But we are, through the

11  history, able to establish the same point as

12  imminence.

13                  Imminence is this -- the point of

14  addressing imminence is that if you don't address

15  this, it is going to happen, and it's going to happen

16  very soon.  We can't tell you that it's going to

17  happen very soon, but we can tell you that there's

18  every reason to believe that it will happen before the

19  end of this trial.

20                  THE COURT:  But what about the -- I

21  think many times when one is considering imminence,

22  there's sort of a *laches*-esque element that comes into

23  it.  And this case was filed in 2017.  So this "it"

24  that we're discussing very well may have already

Appellee Appx. 00297
007105

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 305 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 188 of 1017   PageID 7918
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 304 of 1803   PageID 11050

31

1    happened.

2              And so I wonder what the justification

3    is for sort of after the fact -- maybe, I don't

4    know -- after the fact then seizing up Highland simply

5    based on the way that things have played out in other

6    cases.

7              MR. CHRISTENSEN:  So I think I can

8    explain why we didn't act earlier, and why it wouldn't

9    have been justified to act earlier, and so why we

10   shouldn't be subject to *laches* on this argument.

11             When we started, we had no reason to

12   believe that those assets had gone anywhere other than

13   Highland.  Then the Acis bankruptcy discussed that

14   Dondero was moving out tens of millions of dollars to

15   his charitable foundation.  That was another brick in

16   the wall.  Then we got the discovery responses that

17   were not responsive.

18             And to be clear, we have not given up

19   on that.  We had a meet-and-confer as recently as this

20   morning, and one on Friday of last week, in which we

21   are trying to get these documents.  It doesn't appear

22   that we're going to have much success on our own.  But

23   we are absolutely pursuing that and have pursued those

24   documents as vigorously as we pursued the Abrams &

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 306 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 189 of 1017 PageID 7919
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 305 of 1803 PageID 11051

32

1   Bayliss documents.

2                    To mix the metaphors, the straw that

3   broke the camel's back was the *Crusader Redeemer*

4   action where Highland said:  We cannot pay this

5   judgment right now.  We have more assets than

6   liabilities, but we cannot pay this right now.

7                    And it's also important to remember

8   that it's not just large judgments that Highland has a

9   history of not paying, and it's not only Daugherty's

10  relatively small judgment that they refused to pay.

11  But in the Acis bankruptcy, it was an $8 million claim

12  at issue, and they made him go through -- or are still

13  going through involuntary bankruptcy.

14                   So I think we acted when it was

15  prudent to act.  And before that occurred, I don't

16  think any member of this court would have been likely

17  to give us relief without something to point to, a

18  reason to believe that Highland wouldn't pay apart

19  from the history.

20                   THE COURT:  And the reason is that

21  affidavit in the *Redeemer* case stating that Highland

22  doesn't have the liquid assets to pay the $175 million

23  judgment?  That's what you're interpreting to say that

24  they will not pay or will somehow manage to avoid

CHANCERY COURT REPORTERS

Appellee Appx. 00299

007107

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 307 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 190 of 1017 PageID 7920
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 306 of 1803 PageID 11052

33

1   paying Mr. Daugherty's -- what is allegedly owed to

2   him?

3                   MR. CHRISTENSEN:  We aren't sure about

4   the damages, but effectively, yes.  That Highland --

5   which is, we assume, the most solvent of any of the

6   entities -- now has a cash flow solvency issue.  And

7   so at that point we felt we needed to act.

8                   THE COURT:  Understand.

9                   MR. CHRISTENSEN:  The other thing that

10  I think Your Honor should consider, it doesn't fit

11  exactly within the three factors of a status quo or a

12  preliminary injunction standard; but I think Your

13  Honor should also take into account that it may not be

14  a question of whether or not Highland is able to

15  satisfy the judgment, but whether it will, even if it

16  is able.

17                  THE COURT:  That's what I'm wondering.

18  That's the part that I'm wondering how that's being

19  derived from the affidavit in the *Redeemer* case, if

20  that's the precipitating factor.  Am I understanding

21  you to read that affidavit only to inform solvency and

22  not intent?

23                  MR. CHRISTENSEN:  It is consistent

24  with an intent to make people work for their

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 308 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 191 of 1017   PageID 7921
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 307 of 1803   PageID 11053

34

1   judgments, but I mostly consider it separately.  And

2   what I'm really referring to, the short name for it is

3   spite.  It appears, if you look, not only at the

4   previous action in Texas, but also the Josh Terry

5   situation, that a major factor motivating whether or

6   not Highland pays judgments is how Highland feels or

7   how Jim Dondero feels about the people who are trying

8   to collect that judgment.

9               And so you have the court in the

10  bankruptcy case in *Acis* said that the expenditures

11  were out of whack versus what's at stake.  Or in the

12  *Credit Strategies Fund* case -- which the defendants

13  did not address -- the factual findings there refer to

14  some notes from a call between those parties and

15  Dondero.  Those notes read, "Dondero directly

16  threatens Concord and Brant personally.  We are very

17  good at being spiteful."

18              And so that spite doesn't -- it's not

19  one of the factors normally considered on a status quo

20  motion or a preliminary injunction.  I do think, as a

21  matter of equity, Your Honor ought to consider that.

22  And I think it's consistent with, and maybe grows out

23  of the kind of considerations that Vice Chancellor

24  Glasscock was taking into account in the *Trussway*

Appellee Appx. 00301
Appx. 02106
007109

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 309 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 192 of 1017 PageID 7922
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 308 of 1803 PageID 11054

35

1   action.

2              I think I'll skip to likelihood of

3   success on the merits.  We do think the likelihood of

4   success on the merits prong of this analysis is fairly

5   straightforward.  At a big-picture level, Daugherty

6   had a claim on these assets, either directly or

7   through HERA.  He was entitled to that compensation,

8   he earned it, and it was taken from him after he

9   proved his entitlement not only to damages -- which he

10  received in the amount of 2.6 million and has never

11  seen, but also the underlying assets.

12             So for fraudulent transfer purposes,

13  we think actual intent to hinder, delay, or defraud

14  based on the documents that we have seen so far is

15  compelling evidence that there was actual intent to

16  hinder, delay, or defraud.

17             Your Honor only has to find that we

18  have a reasonable probability of success on one of our

19  claims.  You do not have to decide that we have a

20  reasonable probability of success on all of them.  And

21  that comes out of the *Destra Targeted Income* case.

22             But we also think our other claims are

23  quite strong, the alternative bases under fraudulent

24  transfer law.  We do not believe that HERA got

Appellee Appx. 00302
Appx. 03105
007110

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 310 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 193 of 1017   PageID 7923
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 309 of 1803   PageID 11055

36

 1   equivalent value, for example, in the transfer.

 2   Unjust enrichment, it's an equitable doctrine, so in

 3   some sense you back away and look at what really

 4   happened, what's the substance.

 5                    And again, what happened was Daugherty

 6   earned compensation, he proved his entitlement to it,

 7   and then it was taken from him.  That enriched

 8   Highland; it impoverished Daugherty to the extent that

 9   he was entitled to it.  There was obviously a

10   connection between those two results.

11                    And as far as their defense of

12   justification, the evidence doesn't seem to show that.

13   I take their justification argument to mean that they

14   were justified in taking the money because of the

15   legal expenses.  But the bills that we have seen so

16   far do not support that HERA was receiving the benefit

17   of those legal expenses.

18                    And just briefly on the promissory

19   estoppel claim -- I'm not going to spend much time on

20   that; you'll hear a lot about that in a minute.  But I

21   do want to refer to those quotations from the Texas

22   trial as additional reasons that support our

23   probability of success on the merits of that claim.

24   They demonstrate that throughout the trial, the

Appellee Appx. 00303
Appx. 03468
007111

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22  Entered 08/15/22 16:45:41  Page 311 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 194 of 1017   PageID 7924
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 310 of 1803  PageID 11056

37

1   strategy appears to have been to convince the jury

2   that Highland was the good guy because they were --

3   don't worry, they're going to hold on to the assets

4   for Pat.  Pat is going to get those assets if he

5   proves his entitlement to them.  But -- you know, so

6   don't think we're bad for taking them.  Tell us that

7   we win now and we don't have to give them to him.

8                    The narrowest way to grant the motion,

9   I think, is based on probability of success of the

10  fraudulent transfer claim for actual intent to hinder,

11  delay, or defraud.  And Your Honor only needs to find

12  that to issue the status quo order.

13                   On the balance of equities, also seems

14  very clear to us.  On the one hand, our client would

15  go through potentially another half a decade or decade

16  of litigation if he has to chase these assets again.

17  And it would be a real shame to have to do that twice.

18  On the other hand, the defendants, the harm that they

19  identify on their side is that it would lower the bar

20  for future plaintiffs against Highland that are

21  seeking monetary damages to obtain a status quo order.

22  And on that point, I just have to point out, again,

23  that it is not only monetary damages that we are

24  seeking, but seeking to move the escrow assets.

Appellee Appx. 00304
Appx_03409
007112

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 312 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 195 of 1017 PageID 7925
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 311 of 1803 PageID 11057

38

```
 1              The other harm that they identify is
 2   the harm to their reputation if they're required to
 3   freeze these assets for what I take them to perceive
 4   as a very small claim.  But again, we're not only
 5   seeking monetary assets, so this is not just, as they
 6   characterize it, a $3 million claim but a claim on
 7   specific assets.  And their history of paying small
 8   claims is not great.  So we think the balance of
 9   equity also favors Daugherty.
10              Unless Your Honor has any other
11   questions, that's all I have.
12              THE COURT:  I don't.  Not at this
13   time.  Thank you.
14              MR. REED:  Good afternoon, Your Honor.
15   John Reed from DLA Piper for the defendants.
16              First of all, I want to apologize for
17   what happened at the last hearing.  We were only into
18   the case for like two days.  I had no idea that the
19   lawyer that was going to present was not going to be
20   able to answer Your Honor's questions.  I was not
21   happy about that, probably much more unhappy than the
22   Court was and the Court was very unhappy.
23              Mr. Katz is the lawyer most familiar
24   with everything in this case.  And he's here today to
```

39

```
 1   present the arguments and should be able to answer all

 2   of Your Honor's questions.

 3                THE COURT:  I appreciate your comment.

 4   Thank you.

 5                MR. KATZ:  Your Honor, may I approach?

 6                THE COURT:  Yes.

 7                MR. KATZ:  Thank you for letting me be

 8   heard today.

 9                And as Mr. Reed said, I echo his

10   apologies for the last hearing.  I apologize that I

11   was not able to be here at that last hearing.  But if

12   Your Honor does have questions about -- I understand

13   Your Honor's ruling, but if Your Honor does have

14   questions about any of those matters, I'm happy to

15   address those as well.

16                THE COURT:  Thank you.

17                MR. KATZ:  With respect to the status

18   quo motion.  Obviously, the Court is aware of the

19   legal standard.  I'm not going to go into that.  I

20   just want to address a few of the points that counsel

21   addressed.

22                And I'd like to start with the

23   irreparable harm element, which is one of the required

24   elements.  And counsel said a number of times that
```

Appellee Appx. 00306

007114

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 314 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 197 of 1017 PageID 7927
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 313 of 1803 PageID 11059

40

1      they're seeking the assets, not just monetary relief.

2      And I presume that that argument is being proffered

3      because they recognize, otherwise, the issue with

4      irreparable harm component that they have to show.

5                  And I note, just by way of background,

6      is that the Texas award was not in favor of

7      Mr. Daugherty vis-a-vis HERA.  It was not for specific

8      assets; it was a monetary award.  And, moreover,

9      Mr. Daugherty never had ownership of -- direct

10     ownership of any assets in HERA.  Mr. Daugherty was a

11     shareholder in an LLC and the LLC owned some assets.

12                 So if their lawsuit is now seeking

13     recovery of specific assets as opposed to monetary

14     relief, I note that there's a host of procedural and

15     substantive issues with that which I think goes well

16     to the likelihood of success on the merits.

17                 But the point for us today, Your

18     Honor, is that a monetary award would certainly be

19     sufficient to recompense Mr. Daugherty if he were to

20     prevail on any of his claims in this case.  And

21     there's no evidence -- and maybe more importantly,

22     there's no evidence that's been offered to the Court

23     in support of the status quo motion that would

24     demonstrate otherwise.  And when I say "demonstrate

Appellee Appx. 00307
Appx. 03172
007115

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 315 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 198 of 1017 PageID 7928
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 314 of 1803 PageID 11060

41

1   otherwise," demonstrate that there are assets that

2   were in HERA that can't be valued, or some other basis

3   to show some sort of irreparable harm.  That issue is

4   not even addressed.

5              We're -- this is, I think, very

6   apparently a case that -- where there is no

7   irreparable harm.  And money can certainly compensate

8   for any harm that Mr. Daugherty may be able to prove

9   ultimately that he suffered.  The only evidence on

10  that issue, I think as Your Honor correctly pointed

11  out, was the affidavit of Scott Ellington.  And that

12  affidavit says to the contrary.  It says, "... the

13  value of Highland's assets exceed[s] the amount of the

14  ... Award."

15             There's absolutely no evidence in

16  connection with the status quo motion that would show

17  that there is irreparable harm or there is insolvency.

18  In fact, what a good counsel wants to do is make

19  allegations of what they believe is inappropriate

20  conduct some by Highland, some by Highland's

21  affiliates.  And I note that the conduct that they've

22  cited to in their motion are allegations taken from

23  pleadings in other cases, as opposed to direct

24  evidence of anything that has been done by Highland.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 316 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 199 of 1017   PageID 7929
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 315 of 1803   PageID 11061

42

1    And most of it, again, is not directly Highland

2    allegations to any extent.

3                    There is -- and then also as Your

4    Honor appropriately, I believe, questioned counsel

5    about, there's no evidence of anything imminent on the

6    horizon that might give rise to any potential concern

7    that would support the status quo order.  And what

8    they're seeking is really, truly an extraordinary

9    remedy.  And I don't believe that they've pointed to

10   any concrete basis which they can meet the high

11   standard that they need to show to justify a status

12   quo order.

13                   THE COURT:  How do you justify the

14   situation here from the one in *Trussway*?

15                   MR. KATZ:  Well, I guess, Your Honor,

16   in two ways.  One, in *Trussway*, there's allegations of

17   specific conduct.  Where here, we've got -- there's no

18   allegations of any conduct that they believe is about

19   to occur or evidence to support that.

20                   THE COURT:  I suspect they would say

21   that's because you haven't answered their questions,

22   but I don't know.

23                   MR. KATZ:  Well, but, Your Honor, I

24   guess that it would also go back to the irreparable

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 317 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 200 of 1017 PageID 7930
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 316 of 1803 PageID 11062

43

```
 1   harm issue that, you know, there's nothing that --

 2   even the allegations, that if they were able to

 3   provide some supportive allegations in this case as

 4   opposed to relying on allegations in other cases,

 5   there would still be -- they still have not shown that

 6   there's any risk of insolvency or potential

 7   irreparable harm.

 8              And the Mitsubishi case that they

 9   cited in their brief I think is very on point.  And on

10   this issue where they had -- the Court noted that

11   there was an allegation -- actually more than an

12   allegation -- there actually was a prior incident that

13   the Court had very serious concerns about but that on

14   its own wasn't enough.  It was -- the Court

15   specifically found that the defendant in that case was

16   insolvent.  And they also found that there was a sale

17   being negotiated, actual evidence of a sale, where the

18   assets were going to be transferred.  But we don't

19   have that type of evidence with us in this case, Your

20   Honor.

21              On the likelihood of success on the

22   merits, Counsel spent a little bit of time on that

23   issue.  But I think it's important, Your Honor, again,

24   that this is an extraordinary remedy they're seeking
```

Appellee Appx. 00310
Appx. 03175
007118

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 318 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 201 of 1017 PageID 7931
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 317 of 1803 PageID 11063

44

```
 1    that has a heightened standard.  And their motion on

 2    the likelihood of success on the merits simply has

 3    conclusory allegations, that they believe they're

 4    going to be able to prevail on the merits without

 5    addressing the specific elements and what evidence

 6    they've got to show the specific elements.

 7                   I note, you know, Counsel, in a number

 8    of pleadings has -- and I know Your Honor has noted

 9    this as well -- that Judge Glasscock had expressed his

10    skepticism about when he was trying to determine what

11    the nature of the escrow agreement was.  And I note

12    that Judge Glasscock, when he was doing that, also

13    when he was talking about the formation of the escrow

14    agreement, he was not talking about the resignation of

15    Abrams & Bayliss or the -- what happened to the assets

16    that formerly were held by HERA.

17                   And, in fact, even Judge Glasscock

18    indicated at that time that it may be that this

19    fraudulent transfer claim was appropriate for summary

20    judgment.  I think his direct quote -- I know I wrote

21    it down.  His direct quote was that it wasn't

22    prepared -- on page 79 and 80 of the transcript, that,

23    "It may be ... perfectly fit ... for a motion for

24    summary judgment.  I'm just not convinced I can get
```

Appellee Appx. 00311
Appx. 03476
007119

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 319 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 202 of 1017    PageID 7932
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 318 of 1803    PageID 11064

45

1    rid of it on a motion to dismiss ...."  That was his

2    quote.

3                    But I think that has been turned on

4    its head a little bit to say that because he didn't

5    understand the purpose of the escrow agreement and why

6    that was formed, that somehow that shows that the

7    fraudulent transfer claim is a sure-fire winner.  In

8    fact, I also note that Judge Glasscock dismissed the

9    same fraudulent transfer claim against Mr. Dondero in

10   the motion to dismiss.

11                   So we think there's a number of

12   problems with each of the claims.  And I know we're

13   going to get to the promissory estoppel claim.  But I

14   think a couple of issues with that is that we've

15   got -- that claim is predicated on two statements that

16   were by individuals that I don't believe were clear

17   and unequivocal type of statements that could support

18   a promissory estoppel claim.  But moreover, they went

19   to the representation of what was in the terms of the

20   escrow agreement.

21                   And I believe the law is fairly clear

22   that if there is a contract provision that addresses

23   the issue at hand, then you cannot have a promissory

24   estoppel claim based on a representation about that

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 320 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 203 of 1017 PageID 7933
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 319 of 1803 PageID 11065

46

```
 1    contract claim.  And Mr. Daugherty is absolutely
 2    seeking relief pursuant to the provisions in the
 3    escrow agreement.  And that, in and of itself, would
 4    knock out his promissory estoppel claim.
 5                    And then -- and maybe the biggest
 6    problem -- I think he's got a number of problems with
 7    the promissory estoppel claim, but maybe the biggest
 8    one is reasonable reliance.  Again, Mr. Daugherty
 9    hasn't even alleged that any of the statements were
10    made for the purpose of causing Mr. Daugherty to
11    reasonably -- to rely, and that it would be reasonable
12    to expect him to do so.
13                    But Mr. Daugherty's conduct -- he
14    alleges that he would not have paid the judgment and
15    that he would have sought to invalidate the escrow
16    agreement at trial.  And I think both of those are --
17    they're also, again, conclusory allegations that he's
18    made without sufficient -- he has not made allegations
19    in his complaint in this action sufficient to
20    withstand, I believe, a motion to dismiss, and
21    certainly not to show a likelihood of success on the
22    merits for the status quo motion.
23                    But what he's really said and what he
24    explained in the briefing that he meant by that is
```

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 321 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 204 of 1017 PageID 7934
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 320 of 1803 PageID 11066

47

1   that he would have sought offset.  The problem that

2   Mr. Daugherty has there is he -- offset is an

3   affirmative defense.

4                    THE COURT:  I mean, we're all about to

5   get into that very deeply, so ...

6                    MR. KATZ:  Okay, Your Honor.  Thank

7   you, I appreciate that.

8                    But the likelihood of success on the

9   merits on the promissory estoppel claim, I think, is

10  very low.  He's got similar issues on the unjust

11  enrichment claim because of the representations and

12  because of the equivalent value that HERA received in

13  exchange for the assets.

14                   On the fraudulent transfer claim, we

15  don't believe that there was a transfer and there's

16  been evidence of a transfer.  And Counsel may respond

17  to that and say, "Well, that's because Highland hasn't

18  shown where the assets are."  I'm anticipating that to

19  be their response on that.

20                   But I think Your Honor identified the

21  point that that's not why you get a status quo motion.

22  If they think there's evidence that they need, you

23  know, there's a motion to compel.  But for purposes of

24  their motion, they have not produced any -- have not

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 322 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 205 of 1017   PageID 7935
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 321 of 1803   PageID 11067

48

1   cited to any evidence, have not even made the

2   allegation that -- other than a conclusory

3   allegation -- that they have a likelihood to succeed

4   on the merits.

5              And then finally, Your Honor, I think

6   they have the same -- the last element, that with the

7   harm to him, the harm to Mr. Daugherty would outweigh

8   the harm to Highland.  They simply have a conclusory

9   allegation in their motion without providing any

10  support for that, Your Honor.

11             And again, I just -- I'm happy to talk

12  about that issue further, but I think on a motion of

13  this seriousness with the heightened standard, that

14  they need to show that conclusory allegations are not

15  sufficient.

16             THE COURT:  Thank you.

17             MR. KATZ:  Thank you, Your Honor.

18             MR. CHRISTENSEN:  Just briefly, Your

19  Honor.

20             I suppose it's an interesting

21  philosophy of language, a question of what counts as

22  something being conclusory.  But we have certainly

23  done more than offer a conclusion.  We have laid out a

24  timeline of actual intent to delay or defraud with

Appellee Appx. 00315
Appx. 03189
007123

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 323 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 206 of 1017   PageID 7936
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 322 of 1803   PageID 11068

49

1    respect to the fraudulent transfer claim.

2                   And just the items that are attached

3    to our motion at Exhibit N, O, P, and Q, are a series

4    of e-mails and events that I think anybody bringing a

5    fraudulent transfer claim might characterize any one

6    of them as a smoking gun.  That is more than a

7    conclusion.  Our conclusion that this transfer was

8    done with actual intent to defraud is based on very

9    particular, very detailed, minute-by-minute documents.

10   So it is certainly not conclusory.  It's sort of

11   conclusory to call that conclusory.

12                  And it's important, also, to remember

13   that when Vice Chancellor Glasscock suggested that

14   potentially the fraudulent transfer claim could be fit

15   for summary judgment disposition, he also said things

16   like "Maybe there's a perfectly reasonable explanation

17   for this."  I think discovery has shown that there is

18   not a perfectly reasonable explanation for this.  And

19   he did not have access to those documents, nor did we

20   at the time that he made that statement.

21                  As far as seeking this relief rather

22   than simply monetary damages, that has been in our

23   complaint since the beginning.

24                  THE COURT:  What is the -- can you

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 324 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 207 of 1017 PageID 7937
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 323 of 1803 PageID 11069

50

1    address the point that the Texas award is monetary and

2    not for the specific assets that are mentioned now in

3    your briefing?

4                        MR. CHRISTENSEN:  Sure.  I can.

5                        I'll address that by saying, quoting

6    again HERA's closing argument in the Texas trial.

7    "... [I]f Pat Daugherty happens to prevail in his

8    lawsuit against Lane, Patrick and HERA you heard Jim

9    Dondero testify, he gets his interest, which is

10   currently escrowed in the third-party escrow account,

11   all of it."

12                       We have made a claim for promissory

13   estoppel that statements like that with codefendants

14   show clear evidence of a promissory estoppel claim.

15   That kind of statement shows how the statement was

16   meant to be perceived, it shows how people did

17   perceive it.

18                       And I want to go to the jury question

19   because we actually have -- unlike many cases where

20   the idea of an objective standard, what would a

21   reasonable person do, is sort of an academic question.

22   But in this case we have a jury, which is sort of the

23   quintessential reasonable person, writing back to the

24   judge, "If we assign a dollar value to 'Fair Market

Appellee Appx. 00317

Appx. 03182

007125

51

1    Value of Daugherty's HERA units' in Question 18" --

2    that's the question that awarded him $2.6 million --

3    "is this in exchange for his HERA units currently in

4    escrow, or in addition to them?"  The judge instructed

5    back, "Do not discuss or consider the effect your

6    answers will have."

7                    And then the final judgment made clear

8    that it was not in exchange for those assets in

9    escrow, that it was in addition to them.  And there

10   was appellate litigation about that issue, and it was

11   settled that it was not a replacement for those units.

12   But my point really is:  We have very clear evidence

13   that the Texas judgment and the people making the

14   Texas judgment believed that those assets were being

15   held in escrow for Pat Daugherty, which is exactly

16   what the defendants tried to tell the jury to believe

17   in their closing arguments.

18                    So the fact that the Texas judgment

19   was purely monetary is, A, not entirely true; and, B,

20   it's not -- does not defeat the promises that they

21   made throughout that trial, nor the fact that they

22   transferred the assets once the judgment came through.

23                    Let's see.  On the promissory estoppel

24   claim, it's just not what they said at trial, that Pat

Appellee Appx. 00318

Appx. 03183

007126

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 326 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 209 of 1017 PageID 7939
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 325 of 1803 PageID 11071

52

1    Daugherty had an interest in this LLC but, by the way,

2    there's nothing in it.  So if you award him anything,

3    it's going to be completely valueless.

4                    I want to respond just briefly to the

5    point that these assets can be valued.  And they can

6    be.  This court is very experienced in appraisals.

7    But the easiest and most efficient way to deal with

8    this, the value, is to give the assets themselves

9    rather than require, effectively, a -- more than one

10   appraisal inside of this case, because there are

11   assets held by a private equity fund, and those assets

12   include private companies.  So we would have to have a

13   sort of quasi-appraisal action contained inside of

14   this, instead of doing what is much easier for the

15   parties and the Court and just addressing those assets

16   in an equitable manner and providing an equitable

17   remedy.

18                    The affidavit does say that they are

19   solvent.  I believe the affidavit was also given by

20   the same person that the -- it was either the

21   arbitration panel in *Credit Strategies Fund* or the

22   Bankruptcy Court in *Acis* said that Isaac Levinson's

23   statements were not credible and that his statements

24   contradicted documentary evidence in a clear way.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 327 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 210 of 1017    PageID 7940
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 326 of 1803  PageID 11072

53

 1                    In addition, they don't say by how

 2      much they are solvent.  It could be the case, based on

 3      the face of that affidavit, that they are solvent by a

 4      million dollars.  We simply don't know.  And again,

 5      the question of solvency as it relates to irreparable

 6      harm in most of these cases is in a sort of antiseptic

 7      environment where it really is just a matter of:  Does

 8      this party have sufficient assets?

 9                    And again, that's not the only

10      question in this case.  The question in this case is:

11      If the Court does nothing, what is the risk that

12      Highland will do exactly what it has done to these

13      assets vis-a-vis this litigant before?

14                    That's all I have, Your Honor.

15                    THE COURT:  Thank you.

16                    My intention is to hear the status quo

17      order and the motion to dismiss and then take a break

18      and see if I can get something together to share my

19      thoughts.  So let's move on to the motion to dismiss,

20      unless folks want to take a short break.

21                    MR. KATZ:  I'm prepared to proceed,

22      unless Counsel wants a break.

23                    MR. UEBLER:  I'm prepared to go

24      forward.

Appellee Appx. 00320
Appx. 03185
007128

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 328 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 211 of 1017 PageID 7941
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 327 of 1803 PageID 11073

54

1          THE COURT:  All right.  You may

2   proceed.

3          MR. KATZ:  Thank you, Your Honor.

4          So I won't belabor the procedural

5   background, because I know Your Honor is familiar with

6   it, other than to say that after Judge Glasscock had

7   dismissed a large number of Mr. Daugherty's claims,

8   there was -- a promissory estoppel claim was then

9   added.  And we filed the motion to dismiss as to that

10   claim, and that's the motion that we're here for

11   today.

12          To prevail on a promissory estoppel

13   claim, Mr. Daugherty has to allege a conceivable set

14   of circumstances that would allow a showing that there

15   was a promise that was made, that it was reasonable,

16   that the expectation of the promisor was to induce the

17   action of forbearance on the part of the promisee,

18   that the promisee reasonably relied on the promise and

19   took action to his detriment, and such promise is

20   binding because injustice can be avoided only by

21   enforcement of the promise.

22          And I do want to -- I will be

23   efficient, but I want to address each of these

24   elements, Your Honor.  And the -- I want to start with

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 329 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 212 of 1017   PageID 7942
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21   Page 328 of 1803  PageID 11074

55

1   the reasonable reliance.  As I mentioned a moment ago

2   in connection with the status quo order, that

3   Mr. Daugherty is really claiming that he would have

4   sought offset had Mr. Dondero -- actually, I

5   apologize, I want to take a quick step back.

6                   Although Counsel's pointed to a

7   closing argument of HERA, that I believe he attributed

8   to Highland's counsel, I just want to be clear for the

9   record that the statement that Counsel just read from

10  the closing argument was for HERA, not for Highland,

11  and there was separate counsel.

12                  THE COURT:  Hasn't there separately

13  been an assertion of a common interest?

14                  MR. KATZ:  There was, Your Honor.  But

15  I just believe Counsel -- I'm sure it was

16  inadvertent -- said "Highland."  And I just want to be

17  clear for the record that that statement was on behalf

18  of HERA at closing argument.

19                  But, more importantly, in the

20  complaint they only allege two statements: a statement

21  by Jim Dondero at trial and a statement by Mr. Klos in

22  a declaration made several months after the final

23  judgment.  And so when Mr. Daugherty claims that his

24  reasonable reliance was not seeking offset at the

Appellee Appx. 00322
007130

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 330 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 213 of 1017 PageID 7943
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 329 of 1803 PageID 11075

56

1   trial, the second statement can't be a basis of that;

2   and the issue that Mr. Daugherty has, that there can't

3   be a reasonably conceivable set of circumstances to

4   show reasonable reliance for a couple of reasons.

5                    One, the date that Mr. Daugherty filed

6   his counterclaims with his claims, he had -- the LLC

7   agreement with Highland's offset provision against the

8   value of HERA was in that document.  In fact, that was

9   the basis of one of Mr. Daugherty's claims, that there

10  was going to be -- there was the risk of this improper

11  offset.  He was challenging those provisions.

12                   But yet he never pled offset as a

13  defense.  And it is a required affirmative defense

14  under Texas law.  And it is clear that when the final

15  judgment was entered, that's *res judicata*, that issue

16  was barred.

17                   So Mr. Daugherty is saying that now

18  had Jim Dondero not testified as he did on the stand,

19  that he would have filed the declaratory judgment

20  action to offset the judgment that Highland obtained

21  against him from the judgment he obtained against HERA

22  cannot serve as the basis for a promissory estoppel

23  claim in this action because he would be barred as a

24  matter of law.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 331 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 214 of 1017   PageID 7944
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 330 of 1803   PageID 11076

57

1               THE COURT:  Is that a little too

2    technical?  I mean, is the point a little more

3    abstract than that, which is that had Dondero not

4    testified as he did and assured everyone in the

5    courtroom that the escrow was there for Daugherty's

6    satisfaction down the road, that there are plenty of

7    different options he could have taken?  I mean, any

8    sort of resistance or leverage or anything like that

9    in regards to paying his own judgment, whether or not

10   a technical offset was procedurally available to him,

11   seems to be kind of reducing this a little bit too far

12   down into the technicalities.

13               MR. KATZ:  Well, I don't believe so,

14   for two reasons.  But the most important one being

15   there's no reasonably conceivable set of circumstances

16   where he could have taken action.  And I'll address

17   that momentarily.

18               But to the point, that was his

19   response.  That's what's in his pleading, both in his

20   complaint and in response to the motion to dismiss.

21   That's what he said he would have done.  And that

22   wasn't available to him.

23               And it wasn't just filing a

24   declaratory judgment action for offset that he would

Appellee Appx. 00324
Appx. 03189
007132

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 332 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 215 of 1017 PageID 7945
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 331 of 1803 PageID 11077

58

1   have been barred from doing.  He had two years to

2   plead offset as a defense or to plead facts in the

3   Texas action that arguably could have given rise to

4   some reliance claim.

5             THE COURT:  It seems odd to claim that

6   there was no reliance because he didn't do something

7   before the act in question happened.

8             MR. KATZ:  Well, Your Honor, in fact,

9   quite the opposite.  As Mr. Daugherty said in his

10  reply brief to the status quo motion -- and this is on

11  page 2 and 3 of Daugherty's reply brief -- "In fact,

12  during the trial and before Daugherty won his

13  judgment, Defendants stressed that Daugherty was an

14  owner of HERA units."  Then he puts in a footnote, "At

15  the same time, Defendants took the position that

16  Daugherty held no economic interest in HERA.

17  Accordingly, Daugherty did not take the purported

18  admissions at face value and litigated for a judgment

19  that he retained his HERA units."

20            And the significance of that, Your

21  Honor -- it's the same significance as what I was

22  trying to say a moment ago and I probably did not say

23  it very clearly -- is from the moment he filed this

24  claim, he was aware that, as he says here, that his

Appellee Appx. 00325
Appx. 03199
007133

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 333 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 216 of 1017 PageID 7946
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 332 of 1803 PageID 11078

59

1  value -- the value of his shares in HERA were

2  valueless, as Highland was saying they were.  Because

3  that was one of his claims in the lawsuit.  And he did

4  not do anything to try to protect that vis-a-vis a

5  judgment that Highland might get against him at any

6  time during the trial.

7          So to think that, "Oh, well, he was

8  about to do it" after two years, knowing everything

9  that he knew, the LLC agreement allowing the offset,

10  Highland taking the position that his units were

11  valueless even though he was suing for it, that

12  somehow he was going to try to offset his claim

13  against HERA against Highland's claim against him, and

14  he just didn't do it because Jim made the statement he

15  did on the stand is not a reasonably credible

16  position.  It's not something that could have a -- or

17  there could be a reasonably conceivable set of

18  circumstances to show a reasonable and detrimental

19  reliance.

20          And I think -- and, Your Honor, if you

21  also look at the whole circumstances around

22  Mr. Dondero's statement on the stand, was not -- in

23  fact, the question -- it was by HERA's counsel that

24  was questioning him at the time.  And the question

60

1    was:  The assets that are being escrowed, or the money

2    that's being escrowed right now, what happens to them?

3    And I think it's significant for a couple of reasons.

4                One, right now they're talking about

5    the day that the question was asked.  They're not

6    talking about a day in the future.  And I think it's

7    also significant that that was --

8                THE COURT:  Maybe that was the

9    question, but the answer was, "In the future they will

10   go to him."

11               MR. KATZ:  That's -- Your Honor,

12   respectfully, that's not the way I read it.  But I

13   think the point is -- two points, Your Honor.  One,

14   that was a question by HERA's counsel; that was not a

15   question by Daugherty's counsel.

16               If this was so important that

17   Daugherty was going to forego seeking to invalidate

18   the escrow agreement or trying to do trial amendment

19   and get a new claim in, there was no action by his

20   counsel to follow up and say:  Let's be clear.  Let's

21   not talk about right now, let's talk about in the

22   future.  And again -- or ask about what about the

23   resignation provisions, what about the termination

24   provisions.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 335 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 218 of 1017 PageID 7948
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 334 of 1803 PageID 11080

61

1          There's a whole host of conditional

2   circumstances that show that Mr. Daugherty,

3   purportedly relying on that statement to not try to

4   bring a declaratory judgment action for offset or to

5   seek to invalidate the escrow agreement would have

6   been reasonable reliance.  Again -- because, in fact,

7   up until that point, Mr. Daugherty not only waited two

8   years, he waited past the amended pleading deadlines.

9   In the face of what he says, I'm being told by

10  Highland that my assets are valueless.  You know, and

11  to the extent they say that I'm still owning HERA

12  units, I never believed that there was anything there.

13  But yet he didn't do anything about it before

14  Mr. Dondero made the statement to HERA's counsel.

15          So, again, all of those, all of that

16  goes to whether he could have -- show any circumstance

17  where he could have reasonably relied.

18          Similarly, I think if you look -- and

19  I bring in these things to show Your Honor what is not

20  in the complaint or not in the response to the motion

21  to dismiss.  After the judgment, he claims that he was

22  entitled to this offset, but yet he paid his full

23  judgment.  He could have just paid the difference in

24  the judgment.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 336 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 219 of 1017 PageID 7949
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 335 of 1803 PageID 11081

62

1          THE COURT:  That's the point, is that

2    he paid the whole judgment; right?  Kind of chipperly

3    wrote the check and thought it was all going to work

4    out in the end.

5          MR. KATZ:  Right.  Well, without --

6    but with the whole circumstances and you look at his

7    allegations, if his allegations are to be believed,

8    it's not reasonable to believe that somebody who was

9    going to do what he did but for Jim Dondero's

10   statement would have, again, waited for two years, not

11   filed -- not done -- taken the legal actions that he's

12   now claiming he would have taken.

13         He did seek to amend his pleadings

14   right before trial.  These were not in there.  That

15   was, again, before these statements.  Again, it's not

16   credible to believe that he reasonably relied.  And he

17   hasn't alleged anything.

18         Again -- and so that was why I said

19   initially to Your Honor's question, there are two

20   points.  One, when you look at the totality of what he

21   didn't allege and what he didn't do, that there can be

22   no set of circumstances where he reasonably relied,

23   but then when you look at what he says he would have

24   done, which is the offset.  And he would have been

Appellee Appx. 00329
Appx. 03194
007137

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 337 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 220 of 1017 PageID 7950
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 336 of 1803 PageID 11082

63

 1    legally barred from doing that because he waived it.

 2    Also because -- and the law is cited in our motion,

 3    that because Highland and HERA are separate entities,

 4    there wouldn't have been an offset between those

 5    judgments anyway.

 6                      So the two things he says that he

 7    would have done was seek to invalidate the escrow;

 8    which, again, he was aware of that escrow agreement

 9    before trial.  He sought to amend his pleadings before

10    trial but did not address that escrow agreement at

11    all.

12                      He has shown that he believes that

13    his -- before Mr. Dondero made that statement, he

14    didn't -- he thought his HERA units had been rendered

15    valueless and that's how he was litigating the case.

16    But he didn't try to "invalidate" the escrow

17    agreement.  He also doesn't explain or provide any

18    allegation of what that means, to invalidate the

19    escrow settlement.

20                      He doesn't provide any legal theory or

21    allegation of evidence to support a legal theory that

22    would show that had he sought to invalidate the escrow

23    agreement that the court would have allowed that

24    amendment and it would have changed the outcome.

Appellee Appx. 00330

007138

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 338 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 221 of 1017    PageID 7951
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 337 of 1803   PageID 11083

64

1              The next element I want to talk about
2    was that a promise was made.  And, again, he's
3    identified two promises: one by David Klos, one by Jim
4    Dondero.  There's -- the one by Mr. Klos, again, was
5    done several months after trial.  The one by
6    Mr. Dondero is obviously during trial.  But both of
7    those statements, when you look at them, are not
8    unequivocal statements of -- there was no set of
9    circumstances where Mr. Daugherty will not be paid
10   this money on a final, nonappealable judgment.  And --
11   which is what --
12              THE COURT:  Why is that not exactly
13   what Mr. Dondero said?
14              MR. KATZ:  Well, Your Honor,
15   Mr. Dondero was being asked a question about the
16   language in the escrow agreement, that specific
17   provision.  And he was being asked based on
18   circumstances right now.  And perhaps if I give you an
19   analogy.  If I hire an employee and I'm paying the
20   employee $50,000 a year and they're an at-will
21   employee, and somebody asks me, "Well, how much does
22   that employee make?" I'm not likely going to say,
23   "Well, annually $50,000 a year, but I can terminate
24   them at any time."  Or "$50,000 a year, but less

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 339 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 222 of 1017 PageID 7952
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 338 of 1803 PageID 11084

65

```
 1   withholding," or other caveats.
 2                   And the question that was asked to
 3   Mr. Dondero is the -- right now the assets that are --
 4   and I apologize, I don't -- I can grab the quotation.
 5   I don't have it right in front of me.  But the key
 6   part was that it was predicated on right now, what
 7   happens right now if there's a final judgment.
 8                   So -- and, again, this is Mr. Dondero
 9   who's an individual defendant who is not being
10   questioned as a representative of Highland.  And what
11   they want to do is take that statement and say this is
12   an unequivocal statement that was binding Highland.
13   And it just doesn't rise to that level under the legal
14   standard.
15                   And, you know -- but, moreover --
16   again, because what -- Mr. Dondero was reading the
17   escrow agreement on the stand as a layman, but that's
18   really more significantly the point, is that if the
19   alleged promises are subject to termination by a
20   contract -- I know this is in our pleading, the
21   *TrueBlue HRS Holding* case -- promissory estoppel does
22   not apply where a fully integrated and enforceable
23   contract governs the promise at issue.
24                   And that's the issue, is the contract
```

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 340 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 223 of 1017   PageID 7953
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 339 of 1803   PageID 11085

66

1   is the contract; it means what it means.  And the --

2   unless there -- I don't believe, Your Honor, that they

3   even alleged that there is some promise, unequivocal

4   promise, that Mr. Dondero or Mr. Klos made that was

5   not subsumed by the escrow agreement.  And that's

6   really the basis of their claim here.

7                    They also have to show that the claim

8   is necessary to avoid injustice.  And obviously, they

9   have brought a fraudulent transfer claim and an unjust

10  enrichment claim arising out of the same course of

11  conduct, that they claim these representations are

12  related to those claims.  And I think the case law is

13  fairly clear on this, that this is exactly the type of

14  situation where a promissory estoppel claim is not

15  necessary to avoid injustice.

16                   THE COURT:  But is the conclusion to

17  be taken from your argument that nothing can ever be

18  pled in the alternative to a promissory estoppel

19  claim?

20                   MR. KATZ:  No, not at all.  But I

21  believe that you would have to have a set of

22  circumstances where there wasn't a fully integrated

23  enforceable contract, and that the underlying promises

24  weren't about the interpretation of that contract.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 341 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 224 of 1017 PageID 7954
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 340 of 1803 PageID 11086

67

1              And then, finally, Your Honor, I'm

2    going to use the word "conclusory" again, that they --

3    well, actually not even conclusory, Your Honor.  They

4    didn't even plead that Highland intended to induce

5    reliance or that Highland should have reasonably

6    expected to induce reliance by Mr. Daugherty.

7              And I don't think that's necessarily

8    an accident.  I think that's because the statements

9    that they're relying on were not statements that were

10   made on behalf of Highland.  They're individual

11   statements.  And I think that it would be fairly

12   tortured to say otherwise.

13             So, Your Honor, again, for each of

14   those reasons, we don't think that they have pled any

15   reasonably conceivable set of circumstances that could

16   support the promissory estoppel claim.

17             THE COURT:  Thank you.

18             MR. KATZ:  Thank you, Your Honor.

19             MR. UEBLER:  Good afternoon again,

20   Your Honor.

21             THE COURT:  Good afternoon.

22             MR. UEBLER:  I'll start with the

23   promise that was made.  And before I do, I think I

24   heard Mr. Katz talking about the standard to prevail

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 342 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 225 of 1017 PageID 7955
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 341 of 1803 PageID 11087

68

1   on a claim.  And I understand we're a little bit late

2   in the game of this lawsuit.  But this is a 12(b)(6)

3   motion and the standard is reasonably conceivable.

4                  So I just want to reset where we are

5   on this motion and talk about the promise that was

6   made, briefly.  So what was the promise?  The promise

7   was Jim Dondero testifying at trial, under oath, that

8   Mr. Daugherty's assets would be held in escrow and

9   released to him through HERA if he won in Texas.  I

10  mean, it was as simple as that.

11                 You may have been left with the

12  impression from Mr. Katz's presentation that the line

13  of questioning was about the terms of the escrow

14  agreement.  I can save all of us and just refer to the

15  pages of the testimony, or I'd be glad to read the

16  preceding three or four questions to set that up.  But

17  it was not interpreting the escrow agreement.  And

18  Mr. Katz didn't have the testimony on hand, but I do.

19  And the question was:

20                 "Question:  Okay, so -- so if

21  Mr. Daugherty somehow prevails in his lawsuit against

22  Patrick Boyce and Lane Britian and HERA, what happens

23  to Mr. Daugherty's interest that's being escrowed

24  right now with a third-party escrow agent?

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 343 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 226 of 1017   PageID 7956
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 342 of 1803   PageID 11088

69

1                    "Answer:    They go to him.

2                    "Question:    I'm sorry?

3                    "Answer:    They go to him via to HERA

4         and then to him."

5                    Is that promise consistent with the

6         escrow agreement?  Yes.  Is that promise separate and

7         apart from the escrow agreement?  Yes.  Mr. Dondero

8         wasn't there interpreting a contract.  He was there

9         making a promise to Daugherty and to the jury.

10                   And just as we allege in paragraph 131

11        of our complaint, it was the reasonable expectation of

12        Highland, when that promise was made, that it was

13        going to be relied on.

14                   THE COURT:  Tell me more how the

15        statement was separate and apart from the contract.

16                   MR. UEBLER:  The statement is separate

17        and apart from the contract because I think --

18        Mr. Katz would be the first one to tell you that

19        Mr. Daugherty was not a party to the escrow agreement.

20        Mr. Daugherty, on the face of it, has no rights under

21        that escrow agreement.

22                   So this idea that Highland proposes

23        that because there's a contract out there that also

24        addresses the subject matter of the promise, the

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 344 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 227 of 1017 PageID 7957
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 343 of 1803 PageID 11089

70

1   promisee is, therefore, precluded from relying on that

2   promise, it just -- it doesn't hold water.  They

3   don't -- they didn't cite any cases.

4            We said it's not the law of Delaware

5   and never should be.  Highland shouldn't be allowed to

6   contract with Abrams & Bayliss and then use that

7   contract to say that a promise made to Daugherty that

8   Daugherty seeks to enforce, that is -- you know,

9   follows the terms of that contract but doesn't

10  expressly give any rights to Daugherty, that's just --

11  that's not an argument that the Court should accept,

12  in our view.  So that's why I say it's separate from

13  the contract.

14            And that also gets into the

15  alternative claim argument, too.  Are we entitled to

16  bring promissory estoppel and a fraudulent transfer

17  claim and an unjust enrichment claim?  I think the

18  *Chrysler* case in the Supreme Court settled that

19  question a long time ago.  And I think Rule 8 of this

20  court does, too.

21            So, of course, there's overlap in what

22  was promised and what's in the escrow.  Although, I

23  will point out, the escrow -- Mr. Katz said something

24  like -- he referred to a host of conditional

Appellee Appx. 00337
Appx. 03202
007145

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 345 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 228 of 1017    PageID 7958
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 344 of 1803   PageID 11090

71

 1    circumstances in the escrow agreement.  And I think

 2    his point was paragraph 5 and paragraph 10 that they

 3    had relied on when Abrams & Bayliss resigned.  Well,

 4    you won't find any of that in the promise that was

 5    made by Jim Dondero under oath to Pat Daugherty and

 6    the jury.  So whatever conditional circumstances may

 7    be in that contract, they're not in that promise.

 8                    And the notion that Jim Dondero was

 9    testifying in his individual capacity, I think we

10    debunked that in Exhibit A to our answering brief --

11    which was Highland's own witness list -- that provided

12    an entire paragraph of what Mr. Dondero would be

13    testifying about, including testimony in support of

14    Highland's and Cornerstone's claims against Daugherty

15    and the damages suffered and the third-party

16    defendants' defenses to claims asserted against them.

17                    So Jim Dondero is Highland.  He is

18    HERA.  He's HERA ERA management.  He controls them

19    all.  Mr. Katz pointed out that the closing argument

20    by HERA's lawyer in Texas was just HERA's lawyer.

21    Well, Jim Dondero controls HERA, just as he controls

22    Highland.  So I view that as a distinction without a

23    difference.

24                    But what that closing argument did was

Appellee Appx. 00338
Appx. 03203
007146

72

1   reaffirm the promise -- I thought I had it here.  So

2   what was said on closing argument by HERA's counsel,

3   just after Jim Dondero made the promise, was "... if

4   Pat Daugherty happens to prevail in his lawsuit

5   against Lane, Patrick and HERA you heard Jim Dondero

6   testify he gets his interest, which is currently

7   escrowed in the third-party escrow account, all of

8   it."

9              Then we had the other promise, which

10  was that September -- September of 2014, the Klos

11  affidavit.  It restated the promise.  This gets to the

12  reasonableness of the reliance of Daugherty's

13  promise -- the promise to Daugherty.  He kept hearing

14  this.

15             And the idea that Daugherty should

16  have somehow foreseen in either the six weeks between

17  when Highland sprung the escrow agreement on him

18  before trial or when Dondero testified or when Klos

19  submitted his affidavit -- by the way, as the senior

20  finance of Highland Capital -- that Daugherty should

21  have foreseen two years from now when he went to pay

22  the judgment that Highland was going to break that

23  promise.

24             So the idea that Daugherty should have

Appellee Appx. 00339
Appx. 03294
007147

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 347 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 230 of 1017    PageID 7960
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 346 of 1803    PageID 11092

73

1    done something between December 2013 and December of

2    2016, I think entirely misses the point of our claim.

3    The reliance that we allege -- and it's paragraph 133

4    of our complaint -- is "In further reliance on the

5    promises of Highland Capital and its agents, on

6    December 14, 2016, nine days after Highland Capital

7    secretly obtained the Escrow funds, Daugherty wired

8    approximately $3.2 million in cash to Highland Capital

9    in satisfaction of its award of attorneys' fees in the

10   Texas Action."

11                    That was the reliance.  What could

12   have been done, other than a cash payment, Daugherty

13   could have just engaged in self-help.  He could have

14   paid the difference between the 2.6 and the 2.8 of the

15   judgments.  He could have not paid anything at all.

16   He at least should have had the chance to go to court

17   like the petitioner did in the *Bonham Bank* case that

18   we cite from Texas to explain to a judge why, under

19   these circumstances, even though there are three

20   different litigants involved, these claims should be

21   offset.  But he didn't even get that chance because he

22   relied on Highland's promises and he wired the full

23   amount.  They took away that chance from him.

24                    We don't have to prove today whether

Appellee Appx. 00340
Appx. 03205
007148

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 348 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 231 of 1017   PageID 7961
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 347 of 1803   PageID 11093

74

 1  he would have won on that setoff claim in Texas or

 2  anywhere else.  We just have to prove that it's

 3  reasonably conceivable that he was deprived of that

 4  chance because he reasonably relied, to his detriment,

 5  on a promise that was made under oath and repeated.

 6              In their opening brief, the defendants

 7  stated that "Injustice can (and should) be avoided

 8  through collection efforts in the Texas Action, which

 9  Daugherty has not even attempted to pursue, making

10  this claim premature."

11              I just wanted to point out, this was

12  in Exhibit B to Highland's own opening brief.  They

13  attached Mr. Daugherty's interrogatory responses.  And

14  if you look at Interrogatory 36 on page 25,

15  Mr. Daugherty stated that "... apart from filing this

16  action to collect his Texas judgment, he filed for a

17  writ of execution in Texas on July 7, 2017, which was

18  unsuccessful because Highland Capital claimed HERA had

19  no assets.  The return of service was dated

20  September 26, 2017."

21              I think that's totally irrelevant to

22  the questions before the Court, but I wanted to point

23  out that Mr. Daugherty did, in fact, attempt some

24  collection efforts in Texas and those were

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 349 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 232 of 1017 PageID 7962
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 348 of 1803 PageID 11094

75

```
 1   unsuccessful.
 2                   I'd also like to point out that in
 3   addition to being able to plead alternative claims,
 4   this is one of those cases where injustice can only be
 5   avoided through the enforcement of this promise,
 6   notwithstanding the other claims out there.  The
 7   injustice to be avoided is allowing Highland Capital
 8   to walk away with both judgments from the Texas
 9   action.  They got Daugherty's 3.2 million, and they
10   got his HERA assets.  And that's the injustice to be
11   avoided.
12                   When you and Mr. Katz were discussing
13   this element, he referred to a fully integrated
14   contract.  Again, he would be the first to tell you,
15   I'm sure, that Daugherty has no rights under that
16   fully integrated contract.  So the fact that there is
17   a similar contract out there is not relevant to the
18   analysis.
19                   That's all I have, Your Honor.
20                   THE COURT:  Thank you.
21                   MR. UEBLER:  Thank you.
22                   MR. KATZ:  Your Honor, can I just
23   address a couple points?
24                   THE COURT:  Yes.
```

Appellee Appx. 00342

Appx. 03295

007150

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 350 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 233 of 1017    PageID 7963
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 349 of 1803  PageID 11095

76

1                MR. KATZ:  For clarity purposes,

2    Counsel -- this is the second time they've read the

3    statement from HERA's counsel during the closing

4    argument.  That was not part of the statements that

5    were alleged to be part of the detrimental reliance in

6    either the complaint or in the response to the motion

7    to dismiss.

8                And I think that's significant, again,

9    because Counsel is certainly correct that what they

10   say is that Daugherty would not have paid the judgment

11   against him by Highland.  But their explanation of

12   what that means is that he would have sought offset or

13   sought to invalidate the escrow agreement, both of

14   which could only have been done, been sought, during

15   trial.  I suspect that's why they are not relying on

16   the statement that was made at closing argument where

17   it would have been too late for them to make those

18   allegations.

19               Highland had a judgment, a fully

20   perfected final judgment, collectible judgment that

21   Mr. Daugherty paid.  And from the motion to dismiss

22   perspective, claiming that he would have filed either

23   or both of two things that were barred by *res judicata*

24   does not provide the basis to avoid -- where there's a

Appellee Appx. 00343

007151

77

```
 1   reasonably conceivable set of circumstances that those
 2   allegations could support to avoid a motion to
 3   dismiss.
 4                And, again, we're really just talking
 5   about Jim Dondero's statement because, as Counsel
 6   recognized, the Klos statement was made, I believe,
 7   roughly five months after the -- four or five months
 8   after the final judgment was entered.
 9                And then, finally, lastly, I just want
10   to touch on the escrow agreement.  Of course we
11   recognize Mr. Daugherty is not a party to that
12   agreement.  But Mr. Daugherty's case is that he is
13   asserting rights under that escrow agreement.  He is
14   certainly saying that there was a transfer under that
15   agreement and that that agreement required the assets,
16   the money being held pursuant to that escrow
17   agreement, to go to HERA, which then Mr. Daugherty as
18   the shareholder of HERA would have had rights to.
19                And, you know, we disagree with some
20   of the underlying factual basis.  We don't agree that
21   there was a transfer.  But I think counsel for
22   Mr. Daugherty would certainly not say that there's not
23   a fully enforceable promise in that escrow agreement
24   that they are seeking relief under.
```

78

```
 1                    And that's -- and just as importantly,
 2    Mr. Dondero's statement was exclusively an
 3    interpretation of that promise.  And that's why -- and
 4    I think that's exactly what the TrueBlue case is
 5    referring to.  And there's a fully integrated contract
 6    that has the promise that legally and factually
 7    determines what the rights under that contract are.
 8                    And Mr. Dondero's interpretation of
 9    that contract -- even if it's the exact same as the
10    contract or even if it's different than the
11    contract -- doesn't change that the claim is pursuant
12    to the contract and not for promissory estoppel.
13                    THE COURT:  What is your understanding
14    of Mr. Daugherty's ability to sue to enforce the
15    escrow agreement in a way that benefits him?
16                    MR. KATZ:  Well, he is a shareholder
17    of HERA.  And as a shareholder of HERA -- I mean, I'd
18    have to think through all the res judicata, collateral
19    estoppel, statute of limitations issues that all have
20    come out about all the issues that have been
21    litigated.
22                    THE COURT:  I just mean from the terms
23    of the contract.
24                    MR. KATZ:  I don't believe that
```

Appellee Appx. 00345

Appx. 03219

007153

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 353 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 236 of 1017 PageID 7966
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 352 of 1803 PageID 11098

79

1   Mr. Daugherty is a third-party beneficiary of the

2   contract, if that's Your Honor's question.  He's

3   certainly not a direct party to the contract, but he

4   is a shareholder of HERA.  And their allegations are

5   that Highland was contractually obligated to send

6   money to HERA under that agreement.

7                   I think there are potentially

8   technical legal issues under that.  That's, of course,

9   not the claim that Mr. Daugherty has brought.  And --

10  but if Mr. Daugherty had any rights, it would be

11  through HERA.

12                  THE COURT:  So is it your

13  understanding that the point of the doctrine that

14  you're relying on, that there can't be both a contract

15  and a claim for promissory estoppel, is that those

16  rights substantially overlap?

17                  MR. KATZ:  I would suspect that's

18  probably the policy reason behind those decisions.

19                  THE COURT:  So if Mr. Daugherty

20  doesn't have contractual rights under the escrow

21  agreement, why does that knock out his promissory

22  estoppel claim?

23                  MR. KATZ:  Because it's the same --

24  because whatever rights he has under the contract,

Appellee Appx. 00346

007154

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 354 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 237 of 1017 PageID 7967
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 353 of 1803 PageID 11099

80

1 whether he has rights or not, are no different than

2 any rights he would have vis-a-vis Mr. Dondero's

3 interpretation of what that contract said, what that

4 contractual language says.

5                    THE COURT:  Go ahead.

6                    MR. KATZ:  I think that the policy is

7 is not to create quasi-contractual claims when there

8 is a contract, regardless of who's the party to the

9 contract.

10                    And, actually, I think it's even --

11 there's no wiggle room around this situation because

12 it's not -- Mr. Dondero was -- I mean, I think the

13 quote was, "They go to Mr. Daugherty through HERA" is

14 the quote.  He wasn't saying something -- there's not

15 been an allegation, for example, that Mr. Dondero's

16 statement or Mr. Klos' statement created a separate

17 contract between Mr. Dondero or Mr. Daugherty.

18                    I mean -- and that's not what -- I

19 mean, there hasn't been an allegation that that's what

20 they were saying -- that Mr. Dondero was saying that

21 or Mr. Klos was saying that.  The allegation is they

22 were saying that's what the contract, the escrow

23 agreement, means.  And that's why you can't have a

24 separate claim, because the contract means what it is

Appellee Appx. 00347
Appx. 03212
007155

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 355 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 238 of 1017   PageID 7968
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 354 of 1803   PageID 11100

81

1    and the contract determines the rights.

2                  THE COURT:  I understand.

3                  MR. KATZ:  Thank you, Your Honor.

4                  THE COURT:  Thank you.

5                  MR. UEBLER:  May I, briefly?

6                  THE COURT:  Briefly.

7                  MR. UEBLER:  Just to be clear, Your

8    Honor, we very much rely on the Klos statement as a

9    separate promise on behalf of Highland in the

10   affidavit.  We think it also supports the

11   reasonableness of the reliance on Mr. Dondero's

12   promise on behalf of Highland.  But we view the Klos

13   affidavit as part of the promise generally.

14                  With respect to the closing argument

15   by HERA, we didn't use it sooner because we just --

16   actually, I have to give credit where credit is due --

17   my colleague, Mr. Christensen just found it.  We

18   didn't try the Texas case, so we did find it in the

19   record.

20                  And fortunately for us, Highland

21   agrees on pages 13 and 14 of their own motion to

22   dismiss that the Court can "[consider] additional

23   materials from related litigation that were not

24   attached to the complaint if the plaintiff relied on

Appellee Appx. 00348
Appx. 03213
007156

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 356 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 239 of 1017 PageID 7969
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 355 of 1803 PageID 11101

82

1    those materials in casting his complaint, as Daugherty

2    has done with regard to the Texas Action."

3                    The last paragraph on page 14 goes on

4    to say, "To the extent the Court finds that the Texas

5    Action materials are not already subject to

6    consideration based on Daugherty's extensive reliance

7    on them, Defendants respectfully request that the

8    Court take judicial notice of the documents under

9    Delaware Rule of Evidence 202(d)(2)."

10                   So we submit that the Court certainly

11   can consider the trial transcript from the Texas

12   action as further support for the reasonableness of

13   Mr. Daugherty's reliance.

14                   And my final point with respect to the

15   escrow agreement and the notion -- I think that what

16   Mr. Katz said is that Daugherty, in his view, has no

17   direct rights under that agreement.  The only real

18   direct relevance of the escrow agreement with respect

19   to the promissory estoppel claim is that it's even

20   more evidence of the reasonableness of Mr. Daugherty's

21   reliance on the promise because it's consistent with

22   that promise.

23                   Thank you, Your Honor.

24                   THE COURT:  Thank you.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 357 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 240 of 1017   PageID 7970
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 356 of 1803   PageID 11102

83

1                    Anything to -- Mr. Katz, I'll give you
2      the last word.
3                    MR. KATZ:  No, Your Honor.
4                    Just to address Counsel's last point
5      about just finding the statement.  You know, again, I
6      think that the issue is what did Mr. Daugherty
7      actually rely on.  Their claim is that when he wired
8      $3.2 million -- not what statements Counsel has found
9      in the record recently that could be retroactively
10     applied that way.
11                   And Counsel's -- again, the complaint
12     that is in front of Your Honor that has the
13     allegations rely on the two statements and is very
14     clear that -- it is explained in their briefing --
15     that the remedies -- that the detrimental reliance was
16     forbearance from taking action in the Texas lawsuit.
17                   So anything that occurred anytime
18     after they could raise issues in a Texas lawsuit could
19     not have been a basis for detrimental reliance.
20                   THE COURT:  Thank you.
21                   I'm going to take a recess.  It will
22     be at least 20 minutes.  So stretch your legs, do
23     whatever.  It'll probably be longer than that.  But --
24     thanks for your patience, but it's faster this way in

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 358 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 241 of 1017   PageID 7971
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 357 of 1803   PageID 11103

84

1    the short term.

2                    So we are in recess.

3        (Recess taken from 3:35 p.m. until 4:18 p.m.)

4                    THE COURT:  Thank you for your

5    patience.

6                    I'm going to start with the motion for

7    a status quo order.  It is denied.  We have some time

8    constraints this afternoon, so I will cut to the

9    chase.  Daugherty has not established a threat of

10   imminent irreparable harm as he must.  It is clear

11   that Daugherty is pursuing this relief now based on

12   what happened in the *Redeemer* case.  This complaint

13   was filed in July 2017, and he did not seek the relief

14   that he's now seeking until after the papers on the

15   status quo order dispute were filed in the *Redeemer*

16   case.  And Daugherty cites Highland's submissions in

17   that case in his brief.

18                   I disagree with Daugherty's reading of

19   the *Redeemer* papers as indicating that Highland is in

20   "severe financial distress" and is "unable to satisfy"

21   the arbitration judgment at issue there.  And the

22   facts are very different as between the two cases.

23   Before going to arbitration, there were issues

24   involving control over assets that led to Highland

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 359 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 242 of 1017   PageID 7972
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 358 of 1803   PageID 11104

85

 1    making representations to the Court in the *Redeemer*

 2    case.  And in the more recent request for a status quo

 3    order related to confirming an arbitration judgment,

 4    there was no separate claim that this court needed to

 5    adjudicate, like Daugherty's fraudulent transfer claim

 6    here.

 7                    And, finally, the *Redeemer* parties

 8    ultimately stipulated to a status quo order.  So I

 9    don't think that anything that this court did in

10    entering the agreed-upon status quo order is helpful

11    in deciding whether to issue one in this case.

12                    Daugherty says that Highland has a

13    pattern of avoiding judgments, but has given me no

14    reason to think that Highland is going to do something

15    between now and a post-trial opinion that would make

16    it incapable of satisfying a judgment, nor is there

17    anything in the *Redeemer* case that leads me to believe

18    that.

19                    Quite frankly, if Highland is as good

20    at avoiding judgments as Daugherty claims, Highland

21    would have already moved the assets.  Daugherty, in

22    his reply, touches on that point and raises concerns

23    about whether the assets have already been

24    transferred.  He used a metaphor about the straw

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 360 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 243 of 1017 PageID 7973
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 359 of 1803 PageID 11105

86

1 breaking the camel's back. I'm going to use a

2 different ungulate. He's provided no reason to

3 believe the horse is not already out of the barn or

4 that the horse is going to imminently flee the barn.

5 So I fully appreciate that Daugherty

6 says that this is what happened to him in Texas, and

7 I've indicated before that I agree with Vice

8 Chancellor Glasscock's sentiment that what happened

9 here fails more than the smell test. But that doesn't

10 mean that there is a sufficient imminent threat that

11 it's going to happen here with Highland.

12 I also distinguish this case from Vice

13 Chancellor Glasscock's entry of a status quo order in

14 the *Trussway* matter, which admittedly was, in part,

15 based on Highland's "prior history." In that ruling,

16 Vice Chancellor Glasscock noted the unique appraisal

17 remedy that was at issue there, and distinguished that

18 property right -- which is meant to substitute for a

19 stockholder's ability to insist on unanimity in a

20 merger -- from recovery in a tort or contract case.

21 Daugherty is seeking the more common sort of recovery

22 here, so I do not find *Trussway* instructive.

23 So, in sum, because Daugherty's motion

24 for a status quo order is based on a recent

Appellee Appx. 00353
Appx. 02218
007161

87

1    development that does not support a conclusion that

2    Daugherty faces imminent irreparable harm, the motion

3    for a status quo order is denied.

4                    Mr. Christensen, do you have any

5    questions about that?

6                    MR. CHRISTENSEN:  No, I do not.

7                    THE COURT:  Okay.  Anything from DLA?

8                    MR. KATZ:  No, Your Honor.

9                    THE COURT:  Thank you.

10                    Moving on to the motion to dismiss.

11    Highland's motion to dismiss Count IX of the amended

12    complaint is denied.  Count IX is a claim for a

13    promissory estoppel.  And to state a claim for

14    promissory estoppel, a plaintiff must plead four

15    elements.

16                    The first is that a promise was made.

17    The second is that it was the reasonable expectation

18    of the promisor to induce action or forbearance on the

19    part of the promisee.  The third is the promisee

20    reasonably relied on the promise and took action to

21    his detriment.  The fourth is that the promise is

22    binding because injustice can be avoided only by

23    enforcement of the promise.  That's all from the

24    *Chrysler* case out of the Supreme Court in 2003.

Appellee Appx. 00354

Appx. 02319

007162

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 362 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 245 of 1017   PageID 7975
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 361 of 1803   PageID 11107

88

1          On Highland's motion to dismiss, I

2     applied a reasonable conceivability standard of

3     Rule 12(b)(6).  Under that standard, I must accept all

4     well-pleaded factual allegations as true, accept even

5     vague allegations in the complaint as well-pleaded if

6     they provide the defendant notice, draw all reasonable

7     inferences in favor of the plaintiff, and deny the

8     motion unless the plaintiff could not recover under

9     any reasonably conceivable set of circumstances

10     susceptible of proof.  That familiar standard is from

11     *Century Mortgage Company v. Morgan Stanley.*

12          Applying this standard, plaintiff has

13     adequately pled the four elements.  First, Highland

14     made promises through representations it and its

15     agents made in the Texas action.  Highland, through

16     testimony, explained that Daugherty would receive the

17     escrowed assets upon a judgment being finalized.

18          Daugherty cites testimony from James

19     Dondero, Highland's cofounder and president.  On

20     direct examination, Dondero was asked what would

21     happen to Daugherty's interest that was being held in

22     escrow, and Dondero stated that it would go to

23     Daugherty via HERA if he won.  This testimony is cited

24     in paragraphs 43 and 129 of the complaint.

Appellee Appx. 00355
Appx_02229
007163

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 363 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 246 of 1017 PageID 7976
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 362 of 1803 PageID 11108

89

```
1              Highland tries to distance itself from
2   Dondero, but it cannot do so at this stage.  Highland
3   says Dondero was testifying in a personal capacity.
4   But the witness list Highland filed in the Texas
5   action shows that is not the case.  That is Exhibit A
6   to Daugherty's answering brief.  Highland had no
7   response to this in its reply brief, beyond
8   reiterating its original argument that Dondero was not
9   speaking on Highland's behalf.
10             Based on the allegations of the
11  complaint, including Dondero's role, it is reasonably
12  conceivable he was speaking on behalf of Highland.
13             Other support for the alleged promise
14  comes from an affidavit attached as Exhibit I to the
15  complaint from David Klos.  Klos submitted the
16  affidavit and stated he had "... personal knowledge of
17  the facts stated in this affidavit as the Senior
18  Manager of Finance for Highland Capital ..." and
19  because he oversaw accounting relating to HERA.  Klos
20  reiterated in his affidavit what the escrow agreement
21  says, and Dondero testified to, which is that after a
22  final nonappealable judgment, A&B, as the escrow
23  agent, would transfer the deposit assets to HERA.
24             Highland also tries to distance itself
```

Appellee Appx. 00356
Appx. 02324
007164

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 364 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 247 of 1017  PageID 7977
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 363 of 1803  PageID 11109

90

1   from Klos.  And it cannot do so, as the document

2   presented to the Texas court states Klos was providing

3   the affidavit in his capacity as Highland's Senior

4   Manager of Finance.  At this stage, that is

5   sufficient.

6                    Together, these allegations are

7   sufficient to establish that Highland made a promise

8   that the assets would be held in escrow and released

9   to Daugherty, via HERA, if Daugherty won in Texas.

10                   Second, the reasonable expectation of

11  Highland as the promisor was to induce action or

12  forbearance on the part of Daugherty as promisee.

13                   In briefing, Highland says the

14  statements were not directed to Daugherty, "... but

15  rather [to] the jury, the judge, legal counsel, the

16  public, and so forth."  That's a quote from page 20 of

17  Highland's reply.  It simply makes no sense to say

18  that the statements were directed to everyone else

19  involved in the legal proceeding -- indeed, in the

20  world by virtue of including "the public" -- but not

21  Daugherty, who had the greatest interest in that

22  proceeding.  It is reasonably conceivable the

23  reasonable expectation of someone discussing the

24  escrow agreement, as Highland did, would have been to

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 365 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 248 of 1017 PageID 7978
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 364 of 1803 PageID 11110

91

 1    induce action or forbearance by their adversary in the

 2    litigation.

 3                  Third, it is reasonably conceivable

 4    that Daugherty reasonably relied on the promise and

 5    took action to his detriment.

 6                  Daugherty could have pursued other

 7    strategies if the escrow was not in place.  Daugherty

 8    paid a judgment in the same case to Highland, which he

 9    alleges was in the amount of $3.2 million.  If

10    Daugherty knew what would happen with the escrow, he

11    could have fought tooth and nail for an offset of the

12    judgment amounts.

13                  Highland focuses on the availability

14    of a triangular offset in this situation, asserting

15    that even if HERA owed Daugherty money, Daugherty was

16    legally unable to offset the judgment he owed Highland

17    by what he was owed from HERA.  I think that misses

18    the point, which is that Daugherty forewent even

19    trying to obtain the offset, and bringing the issue to

20    the attention of the Texas court.

21                  He could have argued for other

22    provisions in the final judgment, but he didn't.  He

23    paid his judgment and expected HERA and Highland would

24    do the same as set forth in the escrow agreement.

Appellee Appx. 00358
Appx. 02223
007166

92

1                    Other members of this court have
2      adopted a "no-chumps policy," meaning that good guys
3      should not feel like chumps for following the rules.
4      Daugherty played the game straight, and alleges
5      Highland and HERA didn't.  It is at least reasonably
6      conceivable that Daugherty pursued the strategy he did
7      because of the promises Highland made during the
8      course of the litigation.
9                    And that reliance was reasonable.
10     Highland says Daugherty should have expected the worst
11     because the language of the escrow agreement allowed
12     the escrow agent to resign at any time, and so it was
13     never a sure thing that the assets would be available
14     to Daugherty.
15                   In its reply, Highland says there was
16     never any promise "... that the Escrow Agreement would
17     never be terminated or that the Deposit Assets would
18     never be transferred back to Highland ...."  That
19     reflects a dim view of the world, the way adversaries
20     should evaluate the representations and promises made
21     during litigation, and how the people making those
22     promises should conduct themselves.  Daugherty has
23     adequately pled it was reasonable for him to rely on
24     the statements he's identified.

Appellee Appx. 00359

Appx. 02224

007167

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 367 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 250 of 1017 PageID 7980
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 366 of 1803 PageID 11112

93

```
 1              Fourth and finally, it is reasonably
 2   conceivable that the promise is binding because
 3   injustice can be avoided only by enforcement of the
 4   promise.
 5              Daugherty has made the point that
 6   Highland walked away from the Texas litigation with
 7   the benefit of both judgments.  It received the assets
 8   supposedly held in escrow to satisfy the judgment for
 9   Daugherty, and it received payment from Daugherty to
10   satisfy the judgment against him.
11              Black's Law Dictionary defines
12   "injustice" as "an unjust state of affairs;
13   unfairness."  As myself and Vice Chancellor Glasscock
14   have indicated, Daugherty's allegations raise serious
15   concerns over the fairness of how things played out in
16   Texas.  It may be that the only way to avoid injustice
17   is to enforce the promises.
18              It is not fatal to Daugherty that he
19   has pled alternative theories of relief.  Our Rule 8
20   allows it, and our Supreme Court has blessed doing so
21   for promissory estoppel in the *Chrysler v. Chaplake
22   Holdings* case.  At the pleadings stage, those
23   alternative theories of relief can go forward.
24              Highland also claims promissory
```

Appellee Appx. 00360
Appx. 02225
007168

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 368 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 251 of 1017 PageID 7981
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 367 of 1803 PageID 11113

94

```
 1    estoppel is not needed to prevent injustice because

 2    the alleged promises are incorporated within the

 3    escrow agreement, an enforceable contract.  But

 4    Daugherty is not a party or a third-party beneficiary,

 5    and so cannot sue under the contract's terms.  For

 6    those reasons, the motion to dismiss is denied.

 7                    Mr. Katz, any questions?

 8                    MR. KATZ:  No, Your Honor.

 9                    THE COURT:  Anything from you,

10    Mr. Uebler?

11                    MR. UEBLER:  No, Your Honor.

12                    THE COURT:  I'd like to, then, talk

13    about how we're going to get the summary judgment

14    briefing done in time for trial and in time for me to

15    have a minute to think about it.

16                    MR. KATZ:  Your Honor, we conferred --

17    my colleague conferred with Mr. Uebler this morning.

18    I think we've worked out a schedule.

19                    THE COURT:  How long does that

20    schedule leave me to think about it?

21                    MR. UEBLER:  Let me take a stab at

22    this, Your Honor, and see if it makes any sense to

23    you.  So it's my understanding that the defendants are

24    going to cross-move, or Highland -- it's a claim
```

Appellee Appx. 00361
Appx. 02226
007169

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 369 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 252 of 1017   PageID 7982
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 368 of 1803   PageID 11114

95

1   against Highland.  Highland will cross-move for

2   summary judgment, and we will receive an answering

3   brief/opening brief by June 14th.  We'll reply by

4   June 28th.  And then looks like July 17th will be the

5   final brief.

6                   And I'm sure I speak for all the

7   parties when I say we have no intention of imposing a

8   burden on the Court to resolve that motion prior to

9   trial.  I think -- at least my view, and Mr. Katz and

10  Mr. Reed can chime in -- we don't necessarily need to

11  resolve the summary judgment/indemnification claim

12  before trial because there's really not that much, if

13  any, issue of fact to try regarding indemnification.

14                  I would propose that we resolve on the

15  papers, when the Court's able to do so, the issue of

16  entitlement.  And then, to the extent there's an issue

17  of allocation or reasonableness, we can get together

18  and propose something similar to Vice Chancellor

19  Laster's *Fitracks* opinion.  That was an advancement

20  case, but I would envision something similar here.

21                  So we're working in parallel and not

22  burdening anybody prior to trial on those issues.

23                  THE COURT:  Anything to add?

24                  MR. KATZ:  No, Your Honor.

Appellee Appx. 00362
Appx. 03225
007170

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 370 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 253 of 1017   PageID 7983
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 369 of 1803   PageID 11115

96

1              THE COURT:  All right.  That works for

2    me, then, especially with the logical conclusion that

3    this can just kind of float in parallel to the real

4    merits issues to be handled at trial.

5              Anything else that we need to discuss

6    today while we're all together?

7              MR. KATZ:  Not from our side.

8              THE COURT:  We pretty much handled

9    every aspect of the case today.  Thank you, all, for

10   your presentations, they were helpful.  And we'll be

11   in touch.

12             We're adjourned.

13             (Court adjourned at 4:33 p.m.)

14                    - - -

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

Appellee Appx. 00363
Appx. 03228
007171

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 371 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 254 of 1017    PageID 7984
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 370 of 1803    PageID 11116

97

1                        CERTIFICATE

2

3              I, KAREN L. SIEDLECKI, Official Court

4   Reporter for the Court of Chancery of the State of

5   Delaware, Registered Merit Reporter, and Certified

6   Realtime Reporter, do hereby certify that the

7   foregoing pages numbered 3 through 96 contain a true

8   and correct transcription of the proceedings as

9   stenographically reported by me at the hearing in the

10  above cause before the Vice Chancellor of the State of

11  Delaware, on the date therein indicated, except for

12  the rulings at pages 3 through 19 and 84 through 94

13  which were revised by the Vice Chancellor.

14              IN WITNESS WHEREOF I have hereunto set

15  my hand at Wilmington, this 22nd day of May, 2019.

16

17

18

19              /s/Karen L. Siedlecki

20   ----------------------------
           Karen L. Siedlecki
21        Official Court Reporter
         Registered Merit Reporter
22       Certified Realtime Reporter

23

24

CHANCERY COURT REPORTERS

Appellee Appx. 00364
Appx. 03229
007172

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 372 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 255 of 1017 PageID 7985
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 371 of 1803 PageID 11117

# APPENDIX 5

**Appellee Appx. 00365**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 373 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 256 of 1017    PageID 7986
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 372 of 1803   PageID 11118

EFiled:  Jul 08 2019 04:21PM EDT
Transaction ID 63518449
Case No. 2017-0488-MTZ

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                    )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )       C.A. No. 2017-0488-MTZ
                                      )
HIGHLAND CAPITAL MANAGEMENT,          )
L.P., HIGHLAND EMPLOYEE               )
RETENTION ASSETS LLC,                 )
HIGHLAND ERA MANAGEMENT LLC,          )
and JAMES DONDERO,                    )
                                      )
        Defendants,                   )
                                      )
    and                               )
                                      )
HIGHLAND EMPLOYEE                     )
RETENTION ASSETS LLC,                 )
                                      )
        Nominal Defendant.            )

### ORDER DENYING APPLICATION TO
### CERTIFY INTERLOCUTORY APPEAL

WHEREAS:

A.     Plaintiff Patrick Daugherty was a partner and senior executive of

Defendant Highland Capital and certain of its affiliates from 1998 until his

resignation in 2011.

B.     Highland sued Daugherty in Texas, and Daugherty countered with

claims against Highland and Highland Employee Retention Assets LLC ("HERA")

(the "Texas Action").

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 374 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 257 of 1017 PageID 7987
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 373 of 1803 PageID 11119

C.      During the course of the Texas Action, Defendants represented to the
Texas court that Highland had placed Daugherty's HERA interests, worth
approximately $3.1 million, in escrow with Abrams & Bayliss LLP as escrow
agent.

D.      Highland received a judgment against Daugherty, and Daugherty
received a judgment against HERA.  Daugherty paid the judgment against him.
HERA did not pay the judgment against it.  The day after the Texas judgment
became final and non-appealable, Abrams & Bayliss resigned as escrow agent and
transferred the escrow assets it held back to Highland.  HERA claimed to have no
assets to satisfy a judgment.

E.      Daugherty responded by filing his complaint in this action on July 6,
2017.  Vice Chancellor Glasscock, who previously presided over this case,
dismissed some of Daugherty's claims.  Daugherty then filed his first amended
complaint.  The case was reassigned to me in October 2018.  After Daugherty filed
his second amended complaint, I denied a motion to dismiss.  The surviving claims
are for fraudulent transfer, unjust enrichment, and indemnification.

F.      On February 2, 2018, Daugherty served a subpoena on Abrams &
Bayliss.[1]  Defendants moved to quash the subpoena "in its entirety given the
privileged and sensitive nature of the information requested and Daugherty's

---

[1] D.I. 52.

Appellee Appx. 00367
Appx. 03232
007175

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 375 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 258 of 1017 PageID 7988
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 374 of 1803 PageID 11120

failure to demonstrate relevance to this lawsuit."[2] Vice Chancellor Glasscock heard the motion to quash. He started the argument by stating "general principles":

> First, information regarding the actions of Abrams & Bayliss in connection with its operation of the escrow as agents of Highlands, HERA, those documents, that information is relevant, and it doesn't appear to me to be generally privileged. Second, to the extent the subpoena requests attorney client privilege material, I'm going to need a privilege log to decide issues of privilege, waiver, and common interest doctrine. Third, it is appropriate to seek discovery from the escrow agent as well as from the defendants. Fourth, the subpoena in question is overbroad as it seeks information far beyond Abrams & Bayliss' documents as escrow agents, and I'm not going to require a third party to answer overbroad discovery requests that surely implicate attorney-client privilege. Fifth, I am therefore disposed to quash the subpoena with leave to file a more narrow subpoena. And once that subpoena is issued, there needs to be a meaningful meet and confer as to what is producible and what is not so that the disputes that come to me are tailored to the discoverability of the documents and any privilege that may apply.[3]

G. Daugherty again subpoenaed Abrams & Bayliss, which produced 285 documents. Daugherty and Abrams & Bayliss met and conferred. Defendants asserted more than 300 documents were privileged.

H. Daugherty challenged Defendants' privilege assertions by moving to compel (the "Motion"). Daugherty challenged whether documents relating to Abrams & Bayliss's work as escrow agent were properly withheld, and argued the

---

[2] D.I. 61 ¶ 2.

[3] D.I. 97 at 3-4.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 376 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 259 of 1017 PageID 7989
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 375 of 1803 PageID 11121

crime-fraud exception vitiated any proper assertion of privilege. I heard argument on April 12.[4] The hearing was not productive as Defendants could not articulate the scope of their claimed privilege. I gave Highland yet another chance to defend its privilege and reconsider its privilege log, and specifically requested Abrams & Bayliss's engagement letter and billing records. I also requested to review the withheld documents *in camera*.[5]

I.     After receiving and reviewing the documents on the Defendants' privilege log *in camera*, I granted the Motion (the "Motion to Compel Ruling"). The privilege log was organized chronologically, and the withheld documents fell into four categories. The first comprised documents regarding the initiation, negotiation, and establishment of Abrams & Bayliss as Highland's escrow agent. The second comprised Abrams & Bayliss's legal work during the pendency of the Texas action to determine whether and how Daugherty might access the escrowed assets. The third category comprised Abrams & Bayliss's work responding to a subpoena in Texas. And the fourth comprised documents regarding Abrams & Bayliss's resignation as Highland's escrow agent.

J.     For reasons set forth at length in the Motion to Compel Ruling, I concluded that "unfortunately my *in camera* review confirmed Daugherty's fear

---

[4] D.I. 181.

[5] D.I. 181 at 37-38.

Appellee Appx. 00369
Appx. 03234
007177

that Highland is improperly withholding documents in categories 1 and 4 illustrating A&B's service and resignation as escrow agent, which are nonprivileged materials."[6]   I decided any privilege related to the topics in categories 1 and 4 was waived, but stopped short of a broader waiver.[7] Additionally, I concluded that even assuming categories 1 and 4 were privileged, the crime fraud exception applied to categories 1, 2 and 4.[8]

K.     On May 24, 2019, Defendants moved for reargument.[9]   On June 3, Defendants moved to stay the implementation of the Ruling pending interlocutory appeal.   On June 17, I denied Defendants' motion for reargument and declined to stay the decision pending interlocutory appeal (the "Reargument Ruling" and together with the "Motion to Compel Ruling," the "Rulings").[10]   I ordered the parties to agree upon a framework under Delaware Rule of Evidence 510(f) to govern discovery under the Rulings, which was entered on June 27.

---

[6] D.I. 218 at 4.

[7] *Id*. at 10 ("**Because** Highland stuck by its position and continued to assert such a large percentage of improper privilege assertions while claiming it was producing documents concerning A&B's role as escrow agent, any privilege related to that topic is waived, and a full waiver of Highland's privilege could be an appropriate consequence. … I conclude Highland's unjustified withholding of other documents related to the escrow was not so egregious as to waive any privilege over these two sets of documents.").

[8] *Id*. at 10-15.

[9] D.I. 211.

[10] D.I. 253 (unredacted, filed under seal); D.I. 254 (redacted).

5

L.    On June 17, Defendants applied for certification of an interlocutory appeal of the Rulings (the "Application").[11]  Defendants identified three issues for certification:

> 1.    Can Delaware courts apply the crime-fraud exception to destroy both attorney-client privilege and work-product protection without sufficient prima facie evidence that a party committed or attempted a fraud?
>
> 2.    Can Delaware courts apply the crime-fraud exception to destroy both attorney-client privilege and work-product protection with respect to communications years before an alleged fraudulent transfer and without specific findings that each communication at issue was made in furtherance of the alleged fraud?
>
> 3.    Can the Court impose a waiver of privilege as punishment from a party's good faith, but ultimately incorrect, assertion of privilege?[12]

M.    Plaintiff filed his opposition to the Application on June 27.

N.    Under Supreme Court Rule 42(b), there are to be no interlocutory appeals "unless the order of the trial court decides a substantial issue of material importance that merits appellate review before a final judgment."[13]

O.    "If the 'substantial issue' requirement is met, this Court will then analyze whether 'there are substantial benefits that will outweigh the certain costs

---

[11] D.I. 231.

[12] D.I. 231 at 5.

[13] Supr. Ct. R. 42(b)(i).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 379 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 262 of 1017 PageID 7992
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 378 of 1803 PageID 11124

that accompany an interlocutory appeal.'"[14]  Under Supreme Court Rule 42(b)(iii)

the Court weighs the following factors along with "its own assessment of the most

efficient and just schedule to resolve the case":

> (A) The interlocutory order involves a question of law resolved for the
> first time in this State; (B) The decisions of the trial courts are
> conflicting upon the question of law; (C) The question of law relates
> to the constitutionality, construction, or application of a statute of this
> State, which has not been, but should be, settled by this Court in
> advance of an appeal from a final order; (D) The interlocutory order
> has sustained the controverted jurisdiction of the trial court; (E) The
> interlocutory order has reversed or set aside a prior decision of the
> trial court, a jury, or an administrative agency from which an appeal
> was taken to the trial court which had decided a significant issue and a
> review of the interlocutory order may terminate the litigation,
> substantially reduce further litigation, or otherwise serve
> considerations of justice; (F) The interlocutory order has vacated or
> opened a judgment of the trial court; (G) Review of the interlocutory
> order may terminate the litigation; or (H) Review of the interlocutory
> order may serve considerations of justice.

P.      "If the balance is uncertain, the trial court should refuse to certify the

interlocutory appeal."[15]

**IT IS ORDERED**, this 8th day of July, 2019, that the Application is

DENIED based on the following:

1.      The Rulings did not decide "a substantial issue of material importance

that merits appellate review before a final judgment."[16]  "The 'substantial issue'

---

[14] *Sider v. Hertz Glob. Hldgs., Inc.*, 2019 WL 2501481, at *4 (Del. Ch. June 17, 2019)
(quoting Supr. Ct. R. 42(b)(ii)).

[15] Supr. Ct. R. 42(b)(iii).

7

requirement is met when an interlocutory order decides a main question of law which relates to the merits of the case, and not to collateral matters."[17] "Generally speaking, the substantive element of the appealability of an interlocutory order must relate to the merits of the case, not to matters of discovery."[18] That "proscription against interlocutory review of discovery rulings 'does not change merely because the discovery/disclosure order implicates the attorney-client privilege.'"[19] The Rulings decided the application and waiver of the attorney-client and work product privileges, not a main issue on the merits. The Rulings did not decide a substantial issue of material importance that warrants appellate review before a final judgment.

2. Highland argues that it is not seeking "appellate review simply so that an appellate court can re-review each communication at issue and evaluate the privilege determinations made. . . . What [it] seeks is different. It challenges the

---

[16] Supr. Ct. R. 42(b)(i).

[17] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2861717, at *1 (Del. Ch. July 22, 2008).

[18] *In re Examworks Grp., Inc.*, 2018 WL 1672991, at *2 (Del. Ch. Apr. 05, 2018) (ORDER) (quoting *Castaldo v. Pittsburgh-Des Moines Steel Co.*, 301 A.2d 87, 87 (Del. 1973)); *accord Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1993 WL 478084, at *1 (Del. Nov. 16, 1993) (ORDER); *see also Deloitte LLP v. Klig*, 2010 WL 3736141, at *1 (Del. Sept. 27, 2010) (ORDER) (refusing interlocutory appeal of order finding waiver of privilege).

[19] *Certain Underwriters at Lloyd's, London v. Monsanto Co.*, 1991 WL 134471, at *1 (Del. June 7, 1991) (ORDER) (citations omitted) (quoting *In re Rinehardt*, 575 A.2d 1079, 1081 (Del. 1990)).

Appellee Appx. 00373

Appx. 03238

007181

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 381 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 264 of 1017 PageID 7994
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 380 of 1803 PageID 11126

Order's _legal conclusions_ that will reverberate throughout this action."[20]  This is a

distinction without a difference.  Whether a party properly asserted a privilege, or

whether an exception to the privilege applies, is a legal conclusion.  The question

is whether it is the type of legal conclusion that warrants interlocutory review.  It is

not.

3.    Turning to the factors underpinning whether there are substantial

benefits that will outweigh the costs of interlocutory appeal, Highland identifies

only Supreme Court Rule 42(b)(iii)(B) and (H) as favoring its Application.  I

therefore "limit[] my review principally to those" issues.[21]  In short, the high costs

of piecemeal litigation and interlocutory appeals outweigh the value of this

Application.  This is particularly true here where trial will start on September 10

and there are other ongoing discovery disputes requiring the parties' attention.[22]

4.    The Rulings do not conflict with decisions of other trial courts.[23]

Defendants have not identified any Delaware decision at odds with the Rulings on

the crime-fraud exception.  Defendants cite authorities, such as _Buttonwood Tree_

---

[20] D.I. 231 at 6 (emphasis in original).

[21] _Chemours Co. v. DowDuPont Inc._, 2019 WL 2404817, at *3 (Del. Ch. June 7, 2019).

[22] On July 5, I attempted to quantify and remedy Defendants' other discovery shortcomings by appointing a third-party neutral to collect documents.  D.I. 255.  It is possible that trial will have to be postponed.  But this possibility, borne from Defendants' failure to collect their own documents, should not support the relief Defendants seek here.

[23] Supr. Ct. R. 42(b)(iii)(B).

9

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 382 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 265 of 1017 PageID 7995
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 381 of 1803 PageID 11127

*Value Partners, L.P. v. R.L. Polk & Co.*,[24] and *Princeton Ins. Co. v. Vergano*,[25]

discussed in the Rulings, and argue the Court erred in ruling Daugherty had made a

*prima facie* showing of fraud. Defendants do not dispute that Abrams & Bayliss

assisted Highland in the transaction that Daugherty claims was fraudulent, but

argue he "has not established through a prima facie showing [] that the transaction

*was* fraudulent."[26]

5. Distilled, Defendants' argument is that Daugherty has not shown

sufficient evidence of fraud in Highland's "desire to avoid paying money to

Daugherty."[27] In arguing the Court applied a standard that was too low,

Defendants advocate for a standard that is too high. As explained in the

Reargument Ruling, "the party opposing the privilege is not required to introduce

evidence sufficient to support a verdict of crime or fraud or even to show that it is

more likely than not that the crime or fraud occurred."[28] Discovery to date, and *in

camera* review, indicate that Defendants used Abrams & Bayliss as their escrow

agent, made numerous representations to the Texas court and Daugherty that assets

to satisfy any judgment were held in escrow, held the assets in escrow differently

---

[24] 2018 WL 346036 (Del. Ch. Jan. 10, 2018).

[25] 883 A.2d 44 (Del. Ch. 2005).

[26] D.I. 231 at 9 (emphasis in original).

[27] *Id.* at 9 n.2.

[28] D.I. 254 at 11 (quoting *Kickflip, Inc. v. Facebook, Inc.*, 2016 WL 5929003, at *5 (D. Del. Sept. 14, 2016)).

10

Appellee Appx. 00375

Appx. 03349

007183

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 383 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 266 of 1017 PageID 7996
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 382 of 1803 PageID 11128

than represented, and then at the end of it all directed Abrams & Bayliss to transfer assets from that same escrow to Highland to avoid satisfying the judgment to Daugherty.[29] Daugherty met his burden of showing a *prima facie* case of fraud sufficient to warrant the crime-fraud exception. Defendants cite no Delaware decisions that conflict with this analysis. As a result, they have not shown interlocutory review is warranted to resolve conflicting decisions.

6. Defendants also argue that the Court applied the crime-fraud exception too broadly and "did not make the factual finding needed to support its conclusion that each communication [] 'was made in furtherance of a fraud' and thus fell within the exception."[30] In fact, *in camera* review showed that the documents in category 2 reflected "efforts that culminated in the allegedly fraudulent acts."[31] The Court made the factual finding Defendants seek. Again, Defendants cannot identify Delaware decisions that conflict with this analysis, and so have not shown interlocutory review is warranted.

7. Finally, Defendants argue the Rulings conflict with precedent concerning the sanction of a punitive waiver. Defendants have failed to present a conflict among trial court decisions that merits interlocutory review. Waiver was

---

[29] I described specific documents in the Reargument Ruling, but sealed that portion of the transcript pending resolution of Defendants' Application and will not repeat that description here. *See* D.I. 253 at 13-15.

[30] D.I. 231 at 10.

[31] D.I. 218 at 13.

11

**Appellee Appx. 00376**
Appx. 07184
007184

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 384 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 267 of 1017 PageID 7997
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 383 of 1803 PageID 11129

based on Defendants' persistence in claiming privilege over the work of their escrow agent, after Vice Chancellor Glasscock informed them that work was not privileged, and after they were given multiple opportunities to follow those instructions.[32] The waiver component of the Rulings "applied settled principles of law" on the application and waiver of privilege.[33] "An improperly asserted claim of privilege is no claim at all."[34] Further, for reasons explained in the Reargument Ruling, Defendants misconstrued the Motion to Compel Ruling: I concluded categories 1 and 4 were not privileged, but went on to make the point that even if they were, that privilege would have been waived. Defendants have not identified any documents or testimony that they assert are privileged but that they must produce as a result of the waiver.

8.      The second factor Defendants address is that interlocutory review may serve considerations of justice.[35] Defendants seek interlocutory relief on the secondary holding that categories 1 and 4 would be waived if they were privileged, and on the crime-fraud exception, in pursuit of a different set of guideposts for the remainder of the case. The Supreme Court has declined to intervene to move discovery guideposts, even where the attorney-client privilege (and any harm

---

[32] Ex. 254 at 19-22.

[33] *Klig v. Deloitte LLP*, 2010 WL 3489735, at *9 (Del. Ch. Sept. 7, 2010) (describing decisions applying principle).

[34] *Id.* at *4.

[35] Supr. Ct. R. 42(b)(iii)(H).

Appellee Appx. 00377
Appx. 03842
007185

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 385 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 268 of 1017 PageID 7998
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 384 of 1803 PageID 11130

flowing from disclosure) is at issue.[36]  This factor does not support interlocutory
appeal.

9.     Neither side argues any of the remaining factors set out in Supreme
Court Rule 42(b)(iii).  None of those factors apply here.

10.     In line with our State's general preference against interlocutory
appeals, I decline to certify the Rulings for interlocutory review.


    /s/ Morgan T. Zurn
Vice Chancellor Morgan T. Zurn

---

[36] *Supra* ¶ 1.

Appellee Appx. 00378
Appx. 03343
007186

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 386 of
180
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 269 of 1017 PageID 7999
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 385 of 1803 PageID 11131

# APPENDIX 6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 387 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 270 of 1017 PageID 8000
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 386 of 1803 PageID 11132
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 1 of 16

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Hearing Date: TBD** |
| | ) **Objection Deadline: TBD** |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR AN ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED
<u>STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS</u>**

The official committee of unsecured creditors (the "<u>Committee</u>") of Highland Capital

Management, L.P. (the "<u>Debtor</u>"), hereby submits this motion (this "<u>Motion</u>") for entry of an order,

substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Proposed Order</u>"), pursuant to

28 U.S.C. §§ 1408 and 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure

("<u>Bankruptcy Rules</u>"), transferring the venue of the above-captioned chapter 11 case to the United

States Bankruptcy Court for the Northern District of Texas.

**<u>PRELIMINARY STATEMENT</u>**

1.      Although a debtor's choice of venue generally warrants deference, this case

presents unique facts that make a change in venue appropriate. The Debtor has only one location

in the United States—its Dallas, Texas headquarters, which houses the Debtor's management and

key personnel. In fact, the Debtor's headquarters sit less than two miles from the United States

Bankruptcy Court for the Northern District of Texas (the "<u>Dallas Bankruptcy Court</u>"), making the

venue clearly more convenient for the Debtor and its management than Delaware. Additionally,

---

[1]     The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**Appellee Appx. 00380**
**007188**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 388 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 271 of 1017 PageID 8001
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 387 of 1803 PageID 11133
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 2 of 16

although the Debtor's creditors span the nation, a substantial number of the Debtor's creditors (including several of the top twenty unsecured creditors and Committee members) are concentrated in Texas, or the Midwest more broadly. Likewise, nearly all of the professionals active in this case are concentrated in Texas, Chicago, or Los Angeles. The Dallas Bankruptcy Court is more centrally located and easily accessible to the key parties in this case, along with their advisors. Transferring venue from Wilmington, Delaware to Dallas, Texas would result in greater efficiencies and significant cost savings for the Debtor's estate.

2. Moreover, the Dallas Bankruptcy Court is already intimately familiar with the Debtor's principals and complex organizational structure—the involuntary chapter 11 cases of the Debtor's former affiliates and current Committee members, Acis Capital Management, L.P. and Acis Capital Management GP, L.P. (collectively, "Acis") are pending in the Dallas Bankruptcy Court. Specifically, the Dallas Bankruptcy Court has (a) heard multiple days' worth of material testimony from the Debtor's principal owner (James Dondero), the Debtor's minority owner (Mark Okada), the Debtor's general counsel, at least two assistant general counsels, and numerous other employees of the Debtor and other witnesses; and (b) issued at least six published opinions to date, many of which have been affirmed on appeal to the United States District Court for the Northern District of Texas (the "Dallas District Court") in subsequent published opinions. The Dallas Bankruptcy Court is still presiding over an adversary proceeding commenced by the Debtor and its affiliates, and the Debtor's appeal of Acis's confirmed chapter 11 plan is still pending before the Fifth Circuit. As evidenced by the published opinions, the Dallas Bankruptcy Court and the Dallas District Court are intimately familiar with the Debtor's business, principal owner, and key executives. For these reasons, the Dallas Bankruptcy Court is uniquely positioned to oversee this chapter 11 case.

ACTIVE 250501748

**Appellee Appx. 00381**

**007189**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 389 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 272 of 1017 PageID 8002
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 388 of 1803 PageID 11134
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 3 of 16

3.     The Committee respectfully submits that, for the reasons set forth above and discussed more fully below, based on the unique facts of this case, both the interests of justice and convenience of the parties justify an exception to the general deference granted to a debtor's choice of venue and warrant the transfer of venue to the Dallas Bankruptcy Court.

## JURISDICTION

4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Committee confirms its consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.     The statutory and other bases for the relief requested herein are 28 U.S.C. §§ 1408 and 1412, Bankruptcy Rule 1014, and Local Rule 1014-1.

## BACKGROUND

6.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Committee was appointed by the United States Trustee on October 29, 2019 [Docket No. 65].

## I.     The Debtor's Connections to Dallas.

7.     As noted in the Voluntary Petition [Docket No. 1], the Debtor's principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201, which also serves as the Debtor's

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 390 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 273 of 1017 PageID 8003
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 389 of 1803 PageID 11135
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 4 of 16

international headquarters, and, in fact, its only office in the United States. *See Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 9] (the "<u>First Day Declaration</u>"), ¶ 7. Although it is unclear how many of the Debtor's 76 employees are based in the Debtor's international offices, presumably those employees based in the U.S. live in or around the Debtor's headquarters in Dallas, Texas. Furthermore, all but one of the Debtor's equity holders are also located in Dallas, Texas. *See* Voluntary Petition [Docket No. 1], at pg. 14. In sum, Dallas, Texas is the epicenter of the Debtor's operations.

**II.     The Dallas Bankruptcy Court's Familiarity with the Debtor.**

8.     Prior to the commencement of this chapter 11 case, the Debtor was (and currently remains) actively involved in the involuntary chapter 11 case of Acis, its then-affiliate and current Committee member, captioned *In re Acis Capital Mgmt., L.P.*, Case No. 18-30264 (SGJ) (the "<u>Acis Bankruptcy</u>"). Until 2019, Acis was the "structured credit arm of Highland." *In re Acis Capital Mgmt., L.P.*, Nos. 18-30264 (SGJ), 2019 Bankr. LEXIS 292, at *17 n. 21 (Bankr. N.D. Tex. Jan. 31, 2019) (the "<u>Acis Confirmation Opinion</u>"), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019).[2] Acis did not have any of its own employees and, instead, contracted with the Debtor to perform all day-to-day functions, meaning that all Acis corporate representatives and witnesses in the Acis Bankruptcy were employees of the Debtor. *Id.* at *9. Moreover, there was complete overlap between Acis and the Debtor at the executive level, with the Debtor's CEO James Dondero serving as President of Acis and the Debtor's CFO, and first day declarant, Frank Waterhouse serving as Treasurer.

9.     The Acis Bankruptcy commenced on January 30, 2018, when Joshua N. Terry filed involuntary petitions against Acis to commence chapter 7 cases in the Dallas Bankruptcy Court.

---

[2] The Acis Confirmation Opinion is attached hereto as **Exhibit B**.

Appellee Appx. 00383
Appx. 02348
007191

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 391 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 274 of 1017 PageID 8004
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 390 of 1803 PageID 11136
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 5 of 16

In connection with a hotly-contested trial on the involuntary petitions, the Dallas Bankruptcy Court heard seven days of testimony and argument, entered orders for relief and issued a written opinion, which is attached hereto as **Exhibit C** (the "Acis Involuntary Opinion"). Testimony included that of the Debtor's co-founder and CEO, James Dondero, the Debtor's co-founder and then-Chief Investment Officer, Mark Okada, the Debtor's General Counsel, Scott Ellington, the Debtor's Controller, David Klos, and the Debtor's Assistant General Counsel, Isaac Leventon.

10. In May 2018, the Acis bankruptcy cases were converted from Chapter 7 to Chapter 11, and a Chapter 11 Trustee was appointed "due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management." *See* Acis Confirmation Op. at *15.

11. The Debtor and its affiliates were, and remain, exceptionally active throughout the Acis Bankruptcy, objecting to virtually every action proposed by the Chapter 11 Trustee throughout the case. *See In re Acis Capital Mgmt., L.P.*, 603 B.R. 300, 302 (Bankr. N.D. Tex. 2019). As a result, the Dallas Bankruptcy Court was forced to conduct many evidentiary hearings, during which the Debtor's executives and employees were often called to testify. Overall, between the Acis Bankruptcy and related adversary proceedings, the Dallas Bankruptcy Court has to date reviewed approximately 700 exhibits, heard more than thirty days of testimony and oral argument, and issued six opinions. The Dallas District Court has also ruled on three appeals related to the Acis Bankruptcy, all of which were filed by the Debtor and/or its affiliates. The Debtor's appeal of the Acis confirmation order is now pending before the Fifth Circuit.[3]

12. The Dallas Bankruptcy Court is also currently adjudicating a number of fraudulent transfer causes of action that Acis has brought against the Debtor and certain of its non-debtor

---

[3] *See generally Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel Nunc Pro Tunc to the Petition Date* [Docket No. 69] and

Appellee Appx. 00384
Appx. 02849
007192

affiliates in a consolidated adversary case (the "<u>Acis Adversary Proceeding</u>"). Distilled to its essence, the Acis Adversary Proceeding concerns actions taken by the Debtor and its affiliates to denude the Acis debtors' estates of their value and frustrate an imminent, substantial judgment against Acis. *See Acis Capital Mgmt., GP, LLC v. Highland Capital Mgmt., L.P. (In re Acis Capital Mgmt., L.P.)*, 600 B.R. 541, 549 (Bankr. N.D. Tex. 2019) (the "<u>Acis Arbitration Opinion</u>").[4]

13.     In sum, the Dallas Bankruptcy Court and the Dallas District Court are already intimately familiar with the Debtor's complex structure, its management, and key personnel, and are well-versed in the contentious relationship between the Debtor and several of its largest creditors, including members of the Committee. Accordingly, the Dallas Bankruptcy Court is uniquely situated to oversee this chapter 11 case.

## RELIEF REQUESTED

14.     By this Motion, the Committee requests entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, transferring the venue of this chapter 11 case to the Dallas Bankruptcy Court.

## BASIS FOR RELIEF

**III.     The Dallas Bankruptcy Court is an Appropriate Venue Under 28 U.S.C. § 1408.**

15.     Section 1408 of title 28 of the United States Code provides that bankruptcy cases may be commenced in the district court for the district "in which the domicile, residence, principal place of business in the United States, or principal assets in the United States" of the debtor is

---

*Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel Nunc Pro Tunc to the Petition Date* [Docket No. 70] (describing the Debtor's ongoing litigation and involvement with the Acis Bankruptcy).

[4] A copy of the Acis Arbitration Opinion is attached hereto as **Exhibit D**.

6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 393 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 276 of 1017 PageID 8006
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 392 of 1803 PageID 11138
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 7 of 16

located or the district "in which there is a pending case under title 11 concerning such person's affiliate."

16.     The Debtor's headquarters, and indeed its only office in the United States, is located in Dallas, Texas. Moreover, had this chapter 11 case commenced mere months ago, the Acis Bankruptcy would be a "pending case under title 11 concerning" the Debtor's affiliate.[5] The Dallas Bankruptcy Court easily satisfies the statutory venue requirements under 28 U.S.C. § 1408.

## IV.     The Court Should Exercise its Discretion to Transfer Venue to the Dallas Bankruptcy Court.

17.     It is within a court's discretion to transfer a case to another venue if it is "in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412. Courts have interpreted this statutory provision to create two distinct bases upon which transfer of venue may be granted: interest of justice *or* convenience of the parties. *See In re Qualtec Inc.*, No. 11-12572 (KJC), 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012). Movants for transfer of venue have the burden of showing that a transfer is warranted based on the preponderance of the evidence.[6] *Id.* at *5.

### A.     Transferring Venue to the Dallas Bankruptcy Court Would Serve the Convenience of the Parties.

18.     In determining whether a venue transfer would serve the convenience of the parties, courts generally examine the following six factors: "(a) proximity of the creditors of every kind to the court; (b) proximity of the debtor; (c) proximity of the witnesses who are necessary to the administration of the estate; (d) the location of the debtor's assets; (e) the economic administration of the estate; and (f) the necessity for ancillary administration in the event of liquidation." *In re*

---

[5] The Debtor ceased to be an affiliate of Acis following confirmation of the Acis plan of reorganization in January 2019, when equity in reorganized Acis was distributed to Mr. Terry in exchange for a reduction of his allowed claim.

[6] To meet its burden herein, the Committee is relying on the record of this case, including the First Day Declaration, and the established record of the Acis Bankruptcy. The Committee therefore does not anticipate there being any need to hold an evidentiary hearing on this Motion.

ACTIVE 250501748

**Appellee Appx. 00386**
**007194**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 394 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 277 of 1017 PageID 8007
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 393 of 1803 PageID 11139
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 8 of 16

*Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *2 (Bankr. D. Del. Mar. 4,

2016) (*quoting Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re*

*Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir. 1979)).  Under this analysis, the

factor given the most weight is the economic and efficient administration of the estate.  *Id.*

### 1.    Proximity of Creditors of Every Kind to the Court.

19.    Of the Debtor's twenty largest unsecured creditors, at least seven[7] are listed as

having Texas addresses:  Acis, Joshua and Jennifer Terry, McKool Smith, P.C., Foley Gardere,

DLA Piper LLP (US), Lackey Hershman LLP, and Andrews Kurth LLP.  *See* Voluntary Petition

[Docket No. 1].  Additionally, of the total known claims at this juncture, it appears that a significant

number of the Debtor's creditors are located in Texas, and the rest of the creditors appear to be

scattered across the United States.  No known creditors appear to be based in Delaware.  *See id.*

20.    Courts may also focus on the location of the debtor's and creditors' professionals

in deciding whether to transfer venue.  *See In re Caesars Entm't Operating Co., Inc.*, No. 15-10047

(KG), 2015 WL 492529, at *6 (Bankr. D. Del. Feb. 2, 2015).  The Committee's proposed counsel

is primarily located in Chicago, Illinois, but also maintains an office in Dallas, Texas (where its

litigation team for this case is based).  If this case were to proceed before this Court, the Committee

would have to retain Delaware co-counsel.[8]  Additionally, several of the Debtor's largest creditors

are separately represented by counsel based in the Midwest: the Acis is represented by the Rogge

Dunne Group and Winstead PC in Dallas [Docket No. 81], the Redeemer Committee of the

Highland Crusader Fund is represented by Jenner & Block LLP primarily out of its Chicago office

---

[7] Additionally, although listed with a North Carolina address, CLO Holdco, Ltd. is an affiliate of and controlled by the Debtor, whose principal place of business is in the Northern District of Texas.  The Debtor also lists Reid Collins & Tsai's New York office, despite the fact that the firm is a Texas limited liability partnership based in Texas.

[8] Under Local Rule 9010-1(d), the Committee has until November 27, 2019, to obtain Delaware co-counsel, if necessary.

Appellee Appx. 00387
Appx. 02352
007195

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 395 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 278 of 1017 PageID 8008
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 394 of 1803 PageID 11140
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 9 of 16

[Docket Nos. 1, 36], and USB Securities LLC and UBS AG London Branch is represented by
Latham & Watkins LLP, which has an office in Houston [Docket No. 85].

21.    Considering the proximity of both the Debtor's creditors and their professionals to
the Dallas Bankruptcy Court, this factor should weigh in favor of transfer.  *See In re Rehoboth
Hosp., LP*, No. 11-12798 (KG), 2011 WL 5024267, at *3 (Bankr. D. Del. Oct. 19, 2011)
(concluding that, on balance, this factor favored transfer to Texas when the overwhelming majority
of creditors were located in Texas).

### 2.    Proximity of the Debtor to the Court.

22.    Courts have noted that this inquiry should focus primarily on the parties that must
appear in court.  *See Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *6.  The Debtor's
headquarters, and only office located in the United States, is in Dallas, Texas.  *See* First Day Decl.,
at ¶ 7.  As a result, it is likely that any of the Debtor's personnel who would have to appear in court
are located in Dallas, Texas.  The Debtor has no connection to Delaware other than the fact that it
was formed there.

23.    The Committee concedes that Debtor's counsel maintains an office in Delaware but
does not have an office in Dallas.  That said, Debtor's counsel represents itself as having a
"national presence," including in the Fifth Circuit,[9] and its lead lawyers on this matter are based
in Los Angeles.  The Debtor's proposed financial advisor team is also predominantly based in Los
Angeles with several members located in Chicago.  No proposed advisor from Development
Specialists, Inc. is located on the East Coast, let alone in Delaware.  *See Motion of the Debtor
Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc.
to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and*

---

[9] *See* http://www.pszjlaw.com/about-presence.html#circuit5.

**Appellee Appx. 00388**
Appx. 03353
**007196**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 396 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 279 of 1017 PageID 8009
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 395 of 1803 PageID 11141
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 10 of 16

*Restructuring-Related Services,* Nunc Pro Tunc *as of the Petition Date* [Docket No. 75], Ex. A. Accordingly, the Committee respectfully submits that this factor weighs in favor of transferring venue to the Dallas Bankruptcy Court.

### 3. Proximity of the Witnesses Necessary to the Administration of the Estate.

24. The Committee anticipates that the witnesses likely to be necessary in this chapter 11 case are the Debtor's management, who are all located in Dallas, Texas, or the Debtor's financial advisors, who are all located in either Chicago, Illinois, or Los Angeles, California. Dallas, Texas, is significantly closer to any potential witness than Wilmington, Delaware. Thus, the Committee respectfully submits that this factor also weighs in favor of transferring venue to the Dallas Bankruptcy Court.

### 4. Location of the Assets.

25. The location of the Debtor's assets is not as important as other factors where "the ultimate goal is rehabilitation rather than liquidation." *See In re Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *6 (quoting *In re Enron Corp.*, 274 B.R. 327, 347 (Bankr. S.D.N.Y. 2002)). Although the Committee believes that the Debtor's U.S. assets would be located at the Debtor's headquarters in Dallas, Texas, the Committee does not believe this factor important to the Court's decision.

### 5. Economic Administration of the Estate.

26. As noted above, the most important factor is the economic and efficient administration of the Debtor's estate. *Id.* The Committee does not dispute the ability of this Court to administer this chapter 11 case in a just and efficient manner. That said, there are many factors that make the Dallas Bankruptcy Court the more economical venue. As discussed in more detail below as part of the "interests of justice" analysis: (1) there is a higher concentration of creditors

Appellee Appx. 00389
Appx. 02354
007197

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 397 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 280 of 1017 PageID 8010
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 396 of 1803 PageID 11142
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 11 of 16

and creditors' counsel in Texas and the Midwest than elsewhere in the country; (2) the Debtor and

all of its U.S. personnel are in Dallas, Texas; (3) Dallas, Texas is more centrally located in the

United States than Wilmington, Delaware and arguably easier and cheaper for parties to travel to;

(4) most creditors would need to obtain Delaware co-counsel if venue remains before this Court;

and (5) the Dallas Bankruptcy Court and the Dallas District Court has already expended great time

and effort familiarizing itself with the Debtor, the Debtor's operations, and the disputes between

the Debtor and some of its largest creditors. For these reasons and the reasons set forth below in

Section II.B, this factor weighs heavily in favor of transferring venue to the Dallas Bankruptcy

Court. *See In re Qualteq, Inc.* 2012 WL 527669, at *6 (noting that same considerations for this

factor arise in applying the "interest of justice" prong).

### 6. Necessity for Ancillary Administration if Liquidation Should Result.

27. "Most cases do not consider liquidation because it is illogical to focus on liquidation

contingencies when the goal of the bankruptcy is reorganization." *In re Dunmore Homes, Inc.*,

380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008). However, should this case be converted to a

liquidation, the Debtor's personal property would be predominantly located in Dallas, Texas. As

a result, this factor also weighs in favor of transfer.

### B. Interests of Justice.

28. When determining whether a transfer would serve the interests of justice, courts

consider whether such transfer "would promote the efficient administration of the estate, judicial

economy, timeliness, and fairness." *Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *7

(quotations omitted). The interests of justice standard is a "broad and flexible standard which must

be applied on a case-by-case basis." *In re Safety-Kleen Corp.*, Adv. Proc. No. 00-1984, 2001

Bankr. LEXIS 1296, at *6 (Bankr. D. Del. Aug. 27, 2001) (citing *Gulf States Expl. Co. v. Manville

Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990)).

ACTIVE 250501748

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 398 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 281 of 1017 PageID 8011
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 397 of 1803 PageID 11143
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 12 of 16

1.      **Judicial Economy.**

29.     Judicial economy would be served by transferring this case to the Dallas Bankruptcy Court. At the time of this filing, this Court has only held one hearing, granting interim relief for a handful of routine "first day" motions. In contrast, the Dallas Bankruptcy Court has heard at least 30 days of testimony, including that of the Debtor's executives, and conducted countless hearings in the Acis Bankruptcy. With the exception of the Debtor's proposed chief restructuring officer and Mr. Waterhouse, the Dallas Bankruptcy Court is familiar with nearly all of the Debtor's senior management. As summarized above, the Dallas Bankruptcy Court and Dallas District Court have already devoted multiple days of court time to the Debtor.

30.     Additionally, Acis's claim against the Debtor (which is listed on the list of twenty largest unsecured creditors) and the Debtor's proof of claim and administrative claim against Acis (which is technically an asset of the Debtor's estate) are currently pending in the Dallas Bankruptcy Court. Judicial economy would best be served by utilizing the time and resources already extended by the Dallas Bankruptcy Court in connection with these claims. This factor weighs overwhelmingly in favor of transfer. Indeed, it is hard to imagine a case where judicial economy would be better served by a transfer of venue under 28 U.S.C. § 1412.

31.     Courts in this district have historically placed a particular emphasis "on the "learning curve" that typically militates against a transfer. *See In re Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *5 (Bankr. D. Del. Mar. 4, 2016). This case is unique in that the "learning curve" that typically militates against a transfer in the interests-of-justice basis is actually *inverted*. That is, it is not the proposed transferee court that will have a "learning curve," but rather it is this Court that would. Given that this Court has only considered first day relief, and on an interim basis, while the Dallas Bankruptcy Court and Dallas District Court both have

12

Appellee Appx. 00391
Appx. 02356
007199

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 399 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 282 of 1017 PageID 8012
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 398 of 1803 PageID 11144
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 13 of 16

intimate familiarity with the parties and their businesses, transferring the venue would be in furtherance of judicial economy.

> **2.    Economic and Efficient Administration of the Bankruptcy Estate**.

32.     As previously noted, there are economic efficiencies available in Dallas, Texas that are not available in Wilmington, Delaware.  Venue in Dallas would allow the Debtor's employees to easily attend hearings in this case and thus eliminate the need for air travel for most witnesses. The Debtor's headquarters are located in The Crescent in Dallas, Texas, approximately 1.2 miles from the Dallas Bankruptcy Court.  By contrast, this Court is located approximately 1,437 miles from the Debtor's headquarters.  Travel to this Court from the Debtor's headquarters requires, at a minimum, a 30-minute car ride to Dallas/Fort Worth International Airport, approximately three hours flying time to Philadelphia International Airport, and then a 30-minute car ride to Wilmington, Delaware.  The foregoing does not take into account recommended early arrival times at airports for check-in, flight delays, traffic, or the need for overnight stays in Wilmington.  If this case remains in Delaware, critical management personnel will be required to spend extended periods away from their offices when they should be focused on maximizing value for all creditors.

33.     Additionally, as the Debtor's professionals and proposed CRO are primarily located in Los Angeles, venue in Dallas would eliminate hours of travel time and the administrative expense associated with the same.  Dallas-Fort Worth International Airport, consistently the third-busiest airport in the country (behind Chicago O'Hare and Atlanta Hartsfield-Jackson), offers nearly 1,800 flights per day.  American Airlines alone offers approximately 14 non-stop flights per day from LAX to DFW.  According to FlightSphere.com, there are approximately 20 total flights per day from LAX to DFW and 7 flights per day from DAL to LAX.  By contrast, according to FlightSphere.com, there are approximately 10 flights per day from DFW to Philadelphia and approximately 8 flights per day from DAL to Philadelphia.  The flight from LAX to DFW is

ACTIVE 250501748

approximately 3 hours, whereas the flight from LAX to Philadelphia is approximately 6 hours. *See In re Rehoboth Hosp., LP,* No. 11-1279 (KG), 2011 Bankr. LEXIS 3992, at *15 (Bankr. D. Del. October 19, 2011) (transferring venue of a single asset real estate case from Delaware to Texas because "the estate may incur significant travel costs to obtain the testimony of witnesses that are located in Texas").

34.     Additionally, Rule 45 of the Federal Rules of Civil Procedure, incorporated by Bankruptcy Rule 9016, mandates that contested non-party discovery disputes (potentially like those related to the Debtor's approximately 2,000 non-debtor affiliates) be heard in the place of compliance, which would most likely be in the Northern District of Texas.  The Committee is already aware of the Debtor's history of contesting discovery.  *See, e.g., Hamilton Partners, L.P. v. Highland Capital Mgmt., L.P.*, CV 6547-VCN, 2016 WL 61223, at *1 (Del. Ch. Feb. 2, 2016). It is therefore likely that the Dallas District Court and Dallas Bankruptcy Court will need to hear and resolve multiple discovery disputes.  In light of that inevitability, it would be sensible to transfer this case so that related disputes aren't being heard in multiple venues.

35.     There is no doubt that transferring venue to Dallas would promote the economic and efficient administration of this chapter 11 case.  This factor weighs in favor of transfer.

### 3.     Timeliness.

36.     As of the date of this Motion, this case has only been pending for 16 days.  The Committee is also seeking to have this Motion heard on an expedited basis, as set forth in the motion to shorten notice filed concurrently herewith.  *Cf. In re Jones*, 39 B.R. 1019, 1020 (Bankr. S.D.N.Y. 1984) ("[t]he debtor's motion to change venue is untimely given the fact that this case was commenced over one and one-half years ago").  The Court has only considered the Debtor's request for first day relief on an interim basis.  The next hearing is not scheduled until November 19, 2019.  The Motion is timely and this factor weighs in favor of transfer.

14

**Appellee Appx. 00393**

**Appx. 03258**

**007201**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 401 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 284 of 1017 PageID 8014
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 400 of 1803 PageID 11146
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 15 of 16

### 4. Fairness.

37. Transferring this chapter 11 case to a venue where employees, creditors, and numerous other parties-in-interest may more easily participate in the restructuring process would be manifestly fair. To the extent the Debtor chose this forum in order to distance itself from largely unfavorable findings, fairness dictates that this case should be transferred.

*    *    *    *    *

38. For the foregoing reasons, it is both in the interest of justice and for the convenience of the parties that this chapter 11 case be transferred to the Dallas Bankruptcy Court. The majority of the parties and professionals involved in this chapter 11 cases are more centrally located to Dallas, Texas than Wilmington, Delaware, which would create significant costs savings to the Debtor's estate compared to keeping the case in Delaware. Moreover, the Dallas Bankruptcy Court and Dallas District Court are both well-versed in the facts and issues that will undoubtedly need to be addressed in this chapter 11 case. As such, the Committee respectfully requests that this Court transfer venue of this case to the Dallas Bankruptcy Court.

<strong><u>NOTICE</u></strong>

39. Notice of this Motion will be provided to (i) the Debtor, (ii) the Office of the United States Trustee for the District of Delaware, and (iii) any party that has requested notice pursuant to Local Rule 2002-1 as of the date of this Motion. In light of the nature of the relief requested herein, the Committee submits that no other or further notice is necessary.

<em>[Remainder of Page Intentionally Left Blank]</em>

ACTIVE 250501748

Appellee Appx. 00394
Appx. 02259
007202

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 402 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 285 of 1017 PageID 8015
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 401 of 1803 PageID 11147
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 16 of 16

WHEREFORE, the Committee respectfully requests that the Court enter the Proposed

Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested herein

and such other and any further relief as the Court may deem just and proper.

Dated: November 1, 2019          SIDLEY AUSTIN LLP
       Wilmington, Delaware

*/s/ Bojan Guzina*
 Bojan Guzina
 Matthew A. Clemente
Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

        -and-

Jessica C. K. Boelter
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

        -and-

Penny P. Reid
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

PROPOSED ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

ACTIVE 250501748

Appellee Appx. 00395

007203

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 403 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 286 of 1017 PageID 8016
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 402 of 1803 PageID 11148
Case 19-12239-CSS Doc 86-1 Filed 11/01/19 Page 1 of 3

**<u>Exhibit A</u>**

**Proposed Order**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 404 of
Case 3:25-cv-02072-S Document 15-10 1804 10/06/25 Page 287 of 1017 PageID 8017
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 403 of 1803 PageID 11149
Case 19-12239-CSS Doc 86-1 Filed 11/01/19 Page 2 of 3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Ref. Docket No.:** ___ |

### ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS

Upon the motion (the "Motion")[2] of the Committee requesting entry of an order (this "Order") transferring the venue of the above-captioned chapter 11 case to the United States Bankruptcy Court for the Northern District of Texas; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this Motion being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of, and the opportunity for a hearing on, the Motion having been given; and it appearing that no other or further notice need be provided; and this Court having found that the relief requested in the Motion and provided for herein is in the best interest of the Debtor, creditors of the Debtors, and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record herein, and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

**Appellee Appx. 00397**
**Appx. 07205**
**007205**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 405 of
Case 3:25-cv-02072-S      Document 15-10    Filed 10/06/25      Page 288 of 1017      PageID 8018
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 404 of 1803   PageID 11150
Case 19-12239-CSS    Doc 86-1   Filed 11/01/19   Page 3 of 3

1.      Pursuant to Rule 1014(b), in the interest of justice and for the convenience of

parties, the above-captioned chapter 11 case shall proceed in the Dallas Bankruptcy Court.

Accordingly, the Court will transfer this case to the Dallas Bankruptcy Court pursuant to 28 U.S.C.

§ 1412.


Dated: _____, 2019
Wilmington, Delaware                          _____
                                              Honorable Christopher S. Sontchi
                                              United States Bankruptcy Judge

Appellee Appx. 00398

007206

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 406 of
Case 3:25-cv-02072-S     Document 15-10     Filed 10/06/25     Page 289 of 1017     PageID 8019
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 405 of 1803   PageID 11151
Case 19-12239-CSS    Doc 86-2   Filed 11/01/19   Page 1 of 48

## Exhibit B

**Acis Confirmation Opinion**

Appellee Appx. 00399

007207

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 407 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 290 of 1017 PageID 8020
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 406 of 1803 PageID 11152
Case 18-30264-sgj11 Doc 827-3 Filed 01/31/19 Entered 01/31/19 12:04:48 Page 1 of 47



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 31, 2019**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-11** |
| | § | **(Chapter 11)** |
| Debtor. | § | |

_____

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP, L.L.C.,** | § | **CASE NO. 18-30265-SGJ-11** |
| | § | **(Chapter 11)** |
| | § | |
| Debtor. | § | |

## BENCH RULING AND MEMORANDUM OF LAW IN SUPPORT OF:
## (A) FINAL APPROVAL OF DISCLOSURE STATEMENT; AND (B)
## CONFIRMATION OF CHAPTER 11 TRUSTEE'S THIRD AMENDED JOINT PLAN

Before this court is a request by the Chapter 11 Trustee (herein so called) for final

approval of the adequacy of a disclosure statement and for confirmation of his Third Amended

**Appellee Appx. 00400**

007208

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 408 of
Case 3:25-cv-02072-S Document 15-10 1804 10/06/25 Page 291 of 1017 PageID 8021
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 407 of 1803 PageID 11153
Case 18-30264-sgj11 Doc 1392-75 Filed 01/31/19 Entered 01/31/19 15:13:04 Page 2 of 47

Joint Plan of Reorganization,[1] as amended, modified or supplemented (the "Plan"), for the two

above-referenced debtors: (1) Acis Capital Management, L.P. (the "Debtor-Acis"), a Delaware

limited partnership, and (2) Acis Capital Management GP, LLC, a Delaware limited liability

company (the general partner of the Debtor-Acis; collectively, the "Debtors"). The two chapter

11 cases have been administratively consolidated.[2]

     The hearing on these matters transpired over multiple days in December 2018, and the

court considered the testimony of more than a dozen witnesses, more than 700 exhibits, and

hundreds of pages of legal briefing. Based on the foregoing, the court ***overrules all objections***

and will confirm the Plan, including all proposed modifications to it. The Chapter 11 Trustee has

demonstrated, by a preponderance of the evidence, that the Plan, as modified, satisfies the

applicable provisions of the Bankruptcy Code including but not limited to Sections 1122, 1123,

1127, and 1129 of the Bankruptcy Code.[3] The court also approves on a final basis the adequacy

of the accompanying disclosure statement to the Plan, determining that it meets the requirements

set forth in Section 1125 of the Bankruptcy Code. Notice and solicitation with respect to the

---

[1] Exhs. 508 & 509; *see also* DE ## 660, 661, 693, 702, & 769. References to "DE # __" from time to time in this ruling relate to the docket number at which a pleading or other item appears in the docket maintained in these administratively consolidated Bankruptcy Cases, in Case # 18-30264.

[2] Note that the Debtor-Acis is, essentially, the debtor that is the operating company. As a general partner, Acis Capital Management GP, LLC is legally obligated on all of the operating company's debt. *See* 6 Del. C. § 17-403(b) ("Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 (6 Del. C. § 1501 et seq.) to persons other than the partnership and the other partners."); *see also* 6 Del. C. § 15-306(a) ("(a) Except as otherwise provided in subsections (b) and (c) of this section, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law"). The Plan jointly addresses both of the Debtors' debts.

[3] *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.),* 994 F.2d 1160, 1165 (5th Cir. 1993); *In re Sears Methodist Ret. Sys.,* No. 14-32821-11, 2015 Bankr. LEXIS 709, at *8 (Bankr. N.D. Tex. Mar. 5, 2015); *In re Couture Hotel Corp.,* 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015); *In re Mirant Corp.,* No. 03-46590, 2007 Bankr. LEXIS 4951, at *19-20 (Bankr. N.D. Tex. Apr. 27, 2007).

Appellee Appx. 00401
Appx. 07205
007205

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 409 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 292 of 1017   PageID 8022
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 408 of 1803   PageID 11154
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19   Entered 01/31/19 15:14:48 Page 3 of 47

Plan is determined to have complied with the applicable Bankruptcy Rules and due process.  The

court provides reasoning for its ruling below.  The court directs the Chapter 11 Trustee to submit

to the court for signing the proposed Findings of Fact and Conclusions of Law and Order that

were filed at DE # 814.  This Bench Ruling supplements those Findings of Fact and Conclusions

of Law and Order and, where appropriate, should be considered additional findings and

conclusions as contemplated by Fed. R. Bankr. Proc. 7052.

## I.    **Background.**[4]

The above-referenced bankruptcy cases (the "Bankruptcy Cases") have been pending

since January 30, 2018 and have been astonishingly contentious.  The Chapter 11 Trustee has

been in place since on or about May 14, 2018.  The Plan (which is the fourth one proposed by the

Chapter 11 Trustee) has been objected to by three related entities: (a) Highland Capital

Management, L.P. ("Highland"), (b) Highland CLO Funding Ltd. ("HCLOF Guernsey"), and (c)

Neutra, Ltd. ("Neutra Cayman").  The Chapter 11 Trustee loosely refers to these three objectors

(the "Objectors") as "the Highlands" because they are not only related to each other (*i.e.,* they

are all, directly or indirectly, part of the Highland 2,000-member corporate organizational

structure), but they also have been in "lockstep" with one another in objecting to virtually every

position taken by the Chapter 11 Trustee during the Bankruptcy Cases.[5]  These Objectors'

parties-in-interest status will be explained below.

---

[4] For a complete set of background facts, the court incorporates herein by reference its Findings of Fact
and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary
Petitions, entered April 13, 2018.  DE # 118.  Exh. 243.

[5] It is also undisputed that, prior to the appointment of the Chapter 11 Trustee, **the Debtors** and Highland
were affiliated and had a close relationship.  Exhs. 17, 18, 22-27, 251, 619 & 649.

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 410 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 293 of 1017 PageID 8023
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 409 of 1803 PageID 11155
Case 18-30264-sgj11 Doc 892-55 Filed 01/31/19 Entered 01/31/19 15:04:48 Page 4 of 47

In simplest terms, the Debtor-Acis, which was formed in the year 2011, is primarily a CLO portfolio manager. [6] It manages hundreds of millions of dollars' worth of CLOs (which is an acronym for "collateralized loan obligations"). Specifically, it provides fund management services to various special purpose entities that hold CLOs. The Debtor-Acis was providing management services for five such special purpose entities (the "Acis CLOs") as of the time that it and its general partner were put into the involuntary Bankruptcy Cases. The parties have informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs") are structured as follows: (a) on the asset side of their balance sheets, the entities own pieces of senior debt owed by large corporations and, therefore, earn revenue from the variable interest payments made by those corporations on such senior debt; and (b) on the liability side of their balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are mostly institutions and pension funds (these tranches of notes are usually rated anywhere from Triple A to Single B, depending upon things such as their interest rate and perceived risk). The CLO SPEs make a profit, based on the spread or "delta" between: (a) the variable rates of interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the fixed rates of interest that the CLO SPEs must pay on their own tranches of debt. At the bottom of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes," but these "notes" are genuinely equity). As portfolio manager, the Debtor-Acis manages the CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs'

---

[6] The Debtor-Acis has managed other funds, from time to time, besides CLOs.

Appellee Appx. 00403
Appx. 03268
007211

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 411 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 294 of 1017    PageID 8024
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 410 of 1803    PageID 11156
Case 18-30264-sgj11 Doc 1839-2 Filed 01/31/19    Entered 01/31/19 21:16:04 Page 5 of 47

portfolios) and communicates with investors in the CLO SPEs. The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves are in bankruptcy. This has never been threatened or a concern. Only the Debtor-Acis which ***manages*** the CLO business is in bankruptcy. For the most part, the CLO SPEs have continued somewhat "business as usual" during the Chapter 11 Bankruptcy Cases (*i.e.,* they have continued to receive interest payments on their baskets of loans; the usual interest payments on their tranches of debt have been paid;[7] and baskets of loans have been bought and sold from time to time). The CLO SPEs have retained their own separate counsel during the Chapter 11 cases, have appeared from time-to-time on matters, and are not currently objecting to the Plan. There is also an indenture trustee (U.S. Bank National Association) for the CLO SPEs' debt, that has seemingly faithfully carried on its role during the Chapter 11 Bankruptcy Cases without many objections to the bankruptcy process—only making occasional statements aimed at ensuring that the indentures for the CLOs are not interfered with or disrespected. The indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan.

Historically, the Debtor-Acis has had four main sets of contracts that were at the heart of its business and allowed it to function. The Chapter 11 Trustee has from time-to-time credibly

---

[7] The evidence reflected that there have been a couple of occasions recently when there were insufficient funds to make distributions to the equity. *E.g.,* Transcript 12/11/18 (PM) [DE # 790], at p. 15 (line 2) through p. 16 (line 18). But it appears to this court that these missed distributions were due to actions of Highland—as later explained herein—in improperly, surreptitiously attempting to liquidate the Acis CLOs, from the time period after the Chapter 11 Trustee was appointed, until the bankruptcy court issued an injunction to temporarily halt Highland's actions. *E.g.,* Transcript 12/11/18 (AM) [DE # 789], p. 67 (line 14) through p. 68 (line 6).

Appellee Appx. 00404
Appx. 03209
007212

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 412 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 295 of 1017 PageID 8025
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 411 of 1803 PageID 11157
Case 18-3026-sgj11 Doc 3927-5 Filed 01/31/19 Entered 01/31/19 15:17:04 Page 6 of 47

testified that these agreements essentially created an "eco-system" that allowed the Acis CLOs to

be effectively and efficiently managed by the Debtor-Acis.

    1.  The PMAs with the CLO SPEs.[8]

First, the Debtor-Acis has various portfolio management agreements (the "PMAs") **with**

**the CLO SPEs**, pursuant to which the Debtor-Acis earns management fees. The PMAs have

been the primary "assets" (loosely speaking) of the Debtor-Acis (to be more precise, the PMAs

are executory contracts pursuant to section 365 of the Bankruptcy Code). They are what

generate revenue for the Debtor-Acis.

    2.  The Sub-Advisory Agreement with Highland.[9]

Second, the Debtor-Acis had a Sub-Advisory Agreement (herein so called) with an

insider, **Highland** (*i.e.,* one of the Objectors). Highland's "insider" status will be further

explained below. Pursuant to this agreement, the Debtor-Acis essentially sub-contracted for the

use of Highland front-office personnel/advisors to perform management services for the Debtor-

Acis (*i.e.,* so that the Debtor-Acis could fulfill its obligations to the CLO SPEs under the PMAs).

The Debtor-Acis paid handsome fees to Highland pursuant to this agreement. This, too, was an

executory contract pursuant to section 365 of the Bankruptcy Code. As explained below, this

agreement was rejected (with bankruptcy court approval)[10] by the Chapter 11 Trustee during the

Bankruptcy Cases, when the Chapter 11 Trustee credibly represented that he had not only found

resources to provide these services at a much lower cost to the estate, but he also had begun to

---

[8] Exhs. 6-10.

[9] Exh. 17.

[10] *See* 11 U.S.C. § 365(a).

Appellee Appx. 00405
Appx. 03279
007213

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 413 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 296 of 1017 PageID 8026
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 412 of 1803 PageID 11158
Case 18-30264-sgj11 Doc 1392-55 Filed 01/31/19 Entered 01/31/19 15:18:04 Page 7 of 47

believe that Highland was engaging in stealth efforts to liquidate the Acis CLOs, to the detriment
of the Debtor-Acis's creditors.[11]

    <u>3.</u>   <u>The Shared Services Agreement with Highland.</u>[12]

    Third, the Debtor-Acis also had a Shared Services Agreement (herein so called) with
Highland, pursuant to which the Debtor-Acis essentially sub-contracted for the use of Highland's
back-office services (again, so that the Debtor-Acis could fulfill its obligations to the CLO SPEs
under the PMAs). To be clear, the Debtor-Acis had no employees of its own—only a couple of
officers and members. The Debtor-Acis paid handsome fees to Highland for the personnel and
back-office services that Highland provided to the Debtor-Acis. This, too, was an executory
contract pursuant to section 365 of the Bankruptcy Code. As explained below, this agreement
was also rejected by the Chapter 11 Trustee during the Bankruptcy Cases (with bankruptcy court
approval) for the same reasons that the Sub-Advisory Agreement with Highland was rejected.

    <u>4.</u>   <u>The Equity PMA.</u>[13]

    Fourth, until a few weeks before the Bankruptcy Cases were filed, the Debtor-Acis also
had yet another portfolio management agreement (distinct from its PMAs with the CLO SPEs)
whereby the Debtor-Acis provided services not just to the CLO SPEs themselves, but separately
to the equity holder in the CLO SPEs. This portfolio management agreement with the equity
holder in the CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would
probably be easier to refer to it as the "Equity PMA" (for ease of reference, the court will refer to

---

[11] *See* Transcript 12/11/18 (AM) [DE # 789], at p. 48 (line 15) through p. 49 (line 16); p. 50 (line 12)
through p. 52 (line 7).

[12] Exh. 18.

[13] Exh. 11.

Appellee Appx. 00406
Appx. 03274
007214

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 414 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 297 of 1017    PageID 8027
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 413 of 1803    PageID 11159
Case 18-30264-sgj11 Doc 3992-75 Filed 01/31/19    Entered 01/31/19 15:04:48 Page 8 of 47

it as the "Equity/ALF PMA"). [14]    The Debtor-Acis did not earn a specific fee pursuant to the

Equity/ALF PMA, but the Chapter 11 Trustee and certain of his witnesses credibly testified that

the Debtor-Acis considered the agreement valuable and very important, because it essentially

gave the Debtor-Acis the ability to control the whole Acis CLO eco-system—in other words,

gave the Debtor-Acis the ability to make substantial decisions on behalf of the CLO SPEs'

*equity*—distinct from making decisions for the CLO SPEs themselves pursuant to the PMAs.

The more credible evidence before the court suggests that the Equity/ALF PMA delegated to the

portfolio manager (*i.e.,* the Debtor-Acis) the right to control the terms of any liquidation of

collateral in an optional redemption under the terms of the CLO indentures. [15]    In any event,

shortly before the Bankruptcy Cases were filed, agents of Highland and/or others controlling the

Debtor-Acis (including but not limited to Mr. James Dondero—the chief executive officer of

both the Debtor-Acis and of Highland):  (a) caused the Debtor-Acis to terminate this Equity/ALF

PMA (notably, the counter-party to this agreement, the equity owner, would have only been able

to terminate it "for cause"[16]); and (b) then caused the equity owner to enter into a new Equity

PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. ("Highland

HCF"). [17]    Mr. Dondero, in addition to being the chief executive of Highland and the Debtor-

Acis, also became the president of the newly formed Highland HCF. [18]    The Equity/ALF PMA

---

[14] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

[15] Transcript 12/18/18 [DE # 804], at pp. 77-78.  *See also* Exh. 11 at §§ 5 and 6.

[16] The Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager "for cause" at § 14(a)-(e).  Exh. 11.  On the contrary, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c).  Exh. 11.

[17] Exh. 23 (testimony of Scott Ellington), p. 175 (lines 6-25); *see also* Transcript 12/11/18 (AM) [DE # 789], at p. 54 (line 11) through p. 55 (line 5).

[18] *Id.* at p. 266 (lines 1-4).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 415 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 298 of 1017 PageID 8028
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 414 of 1803 PageID 11160
Case 18-30264-sgj11 Doc 827-5 Filed 01/31/19 Page 9 of 47

would have been an executory contract of the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if it had not been terminated shortly before the Bankruptcy Cases. The court has heard credible testimony that leads it to conclude that the Equity/ALF PMA would have been assumed by the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if not terminated by agents of Highland on the eve of bankruptcy. The court has heard credible testimony that it is important for a portfolio manager to have not only the PMAs with the CLO SPEs themselves, but also with the equity owners of the CLO SPEs.

## II.    A Few More Basics About CLOs.

In the world of CLOs (like other public debt instruments) there are occasionally redemptions, refinancings, and resets. A redemption is essentially when the equity in the CLO, before maturity, calls for the liquidation of the collateral in the CLO and the repayment of the tranches of notes, so that the CLO comes to an end. A refinancing is when a lower interest rate can be accomplished in the market place on the tranches of debt of the CLO, but the maturity date and other terms remain in place (similar to a refinancing on a home mortgage). This can happen typically after a two-year non-call period. A reset is when the maturity date, the reinvestment period, or other changes in the terms of a CLO (beyond simply interest rate) are accomplished.[19]

It should be noted that the top tranche of notes in the CLO SPEs (AAA-rated) is considered the "controlling" class, and a majority of holders in this class can terminate the CLO manager (*i.e.*, the Debtor-Acis LP) for cause on 45 days' notice, but these folks have apparently been content to ignore the Bankruptcy Cases and the fighting between the Debtor-Acis and

---

[19] *See generally* Transcript 2/9/2018 [DE # 26], at p. 74-75.

Appellee Appx. 00408
Appx. 03273
007216

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 416 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 299 of 1017    PageID 8029
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 415 of 1803    PageID 11161
Case 18-30264-sgj11 Doc 3927-3 Filed 01/31/19 Entered 01/31/19 Page 11 of Page 10 of 47

Highland (as further described below)—no doubt because they are earning their fixed income

stream without a hitch.  And the bottom tranche of "notes" in the CLO SPEs (the equity) has

voting rights and is a capital provider and, in certain ways, controls the CLO SPEs, by virtue of

having the ability to make a redemption call after a certain "no-call" period—which would force

a liquidation of the basket of loans in the CLO, with the proceeds paying down the tranches of

notes, starting at the top with the Triple A's.  But, by virtue of the Equity/ALF PMA, the Debtor-

Acis was really acting for the equity.  It seems substantially likely to the court that this is why

Highland and its agents caused the Debtor-Acis to terminate the Equity/ALF PMA (which, as

mentioned above, was an agreement that the equity could have only terminated "for cause"—and

it appears there would have been no "cause").

### III.    The Non-Insider Creditors.

The Debtor-Acis does not have many creditors.  The non-insider creditors are, for the

most part, Joshua Terry ("Mr. Terry") and a few vendors (most of which are law firms).

Mr. Terry commenced the Bankruptcy Cases with the filing of involuntary bankruptcy

petitions.  Mr. Terry was the human being who formerly, quite successfully served as the

portfolio manager for the Debtor-Acis for many years.  Mr. Terry was terminated under

contentious circumstances on June 9, 2016, after getting into disagreements with Mr. Dondero.

Mr. Terry was technically an employee of Highland itself (like all employees are, in the

Highland family of companies—no matter which subsidiary or affiliate they work for).  After his

employment termination, Highland sued Mr. Terry in September 2016.  Mr. Terry asserted

claims back against Highland and both of the above-referenced Debtors.  The litigation was

referred to arbitration, and, after a ten-day arbitration trial in September 2017 before "JAMS,"

Mr. Terry obtained an Arbitration Award (herein so called), on October 20, 2017, jointly and

**Appellee Appx. 00409**
**Appx 03271**
**007217**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 417 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 300 of 1017    PageID 8030
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 416 of 1803    PageID 11162
Case 18-30264-sgj11 Doc 3920 Filed 01/31/19 Page 11 of 47

severally, against both of the Debtors in the amount of $7,949,749.15, plus post-award interest at

the legal rate.  A Final Judgment (the "Terry Judgment") confirming the Arbitration Award was

entered on December 18, 2017, in the same amount as that contained in the Arbitration Award—

$7,949,749.15.

Mr. Terry commenced the Bankruptcy Cases when he became concerned that the Debtor-

Acis was being rendered insolvent and unable to pay creditors including himself, due to actions

undertaken by Highland and its agents immediately after entry of the Arbitration Award (*e.g.,*

transfers of assets, contracts, and business away from the Debtor-Acis).

The Debtor-Acis also is obligated on large administrative expense claims, since: (a) a

Chapter 11 Trustee was appointed very early—due to what the bankruptcy court perceived to be

massive conflicts of interest with regard to the Debtors' management; and (b) the Objectors have

opposed virtually every action taken by the Chapter 11 Trustee during the Bankruptcy Cases,

resulting in many long hearings.

## IV.    The Objectors (all of which are "Insiders").

*There are no non-insider creditors objecting to the Plan*.  Mr. Terry supports the Plan.

The CLO SPEs and Indenture Trustee do not oppose the Plan.  None of the vendors oppose the

Plan.  The U.S. Trustee is not opposing the Plan.  As a technical matter, two impaired classes of

creditors voted to accept the Plan.[20]  *So who are the Objectors to the Plan (which Plan will be*

*further described below) and what is their party-in-interest status here?*

As earlier mentioned, the Objectors are: (a) Highland, (b) HCLOF Guernsey, and (c)

Neutra Cayman.  As noted earlier, the Chapter 11 Trustee frequently refers to them collectively

as "The Highlands"—but the Objectors do not like this conflation.  At one time Highland and

---

[20] Classes 2 and 3.  *See* Exh. 613.

Appellee Appx. 00410
Appx. 03275
007218

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 418 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 301 of 1017    PageID 8031
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 417 of 1803   PageID 11163
Case 18-30264-sgj11 Doc 1329 Filed 01/11/19 Page 12 of 47

HCLOF Guernsey had the same lawyers. They do not anymore. However, they frequently file joint pleadings and take the same positions. Highland and Neutra Cayman do still have the same lawyers.

    1.  <u>Highland.</u>

    Highland is a Dallas, Texas-based company that is a Registered Investment Advisor. Highland was founded in 1993 by Mr. Dondero, originally with a 75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest. As mentioned earlier, Mr. Dondero is the chief executive of Highland. Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles including CLOs, private equity funds, and mutual funds. Highland provides employees to entities in the organizational structure, such as it did with the Debtor-Acis, through the mechanism of shared services agreements and sub-advisory agreements (as mentioned above). ***Notably, Highland's chief executive, Mr. Dondero, served as the President of the Debtor-Acis at all relevant times prepetition.***[21] Highland claims to be a large creditor of the Debtor-Acis for services provided to the Debtor-Acis under the Shared Services Agreement and the Sub-Advisory Agreement. The Chapter 11 Trustee disputes these claims and has asserted numerous claims back against Highland in an adversary proceeding (the "Highland Entities Adversary Proceeding").

    In any event, Highland is a ***disputed insider creditor***. It is an "insider," as contemplated by Bankruptcy Code section 101(31)(C), because it, beyond any shadow of a doubt, controlled the Debtor-Acis until these Bankruptcy Cases developed to the point of having a Chapter 11

---

[21] One witness, Hunter Covitz, referred to the Debtor-Acis as the "structured credit arm of Highland." Transcript 12/13/18 (AM) [DE # 793], at p. 57.

Appellee Appx. 00411
Appx. 03276
007219

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 419 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 302 of 1017   PageID 8032
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 418 of 1803   PageID 11164
Case 18-3026-sgj11 Doc 392 Filed 01/31/19   Entered 01/31/19 15:14:04   Page 13 of 47

Trustee take charge of the Debtor-Acis.  Highland does not seem to dispute that it is an insider.[22]

But, for the avoidance of doubt, Highland should be considered an insider of the Debtor-Acis for

at least the following reasons:  (a) the same human being (Mr. Dondero) was president of the

Debtor-Acis and was the chief executive of Highland; (b) Highland's General Counsel, Scott

Ellington, testified that Mr. Dondero controlled them both;[23] and (c) Highland provided the

Debtor-Acis with employees and management services pursuant to the Sub-Advisory Agreement

and Shared Services Agreement.[24]

Additionally, the court believes that the Chapter 11 Trustee made a convincing argument

in connection with Plan confirmation (and his justification for the separate classification of

Highland's claim in the Plan from other general unsecured creditors) that Highland should also

be regarded as a "competitor" of the Debtor-Acis at this juncture, since they are both in the fund

management business and Highland's control over the Debtor-Acis has now been divested.

Highland's competitor status, in addition to its insider status, warrants additional scrutiny of its

---

[22] Under section 101(31) of the Bankruptcy Code, an insider includes certain enumerated parties, such as
an officer of the debtor, affiliate, *etc.*  Further, the list of enumerated "insiders" is not exclusive or
exhaustive.  *See Wilson v. Huffman (In re Missionary Baptist Foundation of Am., Inc.),* 712 F.2d 206, 210
(5th Cir. 1983). Recently, the United States Supreme Court stated: "Courts have additionally recognized
as insiders some persons not on that [101(31)] list—commonly known as 'nonstatutory insiders.'  The
conferral of that status often turns on whether the person's transactions with the debtor (or another of its
insiders) were at arm's length."  *U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018).
The Fifth Circuit has noted that "cases which have considered whether insider status exists generally have
focused on two factors in making that determination: (1) the closeness of the relationship between the
parties and (2) whether the transaction . . . [was] conducted at arm's length."  *Browning Interests v.
Allison* (*In re Holloway*), 955 F.2d 1008, 1011 (5th Cir. 1992).

[23] *E.g.,* Exh. 23, at pp. 160 (line 15) through 161 (line 4); p. 196 (lines 14-19); p. 219 (lines 1-21).

[24] *See* 11 U.S.C. §§ 101(2)(D); (31)(C)(5).  The court notes that, although Highland has, from time to
time, alleged that Mr. Terry is a "non-statutory insider" of the Trustee, it has never put on any credible
evidence to support this contention.

**Appellee Appx. 00412**
**Appx. 03375**
**007220**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 420 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 303 of 1017   PageID 8033
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 419 of 1803   PageID 11165
Case 18-30264-sgj11 Doc 1332-5 Filed 01/31/19   Entered 01/31/19 15:15:04   Page 14 of 47

motivations in objecting to the Plan.  More importantly, it provides a sound legal and business

justification for separately classifying its claim in the Plan.

    2.  <u>HCLOF Guernsey.</u>

    The second Objector, HCLOF Guernsey, is an entity formed in the island nation of

Guernsey.  It has two allegedly independent Directors from Guernsey who have provided

testimony in connection with confirmation of the Plan.  It was enormously clear to the court (as

will be elaborated upon below) that the two Directors of HCLOF Guernsey are—stated in the

kindest way possible—mere "figureheads" for HCLOF Guernsey and they defer to Highland

*entirely* to tell them what to do, what to say, and when.  In any event, HCLOF Guernsey is the

owner of the equity in the CLO SPEs (as earlier mentioned, this equity is sometimes referred to

as the "subordinated notes" in the CLO SPEs).  According to HCLOF Guernsey's 2017 Annual

Report and Audited Financials, all of its subordinated notes issued by the Acis CLOs are

physically held at and are pledged to HCLOF Guernsey's lender, NexBank, which happens to be

a Dallas bank that is an affiliate of Highland.[25]  HCLOF Guernsey was created in the year 2015

and was formerly known as "ALF."[26]  Its name was changed on October 30, 2017 (ten days after

Mr. Terry's Arbitration Award was entered), to allegedly distance itself from the Debtor-Acis.

The equity owner HCLOF Guernsey, in turn, has three equity owners:  (i) a 49% equity owner

that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that was seeded with contributions

from *Highland*, is managed/advised by *Highland*, and whose *independent trustee is a long-time*

*friend of Highland's chief executive officer, Mr. Dondero*; (ii) 2% is owned by *Highland*

*employees*; and (iii)  a 49% equity owner that is a third-party institutional investor based in

---

[25] Exh. 647.

[26] "ALF" is short-hand for Acis Loan Funding, Ltd.

Appellee Appx. 00413
Appx. 03378
007221

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 421 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 304 of 1017 PageID 8034
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 420 of 1803 PageID 11166
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19 Page 15 of 47

Boston, Massachusetts that only recently invested in HCLOF Guernsey (*i.e.,* in November 2017, just after the Terry Arbitration Award was issued), and desires to remain passive and anonymous (hereinafter, the "Passive Investor").[27] Notably, the Debtor-Acis itself owned a small percentage of HCLOF Guernsey, in addition to providing management services to it, until October 24, 2017 (four days after the Terry Arbitration Award was issued).

The court has allowed HCLOF Guernsey to vigorously participate in the confirmation hearing (and other hearings during the Bankruptcy Cases), although its party-in-interest status has been questionable. So how is HCLOF Guernsey a party-in-interest? The answer is a bit of a stretch—but the court has decided it is impacted by the Plan, so it should have the right to object. Its party-in-interest status has evolved during the Bankruptcy Cases.

First, early on in these Bankruptcy Cases, HCLOF Guernsey (together with Highland) sued the Chapter 11 Trustee in the above-mentioned "Highland Entities Adversary Proceeding"—mostly, if not entirely, seeking injunctive relief. At that point, the Chapter 11 Trustee treated HCLOF Guernsey as a disputed creditor,[28] since it was seeking equitable relief that could arguably be monetized.[29] However, HCLOF Guernsey subsequently withdrew its requests for relief in that Highland Entities Adversary Proceeding. But then, the Chapter 11 Trustee subsequently filed claims *against* HCLOF Guernsey in the Highland Entities Adversary Proceeding (along with his claims against Highland and a couple of other Highland entities) asserting avoidance actions and other causes of action against HCLOF Guernsey (among other

---

[27] The testimony was that the Passive Investor committed to a $150 million investment ($75 million immediately and $75 million callable over the next several years).

[28] In fact, on August 15, 2018, the Chapter 11 Trustee filed a proof of claim on behalf of HCLOF Guernsey. HCLOF Guernsey has since objected to the proof of claim.

[29] *See* 11 U.S.C. §§ 101(5)(B) & 101(10).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 422 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 305 of 1017    PageID 8035
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 421 of 1803    PageID 11167
Case 18-30264-sgj11 Doc 392 Filed 01/33/19    Entered 01/31/19 15:11:04 Page 16 of 47

things, the Chapter 11 Trustee alleged that HCLOF Guernsey schemed with Highland to

terminate the Equity/ALF PMA, in a step toward systematically dismantling the Debtor-Acis of

its value). Thus, HCLOF Guernsey may ultimately owe money to this estate. But most

importantly, HCLOF Guernsey should be deemed a party-in-interest because of a proposed

temporary injunction in the Plan that essentially would enjoin (for a finite, defined period)

HCLOF Guernsey from exercising certain of its rights with regard to its equity in the CLO SPEs,

pending resolution of the Highland Entities Adversary Proceeding. This temporary injunction in

the Plan, directed towards HCLOF Guernsey and affiliates, will be further described below.

   3.   Neutra Cayman.

   Neutra Cayman is a Cayman island exempted company that is the equity owner **of the**

**Debtor-Acis itself** (in contrast to HCLOF Guernsey, which only owns equity in the CLO SPEs).

Neutra Cayman only acquired its equity interest in the Debtor-Acis the day after the Terry

Judgment was entered (on December 18, 2017), and for no consideration, from the Dugaboy

Investment Trust (a family trust on which Mr. Dondero's sister is named trustee, that previously

owned 74.9% of the Debtor-Acis) and from Mr. Akada (who previously owned 25% of the

Debtor-Acis).[30] The court concludes that Neutra Cayman has standing to object to the Plan,

---

[30] The court is repeatedly referring to the Debtor-Acis but, to be clear, there are two consolidated Debtors: Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP/LLC"). *See* note 2, *supra*. When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners: (a) the Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest. When Acis GP/LLC was formed (*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment Trust. After Mr. Terry was terminated by Highland, his 25% limited partnership interest in Acis LP was forfeited and divided among the two remaining limited partners: Mr. Akada (increasing his interest by 10% up to 25%), and the Dugaboy Investment Trust (increasing its interest by 15% up to 74.9%). But, most importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on December 18, 2017), both Mr. Akada and the Dugaboy Investment Trust conveyed their entire limited partnership interests in Acis LP—25% and 74.9%, respectively—to Neutra Cayman. The Dugaboy Investment Trust also conveyed its 100% membership interest in Acis GP/LLC to Neutra Cayman.

Appellee Appx. 00415
Appx. 02389
007223

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 423 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 306 of 1017 PageID 8036
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 422 of 1803 PageID 11168
Case 18-30264-sgj11 Doc 3923-5 Filed 01/31/19 Page 18 of 49 Page 17 of 47

since it is an equity owner of the Debtors (albeit only having acquired its equity about a month before the bankruptcy). As with HCLOF Guernsey, the court also concludes that Neutra-Cayman is absolutely, beyond any reasonable doubt, controlled by Highland, as explained further below.

## V. The Plan.

The Plan is fairly simple, considering the complexity of the business and the relationships, and the contentiousness of the Bankruptcy Cases. Again, there aren't many creditors.

The Plan proposes[31] that the Debtor-Acis, as a "Reorganized Debtor," will continue with the business operations of the Debtors after the Effective Date[32] of the Plan. Specifically, the Debtor-Acis will assume, pursuant to section 365 of the Bankruptcy Code, its CLO PMAs and continue to serve as the portfolio manager to the CLO SPEs (and as to any resets of the CLOs therein). The Reorganized Debtor will continue to earn fees and will pay claims from post-Effective Date income as provided in the Plan. The Reorganized Acis will actively pursue additional fund management contracts. Again, there is no objection by the CLO SPEs to the Plan, and the indenture trustee on the tranches of CLO notes has no objection.

Mr. Terry (again, the former human manager of the Debtor-Acis and also the largest creditor) shall receive 100% of the equity interests in the Reorganized Debtor, in exchange for a negotiated $1 million reduction in his partially secured claim.[33] The remainder of his claim will

---

[31] This is merely a high-level summary of the Plan. The Plan terms, as modified, shall in all ways govern, not this summary.

[32] The "Effective Date" is defined, essentially, as the first business day which is fourteen (14) days after entry of an order confirming the Plan, if the confirmation order is not stayed.

[33] Mr. Terry has asserted partial secured status as to his claim in the proofs of claim he has filed in these cases. The Chapter 11 Trustee credibly testified that there was no other logical party to take the equity of

Appellee Appx. 00416
Appx. 03384
007224

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 424 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 307 of 1017   PageID 8037
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 423 of 1803   PageID 11169
Case 18-30264-sgj11 Doc 3927-35 Filed 01/31/19   Entered 01/31/19 15:19:04   Page 18 of 47

be treated as an unsecured claim.  Each unsecured creditor will receive on the Plan Effective

Date an unsecured cash flow note in the full amount of its claim, which notes will mature three

years after the Effective Date of the Plan, with equal quarterly payments of principal and interest,

at 5% interest per annum.  These cash flow notes are expected to yield payment in full (actually

102%) to the unsecured creditors.[34]

As for the sub-advisory and shared services agreements with Highland, as noted earlier,

the Chapter 11 Trustee, with bankruptcy court approval, has already (as of August 2018) rejected

these during the Bankruptcy Cases, pursuant to section 365 of the Bankruptcy Code.  The

Chapter 11 Trustee caused the Debtor-Acis to subsequently contract, with bankruptcy court

approval, with a different entity, Brigade Capital Management, L.P. ("Brigade"), to provide the

sub-advisory and shared services going forward, for a minimum two-year term (unless the

Reorganized Debtor and Brigade otherwise agree), at a much cheaper cost than Highland.[35]

Thus, Brigade will provide sub-servicing and sub-advisory services to the Reorganized Debtor.

---

the Reorganized Debtor, at this juncture, and that he had negotiated this reduction to Mr. Terry's secured
claim, and he thought it was justified by the circumstances of this case.  While the Objectors have argued
that the secured status of Mr. Terry's claim may be subject to challenge under section 547(b) of the
Bankruptcy Code, section 547(b) is discretionary (*e.g.*, a "trustee may avoid any transfer" that might be
avoidable as a preference).  The Chapter 11 Trustee credibly emphasized that this was negotiated
treatment of an asserted secured claim, and he had no "exclusivity" on proposing a plan if someone else
had wanted to propose something different.  Transcript 12/11/18 (AM) [DE # 789], at p. 70 (line 3)
through p. 71 (line 2).

[34] Insider claims—namely Highland—are separately classified from general unsecured claims under the
Plan.  To the extent such claims are ultimately allowed (after any allowed defenses and offsets), and to the
extent such claims are not equitably subordinated by Bankruptcy Court adjudication, these claims will
receive the same treatment as other general unsecured claims (cash flow notes).  To the extent any of
these claims are ultimately allowed but equitably subordinated, they will receive subordinated promissory
notes, accruing interest at 5% per annum, that will not be payable until all non-subordinated claims have
been paid in full (they will have maturity dates to occur on the earlier of:  (i) the date that is two years
after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five years after the Effective
Date).  The expected recovery under the Plan for the insider claims is from 65% to 100%.

[35] An entity named Cortland Capital Markets Services LLC ("Cortland") is actually providing some of the
back-office shared services agreement type functions.

Appellee Appx. 00417

Appx. 03382

007225

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 425 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 308 of 1017 PageID 8038
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 424 of 1803 PageID 11170
Case 18-30264-sgj11 Doc 2392-75 Filed 01/31/19 Entered 01/31/19 Page 19 of 47

As for the Equity/ALF PMA, it is not an agreement with the Debtor-Acis anymore to
either be assumed or rejected, pursuant to section 365.  However, in the Highland Entities
Adversary Proceeding, the Chapter 11 Trustee seeks to avoid the termination of the Equity/ALF
PMA.  Pursuant to the Plan, the Reorganized Debtor will be vested with certain Assets of the
Debtors, including Estate Claims and Estate Defenses, to be administered and liquidated by the
Reorganized Debtor.

    1.   The Highland Entities Adversary Proceeding (Adv. Proc. No. 18-03212).

Suffice it to say that the Highland Entities Adversary Proceeding is a somewhat
significant part of the Plan; it is what justifies the temporary injunction that is a critical part of
the Plan.  With regard to the Highland Entities Adversary Proceeding, the Defendants in it (there
are five of them) are: (i) Highland; (ii) HCLOF Guernsey; (iii) Highland HCF (*i.e.,*  the Cayman
Island entity that was recently formed to essentially replace the Debtor-Acis under the
Equity/ALF PMA); (iv) Highland CLO Management, Ltd. ("Highland Management") (an entity
registered in the Cayman Islands on October 27, 2017—seven days after Mr. Terry's Arbitration
Award); and (v) Highland CLO Holdings, Ltd. (yet another entity incorporated in the Cayman
Island on October 27, 2017).  The Highland Entities Adversary Proceeding is essentially a multi-
faceted fraudulent transfer action. The statutory predicates for the relief sought are sections 502,
542, 544, 547, 548, and 550 of the Bankruptcy Code and Texas Business & Commerce Code §
24.001 et seq. ("TUFTA").

Distilled to its essence, the Highland Entities Adversary Proceeding argues that Highland,
along with its related Co-Defendants, ***orchestrated a systematic transfer of value away from the
Debtor-Acis to other Highland entities*** (all of those transferee-entities are offshore entities—
whereas the Debtor-Acis is a Delaware entity), beginning almost immediately after Mr. Terry

Appellee Appx. 00418
Appx. 03383
007226

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 426 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 309 of 1017    PageID 8039
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 425 of 1803   PageID 11171
Case 18-30264-sgj11 Doc 3392-75 Filed 01/31/19 Entered 01/31/19 Page 20 of 47

was terminated in June 2016, and continuing on during Mr. Terry's litigation/arbitration with the Debtor-Acis, and then rapidly unfolding after the Arbitration Award.  This was allegedly done to denude the Debtor-Acis of value and make the Debtors "judgment proof."  This was allegedly also done to ensure that the Debtor-Acis's very valuable business as portfolio manager would be taken over by other Highland entities and remain under Highland's and Mr. Dondero's control.[36]

The evidence is rather startling on this point.  Among other things, pursuant to amendments made to the Debtor-Acis's Sub-Advisory Agreement and Shared Services Agreements with Highland, starting soon after Mr. Terry was terminated, the fees owed by the Debtor-Acis to Highland under these agreements shot up to an enormously higher level.  Then, in April 2017, a new CLO was issued (or actually a former Acis CLO was reset) and a new Highland-affiliated Cayman Island entity was ultimately put in place to manage it instead of the Debtor-Acis (even though the Debtor-Acis managed all other CLOs in the Highland corporate empire).  Numerous other transactions were undertaken through the Fall of 2017, removing assets and agreements away from the Debtor-Acis.  For example, a multi-million dollar note receivable owed to the Debtor-Acis by Highland was transferred out of the Debtor-Acis,[37] and

---

[36] Exh. 627.

[37] On November 3, 2017, the Debtor-Acis, Highland, and Highland Management (a newly created, offshore Highland affiliate) entered into that certain Agreement for Assignment and Transfer of Promissory Note (the "Note Assignment and Transfer Agreement").  Exh. 225.  The Note Assignment and Transfer Agreement, among other things, transferred a $9.5 million principal amount promissory note executed by Highland and payable to the Debtor-Acis (the "Note"), Exh. 218, from the Debtor-Acis to Highland Management (the "Note Transfer").  The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for the Debtor-Acis.  The document recites that (i) Highland is no longer willing to continue providing support services to the Debtor-Acis, (ii) the Debtor-Acis, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland Management agrees to step into the collateral manager role if the Debtor-Acis will assign the Note to it.  Notably, Highland Management was registered in the Cayman Islands on October 27, 2017, roughly a week before the Note Transfer.  Thus, Highland Management had no portfolio or collateral management experience whatsoever when it entered the Assignment and Transfer Agreement.  To the contrary, it appears Highland Management was an entity that was created specifically to hold the Note and eventually take possession of the CLO PMAs in an international forum that would be difficult for Mr. Terry to reach.  The Debtor-

Appellee Appx. 00419
Appx. 02381
007227

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 427 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 310 of 1017    PageID 8040
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 426 of 1803    PageID 11172
Case 18-30264-sgj11 Doc 3 Filed 11/33/19    Entered 01/31/19 15:22:04    Page 21 of 47

shares in HCLOF Guernsey held by the Debtor-Acis were sold back to HCLOF Guernsey (four

days after the Arbitration Award).  And then the Equity/ALF PMA was terminated so that the

Debtor-Acis would no longer have management-control over HCLOF Guernsey as its portfolio

manager—arguably putting Highland in a position to liquidate the Acis CLOs and put the

Debtor-Acis out of business.  Specifically, on October 27, 2017, just seven days after Mr. Terry's

Arbitration Award, the Debtor-Acis ostensibly terminated its own portfolio management rights

under the Equity/ALF PMA[38] and transferred its authority and its valuable portfolio management

rights—for no value—to Highland HCF, an affiliate of Highland.  It appears that the only alleged

consideration for these transfers, to the extent there was any, was the satisfaction of purported

debts owed to other Highland entities or their representatives.

---

Acis appears to have received no or insufficient consideration for the Note Transfer.  The primary
consideration for the Note Transfer was an alleged payable due from the Debtor-Acis to Highland in the
approximate amount of $7.5 million for participation fees, which was transferred to Highland
Management shortly before the Note Assignment and Transfer Agreement was entered.  The validity of
the alleged "participation fees" is unknown.  The remainder of the consideration for the Note Transfer is a
promise to pay certain expenses of the Debtor-Acis, which has apparently never occurred.  In any event, it
appears highly likely that the Note Transfer took away the Note as an asset from which Mr. Terry could
collect his judgment.

[38] As mentioned earlier, the Equity/ALF PMA provided that the Debtor-Acis could only be removed as
portfolio manager by the equity owner (now known as HCLOF Guernsey) *"for cause"* at § 14(a)-(e).
Exh. 11.  Meanwhile, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least
ninety (90) days' notice, pursuant to § 13(a)-(c).  Exh. 11.  It would appear that these terms were wholly
ignored by the persons orchestrating the Equity/ALF PMA termination.  It appears that the Debtor-Acis
was simply manipulated to consent and agree to its removal and replacement as portfolio manager of
HCLOF Guernsey.  This transfer of the Debtor-Acis's portfolio management rights to the offshore entity
Highland HCF was accomplished by way of a new portfolio management agreement entered into by the
equity owner (now known as HCLOF Guernsey) and Highland HCF on October 27, 2017, which
empowered Highland HCF with the same broad authority to direct the management of HCLOF Guernsey
as was previously held by the Debtor-Acis LP under the Equity/ALF PMA.  *See* Exh. 19, October 27,
2017 PMA §§ 1 & 5(a)-(q).  This agreement appears to have been further solidified in a second portfolio
management agreement dated November 15, 2017.  Exh. 215.  The Debtor-Acis received no consideration
for this transfer.

Appellee Appx. 00420
Appx. 02385
007228

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 428 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 311 of 1017   PageID 8041
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 427 of 1803   PageID 11173
Case 18-30264-sgj11 Doc 1239 Filed 01/31/19   Entered 01/31/19 15:12:04   Page 22 of 47

The Highland Defendants argue that the Equity/ALF PMA (its termination being arguably the most significant transfer referenced in the Highland Entities Adversary Proceeding) did not have value. But the evidence convinces the court that it absolutely did. A witness, Mr. Zachary Alpern, credibly testified that the portfolio manager (under the Equity/ALF PMA) made decisions regarding the underlying financial instruments including seeking an optional redemption and negotiating a reset. Mr. Alpern also credibly testified about the importance, in the CLO industry, of the portfolio manager having control of a CLO's equity to ensure an "evergreen fee stream."[39] Additionally, Mr. Terry also credibly testified that the portfolio manager (not the CLO equity interest holder) has the right to control the terms of the liquidation of collateral in an optional redemption under the terms of the indentures.[40] The Chapter 11 Trustee also credibly testified that the Equity/ALF PMA allowed the Debtor-Acis to have control of an optional redemption.[41] Finally, a witness, Mr. Klein, credibly testified about the value of the Equity/ALF PMA and the negative impact of its transfer on the Debtor-Acis LP. [42]

To be clear, Highland and HCLOF Guernsey have argued in opposition to the Chapter 11 Trustee's position that it is HCLOF Guernsey—the actual equity holder of the CLO SPEs—that had/has the absolute power and authority to control the CLO SPEs' destinies and it is ludicrous to suggest otherwise. However, not only does the Equity/ALF PMA appear to this court to have delegated the relevant power and authority ***to the Debtor-Acis***, but Highland's own expert on this

---

[39] Exh. 404, Transcript 8/23/18 (AM) at pp. 65-67, 81-93 and Transcript 8/23/18 (PM) at pp. 34-35, 38-40, 46, and 49.

[40] Transcript 12/18/18 [DE # 804], at pp. 77-78. *See also* Exh. 405, Transcript 8/27/18 (AM) at pp. 63-75.

[41] Exh. 405, Transcript 8/27/18 (AM) at p. 53.

[42] Exh. 405, Transcript 8/27/18 (PM) at pp. 143-144, 147-159 and 205-207.

Appellee Appx. 00421
Appx. 03386
007229

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 429 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 312 of 1017   PageID 8042
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 428 of 1803   PageID 11174
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19 Entered 01/31/19 15:24:04 Page 23 of 47

topic, Mr. Castro, testified that the "actual humans" who would make the decision for HCLOF

Guernsey as to whether to request an optional redemption of the Acis CLOs were not the

HCLOF Guernsey directors but, rather, Highland executives Mr. Dondero, Mr. Okada, and

Highland employee Mr. Covitz (acting for Highland HCF).[43]  Moreover, Mr. Alpern credibly

testified that, before the Terry Arbitration Award, the Debtor-Acis, as the portfolio manager

under the Equity/ALF PMA, rather than the HCLOF Guernsey's directors, issued the notices of

optional redemption for HCLOF Guernsey.[44]

     The court concludes that the Chapter 11 Trustee has demonstrated a likelihood of

success on the merits with regard to his claims set forth in the Highland Entities Adversary

Proceeding.  Therefore, the Temporary Injunction that is part of the Plan is supportable (as

further explained below).  Of course, the nature and extent of the rights ultimately recovered by

the Debtor-Acis will either be determined in the Highland Entities Adversary Proceeding or, as

HCLOF Guernsey's own Guernsey expert conceded, in a binding arbitration in Dallas, Texas

under the terms of the Equity/ALF PMA.[45]

    2.   <u>The Plan Injunction.</u>

     The most controversial aspect of the Plan—the aspect of it that seems to be the primary

focus of the Objectors—is a ***portion*** of an injunction in the Plan (the "Temporary Injunction").

The Temporary Injunction would ***temporarily*** enjoin the following parties ***from effectuating an***

***optional redemption or liquidating the Acis CLOs*** and related actions: (i) Highland; (ii) HCLOF

---

[43] Exh. 406, Transcript 8/28/18 (PM) at pp. 61-63.

[44] Exh. 404, Transcript 8/23/18 (AM) at pp. 85-89 and Exhs. 323-325 (Notices of Optional Redemption
signed by the Debtor-Acis as portfolio manager of HCLOF).

[45] Transcript 12/13/18 (PM) [DE #794], at pp. 116, 118-19, 122, 124 (Corfield); *see also*, p. 140
(McGuffin).

Appellee Appx. 00422
Appx. 03385
007230

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 430 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 313 of 1017   PageID 8043
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 429 of 1803   PageID 11175
Case 18-30264-sgj11 Doc 1892-75 Filed 01/31/19   Entered 01/31/19 15:12:04   Page 24 of 47

Guernsey; (iii) CLO Holdco, Ltd. (the donor advised fund, seeded with Highland contributions

and managed by Highland that owns 49% of HCLOF Guernsey); (iv) Neutra Cayman; (v)

Highland HCF (the Cayman Island entity created shortly before the Bankruptcy Cases to replace

the Debtor-Acis under the Equity/ALF PMA); (vi) Highland Management (the Highland-created

entity that entered into a portfolio management agreement with a new Acis-CLO that was

established in 2017); and (vii) any affiliates of Highland and their respective employees, agents,

representatives, transferees, assigns, and successors.[46]   This Temporary Injunction is proposed to

only last until the earlier of when:  (a) the creditors of the Debtors are paid in full; (b) resolution

of the Highland Entities Adversary Proceeding; (c) a material breach in the Plan; or (d) the

bankruptcy court terminates the Temporary Injunction upon request of a party-in-interest.  ***Fully***

***consensual resets of the Acis CLOs are permissible if HCLOF Guernsey, as the equity owner***

***in the CLO SPEs, chooses to agree to resets***.  The basis for the Temporary Injunction is as

follows:  The Chapter 11 Trustee has asserted numerous claims in the Highland Entities

Adversary Proceeding against Highland, HCLOF Guernsey, and affiliates, including claims to

recover the Debtor-Acis's rights under the Equity/ALF PMA.[47]   The Temporary Plan Injunction

essentially provides for the continuation, after the Effective Date, of injunctive relief that the

bankruptcy court previously granted in its Preliminary Injunction Order (the "Preliminary

Injunction") [DE # 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the Highland

Entities Adversary Proceeding.  The Preliminary Injunction was originally set to expire by its

---

[46] There is another portion of this Plan injunction that is more of a general plan injunction (*i.e.,* very typical) that would prohibit actions against the Debtors, Reorganized Debtor and the Estate Assets, based on acts occurring before the Effective Date, which would be permanent and would not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

[47] *See* Exh. 627, Trustee's Counterclaims and Claim Objection.

Appellee Appx. 00423
Appx 02386
007231

own terms upon confirmation of the Plan but would be extended pursuant to an order confirming

the Plan, through the Effective Date of the Plan.

As the Fifth Circuit has stated, the four elements to justify a preliminary injunction are (a)

substantial likelihood of success on the merits; (b) substantial threat that the plaintiff will suffer

irreparable injury; (c) the threatened injury outweighs any harm the injunction might cause the

defendant; and (d) the injunction is in the public interest.[48]  Each element is present in these

cases.

*Immediate and Irreparable Harm.*  The court finds and concludes that the Temporary

Injunction is legally permissible, necessary, and appropriate to avoid immediate and irreparable

harm to the Reorganized Debtor (*i.e.,* evisceration of the Acis CLOs, by parties with unclean

hands, that would have no authority to effectuate a liquidation of the CLOs, absent the

prepetition wrongful termination of the Equity/ALF PMA).  Mr. Scott, a director of HCLOF

Guernsey, testified that, absent the Temporary Plan Injunction, HCLOF Guernsey would call for

an optional redemption of the Acis CLOs.[49]  The testimony of Ms. Bestwick, the other director

of HCLOF Guernsey, also implied that, when the injunction expires, HCLOF Guernsey would

redeem the Acis CLOs so that they could once again be managed by Highland.[50]  The Chapter 11

Trustee credibly testified that if the Acis CLOs are liquidated, there is nothing for the Debtor-

Acis to manage.[51]  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction

---

[48] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Women's Med. Ctr. of N.W. Houston v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).

[49] Exh. 721, Mr. Scott Depo. at pp. 204.

[50] Exh. 719, Bestwick Depo. at p. 112.

[51] Exh. 405, Transcript 8/27/18 (AM) at p. 40.

Appellee Appx. 00424

Appx. 007232

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 432 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 315 of 1017 PageID 8045
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 431 of 1803 PageID 11177
Case 18-30264-sgj11 Doc 3927-55 Filed 01/31/19 Entered 01/31/19 Page 26 of 47

is very important because it protects the revenues under the Acis PMAs, which is a source of

potential recovery to creditors under the Plan.[52]  Mr. Terry credibly testified that the Temporary

Plan Injunction is a critical component of the Plan and that the Debtor-Acis would have no going

concern value without it.  In fact, without the Plan Injunction, Mr. Terry will be precluded from

reorganizing the business and paying creditors.[53]

      The Objectors have argued that the Chapter 11 Trustee cannot suffer irreparable harm

because he has an adequate remedy at law.  This argument misses the mark.  The destruction of

the Debtors' ongoing business, which has the potential to repay creditors under the Plan in two

years, constitutes irreparable harm.  The fact that the estate possesses a number of avoidance

claims for damages against Highland and its affiliates, and could potentially obtain damages on

such claims, does not render the destruction of the Debtor-Acis's ongoing business any less

harmful.  Indeed, according to the Fifth Circuit:

> [T]he mere fact that economic damages may be available does not always mean
> that a remedy at law is 'adequate.' For example, some courts have found that a
> remedy at law is inadequate if legal redress may be obtained only by pursuing a
> multiplicity of actions.[54]

    *Likelihood of Success on the Merits.*  The Chapter 11 Trustee has also demonstrated a

likelihood of succeeding on the merits in the Highland Entities Adversary Proceeding.

---

[52] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[53] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[54] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934)
("we are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient . . . to uphold
the remedy by injunction.")).

Appellee Appx. 00425

007233

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 433 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 316 of 1017 PageID 8046
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 432 of 1803 PageID 11178
Case 18-30264-sgj11 Doc 3922-75 Filed 01/31/19 Entered 01/31/19 Page 27 of 47

The record contains substantial evidence of both intentional and constructive fraudulent transfers with regard to the Equity/ALF PMA and other assets.[55] The numerous prepetition transfers that occurred around the time of and after the Terry Arbitration Award appear more likely than not to have been made to deprive the Debtor-Acis of value and with actual intent to hinder, delay or defraud the Debtors' creditors. Highland's only purported business justifications for the prepetition transfers were that the Passive Investor demanded it and that the Debtor-Acis's brand was toxic in the market place.[56] However, these business justifications were not supported (and, in fact, were contradicted) by the evidence.

Indeed, while representatives of Highland and its affiliates said that the Passive Investor's demands were the reason for the termination (*i.e.,* essentially a "transfer") of the Equity/ALF PMA, the Passive Investor's representative testified that this was untrue and that these alleged demands were never made by the Passive Investor.[57] In fact, the Passive Investor was just that— a passive, minority investor in HCLOF Guernsey with no ability to influence or control any of

---

[55] *E.g.,* Exh. 22, Transcript 2/6/18 at pp. 82-109, 130, 202-244, and the exhibits discussed therein; Exh. 201, Transcript 3/21/18 at pp. 110-133 & 186-191; Exh. 24, Transcript 3/22/18 at pp. 71-75 & pp. 204-205; Transcript 12/11/18 [DE # 789], at pp. 52-56; *see also* Transcript 8/27/18 (AM) [DE # 552], at p. 52; Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98;

[56] Highland General Counsel Scott Ellington testified that the Passive Investor said it had no interest in doing business with the Debtor-Acis because the Debtor-Acis brand was purportedly toxic and, consequently, nothing associated with the Debtor-Acis could be managed or marketed as a CLO. Exh. 23, Transcript 2/7/18 at pp. 55-58. Mr. Ellington further testified that the Passive Investor demanded that the Equity/ALF PMA be transferred. Exh. 23, Transcript 2/7/18 at pp. 203-204. Mr. Ellington also testified that, because the Passive Investor would be putting in additional capital in connection with any reset CLOs, it had the ability to "start calling the shots" and dictate the terms of any reset transactions. Exh. 23, Transcript 2/7/18 at p. 226. Additionally, Highland executive Mark Okada testified that a reset transaction could not be performed by the Debtor-Acis because the market would not accept the Debtor-Acis as a portfolio manager and the Debtor-Acis was no longer risk-retention compliant. Exh. 25, Transcript 3/23/18 at p. 53. Additionally, Mr. Dondero testified that the "Boston investor" deal was contingent on getting away from the Debtor-Acis and getting a new collateral manager. Exh. 25, Transcript 3/23/18 at pp. 143-144.

[57] *See* Exh. 720 and excerpts read in to the trial record on 12/11/18 (PM) at pp. 149-157.

Appellee Appx. 00426
Appx. 03391
007234

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 434 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 317 of 1017    PageID 8047
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 433 of 1803    PageID 11179
Case 18-30264-sgj11 Doc 3392755 Filed 01/31/19    Entered 01/31/19 15:12:04    Page 28 of 47

the actual investment decisions.[58]  The only other business justification Highland and HCLOF

Guernsey have suggested for the prepetition transfers was that the Debtor-Acis "was a shell" and

not capable of being risk retention compliant.[59]  However, Highland portfolio manager Hunter

Covitz testified that in October 2017, prior to the Terry Arbitration Award, there was a structure

in place that would comply with risk retention.[60]  Mr. Covitz could not convincingly distinguish

why the "shell" status of the Debtor-Acis was distinguishable from the "shell" status of other

Highland-related entities that were the recipients of various fraudulent transfers.[61]  Mr. Covitz

also subsequently admitted that the Passive Investor did not request that the Debtor-Acis end its

involvement with HCLOF Guernsey through the Equity/ALF PMA fraudulent transfer or request

that ALF change its name to HCLOF [Guernsey].[62]  Mr. Covitz's testimony contradicted the

testimony provided by Scott Ellington, General Counsel[63] and Mr. Dondero.[64]  And, at bottom, if

the Debtor-Acis was a thinly capitalized "shell," it appears to be only because Highland

systematically made it that way after the Terry Arbitration Award.

　　　　The evidence established overwhelmingly that there is a substantial likelihood that the

transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor.

Highland put on an expert, Mr. Greenspan, who testified that he did not consider whether the

---

[58] Exh. 720, Depo. of Passive Investor representative at pp. 32-33.

[59] Transcript 12/13/18 (AM) [DE # 793], at pp. 55-58.

[60] Transcript 12/13/18 (AM) [DE # 793], at pp. 77-78.

[61] Transcript 12/13/18 (AM) [DE # 793], at p. 78; Transcript 12/18/18 [DE # 804], at pp. 59-63.

[62] Transcript 12/13/18 (AM) [DE # 793], at p. 103.

[63] *See* Exh. 23, Transcript 2/7/18 at pp. 177-178.

[64] *See* Ex. 25, Transcript 3/23/28 at pp. 143-44.

Appellee Appx. 00427

Appx. 03392

007235

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 435 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 318 of 1017    PageID 8048
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 434 of 1803    PageID 11180
Case 18-30264-sgj11  Doc 3922  Filed 01/31/19    Entered 01/31/19 15:13:04    Page 29 of 47

Equity/ALF PMA transfer was an "actual" fraudulent transfer, but only considered whether the transfer was "constructively" fraudulent.[65]  While Highland has taken the position that termination of the Equity/ALF PMA was not a transfer, Mr. Greenspan testified that the termination of a contract can constitute a transfer and acknowledged that the definition of a transfer in the Bankruptcy Code does not include a value component.[66]

*Balance of Harms.*  The Chapter 11 Trustee has also shown the balance of harms weighs in his and the estates' favor in granting the Plan's Temporary Injunction.  The Chapter 11 Trustee is entitled to the Temporary Injunction pending resolution of the claims asserted in the Highland Entities Adversary Proceeding.  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction is important to the Plan, because it allows the cash flow from the CLO management to be collected by the Reorganized Debtor, and that is the source of revenue available at this time to pay creditors.[67]  Mr. Terry also credibly testified that the Temporary Plan Injunction is a critical component of the Plan necessary to preserve the Debtors' going concern value and allow the Reorganized Debtor to generate new business and repay creditors.[68]  Conversely, in this court's view, there is no real harm to Highland or the Co-Defendants because they can ask for a reset under the Plan.[69]  Mr. Scott, a director of HCLOF Guernsey, testified that

---

[65] Transcript 12/12/18 (PM) [DE # 792], at pp. 116-117 and 161.

[66] Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98.  Section 548(a)(1)(A) of the Bankruptcy Code only requires that a transfer be made with actual intent to hinder, delay or defraud creditors.  In the context of an intentionally fraudulent transfer claim, questions of value are immaterial. 11 U.S.C. § 548(a)(1)(A). The definition of "transfer" under the Texas Uniform Fraudulent Transfer Act ("TUFTA") also does not include a value component.  Tex. Bus. & Comm. Code Ann. § 24.002(12) (West, Westlaw through 2017).

[67] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[68] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[69] Transcript 12/11/18 (AM) [DE # 792], at p. 92.

Appellee Appx. 00428
Appx. 03293
007236

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 436 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 319 of 1017   PageID 8049
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 435 of 1803   PageID 11181
Case 18-30264-sgj11 Doc 392-75 Filed 01/31/19   Entered 01/31/19 15:13:04 Page 30 of 47

HCLOF Guernsey can sell its interest in the subordinated notes in the market.[70]  The Chapter 11
Trustee credibly testified that the Temporary Plan Injunction would not impair the value of the
subordinated notes because a rational investor would not want to liquidate the Acis CLOs, but
rather would acquire them to do a reset under the Plan.[71]  Mr. Terry credibly testified that even if
the Acis CLOs are not reset, it still does not make sense to redeem the Acis CLOs.[72]

    *Public Interest.*  Finally, issuance of the Plan Injunction is consistent with public policy.
Public policy favors the equitable collecting of a debtor's assets, maximizing the value of those
assets, and distributing the proceeds in an orderly fashion in accordance with the priorities and
safeguards set forth in the Bankruptcy Code, rather than in an uncontrolled, piecemeal, and
potentially wasteful way.  Public policy also supports successful reorganizations.[73]  The public
interest is furthered by confirming a plan that saves the Debtor-Acis's business operations and
allows it to pay its creditors under a successful plan of reorganization.  The public interest is also
furthered by maintaining the status quo through the Temporary Plan Injunction so that the
avoidance action relating to the Equity ALF PMA can be determined on its merits.  The public
interest is not furthered by allowing potential wrongdoers to complete the last step in what
appears likely to have been a scheme to strip the Debtor-Acis of its assets, steal its business, and
leave it unable to pay creditors.  The public interest is not furthered by leaving the Debtors

---

[70] Exh. 721, Mr. Scott Depo. at p. 28.

[71] Transcript 12/11/18 (PM) [DE # 790], at pp. 23-24.

[72] Transcript 12/12/18 (AM) [DE #791], at p. 82.

[73] *Tex. Comptroller of Pub. Accounts v. Transtexas Gas Corp. (In re Transtexas Gas Corp.)*, 303 F.3d
571, 580 (5th Cir. 2002).

**Appellee Appx. 00429**
**Appx. 03294**
007237

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 437 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 320 of 1017    PageID 8050
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 436 of 1803    PageID 11182
Case 18-30264-sgj11 Doc 3892-35 Filed 01/31/19    Entered 01/31/19 15:13:04 Page 31 of 47

without sufficient resources to pursue and effectively litigate potentially valuable causes of

action.

In sum, the court finds and concludes that the proposed Plan injunction (including the

Temporary Injunction) is legally permissible and justified under all the circumstances.  It is

narrowly tailored to address the specific harm to which it is directed and comports with

governing case and statutory authority and applicable rules of bankruptcy and civil procedure.

The Plan Injunction is consistent with Fifth Circuit precedent.[74]  Such an injunction would not

violate section 524(e) of the Bankruptcy Code.  That subsection provides that "discharge of a

debt of the debtor does not affect the liability of any other entity on, or the property of any other

entity for, such debt."[75]  The Plan Injunction would not affect the liability of any entity, or the

liability of any property.  The injunction would only temporarily prohibit Highland and its Co-

Defendants from exercising one form of economic recourse, thereby preserving the status quo

while the Chapter 11 Trustee and/or Reorganized Debtor has a fair opportunity to prosecute the

---

[74] The Fifth Circuit, in an unpublished opinion, has recognized the propriety of an injunction to preserve the status quo in cases where equitable relief is sought.  *See Animale Group v. Sunny's Perfume, Inc.,* 256 F. App'x 707, 709 (5th Cir. 2007) ("Because Defendants seek equitable relief, the district court was authorized to preserve the status quo by entering a limited asset freeze.").  The Chapter 11 Trustee's claims in the Highland Entities Adversary Proceeding to avoid fraudulent transfers seek equitable relief. *See United States ex rel. Rahmen v. Oncology Assocs., P.C.,* 198 F.3d 489, 498 (4th Cir. 1999) ("The complaint's request to void transfers as fraudulent—a form of rescission—is also an equitable remedy."); *Dong v. Miller,* No. 16-CV-5836 (NGG) (JO), 2018 U.S. Dist. LEXIS 48506, at *30-31 (E.D.N.Y. Mar. 23, 2018) ("The setting-aside of a fraudulent conveyance is a form of equitable relief.").  *See also Iantosca v. Step Plan Servs.,* 604 F.3d 24, 33 (1st Cir. 2010) (affirming preliminary injunction where creditors had a "colorable claim that appellants' own supposed interest under the settlement rests upon a fraudulent conveyance"); *Seidel v. Warner (In re Atlas Fin. Mortg., Inc.),* Adv. No. 13-03222, 2014 Bankr. LEXIS 140 at *10 (Bankr. N.D. Tex. Jan. 14, 2014) (granting preliminary injunction where complaint sought avoidance of fraudulent transfers under the Bankruptcy Code and the Texas Uniform Fraudulent Conveyance Act); *Paradigm Biodevices, Inc. v. Centinel Spine, Inc.,* No. 11 Civ. 3489 (JMF), 2013 U.S. Dist. LEXIS 66858, at *7 (S.D.N.Y. May 9, 2013) (authority to grant preliminary injunction existed because plaintiff alleged not only a legal claim for money damages, but also an equitable claim to avoid fraudulently transferred assets).

[75] 11 U.S.C. § 524(e).

Appellee Appx. 00430
Appx. 03395
007238

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 438 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 321 of 1017   PageID 8051
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 437 of 1803   PageID 11183
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19   Entered 01/31/19 15:13:04   Page 32 of 47

Highland Entities Adversary Proceeding.[76]  Likewise, the proposed injunction does not

contravene any other provision of the Bankruptcy Code or the Bankruptcy Rules.[77]  Finally, the

Chapter 11 Trustee's avoidance claim relating to the Equity/ALF PMA transfer under TUFTA

also provides a statutory basis for injunctive relief.[78]

   3.   Feasibility of the Plan—Specific Findings and Conclusions Regarding Mr. Terry and
        Brigade.

    The Objectors have challenged the feasibility of the Plan.[79]  The court finds and

concludes that the preponderance of the evidence supported the feasibility of the Plan.  Among

other things, the Chapter 11 Trustee credibly testified that Mr. Terry has an excellent track

record as a portfolio manager, and that there is no reason why Mr. Terry will not be able to

obtain new business—that is, new portfolios to manage which will provide additional revenue

streams for the Reorganized Debtor.[80]  The evidence was credible and compelling that Mr. Terry

---

[76] *See In re Seatco, Inc.*, 259 B.R. 279, 283-84 (Bankr. N.D. Tex. 2001) (approving temporary injunction of suit against nondebtor on guaranty of debt treated in plan).

[77] *Compare Omni Mfg. v. Smith (In re Smith),* 21 F.3d 660, 666-67 (5th Cir. 1994) (disapproving injunction extending time to file proof of claim beyond limits set in Bankruptcy Rules 3003(c)(3) and 9006(b)(1)); *Chiasson v. Bingler (In re Oxford Mgmt.),* 4 F.3d 1329, 1334 (5th Cir. 1993) (disapproving injunction ordering payment that altered distribution scheme set forth in § 726(b)); *Unites States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (disapproving injunction ordering spousal support payments contrary to § 523(a)(5)).

[78] Tex. Bus. & Comm. Code Ann. § 24.008 (West, Westlaw through 2017) (providing a creditor may obtain "an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property . . . [or] any other relief the circumstances may require.").  TUFTA's injunction provision is construed broadly and courts have found that "[a] claim for fraudulent transfer under Texas law contemplates the issuance of a preliminary injunction."  *Sargeant v. Al Saleh*, 512 S.W.3d 399, 413 (Tex. App.—Corpus Christi 2016, no pet.); *accord, Janvey v Alguire*, 647 F.3d 585, 602-03 (5th Cir. 2011).

[79] 11 U.S.C. § 1129(a)(11).

[80] Transcript 12/11/18 (AM) [DE # 789], at p. 90 (lines 5-12).  Moreover, to the extent there are any gaps, recoveries from the Highland Entities Adversary Proceeding might eventually be available for ongoing operations and payment of creditors.

Appellee Appx. 00431
Appx. 93306
007239

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 439 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 322 of 1017 PageID 8052
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 438 of 1803 PageID 11184
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19 Entered 01/31/19 Page 33 of 47

will be capable of fulfilling the equity owner position in the Reorganized Debtor (stepping in to essentially run the Reorganized Debtor) and will be able to ensure the feasibility of the Plan. He is well qualified to reorganize the Debtor-Acis. Mr. Terry testified that his role with the Reorganized Debtor will be similar to the role he very successfully performed for the Debtor-Acis.[81] The Debtor-Acis received numerous awards during Mr. Terry's service as the portfolio manager of the Acis CLOs.[82] The arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors.[83] Mr. Terry credibly testified that numerous market participants have expressed an interest in working with the Reorganized Debtor if the Plan is confirmed.[84]

Moreover, the court finds and concludes that Brigade (who stepped in as sub-advisor in place of Highland during the Bankruptcy Cases and is a registered investment advisor) is qualified to serve as a sub-advisor to the Reorganized Acis. Mr. Jared Worman, a portfolio manager for Brigade,[85] credibly testified that Brigade, founded in the year 2007, currently has $20 billion of total assets under management, $5 billion of which consists of six U.S. CLOs, two U.S. CDOs, and three European CLOs.[86] Mr. Worman credibly testified that Brigade has issued 17 CLOs and has reset or refinanced several of them.[87] Mr. Worman and Mr. Terry credibly

---

[81] Transcript 12/11/18 (PM) [DE # 790], at pp. 172-73.

[82] Transcript 12/11/18 (PM) [DE # 790], at pp. 162-163 and Exh. 752.

[83] Transcript 12/11/18 (PM) [DE # 790], at pp. 161-62.

[84] Transcript 12/12/18 (AM) [DE # 791], at pp. 16-18.

[85] Mr. Worman has an undergraduate degree from Emory University and an MBA from Wharton.

[86] Transcript 12/11/18 (PM) [DE # 790], at p. 84.

[87] Transcript 12/11/18 (PM) [DE # 790], at p. 86.

Appellee Appx. 00432
Appx. 03295
007240

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 440 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 323 of 1017    PageID 8053
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 439 of 1803   PageID 11185
Case 18-30264-sgj11 Doc 3892-55 Filed 01/31/19   Entered 01/31/19 Page 34 of 47

testified that Brigade is willing to serve as sub-advisor to the Reorganized Acis for fifteen basis

points.[88]  Highland attempted to show with evidence and argument that Brigade had made some

failed trades since stepping in as sub-advisor to the Acis CLOs and that this perhaps made them

unfit to serve in this role.  But Mr. Terry credibly testified that the fact that a few failed trades

were made by Brigade does not make them unfit to serve as sub-advisor to Reorganized Acis,

and that trades out of compliance with the applicable CLO tests occasionally happen, and

Brigade has handled them appropriately.[89]  In fact, the evidence suggested that at least ten failed

trades occurred while Highland was acting as sub-advisor to the Debtor-Acis.[90]

Highland's suggestions that Brigade is not up to the task to manage the Reorganized

Debtor are specious.  Likewise, HCLOF Guernsey's insistence that it will not be getting the

benefit of its bargain if the Acis CLOs are not managed by Highland personnel going forward

appears to be a manufactured position aimed at thwarting Mr. Terry at all costs.  Not only is

there no credible evidence of Brigade mismanagement but, to the contrary, it appears that

Highland (prior to the Debtor-Acis's rejection of the Sub-Advisory Agreement and Shared

Services Agreement), intentionally liquidated assets of the CLO SPEs and built up cash without

reasonable justification.  Specifically, Mr. Terry credibly testified that there were $85 million in

purchases in the Acis CLOs in the hours leading up to the entry of the orders for relief, but

virtually no purchases of loans in the CLOs afterwards—only sales.[91]  And Mr. Worman further

---

[88] Transcript 12/11/18 (PM) [DE # 790], at p. 89; Transcript 12/12/18 (AM) [DE # 791], at p. 62.

[89] Transcript 12/11/18 (PM) [DE # 790], at pp. 182-83; Transcript 12/18/18 [DE # 804], at pp. 72-73.

[90] *See* Exhs. 727, 728; Transcript 12/11/18 (PM) [DE # 790], at pp. 71-74, 182-83.

[91] Transcript 12/12/18 (AM) [DE # 791], at pp. 18-19, 28-31; Transcript 12/18/18 [DE # 804], at pp. 87-89; *see also,* Terry Demonstrative.

Appellee Appx. 00433
Appx 03296
007241

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 441 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 324 of 1017 PageID 8054
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 440 of 1803 PageID 11186
Case 18-30264-sgj11 Doc 1239-2755led 01/31/19 Entered 01/31/19 15:13:04 Page 35 of 47

credibly testified that Highland, while acting as sub-advisor, allowed approximately $380 million

in cash to build up in the Acis CLOs. Meanwhile, Brigade has subsequently reduced that cash

balance by $280 million to approximately $100 million.[92] Mr. Worman also credibly testified

that Brigade has purchased approximately $300 million in loans for the Acis CLOs.[93] The

Chapter 11 Trustee and Mr. Terry both credibly testified that the build-up of cash in the Acis

CLOs while Highland was sub-advisor, rather than the loans acquired by Brigade, left the Acis

CLOs without sufficient interest income to make a distribution to the equity holders.[94] Certain

contradictory testimony of Hunter Covitz was not convincing that: (a) there were very few

conforming loans available to be purchased for the Acis CLOs in the approximately four months

that elapsed between the entry of the Order for Relief and the time when Highland was

terminated as sub-advisor;[95] and (b) it made more sense to accumulate cash to pay down the

AAA notes rather than invest in new loans.[96] The court found more convincing the testimony of

Mr. Terry: (a) that there was $310 billion of performing loans rated above CCC in the S&P loan

index in May of 2018 available for purchase in CLO-6 that would have satisfied the weighted

average life test;[97] (b) that Highland purchased loans for CLO-7 that would have satisfied the

weighted average life constraints in the Debtor-Acis's CLO-4, CLO-5, and CLO-6;[98] and (c)

---

[92] Transcript 12/11/18 (PM) [DE # 790], at p. 100.

[93] Transcript 12/11/18 (PM) [DE # 790], at pp. 70, 94.

[94] Transcript 12/11/18 (AM) [DE # 789], at pp. 67-69; Transcript 12/11/18 (PM) [DE # 790], at pp. 70-71;
Transcript 12/12/18 (AM) [DE # 791] at pp. 34-37.

[95] Transcript 12/13/18 (AM) [DE # 793], at pp. 12-13.

[96] Transcript 12/13/18 (AM) [DE # 793], at pp. 13-16.

[97] Transcript 12/18/18 [DE # 804], at p. 87.

[98] Transcript 12/18/18 [DE # 804], at pp. 87-88.

Appellee Appx. 00434

007242
Appx. 03299

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 442 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 325 of 1017    PageID 8055
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 441 of 1803    PageID 11187
Case 18-30264-sgj11 Doc 3927-55 Filed 01/31/19    Entered 01/31/19 16:13:04    Page 36 of 47

that, although there was no change in market conditions, Highland essentially stopped buying

collateral for the Acis CLOs[99] after the entry of the Orders for Relief.[100]

    4.   <u>Resets—Non-impairment of Anyone's Rights.</u>

        The Plan only contemplates **_consensual_** resets of the Acis CLOs—in other words, only if

HCLOF Guernsey requests resets.[101]  Messrs. Worman and Terry both credibly testified that they

believed the Reorganized Acis and Brigade could perform a consensual reset of the Acis

CLOs.[102]  Mr. Terry credibly testified that other asset managers have been able to issue or reset

CLOs after a bankruptcy proceeding.[103]  Mr. Terry also credibly testified that he wants to come

to a resolution with HCLOF Guernsey and consensually reset the Acis CLOs.[104]

        HCLOF Guernsey has taken the position that it and its new Passive Investor (new as of

mid-November 2017—just before the Bankruptcy Cases) only want to be involved with CLOs

that are managed by Highland or Highland affiliates.  Is the Plan impairing their rights—to the

extent the Plan (and any subsequent re-sets) brings in Brigade as the sub-advisor to the

Reorganized Debtor (whereas Highland was in that sub-advisor role before)?  It appears no.  The

---

[99] Transcript 12/18/18 [DE # 804], at pp. 88-89.

[100] Highland has also argued that the Plan is not feasible because the administrative expense claims are extremely high (to which the Chapter 11 Trustee responds, it is of Highland's making, since Highland has objected to literally every action proposed by the Chapter 11 Trustee).  The court does not believe there is a legitimate feasibility problem here.  Not only has the court not ruled yet on final professional fee applications, but the Chapter 11 Trustee represented that certain professionals have agreed to defer their fees (beyond payment in full on the Effective Date) as necessary.

[101] *See* Plan § 6.08.

[102] Transcript 12/11/18 (PM) [DE # 790], at pp. 86-90, 176-178; Transcript 12/12/18 (AM) [DE # 793], at pp. 16-18.

[103] Transcript 12/11/18 (PM) [DE # 790], at pp. 179-180.

[104] Transcript 12/18/18 [DE # 804], at p. 74.

Appellee Appx. 00435
Appx 03809
007243

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 443 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 326 of 1017   PageID 8056
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 442 of 1803   PageID 11188
Case 18-30264-sgj11 Doc 1392-75 Filed 01/31/19   Entered 01/31/19 15:13:04   Page 37 of 47

Offering Memorandum between HCLOF Guernsey and the Passive Investor, dated November

15, 2017, pursuant to which the Passive Investor agreed to invest in HCLOF Guernsey, provided

that there may be a change in circumstances following the date of the Offering Memorandum

and that any forward-looking statements in the Offering Memorandum involved risks and

uncertainties "because they relate to events and depend on circumstances that may or may not

occur in the future."[105]  Heather Bestwick, one of the HCLOF Guernsey directors, testified that

the Offering Memorandum does not require HCLOF Guernsey to invest only in Highland-

managed funds[106] and instead expressly provides that HCLOF Guernsey will invest in "CLOs

managed by other asset managers."[107]  Another witness, Mr. McGuffin, testified that the HCLOF

Guernsey directors' fiduciary duties require them to act independently and objectively in the best

interests of HCLOF Guernsey, and also require them to consider a change in circumstances.[108]

HCLOF Guernsey's counsel, HCLOF Guernsey's director, and the Passive Investor have all

testified that they would consider doing a reset with the Reorganized Acis in the event the Plan is

confirmed.[109]

Mr. Terry credibly testified that a reset of the Acis CLOs can occur after the expiration of

the reinvestment periods of the Acis CLOs.[110]  The Plan is feasible regardless of whether a reset

of the Acis CLOs is requested by HCLOF Guernsey.  Messrs. Phelan and Terry both credibly

---

[105] *See* Exh. 90, HCLOF Guernsey Offering Memorandum, at pp. 4-5.

[106] *See* Exh. 719, Bestwick Depo., at pp. 109, 118-121.

[107] *See* Exh. 90, HCLOF Offering Memorandum, at p. 12.

[108] Transcript 12/13/18 (PM) [DE # 794], at pp. 142-145.

[109] *See* Exh. 602, p. 12 of 70 (statement by HCLOF Guernsey's Counsel); Exh. 719 at pp. 166-167
(Heather Bestwick); Exh. 720, p. 72.

[110] Transcript 12/18/18 [DE # 804], at pp. 82-83.

Appellee Appx. 00436
0007244

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 444 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 327 of 1017    PageID 8057
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 443 of 1803   PageID 11189
Case 18-30264-sgj11 Doc 3920-75 Filed 01/31/19   Entered 01/31/19 15:13:04   Page 38 of 47

testified that the Reorganized Debtor will have cash flow from multiple potential sources—

including the revenues from the CLO PMAs with the Acis CLOs, potential new business

developed by the Reorganized Acis, and the outcome of any potential litigation claims.[111]

## VI.   General Credibility Assessments.

In ruling in a contested matter such as confirmation, and weighing the preponderance of

the evidence, the credibility of witnesses and contradictions in their testimony naturally can be

significant.  Here, there were some noteworthy problems and contradictions with some of the

testimony provided by the Objectors' witnesses.  They are summarized below.

### 1.   Scott Ellington: A Seemingly Manufactured Narrative to Justify Prior Actions.

Scott Ellington testified on February 7, 2018 at the trial on the involuntary petitions, and

the court was asked to consider his testimony again in connection with confirmation (he did not

attend the confirmation hearing).  He is the General Counsel, Chief Legal Officer, and a Partner

at Highland.  Mr. Ellington testified that the Debtor-Acis's name is "toxic" in the market place

and that, due to the litigation with Mr. Terry and allegations in that litigation, "nothing can be

associated with the Acis brand and be managed as a CLO or marketed as a CLO."[112]   Mr.

Ellington elaborated that it had been determined in late 2016 or 2017 that re-sets or re-financings

of the Acis CLOs were a prudent thing to pursue (in fact, there was indeed a trend of

refinancings and resets for this vintage of CLOs in the market place) and, in connection with

that, the Debtor-Acis's contracts and assets needed to be diverted to different, newly created

entities because:  (a) the "Acis" name was toxic and underwriters and investors were not going to

---

[111] Transcript 12/11/18 (AM) [DE # 789], at pp. 72, 88-90; Transcript 12/12/18 (AM) [DE # 791], at p. 53.

[112] Exh. 23, p. 55 (line 17) through p. 56 (line 7); p. 98 (lines 8-12).

Appellee Appx. 00437
Appx. 03802
007245

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 445 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 328 of 1017    PageID 8058
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 444 of 1803   PageID 11190
Case 18-3026 Case 19-12392735 Filed 01/33/19   Entered 01/31/19 15:14:04   Page 39 of 47

be interested in re-financings or resets for CLOs managed by the Debtor-Acis;[113] and (b) the new

Passive Investor wanted the Debtor-Acis out of the picture.[114]  Mr. Ellington further elaborated:

"The equity, you know, calls the tune, so to speak, in terms of the CLO . . .."[115]  In summary, an

overarching theme of Mr. Ellington's testimony was that the Debtor-Acis was tainted or toxic in

the marketplace and the Passive Investor wanted the Debtor-Acis out of the picture—thus, this

was the motivation for the prepetition transactions orchestrated by Highland prior to the

Bankruptcy Cases.  The problems with the Scott Ellington testimony were at least two-fold.

First, there is no credible evidence that the Debtor-Acis is/was toxic in the market place.  In fact,

in April 2017 (well after the litigation with Mr. Terry commenced), the Debtor-Acis issued a

new CLO (CLO-7).  And in market publications as recently as August 21, 2017, Highland was

touting the ***Acis*** structure stating "our vehicle will allow us to issue between six and 12 CLOs

over the next few years."[116]  Second, the Passive Investor denies demanding that the Debtor-Acis

be removed as the CLO manager.  Term sheets as recent as August 21, 2017 contemplated the

Debtor-Acis as the continuing portfolio manager of CLOs, with apparently no protestations by

the Passive Investor.[117]

---

[113]  *E.g., Id.* at p. 177 (line 21) though p. 178 (line 12); p. 184 (lines 13-17) ("The underwriters in this case, Mizuho, Goldman, et al., the equity, they said we want every possible relation to anything that could be legacy Acis or Acis-related affiliates to be severed").

[114] *Id.* at p. 202 (lines 11-13) ("we have third-party investors that said we don't want to be involved in this brand; and their equity is one of the reasons that new CLOs can be launched"); p. 203 (lines 7-8) ("It was call the deal and terminate the CMAs or transfer the CMAs"); p. 223 (lines 8-12) ("Because if the involuntary remains, and I'm just – I'm just being frank – we've already been told by equity holders, including the separate account, BBK, that you may have seen on some of the exhibits, they're pulling everything.").

[115] *Id.* at p. 74 (lines 3-6).

[116] Exh. 801, pp. 3 & 5.

[117] Exh. 802, p.1.

Appellee Appx. 00438

007246

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 446 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 329 of 1017    PageID 8059
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 445 of 1803   PageID 11191
Case 18-3026-sgj11   Doc 392755 Filed 01/31/19   Entered 01/31/19 Page 40 of 47

2.  <u>Michael Pugatch: The Passive Investor Made Into a Scapegoat.</u>

The reality is that Highland, indeed, started working on the concept of doing resets of

some of the older vintage Acis CLOs in at least early 2017 (and perhaps late 2016). Highland, in

fact, completed a reset of one Acis CLO in April 2017 (with the Debtor-Acis still in place as the

portfolio manager for that reset in April 2017). As part of that process of implementing resets

for the Acis CLOs, Highland worked on bringing in a new investor or investors to have a share

of the equity tranche of the Acis CLOs. Highland finally obtained the commitment of the

Passive Investor in November 2017, after starting initial discussions with them in the second

quarter of 2017.[118] A representative for the Passive Investor referred to itself as "passive" in a

deposition.[119] Concepts and documentation for the Passive Investor's investment in the Acis

CLOs were discussed for a while during 2017. As recently as August 2017, the negotiations

with the Passive Investor appeared to contemplate the Debtor-Acis still as the portfolio manager

for the CLOs.[120] Then the arbitration trial with Mr. Terry began in September 2017 and the

Terry Arbitration Award was issued on October 20, 2017. Suddenly, it appears that the

dismantling of the Debtor-Acis began with all deliberate speed. The court believes, based on the

totality of the evidence, that it was Highland who did not want the Debtor-Acis as CLO manager

going forward, so that Highland could keep reaping the benefits of the reset CLOs. Specifically,

when deposed on the topic, a representative for the Passive Investor, Mr. Pugatch, denied the

accuracy of Mr. Ellington's testimony, stating that the Passive Investor "viewed Acis and

Highland as interchangeable from the perspective of the—you know, the actual investment

---

[118] *See* Exh. 720, Pugatch Deposition Transcript dated November 27, 2018, p. 18, lines 14-20.

[119] *Id.* at p. 22 (lines 2-3) ("we're you know, 49 percent sort of passive minority investor").

[120] Exh. 802, p. 1.

**Appellee Appx. 00439**

**007247**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 447 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 330 of 1017   PageID 8060
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 446 of 1803   PageID 11192
Case 18-30264-sgj11 Doc 1392-75 Filed 01/31/19   Entered 01/31/19 Page 41 of 47

opportunity."[121]  When asked, "Are you aware that Scott Ellington, general counsel for HCM,

testified that [the Passive Investor] said with absolute certainty that they had no interest in doing

business with Acis because the Acis brand was purportedly toxic and, consequently, nothing

associated with Acis could be managed or marketed as a CLO?" Mr. Pugatch testified that he

had read that testimony and that the statement was not true.[122]  He further stated that "the

ultimate sort of name change did not come from [the Passive Investor]."[123]  In fact, when further

asked whether the Passive Investor knew why Acis CLO Funding Limited changed its name to

Highland CLO Funding Limited (*i.e.,* HCLOF Guernsey), Mr. Pugatch testified, "We were told

that it was a change in the brand or the name, as requested by Highland."[124]  And when asked

"Did [the Passive Investor] request that the name be changed?" he answered "No."[125]  When

asked whether the Passive Investor considered "Acis toxic in the industry?" Mr. Pugatch

answered:  "No. What I would say is, when the suggested name change did occur, there were

commercial reasons given to us as to why that would be beneficial in terms of the ongoing

management of those CLOs and the intended investment thesis around the investment that we

had made, which seemed to make commercial sense."[126]  When Mr. Pugatch was asked, "Those

reasons were given by Highland, correct?" he replied "Correct" and confirmed that they were not

demanded by the Passive Investor.[127]  Mr. Pugatch was emphatic that the Passive Investor was

---

[121] *Id.* at p. 30 (lines 19-20).

[122] *Id.* at p. 31 (lines 6-19).

[123] *Id.* (lines 24-25).

[124] *Id.* at p. 27 (lines 24-25).

[125] *Id.* at p. 28 (lines 1-3).

[126] *Id.* at p. 32 (lines 1-8).

[127] *Id.* at p. 32 (lines 9-12).

Appellee Appx. 00440
Appx. 03885
007248

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 448 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 331 of 1017 PageID 8061
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 447 of 1803 PageID 11193
Case 18-30264-sgj11 Doc 392-75 Filed 01/31/19 Entered 01/31/19 Page 42 of 47

just that—a passive investor—that did not have the ability to "start calling the shots" and dictate
the terms of any reset transactions.[128] When asked if the Passive Investor was concerned about
the Terry Arbitration Award, Mr. Pugatch replied: "The award itself, no. I think the only thing
we were concerned about or focused on was that vis-à-vis our equity investment in Highland
CLO Funding Limited and, in turn, the equity that that vehicle held in the various CLOs was
appropriately, you know, ring-fenced or not exposed to any potential damages or economic loss
in value as a result of that arbitration award."[129]

The Passive Investor further testified that Brigade has "a fine reputation in the market"
but that it had no interaction with them historically.[130] The Passive Investor also testified that it
was concerned about the cash buildups that had happened recently due to actions while Highland
had still been the sub-advisor on the Acis CLOs.[131]

    **3.**   <u>The Seemingly Rehearsed Testimony of the Two HCLOF Guernsey Witnesses.</u>

The court was presented with video depositions of HCLOF Guernsey's two non-
executive directors (*i.e.,* its only directors): Mr. William Scott[132] and Ms. Heather Bestwick.[133]
It was very apparent to the court that HCLOF Guernsey is controlled by Highland in every way.
Putting things in the kindest way possible, Mr. Scott and Ms. Bestwick appear to be nominal
figureheads who are paid to act like they are in charge, while they are not. They are both

---

[128] *Id.* at p. 32 (lines 16-17); pp. 33-35.

[129] *Id.* at p. 43 (lines 3-9); p. 89.

[130] *Id.* at p. 68 (lines 11-13).

[131] *Id.* at p. 82, lines 9-24.

[132] *See* Exh. 721.

[133] *See* Exh. 719.

Appellee Appx. 00441
Appx_03806
007249

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 449 of

Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 332 of 1017  PageID 8062

Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 448 of 1803  PageID 11194

Case 18-30264-sgj11 Doc 232 Filed 01/31/19  Entered 01/31/19 16:41:04  Page 43 of 47

basically professional directors-for-hire, for companies that choose to form/organize in the nation

of Guernsey.

Ms. Bestwick testified that she is a nonexecutive director for six companies in Guernsey

(none of the others are in the CLO business).[134]  She testified that she earned £35,000 per year to

serve as a director of HCLOF Guernsey.[135]  She testified that she was selected by Highland[136]

and that Highland also made the decision to hire HCLOF Guernsey's law firm in the Bankruptcy

Cases.[137]  Ms. Bestwick, when questioned as to why the Equity/ALF PMA it had with the

Debtor-Acis was terminated shortly after the Terry Arbitration Award was issued, testified that

she was told it was "a condition precedent to the new Passive Investor" coming in and that she

was told this by Highland.[138]  She also testified that she had never talked to the Passive Investor

(who, of course, is a 49% owner of HCLOF Guernsey)[139] or Grant Scott (the trustee of the

charitable organization that owns 49% of HCLOF Guernsey).[140]  She reiterated that she only

talks to Highland employees.  She also was under the impression that terminating the

Equity/ALF PMA would improve marketability of the CLOs going forward but that it was the

same people and "business as usual for us."[141]  She testified that she learned of the Terry

---

[134] *Id.* at pp. 7-8; p. 21 (line 5) through p. 22 (line 20); p. 26 (lines 10-12).

[135] *Id.* at p. 43 (lines 18-19).

[136] *Id.* at p. 42 (lines 17-25).

[137] *Id.* at p. 53 (lines 7-20).

[138] *Id.* at p. 16 (line 13) through p. 17 (line 23); p. 58 (line 21) through p. 60 (line 17).

[139] *Id.* at p. 188 (lines 12-15).

[140] *Id.* at p. 188 (line 19) through p. 189 (line 9).

[141] *Id.* at p. 189 (lines 12-15); p. 200 (line 22).

Appellee Appx. 00442

Appx. 03305

007250

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 450 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 333 of 1017   PageID 8063
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 449 of 1803   PageID 11195
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19   Entered 01/31/19 Page 45 of 49   Page 44 of 47

Arbitration Award in mid-April 2018 (some six months after the fact)[142] and "[y]ou'd have to

ask Highland"[143] why it did not inform her sooner.  Her testimony was clear that she defers to

Highland on everything, stating that as directors they were "heavily reliant on our service

providers, and that means Highland."[144]  With regard to a lawsuit that HCLOF Guernsey filed

against Mr. Terry in Guernsey during the Bankruptcy Cases, she testified that it was neither her

nor the other director, William Scott's, idea.

Mr. Scott, the other HCLOF Guernsey director, is a "professional director" for 10-15

Guernsey companies[145]—all of which are "paying assignments."[146]  He became rather incensed

when testifying, at the suggestion that he and Ms. Bestwick were not in control of HCLOF

Guernsey, stating that board minutes and other documents would show that they took a great

level of interest in running the company.[147]  He testified that he earned £40,000 per year to serve

as a director of HCLOF Guernsey and that, due to the extra work of the Bankruptcy Cases, he

also was charging another £350 per hour, after the first 35 hours[148] (the court notes, anecdotally,

that it required participation in court hearings by a director of HCLOF Guernsey each time that

HCLOF Guernsey took a position in court).  Mr. Scott confirmed that he was not aware of the

litigation with Mr. Terry nor the Acis Bankruptcy Cases until April 2018.[149]  He also testified

---

[142] *Id.* at p. 61 (lines 3-19); p. 130 (line 14) through p. 136 (line 2).

[143] *Id.* at p. 137 (line 21).

[144] *Id.* at p. 152 (lines 18-19).

[145] *See* Exh. 721 at p 8 (line 9) through p. 9 (line 5); p. 79 (lines 20-25).

[146] *Id.* at p. 80 (lines 3-5).

[147] *Id.* at p. 13 (lines 1-12); p. 22 (line 23) through p. 23 (line 12).

[148] *Id.* at p. 80 (lines 6-18).

[149] *Id.* at p. 132 (line 20) through p. 135 (line 10).

Appellee Appx. 00443

Appx. 03306

007251

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 451 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 334 of 1017    PageID 8064
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 450 of 1803   PageID 11196
Case 18-30264-sgj11 Doc 3392755 Filed 11/31/19   Entered 11/01/39/19 16:41:04 Page 45 of 47

that Highland had proposed the legal counsel HCLOF Guernsey used in the Bankruptcy Cases
and that he had never disagreed with Highland's advice.[150]  He confirmed that all investment
decisions were made by Highland and that he and Ms. Bestwick's role was to "police" service
providers.[151]  Like Ms. Bestwick, Mr. Scott testified that they were told that the Passive Investor
had made it a condition precedent to their investment in HCLOF Guernsey that "Acis depart."[152]
But he had not talked to the Passive Investor.[153]  As if all this deference to Highland were not
enough, HCLOF Guernsey's lender is NexBank (an affiliate of Highland—which is based in
Dallas, not Guernsey) and HCLOF Guernsey has given its actual equity notes to NexBank as
security for its loans from NexBank.[154]  Also, interestingly, when asked about the adversary
proceeding that HCLOF Guernsey filed against the Chapter 11 Trustee a few months ago in the
Bankruptcy Cases (*i.e.,* the Highland Entities Adversary Proceeding—it was originally
commenced by Highland and HCLOF Guernsey as Plaintiffs), Mr. Scott testified that "we
haven't sued the trustee, he has sued us" but later acknowledged his mistake when corrected by
counsel.

This court is not naïve—it realizes that so-called "fiduciary services firms" are apparently
a typical thing in the world of off-shore jurisdictions that are large financial centers.[155]  Maybe

---

[150] *See generally id.* at pp. 277-280.

[151] *Id.* at p. 106 (lines 1-7).

[152] *Id.* at p. 254 (line 20) through p. 260.

[153] *Id.* at p. 155 (lines 2-25).

[154] *See* Exh. 719 at p. 213 (line 2-22); Exh. 721 at p. 129 (line 10) through p. 130 (line 13).

[155] During the testimony of both Ms. Bestwick and Mr. Scott, the court was reminded of an old TV commercial in which an actor states, "I am not a doctor, but I play one on TV."  The court could not help but conclude that these were not real directors but were playing them (when legally necessary).

Appellee Appx. 00444
Appx. 03309
007252

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 452 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 335 of 1017 PageID 8065
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 451 of 1803 PageID 11197
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19 Entered 01/31/19 Page 46 of 47

the system works, for the most part and in many business contexts. But not when trying to convince a bankruptcy court of the bona fides of transactions that look like attempts to denude another party of value and/or to thwart creditors. And not when accusations are made that you are the alter ego of the party (Highland) who orchestrated the company's creation. The evidence was overwhelming that: (a) the HCLOF Guernsey Directors do whatever they are told to do by Highland; (b) they do not talk to anyone else but Highland; (c) they have never challenged Highland; (d) they let Highland pick and consult with their lawyers; and (e) they were not made aware by Highland of the Terry Arbitration Award, the Terry Judgment, the involuntary bankruptcy petitions, or pleadings that lawyers filed in the Bankruptcy Cases on HCLOF Guernsey's behalf.

In summary, the testimony of these two HCLOF Guernsey Directors was of little or no value in convincing the court that the Objector, HCLOF Guernsey, has valid concerns of its own (separate from Highland's) with regard to the bona fides of the Plan.

**VII. Conclusion.**

This Bench Ruling and Memorandum Opinion is intended to address some of the most pertinent facts and issues raised in connection with confirmation of the Plan. Among other things, the court believed it was necessary to stress, in a separate ruling: (a) *the unique status of the Objectors* (they are "insiders" as defined in the Bankruptcy Code whose prepetition actions suggest unclean hands—this seems highly relevant to consider, when there are no non-insider creditors or other relevant parties objecting to the Plan); (b) *the appropriateness and legality of the proposed Plan Injunction* that would temporarily prevent nonconsensual redemptions/liquidations (it is in all ways justified given the allegations in the Highland Entities Adversary Proceeding and under the traditional four-prong test for preliminary injunctions); and

**Appellee Appx. 00445**
**Appx. 03519**
**007253**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 453 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 336 of 1017    PageID 8066
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 452 of 1803   PageID 11198
Case 18-30264-sgj11   Doc 1839-2   Filed 01/31/19   Entered 01/31/19 15:14:04   Page 47 of 47

(c) *the feasibility of the Plan* (Mr. Terry and Brigade are well qualified to perform their

contemplated roles).

The court will separately sign the Findings of Fact, Conclusions of Law and Order

Confirming Plan submitted by the Chapter 11 Trustee to address all other relevant issues.

**#### End of Bench Ruling and Memorandum Opinion ####**

Appellee Appx. 00446
Appx. 09314
007254

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 454 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 337 of 1017 PageID 8067
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 453 of 1803 PageID 11199
Case 19-12239-CSS Doc 86-3 Filed 11/01/19 Page 1 of 54

**<u>Exhibit C</u>**

**Acis Involuntary Opinion**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 455 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 338 of 1017    PageID 8068
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 454 of 1803   PageID 11200
Case 18-30264-sgj11 Doc 13 Filed 04/13/18   Entered 04/13/18 12:55:54 Page 1 of 53



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 13, 2018**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-7** |
| | § | |
| Alleged Debtor. | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **CASE NO. 18-30265-SGJ-7** |
| **L.L.C.,** | § | |
| | § | |
| Alleged Debtor. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF
## ORDERS FOR RELIEF ISSUED AFTER TRIAL ON
## CONTESTED INVOLUNTARY BANKRUPTCY PETITIONS

Joshua N. Terry (the "Petitioning Creditor" or "Mr. Terry") filed involuntary bankruptcy

petitions (the "Involuntary Petitions") against each of the two above-referenced related

1

**Appellee Appx. 00448**
**Appx. 03313**
**007256**

companies (the "Alleged Debtors") on January 30, 2018.[1]  The Involuntary Petitions were

contested, and the court held a multi-day trial (the "Trial") spanning March 21, 22, 23, 27, and

March 29, 2018.[2]  This constitutes the court's findings of fact, conclusions of law and ruling,

pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014.[3]  As explained below, the court has decided

that Orders for Relief are legally required and appropriate as to each of the Alleged Debtors.

## I.    FINDINGS OF FACT

### A.    Introduction.

1.      The Alleged Debtors—Acis Capital Management, L.P. ("Acis LP"), a Delaware

limited partnership, and ACIS Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware

limited liability company—are two entities in the mega-organizational structure of a company

that is known as Highland Capital Management, L.P. ("Highland").

2.      Highland is a Dallas, Texas-based company that is a Registered Investment

Advisor.  Highland was founded in 1993 (changing its original name from "Protective Asset

Management" to Highland in 1997) by James D. Dondero ("Mr. Dondero"), originally with a

---

[1] Exhs. 50 & 51.

[2] Shortly after the Involuntary Petitions were filed, the court held hearings on February 6-7, 2018, on the Petitioning Creditor's Emergency Motion to Abrogate or Modify 11 U.S.C. § 303(f), Prohibit Transfer of Assets, and Import, Inter Alia, 11 U.S.C. § 363 [DE # 3] (the "303(f) Motion") and the Alleged Debtors' Emergency Motion to Seek Emergency Hearing on the Alleged Debtors' Motion to Dismiss Involuntary Petitions and Request for Award of Fees, Costs, and Damages [DE # 9] (the "Emergency Motion to Set Hearing on Motion to Dismiss").  The court ultimately granted the 303(f) Motion and denied the Emergency Motion to Set Hearing on Motion to Dismiss. Both the Petitioning Creditor and the Alleged Debtors have proposed that the court should consider the evidence it heard at the hearings held on February 6-7, 2018, in determining whether it should enter orders for relief.  The court has, accordingly, considered such evidence in this ruling.

[3] Bankruptcy subject matter jurisdiction exists in this contested matter, pursuant to 28 U.S.C. § 1334(b). This is a core proceeding over which the bankruptcy court may exercise subject matter jurisdiction, pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This bankruptcy court has Constitutional authority to issue a final order or judgment in this matter, as it arises under a bankruptcy statute— 11 U.S.C. § 303. Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Alleged Debtors have their business headquarters in this district.

Appellee Appx. 00449

007257

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 457 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 340 of 1017 PageID 8070
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 456 of 1803 PageID 11202
Case 18-30264-sgj11 Doc 39-18 Filed 04/13/18 Entered 04/13/18 08:34:58 Page 3 of 53

75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.[4]

3.      Both Mr. Dondero and Mr. Akada provided witness testimony at the Trial on the Involuntary Petitions, and their names are mentioned numerous times herein—since they were generally the subject of significant evidence and argument presented at the Trial. Mr. Dondero is the chief executive officer for Highland and Mr. Akada is the chief investment officer. Mr. Dondero is also the president of each of the two Alleged Debtors.

4.      Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles ranging from: collateral loan obligation funds ("CLOs"); private equity funds; and mutual funds.

5.      Highland's CLO business was front-and-center at the Trial on the Involuntary Petitions. The Alleged Debtor, Acis LP, for approximately the past seven years, has been the vehicle through which Highland's CLO business has been managed.

6.      The Petitioning Creditor, Mr. Terry, became an employee of Highland in the year 2005, starting as a portfolio analyst, promoting to a loan trader, then ultimately becoming the portfolio manager for (and 25% limited partner in) Highland's CLO business—specifically, Mr. Terry was the human being who was acting for the CLO manager, Acis LP.

7.      Mr. Terry was highly successful in his role in the CLO business, managing billions of dollars of assets during his tenure, but Mr. Terry and Mr. Dondero had a bitter parting of ways on June 9, 2016. Specifically, Mr. Terry's employment was terminated on that date (for

---

[4] Mr. Dondero testified at the Trial that, three years ago, Messrs. Dondero and Akada sold their interests in Highland to a charitable remainder trust in exchange for a 15 year note receivable.

Appellee Appx. 00450
Appx. 07315
007258

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 458 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 341 of 1017 PageID 8071
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 457 of 1803 PageID 11203
Case 18-3026 Case 19-1233918 Filed 04/13/13 Entered 04/13/18 Page 35 5854 Page 4 of 53

reasons that have been highly disputed) and his 25% limited partnership interest in Acis LP was deemed forfeited without any payment of consideration to him.

8.      In September 2016, Highland sued Mr. Terry in the 162nd Judicial District Court of Dallas County, Texas ("State Court 1") for breach of fiduciary duty/self-dealing, disparagement, breach of contract, and various other causes of action and theories.  Mr. Terry asserted his own claims against Highland, and also claims against the two Alleged Debtors, Mr. Dondero, and others and demanded arbitration.  On September 28, 2016, State Court 1 stayed the litigation and ordered the parties to arbitrate.  The parties participated in ten days of arbitration in September 2017 before JAMS.  On October 20, 2017, Mr. Terry obtained an Arbitration Award (herein so called),[5] jointly and severally against both of the Alleged Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate, which was based on theories of breach of contract and breach of fiduciary duties.

9.      There are still claims pending between and among the Petitioning Creditor, Highland, and others (not including the Alleged Debtors) in State Court 1.

10.     A Final Judgment (herein so called) confirming the Arbitration Award was entered by the 44th Judicial District Court of Dallas County, Texas ("State Court 2") on December 18, 2017, in the same amount as that contained in the Arbitration Award— $7,949,749.15.[6]

11.     Mr. Terry began pursuing post-judgment discovery soon after obtaining his Arbitration Award and even more so after entry of the Final Judgment.  Mr. Terry undertook a UCC search on November 8, 2017, to investigate whether there were any liens on the Alleged

---

[5] Exh. 1.

[6] Exh. 105.

Appellee Appx. 00451
Appx. 007259

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 459 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 342 of 1017 PageID 8072
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 458 of 1803 PageID 11204
Case 18-3026 Case 19-12239 1835 Filed 04/18/18 Entered 04/18/18 Page 36 5854 Page 5 of 53

Debtors' assets (none appeared).[7] Mr. Terry also pursued a garnishment of an Acis LP bank

account (at a time when there was only around $2,000 in the account). Mr. Terry's counsel

deposed Highland's General Counsel Scott Ellington (who sat for the deposition as a

representative of Acis, LP) on January 26, 2018, and asked numerous questions about: (a) how

many creditors the Alleged Debtors had,[8] and (b) whether Acis LP was able to pay its debts as

they became due,[9] but did not receive meaningful answers.

12.     Mr. Terry requested a temporary restraining order ("TRO") from State Court 2, on

January 24, 2018, after discovering certain transactions and transfers involving Acis LP's

interests, that he believed were pursued without any legitimate business purpose and with the

purpose of denuding Acis LP of its assets and to make it judgment proof. Most particularly, it

appeared as though Highland was engaged in a scheme to transfer certain fee-generating CLO

management contracts of Acis LP away from it and into a Cayman Island affiliate of Highland.[10]

At a January 24, 2018 hearing on the request for a TRO, Acis LP agreed and State Court 2

ordered that, between that hearing and a later hearing on a request for a temporary injunction, no

CLO management contracts would be transferred away from Acis LP and that no monies would

be diverted from it.[11]

13.     Then, on January 29, 2018, the Controller of and CPA for Highland (David Klos)

submitted a Declaration to State Court 2 concerning the net worth of the Alleged Debtors, stating

---

[7] Exh. 84.

[8] Exh. 25, pp. 7-9.

[9] *Id.* at pp. 102-04.

[10] Exh. 27.

[11] Exh. 28.

Appellee Appx. 00452
Appx. 02317
007260

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 460 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 343 of 1017 PageID 8073
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 459 of 1803 PageID 11205
Case 18-30264-sgj11 Doc 1233-8 Filed 04/13/18 Entered 04/13/18 23:58:54 Page 6 of 53

that Acis GP/LLC had a net worth of $0 and that Acis LP might have a net worth, at best, of $990,141.[12] Mr. Terry thought this was preposterous—given the management fees that Acis LP was entitled to and the receivables that should be owing to it. Mr. Terry believes that the collateral management agreements on which Acis LP receives management fees have a present value of $30 million (about $6 million for each of the five CLOs which Acis LP has been managing).

14. On January 29, 2018, the Alleged Debtors filed a motion for leave to post a supersedeas bond in the amount of **$495,070.50** with State Court 2 (purportedly half of the net worth of the two Alleged Debtors—as stated in the David Klos Declaration), so that they could suspend enforcement of the Final Judgment while they appealed it.[13] Although there is a very stringent standard for appealing an Arbitration Award, the Alleged Debtors apparently believe they have an argument that State Court 2 lacked the subject matter jurisdiction to confirm the Arbitration Award (a motion to vacate the Final Judgment based on this argument has previously been denied by State Court 2).[14]

15. Meanwhile, Mr. Terry was learning of more transactions and transfers involving Acis LP's assets and interests. On January 29, 2018, Mr. Terry filed supplemental pleadings with State Court 2, alleging that further shenanigans (*i.e.,* transfers and transactions that would amount to fraudulent transfers) were underway at Acis LP and seeking a receiver.[15] Also, at

---

[12] Exh. 26.

[13] Exh. 73.

[14] *See* DE # 35, in Case No. 18-30264 and DE # 34 in Case No. 18-30265. Unless otherwise noted, references to "DE #" herein refer to the docket entry number at which a pleading appears in the docket maintained with the Bankruptcy Clerk in the Acis Capital Management L.P. bankruptcy case (Case No. 18-30264).

[15] Exhs. 28-31.

Appellee Appx. 00453
Appx. 007261

some point, in the weeks leading up to this, an Acis LP lawyer represented to Mr. Terry's counsel that the Alleged Debtors were "judgment proof."[16]

16.     At approximately 11:57 p.m. on January 30, 2018 (on the evening before a scheduled temporary injunction hearing in State Court 2—at which time State Court 2 presumably might have considered the Alleged Debtors' request to post the $495,070.50 supersedeas bond to stay enforcement of the Final Judgment), Mr. Terry filed the Involuntary Petitions, as a sole petitioning creditor, against both Acis LP and Acis GP/LLC.

17.     For purposes of this Trial (and this Trial only), the Alleged Debtors do not dispute that Mr. Terry has standing to be a petitioning creditor pursuant to Bankruptcy Code section 303(b)—in other words, they do not dispute that Mr. Terry is a holder of a claim against the Alleged Debtors that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount and that aggregates at least $15,775 in unsecured amount. However, the Alleged Debtors argue that: (a) the Alleged Debtors have *12 or more creditors* and, thus, three or more petitioning creditors were required to prosecute the Involuntary Petitions pursuant to Bankruptcy Code section 303(b)(1); (b) the Petitioning Creditor did not establish, pursuant to Bankruptcy Code section 303(h)(1), that the Alleged Debtors are not *generally paying their debts as such debts become due* unless such debts are the subject of a bona fide dispute as to liability or amount; (c) regardless of whether the Petitioning Creditor has met the statutory tests in sections 303(b)(1) and (h)(1), the Petitioning Creditor has acted in *bad faith*—which serves as an equitable basis for dismissal of the Involuntary Petitions; and (d) if the court disagrees with the Alleged Debtors and determines that the section 303(b) and (h) statutory tests are met, and also determines that the Petitioning Creditor has not acted in bad faith, the court should

---

[16] Exh. 27 (exhibit 3 thereto).

Appellee Appx. 00454

Appx. 02349

007262

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 462 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 345 of 1017 PageID 8075
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 461 of 1803 PageID 11207
Case 18-30264-sgj11 Doc 391-35 Filed 04/18/18 Entered 04/18/18 09:58:54 Page 8 of 53

nevertheless *abstain* in this matter, pursuant to Bankruptcy Code *section 305*, since this is essentially a two-party dispute and the interests of creditors and the debtor would be better served by dismissal.

18.     The Petitioning Creditor argues that he has met the statutory tests of sections 303(b) and (h) but, even if he has not, there is a ***"special circumstances"*** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor—which "special circumstances," Mr. Terry alleges, have been established here.  Moreover, the Petitioning Creditor argues that the facts here ***do not warrant section 305 abstention*** because the interests of creditors and the Alleged Debtors would not be better served by dismissal.

19.     As further explained below, the court finds and concludes that the Petitioning Creditor has met his burden of proving by a preponderance of the evidence that the statutory tests of sections 303(b) and (h) are met here.  Thus, the court does not need to reach the question of whether there is a ***"special circumstances"*** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor, and—if so—whether the exception is applicable here.[17]

20.     Moreover, the Alleged Debtors have not shown by a preponderance of the evidence that the Petitioning Creditor acted in bad faith, such that the Involuntary Petitions should be dismissed.

---

[17] *See e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Appellee Appx. 00455
Appx. 02329
007263

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 463 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 346 of 1017 PageID 8076
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 462 of 1803 PageID 11208
Case 18-30264-sgj11 Doc 91 Filed 04/18/18 Entered 04/18/18 16:34:53 Page 9 of 53

21.     Finally, the Alleged Debtors also have ***not shown facts here that warrant section***

***305 abstention*** because they have not shown that the interests of creditors and the Alleged

Debtors would be better served by dismissal.

> **B.     The CLO Business:  Understanding the Alleged Debtors' Business
> Operations, Structure, and What Creditors and Interest Holders They
> Actually Have.**

22.     Highland set up its first CLO in the year 1996.  Highland was one of the early

participants in the CLO industry.

23.     The Alleged Debtors were formed in 2011 to be the new "brand" or face of the

Highland CLO business, after Highland's name had suffered some negative publicity in the

marketplace.

24.     Acis LP has acted as the portfolio manager of Highland's CLOs since 2011.  Acis

LP currently has a contractual right to CLO portfolio management fees on five CLOs[18] which

were referred to at the Trial as CLO 2013-1; CLO 2014-3; CLO 2014-4; CLO 2014-5; and CLO

2016-6.  CLOs typically have an 8-12 year life.  Thus, there are still several years of life left on

these CLOs (since the oldest one was established in the year 2013).

25.     The key "players" in and features with regard to the Highland CLOs, during the

time period relevant to the issues adjudicated at the Trial, have been:

(a)     <u>The CLO manager.</u>  As mentioned earlier, the CLO manager is the Alleged

Debtor, Acis LP.  Acis LP, has collateral management agreements (hereinafter,

the "CLO Collateral Management Agreements") with the CLOs (which CLOs

were set up as special purpose entities) and, pursuant thereto, receives

---

[18] There is still another Highland CLO (CLO 2017-7), set up in April 2017, as to which Acis LP's
contractual right to manage was terminated shortly before the Petition Date, as will be further described herein.

**Appellee Appx. 00456**

**Appx. 02324**

**007264**

management fees[19] from the CLOs in exchange for managing the pool of assets

within the CLOs and communicating with investors in the CLOs.[20]  As mentioned

earlier, Mr. Terry was the human being that performed the management function

at Acis LP until Highland fired him on June 9, 2016 and also terminated his

limited partnership interest in Acis LP.  Mr. Terry, and all employees who have

ever provided services to the CLO manager, are Highland employees—which

were provided to Acis LP through shared and sub-advisory services agreements—

as further explained below.  Thus, to be clear, Acis LP has always essentially

subcontracted its CLO managerial function out to Highland.

(b)     The pool of assets. Within each CLO that the CLO manager manages is a basket

of loans that the CLO manager purchases.  The basket of loans typically consists

of approximately 200 loans-payable (or portions of loans payable), on which large

well-known companies typically are the makers/obligors (and which loans,

collectively, provide a variable rate of interest).[21]  The CLO manager can

typically decide to buy and sell different loans to go into the pool of assets, with

certain restrictions, during a four or five year reinvestment time period.

---

[19] These fees typically include "senior fees" (*e.g.,* 15 basis points); additional "subordinate fees" (*e.g.,* 25 basis points) if the CLOs are passing certain tests; and perhaps even an "incentive fee" beyond a certain hurdle rate (*e.g.,* after the equity in the CLO received an internal rate of return of 10%, the CLO manager would get 15% of the excess).  Exh. 82, p. 59, lines 14-25.

[20] *See,* as an example, Exh. 3 (the collateral management agreement between Acis LP and CLO 2014-3). Note that the document is entitled "Portfolio Management Agreement" but, to avoid confusion with other similarly titled documents and to highlight the true nature of the agreement, the court uses the defined term "CLO Collateral Management Agreement," which terminology the lawyers also sometimes used at the Trial.

[21] Exh. 8.

Appellee Appx. 00457

Appx. 02322

007265

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 465 of

Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 348 of 1017    PageID 8078

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 464 of 1803   PageID 11210

Case 18-30264-sgj11   Doc 1335   Filed 04/13/18   Entered 04/13/18 16:34:25   Page 11 of 53

(c)  <u>The CLO investors</u> (*i.e.,* CLO note holders).  These may be any number of persons or entities, including pension funds, life insurance companies, or others who decide to invest in the CLOs and contribute capital to fund the purchase of a CLO's loan pool, and, in return, receive fixed rate notes payable—the ratings on which can range anywhere from Triple-A to Single-B, depending upon the risk option the investor chooses.  There are typically five or six traunches of notes issued by the CLO (with the top AAA-rated traunche being the least risky and the bottom traunche being the most risky) and—to be clear—the CLO itself (again, in each case, the CLO is a special purpose vehicle) is the obligor.  As the CLO manager receives income from the pool of loans in the CLO, he distributes that income to the CLO investors, in accordance with their note indentures,[22] starting with the top tranche of notes and then down to the other traunches.  The top traunche of notes (AAA-rated) is considered the "controlling" class and a majority of holders in this class can terminate the CLO manager (*i.e.,* Acis LP) for cause on 45 days' notice, although all parties seem to agree this would be a rare event.

(d)  <u>The CLO equity holder</u>.  The CLO equity holder actually is a holder of subordinated notes issued by the CLOs (*i.e.,* the bottom traunche of notes on which the CLO special purpose entity is obligated), and has voting rights and is itself a capital provider, but it takes the most risk and receives the very last cash

---

[22] The indenture trustee on the CLO notes may actually operate as a payment agent in some cases, for purposes of making the quarterly note payments to holders.

Appellee Appx. 00458

Appx. 02323

007266

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 466 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 349 of 1017 PageID 8079
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 465 of 1803 PageID 11211
Case 18-30264-sgj11 Doc 1391-3 Filed 04/13/18 Entered 04/13/18 Page 12 of 53

flow from the CLOs.  It, in certain ways, controls the CLO vehicle[23]—for
example, by virtue of having the ability to make a redemption call after a certain
"no-call" period—which would force a liquidation of the basket of loans in the
CLO, with the proceeds paying down the traunches of notes, starting at the top
with the Triple A's).  Note that, until recently, a separate entity known as Acis
Loan Funding, Ltd. ("ALF"), which was incorporated under the laws of the island
nation of Guernsey,[24] was the CLO equity holder.  To be clear, ***ALF was
essentially the equity owner in the CLO special purpose entities—not the equity
owner of Acis LP.***  Acis LP was a party to a separate portfolio management
agreement with ALF (hereinafter, the "ALF Portfolio Management Agreement"—
not to be confused with the CLO Collateral Management Agreements that Acis
LP separately has with the special purpose CLOs).  No fees were paid from ALF
to Acis LP pursuant to the ALF Portfolio Management Agreement (rather, fees
are only paid to Acis LP on the CLO Collateral Management Agreements).  The
complicated structure of the CLO business—all parties seemed to agree—has
been developed, among other reasons, to comply with "risk-retention
requirements" imposed by the U.S. Congress's massive Dodd-Frank financial
reform legislation[25] enacted in year 2010, in response to the financial crisis and
recession that first began in 2008.

---

[23] The top tranche of AAA notes also has certain control—such as the ability to terminate the portfolio
manager for cause, on notice.

[24] Guernsey is located in the English Channel.  ALF was created in August 2015.

[25] Simply put, one of the results of the Dodd-Frank legislation (*i.e.*, the Dodd-Frank Wall Street Reform
and Consumer Protection Act, Pub. L. 111-203, H.R. 4173, 124 Stat. 1376-2223, 111th Congress, effective July 21,
2010), which was implemented over a period of several years, was that, ***subsequent to December 2016***, managers of
securitizations needed to retain at least a 5% interest in that securitization.  Thus, if a $400 million CLO were to be

Appellee Appx. 00459
Appx. 02324
007267

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 467 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25   Page 350 of 1017   PageID 8080
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 466 of 1803   PageID 11212
Case 18-30264-sgj11   Doc 391-855   Filed 04/13/18   Entered 04/13/18 34:58   Page 13 of 53

(e)    <u>The Equity Owners of ALF</u>.  Until recently (*i.e.,* until October 24, 2017—four

days after the Arbitration Award), Acis LP itself, as required for a CLO manager,

had a 15% indirect ownership in ALF, in order to be regulatory compliant.[26]  The

parties sometimes refer to ALF (and the web of ownership between it and Acis

LP) as the "risk retention structure."[27]  The evidence at the Trial revealed that

ALF (which has recently been renamed), now, has three equity owners:  (i) a 49%

equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that

was seeded with contributions from Highland, is managed/advised by Highland,

and whose independent trustee is a long-time friend of Highland's chief executive

officer, Mr. Dondero; (ii) 2% is owned by Highland employees; and (iii) finally,

ALF ***may*** be 49% owned by a third-party institutional investor based in Boston

that Highland believed it was required to keep anonymous at the Trial.  Not only

is the court unaware of who this independent third-party is, but the evidence

seems to suggest that it may have acquired its interest fairly recently or may have

simply committed to invest recently.[28]

---

issued, the CLO manager would need to retain at least 5% or $20 million of the assets in the CLO (which 5% could be either all at the equity level or vertically, up and down the note tranches).  There are multiple ways to accomplish this 5% retention (*i.e.,* with either the CLO manager directly investing in at least 5% of the CLO or doing it through a controlled subsidiary).  This particular rule was announced in ***December 2014*** and the SEC thereafter issued a no action letter stating that ***if a CLO was issued prior to December 2014***, then any refinancing of such CLO that happens within four years can be done without risk retention in place.  Resets of any CLO (*i.e.,* changes in terms and maturity—as opposed to mere changes in interest rates), on the other hand, must have risk retention in place.  ***Four of Acis LP's current CLOs were issued prior to December 2014***.  Thus, these four CLOs are still technically able to do a refinancing without a risk retention structure in place.  In any event, by early-to-middle 2017, Acis LP was risk retention compliant.  Exh. 82, pp. 65-69 & 75.  That was recently changed—on October 24, 2017—four days after the Arbitration Award—as later explained herein.

[26] *See* n.23, *supra*.

[27] *See* Demonstrative Aid No. 3.

[28] *See* Exh. 173, which seems to suggest that the only equity owners of ALF just prior to October 24, 2017 were Acis LP and the DAF, until Acis LP's interest in ALF was sold back to ALF on October 24, 2017.  *See also* Exh. 82, p. 162, lines 2-7.

Appellee Appx. 00460
Appx 02325
007268

(f)     <u>The underwriter for the CLO notes.</u>   As with any publicly traded notes, there is
an underwriter for the CLO notes which solicits investors for the CLO notes
(examples given at the Trial:  Mizuho Securities USA, LLC; Merrill Lynch; JP
Morgan Chase).[29]  The CLO notes are traded on the Over-the-Counter Market.

(g)     <u>The independent indenture trustee for the CLO notes.</u>   As also with any issuance
of publicly traded notes, there is an indenture trustee (example given at the Trial:
U.S. Bank).[30]

26.     Mr. Terry, the Petitioning Creditor, as earlier mentioned, began working for
Highland in 2005 until his employment was terminated on June 9, 2016.

27.     Acis LP and Acis GP/LLC have never had any employees.  Rather, all employees
that work for any of the Highland family of companies (including Mr. Terry) have, almost
without exception, been employees of Highland itself.  Highland has approximately 150
employees in the United States.  Highland provides employees to entities in the organizational
structure, such as Acis LP and Acis GP/LLC, through both the mechanism of:  (a) a Shared
Services Agreement (herein so called),[31] which provides "back office" personnel—such as
human resources, accounting, legal and information technology to the Highland family of
companies; and (b) a Sub-Advisory Agreement (herein so called),[32] which provides "front
office" personnel to entities—such as the managers of investments like Mr. Terry.  The evidence
indicated that this is typical in the CLO industry to have such agreements.  The court notes that

---

[29] *See* Exh. 193.

[30] *See* Exh. 7.

[31] Exhs. 17, 99, 179 & 5.

[32] Exhs. 18, 178 & 4.

Appellee Appx. 00461

Appx. 02326

007269

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 469 of

Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 352 of 1017 PageID 8082

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 468 of 1803 PageID 11214

Case 18-3026 Case 19-123918-55 Filed 04/13/18 Entered 04/13/18 Page 15 of 53

all iterations of the Shared Services Agreements and Sub-Advisory Agreements between Acis LP

and Highland were signed by Mr. Dondero both as President of Acis LP and as President of the

General Partner of Highland.

28.     Because Acis LP essentially subcontracts out all of its functions to Highland

pursuant to the Shared Services Agreement and the Sub-Advisory Agreement, Acis LP has very

few vendors or creditors.  Rather Highland incurs expenses and essentially bills them to Acis LP

through these two agreements.[33]  In other words, Highland is one of Acis LP's largest and most

frequent creditor.

29.     The evidence reflected that at all times Mr. Dondero has been the President of

both of the Alleged Debtors, and there have been, at all times, very few, if any, other officers. It

appears that the only other officer of Acis GP/LLC that ever existed was Frank Waterhouse,

Treasurer.[34]  It also appears that the only other officer of Acis LP that ever existed was Frank

Waterhouse, Treasurer, Mr. Terry as Portfolio Manager, and someone named Patrick Boyce as

Secretary at one time.[35]

30.     Mr. Dondero testified that he has decision making authority for the Alleged

Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington

(General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant

General Counsel of Highland) and is rarely involved in "nitty gritty negotiations."   Sometimes

instructions will come to him from the compliance group headed up by Chief Compliance

Officer Thomas Surgent.  Additionally, he testified that he signs hundreds of documents per

---

[33] Exh. 83, pp. 228 (line 8)-230 (line 14).

[34] *See, e.g.*, Exh. 10 & Exh. 173, p.3

[35] Exhs. 14 & 15.

Appellee Appx. 00462

Appx 03325

007270

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 470 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 353 of 1017 PageID 8083
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 469 of 1803 PageID 11215
Case 18-30264-sgj11 Doc 239-3 Filed 04/13/18 Entered 04/13/18 Page 16 of 53

week, and much of what he signs is on advice of counsel and he sometimes even delegates to his

assistant the authority to sign his name. As set forth above, Mr. Ellington (who ***did not*** testify at

the Trial)[36] and Mr. Leventon (who ***did*** testify at the Trial) are not officers, directors, or

employees of the Alleged Debtors. Mr. Leventon is designated to be the representative for the

Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-Trial discovery)—he

explained that this representative-authority derives from the Shared Services Agreement. Mr.

Leventon testified that he takes his instructions generally through his direct supervisor, Mr.

Ellington, although Highland partners can ask him to perform legal services for any of

Highland's 2,000 entities.

> **C. Transfers and Transactions Involving the Alleged Debtors Since the Litigation with Mr. Terry Commenced—and Especially After the Arbitration Award.**

31. Below is a listing of some (but not necessarily all) of the transfers and

transactions that the Alleged Debtors, Highland, and related parties undertook ***after*** the litigation

with Mr. Terry commenced.

> (a) Acis LP's Sale to Highland of a "Participation Interest" in its CLO Cash Flow
>
> Stream. On October 7, 2016 (approximately one month after the litigation arose
>
> among Mr. Terry, Highland, and the Alleged Debtors), Acis LP sold to Highland
>
> a participation interest in its expected future cash flow from the CLO Collateral
>
> Management Agreements—specifically, it sold a portion of the cash flow it
>
> expected to earn from November 2016 to August 2019 (not the full life of the
>
> CLOs), for $666,655 cash, plus a $12,666,446 note payable from Highland to

---

[36] Mr. Ellington did testify at a hearing in the bankruptcy court on February 6, 2018—which the parties asked this court to take judicial notice of—and also provided deposition testimony that was submitted into evidence. *See* Exh. 25.

16

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 471 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 354 of 1017    PageID 8084
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 470 of 1803   PageID 11216
Case 18-3026 Case 19-12395 Filed 04/13/18   Entered 04/13/18 Page 450 of 53   Page 17 of 53

Acis LP (hereinafter, the "Acis LP Note Receivable from Highland").  Mr.
Dondero signed the purchase and sale agreement for both purchaser and seller.[37]
Mr. Dondero signed the Acis LP Note Receivable from Highland, which accrued
interest at 3% per annum.  It appears that the $666,665 cash down payment was
actually paid, and a payment required on the Acis LP Note Receivable from
Highland of $3,370,694 on May 31, 2017, was actually made.  The Acis LP Note
Receivable from Highland was payable in three installments, with a $5,286,243
payment required on May 31, 2018, and a $4,677,690 payment required on May
31, 2019.  When viewed in complete isolation, this transaction does not
necessarily appear problematic.  Although there was evidence that Acis LP had
been managing the five CLOs for about $10 million per year of fees, some of the
recitals in the purchase and sale agreement suggest that there may have been a
sound business reason for the transaction and the arbitration panel,[38] viewing this
transaction in isolation, did not think it was necessarily problematic or actionable.
In any event, Highland is adamant it was a net neutral transaction.

(b)     Transfer of Acis LP's interest in ALF.  Recall that ALF was the entity that held
equity (*i.e.,* the subordinated notes) in the CLO special purpose vehicles, and held
voting rights and was a capital provider to the overall risk retention structure
supporting the CLOs.  And Acis LP, in turn, held a 15% indirect interest in ALF.
On October 24, 2017 (***four days after the Arbitration Award***), Acis, LP entered
into an agreement with ALF whereby ALF acquired back the shares that Acis LP

---

[37] Exhs. 14 & 15.

[38] Exh. 1, p. 18.

Appellee Appx. 00464
Appx. 09329
007272

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 472 of

Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 355 of 1017 PageID 8085

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 471 of 1803 PageID 11217

Case 18-30264-sgj11 Doc 1153 Filed 04/13/18 Entered 04/13/18 Page 18 of 53 Page 18 of 53

indirectly held in ALF (966,679 shares) for the sum of $991,180.13.[39]  No

credible business justification was offered for this transaction, other than mostly

uncorroborated (and self-serving) statements from Highland witnesses that Acis

LP was "toxic" in the market place (due to the litigation with Mr. Terry) and this

was a step in the process of extricating Acis LP from the CLO business.[40]  The

court finds the testimony about Acis LP's toxicity in the marketplace to not be

credible or at all convincing.  For one thing, a new CLO (Acis CLO 2017-7, Ltd.)

was closed on April 10, 2017 with Acis LP as the portfolio manager.  Moreover,

Acis LP subcontracts all of its CLO management function to Highland—and there

was no evidence to suggest that anyone in the marketplace at this juncture

differentiates between Acis LP (whose president is Mr. Dondero) and Highland

(whose president is Mr. Dondero).  ***In any event, the October 24, 2017***

***transaction had the highly consequential effect of making Acis LP***

***"noncompliant" or unable to continue serving as a CLO manager for***

***regulatory purposes for any new CLOs or reset CLOs (or for a refinancing of***

***any of the Highland CLOs that had been created after December 2014)[41]***

***because aspects of the federal Dodd Frank legislation require CLO managers to***

***have "skin in the game" with regard to the CLOs they manage (i.e., they must***

***retain at least 5% of CLOs they manage).***  Mr. Akada, who testified that he had

been involved with the CLO business from the beginning and that the CLO team

---

[39] Exh. 173.

[40] There were also a few hearsay-laden emails offered, that the court did not find probative.  Exhs, 19-22.

[41] *See* n.23 *supra*.

Appellee Appx. 00465

Appx. 05339

007273

reported to him (including Mr. Terry before his termination), testified that he had no knowledge of this particular transaction. The document effectuating this transaction was signed by Frank Waterhouse, Treasurer for and on behalf of Acis LP, acting by its general partner, Acis GP/LLC.[42]

(c)  <u>ALF Next Decides to Jettison Acis, LP as its Portfolio Manager and Replace it with a new Highland Cayman Island Entity</u>.  On October 27, 2017 (seven days after the Arbitration Award), ALF—having purchased back the ownership interest that Acis LP had in it, just three days earlier—decided that it would no longer use Acis LP as its portfolio manager and entered into a new portfolio management agreement to supersede and replace the ALF Portfolio Management Agreement. Specifically, on October 27, 2017, ALF entered into a new Portfolio Management Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd., replacing Acis LP in its role with ALF.[43]  This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017.[44]

(d)  <u>The Acis LP Note Receivable from Highland is Transferred from Acis LP to Yet Another Highland Cayman Island Entity.</u>  On November 3, 2017 (10 days after the Arbitration Award), Acis LP assigned and transferred its interests in the Acis LP Note Receivable from Highland—which at that point had a balance owing of over $9.5 million—to a Highland Cayman Island entity known as Highland CLO

---

[42] Exh. 173, p. 3.

[43] Exh. 43.

[44] Exh. 168.

Appellee Appx. 00466

Appx. 03934

007274

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 474 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 357 of 1017 PageID 8087
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 473 of 1803 PageID 11219
Case 18-30264-sgj11 Doc 391-8 Filed 04/13/18 Entered 04/13/18 16:32:58 Page 20 of 53

Management Ltd. which apparently was created sometime recently to be the new

collateral manager of the CLOs (in other words, the new Acis LP).[45] The

Assignment and Transfer Agreement memorializing this transaction is signed by

Mr. Dondero for Acis LP and Mr. Dondero for Highland and some

undecipherable name for Highland CLO Management Ltd.[46] The document

recites that (i) Highland is no longer willing to continue providing support

services to Acis LP, (ii) Acis LP, therefore, can no longer fulfill its duties as a

collateral manager, and (iii) Highland CLO Management Ltd. agrees to step into

the collateral manager role if Acis LP will assign to it the Acis LP Note

Receivable from Highland. One more thing: since Acis LP was expected to

potentially incur future legal and accounting/administrative fees, and might not

have the ability to pay them when due, ***Highland CLO Management Ltd.*** agreed

to reimburse Acis LP (or pays its vendors directly) up to $2 million of future legal

expenses and up to $1 million of future accounting/administrative expenses.[47]

(e) <u>Various Additional Transactions that further Transitioned CLO Management and
Fees Away from Acis LP to Highland Cayman Island Entity.</u> On December 19,

2017—just one day after the Arbitration Award was confirmed with the entry of

the Final Judgment—the vehicle that can most easily be described as the Acis LP

"risk retention structure" (necessitated by federal Dodd Frank law) was

transferred away from Acis LP and into the ownership of Highland CLO

---

[45] Exh. 16.

[46] *Id.* at p.6.

[47] *Id.* at pp. 1 & 2.

Appellee Appx. 00467
Appx. 03322
007275

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 475 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 358 of 1017 PageID 8088
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 474 of 1803 PageID 11220
Case 18-3026 Case 19-12391855 Filed 04/13/18 Entered 04/13/18 Page 22 of 53 Page 21 of 53

Holdings, Ltd. (yet another Cayman Island entity, incorporated on October 27, 2017[48]).

(f) In addition to transferring Acis LP's interest in the Acis LP risk retention structure on December 19, 2017, Acis LP also transferred its contractual right to receive management fees for Acis CLO 2017-7, Ltd. (which had just closed April 10, 2017), which Mr. Terry credibly testified had a combined value of $5 million, to Highland CLO Holdings, Ltd., another Cayman entity, purportedly in exchange for forgiveness of a $2.8 million receivable that was owed to Highland under the most recent iteration of the Shared Services Agreement and Sub-Advisory Agreement for CLO-7.[49] In conjunction with this transfer, Highland CLO Holdings, Ltd. then entered into new Shared Services and Sub-Advisory Agreements with Highland.[50]

(g) <u>Change of Equity Owners of the Alleged Debtors</u>. When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners: (a) Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the Trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest. When Acis GP/LLC was formed

---

[48] Exh. 157.

[49] *See* Ex. 45 (the Transfer Document); *see also* Exh. 4 (the March 17, 2017 Third Amended and Restated Sub-Advisory Agreement between Acis LP and Highland); Exh. 5 (the March 17, 2017 4th Amended & Restated Shared Services Agreement between Acis LP and Highland); Exh. 165 (March 17, 2017 Staff and Services Agreement between Acis CLO Management, LLC and Acis LP); Exh. 166 (March 17, 2017 Master Sub-Advisory Agreement between Acis CLO Management, LLC and Acis LP).

[50] *See* Exhs. 161 & 162.

Appellee Appx. 00468
Appx. 05323
007276

(*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment

Trust.   After Mr. Terry was terminated by Highland, his 25% limited partnership

interest in Acis LP was forfeited and divided among the two remaining limited

partners: Mr. Akada (increasing his interest by 10% up to 25%), and Dugaboy

Investment Trust (increasing its interest by 15% up to 74.9%).   But, more

importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on

December 18, 2017), both Mr. Akada and Dugaboy Investment Trust conveyed

their entire limited partnership interests in Acis LP—25% and 74.9%,

respectively—to a Cayman Island entity called Neutra, Ltd., a Cayman Islands

exempted company.   Dugaboy Investment Trust also conveyed its 100%

membership interest in Acis GP/LLC to Neutra, Ltd.  Mr. Akada testified that he

did this on advice of counsel.  He also did not dispute that he had made millions

of dollars of equity dividends from his equity investment in Acis LP in recent

years[51]—which he conveyed away for no consideration on December 18, 2017.

(h)     The Intended Reset of Acis CLO 2014-3.  With all of the above maneuverings

having been accomplished, Highland was posed to do a reset on Acis CLO 2014-3

in February 2018 (until Mr. Terry filed the Involuntary Petitions).  The investment

bank Mizuho Securities USA, LLC was engaged November 15, 2017[52] and a final

offering circular was issued in January 2018[53]—contemplating a reset of Acis

CLO 20-14-3 with the recently created Highland CLO Management Ltd.

---

[51] Exh. 23, p.3.

[52] Exh. 104.

[53] Exh. 31.

Appellee Appx. 00469
Appx. 03334
007277

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 477 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 360 of 1017 PageID 8090
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 476 of 1803 PageID 11222
Case 18-30264-sgj11 Doc 133-3 Filed 04/13/18 Entered 04/13/18 22:45:34 Page 23 of 53

Identified as the new portfolio manager, rather than Acis LP. The act of
implementing a reset on the CLO was not in itself suspect. However, the reset
would, of course, have the effect of depriving Acis LP from a valuable asset—an
agreement that could realistically be expected to provide millions of dollars of
future collateral management fees—coincidentally (or not) just after Mr. Terry
obtained his large judgment.

### D. Findings Regarding Credibility of Witnesses.

32.     The court found the testimony of Mr. Terry to be very credible. He was very
familiar with the financial condition of the Alleged Debtors, since he presided over the business
of the Alleged Debtors from their inception until June 9, 2016, and has also closely followed
publicly available information regarding the companies since his termination. Mr. Terry credibly
testified that the Alleged Debtors have never had a significant number of creditors, since most of
the Alleged Debtors' vendors are engaged by and send their invoices to Highland, and Highland
simply obtains reimbursement from the Alleged Debtors (and other entities in the Highland
family), as its in-house lawyers determine is appropriate, through the Shared Services Agreement
and Sub-Advisory Agreement. Thus, Highland should at all times be the Alleged Debtors' main
creditor. The court finds that Mr. Terry had a good faith belief that the Alleged Debtors had only
a handful of creditors (maybe four or so) besides him and Highland. The court also finds that
Mr. Terry—at the time he filed the Involuntary Petitions—had a good faith belief that the
Alleged Debtors and those controlling them were engaged in an orchestrated, sophisticated effort
to denude the Alleged Debtors of their assets and value (*i.e.*, transferring assets and rights for

Appellee Appx. 00470
Appx. 03335
007278

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 478 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 361 of 1017 PageID 8091
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 477 of 1803 PageID 11223
Case 18-30264-sgj11 Doc 391-35 Filed 04/13/18 Entered 04/13/18 Page 24 of 53

less than reasonably equivalent value), which started with intensity after issuance of the
Arbitration Award (if not sooner).[54]

33.     The court found the testimony of almost all of the witnesses for the Alleged
Debtors to be of questionable reliability and, oftentimes, there seemed to be an effort to convey
plausible deniability.  For example, sometimes business decisions concerning the Alleged
Debtors were said to have been made by a "collective," and other times the in-house Highland
lawyers (who, of course, are not themselves officers or employees of Acis LP and Acis GP/LLC)
stressed that Mr. Dondero (the president and manager of the two entities) had ultimate decision
making authority for them.  Meanwhile, Mr. Dondero testified that, while he has decision
making authority at Acis LP, he usually delegates to Highland's in-house lawyers Scott Ellington
and Isaac Leventon.   He testified that he signs hundreds of documents per week and often must
rely on information of others when signing.  Additionally, Mr. Dondero (again, the President of
each of the Alleged Debtors) testified that he had never even read the Arbitration Award.  While
Mr. Dondero is the chief executive of a multi-billion dollar international investment company,
and naturally has widespread responsibilities and must delegate to and rely upon others including
lawyers, this court simply does not believe that he never read the Arbitration Award.  The court
perceived the animosity between Mr. Dondero and Mr. Terry to be rather enormous and Mr.
Dondero even testified (as did others) that the litigation with Mr. Terry was hurting Acis LP and
Highland in the CLO marketplace (*i.e.,* no investors or underwriters wanting to be associated

---

[54] The court also found that the deposition testimony of Brian Shaw and Rahkee Patel (counsel for Mr.
Terry) was also credible and did not demonstrate any bad faith on their parts in filing the Involuntary Petitions on
behalf of Mr. Terry.

Appellee Appx. 00471
Appx. 03336
007279

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 479 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 362 of 1017 PageID 8092
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 478 of 1803 PageID 11224
Case 18-30264-sgj11 Doc 391-15 Filed 04/13/18 Entered 04/13/18 Page 25 of 53 Page 25 of 53

with the Acis brand).[55] If that were the case, it strains credulity to suggest Mr. Dondero never

even read the Arbitration Award.

34.    As mentioned earlier, in December 2017, Acis GP/LLC became 100% owned by

a Cayman Island entity known as Neutra, Ltd. (whose beneficial owner is a Dondero family

trust) and Acis LP became 99.9% owned by Neutra, Ltd.  The directors of Acis GP/LLC and

Acis LP are provided to it now by an entity known as "Maples Fiduciary Services"—another

Cayman Island entity, but the Highland Assistant General Counsel could not remember the

names of those directors provided to Acis GP/LLC and Acis LP, except for perhaps one.  Mr.

Dondero, when questioned about some of the recent transactions pertaining to Acis LP, testified

that there were tax reasons—tax lawyers recommended the recent transactions and transfers.  No

tax lawyers testified.  Mr. Dondero also testified that certain transactions were at the directive of

the Thomas Surgent group (the Highland chief compliance officer).  Neither Mr. Surgent nor

anyone else from the compliance group testified.

35.    Meanwhile, Mr. Akada, who, while testifying, seemed like a generally lovely

person and seemed as knowledgeable as a human being could possibly be on the topic of CLOs

generally, had no idea if he was an officer or director of the Alleged Debtors, nor did he know

whom its officers were.  He could not testify as to the meaning of certain transactions in which

Acis LP had engaged in during recent weeks and said that he signed certain documents on advice

of counsel.  He also could not even testify as to whether Highland was opposing the Involuntary

Petitions.

36.    Again, there was a lot of plausible deniability at Trial as to the "whos" and

"whys" for the recent maneuverings involving the Alleged Debtors assets and rights in the weeks

---

[55] No such investors or underwriters provided testimony.

Appellee Appx. 00472
Appx. 03327
007280

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 480 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 363 of 1017    PageID 8093
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 479 of 1803    PageID 11225
Case 18-30264-sgj11 Doc 391-5 Filed 04/13/18    Entered 04/13/18 Page 26 of 53

since the Arbitration Award.  The one thing that the court was wholly convinced of was that conflicts of interest among Highland and the Alleged Debtors abound, and no one is looking out for the interests of the Alleged Debtors as a fiduciary should.

### E.    Evidence Regarding the Number of Creditors of the Alleged Debtors.[56]

37.    The Alleged Debtors do not dispute Mr. Terry's claim for the purposes of counting creditors under section 303(b) of the Bankruptcy Code.  However, Mr. Terry asserts that the Alleged Debtors have fewer than 12 creditors, and the Alleged Debtors dispute this fact. Specifically, the Alleged Debtors initially filed on January 31, 2018, a Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Dondero listing 18 creditors (the "Original Notice of Creditors").[57]  The Alleged Debtors subsequently filed on February 5, 2018, a First Amended Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Leventon listing 19 creditors (the "First Amended Notice of Creditors").[58]  Finally, the Alleged Debtors filed on March 6, 2018, a Second Amended Notice of List of Creditors Pursuant to Fed. R. Bank. P. 1003(b) signed by Mr. Leventon listing 20 creditors (the "Second Amended List of Creditors").[59]  The following chart summarizes the name, amount, and nature of the 20 creditors listed by the Alleged Debtors in their Second Amended List of Creditors.

---

[56] The court notes that neither Mr. Terry nor the Alleged Debtors attempted to differentiate between the creditors of Acis GP/LLC versus the creditors of Acis LP, but rather presented evidence regarding the collective number of creditors for both of the Alleged Debtors.  This seems legally appropriate, since Acis LP is the entity that incurred most of the debt, and ACIS GP/LLC would be liable on such debt as the general partner of Acis LP.

[57] *See* DE # 7 in Case No. 18-30264 & DE # 7 in Case No. 18-30265.

[58] *See* DE # 17 in Case No. 18-30264 & DE # 16 in Case No. 18-30265.

[59] *See* DE # 39 in Case No. 18-30264 & DE # 38 in Case No. 18-30265.

Appellee Appx. 00473
Appx. 93338
007281

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 481 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 364 of 1017   PageID 8094
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 480 of 1803   PageID 11226
Case 18-30264-sgj11 Doc 131-33 Filed 04/13/18   Entered 04/13/18 Page 25 of 57 Page 27 of 53

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness[60] |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

38.     First, the court believes it necessary to remove certain insider creditor claims,

which are required not to be counted pursuant to section 303(b)(2) of the Bankruptcy Code.[61]

This would clearly include Highland (the Alleged Debtors do not dispute this).

---

[60] The dollar amounts listed here are based upon the amounts listed in the Second Amended List of Creditors.

[61] *In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000).

Appellee Appx. 00474
Appx. 007282

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 482 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 365 of 1017   PageID 8095
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 481 of 1803   PageID 11227
Case 18-30264-sgj11 Doc 391-3 Filed 04/13/18   Entered 04/13/18 Page 28 of 53

39.     Additionally, there were certain creditors that filed sworn statements saying they were not creditors of the Alleged Debtors or were subsequently removed from the creditor list by agreement of the Alleged Debtors.  These creditors would include Case Anywhere, CSI Global Deposition Services,[62] Elite Document Technology, JAMS, Inc.,[63] Stanton Advisors LLC,[64] and the TASA Group, Inc..[65]  Thus, the updated chart now shows 13 creditors of the Alleged Debtors.

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |

---

[62] CSI Global Deposition Services was removed as a creditor by the agreement of the Alleged Debtors.

[63] JAMS, Inc. was removed as a creditor by agreement of the Alleged Debtors.

[64] Stanton Advisors LLC was removed as a creditor by the agreement of the Alleged Debtors.

[65] *See* Exh. 40B, Exh. 186, Exh. 92, and Exh. 94.

Appellee Appx. 00475
Appx. 03349
007283

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 483 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 366 of 1017 PageID 8096
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 482 of 1803 PageID 11228
Case 18-30264-sgj11 Doc 2391-8 Filed 04/13/18 Entered 04/13/18 Page 305 of 5 Page 29 of 53

| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
|---|---|---|---|
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

40. Next, the court finds that there are certain creditors included in the "Law Firm Vendor" category (*e.g.*, experts, data hosting, document managers, court reporters) that are really creditors of the individual law firms and/or Highland, and that these law firm vendor creditors should not be considered creditors of the Alleged Debtors. For these, there was no evidence of a direct contractual obligation on the part of either the Alleged Debtors or Highland—although the court certainly understands that, when the law firms would retain vendors, they would bill these to either the Alleged Debtors or Highland as an expense to be reimbursed. Most of these were already eliminated with agreement of the Alleged Debtors but, from the remaining list of creditors, this would include David Langford (a Dallas County court reporter).[66] To be clear, while the individual law firm creditors may ultimately have a right to reimbursement for these vendor expenses from Highland (who may then potentially have a right to reimbursement from the Alleged Debtors via the Shared Services and Sub-Advisory Agreements), the court does not find this vendor to have a claim *directly* against the Alleged Debtors for purposes of section 303(b) of the Bankruptcy Code.

---

[66] *See* Exh. 40D, Exh. 187, Exh. 40O.

Appellee Appx. 00476
App. 09344
007284

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 484 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 367 of 1017 PageID 8097
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 483 of 1803 PageID 11229
Case 18-3026-sgj11 Doc 391835 Filed 04/13/18 Entered 04/13/18 Page 30 of 53

41.     Next, as to the Stanton Law Firm, the court finds that this creditor should also be

removed from the pool of creditors that "count," for section 303(b) purposes, since this claim

appears to be the subject of a "bona fide dispute as to liability or amount,"[67] based on the

evidence presented at the Trial.  First, there was no engagement letter between either of the

Alleged Debtors and the Stanton Law Firm produced.[68]  Second, the heavily redacted invoice of

the Stanton Law Firm dated October 18, 2016 shows only that it was relating to the "Joshua

Terry Matter" and that it was billed to Highland.[69]  Third, the Responses and Objections to Mr.

Terry's Notice of Intention to Take Depositions by Written Questions sent to the Stanton Law

Firm[70] provides the following responses:

> **Question No. 11**: What is the total amount of debt Acis Capital Management L.P.
> to the Firm. is liable to the Firm.
>
> **Answer**: Acis Capital Management L.P.'s debt to the Firm is unknown at this
> time.
>
> **Question No. 12**: What is the total amount of debt Acis Capital Management GP,
> LLC is liable for to the firm?
>
> **Answer**: Acis Capital Management GP, LLC to the Firm is unknown at this time.
>
> **Question No. 13**: Is any other party also liable for the debt of Acis Capital
> Management L.P. to the Firm? If so, please state the liable party and portion of
> Acis Capital Management L.P. debt the other party is liable for to the Firm.

---

[67] *See Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 655 (5th Cir. 2014) (a claimholder does not have standing to file a petition under section 303(b) if its claim is "the subject of a bona fide dispute as to liability or amount"); *In re Smith*, 415 B.R. 222, 237 (Bankr. N.D. Tex. 2009) (only "a holder of a claim ... that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" is counted in determining the number of creditors necessary to file an involuntary petition).

[68] Rather, there is only an engagement letter between Lackey Hershman LLP (acting on behalf of its client, Highland) and Stanton Advisors LLC to act as an expert in the Terry litigation.  *See* Exh. 144.  As previously noted, the claim of Stanton Advisors LLC was removed from the creditor list by agreement of the Alleged Debtors.

[69] *See* Exh. 40R.

[70] The court notes that these responses were actually signed by James Michael Stanton, attorney for Stanton LLP.  *See* Exh. 139.

Appellee Appx. 00477
App. 02342
007285

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 485 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 368 of 1017   PageID 8098
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 484 of 1803   PageID 11230
Case 18-3026 Case 19-D23918 Filed 04/18/18   Entered 04/13/18 Page 31 of 53 Page 31 of 53

**Answer**: Whether any other party is also liable to the firm for the debt of Acis Capital Management, L.P. is unknown at this time.

**Question No. 14**: Is any other party also liable for the debt of Acis Capital Management GP, LLC to Firm? If so, please state the liable party and portion of Acis Capital Management GP, LLC debt the other party is liable for to the Firm.

**Answer**: Whether any other party is also liable for the debt of Acis Capital Management GP, LLC is unknown at this time. . . .

**Question No. 21**: Does the Firm currently represent Acis Capital Management, L.P.? If so, please state the representation.

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time.

**Question No. 22**: Does the Firm currently represent Acis Capital Management GP, LLC? If so, please state the representation?

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time. . . .[71]

The court finds that this evidence demonstrates that the claim of the Stanton Law Firm is the subject of a bona fide dispute as to either liability or amount and should not be counted since there is no real way of even knowing who the Stanton Law Firm was engaged by and, thus, whether the Alleged Debtors are even responsible for these alleged legal fees.  The court would also specifically refer to the testimony of Mr. Leventon, the in-house lawyer employed by Highland who was in charge of allocating all of the bills that came into Highland's legal invoicing system, where he described a process in which all legal bills relating to the "Terry Matter" would automatically be assigned to the Alleged Debtors, without any real regard to whether the particular law firm had even been engaged by the Alleged Debtors or if whether the

---

[71] *See* Exhibit 139.

Appellee Appx. 00478
Appx. 007286

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 486 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 369 of 1017    PageID 8099
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 485 of 1803   PageID 11231
Case 18-3026-sgj11-D239 1835 Filed Doc13618   Entered 04/19/18 Page 8358 of 5Page 32 of 53

representation was actually relating to one of the other parties in the Terry litigation (*e.g.*, Highland, Mr. Dondero, etc.).  Accordingly, the court finds that there is a bona fide dispute as to whether the Alleged Debtors are actually liable for the Stanton Law Firm legal fees and that they should not be counted as a creditor for purposes of section 303(b) of the Bankruptcy Code.[72]

42.    Thus, it appears, at most, that there are 11 creditors[73] of the Alleged Debtors as set forth in the chart below:

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| ~~2~~ | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| ~~3~~ | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| ~~4~~ | ~~David Langford~~ | ~~Court Reporter/Law Firm Vendor~~ | ~~$550~~ |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| ~~6~~ | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| ~~8~~ | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| ~~9~~ | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |

[72] *See also In re CorrLine Int'l, LLC*, 516 B.R. 106, 152 (Bankr. S.D. Tex. 2014) (bankruptcy court found that creditors contained in the alleged debtor's list of creditors with uncertain or unknown amounts could not be counted towards the numerosity requirement of section 303(b)).

[73] The court notes that, in all likelihood, the list of creditors that should be tallied for purposes of section 303(b) may actually be less than 11, because certain of the remaining creditors (*i.e.*, Drexel Limited, Highfield Equities, Inc., Lackey Hershman LLP, and David Simek) received payments during the 90 days preceding the Petition Date—and, thus, arguably should not be counted as creditors pursuant to section 303(b) of the Bankruptcy Code (which instructs that transferees of voidable transfers should not be counted).  *See, e.g.*, Exh. 124 & Exh. 131. Additionally, certain of the remaining law firm creditors that are owed legal fees are also creditors of Highland and Highland-affiliates, not just the Alleged Debtors.  To elaborate, many of these law firm creditors were employed to represent not only the Alleged Debtors, but also Highland and Highland-affiliates, so there may be an actual dispute as to the allocation of these legal fees among Highland and the Alleged Debtors (thus there could be bona fide disputes as to the amounts allocated by Highland's in-house lawyers to the Alleged Debtors).  *See, e.g.*, Ex. 123 (McKool Smith, P.C. engagement letter referencing representation of numerous parties) & Exhibit 90 (Reid Collins & Tsai's Answers and Objections to Mr. Terry's Deposition by Written Questions, questions 13 & 14, stating that based upon allocation determinations to be made by Highland, other individuals may be liable for the full amount of the debt including Acis LP, Highland, Mr. Dondero, and Mr. Okada).

Appellee Appx. 00479
App 093541
007287

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 487 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 370 of 1017   PageID 8100
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 486 of 1803   PageID 11232
Case 18-3026-sgj11 Doc 3391-3 Filed 04/13/18   Entered 04/13/18 Page 33 of 53   Page 33 of 53

| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees[74] | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| ~~16~~ | ~~Stanton Advisors LLC~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$10,000~~ |
| ~~17~~ | ~~Stanton Law Firm~~ | ~~Legal Fees~~ | ~~$88,133.99~~ |
| ~~18~~ | ~~The TASA Group, Inc.~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$14,530.54~~ |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

43.     Finally, on the topic of creditor numerosity, the court further finds that the evidence

strongly suggested hurried manufacturing of creditors on the part of the Alleged Debtors and

Highland, in order to bolster an argument that having a sole petitioning creditor was legally

inadequate in this case.[75]  For example, the Klos Declaration and other information, that was

provided to State Court 2 and in discovery, only days before the Involuntary Petitions were filed,

---

[74] Mr. Terry has also argued that certain of the law firm creditors (McKool Smith, P.C., Lackey Hershman, LLP, and Reid Collins & Tsai) are "insiders" that must be excluded from the creditor list pursuant to section 303(b) of the Bankruptcy Code.  While there may be some support in case law for such an argument, Mr. Terry would ultimately need to show by a preponderance of the evidence that the law firms exercised such control or influence over the Alleged Debtors as to render their transactions not at arm's length.  *See In re CorrLine Intern., LLC*, 516 B.R. 106, 157-58 (Bankr. S.D. Tex. 2014) (citing *Kepler v. Schmalbach (In re Lemanski)*, 56 B.R. 981, 983 (Bankr.W.D.Wis.1986)).  *See also In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992) (in evaluating whether insider status existed for purposes of evaluating alleged fraudulent conveyance under considered  (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length).  Because there was no evidence suggesting abuse or control by these law firm creditors, nor was there any evidence that would suggest that their dealings with the Alleged Debtors were anything but arm's length, the court finds that these law firm creditors should not be excluded from the creditor list as "insiders" pursuant to section 303(b) of the Bankruptcy Code.

[75] *See* the Original Notice of Creditors, the First Amended Notice of Creditors, and the Second Amended Notice of Creditors.

Appellee Appx. 00480
007288

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 488 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 371 of 1017    PageID 8101
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 487 of 1803    PageID 11233
Case 18-3026-sgj11 Doc 3918 Filed 04/13/18    Entered 04/13/18 Page 350 of 53    Page 34 of 53

seemed to show only a small number of creditors of Acis LP—Mr. Terry credibly testified that

he thought there were less than 12 creditors based on his review of such information, as well as

his understanding of the Alleged Debtors' business.  Yet, only a few days later, the Alleged

Debtors filed their Original Notice of Creditors, which showed 18 creditors, which was amended

twice to add another creditor and then yet another.  This simply does not jive in the court's mind

and supports this court's belief that the Alleged Debtors were scurrying to determine which

Highland creditors might cogently be painted as Acis LP creditors—so as to preclude Mr. Terry

from being able to file the Involuntary Petitions as the single, petitioning creditor.

> **F.    Evidence Regarding Whether the Alleged Debtors are Generally Not Paying
> Debts as They Become Due (Unless Such Debts are the Subject of a Bona
> Fide Dispute as to Liability or Amount).**

44.    The evidence submitted reflects that, for the 11 creditors identified above, 9 out of

11 have unpaid invoices that were more than 90 days old.  The remaining 2 of the 11 were

McKool Smith, P.C. (current counsel for the Alleged Debtors) and the Petitioning Creditor.[76]

The court makes findings with regard to each of the 11 creditors below—focusing specifically on

whether the Alleged Debtors have been paying these creditors as their debts have become due.

45.    First, with regard to Andrews Kurth & Kenyon ("AKK"), the evidence reflected

that out of the $211,088.13 allegedly owed by Acis LP to AKK, the great majority of it—

$173,448.42—was invoiced on November 16, 2016[77] (more than 14 months before the Petition

Date).  Other, smaller amounts were invoiced on a monthly basis in each of the months August

2017, September 2017, October 2017, November 2017, and December 2017.  Although

requested in discovery, no engagement letter for AKK was produced and AKK represented in

---

[76] Exhs. 40 & 54.

[77] Exh. 40.

Appellee Appx. 00481
Appx. 03346
007289

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 489 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 372 of 1017    PageID 8102
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 488 of 1803   PageID 11234
Case 18-30264-sgj11  Doc 391-85  Filed 04/13/18   Entered 04/13/18 16:34:36   Page 35 of 53

written discovery that, to its knowledge, none existed.[78]  The court notes anecdotally that AKK's

invoices (although allegedly related to Acis LP legal matters) were addressed to Highland.[79]  In

any event, AKK represented that both the Alleged Debtors and Highland are jointly and

severally liable for the fees owed to it.[80]  AKK also represented that, to its knowledge, the

amounts owing to it by Acis LP and Highland are not disputed.[81]  AKK also represented that it

has not provided legal work on a contingency basis for the Alleged Debtors or Highland.[82]  The

court makes a logical inference that AKK expected timely payment of its invoices—the largest

of which was dated more than 14 months prior to the Petition Date—and, thus, it has generally

not been paid timely.

46.     Next, with regard to Drexel Limited, the Petitioning Creditor concedes that its

$6,359.96 indebtedness (which is a fee rebate owing to it) is not past-due.

47.     Next, with regard to Highfield Equities, Inc., the Petitioning Creditor concedes

that its $2,510.04 indebtedness (which is also a fee rebate owing to it) is not past-due.

48.     Next, with regard to the Jones Day law firm, the $368.75 indebtedness owed to it

is well more than 90 days old.  Specifically, there is a six-and-a-half-month old invoice dated

July 19, 2017 invoice in the amount of $118.75, and two five-month old invoices dated August

30, 2017 (both in the amount of $150).[83]  The court makes a logical inference that Jones Day

---

[78] Exh. 98, Requests 1-2.

[79] Exh. 98, pp. AKK000061-AKK000060.

[80] Exh. 98, Question 13.

[81] Exh. 98, Questions 52-55.

[82] Exh.  98, Questions 73-75.

[83] Exh. 40K.

Appellee Appx. 00482
007290

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 490 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 373 of 1017    PageID 8103
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 489 of 1803    PageID 11235
Case 18-3026 Case 19-12339-CSS Filed 04/13/18 Entered 04/13/18 Page 35 of 5 Page 36 of 53

expected timely payment of its invoices prior to the Petition Date and, thus, it has generally not

been paid timely.

49.    Next with regard to the Petitioning Creditor, Mr. Terry, the court notes that his

liquidated claim in the amount of $8,060,827.84 first arose with the final Arbitration Award on

October 20, 2017 (although such award was not confirmed by State Court 2 until December 18,

2017).  The judgment was unstayed as of the January 30, 2018 Petition Date, although the

Alleged Debtors state that they still desire to appeal it—as difficult as that is in the situation of an

arbitration award.  The court makes a logical inference that the Alleged Debtors had, on the

Petition Date, no intention of paying this claim any time soon based on their conduct after the

Arbitration Award—although the Arbitration Award had only been in existence for three-and-a-

half months as of the Petition Date. The cash in the Alleged Debtors' bank accounts is wholly

insufficient to cover the Arbitration Award and, meanwhile, corporate transactions have been

ongoing to ensure that no cash streams will be coming into Acis LP in the future in the same way

that they have in the past.  Thus, this court finds that this large claim, as of the Petition Date, was

not being paid timely.

50.    Next with regard to KPMG LLP, the $34,000 indebtedness owed to it was for the

service of auditing Acis LP's financial statements, pursuant to an engagement letter with it dated

March 1, 2017.[84]  KPMG's engagement letter reflected a $40,000 flat fee was agreed to by Acis

LP for the service, of which 40% was due October 2017 (*i.e.,* $16,000), with another 45% was

due in January 2018 ($18,000), and the remaining 15% would be due at the time that a final bill

was sent.  Acis LP has only paid $6,000 of the agreed upon amount—meaning $28,000 was

overdue as of the January 30, 2018 Petition Date (with $10,000 of that being four months past

---

[84] Exh. 40M.

Appellee Appx. 00483
Appx. 07348
007291

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 491 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 374 of 1017 PageID 8104
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 490 of 1803 PageID 11236
Case 18-30264-sgj11 Doc 391-3 Filed 04/13/18 Entered 04/13/18 Page 37 of 53

due). The court makes a logical inference that KPMG LLP expected payment of its audit fees in accordance with its engagement letter and, thus, it has generally not been paid timely.

51. Next with regard to Lackey Hershman LLP, the $236,977.54 indebtedness owed to it was for legal services provided to the Alleged Debtors and Highland in connection with the arbitration and litigation with Mr. Terry. No engagement letter was provided, but the invoices for their services are all directed to Highland.[85] The evidence reflected that three invoices had not been paid as of the Petition Date: an October 31, 2017 invoice in the amount of $56,909.53; a November 30, 2017 invoice setting forth new fees in the amount of $84,789.83; and a December 31, 2017 invoice setting forth new fees in the amount of $95,278.18.[86] The court makes a logical inference that Lackey Hershman LLP expected prompt payment on its invoices (if nothing else, the statement on its invoice indicating "Total now due")[87] and, thus, it has generally not been paid timely.

52. Next with regard to Reid Collins & Tsai LLP, the $17,383.75 indebtedness owed to it was billed in an invoice dated August 31, 2017, indicating an August 31, 2017 "Due Date" (five months before the Petition Date).[88] Although requested in discovery, no engagement letter for this firm was produced and Reid Collins & Tsai LLP in fact represented in written discovery that none existed.[89] Moreover, written discovery propounded on the law firm indicated that, while Acis LP was liable on this debt, other parties including Acis GP/LLC, Highland, Mr.

---

[85] Demonstrative Aid No. 1 (Lackey Hershman tab).

[86] Exh. 40, p. 3.

[87] Demonstrative Aid No. 1 (Lackey Hershman tab).

[88] Exh. 40P; Exh. 130, pp. 7-8.

[89] Exh. 90, Requests 1 & 2; Ex. 130, Requests 1 & 2.

Appellee Appx. 00484
Appx. 02849
007292

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 492 of
Case 3:25-cv-02072-S     Document 15-10   Filed 10/06/25     Page 375 of 1017     PageID 8105
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 491 of 1803   PageID 11237
Case 18-3026-sgj11   Doc 3445-8   Filed 04/13/18   Entered 04/13/18 Page 38 of 53

Dondero, the Dugaboy Trust, and Mr. Akada might also be liable for the full amount of the

debt—subject to Highland's allocation determinations.[90]  Based on this evidence, the court

makes a logical inference that Reid Collins & Tsai LLP generally has not been paid timely.

53.     Next with regard to CT Corporation and the $517.12 indebtedness that the

Alleged Debtors represent is owed, CT Corporation asserts that $4,074.84 is, in fact, owed to it

by Acis LP and Acis GP/LLC.[91]  CT Corporation also believes Highland has liability for the

Alleged Debtors' indebtedness.[92]  CT Corporation also believes the amount owed to it is

undisputed.[93]  CT Corporation further represents that its invoices are due upon receipt.[94] CT

Corporation produced several invoices in discovery, all showing due upon receipt, and one was

dated as far back as December 31, 2016 (in the amount of $932).[95]  Based on this evidence, the

court makes a logical inference that CT Corporation expected prompt payment on its invoices

and, thus, has not been paid timely.

54.     Next with regard to David Simek, the Petitioning Creditor concedes that his

$1,233.19 indebtedness (which is apparently an expense reimbursement relating to some

consulting) is not past-due.

---

[90] Exh. 90, Questions 13 & 14; Exh. 130, Questions 13-14.

[91] Exh. 143, Questions 12 & 13.

[92] *Id.* at Question 14.

[93] *Id.* at Questions 22 & 23.

[94] *Id.* at Question 30.

[95] *Id.* at p. 8; Exh. 40T.

Appellee Appx. 00485
Appx. 02359
007293

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 493 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 376 of 1017    PageID 8106
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 492 of 1803   PageID 11238
Case 18-30264-sgj11 Doc 391-8 Filed 04/13/18   Entered 04/13/18 16:45:58   Page 39 of 53

55.     In summary, the evidence reflects that the creditors of the Alleged Debtors are generally not being paid timely (except for perhaps four that are relatively insignificant and which may also be able to look to Highland for payment).[96]

56.     Further on the topic of timeliness, Mr. Leventon (Highland's in-house Assistant General Counsel) testified that 96% of bills submitted get paid more than 90 days after they are submitted, that approximately 70% of bills are later than 120 days after they are submitted, and some are even later than 150 days.  Mr. Leventon testified that this was a result of Acis LP receiving cash on a quarterly basis from the CLOs.  He further elaborated and testified that, for example, if Acis LP got cash on say February 1st, and it received a legal bill on that same day, that he would probably not approve it and allocate it until say February 8th.  By that time, Acis LP would have already used up all its cash, and that particular creditor would need to wait until the next quarterly payment was received in order to be paid.  He further testified that he explained this to law firms before their engagements and that, if they wanted the business, they would need to understand the process.  There are several things the court finds problematic about this testimony.  First, no testimony was offered showing that this was, in fact, the understanding of the law firms or other creditors, and, moreover, none of the engagement letters or invoices submitted into evidence reflect such payment terms.  Without this additional evidence, the court believes that the Alleged Debtors' testimony regarding how it paid invoices was mostly self-serving and did not support a finding that the Alleged Debtors were generally paying their debts

---

[96] Courts have also held that a debtor is generally not paying its debts as they become due when a debtor is found to have been transferring assets so as to avoid paying creditors.  *See, e.g., In re Moss*, 249 B.R. 411, 423 (Bankr. N.D. Tex. 2000) (bankruptcy court determined that an alleged debtor was not paying its debts as they came due when the alleged debtor "attempted to delay creditors through the transfers of assets she has made," concluding that "[the alleged debtor's] overall conduct of her financial affairs has been poor").  This court has also found that there may have been significant transfers of the Alleged Debtors' assets prior to the filing of the Involuntary Petitions to potentially avoid paying creditors (*i.e.*, Mr. Terry) and this may provide further support for the court's finding that the Alleged Debtors are generally not paying their debts as they become due under section 303(h).

Appellee Appx. 00486
Appx. 02951
007294

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 494 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 377 of 1017 PageID 8107
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 493 of 1803 PageID 11239
Case 18-3026 Case 19-12391-CSS Filed 04/13/18 Entered 04/13/18 Page 40 of 53

as they became due.[97]  Second, to the extent Mr. Leventon's testimony demonstrates that creditors of the Alleged Debtors expected to be paid on a quarterly basis (at the latest), certain of the remaining 11 creditors have debts that are significantly older than four months (*i.e.*, CT Corporation, Jones Day, AKK, and possibly even Reid Collins & Tsai LLP).  Third, the Financial Statements of Acis LP submitted into evidence do not support the notion that the cash balances at Acis LP were only sufficient enough to pay vendors once every quarter.[98]  For example, the balance sheet for January 31, 2017 shows a cash balance in Acis LP bank accounts of $1,061,663.19; the balance sheet for February 28, 2017 shows a cash balance in Acis LP bank accounts of $905,212.36; the balance sheet for March 31, 2017 shows a cash balance in Acis LP bank accounts of $525,626.59; the balance sheet for April 30, 2017 shows a cash balance in Acis LP bank accounts of $117,885.96; the balance sheet for May 31, 2017 shows a cash balance in Acis LP bank accounts of $62,733.31; the balance sheet for June 30, 2017 shows a cash balance in Acis LP bank accounts of $10,329.15; the balance sheet for July 31, 2017 shows a cash balance in Acis LP bank accounts of $701,904.39; the balance sheet for August 31, 2017 shows a cash balance in Acis LP bank accounts of $332,847.05.[99]  In summary, while there may be cash fluctuations with Acis LP, there is not a clear pattern of Acis LP being only able to pay vendors once every quarter.

---

[97] *See In re Trans-High Corp.*, 3 B.R. 1, 2-3 (Bankr. S.D.N.Y. 1980) (bankruptcy court found that evidence showing that the petitioning creditor gave the debtor generous terms of payment (90 days) which were substantially better than the terms set forth in the actual writings between the parties supported finding that the alleged debtors were generally paying debts as they became due and that the involuntary petition must be dismissed).

[98] Exh. 147.

[99] *Id.*

Appellee Appx. 00487
Appx. 02352
007295

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 495 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 378 of 1017  PageID 8108
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 494 of 1803  PageID 11240
Case 18-3026  Case 19-12339  ECF Doc 13611  Entered 04/13/18  Page 41 of 53  Page 41 of 53

## II.    Conclusions of Law

Section 303 of the Bankruptcy Code sets forth the various requirements for initiating an

involuntary bankruptcy case.  First, pursuant to section 303(b) of the Bankruptcy Code, an

involuntary case may be filed against a person by the filing with the bankruptcy court of a

petition under Chapter 7—

> (1) by three or more entities, each of which is either a holder of a claim against
> such person that is not contingent as to liability or the subject of a bona fide
> dispute as to liability or amount ... [that] aggregate at least $15,775 more than the
> value of any lien on property of the debtor securing such claims held by the
> holders of such claims;

> (2) if there are fewer than 12 such holders, excluding any employee or insider of
> such person and any transferee of a transfer that is voidable under section 544,
> 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold
> in the aggregate at least $15,775 of such claims . . .[100]

Thus, if there are twelve or more eligible creditors holding qualified claims on the Petition Date,

three or more entities must participate in the involuntary filing and must hold unsecured claims

aggregating $15,775.00.  If there are less than twelve creditors, a single creditor with an

unsecured claim of $15,775.00 may file the involuntary petition.  To the extent a bankruptcy

court finds that the requisite number of petitioning creditors have commenced the involuntary

case, the court shall order relief against the debtor under the chapter under which the petition was

filed only if "the debtor is generally not paying such debtor's debts as such debts become due

unless such debts are the subject of a bona fide dispute as to liability or amount."[101]

Here, as noted earlier, the Alleged Debtors have made four arguments as to why an order

for relief should not be entered against the Alleged Debtors: (1) the Alleged Debtors have 12 or

---

[100] 11 U.S.C.A § 303(b) (West 2018).

[101] 11 U.S.C.A § 303(h) (West 2018).

Appellee Appx. 00488
Appx. 07296
007296

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 496 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 379 of 1017    PageID 8109
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 495 of 1803    PageID 11241
Case 18-3026 Case 19-1283918 Filed Doc 136 13    Entered 04/13/18 Page 35 of 53 Page 42 of 53

more creditors, and, thus, with Mr. Terry being the sole petitioning creditor, the Involuntary

Petitions were not commenced by the requisite number of creditors; (2) the Alleged Debtors are

generally paying their debts as they become due; (3) the Involuntary Petitions were filed in bad

faith by Mr. Terry; (4) the interests of creditors and the debtors would be better served by

dismissal and the court should abstain pursuant to section 305 of the Bankruptcy Code.

### A.    *Have the Requisite Number of Creditors Commenced the Involuntary Proceedings?*

Pursuant to section 303(b)(2) of the Bankruptcy Code, a sole petitioning creditor holding

at least $15,775 in claims can initiate an involuntary bankruptcy case so long as the alleged

debtors have fewer than 12 creditors.  After the Second Amended List of Creditors was filed, Mr.

Terry had the burden, by a preponderance of the evidence, of showing that the Alleged Debtors

actually had less than 12 qualified creditors.[102]  Here, the court has found that the Alleged

Debtors have, *at most*, 11 qualified creditors.[103]  Accordingly, Mr. Terry has met his burden of

showing that the Alleged Debtors have less than 12 creditors for section 303(b) purposes, and

that he, as the sole petitioning creditor, was permitted to file the Involuntary Petitions.  While

Mr. Terry has made additional arguments as to why certain of these 11 creditors should not be

counted as creditors for purposes of section 303(b) of the Bankruptcy Code, the court does not

believe it necessary to address these arguments at this time.[104]

---

[102] *See In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222, 229 (Bankr. N.D. Tex. 2009).

[103] To be clear, the court believes that even on these 11, there are likely bona fide disputes as to the liability or amount that *Acis LP* has—as opposed to the liability or amount that Highland or other insiders bear responsbility.

[104] Moreover, as previously stated, since the court has determined there are fewer than 12 creditors, the court need not address whether there is a "special circumstances" exception to the statutory requirements of section 303, in situations where an alleged debtor may have engaged in fraud, schemes, or artifice to thwart a creditor or creditors.  *See, e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 497 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 380 of 1017 PageID 8110
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 496 of 1803 PageID 11242
Case 18-30264-sgj11 Doc 391 Filed 04/13/18 Entered 04/13/18 Page 43 of 53

### B. *Are the Alleged Debtors Generally Paying Their Debts as They Become Due?*

Section 303(h) of the Bankruptcy Code requires that a court shall enter order for relief in

an involuntary case "if … (1) the debtor is generally not paying such debtor's debts as such debts

become due unless such debts are the subject of a bona fide dispute as to liability or amount . . .

."[105]  Again, the burden is on the Petitioning Creditor to prove this element by a preponderance

of the evidence.[106]  The determination is made as of the filing date of the Involuntary

Petitions.[107]  In determining whether an alleged debtor is generally paying its debts as they come

due, courts typically look to four factors: (i) the number of unpaid claims; (ii) the amount of such

claims; (iii) the materiality of the non-payments; and (iv) the nature of the debtor's overall

conduct in its financial affairs.[108]  No one factor is more meritorious than another; what is most

relevant depends on the facts of each case.[109]  Courts typically hold that "generally not paying

debts" includes regularly missing a significant number of payments *or* regularly missing

payments which are significant in amount in relation to the size of the debtor's operation.[110]

---

[105] 11 U.S.C.A § 303(h) (West 2018).

[106] *See Norris v. Johnson (In re Norris)*, No. 96-30146, 1997 WL 256808, at *3-*4 (5th Cir. Apr. 11, 1997) (unpublished).

[107] *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 222 (5th Cir. 1993).

[108] *See, e.g., In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000) (citing *In re Norris*, 183 B.R. 437, 456-57 (Bankr. W.D. La. 1995)).

[109] *In re Bates*, 545 B.R. 183, 186 (Bankr. W.D. Tex. 2016) (also noting that petitioning creditors' counsel consistently argued that the final prong—overall conduct in financial affairs—should be afforded more weight than the other factors, and the court found no authority to support this assertion).

[110] *See, e.g., In re All Media Props., Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980).  See also *Concrete Pumping Serv., Inc. v. King Constr. Co. (In re Concrete Pumping Serv., Inc.)*, 943 F.2d 627, 630 (6th Cir.1991) (a debtor was not paying his debts as they became due where the debtor was in default on 100% of its debt to only one creditor); *Knighthead Master Fund, L.P. v. Vitro Packaging, LLC (In re Vitro Asset Corp.)*, No. 3:11–CV–2603–D (N.D.Tex. Aug. 28, 2012) (district court found error in bankruptcy court ruling that the debtors were generally paying their debts as they became due, where bankruptcy court had relied on the fact that the alleged debtors had a significant number of third-party creditors/trade vendors, which had been continually paid, even though the unpaid debts to the petitioning creditors far exceeded the paid debts in terms of dollar amount; petitioning creditors were holders of promissory notes that were guaranteed by the alleged debtors, as to which the primary obligor and alleged

---

43

**Anpx. 02355**
**007298**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 498 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 381 of 1017    PageID 8111
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 497 of 1803    PageID 11243
Case 18-30264-sgj11 Doc 239 Filed 04/13/18    Entered 04/13/18 Page 456 of 5 Page 44 of 53

Furthermore, any debt which the alleged debtor is not current on as of the petition date should be considered as a debt not being paid as it became due.[111]

Here, the court concludes that the creditors of the Alleged Debtors—what few there are—are generally not being paid as their debts have become due (except for perhaps four[112] that are relatively insignificant and which may also be able to look to Highland for payment).  Mr. Terry has met his burden by a preponderance of the evidence as to section 303(h) of the Bankruptcy Code.

**C.    *With the Section 303 Statutory Requirements Being Met by the Petitioning Creditor, Should the Court, Nonetheless, Dismiss the Involuntary Petitions Because They Were Filed in Bad Faith?***

Despite Mr. Terry meeting the necessary statutory requirements for this court to enter orders for relief as to the Alleged Debtors pursuant to section 303 of the Bankruptcy Code, the Alleged Debtors have argued that the Involuntary Petitions must, nonetheless, be dismissed because they were filed in "bad faith" by Mr. Terry.  As support for this argument, the Alleged Debtors rely primarily on the Third Circuit's decision in *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015).  While the court certainly acknowledges that authority exists in other circuits that suggests that dismissal of an involuntary bankruptcy case may be appropriate—even when section 303's statutory requirements have been met—based upon an

---

debtors had ceased making interest payments; the unpaid debts represented 99.9% of the total dollar amount of debt of each of the alleged debtors); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350–51 (E.D.N.Y. 1996) (even though the debtor only had two outstanding debts, the total dollar amount failed to establish that, in terms of dollar amounts, the debtor was paying anywhere close to 50% of his liabilities, so he was not generally paying his debts as they became due); *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (while the debtor was paying small recurring debts, he was not paying 99 percent of his debts in the aggregate amount and thus was not generally paying his debts as they became due).

[111] *In re Bates*, 545 B.R. 183, 188 (Bankr. W.D. Tex. 2016).

[112] Those four are:  Drexel Limited ($6,359.96); Highfield Equities ($2,510.04); David Simek ($1,233.19); and McKool Smith ($70,082.18).

Appellee Appx. 00491

007299

independent finding of "bad faith," the court need not ultimately decide the efficacy or

applicability of such authority, because the court does not believe that the evidence demonstrated

any "bad faith" on the part of Mr. Terry (or his counsel) in filing the Involuntary Petitions.

Indeed, the evidence suggested that Mr. Terry and his counsel filed the Involuntary Petitions out

of a legitimate concern that Highland was dismantling and denuding Acis LP of all of its assets

and value and that a bankruptcy filing was the most effective and efficient way to preserve value

for the Acis LP creditors.  The court concludes that Mr. Terry was wholly justified in pursuing

the Involuntary Petitions.

### D.    Should This Court, Nonetheless, Abstain and Dismiss the Involuntary Petitions Pursuant to Section 305 of the Bankruptcy Code?

Section 305(a)(1) of the Bankruptcy Code provides that:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or
> may suspend all proceedings in a case under this title, at any time if—
>     (1) the interests of creditors and the debtor would be better served by such
> dismissal or suspension; . . .[113]

Courts construing section 305(a)(1) of the Bankruptcy Code have found that abstention in a

properly filed bankruptcy case is an ***extraordinary remedy***.[114]  Moreover, granting an abstention

motion pursuant to section 305(a)(1) of the Bankruptcy Code requires more than a simple

balancing of harm to the debtor and creditors; rather, the interests of ***both*** the ***debtor*** and its

***creditors*** must be served by granting the request to abstain.[115]  The moving party bears the

---

[113] 11 U.S.C.A. § 305(a)(1) (West 2018).

[114] *In re AMC Investors, LLC*, 406 B.R. 478, 487 (Bankr. D. Del. 2009); *see also In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007); *In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718, 726 (Bankr. N.D. Ill. 1996).

[115] *In re Smith*, 415 B.R. 222, 238-39 (Bankr. N.D. Tex. 2009) (citing *AMC Investors, LLC*, 406 B.R. at 488).

Appellee Appx. 00492

Appx. 007300

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 500 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 383 of 1017 PageID 8113
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 499 of 1803 PageID 11245
Case 18-30264-sgj11 Doc 391-15 Filed 04/13/18 Entered 04/13/18 Page 46 of 53

burden to demonstrate that dismissal benefits the debtor and its creditors.[116]  Courts must look to

the individual facts of each case to determine whether abstention is appropriate.[117]

Case law has set forth a litany of factors to be considered by the court to gauge the

overall best interests of the creditors and the debtor for section 305(a)(1) purposes:

> (1) the economy and efficiency of administration;
> (2) whether another forum is available to protect the interests of both parties or
> there is already a pending proceeding in state court;
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
> (4) whether there is an alternative means of achieving an equitable distribution of
> assets;
> (5) whether the debtor and the creditors are able to work out a less expensive out-
> of-court arrangement which better serves all interests in the case;
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that
> it would be costly and time consuming to start afresh with the federal bankruptcy
> process; and
> (7) the purpose for which bankruptcy jurisdiction has been sought.[118]

While all factors are considered, not all are given equal weight in every case and the court should

not conduct a strict balancing.[119]

> i.  *Factor 1: The Economy and Efficiency of Administration.*

---

[116] *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008).

[117] *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001).

[118] *Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65 (citing to *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)); *see also Smith*, 415 B.R. at 239; *AMC Investors, LLC*, 406 B.R. at 488; *In re Euro-American Lodging Corp.*, 357 B.R. 700, 729 (Bankr. S.D.N.Y. 2007); *but see Spade*, 258 B.R. at 231-32 (Bankr. D. Colo. 2001) (applied a four criteria test in evaluating section 305 abstention which included:  (1) the motivation of the parties who sought bankruptcy jurisdiction; (2) whether another forum was available to protect the interests of both parties or there was already a pending proceeding in state court; (3) the economy and efficiency of administration; and (4) the prejudice to the parties).  The Alleged Debtors cite to the case of *In re Murray*, 543 B.R. 484 (Bankr. S.D.N.Y. 2016), in particular, as support for why this court should abstain under section 305(a) of the Bankruptcy Code and dismiss the Involuntary Petitions.  However, in *Murray*, Judge Gerber was analyzing dismissal of an involuntary proceeding pursuant to section 707 of the Bankruptcy Code, more specifically for "cause," and not based upon abstention under section 305(a) of the Bankruptcy Code.  Thus, the court is not convinced *Murray* is relevant to this court's section 305 abstention analysis.

[119] *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (citing *Monitor Single Lift*, 381 B.R. at 464).

Appellee Appx. 00493
Appx. 02356
007301

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 501 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 384 of 1017 PageID 8114
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 500 of 1803 PageID 11246
Case 18-30264-sgj11 Doc 3391-8 Filed 04/13/18 Entered 04/13/18 Page 47 of 53

The economy and efficiency of administering a case in the bankruptcy court is routinely evaluated in considering abstention under section 305 of the Bankruptcy Code. Here, the evidence suggests that the most economical and efficient forum for these parties to resolve their disputes is the bankruptcy court. The court heard ample evidence that the Alleged Debtors are already, essentially, in the process of being liquidated by Highland. This is not a situation where an ably-functioning, going-concern business is being foisted in disruptive fashion into a bankruptcy.[120] Because of the fact that the Alleged Debtors are already in the process of being liquidated, the bankruptcy court (and not a state court) is the most efficient and economical forum to complete this liquidation and distribute whatever assets remain to creditors in accordance with the distribution scheme set forth in the Bankruptcy Code and with the oversight of a neutral third-party trustee. Thus, with the bankruptcy court being the more economic and efficient forum for administering this case, this factor goes against abstention.

  ii. *Factors 2, 3, 4, 5, and 6: Whether Another Forum is Available to Protect the Interests of Both Parties or There is Already a Pending Proceeding in State Court; Whether Federal Proceedings are Necessary to Reach a Just and Equitable Solution; Whether There is an Alternative Means of Achieving an Equitable Distribution of Assets; Whether the Debtor and the Creditors are Able to Work Out a Less Expensive Out-of-Court Arrangement Which Better Serves All Interests in the Case; and Whether a Non-Federal Insolvency Has Proceeded so Far in Those Proceedings That it Would Be Costly and Time Consuming to Start Afresh With the Federal Bankruptcy Process.*

---

[120] *See, e.g., In re The Ceiling Fan Distrib., Inc.*, 37 B.R. 701 (Bankr. M.D. La. 1983) (noting that while the dissection of a living business may not properly be the business of a bankruptcy court, the division of a "carcass" and the reclamation of pre-petition gouging may well be); *In re Bos*, 561 B.R. 868, 898-99 (Bankr. N.D. Fla. 2016) (citing as one of the reasons to abstain under section 305 of the Bankruptcy Code the fact that entities and subsidiaries under the alleged debtor's umbrella were still operating successful businesses and had employed more than 500 people); *but see Remex Elecs. Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 484-86 (S.D. Fla. 1991) (in affirming the bankruptcy court's decision to dismiss an involuntary bankruptcy case, the district court also found that "the interests of a defunct business enterprise would be little affected by the pendency of a bankruptcy proceeding," which the district court believed favored abstention).

Appellee Appx. 00494
Appx. 02359
007302

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 502 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 385 of 1017    PageID 8115
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 501 of 1803    PageID 11247
Case 18-3026-sgj11  Doc 2391835  Filed 04/13/18    Entered 04/13/18  16:34:58  Page 48 of 53

The court believes that factors 2-6 should be grouped together for purposes of its abstention analysis, since all of these factors specifically touch on the availability of an alternative forum to achieve an ***equitable*** distribution.[121]  By way of example, where bringing a case into the bankruptcy court would simply add an additional layer of expense to the resolution of a two-party dispute and another forum already provides a suitable place to resolve the dispute, some courts have found that abstention is the more appropriate choice since keeping the case would transform the bankruptcy process into a collection device.[122]  Here, the Alleged Debtors have repeatedly argued that, because there is already pending state court litigation involving Mr. Terry, Highland, and the Alleged Debtors, these cases should be dismissed and the parties should go back to state court to resolve their issues.  The court does not agree for several reasons.

First, it is worth noting that this court has already heard multiple days of evidence in this case (including almost five days just for the Trial) and would certainly not be "starting afresh" by any means if things go forward in the bankruptcy court.  Additionally, while the Alleged Debtors have argued that a significant amount of attorney's fees have already been spent litigating this case in state court (which they believe supports abstention), the court surmises that these fees have not been wasted dollars, as the money expended by the parties developed discovery of facts that could assist a bankruptcy trustee in pursuing avoidance actions that may be viable and might lead to value that could pay creditors' claims.[123]

---

[121] *See, e.g., In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 460-70 (Bankr. S.D.N.Y. 2008).

[122] *AMC Investors, LLC*, 406 B.R. at 488; *see also Axl Indus., Inc.*, 127 B.R. at 484-86.

[123] *See, e.g., The Ceiling Fan Distributor, Inc.*, 37 B.R. at 703 (the court noted that, despite there being significant legal expenses in the state court, such expenses were not wasted since the legal work done to date would be quite helpful to a trustee).

Appellee Appx. 00495
Appx. 02309
007303

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 503 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 386 of 1017    PageID 8116
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 502 of 1803    PageID 11248
Case 18-30264-sgj11 Doc 3918-13 Filed 04/13/18    Entered 04/13/18 Page 55 of 5 Page 49 of 53

Second, this court heard considerable evidence involving potentially voidable transfers that may have occurred involving the Alleged Debtors and Highland/Highland-affiliates and, while the state court certainly provides a forum for eventually bringing fraudulent transfer claims, the court also heard evidence that none of these claims have actually been brought in the state court.[124]  Moreover, to the extent fraudulent transfer claims were to be pursued in state court and were successful, the state court would still need the ability to reach the assets of alleged fraudulent transfer recipients (which, in this situation, include certain Highland-affiliates located in the Cayman Islands).  The bankruptcy court has concerns whether a state court process could efficiently accomplish this task.[125]  Similarly, it is worth noting that, while a request for a receiver was filed in the state court by Mr. Terry, such request had not yet been heard and decided by the state court.  Thus, at the present time, it does not appear that there is an alternative forum to address the pertinent issues in this case, without the necessity of significant, additional steps being taken by the parties in the state court.

Third, this court believes that a federal bankruptcy proceeding is necessary in order to achieve an equitable result in this case.  Specifically, the court heard evidence from the Alleged Debtors that, if this court chose to abstain and dismiss the Involuntary Petitions, the Alleged Debtors would ultimately pay all of their creditors in full, except for Mr. Terry.  This clearly demonstrates how keeping the case in the bankruptcy court is necessary to allow an equitable

---

[124] *See, e.g., In re Texas EMC Mgmt., LLC,* Nos. 11-40008 & 11-40017, 2012 WL 627844, at *3 (Bankr. S.D. Tex. 2012) (noting that one of the reasons abstention was proper under section 305 of the Bankruptcy Code was because the issues to be litigated amongst the parties were already joined in the state court litigation); *Spade*, 258 B.R. at 236 (court held that one of the reasons abstention was warranted under section 305 of the Bankruptcy Code was because the petitioning creditors had already filed and had pending a "collection case" in the state court).

[125] *See, e.g., Smith*, 415 B.R. at 239 (the bankruptcy court held that there "are remedies under the Bankruptcy Code that are not available to Rhodes under state law, due to Mr. Smith's transfer of the majority of his assets to the Cook Island Trust," and "federal proceedings may be necessary to reach a just and equitable solution").

Appellee Appx. 00496
Appx. 07364

007304

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 504 of
Case 3:25-cv-02072-S Document 15-10 1804 10/06/25 Page 387 of 1017 PageID 8117
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 503 of 1803 PageID 11249
Case 18-3026-sgj11 Doc 3455 Filed 04/13/18 Entered 04/13/18 Page 50 of 53

distribution to **all creditors**, including Mr. Terry. Additionally, a federal bankruptcy court has certain tools available to it that are not available to a state court such as the ability to invalidate potential *ipso facto* clauses in contracts pursuant to section 365 of the Bankruptcy Code, sell assets free and clear of liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, and impose the automatic stay pursuant to section 362 of the Bankruptcy Code. These are all useful tools available to the Alleged Debtors in a bankruptcy case that would be lost if this court were to ultimately abstain.

Finally, there was more than enough evidence showing the acrimonious and bitter relationship that exists between Mr. Terry and Mr. Dondero. Thus, the availability of an out-of-court arrangement being obtained in this case is, in this court's mind, slim to none.

In summation, the court finds that all of the factors above support this case staying with the bankruptcy court.

      iii.    *Factor 7: The Purpose for Which Bankruptcy Jurisdiction Has Been Sought.*

The Alleged Debtors have repeatedly argued that Mr. Terry filed this case in bad faith and as a litigation tactic to gain some sort of advantage in the state court proceedings. The court has already found above that these cases were not filed in bad faith and that Mr. Terry has met the necessary statutory requirements of section 303 of the Bankruptcy Code. Moreover, it is worth noting that at least one court has stated that the filing of an involuntary bankruptcy petition is always a "litigation tactic," but whether the filing is inappropriate for abstention purposes is a fact-dependent determination.[126] Here, the facts show that there was no inappropriateness

---

[126] *In re Marciano*, 459 B.R. 27, 50 (B.A.P. 9th Cir. 2011) (noting that while the filing of the involuntary bankruptcy was a litigation tactic, the bankruptcy court did not abuse its discretion in denying the alleged debtor's motion to dismiss based upon the bankruptcy court's primary concern that the issue of equality of distribution would not effectively be dealt with in another forum).

Appellee Appx. 00497
Appx_02882
007305

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 505 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 388 of 1017    PageID 8118
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 504 of 1803    PageID 11250
Case 18-30264-sgj11 Doc 391-35 Filed 04/13/18    Entered 04/13/18 16:35:53 Page 51 of 53

behind Mr. Terry's decision to file the Involuntary Petitions.  Specifically, Mr. Terry repeatedly

and credibly testified that the purpose for filing the Involuntary Petitions was to ensure that

creditors (including him) were treated fairly and received an equal distribution from the Alleged

Debtors' assets, not to gain some sort of advantage in the state court.  This testimony was

absolutely consistent with additional evidence showing that, since the entry of the arbitration

award, there has been a calculated effort (largely by Highland) to effectively liquidate the

Alleged Debtors.  Unlike the bankruptcy court in *In re Selectron Mgmt. Corp.*,[127] which had no

evidence or "smoking gun" showing that steps were being taken by the alleged debtor to evade

payment on the petitioning creditor's judgment, thereby necessitating abstention, this court has

heard ample evidence showing that the Alleged Debtors, with the aid of Highland, were

transferring assets away from the Alleged Debtors, so that Mr. Terry would have nowhere to

look at the end of the day.

In light of the court's analysis of all the seven factors above, the Alleged Debtors have

not credibly shown how both the Alleged Debtors and the creditors are better served outside of

bankruptcy.  If this matter were to remain outside of bankruptcy, there seems to be a legitimate

prospect that the Alleged Debtors and Highland will continue dismantling the Alleged Debtors,

to the detriment of Acis LP creditors.  Abstention would fly in the face of fundamental fairness

and the principles underlying the Bankruptcy Code.

Beyond just addressing the factors above, the Alleged Debtors have also argued that, if

this court were to not abstain under section 305 of the Bankruptcy Code, there would be

---

[127] *In re Selectron Mgmt. Corp.*, No. 10-75320-DTE, 2010 WL 3811863, at *6-7 (Bankr. E.D.N.Y. Sept. 27, 2010); *see also In re White Nile Software, Inc.*, No. 08–33325–SGJ–11, 2008 WL 5213393, at *4 (Bankr. N.D. Tex. Sept. 16, 2008) (finding that where the filing of a voluntary chapter 11 did not appear to be about insuring a distribution to creditors or winding down or giving a soft landing to a business or avoiding dismantling and dissipation of valuable assets or preserving avoidance actions, but rather was about changing the forum of ongoing litigation between the parties, abstention under section 305 was proper).

Appellee Appx. 00498
Appx. 07303
007306

significant harm to the "equity" of the Alleged Debtors.  Specifically, the Alleged Debtors have

argued that, if this court were to enter orders for relief, the equity would be forced to "call" and

ultimately liquidate CLO 2014-3 (and perhaps all of the CLOs Acis LP manages), resulting in

substantial losses to the equity on their investments.  First, to be clear, the current equity of the

Alleged Debtors is being held by a Highland-affiliate called Neutra, Ltd., which actually only

became the equity of the Alleged Debtors on December 19, 2017.  But this is not the "equity"

being referred to by the Alleged Debtors in its argument.  Rather, the so-called "equity," about

which the Alleged Debtors seemed so concerned, is actually ***certain parties that own the equity***

***of the entity that owns the equity in the CLOs***—which includes (a) an unnamed third-party

investor out of Boston (49%),[128] (b) a charitable foundation managed by a Highland-affiliate

(49%), and (c) Highland employees (2%).  However, abstention under section 305 of the

Bankruptcy Code does not require this court to look at what is in the best interests of these third-

parties (who are not current creditors or interest holders of the Alleged Debtors), but rather what

is in the best interests of the Alleged Debtors and the creditors.  Accordingly, the Alleged

Debtors' effort to argue potential harm to these parties is misplaced for purposes of evaluating

abstention under section 305 of the Bankruptcy Code, and, if anything, further highlights who

the Alleged Debtors are really out to protect—Highland and Highland-affiliates.  Moreover, the

court would note that, even if there were to be a "call" and liquidation of CLO 2014-3, thereby

ending the Alleged Debtors' right to receive future management fees, there would still be

potential assets for a chapter 7 trustee to administer such as chapter 5 causes of action (which

include fraudulent transfers) as well as the Alleged Debtors' contingent claim for approximately

---

[128] Notably, this entity never appeared at the Trial or filed papers stating that it would be harmed by entry
of orders for relief in these cases.

Appellee Appx. 00499

Appx. 02564

007307

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 507 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 390 of 1017   PageID 8120
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 506 of 1803   PageID 11252
Case 18-30264-sgj11 Doc 239 Filed 04/13/18   Entered 04/13/18 16:35:48 Page 53 of 53

$3 million in expense reimbursement owing by Highland CLO Management Ltd., as part of the

November 3, 2017 transfer of the Acis LP Note Receivable from Highland.  Thus, even if the so-

called doomsday scenario of an equity call on CLO 2014-3 (or other CLOs) were to happen,

there is still a potential benefit to creditors if this court chooses not to abstain.

### III.    CONCLUSION

In conclusion, these involuntary proceedings were appropriately filed under section 303,

and orders for relief will be issued forthwith.   This court declines to exercise its discretion to

abstain, because a chapter 7 trustee appears necessary to halt the post-Arbitration Award

transactions and transfers of value out of Acis LP, as discussed above.  A chapter 7 trustee

appears necessary to resolve the inherent conflicts of interest between the Alleged Debtors and

Highland.  A chapter 7 trustee will have tools available to preserve value that a state court

receiver will not have.  The bankruptcy court is single handedly the most efficient place to

administer property of the estate for creditors.  This is not just a two party dispute between Mr.

Terry and the Alleged Debtors, and even if it were, dismissal or abstention is clearly not

warranted.

**###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###**

Appellee Appx. 00500
Appx. 02305
007308

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 508 of
Case 3:25-cv-02072-S      Document 15-10    Filed 10/06/25      Page 391 of 1017      PageID 8121
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 507 of 1803    PageID 11253
Case 19-12239-CSS    Doc 86-4    Filed 11/01/19    Page 1 of 31

**Exhibit D**

**Acis Arbitration Opinion**

ACTIVE 250501748

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 509 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 392 of 1017 PageID 8122
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 508 of 1803 PageID 11254
Case 18-03078-sgj Doc 139 Filed 04/16/19 Entered 04/16/19 Page 1 of 30



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed April 16, 2019

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, GP,** | § | **CASE NO. 18-30265-SGJ-11** |
| **LLC,** | § | **(Jointly Administered Under** |
| Debtors. | § | **Case No. 18-30264-SGJ-11)** |
| _____ | § | **(Chapter 11)** |
| | § | |
| **ROBIN PHELAN, CHAPTER 11** | § | |
| **TRUSTEE,** | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 18-03078-SGJ** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND CLO FUNDING** | § | |
| **LTD, HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **HIGHLAND CLO MANAGEMENT, LTD.,** | § | |
| **and HIGHLAND CLO HOLDINGS, LTD.,** | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO COMPEL
## ARBITRATION [DE # 102]

**Appellee Appx. 00502**
**Appx. 03305**
007310

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 510 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 393 of 1017    PageID 8123
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 509 of 1803    PageID 11255
Case 18-03078-sgj Doc 21 396 Filed 04/16/19 Filed 11/14/19 Page 2 of 30 Page 2 of 30

## I.      **Introduction.**

Before this court is a Motion to Compel Arbitration (the "Arbitration Motion"),[1]

requesting that the bankruptcy court send to arbitration only a ***sub-set*** of claims asserted in the

above-referenced adversary proceeding (the "Adversary Proceeding").  Some procedural context

is crucial in analyzing the merits of the Arbitration Motion and, thus, is set forth immediately

below.

This Adversary Proceeding has morphed into a large, complex lawsuit—at this stage

primarily involving 35 claims, 20 of which are grounded in fraudulent transfer theories.[2]  The

Arbitration Motion, as explained below, seeks arbitration of ***eight*** of the 35 claims (*i.e.,* Counts

1-8).

The Arbitration Motion was filed by party Highland Capital Management, L.P.

("Highland").  Highland and a related company, Highland CLO Funding Ltd. ("HCLOF"), were

originally the plaintiffs in this Adversary Proceeding, suing the Chapter 11 Trustee for injunctive

relief (arguing early during the above-referenced Chapter 11 bankruptcy cases that the Chapter

11 Trustee was interfering with their business rights and decisions, essentially).  The Chapter 11

Trustee fired back with 35 counterclaims against Highland and HCLOF (adding three parties

related to Highland as third-party defendants with regard to some of those 35 counterclaims).

Notably, these 35 counterclaims—***as directed toward Highland***—were also alleged to be

objections to Highland's two $4,672,140.38 proofs of claim filed in the underlying bankruptcy

cases.[3]  In that regard, the Chapter 11 Trustee stated that his Answer and Counterclaims included

---

[1] DE # 102.

[2] There is also a preference count and a section 550 recovery count—thus, 22 out of the 35 claims are chapter 5 avoidance actions and recovery.  11 U.S.C. §§ 544, 547, 548 & 550.

[3] *See Defendant's Amended Answer, Counterclaims (Including Claim Objections) and Third-Party Claims* (DE # 84), filed November 13, 2018, in response to the *Original Complaint and Request for Preliminary Injunction of*

**Appellee Appx. 00503**
**Appx. 93668**
**007311**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 511 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 394 of 1017   PageID 8124
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 510 of 1803   PageID 11256
Case 18-03078-sgj Doc 123-5 Filed 04/03/19 Entered 04/11/19 Page 3 of 30   Page 3 of 30

"an objection to Highland Capital's proofs of claim pursuant to Federal Rule of Bankruptcy

Procedure 3007(b), and the counterclaims asserted herein shall constitute recoupment and/or

offset to such proofs of claim, to the extent such claims are otherwise allowed."[4]  In fact, after

the 35 counts were articulated in the Chapter 11 Trustee's Answer and Counterclaims, there were

20 paragraphs (¶¶ 252-271, pp. 70-77) solely articulating the Chapter 11 Trustee's objections to

Highland's proofs of claim.[5]  The Chapter 11 Trustee also filed yet a separate adversary

proceeding, Adv. Proc. No. 18-03212, seeking his own injunctive relief, which has recently been

consolidated with this Adversary Proceeding.[6]

   The Chapter 11 Trustee ultimately proposed and obtained confirmation of a Chapter 11

plan in the underlying bankruptcy cases, and the Reorganized Debtors, now under new

ownership and management, were vested in that plan with the counterclaims in this Adversary

Proceeding (among other rights and claims).  The injunctive relief initially sought by Highland

and HCLOF, as plaintiffs in the Adversary Proceeding, later became mooted by various orders in

---

*Highland CLO Funding, Ltd and Highland Capital Management Against Chapter 11 Trustee of Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (DE # 1), filed May 30, 2018, and also in response to the proofs of claims filed by Highland Capital Management, L.P. (*see Proof of Claim No. 27,* filed in Case No. 18-30264, and *Proof of Claim No. 13* filed in Case No. 18-30265, each in the amount of $4,672,140.38, with the basis of each of the proofs of claim listed as "Sub-Advisory Services and Shared Services"; these proofs of claim are virtually identical).

[4] DE # 84, ¶ 6.  The Chapter 11 Trustee has argued that the Highland proofs of claim should be disallowed under (i) section 502(b)(1) of the Bankruptcy Code (in that the Highland proofs of claim are allegedly unenforceable against the Debtors under the limited partnership agreement of Acis Capital Management, L.P. and applicable law); (ii) section 502(b)(4) of the Bankruptcy Code (in that the proofs of claim are for services of an insider of the Debtors and allegedly exceed the reasonable value of the services); and (iii) under section 502(d) of the Bankruptcy Code (in that the Trustee has asserted avoidance actions against Highland).  Finally, to the extent allowed at all, the Trustee has argued that the Highland proofs of claim should be equitably subordinated under section 510(c) of the Bankruptcy Code.  In summary, pursuant to section 502(b) and (d) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3007, the Trustee has sought entry of an order disallowing and expunging the Highland proofs of claim from the Debtors' claims registers.  *See id.* at ¶¶ 251-272.

[5] *Id.*

[6] DE # 124.

Appellee Appx. 00504
Appx. 03809
007312

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 512 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 395 of 1017 PageID 8125
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 511 of 1803 PageID 11257
Case 18-03078-sgj Doc 396 Filed 04/16/19 Entered 04/16/19 Page 4 of 30

the bankruptcy cases and such claims were voluntarily dismissed without prejudice.[7] Thus, Highland, which is pursuing the Arbitration Motion, now wears the hat of only a defendant (and proof of claimant), and the Reorganized Debtors are the plaintiffs asserting the 35 original "counterclaims" asserted by the Chapter 11 Trustee against Highland (which 35 claims are also objections to Highland's proof of claim). The separate adversary proceeding that was filed by the Chapter 11 Trustee seeking injunctive relief (Adv. Proc. No 18-03212) was consolidated into this Adversary Proceeding, and the style of this Adversary Proceeding was adjusted to reflect that the Chapter 11 Trustee had become situated as plaintiff.[8] But, to be clear, the Reorganized Debtors are actually now plaintiffs in place of the Chapter 11 Trustee. The Reorganized Debtors are Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP"), and they oppose the Arbitration Motion.[9]

Citing to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq*., Highland argues that the bankruptcy court must enter an order compelling arbitration as to counts 1-8 because: (a) these eight counts revolve around the interpretation of certain prior versions of a Sub-Advisory Agreement and Shared Services Agreement (later defined); and (b) the aforementioned agreements contained binding arbitration clauses. Highland also requests that the Adversary Proceeding be stayed regarding counts 1-8, pending binding arbitration. The Reorganized Debtors dispute that there are binding arbitration clauses applicable to counts 1-8. As explained further below, the aforementioned agreements were amended many times and the arbitration clauses were eventually eliminated in the last versions of the agreements. The Reorganized

---

[7] DE # 79.

[8] DE # 124.

[9] DE # 123.

Appellee Appx. 00505
Appx. 03879
007313

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 513 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 396 of 1017    PageID 8126
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 512 of 1803   PageID 11258
Case 18-03078-sgj Doc 213 Filed 04/08/19   Entered 04/11/19 Page 5 of Page 5 of 30

Debtors also urge that, even if there are applicable arbitration clauses, the court may and should

exercise discretion and decline to order arbitration, since core bankruptcy matters are involved

and arbitration would conflict with the purposes of the Bankruptcy Code.  For the reasons set

forth below, the Arbitration Motion is denied.  This means that Counts 1-26 & 33-35 will go

forward and be adjudicated in this Adversary Proceeding.[10]  But as will be explained in a

separate order that is being issued shortly following this order, there are certain counts

complaining of *postpetition* state law torts and breaches of contract in this Adversary Proceeding

(Counts 27-32) that this court believes should be separated out into a different adversary

proceeding and consolidated with a contested matter involving a Highland request for allowance

of a postpetition administrative expense claim [DE # 772].

**II.**    **Background Facts.**

**A.**    **First, the Agreements Between the Parties.**

As this court has noted on various occasions, Acis LP was formed in the year 2011, and

is primarily a CLO portfolio manager.[11]  Specifically, Acis LP provides fund management

services to various special purpose entities that hold CLOs (which is an acronym for

"collateralized loan obligations").  Acis LP was providing management services for five such

special purpose entities (the "Acis CLOs") as of the time that it and its general partner were put

into the above-referenced involuntary bankruptcy cases (the "Bankruptcy Cases").  The parties

have informally referred to the special purpose entities themselves as the "CLO Issuers" or

"CLO Co-Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs")

---

[10] The court notes that a Supplemental Motion to Withdraw the Reference in this Adversary Proceeding has recently been filed by Highland and HCLOF [DE # 134] and that motion will be addressed in due course hereafter.  The ruling herein with regard to the Arbitration Motion does not affect such motion and such motion will be separately addressed, after a status conference, and through a report and recommendation to the District Court.

[11] Acis LP has managed other funds, from time to time, besides CLOs.

Appellee Appx. 00506
Appx. 03871
007314

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 514 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 397 of 1017    PageID 8127
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 513 of 1803   PageID 11259
Case 18-03078-sgj Doc 22-1 Filed 04/08/19 Entered 04/11/19 Page 28 of 3 Page 6 of 30

are structured as follows:  (a) on the asset side of their balance sheets, the entities own pieces of

senior debt owed by large corporations and, therefore, earn revenue from the variable interest

payments made by those corporations on such senior debt; and (b) on the liability side of their

balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest

rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are

mostly institutions and pension funds.  The CLO SPEs make a profit, based on the spread or

"delta" between:  (a) the variable rates of interest paid on the assets that the CLO SPEs own (*i.e.,*

the basket of senior notes); and (b) the fixed rates of interest that the CLO SPEs must pay on

their own tranches of debt.  At the bottom of the CLO SPEs' capital structure is their equity

(sometimes referred to as "subordinated notes," but these "notes" are genuinely equity).  As

portfolio manager, Acis LP manages the CLO SPEs' pools of assets (by buying and selling

senior loans to hold in the CLO SPEs' portfolios) and communicates with investors in the CLO

SPEs.   The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves have been in bankruptcy.  Only

Acis LP which **manages** the CLO business and its general partner, Acis GP, were put into

bankruptcy.

Historically, Acis LP has had four main sets of contracts that were at the heart of its

business and allowed it to function.  They are described below.  The second and third agreements

set forth below are highly relevant to the Arbitration Motion before the court.  The Chapter 11

Trustee, from time-to-time, credibly testified that these agreements collectively created an "eco-

system" that allowed the Acis CLOs to be effectively and efficiently managed by Acis LP.

Appellee Appx. 00507
Appx. 03872
007315

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 515 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 398 of 1017    PageID 8128
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 514 of 1803    PageID 11260
Case 18-03078-sgj    Doc 22-39    Filed 04/08/19    Entered 04/08/19 21:38:20    Page 7 of 30

1.    <u>The PMAs with the CLO SPEs.</u>

First, Acis LP has various portfolio management agreements ("PMAs") **with the CLO**

**SPEs**, pursuant to which Acis LP earns management fees.  The PMAs have been the primary

"assets" (loosely speaking) of Acis LP.  They are what generate revenue for Acis LP.

2.    <u>The Sub-Advisory Agreement with Highland.</u>

Second, Acis LP had a Sub-Advisory Agreement (herein so called) with **Highland**.

Pursuant to this agreement, Acis LP essentially sub-contracted for the use of Highland front-

office personnel/advisors to perform management services for Acis LP (*i.e.,* so that Acis LP

could fulfill its obligations to the CLO SPEs under the PMAs).  Acis LP paid handsome fees to

Highland pursuant to this agreement.  This agreement was rejected (with bankruptcy court

approval) by the Chapter 11 Trustee during the Bankruptcy Cases, when the Chapter 11 Trustee

credibly represented that he had not only found resources to provide these services at a much

lower cost to the estate, but he also had begun to believe that Highland was engaging in stealth

efforts to liquidate the Acis CLOs, to the detriment of Acis LP's creditors.

*There were five iterations of the Sub-Advisory Agreement between the parties over*

*time*:  (a) the initial Sub-Advisory Agreement, "made effective January 1, 2011" (which had an

arbitration clause at section 16(f));[12] (b) an Amended and Restated Sub-Advisory Agreement,

"made" May 5, 2011, "to be effective January 1, 2011" (which also had an arbitration clause at

section 16(f))[13]; (c) an Amendment to Amended and Restated Sub-Advisory Agreement "entered

into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

---

[12] Exh. 1 to Arbitration Motion.

[13] Exh. 2 to Arbitration Motion.

Appellee Appx. 00508
Appx. 03873
007316

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 516 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 399 of 1017   PageID 8129
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 515 of 1803   PageID 11261
Case 18-03078-sgj   Doc 296-3   Filed 04/03/19   Entered 04/16/19 Page 8 of 30   Page 8 of 30

clause);[14] (d) Second Amended and Restated Sub-Advisory Agreement "made" on July 29, 2016,

"to be effective January 1, 2016" (which had an arbitration clause at section 16(f));[15] and (e) the

Third Amended and Restated Sub-Advisory Agreement "dated as of March 17, 2017" (*which*

*suddenly contained no arbitration clause, with no explanation*).[16]

  3. The Shared Services Agreement with Highland.

  Third, Acis LP also had a Shared Services Agreement (herein so called) with Highland,

pursuant to which Acis LP essentially sub-contracted for the use of Highland's back-office

services (again, so that Acis LP could fulfill its obligations to the CLO SPEs under the PMAs).

To be clear, Acis LP had no employees of its own—only a couple of officers and members.  Acis

LP paid handsome fees to Highland for the personnel and back-office services that Highland

provided to Acis LP.  This agreement was also rejected by the Chapter 11 Trustee during the

Bankruptcy Cases (with Bankruptcy Court approval) for the same reasons that the Sub-Advisory

Agreement with Highland was rejected.

  *There were five iterations of the Shared Services Agreement between the parties over*

*time*:  (a) the initial Shared  Services Agreement "effective as of January 1, 2011" (which had an

arbitration clause at section 9.14);[17] (b) an Amendment to Shared Services Agreement, "entered

into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

clause);[18] (c) a Second Amended and Restated Shared Services Agreement "dated effective

---

[14] Exh. 3 to Arbitration Motion.

[15] Exh. 4 to Arbitration Motion.

[16] Exh. 5 to Arbitration Motion.

[17] Exh. 6 to Arbitration Motion.

[18] Exh. 7 to Arbitration Motion.

Appellee Appx. 00509
Appx 03874
007317

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 517 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 400 of 1017    PageID 8130
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 516 of 1803   PageID 11262
Case 18-03078-sgj-Doc-33-CSB Doc 416-9-4   Entered 11/04/19 Page 108 of Page 9 of 30

January 1, 2015" (which had an arbitration clause at section 9.14);[19] (d) a Third Amended and Restated Shared Services Agreement "dated effective as of January 1, 2016 (which had an arbitration clause at section 9.14);[20] and (e) a Fourth Amended and Restated Shared Services Agreement "dated as of March 17, 2017" (*which suddenly contained no arbitration clause, with no explanation*).[21]

    4.    The Equity/ALF-PMA.

Fourth, until a few weeks before the Bankruptcy Cases were filed, Acis LP also had yet another portfolio management agreement (distinct from its PMAs with the CLO SPEs) whereby Acis LP provided services not just to the CLO SPEs themselves, but separately to the equity holder in the CLO SPEs. This portfolio management agreement with the equity holder in the CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would probably be easier to refer to it as the "Equity PMA"[22] (for ease of reference, the court will refer to it as the "Equity/ALF PMA"). Acis LP did not earn a specific fee pursuant to the Equity/ALF PMA, but the Chapter 11 Trustee and others credibly testified during the Bankruptcy Cases that Acis LP considered the agreement valuable and very important, because it essentially gave Acis LP the ability to control the whole Acis CLO eco-system—in other words, it gave Acis LP the ability to make substantial decisions on behalf of the CLO SPEs' *equity*—distinct from making decisions for the CLO SPEs themselves pursuant to the PMAs. In any event, shortly before the Bankruptcy Cases were filed, agents of Highland and/or others controlling Acis LP: (a) caused

---

[19] Exh. 8 to Arbitration Motion.

[20] Exh. 9 to Arbitration Motion.

[21] Exh. 10 to Arbitration Motion.

[22] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

Appellee Appx. 00510
Appx. 03875
007318

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 518 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 401 of 1017   PageID 8131
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 517 of 1803   PageID 11263
Case 18-03078-sgj11 Doc 236 Filed 04/01/19 Entered 04/01/19 Page 23 of Page 10 of 30

Acis LP to terminate this Equity/ALF PMA; and (b) then caused the equity owner to enter into a
new Equity PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. (one
of the Defendants in this Adversary Proceeding).

> 5.    Limited Partnership Agreement of Acis LP.

There is actually a fifth agreement that should be mentioned.  Although not as integral as
the previous four agreements, there was a certain Amended and Restated Agreement of Limited
Partnership of Acis Capital Management, L.P., dated to be effective as of January 1, 2011 (the
"LPA"), entered into among the general partner and limited partners of Acis LP.  Reorganized
Acis has argued in the Adversary Proceeding that this LPA limited in some respects the
compensation that could be paid to Highland under the Sub-Advisory Agreement and the Shared
Services Agreement.

**B.    Next, the 35 Counts Asserted Against Highland in this Adversary
Proceeding.**

The Adversary Proceeding, distilled to its essence—and as currently framed—is all about
certain activities of Highland and some of its affiliates and actors who controlled it, which
activities were allegedly aimed at ***denuding Acis LP of all of its value,*** at a time when the former
portfolio manager for Acis LP was on the verge of obtaining a very large judgment claim against
Acis LP.  Specifically, these activities of Highland began soon after:  (a) it terminated former
Acis CLO manager Joshua Terry ("Terry") in June 2016; (b) it began litigating with him (which
litigation was sent to arbitration) in September 2016; and (c) Terry obtained an approximately $8
million arbitration award against Acis LP in October 2017, which was confirmed by a judgment
in December 2017.  The activities and counts revolve around:  (a) Highland's alleged
overcharging of Acis LP by more than $7 million for fees/expenses under the Sub-Advisory and
Shared Services Agreement, as limited by the LPA (Counts 1-4); (b) alleged fraudulent transfers

Appellee Appx. 00511
Appx. 03376
007319

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 519 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 402 of 1017 PageID 8132
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 518 of 1803 PageID 11264
Case 18-03078-sgj11 Doc 236-73 Filed 04/16/19 Page 128 of Page 11 of 30

of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory
and Shared Services Agreements (Counts 5-8); (c) an alleged fraudulent transfer as to the
Equity/ALF PMA (Counts 9-12); (d) an alleged fraudulent transfer pertaining to Acis LP's
conveyance away of its so-called ALF Equity (Counts 13-16); (e) an alleged fraudulent transfer
of a $9.5 million note receivable Acis LP held (Counts 17-20); (f) various other fraudulent
transfers (Counts 21-24); (g) preferences (Count 25); (h) assertion of a section 550 recovery
remedy for the aforementioned avoidance actions (Count 26); and (i) requests for punitive
damages, an alter ego/veil piercing remedy, and attorneys' fees (Counts 33-35).  There are also
some counts complaining of postpetition state law torts and breaches of contract (Counts 27-32).

As mentioned earlier, Highland's Arbitration Motion only requests the court defer to
arbitration Counts 1-8—that is the counts relating to:  (a) Highland's alleged overcharging of
Acis LP  by more than $7 million for fees/expenses under the Sub-Advisory and Shared Services
Agreement, as perhaps limited by the LPA (Counts 1-4); and (b) the alleged fraudulent transfers
of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory
and Shared Services Agreements (Counts 5-8).  Highland argues that, *since all of these counts
pertain to the Sub-Advisory Agreement and Shared Services Agreement* between Acis LP and
Highland, the arbitration clauses in those agreements dictate that the counts be carved out from
this Adversary Proceeding and sent to binding arbitration.  Highland acknowledges that these
two agreements were amended and restated numerous times, and that the last time they were
amended (March 17, 2017) the arbitration clauses were eliminated, but Highland argues that,
since all of the activity complained of in Counts 1-8 occurred *prior* to March 17, 2017, *the older
iterations of the Sub-Advisory and Shared Services Agreements, with arbitration clauses,
govern*.  Highland zeroes in on the fact that Counts 1-4, at their essence, are assertions that the

Appellee Appx. 00512

007320

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 520 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 403 of 1017    PageID 8133
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 519 of 1803    PageID 11265
Case 18-03078-sgj11 Doc 2396-8 Filed 04/06/19 Entered 04/16/19 Page 13 of Page 12 of 30

fees for services charged by Highland in the Sub-Advisory and Shared Services Agreements were excessive for the years 2013, 2014, 2015, and through May 2016 (all before the March 17, 2017 iteration of the agreements).  And Counts 5-8, while articulated as fraudulent transfer claims, pertain to the modifications made to the Sub-Advisory and Shared Services Agreements at various stages up to the March 17, 2017 versions.

The Reorganized Debtors have argued that it is quite clear that the last iterations of the Sub-Advisory and Shared Services Agreements intended to supersede in every way the prior versions.  That includes the provisions directing arbitration.  And, they argue, it does not matter *when* the causes of action occurred/accrued or not.  What matters is that the parties agreed at some point that their disputes would not be sent to arbitration and this was the last governing document.

### C.    The Relevant Language in the Sub-Advisory and Shared Services Agreements Pertaining to (i) Arbitration and (ii) Superseding of Prior Agreements.

As mentioned earlier, there was an arbitration clause at Section 16(f) of the Sub-Advisory Agreement until the last March 17, 2017 version.  The clause read as follows:

> [I]n the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[23]

In the Shared Services Agreement, an arbitration clause appeared at Section 9.14, as follows:

> Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[24]

---

[23] Exh. 1 of Arbitration Motion, at 7-8.

[24] Exh. 6 of Arbitration Motion, at 9-10.

Appellee Appx. 00513
Appx. 03378
007321

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 521 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 404 of 1017   PageID 8134
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 520 of 1803   PageID 11266
Case 18-03078-sgj11 Doc 23967384 Filed 04/01/694   Entered 10/41/691 25:13:23 of Page 13 of 30

As earlier mentioned, these two agreements were later amended and restated several

times. The arbitration provisions remained identical until they were completely eliminated in

March 2017.  The Reorganized Debtor argues that this is a short analysis:  there was no longer an

operative arbitration provision as of March 17, 2017.

In the March 17, 2017 version of the Shared Services Agreement, the parties agreed "that

the courts of the State of Texas and the United States District Court located in the Northern

District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether

contractual or noncontractual) which may arise out of or in connection with this Agreement and

that accordingly any action arising out of or in connection therewith (together referred to as

'Proceedings') may be brought in such courts."[25]

The same type language appeared in the March 17, 2017 version of the Sub-Advisory

Agreement:  "The parties unconditionally and irrevocably consent to the exclusive jurisdiction of

the courts located in the State of Texas and waive any objection with respect thereto, for the

purpose of any action, suit or proceeding arising out of or relating to this Agreement or the

transactions contemplated hereby."[26]

More generally, the March 17, 2017 versions of the agreements each provided that they

"amended, restated and replaced the existing agreements *in [their] entirety*."[27]  The March 17,

2017 agreements also each provided that they "supersede[d] all prior agreements and

undertakings, both written and oral, between the parties with respect to such subject matter."[28]

---

[25] Exh. 10 of Arbitration Motion, § 8.04(b).

[26] Exh. 5 of Arbitration Motion, § 13.

[27] Exhs. 5 and 10 of Arbitration Motion, each at p. 1 (emphasis added).

[28] Exh. 5 of Arbitration Motion, ¶ 20; Exh.10 of Arbitration Motion, ¶ 8.14.

Appellee Appx. 00514
Appx. 02379
007322

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 522 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 405 of 1017    PageID 8135
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 521 of 1803    PageID 11267
Case 18-03078-sgj11 Doc 236-35 Filed 04/03/19    Entered 04/11/19 Page 23 of Page 14 of 30

In summary, the Reorganized Debtors argue that, under Texas common law, basic principles of contract interpretation, and the plain language of the March 17, 2017 version of the agreements, there is no agreement to arbitrate.  "A contract's plain language controls."[29] Because the prior versions of the agreements were "amended, restated and replaced in [their] entirety" with the March 17, 2017 agreements—which not only omit an arbitration provision, but also expressly provide for jurisdiction and venue in Texas state or federal courts—the Reorganized Debtors argue that there exists no valid agreement to arbitrate between Highland and Acis LP.  The court's inquiry can and should end there.  But, if the court concludes the arbitration clauses are still applicable, the Reorganized Debtors argue that the bankruptcy court has discretion *not* to compel arbitration when (a) bankruptcy core matters are involved, and (b) arbitration would conflict with the purposes of the Bankruptcy Code.  Therefore, this is further reason why the Arbitration Motion should be denied.

### III.    Legal Analysis.

#### A.    The Federal Arbitration Act and Arbitration Clauses Generally.

The FAA provides that arbitration agreements are always "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[30]  Thus, the FAA reflects a liberal federal policy favoring arbitration, and requires arbitration agreements to be rigorously enforced according to their terms.[31]  The FAA "expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the

---

[29] *Great Am. Ins. Co. v. Primo,* 512 S.W.3d 890, 893 (Tex. 2017).

[30] 9 U.S.C. § 2.

[31] *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (citations omitted).

Appellee Appx. 00515
Appx. 02389
007323

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 523 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 406 of 1017   PageID 8136
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 522 of 1803   PageID 11268
Case 18-03078-sgj Doc 213 60-75 Filed 04/06/94   Entered 04/16/19 15:18:126 of Page 15 of 30

arbitrability of claims should be resolved in favor of arbitration."[32]  "There is a strong

presumption in favor of arbitration and the party seeking to invalidate an arbitration agreement

bears the burden of establishing its invalidity."[33]

When considering a motion to compel arbitration, the Fifth Circuit has held there are two

threshold questions:  (1) whether an arbitration agreement is valid; and (2) whether the dispute

falls within the scope of the agreement.[34]  To evaluate the enforceability of an arbitration

agreement, courts apply the contract law of the state that governs the agreement,[35] whereas the

scope of the agreement is a matter of federal substantive law.[36]

### B.   Is There a Valid Agreement to Arbitrate that Applies Here and is Still Enforceable?[37]

With respect to the first element—whether a valid agreement to arbitrate exists—federal

courts "apply ordinary state-law principles that govern the formation of contracts."[38]  Here, the

choice of law provisions of the Highland-Acis Agreements state:  "This Agreement shall be

---

[32] *Primerica Life Ins. Co. v. Brown,* 304 F.3d 469, 471 (5th Cir. 2002) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)).

[33] *Carter v. Countrywide Credit Indus., Inc.,* 362 F.3d 294, 297 (5th Cir. 2004).

[34] *See Agere Sys. Inc. v. Samsung Elecs. Co. Ltd.*, 560 F.3d 337, 339 (5th Cir. 2009).

[35] *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) (citation omitted).

[36] *Graves v. BP Am., Inc.,* 568 F.3d 221, 222-23 (5th Cir. 2009); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 37 (5th Cir. 1990) (under federal law, courts "resolve doubts concerning the scope of coverage of an arbitration clause in a contract in favor of arbitration," and arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue").

[37] The court is assuming, without analysis, that the Chapter 11 Trustee (and the Reorganized Debtors) are bound by the arbitration clauses, if Acis LP affirmatively agreed to be bound by them and would still be bound by them outside of bankruptcy.  Case law has stated that a bankruptcy trustee "stands in the shoes of the debtor for the purposes of [an] arbitration clause" and "the trustee-plaintiff is bound by the clause to the same extent as would the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989); *see also Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910 at *6 (N.D. Tex. July 30, 2014) (quoting *Hays*).

[38] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004).

Appellee Appx. 00516
Appx. 93584

007324

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 524 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 407 of 1017 PageID 8137
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 523 of 1803 PageID 11269
Case 18-03078-sgj11 Doc 239-58 Filed 04/06/19 Entered 04/06/19 Page 128 of Page 16 of 30

governed by the laws of Texas. . . ."[39]  "Under the Texas rules, in those contract cases in which

the parties have agreed to an enforceable choice of law clause, the law of the chosen state must

be applied."[40]  Accordingly, Texas law governs whether the parties are subject to an enforceable

agreement to arbitrate.

Here, obviously the parties entered into an agreement to arbitrate in both the Sub-

Advisory Agreement (Section 16(f))[41] and the Shared Services Agreement Section 9.14.[42]  And,

it would seem to be beyond peradventure that this was, at one time, enforceable between the

parties, with regard to any disputes that arose regarding the agreements.  The tricky conundrum

here is that those arbitration provisions were deleted in the most recent iterations of the

agreements—that is, the March 17, 2017 versions of the agreements.  Highland argues that, since

Counts 1-8 involve alleged overcharges under the agreements in years 2013-2016, and alleged

fraudulent transfers up to March 17, 2017 (such fraudulent transfers allegedly occurring by virtue

of modifications to the agreements that were made up to March 17, 2017), the pre-March 17,

2017 version of the agreements must be applied with respect to these Counts 1-8 and, thus, the

arbitration provisions apply.  In other words, what matters is when causes of action *accrue* not

when they are ultimately asserted.

The parties have cited a handful of cases to the court, but the one that the court believes is

most analogous is the *Coffman v. Provost * Umphrey Law Firm, L.L.P.* case.[43]  In the *Coffman* case,

---

[39] *See, e.g.,* Exh. 1 to Arbitration Motion, § 16(a); Exh. 5 to Arbitration Motion, § 13; Exh. 6 to Arbitration Motion, § 9.05; Exh. 10 to Arbitration Motion, § 8.04(a).

[40] *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)).

[41] Exhs. 1-4 of the Arbitration Motion.

[42] Exhs. 6-9 of the Arbitration Motion.

[43] *Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720 (E.D. Tex. 2001).

Appellee Appx. 00517
Appx. 03382
007325

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 525 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 408 of 1017    PageID 8138
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 524 of 1803    PageID 11270
Case 18-03078-sgj Doc 23 Filed 04/16/19 Entered 04/16/19 Page 17 of 30

the plaintiff was a former non-equity partner of a law firm and brought a lawsuit against the firm

and its equity partners, alleging *inter alia*, breach of contract, breach of fiduciary duty, violations

of Title VII and/or the Texas Commission on Human Rights Act ("TCHRA"), and violations of

the Equal Pay Act.  The law firm filed a motion to compel arbitration with regard to all of these

claims.  The law firm's motion to compel was based upon various partnership agreements which

governed the law firm.  The original partnership agreement was first effective on August 26,

1986, and the plaintiff did not sign that agreement.  Subsequent to that time, however, the

original partnership agreement was amended and restated on several occasions.  The plaintiff

admitted that she signed four partnership agreement documents:  (1) a Restated Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P.—Effective January 1, 1994 ("1994

Partnership Agreement"); (2) a Restated Partnership Agreement of Provost * Umphrey Law

Firm, L.L.P.—Effective January 1, 1996 ("1996 Partnership Agreement"); (3) an Amendment

No. 1 to the Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P., Dated

January 1, 1996—Effective January 1, 1997 ("1996 Amendment No. 1"); and (4) a Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P., As Restated —Effective January 1, 1998

("1998 Partnership Agreement").  The earlier two agreements—*i.e.,* the 1994 and 1996

Partnership Agreements—did **not** contain an arbitration clause. The 1996 Amendment No. 1 and

the 1998 Partnership Agreement, on the other hand, both contained an identical arbitration clause

as follows:

> Binding Arbitration. The equity partners and non-equity partners shall make a good
> faith effort to settle any dispute or claim arising under this partnership agreement.
> If the equity or non-equity partners fail to resolve a dispute or claim, such equity or
> non-equity partner shall submit the dispute or claim to binding arbitration under the
> rules of the American Arbitration Association then in effect. Judgment on
> arbitration awards may be entered by any court of competent jurisdiction.[44]

---

[44] *Id.* at 723.

Appellee Appx. 00518
Appx. 02383
007326

Additionally, all four of the above-referenced partnership agreements contained an integration clause stating that "[t]his agreement contains the entire agreement . . . and all prior agreements . . . are terminated."[45]

Interestingly, the plaintiff **conceded** that claims she asserted involving the 1996 Amendment No. 1 and the 1998 Partnership Agreement were required to go to arbitration (such claims requested determinations regarding:  (1) the enforceability of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (2) breach of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (3) repudiation; and (4) breach of the duty of good faith and fair dealing).  However, the plaintiff disagreed that her remaining claims were also required to go to arbitration and those were:  (a) breach of the 1994 and 1996 Partnership Agreements; (b) breach of fiduciary duty; (c) violations of Title VII and/or TCHRA; and (d) violations of the Equal Pay Act.  The district court granted in part and denied in part the motion to compel arbitration, holding that:  (1) the plaintiff's contract claims arising under **earlier** partnership agreements, which **did not** contain arbitration clauses, were **not arbitrable**; (2) a common law breach of fiduciary duty claim was arbitrable under the agreements (it appears that these claims arose after the 1996 Amendment No. 1 and 1998 Partnership Agreement); and (3) statutory sex-based discrimination claims were not arbitrable under the agreements.[46]

Relevant to the case at bar, the *Coffman* court noted, first, that the conduct underlying the alleged breaches of the 1994 and 1996 contracts occurred at a time when no arbitration clause was in effect.  The plaintiff's complaint specifically alleged that, during the time the four

---

[45] *Id.*

[46] *Id.* at 733.

Appellee Appx. 00519

Appx. 02384

007327

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 527 of
Case 3:25-cv-02072-S Document 15-10 1804 10/06/25 Page 410 of 1017 PageID 8140
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 526 of 1803 PageID 11272
Case 18-03078-sgj Doc 2396-3 Filed 04/03/94 Filed 11/11/19 Page 328 of Page 19 of 30

agreements were in effect, the law firm failed to properly calculate Plaintiff's compensation, failed to promote her, and deprived her of benefits from a tobacco case. The court noted that, if the law firm did participate in such conduct during the time that the 1994 and 1996 Partnership Agreements were in effect, such conduct could not have "arisen under" the 1996 Amendment No. 1 or the 1998 Partnership Agreement *because those agreements did not even exist at that time*. But, to the extent that the conduct Plaintiff complained of occurred when the 1996 Amendment No. 1 and the 1998 Partnership Agreement were in effect, her claims would be subject to arbitration.[47]

The court further noted that the arbitration clause should not be interpreted as covering the plaintiff's claims for breach of the 1994 and 1996 Partnership Agreements because the plain grammatical language of the arbitration clause gave no indication that it would apply retroactively. "To interpret the arbitration clause to apply retroactively would cause Plaintiff to forego her vested right to litigate an accrued claim."[48]

---

[47] *Id.* at 726 (citing *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (arbitration provision in 1994 shipping agreement did not cover conduct that occurred under prior shipping agreements); *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965) (claim based on conduct which had arisen "prior to" effective date of arbitration clause was not within scope of arbitration agreement); *Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527, 533-34 (E.D.Va. 1999) (arbitration clause in fourth contract did not cover conduct that occurred when third contract was in effect); *Connett v. Justus Enters. of Kansas, Inc.*, Civ. A. No. 87–1739–T, 1989 WL 47071, at *2 (D. Kan. March 21, 1989) (arbitration clause did not apply when alleged fraudulent conduct occurred before plaintiff executed contract with arbitration clause); *George Wash. Univ. v. Scott*, 711 A.2d 1257, 1260-61 (D.C. Ct. App. 1998) (conduct that occurred before arbitration clause took effect was not arbitrable).

[48] *Coffman*, 161 F. Supp. 2d at 726-27 (citing *Sec. Watch*, 176 F.3d at 372–73 (arbitration clause did not reach disputes arising under earlier agreements because it is "nonsensical to suggest that [the plaintiff] would abandon its established right to litigate disputes arising under the [prior] contracts"); *Choice Sec. Sys. v. AT&T Corp*, No. 97-1774, 1998 WL 153254, at *1 (1st Cir. Feb.25, 1998) (arbitration clause in 1994 contracts did not apply to pre–1994 contracts when the language of the arbitration clause did not indicate "that the parties ever contemplated so radical a retroactive renegotiation of their earlier agreements"); *Hendrick*, 50 F. Supp. 2d at 535 (arbitration clause was not retroactive when the text of the clause expressed no language providing that it "reache[d] back in time to require an employee to arbitrate a claim which had accrued before the contract was signed or the [arbitration clause] took effect"); *Connett*, 1989 WL 47071, at *2 (arbitration clause did not apply retroactively when it did not specify that it applied to past conduct); *Kenworth of Dothan, Inc. v. Bruner–Wells Trucking, Inc.*, 745 So.2d 271, 275-76 (Ala. 1999) (arbitration clause was not retroactive when language of the clause did not so state); *George Wash. Univ.*, 711 A.2d at 1261 (arbitration clause was not retroactive when "the arbitration clause itself contained no indication whatsoever that its terms would apply . . . before [its effective date]").

Appellee Appx. 00520
Appx. 03385
007328

Bottom line, the court in *Coffman* seemed to focus on **when each cause of action**

**accrued** and looked to the **agreement that governed at such time**.  This court agrees with that

reasoning and sees no reason why the result should be different in the case at bar, simply because

the arbitration clauses in the case at bar were in **earlier** versions of the Sub-Advisory and Shared

Services Agreements as opposed to being in the **later** versions of those agreements (in other

words, the opposite sequence as in the *Coffman* case).

The Reorganized Debtors have cited a couple of cases that they believe justify a

determination that there is no binding arbitration clause in the case at bar.  One is the case of

*Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*[49]  This case involved a motion to compel

arbitration that was denied (which denial was affirmed by the Fifth Circuit).  Like the case at bar,

it involved a situation where there had been a succession of agreements, with earlier agreements

containing arbitration provisions and the last agreement containing no arbitration clause.

Specifically, in the *Goss-Reid* case, there were three agreements that were relevant.  First, a

**Franchise Agreement** between a franchisor named Transformational Technologies, Inc. ("TTI")

and a party named Rittenhaus-Tate Organization ("RTO").  RTO was a business owned by Tracy

Goss and Sheila Reid.  The Franchise Agreement, among other things, provided that RTO's

owners Tracy Goss and Sheila Reid would be "licensed franchisees of TTI" and would have use

of certain of TTI's intellectual property.  During the term of the Franchise Agreement, Tracy

Goss and Sheila Reid developed certain consulting services technology they called "The

Winning Strategy" and it apparently was built off of TTI's intellectual property.  This first

agreement contained a mandatory arbitration provision.  Second, there was a **License**

---

[49] *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*, 54 Fed. Appx. 405 (5th Cir. 2002) (per curium opinion which is designated as having no precedential effect).

Appellee Appx. 00521

007329

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 529 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 412 of 1017    PageID 8142
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 528 of 1803    PageID 11274
Case 18-03078-sgj Doc 23-8 Filed 04/03/19    Entered 04/11/19 18:23 Page 21 of 30

**Agreement** between the apparent successor-in-interest of TTI called Tekniko, Inc., on the one

hand, and Tracy Goss, Sheila Reid and Goss-Reid & Associates, Inc. (collectively, "Goss/Reid"),

on the other, pursuant to which Goss/Reid obtained a "a non-exclusive license to use the same

intellectual property covered by the Franchise Agreement."  This second agreement also

contained a mandatory arbitration agreement.  Third, there was a **Transfer Agreement** that

appears to have been entered into by the same parties as the second agreement (Tekniko, Inc. and

Goss/Reid).  The Transfer Agreement "permanently transferred [to Goss/Reid] the non-exclusive

right to use the intellectual property that was the subject of the prior agreements in exchange for

a percentage of [Goss & Reid's] adjusted gross profits for that year."  There was no arbitration

provision in this third agreement and the agreement did not adopt or refer to the arbitration

provisions contained in the earlier agreements.  The third agreement stated that it constituted "an

amendment to the License Agreement . . . between you and this company ('TEKNIKO'),

supersedes all prior agreements between you and TEKNIKO and, except as provided below, will

terminate your rights and those of TEKNIKO under the License Agreement."

     At some subsequent time, Goss/Reid filed a lawsuit alleging improper use of "The

Winning Strategy" by the entities Tekniko Licensing Corporation and Landmark Education

Company.  These Defendants (hereafter so called) asserted ownership themselves of "The

Winning Strategy" based on the Franchise Agreement.  The Defendants—citing to the arbitration

clauses in both the Franchise Agreement and the License Agreement—filed a motion to compel

arbitration, which was denied at the district court level and also at the Fifth Circuit.  The district

court determined that New York law applied (*i.e.,* the Transfer Agreement was governed by New

York law and apparently the parties agreed that New York law applied), and that the Transfer

Agreement constituted a novation and extinguished the arbitration provisions of the previous

Appellee Appx. 00522
Appx. 007330

agreements. On appeal, the Fifth Circuit stated that the issue before it was "whether the arbitration provisions of the Franchise and License Agreements were superseded by the Transfer Agreement. Thus, the question before us is one of contractual interpretation."[50]

The Fifth Circuit stated certain principles that apply under both New York and Texas law. Among other principles, the Fifth Circuit noted that courts construing contracts "should strive to give effect to the intentions of the parties, as expressed in the terms of the contract."[51] The Transfer Agreement stated that "it supersedes all prior agreements" between Goss/Reid and the predecessor-in-interest of one of the Defendants, Tekniko Licensing Corporation.[52] "This type of agreement clearly constitutes a novation under New York law."[53] The court also noted that it was not appropriate to consider any extrinsic or parol evidence, since there was no ambiguity in the Transfer Agreement. The court further stated that "[t]he only potential ambiguity raised by the Defendants is that the Transfer Agreement refers to itself as an 'amendment to the License Agreement.' Read as a whole, however, the Transfer Agreement plainly manifests an intention to supersede all prior agreements between the parties and, except as specifically provided, to terminate all rights and obligations under the License Agreement."[54]

The other case that the Reorganized Debtors have significantly relied upon to justify a determination that there is no binding arbitration clause in the case at bar is *Valero Energy Corp. v. Teco Pipeline Co.*[55] In *Valero*, there had been numerous agreements entered into over time

---

[50] *Id.* at *1.

[51] *Id.*

[52] *Id.*

[53] *Id.* (citing various New York state court cases).

[54] *Id.* at *2.

[55] *Valero Energy Corp. v. Teco Pipeline Co.,* 2 S.W.3d 576 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

Appellee Appx. 00523

Appx. 03388

007331

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 531 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 414 of 1017   PageID 8144
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 530 of 1803   PageID 11276
Case 18-03078-sgj11 Doc 396-58 Filed 04/16/19   Entered 04/16/19 Page 22 of Page 23 of 30

amongst the litigating parties, all of which involved gas pipelines and transportation rights, and

those various agreements were not amendments or restatements of one initial agreement.  Rather,

there was an Operating Agreement, there were documents that were alleged to create a joint

venture or partnership, a Purchase Agreement, an Ownership Agreement, a Transportation

Agreement, and a couple of Settlement Agreements entered into later when various disputes

arose.  One of the key agreements, the so-called Operating Agreement, contained an arbitration

clause.  When party Teco Pipeline sued party Valero and other related parties, Valero moved to

compel arbitration, arguing that the litigation was subject to the arbitration clause in the

Operating Agreement.  The trial court denied Valero's motion, but the court of appeals reversed.

Teco had argued that the claims it was asserting were not based on the Operating

Agreement that contained the arbitration clause but, even if they were, a later Settlement

Agreement essentially redefined the parties' relationship—essentially superseding the parties'

relationship that had been set forth in the numerous prior agreements—and it did not have an

arbitration clause.  Rather the Settlement Agreement stated that:

> Each party irrevocably consents and agrees that any legal action, suit or proceeding
> against any of them with respect to their obligations, liabilities, or any other matter
> under or arising out of or in connection with this Agreement may be brought in the
> United States District Court for the Western District of Texas, San Antonio
> Division, or in the courts of the State of Texas, and hereby irrevocably accepts and
> submits to the jurisdiction of each of the aforesaid court in personam, generally and
> unconditionally with respect to any such action, suit or proceeding for itself and in
> respect of its properties, assets and revenues.[56]

Teco asserted that the quoted clause provided for the procedure to be used in future disputes, *i.e.,*

that the parties would go through judicial channels, not arbitration.  Teco also asserted that the

intent to revoke the arbitration clause was signified by a typical merger clause contained in the

---

[56] *Id.* at 587.

Appellee Appx. 00524
Appx. 02389
007332

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 532 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 415 of 1017   PageID 8145
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 531 of 1803   PageID 11277
Case 18-03078-sgj   Doc 22 3653 Filed 04/06/94   Entered 04/16/19 Page 23 of Page 24 of 30

Settlement Agreement.  The appeals court disagreed with Teco's argument and determined arbitration was required.  First, the court determined that the provision regarding litigation applied only to disputes arising under the Settlement Agreement not the previously executed Operating Agreement, Purchase Agreement, Ownership Agreement, or Transportation Agreements.  There was nothing to indicate that all the terms of those previous agreements had been superseded by the Settlement Agreement.  In fact, it appeared that only select terms of the earlier agreements were being modified.  Significantly, the Settlement Agreement referred to an "Amendment No. 1" to the Operating Agreement being attached as an Exhibit D to the Settlement Agreement—suggesting that it remained in intact (except for the amendment attached).  Moreover, there was a post-Settlement Agreement letter submitted into evidence stating that the prior Operating Agreement and arbitration provision were still in effect.  The court addressed many other arguments made by Teco and, in the end, found nothing had superseded or otherwise revoked the prior arbitration clause.

This bankruptcy court does not consider the *Valero* or *Goss-Reid* cases to be dispositive of the situation in the case at bar.  Those cases clearly dealt with a myriad of agreements—for example, in *Valero*, one key agreement had an arbitration clause, and an allegedly superseding Settlement Agreement (with no arbitration clause) was determined not to have been intended to supersede or replace the agreement with the arbitration clause.  In *Goss-Reid*, there were also a myriad of agreements (*i.e.*, a franchise agreement, a license agreement and then a transfer agreement), and the last one containing no arbitration clause was held to have been a novation of the prior agreements.   In *Valero* and *Goss-Reid*, the various agreements were not amendments or restatements of one initial agreement.  The case at bar is more analogous to the *Coffman* case (involving amendments and restatements of an initial agreement) and the logic of that holding

Appellee Appx. 00525
Appx. 02399
007333

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 533 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 416 of 1017    PageID 8146
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 532 of 1803   PageID 11278
Case 18-03078-sgj Doc 236 Filed 04/06/94   Entered 04/16/19 Page 25 of Page 25 of 30

seems sound to apply here—especially given the fact that there is nothing in the March 17, 2017

version of the agreements that suggests that the agreement to submit disputes to litigation in

Texas and the deletion of the arbitration clauses should be applied retroactively.  The court

believes it should look at when a cause of action accrued and determine if there was a binding

arbitration clause between the parties at that time in the governing version of the agreement.

Thus, the court determines that there were valid arbitration agreements that applied to all

disputes arising out of the Sub-Advisory Agreement and Shared Services Agreement—to the

extent that those disputes involved conduct prior to March 17, 2017.  Since Counts 1-8 involve

conduct prior to March 17, 2017, Counts 1-8 fall within the scope of the arbitration agreements

in the Sub-Advisory Agreement and Shared Series Agreement.

**C.      But Wait, this is Bankruptcy and Core Matters and a Proof of Claim Objection are Involved.**

The analysis does not end here.  Yes, there is an otherwise valid, binding arbitration

clause that was contained in each of the Sub-Advisory and Shared Services Agreements (prior to

March 17, 2017).  And, yes, Counts 1-8 involve conduct and disputes arising under these pre-

March 17, 2017 agreements.  But what about the fact that these disputes arise in an adversary

proceeding that involves mostly, if not entirely, "core" matters (*e.g.,* Counts 5-25 are all

fraudulent transfers or preference claims under Section 544,[57] 547,[58] or 548;[59] Count 2 is a

Section 542 turnover request;[60] Count 26 is a request for Section 550 recovery[61])?  And what

---

[57] *See* 28 U.S.C. § 157(b)(2)(H).

[58] *See* 28 U.S.C. § 157(b)(2)(F).

[59] *See* 28 U.S.C. § 157(b)(2)(H).

[60] *See* 28 U.S.C. § 157(b)(2)(E).

[61] *See* 28 U.S.C. § 157(b)(2)(F) & (H).

Appellee Appx. 00526
Appx. 03391
007334

about the fact that Highland (the counter-party to the Sub-Advisory and Shared Services
Agreement who has asked for enforcement of the arbitration clauses in those agreements) has
filed proofs of claim?[62]  And what about the fact that Counts 1-8 (as with every count in the
Adversary Proceeding) are all urged to be *offsets* to Highland's proofs of claim?[63]  Highland's
proofs of claim are based on the post-March 17, 2017 versions of the Sub-Advisory and Shared
Services Agreements (*i.e.,* the versions that have no arbitration clauses).  Highland has not
argued that its proofs of claim are subject to arbitration (likely because they are governed by the
post-March 17, 2017 versions of the Sub-Advisory and Shared Services Agreements).  But,
again, Highland argues that Counts 1-8 must be sent to arbitration, and the Reorganized Debtors
argue that each of these counts present potential offsets to Highlands' proofs of claim.  As a
reminder, these counts are:

**COUNT 1**:    Declaratory Judgment of Ultra Vires Acts by Acis LP in Violation of the LPA
(Highland allegedly overcharged expenses by $7M+ (*i.e.*, excessive fees) under
the Sub-Advisory and Shared Services Agreements).

**COUNT 2**:    Turnover of Property of the Estate Under § 542 for Unauthorized Overpayments
(turnover the $7M+ overcharged).

**COUNT 3**:    Money Had and Received for Overcharges and Unauthorized Overpayments
(again, seeking redress for the $7M+ overcharged—implicating the Sub-Advisory
Agreement and Shared Services Agreement).

**COUNT 4**:    Conversion for Unauthorized Overpayments (again, seeking redress for the $7M+
overcharged implicating the Sub-Advisory Agreement and Shared Services
Agreement).

**COUNT 5**:    Actual Fraudulent Transfer under § 548 related to the Sub-Advisory Agreement
(modifications to the Sub-Advisory Agreement in subsequent iterations were
allegedly fraudulent transfer, as were payments thereunder).

---

[62] *See* 28 U.S.C. § 157(b)(2)(B).

[63] *See* 28 U.S.C. § 157(b)(2)(C).

Appellee Appx. 00527

Appx. 03392

007335

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 535 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 418 of 1017   PageID 8148
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 534 of 1803   PageID 11280
Case 18-03078-sgj11 Doc 2396 Filed 04/01/19 Entered 04/01/19 Page 28 of Page 27 of 30

**COUNT 6**:    Actual Fraudulent Transfer Under TUFTA, § 24.005(a)(1) related to the Sub-Advisory Agreement (same theory as Count 5, asserted through section 544 of the Bankruptcy Code).

**COUNT 7**:    Constructive Fraudulent Transfer Under § 548(a)(1)(B) related to the Sub-Advisory Agreement (same facts as Count 5 only constructive not actual fraud).

**COUNT 8**:    Constructive Fraudulent Transfer Under TUFTA §§ 24.005(a)(2) and 24.006(a) related to the Sub-Advisory Agreement (same facts as Count 5, only constructive fraud under TUFTA, and asserted through section 544 of the Bankruptcy Code).

Thus, to recap, *five of the eight counts that Highland wants arbitrated* (Counts 2, and 5-8) clearly involve statutory core matters.[64]  Moreover, *all* of the counts in the Adversary Proceeding are asserted *defensively* to two proofs of claim—meaning *all eight counts that Highland wants arbitrated* (even Counts 1, 3, and 4) have transformed into statutory core matters.[65]  Does this matter?  This court believes yes.

The Fifth Circuit has shed some light on this topic in the cases of *In re Gandy* and *In re National Gypsum*.[66]  In those cases, the Fifth Circuit instructed that a bankruptcy court may decline to enforce arbitration clauses when it finds:  (a) the underlying nature of the proceeding

---

[64] *See* 28 U.S.C. § 157(b)(2)(E), (F), and (H).

[65] *See* 28 U.S.C. § 157(b)(2)(C).  This court realizes that, from a *Stern v. Marshall* perspective, 131 S. Ct. 2594 (2011), being a *statutory* "core" matter does not necessarily mean a bankruptcy court has Constitutional authority to issue final orders or judgments in the matter.  However, even if this *Stern* pronouncement has any relevance, when evaluating an arbitration clause/right, the court perceives that the various counterclaims here (*i.e.,* all 35 counts) are likely *inexplicably intertwined* with the Highland proofs of claim, such that the bankruptcy court would likely have Constitutional authority to adjudicate them.  While Highland's proofs of claim merely seek payment for services under the post-March 17, 2017 versions of the agreements—which is *after* the time frame that Counts 1-8 implicate—it is not so simple as dividing claims and counterclaims into discreet time periods.  For one thing, the Reorganized Debtors argue that modifications to the Sub-Advisory and Shared Services Agreements that increased fees that Highland could charge (and that Highland is now seeking in its proofs of claim) were tantamount to fraudulent transfers.  Thus, how does one evaluate the proofs of claim separately from this argument?  Additionally, Highland *has asserted unliquidated indemnification claims* in its proofs of claim that presumably reach back to earlier iterations of the Sub-Advisory and Shared Services Agreement (meaning that claims ultimately awarded to the Reorganized Debtors under earlier versions of the agreements might result in indemnification claims being asserted back against them by Highland relating to those very claims).  The point being that all of Highland's assertions in its proofs of claim seem inextricably intertwined with all the Counts in the Adversary Proceeding.

[66] *Gandy v. Gandy (In re Gandy),* 299 F.3d 489 (5th Cir. 2002); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.),* 118 F.3d 1056 (5th Cir. 1997).

Appellee Appx. 00528
Appx. 02393
007336

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 536 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 419 of 1017 PageID 8149
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 535 of 1803 PageID 11281
Case 18-03078-sgj Doc 22 Filed 04/16/19 Entered 04/16/19 Page 28 of Page 28 of 30

derives from the provisions of the Bankruptcy Code; and (b) that enforcement of the arbitration

provision would conflict with the purposes/goals of the Bankruptcy Code.[67]  Some

purposes/goals of the Code that might support a denial of arbitration, include: (1) the equitable

and expeditious distribution of assets of the Debtor's estate; (2) centralized resolution of pure

bankruptcy issues; (3) protection of creditors and reorganizing debtors from piecemeal litigation,

and (4) the undisputed power of a bankruptcy court to enforce its orders.[68]

 The *In re Gandy* opinion from the Fifth Circuit is worthy of discussion here.  In *Gandy*,

an individual Chapter 11 debtor had first, prepetition, filed a state court lawsuit against various

business partners, asserting causes of action against them for making transfers out of a

partnership affecting her ownership interests, and the causes of action included breach of

contract, negligence, breach of fiduciary duty, fraud and constructive trust.  There was an

arbitration clause in the applicable partnership agreement and the state court granted a motion to

compel arbitration.  Then, the debtor filed a Chapter 11 case and removed the state court lawsuit

to the bankruptcy court and filed new claims under sections 544, 548, 550, civil "RICO," and

alter ego in a separate adversary proceeding, and requested substantive consolidation.  The

bankruptcy court granted consolidation of the two actions and then the defendants filed a motion

to compel arbitration.  The bankruptcy court denied the motion, after finding that the debtor was

essentially seeking avoidance of fraudulent transfers.  The Fifth Circuit affirmed the bankruptcy

court's refusal to enforce an arbitration clause contained in the underlying partnership

agreement.  The court agreed with the bankruptcy court that the complaint essentially—more

than anything else—sought avoidance of fraudulent transfers, and the court not only determined

---

[67] *Id.* at 1069.

[68] *Id.*

Appellee Appx. 00529
Appx. 03394
007337

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 537 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 420 of 1017    PageID 8150
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 536 of 1803    PageID 11282
Case 18-03078-sgj Doc 21 Filed 04/01/19 Entered 04/01/19 Page 29 of 30

that such rights derived from the Bankruptcy Code (fully acknowledging the fact that there were

state law tort claims and breach of contract also asserted) but also—in looking at whether

enforcing the arbitration clause would conflict with the purposes of the Bankruptcy Code—noted

that one central purpose of the Bankruptcy Code is the expeditious and equitable distribution of

the assets of a debtor's estate.  The court thought the avoidance actions predominated over the

"peripheral" contract and tort claims and, in such a circumstance, "the importance of the federal

bankruptcy forum provided by the Code is at its zenith."[69]  The court stated that "[s]ome of the

purposes of the Code we mentioned in *National Gypsum*[70] as potentially conflicting with the

Arbitration Act include the goal of centralized resolution of purely bankruptcy issues, the need to

protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of

the bankruptcy court to enforce its own orders."[71]

       This court believes, like the court in *Gandy*, that this Adversary Proceeding—more than

anything else—seeks avoidance of fraudulent transfers.  Such avoidance theories derive from the

Bankruptcy Code.  Sections 542, 547, 548 and 550 of the Bankruptcy Code are front and center,

as are the "strong arm" powers of section 544(a).  Enforcing the arbitration clause here would

conflict with the purposes of the Bankruptcy Code—one of the central purposes of which is the

---

[69] *Gandy,* 299 F.3d at 497.

[70] In the *National Gypsum* case, an asbestos litigation trust created under a confirmed plan filed a post-confirmation adversary proceeding against debtor's liability insurer, seeking a declaratory judgment that the plan had discharged its obligations to the insurance company.  The insurance company, in response to the litigation, sought to exercise its rights to seek arbitration under a certain agreement.  The Fifth Circuit, in affirming the lower courts' refusal to compel arbitration, stated that, "We believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, *i.e.*, whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code."  *Nat'l Gypsum Co.*, 118 F.3d at 1067.  Because the debtor sought to bar the insurance company's actions either by invoking section 524(a)'s discharge injunction or by invoking the terms of a confirmed plan, the proceeding derived entirely from the provisions of the Bankruptcy Code, and, hence, the *National Gypsum* court would not send the dispute to arbitration.

[71] *Gandy*, 299 F.3d at 500.

Appellee Appx. 00530

Appx. 02395

007338

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 538 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 421 of 1017    PageID 8151
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 537 of 1803    PageID 11283
Case 18-03078-sgj   Doc 223   Filed 04/16/19   Entered 04/16/19 Page 30 of Page 30 of 30

expeditious and equitable distribution of the assets of a debtor's estate.  The avoidance actions in

this Adversary Proceeding predominate over all other counts and, in such a circumstance, "the

importance of the federal bankruptcy forum provided by the Code is at its zenith."  Arbitrating

Counts 1-8 would seriously jeopardize the Adversary Proceeding because they are an integral

part of determining Highland's proofs of claim and the other core counts in the Adversary

Proceeding.  The bankruptcy court's quintessential duties are to adjudicate proofs of claim and to

provide a central forum for litigation, whenever feasible and jurisdictionally sound.  Indeed, in

*Gandy*, the Fifth Circuit noted that when a proof of claim is filed, one of the "peculiar powers" of

the bankruptcy court has been invoked and the nature of estate claims becomes "different from

[their] nature . . . following the filing of a proof of claim."[72]

In summary, this court believes it has discretion under established Fifth Circuit authority

to decline to order arbitration here.[73]  It is, therefore,

**ORDERED** that the Arbitration Motion is **DENIED**.

**#### END OF MEMORANDUM OPINION AND ORDER####**

---

[72] *Id.* at 499 (citing *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir. 1987)).

[73] *See also Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 389-90 (2d Cir. 2018) (in proceeding
involving whether section 524 discharge was violated by credit card company whose agreement with debtor
contained arbitration clause, Second Circuit held that bankruptcy court had discretion to decline to enforce the
arbitration agreement; Second Circuit engaged in a particularized inquiry into the nature of the claim and the facts of
the specific bankruptcy and determined that arbitrating claims for violations of the 524 injunction would "seriously
jeopardize a particular core bankruptcy proceeding" because: "(1) the discharge injunction is integral to the
bankruptcy court's ability to provide debtors with a fresh start, (2) the claim relates to an ongoing matter with
continuing court supervision, and (3) the equitable powers of the court to enforce its own injunctions are central to
the structure of the Code.").

Appellee Appx. 00531
Appx. 02386
007339

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 539 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 422 of 1017 PageID 8152
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 538 of 1803 PageID 11284

## CERTIFICATE OF SERVICE

I, Elliot Bromagen, certify that I am not less than 18 years of age, and that service of the foregoing was caused to be made on November 1, 2019, in the manner indicated on the parties on the attached service list.

Date: November 1, 2019        _/s/ Elliot Bromagen_____
Elliot Bromagen

Appellee Appx. 00532

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 540 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 423 of 1017 PageID 8153
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 539 of 1803 PageID 11285

Case 19-12239-CSS Doc 86-5 Filed 11/01/19 Page 2 of 7

**HAND DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
James O'Neill, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19899 (Courier 19801)

**OVERNIGHT DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
Richard M. Pachulski, Esquire
Jeffrey N. Pomerantz, Esquire
Ira D. Kharasch, Esquire
Maxim B. Litvak, Esquire
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067

**HAND DELIVERY**
(United States Trustee)
Jane M. Leamy, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**HAND DELIVERY**
(State Attorney General)
Kathy Jennings, Esquire
Delaware Department of Justice
Carvel State Office Building, 6th Floor
820 N. French Street
Wilmington, DE 19801

**HAND DELIVERY**
Zillah A. Frampton
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE 19801

**HAND DELIVERY**
(United States Attorney)
David C. Weiss
c/o Ellen Slights
US Attorney's Office
District of Delaware
Hercules Building, Suite 400
1313 N. Market Street
Wilmington, DE 19801

**HAND DELIVERY**
(Top 20 Unsecured Creditor)
Ryan P. Newell, Esquire
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Sean M. Beach, Esquire
Jaclyn C. Weissgerber, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street, Rodney Square
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to the Redeemer Committee of the
Highland Crusader Fund)
Curtis S. Miller, Esquire
Morris, Nichols, Arsht & tunnel LLP
Kevin M. Coen, Esquire
1201 North Market Street, Suite 1600
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
John E. Lucian, Esquire
Josef W. Mintz, Esquire
Jose F. Bibiloni, Esquire
Blank Rome LLP
1201 N Market Street, Suite 800
Wilmington, DE 19801

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 541 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 424 of 1017 PageID 8154
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 540 of 1803 PageID 11286
Case 19-12239-CSS Doc 86-5 Filed 11/01/19 Page 3 of 7

**HAND DELIVERY**
(Counsel to Patrick Daugherty)
Michael L. Vild, Esquire
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Hunter Mountain Trust)
William A. Hazeltine, Esquire
Sullivan Hazeltine Allinson LLC
901 North Market Street, Suite 1300
Wilmington, DE 19801

**OVERNIGHT DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
Rakhee V. Patel, Esquire
Phillip Lamberson, Esquire
Winstead PC
2728 N. Harwood Street, Suite 500
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(United States Attorney General)
William Barr, Esquire
Office of the US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Room 4400
Washington, DC 20530-0001

**OVERNIGHT DELIVERY**
State of Delaware
Division of Corporations - Franchise Tax
PO Box 898
Dover, DE 19903

**OVERNIGHT DELIVERY**
Delaware Secretary of Treasury
820 Silver Lake Blvd, Suite 100
Dover, DE 19904

**OVERNIGHT DELIVERY**
Office of General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

**OVERNIGHT DELIVERY**
Office of General Counsel
Securities & Exchange Commission
100 F Street, NE
Washington, DC 20554

**OVERNIGHT DELIVERY**
Sharon Binger, Regional Director
Philadelphia Regional Office
Securities & Exchange Commission
One Penn Center, Suite 520
1617 JFK Boulevard
Philadelphia, PA 19103

**OVERNIGHT DELIVERY**
Andrew Calamari, Regional Director
New York Regional Office
Securities & Exchange Commission
Brookfield Place, Suite 400
200 Vesey Street
New York, NY 10281

**OVERNIGHT DELIVERY**
Office of the General Counsel
Michael I. Baird, Esquire
Pension Benefit Guaranty Corporation
1200 K Street, NW
Washington, DC 20005-4026

**OVERNIGHT DELIVERY**
Internal Revenue Service
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA 19101

Appellee Appx. 00534
Appx. 03899
007342

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 542 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 425 of 1017 PageID 8155
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 541 of 1803 PageID 11287
Case 19-12239-CSS Doc 86-5 Filed 11/01/19 Page 4 of 7

**OVERNIGHT DELIVERY**
BBVA
Michael Doran
8080 N. Central Expressway
Suite 1500
Dallas, TX 75206

**OVERNIGHT DELIVERY**
NexBank
John Danilowicz
2515 McKinney Avenue
Suite 1100
Dallas, TX 75201

**OVERNIGHT DELIVERY**
KeyBank National Association
as Administrative Agent
225 Franklin Street, 18th Floor
Boston, MA 02110

**OVERNIGHT DELIVERY**
KeyBank National Association
as Agent
127 Public Square
Cleveland, OH 44114

**OVERNIGHT DELIVERY**
Prime Brokerage Services
Jefferies LLC
520 Madison Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
Office of the General Counsel
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Director of Compliance
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Frontier State Bank
Attn: Steve Elliot
5100 South I-35 Service Road
Oklahoma City, OK 73129

**OVERNIGHT DELIVERY**
Strand Advisors, Inc.
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Dugaboy Investment Trust
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Mark K. Okada
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #1
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #2
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Hunter Mountain Investment Trust
c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

Appellee Appx. 00535
Appx. 03409
007343

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 543 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 426 of 1017 PageID 8156
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 542 of 1803 PageID 11288
Case 19-12239-CSS Doc 86-5 Filed 11/01/19 Page 5 of 7

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Acis Capital Management, L.P.
  and Acis Capital Management GP, LLC
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
American Arbitration Association
Elizabeth Robertson, Esquire
120 Broadway, 21st Floor,
New York, NY 10271

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Andrews Kurth LLP
Scott A. Brister, Esquire
111 Congress Avenue, Ste 1700
Austin, TX 78701

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Bates White, LLC
Karen Goldberg, Esquire
2001 K Street NW
North Bldg Suite 500
Washington, DC 20006

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
CLO Holdco, Ltd.
Grant Scott, Esquire
Myers Bigel Sibley & Sajovec, P.A.
4140 Park Lake Ave, Ste 600
Raleigh, NC 27612

**OVERNIGHT DELIVERY**
Cole, Schotz, Meisel, Forman & Leonard,
P.A.
Michael D. Warner, Esquire
301 Commerce Street, Suite 1700
Fort Worth, TX 76102

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Debevoise & Plimpton LLP
Michael Harrell, Esquire
c/o Accounting Dept 28th Floor
919 Third Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
DLA Piper LLP (US)
Marc D. Katz, Esquire
1900 N Pearl St, Suite 2200
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Duff & Phelps, LLC
c/o David Landman
Benesch, Friedlander, Coplan & Aronoff
LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Foley Gardere
Holly O'Neil, Esquire
Foley & Lardner LLP
2021 McKinney Avenue Suite 1600
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Joshua & Jennifer Terry
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

4

Appellee Appx. 00536
Appx. 03401
007344

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 544 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 427 of 1017 PageID 8157
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 543 of 1803 PageID 11289
Case 19-12239-CSS Doc 86-5 Filed 11/01/19 Page 6 of 7

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Lackey Hershman LLP
Paul Lackey, Esquire
Stinson LLP
3102 Oak Lawn Avenue, Ste 777
Dallas, TX 75219

**OVERNIGHT DELIVERY**
Lynn Pinker Cox & Hurst, L.L.P.
Michael K. Hurst, Esquire
2100 Ross Avenue, Ste 2700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
McKool Smith, P.C.
(Top 20 Unsecured Creditor)
Gary Cruciani, Esquire
300 Crescent Court, Suite 1500
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Meta-e Discovery LLC
Paul McVoy
Six Landmark Square, 4th Floor
Stamford, CT 6901

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
NWCC, LLC
c/o of Michael A. Battle, Esquire
Barnes & Thornburg, LLP
1717 Pennsylvania Ave N.W. Ste 500
Washington, DC 20006-4623

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Patrick Daugherty
c/o Thomas A. Uebler, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd #401
Wilmington, DE 19808

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Redeemer Committee of the Highland
Crusader Fund
c/o Terri Mascherin, Esquire
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Reid Collins & Tsai LLP
William T. Reid, Esquire
810 Seventh Avenue, Ste 410
New York, NY 10019

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
UBS AG, London Branch and UBS
Securities LLC
c/o Andrew Clubock, Esquire
Latham & Watkins LLP
555 Eleventh Street NW Suite 1000
Washington, DC 20004-130

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Scott E. Gant, Esquire
Boies, Schiller & Flexner LLP
1401 New York Avenue, NW
Washington, DC 20005

**OVERNIGHT DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Marshall R. King, Esquire
Michael A. Rosenthal, Esquire
Alan Moskowitz, Esquire
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10066

Appellee Appx. 00537

Appx. 03492

007345

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 545 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 428 of 1017 PageID 8158
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 544 of 1803 PageID 11290
Case 19-12239-CSS Doc 86-5 Filed 11/01/19 Page 7 of 7

**OVERNIGHT DELIVERY**

(Counsel to California Public Employees'
Retirement System ("CalPERS")
Louis J. Cisz, III, Esquire
Nixon Peabody LLP
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111

**OVERNIGHT DELIVERY**

(Counsel to Alvarez & Marsal CRF
Management, LLC)
Matthew G. Bouslog, Esquire
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612

**OVERNIGHT DELIVERY**

(Counsel to Redeemer Committee of the
Highland Crusader Fund)
Marc B. Hankin, Esquire
Richard Levin, Esquire
Jenner & Block LLP
919 Third Avenue
New York, New York 10022-3908

**OVERNIGHT DELIVERY**

(Counsel to Coleman County TAD, et al.)
Elizabeth Weller, Esquire
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX 75207

**OVERNIGHT DELIVERY**

(Counsel to Jefferies)
Patrick Maxcy, Esq.
Dentons US LLP
233 South Wacker Drive Suite 5900
Chicago, Illinois 60606-6361

**OVERNIGHT DELIVERY**

(Proposed Official Committee of Unsecured
Creditors)
Bojan Guzina, Esquire
Matthew Clemente, Esquire
Alyssa Russell, Esquire
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

**OVERNIGHT DELIVERY**

(Proposed Official Committee of Unsecured
Creditors)
Jessica Boelter, Esquire
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

**OVERNIGHT DELIVERY**

(Proposed Official Committee of Unsecured
Creditors)
Penny P. Reid, Esquire
Paige Holden Montgomery, Esquire
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201

**Appellee Appx. 00538**
**Appx. 03493**
007346

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 546 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 429 of 1017 PageID 8159
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 545 of 1803 PageID 11291

# APPENDIX 7

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 547 of
Case 3:25-cv-02072-S     Document 15-10   Filed 10/06/25    Page 430 of 1017    PageID 8160
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 546 of 1803   PageID 11292
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 1 of 4





**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 20, 2018**

_____

**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-7** |
| | § | |
| Alleged Debtor. | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP, L.P.,** | § | **CASE NO. 18-30265-SGJ-7** |
| | § | |
| | § | |
| Alleged Debtor. | § | |

### ORDER DENYING ALLEGED DEBTORS' JOINT MOTION TO DISMISS THE INVOLUNTARY PETITIONS FILED BY JOSHUA N. TERRY FOR LACK OF SUBJECT MATTER JURISDICTION OR, ALTERNATIVELY, TO COMPEL ARBITRATION[1] [DE ##  72 & 73]

---

[1] DE ## 72 & 73 in Case No. 18-30264; DE ## 69 & 70 in Case No. 18-30265.

1

**Appellee Appx. 00540**
**Appx. 03495**
**007348**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 548 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 431 of 1017 PageID 8161
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 547 of 1803 PageID 11293
Case 18-30264-sgj11 Doc 75 Filed 03/20/18 Entered 03/20/18 17:26:53 Page 2 of 4

Late at night on March 19, 2018—on the day before a long-scheduled Trial of an

Involuntary Bankruptcy Petition filed against the above-referenced Alleged Debtors—and

despite the provisions of an Agreed Scheduling Order dated February 26, 2018 (which clearly

contemplated that motions to dismiss, supplements, and other pleadings would have been filed

significantly prior to March 19, 2018)—the Alleged Debtors filed a Joint Motion to Dismiss the

Involuntary Petitions filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or,

Alternatively, Motion to Compel Arbitration (the "Motions to Dismiss/Compel"),[2] and a

supplement thereto on March 20, 2018.[3] The Motions to Dismiss/Compel argue a lack of subject

matter jurisdiction, with regard to this court's ability to adjudicate the Involuntary Bankruptcy

Petitions, because allegedly Petitioning Creditor Joshua Terry (the "Petitioning Creditor") lacked

standing to file the Involuntary Bankruptcy Petitions because of an arbitration clause in an

Amended and Restated Agreement of Limited Partnership of ACIS Capital Management, L.P.

(the "Partnership Agreement") dated January 21, 2011, which required parties to the Partnership

Agreement to arbitrate disputes. The arbitration clause at issue is found at Section 6.12 of the

Partnership Agreement. The Motions to Dismiss/Compel alternatively argue that this court

should enforce/recognize the arbitration clause and order the parties to arbitrate whether the

above-referenced Alleged Debtors should be in bankruptcy. The Motions to Dismiss/Compel are

**DENIED** for the following reasons:

---

[2] DE # 74 in Case No. 18-30264; DE # 71 in Case No. 18-30265.

[3] The court will presume that the Alleged Debtors thought that a subject matter jurisdiction argument—and the fact that courts can consider their subject matter jurisdiction at all times during litigation—warranted their blatant violation of the Agreed Scheduling Order. The court will expect a good explanation in court as to why this subject matter jurisdiction argument was made 47 days after the case was filed, and after a previous answer and motion to dismiss were filed by the Alleged Debtor, and, of course, in violation of a court order.

Appellee Appx. 00541
Appx. 03406
007349

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 549 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 432 of 1017   PageID 8162
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 548 of 1803   PageID 11294
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 3 of 4

(1) The parties involved here have already arbitrated prepetition.  In fact, it is undisputed that the Petitioning Creditor obtained an arbitration award that was confirmed with a judgment in state court.

(2) Section 6.12 of the Partnership Agreement is not applicable because filing an involuntary bankruptcy case is a *collection remedy* available to creditors with unsecured claims that are not the subject of a bona fide dispute and whose claims aggregate at least $15,775 in amount.  It is not a *claim* or *controversy* in and of itself, and is certainly not a claim or controversy "arising of, relating to or in connection with the [Partnership] Agreement."

(3) Even if Section 6.12 of the Partnership Agreement is applicable, the filing of an involuntary bankruptcy case, such as in the case at bar, presents a "core" bankruptcy proceeding and a bankruptcy court has discretion to decline to stay its proceedings in deference to arbitration where the underlying nature derives exclusively from the Bankruptcy Code (*i.e.,* is "core") and arbitration conflicts with the purposes of the Code. Arbitration in the case at bar would irreconcilably conflict with the purposes and goals of the Bankruptcy Code (including, but not limited to, the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and debtors from piecemeal litigation, and the expeditious and equitable distribution of assets of a debtor's estate). *See In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1069-70 (5th Cir. 1997) (a bankruptcy court can deny enforcement of arbitration provisions when it finds either: (1) that enforcement of the provision would irreconcilably conflict with the Code; or (2) in exercising its discretion in a core case where the only rights at issue were created by the Code rather than inherited from pre-petition property of the debtors); *In re Gandy*, 299 F.3d 489, 499-500 (5th Cir. 2002) (same).

**Appellee Appx. 00542**
**Appx. 03497**
**007350**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 550 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 433 of 1017    PageID 8163
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 549 of 1803   PageID 11295
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 4 of 4

**WHEREFORE** the Motions to Dismiss/Compel are **DENIED.**

**###END OF ORDER###**

Appellee Appx. 00543

Appx. 007351

007351

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 551 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 434 of 1017    PageID 8164
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 550 of 1803   PageID 11296

# APPENDIX 8

Appellee Appx. 00544

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 552 of

Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 435 of 1017    PageID 8165

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 551 of 1803   PageID 11297

Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 1 of 229





**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 31, 2019**

_____

**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | |
| | § | **(Jointly Administered Under Case** |
| DEBTORS. | § | **No. 18-30264-SGJ-11)** |
| | § | |
| | § | **Chapter 11** |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING FINAL**
**APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMING THE THIRD AMENDED**
**JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL**
**MANAGEMENT GP, LLC, AS MODIFIED**

On December 11, 12 and 13, 2018, the Court held a hearing (the "Combined Hearing")

to consider (a) final approval of the *Disclosure Statement Pursuant to Section 1125 of the*

*United States Bankruptcy Code with Respect to the Third Amended Joint Plan for Acis Capital*

*Management, L.P. and Acis Capital Management GP, LLC* (the "Disclosure Statement") [Docket

No. 661] and (b) confirmation of the *Third Amended Joint Plan for Acis Capital Management,*

*L.P. and Acis Capital Management GP, LLC* (the "Third Amended Plan") [Docket No. 660], a

ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT
AND CONFIRMING THIRD AMENDED PLAN, AS MODIFIED

PAGE 1 of 52

**Appellee Appx. 00545**

**Appx. 03419**

# 007353

copy of which is attached hereto as **Exhibit "1,"** as modified by (i) the *First Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "First Modification") [Docket No. 693], a copy of which is attached hereto as **Exhibit "2,"** and (ii) the *Second Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "Second Modification") [Docket No. 702], a copy of which is attached hereto as **Exhibit "3,"** as supplemented by the *Supplement to Second Modification to the Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 769], a copy of which is attached hereto as **Exhibit "4,"** filed by Robin Phelan (the "Chapter 11 Trustee"), as Chapter 11 Trustee for Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors").  The Third Amended Plan, as modified by the First Modification and Second Modification (as supplemented), is hereafter referred to as the "Plan;" *provided that*, as provided in the last sentence of paragraph 13 of this Order, the schedule of assumed executory contracts attached hereto as Exhibit 5 to this Order replaces, is substituted for, and supersedes Exhibit B to the Third Amended Plan.  Capitalized terms used in this Order, unless otherwise specifically defined herein, shall be given the same meaning as in the Plan and/or the Disclosure Statement.

The Combined Hearing was commenced at the time and date scheduled.  Based on the testimony, evidence admitted, judicial notice of the records of the Chapter 11 Cases, and the arguments of counsel, the Court makes this *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified* ("Order").

ACCORDINGLY, IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED AND ORDERED THAT:

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 554 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 437 of 1017 PageID 8167
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 553 of 1803 PageID 11299
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 3 of 229

A.      _Findings and Conclusions_.  All findings of fact or conclusions of law made by the Court on the record at the Combined Hearing are hereby incorporated in their entirety into this Order.  All findings of fact contained in the Court's _Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petitions_ entered on April 13, 2018 [Docket No. 118] are hereby incorporated in their entirety into this Order.  The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 as made applicable herein by Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      _Jurisdiction; Venue; Core Proceeding_.  The Court has jurisdiction over these bankruptcy cases pursuant to 28 U.S.C. sections 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. sections 1408 and 1409.  Final approval of the Disclosure Statement and confirmation of the Plan are core proceedings pursuant to 28 U.S.C. section 157(b)(2)(A), (L) and (O) over which the Court has exclusive jurisdiction and full constitutional jurisdiction and authority to enter final orders with respect thereto.

C.      _Eligibility for Relief_.  The Debtors were and are eligible for relief under section 109 of the Bankruptcy Code.[1]

D.      _Commencement and Joint Administration of the Debtors' Cases_.  On January 30, 2018, Joshua N. Terry ("Terry") filed involuntary petitions under chapter 7 of the Bankruptcy Code against both of the Debtors in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court").  Acis LP's bankruptcy case was assigned Case No. 18-30264, and Acis GP's bankruptcy case was assigned Case No. 18-30265.  The involuntary petitions were contested and the Court held a multi-day trial spanning March 21, 22, 23, 27 and

---

[1] Unless otherwise indicated, section references are to the Bankruptcy Code.

29, 2018.  On April 13, 2018, the Court entered an *Order for Relief in an Involuntary Case* in

both cases [Docket No. 119 in Case No. 18-30264 and Docket No. 114 in Case No. 18-30265].

Diane G. Reed (the "Chapter 7 Trustee") was appointed Chapter 7 Trustee in both cases.  On

motion of the Chapter 7 Trustee, the Court entered an *Order Directing Joint Administration*

[Docket No. 137],[2] which provides for the joint administration of the Debtors' respective

bankruptcy cases under Case No. 18-30264.

       E.     *Conversion of the Debtors' Cases and Appointment of the Chapter 11 Trustee*.

On motion of the Chapter 7 Trustee, the Court entered an *Order Granting Trustee's Expedited*

*Motion to Convert Cases to Chapter 11* [Docket No. 205] on May 11, 2018, converting the

Debtors' bankruptcy cases to cases under chapter 11 of the Bankruptcy Code.  On motion of

Terry, the Court entered an *Order Granting Emergency Motion for an Order Appointing A*

*Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital*

*Management GP, LLC Pursuant to Bankruptcy Code Section 1104(A)* [Docket No. 206] on May

11, 2018, directing the United States Trustee (the "U.S. Trustee") to appoint a Chapter 11

Trustee in the Chapter 11 Cases.  The U.S. Trustee appointed Robin Phelan as Chapter 11

Trustee in the Chapter 11 Cases.  Mr. Phelan's appointment as Chapter 11 Trustee in Acis LP's

case was approved pursuant to an *Order Approving Appointment of Chapter 11 Trustee* [Docket

No. 221] entered by the Court on May 17, 2018 and his appointment as Chapter 11 Trustee in

Acis GP's case was approved pursuant to an *Order Approving Appointment of Chapter 11*

*Trustee* [Docket No. 184 in Case No. 18-30265] entered by the Court on June 12, 2018.

       F.     *No Official Committee of Unsecured Creditors*.  The U.S. Trustee has not

appointed an official committee of unsecured creditors in the Chapter 11 Cases.

       G.     *Claims Bar Date*.   October 15, 2018 was originally fixed as the deadline for all

holders of alleged Claims (except for governmental units) to file proofs of Claim.  However, on

---

[2] Unless otherwise indicated, all references to the "Docket" refer to the Docket in Case No. 18-30264.

ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT
AND CONFIRMING THIRD AMENDED PLAN, AS MODIFIED

PAGE 4 of 46

**Appellee Appx. 00548**

**Appx. 03413**

**007356**

motion of the Chapter 11 Trustee, the Court entered the Bar Date Order on July 9, 2018 [Docket

No. 387]. Pursuant to the Bar Date Order, August 1, 2018 was established as the deadline for

all holders of alleged Claims (except for governmental units) to file proofs of Claim and October

10, 2018 was established as the deadline for governmental units to file proofs of Claim.

       H. _Adequacy of Disclosure Statement_. The Disclosure Statement contains

"adequate information," as that term is defined in section 1125 of the Bankruptcy Code and

satisfies all requirements of section 1125 of the Bankruptcy Code.

       I. _Solicitation Order Compliance_. On October 3, 2018, the Chapter 11 Trustee filed

his _Chapter 11 Trustee's Amended Motion for Entry of Order (A) Conditionally Approving_

_Disclosure Statement; (B) Scheduling Combined Hearing on Final Approval of Disclosure_

_Statement and Confirmation of Second Amended Joint Plan, and Setting Related Deadlines; (C)_

_Approving Forms for Voting and Notice; and (D) Granting Related Relief_ (the "Conditional

Approval Motion") [Docket No. 622]. The Chapter 11 Trustee filed a _Supplement to Amended_

_Motion for Entry of Order (A) Conditionally Approving Disclosure Statement; (B) Scheduling_

_Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Second_

_Amended Joint Plan, and Setting Related Deadlines; (C) Approving Forms for Voting and_

_Notice; and (D) Granting Related Relief_ (the "Supplement to Conditional Approval Motion")

[Docket No. 646] on October 19, 2018. The Court conducted a hearing on the Conditional

Approval Motion, as supplemented, on October 24, 2018. On October 25, 2018, the Court

entered an _Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined_

_Hearing on Final Approval of Disclosure Statement and Confirmation of Second Amended Joint_

_Plan, and Setting Related Deadlines, (III) Approving Forms for Voting and Notice, and (IV)_

_Approving Related Matters_ (the "Solicitation Order") [Docket No. 659] granting the Conditional

Approval Motion. The Conditional Approval Motion was filed in connection with a second

amended plan of reorganization and disclosure statement with respect thereto. However, for

convenience and ease of review, the modifications to the second amended plan and disclosure

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 557 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 440 of 1017 PageID 8170
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 556 of 1803 PageID 11302
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 6 of 229

statement with respect thereto, including modifications discussed at the October 24, 2018

hearing, were incorporated into the Third Amended Plan and Disclosure Statement filed on

October 25, 2018. Consequently, the Solicitation Order approved solicitation of votes on the

Third Amended Plan and distribution of the Disclosure Statement in connection with solicitation

of votes on the Third Amended Plan. Pursuant to the Solicitation Order, the Court, among other

things: (a) conditionally approved the Disclosure Statement for use in soliciting votes on the

Third Amended Plan; (b) established procedures and deadlines for the solicitation and

submission of votes to accept or reject the Third Amended Plan (the "Solicitation Procedures");

(c) fixed deadlines for objections to final approval of the Disclosure Statement and/or

confirmation of the Third Amended Plan and related briefing deadlines; (d) fixed a deadline for

serving notice of the Combined Hearing; and (e) set the Combined Hearing to commence on

December 11, 2018, at 9:30 a.m., Central Time. The Solicitation Order approved the following

documents (collectively the "Solicitation Materials") to be served on Creditors entitled to vote on

the Third Amended Plan:

> (i)     the Third Amended Plan;
>
> (ii)    the Disclosure Statement;
>
> (iii)   the Ballots for voting on the Third Amended Plan;
>
> (iv)    the Solicitation Order;
>
> (v)     a Notice (the "Combined Hearing Notice") [Docket No. 667] reflecting the deadlines and other information relating to the Combined Hearing; and,
>
> (vi)    a letter (the "Transmittal Letter") from counsel for the Chapter 11 Trustee.

The Solicitation Order directed the Chapter 11 Trustee to serve the Solicitation Materials on

holders of Claims in Classes 2 and 3 and Subclasses 4A and 4B under the Third Amended

Plan. The Solicitation Order also authorized the tabulation of Ballots on a consolidated basis.

The Solicitation Order further directed the Chapter 11 Trustee to serve on various parties

defined in the Supplement to Conditional Approval Motion as the "Noteholders," "Highlands" and

ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT
AND CONFIRMING THIRD AMENDED PLAN, AS MODIFIED

PAGE 6 of 46

**Appellee Appx. 00550**
**App. 03415**
**007358**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 558 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 441 of 1017 PageID 8171
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 557 of 1803 PageID 11303
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 7 of 229

"Notice Parties" certain notices and copies of the following documents (the "Notice-Only Materials"): the Disclosure Statement, the Third Amended Plan, the Solicitation Order and the Combined Hearing Notice. The Chapter 11 Trustee has complied with the Solicitation Order, including the Solicitation Procedures contained therein, in all respects.

J. *Transmittal and Mailing of Solicitation Materials; Notice*. Due, adequate, and sufficient notice of the Third Amended Plan, Disclosure Statement and Combined Hearing, together with all deadlines for voting on the Third Amended Plan and for objecting to final approval of the Disclosure Statement and/or confirmation of the Third Amended Plan, has been given to known holders of Claims and Interests and, to the extent required, to all other known parties-in-interest, in compliance with the applicable Bankruptcy Rules and the Solicitation Order, as evidenced by the: (i) Combined Hearing Notice (and Certificate of Service included therewith) filed at Docket No. 667; (ii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Noteholders* (and Certificate of Service included therewith) filed at Docket No. 664; (iii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Highland Entities* (and Certificate of Service included therewith) filed at Docket No. 665; (iv) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Notice Parties* (and Certificate of Service included therewith) filed at Docket No. 666; and (v) *Certificate of Service* filed at Docket No. 676. The packages containing the Solicitation Materials, the packages containing the Notice-Only Materials, and all other materials relating in any way to the solicitation process were transmitted and served in substantial compliance with the Solicitation Order and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth in the Solicitation Order, and all other applicable rules, laws and regulations.

K. *Adequacy of Solicitation*. The Chapter 11 Trustee distributed packages containing the Solicitation Materials to the holders of Claims entitled to vote on the Third

Appellee Appx. 00551
Appx. 03416
007359

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 559 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 442 of 1017    PageID 8172
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 558 of 1803    PageID 11304
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 8 of 229

Amended Plan and sufficient time was prescribed for such holders of Claims to vote on the

Third Amended Plan in substantial compliance with the Solicitation Order and the applicable

provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth

in the Solicitation Order, and all other applicable rules, laws and regulations.  Transmittal and

service were adequate and sufficient, and no further notice is or shall be required.  In addition,

holders of Claims not entitled to vote on the Amended Plan, and certain other parties-in-interest,

were provided with certain non-voting materials approved by the Court in compliance with the

Solicitation Order.  All procedures used to distribute the Solicitation Materials to holders of

Claims entitled to vote on the Third Amended Plan were fair and conducted in good faith and in

accordance with the Bankruptcy Code, Bankruptcy Rules, the Solicitation Procedures contained

in the Solicitation Order, and all other applicable rules, laws and regulations.

      L.     *Good Faith Solicitation – Section 1125(e)*.  Based on the Record, the Chapter 11

Trustee and Estate Professionals have acted in good faith within the meaning of sections

1125(e) and 1129(a)(3), and in compliance with the applicable provisions of the Bankruptcy

Code, the Bankruptcy Rules, and the Solicitation Order, in connection with all of their respective

activities relating to the solicitation of acceptances of the Third Amended Plan and their

participation in the activities described in section 1125, and are entitled to the protections

afforded by section 1125(e).

      M.     *Voting Tabulation*.  In accordance with the Solicitation Order, on December 3,

2018 the *Tabulation of Ballots in Connection with Confirmation of the Third Amended Joint Plan*

*for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "Ballot

Tabulation") [Docket No. 746] was filed and served on all parties that filed a timely objection to

confirmation of the Plan.  All procedures used to tabulate the Ballots (which were tabulated on a

consolidated basis) were fair and conducted in accordance with the Solicitation Order, the

Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations.

Appellee Appx. 00552
Appx. 007360

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 560 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 443 of 1017 PageID 8173
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 559 of 1803 PageID 11305
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 9 of 229

N. *Classes Deemed to Have Accepted or Rejected the Third Amended Plan*. As set forth in the Third Amended Plan and Disclosure Statement: (i) Class 1 is unimpaired and is conclusively deemed to have accepted the Third Amended Plan pursuant to section 1126(f), and (ii) Class 5, consisting of Interests in the Debtors, is Impaired, but because the Third Amended Plan provides that holders of Class 5 Interests shall not receive or retain any property on account of their Interests, Class 5 is conclusively deemed to have rejected the Third Amended Plan pursuant to section 1126(g).

O. *Impaired Classes of Creditors Voting to Accept or Reject the Third Amended Plan*. Based upon the Ballot Tabulation, the Court finds that the following Impaired Classes have voted on the Third Amended Plan as follows:

(i) Class 2 (the Terry Partially Secured Claim) voted to accept the Third Amended Plan as follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $8,060,827.84 100% | 1 100% | $0.00 0.00% | 0 0.00% |

Two Ballots were submitted by Terry in Class 2. One of the Ballots was based on a proof of Claim recorded in the Claims Register for Case No. 18-30264 as Claim No. 26-1 and filed by Terry for the benefit of his IRAs ("Claim No. 26"). Highland filed an objection [Docket No. 522] on August 17, 2018 seeking an order disallowing Claim No. 26 and striking any vote (on a prior plan of reorganization) by Terry on account of Claim No. 26. Although the Ballot Tabulation reflects the Ballot submitted by Terry on account of Claim No. 26, the Court disregards that Ballot and does not take it into account in its determination regarding acceptance of the Third Amended Plan. The other Ballot submitted by Terry accepted the Third Amended Plan.

(ii) Class 3 (General Unsecured Claims) voted to accept the Third Amended Plan as follows:

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 561 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 444 of 1017    PageID 8174
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 560 of 1803   PageID 11306
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06    Page 10 of 229

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $667,550.00 100% | 2 100% | $0.00 0.00% | 0 0.00% |

Three Ballots were submitted in Class 3.  One of the Ballots was submitted by Jennifer G. Terry.

Such Ballot is based on a proof of Claim recorded in the Claims Register for Case No. 18-30264

as Claim No. 25-1 and filed by Jennifer G. Terry for the benefit of her IRAs and 401k ("Claim

No. 25").  Highland filed an objection [Docket No. 521] on August 17, 2018 seeking an order

disallowing Claim No. 25 and striking any vote (on a prior plan of reorganization) by Jennifer G.

Terry on account of Claim No. 25.  Although the Ballot Tabulation reflects the Ballot submitted

by Jennifer G. Terry on account of Claim No. 25, the Court disregards that Ballot and does not

take it into account in its determination regarding acceptance of the Plan.  The other two Ballots

submitted in Class 3 accepted the Third Amended Plan.

      (iii)    Class 4 (Insider Claims) voted to reject the Third Amended Plan as

follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $0.00 0.00% | 0 0.00% | $4,172,140.38 100% | 1 100% |

    Based on the foregoing, and as evidenced by the Ballot Tabulation, at least one

Impaired Class of Claims (excluding the acceptance by any Insiders of the Debtors) has voted

to accept the Third Amended Plan in accordance with the requirements of sections 1124 and

1126 of the Bankruptcy Code.

    P.    *Modifications to the Third Amended Plan*.  The modifications to the Third

Amended Plan set forth in the First Modification, the Second Modification (as supplemented),

and as set forth in this Order constitute non-material or technical changes and do not materially

or adversely affect or change the treatment of any Claims against or Interests in the Debtors

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 562 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 445 of 1017    PageID 8175
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 561 of 1803    PageID 11307
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 11 of 229

under the Third Amended Plan (the "Non-Material Modifications").  The filing of the First

Modification on November 8, 2018 constitutes due and sufficient notice thereof under the

circumstances of these Chapter 11 Cases.  The filing of the Second Modification on November

16, 2018 (as supplemented on December 10, 2018) constitutes due and sufficient notice thereof

under the circumstances of these Chapter 11 Cases.  The Non-Material Modifications neither

require additional disclosure under section 1125 of the Bankruptcy Code nor re-solicitation of

votes on the Plan under section 1126 of the Bankruptcy Code and Bankruptcy Rules 3018 and

3019.  In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all

holders of Claims against the Debtors who voted to accept the Third Amended Plan are hereby

deemed to have accepted the Third Amended Plan as modified consistent with the Non-Material

Modifications.  No Holder of a Claim against the Debtors who has voted to accept the Third

Amended Plan shall be permitted to change its acceptance to a rejection as a consequence of

the Non-Material Modifications.  The Non-Material Modifications incorporated in the Plan comply

with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

Q.    _Bankruptcy Rule 3016_.  The Plan is dated and identifies the Chapter 11 Trustee

as the Person submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the

Disclosure Statement satisfied Bankruptcy Rule 3016(b).  The Plan provides for the Temporary

Plan Injunction (as defined herein), which constitutes an injunction against conduct not

otherwise enjoined under the Bankruptcy Code.  The Plan and Disclosure Statement both

describe in specific and conspicuous language all acts to be enjoined and identify the entities

subject to the Temporary Plan Injunction.  Therefore, the Plan and Disclosure Statement satisfy

the requirements of Bankruptcy Rule 3016(c).

R.    _Bankruptcy Rule 3017_.  The Chapter 11 Trustee has given notice of the

Combined Hearing as required by the applicable provisions of Bankruptcy Rule 3017 and the

Solicitation Order.  The materials transmitted and notice given by the Chapter 11 Trustee to

holders of Claims entitled to vote on the Third Amended Plan and the materials transmitted by

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 563 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 446 of 1017 PageID 8176
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 562 of 1803 PageID 11308
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 12 of 229

the Chapter 11 Trustee to holders of Interests and other parties-in-interest satisfy the applicable provisions of Bankruptcy Rules 3017(d)-(f) and the Solicitation Order. Therefore, the requirements of Bankruptcy Rule 3017 have been satisfied.

S. *Bankruptcy Rule 3018*. The solicitation of votes to accept or reject the Third Amended Plan satisfies Bankruptcy Rule 3018. The Third Amended Plan was transmitted to all holders of Claims entitled to vote, sufficient time was prescribed for such parties to accept or reject the Third Amended Plan, and the Solicitation Materials used and Solicitation Procedures followed comply with sections 1125 and 1126, thereby satisfying the requirements of Bankruptcy Rule 3018. Further, the Chapter 11 Trustee filed the Ballot Tabulation in accordance with the provisions of the Solicitation Order.

T. *Burden of Proof*. The Chapter 11 Trustee, as proponent of the Plan, has the burden of proving the elements of sections 1122, 1123 and 1129 of the Bankruptcy Code by a preponderance of the evidence. The Court finds that the Chapter 11 Trustee has met each element of such burden with respect to the Plan.

U. *Judicial Notice*. The Court takes judicial notice of the entire record of proceedings in the Chapter 11 Cases and related adversary proceedings, including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Court during the Chapter 11 Cases and related adversary proceedings, including, without limitation, the Combined Hearing. Any resolutions of objections to final approval of the Disclosure Statement or confirmation of the Plan explained on the record at the Combined Hearing are hereby incorporated by reference.

V. *The Record*. The record established at the Combined Hearing (the "Record") to support final approval of the Disclosure Statement and confirmation of the Plan includes:

(i) All documents identified by the Chapter 11 Trustee at the Combined Hearing and all exhibits admitted into evidence at the Combined Hearing, including but not limited to admitted exhibits which are listed on the *Joint*

Appellee Appx. 00556
Appx. 02421
007364

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 564 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 447 of 1017 PageID 8177
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 563 of 1803 PageID 11309
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 13 of 229

*Witness and Exhibit List* [Docket No. 767] filed jointly by the Chapter 11 Trustee, Highland and HCLOF with the Court on December 7, 2018;

(ii)     The Ballot Tabulation;

(iii)    The testimony of witnesses; and

(iv)     The statements and arguments of counsel.

W.     *Objections to Final Approval of Disclosure Statement and Confirmation of Plan*.

The Solicitation Order established November 26, 2018 as the deadline for filing objections to final approval of the Disclosure Statement and/or confirmation of the Plan. The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "Objections") were timely filed in accordance with the Solicitation Order:

(i)     *Objection by Stinson Leonard Street LLP to Debtors' Second Modification to the Third Amended Joint Plan* [Docket No. 720];

(ii)    *Joint Objection of Highland Capital Management, L.P. and Highland CLO Funding, Ltd. to Final Approval of Disclosure Statement and to Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket no. 722]; and

(iii)   *Objection of Neutra Ltd. to Final Approval of Disclosure Statement and to Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket No. 723].

X.     *Transfer and Vesting of Assets*. Pursuant to Article VI of the Plan, all Assets shall be transferred to and vested in the Reorganized Debtor as of the Effective Date. The transfer of the Assets to the Reorganized Debtor pursuant to the Plan is consistent with, and authorized by, section 1123(a)(5)(B) of the Bankruptcy Code and will be fully effectuated through this Order as of the Effective Date without the necessity of any other or further assignment or transfer.

Y.     *Claim Objections and Resolutions*. Pursuant to the Plan, the Reorganized Debtor has the sole power and exclusive standing and authority to object to any Claim. Without limiting the generality of the foregoing, the Reorganized Debtor shall have the power: (i) to

Appellee Appx. 00557
Appx. 07422
007365

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 565 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 448 of 1017 PageID 8178
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 564 of 1803 PageID 11310
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 14 of 229

object to any Claim on any legal or equitable basis; (ii) to seek subordination of any Claim on

any legal or equitable basis; (iii) to assert any right of setoff or recoupment, including without

limitation, any such right pursuant to section 553 of the Bankruptcy Code; (iv) to assert any and

all Estate Defenses to any Claim, whether legal or equitable, including any affirmative defenses

or any right of setoff; (v) to assert all Estate Claims as a counterclaim against any Claim,

whether arising out of the same or different transactions, both for an affirmative recovery and as

an offset against any such Claim; and (vi) to object to any Claims on the basis of section 502(d).

Vesting such exclusive power and standing in the Reorganized Debtor is reasonable and

appropriate, and is authorized by, and in compliance with, section 1123(b)(3) of the Bankruptcy

Code.

      Z.    *Compliance with the Requirements of Section 1129 of the Bankruptcy Code*. The

Plan complies with the applicable provisions of the Bankruptcy Code, as follows:

      (i)    *Section 1129(a)(1) – Compliance of the Plan with the Applicable*

*Provisions of the Bankruptcy Code*. The Plan complies with all applicable provisions of the

Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections

1122 and 1123.

      (a)    *Sections 1122 and 1123(a)(1) – Proper Classification*. The

classification of Claims and Interests in the Plan is proper under the Bankruptcy Code.

Pursuant to sections 1122(a) and 1123(a)(1), the Plan provides for the separate classification of

Claims and Interests into six (6) Classes (Class 1, Class 2, Class 3, Subclass 4A, Subclass 4B

and Class 5), based on differences in the legal nature and priority of such Claims and Interests

(other than Claims for Administrative Expenses, Priority Tax Claims and U.S. Trustee's quarterly

fees, which are not required to be designated as separate Classes pursuant to section

1123(a)(1)). Based upon the Record, valid business, factual and legal reasons exist for the

separate classification of the various Classes of Claims and Interests created under the Plan,

the classifications were not created for any improper purpose and the creation of such Classes

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 566 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 449 of 1017    PageID 8179
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 565 of 1803    PageID 11311
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 15 of 229

does not unfairly discriminate between or among holders of Claims or Interests.  In accordance with section 1122(a), each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code have been satisfied.

(b)    _Section 1123(a)(2) – Specification of Unimpaired Classes_.  The Plan specifies that Claims in Class 1 are unimpaired under the Plan.  Therefore, the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

(c)    _Section 1123(a)(3) – Specification of Treatment of Impaired Classes_.  Other than Class 1, all Classes of Claims and Interests (Class 2, Class 3, Subclass 4A, Subclass 4B and Class 5) are Impaired under the Plan.  The Plan specifies the treatment of each Impaired Class of Claims and Interests under the Plan.  The treatment of Impaired Classes of Claims and Interests is specified in Article IV of the Plan.  Therefore, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

(d)    _Section 1123(a)(4) – No Discrimination_.  The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.  Therefore, the requirements of section 1123(a)(4) of the Bankruptcy Code have been satisfied.

(e)    _Section 1123(a)(5) – Adequate Means for Plan Implementation_.  The Plan provides for adequate and proper means for the Plan's implementation.  This includes means for implementation set forth in Article VI of the Plan.  Therefore, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

(f)    _Section 1123(a)(6) – Prohibition on Issuance of Non-Voting Securities_.  The Debtors are not corporations.  Therefore, section 1123(a)(6) of the Bankruptcy Code is inapplicable.

(g)    _Section 1123(a)(7) – Selection of Officers, Directors and Trustees_.  Under the Plan, Terry shall receive 100% of the equity interests in the Reorganized Debtor.  The

Appellee Appx. 00559
Appx. 02424
007367

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 567 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 450 of 1017    PageID 8180
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 566 of 1803    PageID 11312
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 16 of 229

Plan does not provide for the selection or appointment of any officers or directors of the Reorganized Debtor as of the Effective Date and Terry, as the sole owner of the Reorganized Debtor, shall be free to structure the Reorganized Debtor's management as he wishes. Therefore, to the extent section 1123(a)(7) of the Bankruptcy Code is applicable to the Plan, its requirements have been satisfied.

(h)      *Section 1123(a)(8) – Payment of Individual Debtor's Earnings*. The Debtors are not individuals.  Therefore, section 1123(a)(8) of the Bankruptcy Code is inapplicable.

(i)      *Section 1123(b) – Discretionary Contents of the Plan*.  The Plan contains various provisions that are properly construed as discretionary and not required for confirmation of the Plan under the Bankruptcy Code.  As set forth below, all such discretionary provisions comply with section 1123(b) of the Bankruptcy Code, are not inconsistent with the applicable provisions of the Bankruptcy Code and are hereby approved.  Therefore, section 1123(b) of the Bankruptcy Code has been satisfied.

(1)      *Section 1123(b)(1) – Impairment / Unimpairment of Claims and Interests*.  The Plan impairs or leaves unimpaired each Class of Claims and Interests. Therefore, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

(2)      *Section 1123(b)(2) – Assumption / Rejection of Executory Contracts and Unexpired Leases*.  Article XI of the Plan provides that all of the Debtors' Executory Contracts and Unexpired Leases shall be deemed rejected upon the Effective Date unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected pursuant to an order of the Court, (b) is identified in **Exhibit 5** to this Order to be (i) assumed or (ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the Confirmation Date.  Therefore, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

(3)    *Section 1123(b)(3) – Settlement / Retention of Claims and Causes of Action*.  The Chapter 11 Trustee has delineated the Estate Claims and Estate Defenses to be retained in the Plan.  The terms "Estate Claims" and "Estate Defenses" are defined in sections 1.55 and 1.56 of the Plan, respectively, and together include all claims, causes of action, defenses, affirmative defenses, counterclaims, or offsets held by the Debtors' Estate.  The identification and retention of the Estate Claims and Estate Defenses in the Plan is reasonable and appropriate and reflects a proper exercise of the good faith business judgment of the Chapter 11 Trustee.  Articles VI and IX of the Plan, including Exhibit A to the Plan, contain a specific and unequivocal reservation of Estate Claims and Estate Defenses as required under applicable Fifth Circuit authority.  The Estate Claims and Estate Defenses are expressly, specifically, and unequivocally retained and reserved pursuant to Articles VI and IX of the Plan (including Exhibit A to the Plan) in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and Estate Defenses are hereby reserved for the benefit of the Reorganized Debtor and the Reorganized Debtor shall be entitled to file, prosecute and/or settle each of the Estate Claims so reserved in accordance with the terms of the Plan.  The provisions of the Plan regarding reservation of Estate Claims and Estate Defenses are appropriate and in the best interests of the Debtors, the Estate, and holders of Claims and Interests.

(4)    *Section 1123(b)(5) – Modification of Creditors' Rights*. With the exception of holders of Class 1 Claims, which are unimpaired, the Plan modifies the rights of all holders of Claims against the Debtors.  Accordingly, the Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

(ii)    *Section 1129(a)(2) – Compliance of the Chapter 11 Trustee with the Applicable Provisions of the Bankruptcy Code*.  The Chapter 11 Trustee, as proponent of the Plan, has complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1127 and

Appellee Appx. 00561

Appx. 02426

007369

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 569 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 452 of 1017   PageID 8182
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 568 of 1803   PageID 11314
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 18 of 229

1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019.  Votes to accept or

reject the Third Amended Plan were solicited after the Court conditionally approved the

adequacy of the Disclosure Statement.  The Chapter 11 Trustee and his present and former

representatives, advisors, attorneys, professionals and agents have solicited and tabulated the

votes on the Third Amended Plan and have participated in the activities described in section

1125 of the Bankruptcy Code fairly and in good faith within the meaning of section 1125(e) of

the Bankruptcy Code, and in a manner consistent with the applicable provisions of the

Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules,

laws and regulations, and are entitled to the protections afforded by section 1125(e) of the

Bankruptcy Code.  The Chapter 11 Trustee and his present and former representatives,

advisors, attorneys, professionals and agents have participated in good faith and in compliance

with the applicable provisions of the Bankruptcy Code with respect to the offering, issuance and

distribution of recoveries under the Plan and, therefore, are not (and on account of such

distributions, will not be) liable at any time for the violation of any applicable law, rule, or

regulation governing the solicitation of acceptances or rejections of the Third Amended Plan or

distributions made pursuant to the Plan, so long as distributions are made consistent with and

pursuant to the Plan.

> (iii) *Section 1129(a)(3) – Proposal of the Plan in Good Faith*.  The Chapter 11

Trustee has proposed the Plan (and all other agreements, documents and instruments

necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby

satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been

proposed in good faith, the Court has examined and considered the totality of the circumstances

surrounding the formulation of the Plan, including both the Record at the Combined Hearing and

the record of the Chapter 11 Cases.  The Chapter 11 Trustee's good faith is evident from the

facts and Record of the Combined Hearing.  The Chapter 11 Trustee proposed the Plan for

legitimate and honest purposes.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 570 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 453 of 1017    PageID 8183
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 569 of 1803    PageID 11315
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 19 of 229

(iv)    *Section 1129(a)(4) – Court Approval of Certain Payments as Reasonable*.
All payments made or to be made by the Reorganized Debtor for services or for costs and expenses in or in connection with the Chapter 11 Cases or in connection with the Plan and incident to the Chapter 11 Cases, have either been approved by, or are subject to final approval of, the Court as reasonable.  Notwithstanding anything to the contrary in the Plan, the provisions of section 3.01(e) of the Plan governing the filing of final fee applications by Estate Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to the Chapter 11 Trustee.  Compensation sought by the Chapter 11 Trustee through a final fee application shall be subject to final approval of the Court as reasonable in accordance with section 330(a)(3) of the Bankruptcy Code.  Therefore, the requirements of section 1129(a)(4) of the Bankruptcy Code are satisfied.

(v)    *Section 1129(a)(5) – Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy*.  Under the Plan, Terry, who does not constitute an Insider, shall receive 100% of the equity interests in the Reorganized Debtor.  The Plan does not provide for appointment of any officers or directors of the Reorganized Debtor as of the Effective Date and Terry, as the sole owner of the Reorganized Debtor, shall be free to structure the Reorganized Debtor's management as he wishes.  Terry's identity and affiliations have been fully disclosed and, to the extent that Terry serves as an officer of the Reorganized Debtor after confirmation of the Plan, Terry's appointment to any such role is consistent with the interests of Creditors, holders of Interests and public policy.  Therefore, the requirements of section 1129(a)(5) of the Bankruptcy Code are satisfied.

(vi)    *Section 1129(a)(6) – No Rate Changes*.  The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commissions and will not require governmental regulatory approval.  Therefore, section 1129(a)(6) is not applicable to the Chapter 11 Cases.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 571 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 454 of 1017    PageID 8184
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 570 of 1803    PageID 11316
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 20 of 229

(vii)    _Section 1129(a)(7) – Best Interest of Creditors Test_.  The Plan satisfies

section 1129(a)(7).  The Liquidation Analysis attached as Exhibit 4 to the Disclosure Statement

and the other exhibits and evidence proffered or adduced at the Combined Hearing related

thereto: (a) are persuasive and credible; (b) have not been controverted by other evidence; (c)

are based upon sound methodology; and (d) conclusively establish that each holder of an

Impaired Claim or Interest either (1) has accepted the Plan, or (2) will receive or retain under the

Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date,

that is not less than the amount that such holder would receive or retain if the Debtors were

liquidated under chapter 7 of the Bankruptcy Code on such date.

(viii)    _Section 1128(a)(8) – Conclusive Presumption of Acceptance by_

_Unimpaired Classes; Acceptance of Plan by Each Impaired Class_.  Class 1 is unimpaired under

the Plan and is conclusively presumed to have accepted the Plan under section 1126(f) of the

Bankruptcy Code.  Classes 2 and 3 are Impaired under the Plan and have voted to accept the

Plan.  Class 4 is Impaired under the Plan and voted to reject the Plan.  Class 5 is Impaired

under the Plan.  Holders of Class 5 Interests will not receive or retain any property on account of

their Interests under the Plan and are therefore conclusively deemed to have rejected the Plan

under section 1126(g) of the Bankruptcy Code.  Notwithstanding the fact that the Plan was not

accepted by all Classes of Impaired Claims and Interests, the Plan is confirmable because it

satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

(ix)    _Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to_

_Section 507(a) of the Bankruptcy Code_.  The treatment of Allowed Claims for Administrative

Expenses and Priority Tax Claims under Article III of the Plan satisfies the requirements of, and

complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.  Accordingly, the

requirements of section 1129(a)(9) are satisfied.

(x)    _Section 1129(a)(10) – Acceptance by at Least One Impaired Class_.  As

set forth in the Ballot Tabulation and in this Order, Classes 2 and 3 voted to accept the Plan.  As

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 572 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 455 of 1017 PageID 8185
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 571 of 1803 PageID 11317
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 21 of 229

such, at least one Class of Claims that is Impaired under the Plan has accepted the Plan

without including the acceptance of the Plan by any Insider. Therefore, the requirements of

section 1129(a)(10) of the Bankruptcy Code have been satisfied.

(xi) *Section 1129(a)(11) – Feasibility of the Plan*. The evidence submitted at

the Combined Hearing regarding feasibility, together with all evidence proffered or advanced at

or prior to the Combined Hearing, (a) is persuasive and credible, (b) has not been controverted

by other evidence, and (c) establishes that confirmation of the Plan is not likely to be followed by

the liquidation or the need for further financial reorganization of the Reorganized Debtor.

Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have been

satisfied.

(xii) *Section 1129(a)(12) – Payment of Bankruptcy Fees*. The Plan provides

that all fees due and payable under 28 U.S.C. section 1930 as of the Confirmation Date will be

paid in full on the Effective Date or as soon thereafter as is practicable, thus satisfying the

requirements of section 1129(a)(12) of the Bankruptcy Code.

(xiii) *Section 1129(a)(13), (14), (15) and (16) – Non-Applicability*. The Debtors

do not provide any retiree benefits within the meaning of section 1114, do not owe any domestic

support obligations, are not individuals, and are not non-profit corporations. Thus, sections

1129(a)(13), 1129(a)(14), 1129(a)(15) and 1129(a)(16) do not apply to the Chapter 11 Cases.

(xiv) *Section 1129(b) – Confirmation of the Plan Over Non-Acceptance of
Impaired Classes*. Class 4 is Impaired under the Plan and voted to reject the Plan. Holders of

Class 5 Interests are deemed to have rejected the Plan. Nevertheless, the Plan may be

confirmed pursuant to section 1129(b) of the Bankruptcy Code notwithstanding that the

requirements of section 1129(a)(8) have not been met because the Chapter 11 Trustee has

demonstrated by a preponderance of the evidence that the Plan (a) satisfies all of the other

requirements of section 1129(a) of the Bankruptcy Code and (b) does not "discriminate unfairly"

and is "fair and equitable" as to each Impaired Class which has not voted to accept (or is

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 573 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 456 of 1017    PageID 8186
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 572 of 1803    PageID 11318
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 22 of 229

deemed to reject) the Plan.  The Plan therefore satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

(xv)     *Section 1129(c) – Only One Plan*.  Other than the Plan (including previous versions thereof), no other plan has been filed in the Chapter 11 Cases.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code are satisfied.

(xvi)     *Section 1129(d) – Principal Purpose of the Plan is Not the Avoidance of Taxes*.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of application of Section 5 of the Securities Act of 1933 and there has been no filing by a Governmental Unit asserting any such attempted avoidance.  Therefore, the requirements of section 1129(d) of the Bankruptcy Code are satisfied.

(xvii)     *Section 1129(e) – Small Business Case*.  Neither of the Chapter 11 Cases is a "small business case," as that term is defined in the Bankruptcy Code and, accordingly, section 1129(e) is inapplicable to the Chapter 11 Cases.

AA.     *Executory Contracts and Unexpired Leases*.  The Chapter 11 Trustee has satisfied the provisions of section 365 of the Bankruptcy Code with respect to the assumption and rejection of the Executory Contracts and Unexpired Leases pursuant the Plan.  The Chapter 11 Trustee has exercised reasonable business judgment prior to the Combined Hearing in determining whether to assume or reject each of the Executory Contracts and Unexpired Leases as set forth in Article XI of the Plan, **Exhibit "5"** to this Order, or otherwise. Each assumption or rejection of an Executory Contract or Unexpired Lease pursuant to this Order and in accordance with Article XI of the Plan, or otherwise by order of this Court, shall be valid, legal, and binding upon the applicable Debtor, Reorganized Debtor, Estate, and all non-Debtor persons or entities party to such Executory Contract or Unexpired Lease.  Executory Contracts and Unexpired Leases not previously assumed by order of this Court and which the Chapter 11 Trustee has determined to assume are identified in **Exhibit "5"** to this Order.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 574 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 457 of 1017    PageID 8187
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 573 of 1803    PageID 11319
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 23 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in

**Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments,

provide any other compensation, cure any nonmonetary defaults, or provide adequate

assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to

the assumption of such Executory Contracts and Unexpired Leases.

BB.    *Compromise and Settlement*.  The Court finds and concludes that, pursuant to

section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration of

the Distributions and other benefits provided under the Plan, the provisions of the Plan

constitute a good faith compromise and settlement of all Impaired Claims and Interests.  Such

settlement and compromise, which was made at arms'-length in exchange for good and

valuable consideration, is in the best interests of the holders of Impaired Claims and Interests, is

within the range of possible litigation outcomes, and is fair, equitable, and reasonable.  Each

element of the compromise and settlement reflected in the Plan is integrated and inexorably

linked.

CC.    *Plan Injunction*.  The Plan Injunction is necessary and appropriate to facilitate the

transactions and distributions to Creditors pursuant to the Plan.  The Plan Injunction constitutes

an essential and integral part of the Plan without which the holders of Claims against the

Debtors could potentially interfere with implementation and performance of the Plan.  The Plan

Injunction protects the best interests of the holders of Allowed Claims and facilitates the efficient

performance of the Plan.  Consequently, the Plan Injunction is appropriate pursuant to sections

105(a) and 1123(a)(5) of the Bankruptcy Code.

DD.    *Temporary Plan Injunction*.  The Temporary Plan Injunction (as defined herein) is

a temporary injunction which provides for the continuation, after the Effective Date, of injunctive

relief the Court previously granted in its *Preliminary Injunction Order* (the "Preliminary

Injunction") [Docket No. 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the

Trustee's Adversary.  The Preliminary Injunction was originally set to expire by its own terms

upon confirmation of the Plan, but is extended by this Order through the Effective Date of the Plan. Based on the record of prior proceedings in the Chapter 11 Cases, including in the Trustee's Adversary, and the Record at the Combined Hearing, no grounds have been shown to give the Court reason to reconsider any findings supporting its prior Preliminary Injunction. Furthermore, as set forth below, the Record at the Combined Hearing demonstrates that the four elements required for issuance of injunctive relief are present, the Temporary Plan Injunction is necessary and appropriate in all respects, and it complies with the applicable requirements of the Bankruptcy Rules.

(i)    _Substantial Likelihood of Success on the Merits_.  In the Highland Adversary, the Chapter 11 Trustee has asserted a counterclaim seeking to avoid the prepetition transfer of Acis LP's rights under the ALF PMA (the "ALF PMA Transfer") as a fraudulent transfer under the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act.  Such fraudulent transfer actions seek an equitable remedy and involve claims to specific assets of Highland HCF.  But for the ALF PMA Transfer, HCLOF could not have attempted to direct and effectuate an optional redemption of the Acis CLOs (which it has twice attempted to do postpetition in the Chapter 11 Cases).  The rights transferred in the ALF PMA Transfer appear to have been fraudulently transferred for no apparent value.  The Court found in the Preliminary Injunction, and the Court finds again for purposes of this Order, that the Chapter 11 Trustee has demonstrated a substantial likelihood of success on the merits of his claim to avoid the ALF PMA Transfer as a fraudulent transfer.

(ii)    _Irreparable Harm_.  Revenue to be generated by the Reorganized Debtor under the PMAs is a primary source of funding Distributions to Creditors under the Plan.  Absent the Temporary Plan Injunction, HCLOF will be free to direct an optional redemption before this Court can adjudicate the fraudulent transfer actions with respect to the ALF PMA Transfer. Such an optional redemption – or similar call or liquidation of the Acis CLOs – would not only render such fraudulent transfer actions moot, but would effectively terminate and destroy all

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 576 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 459 of 1017    PageID 8189
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 575 of 1803    PageID 11321
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 25 of 229

value in the PMAs.  This would, in turn, effectively destroy the Reorganized Debtor's ability to perform under the Plan to the detriment of the Reorganized Debtor, Creditors and other parties-in-interest.  Consequently, the Reorganized Debtor faces immediate and irreparable harm if the Temporary Plan Injunction is not issued.

(iii)    *Balance of Harms*.  The balance of harms weighs in favor of issuing the Temporary Plan Injunction because any alleged harm to HCLOF, Highland or their affiliates is substantially outweighed by the imminent and irreparable harm that would be suffered by the Reorganized Debtor, Creditors and other parties-in-interest if the Temporary Plan Injunction is not issued and an optional redemption, call or other liquidation of the Acis CLOs follows.  At a minimum, the Temporary Plan Injunction is appropriate to maintain the status quo pending adjudication of the fraudulent transfer actions with respect to the ALF PMA Transfer.  Highland, HCLOF and their affiliates will not suffer any material, recognizable harm if temporarily enjoined from pursuing an optional redemption, call or other liquidation of the Acis CLOs before the Court adjudicates the fraudulent transfer actions concerning the ALF PMA Transfer and thereby determines whether HCLOF has any legitimate right to direct an optional redemption, call or other liquidation of the Acis CLOs in the first instance.

(iv)    *Public Policy*.  Public policy favors maximization of a debtor's assets and successful reorganization.  Because an optional redemption, call or other liquidation of the Acis CLOs would destroy the value of the PMAs and the Reorganized Debtor's ability to perform under the Plan, issuance of the Temporary Plan Injunction is consistent with public policy.  Furthermore, public policy favors disposition of cases on their merits.  Absent the Temporary Plan Injunction, HCLOF could be expected to immediately direct an optional redemption, call or other liquidation of the Acis CLOs following confirmation of the Plan, thus rendering the fraudulent transfer actions concerning the ALF PMA Transfer moot.  Issuance of the Temporary Plan Injunction will avoid the potential for such fraudulent transfer actions being mooted prior to adjudication of such actions on their merits and is consistent with public policy.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 577 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 460 of 1017    PageID 8190
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 576 of 1803    PageID 11322
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 26 of 229

(v)    _Section 105(a)_.  Section 105(a) empowers this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  The Temporary Plan Injunction is essential to the Reorganized Debtor's ability to perform the Plan and to maintain the status quo during prosecution of the fraudulent transfer actions concerning the ALF PMA Transfer.  The Temporary Plan Injunction is therefore both necessary and appropriate to carry out the provisions of the Bankruptcy Code in the Chapter 11 Cases.

(vi)    _Compliance with Technical Requirements_.  Bankruptcy Rule 3020(c) requires that the Temporary Plan Injunction (a) describe the acts enjoined in reasonable detail; (b) be specific in its terms with regard to the injunction; and (c) identify the entities subject thereto.  The Temporary Plan Injunction satisfies each of these requirements.  The description of acts enjoined is specific and particular and the language of the Temporary Plan Injunction is therefore reasonably detailed.  The Temporary Plan Injunction is also specific in its terms, as its language clearly describes the condition triggering the injunction and the specific events which will serve to terminate it.  The Temporary Plan Injunction also specifically identifies the entities subject to its terms.  Federal Rule of Civil Procedure 65(d)(1), made applicable by Bankruptcy Rule 7065, also requires that the Temporary Plan Injunction be specific in its terms and describe the enjoined acts in reasonable detail.  Federal Rule of Civil Procedure 65(d)(1) further requires that the reasons for issuance of the Temporary Plan Injunction are stated.  The reasons for this Court's issuance of the Temporary Plan Injunction are stated herein.  Therefore, the Temporary Plan Injunction satisfies all requirements of the applicable Bankruptcy Rules.

EE.    _Substantive Consolidation of the Debtors_.  The Court finds and concludes that the substantive consolidation of the Debtors for the purpose of implementing the Plan, including for purposes of distributions under the Plan, is in the best interests of the Debtors, the Estate, and holders of Claims and Interests.  Substantive consolidation recognizes the Debtors' common business purpose and the fact that Acis GP's liability is derived from the liabilities of

Appellee Appx. 00570
Appx. 05435
007378

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 578 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 461 of 1017    PageID 8191
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 577 of 1803    PageID 11323
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 27 of 229

Acis LP based on Acis GP's status as general partner of Acis LP.  The Court further finds that substantive consolidation of the Debtors constitutes an integral part of the Plan.

FF.    *Retention of Jurisdiction*.  This Court finds and concludes that this Court's retention of jurisdiction as set forth herein and in the Plan comports with 28 U.S.C. sections 157 and 1334.  Consequently, the Court may properly retain jurisdiction over the matters set forth in Article XV of the Plan.

GG.    *Implementation of Other Necessary Documents and Agreements*.  All documents and agreements necessary to implement the Plan are essential elements of the Plan and entry into and consummation of the transactions contemplated by each of such documents and agreements is in the best interests of the Debtors, the Estate, and holders of Claims and Interests.  The Chapter 11 Trustee has exercised reasonable business judgment in determining which agreements to enter into and has provided sufficient and adequate notice of such documents and agreements.  The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's length, are fair and reasonable, and are reaffirmed and approved.

HH.    *Conditions Precedent to the Effective Date*.  Each of the conditions precedent to the Effective Date, as set forth in Article XIII of the Plan, has been satisfied or waived in accordance with the provisions of the Plan, or is reasonably likely to be satisfied or waived.

II.    *Satisfaction of Confirmation Requirements*.  Based upon the foregoing, all other filed pleadings, exhibits and documents filed in connection with confirmation of the Plan and all evidence and arguments made, proffered, or adduced at the Combined Hearing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

## **ORDER**

Based on the foregoing, it is hereby ORDERED:

1.    Findings of Fact and Conclusions of Law.  The above-referenced findings of fact and conclusions of law are incorporated by reference as though fully set forth herein.  To the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 579 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 462 of 1017 PageID 8192
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 578 of 1803 PageID 11324
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 28 of 229

extent any of the prior findings of fact or conclusions of law constitutes an order of this Court,
they are adopted as such.

2. <u>Objections to Final Approval of Disclosure Statement and Confirmation of Plan</u>.
To the extent that any of the Objections have not been resolved, withdrawn, waived or settled
prior to entry of this Order or otherwise resolved as stated on the Record of the Combined
Hearing or as set forth in this Order, they are hereby overruled on their merits.

3. <u>Final Approval of Disclosure Statement</u>.  The Disclosure Statement is hereby
approved on a final basis as containing adequate information as required by section 1125 of the
Bankruptcy Code.

4. <u>Confirmation of Plan</u>.  All requirements for confirmation of the Plan have been
satisfied.  The Third Amended Plan, as modified by the First Modification and Second
Modification (as supplemented) and as modified herein, is hereby CONFIRMED in accordance
with section 1129 of the Bankruptcy Code, and all terms and conditions set forth in the Plan are
hereby APPROVED.  The terms of the Plan are incorporated by reference into, and as an
integral part of, this Order.

5. <u>Solicitation and Notice</u>.  Notice of the Combined Hearing complied with the terms
of the Solicitation Order, was appropriate and satisfactory based on the circumstances of the
Chapter 11 Cases and was in compliance with the applicable provisions of the Bankruptcy Code
and the Bankruptcy Rules.  The solicitation of votes on the Third Amended Plan and the
Solicitation Materials complied with the Solicitation Procedures, was appropriate and
satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance
with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

6. <u>Plan Classification Controlling</u>.  The terms of the Plan shall solely govern the
classification of Claims and Interests for purposes of distributions to be made thereunder.  The
classifications set forth on the Ballots tendered to or returned by the Holders of Claims in
connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to

ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT
AND CONFIRMING THIRD AMENDED PLAN, AS MODIFIED   PAGE 28 of 46

Appellee Appx. 00572
Appx. 03127
007380

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 580 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 463 of 1017    PageID 8193
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 579 of 1803    PageID 11325
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 29 of 229

accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims under the Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim as representing the actual classification of such Claim under the Plan for distribution purposes; and (d) shall not be binding upon the Debtors and the Reorganized Debtor except for voting purposes.

7.    <u>Resolution of Stinson Objection</u>.  Stinson Leonard Street LLP ("<u>Stinson</u>") has asserted a Claim against the Debtors for $158,552.98.  On July 31, 2018, Stinson initially asserted its Claim as an unsecured Claim by filing proof of Claim number 12 in the Acis LP case and proof of claim number 2 in the Acis GP case.  Those Claims represent a single Claim for satisfaction of a total alleged debt of $158,552.89.  All proofs of Claim filed by Stinson will be referred to collectively as the "<u>Stinson Claim</u>."  The Stinson Claim is treated as part of Class 3 under the Plan.  On November 9, 2018, Stinson amended the Stinson Claim to assert a secured Claim based on a possessory lien on legal files belonging to the Debtors.  The Chapter 11 Trustee currently intends to object to the Stinson Claim, including Stinson's claim to secured status.  Stinson filed an Objection to the Plan on November 26, 2018 [Docket No. 720] which was subsequently withdrawn based on this proposed paragraph being included in any Order confirming the Plan.  This paragraph resolves Stinson's Objection as follows:  Notwithstanding any contrary provision of the Plan or this Order, the Stinson Claim, to the extent it is Allowed by a Final Order of the Bankruptcy Court as a Secured Claim, shall be considered a separate class under the Plan and paid by the Reorganized Debtor within thirty (30) days after entry of such Final Order.  To the extent it is an Allowed Secured Claim, the Stinson Claim will be removed from Class 3.  To the extent it is an Allowed General Unsecured Claim, the Stinson Claim will remain a Class 3 Claim.  This recognizes that the Stinson Claim may be allowed as partly secured (*i.e.* only secured to the extent of the value of its collateral) and be paid accordingly. The Chapter 11 Trustee reserves all rights to object to Stinson's proofs of Claim, and Stinson reserves all rights to defend its proofs of Claim.

Appellee Appx. 00573
Appx. 03438
007381

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 581 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 464 of 1017    PageID 8194
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 580 of 1803    PageID 11326
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 30 of 229

8.    <u>Plan Implementation</u>.  Upon the Effective Date of the Plan, the Chapter 11

Trustee and the Reorganized Debtor are hereby authorized and directed to take all actions

necessary or appropriate to implement, effectuate or consummate the Plan, the terms of this

Order and the transactions respectively contemplated therein, and to otherwise fully perform

and execute their duties under the Plan or this Order.  Without limiting the generality of the

foregoing, pursuant to section 1142(b) of the Bankruptcy Code, each and every Person

(including, without limitation, the Chapter 11 Trustee, HCLOF, Highland, any and all affiliates of

HCLOF and Highland, the Issuers and Co-Issuers, and the Indenture Trustee), to the extent

necessary, is hereby directed to execute or deliver, or to join in the execution or delivery of, any

instrument required to effect the transfers of property dealt with under the Plan and this Order,

and to perform all other acts necessary for the consummation of the Plan.  Further pursuant to

section 1142(b) of the Bankruptcy Code, to the extent that any Person fails to execute or deliver

any instrument required to effect the transfers of property pursuant to the Plan and this Order,

the Chapter 11 Trustee is hereby authorized to execute and deliver on behalf of any such

Person (including, without limitation, HCLOF, Highland, and any and all affiliates of HCLOF and

Highland) any instrument required to effect the transfers of property pursuant to the Plan and

this Order.  In the event of an appeal of this Order, the Chapter 11 Trustee and the Reorganized

Debtor are hereby authorized and directed to take all steps necessary to make the Plan

effective and, from and after the Effective Date, execute their duties, responsibilities and

obligations under the Plan, this Order and the Plan Documents unless and until this Order is

stayed by order of a court of appropriate jurisdiction.

9.    <u>Restructuring Transactions</u>.  On the Effective Date or as soon as reasonably

practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or

appropriate to effect any transaction described in, approved by, contemplated by, or necessary

to effectuate the Plan; <u>provided</u>, <u>however</u>, that no such restructuring transactions may violate

the terms of any assumed Executory Contract or Unexpired Lease.

Appellee Appx. 00574
Appx. 007382

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 582 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 465 of 1017    PageID 8195
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 581 of 1803    PageID 11327
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 31 of 229

10.     <u>Approval of Plan Documents</u>.  The form and substance of the Plan Documents
are all hereby APPROVED.  The Chapter 11 Trustee is authorized and directed, without the
need for further corporate or other organizational action by or on behalf of the Debtors or further
order or authorization of this Court, to take such actions and do all things as may be necessary
or required to implement and effectuate the Plan Documents and to make the Plan effective.

11.     <u>Transfer and Vesting of Assets; Assumption of Obligations</u>.  On the Effective
Date, without the execution of any other or further document or any further order by the Court,
all Assets shall be deemed as fully, completely and irrevocably transferred to, and vested in, the
Reorganized Debtor in accordance with the Plan.  All transfers of Assets to the Reorganized
Debtor shall be free and clear of all Liens, Claims, rights, Interests and charges, except as
otherwise expressly provided in the Plan or any agreement, instrument, or other document
incorporated therein, or this Order.  Upon the Effective Date, the Reorganized Debtor shall be
deemed to have assumed the obligations to make all Distributions pursuant to the Plan and this
Order.

12.     <u>Estate Claims and Estate Defenses</u>.  Upon the Effective Date, without the
necessity of the execution of any further documents or further order of the Court, all Estate
Claims and Estate Defenses, including without limitation all Estate Claims and Estate Defenses
identified in Exhibit A to the Plan, shall be deemed as fully, completely and irrevocably
transferred to, and vested in, the Reorganized Debtor.  From and after the Effective Date, the
Reorganized Debtor shall have the exclusive standing and authority to assert, prosecute,
collect, compromise and settle all Estate Claims and Estate Defenses pursuant to the terms of
the Plan.

13.     <u>Treatment of Executory Contracts and Unexpired Leases</u>.  The Executory
Contract and Unexpired Lease provisions of Article XI of the Plan, as modified herein**,** are
hereby approved in their entirety.  The assumption of Executory Contracts and Unexpired
Leases as set forth in the Plan, this Order, and **Exhibit "5"** to this Order are hereby approved.

**Appellee Appx. 00575**
**Appx. 03449**
**007383**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 583 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 466 of 1017    PageID 8196
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 582 of 1803    PageID 11328
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 32 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in

**Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments,

provide any other compensation, cure any nonmonetary defaults, or provide adequate

assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to

the assumption of such Executory Contracts and Unexpired Leases.  All other Executory

Contracts and Unexpired Leases that have not been previously assumed or rejected shall be

deemed as rejected as of the Effective Date in accordance with the terms of the Plan.  All

Rejection Claims must be filed within the time specified in section 11.03 of the Plan, failing

which any such Rejection Claim shall be forever barred and precluded from receiving any

Distribution pursuant to the Plan.  Notwithstanding anything to the contrary herein or in the Plan,

Exhibit 5 to this Order hereby replaces, is substituted for, and supersedes Exhibit B to the Third

Amended Plan and any explicit or inferred references herein or in the Plan to Exhibit B to the

Third Amended Plan shall refer to Exhibit 5 to this Order.

14.    <u>Executory Contracts with Issuers and Co-Issuers</u>.  Pursuant to the Plan and as

provided in this Order, the Debtors are authorized to assume executory contracts that include as

a party ACIS CLO 2014-3 Ltd., ACIS CLO 2014-4 Ltd., ACIS CLO 2014-5 Ltd., ACIS CLO 2015-

6 Ltd., ACIS CLO 2014-3 LLC, ACIS CLO 2014-4 LLC, ACIS CLO 2014-5 LLC, and/or ACIS

CLO 2015-6 LLC solely if and to the extent that one or more of the Debtors is a signatory to

each such executory contract.

15.    <u>Approval of Brigade as Sub-Advisor and Shared Services Provider</u>.  Pursuant to

an *Order Granting Emergency Motion to Approve Replacement Sub-Advisory and Shared

Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services

LLC* [Docket No. 464] entered on August 1, 2018, the Court authorized the Chapter 11 Trustee

to engage Brigade Capital Management, LP ("<u>Brigade</u>") and Cortland Capital Markets Services

LLC to perform the services previously provided by Highland under the Sub-Advisory

Agreement and Shared Services Agreement, on an interim basis.  The Chapter 11 Trustee

**Appellee Appx. 00576**
**007384**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 584 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 467 of 1017   PageID 8197
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 583 of 1803   PageID 11329
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 33 of 229

selected Brigade as the party to provide both sub-advisory and shared services to the

Reorganized Debtor.  Based on the record of prior proceedings in the Chapter 11 Cases and

the Record at the Combined Hearing, the Chapter 11 Trustee has demonstrated that Brigade is

fully qualified to perform such services, and that the Chapter 11 Trustee's selection of Brigade is

an exercise of his sound business judgment.  Furthermore, adequate assurance of future

performance by Brigade has been shown.  Therefore, the selection of Brigade as the provider to

the Reorganized Debtor of the sub-advisory and shared services previously provided by

Highland under the Sub-Advisory Agreement and Shared Services Agreement is hereby

approved in all respects.

16.     <u>Substantive Consolidation</u>.  The substantive consolidation of the Debtors for

purposes of implementation of and distributions under the Plan is hereby approved as of the

Effective Date such that on the Effective Date:  (a) all assets and liabilities of the Debtors will be

deemed merged; (b) all guaranties by one Debtor of the obligations of the other Debtor will be

deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed

by the other Debtor and any joint or several liability of the Debtors will be deemed to be one

obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the

case of either of the Debtors will be deemed filed against the consolidated Debtors and will be

deemed one Claim against and a single obligation of the consolidated Debtors.

17.     <u>Compromise and Settlement</u>.  Pursuant to section 363 of the Bankruptcy Code

and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and

other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith

compromise and settlement of all Claims, Interests and controversies subject to, or dealt with,

under the Plan, including, without limitation, all Claims against the Debtors or Estate arising

prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or

unasserted, fixed or contingent, arising out of, relating to or in connection with the business or

affairs of, or transactions with, the Debtors or the Estate.  The entry of this Order constitutes the

**Appellee Appx. 00577**
**Appx. 03442**
**007385**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 585 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 468 of 1017    PageID 8198
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 584 of 1803    PageID 11330
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 34 of 229

Court's approval of each of the foregoing compromises or settlements embodied in the Plan, and all other compromises and settlements provided for in the Plan, as well as a finding by the Court that such compromises and settlements are in the best interest of the Debtors, the Estate, holders of Claims and Interests, and other parties-in-interest, and are fair, equitable and within the range of reasonableness. The rights afforded in the Plan and the treatment of all Claims and Interests therein are in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets. Except as otherwise provided in the Plan or this Order, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's assets, the Estate, or the Assets, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

18.    Discharge. Except for the obligations expressly set forth in the Plan or this Order, on the Effective Date, the Debtors, the Reorganized Debtor and their successors in interest and assigns shall be deemed and they each are discharged and released to the fullest extent permitted by applicable law, including pursuant to section 1141(d)(1) of the Bankruptcy Code, from any and all Claims, Interests, demands, debts and liabilities that arose before the Effective Date. Without limiting the generality of the foregoing, the discharge shall apply to and cover both known and unknown Claims although the Court makes no determination in this Order as to which Creditors may constitute holders of unknown Claims. In addition, all such discharged Claims, both known and unknown, shall be subject to the Plan Injunction.

19.    Injunctions. The following injunction provisions set forth in Article XIV of the Plan are hereby approved and authorized in their entirety:

(a)    **Permanent General Plan Injunction:**

Appellee Appx. 00578
Appx. 03443
007386

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING:  (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THE PLAN APPLICABLE TO SUCH CLAIM OR INTEREST.**

The above injunction is an integral term of this Order and shall be fully binding upon, and enforceable against, all Persons through and as a part of this Order.  Furthermore, notwithstanding anything to the contrary in the Plan or this Order, the above injunction is permanent and shall not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

(b)    Temporary Injunction Against the Liquidation of the Acis CLOs and Related Actions (the "Temporary Plan Injunction"):

**EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 587 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 470 of 1017   PageID 8200
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 586 of 1803   PageID 11332
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 36 of 229

**THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF: (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS.  FOR PURPOSES OF THIS PARAGRAPH, THE TERM "ENJOINED PARTIES" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS.  FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.**

The above Temporary Plan Injunction is an integral term of this Order and the Temporary Plan Injunction shall be fully binding upon, and enforceable against, the Enjoined Parties through and as a part of this Order.  For the avoidance of doubt, the occurrence of any event specified in the Temporary Plan Injunction that results in expiration of the Temporary Plan Injunction shall not cause any of the other injunctive relief set forth in the first paragraph of section 14.03 of the Plan and paragraph 18(a) of this Order to expire, such other injunctive relief being permanent.

20.     Notwithstanding anything to the contrary in the Plan or this Order, nothing in the Plan or in this Order shall discharge, release, enjoin or otherwise bar (a) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("Released Parties") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of Claim, (b) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (c) any valid right of setoff or recoupment of a Governmental Unit, and (d) any police or regulatory action by a Governmental Unit.  In addition, nothing in the Plan or this Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any

---

**Appellee Appx. 00580**

**App. 03445**

**007388**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 588 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 471 of 1017    PageID 8201
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 587 of 1803   PageID 11333
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 37 of 229

Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date.  For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

21.    <u>Extension of the Preliminary Injunction</u>.  Notwithstanding anything to the contrary in the terms of the Preliminary Injunction entered in the Trustee's Adversary, the Preliminary Injunction shall not expire upon confirmation of the Plan.  The Preliminary Injunction is hereby extended to and through the Effective Date of the Plan and shall remain in full force and effect until the Effective Date of the Plan.

22.    <u>Exculpation</u>.  The exculpation provisions set forth in section 16.06 of the Plan are hereby approved in all respects.

23.    <u>Priority and Secured Tax Claims</u>.  The treatment of Priority Tax Claims and Secured Tax Claims is specified in the Plan.  Nothing in the Plan or this Order shall modify or affect the Lien rights of a Taxing Authority under applicable non-bankruptcy law.  In the event of a default on the payment of a Priority Tax Claim or Secured Tax Claim under the Plan, the Taxing Authority to which the payment is owed may pursue all administrative and judicial remedies under applicable law to collect the unpaid Priority Tax Claim or Secured Tax Claim.

24.    <u>Injunctions and Automatic Stay</u>.  Except as otherwise provided in the Plan or this Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or this Order shall remain in full force and effect in accordance with their terms.

25.    <u>Setoffs</u>.  Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off

Appellee Appx. 00581
007389

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 589 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 472 of 1017 PageID 8202
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 588 of 1803 PageID 11334
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 38 of 229

against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of

such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and

Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed

Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such

holder have not been otherwise compromised or settled on or prior to the Effective Date

(whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect

such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a

waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate

may possess against such Claimant. In no event shall any Claimant or Interest holder be

entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors

without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion

with the Court requesting the authority to perform such setoff notwithstanding any indication in

any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of

setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

26. Recoupment. Except as otherwise expressly provided for in the Plan, in no event

shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any

Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor

unless (a) such holder actually provides notice thereof in writing to the Debtors or the

Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount

to be recouped by the holder of the Claim or Interest and a specific description of the basis for

the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written

response to such Claim or Interest holder, stating unequivocally that the Debtors or the

Reorganized Debtor consents to the requested recoupment. The Debtors and the Reorganized

Debtor shall have the right, but not the obligation, to seek an order of the Court allowing any or

all of the proposed recoupment. In the absence of a written response from the Debtors or the

Reorganized Debtor consenting to a recoupment or an order of the Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

27.     <u>Preservation of Causes of Action</u>.  Articles VI and IX of the Plan, including Exhibit A to the Plan, contain a specific and unequivocal reservation of Estate Claims and Estate Defenses as required under applicable Fifth Circuit authority.  The Estate Claims and Estate Defenses are expressly, specifically, and unequivocally retained and reserved pursuant to Articles VI and IX of the Plan (including Exhibit A to the Plan) in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Such reservation of the Estate Claims and Estate Defenses is hereby approved.  **No person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against any Person, <u>except</u> as otherwise provided in the Plan.**  Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, such causes of action are hereby expressly reserved (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication and, therefore, no preclusion doctrine, <u>including without limitation</u>, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan.

28.     Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and Estate Defenses are hereby reserved for the benefit of the Reorganized Debtor notwithstanding the occurrence of the Effective Date or the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  All such reserved Estate Claims and Estate Defenses shall be vested with the Reorganized Debtor and the Reorganized Debtor shall have the exclusive right, authority and standing to assert, file,

Appellee Appx. 00583
Appx. 007391
007391

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 591 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 474 of 1017    PageID 8204
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 590 of 1803    PageID 11336
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 40 of 229

prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment each of the Estate Claims and Estate Defenses so reserved in accordance with the terms of the Plan without the consent or approval of any third party or further notice to or action, order or approval of the Court.

29.      Subordinated Claims.  The allowance, classification and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to seek to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

30.      Release of Liens.  Except as otherwise provided in the Plan, this Order, or in any contract, instrument, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date all Liens against any Assets transferred to and vested in the Reorganized Debtor are hereby deemed to be released, terminated and nullified without the necessity of further order of this Court.

31.      Provisions Governing Distributions.  The distribution provisions of Articles VII and VIII of the Plan shall be, and hereby are, approved in their entirety; provided, however, that notwithstanding anything to the contrary set forth in Section 7.02 of the Plan, the Reorganized Debtor may, but shall not be required to, reserve for Distributions to holders of Allowed Subclass 4B Claims.  The Reorganized Debtor shall make all Distributions required under the Plan.

32.      Procedures for Resolving Contested and Contingent Claims.  The Claims resolution procedures contained in Article X of the Plan are hereby approved.

33.    <u>Section 1145 Exemption</u>.  The solicitation of acceptances and rejections of the

Plan was exempt from the registration requirements of the Securities Act of 1933 and applicable

state securities laws, and no other nonbankruptcy law applies to the solicitation.

34.    <u>Exemption from Certain Transfer Taxes and Recording Fees</u>.  Section 1146(a)

shall apply to the transfers of Assets pursuant to the Plan and, therefore, such transfers may not

be taxed under any law imposing a stamp tax or similar tax.

35.    <u>Governmental Approvals Not Required</u>.  This Order shall constitute all approvals

and consents required, if any, by the laws, rules or regulations of any state or any other

governmental authority with respect to the implementation or consummation of the Plan and any

documents, instruments or agreements, and any amendments or modifications thereto, and any

other acts referred to in or contemplated by the Plan, the Disclosure Statement and any

documents, instruments or agreements, and any amendments or modifications thereto.

36.    <u>Allowance and Payment of Certain Administrative Expense Claims</u>

(a)    <u>Administrative Expense Claims (Generally)</u>.  The holder of a Claim for an

Administrative Expense, other than (i) such a Claim by an Estate Professional, (ii) an Ordinary

Course Claim, (iii) a Claim for U.S. Trustee fees under 28 U.S.C. § 1930, or (iv) an Allowed

Administrative Expense, must file with the Court and serve upon the Reorganized Debtor and its

counsel, as set forth in the Plan, a written notice of such Claim for an Administrative Expense

within thirty (30) days after the Effective Date (the "<u>Administrative Bar Date</u>").  Such notice of

Claim for an Administrative Expense shall include at a minimum: (i) the name, address,

telephone number and fax number (if applicable) or email address of the holder of such Claim,

(ii) the amount of such Claim, and (iii) the basis of such Claim.  ***<u>The failure to timely and</u>***

***<u>properly file and serve a notice of Claim for an Administrative Expense on or before the</u>***

***<u>Administrative Bar Date shall result in such Claim for an Administrative Expense being</u>***

***<u>forever barred and discharged without further order of the Court and the holder thereof</u>***

***<u>shall be barred from receiving any Distribution from the Reorganized Debtor on account</u>***

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 593 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 476 of 1017    PageID 8206
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 592 of 1803    PageID 11338
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 42 of 229

*__of such Claim for an Administrative Expense.__*  A Claim for an Administrative Expense with respect to which a notice of Claim for an Administrative Expense has been timely and properly filed and served shall become an Allowed Administrative Expense if no objection is filed within thirty (30) days after the date of filing and service of the applicable notice of Claim for an Administrative Expense, or such later date as may be approved by the Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 30-day period (or any extension thereof), the Claim for an Administrative Expense shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(b)    <u>Estate Professional Compensation</u>.  All final requests for compensation or reimbursement by any Estate Professional shall be filed no later than sixty (60) days after the Effective Date in accordance with the Plan.  A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed shall become an Allowed Administrative Expense only to the extent allowed by Final Order and, if so Allowed, shall be paid in accordance with the terms of the Plan.  Notwithstanding anything to the contrary in the Plan, the provisions of the Plan governing the filing of final fee applications by Estate Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to the Chapter 11 Trustee.  Compensation or reimbursement sought by the Chapter 11 Trustee through a final fee application shall be subject to final approval of the Court as reasonable in accordance with section 330(a)(3) of the Bankruptcy Code.

(c)    <u>U.S. Trustee Fees</u>.  Any U.S. Trustee fees incurred pursuant to 28 U.S.C. § 1930 which are past due as of the Confirmation Date shall be paid in full by the Chapter 11 Trustee on or before the earlier of (i) December 21, 2018, or (ii) that day which is ten (10) days after the Confirmation Date.  After the Confirmation Date, the Reorganized Debtor shall continue to pay U.S. Trustee fees as they accrue until a final decree is entered and the Chapter 11 Cases are closed.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 594 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 477 of 1017    PageID 8207
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 593 of 1803    PageID 11339
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 43 of 229

37.    <u>Effectuating Documents and Further Transactions</u>.  The Chapter 11 Trustee and

the Reorganized Debtor, and their respective representatives, agents and attorneys, may take

all actions to execute, deliver, file, or record such contracts, instruments, releases, and other

agreements or documents and take such actions as may be necessary or appropriate to

effectuate and implement the provisions of the Plan without the need for any approvals,

authorizations, actions, or consents except for those expressly required pursuant hereto.  This

Order shall constitute all approvals and consents required, if any, by the laws, rules and

regulations of all states and any other governmental authority with respect to the implementation

or consummation of the Plan and any documents, instruments, agreements, any amendments

or modifications thereto and any other acts and transactions referred to in or contemplated by

the Plan, the Plan Documents, the Disclosure Statement, and any documents, instruments, and

agreements and any amendments or modifications thereto.

38.    <u>Filing and Recording</u>.  This Order is and shall be binding upon and shall govern

the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state and local officials, and

all other persons and entities who may be required, by operation of law, the duties of their office,

or contract, to accept, file, register or otherwise record or release any document or instruments.

Each and every federal, state and local government agency is hereby directed to accept any

and all documents and instruments necessary, useful or appropriate to effectuate, implement

and consummate the transactions contemplated by the Plan and this Order.

39.    <u>Inconsistency between Documents</u>.  In the event of an inconsistency between

the terms of the Plan and the terms of the Disclosure Statement, the Plan shall control.  In the

event of any inconsistency between the terms of the Plan or the terms of the Disclosure

Statement and the terms of this Order, this Order shall control.

---

Appellee Appx. 00587
Appx. 07452
007395

40. <u>References to Plan Provisions</u>. The failure specifically to include or to refer to any particular article, section, or provision of the Plan or any related document in this Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan and any related documents be confirmed in their entirety.

41. <u>Applicable Nonbankruptcy Law.</u> Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of the Plan and this Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

42. <u>Notice of Entry of the Confirmation Order</u>. No later than the third Business Day after the entry of this Order, the Chapter 11 Trustee shall serve a copy of this Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c) on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest.

43. <u>Notice of the Effective Date</u>. No later than the third Business Day after the occurrence of the Effective Date, the Reorganized Debtor shall file a notice of occurrence of the Effective Date with the Clerk of the Court and shall serve a copy on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest. Such notice shall include notice of (a) the Administrative Bar Date, (b) the deadline for filing Rejection Claims set forth in section 11.03 of the Plan, and (c) the deadline for filing final requests for compensation and reimbursement by Estate Professionals. The filing of such notice shall conclusively establish that all conditions precedent have been satisfied or waived and shall constitute adequate and sufficient notice to all parties entitled thereto of the occurrence of the Effective Date.

44. <u>Retention of Jurisdiction</u>. The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising in, arising under, and related to, the Chapter 11 Cases, including the matters set forth in Article XV of the Plan and section 1142 of the Bankruptcy Code. Without limitation as to the generality of the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 596 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 479 of 1017    PageID 8209
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 595 of 1803    PageID 11341
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 45 of 229

preceding sentence, the Court retains exclusive jurisdiction (a) to interpret and enforce this Order and the Plan; (b) to enforce the provisions of this Order and the Plan; (c) to resolve any disputes arising under or related to this Order or the Plan; and (d) over all transactions contemplated in this Order and the Plan.  All Persons are hereby forever prohibited and enjoined from taking any action (including, without limitation, legal action) that would adversely affect or interfere with the ability of any Person to complete any of the transfers of property contemplated by this Order and the Plan other than in this Court or in connection with any appeals from this Court.

45.    Headings.  Paragraph headings contained in this Order are for convenience of reference only and shall not affect the meaning or interpretation of this Order.

46.    Final Order.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

47.    Appeal or Motion for Reconsideration; Reversal.  In the event this Order is appealed or a motion for reconsideration is filed, the Chapter 11 Trustee and the Reorganized Debtor, and their respective representatives, agents and attorneys, are all hereby authorized to proceed with the consummation and performance of the Plan unless and until this Order is stayed, reversed or modified by a court of competent jurisdiction.  If any or all of the provisions of this Order are hereafter reversed, modified, or vacated by subsequent order of this Court or any other court of competent jurisdiction, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Chapter 11 Trustee's or Reorganized Debtor's receipt of written notice of any such order.  Notwithstanding any such reversal, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan (including the Plan Documents) and any amendments or modifications thereto.

Appellee Appx. 00589
App. 02154
007397

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 597 of
Case 3:25-cv-02072-S     Document 15-10     Filed 10/06/25     Page 480 of 1017     PageID 8210
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 596 of 1803   PageID 11342
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 46 of 229

### END OF ORDER ###

ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT
AND CONFIRMING THIRD AMENDED PLAN, AS MODIFIED

PAGE 46 of 46

Appellee Appx. 00590

Appx. 03455

007398

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 598 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 481 of 1017    PageID 8211
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 597 of 1803    PageID 11343
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 47 of 229

**SUBMITTED BY:**

/s/  Jeff P. Prostok
Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthew G. Maben
State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

-and-

Rakhee V. Patel
State Bar No. 00797213
Phillip Lamberson
State Bar No. 00794134
Joe Wielebinski
State Bar No. 21432400
Annmarie Chiarello
State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Confirmation Order (3rd Amended Plan) 1.31.18.docx

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 599 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 482 of 1017   PageID 8212
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 598 of 1803   PageID 11344
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 48 of 229

# EXHIBIT "1"

**[Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 660]**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 600 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 483 of 1017    PageID 8213
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 599 of 1803   PageID 11345

Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 49 of 229
Case 18-30264-sgj11 Doc 680 Filed 10/25/18   Entered 10/25/18 18:29:08   Page 1 of 62

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | **(Jointly Administered Under Case** |
| | § | **No. 18-30264-SGJ-11)** |
| DEBTORS. | § | |
| | § | **Chapter 11** |

## THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC

Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

DATED:     October 25, 2018
           Dallas, Texas

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 601 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 484 of 1017 PageID 8214
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 600 of 1803 PageID 11346
Case 18-30264-sgj11 Doc 880 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 50 of 229

## ARTICLE I.
## DEFINITIONS

    A.   <u>Defined Terms</u>. In addition to such other terms as are defined in other sections of the Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined).

1.01.   "<u>Acis CLOs</u>" refers collectively to CLO-3, CLO-4, CLO-5, and CLO-6.

1.02.   "<u>Acis GP</u>" means Acis Capital Management, GP, LLC, one of the Debtors in the above-referenced Chapter 11 Cases.

1.03.   "<u>Acis LP</u>" means Acis Capital Management, LP, one of the Debtors in the above-referenced Chapter 11 Cases.

1.04.   "<u>Administrative Bar Date</u>" means the deadline to file Claims for Allowance as an Administrative Expense set forth in section 3.01(c) of the Plan.

1.05.   "<u>Administrative Expense</u>" means any cost or expense of administration of the Chapter 11 Cases allowed under subsections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Estate of the Debtors, any actual and necessary expenses of operating the business of the Debtors, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930, chapter 123 of title 28 of the United States Code.

1.06.   "<u>Affiliate</u>" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

1.07.   "<u>ALF PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and Acis Loan Funding, Ltd. dated December 22, 2016.

1.08.   "<u>Allowed</u>," when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no Objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; *provided, however*, if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court. "<u>Allowed</u>," when used with respect to an Administrative Expense, shall mean an Administrative Expense approved by application to the Bankruptcy Court.

1.09.   "<u>Assets</u>" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code. Without limiting the foregoing, this shall include all

Appellee Appx. 00594
Appx. 03159
007402

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 602 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 485 of 1017    PageID 8215
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 601 of 1803   PageID 11347
Case 18-30264-sgj11 Doc 880 Filed 10/25/18   Entered 10/25/18 17:84:06   Page 51 of 229

1.10.    "Available Cash" means any Cash over and above the amount needed for the Reorganized Debtor to maintain business operations and pursue the Estate Claims, as determined in the sole discretion of the Reorganized Debtor.

1.11.    "Avoidance Action" means a cause of action assertable by the Debtors pursuant to Chapter 5 of the Bankruptcy Code, including without limitation, actions brought or which may be brought under sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code. Such causes of action may be asserted to recover, among other things, the transfers listed in the Debtors' respective Schedules, including in response to Question 3 of the statements of financial affairs.

1.12.    "Ballot" means the form of ballot provided to holders of Claims or Interests entitled to vote pursuant to Bankruptcy Rule 3017(d), by which each such holder may accept or reject the Plan.

1.13.    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified at Title 11 of the United States Code.

1.14.    "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or such other court having jurisdiction over all or any part of the Chapter 11 Cases.

1.15.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, including applicable local rules of the Bankruptcy Court.

1.16.    "Brigade" means Brigade Capital Management, LP.

1.17.    "Business Day" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

1.18.    "Cash" means legal tender of the United States of America, cash equivalents and other readily marketable securities or instruments, including, but not limited to, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks or commercial paper.

1.19.    "Chapter 11 Cases" refers collectively to the Acis LP bankruptcy case, Case No. 18-30264-sgj11, and the Acis GP bankruptcy case, Case No. 18-30265-sgj11, which are being jointly administered under Case No. 18-30264-sgj11.

1.20.    "Chapter 11 Trustee" refers to Robin Phelan, the chapter 11 trustee for the Debtors.

1.21.    "Claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 603 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 486 of 1017   PageID 8216
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 602 of 1803   PageID 11348
Case 18-30264-sgj11 Doc 860 Filed 10/25/18   Entered 01/31/19 17:84:06   Page 52 of 229

1.22.    "<u>Claimant</u>" means the holder of a Claim.

1.23.    "<u>Class</u>" means a class of Claims or Interests as described in the Plan.

1.24.    "<u>CLO</u>" means collateralized loan obligations.

1.25.    "<u>CLO-1</u>" means Acis CLO 2013-1 LTD.

1.26.    "<u>CLO-1 Indenture</u>" means that certain Indenture, dated as of March 18, 2013, issued by CLO-1, as issuer, Acis CLO 2013-1 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.27.    "<u>CLO-1 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-1, dated March 18, 2013.

1.28.    "<u>CLO-3</u>" means Acis CLO 2014-3 LTD.

1.29.    "<u>CLO-3 Indenture</u>" means that certain Indenture, dated as of February 25, 2014, issued by CLO-3, as issuer, Acis CLO 2014-3 LLC, as co-Issuer and US Bank, as Indenture Trustee

1.30.    "<u>CLO-3 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-3, dated February 25, 2014.

1.31.    "<u>CLO-4</u>" means Acis CLO 2014-4 LTD.

1.32.    "<u>CLO-4 Indenture</u>" means that certain Indenture, dated as of June 5, 2014, issued by CLO-4, as issuer, Acis CLO 2014-4 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.33.    "<u>CLO-4 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-4, dated June 5, 2014.

1.34.    "<u>CLO-5</u>" means Acis CLO 2014-5 LTD.

1.35.    "<u>CLO-5 Indenture</u>" means that certain Indenture, dated as of November 18, 2014, issued by CLO-5, as issuer, Acis CLO 2014-5 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.36.    "<u>CLO-5 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-5, dated November 18, 2014.

1.37.    "<u>CLO-6</u>" means Acis CLO 2015-6 LTD.

1.38.    "<u>CLO-6 Indenture</u>" means that certain Indenture, dated as of April 16, 2015, issued by CLO-6, as issuer, Acis CLO 2015-6 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.39.    "<u>CLO-6 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-6, dated April 16, 2015.

1.40.    "<u>CLO Holdco</u>" means CLO Holdco, Ltd.

1.41.    "<u>Collateral</u>" means any Asset subject to a valid and enforceable Lien to secure payment of a Claim.

Appellee Appx. 00596
Appx. 03461
007404

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 604 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 487 of 1017    PageID 8217
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 603 of 1803    PageID 11349
Case 18-30264-sgj11 Doc 880 Filed 01/31/19    Entered 01/31/19 17:84:06    Page 53 of 229
Case 18-30264-sgj11 Doc 680 Filed 10/25/18    Entered 10/25/18 18:23:08    Page 5 of 62

1.42.    "Confirmation Date" means the date of entry of the Confirmation Order.

1.43.    "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as such hearing may be continued from time to time.

1.44.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.45.    "Contested," when used with respect to a Claim, means a Claim against the Debtors that is listed in the Debtors' Schedules as disputed, contingent, or unliquidated; that is listed in the Debtors' Schedules as undisputed, liquidated, and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; that is not listed in the Debtors' Schedules, but as to which a proof of Claim has been filed with the Bankruptcy Court; or as to which an objection has been or may be timely filed and has not been denied by Final Order. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Contested Claim only to the extent of the objection.

1.46.    "Creditor" means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

1.47.    "Cure Claim" means the payment or other performance required to cure any existing default under an Executory Contract or Unexpired Lease.

1.48.    "Debtors" means, collectively, Acis GP and Acis LP, the debtors in the above-captioned Chapter 11 Cases.

1.49.    "Disallowed," when used with respect to all or any part of a Claim or Interest, means that portion of a Claim or Interest to which an objection or motion to disallow has been sustained by a Final Order.

1.50.    "Disclosure Statement" means the Disclosure Statement filed with respect to the Plan, as it may be amended, modified, or supplemented from time to time.

1.51.    "Distribution" means any payment or other disbursement of property pursuant to the Plan.

1.52.    "Effective Date" means the first Business Day which is fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) Business Days after the Confirmation Date, and upon which all conditions to the effectiveness of the Plan set forth in Article XIII below are satisfied.

1.53.    "Estate" shall collectively refer to the bankruptcy estates of the Debtors in the Chapter 11 Cases.

1.54.    "Estate Accounts Receivable" shall include all accounts receivable of the Estate, including from all sums payable to the Debtors on account of goods or services provided by the Debtors.

Appellee Appx. 00597
Appx. 007405
007405

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 605 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 488 of 1017   PageID 8218
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 604 of 1803   PageID 11350
Case 19-34054-sgj11 Doc 880 Filed 01/21/19   Entered 01/21/19 17:84:06   Page 54 of 229

1.55.   "Estate Claims" shall include all claims and causes of action held by the Debtors' Estate, including, without limitation, the Estate Claims listed on the attached **Exhibit A** and all Avoidance Actions.

1.56.   ""Estate Defenses" means all defenses, affirmative defenses, counterclaims, or offsets by the Debtors' Estate against any Person, including but not limited to any Creditor.

1.57.   "Estate Insurance" means any insurance policy or interest in an insurance policy in which the Estate has an interest or rights.

1.58.   "Estate Professionals" means those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, and 1103 of the Bankruptcy Code or who are entitled to compensation or reimbursement pursuant to sections 503(b)(3)(D) or 506(b) of the Bankruptcy Code.

1.59.   "Executory Contract" means any executory contract which is subject to section 365 of the Bankruptcy Code and which is not an Unexpired Lease.

1.60.   "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body, as to which the time to appeal or seek rehearing or petition for certiorari shall have expired or which order or judgment shall no longer be subject to appeal, rehearing, or certiorari proceeding and with respect to which no appeal, motion for rehearing, or certiorari proceeding or stay shall then be pending.

1.61.   "General Unsecured Claim" means any Claim against the Debtors that is not an Administrative Expense, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Secured Claim, or Insider Claim, but includes any Rejection Claims pursuant to section 502(g) of the Bankruptcy Code.

1.62.   "Governmental Unit" means a "governmental unit" as such term is defined in section 101(27) of the Bankruptcy Code.

1.63.   "HCLOF" means Highland CLO Funding, Ltd.

1.64.   "Highland" means Highland Capital Management, L.P.

1.65.   "Highland Adversary" means Adversary Proceeding No. 18-03078-sgj.

1.66.   "Highland Claim" means all Claims asserted by Highland or any Affiliates of Highland against the Debtors, including any Claim resulting from the termination of the Sub-Advisory Agreement and Shared Services Agreement.

1.67.   "Highland CLOM" means Highland CLO Management, Ltd.

1.68.   "Highland HCF" means Highland HCF Advisors, Ltd.

1.69.   "Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.70.   "Indentures" refers collectively to the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture, and the CLO-6 Indenture.

Appellee Appx. 00598
Appx. 02108
007406

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 606 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 489 of 1017    PageID 8219
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 605 of 1803    PageID 11351
Case 19-30264-sgj11 Doc 2360 Filed 10/25/18    Entered 10/25/18 18:23:06    Page 55 of 229

1.71.    "Indenture Trustee" refers to US Bank solely in its capacity as Indenture Trustee under the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture and the CLO-6 Indenture, as applicable

1.72.    "Initial Distribution Date," when used with respect to any Contested Claim or Rejection Claim, shall mean the later of (i) the first Business Day at least thirty (30) days after the date on which any such Contested Claim or Rejection Claim becomes an Allowed Claim, or (ii) if the payment terms of Article IV of this Plan applicable to each such Claim specify a different date, then the date as calculated pursuant to the terms of Article IV of this Plan applicable to each such Claim.  The Initial Distribution Date shall be separately determined with respect to each Contested Claim or Rejection Claim based upon the date each such Claim becomes an Allowed Claim.

1.73.    "Insider" means a Person described in section 101(31) of the Bankruptcy Code.

1.74.    "Insider Claim" means any Claim asserted by Insiders of the Debtors, including but not limited to any Claim asserted by Highland or any Affiliate thereof, unless otherwise indicated in the Plan.

1.75.    "Interests" means any equity or stock ownership interest in the Debtors.

1.76.    "Issuers and Co-Issuers" means CLO-1, CLO-3, CLO-4, CLO-5, CLO-6, Acis CLO 2013-1, Acis CLO-2014-3, LLC, Acis CLO 2014-4, LLC, Acis CLO 2014-5, LLC, and Acis 2015-6, LLC.

1.77.    "Lien" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any asset or property of the Debtors contemplated by section 101(37) of the Bankruptcy Code.

1.78.    "Management Fees" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.79.    "Neutra" means Neutra, Ltd.

1.80.    "Objection" means (a) an objection to the allowance of a Claim interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (b) as to any Taxing Authority, a proceeding commenced under section 505 of the Bankruptcy Code to determine the legality or amount of any tax.

1.81.    "Objection Deadline" shall mean the later of (a) ninety (90) days following the Effective Date, unless otherwise extended by order of the Bankruptcy Court, or (b) as to any Rejection Claim filed after the Effective Date, ninety (90) days after the date on which the proof of Claim reflecting the Rejection Claim is filed.

1.82.    "Optional Redemption" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.83.    "Person" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity.

Appellee Appx. 00599
Appx. 03464
007407

1.84. "Petition Date" means January 30, 2018.

1.85. "Plan" means this Third Amended Joint Chapter 11 plan, either in its present form or as it may be altered, amended, or modified from time to time.

1.86. "Plan Documents" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court.

1.87. "Plan Rate" means a rate of interest of five percent (5%) per annum.

1.88. "PMAs" refers collectively to the CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA.

1.89. "Priority Claim" means a Claim (other than a Claim for an Administrative Expense) to the extent that it is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.90. "Priority Non-Tax Claim" means a Priority Claim other than a Priority Tax Claim.

1.91. "Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in subsection 507(a)(8) of the Bankruptcy Code.

1.92. "Professional" means those persons retained pursuant to an order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code.

1.93. "Pro Rata Distribution" means an optional Distribution made in accordance with section 4.03(c), 4.04(e), or 4.04(i) of the Plan. Each Creditor entitled to receive a portion of a Pro Rata Distribution shall receive such Creditor's Pro Rata Share of such Distribution.

1.94. "Pro Rata Share" means, as to the holder of a specific Claim, the ratio that the amount of such holder's Claim bears to the aggregate amount of all Claims included in the particular Class or category in which such holder's Claim is included.

1.95. "Refinancing Proceeds" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.96. "Rejection Claim" means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract or Unexpired Lease.

1.97. "Reorganized Debtor" refers collectively to the Debtors, as reorganized, acting from and after the Effective Date if the Plan is confirmed based on the terms and provisions herein.

1.98. "Reserve" or "Reserves" means any reserves set aside by the Reorganized Debtor pursuant to this Plan, including reserves set aside to fund any Distributions, make payments pursuant to the Plan, or pursue the Estate Claims.

1.99. "Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules or statements have been or may be subsequently amended.

1.100. "Secured Claim" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, and which is duly Allowed, but only to the

Appellee Appx. 00600

Appx. 03105

007408

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 608 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 491 of 1017   PageID 8221
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 607 of 1803   PageID 11353
Case 18-30264-sgj11 Doc 880 Filed 10/15/18   Entered 10/15/18 18:34:06   Page 57 of 229

extent of the value of the holder's interest in the Collateral that secures payment of the Claim; (b) a Claim against the Debtors that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the Class of which the Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent Allowed.

1.101. "Secured Tax Claim" means any ad valorem tax Claim that arises or is deemed to have arisen on or before the Petition Date, irrespective of the date on which such Claim is assessed or due.

1.102. "Shared Services Agreement" means that certain Fourth Amended and Restated Shared Services Agreement by and between Acis LP and Highland dated March 17, 2017.

1.103. "Sub-Advisory Agreement" means that certain Third Amended and Restated Sub-Advisory Agreement by and between Acis LP and Highland dated March 17, 2017

1.104. "Subordinated Notes" means the subordinated notes in the Acis CLOs held by HCLOF, and expressly does not include any subordinated notes in the Acis CLOs held by any other party.

1.105. "Substantial Consummation" means the day on which a Creditor first receives a Distribution of any kind under the terms and provisions of the Plan.

1.106. "Taxing Authority" shall include the State of Texas or any subdivision thereof, including without limitation any political subdivision of the State of Texas assessing ad valorem taxes against any of the Assets.

1.107. "Terry" means Joshua N. Terry.

1.108. "Terry Partially Secured Claim" means any Claim asserted against the Debtors by Terry, including as asserted in Proof of Claim No. 1 in both Chapter 11 Cases and Proof of Claim No. 26 against Acis LP.

1.109. "Unclaimed Property" means any cash, Distribution, or any other property of the Debtors unclaimed for a period of one (1) year after the applicable Initial Distribution Date.

1.110. "Unexpired Lease" means any unexpired lease or agreement which is subject to section 365 of the Bankruptcy Code and which is not an Executory Contract.

1.111. "US Bank" means U.S. Bank National Association.

1.112. "Other Acis-Managed Funds" refers collectively to CLO-1, Acis CLO 2013-2, Ltd., Hewitt's Island CLO 1-R, Ltd, and BayVK R2 Lux S.A., SICAV-FIS.

B.    Interpretation. Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the

Appellee Appx. 00601
Appx. 02406
007409

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 609 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 492 of 1017    PageID 8222
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 608 of 1803    PageID 11354
Case 18-30264-sgj11 Doc 830 Filed 10/24/18    Entered 10/24/18 17:34:06    Page 58 of 229

same may be amended, waived, or modified from time to time. The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the provisions hereof. The rules of construction set forth in section 102 of the Bankruptcy Code, other than section 102(5) of the Bankruptcy Code, apply to construction of the Plan. For the purposes of construction of the Plan, "or" is disjunctive.

C.    <u>Other Terms</u>. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. References herein to "after notice and hearing" or other similar language shall have the same meaning as in section 102(1) of the Bankruptcy Code. Otherwise, a term used herein that is not specifically defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

D.    <u>Exhibits and Plan Documents</u>. All Exhibits to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. Any Plan Documents may be filed with the Clerk of the Bankruptcy Court prior to the commencement of the Confirmation Hearing. Holders of Claims and Interests may obtain a copy of the Plan Documents, once filed, by a written request sent to the following address: Forshey & Prostok, LLP, 777 Main Street, Suite 1290, Fort Worth, Texas 76102, Attention: Linda Breedlove; Fax number (817) 877-4151; email: lbreedlove@forsheyprostok.com.

## ARTICLE II.
## CLASSIFICATION OF CLAIMS AND INTERESTS

2.01.    The following is a designation of the Classes of Claims and Interests under the Plan. Administrative Expenses, Priority Claims of the kinds specified in sections 507(a)(2) and 507(a)(3) of the Bankruptcy Code and Priority Tax Claims have not been classified, are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code, and their treatment is set forth in Article III of the Plan.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class.  A Claim is included in a particular Class only to the extent that the Claim is an Allowed Claim in that Class.

Class 1 – Secured Tax Claims
Class 2 – Terry Partially Secured Claim
Class 3 – General Unsecured Claims
Class 4 – Insider Claims
Class 5 – Interests

2.02.    <u>Impaired Classes of Claims and Interests</u>.  Class 1 is unimpaired.  Classes 2 through 5 are Impaired.

2.03.    <u>Impairment or Classification Controversies</u>. If a controversy arises as to the classification of any Claim or Interest, or as to whether any Class of Claims or Interests is Impaired under the Plan, the Bankruptcy Court shall determine such controversy as a part of the confirmation process.

## ARTICLE III.
## TREATMENT OF UNCLASSIFIED CLAIMS

3.01.    <u>Administrative Expenses</u>.

Appellee Appx. 00602
Appx. 03485
007410

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 610 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 493 of 1017 PageID 8223
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 609 of 1803 PageID 11355
Case 18-30264-sgj11 Doc 830 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 59 of 229

(a)     The Reorganized Debtor shall pay, in accordance with the ordinary business terms applicable to each such expense or cost, the reasonable and ordinary expenses incurred in operating the Debtors' businesses or administering the Estate before the Effective Date ("Ordinary Course Claims"). The remaining provisions of this section 3.01 shall not apply to the Ordinary Course Claims, except that if there is a dispute relating to any such Ordinary Course Claim, the Reorganized Debtor may move the Bankruptcy Court to apply the provisions of Article III below relating to Contested Claims and require the holder of the Contested Ordinary Course Claim to assert such Claim through the Chapter 11 Cases.

(b)     Each holder of an Allowed Administrative Expense (other than Ordinary Course Claims and Administrative Expense Claims by Estate Professionals), shall receive (i) the amount of such holder's Allowed Administrative Expense in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Administrative Expense becomes an Allowed Administrative Expense, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

(c)     Unless the Bankruptcy Court orders to the contrary or the Reorganized Debtor agrees to the contrary in writing, the holder of a Claim for an Administrative Expense, other than such a Claim by an Estate Professional, an Ordinary Course Claim, or an Administrative Expense which is already Allowed, shall file with the Bankruptcy Court and serve upon the Reorganized Debtor and its counsel a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date. This deadline is the "Administrative Bar Date." Such notice shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) or email address of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim. **Failure to timely and properly file and serve such notice by the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred and discharged and the holder thereof shall be barred from receiving any Distribution from the Reorganized Debtor on account of such Claim for an Administrative Expense**.

(d)     A Claim for an Administrative Expense, for which a proper notice was filed and served under subsection 3.01(c) above, shall become an Allowed Administrative Expense if no Objection is filed within thirty (30) days of the filing and service of such notice. If a timely Objection is filed, the Claim shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(e)     The procedures contained in subsections 3.01(a), (c) and (d) above shall not apply to Administrative Expense Claims asserted by Estate Professionals, who shall each file and submit an appropriate final fee application to the Bankruptcy Court no later than sixty (60) days after the Effective Date. A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed and served shall become an Allowed Administrative Expense only to the extent Allowed by order of the Bankruptcy Court and, if so Allowed, shall be paid in accordance with subsection 3.01(b) above. Professional fees and expenses to any Estate Professional incurred on or after the Effective Date may be paid by the Reorganized Debtor without necessity of application to or order by the Bankruptcy Court.

(f)     If the Reorganized Debtor asserts any Estate Claims as counterclaims or defenses to a Claim for Administrative Expense, the Administrative Expense Claim shall be determined through an adversary proceeding before the Bankruptcy Court. The Bankruptcy

Appellee Appx. 00603
Appx. 03468
007411

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 611 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 494 of 1017 PageID 8224
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 610 of 1803 PageID 11356
Case 19-30264-sgj11 Doc 830 Filed 01/23/19 Entered 01/23/19 17:34:06 Page 60 of 229

Court shall have exclusive jurisdiction to adjudicate and Allow all Claims for any Administrative Expense.

3.02.  Priority Non-Tax Claims.  Each holder of an Allowed Priority Non-Tax Claim shall receive (i) the amount of such holder's Allowed Priority Non-Tax Payment in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim and a determination has been made that such Allowed Priority Non-Tax Claim is not subject to equitable subordination under section 510(c) of the Bankruptcy Code, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

3.03.  Priority Tax Claims. Each holder of an Allowed Priority Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Priority Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Priority Tax Claim may be paid without penalty, no later than sixty (60) days after each such Claim becomes an Allowed Claim, or (b) such other treatment as may be agreed to in writing by the holder of the Priority Tax Claim and the Reorganized Debtor.

3.04.  U.S. Trustee's Fees. The Reorganized Debtor shall pay the U.S. Trustee's quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) which are due as of the Confirmation Date in full on the Effective Date or as soon thereafter as is practicable.  After the Confirmation Date, the Reorganized Debtor shall continue to pay quarterly fees as they accrue until a final decree is entered and the Chapter 11 Cases are closed.  The Reorganized Debtor shall file with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial reports for each quarter, or portion thereof, that the Chapter 11 Cases remain open.

### ARTICLE IV.
### TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

4.01.  Class 1 – Secured Tax Claims. Each holder of an Allowed Secured Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Secured Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Secured Tax Claim may be paid without penalty, on the Initial Distribution Date, or (b) such other treatment as may be agreed to in writing by the holder of the Secured Tax Claim and the Reorganized Debtor.  The Liens securing such Secured Tax Claims shall remain unimpaired and unaffected until each such Class 1 Claim is paid in full.  All Distributions on account of Allowed Class 1 Claims shall be made by the Reorganized Debtor.  Class 1 is unimpaired. Holders of Class 1 Claims are conclusively presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

4.02.  Class 2 – Terry Partially Secured Claim.  In exchange for a one million dollar ($1,000,000.00) reduction in the amount of the Terry Partially Secured Claim, Terry shall receive one hundred percent (100%) of the equity interests in the Reorganized Debtor as of the Effective Date.  The remaining balance of any Allowed Terry Partially Secured Claim shall be treated and paid as a Class 3 General Unsecured Claim.  Class 2 is Impaired.  The Holder of the Class 2 Terry Partially Secured Claim is entitled to vote on the Plan.

4.03.  Class 3 – General Unsecured Claims.

Appellee Appx. 00604
Appx. 03409
007412

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 612 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 495 of 1017 PageID 8225
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 611 of 1803 PageID 11357
Case 18-30264-sgj11 Doc 830 Filed 01/23/19 Entered 01/23/19 17:34:06 Page 13 of 229

(a)     Each holder of an Allowed General Unsecured Claim shall receive a promissory note issued by the Reorganized Debtor (each an "Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's General Unsecured Claim becomes an Allowed Class 3 Claim.  Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(b)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 180th day after the Effective Date.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(c)     If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(d)     Class 3 is Impaired.  Holders of Class 3 Claims are entitled to vote on the Plan.

4.04.   Class 4 – Insider Claims.  Holders of Class 4 Insider Claims shall be treated as follows:

(a)     Class 4 Claims shall be divided into two (2) subclasses.  Subclass 4A shall consist of all Allowed Class 4 claims which are not subject to equitable subordination.  Subclass 4B shall consist of all Class 4 claims which are determined by the Bankruptcy Court to be subject to equitable subordination.  If only a part of a Class 4 Claim is subject to equitable subordination, then the portion of such claim subject to equitable subordination shall be included in Subclass 4B and the remainder not subject to equitable subordination shall be included in Subclass 4A.  Subclass 4A and Subclass 4B will vote separately on the Plan, although Subclass 4B is currently an empty class.

Appellee Appx. 00605
Appx. 03479
007413

(b)     All Class 4 Claims (regardless of which subclass) shall be and remain subject to all Estate Defenses and all Estate Claims, including any rights of offset, recoupment, and/or to an affirmative recovery against the Holder of any Class 4 Claim.

(c)     Each holder of an Allowed Subclass 4A Claim shall receive an Unsecured Cash Flow Note on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim.  Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(d)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first quarterly Distribution being due and payable on the 180th day after the Effective Date.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(e)     If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(f)     Unless otherwise provided by Order of the Bankruptcy Court, holders of Allowed Subclass 4B claims shall not be entitled to any Distribution from the Reorganized Debtor until all Allowed Claims included in Classes 1 through 3 and Subclass 4A, including all Unsecured Cash Flow Notes, have been paid in full.

(g)     Holders of Allowed Subclass 4B Claims shall receive a subordinated promissory note issued by the Reorganized Debtor ("Subordinated Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim.  Each Subordinated Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on the earlier to occur of (i) the date that is two

14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 614 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 497 of 1017 PageID 8227
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 613 of 1803 PageID 11359
Case 19-30264-sgj11 Doc 830 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 63 of 229

(2) years after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five (5) years after the Effective Date.

(h)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of a Subordinated Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 90th day after the payment in full of the Unsecured Cash Flow Notes. Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Subordinated Unsecured Cash Flow Note is paid in full. Notwithstanding the foregoing, in the event that a Subordinated Unsecured Cash Flow Note is first issued after payments have been made on one or more other Subordinated Unsecured Cash Flow Notes, the first Distribution made on account of such Subordinated Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Subordinated Unsecured Cash Flow Note had such Subordinated Unsecured Cash Flow Note been issued at the time the first payment on any Subordinated Unsecured Cash Flow Note was made, such that the first Distribution shall bring all payments current on account of such Subordinated Unsecured Cash Flow Note. If on any date on which a quarterly Distribution is due to the holder of a Subordinated Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Subordinated Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Subordinated Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more. Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Subordinated Unsecured Cash Flow Note.

(i)     Subject to section 4.04(f) above, if the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Subclass 4B Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Subclass 4B Claims. Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Subordinated Unsecured Cash Flow Note.

(j)     The Reorganized Debtor may establish appropriate Reserves as to any Contested Claim included in Class 4.

(k)     Class 4 is Impaired. Holders of Class 4 Claims are entitled to vote on the Plan.

4.05.   Class 5 – Interests. All Interests in the Debtors shall be extinguished and shall cease to exist as of the Effective Date. The holders of such Interests shall not receive or retain any property on account of such Interests under the Plan. Class 5 is Impaired. Holders of Class 5 Interests are conclusively presumed to have rejected the Plan and, accordingly, are not entitled to vote on the Plan.

## ARTICLE V.
## ACCEPTANCE OR REJECTION OF THE PLAN

5.01.   Classes Entitled to Vote. Creditors in Classes 2 through 4 are entitled to vote and shall vote separately to accept or reject the Plan. Any unimpaired Class shall not be entitled to vote to accept or reject the Plan. Any unimpaired Class is deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

Appellee Appx. 00607
Appx. 03472
007415

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 615 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 498 of 1017 PageID 8228
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 614 of 1803 PageID 11360
Case 18-30264-sgj11 Doc 830 Filed 01/28/19 Entered 01/28/19 17:34:06 Page 16 of 29

5.02.   <u>Class Acceptance Requirement</u>. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

5.03.   <u>Cramdown</u>. This section shall constitute the request by the Plan proponent, pursuant to section 1129(b) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) of the Bankruptcy Code have not been met.

**ARTICLE VI.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

6.01.   <u>Vesting of Assets</u>. As of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets, including the PMAs, all Cash, Estate Accounts Receivable, Estate Insurance, Estate Claims and Estate Defenses, shall be transferred from the Estate to, and vested in, the Reorganized Debtor, free and clear of all rights, title, interests, claims, liens, encumbrances and charges, except as expressly set forth in the Plan.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

6.02.   <u>Continued Existence of the Debtors</u>.  The Debtors shall continue to exist after the Effective Date, with all the powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents.  On or after the Effective Date, each Reorganized Debtor may, within its sole and exclusive discretion, take such action as permitted by applicable law and its constituent documents as it determines is reasonable and appropriate.

6.03.   <u>Retention and Assertion of Causes of Action and Defenses</u>.

(a)    Except as expressly set forth in this Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Estate Claims, Estate Defenses and Avoidance Actions) belonging to the Debtors (collectively, the "<u>Retained Causes of Action</u>") shall, upon the occurrence of the Effective Date, be reserved, retained and preserved for, and transferred to, received by and vested, in the Reorganized Debtor for the benefit of the Debtors and the Debtors' estates.  Without limitation, the Retained Causes of Action include the claims and causes of action described on **Exhibit A** attached hereto.

(b)    Except as expressly set forth in this Plan, the rights of the Reorganized Debtor to commence, prosecute or settle the Retained Causes of Action shall be retained, reserved, and preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against them. The Debtors and their Estate expressly reserve all rights to prosecute any and all of the Retained Causes of Action (including all**

16

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 616 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 499 of 1017    PageID 8229
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 615 of 1803   PageID 11361
Case 18-30264-sgj11 Doc 830 Filed 10/25/18    Entered 10/25/18 16:23:06    Page 65 of 229

**Estate Claims, Estate Defenses and Avoidance Actions) against any Person, <u>except</u> as otherwise provided in this Plan**. Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in this Plan or a Final Order, the Debtors expressly reserve all causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication, and, therefore, no preclusion doctrine, <u>including</u> without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan. The Debtors and the Reorganized Debtor may also assert Estate Defenses as a defense to the allowance of any Claim not otherwise Allowed.

6.04.    <u>Assumption of Obligations to Make Distributions</u>.  The Reorganized Debtor shall be deemed to have assumed the obligations to make all Distributions pursuant to this Plan.

6.05.    <u>Actions by the Debtors and the Reorganized Debtor to Implement Plan</u>.  The entry of the Confirmation Order shall constitute all necessary authorization for the Debtors and the Reorganized Debtor to take or cause to be taken all actions necessary or appropriate to consummate, implement or perform all provisions of this Plan on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, (a) all transfers of Assets, including to the Reorganized Debtor, that are to occur pursuant to the Plan; (b) the cancellation of Interests and issuance of 100% of the equity interests in the Reorganized Debtor to Terry; (c) the performance of the terms of the Plan and the making of all Distributions required under the Plan; and (d) subject to the terms of the Plan, entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

6.06.    <u>Termination of Highland as Shared Services Provider and Sub-Advisor</u>.  The Bankruptcy Court authorized the Chapter 11 Trustee to terminate the Shared Services Agreement and Sub-Advisory Agreement and engage Brigade to perform the services previously provided by Highland.  The Shared Services Agreement and Sub-Advisory Agreement were terminated by the Chapter 11 Trustee on or about August 1, 2018, and the services previously performed by Highland were transitioned to Brigade on an interim basis.  Brigade has agreed to continue to provide shared services and sub-advisory services to the Reorganized Debtor with respect to the Acis CLOs and the Other Acis-Managed Funds (and any reset Acis CLOs) subject to a minimum two (2) year term unless otherwise agreed as between the Reorganized Debtor and Brigade.  Consequently, any agreement between the Reorganized Debtor and Brigade shall provide that Brigade cannot be removed without cause for a period of two (2) years except as may be otherwise agreed as between the Reorganized Debtor and Brigade.

6.07.    <u>Continued Portfolio Management by the Reorganized Debtor</u>.  The PMAs and any other Executory Contracts and Unexpired Leases identified on Exhibit B to the Plan or in the Confirmation Order shall be assumed and the Reorganized Debtor shall, from an after the Effective Date, serve as the portfolio manager with respect to the Acis CLOs and the Other Acis-Managed Funds (and any reset Acis CLOs).  Consistent with Section 15 of the PMAs, the Reorganized Debtor may only be removed as portfolio manager under the assumed PMAs for cause as set forth in the PMAs.

6.08.    <u>Reset of the Acis CLOs</u>.  HCLOF has maintained that it desires to reset the Acis CLOs. The Reorganized Debtor, with the assistance of Brigade as its shared services provider and sub-advisor, is prepared to promptly seek to perform such reset transactions as set forth herein.

Appellee Appx. 00609
Appx. 03474
007417

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 617 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 500 of 1017   PageID 8230
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 616 of 1803   PageID 11362
Case 18-30264-sgj11 Doc 830 Filed 10/23/18   Entered 10/23/18 17:34:06   Page 68 of 229

HCLOF shall have the right to submit one or more notice(s) of Optional Redemption solely for the purpose of effectuating a reset of one or more of the Acis CLOs under this section 6.08 of the Plan utilizing Refinancing Proceeds (a "Reset Optional Redemption") for each of the Acis CLOs.  If HCLOF requests a Reset Optional Redemption of an Acis CLO, the Reorganized Debtor, with the assistance of Brigade, shall thereafter seek to reset the Acis CLOs, either consecutively or simultaneously, in its good faith business judgment and consistent with then-prevailing market terms; *provided, however*, (i) the Management Fees to be charged by the Reorganized Debtor to any reset Acis CLOs shall remain the same going forward and shall not be increased, and no transaction fee shall be charged by the Reorganized Debtor (other than, for avoidance of doubt, transaction expense reimbursements consistent with market standards), and (ii) HCLOF shall be granted a right of first refusal for any funding of debt or equity required to effectuate a reset of each of the Acis CLOs.  The terms of the Indentures shall control any Reset Optional Redemption.  If HCLOF elects not to reset one or more of the Acis CLOs, then the Acis CLOs will continue to be managed in accordance with market standards.

6.09.   Post-Effective Date Service List.  Pleadings filed by any party-in-interest with the Bankruptcy Court after the Effective Date shall be served on the following Persons (collectively the "Service List"): (a) any Person directly affected by the relief sought in the pleading, (b) the U.S. Trustee, (c) parties which have filed a Notice of Appearance in the Chapter 11 Cases, and (d) the Reorganized Debtor.

6.10.   Section 505 Powers.  All rights and powers pursuant to section 505 of the Bankruptcy Code are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date.

6.11.   Section 510(c) Powers.  All rights and powers to seek or exercise any right or remedy of equitable subordination are hereby reserved to the Estate and shall be transferred to and vested in, the Reorganized Debtor as of the Effective Date as an Estate Defense.

6.12.   Section 506(c) Powers.  The Estate hereby reserves all rights and powers pursuant to section 506(c) of the Bankruptcy Code, and all such rights shall be specifically transferred to, and vested in, the Reorganized Debtor.

6.13.   Plan Injunction.  The Reorganized Debtor shall each have full power, standing and authority to enforce the Plan Injunction against any Person, either through an action before the Bankruptcy Court or any other tribunal having appropriate jurisdiction.

6.14.   Cancellation of Interests.  Except as otherwise specifically provided herein, upon the Effective Date of the Plan: (a) all Interests in the Debtors shall be cancelled; and (b) all obligations or debts of, or Claims against, the Debtors on account of, or based upon, the Interests shall be deemed as cancelled, released and discharged, including all obligations or duties by the Debtors relating to the Interests in any of their respective formation documents, including Acis LP's limited partnership agreement and bylaws, Acis GP's articles of formation and company agreement, or any similar formation or governing documents.

**ARTICLE VII.
PROVISIONS GOVERNING DISTRIBUTION**

7.01.   Distributions from Reorganized Debtor.  The Reorganized Debtor shall be responsible for making Distributions to holders of Allowed Claims only to the extent this Plan requires Distributions to be made by the Reorganized Debtor.  The priority of Distributions from the

Appellee Appx. 00610
Appx. 03475
007418

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 618 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 501 of 1017   PageID 8231
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 617 of 1803   PageID 11363
Case 19-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 67 of 229

Reorganized Debtor shall be in accordance with the terms of this Plan and the Confirmation Order as follows:

(a)    First, to satisfy Allowed Class 1 Secured Tax Claims;

(b)    Second, to satisfy Allowed Administrative Expenses and Allowed Priority Claims in accordance with Article III above, including all U.S. Trustee quarterly fees due and owing as of the Effective Date;

(c)    Third, to make Distributions to holders of any Allowed Class 3 General Unsecured Claims and Allowed Subclass 4A Claims; and

(e)    Fourth, to make Distributions to holders of any Allowed Subclass 4B Claims

7.02.   Reserves.  The Reorganized Debtor may estimate, create and set aside Reserves as may be necessary or appropriate, including without limitation, Reserves on account of Contested Claims.  The Reorganized Debtor may, but shall not be required to, move the Bankruptcy Court to approve: (a) the amount of, and terms on which, such Reserves shall be held, maintained and disbursed, or (b) the amount and timing of any proposed interim Distribution to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The Reorganized Debtor may elect to seek approval by the Bankruptcy Court for the creation and amount of any Reserves or regarding the amount or timing of any Distribution on account of any Allowed Claims.  Except as otherwise expressly provided herein, the Reorganized Debtor, in the exercise of its good faith business judgment, may transfer funds out of any of the Reserves as necessary or appropriate.  However, the Reorganized Debtor shall not be required to create separate accounts for such Reserves which may be created and memorialized by entries or other accounting methodologies, which may be revised from time-to-time, to enable the Reorganized Debtor to determine the amount of Cash available for Distributions under the Plan. Subject to any specific deadlines set forth herein, the Reorganized Debtor, shall determine, from time-to-time, in the exercise of the Reorganized Debtor's good faith business judgment: (x) the amount of Cash available for Distribution, (y) the timing of any Distributions, and (z) the amount and creation of any Reserves for Contested Claims.  The Reorganized Debtor shall not be entitled to reserve for, and this section 7.02 does not apply to, Distributions to holders of Allowed Subclass 4B Claims.

7.03.   Prosecution and Settlement of Estate Claims.  Upon the Effective Date, the Reorganized Debtor (a) shall automatically be substituted in place of the Chapter 11 Trustee as the party representing the Estate in respect of any pending lawsuit, motion or other pleading pending before the Bankruptcy Court or any other tribunal, and (b) is authorized to file a notice on the docket of each adversary proceeding or the Chapter 11 Cases regarding such substitution.  The Reorganized Debtor shall have exclusive standing and authority to prosecute, settle or compromise Estate Claims for the benefit of the Estate in the manner set forth in this Plan.

7.04.   Plan Injunction.  The Reorganized Debtor shall be entitled to the full protection and benefit of the Plan Injunction and shall have standing to bring any action or proceeding necessary to enforce the Plan Injunction against any Person.

7.05.   Relief from the Bankruptcy Court.  The Reorganized Debtor shall be authorized to seek relief from the Bankruptcy Court or any other tribunal having jurisdiction as to any matter relating or pertaining to the consummation, administration or performance of this Plan, including without

Appellee Appx. 00611
Appx. 03476
007419

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 619 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 502 of 1017 PageID 8232
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 618 of 1803 PageID 11364
Case 18-30264-sgj11 Doc 830 Filed 01/23/19 Entered 01/23/19 17:34:06 Page 68 of 229

limitation seeking any relief from the Bankruptcy Court which the Reorganized Debtor deems
necessary or appropriate to the performance of its duties or the administration of this Plan.

## ARTICLE VIII.
## SOURCE OF DISTRIBUTIONS

8.01.  Source of Distributions.  All Distributions under this Plan shall be made by the
Reorganized Debtor in the manner provided in this Plan and the Confirmation Order.

8.02.  Timing and Amount of Distributions.  No Distribution shall be made on account of any
Claim until such Claim is Allowed, except as otherwise set forth in this Plan or otherwise
ordered by the Bankruptcy Court.  No Distribution shall be made on account of any Contested
Claim until such Claim is Allowed.  Except as expressly set forth in the Plan or in the
Confirmation Order, the Reorganized Debtor shall, in the exercise of its good faith business
judgment, determine the timing and amount of all Distributions which are required to be made
under the Plan, consistent with the goal of making such Distributions as expeditiously as
reasonably possible.  The Reorganized Debtor may, but shall not be required to, seek approval
of, or any other appropriate relief from, the Bankruptcy Court with respect to any of such
Distributions.  Any Unclaimed Property may be paid into the registry of the Bankruptcy Court or
otherwise distributed in accordance with the orders of the Bankruptcy Court.

8.03.  Means of Cash Payment.  Cash payments pursuant to this Plan shall be made by check
drawn on, or by wire transfer from, a domestic bank, or by other means agreed to by the payor
and payee.

8.04.  Record Date for Distributions.  As of the close of business on the Effective Date (the
"Distribution Record Date"), the register for Claims will be closed, and there shall be no further
changes in the holders of record of any Claims.  Although there is no prohibition against the
transfer of any Claim by any Creditor, the Reorganized Debtor shall have no obligation to
recognize any transfer of a Claim occurring after the Distribution Record Date, and the
Reorganized Debtor shall instead be authorized and entitled to recognize and deal for all
purposes under this Plan, including for the purpose of making all Distributions, with only those
holders of Claims so reflected as of the Distribution Record Date.  However, the Reorganized
Debtor may, in the exercise of its good faith business judgment, agree to recognize transfers of
Claims after the Distribution Record Date, but shall have no obligation to do so.

8.05.  Delivery of Distributions.  All Distributions, deliveries and payments to the holders of any
Allowed Claims shall be made to the addresses set forth on the respective proofs of Claim filed
in the Chapter 11 Cases by such Claimants or, if the Distribution is to be made based on a
Claim reflected as Allowed in the Schedules, at the address reflected in the Schedules.  Any
such Distribution, delivery or payment shall be deemed as made for all purposes relating to this
Plan when deposited in the United States Mail, postage prepaid, addressed as required in the
preceding sentence.  If any Distribution is returned as undeliverable, no further Distribution shall
be made on account of such Allowed Claim unless and until the Reorganized Debtor is notified
of such holder's then current address, at which time all missed Distributions shall be made to
the holder of such Allowed Claim.  However, all notices to the Reorganized Debtor reflecting
new or updated addresses for undeliverable Distributions shall be made on or before one
hundred twenty (120) days after the date of the attempted Distribution or such longer period as
the Reorganized Debtor may fix in the exercise of its sole discretion.  After such date, all
Unclaimed Property shall revert to the Reorganized Debtor and the Claim of any holder with
respect to such property shall be discharged and forever barred.

Appellee Appx. 00612
Appx. 02175
007420

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 620 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 503 of 1017 PageID 8233
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 619 of 1803 PageID 11365
Case 18-30264-sgj11 Doc 830 Filed 10/23/18 Entered 10/23/18 18:23:08 Page 69 of 229

8.06. <u>W-9 Forms</u>. Each holder of an Allowed Claim must provide a W-9 form or other such necessary information to comply with any withholding requirements of any Governmental Unit (collectively the "<u>W-9 Form</u>") to the Reorganized Debtor prior to receiving any Distribution from the Reorganized Debtor. In the event a holder of an Allowed Claim does not provide a W-9 Form to the Reorganized Debtor within thirty (30) days of the Effective Date, the Reorganized Debtor shall, at an appropriate time, issue a written request to each holder of an Allowed Claim that has not previously provided a W-9 Form to the Reorganized Debtor. The request shall be in writing and shall be delivered to the last address known to the Debtors or Reorganized Debtor, as appropriate. The request shall conspicuously advise and disclose that failure to provide a W-9 Form to the Reorganized Debtor within thirty (30) days shall result in a waiver of any right or rights to a Distribution from the Reorganized Debtor. In the event any holder of an Allowed Claim fails to provide the Reorganized Debtor with a W-9 Form within thirty (30) days after the date of written request described herein, then the holder of such Allowed Claim shall be deemed to have waived the right to receive any Distribution whatsoever from the Reorganized Debtor.

8.07. <u>Time Bar to Cash Payments</u>. Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof. Requests for reissuance of any check shall be made directly to the issuer of the check by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check shall be made on or before one hundred twenty (120) days after the date of issuance of such check or such longer period as the Reorganized Debtor may fix. After such date, all Claims in respect of void checks shall be discharged and forever barred.

8.08. <u>Cure Period</u>. Except as otherwise set forth herein, the failure by the Reorganized Debtor to timely perform any term, provision or covenant contained in this Plan, or to make any payment or Distribution required by this Plan to any Creditor, or the failure to make any payment or perform any covenant on any note, instrument or document issued pursuant to this Plan, shall not constitute an event of default unless and until the Reorganized Debtor has been given thirty (30) days written notice of such alleged default in the manner provided in this Plan, and provided an opportunity to cure such alleged default. Until the expiration of such thirty (30) day cure period, the Reorganized Debtor shall not be in default, and performance during such thirty (30) day cure period shall be deemed as timely for all purposes. Such written notice and passage of the thirty (30) day cure period shall constitute conditions precedent to declaring or claiming any default under this Plan or bringing any action or legal proceeding by any Person to enforce any right granted under this Plan.

8.09. <u>Pre-Payment of Claims</u>. Unless the Plan expressly prohibits or conditions the pre-payment of an Allowed Claim, the Reorganized Debtor may pre-pay any Allowed Claim in whole or in part at any time and may do so without penalty.

8.10. <u>Distributions after Substantial Consummation</u>. All Distributions of any kind made to any Creditor after Substantial Consummation and any and all other actions taken under this Plan after Substantial Consummation shall not be subject to relief, reversal or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8005.

Appellee Appx. 00613
Appx. 03476
007421

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 621 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 504 of 1017 PageID 8234
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 620 of 1803 PageID 11366
Case 18-30264-sgj11 Doc 830 Filed 01/23/19 Entered 01/23/19 17:34:06 Page 70 of 229

### ARTICLE IX.
### RETENTION OF ESTATE CLAIMS AND ESTATE DEFENSES.

9.01.   Retention of Estate Claims.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Claims shall be transferred to, and vested in, the Reorganized Debtor, both for purposes of seeking an affirmative recovery against any Person and for the purposes of offset, recoupment or defense against any Claim asserted against the Estate or Reorganized Debtor.  All Estate Claims shall be deemed to have been transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

Without limiting the effectiveness or generality of the foregoing reservation, out of an abundance of caution, the Debtors and the Estate hereby specifically reserves, retains, and preserves the Estate Claims reflected in the attached **Exhibit A**.  Reference is here made to **Exhibit A** which constitutes an integral part of this Plan.  The provisions of this Article of the Plan, as well as the descriptions and disclosures relating to the Estate Claims in the Disclosure Statement, are provided in the interest of providing maximum disclosure of the Estate Claims of which Debtors are presently aware and shall not act as a limitation on the potential Estate Claims that may exist.  It is the specific intention of this Plan that all Avoidance Actions and all associated remedies, and any other Estate Claims, whether arising before or after the Petition Date, and whether arising under the Bankruptcy Code or applicable state or federal non-bankruptcy laws, shall all be reserved, retained and preserved under this Plan to be transferred to, and vested in, the Reorganized Debtor.  All Estate Claims are reserved, retained and preserved both as causes of action for an affirmative recovery and as counterclaims and for the purposes of offset or recoupment against any Claims asserted against the Estate.

9.02.   Retention of Estate Defenses.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Defenses shall be transferred to, and vested in, the Reorganized Debtor.  For this purpose, all Estate Defenses are hereby reserved, retained and preserved by the Debtors and the Estate, including without limitation all such Estate Defenses available to the Estate pursuant to section 558 of the Bankruptcy Code, and shall be deemed as transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

9.03.   Assertion of Estate Claims and Estate Defenses.  The Reorganized Debtor shall have, and be vested with, the exclusive right, authority and standing to assert all Estate Claims and Estate Defenses for the benefit of the Reorganized Debtor.

### ARTICLE X.
### PROCEDURES FOR RESOLVING AND TREATING
### CONTESTED AND CONTINGENT CLAIMS

10.01.  Claims Listed in Schedules as Disputed.  Any General Unsecured Claim which is listed in the Schedules as unliquidated, contingent or disputed, and for which no proof of Claim has been timely filed, shall be considered as Disallowed as of the Effective Date without the necessity of any further action by the Reorganized Debtor or further order of the Bankruptcy Court other than the entry of the Confirmation Order.

10.02.  Responsibility for Objecting to Claims and Settlement of Claims.  The Reorganized Debtor shall have the exclusive standing and authority to either object to any Claim or settle and compromise any Objection to any Claim, including as follows:

Appellee Appx. 00614
Appx. 03479
007422

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 622 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 505 of 1017 PageID 8235
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 621 of 1803 PageID 11367
Case 19-30264-sgj11 Doc 830 Filed 01/23/19 Entered 01/23/19 17:34:06 Page 72 of 229
Case 19-30264-sgj11 Doc 830 Filed 10/23/19 Entered 01/23/19 18:23:06 Page 23 of 22

(a)     From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to (i) file, settle, or litigate to Final Order any Objections to any Claims; and (ii) seek to subordinate any Claim.  Any Contested Claim may be litigated to Final Order by the Reorganized Debtor; and

(b)     From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to settle, compromise or otherwise resolve any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court.  Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested Claim after the Effective Date.

10.03.  <u>Objection Deadline</u>.  All Objections to Claims shall be served and filed by the Objection Deadline; <u>provided, however</u>, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim.  The Reorganized Debtor may seek to extend the Objection Deadline pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claim.  Any such motion may be granted without notice or a hearing.  In the event that the Reorganized Debtor files such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such motion.  Any proof of Claim other than one based upon a Rejection Claim and which is filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by the Reorganized Debtor.  Nothing contained herein shall limit the right of the Reorganized Debtor to object to Claims, if any, filed or amended after the Objection Deadline.

10.04.  <u>Response to Claim Objection</u>.  If the Reorganized Debtor files an Objection to any Claim, then the holder of such Claim shall file a written response to such Objection within twenty-four (24) days after the filing and service of the Objection upon the holder of the Contested Claim.  Each such Objection shall contain appropriate negative notice advising the Creditor whose Claim is subject to the Objection of the requirement and time period to file a response to such Objection and that, if no response is timely filed to the Objection, the Bankruptcy Court may enter an order that such Claim is Disallowed without further notice or hearing.  The negative notice language in the Objection shall satisfy the notice requirement in section 3007(a) of the Bankruptcy Rules, and the Reorganized Debtor shall not be required to send a separate notice of the Objection to the Creditor whose Claim is subject to the Objection.

10.05.  <u>Distributions on Account of Contested Claims</u>.  If a Claim is Contested, then the dates for any Distributions as to such Contested Claim shall be determined based upon its date of Allowance, and thereafter Distribution shall be made on account of such Allowed Claim pursuant to the provisions of the Plan.  No Distribution shall be made on account of a Contested Claim until Allowed.  Until such time as a contingent Claim becomes fixed and absolute by a Final Order Allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan.  Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

10.06.  <u>No Waiver of Right to Object</u>.  Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan, or the Confirmation Order shall waive, relinquish, release or impair the Reorganized Debtor's right to object to any Claim.

10.07.  <u>Offsets and Defenses</u>.  The Reorganized Debtor shall be vested with and retain all Estate Claims and Estate Defenses, including without limitation all rights of offset or recoupment and all counterclaims against any Claimant holding a Claim.  Assertion of counterclaims by the

Appellee Appx. 00615
Appx. 03489
007423

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 623 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 506 of 1017    PageID 8236
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 622 of 1803    PageID 11368
Case 19-30264-sgj11 Doc 830 Filed 01/23/18    Entered 01/23/18 17:34:06    Page 72 of 229

Reorganized Debtor against any Claim asserted against the Estate or Reorganized Debtor shall constitute "core" proceedings.

10.08.  Claims Paid or Reduced Prior to Effective Date.  Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date, including pursuant to orders of the Bankruptcy Court.  To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made.  Nothing in the Plan shall preclude the Debtors or the Reorganized Debtor from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

## ARTICLE XI.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

11.01.  Assumption and Rejection of Executory Contracts.  All Executory Contracts and Unexpired Leases of the Debtors shall be deemed rejected by the Debtors upon the Effective Date unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) is identified in **Exhibit B** to this Plan and/or the Confirmation Order to be (i) assumed or (ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the Confirmation Date. The Plan shall constitute a motion to reject all Executory Contracts and Unexpired Leases except as stated in this paragraph.  However, the Debtors may file a separate motion for the assumption or rejection of any Executory Contract or Unexpired Lease at any time through the Confirmation Date.

11.02.  Cure Payments.  All payments that may be required by section 365(b)(1) of the Bankruptcy Code to satisfy any Cure Claim shall be made by the Reorganized Debtor as soon as reasonably practical after the Effective Date or upon such terms as may be otherwise agreed between the Reorganized Debtor and the holder of such Cure Claim; *provided, however*, in the event of a dispute regarding the amount of any Cure Claim, the cure of any other defaults, or any other matter pertaining to assumption or assignment of an Executory Contract, the Reorganized Debtor shall make such cure payments and cure such other defaults, all as may be required by section 365(b)(1) of the Bankruptcy Code, following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

11.03.  Bar to Rejection Claims.  Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract or Unexpired Lease shall be forever barred and shall not be enforceable against the Reorganized Debtor or the Reorganized Debtor's assets unless a proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtor and its counsel by the earlier of thirty (30) days after the Effective Date or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract or Unexpired Lease.

11.04.  Rejection Claims.  Any Rejection Claim not barred by section 11.03 of the Plan shall be classified as a Class 3 General Unsecured Claim subject to the provisions of sections 502(b)(6) and 502(g) of the Bankruptcy Code; *provided, however*, that any Rejection Claim by a lessor based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date, upon the entry of the Confirmation Order, or upon the Effective Date, shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements.  All Rejection Claims shall be deemed as Contested Claims until Allowed. Nothing contained herein shall be deemed an admission by the Debtors or the Reorganized

Appellee Appx. 00616
Appx. 03494
007424

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 624 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 507 of 1017   PageID 8237
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 623 of 1803   PageID 11369
Case 18-30264-sgj11 Doc 830 Filed 10/23/18   Entered 10/23/18 17:34:06   Page 75 of 229

Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtors or the Reorganized Debtor of any objections or defenses to any such Rejection Claim if asserted.

11.05.  Reservation of Rights.  Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtor have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

### ARTICLE XII.
### SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

12.01.  Pursuant to the Confirmation Order, the Bankruptcy Court shall approve the substantive consolidation of the Debtors for the sole purposes of implementing the Plan, including for purposes of voting and Distributions to be made under the Plan.  Pursuant to such order:  (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of the other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by the other Debtor and any joint or several liability of the Debtors will be deemed to be one obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the Chapter 11 Case of either Debtor will be deemed filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors.

### ARTICLE XIII.
### CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF PLAN

13.01.  Conditions to Confirmation and Effectiveness of Plan.  The Plan shall not become effective until the following conditions shall have been satisfied and which may occur concurrently with the Effective Date:  (a) the Confirmation Order shall have been entered, in form and substance acceptable to the Chapter 11 Trustee; (b) the necessary Plan Documents have been executed and delivered, and (c) all other conditions specified by the Chapter 11 Trustee have been satisfied.  Any or all of the above conditions other than (a) may be waived at any time by the Chapter 11 Trustee.

13.02.  Notice of the Effective Date.  On or as soon as reasonably practical after the occurrence of the Effective Date, the Reorganized Debtor shall cause a notice of the Effective Date to be filed with the Bankruptcy Court and served on all Creditors and parties-in-interest.

13.03.  Revocation of Plan.  The Chapter 11 Trustee may revoke and withdraw the Plan at any time before the Effective Date.  If the Chapter 11 Trustee revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then this Plan shall be deemed null and void and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, as the case may be, or any other Person, or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

Appellee Appx. 00617
Appx. 03182
007425

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 625 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 508 of 1017    PageID 8238
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 624 of 1803    PageID 11370
Case 18-30264-sgj11 Doc 830 Filed 01/23/19    Entered 01/23/19 17:34:08    Page 76 of 229

**ARTICLE XIV.**
**EFFECT OF THE PLAN ON CLAIMS AND INTERESTS**

14.01. Compromise and Settlement

(a)    Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies subject to, or dealt with, under this Plan, including, without limitation, all Claims against the Debtors or Estate arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, fixed or contingent, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors or the Estate.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements embodied in this Plan, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interest of the Debtors, the Estate, Creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets.  Except as otherwise provided herein, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's Assets, or the Estate, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

(b)    It is not the intent of this Plan that confirmation of the Plan shall in any manner alter or amend any settlement and compromise (including those contained in agreed orders) between the Debtors and any Person that has been previously approved by the Bankruptcy Court (each, a "Prior Settlement").  To the extent of any conflict between the terms of the Plan and the terms of any Prior Settlement, the terms of the Prior Settlement shall control and such Prior Settlement shall be enforceable according to its terms.

14.02. Discharge.  The Debtors and their successors in interest and assigns shall be deemed discharged and released pursuant to section 1141(d)(1) of the Bankruptcy Code from any and all Claims provided for in the Plan.

14.03. **PLAN INJUNCTION.**

**THIS SECTION IS REFERRED TO HEREIN AS THE "PLAN INJUNCTION." EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING:    (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO**

Appellee Appx. 00618
Appx. 02483
007426

ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THIS PLAN APPLICABLE TO SUCH CLAIM OR INTEREST. THE PLAN INJUNCTION SHALL ALSO BE INCORPORATED INTO THE CONFIRMATION ORDER.

IN ADDITION TO THE FOREGOING, EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF:  (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS.  FOR PURPOSES OF THIS PARAGRAPH, THE TERM "ENJOINED PARTIES" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF

27

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 627 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 510 of 1017 PageID 8240
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 626 of 1803 PageID 11372
Case 19-30264-sgj11 Doc 830 Filed 10/28/19 Entered 10/28/19 17:34:06 Page 78 of 229

**HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS. FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.**

Notwithstanding anything to the contrary in the Plan: (a) third-party professionals employed by the Reorganized Debtor shall not be released or exculpated from any losses, claims, damages, liabilities, or expenses arising from their duties and services provided to the Reorganized Debtor; and (b) any third-party professionals employed by the Reorganized Debtor shall only be entitled to be indemnified by the Reorganized Debtor to the extent provided by applicable law.

Notwithstanding anything to the contrary in the Plan or Confirmation Order, nothing in the Plan or in the Confirmation Order shall discharge, release, enjoin or otherwise bar (i) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("Released Parties") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of claim, (ii) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (iii) any valid right of setoff or recoupment of a Governmental Unit, and (iv) any police or regulatory action by a Governmental Unit. In addition, nothing in the Plan or Confirmation Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date. For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

14.04. Setoffs. Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate may possess against such Claimant. In no event shall any Claimant or Interest holder be entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

14.05. Recoupment. Except as otherwise expressly provided for in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor unless (a) such holder actually provides notice thereof in writing to the Debtors or the Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount to be

28

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 628 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 511 of 1017 PageID 8241
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 627 of 1803 PageID 11373
Case 18-30264-sgj11 Doc 830 Filed 01/22/19 Entered 01/22/19 17:34:06 Page 77 of 229

recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written response to such Claim or Interest holder, stating unequivocally that the Debtors or the Reorganized Debtor consents to the requested recoupment. The Debtors and the Reorganized Debtor shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment. In the absence of a written response from the Debtors or the Reorganized Debtor consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

14.06. <u>Turnover</u>. On the Effective Date, any rights of the Estate to compel turnover of Assets under applicable nonbankruptcy law and pursuant to section 542 or 543 of the Bankruptcy Code shall be deemed transferred to and vested in the Reorganized Debtor.

14.07. <u>Automatic Stay</u>. The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtors, the Estate and all Assets. As of the Effective Date, the automatic stay shall be replaced by the Plan Injunction.

## ARTICLE XV.
## JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN

15.01. <u>Retention of Jurisdiction</u>. Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, to the full extent allowed or permitted by applicable law, including without limitation for the purposes of invoking sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)     To hear and determine any and all objections to, or applications or motions concerning, the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense;

(b)     To hear and determine any and all applications for payment of fees and expenses pursuant to this Plan to any Estate Professional pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed under this Plan, and any and all objections thereto;

(c)     To hear and determine pending applications for the rejection, assumption, or assumption and assignment of Executory Contracts and Unexpired Leases and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the assumption or rejection of any Executory Contract or Unexpired Lease;

(d)     To hear and determine any and all adversary proceedings, applications, or contested matters, including relating to the allowance of any Claim;

(e)     To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, (iii) the determination of the validity of any Lien or claimed right of offset or recoupment; and (iv) determinations of Objections to Contested Claims;

Appellee Appx. 00621
Appx. 03486
007429

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 629 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 512 of 1017 PageID 8242
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 628 of 1803 PageID 11374
Case 18-30264-sgj11 Doc 830 Filed 10/28/18 Entered 10/28/18 17:34:06 Page 30 of 229

(f)  To liquidate and administer any disputed, contingent, or unliquidated Claims, including the Allowance of all Contested Claims;

(g)  To administer Distributions to holders of Allowed Claims as provided herein;

(h)  To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(i)  To enable the Reorganized Debtor to prosecute any and all proceedings which may be brought to set aside transfers, Liens or encumbrances and to recover any transfers, Assets, properties or damages to which the Reorganized Debtor may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between the Reorganized Debtor and any other party, including but not limited to, any causes of action or Objections to Claims, preferences or fraudulent transfers and obligations or equitable subordination;

(j)  To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(k)  To enforce the discharge and Plan Injunction against any Person;

(l)  To enter and implement all such orders as may be necessary or appropriate to execute, interpret, construe, implement, consummate, or enforce the terms and conditions of this Plan and the transactions required or contemplated pursuant thereto;

(m)  To hear and determine any motion or application which the Reorganized Debtor is required or allowed to commence before the Bankruptcy Court pursuant to this Plan;

(n)  To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(o)  To determine proceedings pursuant to section 505 of the Bankruptcy Code;

(p)  To enter a final decree closing the Chapter 11 Cases; and

(q)  To determine any other matter or dispute relating to the Estate, the Estate Claims, the Estate Defenses, the Assets, or the Distributions by the Reorganized Debtor.

15.02.  Abstention and Other Courts.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 Cases, this Article of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

15.03.  Non-Material Modifications.  The Reorganized Debtor may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable.  The Reorganized Debtor may undertake such nonmaterial modification pursuant

Appellee Appx. 00622
Appx. 03485
007430

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 630 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 513 of 1017    PageID 8243
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 629 of 1803    PageID 11375
Case 19-30264-sgj11 Doc 830 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 79 of 229

to this section insofar as it does not adversely change the treatment of the Claim of any Creditor or the Interest of any Interest holder who has not accepted in writing the modification.

15.04.  <u>Material Modifications</u>.  Modifications of this Plan may be proposed in writing by the Chapter 11 Trustee at any time before confirmation, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Chapter 11 Trustee shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be modified at any time after confirmation and before its Substantial Consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification. A holder of a Claim or Interest that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

**ARTICLE XVI.**
**<u>MISCELLANEOUS PROVISIONS</u>**

16.01.  <u>Severability</u>.  Should the Bankruptcy Court determine any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Reorganized Debtor may modify the Plan so that any such provision shall not be applicable to the holder of any Claim or Interest.  Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

16.02.  <u>Oral Agreements; Modification of Plan; Oral Representations or Inducements</u>.  The terms of the Plan, Disclosure Statement and Confirmation Order may only be amended in writing and may not be changed, contradicted or varied by any oral statement, agreement, warranty or representation.  None of the Debtors, any representative of the Estate, including Robin Phelan in his capacity as Chapter 11 Trustee, nor their attorneys have made any representation, warranty, promise or inducement relating to the Plan or its confirmation except as expressly set forth in this Plan, the Disclosure Statement, or the Confirmation Order or other order of the Bankruptcy Court.

16.03.  <u>Waiver</u>.  The Reorganized Debtor shall not be deemed to have waived any right, power or privilege pursuant to the Plan unless the waiver is in writing and signed by the Reorganized Debtor.  There shall be no waiver by implication, course of conduct or dealing, or through any delay or inaction by the Reorganized Debtor, of any right pursuant to the Plan, including the provisions of this anti-waiver section.  The waiver of any right under the Plan shall not act as a waiver of any other or subsequent right, power or privilege.

16.04.  <u>Notice</u>.  Any notice or communication required or permitted by the Plan shall be given, made or sent as follows:

      (a)    If to a Creditor, notice may be given as follows: (i) if the Creditor has not filed a proof of Claim, then to the address reflected in the Schedules, or (ii) if the Creditor has filed a proof of Claim, then to the address reflected in the proof of Claim.

      (b)    If to the Reorganized Debtor, notice shall be sent to the following addresses:

31

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 631 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 514 of 1017    PageID 8244
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 630 of 1803   PageID 11376
Case 18-30264-sgj11 Doc 830 Filed 10/23/18   Entered 10/23/18 17:34:06   Page 82 of 229

| | |
|---|---|
| Jeff P. Prostok | Josh Terry |
| Suzanne K. Rosen | c/o Brian P. Shaw |
| Forshey Prostok LLP | Rogge Dunn Group, PC |
| 777 Main Street, Suite 1290 | 1201 Elm Street, Suite 5200 |
| Fort Worth, Texas 76102 | Dallas, Texas 75270 |

(c)     Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Reorganized Debtor of its new address in accordance with the terms of this section.

(d)     Any notice given, made or sent as set forth above shall be effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address as set forth above; (ii) delivered by hand or messenger to the addressee at the address set forth above; (iii) telecopied to the addressee as set forth above, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

16.05.  <u>Compliance with All Applicable Laws</u>.  If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, the Reorganized Debtor shall comply with such law, rule, regulation, or order; <u>provided, however</u>, that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate Reserve has been set aside on the books of the Reorganized Debtor.

16.06.  <u>Duties to Creditors; Exculpation</u>.  Neither the Chapter 11 Trustee nor any agent, representative, accountant, financial advisor, attorney, shareholder, officer, affiliate, member or employee of the Chapter 11 Trustee or the Debtors, including but not limited to Estate Professionals (collectively, the "<u>Exculpated Parties</u>"), shall ever owe any duty to any Person (including any Creditor) other than the duties owed to the Debtors' bankruptcy Estate, for any act, omission, or event in connection with, or arising out of, or relating to, any of the following: (a) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (b) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (c) any act or omission relating to the administration of the Plan after the Effective Date.  All such Exculpated Parties shall be fully exculpated and released from any and all claims and causes of action by any Person, known or unknown, in connection with, or arising out of, or relating to, any of the following: (x) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (y) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (z) any act or omission relating to the administration of the Plan after the Effective Date, except for claims and causes of action arising out of such Exculpated Party's gross negligence or willful misconduct.

16.07.  <u>Binding Effect</u>.  The Plan shall be binding upon, and shall inure to the benefit of, the Reorganized Debtor, the holders of the Claims or Liens, and their respective successors-in-interest and assigns.

16.08.  <u>Governing Law, Interpretation</u>.  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any Plan

Appellee Appx. 00624
Appx. 02489
007432

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 632 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 515 of 1017 PageID 8245
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 631 of 1803 PageID 11377
Case 18-30264-sgj11 Doc 830 Filed 10/31/18 Entered 10/31/18 17:34:08 Page 83 of 229

Documents without regard to conflicts of law. The Plan shall control any inconsistent term or provision of any other Plan Documents.

16.09. <u>Payment of Statutory Fees</u>. All accrued U.S. Trustee Fees as of the Confirmation Date shall be paid by the Reorganized Debtor on or as soon as practicable after the Effective Date, and thereafter shall be paid by the Reorganized Debtor as such statutory fees become due and payable.

16.10. <u>Filing of Additional Documents</u>. On or before Substantial Consummation of the Plan, the Reorganized Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

16.11. <u>Computation of Time</u>. Bankruptcy Rule 9006 shall apply to the calculation of all time periods pursuant to this Plan. If the final day for any Distribution, performance, act or event under the Plan is not a Business Day, then the time for making or performing such Distribution, performance, act or event shall be extended to the next Business Day. Any payment or Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

16.12. <u>Elections by the Reorganized Debtor</u>. Any right of election or choice granted to the Reorganized Debtor under this Plan may be exercised, at the Reorganized Debtor's election, separately as to each Claim, Creditor or Person.

16.13. <u>Release of Liens</u>. Except as otherwise expressly provided in this Plan or the Confirmation Order, all Liens against any of the Assets transferred to and vested in the Reorganized Debtor shall be deemed to be released, terminated and nullified without the necessity of any order by the Bankruptcy Court other than the Confirmation Order.

16.14. <u>Rates</u>. The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

16.15. <u>Compliance with Tax Requirements</u>. In connection with the Plan, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by federal, state and local Taxing Authorities and all Distributions under the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution under the Plan.

16.16. <u>Notice of Occurrence of the Effective Date</u>. Promptly after occurrence of the Effective Date, the Reorganized Debtor, as directed by the Bankruptcy Court, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of the occurrence of the Effective Date.

16.17. <u>Notice of Entry of Confirmation Order</u>. Promptly after entry of the Confirmation Order, the Chapter 11 Trustee, as directed by the Bankruptcy Court in the Confirmation Order, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of entry of the Confirmation Order.

Appellee Appx. 00625
Appx. 02199
007433

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 633 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 516 of 1017    PageID 8246
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 632 of 1803   PageID 11378
Case 18-30264-sgj11 Doc 830 Filed 10/25/18   Entered 10/25/18 16:34:06    Page 82 of 229

Dated:  October 25, 2018.

Respectfully submitted,


ACIS CAPITAL MANAGEMENT, L.P.


By:  /s/ Robin Phelan
       Robin Phelan
       Chapter 11 Trustee


ACIS CAPITAL MANAGMENET GP, LLC


By:/s/ Robin Phelan
       Robin Phelan
       Chapter 11 Trustee

APPROVED:

/s/ Jeff P. Prostok
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ Rahkee V. Patel
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**


L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Third Amended Joint Plan 10.25.18.docx

Appellee Appx. 00626
007434

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 634 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 517 of 1017 PageID 8247
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 633 of 1803 PageID 11379
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 83 of 229
Case 18-30264-sgj11 Doc 630 Filed 10/25/18 Entered 10/25/18 16:35:08 Page 85 of 462

# EXHIBIT A

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

**[ESTATE CLAIMS]**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 635 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 518 of 1017    PageID 8248
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 634 of 1803    PageID 11380
Case 18-30264-sgj11 Doc 830 Filed 10/31/19    Entered 10/31/19 17:34:06    Page 84 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.     Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.     Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "Estate Claims," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.     Highland Claims.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

Appellee Appx. 00628
Appx. 03493
007436

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 636 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 519 of 1017   PageID 8249
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 635 of 1803   PageID 11381
Case 18-30264-sgj11 Doc 830 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 85 of 229

(d)　　All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)　　All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)　　All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)　　All Claims for breach of the PMAs or the Indentures;

(h)　　All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)　　All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)　　All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)　　All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)　　All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)　　All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)　　All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)　　All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)　　All Claims based on alter ego or rights to pierce the corporate veil of Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 637 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 520 of 1017    PageID 8250
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 636 of 1803    PageID 11382
Case 18-30264-sgj11 Doc 830 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 86 of 229

control of Highland, and,

     (q)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

    4.    <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

     (a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

     (b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

     (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

     (d)    All Avoidance Actions against HCLOF;

     (e)    All Claims for breach of the PMAs or the Indentures;

     (f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

     (g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

     (h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

     (i)    All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

     (j)    All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

     (k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

     (l)    All Claims based on alter ego or rights to pierce the corporate veil of

---

**Appellee Appx. 00630**
**Appx. 03495**
**007438**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 638 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 521 of 1017 PageID 8251
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 637 of 1803 PageID 11383
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 57 of 229

HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00631
Appx. 03406
007439

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 639 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 522 of 1017    PageID 8252
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 638 of 1803    PageID 11384
Case 18-30264-sgj11 Doc 830 Filed 10/25/18    Entered 10/25/18 16:34:06    Page 86 of 232

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.    <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland CLOM;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or

Appellee Appx. 00632
Appx. 03497
007440

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 640 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 523 of 1017   PageID 8253
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 639 of 1803   PageID 11385
Case 18-30264-sgj11 Doc 820 Filed 10/25/18   Entered 10/25/18 16:34:06   Page 89 of 229

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.     <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against CLO Holdco;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

**Appellee Appx. 00633**
**Appx. 03498**
**007441**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 641 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 524 of 1017    PageID 8254
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 640 of 1803    PageID 11386
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 90 of 229

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.    Neutra, Ltd. Claims.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Neutra;

(e)    All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Neutra for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00634
Appx. 03499
007442

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 642 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 525 of 1017 PageID 8255
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 641 of 1803 PageID 11387
Case 18-30264-sgj11 Doc 830 Filed 10/25/18 Entered 10/25/18 18:34:06 Page 91 of 229

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.    Claims against Issuers, Co-Issuers and Indenture Trustee. All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary. The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)    All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Exhibit "A" to Second Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC

Page 8

Appellee Appx. 00635

Appx. 03509

007443

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 643 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 526 of 1017    PageID 8256
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 642 of 1803    PageID 11388
Case 18-30264-sgj11 Doc 830 Filed 10/25/18    Entered 10/25/18 18:34:06    Page 92 of 229

        (i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

        (j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

        (k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

        (l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

        10.    <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

        (a)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

        (d)     All Avoidance Actions against any Highland Affiliate;

        (e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

        (f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

        (g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

        (h)     All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets

Appellee Appx. 00636
Appx. 03591
007444

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 644 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 527 of 1017    PageID 8257
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 643 of 1803    PageID 11389
Case 18-30264-sgj11 Doc 839 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 93 of 229

owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.    <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.    <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 645 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 528 of 1017 PageID 8258
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 644 of 1803 PageID 11390
Case 18-30264-sgj11 Doc 830 Filed 10/25/18 Entered 10/25/18 18:34:06 Page 94 of 229

unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.   Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.   Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.   Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

(a)   William Scott;

(b)   Heather Bestwick;

(c)   Any other Person who may be so named at a later date by the Reorganized Debtor.

---

**Appellee Appx. 00638**

**Appx. 03593**

**007446**

16. <u>Counterclaims</u>. All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

17. <u>Piercing the Corporate Veil</u>. With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor. Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

18. <u>Avoidance Actions</u>. All Avoidance Actions are hereby reserved, retained and preserved as to all Persons. The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

19. <u>Estate Defenses</u>. All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate. This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

20. <u>Equitable Subordination</u>. All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code. Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

21. <u>Recharacterization</u>. All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

**Appellee Appx. 00639**

**007447**

Case 18-30264-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 647 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 530 of 1017 PageID 8260
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 646 of 1803 PageID 11392
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 96 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 48 of 62
Schedule 1 to Exhibit A to
Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| | | Payments within 90 Days of Petition Date | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| | | Payments to Insiders within One Year of Petition Date | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 648 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 531 of 1017   PageID 8261
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 647 of 1803   PageID 11393
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 97 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 49 of 62
Schedule 1 to Exhibit A to
Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Appellee Appx. 00641
Appx. 03506
007449

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 649 of
Case 3:25-cv-02072-S      Document 15-10    Filed 10/06/25    Page 532 of 1017    PageID 8262
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 648 of 1803   PageID 11394
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 98 of 229
Case 18-30264-sgj11 Doc 630 Filed 10/25/18   Entered 10/25/18 16:35:08   Page 90 of 282

# EXHIBIT B

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

### [EXECUTORY CONTRACTS ASSUMED UNDER THE PLAN]

Appellee Appx. 00642

Appx. 03507
007450

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 650 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 533 of 1017 PageID 8263
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 649 of 1803 PageID 11395
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 99 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 51 of 62

**EXHIBIT B**

**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1, Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | March 18, 2013 | $0 |

1

Appellee Appx. 00643
Appx. 03506
007451

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 651 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 534 of 1017 PageID 8264
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 650 of 1803 PageID 11396
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 100 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 52 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Supplemental Indenture | February 26, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Governing Documents<br>(Requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement<br>(requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement<br>(requested from HCM) | -- | $0 |

2

Appellee Appx. 00644
Appx. 03509
007452

Case 18-30264-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 652 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 535 of 1017 PageID 8265
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 651 of 1803 PageID 11397
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 101 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 53 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn: Global Corporate Trust –<br>Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn: Global Corporate Trust –<br>Acis CLO 2013-2 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Governing Document<br>(requested from HCM) | -- | $0 |

3

Appellee Appx. 00645

Appx. 03519

007453

Case 18-30264-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 653 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 536 of 1017 PageID 8266
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 652 of 1803 PageID 11398
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 102 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 54 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-3 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | February 25, 2014 | $0 |

4

Appellee Appx. 00646
Appx. 02514
007454

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 654 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 537 of 1017    PageID 8267
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 653 of 1803   PageID 11399
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 103 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18    Entered 10/25/18 18:23:08    Page 55 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-3 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1 -1102 | Memorandum and Articles of Association of Acis CLO 2014-3 Ltd. | December 24, 2013 | $0 |
| Acis CLO 2014-4 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1 -1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1 -1102 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1 -1102 | Portfolio Management Agreement | June 5, 2014 | $0 |

5

Appellee Appx. 00647
Appx. 03512
007455

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 56 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | June 5, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-4 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Island KY1-1102 | Memorandum and Articles of Association<br>of Acis CLO 2014-4 Ltd. | April 1, 2014 | $0 |
| Acis CLO 2014-5 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | November 18, 2014 | $0 |

6

Appellee Appx. 00648

Appx. 03513

007456

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 656 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 539 of 1017    PageID 8269
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 655 of 1803   PageID 11401
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 105 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | November 18, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-5 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1 -1102 | Memorandum and Articles of Association of Acis CLO 2014-5 Ltd. | August 21, 2014 | $0 |
| Acis CLO 2015-6 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |

7

**Appellee Appx. 00649**
Appx. 03514
**007457**

Case 18-30264-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 657 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 540 of 1017 PageID 8270
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 656 of 1803 PageID 11402
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 106 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 58 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | April 16, 2015 | $0 |
| Acis CLO 2015-6 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Indenture | April 16, 2015 | $0 |

8

Appellee Appx. 00650
Appx. 02515
007458

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 658 of

Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 541 of 1017   PageID 8271

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 657 of 1803   PageID 11403

Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 107 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 59 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd.<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, KY1-1102, Cayman Islands | Memorandum and Articles of Association of Acis CLO 2015-6 Ltd. | February 11, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC<br>P.O. Box. 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |
| Acis CLO Value Master Fund II, LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II (Cayman), L.P.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |

9

Appellee Appx. 00651

Appx. 03516

007459

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 659 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 542 of 1017 PageID 8272
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 658 of 1803 PageID 11404
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 108 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 60 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| BayVK R2 Lux S.A., SICAV FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services<br>Luxembourg Branch<br>60 Avenue John F. Kennedy<br>1855 Luxembourg | Power of Attorney<br>86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Governing Documents<br>(Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement<br>(Requested from HCM) | November 20, 2007 | $0 |

10

Appellee Appx. 00652
Appx. 035457
007460

Case 18-30264-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 660 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 543 of 1017 PageID 8273
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 659 of 1803 PageID 11405
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 109 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd. *c/o* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 20, 2007 | $0 |
| Deutsche Bank Trust Company Americas 1761 East St. Andrew Place Santa Ana, CA 92705 Attn: CDO Business Unit – Hewett's Island CLO 1-R | Indenture | November 20, 2007 | $0 |
| State Street (Guernsey Limited) First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| Acis Loan Funding, Ltd. First Floor, Dorey Court St. Peter Port, Guernsey GY1 6HJ Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |

11

Appellee Appx. 00653
Appx. 02518
007461

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 661 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 544 of 1017 PageID 8274
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 660 of 1803 PageID 11406
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 110 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Capital Management, LP c/o *PHELANLAW* 4214 Woodfin Drive Dallas, Texas 75220 | Amended and Restated Agreement of Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC c/o *PHELANLAW* 4214 Woodfin Drive Dallas, Texas 75220 | Amended and Restated Limited Liability Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1. Acis CLO 2013-1, Ltd.
2. Acis CLO 2013-2, Ltd.
3. Acis CLO 2014-3, Ltd.
4. Acis CLO 2014-4, Ltd.
5. Acis CLO 2014-5, Ltd.
6. Acis CLO 2015-6, Ltd.
7. Acis CLO Value Fund II, L.P.
8. Acis CLO Value Fund II (Cayman), L.P.
9. Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS
11. Hewitt's Island CLO 1-R, Ltd.
12. Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit B.

12

Appellee Appx. 00654
Appx. 02519
007462

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 662 of
Case 3:25-cv-02072-S     Document 15-10     Filed 10/06/25     Page 545 of 1017     PageID 8275
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 661 of 1803   PageID 11407
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 111 of 229

# EXHIBIT "2"

**[First Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 693]**

Appellee Appx. 00655

Appx. 02529

007463

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 663 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 546 of 1017    PageID 8276
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 662 of 1803    PageID 11408
Case 19-30264-sgj11 Doc 839 Filed 01/31/19    Entered 01/31/19 17:34:00    Page 112 of 229
Case 18-30264-sgj11 Doc 835 Filed 01/30/18    Entered 01/30/18 13:03:00    Page 12 of 45

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 CASES |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

## FIRST MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
## ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this First Modification (the "First

Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP

and Acis Capital Management GP, LLC* [Docket No. 660] (the "Plan").

1.    Reference is here made to the Plan for all purposes.  This First Modification

modifies the Plan.

2.    **Modification to Section 1.09.**  Section 1.09 of the Plan is hereby modified to read

**Appellee Appx. 00656**

**007464**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 664 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 547 of 1017    PageID 8277
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 663 of 1803   PageID 11409
Case 19-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 13 of 29

as follows:

    1.09    "Assets" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code.

    3.    The change to section 1.09 above merely corrects a typographical error in the definition of the term "Assets."  Specifically, the revised definition removes the incomplete phrase "Without limiting the foregoing, this shall include all" from the end of the definition of Assets.

    4.    **Modification to Exhibit "A".**  The copy of the Exhibit "A" reflecting Estate Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached hereto as **Exhibit "1."**

    5.    A copy of the document reflecting the modifications to Exhibit A to the Plan in redline format is attached hereto as **Exhibit "2."**

    6.    This First Modification is a non-material change.  It merely corrects a typographical error and revises the Estate Claims being reserved, retained and preserved under the Plan.   Further, even if this First Modification were deemed material, it does not adversely affect any creditor because no ballots have yet been received in relation to the Plan and this First Modification is being sent to all creditors and parties in interest eighteen (18) days in advance of the deadline for parties to submit ballots and any objections to the Plan.  Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this modification prior to voting on the Plan.

Dated:  November 8, 2018.      Respectfully submitted,

           ACIS CAPITAL MANAGEMENT, L.P.

           By:  /s/ *Robin Phelan*
              Robin Phelan
              Chapter 11 Trustee

**Appellee Appx. 00657**
**Appx. 02522**
**007465**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 665 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 548 of 1017 PageID 8278
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 664 of 1803 PageID 11410
Case 18-30264-sgj11 Doc 829 Filed 01/30/18 Entered 01/31/18 17:34:06 Page 114 of 229
Case 18-30264-sgj11 Doc 835 Filed 11/30/18 Entered 11/30/18 13:09:00 Page 3 of 43

ACIS CAPITAL MANAGMENET GP, LLC

By: /s/ *Robin Phelan*
    Robin Phelan
    Chapter 11 Trustee

APPROVED:

/s/ *Jeff P. Prostok*
Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ *Rahkee V. Patel*
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 8, 2018.

        /s/ *Jeff P. Prostok*
        Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\First Modification to Third Amended Plan 11.8.18.docx

**Appellee Appx. 00658**
**Appx. 02523**
**007466**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 666 of
Case 3:25-cv-02072-S      Document 15-10   Filed 10/06/25      Page 549 of 1017   PageID 8279
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 665 of 1803   PageID 11411
Case 18-30264-sgj11 Doc 829 Filed 01/31/19  Entered 01/31/19 17:34:06  Page 115 of 229
Case 18-30264-sgj11 Doc 895 Filed 13/08/18  Entered 13/08/18 13:09:00  Page 4 of 43

# Exhibit "1"

## [Revised Exhibit "A" to the Third Amended Joint Plan]

**Appellee Appx. 00659**

**Appx. 02524**

007467

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 667 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 550 of 1017 PageID 8280
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 666 of 1803 PageID 11412
Case 19-30262-sgj11 Doc 829 Filed 01/31/18 Entered 01/31/18 17:34:00 Page 116 of 229
Case 18-30264-sgj11 Doc 839 Filed 01/31/18 Entered 01/31/18 17:34:00 Page 5 of 43

**EXHIBIT "A"**

**to**

**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.      <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.      <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.      <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

**Appellee Appx. 00660**

**Appx. 02525**

**007468**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 668 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 551 of 1017    PageID 8281
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 667 of 1803    PageID 11413
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 117 of 229
Case 18-30264-sgj11 Doc 835 Filed 01/31/18    Entered 01/31/18 13:09:00    Page 6 of 43

Chapter 11 Trustee or Estate;

      (d)    All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

      (e)    All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

      (f)    All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

      (g)    All Claims for breach of the PMAs or the Indentures;

      (h)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

      (i)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

      (j)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

      (k)    All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

      (l)    All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

      (m)    All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

      (n)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

      (o)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

      (p)    All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 669 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 552 of 1017    PageID 8282
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 668 of 1803    PageID 11414
Case 18-30264-sgj11 Doc 829 Filed 01/31/18    Entered 01/31/18 17:34:00    Page 118 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     HCLOF Claims.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00662
Appx. 03525
007470

(l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Appellee Appx. 00663

Appx. 03528

007471

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 671 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 554 of 1017    PageID 8284
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 670 of 1803    PageID 11416
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:00 Page 120 of 229

Estate;

        (k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

        (l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

        6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

        (a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

        (d)     All Avoidance Actions against Highland CLOM;

        (e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

        (f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

        (g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

        (h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

        (i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00664
Appx. 03529
007472

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 672 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 555 of 1017    PageID 8285
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 671 of 1803    PageID 11417
Case 18-30264-sgj11 Doc 693 Filed 01/30/18    Entered 01/30/18 17:34:06    Page 120 of 28

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.    CLO Holdco, Ltd. Claims. All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary. The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against CLO Holdco;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00665
Appx. 03539
007473

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 673 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 556 of 1017    PageID 8286
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 672 of 1803    PageID 11418
Case 18-30064-sgj11 Doc 893 Filed 01/31/18    Entered 01/31/18 17:34:06    Page 12 of 28

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.    <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Neutra;

(e)    All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Neutra for the unauthorized use of Estate Assets

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 674 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 557 of 1017    PageID 8287
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 673 of 1803    PageID 11419
Case 18-30864-sgj11 Doc 893 Filed 01/04/19    Entered 01/04/19 17:34:06    Page 123 of 229

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

> (j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

> (k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

> (l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

> (m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

> 9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

> (a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

> (b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

> (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

> (d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

> (e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

> (f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

> (g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appellee Appx. 00667
Appx. 03532
007475

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 675 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 558 of 1017   PageID 8288
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 674 of 1803   PageID 11420
Case 18-30064-sgj11 Doc 693 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 124 of 229

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any Highland Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Appellee Appx. 00668
Appx. 03528
007476

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 676 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 559 of 1017    PageID 8289
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 675 of 1803    PageID 11421
Case 18-30264-sgj11 Doc 863 Filed 01/30/18    Entered 01/30/18 17:36:00    Page 15 of 43

(h)     All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 677 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 560 of 1017 PageID 8290
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 676 of 1803 PageID 11422
Case 18-30064-sgj11 Doc 693 Filed 11/30/18 Entered 11/30/18 17:34:00 Page 126 of 259

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

Appellee Appx. 00670
Appx. 03535
007478

(a)     Cole Schotz, P.C.

(b)     Michael D. Warner

(c)     Jacob Frumkin

(d)     Warren A. Usatine

(e)     McKool Smith

(f)     Gary Cruciani

(g)     Michael Fritz

(h)     Carson Young

(i)     Lackey Hershman, LLP

(j)     Stinson Leonard Street LLP

(k)     Paul Lackey, Esq.

(l)     Michael Aigen, Esq.

(m)     Abrams & Bayliss, LLP

(n)     Kevin G. Abrams

(o)     A. Thompson Bayliss

(p)     Jones Day

(q)     Hilda C. Galvan

(r)     Michael Weinberg

(s)     Reid Collins & Tsai, LLP

(t)     Lisa Tsai

(u)     Stanton, LLP

(v)     James M. Stanton

(w)     Hunton Andrews Kurth

(x)     Marc Katz

(y)     Greg Waller

(z)     any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 679 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 562 of 1017    PageID 8292
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 678 of 1803    PageID 11424
Case 18-30664-sgj11 Doc 893 Filed 01/30/19    Entered 01/30/19 17:30:06    Page 12 of 28

16.    <u>Retention of Claims Against Specific Persons or Categories of Persons</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

(a)    William Scott;

(b)    Heather Bestwick;

(c)    Any other Person who may be so named at a later date by the Reorganized Debtor.

17.    <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.    <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.    <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 680 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 563 of 1017    PageID 8293
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 679 of 1803   PageID 11425
Case 18-30264-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 129 of 229

22.    <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Appellee Appx. 00673
Appx. 03538
007481

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 681 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 564 of 1017 PageID 8294
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 680 of 1803 PageID 11426
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 130 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 19 of 45

Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Appellee Appx. 00674

Appx. 03539

007482

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 682 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 565 of 1017 PageID 8295
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 681 of 1803 PageID 11427
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 131 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 20 of 45
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 683 of
Case 3:25-cv-02072-S      Document 15-10      Filed 10/06/25      Page 566 of 1017      PageID 8296
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 682 of 1803   PageID 11428
Case 18-30264-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 132 of 229

# Exhibit "2"
## [Redline – Plan Exhibit "A"]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 684 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 567 of 1017    PageID 8297
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 683 of 1803    PageID 11429
Case 18-30264-sgj11 Doc 829 Filed 01/30/19    Entered 01/30/19 17:34:06    Page 33 of 289
Case 18-30264-sgj11 Doc 693 Filed 11/30/18    Entered 11/30/18 13:03:50    Page 33 of 289

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.    Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.    Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "Estate Claims," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.    Highland Claims.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

---

**Appellee Appx. 00677**
**Appx. 03542**
**007485**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 685 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 568 of 1017 PageID 8298
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 684 of 1803 PageID 11430
Case 18-30064-sgj11 Doc 893 Filed 11/06/18 Entered 01/30/19 17:34:06 Page 34 of 239
Case 18-30064-sgj11 Doc 893 Filed 11/06/18 Entered 11/06/18 13:09:50 Page 35 of 49

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     all claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of

Exhibit "A" to ~~Second~~ Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC

Page 2

Appellee Appx. 00678
Appx. 03543
007486

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 686 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 569 of 1017 PageID 8299
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 685 of 1803 PageID 11431
Case 18-30264-sgj11 Doc 829 Filed 01/30/18 Entered 01/30/18 17:34:06 Page 35 of 289
Case 18-30664-sgj11 Doc 693 Filed 11/30/18 Entered 01/30/18 17:34:06 Page 35 of 239

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00679
Appx. 03544
007487

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 687 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 570 of 1017    PageID 8300
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 686 of 1803   PageID 11432
Case 18-30664-sgj11 Doc 829 Filed 11/26/18   Entered 11/26/18 17:34:20   Page 36 of 29

(l)      All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.      <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland HCF;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                                 Page 4

**Appellee Appx. 00680**
**Appx. 03545**
**007488**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 688 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 571 of 1017   PageID 8301
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 687 of 1803   PageID 11433
Case 18-30064-sgj11 Doc 3693 Filed 01/30/18   Entered 01/30/18 17:34:06   Page 137 of 229

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of
Highland HCF as to any Person, including as against any Affiliates of Highland HCF or
Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control
of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or
abetting any such unlawful act, or assisting, encouraging, and/or participating in any such
unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland
CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit
of the Estate and Reorganized Debtor, including without limitation all such Estate Claims
asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against
Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without
limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the
Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed
to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of
duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of
the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets,
including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363
of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets
owned by the Debtors or Estate, as well as the turnover of any books, documents, records and
papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate
Assets including, without limitation, any intellectual property rights or Assets owned by the
Debtors or Estate;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC
Page 5
Appellee Appx. 00681
Appx. 03546
007489

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 689 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 572 of 1017   PageID 8302
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 688 of 1803   PageID 11434
Case 18-30064-sgj11 Doc 693 Filed 01/30/18   Entered 01/30/18 17:34:00   Page 39 of 289

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 690 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 573 of 1017   PageID 8303
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 689 of 1803   PageID 11435
Case 18-30664-sgj11 Doc 829 Filed 01/30/18   Entered 01/30/18 17:34:06   Page 130 of 289

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      _Neutra, Ltd. Claims_.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

---

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 691 of
Case 3:25-cv-02072-S Document 15-10 1804 10/06/25 Page 574 of 1017 PageID 8304
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 690 of 1803 PageID 11436
Case 18-30964-sgj11 Doc 893 Filed 01/30/18 Entered 01/30/18 13:09:60 Page 29 of 29

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)       All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)       All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)       All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)       All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.       <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)       All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)       All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)       All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)       All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)       All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)       All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)       All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 692 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 575 of 1017   PageID 8305
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 691 of 1803   PageID 11437
Case 18-30664-sgj11 Doc 829 Filed 01/30/18   Entered 01/30/18 13:40:00   Page 140 of 289

(h)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)      All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)      All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against any Highland Affiliate;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Appellee Appx. 00685
Appx. 02559
007493

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 693 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 576 of 1017    PageID 8306
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 692 of 1803    PageID 11438
Case 18-30664-sgj11 Doc 863 Filed 01/30/19    Entered 01/30/18 17:34:06    Page 42 of 89

(h)    All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.    <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.    <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                    Page 10

Appellee Appx. 00686
Appx. 02551
007494

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 694 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 577 of 1017   PageID 8307
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 693 of 1803   PageID 11439
Case 18-30064-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 43 of 289

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.     Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.     Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.     Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                                Page 11

Appellee Appx. 00687
Appx. 02552
007495

(a)     Cole Schotz, P.C.

(b)     Michael D. Warner

(c)     Jacob Frumkin

(d)     Warren A. Usatine

(e)     McKool Smith

(f)     Gary Cruciani

(g)     Michael Fritz

(h)     Carson Young

(i)     Lackey Hershman, LLP

(j)     Stinson Leonard Street LLP

(k)     Paul Lackey, Esq.

(l)     Michael Aigen, Esq.

(m)     Abrams & Bayliss, LLP

(n)     Kevin G. Abrams

(o)     A. Thompson Bayliss

(p)     Jones Day

(q)     Hilda C. Galvan

(r)     Michael Weinberg

(s)     Reid Collins & Tsai, LLP

(t)     Lisa Tsai

(u)     Stanton, LLP

(v)     James M. Stanton

(w)     Hunton Andrews Kurth

(x)     Marc Katz

(y)     Greg Waller

(z)     any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

---

Exhibit "A" to Second Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                    Page 12

**Appellee Appx. 00688**

**007496**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 696 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 579 of 1017   PageID 8309
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 695 of 1803   PageID 11441
Case 18-30064-sgj11 Doc 693 Filed 01/30/19   Entered 01/30/19 17:36:00   Page 45 of 289

15.16.  Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

(a)   William Scott;

(b)   Heather Bestwick;

(c)   Any other Person who may be so named at a later date by the Reorganized Debtor.

16.17.  Counterclaims.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

17.18.  Piercing the Corporate Veil.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

18.19.  Avoidance Actions.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

19.20.  Estate Defenses.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

20.21.  Equitable Subordination.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity

Appellee Appx. 00689
Appx. 02554
007497

interest owners of the Debtors, Highland, or any Affiliates thereof.

21.22.  Recharacterization.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 36 of 45
Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 698 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 581 of 1017 PageID 8311
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 697 of 1803 PageID 11443
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 147 of 229

Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 699 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 582 of 1017 PageID 8312
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 698 of 1803 PageID 11444
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 148 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 37 of 45

**Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

**Schedule 1 to Exhibit "A" to**

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Appellee Appx. 00692
Appx. 03557
007300

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 700 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 583 of 1017    PageID 8313
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 699 of 1803    PageID 11445
Case 18-30264-sgj11 Doc 829 Filed 01/30/19    Entered 01/30/19 17:34:06    Page 149 of 229

# Exhibit "3"
## [Service Lists]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 701 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 584 of 1017   PageID 8314
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 700 of 1803   PageID 11446
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/30/19 17:34:06   Page 150 of 289

## Notice Service List
### Acis Capital Mgmt./Phelan
### #5980

BNP Paribas Securities Services
Luxembourg Branch
60 Avenue John F. Kennedy
1855 Luxembourg

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis Funding GP, Ltd.
Acis Funding L.P.
c/o Maples Corporate Services Limited
P0 Box 309, Ugland House
Grand Cayman, Cayman Islands KY1 -1104

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Robin Phelan, Chapter 11 Trustee
Phelenlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Dallas County
c/o Sherrel K Knighton
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

Acis CLO Value Fund II (Cayman), L.P.
Acis CLO Value Fund II GP, LLC
Acis CLO Value Master Fund II, L.P.
PO Box 309, Ugland House
Grand Cayman, Cayman Islands KY1-1104

CLO Holdco, Ltd.
c/o Intertrust Corp. Srvs. (Cayman) Ltd.
190 Elgin Ave., George Town
Grand Cayman, Cayman Islands KY1-9005

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX  76102

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C.  20530

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

State Street (Guernsey) Limited
First Floor Dorey Court
Admiral Park, St. Peter Port, Guernsey

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

BayVK R2 Lux S.A., SICAV-FIS
15 Rue de Flaxweiler
L-6776 Grevenmacher
Luxembourg

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA  1901-7346

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 702 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 585 of 1017   PageID 8315
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 701 of 1803   PageID 11447
Case 18-30264-sgj11 Doc 829 Filed 01/30/18   Entered 01/30/18 17:34:06   Page 50 of 289

US Bank
PO Box 5229
Cincinnati, OH 45201-5229

Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Acis CLO 2013-1 Ltd.**
**Acis CLO 2013-2**
**c/o Estera Trust (f/k/a Appleby Trust)**
**Clifton House 75 Fort St., P.O. Box 1350**
**Grand Cayman, Cayman Islands KY 1-1108**

**Acis CLO 2014-3 Ltd.**
**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2015-6 Ltd.**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, KY1-1102, Cayman Islands**

Acis CLO 2017-7 Ltd.
c/o MapleFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

**Universal-Investment-Luxembourg S.A.**
**15 Rue de Flaxweiler**
**L-6776 Grevenmacher**
**Luxembourg**

**Hewett's Island CLO I-R, Ltd.**
**c/o Maples Finance Limited**
**PO Box 1093, Queensgate House**
**South Church St., George Town**
**Grand Cayman, Cayman Island KY1-1102**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-1 and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603

Deutsche Bank Trust Company Americas
Attn: CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Andrew Zollinger
DLA Piper LLP
1717 Main St., Suite 4600
Dallas, TX 75201-4629

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Thomas Califano/Shmuel Klahr
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis Loan Funding, Ltd.**
**First Floor, Dorey Court**
**St. Peter Port, Guernsey GYI 6HJ**
**Channel Islands**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 703 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 586 of 1017 PageID 8316
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 702 of 1803 PageID 11448
Case 18-30264-sgj11 Doc 829 Filed 01/30/19 Entered 01/30/19 17:34:06 Page 52 of 28

*Highlands Service List*
*ACIS #5980*

Highland CLO Funding Ltd.
c/o Mark M. Maloney/W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309

**Highland CLO Funding, Ltd.**
**First Floor, Dorey Court**
**Admiral Park, St. Peter Port**
**Guernsey GY1 6HJ, Channel Islands**

**Highland CLO Management, Ltd.**
**P.O. Box 309 Ugland House**
**South Church Street**
**George Town, Grand Cayman KY1-1004**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box, 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Neutra, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Highland CLO Funding, Ltd.
c/o Paul R. Bessette/Rebecca Matsumura
King & Spalding LLP
500 West 2nd St., Suite 1800
Austin, TX 78701-4684

Highland CLO Funding, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**P.O. Box 32311**
**Grand Cayman, KY1-1209**
**Cayman Islands**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

CLO Holdco, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**Suite #4-210 Governor's Square**
**23 Lime Tree Bay Avenue**
**Grand Cayman, Cayman Islands**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

CLO Holdco, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

## Noteholders List

### [Confidential]

Appellee Appx. 00697

007305

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 705 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 588 of 1017   PageID 8318
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 704 of 1803   PageID 11450

Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 154 of 229
Case 18-30264-sgj11 Doc 693 Filed 1/30/19   Entered 01/30/19 17:34:06   Page 54 of 239

**Creditors Service List**
**Acis Capital Mgmt./Phelan**
**#5980**

## Class 2

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

## Class 3

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
P0 Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 706 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 589 of 1017 PageID 8319
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 705 of 1803 PageID 11451
Case 18-30264-sgj11 Doc 829 Filed 01/30/18 Entered 01/30/18 17:34:06 Page 155 of 239

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422-1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Directors – Acis CLO 2013-1 Ltd.
75 Fort St., Clifton House
PO Box 1350
George Town, Grand Cayman
Cayman Island, KY1-1108

Directors – Acis CLO 2014-3 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2014-4 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2014-5 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2015-6 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Acis CLO 2013-1, Ltd.
c/o Appleby Trust, Attn: Directors
Clifton House 75 Fort St., P0 Box 13
Grand Cayman, Cayman Islands KY1-1108

Acis CLO 2013-2 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-3 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-4 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-5 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2015-6 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2017-7 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn: Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 707 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 590 of 1017   PageID 8320
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 706 of 1803   PageID 11452
Case 19-30064-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 156 of 229

## Class 4

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 708 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 591 of 1017   PageID 8321
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 707 of 1803   PageID 11453
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 157 of 229

# EXHIBIT "3"

**[Second Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 702]**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 709 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 592 of 1017    PageID 8322
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 708 of 1803   PageID 11454
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 158 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 0079 8518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | CHAPTER 11 CASES |
| ACIS CAPITAL MANAGEMENT, L.P., ACIS CAPITAL MANAGEMENT GP, LLC, | § § § § | CASE NO. 18-30264-sgj11 (Jointly Administered) |
| Debtors. | § | |

## SECOND MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
## ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this Second Modification (the "First

Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC* [Docket No. 660], as modified by the *First Modification
to the Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP and Acis Capital
Management GP, LLC* [Docket No. 693] (together, the "Plan").

1. Reference is here made to the Plan for all purposes.  This Second Modification

**Appellee Appx. 00702**
**Appx. 03585**
**007310**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 710 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 593 of 1017    PageID 8323
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 709 of 1803    PageID 11455
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 159 of 229

modifies the Plan.

2. **<u>Modification to Exhibit "A"</u>.** The copy of the Exhibit "A" reflecting Estate

Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached

hereto as **Exhibit "1."**

3. A copy of the document reflecting the modifications to Exhibit A to the Plan in

redline format is attached hereto as **Exhibit "2."**

4. This Second Modification is a non-material change. It merely revises the Estate

Claims being reserved, retained and preserved under the Plan. Further, even if this First

Modification were deemed material, it is being sent to all creditors and parties in interest ten (10)

days in advance of the deadline for parties to submit ballots and any objections to the Plan.

Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this

modification prior to voting on the Plan or to change their previous acceptance or rejection upon

consideration of the modification.

Dated: November 16, 2018.          Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By: /s/ *Robin Phelan*
    Robin Phelan
    Chapter 11 Trustee

ACIS CAPITAL MANAGMENET GP, LLC

By: /s/ *Robin Phelan*
    Robin Phelan
    Chapter 11 Trustee

Appellee Appx. 00703
Appx. 03566
007311

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 711 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 594 of 1017    PageID 8324
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 710 of 1803   PageID 11456
Case 19-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06   Page 160 of 229
Case 18-30264-sgj11 Doc 701 Filed 11/16/18   Entered 11/16/18 17:30:35   Page 90 of 92

APPROVED:

*/s/ Jeff P. Prostok*
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

*/s/ Rahkee V. Patel*
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL    COUNSEL    FOR    ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 16, 2018.

*/s/ Jeff P. Prostok*
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Second Modification to Third Amended Plan 11.16.18.docx

**Appellee Appx. 00704**
**Appx. 03509**
**007312**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 712 of
Case 3:25-cv-02072-S      Document 15-10     Filed 10/06/25     Page 595 of 1017     PageID 8325
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 711 of 1803    PageID 11457
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 161 of 229

# Exhibit "1"

## [Revised Exhibit "A" to the Third Amended Joint Plan]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 713 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 596 of 1017   PageID 8326
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 712 of 1803   PageID 11458
Case 18-30264-sgj11 Doc 829 Filed 01/31/18   Entered 01/31/18 17:34:06   Page 162 of 229

**EXHIBIT "A"**
to
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.      Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.      Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "Estate Claims," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.      Highland Claims.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Appellee Appx. 00706
Appx. 03674
007314

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 714 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 597 of 1017    PageID 8327
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 713 of 1803    PageID 11459
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:54:06    Page 163 of 229

Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)    All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)    All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)    All Claims for breach of the PMAs or the Indentures;

(h)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)    All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)    All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)    All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)    All Claims based on alter ego or rights to pierce the corporate veil of

Appellee Appx. 00707
Appx. 03672
007315

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 715 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 598 of 1017   PageID 8328
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 714 of 1803   PageID 11460
Case 18-30264-sgj11 Doc 829 Filed 01/31/18   Entered 01/31/18 17:34:06   Page 164 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00708
Appx. 03673
007316

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 716 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 599 of 1017    PageID 8329
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 715 of 1803   PageID 11461
Case 19-30264-sgj11 Doc 829 Filed 01/31/18   Entered 01/31/18 17:34:06   Page 165 of 229

(l)    All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.    <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland HCF;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Appellee Appx. 00709
Appx. 03574
007317

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 717 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 600 of 1017   PageID 8330
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 716 of 1803   PageID 11462
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 166 of 229

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 718 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 601 of 1017    PageID 8331
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 717 of 1803   PageID 11463
Case 18-30064-sgj11 Doc 792 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 167 of 209

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.    CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 719 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 602 of 1017   PageID 8332
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 718 of 1803   PageID 11464
Case 18-30264-sgj11 Doc 792 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 168 of 289

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 720 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 603 of 1017    PageID 8333
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 719 of 1803    PageID 11465
Case 18-30264-sgj11 Doc 822 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 169 of 229

including, without limitation, any intellectual property rights or Assets owned by the Debtors or
Estate;

        (j)     All Claims, rights or remedies for Equitable Subordination or
Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

        (k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis
LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D.
Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons
otherwise in control of Acis LP;

        (l)     All Claims based on alter ego or rights to pierce the corporate veil of
Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other
officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

        (m)     All Claims for conspiracy to commit any unlawful act, aiding and/or
abetting any such unlawful act, or assisting, encouraging, and/or participating in any such
unlawful act.

      9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims
against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC,
Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-
Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the
Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by
the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-
Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above,
including without limitation the following:

        (a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee
asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts
or transactions alleged in, the Highland Adversary;

        (b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee
asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts
or transactions alleged in, the Trustee's Adversary;

        (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the
Chapter 11 Trustee or Estate;

        (d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture
Trustee;

        (e)     All Claims for breach of the Indentures, PMAs or any other agreements
between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

        (f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed
to the Debtors or Chapter 11 Trustee;

        (g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of
duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 721 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 604 of 1017    PageID 8334
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 720 of 1803    PageID 11466
Case 18-30264-sgj11 Doc 792 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 179 of 229

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates. All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "Affiliates" and each, an "Affiliate") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary. The Estate Claims against such Affiliates shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 722 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 605 of 1017   PageID 8335
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 721 of 1803   PageID 11467
Case 18-30264-sgj11 Doc 792 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 171 of 209

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

**Appellee Appx. 00715**
**Appx. 03589**
**007523**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 723 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 606 of 1017 PageID 8336
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 722 of 1803 PageID 11468
Case 18-30264-sgj11 Doc 792 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 72 of 209

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13. <u>Preference Claims</u>. All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date. A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**. The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code. All rights and remedies are also reserved, retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date. While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee. Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14. <u>Claims Against Officers, Managers and Members</u>. All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy. Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15. <u>Claims Against Former Attorneys and Law Firms</u>. All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 724 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 607 of 1017 PageID 8337
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 723 of 1803 PageID 11469
Case 18-30264-sgj11 Doc 792 Filed 11/16/18 Entered 11/16/18 17:34:06 Page 18 of 209

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the
following:

    (a)    Cole Schotz, P.C.

    (b)    Michael D. Warner

    (c)    Jacob Frumkin

    (d)    Warren A. Usatine

    (e)    McKool Smith

    (f)    Gary Cruciani

    (g)    Michael P. Fritz

    (h)    Carson D. Young

    (i)    Nicholas Matthews

    (j)    Lackey Hershman, LLP

    (k)    Stinson Leonard Street LLP

    (l)    Jamie R. Welton

    (m)    Paul B. Lackey

    (n)    Michael Aigen

    (o)    Roger L. Mandel

    (p)    Abrams & Bayliss, LLP

    (q)    Kevin G. Abrams

    (r)    A. Thompson Bayliss

    (s)    Jones Day

    (t)    Hilda C. Galvan

    (u)    Michael Weinberg

    (v)    Reid Collins & Tsai, LLP

    (w)    Lisa Tsai

    (x)    Stanton, LLP

    (y)    James M. Stanton

Exhibit "A" to Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC

Page 12

**Appellee Appx. 00717**

**Appx. 02582**

**007325**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 725 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 608 of 1017    PageID 8338
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 724 of 1803    PageID 11470
Case 18-30064-sgj11 Doc 792 Filed 01/31/19    Entered 01/31/19 17:34:05    Page 74 of 209

(z)      Hunton Andrews Kurth

(aa)     Marc Katz

(bb)     Greg Waller

(cc)     any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.     <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.</u>  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)      William Scott;

(b)      Heather Bestwick;

(c)      Scott Ellington

(d)      Isaac Leventon

(e)      Jean Paul Sevilla

(f)      Hunter Covitz

(g)      The Dugaboy Investment Trust

(h)      Nancy Dondero, Trustee of the Dugaboy Trust

(i)      Grant Scott

(j)      Any other Person who may be so named at a later date by the Reorganized Debtor.

---

Appellee Appx. 00718
Appx. 03583
007326

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 726 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 609 of 1017    PageID 8339
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 725 of 1803   PageID 11471
Case 18-30064-sgj11 Doc 792 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 75 of 209

17.  <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.  <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.  <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.  <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.  <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.  <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 727 of
Case 3:25-cv-02072-S      Document 15-10     Filed 10/06/25      Page 610 of 1017     PageID 8340
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 726 of 1803   PageID 11472
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 176 of 229
Case 18-90064-sgj11 Doc 701 Filed 11/16/18   Entered 11/16/18 17:34:05   Page 75 of 78

# Exhibit "2"
## [Redline – Plan Exhibit "A"]

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1. <u>Defined Terms</u>. This Exhibit "A" constitutes an integral part of the Plan of which it is a part. Defined terms in the Plan are to be given the same meaning in this Exhibit "A". The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2. <u>Estate Claims Reserved, Retained and Preserved</u>. All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below. In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable. Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3. <u>Highland Claims</u>. All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>"). The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

      (a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

      (b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

      (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

**Appellee Appx. 00721**

**007329**

**Appx. 03586**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 729 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 612 of 1017   PageID 8342
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 728 of 1803   PageID 11474
Case 18-30264-sgj11 Doc 879 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 172 of 229
Case 18-30264-sgj11 Doc 879-1 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 73 of 120

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of

Appellee Appx. 00722
007330

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 730 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 613 of 1017   PageID 8343
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 729 of 1803   PageID 11475
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 179 of 229
Case 18-30264-sgj11 Doc 782 Filed 11/16/18   Entered 11/16/18 17:34:05   Page 29 of 40

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.    <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against HCLOF;

(e)    All Claims for breach of the PMAs or the Indentures;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00723
Appx. 03588
007331

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 731 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 614 of 1017  PageID 8344
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 730 of 1803  PageID 11476
Case 18-30264-sgj11 Doc 820 Filed 01/31/19  Entered 01/31/19 17:34:06  Page 180 of 229
Case 18-30264-sgj11 Doc 792 Filed 12/16/18  Entered 01/16/18 17:34:05  Page 89 of 229

(l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     Highland HCF Advisor, Ltd. Claims.  All Estate Claims against Highland HCF Advisor, Ltd. ("Highland HCF") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Appellee Appx. 00724
007532

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00725

Appx. 02599

007333

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 733 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 616 of 1017   PageID 8346
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 732 of 1803   PageID 11478
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 182 of 229
Case 18-30264-sgj11 Doc 792 Filed 11/16/18   Entered 11/16/18 17:34:05   Page 96 of 229

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.     CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against CLO Holdco;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00726
Appx. 02594
007534

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 734 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 617 of 1017    PageID 8347
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 733 of 1803    PageID 11479
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 182 of 229
Case 18-30264-sgj11 Doc 792 Filed 12/16/18    Entered 12/16/18 17:34:05    Page 36 of 49

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.    <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Neutra;

(e)    All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Neutra for the unauthorized use of Estate Assets

Appellee Appx. 00727
Appx. 03592
007335

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 735 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 618 of 1017    PageID 8348
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 734 of 1803    PageID 11480
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 84 of 229
Case 18-30264-sgj11 Doc 8782 Filed 13/16/23    Entered 13/16/23 17:34:05    Page 84 of 229

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.    Claims against Issuers, Co-Issuers and Indenture Trustee.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)    All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appellee Appx. 00728
Appx. 02593
007536

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 736 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 619 of 1017    PageID 8349
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 735 of 1803    PageID 11481
Case 18-30264-sgj11 Doc 879 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 185 of 229
Case 18-30264-sgj11 Doc 781 Filed 11/16/18    Entered 11/16/18 17:34:05    Page 25 of 40

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    ~~Highland Affiliate~~ Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates. All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "Affiliates" and each, an "Affiliate") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against ~~any~~ such Affiliates ~~of Highland~~ shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any ~~Highland~~ Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any ~~Highland~~ Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any ~~Highland~~ Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appellee Appx. 00729
007537
Appx. 03594

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 737 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 620 of 1017    PageID 8350
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 736 of 1803    PageID 11482
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 186 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/19    Entered 01/16/19 17:34:05    Page 16 of 40

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against any ~~Highland~~ Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against any ~~Highland~~ Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any ~~Highland~~ Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, ~~or any~~the Affiliates ~~thereof~~, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of any ~~Highland~~ Affiliate as to any Person, including as against ~~any other~~Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates ~~of Highland~~, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any ~~Highland~~ Affiliates; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.    <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.    <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due

Appellee Appx. 00730
Appx. 02595
007538

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 738 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 621 of 1017   PageID 8351
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 737 of 1803   PageID 11483
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 197 of 229
Case 18-30264-sgj11 Doc 829-1 Filed 01/16/18   Entered 01/16/19 17:34:05   Page 197 of 209

care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.     Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved, retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.     Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.     Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims

Appellee Appx. 00731
Appx 03506
007539

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 739 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 622 of 1017 PageID 8352
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 738 of 1803 PageID 11484
Case 18-30264-sgj11 Doc 820 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 102 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/19 Entered 01/16/19 17:34:05 Page 98 of 229

for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

  (a)  Cole Schotz, P.C.

  (b)  Michael D. Warner

  (c)  Jacob Frumkin

  (d)  Warren A. Usatine

  (e)  McKool Smith

  (f)  Gary Cruciani

  (g)  Michael P. Fritz

  (h)  Carson D. Young

  (i)  Nicholas Matthews

  (i)(j)  Lackey Hershman, LLP

  (j)(k)  Stinson Leonard Street LLP

  (l)  Jamie R. Welton

  (k)(m)  Paul B. Lackey, Esq.

  (l)(n)  Michael Aigen, Esq.

  (o)  Roger L. Mandel

  (m)(p)  Abrams & Bayliss, LLP

  (n)(q)  Kevin G. Abrams

  (o)(r)  A. Thompson Bayliss

  (p)(s)  Jones Day

  (q)(t)  Hilda C. Galvan

  (r)(u)  Michael Weinberg

  (s)(v)  Reid Collins & Tsai, LLP

  (t)(w)  Lisa Tsai

  (u)(x)  Stanton, LLP

Appellee Appx. 00732
Appx. 03595
007340

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22     Entered 08/15/22 16:45:41     Page 740 of
Case 3:25-cv-02072-S     Document 15-10     Filed 10/06/25     Page 623 of 1017     PageID 8353
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 739 of 1803   PageID 11485
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 189 of 229
Case 18-30264-sgj11 Doc 761 Filed 11/16/18   Entered 11/16/18 17:34:05   Page 92 of 140

(v)(y)  James M. Stanton

(w)(z)  Hunton Andrews Kurth

(x)(aa)  Marc Katz

(y)(bb)  Greg Waller

(z)(cc)  any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.    ~~Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:~~

16.    Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)    William Scott;

(b)    Heather Bestwick;

(c)    Scott Ellington

(d)    Isaac Leventon

(e)    Jean Paul Sevilla

(f)    Hunter Covitz

(g)    The Dugaboy Investment Trust

(h)    Nancy Dondero, Trustee of the Dugaboy Trust

(i)    Grant Scott

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 741 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 624 of 1017 PageID 8354
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 740 of 1803 PageID 11486
Case 18-30264-sgj11 Doc 820 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 100 of 229
Case 18-30264-sgj11 Doc 782 Filed 11/16/18 Entered 11/16/18 17:34:05 Page 99 of 229

(j)     Any other Person who may be so named at a later date by the Reorganized Debtor.

(c)

17.    <u>Counterclaims</u>. All Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.    <u>Piercing the Corporate Veil</u>. With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor. Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.    <u>Avoidance Actions</u>. All Avoidance Actions are hereby reserved, retained and preserved as to all Persons. The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    <u>Estate Defenses</u>. All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate. This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    <u>Equitable Subordination</u>. All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code. Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.    <u>Recharacterization</u>. All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Appellee Appx. 00734
Appx. 03699
007342

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 742 of
Case 3:25-cv-02072-S      Document 15-10      Filed 10/06/25      Page 625 of 1017      PageID 8355
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 741 of 1803   PageID 11487
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 191 of 289
Case 18-30264-sgj11 Doc 68 Filed 01/16/18   Entered 01/16/18 17:34:05   Page 94 of 209

# Exhibit "3"
## [Service Lists]

**Appellee Appx. 00735**

**Appx. 03609**

007343

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 743 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 626 of 1017 PageID 8356
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 742 of 1803 PageID 11488
Case 18-30264-sgj11 Doc 792 Filed 01/31/18 Entered 01/31/18 17:34:06 Page 93 of 209

**Notice Service List**
**Acis Capital Mgmt./Phelan**
**#5980**

**BNP Paribas Securities Services**
**Luxembourg Branch**
**60 Avenue John F. Kennedy**
**1855 Luxembourg**

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

**Acis Funding GP, Ltd.**
**Acis Funding L.P.**
**c/o Maples Corporate Services Limited**
**P0 Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1 -1104**

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Robin Phelan, Chapter 11 Trustee
Phelanlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Dallas County
c/o Sherrel K Knighton
Linebarger, Goggan, Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

**Acis CLO Value Fund II (Cayman), L.P.**
**Acis CLO Value Fund II GP, LLC**
**Acis CLO Value Master Fund II, L.P.**
**PO Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1-1104**

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX 76102

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C. 20530

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

**State Street (Guernsey) Limited**
**First Floor Dorey Court**
**Admiral Park, St. Peter Port, Guernsey**
**Channel Islands GYI 6HJ**

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

**Acis Loan Funding, Ltd.**
**First Floor, Dorey Court**
**St. Peter Port, Guernsey**

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA 1901-7346

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 744 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 627 of 1017 PageID 8357
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 743 of 1803 PageID 11489
Case 18-30264-sgj11 Doc 820 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 98 of 229

US Bank
PO Box 5229
Cincinnati, OH 45201-5229

Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Acis CLO 2013-1 Ltd.**
**Acis CLO 2013-2**
**c/o Estera Trust (f/k/a Appleby Trust)**
**Clifton House 75 Port St., P.O. Box 1350**
**Grand Cayman, Cayman Islands KY 1-1108**

**Acis CLO 2014-3 Ltd.**
**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Hewett's Island CLO I-R, Ltd.**
**c/o Maples Finance Limited**
**PO Box 1093, Queensgate House**
**South Church St., George Town**
**Grand Cayman, Cayman Island KY1-1102**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-1 and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603

Deutsche Bank Trust Company Americas
Attn: CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Acis CLO 2015-6 Ltd.**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102,**

Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2017-7 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Appellee Appx. 00737
Appx 03692
007345

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 745 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 628 of 1017 PageID 8358
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 744 of 1803 PageID 11490
Case 18-30264-sgj11 Doc 820 Filed 01/31/18 Entered 01/31/18 17:34:05 Page 94 of 229

*Highlands Service List*
*ACIS #5980*

Highland CLO Funding Ltd.
c/o Mark M. Maloney/W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309

**Highland CLO Funding, Ltd.**
**First Floor, Dorey Court**
**Admiral Park, St. Peter Port**
**Guernsey GY1 6HJ, Channel Islands**

**Highland CLO Management, Ltd.**
**P.O. Box 309 Ugland House**
**South Church Street**
**George Town, Grand Cayman KY1-1004**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Neutra, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Highland CLO Funding, Ltd.
c/o Paul R. Bessette/Rebecca Matsumura
King & Spalding LLP
500 West 2nd St., Suite 1800
Austin, TX 78701-4684

Highland CLO Funding, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**P.O. Box 32311**
**Grand Cayman, KY1-1209**
**Cayman Islands**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

CLO Holdco, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**Suite #4-210 Governor's Square**
**23 Lime Tree Bay Avenue**
**Grand Cayman, Cayman Islands**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

CLO Holdco, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 746 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 629 of 1017   PageID 8359
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 745 of 1803   PageID 11491
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 195 of 229

### Creditors Service List
### Acis Capital Mgmt./Phelan
### #5980

## Class 2

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

## Class 3

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
PO Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 747 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 630 of 1017    PageID 8360
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 746 of 1803   PageID 11492
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:05   Page 96 of 229

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Directors – Acis CLO 2013-1 Ltd.
75 Fort St., Clifton House
PO Box 1350
George Town, Grand Cayman
Cayman Island, KY1-1108

Directors – Acis CLO 2014-3 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2014-4 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2014-5 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2015-6 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Acis CLO 2013-1, Ltd.
c/o Appleby Trust, Attn: Directors
Clifton House 75 Fort St., P0 Box 13
Grand Cayman, Cayman Islands KY1-1108

Acis CLO 2013-2 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-3 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-4 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-5 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2015-6 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

Acis CLO 2017-7 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn:  Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 748 of
1804
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 631 of 1017 PageID 8361
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 747 of 1803 PageID 11493
Case 18-30264-sgj11 Doc 879 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 197 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/19 Entered 01/16/19 17:34:05 Page 47 of 49

## Class 4

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 749 of
Case 3:25-cv-02072-S     Document 15-10     Filed 10/06/25     Page 632 of 1017     PageID 8362
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 748 of 1803   PageID 11494
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 198 of 229

# EXHIBIT "4"

**[Supplement to Second Modification to the Third Amended
Joint Plan for Acis Capital Management, L.P. and Acis Capital
Management GP, LLC – Dkt. No. 769]**

**Appellee Appx. 00742**

**Appx. 03607**

007350

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 750 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 633 of 1017   PageID 8363
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 749 of 1803   PageID 11495
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 13:34:06   Page 199 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 CASES |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

**SUPPLEMENT TO SECOND MODIFICATION TO THE THIRD AMENDED JOINT
PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND
ACIS CAPITAL MANAGEMENT GP, LLC**

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this Supplement to the Second

Modification (the "Second Modification") to the *Third Amended Joint Chapter 11 Plan for Acis*

*Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 660], as modified

by the *First Modification to the Third Amended Joint Chapter 11 Plan for Acis Capital*

*Management, LP and Acis Capital Management GP, LLC* [Docket No. 693] (together, the "Plan").

Appellee Appx. 00743
Appx. 03608
007351

1.      On November 16, 2018, the Trustee filed the Second Modification.  The Second Modification modified the Plan to replace the Exhibit "A," reflecting Estate Claims, with a revised version of Exhibit A.  The Schedule "1" to Exhibit A, which reflects the Estate's Preference Claims, was not changed from the version attached to the Plan but was inadvertently omitted from the Second Modification.  For completeness and to avoid any confusion regarding the Preference Claims being reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, the Second Modification is hereby supplemented with the Schedule "1" to Exhibit "A" to the Plan.

2.      A copy of the Schedule "1" is attached hereto as **Exhibit 1**.

3.      A copy of the complete Exhibit "A" to the Plan, including Schedule "1," is attached hereto as **Exhibit "2."**

4.      A redline is not necessary because the attached Schedule "1" is unchanged from the version attached to the Plan and included in the Trustee's solicitation materials.

Dated:  December 10, 2018.                Respectfully submitted,

                                         ACIS CAPITAL MANAGEMENT, L.P.

                                         By:  /s/ *Robin Phelan*
                                              Robin Phelan
                                              Chapter 11 Trustee

                                         ACIS CAPITAL MANAGMENET GP, LLC

                                         By:  /s/ *Robin Phelan*
                                              Robin Phelan
                                              Chapter 11 Trustee

Appellee Appx. 00744

Appx. 03609

007552

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 752 of

Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 635 of 1017    PageID 8365

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 751 of 1803   PageID 11497

Case 18-30264-sgj11 Doc 826 Filed 12/10/18   Entered 01/31/19 17:34:06   Page 201 of 229
Case 18-30264-sgj11 Doc 826 Filed 12/10/18   Entered 01/31/19 17:34:06   Page 3 of 23

APPROVED:

/s/ *Jeff P. Prostok*
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ *Rahkee V. Patel*
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL   COUNSEL   FOR   ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system on December 10, 2018.

/s/ *Jeff P. Prostok*
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Supplement to Second Modification to Third Amended Plan 12.10.18.docx

Page 3 of 3

Appellee Appx. 00745

Appx. 03619

007353

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 753 of
Case 3:25-cv-02072-S     Document 15-10     Filed 10/06/25     Page 636 of 1017     PageID 8366
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 752 of 1803   PageID 11498
Case 19-30264-sgj11 Doc 828 Filed 01/31/09 Entered 01/31/09 17:34:06 Page 202 of 229

# EXHIBIT "1"

Schedule "1" to Exhibit "A" to
Third Amended Plan

**Appellee Appx. 00746**

**Appx. 03614**

007554

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 754 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 637 of 1017    PageID 8367
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 753 of 1803   PageID 11499
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 203 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18   Entered 12/10/18 15:10:10   Page 5 of 23

Schedule 1 to Exhibit "A" to

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 755 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 638 of 1017 PageID 8368
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 754 of 1803 PageID 11500
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 204 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18 Entered 12/10/18 15:10:10 Page 6 of 23
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|----------------------------------|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Appellee Appx. 00748
Appx. 03613
007356

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 756 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 639 of 1017 PageID 8369
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 755 of 1803 PageID 11501
Case 19-30264-sgj11 Doc 829-5 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 205 of 229

# EXHIBIT "2"

[Exhibit "A" to Third Amended Plan
as Supplemented]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 757 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 640 of 1017   PageID 8370
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 756 of 1803   PageID 11502
Case 19-30826-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:54:06   Page 206 of 229
Case 18-30264-sgj11 Doc 765 Filed 12/10/18   Entered 12/10/18 18:40:10   Page 5 of 23

**EXHIBIT "A"**
to
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.      Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.      Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "Estate Claims," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.      Highland Claims.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

        (a)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Appellee Appx. 00750
Appx. 03615
007558

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 758 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 641 of 1017 PageID 8371
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 757 of 1803 PageID 11503
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 207 of 229
Case 18-30264-sgj11 Doc 765 Filed 12/10/18 Entered 12/10/18 18:40:10 Page 9 of 23

Chapter 11 Trustee or Estate;

(d) All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e) All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f) All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g) All Claims for breach of the PMAs or the Indentures;

(h) All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i) All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j) All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k) All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l) All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m) All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n) All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o) All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p) All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 759 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 642 of 1017    PageID 8372
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 758 of 1803    PageID 11504
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 208 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.    HCLOF Claims.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against HCLOF;

(e)    All Claims for breach of the PMAs or the Indentures;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 760 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 643 of 1017    PageID 8373
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 759 of 1803    PageID 11505
Case 18-30264-sgj11 Doc 789 Filed 12/10/18    Entered 12/10/18 15:40:00    Page 209 of 229

     (l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

     (m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

     5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

     (a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

     (b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

     (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

     (d)     All Avoidance Actions against Highland HCF;

     (e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

     (f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

     (g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

     (h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

     (i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

     (j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Appellee Appx. 00753
Appx. 02618
007561

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 761 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 644 of 1017 PageID 8374
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 760 of 1803 PageID 11506
Case 18-30264-sgj11 Doc 785 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 219 of 229

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00754
Appx. 02619
007362

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 762 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 645 of 1017   PageID 8375
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 761 of 1803   PageID 11507
Case 18-30264-sgj11 Doc 795 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 211 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00755
Appx. 02629
007563

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 763 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 646 of 1017   PageID 8376
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 762 of 1803   PageID 11508
Case 18-30264-sgj11 Doc 795 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 212 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 764 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 647 of 1017    PageID 8377
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 763 of 1803    PageID 11509
Case 18-30064-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 218 of 229

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.    Claims against Issuers, Co-Issuers and Indenture Trustee.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)    All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appellee Appx. 00757
Appx. 02622
007565

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 765 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 648 of 1017    PageID 8378
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 764 of 1803    PageID 11510
Case 18-30064-sgj11 Doc 820 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 214 of 229

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    <u>Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "<u>Affiliates</u>" and each, an "<u>Affiliate</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against such Affiliates shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of

Appellee Appx. 00758
Appx. 02623
007366

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 766 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 649 of 1017   PageID 8379
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 765 of 1803   PageID 11511
Case 18-30864-sgj11 Doc 785 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 215 of 229

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 767 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 650 of 1017    PageID 8380
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 766 of 1803    PageID 11512
Case 18-30264-sgj11 Doc 795 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 216 of 229

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.  Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved, retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.  Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.  Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which

**Appellee Appx. 00760**
**Appx. 02625**
**007368**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 768 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 651 of 1017 PageID 8381
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 767 of 1803 PageID 11513
Case 18-30264-sgj11 Doc 785 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 217 of 229

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the
following:

|     |     |
|-----|-----|
| (a) | Cole Schotz, P.C. |
| (b) | Michael D. Warner |
| (c) | Jacob Frumkin |
| (d) | Warren A. Usatine |
| (e) | McKool Smith |
| (f) | Gary Cruciani |
| (g) | Michael P. Fritz |
| (h) | Carson D. Young |
| (i) | Nicholas Matthews |
| (j) | Lackey Hershman, LLP |
| (k) | Stinson Leonard Street LLP |
| (l) | Jamie R. Welton |
| (m) | Paul B. Lackey |
| (n) | Michael Aigen |
| (o) | Roger L. Mandel |
| (p) | Abrams & Bayliss, LLP |
| (q) | Kevin G. Abrams |
| (r) | A. Thompson Bayliss |
| (s) | Jones Day |
| (t) | Hilda C. Galvan |
| (u) | Michael Weinberg |
| (v) | Reid Collins & Tsai, LLP |
| (w) | Lisa Tsai |
| (x) | Stanton, LLP |
| (y) | James M. Stanton |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 769 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 652 of 1017    PageID 8382
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 768 of 1803    PageID 11514
Case 18-30064-sgj11 Doc 795 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 218 of 229

     (z)    Hunton Andrews Kurth

     (aa)   Marc Katz

     (bb)   Greg Waller

     (cc)   any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.    <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

     (a)    William Scott;

     (b)    Heather Bestwick;

     (c)    Scott Ellington

     (d)    Isaac Leventon

     (e)    Jean Paul Sevilla

     (f)    Hunter Covitz

     (g)    The Dugaboy Investment Trust

     (h)    Nancy Dondero, Trustee of the Dugaboy Trust

     (i)    Grant Scott

     (j)    Any other Person who may be so named at a later date by the Reorganized Debtor.

---

Appellee Appx. 00762
Appx. 03627
007370

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 770 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 653 of 1017    PageID 8383
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 769 of 1803    PageID 11515
Case 18-30264-sgj11 Doc 789 Filed 12/10/18    Entered 12/10/18 17:34:00    Page 219 of 229

17.    <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.    <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.    <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.    <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 771 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 654 of 1017 PageID 8384
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 770 of 1803 PageID 11516
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 220 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18 Entered 12/10/18 15:10:10 Page 22 of 23

Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|----------------------------------|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Appellee Appx. 00764

Appx. 03629

007372

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 772 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 655 of 1017 PageID 8385
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 771 of 1803 PageID 11517
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 221 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18 Entered 12/10/18 15:10:10 Page 23 of 23
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|--------------------------------|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 773 of
Case 3:25-cv-02072-S      Document 15-10    Filed 10/06/25      Page 656 of 1017      PageID 8386
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 772 of 1803   PageID 11518
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 222 of 229

# EXHIBIT "5"

**[Executory Contracts and Unexpired Leases to be
Assumed by the Trustee]**

Appellee Appx. 00766

Appx. 03631
007374

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A. 601 Travis Street, 16th Floor Houston, Texas 77002 Attn:  Global Corporate Trust – Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |

1

**Appellee Appx. 00767**

**Appx. 03632**

**007575**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 775 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 658 of 1017    PageID 8388
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 774 of 1803    PageID 11520
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 224 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | November 18, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |

2

Appellee Appx. 00768

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 776 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 659 of 1017 PageID 8389
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 775 of 1803 PageID 11521
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 225 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC<br>P.O. Box. 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |

3

Appellee Appx. 00769
Appx. 03834
007377

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 777 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 660 of 1017    PageID 8390
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 776 of 1803   PageID 11522
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 226 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO Value Master Fund II, LP. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II (Cayman), L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd. 300 Crescent Court Suite 700 Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| BayVK R2 Lux S.A., SICAV FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services Luxembourg Branch 60 Avenue John F. Kennedy 1855 Luxembourg | Power of Attorney 86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd. c/o Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |

4

Appellee Appx. 00770
Appx. 03835
007578

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 778 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 661 of 1017 PageID 8391
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 777 of 1803 PageID 11523
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 227 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd. *c/o* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Governing Documents (Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd. *c/o* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd. *c/o* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement (Requested from HCM) | November 20, 2007 | $0 |
| State Street (Guernsey Limited) First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |

5

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Loan Funding, Ltd.<br>First Floor, Dorey Court<br>St. Peter Port, Guernsey GYI 6HJ<br>Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |
| Acis Capital Management, LP<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Agreement of<br>Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Limited Liability<br>Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1. Acis CLO 2013-1, Ltd.
2. Acis CLO 2013-2, Ltd.
3. Acis CLO 2014-3, Ltd.
4. Acis CLO 2014-4, Ltd.
5. Acis CLO 2014-5, Ltd.
6. Acis CLO 2015-6, Ltd.
7. Acis CLO Value Fund II, L.P.
8. Acis CLO Value Fund II (Cayman), L.P.
9. Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS

6

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

11. Hewitt's Island CLO 1-R, Ltd.

12. Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit 5.

7

Appellee Appx. 00773

Appx. 03638

007581

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 781 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 664 of 1017    PageID 8394
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 780 of 1803  PageID 11526

# APPENDIX 9

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 782 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 665 of 1017 PageID 8395
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 781 of 1803 PageID 11527

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| NEUTRA, LTD., et al., | § § § | Civil Action No. 3:18-CV-1056-D (Consolidated with Civil Action Nos. 3:18-CV-1057-D, 3:18-CV-1073-D, and 3:18-CV-1084-D) |
| Appellants, | § § | |
| VS. | § § § | (Bank. Ct. Nos. 18-30264-SGJ-7; 18-30265-SGJ-7) |
| JOSHUA N. TERRY, et al., | § § | |
| Appellees. | § | |
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| HIGHLAND CLO FUNDING, LTD., et al., | § § § | Civil Action No. 3:18-CV-1822-D (Bank. Ct. Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11) |
| Appellants, | § § | |
| VS. | § § | |
| ROBIN PHELAN, CHAPTER 11 TRUSTEE, et al., | § § § | |
| Appellees. | § | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 783 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 666 of 1017 PageID 8396
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 782 of 1803 PageID 11528
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 2 of 84 PageID 97995

| | | |
|---|---|---|
| IN RE ACIS CAPITAL | § | |
| MANAGEMENT, L.P., et al., | § | |
| | § | |
| Debtors. | § | |
| | § | Civil Action No. 3:19-CV-0291-D |
| HIGHLAND CAPITAL | § | (Bank. Ct. Nos. 18-30264-SGJ-11 and |
| MANAGEMENT, L.P., et al., | § | 18-30265-SGJ-11) |
| | § | |
| Appellants, | § | |
| | § | |
| VS. | § | |
| | § | |
| ROBIN PHELAN, CHAPTER 11 | § | |
| TRUSTEE, et al., | § | |
| | § | |
| Appellees. | § | |

APPEALS FROM THE
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

FITZWATER, Senior Judge:

In multiple appeals taken from two involuntary bankruptcy cases, the principal

questions presented are whether the bankruptcy court erred by issuing orders for relief and

denying the debtors' motion to dismiss or compel arbitration; whether the bankruptcy court

erred by approving a seven-figure break-up fee in favor of a potential transaction partner; and

whether the bankruptcy court erred by confirming a reorganization plan ("the Plan") that

enjoins a non-debtor, non-creditor entity from exercising certain contractual rights. The

court must also decide questions of the bankruptcy court's subject matter jurisdiction and of

one appellant's standing to appeal. For the reasons that follow, the court DISMISSES the

appeal from the orders for relief, AFFIRMS the break-up fee order, and AFFIRMS the order

- 2 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 784 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 667 of 1017 PageID 8397
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 783 of 1803 PageID 11529
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 3 of 84 PageID 97996

approving the Plan. The court need not address the bankruptcy court's denial of the motion to dismiss.

I

The following factual summary is based on the bankruptcy court's findings of fact in support of the orders for relief and the Plan confirmation order. *See In re Acis Capital Mgmt., L.P.* (*Acis II*), 2019 WL 417149, at *2-7 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.) (confirmation order); *In re Acis Capital Mgmt., L.P.* (*Acis I*), 584 B.R. 115, 119-42 (Bankr. N.D. Tex. 2018) (Jernigan, J.) (orders for relief).[1]

A

Appellant Highland Capital Management, L.P. ("Highland") is a Dallas-based registered investment advisor that manages nearly $15 billion of assets through an organizational structure comprised of roughly 2,000 different entities. Its investment vehicles include mutual funds, private equity funds, and (relevant here) collateralized loan obligation funds ("CLOs"). Highland conducted its CLO business through an entity called Acis Capital Management, L.P. ("Acis LP") and Acis LP's general partner, Acis Capital Management GP, L.L.C. ("Acis GP") (collectively, "Acis," unless otherwise indicated), both debtors in these appeals.

In 2005 Highland hired appellee Joshua Terry ("Terry") as a portfolio analyst. Terry

---

[1]"The court reviews the bankruptcy court's . . . fact findings only for clear error." *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000) (Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)).

- 3 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 785 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 668 of 1017 PageID 8398
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 784 of 1803 PageID 11530
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 4 of 84 PageID 97997

rose through the ranks at Highland until he became the portfolio manager for Highland's

CLO business, and, in turn, received a 25% limited partnership interest in Acis LP. Terry

successfully managed billions of dollars of assets on Highland's behalf until June 2016, when

Highland terminated him. The reason for Terry's termination is disputed.[2] As a result of the

termination, Terry's partnership interest in Acis LP was deemed forfeited without

compensation.

In September 2016 Highland sued Terry in the 162nd Judicial District Court of Dallas

County, seeking to recover, *inter alia*, on theories of breach of fiduciary duty, disparagement,

and breach of contract. Terry asserted counterclaims against Highland, Acis, and others, and

demanded arbitration. The state court stayed the proceeding and ordered arbitration, and in

October 2017 the arbitration panel rendered an award in Terry's favor for $7,949,749.15,

plus post-judgment interest, against Acis ("the Award"). Terry sought and obtained

confirmation of the Award in the 44th Judicial District Court of Dallas County.

After the Award was confirmed, Terry began conducting post-judgment discovery,

which revealed some transactions that appeared suspicious to Terry. Terry thought that

Highland was denuding Acis of assets in an effort to make Acis judgment-proof. At a

January 24, 2018 hearing, Terry requested a temporary restraining order ("TRO") to restrain

---

[2]According to the bankruptcy court, "[t]he arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors." *Acis II*, 2019 WL 417149, at *14; *see also* P. 1st Supp. to Pet. to Confirm Arbitration Award Exh. 1, No. DC-17-15244 (44th Dist. Ct., Dall. Cty., Tex. filed Nov. 13, 2017).

Appellee Appx. 00778
Appx. 03563
007586

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 786 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 669 of 1017   PageID 8399
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 785 of 1803   PageID 11531
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 5 of 84   PageID 97998

Acis LP from transferring any more assets pending a January 31 temporary injunction hearing.  Acis LP agreed to the request, and the court issued a TRO.  Five days later, Terry filed supplemental pleadings alleging that Acis LP was engaging in more wrongdoing, and requested appointment of a receiver.  Instead of proceeding with the January 31 state-court hearing, however, Terry took a different tack.  At 11:57 p.m. the night before the hearing, Terry filed involuntary bankruptcy petitions against both Acis LP and Acis GP.[3]

B

To comprehend some of the key issues in these appeals, it is helpful to recount some of the fundamentals of CLOs and how Highland structured its CLO business.

At the most basic level, a CLO is a "basket of loans."  *Acis I*, 584 B.R. at 123.  A special-purpose CLO entity ("CLO-SPE") purchases variable-rate commercial loans at the direction of the CLO manager, and collects them into a pool of loans.  The obligors of the loans are usually large, well-known companies.  Investors, such as pension funds, life insurance companies, and others, buy into the CLO by purchasing fixed-rate, secured notes on which the CLO-SPE itself is the obligor.  These notes are typically sold in tranches representing different levels of risk.  The CLO-SPE pays its obligations on the secured notes using the income it receives from its pool of loans, starting with the top tranche of notes and then proceeding through the lower tranches.  These payments are made according to the terms of certain indenture agreements between the CLO-SPE and the indenture trustee (here,

---

[3] The bankruptcy court administratively consolidated the two cases, appointed a single trustee, and ultimately confirmed one Plan applicable to both alleged debtors.

- 5 -

Appellee Appx. 00779
Appx. 03544
007587

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 787 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 670 of 1017    PageID 8400
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 786 of 1803    PageID 11532
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 6 of 84    PageID 97999

U.S. Bank, N.A.) to whom the CLO-SPE pledges collateral to secure the notes.

The last investor to be paid is the "equity" holder, who does not own actual equity but instead holds a subordinated, unsecured note.  The equity investor earns money when the variable interest rates paid to the CLO-SPE on the commercial loans exceed the fixed interest rates that the CLO-SPE must pay to the secured note holders.  Although the equity investor assumes the most risk, it also possesses certain rights that allow it to control the CLO—most significantly, the right to call for an optional redemption of the CLO.[4]  When an optional redemption is effected, the CLO's pool of loans is liquidated and the resulting cash is used to pay back the outstanding secured notes, beginning with the top tranche and proceeding downward.[5]

In the present cases, Acis LP acts as the portfolio manager—*not* as the equity holder—of four CLO-SPEs, and is contractually entitled to receive portfolio management fees from them.  Appellant Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey[6] entity formerly known as Acis Loan Funding, Ltd.,[7] is the primary equity investor in the CLOs.

_____

[4]It is disputed whether the equity holder in this case had the right to compel Acis LP to effect an optional redemption of the relevant CLOs against Acis LP's will.  The court need not resolve this dispute and therefore suggests no view on this question.

[5]The holders of the top tranche of secured notes also have special rights—namely, the right to terminate the CLO manager for cause on 45 days' notice.  The note holders in these cases have so far not exercised that right.

[6]Guernsey is a small island nation located in the English Channel.

[7]For clarity, the court will refer to this entity as HCLOF, even when describing events that occurred before the entity changed its name.

- 6 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 788 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 671 of 1017    PageID 8401
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 787 of 1803    PageID 11533
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 7 of 84    PageID 98000

HCLOF does not own Acis; to the contrary, Acis LP once owned an indirect 15% stake in HCLOF for regulatory compliance reasons. Acis itself has never had any employees. Instead, it subcontracts all front office advising and back office support services to another entity. Highland was originally Acis LP's subcontractor, but, under the Plan, an entity called Brigade Capital Management, L.P. ("Brigade") fills that role (for a much lower cost).

Historically, all of these entities—Acis LP, Highland, HCLOF, and the CLO-SPEs—operated within an ecosystem of contracts that allowed Acis to manage the CLOs effectively. First, Acis LP had various fee-generating portfolio management agreements ("PMAs") with the CLO-SPEs . These contracts remain in place under the Plan. Second, Acis LP and Highland had a sub-advisory agreement, which obligated Highland to provide advisory and management services in exchange for substantial fees. Third, Acis LP and Highland had a shared services agreement, through which Highland provided back office services to Acis for a significant fee. And, fourth, Acis LP had a separate PMA with HCLOF ("the Equity PMA"). While the parties dispute the exact effect of the Equity PMA—i.e., to whom it gave power over whom—it is undisputed that Acis LP earned no fees from this contract.

C

Circumstances changed after the state-court litigation between Highland and Terry began. As noted above, Highland and Acis LP engaged in numerous transactions that caused Terry to believe "that Highland was dismantling and denuding Acis LP of all of its assets and value." *Acis I*, 584 B.R. at 144. In October 2017, four days after Terry obtained the Award,

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 789 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 672 of 1017 PageID 8402
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 788 of 1803 PageID 11534
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 8 of 84 PageID 98001

Acis LP sold its stake in HCLOF back to HCLOF in exchange for about $990,000 in cash.

As a result, Acis LP could no longer lawfully manage any new CLOs under the applicable

regulatory scheme. Three days later, HCLOF entered into a new PMA—a replacement for

the Equity PMA—with a recently-formed Cayman Islands entity called Highland HCF

Advisor, Ltd. At around the same time, Acis LP terminated the original Equity PMA. In

early November 2017, Acis LP transferred one of its most significant assets—a $9.5 million

note receivable that Highland owed to it—to another Cayman Islands entity, Highland CLO

Management, Ltd. ("Highland Management"). Acis LP transferred the note pursuant to a

contract that provided that Highland Management would step into Acis LP's shoes as the

portfolio manager for the CLOs. Highland Management also promised to reimburse Acis LP

for up to $2 million of future legal fees and up to $1 million of future administrative

expenses. One day after the Award was confirmed, Acis LP transferred away "the vehicle

that can most easily be described as the Acis LP 'risk retention structure' (necessitated by

[the] federal Dodd Frank law)" to Highland CLO Holdings Ltd., yet another Cayman Islands

entity. *Acis I*, 584 B.R. at 129. That same day, Acis LP conveyed to the same Cayman

Islands entity its contractual right to receive management fees from a particular CLO-SPE.

This contractual right was worth $5 million, but all Acis LP received in return was

forgiveness of a $2.8 million receivable that it owed to Highland.

On the day after Terry obtained his final judgment in the 44th Judicial District Court

of Dallas County, Acis LP underwent a sudden change in ownership. Previously, Acis LP's

limited partners were Mark Okada ("Okada"), Highland's chief investment officer, and the

Appellee Appx. 00782
Appx. 007390

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 790 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 673 of 1017 PageID 8403
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 789 of 1803 PageID 11535
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 9 of 84 PageID 98002

Dugaboy Investment Trust, a family trust of Highland's CEO, James Dondero. But on December 18, 2017 Okada and the Dugaboy Investment Trust both conveyed their interests in Acis LP to appellant Neutra, Ltd. ("Neutra"), a Cayman Islands exempted company. The Dugaboy Investment Trust also conveyed its 100% ownership interest in Acis GP to Neutra. Thus Neutra became Acis' sole equity owner.

Highland asserts that these transactions were part of a market-driven restructuring, or "reset," of Highland's CLOs. According to Highland's witnesses, Acis LP had become "'toxic' in the market place" due to the litigation with Terry, and had to be excised from Highland's CLO business. *Acis I*, 584 B.R. at 128; *accord Acis II*, 2019 WL 417149, at *11. HCLOF also has an anonymous, third-party institutional investor ("the Passive Investor") who purportedly demanded that Acis LP be removed as Highland's CLO manager. But the Passive Investor's representative testified at a hearing that the Passive Investor had made no such demand, and the bankruptcy court found that Highland's testimony about Acis' supposed toxicity was not credible. According to the bankruptcy court, Highland's explanations for the transfers described above were "a seemingly manufactured narrative to justify prior actions." *Acis II*, 2019 WL 417149, at *16 (capitalization omitted). The bankruptcy court rejected this narrative, finding that "[t]he evidence established overwhelmingly that there is a substantial likelihood that the transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor." *Id.* at *12.

Appellee Appx. 00783
Appx. 03648
007591

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 791 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 674 of 1017   PageID 8404
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 790 of 1803   PageID 11536
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 10 of 84   PageID 98003

D

Terry filed the involuntary petitions against Acis LP and Acis GP in order to stop the apparent transfer of assets away from Acis LP. *See Acis I*, 584 B.R. at 144. Fast-paced litigation followed.

On March 19, 2018—two days before the scheduled trial on the involuntary petitions—Acis filed a motion to dismiss for lack of subject matter jurisdiction, or, in the alternative, to compel arbitration ("the Arbitration Motion"). The bankruptcy court's decision to deny this motion is at issue in all three of the instant appeals. The Arbitration Motion was based on the Acis LP limited partnership agreement ("the Acis LPA"), which governed the relationship between Terry and Acis. The Acis LPA provides a dispute resolution procedure for "any controversy or claim . . . arising out of, relating to or in connection with the [Acis LPA] or otherwise involving the Partnership, its Partners and/or any GP Party." Third Appeal R. 4504 (brackets in original). Under this dispute resolution procedure, the parties must first attempt to mediate any dispute; only after mediating may they resort to binding arbitration. Any party who fails to mediate a claim, or who files a judicial lawsuit, ostensibly waives that claim. Acis argued in the Arbitration Motion that the Acis LPA's dispute resolution provisions applied to the involuntary petitions, and that because Terry failed to comply with those provisions, the bankruptcy court lacked subject matter jurisdiction over the controversy. The bankruptcy court denied the Arbitration Motion on the eve of trial.

In the early morning hours of the day the trial was scheduled to begin (at 2:33 a.m.),

Appellee Appx. 00784

007592

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 792 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 675 of 1017 PageID 8405
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 791 of 1803 PageID 11537
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 11 of 84 PageID 98004

several Highland-related entities—including Neutra and HCLOF—filed a motion to intervene. They sought intervention as of right under Fed. R. Bankr. P. 7024, or, alternatively, permissive intervention under Rule 2018.[8] The putative intervenors did not, however, intend to participate in the trial; they sought only to preserve their right to appeal any adverse ruling. The bankruptcy court denied the motion.

The trial of the involuntary petitions began as scheduled on March 21, 2018, and spanned five days. On the first day of trial, the putative intervenors informed the bankruptcy court of their objection to the involuntary petitions, and they appeared via counsel during each day of the trial. Following the trial, the bankruptcy court ruled in favor of Terry as the petitioning creditor, concluding that Acis had fewer than 12 eligible creditors; Acis was not generally paying its debts as they came due; Terry filed the involuntary petitions in good faith; and abstention under 11 U.S.C. § 305 was not warranted. The bankruptcy court issued orders for relief on April 13, 2018.

E

Highland and its related entities continued to participate in the bankruptcy court proceedings after the orders for relief were issued. The bankruptcy court, after finding that a "trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP . . . [and] to resolve the inherent conflicts of interest between [Acis] and Highland," appointed Robin Phelan ("the Trustee") as trustee. *See Acis I*, 584 B.R. at 149-

---

[8]Unless otherwise indicated, all citations in this opinion to a "Rule" are to the Federal Rules of Bankruptcy Procedure.

Appellee Appx. 00785
Appx. 02659
007593

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 793 of

Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 676 of 1017 PageID 8406

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 792 of 1803 PageID 11538

Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 12 of 84 PageID 98005

50. On April 30, 2018 HCLOF—acting in its capacity as the equity note holder—sent five notices to Acis LP directing it to effect an optional redemption of the Acis CLOs on June 14, 2018. The Trustee analyzed the notices and concluded that they were defective.

Highland and HCLOF responded by filing an adversary proceeding against the Trustee, seeking to compel the Trustee to effect a redemption.[9] The bankruptcy court *sua sponte* issued a TRO forbidding all relevant parties (including HCLOF) from taking any action in furtherance of an optional redemption of the CLOs. HCLOF then informed the bankruptcy court at a June 14, 2018 hearing that it had withdrawn the optional redemption notices. Because of HCLOF's representation, the Trustee did not seek to extend the TRO. The next day, HCLOF sent a *second* set of notices to Acis LP, again demanding that Acis LP effect an optional redemption of the CLOs. The Trustee then filed his own adversary proceeding ("the Trustee Adversary") against Highland, HCLOF, and others, seeking a *second* TRO.[10] The bankruptcy court granted the TRO, and, after an evidentiary hearing, converted the TRO into a preliminary injunction.

While these adversary proceedings were taking place, the Trustee was preparing a chapter 11 reorganization plan for Acis.[11] The Trustee initially proposed three plans: Plan A, Plan B, and Plan C. Under Plan A, the Trustee—using the doctrine of equitable

---

[9]Adversary Proceeding No. 18-03078-SGJ.

[10]Adversary Proceeding No. 18-03212-SGJ.

[11]When the bankruptcy court issued the orders for relief, the cases were under chapter 7 of the Bankruptcy Code. The bankruptcy court later converted the cases to chapter 11 cases.

Appellee Appx. 00786

007594

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 794 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 677 of 1017 PageID 8407
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 793 of 1803 PageID 11539
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 13 of 84 PageID 98006

subrogation—would have transferred HCLOF's subordinated equity notes to a third party—Oaktree Capital Management LP ("Oaktree")—in exchange for a $100 million payment to HCLOF, and would have paid off Acis' other creditors with additional funds provided by Oaktree. Plans B and C would have amended the indenture agreements to prohibit any redemption right from being exercised until all allowed claims were paid in full. The purpose of Plans B and C was to prevent HCLOF from calling for an optional redemption of the CLOs, which would have rendered Acis LP's fee-paying PMAs worthless. The bankruptcy court ultimately held that all three of these proposed plans were unconfirmable.

Before proposing Plans A, B, and C, the Trustee asked the bankruptcy court to approve the payment of a $2.5 million break-up fee ("the Break-Up Fee") to Oaktree if Plan A was not confirmed within a certain time period. This Break-Up Fee was a small percentage of the total value of the Plan A transaction—which was roughly $108 million—but represented a large percentage of the $8.6 million that Acis LP would retain after HCLOF was compensated for its subordinated notes. The Trustee's motion also sought to substitute Oaktree for Highland as Acis LP's investment advisor and service provider. The Trustee also requested that Oaktree be reimbursed for any reasonable expenses it might incur in connection with the proposed transaction ("the Expense Reimbursement"). The bankruptcy court granted the motion with minor modifications.[12]

---

[12]Brigade—not Oaktree—now provides advisory and back office services to Acis.

Appellee Appx. 00787
Appx. 02652
007595

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 795 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 678 of 1017  PageID 8408
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 794 of 1803  PageID 11540
Case 3:19-cv-00291-D  Document 75  Filed 07/18/19  Page 14 of 84  PageID 98007

After the bankruptcy court rejected Plans A, B, and C, the Trustee proposed—and the bankruptcy court confirmed—Plan D. Under the confirmed Plan, Terry received full equity ownership of Acis in exchange for a $1 million reduction in the value of his claim. Acis LP continues to serve as the portfolio manager for the Acis CLOs and continues to earn management fees. The cash flow resulting from Terry's operation of Acis will be used to pay the claims of Acis' creditors, including Terry. To prevent Highland and HCLOF from disrupting this cash flow, the bankruptcy court entered an injunction ("the Temporary Injunction")[13] prohibiting various parties and non-parties—including HCLOF—from taking any steps to effect an optional redemption or liquidation of the Acis CLOs. The Temporary Injunction is actually an extension of the preliminary injunction that the bankruptcy court issued in the Trustee Adversary. It is set to expire upon the earlier of the following: (1) the entry of a final order in the Trustee Adversary; (2) the satisfaction of all allowed claims against Acis; (3) the bankruptcy court's entry of an order finding that a material default has occurred under the Plan; or (4) any subsequent order of the bankruptcy court providing otherwise as to one or more of the CLOs.

F

Three appeals (the first consisting of four consolidated appeals)[14] taken from the

---

[13]Because the briefing refers to the plan injunction as a "temporary" injunction rather than a "preliminary" injunction, which is the federal nomenclature, the court will do so as well.

[14]The First Appeal consists of four consolidated appeals. No. 3:18-CV-1056-D is an appeal of the order denying Neutra the right to intervene in the involuntary proceeding

- 14 -

Appellee Appx. 00788
Appx. 02653
007596

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 796 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 679 of 1017 PageID 8409
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 795 of 1803 PageID 11541
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 15 of 84 PageID 98008

bankruptcy court's rulings are now before this court. For clarity, the court will refer to the appeals as the First, Second, and Third Appeals.

In the First Appeal (No. 3:18-CV-1056-D), appellant Neutra[15] contends that the bankruptcy court erred by denying the Arbitration Motion,[16] failing to dismiss the involuntary petitions on the ground that they were filed in bad faith, and declining to abstain under 11 U.S.C. § 305.

---

against Acis GP. No. 3:18-CV-1073-D is an appeal of the order for relief as to Acis LP. No. 3:18-CV-1084-D is an appeal of the order denying Neutra the right to intervene in the involuntary proceeding against Acis LP.

No. 3:18-CV-1057-D is *supposed* to be an appeal of the order for relief as to Acis GP, but, due to a filing error, the notice of appeal actually challenges the order denying intervention as to Acis GP—the same order at issue in 3:18-CV-1056-D. Neutra attempted to remedy this mistake by filing a second amended notice of appeal in the bankruptcy court, but that notice was erroneously transmitted to the docket of 3:18-CV-1084-D instead of 3:18-CV-1057-D. Because these are ministerial errors that do not affect the court's jurisdiction, the court will correct them at the conclusion of this opinion. *See, e.g., In re Smith*, 133 B.R. 800, 804 (N.D. Tex. 1991) (Fitzwater, J.) ("In contrast to the failure properly to designate an appellant, which is a jurisdictional defect, the failure to specify the correct judgment is irrelevant where it is clear which judgment the appellant is appealing." (citations omitted)).

[15]HCLOF and an entity called CLO Holdco Ltd. are also named as appellants in the First Appeal. Neutra is the only appellant, however, who has submitted briefing.

[16]Neutra did not file a separate notice of appeal with respect to the order denying the Arbitration Motion. Instead, it contends that this order is an interlocutory order that merged into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1). *See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*, 459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Terry does not contest this assertion. Neutra also maintains that mandatory arbitration agreements implicate subject matter jurisdiction, which any party can raise at any time.

- 15 -

In the Second Appeal (No. 3:18-CV-1822-D), appellant Highland[17] contends that the bankruptcy court erred by denying the Arbitration Motion and approving the Break-Up Fee and Expense Reimbursement.[18]

In the Third Appeal (No. 3:19-CV-0291-D), appellants Highland and Neutra contend that the bankruptcy court erred by denying the Arbitration Motion; confirming the Plan while the appeal of the orders for relief was still pending; confirming the Plan even though the statutory requirements of 11 U.S.C. § 1129 were not met; and entering the Temporary Injunction.   HCLOF submitted a separate brief in the Third Appeal, arguing that the Temporary Injunction is beyond the constitutional authority of the bankruptcy court, is overbroad, and is not supportable under the four-part preliminary-injunction test.

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal.

The appeals and Acis' motion are before the court for decision.

## II

"The court reviews the bankruptcy court's conclusions of law *de novo*, but reviews its fact findings only for clear error." *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000)

---

[17]HCLOF is also named as an appellant in the Second Appeal, but it did not submit or join in any briefing.

[18]The notice of appeal in the Second Appeal also challenges the bankruptcy court's decisions to deny a preliminary injunction requested by HCLOF and to grant the Trustee's request for a preliminary injunction in the Trustee Adversary.  These appeals were separately docketed and subsequently dismissed.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 798 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 681 of 1017    PageID 8411
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 797 of 1803    PageID 11543
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 17 of 84    PageID 98010

(Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)).  "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed."  *In re Johnson Sw., Inc.*, 205 B.R. 823, 827 (N.D. Tex. 1997) (Fitzwater, J.) (quoting *In re Placid Oil Co.*, 158 B.R. 404, 412 (N.D. Tex. 1993) (Fitzwater, J.)).  "If the trier of fact's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse it."  *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412). "[T]his court does not find facts.  Neither is it free to view the evidence differently as a matter of choice."  *Id.* (alteration in original) (quoting *Placid Oil Co.*, 158 B.R. at 412). "The bankruptcy judge's unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected."  *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412) (internal quotation marks omitted).

In reviewing matters committed to the bankruptcy court's discretion—such as whether to approve a break-up fee and expense reimbursement—the court applies an abuse of discretion standard.  *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 205 (3d Cir. 2010).  "To constitute an abuse of discretion, the [bankruptcy] court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous."  *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).

- 17 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 799 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 682 of 1017 PageID 8412
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 798 of 1803 PageID 11544
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 18 of 84 PageID 98011

III

In the First Appeal, appellee Terry contends that appellant Neutra lacks standing to appeal the orders for relief.[19]

A

1

"Bankruptcy courts are not authorized by Article III of the Constitution, and as such are not presumptively bound by traditional rules of judicial standing." *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) (citing *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 210 n.18 (5th Cir. 1994)). But there are still limits on who may appeal a bankruptcy court order. *See In re Technicool Sys., Inc.*, 896 F.3d 382, 385 (5th Cir. 2018). Before 1978, those limits were provided by the Bankruptcy Act, which granted appellate standing only to "person[s] aggrieved" by a bankruptcy court order. *Coho Energy*, 395 F.3d at 202 (quoting 11 U.S.C. § 67(c) (1976)). Congress repealed the relevant statutory provision when it passed the Bankruptcy Reform Act of 1978, but courts—including the Fifth Circuit—nonetheless still apply the person aggrieved test to bankruptcy appeals. *See id.* Because "[b]ankruptcy cases often involve numerous parties with conflicting and overlapping interests," and "[a]llowing each and every party to appeal each and every order

---

[19]The other appellants in the First Appeal have not briefed the issue of standing. They have therefore failed to meet their burden to assert that they have standing. *See Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 (5th Cir. 1994) ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal.").

- 18 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 800 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 683 of 1017 PageID 8413
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 799 of 1803 PageID 11545
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 19 of 84 PageID 98012

would clog up the system and bog down the courts," it is necessary for courts to limit who may appeal any given order. *Technicool Sys.*, 896 F.3d at 385.

The person aggrieved test "is 'more exacting' than the test for Article III standing." *Id.* (quoting *In re Delta Produce, L.P.*, 845 F.3d 609, 619 (5th Cir. 2016)). "Rather than showing the customary 'fairly traceable' causal connection, a bankruptcy appellant must instead show that he was 'directly and adversely affected pecuniarily by the order of the bankruptcy court.'" *Id.* (footnotes omitted) (first quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), then quoting *Fortune Nat. Res. Corp. v. U.S. Dep't of Interior*, 806 F.3d 363, 366 (5th Cir. 2015)).[20]

2

Equally important to deciding whether Neutra has standing is the "shareholder standing rule," which is "a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation" absent special circumstances. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). The doctrine derives from the third-party standing rule: "the plaintiff generally must assert his

---

[20]Some courts have imposed an additional prerequisite: that the appellant have attended and objected at the underlying bankruptcy proceedings. *See, e.g., In re Palmaz Sci., Inc.*, 262 F.Supp.3d 428, 435 (W.D. Tex. 2017); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 693-94 (Bankr. W.D. Tex. 2011) (quoting *In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010)). But other courts have held that appearance and objection are not indispensable to appellate standing. *See In re Point Ctr. Fin., Inc.*, 890 F.3d 1188, 1192-93 (9th Cir. 2018); *In re Urban Broad. Corp.*, 401 F.3d 236, 244 (4th Cir. 2005). The Fifth Circuit has not yet decided the question. *See Palmaz*, 262 F.Supp.3d at 434. This court need not decide the issue because it disposes of the question of Neutra's standing on other grounds.

Appellee Appx. 00793
Appx. 02658
007601

own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see In re Troutman Enters., Inc.*, 286 F.3d 359, 364 (6th Cir. 2002). This court has recognized that "[u]nder federal common law [and] Texas law . . . only a corporation and not its shareholders, not even sole shareholders, can complain of an injury sustained by, or a wrong done to, the corporation." *Rigco, Inc. v. Rauscher Pierce Refsnes, Inc.*, 110 F.R.D. 180, 183 (N.D. Tex. 1986) (Fitzwater, J.). Although the rule is phrased in terms of corporations and shareholders, it applies with equal force to limited partnerships like Acis LP. *See CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122-23 (2d Cir. 2013) (applying federal common law); *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 220-22 (5th Cir. 1994) (applying Texas law); *see also In re A.S. Acquisition Corp.*, 56 Fed. Appx. 415, 416 (9th Cir. 2003) (memorandum) (holding that limited partner lacked standing to appeal bankruptcy court order that affected partnership property). It also applies to limited liability companies like Acis GP. *See Heyer v. Schwartz & Assocs. PLLC*, 319 F.Supp.3d 299, 304-05 (D.D.C. 2018) (applying federal common law); *Schoen v. Underwood*, 2012 WL 13029591, at *4 (W.D. Tex. May 15, 2012) (applying Texas law).

The Supreme Court has "treated standing as consisting of two related components: the constitutional requirements of Article III and nonconstitutional prudential considerations." *Franchise Tax Bd.*, 493 U.S. at 335. The shareholder standing rule falls within the latter category, and thus can operate to bar a lawsuit even if Article III standing is satisfied. *See id.* at 336. Recently, the Supreme Court called into question the continuing vitality of

- 20 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 802 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 685 of 1017 PageID 8415
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 801 of 1803 PageID 11547
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 21 of 84 PageID 98014

prudential standing, observing that it is in tension with the principle that "a federal court's

obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B.*

*Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static*

*Control Components, Inc.*, 572 U.S. 118, 126 (2014)) (internal quotation marks omitted); *see*

*also Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat'l Ass'n*, 758 F.3d 592, 603

n.34 (5th Cir. 2014) ("[T]he continued vitality of prudential 'standing' is now uncertain in

the wake of the Supreme Court's recent decision in *Lexmark*[.]"). But the Fifth Circuit has

since reaffirmed the third-party standing doctrine in particular. *See Superior MRI Servs., Inc.*

*v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 506 (5th Cir. 2015). The doctrine therefore

remains binding in this circuit.

    The court is aware of no binding precedent requiring it to apply the shareholder

standing rule in the context of a bankruptcy appeal, but other courts have done so. *See, e.g.,*

*In re Heyl*, 770 F.3d 729, 730 (8th Cir. 2014) (per curiam); *In re AFY*, 734 F.3d 810, 822-23

(8th Cir. 2013); *A.S. Acquisition Corp.*, 56 Fed. Appx. at 416; *In re Troutman Enters.*, 286

F.3d at 365; *In re Dein Host, Inc.*, 835 F.2d 402, 404-06 (1st Cir. 1987); *Rose v. Logan*, 2014

WL 1236008, at *5-7 (D. Md. Mar. 25, 2014). This court concludes that it should do so as

well, for at least two reasons.

    First, the person aggrieved test already includes a version of the third-party standing

rule. It requires that the appellant be "*directly* and adversely affected pecuniarily by the

order of the bankruptcy court." *Technicool Sys.*, 896 F.3d at 385 (emphasis added) (quoting

*Fortune Nat. Res. Corp.*, 806 F.3d at 366). "An 'indirect financial stake' in another's claims

Appellee Appx. 00795
Appx. 02589
007603

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 803 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 686 of 1017 PageID 8416
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 802 of 1803 PageID 11548
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 22 of 84 PageID 98015

is insufficient for standing." *In re The Watch Ltd.*, 257 Fed. Appx. 748, 749 (5th Cir. 2007)

(per curiam) (quoting *Rohm*, 32 F.3d at 208).

Second, the person aggrieved doctrine is itself a creature of prudential standing—it

is distinct from, and narrower than, constitutional standing, and it is justified by practical

considerations. *See Coho Energy*, 395 F.3d at 202 ("To prevent unreasonable delay, courts

have created an *additional* prudential standing requirement in bankruptcy cases: The

appellant must be a 'person aggrieved' by the bankruptcy court's order." (quoting *In re

P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999))); *see also Technicool Sys.*, 896 F.3d at

384-86 (distinguishing constitutional standing from bankruptcy standing, and offering

prudential justifications for the latter). The policy underlying the person aggrieved doctrine

would be well-served by including within it a third-party standing or shareholder standing

rule. Without such a limitation, any one of a debtor's numerous shareholders could

separately appeal bankruptcy court orders affecting the value of the debtor—thus resulting

in "umpteen appeals raising umpteen issues." *Technicool Sys.*, 896 F.3d at 384. Neutra does

not argue that the shareholder standing rule is inapplicable to bankruptcy appeals generally.

Instead, Neutra maintains that it is asserting a direct, rather than a derivative, interest in the

orders for relief. The court therefore holds that the shareholder standing rule applies in the

context of bankruptcy appeals.

Although no party cites it, the court is aware of one Fifth Circuit decision that allowed

a debtor's majority shareholder to appeal an order of the bankruptcy court. In *In re First

Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), *superseded by statute on other*

- 22 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 804 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 687 of 1017 PageID 8417
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 803 of 1803 PageID 11549
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 23 of 84 PageID 98016

*grounds as recognized by In re Woerner*, 783 F.3d 266, 274 (5th Cir. 2015) (en banc),[21] the

Fifth Circuit authorized a debtor's majority shareholder to appeal an order awarding

attorney's fees to the trustee's attorneys (one of whom was himself the trustee). But as the

*First Colonial* panel was careful to point out, the case involved unique circumstances. *See*

*id.* at 1297 ("Although the attorneys and the trustee are correct in stating that in the usual

case the bankrupt and its shareholders do not have an interest in the disposition of the assets

of the estate . . . this is hardly the usual case."). The appeal involved an issue on which the

interests of the trustee and the debtor diverged, because "[w]here the trustee serves as his

own attorney there is no disinterested trustee to ensure that the attorney is paid only for

professional services necessary to the administration of the estate." *Id.* Thus the panel made

an exception: it allowed the shareholder to appeal, thereby "refusing to permit [the trustee]

to use his position as trustee to prevent [the shareholder] from contesting the size of his

attorneys' fee." *Id.* There are no such circumstances present here: the Trustee lacks a

similarly-direct "personal financial stake" in the orders for relief, and he is not using his

special position to insulate a favorable order from review. *Cf. AFY*, 734 F.3d at 823

(distinguishing *First Colonial* because trustee lacked personal financial stake in outcome of

appealed orders). *First Colonial* therefore does not prevent this court from applying the

shareholder standing rule to a bankruptcy appeal.

---

[21]Although *First Colonial* was decided before the passage of the Bankruptcy Reform
Act of 1978, the "person aggrieved" test applied by the courts post-1978 was taken directly
from pre-1978 jurisprudence. *See Coho Energy*, 395 F.3d at 202. *First Colonial*'s analysis
is therefore still relevant.

Appellee Appx. 00797
Appx. 02682
007605

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 805 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 688 of 1017 PageID 8418
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 804 of 1803 PageID 11550
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 24 of 84 PageID 98017

B

Neutra asserts four different interests in the orders for relief. None of these interests suffices to give Neutra standing to appeal.

Neutra contends that it "is watching its interest in Acis being decimated by administrative expenses." Neutra First Appeal Br. 19. In other words, Neutra's ownership interest in Acis is losing value as a result of the inherent expenses of bankruptcy. Under the shareholder standing rule, however, this interest is quintessentially derivative of Acis' own interests, and therefore cannot confer standing. *See, e.g., Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. Unit B Apr. 1981) ("Plaintiffs' individual injury arises only from the loss in value of their stock as a result of injury to the corporation. Under these circumstances, plaintiffs have no independent cause of action."). The First Circuit rejected a nearly-identical argument in *Dein Host*, 835 F.2d 402. It held that an appellant lacked standing where his only interest in the bankruptcy court order was "that his beneficial interest in [another entity]—his stock—[was] in jeopardy and subject to shrinkage." *Id.* at 405. In so concluding, the court relied on the principle that "[t]he fact that the injury may indirectly harm a stockholder by diminishing the value of his corporate shares does not bestow upon him a right to sue on his own behalf." *Id.* at 405-06 (quoting *Papilsky v. Berndt*, 466 F.2d 251, 255 (2d Cir. 1972)). Thus even if Acis loses value as a result of its plunge into bankruptcy, Neutra cannot appeal on this basis.

Neutra also posits that it "has lost its right to protect its interest [in Acis] via control of [Acis]." Neutra First Appeal Br. 19. This interest is insufficient to confer standing

- 24 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 806 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 689 of 1017 PageID 8419
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 805 of 1803 PageID 11551
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 25 of 84 PageID 98018

because losing control over an entity is not, in itself, a *pecuniary* injury. *See Technicool Sys.*,
896 F.3d at 385 (requiring that appellant be "directly and adversely affected *pecuniarily* by
the order of the bankruptcy court" (emphasis added)); *see also Rose*, 2014 WL 1236008, at
\*5-7 (holding that shareholder standing rule applies with full force to entity's *sole* equity
owner). Control rights may enhance the value of Neutra's ownership interest, or may allow
Neutra to protect the value of that interest via advantageous business decisions. But, as the
court has already discussed, any diminishment in the value of Neutra's interest in Acis does
not confer standing on Neutra.

Neutra also asserted, at the time it filed its briefing in the First Appeal, that it would
soon "be forced to partner with Oaktree against its wishes, and may be completely divested
from its equity interests without its consent." Neutra First Appeal Br. 19-20. But this
outcome was by no means an inevitable result of the *orders for relief*. The person aggrieved
test does not take into account every injury caused by the bankruptcy case as a whole, but
instead asks whether "the *order* of the bankruptcy court . . . directly and adversely affect[s]
the appellant pecuniarily." *Fortune Nat. Res. Corp.*, 806 F.3d at 367. And "bankruptcy
standing requires 'a higher causal nexus between act and injury'" than does traditional
Article III standing. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*,
806 F.3d at 366). Thus although the orders for relief created the possibility that Neutra might
suffer harm in the future, Neutra was not aggrieved by them for standing purposes because
"[the] speculative prospect of harm is far from a direct, adverse, pecuniary hit." *Id.* at 386;
*see also id.* at 384-86 (concluding that equity owner was not aggrieved by order allowing

- 25 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 807 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 690 of 1017 PageID 8420
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 806 of 1803 PageID 11552
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 26 of 84 PageID 98019

trustee to employ special counsel, even though special counsel's purpose was to pierce the corporate veil to reach equity owner's other companies and assets).

Of course, the future harms identified by Neutra in the First Appeal did actually come to pass: the bankruptcy court appointed first Oaktree, and then Brigade, as the new service provider for Acis, and later divested Neutra of its equity interest in Acis. But this court cannot take these events into account in its analysis of the First Appeal. A district court hearing a bankruptcy appeal may only consider information if it is "part of the record before the bankruptcy court" or if it "meets the narrow purpose of judicial notice." *In re SI Restructuring Inc.*, 480 Fed. Appx. 327, 329 (5th Cir. 2012) (per curiam). The subsequent events that are asserted to have injured Neutra are not part of the record in the First Appeal. No party has asked this court to take judicial notice of any subsequent bankruptcy court orders in the First Appeal, and the court has no duty to do so *sua sponte*.[22] Moreover, Neutra would lack standing even if the court *did* take these events into account. That a once-speculative harm actually came to pass does not mean that the harm was initially *likely* to happen—so Neutra would still fail to show the "higher causal nexus between act and injury" that the person aggrieved test demands. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366); *cf. Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 101 (N.Y. 1928) (finding no liability for negligence where, *ex ante*, "there was nothing in the

---

[22]The Fifth Circuit has indicated that when no party asks the district court to take judicial notice of a fact, and the district court does not do so *sua sponte*, the Fifth Circuit is unlikely to do so for the first time on appeal. *See United States v. Herrera-Ochoa*, 245 F.3d 495, 502 & n.6 (5th Cir. 2001) (citing cases).

Appellee Appx. 00800
Appx. 02695
007608

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 808 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 691 of 1017 PageID 8421
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 807 of 1803 PageID 11553
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 27 of 84 PageID 98020

situation to suggest to the most cautious mind" that defendant's actions would result in harm to plaintiff, even though harm actually occurred).

The court therefore dismisses the First Appeal, i.e., all the appeals of the orders for relief.

C

The court's conclusion that Neutra lacks standing[23] is buttressed by the fact that the bankruptcy court properly denied Neutra's motion to intervene.[24]

1

Neither Neutra nor Terry has substantially briefed the question whether the bankruptcy court erred by denying Neutra's motion to intervene. Neutra contends that the ruling on its motion to intervene has no bearing on whether it can appeal as a person

_____

[23]This conclusion does not mean that *no one* has standing to appeal. The Trustee likely could have appealed the orders for relief on Acis' behalf had he believed the orders were not in the best interests of the estates. *See In re C.W. Mining Co.*, 636 F.3d 1257, 1261-66 (10th Cir. 2011); *see also* 11 U.S.C. § 323(a) ("The trustee in a case under this title is the representative of the estate.").

[24]The parties agree that this court has jurisdiction over the orders denying intervention because they are interlocutory orders that merged into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1). *See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*, 459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Neutra only asserts that it has standing to appeal the orders for relief; it does not contend that it has standing to appeal independently the orders denying intervention. *Cf. Rohm*, 32 F.3d at 208 ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal."). Thus even though the court concludes—in the context of this standing analysis—that the orders denying intervention were correctly decided, it does not affirm them. Instead, it dismisses the entire First Appeal for lack of standing.

Appellee Appx. 00801
Appx. 02606
007609

aggrieved; Terry, meanwhile, maintains that the bankruptcy court's decision was correct, but also contends that any error was harmless because Neutra had no intention of participating in the trial on the involuntary petitions. The court is not persuaded, however, that the question is irrelevant.

Some courts have suggested that the bankruptcy court's proper denial of a motion to intervene is dispositive of the movant's right to appeal. *See, e.g., In re Living Hope Sw. Med. Servs., LLC*, 598 Fed. Appx. 467, 467 (8th Cir. 2015) (per curiam) (concluding that appellant lacked standing because bankruptcy court correctly denied his motion to intervene); *In re Thompson*, 965 F.2d 1136, 1140-46 & n.9 (1st Cir. 1992) (equating person aggrieved test with the test for intervention under Rule 7024, and concluding that because bankruptcy court properly denied motion to intervene in adversary proceeding, appellant lacked standing to appeal judgment); *In re S. State St. Bldg. Corp.*, 140 F.2d 363, 367 (7th Cir. 1943) ("If one who has a right to intervene, but does not, has no standing to appeal, a fortiori, one who has no right to intervene, and does not, has no standing to appeal."); *see also In re Blair*, 2016 WL 8608454, at *5 (D. Colo. Aug. 24, 2016) ("One might expect that [the person aggrieved] doctrine would not apply to a party that sought and was denied intervention. Or, at a minimum, it seems incongruous to permit a party to file an unsuccessful motion to intervene and nonetheless be permitted to appeal under the persons aggrieved doctrine and immediately attack the Bankruptcy Court's substantive rulings, rather than first challenging the denial of intervention."). Other courts disagree. *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991) (holding that "[Rule 2018,] governing permissive

Appellee Appx. 00802

Appx. 03685

007610

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 810 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 693 of 1017 PageID 8423
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 809 of 1803 PageID 11555
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 29 of 84 PageID 98022

intervention, does not limit the rights of a 'person aggrieved' to be heard" on appeal).

It is also possible that, had Neutra been allowed to intervene, it would have had standing to appeal by virtue of its intervention alone. *See First Colonial*, 544 F.2d at 1296-98 (finding that appellant was a person aggrieved, and then adding, as alternative ground for its holding, that "[appellant] has standing to appeal from all of the fee awards because the bankruptcy judge granted its motion to intervene [under what is now Rule 7024] without qualifying its right to participate in the proceeding"); *see also Int'l Trade Admin.*, 936 F.2d at 747 (stating that permissive intervention under Rule 2018 "provides a formal mechanism that expands the right to be heard to a wider class than those who qualify under the 'person aggrieved' standard"). *But see Troutman Enters.*, 286 F.3d at 363-64 (holding that parties who were permitted to intervene in bankruptcy proceeding nonetheless lacked appellate standing because they were not persons aggrieved).

Because the bankruptcy court's decision to deny intervention could affect Neutra's standing to bring the present appeal, the court will consider the merits of Neutra's appeal of that decision.

2

"A ruling denying intervention of right is reviewed *de novo*." *St. Bernard Par. v. Lafarge N. Am., Inc.*, 914 F.3d 969, 973 (5th Cir. 2019) (quoting *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc)). Although generally "the timeliness of an intervention motion is reviewed for abuse of discretion," if the bankruptcy court did not explain its ruling on timeliness, review is *de novo*. *See id.* (citing *Sommers v. Bank of Am.,*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 811 of

Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 694 of 1017 PageID 8424

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 810 of 1803 PageID 11556

Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 30 of 84 PageID 98023

*N.A.*, 835 F.3d 509, 513 (5th Cir. 2016)). The court reviews the denial of a motion for permissive intervention for "clear abuse of discretion," and will disturb the bankruptcy court's ruling "only under extraordinary circumstances." *Id.* (quoting *Edwards*, 78 F.3d at 995).

Neutra sought intervention as of right under Rule 1018, which provides that Rule 7024 applies in proceedings to contest an involuntary petition. Rule 7024, in turn, states that "[Fed. R. Civ. P. 24] applies in adversary proceedings."

> A party is entitled to an intervention of right under Rule 24(a)(2) if (1) the motion to intervene is timely, (2) the interest asserted by the potential intervenor is related to the action, (3) that interest may be impaired or impeded by the action, and (4) that interest is not adequately represented by the existing parties.

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2012 WL 2133667, at *1 (N.D. Tex. June 12, 2012) (Fitzwater, C.J.) (citing *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247 (5th Cir. 2009); *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994)), *rev'd on other grounds*, 747 F.3d 275 (5th Cir. 2014), *aff'd*, ___ U.S. ___, 135 S. Ct. 2507 (2015). "Failure to satisfy any one requirement precludes intervention of right." *Haspel & Davis Milling & Planting Co. v. Bd. of Levee Comm'rs*, 493 F.3d 570, 578 (5th Cir. 2007).

Neutra also sought permissive intervention under Rule 2018. That rule provides that "after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter." Rule 2018(a).

Appellee Appx. 00804

Appx. 03689

007612

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 812 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 695 of 1017   PageID 8425
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 811 of 1803   PageID 11557
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 31 of 84   PageID 98024

> In deciding whether to permit intervention under Rule 2018(a), courts look to various factors, including (1) whether the moving party has an economic or similar interest in the matter; (2) whether the interest of the moving party [is] adequately represented by the existing parties; [(3)] whether the intervention will cause undue delay to the proceedings; and (4) whether the denial of the movant's request will adversely affect their interest.

*Pasternak & Fidis, P.C. v. Wilson*, 2014 WL 4826109, at *6 (D. Md. Sept. 23, 2014) (collecting cases). Thus "[t]he standards under Rule 2018 and [Rule] 24 overlap." *In re Adilace Holdings, Inc.*, 548 B.R. 458, 462 (Bankr. W.D. Tex. 2016). "The decision whether to allow intervention is wholly discretionary under Rule 2018 . . . even where each required element is met." *Id.* at 463 (citing *Staley v. Harris County*, 160 Fed. Appx. 410, 414 (5th Cir. 2005) (per curiam); *In re Durango Ga. Paper Co.*, 336 B.R. 594, 596 (Bankr. S.D. Ga. 2005)).

3

Neutra was not entitled to intervention of right in the trial of the involuntary petitions because it did not have a sufficiently direct interest in the proceedings. The only interest that Neutra asserted was its property interest in Acis. But in the intervention context, "[t]he term 'interest' is narrowly read to mean a *direct* and substantial interest in the proceedings . . . that the substantive law recognizes as belonging to or being owned by *the party seeking intervention*." *Rigco*, 110 F.R.D. at 183 (emphasis added). Accordingly, the shareholder standing rule applies to Rule 24(a) motions to intervene. *See id.* at 183-84. Neutra's property interest in the alleged debtors therefore could not support Neutra's claimed right to

- 31 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 813 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 696 of 1017 PageID 8426
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 812 of 1803 PageID 11558
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 32 of 84 PageID 98025

intervene in the trial on the involuntary petitions. *See supra* § III(B). Because one of the four Rule 24(a) factors was not met, the bankruptcy court did not err by denying Neutra's motion to intervene as of right. *See Haspel*, 493 F.3d at 578.

For similar reasons, the bankruptcy court did not abuse its discretion by denying Neutra permissive intervention under Rule 2018. This is because Neutra lacked a sufficiently direct interest in the proceedings. And even if Neutra had such an interest, this court still would not disturb the bankruptcy court's ruling. This court reviews the bankruptcy court's denial of a Rule 2018 motion under a deferential standard—the bankruptcy court has discretion to deny such a motion even if all four factors are met. *See Adilace Holdings*, 548 B.R. at 463; *see also St. Bernard*, 914 F.3d at 973 (providing that orders as to permissive intervention are reviewed for clear abuse of discretion). Neutra offers no argument on appeal that the bankruptcy court committed a clear abuse of its discretion by denying its motion. *Cf. Brinkmann v. Dall. Cty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) (holding that arguments not briefed on appeal are deemed abandoned). In the absence of such an argument, the court will not disturb the bankruptcy court's ruling.

IV

Neutra argues in the First Appeal that, regardless whether it has standing to appeal the orders for relief, it can challenge the bankruptcy court's denial of the Arbitration Motion because mandatory arbitration agreements implicate the court's subject matter jurisdiction. The appellants in the Second Appeal and Third Appeal make the same argument, and contend that every subsequent order entered by the bankruptcy court is void for lack of

- 32 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 814 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 697 of 1017 PageID 8427
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 813 of 1803 PageID 11559
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 33 of 84 PageID 98026

subject matter jurisdiction.

The Fifth Circuit recently reiterated that it has not yet decided the question whether a dismissal based on an arbitration provision is a dismissal for lack of subject matter jurisdiction. *See McDonnel Grp., L.L.C. v. Great Lakes Ins. SE, UK Branch*, 923 F.3d 427, 430 n.5 (5th Cir. 2019); *see also McGee v. W. Express, Inc.*, 2016 WL 1622632, at *2 (N.D. Tex. Apr. 5, 2016) (Horan, J.) (explaining that the Fifth Circuit has not yet decided the issue), *rec. adopted*, 2016 WL 1627662, at *1 (N.D. Tex. Apr. 22, 2016) (Kinkeade, J.). Neutra relies, however, on another Fifth Circuit opinion, *Gilbert v. Donahoe*, 751 F.3d 303 (5th Cir. 2014), in which the panel stated: "We have held that a district court lacks subject matter jurisdiction over a case and should dismiss it pursuant to Federal Rule of Civil Procedure 12(b)(1) when the parties' dispute is subject to binding arbitration." *Id.* at 306. The *Gilbert* panel cited two supporting cases in a footnote: *Ballew v. Continental Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012), and *Omni Pinnacle, LLC v. ECC Operating Services, Inc.*, 255 Fed. Appx. 24 (5th Cir. 2007) (per curiam). In both of these supporting cases the Fifth Circuit affirmed a district court's dismissal of a case under Rule 12(b)(1) pursuant to an arbitration agreement. The *Gilbert* opinion also acknowledged precedent indicating that the issue was previously unsettled. *See Gilbert*, 751 F.3d at 306 n.1 (citing *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472 n.3 (5th Cir. 2010) ("Our court has not previously definitively decided whether Rule 12(b)(1) or Rule 12(b)(3) is the proper rule for motions to dismiss based on an arbitration or forum-selection clause.")). Thus *Gilbert*—if read in a vacuum—appears to settle the issue in a precedential decision.

- 33 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 815 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 698 of 1017 PageID 8428
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 814 of 1803 PageID 11560
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 34 of 84 PageID 98027

But in *Ruiz v. Donahoe*, 784 F.3d 247 (5th Cir. 2015) (on petition for rehearing), Judge Owen—who authored *Gilbert* just one year before—wrote for the panel that "[a]lthough in *Gilbert* we spoke in terms of subject-matter jurisdiction, we used the term imprecisely." *Id.* at 249. The *Ruiz* panel observed that whereas subject matter jurisdiction can be raised at any time and cannot be waived by the parties, a party *can* waive its right to compel arbitration. *See id.* And "[i]f a dispute is subject to mandatory grievance and arbitration procedures, then the proper course of action is usually to stay the proceedings pending arbitration." *Id.* Thus "agreements to arbitrate implicate forum selection and claims-processing rules *not subject matter jurisdiction*." *Id.* at 250 (emphasis added).

This court is persuaded by the reasoning of *Ruiz* and follows *Ruiz*'s explanation that the *Gilbert* panel was imprecise when it spoke in terms of subject matter jurisdiction. It is well-established in the Fifth Circuit that a party can waive its right to compel arbitration. *See, e.g., Petroleum Pipe Ams. Corp. v. Jindal Saw, Ltd.*, 575 F.3d 476, 480 (5th Cir. 2009); *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991); *Tenneco Resins, Inc. v. Davy Int'l, AG*, 770 F.2d 416, 420 (5th Cir. 1985). It is equally well-established that a party *cannot* waive challenges to the court's subject matter jurisdiction; the issue can be raised at any time by any party or by the court *sua sponte*. *See, e.g., Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999). Moreover, in the Fifth Circuit a court may order a stay pending arbitration instead of dismissing a case outright. *See, e.g., Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 662 (5th Cir. 1995); *see also* 9 U.S.C. § 3 (authorizing courts to grant stays pending arbitration). But when a court lacks subject matter jurisdiction over a

- 34 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 816 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 699 of 1017 PageID 8429
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 815 of 1803 PageID 11561
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 35 of 84 PageID 98028

controversy, it cannot enter a stay order—or *any* order besides an order dismissing the case.

*See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 434 (2007) ("[O]nce
a court determines that jurisdiction is lacking, it can proceed no further and must dismiss the
case on that account."). Thus if the *Gilbert* panel actually held that a dismissal based on an
arbitration clause is jurisdictional, then it impliedly overruled many years of precedent set
by many prior panels. Under the Fifth Circuit's rule of orderliness, however, the *Gilbert*
panel lacked the power to do so. *See, e.g., Odle v. Flores*, 683 Fed. Appx. 288, 289 (5th Cir.
2017) (per curiam) ("[U]nder the rule of orderliness, to the extent that a more recent case
contradicts an older case, the newer language has no effect." (alteration in original) (quoting
*Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000))). Fifth Circuit
precedent instead supports the conclusion that a dismissal based on an arbitration agreement
does *not* implicate the court's subject matter jurisdiction.

Indeed, it would be strange if parties by contract could divest a federal court of subject
matter jurisdiction or confer such jurisdiction. "Only Congress may determine a lower
federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004)
(citing U.S. Const. art. III, § 1). "[N]o action of the parties can confer subject-matter
jurisdiction upon a federal court" if such jurisdiction is otherwise lacking. *Ins. Corp. of Ir.,
Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). And federal courts
have long resisted attempts by private parties to manipulate their jurisdiction—including
attempts to deprive courts of removal jurisdiction where that jurisdiction properly exists.
*See, e.g., Smallwood v. Ill. Cent. R.R. Co.*, 385 U.S. 568, 576 (5th Cir. 2004) (en banc) ("The

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 817 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 700 of 1017 PageID 8430
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 816 of 1803 PageID 11562
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 36 of 84 PageID 98029

doctrine of improper joinder implements our duty to not allow manipulation of our jurisdiction.").  It follows that "if a court has jurisdiction of an action, the parties cannot deprive the court thereof by contract."  17A C.J.S. *Contracts* § 309 (2019).  Parties may not, in the course of ordering their private affairs, enlarge *or shrink* Article III or the federal statutes governing subject matter jurisdiction.[25]

Nor does the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, mandate that a dismissal based on an arbitration agreement is a dismissal for lack of subject matter jurisdiction.  The Supreme Court has urged caution in interpreting statutory provisions to be jurisdictional.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) ("'Jurisdiction,' this Court has observed, 'is a word of many, too many, meanings.'  This Court, no less than other courts, has sometimes been profligate in its use of the term." (citation omitted) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998))).  This is because calling an issue "jurisdictional" has profound consequences.  If an issue implicates the court's subject matter jurisdiction, then it cannot be waived or forfeited, and the court has a duty to raise the issue on its own; the trial judge (instead of a jury) can resolve factual disputes underlying the issue; and if subject matter jurisdiction is lacking, the court must dismiss the entire complaint.  *See id.* at 514-15.  The Supreme Court has therefore established clear interpretive rules on the subject:

---

[25]For similar reasons, the waiver clause in the Acis LPA does not divest this court or the bankruptcy court of subject matter jurisdiction.

Appellee Appx. 00810
Appx. 03675
007618

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 818 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 701 of 1017 PageID 8431
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 817 of 1803 PageID 11563
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 37 of 84 PageID 98030

> [i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

*Id.* at 515-16 (footnote and citation omitted).

Nothing in the FAA indicates that Congress intended arbitration agreements to divest federal courts of subject matter jurisdiction. To the contrary, the FAA authorizes courts to issue orders that would be beyond the power of a court that lacks jurisdiction. *See Sinochem Int'l*, 549 U.S. at 434. For instance, courts must, in certain circumstances, issue orders staying their proceedings pending arbitration, *see* 9 U.S.C. § 3; orders compelling recalcitrant parties to submit to arbitration, *see id.* § 4; orders appointing an arbitrator, *see id.* § 5; and orders compelling witnesses to appear before an arbitrator, *see id.* § 7. Thus the text of the FAA—far from containing a clear statement that arbitration agreements are jurisdictional—suggests instead that the opposite is true. The court therefore concludes that Congress did not intend for dismissals based on arbitration agreements to be dismissals for lack of subject matter jurisdiction.[26]

---

[26]Neutra contends in the First Appeal that the Acis LPA's arbitration clause deprived Terry of *standing*, and that a creditor who lacks *standing* cannot confer subject matter jurisdiction on the bankruptcy court by filing an involuntary petition. But "[s]tanding is a species of subject matter jurisdiction." *In re Rhinesmith*, 450 B.R. 630, 631 (Bankr. W.D. Tex. 2011) (citing *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009)). To conclude that arbitration agreements do not implicate a court's subject matter jurisdiction is also to conclude that they do not implicate standing. Thus Neutra's circuitous logic does not allow it to escape the court's conclusion on this issue.

Appellee Appx. 00811
Appx. 03676
007619

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 819 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 702 of 1017 PageID 8432
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 818 of 1803 PageID 11564
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 38 of 84 PageID 98031

Because the bankruptcy court's order denying the Arbitration Motion does not implicate subject matter jurisdiction, it can only be challenged by a party with standing. Neutra lacks standing to do so in the First Appeal. *See supra* § III. In the Second and Third Appeals, the appellants who challenge the order do not contend that they have standing to do so; instead, they rely on what they maintain is the jurisdictional nature of the order. They have therefore failed to carry their burden to establish standing. *See Rohm*, 32 F.3d at 208. Thus the court will not consider the merits of appellants' challenges to the bankruptcy court's order denying the Arbitration Motion.

V

Highland argues in the Second Appeal that the Break-Up Fee does not satisfy the requirements of 11 U.S.C. § 503, which governs administrative expenses; the Break-Up Fee is unreasonably large; and the Expense Reimbursement was not a reasonable exercise of the Trustee's business judgment under 11 U.S.C. § 363(b).[27]

A

The court first considers whether the bankruptcy court abused its discretion by finding that the Break-Up Fee satisfies § 503(b)(1)(A).[28]

_____

[27]As a creditor of the estates, Highland has standing to appeal the order approving the Break-Up Fee and Expense Reimbursement because that order disposes of estate assets. *See, e.g., In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997). Neither Oaktree nor the Trustee contends otherwise.

[28]The parties do not dispute that § 503 applies to the bankruptcy court's decision to approve a break-up fee. *See In re ASARCO, L.L.C.*, 650 F.3d 593, 602 (5th Cir. 2011) (suggesting, in *dicta*, that § 503 is "the proper channel for requesting payment" of a break-up

Appellee Appx. 00812
Appx. 02675
007620

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 820 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 703 of 1017 PageID 8433
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 819 of 1803 PageID 11565
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 39 of 84 PageID 98032

In bankruptcy, administrative expenses—such as the "actual and necessary costs and expenses of preserving the estate"—are given priority over other non-secured claims in the distribution of the estate. *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001). "In order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefi[t]ed the estate." *Id.* (citing *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)). Such claims "generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate." *Id.* "Crucial to satisfying the § 503 test is that the estate receive a 'discernible benefit' as a result of the expenditure." *In re ASARCO LLC*, 441 B.R. 813, 824 (S.D. Tex. 2010) (quoting *Jack/Wade Drilling*, 258 F.3d at 387), *aff'd*, 650 F.3d 593 (5th Cir. 2011); *see also In re DeSardi*, 340 B.R. 790, 799 (Bankr. S.D. Tex. 2006) ("The court's administrative expense inquiry centers upon whether the estate has received an *actual benefit, as opposed to the loss a creditor might experience*[.]" (quoting *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866 (4th Cir. 1994))). The claimant bears the burden of proving by a preponderance of the evidence that its claim qualifies as an administrative expense. *See TransAmerican*, 978 F.2d at 1416. Once the claimant has established a prima facie case, the burden of production shifts to the objector—but the burden of persuasion remains at all times upon the claimant. *See id.*

---

fee).

- 39 -

Appellee Appx. 00813
Appx. 03678
007621

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 821 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 704 of 1017 PageID 8434
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 820 of 1803 PageID 11566
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 40 of 84 PageID 98033

The bankruptcy court did not abuse its discretion by concluding that the Break-Up Fee was an actual and necessary expense that conferred a discernible benefit upon the debtors' estates. Courts have recognized that a break-up fee can confer a benefit on the estate even though the contemplated transaction with the claimant was not consummated. *See, e.g., In re Energy Future Holdings Corp.*, 904 F.3d 298, 313-14 (3d Cir. 2018) (recognizing that break-up fee can benefit estate if, *inter alia*, the "assurance of a break-up fee promote[s] more competitive bidding," or the fee "induce[s] a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely"); *In re Lamb*, 2002 WL 31508913, at *1 (Bankr. D. Md. Oct. 11, 2002) (recognizing that break-up fees are appropriate where they incentivize a "stalking horse" bidder).

Here, the primary benefit identified by the bankruptcy court was that the Break-Up Fee facilitated the plan confirmation process. Without the Break-Up Fee, the Trustee would have had no ready, willing, and able partner for the proposed Plan A transaction, because Oaktree would not have made an offer or undertaken the expense and effort of preparing for the contemplated transaction. In this respect, the present case is similar to a traditional "stalking horse" situation, where a break-up fee induces a bidder to research a potential transaction and make an initial bid. *See, e.g., Energy Future Holdings*, 904 F.3d at 313-14. Without Plan A, the bankruptcy court faced the possible "doomsday" scenario, Second Appeal R. 78, of Acis' fee-generating PMAs being rendered worthless by HCLOF's exercise of its optional redemption right. The bankruptcy court did not abuse its discretion by recognizing these benefits.

Appellee Appx. 00814
Appx. 03679
007622

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 822 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 705 of 1017 PageID 8435
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 821 of 1803 PageID 11567
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 41 of 84 PageID 98034

The record also reflects that the Break-Up Fee conferred other benefits on the estates, although the bankruptcy court did not expressly acknowledge them. Oaktree's initial bid was meant to start a public sale process. *Cf. Energy Future Holdings*, 904 F.3d at 313-14 (citing *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999)) (acknowledging that break-up fees can benefit estate by initiating a public bidding process, even where claimant was eventually outbid). And the Break-Up Fee was part of a transaction by which Oaktree agreed to step into Highland's shoes as Acis LP's sub-advisory and shared services provider, for a significantly lower price than what Highland was charging.

Of course, the Break-Up Fee is unique in one significant respect: it was expressly conditioned on the bankruptcy court's approval of Plan A. Plan A was based on the doctrine of equitable subrogation, "the legal fiction through which a person or entity, the subrogee, is substituted, or subrogated, to the rights and remedies of another by virtue of having fulfilled an obligation for which the other was responsible." *Gen. Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949-50 (5th Cir. 1999). Under the Trustee's theory, HCLOF was to be treated as a creditor of the estates on the basis of its adversary claim against the Trustee seeking specific performance of its optional redemption right. The Trustee proposed to monetize HCLOF's claim, and to satisfy that claim by paying HCLOF the sum of $100 million (provided by Oaktree). The Trustee would then, as subrogee, substitute himself as the holder of HCLOF's rights in the subordinated CLO notes. Finally, the Trustee would use his position as subrogee to transfer HCLOF's interest in the subordinated notes to Oaktree. The bankruptcy court acknowledged that "[t]he legal theories [underpinning Plan A] are not

Appellee Appx. 00815
Appx. 03689
007623

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 823 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 706 of 1017 PageID 8436
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 822 of 1803 PageID 11568
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 42 of 84 PageID 98035

at all clear cut and are likely to be hotly contested by [HCLOF] and Highland." Second

Appeal R. at 78. Despite this uncertainty, the bankruptcy court approved the Break-Up Fee.[29]

Break-up fees are by nature contingent upon uncertain future events. If a transaction

were sure to happen, there would be no need for a break-up fee. Highland essentially

contends that there was *too much* uncertainty here—that the bankruptcy court abused its

discretion by approving the Break-Up Fee "in the face of [a] huge execution risk and the

substantial legal authority that the Trustee's proposed transaction with Oaktree could not be

approved." Highland Second Appeal Br. 31. But Highland overstates the degree to which

the Trustee's theory was foreclosed by existing law. The bankruptcy court was aware of

authority suggesting that, in some circumstances, an entity's claim for specific performance

may be treated as a monetary claim against the bankruptcy estate under 11 U.S.C. § 101(5).

*See In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993). And under New York law, which

ostensibly governs the PMAs between Acis and the CLO-SPEs, the doctrine of equitable

subrogation is interpreted

> broad[ly] enough to include every instance in which one party
> pays a debt for which another is primarily answerable and which
> in equity and good conscience should have been discharged by
> the latter, so long as the payment was made either under
> compulsion or for the protection of some interest of the party

---

[29]The bankruptcy court later decided that Plan A was unconfirmable because the
Trustee could not be subrogated to the rights of an entity that did not hold a claim against the
estates. The bankruptcy court concluded that HCLOF did not hold such a claim because the
Equity PMA was not then in effect, and HCLOF could not sue to enforce the PMAs between
Acis and the CLO-SPEs because HCLOF was not a party to, or a third-party beneficiary of,
those PMAs. This decision is not part of the record in the Second Appeal.

Appellee Appx. 00816
Appx. 02681
007624

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 824 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 707 of 1017 PageID 8437
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 823 of 1803 PageID 11569
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 43 of 84 PageID 98036

making the payment, and in discharge of an existing liability.

*Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Corp.*, 878 N.Y.S.2d 97, 112 (N.Y. App. Div. 2009) (quoting *Gerseta Corp. v. Equitable Tr. Co. of N.Y.*, 150 N.E. 501, 504 (N.Y. 1926)). The bankruptcy court was thus within its discretion to conclude that the Trustee's theory was at least colorable.

More important, whether the benefits of the Break-Up Fee outweighed the risks is not for this court to decide. Unless the bankruptcy court committed a clear error of fact or incorrectly applied the law, this court cannot disturb its decision. *See Grigson*, 210 F.3d at 528. There is no indication that the bankruptcy court committed such an error here. The bankruptcy court recognized the potential benefits *and* the potential risks of approving the Break-Up Fee, and it properly applied the correct legal test—the § 503(b)(1)(A) standard—in coming to its conclusion that the Break-Up Fee benefited the estate.

The principal authority on which Highland relies, *Energy Future Holdings*, is not to the contrary. In that case, the Third Circuit affirmed the bankruptcy court's reconsideration of its own decision to authorize a break-up fee. *See Energy Future Holdings*, 904 F.3d at 301. The bankruptcy court originally approved the break-up fee on the premise that the fee would not be paid if a certain regulatory body did not permit the proposed transaction to go forward. *See id.* at 304. When the bankruptcy court learned that this premise was incorrect, it reconsidered the order and came to a different conclusion. *See id.* at 307. The Third Circuit, in affirming the bankruptcy court, *deferred to the bankruptcy court's discretion* to weigh the potential risks and benefits of allowing the fee:

- 43 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 825 of

Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 708 of 1017 PageID 8438

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 824 of 1803 PageID 11570

Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 44 of 84 PageID 98037

> In sum, the Termination Fee provision had the potential of providing a large benefit to the estates, but it also had the possibility to be disastrous. Once it had a complete understanding, the Bankruptcy Court properly weighed the various considerations and determined that the potential benefit was outweighed by the harm that would result under predictable circumstances. In other words, the risk was so great that the Fee was not necessary to preserve the value of Debtors' estates. Having made such a determination, the Bankruptcy Court did not abuse its discretion in denying the Fee in part.

*Id.* at 315 (footnote omitted). Likewise, the bankruptcy court in the present appeal was within its discretion to conclude that the benefits of the Break-Up Fee outweighed the risks, despite the uncertainty of the Trustee's legal theory.

B

The court considers next whether the Break-Up Fee was so large as to be unreasonable.

Highland cites no binding authority for the proposition that a break-up fee that meets the requirements of § 503(b)(1)(A) must be rejected if it is "unreasonable," nor does Highland explain what test a break-up fee must pass in order to be "reasonable." *See* Highland Second Appeal Br. 32-33. Assuming *arguendo* that it would be error to approve an "unreasonable" break-up fee, the court concludes that the bankruptcy court did not err in this respect. The bankruptcy court found that the Break-Up Fee constituted roughly 2.3% of the total price that Oaktree would pay under the terms of the proposed transaction. This amount is in line with break-up fees authorized by other courts. *See, e.g., In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("Except in extremely large transactions,

- 44 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 826 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 709 of 1017 PageID 8439
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 825 of 1803 PageID 11571
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 45 of 84 PageID 98038

break-up fees ranging from one to two percent of the purchase price have been authorized by some courts."); *see also Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 625 (S.D.N.Y. 1987) (approving 2% break-up fee); *In re Sea Island Co.*, 2010 WL 4393269, at *3 (Bankr. S.D. Ga. Sept. 15, 2010) (approving 3% break-up fee).

Highland contends that the relevant benchmark is not the total transaction price, but is instead the amount of money that Acis LP would retain after the transaction was complete. Applying Highland's logic, the Break-Up Fee is actually *26%* of the transaction's value. But Highland's logic does not stand up in light of the legal theory proposed by the Trustee in support of the transaction. Under Plan A, Oaktree was not purchasing HCLOF's subordinated notes outright. Rather, it was funding the proposed plan so that Acis could satisfy all of its creditors' claims—including HCLOF's liquidated claim for specific performance—in exchange for the Trustee's promise to use the doctrine of equitable subrogation to transfer the subordinated notes to Oaktree. There is no principled reason to compare the Break-Up Fee to the amount of money retained by Acis *after* paying off HCLOF's claim, but *before* paying off any other creditor's claim. Highland's unreasonableness argument lacks merit.

C

Finally, the court considers whether the bankruptcy court abused its discretion by concluding that the Expense Reimbursement was a proper exercise of the Trustee's business judgment.

Expense reimbursements are governed by 11 U.S.C. § 363(b), which incorporates a

Appellee Appx. 00819
Appx. 03684
007627

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 827 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 710 of 1017 PageID 8440
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 826 of 1803 PageID 11572
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 46 of 84 PageID 98039

business judgment standard. *See ASARCO*, 650 F.3d at 601-03. Section 363(b) permits a trustee, after notice and a hearing, to use, sell, or lease estate property other than in the ordinary course of business. *See id.* at 601. "In such circumstances, 'for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.'" *Id.* (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)). "The business judgment standard in section 363 is flexible and encourages discretion." *Id.*; *see also GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005) (Lynn, J.) ("Great judicial deference is given to the Trustee's exercise of business judgment.").

The bankruptcy court acknowledged that "Oaktree has spent significant time and expense related to the [Plan A] Transaction," and that "[i]t is reasonable to anticipate that Oaktree will continue to incur additional significant time and expense." Second Appeal R. 78. The bankruptcy court found that the Expense Reimbursement, along with the Break-Up Fee, was an "essential inducement[]" for Oaktree's continuing commitment to the Plan A transaction. *Id.* Oaktree's commitment to the proposed transaction was beneficial to the estates for the reasons explained *supra* at § V(A). Thus the bankruptcy court concluded that "the Trustee has established, in his business judgment, that the Expense Reimbursement is necessary here." *Id.* at 77. The bankruptcy court did not abuse its discretion.

Highland's arguments to the contrary are unavailing. Highland contends that the Trustee lacked any reasonable business justification for allowing the Expense

- 46 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 828 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 711 of 1017 PageID 8441
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 827 of 1803 PageID 11573

Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 47 of 84 PageID 98040

Reimbursement because he knew in advance that Plan A was unconfirmable, as evidenced by his proposing Plans B and C at the same time. The court disagrees. If the Trustee knew that Plan A could not be confirmed, then he would have had *no reason* to propose it in the first place—let alone any reason to go through the effort and expense of negotiating with Oaktree. Highland also argues that Oaktree "assume[d] the risk" of losing any money it spent in relation to the Plan A transaction, because Oaktree was experienced enough to know that Plan A could not be approved. Highland Second Appeal Reply 16. But the question is not whether Oaktree assumed any particular risk; the question is whether the Trustee had an "articulated business justification for" the Expense Reimbursement. *ASARCO*, 650 F.3d at 601 (quoting *Cont'l Air Lines*, 780 F.2d at 1226). The bankruptcy court did not abuse its discretion by concluding that he did.

The court therefore affirms the bankruptcy court's order approving the Break-Up Fee and Expense Reimbursement.

## VI

In the Third Appeal, Highland and Neutra contend that the filing of the First Appeal divested the bankruptcy court of subject matter jurisdiction to confirm the Plan.

### A

"It is a fundamental tenet of federal civil procedure that—subject to certain, defined exceptions—the filing of a notice of appeal from the final judgment of a trial court divests the trial court of jurisdiction and confers jurisdiction upon the appellate court." *In re Transtexas Gas Corp.*, 303 F.3d 571, 578-79 (5th Cir. 2002) (citing *Griggs v. Provident*

- 47 -

007629

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 829 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 712 of 1017 PageID 8442
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 828 of 1803 PageID 11574
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 48 of 84 PageID 98041

*Consumer Co.*, 459 U.S. 56, 58 (1982)). "This rule applies with equal force to bankruptcy cases." *Id.* at 579. Thus while an appeal is pending, the bankruptcy court cannot exercise control over "those aspects of the case involved in the appeal." *In re Scopac*, 624 F.3d 274, 280 (5th Cir. 2010) (quoting *Griggs*, 459 U.S. at 58), *modified on denial of reh'g*, 649 F.3d 320 (5th Cir. 2011).

But "the bankruptcy court retains jurisdiction to address elements of the bankruptcy proceeding that are not the subject of that appeal." *Transtexas*, 303 F.3d at 580 n.2. The Fifth Circuit "has specifically rejected 'the broad rule that a bankruptcy court may not consider any request which either directly or indirectly touches upon the issues involved in a pending appeal and may not do anything which has any impact on the order on appeal.'" *Scopac*, 624 F.3d at 280 (quoting *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 727 (5th Cir. 1991)). Instead, the Fifth Circuit has adopted a "functional test: 'once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process.'" *Id.* (quoting *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 759 (B.A.P. 1st Cir. 2007)).

Where courts have held that a bankruptcy court was divested of jurisdiction to enter a subsequent order, it is usually because the subsequent order would have modified, or would have been inconsistent with, an order pending on appeal. *See, e.g., Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court was divested of jurisdiction to supplement plan confirmation order that was then pending on appeal); *Whispering Pines*, 369 B.R. at 760

(concluding that bankruptcy court could not issue stay relief order that essentially modified confirmed plan while plan confirmation order was pending on appeal); *In re BNP Petroleum Corp.*, 2012 WL 7620694, at \*3 (S.D. Tex. Feb. 27, 2012) (observing that bankruptcy court can consider motion to set aside sale agreement, and can deny that motion, but cannot *grant* it while the order approving the sale agreement is pending on appeal); *In re Southold Dev. Corp.*, 129 B.R. 18, 19, 21 (E.D.N.Y. 1991) (invalidating order that modified reorganization plan, where plan confirmation order was already pending on appeal); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 1648725, at \*1, \*3-6 (Bankr. D.N.J. Apr. 24, 2014) (refusing to consider motion to clarify plan confirmation order that was pending on appeal, because a court "cannot take action that will alter or modify its prior order while that order is pending on appeal"); *In re New Century TRS Holdings, Inc.*, 2012 WL 2064500, at \*1-3 (Bankr. D. Del. June 7, 2012) (dismissing motion for sanctions where motion essentially repackaged issues and arguments then pending in appeal of motion for reconsideration); *In re Wallace's Bookstores, Inc.*, 330 B.R. 193, 195 (Bankr. E.D. Ky. 2005) (denying adversary plaintiff's motion to dismiss claims whose resolution was then pending on appeal); *see also Wireless Agents, LLC v. Sony Ericsson Mobile Comms. AB*, 2006 WL 1189687, at \*3 (N.D. Tex. May 3, 2006) (Fitzwater, J.) ("Because Wireless has appealed the court's denial of a preliminary injunction, the Federal Circuit has exclusive jurisdiction over the preliminary injunction motion, and this court cannot modify its preliminary findings of fact and conclusions of law during the pendency of the appeal."). Attempting to modify an order pending on appeal, or issuing a subsequent order that is inconsistent with the order being

- 49 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 831 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 714 of 1017    PageID 8444
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 830 of 1803    PageID 11576
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 50 of 84    PageID 98043

appealed, circumvents the appellate process. *Cf. Scopac*, 624 F.3d at 280 (holding that a
bankruptcy court cannot "interfere with or effectively circumvent the appeal process").

B

Neutra identifies three issues on appeal in the First Appeal that supposedly divested
the bankruptcy court of jurisdiction to confirm the Plan: (1) whether the bankruptcy court
erred by denying the Arbitration Motion; (2) whether the bankruptcy erred by not abstaining
under 11 U.S.C. § 305; and (3) whether Terry filed the involuntary petitions in good faith.

The appeal of the bankruptcy court's denial of the Arbitration Motion did not divest
the bankruptcy court of jurisdiction to issue further orders. In *Weingarten Realty Investors
v. Miller*, 661 F.3d 904 (5th Cir. 2011), the Fifth Circuit held that the appeal of an order
denying a motion to compel arbitration does not divest a district court of jurisdiction to
decide the merits of a case, even though a motion to compel arbitration—if granted—would
effectively end the case. *See id.* at 907-10. The *Weingarten* panel interpreted the divestiture
doctrine "narrowly." *See id.* at 908-09. It reasoned that, because the denial of a motion to
compel arbitration does not, as a matter of law, determine the merits of the case, the merits
question is not an "aspect[] of the case involved in the appeal," and the district court may
decide it. *See id.* at 909 (alteration in original) (quoting *Griggs*, 459 U.S. at 58). The Fifth
Circuit rejected the Seventh Circuit's reasoning that the appeal of a motion to compel
arbitration—much like the appeal of a motion to dismiss based on double jeopardy, sovereign
immunity, or qualified immunity—results in an automatic stay of the proceedings below
because "the appeal is to determine whether the matter should be litigated in the district court

- 50 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 832 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 715 of 1017    PageID 8445
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 831 of 1803    PageID 11577
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 51 of 84    PageID 98044

at all." *Id.* at 908 (citing *Bradford-Scott Data Corp. v. Physician Comput. Network*, 128 F.3d 504, 505-06 (7th Cir. 1997)).  Under *Weingarten*, because the bankruptcy court's ruling on the Arbitration Motion is separate from the merits of Plan confirmation, the appeal of that prior ruling did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The reasoning of *Weingarten* applies with full force to the § 305 abstention issue. Highland and Neutra have not shown that there is any overlap, as a matter of law, between the bankruptcy court's decision to confirm the Plan and its decision not to abstain from ruling on the involuntary petitions.  Thus even though the bankruptcy court's abstention decision "determine[d] whether the matter should be litigated in the [bankruptcy] court at all," *id.* at 908, the appeal of that decision did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The issue of Terry's good faith in filing the involuntary petitions presents a closer question.  For the bankruptcy court to confirm a plan, it must find, *inter alia*, that the plan was "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Eleventh Circuit has held that where an involuntary petition is filed in bad faith, any subsequently-proposed reorganization plan is *necessarily* proposed in bad faith and cannot be confirmed.  *See In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987); *but see In re Landing Assocs., Ltd.*, 157 B.R. 791, 812 (Bankr. W.D. Tex. 1993) ("Bank United relies on the legal standard established in several bad-faith filing cases for this proposition. However, a different legal standard is employed when evaluating good faith for plan confirmation purposes under [11 U.S.C.] § 1129(a)(3)." (citations omitted)).  Under the

- 51 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 833 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 716 of 1017 PageID 8446
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 832 of 1803 PageID 11578
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 52 of 84 PageID 98045

Eleventh Circuit's rule, the bankruptcy court's ruling that Terry filed the involuntary petitions in good faith has some bearing on its decision to confirm the Plan.

But even assuming that the Eleventh Circuit's rule applies, the court is not convinced that, under these circumstances, the First Appeal divested the bankruptcy court of jurisdiction to confirm the Plan. In issuing the confirmation order, the bankruptcy court did not directly exercise jurisdiction over the question of Terry's good faith in filing the involuntary petitions—it did not revisit, comment upon, or supplement its earlier decision. *See In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 680 (Bankr. S.D.N.Y. 2016) ("[A] confirmation order does not 'tamper' with prior rulings in the case; rather, to state the obvious, it confirms a plan of reorganization."); *cf. Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court lacked jurisdiction to supplement plan confirmation order that was then pending on appeal); *Southold Dev. Corp.*, 129 B.R. at 18, 21 (vacating order that modified reorganization plan that was pending on appeal); *710 Long Ridge, II, LLC*, 2014 WL 1648725, at *1, *3-6 (refusing to consider motion to clarify plan confirmation order that was pending on appeal). Nor did the bankruptcy court issue any order that was inconsistent with, or that implicitly modified, its previous ruling. *Cf. Whispering Pines*, 369 B.R. at 760 (concluding that bankruptcy court could not issue stay relief order that was inconsistent with confirmed plan while plan confirmation order was pending on appeal). Instead, the bankruptcy court proceeded in accordance with that ruling. It was entitled to do so—just as it was entitled to carry out the confirmed Plan in the absence of a stay order, even while the Plan confirmation order was pending on appeal. *See In re Prudential Lines, Inc.*, 170 B.R. 222, 243-44

Appellee Appx. 00826
Appx. 03591
007634

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 834 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 717 of 1017 PageID 8447
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 833 of 1803 PageID 11579
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 53 of 84 PageID 98046

(S.D.N.Y. 1994). If the bankruptcy court had instead *denied* plan confirmation on the ground that Terry filed the involuntary petitions in *bad faith*, the divestiture analysis might be different. *Cf. BNP Petroleum*, 2012 WL 7620694, at *3 (observing that bankruptcy court can deny motion to set aside sale agreement, but cannot grant it while the order approving the sale agreement is pending on appeal). As it is, however, the bankruptcy court's Plan confirmation order did not in any way interfere with, or circumvent, this court's consideration of the First Appeal.

Moreover, to conclude that Neutra's appeal of the orders for relief divested the bankruptcy court of jurisdiction to confirm the Plan would be to hold that whenever an order for relief is entered, any disappointed litigant—even a litigant who *lacks standing to appeal*—can bring the bankruptcy case grinding to a halt. But the divestiture doctrine is not intended to "cede control of the conduct of a chapter 11 case to disappointed litigants. This cannot be, and is not, the law." *Sabine*, 548 B.R. at 680. And such a decision would be contrary to Fifth Circuit precedent indicating that "a narrow interpretation [of divestiture doctrine] is normally appropriate." *See Weingarten*, 661 F.3d at 908. The court thus concludes that the First Appeal did not divest the bankruptcy court of jurisdiction to confirm the Plan.

VII

The court now turns to the contention of HCLOF (joined by Highland and Neutra) in the Third Appeal that the bankruptcy court erred by confirming the Plan because the Temporary Injunction—a crucial part of the Plan—is unlawful.

- 53 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 835 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 718 of 1017 PageID 8448
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 834 of 1803 PageID 11580
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 54 of 84 PageID 98047

A

The bankruptcy court had authority to enter the Temporary Injunction under 11 U.S.C.

§§ 105(a) and 1123(b)(6), and had jurisdiction to do so under 28 U.S.C. § 157(b)(2)(L).

Section 157(b)(2)(L) grants the bankruptcy court jurisdiction to enter final orders concerning

the confirmation of plans.[30]  Section 1123(b)(6) gives bankruptcy courts residual authority

to include in a plan "any other appropriate provision not inconsistent with the applicable

provisions of this title."  11 U.S.C. § 1126(b)(6).  The bankruptcy court can exercise its

residual authority via § 105(a), which provides that "[t]he court may issue any order, process,

or judgment that is necessary or appropriate to carry out the provisions of this title."  11

U.S.C. § 105(a).

Section 105(a) permits a bankruptcy court "to fashion such orders as are necessary to

further the substantive provisions of the Bankruptcy Code."  *In re Sadkin*, 36 F.3d 473, 478

(5th Cir. 1994) (per curiam) (quoting *In re Oxford Mgmt. Inc.*, 4 F.3d 1329, 1333 (5th Cir.

1993)).  But the bankruptcy court's § 105(a) powers are not unlimited: the statute "does not

authorize the bankruptcy courts to create substantive rights that are otherwise unavailable

---

[30]To the extent that a temporary plan injunction restrains a third-party *lawsuit*, the bankruptcy court must have statutory "related to" jurisdiction over that lawsuit per 28 U.S.C. § 157(a).  *See In re Seatco, Inc.*, 257 B.R. 469, 475-76 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.).  For the reasons discussed *infra* at note 34, the bankruptcy court has statutory "related to" jurisdiction over all lawsuits potentially restrained by the Temporary Injunction.  For the reasons discussed *infra* at § VII(B), the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), does not affect the bankruptcy court's statutory jurisdiction to issue a temporary plan injunction.

Appellee Appx. 00828
007636

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 836 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 719 of 1017 PageID 8449
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 835 of 1803 PageID 11581
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 55 of 84 PageID 98048

under applicable law, or constitute a roving commission to do equity." *Id.* (quoting *Oxford Mgmt.*, 4 F.3d at 1333). The Trustee[31] contends that the bankruptcy court's § 105(a) powers are broad enough to allow it to temporarily enjoin a non-debtor, non-creditor entity—HCLOF—from attempting to assert certain contractual rights, at least where such an injunction is necessary to the debtors' successful reorganization.[32]

Fifth Circuit precedent indicates that § 105(a) *does*, under some circumstances, permit a bankruptcy court to enjoin a non-debtor, non-creditor entity from taking particular actions. *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995), involved a challenge to a § 105(a) injunction that prohibited certain nonparties from filing lawsuits against certain other nonparties. *See id.* at 750-51. The Fifth Circuit—citing 11 U.S.C. § 524, which forbids the discharge of the debts of nondebtors—invalidated the injunction insofar as it constituted a *permanent* release of the nonparties' claims. *See id.* at 760-61. But the court noted that "[t]he impropriety of a permanent injunction does not necessarily extend to a temporary injunction of third-party actions." *Id.* at 761. The court provided a non-exhaustive list of "unusual circumstances" that might justify such an injunction: "1) when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and 2) when the third-party action will have an adverse impact on the debtor's ability to

---

[31]On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal, arguing that once the Plan took effect, Acis became the Trustee's successor-in-interest. The court addresses this motion *infra* at § XI.

[32]The court expresses no opinion on the question whether the Equity PMA or any other contract presently entitles HCLOF to demand an optional redemption of the CLOs.

- 55 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 837 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 720 of 1017   PageID 8450
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 836 of 1803   PageID 11582
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 56 of 84   PageID 98049

accomplish reorganization." *Id.* Bankruptcy judges in this district have approved temporary injunctions under *Zale* multiple times. *See In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 117 (Bankr. N.D. Tex. 2002) (Hale, J.); *In re Seatco, Inc.*, 257 B.R. 469, 476-78 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 749-53 (Bankr. N.D. Tex. 2015) (Houser, J.) (applying *Zale* unusual-circumstances test and declining to issue injunction). As discussed below, the second unusual circumstance described in *Zale* is present here.[33]

The court recognizes that the bankruptcy court did not rely on this rationale. Instead, it based the Temporary Injunction on its ostensible authority over the Trustee Adversary. The bankruptcy court described the Trustee Adversary as "a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan." *Acis II*, 2019 WL 417149, at *8. It conducted its four-prong preliminary-injunction analysis in the context of, and based on the likelihood of success of, the Trustee Adversary. *See id.* at *10-12. This court, of course, can affirm the bankruptcy court on alternative grounds. *See, e.g.*, *Cimmaron Oil Co. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1011 (N.D. Tex. 1987)

---

[33]The *Zale* panel ultimately vacated the temporary injunction because it was not issued after an adversary proceeding, as required at the time by Rule 7001(7). *See Zale*, 62 F.3d at 764-65. But Rule 7001(7) was amended in 1999 so that it does not apply where, as here, "a . . . chapter 11 . . . plan provides for the [injunctive] relief." Rule 7001(7); *see* Rule 7001 advisory committee's note (1999 amendments). And HCLOF, unlike the objectors in *Zale*, had a full and fair opportunity to present its objections to the bankruptcy court. *Cf. Zale*, 62 F.3d at 763-64.

Appellee Appx. 00830
Appx. 03695
007638

(Fitzwater, J.) ("[T]his court may affirm a correct judgment for reasons not given by the court below or advanced to it."). But here, the bankruptcy court's rationale is significant because "[i]f the bankruptcy court does not determine that unusual circumstances exist, the court may not enter an injunction of the third-party actions." *Zale*, 62 F.3d at 761.

The bankruptcy court's factual findings are nonetheless sufficient to satisfy the "unusual circumstances" requirement. The bankruptcy court expressly found that the Temporary Injunction is a "critical component of the Plan," *Acis II*, 2019 WL 417149, at *10, and that "[t]he Temporary Plan Injunction is essential to [Acis'] ability to perform the Plan," *In re Acis Capital Mgmt., L.P.*, 2019 WL 406137, at *14 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.). HCLOF has twice demanded that Acis effect an optional redemption of the CLOs, and its directors testified that it will do so again if given the chance. *See Acis II*, 2019 WL 417149, at *10. The bankruptcy court found that an optional redemption would be an economically "[ir]rational" transaction that would serve as the last step in Highland's "intentional scheme to keep assets away from Mr. Terry as a creditor." *Id.* at *12. It further found that if HCLOF succeeds in forcing an optional redemption, Acis "[will] have no going concern value," and "Terry will be precluded from reorganizing the business and paying creditors" in accordance with the Plan. *Id.* at *10. Thus the Temporary Injunction enjoins third-party conduct that would adversely impact the ability of Acis to reorganize. These are unusual circumstances that justify the bankruptcy court's Temporary Injunction. *Cf. Zale*, 62 F.3d at 762 ("We hold that [the bankruptcy court's] language satisfies the 'unusual circumstances' requirement because it clearly identifies the settlement as providing

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 839 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 722 of 1017 PageID 8452
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 838 of 1803 PageID 11584
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 58 of 84 PageID 98051

'substantial consideration' to the estate and constituting part of a 'key provision' of the plan.").[34]

B

HCLOF argues that the Trustee cannot invoke § 105(a) to support an injunction that is prohibited under *Stern v. Marshall*, 564 U.S. 462 (2011). In *Stern* the Supreme Court concluded that certain claims and controversies must, as a constitutional matter, be resolved by an Article III court, even if they are statutorily committed to the jurisdiction of the bankruptcy court. *See id.* at 482. HCLOF contends that the Trustee Adversary, which "is

---

[34]The Fifth Circuit's recent decision in *SEC v. Stanford International Bank, Ltd.*, 927 F.3d 830, ___, 2019 WL 2496901, at *5-7 (5th Cir. June 17, 2019), is not to the contrary. The *Stanford* panel interpreted *Zale*'s discussion of certain limits on a bankruptcy court's statutory "related to" jurisdiction to be a broad "maxim of law" that applies to all receiverships, regardless of the statutory basis of jurisdiction. *See id.* at ___, 2019 WL 2496901, at *6. *Zale* and *Stanford* thus stand for the proposition that a court overseeing a receivership lacks jurisdiction to enjoin third-party lawsuits whose resolution would have no effect on the *res* of the estate. *See id.* at ___, 2019 WL 2496901, at *7 (stating that courts lack jurisdiction "to permanently bar and extinguish independent, non-derivative third-party claims that do not affect the *res* of the receivership estate"); *Zale*, 62 F.3d at 752 ("Those cases in which courts have upheld 'related to' jurisdiction over third-party actions do so because the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate." (footnotes omitted)); *see also In re FoodServiceWarehouse.com, LLC*, 601 B.R. 396, ___, 2019 WL 1877006, at *10 (E.D. La. Apr. 26, 2019) ("If the outcome of a proceeding could conceivably have *any effect* on the estate being administered in bankruptcy, then 'related to' jurisdiction will generally exist." (citing *Zale*, 62 F.3d at 755)). The Temporary Injunction, however, enjoins certain acts that *would* affect the *res* of the bankruptcy estate. The bankruptcy court found that after an optional redemption, Acis "would have no going-concern value" because it would no longer receive any management fees with which to pay creditors. *Acis II*, 2019 WL 417149, at *10. Thus the equitable principles endorsed by *Stanford* do not prevent the bankruptcy court from issuing the Temporary Injunction pursuant to § 157(b)(2)(L)'s conferral of subject matter jurisdiction.

- 58 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 840 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 723 of 1017 PageID 8453
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 839 of 1803 PageID 11585
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 59 of 84 PageID 98052

essentially a multi-faceted fraudulent transfer action," *Acis II*, 2019 WL 417149, at \*8,
involves such a claim. Thus, according to HCLOF, the bankruptcy court lacks authority to
grant final relief in the Trustee Adversary, and where a court lacks the power to grant a
litigant *final* relief, it cannot grant *preliminary* relief. *See* HCLOF Third Appeal Br. 22
(citing *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561-62 (5th Cir. 1987)).
HCLOF maintains that, because *Stern* prohibits the bankruptcy court from issuing the
Temporary Injunction in the context of the Trustee Adversary, the bankruptcy court cannot
issue the Temporary Injunction as part of the confirmed Plan.

Assuming *arguendo* that a fraudulent transfer claim brought by a bankruptcy trustee
against a non-creditor is a *Stern* claim—i.e., "a claim designated for final adjudication in the
bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a
constitutional matter," *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25, 30-31
(2014)—the court disagrees with HCLOF's contention. Whatever the precise contours of
*Stern*, it only concerns the power of a bankruptcy court to enter a "final judgment" on certain
causes of action. *See Stern*, 564 U.S. at 503 ("The Bankruptcy Court below lacked the
constitutional authority to enter a *final judgment* on a state law counterclaim that is not
resolved in the process of ruling on a creditor's proof of claim." (emphasis added)). When
the bankruptcy court exercises powers that are *independent of* its authority to enter a final
judgment on a claim—e.g., when it makes use of its authority under § 105(a) to issue a
temporary plan injunction—*Stern* simply does not apply. *See, e.g., In re Yellowstone
Mountain Club, LLC*, 646 Fed. Appx. 558, 558-59 (9th Cir. 2016) (per curiam) (holding that

Appellee Appx. 00833
Appx. 03698
007641

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 841 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 724 of 1017 PageID 8454
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 840 of 1803 PageID 11586
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 60 of 84 PageID 98053

*Stern* did not apply because "the bankruptcy court issued a preliminary injunction [pursuant to § 105(a)], not a final judgment"); *In re Quigley Co.*, 676 F.3d 45, 52 (2d Cir. 2012) ("[A]t issue here [is] the stay of litigation during the pendency of [debtor's] bankruptcy, rather than the entry of final judgment on a common law claim.").

This conclusion is consistent with the Article III concerns underlying *Stern*. According to *Stern*, Article III creates an independent judiciary by guaranteeing federal judges life tenure and an irreducible salary. *See Stern*, 564 U.S. at 483-84. But "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Id.* at 484. Thus, as a general rule, "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty,'" and place that matter within the authority of an Article I bankruptcy court. *Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)).

The Temporary Injunction does not "withdraw from judicial cognizance any matter" of any kind whatsoever. *Id.* (quoting *Murray's Lessee*, 59 U.S. (18 How.) at 284). Instead, it *temporarily* enjoins a number of parties and non-parties from taking any action—including, presumably, pursuing a lawsuit—in furtherance of an optional redemption or liquidation of the Acis CLOs. To the extent that the Temporary Injunction affects any legal claims, it does not prevent an Article III court from entering a final judgment on those claims after the Temporary Injunction is lifted. In other words, it has no *res judicata* effect on those claims.

- 60 -

*Cf.* 43A C.J.S. *Injunctions* § 378 (2019) ("A temporary or preliminary injunction does not adjudicate the ultimate rights in controversy and it is not conclusive on the court on a subsequent hearing.").  In this respect, the Temporary Injunction is similar to other mine-run, temporary bankruptcy injunctions—including the automatic stay, a hallmark of bankruptcy law that bars creditors from commencing or continuing any judicial action to recover a debt from the debtor after a bankruptcy petition is filed.  *See* 11 U.S.C. § 362(a); *see also In re Quigley*, 676 F.3d at 52 ("Enjoining litigation to protect bankruptcy estates during the pendency of bankruptcy proceedings, unlike the entry of the final tort judgment at issue in *Stern*, has historically been the province of the bankruptcy courts.").  Thus even if *Stern* prevents the bankruptcy court from entering a final judgment in the Trustee Adversary, it has no bearing on whether the bankruptcy court can issue the Temporary Injunction as part of the confirmed Plan.[35]

C

When a bankruptcy court issues a temporary injunction under § 105(a) as part of a confirmed plan, the bankruptcy court must still consider the four-prong preliminary injunction test.  *See, e.g., Seatco*, 257 B.R. at 477 (applying traditional preliminary-injunction factors in approving a temporary plan injunction under *Zale*).  The factors are (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury

---

[35]The present appeal does not involve, and the court does not address, the propriety of a plan provision that finally adjudicates a *Stern* claim.  Nor does the court decide whether a bankruptcy court can grant preliminary relief on a *Stern* claim outside the context of a plan confirmation order.

- 61 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 843 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 726 of 1017   PageID 8456
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 842 of 1803   PageID 11588
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 62 of 84   PageID 98055

if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *See, e.g., Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

The first factor, when applied to a temporary plan injunction, turns on whether the reorganization plan is likely to succeed. *See Seatco*, 257 B.R. at 477. In support of the Temporary Injunction, the bankruptcy court evaluated the likelihood of success of the Trustee Adversary, not the likelihood of success of the Plan. *See Acis II*, 2019 WL 417149, at *11-12. But the bankruptcy court separately determined that the Plan is feasible, *see id.* at *14, and its factual findings in that context support the conclusion that the Plan is substantially likely to succeed. The bankruptcy court found that Terry has an excellent track record as a portfolio manager; that Terry will be able to generate new business for Acis; and that Brigade is qualified to serve as the sub-advisor to Acis. *See id.* Thus in the absence of an optional redemption, it is substantially likely that the reorganized Acis will be able to satisfy its creditors' claims and emerge from bankruptcy.

The bankruptcy court did not clearly err in finding that, without the Temporary Injunction, Acis faces a substantial threat of irreparable injury: specifically, "evisceration of the Acis CLOs, by parties with unclean hands." *Id.* at *10. The bankruptcy court found that an optional redemption would leave Acis with nothing to manage, and thus no going-concern value and no means of satisfying its creditors' claims. *See id.* Highland and Neutra argue that Acis has an adequate remedy at law because all it stands to lose is money—i.e., the

- 62 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 844 of
Case 3:25-cv-02072-S Document 15-10 1804 10/06/25 Page 727 of 1017 PageID 8457
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 843 of 1803 PageID 11589
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 63 of 84 PageID 98056

management fees generated by the PMAs—and it can recover that money via a final
judgment in the Trustee Adversary. But there is more at stake here than money. Without the
Temporary Injunction, Acis will have no opportunity to *reorganize* instead of *liquidate*—and,
"[a]s the Code contemplates, the Debtor should be given the opportunity to successfully
reorganize." *Seatco*, 257 B.R. at 477. To deny Acis the chance to reorganize would be to
subject it to a substantial threat of irreparable injury.

The bankruptcy court likewise did not clearly err in finding that the risk of harm to
Acis in the absence of an injunction outweighs any potential harm to HCLOF. Indeed, the
bankruptcy court found that there *is* no potential harm to HCLOF because "a rational investor
would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under
the Plan." *Acis II*, 2019 WL 417149, at *12. The Plan allows for just such a reset.[36] Thus
HCLOF's complaint that it is losing money on the CLOs as they are currently structured
lacks force.

Finally, the bankruptcy court did not clearly err in finding that the public interest
favors an injunction. The public has an interest in allowing businesses to reorganize instead
of liquidate. And, more important, there is a strong public interest *against* "allowing
potential wrongdoers to complete the last step in what appears likely to have been a scheme

---

[36]HCLOF contends that a reset is impossible under the terms of an offering
memorandum that it issued in November 2017—i.e., within a month after Terry's arbitration
award was issued—but the bankruptcy court did not find this contention to be credible, and
this court will not disturb the bankruptcy court's credibility findings in the absence of clear
error.

Appellee Appx. 00837
Appx. 03792
007645

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 845 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 728 of 1017    PageID 8458
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 844 of 1803    PageID 11590
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 64 of 84    PageID 98057

to strip [Acis] of its assets, steal its business, and leave it unable to pay creditors." *Id.*  The

bankruptcy court therefore did not err by concluding that the four-part preliminary injunction

test supports the Temporary Injunction.

## VIII

Highland and Neutra argue that the Trustee proposed the Plan in bad faith, contrary

to 11 U.S.C. § 1129(a)(3).

### A

The first contention that Highland and Neutra advance is that Terry filed the

involuntary petitions in bad faith per 11 U.S.C. § 303(i)(2), and, as a result, any

subsequently-proposed plan was necessarily proposed in bad faith.  Highland and Neutra

base their argument on *Natural Land Corp.*, 825 F.2d 296, in which the Eleventh Circuit held

that "the taint of a petition filed in bad faith must naturally extend to any subsequent

reorganization proposal." *Id.* at 298.  It is not clear that this rule applies in the Fifth Circuit,

and at least one bankruptcy court has declined to apply it.  *See Landing Assocs.*, 157 B.R. at

812.  But assuming *arguendo* that *Natural Land Corp.* does apply, Highland and Neutra have

nonetheless failed to establish that Terry filed the involuntary petitions in bad faith.

#### 1

The first question the court must resolve is what standard of review to apply.  In their

briefing in the First Appeal, Neutra and Terry agreed that the question whether Terry filed

the involuntary petitions in good faith is a factual determination governed by the clear error

standard.  At oral argument, however, Neutra challenged whether this is the correct standard

- 64 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 846 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 729 of 1017    PageID 8459
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 845 of 1803    PageID 11591
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 65 of 84    PageID 98058

of review.  But case law supports applying the clear error standard to the question of the

petitioner's good faith.  *See, e.g., In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 245 (B.A.P.

9th Cir. 2007) ("The bankruptcy court's finding of the absence of bad faith is reviewed under

the clearly erroneous standard."); *In re Funnel Sci. Internet Mktg., LLC*, 551 B.R. 262, 269

(E.D. Tex. 2016) ("The Court reviews the Bankruptcy Court's determination of bad faith for

clear error as a finding of fact."); *Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R.

768, 785 (E.D. Pa. 2014) ("'Proving an involuntary petition was filed in bad faith requires

an inquiry into the creditor's knowledge,' a factual question that is reviewed for clear error."

(quoting *In re Bock Transp., Inc.*, 327 B.R. 378, 381 (B.A.P. 8th Cir. 2005))), *aff'd sub nom.*

*In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015).  Moreover, Fifth

Circuit case law provides that, post-filing, "[a] bankruptcy court's determination that a debtor

has acted in bad faith is a finding of fact reviewed for clear error."  *In re Jacobsen*, 609 F.3d

647, 652 (5th Cir. 2010).  The parties do not cite any cases suggesting that *de novo* review

would apply; nor would it make sense to conduct a *de novo* review of what is, in large part,

a question of the petitioner's intentions.  The court will therefore apply the clear error

standard.[37]

---

[37]There is some case law suggesting that, where a bankruptcy court dismisses an
involuntary petition on the ground that the petitioner filed it in bad faith, the *dismissal* is
reviewed for abuse of discretion.  *See, e.g., Forever Green*, 804 F.3d at 335.  But even then,
the bankruptcy court's finding that the petitioner acted in bad faith is reviewed for clear error.
*See In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007); *see also Jacobsen*, 609 F.3d at 652
(observing that "[a] bankruptcy court's determination that a debtor has acted in bad faith is
a finding of fact reviewed for clear error," even while "[t]he decision to convert a Chapter
13 case to Chapter 7" on that ground "is reviewed for abuse of discretion").

Appellee Appx. 00839
Appx. 03704
007647

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 847 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 730 of 1017    PageID 8460
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 846 of 1803    PageID 11592
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 66 of 84    PageID 98059

2

The court next considers what legal test governs a determination of bad faith.  This is not a clear-cut or easy question: courts have developed a "dizzying array of standards" that can be applied to the issue.  *Forever Green*, 804 F.3d at 335.  Some of these tests include:

> (1) the "improper use" test, which finds bad faith when a petitioning creditor uses involuntary bankruptcy proceedings in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum[;]

> (2) the "improper purpose" test, which finds bad faith based upon the petitioner's improper motivation for filing the petition. Cases under this line of reasoning have emphasized that the petition was motivated by ill will, malice or for the purpose of harassing the debtor[;]

> (3) the "objective test," which essentially asks the question whether or not a reasonable person would have filed the involuntary petition under the same circumstances;

> (4) the "subjective test" which is almost identical to the "improper purpose" test in that they both look to the subjective motivation of the petitioning creditor for the filing; and

> (5) the "combined" or "two part" test which finds bad faith based upon consideration of both the subjective motivation and the objective reasonableness of the petitioning creditor(s).[38]

---

[38]The "combined test" is often guided by principles from Rule 9011, which mirrors Fed. R. Civ. P. 11.  *See In re Landmark Distribs., Inc.*, 189 B.R. 290, 310 n.24 (Bankr. D.N.J. 1995).  The Second and Eleventh Circuits have likewise observed that "a number of courts have sought to model the bad faith inquiry on the standards set forth in Bankruptcy Rule 9011." *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 106 (2d Cir. 2000) (citing *Gen. Trading, Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501-02 (11th Cir. 1997)).

Appellee Appx. 00840
Appx 03795
007648

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 848 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 731 of 1017   PageID 8461
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 847 of 1803   PageID 11593
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 67 of 84   PageID 98060

*In re Landmark Distribs., Inc.*, 189 B.R. 290, 309-10 (Bankr. D.N.J. 1995) (citations and footnotes omitted). Courts have also applied a "totality of circumstances" test, which essentially combines the improper use, improper purpose, and objective tests. *See, e.g., Forever Green*, 804 F.3d at 336 (citing *In re John Richards Homes Bldg. Co.*, 439 F.3d 248, 255 n.2 (6th Cir. 2006)). This test has been used by at least one bankruptcy court in this circuit. *See In re TRED Holdings, L.P.*, 2010 WL 3516171, at *7 (Bankr. E.D. Tex. Sept. 3, 2010).

The Fifth Circuit has not expressly endorsed any particular standard, but it has considered both objective and subjective factors in deciding whether an involuntary petition was filed in bad faith. *See In re Sims*, 994 F.2d 210, 222 (5th Cir. 1993) (considering whether "the filing of the petitions was 'motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor[s],'" and whether petitioners "conducted a reasonable inquiry into the facts and the law prior to filing the petitions, as required by Bankruptcy Rule 9011" (alteration in original) (quoting *In re W. Side Cmty. Hosp., Inc.*, 112 B.R. 243, 258 (Bankr. N.D. Ill. 1990))). Any test that considers *only* subjective or objective factors thus cannot be correct. The court will therefore apply a totality of circumstances or combined test in analyzing Terry's good faith.

3

Applying the above principles, the court concludes that the bankruptcy court did not clearly err by holding that Terry filed the involuntary petitions in good faith.

On the question of Terry's alleged bad faith, the bankruptcy court found:

- 67 -

> the evidence suggested that Mr. Terry and his counsel filed the
> Involuntary Petitions out of a legitimate concern that Highland
> was dismantling and denuding Acis LP of all of its assets and
> value and that a bankruptcy filing was the most effective and
> efficient way to preserve value for the Acis LP creditors.

*Acis I*, 584 B.R. at 144. This finding is not clearly erroneous. The record before the

bankruptcy court showed that Acis and Highland had engaged in numerous transactions that

stripped Acis of much of its value, and that Terry only filed the involuntary petitions after

learning about these transactions during post-judgment discovery. *See supra* § I(C). Terry

testified that he believed bankruptcy was the best way to stop Acis from making further

fraudulent transfers, so that the entire community of Acis' creditors could receive an

equitable distribution of assets. The bankruptcy court was entitled to credit this testimony.

Terry also took the objectively reasonable step of consulting with bankruptcy counsel, albeit

briefly, before making the filing. He reasonably believed that Acis had fewer than 12

creditors based on a net-worth affidavit he received during post-judgment discovery in the

44th Judicial District Court of Dallas County. As for whether Acis was paying its debts as

they came due, Terry was aware of a number of accruing debts that Acis owed—including

his own judgment against Acis. He also reasonably concluded that if Acis were stripped of

its assets, then *no* creditor would be paid. The bankruptcy court did not clearly err by finding

that Terry filed the petitions based on a legitimate, good-faith belief that Acis was

fraudulently transferring assets to the detriment of all creditors.

Terry's motive, as characterized by the bankruptcy court, is a proper bankruptcy

purpose. The Third Circuit, in a case relied upon by Neutra, describes "protect[ing] against

- 68 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 850 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 733 of 1017 PageID 8463
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 849 of 1803 PageID 11595
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 69 of 84 PageID 98062

the preferential treatment of other creditors or the dissipation of the debtor's assets" as legitimate purposes of an involuntary petition. *Forever Green*, 804 F.3d at 335. An additional "purpose of an involuntary procedure is to provide a method for creditors to protect their rights against debtors who are not meeting their debts" by "forc[ing] [them] to submit to the jurisdiction of the bankruptcy court." *In re All Media Props., Inc.*, 5 B.R. 126, 137 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. Unit A May 1981) (adopting opinion of bankruptcy court). The bankruptcy court's characterization of Terry's "concern that Highland was dismantling and denuding Acis LP of all of its assets and value," to the detriment of all of Acis' creditors, fits comfortably into the bankruptcy purposes described above. *See Acis I*, 584 B.R. at 144.

Neutra argues that the timing of Terry's petitions reveals that he was not actually concerned about fraudulent asset transfers. Neutra points out that Terry filed the involuntary petitions mere hours before a scheduled temporary injunction hearing in Texas state court, and following a single meeting with bankruptcy counsel. According to Neutra, Terry's real motive was to collect his judgment in a more favorable forum. But Neutra's argument constitutes, at best, a plausible alternative view of the evidence. On appellate review, this court may not substitute its own interpretation of the evidence for that of the bankruptcy court in the absence of clear error. *See Johnson Sw.*, 205 B.R. at 827. Because the bankruptcy court did not commit clear error, its pertinent factual findings must be affirmed. *See id.*

Neutra cites a number of cases for the proposition that when an involuntary petition

Appellee Appx. 00843
Appx. 03708
007651

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 851 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 734 of 1017 PageID 8464
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 850 of 1803 PageID 11596
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 70 of 84 PageID 98063

is filed as a collection remedy in what is essentially a two-party dispute, the petition is necessarily filed in bad faith. But Neutra's cases are distinguishable.

In *In re Smith*, 243 B.R. 169 (Bankr. N.D. Ga. 1999), the court found bad faith using a combined subjective and objective test where: (1) the petitioning creditor based its petition on the claim that the alleged debtor was fraudulently transferring assets, but had no evidence of any such transfers; (2) the case involved essentially a two-party dispute, and the petitioning creditor had sufficient remedies under state law; (3) the evidence showed that the petitioning creditor was motivated by a desire to shut down the debtor's business operations and to have the debtor criminally prosecuted; (4) the petitioning creditor failed to conduct critical research before filing its petition; and (5) the petitioning creditor failed to disclose the existence of additional creditors. *See id.* at 195-201. Here, by contrast, there *is* evidence that Highland was denuding Acis of assets; the bankruptcy court found that this is not a two-party dispute and that Terry's remedies under state law were insufficient; Terry conducted sufficient research before filing; and the bankruptcy court did not find that Terry was motivated by ill will or malice toward the debtor.

In *In re Frailey*, 144 B.R. 972 (Bankr. W.D. Pa. 1992), the court stated that "[a] bankruptcy court should refuse to enter an order for relief where petitioning creditors can go into state court to satisfy a debt." *Id.* at 977-78. But the cases cited by the *Frailey* court indicate that it did not make this statement in the context of a bad-faith filing analysis. *See id.* (citing *In re Cent. Hobron Assocs.*, 41 B.R. 444, 451 (D. Haw. 1984) (applying balancing test to exclude unpaid debt from "not generally paying" determination); *In re Kass*, 114 B.R.

Appellee Appx. 00844
Appx. 03709
007652

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 852 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 735 of 1017    PageID 8465
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 851 of 1803    PageID 11597
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 71 of 84    PageID 98064

308, 309 (Bankr. S.D. Fla. 1990) (conducting abstention analysis under 11 U.S.C. § 305)).

Indeed, the court in *Frailey* declined (on other grounds) to award the alleged debtor damages

under § 303(i). *See id.* at 978. The case is therefore inapposite.[39]

*In re Tichy Elec. Co.*, 332 B.R. 364 (Bankr. N.D. Iowa 2005), states: "[t]he power of

an involuntary petition must be exercised for the good of the entire creditor body and for

legitimate bankruptcy purposes. It is not intended to be used in an exclusively self-serving

manner as a collection device." *Id.* at 376. But in the present case, the bankruptcy court

found that Terry acted out of concern for the entire body of Acis' creditors. And the

petitioning creditors in *Tichy* did not actually intend to liquidate or reorganize the debtor.

Rather, "[t]hey understood that after filing, some negotiations would occur, payments would

be made, and the case dismissed." *Id.* In other words, the petitioning creditor intended to

use the threat of bankruptcy as leverage to negotiate a settlement with the debtor. That does

not appear to be the case here. Finally, unlike the present appeals, there is no indication in

*Tichy* that the alleged debtor was fraudulently transferring assets in order to frustrate

collection efforts. *See generally id.*

---

[39]Similarly, *In re Tarletz*, 27 B.R. 787 (Bankr. D. Colo. 1983), states that "it is obvious
that the use of the bankruptcy court as a routine collection device would quickly paralyze this
Court." *Id.* at 794. But this was in the context of 11 U.S.C. § 305 abstention, *not* a bad-faith
filing analysis. *See id.* at 793. And *In re Spade*, 258 B.R. 221 (Bankr. D. Colo. 2001), holds
that where a petitioning creditor seeks only to gain a litigation advantage over the debtor, and
does not seek the orderly distribution of the debtor's assets to all creditors, § 305 abstention
is appropriate. *See id.* at 233. Not only does *Spade* not involve a § 303(i) bad-faith analysis,
it is also factually inapposite: the bankruptcy court here found that Terry *was* motivated by
concern for all of Acis' creditors.

- 71 -

Appellee Appx. 00845
Appx. 03719
007653

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 853 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 736 of 1017 PageID 8466
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 852 of 1803 PageID 11598
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 72 of 84 PageID 98065

In sum, because the bankruptcy court did not commit clear error in determining that Terry filed the involuntary petitions in good faith, its relevant findings on this issue must be affirmed. Neutra and Highland's argument that the proposed Plan was tainted by Terry's bad-faith filing therefore fails to establish that the bankruptcy court committed reversible error.

B

Highland and Neutra maintain that the Plan fails to satisfy § 1129(a)(3) because it effects an unlawful result: allowing a portfolio manager to veto the wishes of the portfolio's owner. They cite *In re Noll*, 172 B.R. 122 (Bankr. M.D. Fla. 1994), for the premise that a reorganization plan cannot be proposed in order to obtain a result that would be unobtainable in state court. Highland and Neutra's reliance on *Noll* is misplaced. *Noll* is, by its own terms, of limited instructive value—it states that "one cannot define [bad faith] but will readily recognize it when one sees it." *Id.* at 124. The case is factually distinguishable because it involves a proposed plan that, in essence, would have constituted self-dealing by the plan proponent (who was not a disinterested trustee). *See id.* And it is difficult to square Highland and Neutra's characterization of the holding of *Noll*—that a reorganization plan cannot be used to obtain results that are unobtainable in state court—with Neutra's argument in the bad-faith filing context that filing involuntary petitions is *only* appropriate when the petitioner lacks adequate remedies in state court.

Highland and Neutra argue that the Plan is unlawful because it contains an overbroad release. They complain about language "vesting assets in the reorganized debtor 'free and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 854 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 737 of 1017 PageID 8467
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 853 of 1803 PageID 11599
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 73 of 84 PageID 98066

clear of all right, title, interests, claims, liens, encumbrances and charges'; purporting to compromise all claims against the estates; preserving estates' right of setoff and recoupment; and enjoining the 'continuation' of lawsuits against the debtors." Highland & Neutra Third Appeal Br. 30. But this language merely effects the express terms of 11 U.S.C. §§ 524(a) and 1141(c). *See* 11 U.S.C. § 524(a) ("A discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor[.]"); 11 U.S.C. § 1141(c) ("[A]fter confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor."); *see also In re Coho Res., Inc.*, 345 F.3d 338, 343 (5th Cir. 2003) ("11 U.S.C. § 524(a) operates as an injunction against actions against a debtor subsequent to a discharge of a debt. The bankruptcy discharge and § 524 injunction serve to give the debtor a financial fresh start." (internal quotation marks, emphasis, and footnote omitted)). The challenged language does not render the Plan unlawful.[40] Highland and Neutra have failed to demonstrate reversible error much less any error.

## IX

The court now considers the argument of Highland and Neutra that the Plan fails to meet the requirements of 11 U.S.C. § 1129(a)(5).

---

[40]Highland and Neutra also cite several cases for the proposition that a plan is proposed in bad faith when it seeks merely to delay or frustrate the efforts of a secured creditor. But Highland and Neutra are not secured creditors.

Appellee Appx. 00847
007655

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 855 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 738 of 1017 PageID 8468
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 854 of 1803 PageID 11600
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 74 of 84 PageID 98067

A

Section 1129(a)(5) provides that a plan may only be confirmed if:

> (A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

> (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

*Id.* Neutra and Highland contend that the Plan is deficient because Terry is actually a non-statutory insider, and because Terry's ownership of Acis is not in the best interests of creditors, Acis' investors, or public policy.[41]

B

The court affirms the bankruptcy court's conclusion that Terry is not an insider.

---

[41]Neutra and Highland also contend that § 1129(a)(5)(A)(i) requires disclosure of the corporate structure of the reorganized debtor, and that the confirmed Plan is deficient because it merely states that Terry will have control over the structure of Acis instead of defining that structure in advance. In support of this argument, Neutra and Highland cite *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 765-66 (Bankr. N.D. Ill. 2013). But the plan in *GAC Storage* did not fail because it left the management structure of the reorganized debtor undefined; rather, it failed because it did not disclose that the reorganized debtor's sole owner "intend[ed] to bring on either himself or another entity which he would control as the manager of [the debtor] and that the manager would have a 1% ownership interest in [the debtor]." *Id.* at 766. Thus *GAC Storage* is not controlling.

- 74 -

Appellee Appx. 00848
Appx. 03718
007656

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 856 of
Case 3:25-cv-02072-S      Document 15-10   Filed 10/06/25   Page 739 of 1017   PageID 8469
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 855 of 1803   PageID 11601
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 75 of 84   PageID 98068

11 U.S.C. § 101(31) provides a list of persons who are considered to be "insiders" of the debtor based on their relationship with the debtor.  A person not included in the statutory list can nonetheless qualify as a "non-statutory insider" under certain circumstances.  In deciding whether a person is a non-statutory insider, the court considers two factors: "(1) the closeness of the relationship between the [putative insider] and the debtor; and (2) whether the transactions between the [putative insider] and the debtor were conducted at arm's length."  *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992); *accord In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002).  Highland and Neutra contend that a person can be a non-statutory insider based on his relationship with a statutory insider of the debtor, regardless of his relationship with the debtor itself.  *See A. Tarricone*, 286 B.R. at 263-64.  They then assert that the Trustee, as a person in control of the debtor, is a statutory insider.  *See In re GSC, Inc.*, 453 B.R. 132, 158 n.31 (Bankr. S.D.N.Y. 2011).  The court will assume *arguendo* that these legal assertions are correct.  Highland, Neutra, and the Trustee agree that the bankruptcy court's determination of insider status is a question of fact that is reviewed for clear error.  *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, ___ U.S. ___, 138 S. Ct. 960, 966 (2018).

Highland and Neutra posit that the relationship between the Trustee and Terry is unusually close.  The controlling question under the first factor is whether the relationship is close enough for the alleged insider to gain advantage due to affinity.  *See In re Rexford Props., LLC*, 557 B.R. 788, 797 (Bankr. C.D. Cal. 2016).  Among the indicators of closeness cited by Highland and Neutra are: that the lawyers who represented Terry in the filing of the

Appellee Appx. 00849
Appx. 03714
007657

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 857 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 740 of 1017   PageID 8470
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 856 of 1803   PageID 11602
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 76 of 84   PageID 98069

involuntary petitions now represent the Trustee; that the Trustee relied on Terry's financial advice for a period of time after the Trustee's appointment; that Terry's expert witness in the arbitration was engaged by the Trustee to testify at the confirmation hearings; that Terry's counsel in related litigation in Guernsey testified as an expert at the confirmation hearings; and that Terry introduced Oaktree to the Trustee's predecessor. As for whether the Plan was negotiated at arm's length, Highland and Neutra point out that the Trustee did not solicit competing bids for Acis' equity, and that there was essentially no negotiation between Trustee and Terry regarding that price.

But after reviewing the record, the court is not "left with the definite and firm conviction that a mistake has been committed." *Johnson Sw.*, 205 B.R. at 827 (quoting *Placid Oil*, 158 B.R. at 412). The Trustee testified that, before the bankruptcy cases, he had no relationship with Terry—and after he was appointed, his relationship with Terry was typical of that between a trustee and the debtor's largest creditor. He relied on Terry's financial advice for a brief time out of necessity, not affinity. Terry appears to have been represented by independent counsel in his dealings with the Trustee. The lack of an auction can be explained by the Trustee's assertion—credited by the bankruptcy court—that no other creditor was a logical choice to be Acis' equity owner. And the record indicates that there was at least some negotiation between Terry and the Trustee regarding the amount of the reduction of Terry's claim against the estates. Indeed, according to the Trustee's testimony, Terry thought the price for Neutra's equity was *too high*, but the Trustee held firm and Terry gave in. These facts plausibly support the findings that Terry and the Trustee were not so

Appellee Appx. 00850
Appx 03715
007658

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 858 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 741 of 1017  PageID 8471
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 857 of 1803  PageID 11603
Case 3:19-cv-00291-D  Document 75  Filed 07/18/19  Page 77 of 84  PageID 98070

close as to give Terry an advantage based on affinity, and that the Plan was negotiated at

arm's length.  The bankruptcy court thus did not commit clear error by finding that Terry was

not an insider.[42]

C

Highland and Neutra's remaining § 1129(a)(5) arguments—that Terry's appointment

as Acis' new equity owner is contrary to the interests of creditors, investors, and the

public—are unavailing.

Highland and Neutra first contend that "[c]onfirmation of a Chapter 11 plan of

reorganization that was designed to allow an *insider* to obtain ownership of the reorganized

debtor for an improper purpose is against public policy."  Highland & Neutra Third Appeal

Br. 43 (emphasis added) (citing *In re S. Beach Sec., Inc.*, 606 F.3d 366, 371 (7th Cir. 2010)).

But Terry is not an insider, and—as discussed *supra* at § VIII(A)(3)—he pursued Acis'

involuntary bankruptcy in good faith and for a proper bankruptcy purpose.

Highland and Neutra also assert that "a bankruptcy court must, by considering the

broader public policy interests, prevent the appointment of a proposed leader who has a

conflict of interest or other financial or personal affiliation that would make his or her control

inappropriate."  Highland & Neutra Third Appeal Br. 44.  They note that Terry is embroiled

in a battle with HCLOF over control of the subordinated notes, and with Highland itself over

---

[42]As an additional ground for finding that Terry is an insider, Highland and Neutra
assert that Terry had access to voluminous insider information during the pendency of these
cases.  But they cite no evidence in the record on appeal in support of this assertion.

- 77 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 859 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 742 of 1017 PageID 8472
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 858 of 1803 PageID 11604
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 78 of 84 PageID 98071

myriad issues in state court. But this assertion is not entirely accurate: it is *Acis*, not Terry, who is battling with HCLOF over the subordinated notes. And even if Terry has disagreements with Highland in state court, this fact is not necessarily dispositive of whether the Plan is in the public interest. According to case law cited by Highland and Neutra, there are numerous factors to consider in deciding whether a proposed plan is in the public interest, and the weight given to each factor varies depending on the circumstances of the case. *See In re Digerati Techs., Inc.*, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014). Relevant factors include whether the appointment "perpetuate[s] incompetence, lack of direction, [or] inexperience," and whether "the individual [is] capable and competent to serve in the proposed capacity assigned to him." *Id.* The bankruptcy court found that Terry is "well qualified to reorganize" Acis and that his new role "will be similar to the role he very successfully performed for" Acis. *Acis II*, 2019 WL 417149, at *14. Giving appropriate weight to all of the public policy factors in the context of this case—particularly in light of the bankruptcy court's finding that Highland has "unclean hands," *id.* at *10—the court concludes that the bankruptcy court did not clearly err by finding that confirmation of the Plan was consistent with public policy.

X

Finally, the court considers the contention of Highland and Neutra that the Plan does not satisfy the cram-down requirements of 11 U.S.C. § 1129(b).

It is familiar jurisprudence that the acceptance of all impaired classes of claims or interests required by § 1129(a)(8) is not necessary for plan confirmation when § 1129(b) is

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 860 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 743 of 1017    PageID 8473
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 859 of 1803    PageID 11605
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 79 of 84    PageID 98072

satisfied.  Section 1129(b) permits confirmation when all other requirements of § 1129(a) are

met and "the plan does not discriminate unfairly, and is fair and equitable, with respect to

each class of claims or interests that is impaired under, and has not accepted, the plan."

§ 1129(b)(1).    The court reviews the bankruptcy court's finding that the cram-down

requirements are met for clear error.  *See In re Block Shim Dev. Co.-Irving*, 118 B.R. 450,

452 (N.D. Tex. 1990) (Fitzwater, J.).

Highland and Neutra challenge the bankruptcy court's finding that the Plan meets

these requirements, contending the Plan is neither fair nor equitable to them, in violation of

§ 1129(b)(1).[43]  More specifically, Highland and Neutra assert that the Plan violates the

absolute priority rule and its corollaries.

Under the absolute priority rule, "fairness and equity require[] that 'the creditors . . .

be paid before the stockholders [can] retain [equity interests] for any purpose whatever.'"

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 444 (1999)

(last alteration in original) (quoting *N. Pac. R.R. Co. v. Boyd*, 228 U.S. 482, 508 (1913)).

The reason for the rule is "the danger inherent in any reorganization plan proposed by a

debtor . . . that the plan will simply turn out to be too good a deal for the debtor's owners."

*Id.*  The rule is embodied in § 1129(b)(2)(B)(ii).  *See LaSalle*, 526 U.S. at 449.  The debtor's

old equity owners *can* retain their interest in the debtor if they contribute new value to the

bankruptcy estate, and this new value "makes the senior creditors (and the estate as a whole)

---

[43]Highland and Neutra also argue that the requirements of § 1129(a)(3) are not met.
For the reasons discussed *supra* at § VIII, the court rejects this argument.

- 79 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 861 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 744 of 1017 PageID 8474
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 860 of 1803 PageID 11606
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 80 of 84 PageID 98073

better off." *In re Castleton Plaza, LP*, 707 F.3d 821, 821 (7th Cir. 2013). The way to assess

whether the value contributed by the old equity owners makes the senior creditors better off

is to allow for a market valuation of the debtor's equity. *See LaSalle*, 526 U.S. at 454-58.

Highland and Neutra contend that the Plan violates the absolute priority rule because

there was no market test to assess the value of Acis' equity—instead, the Trustee unilaterally

selected the $1 million number without soliciting competing bids. But the absolute priority

rule, by its own terms, only applies when the debtor's old equity owners will retain their

equity interest after bankruptcy. *See LaSalle*, 526 U.S. at 444. Where, as here, a non-insider

creditor becomes the debtor's new owner, there is no "danger . . . that the plan will simply

turn out to be too good a deal for the debtor's [old] owners." *Id.* Whatever the significance

of the Trustee's failure to solicit competing bids, it does not violate the absolute priority rule

in this instance.

Highland and Neutra also argue that the Plan violates a corollary of the absolute

priority rule: "that a senior class cannot receive more than full compensation for its claims."

*In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting *In re Genesis Health

Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001)). They assert that "to obtain

confirmation of a reorganization plan that completely extinguishes equity interests, the plan's

proponent must prove that there is no value left once the creditors have had their turn."

Highland & Neutra Third Appeal Br. 47 (quoting *In re Dave's Detailing, Inc.*, 2015 WL

4601726, at *16 (Bankr. S.D. Ind. July 30, 2015)). This, in turn, requires a showing that no

creditor is paid more than in full. *See In re MCorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 862 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 745 of 1017 PageID 8475
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 861 of 1803 PageID 11607
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 81 of 84 PageID 98074

Tex. 1992), *abrogated on other grounds by In re Briscoe Ents., Ltd., II*, 994 F.2d 1160, 1164 n.11 (5th Cir. 1993). Highland and Neutra maintain that the Plan violates this rule in two ways.

First, they contend that the bankruptcy court wrongly inflated the value of the secured portion of Terry's partially-secured claim from approximately $634,000 to $1 million. This argument rests on an erroneous understanding of the Plan. The Plan reduces the *total* value of Terry's partially-secured claim—i.e., the sum of both the secured and unsecured portions of his claim—by $1 million, and then treats the remaining *total* balance of Terry's claim as a general unsecured claim. The Plan does not inflate the value of his secured claim.

Second, Highland and Neutra argue that, without a market test of Acis' value, the bankruptcy court could not have determined whether Terry was overcompensated when he received Acis' equity in exchange for a $1 million reduction in his claim. But there *was* a market valuation in the present case. In *LaSalle* the Supreme Court suggested (but did not decide) that the termination of exclusivity—i.e., allowing any interested person to submit a competing reorganization plan—can constitute a sufficient market test of a debtor's value. *See LaSalle*, 526 U.S. at 458. Since then, courts have concluded in a number of cases that opening the bankruptcy process to competing plan proposals is a valid market test. *See H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*, 2011 WL 2261483, at *7 (D. Md. June 3, 2011) ("Indeed, if the Bankruptcy Court simply allowed Roebuck to file a competing plan, and the creditors found that plan to be inferior, they could still vote for Alter's original plan, and [*LaSalle*] would have been satisfied."); *Dave's Detailing*, 2015 WL 4601726, at *18

Appellee Appx. 00855
Appx. 02720
007663

("The termination of exclusivity provides an open market for competition in the form of competing plans."); *In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859, 866 (Bankr. D. Mass. 2000) ("[T]he competing plan approach provides for a more informed process for creditors and to interested bidders than an auction of equity interests in the context of a Debtor's plan."); *In re Homestead Partners, Ltd.*, 197 B.R. 706, 716-17 (Bankr. N.D. Ga. 1996) ("Competing plans certainly would foster alternate bids for control of the reorganized debtor, and would thereby dispel any concerns regarding the necessity and value of the shareholder's offer."); *In re SM 104 Ltd.*, 160 B.R. 202, 227 (Bankr. S.D. Fla. 1993) ("[A]t least in all but the largest bankruptcy cases, the disclosure and confirmation procedures provided by Chapter 11 offer an acceptable alternative for marketing the ownership interests of the reorganized debtor.").[44]

No party in the present case held the exclusive right to propose a reorganization plan. Highland and Neutra could have proposed a competing plan if they believed that the Trustee's plan undervalued Acis' equity. They did not do so. Thus the bankruptcy court did not err by approving a Plan that valued Acis' equity at $1 million.

---

[44]Highland and Neutra's argument to the contrary, based on the Seventh Circuit's opinion in *Castleton*, 707 F.3d 821, is unpersuasive. The court in *Castleton* concluded that the termination of exclusivity was insufficient to constitute a market test in the context of the absolute priority rule. *See id.* at 823-24. The court applied that rule because the person receiving the debtor's equity under the plan was an insider. *See id.* In contrast, Terry is not an insider, and the absolute priority rule does not apply in the present case. *See Dave's Detailing*, 2015 WL 4601726, at *18 ("The holding in *Castleton Plaza* applies to shareholders or insiders—not to non-insider third parties—obtaining equity in a reorganized debtor.").

Appellee Appx. 00856

Appx. 02524

007664

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 864 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 747 of 1017   PageID 8477
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 863 of 1803   PageID 11609
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 83 of 84   PageID 98076

XI

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third

Appeal.  It maintains that, once the Plan took effect, Acis became the Trustee's successor-in-

interest.  But as Acis recognizes, "the Federal Rules of Bankruptcy Procedure applicable to

this case, those numbered 8001-8028, do not provide a specific rule governing substitution

of parties in bankruptcy appeals to the district court."  Acis Mot. Substitute 3.  Acis also fails

to cite, and the court has not found, any case in which a district court allowed such party

substitution while an appeal was pending.  Accordingly, the court in its discretion denies

Acis' motion.  *Cf. Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th

Cir. 1985) (holding that substitution of parties under an analogous rule, Fed. R. Civ. P. 25(c),

is within court's discretion).  If Acis wishes to take the place of the Trustee in any further

appeal to the Fifth Circuit, it may make a request under the procedure prescribed by Fed. R.

App. P. 43.

\*   \*   \*

In the First Appeal, the clerk is directed to strike ECF Doc. No. 2 from the docket of

No. 3:18-CV-1084-D and to refile that document in No. 3:18-CV-1057-D with a filing date

of April 27, 2018.

The court DISMISSES the appeals of the orders denying intervention in Nos. 3:18-

CV-1056-D and 3:18-CV-1084-D, and DISMISSES the appeals of the orders for relief in

Nos. 3:18-CV-1057-D and 3:18-CV-1073-D.

The court AFFIRMS the Break-Up Fee and Expense Reimbursement order at issue

- 83 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 865 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 748 of 1017 PageID 8478
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 864 of 1803 PageID 11610

Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 84 of 84 PageID 98077

in the Second Appeal, No. 3:18-CV-1822-D.

In the Third Appeal, No. 3:19-CV-0291-D, the court AFFIRMS the bankruptcy court's order confirming the Plan and approving the disclosure statement.

The court DENIES Acis' April 12, 2019 motion to substitute party.

AFFIRMED in part; DISMISSED in part.

July 18, 2019.

SIDNEY A. FITZWATER
SENIOR JUDGE

- 84 -

**Appellee Appx. 00858**

**Appx 02723**

007666

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 866 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 749 of 1017 PageID 8479
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 865 of 1803 PageID 11611

# APPENDIX 10

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 867 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 750 of 1017 PageID 8480
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 866 of 1803 PageID 11612

Case: 19-10847    Document: 00515903826    Page: 1    Date Filed: 06/17/2021

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 17, 2021

Lyle W. Cayce
Clerk

No. 19-10847

IN THE MATTER OF: ACIS CAPITAL MANAGEMENT, L.P.,

*Debtor*,

------------------------------

NEUTRA LIMITED;

*Appellant*,

*versus*

ROBIN E. PHELAN, CHAPTER 11 TRUSTEE,

*Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-291

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 868 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 751 of 1017    PageID 8481
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 867 of 1803   PageID 11613
Case: 19-10847     Document: 00515903826     Page: 2    Date Filed: 06/17/2021

No. 19-10847

Before Smith, Ho, and Oldham, *Circuit Judges*.

Per Curiam:[*]

Having thoroughly reviewed the parties' briefs and arguments, we conclude the district court's judgment affirming the bankruptcy court's order confirming the Chapter 11 plan must be AFFIRMED. We further conclude the appeal of the district court's plan injunction is moot and must be DISMISSED.

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 869 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 752 of 1017 PageID 8482
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 868 of 1803 PageID 11614
Case: 19-10847 Document: 00515903827 Page: 1 Date Filed: 06/17/2021

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 17, 2021

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding: Fifth Circuit Statement on Petitions for Rehearing
         or Rehearing En Banc

No. 19-10847   Neutra v. Phelan
USDC No. 3:19-CV-291

Enclosed is a copy of the court's decision. The court has entered
judgment under Fed. R. App. P. 36. (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

Fed. R. App. P. 39 through 41, and 5th Cir. R. 35, 39, and 41
govern costs, rehearings, and mandates. **5th Cir. R. 35 and 40
require you to attach to your petition for panel rehearing or
rehearing en banc an unmarked copy of the court's opinion or order.**
Please read carefully the Internal Operating Procedures (IOP's)
following Fed. R. App. P. 40 and 5th Cir. R. 35 for a discussion
of when a rehearing may be appropriate, the legal standards applied
and sanctions which may be imposed if you make a nonmeritorious
petition for rehearing en banc.

Direct Criminal Appeals. 5th Cir. R. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request. The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court. Otherwise, this court may deny
the motion and issue the mandate immediately.

Pro Se Cases. If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
certiorari in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41. The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

Court Appointed Counsel. Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order. If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari.** Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 870 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 753 of 1017    PageID 8483
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 869 of 1803    PageID 11615

Case: 19-10847    Document: 00515903827    Page: 2    Date Filed: 06/17/2021

The judgment entered provides that appellant pay to appellee the
costs on appeal. A bill of cost form is available on the court's
website www.ca5.uscourts.gov.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Charles B. Whitney, Deputy Clerk

Enclosure(s)

Ms. Annmarie Antoniette Chiarello
Mr. Phillip Lewis Lamberson
Mr. Jeffrey Scott Levinger
Mrs. Rakhee V. Patel

# APPENDIX 11

**Appellee Appx. 00864**

**Appx. 03729**

007672

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 872 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 755 of 1017    PageID 8485
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 871 of 1803    PageID 11617

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 1 of 27

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) | **Related to Docket No. 86** |
|  | ) |  |

**OBJECTION OF THE DEBTOR TO MOTION OF
OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO TRANSFER VENUE OF THIS CASE TO THE UNITED STATES
<u>BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS</u>**

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") hereby

objects to the motion to transfer venue of this case [Docket No. 86] (the "<u>Motion to Transfer</u>") to

the Northern District of Texas (the "<u>Texas Bankruptcy Court</u>"), filed by the Official Committee

of Unsecured Creditors (the "<u>Committee</u>").

In support of this objection, the Debtor respectfully states as follows:

<u>**Preliminary Statement**</u>

1.      The Debtor owns and manages a sophisticated financial services and

money management business that has assets and interests all over the world.  The amounts at

stake in this case involve hundreds of millions of dollars in terms of asset values and asserted

liabilities.  The Debtor's creditors are sophisticated parties who are either represented by highly

qualified counsel or are attorneys themselves.  The top 20 unsecured creditors in this case consist

almost entirely of litigation claimants and law firms.  There are no "mom and pop" creditors who

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00865
Appx. 03739
007673

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 873 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 756 of 1017   PageID 8486
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 872 of 1803   PageID 11618

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 2 of 27

would be prejudiced if they were not provided with ready access to a local bankruptcy court.

2.      Further, the Texas Bankruptcy Court has no special familiarity with the Debtor or its current management.  The Debtor's restructuring efforts are now led by Bradley Sharp as Chief Restructuring Officer (the "CRO") who has had no prior involvement with either Acis (as defined below) or the Texas Bankruptcy Court with respect to this matter.  The Texas Bankruptcy Court also knows little about the Debtor's business or financial affairs, aside from its prior relationship with Acis.  The Debtor is no longer affiliated with Acis and, in fact, is directly adverse to Acis, which now asserts various contested litigation claims against the Debtor. Hence, the Committee's opening position that this case should be transferred to the Texas Bankruptcy Court is little more than a litigation ploy.  The Committee has decided, based on prior rulings of the Texas Bankruptcy Court in the Acis cases, that such forum would be more advantageous from a litigation perspective *vis-à-vis* the Debtor.  That is not an appropriate basis to transfer venue.

3.      The fact that the Debtor is headquartered in Dallas, Texas also does not mean that this case should be transferred there.  The Debtor's assets, interests, and contractual entanglements are dispersed throughout this country and the world.  As an example, the Debtor has assets under management, including its own proprietary assets and those of its clients, through various related parties in Asia, South America, and Europe.  The Debtor has already brought a motion in this case to appoint a foreign representative in order to manage its various foreign interests [Docket No. 68], including those in pending proceedings in Bermuda and the Cayman Islands.  The Debtor's principal assets in the United States consist of custodial and non-custodial interests in investments located all over the country.  The Debtor's primary brokerage

2

DOCS_SF:102198.7 36027/002

Appellee Appx. 00866
Appx. 03731
007674

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 874 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 757 of 1017    PageID 8487
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 873 of 1803   PageID 11619

Case 19-12239-CSS    Doc 118    Filed 11/12/19   Page 3 of 27

accounts that hold the bulk of the Debtor's liquid and illiquid securities are located in New York

City with Jefferies, LLC ("Jefferies").  The Debtor is also the subject of two pending lawsuits in

the Delaware Chancery Court, one of which involves claims brought by the Redeemer

Committee of the Highland Crusader Fund (the "Redeemer Committee"), a member of the

Committee.  Another member of the Committee, UBS Securities LLC and UBS AG London

Branch ("UBS"), has longstanding litigation pending against the Debtor in New York state court

(not Texas).  Predictably, the Debtor's professionals and those of its creditors are located around

the country.  Given the amounts at stake in this case and the complexity of the Debtor's assets

and liabilities, venue should not be determined by how many miles the Debtor's employees or

professionals or those of its creditors are located from the courthouse.  All parties reside at

various commercial centers around this country and can easily travel wherever necessary in order

to handle the important matters in this case.

   4. Further, the pendency of the involuntary bankruptcy cases of Acis Capital

Management, L.P. and Acis Capital Management GP, LLP (together, "Acis") in Dallas, Texas

does not make the Texas Bankruptcy Court a preferable forum for this case.  Acis's involuntary

cases were commenced by Joshua Terry ("Terry"), who now owns and manages Acis and

represents that entity on the Committee.  Terry assumed ownership of Acis by virtue of a

contested plan of reorganization that was confirmed by the Texas Bankruptcy Court and which is

now the subject of a pending appeal.[2]  ***The interests of Acis are directly adverse to those of this***

---

[2] Although a stay of the confirmation order was sought, no stay was granted despite the ongoing appeal of that order.  The Texas Bankruptcy Court thus has limited ongoing jurisdiction at this juncture.

**Appellee Appx. 00867**

**007675**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 875 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 758 of 1017 PageID 8488
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 874 of 1803 PageID 11620

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 4 of 27

*estate.*[3] The Debtor and Acis have been, and continue to be, involved in highly contentious litigation, including matters that are the subject of multiple appeals from decisions of the Texas Bankruptcy Court and pending fraudulent transfer claims brought by Acis against the Debtor in the Texas Bankruptcy Court. The Debtor and Acis assert various substantial disputed and unliquidated claims against each other. Further, *the Debtor's current business is unrelated to Acis*, which is focused on managing certain collateralized loan obligations (or CLOs) in which the Debtor no longer has any direct interest. The Committee also does not establish how the prior testimony of the Debtor's representatives in the Acis bankruptcy is relevant to the instant chapter 11 case.[4] Aside from the Debtor's prior relationship with Acis, the Texas Bankruptcy Court is not familiar with the Debtor's business and assets or the Debtor's liabilities that need to be restructured in this case. *The Debtor's restructuring efforts are now managed by an independent and highly qualified CRO* who has had no prior involvement with Acis or its bankruptcy proceedings. Hence, while it may be in the interests of *the Acis estate* for this matter to be transferred to the Texas Bankruptcy Court, it is certainly not in the best interests of *the Debtor's estate* or the parties to these proceedings, which is the only thing that matters.

5.     As the Committee admits, the Debtor is entitled to substantial deference with respect to its choice of forum for its bankruptcy case. This Court is indisputably a legally proper forum given that the Debtor is a Delaware limited partnership. This Court also presents a convenient forum given that the Debtor's assets are so widely dispersed and there has been

---

[3] Terry, in his personal capacity and on behalf of his spouse, also purports to hold an unsecured claim against the Debtor's estate in the amount of $425,000, which the Debtor has designated as contingent, unliquidated, and disputed.
[4] Presumably, senior management personnel of the Debtor have provided all manner of testimony in the various pending litigation matters around the country involving or otherwise implicating the Debtor.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00868
Appx. 03723
007676

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 876 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 759 of 1017 PageID 8489
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 875 of 1803 PageID 11621

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 5 of 27

extensive ongoing litigation against the Debtor in the Delaware Chancery Court, including

litigation commenced by the Redeemer Committee, a member of the Committee. In sum, aside

from the Committee's perceived litigation advantage before the Texas Bankruptcy Court, there is

no credible, let alone valid, basis for this case to be transferred to the Texas Bankruptcy Court

where an adverse proceeding is pending when this Court presents a perfectly appropriate forum

for effectuating a successful reorganization of the Debtor's affairs. The Debtor therefore urges

this Court to deny the Motion to Transfer filed by the Committee.

## **Background**

### A. **The Debtor's Bankruptcy Filing**

6.      On October 16, 2019 (the "Petition Date"), the Debtor commenced this

case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The

factual background regarding the Debtor, including its current and historical business operations

and the events precipitating the chapter 11 filing, is set forth in detail in the *Declaration of Frank

Waterhouse in Support of First Day Motions*, which is incorporated herein by reference.

7.      The Debtor continues in the possession of its property and continues to

operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108

of the Bankruptcy Code.

8.      No trustee or examiner has been appointed in the Debtor's chapter 11

case.

9.      On October 29, 2019, the United States Trustee appointed the Committee,

which consists of four members: (1) the Redeemer Committee; (2) UBS; (3) Acis; and (4) Meta-

e Discovery. The Committee is represented by Sidley & Austin, with one of its lead attorneys

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 877 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 760 of 1017    PageID 8490
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 876 of 1803   PageID 11622

Case 19-12239-CSS    Doc 118   Filed 11/12/19   Page 6 of 27

based in New York City.  Since retaining counsel, the Committee's first order of business was to
file the Motion to Transfer.

**B.**     **The Debtor's Organizational Structure and Governance**

    10.     The Debtor is a Delaware limited partnership.  Its limited partnership
interests are owned as follows: (a) 99.5% by Hunter Mountain Trust, a Delaware statutory trust
based in New York, (b) 0.1866% by Dugaboy Investment Trust, a Delaware trust, (c) 0.0627%
by Mark Okada, personally and through family trusts, and (d) 0.25% by Strand Advisors, Inc., a
Delaware corporation.  In sum, 99.94% of the Debtor's partnership interests are held through
Delaware entities.  Strand Advisors, Inc. also owns 100% of Debtor's general partnership
interest.  This Delaware entity, through its principal James Dondero, ultimately controlled the
Debtor as of the Petition Date.

    11.     There is now new governance in place.  On October 29, 2019, the Debtor
filed its motion to retain Bradley Sharp as the CRO [Docket No. 75] (the "CRO Motion").
Pursuant to the CRO Motion, the Debtor seeks to retain the CRO with certain independent and
exclusive powers and significant restrictions on termination.  Specifically, the CRO will have
sole authority over claims and transactions involving insiders.  The CRO was previously
appointed chief restructuring officer in Delaware cases such as *Variant Holding Company LLC*
before Judge Brendan Shannon and *Woodbridge Group of Companies LLC* before Judge Kevin
Carey (retired).  The CRO Motion is set for hearing on November 19, 2019, the same date as the
Motion to Transfer.[5]

---

[5] In an apparent effort to prevent this Court from considering the CRO Motion, the Committee sought to have the
Motion to Transfer set for hearing on shortened notice for November 7, but this Court denied that request before the
Debtor filed its response.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 878 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 761 of 1017 PageID 8491
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 877 of 1803 PageID 11623

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 7 of 27

12.     Also on October 29, 2019, the Debtor filed its motion for approval of certain protocols with respect to ordinary course transactions [Docket No. 77] (the "Protocols Motion").  Pursuant to the Protocols Motion, the Debtor seeks approval of certain protocols to allow the Debtor to conduct ordinary course business in an uninterrupted and transparent manner, both for the benefit of the Debtor's estate and its creditors and for the investors to whom the Debtor provides services.  The Protocols Motion also is set for hearing on November 19.

13.     The CRO Motion and the Protocols Motion are intended to bring independence and clarity to the Debtor's governance structure.  Based on these motions, there should be no doubt that qualified, independent management is in place with the Debtor and will be operating under a specified set of protocols and procedures to ensure that estate assets are properly preserved.

**C.    The Debtor's Business, Assets, and Creditor Relationships are Complex and International in Scope**

14.     The Debtor is a multibillion-dollar global alternative investment manager. The Debtor operates a diverse investment platform, serving both institutional and retail investors worldwide.  In addition to high-yield credit, the Debtor's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built around specialized teams.  The Debtor also provides shared services to its affiliated registered investment advisors.

15.     Pursuant to various contractual arrangements, the Debtor provides money management and advisory services for approximately $2.5 billion of assets under management. Separately, the Debtor provides shared services for approximately $7.5 billion of assets managed

DOCS_SF:102198.7 36027/002

Appellee Appx. 00871
Appx. 03726
007679

by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.

16. Although the Debtor is headquartered in Dallas, Texas, and most of its employees are based there, the Debtor's affiliates and related entities maintain offices in many international locales, including in Buenos Aires, Rio de Janeiro, Singapore, and Seoul. The Debtor primarily generates revenue from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. These funds have investments all over the world. Specifically, the Debtor has its own proprietary investment assets and those of its clients held through various affiliates in Asia, South America, and Europe.

17. On October 29, 2019, the Debtor filed a motion to appoint a foreign representative in order to manage its various foreign interests [Docket No. 68] (the "Foreign Representative Motion"), including those in pending proceedings filed by the Redeemer Committee in Bermuda and the Cayman Islands.

18. The Debtor's principal assets in the United States consist of custodial and non-custodial interests in investments located all over the country. The Debtor has brokerage accounts at Jefferies in New York City that hold the bulk of the Debtor's liquid and illiquid securities. As of the Petition Date, the Debtor owed Jefferies approximately $30 million on account of margin borrowings. The Debtor's other principal secured creditor, Frontier State Bank, is based in Oklahoma City and is owed approximately $5.2 million as of the Petition Date.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00872

Appx. 03735

007680

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 880 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 763 of 1017    PageID 8493
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 879 of 1803   PageID 11625

Case 19-12239-CSS    Doc 118   Filed 11/12/19   Page 9 of 27

### D.     The Debtor Has Litigation Pending in Delaware Chancery Court and New York

19.     Aside from Acis, no Committee members are based in Dallas and two of them have litigation pending against the Debtor outside of Texas. As discussed further below, the Redeemer Committee commenced litigation against the Debtor in the Delaware Chancery Court and UBS commenced litigation against the Debtor in New York state court. The chairman and the majority of the members of the Redeemer Committee are located in Chicago. UBS's business representatives are based in or around New York City. The only trade vendor on the Committee, Meta-e Discovery, is based in Connecticut. Yet another allegedly substantial creditor of the Debtor, Patrick Daugherty ("Daugherty"), also has litigation pending against the Debtor in Delaware Chancery Court, including a matter that went to trial on October 14, 2019, just prior to the Petition Date, before it was stayed.

20.     *Redeemer Committee Litigation: Delaware Chancery Court and New York Arbitration.* The Debtor's bankruptcy filing was precipitated by an arbitration award in favor of the Redeemer Committee (the "Award") initially issued against the Debtor in March 2019 by a panel of the American Arbitration Association based in New York City. The Debtor was formerly the investment manager for the Highland Crusader Fund (the "Crusader Fund"), which was based in Bermuda and the subject of insolvency proceedings there. On July 5, 2016, the Redeemer Committee (a) terminated and replaced the Debtor as investment manager of the Crusader Fund, (b) commenced an arbitration against the Debtor in New York City, and (c) commenced litigation against the Debtor in Delaware Chancery Court. In September 2018, the Debtor and the Redeemer Committee participated in a multi-day evidentiary hearing in New York City. In March 2019, following post-trial briefing, the arbitration panel issued its Award

9

Appellee Appx. 00873
Appx. 03738
007681

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 881 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 764 of 1017    PageID 8494
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 880 of 1803   PageID 11626

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 10 of 27

finding in favor of the Redeemer Committee on a variety of claims and requiring the Debtor to
pay a gross amount of $189 million, subject to certain offsets and deductions.  The Redeemer
Committee set a hearing in the Delaware Chancery Court for October 8, 2019, in order to seek
entry of a judgment with respect to the Award.  The hearing was subsequently continued to
October 16, 2019.  The Debtor filed this case just prior to that hearing.  The Redeemer
Committee is represented by Jenner & Block attorneys based in Chicago, Illinois.

     21.    *UBS Litigation:  New York State Court.*  The Debtor and UBS are parties
to a long-running litigation originally filed by UBS in February 2009 in the New York Supreme
Court, County of New York.  At bottom, UBS alleges that the Debtor and certain funds
fraudulently induced UBS to restructure a transaction at the expense of UBS and then these
parties and other entities fraudulently diverted certain assets to prevent UBS from obtaining a
recovery on its claims.  There have been numerous prejudgment motions and appeals in this
case.  The claims that remain consist primarily of breach of contract, fraudulent inducement and
alter ego claims against certain defendants, a breach of implied covenant of good faith and fair
dealing claim against the Debtor, and fraudulent conveyance claims against all defendants.  UBS
has asserted damages in excess of $686 million in the litigation, which the Debtor and the other
defendants continue to vigorously dispute.  The case was bifurcated, and the contract claims
against certain fund defendants as well as the Debtor's counterclaim were addressed at a bench
trial in July 2018.  The court has not yet ruled on phase one of the trial.  If the court finds a
breach of contract occurred and awards damages against the fund defendants, then the remaining
claims will be tried in a second phase of the trial.  While awaiting a decision on phase one, the
defendants filed a motion for judgment before trial with respect to the fraudulent transfer claims

10

DOCS_SF:102198.7 36027/002

**Appellee Appx. 00874**

**007682**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 882 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 765 of 1017    PageID 8495
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 881 of 1803   PageID 11627
Case 19-12239-CSS    Doc 118   Filed 11/12/19   Page 11 of 27

based on the fact that UBS is not a creditor of the parties who made the alleged fraudulent

transfers.  The motion was withdrawn due to its timing without prejudice to defendants' right to

refile the motion after a decision has been made on phase one of the trial.  UBS is represented by

Latham & Watkins attorneys based in Washington, DC.

        22.    *Daugherty Litigation: Delaware Chancery Court.*  Another allegedly

substantial creditor of the Debtor who is not on the Committee, Daugherty, also commenced

litigation against the Debtor in Delaware Chancery Court.  Daugherty appears on the top 20 list

in this case in the amount of $11.7 million, scheduled as contingent, unliquidated, and disputed.

Daugherty is a former senior management employee of the Debtor.  Among other matters,

Daugherty sued the Debtor and certain of its affiliates in Delaware Chancery Court in July 2017

arising from his separation from the Debtor.  In June 2018, the Delaware Chancery Court

dismissed many of the claims asserted by Daugherty in the litigation.  The remaining counts

went to trial just prior to the Petition Date and have since been stayed by virtue of the Debtor's

bankruptcy filing.  Daugherty is represented by Delaware counsel.

**E.**      **The Debtor's Relationship with Acis and Ongoing Adverse Claims and Litigation**

        23.    The Debtor previously provided sub-manager and sub-advisory services to

Acis pursuant to certain contractual agreements that were terminated during the course of the

Acis bankruptcy in or around August 2018.  Since that time, the Debtor has not had, and does not

currently have, any direct business dealings with respect to Acis or the CLO assets for which

Acis serves as the CLO portfolio manager.[6]

---

[6] The Debtor, through an affiliate, manages a client account that owns a notional value of approximately $150 million in securities issued by Acis CLOs.  All of the Debtor's affiliated CLOs are currently in wind-down, meaning that they are not making any new investments.

DOCS_SF:102198.7 36027/002

**Appellee Appx. 00875**

Appx. 007683

007683

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 883 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 766 of 1017 PageID 8496
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 882 of 1803 PageID 11628

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 12 of 27

24.     Prior to his termination in June 2016, Terry was one of the Debtor's senior

management employees who handled Acis and also had a partnership interest in Acis. After

Terry was discovered surreptitiously tape recording internal meetings and conversations with

numerous Highland personnel, he was terminated by the Debtor and subsequently asserted

claims against Acis that went to arbitration. Terry ultimately obtained an arbitration award

against Acis is the approximate amount of $8 million. Notably, although Terry asserted claims

against the Debtor and other persons at Highland, the arbitration panel did not find liability

against any party besides Acis.

25.     Terry commenced involuntary chapter 7 bankruptcy cases against Acis in

the Texas Bankruptcy Court in January 2018 on his own behalf. No other creditors joined in the

petitions, which Terry asserted was appropriate on the basis that Acis had fewer than 12

creditors. The Debtor is a major prepetition creditor of Acis, owed in excess of $8 million for

various contractual services provided to Acis before and after the Acis bankruptcy filings. Acis,

the alleged debtor in those matters, objected to the involuntary bankruptcy filings and presented

evidence from certain of the Debtor's employees relating to whether the technical requirements

for involuntary bankruptcy filings were met. These objections were ultimately overruled by the

Texas Bankruptcy Court, which decision remains on appeal. Acis's bankruptcy cases were later

converted to chapter 11 and a chapter 11 trustee (Robin Phelan) (the "Acis Trustee") was

appointed in May 2018. No Chief Restructuring Officer was ever appointed in the Acis cases,

much less a CRO with expanded powers.

26.     Subsequently, the Debtor and two of its related, affected parties in interest

objected to the confirmation of a chapter 11 plan proposed by the Acis Trustee (and supported by

12

DOCS_SF:102198.7 36027/002

Appellee Appx. 00876
007684

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 884 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 767 of 1017  PageID 8497
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 883 of 1803  PageID 11629

Case 19-12239-CSS  Doc 118  Filed 11/12/19  Page 13 of 27

Terry) for a multitude of reasons, including that certain injunctive provisions were inappropriately targeted at the Debtor and related parties. The Texas Bankruptcy Court ultimately overruled all objections and confirmed the plan in January 2019, which decision remains on appeal. During the course of the Acis bankruptcy cases, the Texas Bankruptcy Court heard no material evidence from the Debtor's employees about the details of its business, assets, or liabilities, aside from its prior involvement with Acis. The Committee does not establish how the prior testimony of the Debtor's representatives in the Acis bankruptcy is relevant to the instant chapter 11 case. Hence, the Texas Bankruptcy Court has no specialized knowledge with respect to the Debtor generally or the issues that will be relevant in this chapter 11 case.

      27.    Pursuant to the Acis Trustee's confirmed chapter 11 plan, Terry is Acis's sole equity holder and controls and manages that entity. The Acis Trustee had previously commenced litigation in the Texas Bankruptcy Court against the Debtor and other parties for breach of contract, breach of fiduciary duties, fraudulent transfers, and conspiracy, and has sought to offset and/or subordinate the Debtor's claims against Acis. In a nutshell, the causes of action in that lawsuit revolve around the hotly contested allegations that the Debtor conspired to strip Acis of its assets at Terry's expense. Through his ownership and control of Acis pursuant to the Acis Trustee's confirmed plan, Terry now controls these claims against the Debtor, which remain at an early stage in the Texas Bankruptcy Court and have been stayed as to the Debtor.[7]

---

[7] The defendants have filed motions to withdraw the reference as well as motions to dismiss. The Texas Bankruptcy Court held a status conference on the motions to withdraw the reference on September 4, 2019 and was required to submit a "Report and Recommendation" to the United States District Court for the Northern District of Texas. As of the Petition Date, the Texas Bankruptcy Court had not issued its Report and Recommendation. This adversary proceeding is now subject to the automatic stay of 11 U.S.C. §362(a). This proceeding has yet to reach the procedural stage where any of the defendants have had to file their answers.

DOCS_SF:102198.7 36027/002

**Appellee Appx. 00877**
007685

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 885 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 768 of 1017    PageID 8498
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 884 of 1803   PageID 11630

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 14 of 27

28.      The respective bankruptcy estates of Acis and the Debtor are adverse to each other.  Acis has claims and pending litigation against the Debtor and the Debtor has outstanding claims against Acis that total no less than $8 million for services rendered.  The various litigation claims of Acis against the Debtor are prepetition claims that have been stayed.

29.      The Committee now seeks to move the Debtor's bankruptcy case to the Texas Bankruptcy Court -- Acis's "home court" -- in order to obtain some perceived litigation advantage.  The Debtor objects to the Motion to Transfer as completely contrary to the interests of this estate.

### Legal Basis for Objection to Motion to Transfer

**A.**    **The Debtor's Case is Properly Venued in This District Because the Debtor is Organized in the State of Delaware**

30.      The Debtor is a limited partnership formed under the laws of Delaware.  Consequently, venue of this case is proper in Delaware as a matter of law under 28 U.S.C. § 1408.  *See, e.g., In re Restaurants Acquisition I, LLC*, 2016 Bankr. LEXIS 684, at *6 (Bankr. D. Del. Mar. 4, 2016) ("Because the Debtor is organized under the laws of Delaware, this forum is proper under the statute."); *In re Innovative Communication Co., LLC*, 358 B.R. 120, 125 (Bankr. D. Del. 2006) ("Venue is appropriate in the state of incorporation, 28 U.S.C. § 1408(1), so venue is proper in Delaware with respect to the corporate Debtors.").  The Committee does not (and cannot) challenge this point.

**B.**    **The Debtor's Choice of Forum in Delaware is Entitled to Substantial Weight and Should Not Be Disturbed**

31.      Given that venue in this District is legally proper, the Debtor's choice of this forum is entitled to great weight.  *See, e.g., Restaurants Acquisition*, 2016 Bankr. LEXIS at

14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 886 of
Case 3:25-cv-02072-S  Document 15-10  Filed 10/06/25  Page 769 of 1017  PageID 8499
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 885 of 1803  PageID 11631

Case 19-12239-CSS  Doc 118  Filed 11/12/19  Page 15 of 27

*7 ("movant bears the burden of demonstrating that the factors strongly weigh in favor of a

transfer as courts will generally grant substantial deference to a debtor's choice of forum"); *In re*

*Ocean Properties of Delaware, Inc.*, 95 B.R. 304, 305 (Bankr. D. Del. 1988) (same). Therefore,

a court considering a venue transfer motion "should exercise its power to transfer cautiously, and

the party moving for the transfer must show by a preponderance of the evidence that the case

should be transferred." *In re Commonwealth Oil Refining Co., Inc. (Commonwealth of Puerto*

*Rico v. Commonwealth Oil Refining Co., Inc.)*, 596 F.2d 1239, 1241 (5th Cir. 1979), *cert. denied*,

444 U.S. 1045 (1980) ("*CORCO*") (internal citations omitted); *accord In re Fairfield Puerto*

*Rico, Inc.*, 333 F. Supp. 1187, 1989 (D. Del. 1971) ("This Court should not freely abandon to

any other district its duty to determine a matter clearly within its jurisdiction."); *In re Rehoboth*

*Hospitality, LP*, 2011 WL 5024267, at *3 (Bankr. D. Del. 2011) ("The burden of proof is on the

moving party requesting transfer.").

      32.     These principles apply with even greater force in a case such as this where

a Delaware-organized partnership seeks the protection of Delaware courts. As noted above, over

99% of the Debtor's limited interests and 100% of its general partnership interests are held by

Delaware entities. There is a "fundamental legal tenet that every citizen of a state is entitled to

take advantage of the state and federal judicial process available in that state." *In re PWS*

*Holdings*, 1998 Bankr. LEXIS 549, at *14 (Bankr. D. Del. Apr. 28, 1998). Further, "Delaware

has an interest in protecting the rights of its citizens," and correspondingly, change of venue can

only be granted upon a strong showing of equities favoring the transfer. *Intel Corp. v. Broadcom*

*Corp.*, 167 F. Supp. 2d 692, 706 (D. Del. 2001).

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 887 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 770 of 1017 PageID 8500
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 886 of 1803 PageID 11632

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 16 of 27

33. Given the strong presumption that a debtor's choice of forum should not be disturbed, courts rarely grant such relief. In those few cases where venue has been transferred, there was generally some unique compelling factor that justified transfer, such as the debtor's consent, the matter was a single asset real estate case, or there was non-stayed litigation that warranted consolidation of cases before a single court or judge. None of these factors are present here.

34. In fact, the various adversary claims pending against the Debtor that currently linger in the Texas Bankruptcy Court weigh strongly *against* a transfer of venue there. The claims asserted by Acis against the Debtor are prepetition claims that are stayed. Whether those claims are ever unstayed, they are clearly adverse to the interests of the Debtor's estate, particularly where Acis is asserting such claims as a basis to offset and/or subordinate the large claims that the Debtor holds against Acis. Notably, Acis is no longer affiliated with the Debtor. It is merely a litigation claimant. Yet, the Committee chose to file the Motion to Transfer to the Texas Bankruptcy Court in order to achieve a litigation advantage at the expense of this estate. The Debtor urges the Court to see through this blatant litigation tactic which fails to come close to overcoming the strong presumption in favor of the Debtor's proper choice of venue in Delaware.

**C.    The Convenience of the Parties Weighs in Favor of Retaining Venue in Delaware**

35. When a bankruptcy court is asked to transfer an entire bankruptcy case to another bankruptcy court, it must examine whether the transfer would be (a) in the interest of justice, or (b) the convenience of the parties. 28 U.S.C. § 1412. In considering the "convenience

16

DOCS_SF:102198.7 36027/002

Appellee Appx. 00880
Appx. 03745
007688

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 888 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 771 of 1017 PageID 8501
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 887 of 1803 PageID 11633

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 17 of 27

of the parties," courts have identified six factors, among others, to help guide their discretion.

These six factors are:

    i.   the economic administration of the estate;

    ii.   the location of the assets;

    iii.   the proximity of creditors of every kind to the court;

    iv.   the proximity of the debtor to the court;

    v.   the proximity of the witnesses necessary to the administration of the estate; and

    vi.   the necessity for ancillary administration if liquidation should result.

*See, e.g., CORCO*, 596 F.2d at 1247; *Restaurants Acquisition*, 2016 Bankr. LEXIS at *7 (applying *CORCO* factors); *Innovative*, 358 B.R. at 125 (citing *CORCO* factors and other private and public interests that may be relevant). As discussed herein, the Committee has failed to meet its "heavy burden of proof . . . to demonstrate that the balance of convenience weighs in [its] favor." *Lionel Leisure, Inc. v. Trans Cleveland Warehouses, Inc. (In re Lionel Corp.)*, 24 B.R. 141, 142 (Bankr. S.D.N.Y. 1982). Consequently, the Motion to Transfer must be denied.

### *i.*    *The Economic Administration of the Estate*

36.      The economic and efficient administration of the estate is the most important factor when considering a motion to transfer venue. *CORCO*, 596 F.2d at 1247; *In re Caesars Entertainment Operating Co.*, 2015 Bankr. LEXIS 314, at *22 (Bankr. D. Del. Feb. 2, 2015); *In re Industrial Pollution Control, Inc.*, 137 B.R. 176, 182 (Bankr. W.D. Pa. 1992). Despite the importance of this factor, however, the Committee makes little effort to explain why

17

Appellee Appx. 00881
007689

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 889 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 772 of 1017 PageID 8502
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 888 of 1803 PageID 11634

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 18 of 27

the economic administration of the estate would be improved if this case was transferred, other than to argue that the Texas Bankruptcy Court heard days of evidence in an unrelated matter of questionable relevance to the chapter 11 proceedings at hand. *See* Motion to Transfer at ¶¶11 – 13, 29 – 31. The pendency of the Acis bankruptcy in the Texas Bankruptcy Court should not form a basis for transferring venue for the following six (6) reasons.

37. <u>First</u>, the Debtor is now managed by the CRO, who is charged with administering the restructuring efforts of the Debtors in this case and has independent authority as to insider claims and insider transactions. Whatever may have been said by the Debtor's management in the context of the Acis bankruptcy is irrelevant to the tasks at hand in this case that will be carried out by the CRO, an independent and highly qualified professional who has had no involvement in the Acis cases.

38. <u>Second</u>, the evidence presented by the Debtor's employees in the Acis bankruptcy cases is irrelevant to the case at hand. Their testimony generally focused on (a) whether Terry satisfied the legal requirements to file involuntary cases against Acis and (b) the structure of actively managed CLOs. None of this testimony by the Debtor's employees is relevant to the Debtor's present chapter 11 case. Acis was the sole branch of the Debtor's affiliated structure that managed active CLOs. As a result of the confirmed chapter 11 plan in the Acis cases, Acis is no longer part of the Debtor's organizational structure. The Debtor owns no equity in Acis. The Debtor no longer advises or sub-advises any active CLOs. The Debtor only has CLOs that are in liquidation -- monetizing their underlying assets and paying off their remaining investors. While the Texas Bankruptcy Court learned much about the complexities of managing active CLOs, that information is irrelevant to this Debtor.

18

Appellee Appx. 00882
007690

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 890 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25   Page 773 of 1017   PageID 8503
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 889 of 1803   PageID 11635

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 19 of 27

39.     <u>Third</u>, the core issue in the reorganization of Acis was maintaining the cash flows from Acis's managed CLOs.  However, the CLOs currently managed by the Debtor provide just 10% of the Debtor's revenue, and that number will shrink over time as the CLOs liquidate.  The Debtor derives the other 90% of its revenue from managing asset classes that were never implicated in the Acis proceeding, including private equity, mutual funds, open-ended retail funds, hedge funds, and real estate funds.

40.     <u>Fourth</u>, the Committee neither attaches evidence demonstrating what relevant facts the Texas Bankruptcy Court learned about the Debtor, nor explains how any such evidence could possibly implicate an insurmountable "learning curve" for this Court. *See* Motion to Transfer at ¶31.  The Committee does not attach any of the 700 allegedly relevant exhibits or any of the testimony from the Acis proceeding.  The Committee references three published opinions of the Texas Bankruptcy Court from the Acis proceeding, but provides no reasoning or even citations demonstrating how these opinions evidence the Texas Bankruptcy Court's purportedly extensive knowledge of the Debtor's current structure and management.

41.     <u>Fifth</u>, even assuming it learned anything relevant about the Debtor's corporate structure, the Texas Bankruptcy Court knows little about the details of the Debtor's business, assets, or liabilities, or its restructuring efforts.  To the extent it addressed the Debtor's business, the evidence in the Acis proceeding focused on a CLO business that the Debtor no longer operates nor manages in any way.  The evidence in the Acis proceeding never focused on the Debtor's assets and liabilities.  Even at this early stage of the Debtor's chapter 11 case, this Court is already more familiar with the Debtor than the Texas Bankruptcy Court, which is appropriately charged with overseeing the Acis proceeding and not this one.

19

Appellee Appx. 00883
Appx. 007691

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 891 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 774 of 1017 PageID 8504
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 890 of 1803 PageID 11636

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 20 of 27

42. <u>Sixth</u>, the level of conflicts between the Debtor and Acis make the economic and fair administration of this case in the Texas Bankruptcy Court highly problematic. There is a pending adversary proceeding by Acis against the Debtor, which proceeding has been stayed. The Committee does not explain how the Texas Bankruptcy Court is supposed to preside over the Debtor's estate and the pending adversary proceeding in the Acis case concurrently.[8] Indeed, the only reason for the Committee to seek a transfer of venue to the Texas Bankruptcy Court in the first place is to obtain some perceived litigation advantage *vis-à-vis* the Debtor's estate, which is not a proper basis to transfer venue.[9] Given the substantial adverse interests that exist between the Debtor and Acis, the Debtor submits that this chapter 11 case can be much more effectively administered by this Court.

### ii. The Location of the Assets

43. Although the Debtor's headquarters is located in Dallas, Texas and most of its employees are based there, the Debtor's assets are widely dispersed all over the world. The Debtor has over $2.5 billion of assets under management and receives management and advisory fees from a multitude of sources around the world. The Debtor also provides shared services for approximately $7.5 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors. The Debtor's affiliates and related parties maintain offices in many international locales, including Buenos Aires, Rio de Janeiro,

---

[8] *See supra* n. 8.

[9] As part of this ongoing litigation strategy, Acis has objected to the Debtor retaining Foley & Lardner LLP ("Foley") and Lynn, Pinker, Cox, & Hurst LLP ("Lynn Pinker") as counsel to pursue the Debtor's claims against Acis and to defend the Debtor and certain of its wholly owned subsidiaries against Acis's claims. *See* Dkt. 116. Acis's objection to Foley and Lynn Pinker's retention does not even attempt to explain the benefit to the Debtor's estate of stripping the Debtor of its counsel litigating both affirmative and defensive claims against Acis. This highlights the conflict that the Texas Bankruptcy Court would face in handling both the Acis and Highland matters.

DOCS_SF:102198.7 36027/002

Singapore, and Seoul.  And the Debtor has its own proprietary investment assets and those of its clients held through various affiliates in Asia, South America, and Europe.  The Debtor has already filed the Foreign Representative Motion in order to assist the Debtor in managing its various foreign interests.

44.    Similarly, the Debtor's principal assets in the United States consist of custodial and non-custodial interests in investments located across the country.  The Debtor has brokerage accounts at Jefferies in New York City that hold the bulk of the Debtor's liquid and illiquid securities.  As of the Petition Date, the Debtor owed Jefferies approximately $30 million on account of margin borrowings.  The Debtor's other principal secured creditor, Frontier State Bank, is based in Oklahoma City and is owed approximately $5.2 million as of the Petition Date.  Relatively speaking, the Debtor has minimal assets in Texas.

45.    Nonetheless, even if most of the Debtor's assets were construed to be located in Texas (which they are not), numerous courts have found that the location of assets is not a significant factor in deciding whether venue should be transferred unless the case involves liquidation as opposed to rehabilitation or is a single asset real estate case.  *See Restaurants Acquisition*, 2016 Bankr. LEXIS at *12 ("the location of a company's assets is not as crucial to the analysis where the ultimate goal is rehabilitation rather than liquidation"); *In re Safety-Kleen Corp.*, 2001 Bankr. LEXIS 1296, at *10 (Bankr. D. Del. Aug. 27, 2001) ("location of assets is generally only significant in a single asset real estate case or liquidation"); *see also In re Enron Corp.*, 274 B.R. 327, 348 (Bankr. S.D.N.Y. 2002) ("[W]hile a debtor's location and the location of its assets are often important considerations in single asset real estate cases, these factors take on less importance in a case where a debtor has assets in various locations.").

21

Appellee Appx. 00885

007693

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 893 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 776 of 1017 PageID 8506
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 892 of 1803 PageID 11638
Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 22 of 27

46. The outcome of this case will not turn on the day-to-day management of the Debtor's assets, but instead will be driven by the Debtor's ability to restructure its balance sheet and maximize the value of its assets, many of which are illiquid. This Court will be focused on matters such as plan confirmation and governance, which the Debtor proposes to place into the capable hands of the CRO pursuant to the terms of the pending CRO Motion and subject to the guidelines set forth in the Protocols Motion. Most of the objections to the key issues that will arise in this case will be grounded in the Bankruptcy Code and not based on any particular facts or circumstances unique to the Debtor's assets wherever located. However, to the extent this Court gives weight to the location of the Debtor's assets, this factor weighs in favor of denying the Motion to Transfer because the Debtor's interests and assets are widely dispersed throughout the country and the world.

### iii. The Proximity of Creditors of Every Kind

47. The Committee spends a substantial portion of the Motion to Transfer evaluating the location of the Debtor's creditors and their professionals, and the relative amount of time that it takes to travel to this Court as compared to the Texas Bankruptcy Court. This analysis is misguided and irrelevant under the circumstances of this case. The Debtor does not have thousands of small or unsophisticated creditors who cannot navigate their way to Delaware. The creditors here are generally litigants or attorneys. They are located in commercial centers all over the country. The amounts at stake total hundreds of millions of dollars. It is of no consequence whether a creditor or an attorney is based in Chicago, New York, or Los Angeles. The creditors and professionals involved in this case will travel wherever necessary in order to advocate their respective positions, and Delaware is certainly just as convenient as Dallas.

22

Appellee Appx. 00886
Appx. 007694

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 894 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 777 of 1017    PageID 8507
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 893 of 1803   PageID 11639

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 23 of 27

*Caesars*, 2015 Bankr. LEXIS 314, at *23 ("in this day of law firms with multiple offices across

the nation, convenient and accessible airports, electronic access to information and court dockets

at every lawyer's fingertips, it is fair to say that both this [Delaware Bankruptcy] Court and the

Illinois Court are convenient forums for purposes of the *CORCO* analysis.").

48.     Further, one of the Committee members and the Debtor's largest creditor,

the Redeemer Committee, has commenced litigation that is pending in the Delaware Chancery

Court.  In fact, the main trigger for the Debtor's bankruptcy filing was a hearing set by the

Redeemer Committee in the Delaware Chancery Court to obtain a judgment on a $189 million

Award.  If Delaware is convenient enough for the Redeemer Committee, it is certainly an

appropriate forum for this case.  Daugherty is another allegedly significant creditor of the Debtor

who chose to commence litigation in Delaware Chancery Court, which matter commenced trial

just prior to the Petition Date.  UBS, another member of the Committee, has litigation pending

against the Debtor in New York.

49.     The bottom line is that in a case of the size and complexity of this one,

involving highly sophisticated and well-represented creditors, there is absolutely no reason to

transfer venue on the basis of the proximity of creditors to the Texas Bankruptcy Court.

### iv.  *The Proximity of the Debtor and Witnesses Necessary to the Administration of the Estate*

50.     As discussed in *CORCO*, the Court's consideration of the location of the

Debtor should focus on the proximity to the Court of the Debtor's employees and representatives

who must appear in court, not with the employees who conduct the day-to-day business activities

of the Debtor.  *CORCO*, 596 F.2d at 1248; *see also Restaurants Acquisition*, 2016 Bankr. LEXIS

DOCS_SF:102198.7 36027/002

Appellee Appx. 00887
Appx. 007652
007695

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 895 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 778 of 1017 PageID 8508
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 894 of 1803 PageID 11640
Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 24 of 27

at *11 ("Courts have noted the inquiry should focus primarily on the location of parties that must appear in court.").

51.     In this case, the CRO is expected to take the lead in managing the Debtor's restructuring efforts and testifying on behalf of the Debtor. The CRO is a highly accomplished and independent professional based in Los Angeles who regularly appears in this Court and was previously chief restructuring officer in Delaware cases such as *Variant Holding Company LLC* before Judge Brendan Shannon and *Woodbridge Group of Companies LLC* before Judge Kevin Carey (retired). Few Debtor employees should be required to testify in this case on a going forward basis and, even if they were, travel to this Court is easily accomplished and consistent with the many prior trips required of such employees by the Redeemer Committee and Daugherty in choosing to commence litigation in Delaware Chancery Court. The Debtor's bankruptcy counsel also has an office in Delaware and has no need to hire local counsel here, whereas in Dallas, local counsel would need to be retained.

52.     Given what is at stake, the Debtor and its employees, including the CRO, are conveniently located within sufficient proximity of this Court such that this factor does not weigh in favor of a venue transfer to the Texas Bankruptcy Court.

### v. *The Necessity for Ancillary Administration if Liquidation Should Result*

53.     The final factor relates to the necessity for ancillary administration if liquidation should result. As the courts in *CORCO*, *Enron* and *Fairfield Puerto Rico* recognized, "anticipation of the failure of the [Chapter 11] proceeding is an illogical basis upon which to predicate a transfer." *CORCO*, 596 F.2d at 1248; *see also Enron*, 274 B.R. at 349; *In re Fairfield Puerto Rico, Inc.*, 333 F. Supp. at 1191. Indeed, "[t]his factor is often discounted by

24

Appellee Appx. 00888
007696

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 896 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 779 of 1017 PageID 8509
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 895 of 1803 PageID 11641

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 25 of 27

courts." *Enron*, 274 B.R. at 343, n. 11. The Debtor's focus in this case is to propose a chapter 11 plan that will maximize value for all constituents, and the Committee offers no factual basis for this Court to contemplate the failure of the Debtor's chapter 11 case. *See In re Fairfield Puerto Rico, Inc.*, 333 F. Supp. at 1191. Accordingly, this factor does not favor transfer of venue.

**D.      The Interest of Justice is Not Served By Transferring Venue**

54.      In determining whether a transfer would be "in the interest of justice," the court should consider "whether transfer of venue will promote the efficient administration of the estate, judicial economy, timeliness, and fairness." *Enron,* 274 B.R. at 387. These factors have generally been discussed above and support keeping this case in Delaware. Additional concerns that would speak to the "interest of justice" include facts such as the importance of a debtor to the welfare and economic stability of a jurisdiction, and are not present in this case. *See CORCO,* 596 F.2d at 1248 (even though the importance of the debtor, a major supplier of petroleum to Puerto Rico, to the welfare and economic stability of Puerto Rico implicated "interest of justice" considerations, the court determined not to transfer venue to Puerto Rico).

55.      As noted above, venue is legally proper in this Court and the Debtor is entitled to substantial deference as to its choice of forum. But even if the Court considered the interests of justice and the convenience of the parties, there is no legitimate basis to transfer this case to the Texas Bankruptcy Court given the sophistication, complexity, and scope of the Debtors' business, domestic and foreign assets, and creditor constituents, and pendency of creditor actions in the Delaware Chancery Court and New York.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 897 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 780 of 1017    PageID 8510
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 896 of 1803   PageID 11642

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 26 of 27

56.     The Texas Bankruptcy Court is also the venue where the unaffiliated and adverse bankruptcy case of Acis has been pending.  Acis has asserted fraudulent transfer and other disputed claims against the Debtor, which claims are all prepetition in nature.  The Debtor, in turn, has contract claims against Acis totaling in excess of $8 million.  The efficient administration of this estate, judicial economy, timeliness, and fairness would not be served by having the Texas Bankruptcy Court adjudicate these countervailing claims and interests.  The interests of justice also would not be served by transferring venue in order for the Committee to realize a tactical litigation advantage before the Texas Bankruptcy Court.

57.     For all these reasons, the Debtor urges this Court to maintain venue of this case in Delaware.

WHEREFORE, the Debtor respectfully requests that this Court enter an order denying the Motion to Transfer and granting such other and further relief as this Court deems appropriate.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00890
Appx. 007755
007698

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 898 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 781 of 1017    PageID 8511
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 897 of 1803    PageID 11643

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 27 of 27

Dated:  November 12, 2019                    PACHULSKI STANG ZIEHL & JONES LLP

                                            /s/ James E. O'Neill
                                            Richard M. Pachulski (CA Bar No. 62337)
                                            Jeffrey N. Pomerantz (CA Bar No.143717)
                                            Ira D. Kharasch (CA Bar No. 109084)
                                            Maxim B. Litvak (CA Bar No. 215852)
                                            James E. O'Neill (DE Bar No. 4042)
                                            919 North Market Street, 17th Floor
                                            Wilmington, DE 19899 (Courier 19801)
                                            Telephone: (302) 652-4100
                                            Facsimile:  (302) 652-4400
                                            E-mail:    rpachulski@pszjlaw.com
                                                       jpomerantz@pszjlaw.com
                                                       ikharasch@pszjlaw.com
                                                       mlitvak@pszjlaw.com
                                                       joneill@pszjlaw.com

                                            *Proposed Counsel for the Debtor
                                            and Debtor in Possession*

DOCS_SF:102198.7 36027/002

Appellee Appx. 00891

007699

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 899 of
Case 3:25-cv-02072-S     Document 15-10     Filed 10/06/25     Page 782 of 1017     PageID 8512
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 898 of 1803  PageID 11644

# APPENDIX 12

Appellee Appx. 00892

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 900 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 783 of 1017    PageID 8513
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 899 of 1803   PageID 11645
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 1 of 18

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachary Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel and Proposed Counsel for the Debtor and Debtor in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**MOTION OF THE DEBTOR FOR APPROVAL OF SETTLEMENT
WITH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING
GOVERNANCE OF THE DEBTOR AND
PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE**

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") files this

motion (the "<u>Motion</u>") for the entry of an order (the "<u>Order</u>") approving the terms of a settlement

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 901 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 784 of 1017    PageID 8514
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 900 of 1803    PageID 11646
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 2 of 18

between the Debtor and the Committee (as defined below) regarding governance of the Debtor and procedures for operations in the ordinary course of business, as embodied in the term sheet attached hereto as **Exhibit A** (the "Term Sheet").  In support of this Motion, the Debtor respectfully represents as follows:

### Preliminary Statement

1.    Following weeks of negotiations, the Debtor and the Committee have reached a proposed settlement, which contemplates the creation of a new independent board of directors (the "Independent Directors") at Strand Advisors, Inc. ("Strand"), the Debtor's general partner and ultimate party in control, and the implementation of certain protocols governing the operation of the Debtor's business in the ordinary course.  The Independent Directors will consist of the following three highly qualified and independent individuals:  James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee.[2]  Two of the Independent Directors were chosen by the Committee and the third Independent Director will be selected by or otherwise acceptable to the Committee.  Background information for each of the Independent Directors is attached hereto as **Exhibit B**.

2.    Pursuant to the Term Sheet, and effective upon entry of the Order, James Dondero will no longer be a director, officer, managing member, or employee of the Debtor or Strand and will have no authority, directly or indirectly, to act on the Debtor's behalf.  Going forward, the Independent Directors, through Strand, will have sole and exclusive management and control of the Debtor.  The Independent Directors will have the discretion to appoint an interim

---

[2] The Committee's agreement to the Term Sheet in its entirety is contingent upon the selection of a third Independent Director acceptable to the Committee.  In the event the Committee and the Debtor cannot reach an agreement on an acceptable Independent Director to fill the third seat of the Board of Directors, the Term Sheet shall be null and void.

**Appellee Appx. 00894**

**007702**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 902 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 785 of 1017    PageID 8515
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 901 of 1803    PageID 11647
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 3 of 18

Chief Executive Officer (the "CEO") who will manage the Debtor's day-to-day business operations. Subject to Court approval, the Debtor still intends to retain Development Specialists, Inc. ("DSI") to provide a Chief Restructuring Officer (the "CRO") that will serve at the direction of the Independent Directors (or CEO, if appointed).

3.     It bears emphasis that the Independent Directors will not be mere figureheads. The Debtor and the Committee envision that the Independent Directors will be actively involved and intimately familiar with all material aspects of the Debtor's business and restructuring efforts. Moreover, with guidance of the CRO and CEO (if appointed), the Independent Directors will endeavor to prevent any negative influence Mr. Dondero or any of his affiliates or agents may have on the Debtor and its employees. Further, as part of the Term Sheet, the Committee will be granted standing to pursue estate claims against Mr. Dondero and other former insiders of the Debtor who were not employed by the Debtor as of the execution of the Term Sheet. The Committee will also retain the right to move for a chapter 11 trustee.

4.     In sum, the Term Sheet resolves months of litigation between the Debtor and the Committee over the Debtor's governance structure and operating protocols, allowing all parties to refocus on a path forward for this chapter 11 case. With the Independent Directors in place, the Debtor can move forward expeditiously, efficiently, and effectively with the substantive aspects of this case and consider any available restructuring options that will maximize value for all constituents. The Debtor therefore urges the Court to approve the Term Sheet and allow the key economic interest holders to proceed with a productive restructuring effort.

DOCS_NY:39973.7 36027/002

Appellee Appx. 00895
Appx. 23799
007703

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 903 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 786 of 1017 PageID 8516
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 902 of 1803 PageID 11648
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 4 of 18

### Jurisdiction and Venue

5.      The United States Bankruptcy Court for the District of Northern District of Texas, Dallas Division (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Background

8.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

9.      To assist and coordinate the restructuring process, the Debtor retained DSI and Bradley D. Sharp to serve as the CRO on October 7, 2019.  On October 29, 2019, the Debtor filed the *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and Restructuring Related Services, Nunc Pro Tunc as of the Petition Date* [Docket No. 74] (the "CRO Motion") seeking to formally retain the CRO.  The CRO Motion remains pending, and the Debtor is filing a supplement to the CRO Motion concurrently herewith.

10.     On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.  On November 12, 2019, the Committee filed an omnibus objection to the CRO Motion, cash management motion, and

DOCS_NY:39973.7 36027/002

Appellee Appx. 00896
Appx. 02764
007704

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 904 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 787 of 1017    PageID 8517
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 903 of 1803    PageID 11649
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 5 of 18

motion for approval of ordinary course protocols [Docket No. 130] (the "Committee Objection"),

raising various concerns regarding the Debtor's governance and business practices.

11.    On December 4, 2019, the Delaware Court entered an order transferring

venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[3] The Debtor has continued

in the possession of its property and has continued to operate and manage its business as a debtor

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or

examiner has been appointed in this chapter 11 case.

12.    On December 23, 2019, the U.S. Trustee filed a motion in this Court to

appoint a chapter 11 trustee for the Debtor [Docket No. 271] (the "Trustee Motion").  Although

the Debtor will be filing a separate response to the Trustee Motion, it suffices to say that the Trustee

Motion (filed without even considering the proposed Term Sheet) completely lacks merit given

the governance changes and other resolutions encompassed in the Term Sheet agreed to by the

Committee, as the representative of the primary economic stakeholders here.

**Terms of the Proposed Settlement**

13.    Pursuant to the Term Sheet, the Debtor and the Committee have agreed to:

(a) implement certain changes to the Debtor's governance, including the appointment of the

Independent Directors; (b) provide the Committee with additional transparency into the operation

of the Debtor's business; (c) retain the CRO on updated terms; and (d) implement certain protocols

governing the ordinary course business operations of the Debtor.  The terms of this agreement are

contained in the Term Sheet.[4]  A summary of the Term Sheet is as follows:

---

[3] All docket numbers refer to the docket maintained by this Court.

[4] In the event of any inconsistency between the summary of the Term Sheet contained herein and the Term Sheet, the
Term Sheet will govern.

DOCS_NY:39973.7 36027/002

Appellee Appx. 00897
Appx. 02702
007705

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 905 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 788 of 1017   PageID 8518
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 904 of 1803   PageID 11650
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 6 of 18

**Independent Directors**

The Debtor's general partner, Strand will appoint the following three (3) Independent Directors: James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached to the Term Sheet (the "Governing Documents"), which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).

The Independent Directors shall be compensated in a manner to be determined, with an understanding that the source of funding, whether directly or via reimbursement, will be the Debtor.

As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether a CEO should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.

The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also

Appellee Appx. 00898
Appx. 93703
007706

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 906 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 789 of 1017 PageID 8519
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 905 of 1803 PageID 11651
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 7 of 18

|  | participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
|---|---|
| **Role of Mr. James Dondero** | Upon approval of the Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as an employee of the Debtor. |
| **CRO** | Bradley Sharp and DSI shall, subject to approval of the Court, be retained as the CRO to the Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO. Mr. Sharp's and DSI's retention is subject to this Court's approval. The Debtor has filed the CRO Motion, as supplemented as of the date hereof, which requests authority to retain Mr. Sharp and DSI.[5] |
|  | DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Mark Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not include any estate claim or cause of action against any then-current employee of the Debtor. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached to the Term Sheet, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol"). |
|  | Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are |

---

[5] For the avoidance of doubt, the Debtor is not seeking retention of the CRO pursuant to this Motion. The Debtor is seeking such relief pursuant to the CRO Motion (as supplemented).

DOCS_NY:39973.7 36027/002

Appellee Appx. 00899
Appx. 02764
007707

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 907 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 790 of 1017 PageID 8520
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 906 of 1803 PageID 11652
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 8 of 18

within the Debtor's possession, custody, or control ("Shared Privilege").

With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege. The Committee further agrees that the production of any particular document by the Debtor under this process will not be used as a basis for a claim of subject matter waiver.

**Reporting Requirements**      The Debtor shall be subject to and comply with the reporting requirements attached to the Term Sheet, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "Reporting Requirements").

**Plan Exclusivity**      The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code.

**Operating Protocols**      The Debtor shall comply with the operating protocols attached to the Term Sheet, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order (the "Operating Protocols" and, together with the Reporting Requirements, the "Protocols").

14.     By this Motion, the Debtor is seeking the Court's approval of the Term

Sheet, the terms contained therein, and the exhibits attached thereto. For the avoidance of doubt,

approval of the Term Sheet includes the approval of the following:

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 908 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 791 of 1017    PageID 8521
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 907 of 1803    PageID 11653
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 9 of 18

- <u>Independent Directors</u>:  The appointment of James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee as the Independent Directors of Strand, the Debtor's general partner, with power to oversee the operations of the Debtor as set forth in the Term Sheet.  Mr. Seery and Mr. Dubel were selected by the Committee, and the Debtor agreed to their appointment as Independent Directors.  The Debtor is also seeking approval of the Governing Documents appointing the Independent Directors, to the extent required, and the authority to compensate the Independent Directors either directly from the assets of the Debtor or via the reimbursement of Strand of any compensation paid to the Independent Directors.

- <u>Document Management and Preservation</u>:  The implementation of the Document Production Protocol, which will govern how the Debtor retains and produces documents and information to the Committee during the pendency of its bankruptcy case.  The Debtor is also agreeing to the allow the Committee to access certain documents that are otherwise subject to the Shared Privilege to assist the Debtor in investigating the Estate Claims.

- <u>Estate Claims</u>.  The Debtor has agreed to grant the Committee standing to pursue any Estate Claims.  Estate Claims do not include claims or causes of action against any current employees of the Debtor; however, if any employee ceases to be employed by the Debtor, the Committee will have standing to pursue claims against such former employee.

- <u>Reporting Requirements and Operating Protocols</u>:  The Debtor has agreed to provide certain reporting to the Committee and to operate under certain protocols, which set forth the parameters of how the Debtor can conduct its business without the requirement of Court approval.  The Protocols provide, in certain circumstances, how the CRO and the Independent Directors will oversee the Debtor's operations.  The purpose of the Protocols is to allow the Debtor to function in the ordinary course of its business while providing transparency to the Committee.

15.     The Debtor believes that appointing the Independent Directors and otherwise effectuating the terms of the Term Sheet is in the best interests of the Debtor, its estate, and its creditors.  The Term Sheet will allow the Debtor to proceed with a productive reorganization effort that will maximize value for all constituents.  Accordingly, the Debtor seeks approval of the Term Sheet.

### **Relief Requested**

16.     By this Motion, the Debtor seeks entry of an order pursuant to sections 105(a), 363(b)(1), and 363(c)(1) of the Bankruptcy Code and Bankruptcy Rule 9019: (a) approving the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b)

DOCS_NY:39973.7 36027/002

Appellee Appx. 00901
007709

authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of the Term Sheet, including entering into the Governing Documents and compensating – either directly or through reimbursement – the Independent Directors; (c) granting the Committee standing to pursue the Estate Claims; and (d) granting related relief.

### Authority for the Relief Requested

**A.    Section 363(c)(1) of the Bankruptcy Code Authorizes the Debtor to Enter Into Certain Aspects of the Term Sheet in the Ordinary Course**

17.    Because the Debtor is not settling any claims or causes of action through the Term Sheet or otherwise expending estate resources, the Debtor believes that it has the authority to effectuate the majority of the transactions and compromises set forth in the Term Sheet without Court approval under section 363(c)(1) of the Bankruptcy Code.  Specifically, section 363(c)(1) provides:

> [i]f the business of the debtor is authorized to be operated under section. . . 1108. . . of this title. . . the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  As such, a debtor may engage in postpetition actions if the debtor is authorized to operate its business under section 1108 and such transactions are "in the ordinary course of business."

18.    An activity is "ordinary course" if it satisfies both the "horizontal test" and the "vertical test."  *See, e.g., Denton Cty. Elec. Coop. v. Eldorado Ranch, Ltd.* (*In re Denton Cty. Elec. Coop.*), 281 B.R. 876, 882 n.12 (Bankr. N.D. Tex. 2002); *see also In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992).  The vertical test looks to "whether the transaction subjects a

**Appellee Appx. 00902**

**Appx. 03705**

**007710**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 910 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 793 of 1017 PageID 8523
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 909 of 1803 PageID 11655
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 11 of 18

hypothetical creditor to a different economic risk than existed when the creditor originally

extended credit." *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013). The

horizontal test considers "whether the transaction was of the sort commonly undertaken by

companies in the industry." *Id.* Here, both the vertical test and horizontal test are satisfied.

19.     Under the Term Sheet, the Debtor is seeking authority to (a) appoint the

Independent Directors at Strand (a non-debtor entity), (b) have Mr. Dondero removed from his

role at the Debtor and Strand; (c) agree to seek the retention of the CRO under a revised

engagement letter that provides that the CRO will report to the Independent Directors; (d) grant

the Committee standing to pursue the Estate Claims; (e) enter into and implement the Document

Production Protocols; (f) grant the Independent Directors the exclusive right to determine whether

to waive exclusivity; and (g) enter into and implement the Protocols.  Only the compensation of

the Independent Directors, the entrance into the Protocols (which provide the Committee with

certain right to object to the Debtor engaging in a "Transaction" (as defined in the Protocols) and

allow the Debtor to seek a hearing before this Court on an expedited basis), and the grant of

standing to the Committee to pursue Estate Claims could be construed as outside of the ordinary

course of business.  The balance of the terms of the Term Sheet either involve non-debtors[6] or will

be the subject of separate motions seeking Court approval at the appropriate time.

**B.      The Court Should Approve the Term Sheet Under**
**         Rule 9019 of the Bankruptcy Code**

20.     Although the Debtor believes that it has authority to implement the majority

of the Term Sheet in the ordinary course of its business under section 363(c), the Debtor is seeking

---

[6] With respect to the Independent Directors, they are being appointed to a new independent board of Strand, the Debtor's general partner, and Strand is not a debtor in this case or subject to this Court's jurisdiction.

Appellee Appx. 00903

Appx. 93768

007711

this Court's approval of the Term Sheet under section 105 of the Bankruptcy Code and Rule 9019

of the Bankruptcy Rules out of an abundance of caution.  Section 105(a) of the Bankruptcy Code

provides in relevant part that "[t]he court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section

105(a) has been interpreted to expressly empower bankruptcy courts with broad equitable powers

to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the

Code was designed to obtain."  *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex

rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc); *see also Southmark

Corp. v. Grosz* (*In re Southmark Corp.*), 49 F.3d 1111, 1116 (5th Cir. 1995) (stating that section

105(a) of the Bankruptcy Code "authorizes bankruptcy courts to fashion such orders as are

necessary to further the substantive provisions of the Code").

21.    Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court
> may approve a compromise or settlement.  Notice shall be given to
> creditors, the United States trustee, the debtor, and indenture
> trustees as provided in Rule 2002 and to any other entity as the
> court may direct.

Fed. R. Bankr. P. 9019(a).

22.    Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases.  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also

Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve

Appellee Appx. 00904

Appx. 03709

007712

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 912 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 795 of 1017    PageID 8525
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 911 of 1803   PageID 11657
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 13 of 18

a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best

interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately,

"approval of a compromise is within the sound discretion of the bankruptcy court." *See United*

*States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*,

624 F.2d at 602–03.

23.    In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-party test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Committee of Unsecured Creditors v. Cajun Elec. Power*

*Coop. by & through Mabey (In re Cajun Elec. Power Coop.)*, 119 F. 3d 349, 356 (5th Cir. 1997)

(citing *Jackson Brewing*, 624 F.2d at 602). The Fifth Circuit has instructed courts to consider the

following factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of

the compromise." *Id.*

24.    Under the rubric of the third factor referenced above, the Fifth Circuit has

specified two additional factors that bear on the decision to approve a proposed settlement. First,

the court should consider "the paramount interest of creditors with proper deference to their

reasonable views." *Id.; Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg.*

*Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which

the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age*

*Ref. Inc.*, 801 F.3d at 540; Foster Mortg. Corp., 68 F.3d at 918 (citations omitted).

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 913 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 796 of 1017    PageID 8526
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 912 of 1803    PageID 11658
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 14 of 18

25.     Here, the Debtor submits that effectuating the transactions set forth in the Term Sheet satisfies the Fifth Circuit's three-part test.  The settlement embodied in the Term Sheet was driven in large part by the Debtor's creditors and has the support of the Committee, which consists of the Debtor's principal creditors.  The Term Sheet was negotiated at arm's length, and there was no fraud or collusion in its negotiation.  The settlement is also fair and reasonable and in the best interests of the Debtor's estate and also resolves the open disputes regarding the CRO Motion, the *Motion of Debtor for Interim and Final Orders Authorizing (A) Continuance of Existing Cash Management System, (B) Continued Use of the Prime Account, (C) Limited Waiver*, as supplemented [Docket Nos. 51 & 259], and *Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business* [Docket No. 76].

26.     The Debtor and members of the Committee have been entangled in highly contentious litigation that has spanned many years and multiple venues.  As evidenced by the brief history of the Debtor's bankruptcy case,[7] that contention and mistrust has carried over into this proceeding and could derail any chance that the Debtor has to successfully reorganize and structure a plan to pay its creditors.  The governance and operational changes set forth in the Term Sheet, will provide greater transparency to the Committee and start the process of rebuilding the trust necessary to negotiate a successful resolution of this case.  Without the Term Sheet, the Debtor

---

[7] *See, e.g., Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 11], *Motion of the Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the  United States Bankruptcy Court for the Northern District of Texas* [Docket No. 85], *Omnibus Objection of the Official Committee of Unsecured Creditors to the Debtor's (I) Motion for Final Order Authorizing Continuance of the Existing Cash Management System, (II) Motion to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officers, and (III) Precautionary Motion for Approval of Protocol for "Ordinary Course" Transactions* [Docket No. 130], and *United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 271].

14

Appellee Appx. 00906
Appx. 9374
007714

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 914 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 797 of 1017 PageID 8527
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 913 of 1803 PageID 11659
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 15 of 18

anticipates that the Committee would move to appoint a chapter 11 trustee and the U.S. Trustee

has already done so (without even seeing the Term Sheet). The Debtor will contest such motions

because the appointment of a chapter 11 trustee could gravely harm the Debtor's business. The

implementation of the Term Sheet will head off any potential issues that could arise, eliminate

costly, time consuming and uncertain litigation, and give the Debtor sufficient breathing room to

work towards rebuilding trust with its creditor body and allow the Debtor to exit bankruptcy and

preserve the value of its business. The Debtor's bankruptcy case has been pending for over two

and a half months, and it is time for the parties to put the acrimony that marked the initial stages

of this case behind them and to move forward in a productive manner – precisely what the Term

Sheet seeks to accomplish.

C.     **Consummating the Settlement Agreement**
       **is a Sound Exercise of the Debtors' Business Judgment.**

27.    Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession

to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after

notice and a hearing. It is well established in this jurisdiction that a debtor may use property of

the estate outside the ordinary course of business under this provision if there is a good business

reason for doing so. *See, e.g., ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d

593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to

the debtor, creditors, and equity holders, there must be some articulated business justification for

using, selling, or leasing the property outside the ordinary course of business.") (*quoting In re*

*Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); 441 B.R. 813, 830 (Bankr. S.D. Tex.

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 915 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 798 of 1017 PageID 8528
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 914 of 1803 PageID 11660
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 16 of 18

2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

28.    The transactions contemplated by the Term Sheet are within the sound business judgment of the Debtor.  The Term Sheet resolves potentially costly and protracted litigation with the Committee over the Debtor's corporate governance and will give the Debtor the breathing room necessary to negotiate and effectuate the terms of a plan acceptable to the Debtor's creditors.  Further, providing standing to the Committee to investigate Estate Claims and the payment of the Independent Directors from the assets of the estate are each necessary components of the Term Sheet.  The Committee would not have agreed to the Term Sheet without the grant of standing to investigate Estate Claims.  Moreover, Strand, a non-debtor, is unable to cover the costs of the Independent Directors.  As such, there is a good business reason for the Debtor's payment of the Independent Directors' compensation: the Term Sheet and the appointment of the Independent Directors would not have been agreed to or possible without that condition.[8]  The foregoing is sufficient grounds to approve the Term Sheet and authorize the Debtor to effectuate the terms of the Term Sheet under Section 363(b)(1).

### No Prior Request

29.    No previous request for the relief sought herein has been made to this, or any other, Court.

---

[8] Further, although the Debtor seeks to reimburse Strand for the cost of the Independent Directors, the Debtor is otherwise obligated to reimburse Strand for any costs or expenses incurred by Strand in its management of the Debtor. *See* Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., § 3.10(b).

DOCS_NY:39973.7 36027/002

Appellee Appx. 00908
Appx. 93773
007716

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 916 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 799 of 1017   PageID 8529
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 915 of 1803   PageID 11661
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 17 of 18

<u>**Notice**</u>

30.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the Northern District of Texas; (c) the Debtor's principal secured parties; (d) counsel to the Committee; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court enter an Order, substantially in the form attached hereto as **<u>Exhibit C</u>**, (a) approving the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b) authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of the Term Sheet, including entering into the Governing Documents and compensating – either directly or through reimbursement – the Independent Directors; and (c) granting related relief.

DOCS_NY:39973.7 36027/002

Appellee Appx. 00909
Appx. 03774
007717

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 917 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 800 of 1017    PageID 8530
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 916 of 1803   PageID 11662
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 18 of 18

Dated:  December 27, 2019          PACHULSKI STANG ZIEHL & JONES LLP
                                   Jeffrey N. Pomerantz (CA Bar No.143717)
                                   (*admitted pro hac vice*)
                                   Ira D. Kharasch (CA Bar No. 109084)
                                   (*admitted pro hac vice*)
                                   Maxim B. Litvak (Texas Bar No. 24002482)
                                   Gregory V. Demo (NY Bar No. 5371992)
                                   (*admitted pro hac vice*)
                                   10100 Santa Monica Blvd., 13th Floor
                                   Los Angeles, CA 90067
                                   Telephone: (310) 277-6910
                                   Facsimile: (310) 201-0760
                                   E-mail:     jpomerantz@pszjlaw.com
                                               ikharasch@pcszjlaw.com
                                               mlitvak@pszjlaw.com
                                               gdemo@pszjlaw.com

                                   -and-

                                   */s/ Melissa S. Hayward*
                                   HAYWARD & ASSOCIATES PLLC
                                   Melissa S. Hayward
                                   Texas Bar No. 24044908
                                   MHayward@HaywardFirm.com
                                   Zachary Z. Annable
                                   Texas Bar No. 24053075
                                   ZAnnable@HaywardFirm.com
                                   10501 N. Central Expy, Ste. 106
                                   Dallas, Texas 75231
                                   Tel: (972) 755-7100
                                   Fax: (972) 755-7110

                                   *Counsel and Proposed Counsel for the Debtor and
                                   Debtor in Possession*

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 918 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 801 of 1017    PageID 8531
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 917 of 1803   PageID 11663
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 1 of 61

## Highland Capital Management, L.P.

### Preliminary Term Sheet

 This term sheet ("*Term Sheet*") outlines the principal terms of a proposed settlement between Highland Capital Management, L.P. (the "*Debtor*") and the Official Committee of Unsecured Creditors (the "*Committee*") in the chapter 11 case captioned In re Highland Capital Mgm't, L.P., Case No. 19-34054 (SGJ) (the "*Chapter 11 Case*"), pending in the Bankruptcy Court for the Northern District of Texas (the "*Bankruptcy Court*"), to resolve a good faith dispute between the parties related to the Debtor's corporate governance, and specifically, the Committee's various objections to certain relief being sought by the Debtors in the Chapter 11 Case [Del. Docket No. 125]. *This Term Sheet shall be subject to approval by the Bankruptcy Court.*

| Topic | Proposed Terms |
|---|---|
| **Parties** | Highland Capital Management, L.P. (the "Debtor"). The Official Committee of Unsecured Creditors of Highland Capital Management, L.P. (the "Committee"). |
| **Independent Directors** | The Debtor's general partner, Strand Advisors, Inc., will appoint the following three (3) independent directors (the "Independent Directors"): James Seery, John Dubel, and a third director to selected by or otherwise acceptable to the Committee.  The Independent Directors will be granted exclusive control over the Debtor and its operations.  Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached hereto as **Exhibit A**, which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement). The Independent Directors shall be compensated in a manner to be determined with an understanding that the |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 919 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 802 of 1017    PageID 8532
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 918 of 1803    PageID 11664
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 2 of 61

| | |
|---|---|
| | source of funding, whether directly or via reimbursement, will be the Debtor.<br><br>As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether an interim Chief Executive Officer (the "CEO") should be appointed for the Debtor.  If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors.  Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.<br><br>The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
| **Role of Mr. James Dondero** | Upon approval of this Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as an employee of the Debtor. |
| **CRO** | DSI shall, subject to approval of the Bankruptcy Court, be retained as chief restructuring officer ("CRO") to the Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO.  The retention and scope of duties of DSI shall be pursuant to the Further Amended Retention Agreement, attached hereto as **Exhibit B**.<br><br>DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 920 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 803 of 1017    PageID 8533
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 919 of 1803   PageID 11665
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 3 of 61

| | include any estate claim or cause of action against any then-current employee of the Debtor. |
|---|---|
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached hereto as **Exhibit C**, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol").<br><br>Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control ("Shared Privilege").<br><br>With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege.  The Committee further agrees that the production of any particular document by the Debtor under this process will not be used as a basis for a claim of subject matter waiver. |
| **Reporting Requirements** | The Debtor shall be subject to and comply with the reporting requirements attached hereto as **Exhibit D**, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "Reporting Requirements"). |
| **Plan Exclusivity** | The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code. |
| **Operating Protocols** | The Debtor shall comply with the operating protocols set forth in **Exhibit D** hereto, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order. |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 921 of
Case 3:25-cv-02072-S     Document 15-10     Filed 10/06/25     Page 804 of 1017     PageID 8534
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 920 of 1803   PageID 11666
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 4 of 61

| Reservation of Rights | This agreement is without prejudice to the Committee's rights to, among other things, seek the appointment of a trustee or examiner at a later date.  Nothing herein shall constitute or be construed as a waiver of any right of the Debtor or any other party in interest to contest the appointment of a trustee or examiner, and all such rights are expressly reserved. |
|---|---|

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 922 of
Case 3:25-cv-02072-S     Document 15-10    Filed 10/06/25     Page 805 of 1017     PageID 8535
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 921 of 1803   PageID 11667
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 5 of 61

**Exhibit A**

**Debtor's Corporate Governance Documents**

Appellee Appx. 00915

Appx. 03789

007723

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 923 of
Case 3:25-cv-02072-S      Document 15-10    Filed 10/06/25      Page 806 of 1017      PageID 8536
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 922 of 1803   PageID 11668
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 6 of 61

**Exhibit B**

**Amended DSI Retention Letter**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 924 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 807 of 1017    PageID 8537
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 923 of 1803   PageID 11669
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 7 of 61

**Exhibit C**

**Document Production Protocol**

Appellee Appx. 00917

007725

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 925 of
Case 3:25-cv-02072-S     Document 15-10     Filed 10/06/25     Page 808 of 1017     PageID 8538
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 924 of 1803   PageID 11670
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 8 of 61

*PSZJ Revisions 12/23/19*
*Privileged & Confidential*
*Subject to FRE 408*

**Exhibit D**

**Reporting Requirements**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 926 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 809 of 1017 PageID 8539
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 925 of 1803 PageID 11671
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 9 of 61

**WRITTEN CONSENT OF SOLE STOCKHOLDER AND DIRECTOR**

**OF**

**STRAND ADVISORS, INC.**

**[ _____ ]**

Pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") and consistent with the provisions of the Certificate of Incorporation (the "Certificate") and Bylaws (the "Bylaws") of Strand Advisors, Inc., a Delaware corporation (the "Company"), the undersigned, being the holder of all of the issued and outstanding shares of common stock, par value $0.01 per share, of the Company and the sole director of the Company (the "Stockholder"), acting by written consent without a meeting pursuant to Section 228 of the DGCL and Article IV, Section 6, and Article XII of the Bylaws, does hereby consent to the adoption of the following resolutions and to the taking of the actions contemplated thereby, in each case with the same force and effect as if presented to and adopted at a meeting of the stockholders:

    **I.**    **AMENDMENT OF BYLAWS**

    **WHEREAS**, it is acknowledged that the Board of Directors of the Company (the "Board") has heretofore been fixed at one (1) and that the Board currently consists of James Dondero;

    **WHEREAS,** pursuant to Article XII of the Bylaws, the Stockholder wishes to amend the Bylaws in the manner set forth on **Appendix A** hereto (the "Bylaws Amendment") to increase the size of the Board from one (1) to three (3) directors; and

    **NOW, THEREFORE, BE IT RESOLVED,** that the Bylaws Amendment is hereby authorized and approved and the Board is increased from one (1) to three (3) directors;

    **RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as may be required to effectuate the Bylaws Amendment; and

    **RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate such Bylaws Amendment is hereby authorized and affirmed.

    **II.**    **ELECTION OF DIRECTORS**

    **WHEREAS**, the Stockholder desires to appoint James Seery, John Dubel, and _____ to the Board and desires that such individuals constitute the whole Board;

    **NOW, THEREFORE, BE IT RESOLVED,** that James Seery, John Dubel, and _____, having consented to act as such, be, and each of them hereby is, appointed as a director, to serve as a director of the Company and to hold such office until such director's respective successor shall have been duly elected or appointed and shall qualify, or until such director's death, resignation or removal;

    **RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as

Exhibit A
**Appellee Appx. 00919**
007727
**Appx. 83784**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 927 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 810 of 1017   PageID 8540
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 926 of 1803   PageID 11672
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 10 of 61

may be required to effectuate the appointment of the foregoing directors, including executing an indemnification agreement in favor of such directors in substantially the form attached hereto as **Appendix B** (each, an "Indemnification Agreement");

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate the appointment of such directors, including the execution of an Indemnification Agreement, is hereby authorized and affirmed.

**RESOLVED FURTHER**, that James Dondero and any other directors of the Company are hereby removed as directors of the Company;

**RESOLVED FURTHER**, that the directors appointed pursuant to these resolutions shall, pursuant to the terms of the Bylaws, appoint a Chairman of the Board.

### III.   STIPULATION WITH THE BANKRUPTCY COURT

**WHEREAS**, on October 16, 2019, Highland Capital Management, L.P. ("HCMLP") filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Bankruptcy Case");

**WHEREAS**, the Company is the general partner for HCMLP;

**WHEREAS**, the Bankruptcy Case was transferred to the Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11 (the "Texas Court") by order of the Bankruptcy Court for the District of Delaware on December 4, 2019;

**WHEREAS**, the Company and the Stockholder wish to enter into a stipulation with HCMLP and the Official Unsecured Creditors Committee appointed in the Bankruptcy Case (the "Committee"), such stipulation to be approved by the Texas Court, whereby the Stockholder will agree (a) not to transfer or assign his shares in the Company or exercise the voting power of such shares to remove any member of the Board appointed pursuant to these resolutions or further change the authorized number of directors from three (3) directors; (b) to exercise the voting power of his shares so as to cause each member of the Board appointed by this resolutions to be re-elected at upon the expiration of his or her term; and (c) upon the death, disability, or resignation of _____, will exercise the voting power of such shares so as to cause the resulting vacancy to be filled by a successor that is both independent and acceptable to the Stockholder and the Committee (the "Stipulation");

**WHEREAS,** for purposes of the Stipulation, "independent" would exclude the Stockholder, any affiliate of the Stockholder, and any member of management of the Company; and

**WHEREAS,** it is in the intent of the parties that the Stipulation will no longer be effective or bind Strand or the Stockholder following the termination of the Bankruptcy Case.

**NOW, THEREFORE, BE IT RESOLVED**, that the Company is authorized to take such actions as may be necessary to enter into and effectuate the Stipulation in the manner and on the terms set forth above, including, but not limited to, further amending the Certificate, Bylaws, or any other corporate governance documents; and

**RESOLVED FURTHER,** that Scott Ellington, as an officer of the Company, is authorized to take any such actions as may be required to enter into and effectuate the Stipulation in the manner set forth herein; and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 928 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 811 of 1017    PageID 8541
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 927 of 1803   PageID 11673
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 11 of 61

**RESOLVED FURTHER,** that any action taken by Scott Ellington or any other officer of the Company on or prior to the date hereof to effectuate such Stipulation is hereby authorized and affirmed.

*[Signature pages follow.]*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 929 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 812 of 1017    PageID 8542
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 928 of 1803   PageID 11674
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 12 of 61

**IN WITNESS WHEREOF,** the undersigned has executed this Written Consent as of the respective date and year first appearing above.

**STOCKHOLDER:**

_____
James Dondero

*[Signature Page to Written Consent of Sole Stockholder of Strand Advisors, Inc.]*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 930 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 813 of 1017   PageID 8543
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 929 of 1803   PageID 11675
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 13 of 61

**First Amendment to Bylaws of
Strand Advisors, Inc.**

Strand Advisors, Inc. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that the Company's sole stockholder, acting by written consent without a meeting, resolved to amend the Company's Bylaws (the "Bylaws") as follows:

**1.**     Article III, Section 2, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 2. Number of Directors. The number of directors which shall constitute the whole Board shall be three (3).

**2.**     The following shall be added as Section 6 to Article III of the Bylaws:

Section 6. Director Qualifications. Each director appointed to serve on the Board shall (A) (i) be an independent director, (ii) not be affiliated with the corporation's stockholders, and (iii) not be an officer of the corporation; and (B) have been (x) nominated by the stockholders, (y) a retired bankruptcy judge and nominated jointly by the stockholders and any official committee of unsecured creditors in the chapter 11 bankruptcy of Highland Capital Management, L.P. (the "Committee") currently pending in the Bankruptcy Court for the Northern District of Texas (the "Court"), Case No. 19-34054-sgj11; or (z) nominated by the Committee and reasonably acceptable to the stockholders.

**3.**     The following shall be added as Section 7 to Article III of the Bylaws:

Section 7. Removal of Directors.  Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).

Except as expressly amended hereby, the terms of the Company's Bylaws shall remain in full force and effect.

*[Signature Page Follows]*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 931 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 814 of 1017    PageID 8544
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 930 of 1803   PageID 11676
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 14 of 61

**IN WITNESS WHEREOF,** the Company has caused this amendment to be signed this [ __ ] day of [ __ ], 20__.

**STRAND ADVISORS, INC.**

_____

By: Scott Ellington
Its: Secretary

Appellee Appx. 00924
Appx. 03789
007732

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 932 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 815 of 1017    PageID 8545
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 931 of 1803    PageID 11677
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 15 of 61

## INSERT STRAND ADVISORS, INC. LETTERHEAD

[ _____ ]

[NAME]
[ADDRESS]
[ADDRESS]
[ADDRESS]

>    **Re:**    **Strand Advisors, Inc. – Director Agreement**

Dear [ _____ ]:

On behalf of Strand Advisors, Inc. (the "<u>Company</u>"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "<u>Agreement</u>") that the Company is offering to you.

>    **1.**    **APPOINTMENT TO THE BOARD OF DIRECTORS.**

>    >    a.    <u>Title, Term and Responsibilities</u>.

>    >    >    i.    Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "<u>Board</u>"), and you hereby accept such appointment the date you sign this Agreement (the "<u>Effective Date</u>"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "<u>Term</u>"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "<u>Governing Documents</u>"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

>    >    >    ii.    You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("<u>HCMLP</u>") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding pending in the Northern District of Texas (the "<u>Bankruptcy</u>"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

>    >    b.    <u>Mandatory Board Meeting Attendance</u>. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board and no fewer than fifty percent (50%) of these meetings of the Board in person, and no more than fifty percent (50%) of such meetings by telephone or teleconference. You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

>    >    c.    <u>Independent Contractor</u>. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

>    >    d.    <u>Information Provided by the Companies.</u> The Company shall: (i) provide you with reasonable access to management and other representatives of the Company, except to the extent that any such access may impair any attorney client privilege to which the Company may be entitled; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows,

Appellee Appx. 00925
Appx. 93799
007733

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 933 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 816 of 1017    PageID 8546
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 932 of 1803    PageID 11678
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 16 of 61

properties, financial condition and prospects of the Company that you reasonably request in connection with the services to be provided to the Company. You will rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns. You are under no obligation to update data submitted to you or to review any other information unless specifically requested by the Board to do so.

2.    **COMPENSATION AND BENEFITS.**

a.    <u>Retainer</u>. The Company will pay you a retainer for each month you serve on the Board (the "<u>Retainer</u>") to be paid in monthly installments of $[TBD]. The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b.    <u>Expense Reimbursement</u>. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c.    <u>Invoices; Payment</u>.

i.    In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment will be due to you within 10 business days after receipt of each such invoice, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii.    You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d.    <u>Indemnification; D&O Insurance</u>. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated December 5, 2019, a copy of which is attached hereto as **Appendix A** (the "<u>Indemnification Agreement</u>"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e.    <u>Tax Indemnification</u>. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

3.    **PROPRIETARY INFORMATION OBLIGATIONS.**

a.    <u>Proprietary Information</u>. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

Appellee Appx. 00926
Appx. 03791
007734

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 934 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 817 of 1017 PageID 8547
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 933 of 1803 PageID 11679
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 17 of 61

     b.    <u>Third Party Information</u>. The Company has received and will in the future receive from third parties confidential or proprietary information ("<u>Third Party Information</u>") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose itto anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

     c.    <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

**4.    OUTSIDE ACTIVITIES.**

     a.    <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

     b.    <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

     c.    <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

**5.    TERMINATION OF DIRECTORSHIP.**

     a.    <u>Voluntary Resignation, Removal Pursuant to Bylaws and Stockholder Action</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law or by an affirmative vote of a majority of the stockholders of the Company.

     b.    <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

     c.    <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

**6.    GENERAL PROVISIONS.**

     a.    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

**Appellee Appx. 00927**
**Appx. 03792**
**007735**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 935 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 818 of 1017 PageID 8548
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 934 of 1803 PageID 11680
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 18 of 61

b.      Entire Agreement. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise, representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

c.      Successors and Assigns. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder without the written consent of the Company.

d.      Governing Law. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**

By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

Appellee Appx. 00928
Appx. 93793
007736

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 936 of
Case 3:25-cv-02072-S     Document 15-10     Filed 10/06/25     Page 819 of 1017     PageID 8549
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 935 of 1803   PageID 11681
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 19 of 61

**ACCEPTED AND AGREED:**

_____
[NAME]
Date: _____

Appellee Appx. 00929
Appx. 93794
007737

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 937 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 820 of 1017    PageID 8550
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 936 of 1803    PageID 11682
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 20 of 61

## INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("**Agreement**"), dated as of [ _____ ], is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), and [_____] (the "**Indemnitee**").

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company to retain and attract as directors the most capable Persons is in the best interests of the Company and that the Company therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in Section 1(g) below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties agree as follows:

1.    Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

(a)    "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

(b)    "**Claim**" means:

(i)    any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or

**Appellee Appx. 00930**
Appx. 03795
**007738**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 938 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 821 of 1017    PageID 8551
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 937 of 1803   PageID 11683
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 21 of 61

any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

(ii)    any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

(c)    "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

(d)    "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e)    "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f)    "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit

2

Appellee Appx. 00931
Appx. 02706
007739

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 939 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 822 of 1017    PageID 8552
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 938 of 1803    PageID 11684
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 22 of 61

plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g)    "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h)    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i)    "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j)    "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k)    "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l)    "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 940 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 823 of 1017 PageID 8553
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 939 of 1803 PageID 11685
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 23 of 61

benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m) "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n) "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o) References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2. Indemnification.

(a) Subject to Section 9 and Section 10 of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b) For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 941 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 824 of 1017   PageID 8554
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 940 of 1803   PageID 11686
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 24 of 61

3.      Contribution.

(a)      Whether or not the indemnification provided in Section 2 is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b)      The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c)      To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.      Advancement of Expenses. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of

DOCS_NY:39915.4 36027/002

Appellee Appx. 00934
Appx. 93799
007742

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 942 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 825 of 1017 PageID 8555
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 941 of 1803 PageID 11687
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 25 of 61

the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this Section 4, the final sentence of Section 9(b), or Section 11(b) in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to Section 9, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5.     <u>Indemnification for Expenses in Enforcing Rights</u>. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with Section 4, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6.     <u>Partial Indemnity</u>. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.     <u>Notification and Defense of Claims</u>.

    (a)     <u>Notification of Claims</u>. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 943 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 826 of 1017    PageID 8556
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 942 of 1803    PageID 11688
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 26 of 61

prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)    Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.    Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with Section 9 below.

9.    Determination of Right to Indemnification.

(a)    Mandatory Indemnification; Indemnification as a Witness.

(i)    To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with Section 2, and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

(ii)    To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

(b)    Standard of Conduct. To the extent that the provisions of Section 9(a) are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

(i)    if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

(ii)    if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c)    Making the Standard of Conduct Determination. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under Section 9(b) to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under Section 9(b) shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to Section 8 (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

DOCS_NY:39915.4 36027/002

Appellee Appx. 00937

Appx. 03892

007745

(d)     Payment of Indemnification. If, in regard to any Losses:

(i)     Indemnitee shall be entitled to indemnification pursuant to Section 9(a);

(ii)     no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii)     Indemnitee has been determined or deemed pursuant to Section 9(b) or Section 9(c) to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e)     Selection of Independent Counsel for Standard of Conduct Determination. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to Section 9(b)(i), the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to Section 9(b)(ii), the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in Section 1(k), and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this Section 9(e) to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this Section 9(e) or Indemnitee gives its initial notice pursuant to the second sentence of this Section 9(e), as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court

9

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 946 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 829 of 1017    PageID 8559
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 945 of 1803   PageID 11691
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 29 of 61

shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to <u>Section 9(b)</u>.

      (f)    <u>Presumptions and Defenses</u>.

      (i)    <u>Indemnitee's Entitlement to Indemnification</u>. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

      (ii)    <u>Reliance as a Safe Harbor</u>. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

      (iii)    <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.    <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 947 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 830 of 1017    PageID 8560
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 946 of 1803    PageID 11692
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 30 of 61

(a)    indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i)    proceedings referenced in Section 4 above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)    where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)    indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)    indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11.    Remedies of Indemnitee.

(a)    In the event that (i) a determination is made pursuant to Section 9 that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to Section 4, (iii) no determination of entitlement to indemnification is made pursuant to Section 9 within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant Section 9(d), Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 11(a). The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)    In the event that Indemnitee, pursuant to this Section 11, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c)    In the event that a determination shall have been made pursuant to Section 9 that Indemnitee is not entitled to indemnification, any judicial proceeding commenced

DOCS_NY:39915.4 36027/002

Appellee Appx. 00940
Appx. 03895
007748

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 948 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 831 of 1017    PageID 8561
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 947 of 1803    PageID 11693
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 31 of 61

pursuant to this Section 11 shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 9.

(d)    If a determination shall have been made pursuant to Section 9 that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 11, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.    Settlement of Claims. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this Section 12, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.    Duration. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14.    Other Indemnitors. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other

Appellee Appx. 00941

007749

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 949 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 832 of 1017    PageID 8562
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 948 of 1803    PageID 11694
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 32 of 61

Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this Section 14.

15.    Non-Exclusivity. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.    Liability Insurance. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.    No Duplication of Payments. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.    Subrogation. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.    Indemnitee Consent. The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek

DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 950 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 833 of 1017 PageID 8563
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 949 of 1803 PageID 11695
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 33 of 61

indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20. <u>Amendments</u>. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22. <u>Severability</u>. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23. <u>Notices</u>. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

(a)     if to Indemnitee, to the address set forth on the signature page hereto.

(b)     if to the Company, to:

Strand Advisors, Inc.
Attention:     Isaac Leventon

14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 951 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 834 of 1017    PageID 8564
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 950 of 1803    PageID 11696
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 34 of 61

| Address: | 300 Crescent Court, Suite 700 |
| | Dallas, Texas 75201 |
| Email: | ileventon@highlandcapital.com |

Notice of change of address shall be effective only when given in accordance with this Section 23. All notices complying with this Section 23 shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.    Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26.    Enforcement.

(a)    Without limiting Section 15, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(b)    The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27.    Headings and Captions. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28.    Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 952 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 835 of 1017    PageID 8565
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 951 of 1803   PageID 11697
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 35 of 61

same agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

DOCS_NY:39915.4 36027/002

Appellee Appx. 00945
Appx. 93619
007753

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 953 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 836 of 1017    PageID 8566
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 952 of 1803   PageID 11698
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 36 of 61

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.

By: _____
Name:
Title:

[SIGNATURE PAGE – INDEMNIFICATION AGREEMENT]

DOCS_LA:316796.3
DOCS_NY:39915.4 36027/002

Appellee Appx. 00946
Appx. 03814
007754

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 954 of
Case 3:25-cv-02072-S      Document 15-10    Filed 10/06/25    Page 837 of 1017    PageID 8567
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 953 of 1803   PageID 11699
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 37 of 61

INDEMNITEE:

_____

Name:    [_____]
Address: _____
         _____
         _____

Email:

[SIGNATURE PAGE – INDEMNIFICATION AGREEMENT]

DOCS_LA:316796.3
DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 955 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 838 of 1017    PageID 8568
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 954 of 1803   PageID 11700
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 38 of 61

December ___, 2019

Attn:  Independent Directors
Highland Capital Management, LP
300 Crescent Court, Ste. 700
Dallas, TX  75201

       Re:     Development Specialists, Inc. ("DSI")
                  Retention and Letter of Engagement

Dear Members of the Board:

Please accept this letter as our firm's formal written agreement (the "Agreement") to provide restructuring support services to Highland Capital Management, L.P. (the "Company").  This Agreement replaces and supersedes in all respects the letter agreement between DSI and the Company, dated October 7, 2019, as amended and revised by the letter agreement dated October 29, 2019.  However, all fees and expenses incurred by DSI prior to the date hereof in accordance with such prior letter agreements will be paid by the Company, subject to allowance of such fees and expenses by the U.S. Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").  The Agreement will become effective upon execution by duly authorized representatives of the respective parties and approval of the Bankruptcy Court.

Section 1 – Scope of Work

DSI will provide the following services (the "Services") to the Company:

1. Bradley D. Sharp will act as the Company's Chief Restructuring Officer ("CRO") with other DSI personnel to assist Mr. Sharp in carrying out those duties and responsibilities.
2. Subject to the terms of this Agreement, as CRO, Mr. Sharp will assume control of the Company's restructuring and direct the Company with respect to its bankruptcy filed on October 16, 2019 (the "Chapter 11 Case"), which Chapter 11 Case has now been transferred to the Bankruptcy Court.
3. Subject to the terms of this Agreement, Mr. Sharp will report to the Independent Directors and, if appointed, the Chief Executive Officer of the Company ("CEO") and will comply with the Company's corporate governance requirements.
4. As directed by the Independent Directors and/or CEO, the CRO will be responsible for the implementation and prosecution of the Chapter 11 Case, including negotiations with creditors, reconciliation of claims, and confirmation of a plan or plans of reorganization.
5. Provide other personnel of DSI ("Additional Personnel") to provide restructuring support services as requested or required to the Company, which may include but are not limited to:

Exhibit B

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 956 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 839 of 1017    PageID 8569
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 955 of 1803    PageID 11701
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 39 of 61

Highland Capital Management, LP
December ___, 2019
Page 2

    a.  assisting the Company in the preparation of financial disclosures required by the Bankruptcy Code, including the Schedules of Assets and Liabilities, the Statements of Financial Affairs and Monthly Operating Reports;

    b.  advising and assisting the Company, the Company's legal counsel, and other professionals in responding to third party requests;

    c.  attending meetings and assisting in communications with parties in interest and their professionals, including the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case;

    d.  providing litigation advisory services with respect to accounting matters, along with expert witness testimony on case related issues; and

    e.  rendering such other general business consulting services or other assistance as the Company may deem necessary and which are consistent with the role of a financial advisor and not duplicative of services provided by other professionals in this case.

DSI's ability to adequately perform the Services is dependent upon the Company timely providing reliable, accurate, and complete necessary information.  The Company agrees that CRO will have (i) access to and the ability to communicate with any employee of the Company or any affiliate of the Company and (ii) access to any information, including documents, relating to the Company or any Company affiliate, including, but not limited to, information concerning collections and disbursements.  The Company acknowledges that DSI or CRO are not responsible for independently verifying the veracity, completeness, or accuracy of any information supplied to us by or on behalf of the Company.

DSI will submit its evaluations and analyses pursuant to this Agreement in periodic oral and written reports.  Such reports are intended to and shall constitute privileged and confidential information, and shall constitute the Company's property.

Although we do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes, we will perform the Services with reasonable care and in a diligent and competent manner.

Section 2 – Rates, Invoicing and Retainer

DSI will be compensated at a rate of $100,000 per month, plus expenses (capped at $10,000 per month), for the services of Bradley D. Sharp as CRO and such DSI personnel (including Fred Caruso) as are required to fulfill Mr. Sharp's responsibilities as CRO; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

A number of DSI's personnel have experience in providing restructuring support services and may be utilized as Additional Personnel in this representation. Although others of our staff may

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 957 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 840 of 1017 PageID 8570
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 956 of 1803 PageID 11702
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 40 of 61

Highland Capital Management, LP
December ___, 2019
Page 3

also be involved, we have listed below certain of the DSI personnel (along with their corresponding billing rates) who would likely constitute the Additional Personnel. The individuals are:

| | |
|---|---|
| R. Brian Calvert | $640.00/hr. |
| Thomas P. Jeremiassen | $575.00/hr. |
| Eric J. Held | $495.00/hr. |
| Nicholas R. Troszak | $485.00/hr. |
| Spencer G. Ferrero | $350.00/hr. |
| Tom Frey | $325.00/hr. |

The above rates are adjusted as of January 1 of each year to reflect advancing experience, capabilities, and seniority of our professionals as well as general economic factors.

We acknowledge receipt of a retainer of $250,000 from the Company. The purpose of the retainer is to secure a portion of our fees and expenses and to retain our status as a non-creditor should such be required for DSI to continue to provide the Services. As such, should a need arise to increase this retainer due to the level of Services DSI is providing or projected to provide, we will send the Company a supplement to this Agreement requesting the necessary increases and discuss with the Company the amount and timing of providing such increase to the retainer.

This retainer will be applied to our final invoice. If the retainer exceeds the amount of our final invoice, we will refund the difference to the Company at that time. In the event that periodic invoices are not paid timely, we will apply the retainer to the amounts owing on such invoices and, if applicable, any related late charges, and we will stop work until the retainer is replenished to the full amount required. If the retainer is not replenished within ten (10) days after the application of the retainer to unpaid balances, we reserve the right to terminate this Agreement in accordance with the provisions of Section 3 of this Agreement.

DSI also will be entitled to reimbursement for its reasonable costs and expenses. Such costs and expenses may include, among others, charges for messenger services, photocopying, travel expenses, long distance telephone charges, postage and other charges customarily invoiced by consulting firms. Airfare for international flights will be charged at the business class fare; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

This Agreement shall be presented to the Bankruptcy Court for approval and continuation, pursuant to Bankruptcy Code Section 363 and DSI's then-prospective obligations shall be contingent upon such approval.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 958 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 841 of 1017    PageID 8571
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 957 of 1803    PageID 11703
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 41 of 61

Highland Capital Management, LP
December ___, 2019
Page 4

Section 3 – Termination

Either the Company or DSI may terminate this Agreement for any reason with ten (10) business days' written notice.  Notwithstanding anything to the contrary contained herein, the Company shall be obligated, in accordance with any orders of or procedures established by the Court, to pay and/or reimburse DSI all fees and expenses accrued under this Agreement as of the effective date of the termination.

Section 4 – Relationship of the Parties, Confidentiality

DSI will provide the Services to and for the Company, with select members of DSI assigned to specific roles for the benefit of the Company. These members will remain as DSI employees during the pendency of this case. Specifically, the parties intend that an independent contractor relationship will be created by this Agreement. Employees of DSI are not to be considered employees of the Company and are not entitled to any of the benefits that the Company provides for the Company's employees.

The Company acknowledges that all advice (written or oral) given by DSI to the Company in connection with DSI's engagement is intended solely for the benefit and use of the Company in considering the transaction to which it relates, and that no third party is entitled to rely on any such advice or communication.  DSI will in no way be deemed to be providing services for any person not a party to this Agreement.

DSI agrees that all information not publicly available that is received by DSI from the Company in connection with this Agreement or that is developed pursuant to this Agreement, will be treated as confidential and will not be disclosed by DSI, except as required by Court order, or other legal process, or as may be authorized by the Company.  DSI shall not be required to defend any action to obtain an order requiring disclosure of such information, but shall instead give prompt notice of any such action to the Company so that it may seek appropriate remedies, including a protective order. The Company shall reimburse DSI for all costs and fees (including reasonable attorney's fees) incurred by DSI relating to responding to (whether by objecting to or complying with) any subpoenas or requests for production of information or documents.

Section 5 – Indemnity

The Company shall name Bradley D. Sharp as its Chief Restructuring Officer and shall indemnify him on the same terms as provided to the Company's other officers and directors under the Company partnership agreement or other governing document and applicable state law.  Mr. Sharp shall be included as an insured under any insurance policies or coverage available to officers and directors of the Company.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 959 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 842 of 1017    PageID 8572
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 958 of 1803   PageID 11704
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 42 of 61

Highland Capital Management, LP
December ___, 2019
Page 5

The Company shall additionally indemnify those persons, and only those persons, serving as executive officers on the same terms as provided to the Company's other officers and directors under the Company's partnership agreement or other governing document and applicable state law, along with insurance coverage under the Company's D&O policies.  Any such indemnity shall survive the expiration or termination by either party of this Agreement.  Except as provided in this Section and in Section 4, there shall be no indemnification of DSI, its affiliates or the Additional Personnel.

Each and every one of the personnel employed by DSI who works on this particular project, as well as DSI officers, directors, employees and agents (the "DSI Parties") shall not be liable to the Company, or any party asserting claims on behalf of the Company, except for direct damages found in a final determination (not subject to further appeal) by a court of competent jurisdiction to be the direct result of the bad faith, self-dealing or intentional misconduct or gross negligence of DSI.

Section 6 – Conflicts

DSI has made diligent inquiries to determine whether it or any of its professionals have any connections with the Company, its creditors, or other parties in interest in the Chapter 11 Case. Based on that review, the review of DSI's conflict files and responses to inquiries from DSI's professional staff, neither DSI nor its professionals have any known conflicts with the parties in this case.  DSI will separately provide its connections to parties in this case and/or their professionals.

Section 7 – No Audit

The Company acknowledges that it is hiring DSI to assist and advise the Company in business planning and operations.  DSI's engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of AICPA or other such state and national professional bodies.

Section 8 – Non-Solicitation

The Company agrees not to solicit, recruit or hire any employees or agents of DSI for a period of one year subsequent to the completion and/or termination of this Agreement; provided that the Company shall not be prohibited from (x) making general advertisements for employment not specifically directed at employees of DSI or (y) employees of DSI responding to unsolicited requests for employment.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 960 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 843 of 1017   PageID 8573
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 959 of 1803   PageID 11705
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 43 of 61

Highland Capital Management, LP
December ___, 2019
Page 6

Section 9 – Survival

The provisions of this Agreement relating to indemnification, the non-solicitation or hiring of
DSI employees, and all other provisions necessary to the enforcement of the intent of this
Agreement will survive the termination or expiration of this Agreement.

Section 10 – Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of
Delaware without regard to conflicts of law principles.

Section 11 – Entire Agreement, Amendment

This Agreement contains the entire understanding of the parties relating to the subject matter of
this Agreement and supersedes and is intended to nullify any other agreements, understandings
or representations relating to the subject of this Agreement. This Agreement may not be
amended or modified except in a writing signed by the parties.

If you are in agreement with the foregoing terms and conditions please indicate your acceptance
by signing an original copy of this Agreement on the signature lines below, then returning one
fully-executed Agreement to DSI's office. The Agreement will become effective upon execution
by duly authorized representatives of the respective parties.

Very truly yours,

Bradley Sharp
Development Specialists, Inc.


                    AGREED AND ACKNOWLEDGED:

                    Highland Capital Management, L.P.
                    By: Strand Advisors, Inc., its general partner


                    _____
                    By: _____, Independent Director
                    Date: _____

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 961 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 844 of 1017    PageID 8574
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 960 of 1803   PageID 11706
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 44 of 61

**A. Definitions**
    a.  Electronically stored information" or "ESI" shall include all electronic files, documents, data, and information covered under the Federal Rules of Civil Procedure.

**B. Preservation of ESI - Generally**
    a.  Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data.

**C. Preservation of ESI – Specific Forms**
    a.  For email, Debtor uses Outlook Email on an Exchange server.  Veritas Enterprise Vault is used to archive emails.  Journaling is and has been in active use since 2007, and all inbound, outbound, and in-system email .communications have been preserved and are not at risk of deletion due to normal document retention practices.  Out of an abundance of caution, a copy of the latest email back-up, which was performed two months ago, shall be copied and stored at a secured location.

    b.  The file server used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created and stored on a portable hard drive at a secured location.

    c.  The Sharepoint server used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created in a format that maintains all potentially relevant information and stored at a secured location.

    d.  The Oracle E-Business Suite (EBS) server used by Debtor was backed up one week ago.  A copy of this backup shall be created in a format and stored at a secured location.

    e.  The Advent Geneva accounting system used by Debtor was backed up approximately one week ago.  Upon reasonable notice, the Committee may submit search criteria to Debtor to run searches in Advent Geneva.  Subject to Debtor's rights to assert objections as provided by Part G herein, Debtor will provide the data resulting from such agreed searches pursuant to Part F herein..

    f.  The Siepe Database (data warehouse) used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created in a format and stored at a secured location.

    g.  For the Box account used by Debtor, to the extent routine data retention practices may result in file deletion, they shall be suspended pending further discussion with the Committee concerning the relevance of such data.  Users of the Box account who have the ability to delete files shall be notified of the obligation to suspend deletion of any data stored in Box.

    h.  Bloomberg data is archived for five years.  Debtor shall work with Bloomberg client services to preserve a copy of all such archived material, which shall be stored at a secured location, or otherwise extend the backup window in which Bloomberg preserves the data by reasonable time to be agreed by the parties.

Exhibit C

Appellee Appx. 00954
Appx. 02619
007762

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 962 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 845 of 1017   PageID 8575
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 961 of 1803   PageID 11707
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 45 of 61

    i.   Files may be saved locally on laptops/work computers used by employees of Debtor.  This practice is discouraged, but may result in the creation of relevant ESI on local systems in a manner that will not be replicated elsewhere.  Debtor shall therefore cease the deletion of data (*i.e.*, wiping) of any employee-assigned computer hard drives, such as for departing employees.  Debtor shall furthermore instruct current employees not to delete files stored locally on their assigned computers.

**D. Not Reasonably Accessible Documents**

    a.   Absent an order from the Court upon a showing of good cause, a Party from whom ESI has been requested shall not be required to search for responsive ESI from sources that are not reasonably accessible without undue burden or cost.  The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected or preserved, absent a particularized need for the data as established by the facts and legal issues of the case:

        i.   Deleted, slack, fragmented, or other data only accessible by forensics;

        ii.   Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system; and

        iii.   On-line access data such as temporary internet files, history, cache, cookies, and the like.

    b.   To conduct collections in a focused and efficient manner, the Parties also agree to exclude the following file types from collection: Standard system file extensions including, but not limited to, BIN, CAB, CHK, CLASS, COD, COM, DLL DRV, EXE, INF, INI, JAVA, LIB, LOG, SYS and TMP and other file extensions and directories that likely do not contain user generated content such as files identified by hash value when compared to the National Software Reference Library reference data set (RDS Hash), a sub-project of the National Institute of Standards and Technology ("NIST"), of known traceable system and application files. This process is commonly referred to as "De-NISTing."

**E. Collection and Search Methodology**

    a.   Searches for emails in Debtor's custody shall be conducted by DSI on Debtor's Veritas Enterprise Vault storage using an unrestricted account at the earliest opportunity, but in no event later than [date].  DSI shall use an add-on component called Discovery Assistant, which enables searches based on email properties, such as senders, recipients, and dates.  Discovery Assistant also permits text searching of email contents and the contents of electronic file attachments, although not pictures of text (*e.g.*, scanned PDFs).  Debtor did not employ employee message or file encryption that would prevent reasonable operation of the Discovery Assistant search capabilities.

    b.   The results of email searches shall be produced to the Committee pursuant to Part F below, subject to completion of any review for privilege or other purposes contemplated by this Agreement.

    c.   A snapshot copy of Debtor databases (Oracle, Siepe) shall be created in a format to be specified later by agreement with the Committee per Part (C)(d), (f), above.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 963 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 846 of 1017   PageID 8576
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 962 of 1803   PageID 11708
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 46 of 61

Prior to any production of responsive data from such a structured database Debtor will first identify the database type and version number, provide the vendor-originated database dictionary, if any, (identifying all tables in the database, their fields, the meaning of those fields, and any interrelation among fields) and any user manuals, or any other documentation describing the structure and/or content of the database, and a list of all reports that can be generated from the database. The list of reports shall be provided in native Excel (.xis or .xlsx) format.

d.  The Geneva system is highly proprietary and shall not be collected, but the Committee will be given reasonable access to that system per Part C(e), above.

e.  Debtor and Committee will meet and confer to discuss the scope of any necessary searches on the Box account.

f.  Debtor file server contents, where requested by the Committee, shall be produced pursuant to Part F below.

g.  Debtor shall propose a format for producing Sharepoint data. The Committee agrees that it is not necessary to reproduce the interface used by Debtor in the ordinary course of business for Sharepoint.

**F.  Format of Documents Produced**

a.  Non-database ESI shall be produced as black and white Group 4 TIFF files, with a resolution of 300 DPI. Page size shall be 8.5 x 11 inches unless, in the reasonable judgment of the Producing Party, a particular item requires a different page size, and original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape). A Requesting Party may, in good faith and reasonable judgment, request a color copy of a production document if it is necessary to convey the relevant and responsive information. Such color copies may be produced as single page JPG (JPEG) image files. The Requesting Party will bear the costs for color images.

b.  The files shall be accompanied by a metadata load file, in a single standard format to be requested by the Receiving Party prior to any production (e.g., Opticon, Summation DII, or the like) showing the Bates number of each page, the appropriate unitization of the documents, and the entire family range. The Parties agree to meet and confer regarding the requested standard format prior to production.

c.  The files shall be accompanied by a .DAT text file including the delimited fields identified in the Metadata List (below). No Party will have any obligation to manually generate information to provide the fields identified in the Metadata List.

d.  The Producing Party reserves the right to make hard copy documents available for inspection and copying pursuant to Federal Rule of Civil Procedure 34.

e.  In the event that a Party identifies hard copy documents for production, hard copy paper documents shall be scanned and will include, to the extent feasible, the following fields in the .DAT text file: PRODBEG, PRODEND, PAGECOUNT, FULLTEXT, and CUSTODIAN. The Parties agree to share equally in the cost of scanning hard copy documents.

f.  For any documents that were scanned from hard copy paper documents, the Parties will produce images of hard copy documents unitized to the extent the

ACTIVE 252191584

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 964 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 847 of 1017   PageID 8577
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 963 of 1803   PageID 11709
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 47 of 61

original documents appeared to be units in physical form, with attachments following parents, and with information that identifies the holder (or container) structure, to the extent such structure exists and it is reasonable to do so. The Producing Party is not required to OCR (Optical Character Recognition) hard copy documents. If the Receiving Party requests that hard copy documents be OCR'ed, the Receiving Party shall bear the cost of such request, unless the Parties agree to split the cost so that each has an OCR'ed copy of the documents.

g. For ESI that the Producing Party produces in TIFF or JPEG format, the Producing Party shall electronically "burn" a legible, unique Bates number onto each page. The Bates number shall, to the extent reasonably possible: (1) identify the Producing Party; (2) maintain a constant length of nine numeric digits (including 0-padding) across the entire production; (3) contain only alphanumeric characters, no special characters or embedded spaces; and (4) be sequential within a given document. If the Bates number conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

h. For ESI that the Producing Party produces in TIFF format, if the Producing Party is producing the ESI subject to a claim that it is protected from disclosure under any confidentiality order entered in this matter, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document. If the designation conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

i. The Parties agree to produce e-mail families intact absent a privilege or work product claim, so long as each document contains responsive information; for all documents that contain a responsive, non-privileged attachment, the following fields will be produced (if available) as part of the metadata load file to indicate the parent child or parent/sibling relationship:

      i.  Production Bates begin
      ii. Production Bates end
      iii. Production Bates begin attachment
      iv. Production Bates end attachment

Notwithstanding the aforementioned, all parties acknowledge that Debtor's. Veritas Enterprise Vault system does not have the ability to search for the family members of responsive documents, and that Debtor does not have an obligation to manually search for non-responsive family members of otherwise responsive documents.

j. Unless otherwise agreed, all dynamic date and time fields, where such fields are processed to contain a value, and all metadata pertaining to dates and times, will be standardized to Universal Coordinated Time (UTC) or Universal Coordinated Time + 1 (UTC+1) **[TBD]**. The Parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hard-coded text within a file. Dates and times that are hard-coded text within a file (for example, in an email thread, dates and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 965 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 848 of 1017    PageID 8578
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 964 of 1803    PageID 11710
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 48 of 61

typed as such by users) will be produced as part of the document text in accordance with the provisions herein.

k.  Exceptions to the Production Format

l.  Excel spreadsheets shall be produced in native application format, unless redactions are required. The Producing Party will make reasonable efforts to provide a TIFF image of a slip sheet with the Bates number of documents produced natively in its production. The corresponding native file shall be named by using the same Bates number identified on the placeholder TIFF image. Any Excel spreadsheet that requires redaction will be produced in TIFF format only. Certain types of databases are dynamic in nature and may contain information that is irrelevant. These files are sometimes large and would, if rendered to TIFF images completely, produce thousands of pages that would have little utility to a reviewer without the associated database.

m.  To the extent information from a structured data repository, such as a database, is requested, responsive information will be produced via a report or export of such data to an appropriate program that is agreeable to the requesting Party. The Parties agree to meet and confer before such data is exported.

**G.  Production Format Shall Not Alter Authenticity, Admissibility, or Privilege Status**

a.  No Party shall object that ESI produced pursuant to this Protocol is not authentic by virtue of the ESI having been converted to TIFF. The Parties otherwise reserve all rights regarding their ability to object to the authenticity of documents.

b.  Nothing in this Protocol shall be construed to affect in any way the rights of any Party to make any objection as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

c.  Nothing in this Protocol shall constitute a waiver by any Party of any claim or privilege or other protection from discovery.

d.  Nothing in this Protocol shall be interpreted to in any way limit a Producing Parties right and ability to review documents for responsiveness prior to production.

e.  Nothing in the Protocol shall require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.

**Metadata List**

| File Name | Field Description | Sample Values |
|---|---|---|
| BegBates | Bates number for the first page of the document | ABC-0000001 |
| EndBates | Bates number for the last page of the document | ABC-0000002 |
| BegAttach | Bates number for the first page of parent document | ABC-0000001 |
| EndAttach | Bates number for the last page of last attachment | ABC-0000005 |
| Pages | Number of printed pages of the document | 2 |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 966 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 849 of 1017    PageID 8579
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 965 of 1803    PageID 11711
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 49 of 61

| | | |
|---|---|---|
| Global Custodian | Custodian name produced in format:  Lastname, Firstname. | Smith, Jane; Taylor, Michael |
| Confidentiality | Indicates if the document has been designated as "Confidential" or "Highly Confidential" pursuant to the applicable Protective Order | Confidential; Highly Confidential |
| Redacted | Descriptor for documents that have been redacted:  "Yes" for redacted documents; "No" for non-redacted documents | Yes |
| Email Subject | Subject line of Email or | Text of the subject line |
| Document Subject | Subject value of documents | Text of the subject line |
| Date Sent | Date email sent | mm/dd/yyyy |
| Time Sent | Time email sent | hh:mm:ss AM |
| Date Last Modified | Date document was last modified | mm/dd/yyyy |
| Time Last Modified | Time document was last modified | hh:mm:ss AM |
| Date Created | Date document was first created | mm/dd/yyyy |
| To | All SMTP address of email recipients, separated by a semi-colon | Larry.murphy@email.com |
| From | All SMTP address of email author | Bart.cole@email.com |
| CC | All SMTP address of email "CC" recipients, separated by a semi-colon | Jim.James@gmail.com; bjones@yahoo.com |
| BCC | All SMTP address of email "BCC" recipients, separated by a semi-colon | mjones@gmail.com |
| Attach | The file name(s) of the documents attached to emails or embedded in files. Multiple files should be delimited by a semicolon | Filename.doc; filename2.doc |
| Title | The Title property of a file. | Title |
| Author | The Author property of a file | John Doe |
| MessageID | The email message ID | |
| FILENAME | The original name of the file excluding the path | C:\My Documents\letter.doc |
| DocType | Email, letter, memo, invoice, etc., if available | |
| Extension | The file extension | .doc |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 967 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 850 of 1017   PageID 8580
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 966 of 1803   PageID 11712
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 50 of 61

| | | |
|---|---|---|
| FileType | The actual file type of the document (Word, Excel, etc.) regardless of the file extension | |
| HashValue | MD5 Hash value of original file | |
| FilePath | The directory structure of the original file. | C:\My Documents\ letter.doc |
| PathToNative | The relative path to a produced native document | C:\VOL001\BATES000000001.xls |
| PathToText | The relative path to the accompanying text file | C:\VOL001\BATES000000001.txt |
| Volume | The production number or reference from the production | |
| Other Custodian | To the extent global deduplication is used, the field indicates the other custodians who also were in possession of the document at the time of collection | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 968 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 851 of 1017   PageID 8581
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 967 of 1803   PageID 11713
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 51 of 61

I. **Definitions**

A. "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B. "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C. "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D. "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E. "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below (the "Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F. "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G. "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H. "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

1

Exhibit D

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 969 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 852 of 1017 PageID 8582
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 968 of 1803 PageID 11714
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 52 of 61

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.   "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.   "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

**II. Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.   **Covered Entities**: N/A (See entities above).

B.   **Operating Requirements**

1.   Ordinary Course Transactions do not require Court approval (All Stages).

   a)   Stage 1 and Stage 2: ordinary course determined by the CRO.

   b)   Stage 3: ordinary course determined by the Debtor.

2.   Related Entity Transactions

   a)   Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b)   Stage 3:

      (1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      (2)   Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.   Third Party Transactions (All Stages)

   a)   Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the

Appellee Appx. 00962
Appx. 93825
007770

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 970 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 853 of 1017   PageID 8583
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 969 of 1803   PageID 11715
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 53 of 61

<blockquote>
Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.
</blockquote>

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  Redemption requests payable to Related Entities will be held in escrow and will not prevent the winding up or liquidation of any fund or entity.

c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.**    **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    Stage 3:

(1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appellee Appx. 00963
Appx. 03828
007771

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 971 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 854 of 1017    PageID 8584
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 970 of 1803    PageID 11716
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 54 of 61

      (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

    a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**IV.**    **Transactions involving entities that the Debtor manages but in which the Debtor does <u>not hold a direct or indirect interest</u>**

A.    **Covered Entities**: See **<u>Schedule A</u>** hereto.  **<u>Schedule A</u>** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

    a)    <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

    b)    <u>Stage 3</u>: ordinary course determined by the Debtor.

2.    Related Entity Transactions

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

4

a) <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) <u>Stage 3</u>:

(1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages):

a) Except as set forth in (b) and (c) below, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties.  The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

Appellee Appx. 00965

Appx. 03839

007773

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 973 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 856 of 1017 PageID 8586
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 972 of 1803 PageID 11718
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 56 of 61

**V.** **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.** **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.** **Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appellee Appx. 00966
Appx. 03931
007774

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 974 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 857 of 1017    PageID 8587
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 973 of 1803    PageID 11719
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 57 of 61

**VIII.**   **Additional Reporting Requirements – All Stages (to the extent applicable)**

A.   DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

B.   The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

IX.   **Shared Services**

A.   The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

B.   The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

**X.**   **Representations and Warranties**

A.   The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.   The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.   The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

Appellee Appx. 00967
Appx. 05832
007775

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 975 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25    Page 858 of 1017    PageID 8588
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 974 of 1803   PageID 11720
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 58 of 61

*PSZJ Draft 12/27/19*

### Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

8

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 976 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 859 of 1017    PageID 8589
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 975 of 1803    PageID 11721
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 59 of 61

*PSZJ Draft 12/27/19*

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

9

Appellee Appx. 00969
007777
Appx. 93834

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 977 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 860 of 1017   PageID 8590
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 976 of 1803   PageID 11722
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 60 of 61

*PSZJ Draft 12/27/19*

## **Schedule B**

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.14 36027/002

Appellee Appx. 00970
Appx. 03835

007778

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 978 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 861 of 1017   PageID 8591
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 977 of 1803   PageID 11723
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 61 of 61

*PSZJ Draft 12/27/19*

### Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.14 36027/002

Appellee Appx. 00971
Appx. 03836
007779

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 979 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 862 of 1017    PageID 8592
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 978 of 1803   PageID 11724
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 1 of 19

November 2019

**James P. Seery, Jr.**

New York, NY



 James P. Seery, Jr. is a high yield and distressed investing professional who was most recently a Senior Managing Director and co-Head of Credit at Guggenheim Securities LLC, where he is responsible for helping direct the development of a leveraged finance and credit distribution business.  Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, a $1.3bn global credit fund manager.  In that role, he developed and led many of the firm's most profitable credit investments.  Mr. Seery is a licensed attorney and was formerly a partner and co-Head of the Sidley Austin LLP New York Corporate Reorganization and Bankruptcy Group, and he also recently served as a Commissioner on The American Bankruptcy Institute's Commission to Study the Reform of Chapter 11.

Before his joining Sidley Austin, Mr. Seery was a Managing Director and the Global Head of Lehman Brothers' Fixed Income Loan business. In that position, he was responsible for managing the Lehman Brothers' Fixed Income investment grade and high yield loan businesses, including underwriting commitments, distribution, hedging, trading and sales (including CLO manager relationships), portfolio management, and restructuring. Mr. Seery was also a member of the Lehman Brothers' Fixed Income Operating Committee and Global Credit Products Operating Committee as well as the High Yield Commitment and New Business Committees.  From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout businesses with responsibility for management of distressed corporate debt investments, and in 2008 he was a key member of the small team that successfully sold Lehman to Barclays.

Mr. Seery was selected as one of the Top Restructuring Lawyers in the U.S. Under 40 by *Turnarounds and Workouts* in 1999. Mr. Seery graduated in 1990 from New York Law School, *magna cum laude*, where he was an editor of the Law Review and Colgate University in 1984. He was a member of the Board of Directors of the Loan Syndications and Trading Association from 2006 to 2008 and a member of the INSOL International Lenders Group from 2016-2017.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 980 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 863 of 1017 PageID 8593
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 979 of 1803 PageID 11725

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 2 of 19

# JAMES P. SEERY, JR.

795 Columbus Ave., 12A
New York, New York 10025
631-804-2049 · jpseeryjr@gmail.com

## Experience

**Guggenheim Securities LLC,** New York, New York                    Aug. 2017-Nov. 2019
Senior Managing Director, Co-Head Credit
- Responsible for developing leveraged finance and credit portfolio advisory businesses
- Management of teams of leveraged finance bankers and trading and sales professionals

**River Birch Capital, LLC**, New York, New York                    April 2012-July 2017
President, River Birch Capital, LLC
- President and senior investing partner at New York based $1.3bn global long-short credit fund focused on corporate credit from investment grade to distressed
- Responsible for originating, executing and managing stressed and distressed credit investments with a team of 6 investing partners and 5 analysts and traders
- Led finance and operations team with CFO/CCO; firm grew from approx. $200mm in 2012 to $1.3bn in 2017

**Sidley Austin LLP**, New York, New York                    May 2009-April 2012
Co-head New York Corporate and Reorganization Group
- Built and managed a creditor focused restructuring group as part of an international company side practice in a nearly 2000 attorney firm
- Represented banks, corporations, hedge funds, and structured investment vehicles in a variety of restructuring, financing and litigation matters

**Lehman Brothers**, New York, New York                    April 1999-May 2009
Global Head Fixed Income Loans
- Managing Director responsible for managing the global fixed income loan business, including investment grade and high yield commitments, global distribution, hedging, trading and sales, CLO origination, portfolio management, and restructuring; managed underwritten loan commitments and teams of credit sales and trading professionals as well as structuring, portfolio management and work-out specialists
- Member Fixed Income Operating Committee, Global Credit Products Operating Committee, and High Yield Commitment and New Business Committees
- Responsible for originating, structuring and managing proprietary distressed debt investments, rescue financings, and restructurings 1999-2004
- Key member of team that negotiated and completed the sale of Lehman Brothers to Barclays Sept. 2008; remained at Barclays through April 2009

**Phillips Nizer**, Garden City, New York                    May 1995-April 1999
- Senior Associate in corporate reorganization group of boutique New York City law firm

**Cadwalader, Wickersham & Taft**, New York, New York                    May 1989-May 1995
- Associate in corporate reorganization group of New York City based international law firm

## Education

New York Law School, New York, New York, J.D., *magna cum laude*, Editor Law Review      1990
Colgate University, Hamilton, New York, B.A. History                    1984

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 981 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 864 of 1017   PageID 8594
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 980 of 1803   PageID 11726

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 3 of 19

**Experience**

| | |
|---|---|
| Director, River Birch International, Ltd.  Board | 2015-2017 |
| Director, Camphill Foundation Board | 2017-2019 |
| Member, INSOL International Lenders Group Board | 2016-2017 |
| Commissioner, ABI Commission to Study Reform of Ch. 11 | 2012-2015 |
| Director, Loan Syndications and Trading Association | 2006-2008 |

**Selected River Birch Sample Investments**

Cash America International *5.75% Senior Unsecured Notes due 2018 and Litigation Claim – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper spin of payday lending business; U.S. District Court published decision in note holders' favor led to settlement*

Chesapeake Energy Corp *6.775% Senior Notes due 2019 Litigation Claims – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper call of notes; ultimately prevailed in $450mm judgment discussed in published Second Circuit and U.S. District Court decisions*

Caesars Entertainment Resort Properties *8% 1st Lien Notes due 2020; 11% 2d Lien Notes due 2021 – Developed and led (with senior investment analyst partner) execution of successful bankruptcy investment strategy focused on lower beta part of the capital structure of bankrupt casino operator; investment designed for high return with significant downside protection*

Intelsat Jackson Holdings *9.5% Senior Secured Notes due 2022 – Developed and led (with senior investment analyst partner) execution of successful new issue stressed secured note investment strategy; responsible for structuring and tightening covenant package and increasing size of offering after determining that potential litigation threat was low risk; responsible for recommending ICF 12.5% note investment in the low 80s in February 2018*

Motors Liquidation Company *GUC Trust Publicly Traded Units – Developed and led successful investment strategy in publicly traded bankruptcy liquidation units (GM); took the opposite side of sell-side analyst recommendations and engineered a successful settlement in high return/low downside position*

Hypo Alpe Adria Bank (Hetar) *Senior Guaranteed Notes – Developed and led (with senior investment analyst partner) execution of successful investment strategy in insolvent Austrian bank with notes guaranteed by an Austrian State*

Presidio Inc. *10.25% Senior Notes due 2023 – Developed and led execution of successful investment strategy to purchase newly developed mezzanine part of the capital structure on struggling new issue deal; ultimately sponsor purchased the mezzanine but aggressive structuring and bidding for the mezzanine tranche led to outsized allocation of new notes*

Nortel Networks Ltd. *6.875% Senior Notes due 2023 – Developed and led (with senior investment analyst partner) execution of bankruptcy liquidation strategy based on litigation and ultimate leverage of Canadian liquidating estate*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 982 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 865 of 1017    PageID 8595
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 981 of 1803    PageID 11727

**Selected Speaking Engagements**

American Law Institute/ NYU Law – Credit Markets and Corporate Reorganization, New York City, April 2017
Moderator, *Auctions and Asset Sales In and Out of Bankruptcy*

University of Texas Law/American Bankruptcy Institute -- Emerging Valuation Issues in Bankruptcy, Las Vegas, March 2017
Panelist, *Determining Valuation and the Fulcrum Security*
Panelist, *Distressed Investments Strategies*

NYU Law – Claim Priority Roundtable, New York City, September 2016
Panelist, *Allocating Value in and Out of Bankruptcy*

University of Texas Law/ABI – Emerging Valuation Issues in Bankruptcy, Las Vegas, March 2016
Panelist, *ABI Commission Report Proposed Amendments and Their Impact on Valuation*

The M&A Advisor – Distressed Investing Summit, Palm Beach, January 2016
Panelist, *Using Options to Bridge Value Gaps*

NYU Law – Seligman Bankruptcy and Business Reorganization Workshop, New York City, September 2015
Panelist, *Valuation Approaches and Methodologies*

Skadden Arps/Colgate University – Law and Finance Summit, New York City, November 2014
Presenter, *Recent Developments in Bankruptcy and Distressed Debt*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 983 of
Case 3:25-cv-02072-S     Document 15-10     Filed 10/06/25     Page 866 of 1017     PageID 8596
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 982 of 1803   PageID 11728

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 5 of 19

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 984 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 867 of 1017    PageID 8597
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 983 of 1803    PageID 11729
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 6 of 19

**Dubel & Associates, L.L.C.**

# John S. Dubel
## Board of Directors Experience

- **Purdue Pharma Inc. – July 2019 to Present  -** Independent Board Member and Chair of the Special Committee of Directors

  In addition to being a member of the Board of Directors of Purdue Pharma Inc., I am the Chair of the Special Committee of Independent Directors charged with overseeing the investigation of relationships between Purdue and Purdue owners, the Sackler family.

- **WMC Mortgage, LLC – Indirect Subsidiary GE – July 2018 to December 2019  -** Independent Board Member and Chair of the Special Independent Committee of Directors

  WMC's chapter 11 plan was recently confirmed and WMC will emerge from Chapter 11 in early December 2019. I am the Chair of the Special Independent Committee of Independent Directors for this indirect subsidiary of GE. The Special Committee was tasked with reviewing the relationship between the insolvent WMC and GE and resolving its insolvency issues through a court supervised chapter 11 proceeding. I was the lead person responsible for negotiations with the parent concerning the level of support that the parent was required to provide and worked with our creditors to negotiate a resolution amongst all parties.

- **Werner Co.** – January 2013 to Present – Sole Independent Director

  Werner is a global leader in access equipment, secure storage, light duty construction and fall protection products with operations across all geographies. A consortium of private equity investors bought the assets out of a bankruptcy proceeding in 2007. I was asked to serve on the Board as the sole Independent Director by the largest shareholder. Werner more than doubled the size of its business, diversified its product offering and substantially improved its EBITDA prior to its sale in July 2017. As an independent director, working with one other director, we lead the effort in the sale process that achieved an additional $180 million increase in the sale price of the company for its distressed investors.  I am currently the lead director responsible for the resolution of post-sale purchase price adjustments.

- **Old PSG f/k/a Performance Sports Group** – August 2017 to December 2017

  Asked to serve on the Board, by the Official Equity Committee, after the sale of Performance Sports Group's assets. My role was to oversee the plan of reorganization process to drive to a smooth confirmation.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 985 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 868 of 1017 PageID 8598
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 984 of 1803 PageID 11730
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 7 of 19

**Dubel & Associates, L.L.C.**

- **FXI Holdings** – September 2010 to October 2017 – Independent Director

  FXI is a leading producer of engineered polyurethane foam solutions serving the largest customers in the largest markets. It has the broadest customer and consumer reach of any North American foam producer. FXI's assets where purchased during a bankruptcy proceeding in 2009. I was asked to serve on the board of directors by one of the two private equity firms that owned FXI. Shortly after joining the Board, I was asked to Chair a Special Committee of the Board to manage certain litigation and government investigations related to alleged anti-trust infractions. FXI was the subject of over 50 different class action and individual litigations alleging damages in excess of $3 billion. Over a period of several years, FXI was able to settle all of its litigation for a minor fraction of the alleged damages and all investigations by the government were dropped. During this time, the company's performance improved in a consistent manner with EBITDA more than doubling. Once these litigations were settled, the company was marketed and ultimately sold in October 2017.

- **ResCap Liquidating Trust** – December 2013 to March 2017 – Chairman of the Board - December 2013 to late 2015

  After the ResCap chapter 11 plan was confirmed, I served on the Board of the ResCap Liquidating Trust, as FGIC's representative, to guide the wind down of the remaining assets and prosecute claims in excess of $4 billion against institutions that caused harm to ResCap. During this time, I also served as Liquidating Trustee while we brought on board a new in-house lawyer to prosecute these claims and transitioned this individual into the permanent Liquidating Trustee role.

- **FGIC Corporation and FGIC** - December 2008 to April 2014 – Chairman of the Board during various parts of that time frame – while serving as CEO

- **Barneys New York** – February 2012 to May 2012 – Sole Independent Director

  After Barneys' 2007 sale to Istithmar World, the Government of Dubai's private investment fund, Barneys was impacted by the recession in the late 2000's. I was brought in to serve as the sole independent director during the out of court restructuring process which resulted in a consensual change of control for Barneys to its distressed investor creditors.

- **The Leslie Fay Companies** – April 1993 to May 1996 – while serving as the EVP of Restructuring and CFO

- Mr. Dubel has also served as a member and chairperson of various ad hoc and official creditor committees.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 986 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 869 of 1017   PageID 8599
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 985 of 1803   PageID 11731
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 8 of 19

**Dubel & Associates, L.L.C.**

# John S. Dubel
# Key Management Experience

- **Noble Environmental Power –** Restructuring Advisor to the Company - 2018

  Noble was the owner of two utility scale wind power plants in upstate New York which were in default on their debt instruments. Working closely with Noble's investment bankers we were able to complete a sale of these plants while keeping the companies out of chapter 11 and returning net sale proceeds to its shareholders.

- **SunEdison, Inc.** – Chief Executive Officer and Chief Restructuring Officer – 2016-2017

  SunEdison was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SunEdison had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents. A decline in energy prices along with loss of faith in management by investors and numerous litigations filed against the company caused the closing of the capital markets for SunEdison which led to its filing for chapter 11. I was brought in as a requirement of the DIP agreement. SunEdison's assets were sold in a manner to preserve the greatest value for its creditors. I am currently assisting the wind down SunEdison entity as requested.

- **Financial Guaranty Insurance Company** – Chairman and Chief Executive Officer – 2008-2014

  FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts with over $4 billion of capital. After the collapse of the residential mortgage market in the 2007/08 timeframe, FGIC lost its AAA ratings and experienced tremendous losses on its insurance contracts. This led to an insolvency proceeding under NY State insurance law with an innovative resolution through a pre-arranged rehabilitation plan. This enabled it to continue to pay its policy holders in a timely manner.

- **Residential Capital** – Co-Chairman of the Official Creditors Committee – 2012-2013

  ResCap, a wholly owned subsidiary of Ally Financial, was one of the largest mortgage originators in the US. FGIC was its 2nd largest creditor and after its chapter 11 filing in May of 2012, I was appointed as the Co-Chair of ResCap's Official Unsecured Creditors Committee. As the lead negotiator for the UCC, the UCC was able to negotiate an increase in the contribution to the plan of reorganization by the parent, Ally, from approximately $650 million to $2.1 billion. This contribution settled all of the litigation between Ally and Rescap and enabled ResCap to emerge from chapter 11.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 987 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 870 of 1017   PageID 8600
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 986 of 1803   PageID 11732
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 9 of 19

## Dubel & Associates, L.L.C.

- **Anchor Glass Container Corporation** – Chief Restructuring Officer – 2005-2006

  Anchor Glass was the 3rd largest manufacturer of glass containers in the US, with Anheuser Busch and Snapple as its largest customers, where it provided "just in time" deliveries to enable its customers plants to operate 24/7. Its third trip through chapter 11 resulted from poor contract pricing and high legacy costs. I worked closely with the CEO to renegotiate these contracts and reduce the cost structure which enabled it to emerge from chapter 11 as a viable business which continues to operate today.

- **RCN Corporation** – President and Chief Operating Officer - 2004

  RCN was a Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets with over $1.7 billion of debt incurred during its build out period. Working with the Lead Director, a pre-arranged chapter 11 plan was negotiated with all of its creditor constituencies to enable it to emerge as a profitable business in its markets where it continues to operate today.

- **Cable & Wireless America** – Chief Executive Officer – 2003-2004

  C&W America was a premier hosting business with 14% share of the US market and world class a Tier 1 IP Network. When its British parent company experienced financial difficulties, they attempted to abandon C&W America which caused stress for its major customers, including Yahoo, Google and others. A plan was put in place, though a chapter 11 process, to dramatically reduce its daily cash burn and sell the entity while maintaining its customer base.

- **Acterna Corporation** – Chief Restructuring Officer  - 2003

  Acterna was a multi-national manufacturer of telecommunications and cable equipment with revenues of approximately $1.7 billion  and debt of $1 billion prior to the industry down turn. I worked closely with the CEO to stabilize the operations and avoid a fire sale of the business. A quick turn through chapter 11 enabled it to emerge as a viable business, where upon the CEO was able to regrow the business and position it for a successful sale to an industry player 18 months later.

- **WorldCom, Inc.** – Chief Financial Officer – 2002, Advisor – 2003

  WorldCom was one of the largest telecommunication companies with assets of over $107 billion and operations across the globe. It filed for chapter 11 during 2002 due to a massive fraud which covered up the significant operational deficiencies and losses it was experiencing. I was brought in as a condition of the DIP agreement and worked closely with the CEO and other members of the senior management to stabilize the company, restructure the operations to reduce opex, provide stability to the international operations and assist with the plan of reorganization negotiations and confirmation.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 988 of
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 871 of 1017   PageID 8601
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 987 of 1803   PageID 11733

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 10 of 19

## Dubel & Associates, L.L.C.

- **CellNet Data Systems, Inc.** – Chief Restructuring Officer – 1999-2001

  CellNet was a startup technology company that provided smart grid and smart metering and billing solutions for the utility industry. After burning through in excess of $600 million of initial funding it was not able to access the capital markets to continue to build out its platform and realize the cost synergies across contracts that would make it profitable. Working closely with the new CEO, we reduced the cost structure and sold the company to one of its meter suppliers enabling it to continue to operate in a successful manner.

- **Barneys New York** – Chief Financial Officer – 1996-1999

  Barneys was, at this time, a family owned high end retail store chain operating with over 30 stores and international affiliations in Asia. After an uncontrolled growth plan and management that did not understand its cost structure, it filed for chapter 11. I was brought in a the request of the DIP lender to oversee the family's management, to control its costs, close unprofitable locations, renegotiate store leases and work out a consensual chapter 11 plan that included its largest creditors providing financing through a rights offering to enable Barneys to successfully emerge from chapter 11 as a profitable retailer.

- **The Leslie Fay Companies** – EVP Restructuring and Chief Financial Officer – 1993-1995

  Leslie Fay was one of the larger designer and manufacturer of ladies dresses, sportwear and suits in the US. A public company, it was the victim of fraud by its financial management team to hide the true cost of operations and manufacturing of its products. This led to a chapter 11 filing. I worked closely with the CEO and President to stabilize its financial management team, reduce costs and position it for an emergence from chapter 11.

- **Robert Maxwell Group** – Head of US Private Companies – 1991-1993

  Robert Maxwell was a British entrepreneur who invested heavily in the publishing space. After financial improprieties were uncovered and his subsequent suicide, I was appointed by the UK Administrators to run all of his US operations, which included over 40 private companies. I worked closely with the UK administers to realize value through sales of these US operations and turn those proceeds over to the UK Administrators.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 989 of
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 872 of 1017 PageID 8602
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 988 of 1803 PageID 11734

## Dubel & Associates, L.L.C.

Mr. Dubel is a past board member and officer of the Association of Insolvency and Reorganization Advisors, a Certified Insolvency and Reorganization Advisor and is a member of the Turnaround Management Association and the American Bankruptcy Institute. Mr. Dubel received a Bachelor in Business Administration degree from the College of William and Mary.

# Dubel & Associates, LLC

# Selected Case Studies

Appellee Appx. 00983
Appx. 92646
007791

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 991 of 1804

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 990 of 1803   PageID 11736

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 13 of 19

## SunEdison, Inc.
### John Dubel – Chief Executive Officer and Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ SunEdison (SUNE) was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SUNE had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents | ‣ Hired initially as CRO with a clear mandate to take on CEO responsibilities | ‣ Took on CEO role after a short transition with the former CEO |
| | ‣ An immediate assessment of the opportunity to maintain a going concern was initiated. | ‣ Reorganization of key personnel functions including the hiring of a new CFO and Controller provided stability in the Finance functions for the company to operate within the limits of the DIP agreement. |
| ‣ Continued downward pressure on energy prices caused renewable energy projects to experience stress. Lack of proper integration of acquisitions and overpayment on other acquisitions caused a liquidity crisis. Public spin-offs of profitable yieldco assets cut off cash flow that was needed to run the operations. | ‣ Programs were put in place to plug the employee exodus that SUNE was experiencing | |
| | ‣ In consultation with our lenders made the determination that an orderly sale of assets was the best path to optimum value realization | ‣ Executed a global marketing process which resulted in over 60 asset sales with approximately $1.5 billion of gross proceeds |
| ‣ Senior management control of the Yieldcos enabled borrowings from the Yieldcos which could not be repaid | ‣ Maintained an open line of communication with the DIP, 1L and 2 L lenders to build back trust in the company | ‣ Executed a plan which resulted in the transition of administrative and operational functions from SUNE to the Yieldcos which helped stabilize the value of our ownership stake in these entities |
| | ‣ Engaged with the Board of the Yieldcos, TERP and GLBL, to work towards a resolution of the disputes between the Yieldcos and SUNE | |

Appellee Appx. 00984
Appx. 23949
007792

## SunEdison, Inc. (continued)
### John Dubel – Chief Executive Officer and Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ Class and individual litigation against SUNE and the Yieldcos related to these control issues ensued.<br><br>‣ Shortly after a Feb 2016 2L financing the company has exhausted those funds and was out of available funds to operate the business.<br><br>‣ Additional litigation commenced related to cancelled acquisitions.<br><br>‣ During this timeframe, the creditors lost faith in the CEO and CFO.<br><br>‣ SUNE filed for chapter 11 in late April 2016 funded by a DIP provided by the 1L and 2L creditors. | ‣ Engaged with the Board and management of the Yieldcos, TERP and GLBL, to start to work towards a resolution of the disputes between the Yieldcos and SUNE<br><br>‣ Put in place a path to seek resolution of all of the Class Action and individual shareholder litigations by seeking a mediation in the District Court and Bankruptcy Court litigation related to both SUNE and the Yieldcos<br><br>‣ Commenced negotiations to settle the various litigations amongst SUNE's creditor groups and between SUNE and its Yieldcos<br><br>‣ Worked closely with Chief Judge Morris, the mediator appointed in the case, to craft a resolution to all intercreditor disputes | ‣ Drove a plan, through a directed litigation strategy, to force a resolution of the over $3 billion of claims brought against SUNE by the Yieldcos which resulted in a cooperative sale of the Yieldcos netting SUNE approximately $825 million<br><br>‣ A replacement DIP agreement was put in place to eliminate certain concerned creditors and align the interests of the DIP lenders and the prepetition secured creditors.<br><br>‣ Settlements of the vast majority of class and individual shareholders were negotiated<br><br>‣ A mediated resolution amongst SUNE's creditor resulted in a successful chapter plan of reorg funded by a rights offering led by SUNE's 2L creditors |

**Appellee Appx. 00985**

**Appx. 92650**

007793

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 993 of 1804

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 992 of 1803   PageID 11738

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 15 of 19

## Financial Guaranty Insurance Company
### John Dubel – Chief Executive Officer and member of the Board of Directors

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts<br><br>‣ At the start of 2008, FGIC was at risk of losing its AAA ratings<br><br>‣ The residential real estate meltdown caused FGIC to face billions of dollars of claims from CDS and RMBS contracts it had insured<br><br>‣ In addition, several of FGIC's largest public finance deals were on the cusp of defaulting<br><br>‣ In late 2009, FGIC's statutory capital went negative and was subject to immediate takeover by the NYS Department of Financial Services | ‣ Raised capital surplus by $830 million through reinsurance agreements and preferred stock<br><br>‣ Negotiated settlements of CDS contracts<br><br>‣ Managed the workout of multiple public finance insurance contracts<br><br>‣ Managed affirmative litigation actions to recover from parties that harmed FGIC's insurance contracts<br><br>‣ Developed an innovative restructuring plan to allow FGIC to file a pre-arranged rehabilitation plan in NYS Court<br><br>‣ Positioned the company to be able to operate in the post rehabilitation environment to pay claims to policyholders in a timely manner | ‣ Planned and executed an orderly Rehabilitation Plan process which resulted in an innovative and precedent setting proceeding for FGIC's policyholders<br><br>‣ Managed down the overall exposure from $312 billion to under $30 billion<br><br>‣ Settled parent/subsidiary issues without litigation<br><br>‣ Recovered in excess of $1.25 billion for policyholders from parties that harmed FGIC's contracts<br><br>‣ All of these results were accomplished while maintaining an independent view towards protecting all policyholders interests |

**Appellee Appx. 00986**
Appx. 22951
007794

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 994 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 993 of 1803    PageID 11739

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 16 of 19

## RCN Corporation – Integrated Triple Play Service Provider
### John Dubel – President and Chief Operating Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

- Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets
- Revenues of approximately $500 million
- Over 1 million connections
- $1.7 BN of debt in default
- Secured creditors pushing the Company to a forced liquidation
- Lack of confidence in management's business plan and ability to rationalize the business
- Company lacked adequate liquidity to maintain operations

**Actions Taken**

- Hired as President and CRO to lead RCN during this crisis.
- Implemented reorganization of operating costs achieving positive EBITDA and cash flow
- Actions included:
  - Rationalized customer base
  - Segmented Customer Service activity and automated where possible
  - Consolidated Network Operations to drive efficiency
  - Reduced IT functions
  - Reduced customer service call volume through web-based solutions
  - Simplified product offering
  - Generated Tech Operations savings

**Results**

- Streamlined operations and reduced breakeven costs achieving positive cash flow and EBITDA
- Reduced annualized SG&A costs by 20%
- Reduced headcount by 25%
- Improved Customer Service quality
- Company emerged with over $125 million of cash in hand
- Instituted rigorous cost reduction procedures within the company
- Positioned the company for future positive growth

Appellee Appx. 00987
Appx. 72855
007795

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 995 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 994 of 1803    PageID 11740

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 17 of 19

## Cable & Wireless America – Successfully Positioned the Company for a Sale
### John Dubel – Chief Executive Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ Premier hosting business with 14% share of the US market by revenue and World Class Tier 1 IP Network | ‣ Negotiated terms of separation from parent company and obtained ongoing funding commitment | ‣ Reduced daily cash burn to $0.7M |
| ‣ Parent company's announcement of intention to exit the US market created uncertainty for customers, suppliers, and employees | ‣ Stabilized skittish customer base | ‣ Planned and executed orderly Chapter 11 filing with the support of a "stalking horse" bidder to facilitate a 363 sale |
| ‣ Daily cash burn estimated at $2M | ‣ Took control of cash management and forecasting process | ‣ Active auction process resulted in total bid consideration of $167.5M, a threefold increase over the stalking horse bid value |
| ‣ Need to stabilize standalone operations and facilitate a sale transaction | ‣ Implemented cost cutting strategy to achieve cash flow breakeven within 9 months | |
| | ‣ Managed extensive due diligence process by multiple bidders | |

Appellee Appx. 00988

Appx 02983
007796

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 996 of 1804

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 995 of 1803   PageID 11741

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 18 of 19

## Acterna – Reduced Costs, Drove a Successful Turnaround
### John Dubel – Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ Leading Telecom Network equipment supplier with worldwide operations that was facing a severe liquidity crisis | ‣ Assumed role of CRO to lead company through Chapter 11 | ‣ Acterna emerged from Chapter 11 with 80% less debt and a reduction of 85% of interest costs in less than 6 months |
| | ‣ Restructured $1.0 BN of debt | |
| ‣ Test equipment market was crippled by the drought of capital spending from Telecom Network companies | ‣ Preserved non-domestic assets across 30 countries necessary to a successful reorganization. | ‣ Improved international cash liquidity sufficiently for non-US operations to become self funding |
| | ‣ Focused sales activity on core markets | ‣ Cash at emergence was over $60 million |
| ‣ Debt levels were not sustainable in then current market conditions | ‣ Worked with management to reduce SG&A costs | ‣ Reduced operating cash costs so the company was self funding and the DIP was never used to operate the company |
| | ‣ Rationalized headcount through centralization of manufacturing activity | |
| | ‣ Managed the subsidiary divestiture program | ‣ 18 months after C-11, Acterna announced a sale to JDS Uniphase, for a three fold increase in value. |
| | ‣ Integrated worldwide cash control procedures improving liquidity | |

**Appellee Appx. 00989**
Appx. 33854
007797

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 997 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 996 of 1803    PageID 11742

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 19 of 19

## WorldCom – Stabilized Operations and Finance Function
### John Dubel – Chief Financial Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ A massive fraud which masked operational, financial and reporting issues crippled the company's credibility | ‣ Assumed role  Chief Financial Officer until a permanent management team could be put in place then worked as financial advisor for pendency of Chapter 11 case | ‣ Achieved $2 BN of operational savings |
| ‣ WorldCom suffered from excess debt with declining value of assets, financial fraud issues, contentious relationship with creditors, and a substantial cash burn | ‣ Put turnaround teams, operational restructuring plans, and cash management plans in place | ‣ Increased cash flow by more than $100M in international operations and avoided bankruptcy in many jurisdictions |
| ‣ Significant negative cash flow from international operations | ‣ Led the international restructuring efforts | ‣ Worked with all stakeholders to reach consensus on a plan of reorganization |
| ‣ WorldCom filed for bankruptcy in July of 2002, becoming the largest bankruptcy filing in history at the time | ‣ Assisted in negotiations with creditors | ‣ Successfully restructured the balance sheet |
|  | ‣ Implemented an achievable 2003 business plan, facilitated several cost reduction initiatives, and managed the 13-week cash flow forecast |  |
|  | ‣ Reduced capital spending |  |

Appellee Appx. 00990
Appx. 93685
007798

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 998 of
Case 3:25-cv-02072-S    Document 15-10   Filed 10/06/25   Page 881 of 1017   PageID 8611
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 997 of 1803   PageID 11743
Case 19-34054-sgj11 Doc 281-3 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 1 of 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket Nos. 7 & 259 |

**ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR**
**AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE**

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of*

*Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the*

*Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Appellee Appx. 00991
Appx. 02886
007799

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 999 of
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 882 of 1017    PageID 8612
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 998 of 1803   PageID 11744
Case 19-34054-sgj11 Doc 281-3 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 2 of 2

jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding

pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under

the circumstances and no other or further notice is required; and having determined that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

having determined that the relief sought in the Motion is in the best interests of the Debtor and its

estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on the terms and conditions set forth herein.

2.      The Term Sheet is approved and the Debtor is authorized to take such steps

as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not

limited to: (i) entering into the Governing Documents and compensating the Independent Directors

for their services either directly or by reimbursing Strand for any costs incurred in connection with

the appointment and compensation of the Debtor; (ii) implementing the Document Production

Protocol; and (ii) implementing the Protocols.

3.      Subject to the Protocols and the Term Sheet, the Debtor is authorized to

continue operations in the ordinary course of its business.

4.      Notwithstanding any stay under applicable Bankruptcy Rules, this Order

shall be effective immediately upon entry.

5.      The Court shall retain jurisdiction over all matters arising from or related to

the interpretation and implementation of this Order, including matters related to the Committee's

approval rights over the appointment and removal of the Independent Directors.

## END OF ORDER ##

DOCS_NY:39973.7 36027/002

Appellee Appx. 00992
Appx. 02857
007800

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1000
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 883 of 1017 PageID 8613
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 999 of 1803 PageID 11745

# APPENDIX 13

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1001
Case 3:25-cv-02072-S Document 15-10 Filed 06/25 Page 884 of 1017 PageID 8614
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1000 of 1803 PageID 11746
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 1 of 16

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) | **Related to Docket Nos. 69, 70, 116, and 120** |
|  | ) |  |

### DEBTOR'S OMNIBUS REPLY IN SUPPORT OF (I) APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE; AND (II) APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

The above-captioned debtor and debtor in possession (the "Debtor") hereby submits this reply (the "Reply") in support of its (i) *Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 69] (the "Foley Application"); and (ii) *Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 70] (the "Lynn Pinker Application," and together with the Foley Application, the "Applications").

In further support of the Applications, the Debtor respectfully states as follows:

### Preliminary Statement

1.      As set forth in the Applications, and as discussed more fully below, Foley Gardere, Foley & Lardner, LLP ("Foley") and Lynn Pinker Cox & Hurst LLP ("Lynn Pinker")

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Appellee Appx. 00994
Appx. 007802

have represented the Debtor and certain of its affiliates and related entities in highly-contested, prepetition litigation against Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, "Acis"). Lynn Pinker also represented the Debtor in litigation concerning Joshua Terry – Acis's sole owner[2] – and Mr. Terry's wife, Jennifer Terry. In the Applications, the Debtor seeks authority to retain Foley and Lynn Pinker on a postpetition basis to continue the defense of the Debtor and related entities as described herein and the prosecution of the Debtor's rights against Acis and Mr. Terry.

2.       Two objections to the Applications were filed: (i) *Limited Objection of the Official Committee of Unsecured Creditors to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner, LLP and Lynn Pinker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 120] (the "Committee Objection") and (ii) *Limited Objection to the Debtor's: (I) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner, LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (II) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 116] (the "Acis Objection").

3.       The Committee Objection, filed by the Official Unsecured Creditors Committee (the "Committee"), seeks certain additional disclosures concerning the services to be provided by Foley and Lynn Pinker and the entities to which those services will be provided.

---

[2] Mr. Terry obtained 100% of the equity in the Acis entities through the confirmation of Acis's bankruptcy plan. The Debtor is currently appealing that confirmation order as discussed herein.

Appellee Appx. 00995

Appx. 07809

007803

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1003
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 886 of 1017 PageID 8616
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1002 of 1803 PageID 11748
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 3 of 16

The Committee Objection also seeks additional disclosure concerning how the Debtor will pay for those services and their benefit to the Debtor's estate. The Debtor has endeavored to provide the additional disclosures requested by the Committee as set forth herein and in the Supplemental Declaration of Michael Hurst (the "Hurst Declaration") attached hereto as **Exhibit A**, the Supplemental Declaration of Holland O'Neil (the "O'Neil Declaration") attached hereto as **Exhibit B**, and the Declaration of Bradley Sharp (the "Sharp Declaration," and together with the Hurst Declaration and the O'Neil Declaration, the "Declarations") attached hereto as **Exhibit C**.

4.     In contrast, the Acis Objection, filed by Acis LP and Acis GP, seeks to import the highly acrimonious and contentious nature of the Debtor's ongoing litigation with Acis and Acis's counsel, Winstead PC ("Winstead"), into this Court and to use the retention process to secure a litigation advantage in its ongoing dispute with the Debtor in Texas. In short, Acis is seeking to disqualify the Debtor's chosen law firms – law firms that have represented the Debtor for the past twenty (20) months specifically in connection with the Acis and Terry Litigation – from continuing to represent the Debtor in matters adverse to Acis. That tactic is improper and an abuse of the bankruptcy process. Regardless, the Debtor has endeavored to be transparent and to respond to Acis's requests for additional disclosures herein and in the Declarations. Although not relevant to the Applications, the Debtor has also responded to Acis's improper accusations concerning the Acis Litigation.

## Reply

5.     In the Committee Objection, the Committee lists two objections to the Applications. The first, and the Committee's "principal concern," is "the lack of clear delineation of [Foley's and Lynn Pinker's] proposed engagements and representations, and the

Appellee Appx. 00996

Appx 03861
007804

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1004
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 887 of 1017 PageID 8617
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1003 of 1803 PageID 11749
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 4 of 16

Debtor's obligation to pay for the same." (Committee Objection, ¶ 3.)  The second is that "the

Applications do not provide for an allocation of attorneys' fees and expenses among the Debtor

and non-debtor defendants." (*Id.*, ¶ 4.)  Parsing the vitriol in the Acis Objection, it is apparent

that Acis is generally asserting the same two objections as the Committee.  (Acis Objection, ¶¶ 5;

8.)  These two concerns are addressed below.

### I.  Foley's and Lynn Pinker's Proposed Engagements

6.      Prior to the Petition Date, the Debtor was represented by both Foley and

Lynn Pinker acting as co-counsel.  Lynn Pinker is a highly- regarded litigation boutique based in

Dallas, Texas, but does not have bankruptcy attorneys on staff.  Conversely, Foley has a large

and well-established bankruptcy practice.  Because each of the matters set forth below includes

both a bankruptcy and litigation component, the Debtor utilized the services of both Foley and

Lynn Pinker.  Foley provided the bankruptcy expertise – but, in light of the Debtor's retention of

Lynn Pinker, does not have litigators staffed on the matters – and Lynn Pinker primarily handled

litigation strategy but deferred to Foley on the bankruptcy components.  As such, despite both

Lynn Pinker and Foley being retained, there was limited overlap in the services they provided to

the Debtor other than the overlap necessary to collaborate on overall progress and strategy.

7.      The following are the matters in which Foley and Lynn Pinker represented

the Debtor prepetition (collectively, the "Acis Litigation").  The list also includes entities related

to the Debtor which were also represented by Foley and/or Lynn Pinker and whose legal fees

were paid – prepetition – by the Debtor (as discussed below).  The Debtor believes that one of

these matters, the Adversary Proceeding (as defined below), has been stayed as a result of the

Debtor's bankruptcy filing, and that there will only be de minimis, if any, legal work required on

**Appellee Appx. 00997**

**007805**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1005
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 888 of 1017 PageID 8618
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1004 of 1803 PageID 11750
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 5 of 16

such matter during the Debtor's bankruptcy.[3]  As set forth below, the Debtor is only seeking to

retain Foley and Lynn Pinker with respect to the Acis Bankruptcy, Neutra Appeal, Debtor

Appeal, and the Winstead Matter (each as defined below) at this time.

| Matter | Clients | Case Summary | Procedural Posture |
|---|---|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.*), Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy") | Debtor<br><br>Neutra Limited[4] (Foley client only) | Acis involuntary bankruptcy proceeding initiated by Mr. Terry.  The Debtor has a claim in excess of $8 million for pre- and post-petition services provided to Acis.[5]  Neutra is nominally involved in the Acis Bankruptcy as a party in interest.  Other than Mr. Terry, the Debtor is Acis's only material creditor. | The Debtor's claims in the Acis Bankruptcy have been consolidated with the Adversary Proceeding (defined below). |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.*, Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) (collectively, the "Adversary Proceeding") | Debtor<br><br>Highland HCF Advisors, Ltd.<br><br>Highland CLO Management, LLC<br><br>Highland CLO Holdings, Ltd. | The Debtor is currently a defendant in the Adversary Proceeding.  The bankruptcy court consolidated resolution of the Debtor's claims with this Adversary Proceeding.  The defendants have filed a motion to withdraw the reference, which has been argued to the bankruptcy court and is pending.  The bankruptcy court has not yet produced its Report and Recommendation to the District Court as to whether to withdraw the reference. | The Debtor believes this matter is stayed as to the Debtor and the other defendants, and will likely remain so for the foreseeable future due to the nature of the action. |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.)*, Case No. 19-10846 (5th Cir. 2019) (the "Neutra Appeal") | Neutra (Foley client only) | Neutra is appealing the involuntary order for relief entered in the Acis Bankruptcy.  If successful, certain CLO management agreements may revert to the Debtor.  The Debtor previously received in excess of $12 million annually under those agreements.[6] | The Neutra Appeal is not stayed and is proceeding.  Neutra filed its reply brief on November 20, 2019. |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) (the "Debtor Appeal") | Debtor<br><br>Neutra (Foley client only) | The Debtor and Neutra are appealing entry of the confirmation order in the Acis Bankruptcy. | This appeal is not stayed, and the Debtor's reply brief is due December 16, 2019. |

---

[3] If circumstances change, the Debtor proposes to return to this Court to discuss the changed circumstances and to update the Applications if necessary.

[4] The economic interests in Neutra Limited ("Neutra") are owned, indirectly, 25% by Mark Okada and 75% by James Dondero.  Prior to the confirmation of the contested plan in the Acis Bankruptcy, Neutra owned 100% of the limited partnership interests in Acis LP and 100% of the membership interests in Acis GP.  In his deposition, Mr. Sharp stated that Lynn Pinker represented Neutra; however, Neutra is represented by Foley.

[5] *See* Highland Capital Management, L.P. Proof of Claim #27 in the Acis LP case and Proof of Claim # 13 in the Acis GP case, attached hereto as Exhibit D and E, respectively, and Highland Capital Management, L.P.'s Application for Administrative Expense Claim Pursuant to 11 U.S.C. §503(b), Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. Dec. 11, 2018) [Docket No. 772], attached hereto as Exhibit F.

[6] *See* Acis LP's Statement of Financial Affairs, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. April 30, 2018) [Docket No. 165], relevant excerpts of which are attached hereto as Exhibit G.

Appellee Appx. 00998

Appx. 007806

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1006
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 889 of 1017 PageID 8619
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1005 of 1803 PageID 11751
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 6 of 16

| | | | |
|---|---|---|---|
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee,* Case No. 3:19-cv-1477D (N.D. Tex. 2019) (the "Winstead Matter") | Debtor | The Debtor is appealing a ruling allowing Winstead to represent both Acis's chapter 11 trustee and Mr. Terry, individually and as a creditor of Acis, to the District Court. If successful, Winstead will be required to disgorge fees and expenses improperly billed to Acis's estate.[7] | The "Record of Appeal" has not yet been docketed and no briefing schedule has been set. This matter will proceed once docketed. |

8.       In addition, Lynn Pinker represented the Debtor and certain of the

Debtor's officers in the following prepetition matter in which Foley was not involved:

| Matter | Clients | Case Summary | Procedural Posture |
|---|---|---|---|
| *Joshua N. Terry, Individually and on Behalf of IRAs #146771 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al,* Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) (the "Terry Litigation") | Debtor<br><br>J. Dondero<br><br>T. Surgent | The Debtor, Mr. Dondero, and Mr. Surgent are currently defendants in this matter and are facing claims for breach of contract, conversion, violation of Texas Theft Liability Act, and related civil conspiracy claims. Mr. Dondero is individually facing a claim for defamation. | Currently stayed as to the Debtor. |

9.       As set forth above, the Debtor believes that the Terry Litigation and the

Adversary Proceeding are stayed. At this time, the Debtor only intends to continue Foley's and

Lynn Pinker's representations post-petition with respect to the Acis Bankruptcy, the Neutra

Appeal, the Debtor Appeal, and the Winstead Matter. However, the Debtor reserves the right to

supplement the Applications to the extent that Foley and Lynn Pinker's services are needed in

the Adversary Proceeding and the Terry Litigation. Further, in light of the allegations being

asserted by the Committee in the *Motion of the Official Committee of Unsecured Creditors for*

*an Order Transferring Venue of this Case to the United States Bankruptcy Court for the*

*Northern District of Texas* [Docket No. 86] (the "Venue Motion"), as well as the joinder thereto

by Acis [Docket No. 122], the Debtor's bankruptcy professionals have sought input from these

---

[7] *See* Statement of Issues by Appellant Highland Capital Management, L.P., Case No. 18-30264-SGJ-11 (Bankr. N.D. Texas July 1, 2019) [Docket No. 1058], attached hereto as Exhibit H.

DOCS_NY:39826.11 36027/002

Appellee Appx. 00999
Appx. 07864
007807

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1007
Case 3:25-cv-02072-S Document 15-10 Filed 06/05/25 Page 890 of 1017 PageID 8620
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1006 of 1803 PageID 11752
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 7 of 16

firms due to their significant history and familiarity with the Acis Litigation.

10.     The Debtor believes that the continued retention of Foley and Lynn Pinker
in the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter will
provide a substantial benefit to the estate. The Debtor has significant claims against Acis, and
Foley and Lynn Pinker are an integral part of that litigation. As discussed above, the Debtor has
a claim in the Acis Bankruptcy in excess of $8 million, and, if the Neutra Appeal is successful,
the Debtor will be in a position to once again receive the benefit of the CLO management
agreements, which historically have provided the Debtor with annual revenues in excess of $12
million. If the Debtor Appeal is successful, Neutra will regain its interests in Acis and will be
able to reinstate the Debtor to resume providing management services to certain collateralized
loan obligations. Finally, if the Debtor is successful in the Winstead Matter, Winstead will be
required to disgorge its fees and expenses charged to the Acis estate. The Debtor believes such
amounts are currently in excess of $2 million.[8] As such, there is substantial benefit to the
Debtor's estate in the Debtor continuing to protect its rights in the Acis Bankruptcy, the Neutra
Appeal, the Debtor Appeal, and the Winstead Matter.

11.     Conversely, any delay in the retention of Foley and Lynn Pinker will have
a substantial and negative impact on the Debtor's estate and the value of its claims in its
litigation with Acis. If the Debtor is not allowed to continue with the engagement of Foley and
Lynn Pinker, the Debtor would be severely disadvantaged by the loss of critical knowledge and
expertise these law firms have devoted to this representation over the course of the past twenty

---

[8] For the avoidance of doubt, any of Winstead's fees and expenses that are disgorged will not flow directly to the
Debtor but will instead be returned to the Acis estate for distribution to Acis's creditors of which the Debtor is now
the largest.

Appellee Appx. 01000
Appx. 02885
007808

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1008
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 891 of 1017 PageID 8621
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1007 of 1803 PageID 11753
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 8 of 16

(20) months.  Further, the costs to replace these firms would be substantial, and the risk of loss of important tactical litigation strategy would be detrimental to the Debtor.

## II.    Prepetition Allocation of Attorneys' Fees and Expenses

12.    Prior to the Petition Date, legal fees incurred by Foley and Lynn Pinker for their representations of the Debtor and non-Debtor parties in the Acis Litigation and the Terry Litigation were paid by either (i) the Debtor or by (2) Highland CLO Funding, Ltd. ("HCLOF") via an indemnification obligation to the Debtor.  *See* ¶17 *infra*.

**The Acis Litigation:**

13.    The Debtor paid for Foley and Lynn Pinker's services in the Acis Litigation for non-Debtor entities.  However, with the exception of Neutra, each such non-Debtor entity  (i) is either directly or indirectly 100% owned by the Debtor; (ii) has no assets; (iii) is only involved in the Acis Litigation because Acis alleged that the Debtor caused such entities to engage in certain acts that harmed Acis; and (iv) is subject to the exact same claims as the Debtor.  Additionally, absent funding by the Debtor, the non-Debtor defendants that are wholly owned by the Debtor would be have no way to defend against Acis's claims.  Any attempt to collect on those claims from such non-Debtor entities would also lead back to their general partners or members, which are the Debtor.  As such, the Debtor believed and believes such entities are only nominal parties to the Acis Litigation and that Foley's and Lynn Pinker's defense of such parties is part and parcel of the Debtor's defense of itself and its assets.

14.    The Debtor historically paid Foley's fees and expenses incurred by Neutra.  As disclosed above, the economic interests in Neutra are owned, indirectly, 25% by Mr. Okada and 75% by Mr. Dondero.  As a special purpose entity, Neutra, however, has no assets,

DOCS_NY:39826.11 36027/002

Appellee Appx. 01001

Appx. 02806

007809

and had no assets prior to the Acis Bankruptcy except for its interests in Acis. Although the Debtor is not a direct appellant in the Neutra Appeal,[9] if Neutra is successful in the Neutra Appeal, Neutra will regain its interests in Acis and intends to cause certain services and advisory agreements to revert back to the Debtor. The Debtor then would be in a position to earn revenue from those agreements, as it did prior to the filing of the involuntary bankruptcy petitions against Acis LP and Acis GP and prior to its contracts being terminated in the Acis Bankruptcy. By way of example, in the one year period prior to the filing of the involuntary petitions, Acis LP compensated the Debtor more than $12 million for its services.

15. Although the economic interests in Neutra are indirectly owned by Mr. Dondero and Mr. Okada, Mr. Dondero and Mr. Okada will likely not see a return on their equity for some time. If the Neutra Appeal is successful, Neutra will regain its interest in Acis and Acis will also be required to pay the Debtor (i) approximately 85% of its revenue for services provided under the services agreements and (ii) for its claims against Acis for pre- and postpetition services rendered, which are currently in excess of $8 million. As such, it is estimated that Acis would owe approximately four years of revenue to the Debtor, including payment of services and pay down of the $8 million previously accrued and unpaid.

16. For the foregoing reasons, the Debtor has agreed to pay Neutra's fees in the Neutra Appeal, the Acis Bankruptcy, and the Debtor Appeal. Paying those fees makes economic sense for the Debtor, but does not make sense for Mr. Dondero, Mr. Okada, or any other party[10] as they would not see a return on that investment for a significant amount of time.

---

[9] Under the "person aggrieved" standing for purposes of appeal, Neutra was the proper appellant.

[10] As previously stated, as a special purpose entity, Neutra has no assets other than its prior ownership of the equity in Acis.

DOCS_NY:39826.11 36027/002

**Appellee Appx. 01002**

**Appx 03685**

**007810**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1010
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 893 of 1017 PageID 8623
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1009 of 1803 PageID 11755
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 10 of 16

17.     Finally, although the Debtor has agreed to pay Foley and Lynn Pinker for

the services provided to the Debtor and the non-Debtors set forth above in the Acis Litigation,

the majority of those fees and expenses actually were paid by a non-Debtor entity, HCLOF.[11]

The Debtor owns less than 1% of the economic interest in HCLOF.  As part of HCLOF's

agreement with the Debtor, HCLOF indemnifies the Debtor if the Debtor incurs any legal fees on

HCLOF's behalf.  Pursuant to that indemnification, HCLOF, prior to the Petition Date, either

paid directly or reimbursed the Debtor for the majority of Foley's and Lynn Pinker's fees and

expenses incurred in the matters set forth above.

**The Terry Litigation:**

18.     The Debtor historically paid all of Lynn Pinker's fees and expenses with

respect to their representation of the Debtor, Mr. Dondero, and Mr. Surgent in the Terry

Litigation.  The Debtor paid Mr. Dondero's and Mr. Surgent's legal fees in this matter as Mr.

Dondero and Mr. Surgent were entitled to indemnification under the Debtor's limited partnership

agreement.  (Exh G., § 4.1(h).)

**III.     Postpetition Allocation of Fees**

19.     As set forth above, the Debtor believes that all matters except for the Acis

Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter are stayed and will

remain stayed during the pendency of the Debtor's case.  The Debtor is the only party in the

Winstead Matter.  The Debtor, for the reasons set forth above, intends to compensate Foley for

its representation of Neutra – the only non-Debtor party – in the Acis Bankruptcy, the Neutra

---

[11] HCLOF is a party to the Acis Bankruptcy, the Debtor Appeal, and the Adversary Proceeding.  HCLOF is represented by the law firm, King & Spalding, and is not represented by Foley or Lynn Pinker.  HCLOF pays King & Spalding's fees and expenses directly.

Appellee Appx. 01003
Appx 03868
007811

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1011
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 894 of 1017 PageID 8624
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1010 of 1803 PageID 11756
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 11 of 16

Appeal, and the Debtor Appeal, subject to this Court's order.[12] The Debtor believes that if Neutra is successful in the Neutra Appeal, the Debtor and its estate will be a significant beneficiary of such an outcome and will receive a direct and substantial benefit. In the Acis Bankruptcy and the Debtor Appeal, Neutra is only a nominal party, and the Debtor is receiving the primary benefit of Foley's legal services in those matters. Further, a substantial portion of Foley's and Lynn Pinker's fees and expenses may continue to be reimbursed by HCLOF although the exact amount of such reimbursement is not yet known.

20.     To the extent that the other matters set forth above are not stayed, as to any party, the Debtor intends to supplement the Applications to seek authority to pay the costs of the non-Debtor parties represented by Foley and Lynn Pinker.

## IV.     **Additional Issues Raised in the Acis Objection**

21.     The balance of the issues raised in the Acis Objection are irrelevant or misleading and in all cases constitute an inappropriate attempt by Acis to use this Court's authority and the Bankruptcy Code to secure a litigation advantage against the Debtor. Consequently, the Debtor is compelled to respond to each point.

22.     **Rule 2017(a) of the Federal Rules of Bankruptcy Procedure**: Acis has reserved its right "to compel disclosure" of information relating to the amounts billed by Foley and Lynn Pinker prior to the Petition Date pursuant to Rule 2017(a).[13] (Acis Objection, ¶ 5.) By

---

[12] The Debtor and Neutra currently contemplate entering into an agreement pursuant to which Neutra will repay the Debtor for Foley's fees and expenses incurred on Neutra's behalf. Under the proposed agreement, Neutra would reimburse the Debtor from any net proceeds it receives as a result of the transactions discussed herein and would also agree not to make any equity distributions or similar payments to any of Neutra's shareholders, Mr. Dondero, Mr. Okada, or any of their affiliates until after the Debtor is repaid for Foley's legal fees and expenses incurred on Neutra's behalf.

[13] Acis has also stated that Foley and Lynn Pinker should disclose payments made to them pursuant to Rule 2017(b), which requires disclosure of fees incurred after a petition is filed. As set forth in the Applications, Foley and Lynn Pinker intend to comply with Rule 2017(b) – and their other obligations to this Court – and to file fee applications

DOCS_NY:39826.11 36027/002

Appellee Appx. 01004
Appx. 03809
007812

its terms, Rule 2017(a) only applies to payments "in contemplation of the filing of a petition under the Code by or against the debtor. . . ." FRBP 2017(a). As set forth in the Declarations, neither Foley nor Lynn Pinker received payments in contemplation of the bankruptcy. However, Acis's reservation of rights is noted, and the Debtor anticipates Acis will continue its attempts to use this proceeding to influence the Acis Litigation by objecting to Foley's and Lynn Pinker's fees. The Debtor will respond appropriately if and when such objections are filed.

23. **HRA Holdings, LLC**: Foley initially sought a conflict waiver with respect to HRA Holdings, LLC, when it entered into its engagement letter with the Debtor in April 2018. At that time, the Debtor was contemplating a potential investment in HRA Holdings, LLC, another Foley client. However, that investment never occurred, and thus no conflict ever arose.

24. **Lynn Pinker Engagement Letter:** As set forth in the Hurst Declaration, Lynn Pinker does not have an engagement letter with the Debtor and consequently could not attach an engagement letter to its retention application. The terms of Lynn Pinker's engagement were previously disclosed and are re-disclosed in the Hurst Declaration.

25. **Expert Retention of Scott Ellington**: In 2018, Lynn Pinker and the Pettit Law Firm retained Scott Ellington, the Debtor's general counsel, as an expert witness in *Robert A. Imel v. Legacy Texas Bank, N.A. and Energy Reserves Group, LLC*, Cause No. DC-16-01372 (134th Judicial District Court of Dallas County, Texas). The *Imel* litigation was wholly unrelated to the Debtor and did not involve the Debtor or any entities affiliated or related to the

---

subject to appropriate review following their retention. If any of Foley's or Lynn Pinker's fees or expenses are thought to be excessive or inappropriate, parties in interests are entitled to object at the time the fee application is filed, not before.

Appellee Appx. 01005

Appx. 03879

007813

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1013
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 896 of 1017 PageID 8626
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1012 of 1803 PageID 11758
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 13 of 16

Debtor, James, Dondero, or Mark Okada. (Hurst Decl, ¶ 5.) Mr. Ellington's retention in the

*Imel* litigation was in Mr. Ellington's individual capacity, not in his capacity as the Debtor's

general counsel, and was limited to Mr. Ellington preparing a six page expert report and offering

his deposition and trial testimony. As such, Mr. Ellington's retention by Lynn Pinker was not a

representation by Lynn Pinker of the Debtor or any of the Debtor's interested parties. The *Imel*

litigation concluded in 2018.

26. **Charitable Donor Advised Fund, L.P. ("Charitable DAF"):** Despite

Acis's attempts to kick up mud, Lynn Pinker's representation of Charitable DAF is *not* related to

the Debtor's bankruptcy. Charitable DAF is proceeding against U.S. Bank, N.A., and U.S. Bank,

N.A., is not a party in interest in this case.[14] Further, Acis admits that Lynn Pinker's

representation of Charitable DAF is at best a step removed from even the Acis Litigation. Acis

has not alleged that Charitable DAF's proceedings are connected to the Debtor's bankruptcy

proceedings.

27. **CLO Holdco, Ltd.:** As disclosed in the O'Neil Affidavit, Foley has not

represented CLO Holdco, Ltd., since approximately May 2018, and, on information and belief,

CLO Holdco, Ltd. has retained separate counsel to represent it in the Debtor's bankruptcy.

28. **Foley and Lynn Pinker's Prepetition Claims:** Acis alleges that Foley's

and Lynn Pinker's prepetition claims render them adverse to the Debtor. While this could be

true with respect to professionals engaged under 11 U.S.C. § 327(a),[15] it is not true with respect

---

[14] As disclosed in the Hurst Declaration, Lynn Pinker also represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund in confidential matters unrelated to the Debtor's bankruptcy.

[15] *See, e.g., Staiano v. Pillowtex (In re Pillowtex, Inc.)*, 304 F.3d 246 (3rd Cir. 2002).

Appellee Appx. 01006

Appx. 03874

007814

to professionals, like Foley and Lynn Pinker, seeking retention under 11 U.S.C. § 327(e).

Instead, Section 327(e) contemplates professionals having and retaining prepetition claims

against a debtor so long as they do not "hold any interest adverse to the debtor or to the estate

***with respect to the matter on which such attorney is to be employed***." 11 U.S.C. § 327(e)

(emphasis added); *see also* Colliers on Bankruptcy, 16th ed., ¶327.04[0]. Consequently, Foley

and Lynn Pinker would be disqualified from representing the Debtor under Section 327(e) in the

Acis Litigation and Terry Litigation only if they had a conflict with respect to those specific

matters. They do not, and Acis's allegation of a debilitating conflict on account of their

prepetition claims is not well founded.

29.     **Winstead's Conflict of Interest:** Unlike Acis and its counsel, the Debtor

does not wish to litigate in this Court matters properly before another court. However, to clarify

the record, the Debtor believes that it is important to distinguish Foley and Lynn Pinker's

representation of the Debtor in the Acis Litigation from Winstead's representation of both Acis's

Chapter 11 Trustee and Mr. Terry in the Acis Bankruptcy. This matter is currently being

litigated and is referred to as the Winstead Matter above.

30.     Mr. Terry was, and currently is, a creditor of Acis, and he was, and

currently is, represented by Winstead in the filing of his involuntary petitions against Acis.

Concurrently with its representation of Mr. Terry as a substantial creditor of Acis (and while the

orders for relief were on appeal), Winstead sought and was retained by the Chapter 11 trustee in

Acis's bankruptcy under 11 U.S.C. § 327(a).[16] Consequently, Winstead represented both Acis's

---

[16] *See Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. May 30, 2018) [Docket No. 246], attached hereto as Exhibit I, and *Order (I) Approving the Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee and (II) Denying the Motion to*

Appellee Appx. 01007

Appx. 03872

007815

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1015
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 898 of 1017 PageID 8628
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1014 of 1803 PageID 11760
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 15 of 16

Chapter 11 trustee and one of Acis's largest creditors at the same time despite being opposed to Acis in the prosecution of the involuntary petitions. Further, both the approval of the involuntary petition and the confirmation of Acis's chapter 11 plan, respectively, are actively being appealed. Winstead is thus representing Mr. Terry in his action to put Acis into bankruptcy while also representing Acis's Chapter 11 trustee in the confirmation of Acis's bankruptcy plan.

31. Winstead's situation in the Acis Bankruptcy is thus wildly different from Foley and Lynn Pinker's in the Debtor's bankruptcy. Neither Foley nor Lynn Pinker have a conflict of interest with respect to their representation of the Debtor in the Acis and Terry Litigation. Unlike Winstead, they have also never been directly or indirectly adverse to their clients. In addition, Foley and Lynn Pinker are being retained under 11 U.S.C. § 327(e) in the Debtor's bankruptcy as special litigation counsel; they are not being retained as the Debtor's bankruptcy counsel under Section 327(a).

*[Remainder of Page Intentionally Blank]*

---

*Disqualify Winstead PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. June 21, 2018) [Docket No. 313], attached hereto as Exhibit J.

DOCS_NY:39826.11 36027/002

Appellee Appx. 01008
Appx. 03873
007816

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1016
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 899 of 1017 PageID 8629
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1015 of 1803 PageID 11761
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 16 of 16

WHEREFORE, for the reasons set forth above, the Debtor's proposed retention of

(i) Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, and (ii) Lynn Pinker Cox &

Hurst LLP as Special Texas Litigation Counsel are in the best interests of the Debtor's estate and

should be approved on the terms set forth in the Applications.

Dated: November 21, 2019        PACHULSKI STANG ZIEHL & JONES LLP

       */s/ James E. O'Neill*
       Richard M. Pachulski (CA Bar No. 62337)
       Jeffrey N. Pomerantz (CA Bar No.143717)
       Ira D. Kharasch (CA Bar No. 109084)
       Maxim B. Litvak (CA Bar No. 215852)
       James E. O'Neill (DE Bar No. 4042)
       919 North Market Street, 17th Floor
       Wilmington, DE 19899 (Courier 19801)
       Telephone: (302) 652-4100
       Facsimile: (302) 652-4400
       E-mail:    rpachulski@pszjlaw.com
               jpomerantz@pszjlaw.com
               ikharasch@pszjlaw.com
               mlitvak@pszjlaw.com
               joneill@pszjlaw.com

       *Proposed Counsel for the Debtor*
       *and Debtor in Possession*

DOCS_NY:39826.11 36027/002

Appellee Appx. 01009
Appx. 03874
007817

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1017
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 900 of 1017 PageID 8630
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1016 of 1803 PageID 11762

# Exhibit A

**Supplemental Hurst Declaration**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) |  |

**SUPPLEMENTAL DECLARATION OF MICHAEL K. HURST IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST, LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Michael K. Hurst, declare under penalty of perjury as follows:

1.      I am a partner with the law firm of Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH"), located in Dallas, Texas. I am submitting this supplemental declaration ("Declaration") in further support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2]

2.      In the *Declaration of Michael K. Hurst in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst, LLP, as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, dated October 29, 2019 [Docket No. 70-2], I disclosed, that the Firm has represented (a) the Debtor since March 2016; (b) certain other entities related to the Debtor, including the Cayman Defendants in the Pending Acis Proceedings and the defendants in the Texas Lawsuit who are executives of the Debtor; and (c)

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1019
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 902 of 1017 PageID 8632
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1018 of 1803 PageID 11764
Case 19-12239-CSS Doc 159-1 Filed 11/21/19 Page 3 of 5

the Charitable DAF (the Charitable Donor Advised Fund, L.P.) in a case unrelated to the Debtor

pending before the Southern District of New York, case number 1:19-cv-09857-NRB.

3.       To supplement that prior disclosure, as of the Petition Date, the Firm

specifically represented the Debtor and the following entities related to the Debtor in the following

matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.)*, Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) | Debtor |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.*, Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) | Debtor<br><br>Highland HCF Advisors, Ltd.,<br><br>Highland CLO Management, LLC<br><br>Highland CLO Holdings, Ltd. |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) | Debtor |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) | Debtor |
| *Joshua N. Terry, Individually and on Behalf of IRAs #146771 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al*, Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) | Debtor<br><br>J. Dondero<br><br>T. Surgent |
| *The Charitable Donor Advised Fund, L.P. v. U.S. Bank National Association*, Case No. 1:19-cv-09857-NRB (S.D.N.Y. 2019) | Charitable DAF |

4.       In addition, the Firm represents the following entities related to the Debtor

in a non-public matter: (i) NexPoint Strategic Opportunities Fund, (ii) Highland Global Allocation

Fund, and (iii) Highland Income Fund. The Firm inadvertently failed to disclose this

representation as the representation is limited and involves a non-public matter not related to the

Debtor's bankruptcy.

5.       Additionally, in 2018, the Firm, along with the Pettit Law Firm, retained

Scott Ellington, the Debtor's general counsel, to act as an expert witness in *Robert A. Imel v.*

*Legacy Texas Bank, N.A. and Energy Reserves Group, LLC*, Cause No. DC-16-01372 (134th

Appellee Appx. 01012

Appx. 03875

007820

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1020
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 903 of 1017 PageID 8633
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1019 of 1803 PageID 11765
Case 19-12239-CSS Doc 159-1 Filed 11/21/19 Page 4 of 5

Judicial District Court of Dallas County, Texas). The *Imel* litigation was wholly unrelated to the Debtor and did not involve the Debtor or any entities affiliated or related to the Debtor, James, Dondero, or Mark Okada. Mr. Ellington's retention in the *Imel* litigation was in Mr. Ellington's individual capacity, not in his capacity as the Debtor's general counsel, and was limited to Mr. Ellington preparing a six page expert report and offering his deposition and trial testimony. Mr. Ellington was retained by the Firm and the Pettit Law Firm in the *Imel* litigation. The Firm's retention of Mr. Ellington was not previously disclosed as the Firm was not retained to provide legal services to Mr. Ellington. The *Imel* litigation concluded in 2018.

6.     The Firm, as a matter of practice, does not have an engagement letter with the Debtor or any entities related to the Debtor that it represents. However, as previously disclosed, with respect to all matters, the Debtor has (subject to Court approval) agreed to compensate the Firm on an hourly basis at rates that do not (and will not) exceed the rates that the Firm customarily charges to its other clients for work of this type. As of the Petition Date, the applicable hourly rates for timekeepers for the matters that the Firm is engaged to perform legal services ranged from $365 to $800 for attorneys and $180 to $235 for paraprofessionals. The Firm will also charge the Debtor for certain expenses incurred in connection with providing services to the Debtor, including, without limitation, travel, lodging, vendor charges, delivery services and other expenses incurred in providing professional service, and for other services actually provided, including word processing and other charges, excluding secretarial overtime.

7.     The Firm did not bill the Debtor any amounts prior to the Petition Date in contemplation of the Debtor's bankruptcy filing. Any amounts billed and paid prior to the Petition Date by the Debtor were in connection with the matters set forth above.

DOCS_NY:39835.3 36027/002

Appellee Appx. 01013
Appx. 03678
007821

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 21, 2019

/s/ Michael K. Hurst
_____
Michael K. Hurst, Partner

DOCS_NY:39835.3 36027/002

Appellee Appx. 01014

Appx. 03679

007822

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1022
Case 3:25-cv-02072-S    Document 15-10    Filed 06/06/25    Page 905 of 1017    PageID 8635
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1021 of 1803   PageID 11767

# Exhibit B

**Supplemental O'Neil Declaration**

**Appellee Appx. 01015**

**Appx. 03689**

007823

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1023
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 906 of 1017 PageID 8636
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1022 of 1803 PageID 11768
Case 19-12239-CSS Doc 159-2 Filed 11/21/19 Page 2 of 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | )| |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**SUPPLEMENTAL DECLARATION OF HOLLAND N. O'NEIL IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Holland N. O'Neil, declare under penalty of perjury as follows:

1.    I am a partner with the law firm of Foley Gardere, Foley & Lardner LLP (the "Firm"), and I maintain my office in Dallas, Texas.[2]  I am submitting this supplemental declaration ("Declaration") in further support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[3]

2.    In the *Declaration of Holland N. O'Neil in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date*, dated October 29, 2019 [Docket No. 69-2] (the "Initial Declaration"), I disclosed that the Firm has represented the Debtor and

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] The Firm has offices in Austin, Boston, Chicago, Dallas, Denver, Detroit, Houston, Jacksonville, Los Angeles, Madison, Mexico City, Miami, Milwaukee, New York, Orlando, Sacramento, San Diego, San Francisco, Silicon Valley, Tallahassee, Tampa, Washington, D.C., Brussels and Tokyo.

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

4850-8126-8394.6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1024
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 907 of 1017 PageID 8637
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1023 of 1803 PageID 11769
Case 19-12239-CSS Doc 159-2 Filed 11/21/19 Page 3 of 4

certain other related entities, including Neutra, HCLOF and the Cayman Defendants since April 2018 in the Acis Proceedings.

3. To supplement that prior disclosure, as of the Petition Date, the Firm specifically represents the Debtor and the following entities related to the Debtor in the following matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.)*, Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) | Debtor<br><br>Neutra Limited |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.,* Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) | Debtor<br><br>Highland HCF Advisors, Ltd.,<br><br>Highland CLO Management, LLC<br><br>Highland CLO Holdings, Ltd. |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.)*, Case No. 19-10846 (5th Cir. 2019) | Neutra Limited |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) | Debtor<br><br>Neutra Limited |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) | Debtor |

4. As disclosed in the Firm's engagement letter attached to the Initial Declaration, the Firm initially sought a conflict waiver with respect to HRA Holdings, LLC, when it entered into that engagement letter. At that time, the Debtor was contemplating a potential investment in HRA Holdings, LLC, another Foley client. That investment never occurred, and the Firm does not believe that a conflict ever arose.

5. The Firm previously represented CLO Holdco, Ltd., in matters unrelated to the Debtor's bankruptcy. Since approximately May 2018, the Firm has not represented CLO Holdco, Ltd.

Appellee Appx. 01017
Appx. 03882
007825

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1025
Case 3:25-cv-02072-S    Document 15-10    Filed 06/06/25    Page 908 of 1017    PageID 8638
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1024 of 1803   PageID 11770
Case 19-12239-CSS    Doc 159-2   Filed 11/21/19   Page 4 of 4

6.    The Firm did not bill the Debtor any amounts prior to the Petition Date in contemplation of the Debtor's bankruptcy filing.  Any amounts billed and paid prior to the Petition Date by the Debtor were in connection with the matters set forth above.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 21, 2019

/s/ Holland N. O'Neil
Holland N. O'Neil, Partner

4850-8126-8394.6

**Appellee Appx. 01018**
**Appx. 02883**
007826

# EXHIBIT C

Appellee Appx. 01019

Appx. 007827

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1027
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 910 of 1017 PageID 8640
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1026 of 1803 PageID 11772
Case 19-12239-CSS Doc 159-3 Filed 11/21/19 Page 2 of 6

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF BRADLEY SHARP IN SUPPORT OF DEBTOR'S
APPLICATIONS (I) FOR AN ORDER AUTHORIZING THE RETENTION AND
EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL
TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE, AND (II) FOR AN
ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER
COX & HURST, LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO
TUNC* TO THE PETITION DATE**

I, Bradley Sharp, hereby declare under penalty of perjury:

1.      I am the proposed Chief Restructuring Officer of Highland Capital Management, L.P., the above-captioned debtor and debtor in possession (the "Debtor").

2.      I submit this declaration (the "Declaration") in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Foley Application") and *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst, LLP, as Special Texas Litigation Counsel, Nunc Pro Turn to the Petition Date* (the "Lynn Pinker Application," and together with the Foley Application, the "Applications").[2] Except as otherwise noted, I have personal knowledge of the matters set forth herein.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Applications.

Appellee Appx. 01020
Appx. 03885
007828

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1028
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 911 of 1017 PageID 8641
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1027 of 1803 PageID 11773

3.    This Declaration is being submitted to supplement the (i) *Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner, LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 69-6], and (ii) *Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst, LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 70-5].

4.    Prior to the Petition Date, Foley and/or Lynn Pinker represented the Debtor and certain the Debtor's related entities in the following matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.)*, Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) (the "Acis Bankruptcy") | Debtor (Foley/Lynn Pinker)  Neutra Limited (Foley) |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.*, Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) ("Adversary Proceeding") | Debtor (Foley/Lynn Pinker)  Highland HCF Advisors, Ltd. (Foley/Lynn Pinker)  Highland CLO Management, LLC (Foley/Lynn Pinker)  Highland CLO Holdings, Ltd. (Foley/Lynn Pinker) |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.)*, Case No. 19-10846 (5th Cir. 2019) ("Neutra Appeal") | Neutra (Foley) |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) ("Debtor Appeal") | Debtor (Foley/Lynn Pinker)  Neutra (Foley) |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) ("Winstead Matter") | Debtor (Foley/Lynn Pinker) |
| *Joshua N. Terry, Individually and on Behalf of IRAs #146717 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al*, Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) (the "Terry Litigation") | Debtor (Lynn Pinker)  J. Dondero (Lynn Pinker)  T. Surgent (Lynn Pinker) |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1029
Case 3:25-cv-02072-S Document 15-10 Filed 06/25 Page 912 of 1017 PageID 8642
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1028 of 1803 PageID 11774

Case 19-12239-CSS Doc 159-3 Filed 11/21/19 Page 4 of 6

5.      Prior to the Petition Date, the Debtor paid Foley's and/or Lynn Pinker's legal fees and expenses with respect to the Debtor and all the Debtor's related entities in the foregoing matters.

6.      On advice of counsel, I understand that all matters except for the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter are stayed and will remain stayed during the pendency of the Debtor's case.

7.      I believe that it is in the best interests of its estate to continue paying the legal fees incurred by the Debtor's related entities in the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter during the pendency of this bankruptcy case for the following reasons:

8.      <u>Neutra Appeal</u>:  The economic interests in Neutra are owned, indirectly, 25% by Mr. Okada and 75% by Mr. Dondero.  As a special purpose entity, Neutra, however, has no assets, and had no assets prior to the Acis Bankruptcy except for its interests in Acis. Although the Debtor is not a direct appellant in the Neutra Appeal, if Neutra is successful in the Neutra Appeal, I believe that Neutra will regain its interests in Acis and that Neutra intends to cause certain services and advisory agreements to revert back to the Debtor.  The Debtor then would be in a position to earn revenue from those agreements, as it did prior to the filing of the involuntary bankruptcy petitions against Acis LP and Acis GP and prior to its contracts being terminated in the Acis Bankruptcy.  By way of example, in the one year period prior to the filing of the involuntary petitions, Acis LP compensated the Debtor more than $12 million for its services.

9.      If the Neutra Appeal is successful, I believe that Neutra will regain its interest in Acis and Acis will also be required to pay the Debtor (i) approximately 85% of its

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1030
Case 3:25-cv-02072-S Document 15-10 Filed 06/25 Page 913 of 1017 PageID 8643
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1029 of 1803 PageID 11775
Case 19-12239-CSS Doc 159-3 Filed 11/21/19 Page 5 of 6

revenue for services provided under the services agreements and (ii) for its claims against Acis
for pre- and postpetition services rendered, which are currently in excess of $8 million. As such,
it is estimated that Acis would owe approximately four years of revenue to the Debtor, including
payment of services and pay down of the $8 million previously accrued and unpaid. For that
reason, I also believe that Mr. Dondero and Mr. Okada, as the holders of the economic interests
in Neutra, will likely not see a return on their equity for some time.

10. For the foregoing reasons, I believe paying Neutra's fees in the Neutra
Appeal, the Acis Bankruptcy, and the Debtor Appeal makes economic sense for the Debtor, but
does not make sense for Mr. Dondero, Mr. Okada, or any other party as they would not see a
return on that investment for a significant amount of time.

11. <u>Acis Bankruptcy and Debtor Appeal</u>: In addition to paying the Debtor's
legal fees and expenses, the Debtor historically paid Foley's fees for Neutra, a non-Debtor, in the
Acis Bankruptcy and the Debtor Appeal as, discussed above, Neutra's economic interests are
owned, indirectly, 25% by Mark Okada and 75% by James Dondero. As a special purpose
entity, Neutra has no assets.

12. <u>Winstead Matter</u>: The Debtor is the only party to the Winstead Matter,
and the Debtor intends to continue paying Lynn Pinker's and Foley's fees for the Debtor subject
to this Court's approval.

13. Prior to the Petition Date, the majority of Foley's and Lynn Pinker's fees
and expenses were paid by a non-Debtor entity, Highland CLO Funding, Ltd. ("HCLOF").[3] The
Debtor owns less than 1% of the economic interest in HCLOF. As part of HCLOF's agreement
with the Debtor, HCLOF indemnifies the Debtor if the Debtor incurs any legal fees on HCLOF's

---

[3] HCLOF is represented by the law firm, King & Spalding, and is not represented by Foley or Lynn Pinker. HCLOF
pays King & Spalding's fees and expenses directly.

behalf.  Pursuant to that indemnification, HCLOF, prior to the Petition Date, either paid directly

or reimbursed the Debtor for the majority of Foley's and Lynn Pinker's fees and expenses

incurred in the matters set forth above.  I understand, based on the advice of counsel, that a

substantial portion of Foley's and Lynn Pinker's fees and expenses may continue to be

reimbursed by HCLOF following the Petition Date but that the exact amount of such

reimbursement is not yet known.

14.    Although the Debtor has paid certain of Lynn Pinker's and Foley's

invoices for the services it provided in the matters set forth above, all prepetition payments to

such firms were made in connection with the matters set forth above and not in contemplation of

the Debtor's bankruptcy filing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and belief.

Dated:    November 21, 2019

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ Bradley Sharp
Bradley Sharp
Proposed Chief Restructuring Officer

# EXHIBIT D

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1033
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 916 of 1017 PageID 8646
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1032 of 1803 PageID 11778
Case 18-30264-sgj11 Doc 27 Filed 09/01/18 Filed Dec 15 2000 Main Document Page 2 of 54 Page 1 of 3

Fill in this information to identify the case:

Debtor 1    Acis Capital Management, L.P.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Northern District of Texas

Case number   18-30264-sgj11

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Highland Capital Management, L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Holland O'Neil, Foley Gardere, Foley & Lardner
Name

2021 McKinney Ave, Suite 1600
Number    Street

Dallas            TX        75201
City              State     ZIP Code

Contact phone  214-999-3000

Contact email  honeil@foley.com

Where should payments to the creditor be sent? (if different)

Scott Ellington, Highland Capital Management
Name

300 Crescent Court, Suite 700
Number    Street

Dallas            TX        75201
City              State     ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one) _____

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410                                   Proof of Claim                                          page 1

Appellee Appx. 01026
Appx. 02391
007834

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**    $ _____ 4,672,140.38 . Does this amount include interest or other charges?

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Sub-Advisory Services and Shared Services

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                    $ _____
Amount of the claim that is secured:    $ _____
Amount of the claim that is unsecured: $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $ _____

Annual Interest Rate (when case was filed) _____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition.    $ _____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Appellee Appx. 01027

Appx. 02892

007835

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1035
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 918 of 1017 PageID 8648
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1034 of 1803 PageID 11780
Case 18-30264-sgj11 Doc 23-37 Filed 08/01/18 Filed 12/19/19 Main Document Page 4 of 54 Page 3 of 3

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ Yes. Check one: | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 3 ) that applies. | $ 2,049,564.35 |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:** **Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   08/01/2018
                    MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

Name      Scott Ellington
          First name          Middle name          Last name

Title     General Counsel

Company   Highland Capital Management, L.P.
          Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   300 Crescent Court, Suite 700
          Number      Street
          Dallas                          TX        75201
          City                            State     ZIP Code

Contact phone                             Email

---

Appellee Appx. 01028
Appx. 02893
007836

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1036
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 919 of 1017 PageID 8649
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1035 of 1803 PageID 11781
Case 18-30264-sgj11 Doc 537 Part 2 Filed 08/01/18 Desc Part 5 Page 1 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

## EXHIBIT A TO PROOF OF CLAIM

1.  <u>Claimant</u>: Highland Capital Management, L.P. ("**Highland**") maintains its

business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. Highland files its proof of claim

(the "**Claim**") pursuant to 11 U.S.C. §§ 105(a), 501, and 502(f) and the Federal Rules of

Bankruptcy Procedure 3002 and 3003. Prior to the Involuntary Petition Date (defined below),

Highland provided sub-advisory and shared services to the Debtors (defined below). Highland

has provided portfolio management and advisory services to the Debtors pursuant to that certain

Third Amended and Restated Sub-Advisory Agreement by and between the Debtors and

Highland dated March 17, 2017 ("**Sub-Advisory Agreement**") (**Exhibit 1**). Specifically,

Highland has acted as an investment manager and has identified, evaluated, and recommended

investments to investment vehicles advised or sub-advised by the Debtors. Highland has also

provided the Debtors with back and middle office services pursuant to that certain Fourth

Amended and Restated Shared Services Agreement by and between the Debtors and Highland

dated March 17, 2017 ("**Shared Services Agreement**") (**Exhibit 2**). Highland has provided the

Debtors with all of the employees and staff necessary to manage the portfolios. Highland

continued to provide the same sub-advisory and shared services to the Debtors throughout the

Gap Period (defined below). To date, Highland continues to provide such services.

2.  <u>Debtors</u>: Acis Capital Management, L.P. and Acis Capital Management, G.P. (the

"**Debtors**"). The Debtors' cases have been consolidated under case number 18-30264 in the

United States Bankruptcy Court for the Northern District of Texas. Highland provides the service

at the following address: 300 Crescent Court, Suite 700, Dallas, Texas 75201.

Appellee Appx. 01029
Appx. 03894
007837

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

    3.    <u>Indebtedness</u>: Because the Debtors were put into bankruptcy involuntarily, the amount included in the proof of claim accounts for pre-petition claims as well as Gap Claims (defined below).

    a.    <u>Pre-Petition</u>: Joshua Terry, the petitioning creditor, filed the involuntary petition on January 30, 2018 (the "**Petition Date**"). As of the Petition Date, the outstanding indebtedness owing from the Debtors to Highland was as set forth below by account number:

| Invoice | Type | Balance |
|---|---|---|
| A1-A7; BVK[1] | Sub-Advisory | $1,605,362.41 |
| A1-A7; BVK | Shared Services | $1,017,213.62 |
| | **Totals** | **$2,622,576.03** |

    b.    <u>Gap Period</u>: When a debtor files bankruptcy, the order for relief is typically entered on the date the petition is filed. However, an involuntary bankruptcy case diverges from the simultaneous entry of an order for relief in that an order for relief is entered at a later date than when a petition is filed. This creates a period of time, referred to as the "gap period", where the debtor may accrue post-petition but pre-order for relief debt. Pursuant to Section 502(f) of the Bankruptcy Code:

> In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section…the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. 502(f).

---

[1] A1-A7 and BVK account for the following vehicles: Acis CLO 2013-1, Ltd.; Acis CLO 2013-2, Ltd.; Acis CLO 2014-3, Ltd.; Acis CLO 2014-4, Ltd.; Acis CLO 2014-5, Ltd.; Acis CLO 2015-6, Ltd.; Acis CLO 2017-7, Ltd.; BayVK R2 Lux S.A., SICAV-FIS.

Appellee Appx. 01030

Appx. 007835

007838

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1038
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 921 of 1017 PageID 8651
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1037 of 1803 PageID 11783
Case 18-30264-sgj11 Doc 637 Part 2-5 Filed 08/01/18 Desc Exhibit A Page 3 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Claims arising during the gap period are entitled to priority treatment under section 507(a)(3). The Court entered the Order for Relief on April 13, 2018 ("**Order for Relief Date**"). Highland continued to provide services to the Debtors from January 30, 2018 to April 13, 2018 ("**Gap Period**"). The outstanding balance owed from the Debtors to Highland for the sub-advisory and shared services during the Gap Period is set forth below (and shall be referred to as the "**Gap Claim**"):

| Account No. | Type | Balance |
|---|---|---|
| A1-A7; BVK | Sub-Advisory | $1,170,147.06 |
| A1-A7; BVK | Shared Services | $879,417.29 |
| | **Totals** | **$2,049,564.35** |

c.    Reservation of Rights as to Administrative Claim: Highland has provided uninterrupted sub-advisory and shared services since the Order for Relief Date. Highland reserves its rights to seek allowance of its administrative claims.

d.    Indemnity Claims: Highland has contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement. According to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement, "the Management Company [Debtors] hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless Covered Person [Highland and its representatives] from…any and all claims, demands, liabilities, costs…suits, proceedings, judgments, assessments, actions…of whatever nature, known or unknown, liquidated, or unliquidated...arising out of the investment or other activities of the Management Company." Highland reserves such contractual indemnification right.

Appellee Appx. 01031

007839

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1039
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 922 of 1017 PageID 8652
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1038 of 1803 PageID 11784
Case 18-30265-sgj11 Claim 37-2 Part 2 Filed 08/01/21 Desc Exhibit A Page 4 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

    4.    <u>Reservation of Rights; Other Rights</u>: The Claims described in this Attachment are legal, binding, enforceable, allowed, and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature, whatsoever; provided, however, the Chapter 11 Trustee alleges that he may offset Highland's Claims and recover from Highland through his current adversary proceeding against Highland (Adversary Proceeding 18-03212). Highland disputes such contention, and believes all Claims sought herein are recoverable despite the Chapter 11 Trustee's allegations. No portion of the Claims or any funds previously paid to Highland are subject to impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, without limitation, Bankruptcy Code § 502) or applicable non-bankruptcy law. Highland expressly reserves the right in the future to assert any and all claims that it may have, including, without limitation, imposition of a constructive trust, equitable lien, security interest, subrogation, marshaling, or other legal or equitable remedies to which it may be entitled. The filing of this proof of claim is not to be construed as an election of remedies. Highland further reserves the rights (a) to amend, modify or supplement this proof of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the purpose of modifying or liquidating the amount of any interest, fees, costs and expenses accrued or incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of Highland set forth herein; (b) file additional proofs of claim; and (c) against third parties.

    5.    <u>Notices</u>: All notices to Highland are to be sent to:

    Highland Capital Management, L.P.
    Attn: David Klos
    300 Crescent Court
    Suite 700
    Dallas, Texas 75201

    *with copies to:*

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1040
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 923 of 1017 PageID 8653
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1039 of 1803 PageID 11785
Case 18-30264-sgj11 Doc 257 Part 2 Filed 08/01/18 Described 4 54 Page 5 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Foley Gardere
Foley & Lardner, LLP
c/o Holland O'Neil
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201

6. <u>Payments</u>: All payments and distributions to Highland with respect to this proof

of claim are to be made as follows:

Highland Capital Management, L.P.
Attn: David Klos
300 Crescent Court
Suite 700
Dallas, Texas 75201
Re: *In re Acis Capital Management, L.P.*

7. <u>Miscellaneous</u>: This proof of claim is filed under compulsion of the bar date

established in this bankruptcy case solely out of an abundance of caution to protect Highland

from forfeiture of its claim within this bankruptcy proceeding. The amounts set forth in this

proof of claim shall not be construed as an admission by Highland as to the amounts due and

owing outside of this bankruptcy proceeding. The filing of this proof of claim is **not:** (a) a

waiver or release of and/or Highland's rights or remedies against any person, entity or property;

(b) a consent by Highland to entry of final judgment by this Court in any core proceeding

commenced in this bankruptcy case, consistent with the United States Supreme Court's holding

in *Stern v. Marshall*, 131 S. Ct. 2594 (2011); (c) a waiver of the right to move to withdraw the

reference or otherwise challenge the jurisdiction of this Court; (d) a waiver of the right to a jury

trial; (e) an election of a remedy which waives or otherwise affects any other remedy; or (f) a

waiver of the right to assert a different or enhanced classification of priority for its Claim in

respect of the other claims asserted in this bankruptcy case.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1041
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 924 of 1017 PageID 8654
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1040 of 1803 PageID 11786

**EXECUTION VERSION**

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

**Appellee Appx. 01034**

**Appx. 03899**

007842

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1042
Case 3:25-cv-02072-S Document 15-10 Filed 06/25 Page 925 of 1017 PageID 8655
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1041 of 1803 PageID 11787
Case 18-30264-sgj11 Doc 3445-8 Filed 08/01/21 Desc Exhibit 11 Page 2 of 21

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Appointment; Limited Scope of Services | 1 |
| 2. | Compensation | 3 |
| 3. | Representations and Warranties | 3 |
| 4. | Standard of Care; Liability; Indemnification | 4 |
| 5. | Limitations on Employment of the Sub-Advisor; Conflicts of Interest | 7 |
| 6. | Termination; Survival | 8 |
| 7. | Cooperation with Management Company | 8 |
| 8. | Management Agreements and Related Agreements | 8 |
| 9. | Amendments; Assignments | 9 |
| 10. | Advisory Restrictions | 9 |
| 11. | Records; Confidentiality | 10 |
| 12. | Notice | 11 |
| 13. | Governing Law | 11 |
| 14. | WAIVER OF JURY TRIAL | 11 |
| 15. | Severability | 11 |
| 16. | No Waiver | 11 |
| 17. | Counterparts | 12 |
| 18. | Third Party Beneficiaries | 12 |
| 19. | No Partnership or Joint Venture | 12 |
| 20. | Entire Agreement | 12 |

Appellee Appx. 01035
Appx. 03009
007843

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1043
Case 3:25-cv-02072-S    Document 15-10    Filed 06/06/25    Page 926 of 1017    PageID 8656
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1042 of 1803   PageID 11788
Case 18-30264-sgj11 Doc 1239-06527 Doc 159-4 Filed 08/01/18/21 Desc Exhibit 121 of 54 Page 3 of 21

**THIRD AMENDED AND RESTATED
SUB-ADVISORY AGREEMENT**

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

**R E C I T A L S**

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1.    Appointment; Limited Scope of Services.

(a)    Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of <u>Section 8</u>, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b) Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i) make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii) place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii) identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv) assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v) provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi) assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii) assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "<u>Services</u>."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company. Furthermore, the

Appellee Appx. 01037

Appx. 03002

007845

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c) The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.  Compensation.

(a) As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto. The "Sub-Advisory Fee" shall be payable in accordance with Appendix A attached hereto, as such appendix may be amended by the Parties from time to time.

(b) Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c) Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d) From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.  Representations and Warranties.

(a) Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i) it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

Appellee Appx. 01038

Appx 03003

007846

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1046
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 929 of 1017 PageID 8659
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1045 of 1803 PageID 11791
Case 18-30264-sgj11 Doc 1229-27 Part 3 Filed 08/01/18 Desc Exhibit 15 Page 6 of 21

(ii)     this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)     no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)     neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)     The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)     The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.     Standard of Care; Liability; Indemnification.

(a)     Sub-Advisor Standard of Care. Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

Appellee Appx. 01039
Appx. 03064
007847

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1047
Case 3:25-cv-02072-S   Document 15-10   Filed 10/06/25   Page 930 of 1017   PageID 8660
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1046 of 1803   PageID 11792
Case 18-30264-sgj11 Doc 3527 Part 3 Filed 08/01/21 Desc Exhibit 16 Page 7 of 21

Related Agreements.  To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)        Exculpation.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Appellee Appx. 01040
Appx. 03005
007848

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1048
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 931 of 1017 PageID 8661
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1047 of 1803 PageID 11793
Case 18-30264-sgj11 Doc 527 Part 3 Filed 08/01/18 Desc Exhibit 17 Page 8 of 21

(c) <u>Indemnification</u>. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d) <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

Appellee Appx. 01041
Appx. 03006
007849

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1049
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 932 of 1017 PageID 8662
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1048 of 1803 PageID 11794
Case 18-30265-sgj11 Doc 527 Part 5 Filed 08/01/21 Desc Exhibit 1 Page 9 of 21

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

(e) <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 4(c)</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

(f) <u>Reliance</u>. A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

(g) <u>Rights Under Management Agreements and Related Agreements</u>. The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to <u>Section 8</u> if such indemnification and exculpation rights are not reasonably acceptable to it.

5. <u>Limitations on Employment of the Sub-Advisor; Conflicts of Interest</u>.

(a) The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b) So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company. The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder. It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

Appellee Appx. 01042
Appx. 03805
007850

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1050
Case 3:25-cv-02072-S    Document 15-10    Filed 06/06/25    Page 933 of 1017    PageID 8663
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1049 of 1803    PageID 11795
Case 18-30264-sgj11 Doc 1593-27 Part 59 Filed 02/01/21 Desc Exhibit 34 Page 10 of
21

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)    The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in <u>Appendix B</u> hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such <u>Appendix B</u>, as amended from time to time with mutual consent of the Parties.

6.    <u>Termination; Survival</u>.

(a)    This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)    This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and <u>Appendix A</u> hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)    All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.    <u>Cooperation with Management Company</u>.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.    <u>Management Agreements and Related Agreements</u>.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

Appellee Appx. 01043
Appx. 03906
007851

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1051
Case 3:25-cv-02072-S  Document 15-10  Filed 06/25  Page 934 of 1017  PageID 8664
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1050 of 1803  PageID 11796
Case 18-30264-sgj11  Doc 659-1  Filed 01/11/19  Page 11 of 21

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9. <u>Amendments; Assignments</u>.

(a)  Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)  Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)  The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10. <u>Advisory Restrictions</u>.  This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof.  It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Appellee Appx. 01044
Appx. 03909
007832

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1052
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 935 of 1017 PageID 8665
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1051 of 1803 PageID 11797
Case 18-30264-sgj11 Doc 663-27 Doc 659 Filed 08/01/18 Desc Exhibit 21 of 54 Page 12 of 21

11. <u>Records; Confidentiality</u>.

(a)   The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)   The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business. Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Appellee Appx. 01045
Appx. 03919
007853

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1053
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 936 of 1017 PageID 8666
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1052 of 1803 PageID 11798
Case 18-30264-sgj11 Doc 1239-6 Filed 01/11/19 Entered 01/11/19 Desc Exhibit 22 of 54 Page 13 of
21

12. <u>Notice</u>. Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

(a) If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b) If to the Sub-Advisor:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

13. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14. <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15. <u>Severability</u>. The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16. <u>No Waiver</u>. The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement. Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Appellee Appx. 01046
Appx. 09384
007854

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1054

Case 3:25-cv-02072-S    Document 15-10    Filed 06/06/25    Page 937 of 1017    PageID 8667

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1053 of 1803   PageID 11799

Case 18-30264-sgj11 Doc 227-8 Filed 08/01/18 Entered 08/01/18 Desc Exhibit Part 359-4 Page 14 of 21

17.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.    <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.    <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.    <u>Entire Agreement</u>.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Appellee Appx. 01047

Appx. 07835

007835

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By: Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title: President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title: President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

### **Appendix A**

The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table. Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder. Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank*]

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Appellee Appx. 01050

Appx. 03315

007858

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1058
Case 3:25-cv-02072-S    Document 15-10    Filed 06/25    Page 941 of 1017    PageID 8671
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1057 of 1803   PageID 11803
Case 18-30264-sgj11 Doc 5527 Part 359 Filed 08/01/21 Desc Exhibit 27 of 54   Page 18 of 21

**APPENDIX B**

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account.  Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise.  Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)     serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)     receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)     be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)     be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e)     sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)     underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

Appellee Appx. 01051
Appx. 03316
007859

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1059
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 942 of 1017    PageID 8672
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1058 of 1803    PageID 11804
Case 18-30264-sgj11 Doc 1827 Part 59 Filed 01/11/21 Desc Exhibit 21 Page 19 of 21

(g)    serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)    act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account. The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions. The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement. As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Appellee Appx. 01052
Appx. 02917
007860

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1060
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 943 of 1017 PageID 8673
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1059 of 1803 PageID 11805
Case 18-30264-sgj11 Doc 823-27 Part 159 Filed 08/01/21 Desc Exhibit 20 of 54 Page 20 of
21

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

Appellee Appx. 01053
Appx. 02918
007861

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Appellee Appx. 01054

Appx. 02919

007862

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1062
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 945 of 1017 PageID 8675
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1061 of 1803 PageID 11807

**EXECUTION VERSION**

# FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT

by and between

## ACIS CAPITAL MANAGEMENT, L.P.

and

## HIGHLAND CAPITAL MANAGEMENT, L.P.

Dated March 17, 2017

Appellee Appx. 01055

Appx. 02929

007863

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1063
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 946 of 1017 PageID 8676
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1062 of 1803 PageID 11808
Case 18-30264-sgj11 Doc 6527 Part 4 Filed 06/11/21 Desc Exhibit 2 Page 2 of 24

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................... 2

    Section 1.01    Certain Defined Terms ............................................ 2

    Section 1.02    Interpretation ...................................................... 3

ARTICLE II SERVICES ...................................................................... 4

    Section 2.01    General Authority. ............................................... 4

    Section 2.02    Provision of Services. ........................................... 4

    Section 2.03    Shared Employees. ............................................... 6

    Section 2.04    Applicable Asset Criteria and Concentrations. ................... 8

    Section 2.05    Compliance with Management Company Policies and Procedures. ...................................................... 8

    Section 2.06    Authority. ......................................................... 8

    Section 2.07    Third Parties. ..................................................... 9

    Section 2.08    Management Company to Cooperate with the Staff and Services Provider. .............................................. 9

    Section 2.09    Power of Attorney. .............................................. 9

ARTICLE III CONSIDERATION AND EXPENSES .................................... 9

    Section 3.01    Consideration ..................................................... 9

    Section 3.02    Costs and Expenses ............................................. 10

    Section 3.03    Deferral .......................................................... 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ............................. 10

    Section 4.01    Representations .................................................. 10

ARTICLE V COVENANTS .................................................................. 10

    Section 5.01    Compliance; Advisory Restrictions. ............................ 10

    Section 5.02    Records; Confidentiality. ........................................ 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION ............................. 12

    Section 6.01    Standard of Care ................................................. 12

    Section 6.02    Exculpation. ...................................................... 12

    Section 6.03    Indemnification by the Management Company. ................. 13

    Section 6.04    Other Sources of Recovery etc ................................. 14

    Section 6.05    Rights of Heirs, Successors and Assigns ...................... 14

    Section 6.06    Reliance .......................................................... 14

**Appellee Appx. 01056**

**007864**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1064

Case 3:25-cv-02072-S    Document 15-10    Filed 06/06/25    Page 947 of 1017    PageID 8677

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1063 of 1803   PageID 11809

Case 18-30264-sgj11 Doc 1239-6 Part 4 Filed 08/01/18    Desc Exhibit 2 of 5 Page 3 of 24

## TABLE OF CONTENTS
(continued)

**Page**

ARTICLE VII TERMINATION ........................................................................... 14

    Section 7.01    Termination........................................................................ 14

ARTICLE VIII MISCELLANEOUS ................................................................... 15

    Section 8.01    Amendments .................................................................. 15

    Section 8.02    Assignment and Delegation. ............................................ 15

    Section 8.03    Non-Recourse; Non-Petition............................................ 15

    Section 8.04    Governing Law. .............................................................. 16

    Section 8.05    WAIVER OF JURY TRIAL.............................................. 17

    Section 8.06    Severability .................................................................... 17

    Section 8.07    No Waiver ...................................................................... 17

    Section 8.08    Counterparts .................................................................. 17

    Section 8.09    Third Party Beneficiaries ................................................ 17

    Section 8.10    No Partnership or Joint Venture ...................................... 17

    Section 8.11    Independent Contractor .................................................. 17

    Section 8.12    Written Disclosure Statement ........................................ 18

    Section 8.13    Headings ........................................................................ 18

    Section 8.14    Entire Agreement .......................................................... 18

    Section 8.15    Notices .......................................................................... 18

Appellee Appx. 01057

Appx. 02922

007865

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1065
Case 3:25-cv-02072-S Document 15-10 Filed 40/06/25 Page 948 of 1017 PageID 8678
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1064 of 1803 PageID 11810

Case 18-30264-sgj11 Doc 37 Part 4 Filed 08/01/18 Desc Page 342 of 54 Page 4 of 24

## FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

# ARTICLE I

## DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Advisers Act" shall have the meaning set forth in the Recitals to this Agreement.

"Advisory Restriction" shall have the meaning set forth in Section 5.01(b).

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble to this Agreement.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"CLO or Account" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

2

Appellee Appx. 01059

Appx. 02924

007867

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1067
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 950 of 1017 PageID 8680
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1066 of 1803 PageID 11812
Case 18-30264-sgj11 Doc 2239-6 Part 4 Filed 08/01/18 Desc Exhibit 5 Page 6 of 24

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.02  Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

Appellee Appx. 01060
Appx. 02925
007868

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1068
Case 3:25-cv-02072-S   Document 15-10   Filed 06/06/25   Page 951 of 1017   PageID 8681
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1067 of 1803   PageID 11813
Case 18-30264-sgj11 Doc 657 Part 4 Filed 08/11/21 Desc Exhibit 2 of 5 Page 7 of 24

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

### SERVICES

Section 2.01   <u>General Authority</u>.   Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.   The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   <u>Provision of Services</u>.   Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)   *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)   *Legal/Compliance/Risk Analysis*.   Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)   *Management of Collateral Obligations and CLOs and Accounts*.   Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)   *Valuation*.   Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

Appellee Appx. 01061
Appx. 02926
007869

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1069
Case 3:25-cv-02072-S Document 15-10 Filed 06/05/25 Page 952 of 1017 PageID 8682
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1068 of 1803 PageID 11814
Case 18-30264-sgj11 Doc 5-27 Part 9 Filed 08/01/21 Desc Exhibit 2 Page 8 of 24

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e) *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f) *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g) *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h) *Administrative Services.* The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i) *Shared Employees.* The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

(j) *Ancillary Services.* Assistance and advice on all things ancillary or incidental to the foregoing; and

(k) *Other.* Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Appellee Appx. 01062
Appx. 03925
007870

Section 2.03    <u>Shared Employees</u>.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

6

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.   To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

Appellee Appx. 01064

Appx. 05929

007872

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1072
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 955 of 1017 PageID 8685
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1071 of 1803 PageID 11817
Case 18-30264-sgj11 Doc 1239-8 Filed 09/01/21 Desc Exhibit 8 Page 11 of
Case 18-30264-sgj11 Doc 1459-9 Filed 11/18/19 Page 11 of 24
24

   (iv) provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

   (v) to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

   (vi) act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

  (k) Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

  Section 2.04 <u>Applicable Asset Criteria and Concentrations</u>. The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with <u>Section 2.2</u> above and any other assistance or advice provided in accordance with this Agreement.

  Section 2.05 <u>Compliance with Management Company Policies and Procedures</u>. The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

  Section 2.06 <u>Authority</u>. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Appellee Appx. 01065
Appx. 03939
007873

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1073
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 956 of 1017 PageID 8686
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1072 of 1803 PageID 11818
Case 18-30264-sgj11 Doc 68-27 Part 459 Filed 02/01/21 Desc Exhibit C Page 12 of 24

Section 2.07   Third Parties.

(a)      The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)      In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   Power of Attorney.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).   Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01   Consideration.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.  The "Staff and Services Fee" shall be payable in accordance with Appendix A attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

Appellee Appx. 01066
Appx. 03931
007874

Section 3.03 <u>Costs and Expenses</u>. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04 <u>Deferral</u>. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01 <u>Representations</u>. Each of the Parties hereto represents and warrants that:

(a) It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b) this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c) no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d) neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01 <u>Compliance; Advisory Restrictions</u>.

(a) The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

Appellee Appx. 01067

Appx 03932

007875

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1075
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 958 of 1017 PageID 8688
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1074 of 1803 PageID 11820
Case 18-30264-sgj11 2239 CL85-27 Doc 459-Filed 02/01/121/19 Desc Exhibit 2f 54 Page 14 of
24

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)     This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02     Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

Appellee Appx. 01068
Appx. 05928
007876

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1076
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 959 of 1017 PageID 8689
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1075 of 1803 PageID 11821
Case 18-30264-sgj11 Doc 1239-6 Part 459 Filed 02/01/21 Desc Exhibit 2 Page 15 of 24

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01 <u>Standard of Care</u>. Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02 <u>Exculpation</u>. To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "<u>Disabling Conduct</u>") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages. To

Appellee Appx. 01069
Appx. 03934
007877

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1077
Case 3:25-cv-02072-S  Document 15-10  Filed 06/06/25  Page 960 of 1017  PageID 8690
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1076 of 1803  PageID 11822
Case 18-30264-sgj11 Doc 659  Filed 01/11/19  Desc Page 16 of 54  Page 16 of
24

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03  Indemnification by the Management Company.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

Appellee Appx. 01070
Appx. 03935
007878

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04   Other Sources of Recovery etc.  The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; provided that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05   Rights of Heirs, Successors and Assigns.  The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   Reliance.  A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   Termination.  Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

Appellee Appx. 01071

Appx. 05926

007879

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01    Amendments.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    Assignment and Delegation.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 8.02, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this Section 8.02, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of Section 8.02(a) other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    Non-Recourse; Non-Petition.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

15

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)     Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)     The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)     The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04     Governing Law.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)     The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

16

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1081
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 964 of 1017 PageID 8694
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1080 of 1803 PageID 11826
Case 18-30264-sgj11 Doc 227 Part 4-9 Filed 02/01/21 Desc Exhibit Page 20 of 24

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   WAIVER OF JURY TRIAL.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.   EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   Severability.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.   Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   No Waiver.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties.   Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party.   Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   Counterparts.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument.   This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09   Third Party Beneficiaries.   This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   No Partnership or Joint Venture.   Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.   Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   Independent Contractor.   Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Appellee Appx. 01074

Appx. 03939

007882

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1082
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 965 of 1017 PageID 8695
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1081 of 1803 PageID 11827
Case 18-30264-sgj11 Doc 6827 Part 459 Filed 08/01/18 Desc Exhibit 2-4 Page 21 of 24

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    Written Disclosure Statement.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    Headings.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    Notices.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)    If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)    If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

Appellee Appx. 01075
Appx. 03949
007883

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1083
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 966 of 1017    PageID 8696
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1082 of 1803   PageID 11828
Case 18-30264-sgj11 Doc 1230 Class 27 Part 59-4 Filed 09/01/11/19 Desc Exhibit 2 of 54 Page 22 of 24

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:   President

**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

Appellee Appx. 01076

007884

Case 18-30264-sgj11 Doc 1239 Class 27 Part 459-4 Filed 09/01/18 1 Desc Exhibit 2 Page 23 of 54 Page 23 of 24

## **Appendix A**

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table. Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder. Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

*[Remainder of Page Intentionally Left Blank.]*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1085
Case 3:25-cv-02072-S    Document 15-10    Filed 06/06/25    Page 968 of 1017    PageID 8698
Case 3:21-cv-00879-K  Document 21   Filed 07/28/21    Page 1084 of 1803   PageID 11830

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Case 19-12239-CSS    Doc 159-5    Filed 11/21/19    Page 1 of 54

# EXHIBIT E

**Appellee Appx. 01079**

**Appx. 03941**

007887

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1087
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 970 of 1017 PageID 8700
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1086 of 1803 PageID 11832
Case 18-30265-sgj11 Doc 239-1 Filed 09/01/18 Filed 12/18/2 Main Document Page 2 of 54 Page 1 of 3

**Fill in this information to identify the case:**

Debtor 1   Acis Capital Management, G.P.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Northern District of Texas

Case number   18-30265-sgj11

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Highland Capital Management, L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Holland O'Neil, Foley Gardere, Foley & Lardner
Name

2021 McKinney Ave, Suite 1600
Number     Street

Dallas          TX          75201
City            State       ZIP Code

Contact phone  214-999-3000

Contact email  honeil@foley.com

**Where should payments to the creditor be sent?** (if different)

Scott Ellington, Highland Capital Management
Name

300 Crescent Court, Suite 700
Number     Street

Dallas          TX          75201
City            State       ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410                 Proof of Claim                 page 1

Appellee Appx. 01080
Appx. 03945
007888

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1088
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 971 of 1017 PageID 8701
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1087 of 1803 PageID 11833
Case 18-30264-sgj11 Doc 1-1 Filed 09/01/18 Filed 12/12/18 Main Document Page 2 of 54 Page 2 of 3

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

6. Do you have any number you use to identify the debtor?

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. How much is the claim? $ 4,672,140.38 Does this amount include interest or other charges?

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. What is the basis of the claim?

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Sub-Advisory Services and Shared Services

9. Is all or part of the claim secured?

☑ No
☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ _____
Amount of the claim that is secured: $ _____

Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $ _____

Annual Interest Rate (when case was filed) _____ %
☐ Fixed
☐ Variable

10. Is this claim based on a lease?

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____

11. Is this claim subject to a right of setoff?

☑ No
☐ Yes. Identify the property: _____

Official Form 410 Proof of Claim page 2

Appellee Appx. 01081
Appx. 03946
007889

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| | ☑ Yes. *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(_3_) that applies. | $ 2,049,564.35 |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  08/01/2018
            MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Scott Ellington | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | General Counsel | | |
| Company | Highland Capital Management, L.P. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 300 Crescent Court, Suite 700 | | |
| | Number  Street | | |
| | Dallas | TX | 75201 |
| | City | State | ZIP Code |
| Contact phone | | Email | |

Appellee Appx. 01082

Appx. 003067

007890

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

## EXHIBIT A TO PROOF OF CLAIM

1.    <u>Claimant</u>: Highland Capital Management, L.P. ("**Highland**") maintains its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. Highland files its proof of claim (the "**Claim**") pursuant to 11 U.S.C. §§ 105(a), 501, and 502(f) and the Federal Rules of Bankruptcy Procedure 3002 and 3003. Prior to the Involuntary Petition Date (defined below), Highland provided sub-advisory and shared services to the Debtors (defined below). Highland has provided portfolio management and advisory services to the Debtors pursuant to that certain Third Amended and Restated Sub-Advisory Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Sub-Advisory Agreement**") (**Exhibit 1**). Specifically, Highland has acted as an investment manager and has identified, evaluated, and recommended investments to investment vehicles advised or sub-advised by the Debtors. Highland has also provided the Debtors with back and middle office services pursuant to that certain Fourth Amended and Restated Shared Services Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Shared Services Agreement**") (**Exhibit 2**). Highland has provided the Debtors with all of the employees and staff necessary to manage the portfolios. Highland continued to provide the same sub-advisory and shared services to the Debtors throughout the Gap Period (defined below). To date, Highland continues to provide such services.

2.    <u>Debtors</u>: Acis Capital Management, L.P. and Acis Capital Management, G.P. (the "**Debtors**"). The Debtors' cases have been consolidated under case number 18-30264 in the United States Bankruptcy Court for the Northern District of Texas. Highland provides the service at the following address: 300 Crescent Court, Suite 700, Dallas, Texas 75201.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Appellee Appx. 01083

Appx. 07946

007891

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1091
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 974 of 1017 PageID 8704
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1090 of 1803 PageID 11836
Case 18-30265-sgj11 Doc 1239-6 Part 2 Filed 08/01/21 Desc Exhibit A Page 2 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

3.   Indebtedness: Because the Debtors were put into bankruptcy involuntarily, the amount included in the proof of claim accounts for pre-petition claims as well as Gap Claims (defined below).

a.   Pre-Petition: Joshua Terry, the petitioning creditor, filed the involuntary petition on January 30, 2018 (the "**Petition Date**"). As of the Petition Date, the outstanding indebtedness owing from the Debtors to Highland was as set forth below by account number:

| Invoice | Type | Balance |
|---------|------|---------|
| A1-A7; BVK[1] | Sub-Advisory | $1,605,362.41 |
| A1-A7; BVK | Shared Services | $1,017,213.62 |
| | **Totals** | **$2,622,576.03** |

b.   Gap Period: When a debtor files bankruptcy, the order for relief is typically entered on the date the petition is filed. However, an involuntary bankruptcy case diverges from the simultaneous entry of an order for relief in that an order for relief is entered at a later date than when a petition is filed. This creates a period of time, referred to as the "gap period", where the debtor may accrue post-petition but pre-order for relief debt. Pursuant to Section 502(f) of the Bankruptcy Code:

> In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section…the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. 502(f).

---

[1] A1-A7 and BVK account for the following vehicles: Acis CLO 2013-1, Ltd.; Acis CLO 2013-2, Ltd.; Acis CLO 2014-3, Ltd.; Acis CLO 2014-4, Ltd.; Acis CLO 2014-5, Ltd.; Acis CLO 2015-6, Ltd.; Acis CLO 2017-7, Ltd.; BayVK R2 Lux S.A., SICAV-FIS.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Appellee Appx. 01084
Appx. 02949
007892

*In re Acis Capital Management, L.P.- Case No. 18-30264*
*In re Acis Capital Management, G.P.- Case No. 18-30265*
**United States Bankruptcy Court for the Northern District of Texas**

Claims arising during the gap period are entitled to priority treatment under section 507(a)(3). The Court entered the Order for Relief on April 13, 2018 ("**Order for Relief Date**"). Highland continued to provide services to the Debtors from January 30, 2018 to April 13, 2018 ("**Gap Period**"). The outstanding balance owed from the Debtors to Highland for the sub-advisory and shared services during the Gap Period is set forth below (and shall be referred to as the "**Gap Claim**"):

| Account No. | Type | Balance |
|---|---|---|
| A1-A7; BVK | Sub-Advisory | $1,170,147.06 |
| A1-A7; BVK | Shared Services | $879,417.29 |
| | **Totals** | **$2,049,564.35** |

c.     Reservation of Rights as to Administrative Claim: Highland has provided uninterrupted sub-advisory and shared services since the Order for Relief Date. Highland reserves its rights to seek allowance of its administrative claims.

d.     Indemnity Claims: Highland has contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement.  According to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement,  "the Management Company [Debtors] hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless Covered Person [Highland and its representatives] from…any and all claims, demands, liabilities, costs…suits, proceedings, judgments, assessments, actions…of whatever nature, known or unknown, liquidated, or unliquidated...arising out of the investment or other activities of the Management Company." Highland reserves such contractual indemnification right.

**EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND**
4820-3752-6894.1

**Appellee Appx. 01085**

**Appx. 02959**

**007893**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1093
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 976 of 1017 PageID 8706
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1092 of 1803 PageID 11838
Case 18-30265-sgj11 Doc 153 Part 2 Filed 08/01/21 Desc Exhibit A Page 4 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

4.      Reservation of Rights; Other Rights: The Claims described in this Attachment are legal, binding, enforceable, allowed, and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature, whatsoever; provided, however, the Chapter 11 Trustee alleges that he may offset Highland's Claims and recover from Highland through his current adversary proceeding against Highland (Adversary Proceeding 18-03212). Highland disputes such contention, and believes all Claims sought herein are recoverable despite the Chapter 11 Trustee's allegations. No portion of the Claims or any funds previously paid to Highland are subject to impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, without limitation, Bankruptcy Code § 502) or applicable non-bankruptcy law. Highland expressly reserves the right in the future to assert any and all claims that it may have, including, without limitation, imposition of a constructive trust, equitable lien, security interest, subrogation, marshaling, or other legal or equitable remedies to which it may be entitled. The filing of this proof of claim is not to be construed as an election of remedies. Highland further reserves the rights (a) to amend, modify or supplement this proof of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the purpose of modifying or liquidating the amount of any interest, fees, costs and expenses accrued or incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of Highland set forth herein; (b) file additional proofs of claim; and (c) against third parties.

5.      Notices: All notices to Highland are to be sent to:

Highland Capital Management, L.P.
Attn: David Klos
300 Crescent Court
Suite 700
Dallas, Texas 75201

*with copies to:*

Appellee Appx. 01086
Appx. 02951
007894

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1094
Case 3:25-cv-02072-S Document 15-10 Filed 06/25 Page 977 of 1017 PageID 8707
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1093 of 1803 PageID 11839
Case 18-30265-sgj11 Doc 153 Part 2 Filed 08/01/18 Desc Exhibit A 54 Page 5 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Foley Gardere
Foley & Lardner, LLP
c/o Holland O'Neil
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201

6. <u>Payments</u>: All payments and distributions to Highland with respect to this proof

of claim are to be made as follows:

Highland Capital Management, L.P.
Attn: David Klos
300 Crescent Court
Suite 700
Dallas, Texas 75201
Re: *In re Acis Capital Management, L.P.*

7. <u>Miscellaneous</u>: This proof of claim is filed under compulsion of the bar date

established in this bankruptcy case solely out of an abundance of caution to protect Highland

from forfeiture of its claim within this bankruptcy proceeding. The amounts set forth in this

proof of claim shall not be construed as an admission by Highland as to the amounts due and

owing outside of this bankruptcy proceeding. The filing of this proof of claim is **not:** (a) a

waiver or release of and/or Highland's rights or remedies against any person, entity or property;

(b) a consent by Highland to entry of final judgment by this Court in any core proceeding

commenced in this bankruptcy case, consistent with the United States Supreme Court's holding

in *Stern v. Marshall*, 131 S. Ct. 2594 (2011); (c) a waiver of the right to move to withdraw the

reference or otherwise challenge the jurisdiction of this Court; (d) a waiver of the right to a jury

trial; (e) an election of a remedy which waives or otherwise affects any other remedy; or (f) a

waiver of the right to assert a different or enhanced classification of priority for its Claim in

respect of the other claims asserted in this bankruptcy case.

PAGE 5 OF 5

Appellee Appx. 01087

Appx. 02952

007895

**EXECUTION VERSION**

# THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT

by and between

## ACIS CAPITAL MANAGEMENT, L.P.

and

## HIGHLAND CAPITAL MANAGEMENT, L.P.

Dated March 17, 2017

**Appellee Appx. 01088**

**Appx. 02953**

**007896**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1096
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 979 of 1017    PageID 8709
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1095 of 1803    PageID 11841
Case 18-30264-sgj11 Doc 1359-3 Filed 08/01/18 Desc Exhibit 11 Page 2 of 21

## TABLE OF CONTENTS

Page

1. Appointment; Limited Scope of Services ........................................................................ 1
2. Compensation ............................................................................................................... 3
3. Representations and Warranties..................................................................................... 3
4. Standard of Care; Liability; Indemnification. ................................................................. 4
5. Limitations on Employment of the Sub-Advisor; Conflicts of Interest. ......................... 7
6. Termination; Survival .................................................................................................... 8
7. Cooperation with Management Company ....................................................................... 8
8. Management Agreements and Related Agreements ........................................................ 8
9. Amendments; Assignments ........................................................................................... 9
10. Advisory Restrictions..................................................................................................... 9
11. Records; Confidentiality. ............................................................................................. 10
12. Notice .......................................................................................................................... 11
13. Governing Law ............................................................................................................ 11
14. WAIVER OF JURY TRIAL ......................................................................................... 11
15. Severability .................................................................................................................. 11
16. No Waiver .................................................................................................................... 11
17. Counterparts ................................................................................................................ 12
18. Third Party Beneficiaries ............................................................................................. 12
19. No Partnership or Joint Venture ................................................................................... 12
20. Entire Agreement ........................................................................................................ 12

Appellee Appx. 01089

007897

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1097
Case 3:25-cv-02072-S   Document 15-10   Filed 06/06/25   Page 980 of 1017   PageID 8710
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1096 of 1803   PageID 11842
Case 18-30264-sgj11 Doc 1239-6 3 Doc 159-5 Filed 08/01/18/21/Desc Exhibit 21 of 54 Page 3 of 21

**THIRD AMENDED AND RESTATED**
**SUB-ADVISORY AGREEMENT**

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

**R E C I T A L S**

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1. Appointment; Limited Scope of Services.

(a) Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1098
Case 3:25-cv-02072-S Document 15-10 Filed 04/06/25 Page 981 of 1017 PageID 8711
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1097 of 1803 PageID 11843
Case 18-30261-sgj11 Doc 513 Part 3-5 Filed 08/01/21 Desc Exhibit 13 of 54 Page 4 of 21

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of <u>Section 8</u>, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)    Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)    make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii)    place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)    identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)    assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v)    provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi)    assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)    assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "<u>Services</u>."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company.  Furthermore, the

Appellee Appx. 01091
Appx. 02956
007899

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1099
Case 3:25-cv-02072-S Document 15-10 Filed 04/06/25 Page 982 of 1017 PageID 8712
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1098 of 1803 PageID 11844
Case 18-30264-sgj11 Doc 613 Part 3 Filed 08/01/18 Desc Exhibit 4 Page 5 of 21

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     <u>Compensation</u>.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto. The "<u>Sub-Advisory Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     <u>Representations and Warranties</u>.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

Appellee Appx. 01092
Appx. 02957
007900

(ii)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)    no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)    The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)    The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission.  The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.    Standard of Care; Liability; Indemnification.

(a)    Sub-Advisor Standard of Care.  Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1101
Case 3:25-cv-02072-S   Document 15-10   Filed 06/06/25   Page 984 of 1017   PageID 8714
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1100 of 1803   PageID 11846
Case 18-30262-sgj11 Doc 1633 Part 3 Filed 08/01/21 Desc Exhibit 61 of 5 Page 7 of 21

Related Agreements.  To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)          Exculpation.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Appellee Appx. 01094
Appx. 07959
007902

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1102
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 985 of 1017 PageID 8715
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1101 of 1803 PageID 11847
Case 18-30265-sgj11 Doc 513 Part 3 Filed 08/01/18 Desc Exhibit 17 Page 8 of 21

(c) <u>Indemnification</u>. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d) <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

Appellee Appx. 01095
Appx. 07909
007903

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1103
Case 3:25-cv-02072-S Document 15-10 Filed 06/25 Page 986 of 1017 PageID 8716
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1102 of 1803 PageID 11848
Case 18-30263-sgj11 Doc 513 Part 3-9 Filed 08/01/21 Desc Exhibit 8 Page 9 of 21

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

(e) Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 4(c) shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

(f) Reliance. A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

(g) Rights Under Management Agreements and Related Agreements. The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to Section 8 if such indemnification and exculpation rights are not reasonably acceptable to it.

5. Limitations on Employment of the Sub-Advisor; Conflicts of Interest.

(a) The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b) So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company. The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder. It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

Appellee Appx. 01096

007904

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)     The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in Appendix B hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such Appendix B, as amended from time to time with mutual consent of the Parties.

6.     Termination; Survival.

(a)     This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)     This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and Appendix A hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)     All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.     Cooperation with Management Company.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.     Management Agreements and Related Agreements.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

8

Appellee Appx. 01097

Appx. 07905

007905

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9. <u>Amendments; Assignments</u>.

(a)     Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)     Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)     The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10.     <u>Advisory Restrictions</u>. This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof. It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Appellee Appx. 01098

Appx. 007906

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1106
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 989 of 1017 PageID 8719
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1105 of 1803 PageID 11851
Case 18-30265-sgj11 Case 3:68-S13 Doc 159 Filed 08/01/21/19 Desc Exhibit 1 of 54 Page 12 of 21

11.  <u>Records; Confidentiality</u>.

(a)  The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)  The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Appellee Appx. 01099
Appx. 02964
007907

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1107
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 990 of 1017 PageID 8720
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1106 of 1803 PageID 11852
Case 18-30265-sgj11 Doc 13 Part 159 Filed 08/01/18 Desc Exhibit D Page 13 of 21

12.   Notice.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

(a)   If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)   If to the Sub-Advisor:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

13.   Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.   WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.   Severability.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.   No Waiver.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Appellee Appx. 01100
Appx. 02905
007908

17.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.     <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.     <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.     <u>Entire Agreement</u>.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Appellee Appx. 01101

Appx. 02905

007909

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:   President

**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 18-30265-sgj11 230-6 GSS13 Doc 359-5 Filed 08/01/18 1 Desc Exhibit 1 of 54 Page 16 of 21

## <u>Appendix A</u>

The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank*]

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

2

## APPENDIX B

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account. Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise. Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)    serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)    receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)    be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)    be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e)    sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)    underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

Appellee Appx. 01105

Appx. 03979

007913

(g)   serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)   act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account. The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions. The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement. As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Appellee Appx. 01106

Appx. 07974
007974

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1114
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 997 of 1017 PageID 8727
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1113 of 1803 PageID 11859
Case 18-30264-sgj11 Doc 683-13 Part 159 Filed 01/11/19 Desc Exhibit 20 Page 20 of 21

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

Appellee Appx. 01107

Appx. 03072
007915

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1115
Case 3:25-cv-02072-S Document 15-10 Filed 10/06/25 Page 998 of 1017 PageID 8728
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1114 of 1803 PageID 11860
Case 18-30265-sgj11 Doc 1223-6 SS13 Part 59-5 Filed 08/01/18/19 Desc Exhibit 30 of 54 Page 21 of
21

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Appellee Appx. 01108
Appx. 03073
007916

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1116
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 999 of 1017    PageID 8729
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1115 of 1803    PageID 11861

Case 18-30265-sgj11 Doc 33-13 Part 4 Filed 08/01/18 Desc Exhibit 2 Page 1 of 24

**EXECUTION VERSION**

**FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

**Appellee Appx. 01109**

**Appx 03074**

007917

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1117
Case 3:25-cv-02072-S    Document 15-10    Filed 04/06/25    Page 1000 of 1017    PageID 8730
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1116 of 1803   PageID 11862
Case 18-30265-sgj11 Doc 653 Part 459 Filed 06/01/18 Description Page 2 of 24

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................ 2

    Section 1.01     Certain Defined Terms ............................................... 2

    Section 1.02     Interpretation ............................................................. 3

ARTICLE II SERVICES .................................................................................... 4

    Section 2.01     General Authority. ..................................................... 4

    Section 2.02     Provision of Services. ............................................... 4

    Section 2.03     Shared Employees. .................................................... 6

    Section 2.04     Applicable Asset Criteria and Concentrations. ........ 8

    Section 2.05     Compliance with Management Company Policies and
                       Procedures. ................................................................ 8

    Section 2.06     Authority. .................................................................. 8

    Section 2.07     Third Parties. ............................................................ 9

    Section 2.08     Management Company to Cooperate with the Staff and
                       Services Provider. ..................................................... 9

    Section 2.09     Power of Attorney. .................................................... 9

ARTICLE III CONSIDERATION AND EXPENSES ................................................. 9

    Section 3.01     Consideration ............................................................ 9

    Section 3.02     Costs and Expenses .................................................. 10

    Section 3.03     Deferral ..................................................................... 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ......................................... 10

    Section 4.01     Representations ......................................................... 10

ARTICLE V COVENANTS................................................................................. 10

    Section 5.01     Compliance; Advisory Restrictions. ........................ 10

    Section 5.02     Records; Confidentiality. ......................................... 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION ...................................... 12

    Section 6.01     Standard of Care ...................................................... 12

    Section 6.02     Exculpation. .............................................................. 12

    Section 6.03     Indemnification by the Management Company........... 13

    Section 6.04     Other Sources of Recovery etc ................................ 14

    Section 6.05     Rights of Heirs, Successors and Assigns .................. 14

    Section 6.06     Reliance. .................................................................... 14

i

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1118

Case 3:25-cv-02072-S Document 15-10 Filed 04/06/25 Page 1001 of 1017 PageID 8731

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1117 of 1803 PageID 11863

Case 18-30265-sgj11 Doc 1239-6 S3 Part 4 Filed 06/01/21 Desc Exhibit 2 of 5 Page 3 of 24

## TABLE OF CONTENTS
(continued)

Page

ARTICLE VII TERMINATION ........................................................................ 14

    Section 7.01    Termination........................................................................ 14

ARTICLE VIII MISCELLANEOUS ............................................................... 15

    Section 8.01    Amendments ................................................................. 15

    Section 8.02    Assignment and Delegation. .......................................... 15

    Section 8.03    Non-Recourse; Non-Petition.......................................... 15

    Section 8.04    Governing Law. ............................................................. 16

    Section 8.05    WAIVER OF JURY TRIAL............................................ 17

    Section 8.06    Severability ................................................................... 17

    Section 8.07    No Waiver .................................................................... 17

    Section 8.08    Counterparts ................................................................. 17

    Section 8.09    Third Party Beneficiaries ............................................... 17

    Section 8.10    No Partnership or Joint Venture ..................................... 17

    Section 8.11    Independent Contractor .................................................. 17

    Section 8.12    Written Disclosure Statement ........................................ 18

    Section 8.13    Headings ...................................................................... 18

    Section 8.14    Entire Agreement .......................................................... 18

    Section 8.15    Notices ........................................................................ 18

Appellee Appx. 01111

007919

## FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1120
Case 3:25-cv-02072-S Document 15-10 Filed 04/06/25 Page 1003 of 1017 PageID 8733
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1119 of 1803 PageID 11865
Case 18-30264-sgj11 Doc 513 Part 4 Filed 08/11/21 Desc Exhibit 2 Page 5 of 24

## ARTICLE I

## DEFINITIONS

Section 1.01  Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Advisers Act" shall have the meaning set forth in the Recitals to this Agreement.

"Advisory Restriction" shall have the meaning set forth in Section 5.01(b).

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble to this Agreement.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"CLO or Account" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

Appellee Appx. 01113
Appx. 03978
007921

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1121
Case 3:25-cv-02072-S Document 15-10 Filed 04/06/25 Page 1004 of 1017 PageID 8734
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1120 of 1803 PageID 11866
Case 18-30264-sgj11 Doc 513 Part 4 Filed 08/01/18 Desc Exhibit Page 6 of 24

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.02    Interpretation.   The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

Appellee Appx. 01114
Appx. 02979
007922

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1122
Case 3:25-cv-02072-S Document 15-10 Filed 04/06/25 Page 1005 of 1017 PageID 8735
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1121 of 1803 PageID 11867
Case 18-30264-sgj11 Doc 1223-6 S13 Part 4 Filed 08/01/21 Desc Exhibit 2 of 5 Page 7 of 24

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

### SERVICES

Section 2.01   General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.  Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)     *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)     *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)     *Management of Collateral Obligations and CLOs and Accounts*.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)     *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

Appellee Appx. 01115
Appx. 02989
007923

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e) *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f) *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g) *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h) *Administrative Services.* The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i) *Shared Employees.* The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

(j) *Ancillary Services.* Assistance and advice on all things ancillary or incidental to the foregoing; and

(k) *Other.* Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Appellee Appx. 01116

Appx. 02984

007924

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1124
Case 3:25-cv-02072-S    Document 15-10    Filed 04/06/25    Page 1007 of 1017    PageID 8737
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1123 of 1803    PageID 11869
Case 18-30264-sgj11 Doc 3453-6 Doc 459 Filed 08/01/11 21/De sc Exhibit 392 of 5 Page 9 of 24

Section 2.03    <u>Shared Employees</u>.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1125
Case 3:25-cv-02072-S    Document 15-10    Filed 04/06/25    Page 1008 of 1017    PageID 8738
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1124 of 1803    PageID 11870
Case 18-30265-sgj11 Doc 13 Part 59-5 Filed 08/01/18 Desc Exhibit 2 Page 10 of 24

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)    Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)    The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)    The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.   To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)    The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)    The Staff and Services Provider shall require that each Shared Employee:

(i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

Appellee Appx. 01118
Appx. 03983
007926

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)     to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04   <u>Applicable Asset Criteria and Concentrations</u>.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with <u>Section 2.2</u> above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05   <u>Compliance with Management Company Policies and Procedures</u>.  The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   <u>Authority</u>.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Appellee Appx. 01119

Appx. 03984

007927

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1127
Case 3:25-cv-02072-S Document 15-10 Filed 04/06/25 Page 1010 of 1017 PageID 8740
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1126 of 1803 PageID 11872
Case 18-30265-sgj1123 Doc 613 Part 459 Filed 08/01/1121/19 Desc Exhibit G Page 12 of 5 Page 12 of 24

Section 2.07    <u>Third Parties</u>.

     (a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

     (b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    <u>Management Company to Cooperate with the Staff and Services Provider</u>. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    <u>Power of Attorney</u>. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).    Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    <u>Consideration</u>.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.  The "<u>Staff and Services Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

     From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

Appellee Appx. 01120
Appx. 03985
007928

Section 3.03     Costs and Expenses.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04     Deferral.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01     Representations.  Each of the Parties hereto represents and warrants that:

(a)     It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)     this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)     no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)     neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01     Compliance; Advisory Restrictions.

(a)     The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

Appellee Appx. 01121

Amy_00985

007929

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)     This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02   Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

Appellee Appx. 01122

Appx. 02985

007930

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1130
Case 3:25-cv-02072-S    Document 15-10    Filed 04/06/25    Page 1013 of 1017    PageID 8743
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1129 of 1803    PageID 11875
Case 18-30264-sgj11 Doc 1236 Part 4 Filed 02/01/21 Desc Exhibit C-4 Page 15 of 24

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure.  This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01    Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02    Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

12

Appx. 02988
007931

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03 <u>Indemnification by the Management Company</u>. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

Appellee Appx. 01124

Appx. 07989

007932

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1132
Case 3:25-cv-02072-S Document 15-10 Filed 04/06/25 Page 1015 of 1017 PageID 8745
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1131 of 1803 PageID 11877
Case 18-30265-sgj11 23 1 459 Filed 08/01/21 Des Aghendr 7 af 54 Page 17 of
24

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01    Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

Appellee Appx. 01125
Appx 02999
007933

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

Appellee Appx. 01126

Appx. 03991

007934

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1134
Case 3:25-cv-02072-S    Document 15-10    Filed 04/06/25    Page 1017 of 1017    PageID 8747
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1133 of 1803    PageID 11879
Case 18-30265-sgj11 Doc 683-13 Part 459 Filed 08/01/21 19 Desc Exhibit of 54 Page 19 of
24

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)     Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)     The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)     The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04     Governing Law.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)     The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

Appellee Appx. 01127

Appx. 03992
007935